# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARLIN M. ADAMS, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of CORAM HEALTHCARE CORPORATION, a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>DANIEL D. CROWLEY; DONALD J. AMARAL; WILLIAM J. CASEY; L. PETER SMITH; and SANDRA L. SMOLEY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 04-1565<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## OPENING BRIEF IN SUPPORT OF THE OUTSIDE DIRECTOR DEFENDANTS' MOTION TO DISMISS

OF COUNSEL:
Boris Feldman, Esquire
Peri B. Nielsen, Esquire
Shelby K. Pasarell, Esquire
WILSON SONSINI GOODRICH & ROSATI, PC
650 Page Mill Road
Palo Alto, California 94304-1050
Tel: (650) 493-9300

Peter J. Walsh, Jr. (DSB ID No. 2437)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Post Office Box 951
Wilmington, Delaware 19899-0951
Tel: (302) 984-6000
E-mail: pwalsh@potteranderson.com
*Attorneys for Defendants*
*Donald J. Amaral, William J. Casey,*
*L. Peter Smith, and Sandra L. Smoley*

Dated: March 4, 2005

672518v1/28762

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

NATURE AND STATE OF PROCEEDINGS............................................... 1

SUMMARY OF ARGUMENT ........................................................................ 2

SUMMARY OF ALLEGATIONS ................................................................... 4

    Parties.................................................................................................. 4

    Coram's Indebtedness....................................................................... 6

    Mr. Crowley's Retention ................................................................. 6

    Mr. Crowley's Original Employment Agreement .......................... 7

    Mr. Crowley's Amended Employment Agreement ......................... 7

    The Bankruptcy Petition .................................................................. 8

    The Goldin Investigation ................................................................. 8

    The Complaint ................................................................................... 10

ARGUMENT ................................................................................................... 11

I.      STANDARD OF REVIEW ............................................................. 11

II.    PLAINTIFF FAILS TO ALLEGE FACTS TO OVERCOME THE
       PROTECTION AFFORDED BY SECTION 102(B)(7) ................... 14

    A.    Plaintiff Does Not Allege that the Outside Directors Breached
         Their Duty of Loyalty or Good Faith...................................... 14

    B.    The Complaint Alleges No Facts Showing that the Outside
         Directors Acted Intentionally or Knowingly Violated The Law ............ 15

        1.    The Decision to Approve Mr. Crowley's Retention........ 17

        2.    The Decision To Approve Mr. Crowley's Amended
            Employment Agreement ................................................. 20

3.      The Decision to Allow Mr. Crowley to Continue to
        Serve as CEO Post-Petition ............................................ 21

CONCLUSION ........................................................................................ 25

## **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*Aronson v. Lewis,*473 A.2d 805 (Del. 1984), *overruled on other grounds,*
    *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ........................................................11, 12

*Banjo Buddies, Inc. v. Renosky,* Nos. 03-2038, 03-2107,
    2005 WL 406242 (3rd Cir. Feb. 22, 2005) ........................................................ 11

*Beam v. Stewart,* 833 A.2d 961 (Del. Ch. 2003), *aff'd,*
    845 A.2d 1040 (Del. 2004) ................................................................................ 18

*California Public Employees' Retirement Sys. v. Chubb Corp.,*
    394 F.3d 126 (3d Cir. 2004)................................................................................ 11

*Continuing Creditors' Comm. of Star Telecommunications, Inc. v.*
    *Edgecomb*, No. 03-278 KAJ, 2004 U.S. Dist. LEXIS 25807
    (D. Del. Dec. 21, 2004) ................................................................................*passim*

*DiLorenzo v. Edgar*, No. 03-841-SLR, 2004 U.S. Dist. LEXIS 4991
    (D. Del. March 24, 2004)................................................................................. 5

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3rd Cir. 1997) ........................................................................ 9

*In re Caremark Int'l, Inc. Derivative Litig.,*
    698 A.2d 959 (Del. Ch. 1996)............................................................................ 18

*In re Gaylord Container Corp. S'holder Litig.,*
    753 A.2d 462 (Del. Ch. 2000)............................................................................ 13

*In re Lukens Inc. S'holders Litig.,*
    757 A.2d 720 (Del. Ch. 1999), *aff'd sub nom.*
    *Walker v. Lukens, Inc.,* 757 A.2d 1278 (Del. 2000) ........................................... 13

*In re Reliance Sec. Litig.,*
    91 F.Supp.2d 706 (D. Del. 2000)....................................................................13, 14

*In re Walt Disney Co. Derivative Litig.,*
    825 A.2d 275 (Del. Ch. 2003).................................................................... 15, 16,
                                            18, 19

*Malpiede v. Townson,*
    780 A.2d 1075 (Del. 2001) ................................................................................12, 13

*Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys., Inc.,*
 No. 98-80-SLR, 2004 WL 2980734 (D. Del Dec. 17, 2004).............................. 24

*Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins,*
 No. 20228 NC, 2004 Del. Ch. LEXIS 122 (Del. Ch. Aug. 24, 2004) .................15, 16

*Oran v. Stafford,*
 226 F.3d 275 (3d Cir. 2000)............................................................................5, 10

*Orman v. Cullman,*
 794 A.2d 5 (Del. Ch. 2002)................................................................. 13

*Rales v. Blasband,*
 634 A.2d 927 (Del. 1993) .................................................................. 13

*Raytech Corp. v. White,*
 54 F.3d 187 (3d Cir. 1995)................................................................ 24

*Smith v. Van Gorkom,*
 488 A.2d 858 (Del. 1985) ................................................................. 12

*Stanziale v. Nachtomi,* No. 01-403 KAJ, 2004 U.S. Dist. LEXIS 7375
 (D. Del. Apr. 20, 2004)..................................................................... 15

## STATUTES

**Page(s)**

28 U.S.C. § 1404(a) ........................................................................  1

8 Del. Code § 102(b)(7)...........................................................................*passim*

8 Del. Code § 144 .......................................................................... 17

## RULES

Fed. R. Civ. Proc. 12(b)(6) ........................................................................1, 10

## NATURE AND STAGE OF PROCEEDINGS

On December 29, 2004, Arlin M. Adams, as Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of Coram Healthcare Corporation and its wholly-owned subsidiary Coram, Inc. (collectively, "Coram"), filed this action for alleged breaches of fiduciary duty against Daniel D. Crowley, Coram's former Chairman and Chief Executive Officer, as well as Donald J. Amaral, William J. Casey, L. Peter Smith, and Sandra L. Smoley (collectively, "Outside Directors").

On February 4, 2005, the Outside Directors filed a motion to transfer venue to the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1404(a).  On February 22, 2005, Mr. Crowley also filed a motion to transfer venue to the District of Colorado and an answer to the Complaint.  The Outside Directors now file this motion to dismiss the allegations against them for failing to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

## SUMMARY OF ARGUMENT

1.      Plaintiff claims that Coram's Outside Directors breached their fiduciary duty of care with respect to three decisions they made involving Mr. Crowley, Coram's former CEO. Plaintiff cannot state a cognizable claim against the Outside Directors because they are exculpated from personal liability for alleged breaches of the duty of care under Delaware General Corporation Law Section 102(b)(7). To withstand dismissal, plaintiff must allege facts demonstrating that the Outside Directors breached their duty of loyalty or committed "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law." Plaintiff alleges no such facts.

2.      Instead, plaintiff seeks to hold the Outside Directors liable under the relatively novel theory that they "consciously abdicated" their fiduciary responsibilities in making decisions regarding Mr. Crowley. To state a claim under this theory, however, plaintiff must allege facts demonstrating that the Outside Directors *knew* that they were making decisions without adequate information and deliberation and *did not care* whether these decisions caused injury to Coram. Plaintiff's allegations demonstrate just the opposite.

a.      First, plaintiff challenges the Outside Directors' decision to approve the hiring of Mr. Crowley, a well-regarded turnaround expert in the health care field. Coram initially hired Mr. Crowley to serve as a consultant to Coram's CEO and then to replace that CEO. Mr. Crowley was allegedly introduced to Coram through Stephen Feinberg, a Coram director and principal of Cerberus Partners L.P. ("Cerberus"), one of Coram's noteholders. At the time, the Outside Directors were aware that Mr. Crowley had a "relationship" with Cerberus but were not told that Cerberus employed Mr. Crowley to consult on a number of its investments and compensated him based on the investments' profitability. Plaintiff complains that the Outside Directors should have investigated the nature of Mr. Crowley's "relationship" prior to approving his retention. Plaintiff does not contend that Mr. Crowley was unqualified to serve as Coram's CEO or

that the Outside Directors had any reason to suspect that he would not serve in the best interests of Coram and its shareholders.

b.      Second, plaintiff challenges the Outside Directors' approval of Mr. Crowley's revised employment agreement. The Outside Directors had previously approved (and plaintiff does not challenge) Mr. Crowley's original employment agreement, which tied the bulk of his compensation to Coram's operational performance. Mr. Crowley's amended agreement also tied his compensation to Coram's operational performance but offered him more upside if Coram were to hit higher targets. Plaintiff complains that the Outside Directors should not have entrusted Mr. Feinberg, who was also the head of Coram's Compensation Committee, to negotiate these terms. Plaintiff does not contend that these terms were outside the bounds of comparable industry standards or otherwise benefited Mr. Crowley to the detriment of Coram.

c.      Third, plaintiff challenges the Outside Directors' decision to allow Mr. Crowley to remain CEO after the nature of his relationship with Cerberus was fully disclosed and the Bankruptcy Court denied confirmation of Coram's first proposed plan of reorganization. After the plan's denial, the Outside Directors established a Special Committee, hired an expert financial advisor to investigate Mr. Crowley's relationship with Cerberus and determine whether the relationship harmed Coram, and segregated Mr. Crowley from any decisions regarding Coram's proposed bankruptcy plan and limited his role to the day-to-day management of Coram. Plaintiff does not contend that Mr. Crowley performed poorly as Coram's CEO or that the Outside Directors failed to exercise oversight to ensure that Coram's interests were protected and served during this period.

3.      It is clear from plaintiff's allegations that the Outside Directors reviewed and considered each decision and determined that each decision, based on the facts known to the Outside Directors at the time, was in the best interests of Coram and its shareholders. While plaintiff may disagree with the Outside Directors' decisions or

3

second guess them with the benefit of hindsight, he cannot challenge them in this Court. Absent allegations of egregious and intentional disregard of fiduciary responsibilities, the Outside Directors are shielded from personal liability for the decisions they made in the exercise of their business judgment. For each of these reasons, the Outside Directors respectfully request the Court grant this motion to dismiss with prejudice.

## SUMMARY OF ALLEGATIONS

### Parties

Coram Healthcare Corporation is a private Delaware corporation with its principal place of business in Colorado. ¶2.[1] It is the leading provider of alternative-site (i.e., outside of the hospital) infusion therapy in the United States. Infusion therapy involves the intravenous administration of drug therapies for, among other things, nutrition, anti-infection, HIV, pain management, and chemotherapy. *Id.*

Plaintiff Arlin M. Adams is the Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of Coram Healthcare Corporation and its wholly owned subsidiary Coram, Inc. (collectively "Coram"). ¶1.

Defendants are Daniel D. Crowley, the former Chairman and CEO of Coram, as well as Coram's four Outside Directors, three of whom had been directors for several years preceding the events at issue. ¶¶3-7.

Donald J. Amaral joined the Coram Board in October 1995 and served as Coram's CEO until April 23, 1999. Previously, he was President and Chief Operating

---

[1]   Unless otherwise noted, references to "¶__" are to the Complaint, and references to "Ex. __" are to the exhibits appended to the Declaration of Peter J. Walsh, Jr. filed contemporaneously herewith.

Officer of OrNda Healthcorp. Mr. Amaral was also a member of the Board of Directors of CareMatrix Corporation. Ex. E at 43.[2]

William J. Casey joined the Coram Board in September 1997. Mr. Casey is a consultant in the healthcare industry, specializing in hospital management evaluation, hospital planning, managed care contracting and turnaround services. Mr. Casey previously served as a Contract Administrator for both Emergency Department Physicians' Medical Group, Inc. and NP Medical Group, Inc. Additionally, Mr. Casey is a director of TriCounties Bank in Chico, California. *Id.*

L. Peter Smith joined the Coram Board in July 1994. Previously, he was a director of Medisys, Inc., one of the predecessors to Coram. Mr. Smith was also the CEO and a director of Ralin Medical, Inc., a company specializing in cardiac disease management. Mr. Smith also served on the Board of Directors of Gateway, Inc. and AMSYS, Inc. *Id.*

Sandra Smoley joined the Coram Board in February 2000. Ms. Smoley is the Chairperson and CEO of The Sandra Smoley Company, a healthcare and local government consulting firm based in Sacramento, California. Previously, she served as Secretary of the California Health and Welfare Agency and Secretary of the California State and Consumer Services Agency. *Id.*

---

[2]   In considering this motion to dismiss, the Court may consider documents that must be filed with federal or state governments, such as Securities and Exchange Commission ("SEC") filings. *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000); *DiLorenzo v. Edgar*, No. 03-841-SLR, 2004 U.S. Dist. LEXIS 4991, at *5 (D. Del. March 24, 2004). Filed concurrently herewith is the Outside Directors' Request for Judicial Notice of certain documents filed with the SEC or with the United States Bankruptcy Court for the District of Delaware in the case of *In re Coram Healthcare Corp. and Coram, Inc.*, Case Nos. 00-3299 (MFW) & 00-3300 (MFW). A compendium of unreported decisions is being filed simultaneously herewith.

**Coram's Indebtedness**

Coram was founded in 1994 and went public the same year. Owing to a variety of factors, including the purchase of an under-performing business, Coram had incurred substantial indebtedness. On May 6, 1998, Coram restructured its debt by entering into a Securities Exchange Agreement (the "Exchange Agreement") with its Coram's principal lenders: Cerberus, Goldman Sachs Credit Partners L.P., and Wells Fargo Foothill (collectively, the "Noteholders"). ¶10. The Noteholders received approximately $242 million of convertible notes, as well as the right to designate a representative to join Coram's Board of Directors. ¶¶10, 11. Stephen Feinberg, a principal of Cerberus, became the Noteholders' designee. ¶11.

**Mr. Crowley's Retention**

In April 1999, Mr. Amaral resigned as CEO for personal reasons. Coram determined that his replacement, Richard Smith, needed a "CEO coach." ¶¶12, 14. Mr. Feinberg recommended that Coram retain Mr. Crowley as a consultant to work with Mr. Smith. ¶¶13-14. At the time, Cerberus employed Mr. Crowley as a consultant in connection with its investments, particularly in the health care field. In July 1999, Cerberus agreed to pay Mr. Crowley $80,000 per month plus expenses and the possibility of substantial bonuses if the Cerberus' investments on which Mr. Crowley consulted were profitable. ¶13.

When Mr. Feinberg introduced Mr. Crowley to Coram, he allegedly told the Outside Directors that Mr. Crowley had a "relationship" with Cerberus, but he did not disclose the nature or terms of the "relationship." ¶15. The Outside Directors approved Mr. Crowley's retention as a consultant for Coram at a rate of $40,000 per month. *Id.* Approximately two months later, Coram's current CEO resigned. ¶16. Mr. Crowley wrote a letter to Mr. Amaral suggesting that Coram hire him to assist in its restructuring process. ¶17; Compl. Ex. A.

The Noteholders allegedly offered Coram a six-month interest accrual holiday if Mr. Crowley were hired as CEO. This holiday amounted to cash savings of $11 million to Coram. ¶18. Mr. Crowley also allegedly asked Cerberus for additional compensation in the form of an increased share in another of Cerberus' investment (Winterland). ¶19. According to his letter to Mr. Feinberg, Mr. Crowley asked for the increased share in Winterland because Mr. Amaral did not want Mr. Crowley's upside to be tied to Cerberus' debt position in Coram. Compl. Ex. B.

## Mr. Crowley's Original Employment Agreement

On November 18, 1999, Mr. Crowley and Coram entered into an employment agreement (the "Original Employment Agreement"). Compl. Ex. J. at 3. The Original Employment Agreement provided that Mr. Crowley would receive a base salary of $650,000 (the same amount Mr. Amaral earned as CEO, Ex. B) and potential bonuses of $390,000 to $1.95 million, depending on Coram's EBITDA. ¶21. Mr. Crowley was also given a 24-month severance period and the option to purchase one million shares of Coram stock. *Id.*; Compl. Ex. C. The next day, Mr. Crowley also executed an executive employment agreement with Cerberus, which required Mr. Crowley to devote his time and attention to the business assigned by Mr. Feinberg. *Id.* ¶22.

## Mr. Crowley's Amended Employment Agreement

On February 28, 2000, Mr. Crowley requested additional compensation from Coram in light of the unexpected workload involved in the restructuring. ¶27. On April 6, 2000, Mr. Crowley and Coram executed an amendment to his employment agreement (the "Amended Employment Agreement"). ¶28; Compl. Ex. G. Under the Amended Employment Agreement, Mr. Crowley's base compensation stayed the same. Compl. Ex. G. Mr. Crowley's bonus structure, however, changed, allowing him to claim a bonus of up to 25% of the amount by which Coram's EBITDA for 2000 exceeded $14 million, as well as additional $5 million bonus if 2000 EBITDA exceeded $35 million.

¶29.  This revised bonus structure provided Mr. Crowley with more upside than the Original Employment Agreement, but only if Coram's EBITDA for 2000 exceeded $21 million.

**The Bankruptcy Petition**

By the end of 1999, Coram's financial situation had become even more precarious.  Coram's reported operating loss had grown to $114.8 million (from $21.6 million in 1998) and its long-term debt had grown to $302.6 million (compared to $242.2 million).  Ex. C at 20.  In addition, in early 2000, Coram disclosed that it required an equity infusion to maintain compliance with Stark II, a federal health care regulation that required public companies to maintain at least $75 million of stockholder equity to fall within an exception to the prohibition against accepting referrals from physicians who own their stock.  *Id.* at 12-13.  Coram disclosed that a failure to maintain compliance could have a material adverse impact on its business.  *Id.* at 34.

On August 8, 2000, Coram disclosed that, "[d]espite positive cash flow and improving, positive results from operations, the Company's three-year average balance sheet equity is expected, in the first quarter of 2001, to fall below the level that Stark II requires to satisfy the exception for ownership by referring physicians or their family members of stock in publicly-traded companies."  Ex. D.  Consequently, Coram filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware.  ¶33.

**The Goldin Investigation**

On October 18, 2000, the United States Trustee appointed an Official Committee of Equity Securities Holders (the "Equity Committee").  ¶35.  The Equity Committee sought and obtained a copy of Mr. Crowley's employment agreement with Cerberus, which agreement had been referred to in Coram's Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code.  ¶¶34-35.  The Equity Committee subsequently objected to Coram's first proposed plan of reorganization.  On

December 21, 2000, the Bankruptcy Court denied confirmation of Coram's first plan owing to Mr. Crowley's previously undisclosed relationship with Cerberus. ¶36.

In response, Coram's Board of Directors formed a Special Committee (excluding Mr. Crowley) and retained the services of Harrison J. Goldin Associates, L.L.C. ("Goldin"). ¶¶38-39. Mr. Goldin was the former Chief Financial Officer and Comptroller for New York City and a recognized expert in the turnaround field having served as trustee, examiner, and financial consultant in numerous bankruptcy proceedings. On February 26, 2001, the Bankruptcy Court approved Goldin's appointment as the independent restructuring advisor to Coram. ¶38.

Goldin's task was "to advise the Special Committee regarding Crowley's relationship with Cerberus and potential amendments to the plan of reorganization that had been rejected." ¶39. During this time, the Outside Directors continued to serve on Coram's board and oversee Mr. Crowley's management of Coram. Compl. Ex. I, 45:3-12; *see also* Ex. I at 47:20-48:6. After Goldin completed its "extensive investigation," it concluded that, although Mr. Crowley may have consciously concealed his relationship with Cerberus, there was no evidence that Mr. Crowley advanced Cerberus's interests to the detriment of Coram and its shareholders. *See* ¶43; Ex. F at 1-14.[3] Goldin's report of his investigation and recommendations were converted into Coram's second proposed plan of reorganization. ¶43. In December 2001, the Bankruptcy Court reviewed and rejected the second proposed plan because of Mr. Crowley's continued relationship with Cerberus. ¶¶44-47.

---

[3]   This Court may consider Goldin's report, not for the truth of its contents but for what it stated, because it is "'integral to or explicitly relied upon in the complaint.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)); *see also* ¶43; Outside Director Defendants' Request for Judicial Notice (filed concurrently herewith).

On March 7, 2002, the Bankruptcy Court appointed plaintiff as Chapter 11 Trustee of Coram.  ¶1.  Plaintiff assumed control of Coram and retained Mr. Crowley's services for another year.  ¶¶1, 3.  In January 2003, plaintiff moved for Mr. Crowley's re-employment, having evaluated his performance and concluded that Mr. Crowley's retention was in Coram's best interests.  Ex. G, ¶18.  The Bankruptcy Court denied plaintiff's motion.  *In re Coram Healthcare Corp.*, Docket No. 2454, Case No. 00-3299 (MFW) (Bankr. D. Del. March 10, 2003) Order (1) Denying Motion of the Chapter 11 Trustee for Authorization to Enter into Termination and Employment Extension Agreement with Daniel D. Crowley; and (2) Reserving Decision on Equity Committee's Motion for an Order Terminating Daniel Crowley's Employment and for Other Relief, Including Disgorgement of All Payments to Daniel Crowley and Dynamic Healthcare.

Plaintiff eventually proposed a plan of reorganization that the Bankruptcy Court subsequently confirmed (the "Plan") on October 27, 2004.  ¶1.  The Plan releases Cerberus and Mr. Feinberg from any claims that Coram might assert against them in exchange for a cash payment of $56 million.  *In re Coram Healthcare Corp.*, Docket No. 3675, Case No. 00-3299 (MFW) (Bankr. D. Del. April 15, 2004) Chapter 11 Trustee's Second Amended Joint Plan of Reorganization; *In re Coram Healthcare Corp.*, Docket No. 4061, Case No. 00-3299 (MFW) (Bankr. D. Del. Oct. 27, 2004) Order Confirming The Chapter 11 Trustee's Second Amended Joint Plan of Reorganization.

**The Complaint**

On December 29, 2004, plaintiff filed this Complaint.  Plaintiff alleges that Mr. Crowley suffered from an actual and undisclosed conflict of interest while serving as Coram's CEO and Chairman.  ¶¶22-25, 48-50.  Plaintiff alleges that the Outside Directors breached their fiduciary duty of care by failing to investigate Mr. Crowley's relationship with Cerberus and by allowing Mr. Crowley to remain as Coram's CEO once that relationship was disclosed.  ¶¶ 51-68.  The claims against the Outside Directors should be dismissed because plaintiff fails to allege facts that would

demonstrate that the Outside Directors are not entitled to exculpation for alleged breaches of the duty of care under Section 102(b)(7) of the Delaware General Corporation Law.

## ARGUMENT

### I.    STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is properly granted when, "accepting all well pleaded allegations in the complaint as true, and drawing all reasonable factual inferences in favor of the plaintiff, it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would warrant relief." *California Public Employees' Retirement Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *Oran*, 226 F.3d at 279). In making this determination, the court "need not credit a complaint's bald assertions or legal conclusions." *Id.* (internal quotations omitted) (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)).

To survive a motion to dismiss in a case alleging breaches of fiduciary duty, a plaintiff must allege facts showing that the challenged decisions were not the product of reasonable business judgment. [4] *Aronson v. Lewis*, 473 A.2d 805, 814-15 (Del. 1984), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). In other words, "in the absence of facts showing self-dealing or improper motive, a corporate . . . director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that . . . directors authorized in good faith." *Continuing Creditors' Comm. of Star Telecommunications, Inc. v. Edgecomb*, No. 03-278 KAJ, 2004 U.S. Dist. LEXIS 25807, at *21 (D. Del. Dec. 21, 2004) (hereinafter "*Star*") (quoting

---

[4]    Delaware law governs the Complaint because Coram is incorporated in Delaware. *Banjo Buddies, Inc. v. Renosky*, Nos. 03-2038, 03-2107, 2005 WL 406242 (3d Cir. Feb. 22, 2005).

*Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 (Del. Ch. 1996) ; *accord Aronson*, 473 A.2d at 812; (stating the presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company").

Even before this Court reaches the question of whether plaintiff has alleged sufficient facts to overcome the business judgment rule, however, the Court must first consider whether the Complaint pleads a viable claim in the face of Section 102(b)(7). The Delaware legislature adopted Section 102(b)(7) in 1986, in response to a directors and officers insurance liability crisis and the Delaware Supreme Court's decision in *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985), which held that directors could be personally liable for monetary damages for gross negligence in the decision making process. *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del. 2001). Section 102(b)(7) allows shareholders to amend a corporation's certificate of incorporation to include:

> A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such a provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law; (iii) under § 174 of this title;[5] or (iv) for any transaction from which the director derived an improper personal benefit.

8 Del. Code § 102(b)(7). Once Section 102(b)(7) was adopted, stockholders generally approved charter provisions containing this exculpatory provision "because it freed up

---

[5] Section 174 relates to the liability of directors for unlawful payment of dividends or unlawful stock purchases or redemptions.

directors to take business risks without worrying about negligence lawsuits." *Malpiede*, 780 A.2d at 1095.

Coram's stockholders adopted the protections of Section 102(b)(7) for their directors. *See* Ex. A at 35.[6] Accordingly, the Outside Directors are exculpated from personal liability for monetary damages for any negligent or even grossly negligent breaches of the duty of care. *See, e.g., Malpiede*, 780 A.2d at 1095 ("Our jurisprudence since the adoption of the statute has consistently stood for the proposition that a Section 102(b)(7) charter provision bars a claim that is found to state only a due care violation."); *Star*, 2004 U.S. Dist. LEXIS 25807, at *34 ("Section 102(b)(7) . . . allows corporations to adopt a provision in their charters to exculpate directors from breaches of the duty of care").

To survive dismissal in the face of Section 102(b)(7), plaintiff must allege facts demonstrating that the Outside Directors breached either the duty of loyalty or committed acts or omissions not in good faith or involving intentional misconduct or knowing violations of the law in making their decisions. In the absence of such allegations, the Outside Directors "are entitled to this dismissal at this stage of the process, without having to engage in discovery or shoulder the burden of proving that they acted loyally and in good faith." *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 734 (Del. Ch. 1999), *aff'd sub nom, Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000).

---

[6]  On a motion to dismiss, the Supreme Court of Delaware has held that it is appropriate to consider the impact of Section 102(b)(7) provision in a corporation's certificate of incorporation. *Malpiede*, 780 A.2d at 1091-92. The District Court of Delaware has also considered such provisions in granting motions to dismiss. *See, e.g., Star*, 2004 U.S. Dist. LEXIS 25807 at *34-38; *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 731-32 (D. Del. 2000).

## II.    PLAINTIFF FAILS TO ALLEGE FACTS TO OVERCOME THE PROTECTION AFFORDED BY SECTION 102(B)(7)

Plaintiff fails to allege that the Outside Directors breached their duty of loyalty or committed acts or omissions not in good faith or involving intentional misconduct or knowing violations of the law.  Consequently, plaintiff fails to allege facts sufficient to overcome the protections afforded by Section 102(b)(7) and states no actionable claim against the Outside Directors.

### A.    Plaintiff Does Not Allege that the Outside Directors Breached Their Duty of Loyalty or good Faith

At the outset, plaintiff does not even pretend to allege that the Outside Directors breached their duty of loyalty.  To plead such a breach, plaintiff must advance facts showing that a director was either on both sides of a transaction or received a benefit not received by the shareholders generally.  *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002); *see also Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993) (requiring allegations showing a fiduciary received "a personal financial benefit from a transaction that is not equally shared by [other] stockholders").

Plaintiff does not allege that any of the Outside Directors had a conflict of interest, engaged in self-dealing, or personally profited from their business decisions.  Nor does plaintiff allege that the Outside Directors received any benefit not shared equally by Coram's shareholders.  Nor could he, since the Outside Directors were each Coram shareholders and, thus, had interests aligned with Coram's shareholders.  In fact, Mr. Amaral alone owned 5% of the outstanding shares of Coram.  Ex. E at 51.

To plead that a director acted "not in good faith" also encompasses the question of whether he or she acted disloyally since it is well-established that the duty of good faith is a subset of the duty of loyalty.  *Orman*, 794 A.2d at 14 n.3 ("the duty to act in 'good faith' is merely a subset of a director's duty of loyalty"); *In re Gaylord Container Corp. S'holder Litig.*, 753 A.2d 462, 475 n.41 (Del. Ch. 2000) (holding that

duty to act in good faith is subsumed within the duty of loyalty); *see also Star*, 2004 U.S. Dist. LEXIS 25807, at *25 n.9 (finding that the duty of good faith and the duty of loyalty are identical under Delaware law ) (citing *Nagy v. Bistricer*, 770 A.2d 43, 49 n.2 (Del. Ch. 2000). Since plaintiff fails to allege that the Outside Directors breached their duty of loyalty, he necessarily fails to allege that they breached their duty of good faith.

**B.    The Alleges No Facts Showing that the Outside Directors Engaged in Intentional Misconduct or Knowing Violations of the Law**

In the absence of allegations that the Outside Directors breached their duty of loyalty or good faith, plaintiff must allege acts or omissions involving "intentional misconduct or knowing violations of the law" to survive dismissal. It is clear from the Complaint that plaintiff does not purport to allege that the Outside Directors committed any affirmative acts of intentional misconduct or knowing violations of the law. Rather, plaintiff relies on the relatively novel theory that the Outside Directors consciously and intentionally disregarded their responsibilities to Coram and its shareholders. ¶¶59-62, 66.

To fall within the "theoretical exception" to the long-standing rule that a director cannot be legally responsible for losses in the absence of self-dealing or improper motive, a plaintiff must allege facts demonstrating that the directors acted with "deliberate indifference" or committed "intentional misconduct." *Stanziale v. Nachtomi*, No. 01-403 KAJ, 2004 U.S. Dist. LEXIS 7375, at *23 (D. Del. April 20, 2004); *Reliance*, 91 F. Supp. 2d at 732. It is not sufficient to allege, for example, that a set of board minutes lacked a discussion of a particular decision. *Stanziale*, 2004 U.S. Dist LEXIS 7375, at *22-23; *cf. Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, No. 20228 NC, 2004 Del. Ch. LEXIS 122, at *48-49 (Del. Ch. Aug. 24, 2004). A plaintiff must allege facts demonstrating that a director made material decisions *knowing* he or she did not have adequate information or deliberation and *not caring* about the effects of these decisions on the corporation. *In re Walt Disney Co. Derivative Litig.*,

825 A.2d 275, 289 (Del. Ch. 2003); *accord Elkins*, 2004 Del. Ch. LEXIS 122, at *55-56 (finding that a board cannot act simply on "blind faith," particularly when giving ex-post authorization to loans taken by executives without prior approval.).

Since plaintiff's Complaint is a fairly obvious attempt to mirror the allegations in the *Disney* case, it is worthwhile to review the key facts of that case to distinguish them from the case at bar. The plaintiff in *Disney* filed a derivative action challenging the board's decision to hire Michael Ovitz as Disney's president. The Delaware court concluded that the Disney board was not entitled to the protections of Section 102(b)(7) and that plaintiffs had overcome the business judgment rule. Among the claims plaintiffs leveled against the Disney board was that it had:

- Approved Ovitz's retention based solely on the unilateral recommendation of Disney's CEO Michael Eisner, a close personal friend of Ovitz's for 25 years, and notwithstanding that Ovitz had *no* experience as an executive for a publicly owned entertainment company and the terms of his retention had yet to be finalized;

- Failed to review or evaluate the terms of Ovitz's final employment agreement, which differed substantially from the original draft and included stock options "far beyond the normal standards" and a sizeable signing bonus that Disney would have to expense immediately even if Ovitz left the company before his term expired; and

- Allowed Eisner to negotiate and bind Disney to a non-fault termination of Ovitz after 14 months of service, notwithstanding that Ovitz's performance had been abysmal and the severance benefits Disney was obligated to pay him had a present value of approximately $140 million.

*Disney*, 825 A.2d at 279-85. The Court held that the facts alleged, if accepted as true, implied that the directors "*knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care

if the decisions caused the corporation and its stockholders to suffer injury or loss." *Id.* at 289. Plaintiff here does not come close to alleging such facts against Coram's Outside Directors. Indeed, it is clear from the Complaint that the Outside Directors considered and reviewed each decision and determined their decisions were in Coram's best interests.

1.    **The Decision to Approve Mr. Crowley's Retention**

Plaintiff challenges the Outside Directors' decision to approve Coram's retention of Mr. Crowley because the Outside Directors allegedly failed to investigate Mr. Crowley's "relationship" with Cerberus. ¶53.[7] The alleged failure to investigate does not amount to the "deliberate indifference" required to state a claim.

At the outset, plaintiff does not allege that Mr. Crowley was unqualified or incapable of acting as a consultant or as Coram's CEO. To the contrary, far from having "no experience," Mr. Crowley was an expert in the health care industry. ¶13. Furthermore, by the time Mr. Crowley was hired as CEO, the Outside Directors were familiar with his capabilities since Mr. Crowley been had acting as a "CEO coach" for Coram's prior CEO. ¶15.

Plaintiff also fails to allege facts demonstrating that the Outside Directors allowed Mr. Crowley to be hired without any deliberation and "not caring about" about the effect his retention would have on Coram. To the contrary, plaintiff alleges that, by retaining Mr. Crowley as CEO, Coram received a six-month accrual holiday on interest payments worth $11 million. ¶18. Mr. Amaral represented Coram in the negotiations over Mr. Crowley's Original Employment Agreement, which negotiations he described

---

[7]    While plaintiff asserts this claim against all of the Outside Directors, Ms. Smoley cannot be held responsible for any breach of duty with regard to the hiring of Mr. Crowley as Coram's CEO since she did not join Coram's Board until February 2000. ¶7.

as "very difficult." Compl. Ex. J at 3. The Board approved the Original Employment Agreement, which afforded Mr. Crowley a base salary of $650,000 – the same amount Mr. Amaral had received when he was CEO – and tied any additional compensation to Coram's operational performance. ¶21; Ex. B. Moreover, while Mr. Amaral did not have a problem providing Mr. Crowley with incentive-based compensation in the form of Coram equity, he made clear that this upside could not be tied to Cerberus' debt position. Compl. Ex. B.

These allegations, if accepted as true, hardly imply that the Outside Directors approved Mr. Crowley's retention with "conscious disregard" for Coram's interests. Indeed, plaintiff does not suggest as much. Plaintiff complains only that the Outside Directors should have investigated the nature of Mr. Crowley's "relationship" with Cerberus prior to approving his retention. ¶53. Yet, the law does not require directors to ferret out whether someone has a conflict of interest. The law imposes the duty on the person who has the alleged conflict to disclose it. *See* 8 Del. Code § 144. Nor are directors required to investigate or monitor executives outside of their employment with the company. *Beam v. Stewart*, 833 A.2d 961, 971 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004). In fact, "absent grounds to suspect deception, neither corporate boards nor senior officers can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf." *In re Caremark Int'l, Inc. Derivative Litig.*, 698 A.2d 959, 969 (Del. Ch. 1996).

This Court recently dismissed allegations in an analogous case where the directors purportedly failed to investigate a potential relationship between the company's CEO and its lender. In *Star*, the successor in interest to Star Telecommunications, Inc. ("Star") sought damages from certain former Star directors for decisions made shortly before Star's bankruptcy. Star hired a new management team, including a CEO who was affiliated with Gotel Investments Ltd. ("Gotel"), one of Star's investors. *Star*, 2004 U.S. Dist. LEXIS 25807, at *11. One of the first actions this CEO took was to recommend

that Star enter into a short term financing deal with Gotel.  Some of the directors believed that Star's new CEO actually controlled Gotel, and they also believed that the terms of the financing agreement could allow Gotel to take control of Star.  *Id.* at \*12-13. Nevertheless, the directors approved the financing arrangement, acceding to the CEO's representation that Star would collapse without the financing.  *Id.* at \*43.

The Court dismissed all claims that the directors breached their fiduciary duty by approving this financial arrangement.  The Court found that, at most, these allegations supported a claim for a breach of the directors' duty of care, and they were protected from liability for such a breach under Star's Section 102(b)(7) exculpation clause.  *Id.* at \*44.  The Court also noted that, regardless of the exculpation clause, no claim could lie against the directors because there "is no denying that Star faced dire financial circumstances."  *Id.* at \*44 n.14.  Faced with difficult choices, the directors "may have made a poor decision.  But that does not amount to an abdication of responsibility by the Board."  *Id.*

The same is even truer here.  Unlike in *Star*, plaintiff does not allege that any of the Outside Directors actually suspected that Mr. Crowley suffered from any conflict of interest that would harm Coram's interests.  In fact, since both Mr. Crowley's Cerberus compensation and his Coram compensation were tied to *Coram's* profitability, it is not even clear from plaintiff's allegations that the Outside Directors would have chosen *not* to approve Mr. Crowley's retention had they conducted an investigation. Moreover, while the Outside Directors may be faulted for not inquiring into Mr. Crowley's alleged relationship, their actions hardly constitute a "complete abdication" of fiduciary responsibility given the dire financial and management crisis that Coram faced at the time.

2.     **The Decision to Approve Mr. Crowley's Amended Employment Agreement**

Plaintiff also challenges the Outside Directors' approval of Mr. Crowley's Amended Employment Agreement. ¶¶28, 54. This allegation also fails to allege facts demonstrating "conscious disregard" of the Outside Directors' responsibilities.

At the outset, plaintiff does not appear to challenge the terms of either Mr. Crowley's Original or the Amended Employment Agreement. Nor can he since, unlike in *Disney*, the terms of Mr. Crowley's employment agreements contain no provisions even arguably detrimental to Coram. Mr. Crowley's Amended Employment Agreement actually lowered Crowley's bonuses unless Coram significantly exceeded its EBITDA targets. Only if Coram achieved at least 150% of the EBITDA target for 2000 would Mr. Crowley be entitled to more compensation than he would have been entitled to under the Original Employment Agreement. [8]

In homage to *Disney*, plaintiff faults the Outside Directors for delegating to Mr. Feinberg the task of negotiating the terms of this arrangement and failing to retain a compensation consultant. ¶54. His assertion, however, ignores that Mr. Feinberg was the Chairman of Coram's Compensation Committee. Compl. Ex. G at COR-EQTY0000378. Thus, it was well within the purview of Mr. Feinberg's role to assume this responsibility. Plaintiff also alleges no facts known to the Outside Directors that would have led them to question Mr. Feinberg's ability to negotiate adequately and at arm's length with Mr. Crowley. Plaintiff also fails to allege facts that would demonstrate

---

[8]     Under the Original Employment Agreement, if Coram had EBITDA equal to $14 million, Mr. Crowley received 60% of his base salary (or $390,000). His compensation increased along with Coram's EBITDA, up to a maximum of 300% of his base salary (or $1.95 million) if Coram had EBITDA of $21 million. Under the Amended Employment Agreement, Mr. Crowley could receive 25% of Coram's EBITDA over $14 million. If Coram were to achieve EBITDA of $21 million (the maximum foreseen by the Original Employment Agreement), Mr. Crowley was only entitled to a bonus of $1.75 million (25% of $21-$14 million), or $200,000 less than he would have previously received. If, on the other hand, Coram's EBITDA reached $35 million, Mr. Crowley could earn up to $10.25 million.

Mr. Crowley's arrangement was outside the bounds of reasonable industry standards. Indeed, it is not clear from the Complaint how (or even if) a compensation consultant would have advised the Board to do anything but approve Mr. Crowley's Amended Employment Agreement.

### 3. The Decision To Allow Mr. Crowley To Continue To Serve As CEO Post-Petition

Finally, plaintiff challenges the Outside Directors' decision to allow Mr. Crowley to remain as Coram's CEO after the terms of his consulting agreement with Cerberus was disclosed and the Bankruptcy Court denied confirmation of Coram's proposed plan of reorganization. ¶¶55-62. Far from "blindly" allowing Mr. Crowley to continue in his role, plaintiff's allegations make clear that the Outside Directors took affirmative steps to address the issues raised by the Bankruptcy Court and engaged in active oversight of Mr. Crowley during this period.

In particular, the Outside Directors formed a Special Committee to investigate the relationship between Mr. Crowley and Cerberus. ¶38. Each of the Outside Directors joined the Special Committee – hardly conduct demonstrating a "don't care" attitude on their part. *Id.* The Outside Directors also retained an expert independent financial advisor (Goldin) to perform the investigation and propose amendments to the plan of reorganization. ¶¶38-39. Goldin performed an "extensive investigation" into Mr. Crowley's relationship with Cerberus and how that relationship may have impacted Coram. ¶40. While plaintiff suggests Goldin's investigation was inadequate because its scope did not include post December-2000 conduct, he cannot allege that the Outside Directors "consciously disregarded" their fiduciary duty when they retained Goldin's services in the first place.[9]

---

[9]   This assertion is particularly disingenuous considering plaintiff faults the Outside Directors for failing to hire a compensation consultant for Mr. Crowley's employment agreement.   The Outside Directors cannot have "completely abdicated" their
(continued...)

Furthermore, rather than having an "ostrich-like approach" to Coram's management, the Complaint makes clear that the Outside Directors played an active role in overseeing Mr. Crowley and Coram's operations. The Outside Directors reviewed numerous reports summarizing Coram's financial situation and management efforts. The Outside Directors met monthly to review and discuss all of this information. As Mr. Amaral explained:

> We had regularly scheduled meetings very routinely. There was tremendous information flow from management to the company, from the finance area, from – that would be from Scott Danitz. There was personnel reports. There was QA reports, marketing reports, accounts receivable, accounts payable. Just a tremendous amount of detail that we reviewed on a monthly basis. We also had the auditor's reported back to the audit committee before they released their audit report for December 31st, 2000.

Compl. Ex. I, 45:3-12; *see also* Ex. I at 47:20-48:6 (stating that the directors received "a very complete board book" in advance of every meeting, containing "finance, marketing, legal status, cash flows, receivables, everything that a person needs"). These allegations simply do not describe directors who are knowingly indifferent to the consequences of their decisions on a company and its shareholders.

Since plaintiff does not have facts to support his claims against the Outside Directors, he resorts to mischaracterizing their testimony to portray them as individuals who "did not care" about conflicts of interest. ¶¶56, 62. For example, plaintiff alleges that "[Ms.] Smoley admitted she did not care what [Mr.] Crowley was doing outside Coram even if it might be considered a conflict of interest." ¶62. Similarly, plaintiff alleges that Mr. Amaral "testified that he did not care about the

_____

(...continued from previous page)
responsibilities by both hiring and *not* hiring experts.

appearance of the conflict and, therefore, did not think it necessary to ask Feinberg about the details of Crowley's relationship with Cerberus." ¶56. These allegations are a gross distortion of the testimony, the full context of which amply demonstrates that – far from "not caring" – the Outside Directors had concluded Mr. Crowley was serving Coram's best interests, notwithstanding his relationship with Cerberus. Ex. I at 18:23-25 ("It occurred to me that he could not have done a better job than what he has done, whether he was getting $80,000 or a million dollars a month.").[10]

Plaintiff also quotes Mr. Amaral as saying that Goldin had been retained to "sprinkle holy water" on the situation. ¶42. Plaintiff, however, does not challenge either Goldin's independence or the Special Committee's conclusions. Nor can he since plaintiff also determined there were "sound business purposes" to employ Mr. Crowley. Ex. G at ¶29. According to plaintiff, Mr. Crowley had improved Coram's financial results, refocused Coram's business on more profitable core therapies, and built employee loyalty and confidence. *Id.* ¶¶20-27. After his evaluation, plaintiff determined that Coram was "better off with Crowley than without him." *Id.* ¶18. Plaintiff cannot question the Outside Director's business judgment when he reached the same conclusions at the time.

In reality, plaintiff's claims against the Outside Directors are based exclusively on the Bankruptcy Court's decision to deny confirmation of Coram's proposed plans because it believed that Mr. Crowley's alleged conflict had tainted the reorganization process. ¶¶37-47. The Bankruptcy Court's findings, however, have no

---

[10]   When asked if she knew if Mr. Crowley was getting $80,000 a month from Cerberus, she stated, "No. It's outside of Coram. My judgment as a board member is how he's doing with our company, not what he's doing outside of our company in my mind. That's just my value system." Ex. H at 65:11-18; *see also id.* at 66:12-20 ("Q. Do you believe it gave the appearance of a conflict of interest? A. It may have to some people. It did not to me.").

preclusive effect on the Outside Directors who were neither parties to nor represented in the bankruptcy proceedings. *See Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir. 1995). Nor are those findings binding on the Outside Directors because the Bankruptcy Court was determining whether to approve the adoption of a reorganization plan, not whether the Outside Directors should be exposed to personal liability for their business judgment. Compl. Ex. J at 12-18; *See Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys., Inc.*, No. 98-80-SLR, 2004 WL 2980734, at *2-3 (D. Del. Dec. 17, 2004).

In sum, plaintiff's allegations simply do not rise to the level of intentional and knowing misconduct required to strip the Outside Directors of protection from monetary damages. None of the allegations demonstrates that the Outside Directors made their decisions *knowing* they were inadequately informed and *not caring* about the risk that their "deliberate indifference" posed to Coram and its shareholders. Instead, plaintiff's allegations, if accepted as true, show that the Outside Directors reached their decisions on an informed and deliberative basis and simply came to conclusions with which plaintiff, with the benefit of hindsight, disagrees. While plaintiff may second guess the Outside Directors' decisions, he cannot challenge them in this Court absent allegations demonstrating a "complete abdication" of their fiduciary role.

## CONCLUSION

Since plaintiff fails to plead facts demonstrating that the Outside Directors are not entitled to exculpation from personal liability under Section 102(b)(7), the Outside Directors respectfully request that the Complaint be dismissed against them with prejudice.

POTTER ANDERSON & CORROON LLP

By: _____
   Peter J. Walsh, Jr. (DSB ID No. 2437)
   Hercules Plaza, 6th Floor
   1313 North Market Street
   Post Office Box 951
   Wilmington, Delaware  19899-0951
   Tel:  (302) 984-6000
   E-mail:  pwalsh@potteranderson.com
*Attorneys for Defendants*
*Donald J. Amaral, William J. Casey,*
*L. Peter Smith, and Sandra L. Smoley*

OF COUNSEL:
Boris Feldman, Esquire
Peri B. Nielsen, Esquire
Shelby K. Pasarell, Esquire
WILSON SONSINI
 GOODRICH & ROSATI, PC
650 Page Mill Road
Palo Alto, California  94304-1050
Tel:  (650) 493-9300

Dated:  March 4, 2005

672518v1/28762

25

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Peter J. Walsh, Jr., hereby certify that on March 4, 2005, I electronically filed true and correct copies of the foregoing OPENING BRIEF IN SUPPORT OF THE OUTSIDE DIRECTORS' MOTION TO DISMISS with the Clerk of the Court using CM/ECF which will send notification of such filing to the following counsel of record:

Rolin P. Bissell, Esquire (DSB ID No. 4478)
YOUNG CONAWAY STARGATT & TAYLOR
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
Tel:  (302) 571-6560
E-mail:  rbissell@ycst.com

Jeffrey C. Wisler, Esquire (DSB ID No. 2795)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
Wilmington, Delaware  19801
Tel:  (302) 888-6258
E-mail:  jwisler@cblh.com

Peter J. Walsh, Jr. (DSB ID No. 2437)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Post Office Box 951
Wilmington, Delaware  19899-0951
Tel:  (302) 984-6000
E-mail:  pwalsh@potteranderson.com

672518v1/28762