# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARLIN M. ADAMS, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of CORAM HEALTHCARE CORPORATION, a Delaware corporation, )<br><br>Plaintiffs, )<br><br>v. )<br><br>DANIEL D. CROWLEY; DONALD J. AMARAL; WILLIAM J. CASEY; L. PETER SMITH; and SANDRA L. SMOLEY, )<br><br>Defendants. ) | Case No. 04-1565 |

---

## DECLARATION OF PETER J. WALSH, JR. IN SUPPORT OF THE OUTSIDE DIRECTOR DEFENDANTS' MOTION TO DISMISS

---

OF COUNSEL:
Boris Feldman, Esquire
Peri B. Nielsen, Esquire
Shelby K. Pasarell, Esquire
WILSON SONSINI
   GOODRICH & ROSATI, PC
650 Page Mill Road
Palo Alto, CA  94304-1050
Tel:  (650) 493-9300

Dated:  March 4, 2005

Peter J. Walsh, Jr. (DSB ID No. 2437)
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Floor
Post Office Box 951
Wilmington, Delaware  19899-0951
Tel:  (302) 984-6000
E-mail:  pwalsh@potteranderson.com
*Attorneys for Defendants*
*Donald J. Amaral, William J. Casey,*
*L. Peter Smith, and Sandra L. Smoley*

672639v1/28762

I, Peter J. Walsh, Jr., declare as follows:

1.    I am an attorney duly licensed to practice before this Court and a member of the law firm of Potter Anderson & Corroon LLP, counsel to defendants Donald J. Amaral, William J. Casey, L. Peter Smith, and Sandra L. Smoley (the "Outside Directors"). I submit this declaration in support of the Outside Directors' Motion to Dismiss the complaint filed against the Outside Directors and Daniel D. Crowley on December 29, 2004 in the United States District Court for the District of Delaware. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would competently testify thereto.

2.    Attached hereto are true and correct copies of the following documents:

*Securities and Exchange Commission ("SEC") Filings*

3.    Coram Healthcare Corporation's ("Coram") Certificate of Incorporation, which was attached to Coram's Form S-4 (filed on June 3, 1994), is attached as Exhibit A.

4.    Donald J. Amaral's employment agreement, which was attached to Coram's Form 10-Q for the quarterly period ended June 30, 1998 (filed on August 14, 1998) is attached as Exhibit B.

5.    Excerpts from Coram's Form 10-K for the fiscal year ended December 31, 1999 (filed on March 30, 2000) are attached as Exhibit C.

6.    Coram's press release dated, August 8, 2000, which was attached to Form 8-K (filed on August 11, 2000) is attached as Exhibit D.

7.    Excerpts from Coram's Form 10-K for the fiscal year ended December 31, 2000 (filed on April 17, 2001) are attached as Exhibit E.

*Documents Filed with the Bankruptcy Court*

8.    Excerpts from the Report of Independent Restructuring Advisor Goldin Associates L.L.C., which was filed with the United States Bankruptcy Court for

2

the District of Delaware in *In re Coram Healthcare Corp. and Coram, Inc.*, Case No. 00-3299 on July 11, 2001 and is incorporated in the Complaint at ¶43, are attached as Exhibit F.

       9.    Plaintiff's Motion for Authorization to Enter into Termination and Employment Extension Agreement with Daniel D. Crowley, which was filed with the Bankruptcy Court on January 24, 2003, is attached as Exhibit G.

*Documents Incorporated in the Complaint*

       10.    Excerpts from the transcript of the deposition testimony of Sandra L. Smoley, which was taken on September 29, 2001 and is incorporated in the Complaint at ¶62, are attached as Exhibit H.

       11.    Excerpts from the transcript of the deposition testimony of Donald J. Amaral, which was taken on October 26, 2001 and is incorporated in the Complaint at Ex. I and ¶¶ 42, 56, and 59, are attached as Exhibit I.

       I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 4th day of March, 2005, at Wilmington, Delaware.

                                                       _____
                                               Peter J. Walsh, Jr.

672639v1/28762

3

# EXHBIT A

# CORAM HEALTHCARE CORP (CRH)

1675 BROADWAY
SUITE 900
DENVER, CO 80202
303. 292.4973

# EX-3.1

**CERTIFICATE OF INCORPORATION OF REGISTRANT 5/11/94**
**S-4 Filed on 06/03/1994**
File Number 033-53957

GSI

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154 
www.gsionline.com

1

EXHIBIT 3.1 TO
REGISTRATION STATEMENT
ON FORM S-4

CERTIFICATE OF AMENDMENT OF
CERTIFICATE OF INCORPORATION OF
CHM HOLDING CORPORATION

CHM Holding Corporation, a corporation organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), does hereby certify:

FIRST: The Corporation has not received any payment for any of its stock.

SECOND: The amendment to the Corporation's Certificate of Incorporation set forth in the following resolutions was adopted by a majority of the Corporation's Board of Directors and was duly adopted in accordance with the provisions of Section 241 of the Delaware General Corporation Law:

RESOLVED, that the Certificate of Incorporation of the Corporation be amended by deleting Article FIRST in its entirety and inserting in its place the following new Article FIRST which shall read in full as follows:

"FIRST. The name of the Corporation is Coram Healthcare Corporation."

RESOLVED, that the Certificate of Incorporation be amended by deleting Article FOURTH, Section A, in its entirety and inserting in its place the following new Article FOURTH, Section A which shall read in full as follows:

"FOURTH.  A.  AUTHORIZED CAPITAL STOCK.  The total number of shares that the Corporation shall have authority to issue shall be 85,000,000 shares, of which 75,000,000 shares shall be Common Stock, $.001 par value, and 10,000,000 shares shall be Preferred Stock, $.001 par value."

RESOLVED, that the Certificate of Incorporation of the Corporation be amended by deleting Article FIFTH, Section A, in its entirety and inserting in its place the following new Article FIFTH, Section A which shall read in full as follows:

"FIFTH.  A.  NUMBER, ELECTION AND TERMS OF DIRECTORS.  The business of the Corporation shall be managed by a Board of Directors. The number of directors of the Corporation shall be fixed from time to time by or pursuant to the Bylaws of the Corporation. With the exception of the first Board of Directors, which shall be elected by the incorporator(s), and except as otherwise provided in or fixed by or pursuant to the provisions of Article Fourth hereof relating to the right of the holders of any class or series of stock having a preference over the Common Stock as to dividends or upon liquidation to elect directors under specified circumstances, the directors shall be elected each year at the stockholders' annual meeting. Elected directors shall hold office until the next annual meeting and until their successors shall be duly elected and qualified."

(29)

2

    IN WITNESS WHEREOF, CHM Holding Corporation has caused this Certificate to be signed and attested by its duly authorized officers this 11th day of May, 1994.

CHM HOLDING CORPORATION

By:    /s/  JAMES M. SWEENEY
-------------------------------
    James M. Sweeney, Chairman and
        Chief Executive Officer

ATTEST:

     /s/  KEVIN M. HIGGINS
-------------------------------------
    Kevin M. Higgins, Secretary

(30)

3

CERTIFICATE OF INCORPORATION
OF
CHM HOLDING CORPORATION

FIRST

The name of the Corporation is CHM Holding Corporation.

SECOND

The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of the Corporation's registered agent at that office is The Corporation Trust Company.

THIRD

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of Delaware as presently in effect or as it may hereafter be amended.

FOURTH

A. AUTHORIZED CAPITAL STOCK. The total number of shares which the Corporation shall have the authority to issue shall be 60,000,000 shares, of which 50,000,000 shares shall be Common Stock, $.001 par value, and 10,000,000 shares shall be Preferred Stock, $.001 par value.

B. COMMON STOCK. The Board of Directors is hereby authorized to cause shares of Common Stock to be issued from time to time for such consideration as may be fixed from time to time by the Board of Directors, or by way of stock split pro rata to the holders of the Common Stock. The Board of Directors may also determine the proportion of the proceeds received from the sale of such stock which shall be credited upon the books of the Corporation to capital or capital surplus.

Each share of the Common Stock shall be equal in all respects to every other share of the Common Stock. Subject to any special voting rights of the holders of Preferred Stock fixed by or pursuant to the provisions of Paragraph C of this Article Fourth, the shares of Common Stock shall entitle the holders thereof to one vote for each share upon all matters upon which stockholders have the right to vote.

No holder of shares of Common Stock shall be entitled as such as a matter of right to subscribe for or purchase any part of any new or additional issues of stock, or securities convertible into stock, of any class whatsoever, whether now or hereafter authorized, and whether issued for cash, property, services or otherwise.

After the requirements with respect to preferential dividends on Preferred Stock (fixed by or pursuant to the provisions of Paragraph C of this Article Fourth), if any, shall have been met and after the Corporation shall have complied with all the requirements, if any, with respect to the setting aside of sums as sinking funds or redemption or purchase accounts (fixed by or pursuant to the provisions of Paragraph C of this Article Fourth) and subject further to any other conditions which may be fixed by or pursuant to the provisions of Paragraph C of this Article Fourth, then, but not otherwise, the holders of Common Stock shall be entitled to receive dividends, if any, as may be declared from time to time by the Board of Directors, ratably in proportion to the number of shares of Common Stock held by each such holder.

After distribution in full of the preferential amount (fixed by or pursuant to the provisions of Paragraph C of this Article Fourth), if any, to be distributed to the holders of Preferred Stock in the event of voluntary or involuntary liquidation, distribution or sale of assets, dissolution or winding up of the Corporation, the holders of the Common Stock shall be entitled to receive all the remaining assets of the Corporation, tangible and intangible, of whatever kind available for distribution to stockholders, ratably in proportion to the number of shares of Common Stock held by each.

(31)

4

C. PREFERRED STOCK. The Preferred Stock may be issued from time to time in one or more classes or series. The Board of Directors of the Corporation shall have the authority to the fullest extent permitted under the General Corporation Law of Delaware to fix by resolution from time to time the designation of one or more classes or series of Preferred Stock and the voting powers, full or limited or no voting powers, and such designations, preferences and relative, participating, optional or other special rights and qualifications, limitations or restrictions thereof and to fix or alter the number of shares comprising any such class or series subject to the requirements of the Delaware General Corporation Law. The authority of the Board of Directors with respect to each such class or series shall include, without limitation of the foregoing, the right to determine and fix:

1. The distinctive designation of such class or series, and the number of shares to constitute such class or series;

2. The rate and times at which, dividends, if any, on the shares of such class or series shall be declared and paid, or set aside for payment, whether dividends at the rate so determined shall be cumulative or accruing, whether the shares of such class or series shall be entitled to any participating or other dividends at the rate so determined, and if so, on what terms, and the extent of the preference or relation, if any, of such dividends to the dividends payable on any other class or classes, or series of the same or other classes of stock;

3. The right or obligation, if any, of the Corporation to redeem shares of the particular class or series of Preferred Stock and, if redeemable, the price, terms and manner of such redemption;

4. The special and relative rights and preferences, if any, and the amount or amounts per share, which the shares of such class or series of Preferred Stock shall be entitled to receive upon any voluntary or involuntary liquidation, merger, consolidation, distribution or sale of assets, dissolution or winding up of the Corporation;

5. The terms and conditions, if any, upon which shares of such class or series shall be convertible into, or exchangeable for shares of capital stock of any other class or series, including the price or prices or the rate or rates of conversion or exchange and the terms of adjustment, if any;

6. The obligation, if any, of the Corporation to retire, redeem or purchase shares of such class or series pursuant to a sinking fund or fund of a similar nature or otherwise, and the terms and conditions of such obligations;

7. The voting rights, if any, including special voting rights with respect to the election of directors and matters adversely affecting any class or series of Preferred Stock; and

8. Limitations, if any, on the issuance of additional shares of such class or series or any shares of any other class or series of Preferred Stock; and

9. Such other preferences, powers, qualifications, special or relative rights and privileges thereof as the Board of Directors of the Corporation, acting in accordance with this Certificate of Incorporation, may deem advisable and are not inconsistent with law and the provisions of this Certificate of Incorporation.

D.  OTHER PROVISIONS

1. The relative powers, preferences, and rights of each series of Preferred Stock shall, in each case, be as fixed from time to time by the Board of Directors in the resolution or resolutions adopted pursuant to authority granted in Paragraph C of this Article Fourth, and the consent by class or series vote or otherwise, of the holders of the Preferred Stock or such of the series of the Preferred Stock as are from time to time outstanding shall not be required for the issuance by the Board of Directors of any other series of Preferred Stock whether the powers, preferences and rights of such other series shall be fixed by the Board of Directors as senior to, or on a parity with, powers, preferences and rights of such outstanding series, or any of them, provided, however, that the Board of Directors may provide in such resolution or resolutions adopted with respect to any series of Preferred Stock that the consent of the holders of a majority (or such greater proportion as shall be therein

(32)

5

fixed) of the outstanding shares of such series voting thereon shall be required for the issuance of any or all other series of Preferred Stock.

2. Subject to the provisions of Section 1 of this Paragraph D, shares of any series of Preferred Stock may be issued from time to time as the Board of Directors shall determine and on such terms and for such consideration as shall be fixed by the Board of Directors.

3. Common Stock may be issued from time to time as the Board of Directors shall determine and on such terms and for such consideration as shall be fixed by the Board of Directors.

4. No holder of any of the shares of any class or series of shares or securities convertible into such shares of any class or series of shares, or of options, warrants or other rights to purchase or acquire shares of any class or series of shares or of other securities of the Corporation shall have any preemptive right to purchase, acquire, subscribe for any unissued shares of any class or series or any additional shares of any class or series to be issued by reason of any increase of the authorized capital stock of the Corporation of any class or series, or bonds, certificate of indebtedness, debenture or other securities convertible into or exchangeable for shares of any class or series, or carrying any right to purchase or acquire shares of any class or series, but any such unissued shares, additional authorized issue of shares of any class or series of shares or securities convertible into or exchangeable for shares, or carrying any right to purchase or acquire shares, may be issued and disposed of pursuant to resolution of the Board of Directors to such persons, firms, corporations or associations, and upon such terms, as may be deemed advisable by the Board of Directors in the exercise of its sole discretion.

5. The Corporation reserves the right to increase or decrease its authorized capital stock, or any class or series thereof or to reclassify the same and to amend, alter, change or repeal any provision contained in this Certificate of Incorporation or in any amendment thereto, in the manner now or hereafter prescribed by law, but subject to such conditions and limitations as are hereinbefore prescribed, and all rights conferred upon stockholders in this Certificate of Incorporation or any amendment thereto, are granted subject to this reservation.

FIFTH

A.  NUMBER, ELECTION AND TERMS OF DIRECTORS. The business of the Corporation shall be managed by a Board of Directors. The number of directors of the Corporation shall be fixed from time to time by or pursuant to the By-Laws of the Corporation. Except as otherwise provided in or fixed by or pursuant to the provisions of Article Fourth hereof relating to the rights of the holders of any class or series of stock having a preference over the Common Stock as to dividends or upon liquidation to elect directors under specified circumstances, the directors shall be classified, with respect to the time for which they severally hold office, into three classes, as nearly equal in number as possible, as shall be provided in the manner specified in the By-Laws of the Corporation. One class shall be originally elected for a term expiring at the annual meeting of stockholders to be held in 1995, another class shall be originally elected for a term expiring at the annual meeting of stockholders to be held in 1996, and another class shall be originally elected for a term expiring at the annual meeting of stockholders to be held in 1997, with each member of each class to hold office until a successor is elected and qualified. At each annual meeting of stockholders of the Corporation and except as otherwise provided in or fixed by or pursuant to the provisions of Article Fourth hereof relating to the rights of the holders of any class or series of stock having a preference over the Common Stock as to dividends or upon liquidation to elect directors under specified circumstances, the successors of the class of directors whose term expires at that meeting shall be elected to hold office for a term of three years.

B.  STOCKHOLDER NOMINATION OF DIRECTOR CANDIDATES AND INTRODUCTION OF BUSINESS. Advance notice of stockholder nominations for the election of directors, and advance notice of business to be brought by stockholders before an annual meeting of stockholders, shall be given in the manner provided in the By-Laws of the Corporation.

C.  NEWLY CREATED DIRECTORSHIPS AND VACANCIES. Except as otherwise required by law and except as otherwise provided in or fixed by or pursuant to the provisions of Article Fourth hereof

(33)

6

relating to the rights of the holders of any class or series of stock having a
preference over the Common Stock as to dividends or upon liquidation to elect
directors under specified circumstances: (i) newly created directorships
resulting from any increase in the number of directors and any vacancies on the
Board of Directors resulting from death, resignation, disqualification, removal
or other cause shall be filled by the affirmative vote of a majority of the
remaining directors then in office, even though less than a quorum of the Board
of Directors; (ii) any director elected in accordance with the preceding clause
(i) shall hold office for the remainder of the full term of the class of
directors in which the new directorship was created or the vacancy occurred and
until such director's successor shall have been elected and qualified; and (iii)
no decrease in the number of directors constituting the Board of Directors shall
shorten the term of any incumbent director.

D. REMOVAL. Except as otherwise provided in or fixed by or pursuant to the
provisions of Article Fourth hereof relating to the rights of the holders of any
class or series of stock having a preference over the Common Stock as to
dividends or upon liquidation to elect directors under specified circumstances,
any director may be removed from office only for cause and only by the
affirmative vote of the holders of 80% of the combined voting power of the then
outstanding shares of the Corporation's stock entitled to vote generally, voting
together as a single class. Whenever in this Article Fifth or in Article Sixth
hereof or in Article Seventh hereof, the phrase, "the then outstanding shares of
the Corporation's stock entitled to vote generally" is used, such phrase shall
mean each then outstanding share of any class or series of the Corporation's
stock that is entitled to vote generally in the election of the Corporation's
directors.

E. AMENDMENT OR REPEAL. Notwithstanding any other provisions of this
Article Fifth or of any other Article hereof or of the By-Laws of the
Corporation (and notwithstanding the fact that a lesser percentage may be
specified from time to time by law, this Article Fifth, any other Article
hereof, or the By-Laws of the Corporation), the provisions of this Article Fifth
may not be altered, amended or repealed in any respect, nor may any provision
inconsistent therewith be adopted, unless such alteration, amendment, repeal or
adoption is approved by the affirmative vote of at least 80% of the combined
voting power of the then outstanding shares of the Corporation's stock entitled
to vote generally, voting together as a single class.

SIXTH

Both stockholders and directors shall have power, if the By-Laws so
provide, to hold their meetings and to have one or more offices within or
without the State of Delaware.

Except as otherwise fixed by resolution of the Board of Directors pursuant
to the provisions of Article Fourth hereof relating to the rights of the holders
of Preferred Stock, any action required or permitted to be taken by the
stockholders of the Corporation must be effected at a duly called annual or
special meeting of such holders. Except as otherwise required by law and subject
to the rights of the holders of Preferred Stock, special meetings of
stockholders may be called only by the Chairman on his or her own initiative,
the Chief Executive Officer (if different from the Chairman) on his or her own
initiative or the Board of Directors pursuant to a resolution approved by a
majority of the entire Board of Directors. Notwithstanding anything contained in
this Certificate of Incorporation to the contrary, the affirmative vote of the
holders of at least 80% of the voting power of all shares of the Corporation
entitled to vote generally in the election of directors, voting together as a
single class, shall be required to alter, amend, adopt any provision
inconsistent with or repeal this Article Sixth.

SEVENTH

The Board of Directors shall have power to adopt, amend and repeal the
By-Laws of the Corporation to the maximum extent permitted from time to time by
Delaware law; provided, however, that any By-Laws adopted by the Board of
Directors under the powers conferred hereby may be amended or repealed by the
Board of Directors or by the holders of at least a majority of the combined
voting power of the then outstanding shares of the Corporation's stock entitled
to vote generally, voting together as a single class, except that, and
notwithstanding any other provisions of this Article Seventh or any other
Article hereof or of the By-

(34)

7

Laws of the Corporation (and notwithstanding the fact that a lesser percentage may be specified from time to time by law, this Article Seventh, any other Article hereof or the By-Laws of the Corporation), the provisions of Article II, Sections 5 or 11 of the By-Laws, those of Article III, Sections 1, 3 and 4 of the By-Laws and the rights of the directors and officers of the Corporation with respect to indemnification under Article IX of the By-Laws may not be altered, amended or repealed in any respect, nor may any provision inconsistent therewith be adopted, unless such alteration, amendment, repeal or adoption is approved by the affirmative vote of the holders of at least 80% of the combined voting power of the then outstanding shares of the Corporation's stock entitled to vote generally, voting together as a single class (except that rights of directors or officers of the Corporation with respect to indemnification under Article IX may be enlarged by such lesser vote as may otherwise be required if enlargement of such indemnification rights is permitted by applicable law). Notwithstanding any other provisions of this Article Seventh or of any other Article hereof or of the By-Laws of the Corporation (and notwithstanding the fact that a lesser percentage may be specified from time to time by law, this Article Seventh, any other Article hereof or the By-Laws of the Corporation), the provisions of this Article Seventh may not be altered, amended or repealed in any respect, nor may any provision inconsistent therewith be adopted, unless such alteration, amendment, repeal or adoption is approved by the affirmative vote of the holders of at least 80% of the combined voting power or the then outstanding shares of the Corporation's stock entitled to vote generally, voting together as a single class.

EIGHTH

A director of this Corporation shall not be personally liable to this Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to this Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived any improper personal benefit. If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of this Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.

Any repeal or modification of the foregoing paragraph by the stockholders of this Corporation shall not adversely affect any right or protection of a director of this Corporation existing at the time of such repeal or modification.

NINTH

RIGHT OF INDEMNIFICATION. The Corporation may, to the fullest extent to which it is empowered to do so by the General Corporation Law of the State of Delaware or any other applicable laws, as they may from time to time be in effect, indemnity any person who was or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he or she is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, against all expenses (including attorneys' fees), judgments, fines and amounts incurred by him or her in connection with such action, suit or proceeding.

TENTH

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute or this Certificate of Incorporation, and all rights conferred upon stockholders herein are granted subject to this reservation.

(35)

8

### ELEVENTH

Election of directors need not be by written ballot.

### TWELFTH

The name and mailing address of the incorporator is:

Stephen M. Gatlin
Gardner, Carton & Douglas
321 North Clark, Suite 3400
Chicago, Illinois 60610-4795

I, THE UNDERSIGNED, being the incorporator hereinbefore named, for the purpose of forming a corporation pursuant to the General Corporation Law of Delaware, do make this certificate, hereby declaring and certifying that this is my act and deed and the facts herein stated are true, and accordingly have hereunto set my hand this 30th day of November, 1993.

                              /s/  STEPHEN M. GATLIN
                              --------------------------
                                   Stephen M. Gatlin

(36)

# EXHBIT B

# CORAM HEALTHCARE CORP (CRH)

1675 BROADWAY
SUITE 900
DENVER, CO 80202
303. 292.4973

# 10-Q

**FORM 10-Q FOR QUARTER ENDED JUNE 30, 1998**
**Filed on 08/14/1998 – Period: 06/30/1998**
File Number 001-11343



1

EXHIBIT 10.04

AMENDMENT NO. 1
TO EMPLOYMENT AGREEMENT


     THIS AMENDMENT NO. 1 dated as of the 30th day of June, 1998 (this
"Amendment"), amends that certain Employment Agreement dated as of October 13,
1995 (the "Employment Agreement"), between Coram Healthcare Corporation, a
Delaware corporation (the "Company"), and Donald J. Amaral ("Executive"), and is
made and entered into with reference to the following facts (all capitalized
terms not otherwise defined herein have the respective meanings set forth in the
Employment Agreement):

     WHEREAS, the Company and Executive desire to extend the Employment
Period and to increase the Base Salary payable to Executive; and

     WHEREAS, the Company and Executive desire to amend the Employment
Agreement to provide for the payment of a success bonus upon the successful
consummation of a refinancing of the Company's outstanding subordinated debt or
an acquisition of the Company, all on the terms and conditions hereinafter set
forth; and

     WHEREAS, the Company and Executive desire to amend the Employment
Agreement to provide for the payment of an acquisition bonus upon the
consummation of certain transactions; and

     WHEREAS, the Company and Executive desire to amend the Covenant not to
Compete; and

     WHEREAS, the Company has determined to grant Executive options to
purchase an additional 300,000 shares of the Company's Common Stock.

     NOW, THEREFORE, in consideration of the foregoing and for other good
and valuable consideration, the receipt and adequacy of which is hereby
acknowledged, the parties hereby agree as follows:

1.     Amendments to Employment Agreement.

     1.1. The first sentence of paragraph 3(a) is hereby amended in its
entirety to read as follows:

                    (a) Executive's base salary (the "Base Salary") shall
               initially be $600,000 per annum, shall be increased to
               $650,000 per annum on and as of May 16, 1997, and shall be
               payable in cash and in accordance with the Company's general
               payroll practices.

     1.2. Paragraph 3(a) is hereby further amended by changing the date
"June 30" to "April 30" in both places where it appears.

2

1.3. The first grammatical paragraph of paragraph 3(c) is hereby amended in its entirety to read as follows:

(c) Executive shall be granted options as of October 13, 1995 to purchase 2,200,000 shares of Common Stock of the Company (the "Option Shares") at a price equal to the average closing price of the Common Stock on the New York Stock Exchange in the five days immediately preceding October 12, 1995. An aggregate of 1,400,000 of the Option Shares shall be granted to Executive under the Company's 1994 Stock Option/Stock Issuance Plan (the "Plan") and the remaining 800,000 Option Shares shall be granted to Executive outside of the Plan. In addition, Executive shall be granted additional options (the "Additional Options") as of June 2, 1997 to purchase an additional 300,000 shares of the Company's Common Stock (the "Additional Option Shares") at a price of $2.625 per share. The Additional Options shall be granted to Executive under the Plan. The Options and the Additional Options (collectively, the `Options") will vest if Executive is then employed by the Company and become exercisable by Executive as to 33-1/3% of each of the Option Shares and the Additional Option Shares (collectively, the "Shares") covered thereby respectively on each of the first, second and third anniversaries of the respective grant dates thereof, and will vest as to 100% of the Shares upon: (i) a Change in Control (as defined below); (ii) any termination by the Company of this Agreement other than a termination by the Company for Cause (as defined below); (iii) any termination by Executive pursuant to paragraph 5(a)(ii) hereof; or (iv) if the Employment Period is terminated as a result of Executive's death or permanent Disability (as defined below).

1.4. Paragraph 3(c) is hereby further amended by deleting the entire paragraph following the words "For purposes of this Agreement, a Change in Control of the Company shall be deemed to have occurred if" and substituting the following:

(i) any person or group (within the meaning of Rule 13d-5 of the SEC as in effect on the date hereof) other than the Senior Subordinated Noteholders pursuant to the SEA (as hereinafter defined) or a group composed principally thereof shall own directly or indirectly, beneficially or of record, shares representing 30% or more of the aggregate ordinary voting power represented by the issued and outstanding capital stock of the Company;

(ii) during any period of two consecutive years, individuals who at the beginning of such period constituted the Company's Board of Directors (together with any new directors whose election to the Company's Board of Directors or whose nomination for election to the Company's Board of Directors by the Company's shareholders was approved by a vote of at least two-thirds of the Company's directors then still in office who either were directors at the beginning of such period or whose election or nomination for election was previously so approved) together with any individual serving during such period as a member of the Company's Board of Directors designated pursuant to the Security Exchange Agreement dated May 6, 1998 (the "SEA") cease for any reason to constitute a majority of the Company's directors then in office;

-2-

3

        (iii) any change in control with respect to the Company, Coram, Inc. or any subsidiary (or similar event, however denominated) shall occur under and as defined in any agreement in respect of indebtedness other than capital lease obligations (as defined in the SEA) to which the Company, Coram, Inc. or any subsidiary is party;

        (iv) the Company shall cease to own and control directly, of record and beneficially, 100% of each class of outstanding capital stock of Coram, Inc. free and clear of all liens, other than as a result of the exercise of the warrants issued to the lenders under the Credit Agreement dated April 6, 1995; or

        (v) Coram, Inc. shall cease to own and control directly, of record and beneficially, 100% of each class of outstanding capital stock of each of T2 Medical, Inc., Curaflex Health Services, Inc. and Coram Resource Network, other than as a result of the exercise of the warrants issued to the lenders under the Credit Agreement dated April 6, 1995.

1.5. New paragraph 3(d) which reads as follows is hereby added:

        (d) In addition to the Base Salary and any bonuses payable to Executive, Executive shall be entitled to receive a success bonus ("Success Bonus") of $1,000,000 upon the consummation of a Refinancing (as hereinafter defined) of the Company's outstanding subordinated debt originally payable to an affiliate of Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ") pursuant to that certain Securities Purchase Agreement dated as of April 6, 1995 among Coram, Inc., as Issuer, Coram Funding, Inc., as Purchaser, and the Company, as amended (the "DLJ Debt"). The Company shall pay the Success Bonus to Executive in two equal $500,000 installments, the first of which shall be payable concurrently with the consummation of the Refinancing and the second of which shall be payable on the six month anniversary of consummation; provided, however, that if prior to such six month anniversary, this Agreement is terminated by the Company for Cause (as defined below) or as a result of Executive's resignation other than pursuant to Paragraph 5(a)(ii) hereof, Executive shall not be entitled to receive the second installment of the Success Bonus. The parties acknowledge that the payment of a Success Bonus upon consummation of a Refinancing is required by actions of the Board taken on August 8, 1996 and October 18, 1996. For purposes of this Agreement, the term "Refinancing" shall mean the replacement of the DLJ Debt with new debt which has terms acceptable to the Board. The SEA with the present holders of the DLJ Debt, if consummated, shall constitute a Refinancing.

4

   1.6. New paragraph 3(e) which reads as follows is hereby added:

              (e) In addition to the Base Salary and any bonuses
         payable to Executive hereunder, Executive shall be entitled to
         receive an acquisition bonus ("Acquisition Bonus") of
         $4,000,000 to be paid as provided below upon the consummation
         of any transaction where the shareholders of the Company
         approve a merger or consolidation which would result in the
         holders of voting securities of the Company outstanding
         immediately prior thereto failing to continue to represent
         (either by remaining outstanding, or being converted into
         voting securities of the surviving entity) at least 50% of the
         combined voting power of the voting securities of the Company
         or such surviving entity outstanding immediately after such
         merger or consolidation, or an agreement for the sale or
         disposition by the Company of all or substantially all of the
         Company's assets, or any transaction having similar effect,
         other than a liquidation of the Company (an "Acquisition").
         The Company shall pay the Acquisition Bonus to Executive in
         two equal $2,000,000 installments, the first of which shall be
         payable concurrently with the consummation of the Acquisition
         and the second of which shall be payable on the one year
         anniversary of consummation; provided, however, that if prior
         to such one year anniversary, this Agreement is terminated by
         the Company for Cause (as defined below), or as a result of
         Executive's resignation other than pursuant to Paragraph
         5(a)(ii) hereof, Executive shall not be entitled to receive
         the second installment of the Acquisition Bonus.

   1.7. Existing paragraphs 3(d) and 3(e) are hereby redesignated as
Sections 3(f) and 3(g), respectively.

   1.8. Paragraph 5(a) is hereby amended by deleting the words "the third
anniversary hereof" in the first line thereof and substituting the words "May
15, 2000" therefor.

   1.9. Paragraphs 7(c) and 7(d) are hereby amended by changing the
references to paragraph "8" therein to references to paragraph "7".

   1.10. The addresses for notices set forth in paragraph 10 hereof are
hereby amended in their entirety to read as follows:

         Notices to Executive:
         ---------------------

              Donald J. Amaral
              844 Treemont Court
              Nashville, TN  37220
              Telephone:        (615) 383-4460
              Fax:              (615) 269-3532

                              -4-

5

with a copy to:

    Ervin, Cohen & Jessup
    9401 Wilshire Boulevard
    Suite 900
    Beverly Hills, CA 90212
    Attention:      John A. Meyers, Esq.
    Telephone:     (310) 281-6373
    Fax:           (310) 859-2325

Notices to the Company:
-----------------------

    Coram Healthcare Corporation
    1125 Seventeenth Street
    Suite 1500
    Denver, CO 80202
    Attention: Paul J. Quiner, Esq.
    Telephone:     (303) 292-4973
    Fax:           (303) 298-0047

with a copy to:

    Paul, Hastings, Janofsky & Walker LLP
    555 South Flower Street
    Twenty-Third Floor
    Los Angeles, CA 90071
    Attention: David L. Gersh, Esq.
    Telephone:     (213) 683-6240
    Fax:           (213) 627-0705

2. Notices. All notices, requests, demands and other communications under this Amendment shall be in writing and shall be deemed to have been delivered and received five business days after having been deposited in the United States mail and enclosed in a certified or registered post-paid envelope; one business day after having been sent by overnight courier; and when personally delivered or sent by facsimile communications equipment of the sending party on a business day, or otherwise on the next succeeding business day thereafter; and in each case addressed to the respective party at its address set forth in the Employment Agreement (as amended by Section 1.6 above) or to such other changed addresses as the parties may have fixed by notice as provided therein.

3. Jurisdiction and Integration. This Amendment shall be governed by the internal law, and not the laws of conflicts, of the State of Colorado. The preceding choice of law provision shall apply to all claims, under any theory whatsoever, arising out of the parties' relationship (as such relationship is contemplated by, or related to, this Amendment or the Employment Agreement). This Amendment, the Agreement, those documents expressly referred to herein or in the Agreement and other documents of even date herewith or therewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in some way.

6

4. Binding Agreement; Counterparts. This Amendment shall be binding upon the parties hereto, their successors, assigns and legal representatives. This Amendment may be executed in several counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

5. Full Force and Effect. Except as expressly amended by this Amendment, the Employment Agreement shall continue in full force and effect in accordance with the provisions thereof. As used in the Employment Agreement, "hereinafter," "hereto," "hereof," and other words of similar import shall, unless the context otherwise requires, mean the Employment Agreement as amended by this Amendment. In the event of any conflict or inconsistency between the terms and conditions of the Employment Agreement and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall control.

        IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

                        THE COMPANY:

                        CORAM HEALTHCARE CORPORATION


                        By: \s\
                            ---------------------------------------


                        EXECUTIVE


                        \s\
                            ---------------------------------------
                        Donald J. Amaral


                        -6-

# EXHBIT C

# CORAM HEALTHCARE CORP (CRH)

1675 BROADWAY
SUITE 900
DENVER, CO 80202
303. 292.4973

# 10-K

**FORM 10-K FOR FISCAL YEAR END DECEMBER 31, 1999**
**Filed on 03/30/2000 – Period: 12/31/1999**
File Number 001-11343



13

kickback violations can also be imposed through an administrative process. Federal enforcement officials may also attempt to use other general federal statutes to punish behavior considered fraudulent or abusive, including the Federal False Claims Act, which provides for penalties of up to $10,000 per claim plus treble damages, and permits private persons to sue on behalf of the government. While the federal anti-kickback statute expressly prohibits transactions that have traditionally had criminal implications, such as kickbacks, rebates or bribes for patient referrals, its language has been construed broadly and has not been limited to such obviously wrongful transactions. Some court decisions state that, under certain circumstances, the statute is also violated when one purpose (as opposed to the "primary" or a "material" purpose) of a payment is to induce referrals. Congress has frequently considered, but has not yet adopted, federal legislation that would expand the federal anti-kickback statute to include the same broad prohibitions regardless of payer source.

In addition to the payment or receipt of illegal remuneration for the referral or generation of federal healthcare program business, the fraud and abuse laws cover other billing practices that are considered fraudulent (such as presentation of duplicate claims, claims for services not actually rendered or for procedures that are more costly than those actually rendered) or abusive (such as claims presented for services not medically necessary based upon a misrepresentation of fact) subject to the same remedies described above.

Similarly, a large number of states have varying laws prohibiting certain direct or indirect remuneration between health care providers for the referral of patients to a particular provider, including pharmacies and home health agencies. Possible sanctions for violation of these laws include loss of licensure, exclusion from state funded programs, and civil and criminal penalties.

Prohibition on Physician Referrals. Under the Omnibus Budget Reconciliation Act of 1993 ("Stark II"), it is unlawful for a physician to refer patients for certain designated health services reimbursable under the Medicare or Medicaid program to an entity with which the physician has a financial relationship, unless the financial relationship fits within an exception enumerated in Stark II or regulations promulgated thereunder. Aspects of Coram's business which are "designated health services" for purposes of Stark II include outpatient prescription drugs, parenteral and enteral nutrition, equipment and supplies, durable medical equipment and home health services. A "financial relationship" under Stark II is defined broadly as an ownership or investment interest in, or any type of compensation arrangement in which remuneration flows between, the physician and the provider. Coram has financial relationships with physicians and physician owned entities in the form of medical director agreements and services agreements pursuant to which the company provides pharmacy products. In each case the relationship has been structured using an arrangement the company believes to be consistent with applicable exceptions set forth in Stark II, such as the personal services arrangements exception or the exception for payments by a physician for items and services.

In addition, the company is aware of certain referring physicians that have had a financial interests in the company through ownership of shares of the company's common stock. The Stark II law includes an exception for the ownership of publicly traded stock in certain companies with equity above certain levels. As of December 31, 1999, the company complied with the requirements of such exception. However, there can be no assurance that the ownership of shares of Coram common stock by referring physicians will continue to fit within the public company exception of Stark II because the public company exception requires the issuing company to have stockholders' equity of at least $75 million either as of the end of its most recent fiscal year or during the last three fiscal years. At the end of Coram's 1999 fiscal year, its level of stockholders' equity was well below the required level, but average stockholders' equity over the prior three years was above the required level. Without an increase in Coram's stockholders' equity level prior to the end of the fiscal year ending December 31, 2000, Coram would no longer qualify for such exception and would be forced to cease accepting referrals of patients with government sponsored benefit programs from physicians who own shares of Coram's common stock. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Risk Factors."

Under Stark II, an entity is prohibited from claiming payment under the Medicare or Medicaid programs for services rendered pursuant to a prohibited referral and is liable for the refund of amounts received pursuant to prohibited claims. The entity can also receive civil penalties of up to $15,000 per improper claim and can be excluded from participation in the Medicare and Medicaid programs. In addition, a number of the states in which

12

14

the company operates have similar prohibitions on physician self-referrals with similar penalties. Although the company believes it has structured its financial relationships with physicians to comply with such Stark II and applicable state law equivalents, a failure to comply with the provisions of such laws could have a material adverse effect on the company.

Other Fraud and Abuse Laws. The False Claims Act imposes civil liability on individuals or entities that submit false or fraudulent claims for payment to the government. Violations of the False Claims Act may result in civil penalties and forfeitures and exclusion from the Medicare and Medicaid programs. The Health Insurance Portability and Accountability Act of 1996 created two new federal crimes: "Health Care Fraud" and "False Statements Relating to Health Care Matters." The Health Care Fraud statute prohibits knowingly and willfully executing a scheme or artifice to defraud any health care benefit program. A violation of this statute is a felony and may result in fines and/or imprisonment. The False Statements statute prohibits knowingly and willfully falsifying, concealing or covering up a material fact by any trick, scheme or device or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for health care benefits, items or services. A violation of this statute is a felony and may result in fines and/or imprisonment. Recently, the federal government has made a decision to significantly increase the financial resources allocated to enforcing the health care fraud and abuse laws. In addition, private insurers and various state enforcement agencies have increased their level of scrutiny of health care claims in an effort to identify and prosecute fraudulent and abusive practices in health care. A failure to comply with any of the fraud and abuse laws could have a material adverse effect on the company.

Medicare and Health Care Reform. As part of the Balance Budget Act of 1997 (the "BBA"), Congress made numerous changes that affect the participation of Part A certified home health agency providers and Part B suppliers like Coram in the Medicare program.

Pursuant to regulations proposed under the BBA, Part A certified home health agencies will be required, as a condition of their participation in Part A of the Medicare program, to post surety bonds. The bonds are to be used to secure such entities' performance and compliance with Medicare program rules and requirements. The regulations applicable to Medicare certified home health providers, as originally published, would require each Medicare certified home health provider to obtain a surety bond in an amount equal to the greater of 15% of the annual amount Medicare paid to the provider in the prior year (up to a maximum of $3,000,000) or $50,000. The Balanced Budget Refinement Act of 1999 ("BBRA") modified the surety bond amounts to require the lesser of 10% of the annual amount Medicare paid to the provider in the prior year or $50,000. The deadline for securing such bonds has been extended indefinitely while HCFA reviews the bonding requirements. HCFA has indicated that the new compliance date will be sixty days after the publication of the final rule. Coram believes, based upon currently available information derived from its discussions with surety bond brokers and organizations that issue surety bonds, that the necessary bonds will not be generally available to home health providers until HCFA revises its bonding requirements in a way that clarifies and/or limits the types of liabilities that will be covered by the bonds. As of March 15, 2000, the company had only three Medicare certified home health providers, none of which has obtained a surety bond.

Coram understands that HCFA will be issuing separate surety bond regulations applicable to Part B durable medical equipment suppliers. If the regulations applicable to Part B suppliers are similar to those published for Part A providers, Coram would be required to post bonds for each of its branches that participate in the Part B program in the same amounts as those described above for Part A home health service providers. Virtually all of Coram's branch offices participate as suppliers in the Part B Medicare program. Similar bonding requirements are being required by state Medicaid programs. If Coram is required to post surety bonds under the Medicare and Medicaid programs for each of its Part A home health agency providers and Part B durable medical equipment supplier locations, Coram would be required to obtain bonds in the minimum face amount of approximately $17.5 million. If Coram is not able to obtain all of the necessary bonds, it may have to cease its participation in the Medicare and Medicaid programs for some or all of its branch locations. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Liquidity and Capital Resources -- Part A and Part B Medicare Surety Bonds."

13

21

ITEM 6. SELECTED FINANCIAL DATA

The following selected consolidated financial data should be read in conjunction with the company's Consolidated Financial Statements and related notes and Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations." Amounts are in thousands, except per share data.

|  | YEAR ENDED DECEMBER 31, | | | | |
|---|---|---|---|---|---|
|  | 1999 | 1998 | 1997 | 1996 | 1995 |
| INCOME STATEMENT DATA: |  |  |  |  |  |
| Net revenue............................ | $ 521,196 | $445,112 | $439,472 | $502,830 | $ 586,437 |
| Cost of service........................ | 408,878 | 326,736 | 309,693 | 348,247 | 440,025 |
| Gross profit............................ | 112,318 | 118,376 | 129,779 | 154,583 | 146,412 |
| Operating expenses: |  |  |  |  |  |
| Selling, general and administrative expenses............................. | 96,809 | 83,337 | 86,457 | 97,981 | 124,141 |
| Provision for estimated uncollectible accounts............................ | 28,310 | 14,845 | 14,983 | 27,327 | 66,933 |
| Amortization of goodwill.............. | 10,784 | 11,139 | 13,586 | 15,259 | 15,307 |
| Restructuring costs, net(1)........... | 5,831 | (3,900) | -- | -- | 6,158 |
| Charge for long-lived assets and acquired receivables: |  |  |  |  |  |
| Goodwill and other long-lived assets(2)........................ | 9,100 | -- | -- | -- | 166,373 |
| Valuation of acquired receivables(3)...................... | -- | -- | -- | -- | 37,000 |
| Provision for (income from) litigation settlements(4)................... | -- | -- | (156,792) | 27,875 | (7) |
| Total operating expenses......... | 150,834 | 105,421 | (41,766) | 168,442 | 415,905 |
| Operating income (loss).................. | (38,516) | 12,955 | 171,545 | (13,859) | (269,493) |
| Interest income...................... | 655 | 1,086 | 2,236 | 1,486 | 1,494 |
| Interest expense(5)................... | (29,763) | (32,734) | (75,026) | (78,767) | (49,740) |
| Gains on sales of businesses(6).......... | -- | 1,071 | 26,744 | -- | -- |
| Termination fee(7).................... | -- | -- | 15,182 | -- | -- |
| Other income (expense), net.............. | 740 | (266) | 1,517 | 2,114 | (2,119) |
| Income (loss) from continuing operations before income taxes and minority interests............................ | (66,884) | (17,888) | 142,198 | (89,026) | (319,858) |
| Income tax expense (benefit)............. | 440 | 2,300 | 7,550 | (13,998) | (11,154) |
| Minority interest in net income of consolidated joint ventures........... | 1,470 | 1,399 | 7,283 | 7,698 | 10,964 |
| Income (loss) from continuing operations after income taxes and minority interests............................ | (68,794) | (21,587) | 127,365 | (82,726) | (319,668) |
| Discontinued Operations: |  |  |  |  |  |
| Loss from operations.................... | (28,411) | (108) | (2,105) | (2,288) | (14,381) |
| Loss from disposal...................... | (17,618) | -- | -- | -- | -- |
| Net income (loss)......................... | $(114,823) | $(21,695) | $125,260 | $(85,014) | $(334,049) |
| Earnings per share: |  |  |  |  |  |
| Basic |  |  |  |  |  |
| Income (loss) from continuing operations........................ | $ (1.39) | $ (0.44) | $ 2.68 | $ (1.99) | $ (8.04) |
| Loss from discontinued operations..... | (0.93) | (0.00) | (0.04) | (0.06) | (0.36) |
| Net income (loss).................... | $ (2.32) | $ (0.44) | $ 2.64 | $ (2.05) | $ (8.40) |
| Diluted |  |  |  |  |  |
| Income (loss) from continuing operations........................ | $ (1.39) | $ (0.44) | $ 2.34 | $ (1.99) | $ (8.04) |
| Loss from discontinued operations..... | (0.93) | (0.00) | (0.04) | (0.06) | (0.36) |
| Net income (loss).................... | $ (2.32) | $ (0.44) | $ 2.30 | $ (2.05) | $ (8.40) |
| BALANCE SHEET DATA: |  |  |  |  |  |
| Cash and cash equivalents................ | $ 6,242 | $ 53 | $108,950 | $ 15,375 | $ 26,735 |
| Working capital (deficit)................. | 38,508 | 66,261 | (11,620) | (132,529) | 37,422 |
| Total assets............................ | 403,222 | 421,029 | 515,252 | 543,795 | 679,004 |
| Long-term debt, net of current portion(8)............................ | 302,662 | 242,162 | 150,428 | 266,641 | 439,309 |
| Stockholders' equity (deficit)............. | (21,699) | 92,857 | 125,026 | (21,842) | 18,040 |

34

company also had $44.0 million outstanding under its senior credit facility at an interest rate of 10% as of December 31, 1999. This indebtedness may make the company more vulnerable to economic downturns, competitive and payer pricing pressures, adverse changes in government regulation or other adverse events or circumstances. In addition, the lenders, pursuant to the new senior credit facility and the Series B Notes are entitled to the benefits of various restrictive covenants, and their consent is required to be obtained for the company to engage in various activities and transactions. This consent could be withheld which could adversely effect the operations of the company. See Item 7. "Liquidity and Capital Resources." and Note 9 to the company's Consolidated Financial Statements.

Coram will require additional financing and it may not be able to obtain additional financing.

Coram's Fiscal 2000 business plan does not provide for financial results that would guarantee sufficient liquidity to discharge debt obligations coming due in Fiscal 2001. Without sufficient revisions to Coram's existing debt agreements, there can be no assurance that it will have sufficient liquidity to continue to fund operations. At this time, Coram is not in discussions with any financing sources other than the holders of its existing long term debt instruments to replace or supply any funding and the company can offer no guarantees that these or any other parties would agree to a restructuring that would provide future liquidity. See Note 9 to the company's Consolidated Financial Statements.

Coram will require additional equity in order to be able to avoid disruption in accepting referrals of certain patients from physicians who may own shares of Coram common stock.

Coram has learned that certain physicians have, from time to time, owned shares of its common stock. Under federal law, including certain provisions contained in the Omnibus Budget Reconciliation Act of 1993 commonly know as the Stark II law, the ownership of shares in a health care services provider is a financial relationship subject to federal regulation. For example, the Stark II law prohibits a physician from making Medicare or Medicaid referrals for certain "designated health services," including durable medical equipment, parenteral and enteral nutrition therapy and outpatient prescription drugs, to entities with which the physician or an immediate family member has a financial relationship, unless an exception to the law is available. Referrals to Coram for designated health services after January 1, 2001 by physicians who own Coram stock will be protected by an exception under Stark II for publicly traded corporations if Coram's stockholder equity at December 31, 2000 is $75.0 million, or if Coram has had average stockholder equity of $75.0 million during the preceding three (3) years. Absent such protection, Coram would, before accepting a referral, be required to determine whether the physician (or an immediate family member) owns Coram stock and could not accept referrals where such ownership was present. Therefore, absent a significant increase in stockholder equity, Coram may fail to meet the Stark II exception for the publicly-traded corporations. Failure to meet this exception and operating without the protection of the statutory exception under Stark II that Coram has enjoyed in the past could be extremely onerous and could have a material adverse impact on Coram's business or financial condition because of the costs and uncertainties of compliance and Coram's inability to accept certain referrals after January 1, 2001.

Holders of Coram common stock may have their ownership interest diluted by the equity conversion rights held by existing debt holders.

Cerberus Partners, L.P., Goldman Sachs Credit Partners, L.P. and Foothill Capital Corporation (collectively, the "Series B Holders") are holders of the Series B Notes, with an outstanding principal balance of $92.1 million as of March 16, 2000. The Series B Notes mature April 2008, subject to the obligation of Coram to offer to prepay all Series B Notes on the date of maturity of the Series A Notes. The Series B Notes are currently convertible into shares of common stock of Coram at a price of $2.00 per share. In addition, the Series B Holders are holders of warrants to purchase more than 1.9 million shares of common stock of the company at an exercise price of $.01 per share. Based upon the number of shares of common stock currently outstanding, the Series B Holders at a $2.00 conversion price beneficially own in the aggregate approximately 49.3% of the shares of Coram common stock. The Series B Holders would be in a position to generally control the affairs of Coram as well as the outcome of stockholder votes, including votes concerning the election of directors, the adoption of amendments to Coram's Certificate of Incorporation or By-Laws and the approval of significant corporate

33

# EXHBIT D

# CORAM HEALTHCARE CORP (CRH)

1675 BROADWAY
SUITE 900
DENVER, CO 80202
303. 292.4973

# EX−99.1

**PRESS RELEASE DATED 8/8/00**
**8−K Filed on 08/11/2000 − Period: 08/08/2000**
File Number 001−11343



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154&nbsp
www.gsionline.com

1

EXHIBIT 99.1

[CORAM HEALTHCARE LOGO]

FOR IMMEDIATE RELEASE                    FOR FURTHER INFORMATION, CONTACT:
AUGUST 8, 2000                           Kurt Davis, 303-672-8830

CORAM HEALTHCARE CORPORATION AND CORAM, INC. FILE VOLUNTARY

PETITIONS FOR CHAPTER 11 BANKRUPTCY PROTECTION

TO FACILITATE DEBT RESTRUCTURING

All Subsidiaries to Continue Normal Operations and Continue Fulfilling Payroll,
Vendor and Patient Care Obligations in the Normal Course of Business;
Noteholders in Agreement to Reduce and Convert Outstanding Debt
to Equity Ownership and to Provide DIP Financing

DENVER-AUGUST 8, 2000--As part of its previously announced effort to restructure
its capital obligations, Coram Healthcare Corporation and Coram, Inc. ("Coram
Healthcare") (Coram Healthcare, OTCBB: CRHE) today filed voluntary petitions
with the U.S. Bankruptcy Court for the District of Delaware under Chapter 11 of
the U.S. Bankruptcy Code. The Company elected to seek Court protection in order
to facilitate restructuring of its debt while continuing to maintain normal
business operations in all of the Company's subsidiaries and their branches. The
Company took this step with the full support of the three lenders holding the
Company's principal debt instruments.

     Coram Healthcare Corporation and Coram, Inc. are the parent holding
companies of the operating subsidiaries, including all branch offices,
collectively and commonly known as "Coram Healthcare." Because the operating
subsidiaries, including all branch offices, have not filed for bankruptcy
protection, the subsidiaries and their branches are expected to continue
generating positive cash flow and continue paying, in the normal course of
business, all wages, benefits and other employee obligations, as well as all
outstanding and ongoing accounts payable to their contractors and vendors.

     "Operationally our Company is sound and generating adequate cash flow
to meet all of its day-to-day obligations to patients, employees and suppliers,"
said Coram Healthcare chairman, president and chief executive officer Daniel D.
Crowley.

-more-

2

"The Company is not having difficulty paying its normal business expenses. All accounts payable are current and we are not seeking relief from those expenses. This action is solely for the purpose of reducing and restructuring debt and maintaining compliance with Stark II so that Coram's financial health can at long last compare favorably with the undisputed quality of its clinical services," Mr. Crowley said.

The Company's determination to restructure its debt was based upon its currently inadequate level of balance sheet equity and its impact on the Company's ability to remain in compliance with the physician ownership and referral provisions of the Omnibus Budget Reconciliation Act of 1993, commonly known as "Stark II." Despite positive cash flow and improving, positive results from operations, the Company's three-year average balance sheet equity is expected, in the first quarter of 2001, to fall below the level that Stark II requires to satisfy the exception for ownership by referring physicians or their family members of stock in publicly-traded companies. Under the terms of the Company's plan presented to the Court, it would comply with all provisions of Stark II now and in the future.

In addition, the Company would not likely be able to repay the $159 million of outstanding Series A notes that are scheduled to mature in May 2001 as well as prepay $92 million in Series B notes that, according to the covenants, debt holders have the right to require at the same time.

Under the Company's plan of reorganization, the three holders of the debt instruments have agreed to reduce substantially the Company's indebtedness. The Company's debt holders have proposed in the plan to forgive approximately $71 million of the remaining outstanding debt, which would lower the principal debt obligations to approximately $180 million. The debt holders have agreed to restructure the Company's indebtedness at a favorable rate of interest. The forgiven debt would be converted into equity ownership of the enterprise with the Company's three principal debt holders owning approximately 100 percent of the equity.

The Company, which has previously reported and continues to achieve positive cash flow from operations, has also obtained a line of credit on favorable terms through a commitment for up to $40 million in debtor-in-possession ("DIP") financing from the principal debt holders. The Company has requested the Court's permission to access the

-more-

3

DIP financing in the unlikely event that funds are needed to fulfill normal business obligations and other cash needs during the restructuring process.

If the plan is approved substantially as proposed, the Company is expected to be capable of producing positive net income. The Company's plan calls for emergence from bankruptcy as a privately held company before the end of the fourth quarter of 2000. The Company's proposed restructuring plan provides no recoveries for the holders of Company common stock currently outstanding.

"Over the years, Coram's patients, referral sources and suppliers have been very pleased with the quality of our services, but some have expressed concern about the company's indebtedness and related poor financial performance," said Mr. Crowley. "We respectfully hope that they will now support us as we take this important step that will address those concerns and create a stronger company to better serve them. We have taken every precaution to see that patient services and payments to our employees and suppliers will not be interrupted during this process."

Denver-based Coram Healthcare, through its subsidiaries, including all branch offices, is a national leader in providing quality home infusion therapies and support for clinical trials, medical product development and medical informatics.


Note: Except for historical information, all other statements in this press release are "forward-looking" within the meaning of the Private Securities Litigation Reform Act of 1995. The Company's actual results may vary materially from these forward-looking statements due to important risk factors including the Company's lack of profitability; uncertainties associated with the outcomes of certain pending legal proceedings; the Company's significant level of outstanding indebtedness; the Company's need to obtain additional financing or equity; uncertainties associated with the dilution that would occur if the Company's existing debt holders exercise their equity conversion rights; the Company's limited liquidity; and the Company's dependence upon the prices paid by third party payors for the Company's services; and certain other factors. Certain risk factors are described in greater detail in the Company's Form 10-K Annual Report and 10-Q Quarterly Report on file with the Securities and Exchange Commission.

# EXHBIT E

# CORAM HEALTHCARE CORP (CRH)

1675 BROADWAY
SUITE 900
DENVER, CO 80202
303. 292.4973

# 10-K

**FORM 10-K**
**Filed on 04/17/2001 − Period: 12/31/2000**
File Number 001−11343



**LIVEDGAR** Information Provided by Global Securities Information, Inc.
800.669.1154&nbsp
www.gsionline.com

In addition, Mr. Crowley serves as Chairman, Chief Executive Officer and Presidents of Dynamic Healthcare Solutions, LLC, a privately held management consulting and investment firm that he established in 1997. Prior to founding Dynamic Healthcare Solutions, LLC, Mr. Crowley served as the Chairman, Chief Executive Officer and President of Foundation Health Corporation, a post that he had served for more than five years.

Effective August 1, 1999, Mr. Crowley and an affiliate of Cerberus Partners, L.P. ("Cerberus"), a party to the company's debtor-in-possession financing agreement, Senior Credit Facility and Securities Exchange Agreement, executed a three-year employment agreement whereby Mr. Crowley is paid $960,000 per annum, plus the potential of performance related bonus opportunities, equity options and fringe benefits. Such agreement is subject to automatic one year extensions unless either party provides written notice within 60 days of the original expiration date or subsequent renewal dates. The agreement further provides that the Cerberus affiliate can unilaterally terminate the arrangement at any time by written notice; however, certain severance payments would be triggered by such termination. The services rendered by Mr. Crowley include, but are not limited to, business and strategic healthcare investment advice to executive management at Cerberus and its affiliates. Moreover, Mr. Crowley is the Chairman of the Board of Directors of Winterland Productions, Inc. ("Winterland"), a privately held affinity merchandise company, which is a Cerberus affiliate portfolio investment. On January 2, 2001, Winterland voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code in the Northern District of California.

A committee of persons claiming to own shares of the company's publicly-traded common stock (the "Equity Committee") filed a motion with the Bankruptcy Court seeking permission to bring a derivative lawsuit directly against Mr. Crowley, Cerberus and Stephen A. Feinberg, a former member of the Board of Directors. The Equity Committee's lawsuit alleges a collusive plan whereby the named parties conspired to devalue the company for the benefit of the company's creditors under the Securities Exchange Agreement. On February 26, 2001, the Bankruptcy Court ruled that the Equity Committee's motion would not be productive at that time and, accordingly, the motion to proceed with the lawsuit was denied without prejudice.

Mr. Amaral served as Chairman of the company's Board of Directors from September 1997 until November 30, 1999. Mr. Amaral has served as a director of the company since October 1995, Chief Executive Officer of the company from October 1995 through April 23, 1999 and October 22, 1999 through November 30, 1999, and as President from October 1995 through December 1997. Previously, he was President and Chief Operating Officer of OrNda Healthcorp ("OrNda") from April 1994 to August 1995, and served in various executive positions with Summit Health Ltd. ("Summit") from October 1989 to April 1994, including President and Chief Executive Officer between October 1991 and April 1994. Summit was merged into OrNda in April 1994. Mr. Amaral is also a member of the Board of Directors of CareMatrix Corporation.

Mr. Casey has served as a director of Coram since September 1997. Since 1983, Mr. Casey has served as a consultant in the healthcare industry, specializing in hospital management evaluation, hospital planning, managed care contracting and turnaround services. From 1986 to 1997, Mr. Casey also served as Contract Administrator for Emergency Department Physicians' Medical Group, Inc. and its affiliated medical groups, which provide physician services to non-governmental facilities. In addition, from 1988 to 1997, Mr. Casey served as Contract Administrator for NP Medical Group, Inc., which provides physician services to government facilities. Mr. Casey also serves as a director of TriCounties Bank.

Mr. L. Peter Smith has served as a director of Coram since July 1994. Between November 1993 and July 1994, Mr. Smith was a director of Medisys, Inc. (one of the companies that joined together in 1994 to form Coram). Mr. Smith served as the Managing Partner of AllCare Health Services, Inc., which was acquired by Medisys, Inc. in December 1992. Mr. Smith is also the Chief Executive Officer and a member of the Board of Directors of Ralin Medical, Inc., a company specializing in cardiac disease management. Mr. Smith also serves on the Board of Directors of Gateway, Inc. and AMSYS, Inc. Mr. Smith previously served on the Board of Directors of Sabratek Corporation from October 1992 through August 23, 1999. Sabratek Corporation filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code on December 17, 1999 and that proceeding is presently pending before the United States Bankruptcy Court in Delaware. In January 2000, the assets and certain liabilities of Sabratek Corporation's Device Business were acquired by Baxter Healthcare Corporation.

Ms. Smoley was elected to Coram's Board of Directors on February 10, 2000. Ms. Smoley is the Chairperson and Chief Executive Officer of The Sandra Smoley Company, a healthcare and local government consulting firm based in Sacramento, California. From October 1993 to January 1999, she served as Secretary of the California Health and Welfare Agency. Prior to that time, she was Secretary of the California State and Consumer Services Agency from January 1993 to October 1993.

Stephen A. Feinberg, a director of Coram since June 1998, resigned from the Board of Directors on July 24, 2000.

Richard A. Fink, a director of Coram since July 1994, resigned from the Board of Directors on February 10, 2000.

43

had a severance agreement which was to provide him with compensation equal to a minimum of two year's annual salary, a transaction bonus of $500,000 upon the closing of a sale of the CPS division and a retention payment of $72,500 in the event that Mr. Meffe remained employed through the consummation of any such sale. However, in conjunction with the sale of the CPS division to Curascript Pharmacy Services, Inc. and Curascript PBM Services, Inc., which are newly formed affiliates of GTCR Golder Rauner, L.L.C. and are led by certain members of the former CPS management team, including Mr. Meffe, all the aforementioned agreements were effectively rescinded and, as a result, no severance or bonus payments were made.

The Debtors' bankruptcy proceedings and the corresponding impact of the United States Bankruptcy Code could impose certain limitations on the amount of severance that the company would be permitted to pay under the aforementioned employment agreements and contracts.

For employment agreement purposes, a "change in control" is generally defined as (i) a merger or consolidation in which the company is not the surviving entity; (ii) the sale, transfer or other disposition of all or substantially all the assets of the company; (iii) any reverse merger in which the company is the surviving entity but in which securities possessing more than fifty percent of the total combined voting power of Coram's outstanding securities are transferred to a person or persons different from the persons holding those securities immediately prior to such merger. The term "change of control" has been defined in a way that would disqualify any change of control resulting from the conversion by Coram's current debtholders of their current convertible debt instruments into stock of Coram.

ITEM  12. SECURITY OWNERSHIP OF PRINCIPAL STOCKHOLDERS AND MANAGEMENT

The following table sets forth, as of March 30, 2001 (unless otherwise noted below), the number of shares of outstanding Coram common stock beneficially owned by (i) each person known to Coram to be the owner of more than 5% of the its outstanding common stock, (ii) each of the executive officers of the company as of December 31, 2000, (iii) each of the members of the Board of Directors of the company as of December 31, 2000, and (iv) all members of the Board of Directors and executive officers of Coram as a group. All information is taken from or based upon ownership filings made by such persons with the Securities and Exchange Commission (the "Commission") or upon information provided by such persons to Coram.

| Name and Address of Beneficial Owner (1) | Number of Shares of Common Stock (2) | Percentage of Shares of Common Stock Outstanding |
|---|---|---|
| Donald J. Amaral............................................. | 2,624,296 | 5.0% |
| William J. Casey............................................. | 81,900 | * |
| Daniel D. Crowley........................................... | 333,333 | * |
| Scott R. Danitz............................................. | 52,984 | * |
| Scott T. Larson............................................. | 124,931 | * |
| Allen J. Marabito........................................... | 166,666 | * |
| Vito Ponzio, Jr............................................. | 177,881 | * |
| L. Peter Smith............................................. | 117,581 | * |
| Sandra R. Smoley............................................ | 75,000 | * |
| All executive officers and directors, as a group (9 Persons).. | 3,754,572 | 7.1 |
| Reporting Persons (as defined herein), as a group (3) ....... | 6,993,409 | 14.1 |
| Cerberus Entities (4)....................................... | 21,190,076 | 29.9 |
| Foothill (5)............................................... | 8,633,779 | 14.8 |
| Goldman, Sachs (6).......................................... | 21,017,092 | 29.7 |

*     Less than 1%

(1)   Unless otherwise indicated, the address of each person named above is 1125 Seventeenth Street, Suite 2100, Denver, Colorado 80202.

(2)   The aggregate ownership numbers presented in the table above include shares of common stock acquirable upon exercise of common stock subject to options within 60 days for the following persons: Mr. Amaral 2,500,000; Mr. Casey 80,000; Mr. Crowley 333,333; Mr. Danitz 50,207; Mr. Larson 117,707; Mr. Marabito 166,666; Mr. Ponzio 170,857; Mr. L. Peter Smith 87,500 and Ms. Smoley 75,000. Mr. Larson resigned his position with the company on January 15, 2001. In connection therewith, his options to purchase shares of common stock were outstanding as of March 30, 2001 and are included in the table above, but such options expired on or about April 15, 2001. Except as indicated by footnote, Coram has been advised that the persons and entities named in the table above have sole voting and investment power with respect to all shares of common stock shown as beneficially owned by them.

51

# EXHBIT F

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

**R E C E I V E D**

JUL 12 2001

Schulte Roth & Zabel LLP

|  |  |
|---|---|
| In re | Chapter 11 |
| CORAM HEALTHCARE CORP. and CORAM, INC., | Case Nos. 00-3299 (MFW) through 00-3300 (MFW) |
| Debtors. | Jointly Administered |

## REPORT OF INDEPENDENT RESTRUCTURING ADVISOR
## GOLDIN ASSOCIATES, L.L.C.

GOLDIN ASSOCIATES, L.L.C.
400 Madison Avenue
New York, New York 10017
(212) 593-2255

OF COUNSEL:
KRAMER LEVIN NAFTALIS & FRANKEL LLP
919 Third Avenue
New York, NY  10022
(212) 715-9100

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | THE NATURE AND SCOPE OF THE EXAMINATION | 1 |
| | A.    Background | 1 |
| | B.    Scope of the Examination | 4 |
| | C.    Methodology of the Examination | 6 |
| II. | CONCLUSIONS AND RECOMMENDATIONS | 10 |
| III. | FACTUAL FINDINGS | 15 |
| | A.    Background | 15 |
| | B.    The Noteholders | 19 |
| | C.    The Aetna Contract | 22 |
| | D.    The Smith Era | 24 |
| | E.    Crowley's Arrival | 29 |
| |     1.    The Relationship Between Crowley and Cerberus | 29 |
| |     2.    Crowley's Role as Consultant | 34 |
| |     3.    Coram's Outside Directors | 37 |
| | F.    The Crowley Era | 39 |
| |     1.    Crowley's Compensation | 40 |
| |     2.    Coram's Financial Condition at Year-End 1999 | 42 |
| |     3.    Crowley's Performance as CEO | 46 |
| | G.    Events Leading Up to the Bankruptcy Filing | 51 |
| IV. | FINANCIAL ANALYSIS | 56 |
| | A.    Coram's Enterprise Value | 56 |
| |     1.    Comparable Public Company Market Analysis | 57 |
| |         a.    Selection of Comparable Companies | 59 |

|  |  |  |  | Page |
|---|---|---|---|---|
|  | b. | Calculation of Multiples |  | 59 |
|  | c. | Application of Multiples -- Coram Valuation |  | 62 |
| 2. |  | Comparable Company Transaction Analysis |  | 63 |
|  | a. | Selection of Comparable Transactions |  | 64 |
|  | b. | Calculation of Multiples |  | 65 |
|  | c. | Application of Multiples -- Coram Valuation |  | 65 |
| 3. |  | Discounted Cash Flow Analysis |  | 66 |
|  | a. | Industry Fundamentals and Coram's Circumstances |  | 67 |
|  | b. | Projections -- Initial Period |  | 70 |
|  | c. | Perpetual Period Projection |  | 73 |
|  | d. | Discount Rate -- Weighted Average Cost of Capital |  | 74 |
|  | e. | DCF Valuation |  | 75 |
| 4. |  | Adjustments to Enterprise Value Considered |  | 76 |
|  | a. | Excess Cash |  | 76 |
|  | b. | Internal Revenue Service Claim |  | 77 |
|  | c. | SabraTek Pump Replacement |  | 77 |
|  | d. | Net Operating Tax Loss Carryforward |  | 78 |
|  | e. | Clinical Trials, Inc. |  | 78 |
|  | f. | PricewaterhouseCoopers Litigation |  | 78 |
| 5. |  | Conclusions |  | 79 |
| B. |  | The Integrity and Accuracy of Coram's Financial Records |  | 80 |
| 1. |  | Reliability of Financial Statements |  | 82 |

|  |  |  |  | Page |
|---|---|---|---|---|
|  |  | a. | In General | 82 |
|  |  | b. | Interviews | 83 |
|  |  | c. | Analytical Procedures | 84 |
|  | 2. | Issues Raised Regarding Potentially Managed Results | | 84 |
|  |  | a. | The Chanin Valuation | 84 |
|  |  | b. | Gross Revenue, Contractual Allowances and Net Revenue | 85 |
|  |  | c. | Deferral of Revenue | 88 |
|  |  | d. | Deferral of Cost-Cutting Initiatives | 88 |
|  |  | e. | A Question of Managed 2000 EBITDA | 89 |
|  | 3. | Conclusions | | 91 |
| V. | LEGAL ANALYSIS | | | 93 |
| A. | The Equity Committee's Proposed Complaint | | | 93 |
|  | 1. | The Allegations | | 94 |
|  |  | a. | The "Conspiracy" Allegations | 94 |
|  |  | b. | The "Mismanagement" Allegations | 100 |
|  |  |  | i.   The Alleged Scheme to Oust Smith | 100 |
|  |  |  | ii.  The Alleged Failure to Explore Options Other Than Chapter 11 | 103 |
|  |  |  | (A)  Merger or Sale Opportunities | 104 |
|  |  |  | (B)  Capital-Raising Opportunities | 105 |
|  |  |  | iii. The Allegedly Improper CPS Sale | 107 |
|  |  |  | iv.  The Challenged July 2000 Payments to the Noteholders | 109 |

<u>Page</u>

v.    The Allegation That Coram Delayed Filing
as Long as Possible .............................................. 111

2.    The Asserted Causes of Action .................................. 112

a.    Crowley and Feinberg .................................. 113

b.    Cerberus ...................................................... 117

B.    The Equity Committee's Objections to Confirmation ......... 117

1.    The "Fair and Equitable" Requirement ......................... 118

2.    The "Good Faith" Requirement .................................. 118

3.    The Validity of Cerberus' Claim ................................ 120

APPENDICES 1 - 12

KL2 2108873 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | x | |
| In re | : | Chapter 11 |
| | : | |
| CORAM HEALTHCARE CORP. and | : | Case Nos. 00-3299 (MFW) |
| CORAM, INC., | : | through 00-3300 (MFW) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | x | |

## REPORT OF INDEPENDENT RESTRUCTURING ADVISOR, GOLDIN ASSOCIATES, L.L.C.

This report (the "Report") of the independent restructuring advisor, Goldin Associates, L.L.C. ("Goldin"), sets forth Goldin's findings of fact, financial analysis and legal conclusions, as well as its recommendations concerning potential amendments to the Debtors' plan of reorganization. The Report begins with a description of the circumstances that gave rise to Goldin's appointment, the objectives and scope of its investigation and the methodology it used (Section I). The Report then presents a summary of Goldin's conclusions and recommendations to Coram's independent directors (Section II), before turning to a detailed discussion of Goldin's findings of fact (Section III), valuation of the Debtors and assessment of the integrity and accuracy of the Debtors' financial records (Section IV) and analysis of the Equity Committee's proposed complaint and objections to confirmation of the Debtors' plan of reorganization (Section V).

## I. THE NATURE AND SCOPE OF THE EXAMINATION

A.    Background

On August 8, 2000 (the "Petition Date") Coram Healthcare Corp. ("Coram Healthcare") and its wholly-owned subsidiary Coram, Inc. (together, "Coram" or "the Debtors")

filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Pursuant to sections 1107 and 1108 of the Code, the Debtors are continuing to operate their businesses and manage their properties and assets as debtors-in-possession.

On August 22, 2000 the United States Trustee designated an Official Committee of Unsecured Creditors (the "Creditors' Committee"). On October 18, 2000 the United States Trustee designated an Official Committee of Equity Security Holders (the "Equity Committee") to represent the interests of the holders of Coram Healthcare's common stock.

The Debtors filed a joint plan of reorganization and a disclosure statement on the Petition Date and filed an amended joint plan of reorganization (the "Plan of Reorganization" or "Plan") and an accompanying disclosure statement (the "Disclosure Statement") on or about October 10, 2000. The Bankruptcy Court approved the Disclosure Statement in October 2000. All classes entitled to vote on the Plan voted to accept the Plan.

The Plan provided, among other things, for Coram Healthcare's stock to be extinguished and for its shareholders to receive no distributions. The Plan also provided for Coram's Noteholders, who were owed approximately $252.6 million of principal and accrued interest, to receive $180 million of secured notes and 100% of the equity of Reorganized Coram, consideration with an aggregate value estimated at approximately 83% of the amounts owed the Noteholders. Finally, the Plan provided for a $2 million cash payment to Coram Healthcare's general unsecured creditors (whose claims totaled approximately $7.66 million) and for the claims of Coram Inc.'s general unsecured creditors (which totaled less than $100,000) to pass through the bankruptcy unimpaired.

KL2 2108873 5

The Equity Committee took extensive discovery in anticipation of the confirmation hearing. In November 2000, toward the conclusion of that discovery, the Equity Committee filed objections to confirmation of the Plan. It objected to confirmation on four grounds: (i) that the Debtors were not insolvent; (ii) that the Plan was not proposed in good faith because Coram had failed to disclose that its Chief Executive Officer ("CEO") and Chairman, Daniel Crowley, had a lucrative employment contract with Cerberus Partners L.P. ("Cerberus") -- a Noteholder whose principal, Stephen Feinberg, had been a member of the Coram board of directors and Chairman of its Compensation Committee until July 2000; (iii) that "[t]he conduct of Cerberus and certain of Coram's directors and management was improper and inequitable and caused significant damage to the Company," giving rise either to a derivative claim on behalf of the estates or the need to recharacterize Cerberus' claim as equity; and (iv) that the Plan improperly released the shareholders' claims against Crowley and others. (Objections to Confirmation, at 2-3)

On December 21, 2000, at the conclusion of a six day confirmation hearing, the Court denied confirmation of the Plan. The Court found that, under all the various and competing valuations, Coram was, in fact, insolvent. (December 21, 2000 Tr. at 88) The Court concluded, however, that Crowley's relationship with Cerberus gave rise to "an actual conflict of interest," which "tainted the debtors' restructuring of its debt, the debtors' negotiations towards a plan, even the debtors' restructuring of its operations." (*Id.* at 87-89) As a result of the taint, the Court found it impossible to know whether "we would be in the same boat today or whether a different plan would have been proposed by the debtor" had the existence and terms of

Crowley's contract with Cerberus been disclosed timely. (*Id.* at 65)  Accordingly, the Court was unable to find, on the record before it, that the Plan had been proposed in good faith. (*Id.* at 87)

**B.**    **Scope of the Examination**

On February 1, 2001 the Debtors moved for entry of an order, pursuant to Bankruptcy Code § 105, appointing Goldin independent restructuring advisor to the Debtors. The motion proposed that Goldin examine, analyze and report on the following issues:

   a.    whether the Debtors' business plan and the projections that underlie their business plan are consistent with reasonable business judgment;

   b.    whether Goldin found any evidence that Chanin Capital Partners' valuation analysis was not independently prepared or free of any undue or improper influence by a member of the board or the Debtors' management;

   c.    whether the Plan was consistent with the best interests of the Debtors;

   d.    whether Goldin found any material facts that support a conclusion that the Plan was not proposed in good faith and in compliance with applicable law, or was not fundamentally fair to all parties in interest; and

   e.    whether the Plan or some modification thereto would best serve the interests of the Debtors.

The motion proposed that Goldin report on these issues both to the Court and to a special committee (the "Special Committee") of the independent members of Coram Healthcare's board of directors.  The motion stated that, in the Debtors' view, Goldin's services would "enable the Court to make a definitive determination as to whether it can properly confirm a plan similar to the [Plan] and/or provide guidance to the Court, the Debtors, and other parties in interest with respect to the negotiation and formulation of any viable alternative Plan as may be appropriate." (Motion to Appoint Goldin, at ¶¶ 17, 26-29)

Objections to the Debtors' motion to retain Goldin were filed by the Office of the U.S. Trustee and the Equity Committee.  In addition, on February 6, 2001 the Equity Committee moved for leave to file a complaint (the "Complaint") on behalf of Coram Healthcare, asserting breach of fiduciary duty and related claims against Crowley, Feinberg and Cerberus.

At a hearing on February 26, 2001 the Bankruptcy Court approved the Debtors' motion to appoint Goldin as their independent restructuring advisor, subject to certain modifications.[1]  To resolve the U.S. Trustee's objection that the motion impinged on her exclusive power to appoint examiners, the Debtors agreed that (i) Goldin would be retained by the Debtors pursuant to Code § 327(a); (ii) Goldin's report would not be filed with the Court, but would be given to the Special Committee and other parties in interest; and (iii) Goldin's function would not be to report to the Court as an examiner, but, rather, to advise the Special Committee respecting (A) the allegations and claims in the proposed Complaint (including whether the Debtors ought to pursue any of the proposed claims) and (B) potential amendments to the Plan. It was also agreed that Goldin would attempt to mediate a consensual resolution among the Debtors, the Equity Committee and other parties in interest.  (Tr. of Feb. 26, 2001 hearing, at 7-9, 14-18, 26)

---

[1]   The Court also denied the Equity Committee's motion for leave to file the Complaint, without prejudice to renewal of the motion at a later date.  It was also agreed at the February 26 hearing that the Debtors would give the Equity Committee "full due diligence access" to Coram's financial records and other pertinent documents.  (Tr. of Feb. 26, 2001 hearing, at 35-36)  Subsequently, the Court approved a supplemental retention application filed by the Equity Committee, pursuant to which its financial advisor, Deloitte & Touche LLP ("D&T"), was authorized to undertake a due diligence review.

On March 29, 2001 Goldin filed an application to approve the retention of Kramer

Levin Naftalis & Frankel LLP as counsel to the Debtors to assist Goldin in connection with its

investigation and report. By order dated May 14, 2001 the Court approved that retention.

C.    **Methodology of the Examination**

During March 2001 Goldin met with representatives of many of the key

participants in these bankruptcy cases, including the Debtors, the Equity Committee, the

Creditors' Committee and the Noteholders. At these meetings Goldin reviewed with each

constituency the process it intended to follow in conducting its examination. Goldin also

solicited the views of these parties on various factual and legal issues and invited them to provide

further input. Finally, Goldin circulated a draft Report to the various constituencies for their

comment and review. After reviewing and considering those comments and suggestions, Goldin

prepared this final Report.

Documents. Goldin and Kramer Levin reviewed the following documents, among

others: the discovery taken in connection with the confirmation hearing, including the

depositions taken by the Equity Committee and the exhibits marked at those depositions; the

transcript of the confirmation hearing and the hearing exhibits; the papers filed in support of and

in opposition to the Equity's Committee's motion for leave to file the Complaint; documents

filed with the Securities Exchange Commission or in the bankruptcy case; and publicly available

analysts' reports and news articles concerning Coram. In addition, Goldin reviewed extensively

the Debtors' financial records and other pertinent company reports and documents, as well as the

three financial advisors' valuation reports and numerous healthcare company and industry

reports.

<u>Interviews</u>.   Over seven weeks Goldin and its counsel interviewed the following

15 people with knowledge relevant to the investigation:

| <u>Person</u> | <u>Relationship to Coram</u> |
|---|---|
| Donald Amaral | CEO of Coram from October 1995 to April 1999 and October to November 1999; director of Coram from October 1995 to present |
| William Casey | Outside director of Coram since 1997 |
| Daniel Crowley | CEO, President and Chairman of the Board of Coram from November 1999 to present |
| Stephen Feinberg | Managing member of Cerberus Associates, L.L.C., the general partner of Cerberus Partners, LLP; outside director of Coram from June 1998 to July 2000 |
| Richard Fink | Outside director of Coram from 1994 to February 2000 |
| David Friedman | Partner at Kasowitz, Benson, Torres & Friedman LLP, bankruptcy counsel to Coram |
| Daniel M. Lynn | Deloitte & Touche Financial Advisory Services |
| Christina Morrison | Principal at Deutsche Banc Alex. Brown, financial advisors to Coram |
| Edward Mule | Former partner at Goldman, Sachs & Co. |
| Wendy Simpson | CFO of Coram from March 1998 through March 2000 |
| Peter Smith | Outside director of Coram since 1994 |
| Richard Smith | CEO of Coram from April 1999 to October 1999; CFO and then President of Coram prior to April 1999 |
| Sandra Smoley | Outside director of Coram since February 2000 |

| Person | Relationship to Coram |
|--------|----------------------|
| Edward Stearns | Senior Vice President of Foothill Capital Corporation |
| Eugene Tillman | Partner at Reed Smith Shaw & McClay, LLP, regulatory counsel to Coram |

These interviews took place in person or by telephone in New York, Denver, Baltimore and California.

Goldin opted for a relatively informal style of interviewing, which it believed would facilitate the free flow of information and help limit costs. The interviews were not transcribed and other parties in interest were not permitted to attend the interviews. All the interviewees were given the opportunity to appear with counsel; some chose to do so, while others did not. Goldin and/or Kramer Levin took notes at each interview and prepared interview summaries for use in drafting the Report.

In addition, Goldin personnel spent ten days at Coram's offices in Denver, Colorado on four separate occasions, meeting with members of the Debtors' current management. Goldin spoke with the following people, who provided information pertinent to Goldin's financial analysis:

| Coram | |
|-------|--|
| Scott R. Danitz | SVP and CFO |
| Kate Douglass | SVP Clinical Services |
| John Ellis | SVP Operations – Eastern Region |
| Frank Geiger | SVP Materials Management |
| Richard Iriye | SVP Operations – Western Region |
| Allen J. Marabito | EVP |
| Debbie Meyers | SVP Field Sales |
| Ron Mills | VP Management Information Systems |
| Vito Ponzio | SVP Human Resources |

| Gerald A. Reynolds | Controller |
| Michael A. Saracco | SVP Specialty Products |
| Steven Schmahl | VP Contracting and Pricing |
| David A. Schwab | General Counsel |
| Joseph Sivori | VP Finance |
| Rodney Wright | VP Reimbursements |

Ernst & Young
| Arlyn J. Dozeman | Partner |
| Shawn A. Simmons | |
| John R. Sato | |

Chanin Capital Partners
| Eric A. Scroggins | Managing Director |
| Robert J. Stobo | VP Healthcare Group |

UBS Warburg
| Robert D. Dishner | Associate Director Global High-Yield Research |
| Philip M. Pucciarelli | Global Healthcare |

Financial Analysis. Drawing on its extensive review of Coram's financial records and other documents, as well as the discovery and hearing record, the interviews it conducted and other due diligence, Goldin performed a detailed financial analysis to determine the value of Coram at three times: (i) the Petition Date; (ii) the time of the confirmation hearing on the Plan; and (iii) the date of this Report. In addition to performing its own independent valuation, Goldin reviewed, analyzed and critiqued the valuations performed by Chanin Capital Partners (on behalf of the Debtors), UBS Warburg (on behalf of the Creditors' Committee) and D&T (on behalf of the Equity Committee).

Mediation Efforts. In an effort to explore a possible consensual resolution of the outstanding dispute, Goldin had a number of meetings and discussions with representatives of the Equity Committee, the Noteholders and the Debtors. Goldin has considered alternative

settlement proposals and has discussed them with the parties. In addition, as noted, in an attempt to further the settlement dialogue, Goldin simultaneously furnished this Report, in draft form, to the parties in interest, including the Special Committee. The parties' comments on the draft Report have been considered and, when appropriate, the Report has been modified accordingly. The settlement dialogue is ongoing and, should the Court and/or parties in interest wish, Goldin will be available to continue its mediation efforts following dissemination of this Report in final form.

## II. CONCLUSIONS AND RECOMMENDATIONS

As the Bankruptcy Court found, Crowley's employment agreement with Cerberus created an "actual conflict of interest" on his part; the non-disclosure of that agreement "tainted the debtors' restructuring of its debt, the debtors' negotiations towards the plan, [and] even the debtors' restructuring of its operations." (Tr. of Dec. 21, 2000 hearing, at 88-89) Crowley's and Feinberg's failure to disclose the full extent of the Crowley/Cerberus relationship (and the potential for abuse it posed) to other directors and officers was a breach of their respective fiduciary duties. While the evidence as to Crowley's and Feinberg's intentions in this regard is not conclusive, Feinberg's nondisclosure appears to have been inadvertent. Crowley, by contrast, had an incentive to conceal the existence of his Cerberus contract (so as not to risk a reduction of his Coram compensation) and his failure to make appropriate disclosure may not have been inadvertent.

It does not appear, however, that either Crowley or Feinberg acted with culpable intent of the sort alleged in the Equity Committee's Complaint. The evidence does not establish that either man intended or expected that Crowley would seek to advance Cerberus' interests to

KL2:2108873.5

the detriment of Coram and its shareholders. There is no indication that Cerberus (or the other Noteholders) ever instructed Crowley to act contrary to the company's best interests or -- with one possible exception -- that Crowley ever did so of his own accord. The one possible exception is Crowley's decision to make a $6.3 million cash interest payment to the Noteholders on July 14, 2000, at a time when the company's cash was low and a bankruptcy filing was under active consideration. That decision is troublesome: whatever the niceties of the situation, companies preparing for a bankruptcy are invariably advised (well) to husband cash.

Other than the $6.3 million interest payment -- which, as it turned out, did not cause the company any harm -- there is no evidence suggesting that had he had no conflict Crowley would have managed Coram's operations or finances more effectively or that he would have identified (let alone consummated) any merger, sale or financing transaction that might have enabled Coram to avoid bankruptcy. The evidence indicates that Crowley worked diligently and effectively to stabilize Coram's operations and improve its financial performance, a goal shared by the Noteholders *and* the stockholders.

Moreover, at all relevant times the amount of Coram's debt materially exceeded the company's enterprise value. At no time during the relevant period was the integrity of Coram's accounting, financial reporting, recordkeeping or system of controls compromised or materially impaired.

In sum, the only damages Coram has suffered by virtue of Crowley's undisclosed conflict of interest are those related to the Debtors' inability to obtain confirmation of their Plan of Reorganization in December 2000 -- that is, the approximately $5 million to $6 million of

KL2 2108873.5

additional professional fees and expenses incurred by Coram, and the approximately $7 million to $9 million in business losses attributable to the prolonging of the bankruptcy. Under Delaware law the remedies available for Crowley's breach of fiduciary duty are limited to (i) recovery of these damages and (ii) disgorgement (or more precisely, reduction) of amounts owed Crowley under his employment agreement. Recovery, if any, on account of Feinberg's breach of fiduciary duty would be limited to the damages to Coram just noted.

A potentially protracted lawsuit against Crowley and Feinberg to recover the sums potentially awardable could entail more cost to Coram than the suit would be worth. In addition to the direct expense of prosecuting the suit, it would likely divert the attention of Coram's management from the urgent business tasks ahead. It also would provide no benefit to Coram's existing equity holders. From the standpoint of Coram, its creditors *and* its shareholders, a consensual and swift resolution of the claims -- if achievable on appropriate terms -- would be far preferable. Accordingly, Goldin recommends that the Special Committee attempt to resolve the litigation through, among other things, amendments to Coram's Plan of Reorganization.

A necessary first step toward a consensual resolution is to reduce substantially the $13.4 million owed Crowley under his employment agreement (which Crowley is not entitled to receive anyway unless and until the Bankruptcy Court approves Coram's assumption of that agreement). Goldin recommends that the Special Committee require a $7.5 million reduction in that amount. This would leave Crowley with a total of $5.9 million in bonus compensation, on top of his $650,000 annual salary.

Second, Goldin recommends that the Special Committee cause Coram to amend its Plan of Reorganization so as to offer a $13 million distribution to Coram Healthcare's general unsecured creditors and shareholders. Specifically, Goldin recommends that the Plan be amended as follows:

a. The cash distribution to Coram Healthcare's general unsecured creditors should be increased from $2 million to $3 million, contingent on a vote by that creditor class approving the amended Plan. This would increase this class' recovery from the 26% each creditor would have received under the Plan (which they voted unanimously to approve) to almost 40%.

b. In addition, a $10 million distribution should be offered to Coram Healthcare's shareholders, contingent on a shareholder class vote approving the amended Plan by the requisite majorities. The Plan should provide that, if the shareholder class rejects the Plan (and the proposed payment), shareholders will receive no distribution, with the Bankruptcy Court asked to approve the Plan pursuant to the "cramdown" provisions of Code § 1129(b). Goldin recommends that the distribution to shareholders take the form of an equity security, if that can be done consistent with the requirements of Stark II; should Stark II preclude a distribution in that form, the distribution should be in cash.[2]

The recommended $13 million distribution by Coram Healthcare to its shareholders and unsecured creditors is tantamount to a voluntary contribution, designed to

---

[2] Goldin has not attempted to probe whether a distribution of equity securities in any form can be accomplished in a way that meets Stark II requirements.

achieve a consensual reorganization, by those who would otherwise be the beneficiaries of this distribution, *i.e.*, the Noteholders. Its sole purpose is to conclude the bankruptcy and proposed litigation. Significantly in that regard, the proposed $13 million payment approximates the losses suffered by Coram as a result of the breach of fiduciary duty by Crowley and Feinberg.