# EXHBIT G

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CORAM HEALTHCARE CORP. and | : | Case No. 00-3299 (MFW) |
| CORAM, INC., | : | (Jointly Administered) |
| | : | |
| Debtors. | : | **Objection Deadline: February 21, 2003** |
| | : | **Hearing Date: February 28, 2003** |

---

## MOTION OF THE CHAPTER 11 TRUSTEE FOR AUTHORIZATION TO ENTER INTO TERMINATION AND EMPLOYMENT EXTENSION AGREEMENT WITH DANIEL D. CROWLEY

---

Arlin M. Adams, the Chapter 11 Trustee (the "Trustee") of the bankruptcy estates

of Coram Healthcare Corp. ("CHC") and Coram, Inc. ("Coram" and, together with CHC,

referred to as the "Debtors"), by and through his undersigned counsel, hereby moves this

Court for authorization, pursuant to Sections 105 and 363 of Title 11 of the United States

Code §§ 101, *et seq.* (the "Bankruptcy Code"), to enter into the Termination and

Employment Extension Agreement with Daniel D. Crowley ("Crowley"), effective

January 1, 2003.  In support thereof, the Trustee respectfully represents as follows:

### BACKGROUND

1.      On August 8, 2000 (the "Petition Date"), the Debtors filed voluntary

petitions for relief under Chapter 11 of the Bankruptcy Code.  Until March 7, 2002, the

Debtors operated their businesses and managed their properties and assets as debtors-in-

possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  The Debtors'

Chapter 11 cases have been consolidated for procedural purposes only. The Debtors' cases have not been consolidated with that of any other debtor.

2.      On August 22, 2000, the United States Trustee designated an Official Committee of Unsecured Creditors (the "Creditors' Committee") in the Debtors' bankruptcy cases. On October 18, 2000, the United States Trustee designated a Committee of Equity Interest Holders (the "Equity Committee") to represent the interests of CHC's common shareholders.

3.      On December 21, 2000 the Court denied confirmation of the Debtors' first proposed plan of reorganization. On December 21, 2001, the Court entered an order denying confirmation of the Debtors' proposed second plan of reorganization.

4.      At a hearing held on February 12, 2002, the Court granted two motions seeking the appointment of a trustee to assume control over the Debtors' property and affairs pursuant to Section 1104 of the Bankruptcy Code. The Trustee's appointment was approved by the Court on March 7, 2002 (the "Appointment Date").

5.      On December 19, 2002, the Equity Committee filed a proposed plan of reorganization. As the Trustee's counsel informed the Court during the December 27, 2002 omnibus hearing, the Trustee intends to file his own plan by the end of February, 2003.

**Crowley's Current Employment Arrangement**

6.      On or about November 30, 1999, CHC and Crowley entered into an Employment Agreement (the "Employment Agreement") pursuant to which CHC agreed to employ him as President and Chief Executive Officer of CHC and all of its wholly-

owned subsidiaries and Chairman of CHC's Board of Directors. A true and correct copy of the Employment Agreement, together with any and all amendments thereto, is attached hereto as Exhibit "A" and incorporated herein by reference in its entirety.

7.    Under the Employment Agreement, CHC agreed to compensate Crowley for his services with, *inter alia*, (i) a base salary of $650,000 per annum (the "Salary"), (ii) various performance based bonuses, (iii) stock options, (iv) health insurance benefits , (v) paid vacation time, (vi) life insurance benefits, (vii) a car allowance, (viii) corporate housing, and (ix) tax liability preparation and reimbursement benefits.

8.    While the Trustee has continued to pay Crowley his annual salary and certain benefits in the ordinary course of business, neither the Trustee nor the Debtors while debtors-in-possession have made any payments to Crowley on account of his claimed Management Incentive Plan ("MIP") bonuses and Key Employee Retention Plan ("KERP") bonuses. Crowley also maintains he is entitled to a success bonus of $1,800,000 payable upon consummation of debt refinancing and a plan of reorganization.

9.    On or about November 26, 2002, the Trustee moved the Court to enter an Order that would, among other things, authorize the Trustee to reject the Employment Agreement (Docket No. 1972). Since then, Crowley has terminated the Employment Agreement without prejudice to his claims for substantial bonus compensation, including for MIP and KERP bonuses. The Trustee and Crowley are currently engaged in negotiations in an attempt to resolve these and all other claims between them.

10.    After examining the Debtors' businesses, as discussed in further detail below, the Trustee has determined that Crowley has performed his duties under the Employment Agreement competently and that it would serve the Debtors' best interests

to continue Crowley's employment in the capacity of Chief Transition and Restructuring

Officer on an interim basis during the plan confirmation process.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (M).  The statutory

predicates for the relief sought herein are Sections 105 and 363 of the Bankruptcy Code

and Fed. R. Bankr. P. 4001, 6004 and 9014.

## REQUESTED RELIEF AND BASIS THEREFORE

12.    By this motion, the Trustee requests that the Court enter an order

authorizing the Trustee to enter into a Termination and Employment Extension

Agreement which he has negotiated with Crowley (the "Transition Agreement"), a true

and correct copy of which is attached hereto as Exhibit "B" and incorporated herein by

reference in its entirety.

**The Transition Agreement**

13.    The Transition Agreement provides, *inter alia*, the following:

- Commencing as of January 1, 2003, Crowley will serve as the Chief
  Transition and Restructuring Officer for a term not to exceed the
  earlier of (i) six (6) months from January 1, 2003, (ii) the date on
  which a Plan of Reorganization is confirmed by final order of the
  Court, or (iii) the substantial consummation of a plan of
  reorganization.

- The term may be extended one time for up to an additional sixty (60)
  days if a final order has not been entered on or before June 30, 2003,
  unless either party terminates the arrangement on thirty (30) days'
  prior written notice.

4

- Commencing January 1, 2003, the Debtors will pay Crowley a base monthly salary of $80,000.00 and continue to reimburse direct costs and expenses incurred by Crowley as heretofore.

- The Debtors will continue to provide Crowley with the benefits provided under the Employment Agreement as heretofore, including without limitation health, dental and disability insurance, life insurance, transportation allowance and corporate housing.

- The Debtors will continue to maintain D&O coverage covering Crowley to the same extent available to all of the Debtors' officers and directors.

- In consideration of Crowley's agreement to forego other opportunities during his term, and in partial recognition of his efforts over the past nine (9) months, the Debtors will pay Crowley a stay and performance payment of $800,000, plus $200,000 in partial reimbursement of his counsel fees.

**Crowley's Continued Employment**

14.    Section 363 of the Bankruptcy Code provides that a trustee must obtain the bankruptcy court's approval to use property of the estate other than in the ordinary course of business. 11 U.S.C. § 363(b). The proposed transaction may be viewed as being in the ordinary course of business because: (a) companies comparable to the Debtors regularly extend continued employment terms to existing employees and officers, and (b) creditors of the Debtors would reasonably expect a continued relationship between CHC and its chief executive officer. *See In re Roth American, Inc.*, 975 F.2d 949 (3d Cir. 1992). Nevertheless, having terminated Crowley as Chief Executive Officer and President and given the controversy surrounding his past employment by the Debtors' in this case, the Trustee seeks the Court's authorization to enter into the Transition Agreement.

15.    In order to obtain authorization for the use of property of the estate outside of the ordinary course of business, a trustee must articulate some business justification for

5

such action. *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169 (D. Del. 1991). This "is similar to many states' 'business judgment rule,' where great deference is given to a business in determining its own best interests." *In re W.A. Mallory Company*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997). *See also Montgomery Ward*, 242 B.R. at 155 (affirming approval of a 363(b) motion where the bankruptcy court based its findings on the debtors' business judgment).

16.    This Court denied confirmation of both of the proposed plans of reorganization offered by the Debtors because it found that an actual conflict of interest arose as a result of Crowley's employment contract with Cerberus Partners, L.P. ("Cerberus"), who is a noteholder and preferred shareholder. The Court's findings regarding Crowley's relationship with Cerberus, as well as his failure to timely make complete disclosure of the relationship to the CHC Board of Directors, raised a substantial question for the Trustee as to whether Crowley should be retained.

17.    Because Crowley and Cerberus have informed the Trustee that all contractual relations between them have been severed and that Crowley has not received any compensation from Cerberus in 2002, the Trustee is satisfied that there is no continuing conflict of interest.

18.    Moreover, the Trustee's own thorough evaluation of Crowley's performance, has led him to conclude that the company is better off with Crowley than without him, at least on an interim basis to provide stability until a plan is confirmed.

**Crowley's Performance**

19.    Since the Appointment Date, the Trustee has independently examined the actions undertaken by Crowley as the Debtors' chief executive officer.  The Trustee has visited the corporate offices in Denver and has had several meetings and discussions with Crowley, CHC's senior executives and other employees of CHC.  In addition, the Trustee has considered numerous reports regarding the financial performance of the Debtors and has reviewed the Debtors' performance under Crowley with the investment bankers retained by the Trustee.

20.    The Trustee's evaluation is that Crowley has operated the company profitably and efficiently. Under Crowley, notwithstanding being in these bankruptcy proceedings, the Debtors have experienced positive operating margins and EBITDA[1], reduced cost of services, reduced operating costs, improved inventory management, improved information systems, improved management tools, and maintained a stable cash position with no net borrowing to fund post-petition operations.

21.    EBITDA has substantially increased during the period of Crowley's stewardship of the company. From 1995 through 1999, a time prior to Crowley's employment, the Debtors' EBITDA was a negative $37 million.  From January 2000

---

[1] EBITDA as discussed herein is defined as earnings before interest expense, income taxes, depreciation, amortization, net reorganization expenses, losses on impairment of long-lived assets, gains on sales of businesses, provision for (income from) litigation settlements, extraordinary gains on troubled debt restructurings, and for the periods after 1999, discontinued operations.  The financial information of the Debtors contained herein was derived from and should be read in conjunction with CHC's consolidated financial statements and the notes thereto included in its Annual Reports on Form 10-K for the years ended December 31, 1997, 1998, 1999, 2000 and 2001 and its unaudited condensed consolidated financial statements and the notes thereto included in its Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2002.

through September 2002, the Debtors experienced $83 million in positive EBITDA, a
$120 million improvement under Crowley's management. For the first nine months of
2002 (including the six months after the Trustee was appointed), EBITDA was a positive
$21 million; by contrast, EBITDA was negative $54 million for the year ended December
31, 1999.

22.     Revenue and gross profit are also increasing. For the nine-month period
ended September 30, 2002, the Debtors' revenue rose $31 million, or 11 percent,
from the same period the year before, resulting in an increased gross profit of $9 million.
Indeed, revenue was higher during each month of 2002 than during the same month in
2001.

23.     Under Crowley, CHC has improved its financial performance by
identifying and focusing the business on its most profitable core therapies. When
Crowley was named CEO, non-core therapies accounted for approximately 38 percent of
infusion therapy revenues for the quarter ended December 31, 1999; by the third quarter
of 2002, non-core therapies represented only approximately 27 percent of infusion
therapy revenues. In addition, daily average revenue per patient for core therapies rose
3% to $151 per day during the nine months ended September 30, 2002 when compared
with the same period from the prior year.

24.     The most profitable type of business for CHC is the treatment of patients
with chronic disorders. With Crowley at the helm under the Trustee's stewardship, CHC
refined its marketing strategy to target chronic patients. As a result of these efforts,
revenues from the treatment of hemophilia patients grew by 55 percent ($15 million)
during the nine months ended September 30, 2002 when compared with the same period

8

from the prior year. The treatment of hemophilia patients now represents 13 percent of total revenue, up from 9 percent during the nine months ended September 30, 2001. Similarly, revenues from nutrition patients were increased 6 percent during the same time frame.

25.    Furthermore, during Crowley's tenure, CHC has also cut costs by, *inter alia*, leveraging volume to purchase drugs and supplies more effectively. Cost of services for infusion, exclusive of depreciation and amortization expense, as a percentage of net revenue has been reduced from 76 percent for the year ended December 31, 1999 to 71 percent for the nine months ended September 30, 2002.

26.    Under Crowley, the Debtors have neither required post-petition borrowings to fund operations nor utilized their debtor-in-possession facility.

27.    Finally, the evaluation conducted by the Trustee's advisors has revealed improved employee productivity, increased employee morale and reduced employee turnover since Crowley became CEO of the Debtors. Company statistics show that the branch employee turnover rate was reduced by approximately six percent in 2002 when compared to 2001. It is apparent to the Trustee that many of CHC's employees are loyal to Crowley and that they remain confident of his ability to transition the Debtors' through an effective reorganization.

28.    The Trustee believes that it is important to maintain the Debtors' operational status quo during the plan confirmation process. The Equity Committee recently filed a plan and the Trustee intends to file his own plan of reorganization shortly. Replacing Crowley now would endanger the Debtors' ability to reorganize. Specifically, the Trustee believes that Crowley's departure would likely encourage "cherry-picking" of

key employees by competitors, could cause substantial departures of executives and other key employees, and shift the company's focus from its business plan to mere survival.

29.    Accordingly, the Trustee submits that sound business purposes support the Trustee's request for the entry of an order authorizing him to enter into the Transition Agreement.

## NOTICE

30.    The Trustee shall serve a copy of this Motion upon (i) the United States Trustee, (ii) the Official Committee of Unsecured Creditors, (iii) the Official Committee of Equity Holders, (iv) the Post-Petition Lenders and the Noteholders, (v) Crowley and his identified counsel, and (vi) all parties requesting notice pursuant to Rule 2002 of the Bankruptcy Rules.  Notice of this Motion has also been given by filing a Form 8-K with the Securities and Exchange Commission as of the date hereof.  The Trustee respectfully submits that no other or further notice need be given.

## NO PRIOR REQUEST

31.    No previous application for the relief requested herein has been made to this or any other court by the Trustee.

## [THIS SPACE INTENTIONALLY BLANK]

WHEREFORE, the Trustee respectfully requests that this Court enter an Order:

(i) authorizing the Trustee to Enter into the Transition Agreement, and (ii) granting such

other and further relief that this Court deems just and proper under the circumstances.


Dated:   January 24, 2003                              WEIR & PARTNERS LLP


                                             By:_____/s/ Kenneth E. Aaron_____
                                                    Kenneth E. Aaron (#4043)
                                                    Salene R. Mazur
                                                    824 Market Street Mall, Suite 1001
                                                    P.O. Box 708
                                                    Wilmington, Delaware 19899
                                                    (302) 652-8181 (telephone)
                                                    (302) 652-8909 (facsimile)

                                                    -and-

                                                    SCHNADER HARRISON SEGAL
                                                    & LEWIS LLP
                                                    Barry E. Bressler
                                                    Michael J. Barrie
                                                    1600 Market Street, Suite 3600
                                                    Philadelphia, Pennsylvania 19103-7286
                                                    (215) 751-2000 (telephone)
                                                    (215) 751-2205 (facsimile)

                                                    Co-Counsel to Arlin M. Adams,
                                                         Chapter 11 Trustee

11

# EXHBIT H

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

In Re                              )
                                   )
Coram Healthcare Corp.             )
                                   )
and Coram, Inc.,                   )
                                   )        Chapter 11 Case Nos.
        Debtors,                   )        00-3299 (MFW) through
                                   )        00-3300 (MFW)
                                   )
_____   )

**CERTIFIED COPY**

Deposition of

**SANDRA R. SMOLEY**

Saturday, September 29, 2001

Reported by:
CARRIE STOTTLEMEYER, RPR, CM, CRR
CSR No. 4373
Job No. 79663



1801 I Street • First Floor • Sacramento, CA 95814
916.448.0505 • Fax 916.448.8726 • 800.610.0505

1   Q   And that's because you met Golden?

2   A   I met him.

3   Q   Did you try to arrange a meeting with Deloitte

4   so you could determine whether they, too, were

5   independent?

6   A   Yes, sir.  We tried to have a meeting with you,

7   and I thought at that time the Deloitte report would be

8   discussed, but then you chose not to have the meeting

9   with the independent board members, and I thought that

10   would come out during that meeting.

11   Q   You thought what would come out?

12   A   The Deloitte report.

13   Q   And since we didn't have the meeting, you

14   didn't read the report; is that correct?

15   A   Well, I skimmed through it.  I didn't study it

16   in depth as you suggested I should have.

17   Q   What do you recall from reading it?

18   A   That there was this differential, that, you

19   know, they were saying that there was worth in the

20   company, and I remember thinking at the time, "Gosh, if

21   it's worth that, why isn't somebody buying it?  And

22   there are no takers for the company."

23   Q   Did you consider the possibility that nobody's

24   buying it because Mr. Feinberg, who is paying 80,000 a

25   month to your CEO, doesn't want anybody to buy it?

                                                          64

2          THE WITNESS:  No, I didn't consider that.

3     BY MR. LEVY:

4          Q   Did you consider the fact that that's why

5     Mr. Feinberg is paying a million dollars a year to your

6     chief executive officer?

7          MR. HARWOOD:  Objection.

8     BY MR. LEVY:

9          Q   Question is did you consider it?

10         A   No, no.

11         Q   Okay.  Thank you.  Do you know whether Crowley

12    is still getting that 80,000 dollars a month?

13         A   I do not.

14         Q   You never asked?

15         A   No.  It's outside of Coram.  My judgment as a

16    board member is how he's doing with our company, not

17    what he's doing outside of our company in my mind.

18    That's just my value system.

19         Q   Peter Smith Exhibit 10 is the Corporate

20    Compliance Handbook.

21         A   Coram Compliance Handbook.  Okay.

22         Q   You've seen this?

23         A   I have.

24         Q   Do you believe your duties as a director

25    included oversight to make sure that this policy was

                                                          65

2    A    Yes, I do.

3    Q    I'm sorry?

4    A    Yes, I do.

5    Q    And do you feel you discharged those duties?

6    A    Yes, I do.

7    Q    Would you look at page seven, which is headed

8    "Conflicts of Interest"?

9    A    Okay.

10    Q    Now first before -- you can look at it, but my

11    question is -- you may have answered this, forgive me if

12    you did.  Without going to the question of whether there

13    was an actual conflict of interest, do you believe that

14    the payment of 80,000 dollars a month by Feinberg, a

15    note holder, to Crowley, the CEO, was an apparent

16    conflict of interest?

17    A    No, I don't agree with that.

18    Q    Do you believe it gave the appearance of a

19    conflict of interest?

20    A    It may have to some people.  It did not to me.

21    Q    Will you look at the fourth bullet point which

22    says "Now we would include Crowley" there, correct?

23    A    Yes.

24    Q    "Shall not become involved directly or

25    indirectly in outside commercial interests that could

66

1   properly influence our actions -- Do you feel that Dan

2   Crowley's involvement with Cerberus and the payment of

3   80,000 dollars a month could improperly influence his

4   action?

5        A    No, I do not, because if you refer to bullet

6   point one, "We shall avoid engaging in any activity,

7   practice or act which conflicts with the interests of

8   Coram or its patients," and that -- and what Dan was

9   doing, in my mind, does not conflict with the interests

10  of Coram or its patients.

11       Q    So you think bullet point one trumps number

12  four?

13            MR. CUNNINGHAM:   Objection.

14            MR. HARWOOD:   Objection.

15  BY MR. LEVY:

16       Q    Yes?

17            MR. CUNNINGHAM:   Objection.

18            THE WITNESS:   But answer?

19            MR. CUNNINGHAM:   You answer.

20            THE WITNESS:   I think bullet point one

21  supersedes.

22  BY MR. LEVY:

23       Q    Okay.  Now look at number five.

24       A    Bullet point --

25       Q    Bull point five.

                                                    67

```
                                     :ss
 2   COUNTY OF SACRAMENTO    )

 3

 4        I, the undersigned, a Certified Shorthand Reporter

 5   of the State of California, do hereby certify:

 6        That the foregoing proceedings were taken before me

 7   at the time and place herein set forth; that any

 8   witnesses in the foregoing proceedings, prior to

 9   testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14        I further certify that I am neither financially

15   interested in the action nor a relative or employee of

16   any attorney of the parties.

17        IN WITNESS WHEREOF, I have this date subscribed my

18   name.

19

20   Dated: Oct. 2, 2001

21

22

         CARRIE STOTTLEMEYER, RMR, CRR
23       CSR No. 4373

24

25
                                                    100
```

# EXHBIT I

1                   UNITED STATES BANKRUPTCY COURT

2                        DISTRICT OF DELAWARE

3

4    In Re                         )
                                   )
5    CORAM HEALTHCARE CORPORATION  )   Chapter 11 Case Nos.
     and CORAM, INC.,              )   00-3299 (MFW) through
6                                  )   00-3300 (MFW)
               Debtors.            )
7    _____)

8

9

10

11

12

13

14                   Deposition of DON AMARAL, taken on behalf

15        of Equity Committee at 601 California Road,

16        Palo Alto, California, beginning at 9:01 a.m.

17        and ending at 12:48 p.m., on Friday, October 26,

18        2001, before RACHEL FERRIER, Certified Shorthand

19        Reporter No. 6948.

20

21

22

23

24

25



1    substantially under water.

2        A    Yes.

3        Q    Now, having read the portion of the opinion I

4    put in front of you, is that still your testimony?

5        A    Yes.

6        Q    Will you find for me where she said it was

7    substantially under water?

8        A    I think under any of the numbers the company is

9    insolvent today.

10       Q    And you interpret that to mean substantially

11   under water?

12       A    Yes, sir.

13   MR. HARWOOD:  And for the record, the witness was

14   pointing to page 88, lines 10 and 11.

15   BY MR. LEVY:

16       Q    Are you aware that a -- did anyone tell you at

17   a subsequent court hearing Judge Walrath said when she

18   denied confirmation she didn't -- she did not deny it on

19   the basis of insolvency, but rather on the basis of lack

20   of good faith?

21       A    I don't recall.

22       Q    Are you aware that Mr. Crowley continues to

23   receive $80,000 a month from Cerberus?

24       A    I don't know.

25       Q    Never asked?


ESQUIRE™
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
*Chicago:* 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    A    Not recently.

2    Q    Ever -- ever since -- I'm sorry.

3         Ever since December 21st?

4    A    It was disclosed to us that he was receiving

5    that compensation in -- sometime after December 21st,

6    2000.

7    Q    But since then you have never asked him whether

8    he continues to receive it, and you don't know whether

9    he's receiving it today?

10   A    I don't know if he's receiving that today.

11   Q    Is that something you would want to know as a

12   director?

13   A    No.

14   Q    Why?

15   A    Because I'm very pleased with the job

16   Mr. Crowley is doing as CEO.  And when I hired him, I

17   knew he was doing some consulting for Cerberus or one of

18   those -- one of the subsidiaries.

19   Q    Did it ever occur to you that though he is

20   doing a good job, he might have done even better -- he

21   might have done an even better job had there not been

22   this relationship?

23   A    It occurred to me that he could not have done a

24   better job than what he has done, whether he was getting

25   $80,000 or a million dollars a month.

19

1    Q    Take a look at the bottom of page 88 of Judge

2  Walrath's opinion, beginning at line 22.  Let's begin at

3  line 18.

4         The judge says:

5         "I think on that point I think it is a shame

6         that Mr. Crowley and perhaps Cerberus and the

7         debtor itself is tainted in this manner because

8         I think there is evidence that Mr. Crowley did

9         do a good job operationally in helping the

10        debtor turn around.  But I can't conclude that

11        the debtor might not have done even better had

12        there not been this relationship."

13        Now, let me ask you this about the portion I

14  have just read.

15        Do you believe that Mr. Crowley, and perhaps

16  Cerberus, and the debtor was tainted by the relationship

17  between Crowley and Cerberus?

18    MR. CUNNINGHAM:  Objecting to the form of the

19  question inasmuch as it does not seem to relate to your

20  preamble.

21    MR. LEVY:  I'm sorry, Leo, I don't understand.  And

22  I mean, I just don't --

23    MR. CUNNINGHAM:  You read a portion, but the

24  question you asked wasn't about the portion you read.

25  Seems like they are disconnected.

1      A    Because, as I stated earlier, I know how

2    Feinberg treated me as the CEO, very professionally.  I

3    was aware of the relationship between Crowley and

4    Cerberus or the subsidiary when I hired them and

5    negotiated his deal, so I didn't feel the need to talk

6    to Mr. Feinberg.

7      Q    Let me see if I get this straight.

8         Because he treated you professionally and

9    because you were aware of the relationship, you didn't

10    think -- you didn't feel the need to call him up and say

11    something like, well, how about this conflict, is there

12    a conflict?

13    MR. HARWOOD:  Object to the form.

14    THE WITNESS:  That is not my -- something that I

15    would do as a director.  Since I knew that Goldin was

16    going to be meeting with Feinberg, every manager in the

17    company, I didn't want to conduct a separate interview.

18    We had counsel.  We had everyone else.

19    BY MR. LEVY:

20      Q    Was that your general view as to -- was it your

21    general view as a director that since you had Goldin,

22    you had counsel, and you had everyone else, you didn't

23    need to conduct any interviews of your own?

24    MR. HARWOOD:  Object to the form.

25    MR. CUNNINGHAM:  Object to the form of the question.

1      THE WITNESS:  My answer to that question is I'm not

2   a skilled professional and trained to conduct those type

3   of interviews and whatever may be -- that's why we

4   engage professionals to do that type of work.

5   BY MR. LEVY:

6      Q    So is it correct that other than listen to the

7   financial reports of Scott Danitz and the HR people and

8   your auditors and the reports that were sent to you by

9   Mr. Crowley about the operation of the company and the

10  discussions you had with Mr. Crowley at board meetings

11  about the operation of the company, that apart from that

12  you essentially relied on Goldin and your auditors and

13  your lawyers to determine the fairness of the new plan?

14     MR. HARWOOD:  Object to the form.

15     THE WITNESS:  Well, that was a long question.

16  BY MR. LEVY:

17     Q    It was.

18     A    But there was some things I want to clarify as

19  I make my answer.

20          Part of it -- one is the information flow was

21  not verbal.  Dan Crowley, as our CEO, and the whole

22  management team sends us a very complete board book

23  normally two to three days before any board meeting,

24  okay, so we can go through the reports, review them,

25  question them and do the -- it isn't some verbal report,

1    as you referred to, by Scott Danitz.

2         It's a very complete package that we receive

3    that has, as I stated earlier, finance, marketing, legal

4    status, cash flows, receivables, everything that a

5    person needs to be, as I view, the shareholder and

6    debtholders oversight on the company.

7    Q    Okay.  Let me do it differently.

8         I'm trying to get to, Mr. Amaral, what the

9    special committee relied on in making its determination

10   to propose the second plan, the current plan, okay?  And

11   let me see if I've got this correctly.

12        You relied on the board books and other written

13   material provided to you by company management.  You

14   relied on the questioning that you did of company

15   management.  You relied on the complete packages that

16   you received from company management containing finance,

17   marketing, legal status, cash flows, receivables.

18        You relied on Goldin.  And you relied on your

19   lawyers.  And that's all you relied on.

20       MR. HARWOOD:  Object to the form, your effort to --

21   Mr. Levy, your effort to summarize --

22       MR. LEVY:  We are going to take a break right now.

23       MR. HARWOOD:  I'm going to continue.

24        Your effort to summarize the record is

25   inappropriate.  The witness' testimony will stand.

1      MR. LEVY:  We are going to take a break.

2            (Recess taken.)

3   BY MR. LEVY:

4      Q    Mr. Amaral, are you planning to testify at the

5   confirmation hearing?

6      A    No.

7      MR. LEVY:  Mr. Harwood, and this would affect the

8   length of the deposition, are you in a position to

9   confirm to me that the debtor will not call Mr. Amaral

10  as a witness?

11     MR. HARWOOD:  My understanding is that Mr. Amaral is

12  unable to fly to Delaware for it, so it's highly

13  unlikely that we will be calling him as a witness.

14     MR. LEVY:  Let's go off the record for a minute.

15           (Recess taken.)

16     MR. LEVY:  I'm going to say that, if this is okay

17  with you, for me to repeat on the record, I understand

18  that it is highly unlikely that Mr. Amaral will be at

19  the hearing; Mr. Amaral has said he won't be.

20           Based on that I have some more questions.  And

21  that if it changes, and I understand I'm not going to

22  object to his appearing if that's a decision that he

23  makes and you make, that I will have some opportunity to

24  finish my questioning before then.

25           And Michael, you have said you want to check it

```
1

2

3

4              I, the undersigned, a Certified Shorthand

5    Reporter of the State of California, do hereby

6    certify:

7              That the foregoing proceedings were taken

8    before me at the time and place herein set forth; that

9    any witnesses in the foregoing proceedings, prior to

10   testifying, were placed under oath; that a verbatim

11   record of the proceedings was made by me using machine

12   shorthand which was thereafter transcribed under my

13   direction; further, that the foregoing is an accurate

14   transcription thereof.

15             I further certify that I am neither

16   financially interested in the action nor a relative or

17   employee of any attorney of any of the parties.

18             IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21   Dated:  October 29, 2001

22

23

24                        RACHEL FERRIER
25                        CSR No. 6948
```

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Peter J. Walsh, Jr., hereby certify that on March 4, 2005, I electronically filed the foregoing DECLARATION OF PETER J. WALSH, JR. IN SUPPORT OF THE OUTSIDE DIRECTOR DEFENDANTS' MOTION TO DISMISS with the Clerk of the Court using CM/ECF which will send notification of such filing to the following counsel of record:

Rolin P. Bissell, Esquire (DSB ID No. 4478)
YOUNG CONAWAY STARGATT & TAYLOR
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
Tel:  (302) 571-6560
E-mail:  rbissell@ycst.com

Jeffrey C. Wisler, Esquire (DSB ID No. 2795)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
Wilmington, Delaware  19801
Tel:  (302) 888-6258
E-mail:  jwisler@cblh.com

Peter J. Walsh, Jr. (DSB ID No. 2437)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Post Office Box 951
Wilmington, Delaware  19899-0951
Tel:  (302) 984-6000
E-mail:  pwalsh@potteranderson.com

672639v1/28762