**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ARLIN M. ADAMS, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of CORAM HEALTHCARE CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 04-1565 |
| DANIEL D. CROWLEY; DONALD J. AMARAL; WILLIAM J. CASEY; L. PETER SMITH; and SANDRA L. SMOLEY, | ) ) ) ) ) | |
| Defendants. | ) ) | |

---

**COMPENDIUM OF UNREPORTED CASES IN SUPPORT**
**OF OPENING BRIEF IN SUPPORT OF THE OUTSIDE**
**DIRECTORS' MOTION TO DISMISS**

---

OF COUNSEL:
Boris Feldman, Esquire
Peri B. Nielsen, Esquire
Shelby K. Pasarell, Esquire
WILSON SONSINI
  GOODRICH & ROSATI, PC
650 Page Mill Road
Palo Alto, CA 94304-1050
Tel: (650) 493-9300

Dated: March 4, 2005

Peter J. Walsh, Jr. (DSB ID No. 2437)
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Floor
Post Office Box 951
Wilmington, Delaware 19899-0951
Tel: (302) 984-6000
E-mail: pwalsh@potteranderson.com
*Attorneys for Defendants*
*Donald J. Amaral, William J. Casey,*
*L. Peter Smith, and Sandra L. Smoley*

672548v1/28762

## TABLE OF CONTENTS

                                                                    <u>Tab</u>

*Banjo Buddies, Inc. v. Renosky*, Nos. 03-2038, 03-2107,
     2005 WL 406242 (3d Cir. Feb. 22, 2005)                           1

*Continuing Creditors' Comm. of Star Telecommunications, Inc. v. Edgecomb*,
     No. 03-278-KAJ, 2004 U.S. Dist. LEXIS 25807 (D. Del. Dec. 21, 2004)   2

*DiLorenzo v. Edgar*, No. 03-841-SLR, 2004 U.S. Dist. LEXIS 4991
     (D. Del. Mar. 24, 2004)                                          3

*Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys., Inc.*,
     No. 98-80-SLR, 2004 WL 2980734 (D. Del Dec. 17, 2004)            4

*Offical Comm. of Unsecured Creditors of Integrated Health Servs. v. Elkins*,
     No. 20228-NC, 2004 Del. Ch. LEXIS 122 (Del. Ch. Aug. 24, 2004)   5

*Stanziale v. Nachtomi*, No. 01-403-KAJ, 2004 U.S. Dist. LEXIS 7375
     (D. Del. Apr. 20, 2004)                                          6

2612651_1.DOC

# TAB 1

2005 WL 406242

--- F.3d ---

**Page 36**

(Cite as: 2005 WL 406242 (3rd Cir.(Pa.)))

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States Court of Appeals,
Third Circuit.
BANJO BUDDIES, INC.
v.
Joseph F. RENOSKY, Appellant.
No. 03-2038, 03-2107.

Argued March 23, 2004.
Feb. 22, 2005.

Background: Trademark holder brought action against member of its board of directors for trademark infringement and breach of fiduciary duty in connection with director's sale of competing fishing lure kits. The United States District Court for the Western District of Pennsylvania, Donetta W. Ambrose, J., awarded holder profits based on defendant's violation of Lanham Act's false designation of origin provision, but declined to award damages on the breach of fiduciary duty claim. Both parties appealed.

Holdings: The Court of Appeals, Roth, Circuit Judge, held that:

(1) wilfulness of defendant's conduct was an important equitable factor to consider when awarding accounting of defendant's profits, but was not a prerequisite to such an award;

(2) District Court did not abuse its discretion by ordering an accounting of defendant's profits;

(3) defendant failed to satisfy his burden of proof regarding costs and deductions associated with his infringing fishing lure kits; and

(4) undated price quote from defendant to a third party was not sufficiently reliable to support award of damages on breach of fiduciary duty claim.

Affirmed in part and reversed in part.

[1] Trade Regulation ☞673

382k673

Wilfulness of trademark infringer's conduct was an important equitable factor to consider when awarding accounting of infringer's profits for violation of Lanham Act's false designation of origin provision, but was not a prerequisite to such an award. Lanham Trade-Mark Act, §§ 35(a), 43(a), 15 U.S.C.A. §§ 1117(a), 1125(a).

[2] Trade Regulation ☞673

382k673

Factors used in evaluating whether equity supports disgorging trademark infringer's profits include, but are not limited to (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off. Lanham Trade-Mark Act, § 35(a), 15 U.S.C.A. § 1117(a).

[3] Trade Regulation ☞673

382k673

District Court did not abuse its discretion by ordering an accounting of trademark infringer's profits; it was likely that infringer's conduct in selling competing, nearly identical fishing lure kits diverted sales from trademark holder, there were no other adequate remedies, given holder's speculative estimation of its damages, and holder did not delay in bringing suit to stop the infringing actions. Lanham Trade-Mark Act, § 35(a), 15 U.S.C.A. § 1117(a).

[4] Trade Regulation ☞598

382k598

Financial report prepared by trademark infringer's accountant satisfied trademark holder's burden of proving infringer's sales, as required to support award of infringer's profits. Lanham Trade-Mark Act, § 35(a), 15 U.S.C.A. § 1117(a).

[5] Trade Regulation ☞598

382k598

Trademark infringer failed to satisfy his burden of proof regarding costs and deductions associated with his infringing fishing lure kits, for purposes of awarding his profits to trademark holder; report prepared by infringer's accountant lacked detail and lumped costs into six broad categories with no explanation of what specific expenses those categories represented, and infringer twice failed to produce verified financial records supporting his claimed costs and deductions as ordered by court. Lanham Trade-Mark Act, § 35(a), 15 U.S.C.A. § 1117(a).

[6] Trade Regulation ☞598

382k598

Testimony of trademark infringer's business manager that infringer's fishing lure products always made a bottom line of between 15 and 17% was sufficient to support district court's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 406242
**(Cite as: 2005 WL 406242 (3rd Cir.(Pa.)))**

estimate that infringer earned a profit of 16% on his infringing fishing lure kit, for purposes of awarding profits to trademark holder. Lanham Trade-Mark Act, § 35(a), 15 U.S.C.A. § 1117(a).

[7] Trade Regulation ☞684.1
382k684.1
Allowing trademark infringer to keep half the estimated profits of his infringing activities because trademark holder would have allegedly earned only 48% of the profits on the infringing product under its contract with a marketing firm would not have served the Congressional purpose of making infringement unprofitable and would have unjustly enriched the infringer; even if trademark holder received a windfall by awarding it 100% of trademark holder's profits, it was preferable that it, rather than infringer, receive the benefits of the infringement. Lanham Trade-Mark Act, § 35(a), 15 U.S.C.A. § 1117(a).

[8] Trade Regulation ☞673
382k673
There is no requirement that the defendant's profits approximate the plaintiff's damages when awarding profits in trademark infringement case. Lanham Trade-Mark Act, § 35(a), 15 U.S.C.A. § 1117(a).

[9] Trade Regulation ☞673
382k673
Accounting of trademark infringer's profits is available if the defendant is unjustly enriched, if the plaintiff sustained damages, or if an accounting is necessary to deter infringement; such rationales are stated disjunctively, and any one will do. Lanham Trade-Mark Act, § 35, 15 U.S.C.A. § 1117(a).

[10] Trade Regulation ☞684.1
382k684.1
Award of trademark infringer's profits could not include distributions to the infringer as a shareholder of infringing product's manufacturer; court estimated profits at 16% of product's gross sales, and distributions were a percentage of the same gross sales. Lanham Trade-Mark Act, § 35(a), 15 U.S.C.A. § 1117(a).

[11] Fraud ☞58(1)
184k58(1)
Undated price quote from member of corporation's board of directors to a third party for fishing lure kit developed by the director was not sufficiently reliable to support award of damages based on director's violation of fiduciary duty under Wisconsin law by overcharging corporation for fishing lure kits; since

cost of kits' components fluctuated over time, undated nature of the quote made it difficult to determine whether price quoted was comparable to price offered corporation, and corporation failed to substantiate the quote at trial by questioning director or his business manager.

[12] Corporations ☞640
101k640
"Internal affairs doctrine" holds that courts look to the law of the state of incorporation to resolve issues involving the internal affairs of a corporation.

[13] Damages ☞184
115k184
Where records are inadequate to assess specific damages under Wisconsin law, yet plaintiff has been injured and liability is clear, it is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.

Wayne A. Kablack, (Argued), Simpson, Kablack & Bell, Indiana, John J. Richardson, C. James Zeszutek, Thorp, Reed & Armstrong, Pittsburgh, for Appellant/ Cross Appellee.

Todd S. Holbrook, (Argued), Bernstein, Shur, Sawyer & Nelson, Portland,   Mark A. Willard, Eckert, Seamans, Cherin & Mellott, Pittsburgh, for Appellee/ Cross Appellant.

Before ROTH, AMBRO and CHERTOFF, [FN*] Circuit Judges.

OPINION

ROTH, Circuit Judge.

*1 [1] This appeal requires us to decide whether a showing of willful infringement is a prerequisite to an accounting of a trademark infringer's profits for a violation of section 43(a) of the Lanham Act. We hold that wilfulness is an important equitable factor but not a prerequisite to such an award, noting that our contrary position in *SecuraComm Consulting Inc. v. Securacom Inc.,* 166 F.3d 182, 190 (3d Cir.1999), has been superseded by a 1999 amendment to the Lanham Act. We further affirm the District Court's resolution of several other damages issues, with a single exception explained below.

I. Factual Background and Procedural History
Joseph Renosky was a member of the board of directors of Banjo Buddies, Inc., ("Banjo Buddies" or "BBI") from February 1996 until May 1999. Banjo

2005 WL 406242
(Cite as: 2005 WL 406242, *1 (3rd Cir.(Pa.)))

Buddies' principal product during that time was an extremely successful fishing lure called the Banjo Minnow, which Renosky helped develop.

The Banjo Minnow was principally advertised via "infomercial" broadcast, and was also sold in sporting goods catalogs and sporting goods stores. Tristar Products, Inc., obtained exclusive rights to advertise and sell the Banjo Minnow through all forms of "direct response marketing, ... print media, and retail distribution." BBI received 48% of Tristar's net profits in return. Renosky agreed to provide the manufactured Banjo Minnow lure kit through his corporation, Renosky Lures, Inc., to both Tristar and BBI at $5.20 per kit. [FN1] Renosky received additional shares of BBI stock in exchange for producing the Banjo Minnow kits at a "fair price." Renosky also executed a non-compete agreement in favor of BBI in exchange for more BBI stock. The Banjo Minnow sold very well for a little over a year, from mid-1996 through mid-1997, but then sales dwindled considerably. BBI introduced several derivative Banjo Minnow products in 1998, but none approached the success of the original.

During the Banjo Minnow's early success in 1996, Renosky presented an idea to the BBI board for a "new and improved" Banjo Minnow called the Bionic Minnow. [FN2] The board took no formal action on the proposal, and a month later Renosky advised one of BBI's directors that he would develop the new lure independently. At least two board members urged Renosky against this course of action, but Renosky could not be swayed. He immediately began developing the Bionic Minnow through Renosky Lures and ultimately marketed the new lure via infomercial and other means beginning in February 1999.

After Renosky failed to comply with a "cease and desist" letter, BBI brought suit in the United States District Court for the Western District of Pennsylvania in April 1999. BBI alleged that Renosky violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by developing and marketing the Bionic Minnow in such a way that customers would believe the Bionic Minnow was a Banjo Buddies product. BBI also alleged that Renosky's conduct breached the non-compete contract and Renosky's fiduciary duties as an officer of Banjo Buddies. [FN3]

*2 The District Court denied cross-motions for partial summary judgment and held a five-day bench trial in May 2002. In its Findings of Fact and Conclusions of Law issued in November 2002, the court found that

Renosky was liable for "false designation of origin" under § 43(a) of the Lanham Act. [FN4] The court further found that Renosky breached his fiduciary duty of loyalty to Banjo Buddies by pursuing a corporate opportunity--the Bionic Minnow project--without fully disclosing his actions to the board or forcing the board to accept or reject the project. The court also found that Renosky breached the non-compete agreement by independently developing the Bionic Minnow. Finally, the court found that Renosky breached his fiduciary duty of good faith and fair dealing by overcharging BBI for the Banjo Minnow kits.

The District Court concluded that Renosky should be forced to disgorge the net profits of the Bionic Minnow project under section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), which provides for such accountings as an equitable remedy for Lanham Act violations. The District Court also concluded that the damages arising from Renosky's usurpation of a corporate opportunity, breach of the non-compete contract, and overcharging for the Banjo Minnow lure kits were too speculative to support any monetary award.

Accordingly, the District Court ordered Renosky to pay to Banjo Buddies the net profits earned by the Bionic Minnow project, and to produce "verified financial records" attesting to this amount. Renosky never produced these records, despite numerous delays and court orders. Renosky did ultimately retain an independent financial analysis (the "Alpern Report"), which the District Court accepted for purposes of establishing the total sales of the Bionic Minnow through November 2002. However, the court rejected that report's conclusion that the Bionic Minnow project suffered a net loss. Accordingly, the court calculated Renosky's profits by multiplying the total sales figure by 16%, based on testimony from Renosky's business manager that Renosky Lures products typically earn a "bottom line" of between 15-17%. The court also determined that Renosky should be forced to disgorge all of the distributions (based on gross sales) made to him as a shareholder in the Bionic Minnow project. The court entered judgment in March 2003 against Renosky in the amount of $1,589,155.

Banjo Buddies moved to alter or amend the District Court's judgment pursuant to Federal Rule of Civil Procedure 59(e), arguing that the court erred by holding that the damages arising from Renosky's overcharges for the Banjo Minnow lure kits were too speculative to support a monetary award. The District Court denied this motion in March 2003.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Renosky and BBI both appeal the District Court's judgment. Renosky asserts that the District Court should not have ordered an accounting of profits because Renosky did not intentionally or willfully confuse or deceive customers. Renosky alternatively argues that the District Court's calculation of those profits was clearly erroneous. Banjo Buddies cross-appeals, contending that the District Court erred by refusing to award damages for Renosky's overcharges rather than make a reasonable estimate of damages based on the available evidence.

## II. Jurisdiction and Standards of Review

*3 The District Court had federal question jurisdiction over Banjo Buddies' Lanham Act claim, 28 U.S.C. § 1331, supplemental jurisdiction over the parties' state law claims, 28 U.S.C. § 1367, and diversity jurisdiction over all claims owing to the complete diversity of the parties, 28 U.S.C. § 1332. We have appellate jurisdiction to review the District Court's final judgment. 28 U.S.C. § 1291.

We review the District Court's factual findings under a clearly erroneous standard, but exercise plenary review over the District Court's interpretation of legal questions and its application of the law to the facts. *Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 950 (3d Cir.1993). We further review the District Court's award of equitable remedies under section 35(a) of the Lanham Act under an abuse of discretion standard. *Gucci America, Inc. v. Daffy's, Inc.,* 354 F.3d 228, 242 (3rd Cir.2003).

## III. Discussion
### A. Willfulness Is a Factor, Not a Prerequisite.

Renosky argues that the District Court erred by awarding profits from the Bionic Minnow project to Banjo Buddies under section 35(a) of the Lanham Act because Renosky's violation of section 43(a) of that statute was not willful or intentional. Renosky relies on *SecuraComm Consulting, Inc. v. Securacom, Inc.,* 166 F.3d 182 (3d Cir.1999), in which this court held that "a plaintiff must prove that an infringer acted willfully before the infringer's profits are recoverable" under § 35(a) of the Lanham Act. *Id.* at 190 (citing *George Basch Co. v. Blue Coral, Inc.,* 968 F.2d 1532, 1537 (2d Cir.1992)). The District Court's findings related to the issue of Renosky's intent are ambiguous and possibly contradictory. [FN5] However, we need not decide whether the District Court found or should have found that Renosky acted willfully, because we conclude that *SecuraComm'*s bright-line willfulness requirement has been superseded by statute and that,

based on all the relevant equitable factors, the District Court did not abuse its discretion by ordering an accounting of Renosky's profits.

*SecuraComm'*s bright-line rule was the dominant view when *SecuraComm* was issued in January 1999. *See, e.g., Quick Technologies, Inc. v. Sage Group PLC,* 313 F.3d 338, 347-48 (5th Cir.2002) (collecting cases, including *SecuraComm* ); *George Basch Co.,* 968 F.2d at 1537; *Restatement (Third) of Unfair Competition* § 37 (1995); J. Thomas McCarthy, 5 *McCarthy on Trademarks and Unfair Competition* § 30:62 (4th ed.1996). In August 1999, however, Congress amended § 35. Prior to the amendment, that section provided as follows:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 43(a) [15 U.S.C. § 1125(a) ], shall have been established ... the plaintiff shall be entitled ..., subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

*4 *See SecuraComm,* 166 F.3d at 186 (quoting former 15 U.S.C. § 1117(a)). The 1999 amendment replaced "or a violation under section 43(a)" with "a violation under section 43(a), or a *willful* violation under section 43(c)," *see* Pub.L. No. 106-43, § 3(b), 113 Stat. 219 (Aug. 5, 1999) (emphasis added). The plain language of the amendment indicates that Congress intended to condition monetary awards for § 43(c) violations, but not § 43(a) violations, on a showing of willfulness. [FN6]

We presume Congress was aware that most courts had consistently required a showing of willfulness prior to disgorgement of an infringer's profits in Lanham Act cases, despite the absence of the word "willful" in the statutory text prior to 1999. *See Scheidemann v. INS,* 83 F.3d 1517, 1525 (3d Cir.1996) ("[W]e must presume that Congress is aware of existing judicial interpretations of statutes."). By adding this word to the statute in 1999, but limiting it to § 43(c) violations, Congress effectively superseded the willfulness requirement as applied to § 43(a). *See Russello v. U.S.,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (" 'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' ") (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972)).

[2] This conclusion is supported by *Quick*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 406242
**(Cite as: 2005 WL 406242, \*4 (3rd Cir.(Pa.)))**

*Technologies,* 313 F.3d at 349, the only other appellate decision to reach the issue. The Fifth Circuit in *Quick Technologies* considered the effect of the 1999 amendment and held that, based on earlier decisions of that court as well as "the plain language of [§ 43(a) ]," willful infringement was not a prerequisite to an accounting of the infringer's profits. *Id.* The court noted the wealth of contrary authority, including *SecuraComm,* but pointed out that all of those cases preceded the statutory change. *Id.* at 347-48. The *Quick Technologies* court reaffirmed the factor-based approach elaborated in prior Fifth Circuit cases, including *Pebble Beach Co. v. Tour 18 I Limited,* 155 F.3d 526, 554 (5th Cir.1998), explaining that the infringer's intent was an important--but not indispensable--factor in evaluating whether equity supports disgorging the infringer's profits. *Quick Techs.,* 313 F.3d at 349. These factors "include, but are not limited to (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." *Id.* (internal citations omitted).

In *Gucci America, Inc. v. Daffy's, Inc.,* 354 F.3d 228 (3d Cir.2003), the panel majority noted that the 1999 amendment might affect the continued validity of *SecuraComm'* s bright-line willfulness requirement. *Id.* at 239-40 (noting that statutory language and legislative history of the 1999 amendment "suggests that willfulness is a prerequisite in a trademark dilution cause of action, not an infringement action"). The majority determined it did not need to decide the issue, however, reasoning that even under the *Quick Technologies* factor-based approach, the District Court did not abuse its discretion in refusing to order an accounting of the infringer's profits. *Id.* at 241-43 ("Accordingly, even after the 1999 amendments to the Lanham Act and any impact it may have had on our holding in *SecuraComm,* we nevertheless conclude that the district court did not abuse its discretion given the equities here, including Daffy's good faith."). [FN7]

**\*5** [3] For the reasons explained above, we now hold that *SecuraComm* has been superceded by the 1999 amendment. Relying on the *Quick Technologies* factor-based approach endorsed in *Gucci America,* we further conclude that the District Court did not abuse its discretion by ordering an accounting of Renosky's profits. Apart from his contention that his violation was not willful, Renosky does not argue that the District Court abused its discretion. Accordingly, our

consideration of the equities here will be brief. Because the District Court's findings concerning Renosky's intent are difficult to reconcile, *see supra* note 5, we will assume that factor is neutral. Nonetheless, all of the other *Quick Technologies* factors support an award of profits here.

It is likely that Renosky's conduct diverted sales from Banjo Buddies. *See Quick Techs.,* 313 F.3d at 349 (factor two). The District Court found that Renosky's marketing for the Bionic Minnow was confusingly similar to that of the Banjo Minnow, noting numerous material similarities in the infomercials used to market each product. The court also found that the two lure kits were "nearly identical" and were packaged identically. The court further found that the markets for the two products were "either the same or substantially overlap [ping]." The District Court's observations concerning the close similarities of the products as well as their packaging and marketing schemes also strongly support the conclusion that Renosky was "palming off" the Bionic Minnow as a Banjo Buddies product. *See id.* (factor six). The public has an interest in discouraging this type of behavior, as it interferes with the consumer's ability to make informed purchasing decisions. *See id.* (factor five).

Next, there are no other adequate remedies. *See id.* (factor three). The District Court rejected Banjo Buddies' estimation of its damages (for both the Lanham Act claims and the state law claims) as too speculative. If Renosky's profits are not assessed, Banjo Buddies will be wholly uncompensated for Renosky's infringing actions. Finally, Banjo Buddies did not delay in bringing suit to stop Renosky's infringing actions. *See id.* (factor four). Accordingly, we conclude that the District Court did not abuse its discretion in deciding to order an accounting of Renosky's profits.

B. The District Court's Estimation of Profits.

The remaining issues in Renosky's appeal concern the District Court's calculation of the amount of profits to be awarded. We first hold that the District Court did not clearly err by rejecting Renosky's contention that he suffered a net loss on the Bionic Minnow project, and did not abuse its discretion by using an alternative method to estimate Renosky's profits. *See Tamko Roofing Products, Inc. v. Ideal Roofing Co., Ltd.,* 282 F.3d 23, 39 (1st Cir.2002) (calculation of profits under section 35(a) is left to the trial court's discretion, and will not be disturbed unless "it rests on clearly erroneous findings of fact, incorrect legal standards, or

2005 WL 406242
**(Cite as: 2005 WL 406242, *5 (3rd Cir.(Pa.)))**

a meaningful error in judgment").

**\*6** [4] Section 35(a) provides that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a); *see also Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 273 (3d Cir.1975). The District Court accepted the Alpern report's figure for total sales of the Bionic Minnow through November 22, 2002. Thus, Banjo Buddies' burden of proof was satisfied by Renosky's accountant's financial report.

[5] However, the District Court held that Renosky failed to satisfy his burden of proof regarding costs and deductions. The District Court rejected the Alpern report's conclusion that Renosky suffered a loss of $ 492,699.00 for several reasons, most of which Renosky makes no attempt to refute on appeal. First, the court observed that the Alpern report's summary of direct expenses associated with the Bionic Minnow project-- totaling almost five million dollars--was sorely lacking in detail, lumping costs into six broad categories with no explanation of what specific expenses those categories represented. [FN8] Renosky appears to argue that the District Court improperly rejected the direct expense summary because the preparers of the Alpern report were unable to confirm expenses associated with Pacific Media, a vendor representing no more than two percent of the direct expenses associated with the Bionic Minnow. This argument is a red herring. The court rejected the summary *in spite of* the preparers' success in obtaining corroboration from most major vendors, not because of its failure to obtain corroboration from one.

Renosky fails to address the District Court's remaining reasons for rejecting the Alpern report's analysis of costs associated with the Bionic Minnow project. Most important, Renosky makes no attempt to explain why he twice failed to produce verified financial records supporting his claimed costs and deductions as ordered by the court. [FN9] The court also observed several unexplained discrepancies between the Alpern report's summary of direct expenses and other evidence in the record. Next, the court rejected the Alpern report's conclusion that "shared expenses" associated with the Bionic Minnow project were $ 1,416,050. The court explained that the Alpern report did not show how "each item of general expense contributed to the production of the infringing items in issue and offer a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items at issue." (citing *Design v. K-Mart Apparel Corp.*, 13

F.3d 559, 565-66 (2d Cir.1994)). Finally, the court found that the Alpern report's "bottom line" lacked credibility. The court doubted that Renosky would allow the Bionic Minnow to lose nearly half a million dollars, and noted that Renosky's claimed loss was inconsistent with his attempt to secure clarification that profits accrued after November 22, 2002, would belong to him and not Banjo Buddies. Considering the collective strength of these arguments together with Renosky's failure to address most of them, we conclude that the District Court's rejection of the Alpern report's cost analysis was not clearly erroneous.

**\*7** [6] Because Renosky failed to meet his burden of proving costs and deductions, the District Court was forced to use an alternative method to estimate Renosky's profits. The court decided to rely on the trial testimony of Renosky's business manager, Denice Altemus, who stated that Renosky Lures products "always [make] a bottom line of between 15 and 17%." Renosky argues that there is no direct evidence that the Bionic Minnow earned a profit in this range. While this is true, the onus of producing such evidence is clearly placed by § 35(a) on Renosky, not Banjo Buddies. 15 U.S.C. § 1117(a). The District Court has broad discretion in shaping remedies under § 35(a), *see Burger King Corp. v. Weaver,* 169 F.3d 1310, 1321 (11th Cir.1999), and did not abuse that discretion by estimating that the Bionic Minnow earned a profit of 16%.

[7] Renosky further argues that Banjo Buddies is only entitled to 48% of whatever profits were earned by the Bionic Minnow project. That is, if Banjo Buddies had produced the Bionic Minnow, it would have received only 48% of the profits earned from the sale of the lure under its contract with TriStar. We first note that this contention is impossible to evaluate on appeal as a factual matter. Presumably Tri-Star provided some services in exchange for its profit-sharing agreement with Banjo Buddies, and presumably Renosky procured those same services through services contracts rather than a profit-sharing agreement. There is no way for this court to determine which party struck the better deal.

[8][9] Further, this argument also fails as a matter of law, because there is no requirement that the defendant's profits approximate the plaintiff's damages. Section 35(a) permits a plaintiff to recover, "subject to the principles of equity ..., (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). As the Second Circuit observed in *George Basch,* 968 F.2d at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1537, an accounting of the infringer's profits is available if the defendant is unjustly enriched, if the plaintiff sustained damages, or if an accounting is necessary to deter infringement. These rationales are stated disjunctively; any one will do. *See id.* Allowing Renosky to keep half the estimated profits of his infringing activities would not serve the Congressional purpose of making infringement unprofitable--Renosky would be unjustly enriched and other would-be infringers would be insufficiently deterred. *See Burger King Corp.,* 169 F.3d at 1321-22; *Louis Vuitton S.A. v. Lee,* 875 F.2d 584, 588-89 (7th Cir.1989); *Playboy Enters., Inc. v. Baccarat Clothing Co.,* 692 F.2d 1272, 1274 (9th Cir.1982). Even if Banjo Buddies receives a windfall in this case-- which, as discussed in the previous paragraph, is impossible for this court to determine--it is preferable that Banjo Buddies rather than Renosky receive the benefits of Renosky's infringement. *See Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 206-07, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942).

*8 [10] Finally, we agree with Renosky that the District Court clearly erred by adding distributions made to Renosky as a shareholder in the Bionic Minnow project to the profits award because these distributions were already accounted for in the court's estimation of profits. Financial records prepared by Renosky Lures' business manager and introduced at trial by Banjo Buddies show that distributions were paid according to a simple formula: five percent of gross sales each month. Those records treat the distributions as an expense for bookkeeping purposes. That is, each month's "Total Profit" was calculated by subtracting expenses from sales, and shareholder distributions (denominated "Return Reserve") were considered expenses in this calculation. Banjo Buddies added the "Total Profit" and "Return Reserve" figures to arrive at a "Total Net Profit" figure which it then asked the District Court to assess as the measure of profits under section 35(a). This is sensible-- distributing monies to shareholders is a method of disbursing income, not a business expense, and the distributions should be included in the District Court's profits award. The District Court may have been attempting to apply this reasoning when it determined that Renosky's share of the distributions should be added to the estimated profits award. However, when the District Court decided to estimate profits by multiplying the Alpern report's gross sales figure by sixteen percent, rather than use the method proposed by Banjo Buddies, the issue created by Renosky Lure's bookkeeping practice of treating distributions as expenses disappeared. The court's estimate accounts

for all of the profits of the Bionic Minnow project--the shareholder distributions, which amounted to five percent of gross sales, as well as an estimated eleven percent of additional profit.

C. Overcharge Damages.

[11][12] Banjo Buddies argues on cross-appeal that the District Court erred by refusing to award monetary damages after determining that Renosky violated his fiduciary duty by overcharging Banjo Buddies for the Banjo Minnow lure kits. We hold that the District Court properly determined that Renosky failed to meet its burden of proving the amount of damages to a "reasonable certainty." *Plywood Oshkosh, Inc. v. Van's Realty & Constr. of Appleton, Inc.,* 80 Wis.2d 26, 257 N.W.2d 847, 849 (1977) ("The claimant generally has the burden of proving by credible evidence to a reasonable certainty his damage, and the amount thereof must be established at least to a reasonable certainty."). [FN10] Specifically, the District Court did not clearly err by finding that Banjo Buddies' Exhibit 201 was insufficiently reliable. Further, the court did not commit legal error by refusing to estimate damages based on this unreliable exhibit, because Banjo Buddies could have, but failed to, introduce other, more reliable evidence as proof of the amount of damages.

To prove the amount of overcharge, Banjo Buddies combined two approaches. First, Banjo Buddies introduced invoices indicating Renosky's costs for some components of the Banjo Minnow lure kit. The District Court accepted these invoices as reliable proof of Renosky's costs. Banjo Buddies then added estimated overhead and a reasonable profit margin to arrive at the price Renosky should have charged for those components of the lure kit. However, these invoices only accounted for 20 of the 109 components of the Banjo Minnow lure kit. Banjo Buddies introduced Exhibit 201, an undated price quote from Renosky to a third party, National Media, to establish the prices Renosky should have charged Banjo Buddies and Tristar for the remaining 89 components. Combining the invoices (adjusted for overhead and profit) and the price quote, Banjo Buddies contends that Renosky should have charged Tristar and Banjo Buddies $3.44 per lure kit, $1.76 less than the amount actually charged, $5.20. The District Court, however, found the National Media price quote unreliable.

*9 This finding was not clearly erroneous. First, the National Media quote is undated. There is evidence that over time some of Renosky's component prices

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fell, while other component prices, operational expenses, and labor costs rose, after Renosky's business manager produced the quote to Banjo Buddies that established the price of $5.20 per kit in March 1996. Given these fluctuating costs, the District Court properly observed that not knowing the date of the National Media quote makes it difficult to conclude that the component prices quoted therein should have been comparable to those in the Banjo Buddies quote. The District Court further noted that Banjo Buddies' counsel failed to sufficiently question Renosky or his business manager about the National Media quote at trial. Such questioning could have readily established the date and context of the quote, and offered the persons most familiar with the component prices-- Renosky and his business manager--an opportunity to explain the different prices in the National Media and Banjo Buddies price quotes. The National Media quote is not inherently unreliable, but given Banjo Buddies' failure to substantiate the quote at trial, the District Court did not err by refusing to rely on the quote. [FN11]

[13] Banjo Buddies alternatively argues that the District Court, having found liability, should nonetheless have estimated damages based on the less-than-reliable National Media price quote because it was the only available evidence. As the Wisconsin Supreme Court explained in *Metropolitan Sewerage Comm'n v. R.W. Constr., Inc.,* 78 Wis.2d 451, 255 N.W.2d 293, 299 (1977), "where records are inadequate to assess specific damages, yet plaintiff has been injured ... and liability is clear," "[i]t is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." (Internal citation omitted); *see also Cutler Cranberry Co. v. Oakdale Elec. Co-op.,* 78 Wis.2d 222, 254 N.W.2d 234, 240 (1977) ("[T]he fact that the full extent of the damages is a matter of uncertainty by reason of the nature of the tort is not a ground for refusing damages."). The problem here is that the lack of better evidence in this case is not due to a lack of adequate records, *Metropolitan Sewerage,* 255 N.W.2d at 299, or the "nature of the tort," *Cutler Cranberry,* 254 N.W.2d at 240, but to Banjo Buddies' failure to introduce more reliable evidence, either by introducing Renosky's invoices for the remaining 89 components or substantiating the undated National Media quote through questioning at trial. As the court explained in *Cutler Cranberry,* the rule permitting estimated damages in the face of uncertainty as to the amount of damages "has been sustained where, *from the nature of the case,* the extent of injury and the amount of damage are not capable of exact and accurate proof." *Id.*

(emphasis added) (internal citation omitted).

Banjo Buddies attempts to lay the blame for its failure to introduce better evidence on Renosky. Banjo Buddies contends that Renosky failed to provide discovery "in a timely manner," and did not produce "any invoices or other information on costs until two business days before trial." However, Banjo Buddies never claims that Renosky ultimately failed to produce those documents. Further, if Banjo Buddies felt that Renosky had not complied (or not timely complied) with its discovery requests, it should have pursued relief under the discovery rules or sought a continuance. Banjo Buddies cannot reasonably claim that its burden of proof should be lowered because it did not have time to sift through the boxes of documents Renosky allegedly produced on the eve of trial. Furthermore, as noted above, *see supra* n. 11, Banjo Buddies' failure to substantiate the National Media quote cannot be attributed to Renosky's foot-dragging during discovery.

IV. Conclusion

**\*10** For the reasons given above, we will affirm the District Court's award of Renosky's estimated profits on the Bionic Minnow project but reverse the District Court's decision to add Renosky's shareholder distributions to that amount. We will affirm the District Court's judgment in all other respects.

\* \* \*

FN\* Judge Chertoff heard oral argument in this case but resigned prior to the time the opinion was filed. The opinion is filed by a quorum of the panel. 28 U.S.C. § 46(d).

FN1. The kit consisted of numerous plastic minnow bodies of various sizes and colors as well as hooks, jigs, and other fishing bait paraphernalia, all in a plastic "clam-shell" box. The kit also included an instructional videotape.

FN2. The Bionic Minnow kit is distinguished from the Banjo Minnow kit largely by minnow bodies with replaceable heads and the "weedless treble hook," a hook designed to reduce the chance of debris catching on the barbs of the hook.

FN3. BBI made several other claims, and Renosky made several counterclaims, none of which is relevant to this appeal.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN4. Section 43(a) provides in relevant part:
(1) Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof. or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which:--
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the ... origin, sponsorship, or approval of his or her goods, services or commercial activities by another person ...
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a).

FN5. On the one hand, that District Court found that Renosky exhibited "a considerable lack of good faith and fair dealing" by producing a nearly identical product in identical packaging, using the same primary marketing tool (the infomercial) with similar content, and by presenting himself as the developer of the Banjo Minnow in marketing materials for the Bionic Minnow. On the other hand, the court found that even though Renosky copied the successful format of the Banjo Minnow product and infomercial, "there is no evidence that [Renosky] deliberately intended by that copying to confuse consumers into believing that the Bionic Minnow was a Banjo Buddies project."

FN6. The statute has been twice amended since August 1999, *see* Pub.L. No. 106-113, Div. B, § 1000(a)(9), 113 Stat. 1536, 1501A-54 (Nov. 29, 1999). *and* Pub.L. No. 107-273, Div. C, Tit. III, § 13207(a), 116 Stat.1906 (Nov. 2, 2002), and now reads as follows:
When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.
15 U.S.C. § 1117(a).

FN7. Judge Rosenn wrote a dissenting

opinion in *Gucci America*, concluding that the balance of equities favored the plaintiff, and that an accounting of the infringer's profits would make the trademark owner whole. 354 F.3d at 246-47 (Rosenn, J., dissenting). Judge Rosenn specifically concluded that *SecuraComm* "is no longer binding precedent because it has been superceded by subsequent statutory amendments to the Lanham Act." *Id.* at 245.

FN8. As the court explained, "I find disturbing an analysis which includes calculations to the penny for the cost of the product (less than S2 million total) but fails to explain expenses totaling almost S5 million [by] providing even a modicum of detail in support."

FN9. The Alpern report contains summaries of financial records, not the records themselves.

FN10. Banjo Buddies is incorporated in Wisconsin. As the District Court explained, the "internal affairs doctrine" holds that courts look to the law of the state of incorporation to resolve issues involving the internal affairs of a corporation. *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 89-93, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987); *First National City Bank v. Banco Para El Comercio*, 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). Because the District Court sits in Pennsylvania, it applies that state's conflict of law principles, *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and Pennsylvania has adopted the "internal affairs doctrine" by statute. *See* 15 Pa. Cons.Stat. § 4145(a); *In re Estate of Hall*, 731 A.2d 617, 622 (Pa.Super. 1999). Banjo Buddies' claim that Renosky breached his fiduciary duty of good faith and fair dealing by overcharging for the Banjo Minnow lure kits goes to Banjo Buddies' internal affairs. Accordingly, the District Court properly applied Wisconsin law to this issue.

FN11. Banjo Buddies' failure to delve into the National Media price quote at trial despite the fact that this document is the linchpin of its damages proof is not as inexplicable as it appears. It turns out that Banjo Buddies did not make the argument that this price quote establishes the appropriate price for most of the components in the Banjo Minnow lure kit until after trial in its proposed findings of fact and conclusions of law. That is, by the time

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 406242
**(Cite as: 2005 WL 406242, \*10 (3rd Cir.(Pa.)))**

**Page 45**

Banjo Buddies realized the importance of the document, it was too late to flesh it out on the stand.

Briefs and Other Related Documents (Back to top)

.                     03-2107              (Docket)

(Apr. 21, 2003)

.                                  03-2038              (Docket)

(Apr. 16, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

CONTINUING CREDITORS' COMMITTEE OF STAR TELECOMMUNICATIONS INC., Plaintiff, v. CHRISTOPHER EDGECOMB, et al., Defendants.
Civil Action No. 03-278-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2004 U.S. Dist. LEXIS 25807

December 21, 2004, Decided

DISPOSITION: [*1] Defendants' motion to dismiss granted as to all defendants except Messing.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff creditors' committee brought suit against defendants, directors and officers of a bankrupt corporation, alleging the breach of fiduciary duties of loyalty, good faith, and care, and that their acts or omissions constituted gross negligence, mismanagement, and corporate waste. The directors and officers moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

OVERVIEW: The creditors' committee claimed that the corporation's demise was a result of several ill-fated merger and financing transactions that were approved by the directors, who were alleged to have profited from stock sales while knowing that the transactions were risky or problematical. The non-director officers of the corporation were largely ignored in the complaint and were entitled to dismissal of claims against them. The directors argued that, in the absence of a breach of fiduciary duty, they were protected by Delaware's business judgment rule and an exculpation clause in the corporate certificate, pursuant to Del. Code Ann. tit. 8, § 102(b)(7). The court agreed that a proper exculpation clause barred all claims of the breach of the duty of care and for gross negligence. The corporate waste claim was conclusory and insufficient to overcome the protections of the business judgment rule. However, if the facts pleaded were taken as true, one outside director had received a direct financial benefit from the transactions that none of the shareholders received. The claims against him were sufficient to proceed.

OUTCOME: The directors motion to dismiss was granted as to all defendants except the outside director who was alleged to have received benefits and enrichment at the expense of the corporation that other shareholders did not receive.

CORE TERMS: merger, waste, duty of care, gross negligence, shareholder, duty of loyalty, business judgment rule, breached, stock, plead, financing, stockholder, derivative, acquisition, common stock, exculpation, pleaded, announced, duty, breach of fiduciary duty, fiduciary duty, fiduciary duties, resigned, loyalty, insolvency, motion to dismiss, approving, excused, day-to-day, receivable

LexisNexis(R) Headnotes

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Failure to State a Cause of Action
[HN1] The standard for reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6) requires a court to accept as true all material allegations of the complaint. A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint. The moving party has the burden of persuasion.

Civil Procedure: Class Actions: Derivative Actions
[HN2] Where the filing of what otherwise would be a derivative action is approved by a bankruptcy court, there is no motion to dismiss for failure to comply with the demand requirement of Del. Ch. Ct. R. 23.1, and the allegations of the complaint are not subject to the more exacting standard imposed by Rule 23.1 for derivative actions.

Case 1:04-cv-01565-SLR    Document 20-6    Filed 03/04/2005    Page 16 of 33

Page 5
2004 U.S. Dist. LEXIS 25807, *

Civil Procedure: Class Actions: Derivative Actions
[HN3] A derivative suit is a suit brought on behalf of a corporation by a stockholder rather than by the management of the corporation. Derivative claims typically include challenges to the actions or inaction of the corporation's officers or board of directors. Events affecting all stockholders in the same way, such as corporate waste and mismanagement, fall squarely within the definition of a derivative action.

Business & Corporate Entities: Corporations: Shareholders & Other Constituents: Actions Against Corporations
Civil Procedure: Class Actions: Derivative Actions
[HN4] In derivative suits, a shareholder plaintiff either must make a demand on the company's board of directors that it take some corrective action or must demonstrate that such a demand should be excused because it would be futile. Del. Ch. Ct. R. 23.1. Rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations. The demand requirement is not a procedural matter; it is, rather, a matter of substantive state law.

Civil Procedure: Pleading & Practice: Pleadings: Interpretation
[HN5] The federal pleading requirements which dictate when and how facts must be alleged, must be read in conjunction with state substantive law, which controls what facts must be alleged.

Civil Procedure: Class Actions: Derivative Actions
Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Failure to State a Cause of Action
[HN6] The high burden of pleading, with particularity, facts supporting the reasonableness of claims alleging required to withstand a motion to dismiss under Del. Ch. Ct. R. 23.1 is somewhat lower under Fed. R. Civ. P. 12(b)(6).

Civil Procedure: Class Actions: Derivative Actions
[HN7] The demand requirements of Del. Ch. Ct. R. 23.1 are predicated upon the application of the business judgment rule in the context of a board of directors' exercise of its managerial power over a derivative claim.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
[HN8] The business judgment rule eludes precise categorization, as it assumes different shapes in different settings. In the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
[HN9] The business judgment rule serves two important functions: First, it prevents the courts from injecting themselves into a management role for which they were neither trained nor competent. Second, it encourages others to assume entrepreneurial and risk-taking activities by protecting them against personal liability when they have performed in good faith and with due care, however unfortunate the consequence.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
[HN10] Even where a plaintiff is not required to plead particularized facts to raise a reasonable doubt that a challenged corporate transaction was the product of a valid exercise of business judgment, it must still plead facts from which such an inference can be drawn.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
[HN11] Where it is useful at all as an independent concept, the good faith iteration's utility may rest in its constant reminder (1) that a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest; and (2) that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes. Therefore, a reference to the duty of loyalty also refers to the duty of good faith.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
[HN12] The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities

[HN13] To allege a breach of the duty of loyalty based on actions or omissions of a board of directors, a plaintiff must plead facts demonstrating that a majority of a board that approved the transaction in dispute was interested and/or lacked independence. To show that a director was interested, it is usually necessary to show that the director was on both sides of a transaction or received a benefit not received by the shareholders. A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.

Business & Corporate Entities: Corporations: Directors & Officers: Management  Duties & Liabilities
[HN14] Delaware cases repeatedly state that a plaintiff must prove a defendant director's breach of loyalty through a showing of interest in a transaction or lack of independence.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
[HN15] Showing that a corporate director lacks independence because of a subservient relationship to an interested person depends, in the first instance, on a showing that the supposedly dominating person actually is interested in the transaction in question.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
[HN16] If a defendant does not breach his duty of loyalty to the company, he is permitted to rely on the business judgment rule or an exculpatory provision, if applicable, to shield him from liability for a breach of the duty of care.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
[HN17] Under Delaware law, the business judgment rule operates as a presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest. In addition to the protection afforded under the business judgment rule, Delaware statute also allows corporations to grant their directors further protection from liability.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
[HN18] Del. Code Ann. tit. 8, § 102(b)(7).

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
[HN19] Where the standard of review ab initio is the business judgment rule, the directors' properly raising the existence of a valid exculpatory provision in the corporate charter entitles them to dismissal of any claims for monetary damages against them that are based solely on alleged breaches of the board's duty of care.

Business & Corporate Entities: Corporations: Shareholders & Other Constituents: Actions Against Corporations
[HN20] A breach of care claim brought by a creditor for actions that occurred while the company in question was in the zone of insolvency is derivative in nature. The fact of insolvency does not change the primary object of the director's duties, which is the firm itself. The firm's insolvency simply makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value and logically gives them standing to pursue these claims to rectify that injury. Put simply, when a director of an insolvent corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation.

Business & Corporate Entities: Corporations: Shareholders & Other Constituents: Actions Against Corporations
[HN21] Where a claim held by a creditor is derivative in nature, Del. Code Ann. tit. 8, § 102(b)(7) applies to all claims asserted on behalf of the creditors.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
Torts: Negligence: Negligence Generally
[HN22] A claim that a corporate manager or director acted with gross negligence is the same as a claim that he or she breached the fiduciary duty of care.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
Torts: Negligence: Negligence Generally
[HN23] Similar to a claim of breach of the duty of care, an exculpatory provision also protects directors from a claim of gross negligence, under Del. Code Ann. tit. 8, § 102(b)(7).

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities

Case 1:04-cv-01565-SLR    Document 20-6    Filed 03/04/2005    Page 18 of 33

Page 7
2004 U.S. Dist. LEXIS 25807, *

[HN24] The Delaware standard for pleading corporate waste is stringent: an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
[HN25] Absent a breach loyalty, Del. Code Ann. tit. 8, § 102(b)(7) protects directors and officers from a claim of corporate waste.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
[HN26] Where there is any substantial consideration received by a corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste by the corporate directors, even if the fact finder would conclude ex post that the transaction was unreasonably risky.

Business & Corporate Entities: Corporations: Directors & Officers: Management Duties & Liabilities
[HN27] A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.

COUNSEL: Joseph A. Rosenthal, Esq.; Kevin Gross, Esq., Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Counsel for Plaintiff, Of Counsel: Daniel A. Lowenthal, III, Esq., Jonathan D. Siegfried, Esq.; Lawrence S. Hirsh, Esq., Thelen Reid & Priest LLP, New York, New York.

John C. Phillips, Jr., Esq., Phillips, Goldman & Spence P.A., Wilmington, Delaware; Counsel for Defendants, Of Counsel: Marc J. Sonnenfeld, Esq.; Karen Pieslak Pohlmann, Esq.; Jill Baisinger, Esq., Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania.

JUDGES: Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

OPINIONBY: Kent A. Jordan

OPINION: MEMORANDUM OPINION

JORDAN, District Judge

I. Introduction

Before me is a motion (Docket Item ["D.I."] 63; the "Motion to Dismiss") filed by defendants Christopher E. Edgecomb ("Edgecomb"), Mary A. Casey ("Casey"), Arunas A. Chesonis, ("Chesonis"), David Vaun Crumly ("Crumly"), Kelly D. Enos ("Enos"), Mark Gershien ("Gershien"), Gordon Hutchins, Jr. ("Hutchins"), James E. Kolsrud ("Kolsrud"), Allen Sciarillo ("Sciarillo"), John R. Snedegar ("Snedegar"), Samer A. Tawfik ("Tawfik"), [*2] Brett S. Messing ("Messing"), and Paul Vogel ("Vogel") (collectively the "Defendants"), seeking to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

The First Amended Complaint (the "Complaint"), filed by the Continuing Creditors' Committee of Star Telecommunications, Inc. (the "Plaintiff"), for itself and on behalf of the Star Creditors' Liquidating Trust (the "Liquidating Trust"), contains allegations that the Defendants, as directors and officers of Star Telecommunications Inc. ("Star" or the "Company"), breached their fiduciary duties of loyalty, good faith, and care, and that their acts or omissions constituted gross negligence, mismanagement, and corporate waste. (D.I. 4 at PP147-76.) The Plaintiff further alleges that payments made from Star to Messing constitute unjust enrichment at the expense of Star. (Id.)

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1334. For the reasons set forth herein, the Motion to Dismiss will be granted as to all defendants except Messing.

II. Background n1

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 The following rendition of the background information does not constitute findings of fact and is cast in the light most favorable to the non-moving party, the Plaintiff.


- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*3]

Star was a telecommunications carrier specializing in long distance telephone service. (Id. at P1.) Through expanding capacity and acquiring other companies, Star grew rapidly in the mid-1990s and by the late 1990s was the seventh-largest telecommunications carrier in the United States. (Id. at PP1-2.) By 2000, however, Star's financial position had deteriorated considerably, and, in early 2001, the Company was forced to file for bankruptcy. (Id. at P3.)

Star was founded in the Mid-1990s by Edgecomb, who served as Chief Executive Officer ("CEO") and Chairman of Star's Board of Directors from 1996 through January 10, 2001, and defendant Casey, who served as President from 1996 through January 10, 2001, and served as a Director from 1996 through March 13, 2001. (Id. at PP7-8.) Defendant Tawfik was a Director of Star and President of its subsidiary PT-1 from February 1999 through March 18, 2000, the date that Star filed for bankruptcy protection. (Id. at PP17, 21.) Defendants Chesonis, Gershien, Hutchins, and Snedegar were Directors of Star but did not hold management positions within the Company. (Id. at PP9, 12-13, 16-17.) Hutchins and Snedegar served from[*4] the mid-1990s until Star filed for bankruptcy in early 2001; Chesonis served from May 1998 through February 2000; Gershien served from March 1998 through October 1999. (Id.)

In June 1997, Star completed an initial public offering, raising $32 million. (Id. at PP2-3.) In 1998, the price of Star's common stock peaked and Star raised $145 million through an additional stock offering. (Id. at P29.) By the end of the year, however, Star had only $64.4 million of net working capital, due in part to massive capital expenditures. (Id. at PP3, 29.)

On June 8, 1998, Star's Board of Directors met to discuss the acquisition of PT-1, which was in the prepaid calling card business. (Id. at P40.) At that meeting, the Board received a presentation from one of the investment banks advising them on the acquisition, Hambrecht & Quist ("H&Q"). (Id.) Despite the fact that H&Q had represented PT-1 in a failed initial public offering, the Board did not wait to receive a report from the other investment bank advising them, Credit Suisse First Boston, before acting on the acquisition. (Id.) On the following day, after meeting for 12 minutes, the Board approved the acquistion. [*5] (Id.) In February 1999, despite Star's poor cash position and a drop in value of PT-1 from $590 million to $190 million, Star closed the PT-1 acquisition. (Id. at P45.) PT-1's principal shareholder was Tawfik, who, after the acquisition by Star, remained President of PT-1, and, additionally, became a member of Star's Board of Directors. (Id. at PP17, 46.)

Shortly after completing the PT-1 acquisition, Star announced to the public that a syndicate of banks, led by Goldman Sachs Credit Partners, had committed to supply the Company with $275 million in senior secured credit facilities. (Id. at P52.) The credit facilities were not delivered as announced, however, which caused the financial markets to view Star negatively. (Id. at PP52-53.) There is no record of the Board discussing why the financing fell through or who was responsible for the failure of the agreement and its premature announcement. (Id. at P53.)

As a result of the failure to close the proposed credit agreement, Star was forced to agree to more costly financing from another source, Foothill Capital Corporation ("Foothill"). (Id. at P55.) The financing from Foothill, which was finalized on[*6] June 9, 1999, included a $25 million term loan and a $75 million revolving line of credit based on Star's accounts receivable. (Id.) When Star released its quarterly financial statements a few weeks later, on June 30, 1999, it was clear that it had already breached certain covenants. (Id. at P56.) The breaches were caused by two of Star's financial measurements falling below required levels, specifically, tangible net worth and earnings before interest, taxes, depreciation, and amortization. (Id.) Foothill threatened to sue Star for breach of the covenants, and, consequently, Star agreed to additional fees in order to amend the credit agreement. (Id. at P57.) The additional fees Star agreed to pay included a $500,000 agency fee, an increase in the interest rate of the loan, and a payment of $2 million if the term loan was not paid back by January 31, 2001. (Id.)

In the fall of 1999, World Access, Inc. ("World Access") expressed interest in acquiring Star. (Id. at P66.) World Access bundled voice and data services for the European market. (Id.) The Plaintiff, however, alleges that the primary business purpose of World Access was to acquire companies[*7] for MCI WorldCom Inc. ("WorldCom"), when WorldCom could not openly undertake such transactions itself. (Id.) The Plaintiff contends that WorldCom controlled World Access through stock holdings and a carrier service agreement. (Id.) At the time World Access expressed its interest in Star, Star owed WorldCom approximately $56 million and was facing serious financial difficulties. (Id. at P67.) The Plaintiff alleges that WorldCom's purpose in acquiring Star through World Access was to hide unrecoverable receivables Star owed to WorldCom. n2 (Id. at P69.) At a December 16, 1999 meeting, Star's Board discussed its financial difficulties, specifically, the Company's mounting past due accounts payable and lack of available cash. (See id. at P65.) Some Board members at this meeting suggested that "insolvency ... was a clear possibility without fundamental changes in [Star's] operation." (Id.)

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 The Plaintiff argues that the Board should have examined the relationship between World Access and WorldCom further because "the relationship of those companies was relevant to when and under what terms a merger transaction could be completed." (D.I. 4 at P69.) How their relationship would affect the terms of the agreement is not described, however. It could be argued that such a relationship and WorldCom's alleged motivation to hide unrecoverable receivables would have been a benefit to Star in closing the proposed merger, not a detriment.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*8]

In that same meeting, Star's Board authorized a letter of intent to enter into a merger with World Access, wherein Star shareholders would receive World Access stock and cash equal to approximately $10.50 per share of Star common stock. (Id. at P71.) Additionally, World Access agreed to provide Star with tens of millions of dollars in bridge financing when the deal closed. (Id.) As part of the transaction, World Access was to assume Star's WorldCom debt. (Id.)

On February 2, 2000, World Access announced that it was reducing its offer to Star from $650 million to $440 million, due to facts uncovered during due diligence on Star's condition. (Id. at P72.) On February 7, 2000, Star's Board held a 90 minute meeting to discuss the merger and, following another 75 minute meeting on February 11, 2000, voted to approve the merger. (Id. at P73.) The approved merger had a number of conditions precedent, the most notable being the requirement that Star divest itself of PT-1 and receive at least $150 million in consideration for that business. (Id. at P74.)

Citing the Board's minutes, the Plaintiff alleges that the Board did not investigate whether it would be feasible[*9] to sell PT-1 for such a price. (Id.) The Board did, however, receive a fairness opinion from Deutsche Banc, which stated that the transaction, as revised by World Access, was fair from a financial standpoint. (D.I. 66, Ex. 22 at 3.) The Board also received a memorandum from its Delaware counsel advising it of its obligations under Delaware law. (Id. at 2.) Finally, the Board was informed that no serious interest with respect to acquiring Star had been shown by any third parties. (Id.) In March 2000, Star signed a letter of intent to sell PT-1 to Counsel Corporation ("Counsel") for $150 million. (D.I. 4 at P75.) By the end of 2000, Counsel had informed Star that it was lowering its price for PT-1 from $150 million to $70 million. (Id. at P97.) Consequently, World Access terminated its merger with Star for failure to satisfy one of the conditions precedent, namely selling PT-1 for $150 million. (Id. at P101.)

The Plaintiff alleges that the myopic focus of Star's Board and management on completing the merger was to Star's detriment. (Id. at P84.) As a result of the merger negotiations with World Access, the Directors and Officers of Star did not pay appropriate[*10] attention to the day-to-day operations of the Company. (Id. at P78.) In a registration statement sent to the Securities and Exchange Commission (the "SEC") Star admitted that:

FOR THE LAST 16 MONTHS, OUR MANAGEMENT AND KEY EMPLOYEES HAVE FOCUSED ALMOST ENTIRELY ON CLOSING THE WORD ACCESS MERGER AND THE PT-1 ASSET SALE AND HAVE NOT CONCENTRATED ON OUR DAY-TO-DAY OPERATIONS ... Given these efforts, our management and key employees have not spent the requisite time or effort necessary to run our day-to-day operations.

(Id. at P79.) The Plaintiff alleges that the fact that Stars' Chief Financial Officer ("CFO"), Enos, did not attend any Board meetings after December of 1998, further highlights that the Board was not concerned with the day-to-day operations of Star. (Id. at P81.)

In the Summer of 2000, prior to the termination of the proposed merger with World Access, Edgecomb sold 6.2 million shares of Star common stock, Tawfik sold more than 2.2 million shares, and Crumly sold 112,000 shares. (Id. at P85.) They all sold their shares for less than the proposed merger price, and the Plaintiff alleges that this was due to the unique information they were[*11] privy to as Officers and Directors of the Company. (Id. at P86.)

On January 9, 2001, some five to six months after those individuals sold shares of Star's common stock, Star announced that World Access was abandoning its merger with Star due to Star's inability to sell PT-1 for $150 million, as required by the merger agreement. (Id. at P101.) As a result of the merger failing to close and Star's worsening financial condition, Star's creditors began to threaten drastic action to protect their interests. (Id. at PP92, 101.) The Board, realizing the severity of the situation, invited Messing, as a representative of Gotel Investments Ltd. ("Gotel"), one of Star's investors, to make a presentation to the Board on January 1, 2001. (Id. at P93.) Messing offered to assemble a new management team for Star, with the aim of closing the World Access merger and, failing that, repairing the Company's relationships with its vendors and creditors. (Id. at P95.)

On January 10, 2001, the Board turned over control of the Company to Messing. (Id. at P100-03.) At the same time, Edgecomb resigned his position as CEO, Chairman, and a Director n3; Casey resigned as President but[*12] retained her position on the Board. (Id. at P7-8, 103.) After Messing was appointed Chairman and CEO, Sciarillo was named CFO, Timothy Sylvester was named General Counsel, and Vogel joined the Board. (Id. at P103.) Vogel is alleged to have long-standing business and professional relations with Messing. (Id. at P116.)

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -



n3 Although the complaint only states that Edgecomb resigned as the Company's CEO and Chairman of the Board (D.I. 4 at P103), it is assumed that he resigned his directorship as well. (See Id. at P7 (stating that Edgecomb "served as Chief Executive Officer and Chairman of the Board of Directors of Star from in or about January 1996 through on or about January 10, 2001," without any mention of further service as a Director).)

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The first action Messing completed was a short term financing deal with Gotel, a company with which he is alleged to have been affiliated. (Id. at P104.) The deal provided Star with $25-35 million in new capital over six months, in exchange for attractively[*13] priced warrants for 30 million shares of Star's common stock. (Id.) Messing admitted that the cost of capital in this transaction was high, but that without it the Company would likely not survive. (Id.) Some directors were concerned that the new warrants would allow Gotel to take control of the Company, and certain Board members believed that Messing controlled Gotel. (Id. at P105-06.) Upon completion of the transaction with Gotel, Gotel was permitted to name two directors to Star's Board. (Id. at P115.) The two new directors chosen by Gotel were Alan Rothenberg and Steve Carroll, both of whom are alleged to have long-standing business dealings and personal relationships with Messing. (Id. at P116.)

The next major transaction into which Messing led Star, was the sale of PT-1's pre-paid calling card business. (Id. at P119.) On January 21, 2001, Messing, Sciarillo, and Crumly, among others, met with officers of IDT Corporation ("IDT") and negotiated a deal to sell the PT-1 business to IDT; Messing allegedly entered into this agreement (the "January 21 Agreement") without considering other buyers, such as PT-1's management team. (Id. at PP121-22.) The January[*14] 21 Agreement included the transfer of the PT-1 business to IDT, the indemnification of PT-1 by IDT in connection with certain pending lawsuits, and the transfer of $5 million, $4 million of which was paid at the time of the agreement and $1 million of which was to be paid at closing. (Id. at P124.) It also included an indemnity for $3.5 to $5 million in connection with three pending lawsuits. (Id.) This agreement was conditioned on PT-1 having $25 million in gross receivables and the release of all liens and security interests in PT-1 by all creditors. (Id. at P125.) On January 23, the two parties entered into an agreement, whereby IDT and Star agreed to direct $ 100 million in products and services to each other over a two-year period. (Id. at P126.) In addition, IDT Investments, a company affiliated with IDT, agreed to purchase 5% of Star's common stock, as well as warrants giving them the right to purchase an additional 10% of Star's common stock. (Id.) IDT Investments also entered into a standstill agreement with Star that forbade IDT Investments from owning more than 20% of Star's outstanding common stock without first gaining the approval of Star. ([*15] Id.)

On February 1, 2001, Star and IDT closed the deal pursuant to the January 21 Agreement. (Id. at P127.) But, allegedly at the behest of Messing, IDT did not pay the $1 million owed to Star at the time of closing; it instead wired the money to WorldCom in return for WorldCom releasing its security interest in PT-1. (Id.)

Between January 18, 2001 and February 7, 2001, IDT Investment purchased 15,006,236 shares of Star's common stock, or about a 21.1% beneficial ownership in Star. (Id. at P129.) IDT Investments did not, however, retain the voting rights associated with these shares. Rather, it transferred those rights to Messing through a voting proxy. (Id.)

In early March of 2001, WorldCom declared its intention to force Star into bankruptcy, and another Star creditor, RFC Capital, decided not to purchase additional receivables from Star. (Id. at P130.) Shortly thereafter, Messing and IDT renegotiated certain parts of the PT-1 transaction. (Id. at P131.) The Plaintiff alleges that Star received no benefit in this renegotiation. Instead, the renegotiation permitted IDT to eliminate its $3.5 million indemnity obligation on the basis of the $5 million[*16] in cash IDT had already paid as part of the deal. (Id. at PP124, 133.) Another $1.5 million debt obligation IDT owed to Star was eliminated on the basis of the prepayment. (Id.) On March 8, 2001, soon after agreeing to the renegotiation of the PT-1 deal, Messing resigned from Star, as did his team. (Id. at P137.)

The Plaintiff alleges that Messing's actions with respect to IDT were a result of his wish to curry favor with IDT and its principal owner, Howard Jonas ("Jonas"). (Id. at P139.) In fact, shortly after Messing left Star, he became a partner in a capital management firm and he received a $5 million investment from Jonas. (Id. at P140.) Jonas later invested another $2 million with Messing. (Id.)

Before Messing left Star, he submitted a request and received a $25,000 reimbursement for expenses incurred in his capacity as CEO of Star. (Id. at P141.) The largest expenses for which he sought reimbursement were $10,000 given to SAR Academy, a private school of which Jonas was a significant benefactor, and $10,616 to an investment vehicle, partially run by Messing, for rent and support services for offices in Los Angeles. (Id. at PP143-145.) [*17]

Star filed for bankruptcy protection on March 13, 2001. (Id. at P21.)

III. Standard of Review

[HN1] The standard for reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6) requires a court to accept as true all material allegations of the complaint. See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. The moving party has the burden of persuasion. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).

This case is unusual in that it alleges corporate misfeasance and malfeasance of a type most frequently challenged in derivative suits, n4 but, because of the bankruptcy context in which it arises, the case is brought by the Plaintiff directly, without the Plaintiff having first had to make a demand on the Company's Board of Directors for some corrective action. n5 [HN2] In a context like this, [*18] the Delaware Court of Chancery has said, "because the filing of this action was

2004 U.S. Dist. LEXIS 25807, *

approved by the Bankruptcy Court, there is no motion to dismiss for failure to comply with Court of Chancery Rule 23.1's demand requirement. Thus, the Plaintiff's allegations are not subject to the more exacting standard imposed by Court of Chancery Rule 23.1 for derivative actions." Official Comm. of Unsecured Creditors of Integrated Health Servs: v. Elkins, 2004 Del. Ch. LEXIS 122, C.A. No. 20228-NC, 2004 WL 1949290, at *2 n.2 (Del. Ch. August 24, 2004). n6

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n4  [HN3] A derivative suit is a suit brought on behalf of a corporation by a stockholder rather than by the management of the corporation. See Black's Law Dictionary at 475 (8th ed. 2004). Derivative claims typically include challenges to the actions or inaction of the corporation's officers or board of directors. Cf. Steinman v. Levine, 2002 Del. Ch. LEXIS 132, 2002 WL 31761252, at *12 & n.50 (Del.Ch. 2002) (noting that events affecting all stockholders in the same way, such as corporate waste and mismanagement, "fall squarely within the definition of a derivative action.").

n5  The Star Creditors' Liquidating Trust is the successor in interest to Star and has assigned its claims and rights of action to the Plaintiff. (D.I. 4 at P6.) Thus, the Plaintiff has been enabled to bring this action directly and not derivatively. [HN4] In derivative suits, the shareholder plaintiff either must make a demand on the company's board of directors that it take some corrective action or must demonstrate that such a demand should be excused because it would be futile. See Del. Ch. Ct. Rule 23.1; Aronson v. Lewis, 473 A.2d 805, 811-12 (Del. 1983) (by promoting demand on the board, "rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations"). The demand requirement is not a procedural matter; it is, rather, a matter of substantive state law. See Kamen v. Kemper Fin. Servs., 500 U.S. 90, 96-97, 114 L. Ed. 2d 152, 111 S. Ct. 1711 (1991) ("the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of substance, not procedure" (internal citations omitted)); Blasband v. Rales, 971 F.2d 1034, 1048 (3d Cir. 1992) ("It is clear that the demand requirement is not a mere formality, but rather is an important aspect of Delaware's substantive law."); In re General Motors Class E Stock Buyout Sec. Litigation, 790 F. Supp. 77, 80 (D. Del. 1992) [HN5] ("the federal pleading requirements . . . which dictate when and how facts must be alleged, must be read in conjunction with state substantive law, which controls what facts must be alleged").
[*19]

n6  While accepting this direct statement as the clearest direction from the Delaware courts about the applicability of Rule 23.1 in this context, I am nevertheless left to wonder whether the heightened pleading standard ought not apply with full force in a circumstance like this. From a policy standpoint, it seems that the particularized pleading requirement of Rule 23.1 serves a purpose beyond preserving managerial responsibility to directors and officers and beyond encouraging dispute resolution before litigation. It can be argued that one very important purpose of the particularized pleading requirement is to give added force to the business judgment rule at the pleading stage, so that, regardless of the anomalous circumstance of derivative-type claims being raised here without the necessity of a demand on the Board, the heightened standard of particularity should still apply. There are some references in case law that may support a heightened pleading standard even in the 12(b)(6) context. See Leung v. Schuler, 2000 Del. Ch. LEXIS 41, No. C.A. 17089, 2000 WL 1478538 at *19 (Del. Ch. Oct 02, 2000) (under "Rule 12(b)(6) or Rule 23.1, the complaint must plead specific facts from which it can be inferred that the decision by the board is so beyond the bounds of reasonable judgment that it seems essentially inexplicable on any other grounds" (emphasis added; internal citation omitted)); cf. Telxon Corp. v. Bogomolny, 792 A.2d 964, 974 (Del. 2001) (stating that [HN6] the "high burden of pleading with particularity facts supporting the reasonableness" of the alleged claims required to withstand a motion to dismiss under Rule 23.1 is "is somewhat lower" under Rule 12(b)(6)). The Chancery Court's recent decision in Production Resources Group, L.L.C. v. NCT Group, Inc., 2004 Del. Ch. LEXIS 174, C.A. No. 114-N, 2004 WL 2647593 (Nov. 17, 2004) also suggests that the bringing of a derivative claim in the context of a bankruptcy should not lower the pleading bar. Cf., 2004 Del. Ch. LEXIS 174, [WL] at *15 ("It would be puzzling if, in insolvency, the equitable law of corporations expands the rights of firms to recover against their directors so to better protect creditors, who, unlike shareholders, typically have the opportunity to bargain and contract for additional protections to secure their positions.").

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*20]

Nevertheless, the parties apparently agree, as they ought, that analysis of the present Motion must be informed by precedents arising from derivative actions where the plaintiff alleges that demand should be excused as futile. (See D.I. 88 at 24-25 (plaintiff's counsel stating his view of the applicable standard and saying, "is that a different standard than the demand excused cases? Probably not.").) The "demand excused" cases are essential precedent in reviewing the sufficiency of the Complaint because those cases embody and articulate the business judgment rule's impact on claims such as the Plaintiff seeks to assert. See Levine v. Smith, 591 A.2d 194, 205 (Del. 1991) [HN7] ("The demand requirements of [Chancery Court] Rule 23.1 are predicated upon the application of the business judgment rule in the context of a board of directors' exercise of its managerial power over a derivative claim."), overruled on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del. 2000); cf. Gagliardi v. TriFoods Intern., Inc., 683 A.2d 1049, 1051 (Del. Ch., 1996) (analysis of claims of mismanagement and waste begins with business judgment rule).

The Third[*21] Circuit has observed that [HN8] the "business judgment rule eludes precise categorization, as it assumes different shapes in different settings." Weiss v. Temporary Inv. Fund, 692 F.2d 928, 941 (3d Cir. 1982) (internal citation omitted). Although it may be articulated in a variety of ways, it's import is straightforward: "in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith." Gagliardi, 683 A.2d at 1051. It's public policy underpinnings, too, are well known. [HN9] It "serves two important functions." Weiss, 692 F.2d at 941. First, it prevents the courts from "injecting themselves into a management role for which they were neither trained nor competent." Id. (quoting Duesenberg, The Business Judgment Rule and Shareholder Derivative Suits: A View from Inside, 60 Wash.U.L.Q. 311, 314 (1982)("Duesenberg")). Second, it "encourage[s] others to assume entrepreneurial and risk-taking activities by protecting them against [*22]personal liability when they have performed in good faith and with due care, however unfortunate the consequence." Id. (Again quoting Duesenberg). In the words of former Chancellor William T. Allen of Delaware's Court of Chancery, the business judgment rule is "the first protection against a threat of sub-optimal risk acceptance ... ." Gagliardi, 683 A.2d at 1052. Expanding on that theme, he observed:

Shareholders don't want (or shouldn't rationally want) directors to be risk averse. Shareholders' investment interests, across the full range of their diversifiable equity investments, will be maximized if corporate directors and managers honestly assess risk and reward and accept for the corporation the highest risk adjusted returns available that are above the firm's cost of capital.

But directors will tend to deviate from this rational acceptance of corporate risk if in authorizing the corporation to undertake a risky investment, the directors must assume some degree of personal risk relating to ex post facto claims of derivative liability for any resulting corporate loss.

Id. (emphasis added).

Thus, [HN10] even if Plaintiff is not required[*23] to plead "particularized facts" to raise "a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment[,]" Levine, 591 A.2d at 205, it must still plead facts from which such an inference can be drawn. See In re Tri-Star Pictures, Inc., Litigation, 634 A.2d 319, 326 (Del. 1993) (under Chancery Court Rule 12(b)(6), "review is ... limited to the well-pled facts contained in the Complaint which, viewing all inferences in a light most favorable to the plaintiff, we must take as true. Conclusions, however, will not be accepted as true without specific allegations of fact to support them." (emphasis added; internal citation omitted)). (D.I. 88 at 24 (plaintiff's counsel stating, "I think ... the standard for the Court here really can be stated as we need to allege facts to raise at least a reasonable doubt as to the directors breach of fiduciary duty.").)

IV. Discussion

2004 U.S. Dist. LEXIS 25807, *

The Plaintiff has alleged a series of claims, including breach of fiduciary duty, gross negligence, and corporate waste, against the directors and officers of Star.

In Counts I, II, and III of the Complaint, the Plaintiff alleges[*24] that Casey, Chesonis, Edgecomb, Gershien, Hutchins, Snedegar, Tawfik, Enos, Kolsrud, and Crumly n7 breached their fiduciary duties, were grossly negligent, and wasted corporate assets. (D.I. 4 at P147-59.) In Counts IV, V, and VI of the Complaint, the Plaintiff makes the same allegations against Vogel, Casey, Hutchins, Snedegar n8, Messing, and Sciarillo. (Id. at P160-72.) In Count VII of the Complaint, the Plaintiff alleges that Messing unjustly enriched himself at the expense of Star. (Id. at P173-76.) Each claim will be analyzed according to the roles and actions of the various defendants.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n7 Ms. Casey and Messrs. Chesonis, Edgecomb, Gershien, Hutchins, Snedegar, and Tawfik are referred to herein at times as the "Edgecomb Directors". Messrs. Enos, Kolsrud, and Crumly are referred to as the "Edgecomb Non-Director Officers". The Edgecomb Directors and the Edgecomb Non-Director Officers are referred to collectively as the "Edgecomb Directors and Officers."

n8 Messrs. Vogel, Hutchins, and Snedegar, and Ms. Casey are referred to collectively as the "Messing Outside Directors." Messrs. Hutchins and Snedegar and Casey are members of both the "Edgecomb Directors" class of defendants and the "Messing Outside Directors" class.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

[*25]

A. Count I

The Plaintiff alleges in Count I of the Complaint that the Edgecomb Directors and Officers breached their fiduciary duties to Star by participating in decisions, or failing to prevent decisions, that resulted in the acquisition of PT-1, the expansion of Star's business and facilities in a manner that left it unable to pay its debts and continue as a going concern, the onerous short-term financial obligations that burdened the Company, the agreement to merge with World Access, the neglect of the day-to-day operations of Star while management attempted to close the World Access merger, and the disregard of the need for an independent audit committee. (See id. at P149.)

The Defendants argue that any claim alleging breach of fiduciary duty must be dismissed because all the named defendants are protected by the business judgment rule or an exculpation clause in the Company's charter. (See D.I. 64 at 2.)

1. Duty of Loyalty n9

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n9 Although the Plaintiff also invokes the duty of good faith as separate from the duty of loyalty, Delaware case law states that the two duties are identical. See, e.g., Nagy v. Bistricer, 770 A.2d 43, 49 n.2 (Del. Ch. 2000) (holding that [HN11] "if it is useful at all as an independent concept, the good faith iteration's utility may rest in its constant reminder (1) that a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest; and (2) that,

2004 U.S. Dist. LEXIS 25807, *

regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes"). Therefore, throughout this opinion, reference to the duty of loyalty also refers to the duty of good faith.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*26]

[HN12] "The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." Cede & Co. v. Technicolor, 634 A.2d 345, 361 (Del. 1993) (internal citation omitted).

i. Edgecomb Directors

[HN13] To allege a breach of the duty of loyalty based on actions or omissions of the Board, the Plaintiff must "plead facts demonstrating that a majority of a board that approved the transaction in dispute was interested and/or lacked independence." Orman v. Cullman, 794 A.2d 5, 23 (Del. Ch. 2002) (internal citation omitted) (emphasis added). To show that a director was interested, it is usually necessary to show that the director was on both sides of a transaction or received a benefit not received by the shareholders. Orman, 794 A.2d at 23; see also Rales v. Blasband, 634 A.2d 927, 936 (Del. 1993) ("[a] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders").

In the[*27] instant case, the Plaintiff alleges that Edgecomb was interested in the PT-1 acquisition and the World Access merger, that Tawfik was interested in the World Access Merger, and that a majority of the remaining directors, while not interested in these transactions, were beholden to Edgecomb and consequently lacked the requisite independence. n10 (See D.I. 73 at 14.) Because the Plaintiff must show that a majority of the directors that voted on the transactions were not disinterested and because the board had six members when the PT-1 and Word Access transactions were considered, it is necessary for the Plaintiff to allege facts showing that a minimum of four directors were not disinterested. n11 See Orman, 794 A.2d at 23.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

N10 The Plaintiff does not allege that Edgecomb was interested with respect to any of the other claims levied against him. (D.I. 73.)

n11 Although the Plaintiff is required to show that a majority of the directors that voted on the transaction in question violated their duty of loyalty, Chaffin v. GNI Group, Inc., 1999 Del. Ch. LEXIS 182, No. Civ.A. 16211-NC, 1999 WL 721569 at *5 (Del. Ch. Sept. 3, 1999), the Plaintiff does not allege that any of the directors failed to vote on any of the transactions in question. (See D.I. 4.)

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*28]

The Plaintiff contends that Edgecomb was interested in the PT-1 transaction as a result of his large stock position in the Company, combined with his motivation to increase the price of Star's stock. (D.I. 73 at 23-24.) In the Plaintiff's words, Edgecomb's "desire to increase the share price overrode his obligation to consider other effects of the [PT-1]

2004 U.S. Dist. LEXIS 25807, *

acquisition." (Id.) In essence, the Plaintiff's argument rests on the unsupportable premise that a director who owns a lot of stock cannot cast a disinterested vote. No precedent cited by the Plaintiff stands for the proposition that stock ownership, coinciding with a Board decision that may affect the price of those shares, is adequate to show a breach of the duty of loyalty. n12 Therefore, I conclude that the allegations regarding Edgecomb's stock ownership are insufficient to show he was interested in the PT-1 transaction.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n12 The Plaintiff cites Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.), 208 B.R. 288 (Bankr. D. Mass. 1997), but that case concludes that, under Delaware law, a director who approves a leveraged buy-out ("LBO") is engaging in a transaction with his own company. Id. at 302. The court held that the sale of stock to a third party, who financed the purchase through the use of debt assumed by the company, was in essence a transaction between the directors and the company. Id. Consequently, the court held directors who owned a small percentage of company stock could still be considered interested if they were approving an LBO. Id. 303. Brandt does not support the broader proposition that a director who owns company stock is, by that fact alone, interested in a Board decision that affects the price of that stock.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*29]

As to the World Access Merger, the Plaintiff argues that Edgecomb and Tawfik were interested because it gave them an opportunity to sell their shares before the company sought bankruptcy protection. (Id. at 32-33.) The Plaintiff contends that the fact that "Edgecomb [and Tawfik] sold the bulk of ... [their] shares at prices below the publicly announced merger price, corroborate[s] the reasonable inference that ... [they] knew but failed to disclose the merger was not likely to close." (Id. at 33-34.) The Plaintiff appears to assert that Edgecomb and Tawfik approved the merger knowing that it could not be closed, withheld this information from shareholders, and then illicitly traded on this information. However, neither the allegations in the Complaint n13 nor the pertinent precedent warrants such a leap. Under Delaware law, simply selling company stock does not make a director interested. See Guttman v. Jen-Hsun Huang, 823 A.2d 492, 502 (Del. Ch. 2003) ("it is unwise to formulate a common law rule that makes a director 'interested' whenever [it is] alleged that he made sales of company stock in the market at a time when he possessed material, non-public [*30]information"). The argument that one must assume insider trading and breach of fiduciary duty because directors sold stock below the announced merger price simply cannot withstand scrutiny. The merger price was a matter of public record. The stock sales too were based on public information. They were not priced in some back alley; they were traded in the open, regulated securities market. Edgecomb and Tawfik enjoyed no benefit that was not also available to any other shareholder wishing to sell shares at the price the market set, which happened to be below the announced merger price.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n13 The Factual Allegation's section of the Complaint states that officers and Board members sold Star Shares "because they were in a unique position to know the fragile state of the company." (D.I. 4 at P86.) The First Claim for Relief does not list this as one of the "acts and omissions" that breached the Defendant's duties to the Company. (Id. at P149.) In addition, the Plaintiff's Opposition to the Motion also does not address such a claim. (D.I. 74.)

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*31]

The Plaintiff argues that Edgecomb and Tawfik had a personal interest in the transaction because they had motivations beyond the good of the company when approving the transaction. (D.I. 4 at PP32-34.) As previously stated, the general rule is that the "best interest of the corporation and its shareholders takes precedence over any interest possessed by a director ... ." Cede, 634 A.2d at 361 (internal citation omitted). [HN14] Delaware cases repeatedly state, however, that a plaintiff must prove breach of loyalty through a showing of interest in a transaction or lack of independence. See, e.g., Orman, 794 A.2d at 23. The Plaintiff has not alleged that Edgecomb and Tawfik received a benefit from approving the World Access merger that was not shared by the stockholders generally. In short, the Plaintiff has failed to plead any facts that would, even inferentially, support its claim that Edgecomb and Tawfik were interested in the World Access merger and therefore breached their duty of loyalty.

Turning to Hutchins, Snedegar, and Chesonis, the Plaintiff alleges that those directors were beholden to Edgecomb during all of the events that are the subject of[*32] Count I, and, therefore, that they lacked independence. (D.I. 4 at 9, 13, 16, 147-48.) [HN15] It is obvious, though, that showing a director lacks independence because of a subservient relationship to an interested person depends in the first instance on showing that the supposedly dominating person actually is interested in the transaction in question. In re Oracle Corp. Derivative Litig., 824 A.2d 917, 938 (Del. Ch. 2003). Because the Plaintiff has failed to plead facts from which it could be inferred that Edgecomb was interested in the transactions in question, it follows that the Plaintiff has failed to plead facts from which it could be inferred that those remaining directors were beholden to an interested director. Consequently, the Plaintiff has failed to adequately plead that a majority of the Board was interested in the PT-1 and World Access transactions. By extension, the Plaintiff has not adequately pleaded a breach of the duty of loyalty by the Board. See Orman, 794 A.2d at 23.

ii. Edgecomb Non-Director Officers

Defendants Enos, Kolsrud, and Crumly, were officers of the Company but not directors. As non-directors, they did not participate[*33] in any Board votes. Further, two of those defendants, Enos and Kolsrud, are scarcely mentioned in the Complaint. (D.I. 4 at PP14, 48, 81.) Enos was the CFO of Star, and Kolsrud was the Executive Vice President of Operations and Engineering. (Id. ) No facts are pleaded about them, other than their job titles, their dates of service, and the fact that Enos did not attend any board meetings. (Id.) Like Edgecomb and Tawfik, Crumly is alleged to have sold shares in Star at a time when he was in a unique position to know that the merger was unlikely to close. (Id. at P86.) The Plaintiff does not address in its Opposition to the Defendants' Motion to Dismiss how Crumly breached his duty of loyalty by selling stock. See supra at 19-21. Simply put, no basis in fact or law is given to support a grant of relief against Enos, Kolsrud, or Crumly. See Elkins, 2004 Del. Ch. LEXIS 122, 2004 WL 1949290 at *13 (stating conclusory allegations are insufficient to defeat a motion to dismiss under Rule 12(b)(6)).

2. Duty of Care

[HN16] If a defendant does not breach his duty of loyalty to the company, he is permitted to rely on the business judgment rule or an exculpatory provision, [*34] if applicable, to shield him from liability for a breach of the duty of care. Emerald Partners v. Berlin, 787 A.2d 85, 90 (Del. 2001).

[HN17] Under Delaware law, the business judgment rule operates as a presumption "that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest." Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988). In addition to the protection afforded under the business judgment rule, Delaware statute also allows corporations to grant their directors further protection from liability. Section 102(b)(7) of the Delaware General Corporation Law allows corporations to adopt a provision in their charters to exculpate directors from breaches of the duty of care. The section states:

[HN18] the certificate of incorporation may also contain ... [a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director ... provided that such provision shall not eliminate or limit the liability of a director: (i) for[*35] any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; ... or (iv) for any transaction from which the director derived an improper personal benefit.

8 Del. C. § 102(b)(7). [HN19] When "the standard of review ab initio is the business judgment rule, properly raising the existence of a valid exculpatory ... provision in the corporate charter entitles director [defendants] to dismissal of any claims for [monetary] damages against them that are based solely on alleged breaches of the board's duty of care." Emerald Partners, 787 A.2d at 93 (internal citations omitted).

Plaintiff argues that Star's corporate charter, which contains an exculpatory provision, was a contract between the corporation and the shareholders and that it therefore does not prevent them, as creditors, from recovering from the defendants for breaches of the duty of care. (D.I. 73 at 46-47.) To support its argument, the Plaintiff relies on cases from various jurisdictions outside of Delaware. See Pereira v. Cogan (In re Trace Int'l Holdings, Inc.), 2001 U.S. Dist. LEXIS 2461, No. 00 Civ. 619, 2001 WL 243537[*36] at *11 (S.D.N.Y. March 8, 2001); Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.), 2000 U.S. Dist. LEXIS 276, No. 97 C7934, No. 97C6043, 2000 WL 28266 at *7-8 (D. Ill. Jan. 12, 2000). Recently, however, the Delaware Chancery Court has ruled directly on this point and held that exculpation clauses do indeed apply to prevent creditors as well as shareholders from bringing duty of care claims. Production Resources Group, L.L.C. v. NCT Group, Inc., C.A. No. 114-N, 2004 U.S. Del. Ch. LEXIS 174, 2004 WL 2647593 at *13-14 (Del. Ch. Nov. 17, 2004).

In that opinion, the court noted that [HN20] a breach of care claim brought by a creditor for actions that occurred while the company in question was in the zone of insolvency was derivative in nature. Id. In explaining why the creditor's claim was derivative, the court stated that

the fact of insolvency does not change the primary object of the director's duties, which is the firm itself. The firm's insolvency simply makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value and logically gives them standing to pursue these claims to rectify that injury. Put simply, when a director of an insolvent [*37]corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation.

2004 Del. Ch. LEXIS 174, [WL] at 14.

Relying on the fact that [HN21] any claim held by a creditor is derivative in nature, the court went on to hold that § 102(b)(7) applies to all claims asserted by the company on behalf of the creditors. 2004 Del. Ch. LEXIS 174, [WL] at *14 ("Although § 102(b)(7) itself does not mention creditors specifically, its plain terms apply to all claims belonging to the corporation itself, regardless of whether those claims are asserted derivatively by stockholders or by creditors"). Consequently, § 102(b)(7) applies to all actions for which the Plaintiff alleges duty of care violations.

In the Plaintiff's Complaint, it lists several alleged breaches of the Edgecomb Directors and Officers' duty of care. (D.I. 4 at P149.) In its brief, Plaintiff argues that the Edgecomb Directors and Officers breached their duty of care with respect to the PT-1 purchase, the Company's efforts to obtain capital, the World Access merger, and the abdication of management duties while trying to close the World Access merger. (D.I. 73 at 26-32, 35-40.) Although not addressed [*38] in their brief, the lack of an independent audit committee, which is alleged in the Complaint (D.I. 4 at P149), also appears to be a claim for breach of the duty of care. This claim, like the others argued in the Plaintiff's brief, fails as a matter of law because the exculpation clause protects the Edgecomb Directors and Officers against any claim for a breach of the duty of care. See Emerald Partners, 787 A.2d at 93. The Plaintiff itself implicitly admits this in its brief, when it does not refute the notion that a proper exculpation clause bars all claims of the breach of the duty of care. (D.I. 73 at 46-47.) Consequently, all claims of a breach of the duty of care against the Edgecomb Directors and Officers must be dismissed.

B. Count II

The Plaintiff alleges in Count II of the Complaint that the Edgecomb Directors and Officers committed gross negligence with respect to the same actions as alleged in Count I. (D.I. 4 at PP152-55.) However, [HN22] a "claim that a corporate manager [or director] acted with gross negligence is the same as a claim that she breached her fiduciary duty of care." Albert v. Alex. Brown Mgmt. Servs., 2004 Del. Super. LEXIS 303, No. C.A. 04C-05-250, 2004 WL 2050527

[*39]at *6 (Del. Super. Ct. Sept. 15, 2004); see also McMullin v. Beran, 765 A.2d 910, 921 (Del. 2000) (stating that "director liability for breaching the duty of care is predicated upon concepts of gross negligence" (internal citations omitted)).

[HN23] Similar to a claim of breach of the duty of care, an exculpatory provision also protects directors from a claim of gross negligence. See Malpiede v. Townson, 780 A.2d 1075, 1094-1095 (Del. 2001) (stating that "even if the plaintiffs had stated a claim for gross negligence, such a well-pleaded claim is unavailing because defendants have brought forth the Section 102(b)(7) charter provision that bars such claims"). Therefore, the exculpatory clause protections described in Section VI(A)(2), supra, also shield the Edgecomb Directors and Officers from a charge of gross negligence. See supra at 22-25; Malpiede, 780 A.2d at 1094-1095.

C. Count III

The Plaintiff alleges in Count III of the Complaint that the Edgecomb Directors and Officers committed corporate waste with respect to the same actions as alleged in Counts I and II. (D.I. 4 at PP156-59.) In a case similar to the one at[*40] bar, the Chancery Court dismissed a claim of waste. Elkins, 2004 Del. Ch. LEXIS 122, 2004 WL 1949290, at *63-64. In that case, the Official Committee of Unsecured Creditors brought suit against a group of directors on behalf of the company they used to serve. With respect to their claim of waste, the court noted that [HN24] the Delaware standard for pleading corporate waste is stringent: "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." Id. at 17. Further,

waste is a standard rarely satisfied in Delaware courts. Indeed, waste is an extreme test, very rarely satisfied by a plaintiff. In Brehm v. Eisner, the Supreme Court described the plaintiffs' allegations as that the board not only committed a procedural due care violation in approving an employment agreement, but also that the Board committed a substantive due care violation constituting waste. The Court went on to dismiss the characterization of waste in this manner, equating due care with process. In evaluating a waste claim, courts look to the exchange itself. The exchange must be irrational.

Id. That standard[*41] applies equally to claims against officers and directors. See In re Walt Disney Co., 2004 Del. Ch. LEXIS 132, No. C.A. 15452, 1322004 WL 2050138, at *3 (Del. Ch. Sept. 10, 2004) ("the fiduciary duties of officers have been assumed to be identical to those of directors"). [HN25] Absent a breach loyalty, § 102(b)(7) protects directors and officers from a claim of corporate waste. Green v. Phillips, 1996 Del. Ch. LEXIS 76, C.A. No. 14436, 76 1996 WL 342093 at *7 (Del. Ch. June 19, 1996).

In the instant case, I have already found that the Plaintiff has not pleaded facts sufficient to show a breach of the duty of loyalty by any of the Edgecomb Directors and Officers. See supra at 17-22. Therefore, the exculpation clause protects the Edgecomb Directors and Officers from a claim of corporate waste.

Moreover, even without the protection of the exculpation clause, the Plaintiff has not alleged facts that Star did not receive adequate consideration for the transactions entered into and approved by the Edgecomb Directors. (Id. at P158.) In fact, the Plaintiff merely relists the same actions cited as support for Counts I and II of the Complaint. The corporate waste claim is conclusory and insufficient to[*42] overcome the protections of the business judgment rule. See Brehm v. Eisner, 746 A.2d 244, 263 (Del. 2000) (noting that [HN26] if "there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude ex post that the transaction was unreasonably risky").

D. Count IV & V

The Plaintiff alleges in Count IV of the Complaint that Messing and the Messing Outside Directors breached their fiduciary duties to Star and its creditors, and specifically their duty of care. (D.I. 4 at P160-64.) In Count V of the Complaint, the Plaintiff alleges gross negligence as to the same actions listed in Count IV. As previously discussed, gross negligence allegations are analyzed under the same frame work as are allegations of a breach of the duty of care. See supra at 25-26. Therefore, any finding that the Plaintiff failed to adequately plead a breach of the fiduciary duty of care, includes a conclusion that the Plaintiff has failed to adequately plead gross negligence.

i. The Messing Outside Directors

The[*43] Plaintiff alleges in its Complaint that the Messing Outside Directors breached their fiduciary duty with respect to the Gotel transaction, the IDT transaction, and the payment of $25,000 in expenses to Messing. (D.I. 4 at P162.) In its Opposition to the Defendants' Motion to Dismiss, the Plaintiff states that the Board only met once during the two-month period that Messing was in charge. (D.I. 73 at 43.)

The Complaint states, however, that upon request by Messing to approve the Gotel financing, the Board promptly held a special meeting. (D.I. 4 at PP104-05.) The Complaint goes on to say that "certain directors were concerned that control of the Company would change hands if the Company were to issue the warrants [as required by the financing]." (Id. at P105.) "Nevertheless, the directors ultimately yielded to Messing's insistence that they had no choice but to take whatever financing was available, and they authorized him to negotiate the Gotel transaction on behalf of Star." (Id. at P107.) With respect to the sale of PT-1 to IDT, the Complaint does not mention the Messing Outside Directors, aside from stating that "without any knowledge or approval from Star's Board, Messing[*44] signed the March 5 Letter on behalf of Star... ." (Id. at P136.)

In short, there are no allegations supporting, even inferentially, a claim for breach of the fiduciary duty of loyalty. As to any duty of care or gross negligence claims, again the Plaintiff's Complaint must yield to the exculpation clause contained in Star's charter. See supra at 22-25. Therefore, as to Count IV and V, the Plaintiff has failed to state a claim against the Messing Outside Directors. n14

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n14 Even without the exculpation clause, this claim could not stand. There is no denying that Star faced dire financial circumstances. In light of Star's desperate need for capital, the most damning conclusion that can be drawn from the facts pleaded in the Complaint is that the directors, when confronted with the difficult decision of whether to accept the Gotel financing, may have made a poor decision. But that does not amount to an abdication of responsibility by the Board.

The Plaintiff relies on Mills Acquisition Co. v. MacMillan, Inc., 559 A.2d 1261 (Del. 1989), to argue that the Board breached its duty of care (D.I. 73 at 43), but the facts of that case are easily distinguished from the one at bar. In Mills, the Court of Chancery held that the defendant directors were not protected by the business judgment rule when the directors approved a "lock-up" that restricted further bidding on the company that was to be sold. Mills Acquisition Co., 559 A.2d at 1286. The court held that "while those lock-ups which draw bidders into a battle benefit shareholders, similar measures which end an active auction and foreclose further bidding operate to the shareholders' detriment." Id. (internal citation omitted). In that case, the claim was that the directors approved the use of a lock-up that stopped rival bidders from winning the auction for the company so that fellow directors could purchase the company through a leveraged buy-out. Id. at 1279-80, 1286. Here, however, there were no other bidders for Star, the Company was on the verge of bankruptcy, and the Gotel financing was, by the Plaintiff's own admission, the only financing option presented to the Board. (D.I. 4 at P104-07.)

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*45]

ii. Sciarillo

The Complaint only mentions Sciarillo directly two times. First, it states that when Messing took control of Star, Sciarillo was made CFO, and, second, it contends that Sciarillo assisted Messing with the sale of PT-1 to IDT. (D.I. 4 at PP103, 122.) With respect to the other actions in which Messing participated, the Complaint frequently uses the term "his team," which presumably includes Sciarillo. (Id. at PP119-140.) The Plaintiff does not allege that Sciarillo received an improper benefit from any of the transactions in which the Plaintiff alleges he participated, or that he was interested

2004 U.S. Dist. LEXIS 25807, *

in the transactions in any other way. In fact, the only mention of Sciarillo in the Plaintiff's Opposition to the Defendants' Motion to Dismiss is that "Defendants Crumly and Sciarillo also participated in the IDT transaction as officers, though further discovery is required to establish the extent of their involvement." n15 (D.I. 73 at 23, n.10.) Consequently, the Plaintiff has failed to plead any facts to support a claim that Sciarillo breached his fiduciary duty of loyalty. Nor does it adequately plead a duty of care or gross negligence claim, and, if it did, the §[*46] 102(b)(7) charter provision would prevent such claims.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n15 Although Crumly is referenced with respect to Count IV and V, the Complaint does not even name him as a defendant in these claims. (D.I. 4 at PP160-68.) If it did, however, the conclusion as to Mr. Crumly would be the same as it is for Mr. Sciarillo.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

iii. Messing

The Plaintiff alleges that Messing violated his fiduciary duties to Star and its creditors and committed gross negligence with respect to the same actions as alleged against the Messing Outside Directors. (D.I. 4 at P162.) The Plaintiff alleges that Messing controlled Gotel, directly benefitted from the financing agreement entered into between Star and Gotel, and entered into an agreement with IDT to sell it PT-1 in order to secure future benefits from IDT. (Id. at PP117, 140.) Additionally, the Complaint alleges that Messing submitted a bill for $25,000, $10,616 of which was payed to another company that he allegedly controlled. (Id. at P145) The Plaintiff contends that this was[*47] far in excess of the value that was received by Star. (Id.)

If the facts pleaded by the Plaintiff are taken as true, then Messing received a direct financial benefit from all of these transactions. Because Messing is alleged to have received a benefit from these transactions, which was not received by the shareholders generally, the Plaintiff has pleaded sufficient facts to support the allegation that Messing was interested in these transactions. See Rales, 634 A.2d at 936 (holding that [HN27] "[a] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders"). Therefore, as to Messing and Counts IV and V, the Plaintiff has pleaded claims of breach of the fiduciary duty of loyalty sufficient to withstand the Motion to Dismiss. n16

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n16 Because the Plaintiff has adequately pleaded a breach of the duty of loyalty, at this stage of the proceeding, Messing cannot claim the protection of § 102(b)(7) from claims of gross negligence. See Levy v. Stern, 687 A.2d 573 (Del. 1996) (holding that § 102(b)(7) "is inapplicable ... where the alleged breach entails bad faith, intentional misconduct, or a breach of the duty of loyalty").

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*48]

2004 U.S. Dist. LEXIS 25807, *

### E. Count VI

The Plaintiff alleges in Count VI of the Complaint that Messing, Sciarillo, and the Messing Outside Directors wasted corporate assets. (D.I. 4 at P160-64.) As discussed in relation to Count III, a finding of corporate waste requires that the transaction in question be "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." In re Walt Disney Co. Derivative Litig., 731 A.2d 342, 362 (Del. Ch. 1998) (internal citation omitted); see supra at 26-27. In its Opposition to the Defendants' Motion to Dismiss, the Plaintiff only addresses Messing and his involvement in the March 5 Letter agreement and the $25,000 disbursement. The Plaintiff alleges that Star received no compensation for the March 5 Letter agreement, which would lead any reasonable business person to find that there had been corporate waste.

The Plaintiff also alleges that Messing requested and received a $25,000 disbursement. (D.I. 4 at P141.) $10,616 of that disbursement is alleged to have been paid to a company Messing controlled. (Id. at P145.) That fact, coupled with the timing of the submission, [*49] shortly before Messing resigned (Id. at PP141-45.), sufficiently supports the Plaintiff's allegation of corporate waste to withstand the Motion to Dismiss. Therefore, with respect to Messing, the claim of corporate waste is allowed. As to all other defendants, the same pleading failures that resulted in the dismissal of Counts IV and V necessitate dismissal of this claim against them. See supra at 28-30.

### F. Count VII

The Plaintiff alleges in Count VII of the Complaint that Messing unjustly enriched himself at the expense of Star. (D.I. 4 at P173-76.) Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." Fleer Corp. v. Topps Chewing Gum, 539 A.2d 1060, 1062 (Del. 1988) (internal citation omitted). For the reasons discussed in section IV(D), supra, the Plaintiff has sufficiently pleaded its claim that Messing was unjustly enriched, and, consequently, Count VII will not be dismissed. See supra at 30-31.

### V. Conclusion

For the reasons set forth herein, the Defendants' Motion to Dismiss[*50] will be granted as to all the Defendants except Messing. An appropriate order will issue.

### ORDER

For the reasons stated in the Memorandum Opinion issued today,

IT IS HEREBY ORDERED that the Defendants' Motion to Dismiss (D.I. 63; the "Motion") is DENIED as to Counts IV, V, VI, and VII of the First Amended Complaint (D.I. 4) insofar as those Counts allege claims against defendant Brett S. Messing; and,

IT IS FURTHER ORDERED that the Motion is GRANTED in all other respects.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

December 21, 2004
Wilmington, Delaware