# EXHIBIT B

# CORAM HEALTHCARE CORP (CRH)

1675 BROADWAY
SUITE 900
DENVER, CO 80202
303. 292.4973

# 8–K

**FORM 8–K**
**Filed on 12/08/1999 – Period: 11/23/1999**
File Number 001–11343



www.gsionline.com

1

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

----------

FORM 8-K

CURRENT REPORT
PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): November 23, 1999
-----------------

CORAM HEALTHCARE CORPORATION
----------------------------------------------------
(Exact Name of Registrant as Specified in Charter)

| Delaware | 1-11343 | 33-0615337 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

1125 Seventeenth Street, Suite 2100, Denver, Colorado                80202
------------------------------------------------------------------------
(Address of Principal Executive Offices)                          (Zip Code)

(303) 292-4973
----------------------------------------------------
(Registrant's telephone number, including area code)

2

Item 5.  Other Events.

On November 23, 1999, Coram Healthcare Corporation (the "Company") announced that it had finalized an agreement with its principal debtholders pursuant to which its debtholders will forego interest payments, totaling up to $13 million, on the Company's Series A and Series B Notes that were issued pursuant to that certain Securities Exchange Agreement (the "Exchange Agreement") dated as of May 6, 1998, as amended. The Exchange Agreement is among the Company; Coram, Inc.; and Cerberus Partners, L.P.; Goldman Sachs Credit Partners L.P.; and Foothill Capital Corporation as note holders. The precise terms of such agreement are set forth in that certain Amendment No. 3 and Forbearance (the "Amendment No. 3"), dated November 15, 1999, in respect of the Exchange Agreement. Pursuant to Amendment No. 3, the Company will not be required to pay interest on the Series A and Series B Notes for the period from November 15, 1999 through the earlier of the Company's final resolution of its litigation with Aetna U.S. Healthcare, Inc. or May 15, 2000. In addition, the debtholders agreed to waive any non-compliance with certain financial covenants set forth in the Company's Senior Credit Facility for the period ending December 31, 1999.

The Company also announced on November 23, 1999 that its Executive Vice President and Chief Financial Officer, Wendy L. Simpson had resigned. Ms. Simpson has agreed to perform certain services for the Company in connection with a transition of her responsibilities. The Company has commenced a search for a new Chief Financial Officer.

Further, the Company announced on November 30, 1999 that, effective as of such date, the Company named Daniel D. Crowley Chairman of the Board, President and Chief Executive Officer. The press releases issued by the Company in connection with the November 23, 1999 and November 30, 1999 announcements described herein are attached here to as Exhibits 99.1 and 99.2, respectively.

Item 7.  Financial Statements and Exhibits.

(a)     None.

(b)     None.

(c)     Exhibits.

10.49   Amendment No. 3 and Forbearance, dated November 15, 1999, in respect of the Securities Exchange Agreement among Coram, Inc.; Coram Healthcare Corporation; and Cerberus Partners, L.P.; Goldman Sachs Credit Partners L.P. and Foothill Capital Corporation as note holders.

99.1    Press Release, issued November 23, 1999, relating to the Company's agreement with its principal debtholders regarding the Series A and Series B Notes, and the resignation of the Company's Executive Vice President and Chief Financial Officer.

99.2    Press Release, issued November 30, 1999, relating to the employment of Daniel D. Crowley as Chairman of the Board, President and Chief Executive Officer.

3

SIGNATURES

      Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.


CORAM HEALTHCARE CORPORATION


By: /s/ Scott T. Larson
    ---------------------------------------
    Scott T. Larson
    Senior Vice President,
    General Counsel and
    Secretary

Date:  December 8, 1999

4

# EXHIBIT INDEX

10.49    Amendment No. 3 and Forbearance, dated November 15, 1999, in respect of the Securities Exchange Agreement among Coram, Inc.; Coram Healthcare Corporation; and Cerberus Partners, L.P.; Goldman Sachs Credit Partners L.P. and Foothill Capital Corporation as note holders.

99.1    Press Release, issued November 23, 1999, relating to the Company's agreement with its principal debtholders regarding the Series A and Series B Notes, and the resignation of the Company's Executive Vice President and Chief Financial Officer.

99.2    Press Release, issued November 30, 1999, relating to the employment of Daniel D. Crowley as Chairman of the Board, President and Chief Executive Officer.

# CORAM HEALTHCARE CORP (CRH)

1675 BROADWAY
SUITE 900
DENVER, CO 80202
303. 292.4973

# EX-10.49

**AMENDMENT NO. 3 AND FORBEARANCE**
**8-K Filed on 12/08/1999 - Period: 11/23/1999**
File Number 001-11343



LIVEDGAR Information Provided by Global Securities Information, Inc.
www.gsionline.com

1

EXHIBIT 10.49

Amendment No. 3 and Forbearance (this "Agreement"), dated as of November 15, 1999, in respect of the Securities Exchange Agreement dated as of May 6, 1998, as heretofore amended (said Securities Exchange Agreement, as so amended, being the "Securities Exchange Agreement", and the terms defined therein being used herein as therein defined unless otherwise defined herein) among CORAM, INC., a Delaware corporation (the "Company"), CORAM HEALTHCARE CORPORATION, a Delaware corporation ("Holdings"), CERBERUS PARTNERS, L.P. ("Cerberus"), GOLDMAN SACHS CREDIT PARTNERS L.P. ("GSCP") and FOOTHILL CAPITAL CORPORATION ("Foothill") (each a "Noteholder" and, together with any other holders from time to time of interests in the Series A Notes or Series B Notes, collectively, the "Noteholders").

W I T N E S S E T H :

WHEREAS, the Original Noteholders, the Company and Holdings entered into the Securities Exchange Agreement, pursuant to which the Original Noteholders received, among other things, Series A Notes and Series B Notes, as the case may be, in exchange for the Original Noteholders' interests in the Subordinated Rollover Notes and the Warrants; and

WHEREAS, as of the date hereof, the Original Noteholders own in the aggregate 100% of the outstanding principal amount of the Series A Notes and Series B Notes; and

WHEREAS, the Company and Holdings have requested and the Noteholders have agreed (i) to reduce the interest rate applicable to the Series A and the Series B Notes to zero for a period of six months from November 15, 1999 to the earlier of (A) May 15, 2000 and (B) the Aetna Settlement Date and (ii) to forbear from exercising certain rights and remedies available to the Noteholders following a Specified Event of Default (as hereinafter defined); and

WHEREAS, the Company, Holdings and the Noteholders have agreed to amend the Securities Exchange Agreement and to enter into this Agreement upon the terms and subject to the conditions contained herein;

NOW, THEREFORE, the parties hereto agree as follows:

Section 1. Amendments to the Securities Exchange Agreement. Upon the satisfaction of the conditions in Section 4 of this Agreement relating to the effectiveness of Section 1, the Securities Exchange Agreement is hereby amended as follows:

(a) Section 1 is hereby amended by adding the definitions of "Aetna Settlement Date", "Applicable Series B Rate", "Interest Restart Date" and "Net Cash Proceeds" as follows:

2

"Aetna Settlement Date" shall mean the date of any final settlement of all claims in the litigation between Aetna U.S. Healthcare Inc. and its affiliates and Coram Healthcare Corporation and the other Coram parties.

"Applicable Series B Rate" shall mean (i) from the Effective Date to November 15, 1999, 8.00% per annum, (ii) from November 15, 1999 to the Interest Restart Date, 0.00% per annum and (iii) thereafter, 8.00% per annum.

"Interest Restart Date" shall mean the earlier of (i) May 15, 2000 and (ii) the Aetna Settlement Date.

(b) The definition of "Applicable Series A Rate" set forth in Section 1 of the Securities Exchange Agreement is hereby deleted in its entirety and replaced with the following:

"Applicable Series A Rate" shall mean (i) from the Effective Date to the Amendment Date, 9-7/8% per annum, (ii) from the Amendment Date to November 15, 1999, 11-1/2% per annum, (iii) from November 15, 1999 to the Interest Restart Date, 0.00% per annum, and (iv) thereafter, 11-1/2% per annum.

(c) Section 2.5(b) of the Securities Exchange Agreement is hereby deleted in its entirety and replaced with the following:

(b) The Company will pay interest, accruing from and after the Effective Date, on the Series B Notes to each Noteholder quarterly in arrears on January 15, April 15, July 15 and October 15 of each year, commencing July 15, 1998 (each an "Interest Payment Date") at the Applicable Series B Rate.

Section 2. Representations and Warranties of the Company and Holdings. Each of the Company and Holdings hereby represents and warrants as to itself and the Coram Parties that (a) the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action on the part of such Coram Party and this Agreement and the Securities Exchange Agreement amended hereby each constitutes a legal, valid and binding obligation of such Coram Party, enforceable against it in accordance with its terms, (b) no event has occurred and is continuing on the date hereof that constitutes a Default or Event of Default or would constitute a Default or Event of Default after giving effect to this Agreement, and (c) the representations and warranties of Holdings and the Company contained in Section 4 of the Securities Exchange Agreement are true and correct both before and after giving effect to this Agreement, except to the extent such representations and warranties are stated to be true only as of a particular date, in which case such representations and warranties were correct on and as of such date.

3

Representations and Warranties of the Noteholders. Each of the Noteholders hereby represents and warrants as to itself that the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate or partnership action on the part of such Noteholder.

Section 3. Forbearance. Each of the Noteholders hereby agrees that, with effect from the date hereof until May 15, 2000 (the "Forbearance Termination Date") (such period being the "Forbearance Period"), it will not exercise any of the rights or remedies available to it (whether now existing or hereafter arising) following the occurrence and during the continuance of a Specified Event of Default (as hereinafter defined). For the purposes of this Section 4, "Specified Event of Default" shall mean an Event of Default under Section 8.1(f)(ii) of the Securities Exchange Agreement which results solely from the failure by Holdings and its Consolidated Subsidiaries to comply with the financial covenants set forth in Section 7.12 of the Senior Loan Agreement for the periods ended September 30, 1999 and December 31, 1999. Subject to this Section 4, the Noteholders may exercise any right or remedy available to them pursuant to the Note Documents or by applicable law or in equity during the Forbearance Period, including, without limitation, as a result of a Default or Event of Default other than the Specified Event of Default, and nothing herein shall restrict, inhibit or prohibit the Noteholders from exercising any such right or remedy or from the prosecution or continued prosecution of any action or proceeding in furtherance of the foregoing.

Section 4. Conditions to Effectiveness. The amendments in Section 1 of this Agreement and the forbearance in Section 4 of this Agreement shall become effective on the date when (a) counterparts hereof shall have been executed by each of the Noteholders, Holdings and the Company and (b) Holdings and each Subsidiary Guarantor listed on Annex A shall have executed a consent and confirmation of guaranty in the form attached hereto as Exhibit A.

Section 5. Effect on the Securities Exchange Agreement. Except as amended hereby, the Securities Exchange Agreement and the other Note Documents shall remain in full force and effect. Except as set forth herein, nothing in this Agreement shall be deemed to (i) constitute a forbearance or waiver of compliance by any of the Coram Parties of any term, provision or condition of the Securities Exchange Agreement or any other instrument or agreement referred to therein or under the Note Documents or (ii) prejudice any right or remedy that any Noteholder may now have or may have in the future under or in connection with the Securities Exchange Agreement or any other Note Document.

Section 6. Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together constitute one and the same agreement.

Section 7. Governing Law. The validity, interpretation and enforcement of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the conflict of laws principles thereof.

Section 8. Headings. Section headings in this Agreement are included herein for the convenience of reference only and shall not constitute part of this Agreement for any other purpose.

4

      Section 9. References. References herein and in the other Note Documents to the "Securities Exchange Agreement", "this Agreement", "hereunder", "hereof", or words of like import referring to the Securities Exchange Agreement, shall mean and be a reference to the Securities Exchange Agreement as amended hereby.

[Signatures on following page]

5

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their proper and duly authorized officers as of the date set forth above.

CORAM, INC.

By: /s/ Donald J. Amaral
    ----------------------------------------
    Name:  Donald J. Amaral
    Title: Chairman and Chief
           Executive Officer


CORAM HEALTHCARE CORPORATION

By: /s/ Donald J. Amaral
    ----------------------------------------
    Name:  Donald J. Amaral
    Title: Chairman and Chief
           Executive Officer


CERBERUS PARTNERS, L.P.

By: /s/ Stephen Feinberg
    ----------------------------------------
    Name:  Stephen Feinberg
    Title: Managing Member Cerberus
           Associates L.L.C. General
           Partners


GOLDMAN SACHS CREDIT PARTNERS L.P.

By: /s/ John Urban
    ----------------------------------------
    Name:  John Urban
    Title: Managing Director


FOOTHILL CAPITAL CORPORATION

By: /s/ M.E. Stearns
    ----------------------------------------
    Name:  M.E. Stearns
    Title: Senior Vice President

6

EXHIBIT A

CONSENT

Dated as of November 15,1999

Each of the undersigned, in its capacity as a Guarantor under the Securities Exchange Agreement referred to in the foregoing Agreement, hereby consents to the said Agreement and hereby confirms and agrees that its guaranty of the Guaranteed Obligations (as such term is defined in the Guarantee Agreements) is, and shall continue to be, in full force and effect and is hereby ratified and confirmed in all respects except that, upon the effectiveness of, and on and after the date of, the said Agreement, each reference in each Guarantee Agreement to "this Agreement", "hereunder", "thereunder", "thereof" or words of like import shall mean and be a reference to the Securities Exchange Agreement as amended by said Agreement.

This Consent may be executed in any number of counterparts each of which, when executed and delivered, shall constitute an original, but all executed counterparts together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Consent by telecopier shall be effective as delivery of a manually executed counterpart of this Consent.

CORAM HEALTHCARE CORPORATION

By: /s/ Donald J. Amaral
   ------------------------------------------
   Name:  Donald J. Amaral
   Title: Chairman and Chief Executive
          Officer

FOR EACH OF THE SUBSIDIARY
GUARANTORS LISTED ON ANNEX A
HERETO

By: /s/ Wendy Simpson
   ------------------------------------------
   Name:  Wendy Simpson
   Title: Chief Financial Officer

c/o Coram Healthcare Corporation
1125 Seventeenth Street, Suite 1500
Denver, CO 80202

7

ANNEX A

Subsidiaries

Coram International Holdings Ltd.
Coram Healthcare Limited

Coram Physician Services, Inc.
        Fairfax Hematology Oncology Associates, Inc.
Healthinfusion, Inc.
H.M.S.S., Inc.
        Coram Homecare of Texas, Inc.
        Infusion Affiliates of Dallas, Inc.
Medisys, Inc.
        Coram Homecare of Illinois, Inc.
T2 Medical, Inc.
        Columbia Home Therapeutics, Inc.
        Coram Healthcare Corporation of Alabama
        Coram Healthcare Corporation of Colorado
        Coram Healthcare Corporation of Connecticut
        Coram Healthcare Corporation of Delaware
        Coram Healthcare Corporation of Florida
        Coram Healthcare Corporation of Greater D.C.
        Coram Healthcare Corporation of Greater New York
        Coram Healthcare Corporation of Illinois
        Coram Healthcare Corporation of Indiana
        Coram Healthcare Corporation of Iowa
        Coram Healthcare Corporation of Kansas
        Coram Healthcare Corporation of Kentucky
        Coram Healthcare Corporation of Louisiana
        Coram Healthcare Corporation of Michigan
        Coram Healthcare Corporation of Minnesota
        Coram Healthcare Corporation of Missouri
        Coram Healthcare Corporation of Mississippi
        Coram Healthcare Corporation of Nebraska
        Coram Healthcare Corporation of Nevada
        Coram Healthcare Corporation of New Hampshire
        Coram Healthcare Corporation of New Jersey
        Coram Healthcare Corporation of New Mexico
        Coram Healthcare Corporation of North Carolina
        Coram Healthcare Corporation of Northern California
        Coram Healthcare Corporation of Ohio
        Coram Healthcare Corporation of Oklahoma

8

Coram Healthcare Corporation of Oregon
Coram Healthcare Corporation of Pennsylvania
Coram Healthcare Corporation of Rhode Island
Coram Healthcare Corporation of South Carolina
Coram Healthcare Corporation of Southern California
Coram Healthcare Corporation of Southern Florida
Coram Healthcare Corporation of Tennessee
Coram Healthcare Corporation of Texas
Coram Healthcare Corporation of Virginia
Coram Healthcare Corporation of Washington
Coram Healthcare Corporation of West Virginia
Coram Healthcare Corporation of Wisconsin
Coram Homecare of Arizona, Inc.
Coram Homecare of Kansas, Inc.
Coram Homecare of Michigan, Inc.
Coram Homecare of Minnesota, Inc.
Coram Homecare of Nebraska, Inc.
Coram Homecare of Northern California, Inc.
Coram Homecare of Ohio, Inc.
Coram Homecare of South Carolina, Inc.
Coram Homecare of South Carolina, L.L.C.
Coram Homecare of Virginia, Inc.
Coram Homecare of Wisconsin, Inc.
Coram Management of Hawaii, Inc.
Coram Service Corporation
Curaflex Health Services, Inc.
          Caremark Pharmacy Services, Inc.
          Comprehensive Pharmacy Home IV Services, Inc.
          Coram Alternative Site Services, Inc.
          Coram Healthcare Corporation of Massachusetts
                 Clinical Homecare Corporation Coram
          Healthcare Corporation of New York Coram Healthcare
          Corporation of North Texas Coram Healthcare
          Corporation of Utah Coram Healthcare of Wyoming,
          L.L.C. Stratogen of Rhode Island, Inc.
Dallas Home Therapeutics, Inc.
Extendacare Health Systems, Inc.
Intracare Holdings Corporation

# CORAM HEALTHCARE CORP (CRH)

1675 BROADWAY
SUITE 900
DENVER, CO 80202
303. 292.4973

# EX-99.1

**PRESS RELEASE ISSUED NOVEMBER 23, 1999**
**8-K Filed on 12/08/1999 – Period: 11/23/1999**
File Number 001-11343



LIVEDGAR Information Provided by Global Securities Information, Inc. 800.669.1154
www.gsionline.com

1

EXHIBIT 99.1

### CORAM HEALTHCARE OBTAINS DEBT COVENANT WAIVERS AND
### DEBT INTEREST FORBEARANCE THROUGH APRIL 2000

DENVER, Nov. 23, 1999 ....Coram Healthcare Corporation (NYSE:CRH) today announced that it has finalized an agreement with it principal debtholders pursuant to which its debtholders will forego interest payments, totaling up to $13 million, on the company's Series A and Series B Notes. Specifically, the company will not be required to pay interest on such notes for the period from November 15, 1999 through the earlier of the company's final resolution of its litigation with Aetna U.S. Healthcare, Inc. or May 15, 2000. In addition, the debtholders have waived any non-compliance with certain financial covenants set forth in the company's Senior Credit Facility for the period ending December 31, 1999.

"The grant of these waivers demonstrates an extraordinary commitment, on the part of the company's debtholders, to management's plan for restoring this company to profitability. These concessions from our debtholders and continuing improvements in the company's core business operations have increased our confidence that we can overcome the short term financial challenges now confronting this industry and our business," said Donald J. Amaral, chairman and interim chief executive officer of Coram Healthcare Corporation.

The company also announced today that its executive vice president and chief financial officer, Wendy L. Simpson, has resigned her positions with the company and its subsidiaries, effective Friday, November 26, 1999. The company has commenced a search for a new chief financial officer.-

"Wendy Simpson has played an integral role in both formulating and implementing our plans for improving the financial performance of the company and she has been instrumental in managing our relationship with our debtholders throughout her tenure with us. The concessions we announced today would not have been possible without her. We are grateful for her contributions and wish her well," said Mr. Amaral.

2

USA-based Coram is a leading provider of high quality home infusion therapy operating from 88 locations in 43 states and Ontario, Canada. Coram's Prescription Services Division provides pharmacy benefit management services as well as mail order prescription drugs for chronically ill patients. The Clinical Trials and Medical Informatics Division provides home care and product development services to pharmaceutical, biotechnology and medical device companies sponsoring clinical trials.

Note: Except for historical information, all other statements provided in this press release are "forward-looking" within the meaning of the Private Securities Litigation Reform Act of 1995. The Company's actual results may vary materially from the forward-looking statements made above due to important factors such as the Company's history of operating losses and uncertainties associated with future operating results; significant outstanding indebtedness; equity conversion rights held by existing debt holders; limited liquidity; reimbursement-related risks; shifts in the mix of parties that pay for the Company's services; dependence upon relationships with third parties; uncertain future liabilities under capitation arrangements; concentration of large payors; the intensely competitive industry; the timing of or ability to complete acquisitions; government regulation of the home health care industry; certain legal proceedings; dependence on key personnel; recruitment and retention of trained personnel; potential volatility of stock price; New York Stock Exchange listing status; and unanticipated impacts from the Year 2000 issue. These and other risk factors that could affect Coram's financial results are further described in the Company's Form 10-K Annual Report, as amended, Form 10-Q Quarterly Reports, and Form 8-K Current Reports on file with the Securities and Exchange Commission.

# CORAM HEALTHCARE CORP (CRH)

1675 BROADWAY
SUITE 900
DENVER, CO 80202
303. 292.4973

# EX-99.2

**PRESS RELEASE ISSUED NOVEMBER 30, 1999**
**8-K Filed on 12/08/1999 – Period: 11/23/1999**
File Number 001–11343



LIVEDGAR™ Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

1

EXHIBIT 99.2

### DANIEL D. CROWLEY NAMED CHAIRMAN, PRESIDENT AND CEO OF CORAM HEALTHCARE: NEW LEADER HAS REPUTATION FOR FOCUS, INTENSITY AND SUCCESSFUL TURNAROUNDS

DENVER - NOV. 30, 1999 - Coram Healthcare Corporation (NYSE: CRH) announced that, effective today, Daniel D. Crowley has been named Chairman of the Board, President and Chief Executive Officer. Former Coram Chairman and interim Chief Executive Officer Donald J.

Amaral will remain a member of the Board of Directors.

"I am pleased to announce Dan Crowley's arrival at Coram today," said Mr. Amaral. "I have known Dan for a number of years and believe his focus, intensity and turnaround experience will strengthen the company to better compete and better serve our customers, healthcare providers, employees and shareholders."

Mr. Crowley, 52, is Chairman, President and CEO of Sacramento-based Dynamic Healthcare Solutions, a management consulting and investment firm he established in 1997. He also serves as Chairman of the Board of Winterland, a leading privately held affinity merchandise company in the music and entertainment industry. He is also founder of the Crowley Children's Fund, a charitable organization supporting programs for at-risk children.

"My initial focus will be to assess Coram's strengths and opportunities and to provide the leadership catalyst that will create the possibility for a solid turnaround," said Mr. Crowley. "By initiating a disciplined business planning process and a performance-driven incentive program targeted to achieve very specific goals, the Coram team will be able to refocus the energy of the organization toward those areas holding the greatest potential to create profitable growth, positive cash flow and shareholder value.

"With the proposed sale of Coram's prescription services unit and the wind-down of the R-Net subsidiaries, we have a unique opportunity to refocus Coram on its core home infusion business and to build on this with Coram's synergistic clinical trials and medical informatics business. After an initial assessment, we will be prepared to communicate our turnaround plans in more detail.

"Clearly Coram faces a number of very real challenges. However, one positive is that the company's lenders have indicated their support for the company and its leadership by granting the recently announced 6-month moratorium on certain covenants and principal and interest payments."

Before founding Dynamic Healthcare Solutions, Mr. Crowley was Chairman, President and CEO of Foundation Health Corporation. He joined Foundation in 1989 to turn around the diffused, unprofitable company heavily indebted from a leveraged buyout. Under his leadership the company rapidly became profitable, established itself as a national leader in

2

managed care and joined the ranks of the Fortune 500. It grew from less than $300 million in revenues in 1988 to more than $5 billion in 1997, when Mr. Crowley completed a strategic merger with another company.

Prior to his role at Foundation Health, he served as the Executive Vice President of Blue Cross and Blue Shield of Ohio where he led the turnarounds of several business units, including the Western Division, where he reestablished the viability of that operation.

More recently, he brought management focus, stronger profitability and operational improvements to Winterland during a turnaround and a period of rapid growth. The result has been financial performance ahead of plan and the successful refinancing of a portion of Winterland's debt.

Denver-based Coram Healthcare Corporation, through its subsidiaries, is a national leader in providing quality home infusion therapy, support for clinical trials, medical product development and medical informatics, and pharmacy benefit management and mail order services.

Note: Except for historical information, all other statements in this press release are "forward-looking" within the meaning of the Private Securities Litigation Reform Act of 1995. The Company's actual results may vary materially from these forward-looking statements due to important risk factors including the Company's history of operating losses and uncertainties associated with future operating results; significant outstanding indebtedness; equity conversion rights held by existing debt holders; limited liquidity; reimbursement-related risks; shifts in the mix of parties that pay for the Company's services; dependence upon relationships with third parties; uncertain future liabilities under capitation arrangements; timing of or ability to complete acquisitions; government regulation of the home health care industry; certain legal proceedings; dependence on key personnel; potential volatility of the stock price; New York Stock Exchange listing status; and unanticipated impacts from the Year 2000 issue. These and other risk factors are described in the Company's form 10-K Annual Report, as amended, Form 10-Q Quarterly Reports, and Form 8-K Current Reports on file with the Securities and Exchange Commission.

# EXHIBIT C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

———————————————————— x
                                         :
In re                                    :    Chapter 11
                                         :
CORAM HEALTHCARE CORP. and               :    Case Nos. 00-3299 (MFW)
CORAM, INC.,                             :    through 00-3300 (MFW)
                                         :
                    Debtors.             :    Jointly Administered
                                         :
———————————————————— x


## REPORT OF INDEPENDENT RESTRUCTURING ADVISOR
## GOLDIN ASSOCIATES, L.L.C.


GOLDIN ASSOCIATES, L.L.C.
400 Madison Avenue
New York, New York 10017
(212) 593-2255


OF COUNSEL:
KRAMER LEVIN NAFTALIS & FRANKEL LLP
919 Third Avenue
New York, NY 10022
(212) 715-9100

## TABLE OF CONTENTS

Page

I.   THE NATURE AND SCOPE OF THE EXAMINATION                                    1

    A.   Background                                                            1

    B.   Scope of the Examination                                             4

    C.   Methodology of the Examination                                       6

II.  CONCLUSIONS AND RECOMMENDATIONS                                          10

III. FACTUAL FINDINGS                                                        15

    A.   Background                                                           15

    B.   The Noteholders                                                      19

    C.   The Aetna Contract                                                   22

    D.   The Smith Era                                                        24

    E.   Crowley's Arrival                                                    29

        1.   The Relationship Between Crowley and Cerberus                   29

        2.   Crowley's Role as Consultant                                   34

        3.   Coram's Outside Directors                                      37

    F.   The Crowley Era                                                      39

        1.   Crowley's Compensation                                         40

        2.   Coram's Financial Condition at Year-End 1999                   42

        3.   Crowley's Performance as CEO                                   46

    G.   Events Leading Up to the Bankruptcy Filing                           51

IV.  FINANCIAL ANALYSIS                                                      56

    A.   Coram's Enterprise Value                                             56

        1.   Comparable Public Company Market Analysis                      57

            a.   Selection of Comparable Companies                         59

|  |  |  |  | <u>Page</u> |
|---|---|---|---|---|
|  |  | b. | Calculation of Multiples | 59 |
|  |  | c. | Application of Multiples -- Coram Valuation | 62 |
|  | 2. | | Comparable Company Transaction Analysis | 63 |
|  |  | a. | Selection of Comparable Transactions | 64 |
|  |  | b. | Calculation of Multiples | 65 |
|  |  | c. | Application of Multiples -- Coram Valuation | 65 |
|  | 3. | | Discounted Cash Flow Analysis | 66 |
|  |  | a. | Industry Fundamentals and Coram's Circumstances | 67 |
|  |  | b. | Projections -- Initial Period | 70 |
|  |  | c. | Perpetual Period Projection | 73 |
|  |  | d. | Discount Rate -- Weighted Average Cost of Capital | 74 |
|  |  | e. | DCF Valuation | 75 |
|  | 4. | | Adjustments to Enterprise Value Considered | 76 |
|  |  | a. | Excess Cash | 76 |
|  |  | b. | Internal Revenue Service Claim | 77 |
|  |  | c. | SabraTek Pump Replacement | 77 |
|  |  | d. | Net Operating Tax Loss Carryforward | 78 |
|  |  | e. | Clinical Trials, Inc. | 78 |
|  |  | f. | PricewaterhouseCoopers Litigation | 78 |
|  | 5. | | Conclusions | 79 |
| B. | | | The Integrity and Accuracy of Coram's Financial Records | 80 |
|  | 1. | | Reliability of Financial Statements | 82 |

KL2:2108873.5
C:\WINDOWS\TEMPORARY INTERNET FILES\OLKD005\#1096030 V1 - GOLDIN REPORT (WORD FORMAT).DOC
07/31/01 10:29 AM

|  |  |  | Page |
|---|---|---|---|
| | a. | In General | 82 |
| | b. | Interviews | 83 |
| | c. | Analytical Procedures | 84 |
| 2. | | Issues Raised Regarding Potentially Managed Results | 84 |
| | a. | The Chanin Valuation | 84 |
| | b. | Gross Revenue, Contractual Allowances and Net Revenue | 85 |
| | c. | Deferral of Revenue | 88 |
| | d. | Deferral of Cost-Cutting Initiatives | 88 |
| | e. | A Question of Managed 2000 EBITDA | 89 |
| 3. | | Conclusions | 91 |
| V. | LEGAL ANALYSIS | | 93 |
| A. | | The Equity Committee's Proposed Complaint | 93 |
| 1. | | The Allegations | 94 |
| | a. | The "Conspiracy" Allegations | 94 |
| | b. | The "Mismanagement" Allegations | 100 |
| | i. | The Alleged Scheme to Oust Smith | 100 |
| | ii. | The Alleged Failure to Explore Options Other Than Chapter 11 | 103 |
| | (A) | Merger or Sale Opportunities | 104 |
| | (B) | Capital-Raising Opportunities | 105 |
| | iii. | The Allegedly Improper CPS Sale | 107 |
| | iv. | The Challenged July 2000 Payments to the Noteholders | 109 |

-iii-

| | | | | Page |
|---|---|---|---|---|
| | | v. | The Allegation That Coram Delayed Filing as Long as Possible | 111 |
| | 2. | | The Asserted Causes of Action | 112 |
| | | a. | Crowley and Feinberg | 113 |
| | | b. | Cerberus | 117 |
| B. | | | The Equity Committee's Objections to Confirmation | 117 |
| | 1. | | The "Fair and Equitable" Requirement | 118 |
| | 2. | | The "Good Faith" Requirement | 118 |
| | 3. | | The Validity of Cerberus' Claim | 120 |

APPENDICES 1 - 12

KL2:2108873.5
C:\WINDOWS\TEMPORARY INTERNET FILES\OLKD005\#1096030 V1 - GOLDIN REPORT (WORD FORMAT).DOC
07/31/01 10:29 AM

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

———————————————————— x

In re

CORAM HEALTHCARE CORP. and
CORAM, INC.,

                                    Debtors.

———————————————————— x

: Chapter 11
:
: Case Nos. 00-3299 (MFW)
: through 00-3300 (MFW)
:
: Jointly Administered
:
:

## REPORT OF INDEPENDENT RESTRUCTURING ADVISOR, GOLDIN ASSOCIATES, L.L.C.

This report (the "Report") of the independent restructuring advisor, Goldin

Associates, L.L.C. ("Goldin"), sets forth Goldin's findings of fact, financial analysis and legal

conclusions, as well as its recommendations concerning potential amendments to the Debtors'

plan of reorganization.  The Report begins with a description of the circumstances that gave rise

to Goldin's appointment, the objectives and scope of its investigation and the methodology it

used (Section I).  The Report then presents a summary of Goldin's conclusions and

recommendations to Coram's independent directors (Section II), before turning to a detailed

discussion of Goldin's findings of fact (Section III), valuation of the Debtors and assessment of

the integrity and accuracy of the Debtors' financial records (Section IV) and analysis of the

Equity Committee's proposed complaint and objections to confirmation of the Debtors' plan of

reorganization (Section V).

## I. THE NATURE AND SCOPE OF THE EXAMINATION

### A.     Background

On August 8, 2000 (the "Petition Date") Coram Healthcare Corp. ("Coram

Healthcare") and its wholly-owned subsidiary Coram, Inc. (together, "Coram" or "the Debtors")

1

filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Pursuant to

sections 1107 and 1108 of the Code, the Debtors are continuing to operate their businesses and

manage their properties and assets as debtors-in-possession.

On August 22, 2000 the United States Trustee designated an Official Committee

of Unsecured Creditors (the "Creditors' Committee").  On October 18, 2000 the United States

Trustee designated an Official Committee of Equity Security Holders (the "Equity Committee")

to represent the interests of the holders of Coram Healthcare's common stock.

The Debtors filed a joint plan of reorganization and a disclosure statement on the

Petition Date and filed an amended joint plan of reorganization (the "Plan of Reorganization" or

"Plan") and an accompanying disclosure statement (the "Disclosure Statement") on or about

October 10, 2000.  The Bankruptcy Court approved the Disclosure Statement in October 2000.

All classes entitled to vote on the Plan voted to accept the Plan.

The Plan provided, among other things, for Coram Healthcare's stock to be

extinguished and for its shareholders to receive no distributions.  The Plan also provided for

Coram's Noteholders, who were owed approximately $252.6 million of principal and accrued

interest, to receive $180 million of secured notes and 100% of the equity of Reorganized Coram,

consideration with an aggregate value estimated at approximately 83% of the amounts owed the

Noteholders.  Finally, the Plan provided for a $2 million cash payment to Coram Healthcare's

general unsecured creditors (whose claims  totaled approximately $7.66 million) and for the

claims of Coram Inc.'s general unsecured creditors (which totaled less than $100,000) to pass

through the bankruptcy unimpaired.

The Equity Committee took extensive discovery in anticipation of the confirmation hearing. In November 2000, toward the conclusion of that discovery, the Equity Committee filed objections to confirmation of the Plan. It objected to confirmation on four grounds: (i) that the Debtors were not insolvent; (ii) that the Plan was not proposed in good faith because Coram had failed to disclose that its Chief Executive Officer ("CEO") and Chairman, Daniel Crowley, had a lucrative employment contract with Cerberus Partners L.P. ("Cerberus") -- a Noteholder whose principal, Stephen Feinberg, had been a member of the Coram board of directors and Chairman of its Compensation Committee until July 2000; (iii) that "[t]he conduct of Cerberus and certain of Coram's directors and management was improper and inequitable and caused significant damage to the Company," giving rise either to a derivative claim on behalf of the estates or the need to recharacterize Cerberus' claim as equity; and (iv) that the Plan improperly released the shareholders' claims against Crowley and others. (Objections to Confirmation, at 2-3)

On December 21, 2000, at the conclusion of a six day confirmation hearing, the Court denied confirmation of the Plan. The Court found that, under all the various and competing valuations, Coram was, in fact, insolvent. (December 21, 2000 Tr. at 88) The Court concluded, however, that Crowley's relationship with Cerberus gave rise to "an actual conflict of interest," which "tainted the debtors' restructuring of its debt, the debtors' negotiations towards a plan, even the debtors' restructuring of its operations." (*Id.* at 87-89) As a result of the taint, the Court found it impossible to know whether "we would be in the same boat today or whether a different plan would have been proposed by the debtor" had the existence and terms of

-3-

Crowley's contract with Cerberus been disclosed timely. (*Id.* at 65)   Accordingly, the Court was

unable to find, on the record before it, that the Plan had been proposed in good faith. (*Id.* at 87)

**B.     Scope of the Examination**

On February 1, 2001 the Debtors moved for entry of an order, pursuant to

Bankruptcy Code § 105, appointing Goldin independent restructuring advisor to the Debtors.

The motion proposed that Goldin examine, analyze and report on the following issues:

> a.     whether the Debtors' business plan and the projections that underlie their
> business plan are consistent with reasonable business judgment;
>
> b.     whether Goldin found any evidence that Chanin Capital Partners'
> valuation analysis was not independently prepared or free of any undue or
> improper influence by a member of the board or the Debtors'
> management;
>
> c.     whether the Plan was consistent with the best interests of the Debtors;
>
> d.     whether Goldin found any material facts that support a conclusion that the
> Plan was not proposed in good faith and in compliance with applicable
> law, or was not fundamentally fair to all parties in interest; and
>
> e.     whether the Plan or some modification thereto would best serve the
> interests of the Debtors.

The motion proposed that Goldin report on these issues both to the Court and to a special

committee (the "Special Committee") of the independent members of Coram Healthcare's board

of directors.  The motion stated that, in the Debtors' view, Goldin's services would "enable the

Court to make a definitive determination as to whether it can properly confirm a plan similar to

the [Plan] and/or provide guidance to the Court, the Debtors, and other parties in interest with

respect to the negotiation and formulation of any viable alternative Plan as may be appropriate."

(Motion to Appoint Goldin, at ¶¶ 17, 26-29)

-4-

Objections to the Debtors' motion to retain Goldin were filed by the Office of the U.S. Trustee and the Equity Committee. In addition, on February 6, 2001 the Equity Committee moved for leave to file a complaint (the "Complaint") on behalf of Coram Healthcare, asserting breach of fiduciary duty and related claims against Crowley, Feinberg and Cerberus.

At a hearing on February 26, 2001 the Bankruptcy Court approved the Debtors' motion to appoint Goldin as their independent restructuring advisor, subject to certain modifications.[1] To resolve the U.S. Trustee's objection that the motion impinged on her exclusive power to appoint examiners, the Debtors agreed that (i) Goldin would be retained by the Debtors pursuant to Code § 327(a); (ii) Goldin's report would not be filed with the Court, but would be given to the Special Committee and other parties in interest; and (iii) Goldin's function would not be to report to the Court as an examiner, but, rather, to advise the Special Committee respecting (A) the allegations and claims in the proposed Complaint (including whether the Debtors ought to pursue any of the proposed claims) and (B) potential amendments to the Plan. It was also agreed that Goldin would attempt to mediate a consensual resolution among the Debtors, the Equity Committee and other parties in interest. (Tr. of Feb. 26, 2001 hearing, at 7-9, 14-18, 26)

---

[1] The Court also denied the Equity Committee's motion for leave to file the Complaint, without prejudice to renewal of the motion at a later date. It was also agreed at the February 26 hearing that the Debtors would give the Equity Committee "full due diligence access" to Coram's financial records and other pertinent documents. (Tr. of Feb. 26, 2001 hearing, at 35-36) Subsequently, the Court approved a supplemental retention application filed by the Equity Committee, pursuant to which its financial advisor, Deloitte & Touche LLP ("D&T"), was authorized to undertake a due diligence review.

KL2:2108873.5
C:\WINDOWS\TEMPORARY INTERNET FILES\OLKD005\#1096030 V1 - GOLDIN REPORT (WORD FORMAT).DOC
07/31/01 10:29 AM

On March 29, 2001 Goldin filed an application to approve the retention of Kramer Levin Naftalis & Frankel LLP as counsel to the Debtors to assist Goldin in connection with its investigation and report. By order dated May 14, 2001 the Court approved that retention.

## C.    **Methodology of the Examination**

During March 2001 Goldin met with representatives of many of the key participants in these bankruptcy cases, including the Debtors, the Equity Committee, the Creditors' Committee and the Noteholders. At these meetings Goldin reviewed with each constituency the process it intended to follow in conducting its examination. Goldin also solicited the views of these parties on various factual and legal issues and invited them to provide further input. Finally, Goldin circulated a draft Report to the various constituencies for their comment and review. After reviewing and considering those comments and suggestions, Goldin prepared this final Report.

Documents. Goldin and Kramer Levin reviewed the following documents, among others: the discovery taken in connection with the confirmation hearing, including the depositions taken by the Equity Committee and the exhibits marked at those depositions; the transcript of the confirmation hearing and the hearing exhibits; the papers filed in support of and in opposition to the Equity's Committee's motion for leave to file the Complaint; documents filed with the Securities Exchange Commission or in the bankruptcy case; and publicly available analysts' reports and news articles concerning Coram. In addition, Goldin reviewed extensively the Debtors' financial records and other pertinent company reports and documents, as well as the three financial advisors' valuation reports and numerous healthcare company and industry reports.

KL2:2108873.5
C:\WINDOWS\TEMPORARY INTERNET FILES\OLKD005\#1096030 V1 - GOLDIN REPORT (WORD FORMAT).DOC
07/31/01 10:29 AM

<u>Interviews</u>.   Over seven weeks Goldin and its counsel interviewed the following

15 people with knowledge relevant to the investigation:

| <u>Person</u> | <u>Relationship to Coram</u> |
|---|---|
| Donald Amaral | CEO of Coram from October 1995 to April 1999 and October to November 1999; director of Coram from October 1995 to present |
| William Casey | Outside director of Coram since 1997 |
| Daniel Crowley | CEO, President and Chairman of the Board of Coram from November 1999 to present |
| Stephen Feinberg | Managing member of Cerberus Associates, L.L.C., the general partner of Cerberus Partners, LLP; outside director of Coram from June 1998 to July 2000 |
| Richard Fink | Outside director of Coram from 1994 to February 2000 |
| David Friedman | Partner at Kasowitz, Benson, Torres & Friedman LLP, bankruptcy counsel to Coram |
| Daniel M. Lynn | Deloitte & Touche Financial Advisory Services |
| Christina Morrison | Principal at Deutsche Banc Alex. Brown, financial advisors to Coram |
| Edward Mule | Former partner at Goldman, Sachs & Co. |
| Wendy Simpson | CFO of Coram from March 1998 through March 2000 |
| Peter Smith | Outside director of Coram since 1994 |
| Richard Smith | CEO of Coram from April 1999 to October 1999; CFO and then President of Coram prior to April 1999 |
| Sandra Smoley | Outside director of Coram since February 2000 |

| Person | Relationship to Coram |
|---|---|
| Edward Stearns | Senior Vice President of Foothill Capital Corporation |
| Eugene Tillman | Partner at Reed Smith Shaw & McClay, LLP, regulatory counsel to Coram |

These interviews took place in person or by telephone in New York, Denver, Baltimore and California.

Goldin opted for a relatively informal style of interviewing, which it believed would facilitate the free flow of information and help limit costs. The interviews were not transcribed and other parties in interest were not permitted to attend the interviews. All the interviewees were given the opportunity to appear with counsel; some chose to do so, while others did not. Goldin and/or Kramer Levin took notes at each interview and prepared interview summaries for use in drafting the Report.

In addition, Goldin personnel spent ten days at Coram's offices in Denver, Colorado on four separate occasions, meeting with members of the Debtors' current management. Goldin spoke with the following people, who provided information pertinent to Goldin's financial analysis:

| Coram | |
|---|---|
| Scott R. Danitz | SVP and CFO |
| Kate Douglass | SVP Clinical Services |
| John Ellis | SVP Operations – Eastern Region |
| Frank Geiger | SVP Materials Management |
| Richard Iriye | SVP Operations – Western Region |
| Allen J. Marabito | EVP |
| Debbie Meyers | SVP Field Sales |
| Ron Mills | VP Management Information Systems |
| Vito Ponzio | SVP Human Resources |

-8-

| Gerald A. Reynolds | Controller |
| Michael A. Saracco | SVP Specialty Products |
| Steven Schmahl | VP Contracting and Pricing |
| David A. Schwab | General Counsel |
| Joseph Sivori | VP Finance |
| Rodney Wright | VP Reimbursements |

Ernst & Young
| Arlyn J. Dozeman | Partner |
| Shawn A. Simmons | |
| John R. Sato | |

Chanin Capital Partners
| Eric A. Scroggins | Managing Director |
| Robert J. Stobo | VP Healthcare Group |

UBS Warburg
| Robert D. Dishner | Associate Director Global High-Yield Research |
| Philip M. Pucciarelli | Global Healthcare |

Financial Analysis.  Drawing on its extensive review of Coram's financial records and other documents, as well as the discovery and hearing record, the interviews it conducted and other due diligence, Goldin performed a detailed financial analysis to determine the value of Coram at three times:  (i) the Petition Date; (ii) the time of the confirmation hearing on the Plan; and (iii) the date of this Report.  In addition to performing its own independent valuation, Goldin reviewed, analyzed and critiqued the valuations performed by Chanin Capital Partners (on behalf of the Debtors), UBS Warburg (on behalf of the Creditors' Committee) and D&T (on behalf of the Equity Committee).

Mediation Efforts.  In an effort to explore a possible consensual resolution of the outstanding dispute, Goldin had a number of meetings and discussions with representatives of the Equity Committee, the Noteholders and the Debtors.  Goldin has considered alternative

settlement proposals and has discussed them with the parties. In addition, as noted, in an attempt

to further the settlement dialogue, Goldin simultaneously furnished this Report, in draft form, to

the parties in interest, including the Special Committee. The parties' comments on the draft

Report have been considered and, when appropriate, the Report has been modified accordingly.

The settlement dialogue is ongoing and, should the Court and/or parties in interest wish, Goldin

will be available to continue its mediation efforts following dissemination of this Report in final

form.

## II. CONCLUSIONS AND RECOMMENDATIONS

As the Bankruptcy Court found, Crowley's employment agreement with Cerberus

created an "actual conflict of interest" on his part; the non-disclosure of that agreement "tainted

the debtors' restructuring of its debt, the debtors' negotiations towards the plan, [and] even the

debtors' restructuring of its operations." (Tr. of Dec. 21, 2000 hearing, at 88-89) Crowley's and

Feinberg's failure to disclose the full extent of the Crowley/Cerberus relationship (and the

potential for abuse it posed) to other directors and officers was a breach of their respective

fiduciary duties. While the evidence as to Crowley's and Feinberg's intentions in this regard is

not conclusive, Feinberg's nondisclosure appears to have been inadvertent. Crowley, by

contrast, had an incentive to conceal the existence of his Cerberus contract (so as not to risk a

reduction of his Coram compensation) and his failure to make appropriate disclosure may not

have been inadvertent.

It does not appear, however, that either Crowley or Feinberg acted with culpable

intent of the sort alleged in the Equity Committee's Complaint. The evidence does not establish

that either man intended or expected that Crowley would seek to advance Cerberus' interests to

-10-