IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARLIN M. ADAMS, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of CORAM HEALTHCARE CORPORATION, a Delaware Corporation, and of CORAM, INC., a Delaware Corporation,<br><br>          Plaintiff,<br><br>    v.<br><br>DANIEL D. CROWLEY; DONALD J. AMARAL; WILLIAM J. CASEY; L. PETER SMITH; and SANDRA L. SMOLEY<br><br>          Defendants. | C.A. No. 04-1565-SLR |

**COMPENDIUM OF UNREPORTED CASES IN SUPPORT
OF PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION
TO THE OUTSIDE DIRECTOR DEFENDANTS'
<u>MOTION TO DISMISS</u>**

<table>
<tr><td></td><td>YOUNG CONAWAY STARGATT<br>  & TAYLOR<br>Rolin P. Bissell (# 4478)<br>Glenn C. Mandalas (# 4432)<br>The Brandywine Building<br>1000 West Street, 17th Floor</td></tr>
<tr><td>OF COUNSEL:</td><td>P.O. Box 391<br>Wilmington, DE 19801<br>(302) 571-5500</td></tr>
<tr><td>Barry E. Bressler<br>Wilber L. Kipnes<br>Jennifer Nestle<br>Han Nguyen<br>Schnader Harrison Segal & Lewis LLP<br>1600 Market Street, Suite 3600<br>Philadelphia, PA 19103<br>(215) 751-2000</td><td><i>Attorneys for Plaintiff</i></td></tr>
</table>

Dated: April 1, 2005

# TABLE OF CONTENTS

**TAB**

*Alidina v. Internet.com Corp.*,
No. 17235, 2002 Del. Ch. LEXIS 156
(Del. Ch. Nov. 6, 2002)……………………………………………………………………1

*Blackmore Partners, LP v. Link Energy, LLC*,
No. CV-454, 2004 Del. Ch. LEXIS 164
(Del. Ch. Nov. 10, 2004)……………………………………………………………..2

*Continuing Creditors' Committee of Star Telecommunications,*
*Inc. v. Edgecomb*,
No. 03-278, 2004 U.S. Dist. LEXIS 25807
(D. Del. Dec. 21, 2004)……………………………………………………………3

*In re Emerging Communications, Inc. S'holders Litig.*,
No. CA-16415, 2004 WL. 1305745
(Del. Ch. June 4, 2004)……………………………………………………………4

*Hollinger International, Inc. v. Hollinger, Inc.*,
No. 04-C-0698, 2005 WL. 589000
(N.D. Ill. March 11, 2005)…………………………………………………………...5

*The Litigation Trust of MDIP, Inc. v. Rapoport*,
No. 03-779, 2004 WL. 3101575
(D. Del. Nov. 29, 2004)…………………………………………………………..6

*Official Committee of Unsecured Creditors of Integrated*
*Health Services, Inc. v. Elkins*,
No. 20228, 2004 Del. Ch. LEXIS 122
(Del. Ch. Aug. 24, 2004)……………………………………………………………7

*Sanders v. Wang*,
No. 16640, 1999 WL. 1044880
(Del. Ch. Nov. 8, 1999)……………………………………………………………8

*Stanziale v. Nachtomi*,
No. 01-403, 2004 U.S. Dist. LEXIS 7375
(D. Del. Apr. 20, 2004)……………………………………………………………9

*In re Trump Hotels S'holder Derivative Litig.*,
Nos. 96-C-7820, 96-C-8527, 2000 U.S. Dist. LEXIS 13550
(S.D.N.Y. Sept. 21, 2000)…………………………………………………………..10

**TAB 1**

LEXSEE 2002 DEL. CH. LEXIS 156

**ARIFF ALIDINA, DAVID SWART, MOHAMED ALIDINA, and MARION JACK RICKARD, Plaintiffs, v. INTERNET.COM CORPORATION, ALAN MECKLER, CHRISTOPHER S. CARDELL, WAYNE A. MARTINO, WALTER H. LIPPINCOTT, GILBERT F. BACH, BEVERLY C. CHELL, MICHAEL J. DAVIES and CHARLES R. ELLIS, Defendants.**

**Civil Action No. 17235-NC**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2002 Del. Ch. LEXIS 156*

**October 3, 2002, Submitted**
**November 6, 2002, Decided**
**November 8, 2002, Filed**

**DISPOSITION:** [*1] Defendants' motion to dismiss complaint denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant directors moved to dismiss pursuant to Del. Ch. Ct. R. 12(b)(6) a class action by shareholders claiming breaches of fiduciary duties in connection with a tender offer. They argued that no breach had been properly alleged and that in any case, the shareholders had acquiesced by tendering their shares.

**OVERVIEW:** After a tender offer had been accepted and a merger had occurred, the shareholders claimed that one director, who was also the chief executive officer (CEO) of the acquired company, who had negotiated the deal, had also negotiated majority ownership for himself of a valuable subsidiary of the acquired company. In their class action, the shareholders did not challenge the personal independence of the remaining directors, but did argue that they had breached their fiduciary duties by recommending approval of the transaction without providing information that would have enabled the shareholders to discern improprieties in the CEO's involvement. The court held that while normally the business judgment rule would have mandated dismissal of the complaint, the facts alleged by the shareholders, if proven, might well establish that the directors' decision to recommend acceptance was so groundless as to

amount to bad faith. They could not claim protection of an exculpatory provision in the charter, because the claims related to more than breaches of duty of care. Finally, if the shareholders had not been fully informed, their claims were not precluded by approval of the tender offer.

**OUTCOME:** The court denied the motion to dismiss.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] In deciding a motion to dismiss under Del. Ch. Ct. R. 12(b)(6), a trial court assumes the truth of all well-pled, non-conclusory allegations in the complaint. The court additionally extends the benefit of all reasonable inferences that can be drawn from those allegations to the non-moving party. The court may, however, exclude allegations that are conclusory and lack factual support. Thus, a court will dismiss the claim only when the plaintiffs fail to plead facts supporting an element of the claim, or when the facts pled could not support a claim for relief under any reasonable interpretation of those facts.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*

[HN2] Although the business judgment rule normally prevents a court from reviewing the decisions of an independent, disinterested board that are made in good faith and in the exercise of due care, there is one narrow escape hatch. The business judgment rule may be rebutted in those rare cases where the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith. The decision must be egregious, lack any rational business purpose, constitute a gross abuse of discretion, or be so thoroughly defective that it carries a badge of fraud.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN3] Delaware law provides that the business and affairs of every corporation shall be managed by or under the direction of a board of directors. *Del. Code Ann. tit. 8, § 141(a)*. When the board of a corporation acts, Delaware courts ordinarily review that act under the presumption of the business judgment rule. The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Thus, as long as the board was informed and not self-interested, this presumption will not be disturbed if the board's business decision can be attributed to any rational business purpose.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN4] Under Delaware law, there is nothing inherently wrong with allowing an interested chief executive officer to negotiate a transaction. What does matter is whether the directors sufficiently oversee such negotiations by scrutinizing the resulting transaction in order to assure themselves that it is fair to the shareholders and to the company. There is no automatic requirement that the board employ a special committee to perform this evaluation, especially when a majority of the board is disinterested and independent.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN5] When a duty of care breach is not the exclusive claim, a Delaware court may not dismiss an action against directors based upon an exculpatory provision.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN6] Since its enactment, Delaware courts have consistently held that the adoption of a charter provision, in accordance with *Del. Code Ann. tit. 8, § 102(b)(7)*, bars the recovery of monetary damages from directors for a successful shareholder claim that is based exclusively upon establishing a violation of the duty of care.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN7] For purposes of shareholders' claims of breach of the duty to disclose, a fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote. The shareholders must demonstrate there was a substantial likelihood that the omitted fact would have significantly altered the total mix of information made available to them. In order to state a claim for relief, a shareholder plaintiff must: (1) allege that there are facts missing from the disclosure; (2) identify specific facts that were omitted or misleading; (3) state why those facts were material; and (4) demonstrate how the omitted or missing fact caused injury.

*Business & Corporate Entities > Business Combinations > Transfers of Shares & Tender Offers*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN8] Shareholders are generally able to draw their own conclusions about valuations when given the valuation method and results.

*Business & Corporate Entities > Business Combinations > Transfers of Shares & Tender Offers*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN9] A board of directors is only required to present the material facts of a proposed transaction; it is not required to cast those facts in a negative light.

*Business & Corporate Entities > Business Combinations > Transfers of Shares & Tender Offers*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN10] A board of directors does not necessarily need to disclose specific details regarding the analysis underlying a report on the fairness of a tender offer, but stockholders are entitled to a fair summary of the

2002 Del. Ch. LEXIS 156, *

substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Shareholder Duties & Liabilities*
*Contracts Law > Remedies > Equitable Relief*
*Estate, Gift & Trust Law > Trusts > Constructive & Resulting Trusts*
[HN11] If a majority ownership interest in a corporation is ill-gotten, it follows that a constructive trust may be placed upon the majority owner's equity interest so that he is not unjustly enriched.

COUNSEL: Norman M. Monhait, of ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; OF COUNSEL: Sanford P. Dumain, Samuel H. Rudman and Susan M. Greenwood, of MILBERG WEISS BERSHAD HYNES & LERACH LLP, New York, New York, Attorneys for Plaintiffs.

Allen M. Terrell, Jr. and Dominick Gattuso, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Stephen Greiner, Albert M. Myers III and Barbara B. Farley, of WILLKIE FARR & GALLAGHER, New York, New York, Attorneys for Defendants.

JUDGES: Chandler, Chancellor.

OPINIONBY: Chandler

OPINION:

**MEMORANDUM OPINION**

Chandler, Chancellor

This class action arises out of a tender offer for shares of a Delaware corporation followed by a merger between it and the acquiring company. Certain shareholders who tendered their stock filed this lawsuit, challenging the two-step transaction. They charge the directors who approved and recommended the transaction with breaches of their fiduciary duties of care, loyalty and candor. Similar to other recent cases in this Court, the challenged transactions involve a chief executive officer/director who negotiated most of the terms of the transaction, [*2] including one aspect in which the officer/director was clearly self-interested. The defendants have moved to dismiss all of the asserted claims, which I deny for the reasons set forth below.

I. INTRODUCTION

In late 1998, Penton Media, Inc. ("Penton") purchased Mecklermedia Corporation ("Mecklermedia" or the "Company"). This two-step transaction ("Transaction") was accomplished by way of a tender offer followed by a merger, pursuant to an Agreement and Plan of Merger among Mecklermedia, Penton and Internet World Media Inc., dated October 7, 1998.

The plaintiff shareholders of Mecklermedia brought this class action challenging the fairness of the Transaction, alleging that the individual board members breached their fiduciary duties. They allege that these breaches resulted in merger consideration that was "grossly unfair," largely due to the concurrent sale of an 80.1% interest in Internet.com (the "iWorld transaction"), Mecklermedia's wholly owned subsidiary, at an allegedly unfair price to Alan Meckler ("Meckler"), who was a 26% shareholder, board member, and the CEO of Mecklermedia. Plaintiffs allege that Meckler demanded this sale in exchange for his approval of the Transaction [*3] and that this sale diverted funds from the Company to Meckler. Because of this, plaintiffs contend that the board members could not have approved and recommended the Transaction and iWorld transaction (collectively, the "Transactions") in good faith. Last, plaintiffs allege that the board members were grossly negligent in the negotiation and approval of the Transactions and in failing to disclose all material facts to the shareholders. In short, plaintiffs' complaint alleges breaches of the directors' fiduciary duties of loyalty, care, and disclosure.

II. STATEMENT OF FACTS

Mecklermedia was an internet media company providing internet information to industry professionals via trade shows, conferences and print publications. Internet.com was its wholly owned subsidiary that disseminated internet information electronically through a network of web sites.

Penton, the acquiror, is also a company that specializes in internet industry trade shows and print publications and maintains web sites for the purpose of advertising these trade shows and print publications. The Transactions combining Penton and Mecklermedia came about after Mecklermedia had explored business combinations with at [*4] least three other suitors throughout 1998.

Mecklermedia began exploring potential business combinations in early 1998 with the assistance of its investment banker, Allen & Company ("Allen & Co."). Mecklermedia first discussed a potential combination with Advanstar Holdings, Inc. ("Advanstar"). In June, after approximately three months of negotiations, Advanstar proposed a transaction in which it would conduct a cash tender offer for all Mecklermedia stock

and then sell the publishing and internet assets to a newly-formed entity that would be majority-owned by Meckler. Allen & Co. consulted Deloitte & Touche LLP ("D&T") regarding the tax consequences of the various acquisition scenarios proposed. D&T provided this tax information and at the same time valued Internet.com at $ 50 million. Negotiations with Advanstar did not result in a letter of intent.

Mecklermedia concurrently explored a potential transaction with Miller Freeman, the United States division of United News & Media ("United News") in June. Shortly after Miller Freeman's overtures, United News approached Meckler to propose its potential acquisition of Mecklermedia. United News eventually offered to purchase all Mecklermedia [*5] shares for $ 270 million. n1 The last offer United News delivered to Mecklermedia included an agreement for Meckler to purchase a 50% interest in Internet.com for $ 17.5 million.

> n1 Plaintiffs provide different figures representing United News' offer to Mecklermedia without accounting for the discrepancy in the figures. Although more than one offer was received, it is difficult to determine from the pleadings the value of the highest offer. The $ 270 million offer is the only offer that refers to a purchase of all Mecklermedia shares, and is the offer that plaintiffs contend should have been disclosed to the shareholders. Thus, this is the figure I employ throughout the opinion.

After negotiations failed with each prior suitor, Mecklermedia found its match. On September 21, 1998, Thomas L. Kemp, Penton's Chairman and CEO, contacted Meckler regarding Penton's acquisition of Mecklermedia. During this conversation, plaintiffs contend that Meckler emphasized the importance of the iWorld transaction and insinuated [*6] that prior negotiations had fallen through because the terms of this side deal had not been favorable.

Penton then presented a draft letter of intent to Meckler on September 24, 1998, offering to purchase Mecklermedia. For unexplained reasons, this initial draft letter did not include the iWorld transaction. The next day, the two parties executed a letter of intent that provided for Penton to acquire the Company for $ 29 per share (or $ 274 million for all shares). This new letter additionally agreed to sell a 50% interest in Internet.com to Meckler for $ 15 million. Continuing negotiations resulted in an increase in Meckler's share of Internet.com at a lower price per share (from 50% at $ 15 million to

80.1% at $ 18 million) while there was no increase in the per share purchase price of Mecklermedia.

As a result, the parties agreed to value Internet.com at $ 22.5 million in the sale, as compared to the earlier value of $ 30 million. The lower value allegedly was a function of the amount Meckler was willing to pay for his equity interest (80.1% at $ 18 million = 100% at $ 22.5 million). According to the tender offer materials, this amount was significantly higher than Internet.com's [*7] value based upon its historical accounting, and represented six times the company's revenue and three times its tangible assets.

The Transactions were subjected to various evaluations by advisors to both Mecklermedia and Penton. Mecklermedia's investment bankers, Allen & Co., determined that the merger consideration in the Transactions as structured was fair to the shareholders of Mecklermedia from a financial point of view. Penton and Penton's advisor, Donaldson, Lufkin & Jenrette ("DLJ"), analyzed the purchase price and concluded it was a fair price for Mecklermedia's trade show and publishing assets alone, excluding Internet.com. n2 Plaintiffs emphasize that Penton was earlier cautioned by PriceWaterhouseCoopers LLC ("PwC") to further analyze Penton's purchase of Internet.com from an economic and legal standpoint to determine whether the transaction treated Mecklermedia's shareholders equally and whether Internet.com was being sold at a fair price. There is no allegation in the complaint as to whether such further analysis was ever undertaken by either Penton or Mecklermedia. Plaintiffs also stress that the Mecklermedia board specifically considered forming, and declined to form, [*8] a special committee to review the Transactions.

> n2 DLJ gave Penton an oral opinion regarding the $ 30 million valuation of Internet.com. Plaintiffs fail to disclose the result of this verbal report, although it carries little relevance since the final valuation of Internet.com agreed upon was $ 22.5 million, not $ 30 million. Regardless, plaintiffs do not assert that DLJ orally opined that a $ 30 million valuation was unfair.

After three meetings of the Mecklermedia board, one of which included a presentation to the board by Allen & Co., the board unanimously approved the Transactions on October 7, 1998. At the same time, Meckler signed a Tender, Voting and Option Agreement, which obligated him to tender his Mecklermedia shares to Penton. The next day, Penton issued a press release announcing the tender offer. Penton then filed a Schedule

14D-1 (the "14D-1") with the SEC on October 15, which formally commenced the tender offer. Attached as exhibits to the 14-D-1 were the Offer to Purchase, the Merger Agreement, [*9] the Tender, Voting and Option Agreement, as well as a Services Agreement.

The same day Penton filed its 14D-1, Mecklermedia filed its Schedule 14D-9 Solicitation/Recommendation Statement (the "14D-9") with the SEC. This statement announced that Mecklermedia's board had unanimously approved the tender offer and Merger Agreement, had determined that the Transactions were fair, and recommended that the shareholders accept the offer to tender their shares. This 14D-9 attached the fairness opinion of Allen & Co. Mecklermedia filed an amended Schedule 14D-9 (the "Amended 14D-9") on Nov. 12, 1998, to provide more information regarding the iWorld transaction, which extended the tender offer period and included Meckler's opinion that the iWorld transaction (and his purchase of 80.1% of Internet.com at $ 18 million) was fair to the shareholders of Mecklermedia.

On November 24, 1998, the tender offer ended and 97.9% of the shares were tendered and not withdrawn. The Transaction and iWorld transaction were completed, and Internet.com was spun-off and renamed internet.com ("New internet.com").

Five months later, New internet.com announced its intent to go public. On June 25, 1999, New internet. [*10] com completed its initial public offering and sold 3,400,000 shares of common stock at $ 14 per share. This action was filed that same month and was amended on November 7, 2000, and again on November 9, 2001. Defendants have now moved to dismiss the entire complaint on the basis that it fails to state a claim.

III. ANALYSIS

Defendants' motion to dismiss is based upon two main theories: 1) the board did not breach any fiduciary duties; and 2) in any event, plaintiffs acquiesced in any alleged misconduct by tendering their shares. Plaintiffs counter these theories by reaffirming allegations that the board breached its fiduciary duties of loyalty, care, and disclosure, and that they could not have acquiesced by tendering their shares because they were not fully informed.

A. Standard of Review on a Motion to Dismiss

Defendants have moved to dismiss plaintiffs' complaint pursuant to Court of Chancery Rule 12(b)(6), asserting that the complaint fails to state a claim upon which relief can be granted. [HN1] In deciding a motion to dismiss, a trial court must assume the truth of all well-pled, non-conclusory allegations in the complaint. n3 The court must additionally extend the benefit of [*11] all reasonable inferences that can be drawn from those

allegations to the non-moving party, the plaintiffs here. n4 The court may, however, exclude allegations that are conclusory and lack factual support. n5 Thus, a court will dismiss the claim only when the plaintiffs fail to plead facts supporting an element of the claim, or when the facts pled could not support a claim for relief under any reasonable interpretation of those facts. n6 Defendants also move to dismiss New internet.com as a defendant.

n3 *Loudon v. Archer-Daniels-Midland Co., 700 A.2d 135, 140 (Del. 1997).*

n4 *Id.*

n5 *In re Walt Disney Co. Derivative Litig., 731 A.2d 342, 353 (Del. Ch. 1998).*

n6 *Del. State Troopers Lodge v. O'Rourke, 403 A.2d 1109, 1110 (Del. Ch. 1979).*

B. Did the Board Breach Its Fiduciary Duties?

The plaintiffs allege that the Mecklermedia Board breached its fiduciary duties of loyalty, care, and disclosure in considering, approving and recommending the [*12] Transaction and the iWorld transaction.

1. Duty of Loyalty

Defendants argue that the plaintiffs' duty of loyalty claim should be dismissed for two reasons. First, defendants stress that plaintiffs failed to allege facts sufficient to indicate that the Mecklermedia board was self-interested or lacked independence. Second, defendants assert that plaintiffs failed to allege facts sufficient to indicate that the board acted in bad faith or had no rational basis for its decision to approve or recommend the transaction.

Plaintiffs have effectively conceded that the board was not *apparently* self-interested or lacking independence. n7 They counter, however, by alleging that this independent, disinterested board nevertheless must have acted in bad faith because it approved a transaction that was so far beyond the bounds of reasonable judgment that it was inexplicable on any other ground.

n7 "Defendants' arguments concerning whether the directors were interested in the transaction or lacked independence are beside the point." (Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss the Second Am. Compl. at 24 n.4.)

[*13]

[HN2] Although the business judgment rule normally prevents a court from reviewing the decisions of an independent, disinterested board that are made in good faith and in the exercise of due care, there is one narrow "escape hatch." n8 The business judgment rule may be rebutted "in those *rare* cases where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'" n9 The decision must be "egregious," lack "any rational business purpose," constitute a "gross abuse of discretion," or be so thoroughly defective that it carries a "badge of fraud." n10

> n8 *In re J.P. Stevens & Co., 542 A.2d 770, 780-81 & n.5 (Del. Ch. 1988)* ("This 'escape hatch' language has been variously stated in the Delaware opinions: 'egregious' decisions are said to be beyond the protections of the business judgment rule, as are decisions that cannot 'be attributed to any rational business purpose', or decisions that constitute 'a gross abuse of discretion.'") (internal citations omitted).

> n9 *Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1246 (Del. 1999)* (quoting *In re J.P. Stevens & Co., 542 A.2d at 780-81*) (emphasis added). [*14]

> n10 *In re J.P. Stevens & Co., 542 A.2d at 781 n.5.*

The Court's responsibility at this stage is to determine whether any reasonable interpretation of the facts in plaintiffs' complaint could support a claim for relief. Thus, plaintiffs must allege sufficient facts that could reasonably lead to an inference that the board's act was so egregious that it must have been the product of disloyalty or bad faith. Here, the complaint alleges facts that, if proven, could support a claim that Meckler and the Mecklermedia board members breached their fiduciary duty of loyalty. n11

> n11 Many of these allegations border upon conclusory statements, yet I am reluctant to summarily dismiss them at this stage, as I must assume the truth of all well-pled facts and give plaintiff the benefit of all reasonable inferences. I would stress, however, that plaintiffs must meet their burdensome task of supporting these allegations (such as the bald assertion that

Meckler demanded and received a "bribe") with more specific facts to survive the summary judgment stage. Although I have assumed the truth of most of the facts in plaintiffs' complaint, I have disregarded an allegation that Meckler was provided with a vehicle to induce four other affiliates to approve or facilitate the transaction. Even though Meckler had the option to provide four others with a small equity interest in New internet.com, plaintiffs have failed to allege any facts that even remotely indicate that Meckler employed or even considered using this method to facilitate the approval of the transaction.

[*15]

Similar to the plaintiffs in *Parnes v. Bally Entm't Corp.* n12 and *Crescent/Mach I Partners, L.P. v. Turner*, n13 the plaintiffs here have alleged that this disinterested, independent board approved of an unfairly negotiated transaction that benefited Meckler at the expense of the other Mecklermedia shareholders. In *Parnes*, the plaintiffs alleged that the company's CEO, Mr. Goldberg, controlled the merger negotiations and extracted substantial cash payments and assets that lacked consideration and were conditioned upon completion of the merger. n14 These benefits were offered in exchange for his consent, which he claimed was mandatory to the sale. n15 Further, it was alleged that he discouraged other bidders who would not consent to these bribes and who may have paid a higher price for the company otherwise. n16 These allegations of bribery and unfair dealing by the CEO who negotiated the transaction, even in the context of an independent, non-conflicted board, provided enough substance to persuade the Supreme Court to overturn this Court's earlier dismissal of the *Parnes* complaint.

> n12 *722 A.2d 1243 (Del. 1999).* [*16]

> n13 C.A. No. 17455, *2000 Del. Ch. LEXIS 145 (Sept. 29, 2000)* [hereinafter *Crescent/Mach*].

> n14 These payments and asset transfers included: (1) a termination payment of $ 21 million (which exceeded the amount arguably due to Goldberg by approximately $ 14.4 million); (2) a transfer to Goldberg for $ 250,000 of a warrant worth $ 5 million for the purchase of 20% of Bally Total Fitness Holding Corporation's common stock and the forgiveness of $ 15.2 million of Bally Fitness indebtedness to Bally; (3) the merger of Bally's Casino Holdings, Inc., a

2002 Del. Ch. LEXIS 156, *

shell corporation, into Bally and the conversion of the Casino Holdings preferred stock, all owned by Goldberg, into Bally and Bally Total Fitness stock worth approximately $ 43 million; (4) the transfer to Goldberg of 20% of Bally's interest in a Maryland race track project; and (5) the transfer to Goldberg of 40% of Bally's interest in a proposed Mexican gaming venture. *Parnes, 722 A.2d at 1246.*

n15 *Id. at 1245.*

n16 *Id. at 1246.*

In *Crescent/Mach*, this Court found [*17] that Mr. Turner, CEO, controlling shareholder and Chairman of the Board, secured "a substantial transfer of . . . assets and substantial financial remuneration" for himself that were not made available to the minority shareholders, similar to the benefits obtained in *Parnes*. n17 Even though the board received a fairness opinion based upon three different valuation methods, the court denied the defendants' motion to dismiss because Mr. Turner's alleged breach of his fiduciary duties was so egregious that they tainted the entire merger process. n18 Thus, the board's approval of the transaction alone was enough to rebut the business judgment rule because the board "failed to protect the interests of the corporation and the minority stockholders." n19

n17 *Crescent/Mach, 2000 Del. Ch. LEXIS 145 at *43* & n.47. The import of these "side-deals" is that Turner stood to gain a substantial equity interest in Bottling Group while Holdings and ABC would become wholly owned subsidiaries of Bottling Group. For example, these alleged "side-deals" included: 1) the Turner Family Partnership contracting with Bottling Group to contribute one million shares of Holdings' stock, owned and controlled by Turner, to Bottling Group in exchange for 250,000 shares of Bottling Group thereby securing for Turner a substantial equity interest in the surviving entity; 2) CAI and Carlyle Bottling contracting for a stock exchange with Bottling Group in which they agreed to exchange their stock in ABC for stock in Bottling Group; 3) Holdings redeeming approximately 6 million shares of its stock owned or controlled by Turner or the Turner Family Partnership for $ 25 per share thereby securing for Turner certain tax advantages not offered to other stockholders; 4) making the merger contingent on the sale of JLT Beverages' claimed brand name Deja Blue and franchise rights in Snapple brand products for $ 15 million to

Bottling Group; 5) CSI and Carlyle Bottling agreeing to each purchase $ 75 million of Bottling Group's stock after the consummation of the merger; 6) Cadbury Schweppes agreeing to purchase $ 150 million of Bottling Group's subordinated debt; 7) Turner, Bottling Group, CSI, Carlyle Bottling, and the Turner Family Partnership entering into an agreement to retain Turner on the board of directors of the surviving entity for so long as he is employed by the Bottling Group at a base salary of $ 900,000 including bonuses and stock options; 8) Turner receiving shares in the surviving entity which would 'facilitate realization of a profit by the Turner interests through an initial public offering of Bottling Group's stock--an opportunity not afforded to other stockholders; 9) Carlyle Bottling and the Turner Family Partnership agreeing that the Bottling Group stock acquired in the transactions by the Turner Family Partnership, CSI and Carlyle Bottling would be treated as a tax free exchange; 10) CSI and Carlyle Bottling agreeing to purchase the Holdings' stock that Turner and the Turner Family Partnership were to have redeemed in the event the Merger was enjoined. *2000 Del. Ch. LEXIS 145 at *8-10.* [*18]

n18 *2000 Del. Ch. LEXIS 145 at *45.*

n19 *2000 Del. Ch. LEXIS 145 at *37, 2000 Del. Ch. LEXIS 145 at *45.*

Similar to the allegations of asset transfers in these cases, the allegations here charge Meckler with receiving Internet.com at a grossly unfair price in exchange for his presentation, recommendation, and approval of the Transaction. n20 The asset transfers in *Parnes* and *Crescent/Mach* allegedly lacked *any* consideration. In this case, Meckler paid $ 18 million for his share of Internet.com. Nevertheless, it follows that a *grossly inadequate* purchase price for Internet.com should lead to the same result as an agreement wholly lacking consideration. A grossly inadequate purchase price would still wrongly divert Company funds to Meckler. Thus, the complaint adequately asserts that Meckler violated his fiduciary duties by unfairly demanding that Penton sell Internet.com to him "on the cheap." This allegedly coercive purchase may have diverted Company funds to Meckler, resulting in the shareholders receiving a grossly unfair price.

n20 The complaint also alleges that Meckler's receipt of a $ 100,000 consulting agreement and Penton's provision of a Services Agreement to New internet.com amounted to a "windfall" to Meckler. These may be additional circumstances that will provide fuel for the fire of a suspicious mind. I note, however, that the complaint indicates the Services Agreement was a customary agreement between Penton and its business affiliates. *See* Second Amended Class Action Compl. P51 ("As part of our agreement, we will sign a service agreement between the trade shows/magazines and Internet.com to maintain the mutual benefit and support of all three product lines. The services agreement will be similar to our Index and Findlay agreement, which is largely based on barter.").

[*19]

Contrary to defendants' assertion, the fact that $ 274 million was the highest offer entertained does not lead to the conclusion that Internet.com was sold at a fair price. Although the total merger consideration of $ 274 million was higher than the $ 270 million offered by United News, both offers included the sale of Internet.com to Meckler for a similar price. If this price was grossly inadequate as plaintiffs allege, both offers would have diverted significant funds from the Company to Meckler and both prices would have been unfair to the shareholders. Because I must give plaintiffs the benefit of all reasonable inferences in their complaint, I must accept plaintiffs' assertion that Internet.com was grossly undervalued when it was sold to Meckler. n21

n21 Additionally, plaintiffs allege that several other sources indicated that Internet.com should have commanded a much higher value, such as the earlier $ 50 million estimate provided by D&T.

Further, if the board members acquiesced in such unfair dealing [*20] to the detriment of the Mecklermedia shareholders, they too may have breached their fiduciary duty of loyalty. Plaintiffs allege that the board members knew Meckler allegedly sought out an interested merging partner, dictated the terms of the Transaction, secured a valuable asset of the Company at a grossly unfair price, and diverted funds away from the Company to himself. With these allegations, the plaintiffs have sufficiently pled that the directors' acquiescence to this process, passive or otherwise, was beyond the bounds of reasonableness. Just as the CEOs' conduct in both *Parnes* and *Crescent/Mach* "tainted the

entire process," if plaintiffs' assertions in this case are accepted as true, Meckler's conduct would have been so egregious that the Mecklermedia board likely could not have approved the Transactions in good faith. Thus, I conclude that plaintiffs have sufficiently alleged that the directors may have breached their duty of loyalty. Defendants' motion to dismiss the duty of loyalty claim is denied.

2. Duty of Care

Defendants argue that plaintiffs failed to allege any facts that would establish that the directors breached their duty of care. And, even if a duty [*21] of care claim were established, it should be dismissed because Mecklermedia's charter contained an exculpatory § 102(b)(7) provision.

Plaintiffs counter by enumerating several instances in which they believe the board members failed to use due care in the negotiation and approval of the transactions. Additionally, plaintiffs contend that the § 102(b)(7) exculpatory provision may not be used to dismiss the duty of care claims at this stage due to the presence of an adequately pled duty of loyalty claim.

a. Breach of the Duty of Care

Plaintiffs have alleged sufficient facts to show the Mecklermedia board breached its duty of care to the Mecklermedia shareholders. [HN3] Delaware law provides that the "business and affairs of every corporation ... shall be managed by or under the direction of a board of directors." n22 When the board of a corporation acts, Delaware courts ordinarily review that act under the presumption of the business judgment rule. n23 The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the [*22] company." n24 Thus, as long as the board was informed and not self-interested, this presumption will not be disturbed if the board's business decision can be attributed to "any rational business purpose." n25

n22 *8 Del. C. § 141(a)*.

n23 *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)*.

n24 *Id.*

n25 *Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971)*.

Plaintiffs contend that the board breached its duty of care by yielding to Meckler's negotiations, by not using a special committee, and by not appropriately educating itself on the value of Internet.com. Here, the board was admittedly not self-interested. It was within the board's business judgment to delegate the negotiation of the Transactions to its CEO. [HN4] There is nothing inherently wrong with allowing an interested CEO to negotiate a transaction. n26 What does matter is whether the directors sufficiently oversee such negotiations by scrutinizing the resulting transaction in [*23] order to assure themselves that it is fair to the shareholders and to the company. There is no automatic requirement that the board employ a special committee to perform this evaluation, especially when a majority of the board is disinterested and independent. Here, the board considered whether a special committee was needed and explicitly found that one was not. This is a valid exercise of the board's business judgment. Therefore, the only questions remaining are whether the board was informed and whether its decision was based on a rational business purpose.

n26 *In re Ply Gem Indus., S'holders Litig., 2001 Del. Ch. LEXIS 84,* at *28 (Del. Ch. June 26, 2001).

In evaluating the Transactions, the board informed itself through several rounds of board deliberations, reports by experts and by conducting a market "survey." As noted in the complaint, the board met several times to discuss the proposed Transactions. It retained investment bankers to assist in structuring and evaluating a business [*24] combination strategy. It received written and oral reports from this investment banker regarding the overall combination.

These evaluative measures, however, were all flawed to some degree according to the complaint. Although the board had no duty to engage a special committee, the board did have a duty to scrutinize the Transactions more closely to ensure that the shareholders were being treated fairly. Here, plaintiffs allege, the board failed to ensure that the shareholders were receiving adequate consideration for Internet.com. The board was aware of the amount of the earlier United News offer, but this offer may not have sufficiently reflected the value of the Company and Internet.com. Because the prior offer also included a sale of Internet.com at a similar (and allegedly discounted) price to Meckler, this market "survey" would have resulted in a similarly depressed price. Thus, according to the plaintiffs, the market "survey" may not have been a

sufficient indication of the value of the shares of Mecklermedia.

Although no other bidders came forward after the Penton negotiations were underway, such potential bidders may have shied away from bidding because of the conflicts [*25] of interest involved. Plaintiffs allege that Meckler made it clear that he would not sell the Company without retaining a majority interest in Internet.com. Consequently, the fact that there were no other bidders for the Company does not establish that it was sold at a fair price.

Additionally, the board received no fairness opinion regarding the iWorld transaction. Even though Allen & Co. opined upon the overall fairness of the Transactions, it did not separately consider the fairness of the iWorld transaction. n27 The only possible way for the board to have known whether the shareholders were receiving a fair price for their shares in Mecklermedia was to have had some assurance that Meckler was paying a fair price for his equity interest in Internet.com. According to the complaint, the expert advice the board relied upon failed to provide this assurance.

n27 *Cf. Levco Alternative Fund Ltd. v. Readers Digest Ass'n, 803 A.2d 428 (Del. 2002).*

Plaintiffs' complaint also alleges that [*26] the board had no information about the value of Internet.com to enable it to make an informed decision. The facts in the complaint suggest that the board had every reason to doubt the adequacy of the price Meckler paid for his interest in Internet.com. The board knew that its CEO had retained complete control over the negotiation of a self-dealing transaction. The board knew that Allen & Co. did not separately opine on the fairness of the iWorld transaction. The board knew the "agreed upon" value of Internet.com dropped from $ 30 million to $ 22.5 million during negotiations (a 25% decrease in value) because Meckler could afford to pay no more than $ 18 million for his 80.1% interest. At the same time, there was no corresponding increase in the per share purchase price of Mecklermedia. Presumably, the board would also have known that PwC warned Penton to take a closer look at the iWorld transaction from an economic and legal standpoint and that D&T valued Internet.com at $ 50 million when consulted by Allen & Co. All of this information arguably should have compelled the board, at a minimum, to further scrutinize the iWorld transaction's [*27] fairness independently. Otherwise, the board assertedly would have had no reasonable basis upon which to conclude that the Mecklermedia shareholders were being treated fairly.

Because the complaint arguably alleges that the directors were not fully informed when they approved the Transactions, I do not need to address whether the board had a rational business purpose. n28 Thus, at this juncture, I conclude that the plaintiffs have sufficiently alleged that the Mecklermedia directors were not fully informed when evaluating and approving the Transactions.

n28 Several rational business purposes have been given for the business combination and the resulting ownership structure of New internet.com. It seems irreconcilable, however, to find that the approval of the transactions arguably exceeded all bounds of rational decisionmaking for the purposes of the duty of loyalty, but also find that the very same decision was rational for the purposes of evaluating the board's duty of care.

b. *Section 102(b)(7)*

At this stage, I cannot dismiss plaintiffs' duty of care [*28] claim based upon an exculpatory provision contained in the Mecklermedia charter. As *Malpiede*, n29 and *Emerald Partners* n30 instruct, [HN5] when a duty of care breach is not the *exclusive* claim, a court may not dismiss based upon an exculpatory provision. n31 Because the duty of loyalty is implicated in this case, the § 102(b)(7) provision cannot operate to negate plaintiffs' duty of care claim on a motion to dismiss.

n29 *Malpiede v. Townson, 780 A.2d 1075 (Del. 2001)*.

n30 *Emerald Partners v. Berlin, 787 A.2d 85 (Del. 2001)*.

n31 *Id. at 91* [HN6] ("Since its enactment, Delaware courts have consistently held that the adoption of a charter provision, in accordance with *Section 102(b)(7)*, bars the recovery of monetary damages from directors for a successful shareholder claim that is based *exclusively* upon establishing a violation of the duty of care.") (emphasis added).

3. Duty to Disclose

Plaintiffs contend that defendants failed to disclose all [*29] material information to the shareholders in the 14D-9 and Amended 14D-9. Defendants assert that all relevant information was disclosed and that the claim should therefore be dismissed.

[HN7] A fact is material if "there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote." n32 The plaintiff must demonstrate there was a substantial likelihood that the omitted fact would have "significantly altered the 'total mix' of information made available" to the stockholders. n33 In order to state a claim for relief, plaintiff must: 1) allege that there are facts missing from the disclosure; 2) identify specific facts that were omitted or misleading; 3) state why those facts were material; and 4) demonstrate how the omitted or missing fact caused injury. n34

n32 *Loudon v. Archer-Daniels-Midland Co., 700 A.2d 135, 143 (Del. 1997)*.

N33 *Id. at 143*; *Rosenblatt v. Getty Oil Co., 493 A.2d 929, 944 (Del. 1985)*.

n34 *Skeen v. Jo-Ann Stores, Inc., 750 A.2d 1170, 1173 (Del. 2000)*.

[*30]

Plaintiffs assert that Mecklermedia's 14D-9 and Amended 14D-9 were materially false and misleading and that this information would have altered the total mix of information available to the shareholders if disclosed accurately. Plaintiffs contest four main portions of the tender offer materials: 1) the failure to disclose the source of the $ 22.5 million valuation of Internet.com; 2) the failure to disclose details about the United News negotiation; 3) the failure to disclose the "true reason" for the iWorld transaction; and 4) the allegedly false characterization of the merger consideration as "fair." The contents of the challenged tender offer materials will be considered on this motion to dismiss because they were incorporated by reference in the complaint. n35

n35 *In re Santa Fe Pac. Corp. S'holder Litig., 669 A.2d 59, 69-70 (Del. 1995)*.

a. Internet.com Valuation

Plaintiffs successfully contend that the tender offer materials did not adequately disclose the source of the $ 22.5 million [*31] valuation of Internet.com. The Amended 14D-9 parenthetically explains that the agreed valuation of iWorld was "based upon [Meckler's] payment of $ 18 million for an 80.1% equity interest in iWorld." n36 This statement--which was buried in a subpart of multiple factors Meckler considered when opining upon the fairness of the iWorld transaction--fails to point out the fact that no independent valuation of iWorld was ever attempted. Instead, the Amended 14D-9

compared this agreed-upon value to other factors, such as historical accounting data, revenues, tangible assets, and the value per page viewed on the web site. Although [HN8] shareholders are generally able to draw their own conclusions about valuations when given the valuation method and results, here there was no attempt to provide the shareholders with a valuation of Internet.com, leaving them with no basis, other than Meckler's own self-serving fairness opinion, to determine whether they were receiving adequate value for their stake in Internet.com. Thus, it seems reasonable that further disclosure regarding the $ 22.5 million valuation of Internet.com may have altered the total mix of information available to the shareholders.

    n36 Amended Schedule 14D-9, item 8(d).

    [*32]

    b. United News Negotiation

    Plaintiffs assert that defendants should have disclosed more details regarding the United News negotiation, even though United News' $ 270 million offer was lower than Penton's $ 274 million offer. The information disclosed in the Schedule 14D-9 was limited to a statement that "the Company reached an oral understanding regarding an approximate three week period of exclusivity with one of the companies interested in a potential strategic combination; however, the period of exclusivity expired prior to a letter of intent being executed with such company."

    Plaintiffs allege that the board should have further disclosed that it was United News making the bid, that the oral offer was to purchase all shares of the company for $ 270 million and included a similar side transaction to sell Internet.com to Meckler, and that negotiations failed due to United News' attempt to change the terms of the side deal. Because the United News negotiation never progressed to the letter of intent stage, it would not have been material for a stockholder to know the identity of one potential buyer. Nor have plaintiffs explained how this additional information would have altered [*33] the total mix of information available to the Mecklermedia stockholders. If the negotiation terminated over the terms of the iWorld transaction, however, this information likely would have been material to Mecklermedia's shareholders because it would imply that the Company's value was somehow tied to the successful negotiation of a side deal with Meckler for iWorld. Thus, plaintiffs have alleged a claim based on the partial disclosure regarding the United News negotiation.

    c. The "True Reason" for the iWorld Transaction

    Plaintiffs assert that the tender offer materials omitted the "true reason" for the iWorld transaction, which they allege was to provide a windfall to Meckler. Besides having no basis for this assertion, [HN9] a board is only required to present the material facts of the transaction; it is not required to cast those facts in a negative light. n37 Thus, the board was not herein required to engage in "self-flagellation" of this sort. n38

        n37 Loudon, 700 A.2d at 143; In re GM Class H S'holders Litig., 734 A.2d 611, 628 (Del. Ch. 1999).

        n38 Loudon, 700 A.2d at 143.

    [*34]

    d. Board Representation Regarding Fairness

    Plaintiffs assert that the board members' representation regarding the fairness of the Transaction and iWorld transaction was false and misleading and that the board members lacked a reasonable basis for this opinion. Plaintiffs contend that the terms were in fact unfair to the Company's shareholders for four reasons: 1) the shareholders did not receive any consideration for Internet.com; 2) Meckler participated in unfair dealing when negotiating the iWorld transaction; 3) the board approved the transaction to provide an "economic windfall" to Meckler; and 4) the board lacked a reasonable basis for opining that the Transaction was fair.

    I conclude that some of these allegations cannot withstand scrutiny on a motion to dismiss, as the board does not have to cast its decisionmaking in a negative light, and because they are refuted by the information contained in the tender offering documents. First, contrary to plaintiffs' allegations, the Mecklermedia shareholders were not deprived of their interest in Internet.com without any consideration. The shareholders were informed of the amount Meckler paid for his interest in Internet.com [*35] in the 14D-9 before deciding whether to accept or reject the tender offer. To the extent that the shareholders may have received inadequate consideration for their interest in Internet.com, however, the transaction may have been unfair. This conclusion, obviously, is one that cannot be drawn at this juncture because Internet.com was not separately valued and thus there is not enough information to determine whether the shareholders were improperly deprived of their interest in Internet.com. Thus, plaintiffs have adequately alleged that the transaction may have been unfair and that the Mecklermedia board members' fairness opinion was false or misleading.

Second, if the transaction (and the negotiations leading up to it) were in fact unfair to the shareholders, the Mecklermedia board was not required to *characterize* it as illegal or wrong. As discussed above, a board is not required to engage in self-flagellation in its disclosure materials. Thus, both allegations, including the board's alleged desire to bestow a "windfall" upon Meckler and the negative characterization of Meckler's negotiation tactics, were not required disclosures in the tender offer materials. What was required [*36] of the board was already disclosed. The tender offer materials fully described the material portions of the negotiation and its resulting terms as well as Meckler's self-interest. Having failed to allege how further disclosure of Meckler's self-interest is more than redundant or how a shareholder would consider it material in deciding whether to tender her shares, this aspect of plaintiffs' disclosure claim fails as a matter of law.

Last, the fairness opinion may have been misleading if the board members in fact lacked a reasonable basis for their fairness statement. Although the board was entitled to rely upon the fairness opinion of Allen & Co., n39 the board arguably should have evaluated the fairness of the iWorld transaction separately as noted above. A reasonable stockholder may have been misled by the Allen & Co. fairness opinion to believe that Internet.com *itself* was being sold for a fair price when it may not have been. [HN10] A board does not necessarily need to disclose specific details regarding the analysis underlying the report, n40 but a stockholder would likely have found the inadequacies of, or limitation on, the fairness opinion material to her decision whether to [*37] tender her shares. This Court has held that "stockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely." n41 Although the material terms of the Transactions were disclosed, as well as Meckler's self-interest and resulting equity in Internet.com, a reasonable shareholder may have been misled to believe that Allen & Co.'s opinion regarding the Transactions encompassed the fairness of these factors without having received the underlying data the investment banker relied upon. Further, if the board itself was not fully informed (allegedly) regarding the iWorld transaction, it can hardly be argued that it adequately informed the stockholders regarding the fairness of this very same transaction. Therefore, plaintiffs have stated a claim for breach of the board's duty of disclosure in this respect.

n39 *McMillan v. Intercargo Corp., 768 A.2d 492, 505 n.55 (Del. Ch. 2000).*

N40 *Skeen, 750 A.2d at 1174; In re Best Lock Corp. S'holder Litig., 2001 Del. Ch. LEXIS 134, *35 (Oct. 29, 2001).* [*38]

n41 *In re Pure Resources, Inc., 808 A.2d 421, 2002 Del. Ch. LEXIS 112, at *80-81 (Del. Ch. 2002)* (finding that disclosure of a banker's fairness opinion provided stockholders with "nothing other than a conclusion, qualified by a gauze of protective language designed to insulate the banker from liability").

## C. Did the Shareholders Acquiesce in the Board's Conduct by Tendering Their Shares?

Last, defendants assert that all of plaintiffs' claims should be dismissed because all material facts were disclosed to plaintiffs before they tendered their shares. Thus, they argue, the act of tendering their shares shows that the plaintiffs thereby acquiesced in the Transaction and iWorld transaction and cannot now challenge it. Plaintiffs counter by alleging that they could not have acquiesced by tendering their shares because they were not fully informed.

I pause a moment to consider what plaintiffs do not allege in this instance. Plaintiffs do not assert that they were "under protest" when they tendered their shares, which would negate a finding of acquiescence. n42 Additionally, [*39] plaintiffs do not allege that the tender offer was in any way coercive, which would have prevented meaningful choice and similarly negated a finding of acquiescence. Plaintiffs rely solely upon the allegation that the shareholders were not sufficiently informed. This entire argument relies upon their earlier assertion that the board breached its duty to disclose all material information to the shareholders. If the board did not breach its duty to disclose all material information regarding the transaction to the shareholders, then the shareholders were fully informed when they tendered.

n42 *Kahn v. Household Acquisition Corp., 1982 Del. Ch. LEXIS 580, at *6 (Jan. 19, 1982).*

Because plaintiffs have adequately alleged that the board breached its duty of disclosure, I cannot, at this stage, conclude as a matter of law that the shareholders were fully informed when they tendered their shares. Although the material terms of the Transactions were disclosed, as well as Meckler's conflict of interest [*40] and resulting equity interest in Internet.com, the shareholders may have been misled into believing that

2002 Del. Ch. LEXIS 156, *

the iWorld transaction was independently evaluated as "fair" when it had not been. Neither the board nor Allen & Co. separately opined upon the fairness of the iWorld transaction. Instead, both Transactions were categorically lumped into a single fairness opinion that plaintiffs contend did not fully inform the shareholders of the value of Internet.com. In addition, plaintiffs insist they were not provided with full and complete information regarding how the $ 22.5 million valuation for iWorld was determined. Accordingly, because plaintiffs have adequately pled disclosure claims, I cannot conclude that their complaint is barred by the doctrine of acquiescence.

### D. Should the Court Impose a Constructive Trust over Internet.com?

Plaintiffs cite *O'Malley v. Boris* n43 for their assertion that a constructive trust should be imposed upon New internet.com. Although it is debatable whether such a remedy would be advisable, as in *O'Malley* I am reluctant to dismiss New internet.com from the case at this point. The company is majority owned by Meckler and this ownership arose [*41] from the transactions in dispute. Thus, [HN11] if this ownership was "ill-gotten," it follows that a constructive trust may be placed upon

Meckler's equity interest in New internet.com so that he is not unjustly enriched at the expense of the Mecklermedia shareholders. For this reason, I decline to dismiss New internet.com as a defendant.

n43 *2002 Del. Ch. LEXIS 33 (March 18, 2002)*.

### IV. CONCLUSION

In sum, defendants' motion to dismiss the complaint is denied. Plaintiffs have stated a claim for a breach of the duties of loyalty, care and disclosure against the Mecklermedia board. The § 102(b)(7) provision cannot operate to immunize the duty of care claim at this juncture. The affirmative defense of acquiescence fails because plaintiffs adequately alleged that the board did not fully inform the shareholders before they tendered their shares. Further, New internet.com is not dismissed as a defendant at this time as it may be a necessary party in connection with a potential remedy.

IT IS SO ORDERED.

**TAB 2**

LEXSEE 2004 DEL. CH. LEXIS 164

**BLACKMORE PARTNERS, L.P., Plaintiff, v. LINK ENERGY LLC, J. ROBERT CHAMBERS, JULIE H. EDWARDS, THOMAS M. MATTHEWS, ROBERT E. OGLE, JAMES M. TIDWELL, S. WIL VANLOH, JR., and DANIEL J. ZALOUDEK, Defendants.**

**C.A. No. 454-N**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*864 A.2d 80; 2004 Del. Ch. LEXIS 164*

**November 1, 2004, Submitted**
**November 10, 2004, Decided**
**November 10, 2004, Filed**

**DISPOSITION:** Motion denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, a limited liability company (company) and its directors, filed a motion to dismiss pursuant to Del. Ch. Ct. R. 12(b)(6) with regard to the complaint filed by plaintiff, a former equity unit holder. Plaintiff purported to have brought a class action suit against defendants, asserting a breach of fiduciary duty in connection with a transaction that rendered the equity units of the company worthless.

**OVERVIEW:** The complaint asserted that the directors breached their fiduciary duties by approving a sale of substantially all of the company's assets in a transaction that resulted in the distribution to the company's creditors of 100 percent of available funds in an amount that exceeded the total amount of their claims. Plaintiff also alleged that defendants violated their fiduciary duties by failing to consider alternative transactions that would have provided a better result for the company's equity holders. Defendants asserted that the complaint did not contain specific allegations that a majority of the directors were either interested in the transaction or lacked independence. The court disagreed and found that the well-pleaded allegations of fact found in the complaint, if true, supported a reasonable inference of disloyal conduct, which was enough to survive defendants' motion to dismiss. The complaint alleged that the approval of the transaction disadvantaged the

equity unit holders and that the company was neither insolvent nor verging on re-entering bankruptcy, yet the result of the transaction was that the units were rendered valueless.

**OUTCOME:** The court denied defendants' motion to dismiss.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] In a Del. Ch. Ct. R. 12(b)(6) motion to dismiss, a court may consider, for certain purposes, the content of documents that are integral to or are incorporated by reference into the complaint.

*Business & Corporate Entities > Limited Liability Businesses > Management Duties & Liabilities*
[HN2] *Del. Code Ann. tit. 6, § 18-1101* provides that a manager's duties and liabilities may be expanded or restricted by provisions in the limited liability company agreement.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN3] The standard for dismissal pursuant to Del. Ch. Ct. R. 12(b)(6) for failure to state a claim upon which relief can be granted is well established. The motion will

864 A.2d 80, *; 2004 Del. Ch. LEXIS 164, **

be granted if it appears with reasonable certainty that a plaintiff could not prevail on any set of facts that can be inferred from the pleading. In considering a motion to dismiss under Rule 12(b)(6), a court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint. All facts of the pleadings and inferences that can reasonably be drawn therefrom are accepted as true. Neither inferences nor conclusions of fact unsupported by allegations of specific facts are accepted as true. A trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiffs' favor unless they are reasonable inferences.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
*Business & Corporate Entities > Limited Liability Businesses > Management Duties & Liabilities*
[HN4] Once a board of directors determines to sell the corporation in a change of control transaction, its responsibility is to endeavor to secure the highest value reasonably attainable for the stockholders. That obligation is a contextually-specific application of the directors' duty to act in accordance with their fiduciary obligations, and there is no single blueprint that a board must follow to fulfill its duties. A board's actions must be evaluated in light of the relevant circumstances to determine whether they were undertaken with due diligence and in good faith. If no breach of duty is found, a board's actions are entitled to the protections of the business judgment rule.

*Business & Corporate Entities > Limited Liability Businesses > Management Duties & Liabilities*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN5] The presence of an exculpatory clause in a limited liability company agreement has an important, but confined, influence on a court's analysis of a motion to dismiss pursuant to Del. Ch. Ct. R. 12(b)(6). Because a plaintiff may not recover damages for a breach of the duty of care by the defendant directors, a court's focus is necessarily upon whether the complaint alleges facts that, if true, would buttress a conclusion that the defendant directors breached their duty of loyalty or otherwise engaged in conduct not immunized by the exculpatory charter provision. To survive the motion to dismiss, the complaint must allege particularized facts that support an inference of disloyalty or a lack of good faith.

*Business & Corporate Entities > Limited Liability Businesses > Management Duties & Liabilities*

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN6] While the absence of well-pleaded allegations of self-interest or lack of independence often is a fatal defect in a claim for breach of the duty of loyalty, that is not invariably the case.

**COUNSEL:** [**1] Attorneys for the Plaintiff: Norman M. Monhait, Esquire, Jessica Zeldin, Esquire, ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; Stephen T. Rodd, Esquire, Stephanie D. Amin-Giwner, Esquire, Rebecca A. Scheinberg, Esquire, ABBEY GARDY LLP, New York.

Attorneys for the Defendants: Srivinas M. Raju, Esquire, Elizabeth C. Tucker, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; David D. Sterling, Esquire, Samuel W. Cooper, Esquire, Robeca Aizpuru, Esquire, BAKER BOTTS LLP, Houston, Texas.

**OPINION:**

[*81] *MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

A former equity unit holder of a solvent limited liability company brings this purported class action suit against the company and directors for breach of fiduciary duty in connection with a transaction that rendered the equity units worthless. The complaint alleges that the directors breached their fiduciary duties by approving (as they were authorized to do without a vote of the unit holders) a sale of substantially all the company's assets in a transaction that resulted in the distribution [**2] to the company's creditors of 100% of available funds in an amount that exceeded the total amount of their claims. The plaintiff also alleges that the defendants violated their fiduciary duties by failing to consider alternative transactions that would have provided a better result for the company's equity holders.

The defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, in accordance with Rule 12(b)(6) of the Court of Chancery Rules. The question presented is whether a complaint that does not contain specific allegations that a majority of the directors were either interested in the transaction or lacked independence may nevertheless survive a motion to dismiss on the basis of a permissible inference that the actions of the directors amounted to a breach of the duty of loyalty. The court holds that the well-pleaded allegations of fact found in the complaint, if true, could support a reasonable

864 A.2d 80, *; 2004 Del. Ch. LEXIS 164, **

inference of disloyal conduct. This is all that is required to survive a motion to dismiss.

## I.

### A. The Parties n1

> n1 Unless otherwise noted, the facts recited in this opinion are taken from the well-pleaded allegations of the amended complaint.

[**3]

Link Energy LLC is a Delaware limited liability company formed in November of 2002, in anticipation of assuming and continuing the business of EOTT Energy Partners, L.P. upon its emergence from bankruptcy. Link, and EOTT Energy Partners before it, engaged in the purchasing, gathering, transporting, trading, storage and resale of crude oil and related activities.

In October of 2002, EOTT Energy Partners filed for Chapter 11 restructuring in the United States Bankruptcy Court for the Southern District of Texas. As part of the restructuring plan approved by the bankruptcy court, EOTT Energy Partners' publicly traded common units were cancelled and its former common unit holders received equity units in Link representing 3% of Link's newly issued equity units. Moreover, as part of the restructuring, EOTT Energy Partners cancelled $ 235 million of its outstanding 11% senior unsecured notes in exchange for which the holders received a pro rata share of $ 104 million in 9% senior unsecured notes issued by Link and a pro rata share of the Link equity units. The remaining equity units were distributed to other allowed unsecured creditors.

The seven individual defendants, J. Robert Chambers, [**4] Julie H. Edwards, Thomas M. Matthews, Robert E. Ogle, James M. Tidwell, S. Wil VanLoh, Jr., and Daniel J. Zaloudek, comprise Link's board of directors (the "Director Defendants"). Matthews is Chairman of the board and CEO [*82] of Link. Chambers, Edwards, Ogle, Tidwell, VanLoh, and Zaloudek were elected to Link's board pursuant to the terms of the bankruptcy restructuring. n2

> n2 The amended complaint alleges that Edwards is the Executive Vice President of Frontier Oil Company. As of March 31, 2004, Frontier owned 23,700 shares of Prudential Company of America, one of the holders of the 9% notes. These facts do not raise a reasonable inference that Edwards was not an independent, disinterested director.

Plaintiff Blackmore Partners, L.P. is a Delaware investment partnership. Blackmore beneficially owned 16, 239 Link equity units through March 16, 2004 and remains a unit holder.

### B. The Sale Of Link's Assets

At the time the company emerged from bankruptcy, its capital structure was highly leveraged. According [**5] to periodic statements made by Link, business forecasts were not being met and the company's high cost of capital was putting it at a competitive disadvantage. Therefore, Link's management and board announced that they were considering alternatives to continuing operation and engaged Lehman Brothers Inc. as an advisor. In March 2004, Link agreed to sell its assets and business to Plains All American Pipeline, L.P. for $ 290 million. Under the terms of the Link LLC operating agreement the board of directors had the power to effectuate that transaction without a vote of unit holders. Link has now sold substantially all of its assets, ceased all of its principal business, and is in the process of winding up.

On March 16, 2004, n3 Link issued a press release regarding the late filing of its 10-K report, due on March 31, 2004. In its press release, Link disclosed that it was in negotiations to sell all of its operating assets, and that any proceeds would be used to pay its creditors. The press release reported that the proposed transaction required of Link's board of directors and the board of directors of the buyer and continued:

> Based on current projections, the company's management [**6] believes that its unit holders would receive a minimal amount, if any, after payment of, or otherwise making provision for, all of its liabilities, obligations and contingencies, which are substantial. There can be no assurance, however, that there will be any funds to distribute to unit holders. n4

The day following the press release, Links units traded at $ 1 per unit, down from over $ 5 per unit. Before they were eventually stopped regular trading, the units traded at, or below, $ 0.20.

> n3 The amended complaint recites the content of the March 16, 2004 press release at length. See *McMillan v. Intercargo Corp., 768 A.2d 492, 500*

864 A.2d 80, *; 2004 Del. Ch. LEXIS 164, **

*(Del. Ch., 2000)* ("In analyzing a motion to dismiss, the court may consider, for carefully limited purposes, documents integral to or incorporated into the complaint by reference.").n4 Pl.'s Am. Class Action Compl. ("Compl.") P 25.

According to the amended complaint, after Link's March 16 announcement, certain unit holders who were not also 9% [**7] note holders, including a representative of the plaintiff, contacted Link to discuss an alternative transaction to avoid the asset sale. This so-called "Alternative Proposal," which is described only in the most conclusory terms, allegedly would have involved an infusion of equity into the company that would have allowed Link to remain independent, obviating the need to redeem the 9% notes. The amended complaint also alleges in a conclusory fashion that ChevronTexaco was "willing and eager" to take over some of Link's marketing [*83] activities, which were limited by Link's inability to obtain substantial letters of credit for such activities. This relationship with ChevronTexaco would allegedly have been extremely beneficial to Link, allowing it to increase its revenue while improving its balance sheet. After receiving the Alternative Proposal, Link's management communicated that Link would not do anything without first discussing a transaction with the plaintiff and other unit holders.

On March 31, 2004, without any further contact with the plaintiff or the other unit holders, Link made public in a press release its sale of assets to Plains. n5 According to the press release, Link was [**8] to receive $ 290 million in consideration: $ 273 million in cash from Plains and the assumption of certain obligations, and $ 17 million in cash from Texas New Mexico Pipe Line Company, a wholly owned subsidiary of Shell Pipeline Company, in consideration for settling outstanding litigation with that company. From these proceeds, $ 265 million of the $ 290 million was to be used to repay debt, including the 9% notes. However, in addition to the value of the principal and the accrued interest, the 9% note holders also received their pro rata share of the $ 25 million remaining from the sale of Link's assets. This $ 25 million kicker was in return for the note holders waiving covenants in the notes that required any purchaser of the Link's assets to assume the notes. n6 The March 31 press release stated: "The potential premium is in exchange for the senior note holders' waiver and modification of certain provisions of the notes, including the right to have Plains assume the notes, and approximates the premium on the notes reflected by the estimated market value if Plains had assumed the notes." n7 The press release also restated the belief of Link's board, later confirmed, that the unit [**9] holders would receive no distributions under the sale. n8

n5 The complaint incorporates the March 31, 2004 press release by reference. *See supra* note 2.n6 Compl. P 32 states, in pertinent part:

> The holders of approximately 89% of the outstanding senior notes have agreed to sell their notes to Link Energy for 100% of the principal and accrued interest, subject to the closing of the transaction. The other holders of the senior notes will be offered the right to resell their notes on the same terms. Senior note holders that sell their notes to Link Energy on these terms will also receive their proportionate share of up to $ 25 million from any funds, including funds released from the escrow, that may remain after Link Energy makes provision for its outstanding liabilities, obligations and contingencies.

n7 Compl. P 32.n8 Compl. P 32, states, in pertinent part: "Based on current projections, the Company believes that it is likely that there will not be any liquidating or other distributions to the holders of Link Energy's LLC units."

[**10]

The press release does not say that Link was on the verge of returning to insolvency, nor does it say that maintenance of the status quo was untenable. Instead, it states that "this sale is in Link Energy's long-term best interest in order to protect the value of the assets, the needs of our customers, and the jobs of our employees." n9 The press release does not address any concern for the interests of the common unit holders, the value of whose interest in Link was wiped out by the transaction.

n9 Compl. P 32.

**II.**

On May 5, 2004, Blackmore filed this purported class action suit against Link and the Director Defendants for breach of [*84] fiduciary duty. On June 15, 2004, all of the defendants filed a motion to dismiss pursuant to Court of Chancery Rule 12(b)(6). On August 2, 2004, Blackmore filed its amended class action complaint.

864 A.2d 80, *; 2004 Del. Ch. LEXIS 164, **

In the amended complaint, Blackmore alleges that the board members violated their fiduciary duties owed to Link's equity holders by approving the sale of substantially all [**11] of Link's assets to Plains. The amended complaint raises two distinct, but related, claims. First, it alleges that Link's board favored the 9% note holders, to whom they did not owe a fiduciary duty, at the expense of the unit holders, to whom they did owe a fiduciary duty. Specifically, the amended complaint alleges that the board violated its fiduciary duty by approving the distribution of the $ 25 million excess consideration to the 9% note holders. As alleged in the amended complaint: "In approving the distribution, the [Director Defendants] deployed the LLC's power against its unit holders, failed to act with a rational basis and failed to act in good faith with regard to the unit holders. This distribution plan constitutes a breach of duty owed to plaintiff and the Class by defendants." n10 Second, the plaintiff alleges that the board failed to maximize unit holder value in a sale of control transaction and, therefore, violated its duty of loyalty under *Revlon.*

n10 Compl. P 36.

On August 18, 2004, the [**12] defendants renewed their 12(b)(6) motion to dismiss. They allege that the plaintiff has failed to state a claim upon which relief can be granted. They argue that, since Link's LLC Operating Agreement n11 contains an exculpatory clause based on *8 Del. C. 102(b)(7),* claims for breach of the duty of care are barred. n12 Furthermore, the defendants argue that, to sustain a claim for breach of the duty of loyalty, the plaintiff bears the burden of pleading facts sufficient for this court to infer that the board's decision was motivated by self-interest, lack of independence or bad faith, and that the plaintiff has failed to meet that burden. Therefore, they argue, the plaintiff's action should be dismissed.

n11 [HN1] In a motion Rule 12(b)(6) motion to dismiss, the court may consider, for certain purposes, the content of documents that are integral to or are incorporated by reference into the complaint; e.g. the provisions of the certificate of incorporation or, in this case, the LLC Operating Agreement. *In re Lukens Inc. Shareholders Litig., 757 A.2d 720, 727 (Del. Ch. 1999).*n12 This provision is authorized by [HN2] *6 Del. C. § 18-1101 (c)(2),* which provides that a manager's "duties and liabilities may be expanded or restricted by provisions in the limited liability company agreement."

[**13]

**IV.**

[HN3] The standard for dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established. The motion will be granted if it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading. n13 In considering a motion to dismiss under Rule 12(b)(6), the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint. n14 All facts of the pleadings and inferences that can reasonably be drawn therefrom are accepted as true. n15 However, neither inferences nor conclusions of fact unsupported by allegations of specific [*85] facts are accepted as true. n16 That is, a trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiffs' favor unless they are reasonable inferences. n17

n13 *Kohls v. Kenetech Corp., 791 A.2d 763, 767 (Del. Ch. 2000).*n14 *Grobow v. Perot, 539 A.2d 180, 188 n.6 (Del. 1988).*n15 *Id.*n16 *Id.*n17 *Lukens, 757 A.2d at 727.*

[**14]

**V.**

[HN4] Once a board of directors determines to sell the corporation in a change of control transaction, its responsibility is to endeavor to secure the highest value reasonably attainable for the stockholders. n18 This obligation is a contextually-specific application of the directors' duty to act in accordance with their fiduciary obligations, and there is no single blueprint that a board must follow to fulfill its duties. n19 Rather, the board's actions must be evaluated in light of the relevant circumstances to determine whether they were undertaken with due diligence and in good faith. n20 If no breach of duty is found, the board's actions are entitled to the protections of the business judgment rule. n21

n18 *McMillan, 768 A.2d at 502* (citing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 182 (Del. 1986)).*n19 *McMillan, 768 A.2d at 502* (internal citations omitted).n20 *Id.*n21 *Id.*

As Vice Chancellor [**15]  Strine pointed out in *McMillan v. Intercargo Corp.*, [HN5] the presence of the exculpatory clause in the LLC Agreement:

> . . . has an important, but confined, influence on the court's analysis of this motion. Because the plaintiff [] may not recover damages for a breach of the duty of care by the defendant directors, the court's focus is necessarily upon whether the complaint alleges facts that, if true, would buttress a conclusion that the defendant directors breached their duty of loyalty or otherwise engaged in conduct not immunized by the exculpatory charter provision. n22

Thus, to survive the motion to dismiss, the complaint must allege particularized facts that support an inference of disloyalty or a lack of good faith. n23

n22 *Id.* at 501.n23 *Lukens,* 757 A.2d at 734 n.38.

The defendants claim that the plaintiff has failed to allege such facts because the complaint makes no substantial allegations about the motivation of the board. The defendants [**16]  argue that since the plaintiff has not alleged any particularized facts of self-interest or lack of independence by the Defendant Directors, the complaint does not adequately allege a breach of the duty of loyalty or "acts or omissions not in good faith." [HN6] While the absence of well-pleaded allegations of self-interest or lack of independence often is, as was true in *McMillan,* a fatal defect in a claim for breach of the duty of loyalty, that is not invariably the case.

The complaint alleges, and for purposes of this motion the court assumes as true, that the Director Defendants approved a transaction that disadvantaged the holders of Link's equity units. Until the announcement of the transaction, the units had significant, if not substantial, trading value. Indeed, there is a basis in the complaint to infer that the value of Link's

assets exceeded its liabilities by least $ 25 million. Moreover, the facts alleged support an inference that Link was neither insolvent nor on the verge of re-entering bankruptcy. Yet, as a result of the transaction [*86]  at issue, those units were rendered valueless.

In the circumstances, the allegation that the Defendant Directors approved a sale of substantially [**17]  all of Link's assets and a resultant distribution of proceeds that went exclusively to the company's creditors raises a reasonable inference of disloyalty or intentional misconduct. Of course, it is also possible to infer (and the record at a later stage may well show) that the Director Defendants made a good faith judgment, after reasonable investigation, that there was no future for the business and no better alternative for the unit holders. Nevertheless, based only on the facts alleged and the reasonable inferences that the court must draw from them, it would appear that no transaction could have been worse for the unit holders and reasonable to infer, as the plaintiff argues, that a properly motivated board of directors would not have agreed to a proposal that wiped out the value of the common equity and surrendered all of that value to the company's creditors.

In an analogous case, Chancellor Allen recognized "the broad principle that if directors take action directed against a class of securities they should be required to justify" their action. n24 Thus, while on a more complete record, it may appear that the Director Defendants took no such action or were justified in acting [**18]  as they did, this court cannot now conclude that the complaint does not state a claim for breach of the duty of loyalty or other misconduct not protected by the exculpatory provision in Link's operating agreement. For this reason, the Rule 12(b)(6) motion to dismiss must be denied.

n24 *Orban v. Field,* 1993 Del. Ch. LEXIS 277, 1993 WL 547187, at *9 (Del. Ch. Dec. 30, 1993).

## VI.

For the foregoing reasons, the defendants' motion to dismiss pursuant to Rule 12(b)(6) is DENIED. IT IS SO ORDERED.