TAB 3

LEXSEE 2004 US DIST LEXIS 25807

CONTINUING CREDITORS' COMMITTEE OF STAR TELECOMMUNICATIONS INC., Plaintiff, v. CHRISTOPHER EDGECOMB, et al., Defendants.

Civil Action No. 03-278-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2004 U.S. Dist. LEXIS 25807

December 21, 2004, Decided

**DISPOSITION:** [*1] Defendants' motion to dismiss granted as to all defendants except Messing.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff creditors' committee brought suit against defendants, directors and officers of a bankrupt corporation, alleging the breach of fiduciary duties of loyalty, good faith, and care, and that their acts or omissions constituted gross negligence, mismanagement, and corporate waste. The directors and officers moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

**OVERVIEW:** The creditors' committee claimed that the corporation's demise was a result of several ill-fated merger and financing transactions that were approved by the directors, who were alleged to have profited from stock sales while knowing that the transactions were risky or problematical. The non-director officers of the corporation were largely ignored in the complaint and were entitled to dismissal of claims against them. The directors argued that, in the absence of a breach of fiduciary duty, they were protected by Delaware's business judgment rule and an exculpation clause in the corporate certificate, pursuant to Del. Code Ann. tit. 8, § 102(b)(7). The court agreed that a proper exculpation clause barred all claims of the breach of the duty of care and for gross negligence. The corporate waste claim was conclusory and insufficient to overcome the protections of the business judgment rule. However, if the facts pleaded were taken as true, one outside director had received a direct financial benefit from the transactions that none of the shareholders received. The claims against him were sufficient to proceed.

**OUTCOME:** The directors motion to dismiss was granted as to all defendants except the outside director who was alleged to have received benefits and enrichment at the expense of the corporation that other shareholders did not receive.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] The standard for reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6) requires a court to accept as true all material allegations of the complaint. A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint. The moving party has the burden of persuasion.

*Civil Procedure > Class Actions > Derivative Actions*
[HN2] Where the filing of what otherwise would be a derivative action is approved by a bankruptcy court, there is no motion to dismiss for failure to comply with the demand requirement of Del. Ch. Ct. R. 23.1, and the allegations of the complaint are not subject to the more exacting standard imposed by Rule 23.1 for derivative actions.

*Civil Procedure > Class Actions > Derivative Actions*

Case 1:04-cv-01565-SLR    Document 34-2    Filed 04/01/2005    Page 3 of 17

Page 2
2004 U.S. Dist. LEXIS 25807, *

[HN3] A derivative suit is a suit brought on behalf of a corporation by a stockholder rather than by the management of the corporation. Derivative claims typically include challenges to the actions or inaction of the corporation's officers or board of directors. Events affecting all stockholders in the same way, such as corporate waste and mismanagement, fall squarely within the definition of a derivative action.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Civil Procedure > Class Actions > Derivative Actions*
[HN4] In derivative suits, a shareholder plaintiff either must make a demand on the company's board of directors that it take some corrective action or must demonstrate that such a demand should be excused because it would be futile. Del. Ch. Ct. R. 23.1. Rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations. The demand requirement is not a procedural matter; it is, rather, a matter of substantive state law.

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
[HN5] The federal pleading requirements which dictate when and how facts must be alleged, must be read in conjunction with state substantive law, which controls what facts must be alleged.

*Civil Procedure > Class Actions > Derivative Actions*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN6] The high burden of pleading, with particularity, facts supporting the reasonableness of claims alleging required to withstand a motion to dismiss under Del. Ch. Ct. R. 23.1 is somewhat lower under *Fed. R. Civ. P. 12(b)(6)*.

*Civil Procedure > Class Actions > Derivative Actions*
[HN7] The demand requirements of Del. Ch. Ct. R. 23.1 are predicated upon the application of the business judgment rule in the context of a board of directors' exercise of its managerial power over a derivative claim.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN8] The business judgment rule eludes precise categorization, as it assumes different shapes in different settings. In the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN9] The business judgment rule serves two important functions: First, it prevents the courts from injecting themselves into a management role for which they were neither trained nor competent. Second, it encourages others to assume entrepreneurial and risk-taking activities by protecting them against personal liability when they have performed in good faith and with due care, however unfortunate the consequence.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN10] Even where a plaintiff is not required to plead particularized facts to raise a reasonable doubt that a challenged corporate transaction was the product of a valid exercise of business judgment, it must still plead facts from which such an inference can be drawn.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN11] Where it is useful at all as an independent concept, the good faith iteration's utility may rest in its constant reminder (1) that a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest; and (2) that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes. Therefore, a reference to the duty of loyalty also refers to the duty of good faith.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN12] The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN13] To allege a breach of the duty of loyalty based on actions or omissions of a board of directors, a plaintiff must plead facts demonstrating that a majority of a board that approved the transaction in dispute was interested and/or lacked independence. To show that a director was

Case 1:04-cv-01565-SLR   Document 34-2   Filed 04/01/2005   Page 4 of 17

Page 3
2004 U.S. Dist. LEXIS 25807, *

interested, it is usually necessary to show that the director was on both sides of a transaction or received a benefit not received by the shareholders. A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN14] Delaware cases repeatedly state that a plaintiff must prove a defendant director's breach of loyalty through a showing of interest in a transaction or lack of independence.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN15] Showing that a corporate director lacks independence because of a subservient relationship to an interested person depends, in the first instance, on a showing that the supposedly dominating person actually is interested in the transaction in question.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN16] If a defendant does not breach his duty of loyalty to the company, he is permitted to rely on the business judgment rule or an exculpatory provision, if applicable, to shield him from liability for a breach of the duty of care.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN17] Under Delaware law, the business judgment rule operates as a presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest. In addition to the protection afforded under the business judgment rule, Delaware statute also allows corporations to grant their directors further protection from liability.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN18] *Del. Code Ann. tit. 8, § 102(b)(7).*

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN19] Where the standard of review ab initio is the business judgment rule, the directors' properly raising the existence of a valid exculpatory provision in the corporate charter entitles them to dismissal of any claims for monetary damages against them that are based solely on alleged breaches of the board's duty of care.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN20] A breach of care claim brought by a creditor for actions that occurred while the company in question was in the zone of insolvency is derivative in nature. The fact of insolvency does not change the primary object of the director's duties, which is the firm itself. The firm's insolvency simply makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value and logically gives them standing to pursue these claims to rectify that injury. Put simply, when a director of an insolvent corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN21] Where a claim held by a creditor is derivative in nature, *Del. Code Ann. tit. 8, § 102(b)(7)* applies to all claims asserted on behalf of the creditors.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
*Torts > Negligence > Negligence Generally*
[HN22] A claim that a corporate manager or director acted with gross negligence is the same as a claim that he or she breached the fiduciary duty of care.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
*Torts > Negligence > Negligence Generally*
[HN23] Similar to a claim of breach of the duty of care, an exculpatory provision also protects directors from a claim of gross negligence, under *Del. Code Ann. tit. 8, § 102(b)(7).*

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN24] The Delaware standard for pleading corporate waste is stringent: an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.

Case 1:04-cv-01565-SLR    Document 34-2    Filed 04/01/2005    Page 5 of 17

Page 4
2004 U.S. Dist. LEXIS 25807, *

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN25] Absent a breach loyalty, *Del. Code Ann. tit. 8, § 102(b)(7)* protects directors and officers from a claim of corporate waste.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN26] Where there is any substantial consideration received by a corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste by the corporate directors, even if the fact finder would conclude ex post that the transaction was unreasonably risky.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN27] A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.

**COUNSEL:** Joseph A. Rosenthal, Esq.; Kevin Gross, Esq., Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Counsel for Plaintiff, Of Counsel: Daniel A. Lowenthal, III, Esq., Jonathan D. Siegfried, Esq.; Lawrence S. Hirsh, Esq., Thelen Reid & Priest LLP, New York, New York.

John C. Phillips, Jr., Esq., Phillips, Goldman & Spence P.A., Wilmington, Delaware; Counsel for Defendants, Of Counsel: Marc J. Sonnenfeld, Esq.; Karen Pieslak Pohlmann, Esq.; Jill Baisinger, Esq., Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

MEMORANDUM OPINION

**JORDAN, District Judge**

**I. Introduction**

Before me is a motion (Docket Item ["D.I."] 63; the "Motion to Dismiss") filed by defendants Christopher E. Edgecomb ("Edgecomb"), Mary A. Casey ("Casey"), Arunas A. Chesonis, ("Chesonis"), David Vaun Crumly ("Crumly"), Kelly D. Enos ("Enos"), Mark Gershien ("Gershien"), Gordon Hutchins, Jr. ("Hutchins"), James E. Kolsrud ("Kolsrud"), Allen Sciarillo ("Sciarillo"), John R. Snedegar ("Snedegar"), Samer A. Tawfik ("Tawfik"), [*2] Brett S. Messing ("Messing"), and Paul Vogel ("Vogel") (collectively the "Defendants"), seeking to dismiss this action pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim upon which relief may be granted.

The First Amended Complaint (the "Complaint"), filed by the Continuing Creditors' Committee of Star Telecommunications, Inc. (the "Plaintiff"), for itself and on behalf of the Star Creditors' Liquidating Trust (the "Liquidating Trust"), contains allegations that the Defendants, as directors and officers of Star Telecommunications Inc. ("Star" or the "Company"), breached their fiduciary duties of loyalty, good faith, and care, and that their acts or omissions constituted gross negligence, mismanagement, and corporate waste. (D.I. 4 at PP147-76.) The Plaintiff further alleges that payments made from Star to Messing constitute unjust enrichment at the expense of Star. (*Id.*)

The court has jurisdiction over this case pursuant to *28 U.S.C. § 1334*. For the reasons set forth herein, the Motion to Dismiss will be granted as to all defendants except Messing.

**II. Background** n1

> n1 The following rendition of the background information does not constitute findings of fact and is cast in the light most favorable to the non-moving party, the Plaintiff.

[*3]
Star was a telecommunications carrier specializing in long distance telephone service. (*Id.* at P1.) Through expanding capacity and acquiring other companies, Star grew rapidly in the mid-1990s and by the late 1990s was the seventh-largest telecommunications carrier in the United States. (*Id.* at PP1-2.) By 2000, however, Star's financial position had deteriorated considerably, and, in early 2001, the Company was forced to file for bankruptcy. (*Id.* at P3.)

Star was founded in the Mid-1990s by Edgecomb, who served as Chief Executive Officer ("CEO") and Chairman of Star's Board of Directors from 1996 through January 10, 2001, and defendant Casey, who served as President from 1996 through January 10, 2001, and served as a Director from 1996 through March 13, 2001. (*Id.* at PP7-8.) Defendant Tawfik was a Director of Star and President of its subsidiary PT-1 from February 1999 through March 18, 2000, the date that Star filed for bankruptcy protection. (*Id.* at PP17, 21.) Defendants

Chesonis, Gershien, Hutchins, and Snedegar were Directors of Star but did not hold management positions within the Company. (*Id.* at PP9, 12-13, 16-17.) Hutchins and Snedegar served from [*4] the mid-1990s until Star filed for bankruptcy in early 2001; Chesonis served from May 1998 through February 2000; Gershien served from March 1998 through October 1999. (*Id.*)

In June 1997, Star completed an initial public offering, raising $ 32 million. (*Id.* at PP2-3.) In 1998, the price of Star's common stock peaked and Star raised $ 145 million through an additional stock offering. (*Id.* at P29.) By the end of the year, however, Star had only $ 64.4 million of net working capital, due in part to massive capital expenditures. (*Id.* at PP3, 29.)

On June 8, 1998, Star's Board of Directors met to discuss the acquisition of PT-1, which was in the prepaid calling card business. (*Id.* at P40.) At that meeting, the Board received a presentation from one of the investment banks advising them on the acquisition, Hambrecht & Quist ("H&Q"). (*Id.*) Despite the fact that H&Q had represented PT-1 in a failed initial public offering, the Board did not wait to receive a report from the other investment bank advising them, Credit Suisse First Boston, before acting on the acquisition. (*Id.*) On the following day, after meeting for 12 minutes, the Board approved the acquistion. [*5] (*Id.*) In February 1999, despite Star's poor cash position and a drop in value of PT-1 from $ 590 million to $ 190 million, Star closed the PT-1 acquisition. (*Id.* at P45.) PT-1's principal shareholder was Tawfik, who, after the acquisition by Star, remained President of PT-1, and, additionally, became a member of Star's Board of Directors. (*Id.* at PP17, 46.)

Shortly after completing the PT-1 acquisition, Star announced to the public that a syndicate of banks, led by Goldman Sachs Credit Partners, had committed to supply the Company with $ 275 million in senior secured credit facilities. (*Id.* at P52.) The credit facilities were not delivered as announced, however, which caused the financial markets to view Star negatively. (*Id.* at PP52-53.) There is no record of the Board discussing why the financing fell through or who was responsible for the failure of the agreement and its premature announcement. (*Id.* at P53.)

As a result of the failure to close the proposed credit agreement, Star was forced to agree to more costly financing from another source, Foothill Capital Corporation ("Foothill"). (*Id.* at P55.) The financing from Foothill, which was finalized on [*6] June 9, 1999, included a $ 25 million term loan and a $ 75 million revolving line of credit based on Star's accounts receivable. (*Id.*) When Star released its quarterly financial statements a few weeks later, on June 30, 1999, it was clear that it had already breached certain covenants. (*Id.* at P56.) The breaches were caused by two of Star's financial measurements falling below required levels, specifically, tangible net worth and earnings before interest, taxes, depreciation, and amortization. (*Id.*) Foothill threatened to sue Star for breach of the covenants, and, consequently, Star agreed to additional fees in order to amend the credit agreement. (*Id.* at P57.) The additional fees Star agreed to pay included a $ 500,000 agency fee, an increase in the interest rate of the loan, and a payment of $ 2 million if the term loan was not paid back by January 31, 2001. (*Id.*)

In the fall of 1999, World Access, Inc. ("World Access") expressed interest in acquiring Star. (*Id.* at P66.) World Access bundled voice and data services for the European market. (*Id.*) The Plaintiff, however, alleges that the primary business purpose of World Access was to acquire companies [*7] for MCI WorldCom Inc. ("WorldCom"), when WorldCom could not openly undertake such transactions itself. (*Id.*) The Plaintiff contends that WorldCom controlled World Access through stock holdings and a carrier service agreement. (*Id.*) At the time World Access expressed its interest in Star, Star owed WorldCom approximately $ 56 million and was facing serious financial difficulties. (*Id.* at P67.) The Plaintiff alleges that WorldCom's purpose in acquiring Star through World Access was to hide unrecoverable receivables Star owed to WorldCom. n2 (*Id.* at P69.) At a December 16, 1999 meeting, Star's Board discussed its financial difficulties, specifically, the Company's mounting past due accounts payable and lack of available cash. (*See id.* at P65.) Some Board members at this meeting suggested that "insolvency ... was a clear possibility without fundamental changes in [Star's] operation." (*Id.*)

---

n2 The Plaintiff argues that the Board should have examined the relationship between World Access and WorldCom further because "the relationship of those companies was relevant to when and under what terms a merger transaction could be completed." (D.I. 4 at P69.) How their relationship would affect the terms of the agreement is not described, however. It could be argued that such a relationship and WorldCom's alleged motivation to hide unrecoverable receivables would have been a benefit to Star in closing the proposed merger, not a detriment.

[*8]

In that same meeting, Star's Board authorized a letter of intent to enter into a merger with World Access, wherein Star shareholders would receive World Access

Case 1:04-cv-01565-SLR   Document 34-2   Filed 04/01/2005   Page 7 of 17

Page 6
2004 U.S. Dist. LEXIS 25807, *

stock and cash equal to approximately $ 10.50 per share of Star common stock. (*Id.* at P71.) Additionally, World Access agreed to provide Star with tens of millions of dollars in bridge financing when the deal closed. (*Id.*) As part of the transaction, World Access was to assume Star's WorldCom debt. (*Id.*)

On February 2, 2000, World Access announced that it was reducing its offer to Star from $ 650 million to $ 440 million, due to facts uncovered during due diligence on Star's condition. (*Id.* at P72.) On February 7, 2000, Star's Board held a 90 minute meeting to discuss the merger and, following another 75 minute meeting on February 11, 2000, voted to approve the merger. (*Id.* at P73.) The approved merger had a number of conditions precedent, the most notable being the requirement that Star divest itself of PT-1 and receive at least $ 150 million in consideration for that business. (*Id.* at P74.)

Citing the Board's minutes, the Plaintiff alleges that the Board did not investigate whether it would be feasible [*9] to sell PT-1 for such a price. (*Id.*) The Board did, however, receive a fairness opinion from Deutsche Banc, which stated that the transaction, as revised by World Access, was fair from a financial standpoint. (D.I. 66, Ex. 22 at 3.) The Board also received a memorandum from its Delaware counsel advising it of its obligations under Delaware law. (*Id.* at 2.) Finally, the Board was informed that no serious interest with respect to acquiring Star had been shown by any third parties. (*Id.*) In March 2000, Star signed a letter of intent to sell PT-1 to Counsel Corporation ("Counsel") for $ 150 million. (D.I. 4 at P75.) By the end of 2000, Counsel had informed Star that it was lowering its price for PT-1 from $ 150 million to $ 70 million. (*Id.* at P97.) Consequently, World Access terminated its merger with Star for failure to satisfy one of the conditions precedent, namely selling PT-1 for $ 150 million. (*Id.* at P101.)

The Plaintiff alleges that the myopic focus of Star's Board and management on completing the merger was to Star's detriment. (*Id.* at P84.) As a result of the merger negotiations with World Access, the Directors and Officers of Star did not pay appropriate [*10] attention to the day-to-day operations of the Company. (*Id.* at P78.) In a registration statement sent to the Securities and Exchange Commission (the "SEC") Star admitted that:

> FOR THE LAST 16 MONTHS, OUR MANAGEMENT AND KEY EMPLOYEES HAVE FOCUSED ALMOST ENTIRELY ON CLOSING THE WORD ACCESS MERGER AND THE PT-1 ASSET SALE AND HAVE NOT CONCENTRATED ON OUR DAY-TO-DAY OPERATIONS ... Given these efforts, our management and key employees have not spent the requisite time or effort necessary to run our day-to-day operations.

(*Id.* at P79.) The Plaintiff alleges that the fact that Stars' Chief Financial Officer ("CFO"), Enos, did not attend any Board meetings after December of 1998, further highlights that the Board was not concerned with the day-to-day operations of Star. (*Id.* at P81.)

In the Summer of 2000, prior to the termination of the proposed merger with World Access, Edgecomb sold 6.2 million shares of Star common stock, Tawfik sold more than 2.2 million shares, and Crumly sold 112,000 shares. (*Id.* at P85.) They all sold their shares for less than the proposed merger price, and the Plaintiff alleges that this was due to the unique information they were [*11] privy to as Officers and Directors of the Company. (*Id.* at P86.)

On January 9, 2001, some five to six months after those individuals sold shares of Star's common stock, Star announced that World Access was abandoning its merger with Star due to Star's inability to sell PT-1 for $ 150 million, as required by the merger agreement. (*Id.* at P101.) As a result of the merger failing to close and Star's worsening financial condition, Star's creditors began to threaten drastic action to protect their interests. (*Id.* at PP92, 101.) The Board, realizing the severity of the situation, invited Messing, as a representative of Gotel Investments Ltd. ("Gotel"), one of Star's investors, to make a presentation to the Board on January 1, 2001. (*Id.* at P93.) Messing offered to assemble a new management team for Star, with the aim of closing the World Access merger and, failing that, repairing the Company's relationships with its vendors and creditors. (*Id.* at P95.)

On January 10, 2001, the Board turned over control of the Company to Messing. (*Id.* at P100-03.) At the same time, Edgecomb resigned his position as CEO, Chairman, and a Director n3; Casey resigned as President but [*12] retained her position on the Board. (*Id.* at P7-8, 103.) After Messing was appointed Chairman and CEO, Sciarillo was named CFO, Timothy Sylvester was named General Counsel, and Vogel joined the Board. (*Id.* at P103.) Vogel is alleged to have long-standing business and professional relations with Messing. (*Id.* at P116.)

---

n3 Although the complaint only states that Edgecomb resigned as the Company's CEO and Chairman of the Board (D.I. 4 at P103), it is assumed that he resigned his directorship as well. (*See Id.* at P7 (stating that Edgecomb "served as

Case 1:04-cv-01565-SLR    Document 34-2    Filed 04/01/2005    Page 8 of 17

Page 7
2004 U.S. Dist. LEXIS 25807, *

Chief Executive Officer and Chairman of the Board of Directors of Star from in or about January 1996 through on or about January 10, 2001," without any mention of further service as a Director).)

The first action Messing completed was a short term financing deal with Gotel, a company with which he is alleged to have been affiliated. (*Id.* at P104.) The deal provided Star with $ 25-35 million in new capital over six months, in exchange for attractively [*13] priced warrants for 30 million shares of Star's common stock. (*Id.*) Messing admitted that the cost of capital in this transaction was high, but that without it the Company would likely not survive. (*Id.*) Some directors were concerned that the new warrants would allow Gotel to take control of the Company, and certain Board members believed that Messing controlled Gotel. (*Id.* at P105-06.) Upon completion of the transaction with Gotel, Gotel was permitted to name two directors to Star's Board. (*Id.* at P115.) The two new directors chosen by Gotel were Alan Rothenberg and Steve Carroll, both of whom are alleged to have long-standing business dealings and personal relationships with Messing. (*Id.* at P116.)

The next major transaction into which Messing led Star, was the sale of PT-1's pre-paid calling card business. (*Id.* at P119.) On January 21, 2001, Messing, Sciarillo, and Crumly, among others, met with officers of IDT Corporation ("IDT") and negotiated a deal to sell the PT-1 business to IDT; Messing allegedly entered into this agreement (the "January 21 Agreement") without considering other buyers, such as PT-1's management team. (*Id.* at PP121-22.) The January [*14] 21 Agreement included the transfer of the PT-1 business to IDT, the indemnification of PT-1 by IDT in connection with certain pending lawsuits, and the transfer of $ 5 million, $ 4 million of which was paid at the time of the agreement and $ 1 million of which was to be paid at closing. (*Id.* at P124.) It also included an indemnity for $ 3.5 to $ 5 million in connection with three pending lawsuits. (*Id.*) This agreement was conditioned on PT-1 having $ 25 million in gross receivables and the release of all liens and security interests in PT-1 by all creditors. (*Id.* at P125.) On January 23, the two parties entered into an agreement, whereby IDT and Star agreed to direct $ 100 million in products and services to each other over a two-year period. (*Id.* at P126.) In addition, IDT Investments, a company affiliated with IDT, agreed to purchase 5% of Star's common stock, as well as warrants giving them the right to purchase an additional 10% of Star's common stock. (*Id.*) IDT Investments also entered into a standstill agreement with Star that forbade IDT Investments from owning more than 20% of Star's outstanding common stock without first gaining the approval of Star. ( [*15] *Id.*)

On February 1, 2001, Star and IDT closed the deal pursuant to the January 21 Agreement. (*Id.* at P127.) But, allegedly at the behest of Messing, IDT did not pay the $ 1 million owed to Star at the time of closing; it instead wired the money to WorldCom in return for WorldCom releasing its security interest in PT-1. (*Id.*)

Between January 18, 2001 and February 7, 2001, IDT Investment purchased 15,006,236 shares of Star's common stock, or about a 21.1% beneficial ownership in Star. (*Id.* at P129.) IDT Investments did not, however, retain the voting rights associated with these shares. Rather, it transferred those rights to Messing through a voting proxy. (*Id.*)

In early March of 2001, WorldCom declared its intention to force Star into bankruptcy, and another Star creditor, RFC Capital, decided not to purchase additional receivables from Star. (*Id.* at P130.) Shortly thereafter, Messing and IDT renegotiated certain parts of the PT-1 transaction. (*Id.* at P131.) The Plaintiff alleges that Star received no benefit in this renegotiation. Instead, the renegotiation permitted IDT to eliminate its $ 3.5 million indemnity obligation on the basis of the $ 5 million [*16] in cash IDT had already paid as part of the deal. (*Id.* at PP124, 133.) Another $ 1.5 million debt obligation IDT owed to Star was eliminated on the basis of the prepayment. (*Id.*) On March 8, 2001, soon after agreeing to the renegotiation of the PT-1 deal, Messing resigned from Star, as did his team. (*Id.* at P137.)

The Plaintiff alleges that Messing's actions with respect to IDT were a result of his wish to curry favor with IDT and its principal owner, Howard Jonas ("Jonas"). (*Id.* at P139.) In fact, shortly after Messing left Star, he became a partner in a capital management firm and he received a $ 5 million investment from Jonas. (*Id.* at P140.) Jonas later invested another $ 2 million with Messing. (*Id.*)

Before Messing left Star, he submitted a request and received a $ 25,000 reimbursement for expenses incurred in his capacity as CEO of Star. (*Id.* at P141.) The largest expenses for which he sought reimbursement were $ 10,000 given to SAR Academy, a private school of which Jonas was a significant benefactor, and $ 10,616 to an investment vehicle, partially run by Messing, for rent and support services for offices in Los Angeles. (*Id.* at PP143-145.) [*17]

Star filed for bankruptcy protection on March 13, 2001. (*Id.* at P21.)

**III. Standard of Review**

Case 1:04-cv-01565-SLR    Document 34-2    Filed 04/01/2005    Page 9 of 17

Page 8
2004 U.S. Dist. LEXIS 25807, *

[HN1] The standard for reviewing a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)* requires a court to accept as true all material allegations of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir. 1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991).

This case is unusual in that it alleges corporate misfeasance and malfeasance of a type most frequently challenged in derivative suits, n4 but, because of the bankruptcy context in which it arises, the case is brought by the Plaintiff directly, without the Plaintiff having first had to make a demand on the Company's Board of Directors for some corrective action. n5 [HN2] In a context like this, [*18] the Delaware Court of Chancery has said, "because the filing of this action was approved by the Bankruptcy Court, there is no motion to dismiss for failure to comply with Court of Chancery Rule 23.1's demand requirement. Thus, the Plaintiff's allegations are not subject to the more exacting standard imposed by Court of Chancery Rule 23.1 for derivative actions." *Official Comm. of Unsecured Creditors of Integrated Health Servs: v. Elkins*, 2004 Del. Ch. LEXIS 122, C.A. No. 20228-NC, 2004 WL 1949290, at *2 n.2 (Del. Ch. August 24, 2004). n6

n4 [HN3] A derivative suit is a suit brought on behalf of a corporation by a stockholder rather than by the management of the corporation. *See Black's Law Dictionary* at 475 (8th ed. 2004). Derivative claims typically include challenges to the actions or inaction of the corporation's officers or board of directors. *Cf. Steinman v. Levine*, 2002 Del. Ch. LEXIS 132, 2002 WL 31761252, at *12 & n.50 (Del.Ch. 2002) (noting that events affecting all stockholders in the same way, such as corporate waste and mismanagement, "fall squarely within the definition of a derivative action.").

n5 The Star Creditors' Liquidating Trust is the successor in interest to Star and has assigned its claims and rights of action to the Plaintiff. (D.I. 4 at P6.) Thus, the Plaintiff has been enabled to bring this action directly and not derivatively. [HN4] In derivative suits, the shareholder plaintiff either must make a demand on the company's board of directors that it take some corrective action or must demonstrate that such a demand should be excused because it would be futile. *See* Del. Ch. Ct. Rule 23.1; *Aronson v. Lewis*, 473 A.2d 805, 811-12 (Del. 1983) (by promoting demand on the board, "rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations"). The demand requirement is not a procedural matter; it is, rather, a matter of substantive state law. *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 96-97, 114 L. Ed. 2d 152, 111 S. Ct. 1711 (1991) ("the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of substance, not procedure" (internal citations omitted)); *Blasband v. Rales*, 971 F.2d 1034, 1048 (3d Cir. 1992) ("It is clear that the demand requirement is not a mere formality, but rather is an important aspect of Delaware's substantive law."); *In re General Motors Class E Stock Buyout Sec. Litigation*, 790 F. Supp. 77, 80 (D. Del. 1992) [HN5] ("the federal pleading requirements . . . which dictate when and how facts must be alleged, must be read in conjunction with state substantive law, which controls what facts must be alleged"). [*19]

n6 While accepting this direct statement as the clearest direction from the Delaware courts about the applicability of Rule 23.1 in this context, I am nevertheless left to wonder whether the heightened pleading standard ought not apply with full force in a circumstance like this. From a policy standpoint, it seems that the particularized pleading requirement of Rule 23.1 serves a purpose beyond preserving managerial responsibility to directors and officers and beyond encouraging dispute resolution before litigation. It can be argued that one very important purpose of the particularized pleading requirement is to give added force to the business judgment rule at the pleading stage, so that, regardless of the anomalous circumstance of derivative-type claims being raised here without the necessity of a demand on the Board, the heightened standard of particularity should still apply. There are some references in case law that may support a heightened pleading standard even in the *12(b)(6)* context. *See Leung v. Schuler*, 2000 Del. Ch. LEXIS 41, No. C.A. 17089, 2000 WL 1478538 at *19 (Del. Ch. Oct 02, 2000)

Case 1:04-cv-01565-SLR    Document 34-2    Filed 04/01/2005    Page 10 of 17

Page 9
2004 U.S. Dist. LEXIS 25807, *

(under "*Rule 12(b)(6) or Rule 23.1*, the complaint must plead specific facts from which it can be inferred that the decision by the board is so beyond the bounds of reasonable judgment that it seems essentially inexplicable on any other grounds" (emphasis added; internal citation omitted)); *cf. Telxon Corp. v. Bogomolny*, 792 A.2d 964, 974 (Del. Ch. 2001) (stating that [HN6] the "high burden of pleading with particularity facts supporting the reasonableness" of the alleged claims required to withstand a motion to dismiss under *Rule 23.1* is "is somewhat lower" under *Rule 12(b)(6)*). The Chancery Court's recent decision in *Production Resources Group, L.L.C. v. NCT Group, Inc.*, 2004 Del. Ch. LEXIS 174, C.A. No. 114-N, 2004 WL 2647593 (Nov. 17, 2004) also suggests that the bringing of a derivative claim in the context of a bankruptcy should not lower the pleading bar. *Cf.*, 2004 Del. Ch. LEXIS 174, [WL] at *15 ("It would be puzzling if, in insolvency, the equitable law of corporations *expands* the rights of firms to recover against their directors so to better protect creditors, who, unlike shareholders, typically have the opportunity to bargain and contract for additional protections to secure their positions.").

[*20]

Nevertheless, the parties apparently agree, as they ought, that analysis of the present Motion must be informed by precedents arising from derivative actions where the plaintiff alleges that demand should be excused as futile. (*See* D.I. 88 at 24-25 (plaintiff's counsel stating his view of the applicable standard and saying, "is that a different standard than the demand excused cases? Probably not.").) The "demand excused" cases are essential precedent in reviewing the sufficiency of the Complaint because those cases embody and articulate the business judgment rule's impact on claims such as the Plaintiff seeks to assert. *See Levine v. Smith*, 591 A.2d 194, 205 (Del. 1991) [HN7] ("The demand requirements of [Chancery Court] Rule 23.1 are predicated upon the application of the business judgment rule in the context of a board of directors' exercise of its managerial power over a derivative claim."), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *cf. Gagliardi v. TriFoods Intern., Inc.*, 683 A.2d 1049, 1051 (Del. Ch. 1996) (analysis of claims of mismanagement and waste begins with business judgment rule).

The Third [*21] Circuit has observed that [HN8] the "business judgment rule eludes precise categorization, as it assumes different shapes in different settings." *Weiss v. Temporary Inv. Fund*, 692 F.2d 928, 941 (3d Cir. 1982) (internal citation omitted). Although it may be articulated in a variety of ways, it's import is straightforward: "in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith." *Gagliardi*, 683 A.2d at 1051. It's public policy underpinnings, too, are well known. [HN9] It "serves two important functions." *Weiss*, 692 F.2d at 941. First, it prevents the courts from "injecting themselves into a management role for which they were neither trained nor competent." *Id.* (quoting Duesenberg, *The Business Judgment Rule and Shareholder Derivative Suits: A View from Inside*, 60 Wash.U.L.Q. 311, 314 (1982)("Duesenberg")). Second, it "encourage[s] others to assume entrepreneurial and risk-taking activities by protecting them against [*22] personal liability when they have performed in good faith and with due care, however unfortunate the consequence." *Id.* (Again quoting Duesenberg). In the words of former Chancellor William T. Allen of Delaware's Court of Chancery, the business judgment rule is "the first protection against a threat of sub-optimal risk acceptance ... ." *Gagliardi*, 683 A.2d at 1052. Expanding on that theme, he observed:

> Shareholders don't want (or shouldn't rationally want) directors to be risk averse. Shareholders' investment interests, across the full range of their diversifiable equity investments, will be maximized if corporate directors and managers honestly assess risk and reward and accept for the corporation the highest risk adjusted returns available that are above the firm's cost of capital.
>
> But directors will tend to deviate from this rational acceptance of corporate risk *if* in authorizing the corporation to undertake a risky investment, the directors must assume some degree of personal risk relating to *ex post facto* claims of derivative liability for any resulting corporate loss.

*Id.* (emphasis added).

Thus, [HN10] even if Plaintiff is not required [*23] to plead "particularized facts" to raise "a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment[,]" *Levine*, 591 A.2d at 205, it must still plead facts from which such an inference can be drawn. *See In re Tri-Star Pictures, Inc., Litigation*, 634 A.2d 319, 326 (Del. 1993) (under Chancery Court *Rule 12(b)(6)*, "review is ... limited to

the well-pled facts contained in the Complaint which, viewing all inferences in a light most favorable to the plaintiff, we must take as true. Conclusions, however, will not be accepted as true *without specific allegations of fact to support them.*" (emphasis added; internal citation omitted)). (D.I. 88 at 24 (plaintiff's counsel stating, "I think ... the standard for the Court here really can be stated as we need to allege facts to raise at least a reasonable doubt as to the directors breach of fiduciary duty.").)

### IV. Discussion

The Plaintiff has alleged a series of claims, including breach of fiduciary duty, gross negligence, and corporate waste, against the directors and officers of Star.

In Counts I, II, and III of the Complaint, the Plaintiff alleges [*24] that Casey, Chesonis, Edgecomb, Gershien, Hutchins, Snedegar, Tawfik, Enos, Kolsrud, and Crumly n7 breached their fiduciary duties, were grossly negligent, and wasted corporate assets. (D.I. 4 at P147-59.) In Counts IV, V, and VI of the Complaint, the Plaintiff makes the same allegations against Vogel, Casey, Hutchins, Snedegar n8, Messing, and Sciarillo. (*Id.* at P160-72.) In Count VII of the Complaint, the Plaintiff alleges that Messing unjustly enriched himself at the expense of Star. (*Id.* at P173-76.) Each claim will be analyzed according to the roles and actions of the various defendants.

> n7 Ms. Casey and Messrs. Chesonis, Edgecomb, Gershien, Hutchins, Snedegar, and Tawfik are referred to herein at times as the "Edgecomb Directors". Messrs. Enos, Kolsrud, and Crumly are referred to as the "Edgecomb Non-Director Officers". The Edgecomb Directors and the Edgecomb Non-Director Officers are referred to collectively as the "Edgecomb Directors and Officers."

> n8 Messrs. Vogel, Hutchins, and Snedegar, and Ms. Casey are referred to collectively as the "Messing Outside Directors." Messrs. Hutchins and Snedegar and Casey are members of both the "Edgecomb Directors" class of defendants and the "Messing Outside Directors" class.

[*25]

### A. Count I

The Plaintiff alleges in Count I of the Complaint that the Edgecomb Directors and Officers breached their fiduciary duties to Star by participating in decisions, or failing to prevent decisions, that resulted in the acquisition of PT-1, the expansion of Star's business and facilities in a manner that left it unable to pay its debts and continue as a going concern, the onerous short-term financial obligations that burdened the Company, the agreement to merge with World Access, the neglect of the day-to-day operations of Star while management attempted to close the World Access merger, and the disregard of the need for an independent audit committee. (*See id.* at P149.)

The Defendants argue that any claim alleging breach of fiduciary duty must be dismissed because all the named defendants are protected by the business judgment rule or an exculpation clause in the Company's charter. (*See* D.I. 64 at 2.)

### 1. Duty of Loyalty n9

> n9 Although the Plaintiff also invokes the duty of good faith as separate from the duty of loyalty, Delaware case law states that the two duties are identical. *See, e.g., Nagy v. Bistricer, 770 A.2d 43, 49 n.2 (Del. Ch. 2000)* (holding that [HN11] "if it is useful at all as an independent concept, the good faith iteration's utility may rest in its constant reminder (1) that a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest; and (2) that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes"). Therefore, throughout this opinion, reference to the duty of loyalty also refers to the duty of good faith.

[*26]

[HN12] "The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, 634 A.2d 345, 361 (Del. 1993)* (internal citation omitted).

i. Edgecomb Directors

[HN13] To allege a breach of the duty of loyalty based on actions or omissions of the Board, the Plaintiff must "plead facts demonstrating that a *majority* of a board that approved the transaction in dispute was interested and/or lacked independence." *Orman v. Cullman, 794 A.2d 5, 23 (Del. Ch. 2002)* (internal citation omitted) (emphasis added). To show that a director was interested, it is usually necessary to show that the director was on both sides of a transaction or received a benefit not received by the shareholders.

*Orman*, 794 A.2d at 23; *see also Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) ("[a] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders").

In the [*27] instant case, the Plaintiff alleges that Edgecomb was interested in the PT-1 acquisition and the World Access merger, that Tawfik was interested in the World Access Merger, and that a majority of the remaining directors, while not interested in these transactions, were beholden to Edgecomb and consequently lacked the requisite independence. n10 (*See* D.I. 73 at 14.) Because the Plaintiff must show that a majority of the directors that voted on the transactions were not disinterested and because the board had six members when the PT-1 and Word Access transactions were considered, it is necessary for the Plaintiff to allege facts showing that a minimum of four directors were not disinterested. n11 *See Orman*, 794 A.2d at 23.

> N10 The Plaintiff does not allege that Edgecomb was interested with respect to any of the other claims levied against him. (D.I. 73.)
>
> n11 Although the Plaintiff is required to show that a majority of the directors that voted on the transaction in question violated their duty of loyalty, *Chaffin v. GNI Group, Inc.*, 1999 Del. Ch. LEXIS 182, No. Civ.A. 16211-NC, 1999 WL 721569 at *5 (Del. Ch. Sept. 3, 1999), the Plaintiff does not allege that any of the directors failed to vote on any of the transactions in question. (*See* D.I. 4.)

[*28]

The Plaintiff contends that Edgecomb was interested in the PT-1 transaction as a result of his large stock position in the Company, combined with his motivation to increase the price of Star's stock. (D.I. 73 at 23-24.) In the Plaintiff's words, Edgecomb's "desire to increase the share price overrode his obligation to consider other effects of the [PT-1] acquisition." (*Id.*) In essence, the Plaintiff's argument rests on the unsupportable premise that a director who owns a lot of stock cannot cast a disinterested vote. No precedent cited by the Plaintiff stands for the proposition that stock ownership, coinciding with a Board decision that may affect the price of those shares, is adequate to show a breach of the duty of loyalty. n12 Therefore, I conclude that the allegations regarding Edgecomb's stock ownership are insufficient to show he was interested in the PT-1 transaction.

> n12 The Plaintiff cites *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*, 208 B.R. 288 (Bankr. D. Mass. 1997), but that case concludes that, under Delaware law, a director who approves a leveraged buy-out ("LBO") is engaging in a transaction with his own company. *Id.* at 302. The court held that the sale of stock to a third party, who financed the purchase through the use of debt assumed by the company, was in essence a transaction between the directors and the company. *Id.* Consequently, the court held directors who owned a small percentage of company stock could still be considered interested if they were approving an LBO. *Id.* 303. *Brandt* does not support the broader proposition that a director who owns company stock is, by that fact alone, interested in a Board decision that affects the price of that stock.

[*29]

As to the World Access Merger, the Plaintiff argues that Edgecomb and Tawfik were interested because it gave them an opportunity to sell their shares before the company sought bankruptcy protection. (*Id.* at 32-33.) The Plaintiff contends that the fact that "Edgecomb [and Tawfik] sold the bulk of ... [their] shares at prices below the publicly announced merger price, corroborate[s] the reasonable inference that ... [they] knew but failed to disclose the merger was not likely to close." (*Id.* at 33-34.) The Plaintiff appears to assert that Edgecomb and Tawfik approved the merger knowing that it could not be closed, withheld this information from shareholders, and then illicitly traded on this information. However, neither the allegations in the Complaint n13 nor the pertinent precedent warrants such a leap. Under Delaware law, simply selling company stock does not make a director interested. *See Guttman v. Jen-Hsun Huang*, 823 A.2d 492, 502 (Del. Ch. 2003) ("it is unwise to formulate a common law rule that makes a director 'interested' whenever [it is] alleged that he made sales of company stock in the market at a time when he possessed material, non-public [*30] information"). The argument that one must assume insider trading and breach of fiduciary duty because directors sold stock below the announced merger price simply cannot withstand scrutiny. The merger price was a matter of public record. The stock sales too were based on public information. They were not priced in some back alley; they were traded in the open, regulated securities market. Edgecomb and Tawfik enjoyed no benefit that was not also available to any other shareholder wishing to sell shares at the price the market set, which happened to be below the announced merger price.

Case 1:04-cv-01565-SLR   Document 34-2   Filed 04/01/2005   Page 13 of 17

Page 12
2004 U.S. Dist. LEXIS 25807, *

n13 The Factual Allegation's section of the Complaint states that officers and Board members sold Star Shares "because they were in a unique position to know the fragile state of the company." (D.I. 4 at P86.) The First Claim for Relief does not list this as one of the "acts and omissions" that breached the Defendant's duties to the Company. (*Id.* at P149.) In addition, the Plaintiff's Opposition to the Motion also does not address such a claim. (D.I. 74.)

[*31]

The Plaintiff argues that Edgecomb and Tawfik had a personal interest in the transaction because they had motivations beyond the good of the company when approving the transaction. (D.I. 4 at PP32-34.) As previously stated, the general rule is that the "best interest of the corporation and its shareholders takes precedence over any interest possessed by a director ... ." *Cede, 634 A.2d at 361* (internal citation omitted). [HN14] Delaware cases repeatedly state, however, that a plaintiff must prove breach of loyalty through a showing of interest in a transaction or lack of independence. *See, e.g., Orman, 794 A.2d at 23.* The Plaintiff has not alleged that Edgecomb and Tawfik received a benefit from approving the World Access merger that was not shared by the stockholders generally. In short, the Plaintiff has failed to plead any facts that would, even inferentially, support its claim that Edgecomb and Tawfik were interested in the World Access merger and therefore breached their duty of loyalty.

Turning to Hutchins, Snedegar, and Chesonis, the Plaintiff alleges that those directors were beholden to Edgecomb during all of the events that are the subject of [*32] Count I, and, therefore, that they lacked independence. (D.I. 4 at 9, 13, 16, 147-48.) [HN15] It is obvious, though, that showing a director lacks independence because of a subservient relationship to an interested person depends in the first instance on showing that the supposedly dominating person actually is interested in the transaction in question. *In re Oracle Corp. Derivative Litig., 824 A.2d 917, 938 (Del. Ch. 2003).* Because the Plaintiff has failed to plead facts from which it could be inferred that Edgecomb was interested in the transactions in question, it follows that the Plaintiff has failed to plead facts from which it could be inferred that those remaining directors were beholden to an interested director. Consequently, the Plaintiff has failed to adequately plead that a majority of the Board was interested in the PT-1 and World Access transactions. By extension, the Plaintiff has not adequately pleaded a breach of the duty of loyalty by the Board. *See Orman, 794 A.2d at 23.*

ii. Edgecomb Non-Director Officers

Defendants Enos, Kolsrud, and Crumly, were officers of the Company but not directors. As non-directors, they did not participate [*33] in any Board votes. Further, two of those defendants, Enos and Kolsrud, are scarcely mentioned in the Complaint. (D.I. 4 at PP14, 48, 81.) Enos was the CFO of Star, and Kolsrud was the Executive Vice President of Operations and Engineering. (*Id.*) No facts are pleaded about them, other than their job titles, their dates of service, and the fact that Enos did not attend any board meetings. (*Id.*) Like Edgecomb and Tawfik, Crumly is alleged to have sold shares in Star at a time when he was in a unique position to know that the merger was unlikely to close. (*Id.* at P86.) The Plaintiff does not address in its Opposition to the Defendants' Motion to Dismiss how Crumly breached his duty of loyalty by selling stock. *See supra at 19-21.* Simply put, no basis in fact or law is given to support a grant of relief against Enos, Kolsrud, or Crumly. *See Elkins, 2004 Del. Ch. LEXIS 122, 2004 WL 1949290 at \*13* (stating conclusory allegations are insufficient to defeat a motion to dismiss under *Rule 12(b)(6)*).

2. Duty of Care

[HN16] If a defendant does not breach his duty of loyalty to the company, he is permitted to rely on the business judgment rule or an exculpatory provision, [*34] if applicable, to shield him from liability for a breach of the duty of care. *Emerald Partners v. Berlin, 787 A.2d 85, 90 (Del. 2001).*

[HN17] Under Delaware law, the business judgment rule operates as a presumption "that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest." *Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988).* In addition to the protection afforded under the business judgment rule, Delaware statute also allows corporations to grant their directors further protection from liability. *Section 102(b)(7) of the Delaware General Corporation Law* allows corporations to adopt a provision in their charters to exculpate directors from breaches of the duty of care. The section states:

> [HN18] the certificate of incorporation may also contain ... [a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director ... provided that such provision shall not eliminate or limit the liability of a director: (i) for [*35] any breach of the

director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; ... or (iv) for any transaction from which the director derived an improper personal benefit.

*8 Del. C. § 102(b)(7).* [HN19] When "the standard of review *ab initio* is the business judgment rule, properly raising the existence of a valid exculpatory ... provision in the corporate charter entitles director [defendants] to dismissal of any claims for [monetary] damages against them that are based solely on alleged breaches of the board's duty of care." *Emerald Partners, 787 A.2d at 93* (internal citations omitted).

Plaintiff argues that Star's corporate charter, which contains an exculpatory provision, was a contract between the corporation and the shareholders and that it therefore does not prevent them, as creditors, from recovering from the defendants for breaches of the duty of care. (D.I. 73 at 46-47.) To support its argument, the Plaintiff relies on cases from various jurisdictions outside of Delaware. *See Pereira v. Cogan (In re Trace Int'l Holdings, Inc.), 2001 U.S. Dist. LEXIS 2461, No. 00 Civ. 619, 2001 WL 243537* [*36] *at *11 (S.D.N.Y. March 8, 2001); Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.), 2000 U.S. Dist. LEXIS 276, No. 97 C7934, No. 97C6043, 2000 WL 28266 at *7-8 (D. Ill. Jan. 12, 2000).* Recently, however, the Delaware Chancery Court has ruled directly on this point and held that exculpation clauses do indeed apply to prevent creditors as well as shareholders from bringing duty of care claims. *Production Resources Group, L.L.C. v. NCT Group, Inc., C.A. No. 114-N, 2004 U.S. Del. Ch. LEXIS 174, 2004 WL 2647593 at *13-14 (Del. Ch. Nov. 17, 2004).*

In that opinion, the court noted that [HN20] a breach of care claim brought by a creditor for actions that occurred while the company in question was in the zone of insolvency was derivative in nature. *Id.* In explaining why the creditor's claim was derivative, the court stated that

the fact of insolvency does not change the primary object of the director's duties, which is the firm itself. The firm's insolvency simply makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value and logically gives them standing to pursue these claims to rectify that injury. Put simply, when a director of an insolvent [*37] corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation.

*2004 Del. Ch. LEXIS 174, [WL] at 14.*

Relying on the fact that [HN21] any claim held by a creditor is derivative in nature, the court went on to hold that *§ 102(b)(7)* applies to all claims asserted by the company on behalf of the creditors. *2004 Del. Ch. LEXIS 174, [WL] at *14* ("Although *§ 102(b)(7)* itself does not mention creditors specifically, its plain terms apply to all claims belonging to the corporation itself, regardless of whether those claims are asserted derivatively by stockholders or by creditors"). Consequently, *§ 102(b)(7)* applies to all actions for which the Plaintiff alleges duty of care violations.

In the Plaintiff's Complaint, it lists several alleged breaches of the Edgecomb Directors and Officers' duty of care. (D.I. 4 at P149.) In its brief, Plaintiff argues that the Edgecomb Directors and Officers breached their duty of care with respect to the PT-1 purchase, the Company's efforts to obtain capital, the World Access merger, and the abdication of management duties while trying to close the World Access merger. (D.I. 73 at 26-32, 35-40.) Although not addressed [*38] in their brief, the lack of an independent audit committee, which is alleged in the Complaint (D.I. 4 at P149), also appears to be a claim for breach of the duty of care. This claim, like the others argued in the Plaintiff's brief, fails as a matter of law because the exculpation clause protects the Edgecomb Directors and Officers against any claim for a breach of the duty of care. *See Emerald Partners, 787 A.2d at 93.* The Plaintiff itself implicitly admits this in its brief, when it does not refute the notion that a proper exculpation clause bars all claims of the breach of the duty of care. (D.I. 73 at 46-47.) Consequently, all claims of a breach of the duty of care against the Edgecomb Directors and Officers must be dismissed.

### B. Count II

The Plaintiff alleges in Count II of the Complaint that the Edgecomb Directors and Officers committed gross negligence with respect to the same actions as alleged in Count I. (D.I. 4 at PP152-55.) However, [HN22] a "claim that a corporate manager [or director] acted with gross negligence is the same as a claim that she breached her fiduciary duty of care." *Albert v. Alex. Brown Mgmt. Servs., 2004 Del. Super. LEXIS 303, No. C.A. 04C-05-250, 2004 WL 2050527* [*39] *at *6 (Del. Super. Ct. Sept. 15, 2004); see also McMullin v. Beran, 765 A.2d 910, 921 (Del. 2000)* (stating that "director liability for breaching the duty of care is predicated upon

concepts of gross negligence" (internal citations omitted)).

[HN23] Similar to a claim of breach of the duty of care, an exculpatory provision also protects directors from a claim of gross negligence. *See Malpiede v. Townson, 780 A.2d 1075, 1094-1095 (Del. 2001)* (stating that "even if the plaintiffs had stated a claim for gross negligence, such a well-pleaded claim is unavailing because defendants have brought forth the *Section 102(b)(7)* charter provision that bars such claims"). Therefore, the exculpatory clause protections described in Section VI(A)(2), *supra,* also shield the Edgecomb Directors and Officers from a charge of gross negligence. *See supra at 22-25; Malpiede, 780 A.2d at 1094-1095.*

### C. Count III

The Plaintiff alleges in Count III of the Complaint that the Edgecomb Directors and Officers committed corporate waste with respect to the same actions as alleged in Counts I and II. (D.I. 4 at PP156-59.) In a case similar to the one at [*40] bar, the Chancery Court dismissed a claim of waste. *Elkins, 2004 Del. Ch. LEXIS 122, 2004 WL 1949290, at *63-64.* In that case, the Official Committee of Unsecured Creditors brought suit against a group of directors on behalf of the company they used to serve. With respect to their claim of waste, the court noted that [HN24] the Delaware standard for pleading corporate waste is stringent: "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Id.* at 17. Further,

> waste is a standard rarely satisfied in Delaware courts. Indeed, waste is an extreme test, very rarely satisfied by a plaintiff. In *Brehm v. Eisner,* the Supreme Court described the plaintiffs' allegations as that the board not only committed a procedural due care violation in approving an employment agreement, but also that the Board committed a substantive due care violation constituting waste. The Court went on to dismiss the characterization of waste in this manner, equating due care with process. In evaluating a waste claim, courts look to the exchange itself. The exchange must be irrational.

*Id.* That standard [*41] applies equally to claims against officers and directors. *See In re Walt Disney Co., 2004 Del. Ch. LEXIS 132, No. C.A. 15452, 1322004 WL 2050138, at *3 (Del. Ch. Sept. 10, 2004)* ("the fiduciary duties of officers have been assumed to be identical to those of directors"). [HN25] Absent a breach loyalty, *§ 102(b)(7)* protects directors and officers from a claim of corporate waste. *Green v. Phillips, 1996 Del. Ch. LEXIS 76, C.A. No. 14436, 76 1996 WL 342093 at *7 (Del. Ch. June 19, 1996).*

In the instant case, I have already found that the Plaintiff has not pleaded facts sufficient to show a breach of the duty of loyalty by any of the Edgecomb Directors and Officers. *See supra* at 17-22. Therefore, the exculpation clause protects the Edgecomb Directors and Officers from a claim of corporate waste.

Moreover, even without the protection of the exculpation clause, the Plaintiff has not alleged facts that Star did not receive adequate consideration for the transactions entered into and approved by the Edgecomb Directors. (*Id.* at P158.) In fact, the Plaintiff merely relists the same actions cited as support for Counts I and II of the Complaint. The corporate waste claim is conclusory and insufficient to [*42] overcome the protections of the business judgment rule. *See Brehm v. Eisner, 746 A.2d 244, 263 (Del. 2000)* (noting that[HN26] if "there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude ex post that the transaction was unreasonably risky").

### D. Count IV & V

The Plaintiff alleges in Count IV of the Complaint that Messing and the Messing Outside Directors breached their fiduciary duties to Star and its creditors, and specifically their duty of care. (D.I. 4 at P160-64.) In Count V of the Complaint, the Plaintiff alleges gross negligence as to the same actions listed in Count IV. As previously discussed, gross negligence allegations are analyzed under the same frame work as are allegations of a breach of the duty of care. *See supra* at 25-26. Therefore, any finding that the Plaintiff failed to adequately plead a breach of the fiduciary duty of care, includes a conclusion that the Plaintiff has failed to adequately plead gross negligence.

#### i. The Messing Outside Directors

The [*43] Plaintiff alleges in its Complaint that the Messing Outside Directors breached their fiduciary duty with respect to the Gotel transaction, the IDT transaction, and the payment of $25,000 in expenses to Messing. (D.I. 4 at P162.) In its Opposition to the Defendants' Motion to Dismiss, the Plaintiff states that the Board only met once during the two-month period that Messing was in charge. (D.I. 73 at 43.)

The Complaint states, however, that upon request by Messing to approve the Gotel financing, the Board

promptly held a special meeting. (D.I. 4 at PP104-05.) The Complaint goes on to say that "certain directors were concerned that control of the Company would change hands if the Company were to issue the warrants [as required by the financing]." (*Id.* at P105.) "Nevertheless, the directors ultimately yielded to Messing's insistence that they had no choice but to take whatever financing was available, and they authorized him to negotiate the Gotel transaction on behalf of Star." (*Id.* at P107.) With respect to the sale of PT-1 to IDT, the Complaint does not mention the Messing Outside Directors, aside from stating that "without any knowledge or approval from Star's Board, Messing [*44] signed the March 5 Letter on behalf of Star... ." (*Id.* at P136.)

In short, there are no allegations supporting, even inferentially, a claim for breach of the fiduciary duty of loyalty. As to any duty of care or gross negligence claims, again the Plaintiff's Complaint must yield to the exculpation clause contained in Star's charter. *See supra* at 22-25. Therefore, as to Count IV and V, the Plaintiff has failed to state a claim against the Messing Outside Directors. n14

> n14 Even without the exculpation clause, this claim could not stand. There is no denying that Star faced dire financial circumstances. In light of Star's desperate need for capital, the most damning conclusion that can be drawn from the facts pleaded in the Complaint is that the directors, when confronted with the difficult decision of whether to accept the Gotel financing, may have made a poor decision. But that does not amount to an abdication of responsibility by the Board.
>
> The Plaintiff relies on *Mills Acquisition Co. v. MacMillan, Inc., 559 A.2d 1261 (Del. 1989),* to argue that the Board breached its duty of care (D.I. 73 at 43), but the facts of that case are easily distinguished from the one at bar. In *Mills,* the Court of Chancery held that the defendant directors were not protected by the business judgment rule when the directors approved a "lock-up" that restricted further bidding on the company that was to be sold. *Mills Acquisition Co., 559 A.2d at 1286.* The court held that "while those lock-ups which draw bidders into a battle benefit shareholders, similar measures which end an active auction and foreclose further bidding operate to the shareholders' detriment." *Id.* (internal citation omitted). In that case, the claim was that the directors approved the use of a lock-up that stopped rival bidders from winning the auction for the company so that fellow directors could purchase the company through a leveraged buy-out. *Id. at 1279-80, 1286.* Here, however, there were no other bidders for Star, the Company was on the verge of bankruptcy, and the Gotel financing was, by the Plaintiff's own admission, the only financing option presented to the Board. (D.I. 4 at P104-07.)

[*45]

ii. Sciarillo

The Complaint only mentions Sciarillo directly two times. First, it states that when Messing took control of Star, Sciarillo was made CFO, and, second, it contends that Sciarillo assisted Messing with the sale of PT-1 to IDT. (D.I. 4 at PP103, 122.) With respect to the other actions in which Messing participated, the Complaint frequently uses the term "his team," which presumably includes Sciarillo. (*Id.* at PP119-140.) The Plaintiff does not allege that Sciarillo received an improper benefit from any of the transactions in which the Plaintiff alleges he participated, or that he was interested in the transactions in any other way. In fact, the only mention of Sciarillo in the Plaintiff's Opposition to the Defendants' Motion to Dismiss is that "Defendants Crumly and Sciarillo also participated in the IDT transaction as officers, though further discovery is required to establish the extent of their involvement." n15 (D.I. 73 at 23, n.10.) Consequently, the Plaintiff has failed to plead any facts to support a claim that Sciarillo breached his fiduciary duty of loyalty. Nor does it adequately plead a duty of care or gross negligence claim, and, if it did, the § [*46] 102(b)(7) charter provision would prevent such claims.

> n15 Although Crumly is referenced with respect to Count IV and V, the Complaint does not even name him as a defendant in these claims. (D.I. 4 at PP160-68.) If it did, however, the conclusion as to Mr. Crumly would be the same as it is for Mr. Sciarillo.

iii. Messing

The Plaintiff alleges that Messing violated his fiduciary duties to Star and its creditors and committed gross negligence with respect to the same actions as alleged against the Messing Outside Directors. (D.I. 4 at P162.) The Plaintiff alleges that Messing controlled Gotel, directly benefitted from the financing agreement entered into between Star and Gotel, and entered into an agreement with IDT to sell it PT-1 in order to secure future benefits from IDT. (*Id.* at PP117, 140.)

Additionally, the Complaint alleges that Messing submitted a bill for $ 25,000, $ 10,616 of which was payed to another company that he allegedly controlled. (*Id.* at P145) The Plaintiff contends that this was [*47] far in excess of the value that was received by Star. (*Id.*)

If the facts pleaded by the Plaintiff are taken as true, then Messing received a direct financial benefit from all of these transactions. Because Messing is alleged to have received a benefit from these transactions, which was not received by the shareholders generally, the Plaintiff has pleaded sufficient facts to support the allegation that Messing was interested in these transactions. *See Rales, 634 A.2d at 936* (holding that [HN27] "[a] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders"). Therefore, as to Messing and Counts IV and V, the Plaintiff has pleaded claims of breach of the fiduciary duty of loyalty sufficient to withstand the Motion to Dismiss. n16

---

n16 Because the Plaintiff has adequately pleaded a breach of the duty of loyalty, at this stage of the proceeding, Messing cannot claim the protection of *§ 102(b)(7)* from claims of gross negligence. *See Levy v. Stern, 687 A.2d 573 (Del. 1996)* (holding that *§ 102(b)(7)* "is inapplicable ... where the alleged breach entails bad faith, intentional misconduct, or a breach of the duty of loyalty").

---

[*48]

### E. Count VI

The Plaintiff alleges in Count VI of the Complaint that Messing, Sciarillo, and the Messing Outside Directors wasted corporate assets. (D.I. 4 at P160-64.) As discussed in relation to Count III, a finding of corporate waste requires that the transaction in question be "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *In re Walt Disney Co. Derivative Litig., 731 A.2d 342, 362 (Del. Ch. 1998)* (internal citation omitted); *see supra* at 26-27. In its Opposition to the Defendants' Motion to Dismiss, the Plaintiff only addresses Messing and his involvement in the March 5 Letter agreement and the $ 25,000 disbursement. The Plaintiff alleges that Star received no compensation for the March 5 Letter agreement, which would lead any reasonable business person to find that there had been corporate waste.

The Plaintiff also alleges that Messing requested and received a $ 25,000 disbursement. (D.I. 4 at P141.) $ 10,616 of that disbursement is alleged to have been paid to a company Messing controlled. (*Id.* at P145.) That fact, coupled with the timing of the submission, [*49] shortly before Messing resigned (*Id.* at PP141-45.), sufficiently supports the Plaintiff's allegation of corporate waste to withstand the Motion to Dismiss. Therefore, with respect to Messing, the claim of corporate waste is allowed. As to all other defendants, the same pleading failures that resulted in the dismissal of Counts IV and V necessitate dismissal of this claim against them. *See supra* at 28-30.

### F. Count VII

The Plaintiff alleges in Count VII of the Complaint that Messing unjustly enriched himself at the expense of Star. (D.I. 4 at P173-76.) Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Fleer Corp. v. Topps Chewing Gum, 539 A.2d 1060, 1062 (Del. 1988)* (internal citation omitted). For the reasons discussed in section IV(D), *supra*, the Plaintiff has sufficiently pleaded its claim that Messing was unjustly enriched, and, consequently, Count VII will not be dismissed. *See supra* at 30-31.

### V. Conclusion

For the reasons set forth herein, the Defendants' Motion to Dismiss [*50] will be granted as to all the Defendants except Messing. An appropriate order will issue.

### ORDER

For the reasons stated in the Memorandum Opinion issued today,

IT IS HEREBY ORDERED that the Defendants' Motion to Dismiss (D.I. 63; the "Motion") is DENIED as to Counts IV, V, VI, and VII of the First Amended Complaint (D.I. 4) insofar as those Counts allege claims against defendant Brett S. Messing; and,

IT IS FURTHER ORDERED that the Motion is GRANTED in all other respects.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

December 21, 2004
Wilmington, Delaware