**TAB 5**

Slip Copy
2005 WL 589000 (N.D.Ill.)
**(Cite as: 2005 WL 589000 (N.D.Ill.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
HOLLINGER INTERNATIONAL, INC. Plaintiff,
v.
HOLLINGER INC., et al. Defendants.
No. 04 C 0698.

March 11, 2005.

Abby F. Rudzin, Jonathan Rosenberg, Andrew J. Geist, O'Melveny & Myers, New York, NY, Mark V. Chester, Steven Lawson, Joan M. Meyers, Johnson & Colmar, Chicago, IL, Robert M. Schwartz, O'Melveny & Myers, LLP, Los Angeles, CA, Henry C. Thumann, O'Melveny & Myers LLP, Washington, DC, for Plaintiff.

Nathan P. Eimer, Andrew George Klevorn, Linda P. Kurtos, Adam B. Deutsch, Vanessa G. Jacobsen, Eimer Stahl Klevorn & Solberg, LLP, Brian L. Crowe, Allan Tracy Slagel, Cary E. Donham, Douglas Michael Ramsey, Shefsky & Froelich, Ltd., Paula Enid Litt, Veronica Gomez, William Butler Berndt, Schopf & Weiss, Joseph J. Duffy, Jonathan M. Cyrluk, Stetler & Duffy, Ltd., Stephen C. Voris, Burke, Warren, MacKay & Serritella, P.C., James R. Figliulo, Peter A. Silverman, Gregory L. Stelzer, Figliulo & Silverman, Michael J. Gaertner, Lord, Bissell & Brook LLP, Chicago, IL, Laurent S. Wiesel, John L. Warden, Robin D. Fessel, David H. Braff, James V. Masella, III, Sullivan & Cromwell, Maureen Reid, Baker Botts LLP, Lisa Swedenborg Getson, Friedman Kaplan Seiler & Adelman LLP, Greg A. Danilow, Richard A. Rothman, Weil, Gotshal & Manges, Anthony Albanese, Weil, Cotshal & Manges LLP, Ira Lee Sorkin, Donald A. Corbett, Carter, Ledyard & Milburn, Gregory P. Joseph, Douglas J. Pepe, Gregory P. Joseph Law Offices LLC, New York, NY, William H. Jeffress, Alex J. Bourelly, Baker Botts LLP, Washington, DC, Daniel I. Bourer, P. Gavin Eastgate, Reed Smith Shaw & McClay, Pittsburgh, PA, for Defendants.

*MEMORANDUM AND ORDER*

MANNING, J.

**\*1** Plaintiff Hollinger International, Inc. ("International" or "the Company") brought the instant action alleging that Defendant Hollinger Inc. ("Inc.") and other corporate and individual defendants (collectively, "Defendants") used their positions as officers, directors, and controlling shareholders of International to "loot" hundreds of millions of dollars from the Company. In its Second Amended Complaint, International alleges state law claims for breach of fiduciary duty, unjust enrichment, conversion, and civil conspiracy. The present matter comes before this Court on Defendants' various motions to dismiss under Federal Rules of Civil Procedure 12(b)(2), (6), and (7) and 19. For the reasons set forth below, this Court DENIES all pending motions to dismiss.

BACKGROUND [FN1]

> FN1. The facts in the Background section are derived from: (1) the First and Second Amended Complaints; (2) the opinion of Vice Chancellor Strine of the Court of Chancery of Delaware in *Hollinger International, Inc. v. Black, et al.,* 844 A.2d 1022 (Del.Ch.2004) ("the Delaware Litigation" or "Delaware Action"); and (3) exhibits attached to parties' submissions, many of which are referenced in the Second Amended Complaint, including but not limited to the "Restructuring Proposal" and the submissions and court filings from the Delaware Litigation.

International brought this action to recover $425.2 million (plus interest), which it contends Defendants looted (and/or facilitated the looting of) through a series transactions from 1994 to April 2003.

*The Parties*

The litigants in this action are all related through, what can only be described for lack of a better word, an incestuous web of corporate ownership and greed. International is a Delaware corporation, whose corporate offices were located in Chicago, Illinois, during the time of the alleged looting. It owns and operates hundreds of domestic and foreign newspapers, including the *Chicago Sun-Times*.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 589000 (N.D.Ill.)
(Cite as: 2005 WL 589000 (N.D.Ill.))

Although a publicly traded company, International is controlled by Inc., a Canadian corporation. At the time of the alleged looting, Inc. owned 30.3% of the equity in International but controlled 72.8% of its voting rights. [FN2]

> FN2. Inc. has since reduced its holdings and now owns 18% of the equity and 68% of the voting rights in International.

Inc. does not conduct any business of its own but is simply "an investment vehicle" through which Defendants Conrad Black and David Radler control International. Inc. is controlled by Defendant Ravelston Corporation, which owns 78% of its equity. Ravelston, in turn is a "private holding company" controlled by Black and Radler, who respectively own 65.1% and 14.1% of its shares.

Using the above corporate structure, Black and Radler placed themselves and other Defendants, whom they allegedly controlled, in key positions at International, its subsidiaries, and companies doing business with International. [FN3] For example, Black was International's CEO and chairman of its board of directors ("the Board"). Radler was the deputy chairman of the Board and the president and COO of International. Defendant John Boultbee, who owned a small interest in Ravelston, sat on the Board and was International's CFO and an executive vice-president of finance. Defendant John Colson, also a shareholder of Ravelston, was a member of the Board and CEO of several of International's subsidiaries which received excessive payments from International. Defendant Barbara Amiel Black ("Amiel Black"), Conrad Black's wife (collectively, "the Blacks"), served on the Board and was a vice-president at International and a shareholder in at least one company (Defendant Ravelston Management Inc.) to which International allegedly paid unwarranted management fees. Lastly, International alleges that Defendant Richard Perle sat on the Board and on its audit, compensation, and executive committees, while serving as an officer in a company (Digital Management) which received alleged excessive fees for managing International's investments.

> FN3. Individual Defendants resigned from most of their positions with Inc. after their alleged conduct in this action came to light.

*The Looting of International*

*2 Using their controlling interests and positions as officers and directors, Black and Radler allegedly conspired with the other individual Defendants to loot International by causing it to: (1) make unwarranted "non-competition payments" to Defendants; (2) sell hundreds of millions of dollars of its publishing assets "at below market value prices" to companies controlled by Black and Radler; (3) loan money to Inc. at "below market interest rates"; and (4) pay Defendants, either directly or indirectly, through companies they controlled, "unwarranted, excessive, and unauthorized" "management fees," "incentive payments," and other compensation. Each of these alleged "schemes" will be explained in turn.

*Non-Compete Payments*

From January 1999 to November 2001, Defendants allegedly caused International to pay them over $88 million in "sham non-compete payments," which rightfully should have gone to the Company. These payments were made in connection with International selling several of its local newspapers and were often included in the sale price of the newspapers. In exchange for these payments, Defendants agreed not to compete with the purchasers of these papers. While this is standard practice in the newspaper industry, according to International, the problem with these payments was that Defendants were not a threat to compete. Thus, there was no reason for them to receive the non-compete payments. For example, Defendants Inc. and Ravelston, are holding companies, without the ability to compete, but respectively received $16.55 million and $26.43 million in unwarranted non-compete payments.

The first of these improper non-compete payments was made in January of 1999 in connection with the sale certain of International's publishing assets to Intertec Publishing Corporation ("Intertec") for approximately $75 million. As part of the sale, Intertec agreed to pay $2 million to International for entering into a non-compete agreement. Although Inc. was not mentioned in the sales agreement, Defendant Radler allegedly had International transfer the entire $2 million payment to Inc.

In February of 1999, International sold some of its other newspapers to Community Newspaper Holdings, Inc. ("CNHI") for $472 million (the CNHI I Transaction"). Included in this price was $50 million in consideration for a non-compete

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 589000 (N.D.Ill.)
**(Cite as: 2005 WL 589000 (N.D.Ill.))**

Page 4

agreement. Although Inc. was not a threat to compete and CNHI did not ask it to sign the non-compete agreement, Defendants Black, Radler, and Boultbee had Inc. included as a signatory in the non-compete agreement and as a "non-competition covenantor" in the sales agreement. Then without obtaining Board approval, Radler caused $12 million of the $50 million non-compete payment to be wired to Inc. [FN4]

> FN4. After obtaining $14 million in non-compete payments from the assets sales to Intertec and CNHI, Defendants transferred the money back to International as repayment for a prior loan (which is detailed below). Defendants, however, did not disclose the fact that they repaid the loan with International's own money.

Next, in June of 1999, Black and Radler had International sell more of its assets to Horizon Publications, Inc. ("Horizon") (a company, which as explained below, was controlled by Black and Radler) for $43.7 million ("Horizon I"). The price included a $5 million payment for a non-compete agreement. As in the earlier transactions, Black and Radler caused Inc. to be included "as a non-compete covenantor in the asset purchase agreement." As a result, Inc. received $1.2 million of the $5 million non-compete payment.

**\*3** Over a year later, in September of 2000, International again sold certain of its newspapers, this time to Forum Communications Co. for $14 million. As in the other deals, $400,000 of the sale price was for the execution of a non-compete agreement. Inc. was included as a signatory to the non-compete agreement and received $100,000 of the total payment.

In October 2000, International sold additional assets to PMG Acquisition Corporation for $59 million, which included a $2 million payment for a non-compete agreement. As before, Radler caused Inc. to be included as a signatory in the non-compete clause. He then had International transfer $500,000 of the $2 million payment to Inc. Well after the completion of this sale, in April of 2001, Black, Radler, and Boultbee had International pay them $600,000 ($285,000 to Black and Radler (each) and $15,000 to Boultbee) for agreeing not to compete with PMG.

In November 2000, International entered into

another sales agreement with CNHI ("the CNHI II Transaction") for $90 million, which included a $2.25 million non-compete payment. As in the earlier transactions, Black and Radler had International include Inc. in the non-compete agreement and then transferred $750,000 of the payment to Inc. Additionally, Radler "caused [the] closing documents to be altered at closing to create a sham basis for making non-competition payments to Black, Radler, and Boultbee." As a result, International, at Radler's "instruction," transferred $4.3 million of the purchase price to Black and Radler (each) and $450,000 to Boultbee.

Also in November 2000, International agreed to sell the majority of its Canadian newspapers--over 200--to CanWest Global Communications Corp. ("CanWest") for $2.1 billion. Included in this purchase price was a payment for $51.8 million for an agreement not to compete. Although Defendants Black, Radler, Boultbee, and Ravelston were not signatories to the CanWest non-compete agreement, they allegedly induced International to give them the entire payment plus interest--$52.9 million of which $26.44 million went to Ravelston, $11.9 million to Black and Radler (each), and $1.32 million to Boultbee. In orchestrating these payments, Black and Ravelston allegedly made numerous misstatements to the Board.

In an even bolder move, in February 2001, Black, Radler, and Boultbee entered into non-compete agreements with a subsidiary of International-- American Publishing Company, which had previously sold "substantially all of its assets" to Horizon. Because it conducted very little business and was a subsidiary of International, it is unclear why American Publishing would need to protect itself from competition by Defendants, who were its owners. As a result of these non-compete agreements, International inexplicably paid Black and Radler $2,612,500 each and $135,500 to Boultbee.

The final two sets of non-compete payments were made in July and November of 2001 in connection with International's sale of certain Canadian newspapers to Osprey Media Group. Included in the price of these transactions was $5.17 million in non-compete payments. Like the other transactions, Black, Radler, and Boultbee caused International to transfer most of this non-compete payment to themselves-- approximately $2.37 million each to Black and Radler and $245,000 to Boultbee.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 589000 (N.D.Ill.)
**(Cite as: 2005 WL 589000 (N.D.Ill.))**

*4 In all, International alleges that Defendants misappropriated $88,021,498 in non-compete payments which rightfully belonged to the Company. Of this amount, Black and Radler each received $21,431,936, while $2,170,433 went to Boultbee. In addition, Inc. and Ravelston, which are controlled by Black and Radler, received $26,437,193 and $16,550,000 respectively.

*Sale of International's Assets to Horizon and Bradford*

Black and Radler allegedly formed Horizon in 1998 and Bradford Publishing Co. ("Bradford") in 2000, for the sole purpose of using them to buy newspaper assets from International at "below market prices." Through personal ownership and other companies that they controlled, Black and Radler owned up to 80% of Horizon and at least 50 of Bradford. The remainder of the equity in these companies was dispersed to individuals who Black and Radler "dominated or controlled or, who were loyal to them" because these investors were either their employees, friends, or business partners. In addition, Radler was the president, CEO, and a director at Horizon. [FN5]

> FN5. Black and Radler allegedly went to great lengths to hide their control over Horizon and Bradford and failed to fully disclose their ownership interests to the Board or in International's public filings.

In all, International made five sales to Horizon ("Horizon I" to "Horizon V") and one sale to Bradford. In Horizon I, which closed on June 30, 1999, 33 individual local newspapers were sold for $43.7 million. In seeking the Board's approval, Black and Radler allegedly made numerous misrepresentations and manipulated the true value of the assets, including that the purchase price was equal to an offer from "an arm's length purchaser" (CNHI). In fact, however, CNHI had offered $18 million more than Horizon for the same assets. Indeed, shortly after closing on Horizon I, Horizon sold one of the publications which Black and Radler represented was worth $78,000 for $673,314.

Adding insult to injury, Black and Radler "arranged" for International to "finance the entire ... purchase price at closing" without disclosing this fact to the Board. Horizon eventually defaulted on this obligation and currently owes $5.6 million to International. Additionally, as discussed below, Black

and Radler caused International to finance the Horizon I transaction at "a below-market interest rate." In all, International now seeks damages in excess of $20 million for the Horizon I sale.

In Horizon II, completed on April 1, 2000, Black and Radler caused International to enter into "an asset exchange agreement," under which it "swapped" certain assets with Horizon. In seeking Board approval, Defendants made numerous misstatements regarding the value of the assets to be exchanged. Unbeknownst to the Board, International was exchanging profitable newspapers for publications which were "mostly losing money." In fact, one of the unprofitable papers was an asset which Horizon acquired from International in Horizon I. International now alleges that the "exchanged publications ... were worth millions less than the properties ... received."

In Horizon III, Black and Radler had International transfer ownership of two newspapers to Horizon. Instead of being compensated for this transfer, however, International agreed to pay $161,999 to Horizon. To get Board approval, Black and Radler made numerous misstatements, including telling the Board that these two papers had "experienced significant losses and [were] unlikely to yield profits." Defendants, however, did not disclose that a third party had recently offered to purchase the two allegedly unprofitable papers for $750,000. Indeed, 18 months after the sale, Horizon sold the two papers for $730,000.

*5 Additionally, in September 2000, Black and Radler caused International to transfer two regional newspapers in the Horizon IV transaction. Unlike the previous Horizon transactions, Defendants did not even seek Board approval. Instead, this transaction was secretly facilitated through the CNHI II Transaction. Prior to closing on CNHI II, Radler got CNHI's consent to include the two Horizon IV assets with the other publications CNHI had agreed to purchase. The CNHI II purchase agreement, however, called for CNHI to immediately assign these two assets to Horizon. In exchange for facilitating this transfer, CNHI received a $5.2 million discount on the purchase price of the assets it was actually purchasing. Instead of making up this reduction in the purchase price, however, Horizon only paid $4.1 million to International-- resulting in an immediate loss of $1.1 million to International.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In the final transaction (Horizon V), International sold a group of publications to Horizon for $1 (one dollar). Two years prior, International had purchased these same assets for approximately $1.75 million and nine months before had received an offer to sell them for $1.25 million. Like the other transactions, to get Board approval, Black and Radler falsely stated that the publications were losing money when in fact they were very profitable.

In addition to the Horizon transactions, in July of 2000, International sold four of its publications to Bradford for $37.5 million. International contends that this transaction was unfair to the majority non-controlling shareholders because: (1) Black and Radler understated the value of these assets by manipulating valuation figures; (2) a third-party had offered to buy the same publications for $10.6 million more than Bradford paid; (3) the purchase was financed in part by a $6 million interest free loan from International; and (4) International signed a guarantee with a third-party lender for an additional loan of $22 million, which Bradford used to pay the remainder of the purchase price. Like the Horizon transactions, when presenting this sale to the Board, Black and Radler did not disclose the above information.

In conclusion, International contends that Black and Radler usurped several corporate opportunities and cheated the Company out of tens of millions of dollars in orchestrating the above sales to Bradford and Horizon.

*Loans to Related Parties*

International also alleges that Black and Radler breached their fiduciary duties by having International make at least two loans to Inc. at "below market interest rates." In September 1997, Black and Radler forced International to loan Inc. $42.5 million at a 1.4% interest rate. International alleges that based on Inc.'s lack of creditworthiness this was a "grossly low rate." Moreover, the terms of the loan called for it to be repaid in 90 days. Inc., however, did not repay the loan until February of 1999--over a year after the agreed upon date. Even more egregious, Inc. "did not even pay all of the nominal interest" and, as detailed above, used $14 million in improper non-compete payments, which it had misappropriated from International, to repay the loan.

*6 In July of 2000, International made a second loan

of $46.8 million to Inc. at 13% interest. Inc., though, never made the agreed upon interest payments because a month later it "unilaterally reduced" the rate to just under 5% (a decrease of over 60%). Even with the reduced interest rate, however, Inc. did not repay the loan and still owes a balance of $33.5 million.

*Excessive Management Fees, Incentive Payments, and Compensation*

International further alleges that Defendants looted the Company by arranging unwarranted, excessive, and unauthorized management fees, incentive payments, and other improper compensation.

*Management Fees Paid to Inc. and Ravelston*

Corporations in the United States usually directly hire and compensate their professional senior management (*e.g.,* the CEO, CFO, COO, etc.). These senior officers work exclusively for the hiring corporation and do not split their services and time with companies doing business with the hiring corporation.

International alleges that in contrast to the practice of most corporations, Black and Radler, in a "virtually unprecedented" move, caused the Company to "outsource" its management from Defendants Ravelston and Inc. [FN6] As a result, since 1994, International has paid over $226 million in management fees to Inc. and Ravelston. According to International, these fees "were far in excess of the fair market value the Company was receiving, and grossly in excess of the cost to [Inc.] and Ravelston for providing such services."

> FN6. Inc. allegedly provided management services from 1994 to 1997, while Ravelston did so from 1997 until October of 2003.

In getting the Board to approve International's annual "management services agreements" with Ravelston and Inc., Defendants drafted the contracts themselves and did not have an independent law firm representing International review the agreements. The fees paid under these contracts were determined solely by Defendants without any rational basis for calculating the fair value of services being provided to International. According to International, Defendants' only alleged basis in determining the managements fees was to "keep the [ ] fees as high as

Slip Copy
2005 WL 589000 (N.D.Ill.)
**(Cite as: 2005 WL 589000 (N.D.Ill.))**

possible" without regard to the value of the services provided to the Company. In addition, under the guise of paying for its management, International paid for a large portion of the Blacks' "extravagant" travel and living expenses, including $90,000 to repair a Rolls Royce owned by Ravelston but used exclusively by the Blacks.

*Sham Broker Fees*

International further alleges that Defendants incorporated Moffat Management Inc. ("Moffat") to provide management and consulting services to International. Defendants then caused International pay Moffat $900,000 for "broker" services. Moffat, however, never actually performed any "broker" services. Defendants failed to disclose this payment to the Board and had this payment recorded on International's books as a legitimate "broker fee."

*Digital Management Incentive Plan*

Defendants also caused International to pay them over $5 million in "incentive payments" for managing International's investments through Digital Managemet Inc. (a subsidiary of International). To get approval for these payments, Defendants falsely told the Board that the incentive plan was "in-line with comparable plans at other companies." In fact, however, the incentive plan was "unusual and excessive because it paid bonuses based on liquidity ... without regard to the investment portfolio's overall performance." In a memorandum to Black, Colson explicitly acknowledged that Digital's fee structure "is high in comparison with similar plans used by other companies." [FN7] For example, despite losing over $68 million on its investments managed by Digital, International paid Perle over $3.1 million in "incentive payments" for his performance as Digital's CEO. Additionally, many of the investments Digital put International's money into were entities in which Defendants had undisclosed interests.

> FN7. Although he knew that the Digital fee structure was unreasonable, Colson nevertheless approved the payments to Digital and later received over a million dollars from Digital.

*Other Unreasonable Payments and Compensation*

**\*7** International also alleges that Defendants looted its coffers by paying themselves unreasonable salaries and having International pay for personal travel and other life style expenses not associated with work done for the Company. For example, although she "performed little if any work for the Company," International paid Defendant Amiel Black over $1.14 million in salary and bonuses between 1999 to 2003, in addition to the grant of 370,000 options worth millions of dollars.

Apparently not prepared to pay for their extravagant life style themselves, the Blacks allegedly had International pay for such things as: (1) a "tip" for the doorman at an upscale New York boutique; (2) millions of dollars in charitable donations made in the Blacks' name; (3) a collection of FDR memorabilia used by Black to write a book, for which International paid $9 million--allegedly three times its actual value; and (4) corporate jet rids for the Blacks for personal travel at a cost of $4.7 to $6.5 million a year. Additionally, in December of 2000, Black had International sell him an apartment it owned for $2.55 million, which was well underpriced given that the Company had purchased the apartment in 1994 for $3 million dollars.

In all, International alleges that Defendants abused their positions of control and trust to misappropriate $425.2 million from the Company in the above transactions.

*International Opens an Internal Investigation Resulting in the Delaware Litigation* [FN8]

> FN8. The facts surrounding International's internal investigation are taken from the opinion in the Delaware Litigation, *Hollinger International, Inc.,* 844 A.2d 1022.

In May of 2003, one of International's largest stockholders, Tweedy Browne Company, LLC ("Browne") demanded that the Board initiate an investigation into the non-compete payments made to Black, Radler, Boultbee, and Inc. in connection with the CNHI II Transaction (which is detailed above). In response, the Board established a special committee ("the Special Committee"), made up of newly appointed independent directors, to investigate and, if necessary, to recover these alleged improper and unauthorized payments. [FN9]

> FN9. The Special Committee consisted of three members including Gordon A. Paris,

Slip Copy
2005 WL 589000 (N.D.Ill.)
(Cite as: 2005 WL 589000 (N.D.Ill.))

International's current CEO.

A few months after commencing its investigation, in late October 2003, the Special Committee concluded that $32.15 million in non-compete payments had wrongly been paid to Black, Radler, Boultbee, and Inc. [FN10] Particularly troubling to the Special Committee was that these payments were made without "proper authorization" from the Board and were not fully disclosed in International's public SEC filings. Also of concern was that $16.55 million was given to Inc., even though it was simply a holding company with "no operational capacity to compete with anyone."

> FN10. As explained in detail above, these non-compete payments were made in connection with International selling some of its smaller local regional newspapers. In exchange for these payments, International agreed that neither it nor any of its related companies would start a new newspaper in that area to compete with the publication which was just sold. By October of 2003, the Special Committee had uncovered three asset sales in which wrongful non-compete payments were made to Defendants (including the CNHI II Transaction).

In November of 2003, after being confronted with these unauthorized and undisclosed non-compete payments, Black, fearing litigation from both the Special Committee and the SEC, "sued for peace" by entering into an agreement with the Special Committee--termed the "Restructuring Proposal" or "Restructuring Agreement." Under the Restructuring Proposal, Black, without admitting to any wrongdoing, agreed to: (1) return the non-compete payments he received and "endeavor to cause Inc. to do the same"; (2) allow the continuation of the Special Committee's work until June 1, 2004; (3) use his best efforts to effectuate the sale of some of Inc.'s assets, in a way which would benefit all of International's shareholders (termed the "Strategic Process"); (4) step down as CEO (but remain chairman) to be replaced by Gordon A. Paris; (5) terminate the current Ravelston management agreement and negotiate a new more reasonable management fee structure; and (6) ensure an independent Board. Likewise, Radler and Boultbee agreed to repay the non-compete payments and resign from all of their positions with International.

*8 Under the Strategic Process, Black agreed that: (1) the Board would engage a financial advisor to value International's assets and to search for a possible purchaser; (2) he would "devote his principal attention" and use his "best efforts" to effectuate a sale of International's assets to benefit all of International's shareholders; and (3) he would refrain from selling his interest in Inc. unless he gave "reasonable notice" to the Board and only under circumstances that such a sale would not negatively affect International's attempt at maximizing the value of its assets.

Immediately after agreeing to the Restructuring Agreement and the Strategic Process, however, Black began to violate their terms. Under the Strategic Process, International engaged an investment banking company to value and search for purchasers of some of International's assets, including the *London Daily Telegraph* ("the *Telegraph"* ). Unbeknownst to the Special Committee, Black immediately began to do "an end-run around the Strategic Process." Black entered into secret negotiations for the sale of Inc. to the Barclays (an English media company). The Barclays hoped to gain control of the *Telegraph* by purchasing Inc. and thereby acquiring control of International. In attempting to facilitate this purchase, Black used confidential information to his own advantage. In exchange for selling Inc.'s interest in International (at the low end of the value determined by the investment bankers), Black would receive a $10 million severance package for himself. When word of his actions leaked and the Board confronted him, Black lied and intentionally misled the Board as to his dealings with the Barclays.

Around this same time, Black "began steps to repudiate his commitment to repay the [non-compete payments] due ... under the Restructuring Proposal." In fact, on December 31, 2003, Black failed to make his first scheduled repayment, thus breaching the Restructuring Process.

After learning that Black was attempting to sell the *Telegraph* indirectly (thereby usurping a corporate opportunity belonging to International), the Board considered passing a "Rights Plan," which would put a "poison pill" in place to dissuade the Barclays from their proposed purchase. Upon learning of the Rights Plan, Black threatened to remove the Board and/or sue the Special Committee. In fact, Black later filed a defamation suit against certain directors in a Canadian court.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

After finally coming to a satisfactory deal with the Barclays, Black publicly disclosed the deal and repudiated the Restructuring Proposal. As part of the agreement with the Barclays, Black agreed to use his best efforts to prevent International from selling the *Telegraph* to another party or taking any actions to prevent the Barclays from taking control of the *Telegraph.* After learning of Black's double-dealing, the Board formed a Corporate Review Committee ("CRC"), composed of all the independent directors, which was given "broad authority to act for the Company and to adopt such measures as a shareholder rights plan."

\*9 Upon learning of the CRC, Black threatened to remove and sue the Board and caused International's bylaws to be amended ("the Bylaw Amendments"). The "Bylaw Amendments fundamentally altered the power that the International independent directors possessed" and in effect allowed Black to "unilaterally block any material sale of assets, the board from adopting a shareholder rights plan, and prevent the signing of a merger agreement." The independent directors, however, refused to follow the Bylaw Amendments and adopted the Rights Plan.

In response to Black's actions, on January 16, 2004, International brought the Delaware Action against Black and Inc. alleging that Black breached his duty of loyalty and breached the Restructuring Agreement and the Strategic Process. International sought: (1) an injunction preventing Black from selling Inc. to the Barclays; (2) a declaration that the Bylaw Amendments are ineffective; and (3) a determination that the Rights Plan was valid.

After an expedited trial, the Delaware court found that Black breached his fiduciary duty of loyalty, the Restructuring Agreement, and the Strategic Process by: (1) attempting to sell the *Telegraph* to the Barclays for his own benefit at the expense of the majority non-controlling shareholders and using confidential inside corporate information in this attempt; (2) misleading the Board about his actions; and (3) failing to repay the non-compete payments in violation of his promise to do so in the Restructuring Proposal. Accordingly, the Delaware court enjoined Black from proceeding with the sale to the Barclays and found that the Rights Plan was legally enacted but that the Bylaw Amendments were improper. In a later "final judgment," the Delaware court granted summary judgment in favor of International on its

claim that Black breached the Restructuring Proposal and his fiduciary duty of loyalty and awarded International $21,154,025 against Black and Inc. jointly and $8,693,053 against Black individually. These damages represent the amounts (plus interest) of the non-compete payments which Black promised that he and Inc. would repay in the Restructuring Proposal.

*The Chicago Action*

On January 28, 2004, shortly after filing the Delaware Action, International brought the instant action. In its initial nine count, 58-page complaint, International alleged state law claims for breach of fiduciary duty, unjust enrichment, and civil conspiracy against Inc., Ravelston, Black, Radler, and Boultbee in connection with the looting of International.

International subsequently filed a 188-page, 30-count First Amended Complaint against all of the current Defendants and Horizon and Bradford alleging violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § § 1962 and 1964 ("RICO"), and state law claims for breach of fiduciary duty, unjust enrichment, and civil conspiracy. In a Memorandum and Order, entered on October 8, 2004, this Court dismissed the RICO counts on the grounds that 18 U.S.C. § 1964(c), as amended by Section 107 of the Private Securities Litigation Reform Act ("PSLRA"), Pub.L. No. 104-67, 109 Stat. 737 (1995), bars RICO claims "that would have been actionable as fraud in the purchase of securities." In dismissing these counts, the Court ruled that International could file an amended complaint asserting diversity jurisdiction.

\*10 International then filed its 205-page, 44-count Second Amended Complaint against all Defendants in the First Amended Complaint, except for Horizon and Bradford, who are non-diverse, alleging essentially the same conduct alleged in the prior complaint, which is based on the alleged looting of International. Defendants now seek to dismiss the Second Amended Complaint pursuant to: (I) Rule 12(b)(2) for lack of personal jurisdiction; (II) Rules 12(b)(7) and 19 for failure to join indispensable parties; and (III) Rule 12(b)(6) for failure to state a claim. The Court will address each of these motions in turn.

ANALYSIS
I. Motions to Dismiss for Lack of Personal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 589000 (N.D.Ill.)
**(Cite as: 2005 WL 589000 (N.D.Ill.))**

Jurisdiction

Defendants Colson and Perle have moved to dismiss, pursuant to Rule 12(b)(2), on the grounds that this Court does not have personal jurisdiction over them. In ruling on a Rule 12(b)(2) motion, the court may consider matters outside the pleadings, such as affidavits and other materials submitted by the parties. *O'Hare Int'l Bank v. Hampton,* 437 F.2d 1173, 1176 (7th Cir.1971). The plaintiff bears the burden of establishing personal jurisdiction by a preponderance of the evidence. *Turnock v. Cope,* 816 F.2d 332, 333 (7th Cir.1987). The court must resolve any factual disputes in the plaintiff's favor, and accept the allegations in the complaint as true, to the extent that they are not controverted by other evidence in the record. *Id.* The court must also accept uncontested jurisdictional facts presented by the defendant as true. *Connolly v. Samuelson,* 613 F.Supp. 109, 111 (N.D.Ill.1985).

A federal court sitting in diversity has personal jurisdiction over nonresident defendants only if jurisdiction would be proper in the state in which the federal court sits. *Michael J. Neuman & Assocs., Ltd. v. Florabelle Flowers, Inc.,* 15 F.3d 721, 724 (7th Cir.1994). Non-residents are subject to jurisdiction in Illinois if: (A) they fall under one of the provisions of the Illinois long-arm statute; and (B) due process would not be violated under either the United States Constitution or the Illinois Constitution. *Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.,* 906 F.2d 272, 279 (7th Cir.1990).

A. The Illinois Long-Arm Statute

International asserts two grounds under which this Court allegedly has personal jurisdiction under the Illinois-long arm statute (735 ILCS 2-209). First, International contends that section 2-209(a)(12) applies to Defendants Colson and Perle (both of whom were not residents of Illinois but were directors of International during the time of the alleged looting). Alternatively, International alleges that this Court can assert jurisdiction under the "conspiracy theory of personal jurisdiction" and section 2-209(a)(2) over Colson for allegedly conspiring with Black and Radler to loot the Company. The Court will discuss each of these theories in turn.

1. Section 2-209(a)(12)

Under section 2-209(a), "[a]ny person whether or not

a citizen or resident of this State ... submits ... to the jurisdiction of this State as to any cause of action *arising from* ... (12)[t]he *performance of duties as a director* ... of a corporation ... having its *principal place of business in this State.*" 735 ILCS 5/2-209(a)(12) (emphasis added).

**\*11** Defendants contend that subsection (a)(12) does not apply because International's claims "do[ ] not arise out of [their] performance of duties as [ ] director[s]." Instead, International has "sued for [ ] beach of those duties." Therefore, according to Colson and Perle, subsection (a)(11), which covers claims for breach of duty, applies. Under this section, Illinois law only permits personal jurisdiction if the breach of the duty occurred "within this State." 735 ILCS 5/2-209(a)(11).

This contention is without reason in law or under the plain language of the statute. While it is true that subsection (a)(11) encompasses breaches of duties occurring within Illinois, nothing in subsection (a)(12) limits its reach where the performance of the duties also results in a breach of fiduciary duty. It makes perfect sense for the Illinois General Assembly to enact a section of the long-arm statute encompassing breaches of fiduciary duties occurring within Illinois by all persons (not just directors) and to enact a separate and broader subsection encompassing breaches of fiduciary duties arising out of directors' performance of their duties, regardless of where the breach took place, as long as the company for whom the director worked was incorporated in or had its principal place of business in Illinois. Indeed, Illinois courts faced with claims against directors, who were not Illinois residents, where the claims arose out of the performance of the directors' corporate duties, have held that the directors fell within section 2- 209(a)(12). *See, e.g., Int'l Bus. Mach., Corp. v. Martain Property & Caus. Ins. Agency, Inc.,* 281 Ill.App.3d 854, 217 Ill.Dec. 197, 666 N.E.2d 866, 870 (Ill.App.Ct.1996) (subsection (a)(12) "is unambiguous .... [i]t provides that directors ... are subject to long-arm jurisdiction simply because they have performed duties as a corporate ... director"); *People ex rel. Morse v. E & B Coal Co.,* 261 Ill.App.3d 738, 199 Ill.Dec. 597, 634 N.E.2d 436, 442-43 (Ill.App.Ct.1994) (finding that a defendant who accepted position as director with an Illinois corporation fell within the scope of Illinois long arm statute).

The cases cited by Colson in support of his

contention that subsection (a)(12) does not encompass claims against directors for breaches of fiduciary duties are completely inapposite. Although these cases found that non-resident directors did not fall under the Illinois long-arm statute, section 2-209(a)(12) was not even at issue because the corporations for which the directors worked were neither incorporated in Illinois nor had their principal place of business in Illinois. *See Alpert v. Bertsch,* 235 Ill.App.3d 452, 176 Ill.Dec. 333, 601 N.E.2d 1031, 1033, 1037 (Ill.App.Ct.1992) (no jurisdiction over non-resident director of Delaware corporation whose principal place of business was in South Carolina, where decision constituting the alleged breach of fiduciary duty took place in South Carolina); *Heil v. Morrison Knudsen Corp.,* 863 F.2d 546, 547-49 (7th Cir.1988) (no jurisdiction over non-resident directors of a Delaware corporation with its principal place of business in Idaho, even though the board made the decision, which allegedly violated their fiduciary duties, at a meeting in Chicago).

*12 Consequently, this Court will apply section 2-209(a)(12) and examine whether the claims against Colson and Perle "arose out of" the performance of their duties as directors of International and whether International's principal place of business is in Illinois.

International alleges generally that Colson and Perle used their positions as officers and/or directors of International to loot and/or facilitate the looting of the Company. As to Colson, International asserts claims for breach of fiduciary, unjust enrichment, conversion, and conspiracy. These claims are alleged to have arisen from Colson's position as a director of International, a position he held from 1995 to 2003. International alleges that in exchange for using his position as a director to facilitate the overall looting, Colson received, through the actions of Black and Radler: (1) over $1.8 million dollars in "incentive payments" through the Digital scheme; (2) over $1 million in unauthorized bonuses; and (3) part of the $226 million excessive management fees paid to Ravelston (a company in which he had an undisclosed interest).

With respect to Ravelston, International alleges that Colson used his directorship, including his position on the compensation committee, to have International pay Ravelston fees well above fair market value for performing management and administrative functions that should and could have been performed by

International's own employees. As explained in detail above, during the relevant time, International paid over $226 million in "excessive management fees" to Ravelston and Inc. As a shareholder of Ravelston, Colson received a portion of these fees.

In addition, Colson allegedly conspired with other Defendants to misappropriate over $5 million from International through "incentive payments" made to Digital. As explained above, Colson acknowledged that the payments to Digital were "high in comparison with similar plans used by other companies." Nevertheless, while on the Board, Colson approved these payments without expressing his concern to his fellow Board members. International alleges that in exchange for his silence, Black arranged for Colson to receive a payment of $1.8 million from Digital.

Similarly, International alleges that Perle abused his positions as a director with International (including membership on the executive, audit, and compensation committees) and CEO of Digital to loot and facilitate the looting of the Company. Although it lost over $68 million on its investments managed by Digital, International paid Perle over $3.1 million in "incentive payments" for his performance as Digital's CEO. Despite having his "independence compromised" by these unwarranted payments, Perle remained on International's executive and compensation committees where he improperly "signed-off" on a number of "unfair related party transactions that benefitted Defendants Black and Radler." International alleges that Perle knew that these transactions were improper but nevertheless, approved them in return for Black granting his generous compensation package with Digital.

*13 Accordingly, construing section 2-209(a)'s "arising from requirement ... liberally," as is required, *Heil.,* 863 F.2d at 549, this Court finds that International has properly alleged that its claims against Colson and Perle "arose out of" their "performance" as its directors. *See, e.g., Stearn v. Malloy,* 89 F.R.D. 421, 423 (E.D.Wis.1981) (applying the Wisconsin long-arm statute, the court held that the allegation that a defendant "carried out several acts detrimental to the corporation" while acting as a director was sufficient to allege that the action arose out of the defendant's conduct as a director).

Under the second requirement of section 2-209(a)(12), this Court must examine whether Illinois

is International's "principal place of business." With regard to this inquiry, this Court has not found (nor have the parties cited) any decisions interpreting this term with respect to subsection (a)(12). Perle and International both assert that this Court should apply the "nerve center test" to determine the location of International's "principal place of business." *Wisconsin Knife Works v. Nat'l Metal Crafters,* 781 F.2d 1280, 1282 (7th Cir.1986). Under the "nerve center test," courts "look for the corporation's brain, and *ordinarily* find it *where the corporation has its headquarters."* *Id.* (Emphasis added.) Thus, "although the state in which a corporation has its headquarters is not always the state of the corporation's principal place of business, usually it is." [FN11] *Id.*

> FN11. In *Chamberlain Manuf. Corp. v. Maremont Corp.,* 828 F.Supp. 589, 590-91 (N.D.Ill.1993), in applying the "nerve center test" from *Wisconsin Knife,* in addition to considering the location of the corporation's headquarters, the court looked at the location of where: (1) important corporate decisions are made; (2) the corporations' general counsel, directors, officers, and shareholders reside; and (3) the corporation kept its bank accounts.

Although he argued under the "nerve center test" in his opening brief, in his reply brief, Colson contends that this Court should apply the test in *Illinois Life & Health Ins. Guarantee Association v. Boozell,* 289 Ill.App.3d 621, 224 Ill.Dec. 730, 682 N.E.2d 291, 298 (Ill.App.Ct.1997), which includes the "nerve center" as one of five factors courts should consider in determining a corporation's principal place of business. The other four factors in the *Boozell* test are "the location": (1) "of the offices responsible for the main activities of the entity"; (2) "where the business of the entity is carried out"; (3) "of business decision-making"; and (4) "of the residences of the [officers and directors]." *Id.*

Under both the nerve center test and the additional *Boozell* factors, there are ample facts in the record at this time to support International's assertion that, at the time of the alleged looting, its corporate headquarters, and hence its "principal place of business," was located in Chicago, Illinois. According to the Declaration of Lynda Loye, International's former assistant corporate counsel, International's "principal executive offices were [until 2004] located

in Chicago" at the offices of the *Chicago Sun-Times.* This assertion is consistent with International's SEC filings during the relevant time which listed this location as the "[a]ddress of its Principal Executive Office." [FN12] In addition, International kept its corporate minutes and books at its office in Chicago. Several meetings of the Board and the audit and compensation committees were held in Chicago at the offices of the *Sun-Times.* Likewise, when individual directors signed off on corporate consents, including many of the transactions at issue in this action, they received the consents from International's general counsel in Chicago and returned the signed documents to International's legal department in Chicago. Furthermore, International's checking and most of its bank accounts were with banks located in Chicago. Consequently, at this time, resolving factual conflicts in favor of Illinois, as is required, this Court finds that International has sufficiently shown that its "principal place of business" at the time of the alleged looting was in Chicago. [FN13]

> FN12. Chicago certainly would be the logical location. Although International owns and operates newspapers around the world (including the United States, Canada, United Kingdom, and Israel) it owns over 100 newspapers in the Chicago area, including the *Sun-Times,* one of the largest newspapers in the United States, and has over a thousand employees in Illinois.

> FN13. Defendants contend that while International's "nominal executive offices may have been in Chicago, its real executive offices were undeniably in New York and Toronto." This argument is based on the general assertion that: (1) most of the Board meetings took place in New York; and (2) Ravelston and Inc., the companies who were given the management contracts, were located in Toronto. While this may be true, these facts are not determinative. Indeed, "[i]t is common for large corporations to hold their board meetings in different places rather than just at corporate headquarters." *Heil,* 863 F.2d at 550. Therefore, at this time, this Court finds that these facts do not rebut the fact that International's "principal executive office" was in Chicago.

**\*14** Based on the above, this Court thus finds that it has jurisdiction over Colson and Perle under section

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2-209(a)(12) because the claims against them arose out of the performance of their duties as directors of International, whose principal place of business was in Illinois at the time the claims arose.

2. The "Conspiracy Theory of Personal Jurisdiction"

In addition to section 2-209(a)(12), International contends that section 2-209(a)(2) applies to Colson because he conspired with Black and Radler, who worked out of the Company's Chicago executive offices, to loot the Company. [FN14] Under Illinois law, a plaintiff may assert a "conspiracy theory of personal jurisdiction" against a non-resident defendant, who, although did not itself commit a tort in Illinois, conspired with others to do so. *See Cleary v. Phillip Morris Inc.,* 312 Ill.App.3d 406, 244 Ill.Dec. 795, 726 N.E.2d 770, 773 (Ill.App.Ct.2000). Under this theory, the plaintiff must sufficiently allege that: (1) the non-resident defendant "was part of an actionable conspiracy"; and (2) "a co-conspirator performed a substantial act in furtherance of the conspiracy in Illinois." *Id.*

> FN14. Under section 2-209(a)(2) the "commission of a tortious act within this State" is a sufficient basis to assert personal jurisdiction under the Illinois long-arm statute.

Colson contends that the above requirements are not met because International cannot allege that: (1) he participated in an "actionable conspiracy"; (2) a co-conspirator committed a tortious act in Illinois in furtherance of the conspiracy; (3) a "conspiracy [ ] exist[ed] among a corporation's own officer or employees"; and (4) there was an civil conspiracy because Delaware law precludes such a claim. The Court will address each of these contentions in turn.

To allege an actionable conspiracy, the plaintiff must do more than "simply allege that a corporate defendant participated in a conspiracy." *United Phosphorus, Ltd. v. Angus Chem. Co.,* 43 F.Supp.2d 904, 912 (N.D.Ill.1999). Instead, the plaintiff must: (1) "point[ ] to evidence showing the existence of [a] conspiracy and the defendants' knowing participation in that conspiracy"; and (2) "allege[ ] specific facts warranting [an] inference that the defendant was a member of the conspiracy." [FN15] *Id.* at 913. A plaintiff may meet this burden through either direct or circumstantial evidence. *Id.* at 912. In determining whether a plaintiff has sufficiently alleged a

conspiracy, the court "must construe all facts relating to jurisdiction in favor of the plaintiff, including disputed or contested facts." *Id.* at 913.

> FN15. Illinois law defines a conspiracy as "an agreement or combination of two or more people or entities to do an unlawful act." *Salaymeh v. Interqual, Inc.,* 155 Ill.App.3d 1040, 108 Ill.Dec. 578, 508 N.E.2d 1155, 1158 (Ill.App.Ct.1987).

Here, after carefully reviewing the allegations in the Second Amended Complaint and the parties' submissions, this Court finds that International has sufficiently alleged facts warranting an inference that Colson was a knowing member of a conspiracy, whose purpose was to loot the Company. As detailed above, International alleges that Colson conspired with the other Defendants to loot International through the payment of excessive and unauthorized non-competition payments, management fees, incentive payments, and other compensation and the sale of publishing assets "at below market value prices." According to International, in exchange for using his position as a director to facilitate the overall looting, Colson received, through the actions of Black and Radler: (1) over $1.8 million dollars in "incentive payments" through the Digital scheme; (2) over $1 million in unauthorized bonuses; and (3) part of the $226 million excessive management fee paid to Ravelston (a company which he had an undisclosed interest in).

**\*15** To rebut these general allegations, Colson contends that he "never had [any] agreements, understandings or discussions with anyone at anytime concerning excessive or improper compensation, payments, bonuses or fees to me from [International]" or any of its parents or subsidiaries. According to Colson, the above payments and fees were made to him based on his preexisting interests in Digital and Ravelston and his position as a director.

This statement, however, conflicts with specific evidence put forth by International. For example, according to Peter Atkinson, a former officer of International, Inc. and Ravelston, after a September 2000 Board meeting, in which the CanWest non-compete payments were presented for approval, Colson called him "and expressed his displeasure" at not receiving any of the non-compete payments. Atkinson told Colson to take the matter up with Black. Apparently Colson did so because Black

subsequently told Atkinson that "he would make Dan [Colson] whole." Shortly thereafter, Black arranged to have Colson paid "a large year-end bonus" for his work as an officer at Ravelston. In a facsimile to Colson from Black regarding this payment, Black stated "I trust this is satisfactory. There will be further dispositions as we discussed in the future." (Ex. 7, Appendix of Exhibits to International's Opposition brief.) Indeed, according to Atkinson, in September of 2001, International, at Black's direction, made a $1.07 million payment to Colson for no particular reason. [FN16]

> FN16. Colson denies ever complaining to Black and contends that the payments were made for work he did for Digital and Ravelston.

In 2002, in a "Memo" to Defendants Colson, Radler, and Boultbee, Black stated:

> We have pretty well won the great battle over the non-competition agreements and a decent interval has passed. A conciliatory gesture should be made now that could not be construed as a sign of weakness or a confession of excess. We should steer the middle course between accommodating the present assertive and suspicious mood of investors.

(Ex. 8, Appendix of Exhibits to International's Opposition brief.) Black further stated that to prevent future complaints by the non-controlling shareholders that, "without mentioning it publicly or to the directors, use of corporate aircraft for personal use should, henceforth, be charged to Ravelston." Black then went on to outline some of the practices which are now at issue in this case, such as the payment of his personal expenses by International, the management fees, and the CanWest transaction. Black closes with "[t]he Goose keeps laying a golden egg every year and the best, by far, is yet to come."

Additionally, according to Linda Loye, a former in-house counsel at International, Colson and Radler met to discuss the allocation of the alleged excessive management fees paid to Ravelston by International and in 2001 and 2002, Colson received over $3.4 million of these fees.

Likewise, with respect to the "incentive fees" paid to Digital, in a "memo" to Black, Colson stated that the fee structure "is high in comparison with similar plans used by other companies." At the Board meeting approving the Digital fees, however, neither Colson

nor Black objected when a fellow Board member stated that the incentive payments were "consistent with those type of bonuses found in the marketplace." International alleges that in exchange for his silence, Colson received $1.8 million from Digital.

*16 Accordingly, based on the above, resolving any factual disputes in favor of International, this Court finds that International has presented sufficient facts to warrant an inference that Colson knowingly conspired with Black, Radler, and other Defendants to loot the Company.

Next, this Court also finds that International has sufficiently alleged that at least two of Colson's co-conspirators (Defendants Radler and Black) committed various torts and breaches of their fiduciary duties in furtherance of the conspiracy in Illinois. In the Second Amended Complaint at paragraph 369, International details 14 acts committed in furtherance of the looting which occurred in Chicago. Colson has not attempted to rebut these allegations other than to generally assert that these acts were not "authorized or undertaken for the benefit" of Colson. This contention, even if a legal requirement, which it is not (the act only need be in furtherance of the conspiracy), is incorrect. Many of the 14 alleged acts committed in furtherance of the looting which occurred in Chicago were done to facilitate the alleged improper payment of the Digital incentive fees and the Ravelston management fees, part of which was then paid to Colson.

Colson also contends that International cannot legally allege a "conspiracy" because under Illinois law a "conspiracy cannot exist among a corporation's own officers or employees." While this is true, *see J.C. Whitney & Co. v. Renaissance Software Corp., 98 F.Supp.2d 981, 983 (N.D.Ill.2000),* the mere fact that alleged coconspirators are officers of the same corporation does not necessarily defeat a claim that they conspired to commit a tort. A corporate employee and his employer "can be liable for conspiracy if it is shown that the [employee] acted outside the scope of his employment and/or acted to achieve some personal gain." *Jamaica Citizens Bank, Ltd. v. North Am. Special Risk Assocs., Inc., 1996 WL 648712, at *5 (N.D.Ill. Nov.1, 1996).*

Here, the Second Amended Complaint alleges that individual Defendants (including Colson) breached their fiduciary duties "in their capacities as employees and agents of [Inc.] and Ravelston, as well as their

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.