**TAB 7**

LEXSEE 2004 DEL. CH. LEXIS 122

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF INTEGRATED
HEALTH SERVICES, INC. for and on behalf of the Bankruptcy Estates of
Integrated Health Services, Inc., Plaintiff, v. ROBERT N. ELKINS, LAWRENCE P.
CIRKA, EDWIN M. CRAWFORD, KENNETH M. MAZIK, ROBERT A.
MITCHELL, CHARLES W. NEWHALL, III, TIMOTHY F. NICHOLSON, JOHN
L. SILVERMAN, GEORGE H. STRONG, Defendants.**

**C.A. No. 20228-NC**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2004 Del. Ch. LEXIS 122*

**October 8, 2003, Submitted
August 24, 2004, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** Motions granted in part; dismissed in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff committee of unsecured creditors sued defendants, the former president and other current and former board members (others), in the United States Bankruptcy Court for the District of Delaware. The Bankruptcy Court abstained from hearing the dispute, and the committee brought the instant suit. The others filed a Del. Ch. Ct. R. 12(b)(6) motion to dismiss. The former president adopted that motion and added his supplemental motion.

**OVERVIEW:** The committee alleged the former president breached his fiduciary duties of loyalty and good faith to the company by obtaining certain compensation arrangements without regard to the company's best interests. The committee alleged the others breached their duties of loyalty and good faith by subordinating the best interests of the company to their allegiance to the former president, and by failing to exercise independent judgment. The committee also alleged defendants breached their fiduciary duty of due care and wasted corporate assets by approving certain compensation agreements. The court found the committee failed to raise any doubt that a majority of those approving the questioned transactions were independent and disinterested. Certain of the committee's pleadings as to the duty of care and duty of loyalty claims, based on allegations that the others exercised no business judgment, alleged sufficient facts to maintain a breach of fiduciary duty action. Also, the committee's allegations that the former president breached his fiduciary duties to the company withstood a motion to dismiss. The committee, however, did not allege sufficient facts to support a waste claim.

**OUTCOME:** The others' motion to dismiss the committee's waste claim was granted. Their motion to dismiss the committee's fiduciary duty claims, with regard to a 1996 bonus, a 1997 option grant, a 1997 loan program, and 1997 compensation revisions was granted. Their motion to dismiss the committee's fiduciary duty claim in regard to a $ 2.088 million loan was dismissed as to all others except for two.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN1] In addressing a motion to dismiss, a court must accept all of a plaintiff's well-pleaded factual allegations as true, must view those facts in the light most favorable

to the plaintiff, and must draw all reasonable inferences from those facts in favor of the plaintiff. This does not, however, extend to conclusory allegations that may be contained in the complaint.

***Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss***
***Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses***
[HN2] While a statute of limitations defense is generally raised in a defendant's answer, it may be raised in a motion to dismiss if the complaint alleges facts showing that the complaint was in fact filed too late.

***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
[HN3] See *Del. Code Ann. tit. 8, § 141(e)*.

***Business & Corporate Entities > Corporations > Governance > Articles of Incorporation & Bylaws***
***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
[HN4] *Del. Code Ann. tit. 8, § 102(b)(7)* allows corporate charters to include a provision eliminating the personal liability of a director for monetary damages for breach of fiduciary duty as a director.

***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
[HN5] *Del. Code Ann. tit. 8, § 102(b)(7)* has four exceptions: such provision shall not eliminate or limit the liability of a director: (i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under *Del. Code Ann. tit. 8, § 174*; or (iv) for any transaction from which the director derived an improper personal benefit.

***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
[HN6] A corporate director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest. One cannot act in conformity with her duty of loyalty to a company if she acts in bad faith.

***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***

[HN7] The duty of care requires that in making business decisions, corporate directors must consider all material information reasonably available, and the directors' process is actionable only if grossly negligent. *Del. Code Ann. tit. 8, § 102(b)(7)* begins by protecting from monetary damages any violations of fiduciary duty. It then provides four types of actions, including a breach of the duty loyalty or acts or omissions not in good faith, that would not be shielded from monetary damage. Not among these are violations of the duty of care. Thus, actions taken that are even grossly negligent, so long as not falling within one of the exceptions contained in § 102(b)(7), will be shielded by a § 102(b)(7) provision.

***Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss***
***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
[HN8] A defense under *Del. Code Ann. tit. 8, § 102(b)(7)* may be considered in the context of a motion to dismiss.

***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
[HN9] A director is "interested" if she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. Director independence is a separate concept from director interestedness. In order to claim a lack of independence, a plaintiff must allege facts that raise sufficient doubt that a director's decision was based on extraneous considerations or influences, and not on the corporate merits of the transaction. The inquiry into a director's independence is fact-specific, and the court is called upon to apply a subjective "actual person" standard, instead of an objective "reasonable director" standard in making its determination. Furthermore, the court will not deem a director lacking independence unless the plaintiff alleges, in addition to control, such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person.

***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
[HN10] General allegations of domination over a corporation's board are simply not sufficient under Delaware law to state a traditional duty of loyalty claim. Cases have determined that personal friendships, without more; outside business relationships, without more; and approving of or acquiescing in the challenged transactions, without more, are each insufficient to raise a reasonable doubt of a director's ability to exercise

2004 Del. Ch. LEXIS 122, *

independent business judgment. And while domination and control are not tested merely by economics, a plaintiff must allege some facts showing a director is beholden to an interested director in order to show a lack of independence. The critical issue is whether the director was conflicted in his loyalties with respect to the challenged board actions.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN11] A corporate director's lack of independence may arise from a close personal or familial relationship or through force of will. A conclusory allegation that an executive exercised his force of will, does not, by itself, raise sufficient doubt about a director's independence.

*Business & Corporate Entities > Corporations > Directors & Officers > Compensation & Qualifications*
[HN12] While there may be instances in which a board may act with deference to corporate officers' judgments, executive compensation is not one of those instances. The board must exercise its own business judgment in approving an executive compensation transaction.

*Business & Corporate Entities > Corporations > Directors & Officers > Compensation & Qualifications*
[HN13] In the realm of executive compensation, the Court of Chancery of Delaware will not dismiss claims that properly allege that a board was dominated and controlled by its executives to the extent that it could not even exercise any form of its own business judgment.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
*Business & Corporate Entities > Corporations > Governance > Articles of Incorporation & Bylaws*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN14] To survive a motion to dismiss where a corporate charter contains a *Del. Code Ann. tit. 8, § 102(b)(7)* provision, a plaintiff must plead facts that, if true, would imply that a board consciously and intentionally disregarded its responsibilities.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN15] On a motion to dismiss, a court may only consider the complaint and documents that the complaint incorporates or that are integral to it.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*

[HN16] When a corporate board acts with knowing and deliberate indifference to its duties to act faithfully and with appropriate care, it acts in such a way as to be denied the protection of a *Del. Code Ann. tit. 8, § 102(b)(7)* provision.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN17] On a motion to dismiss pursuant to Del. Ch. Ct. R. 12(b)(6), a court must take all reasonable inferences from the allegations in the favor of the nonmoving party.

*Contracts Law > Types of Contracts > Employment Contracts*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN18] In general, employees negotiating employment agreements with their employers have the right to seek an agreement containing the best terms possible for themselves. However, once an employee becomes a fiduciary of an entity, he has a duty to negotiate further compensation agreements honestly and in good faith so as not to advantage himself at the expense of the entity's shareholders. This requirement does not prevent fiduciaries from negotiating their own employment agreements so long as such negotiations are performed in an adversarial and arms-length manner.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN19] Waste is an extreme test, very rarely satisfied by a plaintiff.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN20] In evaluating a waste claim, courts look to the exchange itself. The exchange must be irrational.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN21] A court, in analyzing whether an action was taken with intentional and conscious disregard of a corporate board's duties, must determine that the action is beyond unreasonable; it must determine that the action was irrational.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN22] Due care in the decisionmaking context is process due care only. Irrationality is the outer limit of

2004 Del. Ch. LEXIS 122, *

the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule.

***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
***Business & Corporate Entities > Corporations > Directors & Officers > Compensation & Qualifications***
[HN23] In the case of an alleged breach of fiduciary duty for intentionally and consciously disregarding one's duties of faithfulness and care, a court will focus on whether the corporate board's process is irrational. In executive compensation cases, the court will look to see whether the board engaged in any form of review or deliberation.

***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
***Business & Corporate Entities > Corporations > Directors & Officers > Compensation & Qualifications***
[HN24] To succeed in proving waste, a plaintiff must plead facts showing an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration. Further, when dealing with a board's decision on executive compensation, its substantive decision is entitled to great deference. It is the essence of business judgment for a board to determine if a particular individual warrants large amounts of money, whether in the form of current salary or severance payments.

**COUNSEL:** Attorneys for Plaintiff: Joanne B. Wills, Esquire and David S. Eagle, Esquire of Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Wilmington, Delaware and Max W. Berger, Esquire, Daniel L. Berger, Esquire, Jeffrey N. Leibell, Esquire and Beata Gocyk-Farber, Esquire of Bernstein Litowitz Berger & Grossmann LLP, New York.

Attorneys for Defendants Lawrence P. Cirka, Edwin M. Crawford, Kenneth M. Mazik, Robert A. Mitchell, Charles W. Newhall, III, Timothy F. Nicholson, John L. Silverman and George H. Strong: Michael F. Bonkowski, Esquire of Saul Ewing LLP, Wilmington, Delaware and Roger A. Lane, Esquire of Testa, Hurwitz & Thibeault, LLP, Boston, Massachusetts; Thomas J. Hall, Esquire of Chadbourne & Park LLP, New York, New York; and Thomas F. Panza, Esquire of Panza, Maurer & Maynard, P.A., Ft. Lauderdale, Florida.

Attorneys for Defendant Robert N. Elkins: Sherry Ruggiero Fallon, Esquire of Tybout, Redfearn & Pell,

Wilmington, Delaware and Paul R. DeFilippo, Esquire of Woolmuth, Maher & Deutsch LLP, New York.

**OPINION:**

**MEMORANDUM OPINION**

NOBLE, Vice Chancellor. [*2]

This case arises from various compensation arrangements approved by the Directors of Integrated Health Services, Inc. ("IHS"). Plaintiff, the Official Committee of Unsecured Creditors (the "Committee" or "Plaintiff) of IHS, initiated a suit against Defendants Lawrence P. Cirka, Edwin M. Crawford, Kenneth M. Mazik, Robert A. Mitchell, Charles W. Newhall III, Timothy F. Nicholson, John L. Silverman, George H. Strong (collectively, the "non-Elkins Defendants"), and Robert N. Elkins (together, with the non-Elkins Defendants, the "Defendants"), all current or former members of the IHS Board of Directors (the "Board"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Bankruptcy Court abstained from hearing this fiduciary duty dispute under Delaware law, and the Plaintiff, accordingly, brought suit in this Court.

In its Complaint, the Plaintiff alleges that Elkins breached his fiduciary duties of loyalty and good faith to IHS by obtaining certain compensation arrangements without regard to the best interests of IHS; by using his various positions at IHS to exert improper influence over other members of the Board and the Board's compensation [*3] consultant, Joseph Bachelder, in connection with his compensation arrangements; by causing IHS to loan him money prior to approval by the IHS Board's Compensation and Stock Option Committee (the "Compensation Committee"); and by entrenching himself in office by insisting on unconscionable compensation arrangements.

The Plaintiff also alleges that the non-Elkins Defendants breached their duties of loyalty and good faith by subordinating the best interests of IHS to their allegiance to Elkins; by failing to exercise independent judgment with respect to certain compensation arrangements, by failing to select an independent compensation consultant to address Elkins's compensation arrangements on behalf of IHS; by failing to rely on the advice of Bachelder; and by participating in Elkins's breaches of fiduciary duty by approving or ratifying his actions.

Furthermore, the Plaintiff alleges that each of the Defendants breached their fiduciary duty of due care by approving or ratifying certain compensation arrangements without adequate information, consideration, or deliberation; by failing to exercise

2004 Del. Ch. LEXIS 122, *

reasonable care in selecting, and in overseeing the work of, Bachelder (and thus, at times, [*4] relying on a conflicted compensation consultant's advice); by not acting in accordance with the advice of Bachelder in regard to certain compensation agreements; and by failing to monitor how the proceeds of company loans were utilized. The Plaintiff alleges that these actions were performed in bad faith. n1

> n1 As will be discussed more fully below, the Plaintiff's principal duty of loyalty claim and its duty of care claim depend upon the same factual allegations.

Finally, the Plaintiff asserts that the Defendants wasted corporate assets by approving certain compensation agreements and by failing to assure that proceeds from loans to executive officers for the purchase of stock in IHS were, in fact, used to purchase stock of IHS.

The non-Elkins Defendants have moved to dismiss this action pursuant to Court of Chancery Rule 12(b)(6). n2 They contend that the Plaintiff has failed to plead facts demonstrating that the challenged compensation arrangements were not approved by an independent and disinterested [*5] majority of the directors of IHS at the time of the approval of any compensation agreement, that they are entitled to the protections of the exculpatory clause incorporated into IHS's charter in accordance with *8 Del. C. § 102(b)(7)*, that no facts in the Complaint allege that they were grossly negligent in making compensation decisions, and that the Complaint does not set forth facts that would sustain a waste claim. Furthermore, they argue that claims based on any compensation matters arising before January 31,1997, are barred by the applicable statute of limitations. Elkins has adopted the non-Elkins Defendants' motion to dismiss and, additionally, has submitted a supplemental motion to dismiss (together, the "Motions to Dismiss"). Elkins's supplemental motion argues that to the extent that duty of loyalty claims are asserted against him, as opposed to the non-Elkins Defendants, such claims should be dismissed because all of the challenged transactions were approved by a majority of disinterested, independent members of IHS's Board or Compensation Committee. He also argues that an agreement which he reached with IHS and which was approved by an order [*6] of the Bankruptcy Court on January 3, 2001, (the "Agreement"), bars the Plaintiff from prosecuting claims not arising from "wrongful" acts. To the extent that claims within the Complaint are for "wrongful" acts, Elkins seeks a determination that the Agreement limits his liability exposure to claims paid by

IHS's directors' and officers' liability insurance policy (the "D&O Policy").

> n2 Because the filing of this action was approved by the Bankruptcy Court, there is no motion to dismiss for failure to comply with Court of Chancery Rule 23.1's demand requirement. Thus, the Plaintiff's allegations are not subject to the more exacting standard imposed by Court of Chancery Rule 23.1 for derivative actions. *See In re Walt Disney Co. Deriv. Litig., 825 A.2d 275, 285 (Del. Ch. 2003)*.

As set forth below, I conclude that the Plaintiff has failed to raise any doubt that a majority of the directors approving the transactions questioned by the Plaintiff were independent and disinterested. I also conclude [*7] that the Plaintiff's duty of care and duty of loyalty claims against the Board -- based on allegations that the non-Elkins Defendants exercised no business judgment -- ought to be analyzed together and, from that analysis, I am persuaded that certain of the Plaintiff's pleadings allege sufficient facts to maintain an action alleging breach of fiduciary duty. In addition, I conclude that the Plaintiff has alleged, in a manner sufficient to withstand a motion to dismiss, that Elkins breached his fiduciary duties to IHS. The Plaintiff, however, has not alleged sufficient facts to support a waste claim. n3

> n3 Also before the Court is the Plaintiff's motion to strike certain exhibits presented by the non-Elkins Defendants in support of their motion to dismiss. To the extent I do not rely on the contested exhibits, I need not reach decision on the motion to strike.

## I.    PROCEDURAL    BACKGROUND    AND STANDARD OF REVIEW

The Bankruptcy Court granted the Plaintiff's motion to commence and prosecute certain actions [*8] on behalf of the estates of debtor IHS. Following an investigation, on January 31, 2002, the Plaintiff filed a complaint in Bankruptcy Court. The Defendants successfully moved for permissive abstention in favor of this Court.

As a result, the Plaintiff filed its Complaint in this Court on April 2, 2003. In response, the non-Elkins Defendants filed a motion to dismiss pursuant to Rule 12(b)(6). Elkins adopted that motion and added his

supplemental motion. This memorandum opinion addresses those motions.

[HN1] In addressing a motion to dismiss, the Court must accept all of a plaintiff's well-pleaded factual allegations as true, must view those facts in the light most favorable to the plaintiff, and must draw all reasonable inferences from those facts in favor of the plaintiff. n4 This does not, however, extend to conclusory allegations that may be contained in the complaint. n5 With this in mind, the facts recited in this memorandum opinion are derived from the well-pleaded allegations of the Complaint unless otherwise noted.

n4 *Orman v. Cullman, 794 A.2d 5, 15 (Del. Ch. 2002)*; *Solomon v. Pathe Communications Corp., 672 A.2d 35, 38 (Del. 1996)*. [*9]

n5 *Orman, 794 A.2d at 15*; *Gelfman v. Weeden Investors, L.P., 792 A.2d 977, 984 (Del. Ch. 2001)*.

## II. FACTUAL BACKGROUND

*A. The Parties*

1. The Company, its Bankruptcy, and the Formation of the Committee

IHS was founded by Elkins in the mid-1980s as a small private company. It operated a national chain of nursing homes and provided subacute care to patients typically following discharge from hospitals. n6 Between its founding and 1997, IHS experienced much success. At its peak, IHS was listed on the New York Stock Exchange, employed over 80,000 people and generated $ 3 billion in annual revenue. n7 In 1997, Congress passed the *Balanced Budget Act of 1997*. n8 This act changed the Medicare reimbursement formula in the subacute care industry and negatively affected IHS's cash flow, which, in turn, had an adverse impact on IHS's financial prospects and stock price. On July 14, 1998, IHS's stock price reached $ 37.18; by September 30, 1998, the stock had lost more than half its value, trading at only $ 16.81 per share.

n6 Oral Argument on Defs.' Mot. to Dismiss and Pl's Mot. to Strike, Tr. ("Hearing Tr.") at 6. [*10]

n7 *Id.* n8 Pub. L. No. 105-33, 111 Stat. 251.

On February 2, 2000, IHS commenced a voluntary proceeding in the Bankruptcy Court. n9 The Committee was formed by the United States Trustee on February 15, 2000. It consists of eight members, including two representatives of the trade vendor community, three representatives of IHS's public debt, and three representatives of IHS's bank debt.

n9 While IHS continues to be run pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, it is not named in the Complaint as a nominal defendant.

2. The Non-Elkins Defendants

a. Cirka

Defendant Cirka was a member of the Board from 1994 to March 1998. He served as President of IHS from July 1994 to March 1998 and Senior Vice President and Chief Operating Officer from October 1987 through April 1997.

b. Crawford

Defendant Crawford was a member of the Board from 1995 to October 9, 1999. He was a member of the [*11] Compensation Committee until April 1997.

c. Mazik

Defendant Mazik joined the Board in 1995. From that time, he has been a member of the Board and of the Compensation Committee.

d. Mitchell

Defendant Mitchell has been a member of the Board since 1995. Mitchell is a founding partner of the Law Offices of Robert A. Mitchell, which has provided legal services to IHS.

e. Newhall

Defendant Newhall was a member of the Board from 1986 to November 19, 1999. He also became a member of the Compensation Committee in May of 1997. n10

n10 Paragraph 2(f) of the Complaint alleges that Newhall was a member of the Compensation Committee beginning in November 1997. However, paragraph 29 places him on the Compensation Committee on May 27, 1997. Viewing the facts in the light most favorable to the Plaintiff, I will view Newhall as having been a member of the Compensation Committee as of May 1997.

### f. Nicholson

Defendant Nicholson has been a member of the Board since 1986. He served as Executive Vice President of IHS from [*12] March 1986 to May 1993. Since February 1998, Nicholson has been the Managing Director of Lyric Health Care LLC. Defendant Elkins held a financial interest in Lyric Health Care LLC at all times relevant to the Complaint.

### g. Silverman

Defendant Silverman has been a member of the Board since 1986, and from June 1995 to December 1997, he served as CEO of a subsidiary of IHS, Asia Care, Inc.

### h. Strong

Defendant Strong was a member of IHS's Board from 1994 until Octobers, 1999.

### 3. Elkins

Defendant Elkins served as Chairman of the Board and Chief Executive Officer of IHS from 1986 to July 27, 2000. He served as President of IHS from March 1986 to July 1994, and from March 1998 to January 3, 2001. He was the primary beneficiary of the compensation awards attacked by the Plaintiff.

### 4. Bachelder

While not a party to the litigation, Bachelder plays a central role in the events at issue. The Complaint alleges that Elkins selected Bachelder as a compensation consultant for IHS and negotiated the terms for Bachelder's services. The Complaint describes Bachelder as "an attorney known for representing key executive officers in their negotiations with corporate employers." n11

n11 Compl. P 32.

[*13]

### B. The Original Elkins Employment Agreement and Compensation

Under the terms of a five-year employment agreement, effective January 1, 1994 (and, as amended, January 1, 1995), between Elkins and IHS (the "Employment Agreement"), Elkins was to be employed as President and Chief Executive Officer of IHS. Elkins's compensation was to include salary, a performance-based bonus, stock and stock options, and contributions to the IHS employee benefit and retirement plans. Elkins's salary under the Employment Agreement was $

750,000 for 1996; $ 752,277 for 1997; and $ 809,935 for 1998. In 1996, he received a $ 5 million bonus, and in 1997, a bonus of $ 750,000. No bonus was awarded in 1998 because IHS did not meet specified performance targets. IHS made a contribution of $ 1.2 million to the Key Employee Supplemental Executive Retirement Plan in 1997 for Elkins's benefit. A similar contribution of $ 14.2 million was made in 1997. Additionally, IHS paid $ 2 million in life insurance premiums and provided him access to IHS's airplanes.

### C. The Challenged Transactions n12

n12 Throughout this memorandum opinion, I will refer to the transactions criticized by the Plaintiff as the "Challenged Transactions."

[*14]

### 1. 1996 Bonus

Elkins's Employment Agreement included a performance-based bonus. On July 16, 1996, Elkins sent a letter to the Compensation Committee n13 (at this time comprised of Mazik and Crawford) which instructed them to "determine" the amount of bonuses for 1996. The Plaintiff claims that Elkins was present at a July 24, 1996, Board meeting, and discussed with the Board bonuses both for himself and for Cirka. At this meeting, the Board considered two studies prepared by outside consultants (which were sent to them by Elkins), and awarded bonuses of $ 5,000,000 to Elkins and $ 1,666,667 to Cirka. These awards were made despite the fact that IHS had not met the objectives prescribed for a bonus under the Employment Agreement. The Complaint alleges that before the Board meeting, Elkins approached each of the voting directors individually to discuss his bonus.

n13 Unless otherwise noted, the Compensation Committee consisted of Mazik and Newhall.

### 2. 1996 Loans

At some time in 1996, Elkins and Cirka [*15] (both officers at this time) caused IHS to disburse $ 705,527 and $ 880,630 to each of them respectively. At the time, these disbursements had not been authorized by the Board, and neither Elkins nor Cirka provided a note or other loan documentation to IHS.

At an April 29, 1997, meeting, the Compensation Committee approved the loan ex post. This approval was ratified by the full Board the next day.

2004 Del. Ch. LEXIS 122, *

3. 1997 Option Grant

On May 27, 1997, Elkins sent a letter to the Compensation Committee, which requested signatures on unanimous written consents to grant Elkins an option to purchase 700,000 shares of IHS stock. This action was taken by the Compensation Committee, and ratified within a few days. Subsequently, Bachelder presented a report supporting the grant of these options.

4. 1997 Loan Program

In July 1997, Bachelder was asked to analyze IHS's option ratio. n14 Bachelder compiled a report ("Bachelder's September Report"), which was presented to the Compensation Committee at its September 29, 1997, meeting. Bachelder did not attend the meeting; his report was sponsored by Taylor Pickett, IHS's Chief Financial Officer.

> n14 An option ratio is a measure of the relationship between employee stock options and the outstanding stock of a company.

[*16]

Bachelder's September Report recommended that certain employees' options be accelerated and that IHS institute a loan program (including a convertible debenture for Elkins) in order to allow those employees to exercise their now-accelerated options. The convertible debenture included a loan forgiveness component, which was tied to a "Change-in-Control" event (defined in the Employment Agreement). n15

> n15 Such a forgiveness term will be referred to throughout the Opinion as a "Change-in-Control Forgiveness Term."

At its September 29, 1997, meeting, the Compensation Committee instituted a loan program. This program authorized loans of up to $ 16 million to "enable the officers of [IHS] to acquire or to hold the common stock of [IHS]," n16 but did not set up any mechanism to monitor how the proceeds of the loans would be spent. At the same meeting, the Compensation Committee granted Elkins a loan of up to $ 14 million to exercise previously awarded options, as well as additional options to purchase up to [*17] 400,000 shares of IHS stock. n17

n16 Compl. P 44.n17 The Complaint, in reviewing certain Challenged Transactions, including the 1997 Loan Program, only alleges approval by the Compensation Committee, and not the full Board. Because the Plaintiff does not allege irregular conduct by the Compensation Committee in the sense of its having taken action beyond its charge, it is reasonable to conclude that the necessary powers were delegated to it. *See 8 Del. C. § 141(c)(1).*

That same day, Elkins executed a Promissory Note to IHS for $ 13,447,000 (the "$ 13.5 Million Loan"). The terms of this note provided loan forgiveness under three circumstances: (1) a "Change-in-Control" (as defined in the Employment Agreement); (2) termination of Elkins without "Cause" (as defined in the Employment Agreement); or (3) Elkins's departure from IHS for "Good Cause" (as defined in the Employment Agreement).

Other officers borrowed the remaining $ 2.5 million authorized under the program. [*18]

5. 1997 Compensation Revisions

a. July Revision

In early 1997, the Compensation Committee, at the request of Elkins, conducted a review of the compensation arrangements of Elkins and other officers of IHS. Bachelder was retained as a compensation consultant. On July 24, 1997, Bachelder made recommendations relating to Elkins's compensation, including amending Elkins's Key Employee Supplemental Deferred Compensation Plan, granting options to purchase 1.7 million shares of IHS stock, and amending Elkins's employment agreement. After a 15-minute presentation by Bachelder and a short discussion, the Compensation Committee approved all of Bachelder's recommendations. The Board approved these recommendations the same day. Bachelder was not present at the Board meeting and the Board was not given copies of Bachelder's report.

b. November Revision and the Bonus Forgiveness Term

At an October 19, 1997, meeting among Bachelder, Elkins, and IHS's General Counsel, Marshall Elkins (Elkins's brother), additional changes to the Employment Agreement were discussed. Elkins desired to add another forgiveness term to both the $ 13.5 Million Loan and a previous $ 4.7 million loan (the "$ 4.7 [*19] Million Loan"). n18 The forgiveness term (a "Bonus Forgiveness Term") would establish an annual bonus program, under which Elkins would be entitled to receive bonuses once a year beginning in 1998, and ending in 2002. These

bonuses would be in an amount that would enable Elkins to repay the principal and interest on each loan covered by the Bonus Forgiveness Term, reduced by the amount his total salary and bonus for the previous calendar year exceeded $ 500,000.

n18 It is unclear from the Complaint when this loan was approved. The validity of this loan, however, is not contested in the Complaint.

Although Elkins wanted this Bonus Forgiveness Term to apply both to the $ 13.5 Million Loan and the $ 4.7 Million Loan, Bachelder would only recommend the Bonus Forgiveness Term with respect to the larger loan. If the forgiveness terms were to apply to both loans, Bachelder reported, the total forgiveness amount would be too large.

The Compensation Committee approved amendments to Elkins's Employment Agreement, [*20] including the Bonus Forgiveness Term for the $ 13.5 Million Loan, on November 18, 1997. The $ 4.7 Million Loan was subject only to a Change-in-Control Forgiveness Term. Board approval was obtained the same day.

An amended employment agreement, which included the new loan forgiveness terms and the recommendations approved in July, was signed on November 18, 1997.

6. Forgiveness for Amount Due on $ 4.7 Million Loan

Elkins did not pay the amount due on his $ 4.7 Million Loan for 1997. On March 19, 1998, he sent backdated unanimous written consents to the Compensation Committee, which would *ex post* approve a 1997 forgiveness bonus to cover the amount due on the loan ($ 281,482). This had the effect of essentially applying a one-time Bonus Forgiveness Term to the $ 4.7 Million Loan.

The consents were signed and sent to Elkins. The Board subsequently ratified the Compensation Committee's actions.

7. $ 2.088 Million Loan

On January 28, 1998, Elkins caused IHS to provide to him $ 2.088 million in the form of a loan (the "$ 2.088 Million Loan"). This disbursement of funds was initially undertaken without approval from the Compensation Committee or the Board. n19

n19 Newhall, who, along with Mazik, constituted the Compensation Committee at the time of this loan, testified that he knew that the proceeds of the loan were provided to Elkins prior to the Compensation Committee's approval.

[*21]

In a letter dated March 19, 1998, Elkins sent to the Compensation Committee loan documents and backdated unanimous written consents approving the loan *ex post*, which the Compensation Committee duly approved.

8. $ 4.2 Million Loan and Extension of the Bonus Forgiveness Term to the $ 2.088 Million Loan

On September 30, 1998, Leslie Glew, then associate corporate counsel of IHS and assistant secretary to the Board, sent unanimous written consents to the Compensation Committee on behalf of Elkins. These consents would consolidate the $ 13.5 Million and $ 2.088 Million Loans, extend the Bonus Forgiveness Term to cover the $ 2.088 Million Loan, and provide a new $ 4 million loan to Elkins. This new loan would be issued to allow Elkins to pay taxes on profits he realized through exercising options.

The Compensation Committee executed the unanimous written consents that same day, and this action was later ratified by the Board. Although Bachelder was never consulted by the Compensation Committee regarding these requests, Glew's cover letter included a reference to Bachelder's previous reports.

As a result of this, Elkins executed two promissory notes. The first, in the amount of [*22] $ 15,535,000, represented the consolidated $ 13.5 and $ 2.088 million loans (combined, the "$ 15.5 Million Loan"). The second stemmed from the authorization of the new $ 4 million loan. The total proceeds from this loan, however, exceeded the authorized $ 4,000,000 by $ 250,000; therefore, Elkins executed a $ 4.3 million note (the "$ 4.3 Million Loan") to IHS on October 12, 1998. n20

n20 The Plaintiff emphasizes that many of the Challenged Transactions occurred while IHS was suffering severe financial consequences from the legislative changes to Medicare reimbursement.

9. $ 4.5 Million Loan

In November 1998, Elkins received funds from a $ 4.5 million loan (the "$ 4.5 Million Loan"). As with the $ 2.088 Million Loan, this disbursement of funds was not authorized when taken. The loan was approved and ratified by the Compensation Committee on November

19, 1998. That action was ratified by the Board hours later. Elkins then executed a promissory note to IHS reflecting this loan.

10. 1999 Loan Program [*23]

By 1999, the effects of the *Balanced Budget Act of 1997* were beginning to be felt. As of March 19, 1999, IHS's stock was trading at only $ 6.81 per share. In light of this, Elkins and Pickett, the Plaintiff claims, believed that Citibank n21 would seek to amend IHS's credit agreement so as to eliminate IHS's ability to use the credit agreement for loans to employees.

> n21 It is not clear from the Complaint if Citibank was IHS's primary lender.

On March 18, 1999, the Board n22 was sent unanimous written consents. These consents would establish a $ 25 million loan program for officers of IHS. Under this program, each beneficiary would execute a promissory note to IHS. The note would contain both a Change-in-Control Forgiveness Term and a Five-Year Forgiveness Term. The Five-Year Forgiveness Term provided that 20% of the amount of the loan, and any interest, would automatically be forgiven on each anniversary of the loan if the beneficiary was still employed at IHS. The Board approved this program on March 19, 1999 without [*24] consultation with Bachelder. As of March 31, 1999, IHS had loaned $ 11.5 million to Elkins (the "$ 11.5 Million Loan"), and $ 12.9 million to other IHS officers.

> n22 In contrast to other Challenged Transactions, in this case, the Board, not the Compensation Committee, was requested to take initial action.

11. Extension of the Five-Year Forgiveness Term

By mid-1999, Elkins had several loans outstanding: The $ 15.5 Million Loan, which was subject to the Bonus Forgiveness Term; the $ 4.7 Million Loan, which was subject only to the Change-in-Control Forgiveness Term, but for which the Board had approved a bonus-forgiveness-type award in 1998; the $ 4.3 Million and $ 4.5 Million Loans, which were subject only to the Change-in-Control Forgiveness Term; and the $ 11.5 Million Loan, which was subject to the Five-Year Forgiveness Term. n23 These loans totaled over $ 40 million, almost thirty million of which were not subject to the Five-Year Forgiveness Provisions.

> n23 The status of the 1996 Loan is uncertain, based on facts alleged in the Complaint.

[*25]

On July 8, 1999, in a meeting attended by Elkins, the Compensation Committee extended the application of the Five-Year Forgiveness Provisions to all of Elkins's loans. Further, it extended the time for repayment of the $ 4.7 Million Loan by five years, removed selling restrictions on the IHS stock Elkins purchased in connection with the $ 15.5 Million Loan, and consolidated the $ 4.3 Million and $ 4.5 Million Loans into one loan totaling $ 8,750,000. The Board approved this action that same day.

12. The Elkins "Poison Pill"

In a move the Plaintiff calls the creation of a "Poison Pill," IHS, in January 2000, amended the employment agreements of officers having outstanding loans from IHS to allow for forgiveness of those loans (totaling approximately $ 16 million) if Elkins were to depart from IHS.

When Elkins left IHS in January 2000, IHS forgave $ 16 million in loans to other IHS officers, as well as $ 40 million in loans to Elkins.

### III. ANALYSIS

*A. The Statute of Limitations and the 1996 Bonus*

The Defendants argue that the Plaintiff's claims arising out of conduct prior to January 31, 1997, n24 should be barred by the statute of limitations applicable to breach [*26] of fiduciary duty claims. n25 The Plaintiff counters, citing *Kahn v. Seaboard Corp.*, that the statute of limitations should be tolled because this is a case involving wrongful self-dealing and that in such a case, the statute of limitations is tolled until stockholders knew or had reason to know of the facts constituting the alleged wrong. n26 Although *Kahn* does not require any affirmative act of concealment by the defendant in order for this tolling principle to apply, it notes that the statute of limitations will not be tolled if the plaintiff *had reason to know* of the facts constituting the alleged wrong. Further, *Kahn* leaves it to the plaintiff to plead and prove facts that would support the tolling principle. n27 The Plaintiff acknowledges that the 1996 Bonus was disclosed in IHS's proxy statement. n28 This filing was enough to alert stockholders reasonably to a possible infringement of their rights. Although the Plaintiff claims this filing did not actually alert any responsible outside stockholder to the *process* the Board undertook, the standard only requires it *reasonably to alert* the stockholders as to that alleged process. n29 As such, all

2004 Del. Ch. LEXIS 122, *

claims associated [*27] with the 1996 Bonus are dismissed.

> n24 The only transaction affected by this is the 1996 Bonus. Although funds involved in the 1996 Loans were disbursed in 1996, Board approval of these loans occurred in April of 1997, inside the statute of limitations period.n25 Opening Br. of Defs. Lawrence P. Cirka, Edwin M. Crawford, Kenneth M. Mazik, Robert A. Mitchell, Charles W. Newhall, III, Timothy F. Nicholson, John L. Silverman and George H. Strong in Support of Their Mot. to Dismiss on Grounds of Failure to State a Claim ("Defs.' Opening Br.") at 44. The applicable statute of limitations is *10 Del. C. § 8106*: "No action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action." The Plaintiff filed its petition for relief in the Bankruptcy Court on February 2, 2000.

> [HN2] While a statute of limitations defense is generally raised in a defendant's answer, it may be raised in a motion to dismiss if the complaint alleges facts showing that the complaint was in fact filed too late. *Brooks v. Savitch, 576 A.2d 1329, 1330 (Del. 1989).* [*28]

> n26 *Kahn v. Seaboard Corp, 625 A.2d 269, 276 (Del. Ch. 1993).*n27 *Id. at 277.*n28 Br. of Pl., Official Committee of Unsecured Creditors of Integrated Health Services, Inc., in Opp'n to Defs.' Mot. to Dismiss ("Pl's Brief) at 41.n29 Of course, the Committee did not exist during the events at issue.

### B. Liability Post-Resignation

The Complaint, as drafted, alleges that the members of the Board breached their fiduciary duties with respect to the Challenged Transactions. It does not designate which transactions any Defendant is liable for. The Defendants have argued that once a director has resigned, that director may no longer be held liable for the subsequent actions of the Board. n30 To the extent that the Plaintiff is suing the non-Elkins Defendants solely based on their positions as board members, this is a correct statement of law.

> n30 Hearing Tr. at 12-13.

[*29]

Cirka left the Board in March 1998. He cannot be held liable for any harm caused by the Board's decisions concerning the $ 4.2 Million Loan, Extension of the Bonus Forgiveness Term to the $ 2.088 Million Loan, the $ 4.5 Million Loan, the 1999 Loan Program, the Extension of the Five-Year Forgiveness Term to all of Elkins's Loans, or the Elkins "Poison Pill." As to Cirka only, claims arising out of those Challenged Transactions are dismissed with prejudice.

Crawford and Strong both left the Board on October 8, 1999, and Newhall left on November 19, 1999. As such, they do not have any potential liability with regard to the Elkins "Poison Pill." As to Crawford, Strong, and Newhall, any claim arising out of the Elkins "Poison Pill" is dismissed with prejudice.

### C. Fiduciary Duty Violation -- Board Action

#### 1. Characterization of the Plaintiff's Claims

The Complaint contains two Counts premised on breach of a corporate director's fiduciary duties. One alleges breach of the fiduciary duty of loyalty and the second alleges breach of the fiduciary duty of care.

The alleged conduct that forms the basis of both counts is substantially similar. The Defendants attempt to defend against [*30] the loyalty count by arguing that a board consisting of a majority of disinterested, independent directors approved all compensation arrangements. The Defendants respond to Plaintiff's care claims with three separate arguments: (1) to the extent the Defendants relied on Bachelder's opinions in approving the challenged transactions, they are insulated from liability by *8 Del. C. § 141 (e)*; n31 (2) to the extent *8 Del. C. § 141 (e)* does not insulate the Defendants from liability, IHS's *§ 102(b)(7)* exculpation provision does so; n32 and (3) regardless of the above, the Plaintiff has failed to plead facts that show gross negligence, a necessary minimum foundation for a due care claim on behalf of the Board.

> n31 *8 Del. C. § 141(e)* provides as follows:

> > [HN3] A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon . . . such information, opinions, reports or

statements presented to the corporation by any of the corporation's officers . . . or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.

[*31]

n32 8 *Del. C. § 102(b)(7)* [HN4] allows corporate charters to include a provision "eliminating . . . the personal liability of a director . . . for monetary damages for breach of fiduciary duty as a director." IHS's *§ 102(b)(7)* provision is included among the exhibits to the non-Elkins Defendants' Motion to Dismiss and is not among the documents Plaintiff has sought to strike. It follows substantially the wording of *8 Del. C. § 102(b)(7)*.

> Importantly, *8 Del. C. § 102(b)(7)* [HN5] has four exceptions:

> > Such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

There was much confusion, both in the parties' briefs, and at oral argument, as to whether the Plaintiff's [*32] claims stem from the Defendants' duty of care or duty of loyalty. n33 In *In re the Walt Disney Co. Derivative Litigation*, the Chancellor found that the facts alleged in the complaint, if true, would imply that disinterested, independent directors "*knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." n34 The Chancellor held that if they did indeed act in such a way, they "*consciously and intentionally disregarded their responsibilities*" n35 and that the defendants, therefore, could be in violation of their fiduciary duties to the corporation.

n33 In particular, counsel for the non-Elkins Defendants stated:

> What could be confusing in the cases is that there's language -- and I don't believe that it's subtle -- as to whether the bad-faith claim is a subset of the duty of loyalty or not. For this argument, I don't care, okay, frankly. The tests are there. We should apply the test. Prior to the *Disney* decision, the cases lined up in saying "Bad faith is a subset of the duty of loyalty and here's the test." After the recent *Disney* decision, we have a bad-faith claim under a duty-of-care theory. I'm prepared on this complaint to apply either standard. It doesn't matter; okay?

Hearing Tr. at 18. [*33]

n34 *In re Walt Disney Co. Deriv. Litig, 825 A.2d at 289.*n35 *Id.* ('emphasis in original).

The Court, therefore, must determine whether the Plaintiff's well-pleaded allegations, taken as true, amount to a violation of the fiduciary duty of loyalty n36 or the fiduciary duty of care. n37 Then, the Court will evaluate if the fiduciary duty claims surviving that inquiry are barred by the *§ 102(b)(7)* provision in IHS's charter. n38

n36 As observed in *Guttman v. Huang, 823 A.2d 492, 506 (Del. Ch. 2003),* [HN6] "[a] director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest." One cannot act in conformity with her duty of loyalty to a company if she acts in bad faith. *Disney*, in its discussion of the benefited corporate officer's actions in negotiating with the company after he became a fiduciary of it, points this out. It is on this notion that an actionable fiduciary duty violation, based on the fiduciary duty of loyalty, can be read from *Disney.* [*34]

n37[HN7] "The duty of care requires that in making business decisions, directors must consider all material information reasonably available, and the directors' process is actionably only if grossly negligent.'" *In re Nat'l Auto Credit, Inc. S'holders Litig., 2003 Del. Ch.*

LEXIS 5, 2003 WL 139768 at *12 (Del. Ch. Jan. 10, 2003) (quoting Brehm v. Eisner, 746 A.2d 244, 259 (Del. 2000)). 8 Del. C. § 102(b)(7) begins by protecting from monetary damages any violations of fiduciary duty. It then provides four types of actions, including a breach of the duty loyalty or acts or omissions not in good faith, that would not be shielded from monetary damage. Not among these are violations of the duty of care. Thus, actions taken that are even grossly negligent, so long as not falling within one of the exceptions contained in § 102(b)(7), will be shielded by a § 102(b)(7) provision. One may alternatively conceptualize the holding in Disney as a duty of care claim that is so egregious -- that essentially alleges the Board abdicated its responsibility to make any business decision -- that it falls within the second exception to the general exculpating power of § 102(b)(7). See 8 Del. C. § 102(b)(7)(ii) (preventing exculpation from monetary liability "for acts or omissions not in good faith . . ."). [*35]

n38 [HN8] A defense under § 102(b)(7) may be considered in the context of a motion to dismiss. Emerald Partners v. Berlin, 787 A.2d 85, 91-93 (Del. 2001) (emphasizing that the § 102(b)(7) defense applies to due care claims for monetary damages); Malpiede v. Townson, 780 A.2d 1075 (Del. 2001).

Specifically, the Court undertakes two separate analyses. Initially, the Court will inquire as to whether the Board that approved each Challenged Transaction consisted of a majority of members not interested in the Challenged Transaction or not beholden to one who was interested in the Challenged Transaction.

Because the Court concludes that a majority of the Board members who approved the Challenged Transactions were disinterested and independent, the Court will move on to the next inquiry. The question will become one of whether the facts alleged in the Complaint reasonably support the inference that these disinterested, independent directors "knew that they were making material decisions without adequate information and without adequate deliberation, and that they simply [*36] did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." n39 If they did indeed act in such a way, they have acted in a manner that cannot be said to be the product of sound business judgment and so cannot be protected by the presumption of the business judgment rule. Or put another way, if they "consciously and intentionally disregarded their responsibilities," n40 they could not have acted in such a way so as to be shielded by a § 102(b)(7) provision from monetary damages resulting from violations of fiduciary duty.

n39 In re Walt Disney Co. Deriv. Litig, 825 A.2d at 289.n40 Id. (emphasis in original).

2. A Board Consisting of a Majority of Disinterested and Independent Directors Approved the Challenged Transactions

[HN9] A director is "interested" if she "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." n41 Director independence is a separate concept from director [*37] interestedness. In order to claim a lack of independence, a plaintiff must allege facts that raise sufficient doubt that a director's decision was based on extraneous considerations or influences, and not on the corporate merits of the transaction. n42 The inquiry into a director's independence is fact-specific, and the Court is called upon to apply a subjective "actual person" standard, instead of an objective "reasonable director" standard in making its determination. n43 Furthermore, the Court will not deem a director lacking independence unless the plaintiff alleges, in addition to control, "such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person." n44

n41 Rales v. Blasband, 634 A.2d 927, 936 (Del. 1993).n42 Id. (quoting Aronson v. Lewis, 473 A.2d 805, 816 (Del. 1989)).n43 Orman, 794 A.2d at 24; Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1167 (Del. 1995).n44 Aronson, 413 A.2d at 815.

[*38]

The Plaintiff argues that Elkins dominated and controlled the Board as a whole, and that, as such, the Board itself was not independent. Since the Complaint pleads a pattern of Board deferral to Elkins, the Plaintiff argues, the Board can be said to lack independence from Elkins. General allegations of domination over a Board are simply not sufficient under Delaware law to state a traditional duty of loyalty claim. n45 "Our cases have determined that personal friendships, without more; outside business relationships, without more; and approving of or acquiescing in the challenged transactions, without more, are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment." n46 And while domination and control are not tested merely by economics, n47 a plaintiff must allege some facts showing a director is beholden to an interested director in order to show a lack of independence. n48 "The critical

issue . . . is whether the director was conflicted in his loyalties with respect to the challenged board actions." n49

> n45 [HN11] A lack of independence may arise from a "close personal or familial relationship or through *force of will*." *Orman, 794 A.2d at 25 n.50* (emphasis added). A conclusory allegation that an executive exercised his "force of will," does not, by itself, raise sufficient doubt about a director's independence. [*39]

n46 *Cal. Pub. Employee's Ret. Sys. v. Coulter, 2002 Del. Ch. LEXIS 144, 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002)* (emphasis added).n47 *In re Oracle Corp. Deriv. Litig., 824 A.2d 917, 938 (Del. Ch. 2003)*.n48 *Id. at 938-939*; *Orman, 794 A.2d at 24*.n49 *Litt v. Wycoff, 2003 Del. Ch. LEXIS 23, 2003 WL 1794724, at *4 (Del. Ch. Mar. 28, 2003)*.

#### a. Interested Directors

It is not in dispute that Elkins was interested in the outcome of all Challenged Transactions. Cirka was interested in the 1996 Loan (and 1997 *ex post* approval of that loan). Giving the Plaintiff the benefit of the doubt, I will assume Cirka was one of the officers who benefited from the 1997 Loan Program as well. Cirka, however, was not interested in any other Challenged Transaction. No allegations in the Complaint indicate any other Board member was ever interested in any of the Challenged Transactions.

#### b. Independence of Directors

i. Independence of Crawford, Mazik, Newhall, and Strong The Complaint raises no allegations of a lack of independence of Crawford, [*40] Mazik, Newhall, or Strong. It contains no factual allegations that any of these directors were beholden to the interested directors. These four directors are disinterested and independent. n50

> n50 *McMillan v. Intercargo Corp., 768 A.2d 492, 496 (Del. Ch. 2000)* ("In sum, the complaint alleges no facts from which a reasonable inference can be drawn that any conflicting self-interest or bad faith motive caused the defendant directors to fail to meet their obligations.").

#### ii. Mitchell

The Complaint alleges that Mitchell is a "founding partner of the Law Offices of Robert A. Mitchell, which provided legal services to IHS at relevant times." n51 The Complaint, however, makes no allegations as to the amount of fees the law firm obtained from IHS, and whether those fees constituted such a large part of the firm's income so as to be material to either the firm or Mitchell. Simply because Mitchell is the founding partner of a law firm which provided legal services to IHS, without more, is not enough [*41] to establish Mitchell was "beholden to" Elkins or Cirka. n52

> n51 Compl. P 2(e).n52 *Accord McMillan, 768 A.2d at 503*; *In re Walt Disney Co., 731 A.2d 342, 360 (Del. Ch. 1998)*, rev'd on other grounds sub nom. *Brehm v. Eisner, 746 A.2d 244 (Del. 2000)*.

#### iii. Nicholson

Nicholson was an officer of IHS from March 1986 to May 1993. n53 That Nicholson was an officer of IHS three years before the first of the Challenged Transactions makes him neither interested nor dependent. From February 1998 on, Nicholson has been the Managing Director of Lyric Health Care LLC ("Lyric"), a company in which Elkins held a financial interest. n54 Here, again, the Complaint fails to allege any facts indicating that because of these circumstances, Nicholson was in any way *beholden* to Elkins. Specifically, the Complaint fails to allege that Elkins's interest was sufficiently material to Nicholson to warrant a determination that by way of this interest, Elkins controlled [*42] or dominated Nicholson. No other allegations as to Nicholson have been made. As such, Nicholson, at all relevant times, was disinterested and independent.

> n53 Compl. P 2(g).n54 There is disagreement over whether it was Elkins or IHS that had an interest in Lyric. Defs.' Opening Br. at 19. For purposes of the Motions to Dismiss, I will assume Elkins did have a stake in Lyric.

#### iv. Silverman

Finally, the Complaint alleges that from June 1995 to December 1997, Silverman served as CEO of Asia Care, Inc., a subsidiary of IHS. n55 Although the Complaint does not allege that Silverman's position was material to his financial well-being or that Silverman served at Elkins's pleasure, I will assume, without deciding, that he lacked independence from Elkins.

n55 Compl. P 2(h).

c. All Transactions Were Approved by a Majority of Disinterested, [*43] Independent Directors

From 1996 through 1998, the Board consisted of Elkins, Cirka, Crawford, Mazik, Mitchell, Newhall, Nicholson, Silverman, and Strong. Of these nine directors, only Elkins and Cirka, and possibly Silverman, could be deemed interested or not independent with respect to the 1996 Loans and 1997 Loan Program. Only Elkins could be deemed interested (and possibly Silverman could be deemed not independent) with respect to the 1997 Option Grant, the Compensation Revisions, the $ 2.088 Million Loan, or the forgiveness of the amount due on the $ 4.7 Million Loan. Thus, all of these transactions were approved by a board consisting of a majority of independent, disinterested directors.

The Board approving the $ 4.2 and $ 4.5 Million Loan, the Extension of the Bonus Forgiveness Term to the $ 2.088 Million Loan, the 1999 Loan Program, and the Extension of the Five-Year Forgiveness Term consisted of Elkins, Crawford, Mazik, Mitchell, Newhall, Nicholson, Silverman and Strong. Here, at least six of eight Board Members were disinterested and independent, and all of these directors approved the Challenged Transactions.

Finally, when the Board approved the Elkins Poison Pill, it [*44] consisted of Elkins, Mazik, Mitchell, Nicholson, and Silverman. Here, at least three of the five directors approving this "poison pill" were disinterested and independent.

Since all Challenged Transactions were approved by the majority of a board consisting of a majority of disinterested, independent directors, I must now turn to whether any of the Challenged Transactions was authorized with the form of intentional and conscious disregard to a director's duties that sustains fiduciary duty claims and avoids the § 102(b)(7) exculpatory provision.

3. Did the Directors "Consciously and Intentionally Disregard Their Responsibilities"?

a. The *Disney* Standard

This Court's May 2003 *Disney* decision is the most recent in a series of decisions arising out of the hiring and termination of Michael Ovitz as the president of Disney. In that decision, the Court came to the conclusion that the complaint's allegations, if true, showed that the defendant directors did more than act in a negligent or even grossly negligent fashion in approving Ovitz's hiring and termination. As stated above, the Chancellor determined that the complaint

adequately alleged that the defendants *"consciously* [*45] *and intentionally disregarded their responsibilities."* n56

n56 *In re Walt Disney Co. Deriv. Litig, 825 A.2d at 289.*

Before pursuing this fact-specific inquiry, I pause to make two observations. First, both *Disney* and this case involve Board approval of compensation packages for corporate officers and directors. [HN12] While there may be instances in which a board may act with deference to corporate officers' judgments, executive compensation is not one of those instances. The board must exercise its own business judgment in approving an executive compensation transaction. n57

n57 In a sense, this is a variation of the Plaintiff's "force of will" argument. While such an argument would not suffice to show that a group of directors lacked independence in the traditional duty of loyalty analysis, [HN13] in the realm of executive compensation, this Court will not dismiss claims that properly allege that a board was dominated and controlled by its executives to the extent that it could not even exercise any form of its own business judgment.

[*46]

Second, it is important to highlight yet again that the standard moves beyond gross negligence. [HN14] To survive a motion to dismiss based on this standard, where the charter contains a § 102(b)(7) provision, a plaintiff must plead facts that, if true, would imply that a Board *"consciously and intentionally disregarded [its] responsibilities."* While a high bar, the Plaintiff has pleaded such facts here,

b. The 1996 Loans

The Complaint alleges the Compensation Committee approved the 1996 Loans *ex post* and Board ratification followed shortly thereafter. The Complaint further alleges that the Compensation Committee gave such approval even though the Compensation Committee was given no explanation as to why the loans were made and the Board, without "any additional investigation, deliberation, consultation with an expert, or determination as to what the Compensation Committee's decision process was," provided such ratification. n58 These allegations, if true, would imply knowing and deliberate indifference to the Board's duties to act

"faithfully and with appropriate care," n59 and thus I cannot dismiss the Plaintiff's fiduciary duty claim arising out of this Challenged Transaction. [*47]

n58 Compl. P 27. There has been much discussion as to whether the allegations in the Complaint are either false or mischaracterizations. Hearing Tr. at 25-27; Defs.' Opening Br. at 31-38; Reply Br. of Defs. Lawrence P. Cirka, Edwin M. Crawford, Kenneth M. Mazik, Robert A. Mitchell, Charles W. Newhall, III, Timothy F. Nicholson, John L. Silverman and George H. Strong in Support of Their Mot. to Dismiss on Grounds of Failure to State a Claim ("Defs.' Reply Br.") at Ex. B; Pl's Brief at 31-33. In support of their claim that such allegations are either false or mischaracterizations, the Defendants offered numerous exhibits to their Opening Brief. As discussed above, the Plaintiff initially moved to either strike such exhibits or, alternatively, to convert the Motions to Dismiss to motions for summary judgment.

At oral argument, the Defendants conceded that, instead of converting Defendants' Motions to Dismiss into motions for summary judgment, the Defendants would prefer that the Court not rely on the documents identified in the Motion to Strike, and proceed with the Motions to Dismiss. Hearing Tr. at 28.

In its brief in opposition to the Motions to Dismiss, the Plaintiff attempts to refute assertions of mischaracterization and does address the challenged exhibits. In addressing such exhibits, the Plaintiff may be seen to alter its allegations. The Plaintiff implies that it is alleging a lack of "meaningful" deliberation, as opposed to a total lack of deliberation. Pl's Brief at 31-33.

The facts in this case are different from those in *Disney*. Elkins founded IHS and had been an executive of the company for over 10 years at the time of the first Challenged Transaction. Ovitz was at Disney for one year. No expert was retained by Disney, while Bachelder (regardless of questions over the method of his selection) was retained by IHS. Thus, a change in characterization from a *total* lack of deliberation (and for that matter, a difference between the meaning of discussion and deliberation, if there is one), to even a short conversation may change the outcome of a *Disney* analysis. Allegations of

nondeliberation are different from allegations of not enough deliberation.

Nevertheless, these are motions to dismiss, governed by Court of Chancery Rule 12(b)(6). [HN15] On a motion to dismiss, I may only consider the Complaint and documents that the Complaint incorporates or that are integral to it. *Orman, 794 A.2d at 15*. As a practical matter, therefore, I do not consider the disputed exhibits, or even the Plaintiff's seeming alteration of allegations. The future course of this proceeding, obviously, will depend upon whether the facts which the Plaintiff can prove match its allegations. [*48]

n59 *In re Walt Disney Co. Deriv. Litig., 825 A.2d at 289.*

c. The 1997 Option Grant

The Complaint discusses a letter Elkins sent to the Compensation Committee, urging them to sign consents for the 1997 Option Grant. n60 The letter, the Complaint alleges, opened with the phrase "as we discussed and approved." n61 Because the approval cited by the letter was only approval as to a grant "in the amount and price to be determined at a later date," and because no later discussion was ever taken, the Complaint concludes that "Elkins unilaterally determined the amount of his own option grant." n62 This is a conclusory allegation of the type I need not take as true for purposes of a motion to dismiss. n63 Here, the Complaint states that the Compensation Committee previously discussed and approved an option grant. While the Complaint alleges that Bachelder was asked to provide an after-the-fact supporting report, it does not allege that this previous discussion was defective. I cannot find, based on the nonconclusory allegations of fact in the Complaint, that the Defendants intentionally [*49] disregarded their responsibilities with regard to this option grant. IHS's § 102(b)(7) provision thus insulates the non-Elkins Defendants from liability in regard to. this Challenged Transaction, assuming for these purposes that these facts otherwise would describe a breach of fiduciary duty.

n60 Compl. PP 29-30.n61 *Id.* P 30.n62 *Id.*n63 *Orman, 794 A.2d at 15.*

d. The 1997 Loan Program

I can find no sufficient allegation of knowing and deliberate indifference to the duty to act faithfully and with appropriate care with regard to the 1997 Loan

Program. The Compensation Committee and the Board received Bachelder's September Report relating to IHS's option ratio. n64 Even accepting as true that IHS never contacted Bachelder to question him on this report, the report was presented to the Compensation Committee by Pickett, IHS's Chief Financial Officer. The Complaint alleges that the Compensation Committee did engage in a discussion in regard to the report. While [*50] failure to consult a tax expert on the tax consequences of the report, and even the failure to set up a monitoring mechanism with regard to the loan program may or may not have been negligent (or even grossly negligent), no inference can be drawn that this decision was made without good faith. Defendants commissioned a compensation consultant report, discussed his report, and implemented a program based on that report. While the Board may not have acted with the degree of care the Plaintiff would have preferred, IHS's § 102(b)(7) provision, as pertinent here, prevents the imposition of monetary liability for all but those actions undertaken disloyally or without good faith. The Plaintiff's allegations do not meet that standard.

> n64 Because I find IHS's § 102(b)(7) provision shields Defendants from liability regarding the 1997 Loan Program, I do not reach arguments regarding 8 Del. C. § 141(e).

e. The 1997 Compensation Revisions

With regard to the 1997 Compensation Revisions, [*51] the Plaintiff alleges that the Compensation Committee "completely abdicated [its] fiduciary duties with respect to review and approval of [Bachelder's] Compensation Review." n65 Specifically, the Complaint alleges the Compensation Committee did not meet with Bachelder, or discuss the progress of his work, and did not ask any questions or make requests or recommendations. The Complaint does, however, note that Bachelder did make a 15-minute presentation to the Compensation Committee, at which he provided the Committee with a 32-page report. Further, the Complaint concedes that following this presentation, a discussion ensued. As to the implementation of the Bonus Forgiveness Term, the Compensation Committee actually denied extension of the Bonus Forgiveness Term to the $ 4.7 Million Loan. And while the Board did not engage in discussion following the Committee's approval, it is clear the Committee took enough action that I cannot conclude it acted in *more* than a grossly negligent manner, if that. n66

n65 Compl. P 33.n66 For the same reason discussed above, I do not reach 8 Del. C. § 141(e).

[*52]

Counsel for the Plaintiff, at oral argument on the Motions to Dismiss, discussed what would be a reasonable length of time for board discussion before approving, in that case, the 1997 Loan Program, or what would be an *unreasonable* length of time for the Board to consider such decisions. Counsel took the following position: "Now we're not saying if it was 20 minutes, it would have been okay or if it was 5 minutes, it wouldn't have been okay. Perhaps 5 or 10 minutes would have been sufficient if there had been some other involvement or discussion with the expert other than that very brief meeting." n67 The type of inquiry counsel may be suggesting is not particularly helpful in evaluating a fiduciary claim. As long as the Board engaged in action that can lead the Court to conclude it did not act in knowing and deliberate indifference to its fiduciary duties, the inquiry of this nature ends. The Court does not look at the *reasonableness* of a Board's actions in this context, as long as the Board exercised *some* business judgment.

> n67 Hearing Tr. at 42.

[*53]

The Compensation Committee did rely on Elkins to identify the appropriate compensation consulting firm to advise it with respect to his compensation. By selecting a consultant under his influence, Elkins may have violated his fiduciary duties. To the extent the Board should have been more diligent in the selection process, the lack of diligence alleged, by itself and especially in light of Elkins's long history with the Company, is simply not enough to demonstrate a lack of loyalty or good faith on the part of the members of the Compensation Committee.

f. Forgiveness for Amount Due Under the $ 4.7 Million Loan

Accepting that the facts alleged regarding the extension of the Bonus Forgiveness Term to the $ 4.7 Million Loan are true, the Compensation Committee acted based on a misleading letter from Elkins. Nevertheless, the Compensation Committee, if acting in conformity with even the *Disney* standard, should have at least been cognizant of its own refusal to extend a Bonus Forgiveness Term to the $ 4.7 Million Loan at one of its meetings held less than five months before. Elkins's letter should have at least prompted some discussion. The Compensation Committee's signing of the [*54]

unanimous written consents in this case raises a concern as to whether it acted with knowing and deliberate indifference. Moreover, since the Complaint alleges the Board ratified the Compensation Committee's action without any review whatsoever, claims as to this Challenged Transaction survive the Motions to Dismiss.

g. $ 2.088 Million Loan

The $ 2.088 Million Loan was the smallest of the loans and obviously begs the question: how does one compare a board's blessing of such a loan with the $ 145 million transactions involved in *Disney*? The question, again in this context, is whether a board exercises some business judgment in making a compensation decision. As the Chancellor wrote in the first incarnation of *Disney*,

> Just as the 85,000-ton cruise ships *Disney Magic* and *Disney Wonder* are forced by science to obey the same laws of buoyancy as Disneyland's significantly smaller *Jungle Cruise* ships, so is a corporate board's extraordinary decision to award a $ 140 million severance package governed by the same corporate law principles as its everyday decision to authorize a loan. Legal rules that govern corporate boards, as well as the managers of day-to-day operations, [*55] are resilient, irrespective of context. n68

n68 *In re Walt Disney Co. Deriv. Litig., 731 A.2d 342, 350 (Del. Ch. 1998), aff'd in part, rev'd in part sum nom Brehm v. Eisner, 746 A.2d 244 (Del. 2000).*

While this loan, by itself, is much smaller than the package under scrutiny in *Disney*, the same principles apply -- [HN16] when a board acts with knowing and deliberate indifference to its duties to act faithfully and with appropriate care, it acts in such a way as to be denied the protection of a *§ 102(b)(7)* provision.

Here, Newhall testified to his knowledge that Elkins was receiving the proceeds of the $ 2.088 Million Loan prior to the Compensation Committee's approval. In justifying the signing of the unanimous consent without deliberation, Newhall simply stated he knew Elkins would never " pull anything behind anyone's back.'" n69 Even for an officer who founded a company and had been with that company for over 10 years, and even for a transaction as proportionately [*56] small as this,

directors of a public corporation must exercise more than blind faith in approving loans. Claims against Mazik and Newhall n70 arising out of the *ex post* approval of this loan survive the Motions to Dismiss.

n69 Compl. P 58.n70 The Complaint does not allege Board ratification of this transaction.

h. $ 4.2 Million Loan and Extension of the Bonus Forgiveness Term to the $ 2.088 Million Loan

Again, the Complaint alleges Compensation Committee approval and Board ratification of an Elkins request without *any* "consideration, deliberation, or advice from any expert." n71 Because I must accept this allegation as true on a motion to dismiss, I deny the Motions to Dismiss as to this claim.

n71 Compl. P 60.

i. $ 4.5 Million Loan

The Complaint alleges that the Compensation Committee approved this $ 4.5 Million Loan [*57] "without any deliberation as to the appropriateness of granting a new loan to Elkins or whether IHS received any consideration for this loan'" n72 and that subsequent Board approval was "without consideration, deliberation or advice from any exert [sic]." n73 As such, I cannot dismiss claims regarding the approval of this loan.

n72 *Id.* P 64.n73 *Id.* P 65.

j. 1999 Loan Program

The entire Board approved the 1999 Loan Program without Compensation Committee approval. While Glew sent a letter to the Board stating that the Compensation Committee " discussed and recommended'" the loan program, n74 the Complaint alleges it in fact did not. Instead, the Complaint alleges that the Board approved the program "without any consideration, deliberation, or advice from any expert." n75 Such an allegation, if true, would imply the type of knowing and intentional indifference that would imply a breach of fiduciary duty not insulated from liability by a *§ 102(b)(7)* clause. The Motions to Dismiss the claims [*58] with regard to this Challenged Transaction are denied.

2004 Del. Ch. LEXIS 122, *

n74 *Id.* P 73.n75 *Id.* P 68.

k. Extension of the Five-Year Forgiveness Term to all of Elkins's Loans

The Complaint alleges that Bachelder was opposed to extending the Five-Year Forgiveness Provision to all of Elkins's loans, but it stops short of alleging the Compensation Committee knew of his opposition. n76 While not alleging a total lack of deliberation on behalf of the Compensation Committee, it does allege such a lack in the Board's ratification of Compensation Committee action. Moreover, the Complaint, at paragraph 78, may be read to allege that, although the Compensation Committee deliberated at a July 8, 1999, meeting, it did not consult with any experts with respect to the extension of the term, and did not consider its costs to IHS or whether IHS would receive any consideration from it. Once again, given the procedural posture of this matter, the Motions to Dismiss as to this Challenged Transaction are denied.

n76 *Id.* PP 76-77; Hearing Tr. at 45-46.

[*59]

1. The Elkins "Poison Pill"

The Plaintiff alleges that it was "unable to identify any corporate authorizations for the January 2000 Amendments, or any analysis of the January 2000 Amendments, their cost to IHS or the corporate reason for this performed either by the Compensation Committee or by other members of the Board." n77 [HN17] On a motion to dismiss pursuant to Court of Chancery Rule 12(b)(6), the Court must take all reasonable inferences from the allegations in the favor of the nonmoving party. A reasonable inference one can take from an inability to find such information, after a reasonable inspection, is that no such action was taken. n78 Thus allegations regarding the Elkins "Poison Pill" are sufficient, at this stage of litigation, to sustain the Plaintiff's breach of fiduciary duty claims.

n77 Compl. P 80.n78 Without more, a plaintiff's allegation that it did not find a certain corporate document may mean little. It is significant, however, that the Committee, through proceedings in the Bankruptcy Court, was able to conduct an investigation to develop and to support its allegations. *E.g.*, Compl. PP 17, 20 & 58. This investigation allowed for substantially broader inquiry than would have been available

under, for example, *8 Del. C. § 220*. It included not only obtaining documents but also deposing directors and former in-house counsel. Thus, the alleged absence of approvals, in this unique circumstance, supports the inference, at least in the context of a motion under Court of Chancery Rule 12(b)(6), that there was none. Again, the facts, when fully developed, may turn out to be quite different.

[*60]

*D. Duty of Loyalty -- Elkins*

[HN18] In general, employees negotiating employment agreements with their employers have the right to seek an agreement containing the best terms possible for themselves. However, once an employee becomes a fiduciary of an entity, he has a duty to negotiate further compensation agreements "honestly and in good faith so as not to advantage himself at the expense of the [entity's] shareholders." n79 This requirement does not prevent fiduciaries from negotiating their own employment agreements so long as such negotiations are "*performed in an adversarial and arms-length manner.*" n80

n79 *In re Walt Disney Co. Deriv. Litig., 825 A.2d at 290.*n80 *Id.*

The Complaint contains numerous allegations that Elkins failed to fulfill this duty. At oral argument, counsel for the non-Elkins Defendants, discussed some of the Plaintiff's allegations of Elkins's control of the Board. n81 That Elkins set out agendas for Board and Compensation Committee meetings; [*61] that Elkins attended meetings; that he spoke with directors outside of the meetings; that he negotiated his compensation packages with the Board and Compensation Committee; or even that he spoke with the Board's compensation consultant are all, individually, not enough to show a breach of Elkins's duty of loyalty. But these, taken together, and coupled with the Complaint's allegations that Elkins reviewed and revised every draft of Bachelder's reports before they were submitted to the Board; n82 that Elkins exerted pressure on Bachelder to justify Elkins's compensation; n83 that Elkins's March 19, 1998 letter to the Board stated inaccurate facts as to what the Compensation Committee had previously approved in regard to forgiveness of previous loans; n84 that Elkins caused IHS to disburse funds to him without corporate authority; n85 that Elkins insisted on the 1999 Loan Program solely because he thought Citibank would

seek to eliminate IHS's use of its credit agreement to provide loans to employees; n86 and that Elkins insisted on extending a Five-Year Forgiveness Term to all of his loans, notwithstanding opposition by Bachelder; n87 suggest Elkins "may have breached his fiduciary [*62] duties by engaging in a self-interested transaction." n88

> n81 Hearing Tr. at 23-24. While this discussion dealt with whether the Board was "beholden" to Elkins, it is useful in this context as well. The allegations are listed in Compl. PP 17-19.n82 *Id.* P 34.n83 *Id.* P 38n84 *Id.* P 57.n85 *Id.* PP 26, 27, 58, 64.n86 *Id.* P 66.n87 *Id.* P 75.n88 *In re Walt Disney Co. Deriv. Litig., 825 A.2d at 290.*

Elkins argues that either Compensation Committee or Board approval cleanses any duty of loyalty violation he may have committed. The Plaintiff is not alleging here that Elkins breached his fiduciary duty of loyalty because of the end result of achieving the Challenged Transactions. The Plaintiff is arguing that Elkins, in bad faith, manipulated the process of Compensation Committee or Board approval itself. If he manipulated the process, he cannot benefit from the decisions reached through that process.

Elkins [*63] is correct that this case is not identical to *Telxon Corp. v. Meyerson.* n89 *Telxon* addressed an entire board's approval of board member compensation. There, the board was self-determining its compensation. Here, however, the Plaintiff is alleging that Elkins engaged in a pattern of behavior, in bad faith, to self-determine his benefits, notwithstanding the necessity of board approval. To the extent the Complaint argues facts that, if true, would show Elkins acted in bad faith and in conflict with his fiduciary duty of loyalty to IHS, such a claim cannot be dismissed at this stage.

n89 *802 A.2d 257 (Del. 2000).*

*E. Waste*

Count III of the Complaint claims that each of the Defendants wasted corporate assets by approving the Challenged Transactions and by failing to assure the proceeds of the loans from IHS to executive officers were used for the stated corporate purpose.

Waste is a standard rarely satisfied in Delaware courts. Indeed, [HN19] waste is "an extreme test, very rarely satisfied [*64] by a . . . plaintiff." n90 *In re Brehm v. Eisner,* the Supreme Court described the plaintiffs'

allegations as that the board not only committed a procedural due care violation in approving an employment agreement, "but also that the Board committed a substantive due care' violation constituting waste." n91 The Court went on to dismiss the characterization of waste in this manner, equating due care with *process.* [HN20] In evaluating a waste claim, courts look to the exchange *itself.* The exchange must be *irrational.* n92

> n90 *Steiner v. Meyerson, 1995 Del. Ch. LEXIS 95, 1995 WL 441999, at *1 (Del. Ch. Jul. 19, 1995).*n91 *Brehm v. Eisner, 746 A.2d 244, 262 (2000).*n92 *Id. at 264.* This is an important distinction. Rarely, if ever, will a plaintiff have direct evidence of a board's intent. Yet the *Disney* standard is scienter-based. Thus, the Court will generally be required to look to the Board's actions as circumstantial evidence of state of mind. [HN21] The Court, in analyzing whether an action was taken with intentional and conscious disregard of a board's duties, must determine that the action is beyond unreasonable; it must determine that the action was irrational.

In *Brehm,* the Supreme Court noted this distinction. In rejecting the "substantive due care" argument made by the plaintiffs, the court noted

> [HN22] Due care in the decisionmaking context is *process* due care only. Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test *or it may tend to show that the decision is not made in good faith*, which is a key ingredient of the business judgment rule.

*Id. at 264.*[HN23] In the case of an alleged breach of fiduciary duty for intentionally and consciously disregarding one's duties of faithfulness and care, the Court will focus on whether the Board's *process* is *irrational.* In executive compensation cases, the Court will look to see whether the Board engaged in any form of review or deliberation. While a board's action might be found to violate both the standard framed in *Disney* and the waste standard, this is not one of those cases.

2004 Del. Ch. LEXIS 122, *

[*65]

[HN24] To succeed in proving waste, a plaintiff must plead facts showing ""an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."" n93 Further, when dealing with a board's decision on executive compensation, its substantive decision is entitled to great deference. "It is the essence of business judgment for a board to determine if "a" particular individual warrant[s] large amount[s] of money, whether in the form of current salary or severance payments."" n94

> n93 *Id. at 263* (quoting *In re Walt Disney Co. Deriv. Litig., 731 A.2d at 362* (quoting *Glazer v. Zapata, 658 A.2d 176, 183 (Del. Ch. 1993)))*.n94 *Id.* (quoting *In re Walt Disney Co. Deriv. Litig., 731 A.2d at 362* (quoting *Grimes v. Donald, 673 A.2d 1207, 1215 (Del. 1996)))*.

The Plaintiff's brief acknowledges that there are only two ways for a waste claim [*66] to survive a motion to dismiss: the Complaint alleges facts showing the corporation received no consideration, or that a transfer of corporate assets served no corporate purpose. n95 As written in IHS's 1999 Proxy Statement: n96

> One of the Company's strengths contributing to its success is a strong management team, many of whom have been with the Company for a large number of years. The Committee believes that low executive turnover has been instrumental to the Company's success, and that the Company's compensation program has played a major role in limiting executive turnover. The compensation program is designed to enable the Company to attract, retain and reward capable employees who can contribute to the continued success of the Company, principally by linking compensation with the attainment of key business objectives. n97

> n95 Pl.'s Brief at 38 (citations omitted).n96 IHS's 1997-1999 Proxy Statements are included in the Appendix to the non-Elkins Defendants' Motion to Dismiss, and were not among the documents included in the Plaintiff's motion to strike. The

Court considers them incorporated by reference to the Complaint. [*67]

> n97 1999 Proxy statement.

This stated corporate purpose, to retain key employees, is repeated in IHS's 1998 and 1997 Proxy Statements.

The Plaintiff challenges this stated purpose, claiming it to be a sham, because of the Board's failure to monitor how the loans were spent. While challenging a failure to monitor may be a proper breach of duty of care claim, I cannot conclude that an alleged failure to monitor proceeds of compensation, *ex post*, without more, is enough to conclude that a Company's articulated purpose is a sham.

The Plaintiff's brief argues that, regardless of corporate purpose, a motion to dismiss a waste claim must fail if the corporation received no valid consideration for its exchange of assets. Delaware law recognizes that retention of key employees may itself be a benefit to the corporation. n98 The Plaintiff argues that, with regard to the Extension of the Five-Year Forgiveness Term, Bachelder believed that such extension could not be supported by consideration to be obtained by IHS. However, Plaintiff does not claim that the Board knew of Bachelder's determination. [*68] " n99 The Five-Year Forgiveness provisions were designed to forgive 20% of a loan so long as an officer was in the continuous employ of IHS. n100 It is not irrational to conclude that the extension of these provisions induced Elkins to stay with IHS in the face of troubling financial times. n101 In sum, I conclude that this is not an "unconscionable case [] where [the] directors irrationally squander[ed] or gave away corporate assets." n102

> n98 *Beard v. Elster, 39 Del. Ch. 153, 160 A.2d 731, 738 (Del. 1960). See also Zupnick v. Goizueta, 698 A.2d 384, 387-88 (Del. Ch. 1997).* The Plaintiff challenges the Defendants' reliance on *Zupnick.* Although *Zupnick* dealt with the awarding of options for past. consideration, instead of the awarding of compensation to retain services, the basic argument that additional compensation is waste because an officer was already contractually obligated to perform services to the company and had been compensated for doing so is present in both *Zupnick* and this case, and was rejected in *Zupnick.*n99 At oral argument, the Plaintiff conceded that the Complaint, while alleging that Elkins sought out Bachelder to justify the

2004 Del. Ch. LEXIS 122, *

extension of the forgiveness provisions, does not allege that the Board relied on Bachelder, or knew of Elkins's consultation with him. Hearing Tr. at 45-46. Specifically, the Complaint states that "neither the Board nor the Compensation Committee consulted with any experts with respect to the July Forgiveness." Compl. P 78. [*69]

n100 Compl. P 71.n101 *Brehm, 746 A.2d at 264 (2000)* ("Irrationality is the outer limit of the business judgment rule.").n102 *Id. 263.*

*F. The Elkins Waiver Agreement*

The Agreement n103 provides:

> The Debtors shall have, and shall be deemed to have fully, finally and forever released, relinquished and discharged all Elkins Released Parties from all Released Claims that they individually or collectively, whether directly, representatively, derivatively, or in any other capacity, ever had, now have, or hereafter can, shall or may have[.] n104

n103 The parties have not questioned that the Court may consider the Agreement.n104 Agreement at § 7.1 (ii).

Released Claims are defined generally to include:

> All Claims, rights, causes of action (including Avoidance Power Causes of Action), notes, debts, accounts payable, rights of [*70] reimbursement or contribution, demands, judgments, suits, matters and issues, known or unknown, whether individual, class, derivative, representative, legal, equitable, or any other type, or in any other capacity, of the Debtors, in each case against an Elkins Released Party. n105

n105 *Id.* § 1.24.

Excluded from this general definition are claims giving right to a loss arising from Wrongful Acts. n106 That

term, defined for purposes of the Agreement as defined in directors' and officers' insurance policies procured by IHS (the "D&O Policies"), includes alleged breaches of fiduciary duty.

n106 *Id.* § 1.24(1).

Moreover, the Agreement limits the source of recovery for Non-Released (*i.e.*, Wrongful Acts for these purposes) claims to those covered by the D&O Policies:

> It [is] the express intent of the parties [*71] to this Agreement that the insurance available, if any, pursuant to the D&O Policies shall be the sole source of recovery for any Claims of the Debtors which do not constitute Released Claims; provided, however, a Claim against Elkins giving rise to a Loss arising from a Wrongful Act shall constitute a Released Claim if the Loss incurred by Elkins with respect thereto exceeds the amount actually paid by the Insurer under any D&O Policy (but shall constitute a Released Claim only for the amount of such excess)[.] n107

n107 *Id.*

It is not in dispute that the breach of fiduciary duty claims are Wrongful Acts, as the Agreement (by way of the D&O Policies) defines them. The Plaintiff has admitted that the D&O Policies are the sole source of recovery. n108 I see no reason, especially in light of this concession, that the Plaintiff's claims against Elkins should be dismissed. To the extent any damages, if found, exceed coverage under the D&O Policies, they will be deemed to constitute Released Claims. [*72]

n108 Pl's Opening Br. at 44 ("Plaintiff acknowledges that the Release limits any recovery against Elkins to amounts actually paid by the insurers, and acknowledges further than, as a result, Plaintiff may not recover from Elkins or from any Elkins Released Party any amount in excess of amounts actually paid by the insurers.").

**IV. CONCLUSION**

2004 Del. Ch. LEXIS 122, *

For the foregoing reasons, the non-Elkins Defendants' motion to dismiss the Plaintiff's waste claim is granted. Similarly, the non-Elkins Defendants' motion to dismiss the Plaintiffs fiduciary duty claims, with regard to the 1996 Bonus, 1997 Option Grant, 1997 Loan Program, and 1997 Compensation Revisions is granted. The non-Elkins Defendants' motion to dismiss the Plaintiff's fiduciary duty claim in regard to the $ 2.088 Million Loan is dismissed as to all non-Elkins defendants except for Mazik and Newhall. The non-Elkins Defendants' motion to dismiss is granted for Cirka as to the $ 4.2 Million Loan, the Extension of the Bonus Forgiveness Term to the $ 2.088 [*73] Million Loan, the $ 4.5 Million Loan, the 1999 Loan Program, the Extension of the Five-Year Forgiveness Term, and the Elkin "Poison Pill." The non-Elkins Defendants' motion to dismiss is granted for Crawford and Strong as to the Elkins "Poison Pill." In all other respects, the non-Elkins Defendants' motion to dismiss is denied.

Elkins's motion to dismiss the Plaintiff's waste claim is granted. To the extent the Plaintiff's claims reach Elkins as a Board member, Elkins's motion to dismiss those claims is granted to the same extent as the non-Elkins Defendants' motion to dismiss. Elkins's motion to dismiss the Plaintiff's breach of fiduciary duty claims made against him individually and in a capacity apart from his role as a director is denied.

Counsel shall confer and submit a conforming order within 10 days.