TAB 8

Westlaw.

Not Reported in A.2d                                                                                                   Page 1
1999 WL 1044880 (Del.Ch.), 25 Del. J. Corp. L. 1036, 24 Employee Benefits Cas. 1924
(Cite as: 1999 WL 1044880 (Del.Ch.))

▷

UNPLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Lisa SANDERS, Plaintiff,
v.
Charles B. WANG, Sanjay Kumar, Russell M. Artzt, Willem F.P. de Vogel, Richard
A. Grasso, Irving Goldstein and Shirley Strum Kenny, Defendants,
and
COMPUTER ASSOCIATES INTERNATIONAL, INC., Nominal Defendant.
Edward BICKEL, derivatively on behalf of Computer Associates International,
Inc., Plaintiff,
v.
Charles B. WANG, Sanjay Kumar, Russell M. Artzt, Willem F.P. de Vogel, Irving
Goldstein, and Richard A. Grasso, Defendants,
and
COMPUTER ASSOCIATES INTERNATIONAL, INC., Nominal Defendant.
No. 16640.

Submitted Aug. 4, 1999.
Decided Nov. 8, 1999.
Pamela S. Tikellis, James C. Strum and Robert J. Kriner  Chimicles & Tikellis, Wilmington, DE, Bruce E. Gerstein, Scott Fisher, Barry S. Taus and Stephen H. Schwartz of Garwin, Bronzaft, Gerstein & Fisher, New York, New York, Fred Taylor Isquith and Gregory M. Nespole of Wolf Haldenstein Adler Freeman & Herz, New York, New York, for Plaintiff Edward Bickel, of counsel.

Norman M. Monhait of Rosenthal, Monhait, Gross & Goddess, Wilmington, Delaware, Martin P. Unger of Tenzer Greenblatt, New York, New York; George H. Linck, New York, New York, for Plaintiff Lisa Sanders, of counsel.

Alan J. Stone and Jessica Zeldin of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Moses Silverman and Jonathan J. Freedman of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, for Defendants Richard A. Grasso, Irving Goldstein, Shirley Strum Kenny, Willem F.P. de Vogel and Computer Associates International, Inc., of counsel.

Wayne N. Elliott and James L. Holzman, Prickett, Jones & Elliott, Wilmington, Delaware, David E. Nachman and Caroline S. Press, Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York, New York, for Defendants Charles B. Wang, Sanjay Kumar and Russell M. Artzt, of counsel.

*MEMORANDUM OPINION*

STEELE, Vice Chancellor.

I. Issues Presented
*1 1. Can a board of directors rely upon its purported discretion to administer a shareholder-approved "key employee stock ownership plan" to grant key executives more shares than expressly authorized by the plain language of the KESOP? No.

Where an employee stock ownership plan contains a clear, unambiguous limitation on the total number of shares authorized, the board of directors may not exceed this limit based upon a general provision that does nothing more than grant them discretion to administer the plan.
2. By establishing a prima facie case that a board of directors awarded at least 9.5 million more shares than actually authorized by a stock plan, do the plaintiffs state claims for gross negligence, waste of corporate assets and breach of fiduciary duty? Yes.

An allegation that a board of directors' awarded at least 9.5 million more shares than a stock plan expressly authorized sufficiently establishes claims for gross negligence, waste of corporate assets and a breach of fiduciary duty.
3. Where the pleadings establish with certainty that a stock plan did not authorize defendant directors to award the amount of shares they undisputedly did award, is it appropriate that plaintiffs be granted judgment on the pleadings for their claims against the directors for gross negligence, waste, and breach of the fiduciary duties of loyalty and care, when the requested relief includes: (a) rescission of the unauthorized share award; (b) imposition of a constructive trust over persons receiving any benefit flowing from that award; (c) damages against the directors; and, (d) fees and costs? Not entirely.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                       Page 2
1999 WL 1044880 (Del.Ch.), 25 Del. J. Corp. L. 1036, 24 Employee Benefits Cas. 1924
**(Cite as: 1999 WL 1044880 (Del.Ch.))**

When the pleadings can establish with certainty only that a stock plan did not authorize defendant directors to award the amount of shares that they actually awarded, judgment on the pleadings is appropriate only to the extent that the plaintiff is entitled to equitable relief as a result of the unauthorized award, whether by (1) rescission of the unauthorized award; and, (2) imposition of a constructive trust over any person receiving benefits resulting from that award. With the record very limited at the pleadings stage and the defendants asserting a triable affirmative defense to the damage claims, any judgment on the plaintiffs' claims seeking compensatory damages would be premature.

II. Background

*1. The Basic Allegation*

The plaintiffs, shareholders of Computer Associates International, Inc. ("CA"), sue CA's seven directors for gross negligence, corporate waste and for breach of their fiduciary duties by granting three of the board members, who are also the company's top executives, [FN1] 20.25 million shares of CA common stock under the 1995 Key Employee Stock Ownership Plan ("KESOP" or the "plan"). The plaintiffs' allege that this share grant to the "Participants" far exceeded the number authorized by the KESOP and assert various claims against the directors flowing from this grant. Though the two plaintiffs' positions vary over exactly how many of the granted shares were excess, they both agree that the board granted excess shares which damaged the corporation.

> FN1. The recipients of these grants are defendants *Charles B. Wang,* Chairman of the Board and CEO of CA; *Sanjay Kumar,* the President and COO of CA; and *Russell P. Artzt,* the Executive Vice President-Research and Development for CA and CA's Senior Development Officer. All three individuals are also directors of CA.

*2. The KESOP and the Challenged Share Grants*

**\*2** The CA board adopted the KESOP on May 25, 1995. The shareholders approved the Plan at an Annual Meeting held in August, 1995. Its terms are quite straightforward. The Plan is administered by the Compensation Committee of the board, which "shall be vested with all discretion and authority as it deems necessary or appropriate to administer the Plan and to interpret the provisions of the Plan." [FN2] An express provision authorizes the Compensation

Committee "to grant up to 6,000,000 shares of Common Stock to the Participants." [FN3] This is to be done by granting 2 million shares, outright, upon the Plan's adoption [FN4] and then by additional grants of up to 4 million total shares, contingent on CA's common stock reaching certain specified price targets and maintaining those target prices for at least 30 trading days on the New York Stock Exchange. [FN5] In deciding whether these targets have been met the Committee may adjust the stock price to account for any stock splits that occur after the KESOP was adopted. [FN6] However, the plan does not permit the Committee to adjust the number of shares granted to account for stock splits or any other recapitalization transactions. In addition to share price performance targets determining how many shares may be granted, similar performance targets determine when the shares will actually vest. In particular, § 4.4 permits "Early Vesting" of *all* of the shares granted (the six million total) if the CA share price trades at $180 or more for at least 60 trading days.

> FN2. § 6.1 of the KESOP (The KESOP is Exhibit B of the Complaint).

> FN3. "The Committee is authorized to grant up to 6,000,000 shares of Common Stock to the Participants." § 3.1 of the KESOP.

> FN4. § 3.2 of the KESOP.

> FN5. *Id* at § 3.3 *Additional Grants.*

> FN6. *Id* at § 3.2.

On May 21, 1998, the Compensation Committee certified that the price of CA common stock had traded for at least 60 trading days in a twelve-month period at $180 or better (the actual price was $53.33 per share, which is equivalent to $180, adjusted for the stock splits) which triggered the § 4.4 "Early Vesting" provision. Before this event, in August 1995, June 1996, and November 1997, CA gave all holders of Common Stock one share for every two shares held, amounting to three separate "three for two" stock splits. The Compensation Committee granted the Participants 20.25 million total shares total, which is equivalent to 6 million shares adjusted for these three stock splits.

III. Contentions

*1. Plaintiffs*

There are two plaintiffs. The first, Lisa Sanders, filed

Not Reported in A.2d                                                                                          Page 3
1999 WL 1044880 (Del.Ch.), 25 Del. J. Corp. L. 1036, 24 Employee Benefits Cas. 1924
**(Cite as: 1999 WL 1044880 (Del.Ch.))**

this action on September 15, 1998. She amended her Complaint on October 26, 1998. The second plaintiff, Edward Bickel, intervened in this action with a Complaint in Intervention on November 19, 1998.

Sanders alleges the Committee violated the KESOP by exceeding the limit on additional share grants (four million) in order to adjust for the three stock splits. However, Sanders does not take issue with the initial two million share grant presumably in the belief they were awarded before the stock splits happened. Thus, Sanders believes that the defendant board should have awarded a total of 10.75 million shares (6 million under the plan + 4.75 million in dividends on the initial two million share grant) and that they awarded 9.5 million shares more than authorized. Sanders charges the board with waste of CA's assets, gross negligence and breach of the directors' fiduciary duties of loyalty and care. Sanders seeks: (1) cancellation or rescission of the 9.5 million share award; (2) imposition of a constructive trust over the Participant-directors and an accounting of the benefits received from these shares; (3) damages; and, (4) fees and costs.

*3 Bickel takes a harder line, arguing that the KESOP authorizes only six million shares total, and does not permit any adjustment for stock splits, nor any dividends on *any* of the shares. He argues that granting any shares above this limit violates the KESOP. Thus, Bickel believes that the Committee granted 14.25 million shares in excess.

Bickel charges the entire CA board, individually and/or jointly, with waste of corporate assets, mismanagement, gross negligence, and breach of the fiduciary duties of loyalty, due care, and "good faith." Bickel seeks: (1) rescission of the unlawfully awarded shares (14.25 million); and, (2) imposition of a constructive trust over defendants Wang, Kumar and Artzt for any benefits flowing from these shares; and, (3) an injunction against the voting rights of these shares against defendants Wang, Kumar and Artzt; and, (4) damages from all directors individually; and, (5) fees and costs.

In the present motions plaintiffs ask for judgment on the pleadings or, alternatively, for summary judgment on the basis that they have established on the undisputed facts that the CA board exceeded its authority which alone warrants judgment for the plaintiffs on all their claims.

*2. Defendants*

The defendant directors say that:

1. Demand requirements have not been met by the plaintiffs, because
   a) a majority of the directors are disinterested and independent, and
   b) the share grant resulted from a valid exercise of business judgment;

2. A disinterested Compensation Committee awarded the 20.25 million shares within its discretion to administer the Plan under § 6.2. The Committee believes the Plan gave it authority to adjust the number of shares granted to account for the stock splits that happened after the shareholders approved the Plan.

3. Because plaintiffs disagree over how many excess shares were awarded, their allegations are arbitrary, confirming the defendants' argument that their decision resulted from the valid exercise of business judgment;

4. The terms of the Plan, specifically that all 6 million shares vest when the share price stays at $180 for at least 60 days, demonstrate the Plan's intent to award the Participants 3.75% equity in the company, or about $1.08 billion worth of shares (6 million x $180);

5. The strict reading of the share limitation provision frustrates the purpose of the Plan and penalizes its recipients. In particular, defendants say that plaintiffs' strict reading does not make economic sense because if, instead of stock splits, there had been a "reverse stock split" or a share consolidation, then the defendant Participants would get twice as much equity, or over $2 billion. Defendants say that if this were actually the case that the plaintiffs would then not support their own proposition that a strict reading is required, and would in fact argue just the opposite.

6. In any event, exculpatory provisions in the CA charter and in § 7.3 of the Plan promulgated pursuant to § 102(b)7 of the DGCA, shield the directors from personal liability for money damages.

*4 On these various grounds, the defendants move both for dismissal for failure to state claims upon which relief can be granted and for judgment on the pleadings.

IV. Discussion
*1. The Threshold Question of the Demand Requirement For A Derivative Action*

Not Reported in A.2d                                                                          Page 4
1999 WL 1044880 (Del.Ch.), 25 Del. J. Corp. L. 1036, 24 Employee Benefits Cas. 1924
**(Cite as: 1999 WL 1044880 (Del.Ch.))**

The defendants argue that the plaintiffs have not met the demand requirements of Delaware law and have not pleaded facts to excuse them from this requirement. Defendants believe this precludes the plaintiffs from pursuing these derivative claims.

When a shareholder of a corporation discovers acts which somehow injure the corporation, Delaware law requires that the shareholder "demand" that the corporation's board of directors examine the injurious acts and pursue legal redress. This is known as the "demand requirement," and its underlying policy is to curb a myriad of individual shareholders from bringing potentially frivolous lawsuits "on behalf of the corporation," which may tie up the corporation's governors in constant litigation and diminish the board's authority to govern the affairs of the corporation. These suits are commonly known as "strike suits." If this Court had to entertain these lawsuits without a threshold barrier like the demand requirement, then the role of the board of directors as the shareholders' chosen arbiter of the corporation's interests, legal and otherwise, could be constantly frustrated.

There are cases, however, where the *board itself* acts causing shareholder complaint. In these cases a question is rightfully raised over whether the board will pursue these claims with 100% allegiance to the corporation, since doing so may require that the board sue *itself* on behalf of the corporation. So in order to balance the desire to discourage strike suits with the need to hold boards of directors accountable, Delaware law provides a basic test to determine whether a plaintiff may bypass the board of directors to pursue the claims for the corporation.

Under this test a plaintiff may be excused from demanding that the directors sue themselves if that plaintiff can demonstrate, through particularized factual allegations, a reasonable doubt that: (1) the board is disinterested and independent; or, (2) the acts complained of were the product of the board's valid exercise of business judgment. [FN7] Once this showing of "demand futility" is made, by fulfilling at least one of the elements of the test, the plaintiff may file a "derivative" action, under Court of Chancery Rule 23.1.

FN7. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984).

Here, plaintiffs did not make demand on the CA board and have argued that making demand would be futile. Plaintiffs first say that enough of the CA board is self-interested to make demand futile, since three of the seven directors are recipients of the allegedly excessive share awards, and three of the remaining four directors are responsible for actually making the allegedly wasteful awards. Second, plaintiffs argue that they have alleged particular facts raising at least a reasonable doubt that the transaction awarding the excess shares was a valid exercise of the board's business judgment by alleging that the share awards far exceed a clear limitation contained in the KESOP.

*5 I need not address whether the CA board is disinterested or independent because I find that the facts alleged raise a reasonable doubt that the share transaction resulted from a valid exercise of business judgment. As a minimum, the plaintiffs have sufficiently alleged facts which, taken as true, show that the CA board violated an express KESOP provision limiting the number of shares they were authorized to award. As I discuss in detail later, the provision is not ambiguous and it is clear from the uncontroverted facts that the number of shares the board actually awarded exceeded its limitation of six million shares. Thus the facts raise doubt that the board's actions resulted from a valid exercise of business judgment.

The defendants raise the issue that the plaintiffs have differing allegations over exactly how many of the shares granted were excess. Defendants say that since the plaintiffs' own allegations here are arguably "arbitrary," they can not lead to reasonable doubt that the awards were an exercise of valid business judgment. I disagree with this argument. In these circumstances, the issue of exactly how many of the awarded shares were excess is secondary to and severable from the primary issue of whether the board exceeded the shareholders' grant of express authority. This ancillary issue of the appropriate number of shares only comes into play after a determination that at least some portion of the 20.25 million share grant exceeded the board's authority. Though the plaintiffs' allegations may differ on this precise point, each plaintiff's core allegation that the board exceeded its authority is still the same.

For immediate purposes here, I find the plaintiffs have sufficiently pleaded facts which cast doubt that the board's alleged acts could be the result of a valid exercise of business judgment. Therefore, demand is excused.

*2. Judgment on the Pleadings/Motion to Dismiss*

Not Reported in A.2d                                                                                    Page 5
1999 WL 1044880 (Del.Ch.), 25 Del. J. Corp. L. 1036, 24 Employee Benefits Cas. 1924
**(Cite as: 1999 WL 1044880 (Del.Ch.))**

Plaintiffs and defendants each move for judgment on the pleadings. Judgment on the pleadings is appropriate where under any set of facts pleaded and drawing all inferences from these facts in favor of the nonmoving party, the moving party would still be entitled to judgment as a matter of law. [FN8] This substantive standard is the same as that of summary judgment, but without the need to look beyond the pleadings, and "is the proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact ... a determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law." [FN9]

> FN8. *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund,* Del.Supr., 624 A.2d 1199 (1993).
>
> FN9. *Cantera v. Marriott Senior Living Services, Inc.,* Del. Ch., C.A. No. 16498, Lamb, V.C., mem. op. at 9 (citing *Pellaton v. Bank of New York,* Del.Supr., 592 A.2d 473, 478 (1991)). *See also SBC Interactive, Inc. v. Corporate Media Partners,* Del.Supr., 714 A.2d 758, 761 (1998).

Similarly, a motion to dismiss for failure to state a claim upon which relief may be granted, under Court of Chancery Rule 12(b)6 requires that under any possible set of facts consistent with the facts alleged in the complaint the plaintiff would still not be entitled to judgment. [FN10] Any conclusory allegations that lack factual basis in the complaint will not survive a motion to dismiss. [FN11] Further, I must accept all well-pleaded facts as true and construe any inferences from these facts in the light most favorable to the non-moving party. [FN12]

> FN10. *Lewis v. Austen,* Del. Ch., C.A. No. 12937, mem. Op. at 4, Jacobs, V.C. (June 2, 1999) ("a plaintiff must allege facts that, taken as true, establish each and every element of a claim upon which relief could be granted.").
>
> FN11. *In re The Walt Disney Company Shareholders' Litigation,* Del. Ch., 731 A.2d 342, 353 (1998).
>
> FN12. *O'Reilly v. Transworld Healthcare, Inc.,* Del. Ch., C.A. No. 16507, mem. op. at 11, Steele, V.C. (August 20, 1999).

**\*6** I find that under the undisputed facts in this case, no matter how favorably I draw factual inferences in favor of the defendants, that plaintiffs have established a prima facie case that the CA board exceeded its authority. The CA board can not justify its clear violation of the express terms of the KESOP nor can it justify the unauthorized share awards under any other legal authority.

The plaintiffs are entitled to a limited judgment on the contract interpretation issue of law raised in the pleadings and, as a result, to equitable relief. However, this case does not warrant any judgment or relief, at this stage, with respect to the plaintiff's money damage claims against the directors. For the reasons explained below, correspondingly the defendants' motions for judgment on the pleadings and/or to dismiss the complaint are denied.

A. Standards for Contract Interpretation

Contract interpretation starts with the terms of the contract. If the terms are plain on their face, then the analysis stops there. [FN13] The "primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract," a process which "often requires a court to engage in an analysis of the intent or shared understanding of the parties" at the time of the contract. [FN14] Under the plain meaning rule of contract construction, if a contract is "clear on its face, the Court should rely solely on the clear literal meaning of the words." [FN15]

> FN13. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* Del.Supr., 702 A.2d 1228, 1232 (1997).
>
> FN14. *Demetree v. Commonwealth Trust Co.,* Del. Ch., C.A. No. 14354, Allen, C., mem. op. at 7 (Aug. 27, 1996).
>
> FN15. *Id.*

One begins to analyze the terms by determining whether provisions are "reasonably subject to more than one interpretation." [FN16] Toward that end, contract language "is not rendered ambiguous simply because the parties in litigation differ concerning its meaning." [FN17] Nor is it rendered ambiguous simply because the parties "do not agree upon its proper construction." [FN18] A contract is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." [FN19]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 6
1999 WL 1044880 (Del.Ch.), 25 Del. J. Corp. L. 1036, 24 Employee Benefits Cas. 1924
**(Cite as: 1999 WL 1044880 (Del.Ch.))**

FN16. *Supermex Trading Co. v. Strategic Solutions Group, Inc.,* Del. Ch., C.A. No. 16183, Lamb, V.C., mem. op. at 7 (May 1, 1998).

FN17. *City Investing Co. Liquidating Trust v. Continental Cas. Co.,* Del.Supr., 624 A.2d 1191, 1198 (1993). *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,* Del.Supr., 616 A.2d 1192, 1196 (1992).

FN18. *Rhone-Poulenc,* Del.Supr., 616 A.2d at 1196; accord *City Investing,* Del.Supr., 624 A.2d at 1198. See Wright, S 2730.1, at 65 ("The mere assertion that ambiguity or divergent intent exists will not prevent summary judgment from being entered.").

FN19. *MHM/LLC, Inc. v. Horizon Mental Health Mgmt, Inc.,* Del. Ch ., C.A. No. 14465, Steele, V.C., mem. op. at 6 (Oct. 3, 1996) ("To be ambiguous, the provision must be capable of being read reasonably to support the different positions."), *aff'd,* Del.Supr., 694 A.2d 844 (1997).

Delaware courts adhere to the "objective" theory of contracts. A contract's "construction should be that which would be understood by an objective reasonable third party." [FN20]

FN20. *Supermex,* Del. Ch., slip op. at 7 (quoting *Demetree v. Commonwealth Trust Co.,* Del. Ch., C.A. No. 14354, Allen, C., slip op. 7 (Aug. 27, 1996)).

Where the parties have entered into an unambiguous integrated written contract, the contract['s] construction should be that which would be understood by an objective reasonable third party.... [I]nquiry into the subjective unexpressed intent or understanding of the individual parties [to the contract] is neither necessary nor appropriate where words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning. [FN21]

FN21. *Demetree v. Commonwealth Trust Co.,* Del. Ch., C.A. No. 14354, slip op. 7-8. *See also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* Del.Supr., 702 A.2d 1228, 1232 (1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so

that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.").

The standards of contract interpretation here are "black letter law" and fully comport with New York contract law, under which the parties agree this Plan arises.

B. Interpreting this KESOP

The Plan here is simply a contract between CA shareholders (which includes plaintiffs), on one hand, and the defendant board of directors (which includes the management Participants), on the other. One party to the contract (plaintiffs) claims that the other party (defendants, some of whom are beneficiaries, some of whom are fiduciaries under the contract) committed a single act (awarding excess shares) in clear violation of a specific provision of the contract (the share ceiling in § 3.1). The accused party answers this claim saying that another provision in the contract (the "Rules and Interpretation" provision in § 6.2) authorized them to act contrary to the limitation in the first provision and that their actions carried out the implied intent of the contract as well as its specific intent declared under § 1.1.

*7 In analyzing the terms of the Plan, I find they are not susceptible to varying interpretations under any reasonable analysis that could lead to the conclusion that the board had the authority to award excess shares over the limitation found in § 3.1. When the language is "clear and unequivocal, a party will be bound by its clear meaning." [FN22] Section 3.1 could not be more clear in limiting the total share grant under the Plan. While § 6.2 gives the board authority to interpret and administer the Plan, I can not find that the board could reasonably ignore a clear six million share limit in order to authorize an award of 20.25 million shares.

FN22. *Abb Flakt, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA.,* Del.Supr., C.A. No. 299, 1998, Walsh, J., slip op. at 11 (June 28, 1999) (citations omitted).

Further, while § 3.3 explicitly permits any stock splits to be reflected when calculating performance targets, *no other provisions or language* explicitly support the proposition that the § 3.1 limit may be contravened or unilaterally adjusted for these same stock splits. The presence of this § 3.3 authorization and the corresponding and conspicuous absence of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

1999 WL 1044880 (Del.Ch.), 25 Del. J. Corp. L. 1036, 24 Employee Benefits Cas. 1924
**(Cite as: 1999 WL 1044880 (Del.Ch.))**

Page 7

provision authorizing alteration of § 3.1 reinforces my conclusion that the Plan's clear language provided *no power* to alter the limitations in § 3.1 based on any stock split criteria.

Finally, § 1.1 does not state objectives that, read along with the board's § 6.2 discretion, justify ignoring the § 3.1 share ceiling in order to achieve these objectives. The basic premise of contract law that "in upholding the intention of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein" requires that I give effect to § 3.1, particularly where doing so does not conflict with the plan's other provisions. [FN23] Those who drafted § 1.1 also wrote § 3. It is simply illogical to say that § 3.1 is inconsistent with the Plan's statement of intent found in § 1.1. I must conclude that § 3.1 and its plain meaning is, in fact, integral to understanding the Plan's intent. It is as much a part of understanding how the drafters and the approving shareholders intended the Plan to operate and the purpose of this Plan as any other particular provision.

> FN23. *E.I. du Pont de Nemours & Co. v. Shell Oil Co.,* Del.Supr., 498 A.2d 1108, 1113 (1985). The meaning of contract provisions should be "interpreted using standard rules of contract interpretation which require a court to determine, from the language of the contract, the intent of the parties. In discerning the intent of the parties, the [contract] should be read as a whole and, if possible, interpreted to reconcile all of the provisions of the document." *Kaiser Aluminum Corp. v. Matheson,* Del.Supr., 681 A.2d 392, 395 (1996).

As a practical matter, my rough calculations indicate that even under the strictest reading of the Plan, the three Participants will together still receive nearly $320 million. $320 million is no mere bagatelle. I find it remarkable that defendants would have me believe that CA's shareholders would consider that $320 million for three individuals failed to "encourage, recognize, and reward sustained outstanding individual performance by certain key employees." [FN24]

> FN24. § 1.1 of the KESOP.

Thus, given, (1) a clear, unambiguous contract provision; (2) two other contract provisions subject to interpretation; (3) no facial inconsistency between the three provisions; (4) a single act that clearly violates the unambiguous provision; and, (5) the fact that the sole justification for the act complained of lies in the two provisions that are subject to interpretation, I find that the relevant law weighs against the use of an interpretable provision to materially disregard another provision that could not be clearer on its face. Applying this analysis to the facts, I find that the Committee awarded the 20.25 million shares in clear violation of § 3 .1, and without any legal justification under the Plan.

**\*8** The defendants make no attempt to find support for their actions under other sources of director power: the CA corporate charter, any CA by-laws, the Delaware General Corporation Act, or the Delaware corporate common law. It is appropriate, nonetheless, to address several of their specific justifications for their view of § 3.1.
> (1) Murky "Intent" to Award 3.75% Equity or $1.08 Billion in Shares

The defendants justify their award of more shares than expressly permitted in § 3.1 by arguing that it carries out the "fundamental and unambiguous" intent to award the Participants 3.75% of the company's equity or about $1.08 billion worth of stock, once the relevant performance goals are reached. [FN25] I find the defendants' argument that their construction of the Plan is "unambiguous" to be unsupported by the reality of the Plan's clear terms and, more importantly, by the fact that their result can only be reached by patently violating an express term of the Plan.

> FN25. Defendants' Reply Brief in Support of Defendants' Motions and In Opposition to Both Plaintiffs' Motions at 1.

The defendants admit that they never explained this "unambiguous" intent to the shareholders when seeking approval for the Plan. Further, nothing in the documents I have reviewed shows that this was the case, though it seems it would have been simple enough for the Plan's proponents to describe this "fundamental" feature of the Plan, either in the text of the Plan itself, or, at minimum, in the proxy materials. If the defendant board members believed that at the time they formulated the Plan that its clear and fundamental intent was to award 3.75% equity/$1.08 billion in shares, they have not adequately explained why they did not write a Plan that clearly stated and expressly provided for this result.

Instead, defendants answer by citing authority for the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 8
1999 WL 1044880 (Del.Ch.), 25 Del. J. Corp. L. 1036, 24 Employee Benefits Cas. 1924
**(Cite as: 1999 WL 1044880 (Del.Ch.))**

proposition that they did not need to include such a "fundamental and unambiguous" feature of the Plan in clear language because not every single detail of a plan must be spelled out to shareholders. They argue that shareholders should be able to infer this unstated intent by simply reading the Plan's terms together. They say shareholders are capable of making math calculations that arrive at the above result, without needing it explicitly stated. However, the authorities cited were cases in which the information that was not explicitly conveyed was so obvious that those courts rejected the overly-literal reading the parties had given to the language (such as construing the phrase "an option" as limiting the awardee to one, single option).

Defendants' argument that shareholders could do simple math to arrive at their result takes an over-simplistic, narrow, and self-serving view of what shareholders might conclude from reading the Plan. Many shareholders might have taken at face value the clear provision limiting the award total to six million shares, particularly in the absence of any explicit modifiers accounting for the share price at the time of the award or at the time of intervening stock splits. In making this argument, defendants give absolutely no credence to the possibility that many shareholders (just like plaintiff shareholders here assert) might simply have read the Plan at face value without gleaning the purported underlying, unstated, "fundamental" economic intent. A disguised intent, not immediately obvious in the language of the contract and requiring a tortured construction of its terms, can not overcome plain, unambiguous language.

*9 I find the Plan's language straightforward enough that only the plaintiffs' reading can be plausible, and the defendants' reading, at best, distorts the Plan's plain language. The defendants' assertion that the express six million share limit means nothing if it does not result in the Participants getting $1.08 billion worth of stock defies any interpretation of the Plan consistent with the common meaning of its terms and the view of any reasonable person in the position of either party.

Further, since the board, as the corporate governing body, considered and approved the Plan long before it reached the shareholders, I will not give them the after-the-fact benefit of their own failure to make their view of the Plan's intent plain to the shareholders. If the board truly intended the shareholders to know that the Plan could result in an award of as much as 3.75% of the equity of the

company or $1.08 billion in shares regardless of how many shares needed to be awarded to reach this result, I find it remarkable that neither the board's presentation of the plan to shareholders, the unambiguous terms of the plan, nor any reasonable reading of the Plan as a whole makes that intent clear.

(2) Section 6.2 Does Not Give Defendants Broad Discretion to Interpret and Administer the Plan so they May Adjust the § 3.1 Ceiling For Stock Splits

The defendants argue that the purpose of the Plan, stated in § 1.1, and the shareholders' intent in enacting the Plan are both thwarted by a strict reading of the Plan's terms. They say that § 6.2 gives the Compensation Committee broad authority to interpret and administer the Plan to carry out its objectives, and allows them to disregard an express provision where that provision is inconsistent with the Plan's objectives. Thus they argue that they may adjust the § 3.1 ceiling to incorporate the stock splits into the final award under the Plan.

I conclude that § 6.2 is not so explicit that it can be used as a source of power for the board to alter the terms of the Plan itself. Interpreting the Plan in order to administer it properly is one thing, fundamentally altering its substantive terms is quite another. More than a loosely worded clause implying flexibility to carry out the logistics of administration must be present. Though I do not think it necessary to look beyond the four corners of the Plan to find that § 6.2 does not empower the board to alter the Plan's terms, I nevertheless find it quite illuminating that other CA stock plans instituted by this very board contain clear, express provisions that empower the board to adjust the grants of shares to account for stock splits. [FN26]

FN26. *See* Exhs. C, D, E, F of the Complaint.

One must recognize that the board had every opportunity and the ability to insert a similar provision in this KESOP. Past practice showed that where the board wanted such authority and the shareholders have been asked to grant it, that after being fully informed of the consequences, they have approved similar provisions. Further, the board's fiduciary role as arbiter of the processes by which all of these plans came about only reinforces my view that they must be held to the plain, unambiguous limitation found in § 3.1. I can not accept that either the board or the shareholders believed that the six million share ceiling, which is literally the first substantive clause of the Plan, is superfluous and can

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1999 WL 1044880 (Del.Ch.), 25 Del. J. Corp. L. 1036, 24 Employee Benefits Cas. 1924
**(Cite as: 1999 WL 1044880 (Del.Ch.))**

be ignored by an exercise of board discretion. The board's role, at most, under § 6.2 is ministerial in nature and does not permit them to alter materially the numerical limit (the share ceiling). Section 6.2 can not justify altering § 3.1 under any reasonable interpretation of the Plan, particularly given the existence of other plans that show the board and shareholders knew how to authorize this type of material alteration when they so desired.

C. Defendants' Motion to Dismiss

*10 For a waste claim to survive a motion to dismiss, the plaintiff must allege facts sufficient to show that the corporation received no consideration for the transferred asset. The standard is stringent and requires that no person of ordinary business judgment would conclude that the deal was fair to the corporation. It is my view that the alleged acts, drawing all inferences in plaintiffs' favor, raise sufficient question about the appropriateness of the share grants to state a claim of breach of fiduciary duty and for this Court to deny the defendants' motion to dismiss. Decidedly, the characterization of the claim as one for "waste" or for unjust enrichment can not be the focus of analysis. Having concluded as a matter of law that the Board exceeded its authority, the alleged acts clearly call into question whether the transaction as consummated could have benefited CA and whether the breach of fiduciary duty caused corporate officers to be unjustly enriched.

It is, of course, fundamental that a fiduciary who breaches his duty is liable for *any loss* suffered by the beneficiary of his trust ... [and] any profit made through the breach of trust may be disgorged through the device of constructive trust. [FN27]

> FN27. *Thorpe v. Cerbco,* Del. Ch., C.A. No. 11713, mem op. at 24, Allen, C. (Oct. 29, 1993), *quoted in* DONALD J. WOLFE & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 12-7(b) (1998).

It seems to me that just as in the corporate opportunity context, a share grant in excess of that authorized by a KESOP calls the mechanism of the constructive trust into play as an effective remedial measure. [FN28] This case presents an interesting but complicating twist in that certain management executives, who also served in a fiduciary capacity, received a benefit wrongfully and unfairly conferred upon them by directors who also served as fiduciaries but who did not receive the benefit. At this stage of

the proceedings, it is clear that plaintiffs are entitled to judgment on the pleadings that the directors wrongfully authorized the award and that the director executives who received the award must disgorge the benefit received in order to avoid being unjustly enriched.

> FN28. *See Guth v. Loft, Inc.,* Del.Supr., 5A 2d 503, 510 (1939).

What remains unclear, subject to further proof and incapable of resolution at this stage of the proceedings, is the nature of the breach of fiduciary duty giving rise to the imposition of a constructive trust in order to redress the unjust enrichment. The claims for money damages relating back to the date of approval or issuance of the unfair share grants implicates the fundamental nature of the breach of fiduciary duty giving rise to the imposition of a constructive trust. A constructive trustee (here, the management executives/directors who received the improper share grants) may face personal liability for monetary damages if they are necessary to make the shareholders whole. The directors authorizing the share grants face damage claims, yet to be proved, for which they may be liable or from which, depending upon the proof of the nature of their conduct, they may be exculpated.

As stated above, I have only ruled as a matter of law that the board exceeded its authority. I draw no conclusion whether these acts were breaches of the duty of care or duty of loyalty or whether they resulted from negligent or grossly negligent conduct. At this stage, I can only conclude that the plaintiffs have sufficiently stated their claims.

D. Exculpatory Provisions Shielding the Directors

*11 The defendants invoke exculpatory provisions from the CA corporate charter and § 7.3 of the KESOP, promulgated pursuant to § 102(b)7 of the DGCA, to shield them from personal liability for any damage claims brought against them for violation of their duty of care. [FN29] The Delaware Supreme Court's decision in *Emerald Partners v. Berlin* instructs this Court that the use of exculpatory provisions to shield fiduciaries from personal liability presents an affirmative defense not amenable to pre-trial disposition. [FN30] However, where the *only* alleged acts are breaches of the duty of care, then this Court may consider the defense for the purpose of pre-trial disposition. [FN31] Because the nature of the defendants' breach of fiduciary duty remains unclear at this time, I may not now properly consider

Not Reported in A.2d

1999 WL 1044880 (Del.Ch.), 25 Del. J. Corp. L. 1036, 24 Employee Benefits Cas. 1924

**(Cite as: 1999 WL 1044880 (Del.Ch.))**

exculpatory provisions. The defendants will have the opportunity to present their affirmative defense as the case progresses. At this stage of the proceedings, I can not conclude as a matter of law that the Board acted in good faith and that their actions constituted no more than mere carelessness.

> FN29. "*No Individual Liability.* No member of the Committee or the Board, or any officer of the Company, shall be liable for any determination, decision, or action made in good faith with respect to the Plan or any award under the Plan." § 7.3 of the KESOP.

> FN30. *Emerald Partners v. Berlin,* Del.Supr., C.A. No. 393, 1998, Walsh, J., slip op. at 16, (March 16, 1999).

> FN31. *Id.*

*3. Only a Limited Judgment Is Possible At This Stage*

Since at this stage it is only clear to me as a matter of law that the Plan does not authorize the defendants to award 20.25 million shares, I am only able to enter a limited order granting partial judgment on the pleadings. Sanders alleges an improper award of 9.5 million shares, while Bickel alleges an improper award of 14.25 million shares. As I understand the Plan, the share grants take place in two stages: first, an initial 2 million share grant occurs immediately upon the Plan's adoption, and second, the board may award up to 4 million shares in "Additional Grants," based on share price performance.

It is clear from this that when the shareholders' approved the Plan in August 1995 the Plan *immediately* granted 2 million shares to the Participants. Based on this, it is my opinion that any dividends on CA common stock after this date should rightfully accrue to these awarded shares, even though these shares might not have been vested at the time granted. I believe this arrangement is analogous to an escrow, by which funds are held in an interest bearing account, but not fully accessible to the recipient until a specified condition occurs. Even though the recipient can not access the funds prior to that condition being met, they still receive the benefit of any interest that accrues on the funds in the meantime. In short, what would be the point of "granting" two million shares to the Participants if this "conditional ownership" denies them any of the additional pecuniary benefits flowing from these shares?

Therefore, the 4.75 million shares awarded after the Plan's adoption as dividends on the initial grant are not "Additional Grants" under the Plan; and, thus, do not violate the 4 million share limit on additional grants. These 4.75 million shares are simply stock dividends based upon shares *already properly granted.*

*12 Conversely, the same is not true of the additional share grant of four million shares in May, 1998. This additional grant happened *after* these stock dividends were declared. As explained in the analysis of the contract terms above, there is no authority in the Plan for retroactive adjustments for share dividends/stock splits. Thus, the 9.5 million share grant that purportedly adjusted the 4 million share grant for the dividend/stock splits is invalid.

The board had authority to grant only 10.75 million of the 20.25 million shares granted. Therefore, I can enter judgment on the pleadings that plaintiffs are entitled to cancellation or rescission of the 9.5 million shares issued to the defendants Wang, Kumar, and Artzt. Further, they are entitled to an order imposing a constructive trust in favor of CA over Wang, Kumar and Artzt and an accounting for any profits or benefits directly traceable to these 9.5 million shares.

*4. Policy*

No doubt the strict construction of the KESOP will suggest to some that this Court may not be aware of the tension that exists, particularly in growth-oriented (often technology) companies, between shareholder dilution that may result from aggressively expanding management stock compensation plans and the need to use those plans to attract and maintain skilled management. That is, of course, not correct. Often growth companies must attract and retain the best managers by awarding these executives enhanced equity positions since high-end cash salaries and other compensation may not be economically feasible.

It is certainly the province of shareholders, by way of their franchise, to compensate their executives as lavishly as they deem necessary to ensure the growth and prosperity of their company. However, with the shareholder franchise often quite dispersed, it is critical as a matter of governance policy that this Court ensure that these compensation plans when approved by shareholders are administered in strict accordance with the terms of the Plan and as the shareholders had the right to anticipate.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 11
1999 WL 1044880 (Del.Ch.), 25 Del. J. Corp. L. 1036, 24 Employee Benefits Cas. 1924
**(Cite as: 1999 WL 1044880 (Del.Ch.))**

I am mindful of the understandable arguments put forth by defendants' counsel that strict adherence to the facial terms of the Plan here could have the effect of penalizing the CA executives despite the dividends resulting from their efforts to maximize shareholder value. However no court can blind itself to the reality that: (1) the limitation clause here plainly and unambiguously sets a ceiling for the share grants; and, (2) other shareholder approved CA plans explicitly authorize the board to adjust the grants, while this one plainly does not. The "penalized" executives sit on the CA board which knew that it was free to present shareholders with a KESOP that included a recapitalization adjustment provision and free to seek shareholder approval of an amendment of the terms of the KESOP if they believed it to be deficient in achieving the Plan's objectives. They did neither. The history of this very company shows that a fully informed, rational shareholder electorate could be persuaded to grant the board broad explicit discretionary authority to adjust share grant ceilings if management achieved measurable economic benefits for the shareholders. Given the clear record here that no such shareholder endorsement sanctioned these particular grants, the results of these plaintiffs' challenge should be unsurprising.

### V. Conclusion

**\*13** The defendants exceeded their authority under the KESOP by awarding 9.5 million excess shares to the Participants. The plaintiffs are granted partial judgment on the pleadings in that I order these shares returned to the corporation and a constructive trust imposed on the defendant Participants and an accounting rendered for any economic benefit derived from these shares.

The defendants properly transferred 4.75 million shares (outside of the Plan's six million share limit) to the Participants as stock dividends on shares that the defendants had already granted. As a result, I grant the defendants partial judgment on the pleadings.

The defendants' motion to dismiss plaintiffs' claims are denied.

All other motions of the parties are denied.

Plaintiffs' counsel are to submit an order, approved as to form, consistent with this Memorandum Opinion.

1999 WL 1044880 (Del.Ch.), 25 Del. J. Corp. L. 1036, 24 Employee Benefits Cas. 1924

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.