**TAB 10**

LEXSEE 2000 U.S. DIST. LEXIS 13550

## IN RE: TRUMP HOTELS SHAREHOLDER DERIVATIVE LITIGATION

### 96 Civ. 7820 (DAB), 96 Civ. 8527 (DAB)

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2000 U.S. Dist. LEXIS 13550*

**September 21, 2000, Decided**
**September 21, 2000, Filed**

**DISPOSITION:** [*1] Defendants' motions to dismiss Plaintiffs' Complaint GRANTED in part and DENIED in part. Plaintiffs' motion for leave to amend the Complaint GRANTED.

## CASE SUMMARY:

**PROCEDURAL POSTURE:** In stockholders' derivative action, stockholders of casino brought this action against the individual members of casino's board of directors and other corporate entities controlled and/or owned by defendant owner and against the board's financial advisor for violations of § 14(a) of the Securities Exchange Act, breach of contract, breach of fiduciary duties, negligent misrepresentation, and waste. Defendants moved to dismiss the complaint.

**OVERVIEW:** In stockholders' derivative action, plaintiff stockholders of casino brought this action against the individual members of casino's board of directors and other corporate entities and against the board's financial advisor for violations of § 14(a) of the Securities Exchange Act, breach of contract, breach of fiduciary duties, negligent misrepresentation, and waste. Defendants moved to dismiss plaintiffs' derivative complaint for failure to make a demand on the Board and failure to state a claim. The court concluded that plaintiffs had sufficiently alleged the futility of demand upon the board with respect to their claims against defendant casino, directors, and financial advisor. With respect to the claims against defendant casino and directors, the court granted the motion to dismiss as to the claim of waste for expenses related to a certain transaction. In addition, the motion to dismiss the direct

fiduciary claims as against defendant casino was granted. The remainder of defendants' motion to dismiss was denied.

**OUTCOME:** Court granted defendants' motion to dismiss as to the claim of waste. In addition, the motion to dismiss the direct fiduciary claims as against defendant casino was granted. The remainder of defendants' motion to dismiss was denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN1] Fed. R. Civ. P. 15(a) provides that leave to amend shall be freely given when justice so requires. In the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. - leave to amend should be granted.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN2] On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff. The district court should grant such a motion only if, after viewing the plaintiff's allegations in this most favorable light, it appears beyond doubt that the plaintiff can prove no set

2000 U.S. Dist. LEXIS 13550, *

of facts in support of his claim which would entitle him to relief.

*Civil Procedure > Pleading & Practice > Pleadings*
[HN3] See Fed. R. Civ. P. 23.1.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN4] Unlike a claim brought by a plaintiff on his own behalf to enforce a right he personally possesses, a derivative claim is brought on behalf of a corporation to remedy an injury suffered by the corporation. It is, therefore, the corporation and not the shareholder plaintiff who is the real plaintiff.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN5] Since claims asserted in a shareholder derivative suit belong to the corporation, it is incumbent upon the shareholder plaintiff to make a demand upon the corporation's board of directors prior to commencing the action. This requirement stems from the well-settled principle that directors, rather than shareholders, manage the affairs of the corporation and the decision to bring or not to bring a lawsuit on behalf of a corporation is a decision concerning the management of the corporation. Therefore, a motion to dismiss for failure to make a demand is not intended to test the legal sufficiency of the plaintiff's substantive claim. Rather its purpose is to determine who is entitled, as between the corporation and its shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf.

*Civil Procedure > Pleading & Practice > Pleadings*
[HN6] Fed. R. Civ. P. 23.1 is a pleading rule, requiring the plaintiff to plead with particularity the claimed basis for excusing the demand requirement. The substantive aspect of demand futility is governed by applicable state law, and thus determinations of when demand will be excused are evaluated according to the law of the state in which the company is incorporated.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN7] Under the well-settled rule, demand will be excused if a reasonable doubt is created that: (1) the directors were disinterested and independent or; (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN8] The Delaware Supreme Court has not defined what degree of factual specificity is required to establish reasonable doubt sufficient to excuse a demand; however, particularized facts are required, thus the pleading requirements are more stringent than they would be on a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN9] To establish lack of independence, a plaintiff meets his burden by showing that the directors are either beholden to the controlling shareholder or so under its influence that their discretion is sterilized.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
[HN10] From a practical perspective, the confluence of voting control with directorial and official decision making authority is itself quite consistent with control of the board. Delaware courts have found substantial minority interests, ranging from 20 percent to 40 percent sufficient to grant the holder working control.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN11] The question of independence flows from an analysis of the factual allegations pertaining to the influences upon corporate directors' performance of their duties generally, and more specifically in respect to the challenged transaction.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN12] To establish demand futility based on lack of independence, plaintiffs must raise a reasonable doubt that a majority of the directors were interested or controlled.

***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
[HN13] The ability of controlling officers to affect the compensation or influence of a director is one factor that may support a finding of reasonable doubt.

***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
[HN14] Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.

***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
[HN15] Allegations which raise a reasonable doubt as to whether a transaction constitutes a waste of corporate assets in turn create a reasonable doubt that the transaction was the product of a valid exercise of business judgment.

***Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Scope & Jurisdiction***
***Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations***
[HN16] It is well settled law that a § 14(a) of the Securities Exchange Act claim may be brought directly or derivatively.

***Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations***
[HN17] Pre-suit demand is essential where the acts of third parties are at issue because the demand requirement draws the attention of the board to its managerial duties where it may not have previously considered action.

***Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations***
***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
[HN18] Where the subject of the derivative suit concerns breach by a third party, it is appropriate to examine whether the board can impartially consider the merits of the demand without being influenced by improper considerations; whether the board could properly exercise its independent and disinterested business judgment in responding to the demand.

***Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Proxies***
[HN19] Federal proxy rules apply to all companies with securities registered under § 12 of the Securities Exchange Act of 1934.

***Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Proxies***
[HN20] Section 14(a) of the federal proxy rules provides that it is unlawful to solicit a proxy contrary to rules established by the Securities and Exchange Commission.

***Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Proxies***
[HN21] To state a claim under § 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 of the federal proxy rules, a shareholder must allege that (1) his proxy was solicited for authorization of a corporate action; and (2) the proxy solicitation was materially false or misleading. Material information is information that, if disclosed in a proxy statement, would likely be viewed by a reasonable investor as having significantly altered the total mix of information made available. An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote, even if it would not have changed the investor's decision on whether to consummate the transaction.

***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
[HN22] Self-dealing presents opportunities for abuse of a corporate position of trust; the circumstances surrounding corporate transactions in which directors have a personal interest are directly relevant to a determination of whether they are qualified to exercise stewardship of the company. Thus, related transactions, defined, inter alia, as transactions between directors or board nominees and their corporations, are matters explicitly addressed by the Securities and Exchange Commission disclosure regulations.

***Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Proxies***
[HN23] Securities and Exchange Commission regulations require that an election proxy include disclosure of any recent or currently proposed transaction whose value exceeds $ 60,000 involving a director or board nominee and the corporation. 17 C.F.R. § 229.404 (Item 404). While the United States Court of Appeals for the Second Circuit has made clear that compliance with Schedule 14A does not necessarily guarantee that a proxy statement satisfies Rule 14a-9(a)

of the federal proxy rules, the regulation does provide us with the commission's expert view of the types of involvement that are most likely to be matters of concern to shareholders in a proxy contest.

*Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Proxies*
[HN24] When related transactions are involved, even incomplete but "currently proposed" transactions must be disclosed. 17 C.F.R. § 229.404a (Item 404).

*Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Proxies*
[HN25] When a shareholder challenges the solicitation of proxies for the election of directors to a term now complete, courts addressing the question of mootness have looked to the nature of the relief sought.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN26] Under Delaware law, a director who assumes office pursuant to an irregular election achieves only de facto status which may be successfully attacked by the stockholders. Where stockholders challenge officer conduct not primarily involving third parties, courts may void those actions.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN27] The "Duty of Candor" is the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action. This duty of disclosure is based on the materiality standard advanced by the court in TSC Industries: directors must disclose all facts which, under all the circumstances, would have assumed actual significance in the deliberations of the reasonable shareholder.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN28] Directors are bound to protect the interests of the corporation through exercise of the duties of due care, good faith, and loyalty. This obligation has been described as a duty not only affirmatively to protect the interests of the corporation committed to an officer's charge, but also to refrain from doing anything that would work injury to the corporation.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN29] A vote by the fully-informed shareholders ratifies a challenged transaction and extinguishes any claim that a disinterested director breached his duty of care in connection with it.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN30] In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint. If a judge looks to additional materials, the motion should be converted into a motion for summary judgment. Unless a nonmovant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment, a court must ordinarily give notice and an opportunity to respond before converting a motion to one for summary judgment.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN31] Del Code Ann. tit. 8, § 102(b)(7) allows a corporation to limit or eliminate directors' liability for monetary damages for breach of fiduciary duty by including an exculpatory provision in its certificate of incorporation. However, the statute is strictly limited, prohibiting indemnification for any breach of the director's duty of loyalty to the corporation or its stockholders, for acts or omissions not in good faith or involving intentional misconduct or for any transaction for which the director derived an improper personal benefit. Del. Code Ann. tit. 8, § 102(b)(7).

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Shareholder Duties & Liabilities*
[HN32] A shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation.

*Business & Corporate Entities > Agency > Agents Distinguished > Fiduciary Relationships*
[HN33] Delaware courts have consistently rejected the notion of fiduciary duties for third parties.

2000 U.S. Dist. LEXIS 13550, *

*Business & Corporate Entities > Agency > Causes of Action & Remedies > Breach of Fiduciary Responsibility*
[HN34] Delaware courts have permitted third party fiduciary duty claims to proceed for aiding and abetting a parent company's breach of fiduciary duties.

*Business & Corporate Entities > Agency > Causes of Action & Remedies > Breach of Fiduciary Responsibility*
[HN35] To state a claim for aiding and abetting breach of fiduciary duties, a plaintiff must allege (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendant.

*Business & Corporate Entities > Agency > Causes of Action & Remedies*
[HN36] The judicial standard for determination of corporate waste entails an exchange of corporate asset for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. If, however, there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude ex post that the transaction was unreasonably risky.

**COUNSEL:** Melvyn I. Weiss, Steven G. Schulman, Janine L. Pollack, Of Counsel, MILBERG WEISS BERSHAD HYNES & LERACH LLP, Robert I. Harwood, Jeffrey M. Haber, Of Counsel, WECHSLER HARWOOD HALEBIAN & FEFFER LLP, Jules Brody, Mark Levine, Of Counsel, STULL, STULL & BRODY, New York, New York, FOR PLAINTIFF.

Shari L. Steinberg, Of Counsel, SHEREFF, FRIEDMAN, HOFFMAN & GOODMAN, LLP, New York, New York, FOR DONALD J. TRUMP AND NICHOLAS L. RIBIS, DEFENDANTS.

Richard L. Posen, Thomas H. Golden, Annette Haselhoff, Of Counsel, WILLKIE FARR & GALLAGHER, New York, New York, FOR TRUMP'S CASTLE ASSOCIATES, TC/GP, INC., TRUMP'S CASINO, INC., WALLACE B. ASKINS, DON M. THOMAS AND PETER M. RYAN; AND NOMINAL DEFENDANTS TRUMP HOTELS & CASINO RESORTS, INC. AND TRUMP HOTELS & CASINO RESORTS HOLDINGS, L.P., DEFENDANTS.

Frederick A. O. Schwarz, Jr., David A Stoll, Of Counsel, CRAVATH, SWAINE & MOORE, New York, New

York, FOR SALOMON BROTHERS, INC., DEFENDANT.

**JUDGES:** DEBORAH A. BATTS, United States District Judge.

**OPINIONBY:** DEBORAH A. BATTS

**OPINION:**

OPINION and ORDER [*2]

DEBORAH A. BATTS, United States District Judge.

This is a stockholders' derivative action brought by stockholders of Trump Hotels & Casino Resorts, Inc. ("THCR"), against the individual members of THCR's Board of Directors and other corporate entities controlled and/or owned by Defendant Donald J. Trump, and against the Board's financial advisor, Salomon Brothers, Inc. In short, Plaintiffs claim violations of § 14(a) of the Securities Exchange Act, breach of contract, breach of fiduciary duties, negligent misrepresentation and waste.

Defendants move to dismiss Plaintiffs' Third Consolidated Amended Stockholders' Derivative Complaint for failure to make a demand on the Board and failure to state a claim. Plaintiffs cross-move for leave to amend the Complaint. For the reasons stated below, Defendants' motions to dismiss Plaintiffs' Complaint are GRANTED in part and DENIED in part. Plaintiffs' motion for leave to amend the Complaint is GRANTED.

I. PROCEDURAL BACKGROUND

This derivative action was commenced upon the filing of two separate actions in federal court, which were later consolidated under the above caption. Pursuant to a stipulated Pretrial Order, Plaintiffs filed a [*3] consolidated Complaint on January 17, 1997. Plaintiffs later amended their consolidated Complaint to address ongoing conduct. Then, due to unanticipated events, Plaintiffs filed another Amended Complaint, withdrawing the allegations previously added. This latest Complaint, Plaintiffs' Third Consolidated Amended Derivative Complaint, filed June 26, 1997, is the subject of the instant motions.

By a letter brief of April 2, 1998, Plaintiffs sought leave of Court to amend the Third Consolidated Amended Derivative Complaint in order to add two demand-related sub-paragraphs. See Weiss Ltr. of April 2, 1998 ("Pls.' Ltr."). Plaintiffs attached the proposed amendment, designated as new paragraphs 43(i) and 43(j), as "Exhibit A." See id. at Ex. A. Defendants Salomon Brothers and Trump's Castle Associates, et al. opposed Plaintiffs' request both procedurally and

substantively in letter briefs dated April 6, 1998 and April 9, 1998, respectively. See Schwarz Ltr. of April 6, 1998 ("Salomon Ltr.") and Posen Ltr. of April 9, 1998 ("Trump Ltr.").

[HN1] *Fed. R. Civ. P. 15(a)* provides that "leave [to amend] shall be freely given when justice so requires." "In the absence of any apparent or [*4] declared reason - such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be granted. *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962); State Teachers Retirement Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981).*

Plaintiffs argue that the proposed paragraphs, 43(i) and 43(j), provide substantive factual allegations relevant to the "pivotal threshold determination" of excuse from pre-suit demand. See Pls.' Ltr. at 2 (citing *Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984))*. Plaintiffs must allege the futility of pre-suit demand with particularized facts if the litigation is to proceed. See *Grobow v. Perot, 526 A.2d 914, 920 (Del. Ch. 1987)*, overruled on other grounds by *Brehm v. Eisner, 746 A.2d 244 (Del. 2000)* (modifying the standard of appellate review).

Plaintiffs claim the information contained in the proposed amendments was recently uncovered [*5] by Plaintiffs' counsel. See Pls.' Ltr. at 2. Defendants dispute this allegation and claim that the information contained in the amendments was previously available. See Salomon Ltr. at 1, n.1; Trump Ltr. at 1. Defendants further argue that the motion to amend is untimely, as it came several months after the completion of briefing of the motion to dismiss. Finally, Defendants argue that the amendment is futile as even the proposed Amended Complaint will not withstand the 12(b)(6) motions. See Salomon Ltr. at 1; Trump Ltr. at 1-3.

As Plaintiffs assert the information in the proposed amendment was recently discovered, the Court finds there was no undue delay in incorporating this new information in the Complaint. The Court finds no assertions or evidence of bad faith or dilatory motive. If, as the Defendants assert, the new information was readily available, the Court concludes the Defendants will be neither unfairly surprised nor unduly prejudiced by the proposed addition of the information. To underscore the lack of prejudice to any Defendants, the Court notes that the proposed amendment adds no new legal claims.

In the interest of all parties in a fair and speedy resolution [*6] of this case, Plaintiffs' motion for leave to amend the complaint is GRANTED. The Third

Consolidated Amended Derivative Complaint is hereby deemed to incorporate paragraphs 43(i) and 43(j). See Pls' Ltr. at Ex. A. Plaintiffs shall file the proposed Amended Complaint with the Clerk of the Court and serve all parties.

For the purpose of judicial efficiency, the Court deems both motions to dismiss to be directed toward the Third Consolidated Amended Derivative Complaint as amended by incorporation of proposed paragraphs 43(i) and 43(j).

## II. BACKGROUND

Plaintiffs' claim centers around the sale of Trump's Castle, a casino owned by Donald Trump, to the corporation in which Plaintiffs hold stock. n1 Plaintiffs allege that in a self-serving stock transaction, Trump sold the casino in order to dispose of a losing business and escape all the attendant risks of default on the large debt held by the casino's parent company.

> n1 The factual allegations set forth and considered herein are taken from Plaintiffs' Third Consolidated Amended Stockholders' Derivative Complaint and proposed paragraphs 43(i)-(j) of Plaintiffs' proposed Fourth Consolidated Amended Stockholders' Derivative Complaint (hereinafter referred to as the "Complaint"). See Pls.' Ltr. April 2, 1998, Ex. A. The facts as stated are presumed to be true for the purpose of deciding the instant motion to dismiss.

[*7]

Plaintiffs are shareholders in THCR, a holding company with no independent operations. (Compl. P 19(a).) THCR's principal asset is a general partnership interest in THCR Holdings. (Id. P 19(a).) THCR Holdings has no independent business operations and operates through wholly-owned subsidiaries which, in turn, own and operate the Trump Plaza Hotel and Casino, the Trump Taj Mahal Resort and the Indiana Riverboat Casino. (Id. P 20(b).) Defendant Donald J. Trump ("Trump") and entities he owns or controls are limited partners of THCR Holdings. (Id. P 20(a).)

Trump is the Chairman of the THCR Board of Directors. (Id. P 22(a).) As of May 7, 1996, of the 1000 shares of THCR Class B common stock, Trump held 800 shares individually and held the remaining 200 shares through the wholly owned entity Trump Casino, Inc. (Id. PP 19(c),22(c).) Prior to the events alleged herein, Trump's beneficial ownership of all of the Class B stock gave him 25.08% of the voting power of THCR. (Id. P 22.)

Trump's Castle is a casino hotel resort located in the Marina District of Atlantic City, New Jersey. (Id. PP 45-46.) Prior to its sale, Trump owned 61.5% of Castle Associates, the [*8] parent company that owned and operated Trump's Castle. (Id. PP 22(b), 23(a).) Trump owned an additional 37.5% interest in Castle Associates through his wholly-owned corporation TC/GP, Inc.. (Id. P 24.) Trump, as well as Trump's Castle Associates, TC/GP, Inc., Trump's Castle Hotel & Casino, Inc., Trump Casino (collectively the "Trump-related Defendants"), entities owned or controlled by Trump, are named as Defendants. (Id. PP 22-26.)

Trump's Castle has lost money for the past several years, and by the end of 1995 the total accumulated deficit of the Castle Associates' operations was $ 67,582,000. (Id. P 46.) Castle Associates' financial situation continued to be poor in 1996, and the casino reported the biggest drop in gross gaming revenue of any of the Atlantic City casinos. (Id. P 50.) In addition, Castle Associates faced increasing competition from Mirage Resorts, Inc., which planned to develop a large casino resort complex in the Marina District. (Id. P 52)

On or about May 10, 1996, THCR issued a proxy statement (the "May 1996 Proxy Statement") to Plaintiffs and all stockholders of THCR. (Id. P 57.) The May 1996 Proxy Statement was silent as to the [*9] possibility of a transaction between Castle Associates and THCR, although Plaintiffs contend that such a transaction was already being planned. (Id. P 57.) This proxy statement solicited the votes for, among other things, the election of Trump and Defendants Nicholas A. Ribis ("Ribis"), Wallace B. Askins ("Askins"), Don M. Thomas ("Thomas"), and Peter M. Ryan ("Ryan") (collectively, the "Director Defendants") to THCR's Board. (Id. PP 30-34,59.) On June 12, 1996, all four Director Defendants and Trump were re-elected to THCR's Board. (Id. P 63.)

Prior to the election, on May 21, 1996, THCR publicly announced that THCR Holdings had purchased approximately $ 59.3 million, or 90%, of Castle Associates' Pay-In-Kind (PIK) notes for $ 38.7 million. (Id. P 60(a).) In exchange, THCR entered into an agreement with Castle Associates and Trump, which granted THCR Holdings a six-month exclusive right to negotiate with Castle Associates and Trump with respect to the acquisition of Trump's Castle by THCR. (Id. P 60(b).) Plaintiffs allege that there was no valid business purpose for the purchase of the PIK notes. (Id. P 61(a).)

By May 28, 1996, the Board formed a Special [*10] Committee to discuss a potential acquisition of Castle Associates by THCR. (Id. P 62.) The Committee planned to retain Defendant Salomon Brothers as financial advisors for the transaction. (Id. P 62.) On June 13, 1996, the day after the board election, counsel for Trump

delivered to counsel for the Special Committee a formal proposal to sell Castle Associates to THCR for $ 600 million, including the assumption of debt. (Id. P 64.) On June 24, 1996, a deal was struck: THCR was to acquire Castle Associates, including the assumption of debt, in exchange for a limited partnership interest in THCR Holdings exchangeable into 5,837,700 shares of THCR common stock and approximately $ 885,000 in cash (hereinafter the "Trump Transaction"). (Id. P 66.) The total reported value of the Transaction, including assumption of debt, was $ 525 million at the time of the June 24, 1996 announcement. (Id. P 66.) At close of trading on June 26, 1996, the stock declined noticeably, by over $ 100 million dollars. (Id. P 68.) By September 30, 1996, the date the Transaction closed, the value of the Transaction had decreased to $ 485 million due to the decrease in the price of THCR stock. [*11] (Id. P 68.) The Transaction was subject to the affirmative vote of a majority of the outstanding shareholders of THCR and the receipt of various third-party approvals and consents, including the receipt of a "Fairness Opinion" prepared by Defendant Salomon Brothers. (Id. P 67.)

On August 29, 1996, THCR issued a proxy statement (the "August 1996 Proxy Statement") soliciting stockholder approval of the Trump Transaction in connection with a special meeting of THCR stockholders to vote on the Transaction scheduled for September 30, 1996. (Id. P 70.) The proxy statement described Trump's Castle as an attractive property with excellent growth prospects and represented that THCR intended to expand Trump's Castle with a luxury yacht, to be moored in the Marina and connected to the casino-hotel. (Id. P 72(a).) Plaintiffs contend that this expansion was highly unlikely to succeed and unfeasible due to physical constraints and administrative hurdles. (Id. P 72(c).)

The August Proxy Statement also disclosed that Defendant Salomon Brothers had concluded that the transaction was "fair, from a financial point of view to THCR and THCR Holdings." (Id. P 73.) Plaintiffs allege [*12] that the representations made by Salomon Brothers in their Fairness Opinion were materially false and misleading because Salomon Brothers "lacked a reasonable basis or did not, in fact, believe in good faith that 'the [Trump Transaction] . . . [was] fair, from a financial point of view, to [THCR] and THCR Holdings.'" (Id. P 74.) Plaintiffs allege that the methodologies used in the Fairness Opinion were contradicted or unsupported by the actual facts. (Id. P 74.)

Shortly before the Special Meeting to vote on the Trump Transaction, there were rumors in the marketplace of a possible deal with third party, Rank Organization PLC ("Rank"), a British hotel and entertainment company, and owner of 58 Hard Rock

Cafe restaurants worldwide. (Id. PP 5,88.) The purported deal involved the investment by Rank of approximately $ 50 million to remodel Trump's Castle with a Hard Rock theme along with a possible additional equity investment. (Id. P 88.) Plaintiffs allege that this rumor of a re-theming by Rank made the sale of Trump's Castle more attractive to the THCR stockholders and was fostered by Trump and the Trump-related Defendants in order to encourage approval of the Trump [*13] Transaction. (Id. P 88.) Rumored negotiations between Trump's Castle and Rank were reported by Reuters, The Wall Street Journal, The Daily News and AFX News. (Id. PP 89-92.)

Castle Associates' financial condition continued to deteriorate after the second fiscal quarter of 1996 and prior to the Special Meeting of September 30, 1996. (Id. P 85.) Salomon Brothers did not update their Fairness Opinion based on any new available financial data from Castle Associates. (Id. P 82.) At the Special Meeting, THCR's stockholders approved the Trump Transaction. (Id. P 87.)

On October 3, 1996, days after the approval vote, The Wall Street Journal reported that Rank would invest $ 50 million to redesign the casino in a rock and roll theme. (Id. P 91(a).) However, according to the news report, the physical expansion of Trump's Castle and the addition of a yacht, as previously presented in the August 1996 Proxy Statement, would not take place. (Id. P 91(a).) Plaintiffs allege that since this disclosure came three days after the Special Meeting approving the Trump Transaction, Defendants either knew or should have known at the time of the Special Meeting that the expansion [*14] would not take place. (Id. P 91(a).) Defendant Salomon Brothers had relied upon this planned expansion in its financial analysis. (Id. P 91(a).)

On November 14, 1996, Reuters reported that the change-of-theme deal between Rank and THCR would not include an equity investment, but would instead provide that Rank would receive apercentage of gaming profits and Trump would receive a percentage of profits from a Hard Rock store and restaurant, (Id. P 92), presumably to be located within the casino. However, the official announcement of the deal was delayed and on December 2, 1996, Reuters reported that THCR and Rank had ended their negotiations and no deal had been made. (Id. P 94.) Upon this announcement, THCR stock subsequently dropped to $ 12.25 per share, almost 65% below its high of $ 34 on June 6, 1996, just six months earlier. (Id. P 97.)

Six weeks after the announcement that the Rank deal was not going forward, on January 20, 1997, THCR issued a press release announcing that they had signed a Letter of Intent to form a joint venture partnership with third party Colony Capital Inc. ("Colony"). (Compl. P 98.) The press release stated that Colony would [*15] invest $ 125 million to fund the expansion and re-theming of Trump's Castle through the purchase of a 51% equity interest in the property. (Id. P 98.) Plaintiffs allege that the terms of this proposed deal were "fundamentally unfair and wasteful" and that the proposed deal was designed to validate the price paid for Trump's Castle in the Trump Transaction. (Id. PP 98, 102.) The Colony deal was never consummated: on March 27, 1997, Colony announced that it was terminating the proposed deal. (Id. P 121.) According to Plaintiffs THCR has never fully recovered since its stock dip of December 2, 1996. (Id. P 96.)

III. DISCUSSION

[HN2] "On a motion to dismiss under Rule 12(b)(6), the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999).* "The district court should grant such a motion only if, after viewing the plaintiff's allegations in this most favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. Accordingly, the factual allegations [*16] set forth and considered herein are presumed to be true for the purpose of deciding the motion to dismiss.

A. Demand Futility

Defendants move to dismiss the Complaint for failure to make a demand upon the Board requesting the action or relief sought before filing suit, pursuant to *Fed. R. Civ. P. 23.1.* n2 Plaintiffs argue that demand should be excused as demand would have been futile.

> n2 [HN3] *Fed. R. Civ. P. 23.1* states, in part: "The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." This rule is effectively identical to Delaware Chancery Court Rule 23.1.

[HN4] Unlike a claim brought by a plaintiff on his own behalf to enforce a right he personally possesses, a derivative claim is brought on behalf of a corporation to remedy an injury suffered [*17] by the corporation. *Ross v. Bernhard, 396 U.S. 531, 538, 24 L. Ed. 2d 729, 90 S. Ct. 733 (1970).* It is, therefore, the corporation and not the shareholder plaintiff who is the real plaintiff. Id.

[HN5] Since claims asserted in a shareholder derivative suit belong to the corporation, it is incumbent upon the shareholder plaintiff to make a demand upon the corporation's board of directors prior to commencing the action. *Spiegel v. Buntrock, 571 A.2d 767, 773 (Del. 1990).* This requirement stems from the well-settled principle that directors, rather than shareholders, manage the affairs of the corporation and the decision to bring or not to bring a lawsuit on behalf of a corporation is a decision concerning the management of the corporation. *Id. at 772-73.* Therefore, a motion to dismiss for failure to make a demand "is not intended to test the legal sufficiency of the plaintiff's substantive claim. Rather its purpose is to determine who is entitled, as between the corporation and its shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf." *Levine v. Smith, 1989 Del. Ch. LEXIS 160, *17, 1989 WL 150784, 16 Del. J. Corp. L. 333, 345 (Del. Ch. 1989),* [*18] aff'd *591 A.2d 194 (Del. 1991),* overruled on other grounds by Brehm, see supra (modifying the standard of appellate review).

Defendants make their motions to dismiss pursuant to *Fed R. Civ. P. 23.1* for failure to make a pre-suit demand of the THCR Board. [HN6] Rule 23.1, however, is a pleading rule, requiring the plaintiff to plead with particularity the claimed basis for excusing the demand requirement. The substantive aspect of demand futility is governed by applicable state law, and thus determinations of when demand will be excused are evaluated according to the law of the state in which the company is incorporated. *Kamen v. Kemper Financial Services, Inc., 500 U.S. 90, 99, 114 L. Ed. 2d 152, 111 S. Ct. 1711 (1991).* As THCR is a Delaware corporation, Delaware law governs the demand requirement.

Under Delaware law, the demand requirement is predicated upon the presumption that directors manage the corporation with the good faith belief that their actions are in the best interest of the company. *Grobow v. Perot, 539 A.2d 180, 187* overruled on other grounds by Brehm, see supra. "The premise of a shareholder claim of futility of [*19] demand is that a majority of the board of directors either has a financial interest in the challenged transaction or lacks independence or otherwise failed to exercise due care." *Levine v. Smith, 591 A.2d 194, 205* overruled on other grounds by Brehm, see supra. [HN7] Under the well-settled rule, demand will be excused if a reasonable doubt is created that: (1) the directors were disinterested and independent or; (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. *Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984),* overruled on other grounds by Brehm, see supra (affirming the test but modifying the standard of appellate review). See also *Levine, 591 A.2d at 205-206* (clarifying that a reasonable

doubt under either prong of the test will excuse demand) overruled on other grounds by Brehm, see supra. [HN8] The Delaware Supreme Court has not defined what degree of factual specificity is required to establish reasonable doubt sufficient to excuse a demand; however, particularized facts are required, thus the pleading requirements are more stringent than they would be on a motion to dismiss for [*20] failure to state a claim under Rule 12(b)(6). *Grobow v. Perot, 526 A.2d 914, 920* overruled on other grounds by Brehm, see supra.

1. The Board's Lack of Disinterestedness or Independence

The gravamen of Plaintiffs' claim is that, while the Defendants may not have directly benefited from the Transaction, each was beholden to Trump, the alleged controlling shareholder, Chairman of the THCR Board and interested beneficiary, such that they lacked the requisite independence. "[HN9] To establish lack of independence, a plaintiff meets his burden by showing that the directors are either beholden to the controlling shareholder or so under its influence that their discretion is sterilized." *In re Western Nat'l Corporation Shareholders Litig., 2000 Del. Ch. LEXIS 82, *37, 2000 WL 710192, at *11 (Del.Ch. May 22, 2000)* (citing *Aronson 473 A.2d at 815; Levine, 591 A.2d at 205).*

a. Trump and Ribis

Defendants do not seriously contest that Trump is and was the controlling shareholder of THCR and Chairman of the Board of Directors. n3 Nor do they discredit Plaintiffs' allegation that Trump, as 99 percent owner of Castle Associates, was the primary and interested beneficiary [*21] of the Trump's Castle sale. Prior to the Transaction, Trump held over 25 percent of the THCR voting power. After the sale, Trump controlled over 36 percent of the THCR voting power. Compl. P 22. According to the Complaint, both prior to and after the Transaction, Trump served as Chairman of the Board and enjoyed "long and extensive relationships with the Director Defendants." Compl. P 55.

> n3 In an eleventh hour attempt to rewrite their position, Defendants wrote to the Court citing cases holding that significant stock ownership alone is insufficient to support alleged domination. See Trump Ltr. dated August 30, 2000 at 2 (citing *In re Delta Pine & Land Company, 2000 Del. Ch. LEXIS 91 (Del. Ch. June 21, 2000); In re Western National Shareholders Litig., 2000 Del. Ch. LEXIS 82 (Del. Ch. May 22, 2000); and Solomon v. Armstrong, 747 A.2d 1098 (Del. Ch. 1999),* aff'd,

*746 A.2d 277 (Del. 2000).* Plaintiffs responded to this letter on September 11, 2000. However, as discussed above, Plaintiffs allege more than significant stock ownership in support of their allegation of control.

[*22] [HN10]

"From a practical perspective, [the] confluence of voting control with directorial and official decision making authority . . . is . . . itself quite consistent with control of the board." *Friedman v. Beningson, 1995 Del. Ch. LEXIS 154, *13, 1995 WL 716762,* at *5, *21 Del. J. Corp. L. 659 (Del. Ch. 1995).* Delaware courts have found substantial minority interests, ranging from 20% to 40% sufficient to grant the holder working control. See e.g., *Robbins and Co. v. A. C. Israel Enter., Inc., 1985 Del. Ch. LEXIS 498, 1985 WL 149627,* at *5, *11 Del. J. Corp. L. 968 (Del. Ch. 1985)* (citations omitted). Trump clearly yielded significant and controlling power over THCR.

[HN11] "The question of independence flows from an analysis of the factual allegations pertaining to the influences upon the directors' performance of their duties generally, and more specifically in respect to the challenged transaction." *Pogostin v. Rice, 480 A.2d 619, 624* (citing *Aronson, 473 A.2d at 814, 816,* overruled on other grounds by Brehm, see supra). To establish lack of independence, Plaintiffs must show that the directors are "beholden" to Trump or so under his influence that [*23] the Board would not be willing or able to use its own discretion. See Aronson at 815. See also, *Grobow, 539 A.2d at 189* (finding lack of independence where the "directors were dominated or otherwise controlled by an individual or entity interested in the transaction.") overruled on other grounds by Brehm, see supra.

Plaintiffs allege that because the transaction benefited Trump directly, he exerted dominance over the other Board members, impairing the Board's ability to exercise valid business judgment and rendering it incapable of reaching an independent decision on the Transaction. Plaintiffs claim that the Board members were beholden to Trump because they received payments, benefits, and other rewards by virtue of their membership on the THCR Board, their control of THCR, and their service on the boards of other companies that THCR and/or Trump controls. Compl. P 43. Accordingly, Plaintiffs argue, the Board members have all benefited from the wrongdoing alleged, and were incapable of exercising independent judgment. Id. However, such conclusory allegations are insufficient. Plaintiffs must allege specific facts detailing why board members lacked independence [*24] or were beholden to Trump with respect to the challenged transaction.

Defendants concede that Trump and Ribis, a member of the THCR board who also served as an officer of Castle Associates, were arguably interested in the transaction, as they sat on both sides of the sale. See Defs.' Mem. Law at 16; Compl P 43(f). See also *Ryan v. Aetna Life Ins. Co., 765 F. Supp. 133, 138 (S.D.N.Y. 1991)* (addressing Delaware law excusing demand where directors are also parties on the opposite side of a transaction) (citing *In re NVF Co. Litigation, 1989 Del. Ch. LEXIS 167, 1989 WL 146237* (Del. Ch. Nov. 22, 1989); *Siegman v. Tri-Star Pictures, Inc., No. 9050, 1989 WL 48746* (Del. Ch. May 30, 1989)). Ribis is the President, Chief Executive Officer, and Director of THCR and a member of the Castle Board. Compl. P 30. In addition, Ribis serves on the boards of eleven other companies or subsidiaries controlled by Trump for which he receives millions of dollars in compensation. Compl. P 43(f). Ribis was clearly conflicted and was likely incapable of rendering an unbiased decision.

b. Remaining Directors

[HN12] To establish demand futility based on lack of independence, [*25] Plaintiffs must raise a reasonable doubt that a majority of the directors were interested or controlled. See *Aronson, 473 A.2d at 812.* The Board has five members, including Trump. Compl. PP 22(a), 30-33. Therefore, the question becomes whether all of the three remaining members of the board, Askins, Thomas and Ryan, were disinterested and independent.

Plaintiffs allege that Askins, Thomas, and Ryan were beholden to Trump at the time a demand would have been made because they served on other Trump-controlled boards. Specifically, Askins, Thomas, and Ryan also served on the board of THCR Funding, a THCR subsidiary, along with Defendants Trump and Ribis. Compl. P 43(f); Pls.' Mem Law at 31, n.13. Askins and Thomas served on the boards of AC Funding, Plaza Funding and AC Holding, also all THCR subsidiaries. n4 Compl. P 43(f), Pls.' Mem Law at 31, n.13.

n4 The Court may take judicial notice of the fact that THCR Funding, AC Funding, Plaza Funding and AC Holding are all wholly-owned subsidiaries of THCR Holdings. See *Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991)* (permitting judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."). See also, Pls.' Mem Law at 31, n.13.

[*26]

However, Plaintiffs do not allege that Askins, Thomas, or Ryan received additional compensation for their board positions on any of the subsidiaries. Standing alone, these allegations are insufficient to raise a reasonable doubt. See *Langner v. Brown, 913 F. Supp. 260, 266 (S.D.N.Y. 1996)* (rejecting claim of demand futility for multiple directorships where "there is no pleading that a majority of the directors are beholden to [the controlling shareholder] for their livelihoods or a material portion of their incomes.").

It is reasonable to infer, however, that all three directors knew that successful service on the board of THCR and its subsidiaries might lead to future positions on other Trump-controlled entities as it had for Ribis. Courts have considered the possibility of future influence or remuneration as a factor when weighing director independence. See, e.g., *Kahn v. Tremont Corp., 694 A.2d 422, 430-31 (Del. 1997); Kahn v. Tremont Corp., 1994 Del. Ch. LEXIS 41, No. 12339, 1994 WL 162613* (Del. Ch. Apr. 21, 1994) rev'd on other grounds, *694 A.2d 422 (Del. 1997).*

Plaintiffs allege additional facts concerning the independence of both [*27] Askins and Thomas. Plaintiffs claim Thomas was interested and conflicted because he won a contract for his primary employer as a result of his appointment as a director of THCR. As of May 1994 and continuing today, Thomas was Senior Vice President of Corporate Affairs of the Pepsi-Cola Bottling Company. Compl. P 43(i). In May 1994, one year after Thomas joined the THCR Board, Pepsi was awarded the exclusive contract to supply its beverages to Trump's Taj Mahal Casino, a THCR subsidiary. Id. Previously, Coca-Cola had enjoyed the exclusive contract, which provides approximately $ 500,000 in annual revenues. Id. Plaintiffs allege that this contract made Thomas beholden to Trump because Thomas would have been "averse to taking any actions that would endanger Pepsi's relationship with the Taj Mahal or Trump." Id. Thus, Plaintiffs argue, Thomas lacked independence with respect to the challenged transaction.

[HN13] The ability of controlling officers to affect the compensation or influence of a director is one factor that may support a finding of reasonable doubt. See *Rales v. Blasband, 634 A.2d 927, 937 (Del. 1993); Tremont Corp., 694 A.2d at 429-30.* [*28] Plaintiffs analogize the Pepsi contract to the payment of consulting fees. Pls.' Ltr. at 3. An interested director's ability to control payment of consulting fees to another director was sufficient to find the receiving director interested in one case cited by Plaintiffs. See *Friedman v. Beningson, 1995 Del. Ch. LEXIS 154, No. 12232, 1995 WL 716762* (Del. Ch. Dec. 4, 1995). However, Plaintiffs have not alleged that Thomas received a personal financial benefit as in Friedman. At best, Thomas may have received

increased compensation or influence from Pepsi for his role in securing the contract. Because any link to Trump is attenuated at best, the presence of the contract alone is insufficient to raise a reasonable doubt. However, the presence of the contract as well as the possibility of future contracts, given the totality of the circumstances raises a reasonable doubt as to Thomas' independence from Trump.

Finally, Plaintiffs allege Askins lacked independence because he previously served on boards on the Trump's Castle side of the transaction. Askins served on the boards of Trump's Castle and TC/GP, the company that owned 37.5 percent of Castle Associate's the casino's parent company prior [*29] to the sale. Compl. P 43(f). Significantly, Askins worked on both boards with Trump and Ribis, the two THCR board members most interested in the transaction. Id. Askins' prior board membership on the very property sold to THCR as well as his directorship in TC/GP necessarily provided him with additional information, which arguably made him a less than neutral decisionmaker. Further, Askins' history of personally beneficial affiliation with Trump-controlled entities, and specifically with Trump and Ribis, both clearly interested THCR Board leaders, diminishes the possibility that Askins had only the corporation's interests in mind when evaluating the transaction. See *Tremont, 694 A.2d at 429-30.* See also *Brehm, 746 A.2d 244, 256 n.31 (Del. 2000)* ("[HN14] Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.")(quoting *Aronson 473 A.2d at 816).* Again, given the totality of the circumstances Plaintiffs raise a reasonable doubt as to Askins' independence from Trump.

Defendants argue that the Board's formation of a Special Committee, [*30] composed of allegedly independent and non-interested board members, to consider the transaction compels dismissal. See Defs' Mem. Law at 28 (citing *Grobow 526 A.2d 914).* However, the Delaware Supreme Court made it clear in Tremont that a board's creation of an ostensibly independent special committee is meaningless when, as here, the court finds members of the special committee to be interested and lack independence. See *Tremont, 694 A.2d 422, 429-30.* Accordingly, the Court assigns little weight to the Special Committee.

Plaintiffs have alleged sufficient particularized facts to raise a reasonable doubt that the majority of the THCR Board were disinterested and independent. Plaintiffs have met their burden under the first prong of the Aronson test and have thus established that pre-suit demand would have been futile.

2. Business Judgment

It is not necessary to examine whether the transaction was a valid exercise of business judgment under the second prong of Aronson. See *Levine, 591 A.2d at 205-206.* However, the Court notes that although a finding of demand futility under the second prong of Aronson is limited [*31] to "extreme cases," *Kahn, 1994 WL 162613* at *6, Plaintiffs have also raise a reasonable doubt that "the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson, 473 A.2d at 814.* "[HN15] Allegations which raise a reasonable doubt as to whether a transaction constitutes a waste of corporate assets in turn create a reasonable doubt that the transaction was the product of a valid exercise of business judgment." *Lewis v. Aronson, No. 6919, 1985 WL 11553,* *6 (Del. Ch. May 1, 1985). As discussed infra, Plaintiffs have stated a claim for waste. Accordingly, demand is also excused under the second business judgment prong of Aronson

3. Demand and Salomon Brothers

Plaintiffs have asserted five claims against Salomon Brothers, the Board's financial advisors, for the alleged faulty advice and misstatements issued in Salomon's Fairness Opinion. Specifically, Plaintiffs allege violations of Section 14(a) of the Exchange Act, breach of fiduciary duties of due care, loyalty and good faith, breach of fiduciary duty of candor, negligence and negligent misrepresentation. Plaintiffs' derivative claims [*32] against Salomon challenge the Fairness Opinion rather than the actual sale of Trump's Castle. Accordingly, Plaintiffs were equally required to make a pre-suit demand on the Board before bringing a derivative suit against third-party Salomon Brothers. n5 See, e.g., *Rales 634 A.2d 927, 934 n.9.* (addressing requirement of demand for derivative third party breach of contract suits); *Kaplan v. Peat, Marwick, Mitchell & Co., 540 A.2d 726, 730 (Del. 1988)* (upholding standing of third-party defendant to assert defense of failure to make demand). Plaintiffs argue that because demand would have been futile for the claims against the Trump and Director Defendants, demand is necessarily excused for the third-party claims against Salomon Brothers.

n5 [HN16] It is well settled law that a Section 14(a) claim may be brought directly or derivatively. See Koppel v. 4987 Corp., 167 F.3d 125, 131 (2d Cir. 1999) (citing *J.I. Case Co. v. Borak, 377 U.S. 426, 431, 12 L. Ed. 2d 423, 84 S. Ct. 1555 (1964).* However, the demand requirement applies to Plaintiffs' claims against Salomon, including the 14(a) claim, because Plaintiffs bring their 14(a) claim derivatively. See

Compl. P 141. See also, Pls.' Mem. Law at 4 (stating Plaintiffs are "proceeding in a purely derivative capacity in the right and for the benefit of the Company").

[*33]

As the Delaware Supreme Court has suggested, [HN17] pre-suit demand is essential where the acts of third parties are at issue because the demand requirement draws the attention of the board to its managerial duties where it may not have previously considered action. *Rales, 634 A.2d at 934, n.9.* However, Plaintiffs argue that an interested or beholden Board would be unable to consider fairly a demand against its financial advisors.

[HN18] Where the subject of the derivative suit concerns breach by a third party, it is appropriate to examine whether the board can impartially consider the merits of the demand without being influenced by improper considerations; whether the board could properly exercise its independent and disinterested business judgment in responding to the demand. *Rales v. Blasband, 634 A.2d 927, 933-34 (Del. 1993).*

Defendant Salomon Brothers argues that Plaintiffs cannot rely upon the alleged unclean hands of the Board to excuse its failure to make a demand upon the Board before initiating suit against Salomon Brothers. See Salomon Reply at 12. However, Salomon presents no case law to support this conclusion. n6

n6 In fact, Salomon Brothers cites to only one case involving a derivative suit against a third party defendant and that case did not address the question presented here. See *Ryan v. Aetna Life Ins. Co., 765 F. Supp. 133 (S.D.N.Y. 1991);* Salomon Reply at 7.

[*34]

On the facts of this case, because the Board could not have been expected to exercise independent business judgment with respect to the Trump Transaction, it follows that the Board would also be unable to consider impartially the merits of a demand against a third party, Salomon Brothers, whose Fairness Opinion was critical to the success of the Transaction. Accordingly, initiating a demand would have been futile and Plaintiffs' failure to make a demand upon the Board before initiating suit against Salomon Brothers is excused.

B. Federal Proxy Claims

[HN19] Federal Proxy rules apply to all companies with securities registered under § 12 of the 1934 Securities Exchange Act. *Katz v. Pels, 774 F. Supp. 121,*

2000 U.S. Dist. LEXIS 13550, *

*124 (S.D.N.Y. 1991).* Section 14(a) of the Federal proxy rules was enacted to prevent abuses in the proxy solicitation process. *J.I. Case Co. v. Borak, 377 U.S. 426, 12 L. Ed. 2d 423, 84 S. Ct. 1555 (1964).* [HN20] Section 14(a) provides that it is unlawful to solicit a proxy contrary to rules established by the Securities and Exchange Commission. *In re American Express Co. Shareholder Litigation, 840 F. Supp. 260, 267 (S.D.N.Y. 1993).* The [*35] objectives of this section are to encourage full disclosure and prevent fraud. *Katz, 774 F. Supp. at 124.*

[HN21] To state a claim under Section 14(a) and Rule 14a-9, a shareholder must allege that (1) his proxy was solicited for authorization of a corporate action; and (2) the proxy solicitation was materially false or misleading. *Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384-85, 24 L. Ed. 2d 593, 90 S. Ct. 616 (1970).* Material information is information that, if disclosed in a proxy statement, would likely be viewed by a reasonable investor as having "significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976).* "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," *TSC Indus., 426 U.S. at 449,* "even if it would not have changed the investor's decision on whether to consummate the transaction." *Folger Adam Co. v. PMI Industries, Inc., 938 F.2d 1529, 1535 (2d Cir. 1991).*

Under the federal rules, this [*36] action may not be dismissed unless the Court concludes that Plaintiffs can prove no set of facts to support their contention that THCR's May 1996 and August 1996 proxy statements misrepresented and/or omitted material facts. *Katz v. Pels, 774 F. Supp. 121, 124 (S.D.N.Y. 1991).*

1. The May 1996 Proxy Statement

Count I concerns the May 1996 Proxy Statement and Annual Meeting, and claims violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder. Specifically, Plaintiffs claim that the May 1996 Proxy Statement, seeking, inter alia, reelection of the Board of Directors, was false and misleading because it was "entirely silent, as to the likely transaction between Castle Associate and THCR, although at the time the Individual Defendants and the Trump Defendants were planning to consummate the Trump Transaction." Compl. P 57. Defendants counter that Count I is moot, as the terms of the Board members elected pursuant to the May 1996 Proxy Statement expired in July 1997, after which the same Board Members were reelected after the precise terms of the Castle Transaction were fully disclosed. Trump Reply Mem. at 23.

[HN22] "Self-dealing presents [*37] opportunities for abuse of a corporate position of trust, the circumstances surrounding corporate transactions in which directors have a personal interest are directly relevant to a determination of whether they are qualified to exercise stewardship of the company." *Maldonado v. Flynn, 597 F.2d 789, 796 (2d Cir. 1979).* Thus, "related transactions," defined, inter alia, as transactions between directors or board nominees and their corporations, are matters explicitly addressed by the SEC disclosure regulations. See Schedule 14A, Item 7 (incorporating 17 C.F.R. § 229.404a (Item 404)).

[HN23] SEC regulations require that an election proxy include disclosure of any recent or "currently proposed" transaction whose value exceeds $ 60,000 involving a director or board nominee and the corporation. See *17 C.F.R. § 229.404* (Item 404). While the Second Circuit Court of Appeals has made clear that compliance with Schedule 14A "does not necessarily guarantee that a proxy statement satisfies Rule 14a-9(a) . . . the regulation does provide us with the Commission's expert view of the types of involvement . . . that are most likely to be matters of concern to shareholders in [*38] a proxy contest." *GAF Corp. v. Heyman, 724 F.2d 727, 739 (2d Cir. 1983)* (applying comparable Item 103 regarding legal proceeding disclosure in an election proxy). Thus, in the view of the SEC, "related transactions" of over $ 60,000 are material facts that must be disclosed in a proxy statement. *17 C.F.R. § 229.404* (Item 404).

As has already been established above, the Trump Transaction was a "related transaction" valued far above $ 60,000. The remaining statutory interpretation concerns whether the Trump Transaction was "currently proposed" within the meaning of the regulation at the time of the May 10, 1996 proxy issuance. Plaintiffs cite to a number of material steps taken within days of the proxy issuance to establish that the Transaction was "basically a foregone conclusion" at the time of the Proxy issuance. See Compl. PP 58-60. Only days after the Proxy was issued, THCR purchased the PIK notes and announced it had entered into exclusive negotiation for purchase of Trump's Castle. Id. Further circumstantial evidence supports this allegation, in particular, on June 13, 1996, one day after election of the Board, Trump issued a formal proposal to sell [*39] Castle Associates. Compl. P 64.

Although the Trump Transaction had not yet been formally proposed prior to issuance of the May Proxy Statement, such a narrow statutory interpretation would permit Directors to postpone "formal proposal" of related transactions and thus evade the spirit of the SEC Regulation. In addition, even if such a manipulation were permitted by SEC Regulation, this does not guarantee the

Proxy Statement satisfies Rule 14a-9(a). See *GAF Corp.,* 724 F.2d at 739.

Defendants argue that proxy statements do not require predictions of future activity or pending negotiations citing *Krauth v. Executive Telecard, Ltd.,* 890 F. Supp. 269, 288 (S.D.N.Y. 1995) and *Reiss v. Pan Am. World Airways, Inc.,* 711 F.2d 11, 14 (2d Cir. 1983). However, both cases involved the unpredictable actions of unrelated third parties. Unlike the facts in Krauth and Reiss, Plaintiffs allege that all the parties to the Trump Transaction were insiders. Consequently, the eventual outcome of negotiations could hardly be said to be "inherently fluid" or "shrouded in uncertainty." See *Reiss, 711 F.2d at 14.* Furthermore, the language [*40] of Item 404 makes clear that [HN24] when related transactions are involved, even incomplete but "currently proposed" transactions must be disclosed. See 17 C.F.R. § 229.404a (Item 404).

Finally, Defendants argue that the May Proxy claim must be dismissed as moot as the terms of the officers expired in July 1997. [HN25] When a shareholder "challenges the solicitation of proxies for the election of directors to a term now complete, courts addressing the question of mootness have looked to the nature of the relief sought." *Sanders v. Thrall Car Mfg. Co., 582 F. Supp. 945, 955 (S.D.N.Y. 1983),* aff'd, *730 F.2d 910 (2d Cir. 1984).* Plaintiffs seek equitable and declaratory relief including removal of the present directors, a new election, and voiding of an increase in the number of THCR shares available in the Stock Incentive Plan, also approved by the May 1996 Proxy Statement. Thus, because the relief sought is more than a declaration of law "without implications for practical enforcement upon the parties" the cause of action is not moot. See *Sanders, 582 F. Supp. at 955* (quoting *Browning Debenture Holders' Committee v. DASA Corp., 524 F.2d 811, 817 (2d Cir. 1975)).* [*41]

Assuming, as the Court must on a motion to dismiss, that Defendants were planning to consummate the Trump Transaction prior to issuance of the May Proxy Statement, omission of this fact was material. Disclosure of the pending Transaction would have "significantly altered the 'total mix' of information made available." *TSC Indus., 426 U.S. at 449.* Thus, Plaintiffs have stated a viable and continuing federal proxy cause of action concerning the May 1996 Proxy Statement. Accordingly, Defendants motion to dismiss the May 1996 Proxy claim is DENIED.

    2. The August 1996 Proxy Statement

    a. Against the Trump and Director Defendants

    Count III, in essence, alleges that by misrepresenting the terms of the sale of Trump's Castle to THCR and

plans for renovation, and by reporting Castle Associates' aggregate financial results for the six-month period ending June 30, 1996, the August 1996 Proxy Statement was false and misleading. n7 Defendants argue that the Proxy Statement fully disclosed the relevant business uncertainties attending the expansion of Trump's Castle, and fully disclosed the casino's financial information.

        n7 The Proxy Statement did disclose that Trump was the "beneficial owner of 100% of the outstanding equity interests of Castle Associates." Aff. Posen, Ex. C (August Proxy Statement).

[*42]

    Contrary to Plaintiffs' allegations, the Proxy Statement disclosed the pertinent and significant losses. Specifically, the Proxy Statement disclosed that Castle Associates lost nearly $ 19 million in the first six months of 1996. See Aff. Posen, Ex. C at 10 (August 1996 Proxy Statement). n8 Consequently, Plaintiffs' argument that an aggregate quarterly break down of Castle Associate's finances was required is both unsupported by authority and unpersuasive.

        n8 The Court's consideration of this document is appropriate on this 12(b)(6) motion, notwithstanding the fact that it was not attached by Plaintiffs as an exhibit to the pleadings, because it was clearly incorporated by reference to the Complaint. See *Stuto v. Fleishman, 164 F.3d 820, 826 n.1 (2d Cir. 1999)* (document could be considered on a 12(b)(6) motion because it was part of another document sent to plaintiff, and was discussed in the complaint, thereby incorporating it by reference.) Moreover, the Proxy statements constitute the basis upon which Plaintiffs' claims rest. See *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991)* (court may consider documents of which Plaintiffs had notice and which were integral to their claim).

[*43]

    Likewise, the Proxy Statement disclosed the zoning, lease, and permit hurdles necessary to the Trump's Castle Expansion with sufficient detail to foreclose Plaintiffs' allegations that further disclosure was necessary as a matter of law. See Aff. Posen, Ex. C at 48 (August 1996 Proxy Statement). Specifically, the Proxy Statement disclosed that the expansion was subject to a number of contingencies and that there was "no assurance that Castle Associates [would] be able to obtain all the

necessary financing, consents, licenses and regulatory approvals to complete the Trump's Castle Expansion.". Id.

However, Plaintiffs' allegations concerning the likelihood and feasibility of the expansion disclosed in the August Proxy deserve closer scrutiny. According to the Plaintiffs, shortly before the September 30, 1996 shareholder vote, Trump and certain other Trump and Director Defendants "fostered rumors in the marketplace" about a possible Hard Rock re-theming and infusion of equity from Rank PLC (the "Rank rumors"). Compl P 88. On October 3, 1996, just days after Shareholders approved the Transaction, the Wall Street Journal announced the Rank investment and reported that the [*44] expansion of Trump's Castle and the addition of a yacht, as disclosed in the August Proxy, would not go forward. Compl. P 91(a). Plaintiffs allege, based upon the timing of this disclosure, that prior to the Special Meeting, the Trump and Director Defendants knew or should have known the expansion of Trump's Castle, which formed the basis of the Fairness Opinion, would not take place as described in the August Proxy Statement. Compl. P 91(b). The fact that the expansion, described in the August Proxy Statement and relied upon by Salomon Brothers, would not take place, was a material fact which could have influenced a shareholder's vote.

In addition, Plaintiffs allege that even if the expansion had gone forward, the disclosures concerning the addition of a luxury yacht were materially false. Plaintiffs contend that the depth of the water necessary to accommodate the proposed yacht would require its moorage in the middle of the Marina, approximately one-quarter mile from Trump's Castle. (Compl. P 72(c)(iii)). Thus, Plaintiff's argue, it was highly unlikely the boat could be "physically connected to the casino-hotel and accessible to the main casino" as stated in the Proxy Statement. [*45] Aff. Posen, Ex. C at 5, 48 (August 1996 Proxy Statement). Plaintiffs claim that such information was material because, they contend, "a casino expansion located on a boat and physically separated and distant from the existing Trump's Castle would be much less productive than an expansion of a land-based casino." Compl. P 72(c)(iii).

Contrary to Defendants' argument, the distance from the proposed yacht to the casino and casino-hotel was not self-evident. The August Proxy Statement did not contain any physical maps of the Marina. To assume that the proximity of the waterfront from the casino was self-evident is to assume that all stockholders were familiar with the area. The proximity of the yacht expansion to the casino is a material fact which could have influenced a shareholder's vote, as it would likely be an indicator of the expansion site's estimated profitability.

Accordingly, on this claim, Plaintiffs state a federal proxy cause of action against the Trump and Director Defendants. Accordingly, Defendants' motion to dismiss the August 1996 Proxy claim is DENIED.

b. Against Salomon Brothers

Count III makes a separate allegation against Salomon Brothers for allegedly false [*46] and materially misleading statements and methodologies contained in its Fairness Opinion and annexed to the August Proxy Statement. Specifically, Plaintiffs allege Salomon's statement that "the [Trump Transaction] . . . is fair, from a financial point of view, to the Company and THCR Holdings" was materially false, and further that Salomon Brother's did not, in fact, believe in good faith that the Transaction was fair. Compl. P 74. In short, Plaintiffs allege that the false conclusion was based upon, 1) a financial analysis contradicted or unsupported by the actual facts, Compl. PP 74-76, 78-81 and; 2) a failure by Salomon Brothers to reissue and reevaluate its Opinion after new and unfavorable financial information was disclosed by Castle Associates just six days after the Opinion was issued. Compl. P 82.

Regarding Plaintiffs' allegations of flawed financial analysis, Plaintiffs allege that Salomon Brothers' analysis comparing the Trump's Castle to 20 other public gaming companies failed to reflect Trump's Castle's net losses; overestimated its growth prospects, and overvalued anticipated synergies between TCHR and Trump's Castle. Compl. PP 75-76; 78-81. To support the allegation [*47] that the analysis was flawed, Plaintiffs assert that "Salomon Brothers' gaming analyst, W. Bruce Turner, who regularly follows gaming stocks such as THCR's, was at no time consulted by the Special Committee and Salomon Brothers never made use of his services in connection with this engagement." Compl. P 43(j). Defendant Salomon Brothers responds that its methodologies were disclosed within the Fairness Opinion, thus providing the opportunity for open discussion and criticism.

Plaintiffs also assert that the Fairness Opinion was misleading because Salomon Brothers failed to update its Opinion to incorporate new negative financial information disclosed after the second fiscal quarter ended June 30, 1996, just six days after the Opinion was issued. Compl. P 82. The second quarter results disclosed that Castle Associate's quarterly income from operations declined by 80% from the prior year's second quarter. Compl. P 83.

Finally, Plaintiffs allege that Salomon Brothers issued the misleading statements because it was to receive loan fees from Trump, which made the financial advisors incapable of providing an unbiased opinion. Compl. P 43(j).

2000 U.S. Dist. LEXIS 13550, *

On a motion to dismiss, the Court must assume [*48] the truth of the facts asserted by Plaintiffs. Thus, if Salomon Brothers issued a Fairness Opinion based on faulty methodology and stating conclusions not actually held in good faith, the August Proxy Statement, annexed to and based upon that Opinion, may have been false and misleading in its conclusion that the Transaction was "fair, from a financial point of view." Compl. P 74. If, as Plaintiffs allege, the Corporation's financial advisors did not find the Transaction to be financially fair, this would clearly be a fact a "reasonable shareholder would consider ... important". *TSC Indus., 426 U.S. at 449.* Accordingly, Plaintiffs have stated a proxy claim against Salomon Brothers for its role in issuing the annexed Fairness Opinion and Defendants' motion is DENIED.

## C. Remaining State Claims

Defendants also move to dismiss all of the Plaintiffs' state law claims for failure to state a claim.

### 1. Ultra Vires Acts

Plaintiffs allege all actions taken by the Board are voidable as ultra vires acts because the Board was never properly elected as they were elected pursuant to a false and misleading proxy statement. Compl. PP 136-37. Defendants move to dismiss [*49] this claim on the grounds that the election Proxy was valid.

[HN26] Under Delaware law, a director who assumes office "pursuant to an irregular election . . . achieves only de facto status which may be successfully attacked by the stockholders." *Prickett v. American Steel & Pump Corp., 253 A.2d 86, 88 (Del. Ch. 1969).* Where stockholders challenge officer conduct not primarily involving third parties, courts may void those actions. *Dillon v. Scotten, Dillon Co., 335 F. Supp. 566, 569 (D. Del 1971)* (citing 2 Fletcher, Cyclopedia of Corporations § 383).

The Court has determined that there may have been material omissions or misstatements in the May 1996 election Proxy Statement, thus the Board's election may be voidable. Accordingly, to the extent the Trump Transaction did not involve third parties, the Transaction may also be voidable. Accordingly, Plaintiffs state a claim for ultra vires conduct and Defendants' motion is DENIED.

### 2. Breach of Contract and Fiduciary Duty of Candor

Plaintiffs allege that Defendants Trump, TC/GP, and TCHI breached their contract with THCR because the Defendants violated the provision of the Transaction Agreement [*50] stating that information to be supplied to THCR shareholders in connection with the August 1996 Proxy Statement would be free of any material misstatements or omissions. Compl. PP 151-153.

In addition, Plaintiffs allege Trump and the Director Defendants breached their duty of candor through the same alleged misstatements and omissions. Defendants move to dismiss these claims on the grounds that no materially misleading statements were included in the August Proxy Statement.

[HN27] The "Duty of Candor" is the "well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Stroud v. Grace, 606 A.2d 75, 84 (Del. 1992).* This duty of disclosure is based on the materiality standard advanced by the court in TSC Industries: directors must disclose all facts which, "under all the circumstances, . . . would have assumed actual significance in the deliberations of the reasonable shareholder." *Arnold v. Society for Sav. Bancorp, Inc., 650 A.2d 1270, 1277 (Del. 1994)* (quoting *TSC Industries, 426 U.S. at 449).* [*51]

As this Court has found that at least three claims for misrepresentation or omission of material facts under Section 14(a) survive this motion to dismiss, Plaintiffs have stated a state law claim for breach of contract against Trump, TC/GP, and TCHI. Plaintiffs also state a breach of the duty of candor claim against Trump and the Director Defendants. Accordingly, Defendants' motion to dismiss Plaintiff's breach of contract and fiduciary duty of candor claims against the above Defendants is DENIED.

### 3. Breach of Fiduciary Duties of Due Care, Loyalty, and Good Faith

[HN28] Directors are bound to protect the interests of the corporation through exercise of the duties of due care, good faith, and loyalty. *Malone v. Brincat, 722 A.2d 5, 10 (Del. 1998).* This obligation has been described as a duty "not only affirmatively to protect the interests of the corporation committed to [an officer's] charge, but also to refrain from doing anything that would work injury to the corporation. *Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993)* (subsequent history omitted). Plaintiffs allege facts of fostering and facilitating self-dealing and compromising [*52] corporate interests sufficient to state a claim for breach of the fiduciary duties of due care, good faith, and loyalty.

Defendants correctly argue that [HN29] a vote by the fully-informed shareholders ratifies a challenged transaction and extinguishes any claim that a disinterested director breached his duty of care in connection with it. See *Smith v. Van Gorkom, 488 A.2d 858, 890 (Del. 1985).* However, as the Court has determined that the shareholders were not fully informed and material facts were omitted from the August 1996

Proxy Statement, the shareholder vote does not extinguish Plaintiffs' fiduciary duty of due care claim.

Finally, Trump and the Director Defendants also argue that all breach of fiduciary duty claims against them for money damages should be dismissed because THCR's certificate of incorporation includes an indemnification provision. Trump Mem. Law at 54.

[HN30] "In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint. If a judge looks to additional materials, the motion [*53] should be converted into a motion for summary judgment." *Hayden v. County of Nassau, 180 F.3d 42, 53 (2d Cir. 1999)* (citations omitted). Unless a nonmovant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment, a court must ordinarily give notice and an opportunity to respond before converting a motion to one for summary judgment. See *Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999).*

THCR's certificate of incorporation and the indemnification provision therein are clearly outside of the pleadings. However, both sides have briefed the issue, Plaintiffs are thus clearly on notice, and this point is ripe for determination.

The indemnification provision is pursuant to [HN31] *8 Del. Code Ann. § 102(b)(7)*, which allows a corporation to limit or eliminate directors' liability for monetary damages for breach of fiduciary duty by including an exculpatory provision in its certificate of incorporation. However, the statute is strictly limited, prohibiting indemnification for any breach of the director's duty of loyalty to the corporation or its stockholders, for acts or omissions not in good faith or [*54] involving intentional misconduct or for any transaction for which the director derived an improper personal benefit. See *8 Del. Code Ann. § 102(b)(7)*. As Plaintiffs' claims for breach of fiduciary duty involve breach of due care, loyalty, good faith and candor, these claims are not prohibited by the indemnification provision. Accordingly, Defendants' motion to dismiss Plaintiffs' breach of fiduciary duties claim as against Trump and the Director Defendants is DENIED.

4. Fiduciary Duty Claims Against the Remaining Defendants

Plaintiffs also allege that Defendant Salomon Brothers as well as the remaining Trump Defendants breached their alleged duties of candor, due care, loyalty, and good faith through the same alleged misstatements, actions, and omissions.

Plaintiffs allege Defendant Trump Casino, Inc, as owner of 200 shares of THCR Class B common stock, owed the corporation fiduciary duties. However, [HN32] "a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation." *Kahn v. Lynch Communication Systems, Inc., 638 A.2d 1110, 1113 (Del. 1994)* (quoting *Ivanhoe Partners v. Newmont Mining Corp., 535 A.2d 1334, 1344 (Del. 1987).* [*55] Plaintiffs have failed to allege facts supporting the alleged controlling or majority shareholder status of Defendant Trump Casino, Inc. Accordingly, Plaintiffs' fiduciary duty claims are DISMISSED as to Trump Casino, Inc.

As to the remaining Trump Defendants and Salomon Brothers, [HN33] Delaware courts have consistently rejected the notion of fiduciary duties for third parties. See, e.g., *Lewis v. Leaseway Transp. Corp., 1990 Del. Ch. LEXIS 69, *21, No. 8720, 1990 WL 67383* (Del. Ch. May 16, 1990) ("Plaintiffs do not claim, nor could they, that Citicorp or Drexel owed a fiduciary duty to Leaseway shareholders."); *In re Shoe-Town, Inc. Stockholders Litig., 1990 Del. Ch. LEXIS 14, *22, No. 9483, 1990 WL 13475, at *7, 16 Del. J. Corp. L. 404, *417* (Del. Ch. Feb. 12, 1990) ("because a fairness opinion or an outside valuation is not an absolute requirement under Delaware law, it makes little sense to strap those investment banks, who are retained, with the duties of a fiduciary."). Accordingly, Plaintiffs fail to state a claim for failure of fiduciary duties against Trump's Castle Associates, TC/GP, TCHI, and Salomon Brothers and Defendants' motions to dismiss these claims are GRANTED.

However, Plaintiffs [*56] also allege the fiduciary duty claims in the alternative, under a theory of aiding and abetting. [HN34] Delaware Courts have permitted third party fiduciary duty claims to proceed for aiding and abetting a parent company's breach of fiduciary duties. See, e.g., *Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1284 n.33 (Del. 1989)* (finding "the conduct of one who knowingly joins with a fiduciary, including corporate officials, in breaching a fiduciary obligation, is equally culpable.").

[HN35] To state a claim for aiding and abetting breach of fiduciary duties, a plaintiff must allege "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendant." *Shoe-Town, 1990 Del. Ch. LEXIS 14, *23, 1990 WL 13475, at *7-8* (citing *Penn Mart Realty Co. v. Becker, 298 A.2d 349, 351 (Del. Ch. 1972); Gilbert v. El Paso Co., 490 A.2d 1050, 1057 (Del. Ch. 1984)).* Plaintiffs have alleged a concerted effort on the part of all the Defendants to carry out the insider deal for the benefit of Defendant Trump, despite their knowledge that the Transaction was not in the best interests of the

corporation [*57] or its shareholders. Thus, Plaintiffs have alleged the requisite knowledge for the third party aiding and abetting claims against the remaining Trump Defendants and Salomon Brothers. Accordingly, Defendants' motions to dismiss these claims are DENIED.

### 5. Waste

[HN36] The judicial standard for determination of corporate waste entails "an exchange of corporate asset for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Lewis v. Vogelstein, 699 A.2d 327, 336 (Del. Ch 1997).* "If, however, there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude ex post that the transaction was unreasonably risky." Id. See also *Brehm v. Eisner, 746 A.2d 244, 263 (Del. 2000)* (describing the "stringent requirements of the waste test").

Plaintiffs bring a claim for waste against Trump and the Director Defendants under two separate theories. Compl. PP 193-99. Plaintiffs first allege that Trump and the Director Defendants [*58] should be liable for the alleged wasted resources necessary to explore renovation plans with non-party Colony. Plaintiffs cite no authority supporting their claim that the expenses incurred in exploratory discussions may be recouped by the corporation when those plans fail. Further, Plaintiffs fail to provide a factual basis for this claim.

Defendants argue that the Complaint is internally inconsistent because it states that the proposed Colony Transaction was a windfall for Colony but also that Colony withdrew from the deal based on economic concerns, suggesting, Defendants argue, that the deal may have been beneficial to THCR as well. See Trump Mem. Law at 60; Compl. PP, 117, 122. Defendants argue simply that "reasonable minds might differ" as to the value of the negotiations thus precluding a claim of waste as a matter of law. See Trump Mem. Law at 60 (citing *Uni-Marts, Inc. v. Stein, 1996 Del. Ch. LEXIS 95, No. 14713, 1996 WL 466961,* at *6 (Del. Ch. Aug. 12 1996)).

Plaintiffs have failed to assert factual allegations to support their claim and cannot meet the high burden for claims of waste based upon the conclusory allegations before the Court, Accordingly, Plaintiffs' waste [*59] claim concerning the Colony-related expenses is DISMISSED.

Plaintiffs next claim that no person of sound business judgment would deem Castle Associates worth

what THCR agreed to pay or actually paid and thus, that Trump and the Director Defendants are liable for waste. Trump and the Director Defendants counter that the final purchase price was "only about 20 percent higher" than the $ 400 million valuation cited in the Complaint and was thus a reasonable business judgment. Trump Mem. Law at 26.

Plaintiffs' waste claim is frustrated by the absence of an independent financial evaluation of the Trump Transaction. However, Plaintiffs offer substantial circumstantial evidence to support their claim of waste. For example, even at closing, when THCR paid $ 485 million for Castle Associates, Richard Sokol, Vice President of Equity Research for Massachusetts Financial Services stated in The Wall Street Journal: "The bottom line is, we think the deal is mispriced. I think they paid about $ 100 million too much. [Trump's Castle] is worth about $ 400 million." Compl. P 69. Plaintiffs now claim that even this figure, cited in their Complaint, was an "optimistic valuation" and may overstate [*60] the value of Trump's Castle. Pls.' Mem. Law at 46.

Plaintiffs point out that the value of Trump's Castle slumped further during the three months between the date of agreement and the date of shareholder approval. Compl. PP 83, 85. THCR had originally agreed to pay $ 525 million, which reflected the greater value of THCR stock at the time of the deal's announcement. Compl P 66. Thus, TCHR agreed to pay approximately $ 125 million more than the $ 400 million estimate cited in the Complaint and now deemed "optimistic" by the Plaintiffs. In addition, according to the Complaint, the original $ 525 million price tag was said to be almost 10 times Trump's Castle's annual estimated 1996 cash flow of $ 55 million, which was substantially higher than reflected in several other then-recent gambling acquisitions. Compl. P 69.

Further, Plaintiffs cite to both the Rank and Colony deals, which collapsed in the months just after the Transaction, to support their allegation that THCR overpaid for Trump's Castle. Compl. P 123. Specifically, Plaintiffs suggest that the unwillingness of Rank and Colony to enter into business agreements demonstrates "the poor future prospects for Trump's Castle." [*61] Id.

Finally, the price of THCR stock dropped over 20 percent after the announcement of the Trump's Castle deal. Compl. P 68. Plaintiffs attribute this drop in THCR's stock price to the announcement of the Trump Transaction and allege the drop reflected shareholder disapproval of the proposed Transaction. Id.

Plaintiffs have alleged facts from which this Court could ascertain that "'no business person of ordinary, sound judgment could conclude that the corporation has

2000 U.S. Dist. LEXIS 13550, *

received adequate consideration.'" *Brehm v. Eisner, 746 A.2d 244, 263 (Del. 2000)* (quoting *Glazer v. Zapata Corp., 658 A.2d 176, 183 (Del. Ch. 1993)* (emphasis added) (internal citation omitted). Accordingly, Defendants' motion to dismiss Plaintiffs' waste claim concerning the Trump Transaction is DENIED.

6. Remaining Claims Against Salomon Brothers

Finally, Plaintiffs bring claims for negligence and negligent misrepresentation against Defendant Salomon Brothers. In its defense Salomon Brothers raises an indemnification contract between THCR and Salomon that requires indemnification for all suits except those "finally and judicially determined to have resulted primarily from [Salomon [*62] Brothers'] willful misconduct, bad faith or gross negligence." See Daniels Aff. Ex. A at 1.

Defendant Salomon Brothers argues that Plaintiffs are "stepping into the shoes" of the Company and thus are bound by THCR's waiver of suit precluding, inter alia, the negligence and negligent misrepresentation claims. Salomon Brothers' Reply Mem. at 13 (citing *Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 78 L. Ed. 2d 645, 104 S. Ct. 831 (1984)).*

However, the indemnification clause is a matter outside of the pleadings. Unlike the clause previously addressed, the parties have not fully briefed this issue.

Salomon Brothers placed a clandestine footnote raising the defense in its initiating motion papers, but Plaintiff failed to respond to this defense in their papers. Thus, it appears from a reading of Plaintiffs' opposition, that they were not substantively on notice of Salomon's indemnification defense.

In the alternative, Defendants also urge the Court to deem the indemnity contract integrated into the Complaint citing *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991).* However, Defendants do not offer sufficient citation [*63] to the Complaint to justify the alleged integration.

Accordingly, Defendants' motion to dismiss the negligence claims based on their indemnification clause defense is DENIED at this time without prejudice to renew if appropriate after discovery.

III. CONCLUSION

Plaintiffs have sufficiently alleged the futility of demand upon the Board with respect to their claims against the Trump and Director Defendants and Salomon Brothers. With respect to the claims against the Trump and Director Defendants, the Court hereby GRANTS the motion to dismiss as to the claim of waste for expenses related to the Colony transaction. In addition, the motion to dismiss the direct fiduciary claims as against Trump Casino and the other nonfiduciary Trump Defendants is GRANTED. The remainder of the Trump and Director Defendants' motion to dismiss is DENIED.

With respect to the claims against Salomon Brothers, the Court hereby GRANTS the motion to dismiss as to the direct fiduciary duty claims and DENIES the motion as to the federal proxy and fiduciary aiding and abetting claims. Further, the Court DENIES the motion to dismiss the negligence claims against Salomon Brothers.

Plaintiffs shall file and serve [*64] their Fourth Amended Complaint in accordance with this Opinion within 20 days of the date of this Order. Defendants shall answer the Complaint within 20 days of service. n9

n9 Ordinarily, a Defendant retains the right to move or answer as to an amended complaint. See *Fed. R. Civ. P. 15*. However, because this Opinion resolves all of the pending issues raised by Plaintiffs' limited amendment and because the Court has fully considered Defendants' procedural and substantive arguments in opposition to the amendment submitted by letter brief, Defendants are now directed to answer the remaining claims. See Salomon Ltr. of April 6, 1998; Trump. Ltr. of April 9, 1998.

SO ORDERED.

Dated: New York, New York

September 21, 2000

Deborah A. Batts

United States District Judge

## CERTIFICATE OF SERVICE

I, Glenn C. Mandalas, hereby certify that on April 1, 2005, I caused to be electronically

filed a true and correct copy of the foregoing document with the Clerk of the Court using

CM/ECF, which will send notification that such filing is available for viewing and downloading

to the following counsel of record:

> Peter J. Walsh, Jr., Esquire
> Potter, Anderson & Corroon, LLP
> Hercules Plaza, 6th Floor,
> 1313 North Market Street
> P.O. Box 951
> Wilmington, DE  19801

> Jeffery C. Wisler, Esquire
> Connolly Bove Lodge & Hutz, LLP
> 1007 North Orange Street
> P.O. Box 2207
> Wilmington, DE  19899

I further certify that on April 1, 2005,  I caused a copy of  the foregoing document to be

served on the following counsel of record in the manner indicated:

### BY HAND DELIVERY

> Peter J. Walsh, Jr., Esquire
> Potter, Anderson & Corroon, LLP
> Hercules Plaza, 6th Floor,
> 1313 North Market Street
> P.O. Box 951
> Wilmington, DE  19801

> Jeffery C. Wisler, Esquire
> Connolly Bove Lodge & Hutz, LLP
> 1007 North Orange Street
> P.O. Box 2207
> Wilmington, DE  19899

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP


Glenn C. Mandalas (# 4432)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

P.O. Box 391
Wilmington, DE  19899-0391
(302) 571-6600
gmand@ycst.com

*Attorneys for Plaintiff*

063702.1002