# TAB 1

LEXSEE 2002 DEL. CH. LEXIS 156

**ARIFF ALIDINA, DAVID SWART, MOHAMED ALIDINA, and MARION JACK RICKARD, Plaintiffs, v. INTERNET.COM CORPORATION, ALAN MECKLER, CHRISTOPHER S. CARDELL, WAYNE A. MARTINO, WALTER H. LIPPINCOTT, GILBERT F. BACH, BEVERLY C. CHELL, MICHAEL J. DAVIES and CHARLES R. ELLIS, Defendants.**

Civil Action No. 17235-NC

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

2002 Del. Ch. LEXIS 156

October 3, 2002, Submitted
November 6, 2002, Decided
November 8, 2002, Filed

**DISPOSITION:** [*1] Defendants' motion to dismiss complaint denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** Norman M. Monhait, of ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; OF COUNSEL: Sanford P. Dumain, Samuel H. Rudman and Susan M. Greenwood, of MILBERG WEISS BERSHAD HYNES & LERACH LLP, New York, New York, Attorneys for Plaintiffs.

Allen M. Terrell, Jr. and Dominick Gattuso, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Stephen Greiner, Albert M. Myers III and Barbara B. Farley, of WILLKIE FARR & GALLAGHER, New York, New York, Attorneys for Defendants.

**JUDGES:** Chandler, Chancellor.

**OPINIONBY:** Chandler

**OPINION:**

### MEMORANDUM OPINION

Chandler, Chancellor

This class action arises out of a tender offer for shares of a Delaware corporation followed by a merger between it and the acquiring company. Certain shareholders who tendered their stock filed this lawsuit, challenging the two-step transaction. They charge the directors who approved and recommended the transaction with breaches of their fiduciary duties of care, loyalty and candor. Similar to other recent cases in this Court, the challenged transactions involve a chief executive officer/director who negotiated most of the terms of the transaction, [*2] including one aspect in which the officer/director was clearly self-interested. The defendants have moved to dismiss all of the asserted claims, which I deny for the reasons set forth below.

### I. INTRODUCTION

In late 1998, Penton Media, Inc. ("Penton") purchased Mecklermedia Corporation ("Mecklermedia" or the "Company"). This two-step transaction ("Transaction") was accomplished by way of a tender offer followed by a merger, pursuant to an Agreement and Plan of Merger among Mecklermedia, Penton and Internet World Media Inc., dated October 7, 1998.

The plaintiff shareholders of Mecklermedia brought this class action challenging the fairness of the Transaction, alleging that the individual board members breached their fiduciary duties. They allege that these breaches resulted in merger consideration that was "grossly unfair," largely due to the concurrent sale of an 80.1% interest in Internet.com (the "iWorld transaction"), Mecklermedia's wholly owned subsidiary, at an allegedly unfair price to Alan Meckler ("Meckler"), who was a 26% shareholder, board member, and the CEO of Mecklermedia. Plaintiffs allege that Meckler demanded this sale in exchange for his approval of the Transaction [*3] and that this sale diverted funds from the Company to Meckler. Because of this, plaintiffs contend that the board members could not have approved and recommended the Transaction and iWorld transaction (collectively, the "Transactions") in good faith. Last, plaintiffs allege that the board members were grossly negligent in the negotiation and approval of the Transactions and in

  

failing to disclose all material facts to the shareholders. In short, plaintiffs' complaint alleges breaches of the directors' fiduciary duties of loyalty, care, and disclosure.

## II. STATEMENT OF FACTS

Mecklermedia was an internet media company providing internet information to industry professionals via trade shows, conferences and print publications. Internet.com was its wholly owned subsidiary that disseminated internet information electronically through a network of web sites.

Penton, the acquiror, is also a company that specializes in internet industry trade shows and print publications and maintains web sites for the purpose of advertising these trade shows and print publications. The Transactions combining Penton and Mecklermedia came about after Mecklermedia had explored business combinations with at [*4] least three other suitors throughout 1998.

Mecklermedia began exploring potential business combinations in early 1998 with the assistance of its investment banker, Allen & Company ("Allen & Co."). Mecklermedia first discussed a potential combination with Advanstar Holdings, Inc. ("Advanstar"). In June, after approximately three months of negotiations, Advanstar proposed a transaction in which it would conduct a cash tender offer for all Mecklermedia stock and then sell the publishing and internet assets to a newly-formed entity that would be majority-owned by Meckler. Allen & Co. consulted Deloitte & Touche LLP ("D&T") regarding the tax consequences of the various acquisition scenarios proposed. D&T provided this tax information and at the same time valued Internet.com at $50 million. Negotiations with Advanstar did not result in a letter of intent.

Mecklermedia concurrently explored a potential transaction with Miller Freeman, the United States division of United News & Media ("United News") in June. Shortly after Miller Freeman's overtures, United News approached Meckler to propose its potential acquisition of Mecklermedia. United News eventually offered to purchase all Mecklermedia [*5] shares for $270 million. n1 The last offer United News delivered to Mecklermedia included an agreement for Meckler to purchase a 50% interest in Internet.com for $17.5 million.

n1 Plaintiffs provide different figures representing United News' offer to Mecklermedia without accounting for the discrepancy in the figures. Although more than one offer was received, it is difficult to determine from the pleadings the value of the highest offer. The $270 million offer is the only offer that refers to a purchase of all Mecklermedia shares, and is the offer that plaintiffs contend should have been disclosed to the shareholders. Thus, this is the figure I employ throughout the opinion.

After negotiations failed with each prior suitor, Mecklermedia found its match. On September 21, 1998, Thomas L. Kemp, Penton's Chairman and CEO, contacted Meckler regarding Penton's acquisition of Mecklermedia. During this conversation, plaintiffs contend that Meckler emphasized the importance of the iWorld transaction and insinuated [*6] that prior negotiations had fallen through because the terms of this side deal had not been favorable.

Penton then presented a draft letter of intent to Meckler on September 24, 1998, offering to purchase Mecklermedia. For unexplained reasons, this initial draft letter did not include the iWorld transaction. The next day, the two parties executed a letter of intent that provided for Penton to acquire the Company for $29 per share (or $274 million for all shares). This new letter additionally agreed to sell a 50% interest in Internet.com to Meckler for $15 million. Continuing negotiations resulted in an increase in Meckler's share of Internet.com at a lower price per share (from 50% at $15 million to 80.1% at $18 million) while there was no increase in the per share purchase price of Mecklermedia.

As a result, the parties agreed to value Internet.com at $22.5 million in the sale, as compared to the earlier value of $30 million. The lower value allegedly was a function of the amount Meckler was willing to pay for his equity interest (80.1% at $18 million = 100% at $22.5 million). According to the tender offer materials, this amount was significantly higher than Internet.com's [*7] value based upon its historical accounting, and represented six times the company's revenue and three times its tangible assets.

The Transactions were subjected to various evaluations by advisors to both Mecklermedia and Penton. Mecklermedia's investment bankers, Allen & Co., determined that the merger consideration in the Transactions as structured was fair to the shareholders of Mecklermedia from a financial point of view. Penton and Penton's advisor, Donaldson, Lufkin & Jenrette ("DLJ"), analyzed the purchase price and concluded it was a fair price for Mecklermedia's trade show and publishing assets alone, excluding Internet.com. n2 Plaintiffs emphasize that Penton was earlier cautioned by PriceWaterhouseCoopers LLC ("PwC") to further analyze Meckler's purchase of Internet.com from an eco-

  

nomic and legal standpoint to determine whether the transaction treated Mecklermedia's shareholders equally and whether Internet.com was being sold at a fair price. There is no allegation in the complaint as to whether such further analysis was ever undertaken by either Penton or Mecklermedia. Plaintiffs also stress that the Mecklermedia board specifically considered forming, and declined to form, [*8] a special committee to review the Transactions.

> n2 DLJ gave Penton an oral opinion regarding the $30 million valuation of Internet.com. Plaintiffs fail to disclose the result of this verbal report, although it carries little relevance since the final valuation of Internet.com agreed upon was $22.5 million, not $30 million. Regardless, plaintiffs do not assert that DLJ orally opined that a $30 million valuation was unfair.

After three meetings of the Mecklermedia board, one of which included a presentation to the board by Allen & Co., the board unanimously approved the Transactions on October 7, 1998. At the same time, Meckler signed a Tender, Voting and Option Agreement, which obligated him to tender his Mecklermedia shares to Penton. The next day, Penton issued a press release announcing the tender offer. Penton then filed a Schedule 14D-1 (the "14D-1") with the SEC on October 15, which formally commenced the tender offer. Attached as exhibits to the 14-D-1 were the Offer to Purchase, the Merger Agreement, [*9] the Tender, Voting and Option Agreement, as well as a Services Agreement.

The same day Penton filed its 14D-1, Mecklermedia filed its Schedule 14D-9 Solicitation/Recommendation Statement (the "14D-9") with the SEC. This statement announced that Mecklermedia's board had unanimously approved the tender offer and Merger Agreement, had determined that the Transactions were fair, and recommended that the shareholders accept the offer to tender their shares. This 14D-9 attached the fairness opinion of Allen & Co. Mecklermedia filed an amended Schedule 14D-9 (the "Amended 14D-9") on Nov. 12, 1998, to provide more information regarding the iWorld transaction, which extended the tender offer period and included Meckler's opinion that the iWorld transaction (and his purchase of 80.1% of Internet.com at $18 million) was fair to the shareholders of Mecklermedia.

On November 24, 1998, the tender offer ended and 97.9% of the shares were tendered and not withdrawn. The Transaction and iWorld transaction were completed, and Internet.com was spun-off and renamed internet.com ("New internet.com").

Five months later, New internet.com announced its intent to go public. On June 25, 1999, New internet. [*10] com completed its initial public offering and sold 3,400,000 shares of common stock at $14 per share. This action was filed that same month and was amended on November 7, 2000, and again on November 9, 2001. Defendants have now moved to dismiss the entire complaint on the basis that it fails to state a claim.

### III. ANALYSIS

Defendants' motion to dismiss is based upon two main theories: 1) the board did not breach any fiduciary duties; and 2) in any event, plaintiffs acquiesced in any alleged misconduct by tendering their shares. Plaintiffs counter these theories by reaffirming allegations that the board breached its fiduciary duties of loyalty, care, and disclosure, and that they could not have acquiesced by tendering their shares because they were not fully informed.

#### A. Standard of Review on a Motion to Dismiss

Defendants have moved to dismiss plaintiffs' complaint pursuant to Court of Chancery Rule 12(b)(6), asserting that the complaint fails to state a claim upon which relief can be granted. In deciding a motion to dismiss, a trial court must assume the truth of all well-pled, non-conclusory allegations in the complaint. n3 The court must additionally extend the benefit of [*11] all reasonable inferences that can be drawn from those allegations to the non-moving party, the plaintiffs here. n4 The court may, however, exclude allegations that are conclusory and lack factual support. n5 Thus, a court will dismiss the claim only when the plaintiffs fail to plead facts supporting an element of the claim, or when the facts pled could not support a claim for relief under any reasonable interpretation of those facts. n6 Defendants also move to dismiss New internet.com as a defendant.

> n3 *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 140 (Del. 1997).
>
> n4 *Id.*
>
> n5 *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 353 (Del. Ch. 1998).
>
> n6 *Del. State Troopers Lodge v. O'Rourke*, 403 A.2d 1109, 1110 (Del. Ch. 1979).

#### B. Did the Board Breach Its Fiduciary Duties?

The plaintiffs allege that the Mecklermedia Board breached its fiduciary duties of loyalty, care, and disclosure in considering, approving and recommending the

  

[*12] Transaction and the iWorld transaction.

1. Duty of Loyalty

Defendants argue that the plaintiffs' duty of loyalty claim should be dismissed for two reasons. First, defendants stress that plaintiffs failed to allege facts sufficient to indicate that the Mecklermedia board was self-interested or lacked independence. Second, defendants assert that plaintiffs failed to allege facts sufficient to indicate that the board acted in bad faith or had no rational basis for its decision to approve or recommend the transaction.

Plaintiffs have effectively conceded that the board was not *apparently* self-interested or lacking independence. n7 They counter, however, by alleging that this independent, disinterested board nevertheless must have acted in bad faith because it approved a transaction that was so far beyond the bounds of reasonable judgment that it was inexplicable on any other ground.

> n7 "Defendants' arguments concerning whether the directors were interested in the transaction or lacked independence are beside the point." (Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss the Second Am. Compl. at 24 n.4.)

[*13]

Although the business judgment rule normally prevents a court from reviewing the decisions of an independent, disinterested board that are made in good faith and in the exercise of due care, there is one narrow "escape hatch." n8 The business judgment rule may be rebutted "in those *rare* cases where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'" n9 The decision must be "egregious," lack "any rational business purpose," constitute a "gross abuse of discretion," or be so thoroughly defective that it carries a "badge of fraud." n10

> n8 *In re J.P. Stevens & Co.*, 542 A.2d 770, 780-81 & n.5 (Del. Ch. 1988) ("This 'escape hatch' language has been variously stated in the Delaware opinions: 'egregious' decisions are said to be beyond the protections of the business judgment rule, as are decisions that cannot 'be attributed to any rational business purpose', or decisions that constitute 'a gross abuse of discretion.'") (internal citations omitted).
>
> n9 *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999) (quoting *In re J.P. Stevens & Co.*, 542 A.2d at 780-81) (emphasis added).

[*14]

> n10 *In re J.P. Stevens & Co.*, 542 A.2d at 781 n.5.

The Court's responsibility at this stage is to determine whether any reasonable interpretation of the facts in plaintiffs' complaint could support a claim for relief. Thus, plaintiffs must allege sufficient facts that could reasonably lead to an inference that the board's act was so egregious that it must have been the product of disloyalty or bad faith. Here, the complaint alleges facts that, if proven, could support a claim that Meckler and the Mecklermedia board members breached their fiduciary duty of loyalty. n11

> n11 Many of these allegations border upon conclusory statements, yet I am reluctant to summarily dismiss them at this stage, as I must assume the truth of all well-pled facts and give plaintiff the benefit of all reasonable inferences. I would stress, however, that plaintiffs must meet their burdensome task of supporting these allegations (such as the bald assertion that Meckler demanded and received a "bribe") with more specific facts to survive the summary judgment stage. Although I have assumed the truth of most of the facts in plaintiffs' complaint, I have disregarded an allegation that Meckler was provided with a vehicle to induce four other affiliates to approve or facilitate the transaction. Even though Meckler had the option to provide four others with a small equity interest in New internet.com, plaintiffs have failed to allege any facts that even remotely indicate that Meckler employed or even considered using this method to facilitate the approval of the transaction.

[*15]

Similar to the plaintiffs in *Parnes v. Bally Entm't Corp.* n12 and *Crescent/Mach I Partners, L.P. v. Turner*, n13 the plaintiffs here have alleged that this disinterested, independent board approved of an unfairly negotiated transaction that benefited Meckler at the expense of the other Mecklermedia shareholders. In *Parnes*, the plaintiffs alleged that the company's CEO, Mr. Goldberg, controlled the merger negotiations and extracted substantial cash payments and assets that lacked consideration and were conditioned upon completion of the merger. n14 These benefits were offered in exchange for his consent, which he claimed was mandatory to the sale. n15 Further, it was alleged that he discouraged

  

other bidders who would not consent to these bribes and who may have paid a higher price for the company otherwise. n16 These allegations of bribery and unfair dealing by the CEO who negotiated the transaction, even in the context of an independent, non-conflicted board, provided enough substance to persuade the Supreme Court to overturn this Court's earlier dismissal of the *Parnes* complaint.

[*16]

  n12 722 A.2d 1243 (Del. 1999).

  n13 C.A. No. 17455, 2000 Del. Ch. LEXIS 145 (Sept. 29, 2000) [hereinafter *Crescent/Mach*].

  n14 These payments and asset transfers included: (1) a termination payment of $21 million (which exceeded the amount arguably due to Goldberg by approximately $14.4 million); (2) a transfer to Goldberg for $250,000 of a warrant worth $5 million for the purchase of 20% of Bally Total Fitness Holding Corporation's common stock and the forgiveness of $15.2 million of Bally Fitness indebtedness to Bally; (3) the merger of Bally's Casino Holdings, Inc., a shell corporation, into Bally and the conversion of the Casino Holdings preferred stock, all owned by Goldberg, into Bally and Bally Total Fitness stock worth approximately $43 million; (4) the transfer to Goldberg of 20% of Bally's interest in a Maryland race track project; and (5) the transfer to Goldberg of 40% of Bally's interest in a proposed Mexican gaming venture. *Parnes*, 722 A.2d at 1246.

  n15 *Id.* at 1245.

  n16 *Id.* at 1246.

In *Crescent/Mach*, this Court found [*17] that Mr. Turner, CEO, controlling shareholder and Chairman of the Board, secured "a substantial transfer of . . . assets and substantial financial remuneration" for himself that were not made available to the minority shareholders, similar to the benefits obtained in *Parnes*. n17 Even though the board received a fairness opinion based upon three different valuation methods, the court denied the defendants' motion to dismiss because Mr. Turner's alleged breach of his fiduciary duties was so egregious that they tainted the entire merger process. n18 Thus, the board's approval of the transaction alone was enough to rebut the business judgment rule because the board "failed to protect the interests of the corporation and the minority stockholders." n19

  n17 *Crescent/Mach*, 2000 Del. Ch. LEXIS 145 at *43 & n.47. The import of these "side-deals" is that Turner stood to gain a substantial equity interest in Bottling Group while Holdings and ABC would become wholly owned subsidiaries of Bottling Group. For example, these alleged "side-deals" included: 1) the Turner Family Partnership contracting with Bottling Group to contribute one million shares of Holdings' stock, owned and controlled by Turner, to Bottling Group in exchange for 250,000 shares of Bottling Group thereby securing for Turner a substantial equity interest in the surviving entity; 2) CAI and Carlyle Bottling contracting for a stock exchange with Bottling Group in which they agreed to exchange their stock in ABC for stock in Bottling Group; 3) Holdings redeeming approximately 6 million shares of its stock owned or controlled by Turner or the Turner Family Partnership for $25 per share thereby securing for Turner certain tax advantages not offered to other stockholders; 4) making the merger contingent on the sale of JLT Beverages' claimed brand name Deja Blue and franchise rights in Snapple brand products for $15 million to Bottling Group; 5) CSI and Carlyle Bottling agreeing to each purchase $75 million of Bottling Group's stock after the consummation of the merger; 6) Cadbury Schweppes agreeing to purchase $150 million of Bottling Group's subordinated debt; 7) Turner, Bottling Group, CSI, Carlyle Bottling, and the Turner Family Partnership entering into an agreement to retain Turner on the board of directors of the surviving entity for so long as he is employed by the Bottling Group at a base salary of $900,000 including bonuses and stock options; 8) Turner receiving shares in the surviving entity which would 'facilitate realization of a profit by the Turner interests through an initial public offering of Bottling Group's stock—an opportunity not afforded to other stockholders; 9) Carlyle Bottling and the Turner Family Partnership agreeing that the Bottling Group stock acquired in the transactions by the Turner Family Partnership, CSI and Carlyle Bottling would be treated as a tax free exchange; 10) CSI and Carlyle Bottling agreeing to purchase the Holdings' stock that Turner and the Turner Family Partnership were to have redeemed in the event the Merger was enjoined. 2000 Del. Ch. LEXIS 145 at *8-10.

[*18]

  n18 2000 Del. Ch. LEXIS 145 at *45.

  

n19 2000 Del. Ch. LEXIS 145 at *37, 2000 Del. Ch. LEXIS 145 at *45.

Similar to the allegations of asset transfers in these cases, the allegations here charge Meckler with receiving Internet.com at a grossly unfair price in exchange for his presentation, recommendation, and approval of the Transaction. n20 The asset transfers in *Parnes* and *Crescent/Mach* allegedly lacked *any* consideration. In this case, Meckler paid $18 million for his share of Internet.com. Nevertheless, it follows that a *grossly inadequate* purchase price for Internet.com should lead to the same result as an agreement wholly lacking consideration. A grossly inadequate purchase price would still wrongly divert Company funds to Meckler. Thus, the complaint adequately asserts that Meckler violated his fiduciary duties by unfairly demanding that Penton sell Internet.com to him "on the cheap." This allegedly coercive purchase may have diverted Company funds to Meckler, resulting in the shareholders receiving a grossly unfair price.

n20 The complaint also alleges that Meckler's receipt of a $100,000 consulting agreement and Penton's provision of a Services Agreement to New internet.com amounted to a "windfall" to Meckler. These may be additional circumstances that will provide fuel for the fire of a suspicious mind. I note, however, that the complaint indicates the Services Agreement was a customary agreement between Penton and its business affiliates. *See* Second Amended Class Action Compl. P51 ("As part of our agreement, we will sign a service agreement between the trade shows/magazines and Internet.com to maintain the mutual benefit and support of all three product lines. The services agreement will be similar to our Index and Findlay agreement, which is largely based on barter.").

[*19]

Contrary to defendants' assertion, the fact that $274 million was the highest offer entertained does not lead to the conclusion that Internet.com was sold at a fair price. Although the total merger consideration of $274 million was higher than the $270 million offered by United News, both offers included the sale of Internet.com to Meckler for a similar price. If this price was grossly inadequate as plaintiffs allege, both offers would have diverted significant funds from the Company to Meckler and both prices would have been unfair to the shareholders. Because I must give plaintiffs the benefit of all reasonable inferences in their complaint, I must accept plaintiffs' assertion that Internet.com was grossly undervalued when it was sold to Meckler. n21

n21 Additionally, plaintiffs allege that several other sources indicated that Internet.com should have commanded a much higher value, such as the earlier $50 million estimate provided by D&T.

Further, if the board members acquiesced in such unfair dealing [*20] to the detriment of the Mecklermedia shareholders, they too may have breached their fiduciary duty of loyalty. Plaintiffs allege that the board members knew Meckler allegedly sought out an interested merging partner, dictated the terms of the Transaction, secured a valuable asset of the Company at a grossly unfair price, and diverted funds away from the Company to himself. With these allegations, the plaintiffs have sufficiently pled that the directors' acquiescence to this process, passive or otherwise, was beyond the bounds of reasonableness. Just as the CEOs' conduct in both *Parnes* and *Crescent/Mach* "tainted the entire process," if plaintiffs' assertions in this case are accepted as true, Meckler's conduct would have been so egregious that the Mecklermedia board likely could not have approved the Transactions in good faith. Thus, I conclude that plaintiffs have sufficiently alleged that the directors may have breached their duty of loyalty. Defendants' motion to dismiss the duty of loyalty claim is denied.

2. Duty of Care

Defendants argue that plaintiffs failed to allege any facts that would establish that the directors breached their duty of care. And, even if a duty [*21] of care claim were established, it should be dismissed because Mecklermedia's charter contained an exculpatory § 102(b)(7) provision.

Plaintiffs counter by enumerating several instances in which they believe the board members failed to use due care in the negotiation and approval of the transactions. Additionally, plaintiffs contend that the § 102(b)(7) exculpatory provision may not be used to dismiss the duty of care claims at this stage because of the presence of an adequately pled duty of loyalty claim.

a. Breach of the Duty of Care

Plaintiffs have alleged sufficient facts to show the Mecklermedia board breached its duty of care to the Mecklermedia shareholders. Delaware law provides that the "business and affairs of every corporation ... shall be managed by or under the direction of a board of directors." n22 When the board of a corporation acts, Delaware courts ordinarily review that act under the presumption of the business judgment rule. n23 The business judgment rule is a "presumption that in making a

  

business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the [*22] company." n24 Thus, as long as the board was informed and not self-interested, this presumption will not be disturbed if the board's business decision can be attributed to "any rational business purpose." n25

> n22 8 *Del. C.* § 141(a).
>
> n23 *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).
>
> n24 *Id.*
>
> n25 *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971).

Plaintiffs contend that the board breached its duty of care by yielding to Meckler's negotiations, by not using a special committee, and by not appropriately educating itself on the value of Internet.com. Here, the board was admittedly not self-interested. It was within the board's business judgment to delegate the negotiation of the Transactions to its CEO. There is nothing inherently wrong with allowing an interested CEO to negotiate a transaction. n26 What does matter is whether the directors sufficiently oversee such negotiations by scrutinizing the resulting transaction in [*23] order to assure themselves that it is fair to the shareholders and to the company. There is no automatic requirement that the board employ a special committee to perform this evaluation, especially when a majority of the board is disinterested and independent. Here, the board considered whether a special committee was needed and explicitly found that one was not. This is a valid exercise of the board's business judgment. Therefore, the only questions remaining are whether the board was informed and whether its decision was based on a rational business purpose.

> n26 *In re Ply Gem Indus., S'holders Litig.*, 2001 Del. Ch. LEXIS 84, at *28 (Del. Ch. June 26, 2001).

In evaluating the Transactions, the board informed itself through several rounds of board deliberations, reports by experts and by conducting a market "survey." As noted in the complaint, the board met several times to discuss the proposed Transactions. It retained investment bankers to assist in structuring and evaluating a business [*24] combination strategy. It received written and oral reports from this investment banker regarding the overall combination.

These evaluative measures, however, were all flawed to some degree according to the complaint. Although the board had no duty to engage a special committee, the board did have a duty to scrutinize the Transactions more closely to ensure that the shareholders were being treated fairly. Here, plaintiffs allege, the board failed to ensure that the shareholders were receiving adequate consideration for Internet.com. The board was aware of the amount of the earlier United News offer, but this offer may not have sufficiently reflected the value of the Company and Internet.com. Because the prior offer also included a sale of Internet.com at a similar (and allegedly discounted) price to Meckler, this market "survey" would have resulted in a similarly depressed price. Thus, according to the plaintiffs, the market "survey" may not have been a sufficient indication of the value of the shares of Mecklermedia.

Although no other bidders came forward after the Penton negotiations were underway, such potential bidders may have shied away from bidding because of the conflicts [*25] of interest involved. Plaintiffs allege that Meckler made it clear that he would not sell the Company without retaining a majority interest in Internet.com. Consequently, the fact that there were no other bidders for the Company does not establish that it was sold at a fair price.

Additionally, the board received no fairness opinion regarding the iWorld transaction. Even though Allen & Co. opined upon the overall fairness of the Transactions, it did not separately consider the fairness of the iWorld transaction. n27 The only possible way for the board to have known whether the shareholders were receiving a fair price for their shares in Mecklermedia was to have had some assurance that Meckler was paying a fair price for his equity interest in Internet.com. According to the complaint, the expert advice the board relied upon failed to provide this assurance.

> n27 *Cf. Levco Alternative Fund Ltd. v. Readers Digest Ass'n*, 803 A.2d 428 (Del. 2002).

Plaintiffs' complaint also alleges that [*26] the board had no information about the value of Internet.com to enable it to make an informed decision. The facts in the complaint suggest that the board had every reason to doubt the adequacy of the price Meckler paid for his interest in Internet.com. The board knew that its CEO had retained complete control over the negotiation of a self-dealing transaction. The board knew that Allen & Co. did not separately opine on the fairness of the iWorld transaction. The board knew the "agreed upon" value of Internet.com dropped from $30 million to $22.5 million

  

during negotiations (a 25% decrease in value) because Meckler could afford to pay no more than $18 million for his 80.1% interest. At the same time, there was no corresponding increase in the per share purchase price of Mecklermedia. Presumably, the board would also have known that PwC warned Penton to take a closer look at the iWorld transaction from an economic and legal standpoint and that D&T valued Internet.com at $50 million when consulted by Allen & Co. All of this information arguably should have compelled the board, at a minimum, to further scrutinize the iWorld transaction's fairness independently. Otherwise, the board [*27] assertedly would have had no reasonable basis upon which to conclude that the Mecklermedia shareholders were being treated fairly.

Because the complaint arguably alleges that the directors were not fully informed when they approved the Transactions, I do not need to address whether the board had a rational business purpose. n28 Thus, at this juncture, I conclude that the plaintiffs have sufficiently alleged that the Mecklermedia directors were not fully informed when evaluating and approving the Transactions.

> n28 Several rational business purposes have been given for the business combination and the resulting ownership structure of New internet.com. It seems irreconcilable, however, to find that the approval of the transactions arguably exceeded all bounds of rational decisionmaking for the purposes of the duty of loyalty, but also find that the very same decision was rational for the purposes of evaluating the board's duty of care.

b. Section 102(b)(7)

At this stage, I cannot dismiss plaintiffs' duty of care [*28] claim based upon an exculpatory provision contained in the Mecklermedia charter. As *Malpiede*, n29 and *Emerald Partners* n30 instruct, when a duty of care breach is not the *exclusive* claim, a court may not dismiss based upon an exculpatory provision. n31 Because the duty of loyalty is implicated in this case, the § 102(b)(7) provision cannot operate to negate plaintiffs' duty of care claim on a motion to dismiss.

> n29 *Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001).
>
> n30 *Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 2001).
>
> n31 *Id.* at 91 ("Since its enactment, Delaware courts have consistently held that the adoption of a charter provision, in accordance with Section 102(b)(7), bars the recovery of monetary damages from directors for a successful shareholder claim that is based *exclusively* upon establishing a violation of the duty of care.") (emphasis added).

3. Duty to Disclose

Plaintiffs contend that defendants failed to disclose all [*29] material information to the shareholders in the 14D-9 and Amended 14D-9. Defendants assert that all relevant information was disclosed and that the claim should therefore be dismissed.

A fact is material if "there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote." n32 The plaintiff must demonstrate there was a substantial likelihood that the omitted fact would have "significantly altered the 'total mix' of information made available" to the stockholders. n33 In order to state a claim for relief, plaintiff must: 1) allege that there are facts missing from the disclosure; 2) identify specific facts that were omitted or misleading; 3) state why those facts were material; and 4) demonstrate how the omitted or missing fact caused injury. n34

> n32 *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997).
>
> N33 *Id.* at 143; *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985).
>
> n34 *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1173 (Del. 2000).

[*30]

Plaintiffs assert that Mecklermedia's 14D-9 and Amended 14D-9 were materially false and misleading and that this information would have altered the total mix of information available to the shareholders if disclosed accurately. Plaintiffs contest four main portions of the tender offer materials: 1) the failure to disclose the source of the $22.5 million valuation of Internet.com; 2) the failure to disclose details about the United News negotiation; 3) the failure to disclose the "true reason" for the iWorld transaction; and 4) the allegedly false characterization of the merger consideration as "fair." The contents of the challenged tender offer materials will be considered on this motion to dismiss because they were incorporated by reference in the complaint. n35

> n35 *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69-70 (Del. 1995).

 

a. Internet.com Valuation

Plaintiffs successfully contend that the tender offer materials did not adequately disclose the source of the $22.5 million [*31] valuation of Internet.com. The Amended 14D-9 parenthetically explains that the agreed valuation of iWorld was "based upon [Meckler's] payment of $18 million for an 80.1% equity interest in iWorld." n36 This statement—which was buried in a subpart of multiple factors Meckler considered when opining upon the fairness of the iWorld transaction—fails to point out the fact that no independent valuation of iWorld was ever attempted. Instead, the Amended 14D-9 compared this agreed-upon value to other factors, such as historical accounting data, revenues, tangible assets, and the value per page viewed on the web site. Although shareholders are generally able to draw their own conclusions about valuations when given the valuation method and results, here there was no attempt to provide the shareholders with a valuation of Internet.com, leaving them with no basis, other than Meckler's own self-serving fairness opinion, to determine whether they were receiving adequate value for their stake in Internet.com. Thus, it seems reasonable that further disclosure regarding the $22.5 million valuation of Internet.com may have altered the total mix of information available to the shareholders.

> n36 Amended Schedule 14D-9, item 8(d).

[*32]

b. United News Negotiation

Plaintiffs assert that defendants should have disclosed more details regarding the United News negotiation, even though United News' $270 million offer was lower than Penton's $274 million offer. The information disclosed in the Schedule 14D-9 was limited to a statement that "the Company reached an oral understanding regarding an approximate three week period of exclusivity with one of the companies interested in a potential strategic combination; however, the period of exclusivity expired prior to a letter of intent being executed with such company."

Plaintiffs allege that the board should have further disclosed that it was United News making the bid, that the oral offer was to purchase all shares of the company for $270 million and included a similar side transaction to sell Internet.com to Meckler, and that negotiations failed due to United News' attempt to change the terms of the side deal. Because the United News negotiation never progressed to the letter of intent stage, it would not have been material for a stockholder to know the identity of one potential buyer. Nor have plaintiffs explained how this additional information would have altered [*33] the total mix of information available to the Mecklermedia stockholders. If the negotiation terminated over the terms of the iWorld transaction, however, this information likely would have been material to Mecklermedia's shareholders because it would imply that the Company's value was somehow tied to the successful negotiation of a side deal with Meckler for iWorld. Thus, plaintiffs have alleged a claim based on the partial disclosure regarding the United News negotiation.

c. The "True Reason" for the iWorld Transaction

Plaintiffs assert that the tender offer materials omitted the "true reason" for the iWorld transaction, which they allege was to provide a windfall to Meckler. Besides having no basis for this assertion, a board is only required to present the material facts of the transaction; it is not required to cast those facts in a negative light. n37 Thus, the board would not have been required to engage in "self-flagellation" of this sort. n38

> n37 *Loudon*, 700 A.2d at 143; *In re GM Class H S'holders Litig.*, 734 A.2d 611, 628 (Del. Ch. 1999).
>
> n38 *Loudon*, 700 A.2d at 143.

[*34]

d. Board Representation Regarding Fairness

Plaintiffs assert that the board members' representation regarding the fairness of the Transaction and iWorld transaction was false and misleading and that the board members lacked a reasonable basis for this opinion. Plaintiffs contend that the terms were in fact *unfair* to the Company's shareholders for four reasons: 1) the shareholders did not receive any consideration for Internet.com; 2) Meckler participated in unfair dealing when negotiating the iWorld transaction; 3) the board approved the transaction to provide an "economic windfall" to Meckler; and 4) the board lacked a reasonable basis for opining that the Transaction was fair.

I conclude that some of these allegations cannot withstand scrutiny on a motion to dismiss, as the board does not have to cast its decisionmaking in a negative light, and because they are refuted by the information contained in the tender offering documents. First, contrary to plaintiffs' allegations, the Mecklermedia shareholders were not deprived of their interest in Internet.com without *any* consideration. The shareholders were informed of the amount Meckler paid for his interest in Internet.com [*35] in the 14D-9 before deciding whether to accept or reject the tender offer. To the ex-





tent that the shareholders may have received *inadequate* consideration for their interest in Internet.com, however, the transaction may have been unfair. This conclusion, obviously, is one that cannot be drawn at this juncture because Internet.com was not separately valued and thus there is not enough information to determine whether the shareholders were improperly deprived of their interest in Internet.com. Thus, plaintiffs have adequately alleged that the transaction may have been unfair and that the Mecklermedia board members' fairness opinion was false or misleading.

Second, if the transaction (and the negotiations leading up to it) were in fact unfair to the shareholders, the Mecklermedia board was not required to *characterize* it as illegal or wrong. As discussed above, a board is not required to engage in self-flagellation in its disclosure materials. Thus, both allegations, including the board's alleged desire to bestow a "windfall" upon Meckler and the negative characterization of Meckler's negotiation tactics, were not required disclosures in the tender offer materials. What was required [*36] of the board was already disclosed. The tender offer materials fully described the material portions of the negotiation and its resulting terms as well as Meckler's self-interest. Having failed to allege how further disclosure of Meckler's self-interest is more than redundant or how a shareholder would consider it material in deciding whether to tender her shares, this aspect of plaintiffs' disclosure claim fails as a matter of law.

Last, the fairness opinion may have been misleading if the board members in fact lacked a reasonable basis for their fairness statement. Although the board was entitled to rely upon the fairness opinion of Allen & Co., n39 the board arguably should have evaluated the fairness of the iWorld transaction separately as noted above. A reasonable stockholder may have been misled by the Allen & Co. fairness opinion to believe that Internet.com *itself* was being sold for a fair price when it may not have been. A board does not necessarily need to disclose specific details regarding the analysis underlying the report, n40 but a stockholder would likely have found the inadequacies of, or limitation on, the fairness opinion material to her decision whether to [*37] tender her shares. This Court has held that "stockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely." n41 Although the material terms of the Transactions were disclosed, as well as Meckler's self-interest and resulting equity in Internet.com, a reasonable shareholder may have been misled to believe that Allen & Co.'s opinion regarding the Transactions encompassed the fairness of these factors without having received the underlying data the investment banker relied upon. Further, if the board itself was not fully informed (allegedly) regarding the iWorld transaction, it can hardly be argued that it adequately informed the stockholders regarding the fairness of this very same transaction. Therefore, plaintiffs have stated a claim for breach of the board's duty of disclosure in this respect.

> n39 *McMillan v. Intercargo Corp.*, 768 A.2d 492, 505 n.55 (Del. Ch. 2000).

> N40 *Skeen*, 750 A.2d at 1174; *In re Best Lock Corp. S'holder Litig.*, 2001 Del. Ch. LEXIS 134, *35 (Oct. 29, 2001).

[*38]

> n41 *In re Pure Resources, Inc.*, 808 A.2d 421, 2002 Del. Ch. LEXIS 112, at *80-81 (Del. Ch. 2002) (finding that disclosure of a banker's fairness opinion provided stockholders with "nothing other than a conclusion, qualified by a gauze of protective language designed to insulate the banker from liability").

### C. Did the Shareholders Acquiesce in the Board's Conduct by Tendering Their Shares?

Last, defendants assert that all of plaintiffs' claims should be dismissed because all material facts were disclosed to plaintiffs before they tendered their shares. Thus, they argue, the act of tendering their shares shows that the plaintiffs thereby acquiesced in the Transaction and iWorld transaction and cannot now challenge it. Plaintiffs counter by alleging that they could not have acquiesced by tendering their shares because they were not fully informed.

I pause a moment to consider what plaintiffs do not allege in this instance. Plaintiffs do not assert that they were "under protest" when they tendered their shares, which would negate a finding of acquiescence. n42 Additionally, [*39] plaintiffs do not allege that the tender offer was in any way coercive, which would have prevented meaningful choice and similarly negated a finding of acquiescence. Plaintiffs rely solely upon the allegation that the shareholders were not sufficiently informed. This entire argument relies upon their earlier assertion that the board breached its duty to disclose all material information to the shareholders. If the board did not breach its duty to disclose all material information regarding the transaction to the shareholders, then the shareholders were fully informed when they tendered.

> n42 *Kahn v. Household Acquisition Corp.*,

  

1982 Del. Ch. LEXIS 580, at *6 (Jan. 19, 1982).

Because plaintiffs have adequately alleged that the board breached its duty of disclosure, I cannot, at this stage, conclude as a matter of law that the shareholders were fully informed when they tendered their shares. Although the material terms of the Transactions were disclosed, as well as Meckler's conflict of interest [*40] and resulting equity interest in Internet.com, the shareholders may have been misled into believing that the iWorld transaction was independently evaluated as "fair" when it had not been. Neither the board nor Allen & Co. separately opined upon the fairness of the iWorld transaction. Instead, both Transactions were categorically lumped into a single fairness opinion that plaintiffs contend did not fully inform the shareholders of the value of Internet.com. In addition, plaintiffs insist they were not provided with full and complete information regarding how the $22.5 million valuation for iWorld was determined. Accordingly, because plaintiffs have adequately pled disclosure claims, I cannot conclude that their complaint is barred by the doctrine of acquiescence.

D. *Should the Court Impose a Constructive Trust over Internet.com?*

Plaintiffs cite *O'Malley v. Boris* n43 for their assertion that a constructive trust should be imposed upon New internet.com. Although it is debatable whether such a remedy would be advisable, as in *O'Malley* I am reluctant to dismiss New internet.com from the case at this point. The company is majority owned by Meckler and this ownership arose [*41] from the transactions in dispute. Thus, if this ownership was "ill-gotten," it follows that a constructive trust may be placed upon Meckler's equity interest in New internet.com so that he is not unjustly enriched at the expense of the Mecklermedia shareholders. For this reason, I decline to dismiss New internet.com as a defendant.

n43 2002 Del. Ch. LEXIS 33 (March 18, 2002).

IV. CONCLUSION

In sum, defendants' motion to dismiss the complaint is denied. Plaintiffs have stated a claim for a breach of the duties of loyalty, care and disclosure against the Mecklermedia board. The § 102(b)(7) provision cannot operate to immunize the duty of care claim at this juncture. The affirmative defense of acquiescence fails because plaintiffs adequately alleged that the board did not fully inform the shareholders before they tendered their shares. Further, New internet.com is not dismissed as a defendant at this time as it may be a necessary party in connection with a potential remedy.

IT IS SO ORDERED.

