# TAB 2

*1305745    Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

**In re EMERGING COMMUNICATIONS, INC. SHAREHOLDERS LITIGATION**

**No. Civ.A. 16415.**
Submitted Aug. 30, 2003.

Decided May 3, 2004.

Revised June 4, 2004.

Thomas J. Allingham II, Leonard P. Stark, Rosemary S. Goodier, Douglas E. McCann, and James A. Whitney, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; for Greenlight Capital Qualified L.P., Greenlight Capital L.P. and Greenlight Capital Offshore, Ltd.

Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Shane T. Rowley, of Faruqi & Faruqi, LLP, New York, New York; for Brickell Partners and the Class, of counsel.

Thomas A. Beck, Raymond J. DiCamillo, Catherine G. Dearlove and Kelly C. Ashby, of Richards, Layton & Finger, Wilmington, Delaware; P. Kevin Castel and Jonathan R. Donnellan, of Cahill Gordon & Reindel, New York, New York; for Emerging Defendants Communications, Inc., Jeffrey J. Prosser, Innovative Communication Corporation and Innovative Communication Company, LLC, of counsel.

David C. McBride and Bruce L. Silverstein, of Young Conaway y Stargatt & Taylor, Wilmington, Delaware; Attorneys for the Board Defendants; Kevin C. Logue, and Ryan K. Roth Gallo, of Paul, Hastings, Janofsky & Walker LLP, New York, New York; Attorneys for Defendants Richard N. Goodwin, John G. Vondras, Salvatore Muoio, Terrence A. Todman, Sir Shridath Ramphal; and Paul J. Ruskin, of the Law Offices of Paul J. Ruskin, Douglaston, New York; Attorney for Defendant John P. Raynor, of counsel.

OPINION

JACOBS, J. (FN*)

**1    Addressed in this Opinion are the merits of consolidated statutory appraisal and class actions for breach of fiduciary duty.  These actions all arise out of the two-step "going private" acquisition of the publicly owned shares of Emerging Communications, Inc. ("ECM"), by Innovative Communications Corporation, L.L.C. ("Innovative"), ECM's majority stockholder.    The first step tender offer was commenced on August 18, 1998 by Innovative for 29% of ECM's outstanding shares at a price of $10.25 per share.  The balance of ECM's publicly held shares were acquired in a second-step cash-out merger of ECM into an Innovative subsidiary, at the same price, on October 19, 1998.

At the time of this two-step transaction (the "Privatization"), 52% of the outstanding shares of ECM, and 100% of the outstanding shares of Innovative, were owned by Innovative Communication Company, LLC ("ICC").  ICC, in turn, was wholly owned by ECM's Chairman and Chief Executive Officer, Jeffrey J. Prosser ("Prosser").  Thus, Prosser had voting control of both of the parties to the Privatization transaction.

In June 1998, shortly after the Privatization proposal was announced, a fiduciary duty class action was brought on behalf of the former public shareholders of ECM by Brickell Partners, an ECM shareholder.  On February 10, 1999, four months after the Privatization was consummated, an appraisal action was filed by Greenlight Capital, L.P. and certain of its affiliates (collectively, "Greenlight").  A settlement of the Brickell Partners class action was thereafter proposed and later withdrawn.  Greenlight, which had objected to the proposed settlement, filed a separate fiduciary duty action on behalf of both its 750,300 "appraisal shares" and 2,026,685 ECM minority shares to which Greenlight had been assigned the litigation rights.  Thereafter, the Brickell fiduciary duty action and the Greenlight appraisal and fiduciary duty actions were consolidated, and were tried on the merits between September 17, 2001 and November 6, 2001.    Post-trial briefing and the submission of other memoranda were completed on August 30, 2003.

This is the decision of the Court, after trial, on the merits of the consolidated fiduciary and appraisal actions.

I. THE FACTS

Next recited are the material facts, many of which

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2004 WL 1305745, Emerging Communications, Inc. Shareholders Litigation, In re, (Del.Ch. 2004)   **Page 2**

are undisputed. Where there are disputes, the facts are as found below. Although the recited facts set forth the basic storyline, they are not intended to be comprehensive. To avoid unduly diverting the reader from the essential plotline, other facts that are relevant to discrete issues are discussed elsewhere in this Opinion in the context where those issues are addressed.

A. The Parties

1. *The Plaintiffs*

The plaintiffs, as noted are Brickell Partners, which represents a class of persons who owned shares in ECM between May 29, 1998 and October 19, 1998; and Greenlight, which comprises three investment funds that focus on special situation value investments. At the time of the tender offer, Greenlight owned 750,300 shares of ECM, and it was also the assignee of the litigation rights (which Greenlight had previously acquired) to 2,026,685 ECM minority shares. Greenlight brings its appraisal action on behalf of the 750,300 shares that it owns outright. Greenlight brings its class action on behalf of those shares, and also on behalf of the 2,026,685 ECM shares as to which Greenlight holds the litigation rights.

2. *The Defendants*

**\*\*2** There are two groups of defendants: (1) the "ECM defendants," which consist of ECM, ICC, and Innovative; and (2) the "Board defendants," who were ECM's directors at the time of the Privatization. In addition to Jeffrey Prosser, who was also ECM's Chairman and Chief Executive Officer, ECM's directors were Richard Goodwin; John Raynor; Sir Shridath Ramphal; Salvatore Muoio; John Vondras; and Terrence Todman. Each of the board defendants served as an ECM director at Prosser's request.

(a) *The ECM Defendants*

ECM, a Delaware corporation that was headquartered in the U.S.Virgin Islands ("USVI"), was formed in 1997 to receive the Virgin Islands operations of ECM's corporate predecessor, Atlantic Tele-Network, Inc. ("ATN"), in connection with a division of ATN's business. At the time of the October 1998 Privatization, ECM's principal business was the Virgin Islands Telephone Co. ("Vitelco"), which was the exclusive provider of local wired telephone services in the USVI. Vitelco represented the largest portion of ECM's business and accounted for approximately 88% of its revenues. ECM's other businesses included Vitelcom, an indirect subsidiary engaged in selling and leasing telecommunications equipment; and Vitelcom Cellular ("VitelCellular"), which provided cellular service in the USVI. ECM also owned SMB Holdings, which provided cellular service to the island of St. Maarten/St. Martin.

Innovative, a Virgin Islands corporation that was 100% owned by ICC, is a Delaware limited liability company with its principal place of business in the USVI. As earlier noted, at the time of the Privatization, Prosser owned the entire (100%) membership interest in ICC, which in turn owned 52% of ECM's common stock, and 100% of the stock of Innovative.

(b) *The Board Defendants*

The Board Defendants, and their respective backgrounds, are described at this point.

*Richard N. Goodwin*

Richard Goodwin, a member of the Massachusetts Bar, is a noted author of books on American history, government, and politics. In 1959, Mr. Goodwin served as a law clerk to United States Supreme Court Justice Felix Frankfurter, and during the 1960's, he served as Assistant Special Counsel to President John F. Kennedy. After President Kennedy's assassination, Goodwin served as Deputy Assistant Secretary of State for Inter-American Affairs and as Special Assistant to President Lyndon B. Johnson. In the late 1960's Mr. Goodwin served as campaign advisor to Senator Robert F. Kennedy. During the 1980's and part of the 1990's, Mr. Goodwin also served as a consultant to the government of the USVI.

*Shridath S. Ramphal*

Sir Shridath S. Ramphal ("Ramphal"), a native of Guyana, is a Barrister at Law who has held numerous prestigious government and academic positions. Between 1965 and 1993, Ramphal served successively (from 1965 to 1975) as Solicitor General of British Guyana, Assistant Attorney General of the West Indies, Attorney General of Guyana, and Guyana's Minister of Foreign Affairs of Justice. From 1975 to 1990, Ramphal served as Secretary General of the British Commonwealth, a group of 58 nations headquartered in London, England. Ramphal also served as Vice President of the United Nations General Assembly (from 1968 to 1973), Chairman of the United Nations Committee on Development

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Planning (from 1984 to 1987), Special Advisor to the United Nations Conference on Environment and Development (1992), Chairman of the West Indian Commission (1990 to 1992), and as President of the World Conservation Union (from 1990 to 1993). Finally, Ramphal served as chancellor of the University of Guyana from 1988 to 1992, and as chancellor of the University of Warwick in the United Kingdom and chancellor of the University of the West Indies, since 1989.

**\*\*3** Apart from these positions, Ramphal served as a director of, and a paid consultant to, ATN (ECM's corporate predecessor) in 1992, 1993, 1994, and 1995, during which years he was paid (respectively), $20,000, $140,000, $140,000, and $120,000.

*John G. Vondras*

John G. Vondras ("Vondras") is a professional engineer, with over 25 years of independent experience in the telecommunications industry. Vondras has served and continues to serve as a director (and as President Director) of PT ARIAWEST International, a joint venture company that operates a partnership with PT TELKOM, which provides wireless and land based telephone services in Indonesia. In 1986, Vondras spent two weeks in the USVI assisting Prosser on technical due diligence in Prosser's purchase of Vitelco. Vondras also served as a director of ATN.

*Salvatore Muoio*

Salvatore Muoio ("Muoio") is a principal and general partner of S. Muoio and Co., LLC, an investment advising firm, with significant experience in finance and the telecommunications sector. Mr. Muoio's background includes employment as a securities analyst and vice president at Lazard Fréres & Co., from 1995 to 1996 in the telecommunications and media sector, and then for Gabelli & Co., Inc ., from 1985 to 1995, serving both as a generalist and in the communications sector. During his career, Mr. Muoio has been quoted in many well-regarded financial newspapers and periodicals.

*Terrence A. Todman*

Terrence Todman, ("Todman"), a USVI native, is a former United States ambassador to Argentina, Denmark, Spain, Costa Rica, Guinea, and Chad, and has served as special advisor to the Governor of the USVI. Todman, who is now retired, serves on the boards of directors of several other companies,

including Areolineas Argentinas and the Exxel Group.

*John P. Raynor*

John P. Raynor, ("Raynor"), a practicing attorney, was a partner of an Omaha, Nebraska law firm, and served as Prosser's personal attorney as well as ECM's counsel. Raynor was also a business associate of Mr. Prosser, had been a director of ATN, and acted as Prosser's advisor in formulating the terms of the Privatization transaction.

B. Background Leading To The Formation of ECM

ECM's corporate predecessor, Atlantic TeleNetwork, Inc. ("ATN"), was a company that Prosser and a partner, Cornelius Prior, formed in 1987 to acquire the Virgin Islands Telephone Corporation ("Vitelco").

Vitelco, which was ATN's (and later ECM's) principal subsidiary, was (and still is) the exclusive provider of local wired telephone service in the USVI, where Vitelco operates a modern, fully digital telecommunications network. Vitelco was an extremely valuable asset, for several reasons. At the time of the Privatization, Vitelco faced no competition in the foreseeable future, and was guaranteed an 11.5% rate of return on the rate base for local telephone service by the Virgin Islands Public Service Commission. Vitelco's business, which is essentially non-cyclical and not materially affected by recession or inflation, was enhanced by its membership in the Rural Telephone Finance Cooperative ("RTFC"), a non-profit lending cooperative that provided Vitelco with capital at below-market interest rates. Prosser and his entities had access to RTFC financing only because of their affiliation with Vitelco.

**\*\*4** Moreover, Vitelco had been essentially free from taxation. In May 1997, Vitelco was granted by the USVI Industrial Development Commission ("IDC") a five year tax abatement from 90% of income taxes and 100% of gross receipts, property and excise taxes (running from October 1998 through October 2003). The tax abatement was granted to help Vitelco recover from uninsured damage caused by Hurricane Marilyn in 1995. The tax abatement lasted for almost the entire period from the time ATN acquired Vitelco, until the Privatization.

In January 1991, ATN acquired an 80% interest in a second telephone company: Guyana Telephone &

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2004 WL 1305745, Emerging Communications, Inc. Shareholders Litigation, In re, (Del.Ch. 2004)     **Page 4**

Telegraph Company Limited ("GT & T"). Eleven months later, ATN completed an initial public offering of over 5 million shares of its common stock at $19 per share. As a result, Prosser and Prior together owned about 65% of ATN's stock.

By 1993, Prosser and Prior had a falling out. That led to a management deadlock, which effectively precluded Prosser from pursuing his acquisition strategy. With the co-CEOs at loggerheads and the ATN board deadlocked, Prosser and Prior sued each other in June 1995. In February 1996, Prior and Prosser entered into a global settlement of their disputes, in which they terminated all litigation and released all claims.

As part of the settlement, Prosser and Prior attempted to sell ATN, and engaged two investment banks--Prudential and PaineWebber--to assist in that endeavor. Both banks concluded that a buyer should be willing to pay $25 to $30 per share for ATN, which represented a 150% to 200% premium over ATN's market price. But, potential acquirors expressed interest only in acquiring ATN's Virgin Islands operations, primarily Vitelco.

Because ATN could not be sold as an entirety, and because selling only the USVI business would not resolve the management deadlock, Prosser and Prior decided to split ATN into two new companies (the "Split Off"). One of those companies, to be controlled by Prosser, would consist of ATN's Virgin Islands Group. That company was ECM. The other company, which would be controlled by Prior, was New ATN, to which GT & T would be transferred. The Split Off was approved by ATN's board of directors and shareholders, and was consummated on December 30, 1997. Although ATN had no controlling stockholder before the Split Off (Prosser and Prior owned a large but not majority position), as a result of the Split Off Prosser ended up owning 52% of ECM's 10,959,131 shares, and ECM's public shareholders were relegated to the position of minority stockholders. (FN1)

On December 31, 1997, ECM began trading as a public company on the American Stock Exchange. Shortly after Prosser obtained control of ECM, he appointed his long-time ATN directors, Raynor and Ramphal, to the ECM board. Prosser also appointed Messrs. Goodwin, Muoio and Vondras to the ECM board.

C. The Proposed, But Later Aborted, Merger of Innovative Into ECM

ECM's life as a public company was short--only ten and one half months. That was not accidental: before the Split Off had been completed, Prosser indicated that he intended to merge Innovative into ECM, and he began exploring a combination of the two companies in January 1998. On January 20, 1998, ECM hired Prudential to advise it on the fairness of a potential merger of Innovative into ECM's subsidiary ATNCo (the "Proposed Merger"). During the next month, Prosser formulated the terms of the Proposed Merger, assisted by Prudential, the law firm of Cahill, Gordon and Reindel, ECM's legal advisors ("Cahill Gordon"), and director John Raynor.

**5 On February 27, 1998, Prosser sent to each ECM director an outline of the terms of the Proposed Merger, a draft merger agreement, and proposed resolutions creating a special board committee that would consist of Messrs. Raynor, Goodwin, and Ramphal. At the March 9, 1998 meeting of the ECM board, Prosser formally presented the Proposed Merger, whereby Innovative would merge into ATNCo (the wholly-owned ECM subsidiary that held Vitelco) in exchange for the issuance of $35 million of ATNCo convertible preferred stock to ICC (Innovative's parent). No privatization of ECM was contemplated as part of this transaction. At the March 9, 1998 board meeting, the ECM board also constituted a special committee, consisting of Messrs. Goodwin, Raynor, and Ramphal (the "First Special Committee"), to consider Prosser's Proposed Merger. Those persons were appointed at the suggestion of Prosser. (FN2) At that time, Raynor, who was an ECM director and a Prosser business associate, was on retainer as ECM's attorney and had helped Prosser formulate the terms of the Proposed Merger.

The law firm retained to serve as counsel to the First Special Committee was Cahill Gordon. The firm that was retained as the financial advisor to ECM and the First Special Committee in connection with the Proposed Merger was Prudential. From April 3, 1998 through May 20, 1998, Prudential engaged in discussions with ICC about the Proposed Merger terms.

Whether or not the First Special Committee actively considered the Proposed Merger is a heavily disputed issue. Goodwin testified that that Committee never met, that it had no financial or legal advisor, and that the Proposed Merger was "dropped within the month ." (FN3) The other Committee members also testified that the First Special Committee never met and that it had no advisors.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

(FN4)

The record, however, shows that Prudential and Cahill Gordon were retained by, and performed work for, the First Special Committee. (FN5) The scenario in which the Proposed Merger supposedly "languished" shortly after it first surfaced, is inconsistent with JX 218, which is Prudential's extensive documentary presentation of the Proposed Merger to the Special Committee. Joint exhibit 218 was sent to the Committee members on May 22, 1998 in preparation for the Committee's meeting scheduled for May 27, 1998. In that document Prudential valued ATN--the wholly owned ECM subsidiary into which Innovative would be merged--at $25 to $30 per share. (FN6) It is difficult to square Prudential having sent this document--which evidenced that that firm had done significant work--to the First Special Committee as late as May 22, if in fact the Proposed Merger had languished or if the Special Committee had been disbanded after a week or two, as Goodwin testified.

D. Prosser Abandons the Merger In Favor Of The Privatization

During the third week of May 1998, Prosser began having significant reservations about the Proposed Merger, because the low market interest in ECM's common stock had caused that stock to be undervalued. (FN7) On May 21, 1998, Prosser, together with Raynor, met with representatives of Prudential and Cahill Gordon to discuss the feasibility of Innovative acquiring all of the outstanding stock of ECM. By that point, Prosser had decided (in Raynor's words) to "flip the transaction." (FN8) Having concluded that the market was not recognizing ECM's intrinsic value, Prosser switched from being a seller of ECM stock to becoming a buyer of that stock. Although Prosser had placed a value of $13.25 per share on ECM for purposes of the Split Off that had occurred only 5 months before, as a buyer of that same stock he was now proposing to pay only $9.125 per share.

**\*6** Between May 22 and May 28, Prosser, Prudential and Cahill formulated the terms of a Privatization proposal to be presented to ECM's board. On May 28, Raynor, Prosser and Thomas Minnich, ECM's Chief Operating Officer, informed the RTFC that they had decided to abandon the Proposed Merger and to take ECM private. The next day, Prosser delivered to the ECM board a letter withdrawing the Proposed Merger and proposing instead that Innovative acquire all the ECM shares it

did not already own. The proposed Privatization was structured as a first-step cash tender offer for ECM's publicly traded shares at $9.125 per share, to be followed by a second-step cash-out merger at the same price. (FN9)

Prosser's May 29th letter was the first occasion that the ECM board and the First Special Committee (other than Raynor) learned of the abandonment of the Proposed Merger in favor of the Privatization. Those directors were never told of the roles played by Prudential, Cahill and Raynor--all supposedly retained to represent the interest of the ECM minority stockholders--in formulating the terms of the newly-substituted going private transaction. (FN10)

On the same day that Prosser proposed the Privatization, he told ECM's board that he (Prosser) had retained ECM's former advisors, Prudential and Cahill Gordon, to represent Innovative as the buyer in that transaction. Prudential was an especially valuable advisor to ECM, because it understood ECM's business and properties and had been ECM's only advisor during its brief life as a stand-alone company. Thus, the advisors that initially were retained to work *for* the interests of ECM and its minority stockholders would now be working to serve the interests of Innovative, the party now bargaining *against* ECM. There is no evidence that the ECM board objected either to Prosser's co-opting these valuable advisors, or to the timing of the proposed Privatization. (FN11)

E. The Formation Of The Second Special Committee And The Negotiation Of The Transaction Terms

At the May 29 ECM directors' meeting, the board formed another special committee (the "Second Special Committee") to review the fairness of the proposed Privatization. The directors selected to serve as members of this Second Special Committee were Messrs. Richard Goodwin, John Vondras, and Shridath Ramphal. (FN12)

There were several obstacles to the ability of these three directors to operate as a fully functioning Special Committee. Located on different continents and separated by a time difference of 14 hours, the three Committee members were never able to meet in person. Instead, they had to conduct their business by telephone and fax. Even teleconferences were difficult to arrange and as a result, the Second Special Committee never met collectively--even by telephone--to consider the $10.25 final negotiated offer whose approval it ultimately recommended.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Because one of the Second Special Committee members lived in Indonesia and the other lived in England, practicality dictated that Goodwin would be the Committee chair. In that capacity, Goodwin was designated to--and did--take the lead role in negotiating with Prosser and in selecting the Committee's legal and financial advisors. Mr. Goodwin interviewed William Schwitter of Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings"), as a potential legal advisor to the Second Special Committee, and on June 5, 1998, the Committee retained the Paul Hastings firm as its legal counsel. Later, after meeting with representatives of J.P. Morgan and Houlihan Lokey Howard & Zukin ("Houlihan") at his home in Massachusetts, Goodwin recommended that the Committee retain Houlihan as its financial advisor, and in mid-July, 1998, the Second Special Committee retained Houlihan in that capacity. (FN13)

**\*\*7** As part of its pre-financial analysis investigation of ECM, Houlihan conducted (among other things) a review of ECM's financial information. That information included financial projections for ECM, dated March 25, 1998 (the "March projections"), that had been prepared by James Heying, ECM's then-Chief Financial Officer and Executive Vice President of Acquisitions. (FN14) What Houlihan was *not* provided, however, were financial projections dated June 22, 1998 (the "June projections") (FN15) that Prosser had caused Heying to prepare as part of Prosser's and ICC's application to the RTFC to finance the acquisition of ECM's minority shares.

The June projections forecasted substantially higher growth than did the March projections. Based on the June projections, as modified by the RFTC, the RFTC concluded in July 1998 that ECM was worth (for loan approval purposes) approximately $28 per share. (FN16) Recognizing that the Privatization gave Prosser "the opportunity to retain control at a price below the true market value of the company," (FN17) the RTFC approved financing that would enable Prosser to offer up to $11.40 per share. (FN18) That suggests, and Prosser later confirmed, that he always planned (and gave himself sufficient elbow room) to increase his initial offer by some amount. (FN19) Moreover, the $60 million RTFC loan represented the amount Prosser had asked for, not the limit of what the RTFC would have allowed him to borrow. (FN20)

Although Prosser made the June projections available to his legal advisor (Cahill), his financial advisor (Prudential), and his lender (the RTFC), the June projections were never provided to the Second Special Committee, Houlihan, or the ECM board. Instead, Prosser directed Heying to send Houlihan the March projections, even though the June projections were available by that point. As a result, the Committee and its advisors believed--mistakenly--that the March projections were the most recent projections available. (FN21)

On August 4, 1998, the Committee met with Houlihan to discuss Houlihan's preliminary analysis, which had been furnished to the Committee members in the form of a draft presentation booklet. After explaining in detail his firm's assumptions and methodologies, Houlihan's representative informed the Committee that it was not prepared to opine that $9.125 was a price that was fair to the minority stockholders. After further discussion, the Second Special Committee agreed that $9.125 would not provide adequate compensation to the ECM minority.

Before beginning its negotiations with Prosser, the Committee members discussed different strategies for obtaining the highest possible price for the minority shareholders. The Committee was not ready to reject Prosser's offer outright without at least attempting first to negotiate a higher price. One strategy the Committee discussed was to present Prosser with a "final price" they believed was fair and acceptable. They concluded, however, that the approach best calculated to achieve the highest price was not to demand a specific price from Prosser, but, rather, to negotiate with Prosser for the highest price he would pay for the shares and then determine whether that price represented fair value for the minority stockholders. (FN22)

**\*\*8** Between August 5 and August 10, 1998, in a series of telephone conversations, (FN23) Messrs. Goodwin and Prosser negotiated the buyout price for ECM's publicly held shares. During the first conversation, which took place on August 7, Goodwin told Prosser that his initial offer of $9.125 was inadequate. According to an entry that Goodwin made in his "diary":

After much back and forth [Prosser] said that he could go up another point (which was price Houlihan had told me privately would be acceptable). If this failed [Prosser] was considering making a private tender which he calculated would give him around 90% of all the stock. If he could not get it at what he considered a fair price [he] might withdraw his offer and let the

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

stock go to market level. (FN24)

Eventually, Prosser told Goodwin that he would consider the matter and call Goodwin back. Shortly thereafter, Prosser raised his offer by one eighth of a point, to $9.25 per share. Goodwin reported that offer to the Second Special Committee, which rejected it as inadequate. Goodwin then called Prosser and told Prosser that he would have to improve his offer. In a later negotiation, Prosser raised his offer to $10 per share. Again, Goodwin reported that offer to his fellow Committee members and to Houlihan. The Committee rejected that revised offer, and thereafter, Prosser raised his offer to $10.125 per share. The Second Special Committee rejected that offer as well.

In response, Prosser raised his offer to $10.25 per share, but told Goodwin that $10.25 was his final offer. Because the price had been going up in roughly quarter point increments, Goodwin countered by asking for $10.50 per share. Prosser rejected that request, pointing out that $10.25 was already "straining the limits of [his] financing" for the transaction. (FN25) At that point, Goodwin made a judgment that the Committee "had reached the limits of how far we could push ...," (FN26) and informed the other Committee members--Ramphal and Vondras--of his conclusion. Ramphal and Vondras agreed to stop the negotiations at that point. (FN27)

Thereafter, Goodwin asked Houlihan if it could furnish a fairness opinion at $10.25 per share. Houlihan responded that it could, because that price was within the valuation ranges resulting from its market multiple analysis and its discounted cash flow (DCF) analysis.

The Committee having obtained what they believed was the highest available price, the question then became whether that price was fair. On August 12, 1998, Goodwin and Vondras had a telephonic meeting with Houlihan and Paul Hastings to review Prosser's $10.25 offer. Having updated its financial analysis, Houlihan concluded that the revised offer price of $10.25 was fair to ECM's public shareholders from a financial point of view. Goodwin and Vondras thereafter voted to recommend that the full ECM board approve the Privatization. (FN28)

**F. ECM's Directors and Shareholders Approve The Proposed Privatization**

**\*\*9** A telephonic meeting of the ECM board to consider Prosser's revised offer to buy all of ECM's

publicly held stock for $10.25 per share, was held on August 13, 1998, the following day. Present at that meeting were Mr. Schwitter and Houlihan representatives. Not attending were Messrs. Prosser (at the request of the Board) and Todman (due to a scheduling conflict). The Board members who had not served on the Special Committee had received copies of Houlihan's fairness analysis before the meeting. (FN29)

At the meeting, the Special Committee members described the process they had employed. Houlihan then explained its financial analysis and confirmed that in its opinion, the $10.25 per share price was fair to the minority stockholders from a financial point of view. After discussion, the board determined to approve the Privatization, but only if a majority of the shares held by the minority stockholders were tendered in the first-step tender offer. The meeting was then adjourned to August 17, 1998, at which time the board was told that Prosser would agree to this non-waivable minimum tender condition. The full board, acting upon the unanimous recommendation of the Second Special Committee, then voted to approve the Privatization.

On August 18, 1998, ECM publicly announced the execution of a definitive merger agreement that provided for the Tender Offer and Merger at $10.25 per share, and that the Tender Offer was subject to the minimum tender condition. The Tender Offer commenced on August 24, 1998. At the time of the Tender Offer, there were 10,959,131 outstanding ECM shares, of which 5,606,873 shares were owned by Prosser through ICC, and the remaining 5,352,258 were held by the public. As of September 25, 1998, 3,206,844 of those shares (i.e., a majority of the minority shares) had been tendered. On October 19, 1998, a special meeting of ECM shareholders took place, at which the Merger was approved by a vote of 5,760,660 FOR, and 4,466 AGAINST, out of 10,959,131 shares entitled to vote. The Merger was consummated that same day.

These appraisal and fiduciary duty class actions followed.

**II. THE PARTIES' CONTENTIONS AND THE ISSUES PRESENTED**

As earlier noted, the plaintiffs have brought and litigated two separate actions--a statutory appraisal action and a class action asserting claims that the Privatization was not entirely fair to ECM's minority shareholders. In a statutory appraisal action, the

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2004 WL 1305745, Emerging Communications, Inc. Shareholders Litigation, In re, (Del.Ch. 2004)    **Page 8**

Court must determine the "fair value" of the corporation whose stock is being appraised. (FN30) Plaintiff Greenlight claims that the statutory fair value of ECM at the time of the merger was $41.16 per share, plus the value of certain corporate opportunities that Prosser is claimed to have usurped (valued at $3.79 per share), for a total fair value of $44.95 per share.

In a class action seeking to invalidate a "going private" acquisition of a corporation's minority stock by its majority stockholder, the standard under which this Court reviews the validity of the transaction and the liability of the fiduciaries charged with breach of duty, is entire fairness. (FN31) That standard of review has two aspects: fair dealing and fair price. (FN32) In this case, the plaintiffs claim that the Privatization was the product of unfair dealing that, in turn, resulted in an unfair transaction price. The transaction (it is claimed) resulted from violations of the defendants' fiduciary duties of loyalty and good faith, for which the defendants are liable and must respond in damages.

**10** The plaintiffs' claims, both fiduciary and statutory, and the defenses to those claims, involve a plethora of contentions that are too numerous to catalogue in detail at this point without overburdening an unavoidably lengthy Opinion. The reason, in great part, is that the case was over-litigated and over-briefed, a state of affairs for which the Court (by allowing the parties to file briefs in excess of the page limit) is responsible. The post-trial briefs and other submissions alone total almost 400 pages, (FN33) and the trial record, not surprisingly, is correspondingly voluminous. To save the reader from losing the forest in the trees, what follows is a "broad brush" sketch of the parties' contentions. A more detailed picture of those contentions--and the specific issues which flow therefrom--is set forth in the sections of this Opinion that follow.

In the fiduciary duty class action, the basic issues are whether the defendants dealt fairly with the ECM minority and whether the $10.25 per share transaction price was fair. Because the plaintiffs' class action damages claim is identical (dollar-wise) to their statutory appraisal claim, the fiduciary "fair price," and statutory "fair value," contentions converge and are addressed in connection with the statutory appraisal claim. Accordingly, at this point the Court summarizes the "fair dealing" contentions. Thereafter, it summarizes the fair price/fair value claims.

With respect to fair dealing, the threshold procedural issue is which side has the burden of proof. Because the defendants stood on both sides of the transaction, normally the burden would fall upon them. If, however, the defendants can satisfy the Court that the transaction was approved by a fully functioning independent committee of independent directors or by an informed majority of minority stockholders, the burden shifts to the plaintiff to prove that the transaction was unfair. (FN34) Here, the plaintiffs contend that the Second Special Committee was neither independent of Prosser nor fully functional, for which reason the burden of proving entire fairness falls upon the defendants. The defendants contend the opposite, and assert that the burden of proof must shift to the plaintiffs.

Turning first to the substantive fair dealing issues, the plaintiffs claim that the Privatization was not the result of fair dealing because: (1) the entire ECM board was "unfairly stacked" in favor of (*i.e.,* beholden to) Prosser, (2) the timing of the transaction and Prosser's co-opting of ECM's advisors were unfair, (3) the Special Committee was neither independent nor properly functioning, and (4) the defendants violated, in various respects, their "duty of candor" to the minority shareholders in both the tender offer disclosure document and in the proxy statement issued in connection with the second step merger.

Not surprisingly, the defendants vigorously resist these claims, and contend that in their dealings with ECM's minority stockholders they acted fairly in all respects. The defendants also raise three affirmative defenses: (1) Greenlight lacks standing to assert any claims based on its acquired "litigation rights," and (2) no former stockholders of ECM can recover the value of any shares that they tendered into the tender offer or voted in favor of the merger; and (3) even if the Privatization was not entirely fair, the defendants are exculpated from damages liability under Article Seventh of ECM's certificate of incorporation.

**11** The parties' briefs are largely devoted to the "fair price" and appraisal issues, which in this case (as noted), are one and the same. Typical in litigation of this kind, the overriding question--what ECM was intrinsically worth on the merger date--involves a proverbial "battle of the experts." In this case, the valuation experts were University of Chicago Business School Professor Mark Zmijewski, the plaintiffs' expert who valued ECM at over $41 per share; and Daniel Bayston, a consultant at Duff and Phelps and the defendants' primary valuation expert,

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2004 WL 1305745, Emerging Communications, Inc. Shareholders Litigation, In re, (Del.Ch. 2004)    **Page 9**

(FN35) who valued ECM at $10.38 per share.

These widely differing valuations of the same company result from quite different financial assumptions that each sponsoring side exhorts this Court to accept. To evaluate the parties' competing approaches requires the Court to resolve a multitude of DCF-related valuation issues, some of which are factual and others of which are conceptual.

The first set of issues involve which set of management projections is appropriate to use in a discounted cash flow (DCF) valuation of ECM--the March projections that were furnished to the Special Committee, or the June projections that were created closer in time to the merger date but were furnished only to Prosser, his advisors, and the RTFC, and not the Special Committee or its advisors. Professor Zmijewski used the June projections without modification. Mr. Bayston, on the other hand, used the March projections and modified them in ways that the plaintiffs hotly dispute.

A second set of issues concerns the appropriate discount rate. In this regard, both Prof. Zmijewski and Mr. Bayston determined a discount rate using standard weighted average cost of capital ("WACC") and Capital Asset Pricing Model ("CAPM") formulas. Professor Zmijewski used the WACC formula without any modifications. Mr. Bayston modified the WACC formulas and inputs, by adding various "small firm" and "weather risk" premiums, substituting new costs of debt, and using a debt-to-value capital structure that (together with Bayston's other modifications) has also generated ardent disputes.

The third and fourth sets of issues center on the questions of what weight should be accorded to ECM's stock market price in determining its fair value; and whether the appraisal (or damages) award should include the value of certain businesses that plaintiffs claim were corporate opportunities of ECM.

The analysis that next follows addresses these fair value and fair price issues. In Part III of this Opinion the Court treats the valuation issues raised by the parties, and concludes that (1) the $10.25 merger price was not fair, and (2) ECM's fair value (and fair price) on the date of the merger was $38.05 per share. In Part IV, the Court turns to the fair dealing issues, and concludes that the burden of establishing fair dealing remains with the defendants, who failed to carry that burden. Finally, in Part V, the Court determines what fiduciary duties were violated and

which defendants are monetarily liable as a consequence.

### III. THE FAIR PRICE AND FAIR VALUE OF ECM

**\*\*12** Although each side's experts valued ECM using both the comparable company and DCF approaches, in their briefs the parties focus almost exclusively upon DCF valuation issues. This Court views the parties' virtual non-treatment of the comparable company valuation as a tacit concession that that alternative valuation is a "throwaway" of no material significance. Accordingly, this Opinion addresses only the valuation issues presented by the parties' competing DCF approaches. (FN36)

Both sides agree, and our case law recognizes, that a DCF valuation is based upon three inputs: (a) the projections of free cash flow for a specified number of years, (b) the estimated terminal value of the firm at the end of the "projection period," and (c) the discount rate. (FN37) Although the parties raise a plethora of DCF-related issues, those disputes center around four pivotal questions: (1) which projections (March or June) provide the more appropriate free cash flow input to the DCF model; (2) what is the appropriate discount rate for ECM; (3) how much weight (if any) should the market value of ECM's stock be given in the valuation; and (4) should the value resulting from the DCF method be increased by the value of the businesses that are claimed to be corporate opportunities of ECM? The issues that fall within these four groupings are addressed in this Part of the Opinion.

A. Which Set Of ECM's Projections--March Or June--Is More Reliable For Purposes Of A DCF Valuation On The Merger Date?

Critical to any DCF valuation are the projected revenues, expenses, reserves, and other charges of the firm being valued. On this threshold issue the parties divide, because at Prosser's direction, Heying prepared two sets of management projections, contemporaneously and in the normal course of business. The first set was prepared on March 25, 1998; the second, on June 22, 1998. Plaintiffs' expert, Prof. Zmijewski, used the June projections to derive his projected cash flow inputs, whereas defendants' expert, Duff & Phelps (Bayston) used the March projections, but modified them in significant respects. The issue is what set of projections is the more reliable for purposes of appraising ECM as of the merger date. For the reasons next discussed, the

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2004 WL 1305745, Emerging Communications, Inc. Shareholders Litigation, In re, (Del.Ch. 2004)    **Page 10**

Court determines that the unmodified June projections are the more appropriate and reliable source of inputs for a DCF valuation of ECM.

*First,* as a general proposition (with which defendants' expert, Gilbert Matthews, agreed), "an appraiser should rely on a company's most recent contemporaneous management forecasts unless there are compelling reasons to the contrary." (FN38) Here, the facts compellingly point to reliance on the June projections, which, unlike the March projections, incorporated ECM's first quarter of actual results as a stand-alone company. The June projections also incorporated significant post-March events that were not included in the March projections, namely, the acquisition of St. Maarten Cellular, a corporate jet, and a headquarters building. All those events were "facts on the ground" that would have to be considered in any valuation of ECM on the merger date. If only the March projections were used, those facts could not be considered.

**13 Prosser conceded that the June projections reflected management's interpretation of the first quarter results in the context of the future performance of ECM, and that they were not unreasonably aggressive. (FN39) Also telling is that the June projections were provided to Prosser's legal and financial advisors in the Privatization (Cahill and Prudential)--but not to the Second Special Committee or its advisors. At Prosser's direction, those projections were also provided to the RTFC, which used them to value ECM as collateral for the Privatization financing. If contemporaneous reliance upon the June projections by Prosser, his lender and his financial and legal advisors was appropriate, then logic and common sense dictate that reliance on those same projections by Prof. Zmijewski in performing his valuation was no less appropriate.

*Second,* the defendants' denigrations of Prof. Zmijewski's reliance on the June projections are unpersuasive. Defendants argue that the June projections are inappropriate for use in an appraisal because they incorporated two projected annual cost savings that (defendants say) are synergistic, *i.e.*, merger-related: $2.5 million in savings from the consolidation of ECM and ICC's operations, and $2 million in claimed "going private" savings from the elimination of costs of ECM remaining a public company. Even if those arguments were valid, the proper treatment would be to adjust the June projections for those merger-related cost savings, rather than discard those projections altogether. But more fundamentally, the record shows that (i) the

consolidation cost savings were not merger-dependent and (ii) the claimed going private cost savings are not supported by any credible evidence of record.

The cost savings attributed to the consolidation were properly includable in the June projections, because they were contemplated well before the going private merger and could have been achieved without it. Prosser had identified potential consolidation savings before the Privatization occurred. Because Prosser controlled both ECM and ICC, he had the power to accomplish those savings without a business combination, such as by intercompany contractual arrangements. (FN40) To put it differently, the value achieved by Prosser's existing pre-merger ability to effect those cost savings was an asset of ECM at the time of the Privatization merger. It therefore was a benefit in which all ECM stockholders, not just Prosser, were entitled to share. (FN41) That entitlement cannot be defeated by Prosser's unilateral decision not to achieve those savings except as part of a going private merger that would leave him as the sole owner of the enterprise.

As for the "going private" savings, the only evidence that those savings are reflected in the June projections is the self-interested testimony of Messrs. Prosser and Heying. No document of record identifies or itemizes those savings. Nowhere are those savings reflected or identified in the June projections or in Joint Exhibit 1, a document Heying prepared during this litigation to summarize the differences between the March and the June projections. Unlike the consolidation savings (which are explicitly identified in a separate line item on both the June projections and the Heying memorandum), there is no separate line item for these alleged savings on either of these documents. That is significant, because at the time he prepared the June projections, Heying prepared a cover memorandum to reflect the most significant changes between the March and the June projections. (FN42) The purported going private savings--representing an alleged $2 million change--is conspicuously absent from Heying's memorandum.

**14 The defendants claim that the going private savings include reductions in legal fees and professional fees paid to Deloitte Touche and investment relations companies, but defendants introduced no evidence of the magnitude of those fees, even though they possessed all the relevant data. The defendants could not even reach a consensus among themselves about the magnitude of those

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

undocumented claimed savings. Heying testified at various times that it could be $2.2 to $2.5 million, or $2 million, or $1.8 to $2.2 million. (FN43) Bayston (whose source was Heying) testified that the savings were $2 to $2.5 million annually. (FN44) Matthews' report quantified those alleged savings exactly at $1,644,000 for 1999--a figure for which Matthews was unable to identify any source during his trial testimony. (FN45)

It stands to reason that when a public company goes private, cost savings in some amount will often be achieved. But, in an appraisal proceeding, each party must bear the burden of establishing its own position. (FN46) It was the defendants' burden to establish both the existence and the amount of any cost savings from going private. In this case, the defendants nowhere documented the existence, or the amount, of such cost savings, and the testimony of their witnesses on that subject is hopelessly inconsistent. In these circumstances, the defendants have not carried their burden of persuading the Court that the June projections included a significant cost savings of $2.5 million attributable to eliminating ECM as a public company. Accordingly, those savings are not a valid basis for the defendants to disregard, or to denigrate an appraiser's reliance upon, the June projections for purposes of performing a DCF valuation of ECM.

*Third,* the March projections are inappropriate for the additional reason that the defendants' expert, Mr. Bayston, initially relied on those projections, but then modified them by making large adjustments to critical inputs. The effect of those inputs was to depress the cash flows that management had contemporaneously projected. The defendants argue that Bayston's adjustments must also be made to the June projections if this Court finds those projections to be the appropriate starting point in a DCF valuation. The Court disagrees. It concludes that the June projections, without any modifications, are the most reliable source of inputs to project ECM's future net cash flows.

This Court has consistently expressed a preference for the most recently prepared management projections available as of the merger date. The Court has also been skeptical of *ex post* adjustments to such projections. As Chancellor Chandler observed in *Cede & Co. v. JRC Acquisition Corp.*:

[T]his Court prefers valuations based on management projections available as of the date of the merger and holds a healthy skepticism for post-

merger adjustments to management projections or the creation of new projections entirely. (FN47)

**15 The Chancellor echoed that observation in his most recent appraisal opinion in *Cinerama:*

Contemporary pre-merger management projections are particularly useful in the appraisal context because management projections, by definition, are not tainted by post-merger hindsight and are usually created by an impartial body. In stark contrast, *post hoc* litigation-driven forecasts have an "untenably high" probability of containing "hindsight bias and other cognitive distortions." (FN48)

* * *

* * *

When management projections are made in the ordinary course of business, they are generally deemed reliable. Experts who then vary from management forecasts should proffer legitimate reasons for such variance. (FN49)

The question presented here is whether the defendants have offered "legitimate reasons" for Bayston's modifications to the March projections. The Court concludes that they have not.

The primary modification (FN50) that Bayston made to the March (and, by inference, the June) projections was to increase projected capital expenditures (CapEx). Both the March and the June projections forecasted CapEx of approximately $9 million annually throughout the projection period. Prosser explained that these forecasted capital expenditures were lower than historical levels and were reasonable over the short term, because Vitelco had recently replaced and rebuilt its equipment, thereby reducing the need for short term capital expenditures. (FN51) Heying (FN52) and Matthews (FN53) agreed that the forecasted CapEx were management's best contemporaneous estimates.

Nonetheless, in his cash flow projection Bayston unilaterally increased forecasted CapEx by $3.7 million to $5.7 million per year, because (he claimed) managements "typically" underestimate capital expenditures. Bayston could not cite any scholarly research confirming that view. Nor could he quantify the average amount of any such underestimations, and he never performed an analysis of whether ECM's management had regularly underestimated CapEx.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2004 WL 1305745, Emerging Communications, Inc. Shareholders Litigation, In re, (Del.Ch. 2004)    **Page 12**

(FN54) Bayston's CapEx adjustment decreased free cash flow for each of the forecast years by the amount of the adjusted increase, and for the terminal year decreased cash flow by almost 20 percent. The result was a *negative growth* in free cash flow for years 2005 to 2007, resulting in a consequential decrease in Bayston's overall valuation . (FN55)

That adjustment amounts essentially to Bayston substituting his personal judgment of what CapEx should be for the non-litigation business judgment of ECM's management. Bayston's judgment rests solely upon his opinion that "managements" in general underestimate CapEx. The defendants have nowhere demonstrated that that view is generally accepted within the financial valuation community or that *this* management habitually underestimated CapEx for ECM. Bayston's valuation approach evokes a reaction akin to that expressed by the Chancellor in *Cinerama*. There, the petitioner's expert had rejected a management forecast on unsubstantiated grounds, and the Court observed: "[The expert's] attempts to arrive at more 'realistic' results with a hindsight valuation that ... completely ignores the closest insiders' projections, and results in a strikingly [low] number. This is simply inexcusable." (FN56)

**16 For these reasons, the Court accepts Prof. Zmijewski's adoption of the June projections, and rejects Mr. Bayston's adoption of (and his modifications to) the March projections, as the basis for the cash flow inputs to the DCF valuation of ECM.

B. What Is The Appropriate Discount Rate?

The second major group of issues concerns the appropriate rate for discounting the projected free cash flows. Both Prof. Zmijewski and Mr. Bayston determined their discount rate(s) using the Weighted Average Cost of Capital ("WACC") and the Capital Asset Pricing Model ("CAPM") formulas. Professor Zmijewski used the WACC formula, without adjustment, to calculate a discount rate of 8.8% during the 1998-2002 period when ECM's tax abatement would be in effect, and 8.5% thereafter, assuming that ECM's tax abatement would not be renewed. Mr. Bayston also used the WACC model, but modified the formula and the inputs to that formula by adding various premiums, substituting new debt costs, and using a different debt-to-equity weighting, to arrive at a discount rate of 11.5%.

To understand the significance of the disputes that arise under this heading, it is useful to explain how

the discount rate is determined under the WACC model. Under WACC, the discount rate is calculated based upon the subject company's cost of capital. WACC is the sum of: (1) the percentage of the company's capital structure that is financed with equity, multiplied by the company's cost of equity capital, *plus* (2) the percentage of the company's capital structure that is financed with debt, multiplied by its after-tax cost of debt. (FN57)

One element of the WACC formula--the "cost of equity capital"--is determined by the CAPM model. Under CAPM, the cost of equity capital is the risk-free rate of return plus the subject company's risk. The subject company's risk is determined by multiplying the equity risk premium for the market by the company's beta. "Beta" is the measure of a given company's nondiversifiable risk relative to the market, specifically, the tendency of the returns on a company's security to correlate with swings in the broad market. A beta of 1, for example, means that the security's price will rise and fall with the market; a beta greater than 1 signifies that the security's price will be more volatile than the market; and a beta less than 1 indicates that it will be less volatile than the market. (FN58)

The approximately 3% discrepancy between the two experts' discount rates (8.8% / 8.5% for Zmijewski vs. 11.5% for Bayston) is attributable primarily to their different determinations of the (1) cost of debt, (2) capital structure, and (3) cost of equity. The issues generated by each of these input differences are now discussed.

1. *Cost of Debt*

Professor Zmijewski calculated the weighted average cost of long term debt for ECM at 6.3 %, which was ECM's actual observed cost of debt. He used that figure because of ECM's historical ability to borrow from the RTFC at below-market rates. Mr. Bayston, on the other hand, determined that ECM's weighted average cost of debt on the merger date was 6.59 %, but he assigned ECM a cost of long term debt of 8 %. Bayston's judgment was that ECM would not be able to borrow indefinitely from the RTFC at below-market rates and, therefore, ECM would have to borrow from another lender at rates closer to 8 %. (FN59) The issue is which of these two long-term debt cost figures is more reasonable. The evidence of record persuades this Court that the more reasonable long-term debt cost assumption is 6.3%. (FN60)

**17 The defendants admit that there is nothing of

record which shows that on the merger date, ECM would not have been able to borrow from the RTFC at the weighted average cost of its existing debt. (FN61) As of the merger date, ECM had never borrowed at a rate even as high as 8%. Lending at below-market rates was the RTFC's mission, and as of the merger date management expected it could continue to borrow from the RTFC at favorable interest rates. (FN62) Management never told Mr. Bayston anything to the contrary, (FN63) and the defendants have cited nothing of record that supports Bayston's contrary assumption.

For these reasons, the Court accepts Prof. Zmijewski's 6.3% cost of debt input, and rejects Mr. Bayston's 8% cost-of-debt assumption, the effect of which was to increase Bayston's calculated WACC from 10.9% to 11.16%. (FN64)

### 2. ECM's Debt/Equity Capital Structure

Another important element of the WACC formula is the percentage of the capital structure represented by equity and by long term debt. This factor has proved to be problematic for both sides, and for the Court as well.

At first glance the difference between the experts on this variable appears trivial. Professor Zmijewski arrived at a 28.2% debt-to-enterprise value capital structure, whereas the debt-to-value capital structure used by Mr. Bayston was 30%. Mr. Bayston's 30% figure, however, was a "target," rather than the actual, percentage of ECM's debt to its total enterprise value as of the merger date. It is undisputed that on September 30, 1998 (shortly before the merger date), ECM's actual long term debt was $190.4 million. What is disputed is ECM's total enterprise value. Bayston calculated enterprise value by (i) multiplying ECM's total outstanding shares (10,959,131) by the merger price ($10.38 per share), thus deriving a value of $113.7 million represented by "equity," and then (ii) adding to that value the $190.4 million of long term debt, to arrive at a total enterprise value of $304.1 million. On that basis, Bayston calculated ECM's actual debt-to-value ratio at approximately 63%.

Bayston did not use the actual 63% debt-to-value ratio, however, because in his judgment ECM could not viably sustain such a highly-leveraged capital structure over the long term. Accordingly, Bayston used a 30% "target" figure, which assumed that management would reduce the debt level from 63% to 30%. (FN65)

Professor Zmijewski, unlike Mr. Bayston, based his 28.2% debt-to-value capital structure upon ECM's actual debt level, as opposed to a "target" debt level. But, to arrive at his 28.2% figure, Prof. Zmijewski assumed an enterprise value of $41.16 per share, (FN66) which also was the ultimate fair value that he had determined for ECM.

The finance literature supports elements, but not the entirety, of each side's approach. One treatise instructs that "the appropriate weights to use [to define the firm's capital structure in calculating the WACC] ... are the firm's *long run target weights stated in terms of market value.*" (FN67) Moreover:

> **18 One simple and popular procedure for estimating the target weights is to assume that they equal the company's current market value weights. Unfortunately, this assumption involves a circularity. In most cases, a company is being appraised because the market value of its securities is unknown, and, therefore, cannot be used to calculate the weights.... The circularity can be overcome, in the case of debt and preferred stock by directly establishing the value of these securities.... However, common stock is still a problem. The estimated value of the equity depends on the WACC, which, in turn, depends on the value of the equity.

> In light of the circularity, an iterative procedure must be employed to solve simultaneously for the value of the equity and for the WACC. The iterative process begins with the selection of an initial estimate for the market value of the equity; the book value of the equity is a reasonable choice. Based on this initial estimate, the WACC is calculated ... Subtracting the value of the debt and preferred stock produces a revised estimate of the equity and a revised equity weight. This revised estimate is then used to calculate a new initial estimate of the equity weight. (FN68)

The quoted excerpt does not support the entirety of either side's approach, however. Rather, the quoted treatise appears to support (in some circumstances) Bayston's use of a "target" long term debt weight, but it also supports Zmijewski's employment of an iterative process to solve the circularity problem inherent in the WACC formula. (FN69) Even so, this Court must decide which (if any) of the two competing enterprise values it should accept in determining the percentage of the capital structure represented by debt and the percentage represented

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

by equity.

The difficulty is both that Mr. Bayston's assumed $10.38 per share "enterprise value" and Prof. Zmijewski's assumed $41.16 per share "enterprise value" are identical to the ultimate "fair value" that each expert determined for ECM. Those values exemplify the ultimate circularity inherent in WACC. In this case that circularity is of particular concern, because each expert's ultimate valuation is hotly disputed. Additionally, Mr. Bayston's 30% debt-to-value "target" figure assumes that management would pay down approximately 50% of ECM's debt at some indeterminate future time. That assumption finds no support in the record. For these reasons, the Court is unable to adopt the "enterprise value" assumed by either expert with any degree of confidence. Yet, the Court must still arrive independently at an enterprise value, and neither side has suggested a neutral or middle ground in their briefs.

Because the purpose of this calculation is to determine WACC based upon a reliable "value of the equity," the only sensible way (in the Court's view) to avoid the circularity in this case is to use an enterprise valuation of ECM that is not litigation-driven. On this record, the only such valuation is the $27.84 per share value, based on a 12% discount rate, that the RTFC determined and actually used for purposes of financing the Privatization. (FN70) Having no better or more reliable information, the Court adopts that value for purposes of determining the percentage of ECM's capital structure represented by long term debt and by equity on the merger date.

**\*\*19** As for the percentage represented by long term debt, the only data credibly anchored to the record is the RTFC determination of ECM (ATN)'s net-debt-to-value ratio at 38.8%. Because that ratio was conservatively determined and was calculated as of July 29, 1998, three months before the merger, (FN71) the actual debt-to-value percentage as of the merger date is unknown and can only be estimated. The Court concludes that a debt-to-value ratio of 38% would have been a reasonable estimate and input for purposes of determining a discount rate as of the merger date. From that conclusion it also follows that the percentage of ECM's capital structure represented by equity would have been 62% (*i.e.,* 100%-38%).

### 3. Cost of Equity

Both Prof. Zmijewski and Mr. Bayston used the CAPM formula to calculate ECM's cost of equity. Using that standard approach, Zmijewski derived a cost of equity of 10.4% (for the years when the tax abatement would be in effect), and 10.3% (when the current tax abatement expires). Bayston's initial cost of equity was somewhat lower--9.9%--but Bayston then increased it to 14% by adding "premiums" totaling 4.1%. (FN72) More specifically, Bayston added a "small stock premium" of 1.7% and a "company-specific premium" of 2.4%, the latter consisting of a 1 to 1.5% "super-small stock premium" and a .9 to 1.4% "hurricane risk premium." (FN73) Those "premiums" account for most of the difference between these two experts' cost of equity inputs. Accordingly, the issue becomes whether either of these premiums is appropriate in these circumstances. The party seeking to add the premium (here, the defendants) has the burden to establish that they are appropriate. (FN74)

(a) *The 1.7% "Small Firm/Small Stock" Premium*

Although plaintiffs contend that there is no basis in the finance literature or theory for adding a "small firm/small stock" premium to the cost of equity, that is not entirely accurate. There is finance literature supporting the position that stocks of smaller companies are riskier than securities of large ones and, therefore, command a higher expected rate of return in the market. (FN75) Our case law also recognizes the propriety of a small firm/small stock premium in appropriate circumstances. (FN76) The issue, therefore, is not whether a small firm/small stock premium is permissible theoretically, but whether the defendants have shown that a premium of 1.7% is appropriate in this particular case. The Court concludes that the defendants have made that showing.

Mr. Bayston computed a 1.7% small stock premium by a two step process. First, he determined qualitatively that such a premium was warranted by the size and business of ECM. Second, after reviewing data from the Ibbotson Associates publication, *Stocks, Bonds, Bills and Inflation 1998 Yearbook* ("Ibbotson"), Bayston quantified that premium by subtracting the 11% geometric mean return for large company stocks from the 12.7% mean return for small company stocks. (FN77)

**\*\*20** Plaintiffs do not attack the amount of the premium. Rather, they argue that no small stock/ small company premium should have been added at all. They contend that Bayston mechanically and non-qualitatively applied a premium solely because of ECM's size, even though ECM did not fit the typical profile of a "small company ." Moreover, plaintiffs

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

argue, recent research data show that contrary to the empirical assumption that implicitly underlies the small stock/small firm premium, small firms have in fact under performed large firms.

The answer to the plaintiffs' second argument is that although large-cap companies may have outperformed small-cap companies for discrete, short periods of time, over the last 10 (indeed, the last 75) years, the mean returns for small companies have exceeded the returns for large-cap companies. (FN78 ) The short answer to the plaintiffs' first argument is that although the favorable characteristics of ECM (FN79) are reasons not to apply the second ("supersmall firm") premium that Bayston layered atop the 1.7% small stock/small company premium, those characteristics do not justify ignoring the incremental risk, not fully captured by beta, that typically accompanies a small sized firm.

Accordingly, the Court accepts the 1.7% small stock/small firm premium that Mr. Bayston added to his 9.9% cost of equity, and arrives at a total cost of equity for ECM of 11.6%.

(b) *The 2.4% "Supersmall Firm" And "Hurricane Risk" Premium*

Far more controversial, and less grounded in finance theory and legal precedent, is the additional 2.4% premium added by Bayston to account for what he determined was the incremental risk of ECM being both a "supersmall" firm and also subject to unusually hazardous weather risk, specifically, hurricanes.

Bayston's justification for adding an incremental premium of 1%-1 .5% to ECM due to its "supersmall" size occupies less than one page of defendants' 150 page brief. That justification boils down to an assertion that the 1.7% small firm premium reflected only Ibbotson's average premium for small firms, but that Ibbotson contains "more particularized data which permits an assessment of the appropriate premium for a company, such as [ECM] 'which is much smaller ... than the average companies within the Ibbotson data." ' (FN80) Other than to assert that that additional adjustment of the discount rate "reflects the reality of investment returns in such micro-cap companies" (FN81) the defendants offer no analysis, discussion of specific data, reference to any finance text, or other rationale for their "supersmall" firm premium.

Defendants' support for an incremental premium that if accepted would further increase ECM's cost of

capital, falls woefully short of the showing that is required. The defendants offer nothing to persuade the Court that ECM's risk profile fits what they contend is the "reality" of investment returns for micro-cap companies. ECM may be small, but it is also a utility that was unusually protected from the hazards of the marketplace. ECM was well established, it had no competition, it was able to borrow at below-market rates, and it was cushioned by regulators from extraordinary hazards (for example, by tax abatements). Implicit in the defendants' position, but nowhere straightforwardly argued, is the assumption that these advantages, however extraordinary, were not enough to offset the added risk created by ECM's "supersmall" size. It is the defendant's burden to support that assumption, and they have not done that.

**\*\*21** By adding a second incremental premium to ECM's cost of equity to account for the risk of size, Bayston appears to have performed a mechanical exercise, rather than make a nuanced, textured judgment. Accordingly, the Court determines that the defendants have not established a credible justification for their incremental "supersmall" firm premium, and declines to add that premium to the cost-of-equity.

Apart from the "supersmall firm" premium, Bayston also added a company-specific incremental premium for hurricane risk. The effect was to increase the cost of equity by 1-1.5%, to increase the discount rate by a range of .7% to 1.05%, and to decrease enterprise value by $18 to $24 million (*i.e.*, by $1.64 to $2.19 per share). Bayston's justification for this incremental premium was that (1) as a result of Hurricane Hugo in 1989 and Hurricane Marilyn in 1995, Vitelco (ATN) suffered losses, not reimbursed by insurance or Universal Service Fund revenues, of approximately $80 million; and (2) ECM's management believed that hurricanes would pose a significant risk to ECM's business in the future, in that future storm losses would not be reimbursable by insurance because (management was informed) coverage would no longer be available.

This analysis is faulty on factual and conceptual grounds. First, it overstates the amount of unreimbursed hurricane damage. That amount, Mr. Heying testified, totaled about $55 million for the entire 70 years preceding the merger. (FN82) Second, defendants' claim that management knew as of the merger date that its hurricane insurance would not continue, relies entirely on Prosser's trial testimony, (FN83) which is not corroborated by any

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

contemporaneous document and is inconsistent with ECM's SEC filings and RTFC loan documents, none of which indicate any impending loss of hurricane loss coverage. (FN84) Third, assuming that the risk of future storm losses should be accounted for in some way, the defendants have not supported their argument that the appropriate way to do that is by increasing the cost of equity. Defendants cite no finance literature supporting that approach, nor have they supported their argument empirically, such as (for example) by comparing ECM's company-specific weather-related risk (net of mitigation factors) to the "average" or "mean" weather-related risk for all companies, or even for all "small" companies.

The absence of theoretical and evidentiary support leaves this Court unpersuaded that the risk of unrecoverable hurricane damage loss is so embedded in ECM's business as to require a structural increase in ECM's cost of equity. Absent theoretical and empirical guidance, a more rational approach would be to factor that risk into ECM's cash flow projections such as (for example) by dividing the net hurricane-related loss by a statistically representative number of years to arrive at a loss deduction from projected cash flow for each forecast year. Unfortunately, neither side performed such a calculation.

**\*\*22** The only rational approach that is supported by the record is the plaintiffs' proposal that if the Court finds that the weather-related risk was not appropriately accounted for in Zmijewski's cash flow projections, the Court should reduce Zmijewski's enterprise value calculation by the dollar amount of the estimated effect of the hurricane risk, *i.e.*, by $18 to $24 million. That suggested approach supplies the frame of reference for the analysis that follows.

The plaintiffs' proposed approach to the weather risk issue raises two questions. The first is whether that risk has already been fully accounted for in Prof. Zmijewski's cash flow projections; if not, the second issue becomes what should be the amount of the resulting deduction from enterprise value. The record shows that the projections were based on historical results, and that they included the insurance premiums. (FN85) Because (as defense expert Gilbert Matthews conceded) it would not be appropriate to include the cost of insurance coverage in a forecast without taking into the account the benefit of the protection provided by that insurance, (FN86) the only loss that should be accounted for is the hurricane-related loss that was not reimbursed by insurance. Although the plaintiffs argue that that loss was implicitly included in Prof. Zmijewski's forecast,

the Court has found no evidence to support that assertion. The Court is, therefore, unable to conclude that Professor Zmijewski factored those unreimbursed losses into his cash flow forecast.

Accordingly, it is appropriate (as plaintiffs concede) to deduct the dollar value effect of those losses from enterprise value. The question becomes: what amount should be deducted? The possibilities range from $18 to $24 million. Because the defendants overstated the magnitude of the unreimbursed losses caused by hurricane damage, the Court finds that an appropriately conservative deduction would be at the low end of the range, *i.e.*, $18 million or $1.64 per share.

To summarize, the Court determines that the correct cost of equity for ECM at the merger date was 11.6% (Bayston's initial 9.9% plus a 1.7% small firm/ small stock premium). That cost of equity figure does not include a premium for hurricane damage risk. That risk shall be accounted for by deducting $18 million ($1.64 per share) from the enterprise value calculated (independent of that risk) with the DCF inputs as determined in this Opinion. The result will be to reduce the enterprise value by that $18 million ($1.64 per share) amount.

\* \* \*

\* \* \*

For the reasons previously discussed, the Court cannot accept in its entirety the DCF valuation of either side's expert. Although the Court accepts the plaintiffs' position that the projected cash flows and terminal value should be derived from the June projections, it has determined independently the disputed elements of the WACC and CAPM formulas from which the discount rate is computed. Based upon the Court's findings, the appropriate discount rate is determined to be 8.69%, and the fair value of ECM as of the merger date is determined to be $38.05 per share. (FN87)

C. What Weight Should Be Accorded To ECM's Market Price As Evidence Of Fair Value?

**\*\*23** To support their claim that the fair value of ECM on the merger date was no more than $10.38 per share, the defendants urge that "where, as here, the market for a publicly traded security is an active and efficient one, the market price [of ECM's common stock] is, at the least, important corroborative evidence of value ..." (FN88) For that

2004 WL 1305745, Emerging Communications, Inc. Shareholders Litigation, In re, (Del.Ch. 2004)   **Page 17**

argument, the defendants rely upon the expert testimony of Professor Burton Malkiel of Princeton University. Professor Malkiel opined that ECM's stock "was trade[d] in an efficient market with enough volume and a low enough bid-asked spread, and that it reflected news without delay; and these ... indicators led [Prof. Malkiel] to conclude that ECM was traded in an efficient market and that the [$7.00 per share] market price of ECM common stock prior to the buyout ... was a reasonable reflection of its value." (FN89) Intending no disrespect to Professor Malkiel, the Court is unable to accept his conclusion in this specific case. However sound Professor Malkiel's market price-based theory may be in other circumstances, that theory is inapplicable to these facts because its premise is not supported by either the trial record or Delaware law.

Delaware law recognizes that, although market price should be considered in an appraisal, the market price of shares is not always indicative of fair value. (FN90) Our appraisal cases so confirm. (FN91)

Moreover, the record undermines any assertion that ECM's common stock was traded in an efficient market. Indeed, it was precisely because ECM's stock market price did not reflect ECM's underlying values that Prosser decided to abandon the proposed merger and instead acquire the ECM minority interest in the Privatization. Prosser himself told his fellow ECM directors that the ECM stock price had failed to reach the desired appreciation as a result of the small public float and the fact that the stock was not being followed by Wall Street analysts. (FN92) Moreover, because Prosser always owned the majority interest, the market price of ECM stock always reflected a minority discount. (FN93)

Professor Malkiel admitted that markets occasionally make errors, that the market could have been wrong about ECM, and that it is possible for a stock that trades even in an efficient market to be mispriced, especially in the short run. (FN94) Professor Malkiel also conceded that the market may be inefficient if material information is withheld from it. (FN95) In the case of ECM, while the stock was trading freely, (*i.e.,* before Prosser announced the Privatization), the market never had the benefit of any disclosed earnings or projections of future results, including the June Projections. (FN96)

For these reasons, the Court rejects the defendants' argument that the market price of ECM stock corroborates the $10.25 price as the fair or intrinsic value of ECM on the date of the merger. In this case,

ECM's unaffected stock market price merits little or no weight.

**D. The Corporate Opportunity Claims**

**\*\*24** The plaintiffs contend that to the value of ECM as determined by the DCF method, there should be added an additional $3.79 per share, representing the combined value of the Caribbean Cable Companies (FN97) and the Daily News. Those companies, which ICC (wholly owned by Prosser) acquired on December 30, 1997, are claimed to have been corporate opportunities of ECM that Prosser wrongfully usurped. The plaintiffs urge that Prosser had a fiduciary duty to make those opportunities available to ECM, and that consequently, ECM's minority shareholders were entitled to share in the value of those opportunities on the merger date.

The Court cannot agree, because ECM did not come into existence until December 30, 1997, long after Prosser had had signed definitive purchase agreements on June 9, 1997 to acquire personally three of the Cable Companies, and an agreement to acquire the fourth Cable Company on September 8, 1997. (FN98) Because ECM did not exist, and therefore had no public shareholders at the time Prosser signed those agreements, Prosser was not a fiduciary, and could not have owed any fiduciary duties to ECM. (FN99)

If the Cable Companies and the Daily News were corporate opportunities, they were opportunities of ATN, which owned all the assets later allocated to Messrs. Prior and Prosser in the Split Off. In an Indemnity Agreement entered into among Prosser, Prior, and ATN as part of the Split Off, ATN and Prior relinquished any rights they had to such a claim. In that Agreement, ATN and Prior covenanted "not to bring any action suit or proceeding against Prosser or ECI with respect to any of the matters ... relating to the business, operations or management of [ATN] or any of its Subsidiaries prior to and including the Closing." (FN100)

In short, ECM had no corporate opportunity claim because ECM did not exist at the time the opportunities arose and were taken. If a corporate opportunity claim existed, it belonged to ATN, which relinquished that claim in connection with the Split Off. Accordingly, the corporate opportunity claims cannot form any part of ECM's fair value as of the merger date.

**E. The Fair Value Of ECM And The Unfairness Of**

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

The Merger Price

As a consequence of the foregoing determinations, the fair value of ECM on the merger date is found to be $416,996,000, or $38.05 per share. (FN101) Under 8 *Del. C.* § 262, Greenlight, as the single appraisal claimant, is entitled to recover that per share amount, multiplied by the 750,300 shares for which it seeks appraisal, plus interest as determined in Part III F, *infra,* of this Opinion.

From that fair value finding it further follows that the $10.25 per share merger price was not a "fair price" within the meaning of the Delaware fiduciary duty case law beginning with *Weinberger v. UOP, Inc.* (FN102) Although that, without more, is dispositive, the unfairness of the merger price rests upon more than that one bit of simple deductive logic. The overwhelming weight of the credible evidence of record also compels that conclusion.

**25 The only competent evidence that the merger price was fair was the fairness opinion that Houlihan furnished to the Second Special Committee, and the testimony of Mr. Bayston in support of the fairness opinion rendered by his firm, Duff & Phelps. But whatever evidentiary force Houlihan's opinion might have had was totally undermined by the fact that (i) Houlihan never had the benefit of the June projections, and (ii) the defendants never called Houlihan, upon whose valuation the Special Committee and the board relied, to testify at trial in support of its valuation conclusion. The defendants have never explained their failure to do that. For these reasons, and because it was within the defendant's power to call Houlihan as a witness, (FN103) the only logical inference--and the inference this Court has drawn--is that Houlihan's testimony would have been unfavorable to the defendant's position. (FN104) The RTFC's approximately $28 per share valuation of ECM--which is credible because the RTFC relied on it in deciding to extend to Prosser a multimillion dollar loan to finance the Privatization--was almost thrice the magnitude of the $10.25 per share value that Houlihan was willing to pronounce as fair. And even Duff & Phelps, the defendants' trial valuation expert, was apparently unable to opine that $10.25 per share was fair: that firm valued ECM at not less than $10.38 per share.

The several infirmities that led the Court to reject the Duff & Phelps valuation have been discussed and need not be repeated here. One additional infirmity merits discussion, however, and that is Mr. Bayston's use of impermissible post-merger data in arriving at some of his conclusions. In his deposition Mr. Bayston conceded that he had relied on post-merger evidence in preparing his projections, including his CapEx assumptions:

Q. So that in making your assessment about the best estimate of the costs of the company going forward, you examined and took into account the company's cost experience in the period between the appraisal date and the date of the preparation of your report?

A. That's correct. (FN105)

* * *

* * *

Q. Now, in formulating your more aggressive assumption for capital expenditures, did you take into account the company's capital expenditures experienced between the appraisal date and the date when you prepared your report?

A. I believe we looked at that issue. (FN106)

Although at trial Bayston claimed that he misspoke on his deposition, (FN107) that recantation is not credible because if in fact Bayston misspoke, he did so repeatedly over the course of many deposition pages. Moreover, Bayston had extensive litigation-related contact with ECM's management, (FN108) which would have made it extremely difficult to avoid incorporating post-merger evidence in his valuation.

Striving to portray Mr. Bayston's contacts with management as a strength, the defendants criticize Prof. Zmijewski for "not even attempt[ing] to talk to [ECM] management in connection with his analysis." (FN109) But Prof. Zmijewski cannot fairly be faulted for doing what litigation experts in the valuation area customarily do: conducting careful due diligence using the sworn testimony and contemporaneous discovery record. What Zmijewski did not do in valuing ECM was to rely upon unsworn, post-merger conversations with management. Nor did Prof. Zmijewski rely upon post-merger data to determine the inputs on which his DCF analysis depended.

F. Interest

**26 Once the fair value of the dissenting shareholders' shares is ascertained, our appraisal statute requires the Court to determine "the fair rate of interest, if any" after considering "all relevant

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

factors." (FN110) The interest may be simple or compound, and this Court has broad discretion to determine whether interest should be simple or compound, but the Court must explain its choice. (FN111) As the Chancellor recently stated in *Cede & Co. v. JRC Acquisition:*

> This Court's decision in *Gonsalves v. Straight Arrow Publishers, Inc.* is an accepted method for determining the rate of interest in appraisal actions. *Gonsalves* rests on the principle that an interest award should serve two purposes. First, it should disgorge the respondent of any benefit it received from the use of the petitioner's funds. Second, the interest award should compensate the petitioner for the loss of the use of its money. The second purpose, however, is countenanced with the understanding that the election to 'reject the merger and to pursue appraisal does not shift to the corporation all responsibility for losses [the petitioner] may incur as a result of [its] inability to use the funds retained by the corporation' and that the petitioner can mitigate its losses and obtain perfect 'compensation for the loss of the use of their funds by borrowing the fair value of their shares.' *Gonsalves,* and several other decisions, have found that these twin purposes are served by awarding interest by weighing equally the respondent's actual costs of borrowing and based upon an objective prudent investor standard, the petitioner's opportunity cost. (FN112)

Greenlight claims that it is entitled to an interest award of 22%, compounded daily, from the merger date. To further the compensatory purpose of the interest award, Greenlight argues, the Court should use Greenlight's actual rate of return on its invested capital--37%--for the period beginning October 1, 1998. Because 37% is what Greenlight claims it would have earned on its appraisal award had that award been paid on the merger date, only that rate would restore Greenlight to the financial position it would have had if the merger price were entirely fair. To further the restitutionary purpose of an interest award, Greenlight urges the Court to use the interest rate that ECM pays to short term, unsecured creditors (a category that includes Greenlight in this appraisal). Since the date of the merger, that rate has been 7%. Weighting both rates equally, Greenlight arrives at a rate of 22% which, Greenlight urges, should be compounded daily.

The defendants insist that Greenlight is entitled to simple interest at 5.24%, or at most, interest at that rate compounded no more frequently than monthly.

Although the defendants agree that the "restitutionary purpose of awarding interest is typically addressed by basing one half of the interest award on the corporation's cost of borrowing," (FN113) they contend that as of September 30, 1998, ECM's weighted average interest rate on its $190.4 million of debt was 6.59%.

**\*\*27** As for the compensatory purpose of an interest award, the defendants claim that because this Court has historically applied an objective "prudent investor" standard, (*viz.,* what a prudent investor would have achieved if it had invested the proceeds at the date of the merger) Greenlight's subjective claimed 37% return on its investments is irrelevant as a matter of law. In this case, the prudent investor rate, as determined by Mr. Bayston who relied on the mix of investments specified by Delaware case law, implied an interest rate of 5.54% as of the date of the Duff & Phelps report, and 3.88% as of the date of trial. Because both sides agree that borrowing costs and compensatory measures should be weighed equally, the appropriate rate of interest is 5.24% [ (6.59% + 3.88%) /2]. Finally, defendants argue, Greenlight cites no authority for its request that interest be compounded daily. Defendants urge that the interest award should be either simple interest or, if interest is compounded, the compounding should be no more frequent than monthly, consistent with the case law. (FN114)

These colliding contentions generate four issues: (1) what was ECM's cost of borrowing, (2) what was Greenlight's opportunity cost, (3) based on those inputs, what is the appropriate rate of interest, and (4) should the form of the award be simple or compound interest, and if interest is compounded, over what interval? These issues are now addressed.

Although defendants argue that 6.59% was ECM's cost of borrowing, as Greenlight points out, that represents ECM's average, not its marginal, cost of short term unsecured debt, which was 7%. (FN115) According the Court finds that ECM's cost of borrowing was 7%.

As for Greenlight's opportunity cost, *JRC Acquisition* and *Gonsalves* establish that that cost is to be determined on the basis of an objective "prudent investor" standard, not Greenlight's subjective claimed 37% investment return. The defendants argue that the prudent investor rate of return was 5.54% as of the date Duff & Phelps submitted its report and 3.88% at the time of the trial. Greenlight does not propose any alternative "prudent investor"

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.