rate of return. To err on the conservative side, the Court adopts 5.54% as the prudent investor rate of return.

The Delaware cases require that the interest rate be determined by weighting the cost of borrowing and the prudent investor rate of return equally. On that basis, the appropriate rate of interest on the appraisal award is determined to be 6.27%, running from the date of the Privatization merger. (FN116)

The final issue relating to interest is whether the interest should be simple or compound and if compounded, over what interval. Greenlight cites no authority or evidence that daily compounding is appropriate in this case. But, Greenlight, which is in the business of investing money, has nonetheless satisfied the Court that it would have been able to earn interest on its appraisal award on a compound basis. Moreover, the Court finds, as did the Chancellor in *JRC Acquisition,* that "the dual purpose of compensation and restitution may only be served by a compounding interval at least as frequent as one month." (FN117)

**28 Accordingly, interest on Greenlight's appraisal award shall be at the rate of 6.27%, compounded monthly, from the date of the merger to the date of judgment.

### IV. WAS THE TRANSACTION THE PRODUCT OF FAIR DEALING?

A. Threshold Issues

An entire fairness analysis normally requires the Court to decide, in addition to whether the price paid in an interested merger was "fair," whether the merger was the product of "fair dealing." This case, however, raises three issues that must be confronted at the threshold. The first is whether this Court's determination that the merger price was not fair makes it unnecessary to engage in a "fair dealing" analysis. The Court concludes that a fair dealing analysis is required. The second issue is whether the plaintiffs are barred from asserting their fiduciary duty claims. The Court finds that they are not. The third issue is which side has the burden of proof. The Court determines that the burden falls upon the defendants. What follows is the basis for the Court's rulings on these threshold issues.

*1. Is A Fair Dealing Analysis Required?*

In this case, this Court's determination of ECM's "fair value" disposes of both Greenlight's appraisal action and the "fair price" aspect of the plaintiffs' fiduciary duty claim. The determination that price is not fair raises a preliminary, threshold question of whether in this case any "fair dealing" analysis need be undertaken at all. It is arguable that where (as here) the merger price is found to be unfair, it would be difficult, if not impossible, for the merger to be found "entirely fair" even if the process leading up to the merger involved fair dealing. (FN118) That supposition, if correct, would lead to the result that where the merger price is found not to be fair, that finding establishes, *ipso facto,* the unfairness of the merger, thereby obviating the need for any analysis of the process oriented issues. The Supreme Court has not yet addressed that question, however.

What the Supreme Court has decided is that where an interested merger is found to be unfair and the corporation's charter has a Section 102(b)(7) exculpatory provision, this Court must then proceed to "identify the breach or breaches of fiduciary duty upon which liability [for damages] will be predicated in the *ratio decidendi* of its determination that entire fairness has not been established." (FN119) That is, "when entire fairness is the applicable standard of judicial review, a determination that the director defendants are exculpated from paying monetary damages can be made only *after the basis* for their liability has been decided." (FN120)

That mandate, I find, is applicable here. In this case the defendants have raised a § 102(b)(7) exculpatory defense. In determining that the merger price was not fair, this Court did not address whether the unfairness was the product of a breach of fiduciary duty or if so, the nature or character of that duty. Accordingly, a "fair dealing" analysis is required in this case, if only to enable the Court to determine the "basis for the [defendants'] liability" for § 102(b)(7) exculpation purposes.

*2. The "No Standing" Affirmative Defense*

**29 The defendants have interposed the affirmative defense that the plaintiffs lack standing to assert any fiduciary duty claims. That defense comes in two parts. First, the defendants concede that Greenlight has standing to assert fiduciary claims on behalf of the 750,300 ECM shares that it owns outright. The defendants argue, however, that Greenlight lacks standing to assert any claims on behalf of the former holders of 2,026,685 shares that sold to Greenlight their "litigation rights" to assert the fiduciary claims associated with those shares.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

(FN121) Second, the defendants claim that no former shareholders of ECM can recover anything in respect of any shares that they tendered into the tender offer or voted in favor of the merger. Neither argument, in this Court's view, withstands scrutiny.

(a) *The Litigation Rights Validity Issue*

The plaintiffs contend that Greenlight lacks standing to assert any claims based upon the assigned "litigation rights," because: (1) unliquidated fiduciary claims are not assignable as a matter of Delaware law and public policy, and (2) Greenlight purchased the litigation rights in violation of the parties' Confidentiality Stipulation in the appraisal action. Moreover (argue defendants), (3) if the assignments were invalidated, the litigation rights would not revert back to the assignors, *i.e.,* to the plaintiff class, because by selling these claims those stockholders waived their right to assert their fiduciary claims and must therefore be excluded from the class.

Assuming without deciding that the defendants can be heard to challenge the validity of the assignments, (FN122) it is established Delaware law that choses in action that survive the death of the victim are validly assignable. (FN123) In this case, the choses in action are breach of fiduciary duty and fraud claims. Those claims survive to (or against) a personal representative under 10 *Del. C.* § 3701. (FN124) For purposes of determining which claims are assignable and which are not, Delaware law does not distinguish between claims that are liquidated and those that are unliquidated.

Nor is there any basis for the defendants to argue that the assignments must be deemed invalid on public policy grounds because they are champertous. The short answer is that they are not champertous. Champerty requires "an agreement between the owner of a claim and a volunteer that the latter may take the claim and collect it, dividing the proceeds with the owner, if they prevail; the champertor to carry on the suit at his own expense." (FN125) Greenlight's purchase of the litigation rights was not champertous, because Greenlight has always been involved in the litigation. Greenlight was a shareholder when the Privatization was announced; Greenlight was a member of the shareholder class and always had the right--and standing--to pursue an individual fiduciary duty remedy simultaneously with its appraisal action. Champerty cannot be charged against one with an interest in the matter in controversy. (FN126)

**30 The defendants next urge that Greenlight should be denied standing to sue because it purchased the litigation rights in violation of Paragraph 2 of the Confidentiality Stipulation, which provides that:

> Discovery Material shall be used solely for purposes of this litigation, and shall not be used for any other purpose, including, without limitation, any business or commercial purpose, *provided,* however, that Discovery Material may be used in connection with any litigation among the parties relating to the merger between [ECM] and [ICC] ... effective as of October 19, 1998. (FN127)

Specifically, the defendants contend that Greenlight "used" confidential Discovery Material to purchase the litigation rights in violation of the quoted paragraph. Although Greenlight did possess confidential information, the defendants have not shown that Greenlight used that information in acquiring the litigation rights. Even if Greenlight did use Discovery Material, the defendants have not established that such use was prohibited by the Confidentiality Stipulation, which permitted Discovery Material to be used in both the Appraisal Action ("this litigation") and in "any litigation relating to the Merger" (*i.e.,* the fiduciary duty action challenging that Merger). Nor have the defendants shown that Greenlight disclosed confidential Discovery Material publicly in the marketplace, or otherwise failed to abide by the Confidentiality Stipulation terms.

Finally, the defendants have suffered no prejudice as a result of the assignment of the litigation rights, because those rights belonged to the members of the class. Absent an assignment, the defendants would have had to defend against those claims asserted on behalf of the class in any event. Thus, the defendants can hardly claim cognizable prejudice as a result of the assignment of those same claims to one member of the class that elected to sue individually. (FN128)

(b) *The Waiver Issue*

The defendants next urge that members of the ECM shareholder class who tendered into the first step tender offer, or who voted for the Privatization merger, waived their right to challenge the fairness of that transaction. This argument is flawed, because it presupposes that the shareholders who tendered or voted made a fully informed decision based on full disclosure. As found elsewhere in this Opinion, that is not the case, because the defendants violated their duty of disclosure to the stockholders of ECM in

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

several respects. On that basis alone the defendants' argument must be rejected. (FN129)

(c) *The Burden of Proof Issue*

The final threshold issue is which side has the burden of proof. Both sides agree that because the Privatization is a self-dealing transaction of which the majority stockholder stands on both sides, entire fairness is the standard of review *ab initio*. (FN130) The only question is whether the burden of proof, which normally falls upon the defendants, has shifted to the plaintiffs in this particular case.

**\*\*31** The defendants argue that the burden of establishing that the merger was not entirely fair has shifted to the plaintiffs, because the merger was approved by both an informed independent committee of disinterested directors and an informed majority of minority stockholders. (FN131) The short answer is that the merger was not approved by a committee of independent directors who were properly informed or independent of Prosser, nor was it approved by an informed vote of a majority of ECM's minority stockholders.

In an entire fairness context, where the predicate for a burden-shifting argument is that the merger was negotiated by a special committee, the defendants must establish to the satisfaction of a carefully scrutinizing court, that the special committee was "fully informed." (FN132) As discussed more fully elsewhere in this Opinion, the Special Committee and a majority of ECM's minority shareholders voted to approve the merger, but their votes were not fully informed. A highly material fact was not disclosed either to the Special Committee or to the minority stockholders, namely, that the most recent projections--the June projections--had been provided to Prosser and his financial advisor (Prudential) and his lender (RTFC) but not to the Special Committee. Members of the Special Committee testified that they and Houlihan should have been provided with the June Projections. (FN133) Moreover, the June Projections were not disclosed in the proxy statement, and the proxy disclosures relating to that issue falsely and misleadingly suggested that the shareholders were being provided with all of the projections to which Prosser and his advisers had been privy. The portion of the proxy statement that contained the March projections (identified therein only as Company projections) stated:

> Although the Company does not as a matter of course publicly disclose projections as to future revenues or earnings, because they were received by Mr. Prosser and the parent [ICC, LCC], the purchaser [ICC] is making these projections available to all stockholders. (FN134)

As more fully discussed *infra*, the proxy statement and the tender offer documents omitted to disclose other material facts as well. The material omission relating to the June Projections, however, is sufficient, in and of itself, to undermine the informed character of the Special Committee approval that is a predicate to shifting the burden of proof in an entire fairness case.

The defendants argue that the burden must shift, nonetheless, because the minimum tender condition, *i.e.*, the condition that a majority of the minority shareholders tender into the offer, was the functional equivalent of a shareholder ratification of the transaction. But no Delaware case has held that burden-shifting can be accomplished by a tender of shares rather than by an actual vote. Nor should a tender be treated as the equivalent of an informed vote. Shareholders cannot be deemed to have ratified board action unless they are afforded the opportunity to express their approval of the precise conduct being challenged. (FN135) Stockholders have materially different interests at stake when tendering, as opposed to voting their shares. In considering whether to tender, stockholders must evaluate the risk of being left worse off, *i.e.*, left vulnerable to being frozen out at an even lower price, if the other stockholders were to tender into an inadequate offer. As Vice Chancellor Strine incisively observed in *In re Pure Resources S'holders Litig.*:

> **\*\*32** Indeed, many commentators would argue that the tender offer form is more coercive than a merger vote. In a merger vote, stockholders can vote no and still receive the transactional consideration if the merger prevails. In a tender offer, however, a nontendering shareholder faces an uncertain fate. That stockholder could be one of the few who holds out, leaving herself in an even more thinly traded stock with little hope of liquidity and subject to a § 253 merger at a lower price or at the same price or ... at a later (and, given the time value of money, a less valuable) time. (FN136)

Accordingly, the burden of proving fair dealing remains with the defendants.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

The preliminary issues having been decided, the Court turns next to the substantive fair dealing questions.

B. Fair Dealing Analyzed

A fair dealing analysis requires the Court to address "issues of when the transaction was timed, how it was initiated, structured, negotiated, and disclosed to the board, and how director and shareholder approval was obtained." (FN137)

1. *Timing, Initiation and Structure*

Our courts have recognized that a freeze-out merger of the minority proposed by the majority stockholder is inherently coercive . (FN138) Where, as here, the freeze-out merger is initiated by the majority stockholder, that fact, even though not dispositive, is evidence of unfair dealing.

Another circumstance that evidences the absence of fair dealing is where the transaction is timed in a manner that is financially disadvantageous to the stockholders and that enables the majority stockholder to gain correspondingly. (FN139) This case is the diametric opposite of *Jedwab v. MGM Grand Hotels, Inc.*, where this Court found that the timing of a merger was not unfair because there was no "persuasive indication ... that from the minority's point of view this [was] a particularly poor time to liquidate their investment."  (FN140) Here, the evidence of unfair timing could not be more persuasive. Prosser's initial proposal was to merge Innovative into a wholly owned subsidiary of ECM. That would have benefited ECM stockholders and enabled them to remain as investors in a larger merged company. Because ECM's stock price was depressed, Prosser abandoned that proposal at the eleventh hour and "flipped" the deal for his sole personal benefit to take advantage of the temporarily and artificially depressed stock price. That stock price then became the "floor" for the equally depressed and unfair Privatization price, and benefited Prosser to the same extent that it disadvantaged the minority stockholders who were now being squeezed out of the enterprise.

In addition to, and apart, from the unfairness of its initiation and timing, the transaction was also unfairly structured, in that Prudential and Cahill, the firms that had been retained as advisors to ECM in the initially Proposed (but later abandoned) Merger, were co-opted by Prosser to serve as his advisors. That switch was unfair to ECM, because during ECM's entire existence, Prudential and Cahill had been its advisers and they possessed material nonpublic information about ECM's values, business and prospects. As such, Prudential and Cahill were in the best position to represent the interests of the ECM minority. Those same advisers were now switching sides to represent interests that were adverse to that same minority.

**\*\*33** At a minimum, ECM's board (including Prosser) or the Special Committee should have insisted that Prudential and Cahill remain as advisors to ECM, and that Prosser retain other financial and legal advisors. Failing that, the board--or at the very least the Special Committee--should have insisted that Prudential and Cahill recuse themselves from the negotiations. By doing neither, ECM was deprived of the advantage of knowledgeable advisors. That advantage was conferred upon ECM's controlling stockholder and to-be-adversary in the transaction-- Prosser. There is no evidence that either the full board or the Special Committee ever considered that issue.

2. *The Adequacy of the Minority Shareholders' Representation*

(a) *The Independence Of The Board And Of The Special Committee*

A critical aspect of any fair dealing analysis is the adequacy of the representation of the minority stockholders' interests. In this case, that issue is particularly critical, because a majority of the ECM board members were not independent of Prosser, making it necessary to appoint a Special Committee to negotiate on the minority stockholders' behalf. Unfortunately, a majority of the Special Committee members also lacked independence, and the one Committee member who arguably was independent did not function effectively as a champion of the minority's interests.

Besides Prosser, the ECM board had six members, all of whom Prosser had directly appointed: Raynor, Ramphal, Muoio, Goodwin, Vondras, and Todman. It is undisputed that Prosser, whose wholly-owned entity was the acquirer of ECM's minority interest, was conflicted. But, most of the remaining directors also had disabling conflicts because they were economically beholden to Prosser. Directors who "through personal or other relationships are beholden to the controlling person[ ]" lack independence from that person. (FN141)

Raynor, who was Prosser's long time lawyer, was

clearly conflicted. In 1996, 1997, and 1998, virtually one hundred percent of the legal fees that Raynor generated for his law firm were attributable to work he performed for Prosser and Prosser-owned entities. Before 1996, the percentage of total fees represented by work Raynor performed for Prosser was always greater than fifty percent. From 1987 through 1998, ATNI and its affiliates, and thereafter ECM and its affiliates, were the largest single client of Raynor's firm. (FN142) In 1998, the year of the Privatization, Raynor became "of counsel" at his firm and was put on a retainer arrangement wherein ATNCo paid compensation of $25,000 per month to Raynor, and $5,000 per month to his firm, to cover Raynor's office rental cost. That amount represented all of Raynor's compensation for 1998. (FN143) Raynor also served as a Prosser nominee to the ATNI board, and as a director of Innovative, ECM, ATNCo and Vitelco. (FN144) As a highly paid consultant to, and later full-time employee of, Prosser and his companies, Raynor was clearly beholden to Prosser and, thus, not independent. (FN145)

**34** If further evidence of non-independence were needed, in July 1998--during ECM's consideration of the Privatization proposal--Prosser agreed to pay Raynor $2.4 million over a five year period as compensation for his past services. There was no negotiation over that fee--Raynor requested $2.4 million and Prosser agreed to it. Nor was the $2.4 million compensation arrangement ever disclosed to the ECM board, Compensation Committee or the Special Committee, yet Raynor voted as an ECM director to approve the Privatization. (FN146) That disclosure omission was highly material. Goodwin testified that the $2.4 million payment arrangement should have been disclosed to the board. (FN147) For Raynor to have participated in the board's Privatization deliberations and vote as an ECM director without disclosing this contemporaneously negotiated compensation arrangement, was misleading to Raynor's fellow directors and a breach of his fiduciary duty owed to them and to ECM.

Ramphal was similarly beholden to Prosser. Ramphal was originally introduced to Prosser by his son-in-law, Sir Ronald Sanders, who had a consulting arrangement with Prosser at that time. Like Sanders, Ramphal also fell into a lucrative consultancy with Prosser. In 1993 and 1994, Ramphal was paid consulting fees of $140,000 in both years, and in 1995 he was paid $120,000. On average, those amounts represented 22.5% of Ramphal's total income for that period. (FN148) Those amounts were in addition to the $30,000 directors' fee that Ramphal received annually. (FN149) Moreover, in 1998, Ramphal received $115,000 for his service on the ECM Board and special committees. (FN150)

Given these undisputed facts, the defendants have not shown that Ramphal was independent of, *i.e.,* not beholden to, Prosser, and the Court affirmatively finds that he was not. (FN151) That finding is strengthened by the fact that the consulting arrangement of Ramphal's son-in-law, Sanders, with Prosser would be put at risk if Ramphal, as a Special Committee member, took a position overly adversarial to Prosser. (FN152) Finally, both Sanders and Ramphal were appointed as directors of Innovative after the Privatization had been completed. (FN153)

Muoio was also a consultant to a Prosser entity and beholden to Prosser. As of mid-1997, Muoio was on an annual $200,000 retainer for providing banking/financial advisory services, (FN154) and he viewed Prosser as a source of additional future lucrative consulting fees. In March 1998, Muoio sought up to an additional $2 million for serving as financial adviser on a potential acquisition by ECM of CoreComm Inc. That effort was unsuccessful only because the acquisition ultimately never took place. (FN155)

Lastly, Goodwin, Vondras and Todman received annual directors' fees of $100,000, a generous amount given that ECM's board met only three or four times in 1998. (FN156) Goodwin and Vondras each also received $50,000 and $15,000 for their service on the Special Committee. (FN157) The $115,000 Vondras received in 1998 for serving on ECM's board and Special Committee represented approximately 10% of his income for that year. (FN158)

**35** Although the directors' fees received by Goodwin, Vondras and Todman would not, without more, necessarily constitute a disabling financial interest, (FN159) the record shows that all three of these directors--indeed, all the board defendants--expected to continue as directors of Prosser entities and benefit from the substantial compensation which accompanied that status. In fact, all of ECM's directors except Muoio were appointed to the Innovative board after the Privatization. That expectation, coupled with the fact that his director and committee fees represented a sizeable portion of his income, was sufficient to vitiate Vondras' independence for purposes of considering objectively whether the Privatization was fair to the minority stockholders.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

The director defendants claim that they did not know they would be invited to join the Innovative board after the Privatization closed in October 1998. The evidence shows otherwise. During the negotiations over the Privatization, the ECM directors were told that they would continue on with the company "in its new incarnation." (FN160) The Merger Agreement generated by the board's counsel in connection with the Privatization disclosed that the board defendants would remain directors of the surviving corporation. The Special Committee, through its counsel, received drafts of that Merger Agreement as early as July 17, 1998, before they voted to approve the transaction. (FN161)

In summary, the Court finds that a majority of the full board of ECM (Prosser, Raynor, Ramphal, Vondras, and Muoio) were beholden to Prosser and, thus, were not independent of him. The Court further finds that a majority of the Special Committee (Ramphal and Vondras) were beholden to, and therefore not independent of, Prosser, leaving Goodwin as the only arguably independent Committee member and Todman as the only arguably independent non-Committee director. As previously found, Goodwin, as Committee chair, did almost all of the Committee's work himself. Unfortunately, the work that Goodwin performed in that role, including his negotiations with Prosser, were fatally compromised and, consequently, inadequate to represent the interests of ECM's minority shareholders effectively. (FN162)

(b) *The Committee's Ineffectiveness As The Minority's Representative*

There are several reasons why Mr. Goodwin's efforts as the Special Committee's chairman, and as its sole functioning member, were doomed to failure.

The first is that Prosser withheld the June projections, and knowledge of their existence, from the Committee and its advisors, Houlihan and Paul Hastings. As a consequence, Goodwin and Houlihan were deprived of information that was essential to an informed assessment of the fair value of ECM and of the gross inadequacy of merger price Prosser was offering. Thus disabled, Goodwin was not in a position to negotiate vigorously for a substantial increase in Prosser's opening offer ($9.125 per share) or, alternatively, to make a considered judgment to shut down the negotiations, thereby preventing the Privatization from going forward at all. That nondisclosure, without more, was enough to render the Special Committee ineffective as a bargaining agent for the minority stockholders.

**36 Second, Prosser misled Goodwin by falsely representing that $10.25 per share was already straining the limits of the financing available to him. In fact, Prosser's financing would have enabled him to increase his offer to $11.40 per share, and the record evidence indicates that the RTFC was willing to lend him more, based on its implied valuation of ECM as conservatively worth about $28 per share. (FN163) There is no evidence that Goodwin knew of Prosser's financing arrangements or the RTFC's valuation (for merger financing purposes) of ECM.

Third, and finally, Goodwin was careless, if not reckless, by routing all of his communications with the other Special Committee members through Eling Joseph, Prosser's secretary. The result was to give Prosser access to the Committee's confidential deliberations and strategy. That inexplicable method of channeling communications to Goodwin's fellow Committee members further confirms the severe information imbalance that existed between the two "bargaining" sides. In fact, there was no effective bargaining, because Prosser held all the cards and misled Goodwin into believing that he (Goodwin) and the Committee's financial advisor (Houlihan), possessed all the information that was material to negotiating a fair price. Nothing could have been further from the truth.

3. *The Adequacy of the Board And Shareholder Approvals*

The fourth and final aspect of fair dealing concerns the adequacy of the board and shareholder approvals of the challenged transaction. In this case, those approvals were uninformed and, accordingly, of no legal consequence.

It is undisputed that the Privatization was approved by a unanimous vote of all ECM directors, with Prosser abstaining, at a board of directors' meeting held on August 17, 1998. (FN164) The board's approval was not informed, however, because the voting board members were ignorant of the existence of the June Projections and of the inadequacy of the Houlihan valuation that was based upon the March projections.

Moreover, Raynor, who was conflicted, voted in favor of the Privatization but did not disclose to the other voting board members, the $2.4 million compensation payout arrangement that he had recently negotiated with Prosser. As previously

found, that nondisclosure was material.

By not disclosing these facts, Prosser and Raynor violated the fiduciary duty of disclosure they owed to their fellow directors of ECM. (FN165)

The approval of the transaction by a majority of the minority shareholders was also legally ineffective, because the misdisclosures and omissions in the disclosure documents sent to shareholders in connection with the Privatization rendered that vote uninformed. Those misdisclosures and omissions also violated the fiduciary duty of disclosure owed by ECM's majority stockholder and by the ECM directors who were responsible for the accuracy of those documents. (FN166) The plaintiffs claim several disclosure violations, but the Court need address only three of them.

**\*\*37** First, the Proxy Statement omitted to disclose to the minority shareholders the existence of the June projections and the fact that those projections had been furnished to Prudential and the RTFC, but were withheld from the Special Committee and its advisors. That omission was materially misleading, not only in its own right but also because the proxy statement contained affirmative representations that the public was being provided with the same projections to which Prosser was privy. The section of the proxy statement containing the March projections (identified there only as "Company projections") disclosed that "[a]lthough the company does not as a matter of course publicly disclose projections as to future revenues or earnings, because they were received by Mr. Prosser and the parent [ICC, LLC], the purchaser [ICC] is making these projections available to all stockholders." (FN167) Those misdisclosures were highly material because knowledge of the June projections would have enabled the shareholders to understand ECM's intrinsic worth and the extent of the market's undervaluation of their company.

Second, the disclosure documents misled minority stockholders about the Special Committee's and the board's independence from Prosser. The Schedule 14D-9, which was disseminated in connection with the first-step tender offer, disclosed the members of the Special Committee and their compensation, but not their consulting relationships or retainer agreements with other Prosser entities. (FN168) Specifically, there was no disclosure of Raynor's or Ramphal's long-standing financial relationships with Prosser, including Raynor's $2.4 million payout arrangement for past services and Ramphal's significant consulting arrangements or his conflict concerning the economic and career prospects of his son-in-law. Nor was there disclosure of Muoio's consulting fee arrangement that had resulted in payments to him of hundreds of thousands of dollars. Also, because of their role as negotiators on behalf of the minority stockholders, the prior consulting relationships of Ramphal should have been disclosed. (FN169) The disclosure documents misleadingly suggested that the Special Committee, and perhaps a majority of the entire board, were independent. In fact, that was not true.

Third, that disclosure violation was compounded by the false disclosure that a majority of the board that approved the Privatization were members of the Special Committee. (FN170) In fact, only six of the board's seven members voted to approve the transaction, (FN171) and only three of those six were members of the Special Committee. Three is not a majority of seven. Also not disclosed was the related fact that ECM's and the Committee's original advisors who had been retained to represent the interests of all shareholders in the initially Proposed (but later abandoned) Merger, had been co-opted by Prosser and were now working against the minority stockholders whose interests that they were originally hired to further.

**\*\*38** In short, the disclosure documents were crafted to reassure the minority stockholders that their interests had been effectively represented by a Special Committee of directors who were independent of Prosser and his entities on the other side of the transaction. That impression was materially false and misleading and was sufficient, without more, to render the approving vote of the stockholders uninformed. (FN172)

\* \* \*

\* \* \*

For all these reasons, the Court finds that the Privatization transaction, and the $10.25 per share merger price that has been adjudicated as unfair, were the product of unfair dealing. Accordingly, the Court concludes that the Privatization was not entirely fair to the minority stockholders of ECM. Having so found, the Court must now assess the liability consequences of that determination.

### V. THE DEFENDANTS' FIDUCIARY DUTY BREACHES AND LIABILITY THEREFOR

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Having concluded that the Privatization was not entirely fair, the Court must next determine the nature of the fiduciary duty violation--whether of care, loyalty, or good faith--that resulted in the unfair transaction. (FN173) Under *Emerald Partners v. Berlin,* (FN174) that is necessary to enable the Court to adjudicate which (if any) of the director defendants is liable for money damages, because ECM's § 102(b)(7) charter provision exculpates those directors found to have violated *solely* their duty of care from liability for money damages. Article Seventh of ECM's Certificate of Incorporation provides:

> A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit. (FN175)

By its terms, Article Seventh does not apply to fiduciaries other than directors. Thus, Article Seventh does not apply to Prosser in his capacity as ECM's controlling stockholder, or to ICC or Innovative, the entities that Prosser controlled and through which he effected the Privatization. Prosser, as majority stockholder, breached his duty of loyalty to Greenlight and the plaintiff shareholder class, by eliminating ECM's minority stockholders for an unfair price in an unfair transaction that afforded the minority no procedural protections. For that breach of duty Prosser is liable to Greenlight and the shareholder class. So also are the two Prosser-controlled entity defendants, Innovative and ICC, which were the mechanisms through which Prosser accomplished the Privatization. Those entities are liable for having aided and abetted Prosser's breach of fiduciary duty. (FN176)

The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director.

**39 Prosser is liable in his capacity as a director for breach of his duty of loyalty, conduct that is not exculpated under Article Seventh. Prosser is also liable on the basis that he "derived an improper personal benefit" from the Privatization transaction-- which is another exception to the exculpatory coverage of Article Seventh.

Raynor also is liable for breaching his fiduciary duty of loyalty--conduct that is excluded from the exculpatory shield of Article Seventh. Raynor did not personally and directly benefit from the unfair transaction (as did Prosser), but Raynor actively assisted Prosser in carrying out the Privatization, and he acted to further Prosser's interests in that transaction, which were antithetical to the interests of ECM's minority stockholders.

Raynor acted in concert with Prosser, who was the source of Raynor's livelihood, to "flip" the transaction from a merger of Innovative into ATNCo, to a going private merger of ECM into Innovative. (FN177) Raynor also assisted Prosser and Innovative in obtaining RTFC financing for the Privatization (FN178) at the time when Raynor was still serving on the First Special Committee, ostensibly to safeguard the interests of ECM's minority stockholders . (FN179) After the Second Special Committee was formed, Raynor attended a meeting with Prosser and two ECM officers and the RTFC to discuss issues relating to the structuring of the revised deal. (FN180) Finally, on July 20, 1998, Opus Capital Partners ("Opus") sent a letter to Goodwin, complaining that the initial $9 .125 price was too low and should be around $30. (FN181) This letter was somehow "leaked" to Cahill, Prudential, and Raynor, (FN182) and Raynor reported the contents of the Opus letter to the RTFC, editorializing that "Opus--biggest [shareholder with] dissenting opinion on buy back bought in @$6 or $7/share [but] believes should be valued @ $30 per share." (FN183)

Although Raynor did not benefit directly from the transactions, his loyalties ran solely to Prosser because Raynor's economic interests were tied solely to Prosser and he acted to further those economic interests. Accordingly, Raynor is liable to Greenlight and the shareholder class for breaching his fiduciary duty of loyalty and/or good faith. (FN184)

The Court also concludes, albeit with reluctance, that Muoio is similarly liable, even though Muoio's conduct was less egregious than that of Prosser and Raynor. Unlike Raynor, Muoio did nothing affirmatively to assist Prosser in breaching his fiduciary duties of loyalty and good faith. Like his fellow directors, Muoio was also not independent of Prosser.

Muoio is culpable because he voted to approve the

transaction even though he knew, or at the very least had strong reasons to believe, that the $10.25 per share merger price was unfair. Muoio was in a unique position to know that. He was a principal and general partner of an investment advising firm, with significant experience in finance and the telecommunications sector. From 1995 to 1996, Muoio had been a securities analyst for, and a vice president of, Lazard Freres & Co. in the telecommunications and media sector. From 1985 to 1995, he was a securities analyst for Gabelli & Co., Inc., in the communications sector, and from 1993 to 1995, he was a portfolio manager for Gabelli Global Communications Fund, Inc. (FN185)

**40 Hence, Muoio possessed a specialized financial expertise, and an ability to understand ECM's intrinsic value, that was unique to the ECM board members (other than, perhaps, Prosser). Informed by his specialized expertise and knowledge, Muoio conceded that the $10.25 price was "at the low end of any kind of fair value you would put," (FN186) and expressed to Goodwin his view that the Special Committee might be able to get up to $20 per share from Prosser. (FN187) In these circumstances, it was incumbent upon Muoio, as a fiduciary, to advocate that the board reject the $10.25 price that the Special Committee was recommending. As a fiduciary knowledgeable of ECM's intrinsic value, Muoio should also have gone on record as voting against the proposed transaction at the $10.25 per share merger price. Muoio did neither. Instead he joined the other directors in voting, without objection, to approve the transaction.

ECM's directors other than Prosser and Raynor could plausibly argue that they voted for the transaction in reliance on Houlihan's opinion that the merger term price was fair. In Muoio's case, however, that argument would be implausible. Muoio's expertise in this industry was equivalent, if not superior, to that of Houlihan, the Special Committee's financial advisor. That expertise gave Muoio far less reason to defer to Houlihan's valuation. Knowing (or at least having very strong reasons to suspect) that the price was unfair, why, then, would Muoio vote to approve this deal? The only explanation that makes sense is that Muoio, who was seeking future business opportunities from Prosser, decided that it would disserve his interests to oppose Prosser and become the minority's advocate.

Admittedly, divining the operations of a person's mind is an inherently elusive endeavor. Concededly, the possibility exists that Muoio's decision was driven not by his overriding loyalty to Prosser, but by a sincere belief that the $10.25 price was minimally fair, even if not the fairest or highest price attainable. But in this case that possibility is not sufficient to carry the day, because to establish a director's exculpation from liability under 8 *Del. C.* § 102(b)(7), the burden falls upon the director to show that "[his] failure to withstand an entire fairness analysis is *exclusively* attributable to a violation of the duty of care." (FN188) Muoio has not carried that burden.

The credible evidence persuades the Court that Muoio's conduct is explainable in terms of only one of two possible mindsets. The first is that Muoio made a deliberate judgment that to further his personal business interests, it was of paramount importance for him to exhibit his primary loyalty to Prosser. The second was that Muoio, for whatever reason, "consciously and intentionally disregarded" his responsibility to safeguard the minority stockholders from the risk, of which he had unique knowledge, that the transaction was unfair. (FN189) If motivated by either of those mindsets, Muoio's conduct would have amounted to a violation of his duty of loyalty and/or good faith. (FN190) Because Muoio has not established to the satisfaction of the Court, after careful scrutiny of the record, that his motivation was of a benign character, he is not exculpated from liability to Greenlight and the shareholder class.

**41 That leaves the four remaining directors-- Goodwin, Ramphal, Todman, and Vondras--whose conduct, while also highly troublesome, is far more problematic from a liability standpoint than that of Prosser, Raynor, and Muoio. Like Raynor and Muoio, those directors (except possibly Goodwin) were not independent of Prosser, they all voted for the Privatization, and none had a personal conflicting financial interest in, or derived a personal benefit from, that transaction to the exclusion of the minority stockholders.

The conduct of these four directors differs from that of Raynor and Muoio, in that there is no evidence that any of those four affirmatively colluded with Prosser to effectuate the Privatization, or that they otherwise deliberately engaged in conduct disloyal to the minority stockholders' interests. Nor have the plaintiffs shown that any of those directors knew or had reason to believe, that the merger price was unfair.

This is not intended to suggest that these directors covered themselves in glory, or merit commendation,

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

for the manner in which they discharged their responsibility as fiduciaries. But it is to say, and this Court after considerable reflection finds, that there is no persuasive evidence that the fiduciary violations of the ECM directors other than Prosser, Raynor, and Muoio implicated conduct more egregious than breaches of their duty of care.

A logical starting point in the analysis is first to consider the conduct of the members of the Second Special Committee: Goodwin, Ramphal and Vondras. Because Ramphal was located in London and Vondras in Indonesia, they never met in person with each other or with Goodwin, who became the Committee's sole working member. Put differently, all Committee initiatives and decisions were made initially by Goodwin, subject to concurrence by Ramphal and Vondras, who on all relevant issues willingly deferred to Goodwin and relied upon his recommendations, both as to the Committee's process and the transaction price.

Although Goodwin negotiated a merger price ($10.25 per share) that this Court has found to be unfair, there is no persuasive evidence that Goodwin knew or should have known that this was the case. Primarily, that is because critical information was withheld from Goodwin, from the other Committee members, from and their financial advisor, Houlihan. Based upon information that in material respects was incomplete, Houlihan opined that the negotiated price was fair, and there is no evidence that Goodwin, who had negotiated the price with Prosser, had reason to believe otherwise.

This is not to say that Goodwin carried out this process with the care that would be expected of someone of his distinguished background and accomplishments. No justification has been shown for Goodwin communicating with the other Committee members through Ms. Joseph, the secretary of the minority stockholders' negotiating adversary, Prosser. That misstep constituted a violation of Goodwin's duty of care and resulted in critical information being leaked to the other side. But, that fiduciary breach was of no actionable consequence, because Goodwin had all along been deprived of material information that both he and Houlihan needed to negotiate a fair price. Consequently, even if Goodwin had maintained adequate security arrangements, there is no basis to conclude that the result would have been any different.

**\*\*42** The plaintiffs insist, however, that Goodwin's fiduciary violations were of a character far more egregious than duty of care violations. Plaintiffs urge that: (1) Goodwin (as well as Ramphal and Vondras) were financially not independent of Prosser and were motivated to do whatever was needed to remain in Prosser's good graces, (2) Goodwin willingly acceded to retaining the Special Committee's legal and financial advisors from among candidates that had been selected by Prosser or his advisors, (3) Goodwin's "negotiations" with Prosser were nothing more than a scripted minuet wherein Goodwin, on behalf of the Committee, would bargain for a negligible price increase, (4) that bargaining, coupled with the gilt-edged credentials of all three Committee members, would create a credible record of "arm's length" negotiations sufficient to survive entire fairness review. Goodwin's decision to route his communications through Ms. Joseph was, plaintiffs argue, further dramatic evidence that his true loyalties were to serve Prosser and his interests. This conduct, plaintiffs insist, violated Prosser's (and Ramphal's and Vondras's) fiduciary duties of loyalty and/or good faith--conduct that is not exculpated under Article Seventh.

It is correct (and this Court has found) that with the possible exception of Goodwin, none of the Committee members was independent of Prosser, that viewed with perfect hindsight the magnitude of the negotiated price increase was negligible, and that Goodwin permitted his communications with Ramphal and Vondras to be routed through Prosser's secretary. In quite different circumstances that might establish a violation of the duties of good faith and/or loyalty, especially since the burden of establishing exculpation falls upon the directors seeking exculpation. But here that procedural burden does not help the plaintiffs, because the evidence, viewed as a whole, fails to establish a *prima facie* case of bad faith or disloyalty that these directors would be called upon to negate or disprove.

More specifically, although Goodwin, Ramphal and Vondras, because of their relationship to Prosser, might have been motivated to aid Prosser in his scheme to force out ECM's minority at an unfair price, there is no evidence that they actually engaged in such improperly motivated conduct, or otherwise acted with disloyal intent. To be sure, Goodwin's conduct may fairly be described as having violated his duty of care. And, given the non-independence of Ramphal and Vondras, their wholesale abdications to Goodwin of their responsibility as Committee members to take an active and direct role in the process, also bespeaks a failure to observe the

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

requisite due care. (FN191) But negligent or even gross negligent conduct, however misguided, does not automatically equate to disloyalty or bad faith. There is no evidence that Goodwin, Ramphal and Vondras intentionally conspired with Prosser to engage in a process that would create the illusion, but avoid the reality, of arm's length bargaining to obscure the true purpose of benefiting Prosser at the expense of the minority stockholders.

**43 Nor, in these circumstances, did those directors' conduct amount to a breach of their fiduciary duty to act in good faith. Although the Supreme Court has yet to define the precise conduct that would actionably violate that duty, this Court has recently held that directors can be found to have violated their duty of good faith if they *"consciously and intentionally disregard[ ] their responsibilities,* adopting a 'we don't care about the risks' attitude concerning a material corporate decision." (FN192) Here, there is no evidence that Goodwin, Ramphal, or Vondras acted with conscious and intentional disregard of their responsibilities, or made decisions with knowledge that they lacked material information. Because the conduct of those director defendants was, solely and at most; a violation of their duty of care, they are exculpated from liability under Article Seventh.

The foregoing analysis and conclusion are equally applicable to the seventh director, Todman. The circumstance that differentiates Todman from Goodwin, Ramphal and Vondras is that Todman played no role in the negotiation of the merger terms, his sole involvement being to cast his vote as a director in favor of the Privatization. Because (unlike Muoio) there is no evidence that Todman knew or had reason to suspect that the price was unfair, it may fairly be concluded that he voted for the transaction in reliance upon the pronouncements by Houlihan and the Special Committee that the merger price was fair. Accordingly, it serves no purpose for the Court to determine whether or not Todman's conduct amounted to a breach of his duty of care, because in either case the record evidence compels the finding that Todman committed no violation of his duty of loyalty or his duty of good faith. Accordingly, Todman is not liable, either because he has not been shown culpable in any respect, or because at most his conduct would have amounted to a breach of his duty of care, for which Todman would be exculpated under Article Seventh.

VI. CONCLUSION

For the reasons set forth above:

(1) In the appraisal action, Innovative, as the surviving corporation, is liable to Greenlight in the amount of $38.05 per share for each of the 750,300 shares that are subject to the appraisal, plus interest at the rate of 6.27%, compounded monthly, from the date of the merger to the date of the judgment.

(2) In the fiduciary duty action, defendants Innovative, ICC, Prosser, Raynor and Muoio are jointly and severally liable to the plaintiff class and to Greenlight (in its capacity as holder of litigation rights assigned by former ECM shareholders) in an amount equal to $27.80 per share. (FN193)

Counsel shall confer and submit an agreed form of Final Order and Judgment implementing the rulings made in this Opinion.

(FN*) Sitting by designation as Vice Chancellor under DEL. CONST., art. IV, § 13(2).

(FN1.) Knowing that he would control ECM and Vitelco after the Split Off, Prosser began acquiring telecommunication and other media companies. On December 30, 1997, the same date as the Split Off closed, ICC (wholly owned by Prosser) closed its acquisition of three Caribbean Cable Companies (BVI Cable TV; St. Croix Cable TV, Inc.; and St. Maarten Cable TV) and the Daily News. ICC closed on its agreement to purchase St. Thomas Cable (executed in September 1997) on April 3, 1998. The plaintiffs contend that these acquisitions were all corporate opportunities of ATN and ECM.

(FN2.) Trial. Tr. Vol. 10 (Prosser) 1785).

(FN3.) Trial Tr. Vol. 4 (Goodwin) 829-35, 845-46, 853.

(FN4.) *See* Trial Tr. Vol. 7 (Ramphal) 1423-1425; Raynor Dep. 118-119.

(FN5.) *See, e.g.,* JX35 (Prudential retainer letter); JX96 (draft fairness opinion); JX 265 (Prudential presentation to Cahill Gordon and First Committee); JX218 (Prudential Presentation to Special Committee containing its evaluation of the Proposed Merger); Trial Tr. Vol. 8 (Heying) (stating Prudential and Cahill Gordon were retained; Trial Tr. Vol. 10 (Prosser) 1796-98 (same).

(FN6.) JX 218, Appendix, EC 020890-893. The

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Proposed Merger, if consummated, would have benefited ECM and its minority shareholders by combining all the media holdings Prosser had assembled (telephone, cellular and cable), using Vitelco's cash flow and capital, under the single corporate umbrella of ECM. Those benefits were not made available to ECM's minority stockholders in the Privatization. By definition, only Prosser received those benefits.

(FN7.) Prosser Dep. June 7, 2000, at 67-69. On the first day ECM stock was traded, its high and low sales prices were $8.25 and $7.875, respectively. During the second calendar quarter of 1997 (April 1-June 30), ECM shares traded at prices ranging from a high of $8.9375 to a low of $6.25 per share. On the last trading day before the public announcement of the Privatization, the reported closing price was $7.00 per share. JX 155 at SC4133. Prosser informed the ECM board that the ECM stock price had failed to reach the desired appreciation as a result of the small public float and the fact that the stock was not followed by Wall Street analysts. JX 155 at SC 4111.

(FN8.) Raynor Dep. 173.

(FN9.) JX 150.

(FN10.) The $9.125 per share merger price was arrived at by Prosser in consultation with Prudential, and no one else had a significant role in that decision. Prosser Dep. June 7, 2000 at 73-74. The First Special Committee members (other than Raynor) were not told of the ongoing plans to change the transaction until May 29, 1998. Goodwin Dep. August 11, 2000 at 48-52, 62.

**43 (FN11.) At that time (May 1998), Prosser knew that ECM's stock price was artificially depressed, because the market was not viewing ECM as a U.S. telephone company, but, rather, as a developing nation/third world phone company. That perception, Prosser knew, was unfair, because ECM had all the characteristics of a U.S. telephone company--a stable government, dollar economy, English language, American courts and legal system--and none of the characteristics of a third world company. Trial Tr., Vol. 10 (Prosser) at 1728-29; 1801-02, 1807. Rather than educate the market or afford it time to understand ECM's true characteristics, Prosser exploited the market unfairness by proposing the Privatization at a price that reflected a "premium" over ECM's then-current depressed market price level.

(FN12.) In their briefs the parties dispute whether Mr. Muoio had also been appointed to the Second Special Committee. Plaintiffs argue that he was, pointing to the minutes of the May 29 meeting (JX 97), which recite that Muoio was appointed. The defendants argue that those minutes were incorrect, and point to testimony that Muoio was never on the Committee. The materiality of this fact dispute is, to say the least, obscure. Because even the plaintiffs concede that Muoio "did not serve" (Pl. Op. Trial Br. 27), the Court concludes that it is more probable than not that Muoio was never appointed.

(FN13.) Plaintiffs challenge the independence of both Mr. Schwitter and Houlihan, pointing out that Schwitter had been recommended by Cahill Gordon, counsel for Innovative, and that Houlihan (as well as all other potential financial advisors) "were first vetted by Prudential, which was now working solely for Prosser." Moreover (plaintiffs assert), Houlihan was ultimately recommended by Mr. Goodwin, because Goodwin felt that Houlihan (unlike Morgan Stanley) would not "[push] Prosser too hard," which might cause Prosser to back off and result in a lower stock price. Morgan Stanley, on the other hand, was "more aggressive" in pursuit of the retention, and was insisting on a fee arrangement that was linked to any increase above Prosser's initial $9.125 offer that Morgan could obtain.

These arguments are strained at best. Although at one time Schwitter was an attorney at Cahill, at the time that Cahill recommended Schwitter (among other attorneys), he was a partner at a competitor firm and there is no evidence that Schwitter was beholden to Cahill or that he acted other than loyally as counsel to the Special Committee. Nor is there evidence that the retention of Houlihan prejudiced the Second Special Committee. The weakness was in the bargaining position of the Special Committee in relation to that of Prosser, who was not prepared to support or accept any alternative business transaction other than the Privatization. That is, the Committee's only options were to make a deal with Prosser on whatever terms he was willing to accept, or no deal at all (in which case the stock price might fall, to the minority stockholders' detriment). The defendants' response is that the Special Committee had ample bargaining power to negotiate a fair price, because it had the power to "just say no," i.e., to veto the Privatization proposal, and that the

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Committee would approve the Privatization only if it was the best available transaction and represented fair value for the stock. Although the Court ultimately concludes that the Special Committee was ineffectual, it is not for the reason that Paul Hastings and Houlihan had been retained as the Second Special Committee's advisors.

(FN14.) JX 13, 14.

(FN15.) JX 38.

(FN16.) JX 167 at RTFC 698, 707, 720. The RTFC made certain downward modifications to the June projections so that its valuation would be on the conservative side. Using a 12% medium risk discount in its DCF analysis, the RTFC valued ECM at $27.84 per share. *Id.*

(FN17.) JX 167 at RTFC 710; Reed Dep. 113-15.

(FN18.) *See* JX 167 at RTFC 710. ("The initial offer price will be $9.25. The loan amount includes an additional $11.4 million to accommodate a $2.15 increase to the initial offer price.")

(FN19.) *See* Prosser June 8, 2000 Dep. 270-71 ("I am quite certain that we had requested enough room to go up so that we would have the ability to fund at a higher price obviously than nine and a quarter....").

(FN20.) Trial Tr. Vol. 10 (Prosser) 1813-14.

(FN21.) Trial Tr. Vol. 7 (Vondras) 1351-52.

**\*\*43** (FN22.) There is evidence that sometime after the August 4th meeting, Houlihan told Goodwin that a one point increase above the original $9.125 offer, *i.e.,* an increase to $10.125, would enable Houlihan to furnish a fairness opinion. *See* JX 219, at SC 04099 (the so-called "Goodwin Diary"), where in his entry for August 7, Goodwin recites that he told Prosser that Houlihan had concluded that the initial offer was too low, and that "[a]fter much back and forth [Prosser] said that he could go up another point (*which was price Houlihan had told me privately would be acceptable.*)" Although Goodwin claimed at trial that Houlihan never told him that [Trial Tr. Vol. 5 (Goodwin) 911], Goodwin did not denigrate any other parts of what he wrote in the Goodwin Diary (*see, e.g., id.* at 915-18, 923). The defendants suggest no reason why this particular diary entry should be viewed as inaccurate when the other entries were not.

(FN23.) Goodwin testified that in negotiating by telephone, rather than traveling to the Virgin Islands, he could much more "maintain the necessary detachment and impassivity" than he could in Prosser's presence. Trial Tr. Vol. 4 (Goodwin) 771.

(FN24.) JX 219 at SC 04099.

(FN25.) Trial Tr. Vol. 4 (Goodwin) 778; JX 142. The record shows that, in fact, Prosser's financing would have enabled him to increase his offer to $11.40 per share, and that the implied equity value of ECM was $305 million, or $28 per share. JX 167 at RFTC 698, 720; Reed Dep. 162-163; Prosser 6/7/00 Dep. 93-96. Goodwin testified that Prosser's representation about the limits of his financing, truthful or not, had no impact except to signal to him (Goodwin) that the negotiations had to end.

(FN26.) Trial Tr. Vol. 4 (Goodwin) 779.

(FN27.) The plaintiffs contend that the negotiations between Prosser and Goodwin were not arm's length, and that, in fact, the Special Committee's entire process was "bankrupt." To prove that point, the plaintiffs rely heavily upon the fact that Goodwin's regular practice was to send faxes to Special Committee members (or their counsel) through Prosser's secretary, Eling Joseph, and ask her to fax it to the others. Although Goodwin told Ms. Joseph that the Committee materials were confidential, this practice did create the potential of giving Prosser access to almost every document that circulated among the Special Committee, including Houlihan's financial analysis. Goodwin did not deny having routed his communications through Ms. Joseph, and defended that practice on the basis of convenience, not necessity. The defendants respond that there is no evidence that Prosser or his advisors saw these faxes. Prosser testified that Ms. Joseph never disclosed any of those materials to him, including Houlihan's valuation materials. The record discloses, however, that at least on one occasion the confidentiality of the faxed Committee materials was breached. Even if that had not occurred, this practice cannot help but undermine confidence in the integrity of the bargaining process. It is manifest that Goodwin's decision to route those materials through the secretary who shared the same office as Prosser--Goodwin's bargaining adversary--rather than route them through the

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

(FN27. cont.) office of the Committee's counsel, Mr. Schwitter, created a serious risk of compromising the Committee's process and its effectiveness in negotiating the highest available value.

(FN28.) Ramphal did not attend the Committee's August 12 meeting, even by telephone. Shortly after the meeting, Goodwin contacted Ramphal and gave him a detailed account of what had occurred.

(FN29.) Because the copies were sent after the Committee had acted on August 12, the non-Committee member directors had less than a day to review the Houlihan materials.

(FN30.) 8 *Del. C.* § 262(a).

(FN31.) *Emerald Partners v. Berlin,* 787 A.2d 85 (Del.2001).

(FN32.) *Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983).

(FN33.) The opening post-trial brief is 143 pages, the answering brief is 150 pages, and the reply brief is 72 pages.

(FN34.) *Weinberger v. UOP, Inc., supra; Kahn v. Lynch Communication Sys., Inc.,* 638 A.2d 1110, 1117 (Del.1994).

**\*\*43** (FN35.) The defendants called two additional valuation experts: Princeton University Professor Burton Malkiel, who testified about issues relating to ECM's market value, and Gilbert Matthews, an investment banker and former managing partner of Bear Stearns & Co., who testified as the defendants' rebuttal witness.

(FN36.) The basic flaw in the comparable company approach is that ECM had no true comparables, as Mr. Bayston conceded. Trial Tr. Vol. 3 (Bayston) at 584-585. The DCF methodology, on the other hand, is more appropriate because ECM had available contemporaneous management forecasts, predictable earnings and cash flow.

(FN37.) *Cede & Co. and Cinerama v. Technicolor, Inc.,* C.A. No. 7129, 2003 WL 23104613, (Del.Ch. Dec.31, 2003) (*"Cinerama"*) (citing *Taylor v. American Specialty Retailing Group, Inc.,* 2003 WL 21753752 at \*3 (Del.Ch. July 25, 2003)).

(FN38.) Trial Tr. Vol. 5 (Matthews) 1035.

(FN39.) Trial Tr. Vol. 10 (Prosser) 1020-1022. This testimony flatly conflicts with the defendants' contention that the St. Maarten Cellular forecast in the June projections was "unreasonably aggressive."

(FN40.) JX 41 at RTFC 1507; Raynor Dep. 156. Although Prosser claimed at trial that ECM had analyzed and discussed the potential of savings through intercompany agreements and determined that regulatory and union issues precluded it, that testimony is uncorroborated by any document, pre-trial testimony or any other testimony. Heying, who was ECM's Chief Financial Officer, testified that he never discussed the subject of intercompany agreements with Prosser. It is implausible that ECM's CFO and two of its paid litigation consultants (Bayston and Matthews) would be unaware of that analysis if it had actually been performed, or would be unaware of any discussions about that analysis had any such discussions been held.

(FN41.) *Cede & Co. v. Technicolor, Inc.,* 684 A.2d 289 (Del.1996).

(FN42.) JX 168; Trial Tr. Vol. 8 (Heying) 1537-1539; Heying June 6, 2000 Dep. 183-84.

(FN43.) Heying June 6, 2000 Dep. 196-97; Trial Tr. Vol. 8 (Heying) 1473-74, 1541.

(FN44.) Trial Tr. Vol. 3 (Bayston) 536-537.

(FN45.) Trial Tr. Vol. 6 (Matthews) 1211-14; JX 301, Ex. E.

(FN46.) *M.G. Bancorporation, Inc. v. LeBeau,* 737 A.2d 513, 520 (Del.1999).

(FN47.) *Cede & Co. v. JRC Acquisition Corp.,* No. 18648, 2004 WL 286963, at \*2 (Del.Ch. Feb.10, 2004).

(FN48.) *Cinerama,* at \*7 (quoting *Agranoff v. Miller,* 791 A.2d 880, 892 (Del.Ch.2001)).

(FN49.) *Id.,*(internal citation omitted) (citing *Gray v. Cytokine Pharmasciences, Inc.,* 2002 WL 853549, at \*8 (Del.Ch. Apr.25, 2002)) (rejecting valuation because it inexplicably ignored and altered management forecasts in favor of litigation-driven projections) and *Kleinwort Benson Ltd. v. Silgan Corp.,* 1995 WL 376911, at \*5 (Del.Ch. June 15, 1995) (observing that variations from management

projections merit "close inspection" and may impeach the credibility of an expert witness). In the *Cinerama* opinion, the Chancellor concluded that the respondent company's expert's "repeated discarding or modification of contemporaneous ... management forecasts ... cast serious doubt upon the integrity and reliability of his expert report" ( *Cinerama, supra* at 6), and that "management was in the best position to project the short-term prospects of the company, as they created projections *ex ante,* based upon information gleaned from their particular customers." *Id.* at 8.

(FN50.) Bayston's other modifications were to eliminate the "consolidation savings" and $2.5 million of "going private savings" from the projected revenues. For the reasons already discussed, those modifications have been rejected.

**\*\*43** (FN51.) Trial Tr. Vol. 10 (Prosser) 1742-43.

(FN52.) Trial Tr. Vol. 2 (Bayston) 326 (confirming that Heying told him that management's June CapEx forecasts were their best contemporaneous estimates).

(FN53.) Trial Tr. Vol. 5 (Matthews) 1057-60 (no reason to change management CapEx forecast for 1998 through 2002).

(FN54.) Trial Tr. Vol. 3 (Bayston) 569-72.

(FN55.) *Id.,* Vol. 2 (Bayston) 330-332; Trial Tr. Vol. 1 (Zmijewski) 162-63.

(FN56.) *Cinerama,* at \*26. Nor is there merit to the defendants' criticism (articulated through Mr. Matthews) that in Prof. Zmijewski's terminal year (2002), depreciation exceeds CapEx, a state of affairs that cannot go on forever. Trial Tr. Vol. 5 (Matthews) 999-1001; Vol. 6 (Matthews) 1236-37. The flaw in this criticism is that Zmijewski projected cash flows only; he did not forecast the individual components of free cash flow, including CapEx or depreciation. Accordingly, there is no basis to conclude that Prof. Zmijewski forecasts perpetual divergent depreciation and CapEx. Trial Tr., Vol. 1 (Zmijewski) 120-123.

(FN57.) *See Cinerama, supra,* at \*40; JX 352, p. 11. In formulaic terms, WACC has been expressed thusly (JX 298, at F-1):

WACC = (Leveraged Cost of Equity x Equity % (Cost of Long Term Debt x (1"tax rate) x

(FN58.) *Cinerama, supra,* at 41 and n. 315.

(FN59.) Trial Tr. Vol. 2 (Bayston) 286.

(FN60.) The reason for the discrepancy between the two experts' calculation of ECM's actual weighted cost of debt appears to be that Zmijewski's 6.3% cost figure was as of October 10, 1998 (JX 352 at 22), whereas Bayston's calculation was as of September 30, 1998 (JX 298 at J-1). Because Zmijewski's figure represented ECM's long term debt cost as of a time closer to the merger date than Bayston's, the Court adopts 6.3 % as the relevant actual cost of long term debt for ECM.

(FN61.) Def's Consol. Post-Trial Br. at 110.

(FN62.) *See* Reed Dep. 29-30; Trial Tr. Vol. 10 (Prosser) 1791; JX 209 at G331-32.

(FN63.) Trial Tr. Vol. 3 (Bayston) 502.

(FN64.) Ex. H to Pls.' Op. Post-Trial Br.

(FN65.) Trial. Tr. Vol. 3 (Bayston) 499-500.

(FN66.) Professor Zmijewski's original debt-to-value ratio was 27.2%, based upon a value of $42.94 per share. JX 234 at 46. He later adjusted the ratio to 28.2%, based upon a fair value of $41.16. JX 235 at Ex. S-1.

(FN67.) Bradford Cornell, *CORPORATE VALUATION Tools for Effective Appraisal and Decision Making,* 224 (McGraw-Hill 1993) (italics in original) (hereinafter "Cornell").

(FN68.) Cornell, *supra* at 225.

(FN69.) Trial Tr. Vol. 1 (Zmijewski) at 164-165; Zmijewski Dep. at 128-130.

(FN70.) JX 167 at RTFC 698, 700, 707, 720. Prudential's estimate that ATNI could be sold for $25-30 per share in the Split Off, was for a company that included (but was larger than) ECM. Efforts to sell ATNI at that price were unavailing, because no purchaser was interested in acquiring ATNI in its entirety.

(FN71.) *Id.*

(FN72.) JX 298 at Ex. F-2; JX 352 at 31.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

(FN73.) Trial Tr. Vol. 2 (Bayston) 261, 168; Def. Consol. Post-Trial. Br. 87.

(FN74.) *ONTI, Inc. v. Integra Bank,* 751 A.2d 904, 920 (Del.Ch.1999).

(FN75.) *See* treatises cited in *Onti, supra,* 751 A.2d 920 at n. 71; *see also,* Jay Fishman, et. al, *Guide to Business Valuation,* Vol. 1 at 502.15 (Practitioners Publishing Co., 13th ed., 2003).

(FN76.) *ONTI, supra; Cede & Co. v. JRC Acquisition,* C.A. No. 18648, 2004 WL 286963, at *8 (Del. Ch., Feb. 10, 2004).

**43 (FN77.) JX 315; Trial Tr. Vol. 2 (Bayston) 263-264.

(FN78.) Trial Tr. Vol. 2 (Bayston) 395; JX 315.

(FN79.) Plaintiffs point out that ECM's returns are not volatile, because its principal subsidiary is well-established, lacks competition, has protection against unforeseen events through regulatory relief, and has access to low-cost capital through the RTFC.

(FN80.) Def's Answering Post-Trial Br. at 87 (citing Trial Tr. Vol. 2 (Bayston) at 271).

(FN81.) *Id.*

(FN82.) Trial Tr. Vol. 8 (Heying) at 1513.

(FN83.) *Id.,* Vol. 10 (Prosser) at 1758-59; Defs' Consol. Post-Trial Br. at 93

(FN84.) *See* JX 155 at SC4189 (1997 10K); JX 165 at RTFC 2426 (covenanting to maintain storm insurance for two years).

(FN85.) Trial Tr. Vol. 8 (Heying) at 1460-62.

(FN86.) *Id.,* Vol. 6 (Matthews) at 1073.

(FN87.) The $38.05 fair value represents the difference between the value of $39.69 per share and the $1.64 per share hurricane loss adjustment. The $39.69 per share value, as well as the 8.69% discount rate, were computed by all counsel at the request of the Court. (*See* letter dated March 17, 2004 from the Court to all counsel.) In its letter the Court asked counsel to compute the discount rate and the resulting fair value, based upon the DCF inputs determined in this Opinion. On April 2, 2004, Mr. Allingham responded to the Court on behalf of all counsel, setting forth the manner in which the $39.69 per share value was arrived at. (Letter dated Apr. 2, 2004 from Thomas J. Allingham, II, Esquire, to the Court). In that letter, counsel identified one additional variable that the Court would be required to determine: ECM's assumed growth rate. As disclosed in counsel's April 2, 2004 letter, the parties' different growth rate assumptions yielded a matrix of values ranging from $39.69 to $40.88 per share. Deciding to err on the side of conservatism, the Court selected the lowest value within that range--$39.69 per share--from which $1.64 per share was deducted to arrive at the ultimate adjudicated fair value for ECM of $38.05 per share.

(FN88.) Defs. Consol. Ans. Post-Trial Br. at 105.

(FN89.) Trial Tr. Vol. 9 (Malkiel) at 1597-1598.

(FN90.) *Cede & Co. v. Technicolor, Inc.,* 684 A.2d 289, 301 (Del.1996) (the "market price of shares may not be representative of true value.").

(FN91.) *See, e.g., Harris v. Rapid-American Corp.,* C.A. No. 6462, 1992 WL 69614, at *1, *4. (Del.Ch. Apr.6, 1992) ($28 merger price, representing a 28% premium over unaffected trading price, was barely one-third of adjudicated fair value of $73.29); *In re Shell Oil Co. .,* C.A. No. 8080, 1990 WL 201390, at *14-15, *38 (Del.Ch. Dec.11, 1990), *aff'd,* 607 A.2d 1213 (Del.1992) (market price $44, adjudicated fair value $71.20);

(FN92.) *See* note 7, *supra.*

(FN93.) Trial Tr. Vol. 1(Zmijewski) at 95-96; Finger Dep. (Jan. 11, 2000) at 143-144.

(FN94.) Trial Tr. Vol. 9 (Malkiel) at 1651-52, 1665-66, 1676-79. In this case, ECM stock traded publicly for only five months.

(FN95.) *Id.* at 1633.

(FN96.) Trial Tr. Vol. 1 (Zmijewski) at 93-94, 158-159.

(FN97.) The Caribbean Cable Companies were BVI Cable TV, St. Croix Cable TV, Inc., St. Thomas-St. John Cable TV and St. Maarten Cable TV.

(FN98.) Pretrial Order, ¶ s 81, 95.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

(FN99.) *See Anadarko Pet. Corp. v. Panhandle East. Corp.*, 521 A.2d 624, 628 (Del.Ch.1987) (holding that a parent corporation owes no fiduciary duty to its wholly-owned subsidiary, and that no fiduciary duty arose until the subsidiary had outside stockholders).

(FN100.) JX 22 at ECI 0857, § 3.01(b). The Indemnity Agreement was one of the terms of the Split Off that was disclosed to, and approved by, ATN stockholders. JX 22.

**\*\*43** (FN101.) The fair value of $416,996,000 ($38.05 per share) is equal to the discounted cash flow valuation of ECM that results from the DFC inputs determined in this Opinion ($434,996,000, or $39.69 per share) less $18 million ($1.64 per share), which represents the hurricane losses not reimbursed by insurance. *See* Apr. 2, 2004 Letter from Thomas J. Allingham, II, Esquire, to the Court, discussed in note 87, *supra.*

(FN102.) 457 A.2d 701 (Del.1983).

(FN103.) The defendants do not contend that Houlihan was unavailable to testify.

(FN104.) *Demby v. State*, 744 A.2d 976, 978-979 (Del.2000) (citing *Wheatley v. State*, 465 A.2d 1110 (Del.1983)).

(FN105.) Bayston Dep. 286-87.

(FN106.) *Id.* at 293.

(FN107.) Trial Tr. Vol. 1 (Bayston) 209, Vol. 2 (Bayston) 320, 323, 329.

(FN108.) Trial. Tr. Vol. 2 (Bayston) 252-253, 328-329 (discussions about capital expenditures); 333 -334 (discussing extensive conversations with ECM management.)

(FN109.) Def. Consol. Ans. Post-trial Br. at 52.

(FN110.) 8 *Del. C.* § 262(h).

(FN111.) 8 *Del. C.* § 262(i); *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d at 527. *Gonsalves v. Straight Arrow Publishers, Inc.*, 725 A.2d 442 (Table), 1999 WL 87280 at \*4 (Del., Feb.25, 1999).

(FN112.) *Cede & Co. v. JRC Acquisition, Corp.*, No. 18648, 2004 WL 286963, at \*12 (Del.Ch. Feb.10, 2004) (internal citations omitted).

(FN113.) Defs' Consol. Post-Trial Br. at 110. *See Gilbert v. M.P.M. Enters., Inc.*, 709 A.2d 663, 674 (Del.Ch., 1997); *aff'd.*, 731 A.2d 790 (Del.1999) and *Chang's Holdings, S.A. v. Universal Chems. And Coatings, Inc.*, No. 16856, 1994 WL 681091, at \*2 (Del. Ch. Nov. 22, 1994).

(FN114.) *See ONTI, Inc. v. Integra Bank*, 751 A.2d at 927-29 (interest compounded monthly); *Hintmann v. Frede Weber, Inc.*, 1998 WL 83052 (Del.Ch. Feb.17, 1998) (same); *Grimes v. Vitalink Communications Corp.*, No. 12334, 1997 WL 538676, at \*13 (Del.Ch. Aug.28, 1997).

(FN115.) JX 235 at 26, Ex. 2B.

(FN116.) Computed as follows: 7.00% + 5.54% / 2 = 6.27%.

(FN117.) *JRC Acquisition, supra*, at \*15 (quoting *Grimes v. Vitalink Communications Corp., supra.*, 1997 WL 538676 at \*11). The defendants also concede that if interest is to be compounded, that the compounding be at one month intervals.

(FN118.) *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1140 (Del.Ch.1994), *aff'd*, 663 A.2d 1156 (Del.1995) ("Plainly in a cash-out merger, price is a dominant concern, most especially where the buyer already has voting control of the enterprise, such as a parent-sub merger.").

(FN119.) *Emerald Partners v. Berlin*, 787 A.2d at 94 (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1165 & n. 16 (Del.1995)).

(FN120.) *Id.* (emphasis in original).

(FN121.) The assignments of litigation rights to Greenlight are found in the record at JX9.

(FN122.) There is authority holding that only a party to the assignment can contest its validity *See Wagner v. United States*, 573 F.2d 447 (7th Cir.1978); *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350, 353 (S.C.1991); 6A C.J.S. *Assignments* § 71 (1975).

**\*\*43** (FN123.) *Industrial Trust Co. v. Stidham*, 33 A.2d 159, 160-61 (Del.1942); *Garford Motor Truck Co. v. Buckson*, 143 A. 410, 411 (Del.Super.Ct.1927).

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

(FN124.) Section 3701 provides:

> All causes of action, except actions for defamation, malicious prosecution, or upon penal statutes, shall survive to and against the executors or administrators of the person to, or against whom, the cause of action accrued....[A]ll actions, so surviving, may be instituted or prosecuted by or against the executors or administrators of the person to or against whom the cause of action accrued.

(FN125.) *Gibson v. Gillespie,* 152 A. 589, 593 (Del.Super.Ct.1928); *see also Compaq Computer Corp. v. Horton,* 631 A.2d 1, 5, n. 1 (Del.1993).

(FN126.) *Cede & Co. v. Technicolor, Inc.,* 542 A.2d 1182 (Del.1988).

(FN127.) D.I. 19 in Appraisal Action, Par. 2.

(FN128.) Stated another way, if the Court granted defendants the relief they seek, the assignments would be void and the right to recover would revert to the class. A failed assignment of claims does not (as defendants assert without support), *constitute a waiver* of those claims. The defendants would still pay the same amount in damages; there would simply be a different name on the check. Not allowing the class member-assignors to recover would give the defendants a windfall for no valid factual or legal reason.

(FN129.) *Bershad v. Curtiss-Wright Corp.,* 535 A.2d 840 (Del.1987)(acquiescence requires an informed act). For that same reason, the Court rejects the defendants' argument that the Class members who accepted the benefits of the merger must be deemed to have acquiesced in the merger. As Vice Chancellor Strine held in *Clements v. Rogers,* 790 A.2d 1222 (Del.Ch.2001), a plaintiff who accepts the merger consideration could not have acquiesced where she knew some, but not all of the material facts. The predicament in which Class of former ECM shareholders found themselves was indistinguishable from *Clements.*

(FN130.) *Emerald Partners v. Berlin, supra,* 787 A.2d at 92, 97.

(FN131.) *Kahn v. Lynch Communications Sys., Inc.,* 638 A.2d 1110, 1117 (Del.1994).

(FN132.) *Id.* at 1120.

(FN133.) Trial Tr. Vol. 7 (Vondras) 1296, 1351-52; Vol. 4 (Goodwin) 751; Vol. 5 (Goodwin) 929-30. Mr. Vondras testified that the Special Committee "was deprived of information that [he] would have considered important in [his] assessment of ... Prosser's offer" and that the Committee and Houlihan "... should have had the most current data, and it would have used that in their analysis. Would it change the ... numbers? May or may not have. I don't know, but they should have had that data." Trial Tr. Vol. 7 (Vondras) 1351-52.

(FN134.) JX 155 at SC4128.

(FN135.) *In re Santa Fe Pac. S'holders Litig.,* 669 A.2d 59, 69 (Del.1995); *see also, In re Cencom Cable Income Partners, L.P.,* No. 14634, 2000 WL 640676, at *5 (Del. Ch. May 5, 200) ("Ratification can effectively occur only where the specific transaction is clearly delineated to the investor whose approval is sought and that approval has been put to a vote.").

(FN136.) 808 A.2d 421, 442-43 (Del.Ch.2002), *appeal refused,* 812 A.2d 224 (Del.2002) (footnotes omitted).

(FN137.) *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 937 (Del.1985).

(FN138.) *See In re Pure Resources, Inc. S'holders Litig., supra,* 808 A.2d at 436; *Kahn v. Lynch Communication Systems, Inc., supra,* 638 A.2d at 1116.

**\*43 (FN139.) 509 A.2d 584 (Del.Ch.1986)

(FN140.) *Id.* at 598.

(FN141.) *Aronson v. Lewis,* 473 A.2d 805, 815 (Del.1984); *see Beam v. Stewart,* --- A.2d ----, No. 501, 2003, Slip. Op. at 12 (Del. Mar. 31, 2004).

(FN142.) Raynor Dep.(June 12, 2001) at 25-28. In 1997, Raynor's law firm, Raynor, Rensch & Pfeiffer, was paid $479,000 for legal services provided to ECM and its predecessor. JX155 at SC4176. In 1996, the firm was paid $533,000 for its legal services. JX254 at G893.

(FN143.) *Id.* at 30-32.

(FN144.) *Id.* at 21, 29.

(FN145.) *See In re Maxxam, Inc.,* 659 A.2d 760,

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

773-74 (Del.Ch.1995).

(FN146.) JX 159; Raynor Dep. at 38-39, 61; Trial Tr. Vol. 10 (Prosser) 1834-36; Vol. 5 (Goodwin) 966; Vol. 7 (Vondras) 1732; Vol. 7 (Ramphal) 1444-45.

(FN147.) Trial Tr. Vol. 5 (Goodwin) 966-67.

(FN148.) Trial Tr. Vol. 7 (Ramphal) 1386-87; Ramphal Dep. 33-34.

(FN149.) Ramphal Dep. at 34.

(FN150.) Trial Tr. Vol. 7 (Ramphal) 1390.

(FN151.) *See Kahn v. Tremont Corp.,* 694 A.2d 422, 430 (Del.1997) (purportedly "independent" director found beholden to majority stockholder where, three years previously, company had retained his consulting services for $10,000 per month and more than $325,000 in bonuses); *Kahn v. Dairy Mart Convenience Stores, Inc.,* No. 12489, 1996 WL 159628, at *6 (Del. Ch. Mar 29, 1996) (holding that consulting agreement may render independent director too beholden to management to remain independent).

(FN152.) *See Harbor Fin. Partners v. Huizenga,* 751 A.2d 879, 889 (Del.Ch.1999) (a director has a disabling conflict where the director's decision could advance economic or career opportunities of a family member).

(FN153.) Trial Tr. Vol. 7 (Ramphal) 1422; Ramphal Dep. 17, 35-36, 58.

(FN154.) JX 144 at EC22472

(FN155.) Muoio Dep. at 16-17.

(FN156.) Trial Tr. Vol. 7 (Ramphal) at 1390; Muoio Dep. 18.

(FN157.) JX 140 at EC5950.

(FN158.) Trial Tr. Vol. 7 (Vondras) 1288-89, 1376.

(FN159.) *Grobow v. Perot,* 526 A.2d 914, 923, n. 12 (Del.Ch.1987),*aff'd,* 539 A.2d 180 (Del.1988).

(FN160.) Goodwin Dep. Oct. 19, 2001 at 5.

(FN161.) JX155 at SC4236; SC4111.

(FN162.) As former Justice (then Vice Chancellor) Hartnett appropriately observed in *Lewis v. Fuqua,* 502 A.2d 962, 967 (Del.Ch.1985), in addressing the independence of a special litigation committee appointed to review a derivative action, "[i]f a single member committee is to be used, the member should, like Caesar's wife, be above reproach." Here, as in *Fuqua,* Goodwin's "past and present associations raise a question of fact as to his independence" (502 A.2d at 967), which, given the burden of proof, would ordinarily be resolved against Goodwin's independence. The Court assumes, without deciding, however, that Goodwin was independent, but nonetheless concludes on other grounds that the Special Committee was not an effective representative of the minority stockholders' interests.

(FN163.) See Reed Dep. Mar. 16, 2000 at 162-53, 171; Prosser Dep. June 7, 2000 at 93-96; JX 167 at RTFC 698, 720. That is not to suggest that the level at which the deal could be financed is a measure of ECM's fair value. Any such suggestion would be contrary to Delaware law and to the fair value determinations in this case. *See Smith v. Van Gorkom,* 488 A.2d 858, 890-891 (Del.1985) (holding that price at which a leveraged buy-out of a corporation was financially feasible was not determinative of the corporation's fair value). The import of this nondisclosure is that it evidences Prosser's intent to deprive the Special Committee of any real utility as a bargaining agent for the ECM minority.

**43 (FN164.) JX 33.

(FN165.) *Weinberger v. UOP, Inc.,* supra, 457 A.2d 701.

(FN166.) *Id., see also Lynch v. Vickers Energy Corp.,* 383 A.2d 278 (Del.1977).

(FN167.) JX 155 at SC4128.

(FN168.) JX 251 at SC 4288-89; *see also* JX155 at SC4108-09.

(FN169.) *See Clements v. Rogers,* 790 A.2d 1222, 1242-43 (Del.Ch.2001).

(FN170.) JX251 at SC4295.

(FN171.) JX33.

(FN172.) *See Clements v. Rogers,* 790 A.2d 1222,

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1242-43 (Del.Ch.2001) (accuracy of disclosures concerning the independence and effectiveness of a special negotiating committee are of particular importance were the transaction is with a controlling stockholder).

(FN173.) That determination is required only for purposes of the fiduciary duty class action, not the appraisal. As the Court has found, the defendant that is solely liable in the appraisal proceeding is the surviving corporation in the merger, *i.e.*, Innovative. That entity is liable to Greenlight for $38.05, plus interest, for each ECM share for which appraisal was sought.

(FN174.) 787 A.2d 85 (Del.2001).

(FN175.) Pretrial Stipulation and Order, ¶ 164, at p.20.

(FN176.) *Weinberger v. Rio Grande Industries, Inc.,* 519 A.2d 116 (Del.Ch.1986); *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del.Ch.1984). One of the requirements for "aiding and abetting" liability is the third party's "knowing participation" in the directors' breach of fiduciary duty. In that case, Prosser's knowledge must be attributed to the entities that he controlled and used to effectuate his breaches of duty.

(FN177.) JX155 at SC4110; Raynor Dep. 171-173.

(FN178.) JX184 at RTFC1474.

(FN179.) Trial Tr. Vol. 10 (Prosser) at 1796-97.

(FN180.) JX 187 at RTFC5145-46.

(FN181.) JX 32.

(FN182.) JX 280; JX 106; JX 186 at RTFC5135.

(FN183.) JX 186 at RTFC5135; Reed Dep. 153.

(FN184.) The Court employs the "and/or" phraseology because the Delaware Supreme Court has yet to articulate the precise differentiation between the duties of loyalty and of good faith. If a loyalty breach requires that the fiduciary have a self-dealing conflict of interest in the transaction itself, as at least one commentator has suggested, then only Prosser is liable on that basis. Raynor would be liable for violating his duty of good faith for consciously disregarding his duty to the minority stockholders. *See* Hillary A. Sale, *Delaware's Good Faith,* 89 Cornell L.Rev. 456 (2004). On the other hand, if a loyalty breach does not require a self-dealing conflict of interest or receipt of an improper benefit, then Raynor would be liable for breaching his duties of loyalty *and* good faith. *See Strassburger v. Earley,* 752 A.2d 557 (Del.Ch.2000) (director whose conduct in a transaction evidences loyalty solely to employer whose interests were adverse to the corporation held to have violated his duty of loyalty). The Court need not decide that definitional issue, because under either definition, Raynor's conduct amounted to a non-exculpated breach of fiduciary duty.

(FN185.) Pretrial Stip. and Order, ¶'s 40-42.

(FN186.) Muoio Dep. at 175.

(FN187.) Goodwin Dep. Sept. 6, 2001 at 47.

(FN188.) *Emerald Partners v. Berlin,* 787 A.2d at 98 (italics added).

(FN189.) *See In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 289 (Del.Ch.2003).

(FN190.) *See* note 184, *supra.*

**43 (FN191.) *See Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 368 (Del.1993) ("[W]e have stated that a director's duty of care requires a director to take an active and direct role in the context of a sale of a company from beginning to end.")

(FN192.) *In re Walt Disney,* 825 A.2d at 289 (italics in original). Elaborating on that formulation, the Chancellor observed that directors actionably violate their duty of good faith if they *"knew* that they were making material decisions without adequate information and without adequate deliberation, and ... they simply did not care if the decisions caused the corporations and its stockholders to suffer injury or loss." *Id.*

(FN193.) $27.80 per share is equal to the difference between the fair value of ECM on the merger date ($38.05 per share) and the merger price paid to the ECM minority shareholders ($10.25 per share).

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.