# TAB 6

Westlaw.

Slip Copy
2004 WL 3101575 (D.Del.)
(Cite as: 2004 WL 3101575 (D.Del.))

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
THE LITIGATION TRUST OF MDIP, INC.
(Formerly Known as Mosler, Inc.) and its
Affiliates, as Assignee of Certain Claims Pursuant to
the Second Amended Joint
Plan of Liquidation of MDIP, Inc. and its Affiliates,
Plaintiff,
v.
Michael RAPOPORT, William A. Marquard,
Thomas R. Wall, IV, Robert A. Young,
III, and Kelso & Co., Inc., Defendants.
No. C.A. 03-779(GMS).

Nov. 29, 2004.

Michael F. Bonkowski, Mark Minuti, Saul Ewing LLP, Wilmington, DE, for Plaintiff.

Paul J. Lockwood, Eric M. Davis, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, for Defendants.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

*1 On August 5, 2003, plaintiff Litigation Trust of MDIP, Inc. ("Mosler") filed a complaint against the above-named defendants (D.I. 1), and on February 9, 2004, filed an amended complaint (D.I.28), which states four causes of action. The first two causes of action are for breach of the fiduciary duties of due care, good faith and loyalty, with Count I against defendants Marquard, Wall and Young (collectively, the "Kelso Directors") (id.¶ ¶ 81-84), and Count II against defendant Rapoport (id.¶ ¶ 85-88). In Count III, Mosler seeks avoidance and recovery of constructively fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) against Kelso & Co., Inc. ("Kelso"). (D.I. 28 ¶ ¶ 89-94.) Similarly, in Count IV Mosler seeks avoidance and recovery of constructively fraudulent transfers under 11 U.S.C. § 544(b) against Kelso. (D.I. 28 ¶ ¶ 95- 101.) Currently before the court is the defendants' March 10, 2004 motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). (D.I.35.) For the following reasons, the court will deny the defendants' motion.

II. JURISDICTION

The court's jurisdiction is pursuant to 28 U.S.C. § 1332 (2004).

III. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be granted when, accepting all well-pleaded factual allegations as true, the plaintiff is not entitled to relief as a matter of law. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir.1997). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir.1998). In a motion to dismiss for failure to state a claim, the moving party has the burden of persuasion. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.1991). While the court must accept the factual allegations in the complaint as true, it "need not credit a complaint's 'bald assertions' or 'legal conclusions.' " See In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1429 (citation omitted). Therefore, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir.1996).

IV. BACKGROUND

In its amended complaint, Mosler alleges the detailed set of facts (totaling 80 paragraphs) on which it bases its four claims for relief. (D.I.28.) The following is a brief summary of that background. For the purpose of this motion, the court assumes all allegations of fact to be true.

"Through leveraged buyouts in 1986 and 1990, Kelso acquired control of Mosler, a manufacturer of physical security products and systems, and installed

defendants Marquard, Wall and Young (collectively, the 'Kelso Directors') on Mosler's Board of Directors...." (Id.¶ 2.) From 1992 to 1995, Mosler's sales increased from $203.7 million to $216.9 million. (Id.¶ 26.) Then, in 1995, defendant Rapoport was hired as President and CEO of Mosler (id.¶ 30), despite the fact that he had no prior experience as a CEO of a company of Molser's stature (id.¶ 33). The Kelso Directors allegedly consented to his hiring on the basis of two lines in a one-page memorandum written by the outgoing CEO. (Id.¶ 30.) There was no discussion of "succession planning" at either of the two board meetings immediately preceding Rapoport's hiring (id.¶ 29), and there was no consideration of any alternative candidates (id.¶ 31).

*2 In October 1998, Mosler acquired another security business, named LeFebure, from a company called De La Rue for $39.2 million. (Id.¶ 36.) Prior to the acquisition, Rapoport had assumed responsibility for Mosler's due diligence without formal board approval. (Id.¶ 38.) However, he failed to hire outside consultants to assist in the valuation and due diligence process, relying instead on numbers provided by De La Rue and the evaluations of his own personnel. (Id.¶ 39.) The Kelso Directors gave their approval to begin negotiations with De La Rue at a special September 1998 board meeting, but did so without the benefit of any tangible information concerning the proposed acquisition. (Id.¶ 40.) Unfortunately, LeFebure's financial condition was not as good as was originally represented by De La Rue. (Id.¶ 42.) Thus, it turned out that Mosler had grossly overpaid for LeFebure. (Id.) This problem was compounded by the fact that Rapoport failed to retain key personnel from LeFebure (id.¶ 43) and otherwise mismanaged the integration of the two businesses (id.¶ 45), resulting in "a serious deterioration of Mosler's liquidity (id).

Subsequent to the LeFebure acquisition, mismanagement by Rapoport and the Kelso Directors continued. In 1999, Mosler attempted to convert to a new enterprise software system, which was essential to the proper functioning of its business. (Id.¶ 46.) Rapoport and the Kelso Directors were advised by Mosler's in-house information technology ("IT") employees that this type of conversion would require them to hire outside specialists. (Id.¶ 47.) However, Rapoport ignored this advice and, with the approval of the Kelso Directors, set out to convert the new system using only the in-house IT staff. (Id.¶¶ 48-49.) As a result, the conversion was not entirely successful, and for the next several years Mosler had difficulty invoicing customers, collecting receivables, tracking inventory, etc. (Id.¶ 50.) Furthermore, Rapoport failed to address "sustained and systematic flaws" in Mosler's inventory management system, resulting in untimely deliveries to customers and a loss of goodwill. (Id.¶¶ 52-53.) Rapoport and the Kelso Directors also failed to institute standard internal control procedures for ensuring timely invoicing of customers and collection of accounts receivable. (Id.¶ 54.) As a result, Mosler's accounts receivable rose from $46 million in 1995 to nearly $100 million in 1999. (Id.¶ 55.) Yet, there was no discussion of these problems at either the February 1999 board meeting or the May 1999 board meeting. (Id.¶¶ 56-57.) Thus, Mosler contends, the Kelso Directors' failed to properly monitor Rapoport's management of the company or to investigate the sudden explosion of the accounts receivable. (Id.¶ 58.)

"Moreover, on at least ten occasions between November 1997 and January 2001, certain of the Kelso Directors were approached by veteran, senior Mosler employees about the threat that Mosler's serious business problems and Rapoport's gross mismanagement posed to the company." (Id.¶ 60.) Rapoport allegedly fired at least one of these employees in response to the complaints, and effectively forced another to resign. (Id.) Instead of investigating these reports of mismanagement and attempting to address the problems identified, the Kelso Directors ignored the reports and "actively took steps to ensure that any additional concerns of Mosler's employees would not be brought to the Board's attention." (Id.¶ 61.)

*3 Mosler's financial problems become so serious that its outside auditor and independent accountant, Deloitte, issued a letter in September 1999 to Mosler's board advising it that the matters summarized in the letter were "reportable conditions" with respect to the company's internal controls. (Id.¶ 66.) " 'Reportable conditions' are significant deficiencies in the design or operation of internal control, which could adversely affect Mosler's ability to record, process, summarize and report financial data consistent with the assertions of management in the financial statements." (Id.) Accompanying Deloitte's letter was a report identifying more than forty problems with Mosler's internal controls and suggesting corrective action. (Id.) These problems included:
1. Failure to reconcile the progress billings detail to the general ledger;
2. Duplication of invoices for time and materials;
3. Failure to post cash disbursements in a timely

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 3101575 (D.Del.)
(Cite as: 2004 WL 3101575 (D.Del.))

Page 3

fashion, resulting in "unusual reconciling items;"
4. Unexplained discrepancies in reported accrued vacation time between the detail and the general ledger;
5. Lack of corporate oversight and accountability with respect to service contracts, resulting in lost contracts; and
6. Inaccurate and untimely fulfillment of branch orders for replacement parts from headquarters.
(Id.¶ 67.) Neither Rapoport nor the Kelso Directors took any corrective action in response to Deloitte's warning. (Id.¶ 68.)

Again in November 2000, Deloitte issued another letter to the board advising it that the conditions reported in the letter were "material weaknesses." (Id.¶ 70.) "A material weakness is a reportable condition in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements caused by error or fraud in amounts material to Mosler's financial statements might occur and not be detected within a timely period by Mosler's employees." (Id.) This letter also included a report, this time identifying over fifty problem areas, many of which were identified in the 1999 letter and report. (Id.¶ 71.) Again, neither Rapoport nor the Kelso Directors took any remedial action. (Id.¶ 72.) Consequently, Mosler alleges that Rapoport and the Kelso Directors knew or were on constructive notice that the financial statements and results prepared by Mosler's management were materially misstated and misleading. (Id.¶ 73.) Specifically, the management reported a net loss in 2000 of nearly $11 million, while the net loss reported in Mosler's audited financial statements was nearly $22 million. (Id.¶ 74.)

Mosler's financial problems continued in this direction until August 6, 2001, when it filed a voluntary petition under Chapter 11 of the Bankruptcy Code. (Id.¶ 79.) On or about October 17, 2001, Mosler's assets were sold at auction for nearly $28 million, but Mosler's unsecured creditors did not receive any distribution from the proceeds of the sale. (Id.¶¶ 79-80.) There is more than $200 million in unsecured debt. (Id.¶ 4.) Mosler now seeks to recover, on behalf of the unsecured creditors, damages for breach of fiduciary duties by Rapoport and the Kelso Directors, as well as management fees fraudulently transferred to Kelso by Mosler in the years prior to its bankruptcy. (Id.¶ 5.)

V. DISCUSSION

A. COUNT I--Breach of Fiduciary Duty Against the Kelso Directors

*4 Mosler alleges the Kelso Directors breached their fiduciary duties by failing to be informed before making business decisions, failing to employ rational business practices, failing to take action in circumstances where due attention would have prevented harm, failing to exercise good faith judgment with regard to Mosler's information and reporting systems, ignoring deficiencies in Mosler's internal control system and the account improprieties reported to them, and failing to ensure the accuracy and reliability of Mosler's financial statements. (D.I.28.¶ 83.)

The Kelso Directors argue that this breach of fiduciary duty claim is barred by Mosler's certificate of incorporation, which limits the liability of directors to the corporation or stockholders pursuant to Del.Code Ann. tit. 8, § 102(b)(7). Specifically, the certificate of incorporation provides:
   No director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit.
(D.I. 25 at A134.) Mosler counters by citing two non-binding cases for the proposition that such provisions are inapplicable when the action is brought for the benefit of creditors in a bankruptcy proceeding. See Ben Franklin Retail Stores, Inc. v. Kendig, No. 97C7934, 2000 U.S. Dist. LEXIS 276, at * 23-*24 (N.D.Ill. Jan. 12, 2000); Pereira v. Cogan, No. 00 Civ. 619(RWS), 2001 U.S. Dist. LEXIS 2461, at *29-*38 (S.D.N.Y. Mar. 13, 2001).

The court finds persuasive a recent (but unpublished) decision of the Court of Chancery of Delaware, in which Vice Chancellor Noble applied § 102(b)(7) in a suit brought by unsecured creditors against the directors of a company in bankruptcy. See Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins, No. Civ. A. 20228-NC, 2004 WL 1949290, at *9 (Del.Ch. Aug.24, 2004). Although Elkins did not directly address the issue presented here, it is clear that application of § 102(b)(7) in cases involving creditors was not seen as problematic. Therefore, the court believes Delaware

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

law permits defensive use of § 102(b)(7) provisions even when the suit is for the benefit of a creditor.

As a result, it would seem that the duty of care portion of Count I could be dismissed, leaving only the duty of loyalty/good faith portion to be scrutinized for the requisite factual allegations. However, "[k]nowing or deliberate indifference by a director to his or her duty to act faithfully *and with appropriate care* is conduct ... that may not have been taken honestly and in good faith to advance the best interests of the company." *In re The Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del.Ch. May 28, 2003) (emphasis added). In other words, "[w]here a director consciously ignores his or her duties to the corporation, thereby causing economic injury to its stockholders, the director's actions are either 'not in good faith' or involve 'intentional misconduct' [of the type contemplated by § 102(b)(7) ]." *Id. at 290.* Thus, regardless of whether the claim is labeled as a breach of the duty of care, loyalty, or good faith, when a § 102(b)(7) provision is involved the underlying alleged facts must tend to show that the defendants *"knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." *Id.* at 289 (emphasis in original).

*5 Viewing the totality of the allegations, the court believes Mosler has met its burden of alleging facts sufficient to show that the Kelso Directors *"knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." While it may be the case that the Kelso Directors were justified in each and every decision they made, it would be inappropriate for the court to make such a determination before adequate discovery has taken place. Thus, the defendants' motion to dismiss with regard to Count I will be denied. [FN1]

> FN1. The defendants also argue that the business judgment rule insulates them from liability. The defendants' formulation the business judgment rule is that there can be no liability "so long as the directors' decision 'can be attributed to any rational business purpose.' " (D.I. 36 at 24.) Since the court finds that Mosler has alleged facts sufficient to show (if proven) that the defendants *"knew* that they were making

material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss," then those decisions surely could not be attributable to any rational business purpose.

B. COUNT II--Breach of Fiduciary Duty Against Rapoport

The factual basis for Count II is largely the same as for Count I. However, Mosler argues that the § 102(b)(7) provision in its charter is additionally inapplicable to Rapoport because he is both an officer *and* a director, whereas § 102(b)(7) is limited on its face to directors. Rapoport counters by arguing that "[w]here a defendant was both an officer and a director, he can only be sued for actions taken solely as an officer, and the plaintiff must 'highlight any specific actions [the defendant] undertook as an officer (as distinct from a director)' " (D.I. 50 at 2.) Here, he says, Mosler has not made any specific distinctions, so the § 102(b)(7) provision should protect him. (Id.)

To the extent that Rapoport acted in his capacity as a director, the § 102(b)(7) provision applies to him in the same way it applies to the Kelso Directors. In other words, the plaintiff must allege facts sufficient to show that Rapoport *"knew* that [he was] making material decisions without adequate information and without adequate deliberation, and that [he] simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." To the extent that Rapoport acted solely in his capacity as an officer, he is not insulated by the § 102(b)(7) provision at all.

Therefore, the defendants' motion to dismiss Count II of the complaint will be denied.

C. COUNTS III & IV--Constructively Fraudulent Transfers

In Counts III and IV, Mosler seeks to avoid and recover for constructively fraudulent transfers from Mosler to Kelso totaling $150,000 and $800,000 in violation of 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 544(b), respectively. The defendants argue that Mosler's amended complaint merely restates the elements of constructive fraud under these sections, without asserting any facts to support its claims. (D.I. 36 at 36-38.) Admittedly, the factual allegations supporting these claims are sparse. However, Mosler

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 3101575 (D.Del.)
**(Cite as: 2004 WL 3101575 (D.Del.))**

Page 5

does allege two specific amounts it paid to Kelso for "management fees" and that it received nothing in return. (D.I. 28 ¶¶ 89-101.) It is also true that Mosler filed for bankruptcy during the relevant time period, which tends to shore up Mosler's assertion that the transfers were completed during insolvency or that the transfers rendered the company insolvent. Therefore, the court believes it would be premature to dismiss these claims before adequate discovery. Thus, the defendants' motion to dismiss Counts III and IV will be denied.

V. CONCLUSION

*6 For the aforementioned reasons, the defendants' motion to dismiss all counts of the plaintiff's amended complaint will be denied.

*ORDER*
IT IS HEREBY ORDERED that:

The defendants' motion to dismiss all counts of the second amended complaint (D.I.35) be DENIED.

2004 WL 3101575 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:03CV00779 (Docket) (Aug. 05, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.