# EXHIBIT A

FROM PAUL HASTINGS #1

## EMPLOYMENT AGREEMENT

AGREEMENT between Coram Healthcare Corporation, a Delaware corporation (the "Company"), and Daniel Crowley ("Executive"), made as of November 30, 1999, the date upon which Executive has executed and delivered this Agreement to the Company (the "Effective Date").

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Employment. The Company shall employ Executive, and Executive accepts employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on the date hereof and ending as provided in paragraph 5 hereof (the "Employment Period").

2.    Position and Duties. During the Employment Period, Executive shall serve as the Chairman of the Board, President and Chief Executive Officer of the Company and all of its wholly-owned subsidiaries, and Executive shall have the normal duties, responsibilities and authority of the Chairman of the Board, President, and Chief Executive Officer. Executive is a former Chief Executive Officer of a Fortune 200 Company in demand to serve as Chairman of the Board, Chief Executive Officer or turn around management. Executive also owns and operates his own company, Dynamic Healthcare, that has various business interests. Executive intends to do whatever is professionally necessary to turn the Company around and the Company recognizes that Executive will have other business interests and may serve as an officer or consultant to other businesses. Executive shall have the right, with the concurrence of the Company's Board of Directors, to appoint a chief executive officer when the Company, in Executive's reasonable opinion, has been stabilized; provided, however, that such an appointment shall not be deemed to cause a termination of the Employment Period by the Company hereunder and shall not trigger payment of any amounts to Executive pursuant to Section 5(d). Upon the appointment of a successor chief executive officer pursuant to this Section 2, Executive shall retain his position as Chairman of the Board and all of the terms of this Agreement shall remain in full effect except to the extent modified in a manner which is mutually acceptable to the parties, including without limitation an adjustment to the base compensation payable hereunder.

3.    Base Salary and Benefits.

(a)    Executive's base salary (the "Base Salary") shall initially be $650,000 per annum, payable in cash and in accordance with the Company's general payroll practices. The Base Salary shall be reviewed annually by the Board of Directors of the Company (the "Board") and increased (but not decreased) based upon Executive's performance.

(b)    In addition to the Base Salary, Executive shall be entitled to a performance bonus (the "Bonus") payable within 90 days of the end of each fiscal year based upon the Company's operating results, as follows: if earnings before interest, taxes, depreciation and amortization (EBITDA) of the Company, as measured by the audited financial statements of the Company in any one year equals or exceeds 100% of the target amounts (the "EBITDA Targets") to be determined by the Compensation Committee of the Board of Directors of the Company (consisting of at least two outside directors who will

FROM PAUL HASTINGS FL

comprise a majority of such Committee) and Executive in good faith, beginning in fiscal year 2000, Executive shall be entitled to a bonus for such year (the "Bonus") equal to the percentage set forth on Schedule A hereto of the Base Salary in effect on the last day of the Company's fiscal year for which such Bonus is payable. Any Bonus earned by Executive hereunder shall be payable by the Company in cash.

(c)     Executive shall be granted options as of the Effective Date to purchase 1,000,000 shares of Common Stock of the Company (the "Option Shares") at a price equal to the closing price of the Common Stock on the New York Stock Exchange on the Effective Date. The Option Shares shall be granted to Executive under the Company's 1994 Stock Option/Stock Issuance Plan (the "Plan"). Each of the options (the "Options") shall vest and become exercisable by Executive as to 33-1/3% of the Option Shares covered thereby on each of the first, second and third anniversaries of the Effective Date, if Executive is then employed by the Company, and will vest as to 100% of the Option Shares upon: (i) a Change in Control (as defined below); (ii) any termination by the Company of this Agreement other than a termination by the Company for Cause (as defined below); (iii) any termination by Executive pursuant to paragraph 5(a)(ii) hereof; or (iv) if the Employment Period is terminated as a result of Executive's death or permanent Disability (as defined below).

For purposes of this Agreement, a Change in Control of the Company shall be deemed to have occurred if: (i) any "person" (as such term is Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), other than a trustee or other fiduciary holding securities of the Company under an employee benefit plan of the Company or the Senior Subordinated Noteholders pursuant to the Securities Exchange Agreement dated May 6, 1998, or a group composed principally thereof, becomes the "beneficial owner" (as defined in Rule 13d-3 promulgated under the Exchange Act), directly or indirectly, of securities of the Company representing 50% or more of (A) the outstanding shares of Common Stock of the Company or (B) the combined voting power of the Company's then-outstanding securities entitled to vote generally in the election of directors; (ii) during any period of not more than two consecutive years, individuals who at the beginning of such period constitute the Board, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in paragraph (i) or (iii) of this paragraph 3(c)) whose election by the Board or nomination for election by the Company's shareholders was approved by a vote of at least two-thirds of the directors still in office who were either in office at the beginning of such period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority of the Board; or (iii) the shareholders of the Company approve a merger or consolidation which would result in the holders of voting securities of the Company outstanding immediately prior thereto failing to continue to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least 50% of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; or (iv)  or the shareholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets or any transaction having a similar effect.

(d)     In addition to the Base Salary and any bonuses payable to Executive pursuant to this paragraph, Executive shall be entitled to the following benefits during the Employment Period, unless otherwise increased by the Board:

FROM PAUL HASTINGS FL

(i)     Health insurance, dental insurance and disability insurance as such coverage is made generally available to the senior executives of the Company and whole life insurance with a policy value of $1,000,000 naming Executive's beneficiary of choice;

(ii)     four weeks paid vacation each year (any unused vacation will be paid out at the Base Salary rate on December 31 of each year during the Employment Period and upon termination of this Agreement);

(iii)     participation in any group life insurance plan, or other insurance plan, medical expense plan or other benefit arrangement maintained by the Company for its senior executives generally and, if applicable, their family members; and

(iv)     a car allowance of $1,800 per month.

(e)     The Company shall provide Executive corporate housing in Denver, Colorado for all or such portion of the Employment Period as is requested by Executive.

(f)     The Company shall also pay to Executive an amount equal to the "Grossed-up Excess Tax Liability." The term "Grossed-up Excess Tax Liability" means an amount which, after Executive's payment of federal and state income tax liabilities arising on the receipt of the Grossed-up Excess Tax Liability payment, shall equal the amount of the "Benefits Tax Liability." The term "Benefits Tax Liability" shall mean the sum of federal and state income tax liability which is payable by Executive upon the receipt of the benefits provided for in Section 3(d), (e) and (i) hereof.

(g)     The Company shall reimburse Executive for all reasonable expenses incurred by him in the course of performing his duties under this Agreement, including upgrades for first class air travel, which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

(h)     In addition to the Base Salary and any bonuses payable to Executive hereunder, Executive shall also be entitled to receive an acquisition bonus ("Acquisition Bonus") equal to 2.99 times the annual Base Salary and "Target Bonus" (as defined on Schedule A hereof) payable to Executive hereunder at the time when the Acquisition Bonus becomes payable. The Acquisition Bonus shall be paid concurrently with the consummation of a merger or consolidation which results in the holders of voting securities of the Company outstanding immediately prior thereto failing to continue to represent (either by remaining outstanding, or by being converted into voting securities of the surviving entity) at least 50% of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation, or the sale or disposition by the Company of all or substantially all of the Company's assets, or any transaction having similar effect, other than a liquidation of the Company (an "Acquisition").

(i)     The company shall pay for Executive's annual federal and state tax preparation costs up to a maximum of $10,000 per calendar year.

4.     Board Membership. Executive shall be elected or appointed to serve as a member of the Board of Directors to fill a vacancy thereon and shall be appointed

-3-

FROM PAUL HASTINGS #1

Chairman of the Board as of the Effective Date. With respect to all subsequent regular elections of directors during the Employment Period, the Company shall nominate, and use its best efforts to elect, Executive to serve as a member of the Board. If Executive is elected to serve on the Board, Executive shall be named the Chairman of the Board. Upon the termination of the Employment Period for any reason, Executive shall resign as a director and officer of the Company and its Subsidiaries, as the case may be. For purposes of this Agreement, "Subsidiaries" shall mean any corporation of which the securities having a majority of the voting power in electing directors are, at the time of determination, owned by the Company, directly or through one or more Subsidiaries.

5.    Term.

(a)    The Employment Period shall end on November 29, 2002, provided that: (i) the Employment Period shall terminate prior to such date upon Executive's resignation, death or permanent disability (defined as the expiration of a continuous period of 180 days during which Executive is unable to perform his assigned duties due to physical or mental incapacity); (ii) the Employment Period may be terminated by Executive at any time prior to such date if the Company fails to comply with any material provision of this Agreement, which failure has not been cured within 10 business days after notice of such noncompliance has been given by Executive to the Company; and (iii) the Employment Period may be terminated by the Company at any time prior to such date for Cause.

(b)    If the Employment Period is terminated by the Company for Cause or is terminated by Executive's resignation, Executive shall be entitled to receive all amounts due to him through the date of termination.

(c)    If the Employment Period is terminated as a result of Executive's death or permanent Disability, the Company shall pay any amounts due to Executive through the date of termination and a Bonus (payable as set forth in paragraph 3(b)) in an amount equal to the Bonus which would have otherwise been payable to Executive pursuant to paragraph 3(b) with respect to the fiscal year in which such termination occurs.

(d)    If the Employment Period is terminated by the Company other than for Cause or by Executive pursuant to paragraphs 5(a)(ii) above, Executive shall be entitled to receive (i) his Base Salary through the third anniversary of the Effective Date (or, if longer, for a period of 24 months after the date of termination), payable in accordance with the Company's general payroll practices, and (ii) the then applicable Target Bonus which shall be payable within ninety days after the end of each of the Company's fiscal years ending thereafter through 2002. The Company shall also continue coverage for Employee under the Company's life insurance, medical, health, disability and similar welfare benefit plans and the whole life insurance plan described in paragraph 3(d)(i) through the third anniversary of the Effective Date (or, if longer, for a period of 24 months after the date of termination).

(e)    Except as otherwise set forth above, all of Executive's rights to fringe benefits and bonuses hereunder (if any) accruing after the termination of the Employment Period shall cease upon such termination.

(f)    For purposes of this Agreement, "Cause" shall mean (i) the continuing willful failure or refusal by Executive to perform substantial and material duties hereunder (other than any such failure resulting from Executive's incapacity due to physical or mental illness), which has not ceased within 10 business days after written demand for substantial

-4-

FROM PAUL HASTINGS #1

performance is delivered to Executive by the Company, which demand identifies the manner in which the Company believes that Executive has not performed such duties and the steps required to cure such failure to perform; (ii) Executive shall intentionally and willfully engage in misconduct toward the Company which is materially injurious to the Company and its Subsidiaries, monetarily or otherwise (including, but not limited to, conduct in violation of paragraph 7 or 8 hereof), or (iii) the conviction of Executive of or the entering of a plea of nolo contendere by Executive with respect to, a felony. Notwithstanding the foregoing, Executive's Employment hereunder shall not be deemed to be terminated for Cause unless and until there shall have been delivered to Executive a copy of a resolution duly adopted by an affirmative vote of not less than a majority of the entire membership of the Board at a meeting of the Board (after written notice to Executive and a reasonable opportunity for Executive, together with Executive's counsel, to be heard before the Board), finding that in the good faith opinion of the Board, Executive should be terminated for Cause. Cause shall not be deemed to include the performance of duties for other companies or businesses that do not compete with the Company or unreasonably interfere with Executive's turnaround responsibilities for the Company.

(g)    In the event of any dispute regarding the existence of Executive's Disability hereunder, the matter will be resolved by the determination of a majority of three physicians qualified to practice medicine in Colorado, one to be selected by each of Executive and the Board and the third to be selected by the two designated physicians. For this purpose, Executive will submit to appropriate medical examinations.

(h)    Executive shall not be required to mitigate the amount of any payment provided for in this paragraph 5 by seeking other employment or otherwise, and the amount of any payment or benefit provided for in this paragraph 5 shall not be reduced by any compensation earned by Executive as a result of employment by another employer or by retirement benefits.

6.    Confidential Information.  The Executive acknowledges that the information, observations and data obtained by him while employed by the Company concerning the business or affairs of the Company or any Subsidiary ("Confidential Information") are the property of the Company or such Subsidiary. Therefore, Executive agrees that he shall not disclose to any unauthorized person or use for his own account any Confidential Information without the prior written consent of the Board, unless and to the extent required by law, rule or regulation or pursuant to any administrative or court order. The term "Confidential Information" shall not include (i) information which is generally available to the public or those in the Company's industry as of the date of execution of this Agreement or which later becomes generally available to the public or those in the Company's industry other than as a result of Executive's prohibited disclosure; (ii) information which comes to Executive from a bona fide third party source so long as such source was not, to Executive's knowledge, prohibited from providing such information to Executive by any contractual, legal, fiduciary or other obligation; and (iii) information which was known to Executive before such information was obtained from the Company. Executive shall deliver to the Company at the termination of the Employment Period, or at any other time the Company may request, all memoranda, notes, plans, records, reports, computer tapes and software and other documents and data (and copies thereof) relating to the Confidential Information or the business of the Company or any Subsidiary which he may then possess or have under his control.

FROM PAUL HASTINGS F[

7.    Non-Compete, Non-Solicitation.

(a)    Executive acknowledges that in the course of his employment with the Company he will become familiar with the Company's trade secrets and with other confidential information concerning the Company and its predecessors and that his services will be of special, unique and extraordinary value to the Company. Therefore, Executive agrees that (i) during the period in which Executive is receiving compensation from the Company pursuant to paragraph 5 hereof, or (ii) if the Employment Period is terminated as provided in paragraph 5(b), for a period of one year following such termination (the "Noncompete Period"), he shall not directly or indirectly own, manage, control, participate in, consult with, render services to, or in any manner engage in any business competing with any business of the Company or its Subsidiaries, as such businesses exist or are in process on the date of the termination of Executive's employment, within any geographical area in which the Company or its Subsidiaries engage or plan to engage in such businesses. Geographic areas in which the Company and/or its Subsidiaries plans to operate any businesses or in which any businesses of the Company exist or are in process will be identified in writing upon request of Executive within thirty days of the date of termination of the Employment Period. Nothing herein shall prohibit Executive from being a passive owner of not more than 5% of the outstanding stock of any class of a corporation which is publicly traded, so long as Executive has no active participation in the business of such corporation.

(b)    During the Noncompete Period, Executive shall not directly or indirectly through another entity (i) induce or attempt to induce any employee of the Company or any Subsidiary to leave the employ of the Company or such Subsidiary, or in any way interfere with the relationship between the Company or any Subsidiary and any employee thereof, (ii) solicit any person who was an employee of the Company or any Subsidiary at any time within one year prior to termination of the Employment Period, or (iii) induce or attempt to induce any customer, supplier, licensee or other business relation of the Company or any Subsidiary to cease doing business with the Company or such Subsidiary, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and the Company or any Subsidiary.

(c)    If, at the time of enforcement of this paragraph 7, a court shall hold that the duration, scope or area restrictions stated herein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law.

(d)    In the event of the breach or a threatened breach by Executive of any of the provisions of this paragraph 7, the Company, in addition and supplementary to other rights and remedies existing in its favor, may apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions thereof (without posting a bond or other security).

8.    Executive and Company Representations.    Executive hereby represents and warrants to the Company that (i) the execution, delivery and performance of this Agreement by Executive does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Executive is a party or by which he is bound, and (ii) upon the execution and delivery of this

FROM PAUL HASTINGS #1

Agreement by the Company, this Agreement shall be the valid and binding obligation of Executive, enforceable in accordance with its terms. The Company hereby represents and warrants to Executive that it is not entering into this Agreement in contemplation of any merger or sale of the Company.

9.    Survival. Paragraphs 5, 6, 7 and 8 shall survive and continue in full force in accordance with their terms notwithstanding any termination of the Employment Period.

10.    Notices. All notices, requests, demands and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to be delivered and receive five business days after having been deposited in the United States mail and enclosed in a registered or certified post-paid envelope; one business day after having been sent by overnight courier; when personally delivered or sent by facsimile communications equipment of the sending party on a business day, or otherwise on the next succeeding business day thereafter; and in each case addressed to the respective party at the address set forth below or to such other changed addresses as the party may have fixed by notice as provided herein:

Notices to Executive:

>    Daniel Crowley
>    400 Capitol Mall
>    Suite 1250
>    Sacramento, CA 95814
>    Telephone:    (916) 449-6056
>    Fax:    (916) 449-6059

with a copy to:

>    Pillsbury, Madison & Sutro LLP
>    400 Capitol Mall
>    Suite 1700
>    Sacramento, CA 95814-4419
>    Attention:    Michael A. Kvarme, Esq.
>    Telephone:    (916) 329-4713
>    Fax:    (916) 441-3583

Notices to the Company:

>    Coram Healthcare Corporation
>    1125 Seventeenth Street
>    Suite 1500
>    Denver, CO 80202
>    Attention: Scott Larsen, Esq.
>    Telephone:    (303) 292-4973
>    Fax:    (303) 298-0047

FROM PAUL HASTINGS, P.

with a copy to:

Paul, Hastings, Junofsky & Walker LLP
555 S. Flower Street, 23rd Floor
Los Angeles, CA 90071
Attention: Anna M. Graves, Esq.
Telephone:    (213) 683-6345
Fax:             (213) 996-3345

11.    Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

12.    Complete Agreement.  This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

13.    Counterparts.  This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

14.    Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of and be enforceable by Executive, the Company and their respective heirs, successors and assigns, except that Executive may not assign his rights or delegate his obligations hereunder without the prior written consent of the Company. The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) of all or substantially all of the business and/or assets of the Company, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

15.    Attorneys' Fees and Costs.  If any action at law or equity is necessary to enforce or interpret the terms of this Agreement, Executive shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any relief to which he may otherwise be entitled if he is the prevailing party in such action.

16.    Choice of Law.  This Agreement will be governed by the internal law, and not the laws of conflicts, of the State of Colorado.

17.    Amendment and Waiver.  The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and Executive, and no course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement.

FROM PAUL HASTINGS #1

\* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

CORAM HEALTHCARE CORPORATION

By: _____

Its: _____

EXECUTIVE

_____  30 Nov 99

DANIEL CROWLEY

FROM PAUL HASTINGS FL

## SCHEDULE A
## BONUS COMPENSATION

Beginning with the Company's fiscal year 2000, if the Company hits the percentage of its EBITDA Target set forth below, Executive will be entitled to receive as Bonus that percentage of his Base Salary (as in effect on the last day of the fiscal year in question) set forth below. If the Company hits a percentage of its EBITDA Target which is greater than one of the percentages set forth below but less than the next succeeding percentage, Executive shall be entitled to receive a pro rata portion of the incremental Base Salary payment.

| PERCENTAGE OF EBITDA TARGET | PERCENTAGE OF BASE SALARY |
|---|---|
| 100.0 %* | 60%* |
| 101.5% | 65% |
| 103.0% | 70% |
| 104.5% | 75% |
| 106.0% | 80% |
| 107.5% | 85% |
| 109.0% | 85% |
| 110.5% | 95% |
| 112.0% | 100% |
| 114.0% | 110% |
| 116.0% | 121% |
| 118.0% | 132% |
| 120.0% | 143% |
| 122.0% | 154% |
| 124.0% | 166% |
| 126.0% | 177% |
| 128.0% | 188% |
| 130.0% | 200% |
| 132.0% | 211% |
| 134.0% | 212% |
| 136.0% | 223% |
| 138.0% | 234% |
| 140.0% | 245% |
| 142.0% | 256% |
| 144.0% | 267% |
| 146.0% | 278% |
| 148.0% | 289% |
| 150.0% | 300% |

---

\*     These represent the "Target Bonus" levels for purposes of this Agreement.

# AMENDMENT NO. 1
## TO EMPLOYMENT AGREEMENT

THIS AMENDMENT NO. 1 TO EMPLOYMENT AGREEMENT (this "Amendment"), dated as of _November 30_, 1999 amends that certain Employment Agreement, dated as of November 30, 1999 (the "Employment Agreement") between Coram Healthcare Corporation, a Delaware corporation (the "Company"), and Daniel Crowley (the "Executive"), and is made and entered into with reference to the facts described below. All terms appearing in this Amendment with initial capitalization shall have the meanings ascribed to them in the Employment Agreement, unless otherwise defined herein.

## RECITALS

WHEREAS, the Company and the Executive desire to amend the Employment Agreement to revise the exercise price that will be applicable to the stock options that will be granted to the Executive;

NOW, THEREFORE, in consideration of the foregoing, the parties hereby agree as follows:

1.  Amendment to Employment Agreement.

    1.1   Paragraph (c) of Section 3 of the Employment Agreement is hereby amended by deleting the first sentence of the paragraph in its entirety and substituting the following in its place:

    (a)   Executive shall be granted options as of the Effective Date to purchase 1,000,000 shares of Common Stock of the Company (the "Option Shares") at a price equal to the closing price of the Common Stock of the New York Stock Exchange on November 29, 1999, the day immediately preceding the Effective Date.

2.  Counterparts. This Amendment may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same amendment.

3.  Miscellaneous. Except as expressly amended by this Amendment, the Employment Agreement shall continue in full force and effect in accordance with the provisions thereof. As used in the Employment Agreement, the terms "hereinafter," "hereto," hereof, and other words of similar import shall, unless the context otherwise requires, mean the Employment Agreement as amended by this Amendment. In the event of any conflict or inconsistency between the terms and conditions of the Employment Agreement and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall control.

NOV-29 '01 14:24     LEGAL

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CORAM HEALTHCARE CORPORATION

By: _____
Donald J. Amaral
Chairman

EXECUTIVE

_____
Danie. Crowley

H:\LEGAL\CORAM\CRWLYAMD.DOC                    2

APR 25 2022 13:44 FR CORAM HEALTHCARE          9164496259 TO FEINBERG          P.04/21

# SECOND AMENDMENT TO EMPLOYMENT AGREEMENT

THIS SECOND AMENDMENT TO EMPLOYMENT AGREEMENT (the "Amendment") is made as of April 6, 2000, by and between Coram Healthcare Corporation, a Delaware corporation (the "Company"), and Daniel D. Crowley ("Executive").

## RECITALS

A.    The parties previously made and executed that certain Employment Agreement, effective November 30, 1999, that was subsequently amended effective as of November 30, 1999 (collectively, the "Employment Agreement").

B.    Each of the parties desires to amend the Employment Agreement as set forth herein.

NOW THEREFORE, in consideration of the premises set forth above and the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Executive hereby agree as follows:

1.    Amendment.    The Employment Agreement is hereby amended as follows:

(a)    Section 3(b) of the Employment Agreement is hereby amended by deleting such paragraph in its entirety and replacing it with the following:

In addition to the Base Salary, Executive shall be entitled to a performance bonus (the "Incentive Bonus") payable within 90 days of the end of each fiscal year based upon the Company's operating results measured against a target level of earnings as established by the Executive and the Compensation Committee of Coram's Board of Directors before the beginning of each of the Company's fiscal years during the Employment Term. With respect to the Company's fiscal year ending December 31, 2000, the Incentive Bonus shall be, as follows: If earnings before interest, taxes, depreciation and amortization (EBITDA) of the Company for such year, as measured by the audited financial statements of the Company for its fiscal year ending December 31, 2000, equals or exceeds $14,000,000 (the "2000 Incentive Target"), the Incentive Bonus to which the Executive shall be entitled shall be an amount equal to 25% of the Company's EBITDA that exceeds the 2000 Incentive Target. The Incentive Bonus shall be paid in cash from Coram's available Free Cash (as defined below) or from the Revolving Credit Facility (as that term is defined below).

In addition to the Incentive Bonus, ~~for the fiscal year ending December 31, 2000~~ in the event that the EBITDA of the Company as measured by the audited financial statements of the Company equals or exceeds $35,000,000 ~~in 2000~~, the Company shall pay an additional bonus (the "EBITDA Bonus") of $5,000,000 to the Executive or others as designated by Executive, if any.

Any Incentive Bonus, EBITDA Bonus, Success Bonus (as defined below) or other bonus earned by the Executive under any provision of this Employment Agreement

*The EBITDA Bonus shall be paid in cash from Coram's available Free Cash or from the Revolving Credit Facility.*

APR 26 2000 13:45 FR CORAM HEALTHCARE   9154498259 TU FEINBERG   P.23/91

shall be payable by the Company in cash out of funds derived from the Company's excess available cash flow ("Free Cash") or from amounts drawn on the Company's Credit Facility, dated August 20, 1998, among the Company, Coram, Inc, and the Guarantors named therein, the Lenders named therein and Foothill Capital Corporation, as Agent, or any subsequent credit facility that replaces such facility (the "Revolving Credit Facility"); provided, however, that in the event that the ~~EBITDA Bonus is~~ amount drawn on the Revolving Credit Facility at the time such ~~due~~ is an amount that is greater than 65% (the percentage drawn as of April 6, 2000) of the maximum funds available to the Company under such credit facility (for example, the maximum amount available under the Revolving Credit Facility is $60,000,000 and as of April 6, 2000 the amount drawn was $38.5 Million), the Company shall pay ~~the EBITDA Bonus~~ to the Executive ~~and each~~ (designated individual recipient) as follows: 50% in cash on the due date and 50% in monthly installments over the next eleven (11) months. In the event that the Executive or the designated recipient is terminated for any reason whatsoever, any unpaid ~~EBITDA~~ ~~Bonus~~ shall be paid immediately in a lump sum.

(b)   Section 3 of the Employment Agreement is hereby amended by adding the following provision to such Section as a new Section 3(j):

In addition to the Base Salary and any other bonuses payable under this Amendment or the Agreement, Executive shall also be entitled to receive, upon consummation of a "Refinancing" (as that term is defined below) of the Company's "Principal Debt Instruments" (as that term is defined below), a success bonus (the "Success Bonus") equal to the greater of (i) 1.5% of the principal amount of the Principal Debt Instruments that are converted into common or preferred stock issued by the Company; or (ii) 1.0% of the total principal amount of the Principal Debt Instruments outstanding after consummation of the Refinancing. Such Success Bonus shall be paid immediately upon the Effective Date of the Refinancing from Free Cash or the Revolver.

The term "Principal Debt Instruments" shall mean (a) the Revolving Credit Facility; and (b) that certain Securities Exchange Agreement, dated as of May 6, 1998, as amended, by and between the Company; Coram, Inc.; Cerberus Partners, L.P.; Goldman Sachs Credit Partners, L.P.; and Foothill Capital Corporation and the Series A and Series B Notes issued pursuant thereto.

The term "Refinancing" shall mean a transaction or series of related transactions approved by the Company's Board of Directors that provides for either: (a) the conversion of some or all of the Principal Debt Instruments into a combination of new Company debt instruments and shares of common or preferred stock issued by the Company; or (b) the conversion of the Principal Debt Instruments into new debt instruments issued by the Company.

(c)   Section 5(a) of the Employment Agreement is hereby amended by deleting such Section in its entirety and replacing it with the following:

The Company agrees to employ and Executive accepts such employment for the period beginning as of the Effective Date and ending on the third anniversary of the

-2-

LWCROWLEY AMD 2

APR 05 2000 13:45 FR CORAM HEALTHCARE    9164496039 TO FEINBERG

Effective Date, provided that: (i) the Employment Period shall terminate prior to such date upon Executive's resignation, death or permanent disability (defined as the expiration of a continuous period of 180 days during which Executive is unable to perform the essential functions of his assigned duties due to physical or mental incapacity); (ii) the Employment Period may be terminated by Executive at any time prior to such date if the Company fails to comply with any material provision of this Agreement, which failure has not been cured within 10 business days after *(written)* notice of such noncompliance has been given by Executive to the Company; and (iii) the Employment Period may be terminated by the Company at any time prior to such date for Cause. In the absence of the occurrence of any of the events in subsections (i) through (iv) of this Section, the Employment Period shall automatically be renewed for additional one (1) year terms *(up to two (2))* commencing on the third anniversary of the Effective Date.

(d)    Section 5(d) of the Employment Agreement is hereby amended by deleting such Section in its entirety and replacing it with the following:

If the Employment Period is terminated by the Company other than for Cause or by Executive pursuant to paragraph 5(a)(ii) above, or if Executive's duties, responsibilities, and/or job title is substantially altered from that of Chairman of the Board, Chief Executive Officer and President other as contemplated by Section 2 of this Agreement, then Executive shall be entitled to receive his Base Salary and Automobile Allowance through the third anniversary of the date such termination of employment becomes effective (the "Severance Period"), payable in accordance with the Company's general payroll practices, and all bonuses payable hereunder, however denominated, as described herein throughout the Severance Period. The Company shall also continue coverage for Executive under the Company's life insurance, medical, health, disability and similar welfare benefit plans described in Section 3(d) (or under other plans, including the whole life insurance policy, obtained by the Company for the benefit of the Executive and fully funded by the Company. The Executive shall receive a full tax gross-up for any tax liability of the Executive for such benefits and the Automobile Allowance) throughout the entire Severance Period.

(e)    Section 3 of the Employment Agreement is hereby amended by adding the following provision to such Section as a new Section 3(k):

If the Executive and the Board of Directors concur on the appointment of a Chief Executive Officer and/or a President for the Company as contemplated by Section 2 of the Agreement, this Agreement will remain in full force and effect without modification to any of the terms and conditions set forth herein (other than the Executive's duties to the extent they may be assigned to the new chief executive officer), including but not limited to the Executive's Base Salary, bonus opportunities and full benefits; provided, however, that the new Chief Executive Officer and/or President shall be entitled to receive a portion of the EBITDA Bonus in an amount reasonably negotiated between the Executive and such person. The *(split of the)* *(Board of Directors, the)*

*Split of the money between Dan Crowley and the new CEO or president need to be approved by the board whose approval [not] be unreasonably withheld.*

*DJCROWLEY [initials]*

APR 05 2000 13:46 FR CORAM HEALTHCARE        9164456859 TO FEINBERG

2.    _Counterparts._ This Amendment may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same instrument.

3.    _Miscellaneous._ Except as expressly amended by this Amendment, the Employment Agreement shall continue in full force and effect in accordance with the provisions thereof. As used in the Employment Agreement, the terms "hereinafter," "hereto," hereof, and other words of similar import shall, unless the context otherwise requires, mean the Employment Agreement as amended by this Amendment. In the event of any conflict or inconsistency between the terms and conditions of the Employment Agreement and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall control.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CORAM HEALTHCARE CORPORATION

By: _____
Stephen A. Feinberg
Chairman of Compensation Committee

By: _____
L. Peter Smith
Director, Compensation Committee

EXECUTIVE

_Daniel D. Crowley_    6 Apr 26
Daniel D. Crowley

-4-

LA\CROWLEY AMD 2

** TOTAL PAGE.07

# THIRD AMENDMENT TO EMPLOYMENT AGREEMENT

THIS THIRD AMENDMENT TO EMPLOYMENT AGREEMENT (the "Amendment") is made as of _August 2_, 2000, by and between Coram Healthcare Corporation, a Delaware corporation (the "Company"), and Daniel D. Crowley ("Executive").

## RECITALS

A.    The parties previously made and executed that certain Employment Agreement, effective November 30, 1999, that was subsequently amended effective as of November 30, 1999 and as of April 6, 2000 (collectively, the "Employment Agreement").

B.    Each of the parties desires to amend the Employment Agreement as set forth herein.

NOW, THEREFORE, in consideration of the premises set forth above and the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Executive hereby agree as follows:

1.    Amendment. Section 3(j) of the Employment Agreement is hereby amended by deleting such section in its entirety and replacing it with the following provision:

In addition to the Base Salary and any other bonuses payable under the Agreement, Executive shall also earn a success bonus in the amount of $1,800,000 (the "Success Bonus"), upon confirmation of a plan of reorganization of the Company and its subsidiary Coram, Inc. ("CI") that has been confirmed by this Board of Directors that includes a "Refinancing" (as that term is defined below) of the Company's "Principal Debt Instruments" (as that term is defined below). Such Success Bonus shall be paid immediately upon the effective date of such plan of reorganization from Free Cash or any credit instrument to which the Company is a party and from which the Company may borrow funds as of the time such success bonus is due.

The term "Principal Debt Instruments" shall mean (a) the Revolving Credit Facility; and (b) that certain Securities Exchange Agreement, dated as of May 6, 1998, as amended, by and between the Company; Coram, Inc.; Cerberus Partners, L.P.; Goldman Sachs Credit Partners, L.P.; and Foothill Capital Corporation and the Series A and Series B Notes issued pursuant thereto.

The term "Refinancing" shall mean a transaction or series of related transactions approved by the Company's Board of Directors that provides for either: (a) the conversion of some or all of the Principal Debt Instruments into a combination of new debt instruments and shares of common or preferred stock issued by the Company or CI; or (b) the conversion of the Principal Debt Instruments into new debt instruments issued by the Company or CI.

2.    Counterparts. This Amendment may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same instrument.

3.    _Miscellaneous_.  Except as expressly amended by this Amendment, the Employment Agreement shall continue in full force and effect in accordance with the provisions thereof.  As used in the Employment Agreement, the terms "hereinafter," "hereto," hereof, and other words of similar import shall, unless the context otherwise requires, mean the Employment Agreement as amended by this Amendment.  In the event of any conflict or inconsistency between the terms and conditions of the Employment Agreement and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall control.  All terms appearing in this Amendment with initial capitalization shall have the meanings ascribed to them in the Agreement, unless otherwise defined herein.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CORAM HEALTHCARE CORPORATION

By: _____
Name: Scott T. Larson
Title: Senior Vice President
       and Secretary

EXECUTIVE

_____
Daniel D. Crowley

DRAFT                    Fourth Amendment to Employment Agreement

This Fourth Amendment (the "Fourth Amendment") to a certain Employment Agreement, effective as of November 30, 1999 and as subsequently amended, is made and is effective as of April __, 2002, by and between Coram Healthcare Corporation and Coram, Inc., Delaware Corporations, their parents, subsidiaries and affiliates (collectively the "Company"), and Daniel D. Crowley (the "Executive").

Recitals

A. The parties previously made and executed a certain Employment Agreement, effective November 30, 1999 that was subsequently amended effective as of November 30, 1999, April 6, 2000 and August 2, 2000 (collectively the "Employment Agreement").

B. At the request of the Executive, on March 20, 2001 and March 21, 2001 the Compensation Committee and the Board of Directors of the Company, respectively, approved and authorized this Amendment as set forth herein.

C. Now, therefore, in consideration of the premises set forth above and the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Executive hereby agree as follows:

1. Amendment. Section 3 of the Employment Agreement is hereby amended by adding the following provision to such Section 3 as new Section 3(k):

Notwithstanding the Incentive Bonus, or any other bonuses or monies earned by the Executive under any other provisions of this Employment Agreement for the Company's fiscal year 2000, for the Company's fiscal years 2001 and 2002 and during the remaining Employment Period the bonuses to be paid to the Executive shall be as follows:

In addition to the Base Salary, the Executive shall be entitled to a performance bonus payable within 90 days of the end of each fiscal year based upon the Company's operating results, calculated as follows: if the Company's consolidated earnings before interest expense, income taxes, depreciation and amortization expense ("EBITDA") for any given fiscal year, as measured in its audited consolidated financial statements, equals or exceeds 100% of the Company's Threshold EBITDA targets, then the Executive shall be entitled to a performance bonus for such year ( the "Bonus") equal to a percentage of the Executive's Base Salary in effect on the last day of the fiscal year for which the Bonus is being calculated. The Bonus will be computed on a pro rata basis for the period of time that the Executive is employed by the Company during the fiscal year for which the Bonus is being calculated. The Bonus percentage of Base Salary shall range from 60% (upon attainment of the Threshold EBITDA) to 300% (upon attainment of the Target EBITDA or higher). To

illustrate, for the fiscal year ended December 31, 2001, the Threshold EBITDA and the Target EBITDA were set at $24.0 million and $28.0 million, respectively. If the Company's 2001 consolidated EBITDA was $25.0 million, then 104.2% of the Threshold EBITDA was achieved and, accordingly, the pro rata adjusted payout percentage is 120% of Base Salary. Any Bonus earned by the Executive hereunder shall be payable by the Company in cash.

2. Counterparts. The Fourth Amendment to the Employment Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same amendment.

3. Miscellaneous. (i) Except as expressly amended by the Fourth Amendment, the Employment Agreement shall continue in full force and effect in accordance with the provisions thereof; (ii) As used in the Employment Agreement, the terms "hereinafter," "hereto," "hereof," and other words of similar import, unless the context otherwise requires, mean the Employment Agreement, as amended by the Fourth Amendment; and (iii) In the event of a conflict or inconsistency between the terms and conditions of the Employment Agreement and the terms and conditions of the Fourth Amendment, the terms and conditions of the Fourth Amendment shall control.

IN WITNESS WHEREOF, the parties hereto have executed this Fourth Amendment as of the date first above written.

CORAM HEALTHCARE CORPORATION          EXECUTIVE

By:_____        By:_____
   Name:_____           Daniel D. Crowley
   Title:_____

EXHIBIT B

# Schnader
### ATTORNEYS AT LAW

1600 MARKET STREET  SUITE 3600
PHILADELPHIA, PA 19103-7213
215.751.2000  FAX 215.751.2205  schnader.com

December 24, 2002

BARRY E. BRESSLER
Direct Dial 215-751-2050
Direct Fax 215-751-2205
Internet Address: bbressler@schnader.com

## VIA FACSIMILE #312-621-1750

Scott N. Schreiber, Esquire
Much Shelist Freed Denenberg Ament & Rubenstein
200 North LaSalle Street, Suite 2100
Chicago, IL 60601

> Re:   **In re: Coram Healthcare Corp., Debtor**
> **/Daniel D. Crowley**

Dear Mr. Schreiber:

Per our additional discussions, Arlin M. Adams, the Chapter 11 Trustee for Coram Healthcare Corporation ("Coram") has modified the proposed terms for a termination agreement and extension of employment with Daniel D. Crowley ("Dan"), subject to approval of the Bankruptcy Court, to include the following terms:

1.      Dan has terminated his prior Employment Agreement, as amended ("Employment Agreement") and the Trustee has filed a "placeholder" motion to reject Dan's old Employment Agreement.

2.      Under the proposed termination and employment extension agreement ("Transition Agreement"), the Trustee and Dan agree that commencing January 1, 2003 Dan will continue to render essentially the same services to Coram as he has heretofore for a term not to exceed the earlier of (a) six (6) months from January 1, 2003; (b) the date on which a Plan is confirmed by final order of a court having jurisdiction in the Coram Bankruptcy ("final order"); or (c) the substantial consummation of a Plan in the Coram Bankruptcy. The term could be extended once for up to an additional sixty (60) days, if a final order has not been entered on or before June 30, 2003, unless either party terminates the arrangement on thirty (30) days' prior written notice.

Schnader Harrison Segal & Lewis LLP

BOSTON,MA   NEW YORK,NY   PHILADELPHIA,PA   PITTSBURGH,PA   SAN FRANCISCO,CA   WASHINGTON,DC
CANONSBURG,PA   CHERRY HILL,NJ   HARRISBURG,PA

PHDATA 1026985_1

Schnader
ATTORNEYS AT LAW

Scott N. Schreiber, Esq.
December 24, 2002
Page 2

      3.     Dan's current at will employment will continue until December 31, 2002 on the same terms and conditions as under the old Employment Agreement, while we finalize the Transition Agreement and submit it to the Bankruptcy Court. Through December 31, 2002, Dan will receive the same monthly salary and benefits as under the Employment Agreement.

      4.     Under the Transition Agreement, beginning January 1, 2003, Coram will pay Dan a base monthly salary of $80,000.00 ("Monthly Salary") payable as heretofore and continue to reimburse direct costs and expenses incurred by Dan or Dynamic Healthcare Solutions ("Dynamic") on behalf of Coram or Coram's employees occupying space in Sacramento, California on the same basis as heretofore during Coram's bankruptcy proceedings. If during the six months of the Transition Agreement the Trustee terminates Dan without cause, Dan would still be entitled to be paid his Monthly Salary for the balance of the six month period. If during that period Dan is terminated for cause, Dan would not be paid the Monthly Salary for the balance of the six month period.

      5.     Under the Transition Agreement, Coram will continue to provide the other perquisites and benefits that Coram currently provides to Dan under the old Employment Agreement, including health, dental and disability insurance on the same basis as made available to senior executives of Coram, $1,000,000.00 of whole life coverage, an $1,800.00 transportation allowance, corporate housing in Denver on the same basis as heretofore, gross up for taxes on certain benefits on the same basis as heretofore, reasonable expenses incurred in the course of Dan's rendering services for Coram and tax preparation costs of $10,000.00 for the six months of the Transition Agreement. As heretofore, Dan may maintain his interest in Dynamic and during the term of the Transition Agreement, Dan agrees on behalf of Dynamic that it may consult with other companies not in direct competition with Coram, except for the Noteholders/preferred stockholders or their affiliates for which neither Dynamic nor Dan shall consult, so long as such consulting does not substantially detract from Dan rendering the necessary time and effort to continue to guide Coram on the same basis as heretofore.

      6.     During the Transition Agreement, Coram would continue to maintain D&O coverage covering Dan to the same extent available to all Coram officers and directors.

      7.     In consideration of Dan's agreement to forego other opportunities during the Transition Period and in partial recognition of his efforts over the past nine (9) months, the Trustee will pay Dan a stay and performance payment totaling $1,000,000.00 ("Stay Bonus"). This will be accomplished by reimbursement for counsel fees (not to exceed $200,000.00) paid on approval of the Transition Agreement by the Court, with the balance of $800,000.00 paid as a stay bonus paid at the end of the six month period or upon a final confirmation order, whichever first occurs. Dan will be entitled to the Stay Bonus whether or not a final confirmation order is entered.

PHDATA 1026985_1

Schnader
ATTORNEYS AT LAW

Scott N. Schreiber, Esq.
December 24, 2002
Page 3


8.    The Transition Agreement will be governed by Colorado law, as was Dan's old Employment Agreement, and will be enforceable by either party in the Bankruptcy Court.

9.    The Transition Agreement will be subject to approval of the Bankruptcy Court. The Transition Agreement will have an effective date of, and the Trustee will request the Bankruptcy Court to approve it as of, January 1, 2003.

10.    The Trustee will agree, after consultation with Dan, on an appropriate job title during the Transition Agreement, which tentatively will be Chief Transition and Restructuring Officer.

Sincerely,

BARRY E. BRESSLER


BEB/sh
Cc:    Arlin M. Adams, Chapter 11 Trustee
       Mr. Daniel D. Crowley

Agreed as to Terms and Conditions

DANIEL D. CROWLEY

_____


ARLIN M. ADAMS, CHAPTER 11 TRUSTEE

_____

DEC-24-2002  14:32      MUCH SHELIST FDA                    561121   P.04/04
- 12/24/2002    13:19                                              NO.018   ꓟ204

# Schnader
ATTORNEYS AT LAW

Scott N. Schreiber, Esq.
December 24, 2002
Page 3

8.      The Transition Agreement will be governed by Colorado law, as was Dan's old Employment Agreement, and will be enforceable by either party in the Bankruptcy Court.

9.      The Transition Agreement will be subject to approval of the Bankruptcy Court. The Transition Agreement will have an effective date of, and the Trustee will request the Bankruptcy Court to approve it as of, January 1, 2003.

10.     The Trustee will agree, after consultation with Dan, on an appropriate job title during the Transition Agreement, which tentatively will be Chief Transition and Restructuring Officer.

Sincerely,

*Barry E. Breale*

BARRY E. BREALE

BEB/sh

Cc:     Arlin M. Adams, Chapter 11 Trustee
        Mr. Daniel D. Crowley

Agreed as to Terms and Conditions

DANIEL D. CROWLEY

*Daniel D. Crowley* 24Dec02

ARLIN M. ADAMS, CHAPTER 11 TRUSTEE

*Arlin M. Adams*

PHDATA 1026985_1

TOTAL P.04
P.1/1                   PHONE NO. : 916 852 0641     MUCH SHELIST FDAER
NO.361                                               FROM : MAIL BOXES ETC. #1514
DEC. 24 2002 02:25PM P2                              DEC.24.2002    3:39PM

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                      :    Chapter 11
                                            :
CORAM HEALTHCARE CORP. and                  :    Case No. 00-3299 (MFW)
CORAM, INC.,                                :    (Jointly Administered)
                                            :
            Debtors.                        :    **Objection Deadline: February 21, 2003**
                                            :    **Hearing Date: February 28, 2003**

---

ORDER GRANTING [DOCKET NO. _____] MOTION
OF THE CHAPTER 11 TRUSTEE FOR AUTHORIZATION TO ENTER INTO
TERMINATION AND EMPLOYMENT EXTENSION AGREEMENT
WITH DANIEL D. CROWLEY

---

AND NOW, this _____ day of _____, 2003, upon

consideration of the Motion of the Chapter 11 Trustee for Authorization to Enter into

Termination and Employment Extension Agreement with Daniel D. Crowley (the

"Motion"); and upon further consideration of any objection and response thereto; and for

the reasons set forth on the record in these cases; and the Court finding that (i) the Court

has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334, (ii) venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409, (iii) this is a core proceeding under 28

U.S.C. § 157(b)(2)(A) and (M), (iv) notice of the Motion was proper and adequate under

the circumstances, and no further or additional notice is required or necessary, (v) a

reasonable opportunity to be heard with respect to the Motion and the relief requested

therein has been afforded to all interested persons and entities, (vi) that sound business

purposes exist to grant the relief requested in the Motion; and after due deliberation and

for other good cause both on the record and otherwise shown; it is hereby

*Reference Docket No: _____*
*Filed on January 24, 2003*

ORDERED, that the Motion is GRANTED; and it is further

ORDERED, that all objections to the Motion not previously withdrawn are OVERRULED on the merits; and it is further

ORDERED, that the Transition Agreement[1] and its terms and conditions are APPROVED and the Trustee is AUTHORIZED to enter into the Transition Agreement with Daniel D. Crowley; and it is further

ORDERED, that the Trustee is AUTHORIZED to take all further actions necessary to implement and effectuate the terms of the Transition Agreement; and it is further

ORDERED, that the Court shall retain jurisdiction to enforce this Order.

_____
Mary F. Walrath, U.S.B.J.

---

[1] Unless otherwise defined herein, all capitalized terms shall have the same meanings ascribed to them in the Motion.

2

*Reference Docket No:* _____
*Filed on January 24, 2003*