1    continuously, with Barry Bressler; to some

2    extent with Wil Kipnes and these financial

3    advisors.  They were concerned and I was

4    concerned.  I guess Jeffrey Pearlman was

5    concerned that if we did that, we would

6    very seriously jeopardize the condition of

7    the company over a short-run period when

8    our main goal was trying to resolve this

9    bankruptcy or else sell the company.

10                   (Trustee-7, a letter dated

11        May 9, 2002, marked for identification.)

12   BY MR. LEVY:

13       Q. Trustee-7 is the next exhibit.  This

14   is a letter sent by me and my partner to

15   you dated May 9, 2002.  Do you remember

16   receiving that letter?

17       A. I think I recall it.

18       Q. When you got this letter in which we

19   asked you -- well, first, let me ask you

20   this:  Will you agree that this was not the

21   first time that the Equity Committee or its

22   representatives had requested that you

23   remove Dan Crowley?

24       A. I think you are probably right, but

112

1    I can't be positive of that.  If you say

2    it, I accept your statement.  But, I don't

3    recall it.

4        Q. In this letter, we suggested the

5    name of three potential crisis managers.

6    Did you consult any of those three we

7    recommended at that time?

8        A. I did not.

9        Q. Did you consult anybody else at that

10   time?

11       A. I had these discussions that I have

12   talked to you about today.

13       Q. When you talked to Jeff Pearlman and

14   he said be careful that is, essentially,

15   about whether or not replacing Crowley, did

16   he indicate that there was anything special

17   about Coram that required special care in

18   not replacing the CEO?

19       A. I don't think he discussed anything

20   special about Coram.  He was thinking about

21   the health care industry.

22       Q. You are familiar with the fact,

23   aren't you, that in recent, in the recent

24   year or two, some very large companies that

113

```
 1    have gone into bankruptcy have immediately
 2    fired their CEOs?
 3        A. Yes.
 4        Q. For example, you probably read this
 5    morning's Wall Street Journal that the
 6    world's third largest retailer fired its
 7    CEO and CFO because there was some
 8    potential accounting irregularity?
 9        A. That is not a bankruptcy context.
10        Q. That's true.  Did you read that?
11        A. Yes.
12        Q. You know that WorldCom fired its
13    chief executive officer when they filed
14    what is the world's largest Chapter 11?
15    You are aware of that?
16        A. I have read about it.
17        Q. Did you consider the possibility
18    that, perhaps, Mr. Pearlman and your other
19    advisors were wrong in that Coram would
20    survive very well with the crisis manager,
21    notwithstanding a replacement of Dan Crowley?
22        A. Of course.
23        Q. Did you ever consult a crisis
24    manager, someone experienced in this field,
```

114

1    and say something on the order of I'm

2    concerned if I put you in there, it will

3    destroy the company?  What has your

4    experience been?

5        A. I never did.

6        Q. Why?

7        A. I was not looking at this situation

8    as a long-term situation such as WorldCom

9    or AHold (phonetic).  As I have said

10   repeatedly this morning, I thought my job

11   was to try to get this company out of

12   bankruptcy as promptly as possible and I

13   didn't want to shake the foundations before

14   that could be done.  Now, maybe I was

15   wrong.  I don't think I was.  If anybody

16   can prove that to me, I will cheerfully

17   step down.  I don't need this job.  I

18   didn't seek the job.  All I can use is my

19   best judgment.  I tried to do it.

20   Apparently, I have satisfied most of the

21   people, except you and Don and I'm sorry

22   about that.  I would have loved to have

23   satisfied you.  Through my professional

24   life, I have been able to satisfy most

115

1    people.  Certainly with my integrity, which

2    you seem to be attacking this morning,

3    which concerns me very greatly, but that is

4    your job and if I can't do this job, I will

5    cheerfully step down and I will tell that

6    to the Trustee as I am doing right now

7    because his representative is here.  But,

8    it's your judgment against my judgment and

9    although I respect your judgment, I have to

10   adhere to my best judgment.

11        Q. Of course you do.  I am not and

12   never have attacked your integrity.  I

13   understand that there could be a difference

14   of opinion as to whether there should be a

15   crisis manager.

16              My point, sir, is, and just

17   confirm this for me, you never consulted

18   anyone other than Mr. Pearlman and your

19   lawyers here about whether their views as

20   to whether a crisis manager would have

21   upset the apple cart here?

22              MR. NEUWIRTH:  Objection.

23              THE WITNESS:  That is true.

24   The reason is because I had gone on the

116

```
 1      premises and had interviewed all the

 2      executives individually and became

 3      convinced, perhaps incorrectly, that the

 4      best way to preserve value here was

 5      continuing until we could have a plan.

 6      Now, maybe I'm incorrect, but that is my

 7      best judgment.

 8          Q. Roughly, how many executives did you

 9   interview and for what purpose?

10          A. We used to have a list.  I would say

11   twelve, thirteen.

12          Q. Did any one of those executives tell

13   you or suggest to you that if Crowley was

14   replaced by a crisis manager, they would

15   quit?

16          A. No.  But what they suggested is if

17   we disturb the operation, it would hurt the

18   morale and some of them would quit.

19          Q. Who said they would quit?

20          A. I didn't say that.  They said that

21   some of the colleagues would quit.

22          Q. Not the twelve you interviewed, but

23   someone else?

24          A. No.  Among those, but they didn't
```

117

1    put their finger on it.

2                    MR. BEATIE:  You

3          consistently misstate his testimony.  Is

4          it a professional preference?

5                    THE WITNESS:  One would say

6          if you disturb this situation, you run

7          the risk that some of our colleagues may

8          seek a different assignment.

9    BY MR. LEVY:

10         Q. One of them said that to you and did

11   you say, well, Joe over here says some

12   people may quit.  Are you one of the people

13   who would quit?

14         A. No.  I never did ask.

15         Q. Why?

16         A. Because I didn't do it.  That's not

17   my style.  That may be your style.  It's

18   just not my style.

19         Q. What advice did you get from your

20   lawyers here about whether replacing

21   Crowley would cause a problem in the

22   company?

23         A. Would cause?

24         Q. A problem at Coram.

118

1     A. They said we have to be very careful

2  of doing that.

3     Q. Did they explain to you why they

4  thought so?

5     A. They talked to the executives, too.

6  They talked to these various executives

7  from time to time and they are aware that

8  it is a very ticklish situation?

9     Q. Did they -- who are we talking

10  about?  Mr. Bressler?  Kipnes?  Devine?

11     A. Yes.

12     Q.  Did any executive ever say that if

13  you replace Crowley with a crisis manager,

14  I'm going to look for another job?

15     A. No, I don't think any of them said

16  that.

17     Q. Nobody ever said that to you?

18        MR. MILLER:  Objection.  He

19     testified a few minutes ago that people

20     in Denver told him that.

21        THE WITNESS:  Nobody said if

22     you bring in a crisis manager, I will

23     resign.  Nobody said that.

24     Q. Nobody ever specified who, what

119

```
 1    other persons might resign if you bring in

 2    a crisis manager?

 3         A. Nobody named any such person..

 4              MR. BEATIE:  Number five.

 5    BY MR. LEVY:

 6         Q. Do you remember meeting with Sam

 7    Zell?

 8         A.  I do.

 9         Q. Did you have a discussion with him

10    about replacing Crowley with an independent

11    crisis manager?

12         A. I don't know whether that got into

13    our discussion.  It may have.  I don't have

14    any precise recollection of that.  I know

15    that we had a very nice discussion.  I have

16    great respect for him.  We developed a

17    very, I thought, good relationship in that

18    very limited period of time.  I thought

19    Mr. Zell was primarily interested in what

20    amount the shareholders could get in a

21    resolution of the problem.  I respected

22    that.  He was an investor; and although he

23    had already achieved a great profit by that

24    time, I think he allowed as much -- I was
```

120

1  trying to get for him and his colleagues

2  who were fellow shareholders the maximum

3  amount.  That is a primary goal of mine.

4  So, we really were not very far apart on

5  that.  I thought that the figure that he

6  had in mind was an unrealistic figure, but

7  he is a good salesman and I recognize that

8  and I was perfectly prepared to do the best

9  I could for him and his colleagues.  We

10  left on the most of cordial terms.  He

11  wrote me a letter afterwards, which I

12  thought was a very nice letter which kind

13  of restated what he had told me.  And if

14  you have it in front of you, it will

15  refresh my mind.  I don't remember everything

16  he said.

17      Q. That's the letter which we will mark

18  as number 8.  It is Trustee number 6432.

19              (Trustee-8, a letter dated

20          September 17, 2002, marked for

21          identification.)

22              THE WITNESS:  I forgot when

23          he visited me, we had been talking about

24          a draft of a complaint that you and your

121

1    colleagues had developed which we were

2    giving a great deal of attention to and

3    I mentions that in the letter.

4    Q. It was the Complaint that we

5    presented to you on May 7.

6    A. Correct.  I don't know the date.

7    Thereabouts.

8    Q. You said to us at that meeting that

9    is a very good Complaint and would probably

10   pass a motion to dismiss.

11            MR. KIPNES:  Objection to

12        the question.  Beyond, well beyond the

13        scope.  This letter from Mr. Zell, I

14        believe, is eight days before a

15        mediation.

16            MR. LEVY:  I'm talking about

17        May.

18            MR. KIPNES:  You are not

19        talking about Mr. Crowley.

20            MR. LEVY:  I think I am.

21            THE WITNESS:  You are saying

22        at the meeting I had made a comment that

23        it was a pretty good complaint and it

24        may very well be able to survive Summary

122

1       Judgment?

2       Q. Yes.

3       A. I don't deny that.  I don't recall

4    that I said it.  It sounds like --

5            MR. GODNICK:  The question

6       was with regard to a motion to dismiss,

7       notwithstanding the objectionable nature

8       of the question, not with respect to

9       Summary Judgment.

10           THE WITNESS:  Okay.  I don't

11      recall that.

12           MR. KIPNES:  In no event

13      does any of this have anything to do

14      with what we are here for today.

15           MR. MILLER:  That is true of

16      most of the questions today.

17    BY MR. LEVY:

18      Q. This letter you got from Sam Zell,

19    does it pretty much accurately reflect what

20    went on at the meeting?

21      A. He is not a lawyer.  He is a very

22    good businessman.  I don't know that it's

23    word-for-word.  In substance, it reflects

24    what we talked about.  Is he a lawyer?

123

```
1     Yes, I guess he did tell me he had gone to
2     law school.  I beg your pardon.
3         Q. He is proud of that.  He practiced
4     for six months.
5                 MR. GODNICK:  Could we have
6         a question, please?
7     BY MR. LEVY:
8         Q. Does it now refresh your recollection
9     that Mr. Zell did ask that Mr. Crowley be
10    removed as CEO?
11        A. That does refresh my recollection.
12        Q. You, at that point, raised the
13    question of available management should you
14    terminate Crowley?
15        A. He said he thought that you either
16    had given me names or were about to give me
17    names.  And, I think, the fact is you had
18    submitted names.  That's my recollection.
19    I may be wrong on the timing of it.
20        Q. Did you at that meeting, when he
21    suggested you terminate Crowley, say in
22    substance that if you did, it would make
23    Goldman Sachs very angry?
24        A. No, never said anything like that.
```

124

1     Q. Nothing like that?

2     A. No.  I told him at the time that

3  there was a feeling that he had some, that

4  there was some tension between Goldman

5  Sachs and himself.  And he went on and

6  explained the past relationship that he had

7  with Goldman Sachs dealing with the

8  property at Radio City and that a person

9  who is known to both of us was involved

10

11

12

13     Q. That would be?

14     A. If I heard his name, I could tell

15  you.

16             MR. KIPNES: Does it start

17     with an L?

18             THE WITNESS:  Lindeman.

19     Peter is the first name.

20  BY MR. LEVY:

21     Q. Did you ever consider, ever consider

22  getting rid of Crowley and filling the

23  position from within the company?

24     A. We did, yes.  We did.  That was one

1   of the options that we considered.

2       Q. When did you consider that?

3       A. I can't tell you the date.  I

4   remember talking with Barry Bressler about

5   the qualifications of Marabito who was

6   right below Crowley and we were concerned

7   that he did not have the same skills that

8   Crowley had in trying to keep the

9   organization together.

10      Q. That was Mr. Bressler's view?

11      A. I don't know whether it was Mr.

12  Bressler's view or Joe Devine's view.  It

13  was a concern.

14      Q. When you asked for their views, you

15  were not seeking legal advice?

16      A. No.

17      Q. Did anybody ever, did somebody

18  suggest to you that you should consider

19  filling it from within?

20      A. No, I think that idea came from me.

21      Q. From you.  Let's see if I can

22  refresh your recollection on that.

23              (Trustee-9, a memorandum

24      from Mr. Weber and Mr. Bemiss to Barry

126

1      Bressler, marked for identification.)

2  BY MR. LEVY:

3      Q. The next document, Exhibit 9, is a

4  memorandum from SSG Capital Advisors.  I'm

5  sorry, actually from Michael Weber and Sam

6  Bemiss at EMB & Company addressed to Barry

7  Bressler.  It Bates numbered 6323 through

8  25.  It is addressed to Bressler.  I take

9  it, you have seen it?

10     A. I think he came in and discussed it

11  with me.

12     Q. Why on October 28 were your

13  financial advisors giving you suggestions

14  for an executive who could potentially step

15  into an interim and possible permanent role

16  at Coram Health Care?

17          MR. GODNICK:  Objection.

18     A. We had taken Sam Zell's suggestions

19  seriously.  We had taken -- Don, your

20  colleague, had been persistent in that

21  point of view.  We took it very seriously.

22  We discussed it with those two gentlemen

23  whose name appear on this exhibit plus the

24  other people I have talked about.  They

127

1   responded with this document.  It is

2   addressed to Barry Bressler because they

3   had a better relationship with him than

4   with me from prior to this situation.  He

5   came in and discussed it.  That's how it

6   evolved.  We always took what you said

7   seriously.

8       Q. And did you discuss with your

9   financial advisors at that time after you

10  got this memo whether taking one of their

11  suggestions here would cause problems at

12  Coram?

13      A. I think at this time this was a

14  different consideration.  My recollection

15  is that at this particular time, we were

16  trying to develop a plan and, I think, we

17  were hopeful of filing such a plan in

18  January.  If I'm not mistaken and this

19  is -- what is the date of this?  This is

20  October 28, practically November 1st.  So,

21  we are talking about November and December.

22  To make a change for two months, we were

23  going to have a plan in January, and it

24  just didn't seem to be practical or

128

1    sensible, so we put it aside.

2              It developed that because of

3    certain things that you have done, that has

4    been delayed.  We now think we can fill a

5    plan in March, but we can't just at this

6    time thinking of, whereas meeting the

7    suggestions that you and the equity people

8    have, you are only a piece of the action,

9    you are an important piece, but there is a

10   company to run.  There are creditors,

11   Noteholders.  And it's my job to consider

12   the entire mosaic.  You disagree with the

13   way I have done it.  You are entitled to

14   that opinion.  You are entitled to more

15   than that.  You are entitled to move to

16   have me removed and I think, frankly, you

17   ought to do that.

18       Q. What did I, myself, do to delay your

19   filing of a plan?

20       A. Well --

21              MR. KIPNES:  We are really

22        far afield from Mr. Crowley.  If it's

23        following up on what Judge Adams said,

24        well, it's got nothing to do with

129

1      Mr. Crowley.

2                    MR. LEVY:  Please.

3                    THE WITNESS:  I think you

4      filed a plan.

5   BY MR. LEVY:

6      Q. Did that delay you?

7      A. Well, I think you and Don and your

8   colleagues have used up a lot of the time

9   of our people.  I think far more than

10  anyone else.  We can't do everything.  I

11  have tried desperately to keep our expenses

12  to a minimum.  And I still interpret your

13  questions, perhaps incorrectly, as an

14  attack on me and what I have done and what

15  I do on a day-to-day basis.  I cannot

16  satisfy the points that you are making.

17  It's beyond me.  I can't do it.  If the

18  judge agrees with you and the Trustee

19  agrees with you, I have said several times,

20  I will cheerfully withdraw.

21     Q. Do you know why as your financial

22  advisors prepared these suggestions that

23  are in Exhibit 9, do you know why did they

24  write this

130

```
1              MR. GODNICK:  Asked and

2       answered.

3              THE WITNESS:  I'm sure that

4       we discussed the matter with him.

5   BY MR. LEVY:

6       Q. In October, the end of October, when

7   you thought you were going to file a plan

8   two months later, tell me if I'm

9   understanding you correctly, you asked them

10  to give you suggestions for someone who

11  could step into an interim role?

12      A. I think this came from before

13  October.  We were talking to them.  I think

14  when we first interviewed these people, I

15  guess, in June, I don't remember the date,

16  several months before this, that was one of

17  the questions that I put to them.  Why did

18  they write that on this date?  I can't tell

19  you.

20      Q. Did you ever discuss with your

21  investment advisors their views as to

22  whether replacing Crowley would cause

23  problems at Coram?

24      A. Yes, we did.  We did.  They went
```

1    further.  They said if you are thinking in

2    terms of selling the company -- that was

3    one of the discussions.  That was an

4    extensive discussion.  That will hurt any

5    attempt at same.

6        Q. Who said that?

7        A. I think Victor.  What is Victor's

8    name?

9        Q. Scott Victor?

10       A. Scott Victor.

11       Q. He said it to you?

12       A. He said it at the meeting.  He

13   didn't say it just to me.

14       Q. What meeting?

15       A. We had a meeting with them.

16       Q. When?  Who was there?

17       A. I can't tell you when.

18       Q. About when?

19       A. I would say September, but I'm just

20   guessing.  I don't know the date of the

21   meeting.

22       Q. Can you tell me who was there?

23       A. I'm sure Barry Bressler was there.

24   I don't know whether Wil Kipnes was there.

132

```
 1            MR. KIPNES:  I was not.

 2            THE WITNESS:  I think

 3       Mr. Devine was there.  One of your other

 4       associates was there, Farkasie.  I can't

 5       remember everybody's name.

 6            MR. KIPNES:  The potential

 7       sale of the company has what to do with

 8       Mr. Crowley?

 9  BY MR. LEVY:

10       Q. In Exhibit 9 --

11            MR. MILLER:  Is that what

12       this deposition is about?

13       Q. Your investment advisors talked

14  about the reasonable depth of some

15  management talent at Coram.  Do you agree

16  that Coram has reasonable depth of

17  management talent?

18       A. I think it's pretty good, yes.  I

19  thought it was pretty good.

20       Q. Did you, as they suggested after

21  looking inside, did you look outside the

22  home health care industry for CEO talent?

23       A. Did I look?

24       Q. Did you or did you cause anyone on
```

133

1  your behalf to?

2      A. No.  But I was completely open to

3  that.  I didn't think that that was out of

4  the line, out of line.

5      Q. What did you do about it?  Did you

6  tell -- did you say to one of your people

7  let's go look outside?

8      A. No, because I was concentrating, I

9  have said this time and time again, at that

10  time I was concentrating on filing a plan

11  in January.  Now, could I have concentrated

12  on filing a plan and looking more?  Yes, I

13  guess so.  If I had an unlimited amount of

14  time and wanted to spend money, I could

15  have done that.

16      Q. How about spending the equity

17  from --

18      A. Exactly.  You are exactly right.

19              (Luncheon recess taken,

20      12:30 p.m.)

21              (Afternoon session, 1:08

22      p.m.)

23  BY MR. LEVY:

24      Q. Mr. Adams, I wonder if you would

134

1    repeat on the record what you just said

2    about Exhibit 9.

3        A. Yes, sir.  Near the end of the

4    morning session, Mr. Levy, you were asking

5    me some questions about Trustee's Exhibit 9

6    dated October 28, 2002.  I think you were

7    wondering how that developed timewise.  In

8    thinking about it at lunch, I recall that

9    we were, once again, considering a

10   substitution for Mr. Crowley because we

11   knew that his contract was going to expire,

12   I think, November 30.  I may be wrong on

13   that.

14       Q. The 29th.

15       A. Yes.

16       Q. Thank you.

17               I will change subjects now.

18   Let me just review very briefly.  Did I

19   understand correctly that after your

20   meeting with Crowley that on March 25, 26,

21   that at that point in time, you had come to

22   the conclusion that Crowley did not have a

23   conflict?

24       A. Pretty much I had come to that

135

1    conclusion based on his questions.  There

2    was one other thing that took place at that

3    meeting that I thought about and that is my

4    discussion with him about Cerberus, I hope

5    I'm not mispronouncing it.  He did say that

6    from time to time they would ask him to

7    evaluate situations, and I said, "Do they

8    compensate you for that?"  He said, "No."

9    I said, "Well, if it has nothing to do with

10   Coram, they are not competitors of Coram,

11   they in no way impact on Coram, and you do

12   that off company time, I don't think I

13   would object to that."  He said, "Well, of

14   course."  Some discussion like that.

15       Q. Let me be clear.  One of the

16   conditions was that he not be compensated

17   for --

18       A. That's what I said.

19       Q. That what you said to him?

20       A. That's right.

21       Q. Did he agree that he would not be

22   compensated or seek compensation if he did

23   that kind of work?

24       A. Yes.  He said, "Oh, I understand.  I

136

1   understand."  Something like that.

2        Q. I think you said you had pretty much

3   come, subject to what you just said, you

4   said that at that meeting or at the

5   conclusion of that meeting you had pretty

6   much come to a conclusion that at that

7   point in time he had no conflict?

8        A. That's correct.

9        Q. "Pretty much" is less than

10  completely.  Could you help me and tell me

11  what reservations you had at that point?

12       A. Well, some of the reservations that

13  you pointed out.  After all, I didn't know

14  this gentleman.  This was the first time I

15  had met him face-to-face.  He wasn't giving

16  me anything in writing, not that I asked

17  him for anything in writing.  He was

18  speaking orally, of course, and I was going

19  to go back and talk to Barry Bressler, my

20  counsel, which I did.

21       Q. What did you say to Barry?

22       A. Exactly what had happened; just what

23  I have told you this morning.

24       Q. What did Barry say?

1          A. He has to speak for himself.

2                    MR. GODNICK:  A business

3          conversation or --

4                    MR. LEVY:  That is an

5          improper objection.

6    BY MR. LEVY:

7          Q. Go on.

8                    MR. KIPNES:  It's not an

9          improper objection.  But unless you want

10         to give me the stipulation I asked you

11         to give me so that we could speed things

12         along --

13                   MR. BEATIE:  Not only is it

14         not improper, it's in the rules for a

15         change that --

16                   MR. LEVY:  The fact that

17         these questions are being answered at

18         this deposition does not itself

19         constitute a waiver.

20                   MR. KIPNES:  You will not so

21         assert?  That's what I asked you for.

22         That's fine.  Go ahead.

23                   THE WITNESS:  I really can't

24         tell you accurately how that

138

1       conversation ended, except to say that

2       we were prepared to let the situation

3       alone, at least for that time being, let

4       it alone for that period of time.  That

5       is not a very accurate description

6       sitting here.  That is about the best I

7       can say.

8           Q. Did you rely on what Barry told you,

9       at least in part, in making the decision?

10          A. In part.  But I was relying on my

11      own judgment as well.  I have the utmost

12      confidence in Mr. Bressler, but I want to

13      make it clear that these judgments I'm

14      responsible for.

15          Q. Now, when you made -- this is a

16      December 27 letter signed by both Dan

17      Crowley and Steve Feinberg.  We will mark

18      that as number 10.

19                  (Trustee Exhibit 10, a

20          letter dated December 27, 2001, marked

21          for identification.)

22      BY MR. LEVY:

23          Q. There are two copies and they have

24      different production numbers.

139

1          MS. KRUGMAN:  Can you just

2      identify those Bates numbers for me,

3      please?

4          MR. LEVY:  CRX 607 and 752.

5          MS. KRUGMAN:  Thank you.

6  BY MR. LEVY:

7      Q. My question, Mr. Adams is:  At the

8  time you had, I think you said pretty much

9  come to the conclusion that there was no

10  ongoing conflict, were you aware that on

11  December 27, Feinberg and Crowley had

12  agreed to suspend their contract for one

13  month, that is, January of 2002, and that

14  they had agreed that the suspension will

15  end on January 31st, 2002? Were you aware

16  of that?

17      A.  I was not aware of this exhibit,

18  10.  Nobody told me about the contents of

19  this exhibit.

20      Q. You had never known about it until I

21  handed it to you just a moment ago?

22      A. I didn't see this letter until

23  today, to my knowledge.

24      Q. Do you draw a distinction in your

140

1    mind between suspending a contract and

2    terminating a contract?

3        A. I guess if there is a distinction,

4    if you terminate it, it's ended, period.

5    If you suspend it, it's held in kind of

6    abeyance.  I have not looked up the

7    definition, but something like that.

8        Q. Held in abeyance meaning?

9        A. For the future.

10       Q. So, would it be your understanding

11   looking at this letter now what these

12   parties intended is that they were holding

13   their contract for the future, that is,

14   after January 31st?

15       A. I don't know what they had intended.

16   I never saw it.  I really don't have a

17   conclusion on that document.

18       Q. Do you think if you would had seen

19   this when you reached your conclusion on

20   March 25 or 26 that, or your conclusion

21   that you felt pretty much, that you felt

22   there was no conflict, do you think it

23   might have affected that decision?

24                 MR. GODNICK:  Objection.

141

```
 1              THE WITNESS:  I think it

 2      would have affected the decision to the

 3      extent that I would have asked for a

 4      clarification.

 5      Q. What clarification do you think you

 6  would have?

 7      A. I would have asked what does this

 8  document mean.

 9      Q. Because of the use of the word

10  suspension?

11      A. Correct.

12      Q. The next document is a January 29th

13  letter, also signed by Dan Crowley and

14  Steve Feinberg.  This one has the Bates

15  number CRX 00754.  Mr. Adams, you should

16  understand that means it was produced by

17  Dan Crowley's lawyers.

18              (Trustee-11, a letter dated

19      January 29, 2002, marked for

20      identification.)

21              THE WITNESS:  That's the

22      same as 10, that exhibit.  It changes

23      the month.

24      Q. Correct.  Can I assume you were not
```

142

1    aware of number 11 when you came to your

2    conclusion on March 25 or 26, just as you

3    were not --

4        A. I don't think I saw Trustee-11 until

5    today.

6        Q. And I assume -- can I assume that if

7    you had seen it when you met with Crowley

8    at the end of March, you would have asked

9    for a clarification?

10       A. Correct.

11       Q. You would have asked him what

12   suspension meant?

13       A. Correct.

14       Q. The next is a letter dated February

15   18.  This one is from Mr. Schreiber, this

16   is number twelve.  This is from Mr. Schreiber

17   who, of course, is Mr. Crowley's lawyer to

18   Mr. Michael Cook who is the lawyer for

19   Cerberus.  It shows a copy to Dan Crowley

20   and others.

21                (Trustee-12, a letter dated

22       February 18, 2002, marked for

23       identification.)

24   BY MR. LEVY:

1          Q. One was produced by, according to

2     the Bates numbers, by Crowley; the other by

3     Cerberus, by Mr. Cook.

4                          Have you looked through it?

5     Have you ever seen this letter before

6     today?

7          A.  I don't believe so.  I have not

8     finished reading it.

9          Q. Take your time.

10         A. Already it strikes me as something

11    that I have not seen.  I have had a chance

12    to read it.  I never saw it before.

13         Q. Note that in the first paragraph,

14    Mr. Schreiber writes, "For 2001,

15    Mr. Crowley believes he is entitled to" --

16                          MR. KIPNES:  This would be

17         the second paragraph.

18    BY MR. LEVY:

19         Q. Yes.  "For 2001, Mr. Crowley

20    believes he is entitled to an additional

21    $1,950,000 related to Coram's EBITDA

22    performance."  Do you see that?

23         A. Yes.

24         Q. If you had had that available when

144

1   you met with Mr. Crowley and came to your

2   conclusion that there was no conflict,

3   might you have asked him why he was writing

4   to Michael Cook who was Cerberus's lawyer?

5           MR. GODNICK:  Objection.

6       This is not a letter from Crowley to

7       Cook.  It's a letter from Crowley's

8       attorneys and there has been no

9       foundation that, in fact, Mr. Crowley

10      directed his lawyers to write to

11      Mr. Cook with regard to the subject

12      matter of this letter.

13          MR. LEVY:  Fair objection.

14  BY MR. LEVY:

15      Q. Would you assume this was written by

16  Mr. Crowley's lawyer, assuming

17  Mr. Crowley's lawyer was instructed to

18  write it on his behalf?  Would you have

19  made that inquiry?

20      A. I certainly would have talked to him

21  about it.

22      Q. You would have made the inquiry?

23      A. Yes, I would have talked to him

24  about it.

145

1    Q. What would you have asked?

2    A. How can I tell?  It's a hypothetical

3    question.  I didn't have the letter.  I

4    didn't talk to him.  You are asking me what

5    I would have done had I had the letter and

6    talk to him.  I don't know.

7    Q. I guess I should rephrase it.  What

8    kind of investigation might you have

9    triggered in your mind in view of the fact

10   that, again, assuming Crowley authorized

11   this letter?

12            MR. KIPNES:  I would object

13        on the basis --

14            MR. LEVY:  I'm not finished

15        with --

16   BY MR. LEVY:

17   Q. That he appears, perhaps, to be

18   asking Cerberus to pay him this money.

19            MR. KIPNES:  Objection.

20        Incomplete hypothetical.

21            MR. GODNICK:  Objection.

22            MR. KIPNES:  Among many

23        other objectionable reasons.

24            THE WITNESS:  I can't answer

1        the question.  I don't know what I would

2        have done, but I suspect I would have

3        had some discussion on this subject.

4    BY MR. LEVY:

5        Q. And in the next paragraph, this

6    letter says, "To facilitate the possibility

7    of settling the various disputes related to

8    Coram's bankruptcy, Mr. Crowley has also

9    been waiving his $80,000 monthly retainer

10   from Cerberus for the past two months."

11                  If you had had this letter

12   and you came to your conclusion on March 25

13   and 6, you were pretty sure there was no

14   conflict, would you have asked any

15   questions about that?

16       A. I suspect, yes.

17       Q. You might have said are you going to

18   waive it past two months, right?

19       A. I don't know what I would have said.

20   It's pretty hard to put myself in that

21   position.  I suspect I would have

22   questioned what this is all about.

23       Q. Do you intend to ask Mr. Crowley

24   between now and the end of this case what

147

1    was meant by this, what was meant by

2    suspension?

3                    MR. KIPNES:  Objection.

4                    THE WITNESS:  Do I intend

5        now to ask him?

6        Q. Yes.  Or your attorney's ask him.

7        A. I certainly will discuss it with

8    Mr. Bressler and decide a point of action.

9        Q. Is it your view at this point

10    without having discussed it with him, that

11    it's something you ought to look into or he

12    ought to look into?

13        A. Yes.  But I don't think it's a good

14    idea for somebody in my position to do this

15    kind of thing without discussion with

16    counsel.

17        Q. No problem.

18                    MR. GODNICK:  Will you,

19        Judge Adams?

20                    MR. LEVY:  That is an

21        improper interruption.  I will show it

22        to him.  From you, I wouldn't have

23        expected that.

24    BY MR. LEVY:

148

1       Q. At the bottom of the page,

2   Mr. Schreiber says, "Given the financial

3   consequences, Mr. Crowley is experiencing

4   as a result of the ongoing dispute between

5   the Noteholders and the Equity Committee,

6   we will be recommending that Mr. Crowley

7   tender his resignation unless the dispute

8   between the Noteholders and the equity

9   holders is resolved on or before March 1st,

10   2002 and assurances are provided to

11   Mr. Crowley that the contractual incentives

12   entitlements earned by him will be promptly

13   honored."

14           Would that have raised

15   questions in your mind had you known about

16   this letter when you came to the conclusion

17   on March 25 or 26 that there probably was

18   no conflict?

19       A. I think it would.

20       Q. Mr. Cook responded on February 25,

21   to Mr. Schreiber on a document marked

22   Cerberus 20084.

23               (Trustee-13, a letter dated

24       February 25, 2002, marked for

149

```
 1      identification.)

 2   BY MR. LEVY:

 3      Q. You were not aware of that?

 4      A. I was not.

 5      Q. The next document is dated

 6   February 28, 2002, number CRX 00763, a

 7   letter that appears to be between Dan

 8   Crowley and Steven Feinberg, but it's only

 9   signed by Dan Crowley.

10              (Trustee-14, a letter dated

11       February 28, 2002, marked for

12       identification.)

13              MR. KIPNES:  Attached to the

14       exhibit that you handed me, the copy, as

15       Trustee Exhibit 14, the last page of

16       which is a letter dated August 20, 2002,

17       bears Bates numbers CRX 008716.  I was

18       going to ask you whether -- should we

19       just remove that?

20              MR. LEVY:  The entire

21       Exhibit 14 is 763 through 767 inclusive.

22              MR. KIPNES:  Okay.

23              MR. LEVY:  I'm talking about

24       this exhibit.
```

150

```
 1              MR. KIPNES:  The one you
 2     just handed me.
 3              MR. LEVY:  Let's see if we
 4     can get through this.
 5              MR. MILLER:  Was there a
 6     question about Exhibit 13?
 7              MR. LEVY:  The only question
 8     was had he seen it.  He said no.
 9              MR. MILLER:  Thank you.
10     BY MR. LEVY:
11        Q. I assume Exhibit 14, the
12     February 28th letter, you have never seen
13     that before today?
14        A. I did not.
15        Q. If you had seen that at the time you
16     concluded on March 25 and 26 that there was
17     no conflict, would that have raised
18     questions in your mind?
19        A. I would have questioned it.
20        Q. You would have questioned -- would
21     you have questioned -- the last sentence
22     is, "The suspension of obligations will end
23     on March 31st."  You would have
24     questioned --
```

151

1       A. That seems to me to be the same

2    phraseology as a number of previous

3    exhibits you have shown me covering

4    January, February and March and I would

5    have asked about them collectively.

6       Q. Right.  You probably would have

7    asked why Feinberg didn't sign it, is that

8    a fair assumption?

9       A. I didn't hear the question.

10       Q. You probably would have asked why

11    Feinberg did not sign it?

12       A. Probably.

13            MR. BEATIE:  You have not

14       figured out how to ask that question

15       yet.

16    BY MR. LEVY:

17       Q. The next document is a letter

18    addressed to you dated March 11, 2002.  It

19    has Bates numbers CRX 60, 61 and 62 and it

20    is signed, or there is a signature block

21    for Dan Crowley.

22            MR. MILLER:  What is the

23       document?

24            MR. LEVY:  It's a letter,

152

```
1     addressed to --
2               MR. KIPNES:  It's addressed
3     to Judge Adams.  The date of the letter
4     is March 26, 2000.
5               MR. LEVY:  March 11.
6               MR. KIPNES:  I'm looking at
7     what I was just handed.  It says
8     March 26.  That's the wrong one.
9               MR. LEVY:  60 and 61 and 62.
10              (Trustee-15, a letter dated
11    March 11, 2002, with attachments, marked
12    for identification.)
13              MR. LEVY:  Let me, before
14    anybody points it out, there is a word
15    written on the top which was not on the
16    original.  It was a dread faxing error.
17    It should not be part of what is on
18    there.  I ask you to simply strike
19    through whatever that says.  It's not
20    part of the exhibit.  That is my
21    handwriting there.
22    BY MR. LEVY:
23      Q. Do you remember receiving that
24    letter?
```

153

1     A. That is my recollection, yes.

2     Q. Let me ask you whether, referring,

3   essentially, to the first three pages --

4     A. That's all I have looked at.

5     Q. That's fine.  Would you -- I

6   characterize this letter as a "puffing"

7   letter.  Would you agree with that?

8                 MR. GODNICK:  Objection to

9         the form of the question.

10                THE WITNESS:  I never

11        characterized it.

12    Q. Did it occur to you when you read

13  this -- did you ever discuss this letter

14  with Crowley?

15    A. I can't say sitting here that I did

16  discuss it with Crowley.  I don't have any

17  recollection of discussing this letter with

18  Mr. Crowley.  Much of what is in it, we

19  discussed.  But, I don't think we discussed

20  it as a letter.

21    Q. Did it occur to you that Mr. Crowley

22  spent a lot of time talking about the

23  advice he got in the Goldin report, but

24  that he never mentioned Judge Walrath's

154

1 opinion and her comments about his conflict?

2 Does that strike you as odd?

3    MR. GODNICK:  Objection to

4  the characterization.  The question is

5  contradicted by the language of the

6  letter itself.

7    THE WITNESS:  I didn't draw

8  any conclusion one way or the other from

9  the letter.

10 BY MR. LEVY:

11  Q. Did you ever have a discussion with

12 Crowley in which he talked about Goldin and

13 how Goldin's report had exonerated him?

14  A.  I don't think we had a discussion.

15 I think he mentioned that.

16  Q. When he did, or at anytime did you

17 say to him what about what Judge Walrath

18 said about your conflict?

19  A. I can't remember asking him in the

20 same context that you are raising.  We did

21 talk about the conflicts, as I told you at

22 the first meeting.  I don't think -- he may

23 have specifically mentioned Judge Walrath.

24 I can't remember that.  That is not why I

155

1    was there.

2        Q. He says in the second page in the

3    next-to-the-last paragraph, "However after

4    the second plan was denied, I formally

5    suspended my contractual relationship with

6    Cerberus."

7                When you met with him, or at

8    anytime between getting this letter

9    March 11 or 12 and March 25 and 26, did you

10   ask him what he meant by suspended?

11       A. I did not.  By the time I was out

12   there, I asked him a question that really

13   superseded any such nomenclature.  I asked

14   him if he had any relationship.

15       Q. What did he tell you?

16       A. I thought he said he had terminated

17   any and all such relationships except as to

18   the monies that they owed him, which he was

19   still claiming and then he went into the

20   discussion that from time to time they

21   asked him to evaluate members of a board of

22   directors or business opportunities and

23   that's when I got into the question which,

24   to me, was the more important issue, are

156

1   you being compensated?  No.  Does it have

2   anything to do with the type of business

3   that Coram is in?  No.  Do you do that on

4   company time?  No.  I don't want to repeat

5   all my testimony.

6       Q. When he told you that he was not

7   being compensated for this work, did you

8   ask him why he was doing free work for

9   Cerberus?

10      A. I didn't ask him.  He told me what

11  he thought; that it was important for him

12  to continue his relationship because of the

13  large claim he had.

14      Q. His relationship with Cerberus?

15      A. Yes.  I got the impression, I don't

16  know whether he said it or not, that he

17  didn't want to do anything to disturb that

18  relationship if it jeopardized this big

19  claim that he had, this money claim.

20      Q. How much was the claim?

21      A. I don't recall what it was.  I know

22  it was a substantial amount of money.

23      Q. Did he say how much it was and you

24  just don't remember?

157

1       A. I can't tell you.  He probably

2    mentioned some figure.  I don't recall what

3    it was.

4       Q. Did you feel at that point in time,

5    March, April, did you feel that Mr. Crowley

6    was being completely open with you about

7    his relations and discussions with Cerberus?

8       A. Well, now that you have shown me

9    some of these documents, perhaps to be

10   completely open, I guess he should have

11   shown me copies of those.  He did not, to

12   my recollection.  I don't want to

13   characterize what he was doing.  I don't do

14   that.

15      Q. Let me ask you this:  If you knew,

16   had known at that time that he and his

17   lawyer were deliberately hiding from you

18   what was going on between Cerberus and

19   Crowley, would that have affected your

20   conclusion as to whether there was a

21   conflict?

22              MR. KIPNES:  Objection to

23        the form of the question.

24              MR. BEATIE:  It's already

158

1      been asked at least twice, anyway.

2            THE WITNESS:  I will try to

3      answer it.  I did not know that they

4      were hiding anything.  I don't know

5      whether they were hiding.  That is a

6      conclusion that somebody ought to draw.

7      I would have preferred he made

8      everything available.

9            Would that have affected me?

10     I guess anything affects a person of

11     intelligence.  How much?  I can't tell

12     you here without dreaming up a scenario

13     that I just didn't have.

14     Q. You can assume hypothetically, if

15    you will, that Crowley's lawyer and

16    Cerberus's lawyer deliberately planned to

17    conceal from you their negotiations and

18    their disagreements about their

19    relationship.  Would that have adversely

20    affected your view of Crowley and, perhaps,

21    affected your view that there probably was

22    no conflict?

23           MR. GODNICK:  Objection.

24     Objection among other grounds that that

159

```
 1        is a offensive, offensive hypothetical

 2        to me because I am Cerberus's lawyer.

 3                    THE WITNESS:  If I confront

 4        anyone who, I think, is conspiring to

 5        deprive me of information, my view

 6        toward that person would, obviously, be

 7        affected.  But it's so hypothetical, I

 8        can't answer the question.

 9   BY MR. LEVY:

10        Q. Let's mark this as Exhibit Number

11   16.

12                    (Trustee-16, a memo from

13        Michael Cook to Scott Schreiber dated

14        April 5, 2002, marked for

15        identification.)

16   BY MR. LEVY:

17        Q. The first E-mail appears on the

18   bottom and it was sent on April 5 of 2002

19   from Scott Schreiber to Michael Cook.  The

20   second, which is a response, looks like one

21   minute later from Michael Cook to Scott

22   Schreiber.  Take a look at that again.

23        A. "I'd appreciate it if you would keep

24   our conversations re terminating Dan's
```

160

1    contract between us and our clients for

2    now.  No other attorneys nor the Trustee

3    need to be part of those conversations

4    until Dan and Cerberus decide that's the

5    way to go."

6       Q. That was to Cook.  And how did Cook

7    respond, looking at the top?

8       A. "No problem.  Has there been a leak?

9    I know of none."

10            MR. KIPNES:  I would object.

11     It misstates the record.

12            THE WITNESS:  I'm not sure

13     what the question is that you want me to

14     answer.

15       Q. I assume you have never seen this?

16       A. I never saw that document nor the

17    original.

18       Q. You never saw that before?

19       A. No.

20       Q. Did you know on about April 5 that

21    Cererus and Crowley was still negotiating

22    about terminating their relationship?

23       A. I can't say I did or did not.  I

24    knew that Crowley still had these claims

1   which he told me about and he had also told
2   me that he had been called upon from time
3   to time to give this advice to Cerberus.  I
4   didn't think they had a relationship aside
5   from those two things, so I couldn't know
6   that they were trying to terminate the
7   relationship.
8       Q. Do you recognize -- do you
9   understand this exhibit to show that, first
10  of all, they had not yet terminated their
11  relationship?
12      A. That's what it seems to suggest.
13      Q. And, second of all, that they didn't
14  want you to know the status of those
15  discussions?
16      A. Well, it says "No other attorneys
17  nor the Trustee need to be part of these
18  conversations."  That's from Scott to
19  Michael Cook.
20      Q. Michael answers --
21          MR. KIPNES:  I think we have
22      already read it into the record.
23          THE WITNESS:  It's so
24      cryptic.  I'm not sure I understand what

162

```
1       they were driving at because he had
2       talked to me by now about what that
3       relationship was.  This is April 5.  I
4       don't know what they are talking about.
5   BY MR. LEVY:
6       Q. By April 5, you were under the
7   impression that the relationship had been
8   terminated?
9       A. Yes, except for these two points.
10      Q. If you had known that it hadn't been
11  terminated, that might have affected your
12  decision as to whether a conflict existed,
13  is that correct?
14      A. It could have affected it.
15      Q. Did there come a time when you
16  realized that notwithstanding what you then
17  thought about April 5 that, in fact, the
18  relationship had not yet been terminated?
19      A. I don't think so, subject to those
20  two things that we have been talking about.
21                  (Trustee-17, a letter dated
22          April 10, 2002, marked for
23          identification.
24  BY MR. LEVY:
```

1     Q. This is a letter addressed to you.

2  This is signed by Dan Crowley.   It bears

3  numbers Trustee 4203 through 4211 inclusive.

4  You received this letter?

5     A. Did I receive it?  I'm sure I did.

6     Q. Look at the second page of the

7  letter, 4204.  We have Mr. Crowley saying

8  to you, "We have some timely response

9  indicating when you wish to proceed on open

10  items.  Some of them are rather urgent.

11  The items on which we need direction

12  are" -- then, if you go down to number 6,

13  "The terms for termination of the Crowley/

14  Cerberus contract."  Do you see that?

15     A. I see that.

16     Q. Would you now agree with me that at

17  least as of April 10 or whenever you

18  received this letter, you knew that the

19  Crowley/Cerberus contract had not been

20  terminated?

21             MR GODNICK:  Objection.

22             THE WITNESS:  I thought this

23         referred to their claim, Crowley's claim

24         against Cerberus because that's what we

164

1     talked about.  I still don't know that

2     that is not the case.

3  BY MR. LEVY:

4     Q. Do you know whether at that point --

5  strike that.

6              Do you have a recollection

7  now that that's what you thought?

8     A. That's my recollection, yes.

9     Q. And the next item he wants to talk

10  about is the amendment of the Crowley

11  employment contract with Coram?

12     A.  Right.

13     Q. How did he then -- what amendment

14  did Crowley then indicate to you that he

15  wanted?

16     A. I don't recall right now, but I

17  think it had something to do with bonuses.

18  That's my recollection.

19     Q. Did it concern you in determining

20  whether there was a conflict?  That you had

21  a situation where Crowley's claiming money

22  from Cerberus and he is doing some work

23  free for them that that might somehow bias

24  him towards acting in Cerberus's interest

165

1   so that he could solve that problem?

2       A. I was aware that was a possibility.

3   Therefore, we had to play close attention,

4   which we did.

5       Q. What did you do to -- did you ever

6   say to him, to Crowley, well, aren't you

7   conflicted by the fact that you are doing

8   this free work?

9       A.  I did discuss that.

10      Q. What did he say?

11      A. He didn't think that there was any

12  conflict because that had nothing to do

13  with Coram.  He was not being compensated

14  and not doing anything during his working

15  hours.  Quite frankly, I think he was right

16  if those were the facts.  Now, if there are

17  other facts that I don't know about, that

18  is a different story.

19      Q. You said you were concerned that

20  there be some bias towards Cerberus because

21  of what you described as a large claim and

22  the fact that he was doing free work.  How

23  did he explain, if he did, how did he

24  explain that away to your satisfaction?

166

1          MR. KIPNES:  Misstates the

2     record.  Asked and answered.  Go ahead.

3          THE WITNESS:  I just don't

4     see the connection, quite frankly.  I

5     don't see the conflict there.

6          He was being employed by me

7     to run this company as effectively as he

8     could.  Everyone would benefit:  The

9     creditors, the Noteholders, the equity

10    holders.  That's what I was concerned

11    about, as I have said over and over

12    again.  If I thought that the

13    performance was slipping, I would have

14    done something.  I don't see how the

15    equity holders or the Noteholders would

16    be affected by a lot of the things that

17    you are asking about.  Maybe I'm myopic.

18  BY MR. LEVY:

19     Q. In your mind, was the issue whether

20  what I think is a conflict was affecting

21  his work or was it whether there was a

22  conflict?

23     A. Two separate issues.  Is there a

24  conflict?  And if there is, is it affecting

167

1    his work?  If I took his statements at face

2    value, I didn't see a conflict.  If I

3    looked at his performance, I didn't see how

4    even a conflict could affect the people

5    that I was appointed to protect.

6        Q. You did take his statements at face

7    value?

8        A. I did.

9        Q. Exhibit 18 is a portion of Coram's

10    report to the Securities and Exchange

11    Commission on Form 10-K.  That is the

12    annual report for the fiscal year ended

13    December 31st, 2001.  It was filed on April

14    15, 2002.

15                (Trustee-18, a Form 10-K,

16        marked for identification.)

17    BY MR. LEVY:

18        Q. You were the trustee on April 15

19    when this was filed.  Did you participate

20    in the preparation of the annual report on

21    Form 10-K?

22        A. I believe I did.

23        Q. And you approved it?

24        A. I think I did.  I can look to see.

1                    MR. KIPNES:  You don't have

2        the entire form.

3                    MR. LEVY:  I don't.  Do you

4        want the entire one?

5                    MR. KIPNES:  No.  I know

6        that the period of time covered by this

7        report the witness was not the Trustee

8        or had any role whatever with Coram.

9    BY MR. LEVY:

10       Q. If you can look at the second page,

11   the last line beginning "Mr. Crowley."  Did

12   you, before you approved this report, ask

13   anyone what they meant by suspended as

14   distinguished from terminated?

15       A. No, I did not.

16                   MR. KIPNES:  Objection to

17       the question.  Assumes a fact not in

18       evidence.

19                   MR. LEVY:  Which one?

20                   MR. KIPNES:  That he

21       approved the report.

22   BY MR. LEVY:

23       Q. Did you approve the filing of this

24   report?

169

1      A. I don't have any recollection of

2  doing so.

3      Q. You did see this report at some

4  point? You participated in it?

5      A. I probably did. But I can't say,

6  sitting here, that I recall participating

7  in it.

8      Q. Here we are, April 15. Was it a

9  concern to you in deciding the issue of

10  whether there was a conflict that the

11  parties had not terminated or, at least,

12  they were telling the investing public they

13  had not terminated their contract, but had

14  merely suspended it in this case only

15  through April 12?

16      A. The month in question. I realize

17  or, at least, I thought what they were

18  doing is doing this on a month-to-month

19  basis because of Crowley's claims against

20  Cereberus. I may have been wrong, but that

21  was my impression.

22      Q. You didn't ask him, did you, at that

23  time?

24      A. On the date of that report, no.

170

1          Q. On or about --

2                    MR. BEATIE:  Objection.  Why

3          are you asking that question?  He said

4          that was his impression.  He didn't say

5          he heard it, so you don't have to ask

6          him if he asked it.

7     BY MR. LEVY:

8          Q. On or about the date --

9                    MR. BEATIE:  Unless you want

10         to prolong this thing unnecessarily and

11         behave in an intentional, improper

12         conduct, as you have, in my opinion, all

13         day long and it won't happen on Friday,

14         I guarantee you.

15                   MR. LEVY:  I would agree

16         with you.

17    BY MR. LEVY:

18         Q. Mr. Adams, where did you get the

19         impression that they were suspending this

20         on a month-to-month basis?  Where did that

21         impression come from?  Did someone tell you

22         that?

23         A. I can't tell you.  I don't know.  I

24         had that impression that -- I guess it was

171

1    from the first meeting I had with him when

2    he said that he still had this claim.  Even

3    though he had terminated all relationships,

4    he still had this claim, this substantial

5    claim against Cerberus.  But, that was my

6    impression.

7        Q. Did you ever ask Crowley why he

8    thought it was an open item for you to deal

9    with the terms of the termination of his

10   contract with Cerberus?

11       A.  No, I did not.

12       Q. Did you ever authorize Mr. Bressler

13   to tell Mr. Crowley something on the order

14   of you guys have smart lawyers and you

15   ought to be able to figure out how you can

16   get paid?

17       A.  I can't remember any language like

18   that, no.  I may have said to Mr. Bressler,

19   look, that's a matter between Crowley and

20   his former contract partner.  I don't think

21   we should be using the creditors' money to

22   probe that sort of thing.

23       Q. Even though there was still some

24   reservation that might have caused some

172

1    bias on Crowley's part?

2        A. The amount of bias would be so

3    minimal.

4        Q. How do you know that?

5        A. It's a question of where I wanted --

6    I'm repeating now, and I am going to repeat

7    to the bankruptcy judge and to the Trustee

8    what my job was.  Your question would seem

9    to indicate that my principal job was to

10   investigate the relationship between

11   Crowley and Cerberus.  You may be right, I

12   did not understand that to be my job.  The

13   Trustee never mentioned it to me.  When I

14   was before the judge, she never mentioned

15   it to me.  I was told that I was supposed

16   to maximize the assets and to minimize the

17   liabilities and get this company out of

18   bankruptcy and I was putting most of my

19   emphasis on that.

20             Today, you have gone into

21   that subject very, very little and talked

22   about this relationship and made it appear

23   that I was being negligent in not following

24   up this connection between these two

173

1    parties.  And I have said to you and I will

2    say it again as clearly as I can, that if

3    that was my assignment, I'm prepared to

4    step down.  I was not hired to be a

5    detective or an investigator.  I don't want

6    that job.  I wanted the job as a Trustee.

7    You will have to get somebody else to

8    investigate that if that's what you are

9    after.

10                  MR. GODNICK:  Would you mark

11       that testimony, Mr. Reporter.

12   BY MR. LEVY:

13       Q. Are you aware, Mr. Adams, that

14   sometime around the beginning of May,

15   Mr. Feinberg invited Mr. Crowley to come to

16   New York to have a dinner to talk about

17   resolving the differences?

18       A. I am not, no.

19       Q. Well, hypothetically, if during or

20   following that dinner Mr. Crowley demanded

21   that Cerberus pay him the difference

22   between some $11,000,000.00 and the amount

23   he ultimately gets from the Coram estate,

24   would that have affected your decision as

174

1    to whether a conflict existed?

2                      MR. GODNICK:  Before you

3          answer, I would object.  It's my

4          understanding that the question is based

5          on a document that Mr. Crowley claims to

6          be privileged.  I certainly can't stop

7          you from asking the question.  I think

8          this is an inappropriate line of

9          questions.

10                     MR. KIPNES:  It's the same

11         question.

12                     THE WITNESS:  That is a

13         hypothetical question.  I didn't know of

14         the fact.  I have not addressed the

15         fact.  Asking me here for the first time

16         whether I would have considered it, I

17         can't answer that question.

18   BY MR. LEVY:

19      Q. You still don't know that that's a

20   fact?

21      A. I don't know it.

22      Q. I will show you a document marked

23   CRX 00063, 4 and 5.  It was provided by

24   Coram dated May 6, 2002.  It has been

175

1    redacted or, at least, there are two stamps

2    on it that indicate that portions of it

3    have been redacted, presumably, by

4    Mr. Crowley's lawyers, though I don't know.

5    I know that's the way we got it from

6    Mr. Crowley.

7                    (Trustee-19, a letter dated

8        May 6, 2002, marked for identification.)

9    BY MR. LEVY:

10       Q. Take your time and read this

11   carefully.

12                   MR. KIPNES:  Did you say

13       this document was provided by Coram?

14                   MR. LEVY:  I will make the

15       correction.

16                   MR. GODNICK:  I have a

17       question, which is whether a motion was

18       filed?  As I understand, one was going

19       to be with regard to this document.

20                   MS. KRUGMAN:  I don't know

21       where they came down on that.  I'm

22       sitting in on this deposition.  I'm the

23       wrong person, sorry.

24                   MR. LEVY:  I want to say

176

1        that I have here a Blackberry which gets

2        instant docket information and it

3        "ain't" been filed.

4                    THE WITNESS:  I have not

5        read it carefully.  I have skimmed it.

6   BY MR. LEVY:

7        Q. I would ask you to, please.  I would

8   ask you to read the document.

9        A. I will not read the whole thing

10  carefully.  If you want me to read a

11  sentence or paragraph, fine.

12       Q. You can keep that.  Have you ever

13  seen that document before this moment?

14       A. No.

15       Q. Did your counsel show it to you in

16  preparation for this deposition?

17       A. No.

18       Q. Do its contents surprise you?

19                  MR. GODNICK:  Objection to

20       the form of the question.

21                  THE WITNESS:  I don't know

22       that I'm surprised.  I don't know what

23       they mean.  I don't know what the

24       context is.  I don't know these people.

177

1    I don't know Steve Feinberg.

2    BY MR. LEVY:

3    Q. Do you know who he is?

4    A. I have heard that he is the CEO or

5    some official of Cerberus. I don't know

6    the man. I don't know whether he is a

7    lawyer. I don't know anything about the

8    man. How could I be surprised of a copy of

9    a document not signed? The only thing that

10    concerns me in the document is the last

11    paragraph on page 1, because that refers to

12    me. "Mr. Bressler has told me that he/

13    Trustee don't want to give us/me advice

14    about ending the contract or my getting

15    paid." That's true. I wouldn't give them

16    any advice. "He also said that we have

17    smart lawyers." I don't think I ever used

18    that expression. "He's sure that they can

19    figure out how they can get me paid. He

20    has no objection to my being paid for work

21    done or for terming the contract."

22    Q. Did you authorize Bressler to say

23    that? Bressler is being quoted here, not

24    you.

178

1     A. I don't know.  If he said it, he

2  said it.  I don't know anything about it.

3          MR. GODNICK:  I don't know

4     if the letter purports to quote Barry as

5     opposed to simply characterizing or

6     paraphrasing what the writer believes or

7     wanted to say that Barry said.

8          THE WITNESS:  I may have

9     said I'm not going to get involved in

10    any contract dispute between Crowley and

11    Cerberus.  That is none of my business.

12    Let them work it out.  They have

13    lawyers.  I may have said that.  I have

14    enough to do.  I'm trying to get this

15    company out of bankruptcy.  That's my

16    job.

17  BY MR. LEVY:

18     Q. Might it have concerned you if, as

19  part of that contract dispute, Cerberus had

20  said we've got to meet at Coram, I will pay

21  you some more?  Did that ever occur to you?

22          MR. GODNICK:  Objection.

23          THE WITNESS:  Did anyone say

24    anything about that?  You are conjuring

179

1     up a parade of horribles.  I was not

2     contemplating any such thing.  I was

3     trying to concentrate on the job that I

4     assumed and I was asked to take over.

5  BY MR. LEVY:

6     Q. And not to investigate anything like

7  this?

8         MR. GODNICK:  Objection to

9    the form.

10        MS. KRUGMAN:  Objection.

11        MR. KIPNES:  Objection.

12        MR. MILLER:  Objection.

13  BY MR. LEVY:

14     Q. Sir?

15     A. I'm not going to answer that question.

16     Q. Why?

17     A. I believe I'm not answering that

18  last question.

19     Q. Tell me why, sir.

20     A. Pardon?

21     Q. Tell me why.

22     A. Because I think it's offensive.

23     Q. You said you didn't know these

24  people.  These people are Feinberg, who you

180

1    have explained, and Dan Crowley whose name

2    appear.

3        A. I didn't refer to Dan Crowley.  I

4    talked about Mr. Feinberg and talked about

5    whether he is the CEO.  Never met the man.

6    I know nothing about him.

7        Q. Okay.  Would you look at the

8    paragraph at the top of page, second page,

9    page 64.

10       A. The one that is partly stricken out?

11       Q. Yes.  I don't know who did that.

12       A. Well, I don't know either.

13       Q. I don't either.  I wasn't going to

14   ask you that.

15       A. I don't know Friedman.

16       Q. Friedman, sir, was the attorney for

17   the debtor.  You must have met him at some

18   point.

19       A. I never met Mr. Friedman, to my

20   knowledge.  Maybe if I saw his full name

21   on. . .

22       Q. David Friedman represented the

23   debtor up until the point when you became

24   the Trustee and no longer does.  Okay?

181

1      A. I don't believe I ever met the

2   gentleman.

3                  MR. MILLER:  Objection.

4      That draws a conclusion that that may

5      exist.

6                  MR. LEVY:  I have no quarrel

7      with that.  I would stipulate to it.

8                  MR. MILLER:  Why did you say

9      it?

10                 MR. KIPNES:  Is there a

11     question?

12  BY MR. LEVY:

13     Q. Here we have Mr. Crowley,

14  apparently, writing here, "I know I didn't

15  have to hire Friedman just because you

16  recommended him.  I did it on my own.  I

17  didn't have to recite the answers that

18  Friedman gave me to say in court."

19                 Does that suggest to you,

20  based on your experience, that, perhaps, he

21  is telling Feinberg that he wasn't quite

22  telling the truth in court?

23                 MR. KIPNES:  Objection.

24  BY MR. LEVY:

182

1     Q. But, rather, was reciting what

2  Friedman had told him to do?

3            MR. KIPNES:  Objection to

4     the form of the question.  Calls for

5     speculation.

6            THE WITNESS:  I don't know

7     what answers he gave.  I think I just

8     would be guessing and speculating.  That

9     is of no value.

10  BY MR. LEVY:

11     Q. Given your experience, sir, your

12  impression of that sentence, what does it

13  mean to you?  What is your understanding of

14  it, knowing no more than what is on this

15  paper?

16            MR. KIPNES:  Wait a minute.

17     You are asking him just to read this

18     sentence totally out of context by

19     itself and give you his impression of

20     what the author of that sentence meant?

21            MR. LEVY:  I reject your

22     characterization of my question.  I take

23     it, it's an objection to the form?

24            THE WITNESS:  I can't answer

1    that question.  I don't know what they

2    were talking about.  I don't know the

3    people.  I don't know what the context

4    is.

5  BY MR. LEVY:

6    Q. Who are the people?  You know one of

7  the people, like the guy who wrote it,

8  Mr. Crowley.

9    A. I'm not sure.  It's not signed.

10    Q. Do you doubt that Crowley wrote it?

11    A.  I don't know.  I have no -- you put

12  a document in front of me.  I have never

13  seen it before.  It's marked "Draft,

14  Redacted."  It's written to somebody that I

15  have never met, don't know, and it has

16  various places redacted or stricken and you

17  are asking me what is my opinion about a

18  couple of sentences.  I can't do it.  I

19  don't have that ability.

20    Q. Is it significant to you that it

21  came from Mr. Crowley's file?.

22        MR. GODNICK:  Significant in

23    what respect?

24        THE WITNESS:  Of some

184

1     significance is the fact that it came

2     out of Mr. Crowley's file.

3   BY MR. LEVY:

4       Q. Doesn't that suggest to you that,

5   perhaps, he wrote it?

6       A. I don't know.

7       Q. What significance does it have?

8       A. Just what you said.  It came out of

9   his files.  It seems to me he is talking to

10  him about the same thing he talked to me

11  about, assuming that it's Crowley; that he

12  was trying to get Cerberus to pay him what

13  he thought Cerberus owed him for past

14  service, which he told me about.

15      Q. Look at the next page, if you would.

16      A. "I expect that you will honor the

17  commitment."

18      Q. Read it to yourself.

19      A. Yes.

20      Q. Assuming that Mr. Crowley wrote

21  that --

22              MR. KIPNES:  That's a very

23      large assumption.  Go ahead.

24              MR. LEVY:  Why did you have