IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARLIN M. ADAMS, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of CORAM HEALTHCARE CORPORATION, a Delaware Corporation, and of CORAM, INC., a Delaware Corporation,<br><br>                Plaintiff,<br><br>v.<br><br>DANIEL D. CROWLEY, DONALD J. AMARAL, WILLIAM J. CASEY, L. PETER SMITH, AND SANDRA L. SOMELY,<br><br>                Defendants. | Case No. 04-1565<br><br>JURY TRIAL DEMANDED |

## DEFENDANT DANIEL D. CROWLEY'S AMENDED OPENING BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

                Jeffrey C. Wisler (No. 2795)
                Christina M. Thompson (No. 3976)
                CONNOLLY BOVE LODGE & HUTZ LLP
                The Nemours Building
                1007 North Orange Street
                P.O. Box 2207
                Wilmington, Delaware 19899
                (302) 658-9141

                -and-

                Scott N. Schreiber
                Anthony C. Valiulis
                Oran F. Whiting
                MUCH SHELIST FREED DENENBERG
                AMENT & RUBENSTEIN, P.C.
                191 North Wacker Drive, Suite 1800
                Chicago, Illinois  60606
                (312) 521-2000

Dated:  May 11, 2005                *Attorneys for Daniel D. Crowley*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ ii
TABLE OF AUTHORITIES ......................................................................................................... iii
NATURE AND STAGE OF PROCEEDINGS ............................................................................... 1
SUMMARY OF ARGUMENT ....................................................................................................... 1
STATEMENT OF UNDISPUTED FACTS .................................................................................... 2
    A.    Background of the Debtors and the Bankruptcy ............................................................ 2
    B.    Plaintiff's Specific, Affirmative Acts Towards Crowley ............................................... 4
        1.    Adams met with Crowley ........................................................................................ 5
        2.    Adams requested Crowley to stay at Coram until his Employment Agreement expired ..................................................................................................................... 6
        3.    Crowley worked on Cerberus matters with Adam's knowledge and consent ... 7
        4.    Adams publicly supported and complimented Crowley ................................... 7
        5.    Adams recognized that Coram benefited from Crowley's leadership ............... 7
        6.    Adams instructed his counsel to negotiate an extension with Crowley ............ 8
ARGUMENT ................................................................................................................................... 9
    I.    JURISDICTION AND STANDARD FOR SUMMARY JUDGMENT ................ 9
    II.    PLAINTIFF WAIVED ANY CLAIMS AGAINST CROWLEY ...................... 150
    III.    THE DEBTORS ARE NOT ENTITLED TO HAVE RECOUPED THEIR DAMAGES AND ARE NOT ENTITLED TO COLLECT DAMAGES FROM CROWLEY ..................................................................................................... 15
CONCLUSION ............................................................................................................................. 16

# TABLE OF AUTHORITIES

**Cases**

*Alston v. Rice,* 825 F. Supp. 650, 655 (D. Del. 1993)..................................................................9

*Baio v. Commercial Union Insurance Company,* 410 A. 2d 502, 508 (Del. 1979) ......... 11, 12, 13

*Bowdle v. Automobile Insurance Co. of Hartford,* 99 F. Supp. 161, 162 (D. Del. 1951)...............9

*DiSabatino v. DiSabatino Bros., Inc.,* 894 F. Supp. 810, 814 (D. Del. 1995) ..........................9, 16

*Erie R. Co. v. Thompkins,* 34 U.S. 64, 58 S. Ct. 817 (1938).........................................................9

*In re Burkey Lumber Co. of Grand Junction*, 149 B.R. 177 (Bankr. D. Col. 1993) .............. 10, 11

*In re Momentum Manufacturing Corp.*, 25 F.3d 1132 (2d Cir. 1994)..........................................10

*In re OODC, LLC*, 321 B.R. 128, 137 (D. Del. 2005)................................................................13

*In re Radiology Associates, Inc. Litigation*, 611 A. 2d 475 (Del. 1991) .....................................15

*In re Varat Enterprises, Inc.,* 81 F.3d 1310 (4th Cir. 1996) ........................................................11

*Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A. 2d 437 (Del. 2000)............................................15

*Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019 (1938)......................................................10

*Klein v. American Luggage Works, Inc.*, 158 A. 2d 814, 818 (Del. 1960) ..................................10

*Mazik v. Decision Making, Inc.*, 449 A. 2d 202, 204 (Del. 1982)................................................9

*Miller v. Newsweek, Inc.*, 675 F. Supp. 872 (D. Del. 1987) .......................................................15

*NVF Company v. New Castle County* 276 B.R. 340 (D. Del.2002) ............................................16

*Ortiz v. Eichler,* 616 F. Supp. 1046, 1059 (D. Del. 1985) ...........................................................9

*Pellaton v. Bank of New York*, 592 A. 2d 473, 476 (Del. 1991) .................................................10

*Rose v. Cadillac Fairview Shopping Center,* 668 A. 2d 782, 786 (Del. 1995)............................10

*T. Copeland and Sons, et ano. v. SLM Int'l, Inc., et al.,* 248 B.R. 240, 247 (D. Del. 2000).........10

*Tse v. Ventana Medical Systems, Inc.,* 297 F.3d 210, 217 (3d Cir. 2002) ....................................9

*U.S. v. Webber,* 270 F. Supp. 286, 290 (D. Del. 1967)................................................................9

*Walker v. Chrysler Corp.*, 601 F. Supp. 1358, 1360 (D. Del. 1985) .............................................9

**Statutes**

Fed. R. Civ. P. Rule 56(c) ...........................................................................................................1

11 U.S.C. § 1106………………………………………………………………………………….13

**NATURE AND STAGE OF PROCEEDINGS**

On December 29, 2004, Arlin M. Adams, as Chapter 11 Trustee ("Plaintiff," "Adams," or "Trustee") filed this action for alleged breaches of fiduciary duty against Daniel D. Crowley "Crowley") and other above-captioned defendants. On February 22, 2005, Crowley filed his Answer to the Complaint.

Crowley respectfully submits this amended opening brief in support of his May 5, 2005 motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).

**SUMMARY OF ARGUMENT**

Crowley served as the chief executive officer of Coram Healthcare Corporation ("Coram") and Coram, Inc. (collectively with Coram "the Debtors") immediately prior to and during the Debtors' bankruptcy proceedings. After being appointed as trustee, Adams asked Crowley to continue running the Debtors in the same capacity as he did before the bankruptcy proceedings. The Trustee also took affirmative actions that, at a minimum, indicated that he waived the right to file suit against Crowley for damages allegedly sustained by the Debtors, and in the totality of the circumstances, constituted a waiver of his right to file suit against Crowley as a matter of law. Finally, the Trustee has recovered a substantial sum of money from Cerberus Partners, L.P. ("Cerberus"), along with two other entities (collectively with Cerberus "the Noteholders"), that constitutes a significant portion, if not all of the damages he seeks from Crowley in this lawsuit. The Trustee should be barred from collecting additional damages from Crowley in order to prevent a double recovery, or the amount collected by the Trustee should be set off from any damages awarded.

## STATEMENT OF UNDISPUTED FACTS

A.     **Background of the Debtors and the Bankruptcy**.

On August 8, 2000, the Debtors filed for relief under Chapter 11 of the Bankruptcy Code. *See* Motion for Authorization of the Chapter 11 Trustee to Enter into Termination and Employment Extension Agreement with Daniel D. Crowley ("Trustee's Motion") at ¶ 1.  A true and correct copy of the Trustee's Motion is attached hereto and incorporated herein as Exhibit "A."

The Debtors became leading providers of alternative site infusion therapy services in the United States through acquisitions in the mid 1990's.  These acquisitions were financed by amassing large amounts of debt. As a result of that debt, the Debtors experienced financial difficulties throughout much of the late 1990's.

In April, 1997, the Noteholders purchased unsecured notes issued by the Debtors with a face amount of $250 million.  Subsequently, the Debtors allowed a principal of Cerberus, Stephen Feinberg ("Feinberg"), to represent the Noteholders' interests on Coram's Board of Directors from June, 1998, until July 24, 2000.

Crowley, one of the defendants herein, is a turnaround consultant who consults with financially distressed firms principally in the healthcare field.  Crowley met Feinberg in 1998, and in 1999, Crowley was employed by Cerberus as an advisor.  Crowley advised Cerberus on a wide variety of matters.  He, among other things, evaluated potential investment opportunities, conducted due diligence, researched changes in government reimbursement policies, and provided advice to portfolio managers regarding a wide variety of operational matters.

In July, 1999, Crowley and Feinberg entered into a verbal agreement in which Crowley would be paid $80,000 per month for his services as Cerberus' advisor.  In August, 1999, at the

suggestion of Feinberg, the Debtors' Board of Directors hired Crowley to work with the Debtors' Chief Executive Officer, Rick Smith. In October, 1999, Mr. Smith resigned.

In order to negotiate more favorable terms with their Noteholders, in November, 1999, the Debtors hired Crowley as their new chief executive officer. On November 18, 1999, Crowley signed a three year Employment Agreement with the Debtors. (Trustee's Motion at ¶ 7). On November 19, 1999, Crowley and Cerberus formalized their verbal agreement and Crowley executed an Employment Agreement with Cerberus.

In late 1999, the Debtors began contemplating restructuring options and consulted with bankruptcy counsel. On August 8, 2000, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. (Trustee's Motion at ¶ 1). From that point, the Debtors continued to operate their businesses in the ordinary course of business as debtors-in-possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code. (Trustee's Motion at ¶ 1). Crowley continued to serve as chief executive officer of the Debtors.

The Bankruptcy Court found that the specific terms of Crowley's Employment Agreement with Cerberus had not been fully disclosed to the Debtors. In December, 2000, after the specific details of Crowley's Employment Agreement with Cerberus were disclosed, Judge Walrath denied the First Plan of Reorganization proposed by the Debtor. (Trustee's Motion at ¶ 3). The Court found that the First Plan was not proposed in good faith under § 1129(a)(3) because of the Crowley-Cerberus relationship. Crowley continued to operate the Debtors following the Bankruptcy Court's ruling.

The Debtors then created a special committee of independent directors ("the Special Committee") in response to the Bankruptcy Court's denial of the First Plan. The special committee appointed Harrison J. Goldin, of Goldin Associates, L.L.C. ("Goldin"), a financial

3

advisory firm, specializing in distressed situations, to perform an impartial evaluation of the Debtors' affairs, Crowley's relationship with Cerberus, and other issues relating to confirmation of a new plan of reorganization.

Goldin's report ("the Goldin Report") concluded, in part, that: (1) there was no evidence that the Debtors' books and records were compromised or materially impaired by Crowley's relationship with Cerberus; (2) there was no evidence that Crowley or Feinberg intended or expected that Crowley would seek to advance Cerberus' interests to the detriment of the Debtors; (3) there was no evidence that Cerberus (or the other Noteholders) ever instructed Crowley to act contrary to the Debtors' interests; and, (4) the Debtors suffered damages caused by the Crowley-Cerberus relationship, namely, the professional fees ($5 to $6 million) and possible business losses ($7 to $9 million) resulting from the Debtors' inability to obtain confirmation of the First Plan of Reorganization.

The Goldin Report served as a template of the Debtors' Second Plan of Reorganization. Crowley did not participate in preparing the Second Plan. Following hearings which concluded in December, 2001, Judge Walrath denied confirmation of the Second Plan because Crowley's relationship with Cerberus was unchanged. (Trustee's Motion at ¶ 3).

### B. Plaintiff's Specific, Affirmative Acts Towards Crowley.

After failing to confirm two Plans for Reorganization, the Creditors Committee and the United States Trustee moved to appoint a Chapter 11 Trustee. On February 12, 2002, Judge Walrath entered an order directing the United States Trustee to appoint a Chapter 11 Trustee. (Trustee's Motion at ¶ 4). Plaintiff was appointed as Chapter 11 Trustee on March 7, 2002. (Trustee's Motion at ¶ 4).

4

Over the next several months, Adams not only took specific steps to reaffirm Crowley's responsibilities as chief executive officer of Coram, but subsequently validated his confidence in and reliance on Crowley by moving, on December 31, 2002, in the Bankruptcy Court, for authorization to enter into a termination and employment extension agreement with Crowley. *See* Trustee's Motion.

In his Motion, the Trustee sought to: (a) retain Crowley after the initial term of his Employment Agreement with Coram expired; and (b) pay Crowley a $3,000,000 bonus, in partial consideration of the services that Crowley provided to Coram as its chief executive officer, and as consideration of Crowley's agreement to stay at Coram after the term of his initial Employment Agreement expired. Adams expressed unqualified support for Crowley, and identified several specific examples of how (i) the Debtors' financial condition improved under Crowley's leadership; (ii) Crowley re-focused the Debtors' operations to the "most profitable core therapies;" (iii) Crowley refined Coram's marketing strategy; (iv) Coram reduced costs under Crowley's leadership; and (v) the Debtors' enjoyed increased productivity, loyalty, and morale with Crowley at the Debtors' helm. (Trustee's Motion at ¶¶ 19-28).

In his own words, prior to the hearing on his Motion, the Trustee testified how he evaluated Crowley's performance and determined that he should retain Crowley and pay him a stay bonus. *See* Transcript of Deposition of Arlin Adams, February 25, 2003, ("Tr."), a true and correct copy of which is attached hereto and incorporated herein as Exhibit "B."

  1.  *Adams met with Crowley.*

After he was appointed Trustee, Adams met with Crowley both telephonically and personally. (Tr. at pp. 16-17). The circumstances precipitating his appointment caused Adams

5

to consider immediately terminating Crowley. Adams decided, however, after discussing the issue with his counsel, to retain Crowley's services. (Tr. at pp. 44-62).

Following those initial discussions, Adams consulted with his counsel "on several occasions whether it might be more advisable for [him] to go out to Denver and try to run this company and let Crowley be terminated." (Tr. at p. 88). He considered replacing Crowley with someone within Coram, but was concerned they "did not have the same skills that Crowley had in trying to keep the organization together." (Tr. at pp. 124-125). Adams affirmatively concluded that Crowley did not have a conflict that prevented Crowley from serving the Trustee. (Tr. at pp. 134-135).

      2.    *Adams requested Crowley to stay at Coram until his Employment Agreement expired.*

Adams decided to rely on Crowley to run Coram's day-to-day operations. (Tr. at p. 74). Adams publicly complimented the work that Crowley did to stabilize Coram, and Adams asked Crowley to continue operating Coram as Crowley had operated Coram prior to Adams' appointment as Trustee. (Tr. at pp. 57, 58). He also allowed Crowley's responsibilities to remain virtually unchanged. (Tr. at p. 73).

Adams "told him [Crowley] that until further notice, I would expect him to continue operating the company as he has in the past." (Tr. at p. 70). "I said why don't you continue doing what you are doing unless I tell you otherwise?" (Tr. at p. 71).

6

> 3. *Crowley worked on Cerberus matters with Adam's knowledge and consent.*

Adams knew that in addition to being owed money from Cerberus for past services, Crowley continued to advise Cerberus on "various other matters." (Tr. at pp. 50, 135). Adams allowed Crowley to continue his relationship with Cerberus so long as Crowley's evaluation of situations for Cerberus was done outside of Coram, the companies being evaluated did not compete with Coram, and Crowley was not being paid for those services. (Tr. at pp. 135-136, 155-156, 165-166).

> 4. *Adams publicly supported and complimented Crowley.*

Following his appointment, Adams "did assure the executives [of Coram] that their situation would continue as in the past. I had to give them that assurance or else I probably would have run the risk of losing them…" (Tr. at p. 52). In addition, Adams authorized Crowley to publish a letter to all of Coram's employees assuring them that despite Adams' appointment as Trustee, Crowley's status at Coram would remain basically unchanged. (Tr. at pp. 60-61).

> 5. *Adams recognized that Coram benefited from Crowley's leadership.*

Adams knew that replacing Crowley would be disruptive:

> He was getting along so well with his employees and his executive team and the results that he was achieving were sufficiently good that I put [the idea of moving to Denver] aside.

(Tr. at p. 88).

Indeed, Adams candidly admitted "Could I do as good a job as Mr. Crowley? Probably not." (Tr. at p. 89). Adams was advised by his financial advisor, Scott Victor, that replacing Crowley would have a negative impact on Adams' effort to sell Coram, and that keeping Crowley on board would preserve the value of Coram. (Tr. at pp. 130-131, 207, 209).

7

>And, as it turned out, it has worked pretty well. The executives have stayed. The customers have stayed. The sales have gone up. The EDITDA has been pretty good. Cash flow has been pretty good.

(Tr. at p. 66).

      6.    *Adams instructed his counsel to negotiate an extension with Crowley.*

Crowley's Employment Agreement was set to expire in November, 2002. When Crowley informed Adams that he intended to leave Coram in November, 2002, Adams instructed his counsel to begin negotiations with Crowley's counsel in October, 2002, to retain Crowley's services. (Tr. at p. 206). The parties entered into a proposed Transition Agreement, pursuant to which Crowley would have received a $3,000,000 bonus and his responsibilities would have remained the same. Only his title would have changed. (Tr. at p. 232). True and correct copies of Barry Bressler's December 24, 2002 and January 7, 2003 letters to Scott Schreiber detailing the terms of the aforementioned Agreement are attached hereto and incorporated herein as Exhibits "C" and "D."

As a matter of law, the totality of the circumstances demonstrate that the Trustee has waived his right to now complain that Crowley has caused untold damages to the Debtors or their estates by serving the Debtors; especially after the Trustee has already recovered a substantial sum of money from the Noteholders for the same damages he seeks from Crowley.

**ARGUMENT**

I.   **JURISDICTION AND STANDARD FOR SUMMARY JUDGMENT**

This being a diversity suit with a non-federal issue for determination, Delaware state substantive law is applied. *Erie R. Co. v. Thompkins*, 34 U.S. 64, 58 S. Ct. 817 (1938).

Summary judgment is proper if there are no genuine issues as to any material fact and the defendant is entitled to judgment as a matter of law. *Walker v. Chrysler Corp.*, 601 F. Supp. 1358, 1360 (D. Del. 1985); *Tse v. Ventana Medical Systems, Inc.*, 297 F.3d 210, 217 (3d Cir. 2002); Fed. R. Civ. P. Rule 56(c). The purpose of summary judgment procedure is to enable a court to dispose of a case expeditiously when there are no genuine issues as to the facts. *Bowdle v. Automobile Insurance Co. of Hartford,* 99 F. Supp. 161, 162 (D. Del. 1951). Where the substantive law affords no recovery, even where certain facts exist, summary judgment against the party basing its claim on those facts is appropriate. *DiSabatino v. DiSabatino Bros., Inc.*, 894 F. Supp. 810, 814 (D. Del. 1995).

On a motion for summary judgment, if a non-moving party fails to make a sufficient showing on the essential elements of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *Alston v. Rice,* 825 F. Supp. 650, 655 (D. Del. 1993). Denial alone is insufficient to put facts into controversy and preclude the granting of summary judgment. *U.S. v. Webber,* 270 F. Supp. 286, 290 (D. Del. 1967). The party resisting a summary judgment motion may not rest upon mere allegations or denial of its pleadings, and cannot depend upon those pleadings to create a material issue of fact. *Ortiz v. Eichler,* 616 F. Supp. 1046, 1059 (D. Del. 1985).

## II. PLAINTIFF WAIVED ANY CLAIMS AGAINST CROWLEY

In the context of bankruptcy, in order to find a waiver, a court must review the "totality of the circumstances." *T. Copeland and Sons, et ano. v. SLM Int'l, Inc., et al.,* 248 B.R. 240, 247 (D. Del. 2000), *relying on Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019 (1938); *Pellaton v. Bank of New York*, 592 A. 2d 473, 476 (Del. 1991). Those circumstances must show an intentional relinquishment of a known right. *Mazik v. Decision Making, Inc.*, 449 A. 2d 202, 204 (Del. 1982). In ascertaining what is known, the fact finder looks not only at what the party knew, but also what, by the exercise of reasonable diligence, he arguably should have known at the time of the wavier. *Rose v. Cadillac Fairview Shopping Center,* 668 A. 2d 782, 786 (Del. 1995).

A voluntary relinquishment of a right can be shown inferentially through conduct. *Klein v. American Luggage Works, Inc.*, 158 A. 2d 814, 818 (Del. 1960). Waiver may also be inferred from the circumstances if it is reasonable to do so. 31 C.J.S. Estoppel and Waiver § 68; *Baio v. Commercial Union Insurance Company,* 410 A. 2d 502, 508 (Del. 1979). An individual's specific intent need not be shown. *Klein* at 818. In general, a waiver can occur when an individual in possession of any right performs an act that is inconsistent with that right, or where the individual's conduct, words, or deeds are inconsistent with an intention to enforce a right or insist on it. *Id.* Under the doctrine of waiver, whether the party relying on the wavier knew the facts from which the waiver resulted is not material. 31 C.J.S. Estoppel and Waiver § 84.

Under certain circumstances, a party can waive the right to object to a claim. For example, in *In re Momentum Manufacturing Corp.*, 25 F.3d 1132 (2d Cir. 1994), a debtor could not amend its schedules or file objections to claims when it misled employees to believe that they would receive severance pay but really never intended to pay it, and the employees voted for the reorganization plan because they believed they would receive severance pay. In *In re Burkey*

10

*Lumber Co. of Grand Junction*, 149 B.R. 177 (Bankr. D. Col. 1993), equitable estoppel prevented a debtor from objecting to a claim after confirmation of the debtor's plan after it expressly represented that a creditor's claim was not in dispute. In addition, in *In re Varat Enterprises, Inc.,* 81 F.3d 1310 (4th Cir. 1996), a creditor was barred from objecting to a claim made on the debtor's assets under waiver and equitable estoppel when it failed to object prior to confirmation of the reorganization plan.

The totality of circumstances in this case demonstrates that Plaintiff waived his right to file suit against Crowley by virtue of Plaintiff's affirmative acts (a) by not immediately removing Crowley from his position after being appointed Trustee; (b) engaging Crowley's services; (c) reaping the benefits of Crowley's services; and (d) by filing the Trustee's Motion seeking permission to pay Crowley a $3,000,000.00 bonus. More importantly, Plaintiff engaged in these affirmative acts with full knowledge of the allegations made against Crowley in the bankruptcy case.

The Trustee's acts here closely resemble those of the defendant in *Baio v. Commercial Union Insurance Company*, 410 A. 2d 502 (Del. 1979). In *Baio*, an insurance company paid workers' compensation to the plaintiff who filed suit against two contractors allegedly responsible for plaintiff's injuries. The insurance company, exercising its statutory right to sue in subrogation, joined the plaintiff in his suit, attempting to recover the approximately $8,200.00 it paid to the plaintiff.

After the initiation of the plaintiff's suit, the insurance company discovered that it had a tort-liability contract of insurance with one of the two defendants that it was suing with the plaintiff. Since the plaintiff sought approximately $350,000 from the defendants, the insurance company concluded that it had a greater financial risk under its contract with one of the

defendants. Faced with a conflict, the insurance company decided to switch sides in the litigation.

After successfully defending its assured and defeating the plaintiff with whom it was once aligned, the insurance company attempted to exercise its statutory rights as a subrogee and recover from the plaintiff a part of the money the plaintiff received in damages from the other defendant contractor for which plaintiff worked. The plaintiff argued that the insurance company waived its rights by switching sides and opposing him in the previous litigation. The Delaware Supreme Court was asked to resolve issue of whether the insurance company's act of switching sides and opposing the plaintiff constituted a waiver of its statutory rights. 410 A.2d 502, 505.

Relying on the principle that one who asserts an equitable remedy must in turn do equity itself, the Delaware Supreme Court held that the insurance company waived its statutory right to subrogation by its previous act of opposing the plaintiff in a lawsuit. 410 A.2d 502, 507.

> To put it in somewhat different terms, by its conduct, Commercial Union waived its right to participate in Baio's recovery.
>
> While "waiver" includes the idea of a "voluntary" relinquishment of a right, one's "conduct (may be) such as to warrant an inference to that effect." Klein v. American Luggage Works, Inc., Del.Supr., 158 A.2d 814, 818 (1960). In other words, a specific intent need not be shown.
>
> Clearly, our legal system permits one to waive even a constitutional right…This Court so held in Components, Inc. v. Western Electric Company, Del.Supr., 267 A.2d 579, 582 (1970), when Chief Justice Wolcott wrote that all rights "to which a person is legally entitled under a contract which are intended for his sole benefit, may be waived whether those rights are secured by contract or conferred by statute."

410 A.2d 502, 508

Plaintiff was appointed Chapter 11 Trustee on March 7, 2002. He was chosen, in part, because of his distinguished career, his experience, and his knowledge of the duties and rights of

12

a trustee. Plaintiff was aware that a trustee is given broad powers under the Bankruptcy Code to carry out his duties, which include, but are not limited to, investigating debtor's financial affairs, suing officers, directors, and other insiders to recover on behalf of the estate fraudulent and preferential transfers, and operating the debtor's business under court supervision. 11 U.S.C. § 1106, *amended by* Pub.L. No. 109-8, 119 Stat 23, April 20, 2005; *In re OODC, LLC*, 321 B.R. 128, 137 (D. Del. 2005). Plaintiff certainly knew his rights and privileges as a trustee and passed the test used to ascertain the knowledge possessed by an individual who has waived a known right.

Plaintiff's conduct, as that of the defendant in *Baio*, warranted at least an inference of a voluntary relinquishment of the right not only to terminate Crowley but to file suit against him. Shortly after he was appointed as Trustee, Plaintiff met with Crowley, initially by telephone and then personally. (Tr. at pp. 16-17). Given the circumstances that precipitated his appointment, Plaintiff considered immediately terminating Crowley. Plaintiff decided, however, after meeting with Crowley and discussing the issue with his counsel, to retain Crowley's services.

On several occasions subsequent to his initial meetings with Crowley, Plaintiff thought about whether it might be more advisable for him to go out to Denver and try to run Coram and terminate Crowley. He ultimately concluded that the Crowley-Cerberus relationship did not create a conflict that prevented Crowley from serving the Trustee. (Tr. at pp. 134-135).

Plaintiff decided to rely on Crowley to run Coram's day-to-day operations. (Tr. at p. 74). He also allowed Crowley's responsibilities at Coram to remain virtually unchanged. (Tr. at p. 73). Plaintiff publicly complimented the work that Crowley did to stabilize Coram. (Tr. at p. 57). Plaintiff authorized Crowley to publish a letter to all of Coram's employees giving them assurances that despite the Plaintiff's appointment as Trustee, Crowley's status at Coram would

13

remain basically unchanged. (Tr. at pp. 60-61). Indeed, Plaintiff asked Crowley to continue operating Coram as Crowley had operated Coram prior to Plaintiff's appointment as Trustee.

Plaintiff permitted Crowley to continue running Coram even though Plaintiff knew that Crowley continued to advise Cerberus on "various other matters." (Tr. at pp. 50, 135). Plaintiff even allowed Crowley to continue his relationship with Cerberus.

Plaintiff's own testimony demonstrates that he was acutely aware of all of the issues relating to retaining Crowley after he was appointed. Notwithstanding those issues, he met with Crowley, considered whether – and decided that – Crowley's continued employment would be in the best interest of the estate; and that Coram was better off with Crowley than without him. Thus, on or about March 26, 2002, Plaintiff, through his secretary, authorized Crowley to send a letter to publicly acknowledge the complimentary work that Crowley performed to stabilize Coram, and asking him "more or less" to stay on to operate Coram. (Tr. at pp. 57, 58). As the term of Crowley's (unassumed) Employment Agreement expired, Plaintiff instructed his counsel to negotiate and enter into a Transition Agreement with Crowley. In that Agreement, Plaintiff recognized that Crowley had claims against the estate. Plaintiff instructed his counsel to negotiate a settlement of those claims by actually offering Crowley a 27% salary raise, a $1,000,000 stay bonus and a $2,000,000 settlement of the incentive pay that Crowley earned.

Under the totality of these circumstances, Plaintiff, as did the insurance company in *Baio*, waived his right to bring suit against Crowley for prior conduct. By retaining Crowley after his appointment, when Plaintiff was fully aware of the allegations against Crowley and this Court's impression of Crowley, Plaintiff demonstrated his support for Crowley. Moreover, Plaintiff clearly relied on Crowley's expertise and ability to manage Coram in Denver, which permitted Plaintiff to stay in Philadelphia and work on developing and confirming a plan of reorganization

14

– the role which he believes he was hired to perform.  Plaintiff could not have operated Coram on a daily basis while he was working to develop a confirmable plan of reorganization.

> And, as it turned out, it has worked pretty well.  The executives have stayed.  The customers have stayed.  The sales have gone up.  The EDITDA has been pretty good.  Cash flow has been pretty good.

(Tr. at p. 66).

Plaintiff's affirmative acts can reasonably be interpreted as a voluntary waiver of any right to sue Crowley.  Plaintiff reaffirmed Crowley's responsibilities; moved to retain Crowley after Crowley's Employment Agreement expired; sought to pay Crowley $3,000,000.00 for his efforts and loyalties; publicly lauded Crowley's job performance; and personally informed Crowley of his satisfaction.  For Plaintiff to be allowed to sue Crowley after these acts is contrary to the established Delaware law on waiver.

### III.   THE DEBTORS HAVE RECOUPED THEIR DAMAGES AND ARE NOT ENTITLED TO COLLECT DAMAGES FROM CROWLEY

Adams admits that the Debtors have recovered more than the amount of damages that the estate allegedly sustained.  *See* Disclosure Statement with Respect to the Chapter 11 Trustee's Joint Plan of Reorganization, a true and correct copy of which is attached hereto and incorporated herein as Exhibit "E."  The Debtors are not entitled to a double recovery under Delaware law even should Crowley be found liable.  *See Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A. 2d 437 (Del. 2000)  (Chief executive officer's breach of duty of loyalty to minority shareholders did not require disgorgement of benefits which would result in double recovery); *In re Radiology Associates, Inc. Litigation*, 611 A. 2d 475 (Del. 1991); *Miller v. Newsweek, Inc.*, 675 F. Supp. 872 (D. Del. 1987).

Crowley and the other defendants are entitled to a setoff if found liable.  When, as in this case, a party to a lawsuit has recovered an amount equal to or in excess of the amount of

15

damages claimed, any damages recovered from an adverse party is set off against or from the amount collected or previously recovered. *NVF Company v. New Castle County* 276 B.R. 340 (D. Del. 2002).

The Debtors have recovered the damages sought from Crowley and have been made whole. When the substantive law affords no recovery, even where certain facts exist, summary judgment against the party basing its claim on those facts is appropriate. *DiSabatino v. DiSabatino Bros., Inc.,* 894 F. Supp. 810, 814 (D. Del. 1995). The undisputed facts and the applicable law dictate that Crowley's Motion be granted, that Crowley be dismissed from this case, or, at a minimum, any damages be significantly reduced because of the Debtors' previous recovery or by setoff.

## CONCLUSION

For all the foregoing reasons, Defendant, Daniel D. Crowley, respectfully requests that this Honorable Court enter an Order granting his Motion for Summary Judgment and dismissing him from this case with prejudice, or for whatever relief this Honorable Court deems just.

Dated: May 11, 2005	CONNOLLY BOVE LODGE & HUTZ LLP


/s/ Jeffrey C. Wisler
Jeffrey C. Wisler (No. 2795)
Christina M. Thompson (No. 3976)
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Phone: (302) 658-9141

　　and

Scott N. Schreiber
Anthony C. Valiulis
Oran F. Whiting
MUCH SHELIST FREED DENENBERG
AMENT & RUBENSTEIN, P.C.
191 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
Phone: (312) 521-2000

Attorneys for Defendant Daniel D. Crowley

#395796