# EXHIBIT D

1

1      IN THE UNITED STATES BANKRUPTCY COURT

2        FOR THE DISTRICT OF DELAWARE
                -----

3
    In re:          : Chapter 11
4   CORAM HEALTHCARE CORP:
    and CORAM, INC.   :
5               : Case NO. 00-3299
        Debtors    :
6


7

8               -----
        Tuesday, February 25, 2003
9
              ------
10

11  Pretrial examination of HON. ARLIN ADAMS,

    held in the offices of Schnader, Harrison
12
    Segal & Lewis, 1600 Market Street,
13
    Philadelphia, PA  19103, commencing at
14
    9:35 a.m., on the above date, before Mickey
15
    Dinter, Registered Professional Reporter
16
    and Commissioner of Deeds for the
17
    Commonwealth of Pennsylvania.
18
              ------
19       BRUSILOW & ASSOCIATES
       COURT REPORTERS & VIDEOGRAPHERS
20   1926 Arch Street - 1st Floor West
        Philadelphia, PA 19103-1404
21   215.977.9700 - www.brusilow.com
             ------
22

23

24

2

```
1    A P P E A R A N C E S:

2

3
     JENNER & BLOCK
4    BY:  RICHARD F. LEVY, ESQUIRE
                 &
5        C. STEVEN TOMASHEFSKY, ESQUIRE
     One IBM Plaza
6    Chicago, Ill  60611
     312-222-9350
7    Counsel for the Equity Committee

8
     BEATIE & OSBORNE
9    BY:  RUSSEL BEATIE, ESQUIRE
     521 5th Avenue
10   New York, New York 10175
     212-888-9000
11   Counsel for Feinberg

12
     SCHULTE, ROTH & ZABEL, LLP
13   BY:  HOWARD O. GODNICK, ESQUIRE
                 &
14       MICHAEL L. COOK, ESQUIRE
     919 Third Avenue
15   New York, New York  10022
     212-756-2000
16   Counsel for Cerberus and R-Net

17
     SCHNADER, HARRISON, SEGAL & LEWIS
18   BY:  WILBUR KIPNES, ESQUIRE
                 &
19       THOMAS BLOOM, ESQUIRE
         BARRY E. BRESSLER, ESQUIRE
20   1600 Market Street
     Philadelphia, PA  19103
21   215-751-2336k
     Counsel for the Trustee
22

23

24
```

3

```
 1    Appearances Cont'g:

 2

 3
      WEIL, GOTSHAL & MANGES, LLP
 4    BY:  ALAN B. MILLER, ESQUIRE
                    &
 5         JOHN A. NEUWIRTH, ESQUIRE
      767 Fifth Avenue
 6    New York, New York  10153-0119
      Counsel for Foot Hill Capital Corp.
 7    and Goldman Sachs, Credit Partners

 8

 9    DEPARTMENT OF JUSTICE
      BY:  RICHARD SCHEPACARTER, ESQUIRE
10    Civil Division
      P.O. Box 875
11    Ben Franklin Station
      Washington, D.C.  20044-0875
12    Counsel for the U.S. Government

13

14
      Also Present:  Donald J. Liebentritt,
15    for the Equity Committee

16

17

18

19

20

21

22

23

24
```

4

```
 1
 2          between/among counsel that the reading,
 3          signing, sealing, filing and
 4          certification are waived; and that all
 5          objections, except as to the form of the
 6          question are reserved until the time of
 7          trial.)
 8                      (EXAMINATION)
 9                      ARLIN M. ADAMS, being first
10          duly sworn/affirmed, was examined and
11          testified as follows:
12   BY MR. LEVY:
13          Q. I'm going to address you today as
14   Mr. Adams rather than Judge Adams.  That is
15   not in any way to be disrespectful over
16   your distinguished career.
17          A. Fine.
18                      (Trustee-1, the Opinion of
19          Judge Walrath, marked for
20          identification.)
21   BY MR. LEVY:
22          Q. I have asked the court reporter to
23   mark as Trustee Exhibit 1, the opinion of
24   Judge Walrath dated December 21st, 2001,
```

5

1    and I have three additional copies.  I'm

2    afraid that's all I have.  We are going to

3    have to ask you to share them.

4                    (Trustee-2, a Motion of the

5           Chapter 11 Trustee for Authorization to

6           Enter into Termination and Employment

7           Extension Agreement with Daniel D.

8           Crowley, marked for identification.)

9

10   BY MR. LEVY:

11       Q. I have asked the court reporter also

12   to mark as Trustee Exhibit Number 2, the

13   motion of the Chapter 11 Trustee for

14   Termination and Employment Extension

15   Agreement with Daniel Crowley and here,

16   again, we have three copies.

17                   (Trustee-3, a Response of

18          Chapter 11 Trustee in Opposition to

19          Equity Committee's Motion for an Order

20          Terminating Daniel Crowley Employment,

21          marked for identification.)

22   BY MR. LEVY:

23       Q. I'm going to ask the court reporter

24   now to mark as Trustee Exhibit Number 3,

6

1     the response of Chapter 11 Trustee in

2     Opposition to the Equity Committee's Motion

3     for an Order Terminating Daniel Crowley's

4     Employment.

5                    I wonder if, in the interest

6     of saving time, we could agree that any

7     objection by any one of you would stand as

8     the objection for all of you?

9                    MR. KIPNES:  That's fine.

10                    MR. LEVY:  Thank you.

11    BY MR. LEVY:

12        Q. Mr. Adams, you were appointed as

13    trustee in this case on about March 7 of

14    this year, is that correct?

15        A. Correct.

16                    MR. KIPNES:  March 7 of last

17        year.

18    BY MR. LEVY:

19        Q. Last year, 2002.  Shortly after

20    being appointed as trustee, you reviewed in

21    some detail the opinion of Judge Walrath

22    which we have marked as Trustee Exhibit

23    Number 1, is that correct?

24        A. Correct.

7

1          Q. And am I also correct that shortly

2     after that, you made efforts to have the

3     noteholders or one of them withdraw a

4     Notice of Appeal FROM Judge Walrath's

5     opinion?

6          A.  I did not.  I made no such effort.

7          Q. Do you know whether anyone made such

8     effort on your behalf?

9          A. Could easily be.  I did not talk to

10    them.

11         Q. Have you ever asked Mr. Bressler

12    whether he made such efforts on your

13    behalf?

14         A. I don't think I asked, no.

15         Q. Did you have a discussion with the

16    debtors' counsel immediately or shortly

17    after your appointment in which you

18    discussed the possibility of their not

19    filing an appeal from Judge Walrath's

20    Order?

21         A. I have no recollection.

22         Q. Again, do you know whether

23    Mr. Bressler or any other attorney on your

24    behalf did that?

8

1     A. Could easily be.  I don't know it of

2     my own knowledge.  He may have come in and

3     said they are not going to proceed with an

4     appeal or something like that, but I have

5     not discussed it.

6     Q. You never expressed a view on

7     whether they should or should not appeal?

8     A. No.

9     Q. Now, turning to Exhibit 2 which is

10    your motion, particularly to paragraph 16

11    which you will find on page 6.

12    A. Got it.

13    Q. First, let me ask you this:  Did you

14    read this Motion, Exhibit 2, before it was

15    filed?

16    A. I did.

17    Q. Did you approve of everything that

18    is in it?

19    A. Well, I don't know what you mean by

20    everything.  I approved of the motion.

21    Q. Did you find anything -- fine.  You

22    notice that in paragraph 16 it says, I'm

23    reading the second sentence now, "The

24    Court's findings regarding Crowley's

9

1    relationship with Cererus, as well as his

2    failure to timely make complete disclosure

3    of the relationship to the CHC board of

4    directors, raised a substantial question

5    for the Trustee as to whether Crowley

6    should be retained."

7    A. I see it, yes.

8    Q. My first question, sir, is which of

9    the Court's findings were being referred to

10    in that paragraph?

11    A. I couldn't tell you.  If you are

12    talking about a number, I can't tell you

13    that.

14    Q. Can you recall anything in the

15    Court's findings that raised a substantial

16    question as to whether Crowley should be

17    retained?

18    A. Well, I don't remember the Court's

19    finding on a word-to-word basis.  That was

20    my impression.

21    Q. Can you, as we sit here today,

22    without asking you on a word-to-word basis,

23    tell me your understanding of any one of

24    the Court's findings that raised a

10

```
1    substantial question in your mind?

2        A. The fact that Mr. Crowley had a

3    compensatory relationship with Cerberus

4    that had not been disclosed.

5        Q. Was it your understanding, sir, that

6    it was the fact that if it had not been

7    disclosed was what raised a substantial

8    question or was it the fact simply that

9    there is a compensatory relationship?

10       A. My impression was a combination of

11   the two factors.

12       Q. And it's your understanding then

13   that the compensatory relationship standing

14   alone would not have been one of the things

15   that raised a substantial question of you,

16   is that right?

17                MR. KIPNES:  Objection to

18       the form.

19                THE WITNESS:  I did not

20       dissect it to that extent.

21   BY MR. LEVY:

22       Q. I wonder, sir, if you would look at

23   Exhibit 1, particularly at page 22.

24       A. I have it.
```

11

1        Q. Do you notice that Judge Walrath

2    says there in the heading, D, "Disclosure

3    does not cure the conflict of interest"?

4        A. I can't find what you are talking

5    about. Maybe you can point that out. I

6    see it, yes.

7        Q. Do you see that Judge Walrath's

8    finding was that a disclosure does not cure

9    the conflict of interest?

10       A. Correct.

11       Q. Now in light of that, will you agree

12   with me that, perhaps, one of your

13   substantial questions as to whether Crowley

14   should be retained was solely the conflict

15   of interest as distinguished from a lack of

16   disclosure?

17              MR. KIPNES:  Objection to

18       the form of the question.

19              THE WITNESS:  Well, I don't

20       think that the judge was referring to

21       retaining Crowley in writing this.

22   BY MR. LEVY:

23       Q. I'm sorry?

24       A. I did not understand that the judge

12

```
 1    was referring to the retention of

 2    Mr. Crowley when she wrote Section D on

 3    page 22.  I didn't think that was the issue

 4    before her.  It's important in that

 5    connection to look at footnote 16.

 6         Q. I'm sorry?

 7         A. It is important in connection with

 8    your question to look at footnote 16 at

 9    page 22.

10         Q. Why is it important, sir?

11         A. Because, I think, in my opinion, it

12    discloses what the Court was considering

13    because she says even if the debtors

14    corporate policy did not require such

15    disclosure, the Court would expect the

16    debtor in possession to disclose to the

17    court and its creditors any agreement which

18    its senior management might have with its

19    largest creditors similar to the agreement

20    at issue here.

21              I think what the judge was

22    doing, and the footnote was explaining to

23    the reader further the discussion that she

24    was having under D; at least, that's my
```

13

1    impression.

2        Q. Would you look at page 15 of the

3    opinion.

4        A. Got it.

5        Q. Note that the judge said "given the

6    fact that Crowley had not disclosed the

7    agreement in the first place, the debtor

8    should have asked for full disclosure and

9    required that Crowley severe all agreements

10   with Cereberus as a condition of continued

11   employment."

12       A. I see it.

13       Q. Did you take that into consideration,

14   this is, page 15 of the opinion?  I have a

15   different pagination on my copy.  Now, I

16   will show it to you.  It's at the bottom of

17   22 and the top of 21 and the -- the bottom

18   of 21 and the top of 22.

19       A. Yes, I see it.

20       Q. Was that one of the -- did that

21   raise a substantial question for you as to

22   whether he should be retained?

23       A. I think it raised a question.  I

24   don't know whether I would characterize it

1   as substantial.  I know I thought about it

2   and considered it and discussed it.

3        Q. Who did you discuss it with?

4        A. My counsel.

5        Q. Anybody else?

6              MR. KIPNES:  We need a

7        timeframe on that question, Mr. Levy.

8        Ever?

9   BY MR. LEVY:

10       Q. At about the time -- the timeframe

11  would be from the time you were appointed

12  and read this opinion, let's say, through

13  the end of March.

14       A. March of this year?

15       Q. March of the year you were

16  appointed.

17       A. I was appointed around March 7.  For

18  those 21 days?

19       Q. Right.

20       A. I don't think I discussed it with

21  anyone, except my counsel.  I can't recall

22  in any event.

23       Q. Was a substantial question as to

24  whether he should be retained raised in

15

1    your mind by the fact that the United States

2    Trustee in the Motion for the Appointment

3    of a Chapter 11 Trustee had indicated that

4    Mr. Crowley should be removed?

5        A. We took all of that into

6    consideration, yes.

7        Q. Were you aware of that?

8        A. I read his, I forget whether it was

9    the Trustee's letter or motion.  I forget

10   now what the document was, but I was aware

11   of that.

12       Q. Were you aware, also, that the

13   noteholders filed a brief in which they

14   said Mr. Crowley should be removed?

15       A. I read a lot of papers.  I can't sit

16   here now and tell you what I read about a

17   year ago.  I knew that was a very important

18   question.

19       Q. The question of whether he should be

20   retained was a very important question?

21       A. To me.

22       Q. To you?

23       A. Yes.

24       Q. And what factors that you have not

16

```
1    already mentioned did you take into account

2    in reaching a conclusion as to whether he

3    should be retained or not retained?

4                    MR. KIPNES:  When?

5                    THE WITNESS:  In March.

6    BY MR. LEVY:

7        Q. In March.

8        A. One of the things I did was,

9    perhaps -- one of the first things I did

10   was to arrange to go out and interview

11   Mr. Crowley, which I did, and interviewed

12   the senior members of Coram and,

13   nonetheless, it constituted a very

14   important question in my judgment.

15       Q. Tell us what happened.  Do you

16   recall about when you visited with

17   Mr. Crowley for the first time?

18       A. I think the --

19                   MR. KIPNES:  In person?

20   BY MR. LEVY:

21       Q. In person.

22       A. I think the third week of March.

23       Q. Did you have any discussions with

24   him on the telephone other than arranging
```

17

1   when you were going to meet him prior to

2   going out to see him?

3        A. Well, I know I had discussions with

4   him on the telephone.

5        Q. What do you recall about those

6   discussions?

7        A. Good God, this is still the March

8   time period.

9        Q. Everything is until I tell you

10  otherwise.

11       A. I must have said how are things

12  going?  Are the sales holding up?  What is

13  the status of the staff?  What is their

14  morale.  Questions along those lines.

15       Q. Did you ask him in that phone call

16  whether he had severed his relationship

17  with Cereberus?

18       A. I may have.

19       Q. Do you recall whether you did or

20  didn't?

21       A. I can't specifically recall that

22  discussion.

23       Q. Did you make any notes of that

24  conversation you had on the telephone with

18

1    him?

2       A. No, I did not.

3       Q. You went out to see him, roughly,

4    the third week in March?

5       A. Roughly.

6       Q. How much time did you spend

7    face-to-face with him on that occasion?

8       A. A couple of hours, I guess.

9       Q. What did you talk about?

10      A. Talked about the conflict problem;

11    told him that I was troubled by it; talked

12    about the status of the company and what he

13    considered to be the future possibilities;

14    talked about his relationship with his

15    executive staff; talked about the situation

16    regarding the outlying facilities.

17      Q. The, I'm sorry?

18      A. Outlying facilities other than the

19    one in Denver. I may be repeating:  Talked

20    about the situation in the industry, the

21    future of the industry.  I think we got

22    into the question of the claim of the IRS.

23    I think we got into the question of Coram's

24    claim against Price-Waterhouse.  I think we

19

1     got into the Arnet litigation very briefly.

2

3

4

5

6

7

8         Q. Did you ask him whether he was still

9     getting $80,000 a month at that time from

10    Cerberus?

11        A. I don't think I did.

12        Q. Is that a matter not of interest to

13    you?

14        A. Well, I didn't have a figure of

15    $80,000 in my mind.  He had told me that he

16    had terminated his relationship, so there

17    would be no occasion to say how about the

18    80,000.

19        Q. You knew about the 80,000 from Judge

20    Walrath's opinion?

21        A. Correct.

22        Q. When did he tell you he had

23    terminated his relationship?

24        A. I don't know whether it was during

20

1    the telephone call or when I was out there.

2    I can't tell you that.

3        Q. And did you -- what was your

4    understanding of what he meant when he said

5    terminated?

6        A. That he did not have a contractual

7    relationship to Cerberus.

8        Q. Meaning that he was not obligated to

9    perform for them?

10       A. And they were not obligated --

11   except that he did indicate, I guess, that

12   they owed him some money.  I believe he

13   said that during the discussion that we

14   had.

15       Q. Did he say he was not doing any work

16   for Cerberus at that time?

17       A. He did.

18       Q. Did he say he was not going to do

19   any work for Cerberus?

20       A. I don't think we talked about the

21   future with Cerberus.  He talked about the

22   present.

23       Q. Was the future relationship between

24   Crowley and Cerberus of interest to you at

21

```
 1    that point in making your decision as to
 2    whether to retain him?
 3        A. Yes.
 4        Q. Why didn't you ask him?
 5        A. There were many things on my mind at
 6    the time.  I can't answer that question.  I
 7    don't know.
 8        Q. You said when -- I made a list of
 9    the things you talked about.  You said you
10    talked about the conflict of interest.
11    What else other than what you just
12    testified to either in the phone call or in
13    your meeting in March did you discuss with
14    Mr. Crowley relating to the subject of
15    conflict of interest?
16        A. I recall that he said that it was
17    very unfortunate that this had developed.
18    It was not done intentionally.  If somebody
19    had asked him, he would have disclosed it.
20    He thought that it may have been an error
21    on the part of his counsel.  I can't recall
22    very much more than that.
23        Q. Did you distinguish in that
24    conversation between two periods, the first
```

22

1    period would be the year 2000 leading up to

2    Judge Walrath's opinion of December 21st,

3    2000, where there was no disclosure?  Do

4    you recall that?

5        A. Did I distinguish --

6        Q. In the conversation, did either of

7    you distinguish that?

8        A. I don't think I distinguished that,

9    no.

10        Q. Are you familiar with the fact that

11    at the end of December 2000 Judge Walrath

12    denied confirmation of the first plan

13    because there was a conflict of interest

14    which you had had tainted the debtor,

15    tainted, perhaps, Cerberus?

16        A. Do I remember --

17              MR. GODNICK:  Objection to

18        the characterization of the opinion.

19              THE WITNESS:  I remember

20        reading her opinion.  I can't tell you

21        the exact language.  She raised the

22        question, certainly.

23    BY MR. LEVY:

24        Q. Did she raise the question or was

23

1    that a basis, to your understanding, of her

2    finding that there was no good faith with

3    respect to the first plan?

4        A. I don't think I can, without having

5    her opinion in front of me, answer

6    questions of that sort.

7        Q. Would you look at page 7 of Judge

8    Walrath's 2001 opinion.  There is a

9    paragraph there that begins "At the

10   conclusion."

11       A. All right.

12       Q. "At the conclusion of the

13   confirmation hearings, we found that

14   Crowley's consulting agreement with

15   Cerberus created an actual conflict of

16   interest on his part.  We further held that

17   the conflict of interest has tainted the

18   debtor's restructuring of its debt, the

19   debtor's negotiations towards the plan,

20   even the debtor's restructuring of its

21   operations," and the judge cites to her

22   early opinion.

23             Does that refresh your

24   recollection as to whether you had a

24

1    discussion with Crowley during March

2    focusing on the first year's conflict of

3    interest?

4        A. I don't recall that we divided it

5    timewise, our discussion.  We may have.  I

6    just don't recall.

7        Q. Do you recall, then, discussing the

8    findings in the second opinion that after a

9    year nothing had changed?

10       A. I don't recall discussing with

11    Mr. Crowley a question of findings.  He is

12    not a lawyer.  I did not understand that he

13    would be able to distinguish findings and

14    conclusions.  We covered the subject.

15       Q. Wasn't it of concern to you because

16    you, of course, understand what findings

17    are?

18       A. Certainly.

19       Q. That here was an unappealed, final

20    order, talking about the 2001 opinion now,

21    that found there was a conflict for a

22    second time that was there for a finding

23    that is subject to, perhaps, a collateral

24    estoppel rule and that you were dealing

25

1    with a man at that point who the judge said

2    had a conflict of interest that tainted the

3    debtor?  Did that concern you at that time?

4                    MR. KIPNES:  Objection to

5        the form of the question.  Go ahead and

6        answer it.  I won't get into a debate

7        with you as to the misstatement of the

8        law.

9                    MR. MILLER:  Objection.  It

10       misstates the opinion.

11                   MR. KIPNES:  Do you have the

12       gist of the question?

13                   (Question read back.)

14                   THE WITNESS:  It concerned

15       me not only at that time, but all

16       through this proceeding.

17   BY MR. LEVY:

18       Q. Did it concern you as you met

19   Crowley and talked to him on the phone that

20   the judge had found in the 2001 opinion

21   four or five times that she didn't believe

22   his testimony under oath?

23       A. I did not -- I don't think I

24   discussed that with him, no.

26

1      Q. Were you aware of it?

2      A. Of what the opinion said.

3      Q. Were you aware that Judge Walrath

4   found several times, four or five times,

5   that his testimony, she simply didn't

6   believe or that his conclusion was

7   incredible?

8      A. I can't say whether she found it

9   four or five times.  I know she raised that

10  question.

11     Q. Would you look at footnote 7 to

12  Judge Walrath's opinion.

13     A. The question is?

14     Q. Does that refresh your recollection

15  as to one time when she wouldn't credit his

16  testimony?

17             MR. GODNICK:  Objection.  I

18        don't think the judge's recollection

19        needs to be refreshed.  He indicated --

20             MR. LEVY:  Okay, fine.

21  BY MR. LEVY:

22     Q. Can you answer the question?

23     A. Well, that doesn't -- today's

24  reading doesn't refresh my recollection.

27

1    That was my impression right from the

2    beginning that she had a concern about his

3    testimony on whether he had advised the

4    directors.

5        Q. Did she, do you recall now, that she

6    also, and now look at page 15 where the

7    judge says "Crowley himself demonstrates

8    the insidious effect of that conflict when

9    he caused the debtors to pay in cash rather

10   than notes the 6.3 million dollar interest

11   payment due to Noteholders immediately

12   before the bankruptcy filing.  Crowley's

13   explanation that the payment was made to

14   maintain the Noteholders' support is

15   unconvincing."

16               MR. KIPNES:  What is the

17       question?

18   BY MR. LEVY:

19       Q. Did the fact that the judge found

20   his testimony under oath to be

21   unconvincing, perhaps, give you some

22   caution as to what he said to you might be

23   unconvincing?

24               MR. KIPNES:  Objection.

28

1      That is like saying --

2                  MR. LEVY:  The rule is, you

3      object to the form.  Let's stop with

4      that.

5  BY MR. LEVY:

6      Q. Would you answer.

7                  MR. GODNICK:  I would like

8      to understand the basis.

9                  MR. KIPNES:  I think taking

10     a quote out of context misstates what

11     the judge is saying.

12                 MR. LEVY:  Did I read it

13     wrong?

14                 MR. KIPNES:  No.

15     Unconvincing.

16                 MR. LEVY:  That's what I

17     said.

18                 MR. KIPNES:  Right.

19                 THE WITNESS:  Absolutely.

20                 MR. LEVY:  Same page.

21                 MR. KIPNES:  Can we

22     eliminate the commentary on the answers

23     to the questions if I can't comment on

24     the basis for my objection?

29

1              MR. LEVY:  Hush; be quiet.

2              MR. KIPNES:  Don't tell me

3      to hush.

4   BY MR. LEVY:

5      Q. On the same page, Judge Walrath

6   found that Crowley's assertion that he

7   preferred to pay cash rather than add the

8   amount to the debtors' different structure

9   is also incredible.  Do you see that?

10     A. I see it.

11     Q. Did that give some concern what

12  Mr. Crowley told you then in March and

13  anytime after that might be incredible?.

14             MR. GODNICK:  Objection to

15     the form.

16             THE WITNESS:  Well, when a

17     judge says that the explanation is

18     incredible, I don't think the judge is

19     quite saying that the person asserting

20     it is not telling the truth.  Maybe

21     that's true.  I think what the judge may

22     be saying is that that is not a

23     satisfactory explanation; and you and I

24     know in the course of oral argument, a

1       judge will say to the attorney "I think

2       that explanation to my question is not a

3       credible explanation."  The judge is not

4       saying to the attorney "I think you are

5       lying."  He is saying it's not very

6       convincing.

7   BY MR. LEVY:

8       Q. How about on the same page where she

9   says in commenting on some testimony, "We

10  quite simply do not believe that this --"

11  do you see that?"

12      A. I read that.

13      Q. Is that a suggestion that he was not

14  telling the truth?

15      A. When I read this opinion and when I

16  saw Mr. Crowley, I knew that I had to be

17  careful in talking with him and evaluating

18  his answers to questions that I posed.

19      Q. Why?

20      A. Because of what the judge had

21  written.

22      Q. Because that lead you to what

23  conclusion, that you couldn't believe him?

24      A. Not necessarily.  Because I like to

1    give people the benefit of the doubt.  It's

2    that -- given the statement of a federal,

3    official bankruptcy judge who expressed

4    concern that caused me to take that into

5    very serious consideration.

6        Q. And did you continue to take that

7    into serious consideration?

8        A. I did.

9        Q. And do you to this day?

10       A. I do.

11       Q. Do you think Mr. Crowley is an

12   honest man?

13       A. I do.  When you say "honest," did he

14   ever do something that may have been

15   improper?  I think he did.  This is an

16   instance of it.  Do I think that he lied to

17   me since I have known him?  I have no

18   occasion to believe that.  I don't think

19   that anything he has told me thus far

20   represents a lie.  Do I agree with

21   everything he has said?  Of course not.  He

22   is a salesman.  He is an executive and he

23   does what salesmen, lawyers, doctors,

24   housewives, anybody else does.  Sometimes

32

1    he exaggerates.  He sometimes puts his own

2    spin on an issue.  That doesn't quite get

3    into the area, as far as I'm concerned, of

4    credibility, but it might as far as you are

5    concerned.  I can't speak for you.

6        Q. Did the fact he filed an affidavit

7    in the Bankruptcy Court in which he said he

8    was receiving no compensation from Cerberus

9    for work on Coram cause you any concern in

10   light of Judge Walrath's finding, not

11   statement, but finding that, in fact, she

12   didn't believe that statement?

13       A. Well,  I think, we are really

14   repeating now what you have been asking me.

15   I have given you my best answer.

16       Q. I was asking you a question now

17   about the affidavit.  The others were about

18   what she said.

19       A. Yes.  I tried to make it clear in

20   answer to your various questions that I was

21   concerned, yes.

22       Q. Did you consider the fact that that

23   by itself was perjury in bankruptcy fraud?

24               MR. KIPNES:  Objection to

33

1      the form of the question.

2           THE WITNESS:  No, I did not.

3  BY MR. LEVY:

4      Q. Do you think you should have?

5      A. Did I independently say now that

6  must be perjury?  No, I did not say that.

7      Q. I said did you consider it?

8      A. Yes, of course.

9      Q. And you came to what conclusion as

10  to when you considered whether that was

11  perjury or bankruptcy fraud?  What

12  conclusion did you come to?

13      A. I came to the conclusion that we had

14  to be very, very careful in handling

15  Mr. Crowley.

16      Q. With respect -- that is not

17  responsive.  What conclusion did you come

18  to as to whether that was bankruptcy fraud

19  or perjury?

20           MR. KIPNES:  Asked and

21      answered.  It hasn't been answered.  Do

22      you want to go back about four

23      questions?

24           THE WITNESS:  I don't think

34

1       I can add anything to what I have said

2       on this.

3                MR. LEVY: I would like to,

4       if you can find it -- I really don't

5       believe it was answered.

6                MR. KIPNES:  He said he did

7       not independently look at them.

8    BY MR. LEVY:

9       Q. Did you consider -- think you said

10   you did consider whether that was fraud,

11   whether that was bankruptcy fraud or

12   perjury, didn't you?

13      A. I did not consider in a discrete

14   fashion that that specific point was

15   different from my other evaluation of

16   Mr. Crowley.  If I said that to you, I

17   would be misstating my statement of mind.

18   That was not my state of mind.  Let me add

19   that in approaching Mr. Crowley, I had, as

20   a backdrop of my discussions, the fact that

21   the judge had raised very substantial

22   questions.  My main concern in taking over

23   this assignment was to get this company out

24   of bankruptcy as quickly as I could.  That

35

1    was foremost in my mind.

2               What your questions are

3    doing today is making the item of

4    Mr. Crowley's credibility the foremost

5    consideration.  I have to tell you it was

6    not the foremost consideration that I had

7    in preparing him in approaching my job.  I

8    sought that my main responsibility was to

9    the Court and to the creditors, to the

10   equity people, to maximize the assets,

11   minimize the liabilities and to do it as

12   promptly as I could and that I was not

13   there as a prosecutor or in that type of

14   role.  Maybe I should have been.  I did not

15   perceive my job as such.

16               My discussions with the

17   bankruptcy Trustee did not indicate that.

18   When I had my interviews, that was not a

19   major issue. As a matter of fact, it was

20   not even discussed with the United States

21   Trustee.  The Trustee emphasized that there

22   were two factions opposed to each other and

23   that the reason that the Trustee had

24   recommended me was because of the

36

1   outstanding job I had done in New Era in

2   reconciling two factions or various

3   factions; and that was primarily the guide

4   that I used in approaching this matter.

5               Now, based on your

6   questions, perhaps, I should have said that

7   the main job that I had was to evaluate the

8   credibility of Mr. Crowley.  You may be

9   right, but I did not perceive it that way.

10      Q. Did you believe --

11      A. When you came in to see me shortly

12  after my appointment, you did not emphasize

13  this credibility point.  That's my

14  recollection.  You were very friendly and

15  you talked about the necessity of maximizing

16  the return to equity.  You told me that

17  there was tension between the equity

18  position and the Noteholders and you led me

19  to believe that I had to use my intelligence

20  and my experience in trying to resolve that

21  tension and to do it as promptly as

22  possible.  Maybe I misunderstood what you

23  were talking about.  I don't think so.  We

24  had a very cordial meeting, as you will

37

1    recall.  In the meeting, and I do not have

2    any recollection of your emphasis on the

3    credibility of Mr. Crowley.

4        Q. That meeting was accompanied by

5    Mr. Liebentritt on March 15?

6        A. Yes.

7        Q. Isn't it true that we spent a lot of

8    time at that meeting discussing the claim

9    and potential RICO claim that the Equity

10   Committee believed it had against Crowley

11   and the Noteholders and the fact that there

12   was evidenced in a motion that the Equity

13   Committee had filed some months before

14   seeking leave to file it?  Do you remember

15   that discussion?

16            MR. KIPNES:  I think that is

17       beyond the scope.  I will let him

18       answer.

19            MR. NEUWIRTH:  Objection to

20       the form.

21            THE WITNESS:  I remembered

22       that you or Mr. Liebentritt mentioned

23       that in passing.  There was no lengthy

24       discussion about that subject, no.

38

1    BY MR. LEVY:

2        Q. If Mr. Liebentritt were to testify

3    that he recalls specifically saying you

4    must remove Crowley, would you say he was

5    incorrect or simply that you have no

6    recollection?

7        A. I don't think he used any such

8    expression with me.  I think he said in

9    passing, "you ought to think about removing

10   Mr. Crowley."

11       Q. You do recall, of course, that on

12   many subsequent occasions the Equity

13   Committee asked you to remove Mr. Crowley?

14       A. I don't know whether I would say

15   many subsequent occasions.  On subsequent

16   occasions I do recall that.

17       Q. Let's get back to your statement

18   about what you understood your purpose was

19   to be.  Let me ask you this:  Immediately

20   after reading the opinion, which you did, I

21   think the time records show for 2.6 hours,

22   re-read opinion, right after March 7, did

23   you believe that Crowley at that time had a

24   conflict of interest?

39

1      A. At that particular moment?

2      Q. Yes.  Based on reading Judge

3  Walrath's opinion before you talked to

4  Crowley.

5      A. I don't know whether I could use the

6  word did I believe.  I thought it was a

7  problem.  I don't think I had a belief.

8      Q. Judge Walrath had found in her

9  opinion, didn't she, she had found that

10  Crowley had a conflict of interest?

11      A. Correct.

12      Q. Now, it's March 7 or 8 or 9, you

13  read the opinion, you have not talked to

14  Crowley.  Did you have any reason to

15  question Judge Walrath's finding that

16  Crowley had a conflict of interest?

17      A. I didn't question it, no.

18      Q. Okay.  Would it be fair to say, at

19  least at that point, that he had a conflict

20  of interest?

21              MR. GODNICK:   Is the

22          question whether as of March 7, that is

23          the date that you referenced, a conflict

24          existed or, rather, back in December at

40

1       the point --

2                    MR. LEVY:  March 7.

3                    MR. GODNICK:  -- when the

4       judge wrote her opinion that a conflict

5       existed?

6                    MR. LEVY:  When the judge

7       wrote the opinion March 7, 8 and 9

8       whether she believed there was a

9       conflict of interest.  I think he said

10      yes.

11                   MR. GODNICK:  As of that

12      date?

13                   MR. LEVY:  Yes.

14                   THE WITNESS:  I didn't form

15      that intent.  I didn't form that mens

16      rea at that point.

17      BY MR. LEVY:

18      Q. You did not?

19      A. No.  I think the mens rea that I

20      formed was, Judge Adams, there is a problem

21      here, you have to explore it.  I didn't

22      know whether he had resolved it.  I didn't

23      know what was going on.  I had just been

24      appointed.  The Trustee in bankruptcy or --

41

```
 1    there were two trustees at the meeting.

 2    They had emphasized something different

 3    with me:  The necessity of reconciling

 4    varying interests and to do it very

 5    promptly and to get on the job, so I

 6    didn't, I began forming beliefs.  That just

 7    is not what I was thinking of doing at the

 8    time.  I would mislead you if I told you

 9    otherwise.

10        Q. It says at the bottom of page 13 of

11    the opinion, last sentence, "This is an

12    actual conflict of interest as we concluded

13    at the first confirmation hearing."

14                You understood that to be

15    Judge Walrath's finding?

16        A. Yes.

17        Q. You had no reason to doubt at this

18    time, at that point?

19        A. No, I did not.  I don't doubt it

20    now.

21        Q. You don't doubt it now.  You think

22    he has got a conflict of interest now?

23        A. No.  As of the time she wrote it, I

24    think she was correct, absolutely.  I did
```

42

1    not know what the situation was on March 7

2    or when I met you and Don Liebentritt.  How

3    could I have known it?  I was just

4    appointed.  I just read these opinions and

5    I know you have a very high regard for me,

6    but I can assure you I don't have that type

7    of ability.

8        Q.  I do have a high regard for you.

9            When did, in your view, the

10   conflict of interest that you thought he

11   had, when did it go away?  When did it stop

12   being a conflict of interest?

13           MR. GODNICK:  Objection to

14       the mischaracterization of the witness's

15       prior response.  He didn't believe --

16       as of March 7, he believed a conflict of

17       interest existed.  He testified that in

18       December at the point in time that Judge

19       Walrath wrote her opinion there existed

20       a conflict of interest.

21           THE WITNESS:  I thought it

22       was dissipated when I went out and

23       talked to Dan Crowley.

24   BY MR. LEVY:

43

1      Q. What did he say to you that

2   dissipated that conflict?

3      A. I thought he told me that he had

4   terminated all contractual arrangements

5   with Cerberus; that the only thing that

6   remained was his claim against them for

7   large sums of money.  I really didn't

8   address that.  It was none of my concern.

9      Q. When he told you that, Mr. Adams,

10  did he show you any documents?

11     A. No.

12     Q. Did you ask him how he went about

13  terminating his relationship with Cerberus?

14     A. I don't recall doing that.  But I do

15  recall when I came back to Philadelphia, I

16  discussed this matter at considerable

17  length with Mr. Bressler, my counsel.

18     Q. In order to get what kind of advice

19  from him?

20     A. What kind of advice did he give me?

21             MR. KIPNES:  No.

22  BY MR. LEVY:

23     Q. What kind of advice were you trying

24  to get from him?

44

1              MR. KIPNES:  I will help

2       you, Richard.  Don't -- then, I will

3       instruct him not to answer when you ask

4       him the question.

5              THE WITNESS:  Give me that

6       question.

7              MR. KIPNES:  What kind of

8       legal advice were you seeking?

9    BY MR. LEVY:

10      Q. I said what kind of advice were you

11   seeking from him?

12             MR. KIPNES:  You are

13      correct, I'm sorry.

14             THE WITNESS:  I was seeking

15      his guidance as to what to do in this

16      situation.  He was very well aware of

17      the opinion.  He discussed it with me a

18      number of times.  I told him of my

19      meeting in Denver.  And the question was

20      should we terminate the contract at that

21      time?  That's my best recollection.  I

22      would have to talk to him, but. . .

23   BY MR. LEVY:

24      Q. Were you asking for his business

45

1    advice as to whether this was a good or bad

2    thing to do in part, at least?

3        A. I believe in part, yes.  In part.

4        Q. What did he say in the part where

5    you were seeking his business advice?

6        A. My recollection is that Barry

7    Bressler said this is a matter we have to

8    keep very much in mind.  As we go forward,

9    it's one of the factors that you will have

10   to weigh in whether you want to go forward

11   with Dan Crowley.

12       Q. Did you at or about that time -- did

13   Mr. Bressler tell you you ought to see the

14   documents that evidence the termination, if

15   there were any?

16       A. I can't recall that he said that.  I

17   assume that he had reviewed the documents.

18       Q. What documents?

19       A. Whatever documents there may be.

20       Q. Are you aware that there were any

21   documents at that time or were you then

22   aware that there were documents that

23   terminated the relationship?

24       A. I can't say.  I can't recall that.