46

1          Q. Did you call up anybody from

2     Cerberus and say I hear you terminated the

3     relationship, is that true?

4          A. I never called anybody from Cerberus.

5          Q. What about their lawyer?

6          A. We talked, I think, to their lawyers

7     about the conflict on a number of occasions.

8          Q. Who is "we"?

9          A. I did.  Mr. Bressler, maybe

10    Mr. Kipnes, I'm not sure.  But I remember

11    discussing the conflict issue with them.

12         Q. In March of 2002, did you discuss

13    with anybody from Cerberus, that lawyer or

14    anybody else, whether Mr. Crowley's

15    statements, statement to you that the

16    relationship had been terminated, was true?

17                    MR. KIPNES:  Contractual

18         relationship was his testimony.

19                    THE WITNESS:  You mentioned

20         March.  I cannot recall when I first

21         talked to counsel for Cerberus, except

22         to say that just as you had called me

23         after my appointment, their attorneys

24         called and asked for the opportunity to

47

1     come in and speak with me.  We granted

2     them that opportunity.  They came in.  I

3     think Mr. Bressler was there.  Maybe

4     someone else from my office was there

5     and we talked about the conflict

6     problem.  My recollection is that they

7     either said or indicated that that

8     matter had been resolved.  I did not ask

9     them at that time to show me a document.

10     Q. You said that matter had been

11   resolved.  Did you ask them whether the

12   relationship between Cerberus and Crowley

13   had been terminated?

14     A. I think we did, yes.

15     Q. What did they say?

16     A. I think it was pretty much what Dan

17   Crowley said that that relationship no

18   longer existed, except that Crowley had a

19   claim for compensation.

20     Q. Was it your understanding they were

21   talking about all relationships between

22   Cerberus and Crowley?

23     A. No.  I can't say that I emphasized

24   the word "all."  I didn't know that there

48

 1    was anything beside Coram.  I couldn't ask

 2    that.

 3         Q. Do you know that now?

 4         A. I think there were some.

 5         Q. When did you learn that?

 6         A. I guess as this matter unfolded.

 7         Q. Did you ask -- tell me who told, who

 8    from who, representing Cerberus, told you

 9    that the matter had been resolved?

10         A. I can't recall the name of their

11    attorney who came in.

12         Q. Did you ask that person or did you

13    ask anybody from Cerberus whether the

14    $80,000 a month payments were being

15    continued in March?

16         A. Well, we didn't ask about 80,000

17    payments.  We asked whether there was any

18    compensation.  I did not know about -- I

19    don't think I knew at that time

20    specifically about 80,000 per month.

21         Q. Mr. Adams, this opinion by

22    Judge Walrath is full of $80,000.

23         A. Well --

24         Q. Is it your testimony you didn't pay

49

1    attention to that?

2                   MR. GODNICK:  Objection.

3                   THE WITNESS:  That is not my

4         territory.  You are asking me what I

5         recall of the meeting.  That's the best

6         I can do for you.  I can't make up

7         things to answer your question.  I can

8         only tell you what my recollection is.

9    BY MR. LEVY:

10        Q. Do you have the emphasis in

11   Judge Walrath's opinion on these payments

12   of $80,000 a month -- did you not consider

13   them important to ask Cerberus whether they

14   were still paying $80,000 now a month?.

15                  MR. GODNICK:  Objection.

16                  THE WITNESS:  I thought we

17        were asking whether there was any

18        compensation.  I don't think I stopped

19        at the 80,000.

20   BY MR. LEVY:

21        Q. They told you?

22        A. My impression was they told me that

23   there were no current payments being made,

24   but there was this obligation to pay

1   something for past services.

2       Q. Cerberus told you that?

3       A. Yes.

4       Q. For past service rendered by Crowley

5   to Coram?

6               MR. KIPNES:  Objection to

7       the form.

8               MR. GODNICK:  Objection.

9   BY MR. LEVY:

10      Q. For past service rendered by Crowley

11  to Cerberus in connection with Coram?

12              MR. KIPNES:  Objection.

13              MR. GODNICK:  Objection.

14              THE WITNESS:  I didn't know

15      what the past services were.

16  BY MR. LEVY:

17      Q. You didn't ask?

18      A. I knew that he had been advising

19  Cerberus on various other matters that

20  Cerberus had.  That's what I thought they

21  were talking about.

22      Q. Did he tell you that, did Crowley

23  tell you that Cerberus was his principal

24  client?

51

```
 1              MR. KIPNES:  Objection to
 2       the form of the question.
 3              THE WITNESS:  I don't recall
 4       him saying Cerberus is my principal
 5       client, no.
 6  BY MR. LEVY:
 7       Q. In your view, if you thought that
 8  Crowley had a continuing conflict of
 9  interest, but that he was doing a really
10  good job with Coram, that he could bring
11  this matter to a conclusion, would it have
12  been your judgment to keep him on?
13       A. No.  That would not have been my
14  judgment.
15       Q. So, by the time you decided to keep
16  him on, you had come to a clear view that
17  there was no conflict of interest?
18       A. Well, I really never decided to keep
19  him on as such.  It was moving forward in
20  the hopes that we could reach a pretty
21  quick resolution of this.  I don't think I
22  ever said to myself or to my counsel, "I
23  want you to understand, Mr. Bressler, I
24  made a decision to continue this."  I have
```

52

1    never made that judgment.

2        Q. Didn't you permit Mr. Crowley to

3    tell all of his employees at the end of

4    March that things were going to continue as

5    before?  That he was going to be the CEO?

6    Nothing was going to change?

7        A. Did I permit Mr. Crowley to tell his

8    people that?  I don't think I permitted him

9    to tell his people that, unless you are

10   talking about the general situation at

11   Coram.

12               I did assure the executives

13   that their situation would continue as in

14   the past.  I had to give them that

15   assurance or else I probably would have run

16   the risk of losing them or hurting their

17   morale, but I don't recall saying that

18   Mr. Crowley is going to continue indefinitely

19   as in the past.

20       Q. I didn't say indefinitely.  Did you

21   tell, permit Mr. Crowley to tell his

22   employees that he was going to continue

23   operating the company in the past?

24               MR. BEATIE:  Objection.

53

1     This is another example of your --
2            MR. LEVY:  Mr. Beatie, the
3     rules require if you object, you object
4     to the form.
5            MR. BEATIE:  I would prefer
6     you preserve this for the courtroom so
7     somebody can appreciate your
8     cross-examination skills instead of
9     wasting the time of ten lawyers while we
10    watch you.
11   BY MR. LEVY:
12    Q. As he said in the past
13    A. I don't know what you mean by the
14   word "permit."  I didn't say to Mr. Crowley
15   now you go ahead and tell that to your
16   employees, no.  I did say to the employees
17   in the meeting room when we were all
18   together, that "Until further notice, we
19   are going to continue as we have."  I don't
20   think the emphasis was on Crowley.  The
21   emphasis was on operations.
22            I imagine that Mr. Crowley
23   wanted to create the impression on his,
24   certainly, his executive staff, that there

54

1    would not be a disruption.  As a good

2    executive, I would understand that, but I

3    never gave him any assurance.

4         Q. You are sure of that, sir?

5         A. Am I sure?  When you say gave him

6    assurance in writing or anything, yes, I

7    never gave him any assurance in writing.  I

8    can't recall any.  Maybe I did.  If you

9    have a document, show it to me.  Maybe it

10   will refresh my mind.

11        Q. I do.

12                (Trustee-4, an E-mail,

13        marked for identification.)

14   BY MR. LEVY:

15        Q. This is a document, Trustee 6465

16   with the Bates number through 68.

17        A. This is from Kurt Davis to me.

18        Q. Do you know who Kurt Davis is?

19        A. One of those gentlemen at the

20   meeting.  I don't know anything more than

21   that.

22        Q. Does it refresh your recollection

23   that in this message, Mr. Davis is passing

24   along requests that you review a letter

55

1    that he intended to send to Coram employees?

2        A. It does.

3        Q. And is that your handwriting at the

4    bottom of that page that says, "Your letter

5    of March 26 is fine"?

6        A. No, it is not.

7        Q. Do you recall telling someone to

8    tell Mr. Crowley that the letter of

9    March 26 was fine?

10       A. No.

11       Q. Look at page 6466.  Tell me who

12   Margaret Kalalian is?

13       A. That is my secretary.

14       Q. And would you read to me what she

15   says in the message to "Dear Mr. Davis"?

16       A. "Judge Adams said that your letter

17   of March 26 is fine."

18       Q. Will you agree with me now that you

19   said the March 26 letter was fine?

20       A. Would I agree with you now that the

21   March 26 letter --

22       Q. That you told Mr. Davis that the

23   letter, the proposed letter of March 26, is

24   fine?

56

1       A. No, I did not tell Mr. Davis that.

2       Q. Did you tell Miss Kalalian to tell

3   Mr. Davis that?

4       A. I may have said something to that

5   effect.  I cannot recall what I told her.

6       Q. Do you think she made a mistake when

7   she passed that along?

8       A. I can't say that.  I can't recall

9   what I told her.

10      Q. Do you think it likely that your

11  secretary was reporting accurately what you

12  told her to tell Mr. Davis?

13      A. She could have.  I could have said

14  something to the effect I have no objection

15  or something like that.  I can't recall

16  that.  That is along time ago, March 26.

17      Q. How long has Miss Kalalian been your

18  secretary?

19      A. A few years.

20      Q. Is she reliable?

21      A. I think so.

22      Q. Therefore, isn't it likely that you

23  did tell her to pass along --

24      A. It's possible, but I don't recall

57

1    it.

2        Q. Let's look now at the draft letter

3    of March 26, Trustee number 6467 and 8.

4    This was a letter in which Mr. Crowley in

5    the fourth paragraph, the second sentence

6    beginning "Judge Adams"--

7        A. Yes.

8        Q. "Yesterday we had our first meeting

9    with Arlin Adams."

10                MR. GODNICK:  I don't think

11            it's necessary to read it into the

12            record.

13    BY MR. LEVY:

14        Q. Thank you.  I would like to do it.

15    "Yesterday we had our first meeting with

16    Arlin Adams."  And it goes on to say, "you

17    spent the afternoon with us," and then it

18    says, "Judge Adams was complimentary of the

19    work all you have been doing to stabilize

20    and strengthen Coram."  Is that true?  Were

21    you complimentary?

22        A. I was.

23        Q. "He has asked me to continue

24    operating the company in my present role,

58

```
 1    reporting to him in essentially the same

 2    manner as I reported to Coram's board of

 3    directors."

 4                    Is that statement correct?

 5    Did you ask Mr. Crowley to continue

 6    operating the company in his present role?

 7        A. More or less words to that effect.

 8    That is not my language.  But something to

 9    that effect.

10        Q. And this is the letter that you may

11    have given him approval to send?

12        A. I don't know whether I gave him

13    approval.

14        Q. Well, I'm talking about as indicated

15    by Miss Kalalian's "Judge Adams says this

16    is fine" message.

17        A. Yes.

18        Q. Pardon?

19        A. That's right.  You have to

20    understand the context of this entire thing.

21    You see, you look at this proceeding and

22    you may be right.  Judge Walrath may say

23    that Mr. Levy's approach here is the

24    correct approach and what you did Judge
```

59

1    Adams is wrong.  That is not the way I saw

2    my assignment.  I wanted to keep this

3    company together and functioning so we

4    could get it out of bankruptcy.  What

5    you're trying to do here is, by these

6    questions, is to engage in a verbal,

7    legalistic battle with me.  If you wish to

8    do that, you're probably right legally.  If

9    you wish to run a company, you are clearly

10    wrong legally.  And that's where you and I

11    are not seeing it the same way and you

12    didn't see my assignment the way I did.  I

13    can understand why you are here spending a

14    lot of time, a lot of money, a lot of the

15    creditor's money arguing these points.

16    That was not my point of view.  If that's

17    what the Court wants and if that's what the

18    Trustee wants, I will gladly step down

19    because that's not what I saw my assignment

20    to be.  That's not why I accepted it.

21                    Now, you have to use that

22    context in evaluating the questions or my

23    answer to your questions.

24        Q. Well, Mr. Adams, I will ask you some

60

1    more questions that will make my point of

2    view clearer.

3                On March 7 you get

4    appointed.  You read an opinion which

5    clearly says there is a conflict of

6    interest.  Tell me if I'm saying anything

7    wrong about your testimony.

8        A. We have gone over this this morning.

9    Yes, that's right.

10       Q. You go out and Mr. Crowley says to

11   you, the contract has been terminated, the

12   agreement has been terminated, my

13   relationship has been terminated.  You

14   don't ask for documents, you don't verify

15   it and now on March 26 --

16               MR. BEATIE:  Are you

17       assuming or cross examining or

18       interrogating?  I object to this.  I

19       object to having to pay for it.

20   BY MR. LEVY:

21       Q. On March 26, you permit Mr. Crowley

22   to write a letter saying he is going to

23   continue operating the company in its

24   present role, is that correct?

61

```
1              MR. KIPNES:  Objection to
2         the form.
3              MR. GODNICK:  Objection to
4         the form.
5              THE WITNESS:  I think what
6         it says, it says.  I think I have
7         explained why I permitted him to send
8         the letter out.  I could have stopped
9         the letter.  I don't think I approved
10        the letter.  I don't think I said it was
11        a fine letter.  It's not the letter I
12        would have written, but it's not a legal
13        brief and that's the thing you don't
14        seem to understand or don't want to
15        understand.  I think it's because you
16        don't want to understand it.  I think,
17        looking back over our relationship over
18        the past many months, that has been the
19        problem.  You look at it not for what is
20        in the best interest of Coram; you look
21        at it as to what is in your best
22        interest.  I can understand that.  I
23        disagree with it.  I'm disappointed in
24        it, but I can understand it.  You can't
```

1        understand what I have done or what I

2        have said with that point of view.

3        There is no way you can understand it.

4    BY MR. LEVY:

5        Q. Thank you.

6             Mr. Adams, on March 25 or

7    March 26, had you come to believe in your

8    heart that there was no longer a conflict

9    of interest on Crowley's part?

10             (Multiple objection by

11        counsel.)

12             MR. BEATIE:  At least number

13        three; probably number five.

14             THE WITNESS:  I have tried

15        to explain that I recognize that Judge

16        Walrath believed properly so that there

17        was a conflict.  I have no objection to

18        that.  I don't question that.  When I

19        went out there, I thought that there was

20        a problem.  I was concerned.  I

21        discussed it with my counsel.  I did

22        discuss it with Mr. Crowley.  I took his

23        answers and brought them back and

24        discussed it further with my counsel.

63

1       Was this the only thing in my mind?  Of

2       course not.  That's not why I was

3       appointed to be the Trustee.  My job was

4       to make sure that this company could

5       continue in a viable way.  That was

6       upper most.  In order to protect the

7       interest, not of myself, it didn't

8       protect me, it would have protected the

9       interest of the creditors, equity

10      committee, Noteholders also.  That was

11      uppermost.

12           You have to understand my

13      answers in that context or you don't

14      understand them.

15    BY MR. LEVY:

16     Q. Mr. Adams, how would it protect the

17   interest of the equity holders if

18   Mr. Crowley had a conflict of interest in

19   which his duty of loyalty was no longer to

20   the equity holders, but was to a principal

21   creditor?

22           (Multiple objection.)

23    BY MR. LEVY:

24     Q. In March.

64

1        A. I never perceived that Mr. Crowley

2    was operating in order to help Cerberus or

3    Goldman or whoever these creditors were.

4    My perception was that he was operating

5    this company as effectively as he could

6    have been at the time under the

7    circumstances.  The figures supported that.

8    My interviews with the executives supported

9    that when I went out into the field.

10        Q. We are in March, still in March.

11        A. Yes.  That's when I had these

12    interviews with the executives.

13        Q. Are you aware that Judge Walrath in

14    her opinion made a finding of fact that

15    everything, that nothing Crowley did would

16    have been without, without unduly

17    considering the interests of Cerberus?

18        A. At that time, yes.  I am concerned.

19    I was concerned.

20        Q. Were you concerned when you went out

21    there in March?

22        A. Certainly.  I wouldn't have had the

23    discussion with them.

24        Q. Were you concerned when you let him

65

1   send out that letter saying he was going to

2   operate the company the same as he had done

3   before?

4               MR. GODNICK:  Objection to

5     the form of the question.

6               MR. KIPNES:  Objection.

7               THE WITNESS:  Was I

8     concerned?  I was not thinking of the

9     conflict issue.  What he was doing was

10    sending this letter to his people.  They

11    were not involved in the conflict.  He

12    was trying to give them assurance,

13    ladies and gentlemen, keep working as

14    you have, things are going well.  He

15    wasn't getting into conflicts.

16  BY MR. LEVY:

17    Q. He was saying Judge Adams asked me

18  to continue operating the company in my

19  present role in, essentially, the same

20  manner as I reported to Coram's directors?.

21              MR. BEATIE:  Number 4.  I

22    object to the continued repetition.

23             THE WITNESS:  I don't think

24    I could add very much more.  I can't

66

```
1        give you what is not there.  I told you
2        what motivated me and what was foremost
3        in my mind in approving that letter.
4        And, as it turned out, it has worked
5        pretty well.  The executives have
6        stayed.  The customers have stayed.  The
7        sales have gone up.  The EBITDA has been
8        pretty good.  Cash flow has been pretty
9        good.  I thought I was doing exactly
10       what the Court wanted me to do and the
11       Trustee wanted me to do.  If I'm wrong,
12       I'm perfectly willing to step down.
13                I think you are taking a
14       point of view that is different from the
15       point of view that I have taken.  I
16       respect it, but we disagree.
17   BY MR. LEVY:
18       Q. Can you exclude the possibility,
19   sir, that with someone else operating it,
20   you didn't have possibly a conflict?  That
21   the company might have done even better?.
22                MR. GODNICK:  Objection to
23       the form of the question.
24                THE WITNESS:  I did not
```

67

1      exclude that possibility.

2      Q. Do you exclude it now?

3      A. No.  I have discussed that matter

4    time and time again with the experts that I

5    have had, with my counsel, and with other

6    people in the field who have made offers

7    for the company as a matter of fact, parts

8    of the company, and I have not found

9    anyone, frankly, beside yourself and your

10   colleagues who have criticized Mr. Crowley.

11   I took that very seriously.

12              I spent a lot of time with

13   Don Liebentritt when he came at least once

14   to talk to me about it and I have talked to

15   you about it and, you know, you and I have

16   talked on the phone many times.  Don has

17   talked on the phone many times.  I took

18   your concerns very seriously.  I had to

19   make a critical decision.  Was I wrong?  I

20   don't think so.  If the Court thinks I was

21   wrong, I will step aside.  If the Trustee

22   thinks I was wrong, I will step aside.

23              I wrote a letter, an interim

24   letter to the Trustee telling him exactly

68

1    what was happening.  I never got a response

2    indicating that they were unhappy about it.

3    The Court has never indicated that they

4    were unhappy.  The only unhappiness has

5    been on primarily on the part of you and

6    Don Liebentritt.  You may be right.

7        Q. Tell me about that.  Why do you

8    think I might be right.

9                MR. GODNICK:  Objection to

10        the question.

11                THE WITNESS:  You believe

12        that because of Mr. Crowley's

13        relationship either in the past or

14        present that he does not operate the

15        company as effectively as somebody else

16        might.

17   BY MR. LEVY:

18        Q. That is not our position here.  I

19   believe that Mr. Crowley has a continuing

20   conflict of interest whether he is

21   operating it, sir, effectively or not.

22                MR. MILLER:  Objection.  You

23        are making a speech.

24                MR. LEVY:  This is a

69

```
 1      predicate to a question.  Whether he is

 2      operating it effectively or not may well

 3      be determined at some future time.

 4   BY MR. LEVY:

 5      Q. I'm trying to find out your views

 6   about when he stopped having a conflict of

 7   interest.  I have not yet --

 8              MR. KIPNES:  Objection to

 9      the form of the question.  If you are

10      going to call him Mr. Adams, do not ask

11      him questions that call for a legal

12      conclusion.  That question does and it

13      comes from an erroneous, legal

14      predicate.  I can talk louder if you

15      like.

16              MR. LEVY:  Let's take a

17      break.

18              (Recess taken, 11:05 a.m.)

19              (Resumed 11:12 a.m.)

20   BY MR. LEVY:

21      Q. Mr. Adams, is it correct that on

22   March 26 or about that day you directed

23   Mr. Crowley to continue operating Coram on

24   a day-to-day basis, except that you,
```

1     Mr. Adams, are now to be considered the

2     board?

3         A. I don't know about the word directed

4     him. I don't think I did that. That is

5     not my style. It would be unusual for me

6     to direct anybody to do anything. But, I

7     told him that until further notice, I would

8     expect him to continue operating the

9     company as he has in the past.

10                 MR. LEVY: Let's mark as

11             Exhibit 5, a letter dated March 26

12             directed to you by Mr. Crowley bearing

13             Bates number 4161 through 71.

14                 (Trustee-5, a letter dated

15             March 26, 2002, marked for

16             identification.)

17     BY MR. LEVY:

18         Q. Take a moment and read that.

19         A. I have seen it.

20         Q. Do you notice that Mr. Crowley on

21     that date March 26, that was the day after

22     your meeting with him in Denver, correct?

23         A. Correct.

24         Q. He says, "As you have directed, it

1    is my understanding that I am to continue

2    operating Coram on a day-to-day basis,

3    except that you are now to be considered

4    the 'board.'"

5                    Did you, in substance, tell

6    him that?

7         A. I didn't direct him.  I said why

8    don't you continue doing what you are doing

9    unless I tell you otherwise?  Knowing my

10   own style, I don't direct anybody to do

11   anything.

12        Q. On July 12 -- this is a letter which

13   we will mark Exhibit 6, Trustee number 6445

14   and 46.

15                    (Trustee-6, a letter dated

16        July 9, 2002, marked for

17        identification.)

18   BY MR. LEVY:

19        Q. You will notice there is a copy

20   shown to you, Mr. Adams.

21        A. I do notice.

22        Q. Do you remember reading that letter?

23        A. I think I recall this letter, yes.

24        Q. This letter comes from Mr. Crowley's

72

1    lawyer, Scott Schreiber.

2        A. Yes.

3        Q. He says in the second paragraph,

4    "Since the Trustee'S appointment,

5    Mr. Crowley's responsibilities have

6    remained virtually unchanged.  Over the

7    past four months, the Trustee has relied

8    extensively on Mr. Crowley to operate Coram

9    on the Trustee's behalf, just as

10   Mr. Crowley operated Coram prior to the

11   Trustee's appointment."  Is that statement

12   correct?

13       A. No, I don't think that is a correct

14   statement.

15       Q. In what way is it incorrect?

16       A. When he says "just as he did prior

17   to his appointment," I would not say, I

18   would not use the word superbly.

19       Q. Just the first two sentences.  We

20   will get to superbly in a moment.

21       A. I don't think "extensively" is the

22   right word.  This is a lawyer's letter.

23   This is an advocate's letter.  You can't

24   put his words in my mouth.

1     Q. I'm not trying to.  Let's break it

2  down.  Is it a correct statement that since

3  you were appointed, his responsibility

4  remained virtually unchanged?

5     A. I think that's true.

6     Q. Is it also correct that over the

7  past four months, backwards from July, you

8  relied extensively on Crowley to operate

9  Coram on your behalf?

10    A. I relied on him.  I wouldn't say

11 extensively.  I relied on him with our own

12 safeguards.

13    Q. Is it correct that you relied on him

14 to operate it just as he had operated Coram

15 prior to your appointment?

16    A. That's what I started to say.

17    Q. What is incorrect?.

18             MR. MILLER:  Allow the

19     witness to complete his answer.

20 BY MR. LEVY:

21    Q. Did you complete your answer?

22    A. No.  What I was trying to say, it

23 was a different operation than his prior

24 operation.

74

1      Q. How was it different?

2      A. Because I was in charge.  He was not

3    in charge.

4      Q. What were you in charge of?

5      A. Of everything.

6      Q. How did you go about --

7      A. I think what he is talking about,

8    what I delegated to him was his dealing

9    with customers and his executive staff,

10   whatever the official name was.  That I did

11   not want to disturb because I thought it

12   would detract from the successful operation

13   of the business.  But the legal and

14   financial matters, I did not delegate to

15   him.  They were my responsibility.

16     Q. What about the operation of the

17   business?

18     A. The day-to-day operation, yes, he

19   had day-to-day operation.

20     Q. You have said that there was some

21   safeguards.  What were the safeguards?

22     A. I had to approve any important

23   contract, any bonuses, things of that sort,

24   any long-term contracts, the IRS matter,

75

1    the Price-Waterhouse matter, anything of

2    that sort.

3        Q. Go ahead.

4        A. He didn't have any discretion over

5    those.

6        Q. Wasn't that true before?  Didn't he

7    have to -- wasn't it your understanding

8    that he had to get approval from his board

9    of directors prior to your appointment for

10    items?

11        A. I don't know that.  I don't know.

12        Q. To the extent this statement was

13    incorrect or partially incorrect, did you

14    make any effort to convey back to

15    Mr. Schreiber that this is wrong, this is

16    not what I understand?

17        A. The letter was not addressed to me,

18    so I wouldn't have corrected it.  If I

19    start correcting all the letters that I

20    receive in connection with this matter,

21    that's all I would be doing.  I didn't see

22    that as my job.  You, apparently, think

23    that that was my job.  You may be correct.

24    Perhaps, the Trustee will agree with you.

76

1      Perhaps, the Court will agree with you.  If

2      they do, I will step down.  That is not the

3      role I accepted.  I'm not, at my age, going

4      to parse letters from the attorneys for

5      Mr. Crowley or from you or from your

6      esteemed colleague.  I'm not in that

7      business.  That's not the role that I

8      accepted.  If what you are trying to

9      demonstrate here is that I should have done

10     that, if you show that to the judge and she

11     agrees with you, fine.

12         Q. Did you --

13         A. I have no desire to remain.

14         Q. Did you ask Mr. Bressler to --

15         A. We are not going to ask Mr. Bressler

16     to answer lawyers' letters and make

17     corrections to those letters.  I would not

18     use the creditors money to do that.  I

19     think that's an improvident way to spend

20     the creditors' money.  You think it's the

21     right thing to do.  God bless you.  You may

22     be right.

23         Q. Further in this letter that you have

24     in front of you, it looks like the fact

1   Mr. Crowley's troubled or his lawyers

2   troubled by the fact that you have not

3   approved his performance-based incentives.

4   Why hadn't you at that point approved his

5   performance-based incentives?

6       A. Because I don't think I had an

7   adequate opportunity to observe them.

8       Q. In July?

9       A. I didn't think it was in order, yes.

10      Q. What more at that point did you

11  think you needed to know to get that

12  adequate opportunity?

13      A. I can't tell you that.  I didn't

14  think four months was a long enough period.

15  I didn't think that I was in a position at

16  that time to approve incentive payments.  I

17  was not that sure of what we were going to

18  do.  I tried to say this several times now.

19  I will say it one more time.  I did not

20  perceive that as my job.  I thought that

21  the Trustee wanted me to do that; or if the

22  Court expected me to do that, I would not

23  have accepted this job.  That is not what

24  the Trustee told me.  Therefore, you are

78

1   trying to get me to evaluate all of these
2   documents through your lens. I can't do
3   that. That is not what I was about.
4       Q. You did approve incentive bonuses at
5   that time to other executives?
6       A. That's right. That was in line with
7   keeping the company intact so it could be
8   saleable or viable for the benefit of
9   creditors. That was my pulstar. Your
10  pulstar seems to be correcting legal
11  statements from attorneys. I didn't see it
12  that way.
13      Q. If you wouldn't tell me what I
14  think, I'm asking the questions.
15      A. Your questions indicate that.
16      Q. You said that one of your safeguards
17  was to approve or disapprove important
18  contracts, for example, correct?
19      A. Important?
20      Q. Contracts.
21      A. Yes.
22      Q. That was?
23      A. Yes.
24      Q. Let me ask you this: You have no

79

1    personal experience in the health care

2    business, do you?

3         A. I do, yes, considerable.

4         Q. What was your experience in the

5    health care business?

6         A. Well, let me start out by saying

7    that as a young lawyer, I was appointed by

8    the Court to supervise a home for

9    incurables.  After spending a year doing

10   that, I reached the conclusion that we

11   ought to make it a rehabilitation hospital.

12        Q. What year was this, sir?

13        A. Probably 1960.

14             It has become one of the

15   leading rehabilitation hospitals in the

16   United States.  As a result of that, the

17   governor of Pennsylvania appointed me to be

18   Secretary of Health and Welfare of

19   Pennsylvania in 1963, a job that gave me

20   supervision of all the hospitals in

21   Pennsylvania.  In the course of that job, I

22   actually visited every hospital in

23   Pennsylvania.

24             After I terminated my duties

80

1    in that regard, I returned to Philadelphia.

2    I did not go back to Moss because while I

3    was the secretary, I had certain

4    transactions with Moss.  I thought it was

5    better not to do that and I went to another

6    institution known as the Einstein Medical

7    Center; eventually became the chairman of

8    the board of that institution.

9              I was appointed by the mayor

10   of Philadelphia as a member of the Hospital

11   Study Commission that supervised the

12   construction and addition of any new

13   hospitals in the area.  So, for a long time

14   now I have been kind of associated with the

15   industry.

16       Q. Were you ever a director, officer of

17   a for-profit health care company?

18       A. Yes.  While I was chairman of

19   Einstein, there was a period, let me see if

20   I can give you dates, in which it became

21   the practice in the United States for the

22   nonprofits to create a series of profit

23   hospitals and Einstein at that time -- I

24   did about four of them.  So, I had that

81

```
 1    experience.
 2        Q. What years?
 3        A. Roughly, in the eighties.  1980.
 4    Then, I also had a major role in the Oxford
 5    Hospital which was a profit hospital.  It
 6    has since been absorbed by one of the big
 7    hospitals here.
 8        Q. The last time you were involved with
 9    a for-profit health care venture was in the
10    '80's?
11        A. No.  I don't think that is right.
12    That would have been into the, maybe, the
13    early  '90's.  I'm not sure of the exact
14    date.
15        Q. Can you give me an approximation of
16    the number of important contracts that were
17    presented to you for decision?
18        A. Here in Coram?
19        Q. Yes.
20        A. I think we had a rule that anything
21    over $50,000 I had to approve or that any
22    continuing contract and any contract
23    dealing with pharmacies, except
24    pharmaceutical supplies, that Coram was
```

82

1   using on a day-to-day basis, we had a

2   protocol.

3       Q. And did you actually, yourself, then

4   examine each of those contracts that fell

5   within that protocol?

6       A. Yes.  They were brought into me

7   almost weekly, periodically.

8       Q. Who brought them into you?

9       A. A gentleman in this office.  I don't

10  recall his last name.  His first name is

11  Joe.  Joe Devine.

12      Q. Did they come in with a recommendation

13  from Mr. Crowley to be approved?

14      A. I don't know that it was a

15  recommendation as it was a recommendation

16  of Mr. Marabito.

17      Q. Did you ever return a request?

18      A. We did, yes.

19      Q. Which ones?

20      A. I can't recall.

21      Q. Which ones?

22      A. There are scads of these contracts

23  that came in every week.  I can't tell you.

24  I would send them back and say I want some

83

1    more information.

2        Q. Did you ever look to any source,

3    other than the company, whether it's

4    Crowley, Marabito or someone else, for

5    advice in deciding whether you should or

6    should not approve these contracts that

7    fell within the protocol?

8        A. Yes.  I remember having at least an

9    hour discussion out in Denver on two

10   occasions regarding the purchase of

11   software and technical material that was

12   being used extensively.

13       Q. With who?

14       A. I can't tell you the name.

15       Q. What role?

16       A. He was in charge of that.

17       Q. At Coram?

18       A. Yes.

19       Q. My question was:  Did you ever

20   consult anyone who didn't work for Coram,

21   an outside advisor, for example, as to

22   whether a particular contract should or

23   should not be approved?

24                MR. GODNICK:  Objection.

84

```
 1        The questions go beyond the limited
 2        scope of this deposition.
 3                THE WITNESS:  On the renewal
 4        of the contract, which is the matter, I
 5        guess, that is under consideration
 6        here --
 7   BY MR. LEVY:
 8        Q. Renewal of which contract?
 9        A. Of Crowley's contract.  We talked to
10   the investment bankers, talked to two of
11   them.
12        Q. I'm talking about business contracts
13   that came to you because they fell within
14   the protocol.  My question is:  Did you
15   ever consult anyone, other than an employee
16   of Coram, with respect to your decision as
17   to whether you should approve, not approve,
18   or question those contracts?
19        A. I can't recall doing that.
20        Q. What is Mr. Crowley's salary, do you
21   know?
22        A. Say that again.
23        Q. What is his salary?
24        A. Well, I can tell you his yearly
```

85

1  salary. We can break it down into months.

2     Q. How much?

3     A. It has been $650,000 a year. We can

4  divide that by twelve and get a monthly

5  amount. That's what it was when I took

6  over. I did not give him any increase.

7     Q. Prior to the hiring of the

8  investment banker, SSG and EMG --

9          MR. KIPNES: EMB.

10  BY MR. LEVY:

11     Q. --which was, I believe, in October

12  or November -- strike that.

13          Why didn't you increase

14  Crowley's salary?

15     A. Frankly, I thought that $650,000 was

16  a lot of money.

17     Q. Too much?

18     A. No. I was willing to accept the

19  judgment of my predecessors and not reduce

20  it or anything like that. But I was not

21  concerned that $650,000 was not an adequate

22  salary. I don't recall that he asked me

23  for an increase. I don't recall that. I

24  have no recollection of him saying don't

86

1    you think it's about time I get more money?

2        Q. You don't recall Mr. Crowley

3    constantly asking for more money, incentive

4    bonuses, in one form or another?

5                MR. GODNICK:  Objection.

6        That is opposed to money he may have

7        been entitled to under his existing --

8                THE WITNESS:  He did raise

9        the bonus question once or twice.  I

10       don't recall raising the basic salary

11       question.  I could be wrong on that.  I

12       don't have any visual picture of his

13       saying how about increasing this from

14       six-fifty to seven.  If he did, he did.

15       But, I don't recall it.

16   BY MR. LEVY:

17       Q. Do you think he is greedy?

18       A. I don't think it would be fair for

19   me to apply that to anybody in this room or

20   anybody in my own family.  I don't do that.

21   I take people at face value.  Maybe he is.

22   I don't know.

23       Q. Are you aware of who Mr. Amaral is?

24       A. I know what his position was.

1       Q. Are you aware he testified at one

2    point that he thought Mr. Crowley was

3    greedy?

4       A. Maybe I recall that.  I wouldn't put

5    much credence in something like that.

6    Maybe he is.  Maybe he is not.  I don't

7    know.  I may have been a judge, but I don't

8    go around judging people.  I don't do that.

9    I don't even do that with you in the way

10   you are questioning me.  I give you the

11   benefit of the doubt.

12      Q. Do you think you have the skills and

13   experience to operate Coram?

14             MR. KIPNES:  Objection.

15      Objection to the form of the question.

16      What does that have to do with the

17      purpose we are here today, which is to

18      talk about Mr. Crowley?

19             THE WITNESS:  Let me answer

20      it this way.

21             (Question read back.)

22             THE WITNESS:  I doubt if I

23      have skills to do very much at my stage

24      in life, including answering tough

88

1   questions in a deposition.  But, to be

2   specific, I discussed with Mr. Bressler

3   and maybe Mr. Kipnes on several

4   occasions whether it might be more

5   advisable for me to go out to Denver and

6   try to run this company and let

7   Mr. Crowley be terminated.  That came up

8   primarily in the course of discussing a

9   review of his contract.  But even before

10  that, I gave it some thought.  I talked

11  to my wife about it and said what would

12  you think if I stayed in Denver, say,

13  four or five days a week?  She gave me

14  the answer that she has always has given

15  me.  "If you think it's the right thing

16  to do, we will do it," or "you will do

17  it."

18          I worried, however, that it

19  might be disruptive to the organization.

20  He was getting along so well with his

21  employees and his executive team and the

22  results that he was achieving were

23  sufficiently good that I put it aside,

24  but I kept it in mind.

89

1      Q. Do you feel you were competent at

2    this point to operate the company?

3                MR. KIPNES:  Objection to

4         the form of the question.

5                THE WITNESS:  Well, I don't

6         want to make a self-evaluation.  Could I

7         do as good a job as Mr. Crowley?

8         Probably not.  Could I do an adequate

9         job?  Maybe.  But, I don't think I can

10        be a self evaluator.  I don't think that

11        is a good idea.

12        Q. Prior to the retention of SSG and

13   EMB -- I'm sorry, strike that question.

14                You said you consulted with

15   Mr. Bressler and, perhaps, Mr. Kipnes about

16   the notion of your going out there.  You

17   were seeking business advice, not legal

18   advice at that time?

19        A. That's right.

20        Q. Did you often seek business advice

21   from Mr. Bressler and Mr. Kipnes?

22        A. Did you say often?

23        Q. Yes.  Did you ever seek business

24   advice?

1      A. Yes.

2      Q. How often did you do that?

3      A. Oh, from time to time; not

4    continuously.

5      Q. Did you and Mr. Bressler and

6    Mr. Kipnes ever exchange writings, E-mails,

7    memoranda, that related to business advice?

8      A. I can't recall any.  I would doubt

9    it.  I don't use E-mail for that purpose.

10    I think it's highly unlikely.  If you found

11    one, then you found one.

12      Q. Did Mr. Kipnes ever send E-mails or

13    memoranda to you that included any business

14    advice?

15      A. Sitting here today, I can't recall

16    any.

17            MR. KIPNES:  There were

18      none.  You can have my assurance.

19            MR. LEVY:  Why is that?

20            MR. KIPNES:  I don't give

21      business advice.  If I were putting

22      something in writing to Judge Adams, who

23      is my client, I would be certain it

24      would be privileged, which leads me to

1      ask, your agreement that in answering

2      all these questions we are letting him

3      answer, none of that will be deemed to

4      have waived any attorney/client

5      privilege.  You are not going to respond

6      to that?

7               MR. LEVY:  I have to think

8      about that.

9               MR. KIPNES:  Fair enough.

10     BY MR. LEVY:

11       Q. I will ask the question:  Prior to

12     the retention of SSG and EMB, what persons

13     did you, what persons did you consult in

14     making your decisions about Coram, about

15     Crowley, other than Mr. Bressler and other

16     people at the Schnader firm?

17               MR. KIPNES:  When you say

18      retention, do you mean the date on which

19      the Court approved the actual retention

20      of those organizations?  Or do you mean

21      when the judge first started talking to

22      them?

23     BY MR. LEVY:

24       Q. Let's start with the first date you

92

1    started talking to them, which was about

2    when?  When did you start talking to SSG

3    and EMB, not about retaining then them, but

4    when you started?

5        A. I guess it was the summer of 2002,

6    maybe the fall of 2002.  That is the best I

7    can give you.

8        Q. You can't do any better than that?

9        A. Can you help, Barry?

10              MR. BRESSLER:  In the early

11       summer of 2002.

12              MR. KIPNES:  He is making a

13       statement for the record.

14              THE WITNESS:  That conforms

15       with my understanding.  I talked to two

16       other people beside him.

17       Q. Who did you talk to?

18       A. I early on talked to Martin

19    Goldsmith who was the CEO of Albert

20    Einstein Medical Center here in Philadelphia

21    because I wanted to get a feel of

22    compensation and whether he thought that

23    there were people in this field who would

24    be interested in a Coram-type operation.

93

1       Q. You mean interested to take over as

2   CEO?

3       A. No, no.  He would not have taken

4   over; who would be interested in acquiring

5   a Coram-type operation.

6                   I mentioned the salary to

7   him.  He thought it was in line.  He said

8   he could not give much help on a takeover

9   proposition because it was really out of

10  the general run of operating a large

11  metropolitan city hospital.

12                  Then, I talked to a client

13  of mine, Jeffrey Pearlman, who runs a very

14  extensive dental equipment company, Dental

15  E.  I'm on the board of that company and

16  asked I for his evaluation.  He thought it

17  was somewhat out of his line, but he said

18  he thought that there might be an interest,

19  but he couldn't put a figure on it.

20      Q. Neither of these people involved

21  receiving advice from them about the

22  operation of Coram, is that a fair

23  statement.

24      A. Well, I did, when I talked to

94

1    Jeffrey Pearlman, I told him about Dan

2    Crowley and the problem that he had and he

3    said be very, very careful in disturbing

4    that relationship because you could hurt

5    the morale of the people working under him;

6    and that was consistent with my concern

7    because I thought that the worst thing that

8    I could do was really destroy the corpus

9    over which I had responsibility. If I

10   pulled him away and the other people were

11   to say to themselves, well, he has removed

12   Crowley, I guess I'm next; maybe I better

13   look for another job. Before we were

14   finished, we could have a very reduced

15   operation and, I think, the creditors would

16   have a real complaint. That worried me all

17   the time.

18        Q. What worried you that the creditors

19   would have a complaint?

20        A. They would have a very serious

21   complaint about the exercise of my judgment.

22        Q. Were you worried that the Equity

23   Committee would have a serious complaint?

24        A. Sure. I thought they might even sue

1    me.

2        Q. You said you explained to the dental

3    person about Crowley's problem, that was

4    Jeffrey --

5        A. Pearlman.

6        Q. About Crowley's problem.  What did

7    you say about Crowley's problem?

8        A. Well, the conflict, the opinion of

9    the Court.

10       Q. What did you say, do you remember,

11   or the substance of what you said?

12       A. I'm not going to address that.

13       Q. What did you tell him about the

14   conflict opinion?

15       A. I told him that there was this

16   opinion by the bankruptcy judge.

17       Q. Please tell me, as best you recall,

18   the substance of what you said about this

19   opinion.

20       A. I said, "Jeffrey, one of the

21   problems that I have is whether I should

22   replace Mr. Crowley."  "Why do you want to

23   do that?"  I said, "Well, the bankruptcy

24   judge in an opinion or two opinions had

96

1    expressed some concern about a conflict."

2    He said, "Well, I can't get into that.  I'm

3    not a lawyer, but if you do decide to

4    replace him, you better be careful not to

5    shake the confidence of the executive

6    staff."

7        Q. When was this conversation which you

8    said that, approximately?

9        A. April, May of 2002.

10       Q. You were still concerned about the

11   conflict in April and May 2002?

12                   MR. KIPNES:  Asked and

13           answered.

14                   THE WITNESS:  I wouldn't say

15           that I was still concerned about it.

16           That was not the emphasis.  The emphasis

17           that I was putting on my discussion with

18           Jeffrey was what happens if you disturb

19           the leadership of an organization like

20           Coram?  That was really what I was

21           trying to find out.  He said to be very,

22           very careful.

23   BY MR. LEVY:

24       Q. Apart from these two people, did you

1    ever get, apart from SSG and EMB, did you

2    ever get advice concerning the operation of

3    Coram?  Did you ever go to them and say

4    Crowley wants me to a propose this

5    contract?  Crowley is doing this, what do

6    you think?

7        A. I didn't seek outside advice

8    contracts, no.

9        Q. Did you ever do anything when you

10   would get these business issues put to you

11   to verify that you were getting the

12   straight story from Crowley and the people

13   who reported to him?

14            MR. GODNICK:   Objection to

15        the form of the question.

16            THE WITNESS:  Yes, I would

17        ask questions.

18   BY MR. LEVY:

19        Q. Give me an example.

20            MR. KIPNES:  Objection.

21            THE WITNESS:  I would ask

22        questions of Joe Devine when he would

23        come in with the contracts.  How about

24        this, this, go back and check it.  He

98

1      would go back.  There were a series of

2      executives there, junior executives,

3      however you want to characterize them,

4      Marabito.  There were a whole series of

5      them.  "Judge Adams wants additional

6      information," he would say.  What is the

7      story?

8      Q. Dennis reports to Crowley?

9      A. Yes, sir.

10     Q. Marabito reports to Crowley?

11     A. Yes.

12     Q. Their future in Coram, at least at

13  that time, was determined by Crowley,

14  wasn't it?

15              MR. KIPNES:  Objection to

16     the form of the question.

17              THE WITNESS:  Maybe to some

18     extent.  But I don't think he would make

19     a change without consulting me of that

20     nature.  I don't think he ever

21     discharged any of those people.

22     Q. They were pretty secure in their

23  jobs?

24              MR. KIPNES:  Objection to

99

```
 1     the form.
 2                    MR. GODNICK:   Objection.
 3                    THE WITNESS:  Well, he
 4          knew -- let me tell you what happened.
 5          When I went out to Denver, I would
 6          always give them an opportunity to speak
 7          with me individually with his not being
 8          present, so I had a pretty good idea of
 9          how they viewed him, how they viewed me
10          and what their future plans were which
11          were very important to me.
12     BY MR. LEVY:
13          Q. Did you consider that they might be
14     biased because Crowley was their boss?
15                    MR. NEUWIRTH:  Objection.
16                    THE WITNESS:  Yes.
17     BY MR. LEVY:
18          Q. Were you able to determine that they
19     were or not biased when you met separately?
20          A. I think that's one of my skills.  I
21     don't have many skills.  I think by talking
22     to somebody, I could determine that with
23     reasonable certitude.
24          Q. Your conclusion was that they were
```

100

1    not biased?

2        A. I didn't find that.  I thought they

3    gave me a pretty good evaluation of him.

4    They weren't necessarily in love with them,

5    but they had a high regard for his ability.

6    They thought he was keeping the company

7    together; he was keeping it on the upward

8    road.  That had a great influence on me.

9        Q. Did you ever talk to anyone outside

10   of the company about Crowley, what his

11   reputation was in the health care industry,

12   for example?

13       A. I think I did, but I can't give you

14   any names.

15       Q. Did you ever investigate Crowley in

16   his relationship with Foundation Health?

17       A. With Foundation Health, no.

18       Q. That's the one that he refers to as

19   a Fortune 200 company.  You heard him use

20   that expression?

21       A. I may.  I can't recall that.

22       Q. Mr. Adams, every week according to

23   documents we have here, sometimes more

24   often, you did get a long letter from

101

1    Mr. Crowley?

2        A. That's right, every week.  He would

3    give me a report every week.

4        Q. Those reports, generally speaking,

5    spoke highly of Dan Crowley, is that

6    correct?  Is that your impression of them?

7        A. Well, I don't think that's a fair

8    characterization.  I think he reported that

9    they continued to make progress and,

10   perhaps, reading between the lines, one

11   would assume that he was taking credit for

12   that progress.  I don't recall that he

13   continuously said that.

14       Q. Do you recall his saying he

15   performed a miracle at Coram in one of

16   those letters?

17       A. Oh, I think, he did say that.  He

18   thought it was a great accomplishment given

19   the circumstances that he was able to

20   continue to improve the revenues and EBITDA

21   and cash flows.

22       Q. Generally, he blamed his

23   predecessors for all the problems, is that

24   fair?

```
 1                    MR. KIPNES:  Objection to
 2        the form of the question.
 3   BY MR. LEVY:
 4        Q. Is that your impression?
 5        A. I think he blamed a predecessor for
 6   the acquisition that lead to the heavy
 7   debt.  I do think that.
 8        Q. Did you ever make any investigation
 9   to determine whether that predecessor
10   deserved such blame?
11        A. No.
12        Q. You just took Crowley at his word?
13        A. That was not a consideration.  It's
14   past history.
15        Q. In the letters he wrote to you, did
16   you ever take any steps to verify what he
17   told you with sources outside of Coram?
18        A. Well, what he was giving me were the
19   sales, the cash flow, the EBITDA.  I spoke
20   to Ernst & Young on two occasions.  It so
21   happened that the accountant in charge had
22   a name like mine so I could remember it,
23   although he spelled it differently and I
24   was convinced that they were doing a pretty
```

1    good job as auditors.  I relied on their

2    audits.

3        Q. What convinced you they were doing a

4    pretty good job as auditors?

5        A. My interview with him.

6        Q. You sort of functioned as a board of

7    directors, is that fair?

8        A. Correct.

9        Q. You know that boards of directors

10   are required in fact to have audit

11   committees?

12       A. Correct.

13       Q. And one of the requirements

14   currently under Sarbanes-Oxley is there be

15   a financial expert on the audit committee,

16   correct?

17       A. Correct.

18              MR. BEATIE:  Are you trying

19       a tax fraud case or --

20              MR. LEVY:  You are not going

21       to allow me --

22              MR. BEATIE:  The answer is

23       no, only because I'm exercising maximum

24       restraint.  There is an old saying that

1          you can't kill somebody because it's

2          against the law.

3                    MR. LEVY:  I understand.

4                    MR. BEATIE:  I suggest that

5          you go back to deposition 101 and learn

6          how to ask proper questions.

7                    MR. LEVY:  I wish you would

8          stop interrupting me.

9                    It's correct you were

10         sanctioned by a Federal District Court.

11                   MR. BEATIE:  Would you would

12         like to sanction me?  I invite the

13         effort.

14                   MR. LEVY:  Let's get back.

15    BY MR. LEVY:

16         Q. You are not a financial expert, are

17    you?

18                   MR. KIPNES:  Objection.  I

19         ask you what this has to do with

20         Mr. Crowley?

21                   THE WITNESS:  Am I a

22         financial expert?

23         Q. As that term is generally understood.

24         A. I invest for many foundations and

105

```
 1    trusts and all that.  I would not hold out
 2    a shingle saying I'm a financial expert,
 3    but I think I know how to read balance
 4    sheets and financial statements.  I was an
 5    accounting major in college.  I did
 6    accounting all during the time I was in
 7    college and law school.  I don't know what
 8    you mean by an expert.  I'm not a CPA.
 9        Q. Are you in a position where you
10    could -- you had no audit committee?
11        A. Correct.
12        Q. Are you in a position where you
13    could perform the functions of an audit
14    committee in order to interface with the
15    auditors?
16             MR. GODNICK:  Objection to
17         this line of questioning.
18             MR. KIPNES:  If you want to
19         bring a motion to remove the Trustee,
20         bring a motion to remove the Trustee.
21         We are here talking about Mr. Crowley.
22             MR. BEATIE:  No, we are not.
23             MR. KIPNES:  We are supposed
24         to be talking about Mr. Crowley.
```

106

1           THE WITNESS:  I do have a

2      certain expertise in going over

3      statements.  I had a strong background

4      in accounting.  I was an accountant and

5      made a living as an accountant.  I

6      continue to run a lot of trust accounts,

7      foundations.  I did a lot of this work

8      when I was at Einstein.  I did a lot of

9      this work when I was at the Oxford

10      Hospital.  I don't hold myself out as an

11      expert, but I think I can understand

12      these financial statements sufficiently

13      well so that I can tell when an expert

14      should be called in to advise me.

15   BY MR. LEVY:

16      Q. And did you call in an expert to

17   advise you?

18      A. No.

19      Q. How much time did you spend

20   interfacing with Ernst & Young with respect

21   to the financial statements?.

22           MR. MILLER:  Objection.

23      This is not about retaining Crowley,

24      terminating Crowley, who are paying

1       Crowley.  This is about Judge Adams'
2       background and ability to be the audit
3       committee of Coram.  Let's move on with
4       this and get this deposition in the
5       right place where we need to get to so
6       you can finish.
7               THE WITNESS:  On two
8       occasions, I met with the Ernst & Young
9       people.  We would go over the quarterly
10      statements.  We talked to them by
11      conference call.  Every time we did it,
12      four or five times now, I don't remember
13      how many times we did it that way.  We
14      asked questions and sometimes we were
15      not satisfied with the answers and they
16      dug further in and gave us the answers
17      because we had, I had to certify under
18      Sarbanes-Oxley and I was very careful
19      about that.
20      Q. How much time, total, roughly, did
21   you spend interfacing with Ernst & Young?
22      A. On those occasions?
23              MR. KIPNES:  How much time
24      on --

108

1       Q. How much time?

2       A. I can't tell.  A half hour, maybe

3   three-quarters of an hour.

4       Q. Twice?

5       A. Yes.

6       Q. You said "we interfaced."  Who is

7   the "we"?  Who else?

8       A. Well, at that time, I think on one

9   occasion, Joe Devine.  I forget

10  whether Barry Bressler was there on another

11  occasion.  I can't remember who from this

12  office was with me.

13      Q. When Barry and Devine were there,

14  they were not there to give you legal

15  advice, they were there to give you

16  business advice?

17              MR. GODNICK:  Objection.

18              THE WITNESS:  Not business

19      advice.  Really, accounting advice.

20              The reason that Joe Devine

21      went out, he is a securities lawyer and

22      knows the Sarbanes-Oxley bill pretty

23      well.  That is why we had him there.  He

24      handled for me the review of the

109

1    contracts, review of the quarterly

2    statements and any other matters

3    involving the financial auditing and

4    related subjects.  I thought that with

5    him, and my own background and my

6    confidence in Ernst & Young, that was

7    pretty good.  If it wasn't, I'm very

8    sorry.  I don't think I would have been

9    justified in spending any more time than

10   I did.  Again, that was not the

11   principal assignment that I had.  You

12   have to take your questions and my

13   answers in that context.

14   BY MR. LEVY:

15       Q. Mr. Adams, have you considered what

16   you would do if Mr. Crowley was

17   incapacitated, hit by a trolley car, as

18   people our age used to say?

19       A. I certainly did.  I thought I had

20   went over that before when I talked about

21   my going out myself.  I was prepared to do

22   that.

23       Q. Did you consider, rather than your

24   going out, hiring a crisis manager?

110

1       A. Yes, we did.  I think Don, your

2   colleague, suggested it.  Perhaps, you

3   suggested it.  And that was one of the

4   things that we discussed with the financial

5   managers.

6           MR. KIPNES:  You said

7       financial manager.  You meant the

8       financial advisor.

9           THE WITNESS:  Financial

10      advisors, I beg your pardon.  I

11      misspoke.

12  BY MR. LEVY:

13      Q. Would you agree that the Equity

14  Committee has constantly asked both Crowley

15  be removed and tried to assist you in

16  selecting a crisis manager to replace him?

17      A. I think that's a fair statement.

18      Q. Let's just --

19      A. We took the advice very, very

20  seriously.  I have tried to point that out.

21      Q. Who is "we"?

22      A. I did.

23      Q. Did you discuss it with anyone?

24      A. Yes.  I discussed it with,