185

```
 1      to say that?
 2                MR. KIPNES:  That is a
 3      extremely large assumption.  Assume the
 4      moon is made of green cheese if you want
 5      him to.
 6   BY MR. LEVY:
 7      Q. Assuming that Mr. Crowley wrote
 8   this, does that impact on your conclusion
 9   that at least on the day he wrote it, he
10   had no conflict?
11                MR. KIPNES:  Objection to
12      the form.
13                MR. MILLER:  Objection to
14      the form.
15                THE WITNESS:  I don't see
16      the conflict myself.  Maybe there is a
17      conflict.  Maybe after I dwell on it to
18      the same extent that you and your
19      colleagues have dwelled on it, maybe I
20      would come to a similar conclusion.  I
21      can't do it sitting here.  I don't have
22      that type of imagination.
23   BY MR. LEVY:
24      Q. How long would it take you to dwell,
```

1    sir, on the statement that Crowley thinks

2    he has got a commitment that after the

3    compromise plan is confirmed he would be

4    reinstated and receive $5,000,000?  Isn't

5    that plainly a conflict?

6              MR. KIPNES:  Objection to

7         the form of the question.

8              MS. KRUGMAN:  Objection.

9              THE WITNESS:  I can't do

10        better than I have done.  I have done

11        the best I can for you.  I can't do

12        better.

13   BY MR. LEVY:

14        Q. Do you think it would be deceiving

15   the Court to have a plan under which after

16   confirmation Crowley would be reinstated

17   with Cerberus and receive $5,000,000?

18             MR. KIPNES:  I would

19        instruct the witness not to answer that

20        question.  This is not a Rule 2004

21        examination.  This is a deposition

22        limited, as you have agreed, to the

23        question of the pending motions

24        regarding Crowley.  And once you use the

1     word "plan," the question is beyond the

2     scope and I would ask the witness not to

3     answer it.

4            MR. LEVY:  Perhaps, I was

5     unclear.  I didn't mean the plan.  I

6     mean any plan.

7            MR. KIPNES:  Any plan.  A

8     plan of reorganization?

9            MR. LEVY:  You have made it

10    clear that we don't want to deal with

11    this.

12   BY MR. LEVY:

13     Q. Look at the last sentence of this

14   page, number 65.

15     A. The last sentence says, "If this is

16   not our deal, please just send this

17   letter" --

18     Q. I'm sorry, I mean the one before

19   that.

20     A. "Also, Cerberus will indemnify me

21   for all of my legal fees, plus pay me the

22   difference between what I ultimately

23   receive from Coram by way of bonuses and 11

24   million 2."

188

1      Q. Doesn't that link Cerberus and Coram

2    in a way that plainly is a conflict if

3    Cerberus is paying Crowley for work he did

4    for Coram?

5              MR. KIPNES:  That's about

6         the forty-seventh time.

7              MR. MILLER:  Is this a

8         hypothetical if this was an agreement

9         between the parties?

10              MR. GODNICK:  I didn't hear

11         the question.

12              MR. LEVY:  I will withdraw

13         that question.

14    BY MR. LEVY:

15      Q. I am not at the moment, at the

16    moment, suggesting that Cerberus did or did

17    not agree to this.  I'm focusing on your

18    reaction to the fact that if Crowley wrote

19    this, that at the time he wrote it he felt

20    he had a commitment that Cerberus would pay

21    him the difference between what he got from

22    Coram by way of bonuses, which he claims he

23    is entitled to, and $11,000,000.  Isn't

24    that a conflict?

189

1              MR. KIPNES:  Asked and

2        answered.  I lost count how many times.

3              THE WITNESS:  It may be.  I

4        don't see it offhand.  Maybe there is a

5        conflict.

6    BY MR. LEVY:

7        Q. Let's move along.

8        A. I would have to know more about the

9    facts and the personalities and the

10   context.  But to suggest that two people

11   are engaging in conflict which borders on

12   the improper, I don't want to do by way of

13   speculation.  I don't think that's fair.  I

14   don't think it's appropriate and it's

15   highly hypothetical.  Ask them and then you

16   and the Court can decide that.

17       Q. The next document is what appears to

18   be a letter signed by Dan Crowley addressed

19   to Steve Feinberg, CRX 71, 72 and 73.

20              (Trustee-20, a letter dated

21       May 8, 2002, marked for identification.)

22   BY MR. LEVY:

23       Q. Will you read that exhibit.  This

24   document has "Redacted" on these pages,

1    presumably, by Mr. Crowley's lawyer.  Some

2    of it is the same.  Some of it is different.

3         A. What is the question?

4         Q. You have never seen this before, did

5    you?

6         A. No.

7         Q. In the first sentence, Mr. Crowley

8    and, I think, we can assume he wrote it

9    because that is his signature, says, "I

10   have been thinking a great deal about our

11   dinner last week because, while I have

12   suspended it, I still haven't formally

13   ended my contract with Cerberus."

14             Is that consistent with your

15   understanding?

16        A.  Yes.  That is what he is in effect

17   saying, I don't have an active contract,

18   but I have these claims.  I don't want to

19   tear up the contract until we resolve those

20   claims.

21        Q. And the contract might be reinstated,

22   that's the implication?

23        A. If I ever get out of Coram.

24        Q. If I ever get out of Coram.

191

1            Look at the last page, the

2    third paragraph from the bottom.  Last

3    page, 73.

4        A. Starting, "In fairness to myself"?

5        Q. That's the paragraph, but that is

6    not what I was going to ask you about.  The

7    next-to-the-last sentence, fourth line near

8    the end.  "Steve, I also am anxious that

9    unforeseen events sometime overtake good

10   intentions.  You could get hit by a bus and

11   be gone.  Cerberus could get bought out, or

12   whatever.  The point is that then I would

13   be left with nothing."

14           Does that suggest to you

15   that they have a secret agreement that

16   would die if Feinberg was hit by a bus?

17           MR. KIPNES:  Objection to

18      the question.  Calls for speculation.

19           THE WITNESS:  I don't know

20      what kind of agreement they had.  I

21      don't know.  I can't guess.  I will not

22      guess, no point to it.

23   BY MR. LEVY:

24      Q. You testified earlier, I believe,

192

```
 1    that you often acted on your impressions of

 2    people.  What is your impression of that

 3    sentence?

 4        A. Well, having an impression of a

 5    person and having an impression of a

 6    sentence is two different things.  I can

 7    see the person in front of me, his facial

 8    expressions.  I can't see anybody in front

 9    of me.  I don't know these people.

10        Q. Moving along to the 10-Q.

11                  (Recess taken, 2:39 p.m.)

12                  (Back on the record, 2:46

13        p.m.)

14    BY MR. LEVY:

15        Q. The next document.  The next

16    document is a Form 10-Q for the period

17    ended March 31st, 2002.

18                  (Trustee-21, a Form 10-Q,

19        marked for identification.)

20    BY MR. LEVY:

21        Q. This is the Form 10-Q filed by Coram

22    for the quarter ending June 30, 2002.

23                  MR. KIPNES:  What I was

24        handed is a cover page and an excerpt
```

193

1       from the Form 10-Q for the period ended

2       June 30,2002, and a cover page and an

3       excerpt for the Form 10-Q for the period

4       ended September 30, 2002.

5              MR. LEVY:  That is exactly

6       and completely correct.

7              MR. KIPNES:  Okay.

8  BY MR. LEVY:

9       Q. Now, I take it, Mr. Adams, you

10  participated in the preparation of both the

11  quarterly report for the quarter ended

12  June 30 and September 30 of 2002?

13     A. Correct.

14     Q. And in the first one, which is for

15  the period ended June 30, looking at the

16  second page and the second paragraph from

17  the bottom above the heading there, it says

18  "Mr. Crowley and Cerberus agreed to suspend

19  their contract and all related obligations

20  immediately after the Bankruptcy Court's

21  denial of the second joint plan of

22  reorganization on December 21st, 2001.  The

23  contract remains suspended through

24  August 16, 2002."

1          A. Yes.

2          Q. It was your understanding that in

3     August that the contract had not yet been

4     terminated, but was only suspended?

5          A. Correct.

6          Q. Did you make any inquiry of

7     Mr. Crowley or anyone else as to when they

8     intended to terminate their contract?

9          A.  No.  I talked to my counsel about

10    it.  They explained what they were doing.

11    I said they.  That meant Crowley and

12    Cerberus; that they were continuing to

13    suspend until they could reach some

14    accommodation on the amount of money that

15    Crowley claimed that Cerberus owed them.

16         Q. Did they explain to you if they

17    didn't reach that accommodation that they

18    could just reinstate the contract?

19         A. They didn't go into that, no.

20         Q. Would that be your understanding?

21         A. I have not looked at the contract.

22         Q. Of the word suspend, would that be

23    your understanding?

24         A. It may be.  I don't know.

1     Q. Which counsel explained that to you?

2  Mr. Bressler?  Mr. Devine?

3     A.  I don't know.  We worked together.

4  It's a pretty big operation.  It's not an

5  operation controlled only by myself.  I

6  have a lot of people there.

7     Q. A lot of people you rely on?

8     A. All those executives, fifteen

9  executives, beside Crowley and people in my

10  office.  I'm just one person.

11     Q. What percentage of your time, your

12  professional time since you have been

13  appointed, roughly, have you devoted to the

14  affairs of Coram.

15         MR. BEATIE:  Objection.

16    Totally irrelevant.  Ridiculous.

17         THE WITNESS:  I can tell you

18    it's fairly substantial; and don't be

19    mislead by my timesheets because I am

20    notorious and always have been for not

21    writing things down on timesheets.  I

22    don't do that.

23         To answer your question, if

24    you are asking the question how much

196

```
 1      actual time as distinguished from

 2      timesheets time, I would say twenty-five

 3      percent.

 4   BY MR. LEVY:

 5      Q. Twenty-five percent of your total

 6   time?

 7      A. Yes.

 8      Q. Can you tell me actual time, not

 9   timesheet time, roughly, how many hours a

10   month do you devote to your entire

11   professional activities?

12      A. Well --

13              MR. KIPNES:  Objection.

14      A. This is going to embarrass my

15   colleagues.

16              MR. KIPNES:  Objection to

17      the form of the question.  When you say

18      "professional," what do you mean by

19      that?  Do you mean as an attorney?  Do

20      you mean --

21      A.  Well, let me answer.

22              MR. KIPNES:  As a Trustee?

23      A.  I generally come into the office

24   before nine o'clock.  I do not go out to
```

197

1    lunch.  Maybe once a month I will go out to

2    lunch.  I generally stay until four

3    o'clock.  I generally work on Saturdays.  I

4    generally work on Sundays.  So, if you

5    added that up, I don't know, it comes to

6    about sixty hours a week, something like

7    that.  So, if you take the sixty hours --

8        Q. Could I stop you at sixty hours?  If

9    you work from 9 to 3, that is six hours; 9

10   to 4, that is seven hours times five.

11              MR. GODNICK:  He said he

12       comes in before nine.

13       A. I work at night, too.  I know you

14   are going to get me in trouble with these

15   questions because nobody here can spend the

16   amount of time that I have spent.  Nobody

17   can do that.  I don't expect anybody.  I

18   don't expect you.  I don't expect my

19   colleagues.  I don't ask them to do it.  That

20   happens to be my work ethic.

21       Q. That is, roughly, you say sixty

22   hours a week?

23       A. I would think sixty hours.

24       Q. What percentage, if you know,

198

1  roughly, of Crowley's time is spent on

2  Coram?

3      A. All I can tell you is that any time

4  that I have been there or call him, he

5  either answers my call or returns the call

6  almost right away.  I don't know.  I hope

7  it's a lot.

8      Q. Have you ever investigated -- have

9  you ever asked him how much time he

10  spends on --

11      A. Yes.  He says he is generally here.

12      Q. Where is "here"?

13      A. Denver.  He goes home on the

14  weekend.  He has an apartment in

15  Sacramento.  He is entitled to go home for

16  the weekend.

17      Q. He has told you that he spends most

18  of his time in Denver?

19      A. Yes.

20      Q. Have you ever asked any of the

21  executives you have talked to whether that

22  is true?

23      A. Well, I don't think I have ever

24  asked them that way.  I think I have talked

199

1    to Mr. Marabito who is right below him and

2    he indicated that he never has any difficulty

3    discussing matters with Mr. Crowley.

4        Q. That wasn't my question.  My

5    question was that while he is in Denver --

6        A. I was assuming that he just walks

7    into his office.

8        Q. That is your assumption.  That's not

9    based on anything Marabito told you?

10       A. I have not checked on him, no, nor

11   have I checked on Barry Bressler or

12   Wil Kipnes or Joe Devine.  I just don't do

13   that.  It's just not my nature to do that.

14       Q. Now, the 10-Q, this is now for the

15   period ended September 30.  We have

16   something new.  In the first paragraph on

17   page 2.

18       A. "Effective August 1st 1999, Mr.

19   Crowley"?

20       Q. Skip down to the last sentence.

21   "Mr. Crowley and Cerberus agreed to suspend

22   their contract."

23       A. Mr. Crowley and Cerberus have

24   advised the Chapter 11 Trustee that such

200

1   contract has been terminated and that no

2   payments have been made by Cerberus to

3   Mr. Crowley during 2002."

4       Q. Is that true?  Did they advise you

5   of that?

6       A. They did not advise me directly.

7   Crowley did, but not Cerberus.  Cerberus

8   may have advised my attorney's, but not me.

9   I did not talk to Cerberus.

10      Q. Did your attorney's ever tell you

11  whether or not Cerberus had advised them to

12  that effect?

13      A. I can't say that they told me that

14  that was my impression.

15      Q. Under what circumstances did

16  Mr. Crowley tell you that they had

17  terminated their contract?

18      A. When we were going over this document.

19  We did it with --

20      Q. "This document", meaning the 10, the

21  draft of the 10-Q?

22      A. Yes.  We would review these documents

23  by conference call.

24      Q. And when he said to you we have

1    terminated, we Crowley and Cerberus, have

2    terminated their agreement, did you ask

3    whether you could look at the documents

4    evidencing the termination?

5        A.  No, I did not.

6        Q. Have you ever asked him?

7        A. No.

8        Q. You just totally relied on

9    Mr. Crowley telling you the truth?

10       A.  Correct.

11       Q. And you never called Cerberus to say

12   is that correct, that it's terminated?

13       A. I never called Cerberus.

14       Q. Do you know the terms of the

15   termination agreement, assuming there is

16   one?

17       A. I have not seen it.  I don't know.

18       Q. If the termination agreement

19   provided that Crowley preserved his right

20   to make claims and sue Cerberus even after

21   the termination, would you view that as a

22   termination?

23           MR. KIPNES:  Objection to

24       the form of the question.

1              THE WITNESS:  I just don't

2      know.  I can't answer that question.

3  BY MR. LEVY:

4      Q. Would that give you some concern as

5  to whether there was a conflict of interest

6  if Mr. Crowley preserved the right in the

7  so-called termination agreement to sue

8  Cerberus?

9              MR. KIPNES:  Objection to

10     the form.  Asked and answered.

11             MR. BEATIE:  I want a

12     termination agreement and general

13     release?  Is that what you are asking,

14     without saying it in some many words,

15     because it sounds too stupid?

16             THE WITNESS:  Give me the

17     question again, please.

18             (Question read back.)

19             THE WITNESS:  I have not

20     seen the agreement.  I don't know the

21     arrangement.  Offhand, I don't think

22     there is -- I can't answer that.

23  BY MR. LEVY:

24     Q. When Crowley told you that the

203

```
 1    agreement had been terminated, at least,

 2    did you understand that meant that his

 3    claims against Cerberus had finally been

 4    resolved?

 5                    MR. KIPNES:  Objection.

 6                    MR. GODNICK:  Objection.

 7                    THE WITNESS:  He didn't tell

 8        me.  He didn't tell me as such.  We were

 9        going over this in a conference call

10        regarding this document.  My guess is

11        that sentence was read by somebody and

12        there was no objection.  I did not focus

13        on the difference between termination

14        and suspension.

15    BY MR. LEVY:

16        Q.  You never asked Mr. Crowley is it

17    correct that you have terminated your

18    agreement with Cerberus, correct?

19        A.  As such, no, I did not ask him that

20    question.

21        Q.  Who else was on the phone call?

22        A.  I thought I just answered that

23    question.  Mr. Bressler, Joe Devine.

24        Q.  To your recollection, was there
```

204

1    anybody else on the call?

2        A. There may have been.

3        Q. But you have no recollection?

4        A. No, I don't.

5        Q. The next document which will be

6    Exhibit 23 is a letter dated, 22, is a

7    letter from Scott Schreiber, the attorney

8    for Mr. Crowley to Mr. Barry Bressler dated

9    October 3, 2002, showing a copy to both

10   Daniel Crowley and to you, Mr. Adams.

11                   (Trustee-22, a letter dated

12          October 3, 2002, marked for

13          identification.)

14   BY MR. LEVY:

15       Q. Mr. Adams, did you receive a copy of

16   this letter?

17       A. I believe I did.

18       Q. At the top of the second page,

19   Mr. Schreiber says that Mr. Crowley has --

20   "While Mr. Crowley has no desire to renew

21   an Employment Agreement which to date

22   remains unperformed in so many ways on the

23   debtor's side," did you understand this as

24   a threat by Mr. Crowley to quit as CEO?

205

```
1        A.  I didn't interpret it as such.

2        Q. You did not?

3        A. No.

4        Q. Did it subsequently come to your

5   attention that Mr. Crowley or, at least,

6   his lawyer felt that this was a notice of

7   termination of the Coram agreement?

8        A. It did not come to my attention that

9   I can recall.

10        Q. When did you begin negotiating with

11   Mr. Crowley over the terms of his contract

12   which was due to expire at the end of

13   November?

14        A. I would say October.  That is a

15   guess.

16        Q. About the time of this letter?

17        A. Yes.  It must have been a little bit

18   before.  This letter is dated October 3rd

19   and it reflects the situation that had

20   already occurred.  So, I would guess,

21   maybe, September, late September.  That

22   ties in with that letter from the financial

23   advisor about crisis managers and things

24   like that.  It was all happening about that
```

206

1   time.

2       Q. The letter begins, "I understand

3   that you and Mr. Crowley have recently

4   spoken about Mr. Crowley's role at Coram

5   after his contract expires on November 30,

6   2002."

7               I assume Mr. Bressler

8   imparted to you what conversation he had

9   with Mr. Crowley?

10      A.  He kept me up-to-date.  I talk to

11  Mr. Bressler several times a day.

12      Q. And what did Mr. Bressler tell you

13  about that conversation that is referred to

14  in the first sentence where he spoke to

15  Mr. Crowley about the contract expiration?

16      A. One of the things that Mr. Bressler

17  told me was that he could not be considered

18  the CEO after that time under the new

19  contract.  That was one of the

20  understandings, so that we had to develop a

21  title that would conform to that requirement,

22  but yet not the disturb the employees, the

23  customers and all the other people.

24      Q. Mr. Bressler explained why he

1    couldn't have the title of CEO?

2        A. I think he did.  I can't tell you

3    what it is offhand; something to do with

4    recent legislation.  I can't tell you for

5    sure.

6        Q. You mean the Sarbanes-Oxley?

7        A. Yes.

8        Q. Did Mr. Bressler tell you, apart

9    from that issue, whether there were other

10   issues?

11       A. Yes.

12       Q. What were the other issues?

13       A. The first issue was whether we

14   should have any contract at all.  Should we

15   do it?  Should we seek somebody else?

16   Should I take it over?

17            After talking with the

18   financial advisors, we concluded that given

19   the fact that we wanted to file a plan as

20   quickly as possible, it would be best to

21   keep them during that period for fear that

22   it would undermine the value of the

23   company.  That, I would say, is probably

24   the major issue.

208

1          The next issue was

2   compensation.  I told Mr. Bressler,

3   although I didn't have to, that I was not

4   one for elaborate compensation.  We then

5   got into the question of the bonuses.  I

6   gave Mr. Bressler my idea.  I told him that

7   something would have to be done with the

8   huge claim that Crowley had under the

9   original contract; that we had to make

10  every effort to reduce that claim because

11  that could seriously effect the distribution.

12     Q. You said that you didn't have to

13  tell Mr. Bressler something about an issue

14  involving compensation, something about an

15  issue involving compensation.

16     A. I didn't have to tell him.

17          MR. KIPNES:  He said he did

18     not have to tell Mr. Bressler that he is

19     not one for spending a lot of money,

20     elaborate compensation.

21          THE WITNESS:  He knew that.

22  BY MR. LEVY:

23     Q. In connection with the issue of

24  whether you should seek someone else, were

209

1    you advised by anyone specifically don't

2    seek someone else?  Keep Dan Crowley?

3        A.  I think we went over this this

4    morning.

5                MR. BEATIE:  Objection.

6    BY MR. LEVY:

7        Q. Will you answer that for me?

8        A. Nobody said keep Mr. Crowley.  We

9    were told that disturbing that management

10   pattern at that time would not be a very

11   good idea.  We are going to file a plan.

12   It would undermine the credibility.  It

13   would shake the confidence of the customers,

14   all that.

15       Q. And that came from who, Scott Victor?

16       A. He was one of them.

17       Q. Who else?

18       A. I thought we went into that this

19   morning; that I will talk to Pearlman and

20   the guy at --

21       Q. You talked to Pearlman in May.  I'm

22   up to October.

23                You said you needed to make

24   one of the issues that Crowley relayed,

210

1   that Bressler related to you was the issue

2   of whether we should keep him.  At about

3   that time, a little before October 3rd or

4   after October 3rd, who gave you advice on

5   the issue of keep him or not other than

6   Scott Victor, if anybody?

7        A.  Well, the other guy with Scott

8   Victor.  I can't remember his name.

9        Q.  Bemiss?

10       A.  Sam is the first name.

11       Q.  Anybody else?

12       A.  Plus the people on the outside.

13       Q.  Which people?

14       A.  Mr. Pearlman.

15       Q.  I'm sorry, again.  Let's restrict it

16   this way.  Between October 1st --

17       A.  Did I talk to Pearlman after October

18   the first?  I don't think I did.  I'm not

19   sure.

20       Q.  Who did you talk to other than

21   Bemiss after October 1st on the issue of

22   replacing Crowley?  Who did you talk to,

23   other than Bemiss, Victor, Bressler, if

24   anybody?

211

1      A. I can't think of anybody offhand.  I

2   think there were certain discussions, but I

3   can't tell you offhand.

4      Q. You said that you recognized it was

5   a problem that you had to deal with

6   Mr. Crowley's claim, Mr. Crowley's claim

7   for bonuses.

8      A. Against Coram; not against Cerberus,

9   right.

10      Q. Did you ever consider that one way

11   to deal with that claim was to litigate it

12   and say we don't owe you anything?

13      A. That's one way.  We talked about

14   that at great length.  We thought that

15   extensive litigation at that particular

16   time would undermine the value of the

17   company.

18      Q. Did you come to a conclusion as to

19   the likely result of the litigation,

20   whether it would undermine it or not?

21      A. I don't think so.  I can't recall

22   that we did.

23      Q. So you decided not to litigate

24   without knowing whether you had a winning

212

1    case because you simply didn't want

2    extensive litigation, is that a fair

3    characterization?

4                    MR. KIPNES:  I would object.

5        Way beyond the scope.

6                    THE WITNESS:  Also, expense

7        of the litigation.  That's a big item

8        with us.

9    BY MR. LEVY:

10       Q. Would that additional -- do you

11   agree with what I said before -- read the

12   last question, if you would.

13                   (Testimony read back.)

14       A. That was one of the elements, but

15   not the only element.  You have to keep in

16   mind that in the fall of 2002, we had

17   litigation with R-Net; we had litigation

18   with Price Waterhouse; we had litigation

19   with the IRS.  We had one other case that I

20   can't think of.  These litigations were

21   costing Coram and the creditors a great

22   deal of money and the equity holders, too.

23   I was concerned that we would be creating

24   the impression that we were using this as a

1    litigation mill to generate fees and things

2    of that sort.  I thought that that would

3    not be the right signal to be sending the

4    people who were interested in this.  So, to

5    the extent that you could resolve disputes

6    peacefully, it was in the best interest of

7    everyone and most especially the Bankruptcy

8    Court.  So, that was a very important

9    factor to make.

10        Q. Did you consider at that time that

11   you could have sold the company and simply

12   reserved the litigation claims?

13        A. We did.  Yes, we did.

14        Q. Why wasn't that a good solution?

15        A. We didn't think we would succeed.

16   We explored that.

17        Q. Who is "we"?

18        A. Our group, Mr. Bressler, myself,

19   Mr. Marabito.  My team, we talked about it

20   all the time.

21        Q. Who else did you rely on for that

22   decision beside the people you just named?

23                  MR. GODNICK:  Objection.

24        Beyond the scope.

214

```
 1              MR. KIPNES:  Whether to sell
 2       the company?
 3              THE WITNESS:  That was my
 4       judgment and I take responsibility for
 5       that.
 6   BY MR. LEVY:
 7       Q. At this time, how big was, how big
 8   did you understand that Mr. Crowley's claim
 9   against Coram to be?
10       A. For some reason, the filing of
11   $11,000,000 comes into my mind.  I'm not
12   sure of that.
13       Q. Does $11,200,000 sound about right?
14       A. Could be.
15       Q. Did you fear at that time that if
16   Mr. Crowley wasn't satisfied he would quit?
17       A. I didn't fear it, though.  It was a
18   concern because I knew that I could always
19   go out and try to run the company myself,
20   but it would unsettle the situation.  I
21   didn't think it was a sought after solution,
22   but I didn't fear it.
23       Q. You were concerned about it?
24       A. Concerned, yes.
```

215

1      Q. Here we are on October 3rd and

2   Schreiber says to Bressler, with a copy to

3   you, let's discuss these things.  What's

4   the next thing that happened as far as you

5   now recollect in these discussions about

6   settlement?

7      A. I think the next thing was that I

8   told Mr. Bressler that this was a

9   peculiarly good assignment for him to deal

10  with Mr. Crowley's lawyer.  He seemed to

11  get along reasonably well with him, didn't

12  always agree with him.  He had many

13  discussions with him and he got the work to

14  try to hammer out the best deal possible

15  and to bring it back to me.

16     Q. That was performing a, largely, a

17  business function rather than a legal

18  function when he went out to hammer out a

19  deal?

20     A. Combination business/legal.

21     Q. Next is a letter dated October 18

22  from Mr. Schreiber to Mr. Bressler with a

23  copy to Crowley.  It's Trustee number 6512

24  through 14 inclusive.  It's dated

216

1    October 18.  That would be number 23.

2                        (Trustee-23, a letter dated

3          October 18, marked for identification.)

4                        MR. KIPNES:  The letter is

5          from Mr. Steven K. Sims who, I believe,

6          is a partner of Mr. Schreiber's.

7                        MR. LEVY:  You are correct.

8                        MR. KIPNES:  With a copy to

9          Schreiber.

10   BY MR. LEVY

11       Q. Do you recall receiving this letter

12   or a copy of this letter?

13       A. No.

14       Q. Do you recall Barry Bressler

15   discussing the contents of this letter with

16   you?

17       A. I think he came in and told me about

18   it.

19       Q. Did he tell you, for example, that

20   Mr. Crowley asserted now a claim of 17.3

21   million dollars against Coram?

22       A. I heard that, yes.  I heard that

23   figure.

24       Q. What was your reaction when you

217

1   heard that?

2      A. I almost hit the roof.

3      Q. Does that mean you got angry?

4      A. No.  I don't get angry.

5      Q. Explain to me what "hit the roof"

6   means in Adams jargan.

7      A. It sounded pretty high to me.

8      Q. Sounded ridiculous?

9               MR. KIPNES:  Objection to

10      the form.

11      A. It was awfully high.

12      Q. What did you tell Barry about it?

13      A. I hardly had to tell him anything.

14   He knows me and my attitude about figures

15   like that.  I doubt if I had to tell him.

16   He said, "I know that you will never even

17   consider anything like that."  I said, "You

18   are absolutely right" or something to that

19   effect.

20      Q. Now, I notice in here in paragraph 9

21   that you are being requested -- this is,

22   obviously, a request on behalf of Crowley

23   for you to agree to use your best efforts

24   to promptly seek dismissal of any

218

1    derivative claim.

2        A. That's what he was asking.

3        Q. Is that the first time in the

4    negotiations you recall that he asked to

5    get a release?

6        A. I think so.  I can't recall.

7        Q. It's a fact, isn't it, that much

8    later you offered formally a deal to

9    Crowley in which you would not only use

10   your best efforts, but you agreed in any

11   plan that you would provide he would get a

12   release?

13       A. I don't recall that precisely.

14                MR. KIPNES:  Objection to

15        the form.

16       A. I would have to look at the document.

17       Q. Did you consider that the claim,

18   given Judge Walrath's opinion, everything

19   she said, what you needed to consider, the

20   claim against Crowley had any value at all?

21                MR. KIPNES:  Objection to

22        the form of the question.  I instruct

23        the witness not to answer.  Now, we are

24        talking about the proposed resolution of

219

1       the proposed derivative complaint which

2       the judge held a mediation on

3       September 25, 2002, about and, I

4       believe, that is way beyond the scope of

5       today's deposition and I would urge the

6       judge not to get into any discussions

7       about his views on the proposed

8       derivative complaint.

9   BY MR. LEVY:

10      Q. The reason judge -- since he made a

11  speech, you ultimately are here proposing

12  to keep Crowley; you are doing that

13  partly -- part of the plan you have proposed

14  would be to give him a release. I want to

15  know, coming to the conclusion you did, on

16  the motion you are trying to succeed on

17  whether you considered the value of the

18  claim against Crowley?

19          MR. KIPNES:  Objection to

20      that question.  It misstates the

21      Trustee's motion.  The Trustee's motion

22      that we are here about today is not

23      dependent on a release, has nothing to

24      do with a release, stands or falls on

220

```
 1      its own merits.  It's not tied to
 2      anything else.
 3                  THE WITNESS:  I adopt that.
 4      I think what Mr. Kipnes said is correct.
 5      I think what Mr. Kipnes has said is my
 6      understanding and I adopt that as my
 7      understanding.
 8  BY MR. LEVY:
 9      Q. Let me ask you this question:  If
10  you want to refuse, fine.  I need to ask
11  the question to get an answer or a refusal.
12  Did you, in considering what kind of deal
13  you were going to make with Crowley, consider
14  the value of the claim that the estate had
15  against Crowley?
16      A. Yes.
17                  MR. KIPNES:  Objection.
18  BY MR. LEVY:
19      Q. Can you give me a number as to a,
20  what value that was?
21      A. I can't give you a number.
22      Q. Was it -- did you consider the fact
23  that both Goldin and Judge Walrath said he
24  had caused $13,000,000 worth of damage as a
```

1    result of the first plan?

2                    MR. GODNICK:  Objection to

3            the form of the question, the

4            characterization of the judge's opinion

5            and Jay Goldin's report.

6                    MR. KIPNES:  I would urge

7            the witness not to answer.

8                    THE WITNESS:  We considered

9            the matter generally.  I can't give you

10           figures.

11   BY MR. LEVY:

12       Q. Who is the "we"?

13       A. Our team.

14                   MR. KIPNES:  Objection to

15           the question.  I will instruct him not

16           to answer the question.  Now, you are

17           into my work product and he is not

18           answering that question.  Next question.

19   BY MR. LEVY:

20       Q. As of the time you received this

21   letter, was it your understanding, this

22   October 18 letter, Exhibit 23, that

23   Schreiber was proposing two separate deals,

24   that is, something, to stay on for six

222

1    months and something in the plan or that he

2    was proposing one deal that would cover

3    both issues?

4        A. Well, you said at the time I

5    received this letter.  I did not receive

6    this letter.  Mr. Bressler merely told me

7    about it.

8        Q. Based on what he told you, what was

9    your understanding?

10       A. I don't think I can react to your

11    question.  I didn't know what Schreiber had

12    in mind.  I didn't know he was trying to

13    try to extract from us as much as he could.

14    I was going to resist it.  That was

15    paramount in my mind.

16       Q. Did you ask Bressler whether he was

17    proposing two deals, one an up-front

18    payment?

19       A.  No, I did not.

20       Q. Did you ever come to an understanding

21    as to whether Crowley, through Schreiber,

22    was proposing one deal, that is to say, pay

23    me something now and pay me something on

24    confirmation or two separate deals, just

223

1    pay me something now and we will worry

2    about the rest later?

3                MR. KIPNES:  Asked and

4        answered.  I object.

5                THE WITNESS:  I don't think

6        we segmented our thinking to that

7        extent.  At least, I didn't know that.

8        I didn't segment my one deal, two deals.

9    BY MR. LEVY:

10       Q. You thought of it as one deal?

11       A. Yes.  I wanted to resolve it.

12       Q. Next document is -- it's not right

13   for you to comment to the witness.  You

14   know that.

15               Next exhibit is a Scott

16   Schreiber letter.  This time it's dated

17   November 8, 2002.  It's from Scott

18   Schreiber to Barry Bressler.  6412 is the

19   number on bottom right.

20               (Trustee-24, a letter dated

21        November 8, 2002, marked for

22        identification.)

23   BY MR. LEVY:

24       Q. Do you remember seeing a copy of

224

1   that letter?

2      A. I don't think I saw a copy of this

3   letter, but I think Mr. Bressler advised me

4   of his receipt of the letter.

5      Q. What did he advise you?

6      A. If they had given him official

7   notification pursuant to the agreement of

8   termination.

9      Q. The "they" being Crowley?

10      A. And his counsel.

11      Q. You understood that as of November 8

12   Crowley had terminated his contract with

13   Coram?

14      A. He had given us notice of termination.

15      Q. Do you distinguish that from

16   terminating?

17      A. There is a slight difference.

18   Notice of termination, he called it notice

19   of termination.

20      Q. Now, knowing that he had given a

21   notice of termination, did you run out and

22   say we better get someone to replace him?

23      A. We were thinking about that all the

24   time.

225

```
 1        Q. I mean specifically in response to
 2    Bressler telling you that he had gotten a
 3    notice of replacement, of termination.
 4        A. We didn't segment our discussions
 5    now that we got this, do we do that?  We
 6    were talking about this -- this was a major
 7    issue with us.  What are we going to do
 8    with Crowley?  Are we going to have a
 9    contract?  Suppose we don't have a
10    contract?  What are the implications?
11    Every day we talked about this.  He would
12    come in.  Where are you on this issue?  We
13    would discuss it.  We didn't segment the
14    way your question would suggest.  I can't
15    answer that question.
16        Q. When Bressler comes in and says he
17    is terminated, that caused no particular
18    ripple in your thinking?
19        A. It didn't surprise me.
20            MR. KIPNES:  Objection.
21            THE WITNESS:  It didn't
22        surprise us that they had sent the
23        termination notice.
24    BY MR. LEVY:
```

226

1      Q. Why?

2      A. Because if he was a good negotiator,

3   he wanted to say to Mr. Bressler in effect

4   I want you to know we are terminating the

5   agreement.  It's important for us to have a

6   new agreement in place.

7      Q. When you were negotiating the

8   transition agreement, which is the subject

9   of next Monday's motion, is it fair to say

10   that it was always contemplated that that

11   was part of negotiating a consensual plan

12   which would have Crowley's agreement as to

13   the amount of money he was to be paid on

14   confirmation?

15           MR. KIPNES:  Objection to

16       the question.  The document speaks for

17       itself.  Mischaracterizes the terms of

18       the document.  Misstates the record.

19           MR. LEVY:  I would object to

20       your putting a document in front of the

21       witness.

22           THE WITNESS:  I asked for

23       it.

24           MR. KIPNES:  If you object,

227

1        I won't let the witness see the

2        document.

3    BY MR. LEVY:

4        Q. Is it your understanding that the

5    agreement that is the subject matter of

6    your motion, the transition agreement, was

7    entered into in contemplation of trying to

8    negotiate a consensual plan with Crowley

9    among others which would release his claims?

10               MR. KIPNES:  Objection to

11        the form of the question.

12               THE WITNESS:  We had that

13        very much in mind.  We had that very

14        much in mind.

15    BY MR. LEVY:

16        Q. Will you adopt the word contemplation?

17        A. Yes.

18        Q. This is 6515, which is a letter

19    dated November 26, 2002, from Barry

20    Bressler to Scott Schreiber and Steven

21    Sims.

22               (Trustee-25, a letter dated

23        November 26, 2002, marked for

24        identification.)

228

1    BY MR. LEVY:

2        Q. Do you recognize this as a letter

3    that Bressler sent to Crowley's lawyers?

4        A. I recall that Dan, that Barry

5    discussed this with me.  I don't recall

6    specifically if he showed me this draft.

7        Q. Based on this discussion, this had

8    your approval?

9        A. No question about that.

10       Q. Now, at the time you authorized this

11   letter, is it fair to say that your state

12   of mind was that you wanted to work out a

13   deal with Crowley, ask him what his state

14   of mind was, let him tell us instead of

15   stumbling around like a blind man

16   suggesting answers to questions when you

17   know they are wrong --

18            MR. LEVY:  I would like to

19       incorporate my prior comment about your

20       comments.

21            MR. BEATIE:  101.

22   BY MR. LEVY:

23       Q. So far as we can see, this letter

24   does not propose, November 26th is the date

229

1     of the letter, any transition payment.

2          A. Yes.

3          Q. At this point, you had not yet

4     agreed to give Crowley a million dollars

5     transition payment?

6          A.  There is something here.  Hold on a

7     second.

8          Q. Perhaps you are looking at paragraph

9     6.

10         A. Yes.  That's a blank.

11         Q. At that point, you were

12    contemplating that you were going to

13    propose reduction in his claims similar to

14    those suggested in the Goldin report?

15         A. Yes.

16         Q. Except for the first and second fail

17    plan confirmations, right?

18         A. Right.

19         Q. What was your understanding at that

20    time as to the reductions that would be

21    made based on these criteria?

22         A. Reductions in the bonuses?

23         Q. Reductions in his claims, yes.

24    Looking at paragraph 6.

230

1              MR. KIPNES:  Again, I

2        object.  Beyond the scope of this

3        . deposition.

4              THE WITNESS:  I can't tell

5        you as of November 26th.  This was a

6        continuing negotiation.  I can't stop it

7        at each date and tell you where we were.

8        That is beyond me.  That's why I asked

9        Mr. Bressler to negotiate it.  He was

10       telling me, generally, but I can't tell

11       you date by date.

12   BY MR. LEVY:

13       Q. The next is a letter dated

14   December 2nd, 2002.  But I note that it

15   says 2003.

16              MR. KIPNES:  On the

17       document.

18              MR. LEVY:  We will correct

19       that, with the understanding that that

20       could not be.

21   BY MR. LEVY:

22       Q. That is a letter, Bates numbers

23   Trustee 6528 through 6529.

24              (Recess taken, 3:58 p.m.)

231

1          (Resumed 4:07 p.m.)

2               MR. LEVY:  I want to state

3      on the record something that you missed.

4      The Equity Committee is withdrawing its

5      Notice of Deposition of Steven Feinberg

6      in the 30(b)(6) Notice of Deposition of

7      Cerberus this Friday.  We reserve at

8      some future time to take his deposition.

9      We are not going to take it at this

10     time.

11              THE WITNESS:  Okay.

12     BY MR. LEVY:

13          Q. Let's look, then, at -- Mr. Adams,

14     can you tell me why you caused a Motion for

15     Authority to Reject Executory -- Mr. Adams,

16     why did you authorize the filing of a

17     Motion to Reject the Executory Contract

18     with Mr. Crowley?

19          A. I know we discussed it.  I can't

20     answer that question right now.  I don't

21     have a recollection why I did it, but I did

22     it.

23          Q. Was it part of your negotiations

24     with Crowley?

232

1       A. Probably, yes.

2       Q. Now, I would like to put in front of

3   you the transition agreement which is the

4   subject matter of your motion, at least.

5   It's dated December 24, 2002.  It does not

6   have Bates numbers because it came, the

7   copy I have came from the exhibit.  I think

8   it's Exhibit D to your motion.

9       A. Is this the twenty-fourth?

10      Q. Yes.

11      A. I got it.

12      Q. Now, first, will you agree with me

13   that though Crowley's title was changed,

14   actually your understanding was that he was

15   to render, essentially, the same services

16   to Coram as he had up to that point?

17      A. Pretty much, yes.

18      Q. Pretty much.  Is there any change at

19   all?

20      A. I can't think of anything sitting

21   here.  That's why I used the expression

22   pretty much.

23      Q. And in that agreement which, by the

24   way, you signed yourself --

233

1      A. I did.

2      Q. And Dan Crowley signed?

3      A. He did.  I assume he signed it

4    himself.  His name is on it.

5      Q. You agreed to seek court approval of

6    it?

7      A. Yes.

8      Q. That was on December 24th?

9      A. I think that's the date, yes.

10     Q. But you didn't attempt to seek court

11   approval until January 24th, a month later,

12   is that correct?

13     A. I think that's correct.

14     Q. Why did you wait a month to seek

15   court approval?

16     A. Well, you are in the holiday season.

17   I don't think it was advert as such.  It

18   was mainly because of other things.

19     Q. Well, what other things, sir?

20     A. The holiday season.

21     Q. The holiday ended December 31st to

22   January 2nd.  You waited three weeks to

23   file it.

24     A. I think I was away.  I think I was

234

1  away.  I think so.

2      Q. Did you need to be there to file it?

3      A. No.  I needed to be there to

4  authorize it.  My recollection is I was

5  away.

6      Q. I'm sorry, sir, you signed it.  You

7  needed further authorization to file a

8  motion, is that your testimony?

9      A. They did not want to proceed

10 without, yes.

11     Q. Who told you that?

12     A. I think Mr. Bressler.

13     Q. You agreed in this transition

14 agreement in paragraph 7 to pay, subject to

15 court approval, to pay Crowley a stay in

16 performance bonus of a million dollars?

17     A. Correct.

18     Q. So, that's for staying for six

19 months?

20     A. Roughly.  Approximately.

21     Q. So that raised, in effect, raised

22 his salary for the next six months by a

23 million dollars, is that right?

24     A. In effect.

235

1    Q. You also agreed to raise his salary

2    to 80,000 a month from 48,000 a month?

3    A. About fifty, yes.

4    Q. Why did you do that?

5    A. Because we had to.  I didn't do it

6    willingly.  That was the negotiation.  If I

7    had my way, I would have kept everything

8    the same.

9    Q. Why didn't you just say no?

10    A. I could have said no, but for the

11    reason that I have already mentioned, a

12    number of times.  I thought it was for the

13    benefit of the creditors, the equity

14    holders and the institution.

15    Q. Did Crowley say I will quit if you

16    don't --

17    A. Would he have said it?

18    Q. Did he say it?

19    A. Yes.  That was the implication; if

20    we didn't meet the terms, he was ready to

21    leave.

22    Q. Did he actually say that to you at

23    any point?

24    A. He didn't negotiate it.  His

236

1    attorney negotiated it.  Mr. Schreiber.

2         Q. Did his -- were you part of these

3    negotiations at all?

4         A. I did not talk to Mr. Schreiber.  I

5    didn't talk to his attorney.

6         Q. So, you never face-to-face

7    negotiated with Crowley with respect to

8    this transition agreement, is that correct?

9         A. I talked to Crowley about it, yes.

10   He made it clear that he would leave, yes.

11        Q. You did this in the face of a threat

12   that he was going to quit?

13        A. I don't believe -- he didn't deal

14   with me with threats.  That's not what

15   happened.  He had the position -- he took

16   the position that he, more than anyone

17   else, had suffered financially as a result

18   of what had gone on for two or three years.

19   He didn't get any bonuses.  His salary,

20   according to him, not according to me, was

21   minimal for a person taking that

22   responsibility.  He had not gotten the

23   bonuses that he was entitled to; he had

24   incurred substantial legal fees; he was

237

1    unhappy financially, not with the job he

2    was doing.  He didn't think he had been

3    treated fairly financially and he created

4    the impression with me -- he didn't say you

5    either do it or I walk.  He never treated

6    me that way.  Very few people have, I might

7    say.  In fact, I can't recall in my

8    lifetime that anybody ever has done

9    anything like that.  But, he made it pretty

10    clear that there would be no continuation.

11        Q. That was your understanding anyway

12    from what he said?

13        A. Yes.

14        Q. In the course of these negotiations

15    with him, did he talk about reimbursement

16    for counsel fees as part of the deal?

17        A. Specifically, yes, he did.

18        Q. So, he was claiming a right to

19    indemnity from the corporation because he

20    had incurred counsel fees as a result of

21    his activities?

22        A. He didn't use the expression

23    indemnity.  Maybe you could characterize it

24    that way.

238

1     Q. Did he say who the legal fees were

2  payable to?

3     A. We assumed that it was Schreiber.

4     Q. Did you ever see Schreiber's bills?

5     A. No.

6     Q. Do you know whether Mr. Bressler

7  did?

8     A. He would have to show them to us.

9  You see, two hundred thousand dollars is a

10  cap.  He doesn't get the two hundred

11  thousand dollars.  It's a maximum, as I

12  remember it.

13     Q. It says, "not to exceed two hundred

14  thousand."

15     A. That's right.

16     Q. What do you feel -- what did you at

17  that time feel or what do you feel now

18  entitled him to recover legal fees from

19  Coram?

20          MR. KIPNES:  Objection to

21    the form of the question.

22          THE WITNESS:  What?

23  BY MR. LEVY:

24     Q. What, why did you feel he was

239

1    entitled to recover legal fees from Coram?

2                    MR. KIPNES:  Objection to

3        the form of the question.

4                    THE WITNESS:  I didn't feel

5        that he was entitled to recover

6        anything.  I thought that we, I thought,

7        quite frankly, he was more interested in

8        the tax implications because he could

9        have just said I want a signing bonus of

10       a million dollars.  So, he divided that

11       for his benefit to eight hundred plus

12       two hundred.  I didn't query why he

13       wanted that division, but I assumed it

14       was for tax reasons.  I can assure you

15       that we made the best deal we could

16       under the circumstances unless we wanted

17       to lose him.  That was a possibility

18       which weighed on my mind a great deal.

19   BY MR. LEVY:

20       Q. Did you at about this time before

21   you put your name on here go back to any of

22   your advisors and consult them again about

23   the damage that might occur to the company

24   if you did lose him?

240

1    A. Not again. No. I did not.

2    Q. I take it -- didn't you consult any

3  crisis managers to see whether they thought

4  there would be any damage at that time?

5    A. No.

6    Q. How did the salary get up to $80,000

7  from $48,000?

8    A. Bargaining. That's all. Was I

9  happy about it? No. That's an easy one.

10    Q. Are you happy about it now?

11    A. No. I'm not happy anytime about

12  salaries that are that high. Do you have

13  to pay those salaries in this climate of

14  ours? I suspect yes. I regret it, but I

15  think that's a fact of life.

16    Q. Did you at this time ever consult a

17  compensation expert to determine what the

18  appropriate level of salary was for a man

19  of a company this size in this industry?

20    A. Yes. I had talked about that

21  considerably all during the last half of

22  2002.

23    Q. To who? To what compensation

24  expert?

241

1      A. The compensation people.  By the

2    way, I was the compensation person at

3    Albert Einstein Medical Center.  I worked

4    with the consulting firm and I was always

5    unhappy about the level of their salaries.

6    But, there is no doubt that that is what

7    the advisors and the consultants were

8    telling us.

9      Q. What consultant person did you talk

10    to at about the time you agreed to this

11    transition agreement?

12      A. I didn't talk to anyone at that

13    time.

14      Q. When was the time prior to that that

15    you had, prior to the signing of this

16    transition agreement, that you had talked

17    to a compensation expert about appropriate

18    levels of compensation for a man in

19    Crowley's position?

20      A. All during the last half of 2002.

21      Q. Name a compensation expert who you

22    talked to all during the last half of 2002.

23      A. I didn't talk to a compensation

24    expert.  I talked to the people at Albert

242

1    Einstein that were dealing with these

2    people almost on a month-to-month basis.

3        Q. Who did you talk to at Albert

4    Einstein?

5        A. Jack Adler, Jr., Chairman of the

6    Board; Ralph Roberts, who had served with

7    me who was the retiring CEO of Comcast.

8    People like that that.

9        Q. What did Jack Adler say about this

10   compensation?

11       A. "I can understand how you feel.  I

12   don't know what you can do about it.

13   That's the going rate."

14       Q. So, he said what is the going rate?

15       A. What we were talking about is 650,

16   750, 850.

17       Q. Did he say it was a going rate to

18   give in addition to the 80,000 a month

19   which is -- did he say 80,000 a month, a

20   million dollars a year was the going rate?

21       A. No.  I thought you were talking

22   about the 80,000 a month.  He did not -- I

23   never talked to him about the million

24   dollars.

243

1       Q. The $80,000 a month is roughly --

2       it's $960,000?

3       A. That right.

4       Q. Did he say that was the going rate?

5       A. No.  He didn't say specifically that

6       $960,000 was the going rate.

7       Q. Did anybody who you consulted during

8       the last half of 2002?

9       A. Well, the discussions didn't -- it

10      didn't take the form of your questions.

11      They talked about, generally, what was

12      going on in the health care industry and

13      the equipment industry.

14      Q. Have you ever estimated the cost to

15      Coram of the additional benefits, other

16      than salary and a million dollar stay

17      bonus, the cost to Coram of such things as

18      health, dental and disability insurance,

19      million dollars of whole life coverage,

20      transportation allowances, tax preparation

21      costs?  Did you ever add all that up?

22      A. I did.  I'm appalled at the expense.

23      Don't forget all of those limits were in

24      place when I came into the company.

244

1     Q. But the contract had expired.

2     A. That's true.  But it's very

3     difficult to ask somebody to stay on and

4     say, by the way, all of these things are

5     gone now.  Obviously, they are not going to

6     do it.  You wouldn't do it in your law

7     firm.  Nobody around this table would do it

8     if all of a sudden the senior partner of

9     some of these law firms would call their

10    partners in saying starting January 1st we

11    are not covering health, not covering life,

12    we are not covering your travel expenses,

13    we are not covering this and that.  What

14    would they do?  Would they say if you don't

15    do that, we are going to leave?  I don't

16    know what they would do.  They would be dam

17    unhappy.

18    Q. Tell me about your bargaining back

19    and forth where he wanted more than a

20    million dollars.

21    A. Yes.

22    Q. You wanted to pay him less than

23    that.  Tell me about the time when it came

24    together at around a million dollars.  What

245

1    did you discuss then?

2        A. I can't tell you.  Those discussions

3    were by Mr. Bressler and his attorney.

4        Q. Did Mr. Bressler at some point say

5    to you this is the best I can do?

6        A. He did.  We had to make a judgment.

7    I was very unhappy.

8        Q. Did you think, maybe, you ought to

9    try once more to say I'm not going to pay

10   you a million dollars, Dan?

11       A. I don't think that would have served

12   any purpose.

13       Q. You didn't do it?

14       A. I did not do it.

15       Q. Let me ask you a question.  You said

16   you had to do this.  Did you ever

17   contemplate at the time you signed this

18   what if Mr. Crowley had said or had left

19   you the impression that I will leave unless

20   I get a $2,000,000 transition bonus, would

21   you have accepted that?

22            MR. KIPNES:  Objection to

23       the question.

24            THE WITNESS:  No.  That is

1  hypothetical.  I wouldn't have.  I had

2  reached the top.  I think all of the

3  elements beside the money, it was very

4  difficult for me to argue.  They would

5  be decreases in compensation.

6 BY MR. LEVY:

7  Q. Would it be fair to say that the

8 only --

9  A. As far as the monthly payment is

10 concerned, it's higher than he was getting,

11 but don't forget, he had not received an

12 increase for three and one-half years, I

13 believe.  Everyone else in the company had

14 received an increase.  If you factor the

15 ten percent that they were getting, 10, 10,

16 ten, it seems like 30, but it's more like

17 40, because one is on top of the other.

18 So, he was not getting very much more than

19 his colleagues/compatriots were getting.

20  Q. Did you consider at the time that he

21 was not only getting $80,000 month for the

22 this transition period which for a year

23 would have been a million dollars, but for

24 that same six months he was getting another

1    million dollars so, in effect, his salary

2    for the six months of 2003 was not $80,000

3    a month, but $160,000 a month?

4                    MR. KIPNES:   Objection to

5        the form of the question.

6    BY MR. LEVY:

7        Q. Did you consider that?

8        A. Yes.  You are really talking to the

9    choir really now.  I'm in complete

10   agreement that these figures are high, but

11   I'm also aware that unless you meet those

12   figures, you are not going to have a

13   negotiation and you are not going to have a

14   contract.

15                    I think it's too high to pay

16   an associate $150,000 a year, but what am I

17   going to do about it?  Sure, it's too high.

18   It's outrageous.  I have an associate here.

19   It will do me a lot of good to stand on the

20   table and say that.  If you don't pay them,

21   they all walk out.  You have to be

22   realistic.

23       Q. Will you agree with me that this

24   transition agreement, part of Exhibit 2,

248

1    was entered into in contemplation of a

2    supplemental agreement that was entered

3    into about a month later?

4                    MR. KIPNES:   Objection to

5        the form.

6    BY MR. LEVY:

7        Q. Do you agree with that?

8        A. That's correct.

9        Q. Did you consider by yourself or with

10   your counsel that this transition agreement

11   was filed on December 24th?

12       A. It wasn't file then.

13       Q. It was signed on December 24th; the

14   need to file a Form 8-K to advise the

15   investing public that a transition

16   agreement had been executed.

17       A. Did I do that?  No.   That is a

18   matter which would be up to Mr. Devine.

19       Q. Have you ever discussed with him why

20   they didn't file an 8-K at that time?

21       A. I did not discuss that with him.

22       Q. On January 3rd, a letter was written

23   by Mr. Bressler to Mr. Schreiber.   It has

24   numbers that I fear I can't read because

249

1    your Bates number went off the page.  We

2    think it is 651720.

3            MR. KIPNES:  We can read 20

4    and 19 -- that is 60520 and 6519.  That

5    is 6520.  Let's mark it Trustee X.  Is

6    that okay?  Mark it Trustee next

7    exhibit.  I don't care.

8            MR. LEVY:  I'm talking about

9    for -- I will mark it Trustee 8,000

10    because that is past your numbers.  8001

11    and 8002.

12            (Trustee 26, a letter dated

13    January 3, 2003, marked for

14    identification.)

15    BY MR. LEVY:

16      Q. Trustee Exhibit 26 is a letter dated

17    January 23rd, 2003.  I'm sorry,

18    January 3rd, 2003.  It's on Schnader

19    stationery.  It is addressed to Scott

20    Schreiber and it has a Barry Bressler

21    signature block.  I have now marked 8000

22    and 8001.  Have you seen that before today?

23      A. I think I did.

24      Q. Did you approve it?

250

1    A. I did.

2    Q. The first -- I would ask you to look

3  at the last sentence of the second

4  paragraph.

5    A. Last --

6    Q. Paragraph 2 on the first page on

7  page 8000.

8          MR. KIPNES:  Do you mean the

9      second paragraph or the paragraph

10     numbered?

11         MR. LEVY:  I mean the second

12     un-numbered paragraph.

13         THE WITNESS:  "This letter

14     will serve to reflect the intent."

15  BY MR. LEVY:

16    Q. Read that to yourself.  Have you

17  read that paragraph?

18    A. I have.

19    Q. The second sentence says, "This

20  Settlement Agreement is being negotiated

21  and finalized in connection with the

22  Transition Agreement."

23    A. Yes.

24    Q. Did you authorize that provision?

251

1    A. I did.

2    Q. And the proposal at this point

3    which, I assume, you authorized is that

4    Coram would pay Crowley an additional

5    $2,000,000, is that correct?

6    A. Correct.

7    Q. Correct?

8    A. Correct.

9    Q. The total he would get is three

10    million dollars?

11    A. That right.

12    Q. And in the second paragraph, you

13    said that, "the Trustee will in turn seek

14    to provide Dan with the fullest release

15    approved by the Bankruptcy Court of all

16    proposed derivative and related claims."

17    A. Correct.

18    Q. Do you know whether that provision

19    changed in the next -- you didn't sign this

20    exhibit.

21    A. No.

22    Q. You signed a subsequent?

23    A. Yes.

24    Q. Do you know whether that provision

1    said that you would seek --

2        A. I don't recall.

3        Q. Did you approve -- well, you

4    approved the whole thing?

5        A. Yes.

6        Q. Let's now go to -- here, again, the

7    numbers seem to be completely blocked out.

8    The second page.  This is a letter dated

9    January 7, 2003.  The second page appears

10   to have number 65 -- let's mark this as we

11   did the prior one.  I will call this

12   Trustee 8003 and Trustee 8004.

13                   (Trustee-27, a letter dated

14       January 7, 2003, marked for

15       identification.)

16                   THE WITNESS:  This one I

17       have seen.  Is that the question?

18   BY MR. LEVY:

19       Q. I will adopt that.

20       A. Yes.

21       Q. I notice in paragraph 2 that the

22   provision about releasing Dan Crowley from

23   proposed derivative claims has changed from

24   "will seek to release him" to "will release

253

1   him."

2       A. Yes, I see that.

3       Q. Did you approve that change from the

4   prior draft?

5       A. I did.

6       Q. Why?

7       A. I did it pursuant from advice from

8   Barry Bressler.

9       Q. Barry told you that Crowley wouldn't

10  go along if you didn't put that in?

11      A. I think he said it would be -- yes.

12      Q. Did you ever talk to Crowley about

13  it?

14      A.  Did I?  No, I did not.  I did not

15  negotiate this.  This was handled by

16  Mr. Bressler.  I have complete confidence

17  in him.  He is an outstanding bankruptcy

18  lawyer.  I gave him the guidelines and I

19  was not happy about it, as I have said a

20  number of times, as to the amounts here.

21      Q. You still are not happy?

22      A. Still not happy about it.  I think

23  they are high amounts, but I think that the

24  hourly charges by lawyers are too high.

254

1    I'm not happy about them.

2        Q. Did you sign this on or about

3    January 7?

4        A. I did.

5        Q. So you were in town on January 7.

6    Did you sign it some other place?

7        A. I can't tell you that.  I don't

8    recall that.

9        Q. I hand you -- can you explain why

10   you waited until January 4th, 24th, which

11   is two-and-a-half weeks after January 7th

12   to file the application to approve the

13   transition agreement?

14       A. My vague recollection is I was away.

15   But I can't -- I'm sure I was away in

16   January, but I can't give you the dates.  I

17   looked in my pocket for my diary.  I don't

18   have it.  I know I was away.  In fact, you

19   were away and I remember talking to Don,

20   your colleague, and he told me you were

21   away.  So that's why I'm sure.  He wanted

22   to know why I wasn't going away and I told

23   him I was, indeed, going away.  If you wait

24   a second, I can give you the dates.

255

1      Q. You can tell me the days you were

2   away?

3      A. I think I might.  I went away on --

4   I was away on the 11th of January.  I left

5   on the 11th, 12, 13, 14, 15, 16, 17 and

6   18th.

7      Q. Can you explain to me, sir, why in

8   the application or Motion for Approval of

9   the Transition Agreement you did not

10  disclose the existence of the supplemental

11  agreement which is, it says here, was

12  finalized in connection with the transition

13  agreement?

14            MR. KIPNES:  Objection to

15      that question.

16            THE WITNESS:  I can't.  I

17      didn't handle that.  I can't tell you

18      that.  I don't know.

19  BY MR. LEVY:

20      Q. The next document is a Form 8-K

21  filed on January 14 by Coram.  We will mark

22  that.

23            (Trustee-28, a Form 8-K,

24      marked for identification.)

256

1  BY MR. LEVY:

2      Q. You participated in the preparation

3  of this Form 8-K, would that be correct?

4  That was filed on January 24th, not the

5  14th.

6      A. That's right.  It says January 24th.

7      Q. Did you participate in the

8  preparation of this Form 8-K?

9      A. Yes.

10     Q. You approved it?

11     A. Well, you say approved it.  I didn't

12  object to it.

13     Q. And it reveals under Item 5 that as

14  a Chapter 11 Trustee, you have filed a

15  motion to approve the transition agreement,

16  is that correct?

17     A. It says that.

18     Q. And it does -- and it does not -- it

19  does not disclose that by January 24th you

20  had already signed a supplemental agreement

21  executed in connection with the transition

22  agreement to pay, in which you offered to

23  pay Dan an additional $2,000,000, did you?

24         MR. GODNICK:  Objection.

257

1       This goes more to a motion to remove

2       this particular Trustee than it does to

3       the Crowley retention/termination

4       issues.

5                    MR. KIPNES:  It doesn't say

6       that, does it?  I assume we can all

7       agree it doesn't say it.

8    BY MR. LEVY:

9       Q. Why wasn't that included?

10                   MR. KIPNES:  Objection.

11                   THE WITNESS:  I can't tell

12      you.  I'm not a securities lawyer.  I

13      can't tell you that.

14   BY MR. LEVY:

15      Q. Did you ever discuss it with

16   anybody, that question?

17      A. No, I did not discuss that with

18   anybody.

19      Q. In retrospect, sir, do you feel that

20   your motion to approve the transition

21   agreement which is up next Monday should

22   have disclosed the supplemental agreement

23   executed in connection with it?

24                   MR. KIPNES:  Objection to

258

1          the question.

2                    THE WITNESS:  That is a

3          legal question.  I defer to

4          Mr. Bressler.  I don't know the answer

5          to that.

6     BY MR. LEVY:

7          Q. Did you ever discuss that with him?

8          A. I don't recall.

9                    MR. LEVY:  I would like to

10         take about a five-minute break.  I think

11         we are about done.

12                    (Off the record, 4:28 p.m.)

13                    (Back on the record, 4:32

14         p.m.)

15    BY MR. LEVY:

16         Q. Mr. Adams, let me refer for a moment

17    again to the supplemental agreement

18    executed by you on January 7.

19         A. Correct.

20         Q. You called it a supplemental

21    agreement.  Did you consider it a letter of

22    intent for a supplemental agreement?

23                    MR. KIPNES:  Objection to

24         the form.

259

```
 1              THE WITNESS:  I didn't

 2      characterize it.

 3      BY MR. LEVY:

 4         Q. Has Crowley ever signed that

 5      January 7 letter, Exhibit 22, 27?

 6         A. Address that question to

 7      Mr. Bressler.

 8         Q. You don't know?

 9         A. I don't know the answer to that.  I

10      assume that he did.  I'd rather ask

11      Mr. Bressler who knows.

12         Q. When was the last time you talked to

13      Dan Crowley?

14         A.  I was in Denver last week.

15         Q. When were you out there with

16      Mr. Crowley?

17         A. February 6 and February 7.

18         Q. February 6 and 7 you were there?

19         A. Yes.

20         Q. Did you at that point discuss the

21      additional settlement agreement which we

22      have marked as Exhibit 27?

23         A. No.

24         Q. Never came up?
```

260

1    A. The context of the meeting was quite

2    different.  It was an operational meeting;

3    what they were doing, what the plans were

4    and things of that sort.  We didn't get

5    into this subject.

6        Q. Who accompanied you to that meeting?

7        A. I think Joe went out with me.

8        Q. The lawyer?

9        A. Yes.

10       Q. Joe Devine?

11       A. Yes.

12       Q. You didn't bring any health care

13   experts with you to that meeting?

14       A. No.

15       Q. We talked earlier about what you

16   said was your agreement, that Mr. Crowley

17   could work on Cerberus matters during 2002

18   subject to three conditions:  He not get

19   paid, that there not be a conflict with

20   Coram, and would not interfere with his

21   work.

22       A. That is right.

23       Q. Do you know how many such

24   transactions he actually worked on during

261

1    2002?

2        A. I do not.

3        Q. Did you ever ask?

4        A. No.  I don't think I did.

5        Q. Did you ever ask anyone to ask him

6    in your behalf?

7        A. No, I don't think so.

8        Q. Do you know the names of any of the

9    companies?

10        A. He did mention some names.  They

11    meant nothing to me.

12        Q. Did you take any steps to determine

13    whether in fact they were competitive with

14    Coram?

15        A. They were not in the same business

16    as Coram; completely different businesses.

17        Q. How do you know that, sir?

18        A. I know some of these companies.

19        Q. Tell me one you know.

20        A. I can't tell you that offhand.

21        Q. Tell me what business one was in?

22        A. I can't tell you.

23            MR. LEVY:  I have no further

24        questions.

262

1            MS. KRUGMAN:  Can I just

2    speak with Barry for a minute privately?

3            MR. KIPNES:  I will pick up

4    the speaker.

5                (Off the record.)

6                (Back on the record.)

7            MS. KRUGMAN:  I have no

8    questions.

9            MR. KIPNES:  I believe we

10   are done.

11           MR. LEVY:  Is anybody here

12   serious about trying to take Feinberg's

13   deposition between now and the hearing?

14   I'm just asking.

15           MR. BEATIE:  What?

16           MR. LEVY:  The hearing is on

17   Monday.

18           MR. GODNICK:  You took a

19   different position.  Frankly, Mike and I

20   have not had an opportunity to discuss

21   this at length.  I'm sure counsel to the

22   Trustee wants to give it some

23   consideration.  Perhaps, they want to

24   talk to us.

263

```
1              MR. BEATIE:  I'm confident
2       the answer is no.  No deposition between
3       now and Monday.
4              MR. LEVY:  I'm going to
5       New York from here to get ready for
6       Crowley.  I plan to go back on Thursday.
7       I would like to do it.  Let me know.
8              MR. KIPNES:  Why do you want
9       this on the record?
10             MR. LEVY:  To get some
11      assurance.
12             MR. BRESSLER:  When did you
13      decide that you were not going to take
14      his deposition?
15             MR. LEVY:  When I got,
16      basically, a lot of answers from
17      Mr. Adams.
18             MR. BRESSLER:  So it wasn't
19      yesterday or the day before?
20             MR. LEVY:  No.
21             (Deposition concluded, 4:40
22      p.m.)
23
24
```

264

```
1              CERTIFICATION

2

3

4         I hereby certify that the

5    testimony and the proceedings in the

6    aforegoing matter are contained fully

7    and accurately in the stenographic notes

8    taken by me, and that the copy is a true

9    and correct transcript of the same.

10

11
     MICKEY DINTER
12   Registered Professional Reporter

13            The foregoing certification

14   does not apply to any reproduction of

15   the same by any means unless under the

16   direct control and/or supervision of the

17   certifying shorthand reporter.

18

19

20

21

22

23

24
```

265

```
 1                    SIGNATURE PAGE

 2

 3

 4             I hereby acknowledge that I

 5     have read the foregoing transcript, and

 6     the same is a true and correct

 7     transcription of the answers given by me

 8     to the questions propounded, except for

 9     the changes, if any, noted on the errata

10     sheet.

11

12

13   SIGNATURE:
     DATE:
14

15

16

17

18

19

20

21

22

23

24
```

266

```
 1                    ERRATA SHEET
 2
 3    PAGE         LINE          CORRECTION
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

267

```
1                         INDEX

2

3      WITNESS:  Arlin Adams

4                                  PAGE LINE
       BY MR. LEVY                  4    12
5

6                        EXHIBITS

7      DESCRIPTION                  PAGE LINE
       Trustee-1, the Opinion of    4    18
8      Judge Walrath
       Trustee-2, a Motion of the   5    4
9      Chapter 11 Trustee for
       Authorization to Enter into
10     Termination and Employment
       Extension Agreement with
11     Daniel D. Crowley
       Trustee-3, a Response of     5    17
12     Chapter 11 Trustee in
       Opposition to Equity
13     Committee's Motion for an
       Order
14     Terminating Daniel Crowley
       Employment
15     Trustee-4, an E-mail         54   12
       Trustee-5, a letter dated    70   14
16     March 26, 2002
       Trustee-6, a letter dated    71   15
17     July 9, 2002
       Trustee-7, a letter dated    111  10
18     May 9, 2002
       Trustee-8, a letter dated    120  19
19     September 17, 2002
       Trustee-9, a memorandum      125  23
20     from Mr. Weber and Mr.
       Bemiss to Barry Bressler
21     Trustee Exhibit 10, a        138  19
       letter dated December 27,
22     2001
       Trustee-11, a letter dated   141  18
23     January 29, 2002
       Trustee-12, a letter dated   142  21
24     February 18, 2002
       Trustee-13, a letter dated   148  23
```

268