officers, directors, shareholders, employees, agents, advisors, representatives, attorneys, accountants or other professionals, shall be deemed to have released the Equity Committee and its individual members, and their predecessors, successors, affiliates, parents, subsidiaries and assigns, and their officers, directors, shareholders, employees, agents, advisors, representatives, attorneys, accountants and other professionals, of and from any and all claims, obligations, rights, causes of action and liabilities which such holder may be entitled to assert, whether known or unknown, foreseen or unforeseen, then existing or thereafter arising, based in whole or in part upon any act, omission or other occurrence having taken place on or prior to the Effective Date and in any way relating to the Debtors, this Plan or the Chapter 11 Case, including the Proposed Derivative Claims.

     9.5    **R-Net.** As of the Effective Date, CHC and/or Coram, and their predecessors, successors, affiliates, parents, subsidiaries and assigns, and their officers, directors, shareholders and employees shall be deemed to have released R-Net, and its predecessors, successors, affiliates, parents, subsidiaries and assigns, and/or their officers, directors, shareholders, employees, agents, advisors, representatives, attorneys, accountants and other professionals, of and from any and all Claims, obligations, rights, causes of action and liabilities, whether known or unknown, foreseen or unforeseen, then existing or thereafter arising, based in whole or in part upon any act, omission or other occurrence having taken place on or prior to the Effective Date in any way relating to the Debtors or R-Net, except that the Debtors will retain a General Unsecured Claim of $1,000.00 in R-Net's Chapter 11 case.

     9.6    **Miscellaneous.** Nothing herein shall be construed as releasing Crowley, Amaral, Casey, Smith and/or Smoley from any claims held by the Debtors, including the

Proposed Derivative Claims and all such Claims shall be retained and prosecuted or settled solely by the Trustee.

9.7    Nothing in this Article 9 shall operate to release any party from the obligations expressly contemplated by this Plan. Further, nothing in this Article 9 shall be construed as limiting the rights of the Trustee, or any other party in interest, to object to any interim or final applications for the allowance of Administrative Claims for compensation for professional services rendered and/or reimbursement of expenses incurred which are filed pursuant to Sections 330, 331 and/or 503 of the Bankruptcy Code, or for the reimbursement of expenses incurred by any member of the Equity Committee or the Creditors' Committee pursuant to Section 503(b)(3)(F) of the Bankruptcy Code.

## ARTICLE 10

## DISCHARGE

10.1    **Discharge.** Except as otherwise specifically provided herein or in the Confirmation Order, the consideration to be distributed to the holders of Allowed Claims or Allowed Equity Interests under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Equity Interests of any nature whatsoever against or in the Debtors or any assets, property or interests in property of the Debtors, and the Debtors shall be discharged from any and all Claims, including Claims that arose before the Confirmation Date, and all debts of the kind specified in Sections 502(g), (h) and (i) of the Bankruptcy Code, whether or not a proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or the holder of a Claim based upon such debt has accepted the Plan or any

distribution under the Plan. Except as otherwise provided herein or in the Confirmation Order, the Confirmation Order shall be a judicial determination of the discharge of all liabilities of the Debtors and a termination of all Equity Interests in the Debtors to the fullest extent permitted by law.

10.2    **Injunction. Except as expressly provided in the Plan, the discharge granted hereunder shall act as a permanent injunction against the taking of any of the following actions against the Debtors, Reorganized Coram and/or assets or property of the Debtors' estates: (i) the commencement or continuation of any action or other proceeding of any kind to enforce a Claim or Equity Interests against either of the Debtors; (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award decree or order against the Debtor; (iii) the creation, perfection or enforcement of any encumbrance of any kind against the Debtors, Reorganized Coram or any of their or its property; and/or (iv) the assertion of any right of setoff, subrogation or recoupment of any kind against any obligation.**

## ARTICLE 11

## DISTRIBUTIONS

11.1    **Disbursing Agent**. All Distributions under the Plan shall be made by Reorganized Coram at the direction of the Disbursing Agent. If the Disbursing Agent is an independent third party designated by the Trustee to serve in such capacity, such Disbursing Agent shall receive, without further Bankruptcy Court approval, reasonable compensation for services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services by Reorganized Coram. No Disbursing Agent shall be

required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

11.2  **Delivery of Distributions**. Distributions to holders of Allowed Claims shall be made by Reorganized Coram at the direction of the Disbursing Agent by regular and/or certified mail to the distributees at the addresses set forth in the proofs of Claim filed by such holders, or if no proof of Claim has been filed, to the address listed on the schedules filed by the Debtors, unless another address has been designated by the Creditor in writing to the Disbursing Agent, in such event the address designated by the Creditor shall be utilized. In the event the Distributions are returned due to an incorrect, incomplete or discontinued address, and the holder fails to claim the Distribution within 120 days of the date on which the Distribution was mailed, the amount of the Distribution shall be treated as a Disallowed Claim.

11.3  **Distribution of Cash**. All Cash Distributions shall be in whole dollars. Whenever the payment of other than whole dollars would otherwise be required, the actual Distribution shall be rounded to the nearest whole dollar (with half dollars or less being rounded down).

11.4  **Distribution of Stock**. The Distribution of stock shall be in whole numbers of shares. Whenever the Distribution of other than whole shares would be required, the actual Distribution shall be rounded to the nearest whole share (with half shares or less being rounded down).

11.5  **No Interest on Claims or Interests**. Unless otherwise specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be

29

entitled to interest accruing on or after the Petition Date. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim or disputed Equity Interest in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim or disputed Equity Interest becomes Allowed, except as provided for Class 3 Claims in Article 5, Section 3 of the Plan.

## ARTICLE 12

## ACCEPTANCE OR REJECTION OF THE PLAN

12.1    **Claims.** Each holder of an Allowed Claim in an impaired class of Claims shall be entitled to vote separately to accept or reject the Plan. An impaired class of Claims shall have accepted the Plan if (i) the holders of at least two-thirds in amount of the Allowed Claims actually voting in such class have voted to accept the Plan, and (ii) the holders of more than one-half in number of the Allowed Claims actually voting in such class have voted to accept the Plan.

12.2    **Equity Interests.** An impaired class of Allowed Equity Interests shall have accepted the Plan if the holders of at least two-thirds in amount of the Allowed Equity Interests actually voting in such class have voted to accept the Plan.

12.3    **Ballots.** Any ballot which is executed by the holder of an Allowed Claim or Allowed Equity Interest, but which does not indicate an acceptance or rejection of the Plan, shall be deemed an acceptance of the Plan, provided that the ballot so states in bold type and further provided that the Bankruptcy Court shall have approved the foregoing by appropriate order.

12.4    **Cramdown.** In the event that any impaired class of Claims or Equity Interests fails to accept a plan of reorganization, the proponent may request that the Bankruptcy

30

Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code. In view of the deemed rejection by Class 5, the Trustee will seek confirmation under Section 1129(b).

## ARTICLE 13

## CONFIRMATION AND EFFECTIVENESS OF THE PLAN

13.1   **Conditions Precedent to Confirmation.**   The Plan shall not be confirmed by the Bankruptcy Court unless and until the following conditions shall have been satisfied or waived pursuant to Article 13, Section 4 of the Plan:

(a)   The proposed Confirmation Order shall be in form and substance reasonably acceptable to the Trustee and the Noteholders; and

(b)   All exhibits to the Plan, including those to be contained in the Plan Supplement, shall be in form and substance reasonably acceptable to the Trustee and the Noteholders.

13.2   **Conditions Precedent to Effectiveness.**   The Plan shall not become effective unless and until the following conditions have been satisfied or waived pursuant to Article 13, Section 4 of the Plan:

(a)   The Confirmation Order shall have been entered and there shall be no stay or injunction in force and effect that would prevent the occurrence of the Effective Date;

(b)   The Confirmation Order shall authorize the Trustee and Reorganized Coram to take all actions necessary or appropriate to consummate the Plan and to enter into,

implement and effectuate the contracts, instruments, releases and other agreements or documents created in connection with the Plan.

(c)     The statutory fees owing to the United States Trustee shall have been paid in full;

(d)     Each of the Amended Reorganized Coram Certificate of Incorporation, the Amended Reorganized Coram Bylaws in form and substance satisfactory to the Trustee and Reorganized Coram shall have been filed, effected, or executed, as required;

(e)     All other actions, authorizations, consents and regulatory approvals required (if any) and all Plan documents necessary to implement the provisions of the Plan shall have been obtained, effected or executed in a manner acceptable to the Trustee or, if waivable, waived by the Persons entitled to the benefit thereof;

(f)     The Exit Facility shall have been entered into by all parties thereto and all conditions to the initial draw thereunder shall have been satisfied in accordance with the terms thereof such that the Trustee and Reorganized Coram shall have available to them sufficient funds with which to meet all obligations under the Plan; and

(g)     Reorganized Coram Common Stock shall have been duly authorized and, with the occurrence of the Effective Date, shall be validly issued and outstanding.

13.3    **Effect of Failure of Conditions.**  If each condition to the Effective Date specified in Article 13, Section 2 of the Plan has not been satisfied or duly waived within ninety (90) days after the Confirmation Date, then (unless the period for waiver or satisfaction of such

conditions has been extended with the consent of the Trustee and the Noteholders) the Confirmation Order will be vacated by the Bankruptcy Court.

13.4    **Waiver of Conditions.** The Trustee may, with the consent of Noteholders, which consent shall not be unreasonably withheld, waive, by a writing signed by an authorized representative of the Trustee and subsequently filed with the Bankruptcy Court, the condition precedent to confirmation and effectiveness of the Plan specified in Article 13, Section 1(b), 2(d), (e) and (f) of the Plan.

# ARTICLE 14

## RETENTION OF JURISDICTION

The Bankruptcy Court shall retain jurisdiction over the Chapter 11 Case for the following purposes:

(a)    to determine the extent, validity and amount of all objections to or requests to estimate Claims whether secured or unsecured;

(b)    to determine any applications for compensation;

(c)    to determine any (i) pending and/or future motions, applications and adversary proceedings; (ii) causes of action against third persons; (iii) adversary proceedings; and (iv) contested and litigated matters;

(d)    to determine any pending application for assumption or rejection of executory contracts or unexpired leases, claims for cure amounts and allowance of any Claims resulting from the rejection of executory contracts or unexpired leases;

33

(e)    to enforce the provisions of the Plan;

(f)    to consider any amendments to or modifications of the Plan, correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or documents related to the Plan, or the order of the Bankruptcy Court confirming the Plan as may be necessary to carry out the purposes and intent of the Plan;

(g)    to construe or enforce the Plan, the Confirmation Order or any other order or judgment, injunction or ruling entered or made in the Chapter 11 Case, and to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code;

(h)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; and

(i)    to issue such orders in aid of execution and consummation of the Plan, to the extent authorized by Section 1142 of the Bankruptcy Code.

## ARTICLE 15

## MISCELLANEOUS PROVISIONS

15.1    **Governing Law.**  Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware.

15.2    **Exemption from Registration.**  In accordance with Section 1145 of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan, or the

34

execution, delivery or recording of an instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, shall be exempt from registration under the Securities Act of 1933, as amended, and under state securities laws.

15.3    **Exemption from Certain Transfer Taxes.** Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from CHC or Coram to Reorganized Coram or any other Person pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee or similar tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall serve as a direction to the appropriate state or local governmental officials to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without payment of any such tax or governmental assessment.

15.4    **Severability.** If any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose and intent of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted, unless the consequence of doing so shall materially adversely alter the rights or obligations of the Person affected by any such change, in which event the consent of such Persons shall be required in order to confirm the Plan. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial interpretation and shall provide that each term and provision of the Plan, as it may have been

35

altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms, provided that consents, if any, required by the first sentence of this Article 15, Section 4 shall have been obtained.

15.5    **Successors and Assigns.** The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person.

15.6    **Amendments.** The Trustee reserves the right, in accordance with Section 1127 of the Bankruptcy Code to amend or modify the Plan before or after Confirmation. Any holder of a Claim or Equity Interest that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

15.7    **Payment of Statutory Fees.** All fees payable pursuant to Section 1930 of Title 28 of the United States Code, shall be paid by Reorganized Coram on the Effective Date.

15.8    **Reservation of Rights.** If the Bankruptcy Court or any other court of competent jurisdiction for any reason does not confirm this Plan, the rights of all parties in interest are and will be reserved in full. Each concession, compromise or settlement reflected herein is made for purposes of this Plan only, and if the Effective Date does not occur, no party in interest shall be bound or deemed prejudiced by any such concession, compromise or settlement.

15.9    **Rules of Interpretation.** For purposes of the Plan, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the

singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (d) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (e) any reference to an entity as a holder of a Claim or Equity Interest includes that entity's successors and assigns; (f) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (g) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of this Plan; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (i) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; and (j) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply, where applicable.

15.10  **Plan Supplement.** The Plan Supplement shall be filed with the Court at least ten (10) days prior to the date fixed as the last day for voting to accept or reject the Plan. The Plan Supplement shall include copies of, among other things, the Reorganized Coram certificate of incorporation and bylaws, the identities of the officers of Reorganized Coram, the

Exit Facility documents and a list of executory contracts and leases to be rejected pursuant to the Plan.

15.11  **Revocation.** The Trustee reserves the right to revoke and withdraw this Plan at any time prior to the entry of the Confirmation Order.  If this Plan is so withdrawn, then it shall be deemed null and void.

Respectfully Submitted,


___/s/ Arlin M. Adams_____
Arlin M. Adams, Chapter 11 Trustee of the
Bankruptcy Estates of Coram
Healthcare Corp. and Coram, Inc.


Of Counsel

SCHNADER HARRISON SEGAL
        & LEWIS LLP
Barry E. Bressler
Wilbur L. Kipnes
Richard A. Barkasy
Michael J. Barrie
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2000



Dated: May 2, 2003
        Philadelphia, Pennsylvania

# EXHIBIT B

# ARLIN M. ADAMS

## EDUCATION AND ARMED FORCES

| | |
|---|---|
| 1941 | B.S. Temple University - Highest Honors. Full Scholarship to University of Pennsylvania Law School |
| 1942-45 | U.S. Naval Reserve - 1942-45<br>Service in North Pacific with Fleet Air Wing Four |
| 1947 | LLB - University of Pennsylvania Law School. Editor-in-Chief of Law Review; graduated with honors |
| 1947 | Law Secretary - Chief Justice Horace Stern, Pennsylvania Supreme Court |
| 1950 | M.A. in Economics - Temple University and University of Pennsylvania |

## PROFESSIONAL STATUS

| | |
|---|---|
| 1947-69 | Senior Partner in Schnader, Harrison, Segal & Lewis, one of Philadelphia's largest law firms |
| 1969 | Inducted as a member of U.S. Court of Appeals for the Third Circuit |
| 1979 | Member of the American Philosophical Society |
| 1980-83 | Secretary, American Philosophical Society |
| 1987-92 | Vice President, American Philosophical Society |
| 1993 | President, American Philosophical Society |
| 1987 | Retired as Judge of U.S. Court of Appeals; Counsel to Schnader, Harrison, Segal & Lewis |
| 1991 | Appointed to Extraordinary Challenge Committee Free Trade Agreement, United States and Canada, by Binational Secretariat, U.S. Section |

## HONORARY DEGREES

| | |
|---|---|
| 1998 | Doctor of Laws. University of Pennsylvania |
| 1987 | Doctor of Laws. Villanova University |

| | |
|---|---|
| 1986 | Doctor of Laws, Muhlenberg College |
| 1985 | Doctor of Laws, Susquehanna University |
| 1966 | Doctor of Laws, Philadelphia College of Textiles |
| 1965 | Doctor of Science, Philadelphia College of Optometry |
| 1964 | Doctor of Humane Letters, Temple University |

## ACADEMIC SERVICE AND ACADEMIC HONORS

| | |
|---|---|
| 1949-52 | Faculty - American Institute of Banking |
| 1952-56 | Faculty - University of Pennsylvania Law School, Lecturer in practice courses |
| 1972 | Faculty - University of Pennsylvania Law School, Lecturer in constitutional Law |
| 1967-77 | Chairman of Board of Trustees, Fels Institute of State and Local Government (University of Pennsylvania) |
| 1965- | Board of Overseers, University of Pennsylvania Law School |
| 1985-92 | Chairman of Board of Overseers, University of Pennsylvania Law School |
| 1965-67 | Board of Overseers, School of Social Work University of Pennsylvania |
| 1967-78 | Chairman, Advisory Board, School of Social Work, Bryn Mawr College |
| 1972-78 | Trustee, Bryn Mawr College |
| 1974-80 | Trustee, Medical College of Pennsylvania |
| 1982 | Honorary Trustee, Medical College of Pennsylvania |
| 1975-84 | Board of Overseers, Wharton School, University of Pennsylvania |
| 1975-87 | Board of Advisors, Columbia University Center for Law and Economic Studies |
| 1980 | Board of Advisors, Center for Law and Economics, University of Pennsylvania |

AWARDS

| | |
|---|---|
| 1981 | Distinguished Service Award, University of Pennsylvania |
| 1981-88 | Woodrow Wilson Lecturer (Princeton) |
| 1982 | Justice Award, American Judicature Society |
| 1985 | Trustee, University of Pennsylvania |
| 1987-93 | Chairman, Judicial Fellows Commission, United States Supreme Court |
| 1987 | Awarded Gold Medallion, Chapel of the Four Chaplains |
| 1987 | Good Neighbor Award, Mellon Bank |
| 1987 | James Madison Award, Phila. Society of Professional Journalists |
| 1987 | John Courtney Murray Award, by DePaul University College of Law |
| 1987 | Delivered Owen Roberts Memorial Lecture, at University of Pennsylvania |
| 1988 | Rosemont College Cresset Award |
| 1988 | Leon J. Obermayer Award, from the Committee to Support Philadelphia Public Schools |
| 1994 | Distinguished Service Award, University of Pennsylvania Alumni Society |
| 1997 | The Philadelphia Award — Highest honor for community service in Delaware Valley area |
| 2001 | The James Wilson Award, Law Alumni Society of the University of Pennsylvania |
| | Creation of the Arlin M. Adams Center for Law and Society, Susquehanna University |

BAR ACTIVITIES

| | |
|---|---|
| 1950 | President - Junior Bar Association of Pennsylvania |
| 1967 | Chancellor - Philadelphia Bar Association |

1975-77          President - American Judicature Society

                 House of Delegates, American Bar Association

                 Chairman, Trade Association Committee, ABA

                 American Law Institute

                 American Bar Foundation

1986-1997        Trustee, Pennsylvanians for Modern Courts:    (To improve the judiciary of
                 Pennsylvania)


## COMMUNITY ACTIVITIES

1955-57          Chairman - Moss Rehabilitation Hospital

1966             Trustee - Albert Einstein Medical Center

1984-87          Chairman of the Board - Albert Einstein Medical Center

1971-73          Chairman of the Board - Diagnostic and Rehabilitation Center
                 (large agency for addictive diseases)

1972-84          Trustee - German Marshall Trust

1972             American Philosophical Society

                 1981-84          Secretary
                 1986-92          Vice President
                 1993             President

1978-84          Trustee - The William Penn Foundation

1978-1988        Trustee - The 1908 Foundation

1987-89          Trustee - National Constitution Center

1988-91          Chairman, Annenberg Research Institute

1988-93          Chairman - Judicial Fellows Commission of U.S. Supreme Court

1998             Honorary Director, Philadelphia Museum of Art

## GOVERNMENTAL SERVICE

| | |
|---|---|
| 1963-66 | Secretary of Public Welfare, Commonwealth of Pennsylvania |
| 1985-87 | Member of the Board, Federal Judicial Center |
| 1988-90 | Member, Judicial Nominating Commission. Appointed by Governor Casey |
| 1989-91 | Chair of Commission investigating prison riot at Camp Hill; appointed by Governor Casey |
| 1995 | Appointed by Court as Trustee in New Era Bankruptcy case |

# EXHIBIT C

## Coram Healthcare Corporation ("Coram" or the "Company")
### Feasibility Analysis
### Source and Uses Analysis

**Disclosure:** Certain information and estimates contained in this analysis were obtained from Coram; however, SSG Capital Advisors, L.P. and Ewing Monroe Bemiss & Co. (the "Advisors") assume no liability for such data. Information supplied by the Company has been accepted without further verification as correctly reflecting the Company's past results and current condition in accordance with general accepted accounting principles. With respect to certain financial projections, estimates, and forecasts, we have assumed that they have been reasonably prepared on a basis that reflects the best currently available estimates and judgments of the Company.

The following analysis assumes Coram emerges from bankruptcy on October 31, 2003.

| | |
|---|---:|
| **Sources of Funds** | |
| Projected Cash Balance Available to Fund Plan | $33,496,435 |
| Gross Noteholder Funding | 56,000,000 |
| Less: Deferred IRS Claims | (17,661,535) |
| Net Noteholder Funding | 38,338,465 |
| Total Sources of Funds | $71,834,900 |
| | |
| **Less: Uses of Funds** | |
| Projected Administrative Claims (1) | ($13,500,000) |
| Non-IRS Tax Claims | (100,000) |
| Priority Tax Claims | (12,900) |
| Unsecured Claims (including R-Net settlement) | (17,950,000) |
| Working Capital Left in Company | (10,000,000) |
| Total Uses of Funds | ($41,562,900) |
| **Balance** | **$30,272,000** |

The Plan of Reorganization assumes that the above balance is distributed to the Company's common shareholders.

---

(1) Assumes entire $13.5 million projection of administrative claims from May 1, 2003 to October 31, 2003 is paid in one lump sum at exit. Includes Noteholder Funding closing costs.

## Coram Healthcare Corporation ("Coram" or the "Company")
### Feasibility Analysis
### Liquidity Analysis

The Plan of Reorganization assumes that the Company will have $10 million of cash, $38.3 million of Noteholder Funding, and $17.7 million of Deferred IRS Claims at exit. The following analysis details the Company's debt and cash balances going forward as well as the implied debt and interest coverage ratios.

| | 31-Oct-03 | For the Years Ending December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2003 | 2004 | 2005 | 2006 | 2007 |
| Noteholder Funding | $38,338,000 | $38,338,000 | $38,338,000 | $38,338,000 | $38,338,000 | $38,338,000 |
| Deferred IRS Claims | 17,661,535 | 16,922,535 | 13,966,535 | 11,010,535 | 8,054,535 | 5,098,535 |
| Total Debt (1) | $55,999,535 | $55,260,535 | $52,304,535 | $49,348,535 | $46,392,535 | $43,436,535 |
| Cash | 10,000,000 | 15,129,000 | 29,214,000 | 52,492,000 | 82,379,000 | 107,166,000 |
| Net Debt (1) | 45,999,535 | 40,131,535 | 23,090,535 | (3,143,465) | (35,986,465) | (63,729,465) |
| EBITDA | 28,593,000 (2) | 28,593,000 | 31,040,000 | 32,936,000 | 33,687,000 | 33,661,000 |
| Total Cash Debt Service | 2,396,125 (2) | 2,396,125 | 2,396,125 | 2,396,125 | 2,396,125 | 2,396,125 |
| **Total Debt / EBITDA** | 2.0x | 1.9x | 1.7x | 1.5x | 1.4x | 1.3x |
| **Net Debt / EBITDA** | 1.6x | 1.4x | 0.7x | NM | NM | NM |
| **EBITDA / Total Cash Debt Service** | 11.9x | 11.9x | 13.0x | 13.7x | 14.1x | 14.0x |

Utilizing the assumptions in the Company's projection model, this analysis establishes that Coram maintains sufficient liquidity going forward.

---

(1) For the purposes of this analysis, the deferred IRS claims are categorized as debt.
(2) Projected data for the year ending December 31, 2003.

# EXHIBIT D

Coram Healthcare Corporation, Inc.
Gross Liquidation Valuation as of December 31, 2002 (1)

**Cash as of December 31, 2002**

| | Book Value | Realization Rate | | Liquidation Value | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Cash | $30,591,000 | 100.0% | 100.0% | $30,591,000 | $30,591,000 |
| Cash Limited to Use (2) | 217,000 | 25.0% | 75.0% | 54,250 | 162,750 |
| Total Cash | $30,808,000 | | | $30,645,250 | $30,753,750 |

**Accounts Receivable as of December 31, 2002 (3)**

| | Book Value | Realization Rate | | Liquidation Value | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| 0-30 Days | $33,778,725 | 50.0% | 80.0% | $16,889,363 | $27,022,980 |
| 31-60 Days | 23,829,352 | 45.0% | 75.0% | 10,723,208 | 17,872,014 |
| 61-90 Days | 15,244,268 | 45.0% | 75.0% | 6,859,921 | 11,433,201 |
| 91-120 Days | 9,398,077 | 45.0% | 70.0% | 4,229,135 | 6,578,654 |
| 121-150 Days | 6,995,335 | 45.0% | 70.0% | 3,147,901 | 4,896,735 |
| 151-360 Days | 27,001,639 | 35.0% | 50.0% | 9,450,574 | 13,500,820 |
| Over 360 | 20,474,983 | 30.0% | 40.0% | 6,142,495 | 8,189,993 |
| Total | $136,722,379 | | | $57,442,595 | $89,494,396 |

**Inventory as of December 31, 2002**

| | Book Value | Realization Rate | | Liquidation Value | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| U.S. Drugs and Supplies | $12,803,957 | 10.0% | 25.0% | $1,280,396 | $3,200,989 |
| Canadian Drugs and Supplies | 113,766 | 10.0% | 25.0% | 11,377 | 28,442 |
| Durable Medical Equipment | 242,205 | 15.0% | 35.0% | 36,331 | 84,772 |
| Total Drugs and Supplies | $13,159,928 | | | $1,328,103 | $3,314,203 |

**Pump and Ancillary Component Inventory as of December 31, 2002 (4)**

| | Quantity | Liquidation Value per Pump | | Liquidation Value | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Sabratek (Baxter) 3030 | 2,929 | $1.00 | $1.00 | $2,929 | $2,929 |
| Sabratek (Baxter) 6060 | 4,696 | 200.00 | 300.00 | 939,200 | 1,408,800 |
| Miscellaneous Pumps | 1,899 | 1.00 | 50.00 | 1,899 | 94,950 |
| Total Pumps and Components | 9,524 | | | $944,028 | $1,506,679 |

**Property and Equipment as of December 31, 2002**

| | Book Value | Realization Rate | | Liquidation Value | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Owned Vehicles (5) | $0 | | | $65,000 | $70,000 |
| Durable Medical Equipment | 1,228,620 | 15.0% | 35.0% | 184,293 | 430,017 |
| Computer Equipment (6) | 2,686,212 | | | 685,000 | 790,000 |
| Software | 1,848,414 | 0.0% | 5.0% | 0 | 92,421 |
| Furniture, Fixtures and Equipment (7) | 1,820,426 | 15.0% | 25.0% | 273,064 | 455,107 |
| Leasehold Improvements | 1,108,830 | 0.0% | 5.0% | 0 | 55,442 |
| Total Property and Equipment | $8,692,502 | | | $1,207,357 | $1,892,98 |

**Other Assets as of December 31, 2002**

| | Book Value | Realization Rate | | Liquidation Value | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Intangible and Deferred Assets (8) | $5,270,000 | 0.0% | 15.0% | $0 | $790,500 |
| Other Current Assets (9) | 5,658,000 | 40.0% | 60.0% | 2,263,200 | 3,394,800 |
| Other Noncurrent Assets (10) | 5,064,000 | 10.0% | 50.0% | 506,400 | 2,532,000 |
| Total Other Assets | $15,992,000 | | | $2,769,600 | $6,717,300 |
| | | | | | |
| Total Gross Liquidation Value (1) | | | | $94,336,933  -  | $133,679,313 |

Coram Healthcare Corporation, Inc.
Gross Liquidation Valuation as of December 31, 2002 (1)
Notes

(1) Excludes transaction costs, such as professional fees and wind-down costs.

(2) Cash limited to use relates to that held by the Company's partnerships.

(3) The accounts receivable is primarily due from regulated entities, such as Medicare and Medicaid, and commercial payors.

(4) Sabratek 3030 pumps and many of the miscellaneous pumps are old and no longer supported by the manufacturer. The ancillary components include monitors, cables, pouches and other components. The net book value of the pump and ancillary components is $1,746,133.

(5) As per Daley-Hodkin Corp. Asset listings as of December 31, 2002. Values as of April 4, 2003. The low value is Auction Value and the high value is Orderly Liquidation Value.

(6) As per Daley-Hodkin Corp. Asset listings as of December 31, 2002. Values as of April 4, 2003. The low value is Auction Value and the high value is Orderly Liquidation Value. The following breaks down computer equipment values in more detail:

|  | Auction Value | Orderly Liq. Value |
|---|---|---|
| Workstations and PCs | $365,000 | $424,000 |
| Printers | 58,000 | 65,000 |
| Mainframe Hardware | 118,000 | 135,000 |
| Routers and Switches | 144,000 | 166,000 |
| Total | $685,000 | $790,000 |

(7) The furniture, fixtures and equipment consist primarily of refrigerators for the drugs and supplies, mixing and compounding equipment and office equipment.

(8) The largest component of intangible and deferred assets is the patient outcomes database.

(9) Other current assets include deposits, other receivables, rebates, and prepaid expenses. One of the larger components is federal income tax refund. Although we assume in this analysis that 100% of the refund is recovered, it is likely that the proceeds would be applied to any outstanding tax liabilities.

(10) Other noncurrent assets primarily consists of deposits, letters of credit, and the Company's investments in joint ventures.