# EXHIBIT A

# THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                          : Chapter 11

CORAM HEALTHCARE CORP. and                      : Case No. 00-3299 (MFW)
CORAM, INC.,                                     : (Jointly Administered)

Debtors.                                        :      RE: 4051, 4052, 4057

---

## ORDER CONFIRMING THE CHAPTER 11 TRUSTEE'S
## SECOND AMENDED JOINT PLAN OF REORGANIZATION

---

WHEREAS, on May 2, 2003, Arlin M. Adams, the Chapter 11 Trustee of the above-captioned bankruptcy estates (the "Trustee"), filed the Chapter 11 Trustee's Joint Plan of Reorganization (the "Original Plan"), which Plan the Trustee subsequently amended or modified on June 17, 2003 (the "Amended Plan"), September 8, 2003 and April 15, 2004 (the "Second Amended Plan") (a copy of the Second Plan is annexed hereto as Exhibit A);

WHEREAS, on June 26, 2003, the Court entered an Order (the "Solicitation Order") that, among other things, (i) approved the Disclosure Statement[1] under Section 1125 of the Bankruptcy Code and Fed. R. Bankr. P. 3017, (b) approved the form and method of the notice of Confirmation Hearing (the "Confirmation Hearing Notice") and (c) established certain procedures for the solicitation and tabulation of votes with respect to the Amended Plan;

WHEREAS, the Confirmation Hearing Notice together with the (i) the Amended Plan, (ii) the Disclosure Statement, (iii) the Solicitation Order, (iv) the appropriate ballot(s) and voting instructions, and (v) a pre-addressed return envelope (collectively, a "Solicitation Package")

---

[1] Unless otherwise defined herein, all capitalized terms shall have the same meanings ascribed to them in the Plan.

PHDATA 1234490_1

#4061

were transmitted in the manner set forth in the Disclosure Statement Order, and such service is adequate as provided by Fed. R. Bankr. P. 3017(d);

WHEREAS, the Trustee filed the: (i) certification of publication of Jacqueline Haslbauer, principal clerk of the *New York Times*, attesting to the fact that the Confirmation Hearing Notice was published in the *New York Times* on August 20, 2003, and (ii) certification of Gregg Palmer, advertising clerk of the *Wall Street Journal*, attesting to the fact that the Confirmation Hearing Notice was published in the *Wall Street Journal* on August 20, 2003;

WHEREAS, on June 9, 2004, Henry Colvin of AlixPartners LLC, the claims agent appointed in these bankruptcy cases, filed the Affidavit of Henry Colvin Certifying the Ballots Accepting or Rejecting the Chapter 11 Trustee's Amended Joint Plan of Reorganization, Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Chapter 11 Trustee Dated June 7, 2004 (the "Voting Report");

WHEREAS, on September 29, 2003, the Trustee filed the Plan Supplement with respect to the Amended Plan;

WHEREAS, objections to confirmation of the Amended Plan were filed (collectively, the "Objections");

WHEREAS, the Court held confirmation hearings with respect to the Amended Plan, as amended by the Second Amended Plan, and a competing plan of reorganization filed by the Equity Committee, beginning on September 30, 2003 and ending on April 20, 2004;

WHEREAS, following the conclusion of the confirmation hearings, the Trustee, the Equity Committee and the Noteholders submitted post-confirmation hearing briefs and reply briefs;

WHEREAS, on September 10, 2004, the Trustee filed a Stipulation between the Trustee and the Equity Committee regarding the Second Amended Plan (the "Stipulation");

PHDATA 1234490_1

WHEREAS, on October 5, 2004, the Court issued an Opinion (the "Opinion") and Order (the "Order"): (i) denying confirmation of the Equity Committee's plan; and (ii) stating that the request by the Trustee for confirmation of the Second Amended Plan would be granted, provided that the Second Amended Plan was modified in accordance with the Opinion (copies of the Opinion and Order are annexed hereto as Exhibits B and C, respectively); and

WHEREAS, on October 15, 2004, the Trustee filed with the Court the Modification of Chapter 11 Trustee's Second Amended Joint Plan of Reorganization in Accordance with Opinion and Order Dated October 5, 2004 (the "Plan Modification," and together with the Second Amended Plan, the "Plan") (a copy of the Plan Modification is annexed as Exhibit D).

NOW, THEREFORE, IT IS HEREBY FOUND AND DETERMINED THAT:[2]

1.      Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2), 1334(a)). The Court has jurisdiction over the Bankruptcy Cases and the Plan pursuant to 28 U.S.C. §§ 157(b)(2)(A) & (L) & 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 & 1409. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)&(L) and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

2.      Judicial Notice. The Court takes judicial notice of the docket of these Bankruptcy Cases maintained by the Clerk of the Bankruptcy Court and/or its duly-appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of the Bankruptcy Cases.

---

[2] Pursuant to Fed. R. Bankr. P. 7052, as made applicable to contested matters under Fed. R. Bankr. P. 9014, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.

3.    Burden of Proof. The Trustee has the burden of proving the elements of Section 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

4.    Transmittal and Mailing of Materials; Notice. The Solicitation Package was transmitted and served in accordance with the Solicitation Order and the Bankruptcy Rules and such transmittal and service were adequate and sufficient; publication of the Confirmation Hearing Notice as set forth in the certifications of Jacqueline Haslbauer of the *New York Times* and Gregg Palmer of the *Wall Street Journal* were adequate and sufficient, and no other or further notice was required.

5.    Voting. Votes to accept and reject the Amended Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Order.

6.    Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)). The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying Section 1129(a)(1) of the Bankruptcy Code.

(a)    Proper Classification (11 U.S.C. §§ 1122, 1123 (a)(1). The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exists for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between holders of Claims and Equity Interests. Thus, the Plan satisfies Sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(b)    Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)). Article 4 of the Plan specifies that Classes 1 and 2 are unimpaired under the Plan, thereby satisfying Section 1123(a)(2) of the Bankruptcy Code.

4

PHDATA 1234490_1

(c)    Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Article 4 of the Plan designates Classes 3, 4, 5 and 6 as impaired and the Plan specifies the treatment of Claims and Equity Interests in those Classes, thereby satisfying Section 1123(a)(3) of the Bankruptcy Code.

(d)    No Discrimination (11 U.S.C. § 1123(a)(4)). The Plan provides for the same treatment for each Claim or Equity Interest in each respective Class unless the holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest, thereby satisfying Section 1123(a)(4) of the Bankruptcy Code.

(e)    Implementation of Plan (11 U.S.C. § 1123(a)(5)). The Plan and the various documents and agreements set forth in the Plan and the Plan Supplement provide adequate and proper means for the Plan's implementation, thereby satisfying Section 1123(a)(5) of the Bankruptcy Code.

(f)    Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)). Article 5.4 of the Plan provides that the Certificate of Incorporation and Bylaws of Reorganized Coram shall be amended to satisfy the provisions of the Plan and the Bankruptcy Code, including to prohibit the issuance of nonvoting equity securities. Thus, the requirements of Section 1123(a)(6) of the Bankruptcy Code are satisfied.

(g)    Designation of Directors (11 U.S.C. § 1123(a)(7)). Article 5.5 of the Plan contains provisions with respect to the manner of selection of directors of Reorganized Coram that are consistent with the interests of creditors, equity security holders, and public policy in accordance with Section 1123(a)(7) of the Bankruptcy Code.

(h)    Additional Plan Provisions (11 U.S.C. § 1123(b)). The Plan's provisions are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code.

PHIDATA 1234490_1

(i)    Bankruptcy Rule 3016(a).  The Plan is dated and identifies the party submitting it as proponent, thereby satisfying Bankruptcy Rule 3016(a).

7.    Debtors' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).  The Trustee has complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Section 1129(a)(2) of the Bankruptcy Code.

8.    Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).  As set forth in the Opinion, the Trustee has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying Section 1129(a)(3) of the Bankruptcy Code.  The Trustee's good faith is evident from the facts and record of the Bankruptcy Cases, including the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in the Bankruptcy Cases.

9.    Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).  Any payment made or to be made by any of the Debtors for services or for costs and expenses in or in connection with the Bankruptcy Cases, or in connection with the Plan and incident to the Bankruptcy Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable, thereby satisfying Section 1129(a)(4) of the Bankruptcy Code.

10.    Directors, Officers and Insiders (11 U.S.C. § 1129(a)(5)).  The Trustee has complied with Section 1129(a)(5) of the Bankruptcy Code.  The identity and affiliations of the persons proposed to serve as initial directors or officers of Reorganized Coram after confirmation of the Plan have been disclosed, and the appointment to, or continuance in, such offices of such persons is consistent with the interests of holders of Claims against and Equity Interests in Reorganized Coram and with public policy.  The identity of any insider that will be employed or retained by Reorganized Coram and the nature of such insider's compensation have also been fully disclosed.

6

11.    No Rate Changes (11 U.S.C. § 1129(a)(6)). After confirmation of the Plan, Reorganized Coram's businesses will not involve rates established or approved by, or otherwise subject to, any governmental regulatory commission. Thus, Section 1129(a)(6) of the Bankruptcy Code is not applicable in the Bankruptcy Cases or with respect to the Plan.

12.    Best Interests of Creditors (11 U.S.C. § 1129(a)(7)). The Plan satisfies Section 1129(a)(7) of the Bankruptcy Code. Each holder of an impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on such date.

13.    Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)). Classes 1 (Priority, Non-Tax Claim) and 2 (Secured Claim) of the Plan are Classes of unimpaired Claims that are conclusively presumed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code. Classes 3 (General Unsecured Claims) and 4 (Coram Preferred Stock) voted to accept the Plan in accordance with Sections 1126(c) and (d) of the Bankruptcy Code. Class 5 (Coram Equity Interests) is not entitled to receive or retain any property under the Plan and, therefore, is deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Class 6 (CHC Equity Interests) voted to reject the Plan. Although Section 1129(a)(8) has not been satisfied with respect to Classes 5 and 6, the Plan is confirmable because the Plan satisfies Section 1129(b) of the Bankruptcy Code with respect to such rejecting Classes.

14.    Treatment of Administrative and Priority Claims (11 U.S.C. § 1129(a)(9)). The treatment of Administrative Claims and Priority Claims pursuant to Articles 3 and 4 of the Plan satisfies the requirements of Sections 1129(a)(9)(A) and (B) of the Bankruptcy Code, and the

7

treatment of Priority Tax Claims pursuant to Article 3 of the Plan satisfies the requirements of

Section 1129(a)(9)(C) of the Bankruptcy Code.

15.    Acceptance By Impaired Classes (11 U.S.C. § 1129(a)(10)).  At least one Class of

Claims against the Debtors that is impaired under the Plan has accepted the Plan, determined

without including any acceptance of the Plan by any insider, thus satisfying the requirements of

Section 1129(a)(10) of the Bankruptcy Code.

16.    Feasibility (11 U.S.C. § 1129(a)(11)).  Confirmation of the Plan is not likely to be

followed by the liquidation, or the need for further financial reorganization, of Reorganized

Coram, thus satisfying the requirements of Section 1129(a)(11) of the Bankruptcy Code.

17.    Payment of Fees (11 U.S.C. § 1129(a)(12)).  All fees payable under Section 1930

of title 28 of the United States Code have been paid or will be paid pursuant to Article 13.2(c) of

the Plan on or before the Effective Date.

18.    Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).  Article 5.12 of the

Plan provides that pursuant to Section 1114 of the Bankruptcy Code, payments, if any, due to

any person for the purpose of providing or reimbursing payments for retired employees and their

spouses and dependents for medical, surgical or hospital care benefits, or benefits in the event of

sickness, accident, disability or death under any plan, fund or program (through the purchase of

insurance or otherwise) maintained or established in whole or in part by the Debtors prior to the

Petition Date, shall be continued for the duration of the period the Debtors have obligated

themselves to provide such benefit; provided, however, that Reorganized Coram retains any right

to modify any and all such plans, funds and programs in accordance with the terms thereof.

Thus, the requirements of Section 1129(a)(13) of the Bankruptcy Code are satisfied.

19.    Fair and Equitable; No Unfair Discrimination (11 U.S.C. § 1129(b)).  Class 5 is

deemed to have rejected the Plan and Class 6 voted to reject the Plan (collectively, the

"Rejecting Classes"). The Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes, as required by Section 1129(b)(1) and (2) of the Bankruptcy Code. Upon confirmation and the occurrence of the Effective Date, the Plan shall be binding upon the members of the Rejecting Classes.

20.    Principal Purpose of the Plan (11 U.S.C. § 1129(d)). The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, as amended.

21.    Modifications to the Plan. The modifications of the Amended Plan set forth in the Second Amended Plan and the Plan Modification constitute technical changes and/or changes with respect to particular Claims and Equity Interests adversely affected thereby by agreement with and the consent of the holders of such Claims and Equity Interests, and do not materially adversely affect or change the treatment of any other Claims or Equity Interests. Accordingly, pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under Section 1125 of the Bankruptcy Code or resolicitation of votes under Section 1126 of the Bankruptcy Code, nor do they require that holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Amended Plan.

22.    Good Faith Solicitation (11 U.S.C. § 1125(e)). Based on the record before the Bankruptcy Court in these Bankruptcy Cases, the Trustee, the Debtors, AlixPartners LLC, any Disbursing Agent, the Noteholders, the Equity Committee and their respective members, officers, directors, employees, agents, counsel or other professionals have acted in good faith within the meaning of Section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules in connection with all their respective activities described in Section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by Section 1125(e) of the Bankruptcy Code and the exculpation provisions

PHDATA 1234490_1

set forth in Article 9 of the Second Amended Plan, as modified in conformity with the Opinion by the Plan Modification.

23.     Assumption of Executory Contracts and Unexpired Leases. Article 8 of the Plan governing the assumption and rejection of executory contracts and unexpired leases satisfies the requirements of Sections 365(a) and (b) of the Bankruptcy Code. The assumption of those executory contracts and unexpired leases to be assumed in accordance with the Plan is in the best interest of the Debtors, their estates, Reorganized Coram and all parties in interest in the Bankruptcy Cases. The assignment to Reorganized Coram of those assumed executory contracts and unexpired leases to which the Debtors are a party and of any executory contracts and unexpired leases heretofore assumed by the Debtors during the Bankruptcy Cases is in the best interest of the Debtors, their estates, Reorganized Coram and all parties in interest in the Bankruptcy Cases. The Plan and this Confirmation Order each adequately provides for the timely payment of cure amounts, if any, in Cash in accordance with Section 365(b)(1) of the Bankruptcy Code.

24.     Rejection of Executory Contracts and Unexpired Leases. The executory contracts or unexpired leases of the Debtors listed in the Plan Supplement as all executory contracts and unexpired leases to be rejected are burdensome and, as such, the rejection thereof is in the best interest of the Debtors, their estates, and all parties in interest in the Bankruptcy Cases.

25.     Substantive Consolidation. No creditor of any of the Debtors will be prejudiced by the limited substantive consolidation of the Bankruptcy Cases solely for Plan purposes; such substantive consolidation will benefit all creditors of the Debtors.

26.     R-Net Settlement. For the reasons and based upon the findings and conclusions set forth in the Opinion, the compromise and settlement between the Trustee and R-Net,

PHDATA 1234490_1

incorporated in the Plan, is hereby approved pursuant to Bankruptcy Rule 9019 and is binding upon all entities affected thereby.

    27.    The Plan Funding Agreement. For the reasons and based upon the findings and conclusions set forth in the Opinion, the compromise and settlement between the Trustee and the Noteholders that is incorporated in the Plan, is hereby approved and is binding upon all entities affected thereby.

    28.    Satisfaction of Confirmation Requirements. As provided herein and in the Opinion, the Plan satisfies the requirements for confirmation set forth in Section 1129 of the Bankruptcy Code.

    29.    Retention of Jurisdiction. The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article 11 of the Plan and Section 1142 of the Bankruptcy Code.

### DECREES

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

    30.    Confirmation. The Plan (which consists of the Second Amended Plan as modified by the Plan Modification) is approved and confirmed under Section 1129 of the Bankruptcy Code. The terms of the Plan and the Opinion are incorporated by reference into and are an integral part of this Confirmation Order.

    31.    Technical Amendments. The modifications and amendments to the Amended Plan reflected in the Second Amended Plan and Plan Modification, meet the requirements of Sections 1127 of the Bankruptcy Code, such modifications do not adversely change the treatment of any Creditor or any Equity Interest of which the holder has not consented thereto, and thus no further solicitation or voting is required.

11

32.   <u>Objections</u>. Certain of the objections to the Plan by the Equity Committee are addressed in the Opinion. All other objections that have not been withdrawn, waived, or settled, and all reservations of rights pertaining to confirmation of the Plan included therein, are overruled on the merits.

33.   <u>Plan Supplement</u>. The documents contained in the Plan Supplement and any amendments, modifications, and supplements thereto are incorporated by reference into and are an integral part of the Plan, all documents and agreements related thereto or to consummation and implementation of the Plan, and the execution, delivery, and performance thereof by Reorganized Coram, are authorized and approved. Without need for further order or authorization of the Bankruptcy Court, the Trustee, the Debtors and Reorganized Coram are each authorized and empowered to make any and all modifications to any and all documents included as part of the Plan Supplement that do not materially modify the terms of such documents and are consistent with the Plan.

34.   <u>Restructuring Transactions</u>. The Trustee, the Debtors and Reorganized Coram are authorized to take all steps, and to execute and deliver all documents, necessary to implement and effectuate the Plan and the transactions contemplated by the Plan.

35.   <u>Plan Classification Controlling</u>. The classifications of Claims and Equity Interests for purposes of the Distributions to be made under the Plan shall be governed solely by the terms of the Plan. The classifications set forth on the Ballots tendered to or returned by the Debtors' creditors and equity security holders in connection with voting on the Amended Plan (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims and Equity Interests under the Plan for distribution purposes, and (c) shall not be binding on the Debtors or Reorganized Coram.

PHDATA 1234490_1

36.    Binding Effect.  The Plan and its provisions shall be binding upon the Trustee, the Debtors, Reorganized Coram, the Disbursing Agent, any entity acquiring or receiving property or a distribution under the Plan, and any holder of a Claim against or Equity Interest in the Debtors, including all governmental entities, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder or entity has accepted the Plan.

37.    Transmittal; Notice.  The transmittal and service of the Disclosure Statement, the Amended Plan, the Ballots, the Solicitation Order and the Confirmation Hearing Notice are hereby approved.  The publication of the Confirmation Hearing Notice is hereby approved.

38.    Vesting of Assets (11 U.S.C. § 1141(b), (c)).  Except as otherwise specifically provided in the Plan, in accordance with Article 5.9 of the Plan, upon the Effective Date, title to all assets and property of the Debtors' estates, including the Debtors' equity and other interests in non-debtor affiliates of the Debtors, shall pass to and revest in Reorganized Coram, free and clear of all Claims, Equity Interests, liens and other rights of creditors or holders of Equity Interests arising before the Effective Date.  On and after the Effective Date, Reorganized Coram may operate its business and may use, acquire, and dispose of its property free of any restrictions of the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, except as otherwise specifically provided in the Plan.

39.    Dissolution of CHC.  Consistent with Article 5.1 of the Plan, on the Effective Date, or as soon thereafter as may be reasonably practicable, the Trustee shall cause CHC to be dissolved as a corporation under the laws of the State of Delaware, without the taking of any further action by the stockholders, officers and directors of CHC.

40.    Assumption of Executory Contracts and Unexpired Leases (11 U.S.C. §§ 365 and 1123(b)(2)).  Pursuant to Article 8 of the Plan and Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the Trustee is authorized to assume, as of the Effective Date, those executory

PHDATA 1234490_1

contracts or unexpired leases to which the Debtors are parties, unless such contract or lease (i) was previously assumed or rejected, (ii) previously expired or terminated pursuant to its own terms, or (iii) is on a list of executory contracts to be rejected contained in the Plan Supplement. Pursuant to Section 365(f) and 1123(b)(2) of the Bankruptcy Code, and in accordance with Article 8 of the Plan, the Trustee is authorized to assign to Reorganized Coram and Reorganized Coram is authorized to assume, any executory contracts and unexpired leases to which CHC is a party (and which has not been rejected).

41.     Cure Amounts in Connection with Assumption. With respect to each executory contract or unexpired lease assumed by the Trustee or the Debtors, any monetary amounts required as cure payments shall be satisfied by Reorganized Coram's payment of the cure amount in Cash on the Effective Date, or upon such other terms the Bankruptcy Court may order or the parties to such executory contract or unexpired lease otherwise may agree. In the event of a dispute regarding whether a default exists under the executory contract or unexpired lease or the amount of any cure payment, the cure of any default required by Section 365(b)(1) of the Bankruptcy Code shall occur after the entry of a Final Order of the Bankruptcy Court resolving the dispute.

42.     Rejection of Executory Contracts and Unexpired Leases (11 U.S.C. §§ 365(a) and 1123(b)(2)). The Trustee is authorized pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code to reject the executory contracts or unexpired leases of the Debtors listed in the Plan Supplement. Reorganized Coram shall have no liability under such rejected contracts and leases except as specifically provided for in the Plan.

43.     Bar Date for Rejection Damage Claims. If the rejection of any executory contract or unexpired lease listed as rejected in the Plan Supplement, results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall

PHDATA 1234490_1

not be enforceable against the Debtors, Reorganized Coram or the Debtors' estates, assets, properties or interests in properties unless a proof of claim is filed with the Bankruptcy Court and served upon the Trustee on or before thirty (30) days after the Effective Date.

44.    General Authorization. The Trustee and each of the Debtors and Reorganized Coram are authorized to execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan. The Trustee, the Debtors and Reorganized Coram and their respective directors, officers, members, agents and attorneys, are authorized and empowered to issue, execute, deliver, file, or record any agreement, document or security, including without limitation the documents contained in the Plan Supplement, as modified, amended and supplemented, in substantially the form included therein, and to take any action necessary or appropriate to implement, effectuate and consummate the Plan in accordance with its terms and to take any or all corporate actions authorized to be taken pursuant to the Plan, and any release, amendment, or restatement of any bylaws, certificates of incorporation, or other organization documents of Reorganized Coram, whether or not specifically referred to in the Plan or the Plan Supplement, without further order of the Court or action by the holder of a Claim against or Equity Interest in either of the Debtors, and any or all such documents shall be accepted by each of the respective state filing offices and recorded in accordance with applicable state law and shall become effective in accordance with their terms and the provisions of state law.

45.    Corporate Action. On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of and/or one or both of the Debtors or Reorganized Coram or their successors in interest under the Plan, including, without limitation, the authorization to issue or cause to be issued the Reorganized Coram

15                                    PHDATA 1234490_1

Common Stock, the Reorganized Coram Preference Stock and documents relating thereto, the adoption of the amended certificate of incorporation and amended bylaws of Reorganized Coram and the dissolution of CHC and the election or appointment, as the case may be, of directors and officers of the Debtors pursuant to the Plan, shall be in full force and effect from and after the Effective Date pursuant to Section 303 of the General Corporation Law of the State of Delaware without any requirement of further action by the stockholders or directors of the Debtors, the Trustee or Reorganized Coram. On the Effective Date, or as soon thereafter as is reasonably practicable, Reorganized Coram shall file its amended certificate of incorporation with the Secretary of State of the State of Delaware and the Trustee shall file the appropriate documents to effectuate the dissolution of CHC in accordance with applicable law. The amended certificate of incorporation and bylaws of Reorganized Coram shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Court and shall include, inter alia, a provision prohibiting the issuance of nonvoting equity securities, to the extent such a provision is required by Section 1123(a)(6) of the Bankruptcy Code.

46.    Reorganized Coram Management. On the Effective Date, operation of Reorganized Coram shall become the general responsibility of the board of directors of Reorganized Coram, which shall, thereafter, continue to have the responsibilities for the management, control and operation of Reorganized Coram. As of the Effective Date, the Noteholders or their designees shall be the holders of all of the capital stock of Reorganized Coram and shall, consistent with the requirements of Delaware law, have the right to elect the board of directors of Reorganized Coram. However, as provided in Article 5.5 of the Plan, Daniel Crowley shall not be employed or otherwise affiliated with Reorganized Coram, or any subsidiary or affiliate of Reorganized Coram, for a period of one (1) year following the Effective Date.

16

47.     Annual Meeting of Shareholders.  For purposes of Section 211 of the Delaware General Corporation Law Act, the first annual meeting of shareholders of Reorganized Coram shall be deemed to have taken place on the Effective Date.

48.     Actions by Reorganized Coram; Issuance of New Securities.  As of the Effective Date, Reorganized Coram is authorized, without further action under applicable law, regulation, rule or order, to:  (i) issue Reorganized Coram Common Stock and the Reorganized Coram Preferred Stock as contemplated by the Plan and (ii) execute, deliver, file or record any documents, and take any other actions as maybe necessary to effectuate the terms and provisions of the Plan.

49.     Dissolution of Committee.  As of the Effective Date, the Creditors' Committee and the Equity Committee shall be dissolved and have no further duties, authority or responsibility, and Reorganized Coram shall not have any responsibility for fees, costs and expenses of the Creditors' Committee and the Equity Committee, its individual members or its professionals, incurred on and after the Confirmation Date.

50.     The Causes of Action.  As set forth in Article 5.3 of the Plan, the Trustee shall retain the sole and exclusive right, from and after the Effective Date, to commence, prosecute, compromise and seek Bankruptcy Court approval of any settlement of any of the Causes of Action on behalf of the Debtors' estates; provided, however, that the Trustee shall not commence or maintain any action or cause of action released under Article 9 of the Plan.  Reorganized Coram shall be responsible for payment of all Post-Effective Date Administrative Claims related to the Causes of Action.  The proceeds of the Causes of Action, if any, shall be distributed as follows:  (i) first, to Reorganized Coram in an amount equal to the Post-Effective Date Administrative Claims relating to the Causes of Action; (ii) second, to the holders of Allowed General Unsecured Claims on a *pro rata* basis in an amount equal to the interest accruing (at the

17                            PHDATA 1234490_1

statutory judgment rate set forth in Section 1961 of Title 28 of the United States code) from the Petition Date through the Effective Date on account of such Allowed General Unsecured Claims until such interest has been paid in full; and (iii) third, on a *pro rata* basis to the holders of CHC Equity Interests.

51. Securities Laws Exemption. The offering, issuance, transfer, exchange, and/or distribution by Reorganized Coram of shares in Reorganized Coram are exempt from registration under the Securities Act of 1933, as amended, and any similar state or local laws by reason of Section 1145(a) of the Bankruptcy Code.

52. Substantive Consolidation. Upon the occurrence of the Effective Date, the Debtors' estates shall be deemed substantively consolidated, but only for the limited purpose of effectuating the settlements contemplated by, and making Distributions to the holders of Claims and Equity Interests under the Plan. For such limited purposes, on the Effective Date: (a) all guaranties of either Debtor for the payment, performance or collection of an obligation of the other Debtor with respect to any class of Claims or Equity Interests shall be deemed terminated and cancelled; (b) any obligation of one of the Debtors and all guarantees with respect to any class of Claims or Equity Interests executed by one of the Debtors and any joint obligation of the Debtors, and all multiple Claims against the Debtors on account of such joint obligation, shall be treated and allowed only as a single Claim against the consolidated estates of the Debtors; and (c) each Claim filed in the Chapter 11 Case of either of the Debtors shall be deemed filed against the consolidated Debtors and shall be deemed a Claim against and an obligation of the consolidated Debtors. Except as set forth herein, such substantive consolidation will not (other than for purposes related to Distributions to be made under the Plan) (a) affect the legal entity and corporate structures of either of the Debtors or Reorganized Coram, subject to the right of the Debtors or Reorganized Coram to effect any transaction contemplated by the Plan; (b) render

PHDATA 1234490_1

valid and enforceable against either Debtor any Claim or Equity Interest under the Plan for which it is otherwise not liable, and the liability of the Debtors for any such Claim or Equity Interest will not be affected by such substantive consolidation other than to extinguish duplicate liability on account of such a Claim, and (c) affect interests in any non-debtor affiliates, except as otherwise may be required in connection with any transaction contemplated by the Plan.

53.    Governmental Approvals Not Required.  This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement, the Plan Supplement, and any documents, instruments, or agreements and any amendments or modifications thereto.

54.    Exemption from Certain Taxes.  Pursuant to Section 1146(c) of the Bankruptcy Code, any transfer from the Debtors to Reorganized Coram or any other Person pursuant to the Plan shall not be subject to any recording or stamp tax, conveyance fee or similar tax, mortgage recording or other similar tax or governmental assessment.  This Confirmation Order hereby directs the appropriate state or local government officers to forego the collection of any such tax or governmental assessment and to accept for filing and recording any documents without payment of said tax or governmental assessment.

55.    Disputed Claims.  No Distribution shall be made to the holder of a disputed Claim or disputed Equity Interest until such Claim or Equity Interest is Allowed.  From and after the Effective Date, the Trustee shall have the authority to compromise, withdraw or otherwise resolve objections to Claims, subject to Bankruptcy Court approval.  The total amount of the Distribution attributable to a disputed Claim or disputed Equity Interest (or such lessor amount as

19

the Bankruptcy Court may determine) shall be held in reserve from Plan Funding Cash by
Reorganized Coram pending resolution by the Bankruptcy Court or agreement of the Trustee or
holder of such Claim or Equity Interest that is in dispute. Any Distribution shall be made as
soon as reasonably practicable after the date that the Bankruptcy Court enters a Final Order
allowing such Claim. The holder of a disputed Claim or disputed Equity Interest shall not be
entitled to receive or recover any amount in excess of the amount reserved to pay such Claim or
Equity Interest. The Trustee may at any time request the Bankruptcy Court to estimate any
contingent or unliquidated claim pursuant to Section 502(c) of the Bankruptcy Code or other
applicable law.

56.     Disbursing Agent. All Distributions under the Plan shall be made by Reorganized
Coram and all monetary distributions shall be at the direction of the Disbursing Agent. If the
Disbursing Agent is an independent third party designated by the Trustee to serve in such
capacity, such Disbursing Agent shall receive, without further Bankruptcy Court approval,
reasonable compensation for services rendered pursuant to the Plan and reimbursement of
reasonable out-of-pocket expenses incurred in connection with such services by Reorganized
Coram. No Disbursing Agent shall be required to give any bond or surety or other security for
the performance of its duties unless otherwise ordered by the Bankruptcy Court.

57.     Equity Interests. As set forth in Article 4 of the Plan, all CHC Equity Interests
shall be deemed cancelled and extinguished as of the Effective Date. In accordance with Article
4 of the Plan and as set forth in the Stipulation, the distributions to the members of Class 6 (CHC
Equity Interests) provided for in Article 4 of the Plan shall be made to the current holder as of
the Effective Date of each CHC Equity Interest that was in existence as of the Record Date. In
accordance with Article 1.55 of the Plan, the Record Date for the Purposes of the Plan is June 26,

20

2003, the date on which the order approving the Trustee's Disclosure Statement was entered upon the docket.

58.     The Plan Funding Agreement.  As of the Effective Date, the Noteholders shall be deemed to have agreed to the settlement terms set forth in Article 7.1 of the Plan and the Plan Funding Agreement.

59.     R-Net Settlement.  As of the Effective Date, R-Net shall be deemed to have agreed to the settlement set forth in Article 7.2 of the Plan and the R-Net Settlement Agreement.

60.     Administrative Bar Date.  Pursuant to Article 3.1(b) of the Plan, the holder of an Administrative Claim that arises before the Effective Date, other than an Administrative Claim of a professional employed under Section 327 and 328 of the Bankruptcy Code, or an Administrative Claim incurred by the Debtors in the ordinary course of the Debtors' business, must file an application seeking allowance of such Administrative Claim on or before the thirtieth (30th) day after the Effective Date.  Pursuant to Article 3.1(c) of the Plan, the holder of an Administrative Claim of a professional employed under Section 327 and 328 of the Bankruptcy Code that arises before the Effective Date must file an application for payment of such Administrative Claim under Section 330 of the Bankruptcy Code on or before the thirtieth (30th) day after the Effective Date.  As provided for in Article 3.1(d) of the Plan, Allowed Administrative Claims that arise before the Effective Date shall be paid from Plan Funding Cash. Any Allowed Administrative Claims that arise after the Effective Date shall be paid by Reorganized Coram, but not with the Plan Funding Cash.

61.     Discharge and Injunction.  Pursuant to Articles 10.1 and 10.2 of the Plan, the consideration to be distributed to holders of Allowed Claims or Allowed Equity Interests under the Plan shall completely satisfy, discharge and release all Claims and Equity Interests of any nature whatsoever against or in the Debtors or any assets, property or interests in property of the

21

Debtors to the fullest extent permitted by Section 1141 of the Bankruptcy Code. The Debtors shall be discharged from any and all Claims, including Claims that arose before the Confirmation Date, and all debts of the kind specified in Sections 502(g), (h) and (i) of the Bankruptcy Code whether or not a proof of Claim based upon such debt is filed or deem filed under Section 501 of the Bankruptcy Code, a Claim based upon such debt is allowed under Section 502 of the Bankruptcy Code, or the holder of a claim based upon such debt has accepted the Plan or any Distribution under the Plan. The discharge shall act as a permanent injunction against, among other things, the taking of any of the following actions against the Debtors, Reorganized Coram, and/or assets or property of the Debtors' estates. (i) the commencement or continuation of any action or other proceeding of any kind to enforce a Claim against or Equity Interests in either of the Debtors; (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors; (iii) the creation, perfection or enforcement of any encumbrance of any kind against the Debtors, Reorganized Coram or any of their or its property; and/or (iv) the assertion of any right of setoff, subrogation or recoupment of any kind against any obligation.

62.    Releases, Exculpations, and Injunctions. The release, exculpation, and injunction provisions contained in the Plan, which incorporates the modifications to the Second Amended Plan made in accordance with the Opinion and set forth in the Plan Modification, are approved and such provisions shall be effective and binding upon all persons and entities.

63.    Termination of Injunctions and Automatic Stay. Except as otherwise provided in the Plan or this Confirmation Order, all injunctions or stays arising under or entered during the Bankruptcy Cases under Sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

PHDATA 1234490_1

64.    <u>Termination of Existing Securities</u>.  Except for purposes of evidencing a right to Distributions under the Plan, on the Effective Date all agreements and other documents evidencing Claims or rights of any holder of a Claim against or Equity Interests in any of the Debtors, including all stock, indentures and notes, shall be canceled and deemed null and void and of no force and effect as against the Debtors and Reorganized Coram.

65.    <u>Non-occurrence of Effective Date</u>.  If each condition to the Effective Date specified in Article 13, Section 2 of the Plan has not been satisfied or duly waived within ninety (90) days after the Confirmation Date, then (unless the period of waiver or satisfaction of such conditions has been extended with the consent of the Trustee and the Noteholders) the Confirmation Order will be vacated by the Bankruptcy Court.

66.    <u>Notice of Entry of Confirmation Order</u>.  On or before the tenth (10th) Business Day following the date of entry of this Confirmation Order, the Trustee shall serve notice of entry of this Confirmation Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c) on all creditors and interest holders, the United States Trustee, and other parties in interest, by causing notice of entry of the Confirmation Order (the "<u>Notice of Confirmation</u>"), to be delivered to such parties by first-class mail, postage prepaid.  The Trustee also shall cause the Notice of Confirmation to be published as promptly as practicable after the entry of this Confirmation Order once in *The New York Times* (National Edition).  The notice described herein is adequate under the particular circumstances and no other or further notice is necessary.

67.    <u>Notice of Effective Date</u>.  Within five (5) Business Days following the occurrence of the Effective Date, the Trustee shall file notice of the occurrence of the Effective Date and shall serve a copy of same on those entities which have filed a notice of appearance and request for service of pleadings in the Bankruptcy Cases.

23

PHDATA 1234490_1

68.    Binding Effect. Pursuant to Sections 1123(a) and 1142(a) of the Bankruptcy Code and the provisions of this Confirmation Order, the Plan, the Plan Documents and the Plan Supplement shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

69.    Conflicts Between Confirmation Order and Plan. To the extent of any inconsistency between the provisions of the Plan and this Confirmation Order, the terms and conditions contained in this Confirmation Order shall govern. The provisions of this Confirmation Order are integrated with each other and are nonseverable and mutually dependent unless expressly stated by further order of this Bankruptcy Court. The failure to reference or discuss all or part of any particular provision of the Plan herein shall have no effect on the validity, binding effect and enforceability of such provision, and such provision shall have the same validity, binding effect and enforceability as every other provision of the Plan.

70.    Modification/Reversal. If any provision of this Confirmation Order is hereafter modified, vacated or reversed by subsequent order of this Bankruptcy Court or any other court, such reversal, modification or vacation shall not affect the validity or enforceability of the obligations incurred or undertaken under or in connection with the Plan prior to the ~~Trustee or Reorganized Coram's receipt of written notice~~ entry of any such order unless such order specifically provides otherwise.

71.    Effective Date. This Order shall be deemed entered as of November 1, 2004 and the Effective Date of the Plan shall be December 1, 2004. Plan Ending Cash under the Plan shall be computed as of the close of business on the business day immediately preceding the Effective Date.

<span style="float:right">10/27/04</span>

HONORABLE MARY F. WALRATH,
UNITED STATES BANKRUPTCY JUDGE

24                              PHDATA 1234490_1

# EXHIBIT B

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| CORAM HEALTHCARE CORP. and | : Case No. 00-3299 (MFW) |
| CORAM, INC., | : (Jointly Administered) |
| | : |
| Debtors. | : **Objection Deadline: February 21, 2003** |
| | : **Hearing Date: February 28, 2003** |

---

**MOTION OF THE CHAPTER 11 TRUSTEE FOR
AUTHORIZATION TO ENTER INTO
TERMINATION AND EMPLOYMENT EXTENSION AGREEMENT
WITH DANIEL D. CROWLEY**

---

Arlin M. Adams, the Chapter 11 Trustee (the "Trustee") of the bankruptcy estates

of Coram Healthcare Corp. ("CHC") and Coram, Inc. ("Coram" and, together with CHC,

referred to as the "Debtors"), by and through his undersigned counsel, hereby moves this

Court for authorization, pursuant to Sections 105 and 363 of Title 11 of the United States

Code §§ 101, *et seq.* (the "Bankruptcy Code"), to enter into the Termination and

Employment Extension Agreement with Daniel D. Crowley ("Crowley"), effective

January 1, 2003. In support thereof, the Trustee respectfully represents as follows:

## BACKGROUND

1.    On August 8, 2000 (the "Petition Date"), the Debtors filed voluntary

petitions for relief under Chapter 11 of the Bankruptcy Code. Until March 7, 2002, the

Debtors operated their businesses and managed their properties and assets as debtors-in-

possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The Debtors'

Chapter 11 cases have been consolidated for procedural purposes only. The Debtors' cases have not been consolidated with that of any other debtor.

2.    On August 22, 2000, the United States Trustee designated an Official Committee of Unsecured Creditors (the "Creditors' Committee") in the Debtors' bankruptcy cases. On October 18, 2000, the United States Trustee designated a Committee of Equity Interest Holders (the "Equity Committee") to represent the interests of CHC's common shareholders.

3.    On December 21, 2000 the Court denied confirmation of the Debtors' first proposed plan of reorganization. On December 21, 2001, the Court entered an order denying confirmation of the Debtors' proposed second plan of reorganization.

4.    At a hearing held on February 12, 2002, the Court granted two motions seeking the appointment of a trustee to assume control over the Debtors' property and affairs pursuant to Section 1104 of the Bankruptcy Code. The Trustee's appointment was approved by the Court on March 7, 2002 (the "Appointment Date").

5.    On December 19, 2002, the Equity Committee filed a proposed plan of reorganization. As the Trustee's counsel informed the Court during the December 27, 2002 omnibus hearing, the Trustee intends to file his own plan by the end of February, 2003.

**Crowley's Current Employment Arrangement**

6.    On or about November 30, 1999, CHC and Crowley entered into an Employment Agreement (the "Employment Agreement") pursuant to which CHC agreed to employ him as President and Chief Executive Officer of CHC and all of its wholly-

2

owned subsidiaries and Chairman of CHC's Board of Directors. A true and correct copy of the Employment Agreement, together with any and all amendments thereto, is attached hereto as Exhibit "A" and incorporated herein by reference in its entirety.

7.      Under the Employment Agreement, CHC agreed to compensate Crowley for his services with, *inter alia*, (i) a base salary of $650,000 per annum (the "Salary"), (ii) various performance based bonuses, (iii) stock options, (iv) health insurance benefits , (v) paid vacation time, (vi) life insurance benefits, (vii) a car allowance, (viii) corporate housing, and (ix) tax liability preparation and reimbursement benefits.

8.      While the Trustee has continued to pay Crowley his annual salary and certain benefits in the ordinary course of business, neither the Trustee nor the Debtors while debtors-in-possession have made any payments to Crowley on account of his claimed Management Incentive Plan ("MIP") bonuses and Key Employee Retention Plan ("KERP") bonuses. Crowley also maintains he is entitled to a success bonus of $1,800,000 payable upon consummation of debt refinancing and a plan of reorganization.

9.      On or about November 26, 2002, the Trustee moved the Court to enter an Order that would, among other things, authorize the Trustee to reject the Employment Agreement (Docket No. 1972). Since then, Crowley has terminated the Employment Agreement without prejudice to his claims for substantial bonus compensation, including for MIP and KERP bonuses. The Trustee and Crowley are currently engaged in negotiations in an attempt to resolve these and all other claims between them.

10.     After examining the Debtors' businesses, as discussed in further detail below, the Trustee has determined that Crowley has performed his duties under the Employment Agreement competently and that it would serve the Debtors' best interests

to continue Crowley's employment in the capacity of Chief Transition and Restructuring Officer on an interim basis during the plan confirmation process.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (M). The statutory predicates for the relief sought herein are Sections 105 and 363 of the Bankruptcy Code and Fed. R. Bankr. P. 4001, 6004 and 9014.

## REQUESTED RELIEF AND BASIS THEREFORE

12.    By this motion, the Trustee requests that the Court enter an order authorizing the Trustee to enter into a Termination and Employment Extension Agreement which he has negotiated with Crowley (the "Transition Agreement"), a true and correct copy of which is attached hereto as Exhibit "B" and incorporated herein by reference in its entirety.

**The Transition Agreement**

13.    The Transition Agreement provides, *inter alia*, the following:

- Commencing as of January 1, 2003, Crowley will serve as the Chief Transition and Restructuring Officer for a term not to exceed the earlier of (i) six (6) months from January 1, 2003, (ii) the date on which a Plan of Reorganization is confirmed by final order of the Court, or (iii) the substantial consummation of a plan of reorganization.

- The term may be extended one time for up to an additional sixty (60) days if a final order has not been entered on or before June 30, 2003, unless either party terminates the arrangement on thirty (30) days' prior written notice.

- Commencing January 1, 2003, the Debtors will pay Crowley a base monthly salary of $80,000.00 and continue to reimburse direct costs and expenses incurred by Crowley as heretofore.

- The Debtors will continue to provide Crowley with the benefits provided under the Employment Agreement as heretofore, including without limitation health, dental and disability insurance, life insurance, transportation allowance and corporate housing.

- The Debtors will continue to maintain D&O coverage covering Crowley to the same extent available to all of the Debtors' officers and directors.

- In consideration of Crowley's agreement to forego other opportunities during his term, and in partial recognition of his efforts over the past nine (9) months, the Debtors will pay Crowley a stay and performance payment of $800,000, plus $200,000 in partial reimbursement of his counsel fees.

## Crowley's Continued Employment

14.    Section 363 of the Bankruptcy Code provides that a trustee must obtain the bankruptcy court's approval to use property of the estate other than in the ordinary course of business. 11 U.S.C. § 363(b). The proposed transaction may be viewed as being in the ordinary course of business because: (a) companies comparable to the Debtors regularly extend continued employment terms to existing employees and officers, and (b) creditors of the Debtors would reasonably expect a continued relationship between CHC and its chief executive officer. *See In re Roth American, Inc.*, 975 F.2d 949 (3d Cir. 1992). Nevertheless, having terminated Crowley as Chief Executive Officer and President and given the controversy surrounding his past employment by the Debtors' in this case, the Trustee seeks the Court's authorization to enter into the Transition Agreement.

15.    In order to obtain authorization for the use of property of the estate outside of the ordinary course of business, a trustee must articulate some business justification for

5

such action. *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169 (D. Del. 1991). This "is similar to many states' 'business judgment rule,' where great deference is given to a business in determining its own best interests." *In re W.A. Mallory Company*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997). *See also Montgomery Ward*, 242 B.R. at 155 (affirming approval of a 363(b) motion where the bankruptcy court based its findings on the debtors' business judgment).

16.    This Court denied confirmation of both of the proposed plans of reorganization offered by the Debtors because it found that an actual conflict of interest arose as a result of Crowley's employment contract with Cerberus Partners, L.P. ("Cerberus"), who is a noteholder and preferred shareholder. The Court's findings regarding Crowley's relationship with Cerberus, as well as his failure to timely make complete disclosure of the relationship to the CHC Board of Directors, raised a substantial question for the Trustee as to whether Crowley should be retained.

17.    Because Crowley and Cerberus have informed the Trustee that all contractual relations between them have been severed and that Crowley has not received any compensation from Cerberus in 2002, the Trustee is satisfied that there is no continuing conflict of interest.

18.    Moreover, the Trustee's own thorough evaluation of Crowley's performance, has led him to conclude that the company is better off with Crowley than without him, at least on an interim basis to provide stability until a plan is confirmed.

**Crowley's Performance**

19.     Since the Appointment Date, the Trustee has independently examined the actions undertaken by Crowley as the Debtors' chief executive officer.  The Trustee has visited the corporate offices in Denver and has had several meetings and discussions with Crowley, CHC's senior executives and other employees of CHC.  In addition, the Trustee has considered numerous reports regarding the financial performance of the Debtors and has reviewed the Debtors' performance under Crowley with the investment bankers retained by the Trustee.

20.     The Trustee's evaluation is that Crowley has operated the company profitably and efficiently.  Under Crowley, notwithstanding being in these bankruptcy proceedings, the Debtors have experienced positive operating margins and EBITDA[1], reduced cost of services, reduced operating costs, improved inventory management, improved information systems, improved management tools, and maintained a stable cash position with no net borrowing to fund post-petition operations.

21.     EBITDA has substantially increased during the period of Crowley's stewardship of the company.  From 1995 through 1999, a time prior to Crowley's employment, the Debtors' EBITDA was a negative $37 million.  From January 2000

---

[1] EBITDA as discussed herein is defined as earnings before interest expense, income taxes, depreciation, amortization, net reorganization expenses, losses on impairment of long-lived assets, gains on sales of businesses, provision for (income from) litigation settlements, extraordinary gains on troubled debt restructurings, and for the periods after 1999, discontinued operations. The financial information of the Debtors contained herein was derived from and should be read in conjunction with CHC's consolidated financial statements and the notes thereto included in its Annual Reports on Form 10-K for the years ended December 31, 1997, 1998, 1999, 2000 and 2001 and its unaudited condensed consolidated financial statements and the notes thereto included in its Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2002.

through September 2002, the Debtors experienced $83 million in positive EBITDA, a

$120 million improvement under Crowley's management. For the first nine months of

2002 (including the six months after the Trustee was appointed), EBITDA was a positive

$21 million; by contrast, EBITDA was negative $54 million for the year ended December

31, 1999.

22.    Revenue and gross profit are also increasing. For the nine-month period

ended September 30, 2002, the Debtors' revenue rose $31 million, or 11 percent,

from the same period the year before, resulting in an increased gross profit of $9 million.

Indeed, revenue was higher during each month of 2002 than during the same month in

2001.

23.    Under Crowley, CHC has improved its financial performance by

identifying and focusing the business on its most profitable core therapies. When

Crowley was named CEO, non-core therapies accounted for approximately 38 percent of

infusion therapy revenues for the quarter ended December 31, 1999; by the third quarter

of 2002, non-core therapies represented only approximately 27 percent of infusion

therapy revenues. In addition, daily average revenue per patient for core therapies rose

3% to $151 per day during the nine months ended September 30, 2002 when compared

with the same period from the prior year.

24.    The most profitable type of business for CHC is the treatment of patients

with chronic disorders. With Crowley at the helm under the Trustee's stewardship, CHC

refined its marketing strategy to target chronic patients. As a result of these efforts,

revenues from the treatment of hemophilia patients grew by 55 percent ($15 million)

during the nine months ended September 30, 2002 when compared with the same period

8

from the prior year. The treatment of hemophilia patients now represents 13 percent of total revenue, up from 9 percent during the nine months ended September 30, 2001. Similarly, revenues from nutrition patients were increased 6 percent during the same time frame.

25.    Furthermore, during Crowley's tenure, CHC has also cut costs by, *inter alia*, leveraging volume to purchase drugs and supplies more effectively. Cost of services for infusion, exclusive of depreciation and amortization expense, as a percentage of net revenue has been reduced from 76 percent for the year ended December 31, 1999 to 71 percent for the nine months ended September 30, 2002.

26.    Under Crowley, the Debtors have neither required post-petition borrowings to fund operations nor utilized their debtor-in-possession facility.

27.    Finally, the evaluation conducted by the Trustee's advisors has revealed improved employee productivity, increased employee morale and reduced employee turnover since Crowley became CEO of the Debtors. Company statistics show that the branch employee turnover rate was reduced by approximately six percent in 2002 when compared to 2001. It is apparent to the Trustee that many of CHC's employees are loyal to Crowley and that they remain confident of his ability to transition the Debtors' through an effective reorganization.

28.    The Trustee believes that it is important to maintain the Debtors' operational status quo during the plan confirmation process. The Equity Committee recently filed a plan and the Trustee intends to file his own plan of reorganization shortly. Replacing Crowley now would endanger the Debtors' ability to reorganize. Specifically, the Trustee believes that Crowley's departure would likely encourage "cherry-picking" of

key employees by competitors, could cause substantial departures of executives and other key employees, and shift the company's focus from its business plan to mere survival.

29.     Accordingly, the Trustee submits that sound business purposes support the Trustee's request for the entry of an order authorizing him to enter into the Transition Agreement.

## NOTICE

30.     The Trustee shall serve a copy of this Motion upon (i) the United States Trustee, (ii) the Official Committee of Unsecured Creditors, (iii) the Official Committee of Equity Holders, (iv) the Post-Petition Lenders and the Noteholders, (v) Crowley and his identified counsel, and (vi) all parties requesting notice pursuant to Rule 2002 of the Bankruptcy Rules.  Notice of this Motion has also been given by filing a Form 8-K with the Securities and Exchange Commission as of the date hereof.  The Trustee respectfully submits that no other or further notice need be given.

## NO PRIOR REQUEST

31.     No previous application for the relief requested herein has been made to this or any other court by the Trustee.

## [THIS SPACE INTENTIONALLY BLANK]

10

WHEREFORE, the Trustee respectfully requests that this Court enter an Order: (i) authorizing the Trustee to Enter into the Transition Agreement, and (ii) granting such other and further relief that this Court deems just and proper under the circumstances.

Dated:  January 24, 2003                    WEIR & PARTNERS LLP


                                By:_____/s/ Kenneth E. Aaron_____
                                   Kenneth E. Aaron (#4043)
                                   Salene R. Mazur
                                   824 Market Street Mall, Suite 1001
                                   P.O. Box 708
                                   Wilmington, Delaware 19899
                                   (302) 652-8181 (telephone)
                                   (302) 652-8909 (facsimile)

                                   -and-

                                   SCHNADER HARRISON SEGAL
                                   & LEWIS LLP
                                   Barry E. Bressler
                                   Michael J. Barrie
                                   1600 Market Street, Suite 3600
                                   Philadelphia, Pennsylvania  19103-7286
                                   (215) 751-2000 (telephone)
                                   (215) 751-2205 (facsimile)

                                   Co-Counsel to Arlin M. Adams,
                                       Chapter 11 Trustee

11

# EXHIBIT C

# Schnader
### ATTORNEYS AT LAW

1600 MARKET STREET  SUITE 3600
PHILADELPHIA, PA 19103-7213
215.751.2000  FAX 215.751.2205  schnader.com

January 7, 2003

BARRY E. BRESSLER
Direct Dial 215-751-2050
Direct Fax  215-751-2205
Internet Address: bbressler@schnader.com



### VIA FACSIMILE #312-621-1750

Scott N. Schreiber, Esquire
Much Shelist Freed Denenberg Ament & Rubenstein
200 North LaSalle Street, Suite 2100
Chicago, IL  60601

> Re:    In re: Coram Healthcare Corp., Debtor
> /Daniel D. Crowley

Dear Mr. Schreiber:

Per our additional discussions, Arlin M. Adams, the Chapter 11 Trustee for Coram Healthcare Corporation ("Coram") and Daniel D. Crowley ("Dan") have entered into a letter agreement (the "Transition Agreement") for terminating Dan's prior Employment Agreement and extending his employment. The Transition Agreement will be submitted to the Bankruptcy Court for approval.

This letter will serve to reflect the intent as to an additional settlement agreement ("Settlement Agreement") to be entered into between the Trustee and Dan, subject to a formal agreement being drawn and subject, of course, to approval of the Bankruptcy Court. The Settlement Agreement is being negotiated and finalized in connection with the Transition Agreement, and will include the following terms:

1. All of Dan's contractual and employment claims for performance bonuses, KERP, MIP, and otherwise, including any and all claims under his old Employment Agreement, not dealt with in the Transition Agreement, will be compromised and satisfied by an additional payment, upon final Plan confirmation, of $2,000,000 and the exchange of releases provided below.

2. Dan will release the Trustee and Debtors from any further claims as part of the Plan and the Trustee and Debtors will in turn release Dan from all proposed derivative claims and any other claims arising out of or related to such proposed derivative claims that the Trustee,

Schnader Harrison Segal & Lewis LLP

BOSTON, MA   NEW YORK, NY   PHILADELPHIA, PA   PITTSBURGH, PA   SAN FRANCISCO, CA   WASHINGTON, DC
CANONSBURG, PA   CHERRY HILL, NJ   HARRISBURG, PA

PHDATA 1065313_2

CH-11 TRUSTEE



Schnader
ATTORNEYS AT LAW

Scott N. Schreiber, Esq.
January 7, 2003
Page 2

Coram, any subsidiaries, or any committees or entities claiming through them, may have against Dan, to the fullest extent approved by the Bankruptcy Court.

3.  The parties contemplate that the formal agreement reflecting the above will be finalized by January 31, 2003, and will be presented to the Bankruptcy Court for approval thereafter, but in any event before a Plan to be proposed by the Trustee on or before February 28, 2003.

4.  If the Bankruptcy Court fails to approve the Settlement Agreement, all of the undertakings of the parties will be void and the parties will return to their previous positions, retaining all claims which exist and all defenses thereto. The parties will only be legally bound upon approval of the formal agreement by the Bankruptcy Court.

Sincerely,

BARRY E. BRESSLER

cc:    Arlin M. Adams, Chapter 11 Trustee
       Mr. Daniel D. Crowley

The Terms and Conditions above are hereby agreed to:

DANIEL D. CROWLEY

_____

ARLIN M. ADAMS, CHAPTER 11 TRUSTEE

_____

Schnader Harrison Segal & Lewis LLP

PHDATA 1068521_2

CH-11 TRUSTEE

# Schnader
### ATTORNEYS AT LAW

1600 MARKET STREET   SUITE 3500
PHILADELPHIA, PA 19103-7213
215.751.2000   FAX 215 751 2205   schnader.com

Barry E. Bressler, Esq.
215-751-2050
Fax 215-751-2205

## TELECOPIER TRANSMISSION COVER SHEET

### January 7, 2003

**SEND TO:** Scott N. Schreiber Esquire
**COMPANY:** Much Shelist
**FAX #:** (312) 621-1750
**PHONE #:** (312) 621-1485

**FROM:** Barry E. Bressler, Esq.
**CLIENT #:** 3002511/0001
**ATTY#:** 01296
**RE:** Coram

**NUMBER OF PAGES INCLUDING COVER PAGE:** 3

**COMMENTS:**

CH-11 TRUSTEE
006523

**IF THERE IS A PROBLEM, CALL: 215-751-2051**

The information contained in this fax communication is transmitted by an attorney. It is privileged and confidential, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or reproduction of this fax communication is strictly prohibited. If this fax communication has been received in error, please immediately notify us by telephone, collect if necessary, and return the original message to us at the above address by mail (we will reimburse postage). Thank you.

Schnader Harrison Segal & Lewis LLP

BOSTON, MA   NEW YORK, NY   PHILADELPHIA, PA   PITTSBURGH, PA   SAN FRANCISCO, CA   WASHINGTON DC
JENKINTOWN PA   CHERRY HILL NJ   HARRISBURG PA

# EXHIBIT D

MAY-06-2002 17:35    MUCH SHELIST FDA    561121    P.22-23
MAY 06 2002 15:45 FR ---    9164496859 TO SCHREIBER    P.22/23



EC-8


EXHIBIT
14
Trustee
2-25-03

May 6, 2002                        **DRAFT**        REDACTED

Steve Feinberg

Dear Steve,

I have been thinking about our dinner last week. In retrospect it didn't unfold as you said when you insisted that I had to come to New York. ~~the proposal.~~

Well these past 30 months have sure been unusual for me. While I am crystal clear that I have not done anything "wrong", I sure have suffered dearly. I am in a job that I would never ever have accepted at a rate of pay that I earned 8-9 years ago. I am enmeshed in endless Chapter 11 molasses. I am the only person at Coram that has been paid *nothing* on the 2000 MIP or the KERP(s) or the 2001 MIP or anything. No raise. No nothing. Just be a good soldier.

At the same time, I have had my own Company (Dynamic) totally up-ended. I have had my monthly retainer with Cerberus ended ruining my cash flow. ~~I have been told I am due nothing under the Cerberus Agreement.~~ I have had to pay significant legal bills. I have been unable to participate in any new business deals. All this, and my professional reputation has been trashed, too. But as you once said, I'm working with you and Cerberus so it doesn't matter that my reputation has been hurt. Right?

I am also recalling when you said once that I should think about it all as having..."kissed the wrong woman". I owe it to myself to tell you, Steve, that I guess I don't operate the same way.

~~If I asked you to NYC and told you that I would~~ have a number ....~~I would have had a~~ "number" and probably would ~~have had~~ a check if the shoe were on the other foot, and it ~~was you coming to New York~~ to see me.

I would have been calling often just to see how you were doing. I would not have been badgering you to resign over Christmas/New Years. I would not have been chasing you to get you before you met the Trustee to get your resignation done. If I had done something wrong........you should have simply fired me. If not, why have I been put at arms length? The reality is that I have done a lot right. Nothing to deserve what has happened to me. Nothing.

If the shoe were on the other foot, your legal bills would have been promptly paid. I would have fought to the end on the front side. I would never have stood back and said see you later, let's see how it turns out. Mr. Bressler has told me that he/Trustee don't want to give us/me advice about ending the contract or my getting paid. He also said, we have smart lawyers and he's sure that they can figure out how to get me paid. He has no objection to my being paid for work done or for terming the contract.

CRX 00063

CONFIDENTIAL

MAY 06 2002 15:46 FR                      9164496059 TO SCHREIBER      P.23/83



**DRAFT**

It will be your natural reaction to start to say "Dan's mad". Well, I can honestly tell you that, I am not "mad" at anyone.

I think that Friedman did a terrible job handling this case. He mis-advised me, didn't focus properly, poorly prepared me, and didn't handle most any important aspect of this case correctly. That said. I know that I didn't *have to hire* Friedman just because you recommended him. I did it on my own. And I didn't have to recite the answers that Friedman gave me to say in Court. And, I didn't have to hire Chanin simply because you felt Houlihan Lokey was too expensive.

I suppose if I had been more trusting maybe (maybe) I would not have written the memo about trying to get upside on your position if I did a great job at Coram. I didn't have to take the assignment at Coram. In retrospect, I should have simply told you "no".

If I had been more trusting, maybe (maybe) I would not have asked for a formal contract outlining things like legal bills being paid, upside being shared. I guess I just didn't know you that well when we entered this relationship. History has taught me hard lessons about "amnesia" when it comes to money. To this day, you are still telling me that the 2000 MIP was based upon the gain on the CPS sale even though I have told you it didn't more times than I can count. EBITDA was $37 Million w/o CPS and $54 Million with it. I would have earned another $4.25 Million if I included the gain. I didn't.

Really, the way I am looking at this is that it is just one more sobering seminar in my life-long education. And yes, I still like and admire you a lot. Admire what you do and have built. Admire your intellect and your family commitment. I also like me a lot, when it comes to being back to back with someone in good and bad times. I really like me a lot when it comes to counting on someone to do what they say they will do. No question about that. I never f— a friend. Never.

That's it. I'm not keeping a copy of this note. You can toss yours. I just wanted you to know how I am feeling on this particular day.

Dan Crowley

**REDACTED**

CONFIDENTIAL

CRX 00064

*Insert*

Hence, I expect that you'll honor the commitment that you made to me over dinner: after Coram's plan is confirmed or its assets sold, I'll be reinstated with Cerberus and receive $5,000,000 from Cerberus. Also, Cerberus will indemnify me for all of my legal fees, plus pay me the difference between what I ultimately receive from Coram by way of bonuses, and $11,200,000. If this is not our deal, please just send this letter back to me.

CRX 00065