# EXHIBIT I

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CORAM HEALTHCARE CORP. and | : | Case Nos. 00-3299 (MFW) |
| CORAM, INC., | : | (Jointly Administered) |
| | : | |
| Debtors. | : | |
| | : | |
| | : | |
| | : | |
| | : | |

---

## SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO
## THE CHAPTER 11 TRUSTEE'S AMENDED JOINT PLAN OF REORGANIZATION

---

SCHNADER HARRISON
SEGAL & LEWIS LLP
Barry E. Bressler
Wilbur L. Kipnes
Richard A. Barkasy
Michael J. Barrie
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania
19103-7286
(215) 751-2000

-and-

WEIR & PARTNERS LLP
Kenneth E. Aaron (#4043)
Salene R. Mazur
824 Market Street Mall, Suite 1001
P.O. Box 708
Wilmington, Delaware 19899
(302) 652-8181

Co-Counsel to Arlin M. Adams,
Chapter 11 Trustee

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT.**

DISCLAIMER

THE INFORMATION CONTAINED IN THIS SECOND AMENDED DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE CHAPTER 11 TRUSTEE'S AMENDED JOINT PLAN OF REORGANIZATION OF CORAM HEALTHCARE CORPORATION AND CORAM, INC. (THE "PLAN") AND MAY NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THE TRUSTEE HAS NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN. IF ANY SUCH INFORMATION OR REPRESENTATIONS ARE GIVEN OR MADE, THEY MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE TRUSTEE.

ALL CREDITORS AND HOLDERS OF EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETIES BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETIES BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL CONTROL.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE §§ 101, *ET SEQ.* (THE "BANKRUPTCY CODE") AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE RULE 1001, *ET SEQ.* (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR ANY OTHER NON-BANKRUPTCY LAW. THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") HAS NEITHER APPROVED OR DISAPPROVED OF THIS DISCLOSURE STATEMENT NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF CORAM HEALTHCARE CORPORATION OR CORAM, INC. OR ANY OF ITS DOMESTIC SUBSIDIARIES AND AFFILIATES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, CORAM HEALTHCARE CORPORATION OR CORAM, INC.

## I.    INTRODUCTION

Arlin M. Adams, Chapter 11 Trustee (the "Trustee") of Coram Healthcare Corporation ("CHC") and its wholly owned subsidiary, Coram, Inc. ("Coram") (collectively, the "Debtors"), submits this Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code. This Disclosure Statement describes the material terms of, and provides additional information with respect to, the Plan, a true and correct copy of which is attached hereto as Exhibit A.

The Trustee urges all creditors, shareholders and other parties-in-interest to read this Disclosure Statement and the Plan carefully and in their entireties.

**All capitalized terms used in this Disclosure Statement that are not otherwise defined herein shall have the same meanings ascribed to them in the Plan.**

## II.    BRIEF SUMMARY OF THE TRUSTEE'S PLAN

### A.    Main Features

Some of the main features of the Trustee's Plan are as follows:

- The Trustee's Plan will be funded by $56,000,000 to be contributed by the Noteholders and the Debtors' cash on hand on the Effective Date. In return for providing $56,000,000 in funding, the Noteholders and their officers, directors and employees will be released from all claims that the Debtors' may have against them, including the Proposed Derivative Claims.

- All General Unsecured Creditors shall receive an immediate and certain distribution of one hundred percent (100%) of their Allowed Pre-Petition Claims.

- CHC will be dissolved.

- The Noteholders will receive a Distribution of all of the common stock in Reorganized Coram in satisfaction of their preferred stock interests in Coram and General Unsecured Claims.

- As a privately owned company, Reorganized Coram will be able to maintain compliance with the provisions of Stark II (as defined in Section IV, C of this Disclosure Statement) as a result of having eliminated the risk of ownership by physicians who make Medicare and Medicaid referrals of patients to the Debtors or their operating subsidiaries, or family members of such physicians.

- The holders of Allowed CHC Equity Interests shall receive a Distribution of the Plan Funding Cash Balance, which the Trustee estimates will be more than $28,000,000.

- Reorganized Coram will be left with $10,000,000 in cash working capital and it will have a reduced and manageable debt which will consist only of the Exit Facility.

- The claim of the R-Net Committee of more than $41,000,000 will be settled and R-Net will have a reduced Allowed General Unsecured Claim of $7,950,000. This will provide additional funding for, and also likely result in the confirmation of, the R-Net Committee's or liquidator's plan of liquidation filed in R-Net's bankruptcy case.

The Equity Committee believes that the Debtors' claims against the Noteholders are worth far more than $56,000,000 and that the settlement represented by the $56,000,000 is substantially inadequate. For further information on the Equity Committee's position, see the discussion of alleged claims against the Noteholders in the Equity Committee's Disclosure Statement.

### B.    Summary of Classes and Treatment

The following is a summary of the Trustee's Plan:

| Class Description | Treatment Under Plan |
|---|---|
| Unclassified – Administrative Claims | Except to the extent that the Trustee and the holder of an Allowed Administrative Claim agree to a different treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of (i) the Effective Date, or (ii) fourteen (14) days after the date on which such Claim becomes an Allowed Administrative Claim. Allowed Administrative Claims for pre-Effective Date fees or expenses shall be paid from Plan Funding Cash. Any additional Allowed Administrative Claims shall be paid by Reorganized Coram, but not with Plan Funding Cash.<br><br>**Estimated Amount of Claims:    $ 13,500,000**<br>**Percentage Recovery:            100%** |
| Unclassified – Priority Tax Claims | The Priority Tax Claim of the Internal Revenue Service ("IRS") in an amount in excess of $19,000,000, including interest thereon, shall either be (i) paid in full in Cash on the Effective Date, or (ii) be satisfied in accordance with the terms and conditions of the agreement between the Trustee and the IRS. Any payments required to be made to the IRS on or before the Effective Date shall be made with Plan Funding Cash. If an agreement with the IRS allows for deferred payments, all deferred payments shall be paid by Reorganized Coram, and to the extent necessary, the Noteholders have irrevocably committed to make additional capital contributions to Reorganized Coram to enable it to make such deferred payments on a timely basis. Each holder of an Allowed Priority Tax Claim, |

other than the IRS, shall be paid in full in Cash on the later of (i) the Effective Date, or (ii) fourteen (14) days after the date on which such Claim becomes an Allowed Priority Tax Claim. Such Claims shall be paid with Plan Funding Cash.

**Estimated Amount of Claims:**     **$ 19,430,000.**
**Percentage Recovery:**              **100%**

Class 1 – Priority Non-Tax Claims

Each holder of an Allowed Priority Non-Tax Claim shall be paid in full in Cash on the later of (i) the Effective Date, or (ii) fourteen (14) days after the date on which such Claim becomes an Allowed Priority Non-Tax Claim. Allowed Priority Non-Tax Claims shall be paid with Plan Funding Cash.    Class 1 is unimpaired under the Plan and is presumed to have accepted the Plan.

**Estimated Amount of Claims:**     **$ 12,900.**
**Percentage Recovery:**              **100%**

Class 2 – Secured Claims

Each holder of an Allowed Secured Claim shall receive payment in full in Cash on the later of (i) the Effective Date; and (ii) fourteen (14) days after the date on which such Claim becomes an Allowed Secured Claim. Allowed Secured Claims shall be satisfied with Plan Funding Cash.  Class 2 is unimpaired under the Plan and is presumed to have accepted the Plan.

**Estimated Amount of Claims:**     **$0**
**Percentage Recovery:**              **100%**

Class 3 – General Unsecured Claims

Allowed General Unsecured Claims shall be satisfied from Net Plan Funding Cash.  Each holder of an Allowed General Unsecured Claim, except for the Noteholders, shall be paid in full in Cash (without post-petition interest) on the later of: (i) the Distribution Date, or (ii) fourteen (14) days after the date on which such Claim becomes an Allowed General Unsecured Claim. In addition, the holders of Allowed General Unsecured Claims shall receive, on a *pro rata* basis from the net proceeds of the Causes of Action (if any), a distribution for interest accruing (at the statutory judgment rate set forth in Section 1961 of Title 28 of the United States Code) from the Petition Date through the Effective Date on account of such General Unsecured Claims. The net proceeds of the Causes of Action shall be the sole source of the payment of post-petition interest to holders of Allowed General Unsecured Claims.  Class 3 is impaired under the provisions of the Plan and is entitled to vote to accept or reject the Plan.

**Estimated Amount of Claims:**     **$ 17,950,000**

**Percentage Recovery:**          **100% (without post-petition interest)**

Class 4 – The
Noteholders

The Noteholders are holders of Coram Preferred Stock with an aggregate liquidation preference in excess of $334 million as a result of debt exchanges approved by the Bankruptcy Court. In addition, the Noteholders have a General Unsecured Claim of approximately $9,000,000 on account of the Notes. The Equity Committee disputes the Noteholders' calculation of the claims because it contends that the Noteholders may not be entitled to any or all post-petition interest claimed as part of the liquidation preference, and if they are, the interest should be calculated at the federal judgment rate. On the Effective Date, each of the Noteholders shall receive its *pro rata* share of Reorganized Coram Common Stock in full and final satisfaction of both their Claims against CHC and Coram and Coram Preferred Stock. Class 4 is impaired under the provisions of the Plan and is entitled to vote to accept or reject the Plan.

**Estimated Amount of Claims and Interests: $ 343,600,000.**
**Recovery:   100% of common stock of Reorganized Coram**

Class 5 – Coram Equity
Interest

CHC is the holder of all of the outstanding voting common stock of Coram. CHC shall neither receive a distribution nor retain any legal, equitable or contractual rights with regard to its equity interest in Coram, which shall be deemed cancelled and extinguished as of the Effective Date as part of the Plan. Class 5 is impaired under the provisions of the Plan and is deemed to have rejected the Plan.

**Estimated Value of Interest:  $0**
**Recovery:                          $0**

Class 6 – CHC Equity
Interests

On the Effective Date, each holder of an Allowed CHC Equity Interest shall receive its pro rata share of the Plan Funding Cash Balance. All CHC Equity Interests shall be deemed cancelled and extinguished as of the Effective Date. Class 6 is impaired under the provisions of the Plan and is entitled to vote to accept or reject the Plan.

**Estimated Value of Interests:     $0**
**Estimated Recovery:               in excess of $28,000,000**

The estimated Claim amounts set forth in the table above are the Trustee's best current estimates as to the amounts of Allowed Claims. The actual amounts of Allowed Claims may differ substantially from the estimates. The estimated recovery of Allowed CHC Equity Interests is based upon the Trustee's estimates of Claims and available cash on the Effective Date. There can be no assurance that CHC Equity Interests will recover this amount.

## III.    BACKGROUND OF THE DEBTORS

CHC is a publicly-traded Delaware corporation. Coram is a wholly-owned subsidiary of CHC.

On July 8, 1994, CHC was formed as a result of the merger of four companies that were providers of home infusion therapy and related services: $T^2$ Medical, Inc. ("$T^2M$"), Curaflex Health Services, Inc., Medysis, Inc. and HealthInfusion, Inc.  During the next year, CHC acquired the home infusion business of Caremark, Inc. and H.M.S.S., Inc., leading regional providers of home infusion therapies.

The Debtors are engaged primarily in the business of furnishing alternate site (outside the hospital) infusion therapy, including non-intravenous home health products such as durable medical equipment and respiratory therapy services.  Other services offered by the Debtors include centralized management, administration and clinical support for clinical research trials.

The Debtors provide a variety of infusion therapies, including nutrition, anti-infective therapies, IVIG and coagulant and blood clotting therapies for patients with hemophilia.  The Debtors deliver alternate site infusion therapy services through about seventy-five (75) branch offices located in forty (40) states and Ontario, Canada.

Infusion patients are typically referred to the Debtors following the diagnosis of a specific disease or upon discharge from a hospital.  Delivery of intravenous drugs requires patient training, specialized equipment and clinical monitoring by skilled nurses and pharmacists.  Many therapies require either a gravity-based flow control device or an electro-mechanical pump to administer the drugs.  The Debtors' nurses and pharmacists work with the patient's physician to monitor and assess the patient's condition and update the therapy as necessary.

## IV.    EXISTING CAPITAL STRUCTURE OF THE DEBTORS

As of August 8, 2000, the Debtors' principal credit and debt agreements included (i) a Securities Exchange Agreement, dated May 6, 1998 (the "Securities Exchange Agreement"), with the Noteholders and the related Series A Senior Subordinated Unsecured Notes (the "Series A Notes") and the Series B Senior Subordinated Unsecured Convertible Notes (the "Series B Notes") and (ii) a Senior Credit Facility (the "Senior Credit Facility") with Foothill Income Trust L.P., Cerberus Partners, L.P. and Goldman Sachs Credit Partners L.P. (collectively the "Lenders") and Foothill Capital Corporation as agent thereunder.

Subsequent to the Petition Date, the Debtors entered into a secured debtor-in-possession financing agreement with Madeleine L.L.C., an affiliate of Cerberus Partners, L.P. (the "DIP Agreement").

## A. The Senior Credit Facility

On August 20, 1998, the Debtors entered into the Senior Credit Facility, which provided for the availability of up to $60.0 million for acquisitions, working capital, letters of credit and other corporate purposes. The terms of the agreement also provided for the issuance of letters of credit of up to $25.0 million provided that available credit would not fall below zero.

The Senior Credit Facility provided for interest on outstanding indebtedness at the rate of prime plus 1.5%, payable in arrears. Additionally, the terms of the agreement provided for a fee of 1.0% per annum on the outstanding letter of credit obligations, also payable in arrears. The Senior Credit Facility further provided for additional fees to be paid on demand to any letter of credit issued pursuant to the application and related documentation under which such letters of credit were issued. The Senior Credit Facility was secured by the capital stock of the Debtors' and their subsidiaries, as well as, the accounts receivable and certain other assets held by the Debtors and their subsidiaries. The Senior Credit Facility contained customary covenants and events of default.

Although all borrowings under the Senior Credit Facility were repaid prior to the commencement of the Chapter 11 Case, letters of credit issued before that date were outstanding on August 8, 2000. Effective February 6, 2001, the Lenders and the Debtors terminated the Senior Credit Facility. In connection with the termination of the Senior Credit Facility and pursuant to orders of the Bankruptcy Court, the Debtors established irrevocable letters of credit through Wells Fargo Bank Minnesota, N.A. ("Wells Fargo"), an affiliate of Foothill Capital Corporation. Such letters of credit aggregated approximately $0.9 million as of September 30, 2002 but were reduced to approximately $0.8 million in October 2002. The Debtors' letters of credit are fully secured by interest-bearing cash deposits held by Wells Fargo. The letters of credit matured in February 2003.

## B. Securities Exchange Agreement

The Securities Exchange Agreement cancelled a previously outstanding subordinated rollover note, related deferred interest and fees and related warrants to purchase up to 20% of the outstanding common stock of CHC on a fully diluted basis in an exchange for the payment of $4.3 million in cash and the issuance by CHC to the Noteholders of (i) $150.0 million in principal amount of Series A Notes and (ii) $87.9 million in principal amount of Series B Notes.

On April 9, 1999, CHC entered into Amendment No. 2 (the "Amendment No. 2") to the Securities Exchange Agreement with the Noteholders. Pursuant to the Amendment No. 2, the outstanding principal amount of the Series B Notes is convertible into shares of the CHC's common stock at a conversion price of $2.00 per share (subject to customary anti-dilution adjustments). Prior to entering into the Amendment No. 2, the Series B Notes were convertible into CHC common stock at a conversion price of $3.00 per share, which was subject to downward (but not upward) adjustment based on prevailing market prices for CHC's common stock on April 13, 1999 and October 13, 1999. Pursuant to the Amendment No. 2, the parties also increased the interest rate applicable to the Series A Notes from 9.875% to 11.5% per annum.

## C. Stark II and the Note Exchanges

Under the physician ownership and referral provisions of the Omnibus Budget Reconciliation Act of 1993 ("Stark II"), it is unlawful for a physician to refer patients for certain designated health services reimbursable under the Medicare or Medicaid programs to an entity with which the physician and/or the physician's family has a financial relationship, unless the financial relationship fits within an exception enumerated in Stark II or regulations promulgated thereunder. A "financial relationship" under Stark II is broadly defined as an ownership or investment interest in, or any type of compensation arrangement in which remuneration flows between the physician and the provider. CHC has financial relationships with physicians and physician owned entities in the form of medical director agreements and service agreements pursuant to which the company provides pharmacy products. In each case, the relationship has been structured using an arrangement management believes to be consistent with the applicable exceptions set forth in Stark II. In addition, CHC is aware of certain referring physicians (or their immediate family members) that have had financial interests in CHC through ownership of shares of the CHC's common stock.

The Stark II law includes an exception for the ownership of publicly traded stock in companies with equity above certain levels. This exception of Stark II requires the issuing company to have stockholders' equity of at least $75 million either as of the end of its most recent fiscal year or on average over the last three fiscal years. The penalties for failure to comply with Stark II include, among other things, non-payment of claims and civil penalties that could be imposed upon the company and, in some instances, upon the referring physician. Some of such penalties can be imposed regardless of whether the company intended to violate the law.

A company whose stock is publicly traded has, as a practical matter, no reliable way to implement and maintain an effective compliance plan for addressing the requirements of Stark II other than complying with the public company exception. Accordingly, if CHC's common stock remains publicly traded and its stockholders' equity falls below the required levels, CHC would be forced to cease accepting referrals of patients covered by Medicare or Medicaid programs or run a significant risk of noncompliance with Stark II. Referrals of CHC's patients with such government-sponsored benefit programs comprise a substantial amount of CHC's consolidated net revenue.

CHC previously requested a Stark II waiver from the Health Care Financing Administration (the predecessor to The Centers for Medicare and Medicaid Services), but such waiver request was denied.

During the course of this Chapter 11 Case, CHC has entered into three transactions whereby the Noteholders exchanged debt for Coram Preferred Stock to enable CHC to comply with Stark II.

### 1. The First Note Exchange

On December 28, 2000, the Bankruptcy Court approved the Debtors' request to exchange a sufficient amount of debt and related accrued interest for Coram Preferred Stock in an amount sufficient to maintain compliance with Stark II (the "First Note Exchange"). On December 29, 2000, the Securities Exchange Agreement was amended ("Amendment No. 4") and an Exchange Agreement was simultaneously executed among the Debtors and the Noteholders. Pursuant to such arrangements, the Noteholders agreed to exchange approximately $97.7 million aggregate principal amount of the Series A Notes and $11.6 million of aggregate contractual unpaid interest on the Series A Notes and the Series B Notes as of December 29, 2000 for 905 shares of Coram Preferred Stock. Following the exchange, the Noteholders retained approximately $61.2 million aggregate principal amount of the Series A Notes and $92.1 million aggregate principal amount of the Series B Notes. Pursuant to Amendment No. 4, the per annum interest rate on both the Series A Notes and the Series B Notes was adjusted to 9.0%. Moreover, the Series A Notes' and Series B Notes' original scheduled maturity dates of May 2001 and April 2008, respectively, were both modified to June 30, 2001.

### 2. The Second Note Exchange

On December 27, 2001, the Bankruptcy Court approved the Debtors' request to exchange an additional amount of debt and related contractual unpaid interest for Coram Preferred Stock in an amount sufficient to maintain compliance with Stark II (the "Second Note Exchange"). In connection therewith, on December 31, 2001 the Securities Exchange Agreement was amended ("Amendment No. 5") and an Exchange Agreement was simultaneously executed among the Debtors and the Noteholders. Pursuant to such arrangements, the Noteholders agreed to exchange $21.0 million aggregate principal amount of the Series A Notes and approximately $1.9 million of aggregate contractual unpaid interest on the Series A Notes as of December 31, 2001 for approximately 189.6 shares of Coram Preferred Stock. Following the Second Note Exchange, the Noteholders retained approximately $40.2 million aggregate principal amount of the Series A Notes. Pursuant to Amendment No. 5, the Series A Notes' and Series B Notes' scheduled maturity date of June 30, 2001 were both modified to June 30, 2002.

### 3. The Third Note Exchange

On December 27, 2002, the Bankruptcy Court approved the Trustee's request to exchange an additional amount of debt and related contractual unpaid interest for Coram Preferred Stock in an amount sufficient to maintain compliance with Stark II (the "Third Note Exchange"). In connection therewith, on December 31, 2002 the Securities Exchange Agreement was amended ("Amendment No. 6") and an Exchange Agreement was simultaneously executed among the Trustee, the Debtors and the Noteholders. Pursuant to such arrangements, the Noteholders agreed to exchange $42.5 million aggregate principal amount of the Series A Notes, approximately $83.1 million aggregate principal amount of the Series B Notes and $16.6 million of aggregate contractual unpaid interest on the Series B Notes as of December 31, 2002 for approximately 1,218.3 shares of Coram Preferred Stock. Following the Third Note Exchange, the Noteholders retained $9.0 million aggregate principal amount of the

Series A Notes. Pursuant to Amendment No. 6, the Series A Notes' and Series B Notes' scheduled maturity dates of June 30, 2002 were modified to June 30, 2003.

### D. The DIP Agreement

On September 12, 2000, the Bankruptcy Court authorized, effective August 30, 2000, the Debtors to enter into the DIP Agreement. The DIP Agreement provided that the Debtors could access, as necessary, a line of credit of up to $40 million for use in connection with the operation of their businesses and the businesses of their subsidiaries. The DIP Agreement was secured by the capital stock of the Debtors' subsidiaries, as well as, the accounts receivable and certain other assets held by the Debtors and their subsidiaries. To secure the DIP Agreement, the Debtors paid an origination fee of 1% of the total committed line of credit in 2000, plus commitment fees on the unused facility at the rate of 0.5% per annum, payable monthly in arrears, totaling $0.2 million for the nine months ended September 30, 2001. No borrowings were made under the DIP Agreement, which expired under its terms on August 31, 2001.

### E. Accreditation Note Payable

In August 2001, Coram entered into an agreement (the "ACHC Agreement") with the Accreditation Commission for Health Care, Inc. ("ACHC") whereby ACHC is to, among other things, provide national accreditation for the Debtors as deemed appropriate by ACHC. Under the terms of the ACHC Agreement, which commenced on the date that it was executed and expires in November 2004, the Debtors made an upfront payment and are obligated to make twelve equal non-interest bearing quarterly payments totaling approximately $0.3 million.

## V.    THE CHAPTER 11 CASES

### A. Events Leading to the Debtors' Bankruptcy Filings

According to the Debtors, the Debtors' need to seek the relief afforded by the Bankruptcy Code was due to: (i) the scheduled May 1, 2001 maturity date of the Series A Notes; and (ii) the requirement that CHC remain compliant with Stark II after December 31, 2000.

### B. Continuation of Business; Stay of Litigation

On August 8, 2000, the Debtors commenced the Chapter 11 Case by filing petitions under Chapter 11 of the Bankruptcy Code. An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by Creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors. This relief provided the Debtors with the "breathing room" necessary to assess and reorganize their business. Accordingly, certain Claims against the Debtors in existence prior to the Petition Date are stayed while the Debtors' operations continue under the purview of a Chapter 11 trustee or as debtors-in-possession. In addition, Claims secured by the Debtors' assets were also stayed, although the holders of such Claims have the right to move the Bankruptcy Court for relief from the automatic stay to permit such creditors to

foreclose on the property securing their Claims.  Certain Creditors have sought relief from the Bankruptcy Court to modify the automatic stay and continue pursuit of their Claims against the Debtors or the Debtors' insurance carriers.  The automatic stay remains in effect, unless modified or annulled by the Bankruptcy Court, until consummation of a plan of reorganization.

Following the commencement of the Chapter 11 Case, the Debtors operated as debtors-in-possession subject to the jurisdiction of the Bankruptcy Court.  With the appointment of the Chapter 11 Trustee, however, the Debtors are no longer debtors-in-possession.  The Trustee is authorized to operate the Debtors' business in the ordinary course, with transactions out of the ordinary course of business requiring Bankruptcy Court approval.

## C.  First Day Orders

On August 9, 2000, the Bankruptcy Court approved the Debtors' motions for: (i) payment of all employee wages and salaries and certain benefits and other employee obligations; (ii) payment of critical trade vendors, utilities and insurance in the ordinary course of business for both pre and post-petition expenses; (iii) access to a debtor-in-possession financing arrangement; and (iv) use of all company bank accounts for normal business operations.  In September 2000, the Bankruptcy Court approved the Debtors' motion to reject four unexpired, non-residential real property leases for the following underutilized locations: (i) Allentown, Pennsylvania; (ii) Denver, Colorado; (iii) Philadelphia, Pennsylvania; and (iv) Whippany, New Jersey.

## D.  Unexpired Leases

Pursuant to a motion filed by the Trustee, the Bankruptcy Court has extended the time during which the Trustee may assume or reject the unexpired real property leases through and including June 30, 2003.

## E.  Appointment of Committees

### 1.  Creditors' Committee

On August 22, 2000, the Office of the United States Trustee pursuant to Section 1102 of the Bankruptcy Code, appointed an Official Unsecured Creditors' Committee ("Creditors Committee"), which is generally comprised of certain of the Debtors' creditors and holders of other unsecured claims.  The following creditors were selected as members of the Creditors' Committee: Goldman Sachs Credit Partners, L.P.; Foothill Capital Corporation; and Aetna U.S. Healthcare, Inc.

### 2.  Equity Committee

On October 18, 2000, the United States Trustee designated an Official Committee of Equity Security Holders (the "Equity Committee") pursuant to Section 1102 of the Bankruptcy Code to represent the interests of CHC's common shareholders in the Chapter 11 Case.  The

following holders of CHC Equity Interests are the members of the Equity Committee: Samstock
L.L.C., the Ann and Robert Lurie Foundation and Richard Haydon.

### F. The Debtors' First Plan of Reorganization

On the same day the Debtors commenced the Chapter 11 Case, the Debtors also filed
their joint plan of reorganization (the "Debtors' First Plan") and their joint disclosure statement
with the Bankruptcy Court. The Debtors' First Plan was subsequently amended and restated.
Among other things, the Debtors' Plan provided for: (i) a conversion of all of the Debtors'
obligations represented by CHC's Series A Notes and the Series B Notes into (a) a four year,
interest only note in the principal amount of $180 million, that would bear interest at the rate of
9% per annum and (b) all of the equity in the reorganized debtor; (ii) the payment in full of all
secured, priority and general unsecured claims of Coram; (iii) the impairment of certain general
unsecured debts of CHC, including, among others, CHC's obligations under the Series A Notes
and the Series B Notes; and (iv) the complete elimination of the Equity Interests of CHC.
Furthermore, pursuant to the Debtors' First Plan, CHC would be dissolved as soon as practicable
after the effective date of the Debtors' First Plan and the stock of CHC would be terminated and
extinguished.

At a confirmation hearing on December 21, 2000, the Bankruptcy Court denied
confirmation of the Debtors' First Plan finding that the incomplete disclosure of the relationship
between the Debtors' Chief Executive Officer, Crowley, and Cerberus Capital Management,
L.P., an affiliate of one of the Debtors' largest creditors, precluded the Bankruptcy Court from
finding that the Debtors' First Plan, as restated, was proposed in good faith, a statutory
requirement for plan confirmation. A copy of the transcript of the Court's oral opinion denying
Confirmation of the Debtors' First Plan is attached hereto as Exhibit B.

### G. The Appointment of an Harrison J. Goldin & Associates as Independent Restructuring Advisor

On February 26, 2001, the Bankruptcy Court approved the Debtors' motion to appoint
Goldin Associates, L.L.C. ("Goldin") as an independent restructuring advisor to the Independent
Committee of the Board of Directors of CHC (the "Independent Committee"). Among other
things, the scope of Goldin's services included (i) assessing the appropriateness of the Debtors'
First Plan, as restated, and reporting its findings to the Independent Committee and advising the
Independent Committee regarding an appropriate course of action calculated to bring the Chapter
11 Case to a fair and satisfactory conclusion, (ii) preparing a written report as may have been
required by the Independent Committee and/or the Bankruptcy Court and (iii) appearing before
the Bankruptcy Court to provide testimony, as needed. Goldin was also appointed as a mediator
among the Debtors, the Equity Committee and other parties in interest.

### H. The Debtors' Second Plan of Reorganization

Based upon Goldin's findings and recommendations, as set forth in the Report of
Independent Restructuring Advisor, Goldin Associates, L.L.C. (the "Goldin Report"), on July 31,
2001, the Debtors filed with the Bankruptcy Court a Second Joint Disclosure Statement with

respect to their Second Joint Plan of Reorganization (the "Debtors' Second Plan"). The Debtors' Second Plan, which was also filed on July 31, 2001, provided the terms of a reorganization similar to those described in the Debtors' First Plan; however, utilizing Goldin's recommendations, as set forth in the Goldin Report, the following substantive modifications were included in the Debtors' Second Plan:

- the payment of up to $3.0 million to the holders of CHC allowed general unsecured claims;

- the payment of up to $10.0 million to the holders of CHC equity interests (contingent upon such holders voting in favor of the Second Joint Plan);

- cancellation of the issued and then outstanding Coram Preferred Stock; and

- a $7.5 million reduction in certain performance bonuses payable to Crowley.

On December 21, 2001, after several weeks of confirmation hearings, the Bankruptcy Court issued an order denying confirmation of the Debtors' Second Plan for the reasons set forth in an accompanying opinion, a copy of which is attached hereto as Exhibit C. The Equity Committee believes that, in denying confirmation of the Debtors' Second Plan, the Court rejected a significant portion of the Goldin Report's findings, most importantly Goldin's conclusion that the conflict of interest between Crowley and Cerberus had not harmed the Debtors.

## I.  Appointment of Chapter 11 Trustee

On February 12, 2002, the Bankruptcy Court granted motions made by the Office of the United States Trustee and two of the Noteholders requesting the appointment of a Chapter 11 trustee to oversee the Debtors' operations and facilitate the reorganization process. On March 7, 2002, the Bankruptcy Court approved the appointment of Arlin M. Adams, Esquire, retired Judge of the United States Court of Appeals for the Third Circuit as the Debtors' Chapter 11 trustee. Attached hereto as Exhibit D is the Trustee's curriculum vitae.

The Bankruptcy Code permits a Chapter 11 trustee to operate the Debtors' business. As with a debtor-in-possession, a Chapter 11 trustee may enter into transactions in the ordinary course of business without notice or a hearing before the Bankruptcy Court; however, non-ordinary course actions still require prior authorization from the Bankruptcy Court. A Chapter 11 trustee also assumes responsibility for management functions, including decisions relative to the hiring and firing of personnel. When existing management is necessary to run the day-to-day operations, a Chapter 11 trustee may retain and oversee such management group.

After the Trustee's appointment, CHC's board of directors did not retain its ordinary management powers. While the Trustee has assumed the board of directors' management rights and responsibilities, he has done so without any pervasive changes to the Debtors' existing

management or organizational structure, other than, as further discussed below, the acceptance of Crowley's resignation effective March 31, 2003.

### J.  Significant Events Since the Chapter 11 Trustee's Appointment

#### 1.  Professional Fees

On or about July 24, 2002, the Bankruptcy Court granted a motion submitted by the Trustee to (i) defer payment on account of certain approved interim professional fee applications, (ii) defer the Bankruptcy Court's decisions regarding the allowance or disallowance of compensation and expense reimbursements requested in certain interim professional fee applications, (iii) disallow certain professional fee applications requesting payment for professional services rendered and expense reimbursements subsequent to March 6, 2002, and (iv) disallow certain other professional fee and expense reimbursement applications. Certain legal counsel engaged during the period the Debtors operated as debtors-in-possession have filed final fee applications seeking, *inter alia,* a final order allowing payment of professional fees and reimbursement of expenses incurred in connection with the Chapter 11 Case. The Trustee filed an omnibus objection to all final professional fee applications and seeks to adjourn the adjudication of such final professional fee applications until sometime after confirmation of the Plan.

#### 2.  Administrative Matters

On or about July 24, 2002, the Bankruptcy Court also approved several motions filed by the Trustee related to fiduciary and administrative matters, including (i) the maintenance of the Debtors' existing bank accounts, (ii) continued use of the Debtors' business forms and record retention policies and procedures and (iii) expenditure authorization/check disbursement policies.

#### 3.  Financial Advisors

On October 14, 2002, the Trustee filed a motion requesting approval for the retention of SSG Capital Advisors, L.P. and Ewing Monroe Bemiss & Co. to serve as the Trustee's financial advisors to provide services focusing on the restructuring and reorganization of the Debtors. Such motion was granted by the Bankruptcy Court on December 2, 2002.

#### 4.  Audits and Financial Reporting

Since his appointment, the Trustee has served as the audit committee (the "Audit Committee") for CHC. In fulfilling the function of the Audit Committee, the Trustee has, through meetings with management and CHC's independent auditor, provided oversight on matters relating to accounting, financial reporting, internal control, auditing, and regulatory compliance activities and other matters as the Trustee deemed appropriate.

As of March 7, 2002, the Trustee engaged Ernst & Young LLP ("E&Y") as CHC's independent auditor. Pursuant to guidelines established by the Trustee, the Trustee has, in his capacity acting as the Audit Committee, reviewed the activities and independence of the

independent auditor. This includes communicating to the independent auditor that it is ultimately accountable to the Trustee. The Trustee has the ultimate authority and responsibility to select, evaluate and, where appropriate, replace the independent auditor.

With regard to the CHC's Annual Report on Form 10-K for its fiscal year ended December 31, 2002 (the "2002 Form 10-K") filed with the SEC, the Trustee engaged Mr. Barry Hartzell, President of the Executive Roundtable, to act as a consultant to the Trustee in his performance of functions of the Audit Committee. Based upon information provided by Mr. Hartzell, the Trustee believes that, although not sitting as an Audit Committee member, Mr. Hartzell possesses the type of accounting or related financial management expertise as those qualifications are outlined for an Audit Committee financial expert under Item 401(h) of Regulation S-K. Prior to the CHC's filing of its 2002 Form 10-K, the Trustee held Audit Committee meetings on April 10 and 11, 2003 in fulfillment of the Audit Committee functions with respect to the 2002 Form 10-K, as outlined above, including an assessment of the independent auditor's independence and CEO and CFO certifications, a review and discussion of the audited financial statements with management, and discussion with the independent auditors, E&Y on the matters required to be discussed by relevant auditing standards, including the quality, not just the acceptability, of the accounting principles and underlying estimates used in the audited financial statements. Based on such assessments, reviews and discussions, the Trustee recommended that the audited financial statements for the year ended December 31, 2002 be included in CHC's 2002 Form 10-K filed with the SEC.

The Trustee reviewed CHC's Quarterly Reports on Form 10-Q for the quarterly periods ending on June 30, 2002 and September 30, 2002 with CHC's management and CHC's independent auditor, E&Y, at Audit Committee meetings held on August 16, 2002 and November 15, 2002, respectively, prior to their respective filings with the SEC.

The Trustee also receives periodic reports from management, CHC's General Counsel, and its independent auditor, E&Y, on matters relating to accounting, financial reporting, internal controls, auditing, litigation and compliance with legal business policies and regulatory requirements.

### 5. Crowley Motions

Crowley's employment contract expired by its own terms on November 29, 2002. On January 24, 2003, the Trustee filed a motion seeking authorization to enter into a Termination and Employment Extension Agreement (the "Transition Agreement"), effective January 1, 2003, with Crowley. The Transaction Agreement provided that Crowley would serve as CHC's Chief Transition and Restructuring Officer for a term not to exceed (i) the earlier of six months from January 1, 2003, (ii) the date on which a plan or plans of reorganization were confirmed by Final Order of the Bankruptcy Court, or (iii) the substantial consummation of a plan or plans of reorganization. Pursuant to the Transition Agreement, Mr. Crowley would have continued to render essentially the same services as he previously provided to the Debtors. On March 3, 2003, the Bankruptcy Court denied the Chapter 11 Trustee's motion for authorization to enter into the Transition Agreement. (A copy of the transcript of the Bankruptcy Court's oral opinion is attached hereto as Exhibit E). As a result, Crowley tendered his resignation effective March 31, 2003.

On January 14, 2003, the Equity Committee filed a motion with the Bankruptcy Court seeking an order to terminate Crowley's employment with the Debtors and other relief. The Equity Committee's motion was denied as moot by order entered on March 26, 2003. The Equity Committee's other relief requested, including disgorgement of compensation paid to Crowley, was reserved for determination in any litigation that may be commenced by any party with standing to raise that issue.

### 6.  Incentive and Retention Compensation Programs

In September 2000 and October 2000, the Bankruptcy Court approved payments of up to approximately $2.6 million for retention bonuses payable to certain key employees. The bonuses were scheduled to be paid in two equal installments on the later of the date of emergence from bankruptcy or: (i) December 31, 2000 and (ii) December 31, 2001. After confirmation of the Debtors' First Plan was denied, at the Debtors' request, the Bankruptcy Court approved early payment of the first installment to most individuals within the retention program and such payments, aggregating approximately $0.7 million, were made on March 15, 2001.

In January, 2002, after confirmation of the Debtors' Second Plan was denied, the Debtors requested permission from the Bankruptcy Court to pay: (i) the remaining portion of the first installment of approximately $0.5 million to Crowley and the Debtors' Executive Vice President, Alan Marabito ("Marabito") and (ii) the full amount of the second installment. On March 15, 2002, after the Trustee's appointment, the Bankruptcy Court approved payment of all of the remaining retention bonuses, except the amounts pertaining to Crowley. The incremental retention bonuses, aggregating approximately $0.8 million, were paid on March 25 2002. The Bankruptcy Court postponed its rulings on the Debtors' motions pertaining to the 2002 retention plan and payment of Crowley's retention amounts.

CHC has sponsored a Management Incentive Plan ("MIP"), providing for annual bonuses payable to certain key employees, predicated on overall corporate performance, as well as, individual performance targets and objectives. On March 20, 2001, the CHC Compensation Committee of the Board of Directors approved an overall award of approximately $13.6 million to participating individuals for the year ended December 31, 2000 (the "2000 MIP"). On September 7, 2001, the Bankruptcy Court approved payment of the 2000 MIP to all such participating individuals, except Crowley. In connection therewith, payments to those approved participating individuals were made in September 2001.

Pursuant to the provisions of the MIP for the year ended December 31, 2001 (the "2001 MIP"), which was previously approved by CHC's Compensation Committee of the Board of Directors, the individuals included thereunder were entitled to an aggregate payment of approximately $2.5 million. On August 16, 2002, the Trustee filed a motion with the Bankruptcy Court to make 2001 MIP payments of approximately $1.1 million to participants other than Crowley and Marabito. The Bankruptcy Court granted the Trustee's motion on September 6, 2002 and the approved amounts were paid to the eligible 2001 MIP participants. The Bankruptcy Court order of September 6, 2002 approving the motion also (i) withdrew a previous motion made by the Debtors to implement a 2002 key employee retention plan, (ii)

withdrew the Debtors' previous motion requesting permission to pay the remaining amounts under the first key employee retention plan and (iii) preserved Crowley's and Marabito's rights to later seek Bankruptcy Court orders authorizing payment of amounts due to them under the 2001 MIP.

On April 7, 2003, the Bankruptcy Court entered an order granting the Trustee's motion to approve the 2003 Key Employee Retention Plan (the "2003 KERP") which provided for (i) retention bonus payments of approximately $2.7 million to key management personnel (the "Management Incentive Compensation") and (ii) other bonus payments of approximately $0.3 million to certain branch managers ( the "Branch Incentive Compensation"). The Management Incentive Compensation is payable in two equal installments as follows: (i) upon approval of the Bankruptcy Court and (ii) the earlier of sixty (60) days after confirmation of a plan of reorganization or December 31, 2003 (the "Second Payment Date"). Should a Management Incentive Compensation participant voluntarily leave the Debtors or be terminated for cause prior to the Second Payment Date, such participant must return any amounts previously received under the 2003 KERP, less applicable taxes withheld. Under the 2003 KERP, the entire Branch Incentive Compensation amount was payable upon Bankruptcy Court approval.

## K. The Equity Committee's Plan

On December 19, 2002, the Equity Committee filed a proposed plan of reorganization, subsequently amended on May 15, 2003 (the "Proposed Equity Committee Plan"). A complete description of the Proposed Equity Committee Plan is set forth in the Disclosure Statement of the Equity Committee of Coram Healthcare Corporation in Connection with the First Amended Plan of Reorganization of Coram Healthcare Corporation and Coram, Inc. and Exhibits A through J thereto (collectively the "Proposed Equity Disclosure Statement"). A hearing on the adequacy of the Equity Disclosure Statement commenced on June 19, 2003. The Trustee does not support the Proposed Equity Committee Plan because, *inter alia*: (1) he has been advised by the Noteholders that they will vote to reject and will oppose the Equity Committee's proposed plan and the Trustee believes that the Equity Committee's plan cannot be confirmed over the objections and votes to reject it by the Noteholders; and (2) the Trustee believes that Trustee's Plan will most likely result in a greater and much faster recovery for the holders of Claims and Equity Interests than under the proposed Equity Committee Plan.

## L. The Equity Committee's Equitable Subordination Complaint

On or about March 28, 2003, the Equity Committee commenced an adversary proceeding seeking to equitably subordinate the Noteholder's Coram Preferred Stock interests to CHC's common stock interest in Coram. On June 5, 2003, the Court granted the Noteholders' motions to dismiss the equitable subordination complaint.

## VI.    HISTORICAL FINANCIAL INFORMATION

Pertinent historical financial information concerning the Debtors is contained in CHC's consolidated Annual Reports on Form 10-K for the fiscal years ended December 31, 2000,

December 31, 2001 and December 31, 2002, which are on file with the Securities and Exchange Commission.

## VII.   CLAIMS

On August 23, 2000, the Debtors filed with the Bankruptcy Court Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules and Statements"). The Schedules and Statements of the Debtors include information regarding Claims against CHC and Coram. The Debtors neither prepared nor filed any schedules or statements regarding their non-debtor subsidiaries, nor were they required to do so.

On August 9, 2000, the Bankruptcy Court entered an order (the "Bar Date Order") establishing the general deadline for filing proofs of Claim against the Debtors (the "Bar Date"). The Bankruptcy Court established September 29, 2000, as the deadline for filing Claims. The Debtors' claims and notice agent provided notice of the Bar Date by mailing to each person listed in the Schedules and Statements: (i) a notice of the Bar Date; (ii) a proof of claim form; and (iii) whether the Claim of each recipient was listed in the Schedules and Statements as either unliquidated, contingent and/or disputed. In addition, the Debtors published notice of the Bar Date in the Wall Street Journal and the New York Times. According to information provided by the claims agent, a total of 746 proofs of Claim were filed against the Debtors.

On December 28, 2000, the Bankruptcy Court entered an order regarding the Debtors' First Omnibus Objection to Certain Proofs of Claim disallowing certain Claims. On March 23, 2001, the Debtors filed a Second Omnibus Objection to Certain Proofs of Claim. On May 3, 2001, the Bankruptcy Court entered an Order disallowing certain additional Claims and adjourned the hearing relating to certain other Claims.

The Trustee is in the process of evaluating Claims and intends to object to any additional duplicative, late or meritless claims.

Based upon his preliminary review of the Claims, the Trustee believes that Allowed Claims will not exceed the following amounts:

| | |
|---|---|
| Administrative Claims: | $13,500,000. |
| Priority Tax Claims: | $19,430,000. |
| Priority Non-Tax Claims: | $    12,900. |
| Secured Claims: | $         0 |
| General Unsecured Claims: | $17,950,000. |

Crowley has asserted claims of more than $17 million against the Debtors. The Trustee's estimate of claims does not include any allowance for Crowley's claims because the Trustee believes that the Bankruptcy Court will find them to be without merit.

The estimated Claim amounts reflected herein are the Trustee's best current estimates as to the Allowed amount of Claims. The actual Allowed amount of Claims may differ

substantially from the estimates.  The actual amount of Allowed Claims in this Bankruptcy Case will impact the estimated Distribution to Creditors and holders of CHC Equity Interests.

## VIII.   GENERAL INFORMATION REGARDING THE TRUSTEE'S PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO **AND THE DOCUMENTS CONTAINED IN THE PLAN SUPPLEMENT, WHICH WILL BE AVAILABLE FOR INSPECTION AT CLERK'S OFFICE OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 844 KING STREET, WILMINGTON, DELAWARE 19801, AND WEIR & PARTNERS LLP, 824 MARKET STREET MALL, SUITE 1001, WILMINGTON, DELAWARE 19899.**

ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CREDITORS AND HOLDERS OF EQUITY INTERESTS AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES IN INTEREST.  AS THE PLAN DEALS WITH SOPHISTICATED LEGAL CONCEPTS AND INCORPORATES THE DEFINITIONS AND REQUIREMENTS OF THE BANKRUPTCY CODE, YOU MAY WISH TO CONSULT WITH COUNSEL OF YOUR CHOICE BEFORE VOTING ON THE PLAN.

### A.  Classification and Treatment of Claims and Equity Interests Under the Plan

Section 1122 of the Bankruptcy Code requires that a plan of reorganization classify the Claims of a debtor's creditors and interests of its equity holders.  The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, a plan of reorganization may place a claim of a creditor or an interest of an equity holder in a particular class only if such claim or interest is substantially similar to the other claims of such class.  The Bankruptcy Code further requires that a plan of reorganization provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest.

The Trustee believes that all Claims and Equity Interests are classified in compliance with the requirements of the Bankruptcy Code. If a Creditor or holder of an Equity Interest challenges such a classification of Claims or Equity Interests and the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Trustee, to the extent permitted by the Bankruptcy Court, intends to make such reasonable modifications of the classifications of Claims or Equity Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court for Confirmation.

EXCEPT TO THE EXTENT THAT SUCH A MODIFICATION OR CLASSIFICATION ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR EQUITY INTEREST AND REQUIRES RESOLICITATION, ANY HOLDER OF A CLAIM OR EQUITY INTEREST ACCEPTING THE PLAN WILL BE DEEMED TO HAVE CONSENTED TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM OR EQUITY INTEREST REGARDLESS OF THE CLASS OF WHICH SUCH HOLDER IS ULTIMATELY DEEMED TO BE A MEMBER.

## 1. Treatment of Unclassified Claims

### a. Administrative Claims

Administrative Claims consist of the costs and expenses of the administration of the Chapter 11 Case. Such costs and expenses may include, but are not limited to, Claims arising under the cost of operating the Debtors' business since the Petition Date, the outstanding fees and expenses of the professionals retained by the Trustee, the Debtors, the Creditors' Committee and the Equity Committee in amounts approved by the Bankruptcy Court, and any payment that may be necessary to cure prepetition defaults on unexpired leases and executory contracts that are being assumed under the Plan. All payments to professionals in connection with the Chapter 11 Case for compensation and reimbursement of expenses and all payments to reimburse expenses of members of the Creditors' Committee and Equity Committee will be made in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Rules and must be approved by the Bankruptcy Court as reasonable.

Except to the extent that the Trustee and the holder of an Allowed Administrative Claim agree to a different treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of (i) the Effective Date, or (ii) fourteen (14) days after the date on which such Claim becomes an Allowed Administrative Claim. The holder of an Administrative Claim, other than an Administrative Claim of a professional employed under Sections 327 and 328 of the Bankruptcy Code, must file an application seeking allowance of such Administrative Claims on or before the thirtieth (30th) day after the Effective Date. Failure to timely seek approval of such Administrative Claim shall result in such Administrative Claim being forever barred and discharged. The holder of an Administrative Claim of a professional employed under Sections 327 and 328 of the Bankruptcy Code that arises before the Effective Date must file an application for payment of such Administrative Claims under Section 330 of the Bankruptcy Code on or before the thirtieth (30th) day after the Effective Date. Failure to seek timely approval of any such Allowed Administrative Claim shall result in such Administrative Claim being forever barred and discharged. Allowed administrative Claims that arise before the

19

Effective Date shall be paid from Plan Funding Cash. Any Allowed Administrative Claims that arise after the Effective Date shall be paid by Reorganized Coram, but not with Plan Funding Cash. Notwithstanding the foregoing, Administrative Claims representing obligations incurred in the ordinary course of business shall not be paid with Plan Funding Cash and shall be paid in the ordinary course of business before the Effective Date by the Debtors, and after the Effective Date by Reorganized Coram, in accordance with the terms and conditions of the particular agreements from which such Administrative Claims arise.

### b. Priority Tax Claims

Priority Tax Claim means any Claim of a governmental unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code. The Priority Tax Claim of the IRS in an amount in excess of $19 million, including interest accrued thereon, shall either (i) paid in full in Cash on the Effective Date, or (ii) be satisfied in accordance with the terms and conditions of an agreement between the Trustee and the IRS. Any payments required to be made to the IRS on or before the Effective Date shall be made with Plan Funding Cash. If an agreement with the IRS allows for deferred payments, all deferred payments shall be paid by Reorganized Coram and to the extent necessary, the Noteholders have irrevocably committed to make additional funds available to Reorganized Coram to enable it to make such deferred payments on a timely basis. Each holder of an Allowed Priority Tax Claim, other than the claim of the IRS, shall be paid in full in Cash on the later of (i) the Effective Date, or (ii) fourteen (14) days after the date on which such Claim becomes an Allowed Priority Tax Claim. Allowed Priority Tax Claims other than the Claim of the IRS shall be paid with Plan Funding Cash.

### 2. Treatment of Classified Claims and Interests

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims and Equity Interests in the Debtors. A Claim or Equity Interest is placed in a particular class for the purposes of voting on the Plan and of receiving Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest in that class and such Claim or Equity Interest has not been paid, released, or otherwise settled prior to the Effective Date. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in Sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth above.

### a. Class 1 – Priority Non-Tax Claims

Class 1 consists of all Allowed Priority Non-Tax Claims against the Debtors. A "Priority Non-Tax Claim" means any Claim of a kind specified in Sections 507(a)(3), (4), (5), (6) or (7) of the Bankruptcy Code. Each holder of an Allowed Priority Non-Tax Claim shall be paid in full in Cash on the later of (i) the Effective Date, or (ii) fourteen (14) days after the date on which such claim becomes an Allowed Priority Non-Tax Claim. Allowed Priority Non-Tax Claims shall be paid with Plan Funding Cash. Class 1 is unimpaired under the Plan and is presumed to have accepted the Plan.

### b. Class 2 – Secured Claims

Class 2 consists of all Secured Claims that may exist against the Debtors. A "Secured Claim" means any Claim that is secured, and only to the extent secured, pursuant to Section 506 of the Bankruptcy Code. Each holder of an Allowed Secured Claim shall either be reinstated and rendered unimpaired in accordance with Section 1124 of the Bankruptcy Code or receive payment in full in Cash on the later of (i) the Effective Date; and (ii) fourteen (14) days after the date on which such Claim becomes an Allowed Secured Claim. Allowed Secured Claims shall be satisfied with Plan Funding Cash. Class 2 is unimpaired under the Plan and is presumed to have accepted the Plan.

### c. Class 3 – General Unsecured Claims

Class 3 consists of all Allowed General Unsecured Claims against the Debtors. A General Unsecured Claim means any and all Claims other than an Administrative Claim, Priority Claim and Secured Claims. Each holder of an Allowed General Unsecured Claim, except for the Noteholders, shall be paid in full in Cash (without post-petition interest) from Net Plan Funding Cash on the later of: (i) the Distribution Date, or (ii) fourteen (14) days after the date on which such Claim becomes an Allowed General Unsecured Claim. In addition, the holders of Allowed General Unsecured Claims shall receive, on a *pro rata* basis from the net proceeds of the Causes of Action (if any), a distribution for interest accruing (at the statutory judgment rate set forth in Section 1961 of Title 28 of the United States Code) from the Petition Date through the Effective Date on account of such General Unsecured Claims. The net proceeds of the Causes of Action shall be the sole source of the payment of post-petition interest to holders of Allowed General Unsecured claims. Class 3 is impaired under the provisions of the Plan and is entitled to vote to accept or reject the Plan.

### d. Class 4 – Coram Preferred Stock

The Noteholders are holders of Coram Preferred Stock with an aggregate liquidation preference of in excess of $334 million as a result of debt exchanges approved by the Bankruptcy Court and, in addition, the Noteholders have General Unsecured Claims that total approximately $9 million on account of Notes. The Equity Committee disputes the Noteholders' calculation of the claims because it contends that the Noteholders may not be entitled to any or all post-petition interest claimed as part of the liquidation preference, and if they are, the interest should be calculated at the federal judgment rate.

On the Effective Date, each Noteholder shall receive its *pro rata* share of Reorganized Coram Common Stock in exchange for and in full and final satisfaction of both their Claims against CHC and Coram and Coram Preferred Stock.

### e. Class 5 – Coram Equity Interest

CHC is the holder of all of the outstanding voting common stock of Coram. CHC shall neither receive a Distribution nor retain any legal, equitable or contractual rights with regard to its equity interest in Coram, which shall be deemed cancelled and extinguished as of the

Effective Date as part of this Plan. Class 5 is impaired under the provisions of the Plan and is deemed to have rejected the Plan.

### f.   Class 6 – CHC Equity Interests

Class 6 consists of all holders of Allowed Equity Interests in CHC. On or before Distribution Date, each holder of an Allowed CHC Equity Interest shall receive a Distribution equal to its *pro rata* share of the Plan Funding Cash Balance. All CHC Equity Interests shall be deemed cancelled and extinguished as of the Effective Date. Class 6 is impaired under the provisions of the Plan and is entitled to vote to accept or reject the Plan.

## B.  Means for Implementation of the Plan

### 1.   Dissolution of CHC

On the Effective Date, or as soon thereafter as may be reasonably practicable, the Trustee will dissolve CHC pursuant to the corporate laws of the State of Delaware, without the taking of any further action by the stockholders, officers or directors of CHC.

### 2.   Surrender of Instruments

Each holder of an instrument evidencing an Equity Interest in CHC shall surrender such instrument to the Disbursing Agent as a condition to receipt of any Distribution under the Plan to such holder on account thereof. No Distribution under the Plan shall be made to or on behalf of any holder of such an Equity Interest unless and until such instrument is received or the unavailability of such instrument is reasonably established to the satisfaction of the Disbursing Agent.

In accordance with section 1143 of the Bankruptcy Code, any holder of an Equity Interest that (i) fails to surrender or cause to be surrendered such instrument, or (ii) fails to execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance and amount reasonably satisfactory to the Disbursing Agent, in each case within one (1) year after the Effective Date, shall be deemed to have forfeited forever all rights, claims, and interests in respect of said Distribution and shall not thereafter have any right to participate in any Distribution under the Plan.

### 3.   Vesting of Assets

On the Effective Date, unless otherwise provided in the Plan, title to all assets and property of the Debtors' estates, including the Debtors' equity and other interests in non-debtor affiliates of the Debtors, shall pass to and revest in Reorganized Coram, free and clear of all Claims, Equity Interests, liens and other rights of Creditors or holders of Equity Interests arising before the Effective Date. On and after the Effective Date, Reorganized Coram may operate its business and may use, acquire and dispose of property free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court, except as otherwise provided in this Plan.

### 4. Substantive Consolidation

The Plan provides for substantive consolidation treatment of the Debtors' bankruptcy estates, but only for the limited purpose of effectuating the settlements contemplated by, and making Distributions to the holders of Claims under the Plan, including for voting purposes. For such limited purposes, on the Effective Date (a) all guaranties of any Debtor for the payment, performance, or collection of an obligation of another Debtor with respect to any class of Claims or Equity Interests shall be deemed terminated and cancelled; (b) any obligation of one of the Debtors and all guaranties with respect to any Class of Claims or Equity Interests executed by the other Debtor and any joint or several liability of the Debtors shall be treated as a single obligation, and any joint obligation of the Debtors, and all multiple impaired Claims against the Debtors on account of such joint obligation, shall be treated and Allowed only as a single Claim against the consolidated Estates of Debtors; and (c) each Claim filed in the Chapter 11 Case of either of the Debtors shall be deemed filed against the consolidated Debtors and shall be deemed a single Claim against and a single obligation of the consolidated Debtors. Except as set forth in this Section, such substantive consolidation will not (other than for purposes related to Distributions to be made under the Plan) (a) affect the legal entity and corporate structures of the Debtors or Reorganized Coram, subject to the right of the Debtors or Reorganized Coram to effect any transaction contemplated by the Plan; (b) will not render valid and enforceable against either Debtor any Claim or Equity Interest under the Plan for which it is otherwise not liable, and the liability of any Debtor for any such Claim or Equity Interest will not be affected by such substantive consolidation; and (c) affect Equity Interests in any non-Debtor affiliate except as otherwise may be required in connection with any transaction contemplated by the Plan. The Trustee's Plan shall constitute and be deemed to be a motion by the Trustee requesting that the Bankruptcy Court approve this limited substantive consolidation.

### 5. Certificate of Incorporation and Bylaws

The certificate of incorporation and bylaws of Reorganized Coram shall be, as of the Effective Date, amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code. The amended certificate of incorporation shall among other things: provide, pursuant to Section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of nonvoting equity securities, to the extent that such a provision is required by Section 1123(a)(6) of the Bankruptcy Code. The proposed amended certificate of incorporation and bylaws will be included in the Plan Supplement.

### 6. Directors and Officers of Reorganized Coram

On the Effective Date, the Noteholders or their designees shall be the holders of one hundred (100%) of all capital stock of Reorganized Coram and shall, consistent with the requirements of Delaware law, have the right to elect the Board of Directors of Reorganized Coram. The directors and officers of Reorganized Coram proposed by the Noteholders shall be identified in the Plan Supplement. Crowley shall not be employed by or otherwise affiliated with Reorganized Coram, or any subsidiary or affiliate of Reorganized Coram, for a period of at least one (1) year following the Effective Date.

### 7.  Corporate Action

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of and/or one or both of the Debtors or Reorganized Coram or their successors in interest under the Plan, including, without limitation, the authorization to issue or cause to be issued the Reorganized Coram Common Stock, the Exit Facility and documents relating thereto, the adoption of the amended certificate of incorporation and amended bylaws of Reorganized Coram and the dissolution of CHC to be effectuated pursuant to the Plan and the election or appointment, as the case may be, of directors and officers of the Debtors pursuant to the Plan, shall be deemed to have occurred and shall be in full force and effect from and after the Effective Date pursuant to Section 303 of the General Corporation Law of the State of Delaware without any requirement of further action by the stockholders or directors of the Debtors, the Trustee or Reorganized Coram.  On the Effective Date, or as soon thereafter as is practicable, Reorganized Coram shall file its amended certificate of incorporation with the Secretary of State of the State of Delaware and the Trustee shall file the appropriate documents to effectuate the dissolution of CHC in accordance with applicable law.

### 8.  Effectuating Documents; Further Transactions

As of the Effective Date, Reorganized Coram shall be authorized to: (i) issue the Reorganized Coram Common Stock to the holders of Coram Preferred Stock Interests as contemplated by the Plan; (ii) execute and deliver those documents necessary to obtain the Exit Facility contemplated by the Plan; and (iii) execute, deliver, file or record any documents, and take any other actions, as may be necessary, to effectuate the terms and actions of the Plan.

### 9.  Committees

As of the Effective Date, the Creditors' Committee and the Equity Committee shall be dissolved and shall have no further duties, authority or responsibility, and Reorganized Coram shall not have any responsibility for fees, costs and expenses of the Creditors' Committee and the Equity Committee, its individual members or its professionals, incurred from and after the Confirmation Date.

### C.  The Causes of Action

The Trustee shall retain the sole and exclusive right, from and after the Effective Date, to commence, prosecute and compromise on behalf of the Debtors' estates, the Causes of Action; provided, however, no action or cause of action shall be commenced or maintained against any Person to be released as provided in Article 9 of the Plan. Reorganized Coram shall be responsible for payment of all Post-Confirmation Administrative Claims related to the Causes of Action. The proceeds of the Causes of Action shall be distributed as follows: (a) First, to Reorganized Coram in an amount equal to the Post-Confirmation Administrative Claims relating to the Causes of Action; (b) Second, to the holders of Allowed General Unsecured Claims on a *pro rata* basis in an amount equal to the interest accruing (at the statutory judgment rate set forth in Section 1961 of Title 28 of the United States Code) from the Petition Date through the

Effective Date on account of such Allowed General Unsecured Claims until such interest has been paid in full; and (c) Third, to Reorganized Coram.

## 1. The PricewaterhouseCoopers LLP Claim

On July 7, 1997, CHC filed an action against Price Waterhouse LLP (now known as PricewaterhouseCoopers LLP) (hereinafter "PWC") in the Superior Court of California. The California action was dismissed on forum non conveniens grounds and was re-filed in state court in Illinois. The claim arises from a settlement that resolved a lawsuit that CHC filed against Caremark International, Inc. and Caremark, Inc. (collectively "Caremark"). As part of that settlement, Caremark assigned and transferred to the Debtors all of Caremark's claims and causes of action against PWC, arising out of the facts related to CHC's lawsuit against Caremark. The assignment includes claims for damages sustained by Caremark in defending and settling its lawsuit with CHC.

In this suit, CHC has asserted various claims against PWC for malpractice in connection with PWC's audits of and other accounting work on behalf of Caremark, Inc. CHC alleges, on behalf of Caremark that PWC's improper conduct caused misstatements in Caremark's accounts receivable and other portions of Caremark's financial statements. CHC also alleges that these misstatements and other errors harmed Caremark in connection with Caremark's transaction with CHC and in the subsequent litigation between Caremark and CHC. In the complaint, CHC seeks in excess of $165 million in damages.

PWC filed two motions to dismiss the Complaint, but those motions were denied on March 15, 1999 and January 28, 2000. In addition, PWC filed a motion for summary judgment to dismiss a portion of the Company's claims. That motion was also denied.

Fact and expert discovery is ongoing.

The Trustee cannot predict the outcome of this litigation or whether there will be any recovery from PWC.

## 2. Preference Actions

From March 1, 2003 through March 7, 2003, the Trustee commenced approximately 194 adversary proceedings under Sections 547 and 550 of the Bankruptcy Code (collectively, the "Preference Actions"). By Order of the Bankruptcy Court dated April 8, 2003, the Preference Actions are stayed until thirty (30) days after the entry of the Confirmation Order. Given that the Trustee's Plan contemplates a 100 percent (100%) distribution to unsecured creditors on their pre-petition claims and a potential payment of post-petition interest to unsecured creditors, if the Trustee's Plan is confirmed, it is likely that the Trustee will abandon the preference actions.