### 3. Crowley and the outside directors

The Trustee's claims against Crowley and the outside directors (Amaral, Casey, Smith and Smoley) are described in the Equity Committee's proposed Derivative Complaint, a copy of which is attached to the Equity Committee's Disclosure Statement as Exhibit I. The Company notified its directors' and officers' liability insurance carriers of the proposed Derivative Complaint. The carriers have thus far denied coverage and have asserted certain policy exclusions and other policy provisions. The Trustee has commenced negotiations, but cannot predict whether he will be able to achieve a settlement without the necessity of filing the lawsuit against Crowley and the outside directors. If the lawsuit is filed, the Trustee cannot predict the outcome or whether there will be any recovery, either from the defendants themselves or potentially applicable insurance policies.

### D. Unexpired Leases and Executory Contracts

Except as otherwise provided in the Plan, as of the Effective Date, CHC and Coram shall be deemed to have assumed each executory contract and unexpired lease to which they are parties, unless such contract or lease (i) was previously assumed or rejected; or (ii) previously expired or terminated pursuant to its own terms; or (iii) is on a list of executory contracts to be rejected that is on a list contained in the Plan Supplement. Any executory contract and unexpired lease to which CHC is a party (and which has not been rejected) shall be, as of the Effective Date, deemed to be assigned to, and assumed by, Reorganized Coram. The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365 of the Bankruptcy Code approving the contract and lease assumptions and assignments described above, as of the Effective Date.

Any monetary amounts required as cure payments with respect to any executory contract or unexpired leases to be assumed pursuant to the Plan shall be satisfied by Reorganized Coram's payment of the cure amount in Cash on the Effective Date, or upon such other terms as the Bankruptcy Court may order or the parties to such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding whether a default exists under the executory contract or unexpired lease or the amount of any cure payment, the cure of any default shall occur after the entry of a Final Order of the Bankruptcy Court resolving the dispute.

### E. Compensation and Benefit Programs

All employment and severance practices and policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their directors, officers, and employees, other than Crowley, who served as directors, officers and employees, respectively, on or after the Commencement Date, including without limitation, all savings plans, retirement plans, health care plans, severance benefit plans, incentive plans, workers' compensation programs and life, disability and other insurance plans are treated as executory contracts under the Plan and are hereby assumed pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, provided, however, that the Reorganized Coram retains any right to modify any and all

such compensation and benefit practices, plans, policies, and programs in accordance with the terms thereof.

## F. Retiree Benefits

Pursuant to Section 1114 of the Bankruptcy Code, payments, if any, due to any person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability or death under any plan, fund or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the Debtors prior to the Commencement Date, shall be continued for the duration of the period the Debtors have obligated themselves to provide such benefits; provided, however, that the Reorganized Coram retains any right to modify any and all such plans, funds and programs in accordance with the terms thereof.

## G. Distributions

### 1. No Interest on Claims or Interests

Unless otherwise specifically provided for in the Plan or the Confirmation Order, postpetition interest shall not accrue or be paid on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim or disputed Equity Interest in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim or disputed Equity Interest becomes Allowed, except as provided for Class 3 Claims in Article 5, Section 3 of the Plan.

### 2. Disbursing Agent

All Distributions under the Plan shall be made by Reorganized Coram at the direction of the Disbursing Agent. If the Disbursing Agent is an independent third party designated by the Trustee to serve in such capacity, such Disbursing Agent shall receive, without further Bankruptcy Court approval, reasonable compensation for the services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services by Reorganized Coram. No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 3. Delivery of Distributions

Distributions to holders of Allowed Claims or Allowed Equity Interests shall be made by Reorganized Coram at the direction of the Disbursing Agent by regular and/or certified mail at the addresses set forth in the proofs of Claim filed by such holders, or if no proof of Claim has been filed, to the address listed on the schedules filed by the Debtors, unless another address has been designated by the Creditor in writing to the Disbursing Agent, in such event the address

designated by the Creditor shall be utilized. In the event the Distributions are returned due to an incorrect, incomplete or discontinued address, and the holder fails to claim the Distribution within 120 days of the date on which the Distribution was mailed, the amount of the Distribution shall be treated as a Disallowed Claim.

### 4. Distribution of Cash

All Cash Distributions shall be in whole dollars. Whenever the payment of other than whole dollars would otherwise be required, the actual Distribution shall be rounded to the nearest whole dollar (with half dollars or less being rounded down).

### 5. Distributions of Stock

The Distribution of stock shall be in whole numbers of shares. Whenever the Distribution of other than whole shares would be required, the actual distribution shall be rounded to the nearest whole share (with half shares or less being rounded down).

### 6. Provisions Pertaining to Disputed Claims

#### a. Objection to and Estimation of Claims; Prosecution of Disputed Claims

The Trustee reserves the right to object to any Claim or Equity Interest that has not been specifically Allowed by Order of the Bankruptcy Court; provided, however, that any further objections to Claims or Equity Interests must be filed with the Bankruptcy Court and served not later than thirty (30) days after the Confirmation Date, unless such date is otherwise extended by the Bankruptcy Court.

The Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code or other applicable law.

#### b. Payments and Distribution on Disputed Claims

No distribution shall be made to the holder of a Disputed Claim or disputed Equity Interest until such Claim or Equity Interest is Allowed. Following the Effective Date, the Trustee shall have the authority to compromise, withdraw or otherwise resolve objections to Claims with Bankruptcy Court approval. The total amount of the Distribution attributable to a Disputed Claim or disputed Equity Interest (or such lesser amount that the Bankruptcy Court may determine) shall be held in reserve from Plan Funding Cash by Reorganized Coram pending resolution of the Claim by the Bankruptcy Court or agreement of the Trustee and the holder of such Claim. The holder of a Disputed Claim or disputed Equity Interest shall not be entitled to receive or recover any amount in excess of the amount reserved to pay such Claim or Equity Interest. Nothing in the Plan or Disclosure Statement shall be deemed to entitle any holder of a Disputed Claim or disputed Equity Interest to post-petition interest on account of such Claim or Equity Interest. Distributions to each holder of a Disputed Claim or disputed Equity Interest that ultimately becomes an Allowed Claim or Allowed Equity Interest shall be in accordance with the

provisions of the Plan with respect to the Class or which the respective Allowed Claim or Allowed Equity Interest is a member without interest accruing after the Effective Date. Any such Distributions shall be made as soon as reasonably practicable after the date that the Bankruptcy Court enters a Final Order allowing such Claim or Equity Interest.

## H. Discharge of Debtors

**Except as otherwise provided in the Plan or in the Confirmation Order, the consideration to be distributed to the holders of Allowed Claims or Allowed Equity Interests under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Equity Interests of any nature whatsoever against the Debtors or any assets, property or interests in property of the Debtors, and the Debtors shall be deemed discharged from any and all Claims, including Claims that arose before the Confirmation Date, and all debts of the kind specified in Sections 502(g), (h) and (i) of the Bankruptcy Code, whether or not a proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or the holder of a Claim based upon such debt has accepted the Plan. Except as otherwise provided herein or in the Confirmation Order, the Confirmation Order shall be a judicial determination of the discharge of all liabilities of the Debtors and a termination of all Equity Interest in the Debtors to the fullest extent permitted by law. Except as expressly provided in the Plan, the discharge granted under the Plan shall act as a permanent injunction against the taking of any of the following actions against the Debtors, Reorganized Coram and/or assets or property of the Debtors' estates: (i) the commencement or continuation of any action or other proceeding of any kind to enforce a Claim against or Equity Interests in any of the Debtors; (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award decree or order against the Debtor; (iii) the creation, perfection or enforcement of any encumbrance of any kind against the Debtors, Reorganized Coram or any of their or its property; and (iv) the assertion of any right of setoff, subrogation or recoupment of any kind against any obligation.**

## I. Compromises and Settlements

The Plan provides for the compromise and settlement of certain claims and causes of action of, and against, the Debtors. To the extent that Bankruptcy Rule 9019 is applicable to the settlements, this Plan shall be deemed a properly served motion by the Trustee pursuant to Bankruptcy Rule 9019(a) for approval of the settlements and the settlement agreements listed herein shall be deemed approved by the Bankruptcy Court upon entry of the Confirmation Order.

### 1. The Plan Funding Agreement

The Trustee has entered into the Plan Funding Agreement with the Noteholders. Under the Plan Funding Agreement, the Noteholders have agreed to provide Reorganized Coram and the Estate of CHC with up to $56 million to be used in funding payments to be made under the Plan. In return, the Noteholders and all present and former officers, directors, members or employees of the Noteholders and their respective affiliates, agents, representatives and counsel,

shall be provided with a complete release from any and all claims, including the Proposed Derivative Claims. This release shall not include any of the Debtors' claims against Crowley, Amaral, Casey, Smith and Smoley including the Proposed Derivative Claims. A true and correct copy of the Plan Funding Agreement is attached to the Plan as Exhibit A. An executed copy of the Plan Funding Agreement shall be included in the Plan Supplement.

The Trustee has considered whether it is in the best interests of the estates to initiate litigation and assert causes of action against the Noteholders arising out of Crowley's conflict of interest, including the treble damages claim under the RICO statute and the other causes of action described in the Proposed Derivative Claims. Based on the Trustee's evaluation of the strengths and weaknesses of the potential claims and the costs and risks of pursuing those claims in protracted litigation, the Trustee proposes to enter into a settlement agreement with some of the potential defendants. Pursuant to the proposed settlement, the Noteholders will contribute a total of $56 million to the Debtors' estates in exchange for releases. The Debtors' estates will retain their claims against Crowley, Amaral, Casey, Smith and Smoley.

In deciding whether the proposed settlement is in the best interests of the Estate, the Trustee and his advisors have: (1) independently analyzed the strengths and weaknesses of the claims in the Proposed Derivative Complaint; (2) obtained outside expert advice regarding the claims and the range of reasonable settlement; (3) carefully considered extensive written submissions of the Equity Committee and the proposed defendants addressing the strengths and weakness of the proposed claims in terms of liability and damages; and (4) considered the likelihood that a $56 million settlement will be available from the Noteholders if the litigation is brought after confirmation of a plan of reorganization, as proposed by the Equity Committee.

For purposes of settlement, the Trustee has assumed that the proposed claims against the Noteholders would survive a motion to dismiss. Nevertheless, there is a reasonable possibility that some or all of the claims would be dismissed on the pleadings or on a motion for summary judgment. And even if some or all of the proposed claims were to survive until trial, there is a substantial risk that the Debtors' estates would be unable to obtain a favorable liability verdict against the Noteholders. But assuming for the sake of argument that the Debtors' estates could obtain a liability verdict against the Noteholders, the biggest weakness in the litigation proposed by the Equity Committee relates to the issues of causation and calculation of damages.

The Equity Committee's suggested theory of damages – a so-called "yardstick" measure of damages – is that, in the absence of the Crowley conflict, the Debtors might have performed as well as other healthcare companies much larger than Coram, better capitalized than Coram and not in bankruptcy, and that the difference in performance is recoverable as lost profit damages in the hundreds of millions of dollars. For several reasons, the Trustee believes that this is a dubious legal theory and an unrealistic litigation strategy in this case.

First, a yardstick measure of damages is an unusual and disfavored damages theory that has been permitted in only a small number of cases where proof of actual damages was impossible. The Trustee is skeptical that any court would permit a yardstick measure of damages where, as here, there are provable actual damages.

Second, it is risky to assume that a court would permit evidence of the particular yardstick proposed by the Equity Committee – a comparison of the Debtors' performance to its "peer" healthcare companies – because it is unreasonable to compare the performance of insolvent companies like the Debtors to the performance of much larger and well capitalized solvent companies that are not in bankruptcy.

Third, the yardstick measure of damages does not address the issue of causation. Although the Trustee believes there is credible evidence of causation with respect to administrative costs incurred by the Debtors' estates as a result of the prolonged bankruptcy, there is no evidence that Crowley took any steps to depress the Debtors' profits or operational performance; nor is there evidence that Crowley rejected any specific corporate opportunity that would have substantially enhanced the Debtors' performance. The Trustee believes that the Debtors' financial performance improved under Crowley. In other words, there is no credible evidence that Crowley caused the type of damages that might be calculated by the suggested yardstick.

In the view of the Trustee and his advisors, damages in this case are limited to: (1) a portion of the administrative and legal expenses incurred as a result of the prolonged bankruptcy proceeding; and (2) any damages caused by specific and identifiable business decisions that were not in the best interests of the Debtors (e.g., preferential payments to creditors, questionable sales of assets, etc.). These damages are unlikely to exceed $56 million.

The Trustee believes that the proposed $56 million settlement with the Noteholders is substantially higher than the true settlement value of the case. The Trustee believes that the Noteholders are willing to pay $56 million only because, within the context of the Trustee's plan of reorganization, they are purchasing more than a settlement of litigation – in essence, they are also purchasing the Debtors. If the claims were to be litigated independent of the bankruptcy and the Noteholders' existing investment in the company, the Trustee and his advisors believe that the Noteholders would test the legal sufficiency of the proposed RICO claims and would offer substantially less in settlement.

Furthermore, the settlement enables the Trustee to propose a plan of reorganization that provides an immediate and certain one hundred percent (100%) recovery to all creditors and a meaningful and immediate payment to all holders of CHC Equity Interests.

For all these reasons, the Trustee believes it is in the best interests of the Debtors' estates to accept the certainty of a $56 million settlement rather than to pursue protracted litigation that is unlikely to achieve a result that justifies the substantial costs and risks of failure or a much smaller recovery that the litigation will entail.

> The Equity Committee believes that the Debtors' claims against the Noteholders are worth far more than $56,000,000 and that the settlement represented by the $56,000,000 is substantially inadequate. For further information on the Equity Committee's position, see the discussion of alleged claims against the Noteholders in the Equity Committee's Disclosure Statement.

### 2. Settlement Agreement with R-Net

In September, 2000, R-Net filed four proofs of claim in the amount of $41,524,000 on the basis of an alleged agreement by Coram to reimburse R-Net for services provided by R-Net in connection with a "Master Agreement" with Aetna U.S. Healthcare. R-Net also filed three additional proofs of claim for any and all other claims or causes of action arising in law, equity or otherwise which may be raised by R-Net.

On November 13, 2001, the R-Net Committee filed the R-Net Adversary Proceeding against the Debtors and other defendants. In the R-Net Adversary Proceeding, the R-Net Committee asserts that the Debtors are liable on various claims including breach of fiduciary duty, negligent and fraudulent misrepresentation, violations of federal and state RICO laws, fraudulent conveyances, alter ego, conversion and alleged violations of the automatic stay.

On January 14, 2003, the U.S. District Court for the District of Delaware issued an order withdrawing the reference over the R-Net Adversary Proceeding.

The Trustee has entered into an agreement to settle the R-Net adversary proceeding and the bankruptcy Claim asserted by R-Net. Pursuant to the settlement agreement (1) R-Net's General Unsecured Claim of more than $41 million shall be substantially reduced and shall be fixed and Allowed in the amount of $7,950,000 and (2) the claim filed by CHC in R-Net's bankruptcy case shall be reduced to $1,000. A true and correct copy of the R-Net settlement agreement will be included in the Plan Supplement.

The Company had notified its directors' and officers' liability insurance carrier of the R-Net claims against the individual defendants. The carrier has thus far denied coverage, asserting certain exclusions and other provisions in the policy, but did agree to absorb a portion of the expenses of defending the individuals. The Trustee has commenced negotiations with the carrier in an effort to reach a final resolution on both expense and indemnity without the necessity of having to bring a coverage suit against the carrier, but cannot predict the outcome of either the ongoing discussions or a coverage lawsuit if one is ultimately brought.

Given the uncertainty of the outcome, and the expense and delay attending the litigation, the Trustee believes that the settlement is in the best interest of the Debtors' estates.

### 3. IRS Settlement

The IRS has a claim against CHC and T²M, a non-debtor subsidiary of Coram, which, including interest, will amount to $19,325,958 as of June 30, 2003. The Trustee has entered into an agreement in principal with the IRS with regard to the satisfaction of the IRS claim. Pursuant to the settlement:

> (a) the IRS will be granted relief from the automatic stay to allow it to setoff CHC's outstanding refund claim of $1,646,423, plus interest;

(b) the remaining balance after application of the refund will be paid in quarterly installments; and

(c) interest and failure to pay penalties on the outstanding balance will continue to accrue at the applicable IRS rate.

The Trustee believes that the agreement allowing the IRS claim to be satisfied in quarterly installments is in the best interest of the Debtors' estates because it will help to preserve the Debtors' cash flow and ensure that the Debtors' continuing operations will not be hindered by the IRS claim. If the Trustee's Plan is confirmed, Reorganized Coram will be responsible for the payment of the installments due the IRS and, to the extent necessary, the Noteholders have irrevocably committed to make additional funding available to Reorganized Coram to enable it to make such deferred payments on a timely basis. At the option of the Noteholders, the entire principal balance of approximately $9 million may be paid on the Effective Date with Plan Funding Cash to avoid failure to pay penalties. The Trustee intends to file a separate motion seeking Bankruptcy Court approval of the IRS settlement prior to the Confirmation Hearing.

## J. Releases

The Plan provides for releases to certain Persons as follows:

### 1. CHC and Coram

As of the Effective Date, all Persons who have held, hold or may hold any Claim against CHC and/or Coram, and/or their predecessors, successors, affiliates, parents, subsidiaries and assigns, and/or their officers, directors, shareholders, employees, agents, advisors, representatives, attorneys, accountants or other professionals, except Crowley, Amaral, Casey, Smith and Smoley shall be deemed to have released CHC and/or Coram, and/or their predecessors, successors, affiliates, parents, subsidiaries and assigns, and/or their officers, directors, shareholders, employees, agents, advisors, representatives, attorneys, accountants and other professionals, but not Crowley, Amaral, Casey, Smith and Smoley, of and from any and all Claims, obligations, rights, causes of action and liabilities which such holder may be entitled to assert, whether known or unknown, foreseen or unforeseen, then existing or thereafter arising, based in whole or in part upon any act, omission or other occurrence having taken place on or prior to the Effective Date in any way relating to the Debtors, this Plan or the Chapter 11 Case, including the Proposed Derivative Claims.

### 2. The Trustee

As of the Effective Date, all Persons who have held, hold or may hold any claim against the Trustee, and/or his agents, advisors, representatives, attorneys, accountants or other professionals, shall be deemed to have released the Trustee, and his agents, advisors, representatives, attorneys, accountants and other professionals, of and from any and all claims, obligations, rights, causes of action and liabilities which such holder may be entitled to assert, whether known or unknown, foreseen or unforeseen, then existing or thereafter arising, based in

33

whole or in part upon any act, omission or other occurrence having taken place on or prior to the Effective Date in any way relating to the Debtors, this Plan or the Chapter 11 Case.

### 3. The Noteholders

As of the Effective Date, all Persons who have held, hold or may hold any claim against the Noteholders, and/or all of their present and former predecessors, successors, affiliates, parents, subsidiaries and assigns, and/or their officers (including Feinberg), directors, shareholders, employees, agents, advisors, representatives, attorneys, accountants or other professionals, shall be deemed to have released the Noteholders, and their predecessors, successors, affiliates, parents, subsidiaries and assigns, and their present and former officers (including Feinberg), directors, shareholders, partners, members, employees, agents, advisors, representatives, attorneys, accountants and other professionals, of and from any and all claims, obligations, rights, causes of action and liabilities which such holder may be entitled to assert, whether known or unknown, foreseen or unforeseen, then existing or thereafter arising, based in whole or in part upon any act, omission or other occurrence having taken place on or prior to the Effective Date and in any way relating to the Debtors, this Plan or the Chapter 11 Case, including all of the Proposed Derivative Claims.

### 4. The Equity Committee

As of the Effective Date, all Persons who have held, hold or may hold any claim against the Equity Committee and/or its individual members, and/or their predecessors, successors, affiliates, parents, subsidiaries and assigns, and/or their officers, directors, shareholders, employees, agents, advisors, representatives, attorneys, accountants or other professionals, shall be deemed to have released the Equity Committee and its individual members, and their predecessors, successors, affiliates, parents, subsidiaries and assigns, and their officers, directors, shareholders, employees, agents, advisors, representatives, attorneys, accountants and other professionals, of and from any and all claims, obligations, rights, causes of action and liabilities which such holder may be entitled to assert, whether known or unknown, foreseen or unforeseen, then existing or thereafter arising, based in whole or in part upon any act, omission or other occurrence having taken place on or prior to the Effective Date in any way relating to the Debtors, this Plan or the Chapter 11 Case, including the Proposed Derivative Claims.

### 5. R-Net

As of the Effective Date, CHC and/or Coram, and their predecessors, successors, affiliates, parents, subsidiaries and assigns, and their officers, directors, shareholders and employees shall be deemed to have released R-Net, and its predecessors, successors, affiliates, parents, subsidiaries and assigns, and/or their officers, directors, shareholders, employees, agents, advisors, representatives, attorneys, accountants and other professionals, of and from any and all claims, obligations, rights, causes of action and liabilities, whether known or unknown, foreseen or unforeseen, then existing or thereafter arising, based in whole or in part upon any act, omission or other occurrence having taken place on or prior to the Effective Date in any way relating to the Debtors or R-Net, except that the Debtors shall retain a General Unsecured Claim of $1,000.00 in R-Net's Chapter 11 case.

### 6. Miscellaneous

Nothing in the Plan or Disclosure Statement shall be construed as releasing Crowley, Amaral, Casey, Smith and/or Smoley from any claims held by the Debtors, including the Proposed Derivative Claims Complaint. In addition, nothing in the Plan or Disclosure Statement shall operate to release any party from the obligations expressly contemplated by the Plan. Moreover, nothing in this Article 9 shall be construed as limiting the rights of the Trustee or any other party in interest to object to any interim or final applications for the allowance of Administrative Claims for professional fees or expenses filed pursuant to Sections 327, 330 and 331 of the Bankruptcy Code, or for expenses incurred by members of the Equity Committee or the Creditors' Committee pursuant to Section 503(b)(3)(F).

## K. Confirmation and Effectiveness Of The Plan

### 1. Conditions Precedent to Confirmation

The Plan shall not be confirmed by the Bankruptcy Court unless and until the following conditions shall have been satisfied or waived pursuant to Article 13, Section 4 of the Plan:

      a . The proposed Confirmation Order shall be in form and substance reasonably acceptable to the Trustee and the Noteholders; and

      b. All exhibits to the Plan, including those to be contained in the Plan Supplement, shall be in form and substance reasonably acceptable to the Trustee and the Noteholders.

### 2. Conditions Precedent to Effectiveness

The Plan shall not become effective unless and until the following conditions have been satisfied or waived pursuant to Article 13, Section 4 of the Plan:

    a. The Confirmation Order shall have been entered and there shall be no stay or injunction in force and effect that would prevent the occurrence of the Effective Date;

    b. The Confirmation Order shall authorize the Trustee and Reorganized Coram to take all actions necessary or appropriate to consummate the Plan and to enter into, implement and effectuate the contracts, instruments, releases and other agreements or documents created in connection with the Plan;

    c. The statutory fees owing to the United States Trustee shall have been paid in full;

    d. Each of the Amended Reorganized Coram Certificate of Incorporation, the Amended Reorganized Coram Bylaws in form and substance satisfactory to the

Trustee and Reorganized Coram shall have been filed, effected, or executed, as required;

e.  All other actions, authorizations, consents and regulatory approvals required (if any) and all Plan documents necessary to implement the provisions of the Plan shall have been obtained, effected or executed in a manner acceptable to the Trustee or, if waivable, waived by the Persons entitled to the benefit thereof;

f.  The Exit Facility shall have been entered into by all parties thereto and all conditions to the initial draw thereunder shall have been satisfied in accordance with the terms thereof such that the Trustee and Reorganized Coram shall have available to them sufficient funds with which to meet all obligations under the Plan; and

g.  Reorganized Coram Common Stock shall have been duly authorized and, with the occurrence of the Effective Date, shall be validly issued and outstanding.

## 3.  Effect of Failure of Conditions

If each condition to the Effective Date specified in Article 13, Section 2 of the Plan has not been satisfied or duly waived within ninety (90) days after the Confirmation Date, then (unless the period for waiver or satisfaction of such conditions has been extended with the consent of the Trustee and the Noteholders) the Confirmation Order will be vacated by the Bankruptcy Court.

## 4.  Waiver of Conditions

The Trustee may, with the consent of Noteholders, which consent shall not be unreasonably withheld, waive, by a writing signed by an authorized representative of the Trustee and subsequently filed with the Bankruptcy Court, the condition precedent to confirmation and effectiveness of the Plan specified in Article 13, Sections 1(b) and 2(d), and (e) of the Plan.

## L.  Retention of Jurisdiction

If the Plan is confirmed, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Case for the following purposes:

(1)  to determine the extent, validity and amount of all objections to or requests to estimate Claims whether secured or unsecured;

(2)  to determine any applications for compensation;

(3)  to determine any (i) pending and/or future motions, applications and adversary proceedings; (ii) causes of action against third persons; (iii) adversary proceedings, and (iv) contested and litigated matters;

(4)    to determine any pending application for assumption or rejection of executory contracts or unexpired leases, claims for cure amounts and allowance of any Claims resulting from the rejection of executory contracts or unexpired leases;

(5)    to enforce the provisions of the Plan;

(6)    to consider any amendments to or modifications of the Plan, correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or documents related to the Plan, or the order of the Bankruptcy Court confirming the Plan as may be necessary to carry out the purposes and intent of the Plan;

(7)    to construe or enforce the Plan, the Confirmation Order or any other order or judgment, injunction or ruling entered or made in the Chapter 11 Cases, and to determine such other matters as may be provided for in the order of the Bankruptcy Court confirming the Plan or as may be authorized under the provisions of the Bankruptcy Code;

(8)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; and

(9)    to issue such orders in aid of execution and consummation of the Plan, to the extent authorized by Section 1142 of the Bankruptcy Code.

## IX.    CERTAIN FACTORS TO BE CONSIDERED

The holder of a Claim against or Equity Interest in a Debtor should read and carefully consider the following factors, as well as other information set forth in this Disclosure Statement (and in the documents delivered together herewith and/or incorporated by reference herein) before deciding whether to vote to accept or reject the Plan.

### A.    General Considerations

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The Plan sets forth the means for satisfying the holders of Claims against, and Equity Interests in, the Debtors. The reorganization of the Debtors' business under the proposed Plan also avoids the potentially adverse impact of a liquidation on the Debtors' employees and many of its patients, trade vendors, suppliers of goods and services, and lessors.

### B.    Certain Bankruptcy Considerations

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue and not be converted to a Chapter 7 liquidation or that any alternative plan of reorganization would be on terms as favorable to the holders of Claims and Equity Interests as the terms of the Plan. If a liquidation were to occur, there is a substantial risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of many of the stakeholders.

## C. Claims Estimations

There can be no assurances that the estimated Claim amounts set forth herein are correct. The actual Allowed amount of the Claims may differ in substantially from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should one or more of the underlying assumptions prove incorrect, the actual Allowed amount of Claims may significantly vary from those estimated herein.

## D. Reorganized Coram Common Stock

The Reorganized Coram Common Stock to be distributed under the Plan are new securities for which there is no existing trading market. Thus, a holder of Reorganized Coram Common Stock could find it difficult to dispose of, or to obtain accurate quotations as to the market value of such securities, following the consummation of the Plan.

## E. Key Employees

The success of Reorganized Coram will be highly dependent upon the services of its key executives. The loss of a significant number of key employees could have a material adverse effect on Reorganized Coram and may threaten its ability to survive as a going concern.

## F. Working Capital

Reorganized Coram's businesses are expected to require cash working capital. While the Trustee believes that sufficient cash to meet Reorganized Coram's cash working capital and investment needs for the foreseeable future will either be generated by operations or available under the Exit Facility, Reorganized Coram's ability to gain access to additional capital, if needed, cannot be assured.

## G. Competition and Pricing Pressure

Numerous factors have impacted the Debtors' performance and financial condition to date including, among others: (1) ongoing pricing pressure in the infusion therapy business as a result of a shift in payer mix from private indemnity insurance to managed care and governmental payers and intense competition among infusion providers; (2) increased competition from hospitals and physicians that have sought to increase the scope of services they offer through their facilities and offices, including services similar to those offered by the Debtors; and (3) increased competition from hospitals and physicians that have entered into risk-sharing relationships with third party payers pursuant to which they have been delegated control over the provision of a wide variety of healthcare services, including the services offered by the Debtors. There can be no assurances that the aforementioned factors will not continue to have an adverse effect on the Debtors' financial condition and results of operations.

### H. Relationships With Third Parties

The success of Reorganized Coram's business will be dependent on relationships with third parties. The profitability of Reorganized Coram's business will depend in part on its ability to establish and maintain close working relationships with managed care organizations, private and governmental third-party payers, hospitals, physicians, physician groups, home health agencies, long-term care facilities and other institutional health providers and insurance companies and large self-insured employers. The loss of such existing relationships or the failure to continue to develop and maintain ongoing relationships in the future could have a material adverse effect on Reorganized Coram's business, financial condition and results of operations.

### I. Healthcare Industry Developments and Legislation

The Healthcare industry continues to undergo significant changes driven by various efforts to reduce costs, including trends toward managed care, limits in Medicare coverage and reimbursement levels, consolidation of healthcare distribution companies and collective purchasing arrangements by office-based healthcare practitioners. The impact of third-party pricing pressures and low barriers to entry have dramatically reduced profit margins for certain healthcare providers. Continued growth in managed care has pressured healthcare providers to find ways of becoming more cost competitive. This has also led to consolidation of healthcare providers in the Debtors' market areas where the Debtors compete.

In addition, political, economic and regulatory influences are subjecting the healthcare industry in the United States to extensive and dynamic change. It is possible that healthcare initiatives at the federal or state level, whether implemented through legislation or through action by federal or state administrative agencies, could require Reorganized Coram to make significant changes in the way it conducts business and could have a material adverse efface upon Reorganized Coram's business.

## X.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A summary description of certain United States federal income tax consequences of the Plan is provided below. This description is for information purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Only the principal United States federal income tax consequences of the Plan to the Debtors and to the holders of Allowed Claims and Equity Interests who are entitled to vote to accept or reject the Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the IRS or any other taxing authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other taxing authorities. No representations are being made regarding the particular tax consequences of the Confirmation and consummation of the Plan to the Debtors or any holders of Allowed Claims or Allowed

Equity Interests. No assurance can be given that the IRS would assert, or that a court would not sustain, a different position from any discussed herein.

The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to special classes of taxpayers such as banks and other financial institutions, insurance companies, tax-exempt organizations, governmental entities, Persons that are, or hold their Claims through, pass-through entities, Persons whose functional currency is not the United States dollar, foreign Persons, dealers in securities or foreign currency, employees, Persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction. Furthermore, the following discussion does not address the United States federal taxes other than income taxes.

**EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING FEDERAL, STATE AND LOCAL AND ANY FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

### A. United States Federal Income Tax Consequence to the Debtors

CHC and its consolidated subsidiaries (the "Coram Group") reported approximately $159.3 million of net operating loss ("NOL") carryforwards for federal income tax purposes as of December 31, 2000. As a result of the issuance of preferred stock to the Noteholders in 2000, Coram and its subsidiaries no longer filed a consolidated federal income tax return with CHC. Coram and its consolidated subsidiaries incurred additional NOLs for its taxable years ending September 30, 2001 and September 30, 2002 bringing the total NOL carryovers to approximately $196 million. The amount of the Debtor's NOL carryovers and other losses remain subject to adjustment by the IRS.

### 1. Cancellation of Indebtedness

In general, Title 26 of the United States Code, §§ 1, et seq. (the "Tax Code") provides that a debtor in a bankruptcy case must reduce certain of its tax attributes –NOL carryovers current year NOLs, tax credits and tax basis in assets - - by the amount of any cancellation of debt ("COD"). COD is the amount by which the indebtedness discharged exceeds any consideration given in exchange therefore. To the extent the amount of COD exceeds the tax attributes available for reduction, the remaining COD is simply forgiven. Any reduction in tax attributes does not effectively occur until the first day of the taxable year following the year COD is realized The ability to utilize the full amount of the Debtor's federal NOLs, as discussed above, and certain state NOLs is uncertain due to income tax rules related to the exchanges of debt and related interest for Coram preferred stock in December 2000, December 2001 and December 2002.

## 2. Net Operating Losses – Section 382

As a result of the issuance of preferred stock to the Noteholders on December 29, 2000, Coram underwent an "ownership change" within the meaning of section 382 of the Internal Revenue Code and, as discussed above, no longer was qualified to join in a consolidated federal income tax return with CHC. Following the issuance of the Preferred Stock to the Noteholders, Coram and its subsidiaries joined in the filing of a consolidated return for the fiscal year ended September 30, 2001 and subsequent years. Coram applied the provisions of section 382(l)(5) to reduce its net operating loss carryovers.

The Trustee does not anticipate that the Debtors will experience another ownership change on the Effective Date as a result of the issuance of stock in Reorganized Coram to the Noteholders pursuant to the Plan. As a result, the Debtors' ability to use pre-Effective Date NOLs or other tax attributes should be unimpaired. The ability of Coram to fully utilize its NOLs and other tax attributes is subject to additional limitations and uncertainties under the tax laws. In particular, the Code does not address whether the provisions of section 382(l)(5) can be applied on a consolidated basis or only on a separate company basis. Accordingly, it is possible that only the pre-ownership change losses attributable to Coram (rather than to the other members of the Coram Group) may be able to benefit from this exception.

## B. Federal Income Tax Consequences to Claimholders and Interestholders of the Debtors

The following discusses certain United States federal income tax consequences of the transactions contemplated by the Plan to holders of Allowed Claims and Equity Interests that are "United States Holders" (as defined below). The United States federal income tax consequences of the transactions contemplated by the Plan to holders of Claims and Equity Interests will depend upon, among other things: (1) whether such Claim or Equity Interest and the consideration received in respect thereof are "securities" for federal income tax purposes; (2) the manner in which a holder acquired a Claim or Equity Interest; (3) the length of time the Claim or Equity Interest has been held; (4) whether the Claim or Equity Interest was acquired at a discount; (5) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (6) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the holder's method of tax accounting; and (8) whether the Claim is an installment obligation for federal income tax purposes. Therefore, holders of Claims or Equity Interests should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan. This discussion assumes that the holder has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and such Claim did not become completely or partially worthless in a prior taxable year. Moreover, the Trustee intends to claim deductions to the extent they are permitted to deduct any amounts paid in Cash, stock or other property pursuant to the Plan.

For purposes of the following discussion, a "United States Holder" is a holder of a Claim that is (1) a citizen or individual resident of the United States, (2) a partnership or corporation

created or organized in the United States or under the laws of the United States or any political subdivision thereof, (3) an estate the income of which is subject to United States federal income taxation regardless of its source, or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust or (ii) the trust was in existence on August 20, 1996 and properly elected to be treated as a United States person.

## 1.  Generally

### a.  Accrued Interest

Under the Plan, cash or other property may be distributed or deemed distributed to certain holders of Claims with respect to their Claims for accrued interest.  Holders of Claims for accrued interest which previously have not included such accrued interest in taxable income will be required to recognize ordinary income equal to the amount of Cash or other property received with respect to such Claims for accrued interests.  Holders of Claims for accrued interest which have included such accrued interest in taxable income generally may take an ordinary deduction to the extent that such Claims is not fully satisfied under the Plan (after allocating the distribution between principal and accrued interest), even if the underlying Claim is held as a capital asset. The adjusted tax basis of any property received in exchange for a Claim for accrued interest will equal the fair market value of such property on the Effective Date, and the holding period for the property will begin on the day after the Effective Date.  The extent to which consideration distributable under the Plan is allocable to interest is not clear.  Holders of Claims are advised to consult their own tax advisors to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

### b.  Market Discount

The market discount provisions of the Tax Code may apply to holders of certain Claims. In general, a debt obligation other than a debt obligations with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition.  However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory deminimis amount.  Gain recognized by a Creditor with respect to a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the Creditors' period of ownership, unless the Creditor elected to include accrued market discount in taxable income currently.  A holder of a market discount bond that is required under the market discount rules of the Tax Code to defer deduction of all or a portion of interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on disposition of such bond.

### 2. Priority Non-Tax Claims

A holder whose Claim is paid in full will recognize income, gain or loss for United States federal income tax purposes in an amount equal to the difference between (i) the amount of Cash received by such holder in respect of its Claim, and (ii) the holder's adjusted tax basis in the Claim. The character of such gain or loss as a capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. A holder recognizing a loss as a result of the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year. In addition, the rules summarized above with respect to accrued interest and market discount may apply with respect to the receipt of Cash in discharge of a holder's Priority Non-Tax Claims.

### 3. Holders of General Unsecured Claims

A holder of General Unsecured Claims that receives Cash in discharge of its Claim pursuant to the Plan will generally recognize income, gain or loss of United States federal income tax purposes in an amount equal to the difference between (i) the amount of Cash received in exchange for its Claim and (ii) the holder's adjusted tax basis in its Claim. The character of such gain or loss as a capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. A holder reorganizing a loss as a result of the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year. In addition, the rules summarized above with respect to accrued interest and market discount may apply with respect to the receipt of Cash in discharge of a holder's General Unsecured Claims.

### 4. Holders of Coram Preferred Stock Interests

A holder of Coram Preferred Stock that receives Reorganized Coram Common Stock in exchange for its Claim pursuant to the Plan will generally recognize income, gain or loss for United States federal income tax purpose in an amount equal to the difference between (i) the fair market value on the Effective Date of the Reorganized Coram Common Stock received in exchange for the Claim, and (ii) the holder's adjusted tax basis in its Claim. The character of such gain or loss as a capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. A holder reorganizing a loss as a result of the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year. A holder's aggregate tax basis in Reorganized Coram Common Stock it receives pursuant to the Plan would generally be equal to the fair market value on the Effective Date of

such stock. The holding period for Reorganized Coram Common Stock would begin on the day after the Effective Date.

### 5. Holders of CHC Equity Interests

An existing holder of a CHC Equity Interest will generally recognize a gain or loss for United States federal income tax purposes in an amount equal to the difference between (i) the Cash received on account of such CHC Equity Interest under the Plan and (ii) such stockholder's adjusted basis in its existing common stock cancelled under the Plan. The character of such gain or loss as a capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder and whether the interestholder holds its common stock of CHC as a capital asset.

### 6. Holders of Coram Equity Interests

CHC, the sole holder of Coram Equity Interests which is deemed cancelled under the Plan, will recognize a loss for United States federal income tax purposes in amount equal to CHC's adjusted tax basis in the interest. The character of such loss as a capital loss or as ordinary loss will be determined by a number of factors, including the tax status of CHC and whether the CHC holds its interests as a capital asset.

### 7. Other Claimholders

To the extent certain claimholders reach an agreement with the Trustee to have their Claims satisfied, settled, released, exchanged or otherwise discharged in a manner other than as discussed above, such holders should consult their own tax advisor regarding the tax consequences to them of such treatment.

### 8. Information Reporting and Backup Withholding

Certain payments, including payments in respect of accrued interest or market discounts, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the Tax Code's backup withholding rules, a United States Holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

## C. Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND UNKNOWN BY THE TRUSTEE AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE STRONGLY URGED TO CONSULT THEIR TAX PROFESSIONAL ABOUT THE FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

## XI. FEASIBILITY OF THE PLAN, THE BEST INTERESTS TEST AND CRAMDOWN

### A. Feasibility of the Plan

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by Section 1129(a)(11) of the Bankruptcy Code and is generally referred to as the "feasibility" requirement. The Trustee believes that the Plan is feasible.

The Trustee's financial advisors have prepared a feasibility analysis, a copy of which is attached hereto as Exhibit F. The feasibility analysis reflects that: (i) Net Plan Funding Cash should be sufficient to make all payments required under the Plan; (ii) the Net Plan Funding Cash Balance payable to the holders of Allowed CHC Equity Interests will likely be in excess of $28 million; and (iii) Reorganized Coram should have sufficient cash flow to pay and service the Exit Facility and to fund its operations and capital improvement needs. Accordingly, the Trustee believes that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code. However, the Trustee cautions that no representations can be made as to the accuracy of the feasibility study. Many of the assumptions upon which the feasibility study is based are subject to uncertainties outside the control of the Trustee. Some assumptions inevitably will not materialize, and events and circumstances occurring on or after the date on which the feasibility study was prepared may be different from those assumed or may be unanticipated, and may adversely affect the feasibility analysis.

THE FEASIBILITY ANALYSIS WAS NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION. FURTHERMORE, THE

**FEASIBILITY ANALYSIS IS BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE CONDITIONS THAT ARE NOT IN THE CONTROL OF REORGANIZED CORAM. CONSEQUENTLY, THE FEASIBILITY ANALYSIS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE TRUSTEE THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.**

### B.    Acceptance of the Pan

As a condition to Confirmation, the Bankruptcy Code requires that each class of impaired Claims and Equity Interests vote to accept the Plan, except under certain circumstances. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that class, but for that purpose counts only those Creditors who actually vote to accept or reject the Plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Under Section 1126(d) of the Bankruptcy Code, a class of interests has accepted the Plan if holders of such interests holding at least two-thirds in amount actually voting have voted to accept the Plan.

### C.    Best Interests Test

Even if a plan is accepted by each class of holders of impaired Claims and impaired Equity Interests, the Bankruptcy Code requires the Bankruptcy Court to determine that the Plan is in the "best interests" of all holders of Claims and interests that are impaired by the Plan and have not voted to accept the Plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a Bankruptcy Court to find either that (i) all members of an impaired class of Claims or Equity Interests have accepted the Plan or (ii) the Plan will provide a member who has not accepted the Plan with a recovery of property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would have recovered if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable Distribution to members of each impaired class of holders of Claims and interest if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from a sale of Debtors' assets if its Chapter 11 Case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtors' assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the Claims of secured creditors to the extent of the value of their collateral, and, second, by other Administrative Expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of liquidation under Chapter 7 would include the compensation of a trustee, as well as of

counsel and other professionals retained by the Chapter 7 trustee, asset disposition expenses, all unpaid expenses incurred directly by the Debtors in their Chapter 11 Case (such as compensation of the Trustee, attorneys, financial advisors, and restructuring consultants) that are allowed in the Chapter 7 case, litigation cost, and claims arising from the operations of the Debtors' business during the pendency of the bankruptcy cases. The liquidation itself would trigger certain priority payments that would otherwise become due in the ordinary course of business. Third, priority claims would be paid in full from the liquidation proceeds. Fourth, the balance would be made available to pay General Unsecured Claims including post-petition interest. Fifth, any available balance would be made in respect of Equity Interests. The liquidation also would prompt the rejection of a large number of executory contacts and unexpired leases of non-residential real property and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and Priority Claims, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the Distribution to be received by such creditors and equity security holders under the Trustee's Plan, then such Plan is not in the best interests of the Creditors and the equity security holders.

The Trustee's financial advisors have performed a liquidation valuation that reflects that the liquidation value of the Debtors as of December 31, 2002 was between \$94,336,933 and \$133,684,313. A true and correct copy of the liquidation valuation is attached hereto as Exhibit G. Since the liquidation value of the Debtors is far less that the total of the estimated Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured Claims and the Claims of the Coram Preferred Shareholders, the Trustee believes that the holders of CHC Equity Interests will receive substantially more under the Trustee's Plan than they would receive in a Chapter 7 liquidation.

Of course, any liquidation analysis is speculative. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims. The Trustee has projected the amount of Allowed Claims based upon a review of the Debtors' scheduled liabilities and proofs of Claim filed in the Chapter 11 Case and consultations with the Debtors. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis.

Notwithstanding the difficulties in quantifying recoveries to Creditors with precision, the Trustee believes that the Plan meets the "best interests" test of Section 1129(a)(7) of the Bankruptcy Code.

D.      Cramdown

Section 1129(b) of the Bankruptcy Code provides that the Plan can be confirmed even if it has not been accepted by all impaired classes as long as it has been accepted by at least one impaired class of Claims without considering the acceptances by any insiders. The Court may confirm the Plan at the request of the Trustee notwithstanding the Plan's rejection (or deemed

rejection) by impaired classes as long as the Plan "does not discriminate unfairly" and is "fair and reasonable" as to each impaired class that has not voted to accept it.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank and if no creditor receives property of a value greater than the amount of its Allowed Claim, plus interest thereon if the Debtor is solvent.

A plan is fair an equitable as to a class of secured claims that rejects such plan if the plan provides: (1)(a) that the holders of the claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of the claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holder of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

The votes of the holders of CHC Equity Interests are not being solicited because such holders are not entitled to receive or retain under the Plan any interest in property on account of their CHC Equity Interests.  Such Class is therefore deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Accordingly, the Trustee is seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to such Class, and may seek confirmation pursuant thereto as to other Classes if such Classes vote to reject the Plan. Notwithstanding the deemed rejection by the holders of Coram Equity Interests, the Trustee believes that such Class is being treated fairly and equitably under the Bankruptcy Code because, absent the settlement under the Plan Funding Agreement, litigation of the Proposed Derivative Claims would take many years to conclude without any assurance of recovery by any Creditor or shareholders of the Debtors.  The Trustee therefore believes that the Plan may be confirmed despite its deemed rejection by this Class.

## XII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Trustee believes that the Plan affords the holders of Claims and Equity Interests the potential for the greatest realization of the Debtors' assets and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Case; (b) an alternative plan or plans of reorganization; or (c) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.

### A.       Continuation of the Chapter 11 Cases

If the Debtors remain in Chapter 11, the Trustee could continue to operate the Debtors' businesses and manage the Debtors' properties, subject to the restrictions imposed by the Bankruptcy Code.  However, the Debtors may not be able to continue as viable entities beyond December 31, 2003 because it is possible that the Debtors will fail to meet the public company exception of Stark II.  Moreover, the Debtors undoubtedly would have difficulty sustaining the high costs and further erosion of market confidence which would be caused by remaining in Chapter 11.

### B.       Alternative Plans of Reorganization

If the Plan is not confirmed, the Equity Committee's proposed plan may be confirmed if such plan receives the votes of the requisite majorities of Creditors, the Trustee, or any other party-in-interest in the Chapter 11 Case, could propose a different plan or plans of reorganization.  Such plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

### C.       Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtors' Chapter 11 cases may be converted to cases under Chapter 7 of the Bankruptcy Code.  In a Chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims or Equity Interests of the Debtors.

However, the Trustee believes that Creditors would lose substantially higher going concern value if the Trustee were forced to liquidate the Debtors.  In addition, the Trustee believes that in liquidation under Chapter 7, before Creditors receive any Distribution, additional Administrative Expenses involved in the appointment of a Chapter 7 trustee and attorneys, accountants and other professionals to assist such trustee would cause a substantial diminution in the value of the estates.  The assets available for Distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of unexpired leases of non-

residential real property and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors may also be liquidated pursuant to a Chapter 11 plan. In a liquidation under a Chapter 11 plan, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7. Thus, a Chapter 11 liquidation might result in larger recoveries than a Chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.

The Trustee's financial advisors have performed an enterprise valuation of the Debtors and concluded that the enterprise value of the Debtors as of December 11, 2003 was $188,863,000. Because the total of Allowed Administrative Claim, Allowed Priority Tax Claims, Priority Non-Tax Claims, Allowed General Unsecured claims and the Claims and Interests of Coram Preferred Shareholders will most likely far exceed the enterprise value of the Debtors, if the Debtors were sold as a going concern under a liquidating Chapter 11 plan, the Trustee believes that the holders of Allowed CHC Equity Interests would likely not receive any distribution of the net proceeds.

## XIII.  VOTING REQUIREMENTS

On _____, 2003, the Bankruptcy Court entered an order (the "Solicitation Procedures Order"), among other things, approving this Disclosure Statement as containing adequate information, setting voting procedures and scheduling the hearing on Confirmation of the Plan, a copy of such order is attached hereto as Exhibit ___. A copy of the Confirmation Hearing Notice is also enclosed with this Disclosure Statement. The Confirmation Hearing Notice sets forth in detail, among other things, the voting deadlines and objection deadlines with respect to the Plan. The Confirmation Hearing Notice and the instructions attached to the Ballot should be read in connection with this section of this Disclosure Statement.

If you have any questions about (i) the procedure for voting your Claim with respect to the packet of materials that you have received, (ii) the amount of your Claim holdings, or (iii) if you wish to obtain, at your expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d), an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact:

Richard A. Barkasy, Esquire
Schnader Harrison Segal & Lewis LLP
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, New Jersey  08002
(856) 482-5222

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the requirements of Chapter 11 of the Bankruptcy Code and that the disclosure by the

Trustee concerning the Plan have been adequate and have included information concerning all payments to be made in connection with the Plan. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law, and under Rule 3020(b)(2) Federal Rules of Bankruptcy Procedure, it may do so without receiving evidence if no objection is timely filed.

In particular, and as described in more detail above, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (a) the Plan has been accepted by the requisite votes of all classes of impaired Claims and impaired interests unless approval will be sought under Section 1129(b) of the Bankruptcy Code in spite of the non-acceptance by one or more such classes, (b) the Plan is "feasible," which means that there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation, and (c) the Plan is in the "best interests" of all holders of Claims and interests, which means that such holders will receive at least as much under the Plan as they would have received in a liquidation under Chapter 7 of the Bankruptcy Code.

THE BANKRUPTCY COURT MUST FIND THAT ALL CONDITIONS MENTIONED ABOVE ARE MET BEFORE IT CAN CONFIRM THE PLAN. THUS, EVEN IF ALL THE CLASSES OF IMPAIRED CLAIMS WERE TO ACCEPT THE PLAN BY THE REQUISITE VOTES, THE BANKRUPTCY COURT MUST STILL MAKE AN INDEPENDENT FINDING THAT THE PLAN SATISFIES THESE REQUIREMENTS OF THE BANKRUPTCY CODE, THAT THE PLAN IS FEASIBLE, AND THAT THE PLAN IS IN THE BEST INTERESTS OF THE HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS.

UNLESS THE BALLOT BEING FURNISHED IS TIMELY SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO _____ AT _:____ (PREVAILING EASTERN TIME), THE TRUSTEE MAY, IN HIS SOLE DISCRETION, REJECT SUCH BALLOT AS INVALID AND, THEREFORE, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN. IN NO CASE SHOULD A BALLOT OR ANY OF THE CERTIFICATES BE DELIVERED TO THE DEBTORS, THE TRUSTEE OR ANY OF HIS ADVISORS.

A.    **Persons Entitled to Vote**

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) the claim or interest is "allowed," which means that no party in interest has objected to such claim or interest, and (2) the claim or interest is impaired by the Plan. If the holder of an impaired claim or impaired interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems that the holder of such claim or interest to have rejected the

plan. If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and that the plan proponent need not solicit such holder's vote.

The holder of a Claim that is impaired under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim and (2)(a) the Claim has been scheduled by the respective Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated), (b) such Claimant has timely filed a Proof of Claim as to which no objection has been filed, or (c) the Court has granted a motion pursuant to Rule 3018(a) of the Bankruptcy Rules temporarily allowing such Claim for voting purposes only.

A vote may be disregarded if the Court determines, pursuant to Section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith in accordance with the provisions of the Bankruptcy Code. An order regarding solicitation procedures also sets forth assumptions and procedures for tabulating ballots, including ballots that are not competed fully or correctly.

Any ballot which is executed by the holder of an Allowed Claim or Allowed Equity Interest, but which does not indicate an acceptance or rejection of the Plan, shall be deemed an acceptance of the Plan, provided that the ballot so, states in bold type and further provided that the Bankruptcy Court shall have approved the foregoing by appropriate order.

### B.    Classes Impaired Under the Plan

#### 1.  Voting Impaired Classes of Claims

The following Classes are Impaired under, and are entitled to vote to accept or reject, the Plan: Class 3 (General Unsecured Claims); Class 4 (Coram Preferred Stock Interests); and Class 6 (CHC Equity Interests).

#### 2.  Unimpaired Classes of Claims

Class 1 (Priority Non-Tax Claims) and Class 2 (Secured Claims) are unimpaired under the Plan and are deemed under Section 1126(f) of the Bankruptcy Code to have accepted the Plan. Their votes to accept or reject the Plan will not be solicited.

#### 3.  Impaired Classes of Claims and Interests Deemed to Reject the Plan

The Holders of Coram Equity Interests (Class 5) are not entitled to receive any Distribution under the plan on account of such Interests. Accordingly, pursuant to Section 1126(g) of the Bankruptcy Code, Class 5 is conclusively presumed to have rejected the Plan, and the votes of members of this class will not be solicited.

## XIV.    CONCLUSION

### A.        Hearing and Objections to Confirmation

#### 1.  Confirmation Hearing

The hearing on confirmation of the Plan has been scheduled for _____, 2003 at _____ (prevailing eastern time).  Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without any other or further notice to parties in interest, and the Plan may be modified by the Trustee pursuant to and in compliance with Section 1127 of the Bankruptcy Code prior to, during, or as a result of that hearing.

#### 2.  Date Set for Filing Objections to Confirmation of the Plan

The date and time by which all objections to Confirmation of the Plan must be filed with the Bankruptcy Court and received by the parties listed in the Confirmation Hearing Notice has been set for _____, at _____ (prevailing eastern time).  A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement.

### B.        Recommendation

The Plan provides for an equitable and early Distribution to Creditors and Equity Interests of the Debtors, preserves the value of the Debtors' business as a going concern, preserves the jobs of the employees, and provides continued services to patients that are customers of the Debtors.  The Trustee believes that any alternative to confirmation of the Plan, such as liquidation or attempts by another party in interest to confirm a different Plan, could result in significant delays, litigation, and costs, as well as the loss of jobs by the employees. Moreover, the Trustee believes that the Debtors' Creditors will receive better and much faster recoveries under the Plan that those that would be achieved in liquidation or under an alternative plan.  FOR THESE REASONS, THE TRUSTEE URGES YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.

Respectfully Submitted,


_____/s/ Arlin M. Adams_____
Arlin M. Adams, Chapter 11 Trustee of the
Bankruptcy Estates of Coram
Healthcare Corp. and Coram, Inc.

Of Counsel

SCHNADER HARRISON SEGAL
      & LEWIS LLP
Barry E. Bressler
Wilbur L. Kipnes
Richard A. Barkasy
Michael J. Barrie
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2000

Dated: June 24, 2003
      Philadelphia, Pennsylvania