# EXHIBIT K

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| CORAM HEALTHCARE CORP. and | ) | Case Nos. 00-3299 (MFW) |
| CORAM, INC., | ) | through 00-3300 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered Under |
| | ) | Case No. 00-3299 (MFW)) |

### OPINION[1]

Before the Court is the request of the chapter 11 trustee of
Coram Healthcare Corporation ("CHC") and Coram, Inc. ("Coram" and
collectively with CHC "the Debtors") for approval of the
Trustee's Second Amended Joint Plan of Reorganization ("the
Trustee's Plan"). The Official Committee of Equity Security
Holders ("the Equity Committee") objects to confirmation of the
Trustee's Plan and, instead, seeks approval of the Equity
Committee's Second Amended Joint Plan of Reorganization ("the
Equity Committee's Plan"). For the reasons set forth below, we
will confirm the Trustee's Plan, if it is amended in accordance
with this Opinion.

I.    FACTUAL BACKGROUND

The Debtors filed petitions for relief under chapter 11 of
the Bankruptcy Code ("the Code") on August 8, 2000 ("the Petition

---

[1] This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052, which is made applicable to contested
matters by Federal Rule of Bankruptcy Procedure 9014.

Date"). On that same day, the Debtors filed their First Joint Plan of Reorganization ("the Debtors' First Plan"). The Debtors' First Plan provided for: (1) the cancellation of all shareholder interests; (2) the issuance of new stock (representing 100% of the Debtors' equity) to Cerberus Partners, L.P. ("Cerberus"), Goldman Sachs Credit Partners L.P. ("Goldman"), and Foothill Capital Corporation ("Foothill") who collectively held 100% of the Debtors' outstanding unsecured notes (collectively "the Noteholders"); and (3) payment of $2 million to the other general unsecured creditors. The Equity Committee opposed the Debtors' First Plan.

In December 2000, at the conclusion of the confirmation hearings on the Debtors' First Plan, we found that the Debtors' CEO, Dan Crowley, was also employed as a consultant by Cerberus (the largest Noteholder). We concluded that this employment created a conflict of interest which tainted the Debtors' restructuring efforts. As a result, we denied confirmation of the Debtors' First Plan because we were unable to find that the Debtors had proposed their plan in good faith in accordance with section 1129(a)(3) of the Code.

Thereafter, the Debtors created a special committee of independent directors ("the Special Committee") to review the Debtors' affairs and propose a new plan of reorganization. The Special Committee retained Harrison J. Goldin to perform an

2

impartial investigation.  After consultation with Goldin, the
Debtors proposed a new plan of reorganization ("the Debtors'
Second Plan"), which provided that the Noteholders would receive
all of the Debtors' equity and the shareholders would receive $10
million (if their class voted in favor of the Second Plan and the
creditors did not object to confirmation on the basis of the
absolute priority rule).  The Equity Committee opposed the
Debtors' Second Plan.  We held confirmation hearings to consider
the Debtors' Second Plan over seven days in November and December
2001.  On December 21, 2001, we denied confirmation of the
Debtors' Second Plan.  We found that the employment relationship
between Crowley and Cerberus had not changed since the first
confirmation hearings.  Accordingly, we again held that we could
not conclude that the Debtors' Second Plan satisfied the
requirements of section 1129(a)(3).

Following the denial of the Debtors' Second Plan, we granted
a motion for the appointment of a chapter 11 trustee to oversee
the Debtors' operations and to facilitate the reorganization
process.  On March 7, 2002, the Court approved the United States
Trustee's selection of Arlin M. Adams ("the Trustee") as the
chapter 11 trustee in the Debtors' jointly administered cases.

On December 19, 2002, the Equity Committee filed the Equity
Committee's Plan, and on May 2, 2003, the Trustee filed the

3

Trustee's Plan.[2]  The Trustee's Plan provides for: (1) a
settlement with the Noteholders ("the Noteholders Settlement")
whereby the Noteholders will release their preferred stock and
the remaining $9 million due on their notes,[3] make a $56 million
contribution to the Debtors' estate, and receive a release from
the Trustee of any claims, including derivative claims, that the
Debtors may have against them, their officers, directors, and
employees; (2) an immediate cash payment to the unsecured
creditors of 100% of their allowed pre-petition claims plus the
payment of post-petition interest (calculated at the federal
judgment rate) from the net proceeds of the estate's claims
against Crowley, certain outside directors, and
PriceWaterhouseCoopers ("the Retained Litigation"); (3) the
retention by Reorganized Coram of $10 million in working capital;
(4) the cancellation of the shareholders' equity for a pro-rata
distribution of the remaining Plan Funding Cash (which the

---

[2]  Both the Equity Committee's Plan and the Trustee's Plan
have been amended several times.  Currently before us is the
Equity Committee's Second Amended Plan filed on June 16, 2003,
and the Trustee's Second Amended Joint Plan of Reorganization
filed on April 15, 2004.  (The Equity Committee filed a Third
Amended Plan on June 14, 2004, several months after the
confirmation hearings had ended and briefing was almost complete.
However, that Plan was withdrawn.)

[3]  During the course of this bankruptcy case, the Debtors
entered into three transactions whereby the Noteholders exchanged
debt for Coram preferred stock.  This was done to maintain
sufficient equity in Coram to avoid violation of the Omnibus
Budget Reconciliation Act of 1993 ("Stark II").

4

Trustee estimates will be approximately $40 million) and the remaining net proceeds from the Retained Litigation Claims; (5) a settlement of the claims of Coram Resource Network, Inc. and Coram Independent Practice Association, Inc. (collectively "R-Net") for an allowed general unsecured claim of $7.95 million;[4] (6) the dissolution of CHC; and (7) the issuance of all the common and preferred stock in Reorganized Coram to the Noteholders.

The Equity Committee's Plan provides for: (1) the immediate cash payment to the general unsecured creditors, other than the Noteholders, of the full amount of their allowed claims with interest to the extent required by law; (2) payment in full of the reduced claim of R-Net, $7.95 million, plus 2% from the Reorganized Debtors' net recoveries from the Litigation Claims[5] (to a maximum of $6 million); (3) the satisfaction of the Noteholders' allowed claims through the issuance of New Senior

---

[4]  R-Net is an affiliate of the Debtors.  An involuntary chapter 11 proceeding was filed against R-Net on August 19, 1999. R-Net's Plan of Reorganization, which incorporates the settlement with the Debtors, was confirmed on December 23, 2003, but is conditioned on the Trustee's Plan being confirmed.  The R-Net Settlement also includes a waiver of the claims that R-Net may have against the Noteholders, their officers, directors, and employees.

[5]  The Litigation Claims under the Equity Committee's Plan include actions against Goldman, Foothill, Cerberus, Feinberg, and/or Crowley alleging causes of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), breaches of fiduciary duties, and fraudulent misrepresentation.

Notes[6] and New Preferred Stock;[7] and (4) the retention by the
shareholders of their equity interests in the Debtors.    The
Equity Committee's Plan also provides that a special litigation
committee of the Board of Directors of the Reorganized Debtors
will have full and ultimate authority over the prosecution and
settlement of the Litigation Claims.

Hearings to consider the two plans were held over twelve
days between September 30, 2003, and April 20, 2004.    At the
conclusion of the confirmation hearings, the parties submitted
post-confirmation briefs.    The matter is now ripe for decision.

## II.  JURISDICTION

This Court has jurisdiction over confirmation of the
competing plans pursuant to 28 U.S.C. §§ 1334(b) & 157(b)(2)(A) &
(L).

---

[5]  The term sheet for the New Senior Notes provides that
they will: (1) be for the total amount of the Noteholders'
allowed general unsecured claim for the remaining Notes held by
them; (2) mature 60 months after the Plan's effective date; (3)
have no amortization prior to maturity; (4) accrue interest at
the rate of 8.0% per annum payable semi-annually, in arrears; and
(5) be redeemable at the option of the Reorganized Debtors at any
time at par plus accrued interest.

[7]  The term sheet for the New Preferred Stock provides that
it will: (1) be for the total allowed claim of the Noteholders on
account of their preferred stock; (2) contain an 11% per annum
dividend, payable in arrears in kind or, at the option of the
Reorganized Debtors, in cash; (3) be redeemed at the option of
the Reorganized Debtors at any time (within 66 months of the
effective date of the Equity Committee's Plan) at the Liquidation
Preference amount plus any accrued and unpaid dividends.

III. <u>DISCUSSION</u>

Currently before the Court are two competing plans of reorganization. Each plan proponent contends that its plan satisfies the provisions of the Code and is preferable to the other plan, which it argues does not satisfy the Code's requirements.

A.    <u>Confirmability of the Trustee's Plan</u>

The Equity Committee asserts that the Trustee's Plan does not satisfy the requirements of the Code. In particular, the Equity Committee contends that the Trustee's Plan does not satisfy section 1129(a)(3) because the R-Net Settlement and the Noteholders Settlement were not proposed in good faith. The Equity Committee also contends that the Trustee's Plan violates the absolute priority rule and is not fair and equitable because it gives the Noteholders more than the amount of their claims by granting them releases and issuing them all of the stock of Reorganized Coram.

The Trustee disagrees. He contends that he proposed both settlements in good faith because they are in the best interests of the Debtors. Further, the Trustee argues that his Plan does not violate the absolute priority rule because it provides shareholders with a greater distribution than the value of their interests.

7

1.  Evaluation of Settlements

Compromises are generally favored in bankruptcy. See Myers
v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996). The
consensual resolution of claims minimizes litigation and
expedites the administration of a bankruptcy estate. Id. Under
Rule 9019 of the Federal Rules of Bankruptcy Procedure, the
approval of a compromise settlement is within the sound
discretion of the bankruptcy court. See, e.g., Conn. Gen. Life
Ins. Co. v. United Cos. Fin Corp. (In re Foster Mortgage Corp.),
68 F.3d 914, 917-18 (5th Cir. 1995); LaSalle Nat'l Bank v.
Holland (In re Am. Reserve Corp.), 841 F.2d 159, 162 (7th Cir.
1987). In approving a settlement, the court does not have to be
convinced that the settlement is the best possible compromise.
Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994). Rather,
the court must only conclude that the compromise or settlement
falls within the reasonable range of litigation possibilities.
In re Penn Central Transp. Co., 596 F.2d 1102, 1114 (3d Cir.
1979). That is, the settlement need only be above "the lowest
point in the range of reasonableness." Official Unsecured
Creditors' Comm. of Pa. Truck Lines, Inc. v. Pa. Truck Lines,
Inc. (In re Pa. Truck Lines, Inc.), 150 B.R. 595, 598 (E.D. Pa.
1992).

When determining whether to approve a settlement, the
bankruptcy court should consider: (1) the probability of success

in the litigation; (2) the complexity, expense, and delay of the litigation involved; (3) the possible difficulties in collection; and (4) the paramount interests of creditors. <u>See, e.g.</u>, <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424 (1968); <u>Martin</u>, 91 F.3d at 395. Additionally, the court should defer to a trustee's judgment so long as there is a legitimate business justification for his action. <u>Martin</u>, 91 F.3d at 395.

> a.   <u>R-Net Settlement</u>

The Trustee argues that the R-Net Settlement is proper because: (1) the settlement substantially reduces the amount of the R-Net claim from more than $41 million to $7.95 million, thereby permitting the payment of 100% to the other unsecured creditors under the Trustee's Plan; (2) the Debtors' counterclaim against R-Net is uncollectible because R-Net is in its own bankruptcy proceeding; and (3) settling with R-Net will allow the Trustee to avoid protracted, expensive, inconvenient, and uncertain litigation. The Trustee notes that the Equity Committee does not contest the proposed settlement amount; the Equity Committee incorporates the same figure in its Plan.

Although the Equity Committee does not disagree with the amount of the R-Net Settlement, it argues that the settlement is not in the best interests of the Debtors' estate because it releases R-Net's claims against the Noteholders. The Equity

9

Committee asserts that using estate funds to pay for the release
of claims against the Noteholders is not proper.

The Noteholders argue, of course, that R-Net has no claim
against them and that, therefore, the releases they obtain under
the R-Net Settlement are of no significance.  That alone is
unconvincing.  If that were true, then the Noteholders would not
be insisting upon a release from R-Net in this case.

In addition, the Noteholders assert that the R-Net
Settlement has been approved as reasonable in the R-Net case,
without any objection by the creditors of R-Net.  Therefore, the
Noteholders argue that the R-Net Settlement must be reasonable.
We also discount this argument.  The fact that the settlement is
reasonable to R-Net and its creditors does not mean that it is
reasonable to the Debtors and their creditors.  In fact, a one-
sided settlement would be cheered by the side it favors even
though it is a terrible deal for the side it disfavors.  Thus,
the fact that the settlement has been approved in the R-Net case
is not evidence of its reasonableness in this case.

However, there is sufficient evidence in this case to
support the approval of the R-Net Settlement.  The Noteholders
are correct that there are serious impediments to the assertion
of a claim against them by the R-Net estate.  First, the R-Net
claim against the Debtors is based on allegations of breach of
contract relating to services rendered to Aetna, not on the

10

Crowley conflict of interest.  Second, there is a question
whether the R-Net Creditors' Committee had the authority to
prosecute any action against the Noteholders, since it was vested
with authority only to prosecute actions against the Debtors.
(Exh. Cerb-15.)  See, e.g., Official Comm. of Unsecured Creditors
of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.), 330
F.3d 548, 579-80 (3d Cir. 2003).

Additionally, the Trustee argues that the cost of litigating
with R-Net would be prohibitive because there are twenty-five
named parties and at least eleven law firms involved.  He
estimates the cost to be in the millions of dollars.  He also
notes that, because R-Net is in its own bankruptcy proceeding,
the collection of any judgment that the Trustee may win against
it is questionable.  The benefits of the settlement are clear:
the reduction of R-Net's claim against the Debtors from $41
million to $7.95 million, the avoidance of the cost and delay
inherent in litigating with R-Net, and the agreement by the
Noteholders to fund the Trustee's Plan.

We conclude that the Trustee has established that the R-Net
Settlement satisfies the test for approval of a compromise
because: (1) the probability of the Trustee's success in the
litigation is not assured; (2) it is very likely that the Trustee
will have enormous difficulty in collecting from R-Net and in
proposing a consensual plan of reorganization in this case that

11

pays R-Net's asserted claim; and (3) the expense, inconvenience
and delay caused by that litigation will adversely affect all the
creditors in this case.  See, e.g., TMT Trailer Ferry, 390 U.S.
at 424.  Further, the paramount interest of the creditors in this
case supports the settlement because it will permit the
confirmation of a plan expeditiously that results in full payment
to the general unsecured creditors.  See, e.g., Martin, 91 F.3d
at 395.  Accordingly, the R-Net Settlement has been proposed in
good faith and can be approved.

### b.    Noteholders Settlement

The Trustee seeks approval of the Noteholders Settlement
because it provides a complete recovery for creditors plus a
significant recovery (at least $40 million) for shareholders.
That settlement also preserves the estate's claims against
Crowley and the outside directors for the benefit of the
shareholders.  Therefore, the Trustee asserts that the
Noteholders Settlement is in the best interests of the estate.

The Equity Committee argues, however, that the Noteholders
Settlement is improper because it provides no material value to
the estate and has no cost to the Noteholders.  This argument had
more merit when the Trustee's Plan provided that the $56 million
contribution by the Noteholders would be in the form of a loan.
Since the Reorganized Coram would be solvent upon emergence from
bankruptcy, it would be able to repay that loan.  Therefore, the

12

Equity Committee's argument that the Noteholders were getting something (releases and the equity in the Reorganized Coram) for nothing had some validity.

However, the Trustee's Plan has now been amended to provide that the Noteholders' contribution will be in the form of $38 million in cash and $18 million in the assumption of the IRS debt. Even as modified, though, the Equity Committee argues that the contribution by the Noteholders is a mirage. It argues that the Noteholders are contributing money to a company that they will control. Thus, it argues, the Noteholders will be able to repay their $56 million contribution to themselves at any time. We disagree with this analysis. The contribution of the Noteholders (together with the Debtors' cash on hand of approximately $40 million) will be used to fund the Trustee's Plan, including distributions exceeding $49 million to administrative, priority, and general unsecured creditors and approximately $40 million to the shareholders. (Exh. T-8.) The remainder will be used to assure that Reorganized Coram has sufficient working capital ($10 million) to operate. Therefore, the contribution of the Noteholders to the rehabilitation of the Debtors is not illusory as the Equity Committee suggests.

The Equity Committee also argues that the Noteholders Settlement is fundamentally unfair. It argues that the Trustee cannot show that the Noteholders Settlement is reasonable because

13

the Trustee did not independently investigate the claims the estate has against the Noteholders and settled those claims without filing (or even threatening to file) a lawsuit against them.  We reject this argument, however, because it is in essence only a complaint about the Trustee's negotiating strategy. Rather than sue first and settle later, the Trustee sought to reach a compromise with all the parties before positions became hardened as a result of legal action.  The Trustee met with both the Equity Committee and the Noteholders and asked both to give him their best case against the other.  This process was not "fundamentally unfair" as suggested by the Equity Committee. Instead it was a reasonable effort to achieve a consensual plan which is the hallmark of a successful chapter 11 reorganization case.  Unfortunately, the Trustee reached a settlement only with the Noteholders, not with the Equity Committee.

Although the Trustee did not do an independent investigation of the claims, he did meet at length with the Equity Committee which had done an extensive investigation into the facts surrounding the Cerberus/Crowley relationship.  In fact, the Equity Committee provided the Trustee with a draft complaint against the Noteholders and provided documents and other evidence to support that suit.  We conclude that it was prudent and cost-effective for the Trustee, in determining what course of action to take, to rely on the Equity Committee's findings, rather than

14

re-inventing the wheel.  That the Trustee did not take the course of action advocated by the Equity Committee does not mean his tact was wrong.

The Equity Committee also complains that the Trustee settled with the Noteholders before putting the Debtors on the market and determining what their enterprise value was.  We accept the Trustee's assertion that a sale was not pursued because of the negative effect it could have on the operating results of the Debtors.  Again, we find the Equity Committee's argument on this point to be more of a disagreement about the means by which the settlement was reached rather than about the substance of the settlement itself.

Turning to the substance, we note that, although courts generally apply the three factor approach enunciated in TMT Trailer Ferry to determine whether a settlement is reasonable, the parties in this case agree that the first factor, the probability of success in litigation, dominates our review.

The Trustee contends that the probability of succeeding on the claims against Foothill and Goldman is low.  He asserts that his testimony and the testimony of Jerome Shestack established that the claims against Goldman and Foothill would probably not survive a motion for summary judgment, thus making a settlement preferable to litigation.  The Trustee also contends that his conclusion is supported by the testimony of the Equity

15

Committee's own witness, Roderick McKlevie, who refused to opine
that these claims would survive a motion for summary judgment.

The Trustee also asserts that it is proper for him to settle
the Racketeering Influenced and Corrupt Organizations Act
("RICO") claims against Cerberus and Feinberg.  The Trustee
asserts that RICO claims are particularly difficult to prove
because they require proof of a culpable person who conducts the
affairs of a distinct enterprise through a pattern of
racketeering in a way that proximately causes injury.  18 U.S.C.
§ 1962 (2000).  He asserts that the burden of establishing a RICO
pattern is substantial and costly.

In its draft complaint against those parties, the Equity
Committee asserted that the RICO scheme was to put the Debtors
into bankruptcy so that the Noteholders could obtain the equity.
The Trustee presented evidence rebutting this assertion.
Shestack testified that, at the time the scheme allegedly began,
the Debtor was already in a terrible financial position and a
bankruptcy filing was imminent.  (12/11/04 Shestack at 46-47.)
He also testified that the plaintiff would have a tough time
establishing that Crowley forced the Debtors into bankruptcy.  In
fact, the evidence suggests that Crowley actually improved the
financial position of Coram by reducing debt and increasing
earnings.  (Id. at 51.)

The Equity Committee alleges, however, that the fact that

16

Crowley caused the Debtors to make a $6.3 million pre-petition payment to the Noteholders when they could have satisfied the Noteholders with notes establishes a RICO scheme.  We agree with the Trustee that these allegations alone do not establish a viable claim.  Although the pre-petition payment was unnecessary and improper considering the inevitable bankruptcy filing, this money was in fact due to the Noteholders.  Thus, while this payment may have hurt the Debtors' cash position, we cannot agree with the Equity Committee that this establishes a scheme to force the Debtors into bankruptcy.

Further, the Equity Committee asserts that the sale of CPS (a subsidiary of the Debtors) for substantially less than it was worth supports the existence of a RICO scheme.  We disagree.  If, as the Equity Committee asserts, the Noteholders' scheme was to drive the Debtors into bankruptcy so they could "steal" the company for themselves, it is inconceivable that they would have allowed the Debtors to sell CPS (which the Committee characterizes as the "crown jewel" of the Debtors) for less than its fair value.  Furthermore, the evidence shows that the CPS sale was approved by the Debtors' board of directors before Crowley even became the CEO.  (12/11/04 Shestack at 53.)  In fact, the testimony establishes that Crowley was able to obtain a higher bid for CPS than was previously approved by the board and the Debtors' investment banker.  (Id.)  Thus, we cannot conclude

17

that the sale of CPS establishes a scheme to put the Debtors into bankruptcy.

Even if a RICO pattern or scheme could be proven, however, the Trustee argues that it would be difficult to prove causation and damages. In fact, the Trustee contends that the position of the Equity Committee's expert was novel: assuming causation by simply comparing the Debtors to an index of peer companies. The expert testified that since the Debtors under-performed this group of peer companies, they must have been harmed by the Noteholders' scheme. The Trustee challenges this conclusion. He argues that it is not proper to assume that every shortfall in the Debtor's performance is attributable to the conduct of Crowley and Cerberus. Therefore, he asserts that it will be difficult to establish what harm was caused to the Debtors by the Noteholders. With these inherent difficulties of proving a RICO scheme and establishing damages, the Trustee believes that the $56 million settlement is reasonable.

Finally, the Trustee asserts that there is essentially no evidence that the Noteholders Settlement is unreasonable. The Equity Committee's expert, McKelvie, could not address the reasonableness of the settlement. Instead, McKelvie testified that he would defer to the people who had a better understanding of the facts and circumstances to determine its reasonableness. (3/5/04 McKelvie at 8, 16.) The Equity Committee's other

18

witnesses also failed to address the reasonableness of the
settlement.  Although they talked about what the damages could be
if the Equity Committee proved its theories, they did not address
the issue of whether $56 million was reasonable as a compromise
of the suit.

While we recognize that a successful lawsuit against the
Noteholders could produce damages that exceed $56 million, we
conclude that the Noteholders Settlement is above the lowest
point in the range of reasonableness.  See, e.g., Pa. Truck
Lines, 150 B.R. at 598.  We agree with the Trustee that the
claims against Goldman and Foothill have a low probability of
success.  No facts were presented to the Court to establish that
they participated in a conspiracy to put the Debtors into
bankruptcy.  Even the RICO action against Cerberus and Feinberg
is fraught with difficulty.  Although we found that Crowley had a
conflict of interest because of his undisclosed $1 million
contract with Cerberus, success is far from guaranteed in a RICO
action.  A plaintiff in a RICO case often has a tough time
proving causation and damages.  Although we agree that there is
significant evidence establishing that Crowley breached his
fiduciary duties, there is no guarantee that the Trustee (or
Equity Committee) could prove causation and damages in a suit
against Cerberus and Feinberg.  Further prosecuting that action
will be costly.  The parties apparently agree that the cost to

19

the estate to prosecute such an action could be as much as $6 million.  (Equity Committee's Third Amended Disclosure Statement at 30; 12/11/03 Shestack at 76.)  Additionally, if the prior proceedings in this case are any indication, the delay inherent in prosecuting those claims would be lengthy.  Accordingly, we agree with the Trustee that the Noteholder Settlement is reasonable considering the cost of pursuing the litigation and the likelihood of success.

c.    Releases Under a Plan

The Trustee seeks approval of the settlements as part of the Trustee's Plan, which is permitted by section 1123(b)(3)(A).[8] Where a compromise is part of a plan of reorganization, however, the court has the duty "to determine that a proposed compromise forming part of a reorganization plan is fair and equitable." TMT Trailer Ferry, 390 U.S. at 424.  The standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019, though the court should consider all factors relevant to a "full and fair assessment of the wisdom of the proposed compromise."  Id.

Where releases are granted to non-debtors under a plan of reorganization, additional factors are often relevant to

---

[8]    Section 1123(b)(3)(A) states that: "  (b) Subject to subsection (a) of this section, a plan may - . . . (3) provide for - (A) the settlement or adjustment of any claim or interest belonging to the debtor or the estate."  11 U.S.C. § 1123(b)(3)(A).

determine the fairness of the compromise. See, e.g., Gillman v.
Continental Airlines (In re Continental Airlines), 203 F.3d 203,
212-14 (3d Cir. 2000); In re Genesis Health Ventures, Inc., 266
B.R. 591, 608 (Bankr. D. Del. 2001); In re Zenith Elecs. Corp.,
241 B.R. 92, 110 (Bankr. D. Del. 1999).

i.    Release by Debtors

In Zenith we identified five factors which are relevant to
determine whether a release of a non-debtor by the debtor is
appropriate: (1) an identity of interest between the debtor and
non-debtor such that a suit against the non-debtor will deplete
the estate's resources; (2) a substantial contribution to the
plan by the non-debtor; (3) the necessity of the release to the
reorganization; (4) the overwhelming acceptance of the plan and
release by creditors and interest holders; and (5) the payment of
all or substantially all of the claims of the creditors and
interest holders under the plan. Zenith, 241 B.R. at 110 (citing
In re Master Mortgage Inv. Fund, Inc., 168 B.R. 930, 937 (Bankr.
W.D. Mo. 1994)).

We conclude that the Trustee's Plan meets this standard for
approval of the release of the Noteholders by the estate.    The
Trustee's Plan does provide for repayment in full in cash of all
creditors (except the Noteholders) and for a substantial
distribution to the shareholders (at least $40 million).  This is
made possible by the substantial contribution (of $56 million) by

21

the Noteholders to the Plan funding.  The releases given to the
Noteholders are an essential part of the Plan, since they would
not provide the funding without the releases.  The Trustee's Plan
has been overwhelmingly accepted by all creditors who have voted
on the Plan.[9]  Although the shareholders rejected the Trustee's
Plan as a class, over 68% in number of those who voted did accept
that Plan.  Although the Noteholders do not share an identity of
interest with the estate on the matter of the litigation (unlike
a debtor's insurance carrier or directors and officers who may
have indemnification agreements with the debtor), as the largest
creditors and preferred shareholders they do share a common goal
of achieving a reorganization of the Debtors.  Therefore, we
conclude that the Trustee's Plan, and the releases granted by the
Debtors and the estate to the Noteholders, may be approved as
fair and equitable.

       ii.  <u>Release of Noteholders by Third Parties</u>

    However, as we noted in <u>Zenith</u>, the provision of a plan of
reorganization which purports to grant a release of claims by
third parties against a non-debtor cannot be approved under the
above standards.  241 B.R. at 111.  The Trustee (and the Court)
do not have the power to grant a release of the Noteholders on

----

     [9]  Class 3 (general unsecured creditors) voted in favor of
the Trustee's Plan by 96.6% in amount and 87.2% in number.  Class
4 (the Noteholders) voted in favor of the Trustee's Plan by 100%
in amount and number.

behalf of third parties. <u>See, e.g.</u>, <u>In re Digital Impact, Inc.</u>,
223 B.R. 1, 14 (Bankr. N.D. Okla. 1998) (bankruptcy court does
not have jurisdiction to approve non-debtor releases by third
parties); <u>In re Arrowmill Dev. Corp.</u>, 211 B.R. 497, 506 (Bankr.
D.N.J. 1997) ("Keeping in mind the Third Circuit's analysis that
section 524(e) specifically limits the scope of the discharge,
and that the Bankruptcy Code does not contemplate a discharge of
nondebtors, this court holds that plans of reorganization may not
contain provisions which discharge nondebtors."); <u>In re Elsinore</u>
<u>Shore Assocs.</u>, 91 B.R. 238, 252 (Bankr. D.N.J. 1988) (plan
provisions deeming non-debtor proponents and their principals to
be discharged and released from any and all claims were
prohibited by the Code and relevant case law); <u>In re Monroe Well</u>
<u>Serv., Inc.</u>, 80 B.R. 324, 334 (Bankr. E.D. Pa. 1987) (debtors
could not obtain confirmation of a plan which would attempt, over
the objection of creditors, to discharge the obligations of non-
debtors). Thus, to the extent the Trustee's Plan seeks approval
of a release by third parties of claims they may have against the
Noteholders (other than derivative claims which the Trustee has
waived), it cannot be approved.

However, a Plan is a contract that may bind those who vote
in favor of it. <u>See, e.g.</u>, <u>Zenith</u>, 241 B.R. at 111 (allowing
release by any creditor who actually voted in favor of the plan);
<u>Arrowmill</u>, 211 B.R. at 506 ("When a release of liability of a

nondebtor is a consensual provision, however, agreed to by the
effected [sic] creditor, it is no different from any other
settlement or contract. . . ."); In re West Coast Video Enters.,
Inc., 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) ("each creditor
bound by the terms of the release must individually affirm
same"); Monroe Well Serv., 80 B.R. at 334-35 ("a plan provision
permitting individual creditors the option of providing a
voluntary release to nondebtor plan funders does not violate 11
U.S.C. § 524(e)."). Therefore, to the extent creditors or
shareholders voted in favor of the Trustee's Plan, which provides
for the release of claims they may have against the Noteholders,
they are bound by that.

The cases cited by the Trustee and the Noteholders to
support the third party releases are clearly distinguishable.
The Vencor case did not deal with whether a plan could allow a
release of a third party claim; instead it involved whether a
plan which had been confirmed could be modified or vacated
because it contained such releases. We held that modification or
vacation was not permitted because the request had been filed
beyond the time allowed in the Code and Rules. In re Vencor,
Inc., 284 B.R. 79, 83 (Bankr. D. Del. 2002). But see In re Davis
Broad., Inc., 176 B.R. 290, 292 (M.D. Ga. 1994) (holding that
bankruptcy court erred in not vacating confirmation order because
court did not have jurisdiction to grant releases of third party

24

claims, even though no creditor had objected).

Similarly, the PWS and United Artists cases cited by the Trustee are distinguishable because they do not involve third party releases of the nature present in this case. Both of those cases dealt with provisions exculpating professionals for actions taken during the chapter 11 case. See, e.g., United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.), 315 F.3d 217, 226 (3d Cir. 2003); In re PWS Holding Corp., 228 F.3d 224, 236-37 (3d Cir. 2000).

In PWS, the exculpation clause provided that the professionals and members of the creditors' committee were not subject to claims of creditors for their actions during the chapter 11 case except for gross negligence or wilful misconduct. PWS, 228 F.3d at 245. The Court held that such a provision was not unreasonable or violative of section 524(e), because it merely restated the standard by which such parties would be liable to creditors under section 1103 of the Code. Id. at 246.

In United Artists, there was a proposed release of nondebtors by third parties, but it was limited to those who had accepted the plan. United Artists, 315 F.3d at 224-25. The Court also approved an indemnification provision in the plan of reorganization, finding that such a provision was reasonable when considered in the context of state law. Id. at 229-33.

The issues addressed in those cases are not what is before

25

us, which is the release of third party claims against a non-debtor.  Consequently, we are not persuaded that the third party releases of the Noteholders in this case, to the extent they have not been accepted by the parties affected, can be approved.

### iii. Other Miscellaneous Releases

Though not raised by any of the parties, we find that there are additional releases contained in the Trustee's Plan which cannot be approved.  Specifically, the Trustee's Plan purports to release third party claims against the Trustee, the Equity Committee and their respective agents and professionals. (Trustee's Plan at §§ 9.2 & 9.4.)  Such provisions are not permissible except to the extent they are limited to post-petition activity which does not constitute gross negligence or wilful misconduct.  See, e.g., PWS Holding Corp., 228 F.3d at 236-37 (holding that exculpation clause in plan which frees parties and professionals from third party claims is permissible so long as it is restricted to applicable standard of the duty owed to the estate by that party and professional).  To the extent the Trustee's Plan provides any release beyond the PWS ruling, it must be modified.

Similarly, section 9.1 of the Trustee's Plan purports to grant a release of the Debtors and their officers and directors (excluding Crowley and certain others).  No release of the Debtors is appropriate, since the Debtors are entitled only to

26

the discharge provided by section 1141(d). No evidence has been
presented of any contribution made by any director or officer of
the Debtors supporting any release of them by the Debtors or any
third party. See, e.g., Continental Airlines, 203 F.3d at 212-14
(holding that releases of directors and officers were not
appropriate in absence of proof of substantial and necessary
contribution to the reorganization plan). Consequently, section
9.1 of the Trustee's Plan must be stricken.

         2.    Valuation of the Debtors

     The Equity Committee further asserts that the Trustee's Plan
is not confirmable because the Noteholders receive all the equity
in Reorganized Coram, which is worth much more than the
Noteholders' claims. Therefore, the Equity Committee argues that
it is not fair and equitable under section 1129(b). See, e.g.,
In re Exide Techs., 303 B.R. 48, 61 (Bankr. D. Del. 2003) ("a
corollary of the absolute priority rule is that a senior class
cannot receive more than full compensation for its claims")
(quoting Genesis Health Ventures, 266 B.R. at 612). Thus, a
determination of the Debtors' value directly impacts whether the
Trustee's Plan is "fair and equitable."

     Both the Trustee and the Equity Committee conducted their
own valuations of the Debtors. The Trustee presented an
enterprise valuation prepared by Ewing Bemis and Co. and SSG
Capital Advisors, LLP (collectively "EB/SSG") while the Equity

                              27

Committee presented a valuation prepared by Deloitte & Touche,
LLP ("Deloitte"). Both EB/SSG and Deloitte determined the going
concern value of the Debtors by applying the three standard
valuation methodologies: (1) comparable public company analysis;
(2) comparable transaction analysis; and (3) discounted cash flow
analysis. Id. at 66. Despite using the same valuation
methodologies, the end results were far from similar. Deloitte
and EB/SSG included different assets in reaching their valuation
conclusions, attached different weights to the three valuation
methodologies, and took different positions regarding
management's projections.

        a.    Going Concern Value

        The Equity Committee argues that the Trustees' experts
undervalued the Debtors. In fact, the Equity Committee asserts
that EB/SSG produced a low valuation to establish that equity was
out of the money thereby providing support for the Trustee's
Plan. The Equity Committee asserts that EB/SSG reached their low
valuation by improperly relying on management projections that
were biased and incorrect in four ways. First, EB/SSG accepted
reserves created by management that had no basis in historical or
industry experience. Second, EB/SSG's analysis accepted
management's cash flow projections despite the fact that they
contained computational errors that produced a low discounted
cash flow. Third, EB/SSG did not conduct an independent analysis

28

to determine whether any of management's original or revised projections were consistent with the market or the Debtors' actual performance. Finally, the Equity Committee contends that the EB/SSG valuation varied from the traditional valuation methodologies because they rejected multiples that produced results that they felt were outside the range of reasonableness or that did not fit their conclusions about the market.

In response, the Trustee argues that the EB/SSG enterprise value is more realistic than Deloitte's because EB/SSG properly relied on management's projections, financial models, and other assumptions. Although EB/SSG did make minor adjustments to some of the figures, their valuation was based heavily on management's numbers. After applying the valuation methodologies, EB/SSG relied on their experience in the purchase and sale of healthcare companies to calculate a going concern value of approximately $220 million.

The Equity Committee argues that its enterprise valuation is more appropriate than the Trustee's. Deloitte did not use management's projections because it felt they were too conservative. Instead, Deloitte applied upside projections previously prepared by the Debtors' own experts, EB/SSG.[10] Deloitte also adjusted EBITDA for items that it determined were

---

[10]    Before filing the Trustee's Plan, the Trustee considered selling the Debtors as a going concern. At that time, EB/SSG modified management's projections to create an upside projection.

29

not regular charges. Accordingly, before it applied the standard valuation methodologies, Deloitte made significant adjustments to management's established reserves, cash flow projections, growth projections, and EBITDA. Finally, Deloitte concluded that higher multiples were appropriate because of the Debtors' recent performance and because it determined the Debtors have a significant "specialty pharmaceutical" component. As a result, Deloitte concluded that the proper going concern value of the Debtors was approximately $279 million.

The Trustee contends that the Deloitte valuation overvalues the Debtors. He asserts that Deloitte reached an inflated value by making numerous adjustments to management's projections and utilizing inflated multiples. The Trustee contends that Deloitte was able to obtain its artificially high valuation of the Debtors by mischaracterizing the company as a specialty pharmaceutical company. While the Trustee admitted that a small portion of the Debtors' business could be called specialty pharmaceutical, he argues that characterizing the company as such is very inaccurate because the Debtors operate under a vastly different business model. The Trustee also argues that it was inappropriate for Deloitte to substitute its own aggressive projections for management's carefully prepared projections. The Trustee asserts that Deloitte's inflated projections fail to recognize significant price pressures in the industry. Finally, the

30

Trustee contends that Deloitte was able to achieve its
artificially high valuation by making an excessive number of
adjustments to earnings before interest, taxes, depreciation and
amortization ("EBITDA"), raising the Debtors' EBITDA by 40%.  The
Trustee asserts that this was inappropriate because no purchaser
would accept such extensive adjustments by a seller.

Before we proceed with our analysis of the competing
valuations, we recognize each side's incentives to either
overvalue or undervalue the Debtors.  Exide, 303 B.R. at 61.  We
also understand that preparing valuations of companies is not an
exact science.  Experts and industry analysts often disagree on
the appropriate value, even when employing the same analytical
tools.  "Simply put, when it comes to valuation issues,
reasonable minds can and often do disagree.  This is because the
output of financial valuation models are driven by their inputs,
many of which are subjective in nature."  Peltz v. Hatten, 279
B.R. 710, 736-37 (D. Del. 2002).  Although valuations are
subjective, there are proper and improper methods of performing a
valuation.

In Exide, the Court was faced with a situation similar to
this case when it was asked to determine "whether the Plan was
proposed by self-interested management for the purpose of
maximizing value and benefits to the Prepetition Lenders, who, it
is alleged, will receive in excess of the full value of their

31

claims." Exide, 303 B.R. at 58. To answer this question, the
Exide Court was also required to analyze two competing valuations
of the debtor. Id. While both experts used traditional
valuation methodologies to determine the debtor's value, they
reached different conclusions. Id. at 59. The debtor's expert
used a "market-based approach" by analyzing the price that could
be realized for the debtor's assets in their current state. Its
expert made numerous subjective determinations that reduced the
multiples prior to applying the valuation formula. Id. at 60.
The creditors' committee argued that the most accurate way to
determine the value of the debtor was by a straight-forward
application of the three traditional valuation methodologies.
The Exide Court agreed with the Committee and concluded that
adjusting the company's value for the "taint" of bankruptcy was
not appropriate because it would cause the debtor to be
undervalued. Id. at 66. Accordingly, it held that the debtor's
numerous downward adjustments were inappropriate. Id. at 68.

In this case, both parties argue that the opposing valuation
does not comply with Exide. The Equity Committee asserts that
the EB/SSG valuation subjectively rejected the results of several
traditional valuation methodologies. It asserts that the focus
by EB/SSG on what a buyer would pay for the Debtors unfairly
depressed the value because the Debtors are currently in
bankruptcy. In contrast, the Trustee asserts that the Deloitte

32