valuation does not comply with <u>Exide</u> because Deloitte rejected management's projections and adjusted the Debtors' projected growth rate upward, thereby achieving an artificially inflated value before it applied the traditional valuation methodologies.

We conclude that the Equity Committee's reliance on <u>Exide</u> is misplaced. The <u>Exide</u> Court did not depart from established Third Circuit precedent that valuations must be analyzed in a realistic framework assuming a willing seller and a willing buyer. <u>Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)</u>, 134 F.3d 188, 193-94 (3d Cir. 1998). Here, the evidence did not establish that EB/SSG departed from the three traditional valuation methodologies in an attempt to artificially reduce the Debtors' value. The evidence simply shows that EB/SSG utilized management's conservative projections in a straight-forward application of those methodologies.

The Equity Committee's assertions that management's projections are flawed because they are inconsistent with historical and industry experience is inaccurate. We accept as credible the testimony of the Debtors' representatives who described in detail the process of preparing and vetting the projections. Although there were minor computational errors, the overall product was reasonable and should not have been discarded whole cloth by the Equity Committee's expert. Further, the use of the EB/SSG "upside projections" by Deloitte was inappropriate.

33

Those projections were a sales piece prepared by EB/SSG at a time when the Trustee was contemplating a sale of the Debtors. No buyer would have relied upon them as an indication of the Debtor's value, nor should we.

We also disagree with the Equity Committee's assertion that valuation experts must include every possible valuation result. While the Court in Exide discredited the numerous subjective modifications to the valuation results made by the debtor's expert, the Court did not hold that a valuation expert must include unreasonable valuation results. Exide, 303 B.R. at 64. Instead, the Court rejected those results that strayed too far from generally accepted valuation methods. Id. After our review of the evidence, we cannot conclude that EB/SSG strayed from generally accepted valuation methodologies. While we agree that their numerical inputs (management's projections) may have been conservative, the evidence does not establish that EB/SSG made inappropriate downward adjustments. See id. at 66. Accordingly, we do not find that the EB/SSG valuation is improper.

In contrast, we conclude that the Deloitte valuation is inconsistent with Exide because of Deloitte's numerous adjustments. Deloitte made many subjective adjustments to management's projections, growth rate, and its EBITDA. Deloitte also selected earnings multiples and comparable companies that would produce higher valuation figures. Specifically, Deloitte's

34

valuation was largely premised on its assumption that the Debtors were comparable to specialty pharmacy companies. In fact, we find that the Debtors' business operations are very different, relying heavily on services provided by nurses. Given the chronic nursing shortage, the Debtors have increased costs which specialty pharmacy companies do not have. Further, given price pressures in, and the mature nature of, the Debtors' industry, we conclude that Deloitte's assumed growth rate of the Debtors was unrealistic. Although Deloitte did apply the three traditional valuation methodologies, we find that it made the type of adjustments which the Exide Court criticized. That is, Deloitte took aggressive and optimistic views regarding the valuation and strength of the Debtors. Therefore, we do not find that the Deloitte valuation is an accurate reflection of the Debtors' value. Rather we accept the Debtors' valuation, $220 million, as the proper value of the Debtors as going concerns.

b.    Confirmation Value

The Equity Committee also argues that a proper valuation must include all elements of value available to the estate at the time of confirmation of the plan. Accordingly, the Deloitte valuation added to the going concern value of the Debtors the value of cash on hand, net operating losses ("NOLs"), goodwill amortization, and litigation claims. Although the Trustee recognizes that these additional assets exist, he argues that

35

Deloitte should not have included them in its valuation because a
purchaser would not pay for them.  Even if these assets should be
considered, the Trustee argues that Deloitte improperly inflated
their worth.

We agree with the Equity Committee that the valuation of the
Debtors for purposes of confirmation must include all assets,
even those a buyer may not value.  See, In re New York, New Haven
& Hartford R.R. Co., 4 B.R. 758, 772-73, 790-96 (D. Conn. 1980)
(a proper confirmation valuation needs to take into account all
elements of value available to a debtor); 7 Collier on
Bankruptcy, ¶ 1129.06[2][a] (15th ed. rev. 2003).  Under the
Trustee's Plan, the Debtors are not being sold to an outside
buyer.  Instead, the Noteholders are acquiring the Debtors.
Therefore, we must determine what assets the Noteholders are
acquiring and what their value is to the Noteholders.

However, contrary to the Equity Committee's suggestion, we
conclude that the valuation should not include the estate's
litigation claims against PriceWaterhouseCoopers, Crowley, and
the other directors, because the Trustee's Plan specifically
provides that these assets will be distributed under the plan to
the shareholders, after the unsecured creditors have received
post-petition interest (at the federal judgment rate) on their
claims.  Since these "assets" are not being retained by the
Reorganized Debtors (or the Noteholders) it is improper to

36

account for them in the valuation.

We also find that Deloitte improperly considered the value of Coram's goodwill amortization. Goodwill amortization is an intangible asset. It is part of what a buyer purchases when it buys a company as a going concern (as opposed to simply buying hard assets). Therefore, the determination of the going concern value already includes this asset. Consequently, we decline to add goodwill amortization to the Debtors' going concern value, because doing so would double count that asset.

However, we conclude that Deloitte properly included the NOLs since their value is preserved for Reorganized Coram (and the Noteholders) under the Trustee's Plan. NOLs are often lost when a company is sold, because there is a change of ownership of more than 50%. See 26 U.S.C. § 172 (2002). The Internal Revenue Code has an exception, however, which allows the preservation of NOLs where ownership is transferred to creditors under a chapter 11 plan. Id. at § 382. Therefore, although the NOLs have no value to an outside buyer, we agree with the Equity Committee that they should be considered here because the Trustee's Plan contemplates their preservation for the benefit of Reorganized Coram (and the Noteholders). See, New York, New Haven & Hartford R.R., 4 B.R. at 772-73. In fact, NOLs can be a reorganized debtor's largest asset. See Chaim J. Fortgang & Thomas M. Mayer, Valuation in Bankruptcy, 32 UCLA L. Rev. 1061, 1129-30 (1985).

37

Nonetheless, we do not agree with Deloitte's position that the NOLs are worth $32.9 million. Scott Moeller ("Moeller"), Coram's Director of Taxation, testified that if the IRS challenged the Debtors' position, the NOLs would likely retain no value. (11/20/03 Moeller at 55.) Moeller testified that the Debtors' NOLs arose from the realization of losses on a consolidated basis. Moeller also admitted that while in bankruptcy the Debtors canceled debt. (Id. at 48). While the cancellation of debt in bankruptcy is not included in taxable income, the company must reduce certain tax attributes by the amount of the cancelled debt. (Id.) The Debtors took the position that the cancellation of debt exclusion should be done on a separate entity basis rather than on a consolidated basis, thereby reducing the NOLs by only $8 million. (Id. at 48-49.)

Moeller testified that the IRS could argue that the Debtors may not take such inconsistent positions. If the Debtors were required to treat the reduction of debt on a consolidated basis, much of the NOLs would be lost. Moeller testified that the IRS position is strengthened by the Supreme Court ruling in United Dominion Indus., Inc. v. United States, 532 U.S. 822, 834-35 (2001) (concluding that consolidation of NOLs was the only proper method for an affiliated group of corporations). Accordingly, Moeller testified that there is a high likelihood that the IRS could successfully challenge the Debtors' tax positions, thereby

38

limiting their use of the NOLs.  The Trustee asserts that the Equity Committee's feasibility expert admitted the likelihood of a successful IRS challenge.

Recognizing that there is a level of risk associated with the NOLs, we conclude that it is proper to value them in accordance with the testimony of Patrick Hurst ("Hurst"), the Noteholders' rebuttal witness.  Although Hurst testified that the NOLs should not be utilized because no buyer would pay for them, he opined that the risk adjusted present value is approximately $10 million.  We conclude that $10 million is a fair valuation of the Debtors' NOLs, which should be added to the value of the Debtors being retained by the Noteholders.

The Equity Committee also argues that the Debtors' cash on hand adds value to the company (and the Noteholders).  EB/SSG testified that this cash would not be available to a buyer, because it would be used to pay down claims.  However, it is not proper for the Trustee to discount the cash on hand without similarly discounting the amount of claims against the estate. Therefore, we conclude that the value of the Debtors must include $31.2 million (the $41.2 million cash on hand minus the $10 million in operating capital on which the valuation of the Debtors as a going concern was premised).

Finally, the Equity Committee asserts that the claims against the Noteholders (which are being released as a result of

39

the Noteholders Settlement) are valuable assets of the estate that must be considered in determining what the Noteholders are receiving under this Plan. The Equity Committee asserts that those claims have a value in excess of $1 billion because of the fact that damages are trebled in RICO cases. As noted above, the Trustee and Noteholders contested both the validity of the RICO claims and the calculation of damages by the Equity Committee.

We agree with the Trustee and the Noteholders that the Equity Committee's damage expert was not credible. We cannot conclude that, simply because the Debtors did not perform as well as its peers in the industry, they were damaged by the Noteholders' actions. Nor can we conclude that, if the Debtors were damaged by the Noteholders, its damages are determined by comparing its performance to those of its peers. Many other factors can account for the Debtors' poor performance.

In the absence of credible proof of damages by the Equity Committee, we are left with the value that the Trustee and Noteholders have put on the claims: the $56 million that the Noteholders will pay to get a release of those claims. We recognize, of course, that $56 million is being contributed by the Noteholders for more than the releases (for 100% of the equity of Reorganized Coram for instance). However, based on the evidence presented, we can safely conclude that the value of those claims is no more than $56 million.

40

After considering the competing valuations, the competing incentives of the parties, and the divergent evidence offered in support of the valuations we conclude that the value of the Debtors is less than $317 million.[11]

        3.    Amount of Noteholders' Claims

To determine whether the Noteholders are receiving more than their allowed claims, we must determine the correct amount of their claims. The Equity Committee asserts that we should allow the Noteholders' claims only at the amount as of the Petition Date (approximately $252 million). In contrast, the Trustee and the Noteholders assert that those claims and entitled to post-petition interest at the contract rate (currently the default rate of 15%) and, therefore, total at least $343 million. The Equity Committee argues that no post-petition interest should be allowed. Alternatively, if we determine that interest is due, the Equity Committee insists that it be at the federal judgment rate rather than the contract rate.

        a.    Allowance of Post-Petition Interest

The Trustee and the Noteholders argue that the Noteholders

---

[11] This figure is calculated by adding the going concern value of $220 million determined by EB/SSG, the $31.2 million in cash on hand, the $10 million in present value of the NOLs, and the value of the claims being released (less than $56 million). This figure fits within the range of valuations (from $150 to $376 million) done over the years by the various experts retained by the Noteholders, the Debtors, the Trustee and the Equity Committee. (See Exh. T-14, Cerb-13.)

are entitled to post-petition interest pursuant to section 1129(b)(2). That section requires that creditors receive payment of their claims in order of priority and in full before lesser claims or interests share in the assets of the reorganized debtor. See, e.g., In re Dow Corning Corp., 244 B.R. 678, 689 (Bankr. E.D. Mich. 1999)(Dow II) (recognizing that creditors must receive payment in their established order of priority in full before lesser interests may share in the assets of the reorganized entity). This requirement is commonly referred to as the "absolute priority rule." The Noteholders and the Trustee assert that providing a distribution to shareholders before the Noteholders receive post-petition interest violates the requirements of the absolute priority rule.

The Equity Committee asserts that denying post-petition interest to the Noteholders does not offend the absolute priority rule because that rule requires only that senior creditors receive payment of the allowed amount of their claims and that a claim does not include unmatured interest. 11 U.S.C. § 502(b)(2).[12] Therefore, the Equity Committee argues that the absolute priority rule is not offended if the Noteholders receive

_____

[12]  Section 502(b)(2) states that: "the court . . . shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount, except to the extent that . . . (2) such claim is for unmatured interest." 11 U.S.C. § 502(b)(2).

only the full value of their claims as of the Petition Date.

We disagree with the Equity Committee's arguments.  While
section 502(b)(2) provides that an allowed claim does not include
interest unmatured as of the petition date, it does not prohibit
the award of interest to creditors in all circumstances.  See,
e.g., Dow II, 244 B.R. at 691.

For instance, where there is an allowed claim, secured by
property which is worth more than the value of the claim, the
secured claimant is entitled to post-petition interest on the
claim.  11 U.S.C. § 506(b); United Sav. Ass'n of Texas v. Timbers
of Inwood Forest Assocs., Ltd., 484 U.S. 365, 372 (1988) (noting
that over-secured claimants are entitled to interest on their
claims).

Further, in a chapter 7 liquidation case, where a debtor is
solvent, a creditor is entitled to receive, as a fifth priority
claim, post-petition interest.  See 11 U.S.C. § 726(a)(5); Onink
v. Cardelucci (In re Cardelucci), 285 F.3d 1231, 1234 (9th Cir.
2002); Dow II, 244 B.R. at 691.  Creditors must receive at least
as much under a chapter 11 plan of reorganization as they would
in a liquidation under chapter 7.  11 U.S.C. § 1129(a)(7).

Additionally, section 1124 contemplates that creditors may
be paid interest when they are treated as unimpaired under a plan
of reorganization.  11 U.S.C. § 1124(1) (to be unimpaired a plan
must not alter a creditor's legal, equitable or contractual

43

rights).  <u>See also</u> <u>Solow v. PPI Enters. (U.S.), Inc. (In re PPI
Enters. (U.S.), Inc.)</u>, 324 F.3d 197, 206 (3d Cir. 2003)
(explaining that in 1994 Congress amended section 1124 to
overrule authority which had deprived unimpaired creditors of
post-petition interest from solvent debtors);  <u>Dow II</u>, 244 B.R.
at 686 (holding that "a creditor's contractual right to interest
retains validity during the pendency of chapter 11
reorganization.").

Consequently, we conclude that payment of post-petition
interest before any distribution to equity holders in a chapter
11 case is not prohibited by the Code and, in fact, may be
required.  <u>See, e.g.</u>, <u>Groundhog, Inc. v. San Joaquin Estates,
Inc. (In re Joaquin Estates, Inc.)</u>, 64 B.R. 534, 536 (B.A.P. 9th
Cir. 1986) (bankruptcy court abused its discretion in denying
post-petition interest to unsecured creditor of solvent debtor in
chapter 11 since interest would be paid under § 726); <u>In re
Gaines</u>, 178 B.R. 101, 103 (Bankr. W.D. Va. 1995) (interest must
be paid to unsecured creditors under chapter 11 plan if debtor is
solvent).

The Equity Committee asserts, however, that approving post-
petition interest on the Noteholders' claims would not be fair
and equitable.  The Equity Committee contends that denying post-
petition interest to the Noteholders is "fair and equitable"
because Cerberus created and continued Crowley's conflict of

44

interest.

The cases cited by the Equity Committee do not support its arguments. The Time Sales and Kingsboro Mortgage cases dealt with the effectiveness of a subordination agreement between creditors in liquidation cases under the Bankruptcy Act. In re Time Sales Fin. Corp., 491 F.2d 841, 844 (3d Cir. 1974) (finding that subordination agreement did not clearly require payment of post-petition interest to senior creditor before junior creditors could get any distribution in bankruptcy case);[13] Bankers Life Co. v. Mfrs. Hanover Trust Co. (In re Kingsboro Mortgage Corp.), 514 F.2d 400, 401 (2d Cir. 1975) (subordination agreement did not require that senior creditors receive post-petition interest before junior creditors received principal distribution in bankruptcy liquidation case).

The instant case does not involve the interpretation of a subordination agreement; instead it deals with the interpretation of the Code provisions dealing with the allowance of interest on claims and the priority of distributions to creditors and shareholders. In addition, the cases cited by the Equity Committee involved a dispute between two groups of creditors rather than the relative rights of creditors vis-a-vis

---

[13]    The Time Sales Court did not preclude the possibility that the senior creditor could get paid post-petition interest if the subordination agreement stated that clearly. 491 F.2d at 845.

shareholders.  Further, those cases were decided under the
Bankruptcy Act rather than the Bankruptcy Code.  Therefore, we
conclude that the cases cited by the Equity Committee are
inapposite.

The cases cited by the Trustee and the Noteholders are on
point and do support a finding that in certain circumstances an
award of post-petition interest may be made to creditors under a
chapter 11 reorganization plan before a distribution is made to
shareholders.  See, e.g., Cardelucci, 285 F.3d at 1234 (holding
that when a debtor is solvent, the creditors are entitled to
receive post-petition interest at the legal rate under a chapter
11 plan of reorganization); Dow II, 244 B.R. at 692 (holding
that when a debtor is solvent, the creditors are entitled to
receive post-petition interest at the contract rate under a
chapter 11 plan of reorganization).

However, The Trustee's liquidation analysis (which the
Equity Committee does not dispute) demonstrates that the Debtors'
liquidation value (approximately $134 million) does not exceed
the amount of its outstanding debt (at least $300 million).  In
this case, though, it is relevant to compare the amount of debt
to the confirmation value ($317 million) because the Debtors are
reorganizing instead of liquidating.  Under that scenario the
Debtors are solvent, and post-petition interest should be paid
before shareholders get a distribution.  Cardelucci, 285 F.3d at

46

1234; <u>Dow II</u>, 244 B.R. at 686.  <u>See also</u>, <u>Liberty Nat'l Enters.</u>
<u>v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)</u>,
115 F.3d 650, 654 (9th Cir. 1997) (holding that "the Plan
violated the general absolute priority rule provided in the Code
because it does not pay interest on Liberty's unsecured claim.").

Thus, we conclude that the Noteholders are entitled to post-
petition interest on their unsecured claims.

> b.    <u>Rate of Post-Petition Interest</u>

If post-petition interest is appropriate at all, the Equity
Committee argues that it should accrue at the federal judgment
rate.  28 U.S.C. § 1961(a).[14]  <u>See, e.g.</u>, <u>Cardelucci</u>, 285 F.3d
at 1234 (interest may be paid at the federal judgment rate only).

The Equity Committee asserts that paying a creditor post-
petition interest at its contract rate eliminates any incentive
that the creditor would have to negotiate in good faith so that
the case can be concluded expeditiously.  In this case, in
particular, the Equity Committee urges that paying the contract
rate of interest is inequitable since the Noteholders are

_____

[14]  Section 1961 of title 28 provides that: "Interest shall
be allowed on any money judgment in a civil case recovered in a
district court. . . .  Such interest shall be calculated from the
date of the entry of the judgment, at a rate equal to the weekly
average 1-year constant maturity Treasury yield. . . ."  28
U.S.C. § 1961.  Section 1961 is applicable to bankruptcy courts
as well as district courts.  <u>See</u> <u>In re Dow Corning Corp.</u>, 237
B.R. 380, 386 (Bankr. E.D. Mich. 1999) (<u>Dow I</u>) (citing <u>In re</u>
<u>Goldblatt Bros., Inc.</u>, 61 B.R. 459, 466 n.4 (Bankr. N.D. Ill.
1986)).

responsible for the delay in achieving a reorganization because
of their relationship with Crowley.

Section 1129(a)(7) requires a plan of reorganization to
provide non-consenting impaired creditors with at least as much
as they would receive if the debtor was liquidated in chapter 7.
11 U.S.C. § 1129(a)(7). As noted above, in a chapter 7
liquidation case, where the debtor is solvent, a creditor must
receive post-petition interest on its claim before shareholders
receive any distribution. 11 U.S.C. § 726(a)(5).

Section 726(a)(5) provides that a creditor must receive
post-petition "interest at the legal rate." However, neither the
Code nor its legislative history provides a definition of what
that interest rate is. Most courts, however, conclude that term
means the federal judgment rate. See, e.g., Cardelucci, 285 F.3d
at 1234; In re Dow Corning Corp., 237 B.R. 380, 387 (Bankr. E.D.
Mich. 1999) ("Dow I"); In re Melenyzer, 143 B.R. 829, 832-33
(Bankr W.D. Tex. 1992).

Those courts reason that the purpose of post-petition
interest is to compensate creditors for the delay between the
petition date and the time of payment. Cardelucci, 285 F.3d at
1235; Dow I, 237 B.R. at 405. This is the same purpose served by
post-judgment interest. Cardelucci, 285 F.3d at 1235; Dow I, 237
B.R. at 405-6. Because an allowed claim is the equivalent of a
money judgment, these courts conclude that the federal judgment

48

rate is the appropriate federal statutory rate of interest to be applied for post-petition interest.  <u>Cardelucci</u>, 285 F.3d at 1235; <u>Dow I</u>, 237 B.R. at 391, 406.

The Equity Committee suggests that our analysis end at this point and, if we conclude that the Noteholders are entitled to post-petition interest, that it be allowed only at the federal judgment rate.  However, we are not convinced that Congress intended to supplant a party's contractual right to interest in all circumstances under chapter 11.  <u>See</u> <u>Dow II</u>, 244 B.R. at 686 (holding that section 726(a) is applicable to chapter 11 cases through section 1129(a)(7) and merely sets the minimum that creditors must receive); <u>In re Schoeneberg</u>, 156 B.R. 963, 969 (Bankr. W.D. Tex 1993) (holding that the best interest test in section 1129(a)(7) requires that a creditor receive post-petition interest at the contract rate pursuant to section 726(a)(5)).

Thus, we are not persuaded by the Equity Committee that section 1129(b) <u>requires</u> the use of the federal judgment rate for post-petition interest to be paid under a chapter 11 plan of reorganization.  Instead, we conclude that the specific facts of each case will determine what rate of interest is "fair and equitable".  <u>Dow II</u>, 244 B.R. at 692 (holding that amount of interest which should be paid to creditors in chapter 11 case is within the court's discretion).

In making that determination in this case, we conclude that

49

the actions of Cerberus and the other Noteholders are relevant. As we recognized at the conclusion of the first confirmation hearing, Crowley's consultation agreement with Cerberus created an actual conflict of interest that tainted the Debtors' restructuring of its debt, the Debtors' negotiation of a plan, and the Debtors' ultimate emergence from bankruptcy. The delay (and the additional expenses incurred by the Debtors inherent in that delay[15]) is largely attributable to that conflict. It would be grossly unfair to pay the Noteholders default interest during that delay.

Further, Goldin determined that Crowley did advance the interests of Cerberus (and the other Noteholders) by causing the Debtors to pay them $6.3 million in cash (instead of additional notes) at a time when the Debtors' cash was low and a bankruptcy filing was under active consideration. Further, despite our conclusion at the first confirmation hearing and the Goldin report, the conflict of interest did not cease. In fact, Crowley continued to receive almost $1 million a year from Cerberus, while serving as the Debtors' CEO and President. In re Coram Healthcare Corp., 271 B.R. 228, 235 (Bankr. D. Del. 2001). Under his agreement with Cerberus, Crowley was required to obey its

---

[15] Goldin estimated that the conflict of interest caused damages to the Debtors at least in the amount of additional professional fees ($5 to $6 million) and possible business losses ($7 to $9 million) resulting from the inability to confirm the Debtors' First Plan.

instructions or risk the termination of his agreement.  Id.  At
the conclusion of the second confirmation hearing, we held that
Crowley should have been excluded from every decision that could
have affected Cerberus' interests.  Id. at 240.

As a result of these peculiar facts, we conclude that
allowing the Noteholders to accrue post-petition interest at
their contractual default rate would not be fair and equitable.
Certainly the actions of Cerberus warrant this conclusion.  Even
if the other Noteholders were not involved in the actual conflict
of interest by Crowley, however, we conclude that they also
should not get the contractual default rate of interest for the
post-petition period.  All the Noteholders received the benefit
of the $6 million in cash (as opposed to notes) paid by the
Debtors at Crowley's direction immediately before the bankruptcy
case was filed.  To the extent Crowley acted to advance Cerberus'
interests in this case, he necessarily advanced the interests of
the Noteholders.  Further, the Noteholders have consistently
acted as a group in this case in advancing their interests and
opposing the Equity Committee.  Consequently, we do not feel
compelled by the equities to pay them a default rate (15%) or
their contract rate (9%) of interest while the Debtors were in
bankruptcy.  Therefore, we conclude that the federal judgment
rate is fair and equitable.

Allowing the Noteholders' claims (with interest at the

51

federal judgment rate) results in a claim of approximately $262
million.  All other outstanding claims against the Debtors total
approximately $49 million.  (Exh T-8.)  Therefore total claims
are approximately $311 million.  The value of the Debtors is less
than $317 million.  Consequently, the shareholders' equity
totals no more than $6 million.  Since the Trustee's Plan
provides a greater distribution to shareholders (at least $40
million), we find that the Noteholders are not receiving more
under that Plan than the allowed amount of their claims.

Accordingly, we conclude that the Trustee's Plan (so long as
the releases are modified as detailed above) is fair and
equitable and complies with section 1129(a) and (b).

B.    Confirmability of the Equity Committee's Plan

The Trustee and the Noteholders argue that the Equity
Committee's Plan is not confirmable because it fails to meet
several of the requirements of the Code.  The Trustee and the
Noteholders initially object to the Equity Committee's Plan
because they assert that no impaired class of creditors voted to
accept that Plan.  11 U.S.C. § 1129(a)(10) (court shall confirm a
plan of reorganization only if there is at least one impaired
class that votes to accept the plan).

From the Report of Plan Voting filed on June 11, 2004, it is
clear that no class of impaired creditors in the Coram case
accepted the Equity Committee's Plan.  However, that Report

52

states that in the CHC case,[16] class CHC 3 did accept the Equity
Committee's Plan by 77.1% in amount and 59.5% in number.  See 11
U.S.C. § 1126(c) (a class of claims has accepted a plan if at
least two thirds in amount and one half in number of claims
voting on the plan have accepted it).

    1.   Classification of Claims

    The Trustee and the Noteholders assert that, although class
CHC 3 did appear to accept the Equity Committee's Plan, that
class was improperly constituted.  The Trustee argues that
instead of one class of unsecured creditors, the Equity
Committee's Plan improperly classifies unsecured claims in three
classes: the R-Net claim, the Noteholders' claims and the general
unsecured claims.  See, e.g., FGH Realty Credit Corp. v. Newark
Airport/Hotel Ltd. P'ship, 155 B.R. 93, 99 (D.N.J. 1993)
("Unsecured claims will, generally speaking, comprise one class,
whether trade, tort, publicly held debt or a deficiency of a
secured creditor [because] they are claimants of equal rank
entitled to share pro rata in values remaining after payment of
secured and priority claims." )(quoting In re 266 Washington
Assocs., 141 B.R. 275, 282 (Bankr. E.D.N.Y. 1992)).

    We disagree with the Trustee's argument that separate
classification of unsecured claims is per se improper.  Section

---

[16]  Unlike the Trustee's Plan, the Equity Committee's Plan
separately classified the Coram and CHC creditors.

53

1122 of the Code provides that claims that are not "substantially similar" may not be placed in the same class; it does not expressly prohibit placing "substantially similar" claims in separate classes.  11 U.S.C. § 1122(a).  In fact, the Third Circuit has approved separate classification of unsecured claims. In re Jersey City Med. Ctr., 817 F.2d 1055, 1061 (3d Cir. 1987) (approving classification of general unsecured creditors into different classes: doctors' indemnification claims, medical malpractice claims, employee benefit claims and trade claims). See also, Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.), 800 F.2d 581, 587 (6th Cir. 1986); Barnes v. Whelan, 689 F.2d 193, 200-01 (D.C. Cir. 1982); In re LeBlanc, 622 F.2d 872, 879 (5th Cir. 1980).

The Trustee and the Noteholders argue, nonetheless, that the classification in the Equity Committee's Plan is improper because it is used solely to create an accepting impaired class.  They assert that the Equity Committee gerrymanders the votes by separately classifying the unsecured creditors, because this is the only way  it can obtain an accepting class of impaired creditors.  They argue that, if the Equity Committee's Plan properly classified the unsecured creditors in one class, it would not have an accepting class of impaired creditors.

The Equity Committee responds that the separate classification of unsecured claims is permissible because it is

54

rational and is not designed to gerrymander the votes.  The
Equity Committee contends that allowing the votes of the trade
creditors to be dominated by the Noteholders' opposition to the
Equity Committee's Plan would be improper.

Even though similar claims may be placed in separate
classes, plan proponents cannot do so when it would be
unreasonable.  The Third Circuit has held that "it seems clear
that the Code was not meant to allow a [plan proponent] complete
freedom to place substantially similar claims in separate
classes."  John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park
Assocs. (In re Route 37 Bus. Park Assocs.), 987 F.2d 154, 158 (3d
Cir. 1993).  If a plan proponent could separately classify
substantially similar claims at its discretion, it could
construct a classification scheme designed to secure approval
through arbitrary classes.  Id.  This would effectively eliminate
the requirement of plan acceptance by creditors.  Id.
Accordingly, the Third Circuit found that "the classification of
claims or interests must be reasonable."  Id. (quoting Jersey
City Medical, 817 F.2d at 1061).

Where the sole purpose and effect of creating multiple
classes is to mold the outcome of the voting to effectuate a
"cram down," each class must represent a voting interest that is
sufficiently distinct and weighty to merit a separate voice in
determining whether the proposed reorganization should proceed.

55

<u>John Hancock</u>, 987 F.2d at 159.  <u>See also</u>, <u>Phoenix Mutual Life</u>
<u>Ins. Co. v. Greystone III Joint Venture (In re Greystone III</u>
<u>Joint Venture)</u>, 995 F.2d 1274, 1279 (5th Cir. 1991) ("thou shalt
not classify similar claims differently in order to gerrymander
an affirmative vote on a reorganization plan").

A proper determination of whether claims are "substantially
similar" focuses on the nature of the claims.  <u>In re FF Holdings</u>
<u>Corp. & Farm Fresh, Inc.</u>, 1998 U.S. Dist. LEXIS 10741 *13 (D.
Del. Feb. 17, 1998).  The "primary analysis centers upon the
legal attributes of the claims and not upon the status or
circumstances of the claimant.  Emphasis is not upon the holder
so much as it is upon that which is held."  <u>Id.</u> (quoting <u>In re</u>
<u>Northeast Dairy Coop. Fed'n, Inc.</u>, 73 B.R. 239, 250 (Bankr.
N.D.N.Y. 1987)).

Currently, the Noteholders,[17] R-Net and the trade creditors
hold general unsecured claims against the Debtors' estate with
the same priority.  The R-Net claims arose from services provided
by R-Net to Coram in connection with an agreement with Aetna U.S.
Healthcare.  They are substantially similar to those of the
general unsecured creditors in legal attributes and priority
status.  The Noteholders' claims, however, arose from the

---

[17]  Although the Noteholders converted much of their
unsecured claims to preferred stock so that the Debtors complied
with Stark II, the terms of that conversion required that their
claims be treated as general unsecured claims for purposes of
confirmation of the plan.

o

purchase of notes, not the provision of services to the Debtors.

The Equity Committee argues that the separate classification
of R-Net is proper because it does not provide any ongoing
services to the Debtors, while the trade creditors currently are,
and will in the future be, providing services to Reorganized
Coram.  Numerous courts have held that separate classification
and treatment of trade claims is acceptable if the separate
classification is justified because they are essential to a
reorganized debtor's ongoing business.  See, e.g., FF Holdings,
1998 U.S. Dist. LEXIS at *16; In re Richard Buick, Inc., 126 B.R.
840, 852 (Bankr. E.D. Pa. 1991).

However, we do not agree that the asserted justification is
convincing in this case.  If the continued support of the
Debtors' reorganization by the trade creditors was so important
to justify their separate classification, the Equity Committee's
Plan would provide them with more favorable treatment.  Instead,
the Equity Committee's Plan proposes to treat trade creditors
less generously than it treats R-Net.

Finally, the Equity Committee argues that separately
classifying R-Net's claims is proper because, as an insider
creditor, it was in a superior position to evaluate the risks of
dealing with the Debtors.  However, a proper determination of
what claims are "substantially similar" focuses on the legal
attributes of the claims, not who holds them.  FF Holdings, 1998

57

U.S. Dist. LEXIS 1074 *13. The legal attributes of R-Net's general unsecured claim are no different from the legal attributes of the trade creditors' general unsecured claim. Thus, separately classifying R-Net because it is an insider is not appropriate, especially since R-Net is given more favorable treatment.[18]

We conclude that, based on applicable Third Circuit precedent, the separate classification of R-Net is improper. See John Hancock, 987 F.2d at 157. Therefore, R-Net's claims must be included in the same class as the trade creditors. However, that has no effect on the vote of class CHC 3 to accept the Equity Committee's Plan. The class CHC 3 creditors would still have accepted the Equity Committee's Plan by 71% in amount and 58% in number (as opposed to 71% in amount and 59.5% in number under the current classification). (See Report of Plan Voting filed on June 11, 2004.)

The Trustee and the Noteholders also argue that the Noteholders' claims should be included in the same class as the general unsecured creditors and R-Net in the Equity Committee's

---

[18] One might argue that R-Net's votes should not be considered because it is an insider. However, section 1129(a)(10) provides that courts should not consider "any acceptance of the plan by an insider" in determining whether there is an accepting class of creditors. 11 U.S.C. § 1129(a)(10) (emphasis added). The votes of an insider rejecting a plan are not excluded under that section. See In re United Marine, Inc., 197 B.R. 942, 946 (Bankr. S.D. Fla. 1996).

58

Plan.  The Equity Committee argues that the Noteholders' claims
should remain separately classified.  It argues that those claims
arose from the purchase of notes, not the provision of services.
Therefore, the Noteholders' claims are not similar to the other
general unsecured claims because they did not provide services to
them and clearly will not be providing future services to
Reorganized Coram.  In addition, the Equity Committee argues that
the inequitable conduct of the Noteholders mandates their
separate treatment because the Noteholders should not be
permitted to control the vote of the unsecured creditor class.
We reject this argument, however, because classification of
claims should not be permitted solely on the basis of how the
plan proponent thinks the creditor will vote.  That is
gerrymandering.

However, we also reject the argument of the Trustee and the
Noteholders that the Code mandates that the Noteholders be placed
in the general unsecured creditor class.  The Trustee's Plan,
which the Noteholders support, classifies (and treats) the
Noteholders separately from the general unsecured claims.  Thus,
it is disingenuous for the Trustee to assert that the separate
classification of those claims in the Equity Committee's Plan is
improper.  Further, we are convinced that the Noteholders do
represent a voting interest that is sufficiently distinct from
the trade creditors to merit a separate voice in this

59

reorganization case.  See, e.g., John Hancock, 987 F.2d at 159.

Accordingly, we conclude that the Equity Committee's Plan does not properly classify R-Net's claim, but this has no effect on the voting.  Further, we conclude that the separate classification of the Noteholders was reasonable.

### 2.  Impairment

The Trustee and the Noteholders also argue that the Equity Committee's Plan is not confirmable because it lacks an accepting vote from an "impaired" class of creditors.  Section 1124 provides that a claim is impaired under a plan if the plan alters the legal, equitable, or contractual rights of the claimant.  See 11 U.S.C. § 1124(a)(1).  That is, if the proposed plan of reorganization does not leave the creditor's rights entirely unaltered, the creditor's claim is impaired.  PPI Enters., 324 F.3d at 202.

The Equity Committee's Plan classifies the unsecured creditors' claims as impaired because, the Equity Committee asserts, its Plan alters the rights of creditors by providing them with post-petition interest at the federal judgment rate. We disagree.  The Equity Committee's Plan provides that the creditors will get paid in cash the allowed amount of their claims plus Full Interest, which is defined as "the federal judgment rate (28 U.S.C. § 1961) or at such other interest rate as is determined by the Court at the Confirmation Hearing, that

will cause the Plan to conform to and meet the requirements of
applicable law. . . ." (Equity Committee's Plan at 5, 14.)  The
Equity Committee's Disclosure Statement explains that "all
creditors, other than the Noteholders and Preferred Stockholders,
will be paid the full amount of their Allowed Claims in Cash
after the Equity Committee Plan is confirmed, together with
interest to the extent required by law." (Equity Committee's
Third Amended Disclosure Statement at p. 28 (emphasis added).)
Thus, the Equity Committee's Plan provides for interest to the
general unsecured creditors in class CHC 3 and C 3 at whatever
rate is determined to be the proper rate of interest due them.
The Equity Committee's Plan does not impair creditors' rights at
all.

     The Equity Committee appears to confuse "two distinct
concepts: (1) plan impairment, under which the [plan proponent]
alters the 'legal, equitable and contractual rights to which the
claim entitles the holder of such claim,' and (ii) statutory
impairment, under which the operation of a provision of the Code
alters the amount that the creditor is entitled to under
nonbankruptcy law." See PPI Enters., 324 F.3d at 203 (quoting In
re PPI Enters. (U.S.), Inc., 228 B.R. 339, 353 (Bankr. D. Del.
1998)).

     It is not the Equity Committee's Plan which limits the
rights of the class CHC 3 and C 3 creditors.  Instead, if their

rights are altered at all, it is because of the Code and
decisional law under the Code.  Accordingly, these claims are not
impaired under section 1124(1).  Consequently, we conclude that
the Equity Committee's Plan contains no impaired class which has
voted to accept the Plan.  Thus, it is not confirmable.  11
U.S.C. § 1129(a)(10).

    C.   <u>Which Plan Should Be Confirmed</u>

    Even if we were to conclude that the Equity Committee's Plan
is confirmable, we would still not confirm it over the Trustee's
Plan.  Section 1129(c) provides that "[i]f the requirements of
subsection (a) and (b) of this section are met with respect to
more than one plan, the court shall consider the preferences of
creditors and equity security holders in determining which plan
to confirm."  11 U.S.C. § 1129(c).  In this case, the preferences
of the creditors clearly favor the Trustee's Plan.  According to
the Report of Plan Voting, the creditors accepted the Trustee's
Plan by substantial margins: 100% of the Noteholders and 96.6% in
amount and 87.2% in number of the general unsecured creditors.
In contrast, the Noteholders unanimously rejected the Equity
Committee's Plan and the Coram general unsecured creditors
(including the R-Net claim) rejected the Plan by 99.9% in amount
and 37.5% in number.  The general unsecured creditors of CHC
voted in favor of the Equity Committee's Plan by a margin of
77.1% in amount and 58% in number.  Creditors were permitted to

62

express a preference on their ballots; eighteen preferred the Trustee's Plan while one Coram creditor and nine CHC creditors preferred the Equity Committee's Plan. From the vote it is clear that the creditors prefer the Trustee's Plan to the Equity Committee's Plan.

The shareholders preferred the Equity Committee's Plan, though not by overwhelming numbers. Three hundred eighty (380) shareholders voted in favor of the Trustee's Plan while four hundred fifty-six (456) voted in favor of the Equity Committee's Plan. One hundred seventy-two (172) expressed a preference for the Trustee's Plan, while two hundred sixty-eight (268) expressed a preference for the Equity Committee's Plan.

There is an additional reason to confirm the Trustee's Plan over the Equity Committee's Plan: the Trustee's Plan is more feasible. The Trustee's Plan provides for immediate payment of creditors (from cash on hand and funds contributed by the Noteholders) and the issuance of stock to the Noteholders. There is no payout over time and, therefore, no uncertainty that the Plan can be consummated.

In contrast, the Equity Committee's Plan provides for an extended period (over five years) before the Noteholders will be paid in full. Even without considering the arguments of the Noteholders and the Trustee that Reorganized Coram's operations will not be sufficient to make those payments, we can easily

63

conclude that the Equity Committee's Plan presents more uncertainty than the Trustee's Plan.

Further, under the Equity Committee's Plan, the stock in CHC will remain in the hands of the existing shareholders. Consequently, under the Equity Committee's Plan, the Reorganized Debtors will have to maintain a net equity in accordance with Stark II.  This will likely lead to the need for additional financing or reorganization.  In contrast, under the Trustee's Plan, the stock will be issued to the Noteholders.  As a privately held company, Reorganized Coram will not be required to comply with the net equity requirements of Stark II.

Consequently, we conclude that the Trustee's Plan, if modified, is preferable and should be confirmed.


IV.  CONCLUSION

For the reasons stated above, we conclude that the Equity Committee's Plan improperly classifies unsecured creditors and has not been accepted by an impaired class of claims.  Therefore, we conclude that it is not confirmable.

Although we find that providing the Noteholders with releases from third parties who have not consented to those releases is not fair and equitable and that the other release provisions of the Plan are improper, we conclude that the Trustee's Plan otherwise is confirmable.  Accordingly, we will

64

confirm the Trustee's Plan, if it is modified in accordance with this Opinion.

An appropriate order is attached.

BY THE COURT:

Dated: October 5, 2004

Mary F. Welrath
United States Bankruptcy Judge

65