# EXHIBIT A-1

AO 88 (Rev. 11/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

_____ EASTERN _____ DISTRICT OF __ PENNSYLVANIA __

ARLIN M. ADAMS, Chapter 11 Trustee of
the Post-Confirmation Bankruptcy
Estates of CORAM HEALTHCARE
CORPORATION, a Delaware Corp., et al.

**SUBPOENA IN A CIVIL CASE**

v.

DANIEL D. CROWLEY, DONALD J. AMARAL,
WILLIAM J. CASEY, L. PETER SMITH, AND
SANDRA L. SMOLEY

Case Number: [1] 04-1565 (SLR)
Pending in the U.S. District Court
for the District of Delaware

TO:  WILBUR KIPNES
     Schnader Harrison Segal & Lewis LLP
     1600 Market Street, Ste. 3600, Philadelphia, PA  19103

☐  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to
    testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in
    the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Schnader Harrison Segal & Lewis LLP<br>1600 Market Street, Ste. 3600, Philadelphia, PA  19103 | April 26, 2007<br>9:00 a.m. |

☐  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
    place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
|  |  |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Elliot Peters / signature* | 3/28/07 |

ISSUING OFFICER'S NAME ADDRESS AND TELEPHONE NUMBER

Elliot R. Peters
Keker & Van Nest LLP  710 Sansome St., San Francisco, CA  94111  (415) 391-5400

(See Rule 45, Federal Rules of Civil Procedure, parts C & D on reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

AO-88

**(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.**

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or the demanding party to contest the claim.

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

**(d) DUTIES IN RESPONDING TO SUBPOENA.**

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

Case 1:04-cv-01565-SLR Document 1 Filed 12/23/2004 Page

AO 88 (Rev. 11/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

__EASTERN__   DISTRICT OF __PENNSYLVANIA__

ARLIN M. ADAMS, Chapter 11 Trustee of
the Post-Confirmation Bankruptcy
Estates of CORAM HEALTHCARE
CORPORATION, a Delaware Corp., et al.
                                            **SUBPOENA IN A CIVIL CASE**
        v.

DANIEL D. CROWLEY, DONALD J. AMARAL,       Case Number:[1]  04-1565(SLR)
WILLIAM J. CASEY, L. PETER SMITH, AND
SANDRA L. SMOLEY                           Pending in the U.S. District Court
                                           for the District of Delaware

TO:  BARRY BRESSLER
     Schnader Harrison Segal & Lewis LLP
     1600 Market Street, Ste. 3600, Philadelphia, PA  19103

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to
    testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  |  |
|  | DATE AND TIME |
|  |  |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in
    the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Schnader Harrison Segal & Lewis LLP | April 27, 2007 |
| 1600 Market Street, Ste. 3600, Philadelphia, PA  19103 | 9:00 a.m. |

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
    place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
|  |  |
|  |  |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Elliot Peters/cy* | 3/28/07 |

ISSUING OFFICER'S NAME ADDRESS AND TELEPHONE NUMBER

Elliot R. Peters
Keker & Van Nest LLP  710 Sansome St., San Francisco, CA  94111  (415) 391-5400

(See Rule 45, Federal Rules of Civil Procedure, parts C & D on reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

AO-88

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or the demanding party to contest the claim.

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

# EXHIBIT A-2



**Dynamic
Healthcare
Solutions**

■ June 28, 1999

Mr. Stephen Feinberg
General Partner
Cerberus Partners, L.P.
450 Park Avenue, 28th Floor
New York, NY 10022

Dear Mr. Feinberg: *Steve*

Your call to me today about Coram was a really nice one to receive. My
understanding is that you have secured the CEO's support for me to serve on
Coram's Board as your representative. Your hope is that we will work with the
organization to determine the reasons that this company is not performing as well as
its peer group. Then work with the senior management to create a strategy and the
related initiatives that would change the outcomes for the better. Finally, to be
available for you should you need to replace management.

Steve, you are very important to me. As I said on our phone call, my goal is for us
to work together over the remainder of our careers, to help you take your projects
and turn a nice profit for you and to earn a fair profit for myself and my colleagues.
To this end, we are committed to making your investment in Winterland into a great
one. These past four days, myself and two of my colleagues spent between 15 and
17 hours per day re-directing the Winterland management team and focusing them
on those tasks that will specifically create significant EBIT. We are optimistic that
we can really show improvement in 1999. If it were not for some gaping holes in
management and a real mess in the production area that slows us down, I would
practically guarantee you that we could deliver a 8-10% EBIT on sales.
Nevertheless, we are on the task and working the issues for you.

You asked that I tell you what would make sense economically for me to change the
result at Coram. Presumably, I will be involved in a similar way to that which we
are at Winterland. My expectation is that I will begin working with the Coram CEO
in July; begin to create the analytics to understand the company; and begin to
change the shape of the strategy almost immediately. Following this, we will begin
to work with the organization and move the energy into those areas and ways that

**EXHIBIT**

11

2/14/07  O.P

Mr. Steve Feinberg
June 28, 1999
Page 2

will increase your returns. For this effort, I would like you to consider the same retainer we receive for Winterland ($20,000 per month for the next twelve (12) months plus out-of-pocket expenses [travel, etc.]) and five (5) percent of the net gain upon the sale of the asset if you receive a 20% annualized return, pro-rated up to eight (8) percent of your net return between 20% and 30%. This is a lower share than we are receiving for Winterland, but presumably work has already been done and a management team is already in place which will make it a bit less demanding for me. If it makes sense for you, let me know. If not, please tell me what would work for you so that we can get started.

Steve, I want you to know foremost that I genuinely am grateful for the opportunity you have provided for me. Every day I am thankful for your trust and generosity. That makes it all the more intense for me to want to do everything I can to get you the superior results you deserve. Thank you.

Sincerely,

Daniel D. Crowley
Chairman, President & CEO

# EXHIBIT A-3

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                              )
                                    )
CORAM RESOURCES NETWORK, INC.,)
and CORAM INDEPENDENT PRACTICE) Case No. 99-2889
ASSOCIATION, INC.,                  )        (MFW)
                                    )
              Debtors.              )


                          Bankruptcy Courtroom
                          No. 1, Sixth Floor
                          Marine Midland Plaza
                          824 Market Street
                          Wilmington, Delaware


                          Thursday, December 21, 2000
                          1:35 p.m.


     BEFORE:  THE HONORABLE MARY F. WALRATH,
              United States Bankruptcy Judge



              -- Transcript of Proceedings --


              WILCOX & FETZER
     1330 King Street - Wilmington Delaware  19801

                 (302) 655-0477

37

1   point with another plan or sale or some other vehicle

2   that I think there is no basis to conclude will result in

3   anything other than creditors getting less and the

4   equityholders still getting nothing.

5           So, Your Honor, if the issue is that

6   somebody did something wrong, and I'm not suggesting

7   that, and I'm certainly not endorsing that view, but if

8   that's the point, there is redress in the courts, but I

9   don't think that the answer is to put this company out of

10  business.

11          Thank you.

12          THE COURT:  Well, I'm in a difficult

13  situation.  I would like to sidestep my duties, but I

14  think I have to determine in deciding whether to confirm

15  this plan under 1129(a)(3), I must conclude that it is

16  proposed in good faith and that the plan proponents have

17  acted in good faith.  I just do not want to be in a

18  position to conclude on this record that that is so.  I

19  cannot conclude on this record that that is so.

20          I think that the contractual relationship

21  between Cerberus and the CEO, Mr. Crowley, did taint the

22  process, and I think that, if anything, the ultimate

23  fairness of the process in bankruptcy is a paramount

24  principle to be protected by the Bankruptcy Court.

1          Maybe we would be at the same place today

2   if that contractual relationship had not been there, if

3   it had been disclosed to all parties, but I don't know

4   that and I don't think anybody will know that.

5          We are at a terrible place.  The Equity

6   Committee, even on its numbers, which I agree with the

7   Creditors' Committee's counsel and their valuation expert

8   and the cross-examination of the Equity Committee expert

9   does point out the questionable nature of that valuation.

10         I think under any of the numbers the

11  company is insolvent today.  But I don't think I can

12  confirm a plan based on that fact because I think that

13  because of the process being tainted by this relationship

14  which began in November of 1999, and perhaps in August of

15  1999, has so tainted the debtors' restructuring of its

16  debt, the debtors' negotiations towards a plan, even the

17  debtors' restructuring of its operations.

18         I think on that point I think it is a shame

19  that Mr. Crowley and perhaps Cerberus and the debtor

20  itself is tainted in this manner because I think there is

21  evidence that Mr. Crowley did do a good job operationally

22  in helping the debtor turn around.  But I can't conclude

23  that the debtor might not have done even better had there

24  not been this relationship.  I don't know.  That's the

39

1  problem.  I don't know what would have happened without

2  this actual conflict of interest.  I do think it's an

3  actual conflict of interest.

4           I think that the actions of Mr. Crowley to

5  hide the relationship, and I think that EC-20 did show an

6  intent to hide the relationship and to hide his request

7  for additional compensation in Winterland in exchange for

8  his efforts here did at least evidence that he, himself,

9  believed that this relationship should not be disclosed

10  and, therefore, did, in fact, taint his ability to serve

11  as CEO of the debtor.

12          Whether it opens up a Pandora's box or

13  encourages other noteholders or other parties in future

14  bankruptcies to try the same thing, I'm not as concerned

15  about that, but I just do not want my name confirming a

16  plan where this type of activity occurred for a year

17  before the plan was proposed for confirmation.  I just

18  cannot conclude that it's proposed in good faith for

19  those reasons.

20          I do not have the ability to suggest a

21  different plan.  I do not have the ability to give an

22  exemption from Stark II.

23          So I leave it to the debtor to see where it

24  goes from here for now.  I'll look for a form of order if

30

1   someone wants to present me with one.

2                    MR. MINUTI:  We will, Your Honor.

3               THE COURT:  We'll stand adjourned.

4               MR. LEVY:  Thank you, Your Honor.

5               (The hearing was then concluded at

6   3:35 p.m.)

7                         - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

91

```
1    State of Delaware    )
                          )
2    County of New Castle )

3

4                    C E R T I F I C A T E

5

6           I, Kathleen E. White, Registered Professional
7    Reporter and Notary Public, do hereby certify that the
     foregoing record, pages 1 to 91, inclusive, is a true and
8    accurate transcript of my stenographic notes taken on
     Thursday, December 21, 2000, in the above-captioned
9    matter before the Federal Bankruptcy Court.

10          IN WITNESS WHEREOF, I have hereunto set my hand
     and seal this 24th day of December, 2000, in
11   New Castle County.

12

13                        KATHLEEN E. WHITE,
                          Notary Public-Reporter
14

15

16

17

18

19

20

21

22

23

24
```

# EXHIBIT A-4

1

1

2     IN THE UNITED STATES BANKRUPTCY COURT

3     FOR THE DISTRICT OF DELAWARE

4     ------------------------x Chapter 11

5     In re:                 ) Case Nos. 00-3299 (MFW)

6     CORAM HEALTHCARE CORP.  ) through 00-3300 (MFW)

7     and CORAM, INC.,       ) (Jointly Administered

8                  Debtors. ) Under Case No.

9     ------------------------x 00-3299 (MFW))

10                        February 27, 2003

11                        9:38 a.m.

12

13          Deposition of DANIEL D. CROWLEY, held at

14    the law offices of Weil, Gotshal & Manges LLP, 767

15    Fifth Avenue, New York, New York, pursuant to

16    notice and agreement, before Donald R. DePew, an

17    RPR, CRR and Notary Public within and for the

18    State of New York.

19

20

21

22

23

24

25

6

1  follows:
2  EXAMINATION BY
3  MR. LEVY:
4     Q.  Mr. Crowley --
5        MR. MILLER:  Richard, point of order,
6  please.
7        MR. LEVY:  Yes, sir.
8        MR. MILLER:  You said you didn't know
9  if Don Liebentritt was the chairman.  I
10  recall you telling the Court he was the
11  chairman of the committee; has there been a
12  change?
13        I'd just like to know who the client
14  is.
15        MR. LEVY:  I don't know that he is the
16  chairman and your statement doesn't refresh
17  my recollection.  I'll be happy to straighten
18  out with you whether he is the chairman or
19  not, Alan.  I'm not trying to keep it from
20  you.  I just don't know at this point.
21        MR. MILLER:  I know you wouldn't try to
22  hide anything, so thank you.
23        MR. LEVY:  You're welcome.
24  BY MR. LEVY:
25

7

1              Crowley
2     Q.  Mr. Crowley, did you spend some time
3  preparing for this deposition?
4     A.  Yes.
5     Q.  Was any of that time spent with any
6  person present, other than your attorney,
7  Mr. Ward, or your attorney, Mr. Schreiber?
8     A.  Yes.
9     Q.  Who?
10     A.  Counsel for the trustee.
11     Q.  Who?
12     A.  Principally, Mr. Kipnes.
13     Q.  How much time did you spend with
14  Mr. Kipnes preparing for this deposition?
15     A.  A couple of hours.
16     Q.  When?
17     A.  Yesterday.
18     Q.  Yesterday?
19     A.  Yes.
20     Q.  During the course of that preparation
21  did you look at any documents?
22     A.  Yes.
23     Q.  What documents did you look at?
24        MR. GODNICK:  Objection.
25        MR. MILLER:  The same stipulation?

8

1              Crowley
2        MR. LEVY:  Yes, objection by one is an
3  objection but for all.
4     Q.  What documents did you look at?
5     A.  The materials that had been provided by
6  me to respond to the subpoena by yourself.
7     Q.  About how many documents were those?
8     A.  Several.
9     Q.  Hundred?
10     A.  I don't recall.
11     Q.  Sir, we've got, I believe, 1300
12  numbered pages with the Bates symbol CRX on it,
13  meaning it had been produced by you, is that the
14  approximate number you looked at yesterday?
15     A.  No.
16     Q.  About what part of that 1300 did you
17  look at?
18     A.  25, 50, something in that neighborhood.
19     Q.  This was yesterday, right, yes?
20     A.  Yes.
21     Q.  Can you describe to me any of the
22  documents you looked at?
23        Name one.
24     A.  Correspondence between myself and my
25  attorney as to a draft letter that was part of

9

1              Crowley
2  your brief to the court.
3     Q.  The letter dated May 6th about?
4     A.  About that date.
5        It was two versions of the letter that
6  was one letter, yes.
7     Q.  During your meeting in preparation in
8  which Mr. Kipnes was present at who said let's
9  discuss this document?
10        Whose idea was it?
11     A.  My counsel.
12        MR. WARD:  Objection.
13        The attorneys have a joint interest in
14  this and I think that is covered by
15  privilege.
16     Q.  I'm sorry.
17     A.  I don't understand the procedure when
18  someone objects, am I just --
19        MR. WARD:  I think who said what to
20  whom in this meeting would be privileged.
21        Mr. Kipnes represents the trustee.
22  Mr. Crowley is an employee of the trustee.
23  And I think in this particular proceeding
24  there is a joint interest.
25        MR. LEVY:  Are you going to instruct

3 (Pages 6 to 9)

94

Crowley

1
2    A.   I don't know.  I might have.
3    Q.   Do you have any recollection of it at
4  all?
5    A.   I just said I don't know.
6    Q.   Did you tell Feinberg at this
7  meeting -- perhaps this will refresh your
8  recollection -- that David Friedman, who, of
9  course, was the debtors' attorney, did a poor job?
10   A.   I don't recall.
11       I do think he didn't do as good a job
12  as he could have.
13   Q.   Do you think he did a poor job?
14   A.   He did a lousy job.
15   Q.   Did he ask you to recite some things on
16  the witness stand?
17   A.   Mr. Levy, you're mischaracterizing a
18  draft of my --
19   Q.   I'm not mischaracterizing anything.
20       I'm asking did he, David Friedman, ask
21  you to recite anything on the witness stand?
22   A.   No.  He handed me a sheet with
23  questions and with what he thought were my
24  probable answers.  And I gave my answers in court
25  to the best of my ability, the truth and nothing

95

Crowley

1
2  but the truth.
3    Q.   Did the answers that you gave in court
4  vary from the probable answers on the sheet that
5  David Friedman gave you?
6    MR. KIPNES:  Object to the question.
7    MR. WARD:  Objection to the substance
8    of the form.
9    MR. KIPNES:  Also might be privileged.
10   Go ahead.
11   A.   Sure, they were my answers.
12   I'm my own person.  I speak what I
13  think is right.
14   Q.   Did you come away from that meeting in
15  May disappointed?
16   MR. GODNICK:  You're referring to the
17   dinner?
18   MR. LEVY:  The dinner.
19   MR. GODNICK:  Thank you.
20   MR. LEVY:  Let's clear that up.
21   Q.   You didn't have any meeting in May with
22  Feinberg other than that dinner, did you?
23   A.   I don't recall it.
24   Q.   Did you come away disappointed?
25   A.   I came away disappointed, yes.

96

Crowley

1
2    Q.   Why?
3    A.   I think I've already testified to this.
4    Q.   What disappointed you?
5    A.   I believe I've already testified to
6  this.
7    Q.   I don't believe you've answered that
8  question.  You've told me what happened.  I want
9  to know what part of that or anything else you can
10  think of that disappointed you.
11   A.   Mr. Levy, I believe I'm due a
12  substantial money sum from Cerberus for work I
13  did, unrelated to Coram, in which value was
14  created --
15       Would you like me to stop while you're
16  talking?
17       MR. BEATIE:  I think we've heard this
18   six, seven times already.
19   A.   -- I expected a proposal and a number,
20  there was none.  I was disappointed, I don't know
21  why I was asked to come to New York to hear
22  nothing.
23   Q.   Do you recall him saying to you that
24  "you kissed the wrong woman"?
25   A.   Generally.

97

Crowley

1
2    Q.   Did he say that at the May meeting?
3    A.   I don't recall when it was said.
4    Q.   What did you understand that to mean?
5    MR. WARD:  Objection, foundation.
6    How does he know?
7    Go ahead.
8    A.   I don't know anymore.  I just don't
9  know.  It's a long time ago.
10   Q.   Ten months ago, yes?
11       You don't remember?
12   A.   I think you're going to depose him.
13  Ask him.
14       I don't remember.
15   Q.   Do you know what EC 20 is, does that
16  ring a bell at all?
17   A.   Not a clue.
18   Q.   That's the personal -- memorandum of
19  personal and confidential that you sent to
20  Mr. Feinberg.  You signed it, he never signed it.
21  It was mentioned in the judge's opinion.  It
22  related to your getting an upside on Cerberus's
23  position if you did well at Coram generally.
24       Do you recall that?
25       MR. GODNICK:  I'm going to object to

25 (Pages 94 to 97)

98

Crowley

1           Crowley
2    the characterization of the document.
3        MR. KIPNES: I assume by definition
4    we're talking about a document that's before
5    December 14th of 2001, which is what I --
6        MR. MILLER: 2000, early.
7        MR. KIPNES: -- which is what I thought
8    we were here about.
9        MR. LEVY: I'm simply trying to
10   identify it, because I don't have it here.
11   Q.  Do you recall it at all?
12   A.  I'm sorry, I don't know EC 20 from
13   lunar planetary orbit -- I don't recall what
14   you're talking about.
15   Q.  Do you recall that evening in May with
16   Mr. Feinberg, telling him you didn't have to write
17   a document in which you asked for an upside on
18   Cerberus's position if you did well with Coram?
19   A.  No, I don't remember that.
20   Q.  Trustee's Exhibit 19.
21       MR. KIPNES: 19?
22       MR. LEVY: 19.
23   Q.  There's Bates numbers CRX 63, 4, and 5.
24       And I won't characterize it otherwise
25   for a moment.

99

Crowley

1           Crowley
2        MR. GODNICK: I can't hear you.
3        MR. LEVY: I said I won't characterize
4    it otherwise for the moment.
5        MR. MILLER: It's a draft letter to...
6    Q.  Do you have that in front of you?
7        MR. WARD: No, not yet.
8        I believe you've got the original.
9    Q.  Have you seen this before today?
10   A.  Yes. Counsel showed it to me in
11   preparation.
12   Q.  Did you write this?
13   A.  I wrote the first two pages.
14   Q.  Did you write the third page?
15   A.  No.
16   Q.  Do you know who wrote the third page?
17       MR. GODNICK: I can't hear you.
18   Q.  Do you know who wrote the third page?
19       MR. GODNICK: I'm sorry, Richard, you
20   asked if he wrote the third page, he said,
21   no?
22       MR. LEVY: That's correct.
23   A.  I wrote the first two pages. It's a
24   draft --
25   Q.  If you can confine yourself, please.

100

Crowley

1           Crowley
2    A.  Well, you have to put it in context.
3    This is the first draft of two drafts, which
4    you've mischaracterized and basically did not tell
5    the truth to -- in your brief, two drafts of a
6    single letter, unsent. The third attachment was
7    not written by me. I did not see it. And had no
8    awareness of it until this proceeding and counsel
9    showed it to me. And it was written by Scott
10   Schreiber, not me.
11   Q.  Do you know whose handwriting appears
12   for the word "Insert" on CRX 65?
13   A.  It's Mr. Schreiber's handwriting.
14   Q.  Did you discuss this document in your
15   preparation for your deposition yesterday?
16   A.  Yes.
17   Q.  And Mr. Kipnes was present at that
18   discussion?
19   A.  Yes.
20   Q.  What did Mr. Kipnes say about that?
21       MR. WARD: Same objection as
22   previously.
23       MR. KIPNES: Objection to the form of
24   the question.
25       Assumes facts not in evidence.

101

Crowley

1           Crowley
2        MR. GODNICK: I will make the Federal
3    Rule of Evidence 612 objection.
4        MR. LEVY: Are you going to instruct
5    him?
6        MR. WARD: As long as it is discussions
7    with counsel for the trustee for whom he is
8    an employee, and the counsel for the trustee
9    and counsel for him previously have interest,
10   it is privileged.
11       MR. LEVY: Will you join in the
12   instruction?
13       MR. KIPNES: I do, subject also to my
14   objection that the question assumed a fact
15   not in evidence.
16   Q.  During the preparation did Mr. Kipnes
17   say anything at all about this document?
18       I'm not asking you what he said. I
19   just want to know whether he said anything at all
20   about it.
21       MR. WARD: I'll let the witness answer
22   to the extent, yes or no, was there any
23   discussion with Mr. Kipnes as to the
24   document.
25       MR. KIPNES: Whoa, that's not what the

26 (Pages 98 to 101)

102

Crowley

1   question was.
2
3       MR. LEVY: I adopt the question.
4   Withdraw my question and I adopt Mr. Ward's
5   question.
6       MR. GODNICK: I need to know.
7       MR. KIPNES: Now we need Mr. Ward's
8   question.
9       MR. MILLER: Stop it, will you guys?
10  We're wasting a lot of time.
11      MR. KIPNES: I wasn't fencing.
12      The first question was did Mr. Kipnes
13  say anything. Then what Mr. Ward said was
14  there a discussion at which Mr. Kipnes was
15  present. Those are two very different
16  questions, which question are we asking.
17      MR. LEVY: I thought I was clear, we're
18  asking Mr. Ward's question first.
19      MR. GODNICK: Can you state the
20  question, because I believe you're the
21  questioner, Mr. Levy.
22  Q.   During your preparation was there a
23  discussion of this document at which Mr. Kipnes
24  was present?
25  A.   Yes.

103

Crowley

1
2   Q.   Did Mr. Kipnes say anything -- and you
3   don't have to tell me what he said -- just did
4   Mr. Kipnes say anything about this document?
5   A.   I don't recall that.
6   Q.   Was this document --
7       You know, we've been talking about it
8   being written by you, did you dictate it, did you
9   type it, did you handwrite it and have it
10  transcribed?
11      How did it come into being?
12      MR. GODNICK: We're referring now to
13  the first two pages, correct?
14      MR. LEVY: Sure.
15  A.   Again, this is -- you've only shown me
16  one document. This is draft one of two drafts.
17      MR. LEVY: Let me be clear. I'm
18  talking about only pages CRX 63 and 64.
19  A.   I understand.
20  Q.   My question is physically how did it
21  come into being, did you type it, did you dictate
22  it, did you handwrite it and have someone else
23  type it?
24  A.   I will answer that.
25      I also know you take things out of

104

Crowley

1
2   context, you do sound bites, and mischaracterize.
3       This is an unsigned draft, one of a
4   couple of -- the next letter is the same letter.
5   And you've handed me three pages. The third page
6   is -- I did not see it until this proceeding,
7   written by not me, but my attorney.
8       This letter was typed by me, period.
9   Q.   "This letter" now meaning 63 and 64?
10  A.   CRX 00063 and CRX 00064 was a draft
11  typed by me. I thought it was attorney-client
12  privilege, because I sent it only to my lawyer,
13  Scott Schreiber, and I've never seen it again.
14  Q.   Did you write it?
15      Did you type it on or about May 6th?
16  A.   I must have. I don't know.
17  Q.   Your meeting was on May 1st; is that
18  correct?
19  A.   I don't know. On and about there.
20  Q.   Between May 1st and May 6th did you
21  make any notes, write anything --
22  A.   No.
23      I'm sorry.
24  Q.   -- concerning the meeting?
25  A.   No.

105

Crowley

1
2   Q.   So five days after the meeting you sat
3   down and you typed -- it's called "draft" -- your
4   first draft or a draft of a letter to Feinberg,
5   right?
6       MR. GODNICK: Is there a basis for
7   assuming it's on May 1st?
8       I haven't heard testimony as to
9   May 1st.
10      MR. LEVY: Yes, there is. I was trying
11  to save time. I'll represent to you based on
12  e-mails that Mike was a party to, in fact.
13  A.   Mr. Levy, you said "called "draft,"
14  that's not what this is. It is a draft. It is
15  one of two drafts. You have both of them. It is
16  not called "draft," it is a draft, I typed it. I
17  didn't have any notes. And I sent it to my
18  attorney.
19  Q.   There's what looks like a rubber stamp
20  impression on the top that says "Draft" on both
21  pages.
22  A.   Right.
23  Q.   Do you see that?
24  A.   That would be the "Draft" stamp.
25  Q.   Who put it on?

27 (Pages 102 to 105)

106

Crowley

1
2    A.    I put it on.
3    Q.    What about on the right side, there's
4  something that says "Confidential," a stamp that
5  says "Confidential" on both sides?
6    A.    I put it on there.
7    Q.    You did that, too?
8    A.    Yes, sir.
9    Q.    At the bottom of the second page it
10  says "Redacted," who put that on?
11    A.    I have no idea.
12    Q.    Did you ever tell Scott, when you sent
13  it to him, for what purpose you were sending it to
14  him?
15        MR. SCHREIBER:  Objection, calls for
16  attorney-client privilege.
17        MR. LEVY:  Certainly not.
18    A.    I don't know.
19        MR. WARD:  Can I hear the question
20  again?
21        Go ahead.
22        As long as he doesn't know, let's go.
23    A.    I don't know.
24        I talk to Scott four times a day, I
25  don't know.

107

Crowley

1
2    Q.    Did you ever send drafts to Scott for
3  the purpose of finding out whether he thought, as
4  a business lawyer, that the draft would be an
5  effective way to make a point?
6        MR. WARD:  Solely or as part of legal
7  advice?
8        MR. LEVY:  Part of.
9    A.    I sent Scott who knows how many, 50
10  things, 100 things.
11        Here's what I'm thinking about, give me
12  your reaction.
13        Some fair amount of the time I don't do
14  anything with it.  I told you, I sit it on the
15  side of my desk.  The next day I'll look at it
16  again.  The next day I'll look at it again.  A
17  fair amount of the time it just goes right into
18  the circular file, trash.
19    Q.    Scott's a business lawyer, isn't he?
20    A.    Ask him.  I don't know.
21    Q.    You hired him, what's your impression,
22  he's a business lawyer?
23    A.    I think he's my bankruptcy advocate in
24  response to the attack you've put on me.
25    Q.    Have you ever asked him for his

108

Crowley

1
2  business advice?
3    A.    No.
4    Q.    Never?
5    A.    What for?
6        MR. BEATIE:  Did Mr. Zell (phonetic)
7  ask Mr. Levy for business advice?
8        Why?
9        You can't depose Mr. Zell because he's
10  not involved.
11        MR. LEVY:  Anything else you want to
12  say?
13        MR. BEATIE:  Yes.
14        MR. GODNICK:  Let's move on.
15        MR. BEATIE:  I'm not ready at the
16  moment.  I'll do them on a spontaneous basis.
17  I don't need your coaching for Christ's sake.
18  Simpleton.
19    Q.    What was your purpose of sitting down
20  and writing this when you wrote it, "this"
21  being --
22    A.    I think I was getting it off my chest.
23  You know, just --
24    Q.    What were you getting off your chest?
25    A.    Mr. Levy...

109

Crowley

1
2        I think you know that answer.  I
3  just -- I don't know why you're asking me this
4  question again and again.
5    Q.    Please answer my question, sir.
6        What were you getting off your chest?
7        MR. BEATIE:  8.  Ocho, 8.
8        If you can't do Spanish, hachi for
9  Japanese, acht...
10    A.    Did a lot for Cerberus, Kindred,
11  Hanger, Winterland, Sun, Beverly, Texas Nursing
12  Homes, Care Matrix.  I thought I was due some
13  money.  Thought I was going to get a proposal.
14  Got cold spaghetti.  Didn't get a proposal.
15        Came back.  I was emoting.  Shipped it
16  to my attorney.  Recrafted it and did nothing with
17  it.
18        You know that.
19    Q.    You read this yesterday and I'd like
20  you to look at it again today and go through it
21  carefully and tell me if there is any statement in
22  this exhibit that you believe to be untrue, as you
23  sit here today.
24        MR. WARD:  Look at it line by line.
25        (Witness looks at document.)

28 (Pages 106 to 109)

110

Crowley

1
2     MR. BEATIE: Mr. Levy, are you
3  contemplating a question or have you fallen
4  asleep?
5     MR. WARD: The witness is reading the
6  letter.
7     MR. BEATIE: Okay. Let me get a
8  clarification. This one time I'll take it
9  back.
10     MR. WARD: Counsel, you have referred
11  to this a different way. I think your
12  question is: Is anything in this letter,
13  quote, unquote, untrue. The witness has
14  testified he drafted the first two pages --
15     MR. LEVY: I'll clarify that.
16     Q.  My question relates only to the pages
17  marked CRX 63 and 64.
18     A.  Looking at this at this time, I think
19  there's a lot of drama in this.
20     MR. MILLER: A lot of --
21     THE WITNESS: -- drama.
22     MR. MILLER: Sorry.
23     A.  There's drama. It's an emotional
24  catharsis letter. It's not a business letter. It
25  wasn't intended to be so. It's more like a

111

Crowley

1
2  noontime melodrama TV show.
3     This is something that I didn't
4  carefully consider it. I just dumped down -- it's
5  an overstatement and a drama piece that went to my
6  lawyer and was recrafted by me --
7     You're not showing me that document,
8  but that wouldn't serve your purpose today.
9     Q.  Oh, it's coming.
10     A.  Oh, good.
11     Q.  You understand this, because I know,
12  because you're an intelligent man, what the word
13  "untrue" means, correct?
14     MR. GODNICK: Keep your voice up,
15  Richard. I heard the question, but...
16     Q.  Correct?
17     A.  Yes, I understand what "untrue" means.
18     Q.  Now, please listen to my question.
19  Please read this letter and tell me everything in
20  this letter that you believe -- and by "this
21  letter" I'm referring to 63 and 64 -- that you
22  believe, as you sit here today, to be untrue.
23  Let's begin, let's hear the first one.
24     MR. KIPNES: Object to the form of the
25  question.

112

Crowley

1
2     MR. WARD: We're still only discussing
3  the first two pages.
4     THE WITNESS: Just a second, please.
5  I'm capable of answering this for myself.
6     A.  One hundred percent of CRX 00065 is not
7  true.
8     Q.  I didn't ask you about that, sir. I
9  said 63 and 64.
10     A.  But I need to say it, since you put it
11  in front of me, it's just wrong. I reject it
12  today and I rejected it then, it's wrong.
13     MR. COOK: Let the witness finish his
14  question.
15     MR. LEVY: Do you want to hear the
16  question again?
17     THE WITNESS: No.
18     A.  "I have been thinking about our
19  dinner," I'm sure that's accurate.
20     "It didn't unfold as you said when you
21  insisted that I had to come to New York."
22     "No proposal" looks like it's scratched
23  out, but it is accurate.
24     The "30 months have sure been unusual
25  for me," I think that's fairly accurate.

113

Crowley

1
2     "Crystal clear that I have not done
3  anything 'wrong'." I think I believe that's
4  accurate.
5     Have I "suffered dearly"?
6     I think that's accurate.
7     "I am in a job that I would never ever
8  have accepted at a rate of pay that I earned eight
9  or nine years ago," I think that's accurate.
10     "I am enmeshed in endless Chapter 11
11  molasses," I think that's accurate.
12     "I am the only person at Coram that has
13  been paid nothing on the 2000 MIP or the KERP(s)
14  or the 2001 MIP or anything," I think that's
15  accurate.
16     Nor do I think I've been paid the KERP
17  in 2002 or the MIP on that as well, nor have I had
18  a raise in three years. So "No raise" is
19  accurate. "No nothing," I think "No nothing" is
20  accurate.
21     And being "a good soldier," I don't
22  know what the hell that means. I certainly have
23  done my level best and used the best business
24  judgment I know how to move Coram's agenda. So
25  I...

29 (Pages 110 to 113)

114

Crowley

1  Crowley
2  Have I "had my own Company (Dynamic)
3  totally up-ended"?
4  Yes, it's been up-ended.
5  I have an administrative claim for
6  under $100,000 I filed back in the first plan. I
7  have legal fees coming out of my ears. I had to
8  convert my employees from Dynamic to Coram, so I
9  can't earn any upside on that, of course you know
10  that.
11  I'm not on any deals in 2002, so I have
12  no upside on that.
13  Feinberg told me I wasn't due anything
14  under the Cerberus contract, I think he said that.
15  "I have had to pay significant legal
16  bills," that's true.
17  I haven't been able "to participate in
18  any new business deals" with Cerberus in 2002, I
19  have no upsides.
20  "And my professional reputation has
21  been trashed, too." I think, Mr. Levy, you've
22  done that, so I believe that's accurate.
23  "As you once said, I'm working with you
24  and Cerberus so it doesn't matter." I think
25  that's an exaggeration.

115

Crowley

1  Crowley
2  Q. Excuse me. If I may, did he once say
3  that; is that accurate?
4  A. You know, I don't recall him saying
5  that, so it's an exaggeration. It's drama. It's
6  irritated or --
7  "I am also recalling when you said once
8  that I should think about it all as having...
9  'kissed the wrong woman'"; I don't know what the
10  hell that is.
11  Q. Again, is it accurate that you recall,
12  now as you sit here today, that he once said that?
13  A. I didn't recall that the first time I
14  answered it and I still don't.
15  Q. That's fine. Okay.
16  Keep going.
17  A. "If I asked you to New York City and
18  told you that I would have a number...I would have
19  had a 'number'."
20  Q. I think you skipped the last sentence.
21  A. Did I?
22  "I owe it to myself"?
23  I don't know.
24  Q. Is that accurate?
25  A. I really don't know what context it's

116

Crowley

1  Crowley
2  in any more.
3  Q. Okay. Go ahead.
4  A. "If I asked you to" the city "and told
5  you that I would have a number...I would have had
6  a number." You know, that would be my way. I
7  probably would have had a check. If it was me
8  coming to the city and I had a reconciliation of
9  what you're being paid for.
10  He's the steward of other people's
11  money. I would presume he would have to know.
12  "I would have been calling often just
13  to see how you were doing." That is my nature,
14  Mr. Levy. Anyone who has known me over these half
15  a century of years that I have been a grownup
16  knows I keep in touch with everybody, that's my
17  nature. Yeah, I would have been calling, that's
18  what I do.
19  Would I "have been badgering" someone
20  "to resign over Christmas"?
21  You know, I already testified to that.
22  Q. What?
23  A. I've already testified to it, sir.
24  Q. May I interrupt and ask a question
25  about that, may I?

117

Crowley

1  Crowley
2  Is it accurate that he was badgering
3  you to resign over Christmas?
4  A. You know, it's an emotional
5  overdramatization. Also said how's Christmas,
6  how's the family.
7  Q. Is it true he was badgering you?
8  A. I don't think so.
9  I don't think it's true he was
10  badgering me. I told you before, I think it's an
11  overstatement. This is a draft, unsigned document
12  that went to my lawyer.
13  Q. I understand.
14  A. "I would not have been chasing you to
15  get you before you met the Trustee to get your
16  resignation done." I don't know what the hell
17  that's about.
18  Q. Was he chasing you?
19  A. I don't think so.
20  I'm not able to be chased. I'm my own
21  man. I have a graduate degree. I'm an adult.
22  I'm not put off by any of that. I was pissed off
23  when I wrote the letter.
24  "If I had done something wrong.....you
25  should have simply fired me." I do think I

30 (Pages 114 to 117)

118

Crowley
1    Crowley
2    haven't done anything wrong, I haven't done
3    anything wrong at Coram and I haven't done
4    anything wrong at Cerberus, despite your
5    mischaracterization. And if I have, I ought to
6    get canned or just walk away and let someone else
7    take a shot at it.
8        If I haven't done anything wrong and
9    there is no conspiracy and all I am owed is what
10   I'm owed for other deals, so how come we haven't
11   just presented the evidence right or stood up in
12   front of your Honor and said we missed something
13   here. I mean, justice isn't done.
14       You know, I understand how you do it,
15   Mr. Levy. You would be happy to have someone run
16   me over by a truck, even though you knew the truck
17   was coming, you wouldn't tell them.
18       But that's not me. And so I don't
19   think I've done anything wrong and I don't know
20   why I would -- I don't think that this was right.
21   So that's it. This is what I'm saying. This is
22   an overdramatization, that's what it is.
23       Q.   Which is an overdramatization?
24       A.   "If I had done something wrong.....you
25   should have simply fired me."

120

Crowley
1    Crowley
2    deal or could you, whatever, I fulfilled my end of
3    the bargain. My value-added was to be their
4    health care expert on health care deals excluding
5    Coram. I thought I did that.
6        So if that's what I did, and I haven't
7    been paid a dime from them, and I certainly had no
8    agreement related to Coram, other than it's
9    excluded, then there's a conflict without effect,
10   why aren't we standing up -- in my view.
11       So I don't know what all this is about.
12   So I'm emoting, that's what this is. It's an
13   overdramatization.
14       Q.   What's "this," which sentence?
15       A.   "Nothing to deserve what has happened
16   to me. Nothing." Overdramatization, it's As The
17   World Turns at noon on channel 3.
18       Q.   Next paragraph, is the next sentence
19   untrue?
20       A.   "If the shoe were on the other foot,
21   your legal bills would have been promptly paid."
22       A fellow flew in to see me, he had an
23   expense check before he left. So...
24       Q.   Who did?
25       MR. GODNICK: I'm sorry, Mr. Crowley

119

Crowley
1    Crowley
2        Q.   You don't mean that?
3        A.   I believe if I had done something wrong
4    I deserved to be fired.
5        Q.   That is true?
6        A.   Yes.
7        The rest of it is hyperbole,
8    overdramatization.
9        Q.   The rest of what, that paragraph?
10       A.   We are doing fine. You really do not
11   need to treat me as a child, really.
12       MR. WARD: Let's finish the --
13       MR. LEVY: I don't care about it. We
14   can do --
15       MR. GODNICK: Sentence by sentence.
16       MR. WARD: You're establishing a
17   misleading record, counsel.
18       MR. LEVY: All right. Keep going.
19       A.   My reality is I fulfilled my bargain in
20   the Cerberus contract. If Peter Locke called, if
21   Dan Wolf called, if Seth Plattus called, when
22   Elizabeth what's her name called, when Steve
23   Feinberg called, when his partner, Bill Richter,
24   called. When all they did, seven, however many
25   times, not related to Coram, on this deal or that

121

Crowley
1    Crowley
2    and Mr. Levy, I think you missed a sentence.
3    If it was your intent to go sentence by
4    sentence, "If not, why have I been put at
5    arm's length?"
6        MR. LEVY: I thought I got an answer.
7        THE WITNESS: I thought I gave an
8    answer.
9        MR. GODNICK: I apologize.
10       A.   Overdramatization, noontime --
11       Q.   But not untrue?
12       A.   I don't know anymore.
13       Q.   Keep going.
14       A.   "If the shoe were on the other foot."
15   My point here was why do I have to ask you about
16   1999?
17       Why do I have to ask for payment for
18   2000, for 2001, why do I have to keep doing that?
19       Q.   "You" being Feinberg, correct?
20       A.   Me, Dan Crowley, if the shoe were on
21   the other foot and you had done work for me,
22   Mr. Levy, I would be certain that you would get
23   paid. And I know that you would ask and I know
24   that you would pursue it. And I asked and I was
25   pursuing it and it wasn't clear to me why I was

31 (Pages 118 to 121)

122

Crowley

1
2  drug to New York for a number, for a proposal and
3  got none.
4      So, you know, that's my answer.
5   Q.  Keep on going to the next sentence.
6      "I would have fought to the end on the
7  front side," is that untrue?
8   A.  I would have made it -- I've described
9  it.
10  Q.  I'm sorry?
11  A.  I've already described it.
12 "Mr. Bressler" --
13  Q.  You skipped "I would never have stood
14 back and said see you later, let's see how it
15 turns out."
16  A.  It's drama, it's overstatement, without
17 fundamental statement.  It's acting out on this
18 piece of paper which was a draft to my own
19 attorney.
20  Q.  Did Mr. Feinberg say to you in
21 substance or words see you later, let's see how it
22 turns out?
23  A.  No, he didn't.
24  Q.  Did you have an impression that that's
25 how he felt?

123

Crowley

1
2   A.  I don't know.  I'm telling you --
3   Q.  Next.  Let's go to Mr. Bressler.
4   A.  "Mr. Bressler has told me that
5  he/Trustee don't want to give us/me advice about
6  ending the contract or my getting paid."
7   Q.  Is that true?
8   A.  Yeah.  Mr. Bressler has said it's not a
9  matter for the trustee or for him.  He's not my
10 counsel.  You have a contract with Cerberus,
11 that's your deal.  Go pursue it.  When you get it
12 concluded, come and bring it back to us, we have
13 an interest in it.
14  Q.  Okay.  Let's go to the next sentence.
15  A.  "He also said, we have smart lawyers
16 and he's sure they can figure out how to get me
17 paid."
18  Q.  Did he say that?
19  A.  Not in so many words.  What he said was
20 you have your own lawyer, I am not your lawyer,
21 let them figure it out.
22     MR. KIPNES:  Mr. Levy, you're
23 commenting on the answers again.
24  Q.  The next sentence, sir, "He has no
25 objection" -- he being Bressler, "has no objection

124

Crowley

1
2  to my being" --
3   A.  I think that's an overcharacterization.
4  I think he had great care and concern and interest
5  that I be paid by Cerberus for Cerberus work,
6  which was good, because that's all I wanted.  That
7  there would be no consideration whatsoever as it
8  related to Coram, which is good, because that's
9  what the contract said and that's what I wanted:
10 Nothing to do with Coram.
11     That's not right.  It's not right.  And
12 I fixed it in draft No. 2.
13  Q.  Let's stick with draft No. 1, please.
14     Please tell me if the last sentence is
15 not right, how you would express that thought
16 accurately?
17  A.  Sir, I did express it accurately in
18 draft No. 2.  I don't know why you have to torture
19 me with that.  You have it in your hands, I know
20 you do.
21  Q.  Did Mr. Bressler say to you he has no
22 objection to your "being paid for work done or for
23 terming" -- I assume that means terminating the
24 contract?
25  A.  You asked me that.

125

Crowley

1
2   Q.  I know, please answer it.
3   A.  I answered it.
4   Q.  What's the answer, yes or no?
5      THE WITNESS:  Would you read back my
6  answer to him?
7      I don't have more answers than the one
8  I gave.
9   Q.  Try yes or no.
10  A.  He did not say these words.
11  Q.  Did he say anything about the trustee's
12 views about your being paid -- no, let's leave
13 that.  Let's go to the next one.
14  A.  "It will be your natural reaction to
15 start to say 'Dan's mad'."  Well, I can honestly
16 tell you I'm not mad at anyone.
17  Q.  Is that untrue or true?
18  A.  I don't know, that's like an
19 emotional -- without basis, two sentences that
20 don't mean anything.
21  Q.  Okay.
22  A.  I don't know.  It doesn't mean
23 anything.
24     It's not the way I would write a
25 business letter.  This is like an emotional

32 (Pages 122 to 125)

126

Crowley

1  catharsis thing or something, I don't know.
2  Anyway, I don't think that's where I
3  was at. And I don't think he would have had that
4  reaction.
5  Q.   You don't think who would have had that
6  reaction?
7  A.   Mr. Levy...
8  Q.   I'm sorry, that it would be his
9  reaction.
10  A.   That's right.
11  Q.   Sorry, I apologize.
12  Is it true that you honestly were not
13  mad at anyone?
14  A.   No, I wasn't.
15  Q.   Okay, that's good. Let's go to the
16  next sentence.
17  A.   That's not me. I get mad at the
18  circumstance, not the person.
19  Q.   Good.
20  Next question would be "I think that
21  Friedman did a terrible job handling this case,"
22  and my question is was that untrue when you wrote
23  it?
24  A.   I think Mr. Friedman could have done a

127

Crowley

1  better job of handling this case. Whether the
2  word "terrible" is right, I don't think so. He
3  could have done a better job.
4  Q.   "He mis-advised me, didn't focus
5  properly, poorly prepared me, and didn't handle
6  most any important aspect of this case correctly."
7  A.   Okay. So why don't we take it apart.
8  Q.   Well, please.
9  A.   He misadvised me.
10  Q.   Why?
11  MR. WARD: Let's avoid going into the
12  specifics of the advice. You generally
13  characterized it, but I don't want you to go
14  into the specifics of what Mr. Friedman told
15  you.
16  A.   I think it was his job to understand
17  what evidence needed to be presented to accurately
18  portray my work at Cerberus. I'm not the counsel.
19  I'm not the advocate. I'm not the moving party in
20  the courtroom. The evidence was there.
21  You have it, by the way.
22  There's -- and more. He could have had
23  Mr. Feinberg on the stand. He didn't have him on
24  the stand. He could have had 20 of the project

128

Crowley

1  managers at Cerberus on the stand. He didn't do
2  that. I think he could have done that and he
3  would have been able to very easily and adequately
4  display the evidence for Judge Walrath, that I
5  spent the time working for Cerberus working on
6  nothing related to Coram. And it was there to do
7  and he didn't do it.
8  I think that -- I'm not a bankruptcy
9  person. I've never been in bankruptcy before. He
10  could have sat me down, because he received
11  adequate information to show that I was working
12  for Cerberus, and said here are the disclosures
13  that would be necessary for this. He didn't do
14  that. He could have done that.
15  I think he could have -- we had a
16  threatening letter from you before we even
17  started. And he could have advised me as to what
18  equity committee circumstances should or would or
19  could have been. I don't think he did that as
20  well as he could have.
21  We might have had better advice. I
22  think that Mr. Friedman could have prepared
23  company witnesses to come in and to testify as to
24  the zeal and vigor and improvements that I

129

Crowley

1  uniformly made myself in the company. He didn't
2  bring in any company witnesses.
3  I think he could have brought
4  Ernst & Young to testify at great length the
5  exhaustive figures they went through to kick the
6  numbers 65 ways from Sunday to verify they were
7  accurate. He didn't bring them in. I think he
8  could have brought a witness in from Stark II. He
9  didn't do that. I think he could have brought two
10  or three board members in. I don't think he
11  prepared Don Amaral properly.
12  I believe the evidence could have been
13  prepared and presented that would have accurately
14  portrayed the true picture to Judge Walrath. We
15  might have had a situation in which the judge
16  could have found differently. Gee, we didn't do
17  it.
18  I think David Friedman, who is an
19  experienced bankruptcy lawyer, could have sat me
20  down and said here, in bankruptcy, unlike your
21  other experiences, Dan, when it comes time to make
22  a payment on the interest on these notes, don't
23  make it.
24  I would have said, gee, we're paying

33 (Pages 126 to 129)

130

Crowley

1    11 percent interest on those notes and we're only
2    earning 2, 3, 4 percent interest. It's going to
3    cost the company a ton to do this; is that right?
4    He didn't advise me don't make these
5    payments because it's a bankruptcy proceeding. In
6    court -- this is how you do it in bankruptcy. He
7    didn't do that. I don't think I was advised as
8    well as I could have.
9    Okay, did he focus properly?
10    I think he could have focused along the
11    lines that I'm talking about a whole lot better.
12    I think that he could have spent significant
13    amounts of time with me on preparing so I
14    understood. I'm not an experienced witness.
15    I mean, you certainly have caused me to
16    become more experienced, but this isn't what I do
17    for a living. I don't know much about this whole
18    thing.
19    I saw Perry Mason on television growing
20    up. This is a whole new deal for me, so I wasn't
21    prepared properly as a witness as to how to answer
22    questions and portray the truth, get it out and
23    explain it. And I think you have tortured it to
24    death. I wish I could have -- he didn't prepare
25

131

Crowley

1
2    me.
3    I think that's my view of this
4    sentence, as you have read it, and how I feel
5    about it.
6    Q.   Okay. Can we go on with the next
7    sentence or are you through?
8    A.   I'm done.
9    "That said, I know that I didn't have
10    to hire Friedman just because you recommended
11    him."
12    Q.   Is that statement untrue?
13    MR. WARD:  Saying that he didn't have
14    to hire Friedman?
15    MR. LEVY:  That's it.
16    A.   I didn't have to hire him. Anyway, the
17    board hired him. Overdramatization. The board
18    interviewed him. We interviewed other law firms.
19    I didn't have the authority to hire him anyhow.
20    Uniformly, the universal board, all of
21    the members met him and decided he was qualified
22    and we could hire him.
23    Q.   And it is true Feinberg did recommend
24    him?
25    A.   Feinberg recommended him.

132

Crowley

1
2    Q.   That's good, let's go.
3    "I did it on my own," is that true?
4    A.   No, I didn't do it on my own. I
5    wouldn't have had the authority to do it on my
6    own. The board made the decision. I was one of
7    the board.
8    Q.   So that statement is untrue, right?
9    A.   It's a mischaracterization in a draft
10    of an unsigned document that's one of two drafts
11    that went to my lawyer.
12    Q.   The next sentence says, "And I didn't
13    have to recite the answers that Friedman gave me
14    to say in Court."
15    A.   And that's untrue. As I have testified
16    earlier today.
17    He gave me the questions that he
18    thought he would ask and the answers as he knew
19    it, based on what he knew that I would probably
20    answer.
21    Q.   Have you any explanation as to why, in
22    what you've described as an emotional state, four
23    or five days after the meeting you put this
24    statement in here if you now tell me it's untrue?
25    A.   Gee-whiz, what part of "draft" don't

133

Crowley

1
2    you get?
3    This was me to my attorney, in draft,
4    which was not a business letter. It's an
5    overdramatization and it's not correct.
6    Q.   Next sentence, "And I didn't have to
7    hire Chanin simply because you felt Houlihan Lokey
8    was too expensive"; is that statement true or
9    untrue?
10    A.   No.
11    You know, Houlihan Lokey was too
12    expensive, they're stupid high. It's just
13    ridiculous what they charge. And so was...
14    What's the French name?
15    Lazard Freres.
16    We interviewed them.
17    So was who else -- Paul, Weiss, Rifkind
18    and da, da, da.
19    And you are, too. I mean, I see your
20    bills, they're outrageous.
21    Chanin is no cheap date. I think
22    Chanin is populated mostly by Houlihan Lokey
23    people. They're qualified. The board interviewed
24    them, the board made the decision. I didn't have
25    the authority to hire them anyhow.

34 (Pages 130 to 133)

134

Crowley

1
2      It's an overstatement.
3      Q.   Next paragraph, "I suppose if I had
4   been more trusting (maybe) I would not have
5   written the memo about trying to get upside on
6   your position if I did a great job at Coram."
7           Is that statement true or untrue?
8      A.   I don't even know what the hell that
9   is. I think what I'm saying here is a
10  mischaracterization. It's just not where I'm at,
11  or where I was at, or where it was ever at.
12     Q.   Why did you write it?
13     A.   Again, I came back from New York. I
14  characterize it as an out-of-body experience. I
15  was angry. I was emoting.
16          This never saw the light of day.
17     Q.   But you wrote it?
18     A.   It was attorney-client privileged.
19  You've made a big deal.
20          MR. BEATIE:  You said I can't make
21     objections in this deposition.  He couldn't
22     punch Mr. Friedman and I can't punch you.
23     A.   You know, I didn't mean it and I don't
24  mean it.  It's just not where we are.
25          He doesn't owe me anything on Coram.

135

Crowley

1
2   We never came to an agreement on that.  It's just
3   flat wrong.
4      If I had been more trusting, maybe,
5   maybe, I would not have asked for a formal
6   contract.
7           MR. WARD:  Don't.
8      Q.   Keep going.
9           What were you about to say, sir, "if I
10  had been more trusting" --
11     A.   Were you asking --
12     Q.   Go ahead.
13     A.   You know, I got involved in Oxford
14  Health Plan. I ran up a ton of bills, they had a
15  change of heart and didn't pay me. I'm loath to
16  sue a client. I didn't sue them.
17          I had more occasions like this in my
18  career where I thought I was due something. I
19  thought it was clear. It's not clear.
20          So I didn't know Steve Feinberg from a
21  hole in the wall in 1999. I wanted an agreement.
22  I asked for it, asked for it, asked for it, I
23  finally get it. They took some piece of trash off
24  the shelf and said here.
25          You know, it didn't really reflect

136

Crowley

1
2   accurately, adequately the way the thing operates.
3           I'm not an employee of Cerberus. You
4   knew that. I mean, you torture me about it, but I
5   didn't get Workers' Comp, I didn't get
6   unemployment comp. I never got any benefits,
7   never got paid holidays, paid vacation. They
8   called me an employee, what the hell, that's
9   wrong.
10          I asked for a formal contract, simply
11  because I didn't want them to have amnesia or
12  brain death when it came to paying me on
13  something, like it has on Kindred, that's what
14  it's about.
15     Q.   Is that why you wrote the memo about
16  trying to get upside on your position if you did a
17  great job at Coram?
18     A.   Wow. I've testified to that, been
19  deposed about it, been in open court about it.
20          I told you before we didn't have an
21  agreement. It's not where we ended up. It was
22  preemployment at Coram.
23          Sorry, but it's been much answered.
24     Q.   "I didn't have to take the assignment
25  at Coram," you wrote; is that true?

137

Crowley

1
2      A.   Yeah, yeah. I'm free, white and 21, I
3   mean, I certainly make up my own mind.
4      Q.   You say "In retrospect, I simply should
5   have told you 'no'"; is that correct?
6      A.   You know, in retrospect, it was not the
7   next natural career step for me. I had run
8   something substantially larger. I had turned down
9   jobs around the United States.
10          I mean, you have one of the job offers
11  I turned down. You didn't choose to show it,
12  because it doesn't serve your purpose.
13          I didn't take that job. I've turned
14  down jobs that were logarithmically more
15  interesting and larger than this.
16     Q.   Why did you take it?
17     A.   But I did take it.
18     Q.   Why?
19     A.   I did.
20     Q.   I'm sorry?
21     A.   I did.
22     Q.   Why did you take it?
23          MR. GODNICK:  Can I ask why that
24     question is relevant or how that question is
25     relevant to the two motions?

35 (Pages 134 to 137)

138

Crowley

1    MR. LEVY: Because I believe according
2 to the rules that it will lead to the
3 discovery of relevant evidence.
4    Q.   Why did you take it?
5    MR. WARD: I object, because this is
6 outside of the December 21st -- we've let you
7 ask questions about why he's wrote certain
8 things here. You're not going into the
9 substance underlying that and asking
10 questions that are outside of the range, it's
11 objectionable.
12    A.   I took it because I decided to take it.
13 I can't even tell you what my mind was in 1999. I
14 took the job.
15    Q.   Did you take it because Mr. Feinberg
16 said if you take it I'll sign a contract to pay
17 you $80,000 a month?
18    A.   Hell, no. He was paying me that before
19 that. No.
20    Q.   You signed the contract within two
21 days --
22    A.   He was paying me that before that, and
23 you know that.
24    Q.   Next sentence, "If I had been more

139

Crowley

1 trusting, maybe, (maybe)" --
2    A.   I already answered it. I'm sorry, I
3 already decoded.
4    MR. WARD: He answered that when you
5 went back to the preceding question.
6    MR. LEVY: I'm sorry.
7    Q.   "I guess I just didn't know you that
8 well when we entered this relationship," is that
9 true?
10    A.   I didn't know him well.
11    Q.   Okay. "History has taught me hard
12 lessons about 'amnesia' when it comes to money";
13 is that true?
14    A.   I testified about that a moment go.
15    Q.   Is it true?
16    A.   Yes.
17    Q.   "To this day, you are still telling me
18 that the 2000 MIP was based upon the gain on the
19 CPS sale even though I have told you it didn't
20 more times than I can count"; is that true?
21    A.   I told you that, too, Mr. Levy.
22    Q.   Is that true?
23    A.   That's true.
24    Q.   "EBITDA was $37 Million without CPS and

140

Crowley

1 $54 Million with it. I would have earned another
2 $4.25 Million if I included the gain"; is that
3 true?
4    A.   I think so.
5    Q.   Sir?
6    A.   I think so.
7    Q.   "Really, the way I am looking at this
8 is that it is just one more sobering seminar in my
9 life-long education"; is that true?
10    A.   I don't know. That's just drama.
11    Q.   "And yes, I still like and admire you a
12 lot."
13    A.   I don't know. It's just whining, just
14 drama.
15    What's that got to do with the rain in
16 Spain?
17    Q.   I didn't write it, sir. That's what
18 I'm trying to find out.
19    A.   I don't know. He's a very intelligent
20 guy, runs a nice business, smarter than 99 percent
21 of the people I've ever met. Good, solid person,
22 moral guy, ethical guy. I like him. I just think
23 he's a great businessman and a good person.
24    So, yeah, I don't see any fault in him.

141

Crowley

1    Q.   Do you have an explanation, sir, if
2 he's a moral guy and ethical guy, as to why he
3 won't pay you what's due?
4    A.   You'll have to ask him.
5    MR. GODNICK: Objection.
6    Q.   Do you?
7    A.   I don't have a clue.
8    Q.   Why don't you look at that whole
9 paragraph beginning "Really, the way."
10    A.   I did.
11    Q.   And that paragraph you say is "drama,"
12 but not untrue, is that a fair characterization?
13    A.   I just think it's really crap. It's
14 just nothing.
15    I'm sorry. I would never write a
16 business letter like this, I never have in my
17 life.
18    It's just -- again, it's just a draft
19 that I sent to my attorney. I never saw it again
20 until last week.
21    Q.   What was the purpose of sending it to
22 your attorney?
23    MR. WARD: Asked and answered.
24    A.   I don't know. I've sent him 100 things

36 (Pages 138 to 141)

142

Crowley

1
2 to look at just like this.  You know, stuff that
3 I've said --
4     Q.   What did you expect back?
5     A.   I haven't got a clue anymore.
6     Q.   In the last paragraph you say, "I'm not
7 keeping a copy of this note.  You can toss yours."
8         Why did you say that?
9     A.   I ended up tossing mine.
10    Q.   I'm sorry?
11    A.   I tossed mine.  I never sent it.  It
12 was just -- it was just -- I would love to examine
13 everything you ever wrote in your life, personal
14 and private, and see if -- this has nothing to do
15 with anything.
16        MR. BEATIE:  So would we.
17        MR. GODNICK:  Speak for yourself.
18        MR. KIPNES:  Speak for yourself,
19 Mr. Beatie.
20        MR. BEATIE:  No, I would.  The
21 beginnings, particularly.
22        MR. LEVY:  The what, please?
23        I didn't hear.
24        Did you get what Mr. Beatie said?
25        (Record read.)

143

Crowley

1
2        MR. MILLER:  It might explain a lot.
3        MR. LEVY:  Pardon?
4        MR. MILLER:  It might explain a lot.
5        THE WITNESS:  Are we done with this
6 document?
7        MR. LEVY:  Just a moment, yes.
8        MR. SCHREIBER:  One sentence, the last
9 sentence you didn't talk about.
10    Q.   The last sentence, it says, "I just
11 wanted you to know how I am feeling on this
12 particular day."
13        That is how you were feeling on that
14 particular day?
15    A.   I don't know.  I must not have been
16 wanting him to know.  I never sent it to the guy.
17    Q.   That wasn't my question, sir.
18    A.   I don't know.
19    Q.   Is it true what's in this letter, 63
20 and 64, is how you were feeling on this particular
21 day?
22        MR. GODNICK:  I object.
23        Richard, he's testified portions of
24 this letter, draft letter, never sent, at
25 least were overdramatizations, et cetera, and

144

Crowley

1
2 couldn't recall today how he felt with regard
3 to particular sentences.
4     A.   I think that is not true to the extent
5 you know and have in your possession and were
6 supplied with the second draft that fell
7 immediately on the back of this, which I was
8 willing to sign.
9     Q.   Mr. Crowley, you're an intelligent man.
10        Subject to the testimony you just gave
11 me about 63 and 64, does this letter, 63 and 64,
12 this draft, whatever you want to call it, does it
13 express how you were feeling on the particular day
14 that you wrote it?
15        MR. KIPNES:  Object to form.
16        MR. GODNICK:  We just went through it
17 sentence by sentence, comma by comma.  Why
18 waste time?
19        MR. KIPNES:  Clarify the question.
20        MR. WARD:  Let me make sure I
21 understand the question.  You're saying as
22 explained in the testimony that's been given
23 for the last 30 minutes, taking that plus
24 this letter, is that how he felt?
25        MR. LEVY:  Yes, that's my question.

145

Crowley

1
2        MR. KIPNES:  Object to the form of the
3 question.
4     A.   I believe I can't answer this out of
5 context.  That I have answered it word by word and
6 that my second draft is -- of the same letter in
7 your possession -- clarifies how I was feeling on
8 that particular day.  So, no.
9        MR. LEVY:  Thanks.  Let's take a break.
10        (Luncheon recess:  12:39 p.m.)

37 (Pages 142 to 145)

146

```
 1              Crowley
 2      A F T E R N O O N   S E S S I O N
 3              (1:11 p.m.)
 4   D A N I E L   D.   C R O W L E Y,   having
 5      been previously sworn, resumed the stand and
 6      testified further as follows:
 7   CONTINUED EXAMINATION
 8   BY MR. LEVY:
 9      Q.   Mr. Crowley, are you ready?
10      A.   Yes, I am.
11      Q.   I'm going to ask you to look at the
12   third page of Trustee Exhibit 19, which was marked
13   CRX 65.
14           You testified, I believe, that that was
15   written --
16           MR. MILLER:  The second version of the
17      same draft?
18           MR. LEVY:  When you guys want to let me
19      proceed with the deposition, I'd be glad to
20      do it.
21      Q.   You've testified previously you believe
22   that Mr. Schreiber wrote it, correct?
23      A.   Yes.
24      Q.   Do you have any knowledge at all as to
25   why Mr. Schreiber wrote it?
```

147

```
 1              Crowley
 2      A.   No.
 3      Q.   Have you ever asked Mr. Schreiber why
 4   he wrote it?
 5      A.   I may have when I saw this document in
 6   the last few days.
 7      Q.   Well, you saw it yesterday, right?
 8      A.   Right.
 9      Q.   Did you ask him yesterday?
10      A.   I don't recall that I asked him, other
11   than saying what is this?
12      Q.   Did you say anything at all to
13   Mr. Schreiber about CRX 65 yesterday or the day
14   before?
15           MR. WARD:  Just answer yes or no.
16           THE WITNESS:  Ask it again.
17           MR. LEVY:  Please.
18           (Record read.)
19      A.   Yes.
20      Q.   What did you say?
21           MR. WARD:  At this point there's been
22      an exchange with respect to privilege on
23      these documents, this one and the subsequent
24      one, which I assume you're going to go into.
25      We think it's obviously a closed issue.  We
```

148

```
 1              Crowley
 2      produced it, then we learned that it had
 3      never been sent.
 4           I'm going to let you inquire about this
 5      particular document, or if you want to call
 6      it pair of documents, without waiving any
 7      privilege with respect to any other subject,
 8      just as to these two pieces of paper or these
 9      six pieces of paper, since the other one is
10      three pages.
11           MR. LEVY:  Let me say I want to be
12      clear:  We will not assert a waiver because
13      he answers a question here.  We will assert a
14      waiver depending upon what kind of responses
15      we get.  Let's get to that.
16      Q.   The question, I believe, is:  What did
17   you say to him about CRX 65?
18      A.   "Where the hell did this come from?"
19      Q.   And what did he say?
20      A.   "I don't recall."
21      Q.   Mr. Schreiber said "I don't recall"?
22      A.   Pretty much.
23      Q.   And then what did you say?
24      A.   "It's absolutely wrong.  I would reject
25   this on the surface.  Nothing in here is right."
```

149

```
 1              Crowley
 2      Q.   And then what did he say?
 3      A.   I don't recall.
 4      Q.   Who was in the room when you had the
 5   conversation you've just described?
 6      A.   John Ward.
 7           And it may have been Tony Valiulis,
 8   their colleague attorney, and it may not.  I'm...
 9      Q.   Anybody else?
10      A.   Not to my knowledge.
11      Q.   Mr. Kipnes?
12      A.   No.
13      Q.   Where did this conversation take place?
14      A.   I actually thought it took place on the
15   phone.
16      Q.   On the phone?
17      A.   Uh-huh.
18      Q.   When?
19      A.   In the last couple of days.
20      Q.   How did the document come to your
21   attention?
22      A.   I said "what is this?"
23      Q.   No.
24           How did you get the document?
25      A.   They faxed me a copy to look at.
```

38 (Pages 146 to 149)

# EXHIBIT A-5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No. 00-3299
                                    .
                                    .
CORAM HEALTHCARE,                   .
                                    . 824 Market Street
                                    . Wilmington, DE  19801
            Debtor,                 . March 3, 2003
. . . . . . . . . . . . . . . . . . . 9:30 A.M.

TRANSCRIPT OF TRUSTEE'S MOTION FOR AUTHORIZATION TO REJECT
THE EXECUTORY CONTRACT OF DANIEL CROWLEY
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Trustee:                Schnader Harrison Segal & Lewis,
                                LLP
                                By:  BARRY E. BRESSLER, ESQ.
                                     WILBUR KIPNES, ESQ.
                                     RICHARD BARKASY, ESQ.
                                1600 Market Street, Suite 3600
                                Philadelphia, PA  19103

                                Weir & Partners
                                By:  JOHN B. YORK, ESQ.
                                824 Market Street Mall, Suite 101
                                P.O. Box 708
                                Wilmington, DE  19899

                                Office of the U.S. Trustee
                                By:  RICHARD SCHEPACARTER, ESQ.
                                J. Caleb Boggs Federal Building
                                844 King Street, Lockbox 35
                                Wilmington, DE  19801

Audio Operator:                 Jennifer M. Patone


Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey  08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No.  (609)587-3599**

2

APPEARANCES:     (continued)

For Daniel Crowley:                RICHARD H. CROSS, JR., ESQ.
                                   1201 North Orange Street, St. 610
                                   P.O. Box 1380
                                   Wilmington, DE  19899

                                   Much Shelis Freed Denenberg Ament
                                   & Rubenstein
                                   By:  SCOTT N. SCHREIBER, ESQ.
                                   200 North LaSalle St., Suite 2100
                                   Chicago, IL  60601

For Unsecured Creditors:           Richards, Layton & Finger, P.A.
                                   By:  ETTA WOLFE, ESQ.
                                   One Rodney Square
                                   P.O. Box 551
                                   Wilmington, DE  19899

For Equity Committee:              Saul, Ewing, Remick & Saul, LLP
                                   By:  MARK MINUTI, ESQ.
                                   222 Delaware Avenue, Suite 1200
                                   Wilmington, DE  19899

                                   Jenner & Block, LLC
                                   By:  RICHARD F. LEVY, ESQ.
                                        STEVE TOMASHEFSKY, ESQ.
                                   One IBM Plaza
                                   Chicago, IL  60611

For Senior Noteholders:            Weil, Gotshal & Manges, LLP
                                   By:  ALAN B. MILLER, ESQ.
                                   767 Fifth Avenue
                                   New York, NY  10153

For Cerberus Partners, LP          Klett Rooney Lieber & Schorling
                                   By:  ADAM G. LANDIS, ESQ.
                                   1000 West Street, 14th Floor
                                   Wilmington, DE  19801

                                   Schulte Roth & Zabel LLP
                                   By:  HOWARD O. GODNICK, ESQ.
                                        MICHAEL L. COOK, ESQ.
                                   919 Third Avenue
                                   New York, NY  10022

3

APPEARANCES:    (continued)

For Goldman Sachs:                 Connolly Bove Lodge & Hutz, LLP
                                   By:  GWEN LACY, ESQ.
                                   1220 Market Street
                                   Wilmington, DE  19899

10

1          MR. LEVY:  And so there won't be objections about

2  exceeding the scope of --

3          THE COURT:  Direct, etcetera.

4          MR. LEVY:  -- direct or cross, and for what it's

5  worth, though, Mr. Bressler mentioned the Trustee's motion is

6  number 1.  In fact, the motion by the Equity Committee to

7  terminate was filed two or three weeks before the Trustee's

8  motion.

9          THE COURT:  But do you have any objection to the

10  Trustee presenting first?

11         MR. LEVY:  None at all.

12         THE COURT:  All right, I think that's the best way to

13  proceed.

14         MR. BRESSLER:  Thank you, Your Honor.  We would call

15  the Trustee, Arlin M. Adams.

16         MR. LEVY:  Before the Trustee takes the stand, Your

17  Honor, I would ask that we exclude from the courtroom all

18  witnesses who plan to testify during -- that they be excluded

19  during the testimony of Judge Adams.

20         THE COURT:  Any objection to that?

21         MR. SCHREIBER:  Your Honor, Scott Schreiber for Mr.

22  Crowley.  Obviously I don't expect that Mr. Crowley will be

23  excluded from testimony.  These two motions are clearly about

24  him, and I think he has a right to be here for each and every

25  moment of the testimony that Your Honor's about to hear.

Adams - Direct                                    11

1          MR. LEVY:  I think that's a discretionary matter, and

2    we'd prefer --

3          THE COURT:  Well, I think he is a party and is

4    entitled to be here, so I will allow him.

5          MR. SCHREIBER:  Thank you, Judge.

6          THE COURT:  Any other witnesses that the parties

7    intend to call?

8          MR. BRESSLER:  Your Honor, yes, we intend to call

9    other witnesses, and we have no problem with they're being

10   excluded for this purpose.

11         THE COURT:  All right.  All right, Judge Adams, you

12   may approach.  Good morning.

13         COURT CLERK:  Please state your full name.  Spell

14   your last name.

15         THE WITNESS:  Arlin M. Adams, A-d-a-m-s.

16          ARLIN M. ADAMS, TRUSTEE'S WITNESS, SWORN

17         MR. BRESSLER:  Your Honor, before we begin, the only

18   exhibit that I intend to introduce through the Trustee is

19   attached to our motion.  It is the proposed termination and

20   extension of employment agreement.

21         THE COURT:  All right, can we have that marked

22   Trustee 1?

23         MR. BRESSLER:  May I approach the witness?

24         THE COURT:  You may.

25                         DIRECT EXAMINATION

Crowley - Direct                                73

1  Court.

2          THE WITNESS:  Daniel D. Crowley, C-r-o-w-l-e-y.

3          DANIEL D. CROWLEY, TRUSTEE'S WITNESS, SWORN

4          COURT CLERK:  Please be seated.

5          MR. KIPNES:  Thank you for granting my admission pro

6  hac vice, Your Honor.

7                      DIRECT EXAMINATION

8  BY MR. KIPNES:

9  Q    Mr. Crowley, Judge Adams testified about your meeting in

10  Denver., March 25th or 26th, 2002.  Would you describe what

11  discussions you had at that meeting regarding the operations of

12  Coram?

13  A    Yes.  Judge Adams asked me to go over in detail how the

14  company was running, how it was operating, how it had operated,

15  what issues there were, problems, and began to inquire and

16  create an awareness for himself and understanding of the

17  business that is Coram.

18          I discussed the sales and the strategies.  I discussed the

19  costs and the drivers.  I discussed the gross profitability,

20  the administration.  I discussed the EBITDA, the cash flow.  I

21  discussed the staffing and I had -- I'd been asked to go over

22  what the trends were, and I discussed those in great detail.

23  Q    At some point did Judge Adams ask you to submit a weekly

24  report?

25  A    Judge Adams directed me to submit a weekly report and a

Crowley - Direct                                    74

1  monthly report.

2  Q      And have you done that?

3  A      Yes, I prepared the weekly report in accordance with his

4  instructions.

5  Q      At your initial meeting with Judge Adams, what

6  conversations, if any, did you have regarding Cerberus?

7  A      Judge Adams discussed Judge Walrath's opinion with me.  He

8  asked me directly about my relationship with Cerberus.   He

9  asked me if I was receiving any compensation from Cerberus in

10 2002.  He asked me what work I was doing for Cerberus.   We

11 discussed the current activities that I had with Cerberus, and

12 he instructed me as to what circumstances and conditions in

13 which he would grant permission for me to do those projects for

14 Cerberus.

15 Q      What instructions were those?

16 A      Judge Adams was very specific in that he said I'm not to

17 be paid anything by Cerberus for work done in 2002. I agreed to

18 that.  Judge Adams was very specific in saying that any work

19 that I did for Cerberus in 2002 could not be involved in any

20 way with the business or relationships of Coram.  I said

21 absolutely, I had no problem with that.

22        Judge Adams was very specific that the work, if any, that

23 I would do for Cerberus could not detract from the activities

24 and focus that I had to provide to Coram, and I agreed to that.

25        MR. KIPNES:  Your Honor, may I hand the witness

1   what's been marked as Trustee's Exhibit 2, which is a letter

2   without attachments from Mr. Crowley to Judge Adams dated March

3   11, 2002?

4               THE COURT:  Yes.  Any objection to my having a copy?

5               MR. KIPNES:  My apologies.

6               THE COURT:  Thank you.

7   BY MR. KIPNES:

8   Q    Do you have Trustee's Exhibit 2 in front of you, Mr.

9   Crowley?

10  A    Yes, sir.

11  Q    Did you write this letter?

12  A    Yes.

13  Q    This letter was written before your in-person meeting with

14  Judge Adams, correct?

15  A    Yes.

16  Q    In the last paragraph of Trustee's Exhibit number 2

17  there's a number of entities listed.  You see that?

18  A    On Page --

19  Q    Page 1, last paragraph of Trustee's Exhibit 2.

20  A    Yes, sir.

21  Q    What are those entities?

22  A    Yes.

23  Q    Generally.

24  A    In 1999, 2000 and 2001 my work for Cerberus involved many

25  aspects, one for which I would be entitled to receive upside if

1  any were earned by Cerberus related to deals in which I had

2  placed some 20 or so portfolio managers for Cerberus.  The

3  listing here are some of the deals, not all of the deals, that

4  included Beverly Nursing Homes of Florida.  I did a lot of work

5  for Cerberus as it related to nursing homes, Texas Nursing

6  Homes, Beverly Nursing Homes, Kindred Nursing Homes, Care

7  Matric Nursing Homes, Assisted Living, Sun Nursing Homes, and

8  other work, a worker's comp company, MCA PHP, which was an HMO,

9  Winterland which was a T-shirt company, Curative Health Care

10 which became produced Willen Care (phonetic), Hangor

11 Orthopedics (phonetic) that did artificial limbs and many

12 others, and it lists some of the other work, health care

13 research, locating board members, fund-raising, management team

14 recruiting, all work that related to Cerberus, none that

15 related to Coram, some of which I had an upside.

16 Q     What did you tell Judge Adams about the claim you thought

17 you had against Cerberus at your March 25th or 26th meeting?

18 A     I told Judge Adams that I thought there was a mountain of

19 evidence that could and should have been presented to the Court

20 here in Delaware, but it for whatever reason hadn't, but that

21 there was a substantive and provable mountain of work that I

22 did for Cerberus, had nothing to do with Coram, in which I was

23 owed money, upside, substantial money, and that I hadn't been

24 paid, and I wished to pursue that.

25       Judge Adams said that has nothing to do with this

Crowley - Direct                              77

1  bankruptcy.  That's your claim against Cerberus for non-Coram

2  work.  Pursue it.

3  Q    At the time of your meeting with Judge Adams, had you

4  received any money or any compensation of any kind from

5  Cerberus in the year 2002?

6  A    I have not received any money for anything from Cerberus

7  since December of 2001, not a penny.

8  Q    Do you have the -- are the exhibits before you that have

9  previously been --

10  A    No.

11  Q    -- introduced?

12  A    No, sir.

13         THE COURT:  I have it.

14         MR. KIPNES:  Thank you, Your Honor.

15  BY MR. KIPNES:

16  Q    Would you turn to Equity Committee 7, which is a letter of

17  April 10, 2002.

18  A    Yes, sir.

19  Q    Please turn to the second page, Mr. Crowley.

20  A    Yes.

21  Q    Now, this letter follows your meeting with Judge Adams,

22  your first meeting with Judge Adams.

23  A    Yes, it does.

24  Q    And on the second page there's a list of items on which

25  you say, quote, "We need direction."  See that?

Crowley - Direct                                                    78

1  A    Yes, I do.

2  Q    Then there's a series of items, and one of which is,

3  quote, "The terms for termination of the Crowley/Cerberus

4  contract."

5       See that?

6  A    Yes, I do.

7  Q    Why did you include that on a list of items that -- to

8  Judge Adams on which you said you needed direction?

9  A    I obviously read Judge Walrath's opinion.  The contract

10 was dead in December.  I had discussed it with the Trustee in

11 March.  I'm in the middle of trying to negotiate a termination,

12 and I have upside due me from Cerberus.  I wish to know what

13 role the office of the Trustee or the Chapter 11 Trustee Judge

14 Adams wished to play, because I feel some sense of urgency to

15 terminate this contract.

16       And by that I mean I'm negotiating the amounts of money

17 that are due me for work I did for Cerberus that were unrelated

18 to Coram.  I want to get paid for what I did three years ago,

19 two years ago, one year ago, and I want to know what does Judge

20 Adams wish to participate in what way, what role, what

21 oversight, what does he want to know?

22 Q    What response did you get, if any?

23 A    That that contract was between Cerberus and myself,

24 writing it had nothing to do with Coram.  That he did not wish

25 to weight in.  He did wish to be informed if and when we came

Crowley - Direct                                    79

1   to an agreement as to what payment and for what.  And I said we

2   would absolutely do that, submit it to him, and it would be

3   submitted to this Court.

4   Q    Have you reached any agreement relating to that contract

5   with Cerberus?

6   A    No.  And in the end having talked to them, met with them,

7   wrote them, asked my counsel to talk with them, meet with them,

8   write them, I ended up terminating them for a material breach

9   for not paying the amounts of money that were due for 1999,

10  2000 and 2001.

11  Q    About when was that?

12  A    September of 2002.

13  Q    What's the status of that claim, your claim against

14  Cerberus, today?

15  A    They haven't paid me a penny, and I'm left to my

16  alternatives, which I have not ruled out litigating.

17  Q    In your -- has Cerberus committed to pay you anything?

18  A    No.  If they had, I would have written it to Judge Adams.

19  I would have presented it through Judge Adams, if he wished, to

20  this Court.   We would be talking about in public.  I haven't

21  any agreement or commitment with Cerberus.

22  Q    Why are you still at Coram?

23  A    Judge Adams asked me to stay at Coram.  My contract was

24  expiring at the end of November.  At the beginning of October I

25  wrote the judge a note saying my contract's coming to an end.

Crowley - Direct                                80

1  For the good of the enterprise and everything around it, here's

2  60 days.  What would you wish to do?  We negotiated, we ended

3  up with a month's extension, there was bargaining back and

4  forth.  The judge asked me to stay.  The judge asked me to stay

5  for an additional six months.  I -- so that's one reason.

6      Another is, you know, I had given three years of my life

7  to this thing.  I made commitments to the blood factor supplier

8  to Bax -- the pump company, to Baxter, to providers, to

9  customers.  I -- people in -- 61 people in management count on

10  me.  I want to see the process through.

11      I feel that had evidence been provided I believe other

12  decisions could be made.  It wasn't.  Okay, that's my fault.

13  Was there to present -- my pride, my self-respect, my

14  reputation, I want to see it through.  I'd like to see this

15  process come to a successful conclusion.  And I don't -- I

16  mean, I will.  Judge Walrath, if you wish me to leave, I'll

17  just leave.  I don't want to.

18      I understand that it may not be possible for me to stay.

19  I'd like to.

20  Q  Up until the execution of the agreement that's been marked

21  as Trustee's Exhibit 1, had Judge Adams given you any

22  commitment regarding continued employment at Coram?

23  A  Judge Adams made it clear from the beginning that every

24  day was a day in which he was re-deciding whether I was going

25  to be at Coram another day.  He never made a commitment to me.

Crowley - Direct                              81

1  Q     What's your view, Mr. Crowley, of the current financial

2  situation at Coram?

3  A     Coram has nineteen months, almost -- eighteen months,

4  sorry, of increased sales.  It's the longest string of same

5  store, no big one account, one patient at a time, sales

6  increases since the company was formed in 1994.  Coram mixes

7  the best mix of therapies of patients we've taken ever.

8      Coram's gross margins are the best it's been in five

9  years.  Each year's better.  Coram's cash flow in January was

10 130 percent of the prior year's January.  We went into 2002

11 with $28 million.  We came out here in the last month -- there

12 are many days where we have $40 million in cash.

13     The EBITDA from this company, we were just told by Ernst &

14 Young, we passed a field audit, fourth one under my watch

15 without an adjustment, and no material weaknesses in management

16 controls, fourth year.

17     But turnover in Coram is -- it's the best it's been since

18 before I came there.  It's -- and still we're almost 1,000

19 employees less.  We've grown $45 million over the prior year,

20 albeit because some companies failed.

21     The morale is good.  We have had virtually no turnover in

22 senior management other than the initial turnover that I

23 directed.  The team has stuck together.  I think we also have

24 340 or fifty million dollar worth of debt, I mean, we can't pay

25 it back, we can't service it.  We're under a mound of debt, but

Crowley - Direct                                    82

1  all of that preceded me.  I never put a penny of debt on this

2  company.  So, that all came before me.

3      This -- the company's in -- it's operating -- I mean, it's

4  a handful every day of stuff to deal with.  It's -- but it's

5  stabilized.

6  Q    You said something in your answer about companies failing.

7  What --

8  A    Well, any number of home infusion companies have failed in

9  the last year.  Dr. Kook dot com (phonetic) was a big infusion

10 company.  Genteva (phonetic) sold themselves to Acredo

11 (phonetic).  Acredo ran around trying to sell the non-

12 hemophilia portion of their business to anyone else.  They were

13 unable to sell it at all.  In the end they -- Credo made the

14 decision and closed infusion businesses all over the United

15 States and gave the business away.

16     We benefitted by that.  There were any number of local,

17 small regional infusion companies because of the low margins in

18 infusion, and the fact that the sellers of the drug to us

19 require we pay up front in cash.  And the payers, customers of

20 Coram, pay so slow.  Any company that had much debt couldn't

21 service it.  A lot of them failed.  And that's what I'm talking

22 about.  It's been a watershed two, three, four, five years for

23 home infusion.

24 Q    What was your salary when you first became employed by

25 Coram?

Crowley - Direct                          83

1  A    Yes, Don Emerol (phonetic) made the offer to me.  He said,

2  "You're going to get the same salary I had."

3        I said, "When was that?"

4        "1998."

5        That's the salary I got in '99, 650.

6  Q    What was your salary in 2000?

7  A    650.

8  Q    What was your salary in 2001?

9  A    650.

10 Q    What was your salary in 2002?

11 A    650.

12 Q    In the years 2000, 20002 have you received any bonuses

13 under the management incentive plan or the key employee

14 retention program?

15 A    I have not received one penny under any incentive plan,

16 whether it be management incentive, key employee retention in

17 2000, success fee in 2000, none of it.  I didn't receive

18 management incentive plan or key employee plan in 2001.  I did

19 not receive management incentive plan or key employee retention

20 plan in 2002.  And my expectation is I will earn a bonus for

21 2002.  With the negotiations with Judge Adams I expect not to

22 receive that either.

23 Q    Is there any other management person at Coram who has not

24 received entitled bonuses in those years?

25 A    Of the 2,200 people that work at Coram and the roughly 100

1 that work in management and have for the last three years,

2 every one of them in the same plan that I am, every one of them

3 were paid.  The only person that has not been paid a penny is

4 me.

5 Q    What is your best view, Mr. Crowley, of what happens to

6 Coram in the next four months if Judge Walrath grants the

7 Equity Committee motion and you are terminated from further

8 employment?

9 A    I think that the management and the employees will be

10 completely disaffected.  I think for them to see their leader

11 thrown out in court when they don't believe that the strategy

12 was wrong, that the company has prospered, that the company has

13 flourished, that we're viable and vibrant and doing well, I

14 think they would not know what to do with it.

15       Because of the nature of the business I'm glue in so many

16 areas, so I'm meeting with Baxa (phonetic) and meeting with FFF

17 and I'm meeting with head of medical relations for Anthem.  I'm

18 in the middle of our largest customer, nearly $40 million in a

19 rebid.  I -- I'm central to so much that goes on.  I think it's

20 a calamity.  I believe it's more than just casual entropy.  I

21 worry for the company.

22            MR. KIPNES:  That's all I have, Your Honor.  Thank

23 you.

24            THE COURT:  Do we need to take a break then?

25            MR. LEVY:  I would like to do that, Your Honor.

Crowley - Cross/Levy                                85

1           MR. BRESSLER:  We do not for Judge Adams.  I think

2    you've made your call, Judge?

3           MR. LEVY:  I think I can be more effective with a

4    little time.  Can we take a short lunch break?

5           THE COURT:  Well, do you want to take a short lunch

6    break then, and come back at quarter of one.

7           MR. LEVY:  Thank you.

8           THE COURT:  All right, we'll stand adjourned.

9       (Luncheon recess)

10          THE COURT:  You may.

11                        CROSS EXAMINATION

12   BY MR. LEVY:

13   Q    Mr. Crowley, a few moments ago you told Judge Walrath that

14   your salary was $650,000; is that right?

15   A    Yes.

16   Q    And that you never received a raise; is that right?

17   A    (No verbal response)

18   Q    Over the three years you've been at Coram.

19   A    Yes.

20   Q    Equity Exhibit -- Equity Committee Exhibit 12 is a W-2

21   earnings summary for the year 2002 for Daniel D. Crowley.  That

22   says your wages, tips and other comp during 2002 were not

23   650,000 but were $921,298.08, correct?

24   A    It misrepresents what my wages were, sir.

25   Q    I'm sorry?

Crowley - Cross/Levy                              86

1  A    It misrepresents what my wages were, sir.  My base salary

2  was 650,000.  I received gross-ups for corporate facilities in

3  which I resided when I'm in Denver and life insurance and other

4  emoluments that go to the total.  My base salary is 650.  It's

5  publicly available and known.

6  Q    It costs coram $921,00 for 2002 to have you around,

7  correct, sir?

8  A    Health insurance, life insurance, dental, vision,

9  pharmacy, corporate facilities, travel.  This is what it says.

10 Q    Thank you.  Now, in May of 2002 you had a face-to-face

11 meeting with Stephen Feinberg of Cerberus, correct?

12 A    Yes.

13 Q    The reason you had the meeting is because you thought

14 Cerebus owed you a lot of money, right?

15 A    Cerebus owes me a lot of money, sir.

16 Q    At that time you thought it was more than $10 million,

17 right?

18 A    Testified too that I didn't know what the amount was.  I

19 was trying to ascertain it, but I have a belief that it's

20 significant.

21 Q    Between ten and fifteen million, is that what your belief

22 was when you went to New York to meet with Mr. Feinberg?

23 A    It's significant.  I have never been able to receive the

24 information that would allow me to know for certain what it is.

25 Q    But you think it's more than 10 million, correct?

Decision                     195

1  and has kept out of whatever monetary claim Mr. Crowley may

2  have against Cerberus.

3          MR. LEVY:  Mr. Schreiber said we ought to stick with

4  him.  Merely resonance of what the director's witness, Mr.

5  Emeral said, "Well, he's doing a good job, let's stick with

6  him."

7          And the cases that Mr. Bressler talks about do talk

8  about people who in the past have a conflict.  I certainly

9  think his past conflict twice colors what happened here today,

10 but it is the ongoing relationship that troubles us so.

11         Thanks.

12         THE COURT:  Well, I'm going to deal with the

13 Trustee's motion for approval of the extension.  And in doing

14 so, I agree that it is the business judgment rule that I just

15 consider.

16         To express my feelings I'm going to paraphrase

17 someone I think epitomizes the business judgment rule, and that

18 is Warren Buffet.  And he has said that the ideal employee is

19 someone who's smart, hard-working and honest.  But if the

20 employee isn't honest, you darn well better hope he's stupid

21 and lazy, because otherwise you're in trouble.

22         There is no question in this case that Mr. Crowley is

23 smart, hard-working, a brilliant businessman.  But I do not

24 believe he is honest.  And his testimony today has not

25 convinced me that he has changed since the last time he

1  testified.

2       Judge Adams has an impeccable reputation for

3  integrity.  Quite frankly, I don't want his reputation or mine

4  sullied by approving continuing employment of an employee that

5  I do not believe to be an honest person.  I think being asked

6  today to trust that Mr. Crowley is complying with the Trustee's

7  request simply because there is no proof that he has not

8  complied with the requirements imposed upon him by the Trustee

9  goes too far, given the fact that he has previously failed to

10  disclose relevant information.  And quite frankly, the draft

11  documents that were produced continue to show at least in May

12  of 2002, after the appointment of the Trustee, continue to show

13  what I believe is a continuation of Mr. Crowley's continued

14  efforts to continue to get reimbursement from Cerberus for

15  efforts undertaken in this case.

16       It's a belief I have.  There is no evidence that an

17  agreement was reached with Cerberus or that Cerberus

18  participated in it, but I think that the drafts show that Mr.

19  Crowley sought to have that continuation, sought to be paid,

20  albeit after confirmation, that is after he was no longer

21  subject to the jurisdiction of this court, sought to get

22  remuneration for efforts taken in this case, which quite

23  frankly is not permissible.

24       And given that belief, I will not approve any

25  extension of employment.  I've said before that fortunately or

Decision                                     197

1  unfortunately I'm in the position where principles can guide

2  me, even though it may result in financial harm to others.  But

3  even saying that, I do take into consideration that my decision

4  will have or may have some adverse effect on the business

5  operations.

6       But I am satisfied that the employees that were put

7  in place before and by Mr. Crowley, the systems that were put

8  in place can survive Mr. Crowley leaving.  There are plenty of

9  other competent, in fact, brilliant businessmen who can step

10 in, whether from within this organization or from without.

11      And I think it's more important that the debtor,

12 under the supervision of this Trustee, not be tainted by any

13 suggestion that the senior executive has anything other than

14 100 percent dedication to this entity and to this entity alone.

15      So, I will deny the motion.

16      I'll look for a form of order, Mr. Levy?

17      Need we go any further?

18      UNIDENTIFIED ATTORNEY:  I think Mr. Levy has a

19 motion.

20      MR. LEVY:  Your Honor, we have a motion, and that

21 motion calls for the termination of Mr. Crowley and an

22 instruction to the Trustee to pursue disgorgement of

23 compensation collected.

24      THE COURT:  I'm going to hold that under advisement.

25      MR. LEVY:  Thank you.

Decision                                                     198

1           THE COURT:  Because the ramifications of my decision

2    may have an impact on that.

3           MR. LEVY:  Thank you very much, Your Honor.

4           THE COURT:  All right?

5           We'll stand adjourned.

6           UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

7        (Recording ends)

8                    *                *                *

9                   C E R T I F I C A T I O N

10          I, Betsy Wolfe, certify that the foregoing is a

11   correct transcript from the electronic sound recording of the

12   proceedings in the above-entitled matter.

13

14   _____        _____

15   Betsy Wolfe                      Date

16   J&J COURT TRANSCRIBERS, INC.

17

18

19

20

21

22

23

24

25

# EXHIBIT A-6

## Kipnes, Will

| | |
|---|---|
| **From:** | Kipnes, Will |
| **Sent:** | Friday, March 23, 2007 5:44 PM |
| **To:** | EPeters@KVN.com |
| **Cc:** | 'Warren Braunig'; Bressler, Barry; Barkasy, Rich |
| **Subject:** | Request for Depositions |

Dear Elliott:

    This will respond to Warren's letter of March 21, 2007 advising that you wish to depose Barry and me.  I understand that you also had a brief conversation with Barry and Rich about this while you were in Chicago this week.  Ordinarily, we would reject out of hand a defendant's request to take the deposition of plaintiff's trial counsel in April 2007 in a case filed in December 2004, apparently concerning events in early 2003 of which the defendant was contemporaneously involved.  However, we are assuming that your objective is to learn facts that would assist the court in making pretrial evidentiary rulings, and not to provide a basis for a motion to disqualify us as trial counsel.  If our assumption is correct, then we are willing to work with you, although I do not see why depositions would be necessary.

    I suggest the place to start is for you to advise us in writing of the subjects on which you seek information.  We will discuss with you when you are here next week, how we can provide the information you seek in a mutually acceptable way.

    Will

Wilbur L. Kipnes
Schnader Harrison Segal & Lewis LLP
Suite 3600, 1600 Market Street
Philadelphia, Pa. 19103
215-751-2336 (phone)
215-751-2205 (fax)
wkipnes@schnader.com

LAW OFFICES

# KEKER & VAN NEST
## LLP

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1704
TELEPHONE (415) 391-5400
FAX (415) 397-7188
WWW.KVN.COM

ELLIOT R. PETERS
EPETERS@KVN.COM

March 23, 2007

**VIA ELECTRONIC MAIL**

Wilbur L. Kipnes, Esq.
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286

Re:    *Adams v. Crowley*

Dear Wil:

I write in response to your email dated March 23, 2007. The need for your and Barry's deposition appears obvious, but here it is nonetheless:

Last week the Trustee took the deposition of Scott Schreiber. Mr. Schreiber participated in numerous conversations with Barry relating to Mr. Crowley's relationship with the Trustee. During these conversations, Barry was apparently wearing both the hats of legal advisor and business advisor to the Trustee. Nonetheless, those conversations are evidentiary, relevant and were raised by the Trustee in the deposition of Mr. Schreiber. We are entitled to take discovery on those issues in the form of a deposition of Barry. We first notified you of this possibility many weeks ago. Moreover, Barry and you both appear as disclosed witnesses on our original Rule 26 disclosures.

Among other relevant topics for you, Wil, you prepared Mr. Crowley for his testimony at the March 3, 2003 hearing. Your conversations with him, and statements in that regard were explored during the Schreiber deposition and are likewise reasonably calculated to lead to the discovery of admissible evidence.

In addition, we may explore your and Barry's additional communications with Crowley, Genesis, the U. S. Trustee, and the Equity Committee, all of which are relevant to issues raised by the Trustee in this case. This list is not intended to be exhaustive, but rather to illustrate that there are numerous matters as to which you and Barry have personal knowledge.

With respect to the ethical issues raised by your continuing to handle this case as trial attorneys in the event that you "ought to be witnesses," we have not yet analyzed that issue, but can represent that we do not have a present intention to move for your law firm's disqualification.

Wilbur L. Kipnes, Esq.
March 23, 2007
Page 2

The timing of these depositions has to do with the crush of business and our evolving understanding of the facts and not of a tactical plan to seek anyone's disqualification. There may be ethical issues which you may need to address on your own regarding whether you can both be witnesses in a proceeding, and trial counsel in it. We do not, at this time, express an opinion on that issue.

It is of the utmost importance that by the end of next week, we have firm dates for each of your depositions. To protect our rights in that regard, we want to make it clear that based on our discussions with Barry, we have not yet served deposition notices on you only because we are in the process of working out mutually agreeable dates. We understand that you agree that no argument will later be made that deposition notices were not served on you prior to the discovery cutoff, since that is only so due to these ongoing negotiations.

I look forward to hearing from you.

Very truly yours,

ELLIOT R. PETERS

ERP:aap

cc:    Barry Bressler, Esq.

392379.01

LAW OFFICES

# KEKER & VAN NEST
### LLP

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1704
TELEPHONE (415) 391-5400
FAX (415) 397-7188
WWW.KVN.COM

ELLIOT R. PETERS
EPETERS@KVN.COM

March 30, 2007

**VIA ELECTRONIC
AND FIRST CLASS MAIL**

Wilbur L. Kipnes, Esq.
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286

Re:    *Adams v. Crowley*

Dear Will:

I have been reflecting on your and Barry's upcoming depositions, and the issues relating to potential disqualification. I am sharing this with you, not because I have made up my mind, but because I have growing and sincere concerns. My concerns are primarily in two areas: (1) the likelihood that you and Barry will be necessary witnesses at trial; and (2) Schnader's representation of Dan Crowley via participation in joint interest, attorney client communications with Mr. Crowley in February and March 2003 with respect to an issue which has recently taken on significance in the case.

The Trustee's and Mr. Schreiber's depositions have confirmed that both you and Barry will be necessary witnesses at trial. As I previously described in my March 23 letter to you, Barry participated in many conversations with Mr. Schreiber and others on behalf of the Trustee with respect to Mr. Crowley's relationship with the Trustee, including some of the claims and circumstances at issue in this case. During these conversations, according to the Trustee, Barry was often acting in a business capacity on his behalf, including in determining bonuses that were to be paid to Coram executives, including Mr. Crowley. The need for your testimony, Will, became crystal clear when the Trustee testified that Mr. Crowley's draft May 2002 letters – never sent and inadvertently produced – were the impetus behind this lawsuit, that he believed Mr. Crowley had lied to him with respect to the content of those letters, and that he was not shocked by Judge Walrath's decision on March 3. As you well know, the focus of that hearing was the effect, if any, of the draft correspondence. You and Barry prepared Mr. Crowley for his deposition on the matter, prepared and presented him as a witness at the March 3, 2003 hearing, argued that the contents of the draft letters were not inconsistent with anything Mr. Crowley told

Wilbur L. Kipnes, Esq.
March 30, 2007
Page 2

the Trustee, and expressed in writing to Mr. Crowley the view that you were "shocked and disappointed at the ruling." Your words and conduct contradict the Trustee. The Trustee also testified that in light of the draft letters, he had lost confidence with Mr. Crowley and his stewardship of Coram, thus requiring an examination of all of the communications in that period between Mr. Crowley and the Trustee – and his representatives, including Barry and you. These facts plainly make both of you necessary witnesses at trial. In light of these facts, query how you, Barry, or your firm can represent the Trustee at trial in light of Delaware Rule of Professional Conduct 3.7.

There are related but distinct questions regarding your and Schnader's representation in early 2003, issues which have only recently come into focus. Your complaint focused exclusively on a purported conflict that Mr. Crowley had in 1999 and contains no allegations concerning any conduct in 2002 or beyond. Recently, however, when you took the deposition of Mr. Crowley's former counsel, Mr. Schreiber, you focused on privileged documents dated in 2002 that were produced by the Much Shelist firm in February 2003. The questioning of Mr. Schreiber largely focused on these documents as well as the motion then pending before the bankruptcy court concerning Mr. Crowley's continued employment at Coram and the settlement between the Trustee and Mr. Crowley. In addition, during the deposition of the Trustee this week, he made it clear that the event that precipitated his decision to file this complaint against Mr. Crowley was the production of the documents by Mr. Schreiber and testimony regarding their contents. Thus, the preeminence of this issue in this case has only recently come to our attention.

Moreover, in reviewing prior transcripts it is clear that the Schnader firm, at a minimum, participated in joint interest attorney client communications with Mr. Crowley concerning these very documents and issues in preparing for his deposition on February 27, 2003 in which those documents were the central focus. The following are excerpts from pages 7 thru 12 of Mr. Crowley's February 27, 2003 deposition:

Q. Mr. Crowley, did you spend some time preparing for this deposition?

A. Yes.

Q. Was any of that time spent with any person present, other than your attorney, Mr. Ward, or your attorney, Mr. Schreiber?

A. Yes.

Q. Who?

A. Counsel for the trustee

Q. Who?

A. Principally, Mr. Kipnes.

Wilbur L. Kipnes, Esq.
March 30, 2007
Page 3

Q.    How much time did you spend with Mr. Kipnes preparing for this deposition?

A.    A couple of hours.

Q.    When?

A.    Yesterday.

Q.    Yesterday.

A.    Yes.

Q.    During the course of that preparation did you look at any documents?

A.    Yes.

****************

Q.    Can you describe to me any of the documents you looked at?  Name one.

A.    Correspondence between myself and my attorney as to a draft letter that was part of your brief to the court.

Q.    The letter dated May 6th about?

A.    About that date.  It was two versions of the letter that was one letter, yes.

Q.    During your meeting in preparation in which Mr. Kipnes was present at who said let's discuss this document?  Whose idea was it?

A.    My counsel.

MR. WARD:  Objection.  The attorneys have a joint interest in this and I think that is covered by privilege.

Q.    I'm sorry.

A.    I don't understand the procedure when someone objects, am I just –

MR. WARD:  I think who said what to whom in this meeting would be privileged.  Mr. Kipnes represents the trustee.  Mr. Crowley is an employee of the trustee. And I think in this particular proceeding there is a joint interest.

MR. LEVY:   Are you going to instruct Crowley the witness not to answer?

Wilbur L. Kipnes, Esq.
March 30, 2007
Page 4

MR. WARD:  I will instruct him not to answer as to conversations between and among
himself and the attorneys that were present at this session.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MR. LEVY:  Mr. Kipnes, do you adopt the position on behalf of the trustee that you have
a joint interest and have a privilege?

MR. KIPNES: We do.

MR. LEVY:   Is there a written agreement between counsel regarding this joint interest,
Mr. Ward?

MR. WARD:  I'm not aware of a written agreement.

MR. LEVY:   Mr. Ward, would you tell me whether there was ever a verbal agreement
with respect to that.

MR. WARD:  This particular matter was specifically discussed among counsel and I take
that to be an agreement between counsel that we are exercising a joint
privilege with respect to this motion, in which the trustee is the movant
and his employee is the witness.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q.      Sir, that was not my question.  Do you view yourself as an employee of the trustee
in a layman's sense?

MR. WARD:  Same objection.  Crowley

A.      I work for the trustee, yes.

Q.      Just so we make a record here, just let me ask you this:  What did Mr. Kipnes tell
you or say to you about the May 6th or May 8th document that you discussed?

MR. WARD:  Objection to the extent it calls for any recounting of any statements made
to or by the witness in this conference with counsel, covered by the joint
privilege.

Q.      Do you refuse to answer, sir?

MR. WARD:  I instruct the witness not to answer.

MR. LEVY:   Can we agree, if I were to ask additional questions about what went on at
that meeting you'd give the same instruction?

MR. WARD:  I would.

Wilbur L. Kipnes, Esq.
March 30, 2007
Page 5

The transcript quoted above establishes that Schnader was, at the very least, in a common defense, common interest, attorney-client posture with Mr. Crowley during the February and March 2003 time period. It also appears, under relevant law, that an attorney-client relationship existed between the two. Now the Schnader firm, indeed you yourself, proposes to take Mr. Crowley's deposition on the very issues about which you participated in attorney client communications with Mr. Crowley, having now put those very events at issue. Under Third Circuit precedent, this is improper.

I propose that we meet and confer by telephone on this topic either later today, or early next week, to discuss the issues, see whether the factual issues in the litigation can somehow be narrowed to avoid this conflict, or whether or not it will be necessary either for your law firm to withdraw, or for us to seek your law firm's disqualification. Under no circumstances does Mr. Crowley give his consent for your firm's utilizing in any way confidential information acquired from him during the existence of a common interest, joint defense, or attorney-client relationship, which was admitted by you in the transcript citation quoted above.

We look forward to resolving these issues promptly.

Very truly yours,

ELLIOT R. PETERS

ERP:aap

cc:    Barry Bressler, Esq.

**From:** Kipnes, Will
**Sent:** Friday, March 30, 2007 2:47 PM
**To:** EPeters@KVN.com
**Cc:** Bressler, Barry
**Subject:** FW: Adams v. Crowley

Elliott -- I have quickly reviewed your letter and I do not wish to respond hastily, other than to say that I disagree. But, I can say a few things now.

1.  We have no confidential information -- Mr. Crowley's position regarding the draft letters is set forth in his deposition and trial testimony.  (We had decided that Rich will be taking Mr. Crowley's deposition next week, although I do not know whether we have had any previous occasion to communicate that fact to you.)   In any event, we do not intend and never intended to ask Mr. Crowley any questions about any conversations he had with me or Barry.

2.  Barry was the Trustee's lawyer, not business advisor.

3.  Since we are talking about testimony at trial, the issue is trial relevance, not discoverability, and I thought that many of the questions you asked the Trustee, although appropriate discovery questions, would not be admissible at trial.   I need to reflect on this a good deal more, and I suggest you do the same, but I do have some sense of self-fulfilling prophecy about this.  If you asked the Trustee a question that we would not ask him at trial and then say "aha, you or Barry might say something different," the hypothetical "disagreement" would be on an irrelevant subject.  So, your thought that evidentiary stipulations might be helpful is a good suggestion.

4.  I repeat what I have told you both in writing and in person.  If you feel you need to take my testimony on the question of whether the draft letters were inadvertently produced, I will work with you.  I would rather provide that information in some other way, but even if I am deposed, Judge Robinson will decide before trial whether the letters are admissible or not, rendering any trial testimony on the subject irrelevant.

I am not available for a telephonic meet and confer until Tuesday.  Let me know what time would be convenient for you.

I failed to notice that the subpoenas you issued were from the Eastern District of Pennsylvania.  Don't you agree that it makes more sense to have them issued out of the District of Delaware?  If a court has to render decisions on these issues, it should be the trial court and not a stranger to the case.  We will of course stipulate that service was made on March 29.

Will

**From:** Kipnes, Will
**Sent:** Saturday, April 07, 2007 11:08 AM
**To:** EPeters@KVN.com
**Cc:** Bressler, Barry; Barkasy, Rich
**Subject:** Deposition Subpoenas to Bressler and Kipnes

Elliot -- You sent me a letter on Friday, March 30, 2007, regarding the subpoenas your office had served on Barry and me for depositions on April 26 and 27. In that letter you proposed that we meet and confer by telephone either later that day or early the following week, i.e. the week of April 2. I responded by email on March 30, stating that I disagreed with your letter and providing some preliminary comments. In that email, I advised that I was available for a telephonic meet and confer starting Tuesday, April 3. I also asked that the subpoenas be replaced with subpoenas issued by the District of Delaware, and I agreed to accept service of the new subpoenas as of March 29.

I have not heard from you at all this week. I assume you understood when I said that I "disagreed," that I meant that we would not voluntarily appear for depositions. The only exception is that, as I have stated several times, I remain willing to provide information on the question of whether the privileged documents that were produced in 2003 by Mr. Crowley's then counsel should be returned, although I would of course prefer not to be deposed.

I am leaving for vacation very early on Tuesday morning (7:30 am flight). I was not planning to be in the office much on Monday, but if you let me know if you would like to speak, I will make myself available. Otherwise, we will take whatever steps we deem appropriate.

Will

Wilbur L. Kipnes
Schnader Harrison Segal & Lewis LLP
Suite 3600, 1600 Market Street
Philadelphia, Pa. 19103
215-751-2336 (phone)
215-751-2205 (fax)
wkipnes@schnader.com

**From:** Kipnes, Will
**Sent:** Saturday, April 07, 2007 12:14 PM
**To:** 'R. James Slaughter'; Elliot Peters
**Cc:** Bressler, Barry; Barkasy, Rich; Laurie Mims; Warren Braunig; Garrett Lynch; Brook Dooley
**Subject:** RE: Deposition Subpoenas to Bressler and Kipnes

Jamie --

I beg to differ, as my March 30 email makes quite clear.   All we have heard from you are conclusions and generalized references to the "02 events" and the "Trustee's position" and that as lawyers we had many conversations and learned facts.  I was planning to ask you to provide specifics.  If you care to do that before Monday, that is fine.  If you care not to do so at any time and wish simply to stand on the correspondence to date, that is up to you.

We understand that Mr. Crowley would like to have the May 2002 draft letters deemed inadmissible, and I have consistently said that I am willing to provide information on the subject of their production so that the court can make a pretrial ruling.  Beyond that, we truly don't understand your position.

I will call you at 3:00 eastern, noon pacific on Monday.


Will

---

**From:** R. James Slaughter [mailto:RSlaughter@KVN.com]
**Sent:** Saturday, April 07, 2007 11:59 AM
**To:** Kipnes, Will; Elliot Peters
**Cc:** Bressler, Barry; Barkasy, Rich; Laurie Mims; Warren Braunig; Garrett Lynch; Brook Dooley
**Subject:** Re: Deposition Subpoenas to Bressler and Kipnes


Will -

I'm free anytime after noon pacific on Monday.

We have now told you on numerous occasions some of the reasons your testimony is necessary. We have yet to hear any response as to why it might not be necessary. It would be appropriate to have some indication of that from you before our call. Thanks.

Jamie


-----Original Message-----

From: Kipnes, Will <wkipnes@schnader.com>
To: Elliot Peters
CC: Bressler, Barry <BBressler@Schnader.com>; Barkasy, Rich <RBarkasy@schnader.com>; R. James Slaughter; Laurie Mims; Warren Braunig; Garrett Lynch; Brook Dooley
Sent: Sat Apr 07 08:45:35 2007
Subject: RE: Deposition Subpoenas to Bressler and Kipnes

Enjoy your trip as well.  I said on March 30: "I am not available for a telphonic meet and confer until Tuesday.  Le me know what time would be convenient for you."  It was clear that it was for you to get back to me.

In any event, I will wait to hear from Jamie regarding a time for a meet and confer on Monday.

_____

From: Elliot Peters [mailto:EPeters@KVN.com]
Sent: Saturday, April 07, 2007 11:39 AM
To: Kipnes, Will
Cc: Bressler, Barry; Barkasy, Rich; R. James Slaughter; Laurie Mims; Warren Braunig; Garrett Lynch; Brook Dooley
Subject: Re: Deposition Subpoenas to Bressler and Kipnes


Will,
I am in the airport right now, leaving for a week's vacation. Pls arrange with Jamie to meet and confer Monday morning.  We (your team and ours) were all busy with depos this week, but I heard nothing from you  until this Saturday am email. We have made our position clear. You and Barry (and Rich, for that matter) are all percipient witnesses.  You are agents of the plaintiff, and hence no subpoena is really necessary, but at your request we have served subpoenas.  In light of the 02 events you have recently emphasized in discovery, your testimony is relevant at trial.  We intend to use that testimony and written documents you have all authored which are inconsistent with positions the Trustee is taking. If you wish to withdraw all allegations as to which you are witnesses -- those relating to 2002 and 2003, it is popssible this issue could be avoided.  Otherwise it can't be avoided.  We are not presently intending to seek your disqualification, but you may have your own legal/ethical/practical considerations to address in that regard.
In sum, you have been properly subpoenaed to depositions which we intend to take absent a contrary order of the court.
Have a good trip.
Elliot



-----Original Message-----
From: Kipnes, Will <wkipnes@schnader.com>
To: Elliot Peters
CC: Bressler, Barry <BBressler@Schnader.com>; Barkasy, Rich <RBarkasy@schnader.com>
Sent: Sat Apr 07 08:07:37 2007
Subject: Deposition Subpoenas to Bressler and Kipnes

Elliot -- You sent me a letter on Friday, March 30, 2007, regarding the subpoenas your office had served on Barry and me for depositions on April 26 and 27.  In that letter you proposed that we meet and confer by telephone either later that day or early the following week, i.e. the week of April 2. I responded by email on March 30, stating that I disagreed with your letter and providing some preliminary comments.  In that email, I advised that I was available for a telephonic meet and confer starting Tuesday, April 3.  I also asked that the subpoenas be replaced with subpoenas issued by the District of Delaware, and I agreed to accept service of the new subpoenas as of March 29.

I have not heard from you at all this week.  I assume you understood when I said that I "disagreed," that I meant that we would not voluntarily appear for depositions.   The only exception is that, as I have stated several times, I remain willing to provide information on the question of whether the privileged documents that were produced in 2003 by Mr. Crowley's then counsel should be returned, although I would of course prefer not to be deposed.

I am leaving for vacation very early on Tuesday morning (7:30 am flight).   I was not planning to be in the office much on Monday, but if you let me know if you would like to speak, I will make myself available.  Otherwise, we will take whatever steps we deem appropriate.

Will

Wilbur L. Kipnes
Schnader Harrison Segal & Lewis LLP
Suite 3600, 1600 Market Street
Philadelphia, Pa. 19103
215-751-2336 (phone)
215-751-2205 (fax)
wkipnes@schnader.com

# EXHIBIT A-7

ProTEXT Transcript Condensing for Windows

SHEET 1  PAGE 1 ─────────────────────────
177

```
 1              VOLUME II
 2     IN THE UNITED STATES DISTRICT COURT
 3        FOR THE DISTRICT OF DELAWARE
 4              -  -  -
 5   ARLIN M. ADAMS, Chapter 11      :
     Trustee of the                  :
 6   Post-Confirmation Bankruptcy    :
     Estates of CORAM HEALTHCARE     :
 7   CORPORATION, a Delaware         :
     Corporation and of CORAM,       :
 8   INC., a Delaware Corporation,   :
              Plaintiff             : CASE NO.
 9        vs.                       : 04-1565
10   DANIEL D. CROWLEY; DONALD J.    :
     AMARAL; WILLIAM J. CASEY;       :
11   L. PETER SMITH; AND SANDRA L.   :
     SMOLEY,                         :
12            Defendants             :
13
14
           Wednesday, March 28, 2007
15                9:33 a.m.
16              -  -  -
17
18           Continued videotape deposition
19   of ARLIN M. ADAMS, held at the law
     offices of Schnader Harrison Segal &
20   Lewis, LLP, 1600 Market Street, Suite
     3600, Philadelphia, Pennsylvania, 19103,
21   pursuant to notice before Cynthia A.
     Whyte, Registered Professional Reporter
22   and Notary Public.
23              -  -  -
24
25
```

PAGE 2 ─────────────────────────
178

```
 1   A P P E A R A N C E S :
 2   SCHNADER HARRISON SEGAL & LEWIS LLP
     Counsel for Plaintiff Arlin M. Adams,
 3   Trustee
         1600 Market Street
 4       Suite 3600
         Philadelphia, PA  19103
 5       (215) 751-2050
 6   BY:    BARRY E. BRESSLER, ESQ.
            bbressler@schnader.com
 7
     AND:   RICHARD A. BARKASY, ESQ.
 8          rbarkasy@schnader.com
 9
     KEKER & VAN NEST LLP
10   Counsel for Defendant Daniel Crowley
         710 Sansome Street
11       San Francisco, CA  94111-1704
         (415) 391-5400
12
     BY:    ELLIOT R. PETERS, ESQ.
13          epeters@kvn.com
14   AND:   WARREN A. BRAUNIG, ESQ.
            wbraunig@kvn.com
15
16
17   ALSO PRESENT:   VINCENZO PETULLA,
18                   Videographer
19
20
21
22
23
24
25
```

PAGE 3 ─────────────────────────
179

```
 1            IT IS HEREBY STIPULATED AND
 2   AGREED by and among counsel for the
 3   respective parties hereto that the
 4   filing, sealing and certification of the
 5   within deposition shall be and the same
 6   are hereby waived.
 7            IT IS FURTHER STIPULATED
 8   AND AGREED that all objections,
 9   except as to the form of the
10   question, shall be reserved to the
11   time of the trial.
12            IT IS FURTHER STIPULATED AND
13   AGREED that the within deposition may be
14   signed before any Notary Public with the
15   same force and effect as if signed and
16   sworn to before the Court.
17
18
19
20
21
22
23
24
25
```

PAGE 4 ─────────────────────────
180

```
 1              I N D E X
 2   WITNESS:                          PAGE
 3   ARLIN M. ADAMS - VOLUME II
 4      By Mr. Peters       184, 391
 5      By Mr. Bressler           390
 6         ADAMS EXHIBITS
 7   NO.         DESCRIPTION       PAGE
 8   Exhibit 13  Transcript, 11/14/03  219
 9   Exhibit 14  Letter, 5/16/02, to
                 Judge Adams from Mr.
10               Crowley               234
11   Exhibit 15  Form 10-Q             240
12   Exhibit 16  Form 10-K             250
13   Exhibit 17  Letter, 3/14/02, to
                 Mr. Adams from Mr.
14               Liebentritt           257
15   Exhibit 18  Letter, 8/22/02, to
                 Mr. Beskrone from Mr.
16               Adams                 258
17   Exhibit 19  Letter, 4/11/02, to
                 Mr. Levy from Mr.
18               Bressler              261
19   Exhibit 20  Letter, 5/1/02 to
                 Judge Adams from Mr.
20               Levy                  267
21   Exhibit 21  Letter, 9/17/02, to
                 Judge Adams from Mr.
22               Zell                  272
23   Exhibit 22  Letter, 9/18/02, to
                 Judge Adams from Mr.
24               Levy                  278
25
```

ProTEXT Transcript Condensing for Windows

357

```
 1     A.    I don't recall it, but I could have.
 2     Q.    It's Bates-stamped Chapter 11
 3  Trustee 3163.  Do you know how it came into
 4  the possession of the trustee?
 5     A.    Well, it says, "cc Joseph Devine,"
 6  who is one of the SEC lawyers in the Schnader
 7  office.
 8     Q.    So Mr. Devine is with Schnader?
 9     A.    Yes.
10     Q.    And have you ever reviewed this
11  before to see whether the index of
12  correspondence between Crowley and you is
13  accurate?
14     A.    I did not.
15     Q.    Do you see that at least according
16  to this index the weekly reports are sent from
17  Crowley to you?
18     A.    I see it.
19     Q.    Do you have any reason to believe
20  that is not accurate?
21     A.    No; there is no doubt they were sent
22  under Dan Crowley's name.  If you are asking
23  me who physically sent the report, I think the
24  answer is Danitz.
25     Q.    Why do you say that?
```

359

```
 1     A.    That's their -- that was their
 2  position, yes.
 3     Q.    And did you also understand that
 4  Mr. Crowley was requesting under the
 5  management incentive plan that certain
 6  managers, but not including himself, should
 7  receive bonus payments at this time?
 8        MR. BRESSLER:  Object to the
 9     form, but you can answer.
10     A.    Generally recall something like
11  that.  I turned this type of matter over to
12  Mr. Bressler.  He was in charge of the
13  bonuses.
14     Q.    Mr. Bressler handled this issue,
15  bonuses?
16     A.    I asked him to make sure it was
17  handled.
18     Q.    You asked him to handle it.
19        And when Mr. Bressler handled
20  something like bonuses, was he acting as your
21  lawyer or more of a business consultant?
22        MR. BRESSLER:  Object to the
23     form, but he can answer.
24     A.    He was acting -- I said, "Make sure
25  that this is handled correctly and then give
```

358

```
 1     A.    Because he would tell me if I was
 2  not going to get them or if there were any
 3  questions.  He would sometimes call to correct
 4  things on them.  He made it clear that that
 5  was one of his jobs.
 6        (Discussion off the record.)
 7        (Adams Exhibit 33 was marked
 8     for identification.)
 9     Q.    Adams 33 is an April 24, 2002 letter
10  from Crowley to you.
11        Do you have that in front of you?
12     A.    I see it.
13     Q.    Do you recall receiving
14  communications from Mr. Crowley about the
15  management incentive plan?
16     A.    I don't recall this letter, but I
17  have no doubt that he sent it to me.
18     Q.    Do you recall that with respect to
19  the management incentive plan Mr. Crowley's
20  position was that based on the company's
21  improved EBITDA members of management were
22  entitled to receive -- had qualified to
23  receive bonus payments under that plan?
24        MR. BRESSLER:  Object to the
25     form.
```

360

```
 1  me a report."  You can put the title on it.  I
 2  guess he was my lawyer, of course.
 3     Q.    Have you ever previously testified
 4  that he did that kind of work as a business
 5  consultant and not as a lawyer?
 6     A.    I don't recall so testifying.
 7     Q.    Was there something called a KERP?
 8     A.    Yes.
 9     Q.    And what does KERP stand for?
10     A.    That was an arrangement, a
11  supplemental salary arrangement too.  I can't
12  tell you what the initials were.
13     Q.    A key employee retention program?
14     A.    That sounds right.
15     Q.    Did you turn that over to
16  Mr. Bressler too?
17     A.    I think he supervised that for me.
18     Q.    So is it a fair statement that
19  Mr. Bressler is more knowledgeable than you
20  are about the KERP and the management
21  incentive plan?
22        MR. BRESSLER:  Object to the
23     form.
24     A.    I think he is.
25        MR. PETERS:  Why don't we go
```