# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARLIN M. ADAMS, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of CORAM HEALTHCARE CORPORATION, a Delaware Corporation, and of CORAM, INC., a Delaware Corporation, <br><br> Plaintiff, <br><br> v. <br><br> DANIEL D. CROWLEY, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 04-1565 (SLR) |

## OPENING BRIEF OF DEFENDANT DANIEL CROWLEY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

Dated: April 17, 2007

Jeffrey C. Wisler (DE Bar No. 2795)
Christina M. Thompson (DE Bar No. 3976)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE 19801
(302) 658-9141

-and-

John W. Keker
Elliot R. Peters
R. James Slaughter
KEKER & VAN NEST, LLP
710 Sansome Street
San Francisco, CA 94111
(415) 391-5400

*Attorneys for Defendant DANIEL D. CROWLEY*

# TABLE OF CONTENTS

**Page**

I.     NATURE AND STATE OF PROCEEDINGS....................................................................1

II.    SUMMARY OF ARGUMENT ...................................................................................1

III.   STATEMENT OF FACTS .........................................................................................2

     A.     Coram Healthcare ..........................................................................................2

     B.     Daniel Crowley ..............................................................................................4

     C.     Coram Hires Crowley as CEO with Knowledge of His Relationship
          with Cerberus ...............................................................................................5

     D.     Crowley's Performance as CEO .....................................................................8

     E.     With All Other Alternatives Exhausted, Coram Enters Bankruptcy ...............9

     F.     The Formation of Coram's Equity Committee ................................................10

     G.     The First Confirmation Hearing......................................................................12

     H.     The Goldin Report and the Second Plan.........................................................12

     I.      Arlin Adams is Appointed Trustee .................................................................14

     J.      The Trustee Moves to Extend Crowley's Employment....................................15

     K.     The Bankruptcy Litigation Continues for 18 Months After Crowley
          Leaves ...........................................................................................................16

     L.     The Trustee Accedes to Pressure to Sue Crowley ..........................................17

IV.    UNDISPUTED FACTS ............................................................................................18

V.     ARGUMENT............................................................................................................18

     A.     The Court Should Grant Crowley Summary Judgment Because The
          Undisputed Facts Demonstrate That He Did Not Breach A Fiduciary
          Duty...............................................................................................................18

     B.     Crowley Did Not Breach Any Duty with Respect to Disclosure of His
          Relationship with Cerberus.............................................................................19

          1.     Relevant legal standard ......................................................................20

          2.     All facts regarding Crowley's relationship with Cerberus were
               disclosed prior to the time he became CEO..........................................21

          3.     To the extent some board members did not have knowledge of
               specific terms of Crowley's agreement with Cerberus, that
               information was not material ................................................................22

## TABLE OF CONTENTS
### (cont'd)

Page

4.   Any nondisclosure was based on a good faith mistake and therefore is protected by the exculpatory provision in Coram's certificate of incorporation..................................................24

5.   Crowley's alleged nondisclosure did not cause quantifiable damages..................................................25

C.   Undisputed Facts Show that Crowley's Actions While CEO Are Protected by the Business Judgment Rule ...........................................26

1.   Delaware's business judgment rule protects acts taken by disinterested officers and directors, unless they are "grossly negligent".............................................................27

2.   The decision to sell CPS and use the proceeds to pay down debt was an exercise of reasonable business judgment ...........................27

a.   Crowley and the Board engaged in careful evaluation of all reasonably available information, and their reliance on DBAB protects them from liability............................................28

b.   The doctrine of judicial estoppel prevents the trustee from arguing Crowley committed breaches relating to the CPS sale ......................................................30

c.   The Trustee cannot prove any damages with respect to the CPS sale ........................................................32

3.   The decision to make interest payments to noteholders in cash rather than in kind was an exercise of reasonable business judgment .....................................................................33

D.   Crowley Is Entitled to Partial Summary Judgment Because The Only Damages That Can Legally Be Traced to His Alleged Breach Are Damages Incurred Between Failure of the First Reorganization Plan And Failure of the Second Plan ...............................................35

VI.   CONCLUSION.........................................................................38

## TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases

Carlson v. Hallinan,
2006 WL 771722 (Del.Ch. 2006) .................................................................. 19

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ......................................................................................... 18

Chaplake Holdings, Ltd. v. Chrysler Corp.,
2002 WL 148088 (Del. Super. Ct. 2002) ....................................................... 21

Continuing Creditors' Comm. of Start Telecom., Inc. v. Edgecomb,
385 F. Supp. 2d 449 (D. Del. 2004) ................................................................ 27

Freeman v. Minn. Min. & Mfg. Co.,
675 F. Supp. 877 (D. Del. 1987) ..................................................................... 36

Herrick v. Garvey,
298 F.3d 1184 (10th Cir. 2002) ...................................................................... 12

In re Coram Healthcare Corp.,
315 B.R. 321 (Bankr. D. Del. 2004) ......................................................... 17, 32

In re Fuqua Indus., Inc.,
2005 WL 1138744 (Del.Ch. 2005) .................................................................. 19

In re Tele-Communications, Inc. Shareholders Litig.,
2005 WL 3642727 (Del.Ch. 2005) .................................................................. 20

In re Tyson Foods, Inc.,
--- A.2d ----, 2007 WL 1018209 (Del.Ch. 2007) ...................................... 21, 25

LaSalle Nat'l Bank v. Perelman,
141 F. Supp. 2d 451 (D. Del. 2001) ........................................................... 18, 19

Legatski v. Bethany Forest Assoc., Inc.,
2006 WL 1229689 (Del. Super. Ct. Apr. 28, 2006) ....................................... 19

Metzker v. Int'l Paper Co.,
825 F. Supp. 641 (D. Del. 1993) ..................................................................... 36

Montrose Med. Group Participating Sav. Plan v. Bulger,
243 F.3d 773 (3d Cir. 2001) ........................................................................... 31

New Hampshire v. Maine,
532 U.S. 742 (2001) ........................................................................................ 31

Nipper v. Snipes,
7 F.3d 415 (4th Cir. 1993) .............................................................................. 12

Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc.,
v. Elkins,
2004 WL 1949290 (Del.Ch. 2004) ............................................................. 27, 30

Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,
81 F.3d 355 (3d Cir. 1996) ............................................................................. 31

Solash v. Telex Corp.,
1988 WL 3587 (Del. Ch. 1988) ....................................................................... 27

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

*Thompson v. Glenmede Trust Co.,*
  1996 WL 529693 (E.D. Pa. Sep. 17, 1996) ............................................................. 12

*TSC Indus., Inc. v. Northway, Inc.,*
  426 U.S. 438 (1976) ................................................................................................ 22

*U.S. Steel, LLC v. Tieco, Inc.,*
  261 F.3d 1275 (11th Cir. 2001) ............................................................................. 12

### State Cases

*Arnold v. Soc'y for Sav. Bancorp, Inc.,*
  650 A.2d 1270 (Del. 1994) ..................................................................................... 24

*Aronson v. Lewis,*
  473 A.2d 805 (Del. 1984) ....................................................................................... 27

*Brehm v. Eisner,*
  746 A.2d 244 (Del. 2000) ............................................................................ 27, 30, 35

*Cinerama, Inc. v. Technicolor, Inc.,*
  663 A.2d 1156 (Del. 1995) ........................................................................ 26, 29, 35

*Emerald Partners v. Berlin,*
  726 A.2d 1215 (1999) .............................................................................................. 20

*Gagliardi v. TriFoods Int'l, Inc.*
  683 A.2d 1049, 1051 (Del.Ch. 1996) ..................................................................... 33

*In re Tri-Star Pictures Litig.,*
  634 A.2d 319 (Del. 1993) ................................................................................. 19, 36

*In re Walt Disney Co. Derivative Litig.,*
  907 A.2d 693 (Del.Ch. 2005) ................................................................................ 33

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.,*
  854 A.2d 121 (Del.Ch. 2004) ................................................................................. 20

*O'Reilly v. Transworld Healthcare, Inc.,*
  745 A.2d 902 (Del. 1999) ............................................................... 20, 21, 22, 25

*Prod. Res. Group, L.L.C. v. NCT Group, Inc.,*
  863 A.2d 772 (Del.Ch. 2004) ................................................................................. 35

*Smith v. Van Gorkom,*
  488 A.2d 858 (Del. 1985) ....................................................................................... 25

*Teachers' Retirement Sys. of La. v. Aidinoff,*
  900 A.2d 654 (Del.Ch. 2006) ................................................................................. 21

### State Statutes

8 Del.C. § 141(e) .......................................................................................................... 30

8 Del.C. § 144(a) .......................................................................................................... 29

8 Del.C. § 102(b)(7) .............................................................................................. 20, 24

### Federal Rules

Fed. R. Civ. P. 56(a) ................................................................................................... 36

Fed. R. Civ. P. 56(c) ................................................................................................... 18

## TABLE OF AUTHORITIES
### (cont'd)

**Page(s)**

Fed. R. Civ. P. 56(d) ........................................................................................................... 36

Fed. R. Evid. 802 ............................................................................................................... 12

### Treatises

3 Am. Jur. 2d Agency § 278 ............................................................................................... 21

3 Fletcher Cyc. Corp. § 793 ............................................................................................... 21

Restatement (Third) of Agency § 5.03 .............................................................................. 22

## I.    NATURE AND STATE OF PROCEEDINGS

This action is brought by the bankruptcy Trustee of Coram Healthcare Corp. and Coram, Inc. ("Coram") against Coram's former Chairman and Chief Executive Officer Daniel Crowley. The complaint contains one cause of action, for breach of fiduciary duty. Fact discovery is largely complete, although several depositions have been commenced but not yet completed. The Trustee moved within the last several days for a protective order with respect to subpoenas served by Crowley on Barry Bressler and Wilbur Kipnes, the Trustee's lawyers but also percipient actors in the underlying events. Crowley will oppose the motion. The completion of those depositions, however, is not necessary for resolution of these motions. Expert discovery has not yet begun. Trial is set for September 17, 2007.

## II.    SUMMARY OF ARGUMENT

Crowley is entitled to summary judgment because he did not breach any fiduciary duty to Coram. In the alternative, he is entitled to partial summary judgment because the Trustee's theory of damages is unbounded, and must be circumscribed to comport with Crowley's conduct and the law.

1.      The Trustee alleges, in essence, that Crowley breached his fiduciary duties by failing adequately to disclose his relationship with a Coram creditor, Cerberus Partners, when Coram hired him first as a consultant and then as Chairman and CEO in 1999. In fact, the relationship with Cerberus was known to Coram's Board, expressly permitted in Crowley's employment agreement with Coram, and also set forth by Coram's counsel in the Disclosure Statement filed by Coram in the Bankruptcy Court. To the extent some directors did not know specific details of the relationship, those details were immaterial, and their non-disclosure was inadvertent and made in good faith, making them non-actionable under the exculpatory clause contained in Coram's certificate of incorporation and applicable Delaware law.

2.      Moreover, no actionable damages flowed from the alleged nondisclosure. Once disclosure had been fully made, Coram's Board, its attorneys, its outside bankruptcy advisor, and also the Trustee bringing this action, kept Crowley on for years as CEO, because he was doing a great job running the company. The Trustee, and the lawyers who still represent him, negotiated

with Crowley an extension of his employment agreement with Coram, and sought bankruptcy court approval for a deal which would give Crowley $3.48 million and a complete release from the very claims now being asserted. Crowley saved Coram. His actions never harmed it.

3.    The Trustee's allegations that Crowley acted improperly by selling a Coram unit, Coram Prescription Services ("CPS"), for less than full value are meritless. Prior management made the decision to sell CPS. The sale was engineered by Coram's investment bankers, who rendered a written opinion that the sale was fair to Coram. The Board unanimously approved that transaction. Crowley had no interest in the transaction, and his decisions were well within the protections afforded by the business judgment rule. The Trustee has previously argued that there was nothing wrong with the CPS transaction and the Bankruptcy Court agreed. He is judicially estopped from contending otherwise. Similarly, Coram's decision to use the proceeds of the sale of CPS to pay down debt, and the decision to make interest payments on its debt in cash (rather than in kind by increasing the principal amount of the debt), were reasonable exercises of informed business judgment. Coram's Board approved these decisions and the Trustee previously argued that they did not cause Coram any damage.

4.    With respect to damages, the Trustee seeks to recover massive, unspecified damages, including all professional fees incurred by Coram during the four-year donnybrook that Coram's bankruptcy became. These damages bear no sufficient relationship to the conduct alleged against Crowley. At the very least, this Court should grant partial summary judgment on damages, limiting damages to the specific time period between the first two bankruptcy confirmation hearings when Crowley's alleged conduct can at least arguably be related to a category of damages. Other sweeping damage claims unrelated to any wrongdoing alleged against Crowley should be eliminated from the case, to streamline it for trial, in the event Crowley's entire motion is not granted.

## III.    STATEMENT OF FACTS

### A.    Coram Healthcare

Coram is a provider of alternative-site infusion therapy. Infusion therapy involves the intravenous administration of drug therapies for nutrition, anti-infection, pain management,

chemotherapy and other purposes. In 1999, before Daniel Crowley had any involvement with Coram, the company was in dire straits. It owed about $290 million to a consortium of noteholders and creditors and was repeatedly in default under the terms of those notes. A124-27[1] (Coram 1999 3Q 10Q, pp. 7-10). One of its major business units, R-Net, was underperforming, and embroiled in litigation with Aetna U.S. Healthcare, Inc. A127-29 (*Id.* at 10-12). Another, CPS, required significant cash outlays to fund its expansion, prompting the Coram management and Board of directors to offer it for sale through the investment bankers at Deutsche Bank Alex.Brown. A95-96 (9/17/99 board minutes, pp. 1-2). The company's cash reserves were dwindling, and, as a result, a number of its vendors had placed Coram on credit hold. A75-75 (Coram 1999 2Q 10Q, p. 21-22). The company's failure to collect receivables promptly further magnified its cash problems. *Id.* From 1995 through 1999, the time period immediately preceding Crowley's employment, Coram's EBITDA[2] was a *negative* $37 million. A923-969 (1/9/03 Coram management presentation); A976 (Trustee's motion to retain Crowley, p. 7). In April 1999, Coram's CEO, Donald Amaral, had suddenly announced his resignation, and his replacement, Rick Smith, was not performing to the satisfaction of the company's Board of directors. The company also had a huge regulatory issue on the horizon: with its 50,000,000 shares of common stock sagging below $1.00/share, Coram's total debt of nearly $300 million would likely outstrip equity at the end of 2000, placing it in non-compliance with the federal Stark II legislation, a problem that, if not resolved, would strip the company of its ability to obtain Medicare and Medicaid referrals and would likely force it into bankruptcy.[3] A1409-10

---

[1] References to "A___" are to the Appendix of Documents in Support of Daniel Crowley's Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment filed concurrently herewith.

[2] "EBITDA" refers to earnings before interest, taxes, depreciation, and amortization, and is a commonly used financial measurement of profit or loss. A1405-06 (Danitz 4/6/07 34:8-35:2).

[3] The Omnibus Budget Reconciliation Act of 1993, commonly referred to as "Stark II," prohibits physicians from referring patients for certain Medicaid or Medicare reimbursable services to a company with which the physician and/or the physician's family has a financial relationship, unless the financial relationship fits within an exception. Stark II includes an exception for the ownership of publicly-traded stock in companies with stockholder equity (defined as the difference in value between a corporation's total assets and total liabilities) of at least $75 million either as of the end of its most recent fiscal year or on average over the last three fiscal years. If Coram was unable to qualify for this exception, it would be obligated to determine

(Danitz 4/6/07 51:13-52:12).

By agreement, Coram's noteholders—Goldman Sachs, Foothill Capital, and Cerberus—were represented on Coram's Board of Directors by the head of Cerberus, Stephen Feinberg. Cmplt., ¶ 11 (D.I. 1). Feinberg was understandably concerned about Coram. Unless the company could address its significant business problems, it would never be able to repay its obligations to the noteholders, and the noteholders' huge financial interest in Coram would become worthless. In material respects, the interests of Coram's shareholders were aligned with those of the noteholders: both groups' financial interests in Coram depended on the company finding first-class management, and turning itself around. Only in doing so could the noteholders ever hope to be repaid. Only in doing so could the stock ever have a chance to regain value.

**B.      Daniel Crowley**

In early 1999, Dan Crowley was an extremely successful healthcare executive living in Sacramento, California. Crowley had been the president and CEO of Foundation Healthcare, located in Sacramento, and had overseen a turnaround of that company in which it grew from $349 million in revenue when he became CEO to $7.5 billion at the time he left. *Declaration of Daniel Crowley in Support of Motion for Summary Judgment* ("Crowley Decl."), ¶ 1. After leaving Foundation in 1997, Crowley formed a consulting business of his own, Dynamic Healthcare Solutions, based in Sacramento. *Id.*, ¶ 2. Through Dynamic, Crowley provided a variety of consulting services to healthcare companies and to investors interested in his considerable expertise. *Id.*

In 1998, both Crowley and Feinberg considered an investment in a company called Oxford Health. They worked together on that project, and developed a professional relationship of mutual respect. Crowley and Dynamic began to perform services on a variety of prospective

---

whether a referring physician or his/her family owned stock prior to accepting any Medicare or Medicaid referrals from that physician, which would not only create an extremely onerous administrative burden and significant additional expenses for Coram but would place a significant burden on referring physicians that would discourage them from providing referrals to Coram. A570, 607-08 (Disclosure statement, pp. 14, 51-52).

and actual investments in which Cerberus held an economic interest. For example, Crowley
began consulting for, and ultimately became Chairman of, a company called Winterland, based
in San Leandro, California, in which Cerberus had an economic interest.[4] Crowley Decl., ¶ 3. In
the summer of 1999, Feinberg asked Crowley if he would meet with the new CEO of Coram,
Rick Smith, and provide advice or assistance to Smith with respect to Coram. Crowley Decl., ¶
4; Cmplt. ¶ 14 (D.I. 1); A82-85 (8/9/99 Crowley letter to Feinberg).

**C.    Coram Hires Crowley as CEO with Knowledge of His Relationship with Cerberus**

Crowley's original role at Coram was to provide assistance to Coram's CEO, Rick Smith,
first as part of his relationship with Cerberus, then as a consultant hired directly by the Board of
Coram. Cmplt., ¶ 15 (D.I. 1); A87 (9/4/99 board minutes, p. 2); A96 (9/17/99 board minutes, p.
2); A98-112 (Crowley-Coram consulting agreement). Crowley's observations of Smith revealed
significant performance-related issues on Smith's part, and Smith was not pleased with
Crowley's involvement. A82-85 (8/9/99 Crowley letter to Feinberg); A116-17 (11/2/99 Crowley
memo to board); A1156 (Amaral 12/8/00 33:08-35:18). In October 1999, Smith abruptly
resigned as CEO. Cmplt., ¶ 16 (D.I. 1); A113-14 (10/27/99 board minutes). The Coram Board
replaced him with Donald Amaral, a former CEO of Coram then serving as Chairman of the
Board, as interim CEO. Crowley Decl., ¶ 5; A113-14 (10/27/99 board minutes).

Amaral, Feinberg, and other members of the Board sought to convince Crowley to
become Coram's CEO, but Crowley was initially not interested in the job because Coram was
too small and some of its problems seemed intractable. Crowley Decl., ¶ 5; A1156-57 (Amaral
12/8/00 36:17-21, 37:5-7); A1247 (Amaral 8/30/06 82:8-17). Getting Crowley to be the CEO of
Coram, as one Board member put it, would be "the equivalent of St. Francis High School getting
Wilt Chamberlain on its basketball team." A1191-92 (Goldin 10/4/01 72:11-73:10). Crowley's

---

[4] Between 1999 and 2001, in addition to Winterland, Crowley consulted on numerous
investments and potential investments for Cerberus, including Curative, Hanger Orthopedics,
MaxiCare, NCSS Pharmacy, Pacificare Health, Sunstar, Kindred, Sun Health, PHP, Beverly
Nursing, Health Plan Services, and HRH Sterrit, among others. A891-92 (Crowley 1/24/02
letter); A1388-93, 1396-98 (Crowley 4/6/07 16:15-21:18, 98:10-100:4). Originally, Cerberus
paid Crowley on a day by day basis at a rate of $10,000. In or about August of 1999, in light of
the amount of work Crowley was doing for Cerberus, Mr. Crowley and Cerberus agreed to a
retainer of $80,000 per month. A1394-95 (Crowley 4/6/07 94:11-95:23).

contemporaneous memoranda reveal that becoming Coram's CEO was an assignment that he did not covet—he would have preferred to serve as a temporary crisis manager. A115 (10/29/99 Crowley letter to Amaral); A116-17 (11/2/99 memorandum to board); A176 (11/16/99 Crowley letter to Feinberg); *see also* Crowley Decl., ¶ 5.

During negotiations with Coram, Crowley made plain that he did not want to take on a job that prevented him from continuing his other consulting work, including his consulting work for Cerberus and his work at his own company, Dynamic. Crowley Decl., ¶ 6; A1207-08 (Amaral 11/7/01 400:21-401:5). Crowley also made clear that if he succeeded in saving Coram where the two previous CEO's had failed, thereby saving thousands of jobs, he should be financially rewarded for that success. Crowley Decl., ¶ 7; A1399-1401 (Crowley 4/6/07 119:23-121:16).

On November 18, 1999, Crowley executed a written employment agreement with Coram (effective November 30, 1999) providing that he would receive a salary of $650,000 per year with performance bonuses based upon the company's EBITDA targets.[5] A197-99 (Coram agreement, ¶ 3). Crowley's Coram agreement expressly permitted him to be an officer of or consultant to other companies. A197 (*Id.*, ¶ 2); Crowley Decl., ¶ 6. The Coram contract also included stock options and incentive payments based on Coram's earnings so that Crowley's compensation and Coram's success would be aligned. A197-99 (Coram agreement).[6]

---

[5] Originally, Crowley's incentive based compensation was based on a percentage of his salary – i.e. if Coram were to achieve $14 million in EBITDA, Crowley would be due a bonus of 60% of his salary. A206 (Coram agreement, Schedule A). That amount could increase if Coram's EBITDA was more than $14 million. Subsequently, in April 2000, Crowley renegotiated his agreement with Coram to provide a greater portion of his compensation by incentives, with higher triggers, but higher bonuses if those targets were achieved. A324-25 (second amendment to Coram agreement, ¶ 1(a)). Under the amendment to his Coram agreement, Crowley did not receive any bonus if Coram's EBITDA reached $14 million, but from $14 million through $35 million, Mr. Crowley would earn 25% of the EBITDA achieved. Ultimately, Crowley earned $17 million in bonuses when Coram achieved those EBITDA targets. A1130-37 (Crowley administrative claim). Those bonuses were never paid.

[6] During negotiations over the Coram agreement, Crowley had requested of both Amaral and Feinberg incentive compensation based upon a return to the noteholders. Crowley Decl., ¶ 7; A1399-1402 (Crowley 4/6/07 119:23-122:13); A1158 (Amaral 12/8/00 49:3-52:10). Crowley was unaware that this could be perceived in any way as creating divided loyalties on his part, and when Amaral and Feinberg declined Crowley's idea, the issue was dropped and did not become part of Crowley's agreement with Coram or Cerberus. Crowley Decl., ¶ 7; A1399-1402 (Crowley 4/6/07 119:23-122:13); A1158 (Amaral 12/8/00 49:3-52:10).

During the same time period that Crowley was negotiating a possible agreement with Coram, he was also memorializing the agreement he had previously reached with Feinberg regarding his consulting work for Cerberus. Crowley's agreement with Cerberus excluded compensation for Coram. Crowley Decl., ¶ 8; A181-83 (Cerberus agreement); A1260 (Feinberg 2/14/07 157:17-24); A1150 (Crowley 12/1/00 55:10-19).

Coram's directors were aware from the outset that Crowley had a financial relationship with Cerberus, that he performed services for other Cerberus companies, and that he was paid for those services. A1154-55, 1157 (Amaral 12/8/00 20:21-21:20, 37:8-17); A1253.01 (Smoley 8/31/06 28:17-29:17); A1215 (Amaral 11/7/01 437:4-10); A1245-46 (Amaral 8/30/06 80:3-81:20); A1256-58 (Feinberg 2/14/07 124:24-126:15); Crowley Decl., ¶ 9. Indeed, the Complaint concedes that the Board knew of the relationship between Crowley and Cerberus and that it was disclosed to the Board by Feinberg. Cmplt., ¶¶ 14, 15 (D.I. 1); *see also* Crowley Decl., ¶ 9; A1149 (Crowley 12/1/00 54:9-23). If any of the directors did not know specific terms of Crowley's agreement with Cerberus, it was only because they declined to ask for that information. Crowley Decl., ¶ 9. Several have testified that it did not matter to them. A1253 (Smoley 8/31/06 15:24-16:10); A1157 (Amaral 12/8/00 37:8-17); A1246-48 (Amaral 8/30/06 81:23-82:17, 87:12-22); A1178 (Casey 9/28/01 51:16-20). Crowley never refused to give any information regarding the terms of this relationship with Cerberus to anyone. Crowley Decl., ¶ 9; A1162-65 (Crowley 12/15/00 19:24-22:13); A1183 (Smoley 9/29/01 52:23-25); A1169 (Amaral 12/20/00 7:16-25). Indeed, just two days before he signed his Coram contract and three days before he signed his Cerberus agreement, Crowley proposed that the full Coram Board – including Feinberg, Amaral and all independent directors – meet with Crowley to discuss the situation with Coram and Cerberus. A176 (Crowley 11/16/99 letter to Feinberg). Of course, Feinberg, both a Board member and Chair of Coram's Compensation Committee, knew the precise terms of Cerberus' agreement with Crowley, since he signed the document. A177-196 (Cerberus agreement). Moreover, Crowley's written employment agreement with Coram contained explicit language making it clear that Crowley was authorized to serve as an officer of, and consult for, companies other than Coram. The agreement provides:

[Crowley] is a former Chief Executive Officer of a Fortune 200 company in demand to serve as Chairman of the Board, Chief Executive Officer or turn around management. [Crowley] also owns and operates his own company, Dynamic Healthcare, that has various business interests. [Crowley] intends to do whatever is professionally necessary to turn the Company around and the *Company recognizes that [Crowley] will have other business interests and may serve as an officer or consultant to other businesses.*

A197 (Coram agreement) (emphasis added). Amaral knew that one of the "business interests" that Crowley intended to continue was being "a consultant to Cerberus." A1207-08 (Amaral 11/7/01 400:21-401:5).

## D.    Crowley's Performance as CEO

Crowley became CEO of Coram effective November 30, 1999, and within months, Coram began to improve significantly. Coram's Board members, and then its bankruptcy Trustee, the plaintiff in this case, have all repeatedly observed that during Crowley's tenure as CEO, he worked tirelessly and effectively as Coram's CEO. The evidence in this regard, including the Trustee's numerous statements and court filings to this effect, read like testimonials, and make the charges in the instant case bewildering:

"Under Crowley, notwithstanding being in these bankruptcy proceedings, [Coram has] experienced positive operating margins and EBITDA, reduced cost of services, reduced operating costs, improved inventory management, improved information systems, improved management tools, and maintained a stable cash position with no net borrowing to fund post-petition operations." A976 (Trustee's motion to retain Crowley, p. 7).

"My perception was that he was operating this company as effectively as he could have been at the time under the circumstances. The figures supported that. My interviews with the executives supported that." A1224 (Trustee 2/25/03 64:4-9).

"Crowley has operated the company profitably and efficiently." A976 (Trustee's motion to retain Crowley, p. 7).

"EBITDA has substantially increased during the period of Crowley's stewardship of the company." A976 (Trustee's motion to retain Crowley, p. 7).

"[T]he evaluation conducted by the Trustee's advisors has revealed improved employee productivity, increased employee morale, and reduced employee turnover since Crowley became CEO." A978 (Trustee's motion to retain Crowley, p. 9).

"I don't think I could do as good a job as Mr. Crowley, nowhere near a job like he has done." A1231 (Trustee 3/3/03 22:10-11).

"Dan is an operating maestro … He cut costs, increased revenue, increased collections … and he provided charismatic leadership." A1249 (Amaral 8/30/06 88:9-13).

Crowley "managed the company brilliantly; he's done an excellent job that we hired him for." A1176-77 (Casey 9/28/01 31:25-32:2).

"[A]ll I saw was Dan Crowley performing in an exemplary manner doing great things for the Company, holding the company afloat.... I don't see how he could have done any better." A1184 (Smoley 9/29/01 54:16-25).[7]

Two huge and related problems at Coram, however, could not be immediately addressed. First, Coram could not service its debt from continuing operations and hence was constantly in default on its loan agreements. Second, as the total amount of its indebtedness increased, Coram's equity dwindled, bringing it perilously close to falling out of compliance with Stark II and causing the loss of the huge portion of its business derived from Medicare and Medicaid referrals.

E.    **With All Other Alternatives Exhausted, Coram Enters Bankruptcy**

In early 2000, Coram's Board of Directors retained David Friedman and his firm Kasowitz, Benson, Torres & Friedman to provide restructuring advice to the company. A315-23 (4/5/00 board minutes). At Friedman's recommendation, Coram hired the investment banking firm of Chanin Capital to value Coram. Chanin's analysis valued the Company at $207 million, with debts of $252 million. Coram was insolvent. A541-42 (7/31/00 board minutes, pp. 5-6). On Friedman's recommendation, the Board authorized Friedman to prepare a reorganization plan for Coram pursuant to Chapter 11 of the U.S. Bankruptcy Code. A544-45 (7/31/00 board minutes, pp. 7-8); A549-52 (8/7/00 board minutes).

Recognizing the seriousness of the Stark II hurdle (sufficient levels of equity), Crowley had also contacted Deutsche Bank Alex.Brown ("DBAB") to explore whether Coram had any alternatives to obtain the requisite financing to avert Stark II. A1341-42 (Morrison 3/26/07 128:12-129:3). DBAB's Christina Morrison delivered a presentation to the Board on July 31, 2000 that concluded that no such financing alternatives were available to Coram. A1343 (*Id.*

---

[7] Others concurred: "The evidence indicates that Crowley worked diligently and effectively to stabilize Coram's operations and improve its financial performance, a goal shared by the noteholders *and* the stockholders." A759 (Goldin report, p. 11) (emphasis in original); "[U]nder Crowley, the company performed substantially better and its financial picture improved considerably." A1005 (Shestack report, p. 23); "[W]hen I think about what Dan Crowley's done for Coram Healthcare . . . he's done the most stellar job of any CEO, and I've probably reported directly or indirectly to six or seven folks." A1233 (Saracco 3/3/03 hearing 133:18-22).

135:1-19); A540-41 (7/31/00 board minutes, pp. 4-5.)

On August 8, 2000, Friedman filed Coram's Bankruptcy Petition, Disclosure Statement

and Proposed Plan of Reorganization. The proposed plan would convert debt to equity in order

to address Stark II, and would eliminate the financial interests of Coram's stockholders.

Coram's Disclosure Statement contained a description of Coram's CEO, Daniel Crowley. That

description explicitly disclosed Crowley's relationship with Cerberus, identified as a member of

the consortium of noteholders, including the fact that he was being paid for his services:

> Mr. Crowley also serves as a consultant to Cerberus Partners LP, "Cerberus"
> which is a member of the Noteholder Group, with respect to its investments in
> various health care companies other than the Debtors. Mr. Crowley generally
> receives a fee from Cerberus for such services, but receives no fee from Cerberus
> for any services he provides respecting the Debtors.

A600-01 (Disclosure statement, pp. 44-45). The Disclosure Statement was prepared by Friedman

and his firm. A1281-83 (Friedman 3/16/07 49:25-50:25, 53:11-19). Although plainly well

aware of the financial relationship between Crowley and Cerberus, Friedman did not seek further

information regarding the Crowley/Cerberus relationship—either from Crowley or Cerberus.

A1284-87 (Friedman 3/16/07 56:1-58:22; 64:12-20), A1383-85 (Marabito 4/5/07 93:16-25,

94:13-95:24).

## F.    The Formation of Coram's Equity Committee

Once the possibility of a restructuring was disclosed in Coram's SEC public filings, a

group of highly sophisticated Coram shareholders sought a way to profit from Coram's

bankruptcy. In the spring of 2000, Will Weinstein, a San Francisco investor, was carefully

watching Coram. Weinstein contacted his long-time friend and attorney, Richard Levy, then a

partner at Altheimer & Gray in Chicago, Illinois, and an expert bankruptcy litigator, to begin

putting the pieces together for a group that could capitalize economically on the Coram situation.

A1310-11, 1314-18 (Levy 3/22/07 32:23-33:9, 70:6-72:9, 73:21-74:2). Weinstein manages large

sums of money for the prominent billionaire Chicago investor Sam Zell, and the estate of Zell's

former business partner, Robert Lurie. A1263-64, 1265, 1266 (Weinstein 3/2/07 29:17-30:16,

72:2-14, 80:4-17). In the early stages, however, Weinstein sought to keep his identity and the

identities of Zell and the Lurie family interests hidden.

In a letter dated June 1, 2000, Richard Levy wrote to Crowley about a potential conflict of interest that Coram director Feinberg would have by serving on the Board and considering any possible Coram debt restructuring. A337 (6/1/01 Levy letter to Crowley). The letter was written on behalf of Richard Haydon, a Coram shareholder Levy had never met, and makes no mention of Weinstein or Zell. A1312-13 (Levy 3/22/07 49:13-50:6). Within weeks, Levy assembled a group of shareholders representing more than 25% of Coram's common stock, and on July 17 and 27, 2000, these shareholders filed a form 13D with the SEC, setting forth their interest in Coram and their intention to act collectively with respect thereto. A372-425 (Form 13D); A1314-16 (Levy 3/22/07 70:6-72:9).

On the day following Coram's bankruptcy filing, Zell bought 450,000 shares of Coram common stock at six cents per share through his personal investment vehicle, Samstock, LLC. A1271-73 (Liebentritt 3/14/07 101:5-103:8), A654-61 (10/12/00 Flynn email to Liebentritt). The investment would be worthless unless Levy could defeat Coram's Plan of Reorganization. A1319-20 (Levy 3/22/07 104:12-105:2), A1276, 1277-78 (Liebentritt 3/14/07 108:13-17, 123:5-124:7). In subsequent weeks, Zell purchased another 1.6 million shares. A1274-75 (Liebentritt 3/14/07 106:20-107:3); A654-61 (10/12/00 Flynn email to Liebentritt). Other members of Levy's 13D group, including Weinstein and several of his clients, also increased their positions in Coram, buying large numbers of shares (more than 3.6 million) at rock-bottom prices. A1267-68 (Weinstein 3/2/07 118:19-119:23).

Levy sought the formation and appointment of an official equity committee of Coram's shareholders, to give him standing in the Coram bankruptcy proceeding and to cause all of his fees to be paid by Coram. A653 (9/11/00 Levy letter to Coram investors). On October 18, 2000, the Bankruptcy Court appointed an Equity Committee. A662 (Order appointing Equity Committee). Its members were Donald Liebentritt, a long-time employee of Sam Zell, and the President of Samstock LLC; Mark Slezak, another long-time Zell employee, and the Lurie Foundation's CEO and Vice President; and Richard Haydon, the shareholder on whose behalf Levy had originally written to Crowley in June 2000. *Id.* Weinstein, Levy's original client with respect to Coram and the long-time financial advisor to Zell and Lurie, served as an "advisor" to

the Equity Committee, but was not an official member. A1321 (Levy 3/22/07 179:5-8).

## G.    The First Confirmation Hearing

The Equity Committee was aggressive and skillful in opposing the original Plan of

Reorganization. They took extensive discovery and made several arguments for why the

Bankruptcy Court should reject Coram's plan, including that Coram was not insolvent, that

Coram was prospering, that Feinberg had a conflict of interest serving on Coram's Board of

Directors, and that Crowley had a conflict of interest due to his financial relationship with

Cerberus. A638-52 (Motion for Appointment of Equity Committee). The Bankruptcy Court

rejected Coram's plan on December 21, 2000. Crowley was not a party to that proceeding. The

Bankruptcy Court found that while "Crowley did do a good job operationally in helping turn the

debtor around," the Court could not conclude that Coram's Plan was proposed in good faith as

required by the Bankruptcy Code because Crowley's relationship with Cerberus was a conflict of

interest that had not been adequately disclosed. The Bankruptcy Court's stated reasons for

denial of the Plan are hearsay, and are inadmissible in this proceeding to prove breach of

fiduciary duty or causation.[8]

## H.    The Goldin Report and the Second Plan

After the Bankruptcy Court denied Coram's First Plan of Reorganization, Coram's

Board, upon the advice of bankruptcy counsel Friedman, created an independent special

committee of the Board of directors consisting of the entire Board *except* Crowley. Cmplt., ¶ 38

(D.I. 1); Crowley Decl., ¶ 11; A663-68 (12/28/00 board minutes); A1288-90, 1297-99, 1305

(Friedman 3/16/07 88:16-90:6, 101:11-103:15, 111:2-14); A1209-10 (Amaral 11/7/01 hearing

402:14-403:10). The Special Committee then retained former Comptroller of the City of New

York, Harrison J. Goldin, to study Coram's Bankruptcy Plan and the Crowley/Cerberus

relationship, and to provide to the Special Committee an independent series of recommendations

---

[8] Fed. R. Evid. 802; *Thompson v. Glenmede Trust Co.*, No. CIV. A. 92-5233, 1996 WL 529693, at * 2 (E.D. Pa. Sep. 17, 1996) ("It is black letter law that a court decision is inadmissible as hearsay."); *see also Herrick v. Garvey*, 298 F.3d 1184, 1191-92 (10th Cir. 2002); *U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1287-88 (11th Cir. 2001); *Nipper v. Snipes*, 7 F.3d 415, 417-18 (4th Cir. 1993).

about how best to proceed. Crowley Decl., ¶ 11; A734-36 (2/9/01 board minutes); A737 (Court order appointing Goldin). With the assistance of counsel from the Kramer Levin Naftalis & Frankel LLP law firm, Goldin conducted an independent investigation and wrote a lengthy report. A744-890 (Goldin report). The preparation of this report was entirely independent of Crowley. Crowley Decl., ¶ 11; A1368-69 (Goldin 3/21/07 97:19-98:7); A1291-94, 1297-99, 1300, 1301, 1302-04 (Friedman 3/16/07 91:18-94:3, 101:11-103:5, 106:16-22, 107:8-12, 108:22-110:23).

Immediately following the rejection of Coram's First Plan, Crowley again disclosed to the Board of directors and Friedman his relationship with Cerberus. Crowley Decl., ¶ 10. Crowley told the Board and Friedman that he was continuing to receive $80,000 per month from Cerberus for services unrelated to Coram. Id.; A1195-98 (Crowley 10/25/01 12:25-15:06); A1220-21 (Crowley 12/13/01 hearing 457:16-458:8); A1212 (Amaral 11/7/01 hearing 412:13-22); A1177.1-78 (Casey 9/28/01 49:11-51:15). Crowley's continuing relationship with Cerberus was also fully disclosed in Coram's 2000 SEC Form 10-K, which was signed by each member of Coram's Board. A669-733 (Coram 2000 10-K). The 10-K disclosed that:

> Effective August 1, 1999, Mr. Crowley and an affiliate of Cerberus Partners, L.P. ("Cerberus"), a party to the company's debtor-in-possession financing agreement, Senior Credit Facility and Securities Exchange Agreement, executed a three-year employment agreement whereby Mr. Crowley is paid $960,000 per annum, plus the potential of performance related bonus opportunities, equity options and fringe benefits. A713 (id., p. 45).

Despite full knowledge of Crowley's relationship with Cerberus—including compensation and other terms of the agreement—neither the Coram Board, Friedman or Goldin ever sought to have Coram terminate Crowley, or to have Crowley end his ongoing economic relationship with Cerberus. Crowley Decl., ¶ 10; A1211-12, 1216 (Amaral 11/7/01 hearing 411:24-412:12, 438:3-13); A1187-88 (Smoley 9/29/01 73:25-74:4); A1172 (Smith 9/24/01 172:8-13); A1295-96 (Friedman 3/16/07 95:3-96:13); A1366-67 (Goldin 3/21/07 29:9-30:4).

The Special Committee directed Friedman to prepare a Second Plan of Reorganization for Coram based on the Goldin report, which was the subject of a further confirmation hearing during the latter part of 2001. A741 (7/12/01 board minutes, p. 3); A1305, 1305.1 (Friedman

3/16/07 111:7-14, 120:17-25). As with the First Plan, the Equity Committee and its lawyer,

Levy, took significant discovery, litigated almost every conceivable question before the

Bankruptcy Court, and vigorously opposed confirmation of Coram's Second Plan. By order

dated December 21, 2001, the Bankruptcy Court denied Coram's Second Plan of Reorganization.

The Court concluded that Crowley's very public and continuing relationship with Cerberus

precluded confirmation of the plan.

### I.    Arlin Adams is Appointed Trustee

After rejection of Coram's Second Plan, on March 7, 2002, Arlin M. Adams was

appointed Coram's Bankruptcy Trustee. Cmplt., ¶ 1 (D.I. 1). The Trustee promptly reviewed

the Bankruptcy Court opinions, the Goldin report, Coram's Second Plan and other materials to

become fully familiar with all issues pertaining to Coram's bankruptcy and Crowley's

relationship to Coram and Cerberus. A1356-60 (Trustee 3/27/07 107:2-111:3). The Trustee met

with Crowley and questioned him about his relationship with Cerberus and the allegations that

had been made by the Equity Committee. A1225-26 (Trustee 2/25/03 134:18-135:24). All the

facts underlying the breaches of fiduciary duty alleged in this action were known to the Trustee

at or around the time he became Trustee in March 2002. A1356-60 (Trustee 3/27/07 107:2-

111:3). The Trustee decided to keep Crowley on as the CEO of Coram, and the two

corresponded in writing no less frequently than every week, as Crowley furnished great detail to

the Trustee about Coram's operations throughout 2002. A914-16 (11/6/02 Danitz letter to

Munford); A1411-12, 1413 (Danitz 4/6/07 107:23-108:18, 110:3-7).

Crowley and the Trustee specifically discussed Crowley's relationship with Cerberus.

A1347-55 (Trustee 3/27/07 34:24-42:9); A1226 (Trustee 2/25/03 135:1-24); A1229-30 (Trustee

3/3/03 hearing 14:1-15:20). They agreed that Crowley would suspend his relationship with

Cerberus, so that Crowley would not receive monthly compensation from Cerberus for work

performed from that time forward. A1347 (Trustee 3/27/07 34:20-21); A1229-32 (Trustee

3/3/03 hearing 14:23-15:8); A1226 (Trustee 2/25/03 135:15-24); A894 (3/11/02 Crowley letter to Adams, p. 2). However, Crowley informed the Trustee that Crowley had a significant financial claim against Cerberus for money owed to him, and the Trustee agreed that Crowley could pursue that claim and attempt to collect that money, since that matter was "between Cerberus and Mr. Crowley." A1347-50 (Trustee 3/27/07 depo., 34:24-37:4); A1230-32 (Trustee 3/3/03 hearing 15:17-20, 68:20-22). The Trustee and Crowley further agreed that Crowley could continue to perform periodic services on behalf of Cerberus, so long as he was not paid for those services and those services did not conflict with his work for Coram. A1354-55 (Trustee 3/27/07 41:11-42:2); A1230 (Trustee 3/3/03 hearing 15:9-20).

Notwithstanding the Bankruptcy Court opinions and Levy's criticism, the Trustee decided that retaining Crowley as CEO was in Coram's best interest. During 2002, he met frequently with the Equity Committee's representatives, Levy and Liebentritt, who urged him to sue Feinberg, Cerberus, Goldin, Coram's directors and Crowley. A1346, 1361-62 (Trustee 3/27/07 11:2-23, 167:19-168:10). Yet the Trustee resisted Levy's entreaties to sue. A1362-63 (Trustee 3/27/07 168:6-169:23); A1379-80 (Trustee 3/28/07 280:16-281:21). Indeed, the Trustee testified that Crowley's actions did not harm Coram: "The problem in the claim against Dan Crowley is, again, damages. ... I think there will be some difficulty in establishing that whatever he did was deleterious to the financial well-being of Coram." A1239.3 (Trustee 1/21/04 11:4-18).

## J.    The Trustee Moves to Extend Crowley's Employment

Rather than sue Crowley, the Trustee decided at the end of 2002 to extend Crowley's employment agreement with Coram, entering into two letter agreements signed by the Trustee and his counsel Barry Bressler, dated December 24, 2002, and January 7, 2003. A917-20 (12/24/02 letter agreement); A921-22 (1/7/03 letter agreement). Under those agreements, Crowley would continue to work for Coram for an additional six months or until such time as a Plan of Reorganization was confirmed, whichever came earlier. *Id.* In exchange, Crowley

would receive a total of $3,480,000 from Coram, a full and complete release of all claims against him, and would in turn release Coram from any claims he had for bonus compensation. *Id.* Those agreements were subject to Bankruptcy Court approval.

The Trustee moved the Bankruptcy Court to approve the extension of Crowley's employment. A970-80 (Trustee motion to retain Crowley). The Trustee argued to the Bankruptcy Court that Crowley's performance as CEO justified the extension of his employment, cash payments, and release of liability. A976-78 (*Id.*, ¶¶ 19-27). Among other things, the Trustee noted that Crowley had turned massive losses into substantial earnings: Coram's EBITDA was *negative* $37 million the years immediately preceding Crowley's arrival at Coram, but from January 2000 through September 2002, Coram's EBITDA was a positive $83 million, a $120 million improvement under Crowley's management. A976-77 (*Id.*, ¶ 21). The Equity Committee opposed the Trustee's motion to extend Crowley's employment, and for the first time sought an Order from the Bankruptcy Court terminating Crowley.

The Bankruptcy Court declined to approve the Trustee's agreements with Crowley. Three days after the hearing, the Trustee's counsel, Wilbur Kipnes, wrote Crowley the following email:

> I was shocked and disappointed at the ruling: I still don't understand the legal underpinnings. Not wishing to be deposed by Mr. Levy, I think it best to leave it at that. I wish you all the best. I know you won't be down for long. – Will

A981-82 (3/6/03 Kipnes email to Crowley). Following the Bankruptcy Court's rejection of the Trustee's motion to retain Crowley, on March 20, 2003, Crowley resigned from the company he had saved.

## K.    The Bankruptcy Litigation Continues for 18 Months After Crowley Leaves

Crowley's departure from Coram did not end the bankruptcy saga. Levy, on behalf of the Equity Committee, and the Trustee continued to litigate for the balance of 2003 and all of 2004. The Equity Committee and the Trustee each proposed their own Plans of Reorganization, which the other side opposed. *See generally In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D.

Del. 2004). Discovery was taken, motions were filed and decided, and after a lengthy hearing, the Bankruptcy Court confirmed the Trustee's Plan of Reorganization on October 5, 2004. *See id.*

That Plan required the noteholders to pay $56 million into the Coram Bankruptcy Estate in exchange for ownership of the company and broad general releases. *Id.* at 328. Coram's shareholders, represented by the Equity Committee, did not receive any equity in the reorganized Coram, but did receive approximately $40 million in cash, or $.80 a share.[9] *Id.* In addition, the Plan provided that the reorganized Coram would fund any litigation against Crowley and the directors and that virtually all net proceeds of such litigation would go to Coram's former shareholders. *Id.*

## L.    The Trustee Accedes to Pressure to Sue Crowley

On December 29, 2004, the Trustee filed the instant Complaint against Crowley and the other former members of Coram's Board of Directors.[10] The Trustee alleges one cause of action for breach of fiduciary duty against Crowley. In his Complaint and responses to interrogatories, the Trustee identified two broad areas that allegedly constituted breaches of fiduciary duty by Crowley: first, Crowley's alleged failure to disclose adequately the terms of his consulting agreement with Cerberus; and second, Crowley's decisions while he was CEO to sell CPS (and use the proceeds to reduce Coram's revolving loan and Series A debt) and the related decision to make interest payments in cash rather than in kind to the noteholders prior to bankruptcy. Cmplt. ¶¶ 31, 48-50 (D.I. 1); A4-12 (Trustee's responses to first set of interrogatories 1-4); A21, 22-24

---

[9] Sam Zell, for example, made more than 10 times his investment on shares purchased during the first three months of Coram's bankruptcy.

[10] The Trustee settled the litigation against the outside directors for $9 million, but agreed that he would only seek to collect that judgment from Coram's D&O insurer, Genesis Insurance Company. A1138-47 (Trustee settlement with outside directors). Genesis meanwhile had filed a declaratory relief action in the United States District Court for the District of Colorado, asserting that it had no coverage obligations Coram and its former directors, including Crowley. Genesis has also objected to the Trustee's settlement with the outside directors. Those matters remain pending in the United States District Court for the District of Colorado.

(Trustee's responses to second set of interrogatories 3, 7, 8, 9 and 10).

## IV.    UNDISPUTED FACTS

While the foregoing provides necessary factual background and context for this dispute,

the undisputed facts which furnish the basis for this motion are far fewer and simpler to digest.

They are:

- Coram's Board of directors knew of Crowley's financial relationship with Cerberus prior to the time Crowley became CEO of Coram, and received all of the information regarding that relationship that they asked for. Crowley did not purposefully withhold any information from Coram regarding his relationship with Cerberus. Crowley's employment agreement with Coram expressly provided that he could serve as an officer of and consultant to other companies.

- Coram's Board of directors decided to put CPS up for sale before Crowley became CEO. Coram's Board, including Crowley, relied on DBAB's opinion that the transaction was fair. The Trustee previously argued that the sale of CPS was fair.

- In 2000, Coram's Board of directors approved payments to noteholders in cash. Coram was obligated to use the proceeds of the sale of CPS to pay down the debt. From the time Crowley became CEO, Coram did not borrow any additional money to fund operations.

- Following denial of the first plan, Coram's Board and outside bankruptcy counsel were aware of Crowley's continuing relationship with Cerberus and never suggested that he resign from Coram or sever his relationship with Cerberus. Crowley had no role in the preparation of Coram's second plan of reorganization.

## V.    ARGUMENT

**A.    The Court Should Grant Crowley Summary Judgment Because the Undisputed Facts Demonstrate That He Did Not Breach a Fiduciary Duty**

Summary judgment is appropriate here because the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law." *LaSalle Nat'l Bank v. Perelman*, 141 F. Supp. 2d 451, 459 (D. Del. 2001) (quoting Fed. R.

Civ. P. 56). While the burden of demonstrating the absence of material fact falls on Crowley as

the moving party, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), the court's proper function

on a motion for summary judgment is to determine, based on the evidence before it, whether the

non-moving party could possibly prevail at trial. As this Court has explained, Rule 56(c)

mandates summary judgment "against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Perelman*, 141 F. Supp. 2d at 459.

The Trustee's Complaint accuses Crowley of breaching his fiduciary duties of care, loyalty, disclosure and good faith. Cmplt., ¶ 49. "It is understood in Delaware law that the elements of breach of fiduciary duty that must be proven by a preponderance of evidence by the plaintiff are: (i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty." *Legatski v. Bethany Forest Assoc., Inc.*, 2006 WL 1229689, at *3 (Del. Super. Ct. Apr. 28, 2006) (internal quotations omitted). Moreover, to recover more than nominal damages, the Trustee must also demonstrate that the breach caused particular damages to the company or unjustly enriched the fiduciary. *See Carlson v. Hallinan*, 2006 WL 771722, at *18-19 (Del.Ch. 2006).[11]

**B.   Crowley Did Not Breach Any Duty with Respect to Disclosure of His Relationship with Cerberus**

The Trustee's breach of fiduciary duty claim based on insufficient disclosure of Crowley's relationship with Cerberus fails for four independent reasons:

- The undisputed facts show that Coram's Board (through Board members Feinberg and Amaral) knew all facts—including the specific terms of the agreement— regarding Crowley's relationship with Cerberus prior to the time Crowley became CEO. That knowledge is imputed to Coram as a matter of law.

- The law does not require that a director disclose all information; it only requires that he disclose facts material to the decision at hand. The undisputed evidence shows that the Board was aware of all *material* information regarding Crowley's relationship with Cerberus.

- Even if Crowley inadvertently failed to disclose material information, he is protected from liability under the exculpatory provision in Coram's Certificate of Incorporation, because the undisputed facts show that any such nondisclosure was based on Crowley's good faith mistake as to the scope and content of the disclosure that was required.

- Finally, the Trustee may not hold Crowley liable for any nondisclosure because the Trustee cannot show that the alleged nondisclosure in and of itself (as opposed to the relationship that was allegedly not disclosed) caused actual identifiable damages to Coram. The nondisclosure could not have caused the harm alleged— denial of the first bankruptcy plan—because the Trustee concedes that the

---

[11] Under Delaware law, the Trustee need not prove damages to establish that a breach of the duty of loyalty or disclosure to shareholders has occurred, *see In re Fuqua Indus., Inc.*, 2005 WL 1138744, at *6 (Del.Ch. 2005), but to recover more than nominal damages, the Trustee must demonstrate that Crowley injured Coram or gained in some personal capacity from his alleged breaches, *see In re Tri-Star Pictures, Inc., Litigation*, 634 A.2d 319, 334 & n.18 (Del. 1993).

relationship was disclosed after the denial of the first plan, yet the second bankruptcy plan was still rejected.

## 1.    Relevant legal standard

In the context of a claim for breach of fiduciary duty, the "duty of disclosure" is not a separate duty but arises out of "the broader fiduciary duties of loyalty, 'good faith' and care." *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 914-16 (Del. 1999). Any claim premised on a nondisclosure requires evidence that the fiduciary failed to disclose, or at least failed to disclose completely, some piece of *material* information. *Id.* at 917. Facts are "material" when there is a substantial likelihood that a reasonable person would consider them important in making decisions. *Id.* at 916 (citing *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)). "Materiality is generally considered a question of fact, but summary judgment of materiality claims is appropriate when established omissions are 'so obviously unimportant to [a decision-maker], that reasonable minds cannot differ on the question of materiality.'" *See In re Tele-Communications, Inc. Shareholders Litig.*, 2005 WL 3642727, at *3 (Del.Ch. 2005) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Moreover, even where material facts are not adequately disclosed, a director may not be liable for failure to disclose information where a corporation's certificate of incorporation has an "exculpatory provision" tracking the language of 8 Del.C. § 102(b)(7), as Coram's does. That provision immunizes a person in Crowley's position from liability where the factual basis for a claim for breach of fiduciary duty against him solely implicates a violation of the duty of care. *Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (1999). Where "the factual basis for the alleged violation suggests that the violation was made as a result of a good faith, but nevertheless, erroneous judgment about the proper scope or content of the required disclosure," it is barred by the exculpatory provision. *O'Reilly*, 745 A.2d at 914-15 (citing *Zirn v. VLI Corp.*, 681 A.2d 1050, 1061-62 (Del. 1996)); *see also Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 160 (Del.Ch. 2004).

Finally, a claim for breach of fiduciary duty based on nondisclosure of information cannot succeed where a plaintiff fails to demonstrate that the alleged nondisclosure caused harm

and actual identifiable damages to the corporation. *O'Reilly*, 745 A.2d at 917; *In re Tyson Foods, Inc.*, --- A.2d ----, 2007 WL 1018209, at *21 (Del.Ch. 2007) (plaintiff must show "some connection between the lack of disclosure and an actual harm"). "For a disclosure claim to be viable, it must demonstrate damages that flow from the failure to adequately disclose information, *not* that the information disclosed concerned matters for which damages are appropriate." *In re Tyson Foods*, 2007 WL 1018209, at *21 (emphasis added).

## 2. All facts regarding Crowley's relationship with Cerberus were disclosed prior to the time he became CEO

The Trustee's claim of nondisclosure is based on the false premise that the Board did not know all the facts regarding the relationship between Crowley and Cerberus when they hired Crowley. This is not so: the undisputed facts show that the Board knew all the details of Crowley's relationship with Cerberus prior to the time he became CEO.

It cannot be disputed that Stephen Feinberg—a member of Coram's Board and chair of its compensation committee—was aware of every detail of Crowley's agreement with Cerberus. Feinberg signed that agreement on behalf of Cerberus. A178-96 (Cerberus agreement). Likewise, Donald Amaral, Chairman of Coram's Board and interim CEO at the time Crowley was retained, knew that Crowley had a consulting relationship with Cerberus in which Crowley was paid for work he did for Cerberus. A1154-55, 1157 (Amaral 12/8/00 20:21-21:20, 37:8-17). Amaral also knew that Crowley had suggested the possibility of being compensated based on the noteholders' interest in Coram. A1158 (Amaral 12/8/00 49:3-50:15). The knowledge of both Feinberg and Amaral is imputed to Coram. *Teachers' Retirement Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del.Ch. 2006) ("[I]t is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation.").[12]

---

[12] Knowledge gained by a director as an agent of the corporation in the scope of his agency for a corporation or knowledge gained outside of the scope of his agency that is gained close in time to the transaction in question, is imputed to the corporation. *Chaplake Holdings, Ltd. v. Chrysler Corp.*, 2002 WL 148088, at *32 (Del. Super. Ct. 2002), *rev'd in part on other grounds, Chrysler Corp. (Delaware) v. Chaplake Holdings, Ltd.*, 822 A.2d 1024 (Del. 2003); 3 Fletcher Cyc. Corp. § 793; *see also* 3 Am. Jur. 2d Agency § 278 ("[T]he relevant consideration is whether the agent has the knowledge at the time it becomes relevant in his or her work for the principal; if the agent has it at that time, the principal is bound regardless of whether the agent's knowledge was

Furthermore, the undisputed facts belie any notion that a significant financial business relationship between Crowley and Cerberus was not disclosed adequately. Below are a few examples:

- Feinberg recommended Crowley to the Board and advised them that Crowley had a relationship with Cerberus. Cmplt., ¶¶ 14-15 (D.I. 1).

- The employment contract between Crowley and Coram, which was approved unanimously by the Board, explicitly provided that Crowley had other business interests and was authorized to serve as an officer of, and consult for, companies other than Coram. A197-208 (Coram contract). During negotiation of that provision of the contract, Amaral knew that one of the particular other business interests Crowley intended to continue was being "a consultant to Cerberus." A1207-08 (Amaral 11/7/01 hearing 400:21- 401:5).

- Amaral testified that "[w]hen [the board] hired [Crowley]…we were aware of the situation. [Crowley] made…the entire board of directors aware that he had a relationship with Cerberus that he would be unwilling to give up in order to become the CEO of Coram." A1215 (Amaral 11/07/01 hearing 437:3-8).

- When a special committee was created in summer of 2000 to negotiate with the Noteholders regarding an equity conversion, the committee did not include Crowley because the Board "wanted a third party to do it because of the relationship of Crowley to Cerberus." A1159 (Amaral 12/8/00 81:6 -82:2).

- The disclosure statement that Coram's bankruptcy counsel filed in conjunction with Coram's Chapter 11 petition on August 8, 2000 disclosed that Crowley was serving as a consultant to Cerberus and received a fee for such services. A600-01 (2000 disclosure statement, pp. 44-45).

These examples make clear that the financial relationship between Crowley and Cerberus, far from being undisclosed, was well known by Coram's Board.

### 3.    To the extent some Board members did not have knowledge of specific terms of Crowley's agreement with Cerberus, that information was not material

Even if some of Coram's Board members were not aware of every fact regarding Crowley's relationship with Cerberus, the undisputed facts show that they were aware of all *material* facts. Material facts are those facts that decision-makers—here the Board members— would consider important in making a decision. *See O'Reilly*, 745 A.2d at 916; *TSC Indus.*, 426 U.S. at 449. In this case, the decision was whether to hire and retain Crowley.

This is not a case in which the Court need guess or speculate as to whether any inadvertently undisclosed information was material. The undisputed facts show that the

---

acquired as a result of the agency."); Restatement (Third) of Agency § 5.03.

information regarding the specific amount of compensation or terms of Crowley's agreement with Cerberus was not material to the Board. The Coram Board knew that Crowley was being compensated by Cerberus. A1154-55, 1157 (Amaral 12/8/00 20:21-21:20, 37:8-17); A1253.01 (Smoley 8/31/06 28:17-29:17); A1215 (Amaral 11/7/01 hearing 437:3-10); A1245-46 (Amaral 8/30/06 80:3-81:20); A1256-59 (Feinberg 2/14/07 124:24-127:3); Crowley Decl., ¶ 9. The question, therefore, is whether the *amount* of compensation was material to the Board. It was not. Coram Board members testified that they "did not care" about Crowley's Cerberus compensation and that such information "did not matter" to them. A1184 (Smoley 9/29/01 54:9-11); A1201 (Amaral 10/26/01 18:4-25); A1178 (Casey 9/28/01 51:16-20). Despite knowing that Crowley had a relationship with Cerberus, no member of the Board asked Crowley for specific information regarding his agreement with Cerberus; had any Board member deemed the information material, they were entirely free to ask for it. Cmplt., ¶ 23, 35 (D.I. 1). Indeed, the best evidence that the amount of compensation and precise terms of the Crowley-Cerberus agreement were not material is that even *after* the Bankruptcy Court denied Coram's First Plan and Crowley again disclosed the details of his relationship with Cerberus[13]—including the fact that he continued to be compensated $80,000 per month by Cerberus—the Board chose to keep Crowley in place as CEO and Chairman and did not ask him to terminate his relationship with Cerberus.[14] A1216 (Amaral 11/7/01 hearing 438:2-13); A1202-04 (Amaral 10/26/01 99:24-101:7); A1172 (Smith 9/24/01 172:8-13); A1187-88 (Smoley 9/29/01 73:25-74:4).

---

[13] The Complaint acknowledges that "[n]o later than a telephonic meeting of the Board of Directors on December 27, 2000, the outside directors were fully aware of the material terms of the Crowley/Cerberus Employment Agreement." Cmplt., ¶ 57 (D.I. 1). Plaintiff goes on to admit in the Complaint that with this knowledge, the Board Members "took no action." *Id.*

[14] The Trustee cannot claim that the board was unaware, following the denial of the first plan, that Crowley continued to receive compensation from Cerberus. Crowley specifically disclosed the information to the board in December of 2000. Amaral testified that Crowley "reminded [the Board] of the relationship...[and] told us of the dollar amount and that it was still in force today." A1212, 1217 (Amaral 11/7/01 hearing 412:13-22, 440:17-14). Moreover, the entire board of directors signed Coram's 2000 form 10-K in April 2001, which included all details regarding Crowley's agreement with Cerberus. The 10-K disclosed that "[e]ffective August 1, 1999" Crowley and Cerberus "executed a *three-year* employment agreement whereby Mr. Crowley *is* paid $960,000 per annum." A713, 733 (Coram 2000 10-K, p. 45 (disclosure), p. 65 (board's signatures)); A1385.1-1385.5 (Marabito 4/5/07 209:1-213:23).

### 4.   Any nondisclosure was based on a good faith mistake and therefore is protected by the exculpatory provision in Coram's certificate of incorporation

Even if the Trustee could show that the Board was not aware of some material information at the time it hired Crowley (which he cannot), Crowley is entitled to summary judgment because he is immunized from personal liability arising from such a claim by the exculpatory provision of Coram's Certificate of Incorporation, which has a provision that tracks the language of 8 Del.C. § 102(b)(7).[15]   The exculpatory provision protects Crowley because any failure on his part to adequately disclose his relationship was at most a breach of the duty of care, given that the undisputed facts show that he did not "knowingly or deliberately fail to disclose facts [he] knew were material." *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994).[16]

Any nondisclosure was at most the result of Crowley's good faith mistake as to what needed to be disclosed. Crowley Decl., ¶ 9. Crowley never refused to give any information regarding his Cerberus contract to anyone. *Id.* He never made the slightest misrepresentation. The Board members knew of Crowley's relationship with Cerberus, and to the extent any director did not know specific terms of Crowley's agreement with Cerberus, it is only because they declined to ask for that information.[17]  *Id.*; A1162-65 (Crowley 12/15/00 hearing 19:24-

---

[15] The Eighth Article of Coram's Certificate of Incorporation provides:

A director of this Corporation shall not be personally liable to this Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to this Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived any improper personal benefit. If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of this Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.  A38 (Coram Certificate of Incorporation, p. 7).

[16] Although Section 102(b)(7) and Coram's Exculpation Provision only exculpates directors, where a defendant, like Crowley, is both a director and an officer, "only those actions taken *solely* in the defendant's capacity as an officer are outside the purview of Section 102(b)(7)." *See Arnold,* 650 A.2d at 1288 (emphasis added) (citations omitted).  Here, Crowley's actions regarding disclosure of his relationship with Cerberus were in his role as both a director and officer.

[17] As fiduciaries, Coram's Board members had "an affirmative duty to protect th[e] interests [of

---

22:13). In fact, the directors have testified that Crowley was forthcoming and candid in his discussions regarding his relationship with Cerberus and never misrepresented anything to them about the relationship. A1169 (Amaral 12/20/00 7:16-25); A1185-86 (Smoley 9/29/01 56:20-57:5). Crowley, in good faith, believed that the Board members had all the information they needed when they did not ask for more. Crowley Decl., ¶ 9. There is *no* evidence that Crowley knew he was supposed to disclose the amount of compensation he was receiving from Cerberus or the precise terms of the contract, or that he deliberately withheld or concealed that information. To the contrary, the undisputed facts show that days before he entered into his contract with Coram, Crowley suggested that a meeting be held with all of the directors to discuss his relationships with Coram and Cerberus. A173-76 (11/16/99 Crowley letter to Feinberg). Accordingly, the exculpatory provision protects Crowley from any liability arising from the alleged inadvertent nondisclosure.

### 5.    Crowley's alleged nondisclosure did not cause quantifiable damages

Finally, Crowley cannot be held liable for any nondisclosure for the independent reason that the Trustee cannot show a connection between the alleged nondisclosure and any particularized harm or identifiable damages. *See O'Reilly*, 745 A.2d at 917; *In re Tyson Foods*, 2007 WL 1018209, at *21-22. The Complaint alleges that Crowley had a "duty to disclose actual and potential conflicts of interest" and that his breach of that duty, among others, "transcend[ed] every single thing Crowley did on Coram's behalf." Cmplt., ¶49 (D.I. 1). But, as the Delaware Chancery Court recently recognized, "[d]isclosure claims do not allow so broad a target." *In re Tyson Foods*, 2007 WL 1018209, at *21. Instead, the Trustee must show that the nondisclosure itself, rather than the *matter* that was not disclosed (in this case, details of Crowley's relationship with Cerberus), caused harm that led to actual identifiable damages. *Id.* at 22. He cannot do so.

There is no evidence here of any connection between the alleged lack of disclosure of the

Coram's shareholders] and to proceed with a critical eye in assessing information." *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985). Any failure on their part to do so here cannot be blamed on Crowley, when there is no evidence that he intentionally kept information from them and undisputed evidence that he provided all information requested of him.

specific terms of the Crowley-Cerberus agreement and harm to Coram. The Trustee cannot claim that any nondisclosure resulted in the denial of the bankruptcy plans, because he has acknowledged that even after denial of the First Plan (when the relationship was undeniably fully disclosed), the Board did not terminate Crowley or require him to cease his relationship with Cerberus, and yet confirmation of the Second Plan was nevertheless denied. There is no evidence that the Board would have acted differently if the additional information regarding Crowley's agreement with Cerberus had been disclosed initially. Indeed, the Board's decision to keep Crowley on after denial of the First Plan establishes just the opposite. Therefore, the situation considered by the bankruptcy court when the First Plan was proposed would have been the same as the situation when the Second Plan was proposed—i.e., Crowley would have been serving as CEO and continuing his relationship with Cerberus. The fact that the Second Plan was rejected by the bankruptcy court—after repetitive disclosure—belies any notion that the First Plan would have met a different fate had the specific terms of the Cerberus-Crowley relationship been disclosed initially. Therefore, the Trustee cannot show that any nondisclosure led to identifiable damages, and, as a result, Crowley is entitled to summary judgment.[18]

## C.    Undisputed Facts Show that Crowley's Actions While CEO Are Protected by the Business Judgment Rule

In addition to his non-disclosure claim addressed above, the Trustee uses hindsight to second-guess certain decisions that Crowley and the Board made while Crowley was CEO in an effort to manufacture a breach of fiduciary duty claim against Crowley. But Crowley's informed decisions—to sell CPS and make payments to noteholders before bankruptcy—were reasonable exercises of business judgment made with due care and approved by Coram's Board. As a matter of law, therefore, Crowley cannot be liable for making those judgments.

---

[18] Nor can the Trustee claim that the alleged conflict alone caused Coram harm. A conflict of interest in and of itself is not a breach of fiduciary duty. *See Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1170 (Del. 1995) ("The fact that some interested transactions are permitted under our corporate law demonstrates that they are not inherently detrimental to a corporation.") (quoting *Oberly v. Kirby,* 592 A.2d 445, 467 (Del. 1991)). Rather, the Trustee must allege that the conflict manifested itself in conduct that harmed Coram. The Trustee attempts to do this with allegations that Crowley favored Cerberus to the detriment of Coram, but as detailed below those allegations have no merit.

1.   **Delaware's business judgment rule protects acts taken by disinterested officers and directors, unless they are "grossly negligent"**

Delaware's business judgment rule protects disinterested officers and directors who, "in making a business decision … acted

on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000). The business judgment rule springs from the courts' recognition that "businessmen and women are correctly perceived as possessing skills, information and judgment not possessed by reviewing courts" and the courts' reluctance to "second-guess such decisions when they appear to have been made in good faith." *Solash v. Telex Corp.*, 1988 WL 3587, at *8 (Del. Ch. 1988). As a result, this Court has explained, "'in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith.'" *Continuing Creditors' Comm. of Start Telecom., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 458 (D. Del. 2004) (quoting *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 (Del.Ch. 1996)). Indeed, the approval of a majority of disinterested board members preserves the business judgment standard even for an otherwise interested transaction. *See Official Comm. of Unsecured Creditors of Integrated Health Servs, Inc., v. Elkins*, 2004 WL 1949290, at *10 (Del.Ch. 2004). Therefore, so long as an independent board of directors "consider[ed] all material information reasonably available" and did not behave in a "grossly negligent" manner, its decisions will not be subject to the hindsight of the court. *See Brehm*, 746 A.2d at 259.

2.   **The decision to sell CPS and use the proceeds to pay down debt was an exercise of reasonable business judgment**

The apparent reasoning of the Trustee's CPS claim against Crowley is that Crowley engineered the sale of a highly promising unit of Coram, at a deflated price, for the benefit of Cerberus, which, as a debtholder, stood to receive some portion of the proceeds as a payment on debt. The argument is bereft of logic. Cerberus, the other noteholders, and the shareholders shared an interest to see CPS sold for the best possible price. That is what DBAB, Coram's

Board, and Crowley sought to accomplish. The DBAB fairness opinion is ironclad proof of this.

> a. **Crowley and the Board engaged in careful evaluation of all reasonably available information, and their reliance on DBAB protects them from liability**

In the summer of 1999, prior to any interaction between Crowley and Coram, Coram's Board, in consultation with its CEO and CFO, decided that CPS, although promising in the long term, should be sold because it was a net cash user and had lower profit margins than Coram's core infusion business. A95-97 (9/17/99 board minutes); A1213-14 (Amaral 11/7/01 hearing 424:22-425:12); A1405, 1407-08 (Danitz 34:3-10, 48:22-49:14). Coram's then-CEO Amaral testified that he personally made the decision to sell CPS six months before Crowley's arrival at Coram, "because [CPS] was burning a tremendous amount of cash" and he was "worried about its future." A1213-14 (Amaral 11/7/01 hearing 424:22-425:12). And it was Rick Smith, Coram's CEO after Amaral, who contacted and engaged DBAB to effect a sale of CPS, a decision made with the unanimous support of Coram's Board. A88-94 (9/16/99 engagement letter); A1324.01-1324.02 (Morrison 3/26/07 21:7-14, 32:1-3); A95-97 (9/17/99 board minutes).

Pursuing a standard investment banking methodology, DBAB, led by managing director Christina Morrison, collected and prepared due diligence material, and then conducted an auction to secure the best available price for CPS. A1329, 1330-31, 1332, 1333, 1338-40 (Morrison 3/26/07 54:1-13, 62:20-63:24, 70:8-24; 81:4-19, 86:3-88:8). During this process, Crowley became Coram CEO. A1325-26 (Morrison 3/26/07 50:23-51:5). DBAB's auction produced only one bid, from CVS ProCare, for $34.5 million with significant conditions and a 10% holdback.[19] A299-301 (CVS ProCare bid); A341-42 (3/9/00 board minutes, pp. 1-2). Crowley told DBAB that the prices were not high enough, and that Coram would not sell CPS unless a higher return could be achieved. A1327-28 (Morrison 3/26/07 52:8-53:20). Eventually, Coram

---

[19] DBAB contacted roughly forty-five companies and investment funds whom it had determined might be interested in acquiring CPS. Twenty-four of those entities signed a non-disclosure agreement and reviewed the Offering Memorandum. A350 (6/9/00 DBAB presentation, p. 2). Coram received seven non-binding bid letters for CPS, but all the preliminary offers ranged from $10 to $50 million. A1332.01 (Morrison 3/26/07 80:6-23). Although four companies were selected by DBAB to perform further due diligence on CPS, only CVS ProCare made an official offer.

received a bid from GTCR Golder Rauner to acquire CPS for $41 million in cash, with few

conditions and no holdback. A351 (6/9/00 DBAB presentation, p. 3); A316 (4/5/00 board

minutes, p. 2).

In evaluating the CPS transaction, Crowley and the Board reviewed financial analyses of

the CVS and GTCR bids; obtained the advice of investment bankers and lawyers; negotiated

with GTCR; and maximized the cash value of the transaction, largely through the efforts of

Crowley himself. A316 (4/5/00 board minutes, p. 2); A338-40 (6/7/00 board minutes); A341-45

(6/9/00 board minutes). Between December 1999 and June 2000, DBAB's Morrison made six

presentations to Coram's Board regarding the CPS sale.[20] Furthermore, as Coram's Board

minutes indicate, Crowley and the Board considered a number of different options with respect

to the CPS business, including retaining CPS when it appeared that the disappointing CVS

ProCare offer was the only bid Coram would receive. A341-42 (3/9/00 board minutes, pp. 1-2).

DBAB opined that the GTCR offer was both procedurally and substantively fair to

Coram.[21] A370-71 (fairness opinion); A346-69 (6/9/00 DBAB presentation). In reliance on

DBAB's fairness opinion, the Board unanimously approved the transaction.[22] A342 (6/9/00

board minutes, p. 2). The Board's good faith reliance on the financial advice and fairness

opinion provided by its investment banker DBAB fully protects Crowley from liability under

---

[20] Coram's Board minutes reflect her participation in meetings on December 21, 1999 (A219-30); February 10, 2000 (A231-34); March 9, 2000 (A302-04); May 17, 2000 (A329-36); June 7, 2000 (A338-40); and June 9, 2000 (A341-45).

[21] Goldin agreed: "When judged from the dual perspectives of process and price, the CPS sale appears to have been entirely proper." A853 (Goldin report, p. 105).

[22] No evidence calls into question Crowley's disinterestedness in the sale of CPS. Crowley did not stand on both sides of the CPS transaction. He had no interest in the acquirers, GTCR, and was not financially aligned with the CPS management group that continued to run the company. But even if somehow Crowley was conflicted in proceeding with the sale of CPS, an allegation unsupported by a scintilla of evidence, the approval of the sale by Coram's independent Board members ensures the protection of Delaware's business judgment rule. *Cinerama*, 663 A.2d at 1170 (quoting *Oberly v. Kirby*, 592 A.2d 445, 467 (Del. 1991)); *see also* 8 Del. Code § 144(a) (transaction involving interested officer or director may be confirmed by majority of independent board members who are advised of the conflict). Coram's Board unanimously approved the sale, A341-45 (6/9/00 board minutes), and there is no dispute that the three board members present other than Crowley (Smoley, Amaral, and Casey) were independent. *Id.* Thus, the CPS sale must fall within the business judgment rule. *Cinerama*, 663 A.2d at 1170.

Delaware law. *See* 8 Del.C. § 141(e); *Brehm*, 746 A.2d at 261-62.[23]

The Board's and Crowley's decision to use the net proceeds of the CPS sale to pay off a portion of its revolving loan and a portion of the Series A notes was similarly a reasonable exercise of business judgment. Indeed, Coram was obligated to make the payments. A855 (Goldin report); A23 (Trustee responses to second set of interrogatories p. 5-6).[24]  Crowley discussed with the Board that the proceeds of the sale would be used to pay down debt, and the Board unanimously approved the decision.[25]  A1214 (Amaral 11/7/01 hearing 425:16-22); A220 (12/21/99 board minutes, p. 2); A258 (2000 target budget); A331 (5/17/00 board minutes, p. 3); A339 (6/7/00 board minutes, p. 2).  This approval by Coram's majority disinterested board confirms the appropriateness of the business judgment standard. *See Elkins*, 2004 WL 1949290, at *10.

**b.    The doctrine of judicial estoppel prevents the Trustee from arguing Crowley committed breaches relating to the CPS sale**

The CPS sale cannot form the basis of a claim against Crowley for the independent reason that the Trustee is barred by judicial estoppel from claiming the sale was improper.  The doctrine of judicial estoppel exists "to protect the integrity of the judicial process by prohibiting

---

[23] Delaware law protects from liability directors who rely in good faith on the guidance of independent financial advisors, like investment bankers:

> A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be *fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation* by any of the corporation's officers or employees or committees of the board of directors, or *by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.*

8 Del. C. § 141(e) (emphasis added).

[24] The Trustee does not dispute that Coram was obligated to use the proceeds of the CPS sale as it did.  Rather, the Trustee suggests that Coram ought to have considered other options during the course of its deliberations regarding the sale.  A23 (Trustee responses to second set of interrogatories).  Of course, as described above, that is exactly what Coram did.

[25] Indeed, one board member "strongly urged [Crowley] that when the [CPS] bids came in substantially lower than what the investment bankers had initially stated to them, that we should take the offer, use the proceeds, *pay down debt*, go forward, along those lines." A1214 (Amaral 11/7/01 hearing 425:16-22) (emphasis added).

parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001). The Third Circuit considers three primary factors in evaluating whether judicial estoppel should be invoked by the court: first, whether the party's positions are irreconcilably inconsistent; second whether the party's change of position is a good faith mistake or part of a scheme to manipulate the court; and third, whether the remedy of estoppel is well-tailored to address the harm identified and no lesser sanction would adequately remedy the damage. *See Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779-80 (3d Cir. 2001); *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996).

The Trustee's position in this litigation with respect to CPS is "irreconcilably inconsistent" with positions taken before the Bankruptcy Court. In seeking the confirmation of his own proposed plan of reorganization for Coram over the one proposed by the Equity Committee, the Trustee offered the expert testimony of Jerome Shestack, whom the Trustee described as "the best legal mind that was available to me." A1242 (Trustee 1/22/04 hearing 183:8-11). Shestack testified that there was no connection between Crowley's relationship with Cerberus and the CPS transaction: "Now if the conflict affected that sale and it was sold for less than it was worth, there didn't seem to be any evidence of it ... I didn't see any reason to question what was done as being affected by a conflict of interest." A1238 (Shestack 11/14/03 118:1-13). Shestack also testified that the CPS sale was protected by the business judgment rule:

> This was an independent Board except perhaps for Feinberg. They had the proposition before them, and they made an independent decision. It may have been an unwise decision, but that decision, it seems to me, would pass the business judgment rule.

A1241 (Shestack 1/22/04 hearing 51:19-23). Shestack likewise concluded that the sale price achieved by Coram for CPS was fair: "[I]t seemed to me that what was done was certainly a reasonable exploration with respect to the sale of that company and the realization of the best price they could get." A1237 (Shestack 11/14/03 40:9-13).[26]

---

[26] By contrast, the Trustee now suggests exactly the opposite: that the sale price was substantially lower than CPS was worth, A1372 (Trustee 3/28/07 192:2-11); that Crowley may have intentionally tried to decrease the value of the sale, A1373-74 (Trustee 3/28/07 206:8-

The Trustee convinced the Bankruptcy Court that the Equity Committee's causes of action, including those theories related to the CPS transaction, were meritless. The Court concluded:

> [T]he CPS sale was approved by [Coram's] board of directors before Crowley even became CEO. In fact, testimony establishes that Crowley was able to obtain a higher bid for CPS than was previously approved by the board and [Coram's] investment banker. Thus, we cannot conclude that the sale of CPS established a scheme to put [Coram] into bankruptcy.

*In re Coram Healthcare Corp.,* 315 B.R. 321, 333 (Bankr. D. Del. 2004) (internal citations omitted). Allowing the Trustee to argue that Crowley's sale of CPS was a breach of fiduciary duty because it was sold for an unfair price, after he previously argued to the Bankruptcy Court that the transaction was fair, would allow the Trustee to play "fast and loose" with this Court.[27] Prohibiting the Trustee from doing so is therefore appropriate.

### c.    The Trustee cannot prove any damages with respect to the CPS sale

Even if the Trustee were able to establish a breach of fiduciary duty with respect to the sale of CPS, he cannot prove any damages associated with the transaction. The Trustee surmises that Crowley's decision to sell CPS "deprived Coram of the increase in value CPS enjoyed following the sale. CPS was sold to a management-led buy out group for $40 million and was sold three years later for $335 million." A14 (Trustee's responses to first set of interrogatories, p. 14).

The Trustee's theory does not take into account that the business sold by GTCR in 2003 was a very different business than the one Coram had owned in 2000. During those three years, CPS's new owner, GTCR, invested significant capital in the business, acquired other complimentary businesses, and enjoyed the benefit of improved market conditions. A1343.01-.04 (Morrison 3/26/07 161:15-162:24, 181:16-182:20). The Trustee himself argued to the Bankruptcy Court that damages could not be based on the subsequent sale of CPS: "The EC

---

207:10); and that the DBAB fairness opinion and unanimous board approval are not relevant to whether Crowley breached his duty, A1375-78 (Trustee 3/28/07 212:21-215:3).

[27] The inconsistency of the Trustee's positions is particularly troubling because the beneficiaries of this suit are the members of the Equity Committee, against whom the prior inconsistent argument was successfully utilized.

[Equity Committee] brief asserts that rescissory damages based on the sale of CPS are approximately $275 million, but did not offer any competent evidence to support this belated damages calculation. Damages cannot be calculated by simply subtracting the sale price of CPS in 2000 from the sale price of Curascript in 2004." A1095 (Trustee's post confirmation hearing reply brief, p. 10). As the Trustee explained, such a simple comparison is "very unrealistic" because the nature of the company changed dramatically after Coram sold it. *Id.* As such, any damages calculated using the subsequent CPS sale as a benchmark—as the Trustee suggests—would be inherently speculative and inaccurate. And because this damages theory is directly contrary to the Trustee's prior successful argument to the Bankruptcy Court, judicial estoppel is again appropriate.

Furthermore, under Delaware law the Trustee cannot rely on a later sale price as proof that the 2000 sale was injurious to Coram: by the Trustee's logic, a corporate Board would be liable every time an asset it sold was later re-sold at a higher price. Such a backwards-looking damages theory is precisely what Delaware's business judgment rule seeks to prevent. *Gagliardi,* 683 A.2d at 1052 (noting that it is "in the shareholders' economic interest" to allow directors to make business decisions without being punished if their decisions result in economic loss); *see also In re Walt Disney Co. Derivative Litig.,* 907 A.2d 693, 698 (Del.Ch. 2005). As such, evidence of the subsequent sale of CPS must be excluded and cannot be used to determine damages.

### 3. The decision to make interest payments to noteholders in cash rather than in kind was an exercise of reasonable business judgment

The Trustee alleges that Crowley breached his fiduciary duty by causing Coram to make approximately $60 million in principal and interest payments to its noteholders while he was CEO. A8 (Trustee responses to first set of interrogatories 1-4, p. 8). Of the $60 million, the Trustee concedes that the majority was Coram's use of the proceeds of the CPS sale to pay down debt. *Id.* As discussed above, those payments were obligatory and approved by Coram's Board and therefore cannot form the basis of a claim against Crowley.

---

The only other allegedly improper payment the Trustee identifies is a $6.3 million interest payment made in cash rather than "in kind."[28] *Id.* The Trustee cannot make out a claim based on this payment because the undisputed facts show that Coram owed the money to its noteholders, Coram had sufficient cash to make the payment while still funding its operations, and the payment was approved by Coram's Board. Therefore, it was a reasonable exercise of business judgment. Moreover, the Trustee concedes that that the payment did not harm Coram.

In 2000, Coram owed nearly $300 million to its noteholders, which required monthly interest payments. A248 (2000 target budget); A1414 (Danitz 4/6/07 111:6-17). For years, Coram had been drawing on its revolving loan to fund operations and making interests payments by increasing the amount of debt rather than paying cash. A910-13 (5/6/02 Crowley letter to Adams). In December 1999, Crowley presented to the Coram Board of directors a target budget for the year 2000 that projected paying interest and other debt payments in cash rather than in kind, in order to stop increasing Coram's debt. A215-18 (Coram 2000 budget); A1415-17 (Danitz 4/6/07 115:22-117:1). The Board approved that budget. A255-58 (2000 target budget); A1415-17 (Danitz 4/6/07 115:22-117:1); A219-30 (12/21/99 board minutes); A215-18 (Coram 2000 budget). Thereafter, pursuant to its contractual obligations to make interest payments and its approved plan to pay in cash rather than in kind, Coram made cash payments to its noteholders.[29]

The decision by the Board and Crowley to make interest payments in cash rather than in kind did not adversely affect Coram's operations. From the time that Crowley became CEO in November 1999 through the more than four years it spent in bankruptcy, Coram's cash flows were positive and the company *never* fell short on cash, a point evidenced by the fact that it never borrowed to fund operations—even after filing for bankruptcy. A1418-19 (Danitz 4/6/07

---

[28] Under its agreement with its noteholders, Coram could make its interest payments in cash or it could make the interest payment in kind by adding to the principal amount of its debt. A1414-1414.01 (Danitz 4/6/07 111:14-112:3).

[29] Director Casey testified with respect to the $6.3 million interest payment in cash rather than in kind, that the Board "did review what happened and we did concur." A1179, A1180 (Casey 9/28/01 140:19-21, 144:9-13).

121:13-19, 122:6-12); A978 (Trustee's motion to retain Crowley, p. 9); A910-13 (5/6/02 Crowley letter to Adams). Unlike most bankruptcy cases, Coram did not have "liquidity issues." A1306-07 (Friedman 3/16/07 153:24-154:22). Coram's bankruptcy was caused not by its lack of cash to fund operations, but rather by the impending Stark II deadline and Coram's staggering debt. Since the $6.3 million payment was a reasonable exercise of business judgment approved by Coram's Board, it cannot form the basis of a claim by the Trustee. *Brehm*, 746 A.2d at 261-62; *Cinerama*, 663 A.2d at 1170.[30]

Moreover, the $6.3 million cash payment did not harm Coram. Since Coram's debt exceeded its equity, the payments at issue belonged to the noteholders whether they were paid in cash or in kind. Apparently for this reason, the Trustee does not claim damages with respect to the $6.3 million payment. A14-15 (Trustee responses to first set of interrogatories 5-8, pp. 14-15). Indeed, the Trustee argued to the Bankruptcy Court that "it is difficult to see how [the $6.3 million payment in cash rather than in kind] harmed Coram, which owed the money to the Noteholders." A1065 (Trustee's post-confirmation hearing brief, p. 33). Goldin agreed, finding that the $6.3 million interest payment "did not cause the company any harm." A759 (Goldin report, p. 11). Because the undisputed facts make clear that Crowley committed no breach, and the Trustee concedes that there is no basis for damages caused by the payments, Crowley is entitled to summary judgment.

**D. Crowley Is Entitled to Partial Summary Judgment Because the Only Damages That Can Legally Be Traced to His Alleged Breach Are Damages Incurred Between Failure of the First Reorganization Plan And Failure of the Second Plan**

Even if this Court determines that Crowley is not entitled to summary judgment, partial summary judgment should be granted to narrow the scope of issues to be tried. Pursuant to

---

[30] To the extent that the Trustee argues that Crowley should have acted differently during July 2000 because he knew of the insolvency of the company based on the Chanin Capital valuation, this knowledge only supports Crowley's business judgment. "When a firm has reached the point of insolvency, it is settled that under Delaware law, the firm's directors are said to owe fiduciary duties to the company's creditors." *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 790-91 (Del.Ch. 2004) (citing *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 787 (Del.Ch.1992)). This is because "the fact of insolvency places the creditors in the shoes normally occupied by the shareholders—that of residual risk-bearers." *Id.* Given the insolvency of Coram during July 2000, Crowley was appropriately acting in the best interest of *both* the Noteholders and the shareholders in making the payments toward debt.

Federal Rule of Civil Procedure Rule 56(a) and (d), this Court may grant summary judgment on specified issues even if other issues in the case are allowed to proceed to trial. *Metzker v. Int'l Paper Co.*, 825 F. Supp. 641, 644 (D. Del. 1993). Partial summary judgment is an "economical" remedy to narrow the issues for trial when uncontroverted facts make clear that certain legal theories or defenses may be summarily resolved. *See Freeman v. Minnesota Min. & Mfg. Co.*, 675 F. Supp. 877, 890-91 (D. Del. 1987).

The Trustee seeks to recover from Crowley all the costs associated with all four years of Coram's bankruptcy proceeding plus unidentified "business losses."[31] A14 (Trustee's responses to first set of interrogatories 1-8, p. 14). But, Crowley had no role in the preparation of the second plan of reorganization, which was exclusively the responsibility of Coram's independent directors, outside counsel, and the independent restructuring advisor. Cmplt., ¶ 38 (D.I. 1). Crowley Decl., ¶ 11; A663-68 (12/28/00 board minutes); A1288-90, 1297-99, 1305 (Friedman 3/16/07 88:16-90:6, 101:11-103:15, 111:2-14); A1209-10 (Amaral 11/7/01 hearing 402:24-403:16). Crowley's exclusion from the preparation of the second plan precludes the Trustee from holding him responsible for costs associated with its failure and subsequent alleged damages.

Under Delaware law, to recover more than nominal damages, the Trustee must prove that any breach by Crowley was the proximate cause of specific and ascertainable damages to Coram or that Crowley personally profited from the breach. *See In re Tri-Star* 634 A.2d at 334 n.18. Even if the Trustee were permitted to proceed to trial on the theory that some conduct by Crowley caused the First Plan to be rejected (a proposition Crowley firmly disputes), then Crowley could conceivably be liable for the damages incurred between the court's denial of Coram's First Plan and the court's denial of its Second Plan (December 22, 2000 – December 21, 2001). But that would be the uppermost limit.

Coram's bankruptcy costs from the date of its Chapter 11 filing to the rejection of its initial reorganization plan (August 2000 – December 2000) may not be attributed to anything

---

[31] The Trustee also claims that Crowley is responsible for damages related to CPS. For the reasons described in section V.C.2 above, he is not.

Crowley did because those costs would have been incurred regardless. The Equity Committee opposed Coram's plan on numerous grounds that had nothing to do with Crowley, and the legal battle would have been fought anyway.

As to the Second Plan, the record indisputably proves that it was the special committee, Coram's legal counsel, and Goldin who formulated it. Other than being interviewed by Goldin, Crowley had no involvement in the preparation of this plan. Crowley Decl., ¶ 11; A1368-69 (Goldin 3/21/07 97:19-98:7); A1291-94, 1297-1304 (Friedman 3/16/07 91:18-94:3, 101:11-103:5, 106:16-22, 107:8-12, 108:22-110:23). By December 2000 and throughout the preparation and confirmation hearings on the second plan, undisputed facts also show that Crowley had disclosed to Friedman and to the Board that he was continuing to receive $80,000 per month from Cerberus for activities unrelated to Coram. Coram's 2000 10-K, signed by every member of Coram's Board in April 2001, explicitly stated: "[e]ffective August 1, 1999" Crowley and Cerberus "executed a *three-year* employment agreement whereby Mr. Crowley *is* paid $960,000 per annum." A713, 733 (Coram 2000 10-K, p. 45 (disclosure); p. 65 (board's signatures)) (emphasis added). Neither the independent Directors, nor Coram's bankruptcy counsel, nor Coram's independent restructuring advisor recommended to Crowley that he resign from Coram or sever his relationship with Cerberus. A1216 (Amaral 11/7/01 hearing 438:2-13); A1202-04 (Amaral 10/26/01 99:24-101:7); A1172 (Smith 9/24/01 172:8-13); A1187-88 (Smoley 9/29/01 73:25-74:4); A1295-96 (Friedman 3/16/07 95:3-96:13). For these reasons, the Trustee himself previously argued that the costs post-dating the failure of the Second Plan (December 2001 – December 2004) must fall at the feet of the independent Directors, not Crowley: "The Outside Directors are the appropriate defendants for the costs of the second and third confirmation hearings because they proposed the second plan . . . ." A1065 (Trustee's post-confirmation hearing brief, p. 33). In this case, the Trustee is surely right: if you didn't break it, you don't have to buy it. Because Crowley was not responsible for the Second Plan or its failure, the Trustee cannot collect damages Crowley did not cause. Therefore, via partial summary judgment, damages should be limited to the period between the first and second confirmation hearings.

## VI.    CONCLUSION

For the foregoing reasons, Defendant Daniel Crowley respectfully requests that the Court enter summary judgment in his favor, or, in the alternative, partial summary judgment as described above.


Dated:  April 17, 2007                                        CONNOLLY BOVE LODGE & HUTZ LLP


                                                              **/s/ Christina M. Thompson**
                                                              Jeffrey C. Wisler (DE Bar No. 2795)
                                                              Christina M. Thompson – (DE Bar No. 3976)
                                                              The Nemours Building
                                                              1007 N. Orange Street
                                                              Wilmington, DE  19801
                                                              (302) 658-9141

                                                                     -and-

                                                              John W. Keker
                                                              Elliot R. Peters
                                                              R. James Slaughter
                                                              KEKER & VAN NEST, LLP
                                                              710 Sansome Street
                                                              San Francisco, CA  94111
                                                              (415) 391-5400


                                                              *Attorneys for Defendant* DANIEL D. CROWLEY

#533654