Common Stock shall be entitled to receive dividends, if any, as may be declared from time to time by the Board of Directors, ratably in proportion to the number of shares of Common Stock held by each such holder.

After distribution in full of the preferential amount (fixed by or pursuant to the provisions of Paragraph C of this Article Fourth), if any, to be distributed to the holders of Preferred Stock in the event of voluntary or involuntary liquidation, distribution or sale of assets, dissolution or winding up of the Corporation, the holders of the Common Stock shall be entitled to receive all the remaining assets of the Corporation, tangible and intangible, of whatever kind available for distribution to stockholders, ratably in proportion to the number of shares of Common Stock held by each.

(31)

C. PREFERRED STOCK. The Preferred Stock may be issued from time to time in one or more classes or series. The Board of Directors of the Corporation shall have the authority to the fullest extent permitted under the General Corporation Law of Delaware to fix by resolution from time to time the designation of one or more classes or series of Preferred Stock and the voting powers, full or limited or no voting powers, and such designations, preferences and relative, participating, optional or other special rights and qualifications, limitations or restrictions thereof and to fix or alter the number of shares comprising any such class or series subject to the requirements of the Delaware General Corporation Law. The authority of the Board of Directors with respect to each such class or series shall include, without limitation of the foregoing, the right to determine and fix:

1. The distinctive designation of such class or series, and the number of shares to constitute such class or series;

2. The rate and times at which, dividends, if any, on the shares of such class or series shall be declared and paid, or set aside for payment, whether dividends at the rate so determined shall be cumulative or accruing, whether the shares of such class or series shall be entitled to any participating or other dividends at the rate so determined, and if so, on what terms, and the extent of the preference or relation, if any, of such dividends to the dividends payable on any other class or classes, or series of the same or other classes of stock;

3. The right or obligation, if any, of the Corporation to redeem shares of the particular class or series of Preferred Stock and, if redeemable, the price, terms and manner of such redemption;

4. The special and relative rights and preferences, if any, and the amount or amounts per share, which the shares of such class or series of Preferred Stock shall be entitled to receive upon any voluntary or involuntary liquidation, merger, consolidation, distribution or sale of assets, dissolution or winding up of the Corporation;

5. The terms and conditions, if any, upon which shares of such class or series shall be convertible into, or exchangeable for shares of capital stock of any other class or series, including the price or prices or the rate or rates of conversion or exchange and the terms of adjustment, if any;

6. The obligation, if any, of the Corporation to retire, redeem or purchase shares of such class or series pursuant to a sinking fund or fund of a similar nature or otherwise, and the terms and conditions of such obligations;

7. The voting rights, if any, including special voting rights with respect to the election of directors and matters adversely affecting any class or series of Preferred Stock; and

8. Limitations, if any, on the issuance of additional shares of such class or series or any shares of any other class or series of Preferred Stock; and

9. Such other preferences, powers, qualifications, special or relative rights and privileges thereof as the Board of Directors of the Corporation, acting in accordance with this Certificate of Incorporation,

may deem advisable and are not inconsistent with law and the provisions of this Certificate of Incorporation.

D.  OTHER PROVISIONS

1. The relative powers, preferences, and rights of each series of Preferred Stock shall, in each case, be as fixed from time to time by the Board of Directors in the resolution or resolutions adopted pursuant to authority granted in Paragraph C of this Article Fourth, and the consent by class or series vote or otherwise, of the holders of the Preferred Stock or such of the series of the Preferred Stock as are from time to time outstanding shall not be required for the issuance by the Board of Directors of any other series of Preferred Stock whether the powers, preferences and rights of such other series shall be fixed by the Board of Directors as senior to, or on a parity with, powers, preferences and rights of such outstanding series, or any of them, provided, however, that the Board of Directors may provide in such resolution or resolutions adopted with respect to any series of Preferred Stock that the consent of the holders of a majority (or such greater proportion as shall be therein

(32)

A33

fixed) of the outstanding shares of such series voting thereon shall be required for the issuance of any or all other series of Preferred Stock.

2. Subject to the provisions of Section 1 of this Paragraph D, shares of any series of Preferred Stock may be issued from time to time as the Board of Directors shall determine and on such terms and for such consideration as shall be fixed by the Board of Directors.

3. Common Stock may be issued from time to time as the Board of Directors shall determine and on such terms and for such consideration as shall be fixed by the Board of Directors.

4. No holder of any of the shares of any class or series of shares or securities convertible into such shares of any class or series of shares, or of options, warrants or other rights to purchase or acquire shares of any class or series of shares or of other securities of the Corporation shall have any preemptive right to purchase, acquire, subscribe for any unissued shares of any class or series or any additional shares of any class or series to be issued by reason of any increase of the authorized capital stock of the Corporation of any class or series, or bonds, certificate of indebtedness, debenture or other securities convertible into or exchangeable for shares of any class or series, or carrying any right to purchase or acquire shares of any class or series, but any such unissued shares, additional authorized issue of shares of any class or series of shares or securities convertible into or exchangeable for shares, or carrying any right to purchase or acquire shares, may be issued and disposed of pursuant to resolution of the Board of Directors to such persons, firms, corporations or associations, and upon such terms, as may be deemed advisable by the Board of Directors in the exercise of its sole discretion.

5. The Corporation reserves the right to increase or decrease its authorized capital stock, or any class or series thereof or to reclassify the same and to amend, alter, change or repeal any provision contained in this Certificate of Incorporation or in any amendment thereto, in the manner now or hereafter prescribed by law, but subject to such conditions and limitations as are hereinbefore prescribed, and all rights conferred upon stockholders in this Certificate of Incorporation or any amendment thereto, are granted subject to this reservation.

FIFTH

A.  NUMBER, ELECTION AND TERMS OF DIRECTORS. The business of the Corporation shall be managed by a Board of Directors. The number of directors of the Corporation shall be fixed from time to time by or pursuant to the By-Laws of the Corporation. Except as otherwise provided in or fixed by or pursuant to the provisions of Article Fourth hereof relating to the rights of the holders of any class or series of stock having a preference over the Common Stock as to dividends or upon liquidation to elect directors under specified circumstances, the directors shall be classified, with respect to the time for which they severally hold office, into three classes, as nearly equal in number as possible, as shall be provided in the manner specified in the By-Laws of the Corporation. One class shall be originally elected for a term expiring at the annual meeting of stockholders to be held in 1995, another class shall be originally elected for a term expiring at the annual meeting of stockholders to be held in 1996, and another class shall be originally elected for a term expiring at the annual meeting of stockholders to be held in 1997, with each member of each class to hold office until a successor is elected and qualified. At each annual meeting of stockholders of the Corporation and except as

otherwise provided in or fixed by or pursuant to the provisions of Article Fourth hereof relating to the rights of the holders of any class or series of stock having a preference over the Common Stock as to dividends or upon liquidation to elect directors under specified circumstances, the successors of the class of directors whose term expires at that meeting shall be elected to hold office for a term of three years.

    B.   **STOCKHOLDER NOMINATION OF DIRECTOR CANDIDATES AND INTRODUCTION OF BUSINESS.** Advance notice of stockholder nominations for the election of directors, and advance notice of business to be brought by stockholders before an annual meeting of stockholders, shall be given in the manner provided in the <u>By-Laws</u> of the Corporation.

    C.   **NEWLY CREATED DIRECTORSHIPS AND VACANCIES.** Except as otherwise required by law and except as otherwise provided in or fixed by or pursuant to the provisions of Article Fourth hereof

(33)

relating to the rights of the holders of any class or series of stock having a preference over the Common Stock as to dividends or upon liquidation to elect directors under specified circumstances: (i) newly created directorships resulting from any increase in the number of directors and any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other cause shall be filled by the affirmative vote of a majority of the remaining directors then in office, even though less than a quorum of the Board of Directors; (ii) any director elected in accordance with the preceding clause (i) shall hold office for the remainder of the full term of the class of directors in which the new directorship was created or the vacancy occurred and until such director's successor shall have been elected and qualified; and (iii) no decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director.

D.  REMOVAL. Except as otherwise provided in or fixed by or pursuant to the provisions of Article Fourth hereof relating to the rights of the holders of any class or series of stock having a preference over the Common Stock as to dividends or upon liquidation to elect directors under specified circumstances, any director may be removed from office only for cause and only by the affirmative vote of the holders of 80% of the combined voting power of the then outstanding shares of the Corporation's stock entitled to vote generally, voting together as a single class. Whenever in this Article Fifth or in Article Sixth hereof or in Article Seventh hereof, the phrase, *"the then outstanding shares of the Corporation's stock entitled to vote generally"* is used, such phrase shall mean each then outstanding share of any class or series of the Corporation's stock that is entitled to vote generally in the election of the Corporation's directors.

E.  AMENDMENT OR REPEAL. Notwithstanding any other provisions of this Article Fifth or of any other Article hereof or of the By-Laws of the Corporation (and notwithstanding the fact that a lesser percentage may be specified from time to time by law, this Article Fifth, any other Article hereof, or the By-Laws of the Corporation), the provisions of this Article Fifth may not be altered, amended or repealed in any respect, nor may any provision inconsistent therewith be adopted, unless such alteration, amendment, repeal or adoption is approved by the affirmative vote of at least 80% of the combined voting power of the then outstanding shares of the Corporation's stock entitled to vote generally, voting together as a single class.

SIXTH

Both stockholders and directors shall have power, if the By-Laws so provide, to hold their meetings and to have one or more offices within or without the State of Delaware.

Except as otherwise fixed by resolution of the Board of Directors pursuant to the provisions of Article Fourth hereof relating to the rights of the holders of Preferred Stock, any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of such holders. Except as otherwise required by law and subject to the rights of the holders of Preferred Stock, special meetings of stockholders may be called only by the Chairman on his or her own initiative, the Chief Executive Officer (if different from the Chairman) on his or her own initiative or the Board of Directors pursuant to a resolution approved by a majority of the entire Board of Directors. Notwithstanding anything contained in this Certificate of Incorporation to the contrary, the affirmative vote of the holders of at least 80% of the voting power of all shares of the Corporation

entitled to vote generally in the election of directors, voting together as a single class, shall be required to alter, amend, adopt any provision inconsistent with or repeal this Article Sixth.

### SEVENTH

The Board of Directors shall have power to adopt, amend and repeal the By-Laws of the Corporation to the maximum extent permitted from time to time by Delaware law; provided, however, that any By-Laws adopted by the Board of Directors under the powers conferred hereby may be amended or repealed by the Board of Directors or by the holders of at least a majority of the combined voting power of the then outstanding shares of the Corporation's stock entitled to vote generally, voting together as a single class, except that, and notwithstanding any other provisions of this Article Seventh or any other Article hereof or of the By-

(34)

Laws of the Corporation (and notwithstanding the fact that a lesser percentage may be specified from time to time by law, this Article Seventh, any other Article hereof or the By-Laws of the Corporation), the provisions of Article II, Sections 5 or 11 of the By-Laws, those of Article III, Sections 1, 3 and 4 of the By-Laws and the rights of the directors and officers of the Corporation with respect to indemnification under Article IX of the By-Laws may not be altered, amended or repealed in any respect, nor may any provision inconsistent therewith be adopted, unless such alteration, amendment, repeal or adoption is approved by the affirmative vote of the holders of at least 80% of the combined voting power of the then outstanding shares of the Corporation's stock entitled to vote generally, voting together as a single class (except that rights of directors or officers of the Corporation with respect to indemnification under Article IX may be enlarged by such lesser vote as may otherwise be required if enlargement of such indemnification rights is permitted by applicable law). Notwithstanding any other provisions of this Article Seventh or of any other Article hereof or of the By-Laws of the Corporation (and notwithstanding the fact that a lesser percentage may be specified from time to time by law, this Article Seventh, any other Article hereof or the By-Laws of the Corporation), the provisions of this Article Seventh may not be altered, amended or repealed in any respect, nor may any provision inconsistent therewith be adopted, unless such alteration, amendment, repeal or adoption is approved by the affirmative vote of the holders of at least 80% of the combined voting power or the then outstanding shares of the Corporation's stock entitled to vote generally, voting together as a single class.

## EIGHTH

A director of this Corporation shall not be personally liable to this Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to this Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived any improper personal benefit. If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of this Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.

Any repeal or modification of the foregoing paragraph by the stockholders of this Corporation shall not adversely affect any right or protection of a director of this Corporation existing at the time of such repeal or modification.

## NINTH

RIGHT OF INDEMNIFICATION. The Corporation may, to the fullest extent to which it is empowered to do so by the General Corporation Law of the State of Delaware or any other applicable laws, as they may from time to time be in effect, indemnify any person who was or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he or she is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, against all expenses (including attorneys' fees), judgments, fines and amounts incurred by him or her

in connection with such action, suit or proceeding.

### TENTH

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute or this Certificate of Incorporation, and all rights conferred upon stockholders herein are granted subject to this reservation.

(35)

**ELEVENTH**

Election of directors need not be by written ballot.

**TWELFTH**

The name and mailing address of the incorporator is:

> Stephen M. Gatlin
> Gardner, Carton & Douglas
> 321 North Clark, Suite 3400
> Chicago, Illinois 60610-4795

I, THE UNDERSIGNED, being the incorporator hereinbefore named, for the purpose of forming a corporation pursuant to the General Corporation Law of Delaware, do make this certificate, hereby declaring and certifying that this is my act and deed and the facts herein stated are true, and accordingly have hereunto set my hand this 30th day of November, 1993.

/s/  **STEPHEN M. GATLIN**
-----------------------------
Stephen M. Gatlin

(36)

---

*Alternative Formats:*  Rich Text / Word (.rtf), Text (.txt), EDGAR (.sgml), XML (.xml), et al.

---

*Copyright © 2006 Fran Finnegan & Company  All Rights Reserved.*
*www.secinfo.com - Tue, 25 Apr 2006 17:29:47.1 GMT - Help at SEC Info*

MINUTES OF A TELEPHONIC MEETING

OF THE BOARD OF DIRECTORS OF

CORAM HEALTHCARE CORPORATION

**April 22, 1999**

A telephonic meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was convened at approximately 12:40 p.m. MST on Thursday, April 22, 1999, pursuant to notice duly given. Participating in the meeting were the following Directors: Donald J. Amaral, Chairman and Chief Executive Officer; William J. Casey; Stephen A. Feinberg; Richard A. Fink; Stephen G. Pagliuca; and L. Peter Smith. Also participating in the meeting were Richard M. Smith, President and Secretary; Wendy L. Simpson, Executive Vice President and Chief Financial Officer; and Scott T. Larson, Senior Vice President and General Counsel. Blair L. Lockwood of Otten, Johnson, Robinson, Neff & Ragonetti, P.C. also participated in the meeting at the invitation of the Chairman. Mr. Amaral acted as Chairman of the meeting, and Mr. Larson kept the Minutes.

REVIEW AND APPROVAL OF MINUTES OF PRIOR MEETINGS

The first item of business was a review and consideration of the draft Board minutes from the meetings of the Board of Directors held on January 14, 1999; March 1, 1999 and April 7, 1999. The draft minutes had been distributed to the Directors prior to the meeting. Upon a motion duly made and seconded, the minutes were adopted as presented.

FIRST QUARTER FINANCIAL REPORT

Mr. Amaral invited Ms. Simpson to provide an overview of the Company's financial performance during its first quarter of 1999. Ms. Simpson reviewed the highlights of the Company's financial results as outlined in the materials presented to the Board of Directors. Ms. Simpson summarized the various points of non-operating income such as recoveries from litigation reserves and other matters such as bonuses that impacted the Company's financial statements. She also reviewed the financial results associated with the various contracts the Company has with Aetna U.S. Healthcare, Inc. ("Aetna USHC"). She explained that the Company had been working on its base business to collect the various amounts of cash owed to the Company by Aetna USHC. She stated that Aetna USHC had been slow in remitting cash payments to the Company, but that the Company was negotiating various methods for receiving advances and ultimately achieving full payment for its services.

Turning to the Resource Network division, Ms. Simpson highlighted the outstanding revenue and cost of goods matters associated with the Master Agreement the Resource Network division has with Aetna USHC. She explained that the Company had certain unresolved issues with Aetna USHC which prevented the Company from recording certain revenues even though the

EXHIBIT

9

2/14/·7 OD

COR-EQTY 0014530

**A41**

Minutes of the Board of Directors
April 22, 1999
Page 2

corresponding costs were incurred and recorded. She added that the Company's treatment of these matters had been established after consulting with the Company's auditors, Ernst & Young, LLP.

Ms. Simpson outlined the Company's balance sheet noting increases in accounts receivable and inventory. She explained that the Company had made capital expenditures for pumps and for certain office equipment and other matters required in connection with the outfitting of the Resource Network division office in Whippany, New Jersey and the Coram Prescription Services ("CPS") location in Orlando, Florida.

Ms. Simpson noted that the Company had borrowed approximately $22.5 million during the first quarter and that its debt had increased $26.3 million during the quarter in order to fund operations, an increase in receivables and inventory and certain other matters. She noted that the Company continued to experience a negative spread on its cash flow given that the time required for collection of the Company's cash remained above seventy (70) days while it tended to pay its employees and vendors in two (2) and four (4) weeks, respectively. She noted that the Company's day sale outstanding (DSO) had increased three (3) days during the first quarter, but that the Company was working to attempt to reverse that trend by focusing on collecting cash.

Mr. Fink inquired about obtaining more favorable terms from vendors such as the Company's primary wholesale supplier, Cardinal. Rick Smith stated that the Company had been working its inventory down and had decreased its inventory by $600,000 since the end of the year. He explained that this progress, however, had been partially offset by CPS and its build-up of inventory during the establishment of its Orlando, Florida facility. Mr. Smith also explained that the Company's inventories of blood products and hemophilia factor had increased due to product shortages and the Company's desire to have inventories of these types of products to provide assurances to support its sales opportunities. Mr. Smith also explained that CPS had begun attempting to source many of its products directly from the manufacturers or through consignment programs in order to achieve more favorable payment terms and rather than through the Company's traditional wholesale source.

FIRST QUARTER OPERATIONAL REPORT

Mr. Amaral invited Rick Smith to review the Company's operations during the first quarter. Mr. Smith directed the Board to the materials distributed. He reviewed the changes in types of therapies the Company's patients were receiving. These trends revealed a decrease in certain therapies such as antibiotics and an increase in certain therapies that had higher costs of goods such as intravenous immunoglobulin (IVIG) and hemophilia blood factor products. Mr. Smith explained that Company management was attempting to steer its sales efforts toward its lower cost therapies. He noted that patient census was generally up, but that much of the potential profit had been taken away through the sales of less profitable therapies. Accordingly, he was also working on programs to further transition higher cost therapies to lower cost models such as those offered by CPS.

h:\legal\scott\minutes.99\board422.doc

COR-EQTY 0014531

A42

Minutes of the Board of Directors
April 22, 1999
Page 3

Mr. Smith also reviewed opportunities that he had highlighted for his Branch Managers that could lead to cost savings. These included tighter management of inventory, pump rentals, overtime for staff, nursing costs, cost of deliveries and other related items.

Mr. Smith then summarized certain opportunities available for the Resource Network division such as outsourcing claims processing and opportunities for CPS in E-Commerce. He observed that CPS had been a large cash consumer during the transition of the Company's main mail-order facility to its new Orlando facility, but added that he expected CPS to move back on track.

Mr. Smith also highlighted the opportunities available for the Clinical Research and Medical Informatics division. He explained that this division would continue to attempt to cross sell with the Resource Network division using the Company's "Corametrics" program as a tool for not only its payor customers but also for its clinical research customers.

Mr. Smith explained that so far he was comfortable that the Company would reach its second quarter budget estimates. Mr. Feinberg asked several questions of Ms. Simpson and Mr. Smith regarding the first quarter results and the expected results for the second quarter. Mr. Feinberg expressed concern over the limited growth in the base business, the role the non-operating income items such as the reverse of the litigation reserves had on the Company's financial results and the Company's cash collection results. He inquired as to when the cost savings associated with the field reorganization would be felt by the Company. Mr. Feinberg also asked questions regarding the contribution of the Aetna USHC agreement and the performance in the Company's base business. Mr. Amaral explained that the Company's base home infusion business, on its own, was short of its plan during the second quarter but that management believed that it would meet its second quarter plan.

## COMPENSATION COMMITTEE REPORT

Ms. Simpson and Rick Smith departed from the meeting.

Mr. Amaral opened the discussion stating that he had met with Goldman Sachs Credit Partners, L.P. ("Goldman Sachs") and Cerberus Financial Partners, L.P. ("Cerberus") on April 21, 1999 in New York, and that he had explained his proposal to reduce his role at the Company and turn his duties as Chief Executive Officer over to Rick Smith and the members of his management team effective at the close of business Friday, April 23, 1999. He stated that Goldman Sachs and Cerberus were comfortable with his role changes. Mr. Amaral reviewed the proposed terms of an amendment to his Employment Agreement. Those proposed terms are set forth on Exhibit A to these minutes. Under the amended agreement, Mr. Amaral would serve only in the capacity as

h:\legal\uson\minutes.99\board422.doc

COR-EQTY 0014532

**A43**

Minutes of the Board of Directors
April 22, 1999
Page 4

Chairman with a salary of $100,000 per year through the term of the agreement which is scheduled to expire on May 15, 2000. Under the arrangement, Mr. Amaral would devote up to two (2) days per month to the Company and would charge $2,500 per day for any additional days required by the Company.

Mr. Amaral then explained that the Compensation Committee had reviewed management's proposal for providing employment agreements to certain members of Company management. He explained that many of these executives already had letters providing them with various severance benefits and, in some cases, change of control payments. Mr. Amaral stated that the employment agreements would help the Company in retaining these individuals and in providing standardized benefits and restrictive covenants for these individuals. Mr. Fink, in reviewing the memo, requested an explanation of the differences in the benefits afforded under the proposal and the benefits currently in place. Mr. Amaral explained that the severance benefits were largely the same, but that change of control payments were added for Wendy Simpson, Scott Larson and Vito Ponzio.

Mr. Amaral reviewed in greater detail the proposed terms for employing Rick Smith as the Company's Chief Executive Officer. The terms included an increase in his annual compensation, change of control payment, cash bonus opportunity and other benefits set forth on Exhibit A to these minutes.

Peter Smith inquired about the Company's compensation strategy. He noted that the strategy must differ today from what it was in 1995 given that the Company was in more of an operations mode than in the mode of selling to or combining with another entity. Mr. Fink added that he was concerned that Mr. Amaral's change in control bonus was very different than the change in control incentives provided to other members of management. Mr. Amaral stated that he would be agreeable to changing the success fee criteria set forth in his employment agreement, but no agreement was reached as to the terms of a subsequent success fee. However, it was agreed that Mr. Amaral and the Compensation Committee would take up the discussion of a change in Mr. Amaral's success fee at a later date.

Upon a motion duly made and seconded, the Board approved the proposed terms of employment for Mr. Amaral and Mr. Smith as outlined on Exhibit A and authorized Company management to enter into an employment agreement amendment with Mr. Amaral and an employment agreement with Mr. Smith as recommended by the Compensation Committee.

Mr. Amaral added that the Compensation Committee had also adopted resolutions recommending that the Board authorize Company management to enter into employment agreements with certain other executive officers and key members of the Company's management team. The forms of the employment agreements, principal terms and names of the proposed recipients were set forth in the materials presented to the Board. Upon a motion duly made and seconded, the Board

h:\legal\scon\minutes.99\board422.doc

COR-EQTY 0014533

A44

Minutes of the Board of Directors
April 22, 1999
Page 5

approved the Compensation Committee's recommendation and authorized Comp any management to enter into employment agreements substantially in the forms presented to the Board with the individuals designated.

The discussion turned then to the options proposed for issuance under the Company's 1994 Stock Option/Stock Issuance Plan (the "Stock Option Plan") that had been recommended by the Compensation Committee. Mr. Fink inquired about the options currently held by the persons slated to receive option grants. Mr. Amaral then reviewed the list noting the five categories of option grant recipients and summarizing the amounts of their prior holdings, if any. Mr. Amaral explained that the option grants were intended as a combination of rewards for past performance and for new hires and promotions. Peter Smith stated that the management team needs to have competitive equity ownership through options and he had reviewed amounts and compared them with the stock options granted by other companies to their executives. Without extensive review, he b elieved that those were consistent with other companies. Upon a motion duly made and seconded, the Board approved the numbers of options included in the Compensation Committee report for the individuals listed on Exhibit B to these minutes. In addition, the Board agreed to effect an amendment to Mr. Amaral's Option Agreement to reflect that all of Mr. Amaral's options would be vested prior to the termination of his Employment Agreement, as amended.

Mr. Fink recommended that Rick Smith be added to the Board of Directors. Upon a motion duly made and seconded, and effective upon the close of business on April 23, 1999, Mr. Smith was elected to serve as the Company's Chief Executive Officer and as a member of the Company's Board of Directors, to serve in each capacity until his successors are duly elected and qualified.

DEBT RESTRUCTURING AND STOCK LISTING STATUS

Mr. Amaral opened the discussion by stating that the Company had been d iscussing its listing status with the New York Stock Exchange (the "Exchange") over the past year. During that time, the Company has been reporting its financial performance and describing its business strategy to representatives of the Exchange. Thus far, the representatives of the Exchange have provided the Company with assurances that the Company would not be delisted and that the Company would receive notice from the Exchange in the event that it decided to commence delisting procedures. The Exchange had stated that it would review the Company's status on a quarterly basis, but would not make any long term commitments. Mr. Amaral then invited Mr. Larson to provide a discussion of the Company's investigation of its other listing alternatives.

Mr. Larson stated that the Company had been working with Mr. Lockwood at Onten, Johnson, Robinson, Neff & Ragonetti to review the possibility of listing the Company's common stock for trading on the American Stock Exchange ("AMEX") or the Natio-nal Association of Securities Dealers Automated Quotation System ("NASDAQ"). The Company had reviewed

h:\legal\scott\minutes.99\board422.doc

COR-EQTY 0014534

A45

Minutes of the Board of Directors
April 22, 1999
Page 6

whether it met the relevant listing criteria and found that the Company's current stock price prevented the Company from moving to either the AMEX or NASDAQ. Accordingly, management had considered recommending the pursuit of a reverse stock split with the expectation of a corresponding increase in the Company's stock price in order to meet the requirements.

Mr. Feinberg stated that his strong preference was to remain on the Exchange. He inquired as to what had changed recently in the listing status. Mr. Amaral responded that nothing had changed, but that management was intent upon exploring the Company's alternatives.

Mr. Amaral added that Rick Smith had suggested a face-to-face meeting with the Exchange to further inquire about status. He believed that taking this step as a precautionary measure would help the Company make decisions as necessary regarding the agenda for its annual meeting of stockholders and for whether the Company should remain on the Exchange. Accordingly, Rick Smith explained that the Company would be pursuing a meeting with representatives of the Exchange as soon as possible to obtain whatever assurances were possible to permit the Company to "earn its way" out of its listing problem.

Mr. Amaral explained that if no assurances could be given, the Board would need to reconsider whether a reverse stock split was appropriate. Mr. Fink stated that he had serious concerns about a reverse stock split. Mr. Feinberg echoed those concerns explaining that the stock price may continue to decline following a stock split.

After discussion, the Board agreed to delay consideration of a reverse stock split until after the Exchange meeting occurs. At that time, the Board would reconvene, discuss the results of the meeting and consider what other actions would be necessary at the annual meeting of stockholders to address the Company's listing status.

The Board discussed the possible upcoming earnings release on May 4, 1999 and the release of information concerning Mr. Amaral's resignation and change in roles effective as of the close of business on April 23, 1999. Mr. Fink expressed concern that Mr. Amaral's resignation may be viewed as a negative. Mr. Amaral explained that the release, as distributed to the Board, would be released on Monday, April 26, 1999. The Board agreed to proceed with the release on Monday, April 26, 1999, but to delay any decision on a reverse stock split.

ANNUAL MEETING

Mr. Amaral explained that Mr. Larson had requested that the Board consider other resolutions regarding the annual meeting of stockholders and certain other matters. Following the discussion about the Company's stock listing status and possible consideration of a reverse stock split, the proposed resolutions regarding the 1999 Annual Meeting of Stockholders were not

h:\legal\scott\minutes.99\board422.doc

COR-EQTY 0014535

A46

Minutes of the Board of Directors
April 22, 1999
Page 7

considered. However, Mr. Larson led a discussion of the other resolutions presented. These resolutions included ratification of certain stock options that were previously approved by the Compensation Committee and issued by the Company. Mr. Larson explained that records indicated that the Board considered and approved these option grants, but that the minutes did not adequately reflect their approval. Furthermore, the prior minutes did not adequately reflect the designation of the persons slated for the Compensation Committee. Accordingly, the prior appointment of members of the Compensation Committee, Messrs. Feinberg, Pagliuca and Peter Smith, was ratified. Mr. Larson also introduced the proposed resolutions outlining the granting of signatory authority to certain members of the Company management for the Company's leases and related real estate documents.

Upon a motion duly made and seconded, the resolutions set forth on Exhibit C to these minutes were adopted and approved.

**OTHER BUSINESS**

Peter Smith inquired of Mr. Amaral and Rick Smith about conversations he had with the Company's former Chief Operating Officer of the Western Area, Christopher York. He explained that Mr. York had been considering a position with Gateway Homecare. Inc. Mr. Amaral and Mr. Smith replied that they had received the request from Mr. York requesting that the Company waive the covenant not to compete, and had been considering this matter. However, they stated that they had incomplete information about Gateway's competitive status and that they were not prepared to make a decision until additional information was obtained about Gateway. No further action was taken regarding this matter.

There being no further business, the meeting was adjourned at approximately 3:20 p.m. MST.

Respectfully submitted,

Scott T. Larson
Secretary of the Meeting

h:\legal\scott\minutes.99\board422.doc

COR-EQTY 00148536

EXHIBIT A

Compensation Committee
April 22, 1999
Executive Appointments and Changes

Donald J. Amaral

| | |
|---|---|
| Title: | Chairman of the Board |
| Term: | Through May 15, 2000 (Original Term) |
| Benefits: | Continued payment by Company through May 15, 2000 |
| Salary: | $100,000 annually ($3846.15 per bi-weekly paycheck) |
| Hour Commitment: | 16 hours per month |
| Consulting Rate: | $2500 per day plus expenses (if greater than 16 hours per month |
| Bonus: | Eligible for 4/12 pro-rated payout –declined by Mr. Amaral |
| Options: | Accelerate to Full Vesting at end of term (May 15, 2000) |
| Success Fee: | As per contract if Change of Control occurs on or before May 15, 2000 |

Richard M. Smith

| | |
|---|---|
| Title: | President and Chief Executive Officer |
| Effective: | April 22, 1999 |
| Salary: | $425,000 annually |
| Car Allowance: | $600 per month |
| Travel: | Option for First Class Travel at Mr. Smith's discretion |
| Initial Term: | Three (3) years through April 30, 2002 |
| Severance: | Two (2) years |
| Bonus Compensation: | |

If the Company hits the percentage of its EBITDA target set forth
below, the Executive will be entitled to receive as bonus that percentage
of his Base Salary (as in effect on the last day of the fiscal year in question)
set forth below:

| Percentage of EBIDA Target | Percentage of Base Salary |
|---|---|
| 100.0% | 60% |
| 101.5% | 65% |
| 103.0% | 70% |
| 104.5% | 75% |
| 106.0% | 80% |
| 107.5% | 85% |
| 109.0% | 90% |
| 110.5% | 95% |
| 112% | 100% |

COR-EQTY 0014537

A48

EXHIBIT B

BOARD OF DIRECTORS MEETING
APRIL 22, 1999

Stock Option Grants
Page 1

### 1999 FIELD REORGANIZATION

| | | |
|---|---|---|
| Rick Smith | President | 500,000 |
| Joseph Smith | Chief Operating Officer , President, R-Net | 350,000 |
| Perry Bernocchi | Senior Vice President, Operations | 100,000 |
| Mark Hanley | Senior Vice President, Sales | 100,000 |
| Vito Ponzio | Senior Vice President, H.R. | 50,000 |
| John Ellis | Area Vice President, Operations, East | 50,000 |
| Ray McCaslin | Area Vice President, Sales, South | 50,000 |
| Bruce Harper | Area Vice President, Operations Central | 50,000 |
| John Harrington | Area Vice President, Operations , South | 50,000 |
| Richard Iriye | Area Vice President, Operations West | 50,000 |
| Richard Weakland | Area Vice President, Sales, West | 50,000 |
| Deborah Meyer | Area Vice President, Sales, Central | 45,000 |
| Michael Saracco | Area Vice President, Sales, East | 40,000 |

### 1998 FOURTH QUARTER STOCK OPTION WINNERS

| | |
|---|---|
| Frank Vivona | 10,000 |
| Paula Gaida | 5,000 |
| Paul Astphan | 2,500 |

### 1999 SALES COMMISSION PLAN

Sales Managers

| | | | |
|---|---|---|---|
| Karen Bryant | 5,000 | Leslie Beecher | 5,000 |
| Antony Clarke | 5,000 | Debbie Dennis | 5,000 |
| Dawn Fleming | 5,000 | Paula Gaida | 5,000 |
| Christopher Gleeson | 5,000 | Cherie Ismael | 5,000 |
| Bene Jacobs | 5,000 | Lisbeth Jarm | 5,000 |
| Marianne Rose | 5,000 | Eileen Thomas | 5,000 |
| Jim Turner | 5,000 | Craig Volmer | 5,000 |
| Chris Tice | 5,000 | | |

COR-EQTY 0014538

**A49**

BOARD OF DIRECTORS MEETING
APRIL 22, 1999

Stock Option Grants
Page 2

1999 SALES COMMISSION PLAN

Managed Care Consultants

| | | | |
|---|---|---|---|
| Jan Bounds | 750 | William Brennan | 750 |
| Frosty Comer | 750 | Deborah Dannas | 750 |
| Joanne Donnelly | 750 | Janet Dunn-Ruehle | 750 |
| Kim Eplee | 750 | Lynn Hanmer | 750 |
| Megan Hasenberg | 750 | Cathy Heinsohn | 750 |
| Janette Harden | 750 | Jamie Holland | 750 |
| Lisa Johnson | 750 | Elizabeth Moson | 750 |
| Teri Kolar | 750 | Barbara Mussared | 750 |
| Kymber Murphy | 750 | Cathy Overton | 750 |
| Roy Poillon | 750 | Barb Platten | 750 |
| David Retherford | 750 | James Reynolds | 750 |
| Sandra Saragoni | 750 | Jim Sepeda | 750 |
| Doug Schlinder | 750 | Angele Trimble | 750 |
| Frank Vivona | 750 | Maggie VonGras | 750 |
| David Zelaskowski | 750 | | |

NEW HIRES AND PROMOTIONS

| | | |
|---|---|---|
| Rodney Wright | 7,500 | Promotion to Vice-President, Reimbursement |
| Wendy Barry | 2,500 | Equity Stake in lieu of increased salary. |
| Eric Kastango | 40,000 | Vice President, Pharmacy Services |
| Kate Douglass | 40,000 | Vice President, Nursing Services |

COR-EQTY 0014539

A50

EXHIBIT C

## RESOLUTIONS ADOPTED BY THE BOARD OF DIRECTORS

## CORAM HEALTHCARE CORPORATION

April 22, 1999

RESOLVED, that the Chief Executive Officer, President, Chief Financial Officer, Chief Operating Offer or any Senior Vice President of the Company (each an "Authorized Officer") is hereby authorized, empowered and directed to enter into an amendment to the Employment Agreement for Donald J. Amaral substantially on the terms outlined on Exhibit A to the minutes for the April 22, 1999 meeting of this Board of Directors, subject to the approval of the Compensation Committee;

RESOLVED, that any Authorized Officer is hereby authorized, empowered and directed to effect an amendment to Mr. Amaral's stock option agreements to reflect that all of the options granted thereunder would be vested prior to the termination of his employment agreement, as amended;

RESOLVED, that any Authorized Officer is hereby authorized, empowered and directed to enter into an employment agreement on behalf of the Company with Richard M. Smith substantially on the terms outlined on Exhibit A to the minutes for the April 22, 1999 meeting of this Board of Directors, subject to the approval of the Compensation Committee;

RESOLVED, that any Authorized Officer is hereby authorized, empowered and directed to enter into, on the Company's behalf, employment agreements substantially in the forms attached hereto with the other persons designated on Schedule 1 to these resolutions;

RESOLVED, that Richard M. Smith is hereby elected to serve as the Company's Chief Executive Officer and as a member of the Company's Board of Directors, to serve in such capacities until his successor is hereby duly elected and qualified. These elections were made effective upon the close of business day on April 23, 1999;

RESOLVED, that the members of the Compensation Committee of the Board of Directors shall be Stephen A. Feinberg, Stephen G. Pagliuca and L. Peter Smith and their service on such committee since the June 24, 1998 meeting of this Board of Directors is hereby ratified, authorized and approved.

H:\LEGAL\SCOTT\MINUTES.99\422_RES.WPD

COR—EQTY 0014540

**A51**

## SCHEDULE 1

### PERSONS DESIGNATED FOR EMPLOYMENT AGREEMENTS

Joseph Smith
Wendy Simpson
Scott Larson
Vito Ponzio
Paul Quiner
Joan Adler
Perry Bernocchi
David Evans
Mark Hanley
David McCormick
Dom Meffe
Robert Roose

COR-EQTY 0014541

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Form 10-Q

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Quarterly Period Ended June 30, 1999**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from             to**

**Commission File Number 1-11343**

---

# Coram Healthcare Corporation
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **33-0615337** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

| | |
|---|---|
| **1125 Seventeenth Street** | |
| **Suite 2100** | |
| **Denver, CO** | **80202** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:  **(303) 292-4973**

---

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

The number of shares outstanding of the Registrant's Common Stock, $.001 par value, as of August 10, 1999, was 49,549,366.

**CROWLEYKVN 016900**

# PART I

## FINANCIAL INFORMATION

**ITEM 1.** *Financial Statements*

### CORAM HEALTHCARE CORPORATION

### CONDENSED CONSOLIDATED BALANCE SHEETS
(In Thousands)

#### ASSETS

| | June 30, 1999 (Unaudited) | December 31, 1998 |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $ 8,001 | $ 53 |
| Cash limited as to use | 1,776 | 1,557 |
| Accounts receivable, net of allowance of $16,254 and $18,128 | 120,106 | 113,697 |
| Inventories | 23,026 | 27,203 |
| Deferred income taxes, net | 280 | 705 |
| Other current assets | 5,584 | 4,963 |
| Total current assets | 158,773 | 148,178 |
| Property and equipment, net | 27,000 | 26,563 |
| Deferred income taxes, net | 2,392 | 4,365 |
| Other assets | 17,950 | 17,574 |
| Other deferred costs | 3,732 | 5,243 |
| Goodwill, net of accumulated amortization of $72,693 and $67,247 | 230,648 | 235,696 |
| Total assets | $ 440,495 | $ 437,619 |

#### LIABILITIES AND STOCKHOLDERS' EQUITY

| | June 30, 1999 | December 31, 1998 |
|---|---|---|
| Current liabilities: | | |
| Accounts payable | $ 72,356 | $ 52,930 |
| Accrued compensation | 7,898 | 11,205 |
| Interest payable | 5,460 | 4,671 |
| Current maturities of long-term debt | 399 | 260 |
| Income taxes payable | 495 | 300 |
| Deferred income taxes | 319 | 1,060 |
| Reserve for litigation | 1,365 | 2,987 |
| Accrued merger and restructuring | 3,233 | 3,935 |
| Other current liabilities | 7,556 | 6,271 |
| Total current liabilities | 99,081 | 83,619 |
| Long-term debt | 268,574 | 242,162 |
| Minority interest in consolidated joint ventures | 2,353 | 2,024 |
| Other liabilities | 13,493 | 12,947 |
| Deferred income taxes | 2,352 | 4,010 |
| Commitments and contingencies | — | — |
| Total liabilities | 385,853 | 344,762 |
| Stockholders' equity: | | |
| Preferred stock, par value $.001, authorized 10,000 shares, none issued | — | — |
| Common stock, par value $.001, authorized 100,000 shares, issued and outstanding 49,549 at June 30, 1999 and 49,201 at December 31, 1998 | 50 | 49 |
| Additional paid-in capital | 427,296 | 427,133 |
| Accumulated deficit | (372,704) | (334,325) |
| Total stockholders' equity | 54,642 | 92,857 |
| Total liabilities and stockholders' equity | $ 440,495 | $ 437,619 |

See accompanying notes to unaudited condensed consolidated financial statements.

1

**CROWLEYKVN 016901**

## CORAM HEALTHCARE CORPORATION

### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
#### (Unaudited)
#### (In Thousands, Except per Common Share Data)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | ---: | ---: | ---: | ---: |
| | 1999 | 1998 | 1999 | 1998 |
| Net revenue | $152,797 | $117,173 | $313,751 | $224,862 |
| Cost of service | 146,846 | 87,882 | 269,661 | 168,382 |
| Gross profit | 5,951 | 29,291 | 44,090 | 56,480 |
| Operating expenses: | | | | |
| Selling, general and administrative expenses | 28,680 | 21,625 | 52,509 | 42,698 |
| Provision for estimated uncollectible accounts | 4,452 | 3,577 | 8,613 | 7,243 |
| Amortization of goodwill | 2,716 | 2,778 | 5,448 | 5,543 |
| Restructuring costs | — | — | 950 | — |
| Total operating expenses | 35,848 | 27,980 | 67,520 | 55,484 |
| Operating income (loss) | (29,897) | 1,311 | (23,430) | 996 |
| Other income (expenses): | | | | |
| Interest expense | (7,524) | (6,083) | (14,083) | (20,258) |
| Other income, net | 182 | 946 | 391 | 1,723 |
| Loss before income taxes and minority interests | (37,239) | (3,826) | (37,122) | (17,539) |
| Income tax expense | 175 | 400 | 250 | 1,400 |
| Minority interests in net income of consolidated joint ventures | 579 | 302 | 1,006 | 713 |
| Net loss | $(37,993) | $ (4,528) | $(38,378) | $(19,652) |
| Loss per common share | $   (0.77) | $   (0.09) | $   (0.78) | $   (0.40) |
| Loss per common share — assuming dilution | $   (0.77) | $   (0.09) | $   (0.78) | $   (0.40) |

See accompanying notes to unaudited condensed consolidated financial statements.

2

CROWLEYKVN 016902

## CORAM HEALTHCARE CORPORATION

### CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(Unaudited)
(In Thousands)

|  | Six Months Ended June 30, 1999 | |
|  | 1999 | 1998 |
| --- | --- | --- |
| Net cash used in operating activities | $(8,888) | $ (22,087) |
| Cash flows from investing activities: | | |
|   Purchases of property and equipment | (5,074) | (3,911) |
|   Other | (525) | (620) |
|     Net cash used in investing activities | (5,599) | (4,531) |
| Cash flows from financing activities: | | |
|   Borrowings on line of credit | 28,500 | — |
|   Repayment of debt | (6,065) | (80,226) |
|   Sales of stock, including exercise of stock options | — | 10 |
|     Net cash provided by (used in) financing activities | 22,435 | (80,216) |
|     Net increase (decrease) in cash and cash equivalents | $ 7,948 | $(106,834) |

See accompanying notes to unaudited condensed consolidated financial statements.

3

CROWLEYKVN 016903

A56

## CORAM HEALTHCARE CORPORATION

### NOTES TO UNAUDITED CONDENSED CONSOLIDATED
### FINANCIAL STATEMENTS
### June 30, 1999

### 1. Basis of Presentation

*Business Activity.*  Coram Healthcare Corporation and its subsidiaries ("Coram" or the "Company") are engaged in four principal lines of business: alternate site (outside the hospital) infusion therapy and related services, ancillary network management services, pharmacy benefit management and specialty mail-order pharmacy services and centralized management, administrative and clinical support for clinical research trials, and medical informatics services. Other services offered by Coram include non-intravenous home health products such as durable medical equipment and respiratory therapy services.

Coram delivers its alternate and site infusion therapy services through approximately 90 branch offices located in 44 states and Ontario, Canada. Infusion therapy involves the intravenous administration of anti-infective therapy, intravenous immunoglobulin ("IVIG"), chemotherapy, pain management, nutrition and other therapies.

The Company provides ancillary network management services through its Resource Network division ("R-Net"), which manages networks of home health care providers on behalf of health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs"), at-risk physician groups and other managed care organizations. R-Net serves its customers through two primary call centers and three satellite offices.

The Company delivers pharmacy benefit management and specialty pharmacy services through its Coram Prescription Services division ("CPS"). The division provides services through a centralized mail order pharmacy and service center in Orlando, Florida; four regional mail order pharmacies in Plainview, New York; Omaha, Nebraska; Las Vegas, Nevada; Hayward, California; and one retail pharmacy in Baltimore, Maryland. The pharmacy benefit management service provides on-line claims administration, formulary management and certain drug utilization review services through a nationwide network of retail pharmacies. CPS's specialty pharmacy services provide centralized distribution, adherence programs, patient education, and clinical support to patients with high cost, high risk conditions.

Through its Clinical Research and Medical Informatics division, the Company provides centralized management and support for clinical research trials. This division also offers data collection and integration services as well as pharmaceconomic outcomes and utilization analyses.

*Basis of Presentation.*  The accompanying unaudited condensed consolidated financial statements have been prepared by the Company pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such regulations. The unaudited condensed consolidated financial statements reflect all adjustments and disclosures that are, in the opinion of management, necessary for a fair presentation. All such adjustments are of a normal recurring nature. The results of operations for the interim period ended June 30, 1999, are not necessarily indicative of the results of the full fiscal year. For further information, refer to the audited consolidated financial statements and notes thereto included in the Company's Annual Report on Form 10-K, as amended, for the year ended December 31, 1998 and subsequent filings on Forms 10-Q and 8-K in 1999.

*Provision for Estimated Uncollectible Accounts.*  Management believes the net carrying amount of accounts receivable is fairly stated and that the Company has adequate provision for uncollectible accounts based on all information available. However, no assurance can be given as to the level of future provisions for uncollectible accounts, or how they will compare to the levels experienced in the past.

*Earnings (Loss) per Share.*  In 1997, the Financial Accounting Standards Board (the "FASB") issued Statement No. 128, Earnings per Share ("Statement 128"). In accordance with Statement 128, basic

4

CROWLEYKVN 016904

CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS — (Continued)

earnings per share exclude any dilutive effects of options, warrants and convertible securities. The following table sets forth the computation of basic and diluted earnings per share for the three and six months ended June 30, 1999 and 1998:

|  | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
|  | June 30,1999 | June 30, 1998 | June 30,1999 | June 30,1998 |
| Numerator for basic and diluted loss per share | $(37,993) | $(4,528) | $(38,378) | $(19,652) |
| Weighted average shares--denominator for basic earnings per share | 49,495 | 48,818 | 49,448 | 48,651 |
| Effect of other dilutive securities: | | | | |
| Stock options | — | — | — | — |
| Warrants | — | — | — | — |
| Denominator for diluted earnings per share — adjusted weighted average shares and assumed conversion | 49,495 | 48,818 | 49,448 | 48,651 |
| Loss per common share | $  (0.77) | $  (0.09) | $  (0.78) | $  (0.40) |
| Loss per common share--assuming dilution | $  (0.77) | $  (0.09) | $  (0.78) | $  (0.40) |

Diluted earnings (loss) per share computations do not give effect to stock options or warrants to purchase common stock as their effect would have been anti-dilutive.

*Derivatives and Hedging Activities.*  In June 1998, the FASB issued Statement of Financial Accounting Standards No. 133, Accounting for Derivative Instruments and Hedging Activities ("Statement 133"), which requires recording all derivative instruments as assets or liabilities, measured at fair value. Statement 133 was effective for fiscal years beginning after June 15, 1999. The FASB issued, in June 1999, the Statement of Financial Accounting Standards No. 137, Accounting for Derivative Instruments and Hedging Activities — Deferral of the Effective Date of FASB Statement 133. ("Statement 137"), which amends Statement 133. Statement 137 will apply to all fiscal quarters of all fiscal years beginning after June 15, 2000. As of June 30, 1999, the Company had not entered into any derivative and hedging transactions, and as such, the Company does not believe that adoption of the new requirement will have an effect on the Company's future financial position or operating results.

*Start-up Costs.*  In 1998, the AICPA issued SOP 98-5 "Reporting on the Costs of Start-Up Activities," which requires that the costs of start-up activities be expensed as incurred. Initial adoption of SOP 98-5 was accounted for as a cumulative effect of an accounting change. The Company adopted the SOP 98-5 effective January 1, 1999 and such adoption did not have a significant effect on the results of operations or financial position.

5

CROWLEYKVN 016905

CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS — (Continued)

## 2. Acquisitions and Restructuring

*Acquisitions.* Certain agreements related to previously acquired businesses or interests therein provide for additional contingent consideration to be paid by the Company. The amount of additional consideration, if any, is generally based on the financial performance levels of the acquired companies. As of June 30, 1999, the Company may be required to pay a minimum of approximately $2.0 million, subject to increase based, in certain cases, on the Company or its subsidiaries exceeding certain revenue or income targets and changes in the market value of the Company's stock. These minimum contingent obligations have been recorded as additional goodwill. Subject to certain elections by the Company or the sellers, a maximum of approximately $1.1 million of these contingent obligations, subject to increase, may be paid in cash with the remaining to be paid in common stock of the Company. If these contingent payments exceed the minimum contingent amounts, they will be recorded as additional goodwill in the period in which the payment becomes probable. Payments during the three months ended June 30, 1999 and 1998 totaled $0.2 million and $0.1 million, respectively.

*Merger and Restructuring.* As a result of the formation of Coram and the acquisition of substantially all of the assets of the alternate site infusion business of Caremark, Inc., a subsidiary of Caremark International, Inc. (the "Caremark Business"), during May 1995, the Company initiated a restructuring plan (the "Caremark Business Consolidation Plan") and charged $25.8 million to operations as a restructuring cost. Certain additional restructuring costs totaling approximately $11.4 million were incurred and accounted for as adjustments to the purchase price of the Caremark Business in 1995. In December 1998, the Company evaluated the estimated costs to complete the Caremark Business Consolidation Plan and other accruals and recognized a restructure reversal benefit of $0.7 million.

Under the Caremark Business Consolidation plan, the Company has made total payments, disposals and reversals as follows (in thousands):

| | Through June 30, 1999 | | | | Balance at June 30, 1999 | |
| | Cash Expenditures | Non-Cash Charges | Total | Restructure Reversal | Future Cash Expenditures | Total Charges |
|---|---|---|---|---|---|---|
| Caremark Business Consolidation Plan: | | | | | | |
| Personnel Reduction Costs.. | $11,300 | $ — | $11,300 | $ — | $ — | $11,300 |
| Facility Reduction Costs ... | 9,496 | 3,900 | 13,396 | 714 | 2,590 | 16,700 |
| Total Restructuring Costs............ | $20,796 | $3,900 | $24,696 | $714 | $2,590 | $28,000 |

During January 1999, the Company adopted a restructuring plan, which was initiated in the first quarter of 1999. The plan resulted in an organizational restructure in which $0.9 million of expense was recognized for severance costs. The balance in the "Accrued Merger and Restructuring" liability at June 30, 1999 consists of future cash expenditures related to the Caremark Business Consolidation Plan of $2.6 million, the 1999 restructure plan of $0.3 million and other accruals of $0.3 million.

The Company estimates that the future cash expenditures related to the Caremark Business Consolidation Plan and the 1999 restructure plan will be made in the following periods: 35% through June 30, 2000, 16% through June 30, 2001, 17% through June 30, 2002, and 32% through June 30, 2003, and thereafter.

CROWLEYKVN 016906

### CORAM HEALTHCARE CORPORATION

### NOTES TO UNAUDITED CONDENSED CONSOLIDATED
### FINANCIAL STATEMENTS — (Continued)

#### 3. Long-Term Debt

Long-term debt is as follows (in thousands):

|  | June 30, 1999 | December 31, 1998 |
|---|---|---|
| Series A Senior Subordinated Unsecured Notes . . . . . . . . . . . . . . . . . . . . | $157,631 | $153,785 |
| Series B Senior Subordinated Convertible Notes . . . . . . . . . . . . . . . . . . . | 87,922 | 87,922 |
| New Senior Credit Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22,500 | — |
| Other obligations, including capital leases, at interest rates ranging from 6% to 16%, collateralized by certain property and equipment . . . . . . . . | 920 | 715 |
|  | 268,973 | 242,422 |
| Less current scheduled maturities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (399) | (260) |
|  | $268,574 | $242,162 |

As of June 30, 1999, the Company's principal credit and debt agreements included (i) a Securities Exchange Agreement (the "Securities Exchange Agreement") dated May 6, 1998 with Cerberus Partners, L.P., Goldman Sachs Credit Partners, L.P. and Foothill Capital Corporation (collectively known as the "Holders") and the related Series A Senior Subordinated Unsecured Notes (the "Series A Notes") and the Series B Senior Subordinated Convertible Notes (the "Series B Notes") contemplated thereby and (ii) a new senior credit facility with Foothill Income Trust, L.P., Cerberus Partners, L.P. and Goldman Sachs Credit Partners L.P. (collectively known as the "Lenders") and Foothill Capital Corporation, as Agent, dated as of August 20, 1998 (the "New Senior Credit Facility"). Under the outstanding credit and debt agreements, the Company is precluded from paying cash dividends during the term of the debt agreement.

*Securities Exchange Agreement.* On May 6, 1998, the Company entered into the Securities Exchange Agreement with the Holders of its previously outstanding subordinated rollover note (the "Rollover Note"). As long as the Rollover Note was outstanding, the Holders had the right to receive warrants to purchase up to 20% of the outstanding shares of the common stock of the Company (the "Warrants") on a fully diluted basis. The Securities Exchange Agreement provided for the cancellation of the Rollover Note (including deferred interest and fees) and the Warrants in an exchange (the "Exchange"), effective April 13, 1998, for the payment of $4.3 million in cash and the issuance by the Company to the Holders of (i) $150.0 million in original principal amount Series A Notes and (ii) $87.9 million in original principal amount of Series B Notes. In addition, under the Securities Exchange Agreement, the Holders of the Series A and Series B Notes were given the right to approve certain new debt and the right to name one director to the Company's Board of Directors, who was elected to the board in June 1998 and re-elected in August 1999.

On April 9, 1999, the Company entered into Amendment No. 2 (the "Note Amendment") to the Securities Exchange Agreement with the Holders. Pursuant to the Note Amendment, the outstanding principal amount of Series B Notes is convertible into shares of the Company's common stock, par value $.001 per share (the "Common Stock"), at a price of $2.00 per share (subject to customary anti-dilution adjustments). Prior to entering into the Note Amendment, the Series B Notes were convertible into Common Stock at a price of $3.00, which price was subject to downward (but not upward) adjustment based on prevailing market prices for the Common Stock on each of April 13, 1999 and October 13, 1999. Based on reported closing prices for trading in the Common Stock prior to April 13, 1999, this conversion price would have been adjusted to below $2.00 on such date had the Company not entered into the Note Amendment. Pursuant to the Note Amendment, the parties also increased the interest rate applicable to the Series A Notes from 9.875% to 11.5% per annum. The Securities Exchange Agreement pursuant to which the Series A Notes and the Series B Notes were issued contains certain other customary covenants and events of default. At

7

CROWLEYKVN 016907