CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS — (Continued)

June 30, 1999, the Company was in compliance with all of these covenants, other than covenants relating to certain relationships its Coram Resource Network, Inc. and Coram Independent Practice Association, Inc. subsidiaries have with certain parties that were contracted to provide services pursuant to the Master Agreement, effective May 1, 1998, (the "Master Agreement") with Aetna U.S. Healthcare, Inc. ("Aetna USHC" or "Aetna") and to certain covenants relating to the capitalization of certain subsidiaries. The Company has, however, received waivers from its lenders regarding such noncompliance. There can be no assurance as to whether further covenant violations will occur in future periods and whether any necessary waivers will be forthcoming at that time. See Note 4 to the Company's Unaudited Condensed Consolidated Financial Statements.

*Series A Notes.* The Series A Notes mature in May 2001 and bore interest at an initial rate of 9.875% per annum payable quarterly in arrears in cash or through the issuance of additional Series A Notes at the election of the Company. Pursuant to the Note Amendment, the parties increased the interest rate applicable to the Series A Notes to 11.5% per annum. The Holders can require the Company to pay interest in cash if the Company exceeds a certain interest coverage ratio. During the quarter ended June 30, 1999, interest expense on the Series A Notes was approximately $4.5 million. On July 15, 1999, additional Series A Notes totaling approximately $4.5 million were issued in lieu of a cash payment of interest due through such date.

*Series B Notes.* The Series B Notes mature in April 2008 and bear interest at the rate of 8% per annum, payable quarterly in arrears in cash or through the issuance of additional Series B Notes at the election of the Company. Pursuant to the Note Amendment, the outstanding principal amount of Series B Notes are convertible into shares of the Company's Common Stock at a price of $2.00 per share subject to customary anti-dilution adjustments including adjustments for sale of common stock other than pursuant to existing obligations or employee benefit plans at a price below the conversion price prevailing at the time of such sale. Cash will be paid in lieu of fractional shares upon conversion of the Series B Notes. During the quarter ended June 30, 1999, interest expense on the Series B Notes was approximately $1.8 million. On July 15, 1999, additional Series B Notes totaling approximately $1.8 million were issued in lieu of a cash payment of interest, due through such date.

The Series A and Series B Notes are redeemable, in whole or in part, at the option of the Holders thereof in connection with any change of control of the Company (as defined in the Securities Exchange Agreement), if the Company ceases to hold and control certain interests in its significant subsidiaries, or upon the acquisition of the Company or certain of its subsidiaries by a third party. In such instances, the Series A and Series B Notes are redeemable at 103% of the then outstanding principal amount plus accrued interest. The Series B Notes are also redeemable at the option of the Holders thereof upon maturity of the Series A Notes at the outstanding principal amount thereof plus accrued interest. In addition, the Series A Notes are callable at any time at 103% of the then outstanding principal amount plus accrued interest at the option of the Company.

*Exchange; New Senior Credit Facility.* The consummation of the Exchange was contingent upon the satisfaction of certain conditions prior to closing of the Securities Exchange Agreement on June 30, 1998. All conditions were satisfied with the exception of the condition requiring the Company to execute an agreement for a new senior credit facility. Accordingly, on June 30, 1998, the Company entered into the First Amendment and Waiver (the "Amendment") to the Securities Exchange Agreement, and the Exchange was consummated. The Amendment waived the condition under the Securities Exchange Agreement requiring the Company to execute an agreement for a new senior credit facility on or prior to June 30, 1998. In addition, under the Amendment, the Holders of the Series A and Series B Notes agreed to extend the Company up to $60.0 million of senior secured debt (the "New Senior Credit Facility"), subject to the completion of definitive agreements on or prior to September 30, 1998. On August 20, 1998, the Company entered into a

8

CROWLEYKVN 016908

## CORAM HEALTHCARE CORPORATION

## NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS — (Continued)

definitive agreement for the New Senior Credit Facility providing for the availability of the $60.0 million facility for acquisitions, working capital, letters of credit and other corporate purposes. The availability is subject to certain borrowing base calculations as defined in the underlying agreement. The New Senior Credit Facility matures February 26, 2001 and bears an interest rate of prime plus 1.5%, payable in arrears on the first business day of each month. The interest rate was 9.25% at June 30, 1999. The New Senior Credit Facility is secured by the capital stock of the Company's subsidiaries, as well as the accounts receivable and certain other assets held by the Company and its subsidiaries. Under the New Senior Credit Facility, among other nominal fees, the Company was required to pay an upfront fee of 1.0% or $0.6 million and is liable for commitment fees on the unused facility of ⅜ of 1.0% per annum, due quarterly in arrears. During the quarter ended June 30, 1999, interest and related fees on the New Senior Credit Facility were approximately $0.8 million. In addition, the terms of the New Senior Credit Facility provide for the issuance of warrants to purchase up to 1.9 million shares of common stock of the Company at $0.01 per share, subject to customary adjustments (the "1998 Warrants"). The 1998 Warrants were valued at their fair value at the date of issuance, and were accounted for as deferred costs to be amortized over the life of the New Senior Credit Facility. The Company charged $0.4 million to interest expense during the quarter ended June 30, 1999 related to the 1998 Warrants. The terms of the New Senior Credit Facility also provide for the issuance of letters of credit of up to $25.0 million provided that available credit would not fall below zero. As of June 30, 1999, the Holders had issued letters of credit totaling approximately $17.1 million thereby reducing the Company's availability under the New Senior Credit Facility by that amount. The terms of the New Senior Credit Facility also provide for a fee of 1.0% per annum on the outstanding letter of credit obligations, due in arrears on the first business day of each month. The terms of the New Senior Credit Facility also provide for additional fees to be paid on demand to any letter of credit issuer pursuant to the application and related documentation under which such letters of credit are issued. As of June 30, 1999, such fees were 0.825% per annum on the amount of outstanding letter of credit obligations. The New Senior Credit Facility contains certain other customary covenants and events of default. At June 30, 1999, the Company was in compliance with all of these covenants, other than the covenants relating to earnings before interest expense, income taxes, depreciation and amortization (EBITDA) covenant, interest coverage ratio covenant, and debt ratio covenant as of June 30, 1999 and for certain other matters. The Company, has, however, received waivers from its lenders regarding such noncompliance. There can be no assurance as to whether further covenant violations will occur in future periods and whether necessary waivers will be forthcoming at that time.

At August 16, 1999, the New Senior Credit Facility had an available borrowing base of $58.7 million, of which, $37.0 million had been drawn, including $14.5 million relating to the letters of credit that had been delivered in accordance with the Master Agreement with Aetna. In addition, after deducting from the borrowing base the other letters of credit obligations totaling $2.5 million, the total available under the facility is $19.2 million as of August 16, 1999.

### 4. Contingencies

*Litigation.* On November 21, 1995, a suit captioned William Hall and Barbara Lisser v. Coram Healthcare Corporation, James W. Sweeney, Patrick Fortune, and Sam Leno, No 1:95-CV-2994(WHB) was filed in the United States District Court for the Northern District of Georgia on behalf of a purported class of plaintiffs who were entitled to receive warrants pursuant to the settlement of In re T2 Medical, Inc. Shareholder Litigation. Plaintiffs filed an Amended Class Action Complaint on February 28, 1996, in which they allege that the Defendants made false and misleading statements that caused a fraud on the market and artificially inflated the price of the Company's stock during the period from August 1994 through August 1995. Such Complaint alleges violations of Section 10(b) of the Securities Act of 1934, and Rule 10b-5 promulgated thereunder, against all of the Defendants. The Complaint also alleges controlling person liability against the individual defendants under Section 20(a) of the Securities and Exchange Act, and further alleges

CROWLEYKVN 016909

CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS — (Continued)

fraud by all of the Defendants under Georgia law. Finally, Plaintiffs allege a breach of the covenant of good faith and fair dealing by all Defendants. Plaintiffs seek compensatory damages reflecting the difference in value between the warrants as issued pursuant to the settlement of In re T2 Medical, Inc. Shareholder Litigation with the trading price of the Company's common stock at its actual price and the same number of warrants at the same exercise price with the Company's stock trading at its alleged true value. The Defendants filed a Motion to dismiss the Amended Class Action Complaint on March 13, 1996. The Court granted the Company's Motion to Dismiss the Complaint on February 12, 1997. The Plaintiffs appealed the dismissal to the Eleventh Circuit Court of Appeals which affirmed the dismissal on October 15, 1998. The Plaintiffs filed a petition with the United States Supreme Court on March 15, 1999 for a writ of certiorari and the Company responded to the petition. On May 19, 1999, the Supreme Court entered an order denying the Plaintiffs' petition for certiorari, thereby ending the matter.

In January 1999, the Internal Revenue Service ("IRS") completed the examination of the federal income tax return of the Company for the year ended September 30, 1995, and proposed substantial adjustments to the prior tax liabilities of the Company. The Company has agreed to adjustments of $24.4 million that only affect the net operating loss carryforwards available. The Company does not agree with the other proposed adjustments regarding the deduction of warrants, write-off of goodwill and the specified liability portion of the 1995 loss, which would, if the IRS prevails, affect the prior year's tax liability. On May 14, 1999, the Company received a statutory notice of deficiency with respect to the proposed adjustments. The alleged deficiency totaled approximately $12.7 million plus interest and penalties to be determined. The Company is contesting the notice of deficiency through administrative proceedings and litigation and will vigorously defend its position. The most significant adjustment proposed by the IRS relates to the ability of the Company to categorize certain net operating losses as specified liability losses and offset income in prior years, for which the Company has previously received refunds in the amount of approximately $12.7 million. Due to the uncertainty of final resolution, the Company's financial statements include a reserve for these potential liabilities. No assurance can be given that the Company will prevail given the early phase of this matter and the uncertainties inherent in any proceeding with the IRS or in litigation. If the Company does not prevail with respect to the proposed material adjustments, the financial position and liquidity of the Company could be materially adversely affected. See Part II, Item 1. "Legal Proceedings," and Note 5 to the Company's Unaudited Condensed Consolidated Financial Statements.

On July 7, 1997, the Company filed suit against Price Waterhouse LLP (now known as Price-waterhouseCoopers LLP) in the Supreme Court of San Francisco, California, seeking damages in excess of $165.0 million. As part of the settlement that resolved a case filed by the Company against Caremark International, Inc. and Caremark, Inc. (collectively, "Caremark"), Caremark assigned and transferred to the Company all of Caremark's claims and causes of action against Price Waterhouse LLP, Caremark's auditors. This assignment of claims includes claims for damages sustained by Caremark in defending and settling its lawsuit with the Company. The case was dismissed from the court in California because of inconvenience to witnesses with a right to re-file in Illinois. The Company re-filed the lawsuit in state court in Illinois. PricewaterhouseCoopers LLP filed a motion to dismiss the Company's lawsuit in the state court in Illinois on several grounds, but their motion was denied on March 15, 1999. In May, 1999, PricewaterhouseCoopers LLP filed another motion to dismiss and the Company has submitted an opposition. The hearing on the motion is set for October 29, 1999. The lawsuit has progressed into the discovery stage. There can be no assurance of any recovery from PricewaterhouseCoopers LLP.

On June 30, 1999, the Company filed a complaint (the "Coram Complaint") against Aetna in the United States District Court for the Eastern District of Pennsylvania (Civil Action No. 99-CV-3330). The Coram Complaint sets forth claims against Aetna for fraud, misrepresentation, breach of contract and rescission relating to the Master Agreement between the parties for ancillary network management services through Coram's Resource Network Division ("R-Net"). Coram provided its notice of termination of the Master

10

CROWLEYKVN 016910

CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS — (Continued)

Agreement effective June 30, 1999. Under the arrangement, that was expected to last for five years, Coram managed and provided home health care services for over 2,000,000 Aetna enrollees in eight states for a stated monthly fee per enrollee. Coram began serving Aetna enrollees under the Master Agreement on approximately July 1, 1998.

As stated in the Coram Complaint, Aetna wrongfully induced Coram to enter into and continue performing under the Master Agreement by, among other things, misrepresenting and understating utilization of home health care services, which utilization has been substantially higher than Aetna represented at the commencement of the Master Agreement. As also stated in the Coram Complaint, Aetna has breached the Master Agreement in several respects, including its failure to pay amounts due under the Master Agreement totaling in excess of $10.0 million. Furthermore, Aetna's misrepresentations induced Coram to expend additional amounts for the infrastructure necessary to perform its duties under the Master Agreement. In the lawsuit, Coram is seeking compensatory and punitive damages in excess of $50.0 million.

On June 30, 1999, the Company received a copy of a complaint (the "Aetna Complaint") that had been filed by Aetna on June 29, 1999 in the Court of Common Pleas of Montgomery County, Pennsylvania (Case No. 99-11025). The Aetna Complaint seeks equitable and declaratory relief to compel the Company to perform under the Agreement, including the payment of compensation to the healthcare providers that have rendered and continue to render services to Aetna's health plan members. As stated in the Aetna Complaint, Aetna disputes the Company's right to terminate the Agreement. On approximately July 1, 1999, Coram removed the Aetna Complaint to federal court. Then, Aetna filed a motion to remand seeking to have the case transferred back to state court. Aetna subsequently withdrew its remand motion, such that the Aetna Complaint is also pending in the United States District Court for the Eastern District of Pennsylvania (Civil Action No. 99-CV-3378).

On July 20, 1999, Aetna filed a counterclaim against Coram in the federal court lawsuit brought by Coram (Civil Action No. 99-CV-3330) and a motion to dismiss the claims of Coram for fraud, misrepresentation and rescission of the Master Agreement (Coram has filed an opposition to the motion to dismiss.). In its counterclaim, Aetna has sued Coram for, among other things, breach of the Master Agreement and fraudulent misrepresentation, contending Coram never intended to perform the Master Agreement, defamation, interference with contractual relations with providers and for interference with prospective contractual relations with other companies that allegedly bid for the Master Agreement. Aetna seeks in excess of $100.0 million in the lawsuit, plus punitive damages.

Pursuant to an agreed upon order dated July 23, 1999, Coram is transitioning back to Aetna, in an orderly fashion, the management of home health care services under the Master Agreement. Coram has learned that Aetna has agreed to pay network providers for properly authorized home health care services rendered after July 23, 1999 while reserving its rights to pursue Coram for the cost of such services as part of its complaint and counterclaim against Coram. The Company's R-Net division is continuing to process claims submitted by members of its provider network for services rendered through June 30, 1999.

The Company intends to pursue its claims against Aetna vigorously and to put forth a vigorous defense against all of the claims brought by Aetna against Coram and the other Coram parties. Due to the uncertainties inherent in litigation, the ultimate disposition of the Aetna litigation described in the preceding paragraphs cannot presently be determined and no provision has been recorded in the Company's Consolidated Financial Statements for any recovery or loss that may result upon resolution of the Aetna litigation described above. An adverse outcome in such litigation could have a material adverse effect on the financial position, results of operations and liquidity of the Company.

The Company is also a party to various other legal actions arising out of the normal course of its business. Management believes that the ultimate resolution of such other actions will not have a material adverse effect

11

CROWLEYKVN 016911

A64

## CORAM HEALTHCARE CORPORATION

### NOTES TO UNAUDITED CONDENSED CONSOLIDATED
### FINANCIAL STATEMENTS — (Continued)

on the financial position, results of operations or liquidity of the Company. Nevertheless, due to the uncertainties inherent in litigation, the ultimate disposition of these actions cannot presently be determined.

*Contingencies.* The Master Agreement provides that the Company would be financially responsible for certain covered home health services rendered to covered enrollees in certain Aetna HMO based plans. The Master Agreement also contemplates that the Company under certain circumstances, would reimburse Aetna for services paid for directly by Aetna to providers of such services. These amounts are referred to in the Master Agreement as "leakage." Aetna withheld certain amounts from each capitation payment made to the Company as a reserve for the reimbursement of leakage claims. During the term of the Master Agreement, approximately $5.3 million was withheld by Aetna for payment of leakage.

The Master Agreement required Aetna to provide the Company with monthly reports showing its claims for leakage, but Aetna failed to do so. The most recent of approximately three leakage reports that Aetna did provide purported to show approximately $19.7 million in leakage claims incurred through approximately March 1999, with potentially more leakage claims to follow. The Company's review of the initial reports revealed that the reports were inaccurate in various respects. The Company reported these inaccuracies to Aetna, but received no response. At this time, the Company cannot determine whether it will be held responsible for the leakage claims asserted by Aetna due to the uncertainties of litigation and cannot estimate how much, if any, of the leakage claims are properly the responsibility of the Company. These matters are among the issues in dispute in the litigation described above.

### 5. Income Taxes

During the six months ended June 30, 1999 and 1998, the Company recorded an income tax expense of $0.8 million and $0.1 million, respectively. The effective income tax rates for the six month periods ended June 30, 1999 and 1998 differ substantially from the expected combined federal and state income tax rates calculated using applicable statutory rates as a result of the Company providing a full valuation reserve against its deferred tax assets.

As of June 30, 1999, deferred tax assets are net of a $134.7 million valuation allowance. Realization of deferred tax assets is dependent upon the ability of the Company to generate taxable income in the future. Deferred taxes relate primarily to temporary differences consisting, in part, of accrued restructuring costs, the charge for goodwill and other long-lived assets, allowances for doubtful accounts and other accrued liabilities that are not deductible for income tax purposes until paid or realized and to net operating loss carryforwards that are deductible against future taxable income.

In January 1999, the Internal Revenue Service ("IRS") completed the examination of the federal income tax return of the Company for the year ended September 30, 1995, and proposed substantial adjustments to the prior tax liabilities of the Company. The Company has agreed to adjustments of $24.4 million that only affect the net operating loss carryforwards available. The Company does not agree with the other proposed adjustments regarding the deduction of warrants, write-off of goodwill and the specified liability portion of the 1995 loss which would, if the IRS prevails, affect the prior years' tax liabilities. On May 14, 1999, the Company received a statutory notice of deficiency with respect to the proposed adjustments. The alleged deficiency totaled approximately $12.7 million plus interest and penalties to be determined. The Company is contesting the notice of deficiency through administrative proceedings and litigation, and will vigorously defend its position. The most significant adjustment proposed by the IRS relates to the ability of the Company to categorize certain net operating losses as specified liability losses and offset income in prior years, for which the Company has previously received refunds in the amount of approximately $12.7 million. Due to the uncertainty of final resolution, the Company's financial statements include a reserve for these potential liabilities. No assurance can be given that the Company will prevail given the early phase of this matter and the uncertainties inherent in any proceeding with the IRS or in litigation. If the Company does

12

CROWLEYKVN 016912

## CORAM HEALTHCARE CORPORATION

### NOTES TO UNAUDITED CONDENSED CONSOLIDATED
### FINANCIAL STATEMENTS — (Continued)

not prevail with respect to the proposed material adjustments, the financial position and liquidity of the Company could be materially adversely affected.

### 6. Industry Segment and Geographic Area Operations

Management regularly evaluates the operating performance of the Company by reviewing results on a product or service provided basis. The Company's reportable segments are Infusion, R-Net and CPS. Infusion is the Company's base business, which derives its revenue primarily from alternate site infusion therapy. R-Net's revenue is derived primarily from management services offered to HMOs, PPOs, at-risk physician groups and other managed care organizations for home health services. CPS primarily provides specialty mail-order pharmacy and pharmacy benefit management services. The other non-reportable segment represents lithotripsy services for the three and six months ended June 30, 1998 and clinical research services for the three and six months ended June 30, 1999.

Coram uses earnings before interest expense, income taxes, depreciation and amortization ("EBITDA") for purposes of performance measurement. The measurement basis for segment assets includes net accounts receivable, inventory, net property and equipment, and other current assets.

13

CROWLEYKVN 016913

## CORAM HEALTHCARE CORPORATION

### NOTES TO UNAUDITED CONDENSED CONSOLIDATED
### FINANCIAL STATEMENTS — (Continued)

Summary information by segment is as follows (in thousands):

| | As of and for the Three Months Ended June 30, | | As of and for the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 1999 | 1998 | 1999 | 1998 |
| **Infusion** | | | | |
| Revenue from external customers | $108,430 | $94,724 | $214,035 | $183,522 |
| Intersegment revenue | 8,202 | 3,784 | 15,405 | 7,316 |
| Interest income | 23 | 17 | 45 | 32 |
| Equity in net income of unconsolidated joint ventures | 1 | 15 | 1 | 46 |
| Segment EBITDA profit | 11,461 | 14,353 | 23,256 | 28,021 |
| Segment assets | 136,535 | 115,408 | 136,535 | 115,408 |
| Segment asset expenditures | 965 | 953 | 2,456 | 2,293 |
| **R-Net** | | | | |
| Revenue from external customers | $ 23,226 | $11,621 | $ 59,832 | $ 21,393 |
| Intersegment revenue | — | — | — | — |
| Interest income | 8 | 5 | 15 | 8 |
| Equity in net income of unconsolidated joint ventures | — | — | — | — |
| Segment EBITDA loss | (29,429) | (714) | (24,498) | (1,706) |
| Segment assets | 6,608 | 6,216 | 6,608 | 6,216 |
| Segment asset expenditures | 287 | 500 | 813 | 601 |
| **CPS** | | | | |
| Revenue from external customers | $ 21,011 | $10,580 | $ 39,666 | $ 19,300 |
| Intersegment revenue | 533 | 280 | 615 | 499 |
| Interest income | — | — | — | — |
| Equity in net income of unconsolidated joint ventures | — | — | — | — |
| Segment EBITDA profit | 839 | 519 | 1,406 | 837 |
| Segment assets | 18,883 | 7,077 | 18,883 | 7,077 |
| Segment asset expenditures | 366 | 70 | 822 | 152 |
| **All Other** | | | | |
| Revenue from external customers | $ 130 | $ 248 | $ 218 | $ 647 |
| Intersegment revenue | — | — | — | — |
| Interest income | — | — | — | — |
| Equity in net income of unconsolidated joint ventures | — | — | — | — |
| Segment EBITDA profit (loss) | (149) | 127 | (204) | 293 |
| Segment assets | 131 | — | 131 | — |
| Segment asset expenditures | — | — | — | — |

14

CROWLEYKVN 016914

A67

CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS — (Continued)

A reconciliation of the Company's segment revenue, segment EBITDA profit (loss), segment assets and other significant items to the corresponding amounts in the Consolidated Financial Statements are as follows (in thousands):

| | As of and for the Three Months Ended June 30, | | As of and for the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 1999 | 1998 | 1999 | 1998 |
| **Net Revenues** | | | | |
| Total for reportable segments | $161,402 | $120,989 | $329,553 | $232,030 |
| Other revenue | 130 | 248 | 218 | 647 |
| Elimination of intersegment revenue | (8,735) | (4,064) | (16,020) | (7,815) |
| Total consolidated revenue | $152,797 | $117,173 | $313,751 | $224,862 |
| **Loss Before Income Taxes and Minority Interests** | | | | |
| Total EBITDA profit (loss) for reportable segments | $(17,129) | $ 14,158 | $   164 | $ 27,152 |
| Other EBITDA profit (loss) | (149) | 127 | (204) | 293 |
| Goodwill amortization expense | (2,716) | (2,778) | (5,448) | (5,543) |
| Depreciation and other amortization expense | (2,953) | (2,937) | (5,752) | (5,937) |
| Interest expense | (7,524) | (6,083) | (14,083) | (20,258) |
| All other income (expense), net | (6,768) | (6,313) | (11,799) | (13,246) |
| Loss before income taxes and minority interests | $(37,239) | $ (3,826) | $(37,122) | $(17,539) |
| **Assets** | | | | |
| Total assets for reportable segments | $162,026 | $128,701 | $162,026 | $128,701 |
| Other assets | 278,469 | 284,561 | 278,469 | 284,561 |
| Consolidated total assets | $440,495 | $413,262 | $440,495 | $413,262 |

For each of the years presented, the Company's primary operations and assets were within the United States. The Company maintains an infusion operation in Canada; however, the assets and revenue generated from this business are not material to the Company's operations.

Net revenue from one customer for the Company's reportable segments represented approximately 13% and 5%, respectively, of the Company's total consolidated net revenue for the three months ended June 30, 1999 and 1998, and 17% and 5%, respectively, for the six months ended June 30, 1999 and 1998. Net revenue from the Medicare and Medicaid programs for the Company's Infusion and CPS segments represented approximately 17% and 23%, respectively, of the Company's total consolidated net revenue for the three months ended June 30, 1999 and 1998, and 17% and 23%, respectively, for the six months ending June 30, 1999 and 1998.

## 7. Subsequent Events

In July 1999, Coram laid off 114 employees in its Whippany, New Jersey, office, who were responsible for managing the Aetna Master Agreement. Costs incurred as a result of these lay offs, and other actions taken to reorganize the R-Net division's Whippany, New Jersey call center operations, will be recognized in the Company's financial statements for the quarterly period ended September 30, 1999.

15

CROWLEYKVN 016915

A68

**ITEM 2.** *Management's Discussion and Analysis of Financial Condition and Results of Operations*

This Quarterly Report on Form 10-Q contains certain "forward-looking" statements (as such term is defined in the Private Securities Litigation Reform Act of 1995) and information relating to Coram that are based on the beliefs of the management of Coram as well as assumptions made by and information currently available to the management of Coram. The Company's actual results may vary materially from the forward-looking statements made in this report due to important factors such as: history of operating losses and uncertainties associated with future operating results; significant outstanding indebtedness; equity conversion rights held by existing debt holders; limited liquidity; reimbursement related risks; shifts in the mix of parties that pay for the Company's services; dependence on relationships with third parties; concentration of large payors; industry competition; timing of or ability to complete acquisitions; government regulation of the home health care industry; certain legal proceedings; dependence on key personnel; recruitment and retention of trained personnel; potential volatility of stock price; New York Stock Exchange listing status; and unanticipated impacts from the Year 2000 Issue. See Item 7 — "Management's Discussion and Analysis of Financial Condition and Results of Operations — Risk Factors" in the Company's Annual Report on Form 10-K, as amended, for the year ended December 31, 1998. When used in this report, the words "estimate," "project," "believe," "anticipate," "intend," "expect" and similar expressions are intended to identify forward-looking statements. Such statements reflect the current views of Coram with respect to future events based on currently available information and are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in such forward-looking statements. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. Coram does not undertake any obligation to release publicly any revisions to these forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

### Background

*General.* The Company is engaged in four principal lines of business: alternate site (outside the hospital) infusion therapy and related services, ancillary network management services, pharmacy benefit management and specialty mail-order pharmacy services and centralized management, administrative and clinical support for clinical research trials and medical informatics services. Other services offered by Coram include non-intravenous home health products such as durable medical equipment and respiratory therapy services.

*Business Strategy.* The Company's overall business strategy is focused on the basic factors that could lead to profitability: strategic revenue generation programs, cost reduction and control, quality improvement and cash collections. The Company's revenue generation programs include a focus on business relationships where the Company can provide high quality of care while operating profitably. In the Company's alternate site infusion therapy business, the Company is continuing to emphasize marketing efforts aimed at improving its therapy mix, physician relationships and payor relationships. It also has continued the development of its specialty programs aimed at serving patients requiring intravenous nutrition; pre- and post-transplant patients; patients with HIV/AIDS; and patients with chronic disorders such as hemophilia, immune deficiencies and alpha-one antitrypsin deficiency. The R-Net division remains focused on marketing to HMOs, PPOs, at-risk physician groups and other managed care payors desiring to reduce the cost of their health care expenditures through management of the home health services utilized by their members. Meanwhile, the CPS division has focused its marketing efforts on smaller health plans, including companies with self-insured plans, self-funded employer health plans, labor unions, managed care payors and patient populations with specialized needs such as pre- and post-transplant patients, patients with HIV/AIDS and chronic conditions such as diabetes and asthma. The Company is pursuing a plan to expand the reach of the CPS division by developing the capability to accept orders for its specialty mail-order pharmacy services over the Internet, with the site appearing on the Internet prior to the end of 1999 with revenues beginning in 2000. The Clinical Research and Medical Informatics division is directing its marketing efforts toward pharmaceutical and medical device manufacturers that can benefit from the centralized management, data collection and integration services offered by the Company that can provide these manufacturers with the opportunity to complete some of the most challenging aspects of their clinical trials more quickly.

16

**CROWLEYKVN 016916**

The Company has implemented cost reduction and control programs focused on the reduction and control of cost of services and operating expenses, assessment of poorly performing branches and review of branch efficiencies. Delivery of quality service in the Company's infusion therapy division in particular is being closely monitored through an internal task force, more rigorous reporting and independent patient satisfaction surveys. Furthermore, management throughout the Company is continuing to concentrate on reimbursement by emphasizing improved billing and cash collections methods and continued assessment of systems support and support for reimbursement.

Strategic alternatives currently being considered by the Company include, among others: (i) the evaluation of potential acquisitions in markets that would permit the Company to grow its local or regional business either through one of its principal lines of business; (ii) CPS's upcoming entrance into the E-commerce market which would allow the division to transact business over the Internet; and (iii) the continued investment into and development of services provided by the Clinical Research and Medical Informatics division. There can be no assurance that any growth in its local or regional business or other strategic alternatives will be effected or will be available to the Company on commercially acceptable terms and there can be no assurance that any investment capital will be available to the Company.

*Factors Affecting Recent Operating Results*

Dispute with Aetna U.S. Healthcare, Inc. On June 30, 1999, the Company notified Aetna that effective immediately Coram had terminated the Master Agreement. The Company is now in litigation with Aetna, and the case is presently scheduled for trial in April 2000. See Part II, Item 1. "Legal Proceedings."

The Company's performance under the Master Agreement during the three and six month periods ended June 30, 1999, resulted in losses under the agreement of approximately $(29.1) million and $(24.0) million, respectively, including costs of services paid and accrued of approximately $37.2 million and $55.4 million, respectively. These figures do not take into account the various claims of Aetna including its leakage claims. Also, due to the uncertainties of litigation in calculating these losses Coram did not include as part of the recognized revenue the amounts previously retained by Aetna for alleged leakage claims and included only the actual capitation payments received as revenue. The costs of service increased during the three months ended June 30, 1999, due to higher than expected utilization rates which had previously been misrepresented by Aetna as alleged in Coram's lawsuit. The Company believes that termination of the Master Agreement was proper based upon non-payments by Aetna and was a necessary step toward improving its operating profit and cash flow. The Company will take a charge in its third quarter financial statements for costs associated with terminating the Master Agreement in an amount yet to be determined due to the uncertainties of litigation.

For the three and six month periods ended June 30, 1999, revenue related to the Company's performance of the Master Agreement represented approximately 7% and 12%, respectively, of the Company's total revenue. Apart from the Master Agreement, Coram's infusion therapy branches have historically served Aetna enrollees under various agreements, including a national ancillary services agreement executed in April 1998 for home infusion services furnished to Aetna enrollees not covered by the Master Agreement. The aggregate revenue of the Company related to all of its relationships with Aetna for the three and six months ended June 30, 1999 was approximately 13% and 17%, respectively. Although the Company has not received notice from Aetna that it intends to terminate the April 1998 national agreement for infusion services, the CPS division received notice from Aetna that Aetna did not intend to renew its agreement with CPS that was scheduled to expire in accordance with its terms on September 30, 1999.

The termination of the Master Agreement and related dispute with Aetna may have other negative effects on the Company's Resource Network division and in the Company's Infusion business if, for example, Aetna refuses to pay claims for the services rendered by Coram to Aetna enrollees that are serviced outside the Master Agreement, or if Aetna causes its newly acquired Prudential affiliates to cease doing business with Coram. The Company cannot predict the ultimate impact the dispute with Aetna may have but if the Company does not prevail in its dispute with Aetna, the Company could incur additional substantial losses. Further, the Company anticipates incurring significant legal fees associated with pursuing the litigation related to the dispute with Aetna.

17

CROWLEYKVN 016917

Other Factors Affecting Recent Operating Results. Other significant factors currently affecting the Company's operating performance and financial condition are as follows:

(i) restructure of its credit facilities through the repayment of its former senior credit facility in January 1998, the exchange of its former subordinated debt for the issuance of the Series A Notes and the Series B Notes in June 1998 and the establishment of the New Senior Credit Facility in August 1998 and the setting of the conversion price applicable to the Series B Notes contemplated by the April 1999 amendment to the Securities Exchange Agreement offset by the increased interest rate applicable to the Series A Notes also included in such April 1999 amendment;

(ii) expansion and improved sales efforts in the Company's CPS division;

(iii) ongoing pricing pressure in the Company's infusion business as a result of an unfavorable shift in payor mix from private indemnity insurers to managed care organizations and other contracted payors, and intense competition among infusion providers. The following table sets forth the approximate percentages of the Company's infusion therapy net revenue from certain categories of payors:

|  | Three Months Ended | | |
|---|---|---|---|
|  | June 30, 1999 | March 31, 1999 | June 30, 1998 |
| Private Indemnity Insurance and Other Non-Contracted Payors | 24% | 23% | 27% |
| Managed Care Organizations and Other Contracted Payors | 54% | 54% | 47% |
| Medicare and Medicaid Programs | 22% | 23% | 26% |
| Total | 100% | 100% | 100% |

(iv) increased competition from hospitals and physicians that have sought to increase the scope of services they offer through their facilities and offices, including services similar to those offered by the Company, or that have entered into risk-bearing relationships with third-party payors pursuant to which they have been delegated control over the provision of a wide variety of health care services, including the services offered by the Company; and

(v) increased clinical staffing, delivery, on-call, and other volume related costs, as well as, increased costs of certain blood and blood derivative products that are in short supply that have been required by the increasing numbers of patients served by the Company's infusion division and the increasing numbers of patients receiving the therapies that require the products that are in short supply.

18

CROWLEYKVN 016918

A71

*Results of Operations*

*Certain Quarterly Comparisons*

Unaudited, in thousands except per share data:

| | Three Months Ended | | |
|---|---|---|---|
| | June 30, 1999 | March 31, 1999 | June 30, 1998 |
| Net revenue | $152,797 | $160,954 | $117,173 |
| Cost of service | 146,846 | 122,815 | 87,882 |
| Gross profit | 5,951 | 38,139 | 29,291 |
| Operating expenses: | | | |
| Selling, general and administrative expenses | 28,680 | 23,829 | 21,625 |
| Provision for estimated uncollectible accounts | 4,452 | 4,161 | 3,577 |
| Amortization of goodwill | 2,716 | 2,732 | 2,778 |
| Restructuring costs | — | 950 | — |
| Total operating expenses | 35,848 | 31,672 | 27,980 |
| Operating income (loss) | (29,897) | 6,467 | 1,311 |
| Other income (expenses): | | | |
| Interest expense | (7,524) | (6,559) | (6,083) |
| Other income, net | 182 | 210 | 946 |
| Income (loss) before income taxes and minority interests | (37,239) | 118 | (3,826) |
| Income tax expense | 175 | 75 | 400 |
| Minority interests in net income of consolidated joint ventures | 579 | 428 | 302 |
| Net loss | $(37,993) | $ (385) | $ (4,528) |
| Loss per common share | $ (0.77) | $ (0.01) | $ (0.09) |
| Loss per common share — assuming dilution | $ (0.77) | $ (0.01) | $ (0.09) |

*Three Months Ended June 30, 1999 Compared With Three Months Ended March 31, 1999 (unaudited, in millions except per share data):*

*Net Revenue.* Net revenue decreased $8.3 million or 5.2%, to $152.7 million in the quarter ended June 30, 1999 from $161.0 million in the quarter ended March 31, 1999. The decrease can be attributed to a decrease in sales at the R-Net division of $13.4 million in the current quarter, of which $10.0 million represented adjustments related to amounts that presently are in dispute in the litigation between the Company and Aetna. See Part II. Item 1 — "Legal Proceedings." The overall decrease in net revenue was partially offset by an increase in sales at the Infusion and CPS divisions of $2.8 million and $2.4 million, respectively, derived from internal sales growth.

*Gross Profit.* Gross profit decreased $32.2 million to $5.9 million or a gross margin of 3.9% in the quarter ended June 30, 1999 from $38.1 million or a gross margin of 23.7% in the quarter ended March 31, 1999. The reduction is due primarily to increased cost of service of $18.9 million for greater than anticipated utilization and decreased net revenue of $10.0 million related to the R-Net division and certain costs associated with the Master Agreement, as discussed above. In addition, the infusion business reflected a higher cost of service relating to variable costs that fluctuate with the number of patients served and higher costs of drugs and supplies caused by current market shortages of certain blood products. See "Factors Affecting Recent Operating Results" and Part II, Item 1. "Legal Proceedings."

*Selling, General and Administrative Expenses.* SG&A increased $4.9 million or 20.6% to $28.7 million in the quarter ended June 30, 1999 from $23.8 million in the quarter ended March 31, 1999. Excluding in the first quarter of 1999, a $1.8 million recovery of a note receivable, the increase in SG&A is $3.1 million or 13.0%. See "Factors Affecting Recent Operating Results."

19

CROWLEYKVN 016919

*Operating Income (Loss).* The Company had an operating loss of ($29.9) million during the three months ended June 30, 1999 compared to operating income of $6.5 million during the three months ended March 31, 1999. The decline is due primarily to the decrease in net revenue of $8.3 million, coupled with the increases in cost of service of $24.0 million and SG&A costs of $4.9 million, as described above.

*Net Loss.* Net loss for the quarter ended June 30, 1999 was ($38.0) million compared to a net loss of ($0.4) million for the quarter ended March 31, 1999. As discussed above, the decline is due primarily to the cost of service increase of $18.9 million and revenue decrease of $10.0 million associated with the Aetna Master Agreement and related dispute, and an increase in SG&A expense of $4.9 million.

*Three Months Ended June 30, 1999 Compared With Three Months Ended June 30, 1998 (unaudited; in millions except per share data):*

*Net Revenue.* Net revenue increased $35.5 million or 30.3%, to $152.7 million in the quarter ended June 30, 1999 from $117.2 million in the quarter ended June 30, 1998. The increase is primarily due to a (i) $9.9 million increase in net revenue from the infusion business primarily due to a 9.0% increase in patient census partially offset by an unfavorable shift in payor mix; (ii) $15.7 million increase in net revenue from the R-Net division primarily relating to the Aetna Master Agreement; and (iii) $10.1 million increase in net revenue from the CPS division resulting from an increased number of patients served, generated by internal sales growth. See "Factors Affecting Recent Operating Results."

*Gross Profit.* Gross profit decreased $23.4 million, to $5.9 million or a gross margin of 3.9% in the quarter ended June 30, 1999 from $29.3 million or a gross margin of 25.0% in the quarter ended June 30, 1998. The decrease results primarily from the impact of $18.9 million increased cost of service relating to the Aetna Master Agreement, as described above. See "Factors Affecting Recent Operating Results."

*Selling, General and Administrative Expenses.* SG&A increased $7.1 million or 32.9% to $28.7 million in the quarter ended June 30, 1999 from $21.6 million in the quarter ended June 30, 1998. The increase is due primarily to the growth of the R-Net and CPS divisions. See "Factors Affecting Recent Operating Results."

*Interest Expense.* Interest expense increased by $1.4 million to $7.5 million in the three months ended June 30, 1999 from $6.1 million during the three months ended June 30, 1998. The increase is attributable to the addition of draws of $22.5 million on the Senior Credit Facility, a $3.8 million increase in the Series A Senior Subordinated Unsecured Notes, and a rate change on the Series A Notes from 9.875% to 11.5% beginning on April 9, 1999.

*Operating Income (Loss).* The Company had an operating loss of ($29.9) million during the three months ended June 30, 1999 compared to operating income of $1.3 million during the three months ended June 30, 1998. The decline is due primarily to the decrease in gross profit of $23.4 million and increase in SG&A of $7.1 million, as described above.

*Net Loss.* Net loss for the quarter ended June 30, 1999 was ($38.0) million compared to ($4.5) million for the quarter ended June 30, 1998. As discussed above, the decline can be attributed to the decrease in operating income and the increase in interest expense. See "Factors Affecting Recent Operating Results."

*Six Months Ended June 30, 1999 Compared With Six Months Ended June 30, 1998 (unaudited; in millions except per share data):*

*Net Revenue.* Net revenue increased $88.9 million or 39.6%, to $313.8 million in the six months ended June 30, 1999 from $224.9 million in the six months ended June 30, 1998. The increase is primarily due to a (i) $23.1 million increase in net revenue from the infusion business primarily due to a 10.0% increase in patient census partially offset by an unfavorable shift in payor mix; (ii) $46.2 million increase in net revenue from the R-Net division primarily relating to the Aetna Master Agreement; and (iii) $19.9 million increase in net revenue from the CPS division resulting from an increased number of patients served, generated by internal sales growth. See "Factors Affecting Recent Operating Results."

20

CROWLEYKVN 016920

*Gross Profit.* Gross profit decreased $12.4 million to $44.1 million or a gross margin of 14.1% in the six months ended June 30, 1999 from $56.5 million or a gross margin of 25.1% in the six months ended June 30, 1998. The decrease results primarily from the increase in net revenue, discussed above, in the R-Net and CPS divisions, offset by an increase in cost of service associated with the Aetna Master Agreement, variable costs that fluctuate with the number of patients served and higher costs of drugs and supplies caused by current market shortages of certain blood products. See "Factors Affecting Recent Operating Results."

*Selling, General and Administrative Expenses.* SG&A increased $9.8 million or 23.0%, to $52.5 million in the six months ended June 30, 1999 from $42.7 million in the six months ended June 30, 1998. The increase is due primarily to the growth of the Infusion business, R-Net division, and the CPS division. Expenses increased primarily from business growth for salary and benefits along with costs associated with additional personnel such as additional rent for office space, telephone, and business insurance expense. See "Factors Affecting Recent Operating Results."

*Operating Income (Loss).* The Company had an operating loss of ($23.4) million during the six months ended June 30, 1999 compared to operating income of $1.0 million during the six months ended June 30, 1998. The decrease in operating income is due primarily to the decline in gross profit of $12.4 million, coupled with an increase of $9.8 million in SG&A for the quarter ended June 30, 1999.

*Restructuring Costs.* The Company recorded approximately $0.9 million of charges in March 1999 relating to reorganization of the Company's management structure completed during the first quarter of 1999.

*Interest Expense.* Interest expense decreased by $6.1 million to $14.1 million in the six months ended June 30, 1999 from $20.2 million during the six months ended June 30, 1998. The decrease is due primarily to a decrease of $10.3 million in interest related to the Rollover Note which was cancelled in connection with the Securities Exchange Agreement and a decrease of $3.2 million in interest relating to the Warrants issued under the Rollover Note, offset by interest related to the Securities Exchange Agreement of $7.1 million. See Note 3 to the Unaudited Condensed Consolidated Financial Statements as of June 30, 1999.

*Net Loss.* During the six months ended June 30, 1999, the Company recognized a net loss of ($38.4) million compared to a net loss of ($19.7) million during the six months ended June 30, 1998. As discussed above, the decline can be attributed to the decrease in operating income (loss), partially offset by a decrease in interest expense. See "Factors Affecting Recent Operating Results."

*Liquidity and Capital Resources*

The Company uses cash generated from operations and available credit under the New Senior Credit Facility to fund its working capital requirements and operations. The Company's working capital as of June 30, 1999 was $59.7 million compared to $64.6 million at December 31, 1998, a decrease of $4.9 million. During the six months ended June 30, 1999, the primary increases in current assets related to (i) an increase in cash and cash equivalents of $7.9 million; (ii) an increase in net accounts receivable of $6.4 million, primarily due to an approximate three day increase in days sales outstanding (DSO) and additional sales volume at the CPS division; and (iii) a decrease in inventory of $4.2 million. The increase in cash and cash equivalents was primarily due to borrowings, net of repayments, on the New Senior Credit Facility. Property and equipment purchases primarily consisted of $2.1 million for computer systems and software and the purchase of durable medical equipment for $1.6 million. Total current liabilities increased in the six months ended June 30, 1999 primarily due to an increase in accounts payable of $19.4 million coupled with a decrease in accrued compensation of $3.3 million. These changes primarily relate to expenses recognized for the R-Net division business with Aetna, through June 30, 1999.

As of June 30, 1999, the Company did not have any material commitments for capital expenditures.

Under the terms of the New Senior Credit Facility, the maximum funds available to the Company (defined as the "Revolving Credit Commitment") is an amount equal to the lesser of (a) the Company's borrowing base as calculated pursuant to the agreement or (b) the total revolving credit commitment of $60.0 million. As of June 30, 1999, the Company's Revolving Credit Commitment was $59.1 million. Offset by letter of credit obligations of $17.1 million and revolver borrowings of $22.5 million, the total available

CROWLEYKVN 016921

credit under the New Senior Credit Facility was $19.5 million as of June 30, 1999. As of August 16, 1999, the Company's Revolving Credit Commitment was $58.7 million. Of that amount, $37.0 million had been drawn against the New Senior Credit Facility, which includes $14.5 million relating to the letters of credit that had been delivered in accordance with the Aetna Master Agreement. In addition, after deducting the other letters of credit obligations totaling $2.5 million, the total available under the facility is $19.2 million as of August 16, 1999. As of June 30, 1999, the Company was not in compliance with certain financial and other covenants set forth in its principal debt agreements. The Company has, however, received waivers from its lenders regarding such noncompliance. There can be no assurance as to whether further covenant violations will occur in future periods and whether any necessary waivers will be forthcoming at that time. See Note 3 to the Unaudited Condensed Consolidated Financial Statements.

The Company has experienced a reduction in liquidity due to the higher than expected costs of service as described above with respect to the Master Agreement and Aetna's draws on letters of credit that increased outstanding debt by $14.5 million. Liquidity will be further reduced if Aetna should fail to use the $14.5 million letter of credit proceeds to satisfy claims of participating providers against Coram for services rendered prior to June 30, 1999 (when Coram terminated the Master Agreement) and Aetna has indicated that at present it does not intend to so utilize the funds from the letters of credit. Although the Company has sought to record a good faith estimate of all service costs related to the Master Agreement, due to the uncertainties of litigation, there can be no assurance that the exact amount and nature of all such costs can be presently identified. If Aetna does not use the letter of credit proceeds to satisfy the claims of participating providers for services rendered prior to June 30, 1999 or if additional liabilities should arise related to the Master Agreement, the Company may need to seek additional or alternative sources of liquidity. The Company is continuing to assess the impact of the Master Agreement at the same time it is reviewing its business plan and formulating revised plans for operations and cash flow without the Master Agreement and is under discussions with its current lenders for a possible restructuring of its principal debt agreements. The Company also continues to have discussions with other commercial and investment banks and private equity sources regarding other sources of capital for refinancing its debt to address its liquidity needs. The Company may also consider strategic alternatives to provide any needed liquidity. There can be no assurance that the Company will be able to obtain any needed liquidity on commercially acceptable terms.

*Year 2000 Issues.* The Company believes the most significant risk with the Year 2000 problem is the effect such issues may have on third party payors, such as Medicare. While all of the effects of such noncompliance have not been identified by the Company, any failure of these third party payors to resolve Year 2000 problems in a timely manner could impact the Company's capital availability due to a slow down in the payment of accounts receivable associated with these payors. While the Company has not incurred any payment issues to date which management can directly attribute to the Year 2000 problem at any specific payor, no assurance can be made that payment issues will not occur. Such an impact could have a material adverse effect on the Company's ability to generate cash from operations and require the Company to use available capital from the New Senior Credit Facility. Significant delays in collecting accounts receivable due to Year 2000 problems experienced by third party payors could reduce the capital available to the Company by reducing the borrowing base under the terms of the New Senior Credit Facility. In addition, such payment delays due to the Year 2000 problem could impact the Company's ability to meet its debt obligations.

*Restructure Costs.* Of the $3.2 million of remaining accrued restructure costs, the Company estimates that the future cash expenditures will be made in the following periods: 35% through June 30, 2000, 16% through June 30, 2001, 17% through June 30, 2002, and 32% through June 30, 2003, and thereafter. Although subject to future adjustment and the Company's ability to successfully implement its business strategy, the Company believes it has adequate reserves and liquidity as of June 30, 1999 to meet future expenditures related to the plans. However, there is no assurance that the reserves will be adequate or that the Company will generate sufficient working capital to meet future expenditures.

### Year 2000 Issues

*Background.* Some computers, software and other equipment include programming code in which calendar year data is abbreviated to only two digits. As a result of this design decision, some of these systems

22

CROWLEYKVN 016922

A75

could fail to operate or fail to produce correct results if "00" is interpreted to mean 1900, rather than 2000. These problems are widely expected to increase in frequency and severity as the year 2000 approaches and are commonly referred to as the "Millennium Bug" or "Year 2000 Problem."

*Assessment.* The Year 2000 Problem could affect computers, software, and other equipment used, operated or maintained by the Company. Accordingly, the Company is reviewing its internal computer programs and systems to ensure that the programs and systems will be Year 2000 compliant.

*Internal Infrastructure.* The Company believes that it has identified substantially all of the major computers, software applications, and related equipment used in connection with its internal operations that must be modified, upgraded, or replaced to minimize the possibility of material disruption to its business. The Company has completed the majority of activity related to the modification, upgrade or replacement of all major systems that have been identified as adversely affected by Year 2000. To date, all work has been completed, fully tested and systems for asset tracking, general accounting, payroll, branch operations including admissions, pharmacy management, billing, collections and inventory are fully operational and in compliance. Systems for our Resource Network Group are compliant for billing and collections. Systems that support our Coram Prescription Services division for both the pharmacy benefit management and mail order pharmacy systems have been completed. Systems that support our Home Medical Equipment locations have been upgraded and are also in operation. Current plans call for the Company to complete final systems remediation by September 30, 1999. These areas of remediation include the upgrade of the Resource Network claims adjudication system, final deployment of our inventory management system, minor turnkey software upgrades to our data communications hardware and upgrade or replacement of personal computer equipment that does not support Year 2000 calculations.

*Suppliers.* At the end of 1998, the company formally communicated with its major suppliers to identify any potential adverse situations. During the first six months of 1999, we have reviewed these responses and worked to resolve issues involving the Year 2000 problem. However, the Company has limited or no control over the actions of these suppliers. Thus, while the Company expects that it will be able to resolve any significant Year 2000 Problems with these suppliers by September 30, 1999, there can be no assurance that these suppliers will resolve any or all Year 2000 Problems with any of its customers. Any failure of these suppliers to resolve Year 2000 Problems with their systems in a timely manner could have a material adverse effect on the Company's business, financial condition, and results of operations.

*Third Party Payors.* Management believes that the most significant risk to the Company for the Year 2000 Problem is the effect such issues may have on third party payors, such as Medicare. News reports have indicated that various agencies of the federal government are having difficulty becoming Year 2000 compliant before the Year 2000. The Company has not yet undertaken quantification of the effects of such noncompliance or to determine whether such quantification is even possible. The Company has communicated with its third party payors to identify and, to the extent possible, to resolve issues involving the Year 2000 Problem. However, the Company has limited or no control over the actions of these third party payors. Thus, while the Company expects that it will be able to resolve any significant Year 2000 Problems with these payors, there can be no assurance that these payors will resolve any or all Year 2000 Problems with their systems before the occurrence of a material disruption to the business of the Company. Any failure of these third party payors to resolve Year 2000 Problems with their systems in a timely manner could have a material adverse effect on the Company's business, financial condition, and results of operations.

*Remediation Costs.* The Company is using internal and external resources to reprogram or replace, test and implement the software and equipment modifications required under this project. The total cost of the Year 2000 remediation project is estimated at $0.8 million and is being funded through operating cash flows. As of the six months ended June 30, 1999, the Company has incurred approximately $0.6 million related to this remediation process. Of these costs, $0.4 million has been expensed and $0.2 million was capitalized as new equipment or software. Of the remaining estimated remediation costs of $0.2 million, expenses are estimated to be $0.1 million with capitalized equipment and software at $0.1 million. This estimate is being monitored and will be revised in future public filings by the Company as additional information becomes available.

23

CROWLEYKVN 016923

*Contingency Plans.* The Company's focus in the area of contingency plans is primarily on the development of plans to ensure the continuation of patient care in the event of system failures related to Year 2000 that are beyond our control. The types of contingency's for which plans are being developed include: local telephone system failures, local power grid failures and inadequacy/unavailability of medical supplies. In addition, although the Company anticipates that remediation of its internal systems will be complete by September 30, 1999, contingency plans are also being developed to ensure appropriate personnel are immediately available to address any situation in the event of an unanticipated failure.

Management believes that it is not possible to determine with complete certainty that all Year 2000 Problems affecting the Company have been identified or corrected. The number of devices that could be affected and the interactions among these devices are simply too numerous. In addition, the Company cannot accurately predict how many Year 2000 Problems related failures will occur or the severity, duration or financial consequences of any inevitable failures.

### Future Health Care Proposals and Legislation

In recent years, an increasing number of legislative initiatives have been introduced or proposed in Congress and in state legislatures that would effect major changes in the health care system, either nationally or at the state level. Among the proposals under consideration are various insurance market reforms, forms of price control, including competitive bidding by market, expanded fraud and abuse and anti-referral legislation and further reductions in Medicare and Medicaid reimbursement. Most recently, on August 5, 1997, President Clinton signed into law the Budget Reconciliation Act of 1997, which provides for reductions in Medicare and Medicaid of over $115 billion and $13 billion, respectively, over five years. The Health Care Financing Administration ("HCFA") recently proposed a rule that purports to change reimbursement rates for parenteral and enteral nutrients, equipment and supplies ("PEN"). The preamble to the proposed rule states that it is intended to be budget neutral in its first year of application, but would change reimbursement rates to the lesser of the applicable rates paid in 1995 or 1998 (adjusted for inflation). The PEN therapies represent the primary therapies that the infusion therapy division received reimbursement for from the Medicare program. The impact of any reductions on the health care industry in general and the Company specifically cannot be determined at this time. Further, the Company cannot predict whether any of the above proposals, proposed rules or any other proposals will be adopted. No assurance can be given that the implementation of the Budget Reconciliation Act or any other reforms will not have a material adverse effect on the business of the Company.

### ITEM 3. *Quantitative and Qualitative Disclosures about Market Risk*

The following discusses the Company's exposure to market risk related to changes in interest rates. This discussion contains forward-looking statements that are subject to risks and uncertainties. Actual results could vary materially as a result of a number of factors, including but not limited to, changes in interest rates, and those set forth under Item 2. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Background — Factors Affecting Recent Operating Results."

As of June 30, 1999, the Company had outstanding debt of $269.0 million of which $157.6 million matures in May 2001 bears interest at 11.5% per annum and $87.9 million matures in April 2008 and bears interest at the rate of 8.0% per annum. On July 15, 1999, Series A and Series B Notes totaling approximately $4.5 million and $1.8 million, respectively were issued in lieu of a cash payment of interest due through such date. The Company also has a New Senior Credit Facility providing for the availability of up to $60.0 million for acquisitions, working capital, letters of credit and other corporate purposes. The New Senior Credit Facility matures in February 2001 and bears an interest rate of prime plus 1.5%, which was 9.5% as of August 13, 1999. As of August 16, 1999, the principal amount outstanding under the New Senior Credit Facility was approximately $37.0 million. Because substantially all of the interest on the Company's debt is fixed, a hypothetical 10.0% decrease in interest rates would not have a material impact on the Company. Increases in interest rates could, however, increase interest expenses associated with future borrowings by the Company, if any. The Company does not hedge against interest rate changes.

CROWLEYKVN 016924

# PART II

## OTHER INFORMATION

**ITEM 1.** *Legal Proceedings*

On November 21, 1995, a suit captioned *William Hall and Barbara Lisser v. Coram Healthcare Corporation,* James W. Sweeney, Patrick Fortune, and Sam Leno, No 1:95-CV-2994(WHB) was filed in the United States District Court for the Northern District of Georgia on behalf of a purported class of plaintiffs who were entitled to receive warrants pursuant to the settlement of In re T2 Medical, Inc. Shareholder Litigation. Plaintiffs filed an Amended Class Action Complaint on February 28, 1996, in which they allege that the Defendants made false and misleading statements that caused a fraud on the market and artificially inflated the price of the Company's stock during the period from August 1994 through August 1995. Such Complaint alleges violations of Section 10(b) of the Securities Act of 1934, and Rule 10b-5 promulgated thereunder, against all of the Defendants. The Complaint also alleges controlling person liability against the individual defendants under Section 20(a) of the Securities and Exchange Act, and further alleges fraud by all of the Defendants under Georgia law. Finally, Plaintiffs allege a breach of the covenant of good faith and fair dealing by all Defendants. Plaintiffs seek compensatory damages reflecting the difference in value between the warrants as issued pursuant to the settlement of In re T2 Medical, Inc. Shareholder Litigation with the trading price of the Company's common stock at its actual price and the same number of warrants at the same exercise price with the Company's stock trading at its alleged true value. The Defendants filed a Motion to dismiss the Amended Class Action Complaint on March 13, 1996. The Court granted the Company's Motion to Dismiss the Complaint on February 12, 1997. The Plaintiffs appealed the dismissal to the Eleventh Circuit Court of Appeals which affirmed the dismissal on October 15, 1998. The Plaintiffs filed a petition with the United States Supreme Court on March 15, 1999 for a writ of certiorari and the Company responded to the petition. On May 19, 1999, the Supreme Court entered an order denying the Plaintiffs' petition for certiorari, ending the matter.

In January 1999, the Internal Revenue Service ("IRS") completed the examination of the federal income tax return of the Company for the year ended September 30, 1995, and proposed substantial adjustments to the prior tax liabilities of the Company. The Company has agreed to adjustments of $24.4 million that only affect the net operating loss carryforwards available. The Company does not agree with the other proposed adjustments regarding the deduction of warrants, write-off of goodwill and the specified liability portion of the 1995 loss, which affect the prior year's tax liability. On May 14, 1999, the Company received a statutory notice of deficiency with respect to the proposed adjustments. The alleged deficiency totaled approximately $12.7 million plus interest and penalties to be determined. The Company is contesting the notice of deficiency through administrative proceedings and litigation and will vigorously defend its position. The most significant adjustment proposed by the IRS relates to the ability of the Company to categorize certain net operating losses as specified liability losses and offset income in prior years, for which the Company has previously received refunds in the amount of approximately $12.7 million. Due to the uncertainty of final resolution, the Company's financial statements include a reserve for these potential liabilities. No assurance can be given that the Company will prevail given the early phase of this matter and the uncertainties inherent in any proceeding with the IRS or in litigation. If the Company does not prevail with respect to the proposed material adjustments, the financial position and liquidity of the Company could be materially adversely affected. See Item-2. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Risk Factors — Certain Legal Proceedings," and Note 5 to the Company's Unaudited Condensed Consolidated Financial Statements.

On June 30, 1999, the Company filed a complaint (the "Coram Complaint") against Aetna U.S. Healthcare, Inc. in the United States District Court for the Eastern District of Pennsylvania (Civil Action No. 99-CV-3330). The Coram Complaint sets forth claims against Aetna for fraud, misrepresentation, breach of contract and rescission relating to the Master Agreement between the parties, effective May 1, 1998 for ancillary network management services through Coram's Resource Network Division ("R-Net"). Coram provided its notice of termination of the Master Agreement effective June 30, 1999. Under the arrangement,

CROWLEYKVN 016925

that was expected to last for five years, Coram managed and provided home health care services for over 2,000,000 Aetna enrollees in eight states for a stated monthly fee per enrollee. Coram began serving Aetna enrollees under the Master Agreement on approximately July 1, 1998.

As stated in the Coram Complaint, Aetna wrongfully induced Coram to enter into and continue performing under the Master Agreement by, among other things, misrepresenting and understating utilization of home health care services, which utilization has been substantially higher than Aetna represented at the commencement of the Master Agreement. As also stated in the Coram Complaint, Aetna has breached the Master Agreement in several respects, including its failure to pay amounts due under the Master Agreement totaling in excess of $10.0 million. Furthermore, Aetna's misrepresentations induced Coram to expend additional amounts for the infrastructure necessary to perform its duties under the Master Agreement. In the lawsuit, Coram is seeking compensatory and punitive damages in excess of $50.0 million.

On June 30, 1999, the Company received a copy of a complaint (the "Aetna Complaint") that had been filed by Aetna on June 29, 1999 in the Court of Common Pleas of Montgomery County, Pennsylvania (Case No. 99-11025). The Aetna Complaint seeks equitable and declaratory relief to compel the Company to perform under the Agreement, including the payment of compensation to the healthcare providers that have rendered and continue to render services to Aetna's health plan members. As stated in the Aetna Complaint, Aetna disputes the Company's right to terminate the Agreement. On approximately July 1, 1999, Coram removed the Aetna Complaint to federal court. Then, Aetna filed a motion to remand seeking to have the case transferred back to state court. Aetna subsequently withdrew its remand motion, such that the Aetna Complaint is also pending in the United States District Court for the Eastern District of Pennsylvania (Civil Action No. 99-CV-3378).

On July 20, 1999, Aetna filed a counterclaim against Coram in the federal court lawsuit brought by Coram (Civil Action No. 99-CV-3330) and a motion to dismiss the claims of Coram for fraud, misrepresentation and rescission of the Master Agreement (Coram has filed an opposition to the motion to dismiss.). In its counterclaim, Aetna has sued Coram for, among other things, breach of the Master Agreement and fraudulent misrepresentation, contending Coram never intended to perform the Master Agreement, defamation, interference with providers and for interference with prospective contractual relations with other companies that allegedly bid for the Master Agreement. Aetna seeks in excess of $100 million in the lawsuit, plus punitive damages.

Pursuant to an agreed upon order dated July 23, 1999, Coram is transitioning back to Aetna, in an orderly fashion, the management of home health care services under the Master Agreement. Coram has learned that Aetna has agreed to pay network providers for properly authorized home health care services rendered after July 23, 1999 while reserving its rights to pursue Coram for the cost of such services as part of its complaint and counterclaim against Coram. The Company's R-Net division is continuing to process claims submitted by members of its provider network for services rendered through June 30, 1999.

The Company intends to pursue its claims against Aetna vigorously and to put forth a vigorous defense against all of the claims brought by Aetna against Coram and the other Coram parties. Due to the uncertainties inherent in litigation, the ultimate disposition of the Aetna litigation described in the preceding paragraphs cannot presently be determined and no provision has been recorded in the Company's Consolidated Financial Statements for any recovery or loss that may result upon resolution of the Aetna litigation described above. An adverse outcome in such litigation could have a material adverse effect on the financial position, results of operations and liquidity of the Company.

On July 7, 1997, the Company filed suit against Price Waterhouse LLP (now known as PricewaterhouseCoopers LLP) in the Supreme Court of San Francisco, California, seeking damages in excess of $165.0 million. As part of the settlement that resolved a case filed by the Company against Caremark International, Inc. and Caremark, Inc. (collectively, "Caremark"), Caremark assigned and transferred to the Company all of Caremark's claims and causes of action against PricewaterhouseCoopers LLP, Caremark's auditors. This assignment of claims includes claims for damages sustained by Caremark in defending and settling its lawsuit with the Company. The case was dismissed from the court in California because of inconvenience to witnesses with a right to re-file in Illinois. The Company re-filed the lawsuit in state court in

26

CROWLEYKVN 016926

Illinois. PricewaterhouseCoopers LLP filed a motion to dismiss the Company's lawsuit in the state court in Illinois on several grounds, but their motion was denied on March 15, 1999. In May, 1999, Price-waterhouseCoopers LLP filed another motion to dismiss and the Company has submitted an opposition. The hearing on the motion is set for October 29, 1999. The lawsuit has progressed into the discovery stage. There can be no assurance of any recovery from PricewaterhouseCoopers LLP. See Note 3 and Note 12 to the Company's 1998 10K/A.

The Company is also a party to various other legal actions arising out of the normal course of its business. Management believes that the ultimate resolution of such other actions will not have a material adverse effect on the financial position, results of operations or liquidity of the Company. Nevertheless, due to the uncertainties inherent in litigation, the ultimate disposition of these actions cannot presently be determined

**ITEM 2.** *Change In Securities and Use of Proceeds*

Not applicable.

**ITEM 3.** *Defaults Upon Senior Securities*

A discussion of certain matters of non-compliance with certain covenants contained in the Company's principal debt agreements and the waivers received relating to such matters is set forth in Note 3 to the Company's Unaudited Condensed Consolidated Financial Statements.

**ITEM 4.** *Submission of Matters to Vote of Security Holders*

Not applicable.

**ITEM 5.** *Other Information*

In July 1999, Coram laid off 114 employees in its Whippany, New Jersey, office, who were responsible for managing the Aetna Master Agreement. Costs incurred as a result of these lay offs and other actions taken to reorganize the R-Net division's Whippany, New Jersey call center operations will be recognized in the Company's financial statements for the quarterly period ended September 30, 1999.

**ITEM 6.** *Exhibits and Reports on Form 8-K*

(A) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 27 | — Financial Data Schedule |

(B) Reports on Form 8-K.

On July 12, 1999, the Company filed a report on Form 8-K announcing the complaint against Aetna U.S. Healthcare, Inc. in the United States District Court for the Eastern District of Pennsylvania (Civil Action No. 99-CV-3330) regarding claims set forth against Aetna for fraud, misrepresentation, breach of contract and rescission.

27

CROWLEYKVN 016927

A80

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

CORAM HEALTHCARE CORPORATION

By: ____/s/____WENDY L. SIMPSON_____
Wendy L. Simpson
*Executive Vice President and*
*Chief Financial Officer*

August 16, 1999

28

CROWLEYKVN 016928

A81



9 August 1999

Steve Feinberg
Cerberus

Dear Steve,

These past two (2) weeks or so I have logged in *many* calls to Rick Smith at Coram. He and I actually did have a few conversations which I thought had gone quite well. I really felt he was not threatened and wanted to go forward. It appeared as recently as last Tuesday that he and I were on a path to get started (although, he declined to provide us with any of the information we requested). However the bottom line is that we have not been able to arrange any meetings in Denver so far.

Thank you for your effort to clear away the obstacles at Coram. At your request, I called Don Amarol at his home last Friday. I put my salesman's hat on and spoke positively to Don about what he has accomplished in his career. Actually he and I go back ten (10) years now, so it was easy and painless for me to do so. He said he will try to set up a meeting with two (2) of Coram's Board Members next week in Sacramento.

Steve, other than my few phone conversations with Rick, my only real direct exposure to Rick Smith was at your offices and at Dinner, at Bice's. Just the same he left me with several first impressions. I want to share those with you briefly:

1) Rick is like many junior professionals that I've met along the way. He creates a tremendous woosh. Not from results, not from clarity of purpose, not from simplicity of strategy, not from the force of focus. Rather from the enormous energy of resources (time, people, money) that creates a huge flurry of activity. The sense he gives off is of a guy who is real busy, totally possessed of what he's about, and who earnestly believes that he is going about the important business of the Company. I'm sure that he feels quite tired, because he pushes too hard.

*I would recommend that he try to follow the natural business process of framing the issues, understanding the facts, analyzing the alternatives, and creating a laser focus that maximizes the organization's strength and moves it through strategic windows in which the real opportunities exist.*



2) Smith is trying to hit one over the fence. This is typical of new leaders. They often want to prove their worthiness by creating a huge flurry of activity and a spectacular or superstar-like win. That's why they are likely to create waves of change, and sign deals like the US Healthcare contract. If we had known him before he took the CEO's job, we would have counseled him differently.

*Experience proves that it's better for new leaders to spend some time initially becoming comfortable with being in the leadership role, understanding company, and gaining a keen sense of the competitive environment. Smart leaders settle for good work rather than putting the corpus of the firm at risk, (life or death) and creating the possibility that the whole entity will fly off center and crash. Smith put Coram at real risk. The Aetna USHealthcare contract was probably applauded loudly but the risk he took for the Company was out of relationship with the possible good that might have come from the deal. It should not have been taken.*

3) It's clear to me that Smith is real concerned with the fame of being CEO. This causes him to talk too much rather than listen. Because of this he does not have the opportunity to understand the human situation that might exist in others (e.g. Tim at USHealthcare) that motivates them to do what they do. This is the classic win-lose situation that leads to big breakdowns. I think that the position of CEO probably creates a sense for Rick that he must be right and if he argues long enough or threatens lawsuits then the other side will recognize that he's right and give in.

*When people measure their success in terms of praise and criticism their anxiety is endless. This is probably where Smith is right now. Unfortunately, just because someone is CEO does not mean they are right and their organization will succeed. A good reputation naturally arises from doing good work. In order to do really good work, the CEO has to take good care of the company and its constituents. We have not done this at Coram with our customers, shareholders, or our debt holders. Real success is measured in organizational accomplishment . . .results. I'm not sure that Smith understands what a real success would look like. That's why the focus is not there.*

4) Smith describes Coram in very complex and hard to understand ways. Coram spends its resources in many different channels creating potential "windfalls". Coram has many products and avenues that it hopes will lead to the pot of gold at the end of the rainbow.

2

**A83**

Companies that can tell their story simply are more likely to be efficient. That's not what I heard from Smith about Coram. To the contrary it's a long, complex, unintelligible story.

*Beginners clutter their companies and management teams with endless options. They use up their people and other's money. Their outcomes are like the ripple in the rug. They chase the ripple, make lots of promises, and then . . . . oops! Then they complicate the situation by not telling the truth, and hope that some heroic action will set things right. This probably frustrates everyone around Rick Smith. Smith needs to focus on doing the right things right. It would make an enormous difference in Coram's outcomes. While this sound so simple, it's all in the execution or lack thereof.*

Steve, the challenge we both have is to get Rick Smith to be open, to respond to possible ways to look at the world a little differently. The key is to do this while the situation at Coram is still manageable. There is no virtue in delaying. This makes difficult situations more difficult. I sincerely hope you and I get a chance to help him before he fries your investment.

Finally, attached is some late night reading from Winterland. We are shooting for a $5.2 Million EBIT. We still have *lots of real big problems* to overcome there, but at least Tice is open to working with me on them. Compare their results so far this year with everything that went on before. So we've made things better. My hope and professional commitment to you is to make this investment into the outcome you deserve.

Best Regards,

Dan Crowley

3

**A84**

**1999 FORECAST**
updated July 31; includes Ricky Martin

| | MAY YTD | JUNE | JULY | AUG | SEPT | OCT | NOV | DEC | FULL YEAR |
|---|---|---|---|---|---|---|---|---|---|
| **SALES** | | | | | | | | | |
| PRIVATE LABEL | 8,867 | 758 | 1,980 | 783 | 885 | 1,126 | 1,293 | 1,658 | 17,210 |
| RETAIL | 14,538 | 4,479 | 6,754 | 4,000 | 4,800 | 4,400 | 4,400 | 3,831 | 46,902 |
| TOUR | 8,912 | 848 | 3,021 | 2,000 | 2,325 | 3,000 | 2,000 | 1,000 | 23,104 |
| UK | 1,114 | 831 | 356 | 1,296 | 621 | 613 | 488 | 206 | 5,525 |
| LICENSING | 603 | 270 | 50 | 100 | 50 | 500 | 700 | 750 | 3,023 |
| LICENSED PRODUCTS | 25,168 | 6,428 | 10,181 | 7,396 | 7,496 | 8,513 | 7,588 | 5,877 | 78,456 |
| TOTAL SALES | 34,036 | 7,184 | 12,181 | 8,180 | 8,381 | 9,638 | 8,881 | 7,235 | 95,666 |
| **COGS** | | | | | | | | | |
| PRIVATE LABEL | 8,479 | 797 | 1,872 | 753 | 848 | 1,086 | 1,240 | 1,383 | 16,455 |
| RETAIL | 9,577 | 3,101 | 4,576 | 2,680 | 3,082 | 2,948 | 2,948 | 2,433 | 31,344 |
| TOUR | 6,843 | 701 | 2,326 | 1,540 | 1,790 | 2,310 | 1,540 | 770 | 17,821 |
| UK | 766 | 540 | 231 | 842 | 339 | 398 | 324 | 192 | 3,636 |
| LICENSING | 489 | 211 | 39 | 78 | 39 | 390 | 546 | 585 | 2,357 |
| OTHER EXPENSES | 133 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 1,533 |
| LICENSED PRODUCTS | 17,790 | 4,753 | 7,372 | 5,340 | 5,450 | 8,246 | 5,558 | 4,180 | 56,689 |
| TOTAL COGS | 26,269 | 5,550 | 9,243 | 6,092 | 6,290 | 7,332 | 6,797 | 5,564 | 73,144 |
| **GROSS MARGIN** | | | | | | | | | |
| PRIVATE LABEL | 388 | (39) | 108 | 11 | 19 | 40 | 53 | 175 | 755 |
| RETAIL | 4,961 | 1,378 | 2,179 | 1,320 | 1,518 | 1,452 | 1,452 | 1,398 | 15,458 |
| TOUR | 2,069 | 148 | 695 | 460 | 535 | 690 | 460 | 230 | 5,283 |
| UK | 348 | 291 | 125 | 454 | 182 | 215 | 174 | 104 | 1,899 |
| LICENSING | 130 | 59 | 11 | 22 | 11 | 110 | 154 | 165 | 668 |
| OTHER EXPENSES | (133) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (1,533) |
| LICENSED PRODUCTS | 7,379 | 1,673 | 2,809 | 2,056 | 2,046 | 2,267 | 2,040 | 1,497 | 21,767 |
| TOTAL GROSS MARGIN | 7,767 | 1,634 | 2,918 | 2,067 | 2,085 | 2,307 | 2,084 | 1,671 | 22,522 |
| | 23% | 23% | 24% | 25% | 25% | 24% | 24% | 23% | 24% |
| **SELLING EXPENSES** | | | | | | | | | |
| PRIVATE LABEL | 733 | 71 | 155 | 92 | 104 | 135 | 155 | 160 | 1,605 |
| RETAIL | 1,398 | 343 | 763 | 440 | 506 | 484 | 484 | 249 | 4,888 |
| TOUR | 622 | 59 | 261 | 140 | 163 | 210 | 140 | 70 | 1,966 |
| UK | 318 | 183 | 100 | 383 | 146 | 172 | 139 | 63 | 1,501 |
| LICENSING | 101 | 24 | 5 | 0 | 5 | 45 | 63 | 68 | 319 |
| LICENSED PRODUCTS | 2,437 | 609 | 1,159 | 952 | 919 | 911 | 829 | 480 | 9,174 |
| TOTAL SELLING EXPENSE | 3,170 | 680 | 1,314 | 1,043 | 923 | 1,046 | 982 | 640 | 9,778 |
| **CONTRIBUTION** | | | | | | | | | |
| PRIVATE LABEL | (345) | (110) | (47) | (81) | (85) | (96) | (102) | 15 | (849) |
| RETAIL | 3,563 | 1,036 | 1,386 | 880 | 1,012 | 968 | 968 | 850 | 10,770 |
| TOUR | 1,447 | 88 | 433 | 320 | 372 | 480 | 320 | 160 | 3,518 |
| UK | 30 | 108 | 25 | 91 | 36 | 43 | 36 | 21 | 398 |
| LICENSING | 30 | 35 | 7 | 13 | 7 | 65 | 91 | 98 | 350 |
| OTHER EXPENSES | (133) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (1,533) |
| LICENSED PRODUCTS | 4,942 | 1,064 | 1,651 | 1,104 | 1,227 | 1,356 | 1,214 | 1,018 | 13,593 |
| TOTAL CONTRIBUTION | 4,597 | 954 | 1,604 | 1,023 | 1,142 | 1,261 | 1,112 | 1,031 | 12,744 |
| G & A | 2,867 | 535 | 700 | 698 | 700 | 700 | 680 | 690 | 7,567 |
| EBIT | 1,730 | 419 | 904 | 326 | 442 | 561 | 432 | 341 | 5,177 |

MINUTES OF A TELEPHONIC MEETING

OF THE BOARD OF DIRECTORS OF

CORAM HEALTHCARE CORPORATION

September 4, 1999

A telephonic meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was convened at approximately 9:00 a.m. MDT on Saturday, September 4, 1999, pursuant to notice duly given. Participating in the meeting were the following Directors: Donald J. Amaral, Chairman of the Board; Richard M. Smith, Chief Executive Officer and President; L. Peter Smith and Richard A. Fink. William J. Casey participated in the meeting as indicated below. Absent from the meeting was Stephen A. Feinberg. Also participating in the meeting were Wendy L. Simpson, Executive Vice President and Chief Financial Officer; Scott T. Larson, Senior Vice President and General Counsel; and Paul J. Quiner, Senior Vice President, Mergers and Acquisitions. Michael Kahn and Douglas Sullivan of the San Francisco law firm Folger, Levin & Kahn, LLP and Dennis Connolly and Steve Pottle of the Atlanta, Georgia law firm Alston & Bird LLP also participated in the meeting. Mr. Amaral acted as Chairman of the meeting and Mr. Larson kept the Minutes.

Mr. Rick Smith invited Doug Sullivan and Michael Kahn to provide an update on the status of the litigation with Aetna U.S. Healthcare, Inc. A privileged and confidential discussion of the status of the litigation ensued. Mr. Rick Smith then invited Neil Batson of Alston & Bird to provide a discussion on the status of the Involuntary Petition filed against the Company's subsidiary, Coram Resource Network, Inc. ("CRN"). A privileged and confidential discussion ensued.

Rick Smith then led a discussion of certain strategies for dealing with the Company's issues with its creditors and the creditors of CRN. He reviewed the levels of debt the Company and CRN had. He also reported on various methods for addressing these debts and described the various assets the Company had that could be sold to re-pay such debts. He explained that Company management had met with certain investment bankers, including representatives of Warburg, Dillon Reed and Deutsche Banc Alex Brown. He reviewed the statements made by these investment banks regarding possibilities for an initial public offering of stock of Coram Prescription Services ("CPS") or a sale of that division. He explained that neither group of investment bankers had confidence that the infusion division could be sold for appropriate value given that most health care sectors are currently out of favor with investors.

Mr. Smith reported on the status of discussions with Richard C. Blum & Associates.

He then reported on meetings held with representatives of the Company's lenders and summarized the results of their recent meeting. He explained that the banks would not be insisting

TRUSTEE009406
USDC-DE #04-1565

Minutes of the Board of Directors
September 4, 1999
Page 2

on additional security at this time. He stated that the lenders were generally in favor of a sale of CPS if management and the Board of Directors determined that such a transaction was in the Company's best interests.

Mr. Rick Smith and Ms. Simpson described various methods for proposing changes to the Company's debt structure to assist it in deleveraging the Company's balance sheet. Ms. Simpson also described the equity opportunities that could ensue from selling CPS and potentially retaining a portion of CPS as an investment.

She also reported the Company's cash status and its status for paying its bills.

Mr. Casey joined the call.

The Board then discussed the interest Richard C. Blum & Associates had expressed in the Company. Mr. Smith reported that Blum & Associates had talked to members of management and would be talking to members of the lending group to pursue a possible purchase of the Company's debt and conversion of such debt into equity. Several Board members supported pursuing a sale of CPS on a parallel track with discussions involving Richard C. Blum & Associates.

A discussion ensued regarding the consultant, Dan Crowley, that Mr. Feinberg had proposed to assist the Company in operating its business. Messrs. Kahn and Sullivan were requested to prepare documents that would establish a privileged relationship between the Company and Mr. Crowley.

There being no further business, the meeting was adjourned at approximately 10:30 a.m. MDT.

Respectfully submitted,

Scott T. Larson
Secretary

h:\legal\scott\minutes.99\board904.doc

TRUSTEE009407
USDC-DE #04-1565

**A87**

Deutsche Banc Alex. Brown

**Deutsche Bank** ◪

Deutsche Banc Alex. Brown
Deutsche Bank Securities, Inc
One South Street
Baltimore, MD 21202

9/16/99

Board of Directors
Coram Healthcare Corporation
1125 Seventeenth Street
Denver, CO 80202

```
EXHIBIT

Morrison 2
CW  3/26/07
```

Attention:    Mr. Richard M. Smith
              President and Chief Executive Officer

Dear Mr. Smith:

This Agreement sets forth the basis upon which Coram Healthcare Corporation ("Client") has engaged Deutsche Bank Securities Inc. ("Deutsche Bank") on an exclusive basis, to provide advisory and investment banking services with respect to the exploration of strategic alternatives that may lead to a possible transaction, through sale, merger, joint venture or otherwise, whether effected in a single transaction or a series of related transactions, in which 40% or more of the voting power of Client's Coram Prescription Services Division ("Division") or all or a substantial portion of the Division's business or assets are combined with or transferred to another company (a "Transaction"):

Section 1.    Services to be Rendered.    Deutsche Bank agrees to perform such of the following financial advisory and investment banking services as Client reasonably and specifically requests:

    (a)    Deutsche Bank will familiarize itself to the extent it deems appropriate and feasible with the business, operations, financial condition and prospects of Division;

    (b)    Deutsche Bank will assist Client in identifying and evaluating candidates for a potential Transaction;

    (c)    Deutsche Bank, in coordination with Client, will prepare and implement a marketing plan and, working with the management of and assembling information provided by Client, prepare a memorandum describing Division (the "Selling Memo") for distribution to potential parties to a Transaction;

    (d)    Deutsche Bank will contact potential candidates which Deutsche Bank and Client have agreed may be appropriate for a potential Transaction, and in rendering such services, Deutsche Bank may meet with representatives of such candidates and provide such representatives with such information about Division as may be appropriate and acceptable to Client, subject to customary business confidentiality;

    (e)    Deutsche Bank will advise and assist Client in considering the desirability of effecting a Transaction, and, if Client believes such a Transaction to be desirable, in developing and implementing a general strategy for accomplishing a Transaction;

CONFIDENTIAL

Goldin 00053

DEL 012352

A88

Coram Healthcare Corporation
9/16/99
Page 2

**Deutsche Banc Alex. Brown**

**Deutsche Bank** 

   (f)   Deutsche Bank will advise and assist senior management of Client in making presentations to the Board of Directors of Client concerning any proposed Transaction, as appropriate;

   (g)   Deutsche Bank will advise and assist Client in the course of its negotiation of a Transaction and will participate in such negotiations as requested;

   (h)   If requested by Client, Deutsche Bank will provide an opinion (in writing, if so requested) to Client's Board of Directors regarding the fairness to Client and its securityholders from a financial point of view of the consideration to be received by Client or its securityholders or the exchange ratio, as the case may be, in connection with the Transaction (the "Opinion"). The nature and scope of the investigation which Deutsche Bank would conduct in order to be able to render the Opinion, as well as the scope, form and substance of the Opinion, will be such as Deutsche Bank considers appropriate. If required by applicable law, the Opinion may be included in any disclosure document filed by Client with the Securities and Exchange Commission with respect to a proposed Transaction, _provided_ that it is reproduced in full, and that any description of or reference to Deutsche Bank or summary of the Opinion in the disclosure document is in a form reasonably acceptable to Deutsche Bank and its counsel. Except as provided herein, the Opinion will not be reproduced, summarized or referred to in any public document or given to any other person without the prior written consent of Deutsche Bank; and

   (i)   Deutsche Bank will render such financial advisory services as Client may reasonably and specifically request in connection with seeking any regulatory approvals of any proposed Transaction.

Client will furnish, and, if Client enters into negotiations with a counterparty regarding a possible Transaction, will request such counterparty to furnish, to Deutsche Bank such Information as Deutsche Bank reasonably requests in connection with the performance of its services hereunder (all such Information so furnished is referred to herein as the "Information"). Client understands and agrees that Deutsche Bank, in performing its services hereunder, will use and rely upon the Information as well as publicly available Information regarding Client and any counterparties and that Deutsche Bank does not assume responsibility for independent verification of any Information, whether publicly available or otherwise furnished to it, concerning Client or any counterparties, including, without limitation, any financial information, forecasts or projections, considered by Deutsche Bank in connection with the rendering of its services. Accordingly, Deutsche Bank shall be entitled to assume and rely upon the accuracy and completeness of all such Information and is not required to conduct a physical inspection of any of the properties or assets, or to prepare or obtain any independent evaluation or appraisal of any of the assets or liabilities, of Client or any counterparty. With respect to any financial forecasts and projections made available to Deutsche Bank by Client or any counterparty and used by Deutsche Bank in its analysis, Deutsche Bank shall be entitled to assume that such forecasts and projections have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of Client or such counterparty, as the case may be, as to the matters covered thereby.

If, during the term of this engagement or within 12 months thereafter, Client undertakes a financing of the Division or refinancing related to, arising from, or in lieu of, a Transaction through a public or private offering of debt or capital stock, other than a Transaction with Client's current debtholders,

CONFIDENTIAL

DEL 012353

Coram Healthcare Corporation
9/16/99
Page 3

**Deutsche Banc Alex. Brown**

**Deutsche Bank** 

Deutsche Bank will have a right of first refusal to serve as lead manager or exclusive placement agent for such financing or refinancing. In such event, Client and Deutsche Bank will enter into a separate agreement or other appropriate documentation for such financing or refinancing containing such compensation and other terms and conditions as are customary for internationally recognized investment banking firms for similar transactions, including, without limitation, appropriate indemnification provisions.

In connection with the services described in this Section 1, Client authorizes Deutsche Bank, as Client's representative, to transmit the Selling Memo to potential parties to a Transaction who have entered into a confidentiality agreement reasonably acceptable to Client. Client hereby acknowledges that all information contained in the Selling Memo will be provided by or based upon information provided by Client or third parties, and that Client will be solely responsible for the contents thereof.

<u>Section 2.</u>  <u>Fees.</u>  Client shall pay Deutsche Bank for its services hereunder a cash fee equal to:

(a)    $75,000 payable upon the execution of this Agreement (the "Retainer Fee");

(b)    in the event that Client requests, and Deutsche Bank delivers, the Opinion, an additional fee of $250,000, payable upon the occurrence of such delivery (the "Opinion Fee");

(c)    in the event that Client requests that Deutsche Bank render an additional Opinion with respect to a materially amended or revised offer, an additional Opinion Fee of $75,000, payable upon the delivery of such additional Opinion; and

(d)    in the event a Transaction is consummated, a fee, payable at the time of closing, equal to $1,000,000 plus 1.45% of any amount above $75,000,000 in Aggregate Consideration (the "Transaction Fee"); provided that the Transaction Fee shall be reduced by the amount of any previously paid Retainer Fee and Opinion Fee(s).

For purposes of this Agreement, the term "Aggregate Consideration" shall mean the total amount of cash and the fair market value on the date of the consummation of the Transaction (the "Valuation Date") of all other property paid or payable directly or indirectly to Client or any of its securityholders in connection with a Transaction (including (i) amounts paid to holders of any warrants or convertible securities of Client and to holders of any options or stock appreciation rights issued by Client, whether or not vested; (ii) the total amount of indebtedness for borrowed money or similar non-trade liabilities or obligations (including unfunded pension liabilities, guarantees, capitalized leases and the like) of Client repaid, retired, extinguished or assumed in connection with, or which otherwise remains outstanding as of the closing of, a Transaction; (iii) the fair market value of any assets of the Division which are retained by or otherwise distributed to its stockholders or affiliates in anticipation of or in connection with a Transaction; and (iv) the present value of payments to be made under any Client non-compete agreement entered into in connection with a Transaction); provided however that Aggregate Consideration shall not include any intercompany debt, loans or similar liabilities. Aggregate Consideration shall also be deemed to include, in the case of a joint venture, the total amount of cash and the fair

CONFIDENTIAL

DEL 012354