Coram Healthcare Corporation
9/16/99
Page 4

**Deutsche Banc Alex. Brown**

**Deutsche Bank** 

market value on the Valuation Date of all other property contributed by the other party to Client or to the joint venture.

For purposes of calculating Aggregate Consideration, (i) the value of any securities issuable in connection with a Transaction (whether debt or equity) that have an established public market (including any such securities subject to resale restrictions) will be determined on the basis of the last closing price in such market on the Valuation Date; and the value of securities that have no established public market or other property will be the fair market value of such securities or other property on such Valuation Date as determined in good faith and upon mutual agreement of Client and Deutsche Bank, and (ii) all present value calculations will utilize a discount rate equal to the prime rate published in *The Wall Street Journal* on the Valuation Date (the "Prime Rate"). In the event an agreement for a Transaction provides for escrowed or contingent payments or other payments over time, the present value of such payments (discounted at the Prime Rate) shall be based upon projections developed in connection with the proposed Transaction, and Deutsche Bank's fees in respect of such payments shall be calculated based upon such present value and paid at the closing of such Transaction.

Section 3. Expenses. In addition to any fees that may be payable to Deutsche Bank hereunder and regardless of whether any Transaction is proposed or consummated, Client hereby agrees, from time to time upon request, to reimburse Deutsche Bank for all reasonable fees and disbursements of Deutsche Bank's counsel and all of Deutsche Bank's reasonable travel and other out-of-pocket expenses incurred in connection with any actual or proposed Transaction or otherwise arising out of Deutsche Bank's engagement hereunder.

Section 4. Termination of Engagement. Deutsche Bank's engagement hereunder may be terminated by either Client or Deutsche Bank at any time, with or without cause, upon written advice to that effect to the other party; provided, however, that

(a) Deutsche Bank will be entitled to its full fee as outlined in Section 2 hereof in the event that (i) at any time prior to the expiration of 12 months after such termination by Client, a Transaction is consummated; or (ii) Client enters into a definitive agreement during the term of this Agreement or during such 12 month period which results in a Transaction, in either case with any party that was identified by Deutsche Bank or entered into discussions with Deutsche Bank or requested the Seller Memo from Deutsche Bank and was identified by Deutsche Bank on a list of parties, which list will be delivered upon termination hereof; and

(b) the provisions of this Section 4 and of Sections 3, 7 and 8 hereof shall survive such termination.

Section 5. Reliance on Others. Client confirms that it will rely on its own counsel, accountants and other similar expert advisors for legal, accounting, tax and other similar advice.

Section 6. Publicity. In the event of consummation of any Transaction, Deutsche Bank shall have the right, at its own expense, to disclose its participation in such Transaction, including, without limitation, the placement of "tombstone" advertisements in financial and other newspapers and journals. Deutsche Bank agrees that Client shall have the right to announce publicly the execution

Goldin 00056
DEL 012355

Coram Healthcare Corporation
9/16/99
Page 5

**Deutsche Banc Alex. Brown**

**Deutsche Bank** 

of this Agreement with Deutsche Bank subject to Deutsche Bank's prior approval of the contents of such announcement.

Section 7.  Scope of Responsibility.  Neither Deutsche Bank nor any of its affiliates (nor any of their respective control persons, directors, officers, employees or agents) shall be liable to Client or to any other person claiming through Client for any claim, loss, damage, liability, cost or expense suffered by Client or any such other person arising out of or related to Deutsche Bank's engagement hereunder except to the extent a claim, loss or expense that arises out of or is based upon any action or failure to act by Deutsche Bank, other than an action or failure to act undertaken at the request or with the consent of Client, that constitutes bad faith, willful misconduct or gross negligence on the part of Deutsche Bank.

Section 8.  Indemnity and Contribution.  Client agrees to indemnify and hold harmless Deutsche Bank and its affiliates (and their respective control persons, directors, officers, employees and agents) to the full extent lawful against any and all claims, losses, damages, liabilities, costs and expenses as incurred (including all reasonable fees and disbursements of counsel and all reasonable travel and other out-of-pocket expenses incurred in connection with investigation of, preparation for and defense of any pending or threatened claim and any litigation or other proceeding arising therefrom, whether or not in connection with pending or threatened litigation in which Deutsche Bank or any other indemnified person is a party) arising out of or related to any actual or proposed Transaction or Deutsche Bank's engagement hereunder; provided, however, there shall be excluded from such indemnification any such claims, losses, damages, liabilities, costs or expenses to the extent arising out of or based upon any action or failure to act by Deutsche Bank, other than an action or failure to act undertaken at the request or with the consent of Client, that constitutes bad faith, willful misconduct or gross negligence on the part of Deutsche Bank.  In the event that the foregoing indemnity is unavailable or insufficient to hold Deutsche Bank and other indemnified parties harmless, then Client shall contribute to amounts paid or payable by Deutsche Bank and other indemnified parties in respect of such claims, losses, damages, liabilities, costs and expenses in such proportion as appropriately reflects the relative benefits received by, and, if applicable law does not permit allocation solely on the basis of benefits, fault of, Client and Deutsche Bank in connection with the matters as to which such claims, losses, damages, liabilities, costs and expenses relate and other equitable considerations, subject to the limitation that in any event Deutsche Bank's aggregate contributions in respect of such claims, losses, damages, liabilities, costs and expenses will not exceed the amount of fees actually received by Deutsche Bank pursuant to this Agreement.  For purposes hereof, relative benefits to Client and Deutsche Bank of the Transaction shall be deemed to be in the same proportion that the total value received or contemplated to be received by Client and/or its security holders in connection with the Transaction bears to the fees paid to Deutsche Bank pursuant to its engagement in respect of such Transaction.

Client will not, without the prior written consent of Deutsche Bank, settle any litigation relating to Deutsche Bank's engagement hereunder unless such settlement includes an express, complete and unconditional release of Deutsche Bank and its affiliates (and their respective control persons, directors, officers, employees and agents) with respect to all claims asserted in such litigation or relating to Deutsche Bank's engagement hereunder; such release to be set forth in an instrument signed by all parties to such settlement.

CONFIDENTIAL

Goldin 00057
DEL 012356

Coram Healthcare Corporation
9/16/99
Page 6

**Deutsche Banc Alex. Brown**                    Deutsche Bank 

Section 9. Governing Law; Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflicts of laws provisions thereof. Any right to trial by jury with respect to any claim, action, suit or proceeding arising out of this Agreement or any of the matters contemplated hereby is waived.

Section 10. No Rights in Shareholders, etc. Client recognizes that Deutsche Bank has been engaged only by Client, and that Client's engagement of Deutsche Bank is not deemed to be on behalf of and is not intended to confer rights upon any shareholder, partner or other owner of Client or any other person not a party hereto as against Deutsche Bank or any of its affiliates or any of their respective directors, officers, agents, employees or representatives. Unless otherwise expressly agreed or provided herein as to the Opinion, no one other than Client is authorized to rely upon Client's engagement of Deutsche Bank or any statements, advice, opinions or conduct by Deutsche Bank, and Client will not disclose such statements, advice, opinions or conduct to others (except Client's professional advisors and except as required by law). Without limiting the foregoing, any opinions or advice rendered to Client's Board of Directors or management in the course of Client's engagement of Deutsche Bank are for the purpose of assisting the Board or management, as the case may be, in evaluating the Transaction and do not constitute a recommendation to any shareholder of Client concerning action that such shareholder might or should take in connection with the Transaction. Deutsche Bank's role herein is that of an independent contractor.

Section 11. Disclosure. Client acknowledges that Deutsche Bank and its affiliates may have and may continue to have investment banking, financial advisory and other relationships with parties other than Client pursuant to which Deutsche Bank may acquire information of interest to Client. Deutsche Bank shall have no obligation to disclose such information to Client or to use such information in the preparation of the Opinion.

Deutsche Bank and its affiliates are engaged in securities trading and brokerage activities as well as investment banking and financial advisory services. In the ordinary course of their trading and brokerage activities, Deutsche Bank and its affiliates may hold positions, for their own account or the account of customers, in equity, debt or other securities of Client or any company that may be involved in the Transaction.

Section 12. Miscellaneous. In order to coordinate most effectively the activities of Client and Deutsche Bank contemplated by this Agreement, both Client (including management or other officers and directors of Client) and Deutsche Bank will promptly inform the other of inquiries of third parties which it receives concerning a Transaction. Nothing in this Agreement is intended to obligate or commit Deutsche Bank or any of its affiliates to provide any services other than as set out above. This Agreement may be executed in two or more counterparts, all of which together shall be considered a single instrument. This Agreement constitutes the entire agreement, and supersedes all prior agreements and understandings (both written and oral) of the parties hereto with respect to the subject matter hereof, and cannot be amended or otherwise modified except in writing executed by the parties hereto. The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of Client and Deutsche Bank.

Goldin 00058

CONFIDENTIAL

DEL 012357

Coram Healthcare Corporation
9/16/99
Page 7

**Deutsche Banc Alex. Brown**

**Deutsche Bank**

If you are in agreement with the foregoing, please sign and return the attached copy of this Agreement, whereupon this Agreement shall become effective as of the date hereof.

Sincerely,

DEUTSCHE BANK SECURITIES INC

BY Christine J. Morrison

Director

AGREED TO:

CORAM HEALTHCARE CORPORATION

BY

**Goldin 00059**

CONFIDENTIAL

DEL 012358

**A94**

### MINUTES OF A TELEPHONIC MEETING

### OF THE BOARD OF DIRECTORS OF

### CORAM HEALTHCARE CORPORATION

**September 17, 1999**

A telephonic meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was convened at approximately 10:00 a.m. MDT on Friday, September 17, 1999, pursuant to notice duly given. Participating in the meeting were the following Directors: Donald J. Amaral, Chairman of the Board; Richard M. Smith, Chief Executive Officer and President; William J. Casey and Richard A. Fink. L. Peter Smith and Stephen A. Feinberg also participated in the meeting as indicated below. Also participating in the meeting were Wendy L. Simpson, Executive Vice President and Chief Financial Officer; Scott T. Larson, Senior Vice President and General Counsel; and Paul J. Quiner, Senior Vice President, Mergers and Acquisitions. Dennis Connolly, Neil Batson and J. Vaughan Curtis of the Atlanta, Georgia law firm Alston & Bird LLP also participated in the meeting. Mr. Amaral acted as Chairman of the meeting and Mr. Larson kept the Minutes.

The first item of business was consideration of a proposal to engage Deutsche Banc Alex Brown to assess strategic alternatives for the Company's Coram Prescription Services division ("CPS"). Mr. Rick Smith stated that management recommended the engagement of this firm given its experience and background in similar transactions that were consummated recently. He explained that the strategic alternatives contemplated could entail an initial public offering of CPS stock or a sale of the division to a third party. He stated that he would expect a relationship to remain in place between the Company and CPS even if the Company did not retain an ownership interest in CPS after any potential transaction. This relationship would involve, among other things, CPS's use of the Company's sales force and the Company's use of CPS's data.

A discussion ensued regarding the structure of the proposed engagement letter. Upon a motion duly made and seconded, the Board unanimously approved the engagement of Deutsche Banc Alex Brown to assess strategic alternatives for CPS on substantially the terms set forth in the materials presented to the Board of Directors.

L. Peter Smith joined the meeting.

Wendy Simpson led a discussion of the Company's listing status with the New York Stock Exchange. She reported that she expected a warning letter given that the price for Company common stock had now gone below $1.00 per share. She reported that the Company had been researching a possible move to the over-the-counter market and was putting together a strategy to address such a move.

TRUSTEE009408
USDC-DE #04-1565

Minutes of the Board of Directors
September 17, 1999
Page 2

Mr. Feinberg joined the call.

Ms. Simpson reported that the over-the-counter trading medium had no financial criteria and that management would make the necessary arrangements if a change were needed.

Paul Quiner was then invited to provide an update on the status of the litigation involving Aetna U. S. Healthcare, Inc.. A privileged and confidential discussion ensued.

Neil Batson of Alston & Bird was invited to provide a discussion of the status of the Involuntary Proceeding involving the Company's subsidiary, Coram Resource Network, Inc. ("CRN"). A privileged and confidential discussion of this proceedings ensued.

Ms. Simpson reported that the Company would be seeking waivers from its lenders under its principal debt agreements pertaining to the involuntary proceeding involving CRN. Mr. Feinberg stated that the wavier would be granted by Cerberus.

The preliminary operating results for the month of August were then presented. The impact of the loss of business from Aetna U.S. Healthcare, Inc. was summarized. Mr. Rick Smith explained that Company management was working on a cost reduction initiative that would be effected through a hub and spoke delivery model. Consolidating certain clinical functions to "hub" locations would permit certain staffing reductions.

Mr. Rick Smith then reviewed the progress of each of the other four areas of the Company and described certain of its operating highlights.

Ms. Simpson stated that the corporate departments were fairly successful in controlling their costs, but stated that legal costs were higher than originally budgeted. She explained that the Company management would review other avenues for reducing costs, such as subletting unneeded space.

Rick Smith reported on his meeting with the consultant proposed by Mr. Feinberg, Dan Crowley.

Mr. Smith also reported that Julia Kopta was hired to serve as special counsel for the Chief Executive Officer to address certain special projects such as the sale of CPS and the wind-down of CRN. He stated that her engagement would be on a limited basis.

h:\legal\scott\minutes.99\board917.doc

TRUSTEE009409
USDC-DE #04-1565

Minutes of the Board of Directors
September 17, 1999
Page 3

Mr. Smith explained that a form of indemnification agreement had been distributed with the agenda for the Board meeting. He explained that the indemnification agreements were being proposed for the purpose of providing certainty relating to the Company's indemnity provision set forth in its By-Laws. Mr. Fink stated that he recalled that other indemnity agreements had been adopted by the Company previously. Mr. Smith requested that each of the members of the Board review the form of indemnification agreements for consideration at the next meeting of the Board.

There being no further business, the meeting was adjourned at approximately 11:05 a.m. MDT.

Respectfully submitted,

Scott F. Larson
Secretary

h:\legal\scott\minutes.99\board917.doc

TRUSTEE009410
USDC-DE #04-1565

A97




Dynamic
Healthcare
Solutions

September 23, 1999

Ms. Julia Kopta
Special Counsel
Coram Healthcare
1125 17th Street, Suite 2100
Denver, CO 80202

Dear Ms. Kopta:

Thank you for sending the revised Consultant Agreement. As you know, Mr. Crowley is now out of the office but he executed the signature page of the Agreement before he left and asked that I forward it to you upon receipt of the revisions.

I have not talked to Mr. Crowley to advise him that the item regarding D&O coverage is not included in the revised Agreement. I assume the two of you have already discussed the issue. With that in mind, I am enclosing the signature page for your use. I will ask Mr. Crowley to call you directly regarding the missing D&O clause.

Sincerely,

Pamela Gridley Herrera
Assistant to Daniel D. Crowley

Enclosure

G 3623

400 Capitol Mall • Suite 1250 • Sacramento, CA 95814   916.449.6056 • 916.449.6059 fax


EXHIBIT
15
2/14/07 OD

Attn: Richard Smith, CEO
Coram Healthcare Corporation
1125 Seventeenth Street, Suite 2100
Denver, CO 80202

Facsimile Number (303) 672-8799

For Consultant:

Attn: Daniel Crowley, Chairman
Dynamic Healthcare Solutions
400 Capitol Mall, Suite 1250
Sacramento, CA 95814

Facsimile:    (916) 449-6059

Notices shall be given (a) by registered or certified mail, return receipt requested or (b) by electronic communication, with confirmation sent by registered or certified mail, return receipt requested.

|  | CONSULTANT | CORAM HEALTHCARE CORP |
|---|---|---|
| Signature: | Daniel D Crowley | |
| Printed Name: | Daniel D. Crowley | |
| Title: | Chairman, Pres. & CEO | |
| Date: | 23 Sep 99 | |

G 3624

## CONSULTANT AGREEMENT

This Agreement is effective as of <u>September 15, 1999</u>                          , by and between <u>Dynamic Healthcare Solutions, LLC</u> (hereafter "Consultant") located at 400 Capitol Mall, Suite 1250, Sacramento, California 95814 and <u>Coram Healthcare Corporation</u>, a Delaware corporation (hereafter "Company").

WHEREAS Company desires to obtain the services of the Consultant and Consultant is willing to provide certain services in connection therewith;

NOW, THEREFORE, in consideration of the promises and mutual obligations herein, the parties hereto do mutually agree as follows:

1.    <u>Scope of Services</u>

    a.    Consultant shall perform the services described on Exhibit A attached hereto and incorporated herein by this reference.

    b.    Consultant shall perform such services in a professional manner, with that degree of knowledge, skill, and judgment ordinarily possessed by independent Consultants in the same or similar industry or profession. The services and the results are to conform to the standards, specifications, and other requirements of Company.

    c.    The services are to be provided in accordance with all applicable federal, state and local laws.

2.    <u>Term</u>

The services of Consultant shall commence upon effective date of the Agreement and terminate on March 15, 1999, or upon notice of termination as set out in Provision 14 herein, whichever is earlier.

3.    <u>Compensation and Method of Payment</u>

    a.    For performing the services specified on Exhibit A, attached hereto and incorporated herein, Company agrees to pay Consultant a fee of $40,000 per month prorated the first month beginning September 15, 1999. At the beginning of the first full month, October 1999, in addition to the $40,000 fee for the month of October 1999, the Company will pay the last month's consulting fee of $40,000 which will be in payment for the period of February 15 through March 15, 2000 This last month payment is referred to in Consultant's invoice as the "Retainer Fee." In clarification, the monthly fee for the month of February 2000 will be prorated to pay for the period of February 1 through February 15, 2000. Exhibit B

G 3625

**A100**

is attached hereto and incorporated herein setting forth a Schedule of Payment. Prior authorization is required from Richard Smith, Chief Executive Officer, hereinafter referred to as "Smith", for any fees in addition to the amount set forth herein.

b.   In the event Consultant must travel in performance of work hereunder, Company shall reimburse Consultant for Daniel Crowley's, Chairman of Consultant, reasonable and necessary travel, lodging, meals, and related expenses, including first class airfare and lodging that is reasonably reserved in advance to permit the best rate possible.   For all other personnel of Consultant, with prior approval by Smith, Consultant shall be reimbursed in accordance with Company's travel policy, attached hereto and incorporated herein as Exhibit C.

c.   The Consultant must submit travel expenses to Smith, for approval for payment.

4.   <u>Reporting and Reports</u>

Consultant will report directly to Smith, and provide reports as requested by Smith.

5.   <u>Agent</u>

a.   Consultant, in performing the services as specified in this Agreement, shall act as an Agent, however Consultant's Personnel are not authorized to bind the Company in any manner without the prior written consent of Smith. Consultant's Personnel are not considered employees of Company for any purpose whatsoever.   "Consultant's Personnel" is defined as Consultant's directors, officers, employees, agents and consultants.

b.   Consultant agrees to be responsible for administrative employment matters, such as the payment of all federal, state and local employment taxes for Consultant's Personnel.

c.   Consultant's Personnel are not entitled to workers' compensation coverage, unemployment compensation, or any employee welfare or pension benefit plans, including but not limited to employee stock option plan, 401(k), health, vision, dental, Short Term Disability, Long Term Disability, vacation or paid time off, that are granted by Company to its employees.

d.   Consultant agrees to hold Company harmless from any expenses, including, but not limited to, penalties and attorneys' fees, which may result from Consultant's failure to withhold taxes, maintain workers' compensation coverage or any conduct on the part of Consultant not in accordance with applicable federal, state and local laws.

G 3626

**A101**

6.  Personnel

a.  With prior approval by Smith, including any expense therefore, Consultant may assign Consultant's personnel required to perform the services under this Agreement. Company reserves the right at its reasonable discretion to accept or reject Consultant's personnel. If Company rejects Consultant's personnel, Consultant shall promptly provide replacement personnel acceptable to Company. Such personnel shall not be Company employees or have any contractual relationship with Company.

b.  All services required hereunder shall be performed by Consultant or under its supervision. All personnel engaged under the Agreement shall be fully qualified, authorized or permitted under federal, state and local law to perform such services.

7.  Indemnity

The Company hereby agrees to hold harmless and indemnify Consultant to the extent authorized or permitted by the provisions of the Delaware Code, as may be amended from time to time, against any and all expenses (including attorneys' fees), judgments, fines and amount paid in settlement actually and reasonably incurred by Consultant in connection with any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative arising out of or related to any services provided pursuant to this Agreement, however, no indemnity pursuant to this section shall be paid by the Company:

(a)  except to the extent the aggregate losses to be indemnified thereunder exceeds the sum of such losses for which Consultant is indemnified pursuant to insurance purchased and maintained by the Company;

(b)  in respect to remuneration paid to Consultant if it shall be determined by a final judgment or other final adjudication that such remuneration was in violation of law;

(c)  on account of any suit in which judgment is rendered against Consultant for an accounting of profits made from the purchase or sale by Consultant of securities of the Company pursuant to the provisions of Section 16(b) of the Securities Exchange Act of 1934, as amended, or similar provisions of any federal, state or local statutory law;

(d)  on account of Consultant's conduct which is finally adjudged to have been knowingly fraudulent or deliberately dishonest, or to constitute willful misconduct;

(e)  if a final decision by a court having jurisdiction in the matter shall determine that such indemnification is not lawful; or

(f)  on account of any action, suit or proceeding (other than a proceeding brought to enforce rights or collect money due under this section and Consultant is

G 3627

A102

successful in such action) commenced by the Consultant against the Company or against any officer, director or stockholder of the Company unless authorized in the specific case by action of the Board of Directors.

(g)  on account of any action for which Consultant has indemnified Company pursuant to Section 5, subsection d of this Agreement, or on account of any action brought by the Company for any breach of this Agreement, or in defense of any action brought by Consultant for any breach of this Agreement (other than a proceeding brought to enforce rights or collect money due for indemnification pursuant to this section).

Consultant agrees to promptly notify the Company in writing upon being served with any summons, citation, subpoenas, complaint, indictment, information or other document relating to any proceeding which may be subject to indemnification hereunder.

The Company jointly with any other indemnifying party will be entitled to assume the defense of any proceeding with counsel reasonably satisfactory to Consultant. After notice from the Company to Consultant of its election so to assume the defense thereof, the Company will not be liable to Consultant under this Agreement for any expenses subsequently incurred by Consultant in connection with the defense thereof other than reasonable costs of investigation, unless the Company and Consultant have reasonably concluded that there may be a conflict of interest between the Company and Consultant in the conduct of the defense of such action or that counsel may not be adequately representing Consultant.

The Company shall not be liable to indemnify Consultant under this Agreement for any amounts paid in settlement of any action or claim effected without its written consent. The Company shall not settle any action or claim in any manner which would impose any penalty or limitation on Consultant without Consultant's written consent. Neither the Company nor the Consultant will unreasonably withhold its or his consent to any proposed settlement.

8.    Conflict of Interest

Consultant warrants that it presently has no interest and shall not acquire any interest, direct or indirect, which would conflict in any manner or degree with the performance or services required under this Agreement.

9.    Discrimination Prohibited

G 3628

A103

In performing the services required under this Agreement, the parties shall not discriminate against any person on the basis of any protected class status. The terms of Executive Order 11246, as amended, governing equal employment opportunity, Section 503 of the Rehabilitation Act of 1973, Section 402 of the Victim Era Veteran's Readjustment Assistance Act of 1974 (38 U.S.C. Section 2012), the Immigration Reform and Control Act of 1986 and the Americans with Disabilities Act of 1990 (42 U.S.C. Section 12101), along with rules and regulations promulgated thereunder, are incorporated herein to this Agreement, and the parties represent they will comply to the extent applicable.

10.    <u>Assignability, Subcontracts</u>

    a.    Consultant shall not assign, delegate or transfer any interest in this Agreement nor subcontract services without the prior written consent of Company and any attempted assignment, subcontract or delegation without such consent shall be void.

    b.    Company may assign its interest in this Agreement to a successor corporation or a subsidiary or affiliate without prior written consent of Consultant.

11.    <u>Audits and Inspections</u>

Consultant shall make available to Company for examination all of Consultant's records with respect to all matters covered by this Agreement. Consultant shall permit Company to audit, examine, and make copies, excerpts or transcripts from such records and to make audits of all contracts, invoices, materials, records of personnel, conditions of employment, and other data relating to all matters under this Agreement. This Provision shall apply during the term of this Agreement (including renewals) and for a period of one (1) year after receipt of final payment under this Agreement.

12.    <u>Amendment</u>

This Agreement shall not be altered, changed, or amended except by instruments in writing executed by the parties hereto.

13.    <u>Changes</u>

Company may request changes in the scope of services to be performed hereunder. Such changes, including any increase or decrease in the amount of Consultant's compensation, which are mutually agreed upon by and between Company and Consultant, shall be incorporated in written amendments to this Agreement.

14.    <u>Termination</u>

G 3629

A104

(a)    Consultant may terminate this Agreement at any time upon notice to the Company if Company fails to pay the fees contemplated by Section 3 hereof when due and such failure continues for a period of five (5) business days following Company's receipt of written notice from the Consultant describing such failure.    Consultant may also terminate this Agreement at any time upon notice to Company if Company materially breaches this Agreement and such breach is not cured in a reasonable period of time, considering the nature of the breach, following the Company's receipt of written notice from the Consultant describing the alleged breach with specificity.

(b)    Company may terminate this Agreement at any time upon notice to Consultant if Consultant materially breaches this Agreement and such breach is not cured in a reasonable period of time, considering the nature of the breach, following Consultant's receipt of written notice from Company describing the alleged breach with specificity.

Upon termination of this Agreement for any reason whatsoever, the Consultant and Company shall promptly deliver to each other all information provided to each other.

15.    <u>Scope of Agreement</u>

This Agreement incorporates all agreements, covenants, and understandings between the parties hereto concerning the subject matter hereof; and all such covenants, agreements, and understandings have been merged into this written Agreement.  No prior agreement or understanding, verbal or otherwise, of the parties or their agents shall be valid or enforceable unless embodied in this Agreement.

16.    <u>Governing Law</u>

The validity, construction and interpretation of this Agreement and the rights and duties of the parties hereto shall be governed by and construed in accordance with the laws of the State of Colorado without regard to that state's conflict of law Sections.  The venue for any lawsuit to interpret or enforce any of the terms of this Agreement shall be in state or federal court located in Denver, Colorado, unless otherwise agreed to by the parties.

17.    <u>Arbitration</u>

**G 3630**

Any controversy or claim arising of or relating to this Agreement, or the breach thereof, which cannot be resolved within sixty (60) days of notice to the party (which period may be extended by mutual agreement), shall be settled by formal arbitration and binding pursuant to the commercial arbitration rules ("Rules") of the American Arbitration Association ("AAA"). The arbitration shall be conducted in Denver, Colorado, with a single arbitrator selected by both parties in accordance with the AAA Rules. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The completion of binding arbitration shall be a condition precedent to the commencement of any civil action in any court of competent jurisdiction to enter the final decision of the arbitrator. Each party shall pay its own costs and expenses.

18.     <u>Restrictive Covenants</u>

<u>Disclosure and Use of Confidential Information and Trade Secrets.</u>   Consultant understands and agrees that the Confidential Information and Trade Secrets, as defined below, constitute valuable assets of Coram and its affiliated entities, and may not be converted to Consultant's own use. Accordingly, Consultant hereby agrees that Consultant shall not, directly or indirectly, at any time during the Term of this Agreement or at any time thereafter reveal, divulge, or disclose to any Person, as defined below, not expressly authorized by Coram any Confidential Information in connection with any business activity other than that of Coram. Throughout the term of this Agreement and at all times after the date that this Agreement terminates for any reason, Consultant shall not directly or indirectly transmit or disclose any Trade Secret of Coram to any Person, and shall not make use of such Trade Secret, directly or indirectly, for himself or for others, without the prior written consent of Coram. The parties acknowledge and agree that this Agreement is not intended to, and does not, alter either Coram's rights or Consultant's obligations under any state or federal statutory or common law regarding trade secrets and unfair trade practices.

Anything herein to the contrary notwithstanding, Consultant shall not be restricted from disclosing or using Confidential Information that is required to be disclosed by law, court order or other legal process; provided, however, than in the event disclosure is required by law, Consultant shall provide Coram with prompt notice of such requirement so that Coram may seek an appropriate protective order prior to any such required disclosure by Consultant.

"Confidential Information" means all information regarding Coram, its activities, business or clients that is the subject of reasonable efforts by Coram to maintain its confidentiality and that is not generally disclosed by practice or authority to persons not employed or contracted by Coram, but that does not rise to the level of a Trade Secret. "Confidential Information" shall include, but is not limited to, financial plans and data concerning Coram; management planning information; business plans; operational methods; market studies; marketing plan or strategies; product development techniques or plans; customer lists; details of customer contracts; current and anticipated customer requirement; past, current and planned

G 3631

**A106**

research and development; business acquisition plans; and new personnel acquisition plans. "Confidential Information" shall not include information that has become generally available to the public by the act of one who has the right to disclose such information without violating any right or privilege of Coram. This definition shall not limit any definition of "confidential information" or any equivalent term under state or federal law.

" Person" means any individual or any corporation, partnership, joint venture, limited liability company, association or other entity or enterprise.

"Trade Secret" means all information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, distribution lists or a list of actual or potential customers, advertisers or suppliers which is not commonly known by or available to the public and which information: (A) derives economic value, actual, or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Without limiting the foregoing, Trade Secret means any item of Confidential Information that constitutes a "trade secret(s)" under the common law or statutory law of the State of Delaware.

Additionally, Consultant may consult with Company's law firm, Folger, Levin & Kahn to provide consulting services related to the Aetna lawsuit described in Exhibit A. Any privileged attorney-client communication to which Consultant may become privy as a result of his consulting assistance is to be held in the strictest confidence and may not be disclosed without prior express written authorization of the company.

Confidential Information may not be copied or reproduced without the Company's prior consent.

<u>Nonsolicitation of Protected Employees.</u> Consultant understands and agrees that the relationship between Coram and each of its Protected Employees, as defined below, constitutes a valuable asset of Coram and may not be converted to Consultant's own use. Accordingly, Consultant hereby agrees that during the Restricted Period, as defined below, Consultant shall not directly or indirectly on Consultant's own behalf or as a Principal or Representative, as defined below, of any Person or otherwise solicit or induce any Protected Employee to terminate his or her employment relationship with Coram or to enter into employment with any other Person.

G 3632

"Protected Employees" means employees of Coram who were employed by Coram at any time within six(6) months prior of this Agreement or termination thereof.

"Restricted Period" means the entire period of time that the Consultant is contracted by Coram and for a period of one year after termination of this Agreement.

"Principal or Representative" means a principal, owner, partner, shareholder, joint venturer, investor, member, trustee, director, officer, manager, employee, agent, representative or consultant.

Restriction on Relationships with Protected Customers. Consultant understands and agrees that the relationship between Coram and each of its Protected Customers constitutes a valuable asset of Coram and may not be converted to Consultant's own use. Accordingly, Consultant hereby agrees that, during the Restricted Period, Consultant shall not, without the prior written consent of Coram, directly or indirectly, on Consultant's own behalf or as a Principal or Representative of any Person, solicit, divert, take away or attempt to solicit, divert or take away a Protected Customer for the purpose of providing or selling Competitive Services, as defined below, provided, however, that the prohibition of this covenant shall apply only to Protected Customers with whom Consultant had Material Contact on Coram's behalf during the six (6) months immediately preceding the termination of the consultancy hereunder. For purposes of this Agreement, Consultant had "Material Contact" with a Protected Customer if (a) he had business dealings with the Protected Customer on Coram's behalf; (b) he was responsible for supervising or coordinating the dealings between Coram and the Protected Customer; or (c) he obtained Trade Secrets or Confidential Information about the Protected Customer as a result of his association with Coram.

"Protected Customers" means any Person to whom Coram has sold its products or services or solicited to sell its products or services during the six (6) months prior to the termination of the Agreement.

19.    Company Policies

Consultant agrees to abide by the Company's employment guidelines and procedures, including, but not limited to, Code of Business Conduct, Sexual Harassment, Drug Free Workplace, Conflict of Interest, etc. in effect from time to time.

20.    Notices

All notices, including notices of address change required under this Agreement shall be in writing, addressed as follows:

For Company:

G 3633

**A108**

Attn:  Richard Smith, CEO
Coram Healthcare Corporation
1125 Seventeenth Street, Suite 2100
Denver, CO 80202

Facsimile Number (303) 672-8799

For Consultant:

Attn:  Daniel Crowley, Chairman
Dynamic Healthcare Solutions
400 Capitol Mall, Suite 1250
Sacramento, CA 95814

Facsimile:    (916) 449-6059

Notices shall be given (a) by registered or certified mail, return receipt requested or (b) by electronic communication, with confirmation sent by registered or certified mail, return receipt requested.

|  | CONSULTANT | CORAM HEALTHCARE CORP |
|---|---|---|
| Signature: | _____ | _____ |
| Printed Name: | _____ | _____ |
| Title: | _____ | _____ |
| Date: | _____ | _____ |

G 3634

## EXHIBIT A

## SCOPE OF SERVICES

1. Assist in development and participate in the implementation of strategic planning initiatives to improve the overall function and results of the Company and its operations, including a payer and provider strategy.

2. Assist in development and participate in bank presentations.

3. Consult directly with Folger, Levin and Kahn regarding Aetna U. S. Healthcare v. Coram Healthcare Corporation and related matters towards effectuating a resolution acceptable to the Company.

4. Assist in development and implementation of a plan for the closure and Disposition of Coram Resource Network, Inc.

5. Such other project as assigned by Richard Smith

G 3635

# EXHIBIT B

Refer to attached Contract Payment Schedule

G 3636

## EXHIBIT B

DYNAMIC HEALTHCARE SOLUTIONS

CONTRACT PAYMENT SCHEDULE

| PERIOD OF SERVICE | | AMOUNT | DATE TO BE PAID | |
|---|---|---|---|---|
| September 15-30, 1999 | $ | 20,000.00 | 24-Sep-99 | ( * ) |
| October, 1999 | | 40,000.00 | 24-Sep-99 | ( * ) |
| November, 1999 | | 40,000.00 | 1-Nov-99 | |
| December, 1999 | | 40,000.00 | 1-Dec-99 | |
| January, 2000 | | 40,000.00 | 3-Jan-99 | |
| February 1-15, 2000 | | 20,000.00 | 2-Feb-00 | |
| February 16-March 15, 2000 | | 40,000.00 | 24-Sep-99 | ( * ) |

( * ) Specified date or date agreement is executed, whichever is later.

**G 3637**

A112

MINUTES OF A TELEPHONIC MEETING

OF THE BOARD OF DIRECTORS OF

CORAM HEALTHCARE CORPORATION

October 27, 1999

A telephonic meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was convened at approximately 5:45 p.m. MDT. Participating in the meeting were the following Directors: Donald J. Amaral, Chairman of the Board; Richard M. Smith, Chief Executive Officer and President; William J. Casey; L. Peter Smith; Richard A. Fink and Stephen A. Feinberg. Scott T. Larson, the Company's Senior Vice President, General Counsel and Secretary and Douglas Sullivan of the San Francisco law firm Folger, Levin & Kahn, LLP also participated in the meeting. Mr. Amaral acted as Chairman of the meeting and Mr. Larson kept the Minutes.

The first order of business was an update on the litigation between the Company and Aetna U.S. Healthcare, Inc. Mr. Amaral invited Mr. Sullivan to describe the progress of the case and the Company's strategies in pursuing the litigation. A privileged and confidential conversation regarding the matter ensued.

Mr. Sullivan then left the meeting.

The next item of business was a review of discussions the Company had with Richard M. Smith regarding his employment with the Company. Mr. Fink summarized the conversations he and Mr. Rick Smith had. Mr. Amaral then invited comments from Mr. Rick Smith and Mr. Smith stated his position was fully articulated in the letter sent by his attorney to the Board of Directors. Following a discussion about this matter, Mr. Rick Smith exited from the call.

Mr. Amaral then took roll of the persons remaining on the call to verify Mr. Rick Smith's departure. Following completion of this roll call, Mr. Amaral stated that the Company had retained David Balabanian of McCutchen, Doyle, Enerson & Brown to negotiate the terms of Mr. Smith's departure. A privileged and confidential discussion ensued regarding the appropriate way to address Mr. Smith's situation. The Board determined that it was in the best interests of the Company to treat Mr. Smith's departure as one in which Mr. Smith had resigned, but one in which he would receive the benefits of his employment agreement as if his employment were "involuntarily" terminated.

With the departure of Mr. Smith as Chief Executive Officer, Mr. Amaral explained that the Company would need a new Chief Executive Officer. He offered his services on an interim basis until the Company could find a permanent replacement for Mr. Rick Smith. Upon a motion duly made and seconded, the following resolution was unanimously adopted:



EXHIBIT

33

2/14/07 dp

Minutes of the Board of Directors
October 27, 1999
Page 2

RESOLVED, that Donald J. Amaral, Chairman of the Board of Directors, shall return as interim Chief Executive Officer of the Company and its subsidiaries to serve until his successor is duly elected and qualified.

The Board then discussed the process for searching for a new Chief Executive Officer. Mr. Amaral explained that he had spoken to an executive search specialist, Neil Maslin, about identifying a candidate. Mr. Feinberg offered that Dan Crowley was available and qualified for the assignment if the Board so chose.

The Board then discussed the appropriate disclosure of Mr. Rick Smith's departure and Mr. Amaral's acceptance of the role of interim Chief Executive Officer.

There being no further business, the meeting was adjourned at 6:35 p.m. MDT.


Respectfully submitted,


Scott T. Larson
Secretary

 **Dynamic
Healthcare
Solutions**



29 October 1999

Don Amaral
Chairman of the Board
Coram Healthcare
1125 17th Street, Suite 2100
Denver, Colorado 80202

Dear Don, *Don*

It must be sad to you to see the ultimate outcome at Coram for Rick. The way
he conducted himself is exactly the way that I have experienced him in my own
dealings. Maybe what he really wanted to do was just maneuver himself into
getting out and doing it with severance.

Don, I am certain that you are aware that Rick and I have a six (6) month crisis
management contract in place. I want you to know that I would like to help you
with this project and begin the restructuring process. Why not think about
appointing me to work for you to be responsible for getting this going for you
right away? It would be fun to work with you and I think I could make this
come around in the next two(2) to four (4) quarters and get things stabilized.
Then we could decide what the right direction longer term should be.

Discuss?

Sincerely,

*Dan Crowley*

Daniel D. Crowley
Chairman, President & CEO

4/6

400 Capitol Mall • Suite 1250 • Sacramento, CA 95814   916.449.6056 • 916.449.6059 fax

CONFIDENTIAL

## CORAM HEALTHCARE
### OVERVIEW FOR BOARD OF DIRECTORS
#### 2 November 1999

Coram is **highly leveraged**.  There is virtually no free cash to operate the firm and Coram is currently "pik-ing" its debt.  **It will need $10-$20M of new money**.

Coram is a **cash user**.  CPS is expected to use $3M in cash in Q4, R-Net will use $4-5M in Q4, and litigation could use another $1M in Q4.  Unexpected cash calls from vendors (e.g. Cardinal for $2+ M in Q4) could add to this drain.

Coram's **EBITDA has declined significantly**.  Q4 EBITDA will be minimal despite seasonal advantages and 2000 can be expected to be worse than 1999.

**Coram's Accounts Receivable (AR) has been deteriorating**.  The AR is $120M and aging.  $75M of the $120M is over 60 days old ($48M is over 120 days old).  There is a **likelihood of a write-down** and prior period earnings hit.

Coram **operations are out of control**.  It lacks a **Strategic, Operating, or tactical plan** making its operations chaotic.  No plan exists for IT.

Coram's **management is "commuter" and decisionmaking is difficult, slowing implementation of changes.**

Coram's core **Home Infusion business is an un-integrated combination** of six (6) companies that merged to form Coram.  The business is held in 88 distribution centers, located in 4 regions consisting of $460M in sales.  $120M in the NorthEast, $120M in Central, $108M in the West, and $112M in the South.

**Field and Corporate overhead is high, adding 9% to total product costs.** With this cost, approximately **$160M of the home infusion revenue is in the red.**  A total reorganization of the "work itself" is needed.

Coram has failed at HMO and Managed Care.  **R-Net is in litigation with Aetna USHealthcare and in an involuntary bankruptcy filing from Apria that could upend the entire firm.**

CONFIDENTIAL

CROWLEY 0082

A116

## NEXT STEPS

Given litigation, number of locations, asset dispositions, failing business unit (s) and lack of cash flow, **Coram does not represent a normal assignment.**

Coram will not be successful at recruiting a qualified and sufficiently experienced turnaround CEO. **A false start could be fatal to Coram** and destroy any opportunity to save the firm.

**Dynamic Healthcare Solutions (DHS)** will enter into twelve (12) month consulting assignment **as Crisis Manager** to facilitate a turnaround. Interim management team could include Interim CEO, CFO, Systems, Human Resources, and Marketing.

As CEO of DHS, Daniel D. Crowley, an experienced turnaround professional, will lead the restructuring.

The Coram Board and debt holders will provide DHS with **sufficient day to day authority** to improve the result at Coram. The Board will fully indemnify and defend DHS and its individual team members from any current or future litigation.

As Crisis Manager **DHS will work to restructure Coram** to try to maximize its value.

Restructuring will require **debt holders to forebear interest, amortization, and covenants** to gain sufficient time to work through Coram's operational issues.

DHS will work to deliver:

  1) A crisis intervention plan to maximize operations, cash, earnings, and rationalize the business in the various business units for Coram.

  2) A plan to normalize day to day business operation with core management in place to go forward.

  3) A valid "go forward" business strategy and an operating plan.

CROWLEY 0083

**A117**

# Coram Healthcare Corp · 10-Q · For 9/30/99

**Filed On 11/15/99 · SEC File 1-11343 · Accession Number 950134-99-10145**

Find [                ] in this filing. [ ] Show [docs searched] and [every "hit"]. [ ]

Help... **Wildcards:** ? (any letter), * (many). **Logic:** for Docs: & (and), | (or); for Text: | (anywhere), "(&)" (near).

| *As Of* | *Filer* | *Filing* | *On/For/As* | *Docs:Pgs* | *Issuer* |
|---------|---------|----------|-------------|------------|----------|
| 11/15/99 | Coram Healthcare Corp | 10-Q | 9/30/99 | 9:98 | |

---

**Quarterly Report · Form 10-Q**
**Filing Table of Contents**

| Document/Exhibit | Description | Pages | Size |
|------------------|-------------|-------|------|
| 1: 10-Q | Form 10-Q for Quarter Ended September 30, 1999 | 29 | 202K |
| 2: EX-10.1 | Letter Agreement to Prime Vendor Agreement | 2 | 13K |
| 3: EX-10.2 | Agreement Between the Company and Richard M. Smith | 3 | 18K |
| 4: EX-10.3 | Amend No.2 - Employment Agrmnt - Donald J Amaral | 2 | 15K |
| 5: EX-10.4 | Employment Agreement - Richard M. Smith | 16 | 68K |
| 6: EX-10.5 | Employment Agreement - Wendy L. Simpson | 16 | 62K |
| 7: EX-10.6 | Employment Agreement - Joseph D. Smith | 16 | 62K |
| 8: EX-10.7 | Form of Indemnification Agreement | 13 | 62K |
| 9: EX-27 | Financial Data Schedule | 1 | 9K |

---

**10-Q · Form 10-Q for Quarter Ended September 30, 1999**
**Document Table of Contents**

| *Page* | (sequential) | (alphabetic) | Top |
|--------|--------------|--------------|-----|
| 1 | 1st Page | • Alternative Formats (RTF, XML, et al.) | |
| 2 | Item 1. Financial Statements | • Business Strategy | |
| 7 | Caremark Business | • Caremark Business | |
| 8 | Securities Exchange Agreement | • Change in Securities and Use of Proceeds | |
| 9 | Series A Notes | • Defaults Upon Senior Securities | |
| " | Series B Notes | • Exhibits and Reports on Form 8-K | |
| 17 | Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | • Factors Affecting Recent Operating Results | |
| " | Business Strategy | • Financial Statements | |
| 18 | Factors Affecting Recent Operating Results | • Interest expense | |
| 20 | Interest expense | • Legal Proceedings | |
| 25 | Item 3. Quantitative and Qualitative Disclosures About Market Risk | • Management's Discussion and Analysis of Financial Condition and Results of Operations | |
| " | Item 1. Legal Proceedings | • Other Information | |
| " | Item 2. Change in Securities and Use of Proceeds | • Quantitative and Qualitative Disclosures About Market Risk | |
| 26 | Item 3. Defaults Upon Senior Securities | • Securities Exchange Agreement | |
| " | Item 4. Submission of Matters to Vote of Security | • Series A Notes | |

Holders
" Item 5. Other Information
27 Item 6. Exhibits and Reports on Form 8-K

- Series B Notes
- Submission of Matters to Vote of Security Holders

---
---

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-Q

(MARK ONE)
[X]      QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE QUARTERLY PERIOD ENDED SEPTEMBER 30, 1999

OR

[ ]      TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE TRANSITION PERIOD FROM          TO

COMMISSION FILE NUMBER 1-11343

----------------------

CORAM HEALTHCARE CORPORATION
(Exact name of Registrant as specified in its charter)

· *Download Table*

| DELAWARE | 33-0615337 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1125 SEVENTEENTH STREET SUITE 2100 | |
| DENVER, CO | 80202 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's Telephone Number, Including Area Code: (303) 292-4973

----------------------

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes [X]  No [ ]

The number of shares outstanding of the Registrant's Common Stock, $.001 par value, as of November 10, 1999, was 49,597,376.

----------------------
----------------------