PART I

FINANCIAL INFORMATION

ITEM 1. FINANCIAL STATEMENTS

CORAM HEALTHCARE CORPORATION

CONDENSED CONSOLIDATED BALANCE SHEETS
(IN THOUSANDS)

ASSETS

· *Enlarge/Download Table*

| | SEPTEMBER 30, 1999 | DECEMBER 31, 1998 |
|---|---|---|
| | (UNAUDITED) | |
| **Current assets:** | | |
| Cash and cash equivalents................................. | $ 8,466 | $ 53 |
| Cash limited as to use.................................... | 544 | 1,557 |
| Accounts receivable, net of allowance of $21,377 and $18,128............................................... | 126,232 | 113,697 |
| Inventories............................................... | 18,973 | 27,203 |
| Deferred income taxes, net................................ | 290 | 705 |
| Other current assets...................................... | 6,094 | 4,963 |
| Total current assets............................. | 160,599 | 148,178 |
| Property and equipment, net................................... | 25,373 | 26,563 |
| Deferred income taxes, net.................................... | 2,287 | 4,365 |
| Other assets................................................. | 17,394 | 17,574 |
| Other deferred costs......................................... | 3,155 | 5,243 |
| Goodwill, net of accumulated amortization of $75,401 and $67,247................................................ | 227,868 | 235,696 |
| Total assets.................................... | $ 436,676 | $ 437,619 |

LIABILITIES AND STOCKHOLDERS' EQUITY

| | SEPTEMBER 30, 1999 | DECEMBER 31, 1998 |
|---|---|---|
| **Current Liabilities:** | | |
| Accounts payable.......................................... | $ 55,628 | $ 52,930 |
| Accrued compensation...................................... | 11,163 | 11,205 |
| Interest payable.......................................... | 5,707 | 4,671 |
| Current maturities of long-term debt...................... | 414 | 260 |
| Income taxes payable...................................... | 472 | 300 |
| Deferred income taxes..................................... | 300 | 1,060 |
| Reserve for litigation.................................... | 1,420 | 2,987 |
| Accrued merger and restructuring.......................... | 6,673 | 3,935 |
| Other current liabilities................................. | 8,699 | 6,271 |
| Total current liabilities........................ | 90,476 | 83,619 |
| Long-term debt............................................... | 289,265 | 242,162 |
| Minority interest in consolidated joint ventures............ | 1,427 | 2,024 |
| Other liabilities........................................... | 13,674 | 12,947 |
| Deferred income taxes....................................... | 2,277 | 4,010 |
| Commitments and contingencies............................... | -- | -- |
| Total liabilities............................... | 397,119 | 344,762 |
| **Stockholders' equity:** | | |
| Preferred stock, par value $.001, authorized 10,000 shares, none issued................................... | -- | -- |
| Common stock, par value $.001, authorized 100,000 shares, issued and outstanding 49,598 at September 30, 1999 and 49,201 at December 31, 1998.............................. | 50 | 49 |
| Additional paid-in capital................................ | 427,377 | 427,133 |
| Accumulated deficit....................................... | (387,870) | (334,325) |
| Total stockholders' equity....................... | 39,557 | 92,857 |
| Total liabilities and stockholders' equity........ | $ 436,676 | $ 437,619 |

See accompanying notes to unaudited condensed consolidated financial statements.

## CORAM HEALTHCARE CORPORATION

### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
### (UNAUDITED)
### (IN THOUSANDS, EXCEPT PER COMMON SHARE DATA)

*Enlarge/Download Table*

|  | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
| --- | --- | --- | --- | --- |
|  | 1999 | 1998 | 1999 | 1998 |
| Net revenue............................................ | $143,232 | $143,607 | $456,983 | $368,469 |
| Cost of service....................................... | 110,299 | 108,317 | 379,960 | 275,402 |
| Gross profit........................................... | 32,933 | 35,290 | 77,023 | 93,067 |
| Operating expenses: | | | | |
| Selling, general and administrative expenses..... | 28,290 | 25,030 | 80,799 | 69,025 |
| Provision for estimated uncollectible accounts... | 4,168 | 3,897 | 12,781 | 11,140 |
| Amortization of goodwill......................... | 2,711 | 2,794 | 8,159 | 8,337 |
| Restructuring costs.............................. | 5,100 | -- | 6,050 | -- |
| Total operating expenses................. | 40,269 | 31,721 | 107,789 | 88,502 |
| Operating income (loss)............................ | (7,336) | 3,569 | (30,766) | 4,565 |
| Other income (expenses): | | | | |
| Interest expense................................ | (8,110) | (6,114) | (22,193) | (26,372) |
| Other income, net............................... | 580 | 407 | 971 | 2,130 |
| Loss before income taxes and minority interests.... | (14,866) | (2,138) | (51,988) | (19,677) |
| Income tax expense.................................... | 125 | 450 | 375 | 1,850 |
| Minority interests in net income of consolidated joint ventures................................. | 176 | 261 | 1,182 | 974 |
| Net loss.............................................. | $(15,167) | $(2,849) | $(53,545) | $(22,501) |
| Loss per common share.............................. | $ (0.30) | $ (0.06) | $ (1.08) | $ (0.46) |
| Loss per common share -- assuming dilution......... | $ (0.30) | $ (0.06) | $ (1.08) | $ (0.46) |

See accompanying notes to unaudited condensed consolidated financial statements.

2

CORAM HEALTHCARE CORPORATION

CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(UNAUDITED)
(IN THOUSANDS)

· *Download Table*

|  | NINE MONTHS ENDED SEPTEMBER 30, | |
|  | 1999 | 1998 |
| --- | --- | --- |
| Net cash used in operating activities...................... | $(21,259) | $ (8,876) |
| Cash flows from investing activities: | | |
| Purchases of property and equipment...................... | (6,782) | (7,576) |
| Other.................................................... | (481) | (3,084) |
| Net cash used in investing activities................. | (7,263) | (10,660) |
| Cash flows from financing activities: | | |
| Borrowings on line of credit............................ | 43,000 | 17,250 |
| Repayment of debt........................................ | (6,065) | (94,380) |
| Proceeds on issuance of promissory notes................. | -- | 6,000 |
| Consideration for warrant cancellation................... | -- | (4,300) |
| Other.................................................... | -- | (846) |
| Net cash provided by (used in) financing activities.... | 36,935 | (76,276) |
| Net increase (decrease) in cash and cash equivalents....................................... | $  8,413 | $(95,812) |

See accompanying notes to unaudited condensed consolidated financial statements.

3

CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS
SEPTEMBER 30, 1999

## 1. BASIS OF PRESENTATION

Business Activity. Coram Healthcare Corporation and its subsidiaries ("Coram" or the "Company") are engaged in four principal lines of business: alternate site (outside the hospital) infusion therapy and related services, ancillary network management services, pharmacy benefit management and specialty mail-order pharmacy services and centralized management, administrative and clinical support for clinical research trials, and medical informatics services. Other services offered by Coram include non-intravenous home health products such as durable medical equipment and respiratory therapy services. See Note 4 and Note 7 to the Unaudited Condensed Consolidated Financial Statements.

Coram delivers its alternate site infusion therapy services through approximately 88 branch offices located in 43 states and Ontario, Canada. Infusion therapy involves the intravenous administration of anti-infective therapy, intravenous immunoglobulin ("IVIG"), chemotherapy, pain management, nutrition and other therapies.

For all periods presented, the Company provided ancillary network management services through its Resource Network division ("R-Net"), which managed networks of home health care providers on behalf of health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs"), at-risk physician groups and other managed care organizations. R-Net served its customers through two primary call centers and three satellite offices. See Note 4 and Note 7 to the Unaudited Condensed Consolidated Financial Statements.

The Company delivers pharmacy benefit management and specialty pharmacy services through its Coram Prescription Services division ("CPS"). The division provides services through a centralized mail order pharmacy and service center in Orlando, Florida; five regional mail order pharmacies in Plainview, New York; Omaha, Nebraska; Las Vegas, Nevada; Hayward, California; Houston, Texas and one retail pharmacy in Baltimore, Maryland. The pharmacy benefit management service provides on-line claims administration, formulary management and certain drug utilization review services through a nationwide network of retail pharmacies. CPS's specialty pharmacy services provide centralized distribution, adherence programs, patient education, and clinical support to patients with high cost, high risk conditions. See Part I, Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations: "Business Strategy".

Through its Clinical Trials and Informatics division ("CTI Network, Inc."), the Company provides centralized management and support for clinical research trials. This division also offers data collection and integration services as well as pharmaceconomic outcomes and utilization analyses.

Basis of Presentation. The accompanying unaudited condensed consolidated financial statements have been prepared by the Company pursuant to the rules and regulations of the Securities and Exchange Commission (the "Commission"). Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such regulations. The unaudited condensed consolidated financial statements reflect all adjustments and disclosures that are, in the opinion of management, necessary for a fair presentation. All such adjustments are of a normal recurring nature. The results of operations for the interim period ended September 30, 1999, are not necessarily indicative of the results of the full fiscal year. For further

Case 1:04-cv-01565-SLR - Document 124-5    Filed 04/17/2007    Page 6 of 30

information, refer to the audited consolidated financial statements and notes
thereto included in the Company's Annual Report on Form 10-K, as amended, for
the year ended December 31, 1998 and subsequent filings on Forms 10-Q and 8-K
filed with the Commission in 1999.

Provision for Estimated Uncollectible Accounts. Management believes the net
carrying amount of accounts receivable is fairly stated and that the Company has
made adequate provision for uncollectible

4

## CORAM HEALTHCARE CORPORATION

### NOTES TO UNAUDITED CONDENSED CONSOLIDATED
### FINANCIAL STATEMENTS -- (CONTINUED)

accounts based on all information available. However, no assurance can be given as to the level of future provisions for uncollectible accounts, or how they will compare to the levels experienced in the past.

Loss per Share. In 1997, the Financial Accounting Standards Board (the "FASB") issued Statement No. 128, Earnings per Share ("Statement 128"). In accordance with Statement 128, basic earnings per share exclude any dilutive effects of options, warrants and convertible securities. The following table sets forth the computation of basic and diluted loss per share for the three and nine months ended September 30, 1999 and 1998:

Enlarge/Download Table

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
| --- | --- | --- | --- | --- |
| | 1999 | 1998 | 1999 | 1998 |
| Numerator for basic and diluted loss per share......................................... | $(15,167) | $(2,849) | $(53,545) | $(22,501) |
| Weighted average shares -- denominator for basic earnings per share.................. | 49,550 | 48,888 | 49,483 | 48,731 |
| Effect of other dilutive securities: | | | | |
| Stock options............................ | -- | -- | -- | -- |
| Warrants................................. | -- | -- | -- | -- |
| Denominator for diluted earnings per share-- adjusted weighted average shares and assumed conversion...................... | 49,550 | 48,888 | 49,483 | 48,731 |
| Loss per common share..................... | $ (0.30) | $ (0.06) | $ (1.08) | $ (0.46) |
| Loss per common share -- assuming dilution................................. | $ (0.30) | $ (0.06) | $ (1.08) | $ (0.46) |

Diluted loss per share computations do not give effect to stock options or warrants to purchase common stock as their effect would have been anti-dilutive.

Derivatives and Hedging Activities. In June 1998, the FASB issued Statement of Financial Accounting Standards No. 133, Accounting for Derivative Instruments and Hedging Activities ("Statement 133"), which requires recording all derivative instruments as assets or liabilities, measured at fair value. Statement 133 was effective for fiscal years beginning after June 15, 1999. The FASB issued, in June 1999, the Statement of Financial Accounting Standards No. 137, Accounting for Derivative Instruments and Hedging Activities -- Deferral of the Effective Date of FASB Statement 133. ("Statement 137"), which amends Statement 133. Statement 137 will apply to all fiscal quarters of all fiscal years beginning after June 15, 2000. As of September 30, 1999, the Company had not entered into any derivative and hedging transactions, and as such, the Company does not believe that adoption of the new requirement will have an effect on the Company's future financial position or operating results.

Start-up Costs. In 1998, the AICPA issued SOP 98-5 "Reporting on the Costs of Start-Up Activities," which requires that the costs of start-up activities be expensed as incurred. Initial adoption of SOP 98-5 was accounted for as a cumulative effect of an accounting change. The Company adopted the SOP 98-5 effective January 1, 1999 and such adoption did not have a significant effect on the results of operations or financial position.

## 2. ACQUISITIONS AND RESTRUCTURING

Acquisitions. Certain agreements related to previously acquired businesses or interests therein provide for additional contingent consideration to be paid by the Company. The amount of additional consideration, if any, is generally based on the financial performance levels of the acquired companies. As of September 30,

5

CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS -- (CONTINUED)

1999, the Company may be required to pay a minimum of approximately $2.0 million, subject to increase based, in certain cases, on the Company or its subsidiaries exceeding certain revenue or income targets and changes in the market value of the Company's stock. These minimum contingent obligations have been recorded as additional goodwill. Subject to certain elections by the Company or the sellers, a maximum of approximately $1.1 million of these contingent obligations, subject to increase, may be paid in cash with the remaining to be paid in common stock of the Company. If these contingent payments exceed the minimum contingent amounts, they will be recorded as additional goodwill in the period in which the payment becomes probable. Payments during the three months ended September 30, 1999 and 1998 totaled $0.1 million each period.

Merger and Restructuring. As a result of the formation of Coram and the acquisition of substantially all of the assets of the alternate site infusion business of Caremark, Inc., a subsidiary of Caremark International, Inc. (the "Caremark Business"), during May 1995, the Company initiated a restructuring plan (the "Caremark Business Consolidation Plan") and charged $25.8 million to operations as a restructuring cost. Certain additional restructuring costs totaling approximately $11.4 million were incurred and accounted for as adjustments to the purchase price of the Caremark Business in 1995. In December 1998, the Company evaluated the estimated costs to complete the Caremark Business Consolidation Plan and other accruals and recognized a restructure reversal benefit of $0.7 million.

Under the Caremark Business Consolidation plan, the Company has made total payments, disposals and reversals as follows (in thousands):

*Enlarge/Download Table*

| | THROUGH SEPTEMBER 30, 1999 | | | | BALANCE AT SEPTEMBER 30, 1999 | |
| | CASH EXPENDITURES | NON-CASH CHARGES | TOTAL | RESTRUCTURE REVERSAL | FUTURE CASH EXPENDITURES | TOTAL CHARGES |
|---|---|---|---|---|---|---|
| Caremark Business Consolidation Plan: | | | | | | |
| Personnel Reduction Costs.................. | $11,300 | $ -- | $11,300 | $ -- | $ -- | $11,300 |
| Facility Reduction Costs... | 9,547 | 3,900 | 13,447 | 714 | 2,539 | 16,700 |
| Total Restructuring Costs............ | $20,847 | $3,900 | $24,747 | $714 | $2,539 | $28,000 |

During January 1999, the Company adopted a restructuring plan, which was initiated in the first quarter of 1999. The plan resulted in an organizational restructure in which $0.9 million of expense was recognized for severance costs.

During July 1999, the Company adopted a restructuring plan associated with the reorganization of the R-Net division's Whippany, New Jersey call center operations which was responsible for managing the Aetna Master Agreement. The plan which was initiated in the third quarter of 1999, and was described in the Company's Quarterly Report on Form 10-Q for the period ended June 30, 1999 as a subsequent event. The plan resulted in a charge of $5.1 million during the quarter and consisted of $0.8 million for severance, $3.4 million for facility costs, and $0.9 million for impairment of assets. See Note 4 to the Unaudited Condensed Consolidated Financial Statements.

The balance in the *"Accrued Merger and Restructuring"* liability at <u>September 30, 1999</u> consists of future cash expenditures related to the Caremark Business Consolidation Plan of $2.5 million, the January 1999 restructure plan of $0.1 million, the R-Net restructure plan of $3.9 million and other accruals of $0.2 million.

6

CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS -- (CONTINUED)

The Company estimates that the future cash expenditures related to the Caremark Business Consolidation Plan, the 1999 restructure plan from the first quarter of 1999, and the third quarter restructuring associated with the R-Net Whippany, New Jersey call center operations will be made in the following periods: 36% through September 30, 2000, 17% through September 30, 2001, 17% through September 30, 2002, and 30% through September 30, 2003, and thereafter.

## 3. LONG-TERM DEBT

Long-term debt is as follows (in thousands):

· *Enlarge/Download Table*

| | SEPTEMBER 30, 1999 | DECEMBER 31, 1998 |
|---|---|---|
| Series A Senior Subordinated Unsecured Notes................ | $162,162 | $153,785 |
| Series B Senior Subordinated Convertible Notes............. | 89,681 | 87,922 |
| New Senior Credit Facility................................. | 37,000 | -- |
| Other obligations, including capital leases, at interest rates ranging from 6% to 16%, collateralized by certain property and equipment.................................... | 836 | 715 |
| | 289,679 | 242,422 |
| Less current scheduled maturities......................... | (414) | (260) |
| | $289,265 | $242,162 |

As of September 30, 1999, the Company's principal credit and debt agreements included (i) a Securities Exchange Agreement (the "*Securities Exchange Agreement*"), dated May 6, 1998 with Cerberus Partners, L.P., Goldman Sachs Credit Partners, L.P. and Foothill Capital Corporation (collectively known as the "*Holders*") and the related Series A Senior Subordinated Unsecured Notes (the "*Series A Notes*") and the Series B Senior Subordinated Convertible Notes (the "*Series B Notes*") contemplated thereby and (ii) a new senior credit facility with Foothill Income Trust, L.P., Cerberus Partners, L.P. and Goldman Sachs Credit Partners L.P. (collectively known as the "*Lenders*") and Foothill Capital Corporation, as Agent, dated as of August 20, 1998 (the "*New Senior Credit Facility*"). Under the outstanding credit and debt agreements, the Company is precluded from paying cash dividends during the term of the debt agreement.

**Securities Exchange Agreement.** On May 6, 1998, the Company entered into the Securities Exchange Agreement with the Holders of its previously outstanding subordinated rollover note (the "*Rollover Note*"). As long as the Rollover Note was outstanding, the Holders had the right to receive warrants to purchase up to 20% of the outstanding shares of the common stock of the Company (the "*Warrants*") on a fully diluted basis. The Securities Exchange Agreement provided for the cancellation of the Rollover Note (including deferred interest and fees) and the Warrants in an exchange (the "*Exchange*"), effective April 13, 1998, for the payment of $4.3 million in cash and the issuance by the Company to the Holders of (i) $150.0 million in original principal amount Series A Notes and (ii) $87.9 million in original principal amount of Series B Notes. In addition, under the Securities Exchange Agreement, the Holders of the Series A and Series B Notes were given the right to approve certain new debt and the right to name one director to the Company's Board of Directors, who was elected to the board in June 1998 and re-elected in August 1999.

On April 9, 1999, the Company entered into Amendment No. 2 (the "*Note Amendment*") to the Securities Exchange Agreement with the Holders. Pursuant to

the Note Amendment, the outstanding principal amount of Series B Notes is convertible into shares of the Company's common stock, par value $.001 per share (the *"Common Stock"*), at a price of $2.00 per share (subject to customary anti-dilution adjustments). Prior to entering into the Note Amendment, the Series B Notes were convertible into Common Stock at a price of $3.00, which price was subject to downward (but not upward) adjustment based on prevailing market prices for the Common Stock on each of April 13, 1999 and October 13, 1999. Based on

7

CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS -- (CONTINUED)

reported closing prices for trading in the Common Stock prior to April 13, 1999, this conversion price would have been adjusted to below $2.00 on such date had the Company not entered into the Note Amendment. Pursuant to the Note Amendment, the parties also increased the interest rate applicable to the Series A Notes from 9.875% to 11.5% per annum. The Securities Exchange Agreement pursuant to which the Series A Notes and the Series B Notes were issued contains certain other customary covenants and events of default. At September 30, 1999, the Company was in compliance with all of these covenants, other than covenants relating to certain relationships its Coram Resource Network, Inc. and Coram Independent Practice Association, Inc. subsidiaries have with certain parties that were contracted to provide services pursuant to the Master Agreement, effective May 1, 1998, (the *"Master Agreement"*) with Aetna U.S. Healthcare, Inc. (*"Aetna USHC"* or *"Aetna"*) and to certain covenants relating to the capitalization of certain subsidiaries. The Company has, however, received waivers from its lenders regarding such noncompliance. In addition, the filing of the voluntary chapter 11 bankruptcy petitions by Coram Resource Network, Inc. and Coram Independent Practice Association, Inc. could have caused defaults under the Exchange Agreement had such defaults not been waived. In connection with such waivers and the waivers provided for certain matters of non-compliance with certain covenants set forth in the New Senior Credit Facility (as described below), the Company and the Holders have reached a preliminary understanding pursuant to which the Holders would agree that no interest on the Series A and Series B Notes would be due for the period from November 15, 1999 through the earlier of (i) final resolution of the litigation with Aetna or (ii) May 15, 2000. Furthermore, certain proceeds from the sale of any Company asset outside of the ordinary course of business would be applied to a partial redemption of the Series A and the Series B Notes at par in such amounts as the Holders designate, provided that such application of the proceeds derived from such sale is waived by the lenders under the New Senior Credit Facility. The precise terms of such understanding have not been finalized and there can be no assurance that such understanding will be finalized under such terms or any similar terms. There can be no assurance as to whether further covenant violations or defaults will occur in future periods and whether any necessary waivers will be forthcoming at that time. See Note 4 to the Company's Unaudited Condensed Consolidated Financial Statements. See Note 4 to the Unaudited Condensed Consolidated Financial Statements.

**Series A Notes.** The Series A Notes mature in May 2001 and bore interest at an initial rate of 9.875% per annum payable quarterly in arrears in cash or through the issuance of additional Series A Notes at the election of the Company. Pursuant to the Note Amendment, the parties increased the interest rate applicable to the Series A Notes to 11.5% per annum. The Holders can require the Company to pay interest in cash if the Company exceeds a certain interest coverage ratio. During the quarter ended September 30, 1999, interest expense on the Series A Notes was approximately $4.6 million. On October 15, 1999, additional Series A Notes totaling approximately $4.7 million were issued in lieu of a cash payment of interest due through such date.

As described above, no interest will be due on the outstanding balance under the Series A Notes for the period from November 15, 1999 through the earlier of (i) resolution of the litigation with Aetna or (ii) May 15, 2000. Following the expiration of such period of time, the interest rate applicable to the Series A Notes shall return to the prior rate, 11.5% per annum.

**Series B Notes.** The Series B Notes mature in April 2008 and bear interest at the rate of 8% per annum, payable quarterly in arrears in cash or through the

SEC Info - Coram Healthcare Corp - 10-Q - For 9/30/99

issuance of additional Series B Notes at the election of the Company. Pursuant to the Note Amendment, the outstanding principal amount of Series B Notes are convertible into shares of the Company's Common Stock at a price of $2.00 per share subject to customary anti-dilution adjustments including adjustments for sale of common stock other than pursuant to existing obligations or employee benefit plans at a price below the conversion price prevailing at the time of such sale. Cash will be paid in lieu of fractional shares upon conversion of the Series B Notes. During the quarter ended September 30, 1999, interest expense on the Series B Notes was approximately $1.8 million. On October 15,

8

CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS -- (CONTINUED)

1999, additional Series B Notes totaling approximately $1.8 million were issued in lieu of a cash payment of interest due through such date.

As described above, no interest will be due on the outstanding balance under the Series B Notes for the period from November 15, 1999 through the earlier of (i) resolution of the litigation with Aetna or (ii) May 15, 2000. Following the expiration of such period of time, the interest rate applicable to the Series B Notes shall return to the prior rate, 8.0% per annum.

The Series A and Series B Notes are redeemable, in whole or in part, at the option of the Holders thereof in connection with any change of control of the Company (as defined in the Securities Exchange Agreement), if the Company ceases to hold and control certain interests in its significant subsidiaries, or upon the acquisition of the Company or certain of its subsidiaries by a third party. In such instances, the Series A and Series B Notes are redeemable at 103% of the then outstanding principal amount plus accrued interest. The Series B Notes are also redeemable at the option of the Holders thereof upon maturity of the Series A Notes at the outstanding principal amount thereof plus accrued interest. In addition, the Series A Notes are callable at any time at 103% of the then outstanding principal amount plus accrued interest at the option of the Company.

Exchange; New Senior Credit Facility. The consummation of the Exchange was contingent upon the satisfaction of certain conditions prior to closing of the Securities Exchange Agreement on June 30, 1998. All conditions were satisfied with the exception of the condition requiring the Company to execute an agreement for a new senior credit facility. Accordingly, on June 30, 1998, the Company entered into the First Amendment and Waiver (the "Amendment") to the Securities Exchange Agreement, and the Exchange was consummated. The Amendment waived the condition under the Securities Exchange Agreement requiring the Company to execute an agreement for a new senior credit facility on or prior to June 30, 1998. In addition, under the Amendment, the Holders of the Series A and Series B Notes agreed to extend the Company up to $60.0 million of senior secured debt (the "New Senior Credit Facility"), subject to the completion of definitive agreements on or prior to September 30, 1998. On August 20, 1998, the Company entered into a definitive agreement for the New Senior Credit Facility providing for the availability of the $60.0 million facility for acquisitions, working capital, letters of credit and other corporate purposes. The availability is subject to certain borrowing base calculations as defined in the underlying agreement. The New Senior Credit Facility matures February 26, 2001 and bears an interest rate of prime plus 1.5%, payable in arrears on the first business day of each month. The interest rate was 9.75% at September 30, 1999. The New Senior Credit Facility is secured by the capital stock of the Company's subsidiaries, as well as the accounts receivable and certain other assets held by the Company and its subsidiaries. Under the New Senior Credit Facility, among other nominal fees, the Company was required to pay an upfront fee of 1.0% or $0.6 million and is liable for commitment fees on the unused facility of 3/8 of 1.0% per annum, due quarterly in arrears. During the quarter ended September 30, 1999, interest and related fees on the New Senior Credit Facility were approximately $1.1 million. In addition, the terms of the New Senior Credit Facility provide for the issuance of warrants to purchase up to 1.9 million shares of common stock of the Company at $0.01 per share, subject to customary adjustments (the "1998 Warrants"). The 1998 Warrants were valued at their fair value at the date of issuance, and were accounted for as deferred costs to be amortized over the life of the New Senior Credit Facility. The Company charged $0.4 million to interest expense during the quarter ended September 30, 1999 related to the 1998 Warrants. The terms of the New Senior Credit Facility also

provide for the issuance of letters of credit of up to $25.0 million provided that available credit would not fall below zero. As of September 30, 1999, the Holders had issued letters of credit totaling approximately $2.5 million thereby reducing the Company's availability under the New Senior Credit Facility by that amount. The terms of the New Senior Credit Facility also provide for a fee of 1.0% per annum on the outstanding letter of credit obligations, due in arrears on the first business day of each month. The terms of the New Senior Credit Facility also provide for additional fees to be paid on demand to any letter of credit issuer pursuant to the application and related documentation

9

CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS -- (CONTINUED)

under which such letters of credit are issued. As of September 30, 1999, such fees were 0.825% per annum on the amount of outstanding letter of credit obligations. The New Senior Credit Facility contains certain other customary covenants and events of default. At September 30, 1999, the Company was not in compliance with all of these covenants. In connection with the understanding regarding the waivers and interest concession described above applicable to the Securities Exchange Agreement and the Series A and Series B Notes, the Company received waivers from its lenders regarding such non-compliance for the period ended September 30, 1999 and waivers of non-compliance with such covenants for the period ending December 31, 1999. There can be no assurance as to whether further covenant violations will occur in periods ending after December 31, 1999 and whether necessary waivers will be forthcoming at that time.

At October 15, 1999, the New Senior Credit Facility had an available borrowing base of $60.0 million, of which, $37.0 million had been drawn, including $14.5 million relating to the letters of credit that had been delivered in accordance with the Master Agreement with Aetna. In addition, after deducting from the borrowing base the other letters of credit obligations totaling $2.5 million, the total available under the facility is $20.5 million as of November 15, 1999.

4. LITIGATION AND CONTINGENCIES

Litigation. As described more fully in the Company's Quarterly Report on Form 10-Q for the period ended June 30, 1999, the Company is involved in a dispute with the Internal Revenue Service ("IRS") regarding certain substantial adjustments proposed by the IRS to the prior tax liabilities of the Company. On May 14, 1999, the Company received a statutory notice of deficiency, and the alleged deficiency totaled approximately $12.7 million plus interest and penalties to be determined. The Company is contesting the notice of deficiency through administrative proceedings and litigation and will vigorously defend its position. The most significant adjustment proposed by the IRS relates to the ability of the Company to categorize certain net operating losses as specified liability losses and offset income in prior years, for which the Company has previously received refunds in the amount of approximately $12.7 million. On August 11, 1999, the Company filed a petition with the United States Tax Court contesting the notice of deficency. On October 4, 1999, the IRS responded to the petition and requested the petition be denied. Due to the uncertainty of final resolution, the Company's financial statements include a reserve for these potential liabilities. No assurance can be given that the Company will prevail given the early phase of this matter and the uncertainties inherent in any proceeding with the IRS or in litigation. If the Company does not prevail with respect to the proposed material adjustments, the financial position and liquidity of the Company could be materially adversely affected. See Note 5 to the Company's Unaudited Condensed Consolidated Financial Statements.

As described more fully in the Company's Quarterly Report on Form 10-Q for the period ended June 30, 1999, the Company is suing Price Waterhouse LLP (now known as PricewaterhouseCoopers LLP) for damages in excess of $165.0 million regarding certain claims and causes of action of Caremark International, Inc. and Caremark, Inc. (collectively, "Caremark") against Price Waterhouse LLP, Caremark's auditors. These claims and causes of action were assigned to the Company as part of the settlement that resolved a case filed by the Company against Caremark. The case is now pending in state court in Illinois. PricewaterhouseCoopers LLP filed a motion to dismiss the Company's lawsuit on several grounds, but their motion was denied on March 15, 1999. In May, 1999,

PricewaterhouseCoopers LLP filed another motion to dismiss. A hearing on the motion occurred on October 29, 1999, but the Court declined to rule and scheduled another hearing on the motion for January 28, 2000. The lawsuit has otherwise progressed into the discovery stage. There can be no assurance of any recovery from PricewaterhouseCoopers LLP.

As described more fully in the Company's Quarterly Report on Form 10-Q for the period ended June 30, 1999, the Company is involved in a lawsuit with Aetna U.S. Healthcare, Inc. ("Aetna"). The Company filed a complaint (the "Coram Complaint") against Aetna in the United States District Court for the Eastern

10

CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS -- (CONTINUED)

District of Pennsylvania (Civil Action No. 99-CV-3330) on June 30, 1999. The Coram Complaint sets forth claims against Aetna for fraud, misrepresentation, breach of contract and rescission relating to the Master Agreement between the parties for ancillary network management services through Coram's Resource Network Division ("R-Net"). Coram provided its notice of termination of the Master Agreement effective June 30, 1999. Under the arrangement, that was expected to last for five years, Coram managed and provided home health care services for over 2,000,000 Aetna enrollees in eight states for a stated monthly fee per enrollee. Coram began serving Aetna enrollees under the Master Agreement on approximately July 1, 1998. On June 30, 1999, the Company received a copy of a complaint (the "Aetna Complaint") that had been filed by Aetna on June 29, 1999 in the Court of Common Pleas of Montgomery County, Pennsylvania (Case No. 99-11025). The Aetna Complaint seeks equitable and declaratory relief to compel the Company to perform under the Agreement, including the payment of compensation to the healthcare providers that have rendered and continue to render services to Aetna's health plan members. As stated in the Aetna Complaint, Aetna disputes the Company's right to terminate the Agreement. Coram removed the Aetna Complaint to federal court, and the Aetna Complaint is also pending in the United States District Court for the Eastern District of Pennsylvania (Civil Action No. 99-CV-3378).

On July 20, 1999, Aetna filed a counterclaim against Coram in the federal court lawsuit brought by Coram (Civil Action No. 99-CV-3330) and a motion to dismiss the claims of Coram for fraud, misrepresentation and rescission of the Master Agreement (Coram has filed an opposition to the motion to dismiss.). In its counterclaim, Aetna has sued Coram for, among other things, breach of the Master Agreement and fraudulent misrepresentation, contending Coram never intended to perform the Master Agreement, defamation, interference with contractual relations with providers and for interference with prospective contractual relations with other companies that allegedly bid for the Master Agreement. Aetna seeks in excess of $100.0 million in the lawsuit, plus punitive damages.

Various motions have been filed by the parties and others in the lawsuit, including the motion to dismiss filed by Aetna referenced above, a motion by Aetna for sanctions and other relief under Rule 11 of the Federal Rules of Civil Procedure, a motion by Aetna for an equitable accounting and constructive trust on the assets of Coram and a motion to intervene filed by approximately eight entities that were providers in the network of providers assembled by the R-Net in connection with the Master Agreement. Coram has opposed all motions filed by Aetna. To date, the Court has denied Aetna's Rule 11 motion and the providers' motion to intervene. In addition, the Court issued a scheduling order that contemplates a trial in April 2000.

The Company intends to pursue its claims against Aetna vigorously and to put forth a vigorous defense against all of the claims brought by Aetna against Coram and the other Coram parties. Due to the uncertainties inherent in litigation, the ultimate disposition of the Aetna litigation described in the preceding paragraphs cannot presently be determined and no provision has been recorded in the Company's Consolidated Financial Statements for any recovery or loss that may result upon resolution of the Aetna litigation described above. An adverse outcome in such litigation could have a material adverse effect on the financial position, results of operations and liquidity of the Company.

On August 19, 1999, a small group of providers filed an involuntary chapter 11 proceeding against Coram Resource Network, Inc. (the "Resource Network"), the

principal Company subsidiary that operates the R-Net division. On November 12, the Resource Network and Coram Independent Practice Association, Inc. ("CIPA"), the other Company subsidiary involved in the operation of the R-Net division, filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware under chapter 11 of the United States Bankruptcy Code. Due to the uncertainty of proceedings in the bankruptcy court, the Company cannot predict what impact such proceedings may have on Coram or its financial position, results of operations or liquidity.

11

| 10-Q | 13th Page of 29 | | TOC | 1st | Previous | Next | Bottom | Just 13th |

CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS -- (CONTINUED)

Apria and one of its affiliates (collectively *"Apria"*) have also filed suit against the Company, the Resource Network and CIPA in the Superior Court of Orange County, California (Apria Healthcare, Inc. and Apria Healthcare of New York State, Inc. v. Coram Healthcare Corporation, Coram Resource Network, Inc. and Coram Independent Practice Association, Inc., Case No. 813264) regarding Apria's specific provider claims. Apria's complaint alleges, among other things, that the Resource Network and CIPA operated as the alter ego of Coram and, as a result, Coram should be declared responsible for the alleged breaches of the contracts that the Resource Network and CIPA had with Apria. The complaint includes requests for declaratory, compensatory and other relief in excess of $1.4 million. A notice had been filed with the Court notifying it of the involuntary bankruptcy proceeding filed against the Resource Network and the matter has, by operation of certain provisions of the United States Bankruptcy Code, been stayed with respect to the Resource Network. The filing of the voluntary bankruptcy petition by CIPA will have a similar effect on the claims against CIPA. Coram filed an answer raising applicable defenses. The Company will pursue all available grounds for dismissal and defend itself vigorously in the matter. Due to the uncertainties inherent in litigation, the ultimate disposition of this matter cannot presently be determined and no provision has been recorded in the Company's Consolidated Financial Statements for any loss that may result upon resolution of the litigation with Apria.

The Company is also a party to various other legal actions arising out of the normal course of its business. Management believes that the ultimate resolution of such other actions will not have a material adverse effect on the financial position, results of operations or liquidity of the Company. Nevertheless, due to the uncertainties inherent in litigation, the ultimate disposition of these actions cannot presently be determined.

Contingencies. The Master Agreement between Coram and Aetna provides that Coram would be financially responsible for certain covered home health services rendered to covered enrollees in certain Aetna HMO based plans. The Master Agreement also contemplates that the Company under certain circumstances, would reimburse Aetna for services paid for directly by Aetna to providers of such services. These amounts are referred to in the Master Agreement as *"leakage."* Aetna withheld certain amounts from each capitation payment made to the Company as a reserve for the reimbursement of leakage claims. During the term of the Master Agreement, approximately $5.3 million was withheld by Aetna for payment of leakage.

The Master Agreement required Aetna to provide the Company with monthly reports showing its claims for leakage, but Aetna failed to do so. The most recent report that Aetna did provide purported to show approximately $19.7 million in leakage claims incurred through approximately March 1999, with potentially more leakage claims to follow. The Company's review of the initial reports revealed that the reports were inaccurate in various respects. The Company reported these inaccuracies to Aetna, but received no response. At this time, the Company cannot determine whether it will be held responsible for the leakage claims asserted by Aetna due to the uncertainties of litigation and cannot estimate how much, if any, of the leakage claims are properly the responsibility of the Company. These matters are among the issues in dispute in the litigation described above.

5. INCOME TAXES

During the nine months ended September 30, 1999 and 1998, the Company

recorded an income tax expense of $0.4 million and $1.9 million, respectively. The effective income tax rates for the nine month periods ended September 30, 1999 and 1998 differ substantially from the expected combined federal and state income tax rates calculated using applicable statutory rates as a result of the Company providing a full valuation reserve against its deferred tax assets.

As of September 30, 1999, deferred tax assets are net of a $149.9 million valuation allowance. Realization of deferred tax assets is dependent upon the ability of the Company to generate taxable income in the future. Deferred taxes relate primarily to temporary differences consisting, in part, of accrued restructuring costs, the

12

CORAM HEALTHCARE CORPORATION

NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS -- (CONTINUED)

charge for goodwill and other long-lived assets, allowances for doubtful accounts and other accrued liabilities that are not deductible for income tax purposes until paid or realized and to net operating loss carryforwards that are deductible against future taxable income.

In January 1999, the Internal Revenue Service ("*IRS*") completed the examination of the federal income tax return of the Company for the year ended September 30, 1995, and proposed substantial adjustments to the prior tax liabilities of the Company. The Company has agreed to adjustments of $24.4 million that only affect the net operating loss carryforwards available. The Company does not agree with the other proposed adjustments regarding the deduction of warrants, write-off of goodwill and the specified liability portion of the 1995 loss which would, if the IRS prevails, affect the prior years' tax liabilities. On May 14, 1999, the Company received a statutory notice of deficiency with respect to the proposed adjustments. The alleged deficiency totaled approximately $12.7 million plus interest and penalties to be determined. The Company is contesting the notice of deficiency through administrative proceedings and litigation, and will vigorously defend its position. The most significant adjustment proposed by the IRS relates to the ability of the Company to categorize certain net operating losses as specified liability losses and offset income in prior years, for which the Company has previously received refunds in the amount of approximately $12.7 million. On August 11, 1999, the Company filed a petition with the United States Tax Court contesting the notice of defiency. On October 4, 1999, the IRS responded to the petition and requested the petition be denied. Due to the uncertainty of final resolution, the Company's financial statements include a reserve for these potential liabilities. No assurance can be given that the Company will prevail given the early phase of this matter and the uncertainties inherent in any proceeding with the IRS or in litigation. If the Company does not prevail with respect to the proposed material adjustments, the financial position and liquidity of the Company could be materially adversely affected.

6. INDUSTRY SEGMENT AND GEOGRAPHIC AREA OPERATIONS

Management regularly evaluates the operating performance of the Company by reviewing results on a product or service provided basis. The Company's reportable segments are Infusion, R-Net and CPS. Infusion is the Company's base business, which derives its revenue primarily from alternate site infusion therapy. R-Net's revenue is derived primarily from management services offered to HMOs, PPOs, at-risk physician groups and other managed care organizations for home health services. CPS primarily provides specialty mail-order pharmacy and pharmacy benefit management services. The other non-reportable segment represents lithotripsy services for the three and nine months ended September 30, 1998 and clinical trials and informatics services for the three and nine months ended September 30, 1999. See Note 4 to the Unaudited Condensed Consolidated Financial Statements.

Coram uses earnings before interest expense, income taxes, depreciation and amortization ("*EBITDA*") for purposes of performance measurement. The measurement basis for segment assets includes net accounts receivable, inventory, net property and equipment, and other current assets.

13

# CORAM HEALTHCARE CORPORATION

## NOTES TO UNAUDITED CONDENSED CONSOLIDATED
## FINANCIAL STATEMENTS -- (CONTINUED)

Summary information by segment is as follows (in thousands):

*Enlarge/Download Table*

|  | AS OF AND FOR THE THREE MONTHS ENDED SEPTEMBER 30, | | AS OF AND FOR THE NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
|  | 1999 | 1998 | 1999 | 1998 |
| **INFUSION** |  |  |  |  |
| Revenue from external customers............ | $109,434 | $100,751 | $323,469 | $284,275 |
| Intersegment revenue...................... | 4,260 | 4,960 | 19,665 | 12,275 |
| Interest income........................... | 15 | 19 | 60 | 51 |
| Equity in net income of unconsolidated joint ventures.............................. | 193 | 55 | 194 | 102 |
| Segment EBITDA profit...................... | 14,783 | 15,792 | 38,038 | 43,813 |
| Segment assets............................ | 146,693 | 122,305 | 146,693 | 122,305 |
| Segment asset expenditures................ | 835 | 1,194 | 3,291 | 3,487 |
| **R-NET** |  |  |  |  |
| Revenue from external customers............ | $ 10,293 | $ 29,674 | $ 70,125 | $ 51,067 |
| Intersegment revenue...................... | -- | -- | -- | -- |
| Interest income........................... | 9 | 3 | 25 | 10 |
| Equity in net income of unconsolidated joint ventures.............................. | -- | -- | -- | -- |
| Segment EBITDA loss........................ | (3,613) | 893 | (28,111) | (814) |
| Segment assets............................ | 17,879 | 9,618 | 17,879 | 9,618 |
| Segment asset expenditures................ | 67 | 893 | 880 | 1,494 |
| **CPS** |  |  |  |  |
| Revenue from external customers............ | $ 22,644 | $ 13,169 | $ 62,310 | $ 32,469 |
| Intersegment revenue...................... | 966 | 427 | 1,582 | 927 |
| Interest income........................... | -- | -- | -- | -- |
| Equity in net income of unconsolidated joint ventures.............................. | -- | -- | -- | -- |
| Segment EBITDA profit...................... | 502 | 723 | 1,908 | 1,561 |
| Segment assets............................ | 20,283 | 9,148 | 20,283 | 9,148 |
| Segment asset expenditures................ | 628 | 25 | 1,450 | 177 |
| **ALL OTHER** |  |  |  |  |
| Revenue from external customers............ | $    861 | $     13 | $  1,079 | $    658 |
| Intersegment revenue...................... | -- | -- | -- | -- |
| Interest income........................... | -- | -- | -- | -- |
| Equity in net income of unconsolidated joint ventures.............................. | -- | -- | -- | -- |
| Segment EBITDA profit (loss)............... | 124 | 1 | (79) | 294 |
| Segment assets............................ | 178 | -- | 178 | -- |
| Segment asset expenditures................ | -- | -- | -- | -- |

14

## CORAM HEALTHCARE CORPORATION

### NOTES TO UNAUDITED CONDENSED CONSOLIDATED
### FINANCIAL STATEMENTS -- (CONTINUED)

A reconciliation of the Company's segment revenue, segment EBITDA profit (loss), segment assets and other significant items to the corresponding amounts in the Consolidated Financial Statements are as follows (in thousands):

· *Enlarge/Download Table*

|  | AS OF AND FOR THE THREE MONTHS ENDED SEPTEMBER 30, | | AS OF AND FOR THE NINE MONTHS ENDED SEPTEMBER 30, | |
|  | 1999 | 1998 | 1999 | 1998 |
| --- | --- | --- | --- | --- |
| **NET REVENUES** | | | | |
| Total for reportable segments.............. | $147,597 | $148,981 | $477,151 | $381,013 |
| Other revenue............................. | 861 | 13 | 1,079 | 658 |
| Elimination of intersegment revenue........ | (5,226) | (5,387) | (21,247) | (13,202) |
| Total consolidated revenue....... | $143,232 | $143,607 | $456,983 | $368,469 |
| **LOSS BEFORE INCOME TAXES AND MINORITY INTERESTS** | | | | |
| Total EBITDA profit for reportable segments................................. | $ 11,672 | $ 17,408 | $ 11,835 | $ 44,560 |
| Other EBITDA profit (loss)................. | 124 | 1 | (79) | 294 |
| Goodwill amortization expense.............. | (2,711) | (2,794) | (8,159) | (8,337) |
| Depreciation and other amortization expense................................. | (2,763) | (2,851) | (8,515) | (8,788) |
| Interest expense........................... | (8,110) | (6,114) | (22,193) | (26,372) |
| All other income (expense), net........... | (13,078) | (7,789) | (24,877) | (21,034) |
| Loss before income taxes and minority interests.......................... | $(14,866) | $ (2,139) | $(51,988) | $(19,677) |
| **ASSETS** | | | | |
| Total assets for reportable segments....... | $184,855 | $141,071 | $184,855 | $141,071 |
| Other assets............................... | 251,821 | 293,628 | 251,821 | 293,628 |
| Consolidated total assets............. | $436,676 | $434,699 | $436,676 | $434,699 |

For each of the years presented, the Company's primary operations and assets were within the United States. The Company maintains an infusion operation in Canada; however, the assets and revenue generated from this business are not material to the Company's operations.

Net revenue from one customer for the Company's reportable segments represented approximately 8% and 19%, respectively, of the Company's total consolidated net revenue for the three months ended September 30, 1999 and 1998, and 15% and 11%, respectively, for the nine months ended September 30, 1999 and 1998. Net revenue from the Medicare and Medicaid programs for the Company's Infusion and CPS segments represented approximately 19% and 18%, respectively, of the Company's total consolidated net revenue for the three months ended September 30, 1999 and 1998, and 18% and 21%, respectively, for the nine months ending September 30, 1999 and 1998.

## 7. SUBSEQUENT EVENTS

On October 29, 1999, the Company announced that Donald J. Amaral, the Company's Chairman of the Board and former Chief Executive Officer, would return as the Company's Chief Executive Officer on an interim basis as the Company searches for a new Chief Executive Officer following the departure of Richard M. Smith.

On November 12, 1999, two Company subsidiaries that comprised the R-Net

division filed voluntary bankruptcy petitions under Chapter 11 of the United
States Bankruptcy Code. See Note 4 to these Unaudited Condensed Consolidated
Financial Statements.

15

A146

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

This Quarterly Report on Form 10-Q contains certain *"forward-looking"* statements (as such term is defined in the Private Securities Litigation Reform Act of 1995) and information relating to Coram that are based on the beliefs of the management of Coram as well as assumptions made by and information currently available to the management of Coram. The Company's actual results may vary materially from the forward-looking statements made in this report due to important factors such as: history of operating losses and uncertainties associated with future operating results; significant outstanding indebtedness; equity conversion rights held by existing debt holders; limited liquidity; reimbursement related risks; shifts in the mix of parties that pay for the Company's services; dependence on relationships with third parties; concentration of large payors; industry competition; timing of or ability to complete acquisitions; government regulation of the home health care industry; the outcome of certain litigation with Aetna and the IRS; dependence on key personnel; recruitment and retention of trained personnel; potential volatility of stock price; New York Stock Exchange listing status; and unanticipated impacts from the Year 2000 Issue. See Item 7 -- *"Management's Discussion and Analysis of Financial Condition and Results of Operations -- Risk Factors"* in the Company's Annual Report on Form 10-K, as amended, for the year ended December 31, 1998. When used in this report, the words *"estimate," "project," "believe," "anticipate," "intend," "expect"* and similar expressions are intended to identify forward-looking statements. Such statements reflect the current views of Coram with respect to future events based on currently available information and are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in such forward-looking statements. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. Coram does not undertake any obligation to release publicly any revisions to these forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

Background

General. The Company has been engaged in four principal lines of business: alternate site (outside the hospital) infusion therapy and related services, ancillary network management services, pharmacy benefit management and specialty mail-order pharmacy services and centralized management, administrative and clinical support for clinical research trials and medical informatics services. Other services offered by Coram include non-intravenous home health products such as durable medical equipment and respiratory therapy services.

Business Strategy. The Company's overall business strategy is focused on the basic factors that could lead to profitability: strategic revenue generation programs, cost reduction and control, quality improvement and cash collections. The Company's revenue generation programs include a focus on business relationships where the Company can provide high quality of care while operating profitably. In the Company's alternate site infusion therapy business, the Company is continuing to emphasize marketing efforts aimed at improving its therapy mix, physician relationships and payor relationships. It also has continued the development of its specialty programs aimed at serving patients requiring intravenous nutrition; pre- and post-transplant patients; patients with HIV/AIDS; and patients with chronic disorders such as hemophilia, immune deficiencies and alpha-one antitrypsin deficiency. To that end, the Company has established the Coram Hemophilia Services division to provide focus on developing a service model geared toward meeting the needs of persons with hemophilia through a specialized distribution center staffed with experienced clinicians to serve the division's customers. The Company is developing similar focus programs for its nutrition and transplant services. Meanwhile, the CPS

division has focused its marketing efforts on smaller health plans, including companies with self-insured plans, self-funded employer health plans, labor unions, managed care payors and patient populations with specialized needs such as pre- and post-transplant patients, patients with HIV/AIDS and chronic conditions such as diabetes and asthma. The Company is pursuing a plan to expand the reach of the CPS division by developing the capability to accept orders for its specialty mail-order pharmacy services over the internet. The site is now accessable at www.corampharmacy.com and CPS anticipates generating revenues over the internet beginning in 2000. The Clinical Trials and Informatics division is directing its marketing efforts toward pharmaceutical and medical device manufacturers that can benefit from the centralized

16

management, data collection and integration services offered by the Company that can provide these manufacturers with the opportunity to complete some of the most challenging aspects of their clinical trials more quickly.

The Company has implemented cost reduction and control programs focused on the reduction and control of cost of services and operating expenses, assessment of poorly performing branches and review of branch efficiencies. Delivery of quality service in the Company's infusion therapy division in particular is being closely monitored through an internal task force, more rigorous reporting and independent patient satisfaction surveys. Furthermore, management throughout the Company is continuing to concentrate on reimbursement by emphasizing improved billing and cash collections methods and continued assessment of systems support and support for reimbursement.

Following the filing of voluntary bankruptcy petitions by its Coram Resource Network, Inc. ("Resource Network") and Coram Independent Practice Association, Inc. ("CIPA") (collectively, "R-Net") subsidiaries, the Company anticipates that R-Net will cease offering ancillary network management services, and the services performed by R-Net will be transitioned back to the payor customers of R-Net.

The Company has engaged Deutsche Bank Alex. Brown to assess strategic alternatives for CPS, including the possible sale of CPS to a third party. If consummated, a sale of CPS could assist the Company in paying down its debt and improving its financial position.

Strategic alternatives currently being considered by the Company in addition to the CPS strategic analysis and the Coram Hemophilia Services division include the continued investment into and development of services provided by the Clinical Trials and Informatics division. There can be no assurance that any growth in its local or regional business or other strategic alternatives will be effected or will be available to the Company on commercially acceptable terms and there can be no assurance that any investment capital will be available to the Company.

**Factors Affecting Recent Operating Results**

Dispute with Aetna U.S. Healthcare, Inc. On June 30, 1999, the Company notified Aetna that effective immediately Coram had terminated the Master Agreement. The Company is now in litigation with Aetna, and the case is presently scheduled for trial in April 2000. See Note 4 to the Unaudited Condensed Consolidated Financial Statements.

The Company's performance under the Master Agreement during the nine month period ended September 30, 1999, resulted in losses under the agreement of approximately $(24.0) million, including costs of services paid and accrued of approximately $55.4 million. During the three month period ended September 30, 1999, the Company recorded no losses or costs of service related to performance under the Master Agreement. These figures do not take into account the various claims of Aetna including its leakage claims. Also, due to the uncertainties of litigation in calculating these losses Coram did not include as part of the recognized revenue the amounts previously retained by Aetna for alleged leakage claims and included only the actual capitation payments received as revenue. As alleged in the lawsuit, the Company believes that termination of the Master Agreement was proper based upon non-payments by Aetna and was a necessary step toward terminating a fraudulently induced contract that was financially burdensome on the Company. The Company took a charge in its third quarter financial statements for costs associated with terminating the Master Agreement in the amount of $5.1 million. See Note 4 to the Unaudited Condensed Consolidated Financial Statements.

For the three month period ended September 30, 1999, the Company had no
revenue related to performance of the Master Agreement and for the nine month
period ended September 30, 1999 this revenue represented approximately 8% of the
Company's total revenue. Apart from the Master Agreement, Coram's infusion
therapy branches have historically served Aetna enrollees under various
agreements, including a national ancillary services agreement executed in April
1998 for home infusion services furnished to Aetna enrollees not covered by the
Master Agreement. The aggregate revenue of the Company related to all of its
relationships with Aetna for the three and nine months ended September 30, 1999
was approximately 8% and

17

**A150**