15%, respectively. The Company received notice from Aetna that it terminated the April 1998 national agreement for infusion services effective April 12, 2000. The CPS division received notice from Aetna that Aetna did not intend to renew its agreement with CPS that was scheduled to expire in accordance with its terms on September 30, 1999.

The termination of the Master Agreement and related dispute with Aetna may have other negative effects on the Company's Resource Network division and in the Company's infusion business if, for example, Aetna refuses to pay claims for the services rendered by Coram to Aetna enrollees that are serviced outside the Master Agreement or if Aetna causes its newly acquired Prudential affiliates to cease doing business with Coram. The Company cannot predict the ultimate impact the dispute with Aetna may have, but if the Company does not prevail in its dispute with Aetna, the Company could incur additional substantial losses. Further, the Company anticipates that it will continue to incur significant legal fees associated with pursuing the litigation related to the dispute with Aetna.

Other Factors Affecting Recent Operating Results. Other significant factors currently affecting the Company's operating performance and financial condition are as follows:

(i) restructure of its credit facilities through the repayment of its former senior credit facility in January 1998, the exchange of its former subordinated debt for the issuance of the Series A Notes and the Series B Notes in June 1998, the establishment of the New Senior Credit Facility in August 1998 and the setting of the conversion price applicable to the Series B Notes contemplated by the April 1999 amendment to the Securities Exchange Agreement offset by the increased interest rate applicable to the Series A Notes also included in such April 1999 amendment;

(ii) expansion and improved sales efforts in the Company's CPS division;

(iii) ongoing pricing pressure in the Company's infusion business as a result of an unfavorable shift in payor mix from private indemnity insurers to managed care organizations and other contracted payors, and intense competition among infusion providers. The following table sets forth the approximate percentages of the Company's infusion therapy net revenue from certain categories of payors:

· Download Table

| | THREE MONTHS ENDED SEPTEMBER 30, | |
| --- | --- | --- |
| | 1999 | 1998 |
| | ---- | ---- |
| Private Indemnity Insurance and Other Non-Contracted Payors................................................ | 21% | 23% |
| Managed Care Organizations and Other Contracted Payors..... | 57% | 54% |
| Medicare and Medicaid Programs........................... | 22% | 23% |
| | --- | --- |
| Total.............................................. | 100% | 100% |
| | === | === |

(iv) increased competition from hospitals and physicians that have sought to increase the scope of services they offer through their facilities and offices, including services similar to those offered by the

Company, or that have entered into risk-bearing relationships with third-party payors pursuant to which they have been delegated control over the provision of a wide variety of health care services, including the services offered by the Company; and

    (v) increased clinical staffing, delivery, on-call, and other volume related costs, as well as, increased costs of certain blood and blood derivative products that are in short supply that have been required by the increasing numbers of patients served by the Company's infusion division and the increasing numbers of patients receiving the therapies that require the products that are in short supply.

On October 26, 1999, the Company received notice that Bayer Corporation, the manufacturer of Prolastin(R), a drug furnished by the Company to persons with a chronic condition called alpha-1 antitrypsin defiency, would cease selling this drug to all traditional suppliers of this drug, including the Company. Bayer informed the Company and end users of the product that the product would only be available through an exclusive distribution source sponsored by Bayer. During the three and nine months ended September 30,

18

1999, revenues from sales of Prolastin(R) and related services were $2.1 million and $6.6 million, respectively. Because Bayer is the only source for Prolastin(R), the Company has been forced to make arrangements with its patients to transition their service to Bayer once the Company's supply of Prolastin(R) has been depleted. The Company has learned that Bayer may implement similar distribution programs for other drugs it manufactures, including Gamimune(R).

Results of Operations

Three Months Ended September 30, 1999 Compared With Three Months Ended September 30, 1998 (unaudited)

Net Revenue. Net revenue decreased $0.4 million or (0.3%), to $143.2 million in the quarter ended September 30, 1999 from $143.6 million in the quarter ended September 30, 1998. The decrease is primarily due to a (i) $14.0 million decrease in net revenue from the R-Net division primarily relating to the termination of the Aetna Master Agreement, and (ii) $12.7 million increase in net revenue from the infusion business and CPS division due to an overall increase in patients served, generated by internal sales growth. See "Factors Affecting Recent Operating Results."

Gross Profit. Gross profit decreased $2.3 million, to $32.9 million or a gross margin of 23.0% in the quarter ended September 30, 1999 from $35.2 million or a gross margin of 24.5% in the quarter ended September 30, 1998. See "Factors Affecting Recent Operating Results."

Selling, General and Administrative Expenses. SG&A increased $3.3 million or 13.2% to $28.3 million in the quarter ended September 30, 1999 from $25.0 million in the quarter ended September 30, 1998. The increase is due primarily to the growth of the CPS division as well as legal fees incurred in conjunction with the dispute with Aetna. See "Factors Affecting Recent Operating Results."

Interest Expense. Interest expense increased by $2.0 million to $8.1 million in the three months ended September 30, 1999 from $6.1 million during the three months ended September 30, 1998. The increase is attributable to the addition of draws of $22.5 million on the Senior Credit Facility, a $8.3 million increase in the principal amount outstanding under the Series A Senior Subordinated Unsecured Notes, a $1.8 million increase in the principal amount outstanding under the Series B Senior Subordinated Unsecured Notes, and a rate change on the Series A Notes from 9.875% to 11.5% beginning on April 9, 1999.

The Company anticipates that interest due related to the Series A and Series B notes will be reduced by as much as $13 million over the six month period beginning November 15, 1999 as a result of the preliminary understanding the Company has reached with the Holders of such notes. See Note 3 to the Unaudited Condensed Consolidated Financial Statements.

Operating Income (Loss). The Company had an operating loss of ($7.3) million during the three months ended September 30, 1999 compared to operating income of $3.6 million during the three months ended September 30, 1998. The decline is due primarily to the decrease in gross profit of $2.4 million and the increase in SG&A of $3.3 million, as described above.

Restructuring Costs. The Company recorded cost of a restructuring plan during the third quarter in the amount of $5.1 million associated with the reorganization of the R-Net division's Whippany, New Jersey call center operations.

Net Loss. Net loss for the quarter ended September 30, 1999 was ($15.2) million compared to ($2.8) million for the quarter ended September 30, 1998. As discussed above, the decline can be attributed to the decrease in operating

income and the increase in interest expense. See "*Factors Affecting Recent Operating Results*."

    Nine Months Ended September 30, 1999 Compared With Nine Months Ended September 30, 1998 (unaudited)

    Net Revenue. Net revenue increased $88.5 million or 24.0%, to $457.0 million in the nine months ended September 30, 1999 from $368.5 million in the nine months ended September 30, 1998. The increase is

19

A154

primarily due to a (i) $26.9 million increase in net revenue from the infusion business primarily due to a 5.5% increase in patient census and partially offset by an unfavorable shift in payor mix; (ii) $32.2 million increase in net revenue from the R-Net division primarily relating to the termination of the Aetna Master Agreement that was subsequently terminated effective June 30, 1999; and (iii) $28.9 million increase in net revenue from the CPS division resulting from an increased number of patients served, generated by internal sales growth. See *"Factors Affecting Recent Operating Results."*

Gross Profit. Gross profit decreased $16.1 million to $77.0 million or a gross margin of 16.9% in the nine months ended September 30, 1999 from $93.1 million or a gross margin of 25.3% in the nine months ended September 30, 1998. The decrease results primarily from the increase in net revenue, discussed above, in the Infusion and CPS divisions, offset by an increase in cost of service associated with the Aetna Master Agreement, variable costs that fluctuate with the number of patients served and higher costs of drugs and supplies caused by current market shortages of certain blood products. See *"Factors Affecting Recent Operating Results."*

Selling, General and Administrative Expenses. SG&A increased $11.8 million or 17.1%, to $80.8 million in the nine months ended September 30, 1999 from $69.0 million in the nine months ended September 30, 1998. The increase is due primarily to the growth of the infusion business, R-Net division, and the CPS division as well as legal fees incurred in conjunction with the Aetna dispute. Expenses increased primarily from business growth for salary and benefits along with costs associated with additional personnel such as additional rent for office space, telephone, and legal fees incurred in conjunction with the dispute with Aetna. See *"Factors Affecting Recent Operating Results."*

Operating Income (Loss). The Company had an operating loss of ($30.8) million during the nine months ended September 30, 1999 compared to operating income of $4.6 million during the nine months ended September 30, 1998. The decrease in operating income is due primarily to the decline in gross profit of $16.1 million, coupled with an increase of $11.8 million in SG&A for the quarter ended September 30, 1999.

Restructuring Costs. The Company recorded approximately $0.9 million of charges in March 1999 relating to reorganization of the Company's management structure completed during the first quarter of 1999. During the third quarter of 1999, the Company recorded costs of a restructuring plan in the amount of $5.1 million associated with the reorganization of the R-Net division's Whippany, New Jersey call center operations.

**Interest Expense.** Interest expense decreased by $4.2 million to $22.2 million in the nine months ended September 30, 1999 from $26.4 million during the nine months ended September 30, 1998. The decrease is due primarily to a decrease of $10.3 million in interest related to the Rollover Note which was cancelled in connection with the Securities Exchange Agreement and a decrease of $3.2 million in interest relating to the Warrants issued under the Rollover Note, offset by interest related to the Securities Exchange Agreement of $7.1 million. See Note 3 to the Unaudited Condensed Consolidated Financial Statements.

The Company anticipates that interest due related to the Series A and Series B notes will be reduced by as much as $13 million over the six month period beginning November 15, 1999 as a result of the preliminary understanding the Company has reached with the Holders of such notes. See Note 3 to the Unaudited Condensed Consolidated Financial Statements.

Net Loss. During the nine months ended September 30, 1999, the Company recognized a net loss of ($53.5) million compared to a net loss of ($22.5)

Case 1:04-cv-01565-SLR - Document 124-6    Filed 04/17/2007    Page 6 of 30

million during the nine months ended September 30, 1998. As discussed above, the decline can be attributed to the decrease in operating income (loss), partially offset by a decrease in interest expense. See "*Factors Affecting Recent Operating Results.*"

   Liquidity and Capital Resources

   The Company uses cash generated from operations and available credit under the New Senior Credit Facility to fund its working capital requirements and operations. The Company's working capital as of September 30, 1999 was $70.1 million compared to $64.6 million at December 31, 1998, an increase of $5.5 million. During the nine months ended September 30, 1999, the primary increases in current assets

20

SEC Info - Comprehensive Care Corp - 10-Q - For 9/30/99 - Document 124-6 · Filed 04/17/2007 · Page 7 of 30 Page 40 of 55

| 10-Q | 22nd Page of 29 | | TOC | 1st | Previous | Next | Bottom | Just 22nd |

related to (i) an increase in cash and cash equivalents of $8.4 million; (ii) an increase in net accounts receivable of $12.5 million, primarily due to an approximate eight day increase in days sales outstanding (DSO) and additional sales volume at the CPS division; and (iii) a decrease in inventory of $8.4 million. The increase in cash and cash equivalents was primarily due to borrowings, net of repayments, on the New Senior Credit Facility. Property and equipment purchases consisted of $2.8 million for computer systems and software, $1.8 million for furniture, equipment, and improvements, and the purchase of durable medical equipment for $2.1 million. Total current liabilities increased in the nine months ended September 30, 1999 primarily due to an increase in accounts payable of $2.7 million and an increase in accrued merger and restructuring costs of $2.7 million.

As of September 30, 1999, the Company did not have any material commitments for capital expenditures.

Under the terms of the New Senior Credit Facility, the maximum funds available to the Company (defined as the "Revolving Credit Commitment") is an amount equal to the lesser of (a) the Company's borrowing base as calculated pursuant to the agreement or (b) the total revolving credit commitment of $60.0 million. As of September 30, 1999, the Company's Revolving Credit Commitment was $59.3 million. Offset by letter of credit obligations of $2.5 million and revolver borrowings of $37.0 million, the total available credit under the New Senior Credit Facility was $19.8 million as of September 30, 1999. As of October 15, 1999, the Company's Revolving Credit Commitment was $60.0 million. Of that amount, $37.0 million had been drawn against the New Senior Credit Facility, which includes $14.5 million relating to the letters of credit that had been delivered in accordance with the Aetna Master Agreement. In addition, after deducting the other letters of credit obligations totaling $2.5 million, the total available under the facility is $20.5 million as of October 15, 1999. As of September 30, 1999, the Company was not in compliance with certain financial and other covenants set forth in its principal debt agreements. The Company has received waivers with regard to such non-compliance. In addition, the Company has reached an understanding with its lenders pursuant to which they have waived non-compliance with certain covenants under the New Senior Credit Facility for the period ending December 31, 1999. The understanding also includes provisions whereby: (a) no interest would be due on the Series A and Series B Notes for the period from November 15, 1999 though the earlier of (i) final resolution of the litigation with Aetna or (ii) May 15, 2000; and (b) certain proceeds from the sale of any Company asset outside of the ordinary course of business would be applied to a partial redemption of the Series A and the Series B notes at par in such amounts as the Holders of the Series A and Series B Notes designate, provided that such application of the proceeds derived from such sale is waived by the lenders under the New Senior Credit Facility. The precise terms of such understanding have not been finalized and there can be no assurance that such understanding will be finalized under such terms. There can be no assurance as to whether further covenant violations or defaults will occur in future periods and whether any necessary waivers will be forthcoming at that time. See Note 3 to the Unaudited Condensed Consolidated Financial Statements.

The Company has experienced pressure on liquidity due to the higher than expected costs of service as described above with respect to the Master Agreement and Aetna's draws on letters of credit that increased outstanding debt by $14.5 million. Although the Company has sought to record a good faith estimate of all service costs related to the Master Agreement, due to the uncertainties of litigation, there can be no assurance that the exact amount and nature of all such costs can be presently identified. The Company is continuing to assess the impact of the Master Agreement. The Company is also reviewing its business plan and formulating revised plans for operations and cash flow without the Master Agreement. The Company is considering strategic alternatives to provide any needed liquidity including a possible transaction with its CPS

division. There can be no assurance that the Company will be able to obtain any
needed liquidity on commercially acceptable terms.

The Company believes the most significant risk with the Year 2000 problem
is the effect such issues may have on third party payors, such as Medicare.
While all of the effects of such noncompliance have not been identified by the
Company, any failure of these third party payors to resolve Year 2000 problems
in a timely manner could impact the Company's capital availability due to a slow
down in the payment of accounts receivable associated with these payors. While
the Company has not incurred any payment issues to date which management can
directly attribute to the Year 2000 problem in connection with any specific
payor, no

21

assurance can be made that payment issues will not occur. Such an impact could have a material adverse effect on the Company's ability to generate cash from operations and require the Company to use available capital from the New Senior Credit Facility. Significant delays in collecting accounts receivable due to Year 2000 problems experienced by third party payors could reduce the capital available to the Company by reducing the borrowing base under the terms of the New Senior Credit Facility. In addition, such payment delays due to the Year 2000 problem could impact the Company's ability to meet its debt obligations.

Of the $6.7 million of remaining accrued restructure costs, the Company estimates that the future cash expenditures will be made in the following periods: 36% through September 30, 2000, 17% through September 30, 2001, 17% through September 30, 2002, and 30% through September 30, 2003, and thereafter. Although subject to future adjustment and the Company's ability to successfully implement its business strategy, the Company believes it has adequate reserves and liquidity as of September 30, 1999 to meet future expenditures related to the plans. However, there is no assurance that the reserves will be adequate or that the Company will generate sufficient working capital to meet future expenditures.

Year 2000 Issues

Background. Some computers, software and other equipment include programming code in which calendar year data is abbreviated to only two digits. As a result of this design decision, some of these systems could fail to operate or fail to produce correct results if "00" is interpreted to mean 1900, rather than 2000. These problems are widely expected to increase in frequency and severity as the year 2000 approaches and are commonly referred to as the "Millennium Bug" or "Year 2000 Problem."

Assessment. The Year 2000 Problem could affect computers, software, and other equipment used, operated or maintained by the Company. Accordingly, the Company is reviewing its internal computer programs and systems to ensure that the programs and systems will be Year 2000 compliant.

Internal Infrastructure. The Company believes that it has identified substantially all of the major computers, software applications, and related equipment used in connection with its internal operations that must be modified, upgraded, or replaced to minimize the possibility of material disruption to its business. The Company has completed the majority of activity related to the modification, upgrade or replacement of all major systems that have been identified as adversely affected by Year 2000. To date, all work has been completed, fully tested and systems for asset tracking, general accounting, payroll, branch operations including admissions, pharmacy management, billing, collections and inventory are fully operational and in compliance. Systems for the R-Net division are compliant for billing and collections. Systems that support the CPS division for both the pharmacy benefit management and mail order pharmacy systems have been completed. Systems that support the Home Medical Equipment locations have been upgraded and are also in operation. Current plans call for the Company to complete final systems remediation by September 30, 1999. These areas of remediation include the upgrade of the Resource Network claims adjudication system, final deployment of our inventory management system, minor turnkey software upgrades to our data communications hardware and upgrade or replacement of personal computer equipment that does not support Year 2000 calculations.

Suppliers. At the end of 1998, the Company formally communicated with its major suppliers to identify any potential adverse situations. During the first six months of 1999, the Company reviewed these responses and worked to resolve issues involving the Year 2000 problem. However, the Company has limited or no control over the actions of these suppliers. Thus, while the Company believes it

has resolved all significant Year 2000 Problems with these suppliers, there can be no assurance that these suppliers will resolve any or all Year 2000 Problems with any of its customers. Any failure of these suppliers to resolve Year 2000 Problems with their systems in a timely manner could have a material adverse effect on the Company's business, financial condition, and results of operations.

Third Party Payors. Management believes that the most significant risk to the Company for the Year 2000 Problem is the effect such issues may have on third party payors, such as Medicare. News reports have indicated that various agencies of the federal government are having difficulty becoming Year 2000 compliant before the Year 2000. The Company has not yet undertaken quantification of the effects of such noncompliance or to determine whether such quantification is even possible. The Company has communicated

22

with its third party payors to identify and, to the extent possible, to resolve issues involving the Year 2000 Problem. However, the Company has limited or no control over the actions of these third party payors. Thus, while the Company expects that it will be able to resolve any significant Year 2000 Problems with these payors, there can be no assurance that these payors will resolve any or all Year 2000 Problems with their systems before the occurrence of a material disruption to the business of the Company. Any failure of these third party payors to resolve Year 2000 Problems with their systems in a timely manner could have a material adverse effect on the Company's business, financial condition, and results of operations.

Remediation Costs. The Company is using internal and external resources to reprogram or replace, test and implement the software and equipment modifications required under this project. The total cost of the Year 2000 remediation project is estimated at $0.8 million and is being funded through operating cash flows. As of the nine months ended September 30, 1999, the Company had incurred approximately $0.6 million related to this remediation process. Of these costs, $0.5 million has been expensed and $0.2 million was capitalized as new equipment or software. All of the remaining estimated remediation costs of $0.1 million relate to equipment and software. This estimate is being monitored and will be revised in future public filings by the Company as additional information becomes available.

Contingency Plans. The Company's focus in the area of contingency plans is primarily on the development of plans to ensure the continuation of patient care in the event of system failures related to Year 2000 that are beyond our control. The types of contingencies for which plans are being developed include: local telephone system failures, local power grid failures and inadequacy/unavailability of medical supplies. In addition, although the Company believes that remediation of its internal systems was substantially complete as of September 30, 1999, contingency plans have also been developed to ensure appropriate personnel are immediately available to address any situation in the event of an unanticipated failure.

Management believes that it is not possible to determine with complete certainty that all Year 2000 Problems affecting the Company have been identified or corrected. The number of devices that could be affected and the interactions among these devices are simply too numerous. In addition, the Company cannot accurately predict how many Year 2000 Problems related failures will occur or the severity, duration or financial consequences of any inevitable failures. The information set forth herein is designed as a *"Year 2000 Readiness Disclosure"* under the Year 2000 Information and Readiness Disclosure Act of 1998.

Future Health Care Proposals and Legislation

In recent years, an increasing number of legislative initiatives have been introduced or proposed in Congress and in state legislatures that would effect major changes in the health care system, either nationally or at the state level. Various forms of payment control are under consideration, including competitive bidding by market, expanded fraud and abuse legislation and further reductions in Medicare and Medicaid reimbursement. On August 5, 1997, President Clinton signed into law the Balanced Budget Act of 1997 (the *"1997 Budget Act"*), which provides for reductions in Medicare and Medicaid spending of more than $115 billion and $13 billion, respectively, over five years. Congress is presently considering legislation that would provide limited financial relief to, among others, certain hospital, home health and skilled nursing facility providers and home medical equipment suppliers that experienced payment reductions under the 1997 Budget Act. In particular, one proposal would provide direct relief for entities such as the Company through an update in the durable medical equipment (*"DME"*) fee schedule applicable to suppliers under Part B of the Medicare program.

The Health Care Financing Administration ("*HCFA*") recently proposed a rule that would change reimbursement rates for parenteral and enteral nutrients, equipment and supplies ("*PEN*"). The preamble to the proposed rule states that it is intended to be budget neutral in its first year of application, but would set reimbursement rates at the lower of the applicable rates paid in 1995 or 1998 (adjusted for inflation). The PEN therapies represent the primary therapies for which the infusion therapy division receives reimbursement from the Medicare program.

HCFA also has proposed exercising its expanded authority under the 1997 Budget Act to adjust Medicare fee schedule amounts that the agency deems to be not "*inherently reasonable.*" Under this

23

authority, HCFA or its contractors may impose payment reductions of up to 15% by providing limited notice; reductions in excess of 15% can be made if notice and comment is provided in the Federal Register and HCFA meets certain other criteria. In an August 1999 notice, HCFA proposed inherent reasonableness payment reductions ranging from 22% to 57% for six items of DME, orthotics, prosthetics, and supplies. Congress currently is considering proposals that would restrict or postpone HCFA's use of this inherent reasonableness authority. In addition, the 1997 Budget Act authorized HCFA to conduct up to five competitive bidding demonstration projects. The first competitive bidding project is underway in Polk County, Florida, using payment rates that are between 13% and 31% lower than Medicare's existing fee schedule for five categories of medical equipment and supplies (including enteral nutrition products and supplies). A second competitive bidding project, also covering DME, is now being planned.

The impact of any payment reductions on the Company cannot be determined at this time. Moreover, the Company cannot predict whether any pending proposals will be adopted. No assurance can be given that the implementation of the 1997 Budget Act or any other legislative or regulatory initiatives will not have a material adverse effect on the business of the Company.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The following discusses the Company's exposure to market risk related to changes in interest rates. This discussion contains forward-looking statements that are subject to risks and uncertainties. Actual results could vary materially as a result of a number of factors, including but not limited to, changes in interest rates, and those set forth under Item 2. *"Management's Discussion and Analysis of Financial Condition and Results of Operations: Background -- Factors Affecting Recent Operating Results."*

As of September 30, 1999, the Company had outstanding debt of $289.7 million of which $162.2 million matures in May 2001 bears interest at 11.5% per annum and $89.7 million matures in April 2008 and bears interest at the rate of 8.0% per annum. On October 15, 1999, Series A and Series B Notes totaling approximately $4.7 million and $1.8 million, respectively were issued in lieu of a cash payment of interest due through such date. The Company also has a New Senior Credit Facility providing for the availability of up to $60.0 million for acquisitions, working capital, letters of credit and other corporate purposes. The New Senior Credit Facility matures in February 2001 and bears an interest rate of prime plus 1.5%, which was 9.75% as of October 15, 1999. As of November 15, 1999, the principal amount outstanding under the New Senior Credit Facility was approximately $37.0 million. Because substantially all of the interest on the Company's debt is fixed, a hypothetical 10.0% decrease in interest rates would not have a material impact on the Company. Increases in interest rates could, however, increase interest expenses associated with future borrowings by the Company, if any. The Company does not hedge against interest rate changes.

### PART II

### OTHER INFORMATION

## ITEM 1. LEGAL PROCEEDINGS

Descriptions of the material legal proceedings to which the Company is a party are set forth in Note 4 to the Company's Unaudited Condensed Consolidated Financial Statements.

The Company is also a party to various other legal actions arising out of the normal course of its business. Management believes that the ultimate resolution of such other actions will not have a material adverse effect on the

financial position, results of operations or liquidity of the Company.
Nevertheless, due to the uncertainties inherent in litigation, the ultimate
disposition of these actions cannot presently be determined.

ITEM 2.  CHANGE IN SECURITIES AND USE OF PROCEEDS

        Not applicable.

24

### ITEM 3. DEFAULTS UPON SENIOR SECURITIES

A discussion of certain matters of potential defaults and non-compliance with certain covenants contained in the Company's principal debt agreements and the waivers received relating to such matters is set forth in Note 3 to the Company's Unaudited Condensed Consolidated Financial Statements.

### ITEM 4. SUBMISSION OF MATTERS TO VOTE OF SECURITY HOLDERS

The Company held its Annual Meeting of Stockholders on August 5, 1999 to consider and vote upon:

(1) Election of directors to serve until the 2000 Annual Meeting of Stockholders and until their successors are duly elected and qualified;

(2) Approval of an amendment to the Company's Restated Certificate of Incorporation, as amended, to increase the number of authorized shares of the Company's $.001 par value common stock (the "Common Stock") from 100,000,000 to 150,000,000;

(3) Approval of certain options to purchase shares of the Company's Common Stock granted to four directors of the Company: Richard A. Fink, William J. Casey, Stephen G. Pagliuca and L. Peter Smith, on September 9, 1998; and

(4) Ratification of the appointment of Ernst & Young LLP as independent auditors of the Company of the Company's 1999 fiscal year.

All proposals were approved. The results of the voting are as follows:

· *Enlarge/Download Table*

| | | TOTAL VOTE FOR EACH DIRECTOR | TOTAL VOTE WITHHELD FROM EACH DIRECTOR |
| --- | --- | --- | --- |
| (1) | For election as director: | | |
| | Donald J. Amaral......................................... | 39,952,129 | 1,638,010 |
| | William J. Casey......................................... | 40,057,928 | 1,532,211 |
| | Stephen A. Feinberg...................................... | 39,560,382 | 2,029,757 |
| | Richard A. Fink.......................................... | 40,036,126 | 1,554,013 |
| | Richard M. Smith......................................... | 40,039,936 | 1,550,203 |
| | L. Peter Smith........................................... | 40,046,634 | 1,543,505 |

· *Download Table*

| | | FOR | AGAINST | ABSTAIN | BROKER NON-VOTE |
| --- | --- | --- | --- | --- | --- |
| (2) | Approval of the amendment of the Company's Restated Certificate of Incorporation......................... | 38,355,670 | 2,966,475 | 248,111 | 19,833 |
| (3) | Approval of certain options to purchase Shares of the Company's Common Stock......................... | 37,677,435 | 3,680,313 | 232,391 | |
| (4) | Ratification of the appointment of Ernst & Young LLP..................... | 40,640,610 | 418,363 | 531,166 | |

### ITEM 5. OTHER INFORMATION

On October 29, 1999, the Company announced that its Chairman of the Board, Donald J. Amaral would serve as the Company's Chief Executive Officer on an interim basis following the departure of Richard M. Smith as the Company's Chief

Executive Officer and President. Mr. Smith subsequently resigned his position on the Board of Directors of the Company and all other offices and directorships with the Company's subsidiaries.

The Company received a letter from the New York Stock Exchange, Inc. (the "NYSE") dated October 20,1999, informing the Company that it was "below criteria" for the new NYSE minimum share price continued listing standard. The minimum share price of the Company's stock had traded below

25

$1.00 over a 30 trading-day period. The Company has six months from October 20, 1999 to raise the stock price above the $1.00 level both in terms of absolute value and the 30 trading day average. Failure to restore the stock price within this period would result in immediate suspension of trading and application to the Securities and Exchange Commission ("SEC") for delisting. The NYSE's letter further included an "early warning" regarding the new NYSE continued listing requirement to maintain not less than $50 million each in stockholder's equity and market capitalization. As of the filing of the Company's September 30, 1999 Form 10-Q, the Company will not comply with this continued listing requirement and anticipates receiving another notice from the Exchange. Upon receipt of this notice, the Company must respond within 45 days with a business plan that demonstrates compliance with these continued listing standards no later than within 18 months of receipt of that notice. A Committee of the Exchange will review the plan and will either accept the plan, at which time the Company will be subject to quarterly monitoring for compliance with this business plan, or will not accept the business plan and the Company will be subject to trading suspension and delisting by the SEC. Additionally, the Company is required to issue a press release regarding the receipt of this second letter within 45 days of receipt. Accordingly, the Company has considered certain aspects of a plan it would submit including the possible sale of its CPS division, to the NYSE and has investigated other trading alternatives for Company common stock to allow for the continued trading of its common stock if it is no longer eligible for trading on the NYSE.

While no assurances can be given, the Company believes that successful results from strategic alternatives described in this document would allow the Company to maintain its listing with the NYSE.

ITEM 6. EXHIBITS AND REPORTS ON FORM 8-K

(A) Exhibits

· Download Table

| EXHIBIT NUMBER | DESCRIPTION |
| --- | --- |
| 10.1 | -- Letter Amendment to Prime Vendor Agreement with Cardinal Health, Inc. dated October 14, 1999. |
| 10.2 | -- Agreement between the Company and Richard M. Smith, dated November 11, 1999. |
| 10.3 | -- Amendment No. 2 to Employment Agreement between the Company and Donald J. Amaral, dated as of April 23, 1999. |
| 10.4 | -- Employment Agreement, between the Company and Richard M. Smith, dated as of April 26, 1999. |
| 10.5 | -- Employment Agreement, between the Company and Wendy L. Simpson, dated as of April 26, 1999. |
| 10.6 | -- Employment Agreement, between the Company and Joseph D. Smith, dated as of April 26, 1999. |
| 10.7 | -- Form of Indemnification Agreement for Directors and certain Officers |
| 27 | -- Financial Data Schedule |

(B) Reports on Form 8-K.

On August 23, 1999, the Company filed a report on Form 8-K relating to the filing of an involuntary bankruptcy petition under Chapter 11 of the Bankruptcy Code against Coram Resource Network, Inc., a subsidiary of the Company.

26

## SIGNATURES

    Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

CORAM HEALTHCARE CORPORATION

By:   /s/ _WENDY L. SIMPSON_
      ----------------------------------
           Wendy L. Simpson
     Executive Vice President and
       Chief Financial Officer

November 15, 1999

27

### EXHIBIT INDEX

· *Download Table*

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 10.1 | -- Letter Amendment to Prime Vendor Agreement with Cardinal Health, Inc. dated October 14, 1999. |
| 10.2 | -- Agreement between the Company and Richard M. Smith, dated November 11, 1999. |
| 10.3 | -- Amendment No. 2 to Employment Agreement between the Company and Donald J. Amaral, dated as of April 23, 1999. |
| 10.4 | -- Employment Agreement, between the Company and Richard M. Smith, dated as of April 26, 1999. |
| 10.5 | -- Employment Agreement, between the Company and Wendy L. Simpson, dated as of April 26, 1999. |
| 10.6 | -- Employment Agreement, between the Company and Joseph D. Smith, dated as of April 26, 1999. |
| 10.7 | -- Form of Indemnification Agreement for Directors and certain Officers |
| 27 | -- Financial Data Schedule |

**Dates Referenced Herein** *and* **Documents Incorporated By Reference**

| This 10-Q Filing | Date | Referenced-On Page First | Last | Other Filings |
|---|---|---|---|---|
| | 9/30/95 | 14 | | 10-Q/A, 10-Q |
| | 8/5/97 | 24 | | |
| | 4/13/98 | 8 | | |
| | 5/1/98 | 9 | | |
| | 5/6/98 | 8 | | |
| | 6/30/98 | 10 | | 10-Q, 3 |
| | 7/1/98 | 12 | | |
| | 8/20/98 | 8 | 10 | |
| | 9/9/98 | 26 | | |
| | 9/30/98 | 6 | 21 | 10-Q |
| | 12/31/98 | 2 | 21 | 10-K, 4, 10-K/A |
| | 1/1/99 | 6 | | |
| | 3/15/99 | 11 | | |
| | 4/9/99 | 8 | 20 | 8-K |
| | 4/13/99 | 8 | 9 | SC 13D/A |
| | 4/23/99 | 27 | 29 | |
| | 4/26/99 | 27 | 29 | |
| | 5/14/99 | 11 | 14 | |
| | 6/15/99 | 6 | | |
| | 6/29/99 | 12 | | |
| | 6/30/99 | 7 | 21 | 8-K, 10-Q |
| | 7/20/99 | 12 | | |
| | 8/5/99 | 26 | | PRE 14A, DEF 14A |
| | 8/11/99 | 11 | 14 | |
| | 8/19/99 | 12 | | |
| | 8/23/99 | 27 | | 8-K |
| For The Period Ended | 9/30/99 | 1 | 27 | |
| | 10/4/99 | 11 | 14 | |
| | 10/13/99 | 8 | | |
| | 10/14/99 | 27 | 29 | |
| | 10/15/99 | 9 | 25 | |
| | 10/20/99 | 27 | | |
| | 10/26/99 | 19 | | |
| | 10/29/99 | 11 | 26 | 8-K |
| | 11/10/99 | 1 | | |
| | 11/11/99 | 27 | 29 | |
| | 11/12/99 | 16 | | |
| Filed On / Filed As Of | 11/15/99 | 9 | 28 | |
| | 12/31/99 | 11 | 22 | 10-K |
| | 1/28/0 | 11 | | |
| | 4/12/0 | 19 | | |
| | 5/15/0 | 9 | 22 | 10-Q |
| | 6/15/0 | 6 | | |
| | 9/30/0 | 8 | 23 | 10-Q, NT 10-Q |
| | 2/26/1 | 10 | | |
| | 9/30/1 | 8 | 23 | 10-Q, 10-Q/A, NT 10-Q |
| | 9/30/2 | 8 | 23 | 10-Q, NT 10-Q |
| | 9/30/3 | 8 | 23 | NT 10-Q, 10-Q |

---

**Alternative Formats:**  Rich Text / Word (`.rtf`),  Text (`.txt`),  EDGAR (`.sgml`),  XML (`.xml`),  et al.

---

*Copyright © 2007 **Fran Finnegan & Company** All Rights Reserved.*
*www.secinfo.com - Sun, 15 Apr 2007 21:49:04.1 GMT - Help at SEC Info*

**PERSONAL & CONFIDENTIAL**

16 November 1999

**CONFIDENTIAL**

Steve Feinberg

Dear Steve,

A brief update. Amaral and I continue to work on an Employment Agreement.

I accepted a base of $650,000.

I asked for a bonus of up to 3 x base. Amaral did **not accept** my **formula** and did not accept my **EBITDA target**.

I asked for a rolling 3 year contract. Amaral did **not accept** my **term**.

I asked for options with a partial vest up front and a slightly advantaged option price. Amaral **did not accept** either.

I asked for a 2.99 x base and targeted bonus in the event of a dismissal (not for cause). Amaral **did not accept** either.

I asked for a success fee of 1% in the event that I could engineer a sale/merger to move CRH. Amaral **did not accept** the fee.

I asked for the contract to continue once I had CRH stabilized and that I have an option to appoint a CEO to replace myself. Amaral **did not accept** this. Instead he worded the contract to cease my contract and all of the obligations on the date that I appoint someone as CEO. Ultimately, we arrived at wording in which terms remained in effect but pay would be cut, thereby reducing any incentive I might have under the contract or effectively freezing me into the CEO's job until I can sell CRH.

I asked for protection under 280 G if any of the contract triggered an excess golden parachute under IRS rules. Amaral **did not accept** this. I am having Peat Marwick review the Agreement to see if the IRS limits obviate any real upside on the deal.

**CONFIDENTIAL**

EXHIBIT

18

2/4/07

## CONFIDENTIAL

I asked for the D&O and E&O coverage. Amaral **refused to provide this**. He later relented and said I will receive this tomorrow.

I asked him how many options remain in the option pool. He told me that he **did not know**. He later said it was 12,000. He subsequently told me that he would return 800,000 of his own options to be used to recruit a new corporate management team.

Steve, because of our friendship and the other deal we are in together . . . . I want to do what I can for you. I now see the deal you and I have in writing, and it is clear to me that I cannot make the kind of return I want on one or two deals. For this to work for me, I need to be in several deals and *to make them all succeed.*

So, let's come back to CRH. I know your debt is in jeopardy. I want to help save it.

The reality at CRH is there is $300M in debt and it's too much. CRH "may" reduce this by $30M to $100M (???) on the possible sale of CPS (the list of potential buyers is attached, note the number of financial buyers). When and "if" CPS is sold and R Net is shut, CRH will have lost about $200M of its approximately $650M top line. Infusion and Clinical will be left to service the debt. *Remember* Infusion has about $160M in revenue in the red at this time.

Now, for illustration purposes, if CPS' sale reduces the debt by $50M (a high end result in my opinion), to $250M. At that level of debt, CRH will have to make Interest payments of roughly $25M a year (forget about principal repayment). The bad news is that will leave zip for cap-ex or restructuring, so CRH has very little going for it in terms of improving. **The point is that the debt will still be too high for CRH.**

Suppose that in the next year, *somehow* I am able to improve EBITDA on the $450M top line to roughly $30M to $40M (7% to 9%). No small task given how reduced CRH's situation is at this time. I think it's fair for you to expect there will be a significant charge to be taken at CRH. Certainly the AR is too large and too old not to expect it's soft.

So what? Well, here's how it looks to me from here:
A) Even with the sale of CPS, and the potential for EBITDA improvement, CRH will be able to do little more than service the interest on the debt.
B) With an EBITDA improvement, it's still *quite hard to imagine* that we can turn around and sell this debt-ridden firm to anyone for enough to make this work out well for anyone (think about who's out there to buy something like

## CONFIDENTIAL

**A174**

# CONFIDENTIAL

this and what their realistic appetite would be for CRH and its large debt); and;

C) There's no way there can be any real equity value on the stock. Today's equity value is roughly $40M (50M shares x .75 cents = $37.5M). Obviously, the debt already owns this company and the present public equity value is a mirage, right? Makes having incentive options pointless in my opinion. At any rate, one could expect options to have little value or to be materially diluted if they ever get in the money.

Amaral told me that the debt holders are now offering a six (6) month fore-bearance on the interest, principal, and covenants.

My reaction is that this is too short of what will be needed by CRH. It really needs to be more like a year. I think CRH will probably need cash ($10M to $20M) versus be able to service debt in 2000. To tell the truth, I think CRH will be lucky if it can show much improvement before the six (6) months payment holiday wears off. Then I will be left to be a disappointment to you, have my name trashed as the guy who couldn't turn CRH (or, in time), or worse, my name is on a BK, and people associate me with the failure. At that point, where am I after busting my butt for CRH? H-m-m-m.

Now if you were me what would you do? Knowing CRH will be a 60-75 hour a week **trench-war** for me. Obviously, CRH has been horribly mismanaged. So there's no reason to think that there's some silver lining waiting in the wings and all I need to do is show up.

I absolutely want to do what I can for you because you have been generous with me this past year, I consider you a friend, and you deserve a better outcome. (*In fairness, I hope that you feel that I have delivered for you at W/L, in an investment that had clearly failed up until I signed on to help*). But I have to measure the risk - reward. Wouldn't you?

I am seriously asking myself why I should do this? The upside just isn't there. The Board isn't willing to pay for what needs to be done.

Honestly, I do not see how we can reasonably expect W/L to cover the shortfall. What if at the end of the day, the value at W/L is insufficient? Are you just going to write me a check? Based on what?

What if no matter how clever I am, or how many hours I work, CRH just can't be improved, or enough? Will you still pay me and what would that amount be? I don't think it's realistic for me to expect anything. At the same time, I don't

# CONFIDENTIAL

# CONFIDENTIAL

think CRH will be able to pay me either. In that case, all of my work would have been for nothing.

This is understandably a very sad situation, but it's *not my fault*.
I should have been called much earlier.

What should happen now is that I should be hired as Crisis Manager, for six (6) months, working for all the creditors to assess CRH and determine whether CRH can be salvaged or must be liquidated. Then I could implement the plan. My initial inclination is that CRH may need to be put into a BK and be thoughtfully restructured under protection of a court.

I am open to talking about this but the reality is I think we should go back to ground zero. What is your/Goldman/Foothill's goal? We all need to be at this table together.

We've screwed around with this a lot. I've been much tortured by Smith and Amaral. I've worried about this endlessly, because I want to be there for you.

I am recommending **all of us (including the creditors and CRH's "Independent" Directors) meet in New York** and determine what it is that people think can be done. Whether I am the right person to do it. And, if I am the guy, what is the upside that covers this effort.

Sincerely,

Dan Crowley



**Dynamic
Healthcare
Solutions**

November 19, 1999

Mr. Mark Neporent
Cerberus Capital Management
450 Park Avenue, 28th Floor
New York, NY  10022

Dear Mr. Neporent:

Enclosed is the revised Employment Agreement with two original signature pages
executed by Dan Crowley.  Please return a fully executed signature page for our
file.

Sincerely,

Pamela Gridley Herrera
Assistant to Daniel D. Crowley

Enclosure

$\mathcal{E}/c$ 40



EXHIBIT
EC 40

400 Capitol Mall • Suite 1250 • Sacramento, CA 95814   916.449.6056 • 916.449.6059 fax

CERB 01350



EXHIBIT
22
2/4/07 OP

11/18/99  18:03 FAX 212 758 5305          BLACK ACRE CAPITAL                    ☒006/023

FROM SCHULTE ROTH & ZABEL LLP #2                 (THU)11.18'99 16:19/ST. 16:17/NO. 4260783807 P  6

### EMPLOYMENT AGREEMENT

This Employment Agreement (this "Agreement") is made as of August 1, 1999, by Cerberus Capital Management, L.P., a Delaware limited partnership (the "Employer"), and Daniel Crowley, an individual resident at _____ _____ (the "Executive").

### RECITALS

The Employer desires the Executive's employment with the Employer, and the Executive wishes to accept such employment, upon the terms and conditions set forth in this Agreement.

### AGREEMENT

The Employer desires the Executive's employment with the Employer, and the Executive wishes to accept such employment, upon the terms and conditions set forth in this Agreement.

The Parties, intending to be legally bound, agree as follows:

1.     **Definitions**

For the purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.

"__Agreement__" means this Employment Agreement, as amended from time to time.

"__Affiliate__" means any entity owned or controlled by funds or accounts managed, directly or indirectly, by the Employer or Stephen A. Feinberg.

"__Basic Compensation__" means Salary and Benefits.

"__Benefits__" is defined in Section 3.1(b).

"__Bonus Amount__" is defined in Section 3.2.

"__Competitive Business__" is defined in Section 8.2(a).

"__Confidential Information__" means any and all:

(a)     trade secrets concerning the business and affairs of the Employer and its Affiliates (including Portfolio Companies), product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current, and planned research and development, current and planned manufacturing or distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans,

SRZNY:442423v1

CERB 01351

11/18/99  18:04 FAX 212 758 5305          BLACK ACRE CAPITAL                    ☒007 023

FROM SCHULTE ROTH & ZABE LLP a2          (THU) 11. 18' 99 16:19/ST. 16:17/NO. 4260783807 P  7

computer software and programs (including object code and source code), computer software and database technologies, systems, structure, and architectures (and related formulas, compositions, processes, improvements, devices, know-how, inventions, discoveries, concepts, ideas, designs, methods and information), and any other information, however documented, that is a trade secret within the meaning of all applicable state, federal and common law; and

      (b)    information concerning the business and affairs of the Employer or its Affiliates (including Portfolio Companies) (which includes historical financial statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, the names and backgrounds of key personnel, personnel training and techniques and materials), however documented; and

      (c)    notes, analysis, compilations, studies, summaries, and other material prepared by or for the Employer or its Affiliates (including Portfolio Companies) containing or based, in whole or in part, on any information included in the foregoing.

"Covered Portfolio Company" means any Portfolio Company as to which, at the request of the Employer, the Executive serves as Chief Executive Officer during the term of this Agreement.

"disability" is defined in Section 6.2.

"Disposition" is defined in Section 8.2(d).

"Effective Date" means the date of this Agreement.

"Employee Invention" means any ideas, invention, technique, modification, process or improvement (whether patentable or not), any industrial design (whether registerable or not), any mask work, however fixed or encoded, that is suitable to be fixed, embedded or programmed in a semiconductor product (whether recordable or not), and any work of authorship (whether or not copyright protection may be obtained for it) created, conceived, or developed by the Executive, either solely or in conjunction with others, during the Employment Period, or a period that includes a portion of the Employment Period, that relates in any way to, or is useful in any manner in, the business then being conducted or proposed to be conducted by the Employer or its Affiliates (including Portfolio Companies), and any such item created by the Executive, either solely or in conjunction with others, following termination of the Executive's employment with the Employer or its Affiliates (including Portfolio Companies), that is based upon or uses Confidential Information.

"Employment Period" means the term of the Executive's employment under this Agreement.

"Fiscal Year" means the Employer's fiscal year, as it exists on the Effective Date or as changed from time to time.

-2-

CERB 01352

11/18/99  18:04 FAX 212 758 5305        BLACK ACRE CAPITAL                    ☒008/023

FROM SCHULTE ROTH & ZABEL LLP #2            (THU) 11. 18' 99 16:19/ST. 16:17/NO. 4260783807 P  8

"foregoing" is defined in Section 6.3.

"for good reason" is defined in Section 6.4.

"General Partner" means Craig Court, Inc., the general partner of the Employer.

"Options" is defined in Section 3.3.

"person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, or governmental body.

"Portfolio Company" means any corporation, partnership, joint venture or similar entity or arrangement in which the Employer or any of its Affiliates has made a debt or equity investment, and for which Executive is rendering services as an employee thereof, consultant thereto, or on behalf of Employer.

"Post-Employment Period" is defined in Section 8.2.

"Proprietary Items" is defined in Section 7.2(a)(iv).

"Salary" is defined in Section 3.1(a).

2.    **Employment Terms and Duties**

2.1    **Employment**

The Employer hereby employs the Executive, and the Executive hereby accepts employment by the Employer, upon the terms and conditions set forth in this Agreement.

2.2    **Term**

Subject to the provisions of Section 6, the term of the Executive's employment under this Agreement will be three (3) years; provided that such term shall be automatically extended for successive one year periods unless either party provides written notice to the other within sixty (60) days before the expiry of the initial term, or any renewal term, that such party does not wish to extend the term of this Agreement.

2.3    **Duties**

The Executive will have such duties as are assigned or delegated to the Executive by the General Partner or Stephen A. Feinberg. The Executive will devote his entire business time, attention, skill and energy exclusively to the business of the Employer (or any Portfolio Company or Companies and as to which the Executive is assigned by the Employer), will use his best efforts to promote the success of the Employer's business (or the business of such Portfolio Company), and will cooperate fully with the General Partner in the advancement of the best interests of the Employer. Nothing in this Section 2.3, however, will prevent the Executive from

-1-

CERB 0135