11·15·99  18:04 FAX 212 758 5305        BLACK ACRE CAPITAL                    @ 009/023

FROM SCHULTE ROTH & ZABELLLP i.2          (THU) 11. 18' 99 16:20/ST. 16:17/NO. 4260783807 P  9

(a) engaging in additional activities in connection with personal investments and community affairs that are not inconsistent with the Executive's duties under this Agreement or his duties to any Portfolio Company to which the Executive is assigned or (b) continuing to own and operate Dynamic Healthcare Solutions in the same lines of business currently engaged in by such firm, to the extent not inconsistent with the Executive's duties under this Agreement or his duties to any Portfolio Company to which the Executive is assigned. If the Executive is elected as a managing director of the Employer or as a director or officer of any of its Affiliates (other than any Portfolio Company), the Executive will fulfill his duties as such director or officer without additional compensation.

**3.    Compensation**

**3.1    Basic Compensation**

(a)    **Salary.** The Executive will be paid a monthly salary of $80,000, subject to adjustment as provided below (the "Salary"), which will be payable in equal periodic installments according to the Employer's customary payroll practices. The Salary may be reduced to $60,000 per month in the discretion of the General Partner if the Executive ceases to serve as Chief Executive Officer of two or more Portfolio Companies. The Salary shall be reduced and offset, on a dollar for dollar basis, for any directors fees, salary, consulting payments, bonuses or other cash incentive payments that the Executive may receive from any Portfolio Company other than Coram Healthcare ("Coram").

(b)    **Benefits.** The Executive will, during the Employment Period, be permitted to participate in such pension, profit sharing, bonus, life insurance, hospitalization, major medical and other employee benefit plans of the Employer that may be in effect from time to time, to the extent the Executive is eligible under the terms of those plans (collectively, the "Benefits"). The obligation of Employer to provide the Benefits shall be suspended for each period of time as the Executive shall receive substantially equivalent benefits from a Portfolio Company.

**3.2    Bonuses**

(a)    As additional compensation for the services to be rendered by the Executive pursuant to this Agreement, the Employer will pay the Executive with respect to Covered Portfolio Companies (other than Coram), the Adjusted Net Profit Share from all Investments in the Covered Portfolio Companies (other than Coram) during the Employment Period, determined as of the last day of each Applicable Period (the "Bonus Amount"). The Adjusted Net Profit Share in respect of an Applicable Period means the amount equal to, without duplication, (A) 20% of the gains actually realized in cash on the Investments in the Covered Portfolio Companies (other than Winterland) during such Applicable Period, and 30% of the gains actually realized in cash on the Investments in Winterland (if Winterland is a Covered Portfolio Company) during such Applicable Period, plus (B) 20% of any income from Investments in the Covered Portfolio Companies (other than Winterland), including investment income, dividends and other amounts actually received during such Applicable Period and 30% of any income from Investments in Winterland (if Winterland is a Covered Portfolio Company), including investment income, dividends and other amounts actually received during such

- 4 -

CERB 01354

Applicable Period, plus (C) in the case of the final Applicable Period only, 10% of unrealized gains on all Investments in Covered Portfolio Companies (other than Winterland) owned at the end of such Applicable Period and 15% of unrealized gains on all Investments in Winterland (if Winterland is a Covered Portfolio Company) owned at the end of such Applicable Period, minus (D) 30% of all losses actually realized on Investments in the Covered Portfolio Companies (other than Winterland) during such Applicable Period and 30% of all losses actually realized on Investments in Winterland (if Winterland is a Covered Portfolio Company) during such Applicable Period, minus (E) with respect to Investments in the Covered Portfolio Companies owned on the last day of such Applicable Period, 20% of the Net Unrealized Loss (as defined below) if any, with respect to all such Investments other than Winterland and 30% of the Net Unrealized Loss if any with respect to all Investments in Winterland (if Winterland is a Covered Portfolio Company), provided, that if there shall be a Net Unrealized Loss for an Applicable Period which reduces the amount otherwise payable as a Bonus Amount for that Applicable Period, the Cost of the Investments in each of the Covered Portfolio Companies (or in Winterland, if applicable) shall, for the purpose of determining realized and unrealized gains or losses in a subsequent Applicable Period, be reduced, on a pro rata basis by the amount by which the Bonus Amount had been reduced, minus (F) an amount equal to the product of (x) 20% in the case of all Investments in Covered Portfolio Companies (other than Winterland) and 30% in the case of Winterland (if Winterland is a Covered Portfolio Company) and (y) an amount equal to interest at the rate of 14%, compounded annually, on the Cost of Investments in each such Covered Portfolio Company, from the date of such Investment to the date of Disposition, if sold during such Applicable Period, or the last day of such Applicable Period, if not sold, minus ((z) 20% (or in the case of Winterland, if Winterland is a Covered Portfolio Company, 30%) of the excess of realized losses over realized gains in any prior Applicable Period, to the extent not previously taken into account for this purpose, minus (H), to the extent not otherwise included in Cost, 20% of all expenses relating to Investments in the Covered Portfolio Companies, including brokerage and transaction costs (to the extent not included above), custodial fees and expenses and any other overhead expenses or expenses hereunder.

(b)     For purposes of valuing the items included in Adjusted Net Profit (all such values being determined as of the last business day of an Applicable Period), all securities listed on a securities exchange or quoted on the National Association of Securities Dealers, Inc. Automated Quotation System ("NASDAQ"), shall be valued based upon available quotations thereof. In the case of securities not listed on a securities exchange or quoted on NASDAQ, but for which there are available quotations, such valuations shall be based upon quotations obtained by the Employer from market makers, dealers or pricing services. Notwithstanding the foregoing, all valuations shall be equal to the valuation of such securities, properties, assets and liabilities relating to the Investments in the Covered Portfolio Companies based upon the values set forth in the audited financial statements of the investment funds or managed accounts owning of each such Investment to the extent applicable, or as otherwise determined in accordance with the same valuation methods and procedures as are used in determining the valuations in such audited financial statements.

(c)     For purposes of this Agreement: "Applicable Period" means each of the three successive 12-month periods following the Effective Date and each 12-month period of any

- 5 -

CERB 01355

11/18/99  18:05 FAX 212 ... ...05    BLACK ACRE CAPITAL    @011·023

FROM SCHULTE ROTH & ZABEL,LLP x?    (THU)11.18'99 16:20/ST. 16:17/NO. 4260783807 P 11

renewal term hereunder, *provided*, that if the Executive's employment hereunder terminates pursuant to Section 6.1(e) or Section 6.1(c), the then-current Applicable Period shall end on the date of such termination and shall not be followed by any additional Applicable Periods; "Cost" means the purchase price paid for any Investment in a Covered Portfolio Company, together with all transaction and other costs relating thereto; "Investments" means securities or other obligations of, or interests in, entities or individuals, including publicly or privately traded or quoted equity or debt indebtedness to banks or other financial institutions; and "Net Unrealized Loss" means the positive difference, if any, between (a) the Cost of all Covered Portfolio Companies as of the date of determination of Net Unrealized Loss and (b) the value of all Covered Portfolio Companies as of the date of determination of Net Unrealized Loss.

To the extent that the Executive receives any non-cash incentive compensation (such as stock option or restricted stock grants) other than from Corum, the Executive shall, to the extent he may lawfully do so, assign to the Employer such stock option or restricted stock grants, or shall otherwise transfer to the Employer the after-tax benefit realized by the Executive from such incentive compensation (whether or not the Executive realizes such benefit during the term of this Agreement).

### 3.3    Options to Purchase Shares

The Executive will have the option to purchase, from the Employer or its Affiliate that owns the Investment, up to three percent (3%) of the shares of capital stock of each Covered Portfolio Company (other than Corum) owned by Employer or such Affiliate (the "Options"), at the Cost of each Investment; provided that such option shall not be exercisable (x) until immediately prior to the termination or expiration of this Agreement or (y) if the Executive shall be entitled to receive any payment of any Bonus Amount pursuant to Section 3.2.

### 3.4    Right of Refusal

From time to time the Employer may request that the Executive become the Chief Executive Officer of a Portfolio Company. If the Executive accepts such request (which acceptance shall be at the Executive's sole discretion), the Executive will be entitled to receive such Salary, Benefits and bonus as may be negotiated between the Executive and such Portfolio Company, as the case may be, subject to the offset provisions of Sections 3.1 and 3.2. If the Executive declines such request, the Executive will not be entitled to receive any Bonus Amount related to such Portfolio Company.

### 3.5    Relocation

The Employer will have no right to cause the Executive to permanently relocated from his primary residence.

### 4.    Expenses

The Employer will pay on behalf of the Executive (or reimburse the Executive for) reasonable expenses incurred by the Executive at the request of, or on behalf of, the Employer in

-6-

CERB 01356

the performance of the Executive's duties pursuant to this Agreement, and in accordance with the Employer's employment policies. The Executive must file expense reports with respect to such expenses in accordance with the Employer's policies.

5.   Vacations and Holidays

The Executive will be entitled to paid vacation each Fiscal Year in accordance with the vacation policies of the Employer in effect for its executive officers from time to time. Vacation must be taken by the Executive at such time or times as approved by the General Partner, and as are consistent with the Executive's responsibilities to any Portfolio Company. The Executive will also be entitled to the paid holidays and other paid leave set forth in the Employer's policies. Vacation days and holiday during any Fiscal Year that are not used by the Executive during such Fiscal Year may not be used in any subsequent Fiscal Year.

6.   Termination

6.1   Events of Termination

The Employment Period, the Executive's Salary and the Executive's right to receive the Bonus Amount, and any and all other rights of the Executive under this Agreement or otherwise as an employee of the Employer will terminate (except as otherwise provided in this Section 6):

(a)   upon the death of the Executive;

(b)   upon the disability of the Executive (as defined in Section 6.2) immediately upon notice from either party to the other;

(c)   for cause (as defined in Section 6.3), immediately upon notice from the Employer to the Executive, or at such later time as such notice may specify;

(d)   for good reason (as defined in Section 6.4) upon not less than 30 days' prior notice from the Executive to the Employer; or

(e)   without cause, at any time and in the Employer's sole discretion, upon written notice to the Executive of such termination.

6.2   Definition of Disability

For purposes of Section 5.1, the Executive will be deemed to have a "disability" if, for physical or mental reasons, the Executive is unable to perform the Executive's duties under this Agreement for 45 consecutive days, or 90 days during any twelve month period, as determined in accordance with this Section 6.2. The disability of the Executive will be determined by a medical doctor selected by written agreement of the Employer and the Executive upon the request of either party by notice to the other. If the Employer and the Executive cannot agree on the selection of a medical doctor, each of them will select a medical doctor and the two medical doctors will select a third medical doctor who will determine whether the Executive has a disability. The determination of the medical doctor selected under this Section 6.2 will be

- 7 -

SRZNY1 614382V7

CERB 01357

binding on both parties. The Executive must submit a reasonable number of examinations by the medical doctor making the determination of disability under this Section 6.2, and the Executive hereby authorized the disclosure, and release to the Employer of such determination and all supporting medical records. If the Executive is not legally competent, the Executive's legal guardian or duly authorized attorney-in-fact will act in the Executive's stead, under this Section 6.2, for the purposes of submitting the Executive to the examinations, and providing the authorization of disclosure, required under this Section 6.2.

6.3    Definition of "For Cause"

For purposes of Section 6.1, the phrase "for cause" means:  (a) the Executive's material breach of this Agreement; (b) the Executive's: (i) failure to follow the reasonable instructions of the Employer, the General Partner, Stephen A. Feinberg or the Board of Directors of any Portfolio Company, or (ii) failure to adhere to any written Employer or Affiliate (including any Portfolio Company) policy or care his failure to comply (which reasonable opportunity must be granted during the ten-day period preceding termination of the Executive's employment under this Agreement); (c) the appropriation (or attempted appropriation) of a material business opportunity of the Employer or any of its Affiliates (including any Portfolio Company), including attempting to secure or securing any personal profit in connection with any transaction entered into on behalf of the Employer or any of its Affiliates (including any Portfolio Company); (d) the misappropriation (or attempted misappropriation) of any of the funds or property of the Employer, any of its Affiliates or any Portfolio Company; (e) the conviction of, the indictment for (or its procedural equivalent), or the entering of a guilty plea or plea of no contest with respect to a felony, the equivalent thereof, or any other crime with respect to which imprisonment is a possible punishment or as a result of which, in the good faith judgment of the Board of Directors of any Portfolio Company, it shall no longer be appropriate for the Executive to continue to serve as an employee of or consultant to such Portfolio Company; or (f) any other act on the part of the executive involving dishonesty toward the Employer, its Affiliates or any Portfolio Company.

6.4    Definition of "For Good Reason"

For purposes of Section 6.1, the phrase "for good reason" means the Employer's material breach of this Agreement.

6.5    Termination Pay

Effective upon the termination of the Executive's employment under this Agreement, the Employer will be obligated to pay the Executive (or, in the event of his death, his designated beneficiary as defined below) only such compensation as is provided in this Section 6.5, and in lieu of all other amounts and in settlement and complete release of all claims the Executive may have against the Employer. For purposes of this Section 6.5, the Executive's designated beneficiary will be such individual beneficiary or trust, located at such address, as the Executive may designate by notice to the Employer from time to time or, if the Executive fails to give notice to the Employer of such a beneficiary, the Executive's estate. Notwithstanding the preceding sentence, the Employer will have no duty, in any circumstances, to attempt to open an

- 8 -

SRZ:TT:565597

CERB 01358

.11/18/99  18:07 FAX 212 758 5305          BLACK ACRE CAPITAL               Ø014/023

FROM SCHULTE ROTH & ZABEL,LLP :2                (THU)11. 18' 99 16:21/ST. 16:17/NO. 4260783807 P 14

estate on behalf of the Executive, to determine whether any beneficiary designated by the Executive is alive or to ascertain the address of any such beneficiary, to determine the existence of any trust, to determine whether any person or entity purporting to act as the Executive's personal representative (or the trustee or a trust established by the Executive) is duly authorized to act in that capacity, or to locate or attempt to locate any beneficiary, personal representative, or trustee.

(a)  <u>Termination by the Executive for Good Reason</u>. If the Executive terminates his employment under this Agreement for good reason, the Employer will pay the Executive (i) the Executive's Salary for the remainder of the term of this Agreement and (ii) all Bonus Amounts, determined consistent with this Agreement as of the date of termination, with respect to all Portfolio Companies.

(b)  <u>Termination by the Employer for Cause</u>. If the Employer terminates the Executive's employment under this Agreement for cause, the Executive will be entitled to receive his Salary only through the date such termination is effective, but will not be entitled to any further Salary or any Bonus Amount.

(c)  <u>Termination Upon Disability</u>. If the Executive's employment under this Agreement is terminated by either party as a result of the Executive's disability, as determined under Section 6.1, the Employer will pay the Executive his Salary through the remainder of the calendar month during which such termination is effective and for the lesser of (i) twenty-six (26) consecutive weeks thereafter, or (ii) the period until disability insurance benefits commence under the disability insurance coverage furnished by the Employer to the Executive.

(d)  <u>Termination upon Death</u>. If the Executive's employment under this Agreement is terminated because of the Executive's death, the Executive will be entitled to receive his Salary through the end of the calendar month in which his death occurs.

(e)  <u>Termination Without Cause Pursuant to Section 6.1(e)</u>. If the Executive is terminated pursuant to Section 6.1(e) without cause prior to the expiration of the initial three-year term, the Executive shall continue to receive (i) all Salary payments to be made to him pursuant to Section 3.1(a) hereof, and (ii) all Bonus Amounts, determined consistent with this Agreement as of the date of termination, with respect to all Portfolio Companies.

(f)  <u>Benefits</u>. The Executive's accrual of, or participation in plans providing for, the Benefits will continue so long as the Executive continues to receive Salary payments.

7.  **Non-disclosure Covenant; Employee Inventions.**

7.1  **Acknowledgments by the Executive.**

The Executive acknowledges that (a) during the Employment Period and as part of his employment, the Executive will be afforded access to Confidential Information; (b) public disclosure of such Confidential Information could have an adverse effect on the Employer, its Affiliates, Portfolio Companies and their respective interests and businesses; (c) because the

- 9 -

DLBVT1HIO2497

CERB 01359

11/18/99  15:07 FAX 212 758 5303    BLACK ACRE CAPITAL    @015.023

FROM SCHULTE ROTH & ZABELLLP a2    (THU)11.18'99 16:22/ST.16:17/NO.4260783807 P 15

Executive possesses substantial technical expertise and skill with respect to the Employer's business, the Employer desires to obtain exclusive ownership of each Employee Invention, and the Employer will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each Employee Invention; and (d) the provisions of this Section 7 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information and to provide the Employer and its Affiliates with exclusive ownership of all Employee Inventions.

7.2     Agreements of the Executive

In consideration of the compensation and benefits to be paid or provided to the Executive by the Employer under this Agreement, the Executive covenants as follows:

(a)     Confidentiality

(i)     During and following the Employment Period, the Executive will hold in confidence the Confidential Information and will not disclose it to any person except with the specific prior written consent of the Employer or except as otherwise expressly permitted by the terms of this Agreement.

(ii)     Any trade secrets of the Employer, its Affiliates or any Portfolio Company will be entitled to all of the protections and benefits under applicable state, federal or common trade secret law and any other applicable law. If any information that the Employer deems to be a trade secret for purposes of this Agreement, such information will, nevertheless, be considered Confidential Information for purposes of this Agreement. The Executive hereby waives any requirement that the Employer submit proof of the economic value of any trade secret or post a bond or other security.

(iii)     None of the foregoing obligations and restrictions applies to any part of the Confidential Information that the Executive demonstrates was or became generally available to the public other than as a result of a disclosure by the Executive.

(iv)     The Executive will not remove from the premises of the Employer or any Portfolio Company (except to the extent such removal is for purposes of the performance of the Executive's duties at home or while traveling, or except as otherwise specifically authorized by the Employer) any document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). The Executive recognizes that, as between the Employer and the Executive (or any Portfolio Company), all of the Proprietary Items, whether or not developed by the Executive, are the exclusive property of the Employer or such Portfolio Company, as the case may be. Upon termination of the Executive's employment under this Agreement by either party, or upon the request of the Employer during the Employment Period, the Executive will return to the Employer all of the Proprietary Items in the Executive's possession or subject to the Executive's

- 10 -

CERB 01360

11/18/99  18:08 FAX 212 758 5305        BLACK ACRE CAPITAL                    ☎016/023

FROM SCHULTE ROTH & ZABELLLP n2          (THU)11. 18' 99 16:22/ST. 16:17/NO. 4269783807 P 16

control, and the Executive shall not retain any copies, abstracts, sketches, or other physical embodiment of any of the Proprietary Items.

(b)  **Employee Inventions.** Each Employee Invention will belong exclusively to the Employer, its Affiliates or a Portfolio Company, as the case may be. The Executive acknowledges that all of the Executive writing, works or authorship, specifically commissioned works, and other Employee Inventions are works made for him and the property of the Employer, its Affiliates or a Portfolio Company, as the case may be, including any copyrights, patents, or other intellectual property rights pertaining thereto. If it is determined that any such works are not works made for hire, the Executive hereby assigns to the Employer or to the applicable Portfolio Company, as the case may be, all of the Executive right, title, and interest, including all rights of copyright, patent and other intellectual property rights, to or in such Employee Inventions. The Executive covenants that he will promptly:

(i)  disclose to the Employer or such Portfolio Company, as the case may be, in writing any Employee Invention,

(ii)  assign to the Employer or such Portfolio Company, as the case may be, at the Employer's request and without additional compensation, all of the Executive's right to the Employee Invention for the United States and all foreign jurisdictions;

(iii)  execute and deliver to the Employer or such Portfolio Company, as the case may be, such applications, assignments, and other documents as the Employer or such Portfolio Company, as the case may be, may request in order to apply for and obtain patents or other registrations with respect to any Employee Invention in the United States and any foreign jurisdictions;

(iv)  sign all other papers necessary to carry out the above obligations; and

(v)  give testimony and render any other assistance (but without expense to the Executive) in support of the rights of the Employer or such Portfolio Company, as the case may be, to any Employee Invention.

(c)  **Policies and Procedures.** As an employee of the Employer, the Executive agrees that he will comply with all policies and procedures of the Employer applicable to its employees, including, without limitation, policies and procedures relating to the purchase and sale of securities.

**7.3  Disputes or Controversies**

The Executive recognizes that should a dispute or controversy arising from or relating to this Agreement be submitted for adjudication to any court, arbitration panel, or other third party, the preservation of the secrecy of Confidential Information may be jeopardized. All

- 11 -

CERB 01361

·11/16·99  18:08 FAX 212 758 5305      BLACK ACRE CAPITAL      ☒017. 023

FROM SCHULTE ROTH & ZABEL LLP #2          (THU)11. 18' 99 16:22/ST. 16:17/NO. 4260783807 P 17

pleadings, documents, testimony, and records relating to any such adjudication will be maintained in secrecy and will be available for inspection by the Employer, the Executive, and their respective attorneys and experts, who will agree, in advance and in writing, to receive and maintain all such information in secrecy, except as may be limited by them in writing.

8.    Noncompetition And Non-Interference

8.1    Acknowledgments by the Executive

The Executive acknowledges that: (a) the services to be performed by him under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Employer's business, and the businesses of its Affiliates and Portfolio Companies, are national in scope and its products are marketed throughout the United States, (c) the Employer, its Affiliates and Portfolio Companies each compete with other businesses that are or could be located in any part of the United States, and (d) the provisions of this Section 8 are reasonable and necessary to protect the Employer's business.

8.2    Covenants of the Executive

In consideration of the acknowledgments by the Executive, and in consideration of the compensation and benefits to be paid or provided to the Executive by or on behalf of the Employer, the Executive covenants that he will not, directly or indirectly:

(a)    during the Employment Period, except in the course of his employment hereunder, and during the Post-Employment Period, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend the Executive's name or any similar name to, lend the Executive's credit to or render services or advice to, any Competitive Business, defined as any business (i) whose products or activities compete in whole or in part with the products or activities of any Covered Portfolio Company or (ii) for which (x) the Employer has granted a confidentiality covenant in connection with the purchase or potential purchase of such business (in any of its assets or debt or equity securities) in contemplation of such business becoming a Portfolio Company and (y) the Executive has assisted the Employer in analyzing such purchase or potential purchase; provided, that the Executive may continue to own and operate, in accordance with past practice, Dynamic Healthcare Solutions in the same lines of business engaged in by such firm at the Effective Date;

(b)    Whether for the Executive's own account or the account of any other person (i) at any time during the Employment Period and the Post-Employment Period, solicit, employ, or otherwise engage as an employee, independent contractor, or otherwise, any person who is or was an employee of the Employer, its Affiliates or any Portfolio Company, at any time during the Employment Period or in any manner induce or attempt to induce any employee of the Employer or any such Affiliate or Portfolio Company to terminate his employment with the Employer, or (ii) at any time during the Employment Period and the Post-Employment Period, as to any Portfolio Company,

12

SRZW\NA96047

CERB 01362

11-18-99  18:09 FAX 212 758 5305    BLACK ACRE CAPITAL    ☑018/023

:FROM SCHULTE ROTH & ZABELLLP :.2    (THU)11. 18' 99 16:23/ST. 16:17/NO. 4260783807 P 18

interfere with such Portfolio Company's relationship with any person, including any person who at any time during the Employment Period was an employee, contractor, supplier, or customer of such Portfolio Company;

(c)    at any time during or after the Employment Period, disparage the Employer, the General Partner, Stephen A. Feinberg and his Affiliates or any Portfolio Company or any of their partners, members, shareholders, directors, officers, employees, or agents; or

(d)    in the event the Employer or any of its Affiliates sells, transfers or otherwise disposes (a "Disposition") of a Covered Portfolio Company and, as part of such Disposition, the Employer or such Affiliate has granted a noncompetition covenant to the purchaser, take any action which would (or would reasonably be expected to) cause a violation of such noncompetition covenant.

For purposes of this Section 8.2, the term "Post-Employment Period" means the one year period beginning on the date of termination of the Executive's employment with the Employer.

If any covenant in this Section 8.2 is held to be unreasonable, arbitrary, or against public policy, such covenant will be considered to be divisible with respect to scope, time, and geographic area, and such lesser scope, time, or geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary, and not against public policy, will be effective, binding, and enforceable against the Executive.

The period of time applicable to any covenant in this Section 8.2 will be extended by the duration of any violation by the Executive of such covenant.

The Executive will, while the covenant under this Section 8.2 is in effect, give notice to the Employer, within ten days after accepting any other employment, of the identity of the Executive's employer. The Employer may notify such employer that the Executive is bound by this Agreement and, at the Employer's election, furnish such employer with a copy of this Agreement or relevant portions thereof.

9.    General Provisions

9.1    Injunctive Relief and Additional Remedy

The Executive acknowledges that the injury that would be suffered by the Employer, its Affiliates or any Portfolio Company as a result of a breach of the provisions of this Agreement (including any provision of Sections 7 and 8) would be irreparable and that an award of monetary damages to the Employer or any such Affiliate or Portfolio Company for such a breach would be an inadequate remedy. Consequently, the Employer or such Affiliate or Portfolio Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement. Without limiting their rights under this Section 9 or any other remedies of the

- 13 -

CERB 01363

11/18/99  18:09 FAX 212 738 5305        BLACK ACRE CAPITAL                    ☒019.023

FROM SCHULTE ROTH & ZABELLLP #2        (THU)11.18'99 16:23/ST.16:17/NO.4260783807 P 19

Employer or any such Affiliate or Portfolio Company, if the Executive breaches any of the provisions of Section 7 or 8, the Employer will have the right to cease making any payments otherwise due to the Executive under this Agreement. Each of the parties to this Agreement will be responsible for its own attorneys fees in relation to any remedies sought under this Agreement.

9.2    Covenants of Sections 7 and 8 are essential and Independent Covenants

The covenants by the Executive in Sections 7 and 8 are essential elements of this Agreement, and without the Executive's agreement to comply with such covenants, the Employer would not have entered into this Agreement or employed or continued the employment of the Executive. The Employer and the Executive have independent consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Employer, its affiliates and Portfolio Companies.

The Executive's covenants in Sections 7 and 8 are independent covenants and the existence of any claim by the Executive against the Employer under this agreement or otherwise will not excuse the Executive's breach of any covenant in Section 7 or 8.

If the Executive's employment hereunder expires or is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of the Executive in Sections 7 and 8.

9.3    Representations and Warranties by the Executive

The Executive represents and warrants to the Employer that the execution and delivery by the Executive of this Agreement do not, and the performance by the Executive of the Executive's obligations hereunder or his services to any Portfolio Company will not, with or without the giving of notice or the passage of time, or both: (a) violate any judgment, writ, injunction, or order of any court, arbitrator, or governmental agency applicable to the Executive; or (b) conflict with, result in the breach of any provision of or the termination of, or constitute a default under, any agreement to which the Executive is a party or by which the Executive is or may be bound.

9.4    Obligations Contingent on Performance

The obligation of the Employer hereunder, including its obligation to pay the compensation provided for herein, are contingent upon the Executive's performance of the Executive's obligations hereunder.

9.5    Indemnity and Insurance

It is understood and agreed that the Executive shall be covered by, and entitled to the benefits of, Employer's insurance coverage (as in effect from time to time) for its officers and/or executive employees, including its officers and directors liability policies. In addition, in the event that any claim is asserted against the Executive arising out of the performance of his duties

- 14 -

CERB 01364

A191

under and in accordance with this Agreement, Employer shall provide legal representation to the Executive at Employer's or a Portfolio Company's sole cost and expense, such counsel to be selected at the reasonable discretion of Employer.

9.6    Waiver

The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by either party in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

9.7    Binding Effect; Delegation of Duties Prohibited

This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto and their respective successors, assigns, heirs, and legal representatives, including any entity with which the Employer may merge or consolidate or to which all or substantially all of the assets may be transferred. The duties and covenants of the Executive under this Agreement, being personal, may not be delegated. Notwithstanding anything to the contrary set forth herein, the Employer reserves the right to cause all Salary and Benefits, any Bonus Amount or any other payment to the Executive to be paid or reimbursed or allocated to a Portfolio Company (other than Coram) or another entity in which the Employer or its Affiliates would have an interest; provided, that the Employer shall continue to be obligated for all such Salary, Benefits, Bonus Amount or other payments to the extent such Portfolio Company or other entity fails to make such payment.

9.8    Notices

All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested). In each case to the appropriate addresses and facsimile numbers set forth below (or to such other addresses and facsimile numbers as a party may designate by notice to the other parties):

- 15 -

CERB 01365

11.18/99  18:10 FAX 212 758 5305        BLACK ACRE CAPITAL                    ☒021/023

FROM SCHULTE ROTH & ZABELLLP n2            (THU) 11.18' 99 16:24/ST. 16:17/NO. 4260783807 P 21

If to the Employer:            Cerberus Capital Management, L.P.
                               450 Park Avenue
                               28th Floor
                               New York, NY 10022-2605
                               Attention: Stephen A. Feinberg
                                           Mark A. Neporent
                               Facsimile No.: 212-758-5305

With a copy to:                Schulte Roth & Zabel LLP
                               900 Third Avenue
                               New York, New York 10022
                               Attention: Stuart D. Freedman
                               Facsimile No.: (212) 832-4169

If to the
Executive:


With a copy to:


9.9    Entire Agreement; Amendments

This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, between the parties hereto with respect to the subject matter hereof. This Agreement may not be amended orally, but only by an agreement in writing signed by the parties hereto.

9.10    Governing Law

This Agreement will be governed by the laws of the State of New York without regard to conflicts of laws principles.

9.11    Jurisdiction

Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against either of the parties in the courts of the State of New York, or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of New York, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any

- 16 -

CERB 01366

**A193**

FROM SCHULTE ROTH & ZABELLLP ±2          (THU) 11. 18' 99 16:24/ST. 16:17/NO. 4260783807 P 22

objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on either party anywhere in the world.

### 9.12    Section Headings, Construction

The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement unless otherwise specified. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

### 9.13    Severability

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

### 9.14    Counterparts

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

### 9.15    Waiver of Jury Trial

THE PARTIES HERETO HEREBY WAIVE A JURY TRIAL IN ANY LITIGATION WITH RESPECT TO THIS AGREEMENT.

- 17 -

CERB 01367

**A194**

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date above first written above.

EMPLOYER

CERBERUS CAPITAL
MANAGEMENT, L.P.

By:   Craig Court, Inc., its
General Partner

By:

EXECUTIVE:

Daniel Crowley

CERB 01368

FROM SCHULTE ROTH & ZABELLLP x2          (THU) 11. 18' 99  16:24/ST. 16:17/NO. 4260783607 P 23

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date above first written above.

EMPLOYER

CERBERUS CAPITAL
MANAGEMENT, L.P.

By:   Craig Court, Inc., its
General Partner

By:

EXECUTIVE:

Daniel Crowley

CERB 01369

FROM PAUL HASTINGS FX

## EMPLOYMENT AGREEMENT

AGREEMENT between Coram Healthcare Corporation, a Delaware corporation (the "Company"), and Daniel Crowley ("Executive"), made as of November 30, 1999, the date upon which Executive has executed and delivered this Agreement to the Company (the "Effective Date").

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Employment. The Company shall employ Executive, and Executive accepts employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on the date hereof and ending as provided in paragraph 5 hereof (the "Employment Period").

2.      Position and Duties. During the Employment Period, Executive shall serve as the Chairman of the Board, President and Chief Executive Officer of the Company and all of its wholly-owned subsidiaries, and Executive shall have the normal duties, responsibilities and authority of the Chairman of the Board, President, and Chief Executive Officer.  Executive is a former Chief Executive Officer of a Fortune 200 Company in demand to serve as Chairman of the Board, Chief Executive Officer or turn around management. Executive also owns and operates his own company, Dynamic Healthcare, that has various business interests. Executive intends to do whatever is professionally necessary to turn the Company around and the Company recognizes that Executive will have other business interests and may serve as an officer or consultant to other businesses.  Executive shall have the right, with the concurrence of the Company's Board of Directors, to appoint a chief executive officer when the Company, in Executive's reasonable opinion, has been stabilized; provided, however, that such an appointment shall not be deemed to cause a termination of the Employment Period by the Company hereunder and shall not trigger payment of any amounts to Executive pursuant to Section 5(d).  Upon the appointment of a successor chief executive officer pursuant to this Section 2, Executive shall retain his position as Chairman of the Board and all of the terms of this Agreement shall remain in full effect except to the extent modified in a manner which is mutually acceptable to the parties, including without limitation an adjustment to the base compensation payable hereunder.

3.      Base Salary and Benefits.

(a)      Executive's base salary (the "Base Salary") shall initially be $650,000 per annum, payable in cash and in accordance with the Company's general payroll practices. The Base Salary shall be reviewed annually by the Board of Directors of the Company (the "Board") and increased (but not decreased) based upon Executive's performance.

(b)      In addition to the Base Salary, Executive shall be entitled to a performance bonus (the "Bonus") payable within 90 days of the end of each fiscal year based upon the Company's operating results, as follows:  if earnings before interest, taxes, depreciation and amortization (EBITDA) of the Company, as measured by the audited financial statements of the Company in any one year equals or exceeds 100% of the target amounts (the "EBITDA Targets") to be determined by the Compensation Committee of the Board of Directors of the Company (consisting of at least two outside directors who will

LA/437723.4

CRX 00159



EXHIBIT

Adams 8
CW   3/27/07

CH-11 TRUSTEE/
CrowleyAdmin005722

**A197**

ROM PAUL HASTINGS F.                    (THU) 11 :0 77  / .--.

comprise a majority of such Committee) and Executive in good faith, beginning in fiscal year 2000, Executive shall be entitled to a bonus for such year (the "Bonus") equal to the percentage set forth on Schedule A hereto of the Base Salary in effect on the last day of the Company's fiscal year for which such Bonus is payable. Any Bonus earned by Executive hereunder shall be payable by the Company in cash.

(c)    Executive shall be granted options as of the Effective Date to purchase 1,000,000 shares of Common Stock of the Company (the "Option Shares") at a price equal to the closing price of the Common Stock on the New York Stock Exchange on the Effective Date. The Option Shares shall be granted to Executive under the Company's 1994 Stock Option/Stock Issuance Plan (the "Plan"). Each of the options (the "Options") shall vest and become exercisable by Executive as to 33-1/3% of the Option Shares covered thereby on each of the first, second and third anniversaries of the Effective Date, if Executive is then employed by the Company, and will vest as to 100% of the Option Shares upon: (i) a Change in Control (as defined below); (ii) any termination by the Company of this Agreement other than a termination by the Company for Cause (as defined below); (iii) any termination by Executive pursuant to paragraph 5(a)(ii) hereof; or (iv) if the Employment Period is terminated as a result of Executive's death or permanent Disability (as defined below).

For purposes of this Agreement, a Change in Control of the Company shall be deemed to have occurred if: (i) any "person" (as such term is Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), other than a trustee or other fiduciary holding securities of the Company under an employee benefit plan of the Company or the Senior Subordinated Noteholders pursuant to the Securities Exchange Agreement dated May 6, 1998, or a group composed principally thereof, becomes the "beneficial owner" (as defined in Rule 13d-3 promulgated under the Exchange Act), directly or indirectly, of securities of the Company representing 50% or more of (A) the outstanding shares of Common Stock of the Company or (B) the combined voting power of the Company's then-outstanding securities entitled to vote generally in the election of directors; (ii) during any period of not more than two consecutive years, individuals who at the beginning of such period constitute the Board, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in paragraph (i) or (iii) of this paragraph 3(c)) whose election by the Board or nomination for election by the Company's shareholders was approved by a vote of at least two-thirds of the directors still in office who were either in office at the beginning of such period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority of the Board; or (iii) the shareholders of the Company approve a merger or consolidation which would result in the holders of voting securities of the Company outstanding immediately prior thereto failing to continue to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least 50% of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; or (iv) or the shareholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets or any transaction having a similar effect.

(d)    In addition to the Base Salary and any bonuses payable to Executive pursuant to this paragraph, Executive shall be entitled to the following benefits during the Employment Period, unless otherwise increased by the Board:

CRX 00160

-2-

CH-11 TRUSTEE/
CrowleyAdmin005723

A198

(i)  Health insurance, dental insurance and disability insurance as such coverage is made generally available to the senior executives of the Company and whole life insurance with a policy value of $1,000,000 naming Executive's beneficiary of choice;

(ii)  four weeks paid vacation each year (any unused vacation will be paid out at the Base Salary rate on December 31 of each year during the Employment Period and upon termination of this Agreement);

(iii)  participation in any group life insurance plan, or other insurance plan, medical expense plan or other benefit arrangement maintained by the Company for its senior executives generally and, if applicable, their family members; and

(iv)  a car allowance of $1,800 per month.

(e)  The Company shall provide Executive corporate housing in Denver, Colorado for all or such portion of the Employment Period as is requested by Executive.

(f)  The Company shall also pay to Executive an amount equal to the "Grossed-up Excess Tax Liability." The term "Grossed-up Excess Tax Liability" means an amount which, after Executive's payment of federal and state income tax liabilities arising on the receipt of the Grossed-up Excess Tax Liability payment, shall equal the amount of the "Benefits Tax Liability." The term "Benefits Tax Liability" shall mean the sum of federal and state income tax liability which is payable by Executive upon the receipt of the benefits provided for in Section 3(d), (e) and (i) hereof.

(g)  The Company shall reimburse Executive for all reasonable expenses incurred by him in the course of performing his duties under this Agreement, including upgrades for first class air travel, which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

(h)  In addition to the Base Salary and any bonuses payable to Executive hereunder, Executive shall also be entitled to receive an acquisition bonus ("Acquisition Bonus") equal to 2.99 times the annual Base Salary and "Target Bonus" (as defined on Schedule A hereof) payable to Executive hereunder at the time when the Acquisition Bonus becomes payable. The Acquisition Bonus shall be paid concurrently with the consummation of a merger or consolidation which results in the holders of voting securities of the Company outstanding immediately prior thereto failing to continue to represent (either by remaining outstanding, or by being converted into voting securities of the surviving entity) at least 50% of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation, or the sale or disposition by the Company of all or substantially all of the Company's assets, or any transaction having similar effect, other than a liquidation of the Company (an "Acquisition").

(i)  The company shall pay for Executive's annual federal and state tax preparation costs up to a maximum of $10,000 per calendar year.

4.  Board Membership. Executive shall be elected or appointed to serve as a member of the Board of Directors to fill a vacancy thereon and shall be appointed

LA/697323.4                              -3-                          CRX 00161

CH-11 TRUSTEE/
CrowleyAdmin005724

Chairman of the Board as of the Effective Date.  With respect to all subsequent regular elections of directors during the Employment Period, the Company shall nominate, and use its best efforts to elect, Executive to serve as a member of the Board.  If Executive is elected to serve on the Board, Executive shall be named the Chairman of the Board.  Upon the termination of the Employment Period for any reason, Executive shall resign as a director and officer of the Company and its Subsidiaries, as the case may be.  For purposes of this Agreement, "Subsidiaries" shall mean any corporation of which the securities having a majority of the voting power in electing directors are, at the time of determination, owned by the Company, directly or through one or more Subsidiaries.

5.      Term.

(a)      The Employment Period shall end on November 29, 2002, provided that:  (i) the Employment Period shall terminate prior to such date upon Executive's resignation, death or permanent disability (defined as the expiration of a continuous period of 180 days during which Executive is unable to perform his assigned duties due to physical or mental incapacity); (ii) the Employment Period may be terminated by Executive at any time prior to such date if the Company fails to comply with any material provision of this Agreement, which failure has not been cured within 10 business days after notice of such noncompliance has been given by Executive to the Company; and (iii) the Employment Period may be terminated by the Company at any time prior to such date for Cause.

(b)      If the Employment Period is terminated by the Company for Cause or is terminated by Executive's resignation, Executive shall be entitled to receive all amounts due to him through the date of termination.

(c)      If the Employment Period is terminated as a result of Executive's death or permanent Disability, the Company shall pay any amounts due to Executive through the date of termination and a Bonus (payable as set forth in paragraph 3(b)) in an amount equal to the Bonus which would have otherwise been payable to Executive pursuant to paragraph 3(b) with respect to the fiscal year in which such termination occurs.

(d)      If the Employment Period is terminated by the Company other than for Cause or by Executive pursuant to paragraphs 5(a)(ii) above, Executive shall be entitled to receive (i) his Base Salary through the third anniversary of the Effective Date (or, if longer, for a period of 24 months after the date of termination), payable in accordance with the Company's general payroll practices, and (ii) the then applicable Target Bonus which shall be payable within ninety days after the end of each of the Company's fiscal years ending thereafter through 2002.  The Company shall also continue coverage for Employee under the Company's life insurance, medical, health, disability and similar welfare benefit plans and the whole life insurance plan described in paragraph 3(d)(i) through the third anniversary of the Effective Date (or, if longer, for a period of 24 months after the date of termination).

(e)      Except as otherwise set forth above, all of Executive's rights to fringe benefits and bonuses hereunder (if any) accruing after the termination of the Employment Period shall cease upon such termination.

(f)      For purposes of this Agreement, "Cause" shall mean (i) the continuing willful failure or refusal by Executive to perform substantial and material duties hereunder (other than any such failure resulting from Executive's incapacity due to physical or mental illness), which has not ceased within 10 business days after written demand for substantial

LA\13273 4                              -4-                          CRX 00162

CH-11 TRUSTEE/
CrowleyAdmin005725

FROM PAUL HASTINGS #:

performance is delivered to Executive by the Company, which demand identifies the manner in which the Company believes that Executive has not performed such duties and the steps required to cure such failure to perform; (ii) Executive shall intentionally and willfully engage in misconduct toward the Company which is materially injurious to the Company and its Subsidiaries, monetarily or otherwise (including, but not limited to, conduct in violation of paragraph 7 or 8 hereof), or (iii) the conviction of Executive of or the entering of a plea of nolo contendere by Executive with respect to, a felony. Notwithstanding the foregoing, Executive's Employment hereunder shall not be deemed to be terminated for Cause unless and until there shall have been delivered to Executive a copy of a resolution duly adopted by an affirmative vote of not less than a majority of the entire membership of the Board at a meeting of the Board (after written notice to Executive and a reasonable opportunity for Executive, together with Executive's counsel, to be heard before the Board), finding that in the good faith opinion of the Board, Executive should be terminated for Cause. Cause shall not be deemed to include the performance of duties for other companies or businesses that do not compete with the Company or unreasonably interfere with Executive's turnaround responsibilities for the Company.

(g) In the event of any dispute regarding the existence of Executive's Disability hereunder, the matter will be resolved by the determination of a majority of three physicians qualified to practice medicine in Colorado, one to be selected by each of Executive and the Board and the third to be selected by the two designated physicians. For this purpose, Executive will submit to appropriate medical examinations.

(h) Executive shall not be required to mitigate the amount of any payment provided for in this paragraph 5 by seeking other employment or otherwise, and the amount of any payment or benefit provided for in this paragraph 5 shall not be reduced by any compensation earned by Executive as a result of employment by another employer or by retirement benefits.

6. Confidential Information. The Executive acknowledges that the information, observations and data obtained by him while employed by the Company concerning the business or affairs of the Company or any Subsidiary ("Confidential Information") are the property of the Company or such Subsidiary. Therefore, Executive agrees that he shall not disclose to any unauthorized person or use for his own account any Confidential Information without the prior written consent of the Board, unless and to the extent required by law, rule or regulation or pursuant to any administrative or court order. The term "Confidential Information" shall not include (i) information which is generally available to the public or those in the Company's industry as of the date of execution of this Agreement or which later becomes generally available to the public or those in the Company's industry other than as a result of Executive's prohibited disclosure; (ii) information which comes to Executive from a bona fide third party source so long as such source was not, to Executive's knowledge, prohibited from providing such information to Executive by any contractual, legal, fiduciary or other obligation; and (iii) information which was known to Executive before such information was obtained from the Company. Executive shall deliver to the Company at the termination of the Employment Period, or at any other time the Company may request, all memoranda, notes, plans, records, reports, computer tapes and software and other documents and data (and copies thereof) relating to the Confidential Information or the business of the Company or any Subsidiary which he may then possess or have under his control.

CRX 00163

-5-

CH-11 TRUSTEE/
CrowleyAdmin005726

FROM PAUL HASTINGS P.                    (THU) 11. 18' 99   9:22PM.   9:10/NO. 4200000000

7.    Non-Compete, Non-Solicitation.

(a)     Executive acknowledges that in the course of his employment with the Company he will become familiar with the Company's trade secrets and with other confidential information concerning the Company and its predecessors and that his services will be of special, unique and extraordinary value to the Company. Therefore, Executive agrees that (i) during the period in which Executive is receiving compensation from the Company pursuant to paragraph 5 hereof, or (ii) if the Employment Period is terminated as provided in paragraph 5(b), for a period of one year following such termination (the "Noncompete Period"), he shall not directly or indirectly own, manage, control, participate in, consult with, render services to, or in any manner engage in any business competing with any business of the Company or its Subsidiaries, as such businesses exist or are in process on the date of the termination of Executive's employment, within any geographical area in which the Company or its Subsidiaries engage or plan to engage in such businesses. Geographic areas in which the Company and/or its Subsidiaries plans to operate any businesses or in which any businesses of the Company exist or are in process will be identified in writing upon request of Executive within thirty days of the date of termination of the Employment Period. Nothing herein shall prohibit Executive from being a passive owner of not more than 5% of the outstanding stock of any class of a corporation which is publicly traded, so long as Executive has no active participation in the business of such corporation.

(b)     During the Noncompete Period, Executive shall not directly or indirectly through another entity (i) induce or attempt to induce any employee of the Company or any Subsidiary to leave the employ of the Company or such Subsidiary, or in any way interfere with the relationship between the Company or any Subsidiary and any employee thereof, (ii) solicit any person who was an employee of the Company or any Subsidiary at any time within one year prior to termination of the Employment Period, or (iii) induce or attempt to induce any customer, supplier, licensee or other business relation of the Company or any Subsidiary to cease doing business with the Company or such Subsidiary, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and the Company or any Subsidiary.

(c)     If, at the time of enforcement of this paragraph 7, a court shall hold that the duration, scope or area restrictions stated herein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law.

(d)     In the event of the breach or a threatened breach by Executive of any of the provisions of this paragraph 7, the Company, in addition and supplementary to other rights and remedies existing in its favor, may apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions thereof (without posting a bond or other security).

8.    Executive and Company Representations.     Executive hereby represents and warrants to the Company that (i) the execution, delivery and performance of this Agreement by Executive does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Executive is a party or by which he is bound, and (ii) upon the execution and delivery of this

LA:4512:2                          -6-                          CRX 00164

CH-11 TRUSTEE/
CrowleyAdmin005727

FROM PAUL HASTINGS ₤:                    (THU) ... 18' 99  9:25...  ... ...

Agreement by the Company, this Agreement shall be the valid and binding obligation of Executive, enforceable in accordance with its terms. The Company hereby represents and warrants to Executive that it is not entering into this Agreement in contemplation of any merger or sale of the Company.

9.    Survival. Paragraphs 5, 6, 7 and 8 shall survive and continue in full force in accordance with their terms notwithstanding any termination of the Employment Period.

10.    Notices. All notices, requests, demands and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to be delivered and receive five business days after having been deposited in the United States mail and enclosed in a registered or certified post-paid envelope; one business day after having been sent by overnight courier; when personally delivered or sent by facsimile communications equipment of the sending party on a business day, or otherwise on the next succeeding business day thereafter; and in each case addressed to the respective party at the address set forth below or to such other changed addresses as the party may have fixed by notice as provided herein:

Notices to Executive:

Daniel Crowley
400 Capitol Mall
Suite 1250
Sacramento, CA 95814
Telephone:    (916) 449-6056
Fax:          (916) 449-6059

with a copy to:

Pillsbury, Madison & Sutro LLP
400 Capitol Mall
Suite 1700
Sacramento, CA  95814-4419
Attention:    Michael A. Kvarme, Esq.
Telephone:    (916) 329-4713
Fax:          (916) 441-3583

Notices to the Company:

Coram Healthcare Corporation
1125 Seventeenth Street
Suite 1500
Denver, CO  80202
Attention:  Scott Larsen, Esq.
Telephone:    (303) 292-4973
Fax:          (303) 298-0047

CRX 00165

LA:127923.4                    -7-

CH-11 TRUSTEE/
CrowleyAdmin005728

FROM PAUL HASTINGS #1                    (THU)11.10 '07  7:27

with a copy to:

Paul, Hastings, Janofsky & Walker LLP
555 S. Flower Street, 23rd Floor
Los Angeles, CA 90071
Attention: Anna M. Graves, Esq.
Telephone:    (213) 683-6345
Fax:          (213) 996-3345

11.    Severability.  Whenever possible, each provision of this Agreement
will be interpreted in such manner as to be effective and valid under applicable law, but if
any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect
under any applicable law or rule in any jurisdiction, such invalidity, illegality or
unenforceability will not affect any other provision or any other jurisdiction, but this
Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid,
illegal or unenforceable provision had never been contained herein.

12.    Complete Agreement.  This Agreement, those documents expressly
referred to herein and other documents of even date herewith embody the complete
agreement and understanding among the parties and supersede and preempt any prior
understandings, agreements or representations by or among the parties, written or oral, which
may have related to the subject matter hereof in any way.

13.    Counterparts.  This Agreement may be executed in separate
counterparts, each of which is deemed to be an original and all of which taken together
constitute one and the same agreement.

14.    Successors and Assigns.  This Agreement is intended to bind and inure
to the benefit of and be enforceable by Executive, the Company and their respective heirs,
successors and assigns, except that Executive may not assign his rights or delegate his
obligations hereunder without the prior written consent of the Company. The Company will
require any successor (whether direct or indirect, by purchase, merger, consolidation or
otherwise) of all or substantially all of the business and/or assets of the Company, to
expressly assume and agree to perform this Agreement in the same manner and to the same
extent that the Company would be required to perform it if no such succession had taken
place.

15.    Attorneys' Fees and Costs.  If any action at law or equity is necessary
to enforce or interpret the terms of this Agreement, Executive shall be entitled to reasonable
attorneys' fees, costs and disbursements in addition to any relief to which he may otherwise
be entitled if he is the prevailing party in such action.

16.    Choice of Law.  This Agreement will be governed by the internal law,
and not the laws of conflicts, of the State of Colorado.

17.    Amendment and Waiver.  The provisions of this Agreement may be
amended or waived only with the prior written consent of the Company and Executive, and
no course of conduct or failure or delay in enforcing the provisions of this Agreement shall
affect the validity, binding effect or enforceability of this Agreement.

CRX 00166

CH-11 TRUSTEE/
CrowleyAdmin005729

A204

FROM PAUL HASTINGS E.                    (THU) ... ...

* * * * *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

CORAM HEALTHCARE CORPORATION

By: _David Dual_

Its: _Chairman_

EXECUTIVE

_Daniel Crowley_    30 Nov 99

DANIEL CROWLEY

CRX 00167

CH-11 TRUSTEE/
CrowleyAdmin005730

A205

FROM PAUL HASTINGS ::    (THU) 11 18 99  ::

## SCHEDULE A
## BONUS COMPENSATION

Beginning with the Company's fiscal year 2000, if the Company hits the percentage of its EBITDA Target set forth below, Executive will be entitled to receive as Bonus that percentage of his Base Salary (as in effect on the last day of the fiscal year in question) set forth below. If the Company hits a percentage of its EBITDA Target which is greater than one of the percentages set forth below but less than the next succeeding percentage, Executive shall be entitled to receive a pro rata portion of the incremental Base Salary payment.

| PERCENTAGE OF EBITDA TARGET | PERCENTAGE OF BASE SALARY |
|---|---|
| 100.0 %* | 60%* |
| 101.5% | 65% |
| 103.0% | 70% |
| 104.5% | 75% |
| 106.0% | 80% |
| 107.5% | 85% |
| 109.0% | 85% |
| 110.5% | 95% |
| 112.0% | 100% |
| 114.0% | 110% |
| 116.0% | 121% |
| 118.0% | 132% |
| 120.0% | 143% |
| 122.0% | 154% |
| 124.0% | 166% |
| 126.0% | 177% |
| 128.0% | 188% |
| 130.0% | 200% |
| 132.0% | 211% |
| 134.0% | 212% |
| 136.0% | 223% |
| 138.0% | 234% |
| 140.0% | 245% |
| 142.0% | 256% |
| 144.0% | 267% |
| 146.0% | 278% |
| 148.0% | 289% |
| 150.0% | 300% |

\*    These represent the "Target Bonus" levels for purposes of this Agreement.

CRX 00168

CH-11 TRUSTEE/
CrowleyAdmin005731

A206

## AMENDMENT NO. 1
## TO EMPLOYMENT AGREEMENT

THIS AMENDMENT NO. 1 TO EMPLOYMENT AGREEMENT (this "Amendment"), dated as of _November 30_, 1999 amends that certain Employment Agreement, dated as of November 30, 1999 (the "Employment Agreement") between Coram Healthcare Corporation, a Delaware corporation (the "Company"), and Daniel Crowley (the "Executive"); and is made and entered into with reference to the facts described below. All terms appearing in this Amendment with initial capitalization shall have the meanings ascribed to them in the Employment Agreement, unless otherwise defined herein.

### RECITALS

WHEREAS, the Company and the Executive desire to amend the Employment Agreement to revise the exercise price that will be applicable to the stock options that will be granted to the Executive;

NOW, THEREFORE, in consideration of the foregoing, the parties hereby agree as follows:

1.   Amendment to Employment Agreement.

    1.1   Paragraph (c) of Section 3 of the Employment Agreement is hereby amended by deleting the first sentence of the paragraph in its entirety and substituting the following in its place:

    (a)   Executive shall be granted options as of the Effective Date to purchase 1,000,000 shares of Common Stock of the Company (the "Option Shares") at a price equal to the closing price of the Common Stock of the New York Stock Exchange on November 29, 1999, the day immediately preceding the Effective Date.

2.   Counterparts. This Amendment may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same amendment.

3.   Miscellaneous. Except as expressly amended by this Amendment, the Employment Agreement shall continue in full force and effect in accordance with the provisions thereof. As used in the Employment Agreement, the terms "hereinafter," "hereto," hereof, and other words of similar import shall, unless the context otherwise requires, mean the Employment Agreement as amended by this Amendment. In the event of any conflict or inconsistency between the terms and conditions of the Employment Agreement and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall control.

CRX 00170

CH-11 TRUSTEE/
CrowleyAdmin005733

A207

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date
first above written.

CORAM HEALTHCARE CORPORATION          EXECUTIVE

By: _____         _____
    Donald J. Amaral                  Danie. Crowley
    Chairman

H:\LEGAL\CORAM\CRWLYAMD.DOC                    2

CRX 00171

CH-11 TRUSTEE/
CrowleyAdmin005734

**A208**

# CONFIDENTIAL

## PRIVILEGED & CONFIDENTIAL

## ATTORNEY-CLIENT COMMUNICATION

7 December 1999

To: Michael Kahn of Folger, Levin & Kahn Law Firm
      Coram Board of Directors

Dear Mr. Kahn and Coram Board Member,

This is a highly privileged and company confidential communication. It should not be copied or distributed and must be treated with respect to maintaining its confidential nature.

The purpose of this note is to provide you with a copy of a settlement offer from Aetna (attached) and to discuss and formulate legal strategy in the Aetna matter and related aspects of the Coram business.

First, I want to say thank you for providing me with the opportunity to serve you in pursuing a turnaround effort at Coram Healthcare. I will do everything I can to earn your trust and find a solution, *if possible*, to the serious issues at the Company.

Although I was not an official until 30 November, I nevertheless have been engaged in Coram's work since September 1999. Since then, I have been working to understand the company. In the last week I met with Coram's two outside law firms, the overwhelming majority of Coram's management, and all of the employees at the Denver Headquarters.

Please forgive the familiarity and informal format, but I wanted to give you a quick download of what I have found so far. Here are some data points:

**Cash**:

In the last year Coram has invested $40 Million in CPS, lost $25 Million in the base Home Infusion Business, and lost or not received approximately $65 Million in its R Net operations. Its Account Receivable exceeds $130Million. As a direct result, **Coram's current cash position is both dire and immediate.**



December 7, 1999
Page 2

The Accounts Receivable (A/R) is large and aging. On my first day, the Treasurer told me that we needed to *write-off about $8Million of the A/R*. I believe there could be other write-offs before the Balance Sheet is conservative again. It's clear that management has not taken all of the proper steps to pursue its customers or to repair its contracts to end this freefall in cash. Management has created an incentive (I suggested this to Rick Smith a couple of months ago) to collect the A/R. This has improved collections but not enough. One strategy to build cash was to not pay the bills. As a result, at the end of November, the Accounts Payable had grown substantially and aged to the point that Coram was being cut off by its vendors. Mr. Amaral and I agreed that we needed to draw $7.5 Million more on the credit line to buy some time. With this draw, the oldest and highest priority bills can now be paid. As a follow-on, *we have lit up the entire A/R, Accounting, and Senior Management Staff to get on the collection effort. I will be following cash collection, personally, every single day.*

CPS must be sold. While this start-up was strategically compelling, this was an ill-timed adventure that has drained away cash from Coram at a time when we could not afford it. Our investment easily exceeds $40Million in cash and this cash drain continues. The Board was prudent in putting CPS up for sale. CPS could easily use up another $30Million in the next year to fund its business plan. Hopefully, Coram can recover its $40Million investment (and some of the time value of the invested money). Otherwise, CPS would need many millions more to fund its growth. FY 2000 EBITDA is expected to be minimal. Cash flow is and will be negative at CPS. *Further investment, consulting, staffing, new programs at CPS have been put on hold by me.*

General Expenses have been uncontrolled and are not in keeping with the leveraged nature of Coram or its cash flow. Debt has been used to fund $500,000 in quarterly 401 (k) match ($2,000,000 per year in cash), as well as an endless list of similar expenses (e.g. Employee Stock Purchase Program in which Coram buys shares for cash on the open market and then sells them at 85% of market to employees, who can turn around and sell them at a gain). *We will move to terminate all of such programs immediately.*

Uncontrolled consulting has cost Coram over $1,000,000 in cash the last twelve (12) months. *We have already moved to terminate all but the most essential consultant agreements.*

A210