Coram Healthcare Corporation
c/o Deutsche Banc Alex Brown
March 3, 2000
Page 2

CVS ProCare

| | | |
|---|---|---|
| Dennis Burton | Phone: | 401-765-1500 X2090 |
| | Fax: | 401-765-7803 |
| David Rickard, EVP, CFO, CVS Corporation | Phone: | 401-765-1500 X3660 |
| | Fax: | 401-765-7803 |
| Zenon Lankowsky, VP, General Counsel CVS Corporation | Phone: | 401-765-1500 X3550 |
| | Fax: | 401-765-7887 |

Edwards & Angell

| | | |
|---|---|---|
| Christopher D. Graham | Phone: | 401-274-9200 X6579 |
| | Fax: | 401-276-6611 |
| Patrick A. Rogers | Phone: | 401-274-9200 X6690 |
| | Fax: | 401-276-6611 |

CROWLEY 0100

PRV_Goliath Cvr Ltr.DOC/CGRAHAM

14017657803 PAGE.04
** TOTAL PAGE.04 **

A301

# MINUTES OF A TELEPHONIC MEETING
# OF THE BOARD OF DIRECTORS OF
# CORAM HEALTHCARE CORPORATION

March 9, 2000

A telephonic meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was convened at approximately 9:30 a.m. MST. Participating in the meeting were the following Directors: Daniel D. Crowley, Chairman of the Board, Chief Executive Officer and President; Donald J. Amaral; William J. Casey; Stephen A. Feinberg; L. Peter Smith and Sandra R. Smoley. Allen J. Marabito, Executive Vice President; Wendy L. Simpson, the former Chief Financial Officer of the Company; Vito Ponzio, Senior Vice President, Human Resources; Scott R. Danitz, Senior Vice President, Finance and Chief Accounting Officer; John McIntyre, Vice President, Treasury; and Scott T. Larson, Senior Vice President, General Counsel and Secretary, also participated in the meeting. Also in attendance were Kurt Davis of Dynamic Healthcare Solutions, LLC and Christina Morrison of Deutsche Banc.Alex Brown. Mr. Crowley acted as Chairman of the meeting and Mr. Larson kept the minutes.

## CPS AUCTION UPDATE

Ms. Morrison was invited to report on the status of the sale of the Company's prescription services division, Coram Prescription Services ("CPS"). Ms. Morrison described the actions that had been taken since her last report to the Board and identified the two parties that were continuing to pursue the acquisition of the CPS division. Ms. Morrison outlined the proposal that had been made by one of the parties, a subsidiary of CVS Corporation, a copy of which had been distributed to the Board members for review and discussion. She stated that the other party was not yet prepared to submit an offer. Ms. Morrison responded to the questions of the Board on the CVS proposal and completed her status report. Ms. Morrison departed from the meeting after responding to the Board's inquiries.

## REVIEW AND APPROVAL OF MINUTES FROM PRIOR MEETINGS

The next item of business was a review and consideration of the minutes from prior meetings of the Board of Directors that had been circulated to the Board. Upon a motion duly made and seconded, the minutes from the prior meetings of the Board dated December 21, 1999, and February 10, 2000, were unanimously approved as presented.

## DISCUSSION OF CVS PROPOSAL

The Board resumed its discussion of the CPS auction and the CVS proposal. An analysis of the proposal that had been prepared by management and distributed to the Board was reviewed and discussed. The Board considered the benefits of accepting the proposal and compared and

contrasted the risks and the costs of retaining CPS. After discussing the merits of the proposal, the circumstances of the market for CPS and the position of the Company generally, the Board determined that retaining CPS rather than selling it to CVS on the terms proposed would be in the best interests of the Company and its stockholders at this time. The Board recognized that the market for CPS might improve at a later date at which time it may reconsider the prospects for selling CPS. The Board further determined that it would consider any greater and further proposals from any new or existing parties.

FINANCIAL UPDATE

The next item of business was a report from the Audit Committee. It was reported that the Audit Committee, which is chaired by Mr. Casey, met earlier in the day and received the report of the Company's independent auditors, Ernst & Young, LLP. The Audit Committee had resolved to receive the Audit Report and refer it to the full Board. After discussion among the Board regarding certain financial issues raised and addressed in the audit, the Board unanimously adopted the recommendation of the Audit Committee to receive the report of the Company's independent auditors.

The Board then reviewed and discussed the draft press release that had been previously provided to the Board. The release was intended to announce the Company's financial results during the year ended December 31, 1999 and certain other matters. After review, the Board authorized the distribution of the press release.

Mr. Danitz was then invited to provide an overview of the restructuring charge that had been included in the Company's 1999 financial statements. He summarized the primary differences between the schedule describing the charge that had been distributed in connection with this meeting and the other schedules that had been presented in prior meetings. The Board posed questions regarding the charge and answers were provided regarding the various elements of the charges and their corresponding support.

Mr. Crowley then summarized the Company's financial performance during January 2000. Cuts in operating costs, controls on accounts payable, reductions in the overall level of accounts payable and cash collections were highlighted. In addition, reports were also made on certain operating strategies that had been implemented to change the mix of therapies being delivered as well as the $2.5 million paid on the Company's debt.

The discussion turned to certain other financial difficulties and contingencies impacting the Company including certain obligations for unused or unneeded office space, certain employment agreements, the Company's debt load , the threat of a claim against the Company from the Bankruptcy Estates of Coram Resource Network, Inc. and Coram Independent Practice Association, Inc., litigation, tax disputes and regulatory requirements. Mr. Crowley reviewed

certain alternatives that had been presented to him for addressing such challenges. Further discussion of these matters would be undertaken at a future meeting of the Board.

The Board then determined that its next meeting would occur on Wednesday, April 5, 2000 in New York, New York. The Board requested the use of the offices of Cerberus Partners beginning at 11:00 a.m. local time.

## LEGAL UPDATE

In a privileged and confidential discussion, Mr. Marabito with Mr. Larson informed the Board of the status of the litigation with Aetna U.S. Healthcare Inc. The Board was apprised of a court ordered settlement conference that was scheduled to occur on March 15, 2000 in this case. The Board was also informed of the status of the case involving Price-WaterhouseCoopers and the Coram Resource Network, Inc. bankruptcy matters.

## OTHER BUSINESS

Management informed the Board of Directors regarding centralization of management in the Denver headquarters. Centralization and consolidation would require certain corporate officers relocating to the Company's Denver headquarters or the office where the primary operations for which they are responsible is located. Previous correspondence regarding this matter was distributed to the Board. It was determined that relocation and centralization as described was in the best interests of the Company to improve operating and managerial efficiencies and communication. The Board was informed that certain officers were refusing to relocate and discussion followed regarding the related issues and alternatives.

A discussion occurred regarding certain matters of management incentive compensation. The Compensation Committee would convene as necessary to address such matters.

There being no further business, the meeting was adjourned at 11:10 a.m. MST.

Respectfully submitted,

[signature]

Scott T. Larson
Secretary



CORAM HEALTHCARE

1125 Seventeenth Street, Suite 2100
Denver, Colorado 80202
Telephone 303.292.4973 / 800 CORAM HC
Facsimile 303.298.0043

March 14, 2000

Via Facsimile

To: Coram Board of Directors

At my encouragement, the management at Coram Prescription Services developed an offer to buy CPS. The offer is backed by GTCR which is a private equity fund. Attached is a copy of the proposal.

I have countered on behalf of Coram and asked that GTCR pay between $42,000,000 and $45,000,000 for CPS with terms that make more sense to us. I have suggested that GTCR do two weeks of non-exclusive due diligence. After this due diligence we would require a more firm offer within our range. An purchase of CPS in our range would enable us to pay the debt-holders over $30,000,000 and would not be dilutive. A copy of our analysis of the offer on the table is attached. The analysis shows conservatively that the offer generates $426,000 of accretion.

No action is required on your part at this time, but rather just to stay informed by reading the related materials.

Sincerely,

Dan

Daniel D. Crowley
Chairman, President & CEO

Attachments

cc: Allen Marabito, Esq.
Scott Larson, Esq.

EXHIBIT
Morrison 13
CW 3/26/07

** TX STATUS REPORT ** AS OF MAR 14 2000 09:41 PAGE.01

DYNAMIC HEALTHCARE

| | DATE | TIME | TO/FROM | MODE | MIN/SEC | PGS | JOB# | STATUS |
|---|---|---|---|---|---|---|---|---|
| 01 | 03/14 | 09:15 | 212 755 3009 | EC--S | 02'53" | 010 | 070 | OK |
| 02 | 03/14 | 09:19 | 17757495407 | EC--S | 02'51" | 010 | 070 | OK |
| 03 | 03/14 | 09:22 | 9168933034 | EC--S | 04'34" | 010 | 070 | OK |
| 04 | 03/14 | 09:28 | 916 966 8449 | EC--S | 03'08" | 010 | 070 | OK |
| 08 | 03/14 | 09:30 | 8474789502 | EC--S | 02'52" | 010 | 070 | OK |

**Daniel D. Crowley** **400 Capitol Mall #1250, Sacramento, CA 95814**

# FAX

Date: 3-14-00

Number of pages including cover sheet: 10

**To: Coram Healthcare**
**Board of Directors**

| | |
|---|---|
| Stephen Feinberg | 212.421-2947 |
| Don Amaral | 775.749-5407 |
| William Casey | 530.893-3034 |
| L. Peter Smith | 847.478-9502 |
| Sandy Smoley | 916-966-8449 |

**From:**
**Dan Crowley** **Chairman, President & CEO**
**Coram Healthcare**

Phone: 916.449-6056 (Pam Herrera)

Fax phone: 916.449-6059

REMARKS: Urgent For your review Reply ASAP Please comment

CONFIDENTIAL – CONFIDENTIAL – CONFIDENTIAL – CONFIDENTIAL – CONFIDENTIAL

**Confidentiality Note**

*This communication is intended to be confidential and for the use of only the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution or copy of this telecopy is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original message to us at the address above via the United States Postal Service (we will reimburse postage.) Thank you.*

**Coram Healthcare Corporation**
**Gain Calculation**

| | Book Basis | |
|---|---|---|
| **Sales Price** | $ 40,000,000 | (1) |
| Net Assets to be purchased | $ 19,596,086 | (2) |
| | $ 20,403,914 | |
| Assets Not Purchased | $ 3,131,255 | (9) |
| | $ 17,272,659 | |
| **Direct Expenses of Sale:** | | |
| Investment Bank Fees | $ 1,000,000 | (3) |
| Misc. Investment Bank Expenses | $ 50,000 | (4) |
| Change in Control Payment | $ 755,000 | (5) |
| Retention | $ 247,650 | (5) |
| Severance | $ - | (5) |
| Relocation | $ - | (5) |
| CPS Audit Fees | $ 95,000 | |
| Coram Legal Fees estimate | $ 250,000 | |
| | $ 2,397,650 | |
| **Commitments Per Agreement** | | |
| Holdback Reserve | $ 4,000,000 | (6) |
| IPS Liability(Web) | $ 300,000 | (8) |
| **Net Gain** | $ 10,575,009 | |
| Assume Minimum AMT Tax Rate 2% | $ 240,163 | (7) |
| **After Tax Gain** | $ 10,334,846 | |

(1) The Purchase price represents:
- Their determination of the Company's base asset value
- Working Capital of $15,600,000 at closing; Purchase price to be adjusted up or down upon closing working capital

(2) Based upon unaudited Balance Sheet as of 1/31/00
(3) Based upon Advisory and Investment Banking Agreement dated 9/16/99
(4) Based upon estimated misc. expenses incurred
(5) Individual Agreements with CPS Management (see attached schedule)
- severance up to $645,300 payable if job lost not likely(need to pass liability)
- relocation of $20,000 payable if wanted, not likely(need to pass liability)

(6) Holdback reserve per Asset Purchase Agreement(10%) of Purchase Price This would be booked as a reserve upon close. If and when we received any payments it would be recognized as a gain. Established for the purpose of Purchase price adjustments and idemnification obligations established pursuant to the terms and conditions of the escrow agreement, which shall have an 18 month term.
(7) Minimum AMT tax based upon Tax Basis Gain
(8) Amount Due to IPS under contract for Web development
(9) Goodwill

**Coram Healthcare Corporation**
**Cash Impact of CPS Sale**

| | | | |
|---|---|---|---|
| **Source of Funds:** | | | |
| Sale Price | | $ | 40,000,000 |
| Less: 10% Holdback | | $ | (4,000,000) |
| **Net Cash @ Close** | | $ | **36,000,000** |
| | | | |
| **Use of Funds:** | | | |
| Investment Bank Fees | | $ | 1,000,000 |
| Retainer | (1) | $ | (75,000) |
| Misc. Investment Bank Expenses | | $ | 50,000 |
| Change in Control Payment | | $ | 755,000 |
| Retention | | $ | 247,650 |
| Severance | | $ | - |
| Relocation | | $ | - |
| Accrued Payroll & Benefits | | $ | 680,831 |
| Restructure Reserves | | $ | 562,778 |
| TBOB Liability | (2) | $ | 1,450,728 |
| Copier and Fax Lease Obligations | (5) | | |
| IPS Liability(Web) | (3) | | |
| Coram Legal Fees | (4) | $ | 175,000 |
| Tax Impact | | $ | 240,163 |
| **Total Uses of Funds** | | $ | 5,087,150 |
| | | | |
| **Available for Revolver Paydown** | | $ | **30,912,850** |
| Interest Rate | | | 10.25% |
| Annual Interest Impact | | $ | 3,168,567 |
| **Quarterly Interest Impact** | | $ | **792,142** |

Notes:

(1) Retainer Fee to be applied towards total fees
(2) Maximum Liability under Earnout Agreement with former owner as of Jan. 31, 2000. This would be due and payable upon deal closing
(3) 300k due under contract for Web development to be assumed
(4) Est. of legal fees to complete deal
(5) est 62k due under copier and fax leases to be assumed

**Coram Prescription Services**
**Cost/Benefit**

| | Q1-00 | Q2-00 | Q3-00 | Q4-00 | 2000 |
|---|---|---|---|---|---|
| **EBITDA** | 1,306,084 | 970,116 | 942,983 | 1,065,858 | 4,285,041 |
| (1) Coram Adj. if CPS not Sold | (50,000) | - | - | - | (50,000) |
| **Adjusted EBITDA** | 1,256,084 | 970,116 | 942,983 | 1,065,858 | 4,235,041 |
| **Balance Sheet Cash Requirements** | | | | | |
| Sorces and Uses for Operations | (1,095,940) | 691,951 | 1,089,640 | (1,105,831) | (420,180) |
| (2) Coram Adj. if CPS not Sold | (250,000) | | | | (250,000) |
| Capex | (50,000) | (370,000) (6) | (50,000) | (50,000) | (520,000) |
| **Cash Source(Use)** | (1,395,940) | 321,951 | 1,039,640 | (1,155,831) | (1,190,180) |
| **Net Impact with CPS** | (139,856) | 1,292,067 | 1,982,623 | (89,973) | 3,044,861 |
| **Savings without CPS** | | | | | |
| (3) Interest Savings | 792,142 | 792,142 | 792,142 | 792,142 | 3,168,567 |
| (4) Rent | 42,000 | 42,000 | 42,000 | 42,000 | 168,000 |
| (5) Marketing Agreement | - | 45,000 | 45,000 | 45,000 | 135,000 |
| (7) Transition Service Agreement | | | | | |
| **Net Impact without CPS** | 834,142 | 879,142 | 879,142 | 879,142 | 3,471,567 |
| **Net Difference** | 973,998 | (412,926) | (1,103,481) | 969,115 | 426,706 |

Notes:
(1) investment banker expenses (50k)
(2)TBOB earnout 250k Q1 due for 1999, would reduce total liability accrued in cash impact sheet
(3) Interest based on Paydown of Debt @ 10.25%
(4) Purchaser to p/u entire Orlando lease therefore upside of 14k/mo related to training facility
(5) Marketing Agreement between Coram and purchaser for 36 months @ 15k/mo 1st year, assume 4/1/00
(6) 300k in Capex is IPS Web Development payment due
(7) Mutually agreed to transition Service Agreement to be entered into for up to 1 year

# GTCR

PARTNERS WITH MANAGEMENT IN PRIVATE EQUITY

March 10, 2000

Coram Healthcare Corporation
1125 17th Street, Suite 2100
Denver, CO 80202

Dear Mr. Crowley:

This letter sets forth the terms and conditions under which a new corporation ("Newco"), to be formed by GTCR Golder Rauner, LLC, will acquire (the "Acquisition") the assets of the Coram Prescription Services division (the "Company") from Curaflex Health Services, Inc., a subsidiary of Coram Healthcare Corporation (the "Seller").

1. Structure and Purchase Price. The Acquisition will be structured as a purchase of all of the assets related to the business of the Company (the "Assets"), including without limitation, those assets described in paragraph 2 below. The consideration to be paid to the Seller by Newco for the Assets free and clear of all liens (the "Purchase Price") will be equal to (a) the assumption of the certain limited liabilities as described in paragraph 3 below and (b) $40,000,000, of which (i) $36,000,000 shall be paid in cash at the closing and (ii) $4,000,000 shall be posted as a letter of credit in an escrow account for the purpose of any purchase price adjustments and indemnification obligations established pursuant to the terms and conditions of an escrow agreement, which shall contain a term of 18 months, to be mutually agreed upon. The cash consideration will be decreased or increased, as the case may be, on a dollar-for-dollar basis by the amount, if any, that the Company's net working capital (i.e., current Assets minus current assumed liabilities), computed in accordance with generally accepted accounting principles consistently applied, as of the close of business on the day immediately preceding the closing (the "Closing Net Working Capital") is less than or greater than $15,600,000. The Closing Net Working Capital will be estimated at the closing and finally determined thereafter pursuant to a mutually agreed upon mechanism to be set forth in the definitive purchase agreement.

2. Assets. The Assets will include, but shall not be limited to, the following items:

(a) contracts with the following clients of the Seller on the same terms as existing prior to the date of this letter: (i) employer groups, (ii) HMO organizations, (iii) insurance companies, (iv) independent provider associations, (v) third party administrators, (vi) pharmacy providers, (vii) state/local governments and (viii) certain other specified contracts and arrangements with Seller or affiliates of Seller to be mutually agreed upon;

(b) computer hardware and related software licenses and rights;

(c) cash, accounts receivable and inventory;

(d) telephone listings, switch and hardware;

(e) furniture, fixtures, equipment and leasehold improvements;

(f) permits relating to operation of the Company;

GTCR GOLDER RAUNER, LLC · 6100 Sears Tower · Chicago, Illinois 60606-6402
Phone 312.382.2200 · Fax 312.382.2201 · www.gtcr.com

(g) proprietary rights, know-how and other information including all rights to the Seller's Internet site www.corampharmacy.com;

(h) books and records (including prescription files and records); and

(i) dispensing equipment and related software.

3. Liabilities. The Buyers will only assume the current balance sheet liabilities of the Company (other than indebtedness for borrowed money (including any accrued interest, prepayment penalties or premiums to be paid in connection therewith and cash overdrafts), capitalized leases, notes payable to shareholders and accrued dividends) and the scheduled contractual obligations of the Company which were incurred in the ordinary course of its business (which shall include (a) all real property leases including Orlando, Omaha, Las Vegas, Hayward, Houston, and Baltimore, (b) all equipment and personal property leases and (c) the Intershop Professional Services web development contract but shall specifically exclude any liabilities of the Seller to its former owners for royalties, earn-outs or similar arrangements).

4. Purchase Agreement. The parties will negotiate in good faith the terms of a definitive purchase agreement (the "Purchase Agreement"). The Purchase Agreement will contain closing conditions, covenants, representations and warranties, provisions for indemnification from the Seller for breaches of representations, warranties and covenants, and other customary terms and conditions to be mutually agreed upon.

5. Transition Agreement. In connection with the Acquisition, the Seller will enter into an agreement with Newco providing that the Seller will provide Newco with certain transition services, including accounting (including general ledger), human resources, payroll administration, participation in insurance programs, in each case for period of up to one year following the closing at a cost to be mutually agreed upon.

6. Marketing Services Agreement. In connection with the Acquisition, the Seller will enter into an agreement with Newco whereby the Seller will agree to provide certain marketing services to Newco as defined in such agreement. Newco will be treated as the exclusive specialty pharmacy for the Seller's injectable patients. Under the terms of such agreement, the Seller will agree (a) to make good faith efforts to refer to Newco all of its new patients requiring specialty pharmacy services (with certain exceptions to be mutually agreed upon), (b) include Newco in all requests for proposals and requests for information responses, (c) to use best efforts to introduce Newco's sales personnel to existing and new Seller payor relationships and (d) to continue the use of Newco as an outsource provider of medications on appropriate three party contracts. Such agreement will have an initial term of three years (it being understood that Newco will be able to terminate such agreement at anytime with 30 days notice and the Seller will be able to terminate such agreement if Newco materially breaches it obligations under the agreement). Newco will pay the Seller $15,000 per month for such services during the period ending on the first anniversary of the closing, $20,000 per month for such services during the period ending on the second anniversary of the closing and $25,000 per month for such services during the period ending on the third anniversary of the closing.

7. Purchase Investigation. After the Seller's execution of this agreement, the Seller and the Company will provide the Buyers and their lenders and their accounting and legal representatives full and complete access at reasonable times to the Company's (and, to the extent related to the Company's business, the Seller's) books and records, facilities, key personnel and independent accountants.

8. Exclusivity; Nondisclosure. The Seller agrees and covenants that from the date of its acceptance of this letter until the date that is 45 days after such acceptance (the "Exclusivity Period"), neither the Seller nor any of its officers, directors, representatives or affiliates will (i) submit, solicit, initiate, encourage, entertain or discuss a possible merger, sale, restructuring, refinancing or other disposition of all or a substantial part of the Company or any of its assets (a "Company Sale") with any other party, (ii) enter into any agreement or commitment related to a Company Sale, or (iii) furnish any information with respect to or facilitate in any other manner any effort or attempt by any person to do any of the foregoing. The Seller represents that it is not a party to or bound by any agreement with respect to a Company Sale other than under this letter and agrees that it will notify the Buyers in the event any offer is made for the Company. In addition, without the prior written consent of the other party, neither the Seller, the Buyers nor their representatives will disclose to any person (which shall include without limitation, any corporation, company, group, partnership or individual), except for representatives of the Seller and the Buyers on a need to know basis, including lenders, lawyers, accountants and other advisors, (a) that discussions or negotiations are taking place concerning a possible transaction regarding the Company or (b) any of the terms, conditions or other facts with respect to any such possible transaction, including the status thereof.

9. Conduct of Business. During the Exclusivity Period, the Seller will cause the Company to, and the Company will (i) conduct its business in the ordinary course of business consistent with past custom and practice, (ii) not enter into any material contract, agreement or transaction other than in the ordinary course of business and in accordance with past custom and practice, and (iii) not sell, lease, license or otherwise dispose of any interest in any of its assets outside the ordinary course of business.

10. Closing Conditions. Newco's consummation of the transactions contemplated by this letter will be subject to the satisfaction of customary closing conditions, including:

(a) the negotiation, execution and delivery of a satisfactory Purchase Agreement and other definitive agreements (including the Transition Services Agreement and Marketing Agreement referenced in this letter) necessary for the consummation of the transactions contemplated hereby;

(b) the Seller and Newco obtaining all necessary, third party (including obtaining the consent to assignment of those contracts listed in paragraph 2(a) above) and governmental consents and approvals (including under the Hart-Scott-Rodino Act, if applicable);

(c) accuracy in all material respects as of the closing of the Seller's representations and warranties contained in the Purchase Agreement;

GTCR GOLDER RAUNER, LLC • 6100 Sears Tower • Chicago, Illinois 60606-6402
Phone 312.382.2200 • Fax 312.382.2201 • www.gtcr.com

(d) obtaining satisfactory financing sufficient to consummate the transaction contemplated herein and to fund the working capital needs of the Company on terms and conditions satisfactory to Newco;

(e) the absence of any material adverse change in the Company's business, assets, financial condition, operating results, operations, prospects or employee relations and the absence of any material litigation (whether pending or threatened);

(f) the completion to the Buyers' satisfaction of their legal, accounting and business due diligence investigation and review of the Company; and

(g) the extension of the Baltimore Johns Hopkins pharmacy lease for at least a 12-month period following the closing and renegotiation of the Johns Hopkins PBM capitation contract on no worse than a break-even basis for at least a 12-month period following the closing.

11. Press Releases. All press releases and other public announcements and announcements to the Company's customers, suppliers, licensees or employees relating to this transaction will be prepared jointly by the Seller and the Buyers.

12. Timing. Promptly after the Seller's execution and delivery of this letter, the Buyers will begin conducting their due diligence review and preparing the Purchase Agreement and related documents (it being understood that the Buyers will complete their due diligence and expect to enter into the Purchase Agreement within 45 days after the date of this letter). The Buyers are prepared to devote the necessary resources to complete their due diligence, execute the Purchase Agreement and close the Acquisition expeditiously.

13. Fees and Expenses. Each of the Buyers, on the one hand, and the Sellers, on the other, will bear their own expenses in connection with the transactions contemplated hereby.

14. Effect; Termination; Miscellaneous. This letter is intended to be an expression of the parties' mutual intent and understanding and not a binding agreement, except for the provisions of Sections 7, 8, 9, 11, 13 and this Section 14 which shall be binding upon and inure to the benefit of the parties hereto, their respective successors and their permitted assigns. This letter shall be governed by the internal laws of the State of Illinois. This letter may be signed in two or more counterparts, any one of which need not contain the signature of more than one party, but all such counterparts taken together shall constitute one and the same agreement.

* * * * *

If you are in agreement with the terms of this letter, please sign in the space provided below by March 13, 2000 and return by courier a signed copy. We will then immediately implement our plans for consummating the transaction as expeditiously as possible.

Sincerely,

Edgar D Jannotta, Jr

AGREED AND ACCEPTED THIS
____ DAY OF MARCH, 2000:

CURAFLEX HEALTH SERVICES

By: ______________________________
Its: ______________________________

GTCR GOLDER RAUNER, LLC • 6100 Sears Tower • Chicago, Illinois 60606-6402
Phone 312.382.2200 • Fax 312.382.2201 • www.gtcr.com



MINUTES OF A MEETING

OF THE BOARD OF DIRECTORS OF

CORAM HEALTHCARE CORPORATION

April 5, 2000

A regular meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was held, pursuant to notice duly given, beginning at approximately 11:00 a.m. EST. In attendance at the meeting were the following Directors: Daniel D. Crowley, Chairman of the Board, Chief Executive Officer and President, Donald J. Amaral, William J. Casey, Steven A. Feinberg, L. Peter Smith (telephonically), and Sandra R. Smoley. Also participating in the meeting were Allen J. Marabito, Executive Vice President, Scott Danitz, Senior Vice President, Finance and Chief Accounting Officer, Kurt Davis, Dynamic Healthcare Solutions LLC, Michael J. Kahn, Esquire, Folger Levin & Kahn LLP, David Friedman, Esquire, Kasowitz, Benson, Torres & Friedman LLP, Charles Leonard, Partner, Chlopak Leonard Schechter and Associates, and Robert Mead, President and CEO, Gavin Anderson & Company.

Mr. Crowley, Chairman of the Board, convened the meeting and Mr. Marabito acted as secretary at the meeting.

**Review and Approval of Minutes from Prior Meetings**

Upon a motion duly made and seconded, the Minutes from the prior meetings of the Audit Committee dated March 9, 2000, and of the Board of Directors dated March 9, 2000, having been previously provided to the Board were unanimously approved as presented.

**Legal Update**

In a privileged and confidential communication, Mr. Kahn Esq., the lead trial counsel for the Company in the pending lawsuit, *Coram Healthcare vs. Aetna U.S. Healthcare*, advised and discussed with the Board the relevant procedural, substantive, mock trial and claim or damage issues that he and his firm were addressing in preparation for the trial that is scheduled to begin April 19, 2000. Mr. Kahn, after responding to the Board's questions, advised the Board of the process that would be utilized to keep Senior Management and the Board informed during the pendency of the trial.

TRUSTEE009454
USDC-DE #04-1565

**Coram Prescription Services Sale Update**

Mr. Crowley led a discussion of the analysis of the offers and counteroffers in the Coram Prescription Services ("CPS") auction. Materials previously provided to the Board setting out the gain calculation, cost/benefit analysis, cash impact of the sale, management payments, financials, assumptions and sources and uses of cash were reviewed and discussed with the Board concerning the proposed purchase by GTCR Golder Rauner LLC ("GTCR") as an equity and debt sponsor of CPS management.

The Board addressed the potential sale, its timing, the comparison of CPS relative to the industry and other relevant information and analytics regarding the operational, financial and managerial strengths and weaknesses of this business unit and the progress of the auction process. Various alternatives were discussed and analyzed along with the management buy-out elements. Following the discussion, the Board unanimously resolved to proceed with the approximately $41.3 million bid proffered by GTCR, subject to usual and customary terms, conditions, due diligence and Board approval. As previously determined, the Board reserved, under certain circumstances, the possibility of retaining CPS rather than selling this business unit.

**Restructuring Discussion**

Mr. Crowley addressed the financial issues facing the Company. Mr. Crowley presented financial and other information regarding various financial and operational components of the Company such as the level of recurring operating cash flow, disbursements analysis, trends in accounts receivable and accounts payable (reduced from $19.5 million to $7.3 million since November 1999), principal payments on the revolver ($4.5 million since November 1999), company wide cost reductions, average monthly operating expenses, average bi-weekly payroll, and aging cycles. Analysis and discussion also included comparisons of the present and historical financial and operational performance of the Company, including the impact of prior one-time occurrences and current business trends and operating strategies regarding the beginning and ending sales mix.

Mr. Crowley next presented information concerning the Company's ability to meet its financial and regulatory obligations under present circumstances. To this end, the Board discussed further the so-called "Stark II" law and the necessity of fulfilling the equity requirements imposed by the public company exception of Stark II by year end December 31, 2000; the potential financial default on the credit facility (revolver) of $38.5 million as of March 31, 2000, which becomes due on February 26, 2001; the potential financial default on the Series A notes of $168.4 million as of March 31, 2000, which becomes due on May 26, 2001; and the

potential financial default on the Series B notes of $92.1 million as of March 31, 2000, which may be called by the lenders on May 26, 2001.

Materials previously provided to the Board setting out the financial and regulatory obligations were reviewed and questioned. Also materials showing combinations of certain variables affecting the restructuring results (for example, CPS is sold or not sold, the debt is or is not restructured to a new revolver and a new loan is or is not entered into) were used for purposes of analysis. In the analysis several additional elements were considered, such as the amount of the CPS net book gain, interest rates, term, origination fees, and pay-out periods with differing operating and income assumptions. Additionally, the discussion included various recommendations of Management regarding an equity conversion in the amount of approximately $110 million, the establishment of a new revolver in the amount of $25 million and the establishment of a new term loan in the amount of $150 million.

**Financial Update**

Scott Danitz provided the Company's operating results for the month ended February 29, 2000, and the year to date for the two months ended February 29, 2000. The operating cash flow statement and the analysis of actual to budget variances along with the consolidated balance sheets at February 29, 2000, and December 31, 1999, were presented to the Board. Next, discussion focused on revenue growth, the revenue trends, the sales mix and the end mix, as well as the cash flow and float. Other items of discussion included the refund of $750,000 of the Cardinal deposit and the effect of the termination of Aetna's National Ancillary Services Agreement (to be effective April 12, 2000) on the Company's Northeast region.

Further, the Board addressed elements pertinent to the restructuring issues such as contract commitments, lease commitments, settlements, severance agreements and other matters such as goodwill, depreciation and amortization. Discussion addressed marketplace perceptions of a potential restructuring and the possible impact on physician referrals and vendor expectations.

**Discussion Regarding Restructuring Rights, Responsibilities and Alternatives**

In a privileged and confidential communication, David Friedman, Esq., Special Counsel, provided legal advice regarding the various aspects of the Company's restructure of its non-trade indebtedness and capital structure. Mr. Friedman advised the Board on his experience and his firm's expertise. Mr. Friedman responded to the questions of the Board, describing various approaches to restructuring along with the strengths and weaknesses of each approach.

TRUSTEE009456
USDC-DE #04-1565

Mr. Friedman also discussed with the Board the legal issues attending the Company's need to obtain net equity of $75,000,000 by the end of 2000 and to address potential financial defaults. Mr. Friedman indicated that there will be situations that will be atypical and not easily generalized; however, Mr. Friedman described a process directed to maximize recovery by creditors and shareholders by preserving the Company as a viable entity with a going concern value.

Mr. Friedman discussed the determination of the current value and the value of the entity following restructuring of the debt. Also discussed was the enterprise value of the Company, its debt capacity and the assets available for debt and equity interests. He also discussed with the Board disclosure requirements and financial and other legal reporting requirements along with overall business planning for debt restructuring and required financial information and responded to the Board's inquiries.

**Discussion of Public Relation Issues**

In response to the Board's inquiries regarding restructuring the debt and the perceived impact on employees, vendors, regulators, payors, and other constituents, Charlie Leonard, Partner, of Chlopack, Leonard, Schecter and Associates, and Robert Mead, President and CEO of Galvan Anderson and Company, addressed the Board. Messrs. Leonard and Mead discussed with the Board their background and firm capacity, the locations of their offices and the relationships of the two firms by way of partnership. They also provided their prior industry, association and healthcare representations. Mr. Leonard and Mr. Mead respectively discussed their prior experience in the R-Net bankruptcy and other related proceedings both within and without the healthcare industry.

The Board discussed the Company's communication functions and the requirements of communicating with the Company's constituents pertaining to the business, its future prospects and, where applicable, compliance with various regulatory and other requirements. Messrs. Mead and Leonard advised on the means of managing communications and public relations in a referral driven business; maintaining and defending the integrity of the Company; procedures that provide documentation at all levels of the organization; the communication strategy to maintain and stabilize the business and curtail the loss of key personnel, employees or vendors; and to maintain the continuation of the ordinary business activity. They also discussed the present marketplace perceptions of the Company's performance and circumstances, including assuring the continuing availability of goods and services from creditors, retaining key employees, maintaining creditor relations and preserving referral sources.

Subsequent to the advice of Management and the outside advisors, the Members of the Board having their inquiries responded to, upon a motion duly made and seconded, unanimously approved the following resolution:

**Restructuring Resolution**

WHEREAS, this Board of Directors recognizes that there are numerous financial difficulties and contingencies impacting the Company, any or all of which may require the Company to undertake a restructuring of its non-trade indebtedness and capital structure (the "Restructuring");

WHEREAS, in the judgment of the Board of Directors, it is desirable and in the best interests of this Company, its creditors, stockholders, employees and other interested parties, that the Company explore alternatives relating to the Restructuring;

WHEREAS, Company management has recommended that the Company engage special counsel to assist the Company in considering its Restructuring alternatives;

WHEREAS, management has identified David M. Friedman, Esq. of the firm of Kasowitz, Benson, Torres & Friedman LLP ("KBT&F") to serve in the role of special counsel for the Company relating to the Restructuring;

WHEREAS, management has recommended that the Company engage an independent financial advisor to assist the Company in considering its Restructuring alternatives;

WHEREAS, management has recommended that the Company engage a public relations firm to assist the Company in preserving its business relationships preceding, during and following the implementation of any Restructuring;

WHEREAS, the Board of Directors has also been advised that it may be appropriate, given the legal and other issues associated with the review and implementation of Restructuring alternatives to retain special legal counsel to represent and counsel the directors of the Company that are not employees of the Company (the "Outside Directors") to assist them in carrying out their duties to the Company and its creditors, stockholders, employees and other interested parties; and

WHEREAS, this Board has determined that engaging such legal, financial and public relations advisors experienced in representing and counseling companies with debt or equity restructuring needs would be in the best interests of the Company and its creditors, stockholders, employees and other interested parties;

NOW, THEREFORE BE IT RESOLVED, that the Chairman of the Board, Chief Executive Officer and President or its Executive Vice President, any Senior Vice President or the Secretary of the Company (the "Authorized Officers") are each hereby authorized, empowered and directed to engage KBT&F as special counsel to the Company in connection with the Restructuring substantially under the terms and conditions set forth in the draft retention agreement between the Company and KBT&F attached hereto;

FURTHER RESOLVED, that the Authorized Officers are each hereby authorized, empowered and directed to engage an independent financial advisor deemed qualified by them to advise and counsel the Company in connection with the Restructuring on such terms as may be negotiated by the Authorized Officers on behalf of the Company;

FURTHER RESOLVED, that the Authorized Officers are each hereby authorized, empowered and directed to assist the Outside Directors in identifying and engaging appropriate legal counsel to represent and counsel them in connection with their service to the Company in connection with the Restructuring;

FURTHER RESOLVED, that the Authorized Officers are each hereby authorized, empowered and directed to engage a public relations firm deemed qualified by them to advise and counsel the Company in connection with the Restructuring on such terms as may be negotiated by the Authorized Officers on behalf of the Company;

FURTHER RESOLVED, that the Authorized Officers of the Company are, and each one of them hereby is, authorized, empowered and directed, for and on behalf of the Company to negotiate the terms of the Restructuring including to negotiate the terms of any and all necessary documents and instruments related thereto, all subject to further review and approval of the Board of Directors; and

FURTHER RESOLVED, that each Authorized Officer of the Company be, and each of them hereby is, authorized, empowered and directed, for and on

behalf of the Company, to do and perform, or cause to be done and performed, all such acts, deeds and things, and to make, execute and deliver, or cause to be made, executed and delivered, all such agreements, amendments, undertakings, documents, instruments or certificates as any such Authorized Officer of the Company may deem necessary, advisable or appropriate to effectuate, execute and carry out fully the foregoing resolutions, and that all such action taken by any Authorized Officer prior to the date of these resolutions having heretofore been taken is hereby, ratified, confirmed and approved.

**Compensation Committee Report**

**Stock Options**

The Board next considered Mr. Crowley's request to approve additional stock option grants to certain members of senior management. After review and consideration of the recommendations as set forth on Exhibit A attached, upon a motion duly made and seconded, the Board unanimously approved the following resolution:

WHEREAS, the Company maintains the 1994 Coram Healthcare Corporation Stock Option/Stock Issuance Plan, as amended (the "Option Plan"), for the purpose, among others, of providing management and the Board of Directors with a compensation tool designed to align the interests of Company officers, employees and certain others with the interests of the Company's stockholders;

WHEREAS, the Chairman of the Board, Chief Executive Officer and President has submitted a recommendation to the Compensation Committee of this Board of Directors that provides for the grant of options to purchase shares of the Company's $.001 par value common stock (the "Common Stock") pursuant to the Option Plan to certain persons whose names are set forth on the list attached hereto as Exhibit A; and

WHEREAS, the Compensation Committee had accepted the recommendation of the Company's Chairman, Chief Executive Officer and President and has approved the grant of such options to the persons listed on Exhibit A under the terms and conditions described on Exhibit A (the "Recommended Options");

NOW, THEREFORE BE IT RESOLVED, that the issuance of all Recommended Options to purchase shares of Company Common Stock under the

Option Plan that are listed on Exhibit A hereto is hereby authorized, ratified, confirmed and adopted; and

FURTHER RESOLVED, that the Chairman, Chief Executive Officer and President, any Executive Vice President, any Senior Vice President or the Secretary of the Company (the "Authorized Officers") is each hereby authorized, empowered and directed to make, execute and deliver on behalf of the Company all stock option agreements and all other agreements, documents or certificates deemed necessary, appropriate or expedient to effect the issuance of the Recommended Options; and

FURTHER RESOLVED, that each of the Authorized Officers of the Company is hereby authorized, empowered and directed, for and on behalf of the Company, to take all such other actions and execute all such other documents, agreements and certificates as may be necessary, appropriate or expedient to carry out the intent of the foregoing resolutions.

Employment Agreement Amendment

In a closed session without the presence of management, the Compensation Committee reviewed with the Board the proposed amendment to Mr. Crowley's Employment Agreement.

There being no further business, the regular meeting of the Board was adjourned at approximately 2:45 p.m. EST.

Respectfully submitted,

Allen Marabito

Allen J. Marabito, Secretary of the Meeting

EXHIBIT A

Board of Director's
Compensation Committee

New Hire Stock Option Request

As part of the long-term incentive program used to attract qualified individuals to Coram, stock options are used as part of an individual's total compensation package.

This letter is to request the Coram Healthcare Board of Director's Compensation Committee grant options to the following newly employed individuals. Vesting would be per the 1994 Stock Option Plan.

| Name | Position | Options |
|---|---|---|
| Frank Geiger | Senior Vice President, Purchasing | 50,000 |
| Gerald Reynolds | Vice President, Controller | 25,000 |
| Alex Schott | Director, Accounting | 5,000 |

***Plan Summary:***

| | |
|---|---|
| Available as of May 15, 2000 | 528,965 |
| Grants requested | ( 80,000) |
| Remaining available | 448,965 |

Please indicate your approval by signing below:

Stephen Feinberg     Date        Peter Smith     Date

TRUSTEE009462
USDC-DE #04-1565

EXHIBIT
36
DDC 2/14/07

SECOND AMENDMENT TO EMPLOYMENT AGREEMENT

THIS SECOND AMENDMENT TO EMPLOYMENT AGREEMENT (the "Amendment") is made as of April 6, 2000, by and between Coram Healthcare Corporation, a Delaware corporation (the "Company"), and Daniel D. Crowley ("Executive").

RECITALS

A. The parties previously made and executed that certain Employment Agreement, effective November 30, 1999, that was subsequently amended effective as of November 30, 1999 (collectively, the "Employment Agreement").

B. Each of the parties desires to amend the Employment Agreement as set forth herein.

NOW THEREFORE, in consideration of the premises set forth above and the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Executive hereby agree as follows:

1. Amendment. The Employment Agreement is hereby amended as follows:

(a) Section 3(b) of the Employment Agreement is hereby amended by deleting such paragraph in its entirety and replacing it with the following:

> In addition to the Base Salary, Executive shall be entitled to a performance bonus (the "Incentive Bonus") payable within 90 days of the end of each fiscal year based upon the Company's operating results measured against a target level of earnings as established by the Executive and the Compensation Committee of Coram's Board of Directors before the beginning of each of the Company's fiscal years during the Employment Term. With respect to the Company's fiscal year ending December 31, 2000, the Incentive Bonus shall be, as follows: If earnings before interest, taxes, depreciation and amortization (EBITDA) of the Company for such year, as measured by the audited financial statements of the Company for its fiscal year ending December 31, 2000, equals or exceeds $14,000,000 (the "2000 Incentive Target"), the Incentive Bonus to which the Executive shall be entitled shall be an amount equal to 25% of the Company's EBITDA that exceeds the 2000 Incentive Target. The Incentive Bonus shall be paid in cash from Coram's available Free Cash (as defined below) or from the Revolving Credit Facility (as that term is defined below).
>
> In addition to the Incentive Bonus, *[handwritten: for the fiscal year ending December 31, 2000]* in the event that the EBITDA of the Company as measured by the audited financial statements of the Company equals or exceeds $35,000,000 ~~in 2000~~, the Company shall pay an additional bonus (the "EBITDA Bonus") of $5,000,000 to the Executive or others as designated by Executive, if any. *[handwritten: The EBITDA Bonus shall be paid in cash from Coram's available Free Cash or from the Revolving Credit Facility]*
>
> Any Incentive Bonus, EBITDA Bonus, Success Bonus (as defined below) or other bonus earned by the Executive under any provision of this Employment Agreement

CH-11 TRUSTEE 004809

shall be payable by the Company in cash out of funds derived from the Company's excess available cash flow ("Free Cash") or from amounts drawn on the Company's Credit Facility, dated August 20, 1998, among the Company, Coram, Inc. and the Guarantors named therein, the Lenders named therein and Foothill Capital Corporation, as Agent, or any subsequent credit facility that replaces such facility (the "Revolving Credit Facility"); provided, however, that in the event that the amount drawn on the Revolving Credit Facility at the time such ~~EBITDA Bonus is due~~ is an amount that is greater than 65% (the percentage drawn as of April 6, 2000) of the maximum funds available to the Company under such credit facility (for example, the maximum amount available under the Revolving Credit Facility is $60,000,000 and as of April 6, 2000 the amount drawn was $38.5 Million), the Company shall pay ~~the EBITDA Bonus~~ to the Executive ~~and each~~ designated individual recipient as follows: 50% in cash on the due date and 50% in monthly installments over the next eleven (11) months. In the event that the Executive or the designated recipient is terminated for any reason whatsoever, any unpaid ~~EBITDA Bonus~~ shall be paid immediately in a lump sum.

(b) Section 3 of the Employment Agreement is hereby amended by adding the following provision to such Section as a new Section 3(j):

In addition to the Base Salary and any other bonuses payable under this Amendment or the Agreement, Executive shall also be entitled to receive, upon consummation of a "Refinancing" (as that term is defined below) of the Company's "Principal Debt Instruments" (as that term is defined below), a success bonus (the "Success Bonus") equal to the greater of (i) 1.5% of the principal amount of the Principal Debt Instruments that are converted into common or preferred stock issued by the Company; or (ii) 1.0% of the total principal amount of the Principal Debt Instruments outstanding after consummation of the Refinancing. Such Success Bonus shall be paid immediately upon the Effective Date of the Refinancing from Free Cash or the Revolver.

The term "Principal Debt Instruments" shall mean (a) the Revolving Credit Facility; and (b) that certain Securities Exchange Agreement, dated as of May 6, 1998, as amended, by and between the Company; Coram, Inc.; Cerberus Partners, L.P.; Goldman Sachs Credit Partners, L.P.; and Foothill Capital Corporation and the Series A and Series B Notes issued pursuant thereto.

The term "Refinancing" shall mean a transaction or series of related transactions approved by the Company's Board of Directors that provides for either: (a) the conversion of some or all of the Principal Debt Instruments into a combination of new Company debt instruments and shares of common or preferred stock issued by the Company; or (b) the conversion of the Principal Debt Instruments into new debt instruments issued by the Company.

(c) Section 5(a) of the Employment Agreement is hereby amended by deleting such Section in its entirety and replacing it with the following:

The Company agrees to employ and Executive accepts such employment for the period beginning as of the Effective Date and ending on the third anniversary of the

Handwritten annotations: "any of" (before "funds derived"); "bonuses are due" (after "at the time such"); "(or the" (before "designated individual recipient"); "other than for Cause" (after "for any reason whatsoever"); "amount of such bonus" (replacing "EBITDA Bonus"); "such" (before "shall be paid"); "ing Credit Facility" (after "Revolver")

CH-11 TRUSTEE 004810

APR 10 2000

APR 05 2000 13:45 FR CORAM HEALTHCARE 9164456859 TO FEINBERG

Effective Date, provided that: (i) the Employment Period shall terminate prior to such date upon Executive's resignation, death or permanent disability (defined as the expiration of a continuous period of 180 days during which Executive is unable to perform the essential functions of his assigned duties due to physical or mental incapacity); (ii) the Employment Period may be terminated by Executive at any time prior to such date if the Company fails to comply with any material provision of this Agreement, which failure has not been cured within 10 business days after (written) notice of such noncompliance has been given by Executive to the Company; and (iii) the Employment Period may be terminated by the Company at any time prior to such date for Cause. In the absence of the occurrence of any of the events in subsections (i) through (iv) of this Section, the Employment Period shall automatically be renewed for (up to two (2)) additional one (1) year terms commencing on the third anniversary of the Effective Date.

(d) Section 5(d) of the Employment Agreement is hereby amended by deleting such Section in its entirety and replacing it with the following:

If the Employment Period is terminated by the Company other than for Cause or by Executive pursuant to paragraph 5(a)(ii) above, or if Executive's duties, responsibilities, and/or job title is substantially altered from that of Chairman of the Board, Chief Executive Officer and President other as contemplated by Section 2 of this Agreement, then Executive shall be entitled to receive his Base Salary and Automobile Allowance through the third anniversary of the date such termination of employment becomes effective (the "Severance Period"), payable in accordance with the Company's general payroll practices, and all bonuses payable hereunder, however denominated, as described herein throughout the Severance Period. The Company shall also continue coverage for Executive under the Company's life insurance, medical, health, disability and similar welfare benefit plans described in Section 3(d) (or under other plans, including the whole life insurance policy, obtained by the Company for the benefit of the Executive and fully funded by the Company. The Executive shall receive a full tax gross-up for any tax liability of the Executive for such benefits and the Automobile Allowance) throughout the entire Severance Period.

(e) Section 3 of the Employment Agreement is hereby amended by adding the following provision to such Section as a new Section 3(k):

If the Executive and the Board of Directors concur on the appointment of a Chief Executive Officer and/or a President for the Company as contemplated by Section 2 of the Agreement, this Agreement will remain in full force and effect without modification to any of the terms and conditions set forth herein (other than the Executive's duties to the extent they may be assigned to the new chief executive officer), including but not limited to the Executive's Base Salary, bonus opportunities and full benefits; provided, however, that the new Chief Executive Officer and/or President shall be entitled to receive a portion of the EBITDA Bonus in an amount reasonably negotiated between the (Board of Directors, the) Executive and such person. The ~~split~~ split of the money between Dan Crowley and the new CEO or President need to be approved by the board whose approval [illegible] be unreasonably withheld.

CH-11 TRUSTEE
004811

LWCROWLEY 002

04/07/00

APR 25 2000 13:46 FR CORAM HEALTHCARE 9164458659 TO FEINBERG

2. Counterparts. This Amendment may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same instrument.

3. Miscellaneous. Except as expressly amended by this Amendment, the Employment Agreement shall continue in full force and effect in accordance with the provisions thereof. As used in the Employment Agreement, the terms "hereinafter," "hereto," hereof, and other words of similar import shall, unless the context otherwise requires, mean the Employment Agreement as amended by this Amendment. In the event of any conflict or inconsistency between the terms and conditions of the Employment Agreement and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall control.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CORAM HEALTHCARE CORPORATION

By: ______________________
Stephen A. Feinberg
Chairman of Compensation Committee

By: ______________________
L. Peter Smith
Director, Compensation Committee

EXECUTIVE

Daniel D. Crowley 6 Apr 2000
Daniel D. Crowley

CH-11 TRUSTEE
004812

** TOTAL PAGE.07 **

2. Counterparts. This Amendment may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same instrument.

3. Miscellaneous. Except as expressly amended by this Amendment, the Employment Agreement shall continue in full force and effect in accordance with the provisions thereof. As used in the Employment Agreement, the terms "hereinafter," "hereto," hereof, and other words of similar import shall, unless the context otherwise requires, mean the Employment Agreement as amended by this Amendment. In the event of any conflict or inconsistency between the terms and conditions of the Employment Agreement and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall control.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CORAM HEALTHCARE CORPORATION

By:______________________
Stephen A. Feinberg
Chairman of Compensation Committee

By: [signature]
L. Peter Smith
Director, Compensation Committee

EXECUTIVE

[signature] 6 Apr 2000
Daniel D. Crowley

MINUTES OF A TELEPHONIC MEETING

OF THE BOARD OF DIRECTORS OF

CORAM HEALTHCARE CORPORATION

May 17, 2000

A telephonic meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was convened at approximately 9:05 a.m. MDT. Participating in the meeting were the following Directors: Daniel D. Crowley, Chairman of the Board, Chief Executive Officer and President; Donald J. Amaral; William J. Casey; Stephen A. Feinberg; and Sandra R. Smoley. L. Peter Smith was absent. Allen J. Marabito, Executive Vice President; Scott R. Danitz, Senior Vice President, Finance and Chief Accounting Officer; John T. McIntyre, Vice President, Treasury; Vito Ponzio Jr., Senior Vice President, Human Resources; and Scott T. Larson, Senior Vice President, General Counsel and Secretary, also participated in the meeting. In addition, Christina Morrison, Michael Levitt and Otu Hughes of Deutsche Banc Alex. Brown; Eric Scroggins of Chanin Capital Partners; and David Friedman of Kasowitz, Benson, Torres & Friedman, LLP also participated in the meeting. Mr. Crowley acted as Chairman of the meeting and Mr. Larson kept the minutes.

REVIEW AND APPROVAL OF MINUTES FROM PRIOR MEETING

The first item of business was a review and consideration of the minutes from the meeting of the Board of Directors held on April 5, 2000. Draft minutes had been circulated to the Board prior to the meeting. Upon a motion duly made and seconded, the minutes from such meeting were unanimously approved as presented.

CPS AUCTION UPDATE

It was reported that the Company had reached an agreement with GTCR Golder Rauner, LLC on a price for the purchase of the assets of the Company's Coram Prescription Services business ("CPS") and that the terms of the asset purchase agreement were being finalized. The Board was given a summary of the remaining outstanding issues that were being negotiated. Ms. Morrison reported that the general terms of the transaction had been presented to the Fairness Opinion Committee at Deutsche Banc. Alex Brown and that the transaction, in its current form, would gain the approval of the committee. The Board was then given the opportunity to ask questions regarding the status of the transaction, and answers were provided.

FINANCIAL UPDATE

Subsequently, Mr. Danitz was invited to lead a discussion of the financial information that was distributed to the Board of Directors prior to the meeting. Various comparisons between budgeted and actual results were presented, including amounts recorded as gross profit, salaries, costs of supplies and operating income, as well as earnings before interest, taxes,

COR-EQTY 0014743

depreciation and amortization of goodwill ("EBITDA"). The presentation also included descriptions of various cost reduction initiatives, salary and head count reductions and other measures that had been taken to improve the Company's financial performance. The settlement of the litigation with Aetna U.S. Healthcare was also discussed, including the impact of such settlement on the Company's financial statements. Comparisons were also made between the financial performance of the Company during the first quarter of 1999 and the first quarter of 2000. Items that occurred in each such period were highlighted, including the Management Incentive Plan bonuses that were accrued during the first quarter of the year 2000. The discussion then turned to comparisons of the Company's balance sheets as of December 31, 1999, and as of March 31, 2000. Various aspects of the balance sheet were discussed, including long-term debt incurred and amounts paid against the Company's revolving credit facility.

Next, a presentation was made describing the Company's cash flow performance. It was reported that net cash flow was $2.6 million during the first quarter of 2000. The schedule describing the Company's levels of accounts payable that was distributed to the Board prior to the meeting was also reviewed.

The Board inquired regarding the financial schedules that were distributed to the Board as well as the presentation of such schedules made at the meeting. Following the discussion regarding the preliminary financial results for the month of April 2000, Mr. Casey was then invited to report on the Audit Committee meeting that had taken place on May 10, 2000. Mr. Casey reported that the meeting was routine in nature and that the Company's independent auditors, Ernst & Young LLP, believed that the Company's financial statements were fairly presented.

## CANADA AUCTION UPDATE

It was reported that management had attempted to sell the Company's home infusion operations in Canada. The Company had engaged an investment advisor and had solicited proposals from various parties in Canada. However, the bidders had pulled back from pursuing the transaction on terms that management believed appropriate. Management further reported that the Canadian operations were cash flow neutral and the operations would be reviewed carefully at this time and considered again for disposition at a later date.

## DEBT CONVERSION AND RESTRUCTURING UPDATE

A summary of the amounts that had been repaid on the Company's credit agreements was given and a report was given on the impending deadline associated with the so-called Stark II Physician Self-Referral statute. It was reported that Company management had been working with an independent financial advisory firm, Chanin Capital Partners, to develop and analyze alternatives for effecting a debt conversion and restructuring of the Company's balance sheet. Eric Scroggins of Chanin Capital Partners was invited to present a summary of the type of work that his firm would be undertaking on behalf of the Company.