Minutes of the Board of Directors
May 17, 2000
Page 3

Mr. Scroggins described a two-phase work schedule that would result in various recommendations and a valuation range for the Company. The results of Chanin's analysis would be presented at a meeting of the Board of Directors held during July 2000. He added that they had begun receiving the information necessary for their due diligence and that the data received would be used to prepare their ultimate valuation of the Company and analysis of its future debt capacity. The discussion continued with a summary of the methods that Chanin would employ to derive a "bottoms up" valuation for the Company.

The Board was invited to ask questions regarding the analysis that Chanin would be undertaking. A discussion ensued regarding the values of comparable companies in the industry. Mr. Crowley added that Company management would be seeking the advice of its financial and legal advisors throughout the process. To that end, David Friedman, Esq. was invited to discuss various matters regarding possible restructuring alternatives.

A privileged and confidential discussion followed regarding the various items that may impact the valuation of the Company, including the matter pending in tax court between the Company and the Internal Revenue Service. It was explained that this and other possible contingencies would be factored into the analysis of any restructuring alternatives.

The discussion then turned to certain regulatory requirements affecting the Company such as the application of the Stark II law and the ongoing availability of the public company exception under the Stark II law. It was reported that management had worked with its legal counsel at Reed Smith Shaw & McClay to determine what types of equity would be required to meet the public company exception. A discussion ensued regarding the legal opinion that had been provided by Reed Smith Shaw & McClay, a copy of which was distributed to the Board prior to the meeting. Various information was discussed regarding how much debt would have to be restructured to equity in order to satisfy the public company exception of Stark II, assuming various amounts of proceeds were achieved through the sale of the CPS business. This presentation also considered what amounts of equity would be available at the end of the year 2001 so that additional restructuring or equity raising activities would not immediately be required for ongoing compliance with Stark II. Various alternatives were discussed regarding the amount of debt that would be required for a conversion.

<u>OTHER BUSINESS</u>

In a privileged and confidential discussion, Mr. Marabito described settlement discussions he and the Company's attorneys had with representatives of Price Waterhouse regarding the lawsuit presently pending between the Company and Price Waterhouse. These representatives included members of Price Waterhouse's in-house legal department. The Board was apprised of the discussions that transpired, including a description of how Price Waterhouse views the case and what settlement prospects were available. The Board discussed various strategies for pursuing an appropriate, cost effective outcome. The discussion included

COR-EQTY 0014745

Minutes of the Board of Directors
May 17, 2000
Page 4

consideration of other counsel, such as a contingency attorney, that could pursue the case in a cost effective and efficient manner on behalf of the Company. The Board directed Mr. Marabito to pursue the case in such manner and provide subsequent progress reports.

Next, Mr. Marabito provided a description of the settlement agreement with Aetna U.S. Healthcare, Inc., a copy of which was distributed to the Board of Directors. Members of the Board of Directors were invited to ask questions about the agreement. Upon a motion duly made and seconded, the Board unanimously resolved to accept, confirm and adopt the settlement agreement as presented.

## STOCK OPTION AWARDS

The Board next considered Mr. Crowley's request to approve additional stock option grants to certain members of the Company's senior management team. After review and consideration of the recommendations set forth on Exhibit A attached hereto, and upon a motion duly made and seconded, the Board unanimously approved the following resolution:

WHEREAS, the Company maintains the 1994 Coram Healthcare Corporation Stock Option/Stock Issuance Plan, as amended (the "Option Plan"), for the purpose, among others, of providing management and the Board of Directors with a compensation tool designed to align the interests of Company officers, employees and certain others with the interests of the Company and its stockholders;

WHEREAS, the Chairman of the Board, Chief Executive Officer and President has submitted a recommendation to the Compensation Committee of this Board of Directors that provides for the grant of options to purchase shares of the Company's $.001 par value common stock (the "Common Stock") pursuant to the Option Plan to certain persons whose names are set forth on the list attached hereto as Exhibit A; and

WHEREAS, the Compensation Committee has accepted the recommendation of the Company's Chairman, Chief Executive Officer and President and has approved the grant of such options to the persons listed on Exhibit A under the terms and conditions described on Exhibit A (the "Recommended Options");

NOW, THEREFORE, BE IT RESOLVED, that the issuance of all Recommended Options to purchase shares of Company Common Stock under the Option Plan that are listed on Exhibit A hereto is hereby authorized, ratified, confirmed and adopted; and

COR-EQTY 0014746

**A332**

Minutes of the Board of Directors
May 17, 2000
Page 5

FURTHER RESOLVED, that the Chairman, Chief Executive Officer and President, any Executive Vice President, any Senior Vice President or the Secretary of the Company (the "Authorized Officers") is each hereby authorized, empowered and directed to make, execute and deliver on behalf of the Company all stock option agreements and all other agreements, documents or certificates deemed necessary, appropriate or expedient to effect the issuance of the Recommended Options; and

FURTHER RESOLVED, that each of the Authorized Officers of the Company is hereby authorized, empowered and directed, for and on behalf of the Company, to take all such other actions and execute all such other documents, agreements and certificates as may be necessary, appropriate or expedient to carry out the intent of the foregoing resolutions.

## AMENDMENT TO DYNAMIC HEALTHCARE SOLUTIONS, LLC ENGAGEMENT

Next the Board discussed a proposal made regarding modifications to the engagement of the health care consulting firm owned by Mr. Crowley, Dynamic Healthcare Solutions, LLC. The Board discussed the reasons for such modifications and a discussion ensued regarding the role that Dynamic Healthcare Solutions, LLC plays in the day-to-day operations of the Company. Thereafter, upon a motion duly made and seconded, the Board unanimously approved the following resolution:

WHEREAS, on December 21, 1999, this Board of Directors adopted resolutions approving the Company's engagement of Dynamic Healthcare Solutions, L.L.C. ("Dynamic Healthcare"), a health care consulting firm owned by the Company's Chairman, Chief Executive Officer and President;

WHEREAS, the Company has been utilizing the services of Dynamic Healthcare in accordance with such terms and Dynamic Healthcare has been providing services and resources to the Company in a manner consistent with the Employment Agreement between the Company and its Chairman, Chief Executive Officer and President;

WHEREAS, certain changes to the terms of the Dynamic Healthcare relationship have been proposed due to the higher than anticipated levels of activity and demands placed by the Company on the consultants and resources provided by Dynamic Healthcare under the engagement;

WHEREAS, the proposed changes include increases to the daily rates charged for the services of certain consultants rendering services to the Company and include the reimbursement of certain direct costs reasonably incurred by Dynamic Healthcare's Sacramento, California office in connection with the

COR-EQTY 0014747

Minutes of the Board of Directors
May 17, 2000
Page 6

performance of consulting services for the Company, and such changes are outlined on Exhibit B hereto; and

WHEREAS, this Board desires to continue the relationship with Dynamic Healthcare and maintain access to the services of its consultants at the proposed rates described herein;

NOW, THEREFORE, BE IT RESOLVED, that the ongoing engagement of Dynamic Healthcare on the terms outlined on Exhibit B hereto, is hereby approved, adopted and confirmed;

FURTHER RESOLVED, that any Senior Vice President or the Secretary (each an "Authorized Officer") is hereby authorized, empowered and directed, for and on behalf of the Company, to take all such other actions and execute all such documents, certificates and agreements, as may be necessary, appropriate or expedient to carry out the intent of these resolutions as set forth above; and

FURTHER RESOLVED, that the Chairman of the Board, Chief Executive Officer and President, the Executive Vice President and each Authorized Officer is hereby authorized, empowered and directed, for and on behalf of the Company, to take all such other actions and execute all such documents, certificates and agreements, as may be necessary, appropriate or expedient to carry out the intent of any resolutions adopted or actions at this meeting of the Board of Directors.

Finally, the Board discussed a date for its next meeting. It was determined that the next meeting would be held in New York on July 12, 2000, beginning at 11:00 a.m. EDT.

There being no further business, the meeting was adjourned at 10:15 a.m. MDT.

Respectfully submitted,

Scott T. Larson
Secretary of the Meeting

COR-EQTY 0014748

A334

EXHIBIT A

Board of Director's
Compensation Committee

Stock Option Award Recommendation

On February 1, 2000 the Board of Director's approved stock option grants to several members of Senior Management. All options that were available to grant were distributed at that time. On March 31, 2000 an additional 349,000 will become available for redistribution. I am asking the Compensation Committee to approve grants to the following additional members of Senior Management. I am not requesting redistribution of the total amount at this time as the reserve be for potential new hires at the executive level. Also, it is requested that the committee approve for purposes of this grant, the acceleration of the vesting schedule to 1/3, 1/3, 1/3 at the end of each of the three anniversaries of the grant. The Recommended list and options are as follows:

| Awardee | Title | Options |
|---|---|---|
| Dom Meffe | President, CPS | 40,000 |
| Kate Douglass | Vice President, Clinical Services | 40,000 |
| Dave Evans | Vice President, Field Finance | 40,000 |
| Perry Bernocchi | Senior Vice President, Operations | 40,000 |
| Ron Mills | Consultant | 40,000 |
| Dan Smithson | Consultant | 40,000 |
| Gail Carton | Acting President, CTI, Network Inc | 25,000 |
| Total Requested | | 265,000 |

Sincerely,

Daniel D. Crowley
Chairman, CEO and President

Approved:

_____    _____        _____    _____
Peter Smith          Date           Stephen Feinberg      Date

COR-EQTY 0014749

EXHIBIT B

PROPOSED TERMS OF ENGAGEMENT
OF DYNAMIC HEALTHCARE SOLUTIONS, L_LC

| Name of Professional | Present Daily Rate | Proposed Daily Rate |
|---|---|---|
| Kurt Davis | $ 500.00 | $ 600.00 |
| Ron Mills | 1,000.00 | 1,250.00 |
| Dan Smithson | 750.00 | 750.00 |

The Company shall reimburse Dynamic Healthcare for the reasonable out of pocket expenses incurred by each such person in accordance with the applicable policies and procedures of the Company.

The Company shall also reimburse Dynamic Healthcare on a monthly basis for the reasonable amount of the direct costs incurred by Dynamic Healthcare's Sacramento, California office in providing administrative and professional support in connection with the consulting services and other resources furnished to the Company.

COR-EQTY 0014750

LAW OFFICES



RICHARD F. LEVY
(312) 715-4600
levyr@altheimer.com

**ALTHEIMER
&GRAY**

IO SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606-7482

TEL: (312) 715-4000
FAX: (312) 715-4800

June 1, 2000

Daniel D. Crowley
Chairman and Chief Executive Officer
Coram Healthcare Corp
1125 Seventeenth Street
Suite 2100
Denver, Colorado 80202

Dear Mr. Crowley:

This firm represents Richard Haydon, who is the beneficial owner of a significant number of shares of Coram Healthcare Corp. ("Coram" or the "Company").

We note that the Company's most recent Annual Report (SEC Form 10-K) states that "Coram is currently in discussions with the holders of the Series A and Series B Notes regarding additional restructuring [of those Notes]. Such restructuring would likely include a conversion of a material portion of this debt into some form and amount of equity." However, management's discussion and analysis does not reveal that one of the members of the Board of Directors, Mr. Stanley A. Feinberg, who is also the chairman of the Compensation Committee that recently approved your new employment contract, is directly or indirectly a holder of such Notes.

In the event that you and the Board persist in efforts to convert the Notes into equity – which would almost surely dilute the interests of the existing shareholders such as Mr. Haydon – please be advised that we will scrutinize any such transaction carefully. We remind you that the fiduciary duties of the Board under Delaware law preclude it from approving any transaction where any member of the Board has an interest except in certain limited circumstances. We will seek redress for any violation of those fiduciary duties that causes harm to the shareholders of the Company.

Yours truly,

Richard F. Levy

*Levy*
DEP. EXH. # **3**
Date: 3/22/09

RFL:tjl

cc:    Mr. Richard Haydon

EXHIBIT
EC-75

CHICAGO    WASHINGTON, D.C.    WARSAW    PRAGUE
KYIV    BRATISLAVA    ISTANBUL    SHANGHAI    BUCHAREST    LONDON

(803031.1)

MINUTES OF A TELEPHONIC MEETING

OF THE BOARD OF DIRECTORS OF

CORAM HEALTHCARE CORPORATION

June 7, 2000

A telephonic meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was called to order at approximately 1:05 p.m. MDT. Participating in the meeting were the following Directors: Daniel D. Crowley, Chairman of the Board, Chief Executive Officer and President; Donald J. Amaral; William J. Casey; Stephen A. Feinberg; and Sandra R. Smoley. L. Peter Smith was absent. Allen J. Marabito, Executive Vice President; Scott R. Danitz, Senior Vice President, Finance and Chief Accounting Officer; Vito Ponzio Jr., Senior Vice President, Human Resources; John T. McIntyre, Vice President, Treasury; Gerald Reynolds, Vice President, Controller; Rodney Wright, Vice President, Reimbursement and Scott T. Larson, Senior Vice President General Counsel and Secretary, also participated in the meeting. Also participating in the meeting were Fred Leech of Reed Smith Shaw & McClay LLP, David Friedman of Kasowitz, Benson, Torres & Friedman LLP and Christina Morrison of Deutsche Banc Alex. Brown. Mr. Crowley acted as Chairman of the meeting and Mr. Larson kept the minutes.

The primary item of business was a review of the terms of the Asset Purchase Agreement and the related Marketing Services and Transition Services Agreements relating to the proposed sale of the Company's Coram Prescription Services business ("CPS") to two (2) newly formed affiliates of GTCR Golder Rauner LLC. Mr. Leech was invited to provide a summary of the principal terms of the proposed transaction. Mr. Leech then proceeded to describe, in a privileged and confidential discussion, the terms of the transaction as set forth in the Executive Summary which he had provided for the Board of Directors. Mr. Leech explained that the Asset Purchase Agreement included representations and warranties that were typical of a transaction of this nature and were fair to both sides. He also explained that the agreement included indemnification provisions and described the sizes of the related baskets and caps on the indemnification obligations.

The Board asked questions regarding, among other things, the liabilities that would be assumed by the buyers and what liabilities would be excluded and retained by the Company. The Board asked questions of management, Mr. Leech, Mr. Friedman and Ms. Morrison of Deutsche Bank Alex. Brown. The Board discussed the role of the defined term "Excluded Liabilities" and Ms. Morrison stated that the buyers would not be likely to accept any cap on the amount of indemnification that would be associated with any of "Excluded Liabilities."

The discussion then turned to the Marketing Services Agreement and its terms. The obligations and benefits of the Marketing Services Agreement were also presented. Copies of certificates executed by certain Company officers were discussed. Those certificates assessed the

COR-EQTY 0014752

Minutes of the Board of Directors
June 7, 2000
Page 2

Company's ability to perform its obligations under the Marketing Services Agreement. Copies of such certificates were distributed to the members of the Board of Directors prior to the meeting.

The discussion then turned to the closing conditions contained in the Asset Purchase Agreement. This included the consents to assignment that would be required from customers of the CPS business, consents related to the landlords and the consents of the Company's lenders. The consents of the Company's lenders, it was explained, would be required on or before June 30, 2000.

Mr. Leech then outlined the terms of the non-compete provisions of the Asset Purchase Agreement and offered that they were customary for transactions of this nature.

The presentation then described and discussed the Company's obligations under the Transition Services Agreement. It was explained that these services would be provided during the time that CPS begins to perform such tasks on its own and contemplates that the Company would be paid hourly rates for the services being provided.

Next, the terms of the retention and success fees that had previously been offered to members of CPS management were discussed. It was reported that those Company obligations would be rescinded contemporaneously with the consummation of the transaction.

Next, the liquidated damages provision included in the Asset Purchase Agreement was discussed. The Board members discussed various alternatives that had been used in other transactions with which they had been involved. Ms. Morrison reported that Deutsche Bank Alex. Brown had the experience that fees in the range of 2%-3% of the purchase price were standard for transactions of this nature. The Board then discussed the liquidated damages provision. The Board discussed with these participating in the meeting various alternatives for promoting certainty of closure while preventing the buyers from renegotiating the price prior to closing. After discussion, the Board directed management to present to the buyers other alternatives for the liquidated damages. Specifically, management was directed to either remove the liquidated damages provision altogether or to make it reciprocal.

Thereafter, Deutsche Bank Alex. Brown and transaction counsel from Reed Smith Shaw & McClay left the call.

Mr. Danitz was then invited to review the gain calculation for the CPS transaction that had been distributed to the Board prior to the meeting. A summary of CPS's recent financial performance and the calculation of the estimated cash proceeds were presented to the Board. The Board discussed the gain calculations and application of the CPS cash proceeds. Management responded to the Board's questions regarding the discussion.

COR-EQTY 0014753

Minutes of the Board of Directors
June 7, 2000
Page 3

In other business, Mr. Crowley apprised the Board of a possible incident at certain branches in the State of Florida. He reported that surveyors from the Joint Commission on Accreditation of Health Care Organizations had identified certain potential deficiencies in the operations of the Company's branches located in the State of Florida. Management reported that it would monitor the situation and take appropriate action as necessary.

There being no further business, the meeting was adjourned at approximately 2:40 p.m. MDT.

Respectfully submitted,

Scott T. Larson
Secretary

COR-EQTY 0014754

A340

MINUTES OF A TELEPHONIC MEETING

OF THE BOARD OF DIRECTORS OF

CORAM HEALTHCARE CORPORATION.

June 9, 2000

A telephonic meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was called to order at approximately 12:35 p.m. MDT. Participating in the meeting were the following Directors: Daniel D. Crowley, Chairman of the Board, Chief Executive Officer and President; Donald J. Amaral; William J. Casey, and Sandra R. Smoley. Stephen A. Feinberg and L. Peter Smith were absent. Allen J. Marabito, Executive Vice President; Scott R. Danitz, Senior Vice President, Finance and Chief Accounting Officer; John T. McIntyre, Vice President, Treasury; Gerald Reynolds, Vice President, Controller; and Scott T. Larson, Senior Vice President, General Counsel and Secretary, also participated in the meeting. Also participating in the meeting were Fred Leech of Reed Smith Shaw & McClay LLP; David Rosner of Kasowitz, Benson, Torres & Friedman LLP and Christina Morrison and Oru Hughes of Deutsche Banc Alex. Brown. Mr. Crowley acted as Chairman of the meeting and Mr. Larson kept the minutes.

The meeting began with a summary of the events that had transpired during the auction of the Company's Coram Prescription Services business ("CPS") and the ultimate negotiation of the sale of such business to two (2) newly formed affiliates of GTCR Golder Rauner LLC. Ms. Morrison was then invited to discuss in greater detail the terms of the engagement of Deutsche Banc Alex. Brown and the auction process that they were managing for the Company. Ms. Morrison reviewed the parties that received information regarding the business, those that submitted bids and how the buyer entered the process.

Ms. Morrison then outlined the financial analysis that Deutsche Banc Alex. Brown had undertaken in connection with their fairness opinion analysis. She explained that the full analysis was set forth in the fairness opinion that would be delivered to the Company immediately following this meeting. She offered that the legal documents that had been negotiated among the parties were typical and reasonable and that the agreement s included many standard provisions, including a liquidated damages provision that included an amount that was within the range of amounts used in other similar transactions. She explained that the fairness analysis performed demonstrated that the value of the CPS business yielded a range of fair prices between $24.6 and $53.6 million. Accordingly, Deutsche Bank Alex. Brown was of the opinion that the transaction was fair from a financial point of view to the Company. She added that the Fairness Opinion would be transmitted to the Company following the meeting and would be made available to all members of the Board of Directors.

Mr. Crowley opened the meeting for questions from the Board of Directors to Ms. Morrison and the other professionals attending the meeting. After discussion, a motion was then

COR-EQTY 0014756



Minutes of the Board of Directors
June 9, 2000
Page 2

made to accept and approve the transaction and the related resolutions approving the Asset Purchase Agreement and the related Marketing Services and Transition Services Agreements in the forms presented.

The discussion on the motion continued with a review of the gain calculation and estimated cash proceeds that were presented at the June 7, 2000, meeting of the Board. It was explained that substantially all the estimated net cash proceeds would be applied to the Company's debt.

Mr. Leech was invited to describe the negotiations that had occurred following the June 7, 2000 meeting. Mr. Leech described the discussions that occurred regarding the liquidated damages provisions, copies of which were distributed to the Board prior to the meeting. Mr. Leech stated that the buyer had insisted upon adding a provision that would prevent the Company from "shopping" the deal during the pendency of the Asset Purchase Agreement as a condition to accepting the liquidated damages proposal made by the Company. Ms. Morrison then offered that the provisions that were presented were standard for this type of transaction. Mr. Rosner added that he agreed with the assessment of Ms. Morrison.

It was reported that the Asset Purchase Agreement and the revised provisions thereof were transmitted to the General Counsel of Cerberus Financial Partners for their review. It was further reported that the Cerberus General Counsel stated that he did not find any significant omissions in the documents and that the documents reflected standard agreement provisions for transactions of this nature. Furthermore, Mr. Crowley reported that Mr. Feinberg had provided him his written approval of the terms of the transaction as now modified and that Mr. Feinberg stated satisfaction with the terms of the transaction as presented at this time.

There being no further questions or discussion of such matters and the questions of the Board having been responded to, the motion to approve the transactions and the resolutions set forth below was seconded and unanimously approved:

WHEREAS, Coram Healthcare Corporation (the "Company"), through its indirect wholly owned subsidiary, Curaflex Health Services, Inc., a Delaware corporation ("Curaflex"), operates a specialty mail order pharmacy and pharmacy benefit management services business known as "Coram Prescription Services" (the "Business");

WHEREAS, the Company, as the ultimate parent Company of Curaflex has determined it to be in the best interests of Curaflex to sell substantially all of the assets of Curaflex related to the Business (the "Transaction");

COR-EQTY 0014757

Minutes of the Board of Directors
June 9, 2000
Page 3

WHEREAS, in connection with the Transaction, the Company and Curaflex have, upon receipt of advice from their financial advisors with Deutsche Banc Alex.Brown, determined it to be in the best interests of the Company and Curaflex to enter into an Asset Purchase Agreement, by and between Curaflex, the Company, as Seller Guarantor, CuraScript Pharmacy, Inc., CuraScript PBM Services, Inc. and GTCR Fund VI, L.P., as Buyers Guarantor (the "Purchase Agreement"), together with all of the Exhibits to the Purchase Agreement (collectively, the "Purchase Documents"); and

WHEREAS, in connection with the Transaction, the directors of the Company have determined it to be in the best interests of Curaflex and the Company to guaranty the full performance and compliance of Curaflex's obligations under the Purchase Agreement, as well as the Transition Services Agreement and the Marketing Services Agreement contemplated by the Purchase Agreement, pursuant to Section 11.9(a) of the Purchase Agreement (the "Guaranty");

NOW, THEREFORE, BE IT RESOLVED, that the Guaranty be, and it hereby is, in all respects approved;

RESOLVED FURTHER, that the form and content of the Guaranty set forth in Section 11.9(a) of the Purchase Agreement be, and it hereby is, in all respects approved;

RESOLVED FURTHER, that the Chairman of the Board, Chief Executive Officer and President, the Executive Vice President, any Senior Vice President or the Secretary of the Company (the "Authorized Officers") be, and each hereby is, authorized and directed for and on behalf of the Company to make, execute and deliver (and, if desired, under the corporate seal of the Company attested to by its Secretary) the Purchase Agreement, substantially in the form presented herewith, together with such changes therein and additions thereto as such Authorized Officer shall approve, the execution and delivery thereof by such Authorized Officer to constitute conclusive evidence of such approval;

RESOLVED FURTHER, that the Authorized Officers be, and each hereby is, authorized and directed for and on behalf of the Company to take any and all further action and to execute and deliver any and all other agreements, instruments, certificates and documents for and on behalf of the Company as in his or her opinion may be necessary or desirable to carry out the Guaranty and the Transaction Documents; and

COR-EQTY 0014758

A343

Minutes of the Board of Directors
June 9, 2000
Page 4

RESOLVED FURTHER, that any and all actions heretofore and hereafter taken by the Authorized Officers in connection with the Guaranty and the Transaction Documents be, and they hereby are, ratified and in all respects approved.

**Approval of the Transition Services Agreement and the Marketing Services Agreement in connection with the Sale of Substantially All of the Assets of the Business**

WHEREAS, in connection with the Transaction, the directors of the Company have determined it to be in the best interests of the Company, Curaflex, and Coram, Inc. ("CI") to enter into, upon the closing of the Transaction as contemplated by the Purchase Agreement, (a) a Transition Services Agreement, by and between the Company and CI, on the one hand, and CuraScript Pharmacy, Inc. and CuraScript PBM, Inc., on the other hand (the "Transition Services Agreement"), and (b) a Marketing Services Agreement, by and between the Company and CI, on the one hand, and CuraScript Pharmacy, Inc. and CuraScript PBM, Inc. on the other hand (the "Marketing Services Agreement");

NOW, THEREFORE, BE IT RESOLVED FURTHER, that the form and content of the Transition Services Agreement and the Marketing Services Agreement presented at the June 7, 2000, meeting of the Company's Board of Directors, and each hereby is, in all respects approved;

RESOLVED FURTHER, that the Authorized Officers be, and each is hereby is, authorized and directed for and on behalf of the Company to execute and deliver (and, if desired, under the corporate seal of the Company attested to by its Secretary) the Transition Services Agreement and the Marketing Services Agreement, substantially in the forms heretofore approved, with such changes therein and additions thereto as such Authorized Officer shall approve, the execution and delivery thereof by such Authorized Officer to constitute conclusive evidence of such approval;

RESOLVED FURTHER, that the Authorized Officers be, and each hereby is, authorized and directed for and on behalf of the Company to take any and all further action and to execute and deliver any and all other agreements, instruments, certificates and documents for and on behalf of the Company as in his or her opinion may be necessary or desirable to carry out the Transition Services Agreement and the Marketing Services Agreement; and

COR-EQTY 0014759

Minutes of the Board of Directors
June 9, 2000
Page 5

RESOLVED FURTHER, that any and all actions heretofore and hereafter taken by the Authorized Officers in connection with the Transition Services and the Marketing Services Agreement be, and they hereby are, ratified and in all respects approved.

FURTHER RESOLVED, that each Authorized Officer is hereby authorized, empowered and directed, for and on behalf of the Company, to take all such other actions and execute all such documents, certificates and agreements, as may be necessary, appropriate or expedient to carry out the intent of any resolutions adopted or actions taken at this meeting of the Board of Directors.

There being no further business, the meeting was adjourned at approximately 12:50 p.m. MDT.

Respectfully submitted,

Scott T. Larson
Secretary

COR-EQTY 0014760

A345

EXHIBIT

Morrison 18

CW 3/24/07

Strictly private & confidential

# Project Caddy

## Presentation to the Board

### June 9, 2000

Deutsche Banc Alex. Brown identifies the US investment banking activities of DB Alex. Brown LLC (formerly BT Alex. Brown Incorporated) and Deutsche Bank Securities Inc., which are indirect subsidiaries of Deutsche Bank AG.

**Deutsche Banc Alex. Brown**

 **Deutsche Bank**

COR.-EQTY0000226

These materials were prepared by Deutsche Banc Alex. Brown Incorporated ("Deutsche Banc Alex. Brown") based on publicly available information and certain information provided by Caddy Management ("Caddy" or the "Company"), all without independent verification by Deutsche Banc Alex. Brown or any affiliate thereof. All financial data including forecasts are provided by Caddy without any recommendation or warranty in connection therewith by Deutsche Banc Alex. Brown or any affiliate thereof or any other party. No representation or warranty (express or implied) is made by Deutsche Banc Alex. Brown as to the accuracy or completeness of the information herein. The materials are intended solely for use and benefit of the Board of Directors of Caddy. They are not for publication.

Deutsche Banc Alex. Brown

**Deutsche Bank**

COR.-EQTY0000227

**A347**

# Contents

Section

1    Transaction background and overview                1

2    Overview of Caddy                                  5

3    Overview of bids                                   10

4    Valuation analysis                                 13

Deutsche Banc Alex. Brown

**Deutsche Bank**

COR.-EQTY0000228

A348

# Section 1

## Transaction background and overview

Deutsche Banc Alex. Brown

Deutsche Bank

COR.-EQTY0000229

Section 1

Transaction background and overview

# Transaction history

**Rationale**     Caddy was originally put on the market to:

- Enable Parent focus on its core businesses
- Help strengthen Parent's balance sheet
- Avoid the losses and cash needs necessary to grow Caddy appropriately

**Key events**    Date engaged:  September 16, 1999

Date of public announcement:  September 24, 1999

Total parties contacted/inquiries: 45

Total confidentiality agreements sent: 24

Total preliminary bids received:  8

Final negotiation: 1

Deutsche Banc Alex. Brown

☑ Deutsche Bank

2

060W0154 Falar a5inghAkreahirtDialyms.doc

COR.-EQTY0000230

Section 1

Transaction background and overview

# Key terms of the transaction

| | |
|---|---|
| Structure | ■ Two entities to acquire the two businesses of Caddy |
| | – Specialty Pharmacy Services ("SPS") (Mail Order Business) |
| | – Pharmacy Benefit Management ("PBM"). |
| Price | ■ $41,300,000 |
| Purchase price adjustments | ■ None |
| Consideration | ■ Cash |
| Financing | ■ GTCR (equity and debt guarantee) |
| | ■ Fleet Capital (debt) |
| Reps, warranties and indemnification | ■ Standard |

Deutsche Banc Alex. Brown

Deutsche Bank

COR.-EQTY0000231

A351

# Transaction overview

($000s)

**Selected public companies**

| | Relevant financials | Implied multiples(1) | PBM Median | PBM Range | | Specialty distribution Median | Specialty distribution Range | |
|---|---|---|---|---|---|---|---|---|
| LTM revenues | $96,671 | 0.4x | 0.4x | 0.3x – | 0.7x | 0.5x | 0.1x – | 2.3x |
| LTM EBITDA | 1,669 | 24.7 | 10.9 | 8.0 – | 12.2 | 10.7 | 6.1 – | 30.8 |
| LTM EBIT | 1,257 | 32.9 | 13.7 | 11.6 – | 15.0 | 16.2 | 9.1 – | 33.0 |
| LTM net income | 769 | 53.7 | 22.8 | 16.2 – | 28.1 | 26.1 | 9.5 – | 50.0 |
| 2000E net income | 2,469 | 16.7 | 17.8 | 13.6 – | 23.1 | 14.1 | 7.9 – | 37.5 |
| 2001E net income | 3,517 | 11.7 | 14.5 | 10.3 – | 18.1 | 10.6 | 6.2 – | 28.4 |

**Selected transactions**

| | Relevant financials | Implied multiples(1) | PBM Median | PBM Range | | Specialty distribution Median | Specialty distribution Range | |
|---|---|---|---|---|---|---|---|---|
| LTM revenues | $96,671 | 0.4x | 0.6x | 0.2x – | 7.2x | 0.8x | 0.2x – | 3.9x |
| LTM EBITDA | 1,669 | 24.7 | 11.3 | 6.5 – | 17.5 | 15.7 | 8.9 – | 26.0 |
| LTM EBIT | 1,257 | 32.9 | 15.5 | 8.5 – | 21.6 | 21.4 | 11.1 – | 30.9 |
| LTM net income | 769 | 53.7 | 22.9 | 15.4 – | 53.8 | 34.0 | 18.6 – | 62.7 |
| Forward net income | 2,469 | 16.7 | 14.5 | 12.7 – | 16.2 | 24.0 | 11.9 – | 32.4 |

(1) Based on proceeds to Parent. Assumes Caddy's sold on stock/asset.

Deutsche Banc Alex. Brown

Deutsche Bank

COR.-EQTY0000232

4

# Section 2

Overview of Caddy

Deutsche Banc Alex. Brown

Deutsche Bank

COR.-EQTY0000233

# History

Caddy is a division of CHS, an indirect, wholly-owned subsidiary of Parent, a public company whose common stock trades on the OTC

- Caddy was formed by combining Medical Management Services of Omaha, Inc. ("MMS") and Nebraska Prescription Services, Inc. ("NPS")
  - MMS developed retail pharmacy software, provided electronic clearinghouse services to retail pharmacies, and offered traditional PBM services to health plans
  - NPS provided traditional mail-order pharmacy services
- In 1993, CHS acquired the assets of MMS
- In January of 1994, CHS/MMS entered the SPS business focusing on high-cost, chronic health conditions, such as diabetes, growth deficiencies and cancer
- In July of 1994, Caddy was established through the combination of CHS/MMS, HealthInfusion, Inc., Medisys, Inc. and T² Medical, Inc.
- In 1997, Parent hired a new management team with extensive experience in PBM and SPS to grow Caddy

Deutsche Banc Alex. Brown

Deutsche Bank

COR.-EQTY0000234

Overview of Caddy

# Business lines

Caddy is a provider of a broad range of health care products and services to individuals with chronic health conditions, and also provides comprehensive patient care management

### SFS
### (Mail order)

*Distributes pharmaceuticals and related medical supplies primarily for five chronic conditions/treatments:*

- HIV / AIDS
- Injectables
- Oncology
- Transplants
- Growth deficiency

### E-Commerce
### (New, development on hold)

*Integrated on-line site to complement and extend business:*

- Content - focus on currently served disease states
- Commerce - 24/7 shopping and prescription processing
- Community - disease specific discussion groups and links

### PBM

*Targets underserved PBM markets with patient populations of ten thousand or less including:*

- HMO's
- Health insurers
- Third-party administrators
- Employers
- Union benefit plans

Deutsche Banc Alex. Brown

Deutsche Bank ◪

COR.-EQTY0000235

060909 1:54 Pkfar s/bugbwb/coab3/04/prm.doc

7

A355

Overview of Caddy

Section 2

# Summary historical and projected financial results

($000)

| | Historical(1) | | | | | | Projected(2) | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | LTM 3/00 | 2000 | 2001 | 2002 | 2003 | 2004 |
| Net revenue | $30,440 | $50,463 | $89,077 | 96,671 | $110,245 | $138,341 | $165,600 | $201,000 | $244,100 |
| % growth | - | 65.8% | 76.5% | - | 23.8% | 23.7% | 21.5% | 21.4% | 21.4% |
| Total cost of service | 28,431 | 44,688 | 77,313 | 83,756 | 94,739 | 118,916 | 141,600 | 171,800 | 208,500 |
| % of revenue | 93.4% | 88.6% | 86.8% | 86.6% | 85.9% | 87.2% | 85.5% | 85.5% | 85.4% |
| Gross profit | 2,009 | 5,775 | 11,765 | 12,915 | 15,506 | 19,425 | 24,000 | 29,200 | 35,600 |
| Gross margin | 6.6% | 11.4% | 13.2% | 13.4% | 14.1% | 12.8% | 14.5% | 14.5% | 14.6% |
| EBITDA(3) | (2,729) | (732) | 683 | 1,669 | 4,598 | 6,315 | 8,900 | 11,700 | 15,200 |
| % of revenue | (9.0%) | (1.5%) | 0.8% | 1.7% | 4.2% | 4.6% | 5.4% | 5.8% | 6.2% |
| EBIT(3) | (2,861) | (852) | 335 | 1,257 | 4,048 | 5,765 | 8,350 | 11,150 | 14,650 |
| % of revenue | (9.4%) | (1.7%) | 0.4% | 1.3% | 3.7% | 4.2% | 5.0% | 5.5% | 6.0% |
| Net earnings/(loss)(3)(4) | (2,861) | (852) | 207 | 769 | 2,469 | 3,517 | 5,094 | 6,802 | 8,937 |
| % of revenue | (9.4%) | (1.7%) | 0.2% | 0.8% | 2.2% | 2.6% | 3.1% | 3.4% | 3.7% |

(1) Audited financials for Caddy as a division.
(2) Caddy as a stand-alone company.
(3) Adds back one-time charges relating to relocation, uncollectible allocated to Rnet and start-up expenses.
(4) Assumes fully-taxed at 35%.

Deutsche Banc Alex. Brown

Deutsche Bank

8

COR.-EQTY0000236

Section 2

# Quarterly results

| ($000) | 03/1999 | 03/2000 | Quarterly growth rate |
|---|---|---|---|
| Net revenue | $18,662 | $26,256 | 40.7% |
| Total cost of service | 16,295 | 22,739 | 39.5 |
| % of revenue | 87.3% | 86.6% | |
| Gross profit | 2,366 | 3,517 | 48.6 |
| Gross margin | 12.7% | 13.4% | |
| EBITDA | 199 | 1,185 | 495.5 |
| % of revenue | 1.1% | 4.5% | |
| EBIT | 147 | 1,068 | 626.5 |
| % of revenue | 0.8% | 4.1% | |
| Net earnings/(loss) | 90 | 651 | 623.3 |
| % of revenue | 0.5% | 2.5% | |

Deutsche Banc Alex. Brown

Deutsche Bank ☑

9

COR.-EQTY0000237

A357

Section 3

Overview of bids

# Section 3

## Overview of bids

Deutsche Banc Alex. Brown

Deutsche Bank

COR.-EQTY0000238

Overview of bids

Section 3

# Potential acquirors

The initial list of 45 potential purchasers has been reduced to one party

| Contacted | CA sent | Offering memo sent | Non-binding bid submitted | Further due diligence performed | Bid under consideration |
|---|---|---|---|---|---|
| GTCR | GTCR | GTCR | GTCR | GTCR | GTCR |
| Accredo Health, Inc. | Accredo Health Inc. | Bain Capital | Bain Capital | Bain Capital | |
| Advance Paradigm, Inc. | Advance Paradigm, Inc. | Banc One Equity Capital | Brown McMillan & Co. | CVS ProCare | |
| Advent International | Advent International | Beckton Petty & Co. | CareMark Rx Inc. | Priority Healthcare | |
| American Prescription Providers | Bain Capital | Bessemer Partners & Co. | CVS ProCare | Summit Partners | |
| Atlantic Medical | Barc One Equity Capital | Brown McMillan & Co. | Priority Healthcare | | |
| Bain Capital | Beckton Petty & Co. | Bruckmann, Rosser, Sherrill | ProVantage | | |
| Barc One Equity Capital | Bessemer Partners | CareMark RX Inc. | Summit Partners, | | |
| Beckton Petty & Co. | Brown McMillan & Co. | CVS Procare | | | |
| Bergen Brunsvig Corporation | Bruckmann, Rosser, Sherrill | Lincare Holdings Inc. | | | |
| Bessemer Partners & Co. | CareMark RX Inc. | Madison Dearborn Partners | | | |
| Bristol-Meyers Scabb Company | Charterhouse Group | MIM Corporation | | | |
| Bro Companies (The) | CVS Procare | Priority Healthcare | | | |
| Brown McMillan & Co. | First Health Group | ProVantage | | | |
| Bruckman, Rosser, Sherrill & Co. | Genstar Capital LLC | Rencor Inc. | | | |
| CareMark RX Inc. | Liberty Partners | Summit Partners | | | |
| Carlyle Group (The) | Lincare Holdings Inc. | | | | |
| Charterhouse Group | Madison Dearborn Partners | | | | |
| CVS Procare | MIM Corporation | | | | |
| Express Scripts, Inc. | Panford & Co. Ventures, Inc. | | | | |
| Fairview Hospitals | Priority Healthcare | | | | |
| First Health Group | ProVantage Health Services | | | | |
| Fox Palne & Co., LLC | Rencor Inc. | | | | |
| GlaMark Partners, LP | Summit Partners | | | | |
| Genstar Capital LLC | | | | | |
| Health Network (The) | | | | | |

Deutsche Banc Alex. Brown

Deutsche Bank

COR.-EQTY0000239

11

A359

Overview of bids

Section 3

# Potential acquirors (continued)

| Contacted | CA sent | Offering memo sent | Non-binding bid submitted | Further due diligence performed | Bid under consideration |
|---|---|---|---|---|---|
| GTCR | GTCR | GTCR | GTCR | GTCR | GTCR |
| Henry Schein Inc. | | | | | |
| Half Alternative Income Fund, L.P. | | | | | |
| Liberty Partners | | | | | |
| Linvatec Holdings, Inc. | | | | | |
| Madison Dearborn Partners, Inc. | | | | | |
| MIM Corporation | | | | | |
| Morgan Stanley Dean Witter | | | | | |
| Omnicare | | | | | |
| Patricof & Co. Ventures, Inc. | | | | | |
| Priority Healthcare | | | | | |
| PSS World Medical Inc. | | | | | |
| ProVantage Health Services | | | | | |
| Renoir, Inc. | | | | | |
| Richard C. Blum & Associates | | | | | |
| Summit Partners | | | | | |
| Sterling Ventures, Ltd. | | | | | |
| TA Associates | | | | | |
| Thoma Cressey Equity Partners | | | | | |
| Walgreen's Health Initiatives | | | | | |
| **Total   45** | **24** | **16** | **8** | **5** | **1** |

■ GTCR's bid was selected based on a combination of the following factors:

– price
– contract terms
– timing
– ability to consummate quickly

Deutsche Banc Alex. Brown

☑ Deutsche Bank

12

06/0994 Seb'l FM:er s:hepbardsmhbk12/sejera.doc

COR.-EQTY0000240