IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARLIN M. ADAMS, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of CORAM HEALTHCARE CORPORATION, a Delaware Corporation, and of CORAM, INC., a Delaware Corporation, <br><br> Plaintiff, <br><br> v. <br><br> DANIEL D. CROWLEY, DONALD J. AMARAL, WILLIAM J. CASEY, L. PETER SMITH, AND SANDRA L. SOMELY, <br><br> Defendants. | Case No. 04-1565 |

**APPENDIX OF DOCUMENTS IN SUPPORT OF
DEFENDANT DANIEL D. CROWLEY'S OPENING BRIEF
IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT (PART 2)**

Jeffrey C. Wisler (No. 2795)
Christina M. Thompson (No. 3976)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
(302) 658-9141

-and-

Elliot R. Peters
R. James Slaughter
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(415) 391-5400

Dated: April 17, 2007

*Attorneys for Daniel D. Crowley*

## TABLE OF CONTENTS

| Document Description | Page |
|---|---|
| Minutes of 7/31/00 Coram Board of Directors Meeting | A537 |
| Minutes of 8/7/00 Coram Board of Directors Meeting | A549 |
| Coram's Initial Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code filed 8/8/00 | A553 |
| Memorandum in Support of Motion for Appointment of Equity Security Holders Committee filed 8/30/00 | A638 |
| Letter dated 9/11/00 from Levy to Coram Investors re Appointment of Equity Committee | A653 |
| Email dated 10/12/00 from Flynn to Liebentritt | A654 |
| Notice of Appointment of Equity Committee filed 10/18/00 | A662 |
| Minutes of 12/28/00 Coram Board of Directors Meeting | A663 |
| 2000 Form 10-K for period ending 12/31/00 | A669 |
| Resolutions of the Independent Committee/ Members of the Board of Directors dated 2/9/01 | A734 |
| Order Appointing Goldin Associates, L.L.C. as Independent Restructuring Advisors entered 2/26/01 | A737 |
| Minutes of 7/12/01 Coram Board of Directors Meeting | A739 |
| Updated Report of Independent Restructuring Advisor Goldin Associates, L.L.C. dated 9/4/01 | A744 |
| Letter dated 1/24/02 from Crowley to Gaddigan | A891 |
| Letter dated 3/11/02 from Crowley to Adams | A893 |
| Letter dated 5/6/02 from Crowley to Adams | A910 |
| Letter dated 11/6/02 from Danitz to Mumford re Crowley/Trustee correspondence | A914 |

| **Document Description** | **Page** |
|---|---|
| Letter agreement dated 12/24/02 from Bressler to Schreiber re modified terms of termination and extension agreement | A917 |
| Letter agreement dated 1/7/03 from Bressler to Schreiber re terms of Transition Agreement | A921 |
| Presentation titled "Update of Coram Healthcare and Management Initiatives" dated 1/9/03 | A923 |
| Motion of the Chapter 11 Trustee for Authorization to Enter into Termination and Employment Extension Agreement with Daniel D. Crowley filed 1/24/03 | A970 |

# MINUTES OF A MEETING

## OF THE BOARD OF DIRECTORS OF

## CORAM HEALTHCARE CORPORATION

### July 31, 2000

A meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was convened at approximately 11:00 a.m. EDT at Kasowitz, Benson, Torres & Friedman LLP, 1301 Avenue of the Americas, 36th Floor, New York, New York 10019. Participating in the meeting were the following Directors: Daniel D. Crowley, Chairman of the Board, Chief Executive Officer and President; Donald J. Amaral; William J. Casey; L. Peter Smith (telephonically) and Sandra R. Smoley (telephonically). Also participating in the meeting were Allen J. Marabito, Executive Vice President and Scott R. Danitz, Senior Vice President, Finance and Chief Accounting Officer. Also participating were the following legal and financial advisors: David F. Friedman, Esquire of Kasowitz, Benson, Torres & Friedman, LLP; Russell A. Belinsky, Senior Managing Director, Chanin Capital Partners; Eric A. Scroggins, Senior Vice President, Chanin Capital Partners; Robert J. Stobo, Vice President, Healthcare Group, Chanin Capital Partners; Christina Morrison of Deutsche Banc Alex. Brown; and Eugene Tillman, Esquire, of Reed Smith Shaw & McClay L.L.P.

Mr. Crowley, Chairman of the Board, convened the meeting and Mr. Marabito acted as secretary at the meeting.

## REVIEW AND APPROVAL OF MINUTES FROM PRIOR MEETING

Upon a motion duly made and seconded, the minutes from the prior meetings of the Audit Committee dated March 10, 2000, and of the Board of Directors dated May 17, 2000, June 7, 2000, and June 9, 2000, having been previously provided to the Board, were unanimously approved as presented.

## FINANCIAL REPORT

Mr. Crowley requested the financial report. Mr. Danitz led a discussion of the financial information as previously presented and presently updated to the Board of Directors. Mr. Danitz's report included, among other financial information and schedules, the Company's operating results for the month ended June 30, 2000, including actual to budget for the second quarter ended June 30, 2000, and the year-to-date ended June 30, 2000. Also reported to the Board were analyses of the variances, including second quarter 2000 to first quarter 2000, second quarter 2000 to second quarter 1999 and year-to-date June 30, 2000, to year-to-date June 30, 1999. Messrs. Danitz and Crowley responded to the Board through a discussion of the financial results. Discussion was had concerning the financial results with and without the inclusion of the operating results of Coram Prescription Services ("CPS").

COR-EQTY 0014762



EXHIBIT

MORRISON 21
3/26/07

Minutes of the Board of Directors
July 31, 2000
Page 2

Discussion continued concerning the trends evident in the operating results. It was noted that without the inclusion of CPS, the Company's EBITDA was ahead of budget obtained through continued cost savings as opposed to revenue growth. It was noted that, among other factors, the Company was continuing to improve and lower its costs in such operating categories as drugs, supplies, payroll, inventory and clinical expenses. It was noted that net revenues were under budget for infusion and clinical research for the period ended June 30, 2000. In a comparison of the year-to-date 2000 to year-to-date 1999 revenue it was noted that revenue was approximately two percent less reduced by, among other factors, the runoff of the Aetna business in the Company's second quarter. There has been a 70% improvement in EBITDA over 1999, inclusive of the MIP accrual and without CPS proceeds. The reductions in revenues having been offset by the cost reductions that were carried out during this period as described before. At midyear the Company has a run rate to produce a $35 million EBITDA, inclusive of the MIP accrual. Discussion and analysis next turned to the balance sheet. The discussion included a description of the projected balance sheets provided to the Board. Mr. Danitz indicated additional schedules would be sent to the Board. It was noted in the discussion that the reclassification of the current maturities of the long-term debt of the A and B notes creates a greater short-term liability that produces a negative current ratio as of June 30, 2000.

CPS SALE

The Company, represented by Deutsche Banc Alex. Brown, sold CPS for $41.3 million with a gain to the Company of $18.5 million. Net proceeds are intended to pay down the Company's Revolving Senior Credit Facility and a portion of the Series A Notes in the amount of approximately $38 million combined. Combined Series A and B remaining debt would remain at approximately $252 million. The equity from the sale is insufficient to meet Stark II, pay the balloon on the Series A notes or satisfy the call of the Series B notes scheduled for May 27, 2001.

Beyond the presently intended debt repayments, discussion concerned the necessity of the Company to address the payment of the A note at approximately $168 million on May 27, 2001; and the potential default of the Series B Notes of approximately $92 million which may be called May 27, 2001; and the so-called Stark II net equity requirements.

2000. 2001 BUSINESS PLAN

Mr. Crowley reviewed with the Board an overview of the operational and financial business plan for the Company and its underlying assumptions. The business plan was discussed regarding its strengths and weaknesses, including its capacity to make debt service, including principal and interest. It was noted that even after the sale of CPS the equity of the Company is at a deficit. It was noted that the business plan cannot demonstrate the required earnings to obtain a positive equity in the current calendar year. Further, although the 2000 and 2001 business plans are cash positive, the business plans cannot overcome the balloon payment due on the A notes in May 2001 without new financing. The Board discussed the implications of the

COR-EQTY 0014763

Minutes of the Board of Directors
July 31, 2000
Page 3

business plans that show after improved cash flow, the sale of CPS, the reduction of debt, and improved operations, the Company does not have the financial wherewithal to resolve the Stark II problem or meet the balloon payment when due without other options.

## STARK II EQUITY REQUIREMENTS

REDACTED          REDACTED

Christina Morrison joined the meeting.

REDACTED          REDACTED

## STARK II EQUITY ANALYSIS

In connection with the discussion of Company's business plan and projected earnings, cash flow, and financial position for 2000 and 2001 and Mr. Tillman's report, the Board examined the analysis provided by Management regarding the proposed equity required to be compliant with the public company exception of Stark II at the end of the years 2000 and 2001. To aid the analysis, the calculations were presented under various business plan pro formas beginning with the sale of CPS and forecasted operating revenues at 100% and 90% of forecast with and without various levels of debt restructuring. The Board was referred to the prepared materials. The 100% of forecast scenario requires a $100,000,000 equity infusion at forecasted revenue and a $110,000,000 equity infusion at 90% of forecasted revenue. The Board discussed the assumptions and additional models of the Stark II analysis that proposed several note and revolver debt restructuring levels and assumed interest rates along with estimated debt carrying capacities under the business plan.

COR-EQTY 0014764

Minutes of the Board of Directors
July 31, 2000
Page 4

## STRATEGIC FINANCIAL ALTERNATIVES

The Company requested Deutsche Banc Alex. Brown to analyze the Company's financial options in view of the Company's inability to meet its debt and Stark II obligations.

Christina Morrison of Deutsche Banc Alex. Brown addressed the Board on financial alternatives available to the Company to raise the necessary capital to obtain the required equity under Stark II and the refinancing of its current debt obligations under the business plan.

Ms. Morrison addressed the Board on the additional financing alternatives that had been considered by Deutsche Banc Alex. Brown. She referred to materials previously provided to the Board. Ms. Morrison led a discussion with the Board, responding to their inquiries on each of the capital raising alternatives included in her analyses, such as: follow-on offering alternatives, rights offerings and strategic investment by a third party, and a leveraged buyout to create a new debt and equity capital structure.

The Board discussion compared and contrasted the options. Christina Morrison responded to questions regarding the viability of each. Ms. Morrison noted that at the forecasted EBITDA for 2000 and 2001 and existing debt of the Company in the range of $250,000,000, it is not feasible to raise conventional capital for its additional financing needs. Ms. Morrison discussed with the Board the culmination of her perceptions of the financial markets available to the Company based on her recent experience and present experience in seeking capital for healthcare related companies. Ms. Morrison stated the range for investment capital is small, generally from two times to 4 to 4.5 times EBITDA, and the terms are stringent and the availability uncertain in healthcare. The more available capital is bank debt in amounts in the range of 2 to 2.5 times EBITDA.

The Board discussion considered a follow-on equity offering and the points raised in Ms. Morrison's presentation.

The Board further discussed the possibility of a rights offering to raise equity with the existing shareholders for the estimated $100,000,000 capital infusion required for Stark II (approximately $2.00 a share).

The Board discussed an auction as an alternative. Christina Morrison opined the limited buyers in this market, the financial troubles of potential buyers, the timing requirements of public auction and the uncertainty of anyone paying for 100% of equity with an existing $250,000,000 debt all suggested this was not a viable alternative.

The Board considered partial liquidation, for example selling the Hemophilia business or another part of the Company. However, Hemophiliac is performing and growing and a cash generator for the Company, and its absence would likely reduce the Company's going concern value as would other piecemeal sales or liquidations.

COR-EQTY 0014765

Minutes of the Board of Directors
July 31, 2000
Page 5

In response to inquiries from the Board, Ms. Morrison advised the Board on the alternatives available as described in her presentations. Ms. Morrison concluded in discussion that none of the alternatives were viable in Deutsche Banc Alex. Brown's opinion. The Board, having had its questions answered regarding strategic financing alternatives, further examined the Company's options under Stark II. At this time Ms. Morrison was excused from the meeting.

## STARK II ALTERNATIVES

REDACTED        REDACTED

## REORGANIZATION VALUE

The Company had asked Chanin Capital Partners, an independent financial advisor, to advise the Company with respect to its opinion of the going concern value of the Company. The Company requested the evaluation to help determine the value to be realized by the various interests.

Eric Scroggins explained the materials provided to the Board, and he updated the materials for the Board at the meeting in serial fashion.

He discussed with the Board the process followed in the valuation study and the types of financial and operating information, comparative information, economic information, company projections and the sources of such information that were reviewed and analyzed. Discussion evolved regarding valuation and the various methodologies. The evaluation excludes CPS and R-Net finances and operations resulting in estimated run rates for the two primary business lines, infusion therapy services and CTI. The Chanin representatives addressed through comparison and contrast the discounted cash flow analysis, public company comparable analysis and the comparable functional analysis used to arrive at the enterprise value of approximately $207.0 million for the Company's primary lines of business. Chanin described the various methodologies and their components and their effect on the valuation outcomes. The $207.0 million evaluation results from the weighted average of the three valuation methodologies. It is a cashflow, run rate valuation of the projected go forward business and not what the Company may sell for. The Chanin representatives along with Mr. Friedman responded to the Board's questions regarding the evaluation and the process and its assumptions.

COR-EQTY 0014766

Minutes of the Board of Directors
July 31, 2000
Page 6

Following discussion of valuations, the Board inquired about the Company's debt capacity. Mr. Scroggins addressed the interest rate sensitivity tables and the range of debt capacity based upon EBITDA and EBITDA-CAPEX as projected for 2000 and 2001. Discussion ensued regarding the debt load the Company can meet from anticipated future income.

## LEGAL RIGHTS, RESPONSIBILITIES AND ALTERNATIVES

In a privileged and confidential communication, in furtherance of the Board's evaluation of its options and the advice of its financial and legal outside advisors, the Board requested Mr. Friedman to provide his legal advise and opinions. Following the communication with Mr. Friedman, the Board had further discussion.

## DEBT CAPACITY

Chanin reiterated its analysis of the debt capacity of the Company. Discussion of market interest rates ensued and the ranges of debt load with and without amortization of principal and the Company's capital needs and projected revolver requirements. Mr. Friedman provided additional legal advice. The Board discussed possible ranges of conversion for the remaining $252.0 million in Series A and B notes, following the sale of CPS. It was noted that default on the notes could force an involuntary bankruptcy.

## REORGANIZATION PROCEEDINGS

REDACTED

## 401(K) AND SHAREHOLDER VALUE

Based on Chanin's evaluation, the enterprise value, without contingent liabilities, is approximately $45 million less than the $252.0 million debt owed by the Company, and the Company has balance sheet insolvency with current liabilities approximately three times current assets.

Board members reviewed with David Friedman their responsibilities to the Company's shareholders and the relationship between the creditors and shareholders of the Company. Mr. Friedman, in a privileged and confidential communication, provided the Board with legal advice

COR-EQTY 0014767

Minutes of the Board of Directors
July 31, 2000
Page 7

regarding the rights of creditors and shareholders and the Company's potential negotiation with the debt holders regarding value to the shareholders. Mr. Friedman also advised on the existing shareholder group represented by Mr. Levy, Esq. and the communications he had with Mr. Levy.

**SPECIAL COMMITTEE**

Mr. Friedman proposed a resolution intended to create a special committee to review the Company's bank indebtedness based on the advice of the Company's advisors. The Board discussed the procedure for the committee to proceed with the initial negotiations following which the following resolution was unanimously approved.

WHEREAS, Coram Healthcare Corporation (the "Company") has identified the necessity to restructure its bank indebtedness in order to improve its capital structure and comply with the Stark II statute;

WHEREAS, in the first instance, it is appropriate for management of the Company to initiate discussions with the holders of the Company's bank indebtedness (the "Bank Group") with a view towards achieving an understanding of acceptable parameters for a restructuring, consistent with the Company's financial resources and the valuation opinion provided to the Company by Chanin Capital Partners, LLC, the company's financial advisor;

WHEREAS, it is appropriate that a special committee of the Board of Directors be appointed (the "Special Committee") to review any preliminary agreement or understanding reached between management and the Bank Group, to assess the overall fairness to the Company of any such agreement or understanding, to determine what, if any, changes to such agreement or understanding are appropriate and to make its recommendations to the entire Board of Directors with respect thereto;

NOW, THEREFORE, BE IT RESOLVED that Donald J. Amaral, L. Peter Smith, William J. Casey and Sandra L. Smoley be, and they hereby are, appointed to the Special Committee;

RESOLVED FURTHER that in performing its appointed functions, the Special Committee shall have unrestricted access to the Company's financial and legal advisors and to such other information in the custody or control of the Company as the Special Committee deems necessary or appropriate;

RESOLVED FURTHER that the special Committee shall report back to the entire Board of Directors upon the completion of its appointed tasks, whereupon the Board of Directors shall consider such additional steps as are

COR-EQTY 0014768

Minutes of the Board of Directors
July 31, 2000
Page 7

regarding the rights of creditors and shareholders and the Company's potential negotiation with the debt holders regarding value to the shareholders. Mr. Friedman also advised on the existing shareholder group represented by Mr. Levy, Esq. and the communications he had with Mr. Levy.

SPECIAL COMMITTEE                     REDACTED                                        The Board

discussed the procedure for the committee to proceed with the initial negotiations following which the following resolution was unanimously approved.

WHEREAS, Coram Healthcare Corporation (the "Company") has identified the necessity to restructure its bank indebtedness in order to improve its capital structure and comply with the Stark II statute;

WHEREAS, In the first instance, it is appropriate for management of the Company to initiate discussions with the holders of the Company's bank indebtedness (the "Bank Group") with a view towards achieving an understanding of acceptable parameters for a restructuring, consistent with the Company's financial resources and the valuation opinion provided to the Company by Chanin Capital Partners, LLC, the company's financial advisor;

WHEREAS, it is appropriate that a special committee of the Board of Directors be appointed (the "Special Committee") to review any preliminary agreement or understanding reached between management and the Bank Group, to assess the overall fairness to the Company of any such agreement or understanding, to determine what, if any, changes to such agreement or understanding are appropriate and to make its recommendations to the entire Board of Directors with respect thereto;

NOW, THEREFORE, BE IT RESOLVED that Donald J. Amaral, L. Peter Smith, William J. Casey and Sandra L. Smoley be, and they hereby are, appointed to the Special Committee;

RESOLVED FURTHER that in performing its appointed functions, the Special Committee shall have unrestricted access to the Company's financial and legal advisors and to such other information in the custody or control of the Company as the Special Committee deems necessary or appropriate;

RESOLVED FURTHER that the special Committee shall report back to the entire Board of Directors upon the completion of its appointed tasks, whereupon the Board of Directors shall consider such additional steps as are

COR-EQTY 0014768

Minutes of the Board of Directors
July 31, 2000
Page 8

necessary or appropriate to implement a restructuring of the Company's bank indebtedness.

SHAREHOLDER GROUP

REDACTED

The Board accepted this recommendation and, after discussion, unanimously agreed to cause the Company to request the Company's principal debt holders to consider a cash payment in some reasonable amount to the shareholders despite the insolvency of the Company in order to resolve quickly and efficiently any dispute that may arise with the shareholders.

## RETENTION OF KEY EMPLOYEES

Mr. Crowley discussed the necessity of retaining and motivating management and employees during the uncertainties facing the Company. The Board also considered a recommendation from Mr. Crowley that the Company enter into an employment agreement with Mr. Danitz. Mr. Crowley also discussed with the Board a management retention plan along with the proposed terms and suggested participants. The outside Directors were also of the consensus that a retention bonus should be considered for Mr. Crowley and would consider the action further.

The Board, following its discussion and its questions being answered, unanimously approved the following resolution:

RESOLVED, that the Board of Directors of the Company hereby deems that it is in the best interests of the Company to enter into an Employment Agreement with its Senior Vice President, Finance and Chief Accounting Officer, Scott R. Danitz;

FURTHER RESOLVED, that the Chairman, Chief Executive Officer and President, the Executive Vice President or any Senior Vice President of the Company (the "Authorized Officers") are each hereby authorized, empowered and directed to negotiate, make, execute and deliver as the act and deed of the Company, an employment agreement between the Company and Scott R. Danitz incorporating the principal terms set forth on Exhibit A hereto together with such other terms and conditions as any such Authorized Officer deems necessary, appropriate or expedient for such employment agreement;

COR-EQTY 0014769

Minutes of the Board of Directors
July 31, 2000
Page 9

FURTHER RESOLVED, that the Authorized Officers are each hereby authorized, empowered and directed to prepare, negotiate, make, execute and deliver on behalf of the Company such documents or agreements as may be necessary, appropriate or expedient to cause the issuance and payment of the "Stay Bonuses" in such amounts and to the persons listed on Exhibit A hereto on the principal terms described on such Exhibit A; and

FURTHER RESOLVED, that the Authorized Officers are each hereby authorized, empowered and directed to prepare, negotiate, execute and deliver as the act and deed of the Company such other documents, certificates, motions or agreements as may be necessary, appropriate or expedient to effect the intent of all resolutions adopted at this meeting.

## OTHER BUSINESS

There being no further business, the meeting was adjourned.

Respectfully submitted,

*Allen Marabito*

Allen J. Marabito
Secretary of the Meeting

COR-EQTY 0014770

EXHIBIT A

PERSONAL & CONFIDENTIAL

To provide more certainty that Coram Healthcare will have management both in place and properly focused on the business of the Company *during and after* any restructuring proceeding the following proposal is offered:

1) Coram provide contractual commitment as follows:

| Name | Title | Details |
|------|-------|---------|
| Danitz, Scott | Chief Accountant | one (1) year contract eff 8-1 with one (1) year's pay if Change of control, one (1) year Severance if termed w/o rsn, $200,000 for sale bonus, $900 month car allowance. |

2) Coram provide "Stay Bonus" with 50% paid on successful emergence from any restructuring proceeding but not earlier than December 31, 2000, and the reaminging 50% paid on the last day business day of 2001. Bonus would only be paid to those who listed who remain successfully employed by Coram and are actively at work on the date of payment.

| Name | Title | 50% | Total |
|------|-------|-----|-------|
| Marabito, Allen | Exec. VP | $75,000 | $150,000 |
| Danitz, Scott | Chief Acct | $50,000 | $100,000 |
| Ponzio, Vito | SVP, Human Rscs | $40,000 | $ 80,000 |
| Geiger. Frank | VP Purchasing | $25,000 | $ 50,000 |
| Meyer, Debbie | SVP, Field Sales | $40,000 | $ 80,000 |
| Sarraco, Micael | SVP, Spec. Prods | $40,000 | $ 80,000 |
| Ellis, John | AVP, Ops East | $40,000 | $ 80,000 |
| Iriye, Richard | AVP, Ops West | $40,000 | $ 80,000 |
| Douglass, Kate | VP, Clincial Svcs | $40,000 | $ 80,000 |
| Hill, Eric | VP, Hemophilia | $40,000 | $ 80,000 |
| Reynolds, Gerald | VP, Controller | $25,000 | $ 50,000 |
| Wright, Rodney | VP, Collections | $25,000 | $ 50,000 |
| McIntyre, John | VP, Treasurer | $15,000 | $ 30,000 |

COR-EQTY 0014771

**A547**

| | | | |
|---|---|---|---|
| Sivori, Joe | Director, Finance | $15,000 | $ 30,000 |
| Moeller, Scott | Director, Tax | $15,000 | $ 30,000 |
| Schott, Alex | Director, Accounting | $15,000 | $ 30,000 |
| Jarm, Beth | VP, Rgnl Sales | $15,000 | $ 30,000 |
| Sokolowski, Winnie | VP, Rgnl Sales | $15,000 | $ 30,000 |
| Thomas, Eileen | VP, Rgnl Sales | $15,000 | $ 30,000 |
| Vollmer, Craig | VP, Rgnl Sales | $15,000 | $ 30,000 |
| Dennis, Debbie | VP, Rgnl Sales | $15,000 | $ 30,000 |
| Justice, Jayne | VP, Rgnl Sales | $15,000 | $ 30,000 |
| Poillon, Roy | Mgd Care Consult | $15,000 | $ 30,000 |
| Ruehle, Janet | Mgd Care Consult | $15,000 | $ 30,000 |
| Johnson, Lisa | Mgd Care Consult | $15,000 | $ 30,000 |
| Trimble, Angela | Mgd Care Consult | $15,000 | $ 30,000 |
| Turner, Susan | Mgd Care Consult | $15,000 | $ 30,000 |
| Lampart, Carl | VP, Rgnl Ops | $15,000 | $ 30,000 |
| DePalma, Andrew | VP, Rgnl Ops | $15,000 | $ 30,000 |
| Nechamkin, Melissa | Mgr, Collections | $10,000 | $ 20,000 |
| Velella, Angela | Mgr, Collections | $10,000 | $ 20,000 |
| Mater, Chris | Mgr, Collections | $10,000 | $ 20,000 |
| | | $765,000 | $1,530,000 |

Other

| | | | |
|---|---|---|---|
| Crowley, Dan | Chairman, CEO, Pres | NA | NA |

NOTE: I am not making any recommendation for myself and will leave that matter up to the Board for its consideration, if any.

As a reminder, I am rewarded solely for EBITDA (which *does not* take into consideration the impact of a Bankruptcy proceeding on EBITDA). That said, my Agreement with the Board is that I have the *opportunity* to earn Bonuses as follows:

1) Nothing for EBITDA below $14Million,
2) 25% of the EBITDA above $14Million and capped at $35Million EBITDA,
3) A $5Million Bonus if EBITDA is above $35Million.
4) A restructuring bonus of the greater of one and half (1 ½%) percent of the equity after restructuring or one (1%) percent on the debt remaining after restructuring (e.g. if the debt remaining after the restructuring is $150Million, I would receive $1.5Million at closing).
5) Nothing for remaining as CEO post restructuring or for 2001.

COR-EQTY 0014772

# MINUTES OF A TELEPHONIC MEETING

## OF THE BOARD OF DIRECTORS OF

### CORAM HEALTHCARE CORPORATION

#### August 7, 2000

A telephonic meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was convened at 3:05 p.m. MDT. Participating in the meeting were the following Directors: Daniel D. Crowley, Chairman of the Board, Chief Executive Officer and President; Donald J. Amaral; William J. Casey; and Sandra R. Smoley. L. Peter Smith was absent. Participating telephonically were Allen J. Marabito, Executive Vice President; Scott R. Danitz, Senior Vice President, Finance and Chief Accounting Officer; and Scott T. Larson, Senior Vice President, General Counsel and Secretary. Robert Stobo, Eric Scroggins and Russ Belinsky of Chanin Capital Partners and David Friedman, Esq. and Adam Shiff, Esq. of Kasowitz, Benson, Torres & Friedman, LLP also participated in the meeting. Mr. Crowley acted as Chairman of the meeting and Mr. Larson kept the minutes.

The first item of business was a review and discussion of the proposed resolutions set forth on Exhibit A hereto that had been distributed to the Board of Directors prior to the meeting. It was confirmed that all of the members of the Board had received copies of the proposed resolutions and the proposed plan of reorganization and disclosure statement that had been discussed at the August 4, 2000, meeting. David Friedman was invited to discuss and explain each of the proposed resolutions. Prior to such discussion, Mr. Crowley inquired whether Mr. Amaral or any of the other members of the special committee that had been established at the July 31, 2000, meeting of the Board of Directors ("Committee") had received any word regarding the Committee's request for the debt holders to provide value to the Company's stockholders as part of the plan of reorganization. Mr. Amaral confirmed that no word had been received by the Committee.

As an extension of the management retention program, a motion was made to approve a retention bonus for Mr. Crowley, fifty percent of which would be paid on December 31, 2000, and fifty percent of which be paid on December 31, 2001. The total amount of the bonus would be $800,000, Chanin Capital Partners having opined that the bonus amount was reasonable. After the motion was seconded, and after discussion, Messrs. Amaral and Casey and Ms. Smoley voted in favor of providing such bonus for Mr. Crowley. Mr. Crowley abstained from the voting.

Mr. Friedman then proceeded with a privileged and confidential summary and explanation of the proposed resolutions and plan of reorganization. A copy of such resolutions is set forth on Exhibit A hereto. Mr. Friedman explained that if the resolutions were adopted, that he and members of his firm and local counsel would go to the bankruptcy court, file the petition and first day motions and otherwise take the actions necessary to commence the Chapter 11 case as it has been discussed with this Board. A discussion occurred regarding the contents of the

TRUSTEE009481
USDC-DE #04-1565

Minutes of the Board of Directors
August 7, 2000
Page 2

first day motions, the related press release, the debtor in possession financing agreement and the time frame that was expected for these matters. It was also stated that the filings should occur without interrupting the day-to-day operations of the Company's subsidiaries.

A discussion ensued regarding, among other things, whether the Company's directors and officers liability coverage would remain in force. Mr. Friedman responded that he believed such coverage would remain in force. He also confirmed that the necessary papers would be ready in time to commence the filing on the following day. Upon a motion duly made and seconded, the resolutions set forth on Exhibit A were unanimously adopted and confirmed.

Mr. Friedman confirmed that, with the adoption of such resolutions, he would make the necessary arrangements to cause the filing to be made in Delaware on the following day. It was explained that a press release would be issued on such day. The text of the press release was reviewed by the Board. After discussion and questions, the press release was unanimously approved by the Board.

There being no further business, the meeting was adjourned at approximately 4:15 p.m. MDT.

Respectfully submitted,

Scott T. Larson
Secretary of the Meeting

TRUSTEE009482
USDC-DE #04-1565

## EXHIBIT A

RESOLVED, that in the judgment of the Board of Directors, it is desirable and in the best interest of this Company, its creditors, stockholders, employees and other interested parties, that a petition be filed by the Company seeking relief under the provisions of chapter 11, Title 11, United States Code, (the "Bankruptcy Code"); and it is further

RESOLVED, that the Officers of the Company be, and each one of them hereby is, authorized and directed, on behalf of and in the name of the Company, to execute and verify a petition under chapter 11 of the Bankruptcy Code in such appropriate form and to cause the same to be filed with the United States Bankruptcy Court for the District of Delaware at such time as the Officer executing said petition on behalf of this Company shall determine; and it is further

RESOLVED, that the law firms of Kasowitz, Benson, Torres & Friedman, LLP, 1301 Avenue of the Americas, New York, New York 10019; and Pachulski, Stang, Ziehl, Young & Jones, P.C., 919 North Market Street, Suite 1600, Wilmington, Delaware 19801 be, and they hereby are, employed under general retainers as attorneys for the Company in connection with the preparation of the petition, the commencement and pursuit of the chapter 11 case through final determination and in all related proceedings; and it is further

RESOLVED, that the law firm of Reed Smith Shaw & McClay, LLP, 1301 K Street, N.W., Washington, D.C. 20005, be, and it hereby is, employed under a general retainer as special regulatory counsel for the Company in the chapter 11 case and in all related proceedings; and it is further

RESOLVED, that the consulting firm of Chanin Capital Partners, 11100 Santa Monica Blvd., Suite 830 Los Angeles, CA 90025 be, and it hereby is, employed as financial consultants for the Company in the chapter 11 case and in all related proceedings; and it is further

RESOLVED, that the communications consulting firms Gavin Anderson & Company, 220 East 42nd Street, New York, New York, 10017, and Chlopak, Leonard, Schechter & Associates, 1850 M Street NW, Suite 550, Washington, D.C. 20036 be, and they hereby are, employed under a general retainer as communications consultants for the Company in the chapter 11 case and in all related proceedings; and it is further

RESOLVED, that the accounting firm Ernst & Young LLP, 1285 Avenue of the Americas, New York, New York 10036, be, and it hereby is, employed as accountants for the Company in the chapter 11 case and in all related proceedings; and it is further

RESOLVED, that the Officers of this Company or any one of them be, and each of them hereby is, authorized to execute and file all petitions, schedules, motions, lists, applications, pleadings and other papers for and on behalf of the Company, as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, and in that connection to employ and retain all assistance by legal counsel, accountants or other professionals and to take any and all action which they deem necessary and proper in connection with the chapter 11 case, with a view

TRUSTEE009483
USDC-DE #04-1565

to the appropriate pursuit and conclusion of such case, their authority thereunto to be evidenced by the taking of such actions; and it is further

RESOLVED, that the Company, as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, shall be, and hereby is, authorized (a) to borrow funds in such amounts, from such lenders and on such terms as may be approved by any one or more of the Officers as reasonably necessary for the continuing conduct of the affairs of the Company, (b) to open and maintain such bank accounts, to enter into agreements in connection with any such bank accounts and to effect funds transfers to and withdrawals from any such accounts as may be approved by any one or more of the Officers as reasonably necessary to the conduct of the affairs of the Company and (c) to grant security interests in and liens upon all or substantially all of the Company's assets as may be deemed reasonably necessary by any one or more of the Officers in connection with such borrowings or in connection with obtaining authority to use collateral, cash or otherwise; and it is further

RESOLVED, that the Officers shall be, and each of them hereby is, authorized and empowered to execute, deliver, certify, file and/or record, and perform, for and on behalf of the Company, as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, agreements, instruments, motions, affidavits, applications, and any and all other documents necessary or appropriate to facilitate the transactions contemplated by the foregoing resolution (the "Financing Documents"), and that Financing Documents containing such provisions, terms, conditions, covenants, warranties and representations as may be deemed reasonable necessary or appropriate by the Officer or Officers so acting be, and hereby are authorized and approved; and it is further

RESOLVED, that the Officers are hereby authorized to execute and to cause to be filed the Plan of Reorganization (the "Plan") for the Company in substantially the form presented to the Board of Directors, together with a related Disclosure Statement and any and all necessary ancillary documents, including any and all modifications, supplements and amendments thereto, and to take all appropriate actions to obtain Bankruptcy Court approval of the Plan and the successful conclusion of the Company's reorganization; and it is further

RESOLVED, that any and all past actions heretofore taken by officers and directors of the Company in the name of and on behalf of the Company in furtherance of any or all of the preceding resolutions or actions contemplated thereby be, and the same hereby are, ratified, confirmed and approved.

TRUSTEE009484
USDC-DE #04-1565

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED BY THE COURT. ALL INFORMATION HEREIN IS SUBJECT TO CHANGE AND SHOULD NOT BE RELIED UPON IN MAKING ANY INVESTMENT OR OTHER DECISION.

FILED

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| CORAM HEALTHCARE CORP. and | ) | Chapter 11 |
| CORAM, INC., | ) | |
| | ) | Case Nos. 00-___ ( ) |
| Debtors. | ) | through 00-___ ( ) |
| | ) | |
| | ) | Jointly Administered |

## DISCLOSURE STATEMENT PURSUANT TO
## SECTION 1125 OF THE BANKRUPTCY CODE

KASOWITZ, BENSON, TORRES
   & FRIEDMAN LLP
David M. Friedman
Adam L. Shiff
Robert M. Novick
1301 Avenue of the Americas
New York, New York 10019
(212) 506-1700

– and –

PACHULSKI, STANG, ZIEHL,
YOUNG & JONES, P.C.
Laura Davis Jones
919 North Market Street, Suite 1600
Wilmington, Delaware 19801
(302) 652-4100

COUNSEL TO DEBTORS AND
DEBTORS-IN-POSSESSION



EXHIBIT
31
OP 2/14/07

35

[Chief Executive Officer Letter/Recommendation]
[From Company]

August ___, 2000

To the Creditors of Coram Healthcare Corporation and Coram, Inc.

We are pleased to report that Coram Healthcare Corporation ("CHC") and Coram, Inc. ("Coram"), (together, the "Debtors") are enthusiastically prepared to solicit your acceptance of their joint plan of reorganization, under which the Debtors will emerge from their bankruptcy cases, which were commenced only ___ months ago. The proposed reorganization plan (which will lead to the cancellation of the equity interests held by CHC's current shareholders) is the product of many hours of hard work and negotiations and is presented with the full support of the Debtors' largest creditors, the Noteholder Group. We believe that the enclosed Plan of Reorganization will form the basis for Coram to emerge from chapter 11 as a strong company, and provide the maximum recovery and distribution for creditors of CHC and Coram. Therefore, we strongly urge you to vote in favor of the Plan of Reorganization.

The following documents are contained in the attached materials:

(1)     the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan");

(2)     the Disclosure Statement with respect Plan (the "Disclosure Statement");

(3)     a notice providing information regarding Plan voting and announcing the hearing at __:__ Eastern Time on _____, 2000 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to consider confirmation of the Plan; and

(4)     for the creditors entitled to vote on the Plan, a ballot and a return envelope.

As noted above, the Plan is supported by the Debtors' largest Creditors. The Plan is the result of extensive negotiations among the Debtors and the Noteholder Group. The Debtors believe that the Plan represents a fair, reasonable and appropriate resolution of issues among the various constituencies and will maximize recoveries of all stakeholders.

The overall purposes of the Plan are to (a) cause Coram to remain in compliance with the federal "Stark II" law so that it can lawfully maintain its core businesses by eliminating public equity holders who may be referring physicians; (b) alter the Debtors' balance sheets to permit them to emerge from their chapter 11 cases with enhanced financial strength; (c) maximize the value of the ultimate recoveries to all stakeholders on a fair and equitable basis; and (d) settle, compromise or otherwise dispose of certain claims against and interests in the Debtors. As

described in detail in the Disclosure Statement, the Debtors believe that this course of action is necessary, reasonable, appropriate and in the best interests of their respective estates and creditors.

THE MANAGEMENT OF THE DEBTORS BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND OTHER STAKEHOLDERS. ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE URGED TO VOTE TO ACCEPT THE PLAN BY RETURNING BALLOTS IN ACCORDANCE WITH THE BALLOT INSTRUCTIONS. [THE CREDITORS COMMITTEE HAS INDEPENDENTLY CONCLUDED THE THAT PLAN IS IN THE BEST INTERESTS OF THEIR RESPECTIVE CONSTITUENCIES, AND HAS CONSENTED TO THE TERMS OF THE PLAN.

For further information concerning the Plan, you are encouraged to read carefully the Disclosure Statement which was approved by the Bankruptcy Court on _____, 2000 as well as the Plan itself. You also should read the instructions attached to the enclosed ballad for information regarding the proper completion and submission of a ballot. If you have any questions regarding voting procedures, you may call the Debtors' balloting agent [name and phone number of balloting agent].

PLEASE NOTE THAT TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED NO LATER THAN 5:00 P.M. EASTERN TIME ON _____, 2000 OR SUCH OTHER DATE AND TIME THAT ARE IDENTIFIED ON YOUR BALLOT. WE URGE YOU TO READ THE BALLOT INSTRUCTIONS CAREFULLY BEFORE VOTING.

Sincerely yours,


Daniel D. Crowley
Chairman of the Board, Chief Executive Officer,
   President, and Director
Coram Healthcare Corp.

# Table of Contents

i

i

**DISCLOSURE STATEMENT, DATED AUGUST __, 2000**

Solicitation of Votes

with Respect to the

Joint Plan of Reorganization

of

**CORAM HEALTHCARE CORPORATION
CORAM, INC.**

———————

THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT"), HAVING JURISDICTION OVER THE CHAPTER 11 CASES OF CORAM HEALTHCARE CORPORATION. AND CORAM, INC. (COLLECTIVELY, THE "DEBTORS"), HAS ESTABLISHED [SEPTEMBER __, 2000] AS THE DATE OF THE HEARING AT WHICH THE BANKRUPTCY COURT WILL HEAR THE DEBTORS' REQUEST, PURSUANT TO SECTION 1125 OF TITLE 11, UNITED STATES CODE (THE "BANKRUPTCY CODE"), TO APPROVE THIS DISCLOSURE STATEMENT. PRIOR TO THE HEARING SEEKING APPROVAL OF THIS DISCLOSURE STATEMENT, OR SUBSEQUENT THERETO AS AUTHORIZED BY THE BANKRUPTCY COURT, THE DEBTORS MAY ALTER, AMEND OR SUPPLEMENT THIS DISCLOSURE STATEMENT ONE OR MORE TIMES WITHOUT FURTHER NOTICE EXCEPT AS REQUIRED BY THE BANKRUPTCY CODE OR THE BANKRUPTCY COURT.

———————

[THIS DISCLOSURE STATEMENT, HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT ENTERED ON [SEPTEMBER __, 2000], AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES ON THE JOINT PLAN OF REORGANIZATION (THE "PLAN"). THE BANKRUPTCY COURT'S APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT, HOWEVER, INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN OR OF ANY ALTERNATIVE THERETO. THE BANKRUPTCY COURT HAS DETERMINED ONLY THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT VOTING HOLDERS OF ALLOWED CLAIMS TO MAKE AN INFORMED JUDGMENT AS TO WHETHER TO ACCEPT OR REJECT THE PLAN. THE BANKRUPTCY COURT HAS SET __, 2000 AT 5:00 P.M. NEW YORK TIME (THE "VOTING DEADLINE") AS THE DEADLINE FOR VOTING ON THE PLAN. FOR A DESCRIPTION OF VOTING PROCEDURES, SEE "VOTING AND CONFIRMATION OF THE PLAN -- VOTING PROCEDURES AND REQUIREMENTS." THE BANKRUPTCY COURT HAS SET ___, 2000 AT _ .M. AS THE TIME AND DATE FOR THE HEARING ON CONFIRMATION OF THE PLAN. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AS PROVIDED IN OPEN COURT.

———————

THIS DISCLOSURE STATEMENT, INCLUDING THE EXHIBITS ATTACHED HERETO, IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. MOST STATEMENTS AND FINANCIAL INFORMATION HEREIN ABOUT THE DEBTORS HAVE BEEN OBTAINED FROM DOCUMENTS AND INFORMATION PREPARED BY OR ON BEHALF OF THE DEBTORS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE

MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OR FILING OF THIS DISCLOSURE STATEMENT SHALL UNDER NO CIRCUMSTANCES CONSTITUTE A REPRESENTATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF COMPILATION OF THIS DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTORS UNDER THE PLAN.

———————————

NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF VOTES FOR THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO. IF ANY SUCH INFORMATION OR REPRESENTATIONS ARE GIVEN OR MADE, THEY MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS. WHILE THE DEBTORS WILL FURNISH TO CREDITORS ENTITLED TO VOTE ON ACCEPTANCE OF THE PLAN ANY SUCH ADDITIONAL INFORMATION AS MAY BE REQUIRED BY APPLICABLE LAW OR BY THE BANKRUPTCY COURT PRIOR TO THE VOTING DEADLINE, THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

———————————

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN

———————————

2

# I. INTRODUCTION

Coram Healthcare Corporation, a Delaware corporation ("CHC"), and Coram, Inc., a Delaware Corporation ("Coram"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), jointly submit this "Disclosure Statement" pursuant to section 1125 of the Bankruptcy Code. This Disclosure Statement describes the material terms of, and provides additional important information with respect to, the Joint Plan of Reorganization dated as of August 8, 2000 (the "Plan"), a copy of which is attached to this Disclosure Statement as Exhibit A.

The Debtors urge all voting creditors and other parties-in-interest to read this Disclosure Statement and the Plan carefully and in their entirety. This Disclosure Statement does not include a description of each and every term of the Plan. Accordingly, the description of the Plan set forth herein is qualified by the entirety of the Plan, which is incorporated by reference into this Disclosure Statement.

All capitalized terms used in this Disclosure Statement that are not otherwise defined herein have the meanings ascribed to them in the Plan.

## B.     What is Chapter 11?

Chapter 11 is the principal reorganization chapter of the Federal Bankruptcy Code. Under Chapter 11, the Debtors are permitted a period in which to organize their affairs and to review their assets and obligations in order to reorganize their businesses. The Debtors commenced their Chapter 11 cases on August 8, 2000 by filing petitions for relief under Chapter 11 with the Bankruptcy Court.

The commencement of the Debtors' Chapter 11 cases triggered the application of the "automatic stay" under section 362 of the Bankruptcy Code. The automatic stay halts, with certain exceptions, substantially all attempts to collect pre-petition claims from the Debtors or attempts to otherwise interfere with the Debtors' property.

## C.     What is a Plan of Reorganization?

The principal purpose of a Chapter 11 case is to permit the formulation of a plan of reorganization which provides for the restructuring of a debtor's liabilities and the treatment, if any, of its equity interests. The Plan proposed by the Debtors provides that such restructuring will be accomplished principally through the elimination of existing equity interests and the issuance of new equity, new secured notes, and cash to the Debtors' unsecured (non-priority)

3

creditors. For a discussion of the new equity to be issued pursuant to the Plan, see "New Coram Stock To Be Issued Pursuant To The Plan."

The Plan proposed by the Debtors further provides, among other things, that, after Confirmation and consummation of the Plan, Reorganized Coram and its non-debtor operating subsidiaries shall be able to operate their businesses free from the excessive indebtedness and regulatory concerns that necessitated their petitions for relief. For a discussion of the key regulatory factors bearing on the viability of the Debtors' business, see "Discussion of Stark II Issues."

D.     **What is a Disclosure Statement?**

After a plan of reorganization has been proposed, the holders of claims against, or equity interests in, the debtors that are impaired by the terms of the plan and that are to receive distributions (in cash or securities) under the plan are entitled to vote on whether to accept the plan. The Bankruptcy Code requires disclosure of "adequate information" to all such voting creditors and equity holders by way of a court-approved "disclosure statement" before the plan proponents may solicit any votes on the plan. The Bankruptcy Code provides that a disclosure statement must contain "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."

The Debtors present this Disclosure Statement to the voting holders of Allowed Claims against the Debtors in order to satisfy the disclosure requirements of the Bankruptcy Code by providing each voting holder of an Allowed Claim with sufficient information to make an informed decision as to whether to accept or reject the Plan.

E.     **How Does One Vote?**

Only persons holding "Allowed Claims" (as defined in the Plan) in Classes impaired under the terms of the Plan that are to receive a distribution under the Plan are entitled to vote. Under the Plan, all Classes are impaired except Classes CHC P (CHC Allowed Priority Non-Tax Claims), CHC 1 (Allowed CHC Secured Claims), Coram P (Coram Allowed Priority Non-Tax Claims), Coram 1 (Allowed Coram Secured Claims) and Coram 3 (Allowed Coram General Unsecured Claims). Holders of "Allowed Equity Interests" (Classes CHC 4 and Coram 4) will receive no distribution under the Plan and are therefore deemed to reject the Plan without the need for a solicitation of their votes. Holders of Allowed Claims in Classes CHC P and Coram P (Allowed Priority Non-Tax Claims), CHC 1 and Coram 1 (Secured Claims) and Coram 3 (General Unsecured Claims) are unimpaired and are therefore conclusively presumed to accept

4

the Plan without the need for solicitation of their votes. Holders of Allowed Claims in CHC 2 (CHC General Unsecured Claims), CHC 3 (CHC Note Claims) and Coram 2 (Coram Note Claims) are being solicited to vote on the Plan.

To vote on the Plan, a voting holder of an Allowed Claim must complete the Ballot (enclosed with this Disclosure Statement) and mail it to so that it is received at the address set forth on the enclosed pre-addressed envelope by no later than the Voting Deadline, which is 5:00 P.M., Eastern Daylight Time, on _____ __, 2000. Votes cannot be transmitted orally. Accordingly, the Debtors urge all voting holders of Allowed Claims to return their signed and completed Ballots promptly. For more detailed information regarding voting on the Plan, see "Voting and Confirmation of the Plan -- Voting Procedures and Requirements."

## II. SUMMARY OF THE PLAN AND THE REORGANIZATION

A.    **Summary of the Plan**

The following is a brief overview of certain material provisions of the Plan. This overview is qualified in its entirety by reference to the provisions of the Plan, which is attached hereto as Exhibit A, and the documents contained in the Plan Supplement, which will be available for inspection at the United States Bankruptcy Court for the District of Delaware, 844 King Street, Wilmington, Delaware 19801, and Pachulski, Stang, Ziehl, Young & Jones, P.C., 919 North Market Street, Suite 1600, Wilmington, Delaware 19801.

1.    **Generally**

The Plan proposed by the Debtors provides for, among other things, the satisfaction of substantially all of the Debtors' unsecured (non-priority) indebtedness through a combination of cash payments, issuance of New Coram Stock and New Secured Notes, and cancellation of existing equity interests. The overall purposes of the Plan are:

- to cause and permit Coram to continue to comply with the provisions of "Stark II" necessary for Coram to continue its core infusion therapies business.

- to reduce the amount of debt in the Debtors' capital structure and alter certain other obligations of the Debtors; and

- to maximize the value of the ultimate recoveries to all creditors of the Debtors on a fair and equitable basis.

5

The Plan represents the culmination of management analyses regarding the best means to maximize and allocate value to the Debtors' creditors in accordance with their legal and contractual priorities. Management has determined that the enterprise value of the Debtors that will be created pursuant to the Plan greatly exceeds any values achievable through whole or piecemeal liquidation. See "Voting and Confirmation of the Plan -- Liquidation Analysis." Accordingly, the Plan proposed by the Debtors:

- permits Coram and its operating subsidiaries to continue their business operations;

- eliminates substantially all of the Debtors' existing unsecured (non-priority) indebtedness and provides for the payment of cash and the issuance of New Coram Stock and New Secured Notes to the holders of such indebtedness; and

- extinguishes all existing equity interests of the Debtors.

2.    Summary of Classes and Treatment

Under the Plan, Claims against and Allowed Interests in the Debtors are divided into Classes according to their similarity with other Claims and Allowed Interests, the particular Debtor against which the Claims may be asserted and in which the Allowed Interests may be asserted, and the relative legal and contractual priorities of the Claims and Interests.

In accordance with mandatory provisions of the Bankruptcy Code, the Plan provides that holders of certain Claims (Allowed Administrative Claims, Allowed Non-Tax Priority Claims and Allowed Tax Priority Claims) will be entitled to immediate (or in the case of Allowed Tax Claims, deferred) cash distributions.

The aggregate amount of Claims estimated in each Class is based upon the Debtors' estimates of the aggregate amounts of Claims that the Debtors believe will be asserted upon resolution of any Claims that the Debtors believe will be Disputed Claims. Certain of these Disputed Claims may be material, and the total amount of all such Claims, including Disputed Claims, may materially exceed the total amount of Allowed Claims assumed in the development of the Plan.

The estimated Aggregated Amount of Claims Estimated depicted in the table below are based upon the Debtors' preliminary review of the Debtors' books and records and may be revised following the passage of all applicable bar dates and the completion of a detailed analysis of all Claims filed in the Cases.

6

| Description and Amount of Claims of Interests | Treatment |
|---|---|
| • Administrative Expense Claims (Unclassified) | Unimpaired; payment (i) in full in Cash on the later of the Effective Date and the date such Claim becomes an Allowed Claim, of (ii) on such other, terms to which the parties agree; provided however, that Administrative Expense Claims incurred in the ordinary course of business will be paid as such Claims become due and payable in the ordinary course of business. |
| • Aggregate Amount of Claims Estimated: $_____ | Recovery (Estimated):          100%<br><br>Ownership of Reorganized Coram: 0% |
| • Priority Tax Claims (Unclassified) | Unimpaired; at the Debtors' or Reorganized Coram's option, as applicable, (i) payment in full, in Cash, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, (ii) a Tax Note equal to the full amount of such holder's Priority Tax Claim, or (iii) on such other terms as mutually agreed to by the holder of an Allowed Tax Claim and the Debtors or Reorganized Coram. |
| • Aggregate Amount of Claims Estimated: $_____ | Recovery (Estimated):          100%<br><br>Ownership of Reorganized Coram: 0% |
| •Class CHC P (Allowed CHC Priority Non-Tax Claims)<br><br>• Priority Non-Tax Claims against CHC | Unimpaired; on the Effective Date, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed CHC Priority Non-Tax Claim unimpaired. |
| • Aggregate Amount of Claims Estimated $ [0] | Recovery (Estimated):          100%<br><br>Ownership of Reorganized Coram: 0% |

7

| | |
|---|---|
| •Class CHC 1 (Allowed CHC Secured Claims)<br><br>• Secured Claims against CHC<br><br>• Aggregate Amount of Claims Estimated:  $[0]. | Unimpaired; on the Effective Date, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed CHC Secured Claim unimpaired.<br><br>Recovery (Estimated):  100 %<br><br>Ownership of Reorganized Coram: 0 |
| • Class CHC 2 (Allowed CHC General Unsecured Claims)<br><br>• General Unsecured Claims against CHC<br><br><br><br><br><br><br><br><br><br><br><br>•Aggregate Amount of Claims Estimated: _____. | Impaired.  If Class CHC 2 votes to accept the Plan by the majorities required by section 1126(c) of the Bankruptcy Code, each holder of an Allowed CHC General Unsecured shall receive its Pro Rata share of (i) the CHC General Unsecured Consideration and (ii) the CHC Noteholder Consideration equal, in the aggregate, to a cash pool of $2 million.  If Class CHC 2 fails to accept the Plan by the majorities set forth in section 1126(c) of the Bankruptcy Code, each holder of an Allowed CHC General Unsecured Claim will receive, a Pro Rata share of the CHC General Unsecured Consideration.<br><br><u>Class CHC 2 receives an enhanced distribution if it votes in favor of the Plan.</u><br><br>Recovery (Estimated):        __% if accepting Plan<br>                                          __% if rejecting Plan<br><br>Ownership of Reorganized Coram: 0% |
| Class CHC 3 (Allowed CHC Notes Claims)<br><br>•Allowed Claims arising under the Notes against CHC<br><br>•Aggregate Amount of Claims Estimated: $[252] million. | Impaired; if Class CHC 2 votes to accept the Plan, no recovery.  If Class CHC 2 fails to accept the Plan, pro rata share of the Noteholder Consideration.<br><br>Recovery (Estimated):     0 % if Class CHC 2 accepts Plan<br><br>                                          a <u>pro rata</u> share of a $2 million cash pool if Class CHC 2 rejects Plan<br><br>Ownership of Reorganized Coram: 0% |

8

| | |
|---|---|
| Class CHC 4 (Allowed CHC Equity Interests)<br><br>•All equity interests in CHC<br><br>•Aggregate Value of Interests Estimated: $0. | Impaired; no distribution and all rights and interests canceled.<br><br>Recovery (Estimated):          0 %<br><br>Ownership of Reorganized Coram: 0% |
| •Class Coram P (Allowed Coram Priority Non-Tax Claims)<br><br>• Priority Non-Tax Claims against Coram<br><br>• Aggregate Amount of Claims Estimated $[0] | Unimpaired; on the Effective Date, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed Coram Priority Non-Tax Claim unimpaired.<br><br>Recovery (Estimated):          100%<br><br>Ownership of Reorganized Coram: 0% |
| Class Coram 1 (Allowed Coram Secured Claims)<br><br>• Allowed Secured Claims against Coram<br><br>•Aggregate Amount of Claims Estimated: $[0]. | Unimpaired; on the Effective Date, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed Coram Secured Claim unimpaired.<br><br>Recovery (Estimated):          100%<br><br>Ownership of Reorganized Coram: 0% |
| Class Coram 2 (Allowed Coram Note Claims)<br><br>•Allowed Claims arising under the Notes against Coram<br><br>•Aggregate Amount of Claims Estimated: $[252] million. | Impaired; each holder of an Allowed Coram Note Claim shall receive its Pro Rata share of: (i) the New Coram Stock, and (ii) the New Secured Notes.<br><br>Recovery (Estimated):          $\frac{180 + 29}{252} = 83\%$<br><br>Ownership of Reorganized Coram: 100% |

9

| Class Coram 3 (Allowed Coram General Unsecured Claims)<br><br>• General Unsecured Claims against Coram<br><br>• Aggregate Amount of Claims Estimated: $_____. | Unimpaired; at the option of Coram or Reorganized Coram, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, (ii) Reinstatement, or (iii) such other treatment to render such Allowed Coram General Unsecured Claim unimpaired.<br><br>Recovery (Estimated): 100 %<br><br>Ownership of Reorganized Coram: 0% |
|---|---|
| Class Coram 4 (Allowed Coram Equity Interests)<br><br>All equity interests in Coram<br><br>• Aggregate Value of Interests Estimated: 0. | Impaired; no distribution and all rights and interests canceled.<br><br>Recovery (Estimated): 0 %<br><br>Ownership of Reorganized Coram: 0%. |

THE TREATMENT AND DISTRIBUTION PROVIDED TO HOLDERS OF ALLOWED CLAIMS AND EQUITY INTEREST PURSUANT TO THE PLAN ARE IN FULL AND COMPLETE SATISFACTION OF THE ALLOWED CLAIMS AND EQUITY INTERESTS, AS THE CASE MAY BE, ON ACCOUNT OF WHICH SUCH TREATMENT IS GIVEN AND SUCH DISTRIBUTIONS ARE MADE

    3.    Sources of Cash to Make Plan Distributions

        Coram will contribute cash in the amount of $2 million dollars to fund the Unsecured Claims Reserve, which monies will be distributed to the holders of Allowed Claims in Classes CHC 2 and (if Class CHC 2 fails to accept the Plan) CHC 3 pursuant to the provisions of the Plan. The cash required to make all other payments and distributions contemplated by the Plan will be generated from the operations of the Debtors and, if necessary, the Debtors' Exit Financing Facility. Based on current projections, the Debtors believe that they will have sufficient cash to continue to operate their businesses and make the necessary cash distributions under the Plan. See section XVII "Projections," below. If, however, the Debtors become engaged in protracted litigation or the Plan is not confirmed as anticipated by December 29, 2000, there can be no assurance that the Debtors will have sufficient cash to make distributions thereunder without availing themselves of other (non-operational) sources of funds, and there is no assurance that such funds will be available on acceptable terms and conditions. See "Risk Factors -- Capital Requirements."

10

4.    Summary of Reorganized Company

Reorganized Coram will be privately held by the Noteholder Group and publicly-held CHC will cease to have any direct or indirect business operations (and will be dissolved in accordance with the provisions of the Plan).  As a privately-held company, Reorganized Coram will be able to maintain compliance with the provisions of Stark II as a result of having eliminated the risk of ownership by (i) physicians who make Medicare and Medicaid referrals to Coram or its subsidiary operating companies or (ii) by family members of such physicians.  So owned, Reorganized Coram will also be substantially likely to remain in compliance with Stark II for the foreseeable future, and all of its operating subsidiaries will continue to conduct their prepetition businesses.

Coram will also have a reduced and more manageable level of debt.  The only non-current liabilities of Reorganized Coram will consist of (i) the New Secured Notes (in a known, maximum amount of $180 million) and (ii) six-year tax obligations (in a maximum amount not exceeding $[12 million]).  Coram's short-term borrowing needs, if any, will be provided by the Exit Financing Facility, a $40 million revolving secured credit facility.

## III. BACKGROUND OF THE DEBTORS AND CERTAIN EVENTS PRECEDING THE FILING OF OTHER CHAPTER 11 CASES

A.    Background of the Debtors

CHC was formed on July 8, 1994 as a result of a merger by and among T(2) Medical, Inc., Curaflex Health Services, Inc., Medisys, Inc., and HealthInfusion, Inc., each of which was a publicly-held national or regional provider of home infusion therapy and related services. Each of these companies became and is now an indirect, wholly-owned subsidiary of CHC, and a direct or indirect subsidiary of Coram.

CHC has made a number of acquisitions since operations commenced, the most significant of which was the acquisition of certain assets of the home infusion business of Caremark, Inc., a wholly-owned subsidiary of Caremark International, Inc., effective April 1, 1995. In addition, CHC acquired H.M.S.S., Inc., a leading regional provider of home infusion therapies based in Houston, Texas, effective September 12, 1994. As a result of these acquisitions, CHC became a leading provider of alternate site infusion therapy services in the United States based on geographic service area and total revenue.

Presently, CHC and Coram, through their wholly-owned non-debtor subsidiaries, deliver alternate site infusion therapy services through approximately 75 branch offices located in 41 states and Ontario, Canada. Infusion therapy involves the intravenous administration of nutrition, anti-infective therapy, IVIG, blood factor therapies, pain management, chemotherapy, and other therapies.  An organization chart reflecting the management and hierarchy of the Debtors and their non-debtor subsidiaries is attached hereto as Exhibit F.

11

The initiation and duration of these infusion therapies is determined by a physician based upon a patient's diagnosis, treatment plan and response to therapy. Certain therapies, such as anti-infective therapy, are generally used in the treatment of temporary infection conditions, while others, such as nutrition or coagulants, may be required on a long-term or permanent basis. The infusion therapies that are administered at the patient's home are administered by the patient, the designated care partner or an employee or agent of Coram. In patient groups such as immune suppressed patients (e.g., AIDS/HIV, cancer and transplant patients), blood coagulant therapies or anti-infective therapy care may be provided periodically over the duration of the primary disease or for the remainder of the patient's life, generally as episodic care.

The Debtors' business operations are discussed in detail below.

B.     **Pre-Petition Date Restructurings**

. As of January 1, 1997, CHC provided lithotripsy services through a controlling interest in 11 lithotripsy partnerships and two wholly-owned lithotripsy entities. The company also owned a lithotripsy management company and a lithotripter maintenance company. Lithotripsy is a non-invasive technique that uses shock waves to disintegrate kidney stones. On August 20, 1997, the company signed an agreement with Integrated Health Services, Inc. for the sale of Coram's interest in its thirteen lithotripsy entities, the lithotripsy management company, the stock of its equipment service company and certain related assets. Effective September 30, 1997, the company completed the transaction as to all of the lithotripsy entities other than its interests in three lithotripsy partnerships. Pursuant to a side agreement amending the August 20, 1997 purchase agreement, the company's interests in the three remaining partnerships were placed in escrow pending the satisfaction of certain conditions. Following satisfaction of these conditions, two of the partnerships were conveyed to IHS effective October 3, 1997. Due to the inability of CHC and Integrated Health Services to obtain the consent of the other partner to the transfer of Coram's interest therein, the company retained its interest in the remaining partnership. Effective June 1, 1998, the company completed the sale of its remaining lithotripsy partnership to Integrated Health Services.

During 1999, CHC began to restructure its operations to eliminate unprofitable business units and sell non-strategic business lines to focus operations and improve its financial condition, and recruit executive management to restructure existing operations.

In June 1999, CHC announced that it had determined to terminate an agreement with Aetna U.S. Healthcare, Inc. ("Aetna"). Under the agreement with Aetna, CHC's wholly-owned subsidiary, Coram Resource Network Inc. ("R-NET"), managed and provided home health services to approximately 2 million individuals throughout eight states who were enrolled in Aetna health plans. R-Net had additionally provided home health services to approximately 1.5 million persons under various other contracts. CHC lost approximately $28 million in 1999 from the R-NET business and has accrued an additional $17 million in losses in connection with

12

the liquidation of R-NET. In November 1999, the CHC subsidiaries that conducted the R-Net business filed voluntary petitions under Chapter 11 of the Bankruptcy Code. The termination of the Aetna agreement and the R-Net bankruptcy lead to significant litigation (now resolved), which is discussed below in section IV.E., "Significant Litigation."

In September 1999, CHC engaged Deutsche Alex Brown to aid it in divesting its pharmacy benefit management and specialty mail-order pharmacy services business, Coram Prescription Services. On July 31, 2000, CHC completed the sale of its Coram Prescription Services unit, to a management-led group financed by GTCR Golder Rauner, LLC. The sale generated approximately $38.0 million in net cash proceeds. Approximately $28.5 million of the proceeds were utilized to pay the remaining outstanding principal balance due on the secured revolving line of credit maintained by CHC and Coram. The remaining $9.5 was used to pay obligations under the Senior A Notes.

In November, 1999, CHC hired Daniel D. Crowley as its Chief Executive Officer and President to restructure and improve the profitability of its retained operations. CHC was very fortunate to have retained Mr. Crowley's highly sought-after services, which have already resulted in a substantial improvements to the Debtors' financial condition. The detailed terms of the Debtors' agreements with Mr. Crowley are discussed in section VIII. E. below.

C.      Events Leading to the Debtors' Bankruptcy Filings

The Debtors' bankruptcy filings were primarily precipitated by two factors: a lack of financial resources or debt capacity to meet its maturing debt obligations, and, relatedly, impending failure to comply with Stark II provisions.

As of June 30, 2000, the Debtors had $92.1 million principal outstanding in the form of Series B Notes at 8.0% interest, and $168.4 million principal outstanding in the form of Series A Notes at 11.5% interest. The company also had $28.5 million outstanding under its senior credit facility at an interest rate of 11% as of June 30, 2000. This indebtedness left the Debtors extremely vulnerable to competitive and payer pricing pressures and other adverse events or circumstances. In addition, the lenders, pursuant to the new senior credit facility and the Series A and B Notes are entitled to the benefits of various restrictive covenants, and their consent is required to be obtained for the company to engage in various activities and transactions. The Debtors have determined that they require additional financing or significant revisions to their existing debt agreements in order to maintain sufficient liquidity to discharge their obligation under the Series A Notes, which come due in fiscal 2001. The holders of the Series B Notes also have the right to cause the Debtors to repay the Series B Notes in fiscal 2001. The Debtors have filed bankruptcy petitions to effectuate these revisions to their debt structure through the Plan.

The second, and most urgent, precipitate to the Debtors' bankruptcy filings was their need to remain in compliance with the provisions of the federal law known as "Stark II."

(For a detailed discussion of the provisions of Stark II, see section XII "Discussion of Stark II.") Under federal law, including certain provisions contained in the Omnibus Budget Reconciliation Act of 1993 commonly know as Stark II, the ownership of shares in a health care services provider is a financial relationship subject to federal regulation. Among other things, Stark II prohibits a physician from making Medicare or Medicaid referrals for certain "designated health services," including durable medical equipment, certain types of nutrition therapy, home health services, and outpatient prescription drugs, to entities with which the physician or an immediate family member has a financial relationship, unless an exception to the law is available.

The Debtors have learned that certain physicians have, from time to time, owned shares of its common stock. As a public company, the Debtors are unable to confirm, from time to time, which physicians (or their families) owned their stock. If the Debtor remain publicly traded, referrals to the Debtors for designated health services after January 1, 2001 by physicians who own (or whose family members own) CHC stock could only be accomplished through an exception to Stark II. Under that exception, CHC must either have stockholder equity in excess of $75 million as of December 31, 2000, or have had average stockholder equity of $75.0 million during the preceding three years (the "Capitalization Exceptions"). Absent such protection, the Debtors would be obligated to determine whether a referring physician (or an immediate family member of the physician) owns CHC stock prior to accepting any Medicare or Medicaid referrals from that physician.

CHC has determined there does not exist a reasonable likelihood that it will qualify for the Capitalization Exceptions. Failure to qualify for the Capitalization Exceptions will create an extremely onerous administrative burden that would not only entail significant additional expenses for the Debtors, but place a significant burden on referring physicians that would discourage them from providing referrals to the Debtors. The Debtors' imminent failure to comply with the Capitalization Exceptions will materially and irreparably affect the Debtors' business and financial condition as of January 1, 2001. The Debtors have therefore filed bankruptcy petitions to avoid this fatal development. As a private company with a rational capital structure, Coram will be in compliance with Stark II.

D.     Selected Historical Financial Information

Set forth in Exhibit B and C, respectively, to this Disclosure Statement are copies of the Debtors' consolidated Annual report on Form 10-K for the fiscal year ended December 31, 1999, and Quarterly Report on Form 10-Q for the quarter ended March 31, 2000, with the accompanying Management's Discussion and Analysis.

14