## IV. DEBTORS' CHAPTER 11 CASES AND POST-PETITION OPERATIONS

**A.    The Debtors' Chapter 11 Case**

On August 8, 2000, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Following the Commencement of the Reorganization Cases, all actions and proceedings against the Debtors and all acts to obtain any property of the Estates were automatically stayed under section 362 of the Bankruptcy Code.

Since the Petition Date, the Debtors have continued to operate their businesses in the ordinary course as debtors-in-possession pursuant to sections 1107 and 1108 and, as described below, have taken various actions to minimize any disruption of their business, preserve value, and facilitate reorganization. The following discussion summarizes the significant proceedings and events that have occurred in the Debtors' Chapter 11 cases since commencement.

**B.    Debtor-in-Possession Financing Agreement**

To ensure that the Debtors would be able to satisfy any immediate needs for access to cash after the Petition Date, they determined that it was in the best interest of all parties to enter into a Debtor in Possession facility ("DIP Facility"). A DIP Facility with Madeleine LLC as lender and agent for lenders, Coram as borrower, and certain of Coram's non-debtor subsidiaries as guarantors was approved by order of the Court dated _____, 2000. The provisions of the DIP Facility include a $40 million revolving line of credit bearing interest at the rate of prime plus 2%, secured by a first lien upon substantially all assets of the Debtors and their non-debtor subsidiaries. The DIP Facility further includes a grant of super-priority administrative expense status in accordance with section 364(c)(1) of the Bankruptcy Code to claims of the lenders arising under the DIP Facility. The operative documents respecting the DIP Facility are on file with the Bankruptcy Court.

**C.    [Appointment of the Committee**

At a meeting held on August [    ], 2000 the United States Trustee designated an Official Committee of Unsecured Creditors (the "Committee") consisting of the following _____ members:

[Members]

After its formation, the Committee retained the law firms of [    ] as its attorneys. In addition, the Committee retained [    ] as its financial advisors. Under the Bankruptcy Code, the Debtors' estates are responsible for the payment of reasonable professional fees and

15

necessary disbursements incurred by these professionals to the extent approved by the Bankruptcy Court.]

## D.    Bar Date and Claims Processing

Pursuant to an order entered on August 8, 2000, the Bankruptcy Court has set September [__], 2000 as the last date by which all entities with pre-Petition Date Claims against a Debtor must file proofs of such Claims with the Bankruptcy Court. The Debtors have engaged an outside claims administrator to assist it in the administration of these Claims. In addition, the Debtors will seek entry of an order setting a bar date for the filing of proofs of certain designated Administrative Claims, including post-Petition Date, pre-rejection Claims of lessors and Claims of taxing authorities.

## E.    Significant Litigation

(a)    In April 1998, CHC signed a Master Agreement (the "Master Agreement"), effective July 1, 1998 with Aetna U.S. Healthcare, Inc. ("Aetna"). Under the Master Agreement, which was expected to last five (5) years, the Resource Network Subsidiaries, managed and provided home health care services for over 2,000,000 Aetna enrollees in eight states for a stated monthly fee per enrollee. CHC began serving Aetna enrollees under the Master Agreement on approximately July 1, 1998. CHC provided its notice of termination of the Master Agreement effective June 30, 1999. Subsequently, Aetna terminated the company's National Ancillary Services Agreement effective April 12, 2000. CHC has been involved in litigation with Aetna over the operation and termination of the Master Agreement before the United States District Court for the Eastern District of Pennsylvania. CHC and Aetna entered into a settlement agreement in April 2000 which terminated all litigation. The terms of the settlement are subject to an agreement of confidentiality.

(b)    In January 1999, the Internal Revenue Service ("IRS") completed the examination of CHC's federal income tax return for the year ended September 30, 1995, and proposed substantial adjustments to the prior tax liabilities of CHC. CHC has agreed to adjustments of $24.4 million that only affect the net operating loss carryforwards available. CHC does not agree with the other proposed adjustments regarding the deduction of warrants, write-off of goodwill and the specified liability portion of the 1995 loss which affects the prior year's tax liability. On May 14, 1999, CHC received a statutory notice of deficiency, and the alleged deficiency totaled approximately $12.7 million plus interest and penalties to be determined. The most significant proposed adjustment relates to CHC's ability to categorize certain net operating losses as specified liability losses and offset income in prior years, for which CHC has previously received refunds in the amount of approximately $12.7 million. On August 11, 1999, CHC and its subsidiary, T$^2$ Medical Inc., filed a petition in the United States Tax Court contesting the deficiency. The matter is styled as T$^2$ Medical Inc. and Coram Healthcare Corporation v. Commissioner of Internal Revenue Service, U.S. Tax Court, Denver, Colorado, Docket No.

16

13792-99. The IRS filed a response arguing that CHC's petition should be denied. CHC and the IRS have agreed to pursue a trial date in the early part of 2001 with discovery proceeding during 2000. CHC is contesting the notice of deficiency through administrative proceedings with the IRS and through the litigation in the Tax Court through administrative proceedings with the IRS and through the litigation in the Tax Court described above.

       (c)    On November 12, 2000, two subsidiaries of Coram, Coram Resource Network, Inc. and Coram Independent Practice Association, Inc. (collectively, the "Resource Network subsidiaries"), filed voluntary petitions under Chapter 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, Case No. 99-2889 (MFW). The Resource Network Subsidiaries are now being liquidated pursuant to the proceeding. The Chief Restructuring Officer of the Resource Network Subsidiaries has threatened suit on behalf of the estates against CHC. The draft complaint included claims for damages against CHC and certain former and current officers and directors of CHC and Coram in excess of $41 million. The principal theories included in the draft complaint were piercing the corporate veils of the Resource Network Subsidiaries to reach CHC and breaches by the officers and directors of their fiduciary duties. CHC has not yet received notice that any such complaint has been filed or that the claim will be pursued.

       (d)    Apria Healthcare, Inc. ("Apria") and one of its affiliates (collectively "Apria") filed suit against CHC and the Resource Network Subsidiaries in the Superior Court of Orange County, California (Apria Healthcare, Inc. and Apria Healthcare of New York State, Inc. v. Coram Healthcare Corporation, Coram Resource Network, Inc. and Coram Independent Practice Association, Inc., Case No. 813264). Apria's claims relate to services that were rendered as part of certain home health provider networks managed by the Resource Network Subsidiaries. Apria's complaint alleges, among other things, that the Resource Network Subsidiaries operated as the alter ego of CHC and, as a result, CHC should be declared responsible for the alleged breaches of the contracts that the Resource network Subsidiaries had with Apria. The complaint includes requests for declaratory, compensatory and other relief in excess of $1.4 million. A notice has been filed with the Court notifying it of the bankruptcy proceedings involving the Resource Network Subsidiaries and contending that the case has, by operation of certain provisions of the United States Bankruptcy Code, been stayed. If the case is prosecuted against CHC despite the stay of the proceedings, CHC would pursue all available grounds for dismissal and defend itself vigorously in the matter.

       (e)    On July 17, 2000, TBOB Enterprises, Inc. ("TBOB") filed an arbitration demand against CHC, TBOB Enterprises, Inc. f/k/a Medical Management Services of Omaha, Inc. Against Coram Healthcare Corporation, in the American Arbitration Association office in Dallas, Texas. In its demand, TBOB claims that CHC breached its obligations under an agreement entered into by the parties in 1996 relating to a prior earn-out obligation of the Company's subsidiary, Curaflex Health Services, Inc. ("Curaflex"), that originated from Curaflex's acquisition of the claimant's prescription services business in 1993. The Company and Curaflex operated the business under the name "Coram Prescription Services" ("CPS"), and the assets of the CPS business were sold on July 31, 2000. TBOB alleges, among other things,

17

that CHC has impaired the earn-out payments due TBOB by improperly charging certain expenses to the CPS business and failing to fulfill CHC's commitments to enhance the value of CPS by marketing its services. The TBOB demand claims damages of more than $898,000. TBOB contends that this amount must be paid in addition to the final scheduled earn-out payment of over $1,267,000 that will be due from the Company and Curaflex in February 2001.

CHC intends to defend itself vigorously in the matters described above. Nevertheless, due to the uncertainties inherent in litigation, the ultimate disposition of such matters cannot presently be determined. An adverse outcome in any such litigation or proceedings could have a material adverse effect to the financial position, results of operations and liquidity of CHC.

CHC and Coram are also parties to various other legal actions arising out of the normal course of their business. Management believes that the ultimate resolution of such other actions will not have a material adverse effect on the financial position, results of operations of liquidity of CHC.

F.    **Other Administrative Events**

On the Petition date, the Bankruptcy Court entered certain additional orders designed to minimize any disruption of the Debtors' business operations and to facilitate their reorganization. Certain of these orders are described below.

1.    <u>Cash Management and Payment of Critical Trade Creditors</u>

The primary objective of these cases is to restructure the Debtors' outstanding indebtedness and to cause Coram to remain in compliance with Stark II. To preserve the value of the Debtors' business operations, it is essential that their relationships with trade vendors, physicians, patients, employees, consultants, and other holders of obligations incurred in the ordinary course of business not be disrupted or impaired. Toward that end, the Bankruptcy Court entered an order authorizing the Debtors to continue their current cash management system. Such relief allowed the Debtors to continue to fund certain day to day obligations of their subsidiaries and affiliates, such as payroll, vendor obligations, taxes, employee benefits and insurance, and to allocate such costs from and among the various subsidiaries. Inasmuch as these debts primarily are the debts of the Debtors' non-debtor subsidiaries, they were not subject to the automatic stay and, accordingly, payment thereof was not only critical, it was mandated by applicable law. The Bankruptcy Court's order also authorized the Debtors to pay their critical trade vendors to the extent the obligations to those vendors were not obligations of non-debtor subsidiaries.

18

2.    <u>Payment of Certain Other Prepetition Obligations.</u>

The Bankruptcy Court entered certain orders authorizing the Debtors to pay salaries, wages, benefits and other amounts owed to or with respect to employees and consultants, and insurance premiums. These include obligations that were incurred prior to the Petition Date and include obligations incurred by the Debtors and their subsidiaries.

3.    <u>Key Employee Retention Program.</u>

To accomplish their reorganization, the Debtors must rely upon the services of certain of their key employees who have unique skills and knowledge of the Debtors' business. Understandably, the on-going uncertainty of the Debtors' future had motivated many of the Debtors' key employees to seek other employment. To provide financial incentives to the key employees to forgo other immediate employment opportunities, remain in their existing positions, and use their expertise to assist the Debtors through their chapter 11 cases, the Bankruptcy Court entered an Order authorizing the Debtors to adopt a key employee retention program that under which each of 35 key employees is eligible for up to two bonus payments, depending upon how long the employee remains with the company after the Petition Date.

## V.  GENERAL INFORMATION REGARDING THE PLAN

THE FOLLOWING IS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. IT IS NOT A COMPLETE STATEMENT OF THE PLAN OR ITS OPERATION AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A. IN CERTAIN RESPECTS, THE PLAN DEALS WITH SOPHISTICATED LEGAL CONCEPTS AND INCORPORATES THE DEFINITIONS AND REQUIREMENTS OF THE BANKRUPTCY CODE. THEREFORE, YOU MAY WISH TO CONSULT WITH COUNSEL OF YOUR CHOICE BEFORE VOTING ON THE PLAN.

A.    Classification and Treatment of Claims and Interests

The classification and treatment of Claims and Allowed Interests is summarized below. All Claims and Allowed Interests, other than Administrative Claims and Priority Tax Claims, are placed in Classes under the Plan. The Debtors believe that this classification scheme is consistent with the requirements of the Bankruptcy Code. Under the Bankruptcy Code, only the holders of Allowed Claims (as defined in the Plan) that are impaired are entitled to vote and to receive distributions under the Plan.

19

1.    Administrative Claims

Administrative Claims are defined in the Plan as any Claim constituting a cost or expense of administration of the Debtors' Chapter 11 cases incurred on or after the Petition Date and allowed by Final Order under section 503(b) of the Bankruptcy Code, including, without limitation: (a) any and all DIP Claims, (b) any actual and necessary costs and expenses incurred after the petition date of preserving the Estates of the Debtors and operating the businesses of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their businesses or for the acquisition or lease of property or for the procurement of services, any costs and expenses of the Debtors and/or Reorganized Coram for the management, maintenance, preservation, sale or other disposition of any assets, the administration and implementation of the Plan, the administration, prosecution or defense of claims by or Claims against the Debtors and for distributions under the Plan, (c) compensation for legal, financial, advisory, accounting and other services and reimbursement of expenses allowed by the Bankruptcy Court under section 330, 331, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date, (d) all fees and charges assessed against the Debtors' Estates under section 1930, Chapter 123 of title 28 of the United States Code, and (e) any costs or expenses to the extent allowed by Final Order.

In addition to the foregoing, section 503(b) of the Bankruptcy Code provides for payment of compensation to creditors, indenture trustees, and other persons making a "substantial contribution" to the Debtors' Chapter 11 Cases, and to attorneys for, and other professional advisors to, such persons. Certain entities may file applications with the Bankruptcy Court for allowances of compensation and reimbursement of expenses for such substantial contributions. The amounts which such entities may seek or be allowed for such compensation cannot be estimated by the Debtors at this time. Requests for compensation and reimbursement of this type, as well as those of Bankruptcy Court-approved professionals for the Debtors and the Committee, must be approved by the Bankruptcy Court after a hearing on notice at which the Debtors and other parties-in-interest may participate and, if appropriate, object to the allowance and payment of any such compensation and reimbursement of expenses.

The Plan provides that each holder of an Allowed Administrative Claim will receive, in accordance with section 1129(a)(9) of the Bankruptcy Code, the full amount of its unpaid Allowed Administrative Claim (i) in cash on the Effective Date or (ii) on such other terms as mutually agreed to by the holder of an Allowed Administrative Claim and the Debtors; provided, however, that Allowed Administrative Claims representing (a) post-Petition Date liabilities incurred in the ordinary course of business, or (b) post-Petition Date liabilities arising under loans or advances to any Debtor(s) whether or not incurred in the ordinary course of business, shall be paid in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto; provided, further, however, that administrative claims of the United States Trustee for  pursuant to 29 U.S.C. § 1930(a)(6) shall be paid in accordance with the applicable schedule for payment of such fees, provided, further, however, that interim and/or final payment of Allowed Administrative Claims approved by the Bankruptcy Court shall be paid in accordance with such Bankruptcy Court approval; provided,

20

further, however, that notwithstanding any other provision contained in this section, DIP Claims shall be paid in accordance with the terms of the DIP Facility, the DIP Order, and section 6.1.1 of the Plan, and; provided, further, however, that compensation and reimbursement claims shall be paid in accordance with section 6.1.2 of the Plan.

While any estimate of Allowed Administrative Claims is subject to substantial uncertainty, if there is no significant litigation initiated or objections filed with respect to confirmation of the Plan and the Plan is confirmed within the Debtors' anticipated time frame, the Debtors' estimate that Allowed Administrative Claims (other than the ordinary costs of operating their business) will not exceed [$3.5] million. Under the Plan, holders of Allowed Administrative Claims will recover one hundred percent (100%) of the allowed amount of their Allowed Claims.

2.    **Priority Tax Claims**

Priority Tax Claims are unclassified under the Plan and include Claims that are entitled to priority under section 507(a)(7) of the Bankruptcy Code. Generally, Tax Claims are, subject to certain timing and date of assessment limitations, unsecured Claims of governmental units (as defined in the Bankruptcy Code) based on (i) taxes measured by income or gross receipts; (ii) property taxes; (iii) withholding taxes; (iv) employment taxes; (v) excise taxes; (vi) customs duties; and (vii) penalties based on actual pecuniary losses relating to the foregoing. These Tax Claims include, among others, all taxes measured by income or gross receipts attributable for the period from January 1, 2000 through the Petition Date.

The Plan provides that, in full satisfaction, payment and discharge of its Priority Tax Claim and in accordance with section 1129(c)(9)(C) of the Bankruptcy Code, each holder of an Allowed Priority Tax Claim shall receive, (i) payment, in cash, of the full amount of such holder's Priority Tax Claim, (ii) a Tax Note equal to the full amount of such holder's Priority Tax Claim, or (iii) on such other terms as mutually agreed to by the holder of an Allowed Tax Claim and the Debtors or Reorganized Coram. The Plan further provides that any claim or demand for fines or penalties relating to a Priority Tax Claim shall be disallowed, and the holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Debtors or the Reorganized Coram.

The Debtors estimate that, on the Effective Date, such Allowed Priority Tax Claims will not exceed $[   ]. Under the Plan, holders of Allowed Priority Tax Claims receive distributions of a value equal to one hundred percent (100%) of the allowed amount of their Allowed Claims.

3.    **Class CHC P – CHC Priority Non-Tax Claims**

Class CHC P consists of Priority Non-tax Claims against CHC, which are defined to include any Claim against CHC that is entitled to priority under section 507 of the Bankruptcy

21

Code, other than Claims entitled to priority under sections 507(a)(1) (Administrative Claims) and 507(a)(7) (Tax Claims) of the Bankruptcy Code.

These claims include (i) allowed unsecured claims for wages, salaries, or commissions (including vacation, severance, and sick leave pay) for the Debtors' employees to the extent earned within 90 days before the Petition Date and subject to a cap of $4,300 per employee, (ii) allowed unsecured claims for contributions to an employee benefit plan for services rendered within 180 days before the Petition Date and limited to a maximum of $4,300 per employee and plan (as reduced by other direct Priority Non-Tax Claims of employees (of a kind described in subsection 1 above, and of other benefit plans) and (iii) certain other specific unsecured pre-Petition Date Claims.

The Plan provides that, in full satisfaction, payment and discharge of its Allowed Priority Tax Claim, each holder of a CHC Allowed Priority Non-Tax Claim shall receive in accordance with section 1129(a)(9) of the Bankruptcy Code, payment in full (i) in cash on the Effective Date, or (ii) on such other terms as mutually agreed to by the holder of an Allowed Non-Tax Priority Claim and the Debtors or Reorganized Coram.

Based on the continuation of wage and salary related payments to employees (previously approved by the Bankruptcy Court) and provisions of the Plan under which all non-terminated and unexpired benefit plans are assumed, the Debtors believe that such CHC Allowed Priority Non-Tax Claims will not exceed $[0].

Class CHC P is unimpaired under the Plan and is therefore conclusively presumed to accept the Plan. Therefore, the Debtors will not solicit votes from the holders of Allowed Coram Secured Claims. Under the Plan, holders of CHC Allowed Priority Non-Tax Claims will recover one hundred percent (100%) of the allowed amount of their Allowed Claims.

4.    Class CHC 1 - Allowed CHC Secured Claims

Class 1 consists of Allowed CHC Secured Claims. Under the Plan, Secured Claims are defined to include that portion of a Claim that is secured by a valid, perfected and enforceable security interest, lien, mortgage or other encumbrance that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of the Debtors in and to property of the Estate, to the extent of the value of the holder's interest in such property as of the relevant determination date. The defined term "Secured Claim" includes any Claim that is: (i) subject to an offset right under applicable Law; and (ii) a secured claim against a Debtor pursuant to section 506(a) and 553 of the Bankruptcy Code.

At present, the Debtors are unaware of any Allowed Secured Claims and have provided for this class as a prophylactic measure.

The Plan provides that, in full satisfaction, payment and discharge of their Secured Claims, each holder of an Allowed CHC Secured Claim, if any, shall receive, at the

22

option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed CHC Secured Claim unimpaired.

Class CHC 1 is unimpaired under the Plan and is therefore conclusively presumed to accept the Plan. Therefore, the Debtors will not solicit votes from the holders of Allowed CHC Secured Claims. Under the Plan, holders of Allowed CHC Secured Claims receive distributions of a value equal to one hundred percent (100%) of their Allowed Claims.

5.    Class CHC 2 - Allowed CHC General Unsecured Claims

Class CHC 2 consists of Allowed CHC General Unsecured Claims. Under the Plan, Allowed CHC General Unsecured Claims include any Claim that is an Allowed Claim against CHC, other than an Administrative Claim, Secured Claim, a Priority Non-Tax Claim, a Priority Tax Claim, an Allowed Coram Note Claim, or an Allowed CHC Note Claim. As used in the Plan, the term "General Unsecured Claim" consists of, except for the foregoing, all impaired unsecured claims not otherwise classified that are not cured, paid, released or waived pursuant to the Plan, assumed by a Debtor pursuant to the Plan or agreements incorporated into the Plan, or classified in any other class, including, without limitation, claims (a) for goods sold and/or services rendered, (b) for moneys lent, (c) based upon guarantees of performance or payment of the obligations or duties of any Person, (d) for tort liability, (e) for environmental remediation, (f) of governmental units under any applicable unclaimed property or escheat laws, (g) of governmental units for taxes, assessments, penalties or charges which are not Tax Claims, (h) for contribution, reimbursement or indemnity, (i) for fines, penalties or other assessments, (j) for the portion of any Claim supported directly or indirectly by a letter of credit issued for the account of a Debtor in excess of the amount available under such letter of credit, and (k) representing the undersecured portion of any claim that is otherwise a Secured Claim.

The Debtors believe that Allowed CHC General Unsecured Claims will not exceed $[  ].

The Plan provides that Allowed CHC General Unsecured Claims shall be treated as follows:

(a)    If Class CHC 2 votes to accept the Plan by the majorities required by section 1126(c) of the Bankruptcy Code, each holder of an Allowed CHC General Unsecured Claim, in full satisfaction, payment and discharge of its Allowed CHC General Unsecured Claim, shall receive its Pro Rata share of (i) the CHC General Unsecured Consideration and (ii) the CHC Noteholder Consideration, which, in the aggregate, equal $2 million.

(b)    If Class CHC 2 fails to accept the Plan by the majorities set forth in section 1126(c) of the Bankruptcy Code, each holder of an Allowed CHC General Unsecured Claim will receive, in full satisfaction, payment and discharge of its Allowed CHC General Unsecured Claim, a Pro Rata share of the CHC General Unsecured Consideration.

23

In other words, if Class CHC 2 Votes to accept the Plan, the funds available for distribution to holders of Allowed CHC General Unsecured Claims will be increased.

To provide the distribution of the CHC Noteholder Consideration afforded by subsection (a) above, if it should become applicable, the holders of CHC Notes Claims (Class CHC 3) agree and shall be deemed to have authorized the Debtors (or a Disbursement Agent, if any) to transfer and distribute the CHC Noteholder Consideration to the holders of Class CHC 2.

Generally, pursuant to section 1126(c) of the Bankruptcy Code, a class of claims has accepted a plan if the plan has been accepted by holders of at least two-thirds in amount, and more than one-half in number of the allowed claims of such class.

Class CHC 2 is impaired under the Plan and the Debtors will therefore solicit votes from the holders of Allowed CHC General Unsecured Claims.

The Debtors believe that the treatment accorded the holders of Allowed CHC General Unsecured Claims is both fair and equitable, and meets the requirements of section 1129(b) of the Bankruptcy Code.

6.    Class CHC 3 - Allowed CHC Note Claims

Class CHC 3 consists of Allowed CHC Note Claims. Under the Plan, Allowed CHC Note Claims are defined as any claim against CHC based upon or evidenced by the Notes, which as of the Petition Date, aggregate approximately $[252,000,000].

The Plan provides that each holder of an Allowed CHC Note Claim, in full satisfaction, payment and discharge of its Allowed CHC Note Claim, shall receive its Pro Rata share of the CHC Noteholder Consideration; provided, however, that if Class CHC 2 votes to accept the Plan by the majorities required by section 1126(c) of the Bankruptcy Code, then the holders of Allowed CHC Notes Claims shall be deemed to have authorized the Debtors to transfer and to distribute the CHC Noteholder Consideration to the holders of Class CHC 2 Claims in accordance with section 7.3 of the Plan, (discussed at section V.A.5 of the Disclosure Statement) and the holders of Allowed CHC Notes Claims shall receive no distribution from CHC under the Plan.

Class CHC 3 is impaired under the Plan and the Debtors will therefore solicit votes from the holders of Allowed CHC Note Claims. The Debtors believe that there will be Allowed CHC Note Claims in an aggregate amount not exceeding $ 255 million. Under the Plan, the Holders of Allowed CHC Note Claims receive in respect of such Claims distributions of a value equal to 0% of the Allowed amount of their claims if Class CHC 2 votes to accept the Plan by the majorities required in Section 1126(c) of the Bankruptcy Code, and receive [_____] % of the Allowed amount of their Claims if Class CHC 2 fails to accept the Plan by the majorities set forth in section 1126(c) of the Bankruptcy Code.

24

7.    Class CHC 4 – Allowed CHC Equity Interests

Class CHC 4 consists of Allowed CHC Equity Interests. Under the Plan, Allowed CHC Equity Interests are defined as any equity interest in CHC that is Allowed and represented by duly authorized, validly issues and outstanding shares of stock, or any interest or right to convert into such an equity interest or acquire any equity interest, that was in existence immediately prior to the Petition Date, including, without limitation, any warrants, stock options, and employee stock options.

The Plan provides that in full satisfaction, payment and discharge of Allowed CHC Equity Interests, no distribution shall be made under the Plan to the holders of Allowed CHC Equity Interests on account of such Allowed Interests.

Class CHC 4 is impaired and is deemed to reject the Plan. The Debtors therefore will not solicit votes from the Holders of Class CHC 4 Interests.

The Debtors believe that the treatment accorded the holders of Allowed CHC Equity Interests is both fair and equitable, and meets the requirements of section 1129(b) of the Bankruptcy Code.

8.    Class Coram P – Priority Non-Tax Claims

Class Coram P consists of Coram Priority Non-Tax Claims. Coram Priority Non-Tax Claims are defined to include any Claim against Coram that is entitled to priority under section 507 of the Bankruptcy Code, other than Claims entitled to priority under sections 507(a)(1) (Administrative Claims) and 507(a)(7) (Tax Claims) of the Bankruptcy Code.

These claims include (i) allowed unsecured claims for wages, salaries, or commissions (including vacation, severance, and sick leave pay) for the Debtors' employees to the extent earned within 90 days before the Petition Date and subject to a cap of $4,300 per employee, (ii) allowed unsecured claims for contributions to an employee benefit plan for services rendered within 180 days before the Petition Date and limited to a maximum of $4,300 per employee and plan (as reduced by other direct Priority Non-Tax Claims of employees (of a kind described in subsection 1 above, and of other benefit plans) and (iii) certain other specific unsecured pre-Petition Date Claims.

The Plan provides that, in full satisfaction, payment and discharge of its Allowed Coram Priority Tax Claim, each holder of an Allowed Coram Priority Non-Tax Claim shall receive in accordance with section 1129(a)(9) of the Bankruptcy Code, payment in full (i) in cash on the Effective Date, or (ii) on such other terms as mutually agreed to by the holder of an Allowed Non-Tax Priority Claim and the Debtors or Reorganized Coram.

Based on the continuation of wage and salary related payments to employees (previously approved by the Bankruptcy Court) and provisions of the Plan under which all non-

25

terminated and unexpired benefit plans are assumed, the Debtors believe that such Coram Allowed Priority Non-Tax Claims will not exceed $[          ].

Class Coram P is unimpaired under the Plan and is therefore conclusively presumed to accept the Plan. Therefore, the Debtors will not solicit votes from the holders of Allowed Coram Secured Claims. Under the Plan, holders of Coram Allowed Priority Non-Tax Claims will recover one hundred percent (100%) of the allowed amount of their Allowed Claims.

9.    Class Coram 1 - Allowed Coram Secured Claims

Class Coram 1 consists of Allowed Coram Secured Claims. Under the Plan, Secured Claims are defined to include that portion of a Claim that is secured by a valid, perfected and enforceable security interest, lien, mortgage or other encumbrance that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of the Debtors in and to property of the Estate, to the extent of the value of the holder's interest in such property as of the relevant determination date. The defined term "Secured Claim" includes any Claim that is: (i) subject to an offset right under applicable Law; and (ii) a secured claim against a Debtor pursuant to section 506(a) and 553 of the Bankruptcy Code.

At present, the Debtors are unaware of any asserted Secured Claims and has provided for this class as a prophylactic measure.

The Plan provides that, in full satisfaction, payment and discharge of their Secured Claims, each holder of an Allowed Coram Secured Claim, if any, shall receive, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed Coram Secured Claim unimpaired.

Class Coram 1 is unimpaired under the Plan and are therefore conclusively presumed to accept the Plan. Therefore, the Debtors will not solicit votes from the holders of Allowed Coram Secured Claims. Under the Plan, holders of Allowed Coram Secured Claims receive distributions of a value equal to one hundred percent (100%) of their Allowed Claims.

10.    Class Coram 2 - Allowed Coram Note Claims

Class Coram 2 consists of Allowed Coram Note Claims. Under the Plan, Allowed Coram Note Claims are defined as any claim against Coram based upon or evidenced by the Notes, which as of the Petition Date, aggregate approximately $[252,000,000].

The Plan provides that each holder of an Allowed Coram Note Claim, in full satisfaction, payment and discharge of its Allowed Coram Note Claim, shall receive its Pro Rata share of: (i) the New Coram Stock, and (ii) the New Secured Notes. The New Secured Notes bear interest at a rate (nine (9%) percent) that is substantially below the rate of interest that

26

Reorganized Coram would incur in the marketplace, and it is therefore unlikely that the market value of the New Notes will be equal to the face value thereof.

As noted above, the Plan provides that all holders of Allowed Coram Note Claims (Class Coram 2) are allocated shares of New Coram Stock issued by Reorganized Coram. The Debtors' management has undertaken a valuation of Reorganized Coram and believes that, as reorganized pursuant to the terms of the Plan, Reorganized Coram will have an equity value, on a consolidated basis, of approximately $ [29] million.

The actual recoveries of holders of Coram Note Claims will depend on two factors: (1) the enterprise value of Reorganized Coram, and (2) market value of the New Coram Stock. In addition, although the Debtors' management has formed certain opinions regarding the projected enterprise value of Reorganized Coram on the Effective Date, there can be no assurance that management's view in this regard will be realized. Moreover, based on the lack of an established market for the New Coram Stock, the inability of the Debtors to create an unrestricted trading market and continue to comply with the provisions of Stark II for an indefinite period of time (see "Discussion of Stark II"), and certain other concerns, there can be no assurances that a trading market will develop for the New Coram Stock or the values at which the New Coram Stock will trade if such a market should eventually develop. For a discussion of the risks associated with the issuance of the New Coram Stock, see "Risk Factors -- Lack of Established market for the New Coram Stock, Volatility."

Class Coram 2 is impaired under the Plan, and the Debtors will therefore solicit votes from the holders of Allowed Coram Note Claims. The Debtors believe that there will be Allowed Coram Note Claims in an aggregate amount not exceeding $ [255] million, and that under the Plan, the Holders of Allowed Coram Note Claims receive in respect of such Claims distributions of a value equal to 83% of the Allowed amount of their claims.

11.    **Class Coram 3 - Allowed Coram General Unsecured Claims**

Class Coram 3 consists of Allowed Coram General Unsecured Claims. Under the Plan, Allowed Coram General Unsecured Claims include any Claim that is an Allowed Claim against Coram other than an Administrative Claim, Secured Claim, a Priority Non-Tax Claim, a Priority Tax Claim, an Allowed Coram Note Claim, or an Allowed CHC Note Claim. As used in the Plan, the term "General Unsecured Claim" consists of, except for the foregoing, all unsecured claims not otherwise classified that are not cured, paid, released or waived pursuant to the Plan, assumed by a Debtor pursuant to the Plan or agreements incorporated into the Plan, or classified in any other class, including, without limitation, claims (a) for goods sold and/or services rendered, (b) for moneys lent, (c) based upon guarantees of performance or payment of the obligations or duties of any Person, (d) for tort liability, (e) for environmental remediation, (f) of governmental units under any applicable unclaimed property or escheat laws, (g) of governmental units for taxes, assessments, penalties or charges which are not Tax Claims, (h) for contribution, reimbursement or indemnity, (i) for fines, penalties or other assessments, (j) for the portion of any Claim supported directly or indirectly by a letter of credit issued for the account of

27

a Debtor in excess of the amount available under such letter of credit, and (k) representing the undersecured portion of any claim that is otherwise a Secured Claim.

The Debtors believe that Allowed Coram General Unsecured Claims will not exceed $[30 million].

The Plan provides that, in full satisfaction, payment and discharge of its Allowed Coram General Unsecured Claim, each holder of an Allowed Coram General Unsecured Claim not otherwise paid prior to the Effective Date shall receive, at the option of Coram or Reorganized Coram, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, (ii) Reinstatement, or (iii) such other treatment to render such Allowed Coram General Unsecured Claim unimpaired.

Class Coram 3 is unimpaired under the Plan, and is therefore conclusively presumed to accept the Plan. Therefore, the Debtors will not solicit votes from the holders of Allowed Coram General Unsecured Claims. Under the Plan, holders of Allowed Coram General Unsecured Claims receive distributions of a value equal to one hundred percent (100%) of their Allowed Claims.

12.    **Class Coram 4 - Allowed Coram Equity Interests**

Class Coram 4 consists of Allowed Coram Equity Interests. Under the Plan, Allowed Coram Equity Interests are defined as equity interest in Coram that is Allowed and represented by duly authorized, validly issues and outstanding shares of stock, or any interest or right to convert into such an equity interest or acquire any equity interest, that was in existence immediately prior to the Petition Date, including, without limitation, any warrants, stock options, and employee stock options. The Debtors believe that CHC is the only holder of an Allowed Coram Equity Interest.

The Plan provides that in full satisfaction, payment and discharge of Allowed Coram Equity Interests, no distribution shall be made under the Plan to the holders of Allowed Coram Equity Interests on account of such Allowed Interests.

Class Coram 4 is impaired and is deemed to reject the Plan. The Debtors therefore will not solicit notes from the Holders of Class Coram 4 Interests.

The Debtors believe that the treatment accorded the holders of Allowed CHC Equity Interests is both fair and equitable, and meets the requirements of section 1129(b) of the Bankruptcy Code.

28

B.    **Request for Cram-Down**

The Debtors believe that the treatment accorded the holders of unsecured Claims under the Plan does not discriminate unfairly, is fair and equitable and specifically meets the requirements of section 1129(b) of the Bankruptcy Code (i.e., junior classes receive no recovery on account of their junior interests). Accordingly, if any of Classes CHC 2, CHC 3 and Coram 2 fails to accept the Plan, the Debtors believe that the Plan nevertheless may be confirmed as to the unsecured Claims under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. See "Voting and Confirmation of the Plan -- Acceptance or Cramdown" for further information. In that event, the Debtors intend to use the consents obtained from other Classes to confirm the Plan over the dissent of any such Class, and the Plan specifically requests that the Bankruptcy Court confirm the Plan notwithstanding the dissent of any impaired Class of Claims. In all events, the Debtors will seek cram-down over holders of Equity Interests, which shall receive no distribution under the Plan and are therefore deemed to have rejected the Plan.

C.    **Executory Contracts and Unexpired Leases**

Under Section 365 of the Bankruptcy Code, the Debtors have the right, subject to approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. Although not defined in the Bankruptcy Code, an "executory contract" is usually described as a contract under which material performance (other than the payment of money) is due by each party. If an executory contract or unexpired lease is rejected under section 365 of the Bankruptcy Code, the "rejection" is treated as a breach of the contract or lease prior to the petition date giving rise to a pre-petition unsecured claim. In addition, "rejection" damages are limited in certain contexts under section 502 of the Bankruptcy Code. If an executory contract or unexpired lease is assumed, the Debtors have the obligation to perform its obligations thereunder in accordance with the terms of such agreement.

Pursuant to the Plan, on the Effective Date, the Debtors will take the following actions with respect to their various executory contracts. In all instances, the Plan provides that contracts, licenses and leases will only be assumed or rejected, as the case may be, to the extent they constitute executory contracts or unexpired leases within the meaning of section 365 of the Bankruptcy Code. The Plan provides that nothing contained therein constitutes an admission as to the status of any such agreements.

29

1.    Assumption of Executory Contracts and Unexpired Leases

The Plan provides that, on the Effective Date, in accordance with the provisions of sections 365 and 1123 of the Bankruptcy Code, any executory contracts or unexpired leases which have not expired by their own terms on or prior to the Effective Date, which have not been assumed and assigned or rejected with the approval of the Bankruptcy Court, or which are not the subject of a motion to reject the same pending as of the Effective Date or set forth on the Rejection List shall be deemed assumed by the Debtors on the Effective Date and in the case of CHC, assigned to Reorganized Coram, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and/or assignments pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  An order of the Bankruptcy Court entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose executory contract or lease is being assumed or assumed and assigned pursuant to the Plan of: (a) the contract or lease being assumed or assumed and assigned; (b) the Cure Amount Claim, if any, that the Debtors believe it would be obligated to pay in connection with such assumption; and (c) the procedures for such party to object to the assumption or the assumption and assignment of the applicable contract or lease of the amount of the proposed cure amount claim.

2.    Rejection of Executory Contracts and Unexpired Leases

The Plan provides that no later than ten (10) business days prior to the Confirmation Date, the Debtors shall file with the Bankruptcy Court the Rejection List, and such executory contracts and unexpired leases shall be deemed rejected as of the Effective Date.  If the rejection of an executory contract or unexpired lease by the Debtor results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors, or their properties or agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor on or before thirty (30) days after the later of (a) the Confirmation Date and (b) the date of entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or lease.  Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim are timely filed will be treated as General Unsecured Claims subject to the provisions of the Plan.  Nothing in the Plan shall obligate any of the Debtors to file any list of assumed or rejected executory contracts or unexpired leases.

3.    Claims Based Upon Rejection of Executory Contracts or Unexpired Leases

The Plan provides that all proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court by the later of (i) thirty (30) days after the date of entry of an order of the Bankruptcy Court approving the rejection of such contracts or leases, and (ii) the Confirmation Date.  The Plan further provides that any such Claims, proofs of which are not filed timely, shall be barred forever from assertion against the Debtors, Reorganized Coram, the Estates, and/or any of the respective assets or property of the foregoing.  Unless otherwise ordered by the Bankruptcy

30

Court, all such properly filed Claims, upon allowance thereof, shall be, and shall be treated as General Unsecured Claims.

### 4. Indemnification Obligations

The Plan provides that the obligations of the Debtors to indemnify their respective present and former directors, officers, and employees in such capacity, or as plan administrators or trustees to any employee benefit plan, or any person serving (at the request of a Debtor) as an officer or director of another entity pursuant to the Debtors' certificates of incorporation or by-laws or pursuant to applicable state law or specific agreement, or any combination of the foregoing, shall be deemed assumed executory contracts, shall survive confirmation of the Plan, remain unaffected thereby, shall not be discharged, and shall pass unaltered to Reorganized Coram irrespective of whether such indemnification is owed in connection with an event occurring before, on or after the Petition Date. This provision of the Plan enforces the Debtors' corporate policy and provides necessary assurances to existing key management personnel regarding Reorganized Coram's commitment to them and to its future. The Debtors believe that this provision is essential to its viability as a going-concern. See "Reorganized Coram -- Management" and "Risk Factors -- Loss of Key Personnel."

### 5. Compensation and Benefit Programs

The Plan provides that all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors, in effect as of the Confirmation Date and applicable generally to the respective active employees (including officers of the Debtors), including, without limitation, all employment contracts not previously rejected or rejected under the Plan, and all retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans are treated as executory contracts under the Plan and, as of and on the Effective Date, shall be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, unless previously (i) terminated, modified or rejected in accordance with the Bankruptcy Code, (ii) subject to a pending motion or application before the Bankruptcy Court to terminate, modify or reject, or (iii) identified to be rejected on a list that is filed with the Bankruptcy Court on or before the Confirmation Date. As noted above in section V.C.1 "Assumption of Executory Contracts and Unexpired Leases," the Debtors shall assume all executory contracts except those that are set forth on the Rejection List or the subject of a Motion to Reject. The Debtors do not intend that any of their contracts with employees or consultants, including the Key Employee Retention Plan approved by the Bankruptcy Court, will be placed on the Rejection List or made the subject of a rejection motion.

31

A587

D.    **Legal Effects of Confirmation of the Plan**

1.    **Revesting of Coram Assets**

The Plan provides that, consistent with sections 1123(a)(5)(A) and 1141 of the Bankruptcy Code, on the Effective Date, title to all assets and property of the Estate of Coram shall pass to, and vest in, Reorganized Coram free and clear of all Claims, Allowed Interests, liens, charges and other rights of creditors or equity holders arising prior to the Effective Date. The Confirmation Order shall provide for and shall constitute a judicial determination of discharge of the Debtors' liabilities. The Plan makes clear that, on and after the Effective Date, Reorganized Coram may operate its businesses, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court, except as otherwise provided herein or in the Confirmation Order. Without limiting the foregoing, Reorganized Coram may pay the charges that it incurs on or after the Effective Date for professionals' fees, disbursements, and expenses without application to the Bankruptcy Court.

2.    **Discharge**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and treatment of Claims and Interests under the plan will be in exchange for an and in complete satisfaction, discharge and release of all Claims and termination of all Interests arising on or before the Effective Date, including any interest accrued on Claims from the Petition Date. Except as otherwise provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date and immediately after cancellation of the Equity Interests: (a) discharge the Debtors from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (ii) any Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the holder of a Claim based on such debt is accepted the Plan; and (b) terminate all Interests and other rights of equity security holders in the Debtors. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date and immediately after the cancellation of the Equity Interests and the issuance of the New Coram Stock, of a discharge of all Claims and other debts and liabilities against the Debtors and a termination all Equity Interests and other rights of equity security holders in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharge of the Claim or terminated Interest.

32

3.    **Release**

The Plan provides that, in consideration for the promises and obligations of the Debtors and Reorganized Coram thereunder, as of and on the Effective Date, the Debtors, the Estates, the Committee, all Persons claiming through any of the foregoing entities, and any of their successors, assigns or representatives shall be deemed to have waived, released and discharged all rights or claims, whether based upon tort, fraud, contract or otherwise, which they possessed or may possess prior to the Effective Date against the Debtors, their present and former directors, officers, employees, agents, representatives and attorneys and any successors or assigns of the foregoing, and the Committee and its agents, except as otherwise provided in the Plan, the Bankruptcy Code, or the Confirmation Order.

4.    **Exculpation**

The Plan provides that the Debtors, Reorganized Coram, and their respective members, officers, directors, employees, representatives, attorneys and agents, and the Committee and its agents, shall be deemed released by each of them against the other and by the holders of Claims or Allowed Interests of or from any and all claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Debtors' Chapter 11 cases, including without limiting the generality of the foregoing, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of Confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct, and all such persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.

5.    **Injunction**

The Plan provides that, except as otherwise specifically provided for in the Plan or the Confirmation Order as of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan will be permanently enjoined from taking any of the following actions on account of any such discharged claims, debts or liabilities or terminated Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Debtors, reorganized Coram, or their respective property other than to enforce any right to a distribution pursuant to the Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, Reorganized Coram, or their respective property, other than as permitted as pursuant to (a) above; (c) creating, perfecting, or enforcing any lien or encumbrance against the Debtors, Reorganized Coram or their respective property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or Reorganized Coram; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

33

The Plan further provides that, as of the Effective Date, all entities that have held, currently hold or may hold any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that are released pursuant to the plan will be permanently enjoined from taking any of the following actions against any released entity or its property on account of such release claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities: (a) commencing or continuing in any manner or other proceedings; (b) enforcing, attaching, collecting or recovering in any manner, any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released entity; and (e) commencing or continuing any action, in any manner, in any place that does not comply or is inconsistent with the provisions of the Plan.

6.    **Rights of Action**

The Plan provides that any rights or causes of action accruing to the Debtors or Reorganized Coram, including, without limitation, those arising under or pursuant to the Bankruptcy Code, shall remain assets of, or vest in, Reorganized Coram. Reorganized Coram may pursue, abandon, settle or release all reserved rights of action, as appropriate, in accordance with what is in the best interests, and for the benefit, of Reorganized Coram. In connection therewith, the Plan provides that any distributions provided for therein and the allowance of any Claim for the purpose of voting on the Plan is and shall be without prejudice to the rights of Reorganized Coram to pursue and prosecute any reserved rights of action including without limitation, those arising under or pursuant to the Bankruptcy Code.

E.    **Limitation of Liability in Connection with the Plan**

The Plan provides that neither the Debtors, Reorganized Coram, or any of their respective members, officers, directors, employees, representatives, counsel or agents, nor the Committee and its agents, shall have incurred or shall incur any liability to any holder of a Claim or Allowed Interest or any other Person for any act or omission in connection with, or arising out of, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of Confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct, and all such persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.

F.    **Conditions Precedent to Confirmation and Effectiveness of the Plan**

1.    The Plan provides that it shall not be confirmed unless and until the following conditions shall have been satisfied or waived by the Debtors:

a.    The Confirmation Order will be reasonably acceptable in form and substance to the Debtors and the Noteholder Group;

34

b.    Coram shall have received a binding commitment for the Exit Financing Facility;

c.    All exhibits to the Plan are in form and substance reasonably satisfactory to the Debtors and the Noteholder Group;

2.    The Plan also provides that it shall not become effective unless and until the following conditions shall have been satisfied or waived in writing by the Debtors:

a.    the Bankruptcy Court shall have entered the Confirmation Order;

b.    reorganized Coram shall have, or immediately upon the effectiveness of the Plan shall have, sufficient cash to make all cash payments required to be made on the Effective Date pursuant to the terms of the Plan;

c.    All conditions necessary to effectuate Reorganized Coram's Exit Financing Facility shall have been satisfied or waived;

d.    Any statutory fees owing the U.S. Trustee shall have been paid in full;

e.    All other actions and documents necessary to implement the provisions of the Plan shall have been effected or executed or, if waivable, waived by the Person or Persons entitled to the benefit thereof;

f.    The Plan Administrator shall have executed the Plan Administration Agreement evidencing the Plan Administrator's agreement to serve in that capacity;

g.    The Unsecured Claims Reserve shall have been fully funded in accordance with the Plan and any applicable orders of the Bankruptcy Court with respect thereto;

h.    The Effective Date shall have occurred on or before December 29, 2000.

## VI. IMPLEMENTATION OF THE PLAN

A.    Cancellation of Existing Securities and Agreements

The Plan provides that, on the Effective Date, except as otherwise provided in the Plan, all securities, instruments, instruments of indebtedness, guarantees and agreements governing any claims impaired hereby, including the Notes, shall be deemed canceled and

35

terminated and the obligations of the Debtors and each of their subsidiaries, affiliates, and agents relating to, arising under, in respect of, or in connection with such securities, instruments or agreements shall be discharged. The Plan further provides that the holder of any such documents canceled pursuant to this provision shall have no rights against the Debtors or Coram arising from or relating to such documents, except the right to receive distributions if any, provided for in the Plan.

### B.    Surrender of Instruments

The Plan requires that each holder of an instrument evidencing a Claim shall surrender such instrument to the Debtors as a condition to the receipt of any distribution under the Plan to such holder on account thereof. Unless otherwise agreed by the Debtors, no distribution under the Plan shall be made to or on behalf of any holder of such Claim unless and until such instrument is received or the unavailability of such instrument is reasonably established to the satisfaction of the Debtors. In accordance with section 1143 of the Bankruptcy Code, any holder of a Claim that (i) fails to surrender or cause to be surrendered such instrument or (ii) fails to execute and to deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Debtors and furnish a bond in form, substance and amount reasonably satisfactory to the Debtors, in each case within two (2) years after the Effective Date, shall be deemed to have forfeited forever all rights, claims, and interests in respect of said distribution and shall not thereafter have any right to participate in any distribution under the Plan.

### C.    Certificate of Incorporation

The Plan provides that on the Effective Date, the certificate of incorporation and the by-laws of Reorganized Coram will be substantially in the form included in the Plan Supplement. On the Effective Date, or as soon thereafter as practicable, Reorganized Coram shall file its Amended and Restated Certificate of Incorporation of Reorganized Coram. Among other things, the Amended and Restated Certificate of Incorporation of Reorganized Coram shall: (a) prohibit the issuance of non-voting equity securities to the extent required by section 1123(a) of the Bankruptcy Code; (b) provide for the authorization of the New Coram Stock in amounts not less that the amounts necessary to permit distributions thereof required or contemplated by the Plan; and (c) shall comply with section 1123(a)(6) of the Bankruptcy Code. The Plan further provides that after the Effective Date, Reorganized Coram may amend and restate its certificates of incorporation or by-laws as permitted by the Delaware General Corporation Law, subject to the terms and conditions of such documents.

36

**D.     Management of Reorganized Coram**

The Plan provides that on the Effective Date, the operation of Reorganized Coram shall become the general responsibility of the Reorganized Coram Board of Directors, which shall, thereafter, continue to have the responsibility for the management, control, and operation of Reorganized Coram. The members of the Reorganized Coram Board of Directors on the Effective Date shall be those persons identified in the Plan Supplement. Thereafter, the members of the Reorganized Coram Board of Directors shall be selected in accordance with the Amended By-laws of Reorganized Coram. The officers of Reorganized Coram shall consist of those individuals set forth in the Disclosure Statement and in the Plan Supplement. All existing directors and officers who become officers or directors of Reorganized Coram shall be deemed re-elected. [Creditor Directors shall be deemed newly elected pursuant to the Confirmation Order.] Those officers and directors not continuing in office, if any, shall be deemed removed therefrom (without cause) pursuant to the Confirmation Order. For biographical, compensation and related information regarding the directors and officers of Reorganized Coram, see "Reorganized Coram – Management."

**E.     Issuance of New Coram Stock**

The Plan provides that on the Effective Date, in accordance with the Plan, the Amended and Restated Certificates of Incorporation of Reorganized Coram, and the Amended By-laws of Reorganized Coram, Reorganized Coram shall issue the New Coram Stock in an amount not less than the amounts necessary to permit distributions thereof required or contemplated by the Plan. For a description of the New Coram Stock, see "New Coram Stock to be Issued Pursuant to the Plan."

**F.     Issuance of New Secured Notes**

The Plan provides that on the Effective Date, in accordance with the Plan, Reorganized Coram shall issue the New Secured Notes and cause the distribution thereof required by the Plan, subject to the provisions of section 9.4 of the Plan. For a description of the New Secured Notes, see "New Secured Notes to be Issued Pursuant to the Plan."

**G.     Corporate Action**

The Plan provides that on the Effective Date authorization of the New Coram Stock, the election of directors and officers, the adoption of the Amended and Restated Certificate of Incorporation or Reorganized Coram, the Amended By-laws of Reorganized Coram, and any and all other matters provided for under the Plan involving the corporate structure of Reorganized Coram, or involving corporate action by the directors and/or stockholders of Reorganized Coram, shall be deemed to have occurred and shall be in effect from

37

and after the Effective Date pursuant to section 303 of the Delaware General Corporation Law, section 422A of the Tax Code, the rules and regulations issued thereunder, section 16 of the 34 Act, the rules and regulations issued thereunder and any other applicable law, without any requirement of further action by the stockholders and/or directors of the Debtors or Reorganized Coram. On the Effective Date, all agreements entered into pursuant to the Plan shall be valid, binding and in full force and effect.

## H.    Exit Financing Facility

On the Effective Date, and solely to the extent determined by Reorganized Coram to be in the best interests of Reorganized Coram, Reorganized Coram is authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Financing Facility without further order of the Court. All cash necessary for the Reorganized Debtors to make payments to the Plan will be obtained from the Reorganized Debtors' cash balances and operations and/or the Exit Financing Facility. For a description of the Exit Financing Facility, see section XI, "Exit Finance Facility."

## VII. PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN

### A.    Distributions

The Plan provides that, except as otherwise provided in the Plan, all Distributions under the Plan shall be made by the Debtors to holders of Allowed Claims or their designees at their Most Recent Addresses. The Debtors shall make an initial distribution on the Effective Date or as soon thereafter as is reasonably practicable to all holders of Allowed Claims as of the Effective Date. Thereafter, CHC will made Distributions on account of Allowed Claims on the first Subsequent Distribution Date that is at least ten (10) Business Days after a Claim becomes an Allowed Claim. Coram will make Distributions on account of Allowed Claim in the ordinary course of business as soon as practicable after such Claim becomes an Allowed Claim.

### B.    Plan Administrator

The Plan provides that, on the Effective Date, the officers and board of directors of CHC shall be deemed removed from office pursuant to the Confirmation Order, CHC shall be dissolved in accordance with Section of the Plan and the operation of the Unsecured Claims Reserve shall become the general responsibility of the Plan Administrator pursuant to and in accordance with the provision of the Plan and the Plan Administration Agreement. Specifically, the Plan sets forth the role of the Plan Administrator (subject to all other applicable provisions of the Plan) as follows:

1. *Responsibilities.* The responsibilities of the Plan Administrator shall include maintaining the Unsecured Claims Reserve; liquidating remaining assets; prosecuting

38

objections to and estimations of Claims against CHC; calculating and implementing all distributions from the Unsecured Claims Reserve in accordance with the Plan; filing all required tax returns and paying taxes and all other obligations on behalf of the Unsecured Claims Reserve from funds therein; and such other responsibilities as may be vested in the Plan Administrator pursuant to the Plan, the Plan Administration Agreement or Bankruptcy Court order or as may be necessary and proper to carry out the provisions of the Plan.

      2. *Powers.* The Powers of the Plan Administrator shall include, without Bankruptcy Court approval in each of the following cases, the power to invest funds in, and withdraw, make distributions and pay taxes and other obligation owed by the Unsecured Claims Reserve, from funds therein in accordance with the Plan; the powers to engage employees and professional persons to assist the Plan Administrator with respect to its responsibilities; the power to dispose of, and deliver title to others of, remaining assets on behalf of or against the Reorganized CHC; and such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan or the Plan Administration Agreement.

      3. *Compensation.* In addition to reimbursement for the actual out-of-pocket expenses incurred, the Plan Administrator shall be entitled to reasonable compensation for services rendered on behalf of the Unsecured Claims Reserve in an amount and on such terms as may be agreed to by the Debtors and as reflected in the Plan Administration Agreement. Any dispute with respect to such compensation shall be resolved by agreement among the parties or, if the parties are unable to agree, determined by the Bankruptcy Court.

**C.**    **Distribution of Cash**

      Distributions and transfers of cash called for under the Plan will be made on the Effective Date, except that with respect to Claims that are Disputed Claims on the Effective Date, distributions shall be made on Subsequent Distribution Dates until there are no longer any Disputed Claims as to which cash payments are required under the Plan. All distributions of cash under the Plan may be made either by check or by wire transfer, at the option of the Reorganized Debtors.

**D.**    **Distributions to Noteholder Group**

      Distributions and transfers of New Coram Stock and New Coram Secured Notes under the provisions of the Plan will be made on the Effective Date. The Plan also provides that Coram and Reorganized Coram shall have the right to delay any distribution of New Coram Stock or New Secured Notes to any member of the Noteholder Group until it receives reasonable

39

satisfaction that such distribution will not result in a violation of any statute or regulation applicable to Coram's business.

### E.     Setoffs

The Plan permits, but does not require, the Debtors and Reorganized Coram to set off against any Claim and the payments or distributions to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever the Debtors or the Reorganized Coram may have against the holder thereof, but neither the failure to do so nor the allowance of any Claim under the Plan, for voting purposes or otherwise, shall constitute a waiver or release by the Debtors or Reorganized Coram of any such claim that any of such entities may have against any holder.

### F.     Distribution of Unclaimed Property

The Plan provides that any distribution of property (cash or otherwise) under the Plan which is unclaimed after two (2) years following the Effective Date shall be forfeited to, and re-vest in, Reorganized Coram. Any holder of an Allowed Claim that does not assert a claims pursuant to the Plan for an undelivered or undeliverable distribution to be made be a Disbursing Agent with this two (2) year period will be forever barred from asserting any such claim against the Debtors, Reorganized Coram or their respective property.

### G.     Compliance With Tax Requirements.

The Plan contains several provisions pertaining to compliance with tax requirements with respect to distributions. The provisions are as follows:

1.     In connection with the Plan, to the extent applicable, each disbursing agent, including Reorganized Coram and the Plan Administrator, is required to comply with all tax reporting requirements imposed upon it by any governmental unit with respect to any and all distributions pursuant the Plan, and will be authorized to take any actions that may be necessary or appropriate to comply with such reporting requirements.

2.     Notwithstanding any other provision of the Plan, each entity receiving a distribution of cash or New Coram Stock pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed upon it by any governmental unit on account of such distribution.

3.     To the extent (and only to the extent) required by applicable law, any applicable federal, state or local withholding taxes may be deducted by the Debtors or

40

**A596**

Reorganized Coram from any payments or other Distributions made in respect of Allowed Claims.

## H.    De Minimis Distributions and Fractional Interests

The Plan provides that no cash payment of less than $10.00 shall be made to any holder of an Allowed Claim unless such holder so requests in writing to the Debtors or the Plan Administrator, as appropriate. Absent a request, such funds shall be distributed as if they are Distributions of Unclaimed Property in accordance with the provisions of section 9.6 of the Plan. The Plan additionally provides that fractional interests in New Coram Stock shall not be distributed. Notwithstanding any other provision in the Plan, only whole numbers of shares of New Coram Stock shall be issued to holders of Allowed Claims (who are otherwise entitled to receive New Coram Stock). When any distribution on account of an Allowed Claim would result in the issuance of a number of shares of New Coram Stock that is not a whole number, the actual distribution of such New Coram Stock shall be rounded to the next lower whole number. Any fractional interests in New Coram Stock that are allocated for distribution to holders of Allowed Claims shall be deemed contributed to the Reorganized Debtors.

## I.    Provisions Pertaining to Disputed Claims

The Plan contains provisions governing the Debtors' and Reorganized Coram's rights and obligations respecting distributions and Disputed Claims. These provisions are summarized as follows:

### 1.    Objections to and Estimation of Claims; Prosecution of Disputed Claims

The Debtors, Reorganized Coram, and the Plan Administrator (as applicable) will receive the right to object to the allowance of all Claims (against their respective entity), including any Claims listed in the Schedules or filed with the Bankruptcy Court with respect to which they dispute liability in whole or in part and the characterization of a Claim as secured or unsecured; subject to further extension by the Bankruptcy Court with or without notice, all objections to the allowance of Claims shall be filed with the Bankruptcy Court on or before a date that is sixty (60) days after the Effective Date. All such objections shall be litigated to Final Order; provided however, that the Debtors, Reorganized Coram, and the Plan Administrator, as applicable, may compromise, settle, withdraw or resolve by any other method approved by the Bankruptcy Court, any such objections to Claims. The Debtors, Reorganized Coram, or the Plan Administrator, as applicable, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such contingent or unliquidated Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event

41

that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the amount of such Claim or a maximum limitation on the amount of such Claim, as determined by the Bankruptcy Court, to the extent permissible under the Bankruptcy Code. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, Reorganized Coram, or the Plan Administrator as the case may be, may elect to pursue any supplemental proceedings to object to any ultimate payment or distribution on such Claim.

2.      **Payments and Distribution on Disputed Claims**

Notwithstanding any provision in the Plan to the contrary, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until such Claim becomes an Allowed Claim, in whole or in part. With respect to Claims against CHC only, on the first Subsequent Distribution Date that is at least ten (10) Business Days after a Disputed Claim (or portion thereof) becomes an Allowed Claim, the holder of such Allowed Claim shall receive all payments and/or distributions to which such holder is then entitled under the Plan.

3.      **Disallowance of Reimbursement or Contribution Claims**

Effective as of the Effective Date, in accordance with section 502(e)(1) of the Bankruptcy Code, all Claims or Administrative Claims for reimbursement or contribution of an entity that is liable with a Debtor shall be disallowed against that Debtor to the extent such Claim or Administrative Claim, as the case may be, is contingent as of the Effective Date.


## VIII. REORGANIZED CORAM

A.      **Background of Business**

Reorganized Coram intends to conduct essentially the same business as that which was conducted by Coram. The Debtors' pre-petition business is described in section III, and in its Annual Report on Form 10-K and Quarterly Report on Form 10-Q, annexed hereto as Exhibits B and C, respectively


B.      **Coram's 2000 First Quarter Results**

For the period January 1, 2000 through March 31, 2000, on a consolidated basis, CHC had net revenues of approximately $134.8 million, and earnings before interest and taxes from continuing operations of approximately $4.9 million.

42

**A598**

C.  Projected Performance of Reorganized Coram

Management believes that Reorganized Coram will have revenue for the fiscal year ending December 31, 2000 totalling approximately $223.4 million. Management also believes that revenues for the subsequent four (4) fiscal years will increase with revenue for the fiscal year ending December 31, 2004 totalling approximately $499 million. A chart summarizing revenues projected by management of Coram for the fiscal years ending upon December 31 of the referenced years is attached hereto as Exhibit D.

Management has projected that the EBIT for Reorganized Coram of the fiscal year ending December 31, 2000 will be approximately $5.94 million and that the EBIT of Reorganized Coram will increase to $36.77 million for the fiscal year ending December 31, 2004. A chart summarizing and comparing revenue and net income projected by the Debtors' management for Reorganized Coram's fiscal years ending December 31 of the indicated years is attached hereto as Exhibit D.

The Debtors' management has projected that the EBIT of Reorganized Coram as a percentage of revenue will increase from approximately 2% percent in the fiscal year ending December 31, 2000 to approximately 7.3% percent in Reorganized Coram's fiscal year ending December 31, 2004

Attached hereto as Exhibit D are pro forma financial statements which project the financial performance of Reorganized Coram, on a consolidated basis through December 31, 2004.

D.  Liquidity and Capital Resources

The Exit Finance Facility will be Reorganized Coram's only initial source of financing. Based upon the Debtors' projections (see section VIII. C. "Projections for Reorganized Coram" as qualified by section XVII "Projections"), the Debtors will obtain a positive cash flow during the fiscal 2001. Based on currently anticipated cash flows, Reorganized Coram anticipates that it will have sufficient cash from the Exit Finance Facility and its operations. Reorganized Coram may also be able to develop other sources of financing, but no assurance can be given that such further sources can be developed. Reorganized Coram believes it will be in a better position financing alternatives, should it determine that it is in its best interest to do so, after the Plan is implemented.

43

**A599**

E.    Management

    1.    Reorganized Coram Board of Directors and Executive Officers

        Reorganized Coram will be managed by a Board of Directors composed of the below-listed individuals. Reorganized Coram will have the overall corporate structure depicted in the charts attached hereto as Exhibit G.

        The following biographical information is furnished with respect to the above-named members of the Board of Directors and senior executives of Reorganized Coram:

| NAME | AGE | POSITION WITH CORAM | DIRECTOR SINCE |
|------|-----|---------------------|----------------|
| Daniel D. Crowley | 52 | Chairman of the Board | 1999 |
| Donald J. Amaral | 47 | Director | 1995 |
| William J. Casey | 55 | Director | 1997 |
| L. Peter Smith | 50 | Director | 1994 |
| Sandra L. Smoley | 63 | Director | 2000 |

        Mr. Crowley joined Coram as its Chairman, Chief Executive Officer and President as of November 30, 1999. He is also Chairman of Winterland, a privately held affinity merchandise company in the music and entertainment industry, and Chairman, Chief Executive Officer and President of Dynamic Healthcare Solutions, LLC, a privately held management consulting and investment firm that he established in 1997. Prior to founding Dynamic Healthcare Solutions, Mr. Crowley served as the Chairman, Chief Executive Officer and President of Foundation Health Corporation, a post that he had served in since 1989.

        Mr. Crowley serves as Chairman of the Board, President, and Chief Executive Officer of CHC pursuant to an employment agreement dated as of November 30, 1999 (as subsequently amended, the "Crowley Agreement"). The Crowley Agreement provides, among other things, that Mr. Crowley shall receive, among other compensation, a base salary ("Base Salary") in the amount of $650,000 per annum, and a performance bonus based upon CHC's EBITDA results for fiscal year 2000 as reflected in the Debtors' audited financial statements, in the amount of 25% of the Debtors' EBITDA greater than $14 million, and $5 million to Crowley and other members of management as designated by Crowley if EBITDA exceed $35 million. The Crowley Agreement also provides that Mr. Crowley shall receive a restructuring bonus in the amount of $1.8 million, payable on the Effective Date of a plan of reorganization which is approved by CHC's Board of Directors. The Crowley Agreement will be assumed by CHC and assigned to Coram under the provisions of the Plan.

        Mr. Crowley also serves as a consultant to Cerberus Partners, L.P. ("Cerberus"), which is a member of the Noteholder Group, with respect to its investments in various health

44