care companies other than the Debtors. Mr. Crowley generally receives a fee from Cerberus for such services, but receives no fee from Cerberus for any services he provides respecting the Debtors.

Mr. Amaral served as Chairman of the company's Board of Directors from September 1997 until November 30, 1999. Mr. Amaral has served as a director of the company since October 1995, Chief Executive Officer of the company from October 1995 through April 23, 1999 and October 22, 1999 through November 30, 1999, and as President from October 1995 through December 1997. Previously, he was President and Chief Operating Officer of OrNda Healthcorp ("OrNda") from April 1994 to August 1995, and served in various executive positions with Summit Health Ltd. ("Summit") from October 1989 to April 1994, including President and Chief Executive Officer between October 1991 and April 1994. Summit was merged into OrNda in April 1994. Mr. Amaral is also a member of the Board of Directors of CareMatrix Corporation.

Mr. Casey has served as a director of Coram since September 1997. Since 1983, Mr. Casey has served as a consultant in the healthcare industry, specializing in hospital management evaluation, hospital planning, managed care contracting and turnaround services. From 1986 to 1997, Mr. Casey has also served as Contract Administrator for Emergency Department Physicians' Medical Group, Inc. and its affiliated medical groups, which provide physician services to non-governmental facilities. In addition, from 1988 to 1997, Mr. Casey has served as Contract Administrator for NP Medical Group, Inc., which provides physician services to government facilities. Mr. Casey also serves as a director of TriCounties Bank.

Mr. L. Peter Smith has served as a director of Coram since July 1994. Between November 1993 and July 1994, Mr. Smith was a director of Medisys, Inc. Mr. Smith served as the Managing Partner of AllCare Health Services, Inc., which was acquired by Medisys in December 1992. Mr. Smith is also Chief Executive Officer and serves on the Board of Directors of Ralin Medical, Inc., a company specializing in cardiac disease management. Mr. Smith also serves on the Board of Directors of Gateway, Inc. and AMSYS, Inc. Mr. Smith previously served on the Board of Directors of Sabratek Corporation from October 1992 through August 23, 1999. Sabratek Corporation filed a voluntary bankruptcy petition under Chapter 11 of the United States Code on December 17, 1999 and that proceeding is presently pending before the United States Bankruptcy Court in Delaware.

Ms. Smoley was elected to Coram's Board of Directors on February 10, 2000. Ms. Smoley is the Chairman and Chief Executive Officer of The Sandra Smoley company, a health care and local government consulting firm based in Sacramento, California. From October 1993 to January 1999, she served as the Secretary of the California Health and Welfare Agency. Prior to that time, she was Secretary of the California State and Consumer Services Agency from January 1993 to October 1993.

45

2.    Arrangements with Reorganized Coram's Executives

Reorganized Coram's successful implementation of its business strategies will be highly dependent upon the continuing commitment of its key executives to achieving corporate objectives. Reorganized Coram intends to enter into agreements with its key executives in order to recruit (where necessary) and retain the services of such executives and (a) assure the availability of their skills for the benefit of Reorganized Coram, (b) secure to Reorganized Coram freedom from competition by such persons within reasonable and lawful limits, and (c) provide appropriate base compensation, benefits and financial incentives through bonus, severance and other employment-related programs.

The senior executive officers of Coram and CHC are currently receiving a salary from the Debtors at the following annualized rates:

| NAME | SALARY (BASE) | AGE | POSITION(S) WITH CORAM |
|------|---------------|-----|------------------------|
| Daniel D. Crowley | $650,000 | 52 | Chairman, Chief Executive Officer, President and Director |
| Scott R. Danitz | $200,000 | 42 | Senior Vice President, Finance and Chief Accounting Officer |
| Scott T. Larson | $185,000 | 37 | Senior Vice President, General Counsel and Secretary |
| Allen J. Marabito | $310,000 | 53 | Executive Vice President |
| Vito Ponzio, Jr. | $165,000 | 45 | Senior Vice President, Human Resources |

Certain senior executive officers also receive medical, dental, disability and life insurance coverage, car allowances and paid vacations.

In addition to base salary, Coram's senior executives, as senior executives of Reorganized Coram, will continue to earn bonuses or, if voluntarily terminated or terminated without cause, be provided with severance benefits in accordance with certain of the Debtors' plans that are currently the subject of an application for approval with the Bankruptcy Court.

46

**A602**

Specifically, the Debtors have obtained Bankruptcy Court approval of a Key Employee Retention Program, which is described above at section IV.F.3. "Other Administrative Events."

The Debtors also have a management incentive program ("Executive Compensation Program") which applies to approximately thirty-five (35) people. The Executive Compensation Program consists of three components: base salaries, short term incentives, and long term incentives. The Debtors intend to assume Executive Compensation Program, except that the Executive Compensation Program will be modified to the extent necessary to be consistent with the provisions of the Plan. A copy of the Executive Compensation Program, as modified, will be included in the Plan Supplement.

Scott R. Danitz has served as the company's Vice President and Controller from January 1998 through December 1999 and as Senior Vice President, Finance and Chief Accounting Officer since January 2000. Previously, Mr. Danitz was employed by First Data Corporation from 1989 through 1997 and held various positions, the most recent of which had been Vice President and Controller, Payment Instruments division.

Scott T. Larson has served as the company's Senior Vice President and General Counsel since July 1998 and was elected Secretary in April 1999. Previously, Mr. Larson served as the company's Vice President and Legal Counsel from March 1996 to July 1998 and as Assistant General Counsel from July 1994 through February 1996. Between December 1991 and July 1994, Mr. Larson served as Corporate Counsel and later as Assistant General Counsel for T(2) Medical, Inc. ("T(2) Medical"). Before joining T(2) Medical, Mr. Larson was employed as an attorney with the Atlanta-based law firm of Alston & Bird.

Allen J. Marabito joined Coram effective November 30, 1999 as Executive Vice President. From 1997 to 1999, Mr. Marabito was in private law practice and Senior Vice President with Dynamic Healthcare Solutions, LLC. From 1991 to 1997, he served as the Senior Vice President, Secretary and General Counsel of Foundation Health Corporation.

Vito Ponzio, Jr. has served as the company's Senior Vice President, Human Resources since September 1998. Previously, Mr. Ponzio served as the company's Vice President of Human Resources from February 1996 to September 1998 and as Director of Human Resources from February 1994 to February 1996.

F.    Certificate of Incorporation and By-Laws of the Reorganized Coram

Pursuant to the Plan, on the Effective Date, the Reorganized Coram will file the Amended and Restated Certificate of Incorporation of Reorganized Coram and will adopt the Amended By-Laws of Reorganized Coram. See "Implementation of the Plan -- Corporate Action." The description set forth below is intended as a summary only and is qualified in its

47

A603

entirety by reference to the Amended and Restated Certificate of Incorporation of Coram and the Amended and Restated By-Laws, which are included in the Plan Supplement.

Pursuant to the Plan, all currently outstanding capital stock of the Debtors will be canceled and all rights thereunder or relating thereto will be extinguished. In compliance with section 1123(a)(6) of the Bankruptcy Code, the Amended and Restated Certificate of Incorporation of Reorganized Coram will expressly prohibit the issuance of any non-voting equity securities.

### 1.     Board of Directors

The Amended By-Laws of Reorganized Coram provide that the number of directors on the Board of Directors shall be no less than three nor more than nine, and fixes the number of directors, as of the Effective Date of the Plan, at _____. The Plan provides that the Board of Directors of the Reorganized Coram shall initially consist of the individuals identified in the Plan Supplement. In addition, the Amended By-Laws provide that, unless Reorganized Coram's Board of Directors otherwise determines, any vacancies will be filled by the affirmative vote of a majority of the remaining directors, though less than a quorum. Under the Delaware General Corporation Law ("DGCL"), directors serving on a board may be removed by the stockholders with or without cause.

### 2.     Limitation of Liability of Directors

The Amended and Restated Certificate of Incorporation of Reorganized Coram will provide that a director will not be personally liable for monetary damages to the Reorganized Coram or its stockholders for breach of fiduciary duty as a director, except for liability for: (i) any breach of the director's duty of loyalty to the Reorganized Coram or its stockholders; (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) paying a dividend or approving a stock repurchase in violation of law; or (iv) any transaction from which the director derived an improper personal benefit.

### 3.     Indemnification of Directors and Officers

Subject to certain limitations, the Amended By-Laws of Reorganized Coram will provide that any person made a party or threatened to be made a party to a threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action or suit by or in the right of Reorganized Coram to procure a judgment in its favor) by reason of the fact that such person is or was a director, officer, employee or agent of Reorganized Coram, or is or was serving at the request of Reorganized Coram as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall be indemnified by Reorganized Coram against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding if such person acted in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of

48

Reorganized Coram, and, with respect to any criminal action or proceeding, had no reasonable cause to believe such his conduct was unlawful.

### 4. Director and Officer Insurance Policy

The directors and officers of the Debtors are insured, in such capacities, for an aggregate of $25 million, subject to a $100,000 deductible payable by the Debtors, if a loss (including defense costs) results from certain defined types of actual or alleged acts or omissions, which occur during the period of insurance coverage. The Debtors' currently effective insurance policy expires on January 8, 2001 The Debtors and/or Reorganized Coram intend to secure liability insurance, to be effective after January 8, 2001.

## IX. NEW CORAM STOCK TO BE ISSUED PURSUANT TO THE PLAN.

The following description of the terms and provisions of New Coram Stock does not purport to be complete and is qualified in its entirety by reference to the pertinent sections of the proposed form of the Amended and Restated Certificate of Incorporation or Reorganized Coram, which will be included in the Plan Supplement.

Upon effectiveness of the Amended and Restated Certificate of Incorporation of Reorganized Coram, Reorganized Coram will authorize 10 million shares of New Coram Stock ($.01 par value), representing one hundred percent (100%) of the authorized common stock of Reorganized Coram. Pursuant to the Plan, Reorganized Coram will allocate and issue all of the common stock of Reorganized Coram to the holders of Allowed Claims in Class Coram 2. See "General Information Regarding the Plan -- Classification and Treatment of Claims and Interests."

The holders of New Coram Stock will be entitled to one vote for each share held of record on all matters submitted to a vote of stockholders. Holders of New Coram Stock will be entitled to receive ratably such dividends as may be declared by the Reorganized Coram's Board of Directors out of funds legally available therefor. It is presently intended that Reorganized Coram will retain earnings for working capital and to fund capital expenditures; accordingly, Reorganized Coram does not anticipate paying any dividends on New Coram Stock in the foreseeable future. Holders of New Coram Stock will have no preemptive rights and will have no rights to convert their New Coram Stock into any other securities, and there will be no redemption provisions with respect to such shares. All outstanding shares of New Coram Stock to be issued pursuant to the Plan will, upon such issuance, be fully paid and nonassessable. The Amended and Restated Certificate of Incorporation of Reorganized Coram will not authorize, and Reorganized Coram Board of Directors does not currently contemplate recommending to its shareholders for approval, the authorization of any shares of preferred stock or other stock ranking senior to New Coram Stock in respect of the payment of dividends or the distribution of assets.

49

## X. NEW SECURED NOTES TO BE ISSUED PURSUANT TO THE PLAN

The following description of the terms and provisions of New Secured Notes does not purport to be complete and is qualified in its entirety by reference to the pertinent sections of the proposed form of New Secured Note, and the documents ancillary thereto, that will be included in the Plan Supplement.

Pursuant to the Plan, Reorganized Coram will issue New Secured Notes in the aggregate principal amount of $180 million. The New Secured Notes will have a fixed rate of interest at 9% per annum, computed on a 360 day basis. The Notes will require Reorganized Coram to make payments of interest only (without amortization) on a quarterly basis for the first four years after the Effective Date. At the end of the fourth year following the Effective Date, all remaining outstanding principals and interest will be due. Reorganized Coram may pre-pay any of its obligations under the New Secured Notes without penalty.

The New Secured Notes will be guaranteed by all of Reorganized Coram's operating subsidiaries. The New Secured Notes will be secured by a senior lien on all assets and pledge of all shares held by Reorganized Coram and its non-debtor operating subsidiaries, provided, however, that such pledge and security interests will be junior in liquidation priority to the Exit Finance Facility $40 million secured revolver.

The New Secured Notes will afford Reorganized Coram financing on below-market terms. The Debtors will therefore benefit from reduced interest expense and an enhanced ability to obtain further financing in the future if necessary.

## XI. EXIT FINANCE FACILITY

The following description of the terms and provisions of the Exit Finance Facility is not complete and is qualified in its entirety by reference to the pertinent sections of the Exit Finance Facility documents will be included in the Plan Supplement.

Pursuant to the Plan, and as a condition prerequisite to the Effective Date of the Plan, Reorganized Coram will enter into financing facility in the approximate aggregate principal amount of $40 million with one or more lenders that will be substantially in the form included in the Plan Supplement. The Exit Financing Facility will consist of a revolving senior secured loan under commercially reasonable terms.

## XII. DISCUSSION OF STARK II

Under the ownership and referral provisions of the Omnibus Budget Reconciliation Act of 1993 ("Stark II"), it is unlawful for a physician to refer patients for certain designated health services reimbursable under the Medicare or Medicaid program to an entity

50

**A606**

with which the physician (or the physician's immediate family members -- broadly defined) has a financial relationship, unless the financial relationship fits within an exception enumerated in Stark II or regulations promulgated thereunder. Aspects of Coram's business which are "designated health services" for purposes of Stark II include outpatient prescription drugs, parenteral and enteral nutrition, equipment and supplies, durable medical equipment and home health services. A "financial relationship" under Stark II is defined broadly as an ownership or investment interest in the provider, or any type of compensation arrangement in which remuneration flows between, the physician and the provider.

Under Stark II, an entity is prohibited from claiming payment under the Medicare or Medicaid programs for services rendered pursuant to a prohibited referral and is liable for the refund of amounts received pursuant to prohibited claims. The entity can also be subject to civil penalties of up to $15,000 per improper claim and can be excluded from participation in the Medicare and Medicaid programs. Suits for violations of Stark II can also potentially be brought under the *qui tam* (whisleblower) provisions of the Federal False Claims Act. Stark II effectively imposes "strict liability" for violations. Specifically, the government need not prove improper intent in order to establish liability. Moreover, lack of knowledge that a physician has made a prohibited referral is not a defense. In addition, a number of the states in which the Debtors operate have similar prohibitions on physician self-referrals with similar penalties.

The Stark II regulations broadly define "immediate family members" to include the following:

> [H]usband or wife; natural or adoptive parent, child, or sibling; stepparent, stepchild, stepbrother, or stepsister; father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law; grandparent or grandchild; and spouse of a grandparent or grandchild.

63 Fed. Reg. at 1721-22 (1998) (proposed 42 C.F.R. § 411.351). Thus, a physician who refers patients to the Debtors for the designated health services and who has any relative, as so defined, who is a CHC or Reorganized Coram shareholder would be making an improper referral under Stark II, unless the investment interest were covered by an exception to Stark II. Any improper referrals would subject the Debtors or Reorganized Coram to liability irrespective of any knowledge on the part of the Debtors or Reorganized Coram that the referring physician was a shareholder or relative of a shareholder.

The Debtors have, and require, relationships with physicians and physician owned entities in the form of medical director agreements and services agreements pursuant to which the company provides pharmacy products. The Debtors' are aware of certain referring physicians that have had a financial interests in the company through ownership of shares of the company's common stock.

Stark II includes an exception for a physician's ownership of publicly-traded securities traded under (among others) an automated interdealer quotation system operated by the

51

National Association of Securities Dealers, if the corporation has: (a) at the end of the company's most recent fiscal year, stockholder equity exceeding $75,000,000, or (b) on average during the previous three (3) fiscal years, stockholder equity exceeding $75,000,000. Proposed regulations define the term "stockholder equity" has the difference in value between a corporation's total assets and total liabilities, without further elaboration.

As of December 31, 1999, CHC complied with the requirements of this exception, thereby protecting referrals from physicians who owned (or whose family members owned) CHC stock. However, as of December 31, 2000, the Debtors will not be in compliance with this exception, absent a successful reorganization in accordance with the provisions of the Plan by or before December 31, 2000. Upon CHC's failure to qualify for the $75 million capitalization exception, it will be forced to cease accepting referrals of Medicare or Medicaid patients from physicians who own (or whose family members own) shares of Coram's common stock. The administrative burdens of attempting to make such determinations on a case-by-case basis could be prohibitive for both the Debtors and the referring physicians. Moreover, it is likely that such efforts would be ineffective in identifying all prohibited referrals and would deter physicians from referring patients to CHC.

## XIII. RISK FACTORS

Retention of Claims (if the Plan is not confirmed) or investment in New Coram Stock and New Secured Notes of Reorganized Coram (if the Plan is confirmed) are subject to a number of material risks, including those described below. Prior to deciding whether to vote in favor of the Plan, each Claimant should carefully consider the following factors, together with all the other information contained herein.

A.    Lack of Established Market for New Coram Stock; Volatility

There is no existing market for New Coram Stock. In addition, it is unlikely that a public market for New Coram Stock can be developed in the foreseeable future because of the restrictions on ownership be referring physicians and their family members under Stark II, and it is impossible to predict the degree of price volatility if any such market should develop. Accordingly, no assurance can be given that a holder of New Coram Stock will be able to sell such securities in the future or as to the price at which any such sale may occur. If such a market were to exist, New Coram Stock could trade at prices which depend upon many factors, including the market price for similar securities, industry and general economic conditions and the performance of, and investor expectations for, Reorganized Coram.

Reorganized Coram has no plan to apply for the listing of the New Coram Stock on a National Securities Exchange. The New Coram Stock will be issued pursuant to the Plan to certain holders of Allowed Claims, and certain of these Claimants may prefer to sell their New Coram Stock rather than to hold their shares as an investment on a long-term basis. Accordingly, it is anticipated that the market for New Coram Stock will be volatile, at least for an initial period

52

after the Effective Date. Moreover, while the Plan was developed based upon certain valuation assumptions for New Coram Stock, such valuation assumptions are not a prediction of trading prices of New Coram Stock after the Effective Date. New Coram Stock may trade, if it trades, at substantially lower prices because of a number of risk factors, as set forth herein. The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted. Reorganized Coram is not required to, and does not intend to, register New Coram Stock under the Securities Act of 1933, as amended. See "Applicability Of Federal Securities Laws."

**B.    Competitive Position**

Reorganized Coram will face significant competition and may not be able to compete successfully. Like the Debtors, Reorganized Coram would compete in the alternate site infusion therapy market which is highly competitive. Some of Coram's current and potential competitors include:

    (i)     integrated providers of alternate site health care services;

    (ii)    hospitals;

    (iii)   local providers of multiple products and services offered for the alternate site health care market; and

    (iv)    physicians and physician owned organizations such as independent practice associations and multi-specialty group practices.

The Debtors have experienced increased competition from hospitals and physicians that have sought to increase the scope of services offered at or through their facilities or offices, including services similar to those offered by the company and from hospitals and physicians that have entered into risk relationships with managed care organizations pursuant to which they have taken control of certain medical services, including the services offered by the company. Certain of the Debtors' competitors in various markets may have superior financial, marketing or managerial resources, size, purchasing power or strategic relationships with providers, referral sources, such as physicians and hospital discharge planners, and traditional indemnity and managed care payers.

There are relatively few barriers to entry in the infusion therapy services market. Local or regional companies are currently competing in many of the markets served by the company and others may do so in the future. Reorganized Coram would expect its competitors to continue to improve their service offerings and price competitiveness. Reorganized Coram would also expect its competitors to develop new strategic relationships with providers, referral sources and payers, which could result in increased competition. The introduction of new and enhanced services, acquisitions and industry consolidation and the development of strategic relationships

53

by Reorganized Coram's competitors could cause a decline in sales, loss of market acceptance of Reorganized Coram's services or price competition, or make its services less attractive. There can be no assurance that Reorganized Coram will be able to compete successfully against current or future competitors or that competitive pressures will not have a material adverse effect on Reorganized Coram's business, financial condition and results of operations.

### C.    Loss of Key Personnel

The success of Reorganized Coram will be highly dependent upon the services of its key executives. The loss of key executives of Reorganized Coram could have an adverse impact on Reorganized Coram's ability to implement successfully its business strategies and achieve its business plans. There is no assurance that Reorganized Coram will be able to retain the services of its current key executives or to effect a timely and cost-comparable replacement of any such executives who leave Reorganized Coram.

### D.    Capital Requirements

The Reorganized Company's businesses are expected to require working capital. While the business plan of Reorganized Coram contemplates that sufficient cash to meet Reorganized Coram's working capital and investment needs for the foreseeable future will either be generated by operations or available under the Exit Financing Facility, Reorganized Coram's ability to gain access to additional capital, if needed, cannot be assured.

### E.    Relationships With Third Parties

The success of Reorganized Coram's business will be dependent on relationships with third parties. The profitability of Reorganized Coram's business will depend in part on its ability to establish and maintain close working relationships with managed care organizations, private and governmental third-party payers, hospitals, physicians, physician groups, home health agencies, long-term care facilities and other institutional health providers and insurance companies and large self-insured employers. A feature of Reorganized Coram's business strategy would be to improve its relationships with such third parties in general, and with physicians and physician groups in particular, but there can be no assurance that Reorganized Coram will be successful in improving and maintaining such relationships, that its existing relationships will be successfully maintained, or that additional relationships will be successfully developed and maintained in existing or future markets. The loss of such existing relationships or the failure to continue to develop and maintain ongoing relationships in the future could have a material adverse effect on Reorganized Coram's business, financial condition and results of operations.

54

F.    **Health Care Reform**

The health care industry continues to undergo significant changes driven by various efforts to reduce costs, including efforts at national health care reform, trends toward managed care, limits in Medicare coverage and reimbursement levels, consolidation of health care distribution companies and collective purchasing arrangements by office-based health care practitioners. The impact of third-party pricing pressures and low barriers to entry have dramatically reduced profit margins for health care providers. Continued growth in managed care have pressured health care providers to find ways of becoming more cost competitive. This has also led to consolidation of health care providers in the Debtors' market areas.

In addition, political, economic and regulatory influences are subjecting the health care industry in the United States to extensive and dynamic change, and many competing proposals have been introduced in Congress and various state legislatures to reform the present health care system. It is possible that health care reform at the federal or state level, whether implemented through legislation or through action by federal or state administrative agencies, would require Reorganized Coram to make significant changes in the way it conducts business. Certain aspects of health care reform, such as proposed reductions in Medicare and Medicaid payments and changes in methods for calculating the average wholesale prices of the drugs, if successfully developed, adopted, and implemented, could have a material effect upon Reorganized Coram's business.

G.    **Other Risk Factors**

Confirmation and implementation of the Plan may will have material Federal income tax consequences to holders of New Coram Stock and New Secured Notes, and to Reorganized Coram. See "Certain Federal Income Tax Consequences of the Plan" for a discussion of such tax consequences.

The Debtors' projections are based upon, among other things, the business plan developed for Reorganized Coram in its present configuration, under which the Debtors have a limited operating history. See section XVII "Projections" for a discussion of the projections. The success of the Reorganized Company's business plan is subject to a number of uncertainties and contingencies. Although the Debtors believe that their projections are achievable, there is no assurance that such projections will be achieved.

## XIV.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims. The following summary does not address the federal income tax consequences to (i) holders whose Claims are entitled to reinstatement or payment in full in cash, or are otherwise unimpaired under the Plan

55

(e.g., holders of Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, certain Secured Claims and Allowed Coram General Unsecured Claims), or (ii) holders whose Equity Interests are or may be extinguished without a distribution in exchange therefor (e.g., holders of CHC Equity Interests).

The following summary is based on the Tax Code, Treasury Regulations promulgated thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

A.    Consequences to the Debtors

According to the audited financial statements of CHC, the Debtors and their consolidated subsidiaries (the "CHC Group") had approximately $214.7 million of net operating loss ("NOL") carryforwards for federal income tax purposes as of December 31, 1999, a portion of which is subject to existing limitations on use (see, exhibit B, note 10 to the Debtors Consolidated Annual Reports on Form 10-K for the fiscal year ended December 31, 1999). The Debtors expect to incur additional losses in the current taxable year ( before taking into account any gains from significant asset dispositions). In addition, the amount of such NOL carryforwards and other losses remains subject to adjustment by the IRS. As discussed below, any remaining NOL carryforwards and certain other tax attributes may be reduced or subject to severe limitations in future years upon the implementation of the Plan.

56

1.    **Cancellation of Debt**

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, tax credits, and tax basis in assets – by the amount of any cancellation of debt ("COD"). COD is the amount by which the indebtedness discharged exceeds any consideration given in exchange therefor. To the extent the amount of COD exceeds the tax attributes available for reduction, the remaining COD is simply forgiven. Based on existing authorities, the Debtors believe that any reduction in tax attributes generally should occur on a separate company basis, even though the respective debtor files a consolidated federal income tax return; however, the Debtors are aware that the IRS has, in certain cases, asserted the contrary position. Accordingly, there is no assurance that such reduction would occur on a separate company basis.

As a result of the discharge of Allowed CHC General Unsecured Claims and Allowed Coram Note Claims pursuant to the Plan, the Debtors will suffer significant COD. The extent of such COD and resulting tax attribute reduction will depend, in part, on the amount of cash, the fair market value of the New Coram Stock and the "issue price" of the New Secured Notes distributed. Based on the estimated reorganization value of Reorganized Coram (see, Section XVII, "Projections" below), it is anticipated that Reorganized Coram will incur approximately $58 million of COD, resulting in a reduction of the consolidated NOL carryforwards attributable on a separate company basis to Reorganized Coram and reducing Reorganized Coram's tax bases in its assets, effective as of the beginning of the taxable year following the taxable year in which the Effective Date occurs.

2.    **Limitations on NOL Carryforwards And Other Tax Attributes**

Following the implementation of the Plan, any consolidated NOLs (and carryforwards thereof) and certain other tax attributes of the Debtors allocable to periods prior to the Effective Date will be subject to the limitations imposed by Section 382 of the Tax Code.

Under Section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is, in general, subject to an annual limitation. Such limitation also may apply to certain losses or deductions which are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change that are subsequently recognized. The issuance of the New Coram Stock pursuant to the Plan to holders of Allowed Coram Note Claims will constitute an ownership change of the Debtors and the other members of the CHC Group.

In general, the amount of the annual limitation to which a corporation (or a consolidated group) would be subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-

57

term tax-exempt rate" in effect for the month in which the ownership change occurs (5.70% for ownership changes occurring in August 2000). For a corporation in bankruptcy and, presumably, where, as in the case of the CHC Group, the common parent is in bankruptcy, and that undergoes the ownership change pursuant to a confirmed plan, the stock value generally is determined immediately after (rather than before) the ownership change, an certain adjustments that ordinarily would apply do not apply.

Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

As indicated above, Section 382 can operate to limit built-in losses recognized subsequent to the date of the ownership change. If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then any built-in losses recognized during the following five years (up to the amount of the original built-in loss) generally will be treated as a pre-change losses and similarly will be subject to the annual limitation. Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors believe that they likely will be in a net unrealized built-in loss position on the Effective Date.

An exception to the foregoing annual limitation (and built-in gain and loss) rules generally applies where qualified (so-called "old and cold") creditors of the debtor receive at least 50% of the vote and value of the stock of the reorganized debtor pursuant to a confirmed chapter 11 plan, unless the debtor elects otherwise. Under this exception, a debtor's pre-change losses are not limited on an annual basis but are reduced by the amount of any interest deductions claimed during the three years preceding the effective date of the reorganization, and during the part of the taxable year prior to and including the reorganization, in respect of the debt converted into stock in the reorganization. Moreover, if this exception applies, any further ownership change of the debtor within a two-year period will preclude the debtor's utilization of any pre-change losses at the time of the subsequent ownership change against future taxable income.

The Debtor anticipates that the receipt of New Coram Stock by the holders of Allowed Coram Note Claims in exchange for such Claims would qualify for this exception. The statute does not address whether this exception can be applied on a consolidated basis or only on a separate company basis. Accordingly, it is possible that only any pre-change losses attributable

to Reorganized Coram itself (rather than to the other members of the CHC Group) may be able to benefit from this exception. If the exception were applicable only to Reorganized Coram itself, it appears that the pre-change losses attributable to the other members of the CHC Group would be subject to the annual limitation rules described above determined as if Reorganized Coram had not qualified for this exception.

Even if Reorganized Coram otherwise qualifies for this exception, it may, if it so desires, elect not to have the exception apply and instead remain subject to the annual limitation and built-in gain and loss rules described above. Such election would have to be made in Reorganized Coram's federal income tax return for the taxable year in which the reorganization occurs.

### 3.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of section 382 and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. The application of this provision to Reorganized Coram is unaffected by whether Reorganized Coram otherwise qualifies for the special bankruptcy exception to the annual limitation (and built-in gain and loss) rules of section 382.
Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

### 4.    Continuing Tax Status of CHC Group

Pursuant to the Plan, all of CHC's equity interests in Coram International Holdings Limited and Coram (representing substantially all of CHC's existing assets) will be transferred to Reorganized Coram, and CHC will be dissolved. Accordingly, the Debtors intend to take the position that, in accordance with Treasury Regulations governing affiliated groups of corporations that file consolidated federal income tax returns the CHC Group will be considered to remain in existence for federal income tax purposes, notwithstanding that CHC itself is no longer in existence. However, due to the complex nature of the Plan, there is no assurance that the IRS would not take a contrary position.

B.     Consequences to Holders of Certain Claims

Pursuant to the Plan, holders of the Allowed CHC General Unsecured Claims (Class CHC 2 Claims) will be entitled to receive one or more cash payments in satisfaction of their Claims. In addition, holders of Allowed Coram Note Claims (Class Coram 2 Claims) will be entitled to receive New Coram Stock and New Secured Notes and, as holders of Allowed CHC Notes Claims (Class CHC 3 Claims), potentially may receive cash in satisfaction of their Claims.

1.     Allowed CHC General Unsecured Claims

In general, each holder of an Allowed CHC General Unsecured Claims will recognize gain or loss in an amount equal to the difference between (i) the amount of cash received by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). For a discussion of the tax consequences of Claims for accrued interest, see section "Distributions in Discharge of Accrued Interest," below. See also, "Treatment of the Unsecured Claims Reserve," below.

Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount and whether and to what extent the holder had previously claimed a bad debt deduction. A holder which purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

2.     Allowed Coram Note Claims and CHC Note Claims

The federal income tax consequences of the Plan to holders of Allowed Coram Note Claims and Allowed CHC Notes Claims (collectively, the "Allowed Note Claims") depend, in part, on whether such Claims, and possibly the New Secured Notes, constitute "securities" for federal income tax purposes. The term "security" is not defined in the Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt constitutes a "security" depends on an overall evaluation of the nature of the debt. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of five years or less (e.g., trade

60

debt and revolving credit obligations) do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute securities. The following discussion assumes that the Series A Notes are not, whereas the Series B Notes are, "securities" for federal income tax purposes. The following discussion further assumes that the New Secured Notes will not constitute "securities" for federal income tax purposes. Each holder of a Note Claim is urged to consult its tax advisor regarding the status of its Claim and, as applicable, the New Secured Notes.

          a.      Note Claims That Do Not Constitute "Securities"

In general, each holder of an Allowed Note Claim, to the extent such Claim does not constitute a "security" for federal income tax purposes (i.e., to the extent such Claim is in respect of the Series A Notes), will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" in satisfaction of such Claim (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). The "amount realized" by a holder in satisfaction of such Claim, will equal the sum of the amount of any cash, the fair market value of any New Coram Stock and the "issue price" of any New Secured Notes received therefor (see, "Interest and Original Issue Discount on the New Secured Notes, below). For a discussion of the tax consequences of any Claims for accrued interest, see section "Distributions in Discharge of Accrued Interest," below. Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Claim, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount and whether and to what extent the holder had previously claimed a bad debt deduction. A holder which purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.
A holder's aggregate tax basis in any New Coram Stock and in any New Secured Notes received in respect of any Note Claim that does not constitute a security will equal the fair market value of such stock and the "issue price" of such notes, and the holding period for such stock and notes generally will begin the day following the issuance of such stock and notes.

          b.      Note Claims That Constitute "Securities"

To the extent that an Allowed Coram Note Claim constitutes a "security" for federal income tax purposes (i.e., to the extent such Claim is in respect of the Series B Notes), the receipt of New Coram Stock in partial satisfaction of such Claim will constitute a "recapitalization" for federal income tax purposes. Accordingly, in general, the holder of such Claim will not recognize loss upon such exchange, but will recognize gain (computed in the same manner as described in the preceding section), if any, to the extent of any non-stock

61

consideration received by such holder. The character and timing of any recognized gain will be determined in accordance with the principles discussed in the preceding section. For a discussion of the tax consequences of any Claim for accrued, see "Distributions in Discharge of Accrued Interest," below.

A holder's aggregate tax basis in the New Coram Stock received in respect of any Claim that constitutes a "security" will equal the holder's aggregate adjusted tax basis in such Claim (including any Claim for accrued but unpaid interest), increased by any gain or interest income recognized in respect of such Claim and decreased by any cash and other non-stock consideration received and any deductions claimed in respect of any previously accrued interest or original issue discount. In general, the holder's holding period for the New Coram Stock received will include the holder's holding period for its Claim, except to the extent that the New Coram Stock was issued in respect of a Claim for accrued but unpaid interest.

c.    Interest And Original Issue Discount ("OID") On The New Secured Notes

Pursuant to the Plan, interest on the New Secured Notes generally will be payable quarterly at a rate of 9% per annum. Stated interest on the New Secured Notes should be includable in income by a holder in accordance with such holder's method of accounting.

In addition, under certain circumstances, holders of New Secured Notes may be required to recognize imputed interest to the extent such New Secured Notes are treated as issued with OID. In general, a debt instrument is treated as having OID to the extent its "stated redemption price at maturity" (in this case, the stated principle amount of the New Secured Notes) exceeds its "issue price." The "issue price" of the New Secured Notes will depend upon whether they are considered traded on an "established securities market" during the sixty day period ending thirty days after the Effective Date. If, as is likely, the New Secured Notes are not traded on an established securities market, the "issue price" of the New Secured Notes will be their stated principal amount, assuming the stated interest rate of 9% is greater than the applicable federal rate for four-year obligations in effect on the Confirmation Date (6.33%, compounded annually, for August 2000). If the New Secured Notes are traded on an established securities market, the "issue price" will be their fair market value.

Pursuant to Treasury Regulations, an "established securities market" includes a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions.

In general, if the New Secured Notes are treated as issued with more than a de minimis amount of OID, each holder would be required to accrue the OID in respect of its New Secured Notes, and include such amount in gross income as interest, over the term of such notes based on the constant interest method. Accordingly, each holder generally would be required to include amounts in gross income in advance of the payment of cash in respect of such income. A holder's tax basis in a New Secured Note would be increased by the amount of any OID included in income and reduced by any cash payments (other than payment of stated interest) made with respect to such New Secured Note.

62

d.    Subsequent Sale of New Coram Stock

Any gain recognized by a holder upon a subsequent taxable disposition of New Coram Stock received pursuant to the Plan (or any stock or property received for it in a later tax-free exchange) will be treated as ordinary income to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to its Claim and any ordinary loss deductions incurred upon satisfaction of its Claim, less any income (other than interest income) recognized by the holder upon satisfaction of its Claim, and (ii) with respect to a cash-basis holder, also any amounts which would have been included in its gross income if the holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

In addition, the Treasury Department is expected to promulgate regulations that will provide that any accrued "market discount" not treated as ordinary income upon a tax-free exchange of market discount bonds would carry over to the nonrecognition property received in the exchange. If such regulations are promulgated and applicable to the Plan, any holder of an Allowed Coram Note Claim that constitutes a "security" for federal income tax purposes and which has accrued market discount would carry over such accrued market discount to the New Coram Stock received pursuant to the Plan, such that any gain recognized by the holder upon a subsequent disposition of such New Coram Stock also would be treated as ordinary income to the extent of any accrued market discount not previously included in income. In general, a claim will have "accrued market discount" if such claim was acquired after its original issuance at a discount to its adjusted issue price.

3.    Distributions in Discharge of Accrued Interest

Pursuant to the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent that any amount received (whether stock, cash or other property) by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder of a CHC General Unsecured Claim or a Note Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

4.    Treatment of the Unsecured Claims Reserve

Pursuant to the Plan, any amounts not distributable pending resolution of CHC General Unsecured Claims which are Disputed Claims will be set aside in an Unsecured Claims Reserve, in which the Debtors would have no interest.

63

Under Section 468B(g) of the Tax Code, amounts earned by an escrow account, settlement fund, or similar fund must be subject to current tax. Although certain Treasury Regulations have been issued under this section, no Treasury Regulations have as yet been promulgated to address the tax treatment of accounts in a bankruptcy setting. Thus, depending on the facts, such accounts possibly could be treated as a separately taxable trust, as a grantor trust treated as owned by the holders of Claims or by the Debtors, or otherwise.

On February 1, 1999, the IRS issued a proposed Treasury Regulation that would establish, if finalized in its current form, the tax treatment of reserves of a type similar to that here involved that are established after the date such Treasury Regulation becomes final. In general, such Treasury Regulation would tax such a reserve as a "qualified settlement fund" governed by Treasury Regulation Section 1.468B-1 et seq. Qualified settlement funds are subject to a separate entity level tax. As to previously established accounts or reserves, the proposed Treasury Regulation provides that the IRS would not challenge any reasonable, consistently applied method of taxation for income earned by the escrow, and any reasonable, consistently applied method for reporting such income.

Pursuant to the Plan, and subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Plan Administrator of a private letter ruling if the Plan Administrator so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Administrator ), Reorganized Coram shall (i) treat the Unsecured Claims Reserve as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each CHC General Unsecured Claim that is a Disputed Claim, in accordance with the trust provisions of the Tax Code (Sections 641 et seq.) and (ii) to the extent permitted by applicable law, report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties (including holders of CHC General Unsecured Claims which are Disputed Claims) are required to report consistently with such treatment. Accordingly, subject to issuance of definitive guidance, the [Plan Administrator] will report on the basis that any amounts earned by the Unsecured Claims Reserve and distributed to a holder during the same taxable year will be includable in such holder's gross income. Each holder is urged to consult its tax advisor regarding the potential tax treatment of the Unsecured Claims Reserve and the resulting consequences to such holder.

5.     Information Reporting and Withholding

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding (including employment tax withholding). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at a rate of 31%. Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN

64

provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. <u>ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.</u>**

## XV. APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

Certain holders of Allowed Claims will receive securities under the Plan. Section 1145 of the Bankruptcy Code creates certain exemptions from the registration and licensing requirements of Federal and State securities laws with respect to the distribution of securities pursuant to a plan of reorganization.

### A.   Issuance of Securities Under the Plan

Section 1145 of the Bankruptcy Code exempts the issuance of securities under a plan of reorganization from registration under the Securities Act of 1933, as amended (the "Securities Act"), and under State securities laws if three principal requirements are satisfied: (i) the securities must be issued under a plan of reorganization by the debtor or its successor under a plan or an affiliate participating in a joint plan of reorganization with the debtor, (ii) the recipients of the securities must hold a claim against the debtor, an interest in the debtor or a claim for an administrative expense against the debtor and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property. Although the issuance of the New Coram Stock under the Plan satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and is, therefore, exempt from registration under the Securities Act and State securities laws, under certain circumstances subsequent transfers of such securities may be subject to registration requirements under these laws. Reorganized Coram does not presently intend to file a registration statement under the Securities Act with respect to any New Coram Stock issued pursuant to the Plan.

65

B.    Transfer of New Coram Stock

          The securities to be issued pursuant to the Plan may not be freely transferred. As a condition precedent to the Effectiveness of the Plan, each member of Class CHC 3 (Allowed Note Claims) must execute the Shareholder Agreement in the form included in the Plan Supplement. The purpose of the Shareholder Agreement is to prevent any of the holders of Allowed Note Claims who receive New Coram Stock from transferring such stock such that it is held, directly or indirectly, by a physician or family member of a physician, unless indirectly owned by a physician through a publicly-traded company with stockholder equity in excess of $75 million. The purpose of these restrictions is to ensure that Reorganized Coram will remain in compliance with the Stark II law. See discussion at section XII, above..

          Resales and subsequent transactions in the new securities are exempt from registration under federal and state laws, unless the holder is an "underwriter" with respect to such securities. Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

          (i)  persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

          (ii) persons who offer to sell securities offered under a plan for the holders of such securities;

          (iii) persons who offered to buy such securities for the holders of such securities, if the offer to buy is made (a) with a view to distributing such securities or (b) under a distribution agreement; and

          (iv) a person who is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(11) of the Securities Act.

          Under section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

          To the extent that persons deemed to be "underwriters" receive securities pursuant to the Plan, resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be "underwriters," however, may be able to sell such securities without registration, subject to the provisions of Rule 144 or Rule 148 under the Securities Act, both of which permit the public sale of securities received pursuant to the Plan by "underwriters," subject to the availability to the public of current information regarding the issuer and to volume limitations and certain other conditions.

# EXHIBIT G

This document is not currently available.
Debtors will supply the document when it becomes available.

Whether or not any particular person would be deemed to be an "underwriter" with respect to any security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any person would be an "underwriter" with respect to any security to be issued pursuant to the Plan.

DUE TO THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE NEW CORAM STOCK TO BE DISTRIBUTED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE NEW CORAM STOCK CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY TRADE SUCH SECURITIES FREELY.

C.    Certain Transactions by Stockbrokers

Under section 1145(a)(4) of the Bankruptcy Code, stockbrokers are required to deliver a copy of the Disclosure Statement (and supplements hereto, if any, if ordered by the Bankruptcy Court) at or before the time of delivery of securities issued under the Plan to their customers for the first 40 days after the Effective Date. This requirement specifically applies to trading and other aftermarket transactions in such securities.

D.    Additional Information

CHC is presently subject to the information requirements of the 34 Act, and, in accordance therewith, files reports and other information with the Securities and Exchange Commission. Such reports and other information so filed can be inspected and copied at the Public Reference Room of the Securities and Exchange Commission at Judiciary Plaza, 450 Fifth Street, N.W., Washington D.C. 20549 and at the public reference facilities maintained by the Securities and Exchange Commission at 7 World Trade Center, New York, New York 10048 and Northwestern Atrium Center, Suite 1400, 500 West Madison Street, Chicago, Illinois 60661. Copies of such materials can also be obtained at prescribed rates from the Public Reference Section of the Securities and Exchange Commission at 450 Fifth Street, N.W., Washington, D.C. 20549.

Any statements contained herein concerning the provisions of any document are not necessarily complete and, in each instance, reference is made to the copy of such document for the full text thereof. Each such statement is qualified in its entirety by such reference. Certain documents referred to herein have not been attached as exhibits because of the impracticability of furnishing copies thereof to all of the Debtors' creditors. All of the exhibits and schedules to the Plan and this Disclosure Statement, and all other documents referred to

67

herein, are available for inspection at the offices of the Debtors located at 1125 Seventeenth Street, Suite 2100, Denver, California, 80202, and any other location designated by the Debtors.

## XVI.  VOTING AND CONFIRMATION OF THE PLAN

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims and Allowed Interests in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Debtors have complied with applicable provisions of the Bankruptcy Code; (iv) the Debtors have proposed the Plan in good faith and not by any means forbidden by law; (v) the disclosure required by section 1125 of the Bankruptcy Code has been made; (vi) the Plan has been accepted by the requisite votes of creditors (except to the extent that "cramdown" is available under section 1129(b) of the Bankruptcy Code); (vii) the Plan is feasible and Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of Coram; (viii) the Plan is in the "best interests" of all holders of Claims or Allowed Interests in an impaired Class by providing to such holders, on account of their Claims or Allowed Interests, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a liquidation under Chapter 7 of the Bankruptcy Code, unless each holder of a Claim or Allowed Interest in such Class has accepted the Plan; (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date; and (x) the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time prior to Confirmation pursuant to sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtors have obligated themselves to provide such benefits.

The Debtors believe that each of these requirements have been or will be met and will seek rulings from the Bankruptcy Court to this effect at the Confirmation Hearing.

### A.    Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only Classes of Claims and Allowed Interests that are "impaired," within the meaning of section 1124 of the Bankruptcy Code, under the Plan are entitled to vote to accept or reject the Plan.  A Class is impaired if the legal, equitable or contractual rights to which the Claims or Allowed Interests of that Class entitle the holders of such Claims or Allowed Interests are modified, other than by curing defaults and reinstating the debt or by payment in full in cash.

The Plan divides creditors and equity holders of the Debtors into various Classes and provides separate treatment for each Class.  Under the Plan, only holders of Claims, which are Allowed Claims as if the Confirmation Date, in impaired Classes receiving distributions

68

under the Plan are entitled to vote to accept or reject the Plan.  Classes CHC 2, CHC 3, and Coram 2 are impaired under the Plan and will, or may, receive distributions under the Plan.  The Debtor will therefore solicit votes from holders of Claims in those Classes.   Holders of Allowed Interests in Classes CHC 4 and Coram 4 will receive no distributions under the Plan and are not entitled to vote on the Plan.  The classification of Claims and Allowed Interests is summarized in "Overview of the Plan -- Summary of Classes and Treatment" and discussed in detail in "General Information Regarding The Plan -- Classification and Treatment of Claims and Allowed Interests."   Additional information regarding voting is contained in the instructions accompanying the Ballots.

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may estimate and temporarily allow a Claim for the purpose of voting on the Plan.  The Debtors may seek an order of the Bankruptcy Court temporarily allowing, for voting purposes only, certain Disputed Claims. See "Provisions Covering Distributions Under the Plan - - Disputed Claims."

**VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN IS IMPORTANT.  IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS, YOU MAY RECEIVE MORE THAN ONE BALLOT.  YOU SHOULD COMPLETE, SIGN AND RETURN EACH BALLOT YOU RECEIVE. PLEASE FOLLOW CAREFULLY THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT.**

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED BY 5:00 P.M., NEW YORK TIME, ON _____, ___, 2000, AT THE ADDRESS SET FORTH ON THE ENCLOSED PRE-ADDRESSED ENVELOPE.  IT IS OF THE UTMOST IMPORTANCE TO THE DEBTORS THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.  THE DEBTORS SUPPORT THE PLAN AND ENCOURAGE YOU TO VOTE IN FAVOR OF THE PLAN.**

**VOTES CANNOT BE TRANSMITTED ORALLY.  ACCORDINGLY, YOU ARE URGED TO RETURN YOUR SIGNED AND COMPLETED BALLOT PROMPTLY.**

**IF ANY OF THE CLASSES OF IMPAIRED CLAIMS VOTE TO REJECT THE PLAN, THE DEBTORS SHALL SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AND, IF REQUIRED, SHALL AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION.**

**IF YOU HAVE A CLAIM THAT IS IMPAIRED UNDER THE PLAN AND YOU ARE ENTITLED TO VOTE, BUT YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT OR LOST YOUR BALLOT, OR IF YOU HAVE**

ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT OR THE PLAN, PLEASE CONTACT THE DEBTORS' SOLICITATION AGENT, [NAME], AT _____.

**B.    Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing regarding whether the Plan and Debtor have fulfilled the Confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for _____ __, 2000 at [2:00] [p].m. before the Honorable [_____], United States [District/ Bankruptcy] Judge at the United States [District/Bankruptcy] Court, District of Delaware, [844 King Street], Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement in court at the Confirmation Hearing of the date to which the Confirmation Hearing has been adjourned.

**C.    Confirmation**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. See "Voting and Confirmation."

**D.    Acceptance or Cramdown**

A plan is accepted by an impaired class of Claims if holders of at least two-thirds ($\frac{2}{3}$) in dollar amount and more than one-half ($\frac{1}{2}$) in number of Claims of that Class vote to accept the plan. Only those holders of Claims who actually vote count in these tabulations.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a Claim in an impaired Class or that the plan otherwise be found by the Bankruptcy Court to be in the "best interests" of each holder of a Claim or Allowed Interest in such Class. See "Voting and Confirmation of the Plan -- Best Interests Test." In addition, each impaired class must accept the Plan for the Plan to be confirmed without application of the "cramdown" provisions in section 1129(b) of the Bankruptcy Code discussed below.

The Bankruptcy Code contains provisions authorizing the Confirmation of the Plan even if it is not accepted by all impaired classes, as long as at least one impaired Class of Claims (without including any acceptance of the Plan by any insider) has accepted it. These "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code. The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements

of section 1129 of the Bankruptcy Code, it (i) is "fair and equitable" and (ii) "does not discriminate unfairly" with respect to each Class of Claims or Allowed Interests that is impaired under, and has not accepted, the Plan. The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured Class of Claims or a Class of Allowed Interests receives full compensation for its allowed Claims or Allowed Interests, no holder of Claims or Allowed Interests in any junior Class may receive or retain any property on account of such Claims. With respect to a dissenting class of secured Claims, the "fair and equitable" standard is met if holders either (i) retain their liens and receive deferred cash payments with a value as of the Plan's Effective Date equal to the value of their interest in property of the Estate or (ii) otherwise receive the indubitable equivalent of their secured Claims. The "fair and equitable" standard has also been interpreted to prohibit any Class senior to a dissenting Class from receiving under a Plan 100% of its Allowed Claims. The requirement that a Plan not "discriminate unfairly" means, among other things, that a dissenting Class must not be treated dissimilarly with respect to other classes of equal rank.

In view of the treatment proposed for such Classes and the "absolute priority" model adopted by the Debtors, the Debtors believe that, if necessary, the Plan may be crammed down over the dissent of any of the Classes in the Plan, (other than Class CHC 3 if Class CHC 2 rejects the Plan). If necessary and appropriate, the Debtors intend to amend the Plan to permit cramdown of dissenting Classes of Claims.

The Debtor believes that the treatment under the Plan of Holders of Allowed Interests in Classes CHC 4 and Coram 4 will satisfy the "fair and equitable" test because, although no distribution will be made in respect of Allowed Interests, no Class junior to such non-accepting Class will receive or retain any property under the Plan. In addition, the Debtors believe that the treatment accorded the holders of Secured Claims under the Plan is both fair and equitable, leaves such holders unimpaired with respect to the portions of their Claims that are Secured Claims, and specifically meets the requirements of section 1129(b) of the Bankruptcy Code. Accordingly, if Class CHC 1 or Coram 1 fail to accept the Plan, the Debtors believe that the Plan nevertheless will be confirmed as to the Secured Claims under the cramdown provisions of section 1129(b) of the Bankruptcy Code. The Debtors also believe that the treatment accorded the holders of Allowed CHC General Unsecured Claims, Allowed Coram Note Claims, and Allowed Coram General Unsecured Claims (which are unimpaired) under the Plan does not discriminate unfairly, is fair and equitable and specifically meets the requirements of section 1129(b) of the Bankruptcy Code (i.e., junior classes receive no recovery on account of their junior interests). Accordingly, if any Class other than Class CHC 3 fails to accept the Plan (and irrespective of Class CHC 3 if Class CHC 2 accepts the Plan), the Debtors believe that the Plan nevertheless will be confirmed under the cramdown provisions of section 1129(b) of the Bankruptcy Code.

In the event that any Class votes to reject the Plan, the Debtors intend to use the consents obtained from other Classes to confirm the Plan over the dissent of these Classes and, in this regard, the Plan specifically requests that the Bankruptcy Court confirm the Plan notwithstanding the dissent of any impaired Class of Claims.

71

Subject to the conditions set forth in the Plan, a determination by the Bankruptcy Court that the Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code will not limit or affect the Debtor's ability to modify the Plan to satisfy the confirmation requirements of section 1129 of the Bankruptcy Code.

E.    Best Interests Test

The "best interests" test requires that the bankruptcy court find either that all members of each impaired class have accepted the plan, or that each holder of an allowed claim or interest of each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that the holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on that date.

To calculate what holders of Claims would receive if the Debtors were hypothetically liquidated under chapter 7 of the Bankruptcy Code, the Court must first determine the dollar amount that would be realized from the liquidation (the "Liquidation Fund") of the Debtors. The Liquidation Fund would consist of the net proceeds from the disposition of the Debtors' assets (after satisfaction of all valid liens) augmented by the Cash held by the Debtors and recoveries on actions against third parties, if any. The Liquidation Fund would then be reduced by the costs of the liquidation. The costs of liquidation under chapter 7 would include the fees and expenses of a trustee, as well as those of counsel and other professionals that might be retained by the trustee, selling expenses, any unpaid expenses incurred by the Debtors during their cases (such as fees for attorneys, financial advisors and accountants) which would be allowed in the chapter 7 proceeding, interest expense on secured debt and claims incurred by the Debtor during the pendency of the case. These claims would be paid in full out of the Liquidation Fund before the balance of the Liquidation Fund, if any, would be made available to holders of unsecured Claims. In addition, other claims which would arise upon conversion to a chapter 7 case (e.g., damage claims for termination of contracts, including real property leases assumed in the chapter 11 Cases and executory contracts entered into during the chapter 11 Cases, and the costs of lengthy litigation related to certain of these claims) would dilute the balance of the Liquidation Fund available to holders of Claims. Moreover, additional claims against the Debtors' estates would arise as the result of the establishment of a new bar date for the filing of claims in chapter 7 cases for the Debtors. The present value of the distributions out of the Liquidation Fund (after deducting the amounts described above) are then compared with the present value of the property offered to each of the Classes of Claims and Holders of Interests under the Plan to determine if the Plan is in the best interests of each holder of a Claim.

The Debtors believe that a chapter 7 liquidation of the Debtors' remaining assets would result in diminution in the value to be realized under the Plan by holders of Claims. That belief is based upon, among other factors: (a) the additional administrative expenses involved in the appointment of a trustee, attorneys, accountants, and other chapter 7 professionals; (b) the substantial time which would elapse before creditors would receive any distribution in respect of

72

their Claims due to a trustee's need to become familiar with the Reorganization Cases and the Debtors' books and records, and his duty to conduct his own investigations; (c) the additional unsecured Claims that may be asserted against the Debtors; (d) the substantial cost and delay which can be avoided by a largely consensual plan; (e) the potential for lower returns on the Debtors' assets in a chapter 7 proceeding, as compared to the value of such assets to Reorganized Coram; (f) the disruption related to a change in management and other personnel, including the time and resources needed to train replacement managers and employees; (g) turmoil in the enormous and complex record keeping and information systems involved in the Debtors' business; and (h) the potential for diminished recoveries on any causes of action of the Debtors, given the potential difficulties in managing related legal actions and marshaling and presenting required evidence without the presence of any members of the Debtors prior management.

The Debtors' liquidation analysis is annexed hereto as Exhibit E.

## F.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). For purposes of determining whether the Plan meets this requirement, the Debtors' management analyzed the Reorganized Debtors' future prospects and its ability to meet its respective obligations under the Plan. The Debtors have analyzed their ability to meet their obligations under the Plan and have prepared for Reorganized Coram (the "Projections") for the years ending December 31, 2000 through December 31, 2004. The Projections, and the significant assumption upon which they are based, are included in sections VIII.C. and XVII, below. Based on the Projections, the Debtors believe that Confirmation is not likely to be followed by the liquidation or further financial reorganization of the Reorganized Debtors, or any of them.

The Projections include:

(a)    Significant Assumptions;

(b)    Projected Pro Forma Consolidated Balance Sheets;

(c)    Projected Pro Forma Consolidated Statements of Operations

(d)    Projected Pro Forma Consolidated Statements of Cash Flows; and

(e)    Projected Pro Forma Capitalization.

The Projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and that the Effective Date of the Plan will be no later than December 29,