2000. Based upon the Projections, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Debtors.

### G.    Compliance with the Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. During the course of management analyses leading to the formulation of the Plan, various legal issues were raised. The Debtors have considered each of these issues in the development of the Plan and believe that the Plan complies with all applicable provisions of the Bankruptcy Code.

### H.    Alternatives to Confirmation and Consummation of the Plan

The Debtors have evaluated alternatives to the Plan, including alternative Plan structures and terms; including the sale of the Debtors' subsidiaries as a going concern, either as a whole or on a breakup basis; the liquidation of Coram; and delaying the adoption of any plan of reorganization. The Debtors have concluded that the Plan is the best alternative and will maximize recoveries by holders of Allowed Claims. If the Plan is not confirmed, the Debtors or, subject to further determination by the Bankruptcy Court as to an extension of the Debtors' exclusivity periods under the Bankruptcy Code, any other party-in-interest could attempt to formulate and propose a different plan or plans of reorganization. However, for the reasons discussed in sections III.C. and XII above, the Debtors believe that if their plan is not confirmed by or before December 29, 2000, the value that might be realized by holders of allowed claims will be dramatically lower under any alternative scenario, including liquidation. Further, if no plan of reorganization can be confirmed the Debtors' Chapter 11 cases may be converted to a chapter 7 case or the Debtors may otherwise be liquidated pursuant to a liquidating plan of reorganization under Chapter 11. In a liquidation case under Chapter 7, the proceeds of the liquidation would be distributed to the respective creditors of the Debtors in accordance with the priorities established by the Bankruptcy Code and contractual priorities, and, the Debtors believe holders of Allowed Claims other than holders of Allowed Administrative and other Priority Claims, would receive no material distributions whatsoever. Accordingly, the Debtors believe that Confirmation and consummation of the Plan is preferable to any alternatives described above.

74

# XVII. PROJECTIONS

**A.    Purpose of the Projections**

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of Reorganized Coram. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management has analyzed the ability of the Debtors' to meet their obligations under the Plan. Toward this end, the Debtors have developed business plans and Projections of earnings, cash flows and financial position for the four year period beginning January 1, 2001.

The Projections, annexed hereto as Exhibit D, should be read in conjunction with the assumptions, qualifications, and the footnotes to tables containing the Projections set forth herein, the historical consolidated financial information (including the notes and schedules thereto) and the other information set forth in the Annual Report on Form 10-K and the Quarterly Report of Form 10-Q annexed hereto as Exhibits B and C, respectively, the full texts of which are incorporated herein by reference. The Projections were prepared in good faith based upon assumptions believed to be reasonable and applied in a manner consistent with past practice.

**The Projections Were Not Prepared with a View to Complying with the Guidelines for Prospective Financial Statements Published by the American Institute of Certified Public Accountants. The Debtors' Independent Accountants Have Not Compiled or Examined the Accompanying Prospective Financial Information to Determine the Reasonableness Thereof and, Accordingly, Have Not Expressed Any Opinion or Any Other Form of Assurance with Respect Thereto.**

**The Debtors Do Not, as a Matter of Course, Publish Their Business Plans and Strategies or Projections of Their Anticipated Financial Position, Results of Operations or Cash Flows. Accordingly, the Debtors Do Not Intend, and Disclaim, Any Obligation to (A) Furnish Updated Business Plans or Projections to Holders of Claims or Equity Interests Prior to the Effective Date or to Holders of New Coram Stock or Any Other Party after the Effective Date, (B) Include Such Updated Information in Any Documents Which May Be Required to Be Filed with the SEC, or (C) Otherwise Make Such Updated Information Publicly Available.**

**The Projections Provided in the Disclosure Statement Have Been Prepared by the Debtors' Management. These Projections, While Presented with Numerical Specificity, Are Necessarily Based upon a Variety of Estimates and Assumptions, Which, Though Considered Reasonable by Management, May Not Be Realized, and Are Inherently Subject to Significant Business, Economic and Competitive Uncertainties and Contingencies, Many of Which Are Beyond Control. The Debtors Caution That No Representations Can Be Made as to the Accuracy of These Financial Projections or to the**

A632

Ability of Reorganized Coram to Achieve the Projected Results. Some Assumptions Inevitably Will Not Materialize, and Events and Circumstances Occurring Subsequent to the Date on Which These Projections Were Prepared May Be Different from Those Assume, or May Be Unanticipated and Thus May Affect Financial Results in a Material and Possibly Adverse Manner. The Projections, Therefore, May Not Be Relied upon as a Guaranty or Other Assurance of the Actual Results That Will Occur.

B.    Summary of Significant Assumptions

1.    Effective Date and Plan Terms.

The Projections assume an Effective Date of no later than December 29, 2000, with Allowed Claims and Allowed Equity Interests treated in accordance with the treatment provided in the Plan with respect to such Allowed Claims and Allowed Equity Interests. The Projections consider the ongoing operations of Reorganized Coram and its proposed plan for managing its operations. With respect to the expenses incurred as a result of the Chapter 11 Cases, management has assumed that the Debtors will confirm a Chapter 11 Plan of Reorganization and emerge from Bankruptcy by December 29, 2000. If Reorganized Coram does not emerge from Chapter 11 by December 29, 2000, the Debtors' may be unable to confirm the Plan in the form presently proposed, may have to revise their Projections, and incur additional bankruptcy expenses because, among other reasons, the Debtors may no longer be in compliance with Stark II. See Section XII "Discussion of Stark II Issues." In such event, their will likely be a significant impact on Coram's operations and cash flows.

2.    Reorganized Coram's Business

Reorganized Coram (including its subsidiaries) will continue to operate its core alternate site infusion therapy business. All major management decisions concerning capital expenditures, marketing, human resource policies and other matters will be made centrally from Reorganized Coram's executive offices in Denver, Colorado.

C.    Reorganization Value

The Debtors have been advised by Chanin Capital Partners, their financial advisor, with respect to the reorganization value of Reorganized Coram. Solely for purposes of the Plan, the reorganization value of Reorganized Coram was assumed by the Debtors, based upon advice from Chanin Capital Partners, to be approximately $[207] million plus the amount of Reorganized Coram's ordinary course accounts payable and similar obligations for Reorganized Coram based upon an assumed Effective Date of December 29, 2000.

THE ASSUMED REORGANIZATION VALUE AS OF JANUARY 1, 2001, REFLECTS WORK PERFORMED BY CHANIN CAPITAL PARTNERS ON THE BASIS OF

76

INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO CHANIN CAPITAL PARTNERS AS OF AUGUST 2000.  NEITHER THE DEBTORS NOR CHANIN CAPITAL PARTNERS HAS UPDATED THE ESTIMATED RANGE OF THE REORGANIZATION ENTERPRISE VALUE TO REFLECT INFORMATION AVAILABLE TO THE DEBTORS OR CHANIN CAPITAL PARTNERS SUBSEQUENT TO AUGUST 2000.

Based upon the assumed reorganization enterprise value of Reorganized Coram, the Debtors have employed an imputed estimate of the reorganization equity value for Reorganized Coram of approximately $29 million, or approximately $2.90 per share of New Coram Stock (based upon an assumed distribution of ten million (10,000,000) shares of New Coram Stock under the Plan and an aggregate amount of zero (0) shares outstanding upon completion of such distribution).

The foregoing estimates of the reorganization value of Reorganized Coram are based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of the Reorganized Coram's business plan, the achievement of the forecasts reflected in the Projections, expected market conditions as of January 2001, and the Plan becoming effective in accordance with its terms, on a basis consistent with the estimates and other assumptions discussed herein.

IN ESTIMATING THE REORGANIZATION VALUE OF REORGANIZED CORAM, CHANIN CAPITAL PARTNERS:   (I) REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS FOR RECENT YEARS AND INTERIM PERIODS; (II) REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF THE DEBTORS INCLUDING FINANCIAL PROJECTIONS, PREPARED AND PROVIDED BY MANAGEMENT RELATING TO ITS BUSINESS AND ITS PROSPECTS; (III) MET WITH CERTAIN MEMBERS OF SENIOR MANAGEMENT OF THE DEBTORS TO DISCUSS THEIR OPERATIONS AND FUTURE PROSPECTS; (IV) REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUES OF PUBLIC COMPANIES WHICH CHANIN CAPITAL PARTNERS DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESS OF THE DEBTORS; (V) CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESS; AND (VI) REVIEWED CERTAIN ANALYSES PREPARED BY OTHER FIRMS RETAINED BY THE DEBTORS AND CONDUCTED SUCH OTHER STUDIES, ANALYSES INQUIRIES, AND INVESTIGATIONS AS IT DEEMED APPROPRIATE.  ALTHOUGH CHANIN CAPITAL PARTNERS CONDUCTED A REVIEW AND ANALYSES OF THE DEBTORS' BUSINESS, OPERATING ASSETS AND LIABILITIES AND REORGANIZED CORAM'S BUSINESS PLANS, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL (I) FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTORS AND BY OTHER FIRMS RETAINED BY THE DEBTORS, AND (II) PUBLICLY AVAILABLE INFORMATION.   IN ADDITION, CHANIN CAPITAL PARTNERS DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE, AND NO INDEPENDENT

VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

ESTIMATES OF THE REORGANIZATION VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES WHICH MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

IN THE CASE OF REORGANIZED CORAM, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY CHANIN CAPITAL PARTNERS REPRESENT THE HYPOTHETICAL REORGANIZATION ENTERPRISE VALUE OF REORGANIZED CORAM. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF A PLAN OF REORGANIZATION AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF REORGANIZED CORAM THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT, AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF REORGANIZED CORAM SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, CHANIN CAPITAL PARTNERS, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR ITS ACCURACY. IN ADDITION, THE VALUATION OF NEWLY-ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET VALUES OF SUCH SECURITIES WILL NOT ONLY DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES, BUT ALSO THE TRADING AND OWNERSHIP RESTRICTIONS NECESSITATED BY THE PROVISIONS OF STARK II, WHICH MAY REMAIN IN EFFECT FOR AN INDEFINITE PERIOD OF TIME.

THE ESTIMATES OF THE REORGANIZATION VALUE DETERMINED BY CHANIN CAPITAL PARTNERS REPRESENT ESTIMATED REORGANIZATION VALUES AND DO

NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF REORGANIZED CORAM ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR REORGANIZED CORAM ASSOCIATED WITH CHANIN CAPITAL PARTNERS' VALUATION ANALYSIS.

A636

## XVIII. RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Confirmation and consummation of the Plan is the best means available to provide the greatest level of recovery to creditors in accordance with their legal and contractual rights. Consequently, the Debtors urge all holders of Allowed Claims to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before 5:00 p.m., New York Time, on September, __, 2000.

Dated: August 8, 2000

CORAM HEALTHCARE CORP.

By: _Allen J. Marabito_
Name:    Allen J. Marabito
Its:       Executive Vice President

CORAM INC

By: _Allen J. Marabito_
Name:    Allen J. Marabito
Its:       President

Counsel:

PACHULSKI, STANG, ZIEHL,
   YOUNG & JONES, P.C.
Laura Davis Jones
919 North Market Street, Suite 1600
Wilmington, Delaware 19801
(302) 652-4100

- and -

KASOWITZ, BENSON, TORRES
   & FRIEDMAN LLP
David M. Friedman
Adam L. Shiff
Robert M. Novick
1301 Avenue of the Americas
New York, New York 10019
(212) 506-1700

CO-COUNSEL TO DEBTORS AND
DEBTORS-IN-POSSESSION

AUG-30-2000  14:06   ALTHEIMER & GRAY-CHICAGO   312 715 4800   P.01/16

LAW OFFICES
**ALTHEIMER & GRAY**

WRITER'S DIRECT DIAL
(312) 715-4000
REL FAX: (312) 715-4800

E-mail: rlevy@Altheimer.com (office)
RFLevy@AOL.com (home)

10 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606-7482
MAIN TEL: (312) 715-4000
A&G MAIN FAX: (312) 715-4800

RUSH

**MULTI-TELECOPY COVER PAGE**

FROM: RICHARD F. LEVY   USER #: 0093 DATE: August 30, 2000
COMMENTS:
MATERIAL BEING TELECOPIED:   Motion for Appointment   NUMBER OF PAGES : 16
ORIGINAL DOCUMENTS:   ___ WILL   X  WILL NOT   FOLLOW BY MAIL
IF THERE ARE ANY TRANSMISSION PROBLEMS, PLEASE CALL: (312) 715-4846 (or DURING EVENING
AND WEEKENDS: (312) 715-4787). FOR RETURN TELECOPIES CALL:   (312) 715-4800

SENT BY:   A&G CLIENT NUMBER: 64202.00.0001
THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN
INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF
THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION OR DISTRIBUTION OF THIS
COMMUNICATION TO OTHER THAN THE INTENDED RECIPIENT IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION
IN ERROR, PLEASE NOTIFY US IMMEDIATELY, CALL US COLLECT AT 312-715-4000, EXT. 4846 AND RETURN THE ORIGINAL MESSAGE TO
US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

**DISTRIBUTION LIST**

| Name | Contact | Phone | Fax |
|---|---|---|---|
| 1)<br>Andrew & Jerome Blank<br>JB Capital Management | Shelly Marciano | (305) 670-2277 x-230 | (305) 670-2220 |
| 2)<br>Richard Haydon | | (212) 247-8507 | (212) 265-6539 |
| 3)<br>F. Philip Handy | Kaye Charlton | (407) 644-9706 | (407) 628-2307 |
| 4)<br>Harry Heller Falk<br>Harvey Heller<br>Heller Family Limited Partnership;<br>RHH Company | | (407) 656-2124 | (407) 656-1751 |
| 5)<br>Ann and Robert H. Lurie<br>Foundation; Mark Slazak | Jean Rueggegoor | (312) 466-3172 | (312) 466-3700 |
| 6)<br>Sometock LLC | Joe Paolucci | (312) 466-3886 | (312) 454-0335 |
| 7)<br>Jackson Square Partners<br>Jackson Square Management<br>Bernard Osher Trust; Wil K. Weinstein<br>Rev. Trust; Peter Imber; Scott Dalton;<br>Michiko Baldridge; Jeanmaire Weinstein;<br>AEOW '90, LLC | Michiko Baldridge | (415) 677-1621<br>Main: (415) 677-1590 or -1500 | (415) 956-4126 |
| 8)<br>Bedford Oak Partners<br>Bedford Oak Advisors<br>Harvey Eisen | Dennis Javer | 914/242-5701 | (914) 242-5798 |

KFLEVY 1 - AUG '00 11:06 AM)


EXHIBIT
# 8
7/14-07

JSP 01958



ALTHEIMER
&GRAY

### DISTRIBUTION LIST CORAM 13D SHAREHOLDERS

| Name | Contact | Phone | Fax |
|---|---|---|---|
| 1)<br>Andrew & Jerome Blank<br>JD Capital Management | Shelly Marciano | (305) 670-2277  x-230 | (305) 670-2220 |
| 2)<br>Richard Haydon | | (212) 247-6507 | (212) 265-6839 |
| 3)<br>F. Philip Handy | Kaye Charlton | (407) 644-9796 | (407) 628-2307 |
| 4)<br>Harry Heller Falk<br>Harvey Heller<br>Heller Family Limited Partnership;<br>RHH Company | | (407) 656-2124 | (407) 656-1751 |
| 5)<br>Ann and Robert H. Lurie<br>Foundation; Mark Slezak | Jean Ruegsegger | (312) 466-3122 | (312) 466-3700 |
| 6)<br>Samstock LLC | Joe Paolucci | (312) 466-3885 | (312) 454-0335 |
| 7)<br>Jackson Square Partners<br>Jackson Square Management<br>Bernard Osher Trust; Will K. Weinstein<br>Rev. Trust; Peter Imber; Scott Dalton;<br>Michiko Baldridge; Jeanmarie Weinstein;<br>AEOW '98, LLC | Michiko Baldridge | (415) 677-1621<br>Main: (415) 677-1500 or -1500 | (415) 956-4126 |
| 8)<br>Bedford Oak Partners<br>Bedford Oak Advisors<br>Harvey Eisen | Dennis Juver | 914/242-6701 | (914) 242-5798 |

(LL52810.3 - 6:00PM  10:02.4)CHICAGO  WARSAW  PRAGUE  KYIV  BRATISLAVA  ISTANBUL  SHANGHAI

JSP 01960

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------x
                                           :     Chapter 11
    In re                                  :
                                           :     Case Nos.: 00-3299
    CORAM HEALTHCARE CORP.                 :     through 00-3300
                                           :
        -and-                              :     Jointly Administered
                                           :
    CORAM, INC.,                           :
                                           :
                          Debtors.         :
-------------------------------------------x

## MEMORANDUM IN SUPPORT OF MOTION FOR APPOINTMENT OF EQUITY SECURITY HOLDERS COMMITTEE

### Introduction

The shareholders of Debtor Coram Healthcare Corporation ("Coram" or "Debtor")

("Movants"), by their attorneys, hereby submit this memorandum in support of their Motion for

Appointment of Equity Security Holders Committee in the above captioned cases.

In sum, the grounds for the motion are:

1.    The proposed Plan of Reorganization would wipe out existing equity.

    •    The only relief sought by Coram in these proceedings is a restructuring of
         its balance sheet in a fashion that will (i) "extinguish all existing equity
         interests" of Coram's public shareholders, while (ii) transferring
         substantially all of that equity to the "Noteholder Group," Debtor's
         subordinated unsecured debtholders.[1]

2.    Coram is far from "hopelessly insolvent."

---

[1]. The Noteholder Group consists of Cerebus Partners L.P., Foothill Capital Corporation, and Goldman Sachs Credit Partners, L.P.

JSP 01961

A640

• On the contrary, public statements and quarterly financial statements filed with the SEC indicate the likelihood of substantial equity. On the day these proceedings were filed, the CEO told a conference call audience, "this company is dynamite. We are perfectly positioned to do really big, exciting things."[2]

• Moreover, even the investment banker retained by the Debtor estimates that the reorganization value is 82% of the amount of the debt. Given that the investment banker was (1) retained specifically by the Debtor to defend the proposed Plan of Reorganization, (2) based its estimated valuation solely on the financial information and projections supplied by the Debtor without testing that information for accuracy and (3) provided its estimate only with numerous hedges, qualifications and caveats, it is likely that an independent expert will come to a far different estimate of value.

• The valuation of the Debtor has never been tested in the market place. The Debtor has made no effort to sell the enterprise free of debt. To the extent that the stock market reflects value, it shows that the public continues to believe that shares of Debtor do in fact have some value.

3.     Coram's Board is conflicted and incapable of acting for the shareholders.

• Dan Crowley, Coram's Chairman and CEO, currently receives fees as a consultant to Cerebus, one of the three members of the Noteholder Group. In addition, if the proposed plan is adopted, Crowley will received a restructuring bonus on confirmation of $1.8 million and will become entitled to performance bonuses of many millions of dollars.

• Until very recently, a representative of the Noteholder Group, Mr. Stephen A. Feinberg, also served on the Board. While Mr. Feinberg resigned in order to minimize the appearance of conflict of interest, he was on the Board during the period in which, according to Debtor's own records, negotiations were being held between the Debtor and the Noteholder Group.

• The proposed plan, which extinguishes all existing equity interests, was devised prior to the Petition Date in negotiations between Crowley and

---

[2]  See Transcript of August 8, 2000 conference call, at pg. 5, attached hereto as Exhibit "A."

2

JSP 01962

**A641**

members of the Noteholder Group.[3] The existing equity holders, despite numerous requests, were systematically excluded from all discussions concerning restructuring.

Movants submit that these facts demonstrate that the appointment of an equity committee is not only appropriate but necessary to protect the real rights and interests of all of the nearly 5000 Coram shareholders of record, both the approximately 28% in interest set forth on Schedule 1 attached to the Motion and the 72% in interest who are not currently represented. Movants originally made a request for the appointment of such a committee to the United States Trustee on August 9, the day after these proceedings were filed. The Trustee has not acted on this request as of August 28, 2000, but acknowledged the Trustee's understanding that Movants may need to proceed.

Movants ask that this Court nonetheless recognize that under the circumstances here the costs of such a committee are inconsequential to this enterprise, particularly in view of the draconian relief – the entire elimination of all of the publicly held equity – sought by Debtor. Movants also urge this Court to rule expeditiously on this motion, since the Debtor has stated that the Plan must be confirmed no later than December 31, 2000.

### Factual Background

#### 1. The Debtor and the Plan

Coram is a publicly traded corporation with 4850 record shareholders. (Coram Form 10-K, filed March 30, 2000, p. 18.) Movants hold approximately 28% of the issued and outstanding common stock of Coram. On August 8, 2000, Coram (and its subsidiary Coram, Inc.) filed

---

[3] 10-Q filed August 21, 2000, p. 18

3

JSP 01963

**A642**

petitions for relief under Chapter 11 of the United States Bankruptcy Code ("Petition or Petitions").

Concurrent with the filing of their Chapter 11 Petitions, the Debtors submitted a proposed plan of reorganization (the "Plan"). The proposed Plan would cancel the equity interests of the existing Coram shareholders. All of the equity in the reorganized Debtor (except for equity interests to be issued to company management) will be issued to the three holders of existing notes (the Noteholder Group) who will be converting a portion of the debt (approximately 28%) into the equity of the reorganized Debtor. (Under the Plan, the remainder of the existing debt -- approximately $180 million -- owed to the Noteholder Group will be retained as debt of the reorganized Debtor and will be guaranteed by the Debtor's subsidiaries and secured by all the assets of the reorganized Debtor and its subsidiaries.)[4]

### II. Pre Petition Events

The Debtors assert that the proposed plan is the product of "many hours of hard work and negotiations." (Letter attached to Disclosure Statement, Docket No. 35). Whatever the truth of that statement, there were in fact no negotiations or discussions whatsoever with the shareholders or their representatives regarding Coram's capital restructuring prior to filing of the Petition.

This lack of interface with the shareholders was not due to any lack of interest on the part of the shareholders. After Coram's prior SEC filings disclosed in May of this year that the

---

[4] The business operations of the Debtor are performed by operating subsidiaries of the Debtor which did not file bankruptcy petitions. Thus, these bankruptcy cases will not involve any operational restructuring of the Debtor, and will only involve a reorganization of the Debtor's capital structure.

4

JSP 01964

Debtors contemplated a form of financial restructuring in which existing common stock interests would be diluted (but neither described the specifics of such restructuring nor indicated that the existing shareholders equity interests wold be extinguished rather than merely diluted) (Coram Healthcare Press Release, dated May 10, 2000), certain of the shareholder Movants herein sought to meet with management and the Board of Directors of Coram to discuss any contemplated financial restructuring. However, neither management nor the Board was willing to meet with the shareholders or their representatives or even to discuss restructuring issues prior to the filing of the Petition. The shareholders of Coram first learned that Coram contemplated using the bankruptcy process to cancel all existing equity interests when Debtors filed their bankruptcy Petitions on August 8, 2000, and their proposed Plan.

### III. The Improving Financial Condition of the Debtor

The bankruptcy petitions were only filed after there was a significant operational change in Debtors' business which resulted in dramatic improvements in the Debtors' financial performance. On August 8, 2000 -- the Petition Date -- Mr. Daniel Crowley, Coram's chief executive officer, described these operational changes and the resulting significant improvement in Debtor's financial performance in a conference call. Mr. Crowley reported that Coram's free cash improved from a negative amount in 1999, to $10 million for the first quarter of 2000, to $35 million for the next four months of 2000. Mr. Crowley concluded that "this company is dynamite. We are perfectly positioned to do really big, exciting things." A transcription of Mr. Crowley's remarks is attached hereto as Exhibit "A."

5

JSP 01965

### IV. Management's Conflicting Interests

In fact, Mr. Crowley's upbeat assessment of the Company is likely to be shared by the Noteholder Group since (1) the Noteholder Group placed Mr. Crowley as CEO of Coram based on past workout work he had done for them with another health care company and (2) Mr. Crowley is presently being paid by one of the members of the Noteholder Group as a consultant. (Disclosure Statement, Docket No. 35, at pp. 44-45). Although these payments are said to be made to Mr. Crowley solely with respect to his services in connection with other transactions, there is no question that these payments make it impossible for him to be considered independent of the Noteholder Group and free to exercise his fiduciary duties on behalf of the shareholders of Coram. In addition, under the Plan, Mr. Crowley is scheduled to receive an $1.8 million payment upon confirmation as a "restructuring bonus." Plainly, Mr. Crowley has every incentive to promote the Plan even at the expense of existing equity.

Mr. Crowley is not the only member of Coram's board with ties to the Noteholder Group during the critical period. Mr. Stephen A. Feinberg, affiliated with one of the members of the Noteholder Group, was a director of Coram until 16 days prior to the filing of the Petition in this case. He resigned because of conflict of interest concerns. (Coram Healthcare Press Release, dated July 24, 2000). However, given the fact that Debtor itself acknowledges that the Plan was worked out over a period of many months prior to the filing of the Petition, plainly much of these discussions happened on Mr. Feinberg's watch.

6

JSP 01966

**A645**

## V. Timely Application to the United States Trustee

Counsel for movants contacted the United States Trustee almost immediately -- the day after the Petition -- and requested appointment of an equity security holders committee pursuant to Section 1102(a)(1) of the Bankruptcy Code.[3] However, the Debtor objected to the appointment of such a committee, largely on the grounds that some of the Movants are high net worth individuals and thus all of the thousands of Coram shareholders, rich and poor alike, should be deprived of representation in these proceedings. The United States Trustee, for whatever reason, declined to appoint an equity committee in this matter and thus Movants brought this motion.

## Argument

The motion is made under pursuant to Section 1102(a)(2) of the Bankruptcy Code, which authorizes the court to order the appointment of a committee of equity security holders "if necessary to assure adequate representation . . . of equity security holders."

Generally, whether a committee is required to assure such adequate representation is determined by reference to the criteria set forth in In re Johns - Manville Corp., 68 B.R. 155, 159 (S.D. N.Y. 1986): (1) the number of shareholders; (2) the complexity of the case; and (3) whether the cost of the additional committee significantly outweighs the concern for adequate representation. In re Edison Brothers Stores, Inc., No. Civ. A. No. 96-177-SLR, 1996 WL 534853, at *3, (D. Del. Sept. 17, 1996); In re Wang Laboratories, Inc., 199 B.R. 1, 2 (Bankr. D.

---

[3] Attached hereto as Exhibits "B" and "C" are copies of the initial letter sent to the office of the United States Trustee on August 9, 2000 and a supplemental letter sent on August 14, 2000, at the request of the assistant United States Trustee.

7

JSP 01967

Mass. 1992). In this case, each of these criteria militate in favor of establishing an equity committee.

### I. Coram Has Thousands of Public Shareholders.

Coram is a publicly held and publicly traded company with approximately 4980 registered shareholders. In fact, the actual number of shareholders is almost certainly far greater that this number, because many of the registered shareholders are "street names" that hold the shares for many others.

Under established bankruptcy law, the fact that the shares of the debtor are widely held and publicly traded is a significant factor calling for the appointment of an equity committee. See In re Wang Laboratories, Inc., 149 B.R. at 3; In re Baker Industries, Corp., 55 B.R. 945, 949, 980 (Bankr. S.D. N.Y. 1985); L. King, Collier on Bankruptcy, ¶ 1102.03 at 1102-22 (15th Ed. 1984). As recognized by the commentators, where the shares of the debtor are widely held, it is not cost-effective for individual shareholders to hire professionals to participate in the case. Further, because individual shareholders do not owe a duty to other shareholders, "the only way to ensure that the shareholder body as a whole receives meaningful representation in the case is to appoint an equity committee to represent their interests." Coleman & Woodruff, Looking Out for Shareholders, The Role of the Equity Committee in Chapter 11 Reorganization Cases of Large, Publicly Held Companies, 68 Am. Bankr. L. J. 295, 297, 298 (1994).

Indeed, appointment of an equity committee is appropriate not merely to protect this particular group of shareholders, but, as Congress has recognized, in order to assure public investors generally that their interests will be protected in the event of bankruptcy. "Such

8

JSP 01968

assurance should not be left to a plan negotiated by a debtor in distress and senior or institutional debtors who will have their own interest to look after." S. Rep. No. 989, 95 H Cong. 2d Sess.10 (1978), reprinted in 1978 U.S. Code and Cong. News, 5787, 5796. The Senate Report further states, in language presaging this very case, that Chapter 11 proceedings are designed "to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small, and scattered public investors." Id.

### II. The Case Is Factually and Legally Complex.

Although the result sought by Debtor — the complete elimination of existing equity — is draconianly simple, the factual and legal arguments surrounding the Plan are in fact quite complex, militating in favor of the appointment of an equity committee.

There are at least three complex issues that the Court will be called upon to address in these proceedings: (1) the valuation of the value of the enterprise and hence the relative shares of that enterprise to be assigned to the Noteholder Group and existing equity shareholders, (2) whether or not, as Debtor claims, government health care regulations mandate a reorganization of the Debtor prior to December 31, 2000, and (3) whether the conflicting interests of the officers and directors of Coram, such as the fact that the CEO and Chairman is a paid consultant for one of the members of the Noteholder Group, necessitate the appointment of a trustee in bankruptcy. Movants submit that these issues cannot be adequately resolved without input from the shareholders and that such input is best received from an official committee established for all of the shareholders.

9

JSP 01969

### III. The Costs of An Equity Committee Are Outweighed By The Need for Shareholder Participation In These Proceedings.

This court is of course charged with balancing the interest of the Debtor estate to minimize the cost of its bankruptcy proceedings with the interests of the shareholders to be treated fairly. In evaluating whether the cost of the committee significantly outweighs the concern for adequate representation, there are several factors considered, including the following:

The Nature of the Debtor's Proposed Reorganization. These Chapter 11 cases do not involve an operational reorganization of the Debtors, but only a financial restructuring. Where (as here) the debtor has a basically sound business and seeks bankruptcy relief because of excessive indebtedness, the case usually involves a question of who gets what under the reorganization and equity security holders deserve a committee to represent their interests. Under such circumstances, appointment of a committee is appropriate to protect the shareholders. L. King, Collier on Bankruptcy, ¶ 1102.03 at 1102-23 ("If the reorganization will involve issues that pit the interests of creditors against the interests of stockholders it would be appropriate for the United States trustee to appoint a committee of equity security holders to represent the interests of equity holders in the case.").

Timing of the Request for the Committee. Certain case law indicates that the timing of the motion for appointment of an equity committee is a relevant factor and appointment of an equity committee may be denied where there is an unexplained delay in the motion for appointment. See In re Kalvar Microfilm, Inc., 195 B.R. 599, 600 (Bankr. D. Del. 1996). In this case, at least some of the moving shareholders contacted the United States Trustee immediately upon the filing of the bankruptcy petition. Any delay in filing this motion is due entirely to attempts to persuade the

10

JSP 01970

Trustee to make such an appointment. This motion is being filed within 2 days of the denial of that request. Under no circumstances can it be said that the Movants have been dilatory, nor will they seek to delay these proceedings should a committee be appointed.

Other Representation of Equity Interests. Courts will also consider whether the interests of the equity security holders are being adequately represented by the others participating case. See In re Edison Brothers Stores, Inc., 1996 WL 534853, at *4-5 (finding that there were no facts suggesting that the inside shareholders holding 35% of the equity interests were not aligned with the non-insider shareholders seeking appointment of an equity committee). Here, there are no parties aligned with the existing equity. The management and board of Coram, which have significant ties to the Notcholder Group, have proposed wiping out all of the existing equity in exchange for a partial recapitalization of the Notcholder Debt into all of the equity. This deal was reached prior to the filing of the Chapter 11 Petitions as a result of negotiations between the Debtor and the Notcholders. Obviously, neither management nor the Notcholder Group is at this point watching out for the interests of the shareholders.

Whether the Debtor is Hopelessly Insolvent. While the solvency of the debtor is a factor that some courts consider in the appointment of an equity committee, it "should not be the only factor, or even the principal factor, in deciding" the issue. L. King, Collier on Bankruptcy, ¶1102.03 at 1102-22, 1102-23; see also In re White Motor Credit Corp., 27 B.R. 554, 557 (N.D. Ohio 1982) (holding Bankruptcy Court did not err in excluding evidence of debtor's insolvency in hearing a motion to appoint equity committee). Early in the case, the proponents of an equity committee will lack the information and resources to present an analysis of the debtor's solvency or insolvency. see Coleman & Woodruff, supra, at 298, and the Court is not in a good position to

11

JSP 01971

make a definitive determination. Hence, the applicable rule would only justify precluding appointment of an equity committee where the evidence establishes that the debtor is "hopelessly insolvent." In re Wang Laboratories, Inc., 149 B.R. at 3.

In this case, Debtor has procured the highly hedged and qualified opinion of an investment banker that the reorganization value of Coram is 82% of the face amount of the debt owed to the Noteholders.[8] However, this opinion, and the underlying basis for it, has not been subjected to any scrutiny. Determining an enterprise value is a complicated matter, even more so in this case because Debtor has dramatically improved its financial performance recently. Movants believe that it is significant that even this banker – without any systematic review or testing of the underlying financial records – believes that the value of the enterprise is likely to be in the range of 82% of the debt. Indeed, the Petition Date statements of the CEO that Coram is a "dynamite" company with growing cash flow and significant upside potential, taken with the fact that the Board has made no effort to market the Company as a whole, underscore the likelihood that there may well be real equity value in this company.

Plainly, this Debtor is not "hopelessly insolvent." At minimum, the shareholders are entitled to investigate further and present its case to this Court for resolution.

---

[8]"The disclaimers included with this opinion acknowledge (i) that the estimate of the reorganization value was based on management's projections; (ii) that the financial consultant did not independently verify management's projections; (iii) that the financial advisor assumed the accuracy and completeness of the financial and other information furnished to it by Debtors and by other firms retained by Debtors; (iv) that no independent valuations or appraisals were sought or obtained; and (v) that the estimates of the reorganization value do not purport to reflect or constitute appraisals, liquidation values or estimates of actual market value." (Disclosure Statement, Docket No. 35, at pp. 77-78.)

12

JSP 01972

## Conclusion

WHEREFORE, movants request that this Court order the United States Trustee to appoint an equity security holders committee, and for such other and further relief as the Court deems just and proper.

ALTHEIMER & GRAY

Richard F. Levy (IL ARDC NO. 01645064)
Theodore J. Low (IL ARDC NO. 01696491)
Benjamin D. Schwartz (IL ARDC NO. 0252276)
Brandy A. Sargent (IL ARDC NO. 06270551)
ALTHEIMER & GRAY
10 South Wacker Drive
Suite 4000
Chicago, IL 60606
(312) 715-4000 (phone)
(312) 715-4800 (FAX)
levyr@altheimer.com

ATTORNEYS FOR MOVANTS

13

(800688.0)

TOTAL P.16

JSP 01973

SEP-11-2000 10:42                                    312 715 4266    P.02/02

WRITER'S DIRECT DIAL
(312) 715-4800
RFL FAX: (312)715-4266

E-mail:   LevyR@Altheimer.com (office)
          RFLevy@AOL.com (home)

LAW OFFICES
ALTHEIMER
&GRAY



10 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606-7482
MAIN TEL: (312) 715-4000
A&G MAIN FAX: (312) 715-4800

September 11, 2000

Certain Investors in Coram Health Care
(Distribution List Attached)

Re:    Coram Heath Care

Dear Investors:

The U.S. Trustee, today, agreed to appoint a Committee to represent the shareholders of Coram Health Care. This means that fees for an investment banker, a health care expert and ourselves as attorneys will be paid by Coram (with the reasonableness of the fees subject to Bankruptcy Court approval) and no further expenses will be incurred by you.

This appointment of an Equity Committee is a significant positive event. We will shortly be in touch with you, with details.

Cordially,

*Richard F. Levy*

Richard F. Levy (Electronic Signature)

RFL:jad

(828260.4 - 9/11/00 10:18 AM)CHICAGO  WARSAW  PRAGUE  KYIV  BRATISLAVA  ISTANBUL  SHANGHAI

TOTAL P.02

*Levy*

DEP. EXH. # *17*
Date: 3/22/07

LEFF 01937

A653

**Don Liebentritt**

| | |
|---|---|
| **From:** | Marian Flynn |
| **Sent:** | Thursday, October 12, 2000 4:14 PM |
| **To:** | Don Liebentritt |
| **Subject:** | Coram |
| **Importance:** | High |

The first tab has activity to 8/8/2000 and the second tab has purchases after.



Coram.xls (25 KB)



1

DL00039

Arthur Andersen Center For Outsourcing Services
TRANSACTION SUMMARY
Samstock, L.L.C.
7014
From 01-01-99 To 08-08-00

CORAM HEALTHCARE CORP (NEW)

| Trade Date | Settle Date | Quantity | Trade Amount | Per Share |
|---|---|---|---|---|
| 04-22-99 | 04-27-99 | 17,700 | $41,304.72 | $2.3336 |
| 04-22-99 | 04-27-99 | 5,000 | $12,075.00 | $2.4150 |
| 04-23-99 | 04-28-99 | 4,300 | $10,368.59 | $2.4113 |
| 04-26-99 | 04-29-99 | 18,600 | $37,188.84 | $1.9994 |
| 04-27-99 | 04-30-99 | 4,400 | $8,891.96 | $2.0209 |
| 05-11-99 | 05-14-99 | 25,000 | $52,562.50 | $2.1025 |
| 05-12-99 | 05-17-99 | 38,900 | $79,628.30 | $2.0470 |
| 05-13-99 | 05-18-99 | 6,100 | $12,825.25 | $2.1025 |
| 05-14-99 | 05-19-99 | 20,000 | $41,426.00 | $2.0713 |
| 05-25-99 | 05-28-99 | 5,000 | $11,387.50 | $2.2775 |
| 05-26-99 | 06-01-99 | 5,000 | $11,762.50 | $2.3525 |
| 10-18-99 | 10-21-99 | 50,000 | $29,625.00 | $0.5925 |
| 10-19-99 | 10-22-99 | 25,000 | $15,875.00 | $0.6350 |
| 10-20-99 | 10-25-99 | 14,600 | $10,190.80 | $0.6980 |
| 10-21-99 | 10-26-99 | 15,000 | $10,762.50 | $0.7175 |
| 10-25-99 | 10-28-99 | 15,000 | $9,487.50 | $0.6325 |
| 10-26-99 | 10-29-99 | 20,000 | $11,850.00 | $0.5925 |
| 10-28-99 | 11-02-99 | 11,400 | $7,467.00 | $0.6550 |
| 12-03-99 | 12-08-99 | 24,000 | $19,730.40 | $0.8221 |
| 12-09-99 | 12-14-99 | 10,000 | $7,700.00 | $0.7700 |
| 12-10-99 | 12-15-99 | 10,000 | $7,700.00 | $0.7700 |
| 12-13-99 | 12-16-99 | 5,000 | $3,850.00 | $0.7700 |
| 12-21-99 | 12-27-99 | 25,000 | $18,937.50 | $0.7575 |
| 12-27-99 | 12-30-99 | 7,500 | $5,306.25 | $0.7075 |
| 12-28-99 | 12-31-99 | 5,000 | $3,225.00 | $0.6450 |
| 12-29-99 | 01-03-00 | 5,000 | $3,537.50 | $0.7075 |
| 12-30-99 | 01-04-00 | 7,500 | $4,987.50 | $0.6650 |
| 03-27-00 | 03-30-00 | 30,400 | $15,808.00 | $0.5200 |
| 03-28-00 | 03-31-00 | 5,600 | $2,800.00 | $0.5000 |
| 03-30-00 | 04-04-00 | 14,000 | $7,280.00 | $0.5200 |
| | | 450,000 | $515,541.11 | |

DL00040

TRANSACTION SUMMARY
Samstock, L.L.C.
7014
From 08-09-00 To 09-29-00
CORAM HEALTHCARE CORP (NEW)

| Trade Date | Settle Date | Quantity | Trade Amount | Per Share |
|---|---|---|---|---|
| 08-09-00 | 08-14-00 | 450,000 | $27,000.00 | $0.0600 |
| 08-24-00 | 08-29-00 | 400,000 | $26,000.00 | $0.0650 |
| 08-25-00 | 08-30-00 | 82,500 | $7,012.50 | $0.0850 |
| 08-28-00 | 08-31-00 | 10,000 | $875.00 | $0.0875 |
| 08-29-00 | 09-01-00 | 110,000 | $10,450.00 | $0.0950 |
| 08-30-00 | 09-05-00 | 23,500 | $2,350.00 | $0.1000 |
| 09-08-00 | 09-13-00 | 48,000 | $4,080.00 | $0.0850 |
| 09-11-00 | 09-14-00 | 133,000 | $11,863.60 | $0.0892 |
| 09-14-00 | 09-19-00 | 27,500 | $2,612.50 | $0.0950 |
| 09-15-00 | 09-20-00 | 30,500 | $2,973.75 | $0.0975 |
| 09-18-00 | 09-21-00 | 20,000 | $1,900.00 | $0.0950 |
| 09-19-00 | 09-22-00 | 30,000 | $2,850.00 | $0.0950 |
| 09-20-00 | 09-25-00 | 5,400 | $513.00 | $0.0950 |
| 09-21-00 | 09-26-00 | 10,000 | $950.00 | $0.0950 |
| 09-22-00 | 09-27-00 | 10,000 | $950.00 | $0.0950 |
| 09-25-00 | 09-28-00 | 47,500 | $4,631.25 | $0.0975 |
| 09-27-00 | 10-02-00 | 111,100 | $11,332.20 | $0.1020 |
| 09-28-00 | 10-03-00 | 40,000 | $4,000.00 | $0.1000 |
| 09-29-00 | 10-04-00 | 57,000 | $5,985.00 | $0.1050 |
| | | 1,646,000 | $128,328.80 | |
| October (from Conifer on-line info) | | | | |
| 10/2/2000 | 10/5/2000 | 12,000 | $1,260.00 | $0.1050 |
| 10/3/2000 | 10/6/2000 | 16,500 | | |
| 10/4/2000 | 10/9/2000 | 53,500 | $5,483.75 | $0.1025 |
| Before 8/8/00 | | 450,000 | | |
| | | 2,178,000 | | |

DL00041

## Don Liebentritt

**From:** Marian Flynn
**Sent:** Tuesday, November 14, 2000 11:54 AM
**To:** Don Liebentritt
**Subject:** RE: Coram



Coram.xls (25 KB)

There has been no new purchases but the cost information for Oct purchases has been added.

-----Original Message-----
**From:** Don Liebentritt
**Sent:** Tuesday, November 14, 2000 11:10 AM
**To:** Marian Flynn
**Subject:** Coram

Do you have a current spreadsheet on our Coram position?

1

DL00034

A657

**Arthur Andersen Center For Outsourcing Services**
TRANSACTION SUMMARY
Samstock, L.L.C.
7014
From 01-01-99 To 08-08-00

CORAM HEALTHCARE CORP (NEW)

| Trade Date | Settle Date | Quantity | Trade Amount | Per Share |
|---|---|---|---|---|
| 04-22-99 | 04-27-99 | 17,700 | $41,304.72 | $2.3336 |
| 04-22-99 | 04-27-99 | 5,000 | $12,075.00 | $2.4150 |
| 04-23-99 | 04-28-99 | 4,300 | $10,368.59 | $2.4113 |
| 04-26-99 | 04-29-99 | 18,600 | $37,188.84 | $1.9994 |
| 04-27-99 | 04-30-99 | 4,400 | $8,891.96 | $2.0209 |
| 05-11-99 | 05-14-99 | 25,000 | $52,562.50 | $2.1025 |
| 05-12-99 | 05-17-99 | 38,900 | $79,628.30 | $2.0470 |
| 05-13-99 | 05-18-99 | 6,100 | $12,825.25 | $2.1025 |
| 05-14-99 | 05-19-99 | 20,000 | $41,426.00 | $2.0713 |
| 05-25-99 | 05-28-99 | 5,000 | $11,387.50 | $2.2775 |
| 05-26-99 | 06-01-99 | 5,000 | $11,762.50 | $2.3525 |
| 10-18-99 | 10-21-99 | 50,000 | $29,625.00 | $0.5925 |
| 10-19-99 | 10-22-99 | 25,000 | $15,875.00 | $0.6350 |
| 10-20-99 | 10-25-99 | 14,600 | $10,190.80 | $0.6980 |
| 10-21-99 | 10-26-99 | 15,000 | $10,762.50 | $0.7175 |
| 10-25-99 | 10-28-99 | 15,000 | $9,487.50 | $0.6325 |
| 10-26-99 | 10-29-99 | 20,000 | $11,850.00 | $0.5925 |
| 10-28-99 | 11-02-99 | 11,400 | $7,467.00 | $0.6550 |
| 12-03-99 | 12-08-99 | 24,000 | $19,730.40 | $0.8221 |
| 12-09-99 | 12-14-99 | 10,000 | $7,700.00 | $0.7700 |
| 12-10-99 | 12-15-99 | 10,000 | $7,700.00 | $0.7700 |
| 12-13-99 | 12-16-99 | 5,000 | $3,850.00 | $0.7700 |
| 12-21-99 | 12-27-99 | 25,000 | $18,937.50 | $0.7575 |
| 12-27-99 | 12-30-99 | 7,500 | $5,306.25 | $0.7075 |
| 12-28-99 | 12-31-99 | 5,000 | $3,225.00 | $0.6450 |
| 12-29-99 | 01-03-00 | 5,000 | $3,537.50 | $0.7075 |
| 12-30-99 | 01-04-00 | 7,500 | $4,987.50 | $0.6650 |
| 03-27-00 | 03-30-00 | 30,400 | $15,808.00 | $0.5200 |
| 03-28-00 | 03-31-00 | 5,600 | $2,800.00 | $0.5000 |
| 03-30-00 | 04-04-00 | 14,000 | $7,280.00 | $0.5200 |
| | | 450,000 | $515,541.11 | |

DL00035

TRANSACTION SUMMARY
Samstock, L.L.C.
7014
From 08-09-00 To 09-29-00
CORAM HEALTHCARE CORP (NEW)

| Trade Date | Settle Date | Quantity | Trade Amount | Per Share |
|---|---|---|---|---|
| 08-09-00 | 08-14-00 | 450,000 | $27,000.00 | $0.0600 |
| 08-24-00 | 08-29-00 | 400,000 | $26,000.00 | $0.0650 |
| 08-25-00 | 08-30-00 | 82,500 | $7,012.50 | $0.0850 |
| 08-28-00 | 08-31-00 | 10,000 | $875.00 | $0.0875 |
| 08-29-00 | 09-01-00 | 110,000 | $10,450.00 | $0.0950 |
| 08-30-00 | 09-05-00 | 23,500 | $2,350.00 | $0.1000 |
| 09-08-00 | 09-13-00 | 48,000 | $4,080.00 | $0.0850 |
| 09-11-00 | 09-14-00 | 133,000 | $11,863.60 | $0.0892 |
| 09-14-00 | 09-19-00 | 27,500 | $2,612.50 | $0.0950 |
| 09-15-00 | 09-20-00 | 30,500 | $2,973.75 | $0.0975 |
| 09-18-00 | 09-21-00 | 20,000 | $1,900.00 | $0.0950 |
| 09-19-00 | 09-22-00 | 30,000 | $2,850.00 | $0.0950 |
| 09-20-00 | 09-25-00 | 5,400 | $513.00 | $0.0950 |
| 09-21-00 | 09-26-00 | 10,000 | $950.00 | $0.0950 |
| 09-22-00 | 09-27-00 | 10,000 | $950.00 | $0.0950 |
| 09-25-00 | 09-28-00 | 47,500 | $4,631.25 | $0.0975 |
| 09-27-00 | 10-02-00 | 111,100 | $11,332.20 | $0.1020 |
| 09-28-00 | 10-03-00 | 40,000 | $4,000.00 | $0.1000 |
| 09-29-00 | 10-04-00 | 57,000 | $5,985.00 | $0.1050 |
| 10/2/2000 | 10/5/2000 | 12,000 | $1,260.00 | $0.1050 |
| 10/3/2000 | 10/6/2000 | 16,500 | $1,732.50 | $0.1050 |
| 10/4/2000 | 10/9/2000 | 53,500 | $5,483.75 | $0.1025 |
| 10/16/2000 | ######## | 322,000 | $35,420.00 | $0.1100 |
| | | 2,050,000 | $172,225.05 | |
| Before 8/8/00 | | 450,000 | $515,541.11 | |
| | | 2,500,000 | $687,766.16 | |

DL00036

## Don Liebentritt

| | |
|---|---|
| From: | Don Liebentritt |
| Sent: | Friday, October 27, 2000 3:21 PM |
| To: | Marian Flynn; Joe Paolucci |
| Subject: | RE: Coram |

We bought 322,000 shares on 10/16.

-----Original Message-----
| | |
|---|---|
| From: | Marian Flynn |
| Sent: | Friday, October 27, 2000 3:05 PM |
| To: | Joe Paolucci |
| Cc: | Don Liebentritt |
| Subject: | RE: Coram |

Yes see the attached sheet. I have the total shares but not the breakdown on shares purchased from 10/4 - to now. I may have more detail next week.
<< File: Coram.xls >>

——Original Message——
| | |
|---|---|
| From: | Joe Paolucci |
| Sent: | Friday, October 27, 2000 2:10 PM |
| To: | Marian Flynn; Don Liebentritt |
| Subject: | Coram |

Have we acquired or sold any shares during August, September or October, 2000?

1

DL00037