Don Liebentritt

**From:** Marian Flynn
**Sent:** Tuesday, October 17, 2000 10:20 AM
**To:** Don Liebentritt
**Subject:** Coram

Sam bought 322,000 shares on 10/16 for $35,420.

1

DL00038

10/18/2000 10:51 FAX 215 597 5795          US TRUSTEES                                    @002

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN THE MATTER OF: | : | Chapter 11 |
| CORAM HEALTHCARE CORP., *et al.* | : | Case No. 00-3299 (MFW) through |
| | : | Case No. 00-3300 (MFW) |
| Debtors. | : | |
| | : | NOTICE OF APPOINTMENT OF |
| | : | EQUITY COMMITTEE |

Pursuant to Section 1102(a)(1) of the Bankruptcy Code, I hereby appoint the following persons to the Committee of Unsecured Creditors in connection with the above captioned case:

1.  Samstock, L.L.C., Attn: Donald J. Liebentritt, VP, 2 North Riverside Plaza, Suite 600, Chicago, IL 60606, Phone: (312) 466-3651, Fax: (312) 559-1279.

2.  Ann & Robert Lurie Family Foundation, Inc., Attn: Mark Slezak, CEO and V.P., Two Riverside Plaza, Suite 1500, Chicago, IL 60606, Phone: (312) 466-3900, Fax: (312) 466-3700.

3.  Richard L. Haydon, c/o RLH Management, 168 Cottage Place, 1114 Avenue of the Americas, New York, NY 10036, Phone: (201) 670-0412, Fax: (212) 265-6639.

PATRICIA A. STAIANO
UNITED STATES TRUSTEE

for FREDERIC J. BAKER
SENIOR ASSISTANT UNITED STATES TRUSTEE

DATED: October 18, 2000

Attorney assigned to this Case: Richard L. Schepacarter, Esquire, Phone: (215) 597-441, Fax: (215) 597-5795
Debtors' Counsel: Laura D. Jones, Esquire, Phone: (302) 652-4100, Fax: (302) 652-4400

319

LEVY
DEP. EXH. #18
Date: 3/23/07

MINUTES OF A TELEPHONIC MEETING

OF THE BOARD OF DIRECTORS OF

CORAM HEALTHCARE CORPORATION

December 28, 2000

A telephonic meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was convened, pursuant to a Waiver of Notice signed by each member of the Board, at approximately 4:00 p.m. MST. (See Attachments A) Participating in the meeting were the following Directors: Daniel D. Crowley, Chairman of the Board, Chief Executive Officer and President; Donald J. Amaral; William J. Casey; and Sandra R. Smoley. L. Peter Smith was absent. Allen J. Marabito, Executive Vice President, and Scott R. Danitz, Senior Vice President Finance, also participated in the meeting, along with the following legal advisors to the Company: David F. Friedman, Esq. of Kasowitz, Benson, Torres & Friedman, LLP and Eugene Tillman, Esq. and Frederick C. Leech, Esq. of Reed Smith Shaw & McClay LLP. Mr. Crowley acted as Chairman of the meeting and Mr. Marabito kept the minutes.

<u>REPORT OF DECEMBER 28, 2000 BANKRUPTCY HEARING</u>

After the meeting was called to order, Counsel provided a report on the Court's granting the Debtors' request to authorize and approve issuance of preferred stock in exchange for debt to remain compliant with Stark II. Also reviewed were the final terms and covenants of the conversion. The Board was also briefed on the resolution of certain other issues addressed at the hearing. Messrs. Tillman and Leech advised the Board on the documentation that was required for their approval of, among other things, the issuance of Coram, Inc.'s preferred stock.

The board members next renewed their discussion regarding the identification and selection of third-party, independent persons or firms to review the Debtors' processes in the Chapter 11 reorganization proceeding. Mr. Friedman informed the Board of the possibility of such an approach in the Chapter 11 proceeding. The Board was also informed of the extension for 90 days of the Debtors' period of exclusivity to file a plan of reorganization. The independent members of the Board decided to hold a telephone conference call amongst themselves to discuss potential third-party candidates and the selection process.

There being no further business, the meeting was adjourned at approximately 4:30 p.m. MST.

Respectfully submitted,

Allen Marabito

Allen J. Marabito
Secretary of the Meeting

TRUSTEE009502
USDC-DE #04-1565

WAIVER OF NOTICE OF MEETING
OF THE
BOARD OF DIRECTORS
OF
CORAM HEALTHCARE CORPORATION

I hereby waive any notices required in connection with a telephonic meeting of the Board of Directors of Coram Healthcare Corporation to be held on December 28, 2000 at 4:00pm MST and consent to the convening of such meeting.

_____
Signature

Daniel D. Crowley
_____
Printed Name

TRUSTEE009503
USDC-DE #04-1565

WAIVER OF NOTICE OF MEETING
OF THE
BOARD OF DIRECTORS
OF
CORAM HEALTHCARE CORPORATION


    I hereby waive any notices required in connection with a telephonic meeting of the Board of Directors of Coram Healthcare Corporation to be held on December 28, 2000 at 4:00pm MST and consent to the convening of such meeting.


_____

Signature


_____

Printed Name

TRUSTEE009504
USDC-DE #04-1565

**A665**

### WAIVER OF NOTICE OF MEETING
### OF THE
### BOARD OF DIRECTORS
### OF
### CORAM HEALTHCARE CORPORATION

I hereby waive any notices required in connection with a telephonic meeting of the Board of Directors of Coram Healthcare Corporation to be held on December 28, 2000 at 4:00pm MST and consent to the convening of such meeting.

_____
Signature

_____
Printed Name

TRUSTEE009505
USDC-DE #04-1565

# WAIVER OF NOTICE OF MEETING
## OF THE
## BOARD OF DIRECTORS
### OF
## CORAM HEALTHCARE CORPORATION

I hereby waive any notices required in connection with a telephonic meeting of the Board of Directors of Coram Healthcare Corporation to be held on December 28, 2000 at 4:00pm MST and consent to the convening of such meeting.

_____
Signature

_____
Printed Name

TRUSTEE009506
USDC-DE #04-1565

### WAIVER OF NOTICE OF MEETING
### OF THE
### BOARD OF DIRECTORS
### OF
### CORAM HEALTHCARE CORPORATION

I hereby waive any notices required in connection with a telephonic meeting of the Board of Directors of Coram Healthcare Corporation to be held on December 28, 2000 at 4:00pm MST and consent to the convening of such meeting.

_Sandra R. Smoley_
Signature

_Sandra R. Smoley_
Printed Name

TRUSTEE009507
USDC-DE #04-1565

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Form 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE FISCAL YEAR ENDED DECEMBER 31, 2000
COMMISSION FILE NUMBER 1-11343

## Coram Healthcare Corporation
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| DELAWARE<br>(State or other jurisdiction of<br>Incorporation or organization) | 33-0615337<br>(IRS Employer<br>Identification No.) |
| 1125 SEVENTEENTH STREET, SUITE 2100<br>DENVER, COLORADO<br>(Address of principal executive offices) | 80202<br>(Zip Code) |

Registrant's telephone number, including area code: (303) 292-4973

Securities registered pursuant to Section 12(b) of the Act:

None

Securities registered pursuant to Section 12(g) of the Act:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON<br>WHICH REGISTERED |
|---|---|
| Common Stock ($.001 par value per share) | Over the Counter Bulletin Board |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K [ ]

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. Yes [X] No [ ]

As of April 2, 2001, there were outstanding 49,638,452 shares of the registrant's common stock, which is the only class of voting stock of the registrant outstanding. As of such date, the aggregate market value of the shares of common stock held by nonaffiliates of the registrant based on the closing price for the common stock on the Over the Counter Bulletin Board on April 2, 2001, was approximately $11.6 million.

DOCUMENTS INCORPORATED BY REFERENCE

None

JSP 01800

**Statement of Forward Looking Statements**

This Annual Report on Form 10-K contains certain "forward-looking" statements (as such term is defined in the Private Securities Litigation Reform Act of 1995) and information relating to Coram Healthcare Corporation ("CHC") and its subsidiaries (collectively "Coram" or the "company") that are based on the beliefs of the management of Coram, as well as, assumptions made by and information currently available to the management of Coram. Coram's actual results may vary materially from the forward-looking statements made in this report due to important factors, including, but not limited to: the uncertainties related to the ongoing bankruptcy proceedings of Coram Healthcare Corporation and Coram, Inc., including actions taken by parties who may be adverse to management's plan of reorganization; Coram's ability to maintain continued compliance with the provisions of the Omnibus Budget Reconciliation Act of 1993 (commonly referred to as "Stark II"); Coram's lack of profitability; uncertainties associated with the outcomes of certain pending legal proceedings; the company's significant level of outstanding indebtedness; the company's need to obtain additional financing or equity; uncertainties associated with the dilution that would occur if the company's existing debt holders exercise their equity conversion rights; the company's limited liquidity; the company's dependence upon the prices paid by third-party payers for the company's services; uncertainties associated with the changes in state and federal regulations and the impact on healthcare services businesses, as well as, enhanced regulatory oversight of the healthcare industry; and certain other factors, all of which are described in greater detail in this report in Item 7 under the caption "Risk Factors." When used in this report, the words "estimate," "project," "believe," "anticipate," "intend," "expect" and similar expressions are intended to identify forward-looking statements. Such statements reflect the current views of management with respect to future events based on currently available information and are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in such forward-looking statements. For a discussion of such risks, see Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Risk Factors." Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. Management does not undertake any obligation to publicly release any revisions to these forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

PART I

**ITEM 1. BUSINESS**

**General Overview**

*Lines of Business.* During 2000, Coram was engaged primarily in two principal lines of business consisting of alternate site (outside the hospital) infusion therapy and related services (including non-intravenous home health products such as durable medical equipment and respiratory therapy services) and pharmacy benefit management and specialty mail-order pharmacy services. Other services offered by Coram include centralized management, administration and clinical support for clinical research trials.

In December 1999, Coram announced that it was repositioning its business to focus on its core alternate site infusion therapy business and the clinical research business operated by its wholly-owned subsidiary, CTI Network, Inc. Accordingly, Coram's primary business strategy is to focus its efforts on the delivery of its core infusion therapies, such as nutrition, anti-infective therapies, intravenous immunoglobulin ("IVIG"), therapy for persons receiving transplants, and coagulant and blood clotting therapies for persons with hemophilia. Coram has also implemented programs focused on the reduction and control of the costs of providing services and operating expenses, assessment of under-performing branches and review of branch efficiencies. Accordingly, several branches have been closed or scaled back to serve as satellites for other branches and personnel have been eliminated (see Note 6 to the company's Consolidated Financial Statements). Additionally, the company's pharmacy benefit management and specialty mail-order pharmacy services businesses were sold during the year ended December 31, 2000 (see Note 5 to the company's Consolidated Financial Statements). Most of the company's alternate site infusion therapy net revenue is derived from third-party payers such as private indemnity insurers, managed care organizations and governmental payers. Management's objective is to continue to provide services that consistently achieve desired clinical outcomes and maintain Coram's consistent high level of patient satisfaction while focusing on disciplined enhancements to the service model. By establishing best demonstrated practice benchmarks for nursing, pharmacy and clinical operations personnel, cost reductions have been achieved while simultaneously improving the quality and consistency of care. Furthermore, management throughout Coram is continuing to concentrate on reimbursement for services rendered by emphasizing improved billing procedures, documentation and cash collections methods, continued assessment of systems support for reimbursement and concentration of Coram's expertise and managerial resources into certain reimbursement locations.

2

JSP 01801

Prior to August 1, 2000, the company delivered pharmacy benefit management and specialty mail-order pharmacy services through its Coram Prescription Services ("CPS") business, which provided services and mail-order prescription drugs for chronically ill patients from one primary mail order facility, four satellite mail order facilities and one retail pharmacy. The pharmacy benefit management service provided on-line claims administration, formulary management and certain drug utilization review services through a nationwide network of retail pharmacies. CPS's specialty mail-order pharmacy services were delivered through its six facilities, which provided distribution, compliance monitoring, patient education and clinical support to a wide variety of patients. In connection with Coram's repositioned business focus, on July 31, 2000 the company completed the sale of CPS to Curascript Pharmacy Services, Inc. and Curascript PBM Services, Inc., which are newly formed affiliates of GTCR Golder Rauner, L.L.C. and are led by certain members of the former CPS management team. See Note 5 to the company's Consolidated Financial Statements.

Prior to January 1, 2000, the company provided ancillary network management services through its wholly-owned subsidiaries, Coram Resource Network, Inc. and Coram Independent Practice Association, Inc. (collectively the "Resource Network Subsidiaries" or "R-Net"), which managed networks of home healthcare providers on behalf of HMOs, PPOs, at-risk physician groups and other managed care organizations. R-Net served its customers through two primary call centers and three satellite offices. In April 1998, the company entered into a five-year capitated agreement with Aetna U.S. Healthcare, Inc. ("Aetna") (the "Master Agreement") for the management and provision of certain home health services, including home infusion, respiratory therapy, durable medical equipment, hospice care and home nursing support for several of Aetna's disease management programs. Effective July 1, 1998, the company began receiving capitated payments on a monthly basis for members covered under the Master Agreement. The company also assumed certain financial risks for certain home health services and began providing management services for a network of home health providers through R-Net. The agreements that R-Net had for the provision of ancillary network management services have been terminated and R-Net is no longer providing any ancillary network management services. Coram and Aetna were previously involved in litigation over the Master Agreement; however, the litigation was amicably resolved and the case was dismissed on April 20, 2000. The Resource Network Subsidiaries filed voluntary bankruptcy petitions on November 12, 1999 with the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the United States Bankruptcy Code. The Resource Network Subsidiaries are being liquidated pursuant to such proceedings. See Note 4 to the company's Consolidated Financial Statements.

While management believes the implementation of its overall business strategy has improved operating performance throughout the company, no assurances can be given as to its ultimate success. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations."

Coram's reportable segments over the last three fiscal years have been alternate site infusion therapy and related services (including non-intravenous home health products such as durable medical equipment and respiratory therapy services), ancillary network management services, mail order pharmacy and pharmacy benefit management services, and other services, consisting primarily of centralized management, administration and clinical support for clinical research trials. The Resource Network Subsidiaries managed networks of home healthcare providers on behalf of managed care plans and other payers. The agreements that R-Net had for the provision of ancillary network management services have been terminated and R-Net is no longer providing any ancillary network management services. The Resource Network Subsidiaries are being liquidated in the Chapter 11 proceedings that are currently pending in the United States Bankruptcy Court for the District of Delaware. See Note 4 to the company's Consolidated Financial Statements. Mail order pharmacy and pharmacy benefit management services were provided by the CPS business, which was discontinued effective July 31, 2000 following its disposition. See Note 5 to the company's Consolidated Financial Statements.

## Company History: Recent Events

Coram was formed on July 8, 1994 as a result of a merger by and among T$^2$ Medical, Inc., Curaflex Health Services, Inc., Medisys, Inc., and HealthInfusion, Inc., each of which was a publicly-held national or regional provider of home infusion therapy and related services. Each of these companies became and is now an indirect, wholly-owned subsidiary of CHC. The merger was accounted for as a pooling of interests.

Coram made a number of acquisitions since operations commenced, the most significant of which was the acquisition of certain assets of the home infusion business of Caremark, Inc., a wholly-owned subsidiary of Caremark International, Inc., effective April 1, 1995. In addition, Coram acquired H.M.S.S., Inc., a leading regional provider of home infusion therapies based in Houston, Texas, effective September 12, 1994. As a result of these acquisitions, Coram became a leading provider of alternate site infusion therapy services in the United States based on geographic service area and total revenue.

In April 1998, the company signed the Aetna Master Agreement, which became effective July 1, 1998. Under the Master Agreement, which was expected to last five years, the Resource Network Subsidiaries managed and provided home healthcare

3

services for over two million Aetna enrollees in eight states for a stated monthly fee per enrollee. The Resource Network Subsidiaries began serving Aetna enrollees under the Master Agreement on or about July 1, 1998. The Resource Network Subsidiaries provided a notice of termination of the Master Agreement effective June 30, 1999, and Aetna terminated the company's National Ancillary Services Agreement, which covered infusion services provided by the company's branch locations, effective April 12, 2000. Subsequently, the disputes with Aetna were resolved amicably between the parties on April 20, 2000 and the company and Aetna have agreed to use good faith efforts to negotiate a new agreement for home infusion services. See Item 3. "Legal Proceedings" and Note 13 to the company's Consolidated Financial Statements for more information regarding this matter.

On July 31, 2000, Coram completed the sale of CPS to Curascript Pharmacy Services, Inc. and Curascript PBM Services, Inc. See Note 5 to the company's Consolidated Financial Statements.

CHC and its first tier wholly-owned subsidiary, Coram, Inc. ("CI") (collectively the "Debtors"), filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on August 8, 2000. As of such date, the Debtors are operating as debtors-in-possession subject to the jurisdiction of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). None of the company's other subsidiaries is a debtor in the proceeding. See Note 3 to the company's Consolidated Financial Statements and Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Risk Factors."

### Delivery of Alternate Site Infusion Services

*General.* Coram delivers its alternate site infusion therapy services through 76 branch offices located in 40 states and Ontario, Canada. Additionally, Coram delivers alternate site infusion therapy services through joint venture and partnership agreements at several other geographic locations. Infusion therapy involves the intravenous administration of nutrition, anti-infective therapy, intravenous immunoglobulin ("IVIG"), blood factor therapies, pain management, chemotherapy and other therapies.

Infusion patients are primarily referred to Coram following the diagnosis of a specific disease or upon discharge from a hospital. The treating physician generally will determine whether the patient is a candidate for home infusion treatment. Typically, a hospital discharge planner, the patient's physician and a managed care payer will recommend or determine the infusion company to which a patient is referred even though the patient ultimately has the freedom to choose his or her own service provider. Because drugs administered intravenously tend to be more potent and complex than oral drugs, the delivery of intravenous drugs requires patient training, specialized equipment and clinical monitoring by skilled nurses and pharmacists. Most therapies require either a gravity-based flow control device or an electro-mechanical pump to administer the drugs. Some therapies are administered continuously; however, most are given for prescribed intermittent periods of time. Coram nurses and pharmacists work with the patient's physician to monitor and assess the patient's condition and update the therapy as necessary. The duration of the patient's treatment may last from as little as a few days to as long as the patient's entire life.

*Branch Facilities.* The delivery of infusion services is coordinated through local or regional infusion branches, or related satellite locations. A typical full service branch provides the following functions:

(i)   patient intake and admission;

(ii)  sterile product preparation by pharmacists and pharmacy technicians;

(iii) clinical pharmacy services;

(iv)  clinical nursing services;

(v)   collaborative clinical monitoring and disease management;

(vi)  materials management, including drug and supply inventory and delivery;

(vii) billing, collections and benefit verification;

(viii) marketing to local referral sources, including doctors, hospitals and payers; and

(ix)  general management.

4

JSP 01803

A typical full service branch has a fully equipped infusion pharmacy, offices for clinical and administrative personnel and a storage warehouse. It also employs a branch manager, licensed pharmacists, pharmacy technicians, registered nurses, dietitians, and sales and administrative personnel. Such a branch also serves the market area in which it is located, generally within a two-hour driving radius of the patients served, as well as, outlying locations where it can arrange appropriate nursing services. Smaller satellite locations contain limited supplies and pharmacy operations and are used as support centers to respond to patient needs in specific geographical areas. Coram's full service branches and satellite locations are leased and range from 125 to 32,000 square feet of office space, primarily in suburban office parks, often in close proximity to major medical facilities.

*In-Home Patient Care.* Before accepting a patient for home infusion treatment, the staff at the local branch works closely with the patient's physician or clinician and hospital personnel in order to assess the patient's suitability for home care. This assessment process includes, among other things, an assessment of the patient's physical and emotional status as well as an assessment of certain social factors such as the safety and cleanliness of the home environment and the availability of family members or others to assist in the administration of the patient's therapy, if necessary. Patient review also includes a verification of the patient's eligibility based upon established admission criteria and the patient's benefits package available from his or her insurance carrier, managed care provider or governmental payer.

When a patient's suitability for home care has been confirmed, the patient and the patient's designated carepartner receive training and education concerning the therapy to be administered, including the proper infusion technique and the care and use of intravenous devices and other equipment used in connection with the therapy. The patient and the patient's carepartner are also trained to monitor the patient's response to the therapy in order to identify changes of which the healthcare team should be notified. The initial patient assessment and training are generally performed by nurses employed by or overseen by Coram.

Prior to the patient receiving treatment services from Coram, the treating physician develops the patient's plan of treatment and communicates it to the local branch's clinical support team, including its nurses and pharmacists. The team develops a plan of care and works with the treating physician and the payer case manager, if applicable, to provide care and to monitor the patient's progress and responses to treatment. The Coram pharmacist speaks with the patient or carepartner prior to dispensing the prescribed therapy and performs a prospective review of the patient's condition and medical history. Throughout the patient's therapy, the local branch's clinical support team will regularly provide the treating physician and the payer case manager with reports on the patient's condition, creating an information flow that allows the treating physician to actively manage the patient's treatment. The treating physician always directs the patient's care, including changing the plan of treatment in accordance with the patient's needs and responses.

Upon the patient's arrival home, a nurse performs an initial patient assessment which includes a comprehensive physical examination and environmental assessment. Typically, the administration of the patient's first home infusion treatment is overseen during that visit. Thereafter, the frequency of nursing visits depends upon the particular therapy the patient is receiving, as well as, the level of independence the patient or carepartner has achieved with regard to the administration and monitoring of the prescribed therapy. During these subsequent visits, the nurse may check and assess the patient's intravenous lines and related equipment, obtain blood samples, change the pump settings and/or drug administration, assess the patient's condition and compliance with the plan of care and provide ongoing teaching and support. The patient's supplies and drugs are typically delivered on a weekly basis depending on the therapy and the type of drugs being administered. The treating physician and the payer case manager, if applicable, remain actively involved in the patient's treatment by monitoring the success of the plan of treatment and revising as necessary.

## Alternate Site Infusion Therapy: Products and Services

*General.* Coram provides a variety of infusion therapies, principally nutrition, anti-infective therapies and IVIG, as well as, coagulant and blood clotting therapies for patients with hemophilia. A physician, based upon a patient's diagnosis, treatment plan and response to therapy, determines the initiation and duration of these therapies. Certain therapies, such as anti-infective therapy, are generally used in the treatment of temporary infectious conditions, while others, such as nutrition or coagulants, may be required on a long-term or permanent basis. The patient, the designated carepartner or an employee of Coram administers infusion therapies at the patient's home. In some patient groups, such as immuno-suppressed patients (e.g., AIDS/HIV, cancer, transplant patients, etc.), blood coagulant therapies or anti-infective therapies may be provided periodically over the duration of the primary disease or for the remainder of the patient's life, generally as episodic care.

*Nutrition Therapy.* Total parenteral nutrition therapy ("TPN") involves the intravenous feeding of life-sustaining nutrients to patients with impaired or altered digestive tracts due to inflammatory bowel disease, short bowel syndrome or other gastrointestinal illnesses. The therapy is generally administered through a central catheter surgically implanted into a major blood vessel to introduce

5

JSP 01804

the nutrient solution into the bloodstream. The nutrient solution may contain amino acids, dextrose, fatty acids, electrolytes, trace minerals or vitamins. In many cases, the underlying illness or condition from which parenteral nutrition patients suffer is recurrent in nature requiring periodic re-hospitalization for treatment followed by resumption of parenteral nutrition at home. Some patients must remain on parenteral nutritional therapy for life and other patients may require short-term TPN therapy to augment nutritional status, such as patients with a diagnosis of cancer, hyperemesis, HIV, eating disorders, and other diseases and treatments.

Enteral nutrition therapy is administered through a feeding tube into the gastrointestinal tract to patients who cannot eat as a result of an obstruction to the upper gastrointestinal tract or other medical conditions. Enteral nutrition therapy is often administered over a long period, often for six months or longer.

*Anti-Infective Therapy.* Anti-infective therapy is the infusion of antibacterial, anti-viral or anti-fungal medications into the patient's bloodstream for the treatment of a variety of infectious episodes, such as osteomyelitis (bone infections), bacterial endocarditis (infection of the heart valves), wound infections, infections associated with AIDS, cancer, post-transplant and infections of the kidneys and urinary tract. Intravenous anti-infective drugs are delivered through a peripheral catheter inserted in a vein in the patient's arm or via a centrally placed catheter. Anti-infective drugs are often more effective when infused directly into the bloodstream than when taken orally.

*Intravenous Immunoglobulin.* Intravenous immunoglobulin ("IVIG") therapy involves the administration of blood derivative products (gammaglobulins) which are administered to patients with immune deficiency or altered immune status. IVIG therapy is most commonly administered to patients with primary immune deficiencies or autoimmune disorders or as part of a post-transplant treatment protocol. Patients receiving IVIG therapy for primary immune deficiencies usually receive the therapy for life. Patients receiving IVIG therapy for autoimmune disorders receive the therapy intermittently over a period of months depending on their condition.

*Coagulation and Blood Clotting Therapies.* Coagulation or factor replacement therapy is the intermittent administration of a blood clotting factor. Blood clotting factors are generally administered to persons with hemophilia or related genetic disorders which affect the blood's ability to clot. In these disorders, one or more of the normal blood clotting factors is not produced in sufficient amounts by the body. The absence of these clotting factors makes it difficult or impossible for a patient to stop bleeding. Severe hemophiliacs can suffer from spontaneous bleeding episodes without trauma. Repeated bleeding episodes can cause permanent loss of mobility in the joints putting the patient at further risk medically and impinging on their ability to live a normal life. Factor replacement products are administered via a centrally inserted or peripherally inserted intravenous catheter over a short period of time (approximately 10 minutes). Factor is infused when bleeding episodes occur or on a routine preventative basis (prophylaxis). Most patients (even children) and/or their carepartners learn to start their own intravenous catheter and administer their factor. Persons with hemophilia and others who have inherited clotting disorders will require these products throughout their lives.

The ability to acquire factor product under normal conditions is volatile, but currently the international demand for certain factor products far exceeds the supply. Availability of factor product from manufacturers is spotty, thereby requiring the company to purchase through the blood broker market wherein pricing may not be favorable to the company and product availability can change significantly from day to day. During such times of shortages, prices soar with limited availability to pass these additional costs on to patients. Due to the nature of factor manufacturing processes, intermittent product shortages may be experienced from time to time, which may make it difficult for Coram to meet the needs of its patients and may have an adverse impact on Coram's future results of operations. These shortages could be due to insufficient donor pools, failed production lots, contamination, etc. Moreover, a single patient's requirements may, at any given time, expend what would normally be a whole month's inventory for multiple patients. During March 2001, the company began experiencing difficulties obtaining recombinant factor VIII (rVIII) due to a nationwide shortage of this product which was precipitated by Federal Drug Administration requirements exceeding expectations of current manufacturing. Coram currently has a supply of this factor product in inventory to meet immediate patient demands; however, management is proactively taking steps to secure inventory of this product at levels sufficient to meet anticipated future demands. These steps include, but are not limited to, declining new patients for this particular factor product until the shortage eases, as well as, asking patients who are currently using rVIII to consult with their physicians and consider voluntarily switching to appropriate alternative products on a temporary basis. Under normal circumstances, limited allocations of products from manufacturers greatly impacts the company's ability to expand its customer base, but management believes this current factor shortage is likely to impair the company's ability to grow this segment of its business.

*Transplant Services.* Coram developed a specific program and is providing therapies and services to pre- and post bone marrow, blood cell and organ transplant patients. This clinically focused care management program includes, among other things, proprietary patient and environmental assessment and monitoring protocols, patient education tools and clinical training programs. The most

6

JSP 01805

common therapy for transplant patients is anti-infective therapy, including antibiotics, anti-viral and anti-fungal agents, most often prescribed intravenously to prevent or treat an infection due to the patient's immuno-compromised status. Other prescribed therapies include TPN, IVIG, biologic response modifiers, immunosuppressive therapies and blood products.

*Biotherapy.* Coram provides patients with biological response modifiers, colony stimulating factors, erythropoietin and interferons. In addition, Coram provides growth hormone therapies as prescribed by physicians.

*Durable Medical Equipment and Respiratory Therapy Equipment.* Coram provides durable medical and respiratory therapy equipment to its patients for use at home. Durable medical and respiratory equipment include, but are not limited to, hospital beds, wheelchairs, walkers, oxygen systems, home ventilators, sleep apnea equipment and nebulizers. Coram's integrated service approach allows patients to access infusion therapy or other therapy services and the necessary medical equipment through a single source.

*Other Therapies.* Coram provides other technologically advanced therapies such as antineoplastic chemotherapy, pain management, intravenous inotropic therapy for patients with congestive heart failure or for those who are awaiting cardiac transplants, intravenous anti-coagulant therapy for prevention of blood clots, and anti-nausea therapy for chemotherapy induced emesis or hyperemesis gravidarum. Hydration therapy is often administered in conjunction with intravenous chemotherapy. Other therapies, as described herein, amounted to less than 5% of the company's infusion therapy net revenue for each of the years ended December 31, 2000, 1999, and 1998.

### Alternate Site Infusion Therapy: Organization and Operations

*General.* Coram's alternate site infusion therapy business operations are currently conducted through 76 branches. During the year ended December 31, 2000, the branches were divided into two geographic areas. Each area has a Senior Vice President of Operations who reports directly to the President, and an Area Vice President of Sales who reports to the Senior Vice President of Sales, who reports to the President. Coram's new organizational structure was designed to create greater operating and decision making efficiencies associated with operating and managing the company. Management believes that the functional approach to management has, and will continue to, facilitate high quality local decision making, which allows Coram to attract and retain experienced local managers and be responsive to local market needs. As the company continues to reposition its business and increase its focus on the alternate site infusion therapy business, management continuously reviews operations, focusing on cost effective delivery of quality patient care. For example, Coram established a Hemophilia Services Division and specialty hemophilia distribution centers in Malvern, Pennsylvania, Albuquerque, New Mexico and Sacramento, California. Each center utilizes existing Coram branches and resources and concentrates experienced company clinicians and management on addressing the unique needs of hemophilia patients and their carepartners.

*Operating Systems and Controls.* An important factor in Coram's ability to monitor its operating locations is its management information systems. Besides routine financial reporting, the company has developed a performance model for monitoring the field operations of its infusion business. Actual operating results derived from the management information systems can be compared to the performance model, enabling management to identify opportunities for increased efficiency and productivity. Management believes that the use of standardized, specific performance matrices and the identification and monitoring of best demonstrated practices facilitate operational improvements.

Coram endeavors to ensure that its local managers have the appropriate authority and ability to perform effectively by providing training, education, policies and procedures and standardized systems. Coram has designed various management incentive plans that reward performance based on revenue growth, accounts receivable collection, inventory control and contribution of earnings before interest expense, income taxes, depreciation and amortization ("EBITDA").

### Alternate Site Infusion Therapy: Quality Assurance/Performance Improvement

Coram established performance improvement programs for its infusion therapy business that are consistent with its service standards and enable the company to monitor whether the objectives of those standards are met. In 1999, Coram began triennial re-surveys conducted by the Joint Commission on the Accreditation of Health Care Organizations ("JCAHO"). As of December 31, 1999, the corporate office and 30 branches, including related satellite locations, successfully completed the triennial survey process. During 2000, an additional 32 branches were successfully resurveyed by the JCAHO. The company expects that the entire triennial resurvey of all locations will be completed in the second quarter of 2001.

7

JSP 01806

An integral part of Coram's quality efforts is the branch team that meets periodically to perform, among other things, the following functions:

(i)    evaluate branch programs, policies and procedures and amend protocols as needed;

(ii)   provide ongoing direction to quality improvement efforts;

(iii)  evaluate patient satisfaction activities and results and analyze any trends, respond as necessary to achieve better outcomes;

(iv)   assist in the development of new programs or procedures to meet recognized needs within the branch or the community that it serves;

(v)    evaluate the branch staff efforts related to professional and clinical issues such as clinical monitoring of patients; and

(vi)   identify and monitor key performance areas of operations and modify as needed.

Further, Coram's Clinical Operations Department assists branch management in assessing the levels of service being provided to patients. Coram's integrated approach to performance improvement is designed to identify both national and regional trends related to high volume, high risk and new activities. It encompasses continuous assessment and measurement of patient satisfaction at both local and national levels and clinical outcomes. It also encompasses the measurement of management's success in achieving the desired operational and fiscal benchmarks that are key to the company's success.

## Durable Medical Equipment and Respiratory Therapy Equipment

Coram provides a full line of durable medical and respiratory therapy equipment including, but not limited to, hospital beds, wheelchairs, walkers, oxygen systems, home ventilators, sleep apnea equipment and nebulizers to serve the needs of its home care patients through branches located in San Diego, California; Indianapolis, Indiana; Lenexa, Kansas; New Orleans, Louisiana; Detroit, Michigan and Casper, Wyoming. Coram also provides these services through one of its partnerships which has three locations in Wisconsin. Durable medical and respiratory therapy equipment are available to patients for purchase or rent. The many synergies between the company's durable medical and respiratory therapy equipment product line and its base infusion business benefit both the company and its customers. Coram primarily benefits from the opportunity to provide durable medical and respiratory therapy equipment to patients who are already receiving infusion or other therapy services and patients and payers principally benefit from the opportunity to obtain healthcare services and equipment through a single source.

## Clinical Research

Coram has been providing support services for clinical research studies for the alternate site infusion therapy business since 1995. In 1998, the company created a Clinical Research division and began devoting additional resources to, and actively marketing. its capabilities in this area. This division is operated through the company's wholly-owned subsidiary, CTI Network, Inc. ("CTI"). Utilizing integrated information systems and Coram's national network of approximately 750 full-time equivalent alternate site infusion nurses and pharmacists, as well as, contracted nurses from non-Coram agencies, CTI can offer its customers the opportunity to complete some of the most challenging aspects of a clinical trial more quickly by:

(i)    providing single source contracting through a central office for national services;

(ii)   assisting in the identification of potential investigators;

(iii)  providing nurse study coordinators at the physician's office;

(iv)   providing alternate site healthcare services such as therapy administration, specimen collection, patient education and training, patient assessments and data collection;

(v)    providing alternate site pharmacy services;

(vi)   providing patient screening and surveying services; and

8

JSP 01807

A676

(vii) providing product acquisition and national distribution services.

**CPS: Pharmacy Benefit Management and Specialty Mail-Order Pharmacy Services**

On July 31, 2000, the company completed the sale of CPS to Curascript Pharmacy Services, Inc. and Curascript PBM Services, Inc. (collectively, the "Buyers"). The Buyers are newly formed affiliates of GTCR Golder Rauner, L.L.C. and the Buyers are led by certain members of the former CPS management team. See Note 5 to the company's Consolidated Financial Statements.

CPS offered HMO, PPO, at-risk physician groups, self funded employer benefit plans, labor organizations and other managed care customers pharmacy benefit management and specialty mail-order pharmacy services. The pharmacy benefit management services included on-line claims administration, formulary management and drug utilization review through a nationwide network of over 51,000 retail pharmacies. The company generally maintained approximately 60 such arrangements in place for pharmacy benefit management services. CPS's specialty mail-order pharmacy service offered centralized distribution, compliance monitoring, patient education and clinical support to patients with specialized needs. In particular, CPS focused its marketing efforts on patients with organ transplants, HIV/AIDS, growth deficiencies and other chronic conditions. As of July 31, 2000, CPS had approximately 6,200 active patients receiving its specialty mail-order pharmacy services.

The CPS division operated from its centralized facility in Orlando, Florida, which opened in March 1999, replacing its former centralized facility in Omaha, Nebraska. Both facilities were operational for much of 1999, with the Omaha facility serving a support role as the transition was made to Orlando. The Omaha facility serviced local payer relationships and the Orlando facility served as the primary CPS call center and specialty mail-order pharmacy location. CPS maintained four other satellite pharmacy operations to satisfy specific local customer and payer requirements. One of the satellites functioned as a walk-in retail pharmacy and was located in a large hospital. CPS closed its Plainview, New York satellite pharmacy effective February 2000.

**Resource Network Subsidiaries: Ancillary Network Management Services**

The Resource Network Subsidiaries offered ancillary network management services to HMOs, PPOs, at-risk physician groups and other managed care organizations for the home health services offered under their benefits plans. As of January 1, 1999, R-Net was providing its services to its customers' plans that covered approximately 3.5 million lives. Typically, a network of home health service vendors managed by R-Net included providers of home infusion, home nursing, durable medical equipment, respiratory therapy, home hospice, medical supplies, women's health, orthotics, prosthetics and other home health services identified by the customer. Each network provider was contracted with R-Net and received referrals of patients from R-Net. Where appropriate, the company's infusion and CPS divisions participated in the provider networks established by R-Net.

For most of 1999, R-Net operated from its two primary call centers and three satellite offices. The division's call center in Whippany, New Jersey was opened in 1998 for the purpose of replacing the former Totowa, New Jersey call center with a suitable facility for rendering the services required of R-Net under the Master Agreement with Aetna that was signed in April 1998. R-Net also maintained a call center in Houston, Texas. Together, R-Net's primary call centers provided administrative services for the division and management and intake services for several payer customers. The R-Net satellite offices were devoted to serving the members of only one or two local customers.

The agreements that R-Net had for the provision of ancillary network management services have been terminated and R-Net is no longer providing any ancillary network management services. The Resource Network Subsidiaries are being liquidated pursuant to certain Chapter 11 bankruptcy proceedings that are currently pending in the United States Bankruptcy Court for the District of Delaware. The Chapter 11 proceedings were originally initiated with the filing on August 19, 1999 of an involuntary bankruptcy petition against Coram Resource Network, Inc. in such court. Subsequently, both Resource Network Subsidiaries filed voluntary petitions for relief on November 12, 1999. See Item 3. "Legal Proceedings."

All of the R-Net locations have been closed in connection with its pending liquidation. Additionally, all Coram employees who were members of the Resource Network Subsidiaries' Board of Directors resigned during the year ended December 31, 2000, and currently only the Chief Restructuring Officer appointed by the Bankruptcy Court remains on the Board of Directors to manage and operate the liquidation of the R-Net business. Coram classifies the operating losses of this business as discontinued operations in the consolidated financial statements. See Item 3. "Legal Proceedings" and Notes 4 and 13 to the company's Consolidated Financial Statements for more information regarding discontinued operations and the amicable resolution of certain disputes between Aetna, the company and the Resource Network Subsidiaries.

JSP 01808

## Reimbursement of Services

Virtually all of Coram's operating revenue is derived from third-party payers, including private insurers, managed care organizations such as HMOs and PPOs, at-risk physician groups, and governmental payers such as Medicare and Medicaid. Like other medical service providers, Coram experiences lengthy reimbursement periods in certain circumstances as a result of third-party payment procedures. Consequently, management of accounts receivable through effective patient registration, billing, documentation, collection and reimbursement procedures is critical to financial success and continues to be a high priority for management. Coram continues to focus on the processing of clean claims and the careful screening of new cases to determine that adequate reimbursement will be available and will be received in a timely manner.

In certain instances, fixed fee or capitated fee arrangements are utilized. Under a capitated fee arrangement, Coram would agree to deliver or arrange for the delivery of certain home health services required under the payer customer's health plan in exchange for a fixed per member per month service fee. The total per member per month fee is calculated using all members enrolled in the particular health plan as of certain dates. Before establishing the appropriate per member per month fee, Coram typically reviews utilization data provided by the payer customer and/or other available utilization data. In some instances, the per member per month rates will be adjusted or reconciled periodically to reflect actual utilization to prevent excess losses by the company or excess expense outlays by the payer customer. As of December 31, 2000, the infusion therapy division was a party of only four capitated contracts, none of which provided more than 5% of the company's net revenue for any year during the three year period ended December 31, 2000. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Background."

Reimbursement payments are provided through various sources, such as insurance companies, self-insured employers, patients and the Medicare and Medicaid programs. The Healthcare Financing Administration has developed, for use in the Medicare Part B program, a national fee schedule for respiratory therapy, home medical equipment and infusion therapy, which provides reimbursement at 80% of the amount of any fee on the schedule. The remaining 20% co-insurance portion is the obligation of secondary insurance and/or the patient. A substantial amount of the revenue Coram earns under the Medicare program originates from the Part B program. Private indemnity payers typically reimburse at a higher amount for a given service and provide a broader range of benefits than governmental and managed care payers, although net revenue and gross profit from both private and other third-party non-governmental payers have been affected by continuing efforts to contain or reduce reimbursement for healthcare services. An increasing percentage of Coram's net revenue has been derived in recent years from agreements with HMOs, PPOs, managed care providers and other contracted payers. Although these agreements often provide for negotiated reimbursement at reduced rates, they generally result in lower bad debts and provide opportunities to generate greater volume than traditional indemnity referrals.

Laws and regulations governing the Medicare and Medicaid programs are complex and subject to interpretation. Management is aware of certain ongoing audits and reviews with respect to prior reimbursements from Medicare and Medicaid. While management believes that the company is in substantial compliance with all applicable laws and regulations, compliance with such laws and regulations can be subject to future government review and interpretation, as well as, significant regulatory action, including fines, penalties, and exclusion from the Medicare and Medicaid programs. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Risk Factors."

In December 2000, Coram announced that as part of its continuing efforts to improve efficiency and overall performance, several Patient Financial Service Centers (reimbursement sites) were being consolidated and the related reimbursement positions were to be eliminated. By consolidating to fewer sites, management expects to implement improved training, more easily standardize "best demonstrated practices," enhance specialization related to payers such as Medicare and achieve more consistent and timely cash collections. Management does not expect this change to affect Coram's patients or payers, but believes, instead, that in the long-term they will receive better, more consistent service. The transition is expected to be accomplished in stages beginning April 1, 2001 and ending in the third quarter of the same year. Management has taken certain actions to mitigate the potential shortfall in cash collections during the upcoming transition period, including, but not limited to, offering incentives for personnel to stay with the company until the completion of their corresponding regional consolidation. No assurances can be given that the consolidation of the company's Patient Financial Service Centers will be completed by the end of the third quarter of 2001, that the consolidation will be successful in enhancing timely reimbursement or that the company will not experience a significant shortfall in cash collections during or after the transition period. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Risk Factors."

10

JSP 01809

**Competition**

The alternate site infusion therapy market is highly competitive. Some of Coram's current and potential competitors in these lines of business include:

(i)    integrated providers of alternate site healthcare services;

(ii)   hospitals; and

(iii)  local providers of multiple products and services for the alternate site healthcare market.

Coram has experienced increased competition in its alternate site infusion therapy business from hospitals and physicians that have sought to increase the scope of services offered through their facilities, including services similar to those offered by Coram.

Coram competes with other providers on a number of critical differentiating factors, including quality of care and service, reputation within the medical and payer communities, geographic scope and price. Competition within Coram's alternate site infusion therapy line of business has been affected by the decision of third-party payers and their case managers to be more active in monitoring and directing the care delivered to their beneficiaries. Accordingly, relationships with such payers and their case managers and inclusion within preferred provider and other networks of approved or accredited providers is often a prerequisite to Coram's ability to continue to serve many of its patients. Similarly, Coram's ability to align itself with other healthcare service providers may increase in importance as managed care providers and provider networks seek out providers who offer a broad range of services that may exceed the range of services currently offered directly by Coram.

There are relatively few barriers to entry in the local markets which Coram serves. Local or regional companies are currently competing in many of the healthcare markets served by the company and others may do so in the future. Entrance into the local markets by competitors could cause a decline in net revenue, loss of market acceptance of Coram's services and price competition. Coram expects to continue to encounter competition in the future that could limit its ability to maintain or increase its market share. Such competition could have an adverse effect on the business, financial condition and results of operations of Coram. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Risk Factors."

**Sales and Marketing**

Coram's alternate site infusion therapy products and services are marketed through branch sales personnel, including managed care consultants and account managers, to its primary referral sources. The company established product managers for three of its core therapies: nutrition, anti-infectives/transplant and hemophilia-related services through three Strategic Business Units: Nutrition Services, Anti-Infectives/Transplant Services and Blood Products Services (including hemophilia and IVIG), respectively. The vice president for each unit has responsibility for ongoing program development and provides clinical and marketing resources to focus on growing sales in these areas.

Substantially all of Coram's new patients are referred by physicians, medical groups, hospital discharge planners, case managers employed by HMOs, PPOs or other managed care organizations, insurance companies and home care agencies. Coram's sales force in each of its lines of business is responsible for establishing and maintaining referral sources. Sales employees generally receive a base salary plus incentive compensation based on core therapy revenue growth and/or EBITDA enhancements.

Coram's network of field representatives enables it to market its services to numerous sources of patient referrals, including physicians, hospital discharge planners, hospital personnel, HMOs, PPOs and insurance companies. Marketing is focused on presenting Coram's clinical expertise tailored to specific customer interests, with an emphasis on certain key therapies. Specialty marketing and sales support personnel promote products and services that are outside of base infusion therapy.

As a result of escalating pressures to contain healthcare costs, third-party payers are participating in certain decisions regarding healthcare alternatives, using their significant bargaining power to secure discounts and to direct referrals of their enrollees to providers. In response, Coram has directed its sales and development focus to aggressively pursue agreements with third-party payers, managed care organizations and provider networks that provide high quality, cost-effective care. Coram maintains a dedicated sales force in each of its lines of business to enhance its efforts to market and sell its services to managed care payers. In the company's infusion therapy division, managed care sales representatives are deployed to focus on regional and national payers, with a field sales force to affect "pull-through" from referral sources within each payer's network. Coram is currently focusing its efforts in its infusion

11

JSP 01810

A679

therapy business on increasing referrals through selected managed care agreements, with the goal of being the preferred infusion provider, as well as, selling specialty programs such as nutrition, anti-infectives, IVIG and services for persons with hemophilia and persons receiving certain types of organ and bone marrow/blood cell transplants.

## Customers and Suppliers

Coram provides alternate site home healthcare services and products to a large number of patients and related payers. Excluding Medicare and Medicaid, which collectively represented approximately 22% of consolidated net revenue from continuing operations, including CPS, for the year ended December 31, 2000, no other single payer accounted for more than 5% of Coram's net revenue for 2000.

Coram purchases products from a large number of suppliers and considers its relationships with its vendors to be good, subject to credit uncertainty and the ongoing bankruptcy proceedings. Management believes that substantially all of its products are available from alternative sources with terms consistent, in all material respects, to its present agreements. This is true for products currently being purchased through Cardinal Health, Inc. and Baxter Healthcare Corporation, two of Coram's major suppliers of drugs and supplies. During the year ended December 31, 2000, Coram purchased approximately $95.8 million of drugs and supplies from Cardinal Health, Inc. and $22.8 million from Baxter Corporation, or approximately 63% and 15%, respectively, of its total drugs and supplies.

The principal supplier of Coram's infusion pumps, Sabratek Corporation ("Sabratek"), filed for protection under Chapter 11 of the United States Bankruptcy Code on December 17, 1999. Baxter Healthcare Corporation ("Baxter") purchased certain Sabratek assets, including Sabratek's pump manufacturing division, and has continued to produce the related tubing and infusion sets needed to operate the ambulatory infusion pumps manufactured by Sabratek and used by Coram. Beginning in January 2000, Coram's fleet of approximately 5,000 Sabratek 6060 Homerun pumps began to experience malfunctions and failures of various sorts due to inherent flaws in the design of the pump. Pumps needing repair were sent back to Sabratek for repair at no cost due to a five-year warranty on pump repairs that was part of the underlying contract. However, due to part shortages, Sabratek did not always perform these repairs promptly. When Baxter acquired Sabratek during 2000, the pumps still awaiting repair were transferred to Baxter. The 6060 Homerun pumps continued to malfunction in larger numbers so that by December 2000 approximately 500 pumps were at Baxter awaiting repair. Baxter inherited the same difficulties with repairs that Sabratek experienced: an insufficient labor pool and substandard repair parts. In order to supply a sufficient number of these pumps for patient needs, Coram has had to reserve use of the 6060 Homerun pumps to only those patients who are truly ambulatory, carefully manage its nationwide supply by transferring pumps from branch to branch and, in some cases, rent pumps from other vendors. Vendors in some markets have been similarly affected by Baxter's pump repair backlog and occasionally could not supply the company's 6060 Homerun pump needs. When this has occurred, Coram has doubled its efforts to make effective use of available pumps. Coram has not refused any patients because of the short supply of 6060 Homerun pumps; however, the ability to purchase the amount of tubing required in the contract with Baxter, and thereby attain certain required purchasing thresholds, may be jeopardized by Baxter's inability to repair and return the pumps in a timely manner. Currently, over 600 Coram pumps are in for repair with Baxter. While management believes the company can meet the needs of its patients, quality of care may be impacted resulting in reduced patient satisfaction. Diversifying the pump fleet would add significant cost to the process, as well as, demand on limited resources to provide patient and caregiver training and certification. Under normal conditions, Coram would transition its pump fleet at a rate of approximately 20% per year; however, the current conditions may require the company to replace the entire fleet within the next year. Management is currently pursuing alternatives to the current infusion pump supply chain; however, management cannot predict what consequences will result from obtaining alternate ambulatory infusion pumps.

## Government Regulation

*General.* The federal government and all states in which Coram is currently operating regulate various aspects of Coram's business. In particular, Coram's operations are subject to extensive federal and state laws regulating, among other things, the provision of pharmacy, home care, nursing services, ancillary network management services, health planning, health and safety, environmental compliance and toxic and medical waste disposal. Coram is also subject to fraud and abuse and self-referral laws, which affect its business relationships with physicians, other healthcare providers and referral sources and its reimbursement from government payers. Generally, all states require infusion companies to be licensed as pharmacies and to have appropriate state and federal registrations for dispensing controlled substances. Some states require infusion companies to be licensed as nursing or home health agencies and to obtain medical waste permits. In addition, certain company employees are subject to state laws and regulations governing the ethics and professional practices of pharmacy and/or nursing.

12

JSP 01811

Coram may also be required to obtain certifications or register in order to participate in governmental payment programs such as Medicare and Medicaid. Some states have established certificate-of-need programs regulating the establishment or expansion of healthcare operations, including certain of Coram's operations. The failure to obtain, renew or maintain any of the required regulatory approvals, certifications, registrations or licenses could adversely affect Coram's business and could prevent the location or locations involved from offering products and services to patients and/or from billing third-party payers. Coram's operating results could be adversely affected, directly or indirectly, as a result of any such actions. Coram believes it complies, in all material respects, with these and all other applicable laws and regulations. The healthcare services industry will continue to be subject to pervasive regulation at the federal and state levels, the scope and effect of which cannot be predicted. No assurances can be given that the activities of Coram will not be reviewed and challenged or that government sponsored healthcare reform, if enacted, will not result in material adverse changes to the company.

*Fraud and Abuse.* Coram's operations are subject to the illegal remuneration provisions of the Social Security Act (sometimes referred to as the "anti-kickback" statute) that imposes criminal and civil sanctions on persons who knowingly and willfully solicit, offer, receive or pay any remuneration, whether directly or indirectly, in return for, or to induce, the referral of a patient for treatment, or, among other things, the ordering, purchasing or leasing, of items or services that are paid for in whole or in part by federal healthcare programs. Violations of the federal anti-kickback statute are punishable by criminal penalties, including imprisonment, fines and exclusion of the provider from future participation in federal healthcare programs. Federal healthcare programs have been defined to include any plan or program that provides health benefits which is funded by the United States Government and commonly include, among others, Medicare, Medicaid and the Civilian Health and Medical Program of the Uniformed Services. Administrative exclusion and civil monetary penalties for anti-kickback violations can also be imposed through an administrative process. Federal enforcement officials may also attempt to use other general federal statutes to punish behavior considered fraudulent or abusive, including the Federal False Claims Act, which provides for penalties of up to $10,000 per claim plus treble damages, and permits private persons to sue on behalf of the government. While the federal anti-kickback statute expressly prohibits transactions that have traditionally had criminal implications, such as kickbacks, rebates or bribes for patient referrals, its language has been construed broadly and has not been exclusively limited to such obviously wrongful transactions. Some court decisions state that, under certain circumstances, the statute is also violated when "one" purpose (as opposed to the "primary" or a "material" purpose) of a payment is to induce referrals. Congress has frequently considered, but has not yet adopted, federal legislation that would expand the federal anti-kickback statute to include the same broad prohibitions regardless of payer source.

In addition to the payment or receipt of illegal remuneration for the referral or generation of federal healthcare program business, the fraud and abuse laws cover other billing practices that are considered fraudulent (such as presentation of duplicate claims, claims for services not actually rendered or for procedures that are more costly than those actually rendered) or abusive (such as claims presented for services not medically necessary based upon a misrepresentation of fact) subject to the same remedies described above.

Similarly, a large number of states have varying laws prohibiting certain direct or indirect remuneration between healthcare providers for the referral of patients to a particular provider, including pharmacies and home health agencies. Possible sanctions for violations of these laws include loss of licensure, exclusion from state funded programs and civil and criminal penalties.

*Prohibition on Physician Referrals.* Under the Omnibus Budget Reconciliation Act of 1993 (commonly referred to as "Stark II"), it is unlawful for a physician to refer patients for certain designated health services reimbursable under the Medicare or Medicaid program to an entity with which the physician has a financial relationship, unless the financial relationship fits within an exception enumerated in Stark II or regulations promulgated thereunder. Aspects of Coram's business which are "designated health services" for purposes of Stark II include outpatient prescription drugs, parenteral and enteral nutrition, equipment and supplies, durable medical equipment and home health services. A "financial relationship" under Stark II is defined broadly as an ownership or investment interest in, or any type of compensation arrangement in which remuneration flows between the physician and the provider. Coram has financial relationships with physicians and physician owned entities in the form of medical director agreements and service agreements pursuant to which the company provides pharmacy products. In each case, the relationship has been structured, based on advice of legal counsel, using an arrangement management believes to be consistent with applicable exceptions set forth in Stark II, such as the personal services arrangements exception or the exception for payments by a physician for items and services.

In addition, the company is aware of certain referring physicians that have had a financial interest in the company through ownership of shares of the company's common stock. The Stark II law includes an exception for the ownership of publicly traded stock in certain companies with equity above certain levels. As of December 31, 2000, the company complied with the requirements of such exception. However, there can be no assurance that the ownership of shares of Coram common stock by referring physicians will continue to fit within the public company exception of Stark II because the public company exception requires the issuing company to have stockholders' equity of at least $75 million either as of the end of its most recent fiscal year or on a weighted average

13

JSP 01812

basis during the last three fiscal years. Due principally to the gain on troubled debt restructuring (see Note 8 to the company's Consolidated Financial Statements) and the disposition of CPS (see Note 5 to the company's Consolidated Financial Statements), at December 31, 2000 the company's stockholders' equity was above the required level. However, in light of the company's recurring operational losses during each of the years in the three year period ended December 31, 2000, management's ability to maintain an appropriate level of stockholders' equity cannot be reasonably assured. With a decrease in equity below $75 million at December 31, 2001, Coram may no longer qualify for such exception and would be forced to cease accepting referrals of patients with government sponsored benefit programs from physicians who own shares of Coram's common stock. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Risk Factors."

Under Stark II, an entity is prohibited from claiming payment under the Medicare or Medicaid programs for services rendered pursuant to a prohibited referral and is liable for the refund of amounts received pursuant to prohibited claims. The entity can also be assessed civil penalties of up to $15,000 per improper claim and can be excluded from participation in the Medicare and/or Medicaid programs. In addition, a number of the states in which the company operates have similar prohibitions on physician self-referrals with similar penalties. Although management believes it has structured its financial relationships with physicians to comply with such Stark II and applicable state law equivalents, a failure to comply with the provisions of such laws could have a material adverse effect on the company.

*Other Fraud and Abuse Laws.* The False Claims Act imposes civil liability on individuals or entities that submit false or fraudulent claims for payment to the government. Violations of the False Claims Act may result in civil penalties and forfeitures and exclusion from the Medicare and Medicaid programs. The Health Insurance Portability and Accountability Act of 1996 created two new federal crimes: "Healthcare Fraud" and "False Statements Relating to Healthcare Matters." The Healthcare Fraud statute prohibits knowingly and willfully executing a scheme or artifice to defraud any healthcare benefit program. A violation of this statute is a felony and may result in fines and/or imprisonment. The False Statements statute prohibits knowingly and willfully falsifying, concealing or covering up a material fact by any trick, scheme or device or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items or services. A violation of this statute is a felony and may result in fines and/or imprisonment.

Recently, the federal government has made a decision to significantly increase the financial resources allocated to enforcing the healthcare fraud and abuse laws. In addition, private insurers and various state enforcement agencies have increased their level of scrutiny of healthcare claims in an effort to identify and prosecute fraudulent and abusive practices in healthcare. A failure to comply with any of the fraud and abuse laws could have a material adverse effect on the company.

*Medicare and Healthcare Reform.* As part of the Balanced Budget Act of 1997 (the "BBA"), Congress made numerous changes that affect Part A certified home health agencies and Part B suppliers like Coram that participate in the Medicare program. These policies were subsequently modified by the Medicare, Medicaid and SCHIP Balanced Budget Refinement Act of 1999 (the "BBRA") and the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000 (the "BIPA").

The BBA requires Part A certified home health agencies, as a condition of their participation in Part A of the Medicare program, to post surety bonds. The bonds are to be used to secure performance and compliance with Medicare program rules and requirements. The regulations, as originally published, would have required each Medicare certified home health provider to obtain a surety bond in an amount equal to the greater of 15% of the annual amount Medicare paid to the provider in the prior year (up to a maximum of $3,000,000) or $50,000. The BBRA modified the annual surety bond amounts for home health agencies to require the lesser of 10% of the amount Medicare paid to the provider in the prior year or $50,000. The deadline for securing such bonds has been extended indefinitely while the Health Care Financing Administration ("HCFA") reviews the bonding requirements. HCFA has indicated that the new compliance date will be sixty days after the publication of the final rule. Management believes, based upon currently available information derived from its discussions with surety bond brokers and organizations that issue surety bonds, that the necessary bonds will not be generally available to home health providers until HCFA revises its bonding requirements in a way that clarifies and/or limits the types of liabilities that will be covered by the bonds. As of April 9, 2001, the company had only one Medicare certified home health provider location, which has not obtained a surety bond.

As required by the BBA, HCFA also intends to issue separate surety bond regulations applicable to Part B suppliers. Virtually all of Coram's branch offices participate as suppliers in the Part B Medicare program. Similar bonding requirements are being reviewed by state Medicaid programs. If Coram is not able to obtain all of the necessary surety bonds, it may have to cease its participation in the Medicare and Medicaid programs for some or all of its branch locations. In October 2000, HCFA issued final supplier standards, which expanded certain operational requirements for suppliers. In the final rule, HCFA decided to delay the surety bond rule pending "extensive changes" to this requirement. HCFA stated that it will consider public comments received on the surety bond requirements,

14

primarily relating to costs, along with its experience with surety bonds for home health agencies and the General Accounting Office's study of Medicare surety bonds, when it issues a proposed rule on surety bonds in the future. Until HCFA issues another rule on this provision, there is no surety bond requirement for suppliers. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Liquidity and Capital Resources -- Part A and Part B Medicare Surety Bonds."

The BBA also reduced reimbursement for oxygen and oxygen related therapies by 25% effective January 1, 1998, with an additional 5% reduction effective January 1, 1999 and in subsequent years. In addition, the BBA eliminated consumer price index updates for durable medical equipment and parenteral and enteral nutrients, supplies and equipment for five years, thereby "freezing" the payment amount for such items until the year 2003. The BBRA restored a portion of the durable medical equipment and oxygen payments by increasing the fee schedules by 0.3% in 2001 and 0.6% in 2002. The BIPA further modified payments for durable medical equipment by providing a full inflation update for items of durable medical equipment (but not oxygen and oxygen equipment) in 2001, implemented in two steps; however, the BIPA does not authorize durable medical equipment payment increases for 2002.

The BBA also mandated the implementation of a prospective payment system ("PPS") for home health services for cost reporting periods beginning on or after October 1, 1999. This deadline was subsequently extended to October 1, 2000. On July 3, 2000, HCFA issued a final rule to implement the home health PPS. Under the final rule, Medicare pays home health agencies for each covered 60-day episode of care, based on the care needs of the patients, as determined by a standardized assessment tool used to assess patient needs. Agencies also are eligible for outlier payments if the costs of caring for an individual beneficiary were significantly higher than the specified payment rate. The BIPA delays a scheduled 15 percent reduction in aggregate home health PPS amounts by another year, until October 1, 2002, while the United States Comptroller General studies the need for the 15 percent reduction. The aggregate amount of Medicare payments to home health agencies in fiscal year 2002 will equal the aggregate payments in fiscal year 2001, updated by the market basket index ("MBI") increase, minus 1.1%. The BIPA also provides a full MBI update for services provided under the home health PPS for fiscal year 2001, implemented in two phases. In addition, the BBA established consolidated billing requirements for home health agencies, under which payment for home health products and services may only be made to the home health agency that establishes the beneficiary's home health plan of care, regardless of whether the item or service was furnished by the agency or by an outside provider or supplier. The BBA excludes durable medical equipment and oxygen and oxygen supplies from the consolidated billing requirement, thereby enabling durable medical equipment and oxygen suppliers to continue to bill Medicare Part B directly for items and services furnished to home health patients, rather than be dependent on a home health agency for payment.

The BIPA also addresses HCFA policies regarding coverage of and payment for drugs and biologicals. For instance, the BIPA requires that payment for drugs under Part B be made on an assigned basis; in other words, the provider must accept the Medicare fee schedule amount as payment in full. The BIPA also addresses HCFA's attempts to modify the calculation of average wholesale prices ("AWPs") of drugs, upon which Medicare reimbursement is based. The federal government has been investigating whether pharmaceutical manufacturers have been manipulating AWPs. In May 2000, HCFA proposed using new Department of Justice pricing data for updating Medicare payment allowances for drugs and biologicals, although HCFA withdrew this proposal in November 2000, citing the likelihood of Congressional action in this area. The BIPA established a temporary moratorium on direct or indirect reductions (but not increases) in payment rates in effect on January 1, 2001, until the Secretary of Health and Human Services reviews a study that the General Accounting Office ("GAO") is directed to conduct regarding the Medicare reimbursement for drugs and biologicals and related services. The GAO is directed to report to Congress and the Secretary of Health and Human Services within nine months of enactment on specific recommendations for revised payment methodologies. It is uncertain at this time what Medicare prescription drug payment recommendations will be proposed by the GAO or whether such proposals or other payment initiatives will be adopted by the Medicare program in the future.

The BBA also authorized certain demonstration projects for competitive bidding involving, at a minimum, oxygen and oxygen equipment, through December 31, 2002. The first competitive bidding project, underway in Polk County, Florida, is using payment rates that are between 13% and 31% lower than Medicare's existing fee schedule for five categories of products, including oxygen equipment and supplies, enteral nutrition equipment and supplies and urological supplies. Plans are underway to implement another round of competitive bidding in Polk County in October 2001, covering oxygen equipment and supplies, hospital beds and accessories, urological supplies and surgical dressings. A second competitive bidding project was launched on February 1, 2001 in the San Antonio, Texas area, and applies to, among other things, oxygen equipment and supplies and nebulizer inhalation drugs. The long-range impact of the home health prospective payment system and future competitive bidding projects is unclear. Accordingly, there can be no assurances that adoption of these or other payment systems and the implementation of the Medicare reimbursement reductions and freezes described above will not result in a material decrease in the amount of reimbursement Coram receives from the

JSP 01814

Medicare program for the services it currently provides and any other home health or related oxygen, durable medical equipment or home infusion services Coram may provide in the future.

*Health Information Practices.* The administrative simplification provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") mandate, among other things, the adoption of standards for the exchange of electronic health information in an effort to encourage overall administrative simplification and enhance the effectiveness and efficiency of the healthcare industry. Among the standards that the Department of Health and Human Services (the "DHHS") must adopt pursuant to HIPAA are standards for the following: electronic transactions and code sets; unique identifiers for providers, employers, health plans and individuals; security and electronic signatures; privacy; and enforcement.

Although HIPAA was intended ultimately to reduce administrative expenses and burdens faced within the healthcare industry, the law may initially bring about significant and, in some cases, costly changes. The DHHS has released two rules to date mandating the use of new standards with respect to certain healthcare transactions and health information. The first rule requires the use of uniform standards for common healthcare transactions, including healthcare claims information, plan eligibility, referral certification and authorization, claims status, plan enrollment and disenrollment, payment and remittance advice, plan premium payments and coordination of benefits, and it establishes standards for the use of electronic signatures.

Second, the DHHS released new standards relating to the privacy of individually identifiable health information. These standards not only require compliance with rules governing the use and disclosure of protected health information, but they also impose those rules, by contract, on any business associate to whom such information is disclosed. Rules governing the security of health information have been proposed but have not yet been issued in final form.

The DHHS finalized the new standards on August 17, 2000, and the company will be required to comply with them by October 16, 2002. The privacy standards were issued on December 28, 2000, to become effective on April 14, 2001, with a compliance date of April 14, 2003. In addition, on February 28, 2001, the DHHS amended the final privacy rule to allow additional public comments before the rule becomes effective on April 14, 2001. The current administration and Congress are taking a careful look at the existing regulations, but it is uncertain whether there will be further changes to the privacy standards or their compliance date. With respect to the security regulations, once they are issued in final form, affected parties will have approximately two years to be fully compliant. Sanctions for failing to comply with the HIPAA health information practices provisions include criminal penalties and civil sanctions.

The company is evaluating the effect of HIPAA and taking steps to achieve compliance. At this time, management anticipates that the company will be able to fully comply with the HIPAA requirements that have been adopted. However, management cannot, at this time, estimate the cost of such compliance, nor can management estimate the cost of compliance with standards that have not yet been finalized by the DHHS. Although the new and proposed health information standards are likely to have a significant effect on the manner in which the company handles health data and communicates with payers, based on current knowledge, management believes that the cost of compliance will not have a material adverse effect on the company's business, financial condition, results of operations or cash flows.

Further statutes or regulations may be adopted which would impose additional requirements in order for Coram to be eligible to participate in the federal and state payment programs. Such new legislation or regulations may adversely affect Coram's business operations. There is significant national concern today about the availability and rising cost of healthcare in the United States. It is anticipated that new federal and/or state legislation will be passed and regulations adopted to attempt to provide broader and better healthcare services and to manage and contain their cost. Management is unable to predict the content of any legislation or what, if any, changes may occur in the method and rates of its Medicare and Medicaid reimbursement or in other government regulations that may affect its businesses, or whether such changes, if made, will have a material adverse effect on Coram's business, financial position and results of operations.

*State Laws Regarding Fee Splitting, Provision of Medicine and Insurance.* The laws of many states prohibit physicians from splitting fees with non-physicians and prohibit non-physician entities from practicing medicine. These laws vary from state to state and are enforced by the courts and by regulatory authorities with broad discretion. Although management believes its operations, as currently conducted, are in material compliance with existing applicable laws, certain aspects of Coram's business operations have not been subject to state or federal regulatory interpretation. There can be no assurance that a review of Coram's business by courts or regulatory authorities will not result in determinations that could adversely affect the company's operations or that the healthcare regulatory environment will not change so as to restrict its existing operations or its expansion.

16

JSP 01815

A684

Most states have laws regulating insurance companies and HMOs. Coram is not qualified in any state to engage in either the insurance or HMO business, but Coram had registered one of its R-Net subsidiaries as a risk-taking preferred provider organization in one state. This subsidiary is no longer operating. As managed care penetration increases, state regulators are beginning to scrutinize the practices of and relationships among third-party payers, medical service providers and entities providing management and administrative services to medical service providers, especially with respect to risk-sharing arrangements by and among such providers. State regulators are also reviewing whether risk-bearing entities are subject to insurance or HMO regulation. Management believes that its practices are consistent with those of other direct healthcare service providers and do not constitute licensable HMO or insurance activities. To the extent such licenses may be required, Coram will make the necessary filings and registrations to achieve compliance with applicable laws. However, given the limited regulatory history with respect to such practices, there can be no assurance that states requiring licensure will not attempt to assert jurisdiction. If the states pursue actions against Coram and/or its customers, Coram may be compelled to restructure or refrain from engaging in certain business practices.

*Pharmacies and Home Health Agencies.* Each of Coram's pharmacies is licensed in the states in which it is located and in the states where its products are delivered. Each of these pharmacies also has a Controlled Substances Registration Certificate issued by the Drug Enforcement Administration of the United States Department of Justice. Many states in which the company operates also require home infusion companies to be licensed as home health agencies. The failure of a branch facility to obtain, renew or maintain any required regulatory approvals or licenses could adversely affect the existing operations of that branch facility.

*Other Regulations.* Coram's operations are subject to various state hazardous and medical waste disposal laws. The laws currently in effect do not classify most of the waste produced during the provision of the company's services to be hazardous, although disposal of non-hazardous medical waste is also subject to regulation. Occupational Safety and Health Administration ("OSHA") regulations require employers of workers who are occupationally exposed to blood or other potentially infectious materials to provide those workers with certain prescribed protections against bloodborne pathogens. The regulatory requirements apply to all healthcare facilities, including the company's branches, and require employers to make a determination as to which employees may be exposed to blood or other potentially infectious materials and to have in effect a written exposure control plan. Furthermore, employers are required to provide hepatitis-B vaccinations, personal protective equipment, infection control training, post-exposure evaluation and follow-up, waste disposal policies and procedures, and engineering and work practice controls. Employers are also required to comply with certain record keeping requirements. Management believes that the company is in material compliance with the foregoing laws and regulations.

*Internal Compliance and Monitoring.* Coram implemented measures to ensure compliance with applicable laws and engaged Richard P. Kusserow, the former Inspector General of the Department of Health and Human Services, as a consultant to assist Coram in its continued development and administration of its compliance program. Coram's internal regulatory compliance review program is intended to deal with legal, regulatory and ethical compliance issues. However, no assurances can be given that Coram's business arrangements, present or past (or those of its predecessors or divested subsidiaries, affiliates or partnerships), will not be the subject of an investigation or prosecution by a federal or state governmental authority in the future. Such investigations could result in a penalty, or any combination of the penalties discussed above, depending upon the agency involved in such investigation and prosecution.

Coram regularly monitors legislative developments and would seek to restructure a business arrangement if it was determined that any of its business relationships placed the company in material noncompliance with any applicable statute or regulation. The healthcare services industry will continue to be subject to substantial regulation at the federal and state levels, the scope and effect of which cannot be predicted by management. Any loss by Coram of its various federal certifications, its authorization to participate in the Medicare or Medicaid programs or its licenses under the laws of any state or other governmental authority from which a substantial portion of its revenue is derived would have a material adverse effect on its business. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Risk Factors."

## Employees

As of December 31, 2000, Coram had approximately 2,200 full-time equivalent employees (2,700 full and part-time employees). None of Coram's employees are currently represented by a labor union or other labor organization, or covered by a collective bargaining agreement. Approximately 34% of the full-time employees are nurses and pharmacists, with the remainder consisting primarily of sales and marketing, billing and reimbursement, branch operations, clinical coordinators, financial and systems professionals. Management believes that its employee relations are good.

17

JSP 01816

A685

## ITEM 2. PROPERTIES

The company's corporate headquarters are located in Denver, Colorado and consist of approximately 20,000 square feet of office space leased through August 31, 2001. Due to the current lease agreement expiring in August 2001, Coram is reviewing several options for the corporate office. As of April 2, 2001, Coram had 76 branch offices throughout the United States and Canada, totaling approximately 0.8 million square feet of facility space with annual rent aggregating approximately $10.3 million. In addition, the company leases space in Bannockburn, Illinois which houses the company's information systems and CTI business. Management believes that the loss of a lease on any one facility would not materially effect the company's operations.

In September 2000, the Bankruptcy Court approved a Debtors' motion to reject four unexpired, non-residential real property leases and any associated subleases. The rejected leases include underutilized locations in: (i) Allentown, Pennsylvania; (ii) Denver, Colorado; (iii) Philadelphia, Pennsylvania; and (iv) Whippany, New Jersey.

## ITEM 3. LEGAL PROCEEDINGS

*Bankruptcy Proceedings.* On August 8, 2000, the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware, In Re: Coram Healthcare Corporation and Coram, Inc., Case Nos. 00-3299 (MFW) and 00-3300 (MFW) (collectively the "Chapter 11 Cases"), respectively. The proceedings have been consolidated for administrative purposes only by the United States Bankruptcy Court in Delaware and are being administered under the docket of In Re: Coram Healthcare Corporation, Case No. 00-3299 (MFW). None of the Debtors' other subsidiaries are a debtor in the proceeding. See Note 3 to the company's Consolidated Financial Statements for further details.

Except as may otherwise be determined by the Bankruptcy Court overseeing the Chapter 11 Cases, the protection afforded by Chapter 11 generally automatically stays any litigation proceedings pending against either or both of the Debtors. All such claims will be addressed through the proceedings applicable to the Chapter 11 Cases. The automatic stay would not, however, apply to actions brought against the company's non-debtor subsidiaries.

*Official Committee of the Equity Security Holders' Matters.* A committee of persons claiming to own shares of the company's publicly-traded common stock (the "Equity Committee") objected to an amended and restated joint plan of reorganization (the "Restated Joint Plan") filed in the Bankruptcy Court on October 20, 2000 by the Debtors, contending that, among other things, the company valuation upon which the Restated Joint Plan of reorganization was premised and the underlying projections and assumptions were flawed. On December 21, 2000, the Bankruptcy Court determined not to confirm the Restated Joint Plan. The company and the Equity Committee are involved in a review of certain company information regarding, among other things, the Equity Committee's contentions. Additionally, the Equity Committee filed a motion with the Bankruptcy Court seeking permission to bring a derivative lawsuit directly against the company's Chief Executive Officer, a former member of the Board of Directors and Cerberus Partners, L.P. (a party to the company's debtor-in-possession financing agreement, Senior Credit Facility and Securities Exchange Agreement). The Equity Committee's lawsuit alleges a collusive plan whereby the named parties conspired to devalue the company for the benefit of the company's creditors under the Securities Exchange Agreement. On February 26, 2001, the Bankruptcy Court ruled that the Equity Committee's motion would not be productive at that time and, accordingly, the motion to proceed with the lawsuit was denied without prejudice.

Management cannot predict whether any future objections of the Equity Committee will be forthcoming or if they would prevent confirmation of a plan of reorganization, if any, set forth by the Debtors' management. Management also cannot predict if any other actions of the Equity Committee will have adverse consequences to the company.

*Resource Network Subsidiaries' Bankruptcy.* On November 12, 1999, the Resource Network Subsidiaries filed voluntary petitions under Chapter 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, Case No. 99-2889 (MFW). On August 19, 1999, a small group of parties with claims against the Resource Network Subsidiaries filed an involuntary bankruptcy petition under Chapter 11 against Coram Resource Network, Inc. in the United States Bankruptcy Court for the District of Delaware. The two proceedings were consolidated by stipulation of the parties and the case is pending under the style, *In Re Coram Resource Network, Inc. and Coram Independent Practice Association, Inc.*, Case No. 99-2889 (MFW). The Resource Network Subsidiaries are now being liquidated pursuant to the proceedings. The Chief Restructuring Officer of the Resource Network Subsidiaries had threatened suit on behalf of the estates against Coram Healthcare Corporation ("CHC"). The draft complaint included claims for damages against CHC and certain of its former and current officers and directors in excess of $41 million. The draft complaint included a threat to pierce the corporate veil of the Resource Network Subsidiaries to reach CHC and included claims of breaches by the officers and directors of their fiduciary duties to the Resource Network Subsidiaries and CHC.

18

JSP 01817

**A686**

On September 11, 2000, the Resource Network Subsidiaries filed a motion in the Debtor's Chapter 11 proceedings seeking, among other things, to have the two separate bankruptcy proceedings substantively consolidated into one proceeding. If granted, the Chapter 11 proceedings involving the Resource Network Subsidiaries and the Chapter 11 proceedings involving the Debtors would have been combined such that the assets and liabilities of the Resource Network Subsidiaries would be joined with the assets and liabilities of the Debtors, the liabilities of the combined entity would be satisfied from their combined funds and all intercompany claims would be eliminated. Furthermore, the creditors of both proceedings would have voted on any reorganization plan for the combined entities. The Resource Network Subsidiaries and the Debtors engaged in discovery related to this substantive consolidation motion and, in connection therewith, the parties reached a settlement agreement in November 2000. The settlement agreement was approved by the Bankruptcy Court in December 2000 and the Debtors made a payment of $0.5 million to the Resource Network Subsidiaries in January 2001.

Notwithstanding the withdrawal of the substantive consolidation motion, the Resource Network Subsidiaries still maintain a proof of claim in excess of $41 million against CHC's estate and the company maintains a reciprocal claim of approximately the same amount against the Resource Network Subsidiaries' estate. The ultimate outcome of these claims cannot be predicted with any degree of certainty but management, in consultation with legal counsel, does not believe that the final resolution of this matter or other matters raised by the Resource Network Subsidiaries' Chief Restructuring Officer will have a material adverse impact on the company's financial position or results of operations.

*Aetna U.S. Healthcare, Inc.* On June 30, 1999, the company filed a complaint (the "Coram Complaint") against Aetna in the United States District Court for the Eastern District of Pennsylvania setting forth claims against Aetna for fraud, misrepresentation, breach of contract and rescission relating to the Master Agreement between the parties for ancillary network management services through the Resource Network Subsidiaries. On June 30, 1999, the company received a copy of a complaint (the "Aetna Complaint") that had been filed by Aetna on June 29, 1999 in the Court of Common Pleas of Montgomery County, Pennsylvania. The Aetna Complaint sought specific performance, injunctive relief and declaratory relief to compel the company to perform under the Master Agreement, including the payment of compensation to the healthcare providers that had rendered and continued to render services to Aetna's health plan members. As stated in the Aetna Complaint, Aetna disputed the company's right to terminate the Agreement. The company removed the Aetna Complaint to federal court. On July 20, 1999, Aetna filed a counterclaim against the company in the federal court lawsuit brought by the company. In its counterclaim, Aetna sued the company for, among other things, breach of the Master Agreement and fraudulent misrepresentation, contending the company never intended to perform under the Master Agreement, defamation, interference with contractual relations with providers and interference with prospective contractual relations with other companies that allegedly bid for the Master Agreement.

On April 20, 2000, the company and Aetna reached an amicable resolution to the then outstanding disputes and, in connection therewith, all claims and counterclaims amongst the parties were dismissed from the courts of appropriate jurisdiction. The final resolution of these matters did not have a material adverse effect on the company's consolidated financial position or results of operations. The impact of this dispute resolution has been charged to discontinued operations in the accompanying consolidated financial statements.

*Apria Healthcare, Inc.* Apria Healthcare, Inc. and one of its affiliates, Apria Healthcare of New York State, Inc., (collectively "Apria") filed suit against CHC and the Resource Network Subsidiaries in the Superior Court of Orange County, California. Apria's claims related to services that were rendered as part of certain home health provider networks managed by the Resource Network Subsidiaries. Apria's complaint alleged that, among other things, the Resource Network Subsidiaries operated as the alter ego of CHC and, as a result, CHC should be declared responsible for the alleged breaches of the contracts that the Resource Network Subsidiaries had with Apria. The complaint included requests for declaratory, compensatory and other relief in excess of $1.4 million. On February 21, 2001, the company and Apria agreed to a "dismissal without prejudice" from the Superior Court of Orange County, California with each party responsible for its own legal fees.

*TBOB Enterprises, Inc.* On July 17, 2000, TBOB Enterprises, Inc. ("TBOB") filed an arbitration demand against CHC (TBOB Enterprises, Inc. f/k/a Medical Management Services of Omaha, Inc. against Coram Healthcare Corporation, in the American Arbitration Association office in Dallas, Texas). In its demand, TBOB claims that the company breached its obligations under an agreement entered into by the parties in 1996 relating to a prior earn-out obligation of the company that originated from the acquisition of the claimant's prescription services business in 1993 by a wholly-owned subsidiary of the company. The company operated the business under the name Coram Prescription Services ("CPS") and the assets of the CPS business were sold on July 31, 2000. See Note 5 to the company's Consolidated Financial Statements for further details. TBOB alleges, among other things, that the company has impaired the earn-out payments due TBOB by improperly charging certain expenses to the CPS business and failing to

19

JSP 01818

A687

fulfill the company's commitments to enhance the value of CPS by marketing its services. The TBOB demand alleges damages of more than $0.9 million. TBOB contends that this amount must be paid in addition to the final scheduled earn-out payment of approximately $1.3 million that was due in March 2001. TBOB reiterated its monetary demand through a proof of claim filed against CHC's estate for the aggregate amount of approximately $2.2 million (the scheduled earn-out payment plus the alleged damages). The company received a copy of a letter from TBOB to the American Arbitration Association in which it is attempting to obtain a refund of the filing fees that TBOB paid in connection with the arbitration proceeding because the final $1.3 million earn-out payment that was scheduled for March 2001 and the alleged damages of $0.9 million have been stayed by operation of the Bankruptcy Code. In February 2001, TBOB withdrew its arbitration claim due to the ongoing bankruptcy proceedings. Management does not believe that final resolution of this matter will have a material adverse impact on the company's financial position or results of operations.

*Internal Revenue Service Examination.* CHC is contesting a notice of deficiency issued by the Internal Revenue Service through administrative proceedings and litigation. See Note 9 to the company's Consolidated Financial Statements for further details.

*Alan Furst et. al. v. Stephen Feinberg, et. al.* A complaint was filed in the United States District Court for the Third District of New Jersey on November 8, 2000 and an Amended Class Action Complaint was filed on November 15, 2000, alleging that certain current and former officers and directors of the company and the company's principal lenders, Cerberus Partners, L.P., Foothill Capital Corporation and Goldman Sachs & Co., implemented a scheme to perpetrate a fraud upon the stock market regarding the common stock of CHC. A second Amended Class Action Complaint was filed on March 21, 2001, which removed all of the officers and directors of the company as defendants, except the company's Chief Executive Officer and another current member of the Board of Directors. Plaintiffs allege that the defendants artificially depressed the trading price of the company's publicly traded shares and created the false impression that stockholders' equity was decreasing in value and was ultimately worthless. Plaintiffs further allege that members of the class sustained total investment losses of $50 million or more. The company notified its insurance carrier and intends to avail itself of any appropriate insurance coverage for its directors and officers who are vigorously contesting the allegations. Because of the recent nature of this case, the company cannot predict its outcome nor can it predict the scope and nature of any indemnification that the directors and officers may have with the company's insurance carrier.

*General.* Management of the company and its subsidiaries intends to vigorously defend the company in the matters described above. Nevertheless, due to the uncertainties inherent in litigation, including possible indemnification against other parties, the ultimate disposition of such matters cannot presently be determined. Adverse outcomes in some or all of the proceedings could have a material adverse effect on the financial position, results of operations and liquidity of the company.

The company and its subsidiaries are also parties to various other legal actions arising out of the normal course of their businesses, including employee claims, reviews of cost reports submitted to Medicare and examinations by regulators such as Medicare and Medicaid fiscal intermediaries and the Health Care Financing Administration. Management believes that the ultimate resolution of such other actions will not have a material adverse effect on the financial position, results of operations or liquidity of the company.

*PricewaterhouseCoopers.* On July 7, 1997, the company filed suit against Price Waterhouse LLP (now known as PricewaterhouseCoopers) in the Superior Court of San Francisco, California, seeking damages in excess of $165.0 million. As part of the settlement that resolved a case filed by the company against Caremark International, Inc. and Caremark, Inc. (collectively "Caremark"), Caremark assigned and transferred to the company all of Caremark's claims and causes of action against Caremark's independent auditors, PricewaterhouseCoopers, related to the lawsuit filed by the company against Caremark. This assignment of claims includes claims for damages sustained by Caremark in defending and settling the lawsuit with the company. The case was dismissed from the California court because of inconvenience to witnesses with a right to re-file in Illinois. The company re-filed the lawsuit in state court in Illinois and PricewaterhouseCoopers filed a motion to dismiss the company's lawsuit on several grounds, but their motion was denied on March 15, 1999. PricewaterhouseCoopers filed an additional motion to dismiss the lawsuit in May 1999, and that motion was dismissed on January 28, 2000. The lawsuit is currently in the discovery stage and a trial is scheduled to commence after June 22, 2002. There can be no assurance of any recovery from PricewaterhouseCoopers.

*Government Regulation.* Under the physician ownership and referral provisions of the Omnibus Budget Reconciliation Act of 1993 (commonly referred to as "Stark II"), it is unlawful for a physician to refer patients for certain designated health services reimbursable under the Medicare or Medicaid programs to an entity with which the physician has a financial relationship, unless the financial relationship fits within an exception enumerated in Stark II or regulations promulgated thereunder. A "financial relationship" under Stark II is defined broadly as an ownership or investment interest in, or any type of compensation arrangement in which remuneration flows between the physician and the provider. The company has financial relationships with physicians and physician owned entities in the form of medical director agreements and service agreements pursuant to which the company provides pharmacy-

20

JSP 01819

**A688**

products. In each case, the relationship has been structured, based upon advice of legal counsel, using an arrangement management believes to be consistent with the applicable exceptions set forth in Stark II.

In addition, the company is aware of certain referring physicians that have had financial interests in the company through ownership of shares of the company's common stock. The Stark II law includes an exception for the ownership of publicly traded stock in companies with equity above certain levels. This exception of Stark II requires the issuing company to have stockholders' equity of at least $75 million either as of the end of its most recent fiscal year or on average over the last three fiscal years. Due principally to the extraordinary gain on troubled debt restructuring (see Note 8 to the company's Consolidated Financial Statements) and the disposition of CPS (see Note 5 to the company's Consolidated Financial Statements), at December 31, 2000 the company's stockholders' equity was above the required level. However, in light of the company's recurring operational losses during each of the years in the three year period ended December 31, 2000, management's ability to maintain an appropriate level of stockholders' equity cannot be reasonably assured. The penalties for failure to comply with Stark II include civil penalties that could be imposed upon the company or the referring physician, regardless of whether either the physician or the company intended to violate the law.

Management has been advised by counsel that a company whose stock is publicly traded has, as a practical matter, no reliable way to implement and maintain an effective compliance plan for addressing the requirements of Stark II other than complying with the public company exception. Accordingly, if the company's common stock remains publicly traded and its stockholders' equity falls below the required levels, the company would be forced to cease accepting referrals of patients with government-sponsored benefit programs or run a significant risk of noncompliance with Stark II. Because referrals of the company's patients with government-sponsored benefit programs comprise approximately 23% of the company's consolidated net revenue (excluding CPS) for the year ended December 31, 2000, discontinuing the acceptance of patients with government-sponsored benefit programs would have a material adverse effect on the financial condition, results of operations and cash flows of the company. Additionally, ceasing to accept such referrals could materially adversely affect the company's business reputation in the market as it may cause the company to be a less attractive provider to which a physician could refer his or her patients. The company previously requested a Stark II waiver from the Healthcare Financing Administration, but such waiver request was denied.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None.

## PART II

## ITEM 5. MARKET FOR THE REGISTRANT'S COMMON STOCK AND RELATED SECURITY HOLDER MATTERS

Prior to March 7, 2000, shares of Coram's common stock had been listed and traded on the New York Stock Exchange under the symbol "CRH." Beginning on March 7, 2000, the shares have been traded through the Over the Counter Bulletin Board ("OCBB") maintained by the National Association of Securities Dealers, Inc., under the symbol "CRHE." After the Debtors' filing for Chapter 11 reorganization, the company has been trading under the symbol "CRHEQ." The following table sets forth the high and low sales prices of the company's common stock, as reported on the New York Stock Exchange ("NYSE") Composite Tape and on the OCBB for the two years ended December 31, 2000:

|  | High | Low |
|---|---|---|
| Calendar Year 2000 |  |  |
| First Quarter.......................... | 1 | 1/4 |
| Second Quarter....................... | 39/64 | 1/4 |
| Third Quarter......................... | 7/16 | 1/32 |
| Fourth Quarter....................... | 27/64 | 3/64 |
| Calendar Year 1999 |  |  |
| First Quarter.......................... | 2 13/16 | 1 7/16 |
| Second Quarter....................... | 2 5/8 | 1 1/2 |
| Third Quarter......................... | 1 5/8 | 9/16 |
| Fourth Quarter....................... | 1 1/8 | 3/8 |

As of April 2, 2001, there were 4,682 record holders of the company's common stock. On April 2, 2001, the last bid for Coram's common stock on the OCBB was $0.2344 per share and the last reported ask price was also $0.2344 per share. These quotations reflect inter-dealer prices without retail mark-up, mark-down or commission and may not necessarily represent actual transactions.

The trading of company common stock moved to the OCBB following an agreement between the company and the NYSE that shares of Coram's common stock no longer met the requirements for trading on the NYSE. Coram had received notice in 1999 that it

JSP 01820

had fallen below the minimum listing criteria of the NYSE, including the minimum share price of $1.00, the minimum market capitalization of $50 million and the minimum equity of $50 million.

Coram has not paid or declared any cash dividends on its capital stock since its inception and is currently precluded from doing so under its borrowing agreements. Coram currently intends to retain all future earnings for use in the operations of its businesses. Accordingly, Coram does not anticipate paying cash dividends on its common stock in the foreseeable future. The payment of any future dividends will depend upon, among other things, the terms and conditions set forth in the Debtors' plan of reorganization related to their bankruptcy proceedings, the terms of its borrowing agreements, future earnings, operations, capital requirements, the general financial condition of the company, contractual restrictions and general business conditions.

Coram did not sell any of its equity securities in the year ended December 31, 2000 that were not registered under the Securities Act of 1933 (the "Act"), as amended. However, the registrant's wholly-owned subsidiary, Coram, Inc., exchanged certain of its outstanding debt obligations for 905 shares of Coram, Inc.'s Series A Cumulative Preferred Stock, with an aggregate liquidation preference of approximately $109.3 million (see Note 11 to the company's Consolidated Financial Statements). These preferred shares were not registered under the Act. Under certain conditions in the Debtors' post-bankruptcy period, the combined voting rights of the holders of the preferred stock may represent a majority controlling interest in Coram, Inc. This circumstance could cause a deconsolidation of the registrant's most significant direct subsidiary.

The holders of Coram's Series B Convertible Subordinated Notes (the "Series B Notes") have the right to convert the Series B Notes into shares of the company's common stock. In addition, these holders and/or their affiliates are lenders under the Series A Senior Subordinated Notes (the "Series A Notes") of the company and are lenders under the Securities Exchange Agreement pursuant to which they were issued warrants to purchase 1.9 million shares of Coram's common stock; however, the warrants expired contemporaneous with the termination of the Securities Exchange Agreement on February 6, 2001. In certain circumstances and assuming conversion of the Series B Notes, such holders may collectively own a majority of the issued and outstanding common stock of the company and be in a position to take steps to control the affairs of the company. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Risk Factors" and Note 8 to the company's Consolidated Financial Statements.

The Debtors' restated and amended joint plan of reorganization, if approved, would have effectively eliminated all of Coram's common stock because Coram Healthcare Corporation ("CHC") would be dissolved as soon as practicable after the effective date of the plan and all equity interests in CHC would be completely eliminated. At this time, the Debtors have not formulated another plan of reorganization (see Note 3 to the company's Consolidated Financial Statements).

22

JSP 01821

**A690**