## ITEM 6. SELECTED FINANCIAL DATA

The following selected consolidated financial data should be read in conjunction with the company's Consolidated Financial Statements and related notes and Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations." Amounts are in thousands, except per share data.

| | Year Ended December 31, | | | | |
| --- | ---: | ---: | ---: | ---: | ---: |
| INCOME STATEMENT DATA: | 2000 | 1999 | 1998 | 1997 | 1996 |
| Net revenue | $ 464,820 | $ 521,196 | $ 445,112 | $ 439,472 | $ 502,830 |
| Cost of service | 341,656 | 408,878 | 326,736 | 309,693 | 348,247 |
| Gross profit | 123,164 | 112,318 | 118,376 | 129,779 | 154,583 |
| Operating expenses: | | | | | |
| Selling, general and administrative expenses | 90,329 | 96,809 | 83,337 | 86,457 | 97,981 |
| Provision for estimated uncollectible accounts | 9,773 | 28,310 | 14,845 | 14,983 | 27,327 |
| Amortization of goodwill | 10,227 | 10,784 | 11,139 | 13,586 | 15,259 |
| Restructuring cost (recovery) expense (1) | (322) | 5,831 | (3,900) | -- | -- |
| Losses on impairments of long-lived assets | 8,323 | 9,100 | -- | -- | -- |
| Provision for (income from) litigation settlements (2) | -- | -- | -- | (156,792) | 27,875 |
| Total operating expenses | 118,330 | 150,834 | 105,421 | (41,766) | 168,442 |
| Operating income (loss) from continuing operations | 4,834 | (38,516) | 12,955 | 171,545 | (13,859) |
| Other income (expenses): | | | | | |
| Interest income | 991 | 655 | 1,086 | 2,236 | 1,486 |
| Interest expense (3) | (26,788) | (29,763) | (32,734) | (75,026) | (78,767) |
| Gains on sales of businesses (4) | 18,649 | -- | 1,071 | 26,744 | -- |
| Termination fee (5) | -- | -- | -- | 15,182 | -- |
| Other income (expense), net | 3,008 | 740 | (266) | 1,517 | 2,114 |
| Income (loss) from continuing operations before reorganization expenses, income taxes, minority interests and extraordinary gain on troubled debt restructuring | 694 | (66,884) | (17,888) | 142,198 | (89,026) |
| Reorganization expenses, net (6) | (8,264) | -- | -- | -- | -- |
| Income (loss) from continuing operations before income taxes, minority interests and extraordinary gain on troubled debt restructuring | (7,570) | (66,884) | (17,888) | 142,198 | (89,026) |
| Income tax expense (benefit) | 250 | 440 | 2,300 | 7,550 | (13,998) |
| Minority interests in net income of consolidated joint ventures | 571 | 1,470 | 1,399 | 7,283 | 7,698 |
| Income (loss) from continuing operations before extraordinary gain on troubled debt restructuring | (8,391) | (68,794) | (21,587) | 127,365 | (82,726) |
| Discontinued Operations: | | | | | |
| Loss from operations | -- | (28,411) | (108) | (2,105) | (2,288) |
| Loss from disposal | (662) | (17,618) | -- | -- | -- |
| Total discontinued operations | (662) | (46,029) | (108) | (2,105) | (2,288) |
| Extraordinary gain on troubled debt restructuring, net of income tax expense of $400 (7) | 107,772 | -- | -- | -- | -- |
| Net income (loss) | $ 98,719 | $ (114,823) | $ (21,695) | $ 125,260 | $ (85,014) |
| Earnings (Loss) Per Share | | | | | |
| Basic: | | | | | |
| Income (loss) from continuing operations | $ (0.17) | $ (1.39) | $ (0.44) | $ 2.68 | $ (1.99) |
| Loss from discontinued operations | (0.01) | (0.93) | -- | (0.04) | (0.06) |
| Extraordinary gain on troubled debt restructuring | 2.17 | -- | -- | -- | -- |
| Net income (loss) per common share | $ 1.99 | $ (2.32) | $ (0.44) | $ 2.64 | $ (2.05) |
| Diluted: | | | | | |
| Income (loss) from continuing operations | $ (0.17) | $ (1.39) | $ (0.44) | $ 2.34 | $ (1.99) |
| Loss from discontinued operations | (0.01) | (0.93) | -- | (0.04) | (0.06) |
| Extraordinary gain on troubled debt restructuring | 2.17 | -- | -- | -- | -- |
| Net income (loss) per common share | $ 1.99 | $ (2.32) | $ (0.44) | $ 2.30 | $ (2.05) |
| BALANCE SHEET DATA: | | | | | |
| Cash and cash equivalents | $ 27,259 | $ 6,633 | $ 203 | $ 108,950 | $ 15,375 |
| Working capital (deficit) (8) | (97,144) | 71,045 | 66,261 | (11,620) | (132,529) |
| Total assets | 345,376 | 402,751 | 421,029 | 515,252 | 543,795 |
| Long-term debt, net of current maturities (9) | 24 | 302,662 | 242,162 | 150,428 | 266,641 |
| Stockholders' equity (deficit) | 76,978 | (21,699) | 92,857 | 125,026 | (21,842) |

Earnings per common share amounts prior to 1997 have been restated to comply with Statement of Financial Accounting Standards No. 128, *Earnings Per Share*. The financial data prior to 2000 has been restated to conform with the 2000 presentation.

23

JSP 01822

A691

(1) In 2000, management re-evaluated the reserves necessary to complete its restructuring initiatives and, as a result, recognized a net restructuring reserve reversal of approximately $0.3 million. In 1999, Coram initiated two company-wide restructuring plans, the "Coram Restructure Plan" and the "Field Reorganization Plan," and charged approximately $5.8 million to operations as restructuring charges. These plans resulted in the closure of certain facilities and a reduction of personnel. In 1998, it was determined that the original reserve established in 1994 as a result of the Four Way Merger, the "Coram Consolidation Plan," was substantially complete and the reserve was reversed. See Note 6 to the company's Consolidated Financial Statements.

(2) The $156.8 million income from litigation settlement recorded in 1997 relates to the settlement of a lawsuit against Caremark resulting from the purchase of the Caremark home infusion business in 1995. The provision for litigation settlements in 1996 includes approximately $25.9 million of cash and non-cash charges related to an agreement to settle certain stockholder class actions and certain derivative litigations.

(3) On December 28, 2000, the Debtors announced the Bankruptcy Court's approval of their request to exchange a sufficient amount of debt and related accrued interest for equity in the form of Coram, Inc. Series A Cumulative Preferred Stock. On December 29, 2000, Cerberus Partners, L.P., Goldman Sachs Credit Partners, L.P. and Foothill Capital Corporation agreed to exchange $11.6 million of aggregate unpaid accrued contractual interest on the Series A Notes and the Series B Notes; however, such exchanged accrued interest was charged to expense up to and including the date of the exchange. See Note 8 to the company's Consolidated Financial Statements. The 1999 decrease in interest expense was partially the result of the forbearance of interest from November 15, 1999 through April 20, 2000 (the date of the resolution of certain litigation with Aetna) , offset by an increase in the principal amount of the debt and an increase in the interest rate charged on the Series A notes, beginning in April 1999. Interest expense decreased significantly in 1998 and 1999 due to a repayment of the company's former senior credit facility and a restructuring of its subordinated debt.

(4) Effective July 31, 2000, the company completed the sale of its CPS business and recorded a gain on sale of approximately $18.3 million. In addition, pursuant to a contingent consideration arrangement related to one of the company's operating subsidiaries, approximately $0.4 million was recognized as incremental proceeds during the year ended December 31, 2000. See Note 5 to the company's Consolidated Financial Statements. In 1998 and 1997, Coram sold its lithotripsy business to Integrated Health Services, Inc., and recorded gains on sales of $0.7 million and $26.7 million, respectively.

(5) In 1997, the company received $21.0 million from the termination of a merger agreement with Integrated Health Services, Inc., pursuant to which Integrated Health Services, Inc. would have acquired Coram. As a result, the company recorded other income of $15.2 million, representing the $21.0 million termination fee less related costs.

(6) In 2000, the company recognized $8.3 million in net reorganization expenses related to the Debtors' Chapter 11 bankruptcy proceedings. These expenses include, but are not limited to, professional fees, expenses related to success and retention plans and United States Trustee fees, offset by interest earned on cash accumulated due to the Debtors not paying their pre-petition liabilities and other expenditures during the Chapter 11 proceedings. See Note 3 to the company's Consolidated Financial Statements.

(7) In connection with the exchange of the Series A Notes and certain accrued interest for Coram, Inc. Series A Cumulative Preferred Stock, the company recognized an extraordinary gain on troubled debt restructuring of approximately $107.8 million, net of tax. See Note 11 to the company's Consolidated Financial Statements.

(8) Under the United States Bankruptcy Code, certain claims against the Debtors in existence prior to the filing date are stayed while the Debtors continue their operations as debtors-in-possession. These claims, which total approximately $159.1 million at December 31, 2000, are reflected in the Consolidated Balance Sheets as liabilities subject to compromise and are deemed to be current liabilities. See Note 3 to the company's Consolidated Financial Statements.

(9) At December 31, 2000, the company's Series A Notes and Series B Notes, which aggregate approximately $153.3 million, are classified as liabilities subject to compromise. See Notes 3 and 8 to the company's Consolidated Financial Statements. The current maturities of long-term debt, which gives effect to certain previous debt restructuring transactions were $0.4 million, $0.3 million, $150.2 million, and $198.0 million at December 31, 1999, 1998, 1997, and 1996, respectively.

24

JSP 01823

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

This Annual Report on Form 10-K contains certain "forward-looking" statements (as such term is defined in the Private Securities Litigation Reform Act of 1995) and information relating to Coram that is based on the beliefs of the management of Coram, as well as, assumptions made by and information currently available to the management of Coram. The company's actual results may vary materially from the forward-looking statements made in this report due to important factors such as the outcome of bankruptcy proceedings of the Debtors and certain other factors, which are described in greater detail later in this Item 7. under the caption "Risk Factors." When used in this report, the words "estimate," "project," "believe," "anticipate," "intend," "expect" and similar expressions are intended to identify forward-looking statements. Such statements reflect the current views of management with respect to future events based on currently available information and are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in such forward-looking statements. For a discussion of such risks, see "Risk Factors." Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. Management does not undertake any obligation to publicly release any revisions to these forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

The company's consolidated financial statements have been prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Debtors' bankruptcy filings and circumstances relating thereto, including the company's leveraged financial structure and cumulative losses from operations, such realization of assets and liquidation of liabilities is subject to significant uncertainty. During the pendency of the Debtors' Chapter 11 bankruptcy proceedings, the company may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the consolidated financial statements. Further, a plan of reorganization filed in the Chapter 11 proceedings could materially change the amounts reported in the consolidated financial statements, which do not give effect to any adjustments of the carrying value of assets or liabilities that might be necessary as a consequence of a plan of reorganization. The company's ability to continue as a going concern is dependent upon, among other things, confirmation of a plan of reorganization, future profitable operations, the ability to comply with the terms of the company's financing agreements, the ability to remain in compliance with the physician ownership and referral provisions of the Omnibus Budget Reconciliation Act of 1993 (commonly known as "Stark II") and the ability to generate sufficient cash from operations and/or financing arrangements to meet obligations.

*Background.* During 2000, Coram and its subsidiaries were engaged primarily in two principal lines of business: (i) alternate site (outside the hospital) infusion therapy, including non-intravenous home health products such as durable medical equipment and respiratory therapy services, and (ii) pharmacy benefit management and specialty mail-order pharmacy services. Effective July 31, 2000, the company sold its pharmacy benefit management and specialty mail-order pharmacy services business to Curascript Pharmacy, Inc. and Curascript PBM Services, Inc. (collectively the "Buyers"). The Buyers were effectively a management-led group that was financed by GTCR Golder Rauner, L.L.C. Other services offered by Coram include centralized management, administration and clinical support for clinical research trials.

Also, Coram's R-Net subsidiaries are being liquidated through proceedings that are currently pending in the United States Bankruptcy Court for the District of Delaware. These proceedings originated in August 1999 following the filing of an involuntary bankruptcy petition against Coram Resource Network, Inc. in such court. All of the R-Net locations have been closed in connection with the pending liquidation of R-Net. Additionally, Coram employees who were members of the Resource Network Subsidiaries' Board of Directors resigned during the year ended December 31, 2000, and currently only the Chief Restructuring Officer appointed by the Bankruptcy Court remains on the Board of Directors to manage and operate the liquidation of the R-Net business. See Note 4 to the company's Consolidated Financial Statements.

*Reorganization.* On August 8, 2000, CHC and CI filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). Following the filing of the voluntary Chapter 11 petitions, the Debtors have been operating as debtors-in-possession subject to the jurisdiction of the Bankruptcy Court. None of the company's other subsidiaries is a debtor in the proceeding. The Debtors' need to seek the relief afforded by the Bankruptcy Code was due, in part, to its requirement to remain in compliance with the physician ownership and referral provisions of Stark II after December 31, 2000 and the scheduled May 27, 2001 maturity of the Series A Senior Subordinated Unsecured Notes. The Debtors sought advice and counsel from a variety of sources and, in connection therewith, the Independent Committee of the Board of Directors unanimously concluded that the bankruptcy and restructuring were the only viable alternatives.

JSP 01824

On August 9, 2000, the Bankruptcy Court approved the Debtors' motions for: (i) payment of all employee wages and salaries and certain benefits and other employee obligations; (ii) payment of critical trade vendors, utilities and insurance in the ordinary course of business for both pre and post-petition expenses; (iii) access to a debtor-in-possession financing arrangement (see Note 8 to the company's Consolidated Financial Statements for details of the executed agreement); and (iv) use of all company bank accounts for normal business operations. In September 2000, the Bankruptcy Court approved the Debtors' motion to reject four unexpired, non-residential real property leases and any associated subleases. The rejected leases include underutilized locations in: (i) Allentown, Pennsylvania; (ii) Denver, Colorado; (iii) Philadelphia, Pennsylvania; and (iv) Whippany, New Jersey. Additionally, on January 25, 2001, the Bankruptcy Court approved a motion to extend the period of time in which the Debtors can reject unexpired leases of non-residential real property to May 4, 2001. Certain other motions filed by the Debtors have been granted and others are presently pending.

In September 2000 and October 2000, the Bankruptcy Court approved payments of up to approximately $2.6 million for retention bonuses payable to certain key employees. The bonuses were scheduled to be paid in two equal installments; (i) the later of the date of emergence from bankruptcy or December 31, 2000 and (ii) December 31, 2001. Due to events that have delayed the emergence from bankruptcy, the Bankruptcy Court approved early payment of the first installment to most individuals within the retention program and such payments, aggregating approximately $0.7 million, were made on March 15, 2001. The remaining portion of the first installments of approximately $0.5 million are scheduled for payment upon approval of a plan of reorganization by the Bankruptcy Court, and the second installment remains scheduled to be paid on December 31, 2001.

The Debtors are currently paying the post-petition claims of their vendors in the ordinary course of business and are, pursuant to an order of the Bankruptcy Court, causing their subsidiaries to pay their own debts in the ordinary course of business. Even though the filing of the Chapter 11 cases constituted defaults under the company's principal debt instruments, the Bankruptcy Code imposes an automatic stay that will generally preclude the creditors and other interested parties under such arrangements from taking remedial action in response to any such resulting default without prior Bankruptcy Court approval.

On September 11, 2000, the Resource Network Subsidiaries filed a motion in the Debtors' Chapter 11 proceedings seeking, among other things, to have the two separate bankruptcy proceedings substantively consolidated into one proceeding. The Resource Network Subsidiaries and the Debtors engaged in discovery related to this substantive consolidation motion and, in connection therewith, the parties reached a settlement agreement in November 2000. See Note 13 to the company's Consolidated Financial Statements for further details.

All of the R-Net locations have effectively been closed in connection with the pending liquidation of R-Net. Additionally, Coram employees who were members of the Resource Network Subsidiaries' Board of Directors resigned during the year ended December 31, 2000, and currently only the Chief Restructuring Officer appointed by the Bankruptcy Court remains on the Board of Directors to manage and operate the liquidation of the R-Net business.

On the same day as the Chapter 11 cases were filed, the Debtors filed their joint plan of reorganization (the "Joint Plan") and their joint disclosure statement with the Bankruptcy Court. The Joint Plan was subsequently amended and restated (the "Restated Joint Plan") and, on or about October 10, 2000, the Restated Joint Plan and the First Amended Disclosure Statement with respect to the Restated Joint Plan was approved for distribution by the Bankruptcy Court. Among other things, the Restated Joint Plan provided for: (i) a conversion of all of the CI obligations represented by the company's Series A Senior Subordinated Unsecured Notes (the "Series A Notes") and the Series B Senior Subordinated Unsecured Convertible Notes (the "Series B Notes") into (a) a four-year, interest only note in the principal amount of $180 million, that would bear interest at the rate of 9% per annum and (b) all of the equity in the reorganized CI; (ii) the payment in full of all secured, priority and general unsecured claims against CHC; (iii) the payment in full of all secured and priority claims against CHC; (iv) the impairment of certain general unsecured debts of CHC, including, among others, CHC's obligations under the Series A Notes and the Series B Notes; and (v) the complete elimination of the equity interests of CHC. Furthermore, pursuant to the Restated Joint Plan, CHC would be dissolved as soon as practicable after the effective date of the Restated Joint Plan and the stock of CHC would no longer be publicly traded. Therefore, under the Debtors' Restated Joint Plan, as filed, the existing stockholders of CHC would receive no value for their shares and all of the outstanding equity of CI as the surviving entity would be owned by the holders of the company's Series A Notes and Series B Notes.

Representatives of the company negotiated the principal aspects of the Joint Plan with representatives of the holders of the company's Series A Notes and Series B Notes and Senior Credit Facility prior to the filing of such Joint Plan.

JSP 01825

On or about October 20, 2000, the Restated Joint Plan and First Amended Disclosure Statement were distributed for a vote among persons holding impaired claims that are entitled to a distribution under the Restated Joint Plan. The Debtors did not send ballots to the holders of other types of claims and interested parties, including equity holders; however, the holders of such claims and interested parties are deemed to reject the plan in any event. The tabulated vote of the unsecured creditors was in favor of the company's Restated Joint Plan. A confirmation hearing was held on December 21, 2000 at which time the Restated Joint Plan was not approved by the Bankruptcy Court. On December 28, 2000, the Bankruptcy Court extended the period during which the Debtors have the exclusive right to file a plan or plans before the Bankruptcy Court to March 28, 2001. Additionally, the Bankruptcy Court extended the Debtors' exclusive period to solicit acceptances of any filed plan or plans to May 28, 2001. Management has petitioned the Bankruptcy Court for additional extensions of such exclusivity periods.

In order for the company to remain compliant with the requirements of Stark II, on December 29, 2000, CI exchanged approximately $97.7 million of the Series A Notes and approximately $11.6 million of accrued but unpaid interest on the Series A Notes and the Series B Notes in exchange for 905 shares of CI Series A Cumulative Preferred Stock (see Notes 8 and 11 to the company's Consolidated Financial Statements for further details). This transaction generated an extraordinary gain on troubled debt restructuring of approximately $107.8 million, net of tax, and at December 31, 2000 the company's stockholders' equity exceeded the minimum Stark II requirement necessary to comply with the public company exemption. See Note 13 to the company's Consolidated Financial Statements for further discussion regarding Stark II.

On or about February 6, 2001, the Official Committee of the Equity Security Holders (the "Equity Committee") filed a motion with the Bankruptcy Court seeking permission to bring a lawsuit directly against CHC's Chief Executive Officer, a former member of CHC's Board of Directors and Cerberus Partners, L.P. (a party to the company's debtor-in-possession financing agreement, Senior Credit Facility and Securities Exchange Agreement). On February 26, 2001, the Bankruptcy Court ruled that the Equity Committee's motion would not be productive at that time and, accordingly, the motion was denied without prejudice. See Note 13 to the company's Consolidated Financial Statements for further details.

On the same day, the Bankruptcy Court approved the Debtors' motion and appointed Goldin Associates, L.L.C. ("Goldin") as independent restructuring advisors to the Debtors. Goldin will provide consulting and advisory support services designed to assist the Debtors in concluding their bankruptcy proceedings. Among other things, the scope of Goldin's services include: (i) reporting its findings to the Independent Committee of the Board of Directors (the "Independent Committee"), including its assessment of the appropriateness of the Restated Joint Plan, and advising the Independent Committee respecting an appropriate course of action calculated to bring the Debtors' bankruptcy proceedings to a fair and satisfactory conclusion; (ii) preparing a written report as may be required by the Independent Committee and/or the Bankruptcy Court; and (iii) being available to appear before the court and provide testimony. Goldin was also appointed as an arbiter between the Debtors and the Equity Committee.

Based upon Goldin's findings and recommendations, the Debtors may develop and submit a new joint plan of reorganization to the Bankruptcy Court. However, if the Debtors' exclusivity periods are terminated by one or more interested parties, it is possible that one or more holders of claims or interests in the Debtors will file a plan or plans with the Bankruptcy Court. Any new plan or plans must be approved for distribution by the Bankruptcy Court, voted upon by certain impaired creditors and equity holders of the Debtors and approved by the Bankruptcy Court to become effective after certain findings required by the Bankruptcy Code are made. The Bankruptcy Court may confirm a plan of reorganization notwithstanding the non-acceptance of the plan by an impaired class of creditors or equity holders if certain conditions of the Bankruptcy Code are satisfied. No assurances can be given regarding the timing of or whether the Debtors will submit a new plan or what the terms of such plan may be.

Under the Bankruptcy Code, certain claims against the Debtors in existence prior to the filing date are stayed while the Debtors continue their operations as debtors-in-possession. These claims are reflected in the December 31, 2000 Consolidated Balance Sheet as liabilities subject to compromise. Additional Chapter 11 claims have arisen and may continue to arise subsequent to the filing date resulting from the rejection of executory contracts, including certain leases, and from the determination by the Bankruptcy Court of allowed claims for contingencies and other disputed amounts. Parties affected by the rejections may file claims with the Bankruptcy Court in accordance with the provisions of the Bankruptcy Code and applicable rules. Claims secured by the Debtors' assets also are stayed, although the holders of such claims have the right to petition the Bankruptcy Court for relief from the automatic stay to permit such creditors to foreclose on the property securing their claims. Additionally, certain claimants have sought relief from the Bankruptcy Court to remove the stay against their actions in order to continue pursuit of their claims against the Debtors or the Debtors' insurance carriers.

27

JSP 01826

The holders of Coram, Inc.'s Series A Cumulative Preferred Stock continue to maintain an unsecured creditors' position within the Debtors' bankruptcy proceedings in the aggregate amount of their liquidation preference. Notwithstanding the debt to equity exchange, the aforementioned holders' priority in the Debtors' bankruptcy proceedings will be no less than it was immediately prior to said exchange.

Schedules were filed with the Bankruptcy Court setting forth the assets and liabilities of the Debtors as of the filing date as shown by the Debtors' accounting records. Differences between amounts shown by the Debtors and claims filed by creditors are being investigated and resolved. The ultimate amount and the settlement terms for such liabilities will be subject to the New Joint Plan. The New Joint Plan, once developed, will be subject to a vote by the Debtors' impaired creditors and confirmation by the Bankruptcy Court, as described above.

*Business Strategy.* The major strategic alternatives and initiatives currently being implemented by Coram include: (i) renewed focus on the growth in net revenue from core therapies provided by the infusion therapy division; (ii) continued investment into and development of services provided by CTI; (iv) cost reduction initiatives (including a reimbursement site consolidation plan); (v) cash collections; and (vi) submission of a new plan of reorganization by the Debtors. Combined, management believes that success in the foregoing will improve Coram's financial prospects and improve and stabilize relationships with payers and referral sources. There can be no assurance that any other strategic alternatives will be consummated or will be available to Coram on commercially acceptable terms.

In December 1999, Coram announced that it was repositioning its business to focus on its core alternate site infusion therapy business and the clinical research business operated by its subsidiary, CTI. Accordingly, Coram's primary business strategy is to focus its efforts on the delivery of its core infusion therapies, such as nutrition, anti-infective therapies, IVIG and coagulant and blood clotting therapies for persons with hemophilia. To that end, Coram has established product managers with dedicated sales, marketing and clinical resources aimed at expanding Coram's growth in these areas. Coram has also implemented programs focused on the reduction and control of cost of services and operating expenses, assessment of poorly performing branches and review of branch efficiencies. Coram management is also reviewing the way the company provides nursing care and is implementing changes to its practices to maintain Coram's high level of patient satisfaction and effective clinical results while reducing the actual number of nursing visits.

Management throughout the company is continuing to concentrate on reimbursement by emphasizing improved billing and cash collection methods, continued assessment of systems support for reimbursement and concentration of the company's expertise and managerial resources into certain reimbursement locations. In December 2000, Coram announced that as part of its continuing efforts to improve efficiency and overall performance, several Patient Financial Service Centers (reimbursement sites) were being consolidated and the related reimbursement positions were to be eliminated. By consolidating to fewer sites, management expects to implement improved training, more easily standardize "best demonstrated practices," enhance specialization related to payers such as Medicare and achieve more consistent and timely cash collections. Management does not expect this change to affect Coram's patients or payers; but believes, instead, that in the long-term they will receive better, more consistent service. The transition is expected to be accomplished in stages beginning April 1, 2001 and ending in the third quarter of the same year. Management has taken certain actions to mitigate the potential shortfall in cash collections during the upcoming transition period, including, but not limited to, offering incentives for personnel to stay with the company until the completion of their corresponding regional consolidation. No assurances can be given that the consolidation of the company's Patient Financial Service Centers will be completed by the end of the third quarter of 2001, that the consolidation will be successful in enhancing timely reimbursement or that the company will not experience a significant shortfall in cash collections during or after the transition period, which is described in greater detail in this Item 7 under the caption "Risk Factors."

*Factors Affecting Recent Operating Results.* The following list summarizes the major events or factors impacting Coram's operating and financial condition in 2000, and which may impact Coram in the future:

(i)    maintaining compliance with the provisions of Stark II by, in part, exchanging a sufficient amount of debt and related accrued interest for equity in the form of Coram, Inc. Series A Cumulative Preferred Stock in order to increase its stockholders' equity above the required levels;

(ii)    the Debtors' Chapter 11 bankruptcy filings and their related reorganization expenses including, but not limited to, professional fees;

JSP 01827

(iii) continued refinement and completion of the Caremark Business Consolidation Plan and the Coram Restructure Plan, as described in Note 6 to the company's Consolidated Financial Statements;

(iv) the sale of the CPS business to Curascript Pharmacy, Inc. and Curascript PBM Services, Inc. on July 31, 2000;

(v) the Chapter 11 bankruptcy filings involving the Resource Network Subsidiaries and their anticipated liquidation through such proceedings;

(vi) resolution of certain litigation between Aetna and the company, which was settled amicably amongst the parties on April 20, 2000;

(vii) an increased focus on the company's durable medical equipment and respiratory services business, including non-consolidated joint ventures, and the significant number of days that elapse between the date that services are rendered and the reimbursement for those services;

(viii) ongoing pricing pressure in the company's infusion business as a result of an unfavorable shift in payer mix from private indemnity insurers to managed care organizations and other contracted payers, and intense competition among infusion providers. The following table sets forth the approximate percentages of the company's infusion therapy net revenue from certain categories of payers for the three years ended December 31, 2000;

|  | For the Year Ended December 31, | | |
|  | 2000 | 1999 | 1998 |
|---|---|---|---|
| Managed care organizations and other contracted payers | 59% | 58% | 51% |
| Medicare and Medicaid programs | 23% | 22% | 24% |
| Private indemnity insurance and other non-contracted payers | 18% | 20% | 25% |
| Totals | 100% | 100% | 100% |

(ix) increased competition from hospitals and physicians that have sought to increase the scope of services they offer through their facilities and offices, including services similar to those offered by the company, or that have entered into risk-sharing relationships with third-party payers pursuant to which they have been delegated control over the provision of a wide variety of healthcare services, including the services offered by the company; and

(x) increased costs associated with providing certain infusion therapy services offered by Coram, including increased costs for clinical staffing, product delivery, on-call personnel and other volume related costs associated with such therapies combined with increased costs for certain blood and blood derivative products that are in short supply and an increase in the number of patients receiving such therapies.

**Results of Operations**

*Year Ended December 31, 2000 Compared to Year Ended December 31, 1999*

*Discontinued Operations.* As discussed in Note 4 to the company's Consolidated Financial Statements, the company considers R-Net's results as part of discontinued operations; however, for the year ended December 31, 2000, the Resource Network Subsidiaries had no operations. The following discussion of Coram's financial condition and results of operations during 2000 and 1999 excludes the discontinued operations for R-Net.

*Net Revenue.* Net revenue decreased $56.4 million or 10.8% to $464.8 million in 2000 from $521.2 million in 1999. The decrease is primarily due to a decrease in CPS net revenue of approximately $25.2 million as a result of the sale of the CPS business on July 31, 2000, a decrease in infusion net revenue due, in part, to the termination of its National Ancillary Services Agreement with Aetna and corporate initiatives to focus on core therapies.

*Gross Profit.* Gross profit increased $10.8 million to $123.2 million or a gross margin of 26.5% in 2000 from $112.3 million or a gross margin of 21.6% in 1999. The gross profit and gross margin percentage increases are primarily due to a more favorable product/therapy mix, increased high margin CTI business and certain cost reduction programs implemented in December 1999. The components of gross profit are as follows (in millions):

JSP 01828

| | For the Year Ended December 31, | |
|---|---|---|
| | 2000 | 1999 |
| Infusion | $ 113.5 | $ 99.9 |
| CPS | 8.1 | 11.3 |
| CTI | 1.6 | 1.1 |
| Total gross profit | $ 123.2 | $ 112.3 |

*Selling, General and Administrative ("SG&A") Expenses.* SG&A decreased $6.5 million or 6.7% to $90.3 million in 2000 from $96.8 million in 1999. The decrease is primarily due to the sale of CPS effective July 31, 2000. In addition, certain cost reduction programs were implemented in December 1999 contributing to the favorable expense decrease in 2000. Offsetting the 2000 decrease was an increase in incentive compensation due to certain bonus plans implemented in 2000. In 1999, the recovery of a note receivable of approximately $1.8 million favorably impacted expenses for the year.

*Provision for Estimated Uncollectible Accounts.* The provision for estimated uncollectible accounts is $9.8 million or 2.1% of net revenue in 2000 compared to $28.3 million or 5.4% of net revenue in 1999. The percentage decrease is due primarily to the company's increased collection efforts and certain recoveries of amounts previously deemed to be uncollectible. In 1999, the company's provision was higher as a result of charges of $2.5 million for certain receivables that arose in relation to the R-Net business, receivables due from other healthcare providers or payers that have filed for protection under applicable bankruptcy or receivership laws and other charges of $11.2 million that related to an overall deterioration of the company's accounts receivable aging.

*Restructuring Cost (Recovery) Expense.* During 2000, management re-evaluated the reserves necessary to complete its restructuring plans and, as a result, recognized a net restructuring reversal of $0.3 million. In 1999, Coram initiated two company-wide restructuring plans, the "Coram Restructure Plan" and the "Field Reorganization Plan," and charged approximately $5.8 million to operations as restructuring charges. See Note 6 to the company's Consolidated Financial Statements for further details.

*Loss on Impairment of Long-Lived Assets.* Coram recognized impairments of goodwill and other long-lived assets of $8.3 million and $9.1 million for the years ended December 31, 2000 and 1999, respectively. See Note 2 to the company's Consolidated Financial Statements for further details. These impairment losses relate principally to operating losses of certain infusion business branches that resulted following the termination of agreements with Aetna, the discontinuance of R-Net and certain other operating factors.

*Operating Income (Loss).* Coram had operating income of $4.8 million during 2000 compared to a loss of $38.5 million during 1999. The increase in operating income is due primarily to the increase in gross profit from core therapies, cost reduction efforts, lower net restructuring costs in 2000 and a reduction in the provision for estimated uncollectible accounts.

*Interest Expense.* Interest expense decreased $3.0 million to $26.8 million in 2000 from $29.8 million in 1999. The decrease is primarily due to (i) the forbearance of interest on the Series A and Series B Notes which resulted in a lower effective interest rate for book purposes in 2000 and (ii) the reduced outstanding borrowings on the Senior Credit Facility and the Series A Notes as a result of the application of the proceeds from the sale of the CPS business on July 31, 2000. See Notes 5 and 8 to the company's Consolidated Financial Statements for further details.

*Gains on Sales of Businesses.* During 2000, the company recorded gains on sales of businesses of $18.6 million consisting primarily of the gain on sale of the CPS business and the receipt of a contingent earn-out payment relating to one of the company's operating subsidiaries. See Note 5 to the company's Consolidated Financial Statements for further details.

*Other Income (Expense), Net.* In 2000, the company recognized $3.0 million in other income, compared to $0.7 million in 1999. The increase is primarily due to recovery of a non-operating receivable of approximately $2.0 million and the receipt of approximately $1.0 million in life insurance proceeds, offset by the recognition of a $0.7 million reserve for an escrow deposit receivable related to the 1997 sale of the company's lithotritpsy business to Integrated Health Services, Inc., which filed for protection under Chapter 11 of the United States Bankruptcy Code during 2000.

*Reorganization Expenses, Net.* In 2000, the company recognized $8.3 million in net reorganization expenses related to the Debtors' Chapter 11 bankruptcy proceedings. These expenses include, but are not limited to, professional fees, expenses related to success and retention plans and United States Trustee fees, offset by interest earned on accumulated cash due to the Debtors not paying their pre-petition liabilities and other expenditures during the Chapter 11 proceedings. See Note 3 to the company's Consolidated Financial Statements.

30

JSP 01829

A698

*Income Tax Expense.* See Note 9 to the company's Consolidated Financial Statements for discussion of the variance between the statutory income tax rate and the company's effective income tax rate.

*Minority Interests in Net Income of Consolidated Joint Ventures.* Minority interests in net income of consolidated joint ventures decreased $0.9 million to $0.6 million in 2000 from $1.5 million in 1999. The reduction was primarily due to reduced profitability of certain majority owned joint ventures and the acquisition of the remaining interest of a joint venture in December 1999 which was previously owned 51% by the company.

*Loss from Discontinued Operations.* During December 1999, as a result of the bankruptcy proceedings pending against the Resource Network Subsidiaries, Coram reclassified the operating losses of this division to discontinued operations for all periods prior to the measurement date of November 12, 1999. The $28.4 million for the year ended December 31, 1999 represents operating losses through such measurement date. See Note 4 to the company's Consolidated Financial Statements for further details.

*Loss on Disposal of Discontinued Operations.* During 1999, Coram recorded charges in the aggregate amount of $17.6 million, including estimated losses through final disposition of the Resource Network Subsidiaries, severance, lease obligations, asset impairments and legal costs related to the bankruptcy and wind-down of R-Net's operations. The 2000 net charge of $0.7 million includes additional reserves for litigation and other wind-down costs, net of certain insurance recoveries, facility cost reserve reductions resulting from the Debtors' bankruptcy proceedings, reserve adjustments due to changes in the estimated amounts of legal and professional fees necessary to complete R-Net's Chapter 11 bankruptcy proceedings and a $0.5 million settlement with the Debtors for a certain substantive consolidation matter. See Note 4 to the company's Consolidated Financial Statements for further details.

*Extraordinary Gain on Troubled Debt Restructuring.* With approval from the Bankruptcy Court, the Debtors exchanged debt and related interest for equity in the form of Coram, Inc. Series A Cumulative Preferred Stock and, as a result, recognized an extraordinary gain of approximately $107.8 million, net of $0.4 million of taxes. See Note 8 to the company's Consolidated Financial Statements for further details.

*Year Ended December 31, 1999 Compared to Year Ended December 31, 1998*

*Discontinued Operations.* As discussed in Note 4 to the company's Consolidated Financial Statements, the company considers R-Net's results as part of discontinued operations. Had R-Net been included in continuing operations, the following would have been contributed to the company's operations (in millions):

|  | For the Year Ended December 31, | |
|  | 1999 | 1998 |
|---|---|---|
| Net revenue | $  74.4 | $  61.6 |
| Gross (loss) profit | (8.0) | 13.6 |
| Operating loss | (28.4) | (0.1) |

The following discussion of Coram's financial condition and results of operations during 1999 and 1998 excludes the discontinued operations for R-Net.

*Net Revenue.* Net revenue increased $76.1 million or 17.1% from $445.1 million in 1998 to $521.2 million in 1999. The net revenue increase can be primarily attributed to (i) an increase in infusion therapy business of $36.1 million resulting principally from an 8.9% increase in net revenue per patient and (ii) an increase of approximately $38.8 million from the CPS division, which resulted from expansion of services and improved sales efforts.

*Gross Profit.* Gross profit decreased $6.1 million from $118.4 million or a gross margin of 26.6% in 1998 to $112.3 million or a gross margin of 21.6% in 1999. The gross margin percent decrease was due to a shift to higher cost therapies, partially offset by a gross margin improvement in the CPS and CTI divisions. The components of gross profit are as follows (in millions):

|  | For the Year Ended December 31, | |
|  | 1999 | 1998 |
|---|---|---|
| Infusion | $  99.9 | $  114.4 |
| CPS | 11.3 | 3.9 |
| CTI | 1.1 | 0.1 |
| Total gross profit | $  112.3 | $  118.4 |

31

JSP 01830

*Selling, General and Administrative ("SG&A") Expenses.* SG&A increased $13.5 million or 16.2 % from $83.3 million in 1998 to $96.8 million in 1999. Of this increase, $5.5 million was related to the expansion of the CPS division. The remaining increase was related to an increase in personnel costs in the normal course of business, partially offset by the recovery of a note receivable of approximately $1.8 million which favorably impacted expenses in 1999.

*Provision for Estimated Uncollectible Accounts.* The provision for estimated uncollectible accounts was $28.3 million or 5.4 % of net revenue in 1999 compared to $14.8 million or 3.3 % of net revenue in 1998. In 1999, the company's provision was higher as a result of charges of $2.5 million for certain receivables that arose in relation to the R-Net business, receivables due from other healthcare providers or payers that have filed for protection under applicable bankruptcy or receivership laws and other charges of $11.2 million that related to an overall deterioration of the company's accounts receivable aging.

*Restructuring Cost (Recovery) Expense.* During 1999, Coram recorded charges of $5.8 million for estimated costs related to the Field Reorganization Plan and Coram Restructure Plan. In 1998, it was determined that the original reserve established in 1994 as a result of the Four Way Merger, the "Coram Consolidation Plan," was substantially complete and the remaining reserve of approximately $3.9 million was reversed. See Note 6 to the company's Consolidated Financial Statements.

*Loss on Impairment of Long-Lived Assets.* Coram recognized an impairment on goodwill and other long-lived assets of $9.1 million for the year ended December 31, 1999. See Note 2 to the company's Consolidated Financial Statements for further details. This impairment loss related primarily to operating losses of certain infusion business branches that resulted following the termination of agreements with Aetna, the discontinuance of R-Net and certain other operating factors.

*Operating Income (Loss).* Coram had an operating loss of $38.5 million during 1999 compared to income of $13.0 million during 1998. The decrease is due primarily to the decrease in gross profit, the increase in SG&A expenses, the increase in the provision for uncollectible accounts, the increase in restructuring costs and the impairment of goodwill and other long-lived assets.

*Interest Expense.* Interest expense decreased by $2.9 million to $29.8 million in 1999 from $32.7 million in 1998. The decrease is primarily due to a $14.9 million expense reduction resulting from the completion of the restructuring of the company's former credit facilities, offset by an increase of $3.0 million attributable to draws of $44 million on the senior credit facility, an increase in the principal amounts outstanding under the Series A and Series B Senior Notes as a result of PIK interest payments and an increase in the interest rate on the Series A Notes.

*Gains on Sales of Businesses.* In 1998, the company recorded gains on the sales of businesses totaling $1.0 million. Included therein was $0.7 million in connection with the sale of the company's remaining lithotripsy partnership. See Note 5 to the company's Consolidated Financial Statements for further details.

*Income Tax Expense.* See Note 9 to the company's Consolidated Financial Statements for discussion of the variance between the statutory income tax rate and the company's effective income tax rate.

*Loss from Discontinued Operations.* During December 1999, as a result of the bankruptcy proceedings pending against the Resource Network Subsidiaries, Coram reclassified the operating losses of this division to discontinued operations for all periods prior to the measurement date of November 12, 1999. The $28.3 million increase in the loss from discontinued operations during the year ended December 31, 1999 represents operating losses through such measurement date and such increase is principally due to the termination of the Aetna Master Agreement. See Note 4 to the company's Consolidated Financial Statements for further details.

*Loss on Disposal of Discontinued Operations.* During 1999, Coram recorded charges in the aggregate amount of $17.6 million, including estimated losses through final disposition of the Resource Network Subsidiaries, severance, lease obligations, asset impairments and legal costs related to the bankruptcy and wind-down of R-Net's operations. See Note 4 to the company's Consolidated Financial Statements for further details.

JSP 01831

**Quarterly Results (unaudited)**

The following summarizes selected quarterly financial information with respect to the company's operations for the last eight fiscal quarters. Amounts are in thousands, except per share data.

| | 2000 Quarter Ended | | | | 1999 Quarter Ended | | | |
|---|---|---|---|---|---|---|---|---|
| | Dec. 31 | Sept. 30 | Jun. 30 | Mar. 31 | Dec. 31 | Sept. 30 | Jun. 30 | Mar. 31 |
| Net revenue | $ 96,934 | $ 102,866 | $ 130,224 | $ 134,796 | $ 134,338 | $ 132,939 | $ 129,571 | $ 124,348 |
| Cost of service | 69,265 | 75,667 | 96,069 | 100,655 | 108,638 | 102,370 | 101,150 | 96,720 |
| Gross profit | 27,669 | 27,199 | 34,155 | 34,141 | 25,700 | 30,569 | 28,421 | 27,628 |
| Operating expenses: | | | | | | | | |
| Selling, general and administrative expenses | 19,711 | 22,109 | 25,053 | 23,456 | 30,718 | 23,538 | 23,612 | 18,941 |
| Provision for estimated uncollectible Accounts | (375) | 3,357 | 3,548 | 3,243 | 16,431 | 3,690 | 4,141 | 4,048 |
| Amortization of goodwill | 2,557 | 2,562 | 2,530 | 2,578 | 2,625 | 2,711 | 2,716 | 2,732 |
| Restructuring cost (recovery) expense | (322) | -- | 2,530 | 2,578 | 4,881 | 2,711 | 2,716 | 950 |
| Losses on impairments of long-lived assets | 8,323 | -- | -- | -- | 9,100 | -- | -- | -- |
| Total operating expenses | 29,894 | 28,028 | 31,131 | 29,277 | 63,755 | 29,939 | 30,469 | 26,671 |
| Operating income (loss) from continuing Operations | (2,225) | (829) | 3,024 | 4,864 | (38,055) | 630 | (2,048) | 957 |
| Other income (expenses): | | | | | | | | |
| Interest income | 502 | 195 | 135 | 159 | 140 | 216 | 244 | 55 |
| Interest expense | (6,475) | (6,866) | (6,771) | (6,676) | (7,570) | (8,110) | (7,524) | (6,559) |
| Equity in net income of unconsolidated joint Ventures | 61 | 322 | 117 | -- | 248 | 193 | -- | 1 |
| Gains on sales of businesses | 193 | 18,456 | -- | 259 | -- | -- | -- | -- |
| Gains (losses) on dispositions of property and equipment, net | (126) | (82) | 9 | (25) | (60) | 115 | (110) | (52) |
| Other income, net | 2,396 | 13 | 53 | 11 | 119 | 47 | 40 | 199 |
| Income (loss) from continuing operations before reorganization expenses, income taxes, minority interests and extraordinary gain on troubled debt restructuring | (5,674) | 11,209 | (3,433) | (1,408) | (45,178) | (6,909) | (9,398) | (5,399) |
| Reorganization expenses, net | (6,459) | (1,805) | -- | -- | -- | -- | -- | -- |
| Income (loss) from continuing operations before income taxes, minority interests and extraordinary gain on troubled debt restructuring | (12,133) | 9,404 | (3,433) | (1,408) | (45,178) | (6,909) | (9,398) | (5,399) |
| Income tax expense | -- | 75 | 75 | 100 | 65 | 125 | 175 | 75 |
| Minority interests in net income (loss) of Consolidated joint ventures | 105 | 129 | 356 | (19) | 287 | 176 | 579 | 428 |
| Income (loss) from continuing operations before extraordinary gain on troubled debt restructuring | (12,238) | 9,200 | (3,864) | (1,489) | (45,530) | (7,210) | (10,152) | (5,902) |
| Discontinued Operations: | | | | | | | | |
| Income (loss) from operations | -- | -- | -- | -- | 1,870 | (7,957) | (27,841) | 5,517 |
| Income (loss) from disposal | 2,495 | 324 | (98) | (3,383) | (17,618) | -- | -- | -- |
| Total discontinued operations | 2,495 | 324 | (98) | (3,383) | (15,748) | (7,957) | (27,841) | 5,517 |
| Extraordinary gain on troubled debt restructuring, net of tax | 107,772 | -- | -- | -- | -- | -- | -- | -- |
| Net income (loss) | $ 98,029 | $ 9,524 | $ (3,962) | $ (4,872) | $ (61,278) | $ (15,167) | $ (37,993) | $ (385) |
| Earnings (Loss) Per Share | | | | | | | | |
| Basic: | | | | | | | | |
| Income (loss) from continuing operations | $ (0.25) | $ 0.18 | $ (0.08) | $ (0.03) | $ (0.91) | $ (0.15) | $ (0.21) | $ (0.12) |
| Income (loss) from discontinued operations | 0.05 | 0.01 | -- | (0.07) | (0.32) | (0.16) | (0.56) | 0.11 |
| Extraordinary gain on troubled debt restructuring | 2.17 | -- | -- | -- | -- | -- | -- | -- |
| Net income (loss) per common share | $ 1.97 | $ 0.19 | $ (0.08) | $ (0.10) | $ (1.23) | $ (0.31) | $ (0.77) | $ (0.01) |
| Diluted: | | | | | | | | |
| Income (loss) from continuing operations | $ (0.25) | $ 0.17 | $ (0.08) | $ (0.03) | $ (0.91) | $ (0.15) | $ (0.21) | $ (0.12) |
| Income (loss) from discontinued operations | 0.05 | 0.01 | -- | (0.07) | (0.32) | (0.16) | (0.56) | 0.11 |
| Extraordinary gain on troubled debt restructuring | 2.17 | -- | -- | -- | -- | -- | -- | -- |
| Net income (loss) per common share | $ 1.97 | $ 0.18 | $ (0.08) | $ (0.10) | $ (1.23) | $ (0.31) | $ (0.77) | $ (0.01) |

The quarterly results have historically varied based upon unusual and infrequently occurring charges. See Note 15 to the company's Consolidated Financial Statements.

33

JSP 01832

A701

## Liquidity and Capital Resources

*Bankruptcy Proceedings.* The Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code on August 8, 2000. As of such date, the Debtors are operating as debtors-in-possession subject to the jurisdiction of the Bankruptcy Court. None of the company's other subsidiaries is a debtor in the proceeding. Although the filing of the Chapter 11 cases constitutes defaults under the company's principal debt instruments, Section 362 of the Bankruptcy Code imposes an automatic stay that will generally preclude creditors and other interested parties under such arrangements from taking remedial action in response to any such default without prior Bankruptcy Court approval. In addition, the Debtors may reject executory contracts and unexpired leases. Parties affected by the rejections may file claims with the Bankruptcy Court in accordance with the provisions of the Bankruptcy Code and applicable rules. See Note 3 to the company's Consolidated Financial Statements.

Schedules were filed with the Bankruptcy Court setting forth the assets and liabilities of the Debtors as of the filing date as shown by the Debtors' accounting records. Differences between amounts shown by the Debtors and claims filed by creditors are being investigated and resolved. The ultimate amount and the settlement terms for such liabilities will be subject to the new plan of reorganization, which is yet to be developed. Therefore, it is not possible to fully or completely estimate the liquidation amount of the liabilities subject to compromise at December 31, 2000 due to the Debtors' Chapter 11 cases and the uncertainty surrounding the ultimate amount and settlement terms for such liabilities.

*Credit Facilities.* On August 20, 1998, the company entered into the Senior Credit Facility, which provided for the availability of up to $60.0 million for acquisitions, working capital, letters of credit and other corporate purposes. The terms of the agreement also provided for the issuance of letters of credit of up to $25.0 million provided that available credit would not fall below zero. On September 21, 2000 and January 29, 2001, the company permanently reduced the commitment to $2.7 million and $2.1 million, respectively, in order to reduce the fees related to commitments on which the company was not be able to borrow against due to the Debtors' bankruptcy proceedings. Effective February 6, 2001, the Senior Credit Facility lenders and the company terminated the agreement. As of December 31, 2000, the lenders had outstanding irrevocable letters of credit issued for the benefit of the company totaling $2.1 million. In connection with the termination of the Senior Credit Facility, the company established new letters of credit through Wells Fargo Bank Minnesota, NA ("Wells Fargo") and such new letters of credit are fully secured by interest bearing cash deposits of the company held by Wells Fargo.

The Debtors entered into a secured debtor-in-possession ("DIP") financing agreement with Madeleine L.L.C., an affiliate of Cerberus Partners, L.P. (a party to the Senior Credit Facility), as of August 30, 2000. The agreement provides that the Debtors could access, as necessary, up to $40 million depending upon borrowing base availability, for use in connection with the operations of their businesses and the businesses of their subsidiaries. On September 12, 2000, the Bankruptcy Court approved the DIP agreement. See Note 8 to the company's Consolidated Financial Statements for further details. Through April 2, 2001, no borrowings had been made under the DIP financing agreement; however, at such date, the borrowing base was approximately $35.5 million pursuant to the limitations of the DIP financing agreement.

On December 29, 2000, the Securities Exchange Agreement was amended ("Amendment No. 4") and an Exchange Agreement was simultaneously executed among the Debtors and Cerberus Partners, L.P., Goldman Sachs Credit Partners, L.P. and Foothill Capital Corporation (collectively the "Holders"). Pursuant to such arrangements, the Holders agreed to exchange approximately $97.7 million aggregate principal amount of the Series A Notes and $11.6 million of aggregate unpaid accrued contractual interest on the Series A Notes and the Series B Notes as of December 29, 2000 for 905 shares of Coram, Inc. Series A Cumulative Preferred Stock (see Note 11 to the company's Consolidated Financial Statements for further details regarding the preferred stock). Following the exchange, the Holders retain approximately $61.2 million aggregate principal amount of the Series A Notes and $92.1 million aggregate principal amount of the Series B Notes. Pursuant to Amendment No. 4, the per annum interest rate on both the Series A Notes and the Series B Notes has been adjusted to 9.0%. Moreover, the Series A Notes' and Series B Notes' original scheduled maturity dates of May 2001 and April 2008, respectively, have both been modified to June 30, 2001. Due to the Holders' receipt of consideration with a fair value less than the face value of the exchanged principal and accrued interest, the exchange transactions qualified as a troubled debt restructuring pursuant to Statement of Financial Accounting Standards No. 15, "Accounting by Debtors and Creditors for Troubled Debt Restructurings." In connection therewith, the company recognized an extraordinary gain of approximately $107.8 million, net of tax, in its Consolidated Statements of Income.

*General.* The company's consolidated financial statements have been prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Debtors' bankruptcy filings and circumstances relating thereto, including the company's leveraged financial structure and cumulative losses from operations, such realization of assets and liquidation of liabilities is subject to significant uncertainty. During

JSP 01833

**A702**

the pendency of the Debtors' Chapter 11 bankruptcy proceedings, the company may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the consolidated financial statements. Further, any plan of reorganization filed in the Chapter 11 proceedings could materially change the amounts reported in the consolidated financial statements, which do not give effect to any adjustments of the carrying value of assets or liabilities that might be necessary as a consequence of any proposed plan of reorganization. The company's ability to continue as a going concern is dependent upon, among other things, confirmation of a plan of reorganization, future profitable operations, the ability to comply with the terms of the company's financing agreements, the ability to remain in compliance with the physician ownership and referral provisions of the Omnibus Budget Reconciliation Act of 1993, known as "Stark II," and the ability to generate sufficient cash from operations and/or financing arrangements to meet obligations.

*Cash and Cash Equivalents.* Cash and cash equivalents increased $20.7 million to $27.3 million at December 31, 2000 compared to $6.6 million at December 31, 1999.

Net cash provided by operating activities was approximately $42.6 million for the year ended December 31, 2000, compared to $9.5 million of net cash used in operating activities for the year ended December 31, 1999. The significant components of the operating cash flows are as follows (in millions):

|  | Years Ended December 31, | |
|---|---|---|
|  | 2000 | 1999 |
| Continuing operations after non-cash charges and before gains on sales of businesses | $ 22,547 | $ (1,661) |
| Changes in operating assets and liabilities, net: |  |  |
| Accounts receivable | 3,490 | (36,828) |
| Prepaid expenses, inventories and other assets | 8,275 | 3,136 |
| Current and other liabilities, including accrued interest | 12,418 | 26,203 |
| Cash basis restructuring costs | (3,505) | (2,375) |
| Cash used by reorganization items, net | (1,581) | -- |
| Miscellaneous, other | 919 | 7,057 |
| Totals | $ 42,563 | $ (9,468) |

The increase in the cash provided by continuing operations after non-cash charges and before gains on sales of businesses is principally attributable to (i) management's cost reduction programs implemented in December 1999, (ii) a favorable change in core therapy mix which provided a higher gross margin to the company and (iii) more efficient utilization of company resources toward profit generation.

The net change in cash provided by or (used in) the accounts receivable activity relates to (i) increased collection efforts in 2000 and certain recoveries of amounts previously deemed to be uncollectible, (ii) the absence of a continued build-up in the accounts receivable balances accompanying the CPS revenue growth due to disposition of the CPS business effective July 31, 2000 and (iii) an overall decline in the infusion therapy net revenue of approximately 7.4%, which is indicative of management's initiative to favorably change the core therapy mix.

Net cash provided by investing activities was $37.8 million for the year ended December 31, 2000 as compared to cash used for investing activities of $7.3 million in the year ended December 31, 1999. For 2000, cash provided by investing activities is primarily due to cash proceeds of $41.3 million from the sale of the CPS business and the receipt of a $0.3 million contingent earn-out payment related to one of the company's operating subsidiaries, offset by purchases of property and equipment totaling approximately $3.5 million.

Net cash used in financing activities was $56.0 million for the year ended December 31, 2000 compared to cash provided by financing activities of $43.4 million for the year ended December 31, 1999. For 2000, cash used in financing activities included net debt repayments of $54.1 million, debtor-in-possession financing fees of $0.5 million and cash distributions paid to minority interests of $1.4 million.

Management believes that the net costs for the Debtors' reorganization and bankruptcy proceedings will result in significant use of cash for the year ending December 31, 2001. These items principally consist of professional fees and expenses and employee retention payments. Management believes that such costs will primarily be funded through cash provided by operations and, if necessary, borrowings from the DIP financing agreement.

35

JSP 01834

The final liquidation of the Resource Network Subsidiaries through their bankruptcy proceedings may result in certain additional cash expenditures by the company beyond the cash accounts already deemed to be a part of R-Net's bankruptcy estate. However, management does not expect that such amounts, if any, will be material to the financial condition or cash flows of the company.

As of December 31, 2000, the company did not have any material commitments for capital expenditures; however, management is currently evaluating all of the company's information systems. Pending the outcome of this evaluation, certain commitments for material capital expenditures may result.

Coram is in a dispute with the Internal Revenue Service regarding certain tax refunds previously received by the company. Should it not prevail in the majority of the issues in dispute, Coram would need to access funds to address the alleged deficiency of approximately $12.7 million, plus interest and penalties. Furthermore, management cannot predict whether any future objections of the Official Committee of the Equity Security Holders in the Debtors' bankruptcy proceedings will be forthcoming or if they would prevent confirmation of a plan of reorganization set forth by the Debtors' management. Outcomes unfavorable to the company or unknown additional actions could require the company and the Debtors to access significant additional funds. See Notes 3, 4 and 13 to the company's Consolidated Financial Statements.

*Part A and Part B Medicare Surety Bonds.* As discussed in Item 1 under "Government Regulation," the Health Care Financing Administration ("HCFA") is reviewing the bonding requirements for Part A certified home health agencies and Part B suppliers as a condition of participation in the Medicare program. Management expects that the compliance date for having the necessary bonds in place will be sixty days after the publication of the final rule. Such bond amounts may be funded in whole or in part through cash generated from operations or from available funds under the terms of the DIP financing agreement. Any borrowings under the DIP financing agreement could reduce amounts available under that facility to fund other company capital requirements. In addition, depending upon the final regulations, the company may be able to establish letters of credit for the bonding requirement in whole or in part, however, such letters of credit may require the use of cash in order to be fully collateralized. Management also believes that another potential source for meeting a bonding requirement may be to obtain bonds through a qualified insurance carrier. No assurances can be given that capital generated by operations or funds under the terms of the DIP financing agreement or availability from an insurance carrier at a reasonable cost will satisfy these surety bond requirements, when finalized.

*Working Capital.* Working capital at December 31, 2000 is a deficit of $97.1 million compared to working capital surplus of $71.0 million at December 31, 1999, a decrease of $168.3 million. The change in working capital is primarily due to an increase in current liabilities relating to liabilities subject to compromise, which includes the full amount of the company's Series A Notes and the Series B Notes aggregating approximately $153.3 million, and accruals for management incentive compensation, as well as, administrative costs of the Debtors' bankruptcy proceedings. See Note 3 to the company's Consolidated Financial Statements.

*Accounts Receivable.* Coram maintains systems and processes to collect its accounts receivable as quickly as possible after the underlying service is rendered. Nevertheless, there is a spread between when the company collects payments for services and when the company pays for salaries, supplies and overhead related to that service. As such, as Coram grows its revenue, the need for working capital increases. As a result, due to the timing difference between cash received from the growth in sales and disbursement of cash to pay the expenses associated with these sales, the amount of cash generated from accounts receivable may not be sufficient to cover expenses associated with the growth of the business. Furthermore, if Coram incurs a significant increase in its days sales outstanding of accounts receivable, the borrowing base under the terms of the DIP financing agreement could be reduced, which in turn would reduce the amount of available credit under the agreement. Also see Item 7. under the caption "Risk Factors." Coram may not be able to meet its increased cash requirements.

### Risk Factors

*There can be no assurance regarding Coram's going concern related to the Chapter 11 Proceedings.*

The company's ability to continue operations is dependent upon, among other things, the ability of the company to comply with the terms of the DIP financing arrangement, confirmation of a plan of reorganization, success of future operations after such confirmation and the ability to generate sufficient cash from operations and financing sources to meet obligations. There can be no assurances that any plan of reorganization will be approved by the Bankruptcy Court or that such a plan will allow the company to operate profitably. Any plan of reorganization and other actions during the Chapter 11 proceedings could change materially the financial condition and/or outlook of the company. Furthermore, the future availability or terms of financing can not be determined in light of the Chapter 11 filings and there can be no assurance that the amounts available through the DIP financing will be sufficient to fund the operations of

JSP 01835

the company until a proposed plan of reorganization is approved by the Bankruptcy Court. In addition, the company may experience difficulty in attracting and maintaining patients and appropriate personnel as a result of the Chapter 11 proceedings.

*Coram's future profitability is not certain which could adversely affect the company's continued operations and stock price.*

Numerous factors have affected Coram's performance and financial condition to date, including, among others: (i) ongoing pricing pressure in Coram's infusion therapy business as a result of a continuing shift in payer mix from private indemnity insurance to managed care and governmental payers and intense competition among infusion providers; (ii) increased competition from hospitals and physicians who have sought to increase the scope of services they offer through their facilities and offices, including services similar to those offered by Coram; and (iii) increased competition from hospitals and physicians which have entered into risk-sharing relationships with third-party payers pursuant to which they have been delegated control over the provision of a wide variety of healthcare services, including the services offered by Coram. There can be no assurance that the foregoing factors will not continue to have an adverse effect on the company's financial condition and results of operations in the future.

*The outcome of pending bankruptcy and legal proceedings could adversely affect Coram's business.*

As described in Item 3. Legal Proceedings, Coram is involved in several legal disputes. Additionally, Coram Healthcare Corporation and Coram, Inc. are currently in Chapter 11 Bankruptcy. Even though Coram intends to pursue its claims and defend itself vigorously in these matters, the company can not predict the outcome of current and future matters due to the uncertainties inherent in litigation and bankruptcy proceedings. Pending the submission of a plan of reorganization and its approval by the Bankruptcy Court and the outcome of certain legal disputes, the financial condition, results of operations and liquidity of the company may be materially adversely affected.

*Operations may be adversely affected by the significant outstanding indebtedness.*

Following the exchange of debt for Coram, Inc. Series A Notes Preferred Stock, Coram had approximately $153.3 million outstanding long-term debt in the form of Series A and Series B Notes at an interest rate of 9.0% per annum maturing on June 30, 2001. Pending the submission of plan of reorganization and its approval by the Bankruptcy Court, the financial condition, results of operations and liquidity of the company may be materially adversely affected. See Item 7. "Liquidity and Capital Resources." and Note 8 to the company's Consolidated Financial Statements.

*Under the provisions of Stark II law, Coram will need to maintain certain equity requirements in order to be able to avoid disruption in accepting referrals of certain patients from physicians who may own shares of Coram common stock.*

Coram has learned that certain physicians have, from time to time, owned shares of its common stock. Under federal law, including certain provisions contained in the Stark II law, the ownership of shares in a healthcare service provider is a financial relationship subject to federal regulation. For example, the Stark II law prohibits a physician from making Medicare or Medicaid referrals for certain "designated health services," including durable medical equipment, parenteral and enteral nutrition therapy and outpatient prescription drugs, to entities with which the physician or an immediate family member has a financial relationship, unless an exception to the law is available. The Stark II law includes an exception for the ownership of publicly traded stock in companies with equity above certain levels. This exception of Stark II requires the issuing company to have stockholders' equity of at least $75 million either as of the end of its most recent fiscal year or on average over the last three fiscal years. Due principally to the gain on troubled debt restructuring and the disposition of CPS, at December 31, 2000 the company's stockholders' equity was above the required level. However, in light of the company's recurring operational losses during each of the three years in the period ended December 31, 2000, management's ability to maintain an appropriate level of stockholders' equity cannot be reasonably assured. The penalties for failure to comply with Stark II include civil penalties that could be imposed upon the company or the referring physician, regardless of whether either the physician or the company intended to violate the law. Accordingly, if the company's common stock remains publicly traded, and its stockholders' equity falls below the required levels, the company would be forced to cease accepting referrals of patients with government sponsored benefit programs or run a significant risk of noncompliance with Stark II. Ceasing to accept such referrals could materially adversely affect the company's financial condition and business reputation in the market as it may cause the company to be a less attractive provider to which a physician could refer his or her patients. The company previously requested a Stark II waiver from the Health Care Financing Administration, but such waiver request was denied.

37

JSP 01836

*Coram may not be able to meet its increased cash requirements.*

Management throughout the company is continuing to concentrate on enhancing timely reimbursement by emphasizing improved billing and cash collection methods, continued assessment of systems support for reimbursement and concentration of the company's expertise and managerial resources into certain reimbursement locations. In December 2000, Coram announced that as part of its continuing efforts to improve efficiency and overall performance, several Patient Financial Service Centers (reimbursement sites) were being consolidated and the related reimbursement positions were to be eliminated. By consolidating to fewer sites, management expects to implement improved training, more easily standardize "best demonstrated practices," enhance specialization related to payers such as Medicare and achieve more consistent and timely cash collections. Management does not expect this change to affect Coram's patients or payers, but believes, instead, that in the long-term they will receive better, more consistent service. The transition is expected to be accomplished in stages beginning April 1, 2001 and ending in the third quarter of the same year. Management has taken certain actions to mitigate the potential shortfall in cash collections during the upcoming transition period, including, but not limited to, offering incentives for personnel to stay with the company until the completion of their corresponding regional consolidation. No assurances can be given that the consolidation of the company's Patient Financial Service Centers will be completed by the end of the third quarter of 2001, that the consolidation will be successful in enhancing timely reimbursement or that the company will not experience a significant shortfall in cash collections during or after the transition period.

Coram has experienced pressures from vendors to tighten payment terms for needed drugs and supplies. Noncompliance with terms could result in the company not having access to the necessary drugs and supplies to maintain or grow its present business. In addition, Coram relies heavily on the collection of third party payments from insurance providers to pay these vendors. In connection therewith, it is imperative that the company maintains tightly controlled cash collection and billing practices. There can be no assurance that third party payers will not extend the time in which they pay Coram for its services. Furthermore, there can be no assurances that the closure and consolidation of several reimbursement sites in 2001 will not cause a significant shortfall in cash collections. Any disruption in cash collections, either due to changes in third party payment practices or shortfalls resulting from the closure and consolidation of Coram's reimbursement sites would cause additional liquidity pressures on the company.

*Average Wholesale Price changes have and may continue to trend in a direction that is adverse to Coram's industry.*

For most of the drugs that Coram provides to its patients, it is reimbursed by many of its governmental and third party payers according to rate schedules that are based on the Average Wholesale Price ("AWP") of the drugs provided. AWP is an industry term that is intended to represent the prices at which retail pharmacies, such as Coram, acquire individual drugs from drug manufacturers and distributors. Certain independent sources, including Medical Economics, Inc. and First DataBank, Inc., publish AWP lists for use by the pharmacy and healthcare industries. These independent sources survey drug manufacturers and use the price information provided by these drug manufacturers to calculate AWPs for nearly all the drugs received by Coram's patients. The AWPs provided by these independent sources are intended to represent the prices at which retail pharmacies acquire the drugs provided to their patients. Thus AWPs for drugs should rise and fall roughly corresponding to the rise and fall of the price at which retail pharmacies purchase their drugs.

Since the company is reimbursed by many of its governmental and third party payers for most of the drugs that it provides according to rate schedules that are based on AWP, the company's reimbursement rates for these drugs should move roughly along with the price at which it acquires the drugs. However, in many cases, the AWPs for certain drugs have failed to keep pace with rapid unit cost price increases for those drugs. In such instances, the margin between Coram's reimbursement rate and the cost at which it acquired the drug, which margin should cover the costs of the clinical services and overhead expenses associated with the delivery and administration of the drug, has been substantially reduced or eliminated.

Since 1997, the cost at which Coram has acquired certain drugs has increased over eighty percent with no corresponding increase in AWP. Due to supply shortages, certain drugs derived from blood products, such as certain immunoglobulin agents, have in some instances experienced substantial increases in their unit cost purchase price when compared to their relative changes in AWP. There can be no assurances that the upward trend in the cost of certain drugs will cease, or that the AWPs for certain drugs will keep pace with the increasing unit costs of those drugs. Further significant increases in drug costs that are not accompanied by corresponding increases in AWP could have in a material adverse impact on the company's profit margins.

*The company's revenue and profitability are subject to prices paid by third party payers.*

The company receives payment from government programs and insurance companies for the services it provides. The rates paid by these third parties cannot be controlled by the company and may not be sufficient to allow Coram to generate a profit from providing

38

JSP 01837

**A706**

its services. Additionally, managed care payers and traditional indemnity insurers are increasingly requesting fee structures and other arrangements providing for the assumption by healthcare providers of all or a portion of the financial risk of providing care. The failure of these third party payers to pay prices adequate enough to cover the company's operating expenses could have a material adverse effect on the business, results of operation or financial condition of Coram.

Additionally, the company maintains certain critical third party vendor relationships with Cardinal Health, Inc. and Baxter Healthcare Corporation. The combined aggregate purchases from these two vendors accounted for approximately 78% of the total activity for the year ended December 31, 2000. Although management considers its relationships with these two important drug and supplies vendors to be good and stable, there can be no assurances that such relationships will continue. Should either of these vendors elect not to provide drugs and supplies to the company on a recurring basis, there would likely be a significant disruption to the company's business and the results of operations could be adversely impacted until such time as a replacement vendor could be identified. Moreover, there could be no assurances that the pricing structure that the company currently enjoys could be matched by a replacement vendor. Additionally, because the company's patient census has declined over the past year, its ability to meet volume commitments with certain vendors has eroded, thereby causing additional price increases on some contracts. Further declines in patient census could result in a breach of a contract that could have significant negative financial impact to the company. It would also erode the positive image management has developed with the vendor community and adversely impact the company's ability to leverage its purchasing activity with new vendors.

*The ongoing shift of services delivered to persons covered under benefit plans funded by governmental or managed care payers could have a material adverse effect on the company's business, financial condition and results of operations.*

Since the inception of Coram's business in 1994, it has been experiencing a shift in its payer sources from private indemnity payers to governmental and managed care payers. Private indemnity payers typically reimburse at a higher amount for a given service and provide a broader range of benefits than governmental and managed care payers. Congress has reduced reimbursement rates applicable to certain home health and durable medical equipment services. Similarly, other legislative and regulatory proposals have been made which, if adopted, would have the effect of reducing the amount received by Coram for its services. Moreover, intense competition among providers of healthcare services have encouraged managed care payers to continue to reduce the prices paid for services, including the services offered by Coram.

*Coram may find itself unable to procure the products necessary to serve its patients.*

The ability to acquire factor product under normal conditions is volatile, but currently the international demand for certain factor products far exceeds the supply. Availability of factor product from manufacturers is spotty, thereby requiring the company to purchase through the blood broker market wherein pricing may not be favorable to the company and product availability can change significantly from day to day. During such times of shortages, prices soar with limited availability to pass these additional costs on to patients. Due to the nature of factor manufacturing processes, intermittent product shortages may be experienced from time to time, which may make it difficult for Coram to meet the needs of its patients and may have an adverse impact on Coram's future results of operations. These shortages could be due to insufficient donor pools, failed production lots, contamination, etc. Moreover, a single patient's requirements may, at any given time, expend what would normally be a whole month's inventory for multiple patients. During March 2001, the company began experiencing difficulties obtaining recombinant factor VIII (rVIII) due to a nationwide shortage of this product which was precipitated by Federal Drug Administration requirements exceeding expectations of current manufacturing. Coram currently has a supply of this factor product in inventory to meet immediate patient demands; however, management is proactively taking steps to secure inventory of this product at levels sufficient to meet anticipated future demands. These steps include, but are not limited to, declining new patients for this particular factor product until the shortage eases, as well as, asking patients who are currently using rVIII to consult with their physicians and consider voluntarily switching to appropriate alternative products on a temporary basis. Under normal circumstances, limited allocations of products from manufacturers greatly impacts the company's ability to expand its customer base, but management believes this current factor shortage is likely to impair the company's ability to grow this segment of its business. Coram's potential inability to purchase pharmaceutical products and supplies required by its patients could have a material, adverse impact on the company's business.

*Consolidation in the healthcare industry could give increased pricing power to purchasers of the company's services and reduce the company's revenue and profits.*

Managed care organizations have grown substantially in terms of the percentage of the population that is covered by such organizations and in terms of their control over an increasing portion of the healthcare economy. Managed care plans have continued to consolidate to enhance their ability to influence the delivery of healthcare services and to exert pressure to control healthcare costs.

39

JSP 01838

**A707**

This increased pressure may require the company to reduce its prices or forfeit existing or new business which would have a material adverse effect on its business, financial condition and results of operations.

*Coram faces significant competition and may not be able to compete successfully.*

Coram competes in the alternate site infusion therapy market which is highly competitive. Some of Coram's current and potential competitors include:

(i)    integrated providers of alternate site healthcare services;

(ii)   hospitals;

(iii)  local providers of multiple products and services offered for the alternate site healthcare market; and

(iv)   physicians and physician owned organizations such as independent practice associations and multi-specialty group practices.

Coram has experienced increased competition in its alternate site infusion therapy business from hospitals and physicians that have sought to increase the scope of services offered at or through their facilities or offices, including services similar to those offered by the company and from hospitals and physicians that have entered into risk relationships with managed care organizations pursuant to which they have taken control of certain medical services, including the services offered by the company. Certain competitors in various markets may have superior financial, marketing or managerial resources, size, purchasing power or strategic relationships with providers, referral sources, such as physicians and hospital discharge planners, and traditional indemnity and managed care payers.

There are relatively few barriers to entry in the infusion therapy services market. Local or regional companies are currently competing in many of the markets served by the company and others may do so in the future. Coram expects its competitors to continue to improve their service offerings and price competitiveness. Coram also expects its competitors to develop new strategic relationships with providers, referral sources and payers, which could result in increased competition. The introduction of new and enhanced services, acquisitions and industry consolidation and the development of strategic relationships by Coram's competitors could cause a decline in sales, loss of market acceptance of Coram's services or price competition, or make the company's services less attractive. There can be no assurance that Coram will be able to compete successfully against current or future competitors or that competitive pressures will not have a material adverse effect on Coram's business, financial condition and results of operations. See Item 1. "Competition," and Item 7. "Business Strategy" and "Factors Affecting Recent Operating Results."

*The success of Coram's business is dependent on relationships with third parties.*

The profitability of Coram's business depends in part on its ability to establish and maintain close working relationships with managed care organizations, private and governmental third-party payers, hospitals, physicians, physician groups, home health agencies, long-term care facilities and other institutional health providers and insurance companies and large self-insured employers. A central feature of the company's business strategy is to improve its relationships with such third parties and with physicians and physician groups. There can be no assurance that the company will be successful in improving and maintaining such relationships or that the company's existing relationships will be successfully maintained or that additional relationships will be successfully developed and maintained in existing or future markets. The loss of existing relationships such as the loss of its relationship with Aetna and its affiliated company, Prudential, or the failure to continue to develop and maintain ongoing relationships in the future could have a material adverse effect on the company's business, financial condition and results of operations. See Item 7. "Business Strategy."

*Coram's business may suffer if it is unable to retain key personnel.*

Coram is substantially dependent upon the services of its key executive officers, which include Daniel D. Crowley, Chairman and Chief Executive Officer and Allen J. Marabito, Executive Vice President. The loss of services of any of these executives could have a material adverse effect on the company. The company's future growth and success depends, in large part, upon its ability to obtain, retain and expand its staff of professional personnel. There can be no assurance that the company will be successful in its efforts to attract and retain such personnel.

40

JSP 01839

*Coram may be unable to recruit appropriate personnel, which would have a material adverse effect on its business.*

The continued operation of Coram's business, as well as its future growth and success, depends upon its ability to recruit and retain a staff of professional personnel, including licensed pharmacists and nurses. Certain parts of the United States, including certain states in which the company has operations, are currently experiencing a shortage of these licensed professionals. Coram has been affected by this shortage and management believes that its current financial position has made it more difficult for the company to recruit and retain experienced professional personnel. As a result, the company has experienced higher contract labor costs. A continued prolonged shortage of either or both of these types of professionals being available to or interested in working with Coram could have a material adverse effect on the company's business, results of operations and financial condition.

*Coram's common stock is subject to a high degree of risk and market volatility.*

As a result of the Chapter 11 bankruptcy filings of the Debtors, the equity interests of the common stockholders are subject to a high degree of risk. Should a plan of reorganization similar to the Restated Joint Plan of reorganization be approved, the complete elimination of the equity interests of CHC would occur. The Bankruptcy Court appointed Goldin Associates, L.L.C. as independent restructuring advisors to the Debtors to assess, among other things, the appropriateness of the Restated Joint Plan of reorganization. Goldin is also appointed as an arbiter between the Debtors and the Official Committee of the Equity Security Holders in the Debtors' bankruptcy proceedings. See Note 3 to the company's Consolidated financial Statements.

There has historically been and may continue to be significant volatility in the market price for Coram's common stock. Factors include, but not limited to, the Debtors' Chapter 11 bankruptcy proceedings, actual or anticipated fluctuations in Coram's operating results, new products or services introduced or new contracts entered into by the company or its competitors, conditions and trends in the healthcare industry including changes in government reimbursement policies, changes in financial estimates by securities analysts, general market conditions and other factors could cause the market price of Coram's common stock to fluctuate substantially. In addition, the stock market has from time to time experienced significant price and volume fluctuations that have particularly affected the market price for the common stock of healthcare companies. These broad market fluctuations may adversely affect the market price of the common stock. In the past, following periods of volatility in the market price of a particular company's securities, securities class action litigation has been brought against that company. There can be no assurances that such litigation will not occur in the future with respect to Coram. Such litigation could result in substantial costs and a diversion of management's attention and resources, which could have a material adverse effect upon Coram's business, financial condition and results of operations.

*Coram's reimbursement rates may be adversely impacted by recent regulatory action.*

Approximately thirty state Medicaid programs have adopted regulations or other policies whereby they will begin applying a new average wholesale price list to calculate the amounts that they will pay for certain drugs furnished to Medicaid beneficiaries for services rendered on or after May 1, 2000. Other states may be expected to adopt similar regulations or policies. These new average wholesale price lists would drastically reduce the rates at which the Medicaid programs would reimburse pharmacy providers such as Coram for their services. The drugs and services scheduled for the rate reduction include over 400 individual therapeutic solutions, representing approximately fifty different drug therapies, many of which are commonly received by Coram's patients. The reductions range in size from a ten percent to over ninety percent decrease in the rates that the Medicaid programs would reimburse for these drugs, supplies and services. Some or all of these state Medicaid programs may be expected to adopt new average wholesale price lists that further expand the rate reduction to additional drugs and supplies commonly received by Coram's patients.

Coram has not experienced, and does not expect to experience, any significant decrease in the cost for which it acquires drugs and supplies that would correspond to the decreased reimbursements from the state Medicaid programs. In addition, the state Medicaid programs have made no efforts to balance the reduction in drug and supply reimbursements with a corresponding increase in the amounts which they reimburse providers, such as Coram, for the cost of the clinical services and related overhead associated with the procurement, delivery and administration of these drugs and supplies to Medicaid beneficiaries.

For the year ended December 31, 2000, the company's net revenue derived from services rendered to Medicaid beneficiaries was approximately $34.4 million or 7.4% of the company's overall consolidated net revenue. The company cannot predict what impact such rate reductions will have on the company's results of operations or financial condition.

The Medicare program and most private payer organizations with which the company does business also reimburse the company for its services using a formula that incorporates the average wholesale price of the drug delivered. If the federal Medicare program

41

JSP 01840

and/or private payer organizations adopt the Medicaid average wholesale price lists with the decreased drug reimbursement rates, Coram cannot provide any assurance that its results of operations and financial condition will not be materially adversely impacted.

*The operation of Coram's business is subject to extensive government regulation.*

*General.* Coram's healthcare services business is subject to extensive and frequently changing state and federal regulation. Specifically, Coram is subject to state laws governing and regulating several aspects of its business, including home infusion therapy services (including certificates of need and licensure requirements in certain states), dispensing, distributing and compounding of prescription products and home health services. Federal laws governing Coram's activities include regulation of pharmacy operations and regulations under the Medicare and Medicaid programs relating to, among other things, the submission of claims for payment and certification of home health agencies. Coram also is subject to certain state and federal laws prohibiting the payment of remuneration for patient or business referrals and the provision of services where a prohibited financial relationship exists between a referring physician and the entity providing the service.

New laws and regulations are enacted from time to time to regulate new and existing services and products in the home infusion and home health industries. Changes in the law or new interpretations of existing laws also could have an adverse effect on the company's methods and costs of doing business. Further, Coram's failure to comply with such laws could adversely affect its ability to continue to provide, or receive reimbursement for, its equipment, products and services, and also could subject Coram and its officers and employees to civil and criminal penalties. There can be no assurances that the company will not encounter regulatory impediments that could adversely affect its ability to open new branch offices and to expand the services currently provided at its existing branch offices.

Set forth below is a more detailed discussion of certain factors related to federal and state regulation of Coram and its business.

*Medicare and Medicaid Regulations.* As a provider of services under the Medicare and Medicaid programs, Coram is subject to federal laws and regulations governing its operations, arrangements with other providers and reimbursement procedures and practices. These laws include the federal anti-kickback statute, which prohibits the payment or receipt of any form of remuneration in return for referring business or patients to providers of services for which payments are made by a federal healthcare program. Violation of these laws may result in civil and criminal penalties, including substantial fines, loss of the right to participate in the Medicare and Medicaid programs and imprisonment. In addition, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") expanded the government's fraud and abuse elimination efforts. HIPAA, among other provisions, expands the government's efforts for prosecuting fraud and abuse beyond Medicare and Medicaid to all payers; makes exclusion from the Medicare and Medicaid programs mandatory for a minimum of five years for any felony conviction relating to fraud; requires that organizations contracting with another organization or individual take steps to be informed as to whether the organization or individual is excluded from Medicare and Medicaid participation; and enhances civil penalties by increasing the amount of fines permitted. The applicable federal laws also include prohibitions contained in Stark II, which prohibits referrals by physicians for designated health services, which include outpatient prescription drugs, parenteral and enteral nutrition, equipment and supplies, durable medical equipment and home health services, if such physician has a disqualifying investment or compensation relationship with the supplier of such services and no exceptions applies. While Coram believes it has structured its financial relationships with physicians to comply with Stark II, a failure to comply with the provisions of Stark II could have a material adverse effect on the company. In addition, various federal laws impose civil and criminal penalties against participants in the Medicare or Medicaid programs who make false claims for payment for services or otherwise engage in false billing practices.

Many states also have statutes prohibiting the payment or receipt of (or the offer or solicitation of) anything of value in return for, or to induce, a referral for healthcare goods or services. There are several other state statutes that, although they do not explicitly address payments for referrals, could be interpreted as prohibiting the practice. While similar in many respects to the federal laws, these laws vary from state to state, are often vague and have seldom been interpreted consistently by courts and regulatory agencies. In addition, various state laws impose civil and criminal penalties against participants in the Medicaid program who make false claims for payment for services or otherwise engage in false billing practices. Private insurers and various state enforcement agencies have recently increased their scrutiny of healthcare providers' practices and claims, particularly in the home health and home medical equipment areas.

Enforcement of federal fraud and abuse laws, and regulatory scrutiny generally has increasingly focused on the home healthcare industry. For example, Medicare fiscal intermediaries have implemented "Wedge" audits, which involve a review of a small sample of patient records to identify non-compliance. Any adverse findings under these types of audits can result in overpayment determinations and offsets against future payments. There can be no assurance that Coram will not become the subject of a regulatory or other

42

JSP 01841

investigation or proceeding or that its interpretations of applicable healthcare laws and regulations will not be challenged. The defense of any such challenge could result in substantial cost to the company and diversion of management's time and attention. Any such challenge, whether ultimately sustained or not, could have a material adverse effect on Coram.

*Medicare Certification.* Federal regulations governing the Medicare program are also applicable to Coram's home health services. These regulations include an annual review of healthcare facilities and personnel and provide criteria for coverage and reimbursement. As of December 31, 2000, the company has one location certified by Medicare to provide home health services.

Laws and regulations governing the Medicare and Medicaid programs are complex and subject to interpretation. The company's management is aware of certain current audits and reviews with respect to prior reimbursements from Medicare and Medicaid. While management believes that the company is in compliance with all applicable laws and regulations, compliance with such laws and regulations can be subject to future government review and interpretation, as well as, significant regulatory action including fines, penalties, and exclusion from the Medicare and Medicaid programs.

*Permits and Licensure.* Many states require companies providing home infusion therapy products and services, home healthcare services, and other products and services of the type offered by Coram to be licensed. Through its subsidiaries, Coram currently is licensed under state law to provide nursing services in 20 states and currently is licensed to provide pharmacy services in 42 states and one Canadian province.

*Certificates of Need.* Many states require companies providing home healthcare services, home infusion therapy and other services of the type offered by Coram to have a certificate of need issued by a state health planning agency. Certificates of need are often difficult to obtain and in many instances a certificate of need is not obtainable at all (because an area is determined to be adequately served by existing providers or for other reasons). If Coram commences operations in a state, or expands its operations in a state where it is currently operating, and those operations require a certificate of need, the company will be required to obtain a certificate of need with respect to those operations. There can be no assurance that Coram would be able to obtain required certificates of need and the failure to obtain such certificates of need could adversely affect Coram's ability to grow its business.

*Healthcare Reform.*

The healthcare industry continues to undergo significant changes driven by various efforts to reduce costs, including efforts at national healthcare reform, trends toward managed care, limits in Medicare coverage and reimbursement levels, consolidation of healthcare distribution companies and collective purchasing arrangements by office-based healthcare practitioners. The impact of third-party pricing pressures and low barriers to entry have dramatically reduced profit margins for healthcare providers. Continued growth in managed care and capitated plans have pressured healthcare providers to find ways of becoming more cost competitive. This has also led to consolidation of healthcare providers in the company's market areas. Coram's inability to react effectively to these and other changes in the healthcare industry could adversely affect its operating results.

In addition, political, economic and regulatory influences are subjecting the healthcare industry in the United States to extensive and dynamic change, and many competing proposals have been introduced in Congress and various state legislatures to reform the present healthcare system. It is possible that healthcare reform at the federal or state level, whether implemented through legislation or through action by federal or state administrative agencies, would require Coram to make significant changes in the way it conducts business. Certain aspects of healthcare reform such as proposed reductions in Medicare and Medicaid payments, if successfully developed and adopted, could have a material effect upon the company's business. Coram anticipates that Congress and state legislatures will continue to review and assess alternative healthcare delivery systems and payment methodologies, and public debate of these issues will likely continue in the future. It is not possible at this time to predict what, if any, further reforms will be adopted, or when such reforms will be adopted and implemented. No assurance can be given that any such reforms will not have a material adverse effect upon Coram's business, results of operations, and financial condition.

*Insurance may not be sufficient to cover losses from professional liability and products liability exposure.*

The services performed and products sold by Coram involve an inherent risk of professional and products liability. While the company maintains insurance consistent with industry practice, there can be no assurance that the amount of insurance currently maintained will satisfy any claims made against Coram or that it will be able to obtain insurance in the future at commercially reasonable rates or in adequate amounts. Coram cannot predict the effect that any such claims, regardless of their ultimate outcome, might have on its business or reputation or on its ability to attract and retain patients and employees.

JSP 01842

*Coram may be unable to respond to technological change effectively.*

Coram's alternate site infusion business is dependent on physicians continuing to prescribe the administration of drugs and nutrients through intravenous and other infusion methods. Intravenous administration is often the most appropriate method for treating critically ill patients and is often the only way to administer proteins and biotechnology drugs. Nonetheless, technological advances in drug delivery systems, the development of therapies that can be administered orally, such as protease inhibitors for the treatment of persons with HIV/AIDS, and the development of new medical treatments that cure certain complex diseases or reduce the need for infusion therapy could adversely impact Coram's alternate site infusion therapy business.

## ITEM 7a. QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK

The following discusses the company's exposure to market risk related to changes in interest rates. This discussion contains forward-looking statements that are subject to risks and uncertainties. Actual results could vary materially as a result of a number of factors, including but not limited to, changes in interest rates, and those set forth under Item 7. "Management's Discussion and Analysis of Results of Operations and Financial Condition: Background – *Factors Affecting Recent Operating Results.*"

As of December 31, 2000, the company had outstanding long-term debt of $153.6 million of which $153.3 million matures in June 2001 and bears interest at 9.0% per annum. The company also has a debtor-in-possession ("DIP") agreement providing for the availability of up to $40.0 million for use in connection with the operation of its businesses and the businesses of its subsidiaries. The facility matures on the earlier of either confirmation of the Debtors' plan of reorganization or August 31, 2001 and bears an interest rate of prime plus 2.0%, which was 11.5% on December 31, 2000. As of December 31, 2000, the company had no borrowings under the DIP agreement. Because substantially all of the interest on the company's debt is fixed, a hypothetical 10.0% change in interest rates would not have a material impact on the company. Increases in interest rates could, however, increase interest expenses associated with future borrowings by the company, if any. The company does not hedge against interest rate changes. See Note 8 to the company's Consolidated Financial Statements.

The debt to equity exchange transaction described in Note 8 to the company's Consolidated Financial Statements qualified as a troubled debt restructuring pursuant to Statement of Financial Accounting Standards No. 15, "Accounting by Debtors and Creditors for Troubled Debt Restructurings." In accordance therewith, the Debtors will not recognize any interest expense on the Series A Notes and the Series B Notes until after their maturity in June 2001.

## ITEM 8. FINANCIAL STATEMENTS

The company's Consolidated Financial Statements, Notes to Consolidated Financial Statements and financial statement schedule at December 31, 2000 and 1999 and for the years ended December 31, 2000, 1999 and 1998 and the Report of Independent Auditors are included in this report as indicated on the Index to Financial Statements and Schedule on page F-1.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

### PART III

## ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

**Board of Directors**

The following table sets forth certain information concerning each member of Coram's Board of Directors as of April 9, 2001. Except as provided below, none of the directors entered into any arrangement or understanding pursuant to which such person was to serve as a director.

| Name | Age | Position with Coram | Director Since |
|---|---|---|---|
| Daniel D. Crowley... | 53 | Chairman of the Board | 1999 |
| Donald J. Amaral...... | 48 | Director | 1995 |
| William J. Casey....... | 56 | Director | 1997 |

44

JSP 01843

| | | | |
|---|---|---|---|
| L. Peter Smith............ | 51 | Director | 1994 |
| Sandra L. Smoley...... | 64 | Director | 2000 |

Mr. Crowley joined Coram as its Chairman, Chief Executive Officer and President as of November 30, 1999. In addition, Mr. Crowley serves as Chairman, Chief Executive Officer and President of Dynamic Healthcare Solutions, LLC, a privately held management consulting and investment firm that he established in 1997. Prior to founding Dynamic Healthcare Solutions, LLC, Mr. Crowley served as the Chairman, Chief Executive Officer and President of Foundation Health Corporation, a post that he had served for more than five years.

Effective August 1, 1999, Mr. Crowley and an affiliate of Cerberus Partners, L.P. ("Cerberus"), a party to the company's debtor-in-possession financing agreement, Senior Credit Facility and Securities Exchange Agreement, executed a three-year employment agreement whereby Mr. Crowley is paid $960,000 per annum, plus the potential of performance related bonus opportunities, equity options and fringe benefits. Such agreement is subject to automatic one year extensions unless either party provides written notice within 60 days of the original expiration date or subsequent renewal dates. The agreement further provides that the Cerberus affiliate can unilaterally terminate the arrangement at any time by written notice; however, certain severance payments would be triggered by such termination. The services rendered by Mr. Crowley include, but are not limited to, business and strategic healthcare investment advice to executive management at Cerberus and its affiliates. Moreover, Mr. Crowley is the Chairman of the Board of Directors of Winterland Productions, Inc. ("Winterland"), a privately held affinity merchandise company, which is a Cerberus affiliate portfolio investment. On January 2, 2001, Winterland voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code in the Northern District of California.

A committee of persons claiming to own shares of the company's publicly-traded common stock (the "Equity Committee") filed a motion with the Bankruptcy Court seeking permission to bring a derivative lawsuit directly against Mr. Crowley, Cerberus and Stephen A. Feinberg, a former member of the Board of Directors. The Equity Committee's lawsuit alleges a collusive plan whereby the named parties conspired to devalue the company for the benefit of the company's creditors under the Securities Exchange Agreement. On February 26, 2001, the Bankruptcy Court ruled that the Equity Committee's motion would not be productive at that time and, accordingly, the motion to proceed with the lawsuit was denied without prejudice.

Mr. Amaral served as Chairman of the company's Board of Directors from September 1997 until November 30, 1999. Mr. Amaral has served as a director of the company since October 1995, Chief Executive Officer of the company from October 1995 through April 23, 1999 and October 22, 1999 through November 30, 1999, and as President from October 1995 through December 1997. Previously, he was President and Chief Operating Officer of OrNda Healthcorp ("OrNda") from April 1994 to August 1995, and served in various executive positions with Summit Health Ltd. ("Summit") from October 1989 to April 1994, including President and Chief Executive Officer between October 1991 and April 1994. Summit was merged into OrNda in April 1994. Mr. Amaral is also a member of the Board of Directors of CareMatrix Corporation.

Mr. Casey has served as a director of Coram since September 1997. Since 1983, Mr. Casey has served as a consultant in the healthcare industry, specializing in hospital management evaluation, hospital planning, managed care contracting and turnaround services. From 1986 to 1997, Mr. Casey also served as Contract Administrator for Emergency Department Physicians' Medical Group, Inc. and its affiliated medical groups, which provide physician services to non-governmental facilities. In addition, from 1988 to 1997, Mr. Casey served as Contract Administrator for NP Medical Group, Inc., which provides physician services to government facilities. Mr. Casey also serves as a director of TriCounties Bank.

Mr. L. Peter Smith has served as a director of Coram since July 1994. Between November 1993 and July 1994, Mr. Smith was a director of Medisys, Inc. (one of the companies that joined together in 1994 to form Coram). Mr. Smith served as the Managing Partner of AllCare Health Services, Inc., which was acquired by Medisys, Inc. in December 1992. Mr. Smith is also the Chief Executive Officer and a member of the Board of Directors of Ralin Medical, Inc., a company specializing in cardiac disease management. Mr. Smith also serves on the Board of Directors of Gateway, Inc. and AMSYS, Inc. Mr. Smith previously served on the Board of Directors of Sabratek Corporation from October 1992 through August 23, 1999. Sabratek Corporation filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code on December 17, 1999 and that proceeding is presently pending before the United States Bankruptcy Court in Delaware. In January 2000, the assets and certain liabilities of Sabratek Corporation's Device Business were acquired by Baxter Healthcare Corporation.

Ms. Smoley was elected to Coram's Board of Directors on February 10, 2000. Ms. Smoley is the Chairperson and Chief Executive Officer of The Sandra Smoley Company, a healthcare and local government consulting firm based in Sacramento, California. From

45

JSP 01844

October 1993 to January 1999, she served as Secretary of the California Health and Welfare Agency. Prior to that time, she was Secretary of the California State and Consumer Services Agency from January 1993 to October 1993.

Stephen A. Feinberg, a director of Coram since June 1998, resigned from the Board of Directors on July 24, 2000.

Richard A. Fink, a director of Coram since July 1994, resigned from the Board of Directors on February 10, 2000.

**Executive Officers**

The following table sets forth certain information concerning each of the executive officers of Coram, who serve at the pleasure of the Board of Directors. Biographical information with respect to Daniel D. Crowley is set forth under the caption "*Board of Directors*" above.

| Name | Age | Position(s) with Coram |
|------|-----|------------------------|
| Daniel D. Crowley...... | 53 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Scott R. Danitz (1)...... | 43 | Senior Vice President, Chief Financial Officer and Treasurer |
| Scott T. Larson (2)...... | 38 | Former Senior Vice President, General Counsel and Secretary |
| Allen J. Marabito........ | 54 | Executive Vice President |
| Vito Ponzio, Jr .......... | 46 | Senior Vice President, Human Resources |
| Joseph D. Smith (3).... | 42 | Former Chief Operating Officer |

(1)  Effective January 1, 2001, Mr. Danitz was promoted to Chief Financial Officer and Treasurer.

(2)  Effective January 15, 2001, Mr. Larson resigned his position with Coram.

(3)  Effective June 30, 2000, Mr. Smith resigned his position with Coram and currently has a one year consulting arrangement with the company that expires on June 30, 2001.

Scott R. Danitz served as the company's Vice President and Controller from January 1998 through December 1999, Senior Vice President, Finance and Chief Accounting Officer from January 2000 through December 2000 and Senior Vice President, Chief Financial Officer and Treasurer since January 2001. Previously, Mr. Danitz was employed by First Data Corporation from 1989 through 1997 and held various positions, the most recent of which had been Vice President and Controller, Payment Instruments division.

Scott T. Larson served as the company's Senior Vice President and General Counsel from July 1998 through his resignation date of January 15, 2001. In addition, Mr. Larson was elected Secretary in April 1999. Previously, Mr. Larson served as the company's Vice President and Legal Counsel from March 1996 to July 1998 and as Assistant General Counsel from July 1994 through February 1996. Between December 1991 and July 1994, Mr. Larson served as Corporate Counsel and later as Assistant General Counsel for T$^2$ Medical, Inc. (one of the companies that joined together in 1994 to form Coram). Before joining T$^2$ Medical, Inc., Mr. Larson was employed as an attorney with the Atlanta-based law firm of Alston & Bird.

Allen J. Marabito joined Coram effective November 30, 1999 as Executive Vice President. From 1997 to 1999, Mr. Marabito was in private law practice and Senior Vice President with Dynamic Healthcare Solutions, LLC. From 1991 to 1997, he served as Senior Vice President, Secretary and General Counsel of Foundation Health Corporation.

Vito Ponzio, Jr. has served as the company's Senior Vice President, Human Resources since September 1998. Previously, Mr. Ponzio served as the company's Vice President of Human Resources from February 1996 to September 1998 and as Director of Human Resources from February 1994 to February 1996.

Joseph D. Smith served as the company's Chief Operating Officer from January 1999 through his resignation date of June 30, 2000. In addition, Mr. Smith was President of the Resource Network division from March 1998 until November 1999. Prior to that time, Mr. Smith served as Chief Operating Officer of the East Area of the company beginning in December 1996. Preceding that and since September 1994, Mr. Smith had served as Area Vice President of the Northeast Area of the company. From 1993 until September 1994, Mr. Smith was the Eastern Area Vice President of H.M.S.S., Inc., a regional home infusion company acquired by Coram in September 1994. Effective June 30, 2000, Mr. Smith resigned his position with Coram and currently has a one year consulting arrangement with the company that expires on June 30, 2001.

46

JSP 01845

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16 of the Securities Exchange Act of 1934, as amended, requires Coram's directors, executive officers and persons who beneficially own greater than 10% of a registered class of Coram's equity securities to file reports of ownership and changes in ownership with the Securities and Exchange Commission. Based solely upon its review of copies of the Section 16 reports that Coram received and written representations from certain reporting persons, management believes that during its year ended December 31, 2000 all of its directors, executive officers and greater than 10% beneficial owners were in compliance with these filing requirements.

## ITEM 11. COMPENSATION OF DIRECTORS AND EXECUTIVE OFFICERS

**Compensation of Directors**

*Fees for Board Service.* Under current company policy, non-employee directors earn $2,000 for each Board of Directors' meeting attended in person and $750 for each Board of Directors meeting attended by telephone conference call. No compensation is earned for participating at meetings of committees of the Board of Directors. However, an exception to the aforementioned Board of Director fee structure is the compensation for Donald J. Amaral. Mr. Amaral currently receives a fixed $100,000 per annum for service on the Board of Directors and consulting services to the company's executive management. Such agreement will expire on May 16, 2001.

Employee directors earn no additional compensation for service as a director. All directors are entitled to reimbursement for expenses incurred in connection with attending meetings of the Board of Directors or committees thereof. Compensation for participation on the Board of Directors is at the discretion of the Board of Directors. Effective April 1, 2000, the Board of Directors adopted resolutions approving an annual retainer of $12,000 for each non-employee director, except for Mr. Amaral. Due to the Debtors' bankruptcy proceedings, certain amounts payable to members of the Board of Directors have been stayed and, in connection therewith, such members have filed proofs of claims against the company's bankruptcy estate.

Mr. Crowley, the only director who is currently an employee, received no additional compensation for service on the Board of Directors. In addition to the reimbursement for out-of-pocket expenses relating to meeting attendance, non-employee directors of Coram earned the following compensation for Board of Directors' meetings attended during the year ended December 31, 2000:

| | |
|---|---|
| Donald J. Amaral | $ 100,000 |
| William J. Casey | 25,750 |
| Richard A. Fink (1) | 750 |
| Stephen A. Feinberg (2) | 11,000 |
| L. Peter Smith | 15,750 |
| Sandra L. Smoley | 23,750 |

(1)  Effective February 10, 2000, Mr. Fink resigned from Coram's Board of Directors.

(2)  Effective July 24, 2000, Mr. Feinberg resigned from Coram's Board of Directors.

*Outside Directors' Automatic Option Grant Program.* Non-employee members of the Board of Directors participate in the Automatic Option Grant Program in effect under Coram's 1994 Stock Option Plan. On the date of each annual meeting of Coram's stockholders, each individual who will continue to serve as a non-employee Board member receives a non-statutory stock option to purchase 2,500 shares of Coram common stock at an exercise price equal to the fair market value of Coram's common stock on the automatic option grant date. Due to the absence of an annual meeting of Coram's stockholders during the year ended December 31, 2000, no stock options were granted pursuant to the Automatic Option Grant Program during such year. Additionally, each non-employee individual, upon being newly appointed or elected to Coram's Board of Directors, is automatically granted, at the time of such initial election or appointment, a non-statutory option to purchase 75,000 shares of Coram common stock. For the year ended December 31, 2000, options to purchase 75,000 shares relating to newly appointed/elected individuals were granted to Ms. Smoley upon her appointment to the Board of Directors on February 10, 2000, at an exercise price of $0.6875 per share. With regard to the stock options for both the newly appointed/elected Board members and the continuing Board members, each option is immediately exercisable for all of the option shares. However, any shares purchased under the option will be subject to repurchase by Coram at the original exercise price paid per share upon the optionee's cessation of Board service prior to the vesting of such shares. The optionee's option shares vest in a series of equal monthly installments over twelve months of Board service measured from the automatic option grant date. The shares subject to each automatic option grant under the 1994 Stock Option Plan vest in full upon (i) the optionee's cessation of Board service due to death or disability, (ii) an acquisition of Coram by merger or asset sale or (iii) a change in control of

JSP 01846

**A715**

Coram. As of April 9, 2001, all stock options granted to members of the Board of Directors under the Automatic Option Grant Program are fully vested.

Each automatic option granted to a non-employee Board member includes a limited stock appreciation right which allows the optionee, upon the successful completion of a hostile tender offer for more than 50% of Coram's outstanding securities, to surrender that option to Coram, in return for a cash distribution in an amount per surrendered option share equal to the highest price per share of Coram common stock paid in the tender offer, less the exercise price payable per share.

Following Richard A. Fink's resignation from Coram's Board of Directors on February 10, 2000, the Board of Directors granted a request made by Mr. Fink to amend his stock option agreement, dated September 9, 1998, pursuant to which Mr. Fink was granted options to purchase 75,000 shares of Coram's common stock at $1.6875 per share. Under the amendment, all such options became immediately exercisable and can be exercised at any time through the stated maximum option expiration date of September 9, 2008.

The Debtors' restated joint plan of reorganization, if approved, would have effectively eliminated all options to purchase Coram's common stock because Coram Healthcare Corporation would be dissolved as soon as practicable after the effective date of the plan and all equity interests therein would be completely eliminated. Another plan put forth by the Debtors' management or other interested parties may have a similar effect, however, appropriate approvals thereof in accordance with the United States Bankruptcy Code would be required.

Coram entered into indemnification agreements with each of its directors and executive officers that would require Coram to provide indemnification to each such person in certain circumstances for claims made against them in connection with their service on behalf of the company.

### Summary of Cash and Certain Other Compensation of Executive Officers

The following table sets forth the annual and long-term compensation earned by the Chief Executive Officer and the five most highly compensated current and former executive officers of the company (other than such Chief Executive Officer) during the year ended December 31, 2000 (collectively the "Named Executive Officers") for services rendered in all capacities to the company and its subsidiaries for each of the years in the three-year period ended December 31, 2000.

### Summary Compensation Table

| Name and Principal Position(1) | Year | Annual Compensation | | | Long-Term Compensation Awards | All Other Compensation |
| | | Salary | Bonus | Other Annual Compensation(2) | Stock Options(#) | |
|---|---|---|---|---|---|---|
| Daniel D. Crowley (3) Director and Chairman of the Board, Chief Executive Officer and President | 2000 1999 1998 | $ 650,000 50,000 | $ -- | $ 127,754 -- -- | -- 1,000,000 | $ 50,000 -- |
| Allen J. Marabito (4) Executive Vice President | 2000 1999 1998 | $ 310,000 -- -- | $ -- -- | $ 100,768 -- -- | -- 500,000 -- | $ 23,846 -- |
| Joseph D. Smith (5) Former Chief Operating Officer and President, Resource Network division | 2000 1999 1998 | $ 340,862 311,767 264,827 | $ -- 217,500(8) | $ -- -- -- | -- 350,000 50,000 | -- -- -- |
| Scott R. Danitz (6) Senior Vice President, Chief Financial Officer and Treasurer | 2000 1999 1998 | $ 192,308 132,867 107,231 | $ -- 100,000(9) 10,000(8) | $ -- -- -- | 50,000 -- 45,000 | $ 70,405 -- -- |
| Scott T. Larson (6) Former Senior Vice President, General Counsel and Secretary | 2000 1999 1998 | $ 185,000 184,914 163,481 | $ -- 105,000(8) | $ -- | 40,000 -- 75,000 | $ 100,000(10) -- -- |
| Vito Ponzio, Jr. (7) Senior Vice President, Human Resources | 2000 1999 1998 | $ 161,923 143,846 129,827 | $ -- 86,250(8) | $ -- | 40,000 50,000 50,000 | $ 50,944 -- -- |

48

JSP 01847

In September 2000 and October 2000, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") approved payments of up to approximately $2.6 million for the Debtors' Key Employee Retention Pan ("KERP"), which provides for bonuses payable to certain key management personnel. The bonuses were scheduled to be paid in two equal installments: (i) the later of the date of emergence from bankruptcy or December 31, 2000 (the "First KERP Installment") and (ii) December 31, 2001 (the "Second KERP Installment"). Due to events that have delayed emergence from bankruptcy, in March 2001 the Bankruptcy Court approved early payment of the First KERP Installment to all participating individuals, except for Mr. Crowley and Mr. Marabito. Mr. Crowley and Mr. Marabito will receive their First KERP Installment upon emergence from bankruptcy. Only the First KERP Installment amounts paid in March 2001 are included in the table above as "All Other Compensation" because such amounts principally relate to the year ended December 31, 2000.

The company also sponsors a Management Incentive Plan ("MIP"), which provides for annual bonuses payable to certain key employees. The bonuses are predicated on overall corporate performance (principally cash collections and earnings before interest, taxes, depreciation and amortization ("EBITDA")), as well as, individual performance targets and objectives. On March 20, 2001, the Compensation Committee of the company's Board of Directors approved an overall award of approximately $13.6 million for those individuals participating in the MIP. No amounts from the MIP for the year ended December 31, 2000 are included in the table above because such amounts are not yet scheduled to be paid.

(1)  See information above under captions "Board of Directors" and "Executive Officers" for employment history.

(2)  Does not include perquisites aggregating in dollar value less than the lesser of $50,000 or 10% of the individual's annual salary and bonus reported for such individual for the year presented. The perquisites exceeding 25% of the total perquisites for the Named Executive Officers include (i) $3,600 per month for temporary corporate housing and an auto allowance of $1,800 per month for Mr. Crowley and (ii) $3,500 per month for temporary corporate housing and an auto allowance of $1,000 per month for Mr. Marabito. The aforementioned corporate housing and auto allowances for Mr. Crowley and Mr. Marabito are subject to certain customary tax gross-up adjustments. Such adjustments are included in the "Other Annual Compensation" amounts.

(3)  Mr. Crowley participates in both the KERP and MIP retention/incentive arrangements. In connection therewith, his allocated amount under the First and Second KERP Installments aggregates $800,000. Mr. Crowley's allocated MIP amount for the year ended December 31, 2000 is approximately $10.8 million.

Effective August 2, 2000, the company's Board of Directors approved a contingent bonus to Mr. Crowley. Under the agreement, subject to certain material terms and conditions, Mr. Crowley is to be paid $1.8 million following the successful refinancing of the company's debt. In connection therewith and the debt to preferred stock conversion discussed in Notes 3 and 6 to the company's Consolidated Financial Statements, the company recorded a $1.8 million success bonus expense for the year ended December 31, 2000. Such success bonus will not be payable until such time as the Debtors' amended plan of reorganization is fully approved by the Bankruptcy Court.

Mr. Crowley owns Dynamic Healthcare Solutions, LLC ("DHS"), a consulting company from which Coram purchased services. For the years ended December 31, 2000 and 1999, the company paid approximately $0.7 million and $0.2 million, respectively, to Mr. Crowley's consulting company for related consulting services and reimbursable expenses (such payments to DHS are not included in the table above). The terms and conditions of the underlying consulting agreement were approved by the company's Board of Directors when Mr. Crowley was hired by Coram. Effective with the Debtors' Chapter 11 filings in the Bankruptcy Court, DHS employees who were serving as consultants to Coram terminated their employment with DHS and became full time Coram employees. Coram continues to reimburse DHS for the actual overhead costs of DHS' Sacramento, California location that are directly attributable to the duties Mr. Crowley performs on behalf of Coram. Such reimbursements do not include any element of profit for DHS.

(4)  Mr. Marabito participates in both the KERP and MIP retention/incentive arrangements. In connection therewith, his allocated amount under the First and Second KERP Installments aggregates $150,000. Mr. Marabito's allocated MIP amount for the year ended December 31, 2000 is $930,000.

(5)  Effective June 30, 2000, Mr. Smith resigned his position as Chief Operating Officer with Coram and has entered into a consulting agreement with the company. Under the agreement, Mr. Smith provides sales consulting services on an independent contractor basis until June 30, 2001. His consulting fee is $25,700 per month.

49

JSP 01848

(6)    Effective January 1, 2001, Mr. Danitz was promoted to Chief Financial Officer and Treasurer. Mr. Danitz participates in both the KERP and MIP retention/incentive arrangements. In connection therewith, his allocated amount under the First and Second KERP Installments aggregates $100,000, including $50,000 of which was paid on or about March 15, 2001. Mr. Danitz's allocated MIP amount for the year ended December 31, 2000 is approximately $245,000.

(7)    Mr. Ponzio participates in both the KERP and MIP retention/incentive arrangements. In connection therewith, his allocated amount under the First and Second KERP Installments aggregates $80,000, including $40,000 of which was paid on or about March 15, 2001. Mr. Ponzio's allocated MIP amount for the year ended December 31, 2000 is approximately $199,000.

(8)    This amount reflects performance, retention and discretionary bonuses paid in 1998 for services rendered in 1997.

(9)    This amount reflects discretionary bonuses earned in 1998 and paid in 1999 and retention bonuses paid in 2000 for services rendered in 1999.

(10)   Effective January 15, 2001, Mr. Larson resigned his position with Coram. In connection therewith, an incentive/retention bonus of $100,000 was paid to Mr. Larson in January 2001.

### Option Grants in Last Fiscal Year

The following table sets forth information concerning options granted to each of the Named Executive Officers during the year ended December 31, 2000. In addition, in accordance with the rules of the Securities and Exchange Commission, hypothetical gains or "option spreads" that would exist for the respective options are also shown. These gains are based on assumed rates of annual compounded stock price appreciation of 5% and 10% from the date the options were granted over the full option term. No stock appreciation rights were granted to the Named Executive Officers during the year ended December 31, 2000.

| | Individual Grants | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term(1) | |
| Name | Number of Securities Underlying Options Granted | % of Total Options Granted to Employees in Fiscal Year | Exercise Price Per Share | Expiration Date | 5% | 10% |
|---|---|---|---|---|---|---|
| Daniel D. Crowley.... | -- | -- | $ -- | | $ -- | $ -- |
| Allen J. Marabito...... | -- | -- | -- | | -- | -- |
| Joseph D. Smith........ | -- | -- | -- | | -- | -- |
| Scott R. Danitz......... | 50,000 | 4.42 | 0.625 | February 1, 2010 | 19,653 | 49,804 |
| Scott T. Larson ......... | 40,000 | 3.53 | 0.625 | February 1, 2010 | 15,722 | 39,844 |
| Vito Ponzio, Jr .......... | 40,000 | 3.53 | 0.625 | February 1, 2010 | 15,722 | 39,844 |

(1)    Potential realizable value is determined by taking the exercise price per share and applying the stated annual appreciation rate compounded annually for the term of the option, subtracting the exercise price per share at the end of the period and multiplying the remaining number by the number of options granted. Actual gains, if any, on stock option exercises and common stock holdings are dependent on the future performance of Coram's common stock and overall stock market conditions. The above table does not reflect changes in the market price of Coram's common stock subsequent to December 31, 2000.

### Aggregated Option Exercises in Last Fiscal Year and Fiscal Year End Option Values

The following table sets forth information concerning the outstanding stock options held by each of the Named Executive Officers at December 31, 2000. No stock options or stock appreciation rights were exercised by the Named Executive Officers during the year ended December 31, 2000. No stock appreciation rights were held by the Named Executive Officers as of such date.

| | Number of Unexercised Options at December 31, 2000 | | In-the-Money Options at December 31, 2000(1) | |
| Name | Exercisable | Unexercisable | Exercisable | Unexercisable |
|---|---|---|---|---|
| Daniel D. Crowley.... | 333,333 | 666,667 | $ -- | $ -- |
| Allen J. Marabito...... | 166,667 | 333,333 | -- | -- |
| Joseph D. Smith........ | -- | -- | -- | -- |
| Scott R. Danitz......... | 28,853 | 66,147 | -- | -- |
| Scott T. Larson ......... | 115,625 | 74,375 | -- | -- |
| Vito Ponzio, Jr .......... | 140,467 | 99,533 | -- | -- |

JSP 01849

(1) Whether an option is "in-the-money" is determined by subtracting the exercise price of the option from the closing price for Coram's common stock on December 31, 2000 ($0.42) from the Over the Counter Bulletin Board maintained by the National Association of Securities Dealers, Inc. If the closing price for Coram's common stock on December 31, 2000 is greater than the exercise price of the option, the option is "in-the-money." For the purpose of such calculation, the market price per share is the applicable market price as of December 31, 2000 and does not reflect market price changes subsequent to December 31, 2000.

Shares subject to options granted to the company's Named Executive Officers under the 1994 Stock Option Plan will immediately vest in full upon (i) an acquisition of the company by merger or asset sale in which such options are not to be assumed by the acquiring entity or (ii) if such options are so assumed, the subsequent involuntary termination of the optionee's employment within eighteen months following such acquisition. In addition, the Compensation Committee of the Board of Directors, as the 1994 Stock Option Plan administrator, has the authority to provide for the accelerated vesting of the shares of the company's common stock subject to outstanding options held by the company's executive officers. Similarly, the Compensation Committee can accelerate vesting of any unvested shares actually held by those individuals under the 1994 Stock Option Plan in connection with a hostile takeover of the company effected through a successful tender offer for more than 50% of the company's outstanding securities, or through a change in the majority of the Board of Directors as a result of one or more contested elections for Board of Director membership, or in the event such individual's employment were involuntarily terminated following such hostile takeover.

The Debtors' restated joint plan of reorganization, if approved, would have effectively eliminated all options to purchase Coram's common stock because Coram Healthcare Corporation would be dissolved as soon as practicable after the effective date of the plan and all equity interests therein would be completely eliminated. Another plan put forth by the Debtors' management or other interested parties may have a similar effect, however, appropriate approvals thereof in accordance with the United States Bankruptcy Code would be required.

### Employment Contracts, Termination of Employment and Change of Control Arrangements

The company has entered into or anticipates entering into employment and/or severance agreements with its Named Executive Officers and certain other executive officers as described below.

*Daniel D. Crowley.* Effective November 30, 1999, Coram entered into an employment agreement with Daniel D. Crowley, for a three-year term commencing on such date, unless otherwise terminated in accordance with its terms. The agreement also provides for two automatic one year renewals after the completion of the initial three year term. Under the agreement and related amendments, Mr. Crowley serves as Chairman of the Board of Directors, President and Chief Executive Officer of the company. He receives a base salary of $650,000 per year, subject to annual merit adjustments, and the right to receive performance bonuses, which are characterized as an EBITDA bonus and a refinancing success bonus. The EBITDA bonus generally provides incentive compensation by measuring operating results (EBITDA) against target EBITDA established by the Compensation Committee of the Board of Directors before the beginning of each year. Pursuant to the second amendment to Mr. Crowley's employment agreement, dated April 6, 2000, such EBITDA bonus for the year ended December 31, 2000 utilizes a two-tier methodology whereby Mr. Crowley receives the sum of (i) 25% of the company's EBITDA in excess of $14 million and (ii) a one-time $5 million enhanced bonus, which may be shared with other individuals as designated by Mr. Crowley, if the company's EBITDA exceeds $35 million. The refinancing success bonus provides for a $1.8 million award upon confirmation of the Debtors' plan of reorganization, if the plan includes a refinancing component. A refinancing, as contemplated by the third amendment to the employment agreement, dated August 2, 2000, is a Board of Directors approved transaction or series of related transactions that converts some or all of the company's principal debt instruments into new debt instruments and/or equity securities (common or preferred) of Coram Healthcare Corporation and Coram, Inc. The company's principal debt instruments are further defined to be those under the Securities Exchange Agreement and the Senior Credit Facility (see Note 8 to the company's Consolidated Financial Statements). Additionally, Mr. Crowley is eligible to receive an acquisition bonus of approximately three times the sum of (i) his base salary and (ii) his EBITDA performance bonus in the event the company merges with or is acquired by another company.

Under the employment agreement, Mr. Crowley was also granted options to purchase 1,000,000 shares of Coram's common stock at $0.75 per share (the stock price of the company on November 29, 1999). The options vest and become exercisable in three equal annual installments upon Mr. Crowley's completion of each year of service. Mr. Crowley also receives four weeks of vacation, an automobile allowance in the amount of $1,800 per month, a tax preparation fee allowance, certain customary tax gross-up adjustments, temporary corporate housing in Denver and a company sponsored $1.0 million life insurance policy with Mr. Crowley's designee as the beneficiary thereunder. Mr. Crowley is also eligible for health, dental, medical and group life insurance. As part of the agreement, Mr. Crowley agreed that during the term of his employment at the company, and for one year thereafter, he will not directly or indirectly own, manage, control, participate in, consult with, render services to, or in any manner engage in any business

51

JSP 01850

which competes with the company's business in the company's geographical area. In addition, Mr. Crowley may not solicit the company's employees, customers or suppliers during the term of his employment at the company and for one year thereafter.

If Mr. Crowley's duties are substantially altered or his employment is terminated by the company other than for cause or voluntarily by Mr. Crowley in the event that the company fails to comply with any material provision of the agreement, then Mr. Crowley would be entitled to receive his base salary, automobile allowance and all available bonuses otherwise payable pursuant to the employment agreement for a period of three years from the date of separation. Additionally, during such three-year period, Mr. Crowley would retain his eligibility to participate in the company's health, dental, medical, group life and similar welfare benefit plans, as well as, the aforementioned company sponsored $1.0 million life insurance policy. If the Board of Directors and Mr. Crowley mutually agree to a new Chief Executive Officer and/or President, then all of the terms and conditions of Mr. Crowley's employment agreement would continue in effect; however, the aforementioned EBITDA bonus would be subject to an allocation between Mr. Crowley and the new executive.

*Allen J. Marabito.* Effective November 30, 1999, Coram entered into an employment agreement with Allen J. Marabito, for a three-year term commencing on such date, unless otherwise terminated in accordance with its terms. Under the agreement and related amendment, Mr. Marabito serves as Executive Vice President of the company. He receives a base salary of $310,000 per year, subject to annual merit adjustments, and the right to receive a performance bonus between 60% and 300% of his base salary, if the company's EBITDA exceeds the EBITDA target for that year that was established by the Compensation Committee of the Board of Directors. He is also eligible to receive an acquisition bonus of approximately three times the sum of (i) his base salary and (ii) his EBITDA performance bonus in the event the company merges with or is acquired by another company. If Mr. Marabito's employment is terminated by the company other than for cause or voluntarily by Mr. Marabito in the event that the company fails to comply with any material provision of the agreement, then Mr. Marabito would be entitled to receive his base salary through the longer of (i) the remaining term of the agreement; or (ii) twenty four months, plus the EBITDA target bonuses during such period. Under the agreement, Mr. Marabito was also granted options to purchase 500,000 shares of Coram's common stock at $0.8125 per share (the stock price of the company on December 17, 1999). The options vest and become exercisable in three equal annual installments upon Mr. Marabito's completion of each year of service. Mr. Marabito also receives four weeks of vacation, an automobile allowance in the amount of $1,000 per month, a tax preparation fee allowance, certain customary tax gross-up adjustments and temporary corporate housing in Denver. Mr. Marabito is also eligible for health, dental, medical and group life insurance. As part of the agreement, Mr. Marabito agreed that during the term of his employment at the company, and for one year thereafter, he will not directly or indirectly own, manage, control, participate in, consult with, render services to, or in any manner engage in any business which competes with the company's business in the company's geographical area. In addition, Mr. Marabito may not solicit the company's employees, customers or suppliers during the term of his employment at the company and for one year thereafter.

*Scott R. Danitz.* Effective August 1, 2000, Coram entered into an employment agreement with Mr. Danitz for a one-year term, unless otherwise terminated in accordance with its terms. Under the agreement, Mr. Danitz serves as Senior Vice President and Chief Accounting Officer of the company. Subsequently, Mr. Danitz was promoted to Chief Financial Officer and Treasurer, effective January 1, 2001. Mr. Danitz receives a base salary of $200,000 per year, subject to annual merit adjustments, and the right to receive certain bonus/incentive plan compensation. If Mr. Danitz's employment is terminated by the company other than for cause or upon the occurrence of a "change in control," then Mr. Danitz would be entitled to severance equal to a minimum of one year of salary and health and welfare benefits. In addition, Mr. Danitz is eligible to receive an acquisition bonus of approximately $200,000 in the event the company merges with or is acquired by another company. Mr. Danitz also receives an automobile allowance in the amount of $900 per month and is eligible for health, medical, dental and group life insurance. As part of the agreement, Mr. Danitz agreed that during the term of his employment at the company, and for one year thereafter, he will not directly or indirectly own, manage, control, participate in, consult with, render services to, or in any manner engage in any business which competes with the company's business in the company's geographical area. In addition, Mr. Danitz may not solicit the company's employees, customers or suppliers during the term of his employment at the company and for one year thereafter.

*Vito Ponzio, Jr.* Effective April 26, 1999, the company entered into a one-year automatically renewable employment agreement with Mr. Ponzio which provides for a payment of $150,000 and minimum severance equal to one year of salary upon the occurrence of a "change in control." The severance amount represents minimum severance, including health and welfare benefits, due upon termination by the company (other than for cause) or involuntary termination of employment following a "change in control." Mr. Ponzio agreed that during the term of his employment at the company, and for one year thereafter, he will not directly own, manage, control, participate in, consult with, render services to, or in any manner engage in any business which competes with the company's business in the company's geographical area. In addition, Mr. Ponzio may not solicit the company's employees, customers or suppliers during the term of his employment at the company and for one year thereafter.

52

JSP 01851