Smith believes that Crowley, considering himself a "CEO of CEOs," envisioned Smith working for him, rather than the other way around. For example, he says Crowley sent Simpson, Coram's CFO, to New York "behind his back" to talk to bankers and took other actions on behalf of the company without consulting with Smith. He also says that in October 1999 Crowley wrote a highly critical memo about Coram's management information system — in defiance of Smith's explicit instructions not to write any memos — which could have potentially hurt Coram in the Aetna litigation.

By mid-October it had become clear that Smith and Crowley could not work together. After the October 22 board meeting Richard Fink spoke to Smith on the board's behalf. Fink told Smith that he lacked turnaround experience and needed help; Fink explained that the board wanted Crowley to function, in the short term, as a "CEO coach." He proposed that Crowley and Smith serve as "co-CEOs" for the next few months, at which point Smith could resume running the company on his own. Fink says the board "tried to make it work for everyone."

While conceding that the board *did* ask him to stay on in some capacity, Smith claims Fink conveyed a somewhat different message. According to Smith, he was told the Noteholders would agree to forgive $11 million in debt if the board brought Crowley in to run the company with him as co-CEO. Smith says this was put to him as a direct quid pro quo. Simpson, who was CFO at the time, does not recall the two having been connected. But Fink recalls that the interest/accrual holiday was, in fact, conditioned on Crowley taking over.[9]

---

[9]     As noted below, Crowley's contract with Cerberus, Crowley's contract with Coram and the forbearance agreement between Coram and the Noteholders were executed within

In October 1999 Smith's attorney sent a letter to the board of directors of Coram, claiming Smith had been constructively terminated. According to the minutes of the October 27, 1999 board meeting, the board determined "that it was in the best interests of the Company to treat Mr. Smith's departure as one in which Mr. Smith had resigned, but one in which he would receive the benefits of his employment agreement as if his employment were 'involuntarily' terminated." Amaral (with the board's concurrence) ultimately agreed to pay Smith severance in an amount that was roughly commensurate with the terms of his employment agreement. Smith is currently pursuing an arbitration against Coram and its subsidiaries to recover unpaid severance amounts.

Upon Smith's resignation Amaral agreed to serve as CEO on a temporary basis, while Coram looked for a long-term replacement. Amaral had three goals as interim CEO: (i) "to come to terms with Smith's severance;" (ii) to find a new CEO; and (iii) to assess Coram's financial condition.

Amaral met with an executive search firm to identify possible CEO candidates. But as several directors explained, by November 1999 Coram was in dire financial straits. It could not afford a long and drawn out search and, even if it could, there were few (if any) qualified candidates willing to take on a troubled healthcare company. Feinberg recommended Crowley. But Crowley initially turned the job down. After speaking with Feinberg, however, he changed his mind.

---

days of each other. On November 15, 1999 Amaral and the Noteholders agreed on the terms of the forbearance agreement. On November 18, 1999 Crowley signed the contract with Coram. On November 19, 1999 he executed his contract with Cerberus.

-34-

KL2:2108373.7

In mid-November 1999 Amaral negotiated a restructuring and forbearance agreement with the Noteholders. His goal was to achieve a one year hiatus on all principal and interest payments. He succeeded in obtaining a six month interest accrual holiday, which as noted above may have been conditioned on Coram bringing in Crowley as CEO. The Noteholders agreed to forbear and waive the accrual of interest payments through the earlier of (i) the final resolution of the Aetna litigation or (ii) May 15, 2000, which translated into a cash saving to Coram of approximately $11-12 million. The Noteholders also agreed to waive Coram's non-compliance with certain covenants in the senior secured revolver. As part of the November 1999 restructuring Coram agreed that the net cash proceeds from any sale or disposition of assets which were not applied to reduce senior debt would be used to repurchase the Series A and/or Series B Notes at par, in such proportions as the Noteholders would elect.

On November 17, 1999 the board voted unanimously to elect Crowley the next CEO of Coram, for a three year term beginning November 30, 1999.

3.   **Coram's Outside Directors**

Since Crowley's Coram involvement began in the Summer of 1999, Coram's board of directors has consisted of the CEO (Richard Smith, then Crowley), Amaral, Feinberg (until his July 2000 resignation), and three other outside directors. Each of Coram's directors has extensive experience in the healthcare field. With the exception of Feinberg, none of the directors had or has any affiliation with any of the Noteholders.

Peter Smith became a director of Coram when the company was founded in 1994. He is the only remaining member of Coram's original board. Smith has held management and board positions at a number of companies in the healthcare industry, including Medisys, Inc.,

-35-

AllCare Health Services, Inc., Ralin Medical, Inc., Gateway, Inc. and AMSYS, Inc. He currently runs a company called Core Solutions, which specializes in disease management.

William J. Casey joined the board in September 1997. He has worked as a consultant in the healthcare industry for almost twenty years, specializing in hospital management evaluation, hospital planning, managed care contracting and turnaround services. Among other jobs, he was Contract Administrator for the Emergency Department Physicians' Medical Group, Inc., which provides physician services to non-governmental facilities. He now runs a company that he founded in about 1985, doing healthcare turnaround and other consulting work.

Richard Fink was a partner at the law firm of Brobeck, Phleger & Harrison LP, from October 1987 until recently. He was counsel to James Sweeney and represented him in numerous corporate transactions, including the four-way merger that resulted in the formation of Coram. At Sweeney's request, he joined the Coram board at its inception. He resigned from the board in February 2000.

Sandra Smoley, who replaced Fink on Coram's board in early 2000, spent approximately twenty years in public service in the State of California. For much of that time, she dealt with healthcare-related issues, first as Secretary of the California State Consumer Services Agency and then as Secretary of the California Health and Welfare Agency. She knew Crowley through Foundation Health and joined the board at his request. She is now President and CEO of The Sandra Smoley Company, a consulting firm.

Each of Coram's independent directors agrees that Crowley was, and still is, a tremendous asset to the company. The board regarded Crowley as a top-tier turnaround person

-36-

KL2:2108873.7

and one of the true stars of the healthcare field. Amaral says that "getting Dan Crowley to run Coram was like getting Wilt Chamberlain to play for St. Francis High." Peter Smith says that losing Crowley "would have been devastating" for the company. In the board's estimation, to get someone with Crowley's stature and experience in November of 1999 to run a company as small and troubled as Coram was a unique and valuable opportunity for the company. Amaral believed Crowley had the ability to turn the company around and do a deal. In fact, in the first half of 2000 Crowley improved Coram's performance and began to reverse the company's fortunes.

## F.    The Crowley Era

Although Crowley was willing at the outset to come in and "coach" the next CEO, he says he did *not* want to run the company on a long-term basis. His initial expectation was that the Coram assignment would be intense but short-lived. He planned to relocate temporarily to Denver and work full-time at Coram for three to four months to get the company back on track. At that point, he would transfer control to a successor, return to Sacramento and remain involved, as needed, as a "CEO coach."

### 1.    Crowley's Compensation

On November 18, 2000 Crowley signed a three year employment contract with Coram; the board had approved it the preceding day. The agreement is dated as of November 30, 2000, to last until November 29, 2002. The contract negotiations were primarily between Amaral and Crowley. Amaral says it was the most "difficult" negotiation of his career, because Crowley kept negotiating "for more."

K1.2.2108873.3

A785

On November 12, 1999, while the negotiations with Amaral were still ongoing, Crowley sent a "Personal & Confidential" letter to Feinberg, requesting additional compensation *from Cerberus* in the form of an increased share of the profits at Winterland for his work at Coram. The letter states in relevant part:

> You have asked me to take over the Coram operations.... You agree to increase the economics on Winterland to provide for an upside that is equal to that which I would otherwise have been able to receive (if any) for creating operational and financial improvements resulting in EBITDA at Coram. Our current deal provides a 20% share on the net gain on Winterland.... You (Cerberus), agree to increase my gain [sic] share on the Cerberus' [sic] piece of Winterland to forty (40) percent for me.... In the event that the return on Coram exceeds [or is less than] 40%, Cerberus will increase [or reduce] the payment accordingly on Winterland.... For the purpose of calculating the Coram improvement, you agree to mark your Coram position to $46M.... With these understandings I will undertake to both sign a contract with Coram and a contract with Cerberus today.

Crowley says he was "hitting the wall" in his negotiations with Amaral and "threw this up" to see what, if anything, "would stick." Amaral and Feinberg discussed Crowley's request. They agreed that it would be a potential conflict of interest for Crowley to be compensated by any entity other than Coram for his work at Coram.

As noted, Winterland was a Cerberus "Portfolio Company," for which Crowley was serving at the time as chairman of the board. Under his arrangement with Cerberus Crowley stood to earn up to 20% of Winterland's profits. In his letter dated November 12 he sought to double his potential share. In actuality, Winterland had never generated sufficient profits to entitle Crowley to earn his original 20% share, which meant that the requested increase was to that point largely academic; indeed, with Winterland's performance having continued to decline.

KL2:2100037

(The company is now in bankruptcy.) Crowley has never earned any share of that company's non-existent profits.

Crowley concedes that the request in his letter dated November 12, 1999 was improper. He says that, in retrospect, "just looking at the letter makes me ill." He "regrets" writing it, is "embarrassed" about it and admits that "it was not my brightest moment." Feinberg, apparently, did not countersign the letter and Crowley acknowledges that Feinberg never agreed to his demands. Crowley did receive an additional 10% upside in Winterland, increasing his stake from 20 to 30%. But according to the Cerberus contract, Crowley's stake in Winterland was based solely on the performance of Winterland, not Coram.

Crowley's November 1999 contract with Coram comprised the following components:

- a base salary of $650,000;

- a cash "performance bonus" that was based on Coram's operating results; the bonus ranged from 60% of Crowley's base salary (*i.e.*, $390,000) if Coram achieved 100% of its EBITDA target, to 300% of his base salary (*i.e.*, $1,950,000) if Coram achieved 150% of its EBITDA target;

- an "acquisition bonus" of 2.99 times his base salary (*i.e.*, $1,943,500) upon "the consummation of a merger or consolidation" which resulted in a change of control of the company;

- a minimum 24-month severance period; and

- options to purchase one million shares of Coram stock at then-current market rates.

Depending on Coram's performance, therefore, Crowley stood to earn up to $2.6 million a year, plus an almost $2 million acquisition bonus, plus stock options.

KL2:2108873.7

2. <u>**Coram's Financial Condition at Year End 1999**</u>

Crowley says that when he accepted the job and negotiated his compensation he did not know the full extent of Coram's financial problems; Smith had not given him complete information. Crowley explained that he spent the rest of November and December studying Coram's finances, learning about its operations and assessing the situation. It was not until January, after the Christmas holidays, that he began running the company in earnest.

As Crowley soon learned, Coram was in difficult financial straits. In 1999 Coram suffered a net loss of $115 million -- $93 million more than in the prior year -- and had negligible EBITDA of only $307,000. A number of factors contributed to Coram's declining performance in 1999. The most significant were the termination of the Aetna contract and everything which flowed from that, including the ongoing litigation against Aetna and the involuntary bankruptcy of the R-Net subsidiaries.

Coram also had fundamental operational problems. For example, it had inadequate working capital and poor control over spending. It continued to operate under a decentralized system, whereby buying decisions were made at the branch level. In order to take advantage of volume discounts Coram had to consolidate billing and purchasing through a hub and spoke system. Coram's information systems were antiquated and constantly losing data. In addition, the time lag between the delivery of services and the receipt of payment had increased considerably and little, if anything, was being done to try and improve collections.

Meanwhile, the infusion business itself was becoming more costly and less profitable. Coram faced increased competition from hospitals and physicians offering infusion and other home healthcare services; pricing pressure caused by an unfavorable shift in payor mix

-40-

from private insurance to managed care plans; and an increase in the costs associated with providing infusion therapy services.

In addition to the multitude of problems at Coram, the industry at large was also experiencing hard times. According to Amaral, in 1999 and early 2000 the entire non-acute sector of the healthcare industry was "in a tumble." The report prepared by UBS Warburg for the Creditors' Committee confirms this. The report contains a chart, titled Stock Price Performance of Selected Home Health Companies, which, in turn, is based on an index of 13 home healthcare companies. According to the chart, stock prices declined dramatically from 1997 to 1998, dipped further through 1998 and 1999 and remained at that level through the end of 2000.

Finally, because of its financial problems Coram was on the verge of falling out of compliance with certain Federal regulations that govern the provision of home healthcare services. Under a set of Federal regulations commonly referred to as "Stark II," it is unlawful for a physician to refer patients for certain "designated health services" (which are defined to include home healthcare) to an entity with which the physician (or the physician's family members) has a financial relationship (which includes an ownership or investment interest), unless the investment falls within an enumerated exception, *viz.*, the exception for investments in publicly traded companies. But that exception applies only if the company's stockholder equity exceeds $75 million, either at the end of the most recent fiscal year or on average during the previous three fiscal years. This is commonly known as the "public company exception."

Reed Smith, the company's regulatory counsel, advised the board that the company had no alternative but to comply with Stark II. It also explained that as long as Coram

-41-

was a publicly traded company there was no way to remain in compliance other than by satisfying this "public company exception."[10]

Physician referrals are vital to Coram's business. If Coram could not meet the public company exception it would have to check with each and every physician with whom it does business to ensure that neither the physician, nor his or her family members, owned Coram stock; and it could not accept business from those who did. Thus, it would be impossible for Coram to operate meaningfully outside the confines of the public company exception. As Amaral explained, falling below the $75 million threshold "would mean the death of Coram."

At year-end December 1999, measured against this critical -- and inflexible -- benchmark, the company was literally facing death. When Crowley became CEO stockholder equity was *negative* $21,699,000 -- more than $114 million less than at the end of the prior year. For a brief period in late December 1999 it appeared that Coram might not satisfy the public company exception as of December 31, 1999. In the last week of December Coram engaged Alan Kornberg, the head of the restructuring group at the law firm of Paul Weiss Rifkind Wharton & Garrison; it also appointed a special committee of independent directors (Casey, Fink and Peter Smith) to explore the possibility of converting debt to equity before year-end. Casey and Fink spoke to the Noteholders by phone around Christmas, but the Noteholders refused to convert.

---

[10]    Both the board of directors and Coram's bankruptcy counsel, David Friedman, questioned this advice. In an effort to test the accuracy of it, they asked Reed Smith to seek a waiver from the Health Care Finance Administration. In response to their request, Reed Smith tried, unsuccessfully, to obtain a waiver from HCFA. Consistent with its original advice, Reed Smith informed the board that no such waiver was available and that there was no way around the statutory requirements.

KL2:2108873.7

Ultimately, Ernst & Young, the company's outside auditor, was able to solve the problem for 1999 by calculating stockholder equity by quarter rather than by year. E&Y added up the numbers for each of the preceding twelve quarters to come up with a "12 quarter cumulative equity total" of $911,323,000. It then divided that number by twelve to come up with a "12 quarter average equity" figure of $75,944,000, thereby barely clearing the Stark II hurdle.

But the board knew that the 12-quarter-average solution would not be available the following year. (The success of that solution in 1999 depended heavily on the stockholder equity figures for 1997, which were substantially higher than those for the next two years — and which would no longer fall within the available time period at the end of 2000.) To satisfy Stark II in 2000, Coram would need to have stockholder equity in excess of $75 million, a more than $95 million increase over the company's *negative* $21.7 million in shareholder equity at year-end 1999. Given the financial problems at Coram and in the industry as a whole, it would be virtually impossible to generate that much equity from existing operations. Reed Smith, Coram's regulatory counsel, advised the board in mid-December 1999 that "an equity infusion of some type would probably be required before the end of the year 2000 in order for the Company to be able to continue to use the public company exception beyond December 31, 2000."

### 3.    Crowley's Performance as CEO

Crowley moved quickly to stabilize Coram's finances and turn the company around. Among other changes, he centralized the purchasing process; brought inventory levels down; increased working capital; paid off some of Coram's debt; reduced accounts receivable from $130 million to about $77 million; and emphasized Coram's core therapy focus. According

-43-

to Wendy Simpson, who was CFO at the time, Crowley "focused immediately on cash out." She said he literally "went through stacks of invoices and questioned each one."

Despite the operational improvements that Crowley implemented, Coram could not surmount its financial problems. In early 2000 Coram began to consider the possibility of a bankruptcy filing. Bankruptcy was deferred because of the possibility of a significant addition to equity from the sale of CPS and/or a large return from the Aetna litigation.

In January and February 2000 Coram management interviewed a number of potential restructuring advisors, including Paul Weiss, Kasowitz Benson and several financial advisory firms. At the end of February Crowley forwarded these firms' proposals to the board in advance of the March board meeting. In his accompanying letter to the board, which is dated February 28, 2000, Crowley explained that Coram had no choice but to pursue some type of financial restructuring:

> The purpose of the meeting will be to consider initiating a process aimed at restructuring Coram Healthcare. .... Virtually nothing will obviate the need for restructuring Coram's capital structure. Stark II and the last three (3) years financial performance made that a certainty. So, it is clear we have to deal with Coram's Balance Sheet.

On March 9, 2000 Crowley reviewed these proposals with the board.

At the same time that he was soliciting and vetting restructuring proposals -- indeed, as part of the same letter in which he forwarded those proposals to the board -- Crowley demanded an increase in his compensation. The February 28, 2000 letter goes on to state:

> By way of this memo, I am asking the Board to understand that I need to immediately reopen my compensation relationship to more fairly match it to the task at hand. To do this properly, I think we

K12:2108873.7

> need assistance from a firm that fully understands all of the varied
> issues restructuring has on Executives like myself. ... In the
> absence of this being done, I need the Board to understand that it is
> highly probable that I will not be comfortable in going forward
> with this restructuring and the related assignment to bring
> continuity to Coram thereafter.

In early March Crowley renegotiated the terms of his compensation package with Feinberg, in the latter's capacity as Chairman of the Compensation Committee of Coram's board. These negotiations resulted in an amendment dated April 6, 2000 to Crowley's employment agreement. It left Crowley's base salary unchanged, but gave him the potential to earn significantly more in the form of a performance-based bonus. Specifically, were Coram's EBITDA to exceed $14 million, Crowley would receive 25% of EBITDA above $14 million. Further, if EBITDA equaled or exceeded $35 million, he would receive this 25% share plus *an additional* $5 million. In addition, Crowley was entitled to a "Success Bonus" payable upon the consummation of a "Refinancing," which was defined, in part, as a conversion, acceptable to Coram's board, of some or all of the debt held by the Noteholders into a combination of new Coram debt or issues of its common or preferred stock. The amendment to Crowley's employment agreement based his success bonus on certain percentages of debt converted. The success bonus amount was subsequently amended, on August 2, 2000, to a flat $1,800,000 and was further predicated on the consummation of a Plan of Reorganization

On March 22, 2000 the compensation committee discussed Crowley's request and the proposed amendment. It is unclear whether the full board ever formally approved the revised contract. The minutes of the April 5, 2000 board meeting simply state: "In a closed session without the presence of management, the Compensation Committee reviewed with the Board the

-45-

KL2:2108873.7

proposed amendment to Mr. Crowley's Employment Agreement." The amendment was signed by Feinberg, in his capacity as Chairman of the Compensation Committee.

During the same April 5 board meeting Coram formally retained the law firm of Kasowitz, Benson, Torres & Friedman LLP as Special Restructuring Counsel (although the retention application is dated as of March 19, 2000). David Friedman of the Kasowitz firm addressed the board to discuss restructuring options.

In their interviews with Goldin the directors expressed mixed views as to whether Crowley's demand for additional compensation was appropriate. The board was (and still is) unanimous in its belief that Crowley was essential to the company's ability to survive and that Coram could not afford to lose him. Some of the directors corroborated Crowley's claim that Smith did not fully disclose the company's financial problems and that the job was far more demanding than Crowley had anticipated. On the other hand, some directors suggested that Crowley's insistence on increased compensation at a time when he knew the company could not afford to lose him was a form of economic duress.

By April 2000 the CPS auction process was winding down. During the seven or so months that CPS had been on the market DBAB had contacted and/or received inquiries from about 45 parties in total. Eight of those 45 parties submitted bids and/or preliminary indications of interest. DBAB invited several of the eight interested parties to do further due diligence and to put in a second bid. Only CVS ProCare made a second bid of $34.5 million; the other seven parties pulled out. Crowley instructed Morrison not to accept anything less than $40 million and to hold out for an all-cash offer. Toward the end of the auction process GTCR Fund VI, in tandem with a CPS management group, entered the bidding process. After numerous

KL2:2108873.7

discussions, GTCR ultimately came up with a cash offer of $41.3 million. On April 5, 2000 the board decided to proceed with the GTCR bid.

DBAB issued a fairness opinion, which concluded that the sale was fair from a financial perspective. In rendering its fairness opinion DBAB used the three standard methods of valuation: (i) comparable public company market analysis; (ii) comparable company transaction analysis; and (iii) discounted cash flow analysis. The first method yielded valuations that ranged from $9.7 million to $145 million, the second yielded valuations that ranged from $13.4 million to $61.7 million and the third yielded valuations that ranged from $24.6 million to $53.6 million. In reliance on DBAB's fairness opinion, among other factors, the board approved the sale unanimously. The asset purchase agreement was signed on June 9, 2000. The sale closed in July. It generated approximately $38 million in net cash proceeds.

On July 14, 2000, before the CPS sale closed, Crowley made a regularly scheduled $6.3 million interest payment to the Noteholders. Although Crowley had the option of making the payment "in kind," *i.e.*, adding it to the outstanding principal balance, he made the business judgment not to do so. Both Amaral and Crowley felt strongly that Coram's general practice of PIKing interest payments made it very difficult for the company to surmount its debt load. According to Friedman, Crowley considered paying down debt a sign of success. Crowley did not tell the board of directors, or the company's bankruptcy counsel, about the payment until after it had been made.[11]

---

[11]    Goldin considers it imprudent for Coram to have made an interest payment in cash at the time it was seriously contemplating filing for bankruptcy. The CPS sale had not yet closed; in fact, intense negotiations were still underway. One of the reasons for the CPS auction was that CPS needed cash to support its growth. Had the sale not occurred on

A795

When the CPS sale closed later that month Crowley used the full cash proceeds to pay down the balance of the secured revolver ($28.5 million) and to prepay $9.5 million of the outstanding principal on the Series A Notes. Both payments were mandated by the agreement between Coram and the Noteholders, which required that cash from asset sales be used to pay down debt.

## G. Events Leading up to the Bankruptcy Filing

In April 2000, on the advice of David Friedman, Coram had retained Chanin Capital Partners as its financial advisor. Friedman had communicated to Chanin the scope of its engagement, which was to prepare a valuation and to provide testimony concerning that valuation. On May 17, 2000 Chanin had addressed the board to describe the valuation process, which was to take place in two phases and would culminate in a final valuation, which Chanin would present to the board in July 2000. According to the minutes of the May 17 meeting, Chanin's task was "to develop and analyze alternatives for effecting a debt conversion and restructuring of the Company's balance sheet."

In mid-July Chanin completed its preliminary evaluation, which indicated strongly that Coram was insolvent. In a letter dated July 19, 2000 Crowley advised the board that Chanin was likely to complete the majority of its work within a few days and proposed "that we promptly share that information with the debtholders . . . as soon as we know the valuation."

---

July 31, Coram's ability to fund CPS would have been even more problematic. Furthermore, the cash interest payment drew the company's cash on hand down to less than $7.5 million, which left Coram with the ability to pay less than a week's worth of its normal operating expenses. Indeed, in the week following the cash interest payment cash on hand fell below $5.5 million. No less troublesome is that Coram took this action at a time when most companies would have been marshalling cash in contemplation of surviving in a bankruptcy.

-48-

KL2:2108873.7

Feinberg claims that he never saw the valuation before the bankruptcy filing. No independent evidence refutes, or corroborates, his claim.

In any event, following Chanin's preliminary valuation Feinberg resigned from the board (on July 24). Feinberg says he resigned because bankruptcy had become inevitable and it was clear that all board discussions, going forward, would revolve around the restructuring of Coram's debt. Peter Smith says that although Feinberg did not formally resign until July, he had recused himself from meetings so frequently in the preceding several months that he had, in fact, played no meaningful role on the board since April.

On July 31 Chanin presented its valuation to the board, confirming that Coram was insolvent.[12] At that same meeting Christina Morrison addressed the board to discuss "the additional financial alternatives that had been considered by DBAB." DBAB also prepared an outline of its presentation to the board, titled "Coram Healthcare Corporation: Strategic Alternatives." The outline set forth Coram's immediate objective, which was "to bring the company into compliance with Stark II by the end of the year." To achieve that objective it would have to either "raise $110-$125 million [in] equity" or "become a private company." The outline then goes through four different capital raising alternatives -- a follow-on offering, a rights offering, a strategic investment by a third party and a leveraged buyout -- and concludes that they "are not viable options for Coram at this time."

---

[12]    Friedman says that a draft was given to Crowley about a week before the final valuation came out on July 31. It is unclear whether the report was circulated to the board in draft form. Some directors said a draft valuation was circulated before the end of July; others said no drafts were circulated.

-49-

RLF1-3108873.7

**A797**

In DBAB's opinion a follow-on offering was "not viable" for a number of reasons. Coram had very few institutional shareholders and no existing research coverage; it would need to raise almost ten times its current equity value; it would remain highly leveraged; and it was a difficult time for healthcare companies in general -- and healthcare service providers in particular -- to raise capital. A rights offering, *i.e.*, selling shares to existing shareholders rather than in the public market, raised the same issues. Finally, given Coram's debt load, and the general lack of investor interest in the healthcare services field, Coram's prospects for a strategic third-party investment or a leveraged buyout were remote.

Before Chanin issued its report Crowley met with the Noteholders in an effort to convert or restructure the debt. The Noteholders agreed to reduce their debt to $180 million. Crowley reported on the results of this negotiation at a board meeting on August 2, 2000:

> Mr. Crowley reported on his meeting with the holders of the Company's principal debt instruments. He stated that the debt holders will agree to convert approximately $71 million in debt and enter into new debt arrangements with the Company whereby the Company would issue a replacement debt instrument in the principal amount of $180 million. The debt instrument would be a four-year note requiring only interest payments at nine percent (9%) per annum. . . . After discussion, the consensus of the Special Committee was that the parameters of the new debt and conversion were reasonable and that the new loan instrument should include no pre-payment penalties.

After Chanin issued its report the board recognized that bankruptcy was inevitable. At that point the board made several attempts to persuade the Noteholders to make a payment of some sort to the shareholders. On July 31, 2000 the board had appointed a Special Committee, comprising Amaral, Smith, Casey and Smoley, to negotiate with the Noteholders. Smith was "too busy" with interests outside of Coram to participate; Smoley was in the hospital

KL2:2103873.7

the entire month. Amaral led the negotiations. He says he "took two to three runs at the debt,"

but made no progress.

At the August 2 meeting the board discussed the status of the negotiations with
the Noteholders respecting a payment to shareholders:

> Next, the discussion turned to the steps that had been taken to
> secure value for the Company's stockholders in connection with
> the proposed plan of reorganization. Mr. Casey reported on
> discussions that had transpired between members of the Special
> Committee and representatives of the holders of the Company's
> principal debt instruments. It was reported that the Special
> Committee requested that the stockholders each receive ten cents
> ($.10) per share in consideration for their stock in connection with
> the conversion. .... After discussion, including a privileged and
> confidential discussion of legal advice led by David Friedman,
> Esquire, it was determined that the Special Committee should go
> back to the debt holders to continue to ask for some consideration
> to be provided to the common stockholders at an advisable time in
> the future.

The board also discussed "whether out of the money warrants could be issued in lieu of a cash

payment in order to provide value to the common stockholders" and concluded "that

management should review [that] possibility."

On August 4, 2000 Amaral gave the board an update on his efforts to secure value

for the company's shareholders:

> The first item of business was a report from the Special Committee
> that was established at the July 31, 2000, meeting of the Board of
> Directors (the "Committee"). Mr. Amaral reported on the
> discussion he had with Steve Feinberg of Cerberus Partners the
> prior day and the conference call that occurred among Messrs.
> Casey, Amaral and Marabito on behalf of the Company and Ed
> Mule, Ed Stearns and Steve Feinberg on behalf of the debt holders.
> Mr. Amaral reported that they had reiterated, on behalf of the
> Company, a demand that some value be realized for the holders of
> the Company's common stock. They also discussed whether there

were any incentives that could be provided to Company employees for retention purposes given that the matching contributions that the Company had previously made under its 401(k) Plan were made with shares of Company common stock. Mr. Amaral reported that the representatives of the debt holders were not in favor of providing any value to the common stockholders generally, believing that the stockholders did not have an entitlement to any distribution.

In connection with the board's discussion of "opportunities for other means to obtain value for common stockholders" as part of a reorganization plan, including out-of-the-money warrants, Friedman explained that out-of-the-money warrants are a form of equity and, thus, would not cure the Stark II problem:

> The Board then discussed the possibility of providing value to common stockholders through an out-of-the-money warrant. The Board received advice from David Friedman, who confirmed with special regulatory counsel, Eugene Tillman of Reed Smith Shaw & McClay, L.L.P. that the issuance of such warrants would not solve the Stark II problem. Ultimately, it was advised that cash would have to be the vehicle for providing value to the common stockholders.

At this point the board authorized Friedman to prepare a draft plan of reorganization. On August 7, 2000 the board reviewed and approved the proposed Plan of Reorganization and Chapter 11 petition and authorized the bankruptcy filing.

On August 8, 2000 Coram filed the petition, together with the proposed Plan and Disclosure Statement. As discussed below, the Disclosure Statement did not disclose either the existence, or the terms, of Crowley's agreement with Cerberus.

K1221085713

## IV.  FINANCIAL ANALYSIS

A.  <u>Coram's Enterprise Value</u>

Goldin Associates has conducted an extensive financial analysis to determine the value of Coram Healthcare as of four timeframes: (i) the bankruptcy petition date; (ii) the time of the hearings respecting confirmation of the proposed Plan; (iii) June 15, 2001; and (iv) August 31, 2001 ("Valuation Dates").

Shortly before the bankruptcy filing in August 2000, Coram's board of directors received a valuation analysis prepared by Chanin Capital Partners ("Chanin"); it concluded that the enterprise value of Coram was substantially less than Coram's debt. This conclusion influenced the board's decision to file the petition and the formulation of Coram's proposed Plan. Accordingly, Goldin has reviewed Chanin's valuation and formed a judgment as to its reasonableness.

At the time Coram's proposed Plan was presented to the Court for confirmation in December 2000, an updated valuation analysis by Chanin, as well as valuations by UBS Warburg ("UBS") and Deloitte & Touche ("D&T"), were submitted for the Court's consideration; related testimony was proffered. Goldin has considered these valuations in developing its conclusions respecting Coram's value at that time. Goldin has also considered the valuation of Coram prepared by Chanin in February 2001 in connection with the partial conversion of debt to preferred stock at year-end 2000. While many differing assumptions and calculations were utilized in these various analyses, only a few account significantly for the substantial differences in their valuation conclusions.  These are identified and discussed below.

-53-

KL2:2108873.7

A801

Goldin's assumptions, analysis and conclusion respecting the value of Coram as of June 15, 2001 are presented and discussed below. The assumptions and conclusions in this Updated Report have been adjusted to reflect a number of revisions that Goldin has determined were appropriate subsequent to the issuance of the Report on July 11.

Finally, Goldin's assumptions, analysis and conclusion respecting the value of Coram as of August 31, 2001 are presented and discussed below.

Coram's long-term debt obligations aside, at all relevant times Coram was a viable business, a going concern. Market demand existed for Coram's services and Coram was able to deliver these services at competitive prices. This provided an operating profit, which can be expected to continue. Accordingly, the value of Coram at any time is its "enterprise value," i.e., the value that investors, owners and potential acquirers would attribute to the business. There are three generally accepted methods for determining enterprise value: (i) a comparable public company market analysis; (ii) an analysis of recent acquisitions of comparable companies; and (iii) a discounted cash flow analysis. The appropriate method in a particular case, and what conclusions can be drawn from alternative analyses, depend on the circumstances.[13] The valuations prepared by Chanin, UBS and D&T (collectively, the "Financial Advisors") utilized each of these methods. Goldin has performed similar analyses in reaching the conclusions contained in the Report issued July 11 and in this Updated Report.

---

[13]    Shannon P. Pratt, et al., Valuing A Business, The Analysis and Appraisal of Closely Held Companies (Chicago: Irwin Professional Publishing, 1996) 371.

KL2:2108873.7

## 1.    Comparable Public Company Market Analysis

Under this method enterprise value is determined by first selecting public companies comparable to Coram, calculating their market values from stock trading information (market capitalization) and adding long-term debt (adjusted to its market value if there is a significant difference from book value) and preferred stock, if any, to the market capitalization. This produces trading-market enterprise value, which is then divided by various earnings amounts to generate applicable multiples. Multiples commonly used for this purpose by investment bankers, investors, lenders and valuation professionals include multiples of revenue and EBITDA (earnings before interest, taxes, depreciation and amortization). (Chanin also used multiples of EBITDA minus capital expenditures.) To derive a comparable enterprise value for Coram, these multiples must be applied to Coram's revenue and EBITDA.

This method of calculating enterprise value reflects the valuation principle that values are relative and informs an investor considering investment options of a similar nature.[14] Thus, the results of this method are often used to estimate trading prices at which a company's stock will trade following an initial public offering and to identify stocks that may be overvalued or undervalued relative to comparable investment opportunities at a particular time. Hence, this method best informs the price at which Coram's equity could be expected to trade in an active and liquid public trading market, assuming Coram were not in bankruptcy, its business had normalized and it had a competitive capital structure.[15]  Because stocks trading in public markets represent minority ownership positions, they typically trade at prices reflecting a discount from

---

[14]    Aswath Damodaran, Investment Valuation (New York: John Wiley & Sons, 1996) 13.
[15]    Pratt 208.

-55-

full value for lack of control; accordingly, enterprise value derived by this method reflects any such discount. That distinguishes this method from the comparable transaction analysis; the latter attempts to capture full value to a controlling owner. For Coram, this method was given some weight by Goldin and the Financial Advisors in determining their respective valuations and as a check on the reasonableness of the results of the other methods.

A comparable public company market analysis involves a series of steps. Each is considered below, in turn.

### a.    Selection of Comparable Companies

Appendix 1 sets forth the public companies the Financial Advisors and Goldin selected as comparable to Coram. Goldin reviewed the Financial Advisors' selections and a number of others; Appendix 2 enumerates the possibilities Goldin considered and the basis for the selections Goldin believes constitute a reasonable set of comparables for an analysis of Coram, taking into account that every company has singular features which can affect value. Goldin included public companies with a significant home infusion services business, including those with other lines of business. Goldin excluded companies that do not have a significant home infusion business, as well as those too small to have a substantial stock market following. The companies Goldin selected as comparable for this analysis are:

Apria Healthcare Group          Gentiva Health Services
American HomePatient            Option Care, Inc.

As Appendix 1 makes evident, the Financial Advisors' selections varied. For example, UBS excluded Apria and Lincare because these companies' market valuations are, in their view, driven principally by the strength and relatively more favorable expectations of their

respiratory home care business. Goldin concurs with the exclusion of Lincare, but not Apria, which has a significant home infusion business.

**b.**     **Calculation of Multiples**

Appendix 3 sets forth the calculation of multiples for each of the valuations conducted by the Financial Advisors and by Goldin.

Typically, in calculating enterprise values of comparable public companies, par values of long-term debt are not adjusted to market because the differences between those values and trading (or market) values are not material. However, the debt of American Home Patient was trading at substantial discounts from par at all relevant times. UBS made the relevant adjustment in calculating its enterprise value, but D&T did not. Goldin made adjustments in its calculations to reflect accurately the market's view of the enterprise values of that company as of the Valuation Dates.

For fiscal year 2000 Gentiva Health Services reported negative EBITDA of approximately $90.4 million, which resulted from a restructuring charge of approximately $150 million. As this was non-recurring, Goldin adjusted Gentiva's EBITDA to omit the charge, as did UBS. D&T did not make this adjustment; instead, it excluded from its analysis any EBITDA multiple calculations respecting Gentiva.

A number of accepted techniques are commonly utilized to derive composite multiples from the calculations of individual multiples for each comparable company. These include computing an average, calculating a median and weighting for "comparability" on some basis. Chanin and UBS calculated medians; D&T weighted for comparability. Goldin determined to weight for comparability, based on the relative level of infusion care revenue, because the

-57-

growth prospects, regulatory climate and profitability of infusion home care differ significantly from other segments of the home healthcare industry. The table below sets forth the weighting applied by Goldin.

### Goldin's Calculated Market Multiples

| Comparable Company | Weight | Basis | 7/31/00 | 12/14/00 | 6/15/01 | 8/31/01 |
|---|---|---|---|---|---|---|
| Apria Healthcare | 12.5% | EV/Revenue | 1.09 | 1.67 | 1.73 | 1.67 |
| | | EV/EBITDA | 4.75 | 6.96 | 7.13 | 7.06 |
| American HomePatient | 12.5% | EV/Revenue | 0.36 | 0.41 | 0.67 | 0.72 |
| | | EV/EBITDA | 4.62 | 5.22 | 8.63 | 9.20 |
| Gentiva Health Services | 32.9% | EV/Revenue | 0.19 | 0.25 | 0.28 | 0.33 |
| | | EV/EBITDA | 5.96 | 7.21 | 4.71 | 5.51 |
| Option Care | 42.1% | EV/Revenue | 0.63 | 0.70 | 1.41 | 1.26 |
| | | EV/EBITDA | 5.63 | 6.34 | 12.76 | 11.60 |
| **Composite** | 100.0% | EV/Revenue | 0.51 | 0.64 | 0.99 | 0.94 |
| | | EV/EBITDA | 5.50 | 6.56 | 8.89 | 8.73 |

D&T went one step further, adding a 10% control premium to its comparable public company market multiples. This concept is reasonable in theory if one seeks to render the results of a market-trading valuation methodology comparable to the results of a transaction-based methodology because, as discussed above, enterprise value derived by a market-trading valuation method reflects any discount from full value for lack of control. However, in this case the adjustment is unfounded; the multiples D&T derived from its trading market analysis (revenue x 0.75 and EBITDA x 7.0) are not lower than its transaction multiples (revenue x 0.74 and EBITDA x 6.10). This may reflect that the markets did not ascribe a difference in value for control or, more likely, that D&T did not have enough comparable companies and comparable

-58-

KL2:2108873.7

transactions to refine the analysis. This is a problem also faced by the other Financial Advisors and Goldin; accordingly, Goldin did not consider such an adjustment appropriate.

    c.    <u>Application of Multiples – Coram Valuation</u>

The composite multiples determined as aforesaid, applied to Coram's financial performance as of the Valuation Dates, establish Coram's enterprise value on the basis of a comparable public company market analysis (see Appendix 4).

The Financial Advisors differ substantially as to the appropriate level of EBITDA to utilize for a valuation analysis in this case. For its valuations (as of July and December 2000) Chanin used management's estimates of 2000 EBITDA without adjustment for an abnormally large management incentive plan ("MIP") expense. UBS and D&T made adjustments that in their professional judgments resulted in "normalized" levels; Goldin did as well. In formulating its comparable value calculations of Coram Goldin utilized EBITDA after MIP estimated to be 5.5% of branch operating profit. In doing so, Goldin assumed that the comparable public companies would also have cash incentive plans.

For its valuation as of June 15, 2001 Goldin derived an estimated "Last Twelve Month EBITDA" for Coram by applying three quarters of the 2000 result (75% of the 2000 "normalized" EBITDA) and one quarter (25%) of estimated 2001 EBITDA. The former derives from an updated calculation of "Post-MIP EBITDA" (see Appendix 12). Since the issuance of the Report on July 11, Goldin has determined that certain changes are appropriate to its prior calculation of "normalized" EBITDA for 2000. In summary, these involve: (i) inclusion of infusion-related income from joint ventures and minority interests; (ii) inclusion of a reversal by Coram at the end of 2000 (in adjusting to a normalized 3.2% reserve for uncollectible accounts)

-59-

KL3:2108873.7

of a portion of the prior-period reserve on the year-end 1999 balance sheet for uncollectible accounts; (iii) an add-back of additional one-time infusion-related operating expenses which had been offset by other one-time non-infusion adjustments in the Report issued on July 11; and (iv) exclusion from the calculation of an adjustment for income from the Aetna contract that, in the Report issued on July 11, had been included in the calculation. The estimated 2001 EBITDA figure used in the June 15, 2001 valuation derives from an updated estimate of Coram's 2001 performance prepared by Goldin, utilizing data provided by Coram and reviewed by Goldin (see Appendix 8 and Part IV.A.3.b below).

For its valuation as of August 31, 2001 Goldin derived an estimated "Last Twelve Month EBITDA" for Coram by applying two quarters of the 2000 result (50% of the 2000 "normalized" EBITDA) and two quarters (50%) of estimated 2001 EBITDA.

Chanin placed greater emphasis on calculations that reflect EBITDA less capital expenditures because of its view that this performance measure is more prevalent and appropriate for valuation analyses of healthcare companies; no other Advisor adopted this formulation. Indeed, with capital expenditures often "lumpy," i.e., concentrated in specific time periods, a valuation analysis that utilizes such an approach is overly sensitive to the timing of capital expenditures. Over the long run, capital expenditure levels should approximate depreciation; so the use of this alternative formulation should not produce materially different results. For the reasons stated, Goldin determined not to utilize this formulation; rather, it relied principally on the standard EBITDA multiple approach.

KL2:2108873.7

<u>Comparable Public Company Market Analysis</u>
<u>Goldin's Enterprise Values for Coram</u>
($000s)

| Basis | 7/31/00 | 12/14/00 | 6/15/01 | 8/31/01 |
|---|---|---|---|---|
| EV/Revenue | 227,116 | 255,604 | 396,312 | 375,242 |
| EV/EBITDA | 251,444 | 257,940 | 255,555 | 248,225 |

2.     <u>Comparable Company Transaction Analysis</u>

Under this method Coram's enterprise value can be determined by identifying acquisitions of comparable companies that occurred in market conditions similar to those prevailing at the Valuation Dates, calculating purchase price multiples of various earnings categories for each acquisition and applying those multiples to Coram's earnings immediately prior to the Valuation Dates. This method of calculating enterprise value also reflects the relativity of values; but in contradistinction to the trading value analysis outlined above it attempts to account for full value to a controlling owner.[16]  Accordingly, whereas the comparable public company market analysis reflects any "discount for lack of control," this approach includes what is generally referred to as a "control premium." (Consequently, <u>inter alia</u>, this approach is particularly relevant to investment bankers' opinions respecting the fairness of M&A transactions.) Goldin and the Financial Advisors also gave this method some weight in determining their respective valuations of Coram and as a check on the reasonableness of the results of the other methods.

a.     <u>Selection of Comparable Transactions</u>

Appendix 5 sets forth the transactions the Financial Advisors considered comparable for the purpose of computing an enterprise value of Coram. Goldin has reviewed

---

[16]     Pratt 241-2.

these selections and, with four exceptions, believes they constitute a reasonable set of comparables for an analysis of Coram. Goldin also included a March 2001 transaction for its 6/15/01 valuation.

### Goldin's Comparable Transactions

| Target Comparable | Acquiror | Date |
|---|---|---|
| American Disease Management | MIM Corporation | 8/4/00 |
| Community Care | Landauer Hospital | 12/20/99 |
| Housecall Medical | Sunbelt Home | 8/4/98 |
| Infusion Solutions | Amedisys | 2/1/98 |
| United Medical | Lincare Holdings | 6/28/00 |
| Interwest Home Medical | Praxair | 3/15/01 |

Goldin was not able to identify any other transaction for which sufficient information is available. Notably, the foregoing transactions involved companies in the broader healthcare field, not limited to home infusion services; given the limited number of transactions available for the analysis, Goldin considers this a reasonable approach. Goldin excluded the acquisition of EMSA: its business predominantly involves providing infusion services in prisons; therefore, it does not operate in the same competitive environment as Coram. The transaction whereby Manor Care acquired In Home Health is also excluded; since it involved the acquisition of the remaining minority interest not already owned by Manor Care, the economics of the transaction are inapposite. Finally, Goldin did not include the acquisitions of Homedco and Ro Tech Medical; these transactions occurred before passage of the Balanced Budget Act of 1997, which dramatically changed the economics of the home care industry.

KL2.2110873.7

-62-