b.    Calculation of Multiples

Appendix 6 sets forth the multiples calculated for each transaction, as well as the

composite multiples. In order to eliminate outlyers, Goldin utilized the median of the individual

multiples in calculating the composite multiples.

### Goldin's Calculated Transaction Multiples

| Basis | 7/31/00 | 12/14/00 | 6/15/01 | 8/31/01 |
|-------|---------|----------|---------|---------|
| EV/Revenue | 1.02 | 1.02 | 1.21 | 1.21 |
| EV/EBITDA | 6.10 | 6.10 | 5.55 | 5.55 |

These transaction multiples are generally consistent with the EBITDA multiples reported for

recent acquisitions, ranging from 3 to 4x[17], for smaller companies.

c.    Application of Multiples – Coram Valuation

Utilizing the same performance data for Coram and the composite multiples, the

Financial Advisors and Goldin calculated enterprise values as set forth in Appendix 7. That is,

Goldin multiplied Coram's revenue and EBITDA for applicable periods by the transaction

multiples calculated in (b) above.

### Comparable Company Transaction Analysis
### Goldin's Enterprise Values for Coram
### ($000s)

| Basis | 7/31/00 | 12/14/00 | 6/15/01 | 8/31/01 |
|-------|---------|----------|---------|---------|
| EV/Revenue | 455,690 | 409,141 | 485,210 | 485,210 |
| EV/EBITDA | 278,703 | 239,687 | 159,542 | 157,817 |

---

[17]    UBS Warburg LLC, *Home Healthcare Industry Update* (5/2/01) 1; see also Leerink
    Swann & Company, *Option Care, A Well-Positioned, Emerging "Option"* (4/18/01) 7.

-63-

A811

3.    **Discounted Cash Flow Analysis**

The discounted cash flow ("DCF") method of enterprise valuation involves estimation of the cash flows an owner or acquirer could reasonably expect from an investment. This requires a projection of the duration of the investment, which, in the case of a going concern like Coram, is assumed to be in perpetuity. Standard practice is to break the projection into two parts: (i) a detailed projection of the immediate and foreseeable future, to the point the business is assumed to reach a normalized operating performance and (ii) a perpetual period thereafter in which growth rates and margins are assumed to remain unchanged.[18]

What constitutes an appropriate initial projection period varies, depending, inter alia, on industry, economic conditions, availability of information and predictability of performance; but a five year period is often utilized in connection with this part of the projection. A short-cut, known as the "exit method," is often used for the perpetual period calculation, based on the assumption that the business will be sold at the end of the initial projection period; it involves a calculation of a terminal value by application of a terminal multiple to EBITDA in the final year projected.[19]

Goldin's review of the projections prepared by management and the Financial Advisors and Goldin's preparation of projections for its DCF analyses were informed by Goldin's understanding of the fundamentals of Coram's industry and its present circumstances.

---

[18]    Alan D. Gasiorek, *Merger & Acquisition Valuation and Structuring* (Norcross, GA: Corporate Development Institute, 1997) 151; Pratt 185.

[19]    Gasiorek 164, 172.

KL2:2108873.7

### a.     Industry Fundamentals and Coram's Circumstances

Home Healthcare Industry. Home healthcare continues to offer significant cost savings over hospital inpatient care, as well as benefits relating to patients' well-being. The population of residents over age 65 in the United States is expected to grow significantly over the next two decades, both in absolute numbers and as an overall percentage of the population. These together bode well for the industry, which is projected to grow by 9% per year[20].

Home Infusion Services. Home infusion services are estimated to represent 13% ($5.4B)[21] of the home care industry ($41.3B)[22]. Although not the fastest growing segment of the home healthcare industry, home infusion is nonetheless projected to grow at a rate of 5% per year[23]. While a few large providers account for some 30% of this segment, the balance is highly fragmented among regional and small local providers.

Home Infusion Care – Market Shares[24]

| Provider | 2000 Infusion Volume ($mil.) | Percent of Total Revenue | Infusion Market Share |
|---|---|---|---|
| Gentiva | $ 755 | 50.1% | 14.0% |
| Coram Healthcare | 401 | 100% | 7.4% |
| Apria Healthcare | 195 | 19.2% | 3.6% |
| Option Care | 102 | 72.3% | 1.9% |

---

[20]     UBS Warburg LLC 4 (references 9% growth rate projected by Health Care Financing Administration ("HCFA"), Office of the Actuary, March 2001).

[21]     UBS Warburg LLC 1; but see Leerink Swann 3 for $5.4B estimate of market size by National Home Infusion Association.

[22]     UBS Warburg LLC 4 (references HCFA).

[23]     Leerink Swann 3 (references 5% growth rate projected by the National Home Infusion Association).

[24]     UBS Warburg LLC 14.

KL2:2108873.7

| Provider | 2000 Infusion Volume ($mil.) | Percent of Total Revenue | Infusion Market Share |
|---|---|---|---|
| American HomePatient | 69 | 19.0% | 1.3% |
| RoTech | 17 | 2.9% | 0.3% |
| Home Health Corp. of Am. | 12 | 6.9% | 0.2% |
| Regional, local and other | 3,849 | – | 71.3% |

Competition is primarily at the local level and barriers to entry have historically been low. However, consolidation among commercial payors and HMOs has given rise to increasing price pressure at both regional and national levels. Other factors as well, including growing regulatory and information collection complexity and increasing capital requirements (especially for information technology), tend to favor the larger providers of home infusion care, including Coram. The Wall Street analyst community foresees further consolidation through acquisition of smaller providers.

Regulation. The medical industry in general and the home infusion segment specifically are highly regulated at Federal, state and local levels, affecting profoundly all aspects of the business. The growing complexity of regulations drives a further complexity in requisite information gathering and management and, indeed, in the overall management of service delivery. In the 1990s, regulations, principally at the Federal level, reduced reimbursement levels dramatically, culminating in the Balanced Budget Act of 1997. Apparent recognition by Congress of the need to counterbalance this legislation, which jeopardized the solvency of the industry as a whole, has led to subsequent regulatory relief; further sensitivity in this regard is anticipated and hoped for.

Coram's Opportunities. Coram appears to have the potential to benefit from this business environment. It is the second largest provider of home infusion services in the country,

KL2:2108373.7

operates on a national scale through over 70 branch sites and is positioned to compete on local, regional and national levels. Among Coram's large competitors, only Option Care appears to be focused on growth in the home infusion markets, pursuing a strategy of cross selling therapies through its existing relationships and aggressively seeking small strategic acquisitions. However, the other large providers of infusion services (viz., Apria and Gentiva) and, indeed, others with little or no presence in this segment currently (such as Lincare Holdings) are well-positioned, both in the industry and in terms of capital resources, to present Coram with formidable competition.

Coram's Challenge.  Coram is not now sound financially and is not anticipated to be healthy, in a financial and competitive sense, for two or more years. Whatever commendation Coram might deserve for effort, execution and results, its cost structure remains inefficient. Coram has been stabilized (it has positive cash flow) and reported positive EBIT in 2000. To the extent Option Care can be seen as a model for Coram, the potential is clear for Coram to leverage the $400 million current demand for its services into an increasingly profitable business.

Coram has undertaken a substantial investment approximating $15 million over two years to upgrade its information technology and capabilities. Although needed, this investment will absorb a substantial portion of available cash flow over the period. In Goldin's experience, such major projects often come in substantially over budget, take much longer to complete than originally expected and require additional time to work out bugs before the full potential return on the investment can begin to be realized. As this project is significant to Coram's return to a strong competitive position and to a reduction of its cost structure, the risks in the interim remain substantial.

-67-

KL2:2108872.7

**A815**

Furthermore, Coram's proposed Plan contemplates that Coram will emerge from bankruptcy highly leveraged. Coram has suffered from excessive leverage since its 1995 acquisition of Caremark's home infusion business. The toll this has taken – in lost opportunities, inhibitions on internal growth and ability to compete with companies that are, at least today, soundly financed and formidably positioned for growth – is substantial. Until Coram's capital structure is rationalized, its prospects for gaining a competitive stronghold in its industry remain problematic.

In sum, Coram is still, today, in the early stages of a challenging turnaround.

**b.     Projections – Initial Period**

The valuation Chanin prepared in July 2000 utilized projections prepared by management covering one and a half years and, thereafter, a steady revenue growth rate and improving margin assumptions to the end of a four and a half year period, through 2004. Subsequent projections prepared by the Financial Advisors updated these for actual performance and made various adjustments they deemed appropriate. As noted, Goldin prepared an updated estimate of Coram's 2001 performance (see Appendix 8). Goldin used this estimate as the basis for projections it utilized in its DCF analysis of Coram's enterprise value as of the date of this report. (Given the passage of time, Goldin determined to extend the projection period through 2005, versus the 2004 cut-off used by the Financial Advisors.) Goldin's estimate of Coram's 2001 performance summarized in Appendix 8 (in the Report issued on July 11) resulted from consideration, inter alia, of three budgets the company prepared for the year 2001 (designated "threshold," "target" and "stretch" budgets) and actual results for the first five months of 2001, through May 31, 2001. Although annualizing five months of revenue would produce $386 million, Goldin considered it reasonable to assume that Coram could improve its performance in

-68-

KL2:2108873.7

the balance of the year and achieve a revenue level similar to that of 2000, namely $401 million. Goldin noted that actual EBITDA for the first five months was significantly ahead of the "target budget" and that the company's "target budget" assumed even greater EBITDA margins in the second half of the year. On the other hand, Coram's management noted that the "target budget" did not take into account significant downward pressure on reimbursement levels for certain drugs that the company was beginning to experience. Accordingly, Goldin determined that it was reasonable to assume that Coram's EBITDA for 2001 would approximate the annualized level of the first five months (and the "target budget" level for the year). For its DCF valuations as of the earlier Valuation Dates, July 2000 and December 2000, Goldin satisfied itself as to the reasonableness of Chanin's valuations as of those dates, adjusting for certain assumptions Goldin concluded were reasonable, as discussed below.

In connection with this Updated Report Goldin has reviewed Coram's actual performance for the seven months ending July 2001. Annualizing the revenue in this period produces a result that is somewhat lower than is produced by annualizing the first five months' revenue; nevertheless, Goldin continues to believe that its estimate of $401 million for the year remains reasonable. EBITDA continues to be in line with the "target budget" total for the year, reflecting, on the one hand, the benefit of the many cost-cutting measures instituted by management and, on the other hand, a substantial offsetting loss of profitability in certain drugs (particularly vancomycin). The company estimates that the loss in vancomycin alone, compared to assumptions in its budgets, will be approximately $3.9 million in 2001 and $7.8 million in 2002. This is enough to wipe away the margin of EBITDA over the "target budget" accumulated through the first five months of the year. Accordingly, in Goldin's professional judgment, its earlier estimate for 2001 EBITDA remains reasonable.

-69-

KL2:2103873.7

**A817**

Revenue. A significant difference among the Financial Advisors (including Goldin) pertains to assumptions arising from revenue growth projections following the first one and a half year forecast prepared by management. Management assumed a significant jump in revenue in the second year, assuming Coram would have emerged from bankruptcy by then. Chanin assumed that revenue pertaining to Coram's five core therapies would grow at a rate of 3% through 2004 and that non-core revenue would be flat. D&T used a 5% growth rate for all revenue.

Goldin concluded that management's assumption of an initial spurt in revenue growth immediately following Coram's exit from bankruptcy was reasonable, based on an assumption that regional and national payors have deferred considering long-term contracts with Coram until the resolution of the bankruptcy. Goldin concluded that, given the additional delay in the resolution of the bankruptcy, a reasonable assumption is an immediate growth of 7.4% in core therapy revenue in 2002. Thereafter, Goldin has assumed that core therapy revenue will grow 3.7% in 2003, 4.2% in 2004 and 5% in 2005, rates Goldin believes are realistic for the initial projection period. Goldin has concluded that such drivers as population growth, coupled with stable morbidity, can reasonably be expected to be offset by changes in technology, *i.e.*, the development of oral and other less invasive treatments; in addition, the effect of inflation on revenue can be expected to be offset by continued pricing pressure from competitors and regulations.

EBITDA. Coram's target is to achieve EBITDA of 12% of revenue. Option Care has an approximately 11% EBITDA margin. Coram must incur a minimum level of expenses to maintain the infrastructure necessary to deliver its services in compliance with quality-maintaining regulations. Given an emphasis on reducing its expenses while struggling to keep

-70-

revenue from declining, Coram's normalized EBITDA is estimated to improve over the projection period. The Financial Advisors assumed modest improvements to this margin over the initial projection period, as did Goldin. However, absent acquisitions, Goldin concluded that Coram cannot be expected to achieve its 12% EBITDA target in this period.

Unlevered Free Cash Flow.  For purposes of DCF valuation analysis, unlevered free cash flow represents the flows coming to an owner or acquirer over the projection period. In the initial projection period particularly, these flows are often affected significantly by capital expenditure assumptions. The Financial Advisors accepted management's capex assumptions; Goldin did, as well, updated as reflected in Appendix 8.

Summary of Projections
(Utilized for June 15, 2001 and August 31, 2001 DCF Analysis)
($000s)

| | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| **Net revenue:** | | | | | |
| Core therapies | 270,983 | 291,044 | 301,812 | 314,489 | 330,213 |
| Non-core therapies and other | 130,017 | 130,017 | 130,017 | 130,017 | 130,017 |
| | 401,000 | 421,061 | 431,830 | 444,506 | 460,230 |
| *Growth rate* | | *5.0%* | *2.6%* | *2.9%* | *3.5%* |
| | | | | | |
| **Gross margin** | 113,082 | 124,399 | 129,348 | 136,088 | 145,757 |
| *Percent of net revenue* | *28.2%* | *29.5%* | *30.0%* | *30.6%* | *31.7%* |
| | | | | | |
| **Branch margin** | 54,090 | 63,844 | 67,590 | 73,008 | 81,239 |
| *Percent of net revenue* | *13.5%* | *15.2%* | *15.7%* | *16.4%* | *17.7%* |
| | | | | | |
| **EBITDA** | 27,814 | 36,448 | 39,316 | 43,789 | 50,908 |
| *Percent of net revenue* | *6.9%* | *8.7%* | *9.1%* | *9.9%* | *11.1%* |
| | | | | | |
| **Unlevered Free Cash Flow** | | 13,753 | 25,072 | 28,567 | 33,422 |

KL2:2108873.7

### c.    Perpetual Period Projection

All the Financial Advisors utilized the "exit method" short cut to calculate the value of unlevered free cash flows in perpetuity. Each calculated a terminal value by applying the EBITDA multiple derived from its comparable public company market analysis to the EBITDA in the last year of its initial projection period. Goldin used the average of its two comparable analyses to capture the information provided by the multiple calculations of both valuation methods. Appendix 10 presents these calculations for each Advisor and for Goldin as of each of the Valuation Dates. In the Report Goldin issued on July 11 it did not update from its previous draft report the EBITDA multiple it used for its calculation as of June 15, 2001; it does so here.

UBS also did a perpetual value analysis. It adjusted the last year's unlevered free cash flow for early tax benefits to reflect that Coram could be assumed to be a taxpayer during the perpetual period. It assumed a 2.5% growth rate for the perpetual period and, it appears, used the same discount rate utilized for calculating the present value of all earlier flows (see discussion below). The result of this calculation is approximately half that which UBS derived using the exit method, which suggests that the terminal value calculation of UBS has a strong upward bias.[25]

### d.    Discount Rate – Weighted Average Cost of Capital

A DCF analysis establishes the enterprise value of Coram by calculating the present value of its projected unlevered free cash flows and the terminal value (or perpetual value), using a discount rate equal to an estimated weighted average cost of capital ("WACC").

---

[25]    Gasiorek 184.

-72-

KL2:2105M72.7

The estimation of WACC requires a number of assumptions regarding an optimal capital structure,[26] i.e., the debt to equity ratio; the likely cost of debt at such a level that the market at the Valuation Dates would require Coram to pay; and the expected return on equity that an investor would require at the time. Appendix 9 sets forth the assumptions made by the Financial Advisors and by Goldin for the purpose of deriving the appropriate discount rate.

### Summary of Goldin's WACC Calculation

| Factor | 7/31/00 | 12/14/00 | 6/15/01 | 8/31/01 |
|---|---|---|---|---|
| Cost of Debt, after tax | 6.3% | 5.7% | 4.7% | 4.4% |
| Cost of Equity | 25.8% | 22.5% | 21.4% | 21.0% |
| Debt / Equity | 20% / 80% | 20% / 80% | 20% / 80% | 20% / 80% |
| WACC | 21.9% | 19.1% | 18.1% | 17.7% |

The most significant difference among the Financial Advisors and Goldin in the calculation of WACC is the assumptions made respecting the cost of equity. The components of the analysis (derived from the capital asset pricing model) reflect the expected incremental return investors in the equity of a business require for the assumption of defined incremental risks. Investors in distressed companies, i.e., companies in bankruptcy and/or experiencing significant operating or financial problems, require an incremental expected return to compensate for the risk that a turnaround and recovery will not occur as planned.

The projections presented in Appendix 8 reflect that Coram's recovery, while still problematic, can, in Goldin's view, reasonably be expected to continue. Furthermore, notwithstanding Goldin's conclusions on other matters set forth elsewhere in this Updated

---

[26]     Gasiorek 28, 44-50.

KL2:2103873.7

Report (and while it may be that no individual is indispensable), Goldin believes that the best chance for Coram to recover may rest on continuity and stability of management. Accordingly, in the absence of appropriate management contracts, the risk of a change of management must be factored into the risk equation.

To reflect these risks, Goldin has included a substantial "turnaround risk" factor in its calculation of WACC.

e.          **DCF Valuation**

Based on the assumptions discussed above, the Financial Advisors' and Goldin's DCF analyses determined Coram's enterprise value as set forth in Appendix 10. The tables below summarize Goldin's computation of Coram's enterprise value as of June 15, 2001 and August 31, 2001, utilizing the discounted cash flow methodology.

Summary of Goldin's DCF Analysis
(as of June 15, 2001 - revised)
($000s)

| | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Unlevered Free Cash Flow | 13,753 | 25,072 | 28,567 | 33,422 |
| Terminal Value @ 7.22x EBITDA of 50,908 | | | | 367,554 |
| Present Value @18.1% | 11,647 | 17,982 | 17,352 | 17,193 |
| Present Value of Terminal Value | | | | 173,997 |
| **Enterprise Value** | | | | **238,171** |

-74-

Summary of Goldin's DCF Analysis
(as of August 31, 2001)
($000s)

|  | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Unlevered Free Cash Flow | 13,753 | 25,072 | 28,567 | 33,422 |
| Terminal Value @ 7.13x EBITDA of 50,908 |  |  |  | 363,465 |
| Present Value @17.7% | 12,005 | 18,592 | 17,996 | 17,885 |
| Present Value of Terminal Value |  |  |  | 179,269 |
| Enterprise Value |  |  |  | 245,747 |

4.    Adjustments to Enterprise Value Considered

Depending on the circumstances, a variety of adjustments to enterprise value may be appropriate to determine the fair market value of a business. Goldin considered those that could have a significant impact on the result (discussed below), but concluded that no adjustment to enterprise value is indicated.

a.    Excess Cash

Enterprise value calculations assume normalized balance sheets and, particularly, normal working capital. If, as of any of the Valuation Dates, there are material abnormalities, adjustments may be appropriate. D&T adjusted upward from its enterprise value as of December 2000 (by approximately $16 million) on account of cash it considered excess of normal requirements. Goldin did not make this adjustment as of that Valuation Date because Coram had an offsetting obligation to pay substantial incentive bonuses; D&T assumed away this "abnormal" liability, but Goldin concluded that this was not appropriate for the analysis.

As of June 15, 2001, Coram had over $30 million in cash; as of August 31, the cash balance was lower. Offsetting this amount are the obligation to pay some $13.4 million in

-75-

management incentive and other bonuses to Mr. Crowley, substantial anticipated bankruptcy costs and significant rental obligations due July 1. Coram estimates a minimum requirement of approximately $6 million to run the business; the difference, which may be "excess cash," is less than $5 million.

### b.   Internal Revenue Service Claim

The IRS has made a claim against $T^2$ Medical ("$T^2$"), a non-bankrupt subsidiary of Coram, for back taxes in the amount of $12.7 million plus interest; $T^2$ (with Coram) is disputing the claim. UBS adjusted down its estimated free cash flow by approximately $2.1 million per year to account for this potential liability, assuming a six year pay-out of a compromised claim. Coram's view is that any related tax liability is only an obligation of its subsidiary. Nonetheless, just as the value of $T^2$ is part of Coram's enterprise value, any offset of the subsidiary's value is an offset to Coram's. Accordingly, Goldin considered this claim in its determination of Coram's value.

### c.   SabraTek Pump Replacement

Coram is experiencing problems with pumps it purchased from SabraTek and is replacing them as required. When SabraTek went into bankruptcy Baxter Laboratories purchased its pump business and has since stood behind these products. However, Coram anticipates that it may need to accelerate its replacement expenditures. This would have a short-term negative impact on cash flows, aggregating $12 to $14 million above projections, but would reduce projected capital expenditures modestly for a number of years thereafter.

-76-

KL2:2108873.7

### d.    Net Operating Tax Loss Carryforward

Coram reports having an NOL carryforward of approximately $159.3 million. Its ability to use this potential shelter to offset taxes, however, is problematic for a number of reasons. The Plan contemplates that Coram will have $180 million of post-reorganization debt. Were that level of debt imposed on Coram, after interest expense it would have little, if any, taxable income to shelter. Also, the change-of-control rules in the Federal tax code would reduce the annual utilization of Coram's NOL significantly were control to change. This limitation relates, in part, to Coram's equity value at the time it emerges from bankruptcy. Should the capital structure be as highly leveraged as the Plan contemplates, the equity would be relatively small. Under these circumstances, the NOL would have little value.

### e.    Clinical Trials, Inc.

For several years Coram has provided drug-testing services for pharmaceutical manufacturers through a subsidiary, Clinical Trials, Inc. ("CTI"). With access to industry contacts and over 350,000 patients treated, Coram is able to plan and implement tests utilizing human subjects under controlled circumstances pursuant to FDA guidelines. Although expected to continue to grow at a relatively high rate, the business constitutes less than 1.5% of revenue and is not estimated to exceed 2% of revenue within the initial projection period. Its impact is small and its expected growth uncertain, so its operations are not reflected in Coram's projections used for the various valuations.

### f.    PricewaterhouseCoopers Litigation

A fall-out of Coram's disastrous acquisition of Caremark's home infusion business is a litigation claim Coram assumed against PricewaterhouseCoopers for $165 million. While this claim may have merit and might ultimately result in a substantial recovery, it has

-77-

KL2:2108873.7

A825

dragged on for many years without resolution. Goldin has concluded that an investor/acquiror of Coram would not attribute much value, if any, to this litigation.

Based on the foregoing in the aggregate, Goldin concluded that these six possible adjustments to enterprise value would not materially increase or decrease enterprise value. Accordingly, it made no adjustments based on them.

### 5.     Conclusions

The Financial Advisors and Goldin respectively determined Coram's value as of the various Valuation Dates, utilizing the results of the calculations of enterprise value from the methodologies discussed above and making the adjustments each deemed appropriate; each applied its professional judgment to the ensuing computation, including a weighting of the results.[27] The various calculations and the respective determination of values is set forth in Appendix 11.

Goldin's weighting reflects its view that the DCF analysis is the most informative of the valuation methodologies utilized.[28] As to the comparable market and comparable transaction analyses, Goldin considered the multiple of revenue approach the least informative; revenue is a good indicator of demand for products and services, but is not reflective of the profitability of this revenue[29]; and profitability drives value. Accordingly, Goldin placed greater weight on the multiple of EBITDA calculations.

---

[27]     Pratt 371.

[28]     Pratt 151; also Tom Copeland, et al., *Valuation: Measuring and Managing the Value of Companies* (New York: John Wiley & Sons, Inc. 1995) 70-1.

[29]     Damodaran 338.

-78-

### Summary of Goldin's Valuation of Coram
#### ($000s)

| Method | Basis | July 31, 2000 EV | Weight | December 14, 2000 EV | Weight | June 15, 2001 EV | Weight | August 31, 2001 EV | Weight |
|---|---|---|---|---|---|---|---|---|---|
| Comparable Market | EV/Revenue | 227,116 | 5% | 255,604 | 5% | 396,312 | 5% | 375,242 | 5% |
| | EV/EBITDA | 251,444 | 10% | 257,940 | 10% | 255,555 | 10% | 248,225 | 10% |
| Comparable Transactions | EV/Revenue | 455,690 | 5% | 409,141 | 5% | 485,210 | 5% | 485,210 | 5% |
| | EV/EBITDA | 278,703 | 20% | 239,687 | 20% | 159,542 | 20% | 157,817 | 20% |
| DCF | | 182,502 | 60% | 182,899 | 60% | 238,171 | 60% | 245,747 | 60% |
| Enterprise Value | | 224,527 | | 216,708 | | 244,443 | | 246,857 | |

## B.    The Integrity and Accuracy of Coram's Financial Records

The valuations performed by the Financial Advisors and Goldin utilized the financial information reported by Coram and/or provided by Coram's management; hence, Goldin needed to satisfy itself as to the integrity and accuracy of this information. Given the issues raised in Coram's bankruptcy, Goldin's examination focused on whether:

- the valuation analysis by Chanin as of July 2000 utilized sound and reliable financial information;

- Coram's accounting and financial management systems had been manipulated in a way calculated to produce false or misleading information and to lead the Financial Advisors and Goldin to a particular (and potentially erroneous) conclusion, i.e., that the enterprise value of Coram was, on the Valuation Dates, significantly below the amount of the debt claims; and

- Mr. Crowley and/or Cerberus (Mr. Feinberg) used their positions deliberately to mismanage the company and benefit themselves or itself in dereliction of their respective duties to Coram.

Especially in light of the substantial shortfalls in enterprise value Goldin found from the amount of the debt claims on the Valuation Dates, Goldin focused closely on issues and areas in which a finding of impropriety and/or inaccuracy could have a potentially material financial impact, i.e., could result in a different outcome. Goldin undertook an inquiry in that

KL2:2108573.7

regard of a nature and to an extent it deemed appropriate and necessary to form professionally

bona fide conclusions respecting these matters.

       With the assistance of counsel, Goldin performed a number of tasks in this regard,
including the following:

- A review and analyses of Coram's 10-K and 10-Q filings with the Securities and
  Exchange Commission;

- Interviews of the Ernst & Young ("E&Y") audit partner and associates responsible
  for the audits of Coram from 1997 through 2000, a review of E&Y's management
  letters and a review of certain of E&Y's work papers pertaining to its 2000 audit;

- An interview of the partner at Reed Smith responsible for counseling Coram
  regarding Stark II issues;

- Interviews of numerous members of management, including senior officers
  responsible for Coram's sales efforts, operations, certain branch operations and
  management of certain core therapies, as well as present and former chief financial
  officers; and

- A review and analysis of documents requested of management, as well as documents
  prepared by management at Goldin's request.

       In all cases the individuals interviewed cooperated fully, were forthcoming in

responding to detailed and multiple inquires, produced all information requested and/or asked to

be developed and provided complete and credible responses. The only exception to the

foregoing is certain information requested of E&Y that Goldin was advised was proprietary and

that, as a matter of strict policy, could not be shared with anyone, including clients.

    1.    <u>Reliability of Financial Statements</u>

       a.    <u>In General</u>

       As a general rule, business convention justifies reliance on the financial

statements of public companies, especially where they are independently audited by reputable

-80-

accounting firms and are reported to the public in documents signed by officers and/or directors and filed with the SEC. Historically, Coram has received unqualified audit opinions from its independent auditor. (Unqualified audits mean that nothing of a material nature has caused the reported data to be unreliable.) Goldin has found no reason to question the professional bona fides of Coram's financial disclosure and/or statements:

- Accounting firms, including E&Y, have had increasing reason in recent years to apply rigorous auditing standards, given enhanced public scrutiny of their work and the financial risks implicit in negligence or serious dereliction in their application of professional standards;

- The SEC has intensified its scrutiny and willingness to institute and prosecute enforcement actions; and

- Manipulation and/or conspiracy to meet Stark II financial compliance requirements carries potential criminal penalties.

Goldin conducted a broad inquiry into Coram's financial information systems, recordkeeping, other systems and control environment.

### b.    Interviews

Interviews with Coram financial personnel focused on such as matters as: revenue recognition and billing systems (particularly the difference between gross revenue and allowable deductions to get to net revenue); contract coding, pricing and standard deduction protocols; the relationship between average wholesale prices of drugs and billed amounts; collections and cash application; and the determination of uncollectible receivables and allowances for doubtful accounts. Goldin's inquiry also addressed: profitability by therapy and the application of admission grids; inventory and fixed asset oversight; centralization of accounts payable and the company's approval mechanism; computer systems; divisional and branch accounting and roll-

-81-

up; write-downs for impairment of long-term assets; and restructuring expenses taken in the first three quarters of 2000, but reversed in the fourth quarter.

The independent auditors were specifically asked to address, inter alia, their audit program and risk analysis; internal controls evaluation; review of the general ledger; examination of the billing system and testing at the branch level; review of contractual allowances as deductions from gross receivables; review of the accounts receivable ledger, including allowance for doubtful accounts and write-offs; review and testing of Coram's inventory system at the branch level; review and analysis of plant, property and equipment records; and analysis of all impairment reserves taken or reversed.

### c.    Analytical Procedures

In addition to the interviews and reviews noted above, Goldin performed certain analytical procedures to test for material variances in the financial records. The following analytical measures were performed:

1. For the period December 1998 through March 2001, changes in balance sheet and income statements were calculated, utilizing Coram's 10-Ks and 10-Qs. Adjustments were made for discontinued operations.

2. An analysis of the changes in EBITDA for each of the years ended 2000, 1999 and 1998.

3. Analyses of changes in accounts receivable, the allowance for doubtful accounts and the provision for doubtful accounts.

The foregoing analytical procedures highlighted areas for further discussion and review, helped identify the nature of year-to-year changes in income and assets and assisted in examining the estimation process.

-82-

2.    Issues Raised Regarding Potentially Managed Results.

a.    The Chanin Valuation

In addition to reviewing the financial information and assumptions utilized by Chanin in performing its valuation analysis in July 2000, Goldin also examined Chanin's role in helping management develop projections. In that regard, Goldin focused on such matters as: the forecast model provided to Chanin; the financial templates provided to branch management; the assumptions for such factors as pricing levels, volumes and drug and supply costs; G&A levels; inflation; and the review work done at corporate headquarters. Chanin professionals were queried about their roles in helping Coram develop budgets for use in the Chanin valuation and in undertaking independent verification of therapy market shares, patient censuses, payor reimbursement rates, industry conditions and outlook, revenue growth rates, operating costs and profit margins.

Goldin concluded that Chanin conducted appropriate independent due diligence (involving professionals with extensive healthcare experience) from a financial point of view and guided management in the development of projections by giving direction respecting the form and level of detail such projections should involve; in addition, Chanin examined management's assumptions in a fashion necessary and appropriate to a valuation expert in such circumstances. Chanin made appropriate adjustments in its valuation; for example, Chanin used a standard estimate for losses on uncollectible accounts (approximately 3%), rather than the varied estimates actually made for 1999 and 2000. Goldin found no evidence of improper influence on Chanin or reason to question the professional integrity of its work.

KL2:2108873.7

A831

### b.   Gross Revenue, Contractual Allowances and Net Revenue

Goldin probed carefully the points at which Coram's financial information might be distorted or manipulated in a manner calculated to reduce Coram's apparent value. The prime, albeit not exclusive, candidate is net revenue.

Specified contractual allowances must be deducted from gross revenue (the price for services indicated in Coram's contracts with third-party payors) to calculate billable amounts for those services. The amount billed is booked as net revenue. Calculations of contractual allowances can be complex. At Coram these calculations are performed by computer and checked manually.

The ways to manipulate results boil down essentially to two: (i) booking net revenue below the actual, proper, invoice amount and charging full costs against net revenue, resulting in artificially low margins and profit and (ii) booking net revenue below invoice amounts and charging estimated costs on the basis of assumed margins (similar to standard cost systems), resulting in maintained margins, but, again, artificially low profit. As profits drive value, these manipulations, if on a grand scale, would materially impact calculations of enterprise value.

Since contractual allowances account for more than 60% of gross revenue, there is ample room for a distortion to have an impact. However, for several reasons which Goldin finds compelling such an exercise would be highly unlikely and, in any event, highly unlikely to succeed.

Cash Implications.  A form of manipulation outlined above would result in unreconciled cash amounts: payments of invoices would produce cash receipts in excess of

K12:2108871.7

revenues booked as receivables, unless the cash could be diverted from the attention of members of management and/or auditors not part of the fraud. Alternatively, were the basis for estimating costs booked net revenue amounts, actual costs would exceed estimated costs. This would have the effect of offsetting unexpected cash; but, again, those responsible for paying Coram's bills would be unable to reconcile the bills received against the estimated costs booked. Assuming material differences over time, this, too, would be unlikely to go undiscovered.

Account Distortion.  An understatement of net revenue would require either that a fictional expense be interposed or a legitimate deduction from gross revenue be overstated. For the impact on valuation to be material, the distortion would have to be substantial. The principles of double-entry accounting require that balancing entries be made throughout. Consequently, fictional expense inputs or gross overstatements of deductions would require at least one other distortion (which would accumulate), such as a balancing liability on the balance sheet reflecting an obligation to pay the fictional or overstated and unpaid expense. Without the counterbalancing entries, Coram's general ledgers would not balance; with them, the growing distortion would quickly reach detectable proportions. Goldin questioned E&Y respecting its review of Coram's accounts and, in particular, balancing entries, in connection with its audits of Coram's financial statements; Goldin also examined numerous financial reports and questioned management closely in connection with this review. Goldin found no distortions.

Dispersed Operations.  Coram has over 70 branches across the United States. Currently, as for the past several years, much of the recordkeeping inputs and management of collections and payments of bills occur at the branch level. For a financial manipulation scheme to affect value materially, the requisite scale would require the involvement in the fraud of a

-85-

A833

significant number of branches. That such a scheme could be put in place, managed and kept quiet across such a diverse operation is highly unlikely.

Consolidation of Billing and Collections. Coram is in the process of consolidating its reimbursement management to twelve sites and centralizing the processing of Medicare and Medicaid billing and collections. In the process of making these changes, a fraud of the kind hypothesized would overwhelmingly likely come to light and could not be maintained. Consequently, a rational person involved in such a fraud would not institute these consolidations.

c.    **Deferral of Revenue**

With the demand for infusion home care services said to be rising, but with Coram's revenue declining, query whether Coram has been pursuing revenue opportunities aggressively.

Goldin interviewed the senior management officials responsible for sales and operations, as well as the officer responsible for increasing sales of the most significant of Coram's core therapies. Goldin interviewed a branch manager and sales management personnel at the branch level. Goldin found the branch personnel to be alert and focused; every indication is that they are trying hard to hit revenue targets. Indeed, Mr. Crowley has set very high revenue goals for the core therapies; branch management outlined the efforts being made to realize those goals, the various impediments involved and their strategies for overcoming them.

A changed commission structure for sales managers is designed to incentivize increases in the core therapy census and, on the other hand, not to encourage non-core, unprofitable business. Nonetheless, regional and national payors will likely defer meaningful

-86-

KL2:2108873.7

**A834**

expansion of long-term arrangements with Coram, pending the outcome of its bankruptcy and the resolution of Coram's ownership and leadership. Consequently, the projections of management and those developed by Goldin with management's assistance contemplate a boost in revenue in the year 2002, after Coram exits the bankruptcy proceeding.

### d.     Deferral of Cost-Cutting Initiatives

Management has instituted procedures for analyzing profitability by therapy, payor and branch. The strategy that focuses on profitable "core therapies" and attempts to reduce the unprofitable therapy census reflects that analysis. Some unprofitable branches have been closed already; significant reductions in headcount have been effected.

Through these and other initiatives management effected a significant improvement in EBITDA in 2000. EBITDA for 2001 is estimated to improve modestly over 2000's EBITDA (after the normalization adjustments discussed in the next section), despite flat revenue. Management acknowledges that more must be done, albeit consistent with balancing the need to maintain a level of infrastructure sufficient to develop and service anticipated opportunities to increase revenue once the bankruptcy is over.

### e.     A Question of Managed 2000 EBITDA

Coram took significantly higher reserves for uncollectible accounts in 1999 than past practice would indicate was required: $28 million in reserves as against an indicated $14 million based on historic levels. In 2000, however, approximately $10 million of these "uncollectible" receivables were collected; since the amount of reserves for uncollectible accounts in 2000 was partially offset by this experience, only $9 million, not an indicated $12.8

-87-

million, was taken in reserve in 2000. The difference of $3.8 million was an element in the higher EBITDA in 2000.

Numerous other adjustments, in the aggregate, also boosted reported EBITDA. For example, the company made 23 separate adjustments to EBITDA at the operating level; these aggregated $9.0 million of net additions. At the corporate level, Coram made 15 separate adjustments to EBITDA; these aggregated $4.6 million of net additions. Taken together with the $3.8 million of lower-than-usual reserves for losses, the total upward bias to EBITDA was $17.4 million. As reflected in Appendix 12, Goldin deducted certain of these amounts as part of the calculation for a "normalized" EBITDA (after considering MIP at 5.5% of branch operating profit) of $29.1 million. Query whether Mr. Crowley, who renegotiated his EBITDA-based compensation arrangement early in 2000, and whose new arrangement produced a bonus owed of $10.8 million on these results, managed these EBITDA levels for his own benefit.

On the other hand, the higher EBITDA achieved in 2000 has caused calculations of enterprise value to be higher than they would otherwise have been. Such a result is inconsistent with the assertion that Mr. Crowley was motivated to manage financial results in a fashion that was calculated to produce a lower valuation.

Moreover, Goldin probed the underlying facts in this matter and sought to adduce any evidence of wrongdoing. Goldin has concluded that there is no such evidence, other than the finding of an actual conflict of interest by the Court.

Toward the end of 1999 Coram's DSOs (days sales outstanding – a measure of the level of accounts receivable) climbed dramatically. Collections had slowed, the amount of receivables over 90 days past due had grown substantially and, consequently, the business was

-88-

KL2:2168871.7

A836

cash constrained. It would appear that senior management was consumed by problems associated with Coram's Aetna contract and the resulting dispute and litigation, as well as the bankruptcy of the R-Net subsidiaries. At the same time, management was also focused on the sale of Coram Prescription Services. The conclusion seems inescapable that the collection process, which requires constant attention in any business and especially in Coram's, had been neglected.

Given this circumstance, management determined that an unusually large reserve against uncollectible accounts was necessary. Generally accepted accounting practices required recognition of the situation; it could not be avoided simply by assuming that corrective action would be timely and would result in recovery of a substantial portion of the long-overdue accounts.

The spectre of Coram not complying with the minimum net worth requirements of Stark II hung over the company at the time. Given that the failure to comply with this requirement would unquestionably be fatal to Coram, it is hard to imagine a deliberate effort by management to jeopardize the company's existence by contriving to minimize Coram's net worth.

In this situation, Coram's year-end 1999 accounting entries were bound to receive maximum attention and the greatest possible scrutiny – by management, by E&Y and by Reed Smith, which had to advise whether requirements of Stark II had been met.

The results in 2000, except insofar as they were affected by these reserve decisions in 1999, were otherwise ordinary, raising no question of impropriety.

KL2:2108473.7

Accordingly, for the reasons enumerated, Goldin concluded that these accounting entries were appropriate under the circumstances and found no other improprieties.

### 3.    Conclusions

Given the foregoing, Goldin determined that there are no facts, substantiated suspicions or material variances that lend credence to the inference that Coram's books and records and/or reporting systems (financial and otherwise) should be considered suspect or lacked independence and reliability, giving rise to a need for a more intensive investigation. To be sure, a material part of the results of Coram's operations are based on management's estimates of such matters as collections, write-offs and the value of long-term assets. Many of these types of estimates could cause large fluctuations from year to year, were the estimates incorrect or were economic circumstances to change. However, Coram's historical estimates were substantiated by management (with no evidence of any effort to distort them), not concealed and agreed to by the independent auditors.

Throughout the course of Goldin's examination, Coram's senior finance personnel were forthcoming, knowledgeable and professional, providing whatever help they could, given the many demands on their time. To be sure, they are subordinates of the Chief Executive Officer. Nonetheless, they did not evidence a proclivity to whitewash or tilt facts to vindicate Mr. Crowley.

KL2:2108873.7

A838

## V.    LEGAL ANALYSIS

### A.    The Equity Committee's Proposed Complaint

The Equity Committee's Complaint posits that, in exchange for almost $1 million a year in undisclosed cash compensation and other potential benefits from Cerberus, Crowley agreed "to operate Coram for the benefit of Cerberus . . . and contrary to the interests of" Coram and its shareholders. (Compl. ¶ 5) The Committee contends that "[t]his scheme and conspiracy began sometime in 1999 (and perhaps earlier)," with the decision to bring Crowley in as a consultant; that it "was refined and implemented during the year 2000," after Crowley became CEO; that Feinberg -- acting through Crowley -- "still had de facto control over Coram" even after Feinberg resigned from the board in July 2000; and that the alleged conspiracy "continues to this day." (*Id.* ¶¶ 5, 47)

The objective of the alleged scheme was to "steal the equity" from the shareholders and transfer it, through the reorganization process, to the Noteholders. (*Id.* at p. 12) The Complaint alleges that, after Crowley became CEO of Coram, he "deliberately managed Coram's affairs so that it would appear to have little or no value above the amount owed under the Notes." (*Id.* ¶ 43) If Coram was -- or at least appeared to be -- insolvent, then it would lack sufficient shareholder equity to satisfy the public company exception to Stark II, which would put it out of business by year end 2000. The only solution would be to file for bankruptcy protection and reorganize as a private company, with the Noteholders emerging as the new owners.

According to the Complaint, Crowley and Feinberg initiated this alleged scheme by conspiring to oust Rick Smith so they could discard his growth plans and set Coram on a course toward insolvency. (*Id.* ¶¶ 23 and 32) Once installed as CEO, Crowley allegedly ignored

KL2:2108873.7

all sale, merger or capital-raising opportunities; at the same time, he allegedly made "concessions" to the Noteholders. For example, he made a $6.3 million cash interest payment in July 2000, when he supposedly could and should have made the payment "in kind." He also allegedly agreed to sell CPS for an unjustifiably low price and unwarrantedly used the sale proceeds, at a time of a "serious cash shortage," to pay down debt. Finally, the Committee contends that Feinberg and Crowley intentionally delayed the filing of the bankruptcy petition as long as possible so the Court and the shareholders would have no alternative but to approve it in light of the impending Stark II deadline. (*Id.* ¶¶ 39-40)

1.     The Allegations

     Broadly speaking, the Equity Committee's allegations fall into two categories: (i) the existence of an alleged conspiracy between Crowley and Feinberg and (ii) the separate and independent claim that Crowley mismanaged Coram and caused it to become insolvent. We address these in turn below, before analyzing the causes of action asserted in the Complaint.

a.     The "Conspiracy" Allegations

     As the Bankruptcy Court has already found, that Crowley was being paid by, and had an employment agreement with, one of Coram's principal creditors constituted an actual and serious conflict of interest. The facts that gave rise to this conflict are not in dispute:

- Crowley entered into a three year employment contract with Cerberus under which he earned a base salary of nearly $1 million a year;

- Under Section 2.3 of his Cerberus contract, Crowley was required to work full-time for Cerberus and its Portfolio Companies, to perform "such duties as are assigned or delegated . . . by . . . Feinberg," and to "use his best efforts to promote the success of [Cerberus'] business or the business of each [Portfolio Company]";

-92-

A840