- Under Section 6.3 of his Cerberus contract, Crowley's "failure to follow the reasonable instructions of" Cerberus, Feinberg or the board of directors of a Portfolio Company was grounds for termination and forfeiture of his Cerberus compensation;

- On November 12, 1999, while his contract negotiations with Coram were ongoing, Crowley sent a "personal and confidential" letter to Feinberg seeking additional compensation from Cerberus tied to his performance at Coram.

It is also undisputed that Crowley and Feinberg did not disclose either the existence, or the terms, of the Cerberus contract to the directors or shareholders of Coram, either orally or in writing, prior to discovery in the bankruptcy case. The 1999 Form 10-K, in the section titled "Certain Relationships and Related Transactions," states only that "Cerberus owns an interest in Winterland, the privately held affinity merchandise company of which Mr. Crowley is the Chairman of the Board of Directors." (10-K at 45) There is no mention of the Cerberus contract there or in the section titled "Related Party Transactions." (Id. at 72-73) The "Management" section of the Disclosure Statement describes Crowley as "Chairman of Winterland," but does not explain the relationship between Winterland and Cerberus. It goes on to state that Crowley "also serves as a consultant to Cerberus . . . with respect to its investments in various healthcare companies other than the Debtors" and that he "generally receives a fee from Cerberus for such services." It is silent as to the nature and amount of that "fee" or the nature of the contractual relationship between Crowley and Cerberus. (Disclosure Statement at 47-48)

There is no question that these facts were material, that they were not timely disclosed and that Crowley's and Feinberg's failure to disclose them was a serious breach of duty. As discussed in Point V.A.2. below, the non-disclosure of these facts gives rise to potentially significant claims against Crowley and Feinberg for breach of fiduciary duty.

KL2:2168823.7

-93-

A841

This does not end the analysis, however. For while the non-disclosure of the basic facts is undisputed, the parties hotly dispute two issues: (i) whether Feinberg and Crowley acted with improper motives when they entered into Crowley's Cerberus contract and (ii) whether their non-disclosure of that contract to Coram's other directors and officers was intentional or inadvertent. The resolution of these disputed issues has significant bearing on the nature and magnitude of the penalty that may be imposed on Crowley or Feinberg. We address these two issues in turn below.

The evidence on the first issue — whether Feinberg and Crowley intended or expected Crowley to advance Cerberus' interests to the detriment of Coram and its shareholders — is not conclusive. Crowley's Cerberus contract, the non-disclosure of its terms to Coram's other directors and officers and his November 12, 1999 letter could be deemed sufficient to support an inference of malevolent intent. Feinberg and Crowley, on the other hand, both vociferously deny having had any such intent. They claim it was their understanding and intent that Crowley would "run Coram for Coram" (as Crowley put it), acting at all times in the best interests of Coram and its shareholders.

While an inference to the contrary cannot be precluded definitively, Goldin finds credible Feinberg's and Crowley's assertions that they never intended or expected Crowley to breach his fiduciary duties at Coram. A number of factors support this conclusion:

    ●   Most significant is that, at the time Crowley became CEO of Coram, the Noteholders' interest in how Coram was managed was closely aligned with that of Coram's shareholders. Coram was in a state of financial crisis and it was already apparent that the company was worth substantially less than the amount of its debt. Cerberus, for example, had

written down its Coram debt at this time to less than 50% of its face amount. The immediate imperative, from the standpoint of the Noteholders *and* the shareholders, was to try and stabilize Coram's operations and to improve its financial performance. Given the lack of any conflict between the shareholders' and the Noteholders' basic interests, Feinberg would seem to have had little incentive at the outset to conspire with Crowley in the egregious fashion the Complaint alleges.

●    As for Crowley, his compensation arrangements at Coram gave him strong incentives to maximize shareholder value. Crowley's base salary at Coram was only $650,000 -- a substantial sum, but far below the amount to which an executive of his caliber and experience might be entitled. On top of his base salary, his November 1999 employment agreement gave him options to purchase one million shares of Coram's stock at the then market-price, plus a performance bonus of up to nearly $2 million contingent on his ability to increase Coram's EBITDA, plus an acquisition bonus of almost $2 million in the event of a sale of the company. The April 2000 amendment to his employment agreement increased his incentives to maximize shareholder value; it substantially increased the amount of his EBITDA-based performance bonus and also gave him the right to a $1.9 million "success fee" payable upon the consummation of a refinancing. As a result, the potential benefits to Crowley from generating value for Coram's shareholders far outweighed the relatively small benefits to which he was entitled under his Cerberus agreement -- that is, his salary of $960,000 per year plus expenses and his 30% stake in Winterland (which was worth next to nothing).

●    While the terms of Crowley's employment agreement with Cerberus are susceptible of adverse inferences, they are not inconsistent with an expectation that he would honor his fiduciary duties at Coram. For example, Crowley's agreement with Cerberus requires

-95-

KL2:2108873.7

Crowley to "use his best efforts to promote the success of the Employer's business (or the business of [each] Portfolio Company). . . .". (Agreement § 2.3; emphasis added). Similarly, the agreement defines "cause" for termination to include Crowley's "failure to follow the *reasonable* instructions of the Employer . . . *or* the Board of Directors of any Portfolio Company . . . ." (*Id.* § 6.3; emphasis added) The less strained reading of the agreement would suggest that when the "success" of Cerberus appears to conflict with that of a particular Portfolio Company (in this case, Coram), Crowley is to put his fiduciary duties to the Portfolio Company ahead of his contractual duties to Cerberus. Similarly, it is sensible to read Section 6.3's reference to "reasonable instructions of the Employer" to suggest that an instruction requiring Crowley to breach his fiduciary duties to a Portfolio Company would be unreasonable.

As noted, a separate issue is whether Crowley's and Feinberg's failure to disclose the Cerberus contract to Coram's other directors and officers was deliberate or inadvertent. Both Feinberg and Crowley characterize their failure to disclose the full extent of the Crowley/Cerberus relationship as an oversight, which they greatly regret. While the evidence on this issue, too, is inconclusive, we believe the weight of the evidence points to different conclusions for Feinberg and for Crowley.

We find credible Feinberg's assertion that his non-disclosure was not a calculated deceit. Central to this conclusion is the lack of any apparent motivation for Feinberg to conceal Crowley's Cerberus relationship. Given that the Noteholders' interests at the time were consistent with those of Coram and its shareholders, and given the urgent need felt by Coram's directors to hire a CEO of Crowley's caliber without delay, it appears that the board would have had little hesitation in hiring Crowley, even following full disclosure of his Cerberus ties. In these circumstances, query why Feinberg would have deliberately concealed Crowley's Cerberus

-96-

ties, thereby risking both liability and a taint to Cerberus' reputation. More plausible is that Feinberg, for whom Coram is merely one of many diverse investments under management, was guilty of an inadvertence.

Crowley, by contrast, did have an incentive to conceal the existence of his Cerberus contract. As noted, Crowley consistently sought strongly to maximize his compensation at both Coram and Cerberus. He negotiated and renegotiated his compensation with an unrelenting zeal, on which Amaral, Feinberg and others have commented. Crowley may have feared that disclosure of his $960,000 salary and other compensation from Cerberus might have caused Coram to seek to renegotiate his compensation arrangements, or at least resist demands for increases of the kind Crowley negotiated in April 2000.

Moreover, as the Bankruptcy Court has found, Crowley's November 12, 1999 letter to Feinberg, requesting additional compensation from Winterland tied to Coram's performance, evidences that Crowley was not above concealing his compensation arrangements:

> I think that EC-20 [the November 12, 1999 letter] did show an
> intent to hide [Crowley's] relationship [with Cerberus] and to hide
> his request for additional compensation in Winterland in exchange
> for his efforts here [i.e., at Coram] . . . .

(Tr. of Dec. 21, 2000 confirmation hearing, at 89) Arguably, Crowley did not mean to conceal the existence of his Cerberus contract, but simply his request for additional compensation from Cerberus tied to Coram's performance (a type of compensation that Amaral, as chairman of Coram's board, had told Crowley he would not permit); but it is at least equally plausible that Crowley meant to conceal the existence of his Cerberus contract, as well.

KL2:2108873.7

### b. The "Mismanagement" Allegations

Despite the conflict posed by Crowley's undisclosed dual employment, Goldin's investigation has disclosed no evidence that he deliberately favored the interests of Feinberg and Cerberus to the detriment of Coram and its shareholders. No evidence suggests that Cerberus (or the other Noteholders) instructed Crowley to act in a manner that was contrary to the best interests of the company. Nor does the evidence suggest that Crowley did so of his own accord, with the possible exception of his $6.3 million cash interest payment to the Noteholders (which turned out not to cause Coram any harm). Consequently, Coram and its shareholders have suffered no damage by virtue of Crowley's and Feinberg's breaches of fiduciary duty, other than the delays, professional fees and business losses resulting from the Bankruptcy Court's refusal to confirm the Debtors' Plan.

### i. The alleged scheme to oust Smith

According to the Complaint, Rick Smith's plans to grow the company were incompatible with Feinberg's and Crowley's alleged plan to drive it into Chapter 11 and "steal the equity" for the Noteholders. The Complaint alleges that Feinberg and Crowley developed and implemented a scheme to provoke Smith's resignation as Coram's CEO and his eventual replacement by Crowley. The first step in the alleged scheme was to hire Crowley as a consultant, with the intention that Smith would resign shortly thereafter, as, in fact, he did. (Compl. ¶ 25) Once Crowley became CEO, the Complaint alleges he "discarded the efforts of . . . Rick Smith to grow the business" and set out, instead, "to enhance the value of the Notes held by Cerberus . . . and to give Cerberus and the other Noteholders a claim to the equity of Coram." (Compl. ¶ 32)

-98-

No evidence supports these allegations. Rather than "increas[ing] the value of the Company" (Compl. ¶ 22), Smith presided over a severe decline in Coram's financial condition. In 1999 Coram suffered a net loss of $115 million, $93 million more than in the prior year. By the end of 1999 Coram had negligible EBITDA (only $307,000). A number of factors contributed to Coram's declining performance in 1999. In addition to the loss of the Aetna contract and the attendant business losses (including the bankruptcy of the R-Net subsidiaries), Coram faced increased competition from hospitals and physicians offering infusion and other home healthcare services, pricing pressure caused by an unfavorable shift in payor mix from private insurance to managed care plans and an increase in the costs associated with providing infusion therapy services. At the same time, Coram's accounts receivable had grown substantially and the rate of collections had declined.

To be sure, not all of Coram's declining performance in 1999 can fairly be laid at Smith's doorstep. Nonetheless, Smith seems to have done little to counter the negative trends facing Coram and may well have contributed to them. Smith concedes that the Aetna litigation consumed the bulk of his time and attention throughout a large part of his tenure as CEO, preventing him from devoting his energies to other areas. Perhaps because of his inability to extricate himself from the Aetna dispute, Smith failed to act decisively to stem the company's declining revenues, slower collections and increased costs.

When Smith became CEO in April 1999 he was relatively young and had no prior experience as a CEO. Within a few months the board concluded unanimously, and not without justification, that he was in over his head. Even Amaral, who had trained Smith and urged his elevation to CEO, soon came to believe that Smith was not up to the job and needed to be replaced or, at least, "coached" by a healthcare executive with more experience. Hence, in the

KL2:2108873.7

Summer of 1999 — after two quarters of precipitous declines in the fortunes of the company — the board decided to bring in a more seasoned CEO to serve as a "consultant," "mentor" or "coach" to Smith. From the board's standpoint, it was not unreasonable to think that Crowley, with his strong track record in turning around troubled healthcare companies, could give Smith the guidance he appeared to need.

Unfortunately, the Crowley/Smith relationship got off to a poor start and never recovered, a result for which both men appear to bear responsibility. Smith admits that, for at least the first month after Crowley was hired, he refused to cooperate with him. Although Smith eventually became somewhat more cooperative, he concedes that he often did not return Crowley's phone calls and did not treat Crowley's requests for information as a priority. He considered Crowley an overbearing manager, who sometimes criticized Smith in front of other board members and at other times made decisions behind his back. By October 1999, when Smith resigned and rejected the board's request that he stay on as "co-CEO" with Crowley, it had become clear that Crowley and Smith could not function effectively together.

In any event, there is little, if any, basis for the Equity Committee's allegation that Crowley "discarded" Smith's efforts "to grow the business." Neither Smith nor his CFO, Wendy Simpson, identified *any* significant growth plans that were originated or implemented by Smith, but subsequently abandoned by Crowley. CPS was the major growth area during Smith's tenure. But CPS was still in an early stage of development; it was consuming large amounts of scarce cash and was not expected to generate positive cash flow for years. Given Coram's liquidity problems at the time, CPS was an obvious candidate for the auction block. Accordingly, with the board's approval, Smith retained DBAB to explore a sale or other disposition of CPS, a decision that, in retrospect, Smith continues to believe was sound. Smith's other growth plans

-100-

KL22108473.7

were much smaller in scope and magnitude; and by and large, they were continued, not abandoned, by Crowley.

    ii.    **The alleged failure to explore options other than Chapter 11**

The Equity Committee asserts that "Feinberg caused Crowley to manage Coram so as to avoid all reasonable efforts to explore options other than Chapter 11." The Complaint alleges, for example, that "Coram never retained an investment banker to explore the manner in which the value of Coram could be increased" and that it "never had a functioning special committee of independent directors to explore strategic options to grow the company." By failing to explore such potential options, Coram "missed attractive business opportunities that would have enhanced its value by increasing its revenues, margins and profits, allowed refinancing of its indebtedness and avoided destructive bankruptcy proceedings." (Compl. ¶ 42)

The inferences and allegations are wide of the mark, even were one to assume that Crowley *was* acting at the behest of the Noteholders. On a stand-alone basis, Coram was worth substantially less than its debt throughout Crowley's tenure as CEO. Consequently, any sale or merger that benefited Coram's shareholders (<u>i.e.</u>, for consideration in excess of Coram's debt) would have benefited the Noteholders, as well. Similarly, the Noteholders would have benefited directly and substantially from any equity investment or other financing transaction that benefited shareholders.

It is apparent that the prospects for any sale or financing transaction beneficial to the shareholders were remote at best. Nor does the Complaint identify any specific "opportunity" that was supposedly left unexplored.

KL2:2108873.7

### (A) Merger or Sale Opportunities

At the time Crowley became CEO Coram was concluding a disastrous year and was in no condition to be sold advantageously. Coram's net losses had increased for two consecutive years; it had over $300 million in debt; and it had shareholder equity of *minus* $21,699,000. The prospects for 2000 were no better. Coram was defending a $100 million suit brought by its largest customer, Aetna. It was suffering a decline in revenue due to the resulting bankruptcy of its R-Net subsidiaries. The infusion business was less profitable than ever because of the difficulties associated with managed care and other regulatory and reimbursement issues. And it was highly likely that, absent a substantial capital infusion, Coram would not satisfy Stark II at year-end. In addition to Coram's severe problems, the home healthcare industry as a whole was experiencing hard times.

On a number of occasions in 1999 and 2000 various board members, including Amaral and Crowley, spoke with executives and bankers in the healthcare field to assess the opportunities for either a business combination or a financing. The response was uniform: no such opportunities existed. In the Fall of 1999, while serving as interim CEO, Amaral met with investment bankers from Bear Stearns, Chase Capital, Bain and Fox Payne. Based on those discussions he concluded that "there was no appetite out there for a deal." In the Spring of 2000 Crowley called a number of banks to try and raise capital. Citibank told him that it would lend at most $25 million, and only if the loan was secured by inventory. Everyone else turned him down.

Under these circumstances, retaining an investment banker to explore strategic options for the company would have been an unwarranted and likely pointless expense. In fact, in June or July 2000 Crowley asked Christina Morrison of DBAB whether it made sense for

-102-

KL2:2108873.7

Coram to retain DBAB to try and sell the company. Morrison's response was that, given the size of Coram's market capitalization (less than $20 million at the time), it did not make sense for Coram to pay the minimum fee of $1 million to $1.5 million that DBAB charges for such an engagement.

### (B)     Capital-Raising Opportunities

Given the state of Coram's balance sheet and the inflexible requirements of Stark II, scant reason exists to believe that Coram could have raised sufficient capital to avoid having to file for bankruptcy protection.

At the end of 1999 Coram had barely met the $75 million threshold required to satisfy the public company exception of Stark II. Moreover, it was able to do so only by computing shareholder equity based on the preceding-three-years average -- and that approach would not be available the following year. Because shareholder equity in 1999 was negative $22 million, Coram would have had to increase shareholder equity by more than $95 million before the end of 2000 to satisfy Stark II. With negligible EBITDA, it was virtually impossible for Coram to achieve that result on its own. Thus, as the company's regulatory counsel told the board at its meeting on December 17, 1999, "an equity infusion of some type would probably be required before the end of the year 2000 in order for the Company to be able to use the public company exception beyond December 31, 2000."

Several factors made it difficult or impossible for Coram to raise any equity capital, let alone the massive dollar amount it would have needed to satisfy Stark II and avoid bankruptcy. First and foremost, Coram's reorganization value was substantially less than its existing debt. That alone posed a formidable hurdle to Coram's ability to raise capital without a

-103-

restructuring of its balance sheet. The pendency of Aetna's $100 million claim against Coram posed an additional, very substantial barrier to a potential investment.

A further problem, according to Christina Morrison of DBAB, was that the availability of capital for non-Internet service companies, and for healthcare companies in particular, was relatively scarce in the first half of 2000. Yet another problem was that Coram's stock was held primarily by individual shareholders; few, if any, institutional investors owned significant blocks of Coram stock. The absence of substantial institutional ownership was an impediment to raising capital through either a rights offering or a public offering.

In the circumstances, the board's decision not to incur the expense of retaining a financial advisor to pursue potential financings was reasonable. Nonetheless, prior to authorizing the bankruptcy filing Coram obtained advice from DBAB (gratis) that there was no way to raise sufficient capital to satisfy Stark II and that, accordingly, bankruptcy was unavoidable. Christina Morrison of DBAB addressed the board on July 31, 2000 on a variety of capital-raising alternatives, including a follow-on offering, a rights offering, a strategic investment by a third party and a leveraged buyout. She concluded that none of these options was a viable means of raising the substantial capital that Coram needed to avoid bankruptcy. As Morrison explained, her conclusion on this point was "not a close call."

### iii.  The allegedly improper CPS sale

The Complaint alleges that by deciding to sell CPS for $41.3 million Crowley favored the short-term interests of the Noteholders; the price was allegedly "far below the value estimated by Coram's investment banker, Deutsche Banc Alex. Brown." It maintains that he

-104-

compounded the error by using the sale proceeds to pay down the outstanding balance of the senior revolver and a portion of the Series A Notes. (Compl. ¶ 34) The allegation is unfounded.

For a starter, it is misleading at best to suggest that DBAB had "estimated" CPS' value to be far greater than the eventual sale price. The sole basis for that assertion appears to be an informal discussion between Coram and DBAB in the Summer of 1999, before DBAB was formally retained, before it had been given any meaningful financial information about CPS (other than its gross revenues) and before it had done any financial analysis. In that preliminary meeting DBAB said CPS might yield as much as $100 million, were it valued on the basis of a multiple of gross revenues. A valuation based solely on gross revenues generally has limited utility as a measure of actual value; it appears to have been mentioned by DBAB at the time only because, at that early stage, it had no other financial information about the company. DBAB's preliminary observations, therefore, have little or no bearing on the ultimate valuation of CPS.

When judged from the dual perspective of process and price, the CPS sale appears to have been entirely proper. The sale was the result of a lengthy and competitive bidding process, in which DBAB contacted 45 prospects; 24 were sent confidentiality agreements; 16 returned those agreements and were sent the Offering Memorandum; eight submitted non-binding bids and were given the opportunity to undertake due diligence; four actually did so; and two provided written offers. At the conclusion of that process GTCR emerged as the highest bidder by a substantial margin. The next highest bidder, CVS, offered only $34.5 million, 10% of which was subject to a holdback; Crowley rejected that offer and instructed DBAB to hold out for at least $40 million in cash. There is no reason to believe that the sale process -- which was conducted by DBAB, a respected and independent investment bank, with the assistance of the

-105-

law firm Reed Smith Shaw & McClay -- was conducted in anything other than a professional, thorough and arms-length fashion.

The board approved the sale unanimously . In doing so, it relied (among other things) on DBAB's opinion that the sale was fair from a financial perspective. In rendering its fairness opinion, DBAB used the three standard methods of valuation: (i) comparable public company market analysis; (ii) comparable company transaction analysis; and (iii) discounted cash flow analysis. The first method yielded valuations that ranged from $9.7 million to $145 million, the second yielded valuations that ranged from $13.4 million to $61.7 million and the third yielded valuations that ranged from $24.6 million to $53.6 million. The price that Coram obtained ultimately -- $41.3 million in cash -- was within this range of values.

iv.    The challenged July 2000 payments to the Noteholders

The Committee alleges that to further the Noteholders' interests Crowley "made strategic decisions designed to provide cash to reduce debt at the expense of future cash flow and without regard to the injury thereby caused to Coram." (Compl. ¶ 32) In that regard, it refers to several debt payments Crowley made in July 2000. First, it questions Crowley's decision to make a $6.3 million cash interest payment to the Noteholders, claiming that Coram was "seriously short of cash" and should have exercised its right to make the payment "in kind." It also questions Crowley's decision to use the entire $38 million in proceeds from the sale of CPS to pay down the balance of the revolver ($28.5 million) and part of the principal on the Series A Notes ($9.5 million), claiming that as a matter of "prudent business practice" Coram should have "attempt[ed] to negotiate the amount of this payment." (Id. ¶¶ 33-34)

-106-

Crowley's decision to make the $6.3 million interest payment in cash, rather than in kind, on the eve of Coram's bankruptcy filing raises troubling questions. (By contrast, Coram had no alternative but to use the CPS sale proceeds to pay down the revolver in full and to partially pay down the Series A Notes.) Given Crowley's financial ties to Cerberus, query whose benefit the cash interest payment was intended to promote. Moreover, the payment reduced Coram's cash to a dangerously low level at a time when the company could not count on additional cash coming in. The CPS sale had not yet closed and, indeed, was not even assured of taking place. Immediately following the interest payment, Coram had $7,472,429 in cash — barely enough to cover its weekly cash needs. One week later, cash had dwindled to only $5,481,008. Allowing cash to decline to a level below what the company might need to pay its bills, by making a cash payment that could have been avoided, is difficult to justify.

However, Coram suffered no damages as a result of the interest payment. The CPS sale closed shortly after the payment was made, bringing a sizeable amount of cash into the company and eliminating the need to spend cash on inventory for CPS. Moreover, when viewed from a bankruptcy perspective, the July 2000 debt payments (all of which were made by Coram, Inc., not Coram Healthcare) did not unwarrantedly benefit the Noteholders at the expense of any other constituencies. The Plan of Reorganization proposed to pay general unsecured creditors of Coram, Inc. in full. Consequently, these payments did not have the effect of improving the Noteholders' position vis-à-vis other creditors.

As for the shareholders, they would have been treated no differently in bankruptcy had these payments not been made or had they been made "in kind" rather than in cash. In either case, the net result would have been to increase Coram's outstanding debt, leaving its margin of insolvency unchanged. The payments, thus, had no meaningful impact on

-107-

Coram's solvency from the standpoint of its balance sheet and did not place the shareholders in any worse position.

Arguably, Coram might have gained leverage in its negotiations with the Noteholders had it withheld the $6.3 million cash interest payment. Had Coram withheld that cash payment, the Noteholders would have faced the risk that these monies might be dissipated during the course of the bankruptcy proceeding, a risk they might have been willing to avoid by making concessions for the benefit of the shareholders. Debtors often employ such tactics, particularly when a priority of a debtor's management is to defend shareholder, as distinct from creditor, interests. The argument, therefore, is that Crowley's ties to Cerberus caused him to prioritize the creditors' interests ahead of those of the shareholders and to avoid unduly pressuring the Noteholders during pre-filing negotiations.

On the other hand, Crowley had justification for the alternative he chose. Chanin's valuation and Goldin's independent analysis both confirm that Coram was insolvent by a substantial margin. Accordingly, the shareholders had no entitlement to any distribution under a plan of reorganization; any bargaining leverage Coram might have obtained by withholding the interest payment would have been in furtherance of an outcome not legally or financially warranted. Crowley cannot be held liable for any "damages" Coram's shareholders might arguably have suffered as a result of his failure to employ bargaining tactics of this sort.

v.    <u>The allegation that Coram delayed filing as long as possible</u>

The Committee alleges that Crowley and Feinberg, with the assistance of Coram's bankruptcy counsel, "decided to delay any bankruptcy filing as long as possible in the year

-108-

KL2:2108873.7

2000" in order to create an artificial Stark II "emergency," so Coram would have to emerge from Chapter 11 as a private company before year-end. The allegation appears to lack support.

Had Crowley's and Feinberg's objective been to contrive to wipe out the equity, that goal would have been best served by filing sooner, rather than later. In 1999 Coram had EBITDA of only $307,000 and suffered a $114,823,000 net loss. Clearly, any valuation that rests principally on Coram's 1999, rather than 2000, performance yields a value much further below the amount of Coram's debt. Consequently, deliberate delays in filing for bankruptcy would have increased the chances that improved performance in 2000 would result in a higher valuation, possibly one that would yield value for the equity.

In any event, no evidence has emerged that Crowley or anyone else deliberately delayed the bankruptcy filing in an attempt to prejudice Coram's shareholders. Rather, the timing of the decision was driven by a number of objective factors.[30]

---

[30]    Had Coram been able to raise sufficient equity to satisfy the public company exception to Stark II it might have been able to avoid a bankruptcy filing. Although that prospect became increasingly remote, in the spring of 2000 a few avenues remained open. CPS was still on the market; the Aetna litigation was still pending; and Coram was involved in a litigation against PricewaterhouseCoopers arising out of the Caremark acquisition. Had Coram achieved favorable resolutions of these lawsuits and a high price for CPS, it could conceivably have obtained sufficient equity to satisfy the exception. It was not until the end of April -- when both lawsuits were settled on terms less favorable than had been hoped for and Coram had accepted GTCR's bid for CPS -- that all three avenues were finally closed off.

In April Coram hired Chanin to prepare a valuation of the company, a necessary step prior to filing the petition. From that point on it appears that any "delay" in filing the petition was attributable to the fact that Chanin did not complete its valuation until July 31. Chanin's delay, in turn, appears to be attributable to the fact that when it was retained Coram was not close to having finalized a business plan, much less the projections that Chanin needed to do its work.

-109-

KL2:2108873.7

Even could the Committee prove that Crowley improperly delayed Coram's bankruptcy filing, Coram does not appear to have suffered damage as a result. There is no reason to believe that the deterioration in the company's performance beginning in mid-2000 was in any way attributable to Coram's failure to file earlier in the year. Arguably, an earlier filing would have precipitated an earlier decline in performance.

### 2. The Asserted Causes of Action

Based on the foregoing allegations, the Complaint asserts claims against Crowley and Feinberg for breach of fiduciary duty and fraudulent misrepresentation. (Counts I and IV) The Complaint also asserts three claims against Cerberus, alleging that (i) it is liable as principal for the alleged misconduct of Crowley, its agent; (ii) it aided and abetted Crowley's alleged breaches of fiduciary duty by knowingly inducing those breaches; and (iii) it owed and breached fiduciary duties of its own by virtue of its supposed *de facto* control over Coram's affairs. (Counts II, III and V) We address these in turn below.

#### a. Crowley and Feinberg

Goldin believes that Crowley and Feinberg's actions amounted to a breach of fiduciary duty, but the scope of, and remedies for, the breach are far more limited than the Equity Committee asserts. Crowley and Feinberg breached their fiduciary duties to Coram by failing to disclose the full extent of the Crowley/Cerberus relationship to Coram's other directors and officers. As the Bankruptcy Court has found, Crowley's employment agreement with Cerberus constituted an "actual conflict of interest" and the non-disclosure of that agreement "tainted the debtors' restructuring of its debt, the debtors' negotiations towards the plan [and] even the debtors' restructuring of its operations." (Tr. of Dec. 21, 2000 hearing at 88-89) Nonetheless, as noted, Crowley does not appear to have mismanaged Coram for the benefit of the Noteholders.

-110-

KL3-2108873.7

**A858**

Consequently, the undisclosed conflict caused Coram no actual harm, other than the relatively limited damages resulting from the Bankruptcy Court's inability to confirm the Debtors' Plan of Reorganization.

The Equity Committee has suggested that, under Delaware law (which governs its claims), punitive damages are potentially available as a remedy. (Motion for Leave to File Adversary Proceeding, dated Feb. 6, 2001, at ¶ 4) Our research has disclosed no support for this proposition. To our knowledge, no reported decision applying Delaware law has ever awarded punitive damages (or even suggested that such damages may be appropriate) for breaches of duty in the corporate context.[31]

To be sure, as the Committee notes, Delaware courts frequently characterize the remedies available for breaches of the duty of loyalty as "expansive," *Cede & Co. v. Technicolor*, 542 A.2d 1182, 1187 (Del. 1988), and as involving "[t]he strict imposition of penalties . . . designed to discourage disloyalty," *Bomarko v. Int'l Telecharge, Inc.*, 1999 WL 1022083, at *21 (Del. Ch. Nov. 16, 1999). However, as the Delaware Supreme Court recently observed, statements of this sort

---

[31]    A jury in Indiana did in one case award punitive damages for perceived breaches of fiduciary duty committed by majority shareholders of a Delaware corporation. *See Nagy v. Riblet Products Corp.*, 79 F.3d 572 (7th Cir. 1996) However, the district court had charged the jury under Indiana, not Delaware, law on all issues. *See id.* at 576 On appeal, the Seventh Circuit held the breach of duty claim was governed by Delaware law and certified to the Delaware Supreme Court the question whether defendants' fiduciary duties were even implicated, given that the suit arose under an employment agreement. *Id.* at 577-78 The Delaware Supreme Court answered the certified question in the negative, holding that "[t]his is not a case of breach of fiduciary duty," but, rather, "a case governed by an employment contract." *Riblet Products Corp. v. Nagy*, 683 A.2d 37, 40 (Del. 1996) In light of its ruling, the Delaware Supreme Court did not address the availability *vel non* of punitive damages. *Id.* at 40 n.6

-111-

> stand for nothing more than the proposition that the imposition of
> damages should eliminate the possibility of profit flowing to
> defendants from the breach of the fiduciary relationship.

*Int'l Telecharge, Inc. v. Bomarko*, Inc., 766 A.2d 437, 441 (Del. 2000). While many Delaware

cases recognize the propriety of disgorgement as an alternative to compensatory damages, *e.g.*,

*Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996) (ordering disgorgement, despite a lack

of harm to the corporation, on the ground that "a fiduciary [should] not profit personally from his

conduct"), not one of those cases suggests the availability of a monetary remedy that is punitive

in nature, i.e., that is, that goes beyond the twin goals of disgorgement and compensation of loss.

    A recent Chancery Court decision, *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL

536911, at *3 (Del. Ch. May 11, 2001), illustrates the Delaware courts' unwillingness to award

punitive damages, even for serious breaches of duty. There, the court repeatedly characterized

the defendants' breaches of their duty of loyalty as "egregious." *Id.* at *1, 3  In addition, with the

defendants' conduct having harmed plaintiff "in several identifiable, but inherently

unmeasurable, ways," the court found that even an award of compensatory damages "will not

make the plaintiff completely whole." *Id.* at 3  Nonetheless, the court declined to award

damages beyond the amount of plaintiff's attorneys' fees and expenses, observing that any

greater award "could fairly be deemed tantamount to awarding punitive damages." *Id.*; *see also*

*id.* (noting "the peril of over-harshly punishing the defendants").

    Under Delaware law, therefore, only two kinds of remedies are potentially

available in a suit against Crowley and Feinberg.  A court might order disgorgement of an

appropriate portion of Crowley's compensation or, more precisely, a reduction of the

approximately $13.4 million owed under his employment agreement.  In addition, Crowley and

Feinberg might be held liable for Coram's actual damages, which appear to be limited to the

-112-

KL2:2108573.7

losses related to the Debtors' inability to obtain confirmation of their Plan of Reorganization. These losses fall into two categories:

1.    The non-disclosure of Crowley's conflict of interest has caused or will cause Coram to have to pay approximately $5 million to $6 million more in fees and expenses to bankruptcy professionals than it otherwise would have paid.  The bulk of these additional fees and expenses -- about $4 million to $5 million -- are those that have been incurred since the December 21, 2000 conclusion of the confirmation hearing by the various counsel and financial advisors to the Debtors and the two official committees, as well as by Goldin and its counsel, as a result of the inability to conclude the bankruptcy.  In addition, the non-disclosure of Crowley's conflict of interest caused the December 2000 confirmation hearing and related discovery to be significantly more protracted and costly than would otherwise have been the case and will cause Coram to have to bear the expense of a second confirmation hearing later this year.  While any estimate of the magnitude of these additional expenses (the incremental cost of the December 2000 hearing and the total cost of the future confirmation hearing) is necessarily imprecise, Goldin estimates them to be at least $1 million.

2.    Independent of the professional fees, the approximately ten-month delay in concluding this bankruptcy will cause Coram business losses with an estimated present value of between $7 million and $9 million.  Assuming that an earlier emergence from chapter 11 would have resulted in an earlier realization of (i) higher revenues and (ii) correspondingly higher EBITDA, Goldin estimates that the ten-month delay in confirmation of Coram's plan of reorganization will cause the company's EBITDA in the years 2001 through 2004 to be approximately $4 million to $5 million lower, in the aggregate, than it would have been had the Plan been confirmed last December.  Using the discounted cash flow assumptions discussed in

-113-

KL2:2108871.7

A861

Section IV above (including an 18.1% discount rate and a 7.01 exit multiplier), the effect is to reduce Coram's enterprise value by approximately $8 million. Changes in the assumptions used would, of course, change the amount of the estimated loss.

### b.   Cerberus

Goldin believes that the three claims the Equity Committee asserts against Cerberus are unlikely to prevail. As discussed in Section V.A.1 above, the evidence suggests that Feinberg did not intend for or expect Crowley to disregard his fiduciary duties to Coram. Because of the apparent lack of wrongful intent on Feinberg's part, the Equity Committee is unlikely to be able to prove that Crowley was acting *at Coram* as Cerberus' "agent" (Count II) or that Cerberus *knowingly* induced Crowley to breach his fiduciary duties (Count III) or that Cerberus exercised *de facto* control over Coram's affairs (Count V).[32]

### B.   The Equity Committee's Objections to Confirmation

The Equity Committee objected to confirmation of the Debtors' Plan of Reorganization on three principal grounds: (i) the Plan did not satisfy the "fair and equitable" requirement of Bankruptcy Code § 1129(b) because the value of the distributions to be made to the Noteholders supposedly exceeded the amount of their claims; (ii) the Plan did not satisfy the requirement of Code § 1129(a)(3) that it be "proposed in good faith and not by means forbidden

---

[32]     It is possible that Cerberus might be held liable for Feinberg's breaches of fiduciary duty on an alternative ground, which the Equity Committee has not yet asserted, *i.e.*, that Cerberus is liable as principal for the breaches of Feinberg, its agent. Feinberg served on Coram's board in his capacity as agent for Cerberus, which (along with the two other Noteholders) designated him as board representative pursuant to the loan documents. Nonetheless, the limits on recoverable damages under Delaware law, discussed above, would apply to claims against Cerberus as much as to those against Feinberg.

-114-

by law"; and (iii) Cerberus' claim, which the Plan presumed to be valid, should be recharacterized as equity.[33] We address these objections in turn below.

### 1.    The "Fair and Equitable" Requirement

As discussed in Section IV above, we believe the Equity Committee's first objection to the Plan was unfounded at the time of the confirmation hearing and is still unfounded. Goldin's valuation indicates that, far from having an enterprise value in excess of its approximately $290 million of debt (at the time of the confirmation hearing), Coram's enterprise value was approximately $198 million in December 2000 and is approximately $240 million today.

### 2.    The "Good Faith" Requirement

Given the record before it at the confirmation hearing, the Bankruptcy Court was unable to find that the Debtors had proposed the Plan in good faith as required by Bankruptcy Code § 1129(a)(3). (Dec. 21, 2000 Tr. at 87) The Court found that the contractual relationship between Cerberus and Crowley gave rise to an "actual conflict of interest" on Crowley's part, which "tainted the debtors' restructuring of its debt, the debtors' negotiations towards a plan, [and] even the debtors' restructuring of its operations." (*Id.* at 88-89) As a result, the Court concluded, it was impossible to know whether "we would be in the same boat today or whether a

---

[33]    The Equity Committee also objected to the Plan's releases of direct shareholder claims against Crowley, Feinberg and others, contending that these releases are improper as a matter of law. The objection is well-founded. Under the standards articulated by the Third Circuit in *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000), non-consensual releases of direct shareholder claims are clearly impermissible in the circumstances of this case. By contrast, the Plan's releases of claims held by the Debtors' estates are permissible, provided the Plan amendments recommended in Section II above are implemented.

different plan would have been proposed by the debtor" had Crowley not suffered from an undisclosed conflict of interest. (*Id.* at 65)

The central focus of Goldin's investigation has been to address the question raised by the Court: whether, absent Crowley's undisclosed conflict of interest, Coram would be "in the same boat today" or, instead, would be in a financial position strong enough to entitle its equity holders to share in distributions under its Plan of Reorganization. As the Court observed, that question is inherently speculative and can never be answered with certainty. Nonetheless, Goldin's investigation -- which has included extensive review of Coram's financial records and other documents, interviews of more than 35 present and former representatives of Coram and its creditors, and comprehensive financial analysis -- has unearthed no evidence that Coram's financial position would be materially stronger today had the Crowley conflict been disclosed at the outset.

No evidence suggests that timely disclosure of the conflict would have resulted in more effective management of Coram's operations, in improved financial performance or in the identification (let alone consummation) of a possible merger, sale or financing transaction that might have enabled Coram to avoid bankruptcy. Nor is there any evidence that Coram's financial records, or its accounting or financial management systems, have been malevolently manipulated in any way, much less in a way that might alter the conclusion that the enterprise value of Coram is now, and has at all pertinent times been, substantially below the amount of its debt.

Goldin believes that at a confirmation hearing on an amended Plan of Reorganization (particularly one that incorporates a settlement along the lines discussed in

-116-

Section II above) the Court will be in a position to find that the amended Plan has been proposed in good faith. At the initial confirmation hearing the record on good faith was deficient, in part because evidence of Crowley's conflict of interest had surfaced only weeks before, leaving the parties and the Court with only a limited ability to investigate and determine what effect, if any, the conflict had had on Coram's management. Based on its extensive investigation, Goldin believes that the Court can have confidence that the possibility of mismanagement has been probed adequately.

In Goldin's view, therefore, the Court can fairly conclude that the Debtors' amended Plan satisfies the good faith requirement of Code §1129(a)(3). Given the Debtors' undeniable need to restructure their debts in order to satisfy the requirements of Stark II, there is little question that the Plan "will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Madison Hotel Associates,* 749 F.2d 410, 425 (7th Cir. 1984); *see also, e.g., In re Zenith Electronics Corp.,* 241 B.R. 92, 108 (Bankr. D. Del. 1999) (Walrath, J.) (plan satisfied the good faith requirement where it was "proposed with the legitimate purpose of restructuring [the debtors'] finances to permit it to reorganize successfully").

3.    The Validity of Cerberus' Claim

The Plan is predicated on the assumption that the claims of Cerberus and the other Noteholders are valid. *Compare* Plan § 2.13 (defining "Allowed Coram Note Claims" to mean "the Coram Note Claims") *with* Plan § 2.11 (defining "Allowed Coram General Unsecured Claim" to mean "a Coram General Unsecured Claim, to the extent it is or has become an Allowed Claim"). Consequently, were Cerberus' claim disallowed or subordinated in whole or in part, and were the Plan not amended to modify Cerberus' treatment accordingly, the "fair and

-117-

equitable" requirement of Code §1129(b) would not be satisfied. *See generally* 7 Lawrence P. King, *Collier on Bankruptcy* ¶ 1129.04[4][a][ii] ("fair and equitable" standard requires that "no creditor . . . be paid a 'premium' over the allowed amount of its claim") (15th ed, rev. 1997).

The Equity Committee contends that Cerberus is guilty of inequitable conduct and that its claim should, therefore, be "recharacterized as equity." Objections to Confirmation, dated November 21, 2000, at ¶ 37 (quoting *Zenith Electronics*, 241 B.R. at 107) This assertion is unfounded. There is no legal basis for recharacterizing Cerberus' debt as equity.[34] Nor does any basis exist for "equitable disallowance" of Cerberus' claim (the doctrine the Equity Committee appears to intend to invoke). Even were Cerberus to be held responsible for Feinberg's breach of duty -- and it is uncertain whether such a result would be warranted -- the maximum appropriate remedy would be a reduction of the amount of Cerberus' claim to the extent necessary to compensate creditors for the damages caused by the non-disclosure of Crowley's conflict of interest.

Prior to the enactment of the Bankruptcy Code, the power of bankruptcy courts to "equitably disallow" a claim in appropriate circumstances, when subordination would not be a

---

[34] The doctrine of recharacterization of debt as equity rests not on facts of the sort alleged here -- misconduct by a creditor -- but, instead, on facts indicating that the debt *ab initio* was more akin to an equity contribution than to a debt. "Where a loan has the substance and character of an equity contribution, the court may recharacterize the debt as equity regardless of whether the requirements of equitable subordination have been satisfied." *In re Kids Creek Partners, L.P.*, 200 B.R. 996, 1019 (Bankr. N.D. Ill. 1996). "[T]the primary factor this Court is to consider when evaluating whether funds advanced by a shareholder are the result of an equity contribution or a loan is whether the transaction bears the earmarks of an arm's length negotiation." *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) (citing *Pepper v. Litton*). The Equity Committee has not alleged that Cerberus' debt was in fact an equity contribution *ab initio*, or even that Cerberus engaged in collusive or inequitable behavior in the *acquisition* of the debt.

KL2:2108873.7

sufficient equitable remedy, was well established. *See Pepper v. Litton*, 308 U.S. 295 (1939).
(Douglas, J.) (affirming the bankruptcy court's power to subordinate *or* disallow the claim of a
fiduciary who had committed gross misconduct in connection with the acquisition of the claim).
The language of Bankruptcy Code § 510(c), which expressly codifies the Bankruptcy Court's
equitable subordination power but is silent as to disallowance, could be read to suggest that
Congress intended to nullify the courts' equitable disallowance power. However, the legislative
history makes clear that Congress intended no such result:

> This section is intended to codify case law, such as *Pepper v.
> Litton*, 308 U.S. 295 (1939), . . . and is not intended to limit the
> court's power in any way. The bankruptcy court will remain a
> court of equity . . . . Nor does this subsection preclude a
> bankruptcy court from completely disallowing a claim in
> appropriate circumstances. *See Pepper v. Litton, supra*

H. Rep. No. 95-595, 95th Cong., 1st Sess. 359 (1977).

Since the Code's enactment, few, if any, courts have had occasion to apply the
doctrine of equitable disallowance (perhaps not surprisingly, given that complete subordination
of a claim has the same effect as disallowance, except in cases where the debtor is solvent).
Nonetheless, the courts that have addressed the issue in *dicta* have overwhelmingly recognized
the continuing viability of the equitable disallowance doctrine. *See, e.g., HBE Leasing v. Frank*,
48 F.3d 623, 634 (2d Cir. 1995); *Koch Refining v. Farmers Union Cent. Exch.*, 831 F.2d 1339,
1350-51 (7th Cir. 1987); *Murgillo v. Cal. State Bd. of Equalization*, 176 B.R. 524, 531 (9th Cir.
BAP 1995); *In re Outdoor Sports Headquarters*, 168 B.R. 177 (Bankr. S.D. Ohio 1994); *but see
In re Foundation for New Era Philanthropy*, 201 B.R. 382, n. 13 (Bankr. E.D. Pa. 1996)
(questioning the availability of equitable disallowance after enactment of Code § 510(c)). The
Third Circuit has noted, but not decided, this issue. *See Citicorp Venture Capital, Ltd. v.*

-119-

KL2:2108573.7

**A867**

*Committee of Creditors*, 160 F.3d 982, 991 n.7 (3d Cir. 1998) ("The rationale of *Pepper* would suggest that, under pre-Code law, a bankruptcy court was authorized to disallow a portion of the fiduciary's claim when that would produce an equitable result. We find it unnecessary here to resolve the issue as to whether equitable 'disallowance' remains an available remedy").

Because equitable disallowance rests on the same principles as equitable subordination, *see Pepper v. Litton*, 308 U.S. at 306-12, the two doctrines are subject to the same equitable limitations. The Third Circuit recently delineated those limitations in *Citicorp Venture Capital*. There, the bankruptcy court equitably subordinated debt claims that CVC, a fiduciary of the debtor, had secretly purchased at a discount in an attempt to gain control of the debtor. The Court of Appeals held that it was appropriate to equitably subordinate CVC's claims to the extent of depriving CVC of any profit on its purchases, but that subordination beyond that extent would only be appropriate if the relief was proportional to the injuries suffered by those who would benefit:

> [W]e do not suggest that a bankruptcy court can never impose a subordination remedy beyond disgorgement of profit without putting a specific price tag on the loss suffered by those who will benefit from the subordination. Such quantification may not always be feasible and, where that is the case, it should not redound to the benefit of the wrongdoer. A bankruptcy court should, however, attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination.

160 F.3d at 991

In the present case, Cerberus has reaped no improper gains by virtue of Feinberg's alleged misconduct. Disgorgement, therefore, is not a proper remedy. At most, equitable

A868

subordination -- if warranted, which is questionable[35] -- would be appropriate to a limited extent, proportional to the losses Coram has suffered as a result of the nondisclosure of Crowley's conflict of interest. Under the controlling *Citicorp Venture Capital* decision, no greater remedy -- and certainly not the drastic remedy of disallowing Cerberus' claim -- would be permitted.

---

[35] It is uncertain whether Cerberus will be found to be an "insider" for equitable subordination purposes. It is widely recognized that a lender will not be treated as an insider unless it exerts virtually complete control over the borrower. *See In re Paolella,* 161 B.R. 107, 118 (E.D. Pa. 1993) (collecting cases). A lender's exercise of contractual rights under its loan documents is not by itself sufficient to confer insider status. *See id.* at 120 ("Our attention has not been called to any case wherein a court has equitably subordinated the claims of a non-insider who adhered to the terms of a loan agreement."). Moreover, while Feinberg himself was an insider by virtue of his board seat, *see* Bankruptcy Code § 101(31)(B)(i), that fact alone may be insufficient to confer insider status on Cerberus, given that over 90% of the financial interests in Cerberus Partners, L.P. (the record owner), as well as in the other Cerberus funds that hold participations in the Coram debt, is held by investors unaffiliated with Feinberg.

Were Cerberus not deemed to be an insider, equitable subordination of its claim would be warranted only were it found to have engaged in "gross or egregious misconduct tantamount to fraud, overreaching or spoliation," *In re Paolella,* 161 B.R. at 122, conduct clearly not present here.

-121-

KL2:2103873.7

\* \* \*

The above constitutes the Updated Report of the Independent Restructuring

Advisor. The attached Exhibits are incorporated herein and should be treated as part of the

Updated Report.

Dated:     New York, New York
           September 4, 2001

                                        /s/
                                        _____
                                        Harrison J. Goldin
                                        GOLDIN ASSOCIATES, L.L.C.
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        (212) 593-2255


Of counsel:

KRAMER LEVIN NAFTALIS & FRANKEL LLP

          /s/
_____
By:     Kenneth H. Eckstein
        Philip Bentley
        Marjorie Sheldon
919 Third Avenue
New York, New York 10022
(212) 715-9100


KL2:2108873.7

-122-


A870