# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARLIN M. ADAMS, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of CORAM HEALTHCARE CORPORATION, a Delaware Corporation, and of CORAM, INC., a Delaware Corporation, <br><br> Plaintiff, <br><br> v. <br><br> DANIEL D. CROWLEY, DONALD J. AMARAL, WILLIAM J. CASEY, L. PETER SMITH, AND SANDRA L. SOMELY, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 04-1565 |

---

## APPENDIX OF DOCUMENTS IN SUPPORT OF
## DEFENDANT DANIEL D. CROWLEY'S OPENING BRIEF
## IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT (PART 3)

Jeffrey C. Wisler (No. 2795)
Christina M. Thompson (No. 3976)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
(302) 658-9141

-and-

Elliot R. Peters
R. James Slaughter
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(415) 391-5400

Dated: April 17, 2007                    *Attorneys for Daniel D. Crowley*

## TABLE OF CONTENTS

| Document Description | Page |
|---|---|
| Email dated 3/6/03 from Kipnes to Crowley | A981 |
| Expert Report of Jerome J. Shestack, Esquire dated 9/8/03 | A983 |
| Letter dated 10/28/03 from Barkasy to Schepacarter | A1019 |
| Chapter 11 Trustee's Post-Confirmation Hearing Brief filed 5/27/04 | A1027 |
| Chapter 11 Trustee's Post-Confirmation Hearing Reply Brief filed 6/14/04 | A1083 |
| Order Confirming the Chapter 11 Trustee's Second Amended Joint Plan of Reorganization entered 10/27/04 | A1105 |
| Request of Daniel Crowley for Payment of Administrative Expenses filed 12/30/04 | A1130 |
| Settlement Agreement with Outside Directors dated 4/6/06 | A1138 |
| Excerpts of transcript of Bankruptcy Court hearing dated 12/1/00 | A1148 |
| Excerpts of transcript of deposition of Donald Amaral taken 12/8/00 | A1152 |
| Excerpts of transcript of Bankruptcy Court hearing dated 12/15/00 | A1161 |
| Excerpts of transcript of deposition of Donald Amaral taken 12/20/00 | A1167 |
| Excerpts of transcript of deposition of L. Peter Smith taken 9/24/01 | A1171 |
| Excerpts of transcript of deposition of William Casey taken 9/28/01 | A1175 |
| Excerpts of transcript of deposition of Sandra Smoley taken 9/29/01 | A1182 |
| Excerpts of transcript of deposition of Harrison J. Goldin taken 10/4/01 | A1190 |
| Excerpts of transcript of deposition of Daniel Crowley taken 10/25/01 | A1194 |
| Excerpts of transcript of deposition of Donald Amaral taken 10/26/01 | A1200 |
| Excerpts of transcript of Bankruptcy Court hearing dated 11/7/01 | A1206 |
| Excerpts of transcript of Bankruptcy Court hearing dated 12/13/01 | A1219 |

| **Document Description** | **Page** |
|---|---|
| Excerpts of transcript of deposition of Arlin Adams taken 2/25/03 | A1223 |
| Excerpts of transcript of Bankruptcy Court hearing dated 3/3/03 | A1228 |
| Excerpts of transcript of deposition of Jerome J. Shestack taken 11/14/03 | A1235 |
| Excerpts of transcript of deposition of Arlin Adams taken 1/21/04 | A1239.01 |
| Excerpts of transcript of Bankruptcy Court hearing dated 1/22/04 | A1240 |
| Excerpts of transcript of deposition of Donald Amaral taken 8/30/06 | A1244 |
| Excerpts of transcript of deposition of Sandra Smoley taken 8/31/06 | A1251 |
| Excerpts of transcript of deposition of Stephen Feinberg taken 2/14/07 | A1255 |
| Excerpts of transcript of deposition of Will K. Weinstein taken 3/2/07 | A1262 |
| Excerpts of transcript of deposition of  Donald Liebentritt taken 3/14/07 | A1270 |
| Excerpts of transcript of deposition of David Friedman taken 3/16/07 | A1280 |
| Excerpts of transcript of deposition of Richard Levy taken 3/22/07 | A1309 |
| Excerpts of transcript of deposition of Christina Morrison taken 3/26/07 | A1324 |
| Excerpts of transcript of deposition of Arlin Adams taken 3/27/07 (Volume 1) | A1345 |
| Excerpts of transcript of deposition of Harrison J. Goldin taken 3/21/07 | A1365 |
| Excerpts of transcript of deposition of Arlin Adams taken 3/28/07  (Volume 2) | A1371 |
| Excerpts of transcript of deposition of Allen Marabito taken 4/5/07 | A1382 |
| Excerpts of transcript of deposition of Daniel D. Crowley taken 4/6/07 | A1387 |
| Excerpts of transcript of deposition of Scott Danitz taken 4/6/07 | A1404 |

FW: A few thoughts                                                        Page 1 of 2

**Crowley, Dan**

**From:**    Crowley, Dan
**Sent:**    Friday, March 07, 2003 11:15 AM
**To:**      'Scott Schreiber'
**Subject:** FW: A few thoughts


Dan

-----Original Message-----
**From:** Kipnes, Will [mailto:WKipnes@schnader.com]
**Sent:** Thursday, March 06, 2003 2:56 PM
**To:** Crowley, Dan
**Subject:** RE: A few thoughts

Dear Dan:

I appreciate the sentiment very much. We did the very best we could. I was shocked and disappointed at the ruling; I still don't understand the legal underpinnings. Not wishing to be deposed by Mr. Levy, I think it best to leave it that.

I wish you all the best. I know you won't be down for long.

Will

-----Original Message-----
**From:** Crowley, Dan [mailto:dcrowley@coramhc.com]
**Sent:** Thursday, March 06, 2003 5:40 PM
**To:** 'aadams@schnader.com'; 'bbressler@schnader.com'; 'wkipnes@schnader.com'
**Cc:** 'Scott Schreiber'
**Subject:** FW: A few thoughts
**Importance:** High

Dear Judge Adams, Mr. Bressler, and Mr. Kipnes,

First, I want to personally thank you for the professional, thoughtful, and sincere manner in which you approached the Coram situation and the Motion(s) that related to "me". I am most sad about the outcome because I dearly wished to see the process through and be on the other side "leading Coram". You will always have my deepest respect and admiration for the way you handled everything. So, first and always............thank you.

Secondly, I want you to rely upon the fact that it is my intention to depart Coram in the most respectful, professional and positive manner. Simply said, I earnestly wish every good thing for Coram, its mission, its wonderful people, and the important work that remains for you in your efforts to help Coram emerge from Chapter 11 fairly.

I have received several notes like the one below.

Dan Crowley

EXHIBIT
Adams 7
CW 3/27/07

3/7/2003

CROWLEYKVN 014210

A981

-----Original Message-----
**From:** Maxson, Ben
**Sent:** Thursday, March 06, 2003 10:59 AM
**To:** Crowley, Dan
**Subject:** A few thoughts


Dear Mr. Crowley,

I am sure I was not the only one dissapointed by todays news!  I came to Coram, not only because of

the outstanding reputation it had in the Infusion Industry, but because I saw the hard work and dedication each

person had that worked for the company. People don't put in long hours and weekends, unless they

really believe in something.  After working here for over a year, I learned what each manager believed in, IT WAS YOU!

You have the talent to inspire people, I could see it not only through my boss, Debbie Meyer, but through your

Senior Management Team, which someday, I aspired to be a part of!

Companies are made up of people. An employee, is only as strong as the person above them, which put

a lot of responsability on you. No matter how we spin this, this company will not be the same without you!

Please take my heart felt thanks for giving me a job when I needed it most, thank you for believing in me(when I

was on the road, I kept saying "I can't let people down!) and for giving me the opportunity to work with, and for you!

I truly hope I may have the opportunity to work for you again someday.  With deepest appreciation!

Warm Regards,  Ben Maxson

3/7/2003

CROWLEYKVN 014211

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| CORAM HEALTHCARE CORP. and | ) Case Nos. 00-3299 (MFW) |
| CORAM, INC., | ) through 00-3300 (MFW) |
| | ) |
| Debtors. | ) Jointly Administered Under |
| | ) Case No. 00-3299 (MFW) |

## EXPERT REPORT OF JEROME J. SHESTACK, ESQUIRE

Dated:  September 8, 2003



EXHIBIT

DSCH:77013.1/COR202-213272

CH-11 TRUSTEE/
CrowleyAdmin006511

I.    Scope of Engagement

I have been retained as a testifying expert by the Chapter 11 Trustee of the Debtors, Arlin M. Adams, in order to ascertain whether the proposed settlement of Coram Healthcare Corporation's and Coram Inc.'s (collectively "Coram") potential claims against Cerberus Partners L.P. ("Cerberus"), Goldman Sachs Credit Partners L.P. ("Goldman Sachs"), Foothill Capital Corp. ("Foothill") (collectively the "Noteholders") and Stephen Feinberg ("Feinberg"), the CEO of Cerberus, is within the range of reasonable settlements.

II.    The Proposed Settlement

The Noteholders and the Trustee have entered into a plan funding and settlement agreement, which entails the Noteholders providing financing to Coram in the amount of approximately $56 million dollars to fund the Trustee's plan in exchange for a release of all claims against the Noteholders and Feinberg. The Trustee estimates that after making all payments pursuant to his plan, approximately $28 million dollars will be paid to the equity shareholders. The Noteholders will become the sole shareholders and sole holders of the indebtedness of Reorganized Coram.

The Equity Committee believes that this proposed settlement is not reasonable in light of its belief that Coram has been damaged by the actions of the Noteholders, Feinberg and others in the amount of $320 million dollars, which could potentially be trebled under RICO. Further, the Equity Committee believes the settlement is worth less than $56 million dollars because, among other things, $10 million dollars of the proposed settlement will be retained by Coram as working capital which will revert to the Noteholders as they will be the owners of the reorganized Coram and the Noteholders will be entitled to recover the proceeds of pending

DSCH:77013.1/COR202-213272                        - 2 -

CH-11 TRUSTEE/
CrowleyAdmin006512

litigation as well as proposed litigation against Crowley and the other directors. The Trustee

notes that the Noteholders are also waiving their right to be paid the current amount of their loan,

which is worth approximately $9 million dollars. Moreover, I have been advised that the Trustee

will be amending his plan to provide the equity shareholders with any recovery achieved by

Coram attributable to pending litigation or claims against Crowley and other directors.

III.    Credentials

I have been in private practice since 1955. My practice has concentrated on complex,

commercial trial and appellate litigation around the nation. I have extensive trial experience and

have also settled hundreds of cases. I am listed in more than 200 opinions as trial or appellate

counsel. Currently, I am the chair of the Litigation Department of Wolf, Block, Schorr and

Solis-Cohen LLP in Philadelphia. I was President of the American Bar Association during 1997-

1998. My *curriculum vitae* is attached as Exhibit "A" which sets forth my credentials in greater

detail.

IV.    Documents Reviewed

I have reviewed the following materials in connection with my opinion:

1.    December 21, 2000 Transcript of Closings and Rulings re: First Confirmation Hearings

2.    December 17, 2001 Transcript of Closings re: Second Confirmation Hearings

3.    December 21, 2001 Opinion Denying Confirmation of Second Plan

4.    May 6, 2002 Memorandum from David J. Bradford to File re: In re Coram Healthcare - Subject: Legal Issues re: Proposed Complaint

5.    May 10, 2002 Draft of Proposed Complaint

6.    May 20, 2002 Draft of Proposed Complaint

DSCH:77013.1/COR202-213272

- 3 -

CH-11 TRUSTEE/
CrowleyAdmin006513

7.      May 29, 2002 Memorandum from Richard F. Levy, David J. Bradford, C. Steven Tomashefsky to Hon. Arlin M. Adams, Barry E. Bressler, Wilbur L. Kipnes re: Coram Healthcare Corporation

8.      June 7, 2002 Cerberus/Feinberg Memorandum in Opposition to Proposed Derivative Complaint

9.      June 19, 2002 Memorandum from Weil, Gotshal & Manges, LLP re: Response to the Equity Committee's Draft Complaint Alleging Claims against Goldman Sachs Credit Partners L.P. and Foothill Capital Corporation

10.      Appendix of Exhibits to GSCP's and Foothill's Response to the Equity Committee's Draft Complaint

11.      July 10, 2002 Letter from Boris Feldman to Hon. Arlin Adams re: Coram Healthcare Corporation (review of Proposed Derivative Complaint)

12.      August 14, 2002 Letter from Scott N. Schreiber to Barry E. Bressler re: Coram Healthcare Corporation

13.      August, 2002 Comments to Responses to Draft Complaint

14.      Equity Committee's Response to Cerberus Partners' First Set of Interrogatories Regarding Plan and Disclosure Statement - dated April 25, 2003

15.      Equity Committee's First Supplemental Responses to Cerberus' First Set of Interrogatories - dated June 3, 2003

16.      Equity Committee's Response to Feinberg's First Set of Interrogatories - dated April 25, 2003

17.      Equity Committee's Amended Response to Feinberg's Interrogatory Number Four - dated May 27, 2003

18.      Equity Committee's Second Amended Response to Feinberg's Interrogatory Number Four

19.      Plan of Reorganization: Valuation Analysis - Presentation to the Official Committee of Unsecured Creditors of Coram Healthcare Corp. and Coram, Inc. - dated December 11, 2000 - Prepared by UBS Warburg

20.      Coram Healthcare Corporation - Enterprise Valuation Analysis as of December 11, 2002 - Prepared by Ewing Monroe Bemiss & Co. and SSG Capital Advisors, L.P.

21.      Coram Healthcare Corporation - Valuation Analysis as of March 31, 2003 - Prepared on Behalf of the Official Committee of Equity Security Holders in Connection with Chapter 11 Bankruptcy Proceedings by Deloitte & Touche

CH-11 TRUSTEE/
CrowleyAdmin006514

22. May 2, 2003 Disclosure Statement with Respect to the Chapter 11 Trustee's Joint Plan of Reorganization

23. June 17, 2003 Chapter 11 Trustee's Amended Joint Plan of Reorganization

24. June 24, 2003 Second Amended Disclosure Statement with Respect to the Chapter 11 Trustee's Amended Joint Plan of Reorganization

25. December 19, 2002 Disclosure Statement of the Official Committee of Equity Security Holders of Coram Healthcare Corp. and Coram, Inc.

26. May 15, 2003 Disclosure Statement of the Equity Committee of Coram Healthcare Corp. in Connection with the First Amended Plan of Reorganization of Coram Healthcare Corp. and Coram, Inc.

27. June 17, 2003 Second Amended Plan of Reorganization of the Official Committee of Equity Security Holders of Coram Healthcare Corp. and Coram, Inc.

28. June 24, 2003 Third Amended Disclosure Statement of the Equity Committee of Coram Healthcare Corp. in Connection with the Second Amended Plan of Reorganization of Coram Healthcare Corp. and Coram, Inc.

29. Coram/Bankruptcy - Documentary Support for Complaint BCW (Undated)

30. March 28, 2003 Adversary Complaint for Equitable Subordination - In re: Coram Healthcare Corp. and Coram, Inc. - The Official Committee of Equity Security Holders of Coram Healthcare Corporation v. Cerberus Partners, L.P.; Goldman Sachs Credit Partners L.P. and Foothill Capital Corporation

31. December 1, 2000 Transcript of Proceedings - Cross of Bernard J. Pump; Direct of Daniel D. Crowley

32. December 15, 2000 Transcript of Proceedings - Cross/Redirect/Recross of Daniel D. Crowley

33. December 13, 2001 Transcript of Proceedings - Cross/Redirect/Recross of Daniel D. Crowley; Direct of Daniel Lynn

34. December 14, 2001 Transcript of Proceedings - Direct/Voir Dire/Cross/Recross of Daniel R. Fischel

35. March 3, 2003 Transcript of Trustee's Motion - Testimony of Arlin M. Adams, Daniel D. Crowley, Michael A. Saracco, Deborah M. Meyer, Vito Ponzio and Jay S. Victor; Argument/Rebuttal/Decision

36. November 28, 2000 Deposition Transcript of Stephen A. Feinberg

37. November 1, 2001 Deposition Transcript of Stephen A. Feinberg

CH-11 TRUSTEE/
CrowleyAdmin006515

38.   December 7, 2000 Deposition Transcript of Daniel D. Crowley

39.   October 25, 2001 Deposition Transcript of Daniel D. Crowley

40.   February 27, 2003 Deposition Transcript of Daniel D. Crowley

41.   December 8, 2000 Deposition Transcript of Don Amaral

42.   December 20, 2000 Deposition Transcript of Don Amaral

43.   October 26, 2001 Deposition Transcript of Don Amaral

44.   September 24, 2001 Deposition Transcript of L. Peter Smith

45.   September 28, 2001 Deposition Transcript of William Casey

46.   September 29, 2001 Deposition Transcript of Sandra R. Smoley

47.   December 13, 2001 Deposition Transcripts of Daniel R. Fischel (Vols. I and II)

48.   February 25, 2003 Deposition Transcript of Hon. Arlin Adams

49.   September 4, 2001 Updated Report of Independent Restructuring Advisor Goldin
      Associates, L.L.C.


V.    **Procedural Background**

      Coram filed a voluntary petition for relief under Chapter 11 on August 8, 2000 and also

filed a Joint Plan of Reorganization. The Joint Plan would have given ownership of Coram to

the Noteholders, paid $2 million dollars to the general unsecured creditors of Coram Healthcare

Inc. (whose claims totaled approximately $7.66 million dollars) and allowed the claims of Coram

Inc.'s general unsecured creditors to pass through the bankruptcy unimpaired. It did not provide

any recovery to the equity shareholders. On December 21, 2000, the Court rejected the Joint

Plan, finding that it had not been proposed in good faith because the then CEO of Coram, Daniel

Crowley, had a conflict of interest due to his relationship with one of the Noteholders, which had

not been disclosed to Coram. Coram subsequently filed a Second Plan of Reorganization. The

Second Plan provided that $10 million dollars would be paid to the equity shareholders if they

CH-11 TRUSTEE/
CrowleyAdmin006516

voted in favor of the plan. The creditors would have been paid in full and the Noteholders would have ownership of the reorganized Coram. The majority of the shares were not voted in favor of the plan and a second contested confirmation hearing was held in December of 2001. On December 21, 2001, the Court refused to confirm the Second Plan, finding that nothing had changed since the First Plan as Crowley's conflict of interest continued. The Court appointed Arlin M. Adams (the "Trustee") as Coram's Chapter 11 Trustee on March 7, 2002. The Trustee filed a Joint Plan of Reorganization on May 2, 2003, which was subsequently amended on June 17, 2003. The proposed settlement will be used to fund the Trustee's Amended Joint Plan of Reorganization. In December of 2002, the Equity Committee also filed its own plan of reorganization, which has been amended twice. The Equity Committee's plan proposes to make the same payments to creditors as the Trustee's plan, and will fund the plan by borrowing funds if necessary.

## VI.    Background Regarding Proposed Claims

The Equity Committee, both in its disclosure statements and in a draft complaint it prepared, contends that the Noteholders engaged in a scheme to steal Coram that began in late 1997 or early 1998. The Noteholders had initially bought the existing debt of Coram, valued at $250 million dollars, in April of 1997. In early 1998, Donald Amaral, then Coram's CEO, sought to restructure the debt due to Coram's poor financial condition. Feinberg, the CEO of Cerberus, allegedly arranged for a one million dollar bonus to be paid to Amaral in order to ensure his loyalty to the Noteholders if the restructuring was successful. The restructuring of the debt was accomplished by a Securities Exchange Agreement, which was executed in May of 1998. The Securities Exchange Agreement had provisions that would allow the Noteholders to

DSCH:77013.1/COR202-213272

- 7 -

CH-11 TRUSTEE/
CrowleyAdmin006517

declare a default and accelerate the principal balance due on any Notes then outstanding if Amaral ceased being CEO. The Securities Exchange Agreement required the Noteholders to exchange their existing Notes and Warrants for Series A and Series B Notes. The Noteholders and Feinberg allege that the restructuring was at Coram's request and that the Noteholders gave up valuable rights in connection with that exchange. Most notably, the interest rate on the notes was reduced from 16.75% to 9.875% on the Series A Notes and 8% on the Series B Notes. In addition, Feinberg was not on the Board of Coram at the time that the Securities Exchange Agreement was executed and Coram was on the other side of the negotiating table. The Noteholders and Feinberg, therefore, owed no fiduciary duties to Coram at that time.

Shortly after the agreement was executed in May 1998, Feinberg became a director of Coram in order to represent the interests of the Noteholders. Feinberg claims he fulfilled his duties as a board member by always acting in Coram's best interest and he did not control the board or bias the board toward the Noteholders. In situations where there was a potential conflict between Coram and Cerberus, Feinberg always recused himself. The other members of the Board at that time were Amaral, William J. Casey, L. Peter Smith, and Richard Fink. When Amaral did in fact cease being CEO in April of 1999 for unanticipated personal reasons, the Noteholders did not declare a default nor did they accelerate the Notes as they were entitled to do under the terms of the Securities Exchange Agreement. Instead, Amaral was replaced by his second-in-command, Richard M. Smith. The Equity Committee does not allege that Smith was part of the alleged scheme to control Coram. Rather, they affirmatively allege that Smith was independent of the Noteholders and wanted to grow Coram's business and increase the value of the company.

DSCH:77013.1/COR201-213272                        - 8 -

CH-11 TRUSTEE/
CrowleyAdmin006518

The Equity Committee alleges that Amaral's unanticipated departure and his replacement with an independent CEO conflicted with the Noteholder's plan to take control of Coram, so Feinberg, acting for the Noteholders, developed a plan to replace Smith with another CEO who, like Amaral, would act under his direction and in the Noteholders' interests rather than in Coram's. As part of this plan, the Equity Committee alleges that Feinberg, on behalf of the Noteholders, entered into a secret oral agreement in July 1999, pursuant to which Crowley agreed to work exclusively for Cerberus for three years, at a salary of $80,000 per month plus expenses and other benefits. After Crowley agreed to become Cerberus' exclusive employee, Feinberg recommended to Coram's Board that Coram hire Crowley as a "consultant" to Smith. It was disclosed to Coram's board that Crowley had an economic relationship with Cerberus, but the terms of the arrangement were not disclosed to the Board. At the end of November 1999, Crowley signed an employment agreement with Coram to become its CEO for a salary of $650,000 a year, plus options on one million shares of Coram stock. Crowley also signed a written employment agreement which stated that he would devote "his entire business time, attention, skill and energy exclusively" to Cerberus by performing duties to be assigned by Feinberg, in exchange for a base salary of $960,000, plus potential for sizeable bonuses. The written agreement also provided that Cerberus could terminate all of Crowley's rights to receive these payments if he did not follow Feinberg's instructions.

Because Crowley's stock options would be worthless as part of the alleged scheme to drive Coram into bankruptcy, the Equity Committee alleges that Feinberg, as Chairman of the Coram Board's Compensation Committee, renegotiated Crowley's employment agreement, even though that agreement had been signed only three or four months earlier, and even though Crowley had no right to renegotiate his contract at that time. Crowley testified that he initiated

CH-11 TRUSTEE/
CrowleyAdmin006519

the renegotiation after he discovered that Coram was in far worse shape than he initially believed and required far more work than he anticipated. The renegotiated agreement was signed on Coram's behalf by Feinberg, as chairman of the compensation committee and by L. Peter Smith, as director of the compensation committee. The renegotiated agreement provided Crowley with sizeable bonuses if Coram performed well and met certain EBITDA numbers.

The Equity Committee claims that Crowley and the Noteholders used the pretext of (i) the Notes maturing, and (ii) a deadline looming under a federal statute known as "Stark II" in order to push through the Joint Plan of Reorganization with little resistance in order to eliminate the equity shareholders' interests. While the Equity Committee claims that the solution to the Stark II problem was simply for the Noteholders to convert the Notes to preferred stock, the Noteholders were under no obligation to do so.

At the conclusion of a hearing on the Debtors' Joint Plan, the Court found that Crowley's consulting agreement with Cerberus "created an actual conflict of interest on his part." The Court further held that Crowley's conflict of interest "has ... tainted the Debtors' restructuring of its debt, the Debtors' negotiations towards a plan, even the Debtors' restructuring of its operations." Accordingly, the Court denied confirmation of the Joint Plan because it was not proposed in good faith.

After the Court denied confirmation of the Joint Plan, the Debtors, with the Court's approval, retained Goldin Associates, L.L.C. ("Goldin") to evaluate their affairs and Crowley's relationship with Cerberus. Crowley was continuing to receive monthly payments from Cerberus after the Court's finding that Crowley had a conflict of interest as a result of these payments. Neither Goldin nor the Board of Directors asked whether Crowley was continuing to receive the payments.

DSCH:77013.1/COR202-213272

- 10 -

CH-11 TRUSTEE/
CrowleyAdmin006520

At the hearing on the Second Plan, the Court found that Crowley was not honest and had made several statements regarding his employment contract with Cerberus that the Court found to be untrue. Following this hearing, Crowley did not terminate his contract with Cerberus but merely suspended it. The contractual relationship was not formally terminated until September 24, 2002.

The Equity Committee claims that Crowley's impact in managing Coram for the Noteholders' benefit encompassed not only bad decisions that he made, but also favorable opportunities that he did not pursue. However, despite his conflict, it is not disputed that Crowley did a good job operationally in helping to turn the debtor around. The Equity Committee contends that an unconflicted CEO would have done better and that the measure of damages it suffered due to the conflict of interest is the difference between Coram's actual performance and that of its peers, who did not have conflicted CEOs.

VII.    **Legal Standard For Approval of Settlements in a Bankruptcy Proceeding**

Settlements are favored in bankruptcy proceedings as they minimize litigation and expedite the administration of the estate. In the Matter of Jasmine, Ltd., 258 B.R. 119, 123 (D.N.J. 1999) citing Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996). Settlements are subject to approval pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure. There are four criteria that a bankruptcy court uses in determining whether or not to approve a settlement: (1) the probability of success in the litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414,

DSCH:77013.1/COR202-213272                    - 11 -

CH-11 TRUSTEE/
CrowleyAdmin006521

20 L.3d 211, 88 S.Ct. 1157 (1968); In re Martin, 91 F.3d at 393. The court is not required to determine that the settlement is the best that can be achieved for the debtor, "but rather to canvas the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972). I have evaluated the reasonableness of the proposed settlement with those factors in mind.

## VIII.   Effect of Bankruptcy Court's Prior Rulings and Collateral Estoppel

The legal doctrine of "collateral estoppel" generally prevents a defendant from contesting facts that have previously been decided in a judicial proceeding in which the defendant participated. However, in order for the doctrine to apply, the following factors must exist: (1) the issues sought to be precluded are the same as the issues in the prior action; (2) the issues sought to be precluded were actually litigated in the prior action; (3) the issues sought to be precluded were determined by a valid and final judgment; and (4) the determination of the issues sought to be precluded were essential to the prior judgment. Wolstein v. Docteroff, 133 F.3d 210, 214 (3d Cir. 1997).

The Equity Committee believes that in the proposed litigation, the following facts will have been conclusively established:

- In July 1999, Crowley and Feinberg struck an oral agreement by which Cerberus agreed to pay Crowley $80,000 a month plus expenses to serve as a consultant to distressed companies in which Cerberus had a stake. Shortly thereafter, in August 1999, at the suggestion of Cerberus, the Debtors hired Crowley as a consultant to their CEO.

- In November 1999, the Debtors executed a restructuring and forbearance agreement with the Noteholders. As a condition to that agreement, the Debtors agreed to hire Crowley as their new CEO.

DSCH:77013.1/COR202-213272                   - 12 -

CH-11 TRUSTEE/
CrowleyAdmin006522

- On November 12, 1999, while negotiating his contract with the Debtors, Crowley sent Feinberg a "Personal & Confidential" letter requesting additional compensation from Cerberus for signing an employment contract with the Debtors.

- On November 19, 1999, the day after he signed a three-year employment agreement with the Debtors, Crowley entered into a written "Consulting Agreement" with Cerberus under which Crowley was to receive $80,000 per month and pursuant to which Crowley was to have such duties as were assigned by Feinberg and to devote his "entire business time, attention, skill and energy" exclusively to Cerberus' business. In addition, Cerberus had the right to terminate Crowley "for cause," including Crowley's "failure to follow the reasonable instructions" of Cerberus or Feinberg.

- The Cerberus-Crowley agreement dealt with Crowley's services as the Debtors' CEO.

- Neither Crowley nor Feinberg, who at the time was one of Coram's directors, disclosed the terms of the Consulting Agreement to the Debtors.

- After the Bankruptcy Court denied confirmation of the Debtors' first plan of reorganization, the Coram Board formed a "Special Committee" to study the Cerberus-Crowley conflict of interest. The Special Committee's sole act was to hire Goldin to "sprinkle holy water on the situation." Neither the Special Committee nor Goldin ever asked whether Cerberus was continuing to pay Crowley $80,000 a month after the Court harshly criticized those payments in its December 21, 2000 ruling.

- The Cerberus-Crowley agreement created a conflict of interest with respect to the Debtors.

- The Debtors were harmed by the Cerberus-Crowley conflict of interest.

- The harm from the Cerberus-Crowley conflict of interest did not cease when the Cerberus-Crowley agreement was publicly disclosed in the course of discovery for the first confirmation hearing.

- The Debtors should have asked for full disclosure and required that Crowley sever all agreements with Cerberus as a condition of continued employment. The Special Committee's failure to do so "does not fulfill their fiduciary duty to these estates."

- Crowley is not an honest man.

The Noteholders and Feinberg dispute that collateral estoppel would apply. Whether the Equity Committee can establish each of the four required factors for collateral estoppel with respect to each of the factual findings would have to be litigated in the proposed litigation. There are significant legal issues that would have to be resolved before any court could apply the

CH-11 TRUSTEE/
CrowleyAdmin006523

doctrine. For example, the Court found that the proposed plans were not made in "good faith,"
due to Crowley's conflict of interest. However, the "good faith" standard is not one which
would apply outside of bankruptcy and it is not clear from the record which party carried the
burden of establishing that Crowley had a conflict of interest or what legal standard was applied
to determine that such a conflict of interest existed. For collateral estoppel to apply, the ruling
must have been made under the same legal standard. It is also not readily apparent that each of
the alleged facts was necessary to the Court's determination that the plan was not proposed in
good faith. Coram would also have to establish that the Noteholders and Feinberg had a full and
fair opportunity to litigate issues surrounding Crowley's breach of fiduciary duty in the
confirmation hearing. In addition, if collateral estoppel were to apply, it may also encompass
factual findings that the Court made regarding Coram's financial difficulties and Crowley's
abilities as CEO that are not helpful to the Equity Committee's theories.

Nevertheless, for purposes of my analysis, I have assumed, for the most part, that the
above facts are established by collateral estoppel. Even with collateral estoppel, however, the
facts that the Equity Committee believes would be established through collateral estoppel are not
sufficient, in and of themselves, to establish liability and damages against Feinberg or the
Noteholders.


IX.    **Breach of Fiduciary Duty Claims**

In its plan, The Equity Committee proposes instituting litigation against the Noteholders
and Feinberg for breach of fiduciary duty. Generally, a breach of fiduciary duty occurs when:
(1) the defendant and plaintiff were in a fiduciary relationship; (2) the defendant breached a
fiduciary duty owed to the plaintiff; (3) the plaintiff incurred damages or losses; and (4) the

DSCH:77013.1/COR202-213272                            - 14 -

CH-11 TRUSTEE/
CrowleyAdmin006524

defendant's breach of fiduciary duty was a cause of the plaintiff's damage. In re S & D Foods. Inc., 144 B.R. 121, 162 (D. Col. 1992). It will be Coram's burden of proof to establish each of these elements with a preponderance of evidence. The Equity Committee claims that the burden of proof with respect to the damages element of the breach of fiduciary duty claim shifts to defendants where mismanagement is alleged. However, as the Equity Committee itself acknowledges, the plaintiff bears the initial burden of proving a breach of fiduciary duty and a resulting loss. A plaintiff also has the burden of establishing, with a reasonable degree of certainty, the maximum amount of damages. This alleged burden shifting with regard to damages does not eliminate the need to establish causation.

One count of the proposed derivative complaint alleges that Feinberg breached his fiduciary duties to Coram. His alleged breaches are lumped together with those alleged to have been committed by Crowley. The proposed complaint alleges that Feinberg, as a director of Coram, adopted a business strategy that focused on liquidation of assets and reduction of debt when such actions were taken primarily for the benefit of the Noteholders, failed to explore opportunities for growth, delayed in implementing steps necessary to comply with government regulations, prolonged Coram's time in bankruptcy, approved Crowley's excessive salary, whitewashed Crowley's conflict of interest, failed to use business judgment in negotiating with the Noteholders, used cash to pay down debts, failed to preserve shareholder equity, and engaged in self-dealing.

Feinberg was a director of Coram from June of 1998 through July of 2000. After his resignation, Feinberg no longer owed any duties to Coram to make any disclosures regarding Cerberus' relationship with Crowley and was entitled to act solely in his own interest and in the interest of Cerberus. The primary wrongdoing that Feinberg, as a director of Coram, engaged in

DSCH:77013.I/COR202-213272

- 15 -

was failing to disclose the terms of Crowley's employment agreement with Cerberus to the other board members when he proposed Crowley as a CEO "coach" and later as the CEO of Coram, as well as participating in the alleged scheme of the Noteholders to take over Coram.

However, the proposed complaint and the Equity Committee's disclosure statement does not address the impact of Coram's entering into a "zone of insolvency" where fiduciary duties were owed to the creditors of Coram as well as to the corporation and its shareholders. The Equity Committee does not explain how this will affect its arguments that Coram should have been engaged in activities that sought to maximize return for the shareholders, potentially at the expense of the Noteholders, and that it was a breach of fiduciary duty to do anything that did not seek to maximize growth. A factfinder may determine that this duty to the creditors would have prevented some of the strategies for growth that the Equity Committee argues that Coram should have engaged in if the CEO were unconflicted or that its financially untroubled peers were able to engage in that Coram did not.

Another count in the proposed Complaint contends that Feinberg and Crowley were agents of Cerberus and that Cerberus is, therefore, liable for the actions of its agents in breaching their fiduciary duties. There are problems with this theory. Cerberus owed no fiduciary duty to Coram and, therefore, even under a *respondeat superior* argument, it cannot be liable for a breach of fiduciary duty that it did not owe. If Feinberg and Crowley owed fiduciary duties to Coram, those duties did not arise because they were agents of Cerberus. Rather, those duties were independent of their relationship with Cerberus. However, given that the proposed complaint alleges that the purpose of the employment agreement between Cerberus and Crowley was for Crowley to become CEO in order to drive the company into bankruptcy, this distinction may be meaningless as Cerberus could be liable under an aiding and abetting theory.

DSCH:77013.1/COR202-213272

- 16 -

CH-11 TRUSTEE/
CrowleyAdmin006526

There is little credible evidence that supports the theory that Goldman Sachs and Foothill owed any fiduciary duties to Coram directly. The proposed Complaint addresses this problem by asserting two breach of fiduciary duty claims against Goldman Sachs and Foothill on the theory that Feinberg was the agent of Goldman Sachs and Foothill or that Goldman Sachs and Foothill exercised "de facto control" of Coram "through Feinberg." There has not been any evidence, despite voluminous depositions, which demonstrates that Goldman Sachs or Foothill were able to control Feinberg or that they actually asserted any control over him.

Two additional counts of the proposed Complaint allege that Feinberg and Cerberus aided and abetted Crowley's breach of fiduciary duty and Goldman Sachs and Foothill aided and abetted Crowley's breach of fiduciary duty. The elements for aiding and abetting a breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) a breach, (3) a non-fiduciary's knowing participation in the breach, and (4) damages to the plaintiff as a result of the concerted action of the fiduciary and the non-fiduciary. There are no facts that demonstrate that Goldman Sachs and Foothill knowingly participated in causing either Crowley or Feinberg to breach their fiduciary duties. Goldman Sachs and Foothill were not paying Crowley and there is no evidence that either was aware of the terms of the agreement between Cerberus and Crowley.

The claim against Feinberg and Cerberus for aiding and abetting is stronger as Cerberus was paying Crowley $80,000 a month. This may be compelling circumstantial evidence of a knowing participation in Crowley's breach of fiduciary duty as it was his acceptance of this payment, without disclosing the terms of his agreement, which caused the Court to find a conflict existed. For this reason, the claims of aiding and abetting against Cerberus may resonate with a jury.

CH-11 TRUSTEE/
CrowleyAdmin006527

## X.     RICO Claims

Courts look critically at RICO claims that arise out of ordinary commercial dealings. While often pled by plaintiffs in order to inject the specter of treble damages into a proceeding, it has been my experience that such claims rarely make it to trial. Indeed, the Equity Committee itself acknowledges that it is the "exceptional case" in which elements of RICO can be readily satisfied. Some courts even require special case information statements regarding the alleged RICO activity in order to quickly eliminate some of these claims. In this case, the proposed RICO claims are asserted against Feinberg and Cerberus only and not Goldman Sachs or Foothill.[1]

In order to establish a RICO violation, a plaintiff must prove a pattern of racketeering to (a) acquire and maintain interests in and control of an enterprise (Section 1962(b)), or (b) to conduct the affairs of an enterprise (Section 1962(c)). The Equity Committee attempts to establish this pattern by contending that Feinberg and Cerberus have engaged in a virtually identical scheme in connection with other companies. The Equity Committee alleges that Feinberg and Cerberus have engaged in similar activities with regard to Cerberus's takeover of a company known as WSNet Holdings, Inc, a cable-TV programming provider in Austin, Texas, which is the subject of a lawsuit captioned Beck v. Cerberus Capital Mgmt., No. GN 200604 (District Ct., Travis Cty, Texas). Feinberg and Cerberus deny any wrongdoing in connection with WSNet Holdings and affirmatively allege that they were defrauded investors in that corporation. That litigation is currently ongoing and there have been no findings with regard to any of the Equity Committee's allegations. The Equity Committee has also pointed to Cerberus' involvement in several other ongoing lawsuits as evidence of a pattern.

---

[1]     The RICO claims are also asserted against Crowley. However, he is not a party to the Trustee's settlement and the Trustee is not releasing any claims against him.

CH-11 TRUSTEE/
CrowleyAdmin006528

In order to establish the pattern requirement utilizing other companies will require the equivalent of a trial within a trial and will add extensive delay and complexity to the proposed claims. Without delving into the factual nature of those claims, there is insufficient evidence to establish whether those allegations have credibility and can form the basis for a pattern argument. It is my opinion that a judge will be reluctant to permit a series of mini-trials with regard to unrelated corporations. The Equity Committee also contends that it can establish the pattern requirement based solely upon the conduct of Cerberus and Feinberg directed at Coram. However, Cerberus and Feinberg dispute that a single scheme to acquire a company can ever satisfy the pattern requirement.

Another significant hurdle that the Equity Committee must overcome in order to prevail on the RICO claims is the issue of whether the corporation can be both the enterprise and victim bringing the RICO claim under 1962(c). The Third Circuit has definitively stated that it may not. Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc., 46 F.3d 258 (3d Cir. 1995). The potential litigation is likely to be brought in the Third Circuit and this is a significant roadblock to the proposed RICO claims. Accordingly, it is extremely uncertain that Coram could prevail under the RICO claims. The Equity Committee attempts to avoid this problem by also asserting that the "association-in-fact of the Noteholders" would qualify as an enterprise. However, this approach also has problems, as there has been little evidence to support the "association-in-fact" theory.

## XI.    Factual Roadblocks

In addition to the legal roadblocks identified above, there are also significant factual roadblocks that Coram would have to overcome in order to prevail at trial.

DSCH:77013.1/COR202-213272                    - 19 -

CH-11 TRUSTEE/
CrowleyAdmin006529

1)    The facts surrounding the hatching of the alleged secret plan do not appear persuasive. The Equity Committee alleges that in 1997 or 1998, Feinberg and Cerberus began to execute a scheme to take control and ownership of Coram for the Noteholders benefit. The start of the scheme is allegedly evidenced by Amaral arranging for Coram to execute the Securities Exchange Agreement with provisions that would allow the Noteholders to declare a default and seize Coram if Amaral ceased being CEO. In exchange, Feinberg purportedly arranged for Amaral to receive a bonus from Coram, even though Feinberg was not a director of Coram at that time. However, Amaral did cease being CEO, but the Noteholders did not declare a default and accelerate the debt in order to take control of Coram. Accordingly, it is difficult to see how the scheme or any harm that arose from the scheme could be associated with this time-frame. The evidence presented by the Equity Committee more strongly suggests that any scheme began with the agreement between Cerberus and Crowley.

2).    The fact that Feinberg joined the Board to represent the interests of the Noteholders does not appear unusual. Directors are often put on a Board to represent particular interests and the Noteholders were large creditors with a significant interest in the affairs of Coram. When the restructuring was discussed and it involved restructuring the debt, Feinberg recused himself from those discussions.

3):    The Equity Committee's "scheme" relies heavily on the allegation that Feinberg and Cerberus needed to replace Smith because he was independent and wanted to grow the business. However, Smith resigned voluntarily and there has been no evidence that he was asked to leave or was forced out. Smith may have been resentful of Crowley's role as a consultant, but a jury would have to believe that the Noteholders and Feinberg knew that Crowley's presence would cause Smith to resign in order to prove that this action furthered the scheme.

DSCH:77013.1/COR202-213272                    - 20 -

CH-11 TRUSTEE/
CrowleyAdmin006530

4).    The Equity Committee contends that Crowley allegedly stopped Smith's plan to grow the business. However, under Smith's direction, Coram was continuing to lose money. Coram had a deficit of $9.5 million dollars in 1999 when the company was run by Smith as compared to a positive $42.6 million dollars under Crowley. Given its precarious financial situation, there is no explanation as to why a responsible CEO, with a company in the zone of insolvency, would not make efforts to stem losses, rather than embarking on questionable growth strategies.

5).    Crowley is also alleged not to have pursued favorable business opportunities. But the Equity Committee cannot point to a single opportunity that Crowley failed to pursue, which will make it difficult for a jury to accept this proposition. If Crowley failed to pursue profitable business opportunities that the comparable companies did pursue, one would expect that at least some, if not all, of those opportunities could be identified. Moreover, the Equity Committee's attorney stated to the Court previously that he could not prove that an unconflicted CEO would have performed better and Professor Fischel testified that it was impossible to know whether an unconflicted CEO would have run Coram in exactly the same way.

6).    The Equity Committee also alleges that Feinberg approved additional compensation from Coram to Crowley in order to insure Crowley's loyalty to the Noteholders' interests. It should be noted that Crowley had options on 1 million shares of Coram stock and, therefore, had an interest himself in the equity. The Equity Committee claims that because Crowley realized that his options would be worthless if the scheme to drive Coram into bankruptcy was successful, he demanded more compensation from Feinberg. This begs the question of why Crowley would enter into the scheme without the employment contract providing for adequate compensation as his role, from his first day as CEO, was allegedly to

DSCH:77013.1/COR202-213272                              - 21 -

CH-11 TRUSTEE/
CrowleyAdmin006531

drive Coram into bankruptcy. A factfinder would have trouble accepting that an individual such as Crowley would not ensure that his financial self-interests were protected prior to signing the agreement with Coram, if he intended to drive the company into bankruptcy, rather than assuming that he could renegotiate the agreement at a later date. The Noteholders point out that, while Feinberg renegotiated the employment agreement on Coram's behalf, he did so in his capacity as chairman of the compensation committee for Coram and the amended agreement was also approved by another director. The jury may find it more credible that, as Crowley testified, it was Crowley who initiated the renegotiation of his employment agreement with Coram once he realized that the CEO position would entail more work than he originally anticipated and he wanted to reap the benefits of his efforts. Further, the renegotiation provided Crowley with strong incentives to increase the company's earnings but did not alter his base salary, undercutting again the notion that Crowley was hired to drive the company into bankruptcy.

7). The Equity Committee alleges that part of the scheme to steal Coram was that the bankruptcy was filed under the pretext that the notes were maturing and a deadline was looming under Stark II. The Equity Committee claims that both pretexts were false because the notes were not maturing for nearly nine months and Coram had plenty of cash to pay its debts in the normal course for the next nine months. The Equity Committee contends that the Stark II problem could have been easily solved. However, if Coram's alleged solution to the Stark II problem was for the Noteholders to convert their notes to preferred stock, there has been no explanation as to why the Noteholders would be obligated to do this or why their failure to do so would constitute a scheme to steal Coram.

This is not a complete list of all of the factual disputes that would have to be resolved, rather it is intended to highlight the differing conclusions that individuals could reach when

CH-11 TRUSTEE/
CrowleyAdmin006532

reviewing the facts and to show the evidentiary and factual roadblocks that Coram would have to overcome. I do not believe that the Equity Committee's presentation of the facts is so persuasive that a jury would be unable to find otherwise. Rather, I see significant risk to Coram at trial, if no other facts were developed to support its case. While Coram may be able to persuade a jury with regard to some of these factual disputes, especially those involving Crowley's conflict, significant risk exists that a jury ultimately may not be persuaded about the alleged scheme to steal Coram.

## XII.    Damages

Assuming that the Equity Committee can establish that there was a breach of fiduciary duty on the part of the Noteholders or Feinberg or that a RICO claim may be maintained, they must also establish the damages that flowed from such alleged breaches. In my opinion, the most significant problem with the proposed claims is the difficulty in proving damages in the range of $320 million dollars. The Equity Committee is unable to set forth with specificity what actions were taken or not taken that could have increased the value of Coram by $320 million dollars. They do not dispute that under Crowley the company performed substantially better and its financial picture improved considerably. Rather, the Equity Committee is in the difficult position of having to prove that despite the improvements, Coram would have been worth $320 million dollars more than it is today without identifying these missed opportunities or failures on the part of Crowley. The Equity Committee sets forth some specific instances of conduct that it claims show harm purported caused by Crowley's conflict of interest. However, as those alleged damages do not even begin to approach the $320 million dollars in damages, the Equity

DSCH:77013.1/COR202-213272                                   - 23 -

CH-11 TRUSTEE/
CrowleyAdmin006533

Committee also relies upon a yardstick approach of calculating damages, which uses the earnings of comparable companies to determine damages.

The Equity Committee has identified the following instances in which Coram suffered harm as a result of the alleged breaches of fiduciary duty: the payment of Crowley's salary, the $6.5 million dollar cash payment made to the Noteholders on the eve of bankruptcy, the sale of Coram Prescriptive Services ("CPS"), and the delay in Coram's emergence from bankruptcy. Crowley signed his employment agreement on November 29, 1999 that provided for an annual salary of $650,000 per year. He received this salary up until the Court rejected the Trustee's motion to extend his employment agreement in March of 2003. Accordingly, he received approximately $2,112,500[2] in salary from Coram. An appropriate remedy for a breach of fiduciary duty may be the return of all salary paid to the disloyal employee or officer for the period of disloyalty even absent a showing of actual injury to the employer. Further, one who induces the breach of fiduciary duty may also be liable for the amount of the salary paid to the disloyal employee. Accordingly, Crowley's salary, in its entirety, may be an element of the damages for the breach of fiduciary duty recoverable from either Feinberg or the Noteholders if it is determined that one of them caused the disloyalty.

Crowley caused a $6.3 million dollar cash interest payment to be made to the Noteholders in July of 2000, while Coram was contemplating bankruptcy. While the timing of the payment may have been improvident and designed to favor the Noteholders, it is not disputed that the Noteholders were in fact owed this money and under both the Trustee and the Equity

---

[2]     Crowley testified that in addition to his base salary of $650,000 he also received payments for other benefits. In 2002, his W-2 reflected earnings of $921,298.08 which included "gross-ups for corporate facilities," life insurance and other emoluments. Tr. at 86. Accordingly, the actual damages may be somewhat higher than simply his $650,000 salary.

CH-11 TRUSTEE/
CrowleyAdmin006534

Committee's plan, the money will not be treated as a preference as all creditors are being paid in full. Accordingly, it is not entirely clear whether Coram would be able to recover this payment in the proposed litigation and Coram's best-case scenario in any litigation would be the recovery of the $6.3 million dollars. If Coram were to recover this payment in the proposed litigation, it would increase the liability it owed to the Noteholders by the same $6.3 million dollars.

It will be much harder for Coram to prove that the sale of CPS was the result of the alleged conflict of interest and that Coram suffered damages as a result of the sale. The Equity Committee acknowledges that at the time Crowley joined Coram the sale of CPS was already being considered. Smith, the CEO whom it is acknowledged was independent, participated in the decision to sell CPS. Coram's Board had received independent advice from an investment banker, Deutsche Banc Alex Brown ("DBAB") regarding the sale. The investment banker had originally estimated that CPS might be worth $100 million dollars, but felt there was no market for an IPO and was unable to obtain a value above $40 million dollars after an auction. DBAB contacted 45 potential purchasers and 24 were sent confidentiality agreements, sixteen returned the agreements and were sent the offering memorandum; eight potential purchasers submitted non-binding bids. In the end, two written offers were submitted, one of which had substantial holdbacks and little cash. Crowley subsequently negotiated a better all cash deal with one of the final bidders at a higher price of $42 million. DBAB submitted a written opinion declaring the sale price to be fair and the decision to sell was unanimously approved by Coram's board of directors. Indeed, the highest price the investment banker was able to obtain was rejected by Crowley as being too low. While CPS may have been described as a "crown jewel" by one Coram employee, there is no doubt that it would have required substantial cash infusions in order to survive over the next several years and that the sale price was the best offer received for the

DSCH:77013.1/COR202-213272                            - 25 -

CH-11 TRUSTEE/
CrowleyAdmin006535

company. Given that Coram was in the zone of insolvency at the time CPS was sold, it would be difficult to establish that the sale of CPS was improper given its dire need for cash. As the court found, a company contemplating bankruptcy needs to preserve its cash, not spend it on a business that is losing money and is not expected to become profitable until years later. Accordingly, Coram would have difficulty at trial in establishing that the sale of CPS was improper and that it suffered damages as a result of the sale because it received the market value for the sale, following an auction that was conducted by an independent party. Further, it did not suffer the losses or put cash into CPS in order to make it profitable.

In an apparent recognition that the few instances in which they can actually show some damages do not approach the $320 million dollars claimed, the Equity Committee believes that such a damages figure can be reached by comparing Coram's performance during the relevant time period with the performance of Coram's own self-selected industry peer group. This "yardstick" approach is intended to show how much better Coram may have performed if it had an unconflicted CEO. There are significant roadblocks with regard to this approach.

It is not clear that this yardstick damages approach would survive a Daubert motion. The admissibility of a proffered expert's testimony is measured under the standards established in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Kumho Tire Company v. Carmichael, 526 U.S. 137, 151-52, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Daubert holds that when expert witness testimony is offered, the court must insure that it is both relevant to the instant dispute and based on credible scientific methodologies. Kumho Tire holds that the same standard applies when the court reviews non-scientific expert testimony. The Equity Committee has identified its expert in this area as

DSCH:77013.1/COR202-213272                     - 26 -

CH-11 TRUSTEE/
CrowleyAdmin006536

Professor Daniel Fischel, but his expert report with regard to the calculation of damages has not yet been made available.

Even without viewing Professor Fischel's report, there are preliminary problems that would raise questions in a Daubert analysis. The "yardstick" approach envisioned by the Equity Committee eliminates the causation requirement for proving damages in this context. Even in the context of antitrust cases, the yardstick approach does not establish causation in and of itself. The Equity Committee believes that it can simply rely upon the fact that other companies without conflicted CEOs did better than Coram without having to prove that Crowley's conduct caused those damages. While this yardstick approach is acceptable in some antitrust cases because of the generalized proof of damages permitted in those cases, it does not appear to be accepted in breach of fiduciary duty cases. Further, it is not a substitute for causation. Indeed, the approach has not gained widespread acceptance outside the confines of antitrust and I believe that courts would be reluctant to extend this measure of damages to this type of case.

While there have been some cases that do apply a similar type analysis, those cases do not arise in the same factual scenario as is presented here. By way of example, one case cited by the Equity Committee for the proposition that the yardstick approach is accepted outside of antitrust is a case that utilized a REIT index to approximate the damages suffered from a fraudulent real estate investment. Maiz v. Virani, 253 F.3d 641 (11th Cir. 2001). The Maiz court focused heavily on the issue of proximate cause, finding that:

> [t]o recover damages for an injury sustained as a result of a RICO violation, a plaintiff must prove that the violation proximately caused a loss to its business or property. The touchstone of the inquiry, in other words, is proximate cause; there is no automatic rule against the recovery of any type of lost profits or lost value damages if proximate cause is shown.

Id. at 662-63 (internal citations omitted).

CH-11 TRUSTEE/
CrowleyAdmin006537

In the Maiz case, the plaintiffs established at trial that, but for the defendants' fraud, they would have invested their funds in United States real estate and a REIT index was an appropriate yardstick for measuring the performance of real estate during the period in question. In this case, the Equity Committee has not offered proof that, but for Crowley's conflict, it would have performed the same as the comparable companies. The proximate cause is simply missing. The Equity Committee is attempting to use the comparable companies to establish causation, i.e., that since comparable companies presumably did not have conflicted CEO's, those companies' earnings establish that Crowley damaged Coram, as it did not perform the same as those companies without conflicted CEOs. However, that is not the holding of Maiz, which emphasizes that proximate cause must be established in order to obtain damages for lost profits.

Additionally, the Equity Committee has not provided an explanation as to why the damages cannot be determined with more precision. An expert could certainly study Crowley's actions and determine what actions he took that were adverse to Coram or what actions he failed to take that would have been favorable for Coram. In any event, there are some serious preliminary questions raised by this yardstick approach that I believe will raise Daubert issues, that Coram must overcome in order to prevail on its damages theory.

Further, even if the court accepts the "yardstick" damages theory, it is not alleged that any of the other peer corporations that the Equity Committee proposes as comparable companies were in the "zone of insolvency" and owed duties to their creditors. Even in the context of antitrust where the "yardstick/comparable company" manner of proving damages is accepted, courts often find that the companies selected are not truly comparable and reject the yardstick analysis on that basis. While this approach has been utilized in antitrust actions where the relevant question pertains to the calculation of lost profits or lost market share attributable to one

CH-11 TRUSTEE/
CrowleyAdmin006538

specific type of injury, in this case there is not a single specific type of wrongful action or resulting injury that can be identified. It is simply not established law that one can utilize this antitrust method of establishing damages in other contexts, such as breach of fiduciary duty claims. Accordingly, Coram will have substantial difficulty prevailing at trial utilizing this method of calculating damages and, without the yardstick approach, the claimed damages do not even begin to approach the $320 million dollars claimed by the Equity Committee.

Lastly, even assuming that the Court accepted the yardstick approach and found that the companies utilized were truly comparable, there is another significant hurdle that must be overcome. The Equity Committee's damages theory does not appear credible and may not persuade a jury. One would expect that if a CEO failed to increased a company's value by $320 million, there would be some readily identifiable occurrences that produced a large portion of those damages. Even if it was not possible to identify all instances of such conduct, one would expect that at least some large instances could be provided. A jury would have great difficulty accepting the expert's opinion when it would require the jury to believe that a CEO who increased earnings simultaneously caused $320 million dollars in damages. This appears counterintuitive. In my opinion, there is significant risk that a jury may simply not accept this testimony.

### XIII.  Punitive and Treble Damages

The Equity Committee believes that punitive damages are available for the tort claims and treble damages are available for the RICO claims. The entitlement to treble damages for RICO claims is statutory and not subject to dispute. Punitive damages for the common-law tort claims are generally available; however, the legal standard differs for their application depending

DSCH:77013.1/COR202-213272                        - 29 -

CH-11 TRUSTEE/
CrowleyAdmin006539

A1011

upon each state's laws. Punitive damages are available for tort claims such as breach of fiduciary duty under Delaware and Colorado law as well as many other states. Notwithstanding the availability of such damages, my experience in settling cases is that punitive or treble damages are not considered part of the settlement process. The reason for this is readily apparent. In settlement, the focus is on the actual damages suffered and reaching a compromise that all sides can live with given the risk involved. I have never settled a case in which the settlement was higher than the actual damages claimed. For these reasons, I do not believe that the availability of punitive or treble damages will add much, if anything, to the analysis of whether the proposed settlement falls below the lowest point of reasonableness.

## XIV.    Probability of Success At Trial

It is difficult to estimate percentages of recovery and most lawyers refuse to place percentages on cases due to the inherent uncertainty in litigation. It is this inherent uncertainty that spurs the vast majority of complex litigation matters to settle before trial.

With that caveat in mind, it is my opinion that the likelihood of success against Goldman Sachs and Foothill is extremely low due to the attenuated nature of the claims against them. The Equity Committee alleges that the nexus between Cerberus, which made the $1-million-a-year secret payments to Crowley directly, and Goldman Sachs and Foothill, also renders Goldman Sachs and Foothill liable for the damage caused to Coram. However, the main facts to support this theory, excluding those pertaining to whether the Noteholders had joint representation in the course of this proceeding, are that the Goldman Sachs partner responsible for Coram, Edward Mule, testified that he discussed Crowley's appointment with Feinberg and then independently had him checked out. Mule was aware that Crowley had a "consulting agreement" with Cerberus

DSCH:77013.1/COR202-213272                    - 30 -

CH-11 TRUSTEE/
CrowleyAdmin006540

paying him $80,000 per month plus other benefits. Foothill partner Marshall Steams testified

that, soon after the Equity Committee brought Crowley's $80,000-a-month agreement with

Cerberus to light, he discussed it with Feinberg and raised no objections to its continuation. In

addition, it is alleged that Cerberus and Foothill have been the co-participants in at least 13 loan

or credit transactions in recent years, including Coram, Peregrine, Sunterra, Arthur D. Little,

Northland Cranberries, Avado Brands, General DataCom, e.spire, Panaco, Allied Holdings,

Provell/Damark, Chiquita Brands, and Davel Communications. Goldman Sachs and Foothill

were not directors of Coram and it is not alleged that they owed any direct fiduciary duties to

Coram. The claims asserted against them for breach of fiduciary duty seek to hold Goldman

Sachs and Foothill liable for Feinberg's breaches of fiduciary duty on theories that Feinberg was

an agent of Goldman Sachs and Foothill. However, there is little, if any, evidence to show that

Goldman Sachs and Foothill had any control over Feinberg, a necessary element of any agency

claim.

With regard to the claim that Goldman Sachs and Foothill aided and abetted Crowley's

breach of fiduciary duty, it was Cerberus who entered into the agreement with Crowley, and

while it is claimed that Goldman Sachs and Foothill were aware of this relationship, that

knowledge with no duty to act, does not render Goldman Sachs and Foothill liable for Crowley's

breach of fiduciary duty on an aiding and abetting theory. Significant discovery has already

taken place, and little, if any, credible evidence has come to light regarding Goldman Sachs and

Foothill's alleged improper actions. Accordingly, I believe that these claims would likely have

little success at trial.

The likelihood of success against Feinberg and Cerberus is somewhat higher. Crowley

did have a conflict of interest due to his employment relationship with Cerberus, which neither

DSCH:77013.1/COR202-213272                    - 31 -

CH-11 TRUSTEE/
CrowleyAdmin006541

Feinberg nor he fully disclosed to Coram's board. This conflict caused harm. Further, Crowley appears to be greedy. However, his greed cuts against the claims that he deliberately took actions or failed to take actions in order to lower Coram's value because he had an incentive to improve Coram's performance, i.e., the significant bonuses that he could achieve under the terms of his employment agreement. Accordingly, a factfinder's determination that Crowley was greedy would not necessarily lead to the conclusion that he deliberately and intentionally tried to keep Coram's value low, for the benefit of the Noteholders. In addition, although the Equity Committee relies on the independent CEO, Smith, Smith's leadership and results have been criticized, which certainly casts doubt upon the notion that were it not for Crowley's conflict of interest, the company would have performed better than it did. If Smith had remained as CEO, it is certainly questionable that he could have doubled Coram's earnings in light of his performance while CEO, even though he did not have a conflict of interest.

Even assuming that liability could be established, however, the likelihood of success on the yardstick damages theory is low. The yardstick theory has not been adopted in this context and the Equity Committee has not addressed the fact that even if the court were to accept the theory, there may be no truly comparable corporations as, unlike the selected peer corporations, Coram was financially distressed and had entered the "zone of insolvency."

In addition, I view Coram's ability to prevail on the RICO claims as very weak, assuming they survive a pretrial motion. As set forth above, in order for the proposed RICO claims to prevail, a judge would have to permit extensive testimony regarding Cerberus's involvement with multiple other companies, simply to establish a pattern of activity. In essence, this would require the judge to permit a trial within a trial. In addition, Coram would need to overcome the Third Circuit's determination that a corporation may not be both the enterprise and the victim.

DSCH:77013.1/COR202-213272                              - 32 -

CH-11 TRUSTEE/
CrowleyAdmin006542

A1014

Given the tendency of courts to view such RICO claims with skepticism, the RICO claims are not likely to succeed at trial.

## XV.    Ultimate Conclusion Regarding Reasonableness of Settlement

Given the difficulties of proof of damages as well as the inherent uncertainty surrounding the litigation, I believe that a settlement of $56 million dollars is well within the range of reasonableness. While it is possible that Coram may be able to achieve a greater recovery at trial, in light of the complexity of the proposed litigation against the Noteholders and Feinberg, the expense, inconvenience and delay necessarily attending it and the uncertainty of any recovery, the settlement is certainly reasonable and does not fall below the lowest point in the range of reasonableness. Should the proposed litigation go forward, it would likely be years before it will be resolved. This would drain the attention of Coram's employees and management from its business and would be very costly.

At trial, Coram faces a difficult challenge of proving that Crowley, although performing well as CEO, took or failed to take some actions that would have made Coram worth $320 million dollars more than it is presently worth. Without being able to specifically identify the instances in which Crowley missed opportunities or did something to injure Coram, a jury could have trouble accepting that Coram would have achieved such dramatic growth, especially in light of its troubled history and prior financial difficulties.[3] The Equity Committee, despite years of discovery, is unable to identify the opportunities that Coram missed due to Crowley's actions or

---

[3]     As of the date of this report, the Equity Committee had not been forthcoming in its response to interrogatories proffered by the Trustee with regard to the manner in which it intends to prove the claims in the proposed Complaint and the supporting facts.

CH-11 TRUSTEE/
CrowleyAdmin006543

to identify specific actions that Crowley should not have taken that would have led to such a large damages figure.

It is for this reason that Coram's greatest difficulty at trial will be in establishing damages. The damages claimed by the Equity Committee seem incredibly large and are based upon a theory that is applied in some antitrust cases where generalized proof of damages is permitted. It has not been applied to breach of fiduciary duty cases. Further, given Coram's troubled past and financial difficulties, it strains credibility to believe that it could have grown so significantly. This is especially true in light of the fact that Crowley did improve Coram's finances significantly while CEO and the additional value would have to be on top of that increase. Further, any recovery at trial would have to exceed $56 million dollars plus the anticipated $6 million dollars that the Equity Committee estimates the litigation will cost, for Coram to achieve a result that is better than the proposed settlement.

Liability is also not certain. For each of the alleged facts that the Equity Committee claims establish a scheme on the part of the Noteholders, the Noteholders have a plausible explanation. In addition, although Coram will be able to establish that Crowley may have been a greedy person, his greed gave him a powerful incentive to perform well as Coram's CEO, as he stood to make millions of dollars if Coram hit certain earnings targets, and in fact, by all accounts, he did perform well. The litigation will be long, hotly contested and extremely complex as it will involve not only claims regarding an alleged scheme with regard to Coram, but will also require extensive testimony and fact finding about other, unrelated companies in order to establish elements of the RICO claims.

Another factor weighing in favor of the reasonableness of the settlement is that Coram retains the right to litigate claims against Crowley and other directors of Coram and that any

DSCH:77013.1/COR202-213272                          - 34 -

CH-11 TRUSTEE/
CrowleyAdmin006544

recovery with regard to those claims, will be provided to the equity shareholders. In the event a judgment is reached against the non-settling parties in which the damages against those entities are less than the $56 million dollar settlement, Coram will have realized a far better outcome than what could have been realized after a trial, as it will have achieved a settlement greater than its actual damages. In the event the damages awarded are in excess of $56 million dollars, Coram will be able to recover the excess amount from Crowley and the independent directors. These individuals have assets in the form of Directors and Officers Insurance and Crowley is reportedly a wealthy individual who could afford to pay damages.

In addition, the settlement is beneficial to all of the interested constituents. As of June 2003, as the result of debt exchanges approved by the Court, the Noteholders hold approximately $334,600,000 million dollars of preferred stock that must be paid prior to any distribution to the equity shareholders. Coram's remaining debt is approximately $46 million dollars, which includes $9,000,000 owed to the Noteholders, $19,430,000 owed to the IRS and the remainder owed to other creditors. In addition, there are estimated administrative claims of $13,500,000. These liabilities total approximately $394 million dollars. Before the equity shareholders would be entitled to benefit from any litigation, Coram must obtain a judgment that exceeds $394 million dollars. Any smaller recovery would inure to the benefit of Coram's creditors and not to Coram's out of the money shareholders.

The Trustee has managed to increase the recovery to the equity shareholders from an offer of nothing in the First Plan and $10 million dollars in the Second Plan, to a recovery which will exceed $28 million dollars, as well as providing that all creditors will be paid in full and Coram will retain working capital. Accordingly, considering all of the claims, the interests of the creditors, shareholders, and employees along with the record to date, and the legal theories, it is my opinion that the settlement does not fall below the lowest point of reasonableness.

DSCH:77013.1/COR202-213272                        - 35 -

CH-11 TRUSTEE/
CrowleyAdmin006545

I reserve the right to supplement or amend this opinion should additional information be made available or in response to any report of a litigation expert proffered by the Equity Committee.

*Jerome J. Shestack*

Jerome J. Shestack

Dated:  September 8, 2003

- 36 -

CH-11 TRUSTEE/
CrowleyAdmin006546

A1018

# Schnader
## ATTORNEYS AT LAW

1600 MARKET STREET   SUITE 3600
PHILADELPHIA, PA 19103-7286
215.751.2000   FAX 215.751.2205   schnader.com

October 28, 2003

Richard A. Barkasy
Direct Dial 856-482-5721
Direct Fax 856-482-6980
E-mail: rbarkasy@schnader.com

**VIA ELECTRONIC MAIL**



EXHIBIT
# 50
3-14-07  SB

Richard L. Schepacarter, Esquire
U.S. Department of Justice
Office of The U.S. Trustee
District of Delaware
J. Caleb Boggs Federal Bldg.
844 Kings St., Ste. 2313, Lockbox 35
Wilmington, DE  19801

Re:    In re Coram Healthcare Corp. and Coram, Inc., Debtors

Dear Rich:

I am writing in response to Mr. Levy's October 23, 2003 letter.

Judge Adams is a man of impeccable character and integrity, who has done an excellent job as Coram's Trustee. Mr. Levy's use of false statements and distortions of the record to assault him is demeaning to his client constituency, himself and our profession. Mr. Levy should be ashamed of himself.

Coram has prospered under the supervision of Judge Adams. For example:

- Coram's net revenues were up 10.1% for the calendar year 2002
- Through August, 2003, the companies' net revenues had increased by 11.3%
- Through the end of August, revenues from the most profitable core therapies were up by 9.9%
- Average weekly cash collections are better in 2003 than in 2002
- The cash balance of the company has grown faster than the rate of sales growth since calendar year 2001.

Judge Adams has proposed a plan that is fair to all constituencies. Under the Trustee's Plan, all creditors are paid in full and Coram's shareholders will receive a cash distribution that the Trustee's financial advisors estimate will exceed $37 million. The cash payment to shareholders is estimated to be at least 74 cents per share, which is about the price at which Coram stock has recently been trading. Plus, the shareholders will receive the net proceeds of all of Coram's remaining litigation claims, including the

Schnader Harrison Segal & Lewis LLP

NEW YORK   PENNSYLVANIA   CALIFORNIA   WASHINGTON, DC   NEW JERSEY

TRUSTEE06818

Schnader
ATTORNEYS AT LAW

Richard L. Schepacarter, Esq.
October 28, 2003
Page 2

proposed derivative claims against Daniel Crowley and the outside directors. The shareholders will receive these sums even though the valuation of the company performed by the Trustee's financial advisors shows that they are out of the money by more than $100 million.

The only interested party that opposes the Trustee's Plan is the Equity Committee. Judge Adams' Plan is supported by each class of creditors and even by nearly 70% of the shareholders casting ballots.

Despite the support of nearly 70% of the shareholders, the Equity Committee has never given the Trustee's Plan meaningful consideration. Donald Liebentritt of the Zell Organization testified that no meeting or telephone conference of the Equity Committee was held to discuss the Trustee's Plan. Mark Slezak of the Robert and Ann Lurie Foundation (the "Lurie Foundation") testified that he did not have an understanding as to the amount that shareholders would receive under the Trustee's Plan and that he had not performed any calculations to try to determine the amount.

Contrary to Mr. Levy's assertion, it has been Judge Adams' work which has increased the value of the distributions that will be received by unsecured creditors and Coram's shareholders under his Plan from those that would have been made if the Debtors' earlier plans had been confirmed, not the efforts of the Equity Committee. The distribution of 100% to unsecured creditors and an estimated in excess of $37 million to shareholders is possible only because: (1) Judge Adams has been able to enter into favorable settlements with the Noteholders, the IRS and R-Net; and (2) revenues have increased during the period that Judge Adams has been Trustee.

Judge Adams properly recognized that the paramount goal of a Chapter 11 case is a consensual plan and he set out to try to formulate one. The Equity Committee that has made outrageously high demands foiled him. For instance, Slezak recently testified that he would not support a settlement of less than $1.50 per share, more than twice the current trading price.

The members of a committee have a fiduciary duty to the committee's constituents and are responsible for maximizing their recovery. As a result, a committee member may not use its position on the committee to advance his own individual interests. Here, the Equity Committee is clearly not concerned for its constituents. As Mr. Levy's own firm's website says, this case is about "Sam Zell's battle for control of Coram Healthcare Corporation."

The Equity Committee consists of Samstock, LLC, the Lurie Foundation and Richard Haydon. Discovery has shown that all have strong connections to Mr. Zell and to one another.

Schnader Harrison Segal & Lewis LLP

TRUSTEE06819