Schnader
ATTORNEYS AT LAW

Richard L. Schepacarter, Esq.
October 28, 2003
Page 3

Samstock is owned by Mr. Zell and is one of his investment vehicles.

Robert Lurie was Mr. Zell's business partner until Mr. Lurie's death and he and the Lurie family still have common business interests. Mr. Slezak, who now runs the Lurie family businesses, was a former Zell employee.

Mr. Zell was introduced to Coram by his longtime friend and investment advisor, Will Weinstein. Mr. Weinstein is described as an advisor to the Lurie Foundation on the Coram matter and he has participated in Equity Committee meetings and conference calls. Both Mr. Zell and the Lurie Foundation were muti-million dollar investors in Mr. Weinstein's hedge fund, Jackson Square Partners. Mr. Zell speaks to Mr. Weinstein several times per day.

Mr. Haydon is one of Mr. Weinstein's clients.

Mr. Levy is a personal friend of Mr. Zell. According to Mr. Levy's website, Mr. Zell has been one of his clients.

The individual who is the Equity Committee's designated spokesman and witness, Mr. Liebentritt, is employed by Mr. Zell.

At least three of the five directors proposed by the Equity Committee for Coram have close ties to Mr. Zell. One of the directors would be Mr. Liebentritt. Another proposed director, Dr. Peter Linneman, was the Senior Managing Director of Equity International Properties, a private international real estate investment fund controlled by Mr. Zell. A third proposed director, Mark Gainor has been an investor in ventures in which Mr. Zell's affiliates have been investors.

In a letter dated September 17, 2002, Mr. Zell advised the Trustee that "economics is not the sole motivator behind my participation in these events." This is contrary to the Equity Committee's duty to maximize the recovery of all shareholders. As a committee member, economics is the only permissible motivation for Mr. Zell.

The Equity Committee has shown that it is willing to take actions that will harm shareholders so long as they advance some undefined agenda. For example, in an effort to secure votes for its failed plan, the Equity Committee has filed a motion to allow more than $6 million in creditor claims for voting purposes, to which the Trustee objected. In its motion papers, the Equity Committee argues for the validity of the claims even though the allowance of the claims would reduce the distribution to shareholders by more than $6 million.

We do not know for certain why Mr. Zell and the Equity Committee have adopted this strategy. Perhaps Mr. Zell is seeking to settle an old score. He told the Trustee that

Schnader Harrison Segal & Lewis LLP

TRUSTEE06820

A1021

**Schnader**
ATTORNEYS AT LAW

Richard L. Schepacarter, Esq.
October 28, 2003
Page 4

he had a significant dispute with one of the Noteholders, Goldman Sachs, over the Rockefeller Center deal (although he has recently said he has made peace with Goldman Sachs). Or, maybe Mr. Zell is seeking to harm a competitor, Cerberus, which also invests in distressed debt.

However, what we do know for sure is that the tolerance for risk of Mr. Zell and the other committee members is far greater than that of the other shareholders. Mr. Zell and his colleagues can afford to support a plan that gambles the company on the outcome of risky, expensive and time-consuming litigation, the only sure beneficiary of which will be the Equity Committee's professionals, who would undoubtedly receive millions of dollars of additional fees if the Equity Committee Plan were confirmed.

Further, it appears that Messrs. Haydon and Weinstein wrongfully profited from their association with the Equity Committee. Both Mr. Zell and Mr. Slezak testified that it would be inappropriate for a member of the Equity Committee to trade in Coram stock after the formation of the Equity Committee. Nevertheless, both Mr. Haydon and Mr. Weinstein did just that.

The Equity Committee takes issue with the motion that Judge Adams filed to extend Crowley's employment for a short period pending confirmation of a plan. Given the improvement in the company's financial performance while Crowley was CEO, Judge Adams believed that it would be better to maintain stability in management until the company emerged from bankruptcy. Judge Adams took this position with the best interest of the creditors and shareholders in mind. He had already taken tight control of Coram's purse strings and no Coram expenditure over $50,000 (beyond medication purchases in the ordinary course of business) was made by Crowley or has been made during the nine months since his departure without Judge Adams' approval. His motion was supported by substantial evidence that Crowley's removal could have a negative impact on the company. Although she denied Judge Adams' motion, Judge Walrath did not find that it was frivolous or taken in bad faith.

The Equity Committee cannot in good conscience contend that it has been denied access to information. During his deposition, Mr. Liebentritt testified that "I think that we have sufficient information to proceed with what we're doing."

Indeed, the Equity Committee has engaged in needless and duplicative discovery that will end up costing the shareholders millions. The Trustee, his financial advisors and accountants have produced more than 65,000 pages of documents in response to the Equity Committee's discovery requests. Even though it has already deposed the Trustee for 14 hours and the Trustee has offered to sit for an additional hour, the Equity Committee is not satisfied and is demanding more time. Scott Victor of SSG has been deposed for three full days as to valuation and feasibility issues, but the Equity Committee has demanded at least two more hours. The Equity Committee has deposed

TRUSTEE06821

Schnader
ATTORNEYS AT LAW

Richard L. Schepacarter, Esq.
October 28, 2003
Page 5

Sam Bemiss, Michael Weber and Scott Mumford of EB as to valuation issues and Ernst & Young's audit partner for a full day each. It has deposed Coram's Chief Financial Officer, Scott Danitz, four times. The Equity Committee's financial advisor, Deloitte & Touche, and one of Mr. Zell's employees, Ellen Havdala, have interviewed Mr. Danitz informally. The Equity Committee has deposed several other members of Coram's senior management: Allen Marabito, Executive Vice President; Vito Ponzio, Senior Vice President of Human Resources; Deborah Meyer, Senior Vice President of Sales; and Michael Saracco, President of Specialty Services. Dan Crowley has been deposed by the Equity Committee twice and will be deposed for a third time on November 7. And the Equity Committee has deposed Stephen Feinberg and Mark Neporent of Cerberus, former CEO Donald Amaral and the other outside directors who are targeted as defendants in the Equity Committee's proposed derivative complaint. Yet the Equity Committee is not satisfied. As Mr. Levy says in his October 23 letter, "[t]o be sure, there will be other depositions."

Judge Adams joins in your concern over the Equity Committee's administrative expenses. The Equity Committee's scorched earth litigation tactics have resulted in an astonishing amount of administrative claims. Through August 31, 2003, the Equity Committee's professionals had applied for fees and expenses totaling **$10,104,259.19.** When asked at his August 21, 2003 deposition to estimate the amount of fees that would be incurred by the Equity Committee through confirmation, Donald Liebentritt of the Zell Organization testified flippantly "it could be a lot or more than a lot."

The Equity Committee's assertion that the Trustee has failed to conduct a thorough investigation of the company and its assets is without merit. Judge Adams and his counsel have spent a significant amount of time meeting and discussing the company with members of senior management. Judge Adams retained experienced investment bankers to provide him with advice and guidance with regard to financial matters. He also brought on an experienced accountant to serve with him on the company's audit committee.

The Equity Committee's contention that Judge Adams did not do anything to investigate Crowley's conflict of interest and the proposed derivative claims is absurd. Before proposing a plan, Judge Adams reviewed extensive written briefs by all parties as to the merits of the derivative claims. Counsel for the Equity Committee and Daniel Fischel of Lexecon, the Equity Committee's damages expert, made an in-person presentation to the Trustee regarding the proposed lawsuit, as did counsel for each of the proposed defendants. In addition, Judge Adams' counsel reviewed the transcripts of the two confirmation hearings and all of the related depositions. In evaluating the claims and in settling with the Noteholders, Judge Adams relied upon his more than 50 years of legal experience, including his 18 years as a Judge of the United States Court of Appeals for the Third Circuit.

TRUSTEE0682

Schnader
ATTORNEYS AT LAW

Richard L. Schepacarter, Esq.
October 28, 2003
Page 6

Finally, Judge Adams consulted with Jerome Shestack, an experienced trial lawyer and a former American Bar Association president, who has opined that the settlement is reasonable. There can be no reasonable question that Judge Adams acted prudently.

During his deposition, Liebentritt was unable to identify anything that the Trustee did not do to investigate the litigation claims:

Q.    Are there things that you believe the Trustee should
      have done to develop additional information concerning the litigation
      claims?
A.    They should have filed a lawsuit.

If his mission had been to run up fees for his professionals, Judge Adams could have directed his counsel to repeat all of the discovery concerning the proposed derivative claims that was conducted prior to his appointment, at a cost of several million dollars. However, since his primary goals were to maximize the assets, minimize the liabilities and to get the company out of bankruptcy, Judge Adams relied in part on the thousands of pages of testimony and documents relating to the proposed derivative claims that had already been developed in connection with two prior confirmation hearings. This was the right thing to do.

The Equity Committee's suggestion that Judge Adams has breached his duties as Trustee is truly offensive. It shows that the Equity Committee cares not what it says or does so long as the case goes on and its professionals' fees are paid. A far more reasoned suggestion would be to reconstitute the Equity Committee so that it is more reflective of the shareholder group.

If you have any questions or if you need any additional information as the confirmation process proceeds, please do not hesitate to call.

Yours very truly,

Richard A. Barkasy
For SCHNADER HARRISON SEGAL & LEWIS LLP

RAB/sh

Schnader Harrison Segal & Lewis LLP

TRUSTEE06823

Schnader
ATTORNEYS AT LAW

Richard L. Schepacarter, Esq.
October 28, 2003
Page 7


Cc:    Barry E. Bressler, Esquire
       Wilbur L. Kipnes, Esquire
       Richard F. Levy, Esquire
       Alan B. Miller, Esquire
       Michael L. Cook, Esquire
       Howard O. Godnick, Esquire
       John A. Neuwirth, Esquire
       David J. Bradford, Esquire
       C. Steven Tomashefsky, Esquire
       Matthew P. Heiskell, Esquire

TRUSTEE06824

REDACTED

TRUSTEE06825

## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| CORAM HEALTHCARE CORP. and | : | |
| CORAM, INC., | : | Case No. 00-3299 (MFW) |
| | : | (Jointly Administered) |
| Debtors. | : | |

## CHAPTER 11 TRUSTEE'S POST-CONFIRMATION HEARING BRIEF

Barry E. Bressler
Wilbur L. Kipnes
Richard A. Barkasy
Michael J. Barrie
Matthew B. Holmwood

SCHNADER HARRISON SEGAL & LEWIS
LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania  19103-7286
(215) 751-2000

-and-

Kenneth E. Aaron (#4043)

WEIR & PARTNERS LLP
824 Market Street Mall, Suite 1001
P.O. Box 708
Wilmington, Delaware 19899
(302) 652-8181

Co-Counsel to Arlin M. Adams, Chapter 11
Trustee

## TABLE OF CONTENTS

PAGE

I.     BACKGROUND ................................................................................................. 1

II.    THE COURT SHOULD CONFIRM THE CHAPTER 11 TRUSTEE'S PLAN ................ 2

   A.  OVERVIEW OF THE TRUSTEE'S PLAN. ....................................................... 2

   B.  THE VOTING SUMMARY SHOWS BROAD ACCEPTANCE OF THE PLAN. ........... 3

   C.  THE TRUSTEE'S PLAN IS FAIR AND EQUITABLE TO CHC'S COMMON
       SHAREHOLDERS. ...................................................................................... 3

       1.  The Plan Will Pay CHC's Shareholders In Excess of $40 Million. ........... 3

       2.  The Distribution to CHC's Shareholders Under the Trustee's Plan Is Greater
           Than the Value of Their Interests. ...................................................... 5

           (a)  The Trustee's Confirmation Valuation ......................................... 5

           (b)  Deloitte's Confirmation Valuation is Unreliable. .......................... 8

       3.  The EC Is Out of the Money By Any Measure. .................................... 15

III.   THE CHAPTER 11 TRUSTEE'S PARTIAL SETTLEMENT OF THE EC'S
       PROPOSED DERIVATIVE LITIGATION SHOULD BE APPROVED. ..................... 17

   A.  THE CHAPTER 11 TRUSTEE PROPOSES THIS SETTLEMENT IN HIS
       BUSINESS JUDGMENT AFTER A FULL INVESTIGATION. ................................ 19

   B.  THE PROPOSED SETTLEMENT IS WELL ABOVE THE LOWEST RANGE OF
       REASONABLENESS. .................................................................................. 20

       1.  The Claims Against Goldman Sachs and Foothill Would Probably Not Survive
           Summary Judgment. ........................................................................ 21

       2.  There Is a Serious Chance that the RICO Claims Would Not Survive Summary
           Judgment. ...................................................................................... 22

           (a)  Defendants Would Attack the Proposed Scheme As Unnecessary and
                Illogical. .......................................................................... 23

           (b)  Coram Might Not Establish the Required RICO Pattern. ................ 25

       3.  There Are Difficult Issues Of Causation And Damages. ........................ 27

           (a)  The EC's Damages Calculation Is Subject to Challenge. ................ 27

           (b)  Professor Fischel's Theory Would be Challenged as Improperly Assuming
                Causation. ......................................................................... 29

           (c)  The EC's Causation Theory Is Susceptible to Factual Challenge. ....... 31

           (d)  Even if the EC's Damages Theory Went To The Jury, It Is Unrealistic To
                Assume An Award of $137 Million. ........................................... 31

i

      (e)     The Possibility Of Pursuing An Events Based Lawsuit Against The Noteholders Does Not Justify Rejecting The Settlement. ...................................... 32

      (f)     There Is No Evidence That The Settlement Is Unreasonable. ............... 33

  C.   THE COURT SHOULD APPROVE THE R-NET SETTLEMENT ................................ 36

  D.   THE THIRD PARTY RELEASES UNDER THE PLAN ARE APPROPRIATE. ........... 37

     1.    The Debtors' Release of Their Litigation Claims Against the Noteholders is Proper. ........................................................................................... 37

     2.    The Third Party Releases of Claims Against the Noteholders Are Proper. .............. 39

IV.   THE EQUITY COMMITTEE'S PLAN MAY NOT BE CONFIRMED. ......................... 41

  A.   THE EC PLAN DID NOT RECEIVE THE REQUISITE VOTES. ................................. 41

     1.    No Impaired CI Class Voted to Accept The Equity Plan. ............................ 41

     2.    The EC Plan Misdesignated Classes as Impaired Which Are Unimpaired. .............. 41

     3.    The Equity Plan Impermissibly Classified The R-Net Claim and the Noteholders' Unsecured Claims. ................................................................ 42

  B.   THE EQUITY PLAN IS NOT FEASIBLE. .................................................................. 43

  C.   THERE ARE SEVERAL OTHER LEGAL IMPEDIMENTS TO THE CONFIRMATION OF THE EQUITY PLAN. ................................................................ 46

V.    EVEN IF THE EQUITY PLAN WAS LEGALLY CONFIRMABLE, THE TRUSTEE'S PLAN SHOULD BE CONFIRMED. ......................................................... 46

  A.   THE TRUSTEE'S PLAN IS BETTER FOR CHC'S SHAREHOLDERS ........................ 47

  B.   THE TRUSTEE'S PLAN IS MORE FEASIBLE THAN THE EQUITY PLAN. ............ 47

  C.   THE CREDITORS CLEARLY PREFER THE PLAN. .................................................... 48

VI.   CONCLUSION ............................................................................................................. 50

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*In re A.H. Robbins Co., Inc.*, 880 F.2d 694 (4th Cir. 1989) ................................................ 39

*In re American Family Enterprises*, 256 B.R. 377 (D.N.J. 2000) ................................ 40, 41

*Augustine Medical, Inc. v. Mallinckrodt, Inc.*, 2003 U.S. Dist. LEXIS 6079
    (D. Del. April 9, 2003) ................................................................................ 28, 30

*Blue Cross & Blue Shield United v. Marshfield Clinic*, 152 F.3d 588 (7th Cir. 1998) ..... 30

*In re Cavalier Industrial, Inc.*, 2003 Bankr. LEXIS 150 (Bankr. E.D. Pa.
    Feb. 6, 2003) ................................................................................................ 42

*In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000) ................................................ 40

*In re Coram Health Corp.*, 271 B.R. 228 (Bankr. D. Del. 2001) ............................ 1, 8, 33

*In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002) ................................................ 39

*In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285 (2d Cir. 1992) ..................... 39

*FGH Realty Credit Corp. v. News Airport/Hotel Ltd. Partnership*, 155 B.R. 93
    (D.N.J. 1993) ................................................................................................ 42

*First National Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) ................... 30-31

*Furst v. Feinberg*, 54 Fed. Appx. 94 (3d. Cir. 2002) ..................................................... 48

*In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. Del. 2001) ........................... 20

*In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213 (D.N.J. 2000) .............................. 46

*In re Healthco International Inc.*, 136 F.3d 45 (1st Cir. 1998) ................................... 19-20

*In re Holley Garden Apartments, Ltd.*, 238 B.R. 488 (Bankr. M.D. Fla. 1999) .............. 47

*In re Intergrated Health Services Inc.*, 2001 Bankr. LEXIS 100 (Del. Bankr.
    Jan. 3, 2001) ................................................................................................ 20

*John Hancock Mutual Life Insurance Co. v. Route 37 Business
    Park Associates*, 987 F.2d 154 (3d Cir. 1993) ........................................... 42

*In re Lee Way Holding Comp.*, 120 B.R. 881 (Bankr. S.D. Ohio 1990) .......................... 19

iii

## TABLE OF AUTHORITIES (Continued)

*In re Made in Detroit, Inc.*, 299 B.R. 170 (Bankr. E.D. Mich. 2003) ................................ 43

*In re Martin*, 91 F.3d 389 (3d Cir. 1998) ...................................... 20

*In re Marvel*, 234 B.R. 21 (D. Del. 1999) ........................................ 20

*Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (W.D. Mo. 1994) ...................... 40

*In re Midway Investment, Ltd.*, 187 B.R. 382 (Bankr. S.D. Fla. 1995) ........................... 42

*In re Monarch Life Insurance Co.*, 65 F.3d 973 (1st Cir. 1995) ...................................... 39

*In re Munford, Inc.*, 97 F.3d 449 (11th Cir. 1996) ............................................ 39

*In re National Award Manufacturing, Inc.*, 35 B.R. 691 (Bankr. S.D. Ohio 1983).......... 43

*In re PWS Holding Corporation*, 228 F.3d 224 (3d. Cir. 2000) ...................................... 40

*In re Revco D.S., Inc.*, 1990 Bankr. LEXIS 2966 (Bankr. N.D. Ohio
    Dec. 17 1990) ........................................................................................ 44

*In re River Village Associates*, 181 B.R. 795 (E.D. Pa. 1995) ........................................ 48

*In re Stoffel*, 41 B.R. 390 (Bankr. D. Minn.1984) .............................................. 45

*In re Thornwood Associates*, 161 B.R. 367 (Bankr. M.D. Pa. 1993) ............................... 42

*In re Transit Group, Inc.*, 286 B.R. 811 (M.D. Fla. 2002)...........................................40-41

*In re Tyler, P.E., P.S., Inc.*, 156 B.R. 995 (N. D. Ohio 1993)........................................... 45

*In re United Artists Theatre Company*, 315 F.3d 217 (3d Cir. 2003) .........................39-40

*In re Vencour, Inc.*, 284 B.R. 79 (Bankr. D. Del. 2002) ............................................. 39, 40

*In re Zenith Electronics Corporation*, 241 B.R. 92 (Bankr. Del. 1999) ......................37-38

### FEDERAL STATUTES

11 U.S.C. § 1123 ................................................................................................... 38, 41

11 U.S.C. § 1129 .......................................................................................... 3, 41, 42, 46

18 U.S.C. § 1962 ................................................................................................... 22, 23

iv

## MISCELLANEOUS

R. Franklin Balotti & Jesse A. Finkelstein, 1 Del. L. Corp. & Bus. Org., 4-124
(2004) ................................................................................................................ 30

Jerold S. Solovy & R. Douglas Rees, CIVIL RICO:  A Guide to Federal/RICO
Litigation (Jenner & Block 2003) ........................................................ 22-23, 23, 30-31

v

A1032

## I.    BACKGROUND

Arlin M. Adams, the Chapter 11 Trustee of Coram Healthcare Corporation ("CHC") and Coram, Inc. ("CI") (collectively, "Coram" or "Debtors"), submits this brief in support of the Chapter 11 Trustee's Second Amended Joint Plan of Reorganization ("Plan" or "Trustee's Plan") and in opposition to the Official Committee of Equity Security Holders' ("EC") Second Amended Plan of Reorganization ("Equity Plan"). Confirmation hearings on the Plan and Equity Plan were conducted by the Court commencing on September 30, 2003 and concluding on April 20, 2004.

This Brief is submitted pursuant to the Court's request that the parties emphasize for the Court the credible and convincing evidence, both in the form of testimony and exhibits, which will assist the Court in considering confirmation of the competing plans. The Trustee is mindful of the Court's observation regarding its familiarity with the applicable case law discussing the requirements and considerations regarding confirmation under the Bankruptcy Code.

The factual and procedural history of Coram's bankruptcy proceedings is well known to the Court and will not be repeated here. See, e.g., In re Coram Health Corp., 271 B.R. 228 (Bankr. D. Del. 2001) (TA330-54). Likewise capitalized terms not defined herein have the same meaning as used in the Plan and Disclosure Statement. (Tr. Ex. 2).[1]

---

[1] "Tr. Ex." refer to Trustee's Exhibits from the Confirmation Hearing and "TA" refer to the Trustee's Appendix.

## II.   THE COURT SHOULD CONFIRM THE CHAPTER 11 TRUSTEE'S PLAN.

### A.   OVERVIEW OF THE TRUSTEE'S PLAN.

The main features of the Plan include:

- Assured cash funding by (1) $56 million to be contributed by the Noteholders and (2) the Debtors' cash on hand on the effective date.

- The Noteholders $56 million contribution consists of (1) a cash payment in the amount of approximately $40 million; and (2) the assumption and direct cash payment of the Debtors' remaining deferred tax liability to the Internal Revenue Service in the amount of approximately $16 million.

- In return for the $56 million in funding and waiver of other claims, the Trustee will release the Noteholders and their officers, directors and employees from any claims that the Debtors have against them, including the proposed derivative claims.

- All general unsecured creditors other than the Noteholders will receive an immediate and certain distribution of 100% of their allowed pre-petition claims. CHC will be dissolved, and Coram will become a private company, eliminating any future Stark II issues.

- The Noteholders will receive all the common and preferred stock in reorganized Coram, Inc. ("Reorganized Coram"), in satisfaction of their preferred stock liquidation interest in CI and their general unsecured claims on their Notes (which together exceed $370 million).

- Reorganized Coram will retain $10 million in cash working capital and will be debt free.

- CHC's common shareholders will receive the balance of the Plan Funding Cash remaining after all creditors are paid in full, which both the Trustee and EC's feasibility experts estimate will exceed $40 million.

- Unsecured creditors will receive post-petition interest calculated at the federal judgment rate from the net proceeds of the litigation claims, including claims against Daniel Crowley ("Crowley"), the outside directors and PriceWaterhouseCoopers ("PWC").

- CHC's common shareholders will receive a *pro rata* distribution from the remaining net proceeds of the litigation claims.

- The claim of R-Net, brought by its Unsecured Creditors' Committee, of more than $41 million will be settled, with R-Net receiving an allowed general unsecured claim of $7,950,000, which will be paid in full, enabling R-Net to consummate its confirmed plan of reorganization.

2

B.    THE VOTING SUMMARY SHOWS BROAD ACCEPTANCE OF THE PLAN.

The Plan was accepted by each impaired class of creditors. A clear majority (68.2%) of the shareholders who cast ballots voted to accept the Plan. A minority of shareholders holding a majority of the CHC equity interests voted to reject the Plan.

C.    THE TRUSTEE'S PLAN IS FAIR AND EQUITABLE TO CHC'S COMMON SHAREHOLDERS.

A plan may be confirmed over the dissent of an impaired class of interest holders if it is fair and equitable and not unfairly discriminatory. 11 U.S.C. §1129(b)(1). A class of equity security holders is treated fairly and equitably if it retains property equal in value to each equity security holder's interest. 11 U.S.C. §1129(b)(2)(C)(i).

1.    The Plan Will Pay CHC's Shareholders In Excess of $40 Million.

The Trustee estimates that under his Plan CHC's common shareholders will receive a cash distribution of more than $40 million. (TA122). The shareholders will also receive the net proceeds of all of Coram's litigation claims, after costs and payment of post-petition interest to unsecured creditors.

The evidence presented during the confirmation hearing by both the Trustee and the EC shows the Trustee's estimate of cash available for distribution to shareholders on the effective date is reasonable. The Trustee's feasibility expert, J. Scott Victor ("Victor") of SSG Capital Advisors, LP ("SSG"), an experienced investment banker specializing in distressed companies and a former bankruptcy attorney, performed an analysis estimating that $37,236,000 would be available for distribution to CHC's common shareholders under the Plan (TA2-8) as follows:

**Sources of Funds**

| | |
|---|---|
| Projected Cash Balance Available to Fund Plan | $41,161,900 |
| Gross Noteholder Funding | 56,000,000 |
| Less: Deferred IRS Claims | (18,363,000) |
| Net Noteholder Funding | $37,637,000 |

3

|                                                  |                |
|--------------------------------------------------|----------------|
| Total Sources of Funds                           | $78,798,900    |
| **Less: Uses of Funds**                          |                |
| Projected Administrative Claims                  | ($13,500,000)  |
| Non-IRS Tax Claims                               | (100,000)      |
| Priority Tax Claims                              | (12,900)       |
| Unsecured Claims (including R-Net settlement)    | (17,950,000)   |
| Cash Working Capital Left in Company             | (10,000,000)   |
| Total Uses of Funds                              | ($41,562,900)  |
| **Balance**                                      | $37,236,000    |

(Tr. Ex. 8). In fact, two events since Victor's testimony on September 30, 2003 will result in the availability of additional cash for CHC's shareholders.

First, Victor's analysis assumed Coram would use $8 million of cash to purchase new infusion pumps, but he explained that if any portion of the pump purchase was financed, the financed amount would be available for distribution to shareholders. (TA8). By Order dated December 22, 2003, the Court approved the Trustee's request that Coram finance 50% of the purchase price. (TA44). As a result, Coram has almost $4 million in additional cash, increasing the estimated distribution to shareholders to over $41 million.

Second, Coram has made payments to, and received a credit from, the IRS under the court-approved settlement that have reduced the deferred IRS claims by over $1.5 million to approximately $16 million.

The EC's feasibility expert, Carl Lane ("Lane") of Deloitte & Touche, LLP ("Deloitte") reached a conclusion similar to Victor. He estimated that as of March 31, 2004, Coram would have between $44.5 and $48.5 million in cash. He agreed with Victor that Coram is generating additional cash at the rate of $1.5 to $2.5 million per month. (TA143). Moreover, Lane's estimate of unsecured claims was $1.2 million lower than the Trustee's. (TA163). **Using Lane's estimates**

4

**A1036**

of cash and unsecured claims, the amount available for distribution to CHC's shareholders should be between $41,774,100 and $45,774,000.

The non-contingent cash distribution to be paid to shareholders on the effective date is greater than the market cap of Coram's stock. At the close of trading on April 20, 2004, the last day of the confirmation hearing, CHC stock traded at 69 cents per share and the market cap was approximately $34.25 million, based on the slightly less than 50 million shares outstanding testified to by Donald Liebentritt ("Liebentritt"). (TA262). CHC's shareholders will receive in excess of 80 cents per share under the Plan. (TA262).

### 2. The Distribution to CHC's Shareholders Under the Trustee's Plan Is Greater Than the Value of Their Interests.

The Plan is fair and equitable because the distribution to CHC's shareholders is greater than the value of their interests. As established by the expert testimony of Samuel M. Bemiss ("Bemiss") of Ewing Bemiss & Co. ("EB"), and supported by the expert testimony of Victor, Coram's fair market value is between $195 million and $225 million. (Tr. Ex. 11). The claims and interests with priority over CHC's shareholders exceed $420 million. CHC's shareholders are thus "out of the money." Consequently, the amount to be received by CHC's shareholders under the Plan is far greater than the value of their interests.

### (a) The Trustee's Confirmation Valuation.

The Trustee relied upon the EB/SSG enterprise valuation. Bemiss, the Trustee's primary valuation witness, has an MBA and J.D. from the University of Virginia. (TA49-50). He is an experienced investment banker, frequently representing buyers and sellers of healthcare companies in mergers and acquisitions. (TA50-51). When he testified on November 3, 2003, he had approximately ten active healthcare representations, including sale assignments for several respiratory care and durable medical equipment companies, a specialty pharmacy company, and a

5

home nursing company. (TA52-54). He has performed dozens of valuations in the healthcare sector over the past five years. (TA54).

EB/SSG's enterprise value was based on the traditional definition of fair market value - - the price a willing seller would pay a willing buyer, assuming that neither is under any compulsion and both possess all material information. (TA56-57). EB/SSG used three accepted valuation methodologies: (1) comparable public company analysis; (2) comparable transaction analysis; and (3) discounted cash flow ("DCF") analysis. (TA60-64; Tr. Ex. 11).

EB/SSG's range of indicated values was $209,976,000 to $239,708,000 for their comparable publicly traded company analysis and between $195,528,000 and $225,194,000 for comparable mergers and acquisition transactions in the home nursing, home medical equipment and home infusion sectors of the home healthcare industry during the past seven years. (Tr. Ex. 11). Finally, EB/SSG's DCF analysis, which utilized Coram's management's projections of annual net revenue growth of approximately 5% to 7% and EBITDA margins of approximately 7% to 8%, yielded a value for Coram of $229,646,000. (Tr. Ex. 11).

Weighing the enterprise value indicated by each of the three methodologies based on their extensive experience in the purchase and sale of healthcare companies, EB/SSG determined that Coram's enterprise value was in the range of $195 to $225 million. (Tr. Ex. 11). For purposes of comparison with their December 11, 2002 FASB 142 valuation, they calculated Coram's weighted average enterprise value for confirmation at $219,854,000. (Tr. Ex. 11).

Bemiss believed that the valuation, which was eight times actual reported trailing 12 months' EBITDA, was quite aggressive for a home infusion company:

Q:    You comfortable with your valuation opinion?

A:    Yeah. It's an aggressive valuation, but we think it's a correct valuation based on the information that we had as of the date of the valuation.

6

Q:     And what is your valuation number as a multiple of actual reported last 12 months EBITDA?

A:     Well, it's more than eight times actual reported trailing 12 months EBITDA, which is a big number.

Q:     And you've mentioned several times that, in the course of your testimony, that home infusion does not seem to be exciting. What do you mean by that?

A:     Well, it's been a, historically, difficult business, and if - - you know obviously, we're always on the phone with big home care providers and private equity groups - - big private equity groups expressing interest in home care, and we talk to them about what multiples they would pay for a company - - you know, what their interests are, and then we'll say, well, what would you pay for a respiratory care platform? What would you pay for a diversified DME company? What would you pay for a home nursing company? What would you pay for infusion, and if you did a scatter plot of what they would say, the multiples they would tell you would range between three and a half and probably six times EBITDA. I'm not aware of anybody that would tell me they would pay seven times EBITDA for a home infusion company. Nobody has ever told me that. So, to that extent, our valuation is a full valuation. (TA70-71).

Victor also expressed confidence in the EB/SSG valuation based on his considerable real world experience. (TA24, 27).

EB/SSG's valuation is supported by the marketplace response to Coram's bankruptcy. Because Coram is a public company and the bankruptcy record is public, potential purchasers have access to substantial financial information. (TA58-59). The EB/SSG valuation is consistent with expressions of interest that the Trustee and his financial advisors received, the highest of which came from Joseph Littlejohn & Levy, at between $210 million and $230 million. (TA59).

The EB/SSG valuation is also in the same "ball park" as the valuations previously performed by the financial advisors for the Debtors (Chanin), the Unsecured Creditors' Committee (UBS Warburg) and Harrison J. Goldin, the court-appointed Independent Restructuring Advisor:

| Advisor | Date | Midpoint Valuation (Millions) |
| --- | --- | --- |
| Chanin | 7/30/00 | $206,984 |
| Chanin | 12/04/00 | 189,391 |
| UBS Warburg | 12/11/00 | 192,500 |
| Chanin | 2/20/01 | 159,435 |
| Goldin | 9/04/01 | 245,747 |

7

| | | |
|---|---|---|
| Chanin | 10/01/01 | 222,341 |
| UBS Warburg | 11/05/01 | 170,000 |
| Chanin | 01/31/02 | 169,493 |
| EB/SSG | 06/30/03 | 219,000 |

(Tr. Ex. 14, Cerb. Exhs. 1-6, 13).

### (b)    Deloitte's Confirmation Valuation is Unreliable.

Deloitte has been the EC's financial advisor since 2000. Deloitte's confirmation valuation, like its several earlier valuations of Coram for the EC, is substantially higher than the other experts (TA252):

| Advisor | Date | Midpoint Valuation (Millions) |
|---|---|---|
| Deloitte | 11/15/00 | $292,000 |
| Deloitte | 12/14/00 | 282,724 |
| Deloitte | 07/27/01 | 333,487 |
| Deloitte | 03/31/03 | 329,000 |

(Cerb. Exhs. 7-11).

In its oral opinion denying the Debtors' first proposed plan of reorganization, the Court concluded that Coram was insolvent, explaining that cross-examination pointed out the "questionable nature" of Deloitte's valuation. (TA326). In its opinion denying the Debtors' second proposed plan of reorganization, the Court noted that it had "expressed some doubt" about Deloitte's valuation testimony during the first confirmation hearing. In re Coram Healthcare Corp., 271 B.R. at 232, n. 3 (TA336).

Deloitte's current $376 million valuation is about $100 million higher than the preliminary valuation Lexecon prepared for the EC in February 2003. Lexecon's preliminary valuation was $279.9 million, but that included $48.5 million for cash and NOLs. (Tr. Ex. 72). If those items are eliminated, Lexecon's estimate was close to the EB/SSG valuation. Bemiss and Victor were emphatic that there is no conceivable buyer for Coram at more than $250 million, but Deloitte's valuation is 50% higher than that, a conclusion that is simply unreliable.

8

**(1)    Deloitte Improperly Characterized Coram As a Specialty Pharmacy Company.**

Daniel Lynn ("Lynn"), the principal valuation witness for the EC, acknowledged that EBITDA multiples of specialty pharmacy companies are among the highest in the healthcare industry. (TA244). Even though Deloitte had not previously used specialty pharmacy companies in its guideline public method and guideline transaction method analyses, it did so for its current valuation, artificially inflating the value of Coram. Although Coram has a "specialty pharmacy" component, the evidence is uncontradicted that Coram is very different from the companies Deloitte used for comparison.

Michael Saracco ("Saracco") is the President of Specialty Services for Coram and has worked in home infusion since 1982. (TA73-77). Saracco testified that Coram's "business is focused on pretty high tech intravenous therapy with a host of clinical services wrapped around that nursing pharmacy, clinical monitoring, delivery, waste management, etcetera." (TA76). In contrast, Saracco described specialty pharmacy companies as "lick'em" and "stick'em" operations that fill orders received by telephone or electronically, which they then drop ship by mail directly to the patients (TA77-78). According to Saracco, Coram's "high tech"/"high touch" clinical management of its patients' needs puts it at the "other end of the spectrum" from specialty pharmacy companies. (TA78-79). During the confirmation hearing Coram's Executive Vice President, Alan Marabito ("Marabito"), also described the sharp differences between Coram and specialty pharmacy companies (TA82-84). For instance, he explained that unlike specialty pharmacy companies, which have pharmacists taking orders over the phone, Coram's pharmacists are interactive in their patients' care. (TA84).

9

EB/SSG did not use pure specialty pharmacies as comparable companies because, as Saracco and Marabito explained, they operate under a vastly different business model than Coram. (TA63).

Deloitte's use of pure specialty pharmacy companies as comparables substantially inflated its valuation because specialty pharmacy companies have growth rates three to four times greater than home infusion companies. (TA62). The EC offered no testimony from anyone with knowledge of the industry to show that Coram's business is similar to that of specialty pharmacy companies.[2] This is not a case of experts disagreeing. Lynn chose to ignore uncontroverted facts. He chose to rely on the fact that Coram derives revenue from the sale of pharmaceuticals, but did not consider the enormous differences between an automated mail order company and Coram.[3] As a result, Deloitte's valuation is unrealistically high.

### (2)    Deloitte Improperly Substituted Its Own Aggressive Projections For Carefully Prepared Management Projections.

In performing its DCF, Deloitte disregarded Coram management's carefully prepared projections of the company's growth rate and substituted its own stretched projections, inflating its valuation of Coram to the highest possible number. Management forecasted a revenue growth rate of 5.6% in 2004, 6.4% in 2005, 4.8% in 2006 and 5.2% in 2007 and thereafter. (TA42). Deloitte disregarded the company's model and used a flat 7% growth rate for the entire period.

Coram's Chief Financial Officer, Scott Danitz ("Danitz"), oversaw preparation of management's forecast. It was meticulously prepared on a "bottom-up" basis with input from many Coram employees. (TA36-40). Victor described the current financial management team that

---

[2] Even Liebentritt, Samstock, LLC's representative on, and the most active member of, the EC, testified that Coram is "primarily a home infusion business." (TA255).

[3] Lynn did not even bother to read Saracco's or Marabito's testimony. (TA243-44).

10

assembled the forecast as one of, if not the best, that he has dealt with in his 20 years of working

with distressed companies. (TA28).

In determining the appropriate growth rate, Coram management anticipated decreases in

Coram's reimbursements from insurers and government payors and increased costs for labor and

medications. Victor explained that Deloitte's projection of a flat 7% growth rate failed to take into

account the pricing pressures facing Coram:

> They fail to recognize significant pricing pressures which are expected to
> adversely affect revenue, and we see it today. In the third-party payer contracts
> there's pressure to reduce costs. There's a tremendous pressure around the
> United States for companies to reduce their health costs, and we're seeing it
> from the third-party payers now. There's a huge risk that there can be adverse
> pricing with Medicare by virtue of legislation. That can happen at anytime. . . It
> is not realistic or reasonable to just assume a 7 percent flat revenue top-line
> growth rate for the next five years. (TA34-35).

Coram's new HealthNet contract at lower prices and the United Health Care business it lost confirm

Victor's views.

Patrick Hurst of Houlihan Lokey Howard & Zukin Capital, the Noteholders' financial

advisor, found the Coram management's projections "detailed," "supportive" and that they

addressed the relevant issues. (TA269). He stated that it is inappropriate for a financial advisor

performing a valuation to totally substitute its judgment for that of experienced management and to

disregard competently prepared projections:

> [I]t's inappropriate to basically come up with your own projections saying I
> think based on spending a couple of hours with you I can project your business
> better, and I think you're too conservative, therefore, I'm going to increase your
> own projections. I do this every day. I live in healthcare. I deal with companies
> everyday. I wouldn't adjust management's projections that I thought that they
> were most likely and prepared on a competent basis. (TA269).

Deloitte's previous valuations also contained more aggressive projected growth rates than

management's and Deloitte's past predictions have proven wrong. For example, in November and

December 2000, Deloitte projected Coram's revenue to grow by 5 to 8% in 2001. (TA174-175).

11

Instead, revenue dropped by 2.4% in 2001. (TA41). Similarly, in its projections prepared in 2000, Coram management selected a growth rate of between 2.1 and 2.2%. (TA175). In its December 2000 valuation, Deloitte rejected management's projections and utilized a growth rate of 5%. (TA175). Based upon the increased growth rate, Deloitte projected that Coram's EBIT in 2002 would be $32,190,000. (TA175). However, Coram's actual EBIT for 2002 was only $17,681,000. (TA176).

Again, in its July 2001 valuation, Deloitte rejected management's projected growth rate of 2.1% and predicted a growth rate between 5 and 8%. (TA205). Using a growth rate of between 5 and 8%, Deloitte predicted Coram's EBITDA for 2002 between $49,912,000 and $51,535,000. Deloitte's projections far exceeded actual reported EBITDA for 2002 of $28 million and even Coram's EBITDA as "normalized" by Deloitte of $36.2 million. (TA204-06).

Deloitte had no reasonable basis to reject Coram management's meticulous projections, but did so because the projections provided another opportunity for Deloitte to increase its valuation.

### (3)     Deloitte's Valuation Includes An Excessive Number of EBITDA Adjustments

In performing its valuation analysis, Deloitte made numerous adjustments to Coram's EBITDA, increasing reported EBITDA from approximately $26 million to $36.6 million, a 40% increase, under the guise of "normalizing" EBITDA. (TA249). These adjustments greatly increased Deloitte's valuation. For example, the indicated value under the comparable transaction analysis increased by approximately $78 million.

Both Bemiss and Hurst, based upon their years' of experience in dealing with buyers of healthcare companies, testified unequivocally that a buyer would not accept such a high level of adjustments. (TA268). A buyer would either reject the "add-backs" or significantly discount the multiple it would pay. (TA268).

12

Lane, who sponsored the EBITDA adjustments, has no experience in negotiating EBITDA adjustments with buyers, an activity that Lane acknowledges is a regular part of both Bemiss' and Hurst's investment banking practices (TA292-93) and, therefore, has no basis on which to justify his position that EBITDA adjustments of this magnitude accurately reflect enterprise value.

It is apparent that Deloitte was not normalizing EBITDA; rather it sought to maximize earnings to inflate value. Consequently, Deloitte's valuation is grossly unreliably inflated and does not pass what Bemiss described as a buyer's smell test -- Deloitte's valuation is 12 times trailing 12 months' reported EBITDA, an unheard of multiple for a home infusion company.

### (4)     Deloitte Should Not Have Added Cash To Its Valuation

Deloitte added Coram's cash working capital of $37,910,000 to its valuation. EB/SSG did not do so for a single common sense reason -- that cash is needed to pay the costs of reorganizing. As Bemiss testified, "I don't see the company getting reorganized, or sold or changing form without more than $40 million of liabilities being paid off." (TA67).

Lane agreed that in an asset sale, a buyer would not receive the cash. (TA160). He also admitted that in a stock sale the buyer would take the cash subject to the company's existing liabilities. (TA160-61). Here, the amount of Coram's liabilities (even excluding the Noteholders' claims) exceeds $37,910,000. Consequently, it was improper for Deloitte to add Coram's cash to its enterprise valuation.

### (5)     Deloitte Should Not Have Added Any Value For Coram's NOLs.

Deloitte also added more than $32 million to its valuation for the alleged present value of Coram's Net Operating Losses ("NOLs"). Yet, quite significantly, Deloitte did not attribute any value to the NOLs in any of its three previous valuations that it performed prior to 2003. (TA155-56).

13

Scott Moeller ("Moeller"), Coram's Director of Taxation, testified in detail about the uncertainty of Coram's tax position regarding its NOLs, stemming from the application of Section 382 on a consolidated basis and Section 108 on a separate company basis. (TA91). As Moeller explained, if the IRS successfully challenged Coram's filing position, the NOLs would have no value whatsoever. (TA92). He said that chances were high that the company could lose an IRS challenge. (TA92-93).

Despite his admission that he is not an expert on taxation or NOLs, Lane nevertheless "determined" that the chances of the IRS successfully challenging Coram's tax position are no greater than 25%. (TA136-37, TA150). Lane based his conclusion solely on conversations with others at Deloitte who were not witnesses subject to cross-examination. (TA150-52, TA154). Perhaps they were the same type of Deloitte tax "experts" that provided Coram with advice on NOLs in 1995 and 1996 that resulted in the recent $18.5 million settlement with the IRS. Lane did not review all of Moeller's unrebutted expert testimony as to the risks associated with the NOLs and ignored the testimony of Bemiss and Hurst that buyers will not normally pay for NOLs. (TA152-53). Predicting tax rulings is often a risky endeavor. Since Lane is not a tax expert, his testimony that the chances of the IRS successfully challenging Coram's are no greater than 25% should be given no weight.

In a sale to a third party, the NOLs would not have the value ascribed to them by Deloitte. Moeller testified, and Lane agreed, that in an asset sale, the NOLs would not have any value to the buyer. (TA192). Lane also acknowledged that in a stock sale, there would be limitations on the use of the NOLs which would substantially reduce their value to any buyer. (TA192). Finally, Lane acknowledged that even if the Equity Plan is confirmed and Coram is not sold, in the event of a subsequent change of control within two years, all of the NOLs would be lost. (TA193-94). He admitted that the Equity Plan does not contain a provision which would limit this subsequent

14

transfer of stock by shareholders so as to preclude a change in control within the meaning of the Internal Revenue Code. (TA194).

Bemiss explained that EB/SSG did not include the NOLs in its valuation because a buyer would not pay for them due to the substantial risks in realizing them. (TA68-69). Hurst agreed that a real buyer would not pay for the NOLs. (TA270).

Bemiss' and Hurst's opinions, which are based upon years of experience in assisting clients in buying and selling healthcare companies, cannot be and were not credibly refuted by Lane, who has almost no experience in the purchase and sale of businesses. The Trustee's own experience comported with Bemiss, Victor and Hurst; in sale transactions buyers do not generally pay for NOLs. Consequently, it was inappropriate for Deloitte to add the alleged present value of the NOLs of over $32 million to its valuation of Coram.

> **(6)    Deloitte's Valuation Is Higher Than Every Other Investment Banker.**

Each valuation performed by Deloitte during the course of this Chapter 11 proceeding has been substantially higher than the valuations performed by any other experts in these Chapter 11 cases. Deloitte's approach appears to be an attempt to maximize Coram's value beyond the limits of credibility in order to support the EC's opposition to the Trustee's Plan. Since the valuation evidence presented by Deloitte was unreliable, it should be rejected.

> **3.    The EC Is Out of the Money By Any Measure.**

As Victor testified, even under Deloitte's bloated valuation, the EC would still be out of the money by $44.9 million (TA31-32):

15

|                                                          | (In Millions) |
| -------------------------------------------------------- | ------------- |
| **Enterprise Valuation As Per Deloitte**                 | $376.0        |
| Noteholder Claims as of 11/30/03                         | (252.6)       |
| Noteholder Contractual Interest/PIK Dividends as of 9/30/03 | (117.6)    |
| Cash Disbursements at closing as per EC                  | (32.4)        |
| IRS Claim                                                | (18.2)        |
| **Total Claims Ahead of the CHC Shareholders**           | (420.9)       |
| **Value of Equity Interests**                            | **($44.9)**   |

(Tr. Ex. 16). Even accepting the Deloitte valuation, to realize the same value for shareholders as would be achieved from the cash distribution under the Plan, Coram would need a net recovery of more than $85 million from its litigation claims against the Noteholders.[4]

If Lexecon's $279.9 million preliminary valuation was accurate, equity would be out of the money by $141 million and the company would have to recover more than $181 million in the litigation for the shareholders to come out ahead of the lowest amount they will receive under the Plan.

Finally, using EB/SSG's weighted average valuation of $219.8 million, CHC shareholders are out of the money by $201.1 million and Coram would have to recover more than $241.1 million from the Noteholders in the derivative suit for the shareholders to realize the same amount that they will receive as a cash distribution pursuant from the Plan if it is confirmed (before any recoveries from the retained litigation claims).

---

[4]This calculation holds true even if the EC succeeds on its argument that the Noteholders are not entitled to post-petition interest because they engaged in inequitable conduct. In such case, the Noteholders would be entitled to a credit in the amount of any interest disallowed against the damages claims in the proposed derivative case.

16

III.    THE CHAPTER 11 TRUSTEE'S PARTIAL SETTLEMENT OF THE EC'S
        PROPOSED DERIVATIVE LITIGATION SHOULD BE APPROVED.

The Trustee's proposed settlement provides a certain and significant recovery for Coram while preserving Coram's claims against Daniel Crowley and the outside directors for the benefit of Coram's shareholders. Under the proposed settlement, the Noteholders will make a cash infusion of $56 million and release claims of $9 million on their remaining notes. The settlement is integral to the Plan. Under it, Coram will emerge from bankruptcy as a financially stable, debt-free private company without any Stark II problem, and the shareholders will receive more than $40 million and perhaps considerably more.

In exchange for $56 million, the Trustee proposes to release the RICO claims of questionable merit asserted against Cerberus and Stephen Feinberg, patently weak state law claims against Goldman Sachs and Wells Fargo Foothill (sometimes "Foothill"), and breach of fiduciary duty claims against Feinberg and Cerberus. The Trustee has not settled, with or in any way released, Crowley or the outside directors, who have $100 million in D&O coverage. Under the Plan, the shareholders will receive any net proceeds of those breach of duty claims after payment of the creditors' post-petition interest of less than $2 million.

The Trustee has enormous experience in the evaluation and settlement of complex litigation. He has been a preeminent lawyer, mediator and federal appeals court judge for more than 50 years. He retained experienced counsel, who reviewed the entire record, including discovery, from the first two confirmation hearings and who conducted an independent legal analysis of Coram's claims. (TA124-27). The Trustee requested and received lengthy memoranda from counsel for the EC, the Noteholders, Crowley, and the outside directors, setting forth their respective analyses of the facts and the law. (TA124-27). In May 2002, the Trustee invited the EC to make a combined opening statement and closing argument. (TA265). The EC prepared exhibit books and made a detailed

17

presentation of the facts and the legal issues. Its expert, Daniel Fischel, described his methodology

for calculating damages and presented demonstrative exhibits. Later in May 2002, the Noteholders

made a similar presentation to the Trustee.

Following those presentations, the Trustee was optimistic that he could achieve a settlement

of Coram's claims that would enable him to present a consensual plan of reorganization. His view

was further bolstered by his meeting with Sam Zell, the Chairman of the leading EC member,

Samstock, Ltd. in mid-September 2002, during which Zell suggested a possible settlement in the

$60 million range, a proposal that the Trustee believed could at least provide a platform for serious

negotiations. (TA129-30, TA311). Unfortunately, at the mediation held on September 25, 2002,

the EC made an initial demand of $118 million, and a final demand of $99 million, which was so

unrealistic that it precluded any meaningful discussion between the EC and the Noteholders.

(TA127). (As we now know, the EC's mediation demand was, as Zell had accurately signaled to the

Trustee, more than double its true settlement position.) The EC's objective was to have the Trustee

file the lawsuit. However, the Trustee's fiduciary obligations required him to determine whether he

could achieve a fair settlement with the Noteholders.

The Trustee's counsel negotiated with the Noteholders and reached what the Trustee

believed was a good settlement. Nevertheless, before approving the Plan Funding Agreement, the

Trustee sought the opinion of Jerome J. Shestack, a highly-experienced and well-respected

commercial trial lawyer. After his review, Shestack advised the Trustee to accept the settlement.

(TA124-28).

Both the Trustee and Shestack believed that Coram would establish liability on its Delaware

state law claims against Crowley, Feinberg and Cerberus. (TA98). However, both the Trustee and

Shestack had serious reservations about Coram's ability to prevail on the proposed RICO claims and

any claims against Goldman Sachs and Foothill. Although the Trustee has confidence in Coram's

18