liability case for the breach of duty claims against Feinberg and Cerberus, both he and Shestack

recognized that Coram faced significant obstacles in proving causation and damages. The Trustee

concluded that $56 million and the waiver of their remaining $9 million claim was the maximum

amount to reasonably expect the Noteholders to pay in settlement. (TA124). He faced this

decision: reject a certain recovery of $56 million (plus the forgiveness of $9 million of

indebtedness) from fewer than all defendants or pursue a larger recovery against all defendants,

including RICO claims, in what everyone agrees would be expensive, lengthy, complex and

contentious litigation that had no guarantee of success. The Trustee knows that litigation is

inherently uncertain and that it was very possible that the net proceeds of the litigation could be less

than the settlement amount, perhaps substantially less. (TA130-31). The Trustee believed that it

was reasonable to settle with the Noteholders on these terms.

    The EC did not introduce direct evidence that the settlement is unreasonable. To the

contrary, Mr. Liebentritt testified that he would have settled for $50-$55 million, although he did

not so inform the Trustee. (TA257, TA260). Judge McKelvie criticized Shestack's methodology in

a limited way, but did not opine that the settlement was unreasonable. Even if Shestack's testimony

were discounted entirely, the Trustee would still propose the settlement. As Judge McKelvie

testified, he "would absolutely agree that in this context, the Trustee, and especially Judge Adams

would be in a better position than I would be to make decisions relating to a settlement." (TA241).

    A.    THE CHAPTER 11 TRUSTEE PROPOSES THIS SETTLEMENT IN HIS
             BUSINESS JUDGMENT AFTER A FULL INVESTIGATION.

    To propose a settlement "the Trustee and his counsel need not be so familiar with the case as

to be prepared to go to trial." In re Lee Way Holding Comp., 120 B.R. 881, 897 (Bankr. S.D. Ohio

1990) (rejecting argument that Jenner & Block as counsel to the trustee failed to sufficiently

investigate a lawsuit before trustee proposed settlement) (cited in In re Healthco Inter. Inc., 136

A1051

F.3d 45, 51 (1st Cir. 1998)).  In addition to his own investigation, the Chapter 11 Trustee proposes

this settlement after thorough investigations by his counsel, Shestack, Harrison Goldin, the EC and

its counsel.  See In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (stating that "[u]nder normal

circumstances, the court would defer to the Trustee's judgment so long as there is a legitimate

business justification."); see also In re Genesis Health Ventures, Inc., 266 B.R. 591, 620 (Bankr.

Del. 2001); In re Marvel, 234 B.R. 21, 71 (D. Del. 1999).

The Trustee had the benefit of the aggressive work of the EC, which "spent millions of

dollars in professional fees conducting discovery and investigating the facts surrounding the

Crowley conflict of interest."  (TA264).  There can be no question that the EC obtained all the

important documents and deposed all of the key witnesses.  The EC retained an experienced and

well-regarded damages expert.  In their effort to persuade the Trustee to seek Court permission to

file the derivative lawsuit, the EC "tried to put our best foot forward."  (TA265).  As Shestack

testified:  "I think the equity holders did a very thorough job in trying to ascertain facts that would

sustain their theory, and if they failed, it was because the theory failed not their due diligence."

(TA119).  The Trustee carefully considered the results of the EC's efforts in reaching his own

judgment.

B.    THE PROPOSED SETTLEMENT IS WELL ABOVE THE LOWEST RANGE OF
        REASONABLENESS.

"In approving a settlement the Court is not to determine that the settlement is the best that

can be achieved by the debtor . . . but rather to canvass the issues and see whether the settlement

'fall[s] below the lowest point in the range of reasonableness.'"  In re Intergrated Health Services

Inc., 2001 Bankr. LEXIS 100, at *6-7 (Del. Bankr. Jan. 3, 2001).  A Bankruptcy Court should

consider four criteria.  See In re Martin, 91 F.3d at 393; In re Intergrated Health Services Inc., 2001

Bankr. LEXIS 100, at *6:

20

(1)   the probability of success in litigation;
(2)   the likely difficulties in collection;
(3)   the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
(4)   the paramount interests of the creditors.

Factors (2) through (4) require little discussion: the defendants have appropriate resources, the litigation would be complex, long and expensive,[5] and the creditors will be paid in full. The question is simply this: Should the Trustee pursue the factually and legally complex RICO claims against Cerberus and Feinberg with their possibility of treble damages and the state law claims against Feinberg and the Noteholders, and forego a certain $56 million? The answer is a clear "no."

### 1. The Claims Against Goldman Sachs and Foothill Would Probably Not Survive Summary Judgment.

Judge Adams, Shestack and Judge McKelvie all testified that the proposed state law claims against Goldman Sachs and Foothill are weak. (Goldman Sachs and Foothill are not defendants in the RICO claims.) The Trustee testified that he "scoured the record in this case, many of the statements under oath, and I have nothing that implicates Goldman Sachs in any way." (TA134). Shestack reviewed the discovery in great detail and concluded that Goldman Sachs and Foothill would have "very good strong arguments" against liability because (a) there are no facts to support their participation in an alleged conspiracy and (b) they never occupied fiduciary positions. (TA96). The argument that Feinberg became their agent because he was the Noteholders' representative on the board of directors is factually weak, even assuming the legal theory could

---

[5] The EC's Disclosure Statement states that the lawsuit might take two-years and cost an additional $6 million dollars. (Tr. Ex. 6 at 33-34). The median time to trial in a civil case in Delaware District Court is 21 months. (TA236). As Shestack testified, this lawsuit would be "very contentious because you have very good lawyers on all sides of the issue and law firms that are very experienced and clients that can pay their fees." (TA95). The long delay, high costs, and complexity associated with trying the lawsuit clearly supports accepting the partial settlement. In contrast, a lawsuit against Crowley and the outside directors would not have RICO claims and would focus on the essentially undisputed fact of the conflict and would take place after Coram is out of bankruptcy and financially secure.

21

survive. There is nothing in this extensive record to support the proposition that a Cerberus side-deal with Crowley was within the scope of Feinberg's "agency" as the Noteholders' representative.

Significantly, Judge McKelvie agreed that it was more likely than not that the claims against Goldman Sachs and Foothill would not survive summary judgment even though "summary judgment is not favored in our Court." (TA227).

> Q.    Is it correct that you have no opinion – you are offering no opinion that the claims against Goldman Sachs and Foothill would survive a motion for summary judgment?
>
> A.    That's correct.
>
> Q.    And if you thought it was more likely than not that those claims would survive a motion for summary judgment, you would have said so?
>
> A.    I would have. (TA235).

If Goldman Sachs and Foothill are dismissed, the RICO claim under § 1962(c) fails as well because even though they are not defendants, their participation is necessary to establish the required "association in fact" element. (Tr. Ex. 30 at ¶ 154 (Compl.)). Without Goldman Sachs and Foothill in the case, Coram would have the extremely difficult burden of explaining to a jury why Goldman Sachs and Foothill, who together held 62% of the Notes, would have allowed Cerberus to jeopardize their investments by causing Coram to underperform.

> **2.    There Is a Serious Chance that the RICO Claims Would Not Survive Summary Judgment.**

The proposed complaint attempts to transform fairly straightforward breach of fiduciary duty claims against Crowley and Feinberg into a complicated RICO scheme. There are numerous decisions in which courts have rejected efforts to expand state law claims into RICO violations. A court might well view the proposed RICO claims skeptically. Moreover, RICO is a "complex and confused field of law." (TA99). As the eminent Chairman of Jenner & Block has explained: "Not only is RICO law constantly changing, but there is disagreement among circuits, and even within

22

circuits, about how to apply RICO." Jerold S. Solovy & R. Douglas Rees, <u>CIVIL RICO: A Guide to Federal Civil RICO Litigation</u>, 1-4 (Jenner & Block 2003) ("Jenner RICO Treatise"). (TA319).

RICO claims are particularly difficult because they require proof of more than duty, breach, causation and damages. "RICO's requirements of a culpable 'person' who conducts the affairs of a distinct 'enterprise' through a 'pattern' of 'racketeering' in a way that proximately causes injury can make RICO complex and mystifying." Jenner RICO Treatise at 1-1. (TA318). Shestack testified that there was a "considerable risk" that the RICO claims would not survive. (TA103).

Judge McKelvie agreed that "there are difficult factual issues" with the RICO claims proposed by the EC complaint under §§ 1962(b) and (c). (TA229). He also agreed that the § 1962(c) claim would probably not survive summary judgment. (TA233-34, TA235). The Jenner RICO Treatise states that "successful 1962(b) claims are rare." Jenner RICO Treatise at 6-1. (TA321). The remaining § 1962(d) conspiracy claim is built on the §§ 1962(b) and (c) violations.

### (a)    Defendants Would Attack the Proposed Scheme As Unnecessary and Illogical.

An actionable scheme must have a plausible objective. The proposed RICO claims assert that Crowley, Feinberg and the Noteholders devised a scheme to put Coram into bankruptcy so the Noteholders could "steal" the equity. Shestack testified that defendants' best liability argument is that the alleged scheme simply makes no sense. "Why should there have been a scheme to throw this company into bankruptcy when it was essentially in a zone of insolvency at the time the scheme started[?]" (TA103). Without a scheme, much of the lawsuit "falls by the wayside." (TA97). The court on pretrial motion or the jury after trial may be equally skeptical, asking why the Noteholders would have conspired to put Coram into bankruptcy when they could have done so legally. Moreover, if the defendants can show that the EC was out of the money before Coram's

23

bankruptcy, there was nothing to steal. Professor Fischel acknowledged that Coram's debt (more than $250 million) exceeded its value ($199 million) *before* Crowley became CEO. (TA218).

There is substantial evidence that Coram's bankruptcy was unrelated to Crowley's conflict. Coram had significant economic problems before Crowley became CEO. Coram assumed significant debt to finance its growth in the mid-1990s, which caused Coram "financial difficulties through much of the late 1990's." (TA330-31). When he became CEO in 1996, Donald Amaral described Coram as "the worst train wreck I ever saw." (TA314). Coram's debt problems were exacerbated by the unfortunate Aetna contract that was negotiated by Rick Smith, Coram's CFO who became CEO when Amaral resigned and was later replaced by Crowley, and which caused a $46 million loss in 1999. (Tr. Ex. 6 at 53 (EC Disc. Statement)).

The Noteholders will argue that the facts alleged in the Complaint do not support the supposed scheme. (TA97-98). The Complaint asserts that the first step was the 1998 Securities Exchange Agreement. The EC sees as nefarious the provisions of the Agreement that permitted the Noteholders to declare a default if Amaral stepped down as CEO and to appoint a board member. (Tr. Ex. 30 at ¶ 19-32 (Compl.)). The Complaint alleges that the Noteholders bought Amaral's allegiance by paying him a bonus of $1 million. The Noteholders will counter all of these assertions: (1) Coram initiated the negotiations with the Noteholders to restructure its debt (TA108); (2) Coram's Board, not the Noteholders, gave Amaral the bonus for restructuring the debt; and (3) DLJ, Coram's prior debt holder, had a seat on the board. In fact, the Noteholders would present testimony that their conduct was designed to assist Coram in an effort to help it stave off bankruptcy. (TA113-14). The Noteholders extended the maturity date on the debt, lowered the interest rate and did not declare a default when Amaral resigned. (There is no allegation that the Noteholders could possibly have known that one of Amaral's family members would become very ill and eventually cause his resignation.) Marshall Stearns, a Senior Vice President at Foothill,

24

testified that "[t]here was no scheme to steal the company," and that the Noteholders "had numerous opportunities should we have wanted to steal this company." (TA113-14).

The next step in the alleged scheme concerned Rick Smith. When Amaral resigned, he recommended to the Board that it elevate Smith to CEO. According to the Complaint, the Noteholders used Smith's promotion as the vehicle to place Crowley at the helm. (Tr. Ex. 30 at ¶ 33-39 (Compl.)). If Amaral was aligned with the Noteholders, why would he suggest that the independent Smith be made CEO?

There is substantial factual support for the proposition that Smith lacked the experience to lead a company as troubled as Coram. (TA296-97, TA307). There is certainly nothing wrong with replacing senior management when appropriate. Don Liebentritt testified that Samstock, one of Zell's companies and a member of the EC, effectuates management change "when the situations warrant." (TA208). How the Noteholders knew Smith would resign is not explained, but the more fundamental problem with the RICO claims is that the Complaint concocts an elaborate scheme when none was necessary.

According to the EC's theory, the next step in the conspiracy to drive Coram into bankruptcy to steal the equity, was the Noteholders' failure to help Coram with its Stark II issues. (Tr. Ex. 30 at ¶ 51-61 (Compl.)). The Noteholders had no duty to renegotiate their debt and voluntarily assume a lesser position if Coram, as appeared highly likely, had to file for bankruptcy protection.

The risk to the plaintiff is that the RICO claims would be dismissed in their entirety because of factual (*i.e.*, logical) deficiencies, and it is a very serious risk.

  **(b)**  **Coram Might Not Establish the Required RICO Pattern.**

Even if the alleged scheme survived summary judgment, Coram would have to establish a RICO pattern. RICO claims are often successfully challenged on this basis. The EC contends that

25

continuity will be established because "[t]here is open-ended continuity (as reflected by the three other cases alleging similar conduct against Cerberus) and closed-ended continuity (the scheme persisted for well over two years before a trustee was appointed)." (Tr. Ex. 6 at 42 (EC Disc. Statement)).

Relying upon the three other cases identified by the EC to establish so-called "open-ended continuity" is risky. The court trying the RICO case must admit the evidence. Shestack testified that "It's very likely that they would ask for pretty considerable offers of proof and summary judgment or motions in *limine* would be likely." (TA100-01). Judge McKelvie testified that "it's a difficult management issue for a judge, because you don't want people to retry all of the issues in a case." (TA235). The evidence must also support the current claim. Shestack testified that these cases -- in one of which the plan of reorganization has been confirmed and another was completely unrelated -- "are not really very good cases to prove that point." (TA101). The WSNet case may have similar allegations because it apparently involves a claim that Cerberus attempted to gain control of a bankrupt company. But, the case has not progressed and the Trustee has to decide now whether to settle. It is neither realistic nor prudent for the Trustee to turn down $56 million and await the outcome of the WSNet litigation, which could be years from now. Moreover, it is a certainty that Cerberus would challenge the introduction of facts relating to WSNet, which would open up that case for discovery in Coram's case, thereby very substantially increasing the complexity and expense of the proposed RICO case.

There are also risks in Coram's ability to establish a period of at least one year required by the Third Circuit to establish "close-ended continuity." A court or jury might easily conclude that the pattern began with Crowley's appointment as CEO and ended with Coram's bankruptcy filing, a period of less than nine months. If the court or jury rejected the argument that Amaral was involved, or rejected the argument that the Securities Exchange Agreement was part of the scheme

26

(given the lack of evidence supporting claims against Goldman Sachs and Foothill), Coram's attempt to prove a pattern could fail. More basically, the court or jury might wonder why the Noteholders did not simply declare Coram in default when Amaral resigned, or why Amaral recommended Smith to replace him if Smith was not part of the scheme, and why, as the Complaint alleges, Amaral would be loyal to the Noteholders. In short, there are more than sufficient RICO burdens here to raise serious doubts about the ultimate viability of the proposed RICO claims.

### 3.    There Are Difficult Issues Of Causation And Damages.

#### (a)    The EC's Damages Calculation Is Subject to Challenge.

In Shestack's opinion, "the weakest part of the case was causation and damages." (TA121). Complex cases sometimes call for complex damages theories and complex damages theories create significant litigation risks. There could be no clearer proof of the accuracy of this proposition than the difficulties encountered by Professor Fischel.

We recount those difficulties here not to attack Professor Fischel, an eminent damages expert, but to underscore why the proposed settlement makes so much sense. Professor Fischel's estimates of damages decreased from $320 million (the EC's Disclosure Statement) to $275 million (expert report) to $265 million (trial testimony). (Tr. Ex. 6 at 49-50 (EC Disc. Statement), TA210, TA211). On the eve of his testimony, Professor Fischel acknowledged he made two $100 million changes, which counsel euphemistically described as "computational corrections." (TA215). In his report, Professor Fischel had not accounted for all of Coram's payments of principal and interest in the period under examination. (TA214). The other change, which had the false illusion of symmetry, was to include repayments of principal by the index companies in the calculation of return on debt. Dr. Tabak agreed that the first correction was proper, but testified that the second was indisputably wrong. (TA283). As a result, Professor Fischel overstated by $127 million the damages calculated by his methodology of comparing Coram's growth to the average growth of the

27

four index companies. (TA289). Dr. Tabak explained that Professor Fischel's complex methodology incorrectly credited the peer companies with growth when they simply borrowed and repaid principal.[6] (TA272-83). The EC did not challenge Dr. Tabak's conclusion. (TA289-90). As recalculated by Dr. Tabak, the damages based on Professor Fischel's index are $137.8 million. (TA289). But, Professor Fischel properly acknowledged that the court should not ascribe "false precision" to this figure. (TA220).

As noted, complex legal theories create significant litigation risk. Had Professor Fischel's errors come to light at a Daubert hearing, it is quite possible that his testimony would have been precluded, leaving Coram without a damages case. See Augustine Medical, Inc. v. Mallinckrodt, Inc., 2003 U.S. Dist. LEXIS 6079 at *28-29 (D. Del. April 9, 2003) (Chief Judge Robinson granted Daubert motion because expert "failed to gather facts and data sufficient to form a reliable opinion"). Judge McKelvie expressed his view that the damage analysis would survive a Daubert motion, but that was *before* Dr. Tabak identified additional changes to the damages model that Professor Fischel had not mentioned during his testimony. (TA287-88).

Even assuming the validity of the damages theory, defendants will assert numerous arguments that the number is too high. For example, Professor Fischel used a discounted cash flow analysis to determine Coram's pre-Crowley value of $199.6 million, but used the EB/SSG weighted average of three methodologies to determine Coram's end value. Had he used discounted cash flow

---

[6] Dr. Tabak used a simple example to demonstrate the methodology that had been confirmed at Mr. Gokhale's deposition. (TA276-83, TA280-81). A company that did nothing other than borrow and repay money without interest produced a positive rate of return. (TA280-83). Dr. Tabak explained that the error inflated the performance of the growth rate of the peer index and exaggerated Coram's underperformance. (TA283). The other change – which altered the value of Coram – also involved the repayment of debt. However, Dr. Tabak explained that while these changes were superficially similar because they both involved repayments of debt, they were in fact very different because Professor Fischel included the repayment of debt in two very different methodologies. For Coram, he was measuring Coram's actual enterprise value at two distinct points. For the index, he was determining a rate of return growth rate. (TA284-86).

28

to determine the end value, the damages would be reduced by $11 million. (TA216-17). In fact, the damages would be reduced for every dollar Coram's value exceeds $219 million. (TA217).

### (b) Professor Fischel's Theory Would be Challenged as Improperly Assuming Causation.

The EC's proposed damages are not based on specific events, *i.e.*, decisions Crowley made or did not make that allegedly caused Coram harm. Rather than following a causal link between decisions and damages, the EC resorted to a theory based on the creation of an index of peer companies, the calculation of the growth of an investment in that index, and the application of that growth rate to Coram. Under the EC's theory, the entire shortfall of Coram's actual growth when compared to the growth in the index companies is attributable to Crowley's conflict.

EC's theory is that a conflict such as Crowley's is all pervasive and, therefore, it is simply not possible to attribute damages to specific events and Coram should not be required to do so in order to recover damages. But a court or jury might well ask "why not?" It is reasonable to think that before awarding hundreds of millions of dollars, the trier of fact would require some specific evidence to support the notion that Crowley caused Coram to underperform, particularly in the face of evidence that Crowley greatly improved Coram's financial position. The EC witnesses had to concede that reasons other than Crowley's conflict might have caused Coram to underperform the index. Professor Fischel agreed that "any one of a number of factors" could have caused the difference (TA301-02, TA221), and agreed that Coram underperformed his index before Crowley became CEO. (TA222). Based on his real world experience, Zell agreed that differential performance between companies does not mean that the management of the lesser performing company is corrupt. (TA312).

The EC's response to the challenge that a pervasive conflict is not a proxy for proof of causation is to argue that the burden shifts to defendants to show that the conflict did not cause

29

injury. It is possible that Coram could prevail, but there is a very significant risk it would not. No court has addressed burden shifting in a case like this. The Trustee cannot turn down such a substantial settlement on the hope that he will succeed in a difficult case of first impression. As Shestack testified, there is a significant question whether the "entire fairness" doctrine would be applied when the "interested" transactions are not identified. (TA117). "Entire fairness" is used in cases involving a single defined event involving an officer or director, such as a merger or a corporate opportunity. See R. Franklin Balotti & Jesse A. Finkelstein, 1 Del. L. Corp. & Bus. Org., 4-124 (2004). (TA323). The EC has not cited any case, and the Trustee has found none, in which the plaintiff sought to rely upon the "entire fairness" doctrine without identifying a specific transaction. Furthermore, "entire fairness" is a Delaware state law doctrine. To the Trustee's knowledge no published case permits its use to establish causation in a RICO action.

There is also a risk that Professor Fischel's theory would be rejected for legal insufficiency. As Shestack pointed out, Professor Fischel did not account for any variables between Coram and the companies in the index. Professor Fischel asserts that the very use of the index makes it unnecessary to do so. Perhaps – but perhaps not. Courts have rejected similar damage methodologies. In Blue Cross & Blue Shield United v. Marshfield Clinic, 152 F.3d 588, 593-94 (7th Cir. 1998), the court stated that "[s]tatistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment." Chief Judge Robinson granted summary judgment to defendants in Augustine Medical, Inc., 2003 U.S. Dist. LEXIS 6079, at *28-29, because the expert's analysis "stacks assumption upon assumption" and "made no effort to segregate the effects of legitimate activities" from the effects of the alleged anticompetitive conduct. Similarly, in First National Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994), "the Second Circuit reaffirmed the need for a RICO plaintiff to show both 'transactional' (but for) and

30

'loss' (proximate) causation with particularity" and "affirmed the dismissal of a lender's RICO complaint because the lender could not plead that the plaintiff's misrepresentations, rather than intervening market forces, caused losses to the lender's loan portfolio." Jenner RICO Treatise at 4-22. (TA320).

(c)     <u>The EC's Causation Theory Is Susceptible to Factual Challenge.</u>

There is a significant risk that a jury would not award damages in the amount the EC suggests. A jury would be presented with testimony from both fact and expert witnesses that Coram improved under Crowley. An EC advisor from Equity Group Investments, one of Zell's companies, wrote a draft letter that they "were quite impressed with the current state of Coram's operations" under Crowley. Counsel chastised the EGI financial analyst for this "admission" because he, correctly, predicted that it "would haunt [the EC] in many ways." (TA207). As Shestack noted, "Every one of the independent directors who testified said that he [Crowley] worked very hard, that the company improved considerably and that he did a very good job." (TA115, TA296, TA298-99, TA307, TA309). Coram employees have also praised Crowley. (TA304-05). After the first confirmation hearing, this Court stated that "there is evidence that Mr. Crowley did do a good job operationally in helping the debtor turn around." (TA326).

(d)     **Even if the EC's Damages Theory Went To The Jury, It Is Unrealistic To Assume An Award of $137 Million.**

Professor Fischel's theory is that the entire difference between the performance of Coram and its peers after Crowley's appointment is attributable to Crowley's conflict and is the appropriate measure of damages caused by the conflict. As previously noted, defendants will point out that Coram underperformed the index before Crowley became CEO (TA222), and that the theory failed to adjust for other material differences between Coram and the four companies in the index. Professor Fischel testified that averaging four companies resolves any differences between Coram

31

and the "average" company, (TA221),[7] but defendants will contend that there is no reason to expect

Coram to perform like the hypothetical average company.  Professor Fischel conceded that "you

never expect any individual firm to perform exactly the way an index performs." (TA219).  Don

Liebentritt agreed.  (TA256).  So, even if Professor Fischel's analysis would survive a Daubert

challenge, there is every reason to think that a jury would award far less than EC suggests.

The jury might choose to reject the entire damages theory if it concluded that some of

Crowley's acts were not liability causing events, found that factors other than Crowley's conflict

contributed to Coram's "underperformance," or concluded that Professor Fischel should have

adjusted his average company to more closely resemble Coram at the point Crowley became CEO.

Since Professor Fischel's theory does not allocate damages to any particular act, there is no "fall-

back" position.  Juries compromise.  Even if the jury accepted Professor Fischel's theory, it could

award far less than $56 million.

Finally, the Trustee can and should conclude that this is not a punitive damages case.

Shestack testified that he thought punitive damages were "highly unlikely." (TA119).  Judge

McKelvie offered no opinion on punitive damages.

> (e)  **The Possibility Of Pursuing An Events Based Lawsuit Against The Noteholders Does Not Justify Rejecting The Settlement.**

If a court rejected causation or damages based on the EC's theory, a court would almost

certainly permit Coram to seek damages based on specific events, such as the $6.3 million paid to

the Noteholders prior to bankruptcy, the administrative costs associated with the bankruptcy

---

[7]Putting aside the question of whether the use of peer companies to calculate damages is acceptable because financial experts routinely use peer companies to determine valuation, a point the defendants would dispute, financial advisors do not base their opinions of value on mathematical calculations.  For example, Daniel Lynn of Deloitte, the EC's valuation expert, testified that he did not use "simply the product of a mathematical exercise" to determine the relationship between Coram and other companies for purposes of valuation.  Rather, Deloitte considered the comparable companies and adjusted multiples to take into account for the differences in size, product mixes and other variables between the comparable companies and Coram.  (TA247).  Deloitte did precisely what Shestack criticized Professor Fischel for not doing.

32

proceedings, and the sale of CPS. Given the recent sale of what was CPS when owned by Coram, there is probably a starting point from which damages can be calculated. We make three points regarding the sale of CPS. First, Coram's bankruptcy should not be prolonged in order for the Trustee to investigate rescission-type damages. Second, those damages can be pursued against Crowley and the outside directors, who are the logical defendants on the claim that CPS should not have been sold. Third, Crowley and the outside directors will of course defend their decision, contending that the board decided to sell CPS while Smith was CEO, that the sale was necessary given Coram's need for cash, that the sale was made at a fair price established by a substantial bidding process and that Deutsche Bank Alex Brown provided a fairness opinion. (TA118).

Crowley's decision to make the $6.3 million payment before bankruptcy was highly questionable and perhaps even improper, but it is difficult to see how that harmed Coram, which owed the money to the Noteholders. The administrative costs associated with the first confirmation hearing may not be recoverable unless it can be established that Coram should not have been in bankruptcy.[8] The Outside Directors are the appropriate defendants for the costs of the second and third confirmation hearings because they proposed the second plan, which this Court criticized for its ostrich-like approach. See In re Coram, 271 B.R. at *13-14, *24-25. (TA338-40, TA347).

(f) **There Is No Evidence That The Settlement Is Unreasonable.**

Judge McKelvie did not testify that the settlement was unreasonable (TA225), opting to defer to others, including the Trustee, who have "a much better understanding of the facts and circumstances than I do." (TA226).

In contrast to Shestack, who performed a full litigation risk analysis after reviewing the extensive record, Judge McKelvie did not evaluate all of the facts surrounding the various causes of

---

[8] The administrative costs of the second and third confirmation hearings can only be recovered if the first plan would have been confirmed but for Crowley's conflict. But, the EC objected to the first and second plans on additional grounds.

33

action or the anticipated defenses. Rather, he simply looked at the "core facts" – essentially the conflict. (TA226). As a result, Judge McKelvie did not truly purport to assess the RICO claims. For example, when asked whether he considered the fact that when the Security Exchange Notes were renegotiated the interest rate was lowered, Judge McKelvie testified that he "did not rely on them for the purpose of reaching the opinions I've given." (TA238-39). He provided the same answer when asked about the Noteholders' decision to extend the maturity date on the notes. (TA239).

Judge McKelvie's principal testimony was to rebut Shestack. He said that Shestack made two mistakes: (1) that the settlement was not worth $56 million because it was a loan (TA229), and (2) that Shestack failed to consider the likelihood that the defendants would present a damages theory and the jury would then compromise by granting Coram a recovery somewhere between Coram's number and the defendants' number (TA230-31).

The Trustee disagrees with Judge McKelvie's first point, but it is now moot because the Trustee has amended his Plan to reflect that the Noteholders have agreed to pay cash and assume Coram's IRS liability. There can now be no dispute that the settlement "value" is in excess of $56 million.

The second "error" does not establish that the settlement is unreasonable for a number of reasons. First, Coram would still have to survive motion practice including motions for summary judgment and motions *in limine* before the Noteholders would be called upon to present a damages theory to a jury.

Second, there is no guarantee that the Noteholders would present a damages case and no guarantee that it would be close to $56 million. Judge McKelvie agreed that he does not know what number the defendants would present. (TA237). He "did not analyze" or "do any independent research" into the items identified by Cerberus' trial counsel in his examination of Shestack.

34

(TA237). But as discussed above, recovery based on the $6.3 million payment and the administrative costs associated with the confirmation hearings is far from certain.

Third, the possibility of a compromise verdict between $137.8 million and some number below $56 million does not support rejecting a certain payment of $56 million now. In addition, if Judge McKelvie is correct, Crowley and the outside directors will present a damages figure to the jury (spurred by a $100 million insurance policy), and if the award is more than $56 million the Trustee will collect the difference for the benefit of the equity holders. If the award is less, nothing more will be collected, but the estate and its stakeholders will have had the benefit of $56 million.

Finally, the testimony of Donald Liebentritt, the EC's most active member, also supports the reasonableness of the settlement. At the confirmation hearing, Mr. Liebentritt informed the Trustee for the first time that "[w]e were looking to accept an offer in the 50 to 55 range" prior to the Trustee's appointment. (TA257).

> A. I had not – I didn't have authority from the other members of the EC to accept a number in the 50 to 55 range, but if your question is at that time would I have been willing to go along with that as a member and recommend to other member, I think that's what we were trying to achieve but did not do so.
>
> Q. At the mediation you didn't tell the Trustee of any of his representative that your $118 million demand was more than twice what you'd been willing to accept six months earlier?
>
> A. No one asked that question. We did not – we didn't say that, no.

(TA260).

The only point of Judge McKelvie's testimony was that the Trustee should not have relied on Shestack. Even if that were so, the Trustee had ample basis on which to conclude that his fiduciary responsibilities demanded that he accept such a substantial settlement and there is simply no question that the Trustee is singularly qualified to make that assessment.

35

C.    THE COURT SHOULD APPROVE THE R-NET SETTLEMENT.

The Court should also approve the Trustee's proposed settlement agreement with R-Net (the "R-Net Settlement"), which, among other things, reduces R-Net's claim against the Debtors from more than $41 million to $7.95 million. (Tr. Ex. 26). The R-Net Settlement has already been approved by the Court in the R-Net bankruptcy cases. (TA90).

The Court should approve the R-Net Settlement because it substantially reduces the amount of the R-Net claim, permitting the payment of 100 cents on the dollar to unsecured creditors of Coram under the Plan. The EC does not quarrel with the settlement amount, indeed it adopted it for Equity's Plan. In fact, Liebentritt seemed to suggest that R-Net is entitled to a "bonus" of 2% of the net proceeds of the litigation claims promised to it by the EC under the Equity Plan because the Trustee persuaded R-Net to settle for too low a figure. (TA266-67).

The Court should also approve the R-Net Settlement because the Debtors' claim against R-Net is uncollectible. As Hobart Truesdell ("Truesdell"), R-Net's Chief Liquidating Officer, confirmed, if the Trustee litigated the claims on the merits and prevailed, R-Net's bankruptcy estates would be left administratively insolvent rendering any favorable verdict illusory. (TA89).

Finally, by settling, the Trustee will avoid protracted, expensive, inconvenient and uncertain litigation. There are twenty-five captioned parties who have retained eleven law firms. If litigated, the case would cost millions of dollars.

The EC has argued that the settlement is not in the best interests of the Debtors' estates because the Noteholders are being released by R-Net. This assertion is both a red herring and without merit. None of R-Net's creditors, who are the only parties affected by the release, objected to the settlement. Rather, Truesdell and the R-Net Creditors' Committee agreed to it. And, the Court already approved the settlement in the bankruptcy case of the releasing R-Net parties.

36

Additionally, the Noteholders would not have agreed to fund the Plan without a global resolution which included the R-Net litigation.

For these reasons and those expressed in the testimony of the Trustee and Truesdell, the Court should approve the R-Net Settlement.

D.     THE THIRD PARTY RELEASES UNDER THE PLAN ARE APPROPRIATE.

     1.     **The Debtors' Release of Their Litigation Claims Against the Noteholders is Proper.**

The Third Party releases under the Trustee's plan are appropriate. The releases at issue here are being given as part of the settlement of litigation claims held by the Debtors' estates for tangible economic benefits, not merely as part of a plan of reorganization.[9] The settlement as a whole should be judged under the standard for approval of compromises pursuant to Fed. R. Bankr. 9019. Even if the Court determines these releases are part of a plan (as opposed to being part of a litigation settlement) the releases are nevertheless appropriate.

In In re Zenith Electronics Corporation, 241 B.R. 92, 110 (Bankr. D. Del. 1999), the Court identified five factors to consider when determining whether third party releases are appropriate: (i) an identity of interest between the debtor and the third party, such that a suit against the non-debtor will deplete assets of the estate; (ii) a substantial contribution by the non-debtor of assets to the reorganization; (iii) the essential nature of the injunction to the reorganization to the extent that, without the injunction there is little likelihood of success; (iv) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes vote to accept the plan; and (v) provision in the plan for payment of all or substantially all of the claims of

_____

[9] The Trustee is seeking approval of the settlement as part of his plan as permitted by 11 U.S.C. § 1123(b)(3)(A). Irrespective of whether a claim is settled as part of plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to a separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same." In re International Wireless Communs. Holdings, Inc., 1999 Bankr. LEXIS 1853, at *13 (quoting, In re Best Products Co., Inc., 177 B.R. 791, 794 n. 4 (Bankr. S.D.N.Y. 1995).

37

the class or classes affected by the injunction. In <u>Zenith</u>, the debtor proposed a plan of reorganization based on a pre-petition agreement with its largest creditor and shareholder. 214 B.R. at 97. Under this agreement, the creditor agreed to fund the plan in exchange for a release. <u>Id.</u> at 110. The Court approved the releases after considering the above five factors. <u>Id.</u>

All of the <u>Zenith</u> factors are met in this case. First, an identity of interest exists between the Debtors and the Noteholders because the Noteholders are preferred shareholders and are providing significant funding for the Plan. Just like in <u>Zenith</u>, the Noteholders, "as funder of the Plan" and "who were instrumental in formulating the Plan" similarly share "an identity of interest with [the Debtors] in seeing that the Plan succeeds and the company reorganize." <u>Id.</u>

Second, the Noteholders will make a substantial contribution to the reorganization. In addition to funding the Plan with $56 million, the Noteholders are also exchanging their debt and preferred stock (in excess of $350 million) for 100% ownership of a reorganized company with a fair market value of between $195 to $225 million, and waiving the balance due on their Notes. Thus, similar to the creditor in <u>Zenith</u>, the Noteholders will also make substantial contributions to the Plan by "funding the Plan and agreeing to the compromise of its claim." <u>Id.</u> at 111.

Third, the release is essential to the reorganization, because without it the Plan would not have adequate funding. The releases are "an integral part of the Plan Funding Agreement" and will ensure that the Debtors "are not distracted by litigation by the estate." <u>Id.</u> Moreover, there are no reasonable alternatives to the Plan; the Equity Plan is riddled with defects preventing its confirmation.

Fourth, all classes of claims and interests have overwhelmingly voted to accept the Plan. As of April 2004, 88% of all unsecured creditors, the Noteholders unanimously and 68% of individuals or entities owning shares voted to accept the Plan.

38

Finally, the Plan will provide payment of all or substantially all of the "claims of the class or classes" affected by the injunction. In addition to a 100% plus interest distribution to all unsecured creditors, the Trustee estimates in excess of a $40 million *pro rata* distribution to the CHC common shareholders,[10] despite their being "out of the money."

### 2.    The Third Party Releases of Claims Against the Noteholders Are Proper.

The third party releases of claims against the Noteholders, as contemplated by the Plan, are also permitted by the Bankruptcy Code and appropriate here.[11]

This Court has approved releases of non-debtor third parties over the objection of other parties in interest. In re Vencour, Inc., 284 B.R. 79, 85 (Bankr. D. Del. 2002). In Vencour, the Court confirmed a plan in which a non-debtor third party contributed $40 million and other consideration in exchange for the release of certain tort claims held by those debtors' creditors. 284 B.R. at 81. Subsequent to plan confirmation, some of these creditors moved the Court for modification of the plan's release provisions claiming that the Court lacked jurisdiction to grant such relief. Id. at 82. Rejecting this contention, the Court held that it had "jurisdiction to consider and grant the releases contained in the [p]lan." Id. at 86.

This Court's holding in Vencour is further supported by recent decisions of the Third Circuit which explain the general considerations governing third party non-consensual releases. See In re

---

[10] The payment is anticipated to be in excess of the full market capitalization as of the date of the confirmation hearing - - i.e., the shareholders will receive more than 100% of what they could sell their shares for in the market.

[11] The clear weight of authority holds that bankruptcy courts may confirm plans containing third-party releases. See In re Dow Corning Corp., 280 F.3d 648, 658 (6th Cir. 2002) ("the bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor"); In re Munford, Inc., 97 F.3d 449, 454 (11th Cir. 1996) (bankruptcy court had jurisdiction to enter an order barring claims that might be asserted against a non-debtor); In re Monarch Life Insurance Co., 65 F.3d 973, 984-85 (1st Cir. 1995) (bankruptcy court entered an order enjoining post-confirmation lawsuits against non-debtor entity); In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2d Cir. 1992) ("a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan"); In re A.H. Robbins Co., Inc., 880 F.2d 694, 700-02 (4th Cir. 1989) (bankruptcy court can grant permanent injunctive relief essential to enable the formulation and confirmation of a plan of reorganization if non-debtors who would otherwise contribute to funding the plan will not settle their mutual claims absent protection from potential post-confirmation lawsuits arising form the prepetition relationship with the Chapter 11 debtor).

United Artists Theatre Company, 315 F.3d 217 (3d Cir. 2003); In re PWS Holding Corporation, 228

F.3d 224 (3d. Cir. 2000); In re Continental Airlines, 203 F.3d 203 (3d Cir. 2000). [12]  In these cases,

the Third Circuit set forth the "hallmarks of permissible non-consensual releases" which include:

fairness, necessity to the reorganization, that the releases were given in exchange for fair

consideration, and specific factual findings to support these conclusions.  United Artists, 315 F.3d at

227 (quoting, Continental Airlines, 203 F.3d at 214-215).  See also PWS Holding Corporation, 228

F.3d at 247 (concluding that "under any rule that the Court might adopt" the hallmarks of

permissible non-consensual releases are fairness, necessity to the reorganization, and specific

factual findings to support these conclusions).

The releases provided to the Noteholders are fair to both the Noteholders and other parties in

interest.  The Noteholders are contributing $56 million in cash to fund the Plan that will result in an

immediate 100% distribution to creditors and an estimated distribution of at least $40 million to

CHC's shareholders.  Having made a substantial contribution to the Debtors' reorganization

(including waiving their remaining $9 million in Notes and the balance of their preferred stock

liquidation preference over the value of the Company), they are entitled to freedom from any further

causes of action related to the Debtors which might be conjured up by a third party. [13]

As Marshall Stearns of Wells Fargo Foothill testified, the Noteholders would not have

agreed to fund the Plan without protection from potential post-confirmation lawsuits.  (TA111).

Accordingly, the third party releases are required for a successful reorganization.  See Transit

---

[12] Courts of Appeals in the First, Second, Fourth, Sixth and Eleventh Circuits have supported the appropriateness of third party releases.  See fn. 9, *supra* at p. 40.

[13] Courts have routinely confirmed plans containing non-consensual third party releases for similar, and sometimes less, consideration.  See, e.g., Transit Group, Inc., 286 B.R. 811 (released party extended $22 million in exit financing and subordinated its unsecured debt to other creditors); Vencour, 284 B.R. 79 (released party contributed $40 million); In re American Family Enterprises, 256 B.R. 377 (D.N.J. 2000) (released party contributed $70 million); Master Mortgage Investment Fund, Inc., 160 B.R. 930 (W.D. Mo. 1994) (released parties contributed a total of $7 million).

40

Group, Inc., 286 B.R. at 818 (finding non-consensual third party release essential to reorganization where lender refused to fund the debtor's plan through an exit financing if not granted); American Family Enterprises, 256 B.R. 377 (permanent injunction is essential because, without it, the parties proposed to be released would contribute nothing towards the reorganization).  Since the releases are fair and necessary to the reorganization, they are proper.

IV.    **THE EQUITY COMMITTEE'S PLAN MAY NOT BE CONFIRMED.**

    A.    THE EC PLAN DID NOT RECEIVE THE REQUISITE VOTES.

        1.    **No Impaired CI Class Voted to Accept The Equity Plan.**

In order to have a confirmable plan, at least one impaired class of creditors must vote to accept the plan.  11 U.S.C. § 1129(a)(10).  Although, based upon the outcome of the EC's motion to temporarily allow claims for voting purposes, a CHC class of creditors voted to accept the Equity Plan, no CI impaired class of creditors voted to accept the Equity Plan.  Therefore, the Equity Plan cannot be confirmed as to Debtor Coram, Inc.

        2.    **The EC Plan Misdesignated Classes as Impaired Which Are Unimpaired.**

The Equity Plan states that the classes of general unsecured claims (C3 and CHC3) are impaired.  However, the Equity Plan provides that the claims of unsecured creditors will be paid in full in cash on the effective date.  In response to the Trustee's motion to designate votes, the EC clarified that the unsecured creditors will also receive payment of post-petition interest in cash on the effective date.  Since they are to be paid in full, with post-petition interest, in cash at closing, the members of Classes C3 and CHC3 are not impaired and were misdesignated in violation of 11 U.S.C. §§1123(a)(2) and (3).

The only class of creditors to vote to accept the Equity Plan was CHC3.  Since CHC3 is not impaired, no impaired class of claims voted to accept the EC Plan and, therefore, it may not be confirmed.

41

3.    **The Equity Plan Impermissibly Classified The R-Net Claim and the Noteholders' Unsecured Claims.**

The Equity Plan provides that R-Net will have an allowed unsecured claim in the amount of $7.95 million and that the Noteholders have unsecured claims of $9 million based upon their remaining unconverted notes. However, instead of including R-Net's and the Noteholders' unsecured claims within the classes of CHC's and CI's unsecured creditors, the Equity Plan separately classified them.[14]

As the Third Circuit explained in John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates, 987 F.2d 154, 159 (3d Cir. 1993), "the Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes." In classifying claims, the proper focus of classification is the legal character of the claims as they related to the assets of the debtor. In re Midway Investment, Ltd., 187 B.R. 382, 392 (Bankr. S.D. Fla. 1995); In re Thornwood Assocs., 161 B.R. 367, 371 (Bankr. M.D. Pa. 1993). "Unsecured claims will, generally speaking, comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured creditor because they are claimants of equal rank entitled to share *pro rata* in values remaining after payment of secured and priority claims." FGH Realty Credit Corp. v. News Airport/Hotel Ltd. Partnership, 155 B.R. 93, 99 (D.N.J. 1993); see also In re Cavalier Indus., Inc., 2003 Bankr. LEXIS 150 at *14 (Bankr. E.D. Pa. 2003) ("As a general rule, unsecured creditors are claimants of equal rank entitled to share *pro rata* in whatever remains after payment of secured and priority claims.").

---

[14] The Equity Plan provides for a "bonus" of two percent of the net proceeds of the proposed derivative claims for R-Net, a sum which could far exceed the post-petition interest to be paid to other unsecured creditors under the Equity Plan. As a result, the Equity Plan unfairly discriminates in favor of R-Net in violation of 11 U.S.C. § 1129(b)(1).

42

R-Net's and the Noteholders' unsecured claims are of equal rank to claims of other unsecured creditors in the context of these Chapter 11 proceedings and thus should not have been separately classified.

R-Net and the Noteholders rejected the Equity Plan. If R-Net's and the Noteholders' claims had been properly classified and either or both of their votes against the EC Plan were included in Class CHC3, the CHC3 Class would have voted to reject the Equity Plan and no class of creditors would have voted to accept the Equity Plan for either CHC or CI.

Since there was no justification for the EC's separate classification of the R-Net's and the Noteholders' unsecured claims, the Equity Plan cannot be confirmed.

B.    THE EQUITY PLAN IS NOT FEASIBLE.

In order for the Equity Plan to be confirmed, the EC must establish by a "clear and convincing test" that the confirmation of the Equity Plan is not likely followed by the liquidation, or need for further reorganization, of the Debtors. In re National Award Mfg., Inc., 35 B.R. 691, 693 (Bankr. S.D. Ohio 1983). To satisfy this test, the plan "must present reasonable assurance of success." In re Made in Detroit, Inc., 299 B.R. 170, 176 (Bankr. E.D. Mich. 2003). A review of the record clearly shows that the EC has failed to meet this burden.

The EC proposes to satisfy the Noteholders claims by issuing $50 million in new notes and $212 million in new preferred stock. Despite the dismissal of its equitable subordination lawsuit against the Noteholders, the EC assumes that it will be successful in its argument that the Noteholders should be denied post-petition interest of more than $100 million as a result of their alleged inequitable conduct. If the EC does not prevail on this argument, the company would be forced to issue in excess of $100 million more in new notes and/or stock.

Coram will have substantial difficulty in making the required payments to the Noteholders if the Equity Plan is confirmed. Victor analyzed Coram's ability to pay its debts under the Equity

43

Plan. He explained that investment bankers, lenders and analysts in the marketplace require a fixed-charge coverage ratio of 1.5. (TA14-15). His analysis showed that Coram's fixed-charge coverage ratio under the Equity Plan was only 1.06 (TA14), a razor thin margin. See In re Revco D.S., Inc., 1990 Bankr. LEXIS 2966 at *27 (Bankr. N.D. Ohio 1990) (fixed charge coverage ratios ranging from 1.05 to 1.18 constitute "a very narrow margin.").

Lane testified that a plan would be feasible with a fixed-charge coverage ratio of as low as 1.10. (TA171). However, the fixed-charge coverage ratio for the first year in the feasibility analysis prepared by Lane, contained in the EC's Disclosure Statement, was only 1.04, below Lane's own minimum threshold. (TA171).

In his revised feasibility analysis, Lane increased the ratio to 1.37. (TA170). However, his analysis contained a number of flaws. Lane ignored the $2.9 million in deferred tax payments due to the IRS each year. (TA171-72). He also assumed that the EC would be successful in arguing that the Noteholders are not entitled to post-petition interest at the contract rate and that their claims will be reduced from more than $370 million to $262 million. (TA186-88). Further, he did not include any interest payments on the line of credit included in the Equity Plan. (TA172). Finally, Lane used Deloitte's growth rate projections instead of the projections deemed to be appropriate by Coram's management. (TA172). Nevertheless, even under Lane's new analysis, Coram would suffer a net loss of cash during the first year. (TA187). Moreover, Lane's feasibility analysis showed that the entire remaining principal balance of the new notes and the liquidation preference of the new preferred stock would remain due in 2008. (TA188).

44

Victor warned that if the EC Plan is confirmed, there is a serious risk that the Debtors will not be able to pay their debts as they become due.[15] Danitz agreed that if the Equity Plan was confirmed, it was likely that the company would have to endure a subsequent bankruptcy. (TA122).

Given Lane's testimony, substantial questions arise regarding whether there will be enough cash available to make the payments required under the EC Plan. In his feasibility analysis, Lane: (1) assumed that only $2 million of the $6 million to be contributed to the litigation trust would be funded on the effective date, even though he admitted that the Equity Plan requires it to be funded on the effective date (TA163-65); (2) used an estimate of unsecured claims of $6.8 million, $1.2 million less than the Trustee's estimate (TA163); and (3) did not include any amounts for post-petition interest to be paid to unsecured creditors. (TA166-67).

Lane testified that if the litigation trust was fully funded, the Trustee's more conservative estimate of unsecured claims were used, and post-petition interest was factored in, Coram would be left with only $3.4 million in cash working capital on the effective date of the Equity Plan (TA167-69), $6.6 million less than the minimum that the company believes is required. (TA45). Lane's explanation was that the company could draw on the line of credit provided for in the Equity Plan to make up the difference. (TA169-70). However, as Lane admitted, the EC has not obtained a firm commitment for any financing. (TA169). Absent a firm commitment for the required line of credit, the Equity Plan may not be confirmed. See In re Tyler, P.E., P.S., Inc., 156 B.R. 995, 997 (N. D. Ohio 1993); In re Stoffel, 41 B.R. 390, 393 (Bankr. D. Minn.1984).

---

[15] Q:    Would reorganized Coram under the Equity plan, therefore, be able to pay its debts as they mature?

A:    It would be almost - - I won't say almost impossible, but any - - any kind of hiccup in the company going forward in the next several months and going into '04, if there was another drug issue like there was with bankomycin [sic] a year and a half ago, if there was an increase in bad debt - - anything would cause debt service to be defaulted under the Equity Committee's plan, because that ratio is just way, way too tight. (TA15).

45

The EC has not met its burden of proving that the Equity Plan is feasible. Accordingly, the Equity Plan may not be confirmed.

    C.    THERE ARE SEVERAL OTHER LEGAL IMPEDIMENTS TO THE CONFIRMATION OF THE EQUITY PLAN.

The Equity Plan fails to meet the requirements of §1129 of the Bankruptcy Code for the following additional reasons, which are set forth in detail in the Chapter 11 Trustee's Objection to the EC's Second Amended Plan of Reorganization, which is incorporated herein by reference in its entirety and included in the Trustee's Appendix (TA361-380): (1) the EC Plan was not proposed in good faith as required by 11 U.S.C. §1129(a)(3); (2) the EC Plan unfairly discriminates against general unsecured creditors; (3) the EC Plan unfairly discriminates against the Noteholders; (4) the EC Plan may not be confirmed because it discriminates in favor of, and promises to pay to, R-Net more than 100% of its agreed allowed claim; (5) the EC Plan violates the absolute priority rule imbedded within 11 U.S.C. §1129(b)(2)(B)(i) and (ii); (6) the EC wrongfully manipulated the voting process; (7) the EC does not have standing to propose a Plan of Reorganization for CI because it was not appointed in the CI case; and (8) the release of the EC contained in Equity Plan is improper.

## V.    EVEN IF THE EQUITY PLAN WAS LEGALLY CONFIRMABLE, THE TRUSTEE'S PLAN SHOULD BE CONFIRMED.

Section 1129(c) provides that the court may confirm only one plan. If the requirements of §1129(a) and (b) are met with respect to more than one plan, the court should consider the following factors in determining which plan to confirm: (1) the type of plan; (2) the treatment of creditors and equity security holders; (3) the feasibility of the plan; and (4) the preferences of creditors and equity security holders. In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 245 (D.N.J. 2000). These factors clearly favor the confirmation of the Trustee's Plan over the Equity Plan.

46

**A1078**

A.    THE TRUSTEE'S PLAN IS BETTER FOR CHC'S SHAREHOLDERS.

"The court should confirm the plan that provides better treatment for the creditors and equity security holders." In re Holley Garden Apartments, Ltd., 238 B.R. 488, 496 (Bankr. M.D. Fla. 1999). The Trustee's Plan should be confirmed because CHC's shareholders will receive far better treatment under the Plan than under the Equity Plan.[16] Under the Plan, the shareholders will receive a certain and immediate distribution of more than $40 million, a sum greater than the market cap of the stock at the conclusion of the confirmation hearing.

On the other hand, under the Equity Plan, Coram will retain more than $300 million in obligations to the Noteholders which will be ultimately satisfied only if Coram is wildly successful in the proposed litigation. The EC Plan bets the shareholders' interests and the company on the outcome of a single lawsuit, which admittedly will be hard-fought, time-consuming, expensive and risky.

Sam Zell ("Zell") may be in a position to take such a chance. However, as Liebentritt has testified, the risk tolerance of Zell and the other members of the EC may be greater than that of other shareholders. (TA262).[17] The 68% of the holders of shares who voted in favor of the Plan likely agree and feel otherwise.

The Court should confirm the Trustee's plan because, unlike the EC's gambit, it is a sure thing.

B.    THE TRUSTEE'S PLAN IS MORE FEASIBLE THAN THE EQUITY PLAN.

"The court should give preference to the plan that is more feasible than the other proposed plans." Id. There are no feasibility issues with regard to the Plan. There is more than enough

---

[16] The type of plan is not relevant here because both plans are reorganization plans, not liquidating plans.

[17] Samstock purchased 2,050,000 CHC shares after the Petition Date at an average price of 8.4 cents per share. (Tr. Ex. 6). If the Plan is confirmed, Samstock will realize a profit of approximately 1,000% on these shares.

47

money available from the funds being contributed by the Noteholders and from the cash on hand in the company to make all of the payments required to be made on the Effective Date. Furthermore, the company is left without any debt under the Plan. On the other hand, as described in detail above, there are grave feasibility concerns raised by the Equity Plan.

Furthermore, unlike the Plan, the EC Plan does not solve the Debtors' Stark II problem. Compliance with, or escape from, the Stark II law is essential to Coram's survival. If the company is not in compliance with Stark II, physicians cannot refer Medicare or Medicaid patients to Coram. As a public company, in order to comply with Stark II, Coram must have year-end stockholders' equity of at least $75 million. During this Chapter 11 proceeding, the Noteholders have agreed on three occasions to exchange approximately $272 million of their debt for shares of Coram's preferred stock in order to permit Coram to remain compliant with Stark II. See Furst v. Feinberg, 54 Fed. Appx. 94 (3d Cir. 2002).

Even though Coram qualified for the equity exception in 2003, there is no guarantee that it will qualify in future years. In addition, the Noteholders have only $9 million in debt remaining eligible to exchange for preferred stock in the event of a shortfall, even if they would be inclined to make such an exchange if the Equity Plan was confirmed and they were being sued by Coram.

If the Equity Plan is confirmed, Stark II compliance will continue to remain a problem for the company. (TA22-23). However, if the Trustee's Plan is confirmed, Coram will no longer be a public company and the Stark II issue will be resolved.

Unlike the Trustee's Plan, the Equity Plan is risky, at best.

C.    THE CREDITORS CLEARLY PREFER THE PLAN.

In making its decision as to which of two competing plans to confirm, the Court is called upon to consider the preferences of creditors and equity security holders, but is not bound by those preferences. In re River Village Associates, 181 B.R. 795, 807 (E.D. Pa. 1995). In this case, the

48