creditors clearly favor the Plan. A total of 98.2% in amount and 88.5% of unsecured creditors in number voted for the Plan. In addition, the Noteholders unanimously support the Plan.

The EC Plan was rejected by several classes of creditors: C 3 (unsecured creditors of CI); C 4 (R-Net's claim against CI); C 5 (the Noteholders' claims against CI); CHC 4 (R-Net's claim against CHC); CHC 5 (Noteholders' guaranty claims against CHC). Although based upon the outcome of the EC's motion to temporarily allow claims for voting purposes, the EC Plan was accepted by Class CHC 3, only 23 of 40 ballots cast by CHC's unsecured creditors were to accept the EC Plan.

Creditors who voted for both Plans were permitted to state a preference as between the Trustee's Plan and the EC Plan. Of those creditors, more creditors stated a preference for the Trustee's Plan than the Equity Plan.

Although the Trustee's Plan was rejected based upon the number of shares voting against it, 68.2% of those holding shares casting ballots on the Plan voted in favor of the Plan. This vote was surprisingly strong given that the EC has vehemently opposed the Plan, and that 37.6% of Coram is owned by Samstock's related 13(d) shareholder group.

Perhaps the Trustee said it best:

Q: In comparing the two, why do you feel that the Trustee's plan is better than the Equity Committee's plan?

A: Well, primarily it resolves this matter once and for all. It treats all parties fairly. It pays off all of the claims. The only - - they've had a vote now. Everyone is in favor of it including a majority of the equity holders. The only ones that seem to be opposed to my plan are a small group in the equity category who have paid for their stock. There's no doubt about it. But the overwhelming number of constituents that I'm dealing with according to the vote that's been reported to me, are in favor of the plan. The employees all want the plan. (TA131-32).

The creditors of Coram clearly favor the Trustee's Plan. While it is true that Samstock (which stands to make almost 1,000% on its investment if the Plan is confirmed) opposes it, a

substantial number of shareholders voted to support the Plan. As a result, the Court should confirm the Plan.

## VI.    CONCLUSION

For all of the foregoing reasons and based on all of the evidence submitted at the confirmation hearings, the Court should enter Orders confirming the Trustee's Plan and denying confirmation of the Equity Plan.[18]

Dated: May 27, 2004

Respectfully submitted:

SCHNADER HARRISON SEGAL
& LEWIS LLP

Barry E. Bressler
Wilbur L. Kipnes
Richard A. Barkasy
Michael J. Barrie
Matthew B. Holmwood
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103-7286
(215) 751-2000 (telephone)
(215) 751-2205 (facsimile)

-and-

WEIR & PARTNERS LLP

By:    /s/ Kenneth E. Aaron
Kenneth E. Aaron (#4043)
824 Market Street Mall, Suite 1001
P.O. Box 708
Wilmington, Delaware 19899
(302) 652-8181 (telephone)
(302) 652-8909 (facsimile)

Co-Counsel to Arlin M. Adams, Chapter 11
Trustee

---

[18] See Trustee Appendix, at p. 380, for Trustee's objections to EC exhibits and designations.

50

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:                                            )
                                                  )    Chapter 11
CORAM HEALTHCARE CORP. and                        )
CORAM, INC.,                                       )    Case No. 00-3299 (MFW)
                                                  )    (Jointly Administered)
                          Debtors.                )

---

### CHAPTER 11 TRUSTEE'S POST-CONFIRMATION HEARING REPLY BRIEF

---

Barry E. Bressler
Wilbur L. Kipnes
Richard A. Barkasy
Matthew B. Holmwood
Michael J. Barrie

SCHNADER HARRISON SEGAL & LEWIS
LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103-7213
(215) 751-2000

-and-

Kenneth E. Aaron (#4043)

WEIR & PARTNERS LLP
824 Market Street Mall, Suite 1001
P.O. Box 708
Wilmington, Delaware 19899
(302) 652-8181

Co-Counsel to Arlin M. Adams, Chapter 11
Trustee

### TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................... ii

I.    INTRODUCTION. ............................................................... 1

II.   THE TRUSTEE'S PLAN IS PROPOSED IN GOOD FAITH. ........................ 1

III.  THE TRUSTEE'S PLAN IS FAIR AND EQUITABLE TO CHC'S
      COMMON SHAREHOLDERS BECAUSE THEIR DISTRIBUTION
      UNDER THE PLAN IS GREATER THAN THE VALUE OF THEIR
      INTERESTS. .................................................................. 5

      A.    The Trustee's Confirmation Value Comports With Existing Case Law
            and Is More Credible Than The EC's Valuation................................ 5

      B.    If The EC's Estimates of The Settlement Value of The Litigation
            Claims Prove Accurate, Equity Will Receive More than $126 Million
            Under The Trustee's Plan. ............................................... 7

      C.    The Noteholders Do Not Receive a Windfall Under The Plan. ................. 8

IV.   THE TRUSTEE'S PROPOSED PARTIAL SETTLEMENT OF THE
      PROPOSED DERIVATIVE LITIGATION IS WELL ABOVE THE
      LOWEST RANGE OF REASONABLENESS. ........................................ 9

V.    THE COURT SHOULD APPROVE THE R-NET SETTLEMENT
      WHICH WAS NEGOTIATED AND PROPOSED IN GOOD FAITH. ............. 12

VI.   CONCLUSION. .............................................................. 15

                    *          *          *

EVIDENTIARY REPLY APPENDIX.....................................................

## TABLE OF AUTHORITIES

### FEDERAL CASES

In re Dow Corning Corp., 244 B.R. 678 (Bankr. E.D. Mich. 1999).......................... 8

In re Exide Technologies, 303 B.R. 38 (Bankr. D. Del. 2003)................................ 5-7

In re Lorazepam & Clorazepate Antitrust Litigation, 205 F.R.D. 369 (D.D.C. 2002)...... 12

Oak Park Calabasas Condominium Assoc., 302 B.R. 665 (Bankr. C.D. Cal. 2003)......... 8

Onink v. Cardellucci (In re Cardellucci), 285 F.3d 1231 (9th Cir.), cert. denied,
    537 U.S. 1072 (2002)..................................................................... 8

In re Sound Radio, Inc., 93 B.R. 849 (Bankr. D.N.J. 1988).................................... 1

In re Times Sales Financial Corp., 491 F.2d 841 (3d Cir. 1974)............................. 8-9

In re Trans World Airlines, Inc., 134 F.3d 188 (3d Cir. 1998)................................ 5-6

In re Warfarin Sodium Antitrust Litigation, 212 F.R.D. 231 (D. Del. 2002)................. 12

Weil v. Long Island Savings Bank, 188 F. Supp. 2d 258 (E.D.N.Y. 2002).................. 12

In re Zenith Electronics Corp., 241 B.R. 92 (Bankr. D. Del. 1999)........................... 1

### FEDERAL STATUTES

11 U.S.C. §1129............................................................................... 1

18 U.S.C. §1962............................................................................... 11-12

ii

## I.    INTRODUCTION.

The Trustee submits this Brief in reply to the Equity Committee's Post-Trial Memorandum ("EC Brief").[1]  Unfortunately, the EC's argument is based on many half-truths, mistruths, out of context quotes, and blatantly disregards the record.  Space limitations make it impossible to correct all of these misstatements or address all the internal inconsistencies and contradictory arguments in the EC's Brief.  The Court carefully listened to the testimony and received the exhibits, and will consider the post-hearing Briefs.  The Trustee believes that the evidence in support of confirmation of his Plan is compelling.

## II.    THE TRUSTEE'S PLAN IS PROPOSED IN GOOD FAITH.

The EC contends that the Trustee's Plan cannot be confirmed because it was not proposed in good faith as required by 11 U.S.C. §1129(a)(3).  Apparently having been successful in arguing lack of good faith in connection with the Debtors' prior plans, the EC has decided to place the Trustee into the same category as the Debtors' prior conflicted CEO.  Despite the EC's extensive discovery of every aspect of the Trustee's settlement negotiations, all the evidence confirms that the Trustee has proposed his Plan with honesty, good intentions, and a reasonable basis for expecting that his Plan is feasible and can be confirmed and effected with results consistent with the objectives and purposes of the Bankruptcy Code.[2]

The record is clear that the Trustee first pursued a consensual plan of reorganization and proposed the current Plan only after the EC's conduct established clear that the EC had no

---

[1] Terms referred to herein and not defined shall have the same meaning as used in the Chapter 11 Trustee's Post-Confirmation Hearing Brief ("Trustee's Brief").  Transcripts the Trustee refers to for the first time in this reply Brief appear in the Trustee's Supplement Appendix ("TSA_").

[2] See In re Zenith Electronics Corp., 241 B.R. 92, 107 (Bankr. D. Del. 1999) (quoting In re Sound Radio, Inc., 93 B.R. 849, 853 (Bankr. D.N.J. 1988)), where the Court noted: "The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code."

genuine interest in a consensual plan.  The Trustee moved forward consistent with his fiduciary

obligations to serve the interests of all the constituencies.  In doing so, he negotiated favorable

settlements of the substantial claims of the Internal Revenue Service and R-Net.  He was able to

propose a Plan which provided for:  (a) payment in full to all unsecured creditors (other than the

Noteholders), and (b) a very substantial certain distribution to the shareholders.  In formulating

his Plan, the Trustee was cognizant that the Noteholders were unsecured creditors and interest

holders with claims including post-petition interest in excess of $370 million.  He was also

cognizant of the claims of CHC's shareholders and sought to maximize their return.[3]  Finally, the

Trustee proceeded with the interests of Coram's thousands of employees and patients/customers

in mind, groups totally lost sight of by the EC.

The process and substance of the Trustee's negotiations with various parties was detailed

in the testimony of:  the Trustee, Marshall Stearns, Hobart Truesdell, J. Scott Victor, Samuel

Bemiss, and even Donald Liebentritt.  That testimony made clear that the Trustee proceeded in a

manner that was a model of honesty and good intentions, and that his goal was to achieve a

feasible, fair and equitable result for all the constituencies to which he owed a fiduciary duty.

The EC's contentions to the contrary are not supported by the record.  Indeed, its representations

regarding "process" at times border on the intellectually dishonest.

The following, while by no means exhaustive, are illustrative:

(1)    The evidence clearly established that the Trustee's Plan was not agreed to

on September 25, 2002.  Indeed, the EC itself submitted into evidence numerous drafts of the

Plan Funding Agreement, each reflecting ongoing negotiations and various substantive changes,

including changes made up to the very day the Plan was filed on May 2, 2003.  Those changes

---

[3] The Trustee's Plan, unlike the two prior failed Debtors' plans, pays the unsecured creditors in full and is far more beneficial to CHC's shareholders.

2

included a significant increased contribution to the settlement by the Noteholders. Between September 25, 2002 and May 2003, the Trustee was also negotiating settlements with the IRS and R-Net, which were necessary prerequisites to filing a plan providing payment in full to unsecured creditors and a large distribution to shareholders.

(2)    The Trustee attempted to negotiate a consensual resolution with the EC, but the evidence revealed that the EC was less than forthright in its negotiating tactics. After Samuel Zell told the Trustee that the EC wanted a settlement for shareholders of approximately $60 million dollars (TA311), the EC's initial demand at the mediation session was $118 million, and the EC never decreased its demand below $99 million. (TA127). Even worse, Mr. Liebentritt, the EC's lead spokesman, testified that just before the Trustee was appointed, he would have accepted an amount in the $50-55 million dollar range. He never disclosed that fact to the Trustee or his counsel because, as Liebentritt lamely said, "no one asked that question." (TA260).

(3)    That the EC had no intention of engaging in meaningful negotiations is demonstrated by the fact that the EC had begun to work on its own plan before the mediation session took place, without even mentioning this to the Trustee. Indeed, the EC never advised the Trustee at any time that it was preparing its own plan until a week before its EC Plan was prematurely filed in December 2002. (TA259).

(4)    The EC is incorrect that the Trustee did not have sufficient information regarding the value of Coram or the proposed derivative claims before entering into a proposed settlement with the Noteholders or proposing his Plan. In particular:

(a)    The uncontradicted testimony was that both Messrs. Victor and Bemiss consistently advised to the Trustee that there was no realistic likelihood that the company

3

could be sold for more than $250 million (TA24-27; TA59), even though they stood to earn far larger fees by selling Coram.

       (b)    The Trustee and his advisors had the benefit of the extensive and detailed investigation[4] of the prospective derivative claims by counsel for the EC, as well as additional investigation of those claims by Trustee's counsel, and the Briefs and arguments all parties presented. (TA126-27; TA265). Even then, the Trustee did not agree to the Plan Funding Agreement with the Noteholders until after he received Mr. Shestack's advice that the settlement was well above the low end of the range of reasonableness. (TA125-26).

       (c)    The EC asserts that "notwithstanding the material increase in Coram's value since the Trustee made his deal with the Noteholders, the Trustee acknowledges that he has not increased the return to the stockholders." That statement is completely inaccurate. The first amendment to the Trustee's Plan changed the recipient of the net proceeds of both the proposed derivative claim against Daniel Crowley and the outside directors and the PWC litigation from Reorganized Coram to the shareholders (after only payment of judgment rate interest to the unsecured creditors). The EC Brief asserts that the settlement values of these claims are $56 million and $30 million respectively. Even if the EC's estimates are drastically overstated, as it appears, it is clear that the Trustee's first plan amendment will likely increase substantially the return to the CHC shareholders. Likewise, the Trustee's second plan amendment, by which the Noteholders assume direct payment of the $16 million balance due on the IRS settlement and contribute $40 million of the Noteholders' in cash,[5] greatly benefited the

---

[4] The EC spent millions of dollars investigating the litigation claims before and after the Trustee was appointed. (TA264). Surely, the EC does not contend that the Trustee should have duplicated that work.

[5] The Noteholders will now receive only zero coupon preferred stock, rather than a secured loan.

4

shareholders. Moreover, the $560,000 commitment fee in the previous loan agreement will no longer be required and will be available for distribution to CHC shareholders.

      (d)    EC's discussion of the Trustee's second plan amendment is illustrative of the inconsistencies that have pervaded the EC's entire confirmation case. Judge McKelvie testified that it was hard to gauge whether the settlement was worth $56 million dollars because it was largely reflected by a loan to Reorganized Coram. (TA229). Although the Trustee disagreed that the form of the contribution was substantively meaningful, in order to satisfy this concern, the Trustee continued to negotiate with the Noteholders and persuaded them to make the entire funding in cash. It is disingenuous for the EC now to contend that the second modification to the Plan was "entirely cosmetic" and adds no value.

      (e)    Similarly, the EC ignores the undisputed fact that the Noteholders have received no cash interest payments or cash dividends on their preferred stock since these proceedings began several years ago, which represents a large counter-balance to the increase in Coram's value since the Trustee proposed his Plan.

**III.    THE TRUSTEE'S PLAN IS FAIR AND EQUITABLE TO CHC'S COMMON SHAREHOLDERS BECAUSE THEIR DISTRIBUTION UNDER THE PLAN IS GREATER THAN THE VALUE OF THEIR INTERESTS.**

    *A.    The Trustee's Confirmation Value Comports With Existing Case Law and Is More Credible Than The EC's Valuation.*

The EC contends that Judge Carey's opinion in In re Exide Technologies, 303 B.R. 48 (Bankr. D. Del. 2003), supports its position on valuation. This reliance on Exide is misplaced.

The EC asserts that Exide rejected a "third-party sale" approach to the valuation of an asset in bankruptcy. Contrary to the EC's contention, Judge Carey did not depart from established Third Circuit precedent that the fair valuation of an asset in bankruptcy requires the determination of its market value, which "must be analyzed in a realistic framework,"

5

considering amounts that can be realized "in a reasonable time" assuming a "willing buyer" and a "willing seller." In re Trans World Airlines, Inc., 134 F.3d 188, 193-94 (3d Cir. 1998).[6]

Exide states that the most appropriate method to determine the enterprise value of a debtor corporation is by a "straight forward application" of three standard valuation methodologies: (1) comparable company analysis; (2) comparable transactions analysis; and (3) discounted cash flow ("DCF") analysis. See Exide, 303 B.R. at 65-66. Judge Carey criticized the debtor's valuation expert because he made "numerous adjustments to the valuation methodologies" in order to bring it in line with the expert's view of the current market value. See id. In contrast, EB/SSG made no such adjustments.

As explained by both Victor and Bemiss, EB/SSG performed its valuation of Coram by utilizing this precise "straight forward application" of the three standard valuation methodologies. (TA60-64; Tr. Ex. 11). EB/SSG did not make downward subjective adjustments to the results of the analyses to reflect their view of the current market value. Indeed, Bemiss testified that the value indicated by the traditional methodologies was "aggressive" given his knowledge of the market. (TA70).

Deloitte's valuation for the EC is not consistent with Exide. It is not a "straight forward" application of the valuation methodologies which, as performed by Deloitte, yielded a valuation of $279 million. (EC Ex. 51 at 38). Apparently concerned that even this stretched valuation was not high enough to support the Equity Plan, Deloitte departed from its previous methodology[7] and added approximately $100 million for what it calls non-operating assets: cash, NOLs and goodwill amortization. In Exide, the valuation experts for both sides utilized management's

---

[6] Indeed, EB/SSG and Deloitte both indicated that they followed this approach. (TA56-57; TSA34).

[7] Deloitte did not ascribe any value for cash, NOLs or goodwill in the valuations that it performed for the Debtors' first and second confirmation hearings.

6

five-year projections in performing their DCF analyses. Deloitte, however, performed just the type of adjustment of which Judge Carey was critical -- it rejected management's projections and adjusted Coram's growth rate upward for its DCF analysis, from the growth rate deemed appropriate by management, in order to achieve its artificially inflated value, even before adding the "non-operating assets." Similarly, Deloitte made overly aggressive subjective adjustments to EBITDA, which increased its indicated value under the comparable transactions analysis by approximately $78 million.

The EB/SSG's valuation totaled more than eight times reported trailing 12 months EBITDA (TA70-71) and utilized methodologies consistent with Exide. Every expression of interest the Trustee and his financial advisors received supported EB/SSG's valuation and confirmed that Coram is worth less then $250 million (TA24-27; TA58-59), which leaves the common shareholders "out of the money."

**B.    If The EC's Estimates of The Settlement Value of The Litigation Claims Prove Accurate, Equity Will Receive More Than $126 Million Under The Trustee's Plan.**

Under the Trustee's Plan, common shareholders get a cash distribution of more than $40 million, which is in excess of the market cap of the stock at the time the confirmation hearings ended. If the EC's unsupported estimates of the settlement value of the PWC litigation ($30 million) and the claims against Crowley and the outside directors ($56 million) turn out to be accurate, **CHC's shareholders**, which the testimony of Victor, Bemiss and Hurst established were out of the money, **will receive a total distribution of more than $126 million.** This would represent a return of more than 3000% on Samstock's post-petition investment of more than two million shares. (Tr. Ex. 6). Such a distribution is clearly fair and equitable.

7

**C.    The Noteholders Do Not Receive a Windfall Under The Plan.**

The EC contends that the Trustee's Plan is not fair and equitable because the Noteholders will receive more than the value of their claims.  The EC's argument relies upon several false premises.

Initially, the EC reduces the Noteholders' claims from more than $370 million to $262 million.  The EC has still not coherently answered the question posed by the Court during argument on the Noteholders' motion to dismiss the equitable subordination complaint:

> If the enterprise value permits post petition interest to a creditor, a
> debt holder, why would they [the Noteholders] not be entitled to
> the interest?

The arguments in the EC Brief in this regard make no more sense now than when made by Mr. Bradford at argument and were skeptically received by the Court then.  (TSA38-42).

The cases relied upon by the EC do not support its position.  The court in In re Dow Corning Corp., 244 B.R. 678 (Bankr. E.D. Mich. 1999), actually held that a plan that proposed to pay commercial creditors post-petition interest at the federal judgment rate instead of the contract rate was not fair and equitable.  The EC's reliance upon Onink v. Cardellucci (In re Cardellucci, 285 F.3d 1231, 1233 (9th Cir.), cert. denied, 537 U.S. 1072 (2002), is also misplaced.  The Ninth Circuit's holding in Onink was specifically limited to the distribution by a trustee in a Chapter 7 case pursuant to §726(a)(5) of the Code and is not applicable in a Chapter 11 context.  See Oak Park Calabasas Condominium Assoc., 302 B.R. 665, 672 (Bankr. C.D. Cal. 2003).  Likewise, the Third Circuit's opinion under the old Bankruptcy Act in In re Times Sales Financial Corp., 491 F.2d 841 (3d Cir. 1974) (J. Adams) -- holding no abuse of discretion by the denial of post-petition interest to a creditor where a subordination agreement did not clearly provide that post-petition interest was to be subordinated -- is inapposite.

8

The EC adds $86 million it unilaterally attributes to the potential settlement value of the retained litigation claims to the Noteholders' column. This is not forthright. The **shareholders** are to receive the net proceeds of such claims. The EC also contends inexplicably that $41 million of Coram's cash will remain "in the Noteholders' hands" even though all but $10 million of that cash will be used to pay creditors or go to the shareholders.

Finally, the NOLs will have only speculative (if any) value to the post-confirmation Debtors. Coram's Director of Taxation, Scott Moeller, gave detailed and unrebutted testimony that the Debtors would likely lose an IRS challenge to the Debtors' use of NOLs due to arguably inconsistent past tax filing positions. The EC's witness on NOLs is neither an expert in tax nor NOL issues and he did not fully review Moeller's testimony.

In reality, under the Trustee's Plan, the Noteholders are not receiving anything close to the full amount of their claims. The Noteholders are contributing $56 million in fresh funding and relinquishing claims of more than $370 million and in return are receiving a company that can be fairly valued at no more than $229 million.[8]

## IV.    THE TRUSTEE'S PROPOSED PARTIAL SETTLEMENT OF THE PROPOSED DERIVATIVE LITIGATION IS WELL ABOVE THE LOWEST RANGE OF REASONABLENESS.

In its Disclosure Statement, based upon Professor Fischel's initial report, the EC represented to creditors and shareholders that the damages in the derivative action exceeded $320 million. (Tr. Ex. 6 at 22). But during the confirmation hearing, Professor Fischel reduced his calculation to $265 million. (TA210-211). Now that Dr. Tabak has established, without

---

[8] Although not appropriate for valuation purposes, even if the $10 million in cash working capital remaining in Reorganized Coram is added to what the Noteholders receive under the Plan in exchange for all their claims, they are still $150 million short of being made whole even excluding their $56 million cash settlement payment. The shortfall to the Noteholders was illustrated by Mr. Liebentritt's testimony on cross-examination regarding the demonstrative chart he had prepared. (TSA30-32).

9

challenge, that Professor Fischel made a mistake of more than $100 million and that the maximum amount of damages under his flawed yardstick methodology would approximate $138 million, the EC ignores the other potential deficiencies in the yardstick methodology. In fact, the EC seems to have abandoned Fischel's figures and now suggests a different damages theory.

The EC Brief asserts that rescissory damages based on the sale of CPS are approximately $275 million, but did not offer any competent evidence to support this belated damages calculation. Damages cannot be calculated simply by subtracting the sale price of CPS in 2000 from the sale price of Curascript in 2004. As the Trustee explained, such a simple comparison is "very unrealistic" because the nature of the company changed dramatically after Coram sold it. (TSA22-24). The damages analysis will be complex and it will certainly be opposed vigorously.

Furthermore, because the Curascript sale occurred so recently and minimal evidence would be more misleading than illuminating, the Court properly sustained objections to questions regarding the sale of Curascript and the documents the EC now improperly cites in support of its argument. (EC Exs. 150, 179; TSA12; TSA21; TA148-49).

The EC also ignores the liability defenses available to contest this claim. As Mr. Shestack testified, the defendants would have strong arguments as to why Coram's decision to sell CPS did not constitute a breach of fiduciary duty:

- CPS was a cash drain on the company;
- The initial decision to sell CPS pre-dated Crowley;
- The sale was completed after competitive bidding;
- The sale was approved by the Board of Directors;
- The Board received a fairness opinion from Deutsche Bank Alex Brown. (TSA8-9; TSA14-15).

Finally, as pointed out in our main Brief, if there is a basis for such a claim, it would be against Crowley and the outside directors who made the decision to sell CPS. The possibility of

10

a claim based on the sale of CPS does not in any way detract from the reasonableness of the Trustee's proposed settlement with the Noteholders.

The EC next adds $55 million in "hard" damages it contends were established by Mr. Godnick during his cross-examination of Shestack. The EC appears to contend that Mr. Godnick's questions themselves constitute evidence.[9] Actually, what Mr. Godnick asked Mr. Shestack was a series of hypothetical questions through which he sought to establish that the maximum amount of the possible damages in the derivative case, aside from damages based on Professor Fischel's yardstick measure, could not exceed $55 million. He made various assumptions "to give equity the benefit of the doubt." (TSA18). For example, he asked Mr. Shestack to assume that the Noteholders would be liable for all of the costs associated with Coram's bankruptcy and that those costs were $45 million, without reference to any supporting documentation for the years since the Goldin report was issued. (TSA18). Mr. Shestack clearly did not agree that there are $55 million in "hard" damages. A fair reading of Mr. Shestack's testimony suggests that he did not concur, other than to suggest that if $55 million were the maximum damages then $56 million was obviously a tremendous settlement. (TSA18).

The EC next suggests that its inflated damages claim should be trebled. According to the EC, Judge McKelvie testified "persuasively" that the RICO case against Cerberus, Feinberg and Crowley "would survive a summary judgment motion." (EC Brief at 42). But, Judge McKelvie acknowledged that he was not offering an opinion that the 18 U.S.C. §1962(c) claim would survive summary judgment. (TA233-34). In addition, Judge McKelvie testified that there was no guarantee that the other RICO claims would get past motion practice and that he was "not

---

[9] Neither Professor Fischel nor Judge McKelvie testified about any "hard" damages. To the contrary, Judge McKelvie admitted that he did not even analyze them. (TA237).

11

prepared to put a percentage to it." (TA234). In any event, surviving summary judgment does not mean success at trial or on appeal.

The EC Brief also asserts that Mr. Shestack acknowledged that all of the elements of a RICO claim, except whether Coram could prove a "pattern of predicate acts," were present in this case. (EC Brief at 43). That statement is unsupportable. Mr. Shestack repeatedly stated that the biggest obstacle facing the RICO plaintiff was that the alleged scheme was subject to vigorous attack. Yet, the alleged scheme is the linchpin of a RICO claim.

In arguing that there is evidence from which Goldman and Foothill could be held liable under RICO (EC Brief at 45), the EC is at odds with its proposed complaint and is at odds with its own expert. Neither Goldman nor Foothill are named as RICO defendants. Addressing the claims naming them, Judge McKelvie testified that "I couldn't identify from the core facts that I looked at sufficient facts to say from those facts alone that they would survive a motion for summary judgment." (TSA29).

Finally, because RICO and antitrust claims are so difficult to prove, the recovery of treble damages is considered "purely speculative," and courts evaluate settlements by comparing the settlement amount with the estimated single damages, not treble damages. See In re Warfarin Sodium Antitrust Litigation 212 F.R.D. 231, 257-58 (D. Del. 2002) (C.J. Robinson); see also In re Lorazepam & Clorazepate Antitrust Litigation 205 F.R.D. 369, 377, n.12 (D.D.C. 2002); Weil v. Long Island Savings Bank, 188 F. Supp. 2d 258, 264 (E.D.N.Y. 2002).

## V.    THE COURT SHOULD APPROVE THE R-NET SETTLEMENT WHICH WAS NEGOTIATED AND PROPOSED IN GOOD FAITH.

The Equity Committee contends that the Trustee's Plan should not be confirmed because his Disclosure Statement did not adequately disclose the terms of his settlement with R-Net. This argument is based upon serious distortions of the record.

12

**A1097**

On May 2, 2003, when the Trustee filed his Plan, counsel for the Trustee sent counsel for the R-Net Creditors' Committee a letter to confirm the oral "settlement in principle" that the Trustee had reached with the R-Net Creditors' Committee and the R-Net Debtors. Contrary to the EC's assertion, the letter was not the final settlement agreement -- the letter specifically provides that a formal settlement agreement would be negotiated in due course. (Tr. Ex. 27).

As Hobart Truesdell, R-Net's court-appointed Chief Liquidating Officer testified, as of May 2, 2003, neither he nor his counsel had engaged in any negotiations with counsel for the Trustee regarding the language of a settlement agreement. (TSA3). Thereafter, the parties did negotiate a written settlement agreement that contains a number of different material terms from the May 2 letter. The written agreement was executed at the end of July 2003. (Tr. Ex. 96).

A copy of the written settlement agreement was not included in the Trustee's Disclosure Statement because it had not been completed when the disclosure statement was approved. The settlement agreement was filed on August 18, 2003 with the Trustee's motion to allow R-Net's claim for voting purposes and was included in the Trustee's Plan Supplement, which was filed before the commencement of the confirmation hearings and prior to the conclusion of voting.

The EC claims that the Trustee did not reveal R-Net's agreement to vote for the Trustee's Plan and against the Equity Plan. In fact, there was nothing for the Trustee to disclose because there was no such agreement. The final, integrated settlement agreement does not contain such a provision and Mr. Truesdell testified that R-Net did not have an obligation to vote for the Trustee's Plan or against the Equity Plan. (TSA4-5; Tr. Ex. 96). Mr. Truesdell explained that, despite the EC's substantial efforts to solicit its vote, R-Net voted against the Equity Plan because he was "quizzical about how the plan was being funded." (TSA5).

13

The EC also asserts that the Plan and Disclosure Statement do not reflect that the Noteholders would be released from R-Net's claims. Contrary to this argument, the Plan clearly provides that the Noteholders are to receive a complete release from all persons who may have claims against them "in any way relating to the Debtors, this Plan or the Chapter 11 Case." (Tr. Ex. 2 at p. 34). To the extent there was any question whether this broad release language covered the R-Net claims, it was answered when, before the confirmation hearing commenced, the Trustee filed his motion to allow the R-Net claim for voting purposes and the Plan Supplement. The EC is the only party in either these proceedings, or the R-Net Chapter 11 cases, to object to that release. Indeed, this Court confirmed R-Net's Chapter11 Plan and approved R-Net's settlement with the Trustee in the R-Net case.

The EC's arguments are a continuation of its attempts to mislead the Court regarding the R-Net settlement. For example, Donald Liebentritt inaccurately testified about how and when the EC first received a copy of the R-Net settlement agreement. During his direct examination, he testified that the EC learned of R-Net's release of the Noteholders when it subpoenaed documents from R-Net. (TSA26-27). In fact, as established during Mr. Liebentritt's cross-examination, the Trustee's counsel faxed a copy of the settlement agreement (which includes R-Net's release of the Noteholders) to Mr. Levy on July 30, 2003, just after it was executed. (Tr. Ex. 96; TSA36-37). The motion of the R-Net Creditors' Committee to quash the subpoena served upon it by the EC was filed about a month later and, contrary to Liebentritt's testimony, was not joined in by the Trustee. (Tr. Ex. 97; TSA37).

The EC's argument that estate funds were used to obtain R-Net's release of the Noteholders is a misrepresentation of the terms of the Trustee's Plan. One of the main sources of funding for the Trustee's Plan, including the $7.95 million to be paid to R-Net, is the $56 million

14

to be contributed by the Noteholders. Without a global release, the Noteholders would not have agreed to contribute these funds. (TA111-12). And even a cursory review of the R-Net Plan and dockets makes clear that the increase in the settlement payment to R-Net was to fund unexpectedly large GAP claims, allowing a dividend to R-Net's unsecured creditors.

## VI.    CONCLUSION.

What these proceedings come down to is the following comparison. If the Trustee's Plan is confirmed: (1) the unsecured creditors will be paid in full; (2) the R-Net settlement will be paid and the R-Net Plan will be implemented; (3) the IRS claim will be paid by the Noteholders; (4) the Noteholders will relinquish the balance of their claims; (5) a debt-free Coram will proceed as a private company with no STARK II problems; (6) the shareholders will receive over $40 million in cash and the opportunity for substantially more from the claims against Crowley, the outside directors and PWC. In contrast, if the EC Plan is confirmed, there is no reason to believe that Coram would be able to meet its debt obligations, which would include payments to the IRS and the Noteholders, and it will likely encounter additional STARK II problems as a public company. Furthermore, the future of the company and any return to shareholders would be bet on speculative litigation that would result in continued turmoil for the Debtors. The choice is clear -- the Trustee's Plan is better for all constituencies[10] and more closely conforms to the Bankruptcy Code and its purposes. Accordingly, it should be confirmed.

**[This space intentionally left blank.]**

---

[10] The Trustee's Plan was accepted by all classes of creditors and a clear majority of the shareholders who cast ballots. See Affidavits of Balloting Agent and the Trustee's Report of Plan Voting (TSA at 43-103).

15

Dated: June 14, 2004          Respectfully submitted,

WEIR & PARTNERS LLP          SCHNADER HARRISON SEGAL & LEWIS LLP

By: /s/ Kenneth E. Aaron          Barry E. Bressler
    Kenneth E. Aaron              Wilbur L. Kipnes
824 Market Street Mall, Suite 1001  Richard A. Barkasy
P.O. Box 708                      Matthew B. Holmwood
Wilmington, Delaware 19899        Michael J. Barrie
Ofc: 302-652-8181/Fax: 302-652-8909  1600 Market Street, Ste. 3600
                                  Philadelphia, PA 19103-7213

Co-Counsel to Arlin M. Adams, Chapter 11 Trustee

16

## EVIDENTIARY REPLY APPENDIX

I.    **THE EC'S BRIEF IMPROPERLY RELIES ON EXHIBITS 150 AND 179 WHICH ARE INADMISSIBLE.**

The EC seeks to admit, and relies in the EC Brief upon, EC Exhibits 150 and 179, which relate to the recent sale of Curascript to Express Scripts.  EC Exhibit 150 appears to be some sort of press release for which the author was not identified and EC Exhibit 179 is alleged by the EC to be the Stock Purchase Agreement.

No witness with knowledge of these documents or of the transaction testified.  Hence, the documents constitute hearsay statements that are inadmissible pursuant to Fed. R. Evid. 802. Further, without some testimony as to the nature of the company being sold at the time of sale, the entire structure of the transaction, and all considerations of the parties, these documents would not be relevant to the valuations or damages theory here in any event.

During the hearing, the EC sought to question Mr. Shestack and the Trustee about EC Exhibits 150 and 179, but the Court did not permit it to do so, sustaining objections.  (STA12; STA21; TA148-49).

For these reasons, EC Exhibits 150 and 179 should not be admitted and should not be considered by the Court.

II.    **THE EQUITY COMMITTEE'S ONLY OBJECTION TO THE TRUSTEE'S DEPOSITION DESIGNATIONS IS WITHOUT MERIT AND ITS OBJECTIONS TO THE NOTEHOLDERS' DESIGNATIONS HAVE NO IMPACT ON THE TRUSTEE'S POST-CONFIRMATION BRIEF.**

The EC's Objections To The Designations suggests that the Trustee "attempted to submit substantial portions of deposition testimony without even acknowledging the requirements of admissibility placed on that testimony – let alone demonstrating compliance with those requirements." Yet, the EC actually objects to only one individual's testimony designated by the

Trustee – Richard Haydon – and the designation of the testimony of Richard Haydon is entirely

proper. Many of the EC's objections of the Noteholders designations appear wrong, but are

irrelevant to the Trustee's Post-Confirmation Brief since the Trustee has not cited to such

designations.

### A.    The Equity Committee Ignores The Fact That Richard Haydon Is A Member Of The Equity Committee.

The EC objects to the designations from Richard Haydon's testimony, apparently

contending that Haydon's testimony is hearsay and it cannot be admitted under an exception to

the hearsay rule because the requirements of Fed. Rule of Evidence 804(b)(1) have not been met.

Haydon's testimony, however, is not hearsay and no exception to the hearsay rule is required.

Haydon is a member of the EC. (Tr. Ex. 6 at 15 (EC Disc. Statement at 11)). His

deposition testimony is admissible as the testimony of a party-opponent under Rule 801(d)(2).[1]

The EC apparently agrees with this analysis as it does not object to the designations of either

Donald Liebentritt's or Samuel Zell's deposition testimony.

Even assuming that the EC's reliance on Federal Rule of Evidence 804(b)(1) was correct,

its argument that the requirements of Rule 804(b)(1) are not met is frivolous. The EC contends

that this Court should exclude deposition testimony of a number of individuals – most of whom

were noticed and deposed by the EC – on the basis that the parties did not have sufficient motive

to develop the testimony. This Court is well aware that these proceedings have been litigated

exhaustively and, while the Trustee's Plan is significantly different than the Debtors' plans,

many of the same issues have dominated (e.g., valuation) throughout these proceedings.

---

[1] The Federal Rules of Evidence apply pursuant to Bankruptcy Rule 9017. In addition, Federal Rule of Civil Procedure 32(a)(2) incorporated by Bankruptcy Rule 7032 allows the use of deposition testimony taken from a party without regard to whether the person is located more than 100 miles from the place of trial.

2

**B.    *The Equity Committee's Objections To The Noteholders' Designations Are Generally Incorrect And Are Irrelevant To The Trustee's Post-Confirmation Brief.***

The Trustee's Post-Confirmation Brief did refer to four witnesses designated by the Noteholders that the EC contends are not admissible. The EC's objections are meritless and the facts cited to by the Trustee are amply supported by other testimony cited in the Trustee's Brief.

On page 31, the Trustee cited to the deposition testimony of Coram directors – Don Amaral, William Casey, L. Peter Smith and Sandra Smoley – to substantiate Mr. Shestack's testimony that the directors testified under oath that Daniel Crowley did a good job at Coram. The testimony of these individuals about Mr. Crowley's performance clearly meets the EC's Rule of Evidence 804(b)(1) objection. The EC had a motive to develop testimony about Mr. Crowley's performance. In fact, in each case, Richard Levy, counsel for the EC, asked the question that lead to the testimony relied upon by the Trustee. Regardless, even if the testimony was hearsay, the Trustee cited the testimony for non-hearsay uses. First, it was cited to support Mr. Shestack's testimony. Second, it was cited to show that in defending the derivative claims the Noteholders could elicit testimony that Coram improved operationally under Mr. Crowley.

Finally, on page 29 of the Trustee's Brief, he cited Professor Fischel's deposition to show that Professor Fischel admitted that any number of factors could have caused Coram to underperform his index. Professor Fischel admitted this fact again during his testimony at the confirmation hearings on the current Plans (TA221), and the Trustee's Brief cited to the hearing transcript as well.

3

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| CORAM HEALTHCARE CORP. and CORAM, INC., | : Case No. 00-3299 (MFW) : (Jointly Administered) |
| Debtors. | : QE: 4051, 4052, 4057 |

---

## ORDER CONFIRMING THE CHAPTER 11 TRUSTEE'S SECOND AMENDED JOINT PLAN OF REORGANIZATION

WHEREAS, on May 2, 2003, Arlin M. Adams, the Chapter 11 Trustee of the above-captioned bankruptcy estates (the "Trustee"), filed the Chapter 11 Trustee's Joint Plan of Reorganization (the "Original Plan"), which Plan the Trustee subsequently amended or modified on June 17, 2003 (the "Amended Plan"), September 8, 2003 and April 15, 2004 (the "Second Amended Plan") (a copy of the Second Plan is annexed hereto as Exhibit A);

WHEREAS, on June 26, 2003, the Court entered an Order (the "Solicitation Order") that, among other things, (i) approved the Disclosure Statement[1] under Section 1125 of the Bankruptcy Code and Fed. R. Bankr. P. 3017, (b) approved the form and method of the notice of Confirmation Hearing (the "Confirmation Hearing Notice") and (c) established certain procedures for the solicitation and tabulation of votes with respect to the Amended Plan;

WHEREAS, the Confirmation Hearing Notice together with the (i) the Amended Plan, (ii) the Disclosure Statement, (iii) the Solicitation Order, (iv) the appropriate ballot(s) and voting instructions, and (v) a pre-addressed return envelope (collectively, a "Solicitation Package")

---

[1] Unless otherwise defined herein, all capitalized terms shall have the same meanings ascribed to them in the Plan.

PHDATA 1234490_1

*Slezak* 8
**DEP. EXH. #**
Date: 3/15/07    8

SL 001657    4061

were transmitted in the manner set forth in the Disclosure Statement Order, and such service is

adequate as provided by Fed. R. Bankr. P. 3017(d);

WHEREAS, the Trustee filed the: (i) certification of publication of Jacqueline

Haslbauer, principal clerk of the *New York Times*, attesting to the fact that the Confirmation

Hearing Notice was published in the *New York Times* on August 20, 2003, and (ii) certification

of Gregg Palmer, advertising clerk of the *Wall Street Journal*, attesting to the fact that the

Confirmation Hearing Notice was published in the *Wall Street Journal* on August 20, 2003;

WHEREAS, on June 9, 2004, Henry Colvin of AlixPartners LLC, the claims agent

appointed in these bankruptcy cases, filed the Affidavit of Henry Colvin Certifying the Ballots

Accepting or Rejecting the Chapter 11 Trustee's Amended Joint Plan of Reorganization,

Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Chapter 11 Trustee Dated June

7, 2004 (the "Voting Report");

WHEREAS, on September 29, 2003, the Trustee filed the Plan Supplement with respect

to the Amended Plan;

WHEREAS, objections to confirmation of the Amended Plan were filed (collectively, the

"Objections");

WHEREAS, the Court held confirmation hearings with respect to the Amended Plan, as

amended by the Second Amended Plan, and a competing plan of reorganization filed by the

Equity Committee, beginning on September 30, 2003 and ending on April 20, 2004;

WHEREAS, following the conclusion of the confirmation hearings, the Trustee, the

Equity Committee and the Noteholders submitted post-confirmation hearing briefs and reply

briefs;

WHEREAS, on September 10, 2004, the Trustee filed a Stipulation between the Trustee

and the Equity Committee regarding the Second Amended Plan (the "Stipulation");

2                                    PHDATA 1234490_1

SL 001658

**A1106**

WHEREAS, on October 5, 2004, the Court issued an Opinion (the "Opinion") and Order (the "Order"): (i) denying confirmation of the Equity Committee's plan; and (ii) stating that the request by the Trustee for confirmation of the Second Amended Plan would be granted, provided that the Second Amended Plan was modified in accordance with the Opinion (copies of the Opinion and Order are annexed hereto as Exhibits B and C, respectively); and

WHEREAS, on October 15, 2004, the Trustee filed with the Court the Modification of Chapter 11 Trustee's Second Amended Joint Plan of Reorganization in Accordance with Opinion and Order Dated October 5, 2004 (the "Plan Modification," and together with the Second Amended Plan, the "Plan") (a copy of the Plan Modification is annexed as Exhibit D).

NOW, THEREFORE, IT IS HEREBY FOUND AND DETERMINED THAT:[2]

1.    Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2), 1334(a)). The Court has jurisdiction over the Bankruptcy Cases and the Plan pursuant to 28 U.S.C. §§ 157(b)(2)(A) & (L) & 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 & 1409. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)&(L) and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

2.    Judicial Notice. The Court takes judicial notice of the docket of these Bankruptcy Cases maintained by the Clerk of the Bankruptcy Court and/or its duly-appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of the Bankruptcy Cases.

---

[2] Pursuant to Fed. R. Bankr. P. 7052, as made applicable to contested matters under Fed. R. Bankr. P. 9014, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.

3                                    PHDATA 1234490_1

SL 001659

A1107

3.    <u>Burden of Proof</u>. The Trustee has the burden of proving the elements of Section 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

4.    <u>Transmittal and Mailing of Materials; Notice</u>. The Solicitation Package was transmitted and served in accordance with the Solicitation Order and the Bankruptcy Rules and such transmittal and service were adequate and sufficient; publication of the Confirmation Hearing Notice as set forth in the certifications of Jacqueline Haslbauer of the *New York Times* and Gregg Palmer of the *Wall Street Journal* were adequate and sufficient, and no other or further notice was required.

5.    <u>Voting</u>. Votes to accept and reject the Amended Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Order.

6.    <u>Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>. The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying Section 1129(a)(1) of the Bankruptcy Code.

(a)    <u>Proper Classification (11 U.S.C. §§ 1122, 1123 (a)(1)</u>. The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exists for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between holders of Claims and Equity Interests. Thus, the Plan satisfies Sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(b)    <u>Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>. Article 4 of the Plan specifies that Classes 1 and 2 are unimpaired under the Plan, thereby satisfying Section 1123(a)(2) of the Bankruptcy Code.

4

PHDATA 1234490_1

SL 001660

A1108

(c)    Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Article 4 of the Plan designates Classes 3, 4, 5 and 6 as impaired and the Plan specifies the treatment of Claims and Equity Interests in those Classes, thereby satisfying Section 1123(a)(3) of the Bankruptcy Code.

(d)    No Discrimination (11 U.S.C. § 1123(a)(4)). The Plan provides for the same treatment for each Claim or Equity Interest in each respective Class unless the holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest, thereby satisfying Section 1123(a)(4) of the Bankruptcy Code.

(e)    Implementation of Plan (11 U.S.C. § 1123(a)(5)). The Plan and the various documents and agreements set forth in the Plan and the Plan Supplement provide adequate and proper means for the Plan's implementation, thereby satisfying Section 1123(a)(5) of the Bankruptcy Code.

(f)    Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)). Article 5.4 of the Plan provides that the Certificate of Incorporation and Bylaws of Reorganized Coram shall be amended to satisfy the provisions of the Plan and the Bankruptcy Code, including to prohibit the issuance of nonvoting equity securities. Thus, the requirements of Section 1123(a)(6) of the Bankruptcy Code are satisfied.

(g)    Designation of Directors (11 U.S.C. § 1123(a)(7)). Article 5.5 of the Plan contains provisions with respect to the manner of selection of directors of Reorganized Coram that are consistent with the interests of creditors, equity security holders, and public policy in accordance with Section 1123(a)(7) of the Bankruptcy Code.

(h)    Additional Plan Provisions (11 U.S.C. § 1123(b)). The Plan's provisions are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code.

5                    PHDATA 1234490_1

SL 001661

(i).    Bankruptcy Rule 3016(a). The Plan is dated and identifies the party submitting it as proponent, thereby satisfying Bankruptcy Rule 3016(a).

7.    Debtors' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)). The Trustee has complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Section 1129(a)(2) of the Bankruptcy Code.

8.    Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)). As set forth in the Opinion, the Trustee has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying Section 1129(a)(3) of the Bankruptcy Code. The Trustee's good faith is evident from the facts and record of the Bankruptcy Cases, including the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in the Bankruptcy Cases.

9.    Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)). Any payment made or to be made by any of the Debtors for services or for costs and expenses in or in connection with the Bankruptcy Cases, or in connection with the Plan and incident to the Bankruptcy Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable, thereby satisfying Section 1129(a)(4) of the Bankruptcy Code.

10.    Directors, Officers and Insiders (11 U.S.C. § 1129(a)(5)). The Trustee has complied with Section 1129(a)(5) of the Bankruptcy Code. The identity and affiliations of the persons proposed to serve as initial directors or officers of Reorganized Coram after confirmation of the Plan have been disclosed, and the appointment to, or continuance in, such offices of such persons is consistent with the interests of holders of Claims against and Equity Interests in Reorganized Coram and with public policy. The identity of any insider that will be employed or retained by Reorganized Coram and the nature of such insider's compensation have also been fully disclosed.

6                          PHOATA 1234490_1

SL 001662