fees and costs and the Trustee shall be permitted to compromise such claim with the approval of the Outside Directors, which shall not be unreasonably withheld.

9.      Within ten (10) days of the Bankruptcy Court's approval of this Settlement Agreement, the parties shall cause the consent judgment to be entered in the Delaware Action. If the Bankruptcy Court does not grant the Motion to Approve Settlement, this Settlement Agreement is null, void and of no effect. If the Bankruptcy Court grants the Motion to Approve Settlement but only with modifications, the parties agree to negotiate in good faith in an effort to reach agreement to satisfy any concerns the Bankruptcy Court might express. Failing such agreement, the Settlement Agreement will be null and void and the parties will return to their prior positions.

10.      Upon approval of this Settlement Agreement by the Bankruptcy Court, each of the Outside Directors agrees to cooperate with the Trustee in connection with the Coverage Action and the continuing Delaware Action against defendant Daniel Crowley and shall comply with all reasonable requests of the Trustee.

11.      The Trustee and the Outside Directors represent that they enter into this settlement freely and voluntarily and with and upon the advice of counsel.

12.      No covenants, agreements, representations or warranties of any kind have been made by any party hereto, except as expressly set forth herein. This Settlement Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, and all prior negotiations and discussions with respect to the subject matter of this Settlement

4

PHDATA 1354393_2

Agreement have been and are merged and integrated into, and superseded by this Settlement Agreement.

13.    This Settlement Agreement may not be altered, amended, modified, terminated or otherwise changed in any respect whatsoever except by a writing signed by the Trustee and the Outside Directors.

14.    This Settlement Agreement shall be binding upon and inure to the benefit of the Trustee (in his capacity as Trustee only and not personally) and the Outside Directors, and their respective agents, representatives, attorneys, partners, employees, predecessors, successors, heirs, assigns, executors, administrators, and any other persons who may in any fashion claim an interest in the subject matter hereof through any of the parties.

15.    This Settlement Agreement shall be construed and enforced under the law of the State of Delaware.

16.    This Settlement Agreement may be signed in counterpart copies, each of which shall be deemed to be an original document, and all of which shall together be deemed to constitute a single document.  Facsimile copies shall be deemed to be originals.

**[balance of page intentionally left blank]**

5

PHDATA 1354393_2

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date stated at the outset.

WITNESS: _____

**ARLIN M. ADAMS**

_____
Arlin M. Adams, as Chapter 11 Trustee of
Coram Healthcare Corp. and Coram, Inc.

WITNESS: _____

**DONALD J. AMARAL**

_____
Donald J. Amaral

WITNESS: _____

**WILLIAM J. CASEY**

_____
William J. Casey

WITNESS: _____

**L. PETER SMITH**

_____
L. Peter Smith

WITNESS: _____

**SANDRA L. SMOLEY**

_____
Sandra L. Smoley

6

PHDATA 1354393_2

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date stated at the outset.

WITNESS:                                ARLIN M. ADAMS

_____               _____
                                        Arlin M. Adams, as Chapter 11 Trustee of
                                        Coram Healthcare Corp. and Coram, Inc.

WITNESS:                                DONALD J. AMARAL

_____               _____
                                        Donald J. Amaral

WITNESS:                                WILLIAM J. CASEY

_____               _____
                                        William J. Casey

WITNESS:                                L. PETER SMITH

_____               _____
                                        L. Peter Smith

WITNESS:                                SANDRA L. SMOLEY

_____               _____
                                        Sandra L. Smoley

6

PHDATA 1354393_2

APR-5-2004  12:56  FROM:WILLIAM J CASEY, INC (530) 893-3034      TO:16505655100      P.2/2

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date stated at the outset.

WITNESS:                                    ARLIN M. ADAMS

_____                     _____
                                            Arlin M. Adams, as Chapter 11 Trustee of
                                            Coram Healthcare Corp. and Coram, Inc.

WITNESS:                                    DONALD J. AMARAL

_____                     _____
                                            Donald J. Amaral

WITNESS:                                    WILLIAM J. CASEY

*Marcia Kuelt*                              *W ai Jny*
                                            _____
                                            William J. Casey

WITNESS:                                    L. PETER SMITH

_____                     _____
                                            L. Peter Smith

WITNESS:                                    SANDRA L. SMOLEY

_____                     _____
                                            Sandra L. Smoley

6

PHDATA 1354393 2

To: Boris Feldman

IN WITNESS WHEREOF, the parties hereto have executed this Settlement

Agreement as of the date stated at the outset.

WITNESS:                                ARLIN M. ADAMS

_____                 _____
                                        Arlin M. Adams, as Chapter 11 Trustee of
                                        Coram Healthcare Corp. and Coram, Inc.

WITNESS:                                DONALD J. AMARAL

_____                 _____
                                        Donald J. Amaral

WITNESS:                                WILLIAM J. CASEY

_____                 _____
                                        William J. Casey

WITNESS:                                L. PETER SMITH

_____                 _____
                                        L. Peter Smith

WITNESS:                                SANDRA L. SMOLEY

_____                 _____
                                        Sandra L. Smoley

6

PHDATA 1354393_2

**A1146**

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date stated at the outset.

WITNESS:                           **ARLIN M. ADAMS**

_____           _____
                                  Arlin M. Adams, as Chapter 11 Trustee of
                                  Coram Healthcare Corp. and Coram, Inc.

WITNESS:                           **DONALD J. AMARAL**

_____           _____
                                  Donald J. Amaral

WITNESS:                           **WILLIAM J. CASEY**

_____           _____
                                  William J. Casey

WITNESS:                           **L. PETER SMITH**

_____           _____
                                  L. Peter Smith

WITNESS:                           **SANDRA L. SMOLEY**

_____           _____
                                  Sandra L. Smoley

6

*Crowley*
*Direct*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                          )
                                )
CORAM HEALTHCARE CORP. and      )
CORAM, INC.,                    ) Case Nos. 00-3299
                                ) through 00-3300 (MFW)
        Debtors.                )

                United States Bankruptcy Court
                824 Market Street - Sixth Floor
                Wilmington, Delaware

                December 1, 2000
                9:00 a.m.

BEFORE:   HONORABLE MARY F. WALRATH,
          United States Bankruptcy Judge

                TRANSCRIPT OF PROCEEDINGS

                    WILCOX & FETZER
        1330 King Street - Wilmington Delaware   19801
                    (302) 655-0477

DEC 05 2000

Pachulsk, Stang. Ziehl.
Young & Jones



**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

1    now?

2        A.    It had a hundred million of the 305 is what I

3    meant.

4        Q.    You had mentioned an entity called Dynamic

5    Healthcare Solutions.  Could you just describe that?

6        A.    Dynamic Healthcare Solutions is a company that

7    does consulting for distressed firms, provides crisis

8    management and does investments.

9        Q.    Now, at the time when your employment began

10   with Coram, were you already a consultant to Cerberus

11   and an employee of Dynamic Healthcare?

12       A.    Yes, I was in both capacities.

13       Q.    Were those relationships disclosed to Coram's

14   board before you became employed?

15       A.    Yes.  They were completely known to all of the

16   board members and all of the constituents of the

17   company.

18       Q.    Are those relationships permitted under your

19   employment contract with Coram?

20       A.    Yes.  I specifically bargained with the board

21   of Coram for an understanding that was included in my

22   employment agreement that calls out my ability to do

23   other work and the understanding was clear.

24       Q.    Now, do your agreements or relationships with



Crowley - direct                                    55

1    Dynamic Healthcare or Cerberus in any way operate to

2    restrict the time or the nature of the work which you

3    can perform for Coram?

4        A.   None at all.

5        Q.   And on average, how much of your attention is

6    devoted to Coram in let's say a particular week?

7        A.   Coram has been all consuming for me.  It's

8    averaged something well north of 40 hours, sometimes

9    as much as 75 or 80 a week.

10       Q.   Has Cerberus engaged you to act on their behalf

11   in any way in connection with Coram?

12       A.   Absolutely not.

13       Q.   Do you receive any consulting fees, any

14   compensation, any other benefits at all from Cerberus

15   for any of the work that you do for Coram?

16       A.   I receive nothing from Cerberus for anything

17   that I do at Coram whatsoever.  In fact, my agreement

18   with Cerberus specifically excludes in writing any

19   compensation from Cerberus related to Coram, period.

20       Q.   Does your compensation from Coram in any way,

21   any way at all depend upon how Cerberus is treated

22   under the plan of reorganization?

23       A.   Absolutely not.  My compensation is

24   specifically, specifically tied to the economic



WILCOX & FETZER LTD.
Registered Professional Reporters

A1150

1    State of Delaware    )
                          )
2    New Castle County    )

3

4

5                    CERTIFICATE OF REPORTER

6

7        I, Kurt A. Fetzer, Registered Professional

8    Reporter and Notary Public, do hereby certify that the

9    foregoing record, pages 1 to 153 inclusive, is a true

10   and accurate transcript of my stenographic notes taken

11   on December 1, 2000, in the above-captioned matter.

12

13       IN WITNESS WHEREOF, I have hereunto set my hand

14   and seal this 4th day of December 2000, at Wilmington.

15

16

17   

18                  Kurt A. Fetzer

19

20

21

22

23

24

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

48-D-02

# FILE COPY

Deposition of Don Amaral taken December 8, 2000

Paulson and Hi-Tech

**Page 1 to Page 112**

CONDENSED TRANSCRIPT AND CONCORDANCE
*PREPARED BY:*

*Paulson and Hi-Tech*
*3960 Howard Hughes Parkway*
*Suite 730*
*Las Vegas, NV 89109*
*Phone: 702-871-7750*
*FAX: 702-871-7755*

CH-11 TRUSTEE/
CrowleyAdmin001643

A1152

Deposition of Don Amaral taken December 8, 2000
Paulson and Hi-Tech

B5A                                                                      XMAX(UI)

## Page 1

```
(1)
(2)
(3)    UNITED STATES BANKRUPTCY COURT
       DISTRICT OF DELAWARE
(4)
       ------------------------------------x
(5)    In RE:                        Jointly Administered
       CORAM HEALTHCARE CORP.        Case Nos.
(6)    and CORAM, INC.,              00-3299 (MFW) and
                                     00-3300 (MFW)
(7)    ------------------------------------x
                                     November 28, 2000
(8)                                  9:47 a.m.
(9)
(10)
(11)
(12)
(13)            DEPOSITION OF DON AMARAL
(14)
(15)            LAS VEGAS, NEVADA
(16)
(17)            FRIDAY, DECEMBER 8, 2000
(18)
(19)
(20)
(21)
(22)  REPORTED BY:  FELICIA RENE ZABIN, RPR, CCR NO. 478
(23)               JOB NO. 11441
(24)
(25)
```

## Page 2

```
(1)             DEPOSITION OF DON AMARAL,
(2)   taken at 3960 Howard Hughes Parkway, Suite 730, on
(3)   Friday, December 8, 2000, at 9:09 a.m., before Felicia
(4)   Rene Zabin, Certified Court Reporter, in and for the
(5)   State of Nevada.
(6)
(7)   APPEARANCES:
(8)   For Equity Shareholders:
(9)         THEODORE LOW, ESQ.
            ANDREA HARMON, ESQ.
(10)        Altheimer & Gray
            10 South Wacker Drive
(11)        Chicago, Illinois 60606-7482
(12)  For Coram Healthcare and the Deponent:
(13)        MICHAEL C. HARWOOD, ESQ.
            Kasowitz, Benson, Torres & Friedman LLP
(14)        1633 Broadway
            New York, New York 10019-6799
(15)
(16)              * * * * *
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

## Page 3

```
(1)                  I N D E X
(2)   WITNESS: DON AMARAL
(3)   EXAMINATION                                     PAGE
(4)        By Mr. Low                                  4
(5)
(6)
(7)              INDEX TO EXHIBITS
(8)   AMARAL                                         MARKED
(9)   1   Fax Cover Page from Stuart C. Hirsch,        23
          April 8, 1999, with attached documents,
(10)      Bates stamped CERB 01484 through CERB
          01506; 23 pages
(11)
      2   Amendment No. 1 of Employment Agreement      26
(12)      Amaral; 7 pages
(13)  3   Minutes of a Telephonic Meeting of the       78
          Board of Directors of Coram Healthcare
(14)      Corporation, December 21, 1999; Bates
          stamped COR-SUB CON 0023875 through
(15)      COR-SUB CON 0023886; 12 pages
(16)  4   Letter to the Board of Directors, Coram      83
          Healthcare Corporation from Daniel D.
(17)      Crowley, July 19, 2000, Bates stamped
          CHAN 00081 through CHAN 00083; 3 pages
(18)
      5   Minutes of a Meeting of the Board of         97
(19)      Directors of Coram Healthcare
          Corporation, April 5, 2000; Bates
(20)      stamped COR-SUB CON 0023902 through
          COR-SUB CON 0023910; 9 pages
(21)
(22)
(23)
(24)
(25)
```

## Page 4

```
(1)   LAS VEGAS, NEVADA,.FRIDAY, DECEMBER 8, 2000
(2)              9:09 A.M.
(3)               -oOo-
(4)   Thereupon--
(5)              DON AMARAL,
(6)   having been first duly sworn to testify to the truth,
(7)   the whole truth and nothing but the truth, was examined
(8)   and testified as follows:
(9)
(10)             EXAMINATION
(11)  BY MR. LOW:
(12)     Q.  This is the deposition of Don Amaral taken
(13)  pursuant to agreement of the parties.  And let me start
(14)  out by asking you, sir, to state your name for the record
(15)  and spell your last name.
(16)     A.  Donald Joseph Amaral, A-m-a-r-a-l.
(17)     Q.  And what is your address, sir?
(18)     A.  2010 Pray Meadow Road, Glenbrook, Nevada.
(19)     Q.  And are you employed, sir?
(20)     A.  No.
(21)     Q.  Are you retired?
(22)     A.  Yes.
(23)     Q.  Can you describe for us briefly your educational
(24)  background?
(25)     A.  I graduated high school from Moreau,
```

CH-11 TRUSTEE/
CrowleyAdmin001644

A1153

Deposition of Don Amaral taken December 8, 2000
Paulson and Hi-Tech

BSA                                                                                  XMAX(5/5)

**Page 17**

(1) THE WITNESS: -- as part of the settlement.
(2) They had what we thought was a very good case again their
(3) auditors. And we were doing the settlement conferences
(4) in there. And I just asked Caremark's officers would
(5) they assign that right to Coram to pursue. And that
(6) was -- that -- that right was shifted to Coram as part of
(7) the settlement.
(8) BY MR. LOW:
(9) Q. And was -- did, in fact, Coram institute suit
(10) against Pricewaterhouse?
(11) A. Yes.
(12) Q. Okay. Has there been an outcome in that case?
(13) A. I believe it's been settled.
(14) Q. And when was it settled?
(15) A. In the last six months.
(16) Q. All right. And what did Coram get?
(17) A. I'm not sure.
(18) Q. Can you give me an estimate?
(19) A. No, I don't -- I don't remember the settlement.
(20) Q. And who would know about the settlement?
(21) A. Allen Morabito.
(22) Q. The -- do you recall telling Mr. Hayden that you
(23) thought this -- that the -- that Pricewaterhouse would
(24) pay Coram $20 million or so?
(25) A. What I told Richard it would be somewhere

**Page 18**

(1) between zero and $20 million.
(2) Q. All right. And you believe that it in fact
(3) settled for somewhere between those two?
(4) A. Yes.
(5) Q. Okay. And what was the basis for your statement
(6) to Mr. Hayden?
(7) A. On -- on the information that I had received
(8) from the attorney -- the attorneys who had prosecuted the
(9) Caremark case.
(10) Q. Did that remain your view throughout? I mean,
(11) did your view of the prospects for that case ever change?
(12) A. Not until the very end when it came close time
(13) to settle.
(14) Q. And what caused your view on that to change?
(15) A. To our currency Dan Crowley said that it was
(16) nowhere near that amount and it was gonna settle for a
(17) much less amount.
(18) Q. Okay. And you're -- your only source of
(19) information on that is Mr. Crowley; correct?
(20) A. Yes.
(21) Q. The -- when did you first meet Mr. Crowley?
(22) A. Approximately 1985, '86.
(23) Q. And in what capacity?
(24) A. He -- excuse me -- he was the found- -- the
(25) CEO/chairman of Foundation Healthcare in Sacramento. And

**Page 19**

(1) we were providing a lot of hospital services for his
(2) patients when I was the CEO of Summit Care -- Summit
(3) Healthcare.
(4) Q. So you were essentially -- he was a -- his
(5) company was a customer of yours?
(6) A. Yes.
(7) Q. And did you -- did you deal frequently with him?
(8) A. No.
(9) Q. Did you develop an impression of him?
(10) A. Yes.
(11) Q. And what impression was that?
(12) A. Extremely competency view.
(13) Q. And did that view ever change?
(14) A. No.
(15) Q. The -- what was the next capacity in which you
(16) dealt with Mr. Crowley?
(17) A. We met up at a seminar sponsored by Business
(18) Week. And I was still at Coram, and I was doing
(19) consulting work. And we jokingly talked by the both of
(20) us going together and buying a big healthcare company and
(21) doing something together.
(22) Q. Was this just talk or did you follow up?
(23) A. Talk only.
(24) Q. You say jokingly. I mean, was it a joke or was
(25) it something that --

**Page 20**

(1) A. It was over lunch and a drink. We talked about
(2) it. But we never really pursued it because I had the
(3) issue with my daughter that I had to take care of and it
(4) wouldn't allow me to work.
(5) Q. Approximately when was this?
(6) A. Summer of '98.
(7) Q. And at that time you were still the CEO of --
(8) full-time CEO of Coram?
(9) A. Yes.
(10) Q. Did you ask Mr. Crowley to be a consultant for
(11) Coram?
(12) A. No.
(13) Q. Okay. Mr. Crowley had left the Foundation
(14) Health by that time; correct?
(15) A. Yes.
(16) Q. And he was doing consulting work?
(17) A. I'm not sure.
(18) Q. The -- did you know what, if any, relationship
(19) Mr. Crowley had with Cerberus at that point?
(20) A. No.
(21) Q. When did you learn that Mr. Crowley had a
(22) relationship with Cerberus?
(23) A. Sometime in '99.
(24) Q. Okay. And what -- how did you come to learn
(25) that?

**PAULSON / HI-TECH**                  702-871-7750                  **Page 17 to Page 20**

CH-11 TRUSTEE/
CrowleyAdmin001648

A1154

## Deposition of Don Amaral taken December 8, 2000
### Paulson and Hi-Tech

BSA                                                                                    XMAX(4/6)

### Page 21

(1)     A.  Either Steve or -- Steve Feinberg or Dan Crowley
(2)  told me.  I don't remember which one.
(3)     Q.  Do you recall the context in which they told
(4)  you?
(5)     A.  Two separate contexts.  Dan over a phone
(6)  conversation.  As we just chatted about what the heck was
(7)  gonna on in healthcare.  He -- he said he was doing some
(8)  work for Feinberg.  And Feinberg, as I had talked to him
(9)  about leaving the company -- because I went to my Board
(10)  in October of '98 to leave and they asked me to stay on
(11)  for another six months -- and he said if -- once I did
(12)  leave if I ever wanted to be a consultant, I could have a
(13)  relationship somewhat like Crowley's just helping him
(14)  turn around his problem companies.
(15)     Q.  Did he discuss how you would be compensated?
(16)     A.  Nothing other than generic.
(17)     Q.  And what did he say in those generic terms?
(18)     A.  Compensated as whatever you wanted.
(19)     Q.  Okay.  Sounds like a -- sounds like a good deal.
(20)     A.  If you want to work.
(21)     Q.  If you want to work.
(22)        All right.  Let me see if I have some basic
(23)  facts correct.  I don't want to spend a lot of time
(24)  because I know your time is limited, going through
(25)  documents.

### Page 22

(1)        But am I correct you're a -- you're a
(2)  shareholder in Coram?
(3)     A.  Yes.
(4)     Q.  And you own, as I understand it, approximately
(5)  150,000 shares?
(6)     A.  Yes.
(7)     Q.  And you also have options to purchase another
(8)  2.4 million shares?
(9)     A.  Yes.
(10)     Q.  And those options are all out of the money?
(11)     A.  Yes.
(12)     Q.  Significantly out of the money?
(13)     A.  Yes.
(14)     Q.  Do you recall approximately what the strike
(15)  price would be on those?
(16)     A.  Probably around three and a quarter.
(17)     Q.  And the stock is selling for pennies at this
(18)  point?
(19)     A.  Yes.
(20)     Q.  You never expect to realize anything from those
(21)  options, do you?
(22)     A.  Not at this point.
(23)     Q.  Now, when did you first realize those options
(24)  were worthless?
(25)     A.  When the date on the Series B's were

### Page 23

(1)  restructured a dollar and change.
(2)     Q.  And when was that?
(3)     A.  I don't remember the exact date for them.  But
(4)  there was a re -- reset price date based upon the
(5)  average ten days' share price in here (indicating).
(6)     Q.  Okay.  By "in here," you mean inside Feinberg
(7)  Exhibit 17?
(8)     A.  That's correct.
(9)     Q.  All right.  And there was an amendment to the
(10)  Securities Exchange Agreement?  Is that what you're
(11)  referring to?
(12)     A.  I don't know.
(13)     Q.  Let's see if I can pull that out.  Do you have a
(14)  copy of it?
(15)        MS. HARMON:  This one.  You can mark this.
(16)        MR. LOW:  See if this helps.  I'm not saying it
(17)  will.
(18)        Can you mark this as Amaral --
(19)        THE WITNESS:  Yes.
(20)        MR. LOW:  -- Exhibit No. 1?
(21)        (Whereupon, Amaral Exhibit 1
(22)        was marked for identification.)
(23)  BY MR. LOW:
(24)     Q.  Mr. Amaral, let me hand you what's been marked
(25)  as Amaral Exhibit 1, which after your cover page appears

### Page 24

(1)  to be a -- actually, it appears to be -- it appears to be
(2)  an amendment to the Securities Exchange Agreement dated
(3)  April 9, 1999.
(4)        Are you familiar with this document, sir?
(5)     A.  Familiar?  No.  Have I seen it before?  Yes.
(6)     Q.  And on -- on -- there's a page marked 0 -- in
(7)  the corner it says "CERB," for "Cerberus," 01490.
(8)     A.  Yes.
(9)     Q.  And there's a signature on that page.  Is that
(10)  your signature?
(11)     A.  Yes, it is.
(12)     Q.  And you signed this on behalf of Coram?
(13)     A.  Yes.
(14)     Q.  All right.  Does this document bear any relation
(15)  to the reset you were talking about?
(16)     A.  I don't know.
(17)     Q.  Was it in approximately April of 1999 that you
(18)  learned that -- you became to believe that the options
(19)  you held were -- were not gonna have any value?
(20)     A.  I -- I don't know the exact time frame.  It was
(21)  when the reset price on the Series B was applicable.
(22)     Q.  Were you -- I'm trying to help you establish
(23)  that because I frankly don't know exactly when it was.
(24)        Was that -- were you still employed at Coram at
(25)  that point?

Page 21 to Page 24                     702-871-7750                     PAULSON / HI-TECH

CH-11 TRUSTEE/
CrowleyAdmin001649

**Deposition of Don Amaral taken December 8, 2000**
**Paulson and Hi-Tech**

DSA                                                                                                    XMAX(0/9)

### Page 33

(1)      Q.   Would it be true that the Board misrepresented
(2)   the situation to Mr. Crowley?
(3)      MR. HARWOOD: Object to the form.
(4)      THE WITNESS:  Not that I'm aware of.
(5)   BY MR. LOW:
(6)      Q.   You don't know of any misrepresentations?
(7)      A.   No.
(8)      Q.   The -- you said -- did you have a discussion
(9)   with Mr. Smith about Mr. Crowley coming on as a
(10)   consultant?
(11)      A.   Yes.
(12)      Q.   And what do you recall those conversations?
(13)      A.   Mr. Smith did not want anyone comin' in to
(14)   consult and he thought he would -- he was capable of
(15)   doing the job without any outside help.
(16)      Q.   Were you surprised at that reaction?
(17)      A.   No.
(18)      Q.   Is that what you would expect from a CEO type?
(19)      A.   Depends upon the CEO.
(20)      Q.   It -- it wouldn't be unusual to -- would you --
(21)   in -- in -- would you have wanted a consultant
(22)   Mr. Crowley -- like Mr. Crowley to come in to assist you
(23)   when you were CEO?
(24)      MR. HARWOOD:  Object to the form.
(25)      THE WITNESS:  Absolutely.

### Page 34

(1)   BY MR. LOW:
(2)      Q.   Did you understand why Mr. Smith did not?
(3)      A.   Yes.
(4)      Q.   And why was that?
(5)      A.   Because he was worried that he may lose his job.
(6)      Q.   And, in fact, approximately two months after
(7)   Mr. Crowley came on as consultant he was in fact hired on
(8)   as CEO?
(9)      A.   Yes.
(10)      Q.   The -- the -- and did it -- and at some point
(11)   did Mr. Smith give an ultimatum to the Board that
(12)   essentially you have to choose between either me or
(13)   Crowley?
(14)      A.   No.
(15)      Q.   Did he give any kind of ultimatum to the Board?
(16)      A.   Yes.
(17)      Q.   And what did he say?
(18)      A.   He didn't say; his attorney stated in a letter
(19)   that he had been effectively terminated by the -- by the
(20)   company's hiring of Dan Crowley undermining him and that
(21)   he had these severance demands.  He needed to meet them
(22)   and -- by "X" date period or somethin' else was gonna
(23)   happen.  I don't even remember what the somethin' was
(24)   gonna happen.
(25)      Q.   And what -- what action, if any, did the Board

### Page 35

(1)   take in response?
(2)      A.   We accepted his resignation.
(3)      Q.   Okay.  Did you make a settlement to his
(4)   severance demands?
(5)      A.   Yes.
(6)      Q.   Did you think there was any merit to his claim
(7)   that he had been effectively terminated?
(8)      A.   None.
(9)      Q.   Did you ever discuss that with him?
(10)      A.   Yes.
(11)      Q.   And what, if anything, did he say to you?
(12)      A.   That his over- -- his attorney had overstated
(13)   her bounds and that he had been -- he was -- he was sad
(14)   that the letter had been -- went out the way it did.
(15)      Q.   All right.  Was he sorry to leave?
(16)      A.   Yes.
(17)      Q.   Did he suggest perhaps he would stay on?
(18)      A.   No.
(19)      Q.   After -- after Mr. Smith resigned you were named
(20)   as the interim CEO; is that correct?
(21)      A.   Yes.
(22)      Q.   And what action, if any, did you take as interim
(23)   CEO?
(24)      MR. HARWOOD:  Object to the form.  It's kind of
(25)   general.

### Page 36

(1)      THE WITNESS:  I -- I came back in as the CEO of
(2)   the company.
(3)   BY MR. LOW:
(4)      Q.   Did you actually go to Denver?
(5)      A.   Yes.
(6)      Q.   And did you stay there the entire time?
(7)      A.   No.
(8)      Q.   Okay.  Approximately how much time did you spend
(9)   at Denver while you were the interim CEO?
(10)      A.   Probably the same as when I was the full-time
(11)   CEO; 15, 20 percent of the time.
(12)      Q.   Okay.  So you were not full time there?
(13)      A.   I wasn't full time in Denver, but I was a
(14)   full-time CEO.
(15)      Q.   The -- did you want to be CEO again?
(16)      A.   No.
(17)      Q.   And you were looking to hire somebody else?
(18)      A.   Yes.
(19)      Q.   All right.  And the logical person to hire was
(20)   Mr. Crowley; correct?
(21)      A.   Yes.
(22)      Q.   Were any other candidates considered?
(23)      A.   Yes.
(24)      Q.   Who else was considered?
(25)      A.   Dan Kohl.  Just other healthcare executives that

---

PAULSON / HI-TECH                    702-871-7750                    Page 33 to Page 36

CH-11 TRUSTEE/
CrowleyAdmin001652

Deposition of Don Amaral taken December 8, 2000
Paulson and Hi-Tech

BSA                                                                          XMAX(16/16)

**Page 37**

(1) I knew that you were available in the job market.
(2) Q. Did you actually interview these people?
(3) A. I talked to Dan and I talked to another person.
(4) And his name escapes me.
(5) Q. The — you knew that Mr. Feinberg highly
(6) recommended Mr. Crowley; correct?
(7) A. Yes.
(8) Q. At that — at the time he was recommending him,
(9) did you know that Mr. Feinberg had hired Mr. Crowley to
(10) work for him for a different company or — or in a —
(11) different capacity?
(12) A. Yes.
(13) Q. When did you first learn that?
(14) A. As I testified earlier, sometime in '99.
(15) Q. All right. Now, did you see any problems with
(16) that?
(17) A. No.
(18) Q. The — was the nature and extent of the
(19) employment relationship between Crowley and Cerberus made
(20) known to you at that time?
(21) A. You mean the form of compensation?
(22) Q. Yes. Or the amount?
(23) A. No.
(24) Q. Did you know that Mr. Crowley was receiving
(25) $80,000 a month from Cerberus at that time?

**Page 38**

(1) A. No.
(2) Q. Did you ever know it?
(3) A. Just now.
(4) Q. You — you did not know that before now?
(5) A. No.
(6) Q. Okay. The — I take it that was never disclosed
(7) to the Board; correct?
(8) A. No.
(9) Q. The — the Cerberus/Crowley . . .
(10)        (Discussion between Mr. Low
(11)        and Ms. Harmon.)
(12) BY MR. LOW:
(13) Q. Let me show you, sir, what's been previously
(14) marked as Feinberg Deposition Exhibit 7, which is in fact
(15) a — been identified as an employment contract effective
(16) as of August 1, 1999, in which Mr. Crowley was hired to
(17) be a full-time employee of Cerberus.
(18)        MR. HARWOOD: Object to the form.
(19)        MR. LOW: That's what the contract says.
(20) BY MR. LOW:
(21) Q. Have you ever seen this document before, sir?
(22) A. No.
(23) Q. Were you aware of its contents?
(24) A. No.
(25) Q. Were you aware that Mr. Crowley in fact had been

**Page 39**

(1) employed to be a full-time employee of Cerberus prior to
(2) the time he went to work for Coram?
(3) A. No.
(4) Q. You weren't aware that have till just now?
(5) A. Yes.
(6) Q. Okay. The — what were you told about his
(7) relationship with Cerberus?
(8) A. That he worked one or two days per week on a
(9) T-shirt company.
(10) Q. Was the name "Winterland" mentioned?
(11) A. Yes.
(12) Q. And that's -- that's the name of the T-shirt
(13) company?
(14) A. I assume that.
(15) Q. Yeah. Were you told that Mr. Feinberg — that
(16) Mr. Crowley also received a percentage of the profits of
(17) that company?
(18) A. No.
(19) Q. To your knowledge, was the — were the terms of
(20) this — of Crowley's relationship with Cerberus ever
(21) disclosed to the Board?
(22) A. No.
(23) Q. The — there's been testimony here, sir, in this
(24) case that — that you negotiated with Mr. Crowley the
(25) terms of his employment contract as CEO of Coram in -- in

**Page 40**

(1) approximately November 1999; is that correct? .
(2) A. Yes.
(3) Q. And what do you recall of those negotiations?
(4) A. Most difficult employment agreement I've ever
(5) negotiated.
(6) Q. Well, that's not dissimilar to what others have
(7) said.
(8)        The — what made it so difficult?
(9) A. Dan's continual reaching for more.
(10) Q. And Mr. Crowley wished for very highly
(11) compensated for his services; is that correct?
(12) A. Yes.
(13) Q. And you felt that his commands were beyond what
(14) were appropriate under the circumstances?
(15) A. They were more than we could afford.
(16) Q. And you attempted to scale him back; correct?
(17) A. Yes.
(18) Q. And were you successful in doing so?
(19) A. Depends upon the time frame.
(20) Q. Okay. At least in November?
(21) A. When the agreement was executed, I was satisfied
(22) for the company and the shareholders that I had the best
(23) person in America to — to attempt to turn this company
(24) around.
(25) Q. All right. And on behalf of the company and the

Page 37 to Page 40                    702-871-7750                    PAULSON / HI-TECH

CH-11 TRUSTEE/
CrowleyAdmin001653

A1157

Deposition of Don Amaral taken December 8, 2000
Paulson and Hi-Tech

BSA                                                                                          XMAX(13/13)

**Page 49**

(1)  MR. LOW: It certainly does.

(2)  MR. HARWOOD: But go ahead.

(3)  THE WITNESS: I was aware that he had asked

(4)  Cerberus for an upside based on his job as the CEO of

(5)  Coram.

(6)  BY MR. LOW:

(7)  Q.  Upside of what?

(8)  A.  An upside on their position for any improvement

(9)  that they may have that he would participate.

(10) Q.  That he would be paid by Cerberus based on

(11) his -- any success he had as CEO of Coram?

(12) A.  Correct.

(13) MR. HARWOOD: Object to the form.

(14) THE WITNESS: Correct.

(15) BY MR. LOW:

(16) Q.  How did you become aware that he had made such a

(17) proposal?

(18) A.  He told me that he had or was going to.

(19) Q.  And what, if any, reaction did you have?

(20) A.  I said I needed to think about it. This was at

(21) the end of a extremely long and difficult negotiation

(22) process over the phone. And I was tired and worn out,

(23) and I wanted to move on to somethin' else. And I said,

(24) that I would get back to him. I called he and Cerberus

(25) the next day and told him that I could not live with it.

**Page 50**

(1)  Q.  Okay. And approximately when was that

(2)  conversation? During the November 1999?

(3)  A.  Yes.

(4)  Q.  All right. Can you -- was it near the end, near

(5)  the beginning, in the middle of the negotiations? Can

(6)  you place it any more affirmatively than that?

(7)  A.  Probably in the middle.

(8)  Q.  And you spoke to Mr. Crowley, as I understand

(9)  your testimony you've just given, and told him that you

(10) would not agree to such an arrangement; correct?

(11) A.  Yes.

(12) Q.  And what reason did you give, if any?

(13) A.  That he could not be paid by the debtholders.

(14) He -- he was a full-time employment [sic] -- employee of

(15) the company.

(16) Q.  And what, if anything -- and what -- and -- and

(17) was that in fact your reason for opposing such an

(18) arrangement?

(19) A.  Yes.

(20) Q.  Okay. And what, if anything, did Mr. Crowley

(21) say in response?

(22) A.  He whined.

(23) Q.  Can you be more specific?

(24) A.  He -- he complained that, you know, I was bein'

(25) too tough; that I wasn't given him enough compensation;

**Page 51**

(1)  that the risks here; that we needed to up the ante on

(2)  this. And I said, "Dan, that's the deal."

(3)  Q.  And Mr. Crowley eventually signed the contract?

(4)  A.  Yes.

(5)  Q.  Okay. The -- you say you had a conversation

(6)  with Cerberus on the same topic?

(7)  A.  Yes.

(8)  Q.  Was that with Mr. Feinberg?

(9)  A.  Yes.

(10) Q.  And what do you recall about that conversation?

(11) A.  I don't recall if I actually had the

(12) conversation with Steve or I left initially a voice mail

(13) for him and he called me back. But I told him we could

(14) not have anything I don't -- and that could cause anyone

(15) to look to see if he was getting paid for doin' his work

(16) from anyone other than the company.

(17) Q.  And what, if anything, did Mr. Feinberg say in

(18) response?

(19) A.  He agreed.

(20) Q.  Was it your understanding based on this

(21) conversation that Mr. Feinberg was aware that Mr. Crowley

(22) had or would make such a proposal?

(23) A.  He had already made it.

(24) Q.  And Mr. Feinberg indicated familiarity with that

(25) proposal to you?

**Page 52**

(1)  MR. HARWOOD: Object to the form.

(2)  BY MR. LOW:

(3)  Q.  Is that correct?

(4)  A.  Not familiar. He was -- he had made it known to

(5)  me that Crowley had already hit him up for it.

(6)  Q.  All right. And did Mr. Feinberg give you any --

(7)  any sense of what his Feinberg's reaction to the

(8)  proposal?

(9)  A.  He agreed with me that the CEO of Coram could

(10) not be compensated by also the debtholders.

(11) Q.  Okay. Did he say why?

(12) A.  No.

(13) Q.  Was the term "conflict of interest" mentioned?

(14) A.  No.

(15) Q.  Was your understanding that that would be a

(16) conflict of interest?

(17) A.  Yes.

(18) Q.  Okay. The -- did Mr. Feinberg at that or any

(19) other time disclose that Mr. Crowley was a full-time

(20) employee of Cerberus being paid close to a million

(21) dollars a year?

(22) A.  As I stated earlier, I did not know until today

(23) in this deposition that he was a full-time -- required to

(24) be a full-time employee. That was never disclosed to me

(25) or the Board.

---

PAULSON / HI-TECH                    702-871-7750                    Page 49 to Page 52

CH-11 TRUSTEE/
CrowleyAdmin001656

Deposition of Don Amaral taken December 8, 2000
Paulson and Hi-Tech

#### Page 81

(1) heard, do you recall whether there was some indication of
(2) some counterproposal that was made? I mean, was the
(3) report they'll do "Y" but not "X"?
(4)    A. I'm sorry. I don't recall what it was, but I
(5) just remember we couldn't get anything done.
(6)    Q. And I take it that special committee was
(7) thereafter nonfunctioning?
(8)    A. Yes, until we created another special committee
(9) sometime in the summer of '99.
(10)    Q. Summer of –
(11)    A. Two – two – 2000,
(12)    Q. Right. That was a different committee; correct?
(13)    A. Different committee with one additional
(14) member – two additional members.
(15)    Q. All right. And that committee – when was that
(16) committee formed? Can you put it more specifically?
(17)    A. It was formed sometime to go back and try to do
(18) a better job than what Mr. Crowley had achieved with the
(19) debtholders.
(20)    Q. All right. Mr. Crowley had been negotiating
(21) with the debtholders up to that time?
(22)    A. Yes, along with other members of management.
(23)    Q. Okay. And the Board felt that they had not
(24) achieved as much as they had hoped?
(25)    A. That and we also were aware that there -- you

#### Page 82

(1) know, that we wanted a third party to do it because of
(2) the relationship of Crowley to Cerberus.
(3)    Q. The -- by the time that committee was formed,
(4) the Chanin had already given their evaluation report, had
(5) they not?
(6)    A. I'm not sure. I believe so, but I'm not a
(7) hundred dollars percent.
(8)    Q. And Mr. Feinberg was informed of the Chanin
(9) evaluation; correct?
(10)    A. No. I think Steve was -- kept that away from
(11) Steve.
(12)    Q. Well, let me represent to you that Mr. Feinberg
(13) testified that -- I have a transcript here someplace --
(14) two days ago – three days ago that he in fact was
(15) immediately informed.
(16)    Do you have a understand contrary understanding?
(17)    A. Yeah. I -- I thought of a Steve was not a party
(18) to that.
(19)    (Discussion between Mr. Low
(20)    and Ms. Harmon.)
(21)    MR. LOW: Sorry.
(22)    THE WITNESS: That's okay.
(23)    (Discussion between Mr. Harwood
(24)    and the deponent.)
(25) / / /

#### Page 83

(1)    (Whereupon, Amaral Exhibit 4
(2)    was marked for identification.)
(3) BY MR. LOW:
(4)    Q. Mr. Amaral, let me show you what's just been
(5) marked as Amaral deposition Exhibit -- 4?
(6)    THE REPORTER: Yes.
(7) BY MR. LOW:
(8)    Q. Let me ask you -- which appears to be a letter
(9) from Mr. Crowley to the Board of Directors dated July 19
(10) of 2000 and ask you if you've seen this document before.
(11)    A. Yes.
(12)    Q. Did you see this in preparation for your
(13) deposition?
(14)    A. No.
(15)    Q. Okay. Do you recall receiving this in July of
(16) this year?
(17)    A. Yes.
(18)    Q. Okay. And, again, to perhaps assist your
(19) memory, on the second page in the middle of the -- middle
(20) paragraph -- let me just read to you what it says and see
(21) if this refreshes your recollection.
(22)    "Finally, we have completed the vast majority of
(23) our work with Chanin to create a product from which they
(24) can responsibly establish a valuation for Coram. Along
(25) that line, Chanin" -- "Chanin informed me Monday night

#### Page 84

(1) they should have a completed valuation to discuss with me
(2) this coming Saturday. Counsel suggested that we promptly
(3) share that information with the debtholders on the
(4) telephonic meeting as soon as we know the valuation."
(5)    Does this refresh your recollection as to
(6) whether the valuation of Chanin was kept away from the
(7) debtholders?
(8)    A. My understanding was that it was kept away from
(9) them for a period of time. I mean, it wasn't a long
(10) period of time, but it was kept away from them.
(11)    Q. Okay. Do you recall any discussion -- any
(12) reaction to Mr. Crowley's discussion that they be told as
(13) soon as we know?
(14)    A. I remember the Board meeting that I stated that
(15) we should not let them know of the -- the Chanin
(16) valuation until we knew what we could do, until we knew
(17) the evaluation and we had opportunity to discuss it.
(18)    Q. All right. And was that on the Board meeting of
(19) July 31st?
(20)    A. I -- I'm not sure. I mean, we had so many Board
(21) meetings.
(22)    Q. I appreciate that, sir. And to help you, I
(23) don't believe from my review of the minutes that there
(24) were any meetings between July 19th and July 31st.
(25)    A. Okay.

---

PAULSON / HI-TECH                702-871-7750                Page 81 to Page 84

CH-11 TRUSTEE/
CrowleyAdmin001664

Deposition of Don Amaral taken December 8, 2000
Paulson and Hi-Tech

BSA                                                                                          XJJAX(26/26)

**Page 109**

(1)     MR. LOW:  On what basis?

(2)     MR. HARWOOD:  On the basis that you're asking

(3)  about attorney work product and legal strategy.

(4)     MR. LOW:  He's been identified by your side as a

(5)  witness on their witness list.  I can't imagine what --

(6)  what strategy is being revealed.

(7)     MR. HARWOOD:  So then that's all you need to;

(8)  right?  Other than he's on our list and he's a potential

(9)  witness.  To the extent to which we may have changed our

(10)  mind at some point, I'm not gonna let you get into that.

(11)     MR. LOW:  I'm not asking what --

(12)     MR. HARWOOD:  If and when we make a decision

(13)  that he'll show up, we'll make sure and let you know.

(14)     MR. LOW:  No, no, I'm asking what his plans are.

(15)     MR. HARWOOD:  Whether he would be available if

(16)  we want him to testify?

(17)     MR. LOW:  No.  I didn't say anything if he

(18)  wanted.  I'm asking whether he plans to attend.

(19)     MR. HARWOOD:  Whether he plans --

(20)     THE WITNESS:  That's a simple answer.  Today no.

(21)  BY MR. LOW:

(22)     Q.  Okay.  The -- but that is not your final answer?

(23)     A.  That's correct.

(24)     Q.  Okay.

(25)     A.  You might have to phone my wife to see if it's

**Page 110**

(1)  okay.

(2)     Q.  There are no higher courts than that.  That I'm

(3)  pretty sure.

(4)     MR. LOW:  (To Ms. Harmon) Anything else?  Than I

(5)  think that's all I have.  Thank you very much, sir.

(6)     MR. HARWOOD:  I have no questions at this time.

(7)        (Thereupon, the deposition

(8)         concluded at 11:24 a.m.)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Page 111**

(1)            CERTIFICATE OF DEPONENT

(2)  PAGE  LINE  CHANGE          REASON

(3)  _____

(4)  _____

(5)  _____

(6)  _____

(7)  _____

(8)  _____

(9)  _____

(10)  _____

(11)  _____

(12)  _____

(13)  _____

(14)              * * * * *

       I, DON AMARAL, deponent herein, do hereby certify

(15)  and declare under penalty of perjury the within and

       foregoing transcription to be my deposition in said

(16)  action; that I have read, corrected and do hereby affix

       my signature to said deposition.

(17)

(18)

                          DON AMARAL, Deponent

(19)

(20)  STATE OF _____ )

                               ) ss

(21)  COUNTY OF _____ )

(22)     Subscribed and sworn to before me this ____ day of

(23)  _____, 2000.

(24)

(25)           NOTARY PUBLIC

**Page 112**

(1)            REPORTER'S CERTIFICATE

(2)  STATE OF NEVADA        )

                           ) ss

(3)  COUNTY OF CLARK    )

(4)     I, Felicia Rene Zabin, a duly commissioned Notary

(5)  Public, Clark County, State of Nevada, do hereby certify:

(6)     That I reported the deposition of DON AMARAL

(7)  commencing on Friday, December 8, 2000, at the hour of

(8)  9:09 a.m.

(9)     That prior to being deposed, the witness was by me

(10)  duly sworn to testify to the truth.  That I thereafter

(11)  transcribed my said shorthand notes into typewriting and

(12)  that the typewritten transcript is a complete, true, and

(13)  accurate transcription of my said shorthand notes.

(14)     I further certify that I am not a relative or

(15)  employee of counsel to any of the parties, nor a relative

(16)  or employee to the parties involved in said action, nor a

(17)  person financially interested in the action.

(18)     IN WITNESS WHEREOF, I have set my hand and affixed my

(19)  official seal in my office in the County of Clark, State

(20)  of Nevada, this _____ day of _____, 2000.

(21)

(22)

(23)           FELICIA RENE ZABIN, RPR

              CCR No. 478

(24)

(25)

Page 109 to Page 112                    702-871-7750                    PAULSON / HI-TECH

CH-11 TRUSTEE/
CrowleyAdmin001671

A1160

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In the matter of                )
                                )
CORAM HEALTHCARE CORP.          ) Case No. 00-3299
and CORAM, INC.                 ) Through 00-3300 (MFW)
                                )
        Debtors.                )


                    Bankruptcy Courtroom
                    Room No. 2 - Sixth Floor
                    Marine Midland Plaza
                    824 Market Street Mall
                    Wilmington, Delaware


                    Friday, December 15, 2000
                    9:07 a.m.



BEFORE:  THE HONORABLE MARY F. WALRATH,
         United States Bankruptcy Judge




                TRANSCRIPT OF PROCEEDINGS



            WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters
COPY      488

Crowley - Cross                                    19

1   Look at page 3.  "That document," I'm sorry, being

2   Debtors' Exhibit 1.  That's the employment agreement that

3   you entered into with Cerberus as of August 1st, but you

4   didn't execute it till November.  Right?

5       A.   Yes.

6       Q.   And this, as I think you testified, reflected

7   the handshake deal that had been made back in July with

8   Mr. Feinberg.  Right?

9       A.   I said generally it did.

10      Q.   And you signed Debtors' Exhibit 1?

11      A.   Yes, I did.

12      Q.   Look, please, at paragraph 2.5 which says

13  "Duties."

14           Does Your Honor have this contract?  Kind

15  of hard to read.

16           THE COURT:  I have it.

17  BY MR. LEVY:

18      Q.   Under "Duties," would you read the first two

19  sentences, sir.

20      A.   "Executive will have such duties as are assigned

21  or delegated to the executive by the general partner or

22  Stephen Feinberg."

23      Q.   Next sentence?

24      A.   "The executive will devote his entire business



1    time, attention, skill, and energy exclusively to the

2    business of the employer or any portfolio company or

3    companies" --

4        Q.    "Companies as to which the executive is assigned

5    by the employer."

6        A.    Thank you.

7        Q.    We can agree that you are the executive. They

8    use the word "executive"?

9        A.    That's me.

10       Q.    And that the company is Cerberus.   Right?

11       A.    Cerberus is the company.

12       Q.    Is the company.

13       A.    Yes.

14       Q.    Back to my question.   I'll try and ask it

15   better.  As of August, you had a verbal agreement,

16   handshake, with Cerberus, later generally reflected in

17   Exhibit D-1, which required you to devote all of your

18   time to Cerberus, and as of August you had a consulting

19   agreement with Coram that paid you an additional $40,000

20   a month.  Is that correct?

21       A.    I believe in September I had a consulting

22   agreement with Coram that paid me $40,000 a month.   That

23   is correct.

24       Q.    The board of directors of Coram at that time



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1   didn't know, did they, that you were getting $80,000 a

2   month from Cerberus?

3       A.   I have no idea.

4       Q.   You certainly never made any attempt to disclose

5   it, did you?

6       A.   I don't know that I was asked.

7       Q.   But you didn't volunteer it.

8       A.   I don't know that I was asked.  I was not an

9   employee of Coram in August or September or October or

10  November.  I had my own company.  Why would I have been

11  asked?

12      Q.   You were getting $40,000 a month from Coram,

13  weren't you?

14      A.   I was hired as a consultant by the CEO and

15  president of the company to consult at his pleasure.

16      Q.   In fact, you never told the board of directors

17  of Coram that you were getting $80,000 a month from

18  Cerberus, did you?

19      A.   If I had been asked, I would have told them.

20      Q.   Even after you became an employee, you never

21  told them?

22      A.   The board of directors knew that I had other

23  activities, which included my business relationship with

24  Cerberus.  It was much discussed.  In fact, my employment



1  agreement specifically states that I have other

2  interests, that I have other activities, that is

3  permitted.  It was much discussed by the independent

4  directors.  It was much discussed that I had other

5  activities.  My relationship with Cerberus was known.

6      Q.   But all of this what you call much discussion,

7  it was never disclosed that you were getting nearly a

8  million dollars a year, plus upside, from Cerberus, was

9  it?

10     A.   Again, I have not withheld then or now anything

11 from the board.  Had it been asked, I would have said it.

12 They didn't ask me.  It didn't occur to me if they didn't

13 ask me.

14     Q.   During this period, "this period" being

15 beginning in August, you were spending a great deal of

16 time on Coram's work, weren't you?

17     A.   I was spending some time on Coram's work in

18 August of 1999.  Some time, yes.

19     Q.   And after November of 1999 you were spending

20 7 days a week, 15 hours a day on Coram, weren't you?

21     A.   I was hired November 30th.  So after November I

22 engaged in the business of Coram and gave it that level

23 of attention that I believed that it deserved and I

24 could.



124

1                    C E R T I F I C A T E

2

3    STATE OF DELAWARE)

4                    )

5    NEW CASTLE COUNTY)

6

7              I, Kimberly A. Hurley, Registered
     Professional Reporter and Notary Public, do hereby
8    certify that the foregoing record, pages 1 to 124
     inclusive, is a true and accurate transcript of my
9    stenographic notes taken on Friday, December 15, 2000, in
     the above-captioned matter before the United States
10   Bankruptcy Court for the District of Delaware.

11             IN WITNESS WHEREOF, I have hereunto set my
     hand and seal this 17th day of December, 2000, at
12   Wilmington.

13

14

15                      Kimberly A. Hurley

16

17

18

19

20

21

22

23

24

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

# In The Matter Of:

*IN RE: CORAM HEALTHCARE CORP.*
*and CORAM, INC.*

---

## DONALD AMARAL
### December 20, 2000

---

## MANHATTAN REPORTING CORP.
### 420 Lexington Avenue
### New York, NY 10170
### (212) 557-7400     FAX: (212) 692-9171

Original File 122000DA.TXT, 62 Pages
Min-U-Script® File ID: 1490923494

## Word Index included with this Min-U-Script®

IN RE: CORAM HEALTHCARE CORP.
and CORAM, INC.

DONALD AMARAL
December 20, 2000

---

**Page 1**

[1] UNITED STATES BANKRUPTCY COURT
     DISTRICT OF DELAWARE
[2]
                                                    X
[3]
[4] IN RE: CORAM HEALTHCARE CORP.  Jointly administered
     and CORAM, INC.,          Case Nos.
[5]              00-3299 (MFW) and
                 00-3300 (MFW)
[6]
                                                    X
[7]
[8]
[9]     DEPOSITION OF:  DONALD AMARAL
[10]
        DATE:        December 20, 2000
[11]
[12]    TIME:        10:00 a.m. to 11:10 a.m.
[13]
        LOCATION:    Hyatt Regency Airport
[14]                 Room 8028
                     Orlando, Florida
[15]
[16]  REPORTED BY:  HEIDI KOPY, Court Reporter
                    Notary Public, State of
                        Florida at Large
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 2**

[1] APPEARANCES:
[2]
    MICHAEL C. HARWOOD, ESQUIRE
[3] DAVID M. FRIEDMAN, ESQUIRE (via telephone)
       Kasowitz, Benson, Torres & Friedman, LLP
[4]    1633 Broadway
       New York, New York, 10019-6799
[5]    (212) 557-7400
       On behalf of Coram Healthcare and the
[6]    Deponent
[7] THEODORE LOW, ESQUIRE
       Altheimer & Gray, P.A.
[8]    10 South Wacker Drive
       Chicago, Illinois 60606-7482
[9]    (312) 715-4646
       On behalf of Official Equity Committee
[10]
    JOHN NEUWIERTH, ESQUIRE (via telephone)
[11]    Weil Gotshal & Manges
        767 5th Avenue
[12]    New York, New York 10153
        On behalf of Goldman Sachs Credit Partners
[13]    LP, Foothill Capital, and Cerberus
        Partners, Lp
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

A1168

IN RE: CORAM HEALTHCARE CORP.
and CORAM, INC.

DONALD AMARAL
December 20, 2000

**Page 7**

[1]    A: No.
[2]    Q: At the time that you were having the
[3] negotiations with Mr. Crowley, had you seen a copy of
[4] any contract he may have had with Cerberus?
[5]    A: No.
[6]    Q: In fact, at any time prior to the deposition
[7] you gave in this action, had you ever seen any copy of
[8] any contract Mr. Crowley had with Cerberus?
[9]    A: No.
[10]    Q: Did you ever ask Mr. Crowley for a copy of
[11] that contract?
[12]    A: No.
[13]    Q: In fact, did you know at the time whether he
[14] had any contract in writing?
[15]    A: No.
[16]    Q: And even through the time of up to today, did
[17] you ever have any sense that in your discussions with
[18] Mr. Crowley regarding his employment with Coram or
[19] Cerberus that he was in any way less than candid with
[20] you about his relationship with Cerberus?
[21]    A: No.
[22]    Q: And did you ever have any impression that he
[23] ever misrepresented anything to you about his
[24] relationship with Cerberus?
[25]    A: No.

**Page 8**

[1]    Q: Okay. Now, in connection with that, do you
[2] remember being deposed in this case a couple of weeks
[3] ago on December 8th?
[4]    A: Yes.
[5]    Q: And that deposition was taken by Mr. Low as
[6] counsel for the equity committee?
[7]    A: Yes.
[8]    Q: And do you recall during that deposition
[9] Mr. Low asked you some questions about Mr. Crowley's
[10] relationship with Cerberus? Do you recall that?
[11]    A: Yes.
[12]    Q: I'm just going to bring back to your
[13] attention some testimony that was given during that
[14] deposition. I'm referring specifically to page 38 of
[15] the deposition beginning at line 12. These are
[16] questions by Mr. Low. It says:
[17]    QUESTION: Let me show you, sir, what
[18] has been previously marked as Feinberg
[19] Deposition Exhibit 7, which is in fact a
[20] — been identified as an employment
[21] contract effective as of August 1, 1999,
[22] in which Mr. Crowley was hired to be a
[23] full-time employee of Cerberus.
[24]    MR. HARWOOD: Object to the form.
[25]    MR. LOW: That's what the contract says.

**Page 9**

[1] And in continuing with the question,
[2]    QUESTION: Have you ever seen this
[3] document before, sir?
[4]    ANSWER: No.
[5]    QUESTION: Were you aware of its
[6] contents?
[7]    ANSWER: No.
[8]    QUESTION: Were you aware that
[9] Mr. Crowley, in fact, had been employed
[10] to be a full-time employee of Cerberus
[11] prior to the time he went to work for
[12] Coram?
[13]    ANSWER: No.
[14]    BY MR. HARWOOD:
[15]    Q: Do you recall that testimony?
[16]    A: Yes.
[17]    Q: And when you answered those questions, had
[18] you had a chance to read the contract between
[19] Mr. Crowley and Cerberus?
[20]    A: No.
[21]    Q: When you were answering those questions, did
[22] you accept Mr. Low's assertion that the contract
[23] between Mr. Crowley and Cerberus provided that
[24] Mr. Crowley was a full-time employee of Cerberus as a
[25] true representation?

**Page 10**

[1]    A: Yes, I had no other reason to believe that
[2] Mr. Low wasn't telling me the facts.
[3]    MR. LOW: I did tell him the facts.
[4]    MR. HARWOOD: Well, you told him the facts as
[5] you understood them.
[6]    MR. LOW: I told him the facts as stated in
[7] the contract.
[8]    BY MR. HARWOOD:
[9]    Q: Do you recall later on in the deposition, and
[10] I'm turning now to page 52 beginning line 18, and
[11] again, questioning by Mr. Low:
[12]    QUESTION: Okay. The — Did
[13] Mr. Feinberg at that or any other time
[14] disclose that Mr. Crowley was a
[15] full-time employee of Cerberus being
[16] paid close to a million dollars a year?
[17] This was, just for context, referring to that
[18] or any other time, specifically referring to a
[19] conversation you had with Mr. Feinberg in November of
[20] 1999 during negotiations of Mr. Crowley's contract?
[21]    MR. NEUWIERTH: And the page, Michael?
[22]    MR. HARWOOD: Yes, deposition page 52, line
[23] 18.
[24]    MR. NEUWIERTH: Thank you.
[25]    MR. HARWOOD: Continuing with:

DONALD AMARAL
December 20, 2000

IN RE: CORAM HEALTHCARE CORP.
and CORAM, INC.

---

**Page 59**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 60**

[1]      CERTIFICATE
[2]
[3] STATE OF FLORIDA              )
[4] COUNTY OF ORANGE              )
[5]
[6]      I, HEIDI KOPY, Notary Public, State of
[7] Florida at Large, certify that I was authorized to and
[8] did stenographically report the foregoing proceedings,
[9] that a review of the transcript was requested, and that
[10] the transcript is a true and complete record of my
[11] stenographic notes.
[12]      I further certify that I am not a relative,
[13] employee, attorney, or counsel of any of the parties,
[14] nor am I a relative or employee or any of the parties'
[15] attorney or counsel connected with the action, nor am I
[16] financially interested in the action.
[17]      DATED this 20th day of December, 2000.
[18]
[19]
[20]
[21]
[22]      HEIDI KOPY, Court Reporter
            Notary Public, State of
                  Florida at Large
[23]
[24]
[25]

---

**Page 61**

[1]      Accurate Orlando Reporters, Inc.
            105 E. Robinson Street, Suite 301
[2]            Orlando, Florida 32801
            (407) 246-0046  Fax (407) 246-8084
[3]
[4]                  December 20, 2000
[5]
[6] Mr. Harwood, Esquire
      Kasowitz, Benson, Torres & Friedman, LLP
[7] 1633 Broadway
      New York, New York 10019
[8]
[9]
      IN RE: CORAM HEALTHCARE
[10]
[11] Dear Mr. Harwood,
[12] This letter is to advise you that the deposition
      transcript of DONALD AMARAL, taken in the above-styled
[13] cause on December 20, 2000, is awaiting reading and
      signing.
[14]
      Please have your client make an appointment with our
[15] office to come in and read and sign the transcript.
      Our office hours are from 9:00 a.m. to 5:00 p.m.,
[16] Monday through Friday.  The transcript is 62 pages
      long, and DONALD AMARAL should allow sufficient time.
[17]
      If the reading and signing has not been completed prior
[18] to January 25, 2000, we shall conclude that the reading
      and signing has been waived and we will forward the
[19] original transcript to the ordering attorney without
      further notice.
[20]
      Your prompt attention to this matter is appreciated.
[21]
      Sincerely,
[22]
[23]
[24] Heidi Kopy, Court Reporter
      Notary Public, State of
[25] Florida at Large

---

Page 59 - Page 61  (18)          Min-U-Script®          MANHATTAN REPORTING CORP.