18

1    A    Not recently.

2    Q    Ever -- ever since -- I'm sorry.

3         Ever since December 21st?

4    A    It was disclosed to us that he was receiving

5    that compensation in -- sometime after December 21st,

6    2000.

7    Q    But since then you have never asked him whether

8    he continues to receive it, and you don't know whether

9    he's receiving it today?

10   A    I don't know if he's receiving that today.

11   Q    Is that something you would want to know as a

12   director?

13   A    No.

14   Q    Why?

15   A    Because I'm very pleased with the job

16   Mr. Crowley is doing as CEO.  And when I hired him, I

17   knew he was doing some consulting for Cerberus or one of

18   those -- one of the subsidiaries.

19   Q    Did it ever occur to you that though he is

20   doing a good job, he might have done even better -- he

21   might have done an even better job had there not been

22   this relationship?

23   A    It occurred to me that he could not have done a

24   better job than what he has done, whether he was getting

25   $80,000 or a million dollars a month.



ESQUIRE™
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
*Chicago:* 312.782.8087 • 800.708.8087 • Fax 312.704.4950

CH-11 TRUSTEE/
CrowleyAdmin001778

99

1    Q    Did you or, to your knowledge, any member of

2  the board ever have a discussion with Crowley in which

3  it was suggested that he either give up his relationship

4  with Cerberus or give up his relationship with Coram?

5    A    Only when I was negotiating the agreement with

6  him.

7    Q    Please tell me what "the agreement" means.

8    A    The initial employment agreement in October,

9  November of '99.

10   Q    And tell me about that discussion.

11   A    He said that he -- he made me aware of it.  But

12 at that time, the agreement -- and at that time, the

13 upside was so great that he would not give it up in

14 order to become the CEO of the company.

15   Q    Okay.  You said, "he made me aware of it."

16 What was "it"?

17   A    The relationship with himself and Winterland.

18   Q    At that time, he did not disclose to you he was

19 receiving $80,000 a month from Cerberus?

20   MR. HARWOOD:  That's the twelfth time today,

21 Richard.

22   THE WITNESS:  No.

23 BY MR. LEVY:

24   Q    After you learned in December of 2000 that he

25 was receiving 80,000 a month from Cerberus and that the

CH-11 TRUSTEE/
CrowleyAdmin001859



ESQUIRE™
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

100

1    judge had found an actual conflict, did you ever have a

2    discussion with him in which you suggested he give up

3    one relationship or the other?

4         A    We had a discussion at a full board meeting.    I

5    did not suggest that he give up the Winterland

6    compensation.

7         Q    What do you mean, "the Winterland

8    compensation"?

9         A    He was a consultant to Winterland.

10        Q    Is it your understanding that's why he was

11   receiving $80,000 a month?

12        A    One of the -- Dan's assignments, as I

13   understand it, was to be as CEO of Winterland and then

14   consult on other Cerberus projects as they came across

15   Feinberg's desk.

16        Q    And at that board meeting, you did not suggest

17   to give up his relationship with Winterland and

18   Cerberus?

19        A    No.

20        Q    Or that he give up the compensation of $80,000

21   a month?

22        A    No.

23        Q    Did any other board member?

24        A    Not that I'm aware of.

25        Q    Was the subject discussed?

CH-11 TRUSTEE/
CrowleyAdmin001860



ESQUIRE    A RECORD OF EXCELLENCE
DEPOSITION SERVICES    Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

A1203

101

1      A    Of him giving --

2      Q    Giving up one or the other relationship?

3      A    No.

4      Q    Was it ever discussed, to your knowledge, after

5   December of 2000?

6      A    It was never discussed with me.  I don't know

7   if other board members had conversations separately.

8      Q    After December 21st, 2000, did you ever discuss

9   with Steve Feinberg Crowley's compensation arrangements

10  with Cerberus?

11     A    I have not talked to Steve Feinberg since

12  December 21st, 2000.

13     Q    Did you receive a copy of the Deloitte & Touche

14  report?

15     A    No.

16     Q    Are you aware that Deloitte & Touche filed a

17  valuation report or a report which included a valuation

18  in this case?

19     A    Yes.

20     Q    And you are aware they did that roughly at the

21  end of July of this year?

22     A    Approximately.

23     Q    How did you become aware of that?

24     A    Our attorneys told me.

25     Q    Okay.  Did you ask for a copy of it?

CH-11 TRUSTEE/
CrowleyAdmin001861



ESQUIRE™    A RECORD OF EXCELLENCE
DEPOSITION SERVICES    Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

127

```
 1   In Re                           )
                                     )
 2   CORAM HEALTHCARE CORPORATION    )   Chapter 11 Case Nos.
     and CORAM, INC.,                )   00-3299 (MFW) through
 3                                   )   00-3300 (MFW)
                   Debtors.          )
 4   _____)
```

 5

 6

 7

 8

 9          I, DON AMARAL, do hereby declare under penalty

10   of perjury that I have read the foregoing transcript;

11   that I have made any corrections as appear noted, in

12   ink, initialed by me; that my testimony as contained

13   herein, as corrected, is true and correct.

14          EXECUTED this  7  day of November ,

15   2001, at Glenbrae , NV
                    (City)              (State)

16

17

18          DON AMARAL

19

20

21

22

23

24

25

**CH-11 TRUSTEE/**
**CrowleyAdmin001890**

ESQUIRE™
DEPOSITION SERVICES

A RECORD OF EXCELLENCE

Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

A1205

Volume 3  .          384

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                              )
                                    )
CORAM HEALTHCARE CORP. and          ) Case No. 00-3299
CORAM, INC.,                        )  through 00-3300
                                    )        (MFW)
                    Debtors.        )


Bankruptcy Courtroom
No. 1, Sixth Floor
Marine Midland Plaza
824 Market Street
Wilmington, Delaware


Wednesday, November 7, 2001
1:00 p.m.


BEFORE:  THE HONORABLE MARY F. WALRATH,
         United States Bankruptcy Judge



-- Transcript of Proceedings --



WILCOX & FETZER
1330 King Street - Wilmington Delaware  19801
(302) 655-0477



C:\WINDOWS\Desktop\CR11-7.doc
11/09/01 11:59 AM

Amaral - Direct                           400

1        A.   No.

2        Q.   I'll ask it again just more specifically.

3             Did anyone within the Cerberus

4    organization, including Mr. Feinberg -- you knew

5    Mr. Feinberg at this time, didn't you?

6        A.   Yes.

7        Q.   He was one of your fellow directors; is that

8    right?

9        A.   Yes.

10       Q.   Did he ask you in any way to hire Mr. Crowley as

11   the CEO?

12       A.   No.

13       Q.   Did he offer you the option of not hiring

14   Mr. Crowley?  What did he tell you?

15       A.   He said we needed to find a new CEO.  If I

16   wanted to step back in and run the company, he'd be more

17   than happy with that.  But I said I could not do that.

18       Q.   Did you negotiate Mr. Crowley's contract with

19   him?

20       A.   Yes, I did.

21       Q.   At the time that you were negotiating with

22   Mr. Crowley about his contract, what was your

23   understanding of his other business interests?

24       A.   I was aware that Mr. Crowley had external

Amaral - Direct                    401

1    interests.  In fact, he said he would be unwilling to

2    give them up as part of coming on as CEO and they were --

3    he was a consultant to Cerberus, and also that he ran a

4    foundation that bears his name in the north California

5    area.

6        Q.   What was your reaction to the fact that he was

7    insistent upon maintaining his other business interests?

8        A.   I just wanted to make sure he understood the job

9    in front of him at Coram, that this wasn't something that

10   he was going to be able to do in his spare time.

11       Q.   Have you had the opportunity to observe

12   Mr. Crowley's performance since he was initially hired as

13   the company's CEO?

14       A.   Yes.

15       Q.   What has your observation been of that

16   performance?

17       A.   He's done a tremendous job.  He's worked very

18   diligently for the company, probably averaging 80 to 100

19   hours per workweek trying to improve the company.  He's

20   an exceptionally talented guy with the employees.

21       Q.   When did you first learn about the decision of

22   the Bankruptcy Court to deny confirmation of Coram's

23   first reorganization plan?

24       A.   Either that day or the next day I was made aware

Amaral - Direct                    402

1    of that by the company.

2        Q.    What was your understanding of the Court's

3    ruling?

4        A.    That the Court had determined that even though

5    the company was substantially insolvent, that there was a

6    conflict of interest between our CEO, Dan Crowley, and

7    Cerberus, one of the debtholders; that the judge was just

8    not comfortable in granting the bankruptcy because of

9    that relationship.

10       Q.    Did you ever review any portion of the Court's

11   ruling on this issue?

12       A.    I read the last four or five pages of the

13   judge's transcript.

14       Q.    Did you do anything in response to the Court's

15   decision?

16       A.    Well, my immediate response was we were about

17   ten days away from year-end.  I had to start to phase in

18   us and I wanted to be sure we would be taking care of our

19   16,000 patients so come January 1st we would still be in

20   business.  So I was really interested in getting a start

21   to the proposal behind us.

22       Q.    Was that, in fact, accomplished?

23       A.    Yes, it was.

24       Q.    After that was taken care of, what, if anything

Amaral - Direct                403

1    else, did you do with respect to the Court's decision?

2         A.   I convened the Special Committee, which was

3    comprised of Bill Casey, a healthcare consultant in north

4    California, runs a hospital management company; Sandra

5    Smoley, who is a political person in Sacramento -- former

6    head of Medi/Cal-Medicaid in the state of California; and

7    Peter Smith, who is a businessman in healthcare in

8    Chicago.  That really was the Special Committee.  I got

9    them all together and said, you know, we need to figure

10   out and go forward where we go from here.

11              After a lot of discussion, it was

12   determined that we needed to hire a financial reviewer,

13   advisor, not so much as to render a fairness opinion, but

14   to go through the plan that Scott Danitz had put together

15   in management and investigate this conflict of interest

16   between Crowley and Cerberus.

17        Q.   Have you ever described this process with the

18   metaphor of sprinkling holy water over the numbers?  Do

19   you ever recall saying that?

20        A.   I used that expression in my deposition and I'm

21   a good Catholic with 12 years of nuns beating on me and

22   that's just an expression that we use to make sure

23   something is pure, right, 100 percent foolproof.

24        Q.   Were Miss Smoley, Mr. Casey, and Mr. Smith, to

Amaral - Direct                411

1    know him?

2        A.    Scott joined my management team when I was the

3    CEO the first time as the chief accounting officer there

4    at Coram and he was hired by Rick Smith, who was then the

5    CFO, and myself.

6        Q.    Do you have a view as to his abilities?

7        A.    Exceptional.

8        Q.    How about his integrity?

9        A.    Never in question.

10       Q.    Did you have any concerns about whether or not

11   Mr. Crowley, during this period, might exert any

12   influence over Mr. Danitz's work product?

13       A.    I was never concerned with that.

14       Q.    Why?

15       A.    Because just the type of guy Scott would be, he

16   would either come to me or the board or he would leave

17   before he would jeopardize his work product or his

18   reputation.

19       Q.    During this period between the identification of

20   the conflict and the inclusion of the report, was there

21   an audit going on?

22       A.    Yes.   The year-end audit was being completed by

23   E&Y.

24       Q.    Did you consider having Mr. Crowley step down as

Amaral - Direct                    412

1    the CEO of Coram after the time the conflict was

2    identified but prior to the issuance of the Goldin

3    report?

4        A.   No.  We were -- no, we never asked Mr. Crowley

5    to step down or even considered that.  We were more

6    concerned that the company was in such a tough situation

7    that he may become disgusted and leave the company, so we

8    were concerned because there was no one that could step

9    back in immediately and hold the company together.

10       Q.   Did you have a view at this time as to what

11   would happen to Coram if Mr. Crowley left it?

12       A.   We would perish.

13       Q.   Now, after the decision by the Court in December

14   of last year, did you have a discussion with Mr. Crowley

15   about the Court's findings?

16       A.   Me, on a one-on-one basis, no, but we met with

17   Mr. Crowley.  All the independent outside directors met

18   with him and he discussed the situation.

19       Q.   What do you recall him saying?

20       A.   That he reminded us of the relationship.  He

21   told us of the dollar amount and that it was still in

22   force today.

23       Q.   Have you given any consideration to whether

24   Coram would have performed better had it been run by a

Amaral - Direct                    424

1    EBITDA?

2        A.    No.

3        Q.    What is the current arrangement?

4        A.    He went back to the original agreement that I

5    negotiated with him in October/November of 1999 where he

6    received his base salary plus bonus opportunity of three

7    times base.

8        Q.    How did that come about?

9        A.    The -- Crowley came to the Compensation

10   Committee along with the entire package from management.

11   We went through things.  He said the state of affairs,

12   where the company was today, the company was in a

13   different position and that we should go back to the

14   original compensation that he and I had negotiated.

15       Q.    Has a new contract been signed?

16       A.    No.

17       Q.    Why not?

18       A.    I believe it's incorporated with the bankruptcy

19   filings and will be approved when the bankruptcy is

20   approved.

21       Q.    One last group of questions.

22             Who decided to put CPS up for sale?

23       A.    I did.

24       Q.    When was that?

C:\WINDOWS\Desktop\CR11-7.doc
11/09/01 11:59 AM

A1213

Amaral - Direct                    425

1        A.    Probably at the end of my tenure, April --

2   March/April of 1999.

3        Q.    Why did you decide to put CPS up for sale?

4        A.    Because I was worried about its future.  It was

5   burning a tremendous amount of cash that we didn't have

6   building inventories.  It was in a business where the

7   majority of the patients were controlled by Coram -- were

8   referred as Coram patients to them.

9              And I also was worried that some of the big

10  drug retailers being the Rite-Aids, Walgreens, et cetera,

11  were going to get into the business and just smash our

12  margins.

13       Q.    When Crowley came on board at Coram, was CPS

14  already on the market?

15       A.    Yes.

16       Q.    Did you play any further role in the CPS sale

17  after Mr. Crowley came in?

18       A.    I strongly urged Dan that when the bids came in

19  substantially lower than what the investment bankers had

20  initially stated to them, that we should take the offer,

21  use the proceeds, pay down debt, go forward, along those

22  lines.

23       Q.    Do you have the view, Mr. Amaral, as to whether

24  or not the price received for CPS was fair?

Amaral - Cross                                          437

1       A.    Yes, when we hired him.

2       Q.    Pardon?

3       A.    Yes, when we hired him.

4       Q.    Tell me about that.

5       A.    We were aware of the situation.  He made the --

6    myself and the entire board of directors aware that he

7    had a relationship with Cerberus that he would be

8    unwilling to give up in order to become the CEO of Coram.

9       Q.    What didn't he tell you at that time?

10      A.    How much money he was being paid.

11      Q.    Or that he had signed an employment contract

12   denominating him a full-time employee of Cerberus;

13   correct?

14      A.    Yes.

15      Q.    He did not tell you that?

16      A.    No.

17      Q.    You talked with Mr. Friedman about fiduciary

18   duties.  Do you understand that those fiduciary duties

19   included duty of loyalty and a duty of care?

20      A.    Yes.

21      Q.    You learned right after December 21st from

22   reading the four pages of the Court's opinion that you

23   say you read that the Judge had concluded that

24   Mr. Crowley's conduct, and I quote, did, in fact, taint

Amaral - Cross                    438

1    his ability to serve as CEO of the debtor; correct?

2        A.    I remember that, yes.

3        Q.    After reading that, you've already testified you

4    didn't ask Crowley to give up his job at Coram; correct?

5        A.    Correct.

6        Q.    Did you ask him to stop taking $80,000 a month

7    from Cerberus?

8        A.    No.

9        Q.    You didn't even ask him?

10       A.    No.

11       Q.    So far as you know, did any director ask him to

12   do that?

13       A.    No.

14       Q.    When you did that, you didn't have -- or when

15   you didn't do that, I should say, you didn't have the

16   benefit of Mr. Goldin's views that no damage had been

17   done, did you?

18       A.    No.

19       Q.    Two weeks ago you were not aware that

20   Mr. Crowley continues to receive $80,000 a month; is that

21   correct?

22       A.    If that's what my deposition reflects.

23       Q.    Give me your recollection.

24       A.    I believed that I wasn't aware.

Amaral - Cross                    440

1    his testimony.

2                    THE COURT:  Sustained.  It's repetitive.

3                    MR. LEVY:  I'm sorry?

4                    THE COURT:  It's repetitive.

5                    MR. LEVY:  Repetitive?  Okay.

6    BY MR. LEVY:

7        Q.   Isn't that something you'd want to know as a

8    director, that he is still getting paid after the Judge

9    said that the payment caused a taint?

10       A.   When you asked me the question, I didn't know as

11   of that moment if he still was being paid.  When he

12   talked to the entire board back in the latter part of

13   December/January, he made us aware that he was staying as

14   a consultant to Cerberus.

15       Q.   You say as a consultant?

16       A.   Yes.

17       Q.   But you did testify last December that you knew

18   that he had signed a contract that said he was a

19   full-time employee rather than a consultant?

20       A.   I did not state that.

21       Q.   Back to page 52, line 18:  Did you give this

22   testimony:

23                    "QUESTION:  Okay.  Did Mr. Feinberg at that

24            or any other time disclose that Mr. Crowley was a

493

```
1    State of Delaware    )
                          )
2    County of New Castle )

3

4                    C E R T I F I C A T E

5

6

7         I, Kathleen White Palmer, Registered
     Professional Reporter and Notary Public, do hereby
     certify that the foregoing record, pages 384 to 493,
8    inclusive, is a true and accurate transcript of my
     stenographic notes taken on Wednesday, November 7, 2001,
9    in the above-captioned matter before the Federal
     Bankruptcy Court.
10

          IN WITNESS WHEREOF, I have hereunto set my hand
11   and seal this 8th day of November, 2001, in
     New Castle County.
12

13

14                    KATHLEEN WHITE PALMER,
                      Notary Public-Reporter
15

16

17

18

19

20

21

22

23

24
```

C:\WINDOWS\Desktop\CR11-7.doc
11/09/01 11:59 AM

A1218

Volume III                                        403

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                        )   Chapter 11
                              )
CORAM HEALTHCARE CORP. and    )   Case Nos. 00-3299(MFW)
CORAM, INC.,                  )   through 00-3300(MFW)
                              )
              Debtors.        )   Jointly Administered

United States Bankruptcy Court
Courtroom No. 2A
844 North King Street
Wilmington, Delaware 19801

December 13, 2001
9:00 a.m.

BEFORE:   THE HONORABLE MARY F. WALRATH
United States Bankruptcy Judge

Transcript of Proceedings

WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Dan Crowley - Redirect (Friedman)        457

1          MR. LEVY:  I'm sorry.  It's as leading as a

2    question can be.

3          THE COURT:  Overruled.  Overruled.

4    A.    I didn't advise.  I did not advise them every

5    month what I was being paid

6    BY MR. FRIEDMAN:

7    Q.    You testified in response to Mr. Levy's question

8    that, in November of 1999, when you signed your contract

9    with Coram, that at that time the Directors were not

10   aware that you were getting $80,000 a month from

11   Cerberus.  Do you recall that testimony?

12   A.    Yes.

13   Q.    At that time were the Directors aware that you

14   had a business relationship with Cerberus?

15   A.    Yes.  They were aware.

16   Q.    Since December of the last year, have the

17   details of your relationship with Cerberus been publicly

18   disclosed?

19   A.    Yes.

20   Q.    To your knowledge, on how many separate

21   occasions?

22   A.    At least five.

23   Q.    Can you identify those separate occasions?

24   A.    SEC filing for the year ended 2000.  It's called

Dan Crowley - Redirect (Friedman)          458

1    a 10-K.  It's disclosed.  There's an SEC filing for the

2    quarters ended March, June, and September.  It's called

3    10-Q.  It's been publicly disclosed in writing in these

4    documents.  And there's a public filing with the

5    confirmation hearing reorganization plan that's been

6    printed and widely distributed in a public document.  So

7    at least those five.  And then there was the disclosure

8    to the Board in a face-to-face meeting.

9        Q.    Since you became the CEO of Coram in November of

10   1999, how much money have you actually received from

11   Coram in compensation?

12       A.    I received my base salary.  It's paid in

13   every-two-week increments.  It's the same base salary.

14   I've not had a raise in two years.  I'm paid for my

15   vacation.  I'm paid for a car allowance.  And I'm paid

16   for temporary living.  I never received anything else.

17   Nothing else.

18       Q.    What is your base salary?

19       A.    650,000.

20       Q.    And just so the record is clear on this, what

21   was your involvement in the development of the current

22   plan of reorganization being considered by the Court?

23       A.    I was uninvolved in the development of the plan

24   being considered by the Court.  No involvement.

531

State of Delaware    )
                     )
County of New Castle )


C E R T I F I C A T E


I, Ann M. Calligan, Registered Merit Reporter and Notary Public, do hereby certify that the foregoing record, pages 403 to 530, inclusive, is a true and accurate transcript of my stenographic notes taken on December 13, 2001, in the above-captioned matter.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 13th day of December, 2001, at Wilmington.


_____
Ann M. Calligan

1

```
 1          IN THE UNITED STATES BANKRUPTCY COURT

 2             FOR THE DISTRICT OF DELAWARE
                     ------
 3
    In re:              : Chapter 11
 4  CORAM HEALTHCARE CORP:
    and CORAM, INC.     :
 5                      : Case NO. 00-3299
              Debtors   :
 6


 7                   ------

 8          Tuesday, February 25, 2003

 9                   ------

10  Pretrial examination of HON. ARLIN ADAMS,

11  held in the offices of Schnader, Harrison

12  Segal & Lewis, 1600 Market Street,

13  Philadelphia, PA  19103, commencing at

14  9:35 a.m., on the above date, before Mickey

15  Dinter, Registered Professional Reporter

16  and Commissioner of Deeds for the

17  Commonwealth of Pennsylvania.

18                   ------

19          BRUSILOW & ASSOCIATES
         COURT REPORTERS & VIDEOGRAPHERS
20       1926 Arch Street — 1st Floor West
            Philadelphia, PA 19103-1404
21       215.977.9700 - www.brusilow.com
                     ------

22

23

24
```

L 04368

64

1    A. I never perceived that Mr. Crowley

2    was operating in order to help Cerberus or

3    Goldman or whoever these creditors were.

4    My perception was that he was operating

5    this company as effectively as he could

6    have been at the time under the

7    circumstances.  The figures supported that.

8    My interviews with the executives supported

9    that when I went out into the field.

10    Q. We are in March, still in March.

11    A. Yes.  That's when I had these

12    interviews with the executives.

13    Q. Are you aware that Judge Walrath in

14    her opinion made a finding of fact that

15    everything, that nothing Crowley did would

16    have been without, without unduly

17    considering the interests of Cerberus?

18    A. At that time, yes.  I am concerned.

19    I was concerned.

20    Q. Were you concerned when you went out

21    there in March?

22    A. Certainly.  I wouldn't have had the

23    discussion with them.

24    Q. Were you concerned when you let him

L 04431

134

1    repeat on the record what you just said

2    about Exhibit 9.

3        A. Yes, sir.  Near the end of the

4    morning session, Mr. Levy, you were asking

5    me some questions about Trustee's Exhibit 9

6    dated October 28, 2002.  I think you were

7    wondering how that developed timewise.  In

8    thinking about it at lunch, I recall that

9    we were, once again, considering a

10    substitution for Mr. Crowley because we

11    knew that his contract was going to expire,

12    I think, November 30.  I may be wrong on

13    that.

14        Q. The 29th.

15        A. Yes.

16        Q. Thank you.

17            I will change subjects now.

18    Let me just review very briefly.  Did I

19    understand correctly that after your

20    meeting with Crowley that on March 25, 26,

21    that at that point in time, you had come to

22    the conclusion that Crowley did not have a

23    conflict?

24        A. Pretty much I had come to that

L 04501

135

```
 1   conclusion based on his questions.  There

 2   was one other thing that took place at that

 3   meeting that I thought about and that is my

 4   discussion with him about Cerberus, I hope

 5   I'm not mispronouncing it.  He did say that

 6   from time to time they would ask him to

 7   evaluate situations, and I said, "Do they

 8   compensate you for that?"  He said, "No."

 9   I said, "Well, if it has nothing to do with

10   Coram, they are not competitors of Coram,

11   they in no way impact on Coram, and you do

12   that off company time, I don't think I

13   would object to that."  He said, "Well, of

14   course."  Some discussion like that.

15       Q. Let me be clear.  One of the

16   conditions was that he not be compensated

17   for --

18       A. That's what I said.

19       Q. That what you said to him?

20       A. That's right.

21       Q. Did he agree that he would not be

22   compensated or seek compensation if he did

23   that kind of work?

24       A. Yes.  He said, "Oh, I understand.  I
```

L 04502

264

```
 1                    CERTIFICATION

 2

 3

 4              I hereby certify that the

 5        testimony and the proceedings in the

 6        aforegoing matter are contained fully

 7        and accurately in the stenographic notes

 8        taken by me, and that the copy is a true

 9        and correct transcript of the same.

10

11
          MICKEY DINTER
12        Registered Professional Reporter

13                  The foregoing certification

14        does not apply to any reproduction of

15        the same by any means unless under the

16        direct control and/or supervision of the

17        certifying shorthand reporter.

18

19

20

21

22

23

24
```

L 04631

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No. 00-3299

CORAM HEALTHCARE,                   . 824 Market Street
                                    . Wilmington, DE  19801

              Debtor,               . March 3, 2003
. . . . . . . . . . . . . . . . . . . 9:30 A.M.

TRANSCRIPT OF TRUSTEE'S MOTION FOR AUTHORIZATION TO REJECT
THE EXECUTORY CONTRACT OF DANIEL CROWLEY
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Trustee:            Schnader Harrison Segal & Lewis,
                            LLP
                            By:  BARRY E. BRESSLER, ESQ.
                                 WILBUR KIPNES, ESQ.
                                 RICHARD BARKASY, ESQ.
                            1600 Market Street, Suite 3600
                            Philadelphia, PA  19103

                            Weir & Partners
                            By:  JOHN B. YORK, ESQ.
                            824 Market Street Mall, Suite 101
                            P.O. Box 708
                            Wilmington, DE  19899

                            Office of the U.S. Trustee
                            By:  RICHARD SCHEPACARTER, ESQ.
                            J. Caleb Boggs Federal Building
                            844 King Street, Lockbox 35
                            Wilmington, DE  19801

Audio Operator:             Jennifer M. Patone


        Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey  08619
E-mail:  jjcourt@optonline.net

(609)586-2311      Fax No. (609)587-3599

Adams - Direct                                14

1  A   Oh, maybe a week or so after I was appointed. The first

2 thing I did after I was appointed was to read carefully the

3 opinions written by Her Honor relating to this matter, and then

4 I called Mr. Crowley and arranged to go to Denver, told him I

5 wanted to meet with him and his entire staff, and he set that

6 meeting up. I forget the date, but it was some time in the

7 latter part of March. And I went out to Denver and talked with

8 Mr. Crowley for, I don't know, two hours, maybe three hours,

9 and then met with the entire staff, first collectively, but

10 then I asked that I be given the opportunity to meet with each

11 of the executive staff individual and on a private basis.

12 Q   It is accurate that of the -- approximately the 2,100

13 employees that Coram has, about 100 are in Denver.

14 A   About that.

15 Q   But members of the senior executive were brought in from

16 elsewhere around the country to meet with you?

17 A   They were, and there were approximately fifteen. I can't

18 tell you precisely the number.

19 Q   When you first met with Mr. Crowley was there any

20 discussion of Her Honor's opinion or of his then current

21 relationship with Cerberus?

22 A   There was. Almost the first thing I did with Mr. Crowley

23 was to ask him about the conflicts and that had been referred

24 to in the opinions that I've just averted to, and he assured me

25 that he had no further contractual relationship with Cerberus

Adams – Direct                                    15

1  except for the remaining claim under the contract for work that

2  he had done prior to my appointment that had nothing to do with

3  Coram, and I made it clear to him that he could not take any

4  compensation from Cerberus for anything except that claim and

5  that he could not spend any time that he would ordinarily be

6  devoting to Coram in order to deal with any of the remaining

7  Cerberus matters.

8      He gave me that assurance.

9  Q    Did he also discuss with you that that he still had some

10  talking relationship with Cerberus?

11  A    He did.  He said from time to time Cerberus asked him to

12  give his comments or opinions about matters that came to their

13  attention, an I said, "Well, you could do that, but you have to

14  make sure that those matters could have nothing to do with

15  Coram, couldn't be a competitive situation or anything of the

16  sort," and the reason why I gave them -- him that opportunity,

17  although I was mindful of the judge's concerns, was I knew he

18  had a substantial claim against Cerberus, and I didn't want to

19  do anything to prejudice that claim.  I didn't think that was

20  fair on my part.

21      And I knew that if I was going to succeed as a Trustee it

22  was important to have a good relationship, not only with Mr.

23  Crowley, but all of his people.  And that's the style that I

24  use in handling these matters.  Some people don't use that

25  style.  Mr. Levy, for example, uses a very confrontational