Adams - Direct                                    22

1  out this contract.

2  Q    Would it be fair to say that it was your understanding

3  that Mr. Crowley, through his counsel, was looking for a lot

4  more?

5  A    Well, I knew it.  It wasn't only my understanding, I knew

6  that they were asking for a lot more, but they weren't going to

7  get it from me.  And he knew it.  He knew that there was a high

8  water mark, and he knew that if they could not come to terms I

9  was prepared reluctantly to go out to Denver myself.

10       I don't think I could do as good a job as Mr. Crowley,

11  nowhere near a job like he has done.

12  Q    What has your role with the -- Coram been as opposed to

13  Mr. Crowley's role since March of 2002?

14  A    What has my role been?

15  Q    Yes.

16  A    Like supervise the operation.  I didn't tell him on a day-

17  t0-day basis what to do, but I made ceratin that I reviewed

18  every major decision, every contract for over $50,000, any

19  changes that he wanted to make in the executive branch, any

20  financial arrangements that Coram wanted to do, purchase of

21  software which was an especially big contract, caused me to

22  come out and interview the people for several hours to make

23  sure we were getting our money's worth.

24       I kept on top of it.  I called him very frequently and

25  called people like Mr. Marabita.  I supervised the claim

1  BY MR. GODNICK:

2  Q    Judge Adams, I'd like to refer you to Equity Committee

3  Exhibit 6.

4        MR. GODNICK:  I put that before Your Honor.

5  BY MR. GODNICK:

6  Q    Those are the series of emails between Messrs. Schreiber

7  and --

8  A    I got it.  I got it.

9  Q    Thank you.  And specifically I'd like to direct your

10 attention to Mr. Schreiber's email to Mr. Cook dated April 5th,

11 2002 in which he says, among other things, no other attorney is

12 to know the Trustee needs to be part of those conversations.

13 Do you see that?

14 A    I do.

15 Q    Now, Judge Adams, as of April 5th am I correct it was your

16 understanding that Mr. Crowley believed that Cerberus owed him

17 money under the contract that had existed between Cerberus and

18 Mr. Crowley, correct?

19 A    That's correct.

20 Q    And it was your view, am I right, that that was a matter

21 between Cerberus and Mr. Crowley, correct?

22 A    That was my view, yes.

23 Q    And in fact, I think you testified earlier the resolution

24 of that, in terms of how much, if anything, Cerberus agreed to

25 pay Mr. Crowley was none of your business; is that right?

Saracco - Redirect                    133

1   your thirties and forties and thinking about doing something

2   like that again.  And so that's why I share with you, I could

3   not -- if you ask me today, I could not tell you what would

4   happen if a change was made with Dan Crowley.

5   Q    And you haven't told the Trustee what would happen,

6   either.

7   A    No.

8   Q    Thank you.

REDIRECT EXAMINATION

10  BY MR. BARKASY:

11  Q    Mr. Saracco, when you just answered that last question I

12  took it to mean, and tell me if you disagree with me that you

13  haven't told the Trustee whether or not you would leave the

14  company because Dan Crowley was no longer with the company.

15  A    We don't have those kinds of conversations, because in my

16  world people that do a good job aren't left to leave -- I'm

17  sorry, aren't asked to leave.

18       So, when I think about and look at what Dan Crowley's done

19  for Coram Healthcare, I can't even imagine that there would be

20  a reason that he wouldn't be here, because he's done the most

21  stellar job of any CEO, and I've probably reported directly or

22  indirectly to six or seven folks.

23       So, I'm under oath, and I'm being extremely honest.  I

24  don't think about talking to the judge about what happens if a

25  certain person leaves.  If it happens, myself and significant

Decision                                        198

1      THE COURT:  Because the ramifications of my decision

2  may have an impact on that.

3      MR. LEVY:  Thank you very much, Your Honor.

4      THE COURT:  All right?

5      We'll stand adjourned.

6      UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

7    (Recording ends)

8              *              *              *

9          C E R T I F I C A T I O N

10     I, Betsy Wolfe, certify that the foregoing is a

11  correct transcript from the electronic sound recording of the

12  proceedings in the above-entitled matter.

13

14  _Betsy Wolfe_____        _March 9, 2003_____

15  Betsy Wolfe                  Date

16  J&J COURT TRANSCRIBERS, INC.

17

18

19

20

21

22

23

24

25

# In The Matter Of:

*In Re: Coram Healthcare - Chapter 11*

---

*Jerome Shestack, Esquire*
*November 14, 2003*

---

*Brusilow & Associates*
*1926 Arch Street*
*1st Floor West*
*Philadelphia, PA   19103-1404*
*(215) 977-9700    FAX: (215) 977-9773*

*Original File SHES1114.TXT, 244 Pages*
*Min-U-Script® File ID: 2642985737*

## Word Index included with this Min-U-Script®

CH-11 TRUSTEE/
CrowleyAdmin006382

In Re: Coram Healthcare - Chapter 11

Jerome Shestack, Esquire
November 14, 2003

---

Page 1

[1]
[2]     IN THE UNITED STATES BANKRUPTCY COURT
[3]         FOR THE DISTRICT OF DELAWARE
[4]
[5] In re:                       : Chapter 11
      CORAM HEALTHCARE CORP. :
[6] and CORAM, INC.
                                 : Case NO. 00-3299
[7]     Debtors                  :
[8]
[9]
          Friday, November 14, 2003
[10]
[11]
[12]         Pretrial examination of
[13] JEROME J. SHESTACK, ESQUIRE, held in the
[14] offices of WOLF, BLOCK, 1650 Arch Street,
[15] Philadelphia, PA 19103, commencing at 10:10
[16] a.m., on the above date, before Mickey
[17] Dinter, Registered Professional Reporter and
[18] Commissioner of Deeds for the Commonwealth
[19] of Pennsylvania.
[20]
[21]
[22]         BRUSILOW & ASSOCIATES
            COURT REPORTERS & VIDEOGRAPHERS
            1926 Arch Street - 1st Floor West
[23]        Philadelphia, PA 19103-1404
              215.977.9700
[24]          www.brusilow.com

---

Page 2

[1] APPEARANCES:

[2] JENNER & BLOCK

      BY:  DAVID J. BRADFORD, ESQUIRE

[3]      JOHN B. THORNTON, ESQUIRE

      One IBM Plaza

[4] Chicago, IL. 60611

      312-222-9350

[5] djbradford@jenner.com

      Counsel for the Equity Committee

[6]

[7]

      SCHULTE, ROTH & ZABEL, LLP

[8] BY:  HOWARD GODNICK, ESQUIRE

      919 Third Avenue

[9] New York, New York 10022

      212-756-2000

[10] howard.godnick@srz.com

      Counsel for Cerberus Partners, L.P.

[11]

[12]

      SCHNADER, HARRISON, SEGAL & LEWIS

[13] BY:  WILBUR KIPNES, ESQUIRE

      1600 Market Street

[14] Philadelphia, PA 19103

      215-751-2336

[15] wkipness@schnader.com

      Counsel for the Trustee

[16]

[17] WEIL, GOTSHAL & MANGES LLP

      BY: ALAN MILLER, ESQUIRE

[18] 767 Fifth Avenue

      New York, New York 10153-0119

[19] 212-310-8722

      john.newirth@weil.com

[20] Counsel for Goldman Sachs, Credit Partners,

      L.P., Foothill Capital Corporation

[21]

[22]

[23]

[24]

CH-11 TRUSTEE/
CrowleyAdmin006383

---

A1236

Page 39

[1] bankruptcy?

[2] A: Not in those words. What I was

[3] looking for is as a result of the conflict,

[4] what was done that should not have been

[5] done or what was done that damaged the

[6] company or what acts were there that

[7] resulted from the conflict?

[8] I then followed the

[9] allegations in the Complaint, analyzing

[10] each one of the allegations to the extent

[11] that they were either conclusory or had a

[12] factual basis.

[13] Q: Did you also consider what was not

[14] done that should have been done?

[15] A: I considered it in the sense that

[16] there were questions raised with Professor

[17] Fischel and others as to what should have

[18] been done that wasn't done and no one could

[19] seem to come up with an answer.

[20] Q: Did you consider whether the company

[21] was in a position as a result of the

[22] conflict of interest to make an independent

[23] determination as to whether it was a

[24] reasonable business judgment to sell CPS

Page 40

[1] the pharmacy business?

[2] A: Well, I think in the case of CPS,

[3] they put out a number of bids. I think

[4] they got, maybe, 42 answers and then they

[5] had Brown looking into it. They narrowed

[6] the bids down and then they got a bid, the

[7] highest bid from, maybe, 41 million dollars

[8] and that was rejected. They sold it at a

[9] higher bid. So, it seemed to me that what

[10] was done was certainly a reasonable

[11] exploration with respect to the sale of

[12] that company and the realization of the

[13] best price they could get.

[14] Q: That was the assumption on which you

[15] based your evaluation?

[16] A: That wasn't the assumption of which

[17] I based my evaluation. I didn't make an

[18] evaluation. I made, I had an opinion with

[19] respect to the settlement. But, one of the

[20] matters that was asserted in the Complaint

[21] as being inappropriately handled was the

[22] sale of CPS. I looked at some of the

[23] answers to it. You could still argue that

[24] that shouldn't have been sold. I mean it's

Page 41

[1] not — none of these things are — very few

[2] of these things are open and shut. There

[3] are pretty good answers to the CPS. I

[4] think it comes in under — I will check in

[5] a moment.

[6] Q: Just for the record, the witness is

[7] looking at a particular document that the

[8] witness brought into the deposition which

[9] appears to be a number of typewritten

[10] pages.

[11] A: You are free to look at them later.

[12] Well, basically, the

[13] Complaint alleges that CPS was sold at,

[14] either shouldn't have been sold or was sold

[15] at an improper value and, I think, there

[16] are some pretty good answers to that

[17] allegation.

[18] Q: Just for the record, what is the

[19] document that you are looking at?

[20] A: These are my notes. I took each one

[21] of the counts. In that document, I set

[22] forth in very brief form what the

[23] allegation was, some of the questions that

[24] were raised by the allegations, what

Page 42

[1] evidence is shown dealing with that

[2] allegation. These are cursory notes that I

[3] prepared for myself.

[4] Q: You did that for purposes of

[5] assisting yourself in answering questions

[6] at the deposition today?

[7] A: Well, I did it originally in trying

[8] to reach my expert opinion; and then having

[9] done that from time to time, I would make

[10] corrections, especially since I have a new

[11] secretary.

[12] Q: What I would like to do is just mark

[13] that document as a deposition exhibit, so

[14] if we have questions later as to what you

[15] were referring to as you were testifying,

[16] we will have a record of that.

[17] A: Sure.

[18] (Shestack-3, notes of Mr.

[19] Shestack, marked for identification.)

[20] BY MR. BRADFORD:

[21] Q: I think you testified a few moments

[22] ago that, I don't want to put words in your

[23] mouth, but, in essence, that you took the

[24] proposed settlement and then evaluated

CH-11 TRUSTEE/
CrowleyAdmin006393

A1237

Page 115

[1] Q: And, so, was it your view that the
[2] fact that the company remained in
[3] bankruptcy for nearly three years may not
[4] be attributable to anything done by
[5] Mr. Crowley or Mr. Feinberg?
[6] A: Well, I don't know the answer to
[7] that. There are no allegations that show
[8] any evidence one way or another on that.
[9] Q: Do you believe it's fair to
[10] attribute the company's prolonged stay in
[11] bankruptcy to the fact that two plans of
[12] reorganization were put forth that were not
[13] in good faith?
[14] MR. GODNICK: Objection.
[15] THE WITNESS: What do you
[16] mean by "not in good faith"?
[17] BY MR. BRADFORD:
[18] Q: The Court made a finding that each
[19] of those plans did not qualify under the
[20] good faith standard for a bankruptcy plan.
[21] MR. MILLER: Objection.
[22] That is not what the Court's finding is.
[23] You will see those are not the words she
[24] used.

Page 116

[1] THE WITNESS: It seems to me
[2] that the basis of the Court's rejection
[3] of the plan was largely based on
[4] Crowley's conflict which eventually was
[5] solved, supposedly solved, by the second
[6] one, but not in the Court's mind. As to
[7] what effect that had on value of Coram
[8] or whether that is damages that could be
[9] attributable to any of the principles, I
[10] saw no evidence dealing with that
[11] subject at all.
[12] BY MR. BRADFORD:
[13] Q: Therefore, you gave very little
[14] value to such a claim?
[15] A: I wasn't able to evaluate it.
[16] Q: And to the extent that the Equity
[17] Committee did not supply proof of damages,
[18] did you find yourself in a position unable
[19] to evaluate the damages on your own?
[20] A: Well, what you look at is you had
[21] various experts. The Equity Committee did
[22] state how it reached the damages. It's
[23] experts stated the amount of its claim
[24] damages. It stated the basis for that

Page 117

[1] claim. It gave the legal analysis for it.
[2] So, it seemed to me that whatever claim the
[3] Equity Committee had for damages it
[4] asserted, and it was asked time and again,
[5] apparently, what were the damages and,
[6] basically, pointed to the 6.3 million note
[7] and the sale of CPS and that's about it.
[8] Q: Did you make any effort to evaluate
[9] for yourself what amount of damage, if any,
[10] might be attributable to the sale of CPS?
[11] A: No. I looked at the process, the
[12] competitive bidding, the analysis by Brown,
[13] what was achieved, what was done with the
[14] money. I had no basis for making my own
[15] evaluation as to what that company was
[16] worth, nor did anyone else come up with a
[17] value that seemed different than what the
[18] buyer bought it for.
[19] Q: And did you make any determination
[20] or come to any opinion about whether the
[21] conflict of interest tainted or infected
[22] the decision whether to sell that company?
[23] A: I assume that the conflict of
[24] interest was persuasive in anything that it

Page 118

[1] could affect. Now, if the conflict
[2] affected that sale and it was sold for less
[3] than it was worth, there didn't seem to be
[4] any evidence of it. All of the evidence
[5] seemed to be that proper procedure was
[6] used; that, I think, that the termination
[7] to sell it may have been before Crowley got
[8] there. The problems with that company were
[9] evident on the record and unchallenged.
[10] The bidding procedure was unchallenged, so
[11] I didn't see any reason to question what
[12] was done as being affected by a conflict of
[13] interest.
[14] Q: What did you understand the problems
[15] with CPS to be?
[16] MR. GODNICK: Objection.
[17] THE WITNESS: Well, among
[18] other things, it was a cash drain on the
[19] company.
[20] BY MR. BRADFORD:
[21] Q: Do you have any understanding of the
[22] amount of that cash drain?
[23] A: I did somewhere in my notes, if you
[24] want me to check.

CH-11 TRUSTEE/
CrowleyAdmin006412

A1238

In Re: Coram Healthcare - Chapter 11

Jerome Shestack, Esquire
November 14, 2003

Page 239

[1] could.

[2] Q: Did you, in the context of

[3] evaluating the yardstick damages, compare

[4] the value of Coram today according to the

[5] valuations that were done in 2003 by EMB

[6] and SSG, which I see are among your

[7] documents, with the value of the company,

[8] say, three years ago when Crowley took

[9] over?

[10] A: No, I didn't do that. Professor

[11] Fischel didn't do that either.

[12] Q: Do you recognize that the values

[13] assigned to the company today by the

[14] financial advisors are relatively in the

[15] same ballpark as the valuations that were

[16] being done by Chanin and Warberg two or

[17] three years ago?

[18] A: I didn't concentrate on the

[19] valuation aspect, other than taking

[20] valuations that were given the way

[21] Professor Fischel took a valuation or

[22] others that were used for purposes of

[23] accepting the hypothesis of this case.

[24] Q: Are you familiar with the fact that

Page 240

[1] there is litigation between Coram and

[2] PriceWaterhouse Coopers?

[3] A: I'm not.

[4] Q: You have not seen the damage report

[5] that was done in that case?

[6] A: No.

[7] Q: Give me a minute.

[8] A: Is Coram suing PriceWaterhouse? You

[9] have to stand in line.

[10] MR. BRADFORD: This is as

[11] good a time as any to quit at four.

[12] (Deposition adjourned,

[13] 4 p.m.)

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

Page 241

[1] CERTIFICATION

[2]

[3] I hereby certify that the testimony

[4] and the proceedings in the foregoing matter

[5] are contained fully and accurately in the

[6] stenographic notes taken by me, and that

[7] the copy is a true and correct transcript

[8] of the same.

[9]

[10] MICKEY DINTER

Registered Professional Reporter

[11]

[12]

[13] The foregoing certification does not apply

[14] to any reproduction of the same by any

[15] means unless under the direct control

[16] and/or supervision of the certifying

[17] shorthand reporter.

[18]

[19]

[20]

[21]

[22]

[23]

[24]

Page 242

[1] SIGNATURE PAGE

[2]

[3]

[4] I hereby acknowledge that I have read

[5] the foregoing transcript, and the same is a

[6] true and correct transcription of the

[7] answers given by me to the questions

[8] propounded, except for the changes, if any,

[9] noted on the errata sheet.

[10]

[11]

[12] SIGNATURE:

[13] DATE:

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22] CH-11 TRUSTEE/

CrowleyAdmin006442

[23]

[24]

# In The Matter Of:

*In Re: Coram Healthcare - Chapter 11*

*Hon. Arlin Adams*
*January 21, 2004*

*Brusilow & Associates*
*1926 Arch Street*
*1st Floor West*
*Philadelphia, PA  19103-1404*
*(215) 977-9700    FAX: (215) 977-9773*

Original File ADAMO121.TXT, 73 Pages
Min-U-Script® File ID: 0059159295

## Word Index included with this Min-U-Script®

CH-11 TRUSTEE/
CrowleyAdmin001615

In Re: Coram Healthcare - Chapter 11

Hon. Arlin Adams<br>January 21, 2004

---

**Page 1**

```
[1]
[2]      IN THE UNITED STATES BANKRUPTCY COURT
[3]         FOR THE DISTRICT OF DELAWARE
[4]
      In re:                    : Chapter 11
[5]  CORAM HEALTHCARE CORP. :
      and CORAM, INC.          :
[6]                            : Case NO. 00-3299
      Debtors                  :
[7]
[8]
[9]      Wednesday, January 21, 2004
[10]
[11]
         Continued pretrial examination of
[12]
      HON. ARLIN ADAMS, held in the offices of
[13]
      Schnader, Harrison, Segal & Lewis, 32nd
[14]
      Floor, Philadelphia, PA 19103, commencing
[15]
      at 11:02 a.m., on the above date, before
[16]
      Mickey Dister, Registered Professional
[17]
      Reporter and Commissioner of Deeds for the
[18]
      Commonwealth of Pennsylvania.
[19]
[20]
           BRUSILOW & ASSOCIATES
[21]    COURT REPORTERS & VIDEOGRAPHERS
        1920 Arch Street - 1st Floor West
[22]     Philadelphia, PA 19103-1404
            215.977.9700
[23]        www.brusilow.com
[24]
```

**Page 2**

```
[1]  APPEARANCES:
[2]  JENNER & BLOCK
       BY: RICHARD LEVY, ESQUIRE
[3]      STEVE TOMASHEFSKY, ESQUIRE
       One IBM Plaza
[4]  Chicago, IL 60611
       312-222-9350
[5]  rjlevy@jenner.com
       Counsel for the Equity Committee
[6]
[7]
       SCHULTE, ROTH & ZABEL, LLP  (By telephone)
[8]  BY: HOWARD GODNICK, ESQUIRE
       919 Third Avenue
[9]  New York, New York 10022
       212-756-2000
[10]  howard.godnick@srz.com
       Counsel for Cerberus Partners, L.P.
[11]
[12]
       SCHNADER, HARRISON, SEGAL & LEWIS
[13]  BY: BARRY BRESSLER, ESQUIRE
       1600 Market Street
[14]  Philadelphia, PA 19103
       215-751-2336
[15]  bbressler@schnader.com
       Counsel for the Trustee
[16]
[17]  WEIL, GOTSHAL & MANGES LLP  (By telephone)
       BY: JOHN A. NEUWIRTH, ESQUIRE
[18]  767 Fifth Avenue
       New York, New York 10153-0119
[19]  212-310-8722
       john.neuwirth@weil.com
[20]  Counsel for Goldman Sachs, Credit Partners,
       L.P., Foothill Capital Corporation
[21]
[22]
[23]
[24]
```

CH-11 TRUSTEE/
CrowleyAdmin001616

---

A1239.02

Hon. Arlin Adams
January 21, 2004

In Re: Coram Healthcare - Chapter 11

Page 11

[1] the benefits of the directors and officers
[2] liability insurance, correct?
[3]    A: That's right.
[4]    Q: Do you have any notion as to the
[5] value of those claims to the equity
[6] holders that purport to be assigned under
[7] this plan modification?
[8]    A: I really don't have an idea of the
[9] value. The problem in the claim against
[10] Dan Crowley is, again, damages. I think
[11] it would be hard-pressed, we would be
[12] hard-pressed if we were asserting the
[13] claim to establish damages, even though
[14] there is a finding by Judge Walrath
[15] against Dan Crowley because I think there
[16] will be some difficulty in establishing
[17] that whatever he did was deleterious to
[18] the financial well-being of Coram.
[19]    Q: You never retained or authorized
[20] the retention of a damage expert to
[21] analyze the potential damage claims
[22] against Dan Crowley, did you?
[23]    A: We did not because, there, again,
[24] it's premature. We didn't want to do that

Page 12

[1] at this early stage until we knew where we
[2] were going. We had to do it in the
[3] PriceWaterhouse because we couldn't talk
[4] to the other side without doing it.
[5]    Q: Why do you believe it's premature,
[6] judge?
[7]    A: We don't know who is going to have
[8] this claim.
[9]    Q: You didn't seek the consent of the
[10] Equity Committee to the terms of the plan
[11] modification that you have in front of
[12] you, did you?
[13]    A: I can't tell you whether Barry
[14] spoke to you or your colleagues. I don't
[15] know. I did not.
[16]    Q: So far as you know, there was no
[17] communication with the Equity Committee
[18] before this?
[19]    A: To my knowledge, you are correct.
[20]    Q: Under the provisions of this plan
[21] modification, you retained, you and you
[22] alone decide whether to commence,
[23] prosecute, compromise and seek Bankruptcy
[24] Court approval of any settlement, do you

Page 13

[1] understand that?
[2]    A: Settlement of the PriceWaterhouse?
[3]    Q: Or Crowley or anything assigned
[4] under the plan modification.
[5]    A: That is correct. I think we have
[6] to.
[7]    Q: If the equity holders are to
[8] receive the benefit of any of this
[9] litigation or settlement, why is it
[10] important that you, rather than the Equity
[11] Committee, retain this control?
[12]    A: I think we have to do it.
[13]    Q: What is the basis?
[14]    A: The claim is ours. We can enlist
[15] your help in asserting the claim. It
[16] would have to be done by the Trustee.
[17] That's my understanding.
[18]    Q: Is that the only reason, it's your
[19] belief that as a matter of law you could
[20] not give control of that to, say, a
[21] litigation trust?
[22]    MR. BRESSLER: Objection to
[23] the form of the question.
[24]    THE WITNESS: That was my

Page 14

[1] understanding.
[2]    BY MR. LEVY:
[3]    Q: Is that the only reason?
[4]    A: I remember discussing this with
[5] counsel and I was told at that time that
[6] we would be obligated, when we say "we,"
[7] the Trustee would be obligated to assert
[8] the claim. The Trustee could agree to
[9] give the proceeds of the claim to another
[10] party and enlist the help of the other
[11] party in prosecuting the claim, but it
[12] would have to be done under the aegis of
[13] the Trustee.
[14]    Q: That is not quite the question I
[15] asked. Apart from who asserts the claim,
[16] the question has to do with the provision
[17] that says that you and you alone have the
[18] right to commence, prosecute and
[19] compromise the claims. Do you believe
[20] that right, the right to commence,
[21] prosecute and compromise could have been
[22] given to the Equity Committee or a
[23] post-confirmation litigation trust?
[24]    MR. BRESSLER: Objection to

Page 11 - Page 14  (6)    Min-U-Script®

CH-11 TRUSTEE/
CrowleyAdmin001619

A1239.03

Page 67

[1]   A: I will not object.
[2]   MR. GODNICK: Excuse me,
[3] Mr. Levy, you made requests to the
[4] judge to extend this beyond an hour,
[5] an hour and 15 minutes, an
[6] hour-and-a-half and you were basically
[7] on your knees and she made it very
[8] clear to you and to the court on the
[9] record that this was to be 60 minutes
[10] and no longer.
[11]   THE WITNESS: I don't want
[12] to contradict the judge, no. I want
[13] to cooperate, but I don't want to
[14] contradict the Court.
[15]   MR. BRESSLER: Your last
[16] question, please.
[17]   MR. LEVY: I have a series
[18] of questions that I guarantee will
[19] take five minutes.
[20]   MR. GODNICK: I object.
[21]   MR. LEVY: Mr. Bressler —
[22]   MR. BRESSLER: Ask your
[23] next question.
[24]   MR. LEVY: Can I have five

Page 68

[1] minutes? I don't want to ask one
[2] question and be cut off.
[3]   MR. BRESSLER: You are now
[4] over your limit. We are going to give
[5] you one more question anyway.
[6]   THE WITNESS: I think we
[7] are using up too much time.
[8]   BY MR. LEVY:
[9]   Q: Do you recall a meeting on
[10] November 25th attended by representatives
[11] of the noteholders, you, your counsel?
[12]   A: I think I do, yes.
[13]   Q: Prior to that meeting, you had
[14] started a process with your investment
[15] bankers?
[16]   MR. BRESSLER: These have
[17] been asked and answered of other
[18] people.
[19]   THE WITNESS: I did consult
[20] with investment counselors prior to
[21] that meeting.
[22]   MR. BRESSLER: You are over
[23] your time.
[24]   MR. LEVY: Okay. I can't

Page 69

[1] really continue with that kind —
[2]   THE WITNESS: Ask me
[3] another two or three questions.
[4]   MR. LEVY: I know you want
[5] to cooperate. Your counsel and Mr.
[6] Godnick seem to think five minutes is
[7] just too important.
[8]   MR. GODNICK: Judge Walrath
[9] seems to think that anything in excess
[10] of 60 minutes was verboten. You asked
[11] her seven ways to sundown. You can
[12] take issue with the judge.
[13]   MR. LEVY: I take issue.
[14] I'm not going to argue about it.
[15] Thank you, judge.
[16]   MR. BRESSLER: Your last
[17] topic was going to be about the
[18] November 25th meeting with the
[19] noteholders. Three other people have
[20] testified about that. If it was some
[21] crucial topic that no one else might
[22] have testified to, I may have let him
[23] testify.
[24]   (Deposition concluded.)

Page 70

[1]   CERTIFICATION
[2]
[3]   I hereby certify that the testimony
[4] and the proceedings in the foregoing
[5] matter are contained fully and accurately
[6] in the stenographic notes taken by me, and
[7] that the copy is a true and correct
[8] transcript of the same.
[9]
[10] MICKEY DINTER
    Registered Professional Reporter
[11]
[12]
[13] The foregoing certification does not apply
[14] to any reproduction of the same by any
[15] means unless under the direct control
[16] and/or supervision of the certifying
[17] shorthand reporter.
[18]
[19]
[20]
[21]
[22]
[23]
[24]

CH-11 TRUSTEE/
CrowleyAdmin001633

A1239.04

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case Nos. 00-3299(MFW) and
                                .            00-3300(MFW)
                                . (Jointly Administered under)
   CORAM HEALTHCARE CORP. and . .            00-3299)
   CORAM, INC.,                 . 824 Market Street
                                . Wilmington, Delaware 19801
                                .
              Debtors.          . January 22, 2004
. . . . . . . . . . . . . . . . . 9:41 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Cerberus:                   Schulte Roth & Zabel LLP
                                By:  MICHAEL L. COOK, ESQ.
                                     HOWARD GODNICK, ESQ.
                                     NIKHIL SINGHVI, ESQ.
                                     SOPHIE KIM, ESQ.
                                919 Third Avenue
                                New York, NY  10022

For Chapter 11 Trustee:         Schnader Harrison Segal
                                  & Lewis, LLP
                                By:  BARRY E. BRESSLER, ESQ.
                                     WILLIAM KIPNES, ESQ.
                                     RICHARD BARKASY, ESQ.
                                     MICHAEL BARBIE, ESQ.
                                1600 Market Street
                                Suite 3600
                                Philadelphia, PA  19103

Audio Operator:                 Jennifer M. Patone

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

Shestack - Cross/Bradford                                51

1  review of the record indicated to you, did it not, that there

2  was no secret in July of 2000 that Coram might file bankruptcy?

3  A    I think it was -- yes, I think it was headed for

4  insolvency earlier than the actual filing.

5  Q    Okay, and --

6  A    By the way, on -- in terms of the fairness of the CPS

7  deal, Brown, as I recall, opined specifically that they thought

8  it was a fair deal.  That the $42 million that was received was

9  fair, so at least you have one independent expert group opining

10 as to the fairness of that.  You could make the argument the

11 other way, but you did have a respectable investment banking

12 house saying it was fair.

13 Q    You would agree, would you not, that it is not an

14 opportune time to maximize the price for a sale of an asset to

15 sell it at a time when you're on the verge of filing

16 bankruptcy?

17 A    I don't know the answer to that.  I mean if when you need

18 the money or you're in a cash drain, you need it then.  Then

19 you do what the Board thought was necessary.  This was an

20 independent Board except perhaps for Feinberg.  They had the

21 proposition before them, and they made an independent decision.

22 It may have been an unwise decision, but that decision, it

23 seems to me, would pass the business judgment rule.

24 Q    When a company buys an asset from an insolvent company on

25 the brink of bankruptcy, they take certain legal risks.  Do

J&J COURT TRANSCRIBERS, INC.

1  greater consideration, I thought the consideration that we were

2  obtaining was a reasonable amount. Now I had some doubt,

3  because they had strongly urged upon me the value of what they

4  refer to as a derivative action. That was an action that Mr.

5  Levy and Mr. Liebentritt had brought to my attention. In fact,

6  gave me a copy of the draft complaint, and they were seeking a

7  very substantial amount of money. So that before I would sign

8  the agreement and the plan, I thought I had to call upon the

9  best legal mind that was available to me, and I looked around

10 with that in mind. I have known Jerry Shestack for a long

11 time. He clerked for the Court, as you have already heard. I

12 knew him when he was President of the ABA. He's known as one

13 of the very top litigators both nationally and certainly in the

14 Delaware Valley, and I called him and I asked him if he would

15 be willing to evaluate that claim. It meant a great deal to

16 me.

17        He was very busy at the time. He said he would put

18 aside everything and do that, and I told my staff to give him

19 every conceivable piece of paper or anything that he asked for

20 or his staff, and before I signed these documents, I had a long

21 discussion with him, and I said, "Jerry, I just want you to

22 give me your unvarnished opinion. I want you to take sides for

23 me, against me. Is that reasonable for me to accept the $56

24 million payment under this context?" He said that he thought

25 it was, and I asked him if he would write a report to that

201

1  Monday.

2                    * * * * *

3                    **CERTIFICATION**

4         I, PATRICIA C. REPKO, court approved transcriber,

5  certify that the foregoing is a correct transcript from the

6  official electronic sound recording of the proceedings in the

7  above-entitled matter.

8

9                                        Date:   February 2, 2004

10 PATRICIA C. REPKO

11 J&J COURT TRANSCRIBERS, INC.

1               IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3

4    ─────────────────────────────────────────────

5    GENESIS INSURANCE COMPANY,            )
                                           )
6               Plaintiff and             )
                Counterclaim Defendant,   )  Case No.
7                                          )
            vs.                            )  05-CV-335-WDM
8                                          )  -PAC
     DANIEL D. CROWLEY,                    )
9                                          )
                Defendant and Third-Party )
10               Plaintiff,                )
                                           )
11   ARLIN M. ADAMS,                       )
     Chapter 11 Trustee of the Bankruptcy )
12   Estates of Coram Healthcare Corporation )
     and Coram, Inc.,                      )
13                                         )
                Defendant and             )
14               Counterclaimant,         )
                                           )
15   NATIONAL UNION FIRE INSURANCE COMPANY OF )
     PITTSBURGH, PA,                       )
16                                         )
                Third-Party Defendant.    )

17

18

19   ─────────────────────────────────────────────

20

21             DEPOSITION OF DONALD J. AMARAL
                    August 30, 2006
22                 Palo Alto, California

23
     Reported by:
24   EMI ALBRIGHT                    **CERTIFIED**
     RPR, CSR No. 13042              **COPY**
25   Job No. 70613

                                                              1

1    possibly coming into it with an equity partner being

2    Cerberus.

3         Q    So Feinberg told you that he -- that he and

4    Cerberus had worked with Crowley in connection with another

5    situation?

6         A    Yes.

7         Q    And did he tell you that Crowley was working for

8    any other companies in which Cerberus had a financial

9    interest?

10        A    He made me aware of the relationship with

11   Winterland.

12        Q    What is Winterland?

13        A    T-shirt company.

14        Q    Do you understand it was a little more than a

15   T-shirt company, that Winterland was a rock and roll venue in

16   San Francisco?

17        A    I grew up here and I know what Winterland was.

18   But I understood it until just now to be a T-shirt company.

19        Q    You never had an understanding that it was a

20   little broader than that, that they sold all kinds of music,

21   rock and roll type memorabilia in addition to T-shirts?

22        A    No, sir.

23        Q    But did you understand that Cerberus had some

24   sort of financial relationship with Winterland?

25        A    Yes.

80

Esquire Deposition Services
800.770.3363

A1245

1          Q      And how did you have that understanding, sir?

2          A      Feinberg told me.

3          Q      Did you understand that Crowley had a role in

4     connection with Winterland?

5          A      Yes.

6          Q      And what did you understand that role to be?

7          A      He was a consultant to the CEO.

8          Q      And so you understood that he was providing

9     services to Winterland?

10         A      Yes.

11         Q      And you also understood that he was getting paid

12    to do that work; right?

13         A      Yes.

14         Q      You knew when Crowley was consulting, he was

15    doing it, that was how he made a living; right?

16         A      Correct.

17         Q      So is it a fair statement then that you knew from

18    the beginning that Crowley was also working at the very least

19    for Winterland, this other Cerberus company?

20         A      Yeah.

21         MR. KIPNES:    Object to the form.

22    BY MR. PETERS:

23         Q      Did you care how much Crowley was getting paid to

24    work at Winterland?  Was that something that you thought was

25    important information to obtain?

81

```
 1        A    No.

 2        Q    Did you think it was important for you to obtain

 3    information about what, if anything, Crowley was getting paid

 4    by Cerberus to perform whatever consulting services he may

 5    have been performing for them?

 6        A    No.

 7        Q    Did you ever ask Feinberg for that information?

 8        A    No.

 9        Q    Feinberg certainly knew whatever Cerberus or

10    Cerberus companies were paying Crowley; correct?

11        A    I assume.

12        Q    You would have assumed that Feinberg, also a

13    board member of Coram, could have provided you that

14    information if you had asked him for it --

15        A    Yes.

16        Q    -- correct?  But you never did; right?

17        A    No.

18        Q    Now, there came a time that Dan Crowley started

19    performing services for Coram; is that right?

20        A    Yes.

21        Q    And at various points in time Dan negotiated with

22    members of the Coram board his compensation package; correct?

23             MR. KIPNES:   Object to the form.

24        A    Don't remember.

25    BY MR. PETERS:
```

82

1    Crowley?

2        A    Yes.

3        Q    And then the board approved the agreement that

4    Feinberg and Crowley reached?

5        A    Yes.

6        Q    And at that time you were aware that Crowley was

7    performing services for Winterland; correct?

8        A    Yes.

9        Q    You understood he was getting paid to perform

10   those services; correct?

11       A    Yes.

12       Q    And you didn't ask because you didn't care how

13   much he was getting paid to perform those services; correct?

14       A    Correct.

15       Q    Did you understand that he was getting paid to

16   perform services by Winterland or by Cerberus or did you not

17   have an understanding about that because you didn't care?

18       A    I didn't care.

19       Q    So whether he was getting paid by Cerberus or

20   whether he was being paid by Winterland, didn't make any

21   difference to you?

22       A    No.

23       Q    And then for how long did Dan Crowley serve as

24   the CEO of Coram?

25       A    Couple of years.

87

1      Q    He stepped into the same menu of problems that

2    you've described for us that were facing the company when you

3    were the CEO; is that a fair statement?

4      A    Yes.

5      Q    Did he address them?

6      A    Yes.

7      Q    Can you tell us how he addressed the issue of

8    cash flow?

9      A    Dan is an operating maestro.  He fine tuned and

10    tweaked the system.  He took costs out.  He improved the

11    management information systems and cut cost.  He cut costs,

12    increased revenues, increased collections, which is different

13    than revenues, and he provided charismatic leadership.

14      Q    How about the Aetna R-Net situation?  Did he have

15    to address that?

16      A    He came to resolution with that.  He settled

17    that.

18      Q    How about employee instability?

19      A    His leadership.  Company was looking for

20    leadership.

21      Q    And how would you rate Dan Crowley's performance

22    as the CEO of Coram during the entire period of time that he

23    performed that job?

24      A    Good to excellent.

25      Q    You said that when the company was placed in

88

1

2

3

4          I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby

6   certify:

7          That the foregoing proceedings were taken

8   before me at the time and place herein set forth; that

9   any witnesses in the foregoing proceedings, prior to

10  testifying, were placed under oath; that a verbatim

11  record of the proceedings was made by me using machine

12  shorthand which was thereafter transcribed under my

13  direction; further, that the foregoing is an accurate

14  transcription thereof.

15         I further certify that I am neither

16  financially interested in the action nor a relative or

17  employee of any attorney of any of the parties.

18         IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated: _____SEP 1 3 2006_____

22

23

24         _Emi Albright_____

25         EMI ALBRIGHT, CSR No. 13042

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

---

GENESIS INSURANCE COMPANY,                )
                                          )
            Plaintiff and                 )
            Counterclaim Defendant,       ) Case No.
                                          )
       vs.                                ) 05-CV-335-WDM
                                          ) -PAC
DANIEL D. CROWLEY,                        )
                                          )
            Defendant and Third-Party     )
            Plaintiff,                     )
                                          )
ARLIN M. ADAMS,                           )
Chapter 11 Trustee of the Bankruptcy      )
Estates of Coram Healthcare Corporation   )
and Coram, Inc.,                          )
                                          )
            Defendant and                 )
            Counterclaimant,              )
                                          )
NATIONAL UNION FIRE INSURANCE COMPANY OF  )
PITTSBURGH, PA,                           )
                                          )
            Third-Party Defendant.        )

---

DEPOSITION OF SANDRA R. SMOLEY
August 31, 2006
Palo Alto, California


Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 70614A

Page 2

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF COLORADO
 3
 4    _____
 5    GENESIS INSURANCE COMPANY,          )
                                          )
 6          Plaintiff and                 )
            Counterclaim Defendant,       ) Case No.
 7       vs.                              ) 05-CV-335-WDM
 8                                        ) -PAC
      DANIEL D. CROWLEY,                  )
 9                                        )
            Defendant and Third-Party     )
10          Plaintiff,                    )
                                          )
11    ARLIN M. ADAMS,                     )
            Chapter 11 Trustee of the Bankruptcy   )
12    Estates of Coram Healthcare Corporation   )
      and Coram, Inc.,                    )
13                                        )
            Defendant and                 )
14          Counterclaimant,              )
                                          )
15    NATIONAL UNION FIRE INSURANCE COMPANY OF  )
      PITTSBURGH, PA,                     )
16                                        )
            Third-Party Defendant.        )
17
18
19    _____
20
21          DEPOSITION OF SANDRA R. SMOLEY, taken on behalf of
22    Plaintiff and Counterclaim Defendant, at 650 Page Mill Road,
23    Palo Alto, California, beginning at 10:11 a.m. and ending at
24    11:05 a.m., on August 31, 2006, before me, EMI ALBRIGHT, RPR,
25    CSR No. 13042.
```

Page 3

```
 1                     APPEARANCES
 2
      For Plaintiff and Counterclaim Defendant Genesis
 3    Insurance Company:
 4          THOMPSON, LOSS & JUDGE, LLP
            BY: THOMAS J. JUDGE
 5          1919 Pennsylvania Avenue, N.W.
            Suite M-200
 6          Washington, DC 20006-3458
            202.772.5170
 7          202.772.5180 Fax
            tjudge@tljlaw.com
 8
      For Defendant and Third-Party Plaintiff Daniel
 9    D. Crowley:
10          KEKER & VAN NEST LLP
            BY: LAURIE CARR MIMS
11          710 Sansome Street
            San Francisco, California 94111-1704
12          415.391.5400
            415.397.7188 Fax
13          ERP@KVN.COM
14    For Defendant and Counterclaimant Arlin M. Adams:
15          SCHNADER HARRISON SEGAL & LEWIS LLP
            BY: WILBUR L. KIPNES
16          1600 Market Street
            Suite 3600
17          Philadelphia, Pennsylvania 19103-7286
            215.751.2336
18          215.751.2205 Fax
            wkipnes@schnader.com
19
      For Third-Party Defendant National Union Fire Insurance
20    Company of Pittsburgh, PA:
21          SENTER GOLDFARB & RICE, L.L.C.
            BY: WILLIAM L. SENTER
22          1700 Broadway
            Suite 1700
23          Denver, Colorado 80290
            303.320.0509
24          303.320.0210 Fax
            wsenter@sgrllc.com
25
```

Page 4

```
 1    APPEARANCES - continued
 2
      For the Deponent Sandra R. Smoley:
 3
            WILSON, SONSINI GOODRICH & ROSATI
 4          BY: PERI NIELSEN
            650 Page Mill Road
 5          Palo Alto, California 94304-1050
            650.493.9300
 6          650.493.6811 Fax
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                 EXAMINATION INDEX
 2
      WITNESS: SANDRA R. SMOLEY
 3
 4    EXAMINATION BY:                PAGE NO.
 5
      Mr. Judge                   6
 6
      Ms. Mims                   26
 7
      Mr. Senter                 33
 8
 9
10
11                  EXHIBIT INDEX
12    EXHIBIT NO.  DESCRIPTION          PAGE NO.
13
         (No exhibits marked for identification.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 14

1    Goldin. And we affirmatively moved directly to look into it.
2  Q. When you say a special committee was formed, was that an
3    independent committee from Mr. Crowley and Mr. Fineberg?
4  A. Yes, I mean, they weren't on it. It was a special committee
5    of the board.
6  Q. Who was on that committee?
7  A. Well, the chair was Don Amaral.
8  Q. And it was you?
9  A. Yes.
10 Q. Was it Mr. Casey on the board?
11 A. Yes.
12 Q. Mr. Smith on that committee?
13 A. I don't remember Mr. Smith.
14 Q. Do you remember anybody else being on that committee?
15 A. No.
16 Q. Was that committee -- whose idea was it to form this special
17   independent committee to address Judge Walrath's decision?
18 A. The board -- the independent board members.
19 Q. When you say the independent board members, is that everybody
20   other than Mr. Crowley?
21 A. Correct.
22 Q. Did you do that pursuant to advice of counsel, say, from
23   Mr. Friedman?
24 A. I don't recall his direct -- we thought it up and we moved
25   forward. And we did get advice of counsel but I'm not quite

Page 15

1    sure who it was.
2  Q. Did any counsel associated with Coram say to the board at or
3    around that time, look, before you do anything else, you have
4    to either terminate the employment with Mr. Crowley or
5    Mr. Crowley has to terminate his relationship with Cerberus?
6  A. We were never told that.
7  Q. Did you believe that was necessary --
8  A. We never thought of that. We were moving ahead looking into
9    it with this special committee.
10 Q. When you were moving ahead with the special committee, the
11   board knew about Mr. Crowley's relationship with Cerberus?
12 A. I'm not 100 percent sure the timing of that. It was found
13   out when disclosures were -- and I don't know where it was in
14   relationship to that.
15 Q. But certainly after the judge's ruling and the judge said,
16   look, there is this relationship between Crowley and Cerberus
17   which I think is a conflict of interest, the board had before
18   it the information regarding Mr. Crowley's relationship with
19   Cerberus?
20 A. I'm just unclear as to the timing.
21 Q. All right.
22 A. I knew about it at some point. I don't know where it was in
23   relationship to what you are asking.
24 Q. When you learned of the relationship between Mr. Crowley and
25   Cerberus, did you conclude that that was a conflict of

Page 16

1    interest that would preclude him from continuing as chief
2    executive officer at Coram?
3  A. No.
4  Q. Why did you think that?
5  A. Well, he was a person that came in and did multiple jobs. We
6    weren't the only place he was CEO. He was CEO in multiple
7    areas. And my feeling was I don't care what he is doing
8    outside of his job with Coram. And he was doing a
9    magnificent job at Coram. And so my feeling is he's a
10   consultant elsewhere was of no issue to me.
11 Q. Was the board providing active oversight over Mr. Crowley?
12 A. Oh, yes.
13 Q. So if you had seen that Mr. Crowley was actually acting in
14   some particular way against the interests of Coram, perhaps
15   in the best interests of Cerberus, the board would have taken
16   steps to address that?
17 A. Well, I can't answer that. It didn't happen.
18 Q. All right. But the board -- you were keeping an eye?
19 A. Oh, absolutely, absolutely.
20 Q. How did it come about that the special independent committee
21   retained Goldin and Associates?
22 A. We wanted to get somebody, so we let it out on the street
23   that we were looking for a very independent, well thought of
24   person who would do this, look, see outside of even us,
25   totally independent of the board, here, go do your work. And

Page 17

1    I believe it was three names that came back. One was unable
2    to do it because of being on an extended trip. And Goldin
3    was one that had a reputation of being independent and above
4    reproach. And so we said that's the guy we need because we
5    want somebody that is going to do their thing. And he went
6    off and did his thing.
7  Q. Was it your understanding that Goldin and Associates --
8    withdraw that.
9       Was it your understanding when the committee retained
10   Goldin and Associates that Goldin's scope of the
11   investigation and evaluation was in any way restricted or
12   limited in terms of what Goldin could look at or find?
13 A. Absolutely not.
14 Q. If Mr. Goldin had -- did Mr. Goldin conclude or make any
15   recommendations to the committee that Mr. Crowley had to be
16   terminated or Mr. Crowley had to terminate his relationship
17   with Cerberus?
18 A. No.
19 Q. If Goldin and Associates had made such a recommendation,
20   would you have given it due consideration?
21 A. Well, I can't -- I mean, how do I know what I would have
22   done? That's -- it didn't happen so --
23 Q. During the course of Goldin's investigation, did anyone,
24   Goldin or any of Coram's counsel say or recommend to the
25   board of directors, we have to terminate our relationship

Page 26

1  advice or recommendations?
2          MS. NIELSEN: Yes.
3          MR. JUDGE: I have no further questions.
4          MS. NIELSEN: Thank you.
5          MS. MIMS: We have a few questions, not
6  much.
7          THE WITNESS: Thank you.
8          MR. JUDGE: Thank you for your time. I
9  really appreciate it.
10             (Discussion off the record.)
11
12          EXAMINATION
13  BY MS. MIMS:
14  Q. I am Laurie Mims, and I am with the law firm of Keker and Van
15  Nest, and we met this morning. I told you that I represent
16  Dan Crowley in this matter and in the trustee's matter that's
17  pending in Delaware. And I just have a few follow up
18  questions for you regarding your work with Dan.
19  A. Okay.
20  Q. You said that earlier you testified that you met Dan through
21  his work with HMOs. Could you explain what you know about
22  that?
23  A. He was CEO of Foundation Health. And that was an HMO. It's
24  now it's been sold. But -- and so I just had a professional
25  relationship with him in regards to HMOs, regulations, you

Page 27

1  know, issues that could come before the state legislature,
2  they would want to see the secretary of health and welfare,
3  that kind of thing.
4  Q. And you said I believe that you respected his work. What did
5  you know about his work that you respected?
6  A. He was smart, he was a turnaround artist, and he could fix
7  anything.
8  Q. How did you learn that he was a turnaround artist?
9  A. By reputation.
10  Q. When did you learn that Dan Crowley had been retained in some
11  capacity by Coram Healthcare?
12  A. Probably in the fall -- I went on the board in February.
13  Probably in the fall before that.
14  Q. And how did you learn that?
15  A. I had run into him from time to time in passing. And he
16  started saying, well, you know, I'm doing some work at Coram
17  and would you ever be interested in coming on the board. And
18  I said, yes. Then time went. And then he finally asked me
19  to go on the board in February.
20  Q. Did you talk with anyone else other than Mr. Crowley before
21  you joined the board about Coram?
22  A. Yes, Don Amaral and Bill Casey.
23  Q. And at that time were those individuals also members of the
24  Coram board?
25  A. Yes.

Page 28

1  Q. And what did they tell you about Coram?
2  A. There was going to be a challenge, that it was a company that
3  was in trouble, and that we were going to have to be really
4  prudent to try to salvage the company but we thought that it
5  could be salvaged.
6  Q. You testified earlier -- and I am just paraphrasing -- that
7  Mr. Crowley was working as a CEO for other entities other
8  than Coram?
9  A. Yes.
10  Q. What do you know about that?
11  A. I don't. I just knew that he was. He had a company called
12  Dynamic Healthcare Solutions. And they bought or would run
13  companies that were in trouble.
14  Q. When did you learn about his company, Dynamic?
15  A. I guess I always knew after he left Foundation that he went
16  into that business.
17  Q. So in the fall of 1999 and the winter of 2000 when you were
18  considering going on the board of Coram, you were aware that
19  Mr. Crowley was working on other things?
20  A. Yes.
21  Q. Did you inquire with him as to what those things were?
22  A. No.
23  Q. Why not?
24  A. I didn't think it was any of my business.
25  Q. Were you aware that he was being compensated by any other

Page 29

1  entity?
2  A. Well, not specifically. I mean, what specific entity? I
3  mean, like --
4  Q. Well, any other -- did you think he had any other sources of
5  income other than Coram?
6  A. Oh, yes, because he was working for other companies.
7  Q. Do you know of a company called Winterland?
8  A. He told me about that. Is that the T-shirt company? Yeah.
9  Q. Yes, so it's a T-shirt company. And by he, you mean Dan
10  Crowley told you about that company?
11  A. Yes.
12  Q. What did he tell you about it?
13  A. Minimal. That he was working in that company also.
14  Q. And if you know, around what time frame did he tell you that?
15  A. I don't know.
16  Q. Was it while you were a director at Coram?
17  A. Before.
18  Q. You said this morning that while you were serving on the
19  board of Coram, you and the other board members were keeping
20  an eye or you agreed that you were keeping an eye on Dan
21  Crowley's performance. Can you describe what you did to
22  monitor his performance at Coram?
23  A. Well, we worked, you know, we had board meetings, and he
24  would make reports. And we would talk about money and we
25  would talk about, you know, directions he was going. And so

8 (Pages 26 to 29)

Page 38

```
 1    STATE OF CALIFORNIA )
 2        : ss        )
 3    County of Alameda   )
 4
 5        I, the undersigned, a Certified Shorthand Reporter
 6    of the State of California, do hereby certify:  That the
 7    foregoing proceedings were taken before me at the time and
 8    place herein set forth; that any witnesses in the foregoing
 9    proceedings, prior to testifying, were placed under oath;
10    that a verbatim record of the proceedings was made by me
11    using machine shorthand which was thereafter transcribed
12    under my direction; further, that the foregoing is an
13    accurate transcription thereof.
14        I further certify that I am not a relative,
15    employee, attorney or counsel of any party to this action or
16    relative or employee of any such attorney or counsel and that
17    I am not financially interested in the said action or the
18    outcome thereof;
19        IN WITNESS WHEREOF, I have this date subscribed my
20    name.
21        Dated:_____  _____
22
23
24        EMI ALBRIGHT, CSR No. 13042
25
```

IN THE UNITED STATES DISTRICT COURT

   FOR THE DISTRICT OF DELAWARE

Certified Copy

```
ARLIN M. ADAMS, Chapter II      )
Trustee of the Post-            ) Case No.
Confirmation Bankruptcy of      ) 04-1565
Estates of CORAM HEALTHCARE     )
CORPORATION, and of CORAM,      )
INC., a Delaware corporation,   )
                                )
                   Plaintiff,   )
                                )
          vs.                   )
                                )
DANIEL D. CROWLEY, DONALD J.    )
AMARAL; WILLIAM J. CASEY; L.    )
PETER SMITH; and SANDRA L.      )
SMOLEY,                         )
                                )
                   Defendants.  )
-------------------------------)
```

                 Wednesday, February 14, 2007
                 10:29 a.m.

       Deposition of STEPHEN FEINBERG,
held at the offices of Cerberus
Capital Management, L.P., 200 Park
Avenue, New York, New York 10171,
pursuant to Notice, before Otis Davis,
a Notary Public of the State of New
York.

1          Stephen Feinberg

2          MR. KIPNES:  That's two

3     questions.  Could you break that up,

4     please.

5          MR. PETERS:  Yes.

6     A.     Yes to both of them.  Me

7     initially and then the board, yes.

8     Q.     What do you recall about the

9     board of directors discussions about having

10    Dan Crowley change his role from overseeing

11    Rick Smith and becoming more of a hands-on

12    manager?

13    A.     Rick wasn't cooperating, he was

14    probably not the -- it was probably not the

15    best situation anyway, because you needed

16    one top guy getting it done, because the

17    company had gotten so dire.

18          One, Rick wasn't cooperating;

19    two, it was probably better if Dan just ran

20    the whole thing anyway.  And the company

21    desperately needed it.  The board saw where

22    the company was going.  It was pretty

23    obvious and I believe unanimous.

24    Q.     Did you ever have any

25    discussions with other board members about

1              Stephen Feinberg

2    how you came to know Dan Crowley about his

3    ongoing relationship with Cerberus?

4         A.    Yes.

5         Q.    With whom did you have those

6    discussions?

7         A.    Don Amaral, for one.

8         Q.    Anybody else besides Don

9    Amaral?

10        A.    I believe I talked to other

11   board members about it, yes.

12        Q.    What do you recall telling Don

13   Amaral on the subject of Cerberus's ongoing

14   relationship with Dan Crowley?

15        A.    I told him exactly what it was.

16        Q.    What do you recall telling him?

17        A.    That he worked on a lot of our

18   companies, that we paid him for it, that he

19   has done a good job for us, and that we

20   have a close relationship.

21        Q.    Do you recall -- what do you

22   recall telling other board members about --

23        A.    Something similar.

24        Q.    Something similar?

25        A.    Yes.

1             Stephen Feinberg

2        Q.    Did you ever in any way attempt

3    to hide from Don Amaral or any other board

4    members the fact that Dan Crowley had an

5    ongoing relationship with Cerberus?

6        A.    No.

7        Q.    Was it your understanding --

8    withdrawn.

9             Did you have an understanding

10   as to whether the board members knew that

11   Dan Crowley had an ongoing relationship

12   with Cerberus?

13       A.    They did know.

14       Q.    All of the board members knew?

15       A.    I thought so.

16       Q.    Did anybody ever ask you

17   specifically about how much Dan Crowley

18   gets paid to work with Cerberus at any

19   time, anybody from Coram, while you were a

20   board member?

21       A.    To the best of my recollection,

22   I told Amaral what he was getting paid.

23       Q.    When do you recall telling

24   Mr. Amaral that?

25       A.    At some point when Don was

```
 1              Stephen Feinberg
 2   negotiating with Dan about his Coram
 3   contract.
 4        Q.    Other than the conversation
 5   with Amaral, do you ever recall anybody
 6   else ever asking you specifically at any
 7   time while you were a board member how much
 8   Crowley was getting paid?
 9        A.    No, I don't believe so.
10        Q.    Did you ever feel that you
11   needed to conceal from the board how much
12   Dan Crowley was getting paid by Cerberus?
13        A.    No.
14        Q.    Did you ever discuss with Dan
15   Crowley concealing from the board of Coram
16   how much Dan Crowley was getting paid by
17   Cerberus?
18        A.    No.  I assumed -- additionally,
19   I assumed Dan was telling Amaral in these
20   discussions.  Amaral was the guy that was
21   negotiating the compensation.
22        Q.    And you originally proposed
23   Crowley to the Coram board as a consultant
24   who you knew who could assist Coram; is
25   that right?
```

A1259

1           Stephen Feinberg

2     done a Consulting Agreement, which is what

3     we should have done here.  But I wasn't

4     involved with this.  He takes care of the

5     agreements and a mistake was made.

6         Q.    What was your understanding in

7     November 1999 of the form of the

8     relationship between Cerberus and Dan

9     Crowley, putting aside Coram?

10        A.    That he would consult with us

11    and work on companies, on companies we

12    would bring to him if he wanted to, and he

13    would give us advice or more.  For that, he

14    received compensation, a yearly salary, and

15    upside on deals that we did that he

16    recommended.

17        Q.    It says in paragraph 3.1 under

18    "Basic Compensation" that he would receive

19    a salary of $80,000 a month.

20              Was he receiving that salary

21    for work on Coram or for work on other

22    projects with Cerberus?

23        A.    For work on other projects with

24    Cerberus.

25        Q.    How was that number of $80,000