264

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                           : ss.

5    COUNTY OF NEW YORK     )

6

7         I, OTIS DAVIS, a Notary Public

8    within and for the State of New York,

9    do hereby certify:

10        That STEPHEN FEINBERG, the

11   witness whose deposition is

12   hereinbefore set forth, was duly sworn

13   by me and that such deposition is a

14   true record of the testimony given by

15   the witness.

16        I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, and that

19   I am in no way interested in the

20   outcome of this matter.

21        IN WITNESS WHEREOF, I have hereunto

22   set my hand this 16th day of February 2007.

23

24   *Otis Davis*
     _____

25                    OTIS DAVIS

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

**Certified Copy**

ARLIN M. ADAMS, Chapter 11
Trustee of the
Post-Confirmation Bankruptcy
Estates of CORAM HEALTHCARE
CORPORATION, a Delaware
Corporation, and of CORAM,
INC., a Delaware Corporation,

        Plaintiff,

vs.                     Case No.: 04-1565

DANIEL D. CROWLEY; DONALD J.
AMARAL; WILLIAM J. CASEY; L.
PETER SMITH; AND SANDRA L.
SMOLEY,

        Defendants.

_____/

---o0o---

DEPOSITION OF WILL K. WEINSTEIN

Friday, March 2, 2007

---o0o---

SHEILA CHASE & ASSOCIATES
REPORTING FOR
LiveNote World Service
221 Main Street, Suite 1250
San Francisco, California 94105
Phone:   (415) 321-2311
Fax:   (415) 321-2301

Reported by
APRIL DAWN HEVEROH, CSR
CSR No. 8759

A1262

Weinstein, Will                                                                        3/2/2007

```
 1          Q.   Who is Sam Zell?

 2          A.   He's a man.

 3          Q.   Is he a friend?

 4          A.   Yes.

 5          Q.   And how long have you known him?

 6          A.   Roughly 40 years.

 7          Q.   I've read some other depositions that indicate

 8     that you met Mr. Zell on the ski slopes; is that right?

 9          A.   That's what he says.  I don't remember.

10          Q.   All right.  And you've known him since the

11     early '70s, roughly; is that about right?

12          A.   Yes.

13          Q.   Is he a good friend?

14          A.   Yes.

15          Q.   And is he a close business associate of yours?

16          A.   Yes.

17          Q.   What kind of a business relationship do you

18     currently have with Mr. Zell?

19          A.   He is a client.

20          Q.   Are you essentially his broker?

21          A.   One of them.

22          Q.   Okay.  And how much money does Mr. Zell have

23     invested with you?

24               MR. LEVY:  You can answer if you want to,

25     Will.
```

1             THE WITNESS:  I don't know.

2             MR. GARNETT:  Q.  Is it more than a million

3    dollars?

4         A.   Yes.

5         Q.   Is it more than $5 million?

6         A.   Yes.

7         Q.   Is it more than $10 million?

8         A.   Yes.

9         Q.   Is it more than $20 million?

10        A.   Yes.

11        Q.   Is it more than $50 million?

12        A.   I don't know.

13        Q.   Did Mr. Zell have money invested with you or

14   with any firm you were affiliated with during the period

15   of time 1999 to 2000?

16        A.   Yes, I think so.

17        Q.   Okay.  And was that at Jackson Square

18   Partners?

19        A.   Probably, yes.

20             Wait, it was -- was Jackson Square Partners --

21   if Jackson Square Partners was in business at that time,

22   the answer would be yes.

23        Q.   Fair enough.  And if it wasn't Jackson Square

24   Partners, would it have been Conifer Securities?

25        A.   No.

1                    THE WITNESS:  Oh, yeah, yeah.

2                    MR. GARNETT:  Q.  Who is the Ann and Robert H.

3    Lurie Foundation?

4         A.    It's a foundation in Chicago.

5         Q.    And are they -- is that an entity that you

6    have invested with in the past?

7                    MR. LEVY:  You mean co-invested, don't you?

8                    THE WITNESS:  I don't understand the question.

9                    MR. LEVY:  I don't, either.

10                   MR. GARNETT:  Q.  What's your -- have you ever

11   done business with the Lurie Foundation in the past?

12        A.    Yes.

13        Q.    In what capacity?

14        A.    Advising some of their investments.

15        Q.    And did they invest through Jackson Square

16   Partners?

17        A.    I think so.  I don't remember.  I'm almost

18   certain that they did invest in Jackson Square Partners,

19   not through them.

20        Q.    Yes.

21        A.    Okay.

22        Q.    And when did they first purchase shares of

23   stock of Coram, if you know?

24        A.    I don't know.

25        Q.    Did you handle the purchase of that stock for

1      Q.    Have you known her since before the death of

2  Robert Lurie?

3      A.    Yes.

4      Q.    Were they friends of yours?

5      A.    Yes.

6      Q.    And how long prior to his death was Robert

7  Lurie a friend of yours?

8      A.    10-ish years.

9      Q.    How did you first meet him?

10     A.    He was Sam's old partner, and I met him, I

11  believe, in that context, or socially around that.

12     Q.    And did you have both a business and a social

13  relationship with him?

14     A.    Yes.

15     Q.    And do you continue to have both a business

16  and a social relationship with Ann Lurie?

17     A.    I do.

18     Q.    Who is Mark Slezak?

19         MR. LEVY:  I'm sorry.  You asked that

20  question.

21         THE WITNESS:  You did ask that question, but

22  I'll give you the same answer.

23         He's the financial manager of the Lurie

24  Foundation.  I don't know if that's his title.

25         MR. GARNETT:  Q.  How long have you known

1      A.   Well, as I stated earlier, I don't think the

2   company was in bankruptcy.   I don't think the company

3   had any reason to be put in bankruptcy.   I thought that

4   I and the other 4,000 shareholders, et cetera, had been

5   maltreated and that it wasn't okay and wouldn't, in the

6   end, be okay to simply declare that the company is

7   bankrupt for your own reasons and without any regard to

8   the shareholders.   So I felt that it was an interesting

9   opportunity, and I also thought that the stock was

10  selling at 8 cents, or something like that, and I could

11  measure what the risk was, unlike most of my

12  investments.

13      Q.   At the beginning of this time you did begin a

14  period where you purchased substantial stock of Coram

15  for both yourself and others in your group at that

16  point, right?

17          MR. LEVY:  Let me object to the form, the word

18  "substantial".

19          MR. GARNETT:  Q.  Well, let me ask you this

20  and it may save us some time, and tell me if it's

21  accurate.   I have looked at records, subsequent 13D

22  filings and the like, that would indicate that in

23  between the time of the filing of the bankruptcy and the

24  end of December of 2000, that you and others listed in

25  the 13D letters purchased Coram stock that raised the

1    percentage of stock that you controlled from about

2    25 percent to almost 40 percent.

3                Does that sound right to you?

4                MR. LEVY:  I'm going to object and say if you

5    have some records to show him that say end of

6    December --

7                MR. GARNETT:  I'll be happy to go through the

8    records.

9        Q.    Tell me generally, does that sound right to

10   you?

11       A.    It doesn't sound right or wrong.  I don't mean

12   to be disputing you; I just don't know.

13       Q.    Do you remember beginning to purchase large

14   amounts of stock after the bankruptcy was filed?

15       A.    I remember purchasing stock.

16       Q.    Okay.

17       A.    I don't know what "large amounts" means.

18       Q.    And did you make those -- we'll look at the

19   records in a little while.

20              Did you purchase those for yourself and others

21   of the individuals we went through earlier who had been

22   listed in the 13D letter?

23       A.    Probably.

24       Q.    Okay.  Now, as I understand it, you objected

25   to the initial plan of reorganization that was filed on

Weinstein, Will                                    3/2/2007

```
1
2                  REPORTER'S CERTIFICATE
3
4            I hereby certify that the foregoing is a true
5    record of the testimony as reported to the best of my
6    ability by me, a Certified Shorthand Reporter and a
7    disinterested person, and was thereafter transcribed
8    under my direction into typewriting by computer.
9
10           I FURTHER CERTIFY that I am not interested in
11   the outcome of the said action and not connected with
12   nor related to any of the parties in said action or
13   their respective counsel.
14   Dated: March 15, 2007  _____
15                           APRIL DAWN HEVEROH, CSR
                                  CSR NO. 8759
16
17
18
19
20
21
22
23
24
25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**Certified Copy**

ARLIN M. ADAMS, Chapter 11 )
Trustee of the )
Post-Confirmation )
Bankruptcy Estates of CORAM )
HEALTHCARE CORPORATION, a )
Delaware Corporation, and )
of CORAM, INC., a Delaware )
Corporation, )
                                )
          Plaintiff, )
                                )
     vs.                        ) No. 04-1565
                                )
DANIEL D. CROWLEY; DONALD )
J. AMARAL; WILLIAM J. )
CASEY; L. PETER SMITH; and )
SANDRA L. SMOLEY, )
                                )
          Defendants. )

          The videotaped deposition of DONALD

LIEBENTRITT, called by Defendant Daniel D. Crowley,

for examination, pursuant to the Federal Rules of

Civil Procedure of the United States District Courts

pertaining to the taking of depositions taken before

Stephanie A. Battaglia, CSR and Notary Public in and

for the County of DuPage and State of Illinois, at 11

South LaSalle Street, Suite 1200, Chicago, Illinois,

on March 14, 2007, 9:24 a.m.

1    understanding, and it is a matter of public record

2    what we purchased and when we purchased and how many

3    we paid, that we purchased Coram securities both

4    before and after the filing of the bankruptcy.

5         Q.    I am going to have you take a look at

6    Exhibit No. 9 I believe we are up to.

7                   (Document marked Deposition Exhibit 9 for

8                       identification.)

9    BY MR. LYNCH:

10        Q.    If you can take a look at this, this is

11   an e-mail from Marian Flynn to you, Don Liebentritt,

12   on Thursday, October 12, 2000, Subject:  Coram.

13             Have you seen this before?

14             MR. TOMASHEFSKY:  What you handed me, at

15   least, was several documents paper clipped together.

16             MR. LYNCH:  We are marking it as a single

17   exhibit.

18             MR. TOMASHEFSKY:  You characterized it as

19   an e-mail.  It seems to me there are several e-mails

20   here.

21             MR. LYNCH:  Fair enough.

22   BY MR. LYNCH:

23        Q.    The first page is an e-mail from

24   Marian Flynn dated October 12, 2000.  Attached to that

1    is a transaction summary.

2                    Have you seen this before?

3          A.    I think so.  I mean, it was addressed to

4    me and I produced it.  I am sure I have seen it.

5          Q.    And on that first -- on the first page it

6    says "The first tab has activity 8/8/2000 and the

7    second tab has purchased after."  And if you look at

8    the following page, it lists trade dates, quantities

9    of shares, trade amounts, price per share, among other

10   things, and the last date on that column is 3/30/2000.

11                   Does this represent Samstock purchases of

12   Coram stock?

13         A.    I believe so.  That is my understanding

14   of what it is, yes.

15         Q.    And on that first page at the end of the

16   quantity column, it notes 450,000 shares.

17                   Is that your understanding of the number

18   of shares Samstock held in Coram stock as of August 8,

19   2000?

20         A.    Based on this exhibit, I believe that is

21   the case.

22         Q.    And if you turn to the next page, the

23   first entry is August 9th of 2000 for a trade date, do

24   you see that?

1          A.     Yes.

2          Q.     And it says, quantity, 450,000; per

3     share, it says 6¢.

4                 Is it your understanding that on

5     August 9th Samstock purchased 450,000 shares of Coram

6     stock at 6¢ per share?

7          A.     That is what I would understand from this

8     exhibit.

9          Q.     And if you look down there are three

10    purchases that are offset at the bottom for October,

11    (from Conifer on-line info).

12                Is that Conifer Securities?

13         A.     I believe so, yes.

14         Q.     So is it your understanding from

15    reviewing this that between August 9, 2000, and

16    October 4th of 2000 Samstock purchased 2,178,000

17    shares of Coram stock?

18         A.     No.

19         Q.     What is your understanding?

20         A.     In what regard, of what?

21         Q.     What this represents.

22         A.     It represents a series of purchases of

23    securities by Samstock on the dates indicated and the

24    amounts indicated.

1    BY MR. LYNCH:

2            Q.    The e-mail dated November 14th.

3            A.    DL00034.  Okay, I am looking at it.

4            Q.    In which is a response from Marian Flynn

5    to your request to her stating "Do you have a current

6    spreadsheet on our Coram position?"  Her reply, "There

7    has been no new purchases, but the cost information

8    for October purchases has been added."

9            If you turn to the next page -- turn,

10   rather, to the last page, it looks as though that

11   October 16, 2000 purchase has been added for 322,000

12   shares.

13           Do you see that?

14           A.    Yes.

15           Q.    And do you notice that the previous

16   purchase was for 54,000?

17           A.    500.

18           Q.    And the previous for 16,500 and so on?

19           A.    Yes.

20           Q.    And the total for that column is

21   2,050,000 shares, correct?

22           A.    Yes.

23           Q.    And does that represent the number of

24   shares that Coram purchased -- that Samstock purchased

1    of Coram stock after August 9th -- between August 9th

2    and October 16th?

3         A.    That is what this indicates.

4         Q.    And if you look at the price per share

5    column, is it your understanding that Samstock was

6    purchasing those shares at prices ranging from 6 cents

7    per share up to 11 cents per share?

8         A.    That is what it looks like.  That is what

9    it looks like.

10        Q.    Do you know why Samstock bought more than

11   2 million shares of Coram stock after it filed for

12   bankruptcy?

13        A.    Because it was considered to be a good

14   investment.

15        Q.    Why was it considered to be a good

16   investment?

17        A.    Because I think there was a belief that

18   the value of the equity on a per share basis was in

19   excess of the amounts we were paying to acquire the

20   stock on a per share basis.

21        Q.    And as of Mr. Levy's letter of August 8th

22   indicating that the bankruptcy plan would wipe out

23   existing equity, was it your understanding at this

24   time that these purchases were made that if Coram's

Liebentritt, Donald                                    3/14/2007

1    bankruptcy plan were confirmed equity value -- equity

2    would get nothing and that those shares would be

3    worthless?

4          A.    That would be my understanding or that

5    would have been my understanding.

6          Q.    How did you anticipate making money from

7    these shares?

8          A.    That the plan as proposed by the debtor

9    would not be confirmed and it would be eventually

10   determined that the equity value of the company on a

11   per share basis was in excess of the cost to be paid

12   to acquire securities on a per share basis.

13         Q.    So is it fair to say that the investment

14   strategy of buying Coram stock after it filed for

15   bankruptcy was dependent on defeating that bankruptcy

16   plan?

17         A.    Yes.

18         Q.    And are you aware, did Samstock purchase

19   any shares after October 16, 2000?

20         A.    I don't think we did.  The total shares

21   that we still own is 2,500,000, and -- I don't know if

22   you can say we own shares anymore, but that is what we

23   owned up until the final confirmation hearing, and

24   this accounts for all that activity, so whatever.

1          A.    Yes.

2          Q.    Or, rather, steps -- steps in the legal

3    process?

4          A.    Yes.

5          Q.    And what did you have in mind then for

6    Mr. Levy to do going forward?

7                MR. TOMASHEFSKY:  Object to the form of

8    the question.  I don't understand.

9                THE WITNESS:  To oppose the plan that we

10   thought was unfair.

11   BY MR. LYNCH:

12         Q.    To oppose that plan in court, is that

13   what you mean?

14         A.    Well, yes.  Whatever was the appropriate

15   way to oppose it so that the equity would not be

16   extinguished.

17         Q.    So whatever means necessary to oppose

18   this plan?

19                MR. TOMASHEFSKY:  Object to the form of

20   the question, it is argumentative.

21                THE WITNESS:  Yes, whatever lawful

22   reasonable means, sure.

23   BY MR. LYNCH:

24         Q.    So is it fair to say that the equity

1   committee was going to do whatever it could to defeat

2   Coram's bankruptcy plan?

3                   MR. TOMASHEFSKY:  Object to the form of

4   the question; again, restating and arguing.

5                   THE WITNESS:  Yes, I think my answer to

6   that question is the same as my answer to the previous

7   question.

8   BY MR. LYNCH:

9        Q.    I am going to have you take a look at

10  Exhibit 13.

11                  (Document marked Deposition Exhibit 13 for

12                      identification.)

13  BY MR. LYNCH:

14       Q.    This is an October 25th --

15       A.    I am sorry, can you give me 15 seconds?

16  Thank you.

17       Q.    Mr. Zell?

18       A.    No.  It is for an organizational

19  volunteer form, they are going to get a White House

20  tour.

21       Q.    On October 25, 2000, or this is a letter

22  dated October 25, 2000, from -- to Theodore J. Lowe of

23  Altheimer & Gray, it is from Coram Healthcare

24  Corporation and its attorneys, and it states:

316

```
 1   STATE OF ILLINOIS)
                      ) SS.
 2   COUNTY OF DUPAGE )

 3          I, STEPHANIE A. BATTAGLIA, CSR and Notary

 4   Public in and for the County of DuPage and State of

 5   Illinois, do hereby certify that on the 14th of March,

 6   2007, at 9:24 a.m., at 11 South LaSalle Street, Suite

 7   1200, Chicago, Illinois, the deponent DONALD

 8   LIEBENTRITT personally appeared before me.

 9          I further certify that the said DONALD

10   LIEBENTRITT was by me first duly sworn to testify and

11   that the foregoing is a true record of the testimony

12   given by the witness.

13          I further certify that the deposition was

14   terminated at 4:46 p.m.

15          I further certify that I am not counsel for

16   nor related to any of the parties herein, nor am I

17   interested in the outcome hereof.

18          In witness whereof, I have hereunto set my

19   hand and seal of office this ___19th___ of March, 2007.

20                          Stephanie A. Battaglia

21                                  Notary Public

22   CSR No. 084-003337 - Expiration Date: May 31, 2007.

23

24          "OFFICIAL SEAL"
          Stephanie A. Battaglia
         Notary Public, State of Illinois
         My Commission Exp. 08/03/2010
```

A1279

Certified Copy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELWARE
----------------------------x
ARLIN M. ADAMS, Chapter 11
Trustee of the
Post-Confirmation
Bankruptcy Estates of
CORAM HEALTHCARE CORPORATION,
a Delaware Corporation,
and of CORAM INC.,
a Delaware Corporation,

                  Plaintiff,

        vs.             No. 04-1565 (SLR)

DANIEL D. CROWLEY,
DONALD J. AMARAL,
WILLIAM J. CASEY,
L. PETER SMITH, and
SANDRA L. SMOLEY,

                Defendants.
----------------------------x

  VIDEOTAPED DEPOSITION OF DAVID M. FRIEDMAN

        New York, New York

      Friday, March 16, 2007

Reported by:
Jennifer Ocampo-Guzman, RPR, CRR

```
 1                      FRIEDMAN

 2          A.    It's certainly possibly.

 3          Q.    -- July, August, September

 4    October of 2000 time frame.

 5          A.    I don't recall, but it's certainly

 6    possible.

 7          Q.    Do you recall expressing a view

 8    along the likelihood that an equity committee

 9    would be appointed?

10          A.    I don't recall, no.

11          Q.    Is it your experience that in

12    situations in which equity are -- the equity

13    holders are significantly under water, that

14    there's less likely an equity committee would

15    be appointed?

16          A.    It's less likely but there is --

17    there is very little precision to the -- to

18    the predictability of this, because it's very

19    much within the discretion of the U.S.

20    Trustee.

21          Q.    Didn't you tell the Coram board

22    that you thought it would be unlikely that an

23    equity committee would be appointed?

24          A.    I don't remember.

25          Q.    Now, as part of -- in addition to
```

```
 1                    FRIEDMAN
 2    the plan, you submitted a disclosure
 3    statement on behalf of Coram; is that right?
 4         A.    That's correct.
 5         Q.    I want to talk about how that
 6    disclosure statement was prepared for a few
 7    minutes, and I don't want to talk about the
 8    substance, the contents of the statement but
 9    just physically how it was done.
10         A.    Okay.
11         Q.    So the statement was prepared under
12    your supervision?
13         A.    The disclosure statement?
14         Q.    Yes.
15         A.    Yes.
16         Q.    And was it -- tell me how it was
17    prepared, how it came to be.
18         A.    I think the disclosure statement
19    has a number of components to it.  I don't
20    recall who was responsible for drafting what,
21    but I suspect that we had multiple attorneys
22    that were working on the document.  My
23    recollection is that -- I don't know how we
24    got from -- I'm sorry.  The Chanin report was
25    issued when?
```

```
 1                    FRIEDMAN

 2    which Mr. Marabito or Mr. Danitz or anybody

 3    else didn't -- refused to provide you

 4    information in response to a request?

 5         A.    No.

 6         Q.    At the time you filed the

 7    disclosure statement had you had an adequate

 8    opportunity to gather the information you

 9    needed for the disclosure statement?

10         A.    We thought we had, yes.

11         Q.    Who decided what would be put into

12    the disclosure statement?

13         A.    Probably, probably various lawyers

14    within the office, to the extent that there

15    was a decision, but I don't recall us ever

16    deciding not to include anything.  We were

17    just gathering information that we thought

18    was relevant and throwing it all in as we got

19    it.

20         Q.    Now, at the time that you filed the

21    statement, you believed it to be accurate;

22    correct?

23         A.    Yes.

24              MR. SLAUGHTER:  Now, I would like

25         to talk to you about a specific portion
```

Friedman, David M.                                    3/16/2007

1                    FRIEDMAN

2        Q.    Did you ever ask Mr. Crowley about

3   it at the time that you filed the disclosure

4   statement?

5        A.    I believe I did have conversations

6   with Mr. Crowley about this.

7        Q.    Prior to the time you filed the

8   disclosure statement?

9        A.    Yes.

10       Q.    Okay.  And what -- and how many

11  times did you have that conversation,

12  conversations with Mr. Crowley about this?

13       A.    I really don't recall the number of

14  times.

15       Q.    More than once?

16       A.    I don't know.

17       Q.    And what were the substance of

18  those conversations with Mr. Crowley?

19       A.    I think Mr. Crowley volunteered to

20  me that he had a relationship with Cerberus

21  with respect to other matters, and he made a

22  particular point of telling me that his

23  relationship with Cerberus was completely

24  divorced from his role at Coram.  And I think

25  I asked him to please make sure that we had

```
 1                    FRIEDMAN

 2    accurate language that would describe that

 3    relationship.

 4         Q.   Did you ask to see his agreement

 5    with Cerberus?

 6         A.   I wasn't --

 7              MR. NOVICK:  Object to the form,

 8         foundation.

 9         A.   I was never informed that there was

10    a written agreement.  And I did not

11    understand that there was a written agreement

12    at the time.

13         Q.   Do you have a recollection that

14    your firm didn't have a copy of that

15    agreement prior to the time the disclosure

16    statement was filed?

17         A.   I don't know whether or not our

18    firm had a copy of it or not.  I don't

19    recall, at least sitting here today I don't

20    recall being aware of the agreement at the

21    time.

22         Q.   Did you ever ask Mr. Crowley how

23    much he was being paid by Cerberus?

24         A.   I don't know.

25         Q.   I'm sorry.  Was that "I don't know"
```

```
 1                    FRIEDMAN
 2   or, "no, I don't think I did"?
 3        A.   I don't know.
 4        Q.   Did you ever talk to Mr. Feinberg
 5   about his relationship, about Cerberus'
 6   relationship with Mr. Crowley prior to the
 7   time the disclosure statement was filed?
 8        A.   I don't recall having that
 9   conversation.
10        Q.   Did you ever speak with anybody
11   from Cerberus about Mr. Crowley's
12   relationship with Cerberus prior to the time
13   the disclosure statement was filed?
14        A.   I don't recall having such a
15   conversation.
16        Q.   Did you ever ask Mr. Crowley to see
17   any written agreement he might have had with
18   Cerberus prior to the time the disclosure
19   statement was filed?
20        A.   I didn't understand such an
21   agreement to exist, and I didn't ask him to
22   see it.
23        Q.   I am going to show you a -- I'm not
24   going mark it since it's a transcript, but I
25   am going to show you here a transcript from
```

```
 1                    FRIEDMAN

 2         to strike that answer, and I will ask it

 3         again.

 4         Q.    You knew, however, that Mr. Crowley

 5   was receiving a fee from Cerberus prior to

 6   the time the bankruptcy was filed; isn't that

 7   correct?

 8         A.    When you say "a fee," the answer is

 9   no.  I understood that he was being paid for

10   services, but when you say "a fee," I did not

11   know that there was a fixed fee involved.

12         Q.    You knew that he was being paid by

13   Cerberus for services?

14         A.    Yes, that's correct.

15         Q.    You never asked him how much he was

16   being paid?

17         A.    At the time I don't believe I did.

18         Q.    Why not?

19         A.    I don't know.  I think I probably

20   should have.

21         Q.    Was it a failing on your part not

22   to ask that question?

23         A.    Well, in hindsight it certainly

24   was.  I mean at the time we were trying to

25   get a disclosure statement on file, and we
```

```
 1                    FRIEDMAN
 2   on what should be done next.
 3        Q.   And who are those people that you
 4   are referring to?
 5        A.   I think we consulted with -- with
 6   other lawyers.  I don't remember exactly who
 7   at the time, but there were other lawyers
 8   involved.  I think we definitely discussed it
 9   with creditors' committee counsel.
10             I just remember there being both a
11   discussion of how to proceed, and then a
12   discussion of who to engage to accomplish the
13   objectives.
14        Q.   Okay.  You said you thought --
15   strike that.
16             So what happened next then?
17        A.   Well, I understand we had a number
18   of discussions.  I remember talking about
19   this with Chaim Fortgang who represented the
20   creditors' committee and others, and we
21   concluded that the best path forward was to
22   retain an independent firm to look at the
23   plan, the history of the conflict and its
24   disclosure and nondisclosure, and the -- the
25   remaining aspects that were relevant to the
```

```
 1                    FRIEDMAN
 2   case and to have somebody independent
 3   approved by the court and hired to render
 4   essentially an independent report with
 5   respect to what had happened and make
 6   recommendations as to how to proceed.
 7        Q.   And did you make a recommendation
 8   to Coram that they take that?
 9        A.   Whether I made it or whether I
10   endorsed it, based upon someone else's view,
11   I don't know, but I certainly thought it was
12   the right thing to do.
13        Q.   And what did you envision
14   Mr. Crowley's involvement being in that
15   process?
16        A.   I think the idea would be that Mr.
17   Crowley do nothing other than run the company
18   and -- an operational perspective.  He would
19   be disassociated from any activity with
20   respect to a new plan, a new disclosure
21   statement.  He would run the company
22   operationally and he would be made available
23   to the independent restructuring advisor to
24   answer questions on an as-needed basis, but
25   he would be out of the business of writing a
```

```
 1                    FRIEDMAN

 2   new plan.

 3        Q.   And who would the independent

 4   restructuring advisor report to then?

 5        A.   He would report, I believe, to the

 6   directors other than Crowley.

 7             MR. SLAUGHTER:  And let me mark as

 8        Exhibit 9, if you guys can grab from

 9        your files of meeting minutes the

10        December 28, 2000 Coram minutes.

11             (Exhibit Friedman-9, Minutes of a

12        Telephonic Meeting of the Board of

13        Directors of Coram Healthcare

14        Corporation, December 28, 2000, Bates

15        Nos. TRUSTEE009502 through

16        TRUSTEE009507, marked for

17        identification, this date.)

18        Q.   And this is a minutes of --

19   Exhibit 9, Minutes of a Telephonic Meeting of

20   the Board of Directors of Coram Healthcare,

21   dated December 28, 2000.  You see you are

22   identified as being present on that telephone

23   call?

24        A.   Yes.

25        Q.   In the last full paragraph, if you
```