```
 1                    FRIEDMAN

 2     could read, "The board members next renewed

 3     their discussion," do you see that?

 4          A.    Yes, I do.

 5          Q.    Does that paragraph relate to what

 6     we were just discussing, the selection of an

 7     independent third party to review the debtors

 8     processes in the Chapter 11 organization

 9     proceeding?

10          A.    Yes.

11          Q.    And the last sentence of that

12     paragraph says, "The independent members of

13     the Board decided to hold a telephone

14     conference call amongst themselves to discuss

15     potential third-party candidates and the

16     selection process."

17          A.    Yes.

18          Q.    Is that what you were referring to

19     a moment ago when you said Mr. Crowley

20     wouldn't have a role with respect to the

21     selection or production of the independent

22     advisor or his role or the -- or putting

23     together a new plan?

24          A.    Well, this is the first step.  This

25     is that he would have no role in the
```

```
 1              FRIEDMAN
 2   selection of the independent party.  The idea
 3   was that in addition to having no role in the
 4   selection, he'd also have no role in the plan
 5   process going forward.
 6        Q.   And to your knowledge, did he have
 7   a role in the selection of the independent
 8   restructuring advisor?
 9        A.   I don't believe he did.
10        Q.   And to your knowledge, did he have
11   a role in the restructuring advisor's
12   preparation of his report?
13        A.   Well, he certainly was interviewed
14   by the restructuring advisor.
15        Q.   Beyond being interviewed by the
16   restructuring advisor.
17        A.   I don't believe he had any role.
18        Q.   Is it your understanding that he
19   had any role in the preparation of the second
20   plan, beyond being interviewed by the
21   restructuring advisor?
22        A.   I don't believe he had a role in
23   the operative terms of the plan.  I don't
24   know if he commented on it or not, but I
25   don't believe he had any role in the
```

```
 1                    FRIEDMAN

 2    operative terms.

 3         Q.    Did you have any discussions, again

 4    now in this December 2000, January 2000 [sic]

 5    time frame with Mr. Crowley regarding this

 6    topic?  That is the retention of an

 7    independent restructuring advisor.

 8              MR. BRESSLER:  I'll object to the

 9         form.  I assume you mean January 2001.

10              MR. SLAUGHTER:  Yes, I apologize.

11    Thank you.

12         A.    I'm sure I did.

13         Q.    Do you recall them?

14         A.    I only recall just conceptual

15    discussions.  I don't recall specific back

16    and forth.

17         Q.    Conceptually what do you recall?

18         A.    Conceptually I believe I discussed

19    with him the fact that based upon the judge's

20    ruling, it was essential that he excise

21    himself from -- from everything relating to

22    Coram other than the operation of the

23    business, that he had -- that he needed to be

24    disassociated from the reorganization plan

25    going forward, and in particular, anything to
```

```
                    FRIEDMAN
do with treatment of creditors or
shareholders.
     Q.    Did you have a discussion with him
about Cerberus at the time?
     A.    Not that I recall.
     Q.    You knew that he was continuing to
work for Cerberus with respect to non-Coram
matters though; correct?
     A.    I don't know for sure.  I don't
know.
     Q.    Okay.  Why would you set up a
procedure in which he's not involved in the
preparation of the second plan, if he
wasn't -- wasn't continuing to have a
consulting arrangement or relationship with
Cerberus going forward?
     A.    I think -- I think his historical
relationship with Cerberus was something the
court found to be meaningful, and in
particular because of the manner in which it
came to light, and my concern was not what he
did at Cerberus.  My certain was what he did
at Coram.  And I thought it was important
that at Coram he not have any further role in
```

```
 1                      FRIEDMAN
 2    the development or prosecution of a plan.
 3         Q.   Did you ever tell Mr. Crowley that
 4    he should resign completely from Cerberus in
 5    the December 2000, January 2001 time frame?
 6         A.   I don't think I ever told him he
 7    had to resign.
 8         Q.   Are you aware of anything that
 9    would have prevented the Coram board from
10    terminating Mr. Crowley in December 2000
11    after the first plan was denied?
12         A.   I'm not familiar with what his
13    contractual arrangements were on that issue.
14    At least I'm not now.
15         Q.   Okay.  But beyond any specific
16    contractual arrangements, are you aware of
17    anything that would have prevented the Coram
18    board from saying, "You're fired"?
19         A.   No.
20         Q.   Are you aware of anything that
21    would have prevented the Coram board from
22    saying, "stay on but make sure that you don't
23    do anything further with Cerberus"?
24         A.   In other words, could the board
25    have conditioned his continuing retention at
```

A1295

```
 1                      FRIEDMAN
 2    Coram on his no longer working for Cerberus?
 3         Q.    Yes.
 4         A.    I'm sure they could have made --
 5    made that demand.
 6         Q.    Do you know if they did?
 7         A.    I don't know.
 8         Q.    By this time, and by this time
 9    again I mean Judge Walrath has denied the
10    first plan, Mr. Crowley's relationship with
11    Cerberus is an obviously a well-known fact;
12    correct?
13         A.    Yes.
14         Q.    So who was hired as the independent
15    restructuring advisor?
16         A.    Harrison J. Golden.
17         Q.    Who, if you recall, came up with
18    the idea of hiring Mr. Golden?
19         A.    I don't -- I don't remember.  I
20    also don't know that -- I believe that others
21    were considered as well, but I don't recall
22    how he was considered in the first instance
23    or who considered hiring him.
24         Q.    Had you worked with Goldin on any
25    matters before Coram?
```

```
 1              FRIEDMAN
 2   appointment of Goldin in the debtors' cases.
 3   No members of the debtors' management were
 4   present at such a meeting."
 5              Is that trying to impart the
 6   information that the -- that the special
 7   committee, without the input of Mr. Crowley,
 8   was the entity that was retaining Mr. Goldin
 9   seeking his appointment?
10        A.   I think that's true.
11        Q.   And it was your view at the time
12   that if the court approved the retention of
13   an independent restructuring advisor such as
14   Mr. Goldin, and the Goldin report -- and
15   Goldin produced a report that found that
16   the -- that a plan or a plan should be
17   confirmed, and that this plan obviously, as
18   we've discussed, was not -- was prepared
19   without the input of Mr. Crowley, that that
20   would be sufficient to overcome the judge's
21   concerns with respect to Mr. Crowley's
22   involvement and get a plan confirmed for
23   Coram?
24              MR. BRESSLER:  I'll object to the
25        form.
```

```
 1              FRIEDMAN
 2         THE WITNESS:  Could you read back
 3    that question.
 4         MR. SLAUGHTER:  It wasn't the most
 5    artfully stated, but please read it
 6    back.
 7         (A portion of the record was read.)
 8         MR. NOVICK:  Also object to the
 9    form.
10    A.   If I can just answer it this way
11 and maybe this will suffice:  We had, we were
12 confronted with what in my experience was a
13 unique dilemma.  We had a CEO who by all
14 accounts was doing an excellent job running
15 the company, and so there was no one talking
16 about firing Crowley.
17         At the same time this CEO who was
18 doing such a good job running the company was
19 no longer with a mandate to lead the company
20 in its reorganization process, because of the
21 findings made by the bankruptcy court.  And
22 so what we hoped to accomplish was to retain
23 the benefits of Crowley as the operator,
24 while at the same time lose the taint of
25 Crowley as a plan sponsor and negotiator, and
```

```
 1                      FRIEDMAN
 2    Goldin would take over that role, and based
 3    upon his recommendations, we would then file
 4    a new plan that no longer had any input from
 5    Crowley.
 6         Q.   And this process that you just
 7    described in your previous answer was a
 8    process that you recommended that the special
 9    committee adopt in response to Judge
10    Walrath's order?
11         A.   I would say I endorsed it.  I don't
12    recall whether -- recommendation implies, at
13    least in my mind, some initiative that I may
14    or may not have taken, but I certainly
15    endorsed it.
16         Q.   Well, it wasn't -- it wasn't a plan
17    that was developed by Mr. Crowley, was it?
18         A.   Are you talking about the retention
19    of an independent restructuring advisor?
20         Q.   Yes, this idea that -- the response
21    to Judge Walrath's order and how you were
22    going to go about getting a second plan
23    approved.
24         A.   It was not something that
25    Mr. Crowley sponsored, no.  It was something
```

```
 1                        FRIEDMAN
 2    attend, but beyond that, I don't recall
 3    specific meetings.
 4              MR. SLAUGHTER:  Let's go off the
 5         record to change the tape.
 6              THE VIDEOGRAPHER:  This marks the
 7         end of videotape number 3, volume I, in
 8         the deposition of David Friedman.  Going
 9         off record.  The time is 11:44 a.m.
10              (A brief recess was taken.)
11              THE VIDEOGRAPHER:  This marks the
12         beginning of tape number 4, volume I, in
13         the deposition of David Friedman.  The
14         time is 11:53 a.m.
15              Please continue.
16         Q.   Mr. Goldin was labeled as the,
17    quote, independent, close quote,
18    restructuring advisor.  In your experience in
19    the process, did he -- was he in fact an
20    independent restructuring advisor?  Did he
21    act independently?
22         A.   Yes, absolutely.
23         Q.   Was one -- do you recall whether or
24    not when he distributed his draft plan,
25    whether he, having been hired by the special
```

```
 1                      FRIEDMAN

 2   committee, gave the special committee a first

 3   look at it or whether he distributed it to

 4   all interested parties at the same time?

 5            MR. NOVICK:   Object to the form.

 6        A.   My recollection is that he

 7   distributed it to everybody at the same time.

 8        Q.   And was it your recollection that

 9   Mr. Crowley did not participate in the

10   special committee's deliberations about how

11   to respond, if at all, to the draft report?

12        A.   That's correct.

13        Q.   Do you recall meeting with the

14   special committee to discuss the draft Goldin

15   report?

16        A.   I would think I did, but I don't

17   recall.

18        Q.   Do you recall whether or not the

19   special committee, whether you and -- strike

20   that.

21            Let's start with a good question.

22            Do you recall whether the special

23   committee had any comments on the draft

24   Goldin report?

25        A.   No.
```

```
1                      FRIEDMAN
2        Q.   Do you recall whether you had any
3   comments on the -- you or your firm had any
4   comments on the draft Goldin report?
5        A.   No.
6        Q.   Do you recall whether the special
7   committee adopted the recommendations of the
8   Goldin report?
9        A.   I believe it did.
10           MR. SLAUGHTER:  I direct your
11       attention again, counsel, in the board
12       minutes pile that you have in front of
13       you to the July 12, 2001 board minutes.
14           Exhibit 11.
15           MR. NOVICK:  July 12th.
16           MR. SLAUGHTER:  July 12, 2001.
17           (Exhibit Friedman-11, Draft Minutes
18       of a Meeting of the Board of Directors
19       of Coram Healthcare Corporation,
20       July 12, 2001, marked for
21       identification, this date.)
22       Q.   Exhibit 11 says, "Minutes of the
23   Meeting of the Board of Directors of Coram
24   Healthcare Corporation, July 12, 2001."  It's
25   labeled "Draft" on it, but I will represent
```

```
 1                    FRIEDMAN

 2    to you that this was produced to us recently

 3    by the trustee and is the only copy we have,

 4    so I don't know if there was a further

 5    version.

 6              And it indicates here that you were

 7    present at that meeting, Mr. Friedman?

 8        A.    Yes.

 9        Q.    And just leafing through it, it

10    appears to be that the principal discussion

11    at that meeting was the Goldin Associates

12    report?

13        A.    Yes.

14        Q.    On page 1, in that -- under the

15    Goldin Associates heading, there's a

16    paragraph that says, "Mr. Friedman advised on

17    the exclusivity period within which the

18    Company and Coram, Inc., collectively the

19    debtors, could file an amended plan of

20    reorganization with the bankruptcy court.

21    Mr. Friedman discussed and advised on the

22    duties of the directors stating that he was

23    seeking input from the independent board

24    meetings as the special committee."

25              Do you see that?
```

```
 1                    FRIEDMAN

 2         A.    Yes.

 3         Q.    Do you recall that discussion?

 4         A.    I don't recall the specifics of the

 5    discussion, but I do recall that it took

 6    place.

 7         Q.    Do you recall if not the specifics,

 8    the general substance?

 9         A.    I think so, yes.

10         Q.    What do you recall about the

11    general substance of that discussion?

12         A.    I think the general substance of

13    the discussion was that the independent

14    directors should -- needed to take direction,

15    needed to -- not take direction -- needed to

16    provide direction with respect to what the

17    company should be doing going forward with

18    respect to a plan, that they had the work

19    product of Goldin Associates before them, and

20    that based upon that and without including

21    Crowley in the discussion, they should

22    determine where the company goes in terms of

23    its ongoing reorganization efforts.

24         Q.    I think you put in right there one

25    of my follow-up questions was going to be:
```

```
 1                    FRIEDMAN
 2   Was -- when you are talking about the
 3   independent board members of the special
 4   committee, those are the board members
 5   excluding Mr. Crowley?
 6        A.    Correct.
 7        Q.    Do you recall getting direction
 8   from the special committee in response to
 9   that request?
10        A.    I recall receiving direction to
11   proceed with a plan that embodied the
12   recommendations of Goldin.
13        Q.    Is that what you did?
14        A.    Yes.
15        Q.    One of the recommendations the
16   Goldin report made was that Mr. Crowley's
17   bonus compensation be reduced.  Do you recall
18   that?
19        A.    Yes.
20        Q.    Do you recall what Mr. Crowley's
21   opinion was in that regard?
22        A.    I think that Mr. Crowley was
23   invited to respond to the board about that
24   recommendation, and I believe his response
25   was that he didn't think it was appropriate,
```

```
                         FRIEDMAN
 1
 2     position now to -- to comment on the
 3     existence or quality of evidence.
 4          Q.   Was it -- you say that you were a
 5     scribe or a conduit to the special committee
 6     in this instance, do you recall if you made
 7     recommendations to the special committee
 8     about corrections they may want to suggest to
 9     Goldin Associates with respect to the draft
10     report?
11          A.   I don't recall -- I don't recall
12     having a particular interest in these
13     comments.  I think these are comments that,
14     you know, generally are of a business nature,
15     and I don't know that I have much of a role,
16     but again, I really don't recall.
17          Q.   I think you testified that in
18     response to the direction from the special
19     committee, you prepared a second plan and
20     disclosure statement?
21          A.   Yes.
22          Q.   And that that second plan and
23     disclosure statement largely adopted the
24     recommendations of the Goldin report?
25          A.   Yes.
```

```
 1                    FRIEDMAN
 2   regard was based on your knowledge of the
 3   facts as you knew them at the time?
 4       A.   Yeah, it was based -- it was based
 5   almost entirely on my understanding that it
 6   was, as I understood it, it was a fair
 7   process by which the company was sold, this
 8   entity was sold, and it was sold at arm's
 9   length.
10       Q.   Were you aware that the, at the
11   time or were you aware at any time, either
12   this time, the time of your interview --
13   strike that.
14            Were you aware at any time that the
15   sale of CPS was begun prior to Mr. Crowley's
16   tenure as the CEO?
17       A.   I think I knew it at the time,
18   because I think we made a point of that in
19   court.
20       Q.   Were you aware at the time that the
21   sale of CPS was approved by the full Coram
22   board?
23       A.   I think I was aware of that, yes.
24       Q.   The next bullet point says,
25   "paydown of debt -- no damages."  Do you know
```

```
 1                    FRIEDMAN
 2   what that refers to?
 3        A.   I recall vaguely that prior to the
 4   bankruptcy Coram had paid down either,
 5   certainly they had paid down some principle
 6   and I believe they paid down some interest on
 7   the debt owed to Cerberus, Goldman and
 8   Foothill.
 9        Q.   Okay.
10        A.   And I didn't think that that caused
11   the company any damages, because the only
12   damages that it could have caused would have
13   been relating to liquidity, and I didn't
14   think the company, as I understood it, had
15   any liquidity issues.  In fact this is one of
16   the few companies that I've been involved
17   with that did not require
18   debtor-in-possession financing during the
19   course of the bankruptcy.
20        Q.   Indicating that it had sufficient
21   cash flows to cover its operations?
22        A.   Correct.
23        Q.   Next bullet point says, "There was
24   never any suggestion at any board meeting,"
25   paren, including privileged D, apostrophe,
```

202

```
 1

 2                    C E R T I F I C A T E

 3     STATE OF NEW YORK    )
                            : ss.
 4     COUNTY OF NEW YORK   )

 5          I, JENNIFER OCAMPO-GUZMAN, a

 6     Shorthand Reporter and Notary Public within

 7     and for the State of New York, do hereby

 8     certify:

 9          That DAVID M. FRIEDMAN, the witness

10     whose deposition is hereinbefore set forth,

11     was solemnly, sincerely affirmed and that

12     such deposition is a true record of the

13     testimony of such witness.

14          I further certify that I am not

15     related to any of the parties to this action

16     by blood or marriage, and that I am in no way

17     interested in the outcome of this matter.

18          IN WITNESS WHEREOF, I have hereunto

19     set my hand this 16th day of March 2007.

20

21

22          _____

23                JENNIFER OCAMPO-GUZMAN

24

25
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

# Certified Copy

ARLIN M. ADAMS, Chapter 11          )

Trustee of the Post-Confirmation    )

Bankruptcy of Estates of Coram      )

Healthcare, and of CORAM, INC.,     )

a Delaware corporation,             )

                   Plaintiff,       )

             vs.                    )   Case No. 04-1565

DANIEL D. CROWLEY; DONALD J.        )

AMARAL; WILLIAM J. CASEY; L.        )

PETER SMITH; and SANDRA L. SMOLEY,) Volume I

                   Defendants.      )


        The videotaped deposition of RICHARD F. LEVY,

called by the defendants for examination, taken

pursuant to notice, agreement and under the Rules of

Civil Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Richard H. Dagdigian, CSR No.084-000035, a notary

public within and for the County of Cook, State of

Illinois, and a Certified Shorthand Reporter of said

1    point.

2         Q    Had you represented Mr. Zell as -- or any

3    entity in which he had an economic interest prior to

4    the summer of 2000?

5         A    I don't believe so.

6         Q    Had you -- withdrawn.

7              Have you ever represented the economic

8    interests of either Mr. Weinstein or Mr. Zell in

9    bankruptcy litigation other than Coram?

10        A    Who is the "you" in your question.  If it

11   includes Jenner & Block, my answer is I just don't

12   know.

13             So help me with the question.

14        Q    Well, let's start with you, Richard Levy.

15        A    Okay.

16        Q    Have you ever represented the interests of

17   either Mr. Zell or Mr. Weinstein in bankruptcy

18   litigation other than Coram?

19        A    You know, I'm going to say I don't think

20   so.  I certainly can't recall one.

21             I've represented a lot of people over 52

22   years, and it's possible that my answer is wrong.

23        Q    I would like to direct your attention to

24   the year 2000.  Did there come a time that you heard

1    of a company called Coram Healthcare?

2         A    Yes.

3         Q    When was it that you first heard of a

4    company called Coram Healthcare?

5         A    I'm going to say sometime in the late

6    spring.

7         Q    How did you first come to hear of Coram

8    Healthcare?

9         A    Will Weinstein called me.

10        Q    What did you say to him and what did he say

11   to you?

12        A    Well --

13        MR. TOMASHEFSKY:    I'm going to caution you,

14   Mr. Levy, not to reveal anything that would be

15   covered by the attorney-client privilege.

16        A    He said have you ever heard of a company

17   called Coram.   I said no.

18     BY MR. PETERS:

19        Q    What else did he say?

20        MR. TOMASHEFSKY:    Same caution.

21        A    I need to consult my attorney on this

22   issue, not on factual issues, but on the privilege

23   issue.

24        MR. PETERS:    I won't try to stop you, and I

1    about Coram?

2         A    I just can't approximate it.  Sam Zell and

3    I talk a lot about a lot of things, many of them

4    having nothing to do with the practice of law.

5              Certainly not nearly as often as I spoke to

6    Will or any member of the Equity Committee, or Mr.

7    Bressler, for that matter, about the Coram matter.

8         Q.   At the time that you had your conversation

9    in July of 2000 with Mr. Zell which related to Coram,

10   did you understand that he had an economic interest

11   in Coram?

12        A    Yes.  An economic interest, yes.

13        Q    Showing you what's been marked as Levy

14   Exhibit 3, which is a letter dated June 1st of 2000

15   from you to Dan Crowley, do you recognize that?

16                   (Levy Deposition Exhibit

17                    No. 3 was marked as

18                    requested.)

19        A    I certainly recognize my signature.

20     BY MR. PETERS:

21        Q    Do you recognize that to be a letter from

22   you to Dan Crowley dated June 1st, 2000?

23        MR. TOMASHEFSKY:    give me a moment to read it,

24   please.

1        A    Yes.

2      BY MR. PETERS:

3        Q    At the time you wrote this, had you ever

4    met Richard Haydon?

5        A    I don't believe so, though I can't be

6    certain.

7        Q    At the time you spoke -- at the time you

8    wrote this letter, had you ever spoken to Richard

9    Haydon?

10        A    Yes.

11        Q    When was the first time you spoke to

12    Richard Haydon?

13        A    Sometime between my initial conversation

14    with Weinstein and the date of this letter.  And I

15    can't do better than that.

16        Q    Okay.  Had you ever spoken to Richard

17    Haydon prior -- before your second conversation with

18    Will Weinstein?

19        A    I don't know.

20        Q    Was there a reason that you wrote this

21    letter on behalf of Mr. Haydon rather than Mr.

22    Weinstein?

23        A    I don't know.

24        Q    Was Mr. Weinstein also your client at the

Levy, Richard F.                                    3/22/2007

```
1    the SEC web site of a Rule 13-D filing denominated as

2    Amendment Number One.

3              The cover page is dated July 25th, 2000,

4    but the signature page appears to be dated two days

5    later.

6         Q    Okay.  Do you recognize Levy 7 as a Form

7    13-D that you caused to be filed with the SEC on or

8    about July 27th of 2000?

9         A    Yes --

10        MR. TOMASHEFSKY:   I object to the form of the

11   question.

12        A    Yes.

13    BY MR. PETERS:

14        Q    And I represent to you that I -- withdrawn.

15             Is this the second 13-D that you filed in

16   connection with Coram?

17        A    I can only say I suppose so because it's

18   called Amendment Number One.  But I have no

19   independent recollection.

20        Q    I'm going to represent to you that there

21   was an original 13-D filing on July 17th of 2000, and

22   then a subsequent amended filing on July 27th of

23   2000.  And this is the amended filing from July 27th.

24        A    Okay.
```

Levy, Richard F.                                      3/22/2007

```
 1        Q   I didn't want to mark both of them because

 2   I didn't feel it was necessary.

 3            Is that agreeable to you, sir?

 4        A   I will accept your representation.

 5        Q   Okay.  As of July 27th of 2000, were you

 6   representing the list of persons and entities on page

 7   one which appear alongside the words "Group Members"?

 8        MR. TOMASHEFSKY:   You mean on the very first

 9   page?

10        MR. PETERS:   Right.

11        A   Okay.  The very first page is -- what is

12   it?  It's a -- an SEC form, and my answer is yes.

13      BY MR. PETERS:

14        Q   How did you come to represent all of the

15   persons and entities listed here in connection with

16   Coram as of July of 2000?

17        MR. TOMASHEFSKY:   I object to the form of the

18   question.

19        A   At some point, I was advised that there

20   were a number of people who were owners of the common

21   equity of Coram Healthcare, Inc. who wished to be

22   represented for the reasons that I think are set

23   forth in some detail in this form.

24            I was aware that the securities law
```

1    requires when people owning -- and I think this is

2    right -- more than five percent of the outstanding

3    securities joined together for a common purpose, it's

4    necessary in effect to give public notice of that by

5    filing a 13-D and amending it from time to time to

6    reflect any changes in either purpose or membership.

7         And that's how I came to represent these

8    people -- how Altheimer and I came to represent these

9    people.

10        Q    Were several of the entities that were --

11   and persons that were a member of this group

12   associated with Will Weinstein?

13        A    I don't know what "associated" means.

14        Q    Was Will Weinstein a member of the group?

15        A    Yes.

16        Q    Was the Will Weinstein Revocable Trust a

17   member of the group?

18        A    Well, everybody on the list on page one was

19   a member of the group.

20        Q    Okay.  Was Samstock LLC an entity in which

21   Sam Zell and his family members had an economic

22   interest?

23        A    So I understand.

24        Q    Did you so understand at the time?

Levy, Richard F.                                          3/22/2007

```
 1        A    I don't recall.  Probably.
 2        Q    Is the Ann Lurie and Robert Lurie Family
 3   Foundation an entity that you understood at the time
 4   was -- has assets were managed in part by Will
 5   Weinstein?
 6        A    I don't know what "managed" means and, no,
 7   I -- the answer is, using your word, no.
 8        Q    Did you understand that Mr. Weinstein in
 9   2000 had any advising role with respect to the assets
10   of the Robert and Ann Lurie Family Foundation?
11        A    I think he did.
12        Q    Did you understand in 2000 that Michiko
13   Baldridge was an assistant to Will Weinstein in his
14   office?
15        A    Yes.  Yes.
16        Q    Did you understand in 2000 that Bernard
17   Osher and the Osher Trust were clients of Mr.
18   Weinstein?
19        A    I don't presently recall.  I wouldn't doubt
20   it.
21        Q    Is it a fair statement that Mr. Weinstein
22   put together this group?
23        A    It's a fair statement that Mr. Weinstein
24   referred everyone on this group to me or to someone
```

1   else at Altheimer & Gray for the purposes of

2   complying with the securities law, yes.

3        Q   Was Mr. Weinstein paying you to do this, or

4   was someone else paying you to do this?

5        A   I can give you a recollection that I think

6   is correct, and that is that nobody was paying me at

7   the time.

8            But I think -- and I'm not certain -- that

9   after Altheimer & Gray and I were appointed by the

10  Bankruptcy Court as counsel to the Equity Committee,

11  that we were permitted to file a fee application

12  which retrospectively included work that had been

13  done pre filing, and I think that that's how we were

14  paid.

15           And I've said, I think, in recollection,

16  because I am not positive that that's the case.  It

17  was, as I pointed out, seven years ago, and that's my

18  recollection.

19       Q   Well, at the time you filed this 13-D, did

20  you contemplate subsequently seeking the payment of

21  your fees from the Coram bankruptcy estate?

22       A   I don't know.  Probably not.  I didn't know

23  that there was going to be a bankruptcy.

24           As a matter of fact, I very much didn't

Levy, Richard F.                                              3/22/2007

```
 1            MR. TOMASHEFSKY:   You can answer that

 2    yes or no.

 3            A    Not that I recall.

 4       BY MR. PETERS:

 5            Q    Did you ever have any such discussions

 6    with Don Liebentritt?

 7            MR. TOMASHEFSKY:   Again, I caution you to

 8    answer that question yes or no if you have a

 9    recollection.

10            A    I have no recollection.

11       BY MR. PETERS:

12            Q    As of August 9th of 2000, you were aware,

13    were you not, that if the Coram bankruptcy plan that

14    had been proposed was confirmed, Coram stock would be

15    worth nothing?

16            A    Well, as they say, asked and answered.

17    Yes.

18            Q    Were you also aware that the only way a

19    person could hope to make money purchasing Coram

20    stock on August 9th of 2000 was if the bankruptcy

21    plan were defeated?

22            MR. BRESSLER:   I object to the form.  You can

23    answer.

24            A    I hate to say only, but that's probably --
```

1   if the opposite of defeated is -- if it was -- sure,

2   yes, I was aware.

3      BY MR. PETERS:

4      Q   And it was your job on August 9th of 2000

5   to defeat the Coram bankruptcy --

6      A   That is wrong -- that is wrong and it's

7   offensive.

8          My job was to inquire and see what the

9   facts were and what the laws were as a fiduciary

10  appointed ultimately by the Court for the benefit of

11  the shareholders.

12     Q   Did you understand that Samstock's

13  purchases of stock in August of 2000 was a bet on the

14  ability of -- on your ability to defeat the Coram

15  bankruptcy?

16     MR. TOMASHEFSKY:   I object to the form of

17  the question.

18     A   My answer is no.

19     BY MR. PETERS:

20     Q   Did you ever give any members of the 13-D

21  Group instructions to stop buying Coram stock?

22     MR. TOMASHEFSKY:   Again, I think I have to

23  instruct you to answer -- not to answer that on the

24  grounds of privilege if it's an instruction you gave