1        A    Yes.

2        Q    And the first page of the exhibit is a

3   cover page, a fax cover page?

4        A    Yes.

5        Q    And copies of this pleading were sent to

6   Will Weinstein, and he was an advisor to the Equity

7   Committee?

8        A    Yes.

9        Q    And then Haydon, Liebentritt and Slezak are

10  representatives of members of the Executive

11  Committee?

12       A    Yes.

13       Q    And who is Bill Pate?

14       MR. BRESSLER:    I object to the form.  I think

15  you mean Equity Committee.

16    BY MR. PETERS:

17       Q    Oh, I'm sorry, I mean Equity Committee.

18       A    Bill Pate is -- I'm fairly sure was then --

19  if I had to give him a title, it would be chief

20  investment officer for Sam Zell's -- his family's

21  interests.

22       Q    And then there is a person named Stephanie

23  Stern?

24       A    A public relations person.

```
 1    STATE OF ILLINOIS )
                        ) SS:
 2    COUNTY OF C O O K )

 3

 4          I, RICHARD H. DAGDIGIAN, Illinois CSR No.

 5    084-000035, Registered Professional Reporter and

 6    Notary Public in and for the County of Cook, State of

 7    Illinois, do hereby certify that previous to the

 8    commencement of the examination, said witness was

 9    duly sworn by me to testify the truth; that the said

10    deposition was taken at the time and place aforesaid;

11    that the testimony given by said witness was reduced

12    to writing by means of shorthand and thereafter

13    transcribed into typewritten form; and that the

14    foregoing is a true, correct, and complete transcript

15    of my shorthand notes so taken as aforesaid.

16          I further certify that there were present at

17    the taking of the said deposition the persons and

18    parties as indicated on the appearance page made a

19    part of this deposition.

20          I further certify that I am not counsel for

21    nor in any way related to any of the parties to this

22    suite, nor am I in any way interested in the outcome

23    thereof.

24
```

1        I further certify that this certificate

2    applies to the original signed IN BLUE and certified

3    transcripts only.    I assume no responsibility for

4    the accuracy of any reproduced copies not made under

5    my control or direction.

6

7        IN TESTIMONY WHEREOF, I have hereunto set

8    my hand and affixed my notarial seal this _4th_ day of

9    _April_____, 2007.

10

11

12      _____

13      Richard H. Dagdigian, CSR, RMR, CRR

14

15  My Commission expires

16  May 1, 2007.

**OFFICIAL SEAL**
**RICHARD H DAGDIGIAN**
**NOTARY PUBLIC - STATE OF ILLINOIS**
**MY COMMISSION EXPIRES: 05-01-07**

17

18

19

20

21

22

23

24

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

Certified Copy

- - -

ARLIN M. ADAMS, Chapter 11      :
Trustee of the                  :
Post-Confirmation Bankruptcy    :
Estates of CORAM HEALTHCARE     :
CORPORATION, a Delaware         :
Corporation and of CORAM,       :
INC., a Delaware Corporation,   :
        Plaintiff        : CASE NO.
       vs.              : 04-1565
                  :
DANIEL D. CROWLEY; DONALD J.     :
AMARAL; WILLIAM J. CASEY;        :
L. PETER SMITH; AND SANDRA L.   :
SMOLEY,                          :
       Defendants        :

- - -

Monday, March 26, 2007
9:46 a.m.

- - -

      Videotaped deposition of
CHRISTINA MORRISON, held at the law
offices of Ballard Spahr Andrews &
Ingersoll, LLP, 1735 Market Street, 51st
Floor, Philadelphia, Pennsylvania, 19103,
pursuant to notice before Cynthia A.
Whyte, Registered Professional Reporter
and Notary Public.

- - -

1    Q.   Do you remember who you interacted

2    with at Coram?

3    A.   No; I was sort of in the bowels

4    working on most of the financial pieces of the

5    transaction.  That was the first time I heard

6    of the company.

7    Q.   Did you come to be involved with

8    Coram in roughly 1999?

9    A.   Yeah, I think that was around the

10   time.  We got a call.  I believe it was Rick

11   Smith called in to one of my co-heads who knew

12   him from that original transaction and said,

13   "We have an opportunity.  Bring a team out.

14   We would like to talk to you about it."

15   Q.   And what did you know about Coram at

16   the time?

17   A.   Just what was publicly available.  I

18   knew very little about it.  And, as I recall,

19   we had a pretty short period of time from when

20   we got the call to when we decided to go out

21   there, so there wasn't a lot of time to learn

22   much about it.

23   Q.   And did you travel to Denver to meet

24   with Coram?

25   A.   Yes.

1      Q.    So it was Rick Smith and Wendy

2  Simpson who engaged you to sell the CPS unit?

3      A.    Correct.

4      Q.    How did you -- what did -- strike

5  that.

6            What did you understand to be your

7  responsibilities in serving as the investment

8  bank for the sale of CPS?

9      A.    It was to prepare a document and go

10  out to the market and determine what options

11  they had in terms of selling the business and,

12  to the extent that was acceptable, to then try

13  to get a negotiation -- or to negotiate to get

14  a transaction done.

15     Q.    Let's look at section 1 (b) of this

16  letter.  It says, "Deutsche Bank will assist

17  client in identifying and evaluating

18  candidates for a potential transaction."

19     A.    Right.

20     Q.    So did you understand your role to

21  include --

22     A.    Identifying candidates, correct.

23     Q.    And also evaluating whether or not

24  they would be suitable --

25     A.    Correct.

A1324.02

1   transaction.  So I don't remember who called

2   whom, but it was just calls.

3       Q.   Was it your understanding when you

4   first spoke to Dan Crowley that he was the new

5   CEO of Coram?

6       A.   Initially I didn't really know who

7   he was, what his official role was.  Rick

8   was -- had gone and Dan was there and nobody

9   officially told us that one was out and one

10  was in.  I figured that out eventually, but...

11      Q.   About how long is it --

12  approximately how long had you been working on

13  this deal before you first spoke to Dan

14  Crowley?

15      A.   I don't recall when I first talked

16  to him.

17      Q.   The process of -- was the process of

18  due diligence ongoing when you first spoke to

19  Dan Crowley?

20      A.   Yes.

21      Q.   Was the process of the auction --

22  strike that.

23           Was the auction process ongoing when

24  you first spoke to Dan Crowley?

25      A.   It was.  I don't remember what point

Morrison, Christina                                3/26/2007
CONFIDENTIAL

1  of the process it was, but we had already

2  undergone part of the process because I do

3  recall bringing him up to speed as to where we

4  were, but I don't recall where we were at that

5  point in the process.

6      Q.    Did Dan Crowley change your marching

7  orders or the nature of the scope of your

8  engagement when he -- when you first spoke to

9  him?

10     A.    No.

11     Q.    At any point did Dan Crowley alter

12 what you understood to be your job, your role?

13     A.    The engagement letter was never

14 amended or changed.

15     Q.    What were your perceptions of Dan

16 Crowley from the interactions that you had

17 with him?

18         MR. KIPNES:  Object to the form

19     of the question.

20     A.    Didn't have a lot of conversation

21 with him other than he was just asking about

22 the business and the process, where we were.

23 Beyond that I didn't have a lot of

24 conversations with him.  It was just really

25 very focused.  He would get on the phone, ask

1    some questions.  I would give him the answers

2    and the phone call would be over.

3        Q.    Did you have an understanding of

4    whether Dan Crowley was trying to maximize the

5    value of the sale to Coram?

6        A.    I'm not sure how to answer that.

7    Did I have an understanding?

8        Q.    Did you understand that Dan Crowley

9    wanted to sell the CPS unit for as much as he

10   could sell it for?

11       A.    We -- towards the end of the process

12   we brought forth a handful of specific offers

13   at the very end.  I don't remember how many

14   there were.  And he didn't like any of them.

15   And so he said, "Stop the process."

16       Q.    Why didn't he like them in your

17   understanding?

18       A.    He said they weren't enough, and so

19   he stopped the process.  And we were basically

20   suspended for some period of time.  I think it

21   was up to a month, I don't recall

22   specifically, where we just didn't do anything

23   and went back to those parties and told them

24   that the process was completed, you know, was

25   done at that point.

1    Q.    And your understanding was that the

2    reason Deutsche Bank's activities were

3    suspended was because the bids that had come

4    back were not high enough?

5    A.    He didn't like any of them.

6    Q.    Did he communicate to you what it

7    was he didn't like about them?

8    A.    He didn't like the level of them.

9    He thought they were too low.

10    Q.    They were too low?

11    A.    (Witness shakes head in the

12    affirmative.)

13    Q.    The price?

14    A.    Correct, the price.

15    Q.    So there came a time -- is it

16    correct that there came a time where bids had

17    come back and Dan believed, Dan Crowley

18    believed, that those bids were not

19    sufficiently high to warrant the sale of CPS?

20    A.    Correct.

21    Q.    Can you describe the process of

22    collecting information that Deutsche Bank went

23    through when it was engaged to sell CPS?

24    A.    Which information?

25    Q.    Let me ask it again.

1          What sort of information did

2    Deutsche Bank collect from the CPS unit after

3    it was engaged?

4          A.    We gave them a fairly standard

5    request list that would typically include

6    historical financials, performance of budget

7    versus actual, any business plans they might

8    have had, information about that management

9    team.

10             There is a fairly standard request

11   list that we were looking for so that we could

12   ultimately draft the confidential memorandum

13   that we needed to pull together.

14                  MR. BRAUNIG:  Can we mark this

15        exhibit, please.

16                  (Morrison Exhibit 5 was marked

17        for identification.)

18        Q.    Do you recognize this --

19        A.    Yes.

20        Q.    -- document?

21        A.    Yes.

22        Q.    What is this document?

23        A.    This is the information request list

24   that we sent to the CPS division.

25        Q.    So all of the things that are listed

1    I did not undertake a valuation analysis.

2        Q.    Did you have any communications with

3    Dan Crowley or the board about potential price

4    at that point in time?

5        A.    I don't recall any specific

6    conversations.

7                MR. BRAUNIG:  Let's take a

8        five-minute break.

9                THE WITNESS:  Okay.

10               VIDEO TECHNICIAN:  We are now

11       off the record at 10:51.

12               (Short recess.)

13               VIDEO TECHNICIAN:  We are now

14       on the record at 11:01.

15               MR. BRAUNIG:  Can we mark this

16       next exhibit, please?

17               (Morrison Exhibit 6 was marked

18       for identification.)

19   BY MR. BRAUNIG:

20       Q.    Miss Morrison, do you recognize this

21   document?

22       A.    Yes.

23       Q.    I'm sorry.  This is Morrison 6.

24             And what is this document?

25       A.    This was the offering memorandum

1   that we pulled together for the CPS sale.

2       Q.    What's the purpose of an offering

3   memorandum?

4       A.    It's to tell potential buyers about

5   the business and to provide them typically

6   confidential information about the company to

7   help them determine if they are interested in

8   placing a bid and to give them some sense as

9   to the financial status.  They can prepare

10  their response to the bid request.

11      Q.    And so the goal is to give them

12  enough information that they could then return

13  to the company or the investment bank with a

14  potential bid range in which they would -- is

15  that where it fits into the -- strike that.

16  I'll rephrase.

17            At what stage of the process is an

18  offering memorandum prepared?

19      A.    It's prepared at the beginning of

20  the process and it's typically sent to

21  potential buyers who have signed a

22  confidentiality agreement and have expressed

23  an interest in learning more about the

24  business.

25      Q.    Were you prepared in the

```
 1        A.    What's the question?  Sorry.

 2              MR. BRAUNIG:  Could we read the

 3        question back, please?

 4              (The court reporter read the

 5        record as requested.)

 6              MR. KIPNES:  Same objection.

 7        A.    I can't answer that.

 8        Q.    In the auction process after the

 9   offering memorandum was created, what did

10   Deutsche Bank do to share this with potential

11   acquirers?

12        A.    We had a list of potential acquirers

13   that we had either contacted or had contacted

14   us, and a number of them were asked to sign

15   confidentiality agreements.  If they signed a

16   confidentiality agreement -- before we

17   actually sent out the confidentiality

18   agreements, there was a discussion, I don't

19   remember if it was specifically with the board

20   or with management, but there would have been

21   discussions that narrowed the list to say

22   these are the parties that we are going to

23   give the confidentiality agreements to to

24   ensure that everybody was in agreement with

25   that list and then send the CAs out.
```

1    had provided bids for the CPS unit, is it

2    correct that none of those companies believed

3    the CPS unit was worth more than $50 million?

4         MR. KIPNES:  Object to the form

5      of the question.  Lacks foundation.

6      Q.   So after seven different companies

7    had provided bids for the CPS unit, is it

8    correct that none of those companies stated

9    that CPS was worth more than $50 million?

10         MR. KIPNES:  Object to the form

11      of the question.  Lacks foundation.

12      A.   Yes.

13      Q.   Were all of the bids received for

14    the CPS unit between 10 and $50 million?

15      A.   Yes.

16      Q.   Does anything in the bid letters

17    provided -- strike that.

18         Did anything in the bid letters sent

19    to you indicate that CPS was worth $100

20    million?

21         MR. KIPNES:  Object to the form

22      of the question.

23      A.   No.

24      Q.   All of these companies -- did all of

25    these companies have the same information in

1    front of them?

2        A.    They would have all had the

3    confidential memorandum sent by us, correct.

4        Q.    Did you, from the list of seven

5    companies who submitted bid letters, select

6    four who would be allowed to perform due

7    diligence?

8        A.    I don't recall the specific number,

9    but from that list the list that could come in

10   to perform diligence was selected.

11       Q.    How did you select which four

12   companies would be allowed to perform due

13   diligence?

14       A.    We -- at this point we would have

15   gone back to Coram, presented the bid letters,

16   and talked about the next-step process to

17   determine who should go in and how many people

18   would go back in to conduct more detailed

19   diligence to actually meet with the company.

20       Q.    Did you coordinate the due diligence

21   process for those companies with Coram?

22       A.    Yes.

23       Q.    Did you serve as the interface

24   between them?

25       A.    Yes.

1              MR. BRAUNIG:  Let's mark this

2       next exhibit Morrison 9.

3              (Morrison Exhibit 9 was marked

4       for identification.)

5       Q.    Is this a document that you

6    recognize?

7       A.    No.

8       Q.    This document has the title "buyer

9    due diligence questions 1-31-00.doc."  It was

10   produced by Deutsche Bank.

11             Do you have any reason to believe

12   this is a document that was prepared by

13   Deutsche Bank?

14      A.    We typically would use this format

15   to track deals, track diligence and questions

16   in deals.

17      Q.    Would someone on your -- is it

18   likely that someone on your team created this

19   document to assist with the due diligence

20   process for CPS?

21      A.    Yes.

22      Q.    Looking at the questions that run

23   down the first column -- and this is starting

24   on Page DBSI 000657 -- does this appear to

25   indicate questions or issues raised by parties

```
 1    that were performing due diligence on CPS?

 2        A.   Yes.

 3        Q.   And the companies in the requested

 4    by column, CVS, Bain, Priority, and then there

 5    is sort of an all parties, does that indicate

 6    to you that at least those three companies,

 7    CVS, Bain and Priority, were at the time

 8    performing due diligence on CPS?

 9        A.   Yes.

10        Q.   Is the due diligence performed by

11    companies at this stage of an acquisition

12    similar to the due diligence performed by

13    Deutsche Bank prior to issuing of the

14    confidential offering memorandum?

15             MR. KIPNES:   Object to the form

16        of the question.

17        A.   I'm sorry.   Could you rephrase that

18    or repeat that?

19        Q.   Is the due diligence performed by

20    companies at this stage of an acquisition

21    similar to the due diligence performed by

22    Deutsche Bank prior to issuing a confidential

23    offering memorandum?

24        A.   Typically companies will go into a

25    lot more detail than we might have at that
```

1    point in time because this is their business,

2    so they would have a lot more detailed

3    questions than we would have come up with.

4         Q.    So they were -- their due diligence

5    is a very detailed, very specific form of due

6    diligence?

7              MR. KIPNES:   Object to the form

8         of the question.

9         A.    Companies typically will go into

10   more detail than I would have in this process.

11        Q.    During this process were you making

12   regular presentations to Coram's board of

13   directors?

14        A.    I would periodically be asked to

15   call into a board meeting to provide an

16   update.

17        Q.    And you did that by phone?

18        A.    Yes.

19              MR. BRAUNIG:   Can we mark this

20        Exhibit Morrison 10, please.

21              (Morrison Exhibit 10 was marked

22        for identification.)

23        Q.    These are minutes of the Coram board

24   of directors, telephonic meeting of the board

25   of directors of Coram Healthcare Corporation.

Morrison, Christina                                           3/26/2007
CONFIDENTIAL

```
 1              On Page 2 of this document, also

 2    labeled Bates-stamped COR-EQTY 0014712, there

 3    is a section that reads "CPS Auction Update."

 4              Do you recall having a conversation

 5    with the board of directors around this time,

 6    around February 10, 2000?

 7         A.   Not that specific date, but, yes, I

 8    had conversations, several of them, during

 9    2000.

10         Q.   And was your understanding during

11    this process -- strike that.

12              Was your understanding in February

13    2000 that Coram was going to wait and see what

14    sort of bids were received before deciding

15    whether to sell CPS?

16              MR. GAMBINO:   Objection.

17              You can answer.

18         A.   We didn't talk specifically about

19    that, about what they might or might not do.

20    I was just moving forward on the sale of the

21    business and bringing things forward.   That

22    was what my job was.

23         Q.   Do you recall if any bids were

24    received by Coram for the CPS unit?

25         A.   Received by Coram?
```

A1337

1      Q.    Did any companies bid on CPS?

2            I'll rephrase that.

3            Following the due diligence that was

4      performed by at least Bain, CVS and ProCare,

5      did any of those companies issue a formal

6      offer for the CPS unit?

7      A.    I don't remember who did.  I think

8      there was -- I don't remember.

9                  MR. BRAUNIG:  Let's mark this

10     Morrison 11, please.

11                 (Morrison Exhibit 11 was marked

12     for identification.)

13     Q.    Is this a document that you

14     recognize?

15     A.    Yes.

16     Q.    What is this document?

17     A.    This is the bid letter from March

18     from CVS ProCare.

19     Q.    And it's addressed to you?

20     A.    Correct.

21     Q.    And in the second paragraph are you

22     able to determine what CVS ProCare was

23     prepared to pay for the CPS unit?

24     A.    $34.5 million.

25     Q.    And do you know if -- were there

1    conditions that were placed on this

2    acquisition price?

3         A.    I don't recall that.

4         Q.    Can you tell me what a holdback is?

5         A.    A holdback is typically where part

6    of the purchase price is kept usually in

7    escrow until some milestone is met or

8    something is achieved, at which point it's

9    then paid out.

10        Q.    So an offer that includes a holdback

11   will not provide cash until those conditions

12   are met -- will not provide some percentage of

13   the cash until those conditions are met?

14        A.    Correct.

15        Q.    What is your recollection of Coram's

16   reaction -- let's strike that.  I want to go

17   back.

18            Do you know if Coram received any

19   other bids for the CPS unit from those initial

20   four involved in due diligence?

21        A.    No; I think this was -- this is the

22   only one.  It's the only letter I see here.

23        Q.    What was your understanding of

24   Coram's reaction to this bid?

25                MR. GAMBINO:  Objection to

1    form.

2        A.   Understanding.

3            I had a conversation with -- I don't

4    recall if it was Dan Crowley or the entire

5    board, but Dan's response was that he didn't

6    like the price and that if this was the

7    highest they were going to go, then we

8    would -- he wasn't going to sell the business.

9        Q.   So what Dan informed you was that he

10   was prepared to walk away if this were the

11   only bid?

12       A.   Correct.

13       Q.   Do you recall any board

14   participation in those discussions?

15       A.   I don't.

16            MR. BRAUNIG:  Let's mark this

17       exhibit Morrison 12.

18            (Morrison Exhibit 12 was marked

19       for identification.)

20       Q.   These are minutes of a telephonic

21   meeting of the board of directors of Coram

22   Healthcare Corporation.  They are

23   Bates-stamped COR-EQTY 0014723.

24            Do you recall participating in a

25   telephonic meeting on or around March 9?

1      A.    I do not recall.

2      Q.    Were you on the call when the board

3  of directors decided whether or not to approve

4  the transaction?

5      A.    I don't recall if I was or not.

6      Q.    Do you know whether the board

7  ultimately approved the transaction?

8      A.    Yes, they did.

9      Q.    Do you know whether that approval

10  was unanimous?

11      A.    I don't know.

12      Q.    Did you do any additional work for

13  Coram after June 9, 2000?

14      A.    Dan called and asked if I would be

15  interested in talking to them about some

16  potential financing alternatives, which I did

17  in sort of the context of a pitch to see if

18  there was anything additional that could --

19  any additional work that could be done.  So it

20  wasn't -- I wasn't hired to do anything.  It

21  was really in the context of a pitch, an

22  investigation.

23      Q.    Did Dan tell you why he was

24  interested in this pitch, in this sort of

25  early stage investigation?

1      A.   He was looking for alternative

2  financing sources for Coram and wanted to see

3  what potentially was available.

4      Q.   Let me hand you a document marked

5  Morrison 20.

6              (Morrison Exhibit 20 was marked

7       for identification.)

8      Q.   Miss Morrison, do you recognize this

9  document?

10      A.   Yes.

11      Q.   What is this document, Morrison 20?

12      A.   This is what I prepared and

13  presented in terms of what potential options

14  were available for Coram for raising capital.

15      Q.   Did you share it with the board of

16  directors?

17      A.   I don't recall who this presentation

18  went to specifically.

19      Q.   When Dan Crowley engaged you to look

20  at these different options of financing, did

21  he mention Stark II at all?

22      A.   Well, I wasn't engaged.  It was just

23  a request.  It was, like I said, a pitch.

24              Yeah; until I saw this on Page 2, I

25  had forgotten that it was in relationship to

Morrison, Christina
CONFIDENTIAL                                        3/26/2007

1          Does this refresh your recollection

2     as to whether or not -- what Deutsche Bank

3     concluded about the viability of these

4     options?

5          A.    Yes.

6          Q.    And what is your recollection now?

7          A.    That it was -- that the

8     alternatives -- that none of the alternatives

9     were viable in Deutsche Bank's opinion.

10         Q.    So of these four options that were

11    considered by Deutsche Bank as potential ways

12    to raise financing, your conclusion and that

13    of Deutsche Bank was that none of these were

14    available to Coram?

15         A.    At that time.

16         Q.    At that time.

17               And that time was July 31, 2000, the

18    date of the minutes of this meeting?

19         A.    Yes.

20         Q.    Did the board discuss with you the

21    options that you would lay out and their

22    viability?

23         A.    I don't recall anything specific,

24    any specific discussion around it.

25               MR. BRAUNIG:  I think that's

A1343

1      Q.   And in the confidential offering

2    memorandum that net revenue figure for 2001

3    was projected at 225 million?

4              MR. BRAUNIG:   Objection.   Still

5        lacks foundation.

6      Q.   Is that correct?

7      A.   Yes.

8      Q.   CuraScript came into being on or

9    around August 1, 2000; is that right?

10     A.   Yes.

11     Q.   This presentation document is dated

12   December -- on the front page is dated

13   December 2000?

14     A.   Yes.

15     Q.   Did Deutsche Bank actually make --

16   did Deutsche Bank submit this document to

17   GTCR, do you recall, "this document" being the

18   presentation to CuraScript?

19     A.   Yes.   The discussion on this

20   document was telephonic and it was with

21   CuraScript and with GTCR.

22     Q.   Who was on the phone on behalf of

23   CuraScript?

24     A.   I remember Dom Meffe was.   I don't

25   recall if anyone else was.

1      Q.   Were there any changes between

2    August 1, 2000 and December 2000 to the

3    business of what was CPS and is now

4    CuraScript -- or was now CuraScript?

5              MR. BRAUNIG:  Objection to

6        form.

7      A.   I only recall having very cursory

8    conversations in terms of what GTCR's plans

9    were, putting more money in the company and

10    investing in it.  I don't know any of the

11    specifics of it at that point between the

12    close of the transaction and this

13    presentation.

14      Q.   When you made this telephonic

15    presentation, did you think you were talking

16    about the same company that you had sold to

17    GTCR?

18      A.   No.

19      Q.   And in what ways did you think the

20    company was different?

21      A.   It now had a source of financing.

22    GTCR had been very open in conversations that

23    they were willing to invest in this business

24    and to try to find ways to help it grow.

25      Q.   Was the core business of CPS the

Morrison, Christina                3/26/2007
CONFIDENTIAL

1      questions I have.

2                Thank you, Miss Morrison.

3                MR. BRAUNIG:  Can we go off the

4      record real quick?

5                VIDEO TECHNICIAN:  We are now

6      off the record at 3:10.

7                (Short recess.)

8                VIDEO TECHNICIAN:  We are now

9      on the record at 3:14.

10    BY MR. BRAUNIG:

11        Q.    Miss Morrison, Mr. Kipnes showed you

12    a document, Morrison 23, which was a

13    presentation to CuraScript, Inc., and GTCR in

14    December 2000.

15        A.    Yes.

16        Q.    Do you recall whether GTCR had

17    acquired any other companies after buying CPS?

18        A.    There were some discussions of a

19    couple businesses and I know at some point,

20    and I don't recall when, they bought an

21    oncology business out of Baltimore, and I

22    don't recall when that was, but there was an

23    oncology business that was acquired at some

24    point after this.

25        Q.    Does the name OncoScripts refresh

A1343.03

1    your recollection?

2        A.    Yes.

3        Q.    Do you recall when that acquisition

4    took place?

5                MR. KIPNES:  Objection.  Asked

6        and answered.

7        A.    I don't recall.

8        Q.    If that acquisition had occurred

9    prior to December 2000, would you expect that

10   those numbers would be reflected in the net

11   revenue cited on Page 34, DBSI 008083?

12               MR. KIPNES:  Object to the

13       question.  Overbroad.  Incomplete

14       hypothetical.

15               MR. BRAUNIG:  I will rephrase

16       it.

17       Q.    Mr. Kipnes pointed you to the net

18   revenue projections for 2000 through 2005 on

19   Page 34, correct?

20       A.    Yes.

21       Q.    And he asked you a series of

22   questions about why the net revenue in 2000

23   shown for 2000 might have been different from

24   earlier figures that had been referenced in

25   other documents; is that correct?

Page 186

1                     CERTIFICATE

2              I HEREBY CERTIFY that the

3      proceedings, evidence and objections are

4      contained fully and accurately in the

5      stenographic notes taken by me on Monday,

6      March 26, 2007, and that this is a true and

7      correct transcript of same.

8

9

10

11

12

13

14             Cynthia A. Whyte, RPR

15

16

17              (The foregoing certification of

18     this transcript does not apply to any

19     reproduction of the same by any means,

20     unless under the direct control and/or

21     supervision of the certifying reporter.)

22

23

24

25

VOLUME I

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

Certified Copy

- - -

ARLIN M. ADAMS, Chapter 11      :
Trustee of the                  :
Post-Confirmation Bankruptcy    :
Estates of CORAM HEALTHCARE     :
CORPORATION, a Delaware         :
Corporation and of CORAM,       :
INC., a Delaware Corporation,   :
            Plaintiff           : CASE NO.
        vs.                     : 04-1565
                                :
DANIEL D. CROWLEY; DONALD J.    :
AMARAL; WILLIAM J. CASEY;       :
L. PETER SMITH; AND SANDRA L.   :
SMOLEY,                         :
            Defendants          :

- - -

Tuesday, March 27, 2007
9:34 a.m.

- - -

          Videotaped deposition of ARLIN
M. ADAMS, held at the law offices of
Schnader Harrison Segal & Lewis, LLP,
1600 Market Street, Suite 3600,
Philadelphia, Pennsylvania, 19103,
pursuant to notice before Cynthia A.
Whyte, Registered Professional Reporter
and Notary Public.

- - -

1        A.    I have to go back a little bit.

2              Almost from the outset of my

3    appointment and tenure the equity group, which

4    was counseled by Richard Levy and led in large

5    part by Don Liebentritt, continued to make

6    strong recommendations that the trustees

7    should do something about the members of the

8    board of directors of Coram and the way they

9    appointed Dan Crowley.

10             And I interpreted their

11   protestations as being a strong recommendation

12   to take legal action to compensate Coram for

13   what they thought was the damage that the

14   appointment of Dan Crowley had caused to Coram

15   and the ensuing damage to Coram because of his

16   conflict.  So that it was a continuing matter

17   of communication from them to me.

18       Q.    Isn't it true, sir, that they began

19   to urge you to sue Mr. Crowley, the directors,

20   and others within a week or two of your being

21   appointed the trustee?

22       A.    I don't know that I can say within a

23   week, but shortly thereafter.

24       Q.    And was there a relationship in your

25   mind between their urging you to sue Dan

1      When you disqualify a judge, for

2  example, because the judge may know a party to

3  a litigation, you don't ask the question,

4  well, specifically, how is that going to

5  prejudice the judge.  There is no way to know

6  that, but you say that the possibility of

7  prejudice is such that it is better for the

8  judge to recuse himself or herself.  And it is

9  the same thing with a CEO or a trustee.  You

10 can't run the clock backwards so to speak, at

11 least I can't.

12     Q.   Didn't you try retrospectively to

13 ascertain the intent of Dan Crowley with

14 respect to this conflict when you took over

15 the trusteeship of Coram in or about March of

16 2003?

17     A.   No.  I assumed that there was a

18 conflict and it was bad for the company, and

19 the question in my mind was could he put a

20 stop to it.  He assured me that not only he

21 could but had put a stop to it.  And even

22 though I had some questions in my mind, I

23 so-called gave him the benefit of the doubt.

24     Q.   At that time you knew that Dan

25 Crowley had a large financial claim against

Coram, correct?

　　A.　He told me that.

　　Q.　And you understood that, right?

　　A.　Well, I didn't know what it was, but
he told me that they owed him a good deal of
money.

　　Q.　Did you ask him how much money they
owed him?

　　A.　I don't recall that I did.

　　Q.　Did you understand that he was
trying to get the money that he said they owed
him from them?

　　A.　He told me that.

　　Q.　And you understood it, correct?

　　A.　Well, I had no reason at that time
to disbelieve him.  I didn't know what the
facts were, but he said that I'm trying to get
it.

　　Q.　I'm sorry.  I think I misspoke a
minute ago when I said that he was trying to
get money from Coram.  I meant Cerberus.

　　A.　I understood that.

　　Q.　And I think you understood --

　　A.　I did.  I did.

　　Q.　-- that I meant Cerberus, but I did

A1348

1    misspeak, and I want to apologize.

2         A.    I did.

3         Q.    Did you understand, when you were

4    having these discussions with Mr. Crowley and

5    he told you that he had a claim against

6    Cerberus, that his efforts to obtain the money

7    that he believed Cerberus owed him was an

8    ongoing process?

9         A.    Well, I'm not sure I understand what

10   you mean by ongoing process.  I'll tell you

11   exactly what I understood and you can label

12   it.

13             I understood that Dan Crowley

14   believed that Cerberus owed him, Dan Crowley,

15   a substantial sum of money for services that

16   Dan Crowley claimed that he had rendered to

17   Cerberus and that he was anxious not to do

18   anything to prejudice his ability to collect

19   it.  That's what he told me, so I accepted it.

20        Q.    And did you understand that he was

21   going to be trying to collect it?

22        A.    Oh, I don't think my thinking went

23   that far.  I'm not surprised to hear it, if

24   that's the fact, but I don't think I

25   understood that.

1      Q.    Did you decide that that was an

2  issue between Dan Crowley and Cerberus?

3      A.    That I did decide, yes.  I accepted

4  that.

5      Q.    In reaching that decision, was it

6  your understanding that the issue that was a

7  matter between Crowley and Cerberus involved

8  the payment by Cerberus of a certain amount of

9  money to Dan Crowley?

10                 MR. BRESSLER:  Object to the

11         form.

12                 You may answer.

13     A.    In a general sort of way.

14     Q.    And wasn't it also perfectly clear

15  to you in reaching that decision that Dan

16  Crowley was going to continue to pursue

17  efforts to get paid by Cerberus?

18     A.    Well, you use the words "perfectly

19  clear."  Nothing was perfectly clear, but my

20  understanding was that he still considered

21  that Cerberus owed him money and that he hoped

22  that he would be paid that money and that he

23  didn't want to do anything to prejudice his

24  ability to get paid that money, whatever the

25  amount was.  I don't know what the amount was.