1    Q.    Did you understand at that time that

2    he was going to be trying to get that money?

3    A.    No, I did not.

4    Q.    Is it your experience, sir, that

5    when people tell you they believe someone owes

6    them a large sum of money that they typically

7    try to take steps to collect it?

8                    MR. BRESSLER:  I'll object to

9        the form and the hypothetical nature of

10       the question.

11   A.    I don't have much experience in such

12   matters, so I can't say it's my experience.

13   Q.    So you're telling us then, sir, that

14   you didn't have an expectation one way or the

15   other upon learning that Dan Crowley believed

16   he was owed a large sum of money, that he

17   didn't want to prejudice that claim, that you

18   made the decision it was between him and

19   Cerberus, you didn't have an expectation that

20   he was going to be trying to collect the money

21   from Cerberus?

22                   MR. BRESSLER:  I'll object to

23       the form and the compound, complex nature

24       of the question.

25   A.    I don't think I was thinking along

1    those lines.

2        Q.    Did you expect that he was not going

3    to take any steps --

4        A.    No.

5        Q.    -- to collect it?

6        A.    As I say, I wasn't thinking along

7    those lines.

8        Q.    So the fact that Dan Crowley may

9    have later taken steps to collect that money

10   from Cerberus was not, in your mind, part of a

11   breach of any fiduciary duty; is that right?

12              MR. BRESSLER:    Object to the

13       form.    That's not what he said.

14       A.    I hadn't thought about that.

15       Q.    You're thinking about it now.    Was

16   Dan Crowley's effort to collect that money

17   owed to him by Cerberus a breach of fiduciary

18   duty?

19       A.    In the sense that I think he should

20   have kept me advised.    He knew that this was a

21   very touchy subject with the court and with

22   Judge Walrath.    She made that very clear.    He

23   knew that I was concerned about it.    It was

24   one of the very first things I had discussed

25   with him.

1          And when he -- and despite that he

2    went ahead and had meetings or letters or

3    telephone calls, whatever he had,

4    communicating with Mr. Feinberg and Cerberus.

5    I think, yes, that was not the right way to

6    conduct things with me.

7         Q.    Did you ask him not to pursue his

8    claim against Cerberus?

9         A.    No.

10        Q.    When he asked you -- withdrawn.

11             When he told you he did not want to

12   prejudice his claim against Cerberus, did you

13   tell him that there were certain steps that

14   you did not want him to take in pursuit of

15   that claim?

16        A.    Yes; I laid down three basic rules.

17   I'm not so sure I could remember them, but

18   they are in writing in prior depositions.

19             One, that he could not do anything

20   for Cerberus that was inconsistent with Coram.

21   Number two, he could not spend any time that

22   he should be devoting to Coram in regard to

23   Cerberus matters.  And there was a third.

24   There were three very specific things that I

25   told him.  Sitting here today I can't recall

```
 1    all three.
 2         Q.    Did you ever ask him how much he was
 3    owed by Cerberus?
 4         A.    I don't think so.
 5         Q.    Did you understand that Dan Crowley
 6    was not a lawyer?
 7         A.    I think I understood he was not a
 8    lawyer.
 9         Q.    Was it your understanding --
10    withdrawn.
11              Did Dan Crowley tell you that he
12    continued to do certain things for Cerberus
13    but not to be paid for that work?
14         A.    He told me -- it was not so much an
15    understanding.  What he told me was that from
16    time to time matters would arise within
17    Cerberus which prompted Mr. Feinberg to call
18    him to get his what I call horseback opinion.
19    By that, he created the impression he wasn't
20    expected to do any research.  It was just to
21    give Mr. Feinberg his intuitive response to
22    situations that might arise as Cerberus or for
23    Mr. Feinberg.  And this was very sporadic.
24              And I said, well, if it has nothing
25    to do with Coram and you don't have to spend
```

Adams, Arlin M. - Volume I                                    3/27/2007

1   very much time on it, I'm not going to object

2   to that.

3       Q.    So based on those discussions you

4   knew that he was continuing to communicates

5   with Stephen Feinberg, correct?

6       A.    From time to time -- I knew from

7   what he said that from time to time

8   sporadically Mr. Feinberg might call him.

9   That's all I knew.

10      Q.    So you knew then that he was still

11  communicating with Mr. Feinberg, right?

12      A.    Well, I stand on my prior answer.  I

13  can't embroider it.

14      Q.    Well, it didn't come as a surprise

15  to you at a later time to learn that he was

16  still in communication with Mr. Feinberg, did

17  it?

18      A.    Well, when you say "in

19  communication," yes, that was a surprise.  If

20  you ask the question did it come as a surprise

21  that from time to time Mr. Feinberg would call

22  him, the answer is no.

23      Q.    Did it surprise you to learn that in

24  their communications from time to time

25  Mr. Crowley would raise with Mr. Feinberg the

1    with theirs.

2        Q.    Did there come a time in March of

3    2002, about the time you were appointed

4    trustee, when you read Judge Walrath's

5    opinions, one oral, one written, relating to

6    Coram's first two proposed plans of

7    reorganization?

8        A.    There did.

9        Q.    And do you recall approximately when

10   that was in relation to your appointment?

11       A.    Very early.  I would say maybe the

12   day of the appointment or the day after.

13       Q.    And at that time did you become

14   aware of the issue relating to Dan Crowley and

15   a potential conflict of interest?

16               MR. BRESSLER:  I object to the

17       form --

18       A.    I did.

19               MR. BRESSLER:  -- but he may

20       answer.

21       A.    Yes.

22       Q.    Did you in the early period of your

23   trusteeship review any of the underlying

24   documents relating to this conflict of

25   interest?

1     A.   I can't recall.  I may have, but I

2  don't recall.

3     Q.   Let me try to be a little bit more

4  specific, sir.

5         Do you recall reviewing during the

6  early part of the trusteeship the agreement

7  between Cerberus and Mr. Crowley?

8     A.   I don't recall it.

9     Q.   Do you recall whether you have ever

10  reviewed that?

11     A.   Sitting here today, I can't recall

12  that document.

13     Q.   Do you recall reviewing any

14  correspondence between Mr. Crowley and

15  Mr. Feinberg in approximately November of

16  1999?

17     A.   Sitting here I cannot recall that.

18     Q.   Do you recall reviewing the

19  employment agreement between Crowley and

20  Coram?

21     A.   I don't recall.

22     Q.   Do you recall sometime in the early

23  part of your trusteeship reviewing any of

24  Coram's SEC filings?

25     A.   At any time during the trustee --

1    yes.

2        Q.    I'm trying to focus on the early

3    part of the trusteeship, March, April, that

4    period.

5        A.    I think I did.

6        Q.    And do you recall that at that time,

7    2002, the Cerberus/Crowley relationship was

8    disclosed in Coram's SEC filings?

9              MR. BRESSLER:  I'll object to

10        the form.  He can answer to the extent he

11        recalls.

12        A.    Do I recall sitting here, no, but I

13    vaguely remember reading about it.  Now,

14    whether it was at that time, I'm not sure.

15        Q.    After you became the trustee, you

16    became responsible for Coram's SEC filings,

17    correct?

18        A.    That is correct.

19        Q.    But you also recall having read some

20    of the SEC filings of Coram which were made

21    prior to your taking over?

22        A.    That is correct.

23        Q.    Do you recall at some point early in

24    your trusteeship reviewing a report written by

25    a gentleman named Harrison J. Goldin?

1      A.    I do recall that.

2      Q.    So you read that sometime in the

3  early period of the trusteeship?

4      A.    That is correct.

5      Q.    Do you recall at some point early in

6  the trusteeship reading Coram's original plan

7  of reorganization that had been filed in the

8  bankruptcy court?

9      A.    Well, I read so many documents I

10  can't sit here --

11      Q.    I'm not trying to give you a memory

12  test.

13      A.    I probably did, because I read lots

14  of material.

15      Q.    We are almost at the end of this

16  part of the deposition.

17      A.    Go right ahead.

18      Q.    But do you believe that you also

19  read Coram's second plan of reorganization,

20  its amended plan of reorganization?

21      A.    I'm sure I did.

22      Q.    And do you also believe that you

23  read the disclosure statement that was filed

24  by Coram in connection with its original plan

25  of reorganization?

1        A.    I believe I did, but I can't be sure

2   as to when I did except it would have been

3   during the early days.

4        Q.    Okay.

5              MR. PETERS:  Let's mark this

6        Adams 6.

7              (Adams Exhibit 6 was marked for

8        identification.)

9        Q.    Adams Exhibit 6, do you have that in

10  front of you, sir?

11       A.    I do.

12       Q.    It's the disclosure statement filed

13  by Coram in August of 2000.

14             Is this a document that you've read

15  on a prior occasion?

16       A.    It seems to be, but I'm not sure.

17       Q.    There is a gentleman listed on the

18  front named David Friedman.  Do you know who

19  he is?

20       A.    I have heard of him.  I don't know

21  him.

22       Q.    You have never met him?

23       A.    No.

24       Q.    And you have never spoken to him?

25       A.    I don't have any recollection of

1      Q.    You're writing this at a period of

2   time where you have been the trustee for about

3   ten months?

4      A.    Right.

5      Q.    And he has been the CEO of Coram for

6   over three years, right?

7      A.    Could be.

8      Q.    And you're writing in this document

9   about his entire tenure at Coram, correct?

10     A.    Correct.

11     Q.    And, in fact, you concluded that Dan

12  Crowley was doing an extremely good job as the

13  CEO of Coram, didn't you?

14     A.    Did I say that?

15     Q.    I'm not purporting to quote the

16  document.  I'm just asking you.

17     A.    No, I wouldn't say extremely.  I

18  thought he was doing a pretty good job.

19     Q.    From the time that you first met Sam

20  Zell, Don Liebentritt, and Richard Levy in

21  March of '02 through January of 2003 when that

22  pleading was filed, they were urging you to

23  terminate Mr. Crowley, correct?

24     A.    They were.

25     Q.    And during that time period they

A1361

1    were urging you to sue Mr. Crowley, correct?

2        A.   I don't know about the suing at that

3    time.  The first part of your question is

4    correct.  I would have to hesitate on the

5    second.  I'm not sure.

6        Q.   Don't you recall that from the first

7    time you met Mr. Levy he was urging you to

8    file a lawsuit against Feinberg, Crowley and

9    others?

10       A.   I think that's right.

11       Q.   In fact, Mr. Levy was urging you to

12   file a lawsuit against Feinberg, Crowley and

13   others which branded them as racketeers,

14   right?

15              MR. BRESSLER:  I'll object to

16       the form, but he can answer it.

17       A.   He said he thought it might be a

18   RICO violation.

19       Q.   And the R in RICO stands for

20   racketeering, correct?

21       A.   Well, that's true, but he did not

22   use that expression as applied to them.

23       Q.   Well, Mr. Levy was urging you in

24   April, May, June of 2002 to sue a large number

25   of people including Dan Crowley under a

Adams, Arlin M. - Volume I                                  3/27/2007

1   racketeering statute, correct?

2       A.   That is true.

3       Q.   During that time period you did not

4   terminate Dan Crowley, correct?

5       A.   That is true.

6       Q.   In fact, during that time period you

7   entered into an agreement to give him a raise,

8   correct?

9       A.   You could say that.

10      Q.   And during that time period you

11  entered into an agreement to give him a

12  release from the very litigation that Mr. Levy

13  was urging you to file against him, correct?

14              MR. BRESSLER:  I'll object to

15      the form, but he can answer.

16      A.   Your questions, although

17  well-intentioned, really distort the actual

18  facts.

19      Q.   Can you answer my question, please?

20      A.   I think I did.

21      Q.   So you thought that was a responsive

22  answer to my question?

23      A.   I do.

24      Q.   Did there come a time that you

25  reviewed a report prepared by Goldin &

1                    CERTIFICATE

2              I HEREBY CERTIFY that the

3    proceedings, evidence and objections are

4    contained fully and accurately in the

5    stenographic notes taken by me on Tuesday,

6    March 27, 2007, and that this is a true and

7    correct transcript of same.

8

9

10

11

12

13    _____

14              Cynthia A. Whyte, RPR

15

16

17              (The foregoing certification of

18    this transcript does not apply to any

19    reproduction of the same by any means,

20    unless under the direct control and/or

21    supervision of the certifying reporter.)

22

23

24

25

IN THE UNITED STATES DISTRICT COURT,
FOR, THE DISTRICT OF DELAWARE

**Certified Copy**

ARLIN M. ADAMS, Chapter II      )
Trustee of the Post-            )Case No.
Confirmation Bankruptcy of      )04-1565
Estates of Coram Healthcare     )
CORPORATION, and of CORAM,      )
INC., a Delaware corporation,   )
                  Plaintiff,    )
                                )
          vs.                   )
                                )
DANIEL D. CROWLEY, DONALD J.    )
AMARAL; WILLIAM J. CASEY; L.    )
PETER SMITH; and SANDRA L.      )
SMOLEY,                         )
                                )
          Defendants.           )
-----------------------------)


        Wednesday, March 21, 2007

            10:20 a.m.



        Deposition of HARRISON GOLDIN held at

the offices of Cerberus Capital Management, L.P.,

1177 Avenue of the Americas, New York, New York

pursuant to Notice, before Danielle Grant, a

Notary Public of the State of New York.

```
 1                    H. Goldin
 2   at this deposition, precisely when or how I
 3   learned Mr. Levy's views, but I did learn his
 4   views on my role fairly early on in the process.
 5   And I recall becoming generally familiar with his
 6   position on my role, but I do not recollect
 7   specifically what it was that comprised the
 8   elements or all of the elements of his views.
 9        Q    In the course of your work did you,
10   at any time, make a suggestion to the Special
11   Committee that Mr. Crowley should give up his
12   relationship with Cerberus while he was Coram's
13   CEO?
14        A    Mr. Kipnes, I had a precise and
15   defined role in the Coram matter.  You referred
16   me earlier in this deposition to the formulation
17   of that role.  I regarded that formulation as my
18   charter and it was that role that I fulfilled.
19             I had very limited contact with
20   the Special Committee of the board have the
21   perfection and focused myself and my teams on
22   the elements of the assignment which related to
23   an assessment as to the impact, if any, of
24   Mr. Crowley's conflict on the management of
25   Coram prior to the confirmation hearing in
```

```
 1                        H. Goldin

 2    December of 2000, relating to matters as we

 3    discussed, including valuation issues and

 4    mediation.

 5          Q    Did you feel constrained by the

 6    order appointing you independent restructuring

 7    advisor from recommending to the Special

 8    Committee that they insist that Mr. Crowley give

 9    up his relationship with Cerberus if you

10    concluded that that was the best thing for Coram

11    to do?

12              MR. BENTLEY:  Objection to the form

13         of the question.

14          A    Mr. Kipnes, constrained is a word

15    that may or may not apply in this situation.  I

16    was not a trustee.  I was charged with conducting

17    an independent examination, and that independent

18    examination had a center of gravity, and that

19    center of gravity is the one that I described to

20    you in my prior answer.

21              It was not to enter general advice

22    to the Special Committee, it was not to

23    consider issues of good corporate governance,

24    it was not to participate in or advise on the

25    ongoing management of the company, all of which
```

1                          H. Goldin

2          Q    Mr. Goldin, I placed before you

3    Exhibit 21 which is four pages off of the --

4    which I printed off of the Goldin Associates

5    website.  I ask you to take a quick look at them

6    and let me know if you -- you don't need to read

7    the entire thing, but let me know if this is an

8    accurate portrayal on the Goldin Associates

9    website?

10         A    Yes, sir.

11         Q    Who at Goldin Associates headed up

12   the Coram assignment?

13         A    I did.

14         Q    What was Daniel Crowley's role, if

15   any, with respect to the Goldin Associates

16   assignment?

17         A    I don't understand what you mean by

18   the word role.

19         Q    Did Daniel Crowley have any

20   influence on the report that you drafted?

21         A    No.

22         Q    Did Daniel Crowley participate in

23   the drafting of your report at all?

24         A    No.

25         Q    Apart from being interviewed by you

1                      H. Goldin

2    and your team in connection with the report, did

3    Daniel Crowley do anything, as far as you know,

4    with respect to the report you prepared?

5          A     The only thing I know Mr. Crowley

6    did was to order all of the people at Coram to

7    give us everything we asked for.

8          Q     Was it your experience that you were

9    able to get access to all the documentary

10   information -- evidence and information you

11   needed to reach your conclusion?

12         A     Yes, sir.

13         Q     Was Goldin Associates able to

14   interview all the individuals from Coram that it

15   needed to interview in order to satisfy itself

16   with respect to the conclusions in this report?

17         A     Yes, sir.

18         Q     Did anybody refuse to be interviewed

19   by your team?

20         A     Not to my recollection.

21         Q     Do you know who determined that an

22   independent third party should be retained to

23   perform the investigation that you ultimately

24   were retained to do?

25         A     I was assured it was the advisory

3-21-07 - Adams - Goldin.txt                                        3/29/2007

139

```
 1                    H. Goldin

 2                    CERTIFICATE

 3       STATE OF NEW YORK )

 4                        )ss:

 5       COUNTY OF RICHMOND)

 6              I, DANIELLE GRANT, a Certified

 7              Shorthand Reporter, and Notary

 8              Public within and for the State of

 9              New York, do hereby certify:

10              That HARRISON J. GOLDIN, the

11              witness whose deposition is

12              hereinbefore set forth, was duly

13              sworn by me and that such

14              deposition is a true record of the

15              testimony given by such witness.

16              I further certify that I am not

17              related to any of the parties to

18              this action by blood or marriage

19              and that I am in no way interested

20              in the outcome of this matter.

21              In witness whereof, I have hereunto

22              set my hand this 29th day of March,

23              2007.

24                    Danielle Grant

25                    ─────────────────────
                      DANIELLE GRANT
```

139

VOLUME II

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

# Certified Copy

- - -

ARLIN M. ADAMS, Chapter 11      :
Trustee of the                 :
Post-Confirmation Bankruptcy   :
Estates of CORAM HEALTHCARE    :
CORPORATION, a Delaware        :
Corporation and of CORAM,      :
INC., a Delaware Corporation,  :
         Plaintiff      : CASE NO.
      vs.                 : 04-1565
                     :
DANIEL D. CROWLEY; DONALD J.    :
AMARAL; WILLIAM J. CASEY;       :
L. PETER SMITH; AND SANDRA L.   :
SMOLEY,                         :
         Defendants     :

- - -

Wednesday, March 28, 2007
9:33 a.m.

- - -

Continued videotape deposition
of ARLIN M. ADAMS, held at the law
offices of Schnader Harrison Segal &
Lewis, LLP, 1600 Market Street, Suite
3600, Philadelphia, Pennsylvania, 19103,
pursuant to notice before Cynthia A.
Whyte, Registered Professional Reporter
and Notary Public.

- - -

1    Q.    How?

2    A.    Because as I later learned the

3    facts, that unit was worth at least

4    potentially and probably practically

5    considerably more than was obtained for it in

6    the course of the sale and that Mr. Crowley,

7    who completed the sale, consummated the sale,

8    therefore participated in the sale of an

9    important unit at a price that I thought, from

10   everything I had heard, was less than should

11   have been obtained.

12   Q.    When did you learn those facts?

13   A.    Later on in the proceeding.

14   Q.    How much later?

15   A.    I think at the hearing, one of the

16   hearings when it was discussed.

17   Q.    What year?

18   A.    Can't tell you.

19   Q.    The CPS sale took place in August of

20   2000?

21   A.    Before I was appointed, yes.

22   Q.    Right; late July, very beginning of

23   August of 2000.

24         Are you aware of any facts that were

25   known as of August 1 of 2000 that you believe

1    view is in light of the fact that a number of

2    years later the company was sold for a lot

3    more, I have the opinion that Mr. Crowley

4    should have sold the company for more in 2000?

5              MR. BRESSLER:  Object to the

6        form.

7        A.    No.

8        Q.    How does your opinion differ from

9    what I just said?

10       A.    Because I have not seen any evidence

11   of any real diligence by somebody in

12   Mr. Crowley's position dealing with an asset

13   of that value seeking to obtain the maximum

14   price.  There is a doubt in my mind that for

15   some other reason he didn't want to enhance

16   the value.  Whether that reason was to benefit

17   Cerberus is going to be up to a jury or a

18   judge to decide.  I think there is evidence

19   that support that concern.

20       Q.    What possible reason -- withdrawn.

21            What possible interest would

22   Cerberus have had in selling a business unit

23   of CPS for less than its full value?

24            MR. BRESSLER:  Object to the

25       form.

1      A.    I don't know.

2      Q.    Well, didn't you just suggest that a

3   minute ago?

4      A.    It's a possibility.

5      Q.    What did you mean when you suggested

6   a minute ago that Cerberus might have had some

7   interest in CPS being sold for less than its

8   full value?

9      A.    Exactly what that word "may" means

10  to me.  It may have.

11     Q.    Are you familiar with the term

12  "fairness opinion" as applied to investment

13  banking transactions?

14     A.    I have heard of it.

15     Q.    Do you know whether Deutsche Bank

16  Alex Brown prepared and submitted to Coram a

17  fairness opinion about the sale of CPS?

18     A.    I have not seen that opinion.  I

19  accept -- if you tell me they did, I accept

20  it, but I haven't seen it.

21     Q.    Is that something that you would

22  normally consider in assessing whether or not

23  a business unit was sold for a fair price,

24  whether the investment bankers had submitted

25  to the company a fairness opinion?

1    extent that he should have, that's the big

2    question.

3        Q.    And what about the facts that you've

4    just described constituted a breach of

5    fiduciary duty by Mr. Crowley?

6        A.    What about it?

7                MR. BRESSLER:    Object to the

8        form.

9        A.    What about it?  I still stand on

10   that view.  The fact that he continued to try

11   to get a slightly better price doesn't alter

12   the view.  Why didn't he get a much greater

13   price?

14       Q.    Well, he did get a better price in

15   the auction.

16       A.    Slightly better, not very much.

17       Q.    But you think he should have gotten

18   an even better price?

19       A.    I do, from what I've heard.  I'm not

20   the expert in this field.

21       Q.    Turning your attention to the next

22   paragraph, it says, "The board approved the

23   sale unanimously.  In doing so, it relied

24   (among other things) on DBAB's," which is

25   Deutsche Bank Alex Brown's, "opinion that the

1    sale was fair from a financial perspective."

2                    MR. BRESSLER:  I'm going to

3        object.

4        Q.   "In rendering its fairness opinion,

5    DBAB used the three standard methods of

6    valuation," and then it lists what those

7    valuation methods are.

8            And then the last sentence of the

9    paragraph says, "The price that Coram obtained

10   ultimately, 41.3 million in cash, was within

11   this range of values."

12           Do you recall reading that?

13       A.   I do.

14                   MR. BRESSLER:  I'm going to

15       object.

16       Q.   Do you disagree with that in any

17   way?

18                   MR. BRESSLER:  I'm going to

19       object.  If you want him to read the

20       whole section, you skipped the three

21       lines on Page 105.  Let him read the

22       whole section.

23                   MR. PETERS:  You know what?

24       You can object.  If you want to ask him

25       questions, you can direct his attention

1    to any part of any document you want to.

2    What you are not allowed to do is give a

3    speech in the middle of a question.

4        Q.    There's a question pending, which is

5    do you agree with what I just read to you from

6    that paragraph in any way?

7        A.    Tell me where the paragraph is and I

8    will read it again.

9        Q.    The one that begins, "The board

10   approved the sale unanimously" at the top of

11   Page 106.

12       A.    That doesn't affect me at all, that

13   sentence.

14       Q.    That paragraph.

15       A.    Because he was in control -- no, I

16   said that sentence.

17       Q.    I said the paragraph, sir.

18       A.    In doing so, it relied on DBAB's

19   opinion that the sale was fair.  In rendering

20   its fairness opinion, DBAB used the three

21   standards methods of valuation.  The first

22   method yielded valuations that ranged from 9.7

23   to 145.  The second yielded valuations that

24   ranged from 13 to 61.  And the third yielded

25   valuations that ranged from 24 to 53.  The

1   price that Coram obtained ultimately is in the

2   range of values.

3           That does not change my view, no,

4   sir.

5       Q.    Okay.

6           Were you aware of the portion of the

7   Goldin report that I just pointed out to you

8   when you formed your opinion that the CPS sale

9   involved a breach of fiduciary duty by

10  Crowley?

11      A.    Was I aware of this material?

12      Q.    Yes.

13      A.    Well, I had read it.  I don't know

14  that I zeroed in on that particular paragraph,

15  no, I doubt if I did.

16      Q.    You made reference earlier in your

17  testimony today to some hearing where the

18  issues relating to CPS first came to your

19  attention.  Do you recall saying that?

20      A.    I don't know whether I said first

21  came, but they came to my attention.

22      Q.    Okay.

23           And you said -- you made a reference

24  to experts and the testimony of experts at or

25  about that time.  Do you recall that?

1   own proposed plan of reorganization for Coram?

2       A.   I do.

3       Q.   And do you recall that in that plan

4   there was some sort of a litigation trust set

5   up to be funded by $6 million?

6       A.   I vaguely recall that.

7       Q.   And do you recall whether or not you

8   had an understanding that that $6 million was

9   to fund Jenner and Block's pursuit of this

10  litigation, "this litigation" meaning the

11  litigation they were proposing in 2002 that

12  you bring?

13      A.   I don't know whether they were going

14  to limit it to that, but, if they were, I

15  would not be surprised to hear that.

16      Q.   But Mr. Levy wanted to set aside $6

17  million of Coram's money to pay him and his

18  law firm to pursue certain claims on behalf of

19  Coram?

20              MR. BRESSLER:   Object to the

21      form of the question.

22      A.   In effect, yes.

23      Q.   Now, you didn't -- you opposed that

24  plan?

25      A.   I didn't pursue it.

1    Q.    You didn't agree with his plan,

2    correct?

3    A.    I didn't pursue it in any way.    I

4    was not interested in litigation.    I was

5    interested primarily in resolving the dispute

6    between the two factions.

7              MR. PETERS:    Mark that, but

8         before I do that -- what is that, 23?

9              THE COURT REPORTER:    23.

10   Q.    You said you were not interested in

11   litigation; you were interested primarily in

12   resolving the dispute between the two

13   factions.

14        Did you ever tell Dan Crowley

15   between March 13 of 2002 and March 30 of 2003

16   that you were going to sue him?

17             MR. BRESSLER:    Object to the

18        form of the question.

19             You can answer.

20   A.    I doubt it because I wasn't

21   interested in pursuing that.

22   Q.    Did you ever tell Mr. Crowley

23   between March 13 of 2002 and March 30 of 2003

24   that you were considering suing him?

25   A.    I doubt it.    I may have, but I doubt