1                    CERTIFICATE

2         I HEREBY CERTIFY that the

3    proceedings, evidence and objections are

4    contained fully and accurately in the

5    stenographic notes taken by me on

6    Wednesday, March 28, 2007, and that this is

7    a true and correct transcript of same.

8

9

10

11

12

13        _____

14            Cynthia A. Whyte, RPR

15

16

17         (The foregoing certification of

18    this transcript does not apply to any

19    reproduction of the same by any means,

20    unless under the direct control and/or

21    supervision of the certifying reporter.)

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Certified Copy

Case No. 04-1565

-----------------------------------------------------

VIDEO DEPOSITION OF ALLEN J. MARABITO
April 5, 2007

-----------------------------------------------------

ARLIN M. ADAMS, Chapter 11 Trustee of the
Post-Confirmation Bankruptcy of Estates of Coram
HEALTHCARE CORPORATION, and of CORAM, INC., a
Delaware corporation,
Plaintiffs,

vs.

DANIEL D. CROWLEY, DONALD J. AMARAL, WILLIAM J.
CASEY, L. PETER SMITH, and SANDRA L. SMOLEY,

Defendants.

-----------------------------------------------------

APPEARANCES:

    SCHNADER HARRISON SEGAL & LEWIS, LLP
        By Barry E. Bressler, Esq.
           1600 Market Street, Suite 3600
           Philadelphia, Pennsylvania  19103-7286
           215-751-2050
           bbressler@schnader.com
            Appearing on behalf of Plaintiffs.

    KEKER & VAN NEST, LLP
        By Laurie Carr Mims, Esq.
           710 Sansome Street
           San Francisco, California  94111-1704
           415-391-5400
           lmims@kvn.com
            Appearing on behalf of Defendant
           Daniel D. Crowley.

    Also Present:  Carie Finegan, Videographer

1      now?

2                  (Deponent examined exhibit.)

3      A      Yes.  But it's been undercut, and so while

4      it's accurate, it apparently was not fully expansive

5      in a description of the consulting arrangement that

6      Mr. Crowley had with Cerberus.

7      Q      That wasn't my question, though.  Is

8      the -- the information that is written here

9      accurate, in your opinion?

10                  MR. BRESSLER:  I'll object to the form.

11     His answer was explanatory and complete, but he may

12     answer.

13     A      At the time that this was written I

14     believed that it was accurate and I was convinced of

15     its actuality.

16     Q      (By Ms. Mims)  Did anyone from the -- the

17     Kasowitz firm ask you for more information about

18     Mr. Crowley's consultancy with -- to Cerberus?

19                  MR. BRESSLER:  I'll object to the form.

20     Do you mean at this time?

21     Q      (By Ms. Mims)  At this time.

22     A      It -- I don't recall being asked specific

23     questions about Mr. Crowley's consultancy, as you

24     put it, during the process of perfecting this

25     document by the Kasowitz firm.

Marabito, Allen J.                                      4/5/2007

```
 1         Q    Do you recall asking anyone, including

 2    Mr. Crowley, for more information about this issue?

 3         A    The --

 4         Q    At this time.

 5         A    At this time I would have said or asked,

 6    I -- and I would have said, you know, Dan, is this

 7    an accurate description of the information, or, you

 8    know, is this an accurate portrayal of the

 9    information to be included?  Is -- you know, is this

10    what we're going to use?  And the answer to that

11    would have been yes, because it's in this document.

12              (Pause.)

13         Q    Do you remember any conversations with

14    anyone from the Kasowitz law firm regarding the

15    importance of this issue to this document?

16         A    No.

17         Q    Do you recall anyone from the Kasowitz

18    firm telling you that -- that the relationship

19    between Crowley and Cerberus was in very -- was

20    important for this document?

21              MR. BRESSLER:  I'll object to the form,

22    but he can answer.

23         A    Before this document?

24         Q    (By Ms. Mims)  For this document.  Not

25    before.  Not before.  For this document.
```

A1384

1        A     Oh, for this document.

2        Q     Important for this document.   In

3   conjunction with this document.

4        A     No, I don't -- I don't think this received

5   particularized -- to the exclusion of all else.   It

6   was just part of the document.   In the process, the

7   document is developed, it is exchanged back and

8   forth with the outside attorneys having, if you

9   will, the final cut at the document, and then

10  preparatory to the filing, it is read through,

11  approved by the attorneys as to its legality and its

12  creation, and then it's ready for filing, and that's

13  perfected on the law firm side of the process.

14  We're -- I'm not -- the company's not sitting there

15  saying, Hey, this is a sufficient legal document,

16  let's go ahead and file it.

17       Q     So you do not recall any particularized

18  attention to this issue --

19            MR. BRESSLER:  Object to the form.

20       Q     (By Ms. Mims)  -- in connection with this

21  document.

22            MR. BRESSLER:  Object to the form, asked

23  and answered.   He can answer.

24       A     No.

25            MS. MIMS:  Let's break for lunch.

```
 1        Q     Yes.
 2        A     "Effective August 1st, 1999, Mr. Crowley
 3   and an affiliate of Cerberus Partners, L.P.
 4   ('Cerberus') a party to the company's
 5   debtor-in-possession financing agreement, Senior
 6   Credit Facility and Security Exchange Agreement,
 7   executed a three-year employment agreement whereby
 8   Mr. Crowley is paid $960,000 per annum, plus the
 9   potential of performance related bonus
10   opportunities, equity options and fringe benefits.
11   Such agreement is subject to automatic one year
12   extensions unless either party provides written
13   notice within 60 days of the original expiration
14   date or subsequent renewal dates.  The agreement
15   further provides that the Cerberus affiliate can
16   unilaterally terminate the arrangement at any time
17   by written notice; however, certain severance
18   payments would be triggered by such termination.
19   The services rendered by Mr. Crowley include, but
20   are not limited to, business and strategic
21   healthcare investment advice to executive management
22   at Cerberus and its affiliates.  Moreover,
23   Mr. Crowley is Chairman of the Board of Directors of
24   Winterland Productions, a privately held affinity
25   merchandise company, which is a Cerberus affiliate
```

A1385.01

```
1    portfolio investment.  On January 2nd, 2001,
2    Winterland voluntarily filed for protection under
3    Chapter 11 of the United States Bankruptcy Code in
4    the Northern District of California."
5         Q    Does --
6         A    End of paragraph.
7         Q    Does this reflect -- does this refresh
8    your recollection -- recollection as to whether the
9    SEC filings made by the company disclosed that it
10   was an employment agreement?
11             MR. BRESSLER:  I'll object to the form
12   only as to which SEC filings.
13        Q    (By Ms. Mims)  As -- this SEC filing.
14        A    It -- it focuses my recollection.  I -- I
15   recall that subsequent to its identification it was
16   incorporated at the next public filing.
17        Q    Do you -- do you remember if you took part
18   in drafting this language?
19        A    I would not have been the draft person.
20        Q    Did you review this language?
21        A    Yes.
22        Q    Do you think it accurately describes the
23   employment agreement?
24        A    It -- as best I can recollect, yes.
25        Q    And in the paragraph you read --
```

1    A    Yes.

2    Q    -- it stated that it was a three-year

3    employment agreement; is that correct?

4    A    Yes.

5    Q    And then it went on to say, "whereby

6    Mr. Crowley is paid" --

7    A    Yes.

8    Q    " -- 960,000 per annum"?

9    A    Yes.

10    Q    Does this refresh -- refresh your

11    recollection regarding the fact that you knew

12    Mr. Crowley was still being paid by Coram as of

13    April 2001?

14         MR. BRESSLER:  I'll object to the form.

15    A    You mis -- Mr. Crowley was being paid by

16    Coram.

17    Q    (By Ms. Mims)  By Cerberus.

18    A    And he was also being paid by Cerberus,

19    yes.  I believe that's correct.

20         Does this have a signature date on the

21    back of it?

22         (Deponent examined exhibit.)

23    Q    Sometimes they're in the middle.  I don't

24    see it, but I'll represent to you that this was the

25    filed version since it was -- it's on the SEC's Web

A1385.03

1   site.

2           MR. BRESSLER:  Would you like me to direct

3   the witness' attention?

4           MS. MIMS:  Sure.  Thank you.

5       A    Got it.  Okay.  April 16th -- April 16th,

6   2001 was the filing date of this document.  So at --

7   at that time I would have known.

8       Q    (By Ms. Mims)  That Mr. Crowley --

9       A    Crowley was receiving --

10      Q    Was still receiving.

11      A    Still receiving salary from Cerberus.

12      Q    And that salary was the 960,000 per annum?

13      A    Yes.

14      Q    And that's the same as the 80,000 per

15  month?

16      A    Yes.

17      Q    So you did know as of April 16th, 2001

18  that Mr. Crowley was still receiving 80,000 --

19      A    Yes.

20      Q    -- per month.

21      A    Yes.

22      Q    Was this public filing reviewed by Coram's

23  board?

24      A    Yes.  It's made available to them for

25  their review.

1      Q    Was it made available for Goldin

2    Associate's review?

3      A    I'm sure if they were interested -- if

4    they were still an interested party at that time,

5    yes.

6      Q    To give you a little chronology, they were

7    retained in March of 2001, so that would be

8    preceding April 2001.

9      A    And -- and I would fully expect that

10   their -- that the steps that they would take to know

11   about the corporation, so-called due diligence,

12   would have led them to this document, which they

13   would have read.  I assume they would have read.

14     Q    Isn't it true that anyone who was

15   interested in Coram could have accessed this

16   document and read this paragraph about Mr. Crowley's

17   employment agreement with Cerberus?

18     A    I -- I think that's a true statement

19     Q    And do you agree with me that this

20   paragraph makes clear that Mr. Crowley is currently

21   being paid, as of April 16th, 2001, 960,000 per

22   annum?

23     A    Yes.

24          MR. BRESSLER:  I'll object to the form.

25     A    Yes.

A1385.05

220

```
 1    STATE OF COLORADO    )

 2                         )  ss.      REPORTER'S CERTIFICATE

 3    COUNTY OF DENVER     )

 4               I, Vanessa D. Campbell, do hereby certify

 5    that I am a Registered Professional Reporter and

 6    Notary Public within the State of Colorado; that

 7    previous to the commencement of the examination, the

 8    deponent was duly sworn to testify to the truth.

 9               I further certify that this deposition was

10    taken in shorthand by me at the time and place

11    herein set forth and was thereafter reduced to

12    typewritten form, and that the foregoing constitutes

13    a true and correct transcript.

14               I further certify that I am not related

15    to, employed by, nor of counsel for any of the

16    parties or attorneys herein, nor otherwise

17    interested in the result of the within action.

18               In witness whereof, I have affixed my

19    signature and seal this 12th day of March, 2007.

20               My commission expires November 6, 2010.

21

22                         Vanessa D. Campbell, RPR, CRR

23                         216 - 16th Street, Suite 650
                           Denver, Colorado  80202
24

25
```

A1386

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


ARLIN M. ADAMS, Chapter 11
Trustee of the Post-Confirmation
Bankruptcy Estates of CORAM
HEALTHCARE CORPORATION, a Delaware
Corporation, and of CORAM, INC.,
a Delaware Corporation,

        Plaintiff,                    CASE NO.   04-1565

        vs.

DANIEL D. CROWLEY; DONALD
J. AMARAL; WILLIAM J. CASEY;
L. PETER SMITH; and SANDRA
L. SMOLEY,

        Defendants.
_____/


---oOo---

VIDEOTAPED DEPOSITION OF DANIEL D. CROWLEY

Friday, April 6, 2007

---oOo---

SHEILA CHASE & ASSOCIATES
REPORTING FOR:
LiveNote World Service
221 Main Street, Suite 1250
San Francisco, California  94105
Phone: (415)  321-2300
Fax:  (415)  321-2301


Reported by:
LORRIE L. MARCHANT, CSR, RPR, CRR, CLR
CSR No. 10523

Certified Copy

Crowley, Daniel D.                                    4/6/2007

1      Q.    And Coram filed Chapter 11 bankruptcy on

2   August 8, 2000?

3      A.    Approximately that date.

4      Q.    At some point did you perform work for Cerberus

5   related to a company known as Winterland?

6      A.    Yes, I performed services for Cerberus related

7   to Winterland.

8      Q.    And did you begin to perform those services for

9   Winterland before you became Coram's CEO?

10          MR. PETERS:   Objection.   Lacks foundation.

11          You may answer.

12          THE WITNESS:   Yes.   I was involved with

13   Winterland many months before I heard of Coram or became

14   involved officially with Coram.

15          BY MR. BARKASY:   Q.   Now, do you recall any of

16   the projects that you worked on for Cerberus from the

17   time you entered into your agreement with Mr. Feinberg

18   for the advisory position in 1998 and when you began to

19   work on Winterland?

20      A.    Well, again, if you have something to show me,

21   I'd be happy to look at it.

22          As to my recollection, I worked on many

23   different projects, some short in duration, some longer.

24   Some on the telephone, some in New York, some at

25   potential clients.

1          Some of the names that I would recall I worked

2     with Cerberus entity, Black Acre, on a Beverly Nursing

3     Home transaction, to -- trying to understand the

4     management and the business plan and the viability of it

5     and the likelihood of it working out right.

6          And give thoughts as to reimbursement on

7     Medicare and in the states in which the nursing homes

8     were going to operate as to a potential liabilities for

9     an investor under Medicare and Medicaid and

10    reimbursement rates related to that.

11         I gave some advice on HRH Sterrit, which was

12    more of a systems effort, rather than health care.  But

13    we had systems people and did a review of their hardware

14    and software and technology and work systems design.

15         Provided Cerberus's portfolio manager with an

16    assessment as to whether the company was scalable and

17    could do the kinds of things that Cerberus was being

18    told it could do.  And we give a view on that.

19         There were changes going on back in the -- what

20    was called HCFA, Health Care Financing Agency.  It was

21    being transitioned over to a new entity called CMS, and

22    there were reductions in the rates of reimbursement on

23    various kinds of care and services that Medicare was

24    proffering.

25         Cerberus sought a view of what those changes

1    might be and whether there would be a negative impact on

2    a couple of the entities they were interested in.

3    Particularly, there was a subacute care company by the

4    name of Vencor that provided care for folks that had

5    been paraplegic or quadriplegic and had gone through

6    their benefits and were on Medicaid and were being

7    warehoused in the hospitals.

8            And how that might work and whether new

9    reimbursement rates and laws as related to Medicare

10   would be helpful or harmful.  And did quite a bit of

11   inquiry in HCFA and CMS and various appropriation

12   committees and all of that, to try and understand it and

13   give them a view based on my own experiences and such.

14           And, of course, Vencor had nursing homes and

15   the notion of going to -- away from Medicaid patients to

16   pure pay private patients was being discussed.  And I

17   was asked my view about that and ultimately was asked

18   for a recommendation as to whether I thought the

19   business plan, the management team, were credible and

20   should be an investment.

21           And an investment was made, and I was asked if

22   I knew anyone that might serve properly as a board

23   member.  And I recommended a fellow who ultimately

24   became a board member.

25           I worked on an HMO in Southern Florida.  And my

Crowley, Daniel D.                                            4/6/2007

1    current memory is it was called PHP. And we had a

2    fellow who could do actuarial work as to the claims

3    reserving in it and the pricing and the risk that was

4    being taken on an underwriting basis.

5                And our view of what reimbursement was in

6    Florida and whether this HMO had -- reasonably it could

7    meet its plan and be profitable and the business plan,

8    the management team, due diligence for it. And I

9    recommended Cerberus invest in that, and they did.

10               We were asked about Magellan. Magellan was an

11   employee assistance plan. It was owned by the Texas

12   Pacific Group.

13               Cerberus sought to know whether it ought to

14   invest in that. And Magellan had purchased the Charter

15   Behavioral Hospitals, and it was not working out for

16   them or TPG.

17               And having done due diligence and met the

18   management team and read the business plan, done the

19   analysis, explored the divestiture that was underway to

20   a read of the behavioral hospitals, I recommended, you

21   know, that Cerberus not invest.

22               And ultimately it turned out to be the right

23   choice for Cerberus. They avoided a tremendous loss

24   there.

25               You know, there may have been any other of

1    other investments, and I -- I do think there were other

2    investments.

3              Sun -- I'm going to say Sun Nursing Homes, we

4    did some work for them.  I did some work for them on

5    Sun, understanding the mix of their business and the

6    states they were operating and the reimbursements and

7    the rules and the laws, and waved them off of Sun.  And

8    it turned out to be a right choice.

9              You know, the company was interested in a

10   medical record, electronic medical record, and I was

11   asked to come to New York and meet with the management

12   team, review the business plan and assess whether I

13   thought that that would make some sense, and waved them

14   off of that one.  It turned out to avoid them a, you

15   know, very substantial loss.

16             I was asked to look at a hospice company in

17   Florida and meet with the management team and look at

18   the business plan and review the reimbursement rates and

19   risks and rewards.

20             And I recommended that Cerberus invest in that,

21   and it turned out to be a terrific deal.  And the

22   management was great and the plan was right, the

23   reimbursement was right.  The rules were right.  And mix

24   and pricing and units and places that they were made

25   lots of sense.  And Cerberus made, you know, substantial

Crowley, Daniel D.                                              4/6/2007

1    profit on that.

2         And from time to time, Dan Wolf would call

3    about portfolio companies and ask my view.  Having had a

4    fairly extensive, global, wide and deep health care

5    background, I could give him my view.

6         And Bob Davenport, who had a different

7    portfolio, new and prospective investments -- and Seth

8    Plattus and Ron Goldstein and Steve Feinberg and I -- I

9    don't remember his partner's name at this time, who

10   called from time to time, seeking a view of risk/reward

11   on investments and changes in the -- see changes in the

12   reimbursement and government rules here, there and

13   everywhere.

14        And so it was episodic.  Up and down.  It

15   depended on what they had.  And some days would go by

16   and I wouldn't talk to them at all.  Some days would go

17   by, and, gosh, the phones would be ringing.  So I like

18   that.

19             (Marked for identification purposes,

20             Exhibit 1.)

21        MR. BARKASY:  Did we mark that Crowley 1?

22        THE REPORTER:  Correct.

23        BY MR. BARKASY:  Q.  Mr. Crowley, is Exhibit

24   Crowley 1 a letter from you to Steven Feinberg, general

25   partner of Cerberus Partners, dated April 9, 1999?

Crowley, Daniel D.                                          4/6/2007

1      A.    Yes.

2      Q.    What were you being paid $80,000 a month by

3   Cerberus to do?

4      A.    Do you want me to recite that -- all the

5   testimony I gave earlier?  I'm happy to do it.

6      Q.    Let me ask --

7            MR. PETERS:  Go ahead and answer the -- answer

8   the question.

9            BY MR. BARKASY:  Q.  Answer the question how

10  you want to answer it.

11     A.    Okay.  Well, when I originally started with

12  Cerberus, both Feinberg and myself had no idea the

13  extent to which the Cerberus portfolio managers and the

14  Cerberus organization would take up my time.

15           And, you know, originally we talked about

16  $10,000 a day and, you know, how many hours would that

17  be and just had a quick general conversation and a

18  handshake.

19           And then it started to ramp up and was taking

20  more time.  And then it was taking more time.  And then

21  we adjusted it.  And it was taking more time.

22           And at some point I was being called, you know,

23  at all hours of the day and night.  Monday, Tuesday,

24  Wednesday, Thursday, Friday, Saturday, Sunday.  It

25  didn't matter if it was the Fourth of July or, you know,

Crowley, Daniel D.                                    4/6/2007

1    Cynthia's birthday or anniversary or Christmas.

2           And the amount of time was different than he

3    thought -- Steve Feinberg thought and I thought, and I

4    found myself fielding calls from Ron Goldstein on

5    Kindred and Seth Plattus on something else and

6    Bob Davenport on something else and Dan Wolf on

7    something else and Peter Wolf on something else and

8    Steve on something else.

9           And, you know, the calls were coming all over

10   the place.  And where I had thought that I would have

11   the ability to have other clients, and I did have some,

12   and Steve knew that.

13          (Reporter clarification.)

14          THE WITNESS:  I had some and Steve knew that.

15          That I was suffering in my ability to have

16   other business.  And so their rates were going up, and

17   he was fine with that.

18          And I'm not sure when this -- this

19   memorializing has a certain date, but I do believe I was

20   being paid that before then.  It had gone from something

21   to something to 60 to 80.  And, you know, I wished I had

22   more than an handshake, and this was an attempt to

23   memorialize that.

24          (Marked for identification purposes,

25          Exhibit 14.)

A1395

Crowley, Daniel D.                                          4/6/2007

1          THE WITNESS:  My understanding was that this

2     document said that other portfolio companies, except to

3     say that it -- by the print excluded Coram and by the

4     meeting of the minds excluded Coram and it didn't

5     include Coram.

6          But those portfolio companies that I advised

7     on, to the extent that they made any money or generated

8     a return, that my efforts would result in compensation

9     for me.

10         BY MR. BARKASY:  Q.  Well, what portfolio

11    companies did you work on?

12         A.   Well, for example, I think -- for example, we

13    talked with Kindred.  And I never really knew the

14    magnitude of the investment that Cerberus made in

15    Kindred, but I tried to learn it after repeated attempts

16    of asking for a reconciliation from Cerberus that I

17    never got.

18         I went online and looked at the public

19    documents on Kindred and found investments that Cerberus

20    had made in there.  And it was in the 75- to

21    $100 million neighborhood.

22         And, you know, I tried to track the equity and

23    the performance on it, and, you know, at some point in

24    there my recollection is there was a triple in the

25    equity on -- the Cerberus investment would have yielded

1    an eight-digit reward to me, compensation, for the

2    advice and counseling work I did on it.  So that kind of

3    thing.

4          And Black Acre got involved as a Cerberus

5    subsidiary and Beverly Nursing Homes, because I was

6    doing a spinout in Texas and Florida of their nursing

7    homes, and I did quite a lot of work on that.  And they

8    did make an investment.

9          And I was told by Peter Wolf, I believe, at

10   Black Acre, that they had an annualized return at

11   35 percent, which would have put me into being

12   compensated for the advice and counsel I gave on that.

13         And I remember being told that PHP was much

14   like that in Florida and that they had a baked-in

15   35 percent return, and that I would have been in the

16   money on -- on that.

17         And I advised on Sterritt, and I know they made

18   money on Sterritt.  And I didn't get any upside on

19   investments that they didn't make.  I didn't have the

20   opportunity to participate and earn anything on -- on

21   loss avoidance.

22         You know, so, for example, in Winterland, Rich,

23   at some point it was roughly $45 million worth of debt

24   on Winterland.  And through my work, it was trimmed down

25   to $20 million worth of debt.  And so I saved the

Crowley, Daniel D.                                              4/6/2007

1    company $24 million.  I didn't get anything on that.

2              And so it was about the gain and my ability to

3    be compensated in companies in which there were a gain

4    other than Coram.

5        Q.    Your potential bonus with regard to the upside

6    in Winterland was increased from 20 percent in the

7    incentive agreement to 30 percent in this agreement with

8    Cerberus that you entered into in November 1999;

9    correct?

10       A.    Yeah.  I'd been -- I'd been asking for an

11   increase in Winterland vis-a-vis my engagement and

12   activity and value creation.  And, you know, I saved

13   that company -- it didn't end up that way in the end,

14   but I saved that company and saved a couple hundred jobs

15   and made a material difference and -- you know, both the

16   equity and the noteholders and management, the vendors

17   and the employees.

18             And I went into it with the understanding I

19   would receive an opportunity to earn a portion of a gain

20   if there was one.  And I thought that it ought to be

21   greater, and I'd been asking.  And this reflected that

22   ask.

23       Q.    And as to portfolio companies other than

24   Winterland, you were entitled to a bonus of 20 percent

25   of Cerberus's upside; is that correct?

1              MR. PETERS:  Oh, I see.

2              MR. BARKASY:  It's the letter to Mr. Feinberg.

3              BY MR. BARKASY:  Q.  You wrote to Mr. Feinberg,

4    And if I am the guy, what is the upside that covers this

5    effort?

6              And my question, Mr. Crowley, is did

7    Mr. Feinberg ever answer that question for you, what the

8    upside was that covered your effort?

9         A.   Well, this -- this paragraph is saying, first

10   off, I'm not sure I'm the person.  And if I am the

11   person, and I can improve this company and save this

12   company and generate earnings and profits and save these

13   jobs and turn this into a better company, how am I

14   compensated?  How do I participate for this performance?

15             And, look, let's get everybody around a table,

16   because I may not be the person.  I'm not sure I want to

17   be the person.  But put all the people in one room, and

18   let's talk about it and see what everybody thinks.

19   That's -- that's what I was thinking back then.

20             (Marked for identification purposes,

21             Exhibit 18.)

22             THE VIDEOGRAPHER:  Twenty minutes.

23             BY MR. BARKASY:  Q.  Mr. Crowley, do you

24   recognize Exhibit Crowley 18?

25        A.   Yes, I do recognize it.

Crowley, Daniel D.                                    4/6/2007

1     Q.    What is it?

2     A.    Well, this is a letter from myself to

3  Steve Feinberg in -- on the 12th of November 1999 in

4  which I was exploring ways to be compensated if I were

5  to accept the Coram position.

6         If I could save that company, if I could

7  improve that company, if I generated earnings, to be

8  paid fairly for the contribution that I might make.

9         And this piece -- of course I testified about

10  it in open court and in depositions endlessly, but I was

11  not an employee of Coram.  I wasn't an officer of Coram.

12  I wasn't a director of Coram.  I wasn't in charge of

13  Coram.  I wasn't anything with Coram.  I wasn't even

14  sure I would be, as I wrote this letter.

15         But I had had a conversation with Don Amaral,

16  who was the chairman, and I think he represented that he

17  was the largest individual shareholder, back and forth

18  around what do you want to do with the company after

19  Smith quit.

20         He said he didn't know who was going to step

21  in.  I said I'll be a crisis manager.  I'd like to try

22  that.

23         I met with the board.  Made a proposal.  They

24  weren't interested in that.

25         He was going to hire a recruiter and find a CEO

A1400

Crowley, Daniel D.                                      4/6/2007

1    and then ultimately came back and said, How about you

2    being the CEO?

3           I got this relationship with Cerberus and

4    others.  I'm doing other things.  I'm not interested in

5    giving that stuff up.

6           He spoke with Cerberus.  Feinberg left any

7    number of messages.  Had conversations.  Spoke with me.

8    And I said to Don, Look, if I come in here and save this

9    thing, you haven't been able to do it.  Rick Smith

10   hasn't been able to do it.  And there was some guy

11   before that that hadn't been able to do it.

12          So if I could come in and save this firm and

13   all those thousands of jobs, save this enterprise,

14   generate earnings and cash flow and sales and mix and

15   improve this thing from A to Z, I'd like to be rewarded

16   for that.

17          And I didn't like what he had proposed.  I

18   said, you know, what if I get an upside or get an

19   opportunity to earn something on Cerberus's position?

20          And he thought about it.  We talked about it a

21   couple of times.  And he said, It would be okay if it

22   was on your equity position.

23          So I went back to Cerberus and said, I'd like

24   an opportunity to be recognized if my performance

25   generates an improvement and saves this company.

A1401

Crowley, Daniel D.                                      4/6/2007

1          You know, in the end he didn't agree with it.

2     And in the end, Don didn't agree with what was being

3     talked about.  In the end, I signed an agreement with

4     Cerberus that excluded Coram.

5          And I signed an agreement with Coram that drew

6     a bright line that said if I got paid on Coram, I get

7     paid from Coram.  And that's -- you know, up until you

8     guys stiffed me, that's what -- I think I earned

9     something close to 17 million bucks that I didn't get

10    paid for the work I did on that formula.

11         And then the board resolved bonuses and

12    contract and -- I mean, I did my part.  Everybody

13    benefitted except me, you know.

14    Q.    I'll get to that comment in a minute.

15    A.    But could I ask a question?

16    Q.    In the November 12 letter --

17         MR. PETERS:  Hold on.

18         THE WITNESS:  Could I ask a question before you

19    ask me a question?  I've got to use the bathroom.

20         MR. BARKASY:  We can -- just ask for a break.

21         THE WITNESS:  I need a break.

22         THE VIDEOGRAPHER:  This marks the end of Tape 2

23    in the deposition -- Volume I in the deposition of

24    Daniel Crowley at 1:58.  Going off the record.

25         (Recess taken, from 1:58 to 2:10.)

CERTIFICATE OF DEPOSITION OFFICER

1

2    I, LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523,

3    duly authorized to administer oaths pursuant to Section

4    8211 of the California Code of Civil Procedure, hereby

5    certify that the witness in the foregoing deposition

6    was by me sworn to testify to the truth, the whole truth

7    and nothing but the truth in the within-entitled cause;

8    that said deposition was taken at the time and place

9    therein stated; that the testimony of said witness was

10    reported by me and was thereafter transcribed by me or

11    under my direction by means of computer-aided

12    transcription; that the foregoing is a full, complete

13    and true record of said testimony; and that the witness

14    was given an opportunity to read and correct said

15    deposition and to subscribe same.

16    I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in said

20    caption.

21    IN WITNESS WHEREOF, I have hereunto subscribed

22    by my hand this _12th_ day of _April_, 2007,

23

24    _____

LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523

25

Danitz, Scott R.                                    4/6/2007

IN THE UNITED STATES DISTRICT COURT          **Certified Copy**
FOR THE DISTRICT OF DELAWARE

Case No. 04-1565

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEO DEPOSITION OF SCOTT R. DANITZ
April 6, 2007

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ARLIN M. ADAMS, Chapter 11 Trustee of the
Post-Confirmation Bankruptcy of Estates of Coram
HEALTHCARE CORPORATION, and of CORAM, INC., a
Delaware corporation,
Plaintiffs,

vs.

DANIEL D. CROWLEY, DONALD J. AMARAL, WILLIAM J.
CASEY, L. PETER SMITH, and SANDRA L. SMOLEY,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:

        SCHNADER HARRISON SEGAL & LEWIS, LLP
            By Barry E. Bressler, Esq.
                1600 Market Street, Suite 3600
                Philadelphia, Pennsylvania  19103-7286
                215-751-2050
                bbressler@schnader.com
                    Appearing on behalf of Plaintiffs.

        KEKER & VAN NEST, LLP
            By Laurie Carr Mims, Esq.
                710 Sansome Street
                San Francisco, California  94111-1704
                415-391-5400
                lmims@kvn.com
                    Appearing on behalf of Defendant
                    Daniel D. Crowley.

        Also Present:  Carie Finegan, Videographer

Danitz, Scott R.                                    4/6/2007

1    can answer.

2        A    Yes.

3        Q    (By Ms. Mims)   Was CPS using more cash

4    than it was generating?

5        A    I don't have the -- I don't have any of

6    the financial information in front of me at this

7    point in time.  What I seem to recall was that they

8    were -- it was a negative EBITDA at the time.  So a

9    negative earnings before interest, taxes,

10    depreciation and amortization.  So a loss.

11        Q    Is EBITDA, as you've just defined it, a --

12    a measure of -- of profit or loss?

13        A    It's one measure of profit or loss.

14        Q    Was it a measure that was used frequently

15    at Coram?

16        A    Yes.

17        Q    Is it used at other companies?

18        A    Yes.

19        Q    Why was it used at Coram?

20        A    I wasn't involved in the decision making

21    as to why it was used at Coram.  It's just in -- in

22    the financial world, it's a means of identifying

23    how -- it's a measurement of generating cash.  It

24    might not be the true measurement of cash flow, cash

25    receipts and -- and disbursements and net cash flow,

Danitz, Scott R.                                    4/6/2007

1    but it's a financial measurement that's used,

2    commonly used.

3        Q    During 1999 was there a decision -- do you

4    know if a decision was made to offer CPS for sale by

5    Coram?

6        A    Yes.

7        Q    Do you know who made that decision?

8        A    I don't know the individuals.  I -- I know

9    it was the senior executives and the board of

10   directors.

11       Q    Was -- do you know when that decision was

12   made?

13       A    I -- it was in 1999.  I don't recall what

14   month.

15       Q    Was it prior to when Dan Crowley became

16   CEO of Coram?

17       A    Yes.

18       Q    So by senior executives, do you mean the

19   individuals you previously mentioned, Don Amaral,

20   Rick Smith and Wendy Simpson?

21       A    Yes, and there were a couple others, as

22   well.

23       Q    Do you recall who?

24       A    I -- for certain, no, I don't.

25       Q    Do you know why the decision was made to

A1406

1      A    Yes.

2      Q    Turn to the next page, which is Chapter 11

3   TRUSTEE 000362.  This page is also entitled "Coram

4   in 1999 (continued)," correct?

5      A    Yes.

6      Q    The first bullet point reads, "Negative

7   cash flow from operations."  Do you have an

8   understanding of what that means?

9      A    Yes.

10      Q    What does it mean?

11      A    On a cash flow statement, there's various

12   categories of identifying cash inflow and outflow,

13   and the first category is cash generated from

14   operations, so the -- the -- the business as it --

15   as it stands operationally, and -- and it was

16   negative.  It was not generating cash, it was using

17   cash.

18      Q    Do you have an understanding of why that

19   was the case?

20      A    Yes.  It would have been the reasons I've

21   described before.

22      Q    The next bullet point states, "CPS using

23   cash, diverting management from core (profitable)

24   business"?

25      A    Yes.

1      Q     Do you agree with that characterization?

2      A     Yes.

3      Q     Under that bullet point, I guess there's a

4  sub bullet, it reads, "CPS had 13% gross margin vs.

5  base business, which can run at 29% gross margin."

6  Did you or your department provide those values?

7      A     Yes.

8      Q     What does that statement mean, if you

9  know?

10      A     The revenue less the direct cost of its

11  drugs, and there might be some other costs involved

12  with that.  The -- CPS just had lower margins and

13  was less profitable than the infusion business at

14  that point in time.

15           (Pause.)

16      Q     Let's turn to Chapter 11 TRUSTEE 000365.

17      A     Yes.

18      Q     This page is also entitled "Coram in

19  1999," with an abbre -- abbreviation for continued,

20  correct?

21      A     Yes.

22      Q     The second bullet point states, "NYSE

23  threatening to" dis -- de-list" share -- "shares."

24  Do you know what that refers to?

25      A     Yes.

Danitz, Scott R.                                    4/6/2007

1    compete in terms of its levels of operations from a

2    revenue standpoint and a profitability standpoint,

3    and the public market, the investors were

4    recognizing that as they traded in the marketplace

5    for Coram stock, and that had an impact on the value

6    of the stock in the marketplace.

7         Q    Was the value of the stock low?

8              MR. BRESSLER:  Object to the form, but he

9    can answer.

10        A    Low to -- compared to what?

11        Q    (By Ms. Mims)   Okay.

12             (Pause.)

13        Q    The fourth bullet point states,

14   "Borderline for Stark II exception."  Do you know

15   what that refers to?

16        A    Yes.

17        Q    What does that mean?

18        A    Stark II was a regulatory requirement that

19   required Coram to have a minimum of $75 million of

20   stockholders equity, and at that time it was nearing

21   the low -- nearing the $75 million level, to where

22   if it fell below that, then it wouldn't qualify

23   under the Stark II requirements.

24        Q    Was it important for Coram to qualify

25   under the Stark II requirements?

A1409

1      A      Yes.

2      Q      Why?

3      A      We received referral sources from Medicare

4  and Medicaid, referrals from physicians, and under

5  the -- my understanding of the Stark II law is if

6  you do not qualify under Stark II with the minimum

7  equity requirement, you can no longer receive those

8  referrals for Medicare, and then actually Medicaid

9  would fall in place as well.

10     Q      Was the Medicare/Medicaid business a

11 significant portion of Coram's business?

12     A      Yes.

13            (Pause.)

14     Q      Handing you what will be marked Exhibit 3,

15 Danitz Exhibit 3.  It's a letter dated

16 December 15th, 1999 to Ernst & Young.  The Bates

17 stamp is COR-EQTY 0001681 through 1683.

18            (Exhibit No. 3 marked for

19            identification.)

20     Q      (By Ms. Mims)  Please review that document

21 and --

22     A      All right.

23     Q      -- let me know when you're ready.

24            (Pause.)

25            MR. BRESSLER:  Is this a good time, while