```
 1      A    But ultimately he has to have his
 2  signature on it, unless they were using some kind of
 3  a form signature if he was out in California, I
 4  don't know, but it appears, for example, on this one
 5  to be his signature and then being sent to Judge
 6  Adams.
 7      Q    Do I understand you correctly that it
 8  wasn't the general practice for you to send out
 9  these weekly reports to Judge Adams?
10           MR. BRESSLER:  I'll object to the form,
11  but he can answer.
12      A    Can you repeat the question, please?
13      Q    (By Ms. Mims)  Do I understand you
14  correctly that it wasn't the general practice for
15  you to send out these weekly reports to Judge Adams?
16      A    When -- when you say "send out," I'm
17  putting it in the context of sending the letter, and
18  it could be any number of people at Mr. Crowley's
19  direction, once it was final, to send it out to
20  Judge Adams.  But Mr. Crowley was responsible for
21  sending a weekly update to Judge Adams.
22           (Pause.)
23      Q    Handing you what will be marked Danitz
24  Exhibit 7.
25           (Exhibit No. 7 marked for
```

```
 1              identification.)
 2       Q      (By Ms. Mims)  This is a document Bates
 3  stamped Chapter 11 TRUSTEE 003163 through 3165.  Do
 4  you recognize this document?
 5       A      Let me look at it quickly.
 6              (Deponent examined exhibit.)
 7       Q      Take your time.
 8              (Deponent examined exhibit.)
 9       A      All right.  Yes.
10       Q      Do you recognize this document?
11       A      Yes.
12       Q      What is it?
13       A      It's a letter -- cover letter with
14  attachments that I had prepared and sent to
15  Mr. Mumford of Ewing Monroe Bemiss & Company
16  identifying -- it really is just a summary
17  description of information sent to Judge Adams
18  through Mr. Crowley.
19       Q      Who's Mr. Mumford?
20       A      He was, I believe at the time, vice
21  president or -- or director with the investment
22  banking firm of Ewing Monroe Bemiss.  He was
23  hired -- Ewing Monroe Bemiss was hired by Judge
24  Adams as investment advis -- advisers to the
25  trustee, investment banker advisers.
```

```
 1   directly identified in the data request, I just
 2   don't recall.
 3        Q    When you sent this letter, did you -- with
 4   the attached index, did you believe that the
 5   documents listed in the index were correspondence
 6   from Daniel D. Crowley to Judge Arlin M. Adams?
 7        A    Yes.
 8             MR. BRESSLER:  Object to the form, but he
 9   can answer.
10        A    Yes.
11             MS. MIMS:  Let's break for lunch.
12             MR. BRESSLER:  Sure.
13             THE VIDEOGRAPHER:  We are off the record
14   at 11:57.
15             (A recess was taken from 11:57 a.m. to
16              12:43 p.m.)
17
18
19
20
21
22
23
24
25
```

```
 1              AFTERNOON SESSION
 2         THE VIDEOGRAPHER:  We are back on the
 3   record at 12:43.
 4         Q    (By Ms. Mims)  Good afternoon, Mr. Danitz.
 5         A    Good afternoon.
 6         Q    This morning we were discussing that Coram
 7   had debt.  Do you remember that testimony?
 8         A    Yes.
 9         Q    Did Coram have to pay interest on that
10   debt?
11         A    Yes.
12         Q    Was part of that debt notes?
13         A    Yes.
14         Q    Did Coram have to pay interest on those
15   notes?
16         A    They were obligated to pay interest on the
17   notes.
18         Q    What do you mean by that?
19         A    Well, the -- the note agreements called
20   for an interest obligation, and there were different
21   ways of paying that interest obligation.
22         Q    What were the different ways?
23         A    Either by cash or they could do a payment
24   in kind, called a PIK, and effectively that takes
25   the interest, and instead of paying that obligation
```

1   with cash, it just increases the amount of the
2   obligation that the company has to pay to the
3   lenders.
4       Q   Does it increase the principal?
5       A   Not the original principal, but it's an
6   additional amount of debt that they have to pay.
7       Q   So when a payment in kind or a PIK is
8   made, it increases the liabilities of the company?
9       A   Yes.
10      Q   When you joined Coram in January of 1998,
11  do you know how Coram was paying its interest?
12      A   Not at that time, I don't recall.
13      Q   Do you know why a company would choose
14  to -- or why Coram would choose to pay in cash or
15  pay in kind?
16          MR. BRESSLER:  I'll object to the form,
17  but he may answer.
18      A   Can you repeat the question?
19      Q   (By Ms. Mims)  It was a bad question.
20  I'll try to make it clearer.  Are there certain
21  circumstances that would lead a company to pay its
22  interest obligations in cash versus a payment in
23  kind?
24      A   Absolutely there would be, and it's going
25  to be different for any company that has that option

Danitz, Scott R.                                      4/6/2007

```
 1    Q    What is it?
 2    A    This was the company's presentation that
 3  was being made at the meeting with Cerberus
 4  Partners, Goldman Sachs and Foothill Capital on
 5  February 15th.
 6    Q    Did you -- were you involved in the
 7  preparation of this presentation?
 8    A    I was involved with parts of the
 9  presentation, but not the entire presentation.
10    Q    Which parts of the presentation were you
11  involved in?
12    A    Without going through every -- I just
13  don't recall.
14    Q    Were you involved in the financial
15  parts --
16    A    Yes.
17    Q    -- of --
18    A    Again, it would have been similar to,
19  first, the financial information and then reviewing
20  it for any editorial comments and recommendations
21  for changes and consideration.
22    Q    Let's go to COR-EQTY 0002749.  Did Coram
23  Healthcare -- Healthcare create a target budget in
24  2000?
25    A    Yes.
```

1    Q    What was the target budget?

2    A    It was one measurement of operating

3   profitability that was being used to measure

4   performance of the company and then eventually be

5   used to measure performance for any incentive

6   compensation for executives of the company.

7    Q    Was the target budget presented to the

8   board?

9    A    I recall it being presented to the board,

10  yes.

11   Q    I direct your attention to the document

12  Bates labeled COR-EQTY 0002752, so it's a few pages

13  back.

14       The paragraph numbered 4, could you read

15  that out loud?

16   A    Yes.  All interest payments due on Bank

17  debt in 2000 are paid in cash, and in parentheses,

18  no PIKs, P-I-K -- capital P-I-K-s, 60 million

19  reduction in series B debt principal from the sale

20  of CPS Senior Credit Facility line remains at

21  44 million with half percent -- half a point percent

22  increase in July 2000.

23   Q    Does the first sentence that you read

24  refresh your recollection as to the way that Coram

25  budgeted to pay its interest obligations?

1   A   Yes, it does.  It was to be paid in cash.
2   Q   Was that part of the budget shared with
3   the board?
4   A   Without going back to the original
5   presentation -- I'd have to see that presentation.
6   I just don't recall.
7   Q   Directing your attention to the lower
8   right side of the page, looking at it where you can
9   read the text, there appears to be a date and time
10  stamp?
11  A   Yes.  December 22nd, 1999, 6 o'clock --
12  6:09 p.m.
13  Q   Does the computer system that you used at
14  Coram at this time date stamp documents?
15  A   It would only be on there if the preparer
16  put that command in the report that's being printed.
17  Q   And what would it indicate?
18  A   It can be different.  I mean, you can put
19  anything in the footer or header of a report.
20  Q   Okay.
21  A   But that was the intent here, is in
22  preparation of this it was to put the date that the
23  report was prepared on -- on this particular page.
24  Q   So you believe that this report was
25  prepared in December of -- December 22nd, '99?

```
 1  was paid by cash?
 2       A    Because Mr. Crowley indicated we were
 3  going to pay it by cash.
 4       Q    And did the company have enough cash to
 5  pay it by cash?
 6       A    We had funds available to make the
 7  interest payment with cash, yes.
 8       Q    Did Mr. Crowley direct you to make the
 9  payment in cash?
10       A    I don't know if it was me specifically,
11  but eventually, yes, he would have instructed me to
12  make the payment, yes.
13       Q    After the payment was made, did Coram
14  still have cash available?
15       A    I don't recall how -- the cash
16  availability at the time of the interest payment.
17  But to answer your question, yes, they still had
18  cash, because we never borrowed on any facility
19  during my tenure as the principal financial officer.
20       Q    So is it fair to say that Coram must have
21  had enough cash to meet its obligations because it
22  didn't have to borrow?
23            MR. BRESSLER:  Object to the form.  If
24  they could meet their obligations they wouldn't have
25  filed the bankruptcy petition, but he can answer if
```

1  he knows.
2      A    Right. The -- the question isn't right in
3  terms -- we had cash to make the payment. There was
4  cash available to make the payment and we used that
5  cash to make the payment.
6      Q    (By Ms. Mims)  Did Coram have enough cash
7  available after the payment to meet its day-to-day
8  operations obligations?
9           MR. BRESSLER: Object to the form. He can
10 answer if he can.
11     A    Yes. For the day-to-day operations at
12 that time, yes.
13          (Pause.)
14     Q    (By Ms. Mims)  If that interest payment
15 had been made as a payment in kind, a PIK, would
16 that have affected the valuation that was prepared
17 by Chanin Capital Partners?
18     A    I have no idea.
19     Q    Did paying that interest obligation in
20 cash rather than as a payment in kind have any
21 effect on EBITDA?
22     A    No, it did not.
23     Q    Did it have any effect on the value of
24 shareholder equity?
25     A    We weren't valuing shareholder equity, so

```
1    STATE OF COLORADO    )
2                         ) ss.    REPORTER'S CERTIFICATE
3    COUNTY OF DENVER     )
```

4        I, Vanessa D. Campbell, do hereby certify

5  that I am a Registered Professional Reporter and

6  Notary Public within the State of Colorado; that

7  previous to the commencement of the examination, the

8  deponent was duly sworn to testify to the truth.

9        I further certify that this deposition was

10  taken in shorthand by me at the time and place

11  herein set forth and was thereafter reduced to

12  typewritten form, and that the foregoing constitutes

13  a true and correct transcript.

14       I further certify that I am not related

15  to, employed by, nor of counsel for any of the

16  parties or attorneys herein, nor otherwise

17  interested in the result of the within action.

18       In witness whereof, I have affixed my

19  signature and seal this 12th day of April, 2007.

20       My commission expires November 6, 2010.

21

22

23  Vanessa D. Campbell, RPR, CRR
216 - 16th Street, Suite 650
Denver, Colorado 80202

24

25