# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of CORAM HEALTHCARE CORPORATION, a Delaware Corporation, and of CORAM, INC., a Delaware Corporation,

Plaintiffs,

v.

DANIEL D. CROWLEY, DONALD J. AMARAL, WILLIAM J. CASEY, L. PETER SMITH, AND SANDRA L. SMOLEY,

Defendants.

Case No. 04-1565 (SLR)

---

## DECLARATION OF DANIEL CROWLEY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

---

Dated: April 17, 2007

Jeffrey C. Wisler - #2795
Christina M. Thompson - #3976
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE 19801
(302) 658-9141

-and-

John W. Keker
Elliot R. Peters
R. James Slaughter
KEKER & VAN NEST, LLP
710 Sansome Street
San Francisco, CA 94111
(415) 391-5400

*Attorneys for Defendant DANIEL D. CROWLEY*

393404.01

I, Daniel Crowley, declare and state as follows:

1.      From 1988 through 1997, I was Chief Executive Officer of Foundation Healthcare Corporation, a health maintenance organization (HMO) headquartered in Sacramento, California. At the time I became CEO of Foundation, its revenues were approximately $349 million. In 1997, I oversaw the merger of Foundation into Healthnet. After the merger was complete, I became Chairman of the Board of the merged entity. At the time that I left Foundation (by then Healthnet) in 1997, it had 17,000 employees in approximately 225 locations and revenues were approximately $7.5 billion.

2.      After I left Foundation in 1997, I started my own business, Dynamic Healthcare Solutions. Dynamic provides consulting services principally to healthcare related companies and to investors interested in the healthcare field.

3.      In 1998, I met Stephen Feinberg, head of Cerberus Partners, an investment firm. In 1998, I and Dynamic began to perform services on a variety of prospective and actual investments in which Cerberus held an economic interest. For example, I began consulting for, and ultimately became Chairman of the Board of a company called Winterland based in San Leandro, California, in which Cerberus held an economic interest. By August of 1999, Cerberus was paying Dynamic $80,000 per month for these services, which agreement was memorialized in writing in November 1999.

4.      In the summer of 1999, Feinberg asked me to meet with the CEO of Coram Healthcare Corporation, a company in which Cerberus held an economic interest. Initially, the CEO, Rick Smith was reluctant to meet with me. Eventually we met, and I was able to form a

2

preliminarily assessment of some of the problems facing Coram. In September 1999, Coram hired me, through Dynamic, as a consultant to Mr. Smith.

5.    In October 1999, Smith resigned as CEO of Coram. Coram appointed Donald Amaral, the Chairman of the Board and former CEO, as interim CEO. Subsequently, Amaral and Feinberg (who was on Coram's board of directors and chair of the compensation committee) asked me to consider becoming CEO of Coram. I was initially not interested in becoming Coram's CEO. Coram was a business that was substantially smaller than the last company I had run (Foundation) and many of its problems seemed intractable. Moreover, I had a business (Dynamic) that I was interested in building and wanted to continue my consulting work with Cerberus and others. Rather than be CEO, I suggested to Amaral and Feinberg that Coram hire me as temporary crisis manager. Nevertheless, Amaral and Feinberg persisted in requesting that I consider becoming Coram CEO. I remained unsure of whether I wanted to be CEO up until just before I signed my agreement with Coram.

6.    During November 1999, I negotiated with Mr. Amaral regarding a potential role -- whether it be as CEO or crisis manager -- at Coram. It was important to me that any role at Coram not prevent me from continuing my other consulting work, including my consulting work for Cerberus. The contract I signed with Coram in November 1999 explicitly provides that I "will have other business interests and may serve as on officer or consultant to other business."

7.    It was also important to me that if I were able to succeed in saving Coram where others had failed, I be compensated for that success by participating in the financial gains I had helped to create. In that regard, I requested of Mr. Amaral and Mr. Feinberg incentive compensation based upon a return to the noteholders. I was unaware that this could be perceived

3

in any way as creating divided loyalties. Ultimately, Mr. Feinberg and Mr. Amaral declined and the issue was dropped and did not become part of any agreement. In the end, I signed an agreement with Coram that provided that I be paid $650,000 per year, that I be granted 1,000,000 stock options, and, importantly to me, that I was eligible to receive incentive compensation in the form of a bonus of up to three times my salary if Coram were to achieve specific earnings targets. Subsequently, in April 2000, my Coram contract was amended to provide a larger potential incentive bonus, but only if Coram's earnings were greater.

8.     My agreement with Cerberus specifically excluded compensation related to Coram, and since the time I became CEO of Coram through today I have never been compensated by Cerberus for any work related to Coram.

9.     Coram's board of directors was aware that I had a financial relationship with Cerberus prior to the time I became CEO. Among other things, Mr. Feinberg, as a member of Coram's board, knew all of the details of my agreement with Cerberus since he had signed my Cerberus agreement. In addition, I had numerous discussions with Mr. Amaral prior to the time I signed my Coram contract regarding my relationship with Cerberus, including the fact that I was being paid by Cerberus. I also understand that Mr. Feinberg disclosed to his fellow Coram board members that I was a consultant to Cerberus. In light of Mr. Feinberg's knowledge of all the details of my agreement with Cerberus and my conversations with Mr. Amaral, I reasonably believed that the rest of Coram's board knew the details of my agreement with Cerberus. To the extent that any those directors did not know specific terms of my agreement with Cerberus, it is only because they declined to ask for that information. I never refused to give any information regarding my Cerberus contract to anyone. I believed in good faith that the Board had all the information it needed when they hired me.

4

10.     After the denial of Coram's first proposed plan of reorganization, I disclosed to Coram's board and its bankruptcy counsel, David Friedman, that I continued to provide consulting services to Cerberus on matters unrelated to Coram and that I continued to be paid $80,000 per month for those services. The details of my agreement with Cerberus were also disclosed by Coram in its form 10-K, signed by all of Coram's directors and filed with the SEC in early 2001, which disclosed that "[e]ffective August 1, 1999" Crowley and Cerberus "executed a three-year employment agreement whereby Mr. Crowley is paid $960,000 per annum." No member of Coram's board of directors ever suggested to me that I resign from Coram or sever my relationship with Cerberus. Mr. Friedman, Coram's bankruptcy counsel, never suggested to me that I resign from Coram or sever my relationship with Cerberus.

11.     At Mr. Friedman's suggestion, the independent members of Coram's board of directors created a Special Committee of the board that consisted of all members of the board except me. The Special Committee retained Harrison J. Goldin, former Comptroller of the City of New York, as an Independent Restructuring Advisor to examine and analyze the first plan of reorganization, the preparation of the first plan of reorganization, whether any facts supported the conclusion that the first plan was not proposed in good faith, and how best to proceed with respect to a second plan of reorganization, including the substance of the terms of a proposed second plan.. Mr. Goldin conducted an independent investigation and prepared a lengthy report. Apart from meeting with Mr. Goldin at his request, I had no role in the preparation of the report. I had no role in the preparation of the second proposed plan or reorganization.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct. Executed this _16_ day of April, 2007 at _Sacramento_ _Calif._

Daniel Crowley