IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In the matter of            )
                            )
CORAM HEALTHCARE CORP.      ) Case No. 00-3299
and CORAM, INC.             ) Through 00-3300 (MFW)
                            )
            Debtors.        )


                    Bankruptcy Courtroom
                    Room No. 2 - Sixth Floor
                    Marine Midland Plaza
                    824 Market Street Mall
                    Wilmington, Delaware


                    Friday, December 15, 2000
                    9:07 a.m.


BEFORE:   THE HONORABLE MARY F. WALRATH,
          United States Bankruptcy Judge



                TRANSCRIPT OF PROCEEDINGS



                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                 (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters



A-4

1      Q.   Mr. Crowley, let me try to ask the question

2    again.  Not your expectation, but in the course of that

3    call did you or anyone else, to your knowledge, say, this

4    is only for employees of Coram?

5      A.   I don't know.

6      Q.   Thank you.  Are you aware of any arrangements

7    that were made to limit access to that call, as, for

8    example, by requiring a pass code in order to listen on

9    the call?

10     A.   The fact is those calls -- that call was

11   announced to employees with a call-in number for

12   employees.

13     Q.   Were you through, sir?

14     A.   Yes.

15     Q.   And that call-in number didn't have a pass code

16   or a password attached to it, to your knowledge, did it?

17     A.   I don't know.

18     Q.   Let's then move on, try and explore your

19   relationship with both Cerberus and Coram.  I'd like to

20   focus first on your relationship with Cerberus, which I

21   understand it began in the first half of 1999.  Is that

22   correct?

23     A.   My relationship in what sense?

24     Q.   Your relationship in providing either consultant



Crowley - Cross                                    12

1    or any other services to Cerberus.

2         A.    I had informal workings with them that may have

3    preceded that.    I don't recall the dates.

4         Q.    Is it correct to say prior to June of 1999 or

5    July of 1999 that you were charging Cerberus and Feinberg

6    $10,000 a day plus expenses and staff for your consulting

7    services?

8         A.    Yes.

9         Q.    And the concept at that time between you and

10   Cerberus and Feinberg was that you were sort of a CEO of

11   CEOs.    Correct?

12        A.    In July of 1999 we came to a discussion in which

13   I agreed to serve for Cerberus as a CEO of CEOs and to

14   assist Cerberus in other capacities as I could.

15        Q.    At about that time Cerberus was eating up all

16   your time on their projects, wasn't it?

17        A.    No.

18        Q.    I'm going to put in front of you a transcript of

19   the deposition that I took on December 7th in

20   Mr. Friedman's office -- they are marked, Your Honor, as

21   Exhibit EC 35 -- and ask you to turn to page 51 and look

22   at line 13, if you will.    You're certainly welcome to

23   read the whole answer, but didn't you testify, quote,

24   "They were calling me all the time.    Basically were



1    eating up all my time on all their projects and companies

2    and advice and counsel, anyway."

3        A.    I'm sorry.    I misunderstood the page number

4    here.

5        Q.    51.

6        A.    I'm not familiar with these documents.

7        Q.    It's in the upper right-hand corner.

8        A.    Got it.

9        Q.    I'm looking at line 13 and 14.

10       A.    Generally what I meant by that was that they

11   were --

12       Q.    Excuse me, sir.    Did you testify to that?

13       A.    Those are my words.

14       Q.    You want to explain what you meant by it.

15       A.    They were calling me quite a bit.    My

16   involvement was increasing at an increasing rate.    It's

17   not proper to say that they were consuming all of my

18   time.

19       Q.    Then why did you say that, sir?

20       A.    It was a generalization.

21       Q.    In any event, in July you struck a deal with

22   Mr. Feinberg, correct?

23       A.    Yes.

24       Q.    And that deal was that Cerberus or Feinberg



Crowley - Cross                                        14

1    would pay you $80,000 a month, plus expenses, plus

2    20 percent of the upside over preferred return on certain

3    companies.   Correct?

4         A.    $80,000 a month, plus 20 percent of any gain, if

5    there was one, above a preferred return of 14 percent,

6    plus expenses, compounded annually, is correct.

7         Q.    And under that deal that you struck, that was

8    instead of $10,000 a day, right?

9         A.    Yes.

10        Q.    Now, under that deal you were to work

11   exclusively for Cerberus, correct?

12        A.    Not totally.

13        Q.    Would you look, sir, at page 50 of your

14   testimony and at line 7.   Look at line 6.   I asked you,

15   "Tell me about the alteration."

16               And you said, "I was to work exclusively

17   for Cerberus."

18               Did you give that testimony?

19        A.    I'm trying to find your page number.   11?

20        Q.    Page 50, line 11.

21        A.    I said those words.

22        Q.    Did you mean them when you said them?

23        A.    Again, they are subject to the actual document

24   and the relationship in which Cerberus articulated that

1   they knew I had Dynamic Healthcare Solutions that I could

2   continue, that I had investments that I could continue,

3   that I had a Crowley Children's Fund 501C3 that I could

4   continue, that I had other businesses of my own which I

5   could continue.

6       Q.   You didn't tell me that when I asked you the

7   question at the deposition, did you?  You can read all

8   the rest of that answer.

9       A.   Then you didn't ask me in a way in which I could

10  give you that response.

11      Q.   My question, sir, was, "Tell me about the

12  alteration."  Was that confusing to you?  There was an

13  alteration from $10,000 a month to working exclusively

14  for Cerberus.

15      A.   It means that I wouldn't take other clients,

16  which I had historically done.

17      Q.   You say that at that point in July the document

18  provided you could do all those other things?

19      A.   In July the handshake, which was later

20  articulated in a document, permitted me to do those

21  things.

22      Q.   That handshake deal continued from July until

23  November, when it was documented.  Is that correct?

24      A.   It took several months to get it documented.



Crowley - Cross                                    16

1    That's correct.

2        Q.    It continued until November, when it was

3    documented; is that correct?

4        A.    Yes.

5        Q.    And during that period you operated under the

6    provisions of the written agreement, which you signed in

7    November.

8        A.    Generally so, yes.

9        Q.    And that written agreement is this document

10   which has previously been admitted into evidence as

11   Debtors' Exhibit 1.  Is that correct?

12       A.    Yes.

13              THE COURT:  Excuse me.  I think that's one

14   of the documents that counsel for the debtor took back at

15   our earlier hearing.  At a break I'm going to ask counsel

16   for the debtor to be sure to have the full complement of

17   the debtors' exhibits.  Thank you.

18       Q.    Let's look during the same period at what was

19   going on with Coram.  Switching off of Cerberus now where

20   you have started in July and $80,000-a-month consulting

21   arrangements by a handshake, and I want to talk about

22   Coram, beginning at about the same time you entered into

23   a consulting agreement with Coram.  Is that right?

24              THE WITNESS:  I'm sorry.  Could you read it



1  back?  I was looking at the document.

2              (The reporter read back as instructed.)

3      A.   I believe it was in September that I entered

4  into -- I attempted to enter into a consulting

5  arrangement with the CEO of Coram.

6      Q.   Well, you did, didn't you?

7      A.   It was never executed, but, in fact, I operated

8  as if it had been.

9      Q.   What did you get paid under that consulting

10  arrangement with Coram?

11      A.   We discussed this in my deposition, and I

12  haven't gone back and had the time to look at the

13  document, but my recollection generally was that it was

14  $40,000 a month.

15      Q.   $40,000 a month.

16      A.   Some portion of it was paid up-front.

17      Q.   I'm sorry?

18      A.   Some portion of it was paid up-front.

19      Q.   So at this point you're working, as I understand

20  it, for Cerberus for $80,000 a month on an upside, where

21  your testimony at least has you working exclusively for

22  Cerberus and now you enter into an agreement with Coram

23  where you're providing consulting services for another

24  $40,000 a month.  Is that correct?

1          MR. FRIEDMAN:  Objection.  Mischaracterizes

2    his testimony.

3          THE COURT:  Sustained.

4    BY MR. LEVY:

5      Q.    At this point, July/August, you had an

6    employment agreement by a handshake with Cerberus which

7    was paying you $80,000 a month, plus an upside.  Is that

8    right?

9      A.    A potential upside if value could be created.

10   There was no value to it at the time, but yes, I was

11   being paid $80,000 a month and had a potential upside.

12     Q.    Your testimony, during your deposition at least,

13   was that you were to work exclusively for Cerberus.

14     A.    I already told you, and this document that you

15   have handed me calls out the fact, that I can continue to

16   own and operate Dynamic Healthcare Solutions in the same

17   business currently engaged in by such firm to the extent

18   as and so forth.

19     Q.    That document in front of you wasn't executed

20   till November, was it?

21     A.    But it was part of the handshake that said that

22   I could continue to operate and own my own company, as

23   well as other things that I was doing.

24     Q.    Well, why don't we look at that document, then.

1    Look at page 3.  "That document," I'm sorry, being

2    Debtors' Exhibit 1.  That's the employment agreement that

3    you entered into with Cerberus as of August 1st, but you

4    didn't execute it till November.  Right?

5        A.   Yes.

6        Q.   And this, as I think you testified, reflected

7    the handshake deal that had been made back in July with

8    Mr. Feinberg.  Right?

9        A.   I said generally it did.

10       Q.   And you signed Debtors' Exhibit 1?

11       A.   Yes, I did.

12       Q.   Look, please, at paragraph 2.5 which says

13   "Duties."

14            Does Your Honor have this contract?  Kind

15   of hard to read.

16            THE COURT:  I have it.

17   BY MR. LEVY:

18       Q.   Under "Duties," would you read the first two

19   sentences, sir.

20       A.   "Executive will have such duties as are assigned

21   or delegated to the executive by the general partner or

22   Stephen Feinberg."

23       Q.   Next sentence?

24       A.   "The executive will devote his entire business

Crowley - Cross                                    20

1   time, attention, skill, and energy exclusively to the

2   business of the employer or any portfolio company or

3   companies" --

4       Q.   "Companies as to which the executive is assigned

5   by the employer."

6       A.   Thank you.

7       Q.   We can agree that you are the executive.  They

8   use the word "executive"?

9       A.   That's me.

10      Q.   And that the company is Cerberus.  Right?

11      A.   Cerberus is the company.

12      Q.   Is the company.

13      A.   Yes.

14      Q.   Back to my question.  I'll try and ask it

15  better.  As of August, you had a verbal agreement,

16  handshake, with Cerberus, later generally reflected in

17  Exhibit D-1, which required you to devote all of your

18  time to Cerberus, and as of August you had a consulting

19  agreement with Coram that paid you an additional $40,000

20  a month.  Is that correct?

21      A.   I believe in September I had a consulting

22  agreement with Coram that paid me $40,000 a month.  That

23  is correct.

24      Q.   The board of directors of Coram at that time

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

A-14

1  didn't know, did they, that you were getting $80,000 a

2  month from Cerberus?

3      A.   I have no idea.

4      Q.   You certainly never made any attempt to disclose

5  it, did you?

6      A.   I don't know that I was asked.

7      Q.   But you didn't volunteer it.

8      A.   I don't know that I was asked.  I was not an

9  employee of Coram in August or September or October or

10  November.  I had my own company.  Why would I have been

11  asked?

12      Q.   You were getting $40,000 a month from Coram,

13  weren't you?

14      A.   I was hired as a consultant by the CEO and

15  president of the company to consult at his pleasure.

16      Q.   In fact, you never told the board of directors

17  of Coram that you were getting $80,000 a month from

18  Cerberus, did you?

19      A.   If I had been asked, I would have told them.

20      Q.   Even after you became an employee, you never

21  told them?

22      A.   The board of directors knew that I had other

23  activities, which included my business relationship with

24  Cerberus.  It was much discussed.  In fact, my employment



Crowley - Cross

22

1   agreement specifically states that I have other

2   interests, that I have other activities, that is

3   permitted.  It was much discussed by the independent

4   directors.  It was much discussed that I had other

5   activities.  My relationship with Cerberus was known.

6       Q.   But all of this what you call much discussion,

7   it was never disclosed that you were getting nearly a

8   million dollars a year, plus upside, from Cerberus, was

9   it?

10      A.   Again, I have not withheld then or now anything

11  from the board.  Had it been asked, I would have said it.

12  They didn't ask me.  It didn't occur to me if they didn't

13  ask me.

14      Q.   During this period, "this period" being

15  beginning in August, you were spending a great deal of

16  time on Coram's work, weren't you?

17      A.   I was spending some time on Coram's work in

18  August of 1999.  Some time, yes.

19      Q.   And after November of 1999 you were spending

20  7 days a week, 15 hours a day on Coram, weren't you?

21      A.   I was hired November 30th.  So after November I

22  engaged in the business of Coram and gave it that level

23  of attention that I believed that it deserved and I

24  could.

Crowley - Cross                                    31

1        A.    That's correct.

2        Q.    There was a company called Winterland, wasn't

3    there?

4        A.    Yes.

5        Q.    And Winterland was a portfolio company of

6    Cerberus's, correct?

7        A.    Yes.

8        Q.    And you were the CEO of Winterland?

9        A.    No.

10       Q.    You became the CEO of Winterland?

11       A.    No.

12       Q.    I'm sorry.  You were the boss of the CEO of

13   Winterland?

14       A.    I was the chairman of Winterland.

15       Q.    Sir, you testified you were the boss during your

16   deposition.  Is that correct or not?

17       A.    I'm the chairman of Winterland.

18       Q.    I'm sorry?

19       A.    I am the chairman of the board of Winterland.

20   The CEO of Winterland reports to me.

21       Q.    Page 91, sir, beginning at line 6, did you

22   testify as follows:

23              "Question:  Were you kind of a CEO of the

24              CEO then?  We're talking about Winterland.

W&F
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Crowley - Cross

32

1          "Answer: I was the chairman of the company.

2          "Question: Was there also a CEO at

3      Winterland?

4          "Answer: There was a CEO at the time.

5          "Question: And you were his boss.

6          "Answer: Yes, I was.

7          "Question: Does that relationship continue

8      today?

9          "Answer: Yes, it does."

10         Was that your testimony?

11     A.    Yes.

12     Q.    Now, Cerberus owned 70 percent of Winterland,

13 right?

14     A.    Yes.

15     Q.    And the company called Gordon Brothers owned

16 30 percent of Winterland, correct?

17     A.    Cerberus owned 70 percent. Gordon owned

18 30 percent. Both were diluted by management on

19 approximately 18 percent.

20     Q.    Both were equally diluted -- not equally but

21 proportionately, right?

22     A.    Yes.

23     Q.    Initially they were also diluted by your

24 potential 20 percent upside, correct?

1     A.    There's a difference between the dilution.  So

2  it's not correct.  The management options absolutely

3  diluted them.  Absolutely.  It was without respect to

4  performance.  My options were if and only if there was a

5  gain on the sale or gain on the asset, in which the

6  principals received a preferred return, plus their

7  expenses.  So mine was a potential dilution, versus

8  management which was, in fact, a dilution.

9     Q.    That potential dilution, as you call it, of

10  20 percent was shared in the proportion of 70 percent

11  Cerberus, 30 percent Gordon.  Right?

12     A.    Yes.

13     Q.    While you call it a potential return, the reason

14  you entered into the agreement is because you hoped to

15  make a lot of money on that upside, right?

16     A.    Yeah.

17     Q.    I'm with you.

18     A.    That's why I did.

19     Q.    Now, when Cerberus agreed in November that your

20  return or your upside, rather, could go to 30 percent,

21  Gordon Brothers didn't share that, did they?  They

22  refused to?

23     A.    I didn't ask them.

24     Q.    You didn't ask them.



1      A.    No.

2      Q.    In any event, they didn't share it.  It was all

3  Cerberus, right?

4      A.    What I asked Gordon Brothers to do was to sell

5  me their position completely.

6      Q.    And they said no.

7      A.    I didn't like the price they offered.  I tried

8  to buy their share completely, 100 percent of it.

9      Q.    I simply want to make clear the point that when

10  it went from 20 percent to 30 percent, that Cerberus bore

11  that whole burden, and, whether you asked them or not,

12  the fact is that Gordon Brothers didn't bare the burden

13  of that additional 10 percent potential dilution.

14      A.    Again, on Gordon Brothers, I sought to take

15  their entire position and to purchase it for roughly 7 or

16  8 million dollars.  I didn't seek to potentially dilute

17  them by asking for an increase.  I wanted to buy them

18  out.  That's what the nature of the conversations were.

19      Q.    To pin it down, you got 10 percent more from

20  Cerberus, but you did not receive more from Gordon

21  Brothers.  Is that correct?

22      A.    That is correct.

23      Q.    Thank you.  Now, to get Feinberg to agree to

24  upping your upside, you wrote him a note asking for it,



Crowley - Cross                            35

1    right?

2       A.    No.   I had been talking to him consistently all

3    along.   I testified in court on direct I sent

4    Steve Feinberg a cold, unsolicited note that he rejected

5    and was never executed.   Nevertheless, I had been

6    pounding on Steve consistently, because I wanted a

7    greater upside in Winterland.   I think the guy felt sorry

8    for me and gave it to me.

9       Q.    The question specifically is, did you write

10   Mr. Feinberg a note or a letter because you wanted more,

11   and did you do it by letter rather than do it orally

12   because you wanted more?

13      A.    I have already testified that I wrote him a

14   letter, sir.

15      Q.    And that was because you wanted more.

16      A.    I wanted more.

17      Q.    Before you wrote that letter you asked

18   Mr. Feinberg for an upside on the debt position on Coram,

19   didn't you?

20      A.    Yes, I did.

21      Q.    And then you wrote the letter.

22      A.    I talked to the chairman of the board of Coram

23   and said I wanted an upside on the debt, and I called Don

24   and said I wanted an upside on the debt.   All of them



1    rejected it and I went on.

2             MR. LEVY:  Your Honor, we marked now a

3    document once known as Feinberg 6 and referred to it in

4    some of the depositions as Feinberg 6 but now marked

5    Equity Committee 20.

6         Q.   Now, that's the letter that you wrote Feinberg

7    after you orally asked him for more.  Isn't it?

8         A.   I don't know the exact time frame, but I

9    certainly wrote this letter.

10        Q.   Perhaps I can refresh your recollection, sir, by

11   asking you to look at page 103 of your deposition.  I'm

12   going to start at line 12.  Mr. Friedman says, "Let him

13   answer again.  Repeat the answer.  That's fine."

14             I said, "All right."

15             And then you said, "I had asked that I

16        receive an upside on the debt position at Coram.

17             "Question:  Before you wrote Feinberg

18        Exhibit 6 did you make that request?

19             "Answer:  I don't know when it was.

20             "Question:  Look at it and tell me.  Most

21        likely before you wrote the letter?

22             "Answer:  Yes."

23             Did you give that testimony?

24        A.   Yes.  I can read.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

A-22

1    Q.    Does that refresh your recollection,

2  Mr. Crowley?

3    A.    No, it doesn't.  I said then and I'm telling you

4  now I don't know when it was.

5    Q.    Let's take a look at Feinberg Exhibit 6.  You

6  wrote it?

7    A.    I wrote it.

8    Q.    And you sent it on November 12 to Mr. Feinberg.

9    A.    The letter is written on the 12th.

10   Q.    In fact, if you look at the third page, you

11  faxed it.  That has Bates No. 1349.  From you to

12  Mr. Neporent, correct?

13   A.    My secretary faxed it on November 12.  I can see

14  that.

15   Q.    You know Mr. Neporent to be the chief operating

16  officer and general counsel of Cerberus, right?

17   A.    I do know that.

18   Q.    Now, let's look at that letter.  First of all,

19  you say, "The purpose of this note is to provide both of

20  us with a record that we can both retain for our private

21  records."  Do you see that?

22   A.    I do.

23   Q.    That suggests to me that you wanted him to keep

24  it private.  Does that suggest that to you?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Crowley - Cross                                    38

1          A.   I was not an employee of Coram.   I was

2     negotiating with Coram.   This letter that went to

3     Steve Feinberg was not asked -- or it was unsolicited.

4     It was a cold document sent by me without an awareness by

5     Mr. Feinberg or Cerberus that it was coming.   And I wrote

6     not knowing that I would ever become an employee of

7     Coram's seeking a greater upside.

8          Q.   Mr. Crowley, I thought you just testified, and

9     perhaps I misunderstood, that you made the request before

10    you sent the letter.   So it wasn't a cold proposal.   Was

11    it?

12         A.   No.   You mischaracterized what I said, sir.

13         Q.   How is that?   Let's go back to page 103, if you

14    like.

15         A.   Let's go back to what I said earlier, and that

16    is, as I got into Winterland, I found, as it is today, a

17    company that is overleveraged, struggling, marginal,

18    unprofitable, lacking cash, that is significantly in

19    disarray, and that my activity level was more in an

20    operating capacity in factoring, marketing, purchasing

21    materials, systems, directly with the subordinates, and I

22    asked Steve Feinberg for more upside, recognizing that it

23    wasn't simply going to be simply chairman or CEO of CEOs.

24    I was, in part, running this.

1    Q.    More upside on Winterland?

2    A.    That's what I asked for.

3    Q.    You asked in here for upside on Coram's debt

4 position.  Didn't you?  Isn't that what that says?

5    A.    Again, I had talked to Don Amaral.  I told him I

6 was going to seek some upside on the Goldman, Foothill,

7 and Cerberus debt position.  He was uncomfortable with

8 it.  I talked to Stephen Feinberg and asked for an upside

9 on the debt position.  He was uncomfortable with it.  I

10 did not receive it.  Nor did I receive an affirmation on

11 this document.  It was never executed.

12    Q.    Well, Mr. Amaral did tell you, according to this

13 letter, that there's no problem with Cerberus giving you

14 an upside on Cerberus's equity in Coram.  Right?  Isn't

15 that what it says?

16    A.    That's what it said.  The facade is Cerberus

17 didn't have any equity in Coram.

18    Q.    Well, why didn't you say it?

19    A.    You know, this is a year old.  I haven't got a

20 perfect recollection, except to say that I was wishing to

21 receive more upside in what I viewed as a debt company if

22 I could make it work.  I didn't get it.  The board wasn't

23 comfortable with it.  Cerberus wasn't comfortable with

24 it.  It never got executed.  It was a cold, unsolicited

Crowley - Cross                                    40

1    letter and I went on when they objected to it.

2        Q.    If this was a cold, unsolicited letter, how do

3    you explain, sir, your testimony on page 103 that you

4    made a request of Mr. Feinberg for this probably before

5    you sent the letter?

6                MR. FRIEDMAN:  Your Honor, it's been asked

7    and answered and --

8                THE COURT:  Sustained.

9                MR. LEVY:  Right at the heart --

10                THE COURT:  Sustained.  He's testified.

11    BY MR. LEVY:

12        Q.    You say this was a proposal, "this" being

13    Feinberg Exhibit 6?

14        A.    I believe you exhaustively asked me this in

15    deposition.  It was a proposal, sir.

16        Q.    Mr. Crowley, Her Honor was not at the

17    deposition.  I do need to ask you the question.

18                THE COURT:  Please answer the question.

19        A.    I apologize.  It was an unsolicited proposal,

20    yes, sir.

21        Q.    Does it say anywhere in here anything that would

22    indicate to you that this was a proposal rather than an

23    attempt to reflect in writing an agreement that you had

24    already reached, and, if so, please point it out?

1    A.    Yes.   This is in a statement form.   If I had had

2    an agreement, instead of saying you agree, I would have

3    said you agreed.   You agreed to increase.   You, Cerberus,

4    agreed to increase.   I didn't say it, I agreed.   I didn't

5    say it because we hadn't had an agreement.   It wasn't

6    agreed to.   It was a condition windage, threw it in the

7    air to see if I could have got anything in a situation,

8    actually, where it's remote that I could get any value

9    from Winterland anyhow.

10    Q.    Let's explore that.   Let's look at the last

11    paragraph of the letter where you say, "By signing below,

12    we both indicate that this reflects our understanding."

13    Do you see that?

14    A.    I see it, yes.

15    Q.    You signed below, didn't you?   Didn't you sign

16    below?

17    A.    I signed below, yes.

18    Q.    Doesn't that indicate that that reflected what

19    at least your understanding was on the day you wrote it?

20    A.    No.   This was not an agreement.   You can

21    characterize it any way you wish, but we did not have a

22    meeting of the minds or an agreement.   It never got

23    executed.   It got rejected.

24    Q.    What was the reason, sir, why under what you



1    call a proposal you were proposing to Mr. Feinberg that

2    he increase the economics on Winterland -- I'm looking,

3    of course, at the third paragraph -- "to provide for an

4    upside that is equal to that which I would otherwise have

5    been able to receive, if any, for creating operational

6    and financial improvements resulting in EBITDA at Coram"?

7    Why would you do that?

8        A.    That was my idea at the time, but, again, it was

9    rejected.  It was my idea.  It met on deaf ears

10   everywhere it went.  I didn't get that.

11       Q.    I wonder if you could confine your answer to

12   what your intent was.  We know that you claim it was

13   rejected.  My question is, why did you in what you call a

14   proposal ask that you be compensated for operational and

15   financial improvements in EBITDA at Coram by increasing

16   the economics on a totally unrelated company?

17       A.    I had been bargaining with Don Amaral

18   considerably, who's the chairman of Coram.  I felt that

19   at the time in November there that I was not going to

20   come to an amicable agreement with them.  So early in

21   this process I was testing to see if there were

22   alternatives, and this was rejected by both sides.  That

23   was the thinking.

24       Q.    Again, we know it was rejected.  In looking at



Crowley - Cross                                    49

1        A.    I have the potential of it.   It's worthless

2    today.

3        Q.    So November 12 you asked for 40 percent measured

4    by Coram.   You testified Coram won't give it to you.   Six

5    days letter you enter into a three-year contract with

6    Coram, and seven days later Cerberus gives you what you

7    asked for in the November 12 letter.   Are those facts

8    correct?

9        A.    No.

10       Q.    You're right.   You didn't get 40 percent.   You

11   only got 30 percent.

12       A.    I entered into the agreement with Cerberus with

13   a handshake in July effective August 1.   Took about four

14   months to document.   Those are factually items you're

15   leaving out.   November 12 letter, again, was an

16   unsolicited, cold, threw-it-in-the-air letter.   It was

17   rejected.   I'm sorry that it took four months for

18   Cerberus to document their agreement with me.   That

19   happened in November.   My contract with Coram on

20   November 18 specifically spells out that I can operate my

21   own company, Dynamic Healthcare, that I have other

22   business interests.   It was known, talked about, and in

23   the document.   Everybody knew it.

24       Q.    Let me look again at your throw-it-in-the-air

1    EC 20.  Whether you threw it in the air or not, it states

2    as a fact to Mr. Feinberg that "our current deal provides

3    a 20 percent share of the net gain on Winterland."

4    20 percent, right?  You have to answer audibly, sir.

5        A.    Yes.

6        Q.    You testified that that was rejected, but a week

7    later you get 30 percent of the upside on Winterland from

8    Cerberus.  Isn't that a correct statement?

9        A.    Actually, in my November 12 letter talks about

10   an upside that goes up and down relative to how I do for

11   the Coram people.  What I ended up with was a potential

12   that increased by 10 percent that has no relationship to

13   Coram whatsoever.  So Winterland tanks, I don't get

14   anything.  If Winterland should go through the roof, I

15   would get something.  None of that relates to how Coram

16   does.  It's completely bifurcated.  This letter talks

17   about it relative to operating financial improvement

18   resulting in EBITDA Coram.  What I ended up with has

19   absolutely nothing to do with Coram at all.  It has only

20   to do with Winterland.  So it's not correct.

21       Q.    We will look at that, but isn't it also true

22   that at this point on November 12, this 20 percent upside

23   was split 70/30 between Cerberus and Gordon, but when you

24   got to November 19th, Gordon wouldn't give you that



1        MR. LEVY:  Would you read the question

2   again?

3             (The reporter read back as instructed.)

4             THE WITNESS:  No.

5   BY MR. LEVY:

6        Q.   During this period interest fell due on your

7   debt to the noteholders, correct?  "This period" being

8   say from the beginning of the year up through the filing

9   of the bankruptcy.

10       A.   I'm sure there was an interest payment that was

11  due.

12       Q.   And that interest payment under the terms of the

13  securities exchange agreement gave you the option to pay

14  it either in cash or a payment in kind, or PIK.  Isn't

15  that right?

16       A.   It may have.  I never read it.

17       Q.   It could have.  Isn't that right?

18       A.   It could have.

19       Q.   In fact, you paid, was it, six-and-a-half

20  million dollars this year in cash in interest to the

21  noteholders, correct?

22       A.   We made an interest payment in cash, that's

23  certain.

24       Q.   Did you check with anyone to see whether you had



Crowley - Cross                              96

1    the ability to conserve cash by giving them PIK payments,

2    or did you just say I'll pay them in cash?  Was that

3    question difficult, sir?

4        A.    On the surface it's absurd, but beyond the

5    fact --

6        Q.    I'm sorry?

7        A.    I said on the surface it's absurd.  The company

8    had a note agreement.  The company had the cash.  The

9    company had the obligation.  The company paid the

10    interest payment.

11        Q.    Well, Mr. Crowley, they didn't have the

12    obligation to pay it in cash, did they?  They had the

13    obligation to pay it either by cash or by adding it to

14    the balance of the principal.  Correct?

15        A.    I would not have added it willingly to the

16    balance of the principal and punish Coram by increasing

17    the size of its debts and increasing the demand against

18    its cash flow.  It would not have seemed logical to me,

19    as I was trying to decrease the amount of damage being

20    done to the company.

21        Q.    During this period you were running out of cash,

22    weren't you?

23        A.    During this period of time the company had made

24    an effort to decrease its accounts receivable, which were

1    aged bills, and was having some success in bringing the

2    receivables down.  During this period of time the company

3    had made an effort to reduce its inventory which relieved

4    the demand for cash, and the generation of this modest

5    amount of excess cash permitted the company to make an

6    interest payment.

7         Q.    You have done a lot of workouts, haven't you?

8         A.    I have done some workouts, yes.

9         Q.    Isn't the usual strategic alternative for a

10   company in trouble to conserve cash when it can without

11   default, without thereby causing a default?

12        A.    It's usually not the management's process to

13   stiff the debtholders when it has the cash to make an

14   interest payment.

15        Q.    But it was here, sir.

16        A.    That's an opinion that you're rendering, sir.

17        Q.    Isn't that what you stated, that you had the

18   option or could have had the option to pay by PIK rather

19   than cash?

20        A.    I may have had the option to pay in kind versus

21   in cash, and I chose to make the interest payment,

22   because the company could at that time.

23              MR. LEVY:  Excuse me, Your Honor.  May I

24   take a moment?



W&F
WILCOX & FETZER LTD.
Registered Professional Reporters