IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

FILED 2002 JAN 15 PM 3:4_ CLERK U.S. BANKRUPTCY COURT DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| CORAM HEALTHCARE CORP. and | ) | Case Nos. 00-3299(MFW) |
| CORAM, INC., | ) | through 00-3300(MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |

United States Bankruptcy Court
Courtroom No. 2A
844 North King Street
Wilmington, Delaware 19801

December 13, 2001
9:00 a.m.

BEFORE: THE HONORABLE MARY F. WALRATH
United States Bankruptcy Judge

Transcript of Proceedings

WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

ORIGINAL

A-42

1371

Dan Crowley - Cross (Levy)                           410

1  them informed, haven't you?
2      A.   I tried to keep the directors informed.
3      Q.   Actually you try to keep them informed in every
4  respect, is that right?
5      A.   I try to keep the directors informed.
6      Q.   In every respect?
7      A.   As fully as I know how.
8      Q.   Mr. Crowley, you never told Director Peter Smith
9  that you were continuing to receive $80,000 a month after
10 the Judge's decision in December, did you?
11     A.   Yes.
12     Q.   Well, I guess I asked the question wrong.  Did
13 you tell him or did you not tell him?
14     A.   Mr. Smith signed the 10-K.  The 10-K included
15 reference to the $80,000 per month.  The 10-K reflected
16 2000.  Mr. Smith was party to a Board meeting in which
17 the 10-K was fully discussed.  The $80,000 was fully
18 discussed.  Mr. Smith received March Q.  He received the
19 June Q.  He received the September Q.  He received the
20 plan.  At all times he was required to read and to
21 indicate his assent and approve the Qs, the K, the plan,
22 Mr. Smith was informed.
23     Q.   Did Mr. Smith ever tell you that he knew that
24 you were receiving $80,000 a month after the Judge's

1  decision last December?

2  A. I don't recall. I certainly talked to him on
3  the phone.

4  Q. I'm sorry. You --

5  A. I said, I don't recall that although I certainly
6  talked to him on the phone.

7  Q. Let me read to you from sworn testimony given by
8  Mr. Smith at a deposition taken last September 24th, and
9  that's at page 173, beginning at line 5. I asked
10 Mr. Smith this question. I said, "When did you become
11 aware that the payments were continuing?"

12      Mr. Smith answered, "During the discussion
13 of the Golden report I believe somehow.

14      "Question: Early July?

15      "Answer: Yeah."

16      Now, Mr. Crowley, you think that
17 Mr. Smith's testimony that he only learned that the
18 payments were continuing in July was incorrect?

19 A. I'm at a loss to discuss what Mr. Smith said or
20 didn't say in his deposition. I know that Mr. Smith was
21 a signatory to the 10-K for the year 2000 in which it was
22 disclosed and three Qs and the plan. So for him to make
23 that statement, I don't know what to say about it.

24 Q. Well, now, you knew at least as of the time when

1  I took your deposition in September that Mr. Smith had
2  testified that way, didn't you? I raised it with you in
3  the deposition?
4      A.   Again, I can't speak to what Mr. Smith says or
5  doesn't say.
6      Q.   The question was, you knew it in September when
7  I took your deposition that he had taken that position
8  that he didn't know, correct?
9      A.   I believe you took my deposition in October.
10     Q.   I'm sorry. Correct. October.
11     A.   I don't recall.
12     Q.   Okay. Well, after October, did you call
13 Mr. Smith and say, how come you said you didn't know it
14 until July when you signed this 10-K, sir?
15     A.   I don't recall doing that.
16     Q.   You never told Sandra Smolley you were
17 continuing to receive $80,000 a month, did you?
18     A.   I did tell her.
19     Q.   On September 29th I took Ms. Smolley's
20 deposition in Sacramento, and on page 65 beginning at
21 line 11 I said, "Do you know Mr. Crowley is still getting
22 that $80,000 a month?"
23          And she said, "I do not."
24          Now, in light of that testimony, do you

1  persist in your testimony you told her you were
2  continuing?
3      A.   At a Board meeting with counsel present, I
4  looked Sandy Smolley directly in the eye and told Sandy
5  Smolley that I continued to work for Cerberus.  I
6  continued to receive $80,000 a month.  What my duties
7  were for Cerberus.  What my duties were for Coram.  Sandy
8  Smolley was effusive in her accolades for me and said
9  that she did not believe that I had any conflict and she
10 was fully satisfied with my work.  She knew about the
11 $80,000 I had discussed it face-to-face in a Board
12 meeting with counsel.
13     Q.   You've known Mrs. Smolley for a long time,
14 haven't you?
15     A.   I have known her for a number of years, yes.
16     Q.   Find her a fairly perceptive woman, remembers
17 things she's told?
18     A.   I can't speak to her memory of what she's told
19 or not.
20     Q.   Do you have any explanation for the quote here
21 as to why Ms. Smolley would testify under oath that she
22 didn't know you were getting $80,000 a month in light of
23 your statement that you told her?
24     A.   Sandy Smolley is a terrific person, an honest



1  person, a fair person, a decent person. She was told. I
2  can't speak to the question that you asked her and the
3  manner in which she thought she was responding. She's
4  not a professional witness. She's not used to
5  adversarial court proceedings, being deposed. I honestly
6  can't speak to any of that and the way that she was
7  interrogated.
8      Q.   Have you talked with her since I took her
9  deposition and said, how come you gave this testimony?
10     A.   No. No. I wouldn't talk to her about her
11 deposition.
12     Q.   You never told William Casey you were continuing
13 to receive $80,000 a month, did you?
14     A.   I did tell Bill Casey that I was continuing to
15 work for Cerberus and that I was being paid $80,000 a
16 month. He was at the same Board meeting. We discussed
17 it subsequently. He acknowledges that the Board had
18 assented to my working with Cerberus when it acknowledged
19 it in my original employment contract. He acknowledged
20 that he was a participant in that Board meeting and that
21 he knew and had no difficulty with me working with
22 Cerberus.
23     Q.   Well, I guess this won't come as a surprise, but
24 now I'm going to read you from Mr. Casey's deposition

1  taken on September 28 in Chico, California. This is on
2  page 80 at line 20. I asked him, "Are you aware of
3  whether the contract remains in force today?"
4       He said, "No, I don't know."
5       The question was, "Do you know whether
6  Mr. Crowley continues to receive $80,000 a month from
7  Cerberus today?
8       "Answer: Do I think? I just answered the
9  question. I don't know if the contract's still in
10 effect.
11      "Question: Answer the question the way I
12 put it. Do you know whether he's still getting $80,000 a
13 month?
14      "Answer: I don't know that."
15      Now, in light of that testimony, -- let me
16 put if differently. Do you think Mr. Casey was mistaken
17 in that testimony?
18 A.  Again, I can't speak to his testimony. The
19 nature of the meeting. Bill is not a professional
20 witness. He's a business person. He takes his Board
21 duties seriously. He is head of the audit committee.
22 Bill was a signatory to the K. He was in the Board
23 meeting with counsel. He was involved with Q-1, Q-2,
24 Q-3, 10-Q filing. He was involved in the plan. We

Dan Crowley - Cross (Levy)     416

discussed it on any number of occasions. Bill is completely aware of the Cerberus relationship, of the $80,000. Bill has been effusive publicly, privately, in Board meetings, and out of my performance and his belief that Coram would not exist today but for my leadership, that I saved the company. He knows about the $80,000 a month, sir.

Q. Do you have any explanation for his testimony?

A. I can't speak to his testimony.

Q. And I suppose, once again, you haven't called him since I took your deposition and asked him why he testified that way?

A. Again, it's not been my practice to interrogate Board members about their depositions in this matter.

Q. I didn't ask about practice or interrogating. You never discussed with it him?

A. I did not call him about it.

Q. Now, last we go to Mr. Amaral. I take it that it's your position that you also told Mr. Amaral that you were getting $80,000 a month?

A. He sat in the Board less than three feet away from me when I fully discussed the matter. Don Amaral and I have chatted it about it on any number of occasions since. He was a party to the December 2000 K signature.



1  He's been very active and vocal in all matters.  He's an
2  independent minded man.  He was a participant in Q-1,
3  Q-2, Q-3, and the plan.  He's seen it five times.  And
4  his name is on those documents.
5      Q.  Well, Mr. Amaral sat not three feet away but
6  actually in that share where you were sitting on
7  November 7, and on page 438 of the transcript beginning
8  at line 18, I said to Mr. Amaral, two weeks ago -- two
9  weeks before last November 7 -- "two weeks ago, you were
10 not aware that Mr. Crowley continues to receive 80,000 a
11 month, is that correct?
12          "Answer:  That's what my deposition
13 reflects.
14          "Question:  Give me your recollection.
15          "Answer:  I believe I wasn't aware."
16          Was his testimony in this Court.  Do you
17 think he was mistaken in this Court?
18     A.  I can't tell you whether he was mistaken in the
19 Court.  I can tell you that, with the counsel that's
20 present in this courtroom, I met with that man and the
21 full Board and discussed it, that it was in black and
22 white in print in a public filing that he signed.  He was
23 a party to three Qs.  He was a party to a plan that he
24 approved.  He certainly is aware of it.

Dan Crowley - Cross (Levy)                                    419

1      Q.    More than once?
2      A.    Yes.
3      Q.    Did you cooperate with him?
4      A.    Fully.
5      Q.    Did you give him open access and total
6  information?
7      A.    Whatever I had.
8      Q.    I'm sorry?
9      A.    Everything I had.
10     Q.    But you don't recall ever telling Mr. Golden
11 that you were continuing to receive 80,000 a month from
12 Cerberus, do you?
13     A.    I don't remember that I told him, no.
14     Q.    And you are aware, aren't you, that the updated
15 Golden report doesn't discuss at all the issue of
16 payments received by you from Cerberus after December of
17 2000, right?
18     A.    I'm not conversant with whether it does or
19 doesn't at this point.
20     Q.    You read it?
21     A.    I read it when it came out.
22     Q.    Ernst & Young are the auditors for Coram, right?
23     A.    Yes.
24     Q.    And you were required to sign a representation

1    A.   I believe that -- what I said was that the Board
2 was informed of it and that the Board had assented to my
3 employment agreement and individually, in front of
4 counsel, the Board gave accolades and spoke highly of my
5 performance and that they did not believe that the
6 conflict had manifested itself in any way that's
7 derogatory to the performance of my duties as CEO for
8 Coram.
9    Q.   Let's get some timing on that.  You first said
10 the Board approved your employment agreement.  That would
11 have been back in November of 1999?
12    A.   Approximately.
13    Q.   At that time the Board did not know that you
14 were receiving $80,000 a month from Cerberus, is that
15 correct?
16    A.   That is correct.
17    Q.   Okay.  Now, the next event that I think you were
18 speaking about was January of this year, is that right?
19    A.   Right.
20    Q.   When was the next time?
21    A.   The end of December of 2000.  As early as I
22 could get them together in January.
23    Q.   Fine.  That's the meeting where you claim that
24 you told the directors that you were going to continue to