# EXHIBIT B-1

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re: : Chapter 11
CORAM HEALTHCARE CORP: and CORAM, INC. :
: Case NO. 00-3299
Debtors :

Tuesday, February 25, 2003

Pretrial examination of HON. ARLIN ADAMS, held in the offices of Schnader, Harrison Segal & Lewis, 1600 Market Street, Philadelphia, PA 19103, commencing at 9:35 a.m., on the above date, before Mickey Dinter, Registered Professional Reporter and Commissioner of Deeds for the Commonwealth of Pennsylvania.

BRUSILOW & ASSOCIATES
COURT REPORTERS & VIDEOGRAPHERS
1926 Arch Street - 1st Floor West
Philadelphia, PA 19103-1404
215.977.9700 - www.brusilow.com

Page 2

APPEARANCES:

JENNER & BLOCK
BY: RICHARD F. LEVY, ESQUIRE
&
C. STEVEN TOMASHEFSKY, ESQUIRE
One IBM Plaza
Chicago, Ill 60611
312-222-9350
Counsel for the Equity Committee

BEATIE & OSBORNE
BY: RUSSEL BEATIE, ESQUIRE
521 5th Avenue
New York, New York 10175
212-888-9000
Counsel for Feinberg

SCHULTE, ROTH & ZABEL, LLP
BY: HOWARD O. GODNICK, ESQUIRE
&
MICHAEL L. COOK, ESQUIRE
919 Third Avenue
New York, New York 10022
212-756-2000
Counsel for Cerberus and R-Net

SCHNADER, HARRISON, SEGAL & LEWIS
BY: WILBUR KIPNES, ESQUIRE
&
THOMAS BLOOM, ESQUIRE
BARRY E. BRESSLER, ESQUIRE
1600 Market Street
Philadelphia, PA 19103
215-751-2336k
Counsel for the Trustee

CH-11 TRUSTEE/
CrowleyAdmin001016

A: At that particular moment?
Q: Yes. Based on reading Judge Walrath's opinion before you talked to Crowley.
A: I don't know whether I could use the word did I believe. I thought it was a problem. I don't think I had a belief.
Q: Judge Walrath had found in her opinion, didn't she, she had found that Crowley had a conflict of interest?
A: Correct.
Q: Now, it's March 7 or 8 or 9, you read the opinion, you have not talked to Crowley. Did you have any reason to question Judge Walrath's finding that Crowley had a conflict of interest?
A: I didn't question it, no.
Q: Okay. Would it be fair to say, at least at that point, that he had a conflict of interest?
MR. GODNICK: Is the question whether as of March 7, that is the date that you referenced, a conflict existed or, rather, back in December at

the point —
MR. LEVY: March 7.
MR. GODNICK: — when the judge wrote her opinion that a conflict existed?
MR. LEVY: When the judge wrote the opinion March 7, 8 and 9 whether she believed there was a conflict of interest. I think he said yes.
MR. GODNICK: As of that date?
MR. LEVY: Yes.
THE WITNESS: I didn't form that intent. I didn't form that mens rea at that point.
BY MR. LEVY:
Q: You did not?
A: No. I think the mens rea that I formed was, Judge Adams, there is a problem here, you have to explore it. I didn't know whether he had resolved it. I didn't know what was going on. I had just been appointed. The Trustee in bankruptcy or —

there were two trustees at the meeting. They had emphasized something different with me: The necessity of reconciling varying interests and to do it very promptly and to get on the job, so I didn't, I began forming beliefs. That just is not what I was thinking of doing at the time. I would mislead you if I told you otherwise.
Q: It says at the bottom of page 13 of the opinion, last sentence, "This is an actual conflict of interest as we concluded at the first confirmation hearing."
You understood that to be Judge Walrath's finding?
A: Yes.
Q: You had no reason to doubt at this time, at that point?
A: No, I did not. I don't doubt it now.
Q: You don't doubt it now. You think he has got a conflict of interest now?
A: No. As of the time she wrote it, I think she was correct, absolutely. I did

not know what the situation was on March 7 or when I met you and Don Liebentritt. How could I have known it? I was just appointed. I just read these opinions and I know you have a very high regard for me, but I can assure you I don't have that type of ability.
Q: I do have a high regard for you.
When did, in your view, the conflict of interest that you thought he had, when did it go away? When did it stop being a conflict of interest?
MR. GODNICK: Objection to the mischaracterization of the witness's prior response. He didn't believe — as of March 7, he believed a conflict of interest existed. He testified that in December at the point in time that Judge Walrath wrote her opinion there existed a conflict of interest.
THE WITNESS: I thought it was dissipated when I went out and talked to Dan Crowley.
BY MR. LEVY:

Q: What did he say to you that ~~dissipated that conflict?~~
A: I thought he told me that he had terminated all contractual arrangements with Cerberus; that the only thing that remained was his claim against them for large sums of money. I really didn't address that. It was none of my concern.
Q: When he told you that, Mr. Adams, did he show you any documents?
A: No.
Q: Did you ask him how he went about terminating his relationship with Cerberus?
A: I don't recall doing that. But I do recall when I came back to Philadelphia, I discussed this matter at considerable length with Mr. Bressler, my counsel.
Q: In order to get what kind of advice from him?
A: What kind of advice did he give me?
MR. KIPNES: No.
BY MR. LEVY:
Q: What kind of advice were you trying to get from him?

MR. KIPNES: I will help you, Richard. Don't — then, I will instruct him not to answer when you ask him the question.
THE WITNESS: Give me that question.
MR. KIPNES: What kind of legal advice were you seeking?
BY MR. LEVY:
Q: I said what kind of advice were you seeking from him?
MR. KIPNES: You are correct, I'm sorry.
THE WITNESS: I was seeking his guidance as to what to do in this situation. He was very well aware of the opinion. He discussed it with me a number of times. I told him of my meeting in Denver. And the question was should we terminate the contract at that time? That's my best recollection. I would have to talk to him, but ;
BY MR. LEVY:
Q: Were you asking for his business

advice as to whether this was a good or bad thing to do in part, at least?
A: I believe in part, yes. In part.
Q: What did he say in the part where you were seeking his business advice?
A: My recollection is that Barry Bressler said this is a matter we have to keep very much in mind. As we go forward, it's one of the factors that you will have to weigh in whether you want to go forward with Dan Crowley.
Q: Did you at or about that time — did Mr. Bressler tell you you ought to see the documents that evidence the termination, if there were any?
A: I can't recall that he said that. I assume that he had reviewed the documents.
Q: What documents?
A: Whatever documents there may be.
Q: Are you aware that there were any documents at that time or were you then aware that there were documents that terminated the relationship?
A: I can't say. I can't recall that.

Q: Did you call up anybody from Cerberus and say I hear you terminated the relationship, is that true?
A: I never called anybody from Cerberus.
Q: What about their lawyer?
A: We talked, I think, to their lawyers about the conflict on a number of occasions.
Q: Who is "we"?
A: I did. Mr. Bressler, maybe Mr. Kipnes; I'm not sure. But I remember discussing the conflict issue with them.
Q: In March of 2002, did you discuss with anybody from Cerberus, that lawyer or anybody else, whether Mr. Crowley's statements, statement to you that the relationship had been terminated, was true?
MR. KIPNES: Contractual relationship was his testimony.
THE WITNESS: You mentioned March. I cannot recall when I first talked to counsel for Cerberus, except to say that just as you had called me after my appointment, their attorneys called and asked for the opportunity to

CH-11 TRUSTEE/
CrowleyAdmin001027

Page 87

Q: Are you aware he testified at one point that he thought Mr. Crowley was greedy?

A: Maybe I recall that. I wouldn't put much credence in something like that. Maybe he is. Maybe he is not. I don't know. I may have been a judge, but I don't go around judging people. I don't do that. I don't even do that with you in the way you are questioning me. I give you the benefit of the doubt.

Q: Do you think you have the skills and experience to operate Coram?

MR. KIPNES: Objection. Objection to the form of the question. What does that have to do with the purpose we are here today, which is to talk about Mr. Crowley?

THE WITNESS: Let me answer it this way.

(Question read back.)

THE WITNESS: I doubt if I have skills to do very much at my stage in life, including answering tough

Page 88

questions in a deposition. But, to be specific, I discussed with Mr. Bressler and maybe Mr. Kipnes on several occasions whether it might be more advisable for me to go out to Denver and try to run this company and let Mr. Crowley be terminated. That came up primarily in the course of discussing a review of his contract. But even before that, I gave it some thought. I talked to my wife about it and said what would you think if I stayed in Denver, say, four or five days a week? She gave me the answer that she has always has given me. "If you think it's the right thing to do, we will do it," or "you will do it."

I worried, however, that it might be disruptive to the organization. He was getting along so well with his employees and his executive team and the results that he was achieving were sufficiently good that I put it aside, but I kept it in mind.

Page 89

Q: Do you feel you were competent at this point to operate the company?

MR. KIPNES: Objection to the form of the question.

THE WITNESS: Well, I don't want to make a self-evaluation. Could I do as good a job as Mr. Crowley? Probably not. Could I do an adequate job? Maybe. But, I don't think I can be a self evaluator. I don't think that is a good idea.

Q: Prior to the retention of SSG and EMB — I'm sorry, strike that question.

You said you consulted with Mr. Bressler and, perhaps, Mr. Kipnes about the notion of your going out there. You were seeking business advice, not legal advice at that time?

A: That's right.

Q: Did you often seek business advice from Mr. Bressler and Mr. Kipnes?

A: Did you say often?

Q: Yes. Did you ever seek business advice?

Page 90

A: Yes.

Q: How often did you do that?

A: Oh, from time to time; not continuously.

Q: Did you and Mr. Bressler and Mr. Kipnes ever exchange writings, E-mails, memoranda, that related to business advice?

A: I can't recall any. I would doubt it. I don't use E-mail for that purpose. I think it's highly unlikely. If you found one, then you found one.

Q: Did Mr. Kipnes ever send E-mails or memoranda to you that included any business advice?

A: Sitting here today, I can't recall any.

MR. KIPNES: There were none. You can have my assurance.

MR. LEVY: Why is that?

MR. KIPNES: I don't give business advice. If I were putting something in writing to Judge Adams, who is my client, I would be certain it would be privileged, which leads me to

CH-11 TRUSTEE/
CrowleyAdmin001038

Page 171

from the first meeting I had with him when he said that he still had this claim. Even though he had terminated all relationships, he still had this claim, this substantial claim against Cerberus. But, that was my impression.

Q: Did you ever ask Crowley why he thought it was an open item for you to deal with the terms of the termination of his contract with Cerberus?

A: No, I did not.

Q: Did you ever authorize Mr. Bressler to tell Mr. Crowley something on the order of you guys have smart lawyers and you ought to be able to figure out how you can get paid?

A: I can't remember any language like that, no. I may have said to Mr. Bressler, look, that's a matter between Crowley and his former contract partner. I don't think we should be using the creditors' money to probe that sort of thing.

Q: Even though there was still some reservation that might have caused some

Page 172

bias on Crowley's part?

A: The amount of bias would be so minimal.

Q: How do you know that?

A: It's a question of where I wanted — I'm repeating now, and I am going to repeat to the bankruptcy judge and to the Trustee what my job was. Your question would seem to indicate that my principal job was to investigate the relationship between Crowley and Cerberus. You may be right, I did not understand that to be my job. The Trustee never mentioned it to me. When I was before the judge, she never mentioned it to me. I was told that I was supposed to maximize the assets and to minimize the liabilities and get this company out of bankruptcy and I was putting most of my emphasis on that.

Today, you have gone into that subject very, very little and talked about this relationship and made it appear that I was being negligent in not following up this connection between these two

Page 173

parties. And I have said to you and I will say it again as clearly as I can, that if that was my assignment, I'm prepared to step down. I was not hired to be a detective or an investigator. I don't want that job. I wanted the job as a Trustee. You will have to get somebody else to investigate that if that's what you are after.

MR. GODNICK: Would you mark that testimony, Mr. Reporter.

BY MR. LEVY:

Q: Are you aware, Mr. Adams, that sometime around the beginning of May, Mr. Feinberg invited Mr. Crowley to come to New York to have a dinner to talk about resolving the differences?

A: I am not, no.

Q: Well, hypothetically, if during or following that dinner Mr. Crowley demanded that Cerberus pay him the difference between some $11,000,000.00 and the amount he ultimately gets from the Coram estate, would that have affected your decision as

Page 174

to whether a conflict existed?

MR. GODNICK: Before you answer, I would object. It's my understanding that the question is based on a document that Mr. Crowley claims to be privileged. I certainly can't stop you from asking the question. I think this is an inappropriate line of questions.

MR. KIPNES: It's the same question.

THE WITNESS: That is a hypothetical question. I didn't know of the fact. I have not addressed the fact. Asking me here for the first time whether I would have considered it, I can't answer that question.

BY MR. LEVY:

Q: You still don't know that that's a fact?

A: I don't know it.

Q: I will show you a document marked CRX 00063, 4 and 5. It was provided by Coram dated May 6, 2002. It has been

CH-11 TRUSTEE/
CrowleyAdmin001059

redacted or, at least, there are two stamps on it that indicate that portions of it have been redacted, presumably, by Mr. Crowley's lawyers, though I don't know. I know that's the way we got it from Mr. Crowley.

(Trustee-19, a letter dated May 6, 2002, marked for identification.)

BY MR. LEVY:

Q: Take your time and read this carefully.

MR. KIPNES: Did you say this document was provided by Coram?

MR. LEVY: I will make the correction.

MR. GODNICK: I have a question, which is whether a motion was filed? As I understand, one was going to be with regard to this document.

MS. KRUGMAN: I don't know where they came down on that. I'm sitting in on this deposition. I'm the wrong person, sorry.

MR. LEVY: I want to say

that I have here a Blackberry which gets instant docket information and it "ain't" been filed.

THE WITNESS: I have not read it carefully. I have skimmed it.

BY MR. LEVY:

Q: I would ask you to, please. I would ask you to read the document.

A: I will not read the whole thing carefully. If you want me to read a sentence or paragraph, fine.

Q: You can keep that. Have you ever seen that document before this moment?

A: No.

Q: Did your counsel show it to you in preparation for this deposition?

A: No.

Q: Do its contents surprise you?

MR. GODNICK: Objection to the form of the question.

THE WITNESS: I don't know that I'm surprised. I don't know what they mean. I don't know what the context is. I don't know these people.

I don't know Steve Feinberg.

BY MR. LEVY:

Q: Do you know who he is?

A: I have heard that he is the CEO or some official of Cerberus. I don't know the man. I don't know whether he is a lawyer. I don't know anything about the man. How could I be surprised of a copy of a document not signed? The only thing that concerns me in the document is the last paragraph on page 1, because that refers to me. "Mr. Bressler has told me that he/ Trustee don't want to give us/me advice about ending the contract or my getting paid." That's true. I wouldn't give them any advice. "He also said that we have smart lawyers." I don't think I ever used that expression. "He's sure that they can figure out how they can get me paid. He has no objection to my being paid for work done or for terming the contract."

Q: Did you authorize Bressler to say that? Bressler is being quoted here, not you.

A: I don't know. If he said it, he said it. I don't know anything about it.

MR. GODNICK: I don't know if the letter purports to quote Barry as opposed to simply characterizing or paraphrasing what the writer believes or wanted to say that Barry said.

THE WITNESS: I may have said I'm not going to get involved in any contract dispute between Crowley and Cerberus. That is none of my business. Let them work it out. They have lawyers. I may have said that. I have enough to do. I'm trying to get this company out of bankruptcy. That's my job.

BY MR. LEVY:

Q: Might it have concerned you if, as part of that contract dispute, Cerberus had said we've got to meet at Coram, I will pay you some more? Did that ever occur to you?

MR. GODNICK: Objection.

THE WITNESS: Did anyone say anything about that? You are conjuring

Page 179

up a parade of horribles. I was not contemplating any such thing. I was trying to concentrate on the job that I assumed and I was asked to take over.

BY MR. LEVY:

Q: And not to investigate anything like this?

MR. GODNICK: Objection to the form.

MS. KRUGMAN: Objection.

MR. KIPNES: Objection.

MR. MILLER: Objection.

BY MR. LEVY:

Q: Sir?

A: I'm not going to answer that question.

Q: Why?

A: I believe I'm not answering that last question.

Q: Tell me why, sir.

A: Pardon?

Q: Tell me why.

A: Because I think it's offensive.

Q: You said you didn't know these people. These people are Feinberg, who you

Page 180

have explained, and Dan Crowley whose name appear.

A: I didn't refer to Dan Crowley. I talked about Mr. Feinberg and talked about whether he is the CEO. Never met the man. I know nothing about him.

Q: Okay. Would you look at the paragraph at the top of page, second page, page 64.

A: The one that is partly stricken out?

Q: Yes. I don't know who did that.

A: Well, I don't know either.

Q: I don't either. I wasn't going to ask you that.

A: I don't know Friedman.

Q: Friedman, sir, was the attorney for the debtor. You must have met him at some point.

A: I never met Mr. Friedman, to my knowledge. Maybe if I saw his full name on...

Q: David Friedman represented the debtor up until the point when you became the Trustee and no longer does. Okay?

Page 181

A: I don't believe I ever met the gentleman.

MR. MILLER: Objection. That draws a conclusion that that may exist.

MR. LEVY: I have no quarrel with that. I would stipulate to it.

MR. MILLER: Why did you say it?

MR. KIPNES: Is there a question?

BY MR. LEVY:

Q: Here we have Mr. Crowley, apparently, writing here, "I know I didn't have to hire Friedman just because you recommended him. I did it on my own. I didn't have to recite the answers that Friedman gave me to say in court."

Does that suggest to you, based on your experience, that, perhaps, he is telling Feinberg that he wasn't quite telling the truth in court?

MR. KIPNES: Objection.

BY MR. LEVY:

Page 182

Q: But, rather, was reciting what Friedman had told him to do?

MR. KIPNES: Objection to the form of the question. Calls for speculation.

THE WITNESS: I don't know what answers he gave. I think I just would be guessing and speculating. That is of no value.

BY MR. LEVY:

Q: Given your experience, sir, your impression of that sentence, what does it mean to you? What is your understanding of it, knowing no more than what is on this paper?

MR. KIPNES: Wait a minute. You are asking him just to read this sentence totally out of context by itself and give you his impression of what the author of that sentence meant?

MR. LEVY: I reject your characterization of my question. I take it, it's an objection to the form?

THE WITNESS: I can't answer

that question. I don't know what they were talking about. I don't know the people. I don't know what the context is.

BY MR. LEVY:

Q: Who are the people? You know one of the people, like the guy who wrote it, Mr. Crowley.

A: I'm not sure. It's not signed.

Q: Do you doubt that Crowley wrote it?

A: I don't know. I have no — you put a document in front of me. I have never seen it before. It's marked "Draft, Redacted." It's written to somebody that I have never met, don't know, and it has various places redacted or stricken and you are asking me what is my opinion about a couple of sentences. I can't do it. I don't have that ability.

Q: Is it significant to you that it came from Mr. Crowley's file?

MR. GODNICK: Significant in what respect?

THE WITNESS: Of some

significance is the fact that it came out of Mr. Crowley's file.

BY MR. LEVY:

Q: Doesn't that suggest to you that, perhaps, he wrote it?

A: I don't know.

Q: What significance does it have?

A: Just what you said. It came out of his files. It seems to me he is talking to him about the same thing he talked to me about, assuming that it's Crowley; that he was trying to get Cerberus to pay him what he thought Cerberus owed him for past service, which he told me about.

Q: Look at the next page, if you would.

A: "I expect that you will honor the commitment."

Q: Read it to yourself.

A: Yes.

Q: Assuming that Mr. Crowley wrote that —

MR. KIPNES: That's a very large assumption. Go ahead.

MR. LEVY: Why did you have

to say that?

MR. KIPNES: That is a extremely large assumption. Assume the moon is made of green cheese if you want him to.

BY MR. LEVY:

Q: Assuming that Mr. Crowley wrote this, does that impact on your conclusion that at least on the day he wrote it, he had no conflict?

MR. KIPNES: Objection to the form.

MR. MILLER: Objection to the form.

THE WITNESS: I don't see the conflict myself. Maybe there is a conflict. Maybe after I dwell on it to the same extent that you and your colleagues have dwelled on it, maybe I would come to a similar conclusion. I can't do it sitting here. I don't have that type of imagination.

BY MR. LEVY:

Q: How long would it take you to dwell,

sir, on the statement that Crowley thinks he has got a commitment that after the compromise plan is confirmed he would be reinstated and receive $5,000,000? Isn't that plainly a conflict?

MR. KIPNES: Objection to the form of the question.

MS. KRUGMAN: Objection.

THE WITNESS: I can't do better than I have done. I have done the best I can for you. I can't do better.

BY MR. LEVY:

Q: Do you think it would be deceiving the Court to have a plan under which after confirmation Crowley would be reinstated with Cerberus and receive $5,000,000?

MR. KIPNES: I would instruct the witness not to answer that question. This is not a Rule 2004 examination. This is a deposition limited, as you have agreed, to the question of the pending motions regarding Crowley. And once you use the

word "plan," the question is beyond the scope and I would ask the witness not to answer it.

MR. LEVY: Perhaps, I was unclear. I didn't mean the plan. I mean any plan.

MR. KIPNES: Any plan. A plan of reorganization?

MR. LEVY: You have made it clear that we don't want to deal with this.

BY MR. LEVY:

Q: Look at the last sentence of this page, number 65.

A: The last sentence says, "If this is not our deal, please just send this letter" —

Q: I'm sorry, I mean the one before that.

A: "Also, Cerberus will indemnify me for all of my legal fees, plus pay me the difference between what I ultimately receive from Coram by way of bonuses and 11 million 2."

Q: Doesn't that link Cerberus and Coram in a way that plainly is a conflict if Cerberus is paying Crowley for work he did for Coram?

MR. KIPNES: That's about the forty-seventh time.

MR. MILLER: Is this a hypothetical if this was an agreement between the parties?

MR. GODNICK: I didn't hear the question.

MR. LEVY: I will withdraw that question.

BY MR. LEVY:

Q: I am not at the moment, at the moment, suggesting that Cerberus did or did not agree to this. I'm focusing on your reaction to the fact that if Crowley wrote this, that at the time he wrote it he felt he had a commitment that Cerberus would pay him the difference between what he got from Coram by way of bonuses, which he claims he is entitled to, and $11,000,000. Isn't that a conflict?

MR. KIPNES: Asked and answered. I lost count how many times.

THE WITNESS: It may be. I don't see it offhand. Maybe there is a conflict.

BY MR. LEVY:

Q: Let's move along.

A: I would have to know more about the facts and the personalities and the context. But to suggest that two people are engaging in conflict which borders on the improper, I don't want to do by way of speculation. I don't think that's fair. I don't think it's appropriate and it's highly hypothetical. Ask them and then you and the Court can decide that.

Q: The next document is what appears to be a letter signed by Dan Crowley addressed to Steve Feinberg, CRX 71, 72 and 73.

(Trustee-20, a letter dated May 8, 2002, marked for identification.)

BY MR. LEVY:

Q: Will you read that exhibit. This document has "Redacted" on these pages,

presumably, by Mr. Crowley's lawyer. Some of it is the same. Some of it is different.

A: What is the question?

Q: You have never seen this before, did you?

A: No.

Q: In the first sentence, Mr. Crowley and, I think, we can assume he wrote it because that is his signature, says, "I have been thinking a great deal about our dinner last week because, while I have suspended it, I still haven't formally ended my contract with Cerberus."

Is that consistent with your understanding?

A: Yes. That is what he is in effect saying, I don't have an active contract, but I have these claims. I don't want to tear up the contract until we resolve those claims.

Q: And the contract might be reinstated, that's the implication?

A: If I ever get out of Coram.

Q: If I ever get out of Coram.

Page 191

Look at the last page, the third paragraph from the bottom. Last page, 73.

A: Starting, "In fairness to myself"?

Q: That's the paragraph, but that is not what I was going to ask you about. The next-to-the-last sentence, fourth line near the end. "Steve, I also am anxious that unforeseen events sometime overtake good intentions. You could get hit by a bus and be gone. Cerberus could get bought out, or whatever. The point is that then I would be left with nothing."

Does that suggest to you that they have a secret agreement that would die if Feinberg was hit by a bus?

MR. KIPNES: Objection to the question. Calls for speculation.

THE WITNESS: I don't know what kind of agreement they had. I don't know. I can't guess. I will not guess, no point to it.

BY MR. LEVY:

Q: You testified earlier, I believe,

Page 192

that you often acted on your impressions of people. What is your impression of that sentence?

A: Well, having an impression of a person and having an impression of a sentence is two different things. I can see the person in front of me, his facial expressions. I can't see anybody in front of me. I don't know these people.

Q: Moving along to the 10-Q.

(Recess taken, 2:39 p.m.)

(Back on the record, 2:46 p.m.)

BY MR. LEVY:

Q: The next document. The next document is a Form 10-Q for the period ended March 31st, 2002.

(Trustee-21, a Form 10-Q, marked for identification.)

BY MR. LEVY:

Q: This is the Form 10-Q filed by Coram for the quarter ending June 30, 2002.

MR. KIPNES: What I was handed is a cover page and an excerpt

Page 193

from the Form 10-Q for the period ended June 30, 2002, and a cover page and an excerpt for the Form 10-Q for the period ended September 30, 2002.

MR. LEVY: That is exactly and completely correct.

MR. KIPNES: Okay.

BY MR. LEVY:

Q: Now, I take it, Mr. Adams, you participated in the preparation of both the quarterly report for the quarter ended June 30 and September 30 of 2002?

A: Correct.

Q: And in the first one, which is for the period ended June 30, looking at the second page and the second paragraph from the bottom above the heading there, it says "Mr. Crowley and Cerberus agreed to suspend their contract and all related obligations immediately after the Bankruptcy Court's denial of the second joint plan of reorganization on December 21st, 2001. The contract remains suspended through August 16, 2002."

Page 194

A: Yes.

Q: It was your understanding that in August that the contract had not yet been terminated, but was only suspended?

A: Correct.

Q: Did you make any inquiry of Mr. Crowley or anyone else as to when they intended to terminate their contract?

A: No. I talked to my counsel about it. They explained what they were doing. I said they. That meant Crowley and Cerberus; that they were continuing to suspend until they could reach some accommodation on the amount of money that Crowley claimed that Cerberus owed them.

Q: Did they explain to you if they didn't reach that accommodation that they could just reinstate the contract?

A: They didn't go into that, no.

Q: Would that be your understanding?

A: I have not looked at the contract.

Q: Of the word suspend, would that be your understanding?

A: It may be. I don't know.

CH-11 TRUSTEE/ CrowleyAdmin001064

MR. BEATIE: I'm confident the answer is no. No deposition between now and Monday.

MR. LEVY: I'm going to New York from here to get ready for Crowley. I plan to go back on Thursday. I would like to do it. Let me know.

MR. KIPNES: Why do you want this on the record?

MR. LEVY: To get some assurance.

MR. BRESSLER: When did you decide that you were not going to take his deposition?

MR. LEVY: When I got, basically, a lot of answers from Mr. Adams.

MR. BRESSLER: So it wasn't yesterday or the day before?

MR. LEVY: No.

(Deposition concluded, 4:40 p.m.)

CERTIFICATION

I hereby certify that the testimony and the proceedings in the aforegoing matter are contained fully and accurately in the stenographic notes taken by me, and that the copy is a true and correct transcript of the same.

MICKEY DINTER
Registered Professional Reporter

The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying shorthand reporter.

SIGNATURE PAGE

I hereby acknowledge that I have read the foregoing transcript, and the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the errata sheet.

SIGNATURE:
DATE:

ERRATA SHEET

PAGE LINE CORRECTION

CH-11 TRUSTEE/
CrowleyAdmin001082