# EXHIBIT B-7

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE: . Case No. 00-3299

CORAM HEALTHCARE, . 824 Market Street
. Wilmington, DE 19801

Debtor, . March 3, 2003
. 9:30 A.M.

TRANSCRIPT OF TRUSTEE'S MOTION FOR AUTHORIZATION TO REJECT
THE EXECUTORY CONTRACT OF DANIEL CROWLEY
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Trustee:

Schnader Harrison Segal & Lewis, LLP
By: BARRY E. BRESSLER, ESQ.
WILBUR KIPNES, ESQ.
RICHARD BARKASY, ESQ.
1600 Market Street, Suite 3600
Philadelphia, PA 19103

Weir & Partners
By: JOHN B. YORK, ESQ.
824 Market Street Mall, Suite 101
P.O. Box 708
Wilmington, DE 19899

Office of the U.S. Trustee
By: RICHARD SCHEPACARTER, ESQ.
J. Caleb Boggs Federal Building
844 King Street, Lockbox 35
Wilmington, DE 19801

Audio Operator: Jennifer M. Patone

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail: jjcourt@optonline.net

(609)586-2311 Fax No. (609)587-3599

Q And that would be SSG and the Ewing Menorabemus (phonetic) firm?

A Yes, I've met with them and I've talked with them.

Q And what have you discussed regarding the operation of the company with them?

A Well, one of the things that was always on my mind was whether I should continue Mr. Crowley. I was very concerned about the opinion of the court and conflicts issue. So, I approached that decision with a -- with a ceratin amount of skepticism, and since my family is from Missouri anyway, I kind of took an approach, you've got to show me.

And that has been my approach with Mr. Crowley and his entire staff. You have to demonstrate to me that you are the best people to be operating this what I thought was a very valuable company.

And I never made a final decision. I think Mr. Crowley understood -- I hope he did, that it was kind of a situation where if they did not produce I would feel free to make other decisions.

Q What have you been advised regarding the earnings of the company, or what have you observed yourself regarding the earnings and profitability of the company over the last nine months and since Mr. Crowley has been in control?

A It's been on an upward trend during that entire period in the sales, in profits, in cash flow, in what they call EBITDA

all during that period.

And I think that's been true all during the period Mr. Crowley has been there, but that has not been my concern. My concern was primarily while I was in charge.

Q Have you formed a view as to what the consequences of Mr Crowley no longer being with the -- Coram might be?

A I have.

Q And what is that view?

A I think it would de-stabilize the business, it would cause the executives to begin worrying about their situation and maybe depart for other more secure situations. It would cause the suppliers to begin worrying about having their bills paid, it would cause some of the important customers to feel a good deal of uncertainty.

When you make a change at the very top of the corporation, it has a tendency to de-stabilize unless there is a very, very good reason, such as heart attack or another job or promotion. But if you suddenly remove the CEO it causes a lot of consternation.

Q Have you consulted with processionals in developing that opinion?

A I have.

Q And who have you talked to or consulted with?

A Well, I talked to the -- to gentlemen whose names you have just mentioned on a number of occasions.

MR. LEVY: Excuse me --

THE COURT: Well, I can't -- you can't be heard unless you're speaking into the microphone, Mr. Levy.

MR. LEVY: Excuse me, the response the gentleman just mentioned is a little vague. I just would like to hear the names again so we're clear.

THE WITNESS: The one was Scott, and I think the other was Barra.

BY MR. BRESSLER:

Q Bemus.

A. Bemus. As I told Mr. Levy on -- last week, I talked to some of my former colleagues at Albert Einstein. I'm still the honorary president, so maybe I shouldn't say former colleagues. One in particular that I did not mention to him, I thought about after the deposition, was Mark Levitan. Mark Levitan had run the University of Pennsylvania Hospital system and had created a conglomerate known as Medicorps, and he was my executive assistant -- or actually the president of Einstein when I was the chairman. And he pretty much confirmed what the other gentlemen had said. You have to worry about de-stabilizing an organization unless you have a very good reason.

And then I'm on the board of a --

MR. LEVY: I apologize. That's clear hearsay, Your Honor, what he said --

THE COURT: Overruled. It's not being offered for

the truth of it but what he did to reach his decision.

THE WITNESS: I also talked to Jeffrey Perman who's the CEO of a corporation in which I served on the board which does a great deal of business in the dental industry, and he gave me the same advice.

BY MR. BRESSLER:

Q How many times have you visited Denver?

A Oh, four or five. I can't tell you for sure. See, I went there twice in connection with a matter that brought me to Denver, and I thought I would use that as an opportunity to stop by and see how things were going.

Q And I presume in connection with your determination as to Mr. Crowley you also consulted with your counsel?

A With Mr. Crowley's counsel?

Q No, with your counsel.

A Oh, sure, every day, two, three times a day, yeah. You've become one of my closest friends.

Q Thank you. Looking at Trustee's 1 that's in front of you, did you believe that the terms provided in the agreement were fair and reasonable under the circumstances?

A Yes, but I have to in all frankness and openness say I'm pretty tough when it comes to salaries. You know that. I have a reputation for that. I don't like to see big salaries, and I think I pressed you pretty hard on it. Subject to that, I thought that you had done a very, very good job in hammering

out this contract.

Q Would it be fair to say that it was your understanding that Mr. Crowley, through his counsel, was looking for a lot more?

A Well, I knew it. It wasn't only my understanding, I knew that they were asking for a lot more, but they weren't going to get it from me. And he knew it. He knew that there was a high water mark, and he knew that if they could not come to terms I was prepared reluctantly to go out to Denver myself.

I don't think I could do as good a job as Mr. Crowley, nowhere near a job like he has done.

Q What has your role with the -- Coram been as opposed to Mr. Crowley's role since March of 2002?

A What has my role been?

Q Yes.

A Like supervise the operation. I didn't tell him on a day-t0-day basis what to do, but I made ceratin that I reviewed every major decision, every contract for over $50,000, any changes that he wanted to make in the executive branch, any financial arrangements that Coram wanted to do, purchase of software which was an especially big contract, caused me to come out and interview the people for several hours to make sure we were getting our money's worth.

I kept on top of it. I called him very frequently and called people like Mr. Marabita. I supervised the claim

against Price Waterhouse, which I think is a fairly substantial claim. I got involved in the negotiations with the IRS which involved approximately $18 million. I watch very carefully the negotiations regarding Arnet, which is a stumbling block, and I spent a great deal of time with claimants who would call ion and write in and things of that sort.

Q Do you have any reason to believe that Mr. Crowley has done anything that would be a financial impropriety during your term as Trustee?

A I have no such reason.

Q Have you formed any view as to Mr. Crowley's forthrightness in advising you of the operation of the company during the nine months?

A I have --

MR. LEVY: Can I hear the question again?

MR. BRESSLER: I asked him if he has formed any view as to the forthrightness of Mr. Crowley's information to him regarding the operation of the company since March 7, 2002.

THE WITNESS: I have formed a view, and my view is that he has been completely forthright and forthcoming. If he wasn't, I would not be sitting here today.

BY MR. BRESSLER:

Q During your deposition, in response to some questions from Mr. Levy, I think at one point you stated that in your 55 years of practice you don't recall another occasion when your

THE COURT: Sustained.

BY MR. BRESSLER:

Q What were your views as to the inquiry into the continued possible conflict?

A I instructed you and your colleagues to be very attentive to that issue. I knew of the judge's position, and I had every intention to adhere very closely to that. And if I couldn't take care of the details, I expected you and your associates to do so.

Q Have you seen anything in the documents and unsent drafts that Mr. Levy has shown you that is not consistent with Mr. Crowley's representation to you that he's no longer getting paid by Cerberus?

A I have seen nothing. If I did, I would be upset about it and probably take steps.

Q What is the current level of authority that any of the officers of Coram have to write checks or spend money without your approval?

A I think the level is $50,000. I approve everything above -- from 50,000 up.

Q You don't have to know what services Mr. Crowley may have been claiming monies from Cerberus for to know that he told you they were not for Coram work; is that correct?

MR. LEVY: Objection, leading.

THE COURT: Overruled, but it could be clarified.

Court.

THE WITNESS: Daniel D. Crowley, C-r-o-w-l-e-y.

DANIEL D. CROWLEY, TRUSTEE'S WITNESS, SWORN

COURT CLERK: Please be seated.

MR. KIPNES: Thank you for granting my admission pro hac vice, Your Honor.

DIRECT EXAMINATION

BY MR. KIPNES:

Q Mr. Crowley, Judge Adams testified about your meeting in Denver., March 25th or 26th, 2002. Would you describe what discussions you had at that meeting regarding the operations of Coram?

A Yes. Judge Adams asked me to go over in detail how the company was running, how it was operating, how it had operated, what issues there were, problems, and began to inquire and create an awareness for himself and understanding of the business that is Coram.

I discussed the sales and the strategies. I discussed the costs and the drivers. I discussed the gross profitability, the administration. I discussed the EBITDA, the cash flow. I discussed the staffing and I had -- I'd been asked to go over what the trends were, and I discussed those in great detail.

Q At some point did Judge Adams ask you to submit a weekly report?

A Judge Adams directed me to submit a weekly report and a

monthly report.

Q And have you done that?

A Yes, I prepared the weekly report in accordance with his instructions.

Q At your initial meeting with Judge Adams, what conversations, if any, did you have regarding Cerberus?

A Judge Adams discussed Judge Walrath's opinion with me. He asked me directly about my relationship with Cerberus. He asked me if I was receiving any compensation from Cerberus in 2002. He asked me what work I was doing for Cerberus. We discussed the current activities that I had with Cerberus, and he instructed me as to what circumstances and conditions in which he would grant permission for me to do those projects for Cerberus.

Q What instructions were those?

A Judge Adams was very specific in that he said I'm not to be paid anything by Cerberus for work done in 2002. I agreed to that. Judge Adams was very specific in saying that any work that I did for Cerberus in 2002 could not be involved in any way with the business or relationships of Coram. I said absolutely, I had no problem with that.

Judge Adams was very specific that the work, if any, that I would do for Cerberus could not detract from the activities and focus that I had to provide to Coram, and I agreed to that.

MR. KIPNES: Your Honor, may I hand the witness

what's been marked as Trustee's Exhibit 2, which is a letter without attachments from Mr. Crowley to Judge Adams dated March 11, 2002?

THE COURT: Yes. Any objection to my having a copy?

MR. KIPNES: My apologies.

THE COURT: Thank you.

BY MR. KIPNES:

Q Do you have Trustee's Exhibit 2 in front of you, Mr. Crowley?

A Yes, sir.

Q Did you write this letter?

A Yes.

Q This letter was written before your in-person meeting with Judge Adams, correct?

A Yes.

Q In the last paragraph of Trustee's Exhibit number 2 there's a number of entities listed. You see that?

A On Page --

Q Page 1, last paragraph of Trustee's Exhibit 2.

A Yes, sir.

Q What are those entities?

A Yes.

Q Generally.

A In 1999, 2000 and 2001 my work for Cerberus involved many aspects, one for which I would be entitled to receive upside if

any were earned by Cerberus related to deals in which I had placed some 20 or so portfolio managers for Cerberus. The listing here are some of the deals, not all of the deals, that included Beverly Nursing Homes of Florida. I did a lot of work for Cerberus as it related to nursing homes, Texas Nursing Homes, Beverly Nursing Homes, Kindred Nursing Homes, Care Matric Nursing Homes, Assisted Living, Sun Nursing Homes, and other work, a worker's comp company, MCA PHP, which was an HMO, Winterland which was a T-shirt company, Curative Health Care which became produced Willen Care (phonetic), Hangor Orthopedics (phonetic) that did artificial limbs and many others, and it lists some of the other work, health care research, locating board members, fund-raising, management team recruiting, all work that related to Cerberus, none that related to Coram, some of which I had an upside.

Q What did you tell Judge Adams about the claim you thought you had against Cerberus at your March 25th or 26th meeting?

A I told Judge Adams that I thought there was a mountain of evidence that could and should have been presented to the Court here in Delaware, but it for whatever reason hadn't, but that there was a substantive and provable mountain of work that I did for Cerberus, had nothing to do with Coram, in which I was owed money, upside, substantial money, and that I hadn't been paid, and I wished to pursue that.

Judge Adams said that has nothing to do with this

bankruptcy. That's your claim against Cerberus for non-Coram work. Pursue it.

Q At the time of your meeting with Judge Adams, had you received any money or any compensation of any kind from Cerberus in the year 2002?

A I have not received any money for anything from Cerberus since December of 2001, not a penny.

Q Do you have the -- are the exhibits before you that have previously been --

A No.

Q -- introduced?

A No, sir.

THE COURT: I have it.

MR. KIPNES: Thank you, Your Honor.

BY MR. KIPNES:

Q Would you turn to Equity Committee 7, which is a letter of April 10, 2002.

A Yes, sir.

Q Please turn to the second page, Mr. Crowley.

A Yes.

Q Now, this letter follows your meeting with Judge Adams, your first meeting with Judge Adams.

A Yes, it does.

Q And on the second page there's a list of items on which you say, quote, "We need direction." See that?

A Yes, I do.

Q Then there's a series of items, and one of which is, quote, "The terms for termination of the Crowley/Cerberus contract."

See that?

A Yes, I do.

Q Why did you include that on a list of items that -- to Judge Adams on which you said you needed direction?

A I obviously read Judge Walrath's opinion. The contract was dead in December. I had discussed it with the Trustee in March. I'm in the middle of trying to negotiate a termination and I have upside due me from Cerberus. I wish to know what role the office of the Trustee or the Chapter 11 Trustee Judge Adams wished to play, because I feel some sense of urgency to terminate this contract.

And by that I mean I'm negotiating the amounts of money that are due me for work I did for Cerberus that were unrelated to Coram. I want to get paid for what I did three years ago, two years ago, one year ago, and I want to know what does Judge Adams wish to participate in what way, what role, what oversight, what does he want to know?

Q What response did you get, if any?

A That that contract was between Cerberus and myself, writing it had nothing to do with Coram. That he did not wish to weight in. He did wish to be informed if and when we came

to an agreement as to what payment and for what. And I said we would absolutely do that, submit it to him, and it would be submitted to this Court.

Q Have you reached any agreement relating to that contract with Cerberus?

A No. And in the end having talked to them, met with them, wrote them, asked my counsel to talk with them, meet with them, write them, I ended up terminating them for a material breach for not paying the amounts of money that were due for 1999, 2000 and 2001.

Q About when was that?

A September of 2002.

Q What's the status of that claim, your claim against Cerberus, today?

A They haven't paid me a penny, and I'm left to my alternatives, which I have not ruled out litigating.

Q In your -- has Cerberus committed to pay you anything?

A No. If they had, I would have written it to Judge Adams. I would have presented it through Judge Adams, if he wished, to this Court. We would be talking about in public. I haven't any agreement or commitment with Cerberus.

Q Why are you still at Coram?

A Judge Adams asked me to stay at Coram. My contract was expiring at the end of November. At the beginning of October I wrote the judge a note saying my contract's coming to an end.

If Judge Walrath decides against that, then I'll decide what I want to do. I don't know what that is.

Q Thanks a lot, Mr. Crowley.

THE COURT: Any redirect?

MR. KIPNES: Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. KIPNES:

Q Mr. Crowley, would you turn to Equity Committee-8? Equity Committee 8.

A Yes, sir.

Q The exhibit you marked is Equity Committee 8, the May 6, 2002 draft. Would you turn to the third page.

A Yes.

Q Let's establish that Mr. Schreiber wrote those words, correct?

A He wrote them.

Q When did you see them?

A Last week Mr. Schreiber showed them to me.

Q What did you say to MR. Schreiber when you read the five lines that appear on the third page of Equity Committee Exhibit 8?

A I --

Q A verbatim response it not required.

A -- really --

Q Just what did you tell him?

                            A I was really angry. I -- this is bullshit. I'm sorry. I apologize to the Court.

Q Did you have any conversation at that time with Mr. Schreiber about the accuracy of what appears on that page?

A I did.

Q And what did you say?

A This is absolutely wrong. It's not in context with that meeting. None of this happened. Where in the hell did you get this? And why am I looking at it a year later, an insert that I've never seen before? What is this about?

Q Does Cerberus owe you any money in your view for any work you have done at any time from the date of your birth to now that has anything to do with Coram?

A Not a penny.

MR. KIPNES: No further questions.

RECROSS EXAMINATION

BY MR. LEVY:

Q Perhaps I misunderstood you, Mr. Crowley. I thought you had testified that after you wrote the May 6 letter and discussed it and the third page, Page 65, with Mr. Schreiber; is that not your testimony?

A Mr. Levy, I told you I hadn't seen this thing in over a year, that the only time I've seen it since I thought it was thrown away, I sent it to my lawyer. I did Draft Two, was ready to send it. I cooled down the next day, in the trash it