# EXHIBIT B-9

Schreiber, Scott                                    3/21/2007

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
ARLIN M. ADAMS, Chapter 11      )
Trustee of the                  )
Post-Confirmation               )
Bankruptcy Estates of CORAM     )
HEALTHCARE CORPORATION, a       )
Delaware Corporation, and       )
of CORAM, INC., a Delaware      )
Corporation,                    )
                                )
          Plaintiff,            )
                                )
     vs.                        ) No. 04-1565
                                )
DANIEL D. CROWLEY; DONALD       )
J. AMARAL; WILLIAM J.           )
CASEY; L. PETER SMITH; and      )
SANDRA L. SMOLEY,               )
                                )
          Defendants.           )
```

The videotaped deposition of SCOTT SCHREIBER, called by Plaintiff, for examination, pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions taken before Stephanie A. Battaglia, CSR and Notary Public in and for the County of DuPage and State of Illinois, at 55 West Monroe Street, Chicago, Illinois, on March 21, 2007, 10:37 a.m.

## Page 2

```
1   PRESENT:
2       SCHNADER, HARRISON, SEGAL & LEWIS, LLP
3       BY:  MR. RICHARD A. BARKASY and
             MR. BARRY E. BRESSLER
        Woodland Falls Corporate Park
4       220 Lake Drive East, Suite 200
        Cherry Hill, New Jersey 08002-1165
5       (856) 482-5721 / FAX: (856) 482-6980
        e-mail: rbarkasy@schnader.com
6               bbressler@schnader.com
7           appeared on behalf of Plaintiff Arlin M.
            Adams, Chapter 11 Trustee of Coram Healthcare
8           Corporation and Coram, Inc.;
9       KEKER & VAN NEST, LLP
        BY:  MR. ELLIOT R. PETERS and
10           MR. GARRETT A. LYNCH
        710 Sansome Street
11      San Francisco, California 94111
        (415) 391-5400 / FAX: (415) 397-7188
12      e-mail: epeters@kvn.com
                glynch@kvn.com
13
            appeared on behalf of Defendant
14          Daniel Crowley.
15  ALSO PRESENT:
16      Mr. Bruce Witty, CLVS
        Thompson Court Reporters
17
18
19
20
21
22
23
24
```

## Page 3

```
1              I  N  D  E  X
    WITNESS:                              PAGE:
2   Scott Schreiber                         8
3
    EXAMINATION BY:
4   Mr. Barkasy                          8, 178
    Mr. Peters                          131, 200
5
6              E X H I B I T S
    SCHREIBER DEPOSITION EXHIBITS
7   Exhibit 1   Biography of Scott Schreiber   14
                No Bates Nos.
8
    Exhibit 2   Letter to A. Adams            22
9               from S. Schreiber
                re:  Coram Healthcare
10              4-2-2002
                Bates No. CROWLEYKVN 014088 -
11              Bates No. CROWLEYKVN 014089
12  Exhibit 3   Letter to M. Cook            26
                from S. Schreiber
13              re:  Coram Healthcare
                2-18-2002
14              Bates No. CROWLEYKVN 014090 -
                Bates No. CROWLEYKVN 014091
15
    Exhibit 4   E-mail to S. Schreiber       32
16              from M. Cook
                re:  Crowley
17              4-5-2002
                Bates No. CERB 20092
18
    Exhibit 5   Suspension letter of         35
19              Agreement
                12-27-2001
20              Bates No. CRX 00752
21  Exhibit 6   E-mail to S. Schreiber       37
                from C. Reid
22              re:  Proposed Termination
                Agreement
23              (Crowley)
                4-10-2002
24              Bates No. CROWLEYKVN 001831
```

## Page 4

```
1              E X H I B I T S (Cont'd.):
2   Exhibit 7   Letter to M. Cook           38
                from S. Schreiber with
3               attached employment agreement
                to terminate employment agreement
4               between D. Crowley and Cerberus
                5-21-2002
5               Bates No. CROWLEYKVN 001732 -
                Bates No. CROWLEYKVN 001733
6
    Exhibit 8   Letter to S. Schreiber       41
7               from M. Cook
                re:  Cerberus Capital Management/
8               D. Crowley
                9-20-2002
9               Bates No. CROWLEYKVN 000609 -
                Bates No. CROWLEYKVN 000608
10
    Exhibit 9   Letter to Cerberus Capital   43
11              Management from S. Schreiber
                9-20-2002
12              Bates No. CROWLEYKVN 000607
13  Exhibit 10  Letter to S. Feinberg        51
                from D. Crowley
14              re:  Employment Agreement
                8-20-2002
15              Bates No. CRX 00816
16  Exhibit 11  Letter to B. Bressler        53
                from S. Sims
17              re:  Dan Crowley
                10-18-2002
18              Bates No. CROWLEYKVN 014083 -
                Bates No. CROWLEYKVN 014085
19
    Exhibit 12  Letter to S. Schreiber       55
20              from B. Bressler
                re:  Letter Agreement
21              12-24-2002
                No Bates Nos.
22
    Exhibit 13  Letter from B. Bressler      56
23              to S. Schreiber
                re:  Letter Agreement
24              1-7-2003
```

Pages 1 to 4

Schreiber, Scott                                              3/21/2007

## Page 53

1  THE VIDEOGRAPHER: Going off the record

2  at 11:48 a.m.

3  (Recess taken.)

4  THE VIDEOGRAPHER: This marks the

5  beginning of Tape 2, Volume 1, in the deposition of

6  Scott Schreiber, going on the record the time is now

7  12:05 p.m., please proceed.

8  (Document marked Schreiber Deposition

9  Exhibit 11 for identification.)

10 BY MR. BARKASY:

11 Q.  Mr. Schreiber, Exhibit Schreiber 11 is a

12 letter from Steven K. Sims to Mr. Bressler, dated

13 October 18, 2002 on Much, Shelist letterhead, is that

14 right?

15 A.  Yes, it is.

16 Q.  Was Mr. Sims a colleague of yours in

17 October, 2002 at Much, Shelist?

18 A.  Yes, he was.

19 Q.  And you received the copy of this letter,

20 correct?

21 A.  Yes, I did.

22 Q.  And you are familiar with it?

23 A.  Yes.

24 Q.  And this letter was a proposal that

## Page 54

1  Mr. Crowley made with regard to the continuation of

2  his employment with Coram beyond November 30, 1999, is

3  that correct?

4  A.  November 30, 2002 would be the right

5  date.

6  Q.  2002, I apologize.

7  A.  And you are correct, yes.

8  Q.  And Mr. Crowley's November 30, 1999

9  employment contract with Coram was scheduled to expire

10 on November 30, 2002, correct?

11 A.  Correct.

12 Q.  After you sent this proposal to

13 Mr. Bressler, the Trustee's counsel, is it fair to say

14 that you had discussions with Mr. Bressler regarding

15 terms and conditions of Mr. Crowley's continued

16 employment with Coram beyond November 30, 1999 --

17 2002?

18 A.  Yes, you are correct.

19 Q.  Your discussions with Mr. Bressler led to

20 an agreement, is that right?

21 A.  Yes.

22 (Document marked Schreiber Deposition

23 Exhibit 12 for identification.)

24

## Page 55

1  BY MR. BARKASY:

2  Q.  Mr. Schreiber, what is Exhibit Schreiber

3  12?

4  A.  This looks like the letter agreement

5  between Mr. Bressler and I memorializing the final

6  agreement for Dan's short extension, Mr. Crowley's

7  short extension, at Coram.

8  Q.  What is the date of the agreement?

9  A.  It is December 24, 2002.

10 Q.  Was this signed by the Trustee,

11 Judge Adams, and Mr. Crowley?

12 A.  It seems it was, yes.  I did not see

13 Mr. Adams sign this, but that is his signature,

14 apparently.

15 Q.  What was the short term for which

16 Mr. Crowley's employment was being extended?

17 A.  I think it was for six months.

18 Q.  Mr. Schreiber -- and the agreement is

19 defined in the text of the agreement as the transition

20 agreement, is it not?

21 A.  Correct.

22 Q.  And the transition agreement was subject

23 to the approval of the United States Bankruptcy Court,

24 is that right?

## Page 56

1  A.  That is what Paragraph 9 says.

2  Q.  And that was your understanding as well,

3  is that right?

4  A.  My understanding is that parts of this

5  agreement were subject to the bankruptcy court

6  approval but parts were not.

7  Q.  Which parts were subject to the

8  bankruptcy court approval?

9  A.  The extension, the stay bonuses, his new

10 title.

11 Mr. Barkasy, let me clarify because there

12 was some confusion over that and -- the agreement says

13 it is subject to bankruptcy court approval.

14 (Document marked Schreiber Deposition

15 Exhibit 13 for identification.)

16 BY MR. BARKASY:

17 Q.  Mr. Schreiber, Exhibit Schreiber 13 is an

18 agreement entered into between Mr. Crowley and the

19 Trustee in connection with the transition agreement,

20 is that right?

21 A.  That is what it says.

22 Q.  It also says in Paragraph 3 that "The

23 parties contemplate that the formal agreement

24 reflecting the above will be finalized by January 31,

Pages 53 to 56

## Page 73

1  to the admission of the documents into evidence.

2      At page 115 of the hearing the court

3  asked whether there were any objections to the

4  admission of the document into evidence and counsel

5  for the Trustee, Mr. Kipnes, indicates there is no

6  objection. There was no objection to the admission of

7  the documents made by Mr. Bressler.

8      MR. PETERS: Mr. Bressler had previously

9  objected at the pages that I referred to.

10 BY MR. BARKASY:

11     Q.    Mr. Schreiber, Exhibit Schreiber 15 is a

12 copy of EC-8 -- and while I am at it let me mark a

13 copy of Exhibit 16 as EC-10.

14     (Document marked Schreiber Deposition

15     Exhibit 16 for identification.)

16 BY MR. BARKASY:

17     Q.    Mr. Schreiber --

18     A.    Yes, sir.

19     Q.    -- were Exhibits EC-8 and EC-10 documents

20 that you sent to counsel for the equity committee

21 after the Trustee filed his motion to approve the

22 transition agreement but before the March 3, 2003

23 hearing?

24     MR. PETERS: Objection, lacks foundation,

## Page 74

1  compound, vague and ambiguous.

2      THE WITNESS: These are documents that

3  were sent by the law firm of Much, Shelist in response

4  to the document production request served on it on us,

5  Much, Shelist, counsel for Mr. Crowley, prior to the

6  March 3rd hearing.

7  BY MR. BARKASY:

8      Q.    And they were sent by Much, Shelist to

9  counsel for the equity committee?

10     A.    Yes.

11     Q.    And copies were also sent to the Trustee?

12     A.    You asked that question previously and I

13 didn't know the answer to that and I don't know it

14 now.

15     Q.    Fair enough.

16     Before the March 3, 2003 hearing with

17 regard to the approval of the transition agreement,

18 did you request that the equity committee return

19 Exhibit Schreiber 15 and 16?

20     A.    I believe my partner, Mr. Ward, sent a

21 letter to counsel for the equity committee requesting

22 the return of these documents.

23     Q.    Did the equity committee agree to return

24 the documents?

## Page 75

1      A.    No, they did not.

2      Q.    Did Mr. Crowley file a motion seeking to

3  compel the equity committee to return

4  Exhibit Schreiber 15 and 16?

5      A.    I don't recall.

6      Q.    Please look at Exhibit Schreiber 15.

7  Exhibit Schreiber 15 contains some stamps that say

8  REDACTED on them.

9      A.    Yes, it does.

10     Q.    Two of them, is that right?

11     A.    Yes, it does.

12     Q.    Did someone at the Much, Shelist law firm

13 place the redacted stamp on Exhibit EC-8?

14     A.    Yes, they did.

15     Q.    Who did that?

16     A.    I don't know.

17     Q.    Was it done under your direction?

18     A.    No.

19     Q.    Was it done under the direction of

20 Mr. Ward?

21     A.    I don't know.

22     Q.    Who compiled the documents that were

23 produced by the Much, Shelist law firm to the equity

24 committee's lawyers?

## Page 76

1      A.    Mr. Ward, Mr. Valiulis, and there was a

2  paralegal whose name escapes me. They were

3  responsible for responding to this, the document

4  production request.

5      Q.    And these redacted marks were placed on

6  the document prior to their being sent to the equity

7  committee?

8      MR. PETERS: Objection, lacks foundation.

9  BY MR. BARKASY:

10     Q.    Where are the redacted stamps -- were the

11 redacted stamps placed on the document by the Much,

12 Shelist law firm?

13     A.    I believe so.

14     Q.    Before they were produced to the equity

15 committee?

16     MR. PETERS: Objection, lacks foundation.

17     You may answer.

18     THE WITNESS: I believe so.

19 BY MR. BARKASY:

20     Q.    What material was redacted from

21 Exhibit EC-8?

22     A.    I don't know.

23     Q.    Why was material redacted by the Much,

24 Shelist law firm from Exhibit EC-8?

Pages 73 to 76

Schreiber, Scott                                              3/21/2007

Page 77

1     A.    I don't know.
2     Q.    Did you prepare --
3          MR. PETERS:  I am sorry to interrupt you,
4     but your question, "what material was redacted",
5     just meant what kind of material?  You weren't asking
6     for the substance of any kind of material at the time
7     somebody might have redacted?
8          MR. BARKASY:  Let me ask the question
9     that Mr. Peters just suggested.
10    BY MR. BARKASY:
11    Q.    What type of material was redacted from
12    EC-8?
13    A.    Mr. Barkasy, I don't know.  Without
14    having looked at the material I don't know what was
15    redacted.
16    Q.    Do you now or the law firm that you are
17    affiliated with now possess an unredacted copy of
18    Exhibit EC-8?
19    A.    No to both questions.
20    Q.    Do you know whether the Much, Shelist law
21    firm possesses a copy of an unredacted version of
22    Exhibit EC-8?
23    A.    No, I do not know.
24    Q.    Did you prepare any of the pages of

Page 78

1     Exhibit EC-8?
2          MR. PETERS:  Can I suggest, Mr. Barkasy,
3     not to be -- but for purposes of this record it
4     probably makes more sense to refer to it by its
5     exhibit number in this deposition or at least make
6     clear on the record that the two are one in the same;
7     otherwise, we will have some confused readers of the
8     transcript.
9          MR. BARKASY:  Good idea.
10    BY MR. BARKASY:
11    Q.    Did you prepare any of the pages of
12    Exhibit Schreiber 15, which was Exhibit EC-8 at the
13    March 3, 2003 hearing?
14    A.    Yes.  I prepared this last page of EC-8.
15    Q.    And that is the last page that says,
16    "Hence, I expect that you'll honor the commitment you
17    made to me over dinner:  After Coram's plan is
18    confirmed or its assets sold, I'll be reinstated with
19    Cerberus and receive $5 million from Cerberus.  Also,
20    Cerberus will indemnify me for all of my legal fees,
21    plus pay me the difference between what I ultimately
22    receive from Coram by way of bonuses, and $11,200,000.
23    If this is not our deal, please send this letter back
24    to me."

Page 79

1          That language is what you prepared, is
2     that right?
3          MR. PETERS:  I am going to instruct the
4     witness not to answer any questions relating to the
5     substance of what is in this letter unless we can have
6     an agreement that his describing the substance of any
7     otherwise privileged communication, putting aside the
8     waiver argument, isn't a further waiver and that we
9     can maintain the confidentiality of the privilege.
10         I think it is appropriate to lay a
11    foundation.  I understand that you may ask questions
12    that I instruct him not to answer to, but I would like
13    there with respect to the foundational questions to be
14    an understanding that my permitting him to answer
15    those questions isn't construed as any further waiver
16    based on whatever -- what we do today.
17         Can we have such an agreement?  Otherwise
18    I will have to instruct him not to answer that
19    question in order to preserve our position that the
20    letter is privileged.
21         MR. BARKASY:  Yes, we can have such an
22    agreement.
23         MR. PETERS:  So then I think the witness
24    answered the question that the language you read from

Page 80

1     the third page of this letter is what he drafted.
2          THE WITNESS:  To answer the question,
3     that I drafted -- I wrote this third page.  You
4     actually read a couple -- misread a couple words, but.
5          MR. BARKASY:  We will let the transcript
6     judge that.
7     BY MR. BARKASY:
8     Q.    All I was trying to do, Mr. Schreiber,
9     was by reading those words is to make clear those
10    things that you wrote as opposed to anything that
11    Mr. Crowley or someone else may have written.
12    A.    You have made that clear, the third page
13    I wrote.
14    Q.    Nothing else in EC-8 that appears on EC-8
15    right now?
16    A.    Wrote?
17    Q.    Yes.
18         MR. PETERS:  What about hand -- are you
19    referring to the handwritten?
20         MR. BARKASY:  I don't -- go ahead.
21    BY MR. BARKASY:
22    Q.    Does your handwriting appear anywhere
23    else on Exhibit EC-8?
24    A.    Yes.

Schreiber, Scott                                                    3/21/2007

|  | Page 81 |
|---|---|
| 1 | Q. Where? |
| 2 | A. I would say every place that there is a |
| 3 | written -- a pen mark or lines have been scratched out |
| 4 | was my work. |
| 5 | I did not write EC-8 in the upper |
| 6 | right-hand corner, obviously, but all the lines that |
| 7 | were scratched out I scratched them out. |
| 8 | Q. Did -- |
| 9 | A. This little zero was probably mine as |
| 10 | well on page 2. |
| 11 | Q. Did you put the draft stamp on the |
| 12 | letter? |
| 13 | A. I don't recall. |
| 14 | Q. Did you put the confidential stamp on the |
| 15 | letter? |
| 16 | A. I don't recall. |
| 17 | Q. And do you know whether anyone from Much, |
| 18 | Shelist put the draft or confidential stamps on the |
| 19 | letter? |
| 20 | A. I do not know. |
| 21 | Q. Did Mr. Crowley write the first two pages |
| 22 | of the letter? |
| 23 | A. Yes. |
| 24 | MR. PETERS: And that is, again, pursuant |

|  | Page 82 |
|---|---|
| 1 | to our agreement that that is -- my permitting him to |
| 2 | answer that isn't a further waiver. |
| 3 | MR. BARKASY: Agreed. |
| 4 | THE WITNESS: That is how I answered the |
| 5 | question for the record. |
| 6 | BY MR. BARKASY: |
| 7 | Q. Mr. Crowley wrote the first two pages and |
| 8 | faxed them to you, is that right? |
| 9 | A. Yes. |
| 10 | Q. What did you do with the document after |
| 11 | you received it from Mr. Crowley? |
| 12 | MR. PETERS: The document, meaning the |
| 13 | first two pages of Schreiber 15? |
| 14 | MR. BARKASY: Yes. |
| 15 | THE WITNESS: I am happy to answer this |
| 16 | question provided it is not a further waiver of any |
| 17 | attorney-client privilege or work product privilege I |
| 18 | have with Mr. Crowley. |
| 19 | BY MR. BARKASY: |
| 20 | Q. My understanding of our agreement is that |
| 21 | testimony that Mr. Schreiber gives regarding the |
| 22 | contents of Exhibits EC-8 or EC-10 will not serve as a |
| 23 | further waiver of any claims of privilege or work |
| 24 | product. |

|  | Page 83 |
|---|---|
| 1 | MR. PETERS: Right. |
| 2 | THE WITNESS: I read the letter. I |
| 3 | scratched out parts that I didn't think were |
| 4 | appropriate. |
| 5 | BY MR. BARKASY: |
| 6 | Q. Did Mr. Crowley ask you to prepare the |
| 7 | insert? |
| 8 | A. I don't recall. |
| 9 | Q. Did you have discussions with Mr. Crowley |
| 10 | about EC-8 or Schreiber 15 after the first two pages |
| 11 | were faxed to you by Mr. Crowley? |
| 12 | A. I don't recall specific discussions with |
| 13 | him. |
| 14 | Q. Do you know whether Mr. Crowley sent this |
| 15 | document to anyone? |
| 16 | A. No, I don't know the answer to that |
| 17 | question. |
| 18 | Q. Do you recall discussing whether EC-8 |
| 19 | should be sent by Mr. Crowley to Mr. Feinberg with |
| 20 | Mr. Crowley? |
| 21 | MR. PETERS: Objection. |
| 22 | I instruct you not to answer. |
| 23 | BY MR. BARKASY: |
| 24 | Q. What was the purpose for the insert? |

|  | Page 84 |
|---|---|
| 1 | A. I don't recall. |
| 2 | Q. Please look at Exhibit EC-10. |
| 3 | MR. PETERS: Schreiber 16 you mean? |
| 4 | THE WITNESS: Schreiber 16? |
| 5 | MR. BARKASY: Yes, Schreiber 16. |
| 6 | THE WITNESS: Yes, sir. |
| 7 | BY MR. BARKASY: |
| 8 | Q. Did the Much, Shelist law firm redact |
| 9 | material from Exhibit EC-10? |
| 10 | A. I don't know. |
| 11 | Q. Do you know who put the redacted stamp on |
| 12 | Exhibit EC-10? |
| 13 | A. No. |
| 14 | Q. Schreiber 16. |
| 15 | Do you know what type of material was |
| 16 | redacted from Schreiber 16? |
| 17 | A. No. |
| 18 | Q. Do you or your current law firm possess |
| 19 | an unredacted copy of Exhibit Schreiber 16? |
| 20 | A. No to both questions. |
| 21 | Q. Do -- does the Much, Shelist law firm |
| 22 | possess an unredacted copy of Exhibit Schreiber 16? |
| 23 | A. I don't know. |
| 24 | Q. Does your handwriting appear on Exhibit |

Pages 81 to 84

## Page 85

1   Schreiber 16?

2        A.    Yes, it does.

3        Q.    Where does your handwriting appear on

4   Exhibit Schreiber 16?

5        A.    I would say the edits in the first

6   paragraph. There is some scribbles along the right

7   side of the first paragraph. The stray lines along

8   the second and third paragraphs of page 1. The

9   underline in the end of the second paragraph of page

10  2, the X-out, the bottom of the last paragraph of page

11  2. And all of the handwriting on page 3, with the

12  exception of Dan Crowley's signature, those were all

13  my handwriting.

14       Q.    Was Exhibit Schreiber 16 a document that

15  Mr. Crowley sent to you by fax?

16       A.    Yes, apparently so.

17            MR. PETERS:    Just can we clarify, that

18  the document as received by Mr. Schreiber wouldn't

19  have contained the edits that Mr. Schreiber put on

20  there? I think that is clear, but --

21  BY MR. BARKASY:

22       Q.    Mr. Schreiber, where your handwriting

23  appears on the document you placed that handwriting on

24  the document after you received it by fax from

## Page 86

1   Mr. Crowley, is that right, is that fair?

2        A.    I think that is a fair assumption. It

3   would have been hard to put them on the document

4   before I received them from Mr. Crowley.

5        Q.    I was just trying to satisfy Mr. Peter's

6   concern.

7            MR. PETERS:    Thank you.

8            THE WITNESS:    Incidentally, I did not

9   write EC-10 on the top, that is not my handwriting.

10  BY MR. BARKASY:

11       Q.    Do you know whether the redacted stamp

12  was on the document when you received it from

13  Mr. Crowley?

14       A.    I don't know.

15       Q.    Did you have any discussion with

16  Mr. Crowley about the subject matter of Exhibit

17  Schreiber 16 after he faxed it to you?

18       A.    I don't recall.

19            (Document marked Schreiber Deposition

20            Exhibit 17 for identification.)

21  BY MR. BARKASY:

22       Q.    Mr. Schreiber, Exhibit Schreiber 17 is a

23  letter from David J. Bradford to you and Anthony C.

24  Valiulis dated February 21, 2003, is that right?

## Page 87

1        A.    That is correct.

2        Q.    Mr. Bradford was one of the attorneys for

3   the equity committee in the Coram bankruptcy?

4        A.    Yes, he was.

5        Q.    Was Mr. Valiulis one of your colleagues

6   at Much, Shelist in February of 2003?

7        A.    Yes, he was.

8        Q.    In the letter Mr. Bradford writes, "We

9   have been advised by your office that you now contend

10  that certain documents produced on behalf of

11  Mr. Crowley several days ago were protected by the

12  attorney-client privilege and were produced

13  inadvertently."

14            Who was it that contacted the equity

15  committee's lawyers and advised them that certain

16  documents that were produced on behalf of Mr. Crowley

17  were produced inadvertently?

18       A.    Mr. Ward and Mr. Valiulis.

19       Q.    Did you participate in any of those

20  communications?

21       A.    "In any of those communications," can you

22  be more definitive?

23       Q.    Sure.

24            I assume that -- maybe I shouldn't

## Page 88

1   assume.

2            Did Mr. Ward and Mr. Valiulis call

3   counsel for the equity committee and say that we

4   inadvertently produced documents?

5        A.    Yes.

6        Q.    And were you involved in that telephone

7   conversation?

8        A.    No.

9        Q.    At the end of the letter Mr. Bradford

10  says "Our client reserves the right to use the

11  document in all respects." Do you see that?

12       A.    Yes, I do.

13       Q.    So it was clear as of February 21, 2003

14  that it was the equity committee's position that the

15  documents would not be returned, is that correct?

16       A.    That's correct.

17            (Document marked Schreiber Deposition

18            Exhibit 18 for identification.)

19  BY MR. BARKASY:

20       Q.    Mr. Schreiber, Exhibit 18 is a copy of a

21  letter from John H. Ward to Michael Cook dated

22  February 21, 2003, is that right?

23       A.    That's correct.

24       Q.    And Mr. Ward was one of your colleagues

Schreiber, Scott                                              3/21/2007

Page 113

1  him money?
2      A.    That Cerberus owed Mr. Crowley money for
3  pre-Coram/non-Coram work and advice that he had
4  provided to Cerberus.
5      Q.    Did you discuss the type of
6  pre-Coram/non-Coram work to which you just made
7  reference?
8      A.    Did we discuss the type? Yes.
9      Q.    What did you discuss?
10     A.    We discussed, I recall Winterland sticks
11 out in my mind, that Dan had given advice to Cerberus
12 about Winterland, Kindred Healthcare.
13           There were a number of healthcare
14 companies that Dan had given advice to Cerberus on
15 that predated Coram, had nothing to do with Coram.
16     Q.    Did you have discussions with Mr. Cook
17 concerning how much money Mr. Crowley was owed in
18 relation to Winterland?
19     A.    I don't recall specifically, no.
20     Q.    Did you have discussions with Mr. Cook
21 concerning how much money Mr. Crowley was owed in
22 relation to Kindred?
23     A.    I don't recall specifically, no.
24     Q.    Did you have discussions with Mr. Cook --

Page 114

1  strike that.
2           Please look at page 74 of the
3  transcript --
4      A.    Yes, sir.
5      Q.    -- of the March 3rd hearing.
6           It says in -- on page 74 there is
7  testimony from Mr. Crowley at line 16 where he says
8  "Judge Adams was very specific in that he said I am
9  not to be paid anything by Cerberus for work done in
10 2002." Do you see that?
11     A.    Yes.
12     Q.    Did you discuss that instruction of
13 Judge Adams with Mr. Cook?
14     A.    I don't recall discussing Judge Adams'
15 instructions to Dan with Mr. Cook.
16     Q.    Did you have any discussions with
17 Judge Adams during which he said that Mr. Crowley
18 would not be able to be paid anything by Cerberus for
19 work done in 2002?
20     A.    I don't think so. I don't recall any
21 such discussions with Judge Adams.
22     Q.    Were you ever told that by any of
23 Judge Adams' lawyers?
24     A.    I think Mr. Bressler and I discussed it.

Page 115

1  And he and Mr. Kipnes and you and other lawyers who I
2  would have discussed it with.
3      Q.    Based upon your discussions with
4  Mr. Bressler, was it your understanding that
5  Judge Adams required that Mr. Crowley not be paid
6  anything by Cerberus for work done in 2002?
7           MR. PETERS: Objection to the form.
8           THE WITNESS: Yes.
9           Coram was a line in the sand. Everything
10 that happened after Coram he was not to be paid by
11 Cerberus, simple as that. That was -- those were the
12 marching orders, the instructions. That was the plan,
13 the game plan, strategy.
14           (Document marked Schreiber Deposition
15           Exhibit 20 for identification.)
16 BY MR. BARKASY:
17     Q.    Mr. Schreiber, what is Exhibit
18 Schreiber 20?
19     A.    It is a Request of Daniel Crowley for
20 Payment of Administrative Expense filed in the
21 bankruptcy case of Coram Healthcare Corp., and Coram,
22 Inc.
23     Q.    Did you file this on behalf of
24 Mr. Crowley?

Page 116

1      A.    No.
2           Mr. Cross filed it on behalf of
3  Mr. Crowley.
4      Q.    Did you serve as counsel to Mr. Crowley
5  with regard to this request?
6      A.    Yes, I did.
7      Q.    And Mr. Cross filed it because he is
8  admitted to the Bar in Delaware, is that right?
9      A.    Correct.
10     Q.    What was the basis for Mr. Crowley's
11 request for payment of administrative expense?
12     A.    I think, with all due respect, I think it
13 is laid out very clearly in this seven-page memo of
14 law, and I don't know if you want me to read the whole
15 thing into the record.
16     Q.    Please take a look at page 3.
17     A.    Yes, sir.
18     Q.    In the first line it makes reference to
19 aggregate amount of nearly $16.8 million. Do you see
20 that?
21     A.    Yes.
22     Q.    Is that the amount of the claim that you
23 were asserting on behalf of Mr. Crowley, nearly
24 $16.8 million?

Schreiber, Scott                                                3/21/2007

## Page 137

1   termination of the agreement require a payment by
2   Cerberus to Mr. Crowley?
3        A.    Yes, yes.
4        Q.    And was that different than suspension?
5        A.    Certainly.
6        Q.    How?
7        A.    Suspension, in my mind, versus
8   termination, means that when you suspend something you
9   hold it in abeyance, you don't pursue your rights.
10  And here Dan had rights against Cerberus for
11  pre-Coram/non-Coram matters, so those rights weren't
12  being pursued. Suspension means that you don't get
13  the $80,000 monthly payment.
14        Whether or not you have a right to it is
15  something that we are not talking about, but
16  termination means that you have terminated that right.
17        Q.    And during 2002, to your knowledge, was
18  Mr. Crowley in fact not receiving the $80,000 a month
19  payment from Cerberus?
20        A.    My knowledge is he was not receiving the
21  $80,000 a month payment from Cerberus.
22        Q.    Was it your view on -- withdrawn.
23        Was it your position in your dealings
24  with Cerberus in 2002 that Mr. Crowley was entitled to

## Page 138

1   money from Cerberus?
2        A.    Was it my position -- yes.
3        Q.    And did you engage in negotiations with
4   lawyers for Cerberus in 2002 about terminating the
5   agreement between Mr. Crowley and Cerberus in exchange
6   for payment by Cerberus to Crowley, among other
7   things?
8        A.    Yes.
9        Q.    Have a look at Schreiber Exhibit 3.
10        By the way, do you know whether this is
11  an exhibit that was shown to Mr. Adams during the
12  March 3, 2003 hearing?
13        A.    I don't know.
14        Q.    Why don't you just pull out Schreiber 14
15  from that pile, because we are going to refer to it
16  from time to time during your testimony. But keep
17  Schreiber 3 there in front of you. Take Schreiber 14,
18  which is the transcript of the March 3, '03 hearing.
19        A.    Got it.
20        Q.    Turn to page 45. And just read to
21  yourself lines 16 to 20.
22        A.    Yes.
23        Q.    Does that refresh your recollection that
24  this letter, Schreiber 3, dated February 18th, from

## Page 139

1   you to Michael Cook, was shown to the Trustee,
2   Arlin Adams, during the March 3, '03 hearing?
3        A.    Yes, this does refresh my recollection.
4        Q.    What is your recollection regarding
5   whether or not this letter, Schreiber 3, was shown to
6   Arlin Adams at the March 3rd hearing?
7        A.    He was shown this letter.
8        Q.    To your knowledge had Mr. Adams also been
9   deposed, had his testimony taken prior to the
10  March 3rd hearing?
11        A.    Yes.
12        Q.    To your knowledge had Mr. Adams been
13  shown a number of documents which were then used at
14  the March 3rd hearing previously when he was deposed
15  in February of 2003?
16        A.    Yes.
17        Q.    During this time period were you having
18  discussions with Mr. Adams lawyers from time to time?
19        A.    Yes.
20        Q.    And which of his lawyers were you having
21  discussions with?
22        A.    Mostly Mr. Bressler and Mr. Kipnes.
23        Q.    And did you have discussions with
24  Mr. Bressler in advance of the March 3rd hearing

## Page 140

1   regarding some of these documents that were shown to
2   Mr. Adams during the March 3, 2003 hearing?
3        A.    Yes.
4        Q.    Do you have any doubt whatsoever that the
5   Trustee and his lawyers was aware of -- were aware of
6   these documents prior to the March 3rd hearing?
7        A.    No, I have no doubt whatsoever.
8        Q.    Now, let's have a look at Schreiber 4.
9   We will take Schreiber 3, I am just going to turn it
10  upside down here, have a look at Schreiber 4. It is
11  an e-mail.
12        A.    Yes.
13        Q.    It is an e-mail from you to Michael Cook,
14  dated April 5th. And it says, "Mike, I would
15  appreciate it if you would keep our conversations
16  regarding terminating Dan's contract between us and
17  our clients for now. No other attorneys nor the
18  Trustee need to be part of those conversations until
19  Dan and Cerberus decide that is the way to go.
20  Thanks, Scott." Do you see that?
21        A.    Right.
22        Q.    Now, you were in settlement negotiations
23  with Cerberus, is that a fair statement?
24        A.    We were in negotiations with Cerberus.

Pages 137 to 140

Schreiber, Scott                                    3/21/2007

Page 145

1  counsel for Cerberus asking questions of Arlin Adams
2  who is under oath.
3        "Q    And specifically I would like to
4  direct your attention to Mr. Schreiber's
5  e-mail to Mr. Cook dated April 5, 2002, in
6  which he says, among other things, no other
7  attorney is to know the Trustee needs to be
8  part of those conversations. Do you see
9  that?
10       "A    I do.
11       "Q    Now, Judge Adams, as of April 5th am
12  I correct it was your understanding that
13  Mr. Crowley believed that Cerberus owed him
14  money under the contract that had existed
15  between Cerberus and Mr. Crowley, correct?
16       "A    That is correct.
17       "Q    And it was your view, am I right,
18  that that was a matter between Cerberus and
19  Mr. Crowley, correct?
20       "A    That was my view."
21       Did I read that correctly?
22  A.    You read that correctly.
23  Q.    Did you have an understanding on or
24  before March 3, 2003 that Arlin Adams, the Coram

Page 146

1  Trustee, had the view that the money owed under the
2  contract that existed between Cerberus and Mr. Crowley
3  was a matter between Cerberus and Mr. Crowley?
4        A.    Yes, sir.
5        Q.    Let's have a look at Schreiber 6.
6        A.    Are we done with this?
7        Q.    Yes, we will turn that over there.
8              Have a look at Schreiber 6. Schreiber 6
9  is a e-mail from Schulte, Roth & Zabel to you
10  containing a letter.
11             Was Schulte, Roth Cerberus's counsel?
12       A.    Yes, they were.
13       Q.    Now, this termination -- was this
14  termination agreement acceptable to Mr. Crowley?
15       A.    I don't think so.
16       Q.    There was nothing in here whatever about
17  money or the reservation of rights, correct?
18       A.    Right.
19       Q.    Was that a problem from your perspective?
20       A.    Yes.
21       Q.    I will have you look at Schreiber 7, the
22  next exhibit in order. It is a letter dated May 21st
23  from you to Michael Cook at Schulte, Roth & Zabel.
24             It says "Let's use the enclosed as a

Page 147

1  starting point for negotiating Dan's termination
2  agreement with Cerberus. Please contact me."
3             And I want to go through the items on the
4  attached agreement and ask you in the course of your
5  negotiations with Mr. Cook did you and he discuss that
6  under Section 2.2 of the employment agreement it was a
7  three-year period, it could be -- it would be
8  automatically extended as set forth in that second
9  paragraph of the draft agreement?
10       A.    I don't recall.
11       Q.    Did you discuss with Mr. Cook that under
12  Section 6.5(e) Mr. Crowley would continue to receive
13  salary payments consistent with this agreement under
14  the termination without cause provision?
15       A.    I really don't recall.
16       Q.    Did you communicate to -- withdrawn.
17             In your discussions with Mr. Cook did you
18  and he discuss whether under Section 3.1 Mr. Crowley
19  was entitled to receive $80,000 a month?
20       A.    I don't recall.
21       Q.    Did you ever discuss with Mr. Cook
22  whether Mr. Crowley was entitled to receive indemnity
23  and insurance as set forth in that paragraph?
24       A.    I don't recall.

Page 148

1        Q.    The last paragraph says "Consistent with
2  a mutual agreement to terminate the employment
3  agreement without cause the parties hereby agree that
4  the executives shall receive a lump sum payment equal
5  to three years base salary."
6             Did you and Mr. Cook ever have
7  discussions about Mr. Crowley receiving a lump sum
8  payment from Cerberus?
9        A.    Yes.
10       Q.    What do you recall about that?
11       A.    That we wanted a lump sum payment as part
12  of the termination agreement and he said no.
13       Q.    And you -- withdrawn.
14             Did you discuss with Mr. Cook that
15  Mr. Crowley had the right under the contract with
16  Cerberus to receive $80,000 each month?
17       A.    I don't recall that.
18       Q.    Let's have a look at Schreiber 14 again,
19  page 15, line 17 to 20, where as part of a longer
20  answer the Trustee, Mr. Adams, says "I knew he had a
21  substantial claim against Cerberus, and I didn't want
22  to do anything to prejudice that claim. I didn't
23  think that was fair on my part."
24             Prior to March 3, 2003 had Mr. Adams or

Pages 145 to 148

## Page 149

1  any of his lawyers expressed to you in words or in
2  effect the view that they knew that Crowley had a
3  claim against Cerberus and that they didn't want to do
4  anything to prejudice that claim?
5       A.   They had expressed to me their knowledge
6  that Mr. Crowley had a substantial claim against
7  Cerberus.
8            I don't recall them saying whether or not
9  they wanted to do anything to prejudice that claim,
10 but they were fully aware that he had a substantial
11 claim against Cerberus for his non-Coram Cerberus
12 work.
13      Q.   And did you ever have any discussions
14 with the Trustee or any of his lawyers about the fact
15 that the Cerberus-Crowley agreement contained an
16 indemnity provision?
17      A.   I don't recall.
18      Q.   Based on your conversations with the
19 Trustee and his counsel, did you have an understanding
20 as to whether they had in their possession a copy of
21 the Cerberus-Crowley agreement?
22      A.   I understood that they did have a copy of
23 that agreement.
24      Q.   When you -- we have referred to the

## Page 150

1  Trustee and his counsel.  Who were you referring to,
2  who are the individuals --
3       A.   Again, Mr. Bressler was the primary
4  person I spoke with throughout this period, and then
5  Mr. Kipnes as we got closer to the March 3rd hearing
6  and then subsequent to that.
7       Q.   But certainly as of March 3 did you have
8  an understanding that the Trustee, Mr. Adams, knew
9  that Dan Crowley had a substantial claim against
10 Cerberus that he was going to pursue it and that the
11 Trustee did not want to do anything to prejudice that
12 claim?
13           MR. BARKASY:  Object to form.
14           THE WITNESS:  I understood that that was
15 Mr. -- that Judge Adams knew that at the March 3rd
16 hearing.
17 BY MR. PETERS:
18      Q.   Directing your attention to page 23 of
19 that transcript, these are -- page 23, line 7 to 10,
20 and then 16 to 21, this is questioning -- do you see
21 this is questioning of Arlin Adams by Mr. Bressler?
22      A.   Uh-huh.
23      Q.   "Qbo you have any reason to believe
24     that Mr. Crowley has done anything that would

## Page 151

1          be a financial impropriety during your term
2          as Trustee?
3            "A   I have no such reason."
4       A.   Correct.
5       Q.   My question for you is did you have an
6  understanding as of March 3, 2003 that Mr. Arlin
7  Adams, the Trustee, took the position that Mr. Crowley
8  had not done anything that would be a financial
9  impropriety during the trusteeship?
10      A.   That was my -- my understanding is
11 consistent with his testimony.
12      Q.   And then lines 19 to 21, the Trustee says
13 "I have formed a view, and my view is that he has been
14 completely forthright and forthcoming.  If he wasn't I
15 would not be sitting here today."
16           Were you given assurance prior to the
17 March 3, 2003 hearing by the Trustee or his lawyers
18 that it was their view that Dan Crowley had been
19 completely forthright and forthcoming with them?
20           MR. BARKASY:  Object to the form of the
21 question.
22           MR. PETERS:  I will rephrase it.
23 BY MR. PETERS:
24      Q.   Did Mr. -- prior to the hearing did

## Page 152

1  Mr. Adams ever say to you "I have formed the view that
2  Dan Crowley has been completely forthright and
3  forthcoming" as he testified to in hearing?
4       A.   Not Mr. -- not Judge Adams, no.
5       Q.   Did Mr. Bressler say that to you?
6       A.   Mr. Bressler -- Mr. Bressler gave me
7  assurances that Judge Adams had confidence in
8  Mr. Crowley and that Mr. Crowley had been forthright
9  and forthcoming.
10      Q.   Did you know as of March 3, 2003 whether
11 Arlin Adams, the Trustee, had himself spoken to
12 Cerberus or its counsel about the relationship between
13 Mr. Crowley and Cerberus?
14      A.   I knew that prior to March 3rd
15 Judge Adams had met with Cerberus's counsel in a
16 mediation session.
17      Q.   Let me direct your attention to page 40,
18 lines 16 to 20.  This is, again, still Arlin Adams
19 testifying, question --
20      A.   16 to 20?
21      Q.   "QNow, at some point you talked to
22     Cerberus on this issue of the relationship
23     and Cerberus told you that there was some
24     obligation to pay Crowley for past services,

Pages 149 to 152

Schreiber, Scott                                                3/21/2007

## Page 153

1    correct?

2         "A    Something to that effect.  I didn't

3    talk to Cerberus, I talked to their counsel."

4         So you were aware certainly as of March

5    3, 2003 that the Trustee had spoken to Cerberus about

6    the relationship between Crowley and Cerberus?

7         A.    Yes, yes.

8         Q.    Do you know when the conversation between

9    the Trustee and counsel for Cerberus took place?

10        A.    Not specifically, no.

11        Q.    Do you know whether counsel for the

12   Trustee was also in touch with counsel for Cerberus?

13        A.    Yes, I do know that Mr. Bressler was

14   speaking with Mr. Michael Cook.

15        Q.    And are you aware of anything that was

16   preventing from Bressler from asking Mr. Cook whatever

17   he wanted to know about the relationship between

18   Crowley and Cerberus?

19        A.    No, I wasn't -- no, I am not aware of any

20   reason that would prevent those conversations.

21        Q.    Is it a fair summary of your

22   understanding on March 3, 2003 that the Trustee knew

23   that Cerberus had an obligation to pay Crowley, that

24   Crowley was pursuing that going forward, and that that

## Page 154

1    was not a problem with the Trustee?

2         A.    That is correct.

3         Q.    And can you tell us when it was -- when

4    the first time was that you formed that understanding?

5         A.    I can't tell you when the first time was.

6         Q.    Was it prior to March 3, 2003?

7         A.    Yes.

8         Q.    Can you give us your best recollection of

9    how long prior to March 3, 2003 you formed that

10   understanding?

11        A.    It was in 2002 when Mr. Cook and I were

12   exchanging the correspondence going back and forth and

13   I was asking him to leave everyone else out of the

14   equation, just make it between you and me.

15        I mean, we were having those negotiations

16   because the Trustee not only knew that there was a

17   substantial claim that Crowley held against Cerberus,

18   but he wasn't stating our way of negotiating that

19   claim, so as long as that claim was for

20   pre-Coram/non-Coram matters, which is what it was.

21        Q.    And you -- is it a fair statement that

22   you had the understanding in 2002 as you were

23   negotiating with Cook that the Trustee's view was, as

24   he testified on March 3, 2003, that that was between

## Page 155

1    Cerberus and Crowley?

2         A.    Exactly.

3         MR. BARKASY:  Object to form.

4         THE WITNESS:  Exactly, exactly.

5         MR. PETERS:  In light of the objection

6    let me rephrase it.

7    BY MR. PETERS:

8         Q.    What was your view about the Trustee's

9    willingness to let you negotiate with Cerberus on

10   behalf of Mr. Crowley in 2002?

11        A.    I think the Trustee wanted us to

12   negotiate a settlement.

13        All feeling of senses I got from the

14   Trustee's counsel was that what we did with Cerberus

15   we did with Cerberus, they didn't want to be a part of

16   it until it was done, if it was done, and I think

17   deep-seated they wanted a settlement so we could get

18   this tornado out of the equation.

19        Q.    You were shown Exhibit 10?

20        A.    Yes.

21        Q.    Does that also bear a sticker on it -- I

22   mean, does that also bear a notation in the upper

23   right-hand corner, EC-14?

24        A.    Yes.

## Page 156

1         Q.    And does that indicate to you that that

2    was -- what if anything does that indicate to you?

3         A.    That it was probably an exhibit in the

4    March 3rd hearing, EC-14.  It appears it was

5    identified on page 105, Evidence 118.

6         Q.    Let's go to page 118.

7         I am not going to spend your time doing

8    that.

9         Directing your attention to the last

10   several months of 2002, did you have conversations

11   with Barry Bressler about Mr. Crowley's continued

12   employment at Coram?

13        A.    Yes.

14        Q.    And did you understand that Mr. Bressler was

15   acting on behalf of the Trustee?

16        A.    Yes.

17        Q.    Did you understand that Mr. Bressler was

18   Arlin Adams' law partner?

19        A.    Again, I think Mr. Adams is of counsel.

20   I don't know what the exact relationship is.

21        Q.    During the course of those conversations

22   did Mr. Bressler ever communicate to you his views or

23   the Trustee's views about Dan Crowley's performance as

24   the CEO of Coram?

Pages 153 to 156

Schreiber, Scott                                           3/21/2007

## Page 157

1          MR. BARKASY: Object to form.
2          THE WITNESS: Yes, he did.
3    BY MR. PETERS:
4          Q.    And just to address the objection, did
5    you understand he was communicating his views or the
6    Trustee's views or both?
7          A.    Both.
8          Q.    And what, if anything, did he tell you on
9    that subject?
10         A.    They were satisfied. They were very
11   satisfied with Dan's work. Dan had turned the place
12   around, Dan had built up the revenues, Dan had kept
13   Coram in the marketplace, Dan had held the whole thing
14   together during the chapter proceedings.
15         They were satisfied, so satisfied they
16   wanted to pay Dan a stay bonus, a performance bonus.
17         Q.    Directing your attention to page 18 of
18   the transcript, Mr. Adams testified about Coram, he
19   said "It's been on an upward trend during that entire
20   period in the sales, profits, in cash flow, in what
21   they call EBITDA all during that period. And I think
22   that has been true all during the period Mr. Crowley
23   has been there, but that has not been my concern." Do
24   you see that?

## Page 158

1          A.    I am sorry, you are on page 18?
2          Q.    18, line 24, to 19 --
3          A.    Yes, EBITDA, my concern. Yes, I see
4    this, yes.
5          Q.    Is that consistent with the comments
6    Mr. Bressler made to you during the last several
7    months of 2002?
8          MR. BARKASY: Objection, form.
9          THE WITNESS: That is consistent with the
10   comments that Mr. Bressler made to me.
11   BY MR. PETERS:
12         Q.    Then on page 22, lines 10 to 11, the
13   Trustee, Mr. Adams, says "I don't think I could do as
14   good a job as Mr. Crowley, nowhere near a job like he
15   has done."
16         A.    Yes.
17         Q.    Prior to March 3, 2003 had the Trustee
18   ever expressed the view to you that he couldn't
19   himself have done as good a job as Dan Crowley?
20         A.    I don't recall.
21         Q.    Let's have a look at Schreiber 12. My
22   question is was this the agreement that brought the
23   parties before the Court on March 3rd?
24         A.    There was this agreement. And then there

## Page 159

1    was a subsequent letter, the two weren't in tandem,
2    January, 2003 letter -- this was I think the document
3    that was filed with the motion; although, the other
4    letter might have been as well.
5          Q.    According to this agreement -- well,
6    Mr. Crowley was going to stay on at Coram and receive
7    financial compensation under the terms of this
8    agreement?
9          A.    Yes.
10         Q.    Had you participated in negotiations with
11   Mr. Bressler that culminated in this agreement?
12         A.    Yes, yes.
13         Q.    And did Mr. Bressler ever communicate to
14   you why the Trustee was willing to pay Mr. Crowley
15   $80,000 a month then given the other consideration
16   that was set forth in this document?
17         A.    Yes.
18         Q.    What did he tell you about that?
19         A.    He had to, Crowley was doing such a great
20   job for this company, they could find no one else,
21   Crowley was a steal at $80,000 a month. Mr. Bressler
22   thought that this company was on its way out of
23   bankruptcy. To change courses midstream at this
24   point, to change leadership, would cause a severe

## Page 160

1    disruption of the company, it would hurt morale, it
2    would hurt business. And, quite frankly, they were --
3    they were very pleased with Mr. Crowley's performance.
4    They were -- I don't want to say giddy, but it was
5    almost as if they were giddy. They couldn't have
6    asked for a better leader of this company than
7    Mr. Crowley.
8          Q.    So they were willing to give him a raise
9    basically as an inducement to keep him on?
10         A.    They were reluctantly willing to give him
11   a raise; I say reluctantly because Judge Adams is
12   notoriously cheap. Mr. Bressler and I spent many
13   hours on the phone arguing over this. This was a
14   hard, negotiated deal, but they were happy to keep him
15   on.
16         Q.    Have a look at Schreiber 13, which is a
17   letter from Bressler to you dated January 7, 2003.
18         A.    Yes.
19         Q.    Was it the Trustee's idea to have these
20   two separate agreements as opposed to just putting in
21   one agreement?
22         A.    I think so.
23         Q.    At the time that you were engaged in the
24   negotiations with Mr. Bressler, were you aware of

Pages 157 to 160

LiveNote World Service                    800.548.3668 Ext. 1

Schreiber, Scott                                          3/21/2007

## Page 173

1  this was discovered, and whether or not -- and I don't
2  recall whether that conversation also included whether
3  or not a motion like this should be filed.
4  BY MR. PETERS:
5      Q.  Do you recall either Mr. Bressler or
6  Mr. Kipnes suggesting to you that from a tactical
7  standpoint in light of the upcoming motion hearing it
8  would be a good idea not to file this motion?
9          MR. BARKASY:  Objection to form.
10 BY MR. PETERS:
11     Q.  And that it would just create more
12 problems than it would solve?
13         MR. BARKASY:  Object to form, no
14 foundation.
15         THE WITNESS:  You know, I can't recall
16 specifically.
17     I will tell you that everything we did in
18 connection with this matter was done in lockstep with
19 the Trustee's counsel.  But can I recall specific
20 conversation, no.
21     But I will tell you that everything from
22 the pleadings on the termination pay to this motion to
23 the hearing was done where we were in lockstep with
24 them and subordinate to them.

## Page 174

1  BY MR. PETERS:
2      Q.  So based on your recollection of the
3  working relationship that you had with the Trustee's
4  counsel during this time period, do you have an
5  understanding of whether you would have made a
6  decision not to file this motion for return of the
7  privileged documents without first consulting
8  Mr. Bressler and Mr. Kipnes?
9          MR. BARKASY:  Objection to form of the
10 question.
11         THE WITNESS:  I am certain we consulted
12 with Mr. Bressler and Mr. Kipnes before we made a
13 decision whether or not to file this motion, and I am
14 certain that their opinion on that decision influenced
15 our ultimate decision.
16 BY MR. PETERS:
17     Q.  And when you say our ultimate decision,
18 you are referring to yourself and your partners at
19 Much, Shelist?
20     A.  Correct.
21     If we did not file this motion it was
22 because we did not think that they would support this
23 and they believed it was good that we didn't file this
24 motion.  If we did file this motion it was because

## Page 175

1  they believed we should file this motion.
2      Q.  Now, the subpoena in connection with
3  which these privileged documents were produced, was
4  that served specifically in connection with this
5  hearing to approve the agreements,
6  Schreiber 12 and 13?
7      A.  Yes.
8      I don't know if it was ultimately served
9  that way or if it was narrowed down through subsequent
10 conversations that Trustee's counsel, we Cerberus, and
11 equity committee counsel all subsequently had.
12     Q.  And did you ever discuss with the
13 Trustee's counsel whether you had a commonality of
14 interest with the Trustee with respect to this
15 March 3rd hearing?
16     A.  I am not sure that we ever used those
17 exact words, but we all agreed that we had a common
18 interest in the outcome of this hearing and no one
19 party would go it alone.
20     Q.  And at the hearing did the lawyers for
21 the Trustee, meaning Mr. Bressler, Mr. Kipnes, did
22 they take the lead at the hearing?
23         MR. BARKASY:  Objection to form.
24         THE WITNESS:  Yes.

## Page 176

1          They not only took the lead, they ran the
2  show.  And whether they told me -- they never told me
3  directly, but it was very clear that this was their
4  show, this was their hearing.  My client wasn't -- my
5  client was just tangentially affected.  This was their
6  motion.  This wasn't my client's motion.
7  BY MR. PETERS:
8      Q.  Mr. Crowley, we can see from the
9  transcript, testified at the hearing.
10     Was he prepared to testify at the hearing
11 by any lawyers?
12     A.  Yes.
13     Q.  By whom?
14     A.  By Mr. Ward, Mr. Bressler -- I don't know
15 if it was Mr. Bressler or Mr. Kipnes, but -- I guess
16 Mr. Bressler is shaking his head, it must have been
17 Mr. Kipnes, and Mr. Ward and I prepared Mr. Crowley
18 before the hearing.
19     Q.  In those meetings -- withdrawn.
20     How long did those meetings last in which
21 Mr. Crowley was prepared to testify?
22     A.  Not as long as this deposition, but it
23 was a large part of a day.
24     Q.  Who took the lead in those meetings?

Schreiber, Scott                                              3/21/2007

## Page 201

1  that you had always acted in the best interests of
2  Mr. Crowley. Do you recall that?
3      A.   Yes.
4      Q.   And is it a fair statement that what you
5  mean by that is you always intended to act in the best
6  interests of Mr. Crowley?
7      A.   Yes.
8      Q.   But if a mistake was made that might have
9  harmed Mr. Crowley that would be unintentional but
10  that might have happened?
11          MR. BARKASY:  Object, leading.
12          THE WITNESS:  A mistake by its nature is
13  unintentional.  I never intended to do anything that
14  would hurt Mr. Crowley.
15          MR. PETERS:  I have nothing further.
16          MR. BARKASY:  I don't have anything
17  further at this time.
18          I of course reserve rights with regard to
19  the numerous instructions not to answer.
20          THE VIDEOGRAPHER:  This marks the end of
21  Tape 3, Volume 1, in the deposition of Scott
22  Schreiber.
23          Going off the record at 5:22 p.m.
24          MS. REPORTER:  Signature?

## Page 202

1          MR. PETERS:  We will reserve signature.
2      (WHICH WERE ALL OF THE PROCEEDINGS HAD OR
3      TAKEN PLACE IN THE ABOVE-ENTITLED MATTER.)

## Page 203

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF DELAWARE
2
3  ARLIN M. ADAMS, Chapter 11         )
   Trustee of the                    )
4  Post-Confirmation                 )
   Bankruptcy Estates of CORAM       )
5  HEALTHCARE CORPORATION, a         )
   Delaware Corporation, and         )
6  of CORAM, INC., a Delaware        )
   Corporation,                      )
7                                    )
           Plaintiff,                )
8                                    )
       vs.                           )  No. 04-1565
9                                    )
   DANIEL D. CROWLEY; DONALD         )
10  J. AMARAL; WILLIAM J.            )
   CASEY; L. PETER SMITH; and        )
11  SANDRA L. SMOLEY,                )
                                     )
12         Defendants.               )
13
14
15          I, SCOTT SCHREIBER, being first duly sworn,
   on oath say that I am the deponent in the aforesaid
16  deposition taken on March 21, 2007; that I have read
   the foregoing transcript of my deposition, consisting
17  of pages No. 1 through No. 203, inclusive, and affix
   my signature to same.
18                         --------------------------
19                              SCOTT SCHREIBER
   Subscribed and sworn to
20  before me this     day of
                    , 2007
21
   Notary Public
22
23
24

## Page 204

1  STATE OF ILLINOIS)
                    ) SS.
2  COUNTY OF DUPAGE )
3          I, STEPHANIE A. BATTAGLIA, CSR and Notary
4  Public in and for the County of DuPage and State of
5  Illinois, do hereby certify that on the 21st of March,
6  2007, at 10:37 a.m., at 55 West Monroe Street,
7  Chicago, Illinois, the deponent SCOTT SCHREIBER
8  personally appeared before me.
9          I further certify that the said SCOTT
10  SCHREIBER was by me first duly sworn to testify and
11  that the foregoing is a true record of the testimony
12  given by the witness.
13          I further certify that the deposition was
14  terminated at 5:22 p.m.
15          I further certify that I am not counsel for
16  nor related to any of the parties herein, nor am I
17  interested in the outcome hereof.
18          In witness whereof, I have hereunto set my
19  hand and seal of office this _____ of March, 2007.
20
21                              Notary Public
22  CSR No. 084-003337 - Expiration Date: May 31, 2007.
23
24

Pages 201 to 204