**EXHIBIT B-10**

## Page 1

VOLUME I
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, Chapter 11
Trustee of the
Post-Confirmation Bankruptcy
Estates of CORAM HEALTHCARE
CORPORATION, a Delaware
Corporation and of CORAM,
INC., a Delaware Corporation,
    Plaintiff      : CASE NO.
    vs.            : 04-1565

DANIEL D. CROWLEY; DONALD J.
AMARAL; WILLIAM J. CASEY;
L. PETER SMITH; AND SANDRA L.
SMOLEY,
    Defendants

Tuesday, March 27, 2007
9:34 a.m.

    Videotaped deposition of ARLIN
M. ADAMS, held at the law offices of
Schnader Harrison Segal & Lewis, LLP,
1600 Market Street, Suite 3600,
Philadelphia, Pennsylvania, 19103,
pursuant to notice before Cynthia A.
Whyte, Registered Professional Reporter
and Notary Public.

## Page 2

APPEARANCES:
SCHNADER HARRISON SEGAL & LEWIS LLP
Counsel for Plaintiff Arlin M. Adams,
Trustee
    1600 Market Street
    Suite 3600
    Philadelphia, PA  19103
    (215) 751-2050
BY:  BARRY E. BRESSLER, ESQ.
     bbressler@schnader.com

AND: RICHARD A. BARKASY, ESQ.
     rbarkasy@schnader.com

KEKER & VAN NEST LLP
Counsel for Defendant Daniel Crowley
    710 Sansome Street
    San Francisco, CA  94111-1704
    (415) 391-5400

BY:  ELLIOT R. PETERS, ESQ.
     epeters@kvn.com
AND: WARREN A. BRAUNIG, ESQ.
     wbraunig@kvn.com

ALSO PRESENT:   VINCENZO PETULLA,
                Videographer

## Page 3

    IT IS HEREBY STIPULATED AND
AGREED by and among counsel for the
respective parties hereto that the
filing, sealing and certification of the
within deposition shall be and the same
are hereby waived.
    IT IS FURTHER STIPULATED
AND AGREED that all objections,
except as to the form of the
question, shall be reserved to the
time of the trial.
    IT IS FURTHER STIPULATED AND
AGREED that the within deposition may be
signed before any Notary Public with the
same force and effect as if signed and
sworn to before the Court.

## Page 4

            I N D E X
WITNESS:                             PAGE
ARLIN M. ADAMS, ESQ.
    By Mr. Peters                      5

        ADAMS EXHIBITS
NO.         DESCRIPTION              PAGE
Exhibit 1   Chronology                  7
Exhibit 2   Transcript, 2/25/03        52
Exhibit 3   Transcript, 3/3/03         52
Exhibit 4   Letter, 12/24/02, to
            Mr. Schreiber from
            Mr. Bressler               80
Exhibit 5   Letter, 1/7/03, to
            Mr. Schreiber from
            Mr. Bressler               81
Exhibit 6   Disclosure Statement      111
Exhibit 7   E-mail string             120
Exhibit 8   Employment Agreement      122
Exhibit 9   Letter, 10/28/03, to
            Mr. Schepacarter from
            Mr. Barkasy               130
Exhibit 10  Letter, 10/3/06, to
            Mr. Bressler from Mr.
            Temin                     142
Exhibit 11  Motion of Chapter 11
            Trustee                   163
Exhibit 12  Updated Report of
            Goldin Associates         170

Adams, Arlin M. - Volume I                                    3/27/2007

**Page 17**

1  witness not to testify as to anything
2  that counsel has told him.
3          THE WITNESS: Okay.
4     Q.  In the course of your work as the
5  Coram trustee, you have paid close attention
6  to the affairs of Coram, haven't you?
7     A.  Oh, of course.
8     Q.  You paid close attention to the
9  bankruptcy litigation involving Coram,
10 correct?
11    A.  Correct.
12    Q.  The proceeds, if any, from this
13 litigation, how will they be distributed?
14    A.  My understanding, somebody ought to
15 correct me if I'm wrong, that I think they
16 should be -- they minus expenses and counsel
17 fees and things of that sort -- made available
18 to the equity group. That's my understanding.
19    Q.  Okay.
20        So Sam Zell, among others, are the
21 beneficiaries of this litigation once the
22 expenses and the counsel fees have been paid;
23 is that right?
24        MR. BRESSLER: I'll object to
25    the form.

**Page 18**

1     A.  I don't know. I really don't know.
2     Q.  You don't know whether Sam Zell has
3  been a shareholder of Coram?
4     A.  He was at one time. Whether he
5  still is, I don't know.
6     Q.  Did you discuss that with him when
7  you met personally with him?
8     A.  No.
9     Q.  Did Sam Zell's views about whether
10 or not Dan Crowley should be sued influence
11 you?
12    A.  Well, I had an open door policy. I
13 was willing to listen to any sensible,
14 reasonable person who wished to communicate
15 with me, and I thought that he was in that
16 group. Was I influenced by what he said?
17 Sitting here today, I can't tell you. It was
18 not great influence. You know, you hear so
19 many things whether you are a judge or a
20 trustee, it's hard in retrospect to be able to
21 say what did or did not influence you, so
22 that's where I am right now.
23    Q.  Mr. Levy was the lawyer for the
24 equity committee, correct?
25    A.  That is correct.

**Page 19**

1     Q.  He was the lawyer for the
2  shareholders?
3     A.  Yeah, I think that's correct.
4     Q.  Are you aware that he's a personal
5  friend of Sam Zell's?
6     A.  I don't know about personal friend.
7  I know he was a friend.
8     Q.  Is there a difference in your mind
9  between friend and personal friend?
10    A.  Well, he could have been a friend as
11 an attorney for Sam Zell, which he was.
12 Whether they had a social relationship or a
13 personal relationship, I don't know that.
14    Q.  But the effect of this lawsuit, if
15 successful, would be to obtain a judgment
16 against Dan Crowley and then deliver money so
17 the shareholders of Coram including Sam Zell
18 and others, correct?
19        MR. BRESSLER: I'll object to
20    the form. It misstates the facts.
21    A.  I don't know. I don't know how they
22 would divide the money up. Once the equity
23 group received the money, what the division
24 would be I don't know.
25    Q.  Do you know how much the equity

**Page 20**

1  group has received thus far under your plan of
2  reorganization which was approved by the
3  bankruptcy court?
4         MR. BRESSLER: Objection.
5    Asked and answered, but he may answer if
6    he knows.
7     A.  I don't know.
8     Q.  Your lawsuit against Dan Crowley
9  asserts a cause of action for breach of
10 fiduciary duty. Are you aware of that?
11    A.  That's correct, yes.
12    Q.  What did Dan Crowley do to breach
13 his fiduciary duty?
14    A.  Well, he entered into an arrangement
15 with one of the note holders who was a party
16 to the bankruptcy by which he was to receive
17 very substantial consideration. I think that
18 was a breach of his fiduciary duty and that
19 was compounded when he did not disclose that
20 fact either to the court or to me and did
21 certain things that were completely
22 inconsistent with assurances that he gave me
23 that he was not receiving compensation
24 certainly after my appointment as trustee.
25    Q.  And when did those -- withdrawn.

Pages 17 to 20

Adams, Arlin M. - Volume I                              3/27/2007

### Page 21

1     Is there anything else that he did
2 that constituted a breach of fiduciary duty as
3 alleged in your lawsuit?
4         MR. BRESSLER: I'll object to
5     the form. The complaint speaks for
6     itself.
7     A.  I'd have to go back and look at the
8 complaint. I would think so. I think the
9 whole course of conduct by Mr. Crowley --
10 there is nothing personal about this --
11 represented in my judgment, after I learned
12 the facts that had been disclosed as a result
13 of discovery, constituted various aspects of
14 breach of duty.
15    Q.  Is there anything else that you
16 recall as you sit here today -- I'm not asking
17 you to read the complaint.
18        Is there anything else other than
19 what you've testified about that constituted a
20 breach of fiduciary duty by Dan Crowley?
21        MR. BRESSLER: Objection to the
22    form.
23    A.  Well, I think he spent more time on
24 non-Coram matters as a result of his
25 relationship with Mr. Feinberg and

### Page 22

1 Mr. Feinberg's company than would be
2 consistent with his obligation to Coram and to
3 me as the trustee.
4    Q.  Anything else?
5    A.  Yeah; and to the creditors and to
6 the court. I think that whole arrangement is
7 quite inconsistent with a feeling of trust
8 that all of us considered extremely important
9 given the circumstances.
10    Q.  Any other acts by Dan Crowley that
11 you consider to have been a breach of
12 fiduciary duty?
13    A.  After he was transitioned from a
14 consultant to the CEO of Coram and before my
15 appointment, he was instrumental in completing
16 a sale of one of the subsidiary companies of
17 Coram at a price that I think was considerably
18 lower than what it should have been. I think
19 that was serious.
20        He led me to believe that he was
21 paying far more attention to Coram matters
22 that eventually developed he had been
23 devoting, but the idea that he led me to
24 believe that any concerns that the court, and
25 namely Judge Walrath, had had been taken care

### Page 23

1 of, when in fact they had not been taken care
2 of, created an atmosphere that was not
3 conducive to the ultimate success of Coram and
4 to my success as the trustee of Coram.
5        And I'm not sure that I can sit here
6 in response to your question and enumerate all
7 of those aspects, but there would be many
8 because, after all, he was the CEO of Coram.
9        And now I have a lingering doubt and
10 have had a lingering doubt -- it's not so
11 lingering anymore -- about his loyalty and
12 devotion to duty.
13        Now, what his lack of loyalty, lack
14 of devotion may have caused damage to Coram
15 during that period, it's hard for me to answer
16 sitting here, but it certainly is very
17 worrisome. That's the whole problem with
18 conflicts.
19        THE WITNESS: This fell off.
20        VIDEO TECHNICIAN: It just
21     clips right back on.
22        THE WITNESS: Thank you.
23    Q.  I don't want to interrupt you in any
24 way, but rather than get a speech about the
25 problem with conflicts, I want to try to keep

### Page 24

1 you focused on the acts of Dan Crowley that
2 you believe constituted a breach of fiduciary
3 duty.
4        MR. BRESSLER: I'll object to
5     the question. I think he was answering
6     that.
7    Q.  If you were, continue, but I think
8 you understand the distinction I'm trying to
9 make.
10    A.  I understand what you're saying, but
11 the problem with a conflict is you don't know
12 what motivates the actor. You can't go back
13 and consider all of the conduct of the actor
14 and ask the question that you're asking, did
15 the conflict affect that decision, did the
16 conflict affect -- there is no way to
17 ascertain that. It is such an amorphous
18 situation.
19        And that's why the courts and the
20 commentators and the ethicists are so strong
21 in condemning conflicts, because you can't
22 individuate the individual conduct. You would
23 have to parse the actor's mind. There is no
24 way of doing -- there is no way I can do it in
25 any event.

Page 97

1  to it.
2      Q.   But you -- withdrawn.
3           Did you review either on a weekly or
4  monthly basis in 2003 the financial activity
5  at Coram?
6      A.   I did on a summary basis. I knew
7  what the cash receipts were. I knew what the
8  balances were. I had to approve any contract
9  over $50,000. I went over each contract in
10 order to accomplish that.
11     Q.   Do you recall that at the end of the
12 March 3 hearing the judge ruled from the bench
13 and denied your motion for approval of Adams
14 Exhibit 4?
15     A.   I remember it vividly.
16     Q.   Were you surprised?
17     A.   No.
18     Q.   But up until the time that that
19 motion was denied by the court, you were a
20 proponent of it. You were advocating that it
21 be granted, correct?
22     A.   Oh, you can so argue if you want,
23 but I was not very enthusiastic about it and
24 everybody in the courtroom knew that.
25     Q.   I'm not arguing about it. I'm just

Page 98

1  asking you whether, when you were in court
2  that day asking the court to approve the
3  motion, you wanted the court to approve the
4  motion?
5      A.   I didn't want the court to approve
6  the motion, no. I wanted the court to decide
7  the motion.
8      Q.   Did you authorize your attorneys to
9  file pleadings in court in support of that
10 motion?
11     A.   I did. We had agreed to do that.
12     Q.   Was the purpose of the filing of
13 those pleadings to persuade the court to grant
14 your motion?
15     A.   Up to a point until we found out
16 about these documents.
17     Q.   And did you at any time instruct
18 your lawyers to communicate to the court that
19 your position, as expressed in those papers,
20 had changed?
21          MR. BRESSLER: I will object to
22     the form and instruct you not to answer
23     what you instructed your lawyers to do.
24     Q.   So you're not going to answer that
25 question then?

Page 99

1      A.   Correct.
2      Q.   Did you as the trustee communicate
3  to the court in any fashion prior to the
4  court's ruling at the end of the hearing on
5  March 3 that your position supporting the
6  motion that the trustee had filed had changed
7  in any way?
8      A.   Did I communicate it? Maybe by my
9  facial expressions but not orally or in
10 writing.
11     Q.   What facial expressions did you make
12 during the hearing? Well, did you make facial
13 expressions during the hearing intending to
14 communicate to the court that you weren't
15 supporting the motion that you had filed?
16     A.   No.
17     Q.   So what makes you say that maybe
18 your facial expressions communicated to that?
19     A.   What makes me say anything is not an
20 appropriate question. I refuse to answer it.
21     Q.   When you said a moment ago that
22 maybe your facial expressions in court
23 communicated your feelings to the court, what
24 facial expressions do you recall?
25          MR. BRESSLER: Object to the

Page 100

1  form.
2           You can answer it.
3      A.   I don't think that is an appropriate
4  question to ask of me and I'm not going to
5  answer it. There are limits to depositions.
6      Q.   Do you recall, in fact, having
7  communicated in any way to the court that you
8  were no longer a supporter of the motion you
9  had filed for approval of Adams 4 on March 3?
10     A.   I have answered that, and I will
11 answer it again for the last time. No.
12     Q.   Directing your attention back to
13 Adams 1, the chronology that you arrived here
14 with this morning, it says that you were
15 appointed trustee on March 7, 2002. I would
16 like to direct your attention to that time
17 period. Okay?
18     A.   Go ahead.
19     Q.   Did there come a time that you first
20 heard of Coram Healthcare?
21     A.   That I first heard of Coram?
22     Q.   Healthcare, Coram Healthcare, the
23 company.
24     A.   There came a time, yes.
25     Q.   How did you first come to hear of

Page 173

1  Mr. Goldin whether at all relevant times the
2  amount of Coram's debt materially exceeded the
3  company's enterprise value?
4      A.   I did not discuss that.
5      Q.   Do you disagree with that statement?
6           MR. BRESSLER:  Object to the
7  form, but he can answer it.
8      A.   Well, there are strong words here.
9  I would say -- at no time during the relevant
10 period did Coram's accounting, financial
11 reporting, or recordkeeping appear to be
12 materially impaired.
13          I don't use these strong advocacy
14 words. My reading these documents doesn't put
15 a stamp of approval on them. I just want to
16 make that clear. I have read what he said and
17 I can't disagree about the integrity of the
18 report.
19     Q.   You cannot?
20     A.   I don't disagree.
21     Q.   Do you recall with any more
22 specificity than what you have already told us
23 what it is that you discussed with Mr. Goldin
24 about his report?
25     A.   I can't recall that.

Page 174

1      Q.   You don't recall anything about what
2  you and he discussed other than that it was
3  about his report?
4      A.   That's all we talked about, his
5  report.
6      Q.   Did you discuss -- what do you
7  recall discussing about his report?
8           You know what? We have less than a
9  minute on the tape. Why don't we go off the
10 record at this time because I don't want to
11 run out of the tape in the middle of your
12 answer.
13     A.   Okay.
14     Q.   And we will determine whether we are
15 going to continue asking questions and have
16 them answered today or whether we are going to
17 resume tomorrow, but we will have that
18 discussion off the record.
19     A.   Okay.
20          VIDEO TECHNICIAN:  We are now
21 off the record at 1:12.
22          (Discussion off the record.)
23          (Witness temporarily excused.)
24          (The deposition adjourned at
25 1:12 p.m.)

Page 175

1
2       I have read the foregoing
3  transcript of my deposition given on
4  Tuesday, March 27, 2007, and it is true,
5  correct and complete to the best of my
6  knowledge, recollection and belief except
7  for the corrections noted hereon and/or
8  the list of corrections, if any, attached
9  on a separate sheet herewith.
10
11
12
13       _____
14                ARLIN M. ADAMS
15
16
17
18 Subscribed and sworn before
19 me this ____day of_____, 2007
20
21
22
23
24
25

Page 176

1                CERTIFICATE
2       I HEREBY CERTIFY that the
3  proceedings, evidence and objections are
4  contained fully and accurately in the
5  stenographic notes taken by me on Tuesday,
6  March 27, 2007, and that this is a true and
7  correct transcript of same.
8
9
10
11
12
13       _____
14              Cynthia A. Whyte, RPR
15
16
17       (The foregoing certification of
18 this transcript does not apply to any
19 reproduction of the same by any means,
20 unless under the direct control and/or
21 supervision of the certifying reporter.)
22
23
24
25