Competition

The alternate site infusion therapy market is highly competitive. Some of Coram's current and potential competitors in these lines of business include:

(i)   integrated providers of alternate site healthcare services;

(ii)  hospitals; and

(iii) local providers of multiple products and services for the alternate site healthcare market.

Coram has experienced increased competition in its alternate site infusion therapy business from hospitals and physicians that have sought to increase the scope of services offered through their facilities, including services similar to those offered by Coram.

Coram competes with other providers on a number of critical differentiating factors, including quality of care and service, reputation within the medical and payer communities, geographic scope and price. Competition within Coram's alternate site infusion therapy line of business has been affected by the decision of third-party payers and their case managers to be more active in monitoring and directing the care delivered to their beneficiaries. Accordingly, relationships with such payers and their case managers and inclusion within preferred provider and other networks of approved or accredited providers is often a prerequisite to Coram's ability to continue to serve many of its patients. Similarly, Coram's ability to align itself with other healthcare service providers may increase in importance as managed care providers and provider networks seek out providers who offer a broad range of services that may exceed the range of services currently offered directly by Coram.

There are relatively few barriers to entry in the local markets which Coram serves. Local or regional companies are currently competing in many of the healthcare markets served by the company and others may do so in the future. Entrance into the local markets by competitors could cause a decline in net revenue, loss of market acceptance of Coram's services and price competition. Coram expects to continue to encounter competition in the future that could limit its ability to maintain or increase its market share. Such competition could have an adverse effect on the business, financial condition and results of operations of Coram. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Risk Factors."

Sales and Marketing

Coram's alternate site infusion therapy products and services are marketed through branch sales personnel, including managed care consultants and account managers, to its primary referral sources. The company established product managers for three of its core therapies: nutrition, anti-infectives/transplant and hemophilia-related services through three Strategic Business Units: Nutrition Services, Anti-Infectives/Transplant Services and Blood Products Services (including hemophilia and IVIG), respectively. The vice president for each unit has responsibility for ongoing program development and provides clinical and marketing resources to focus on growing sales in these areas.

Substantially all of Coram's new patients are referred by physicians, medical groups, hospital discharge planners, case managers employed by HMOs, PPOs or other managed care organizations, insurance companies and home care agencies. Coram's sales force in each of its lines of business is responsible for establishing and maintaining referral sources. Sales employees generally receive a base salary plus incentive compensation based on core therapy revenue growth and/or EBITDA enhancements.

Coram's network of field representatives enables it to market its services to numerous sources of patient referrals, including physicians, hospital discharge planners, hospital personnel, HMOs, PPOs and insurance companies. Marketing is focused on presenting Coram's clinical expertise tailored to specific customer interests, with an emphasis on certain key therapies. Specialty marketing and sales support personnel promote products and services that are outside of base infusion therapy.

As a result of escalating pressures to contain healthcare costs, third-party payers are participating in certain decisions regarding healthcare alternatives, using their significant bargaining power to secure discounts and to direct referrals of their enrollees to providers. In response, Coram has directed its sales and development focus to aggressively pursue agreements with third-party payers, managed care organizations and provider networks that provide high quality, cost-effective care. Coram maintains a dedicated sales force in each of its lines of business to enhance its efforts to market and sell its services to managed care payers. In the company's infusion therapy division, managed care sales representatives are deployed to focus on regional and national payers, with a field sales force to affect "pull-through" from referral sources within each payer's network. Coram is currently focusing its efforts in its infusion

11

JSP 01810

therapy business on increasing referrals through selected managed care agreements, with the goal of being the preferred infusion provider, as well as, selling specialty programs such as nutrition, anti-infectives, IVIG and services for persons with hemophilia and persons receiving certain types of organ and bone marrow/blood cell transplants.

## Customers and Suppliers

Coram provides alternate site home healthcare services and products to a large number of patients and related payers. Excluding Medicare and Medicaid, which collectively represented approximately 22% of consolidated net revenue from continuing operations, including CPS, for the year ended December 31, 2000, no other single payer accounted for more than 5% of Coram's net revenue for 2000.

Coram purchases products from a large number of suppliers and considers its relationships with its vendors to be good, subject to credit uncertainty and the ongoing bankruptcy proceedings. Management believes that substantially all of its products are available from alternative sources with terms consistent, in all material respects, to its present agreements. This is true for products currently being purchased through Cardinal Health, Inc. and Baxter Healthcare Corporation, two of Coram's major suppliers of drugs and supplies. During the year ended December 31, 2000, Coram purchased approximately $95.8 million of drugs and supplies from Cardinal Health, Inc. and $22.8 million from Baxter Corporation, or approximately 63% and 15%, respectively, of its total drugs and supplies.

The principal supplier of Coram's infusion pumps, Sabratek Corporation ("Sabratek"), filed for protection under Chapter 11 of the United States Bankruptcy Code on December 17, 1999. Baxter Healthcare Corporation ("Baxter") purchased certain Sabratek assets, including Sabratek's pump manufacturing division, and has continued to produce the related tubing and infusion sets needed to operate the ambulatory infusion pumps manufactured by Sabratek and used by Coram. Beginning in January 2000, Coram's fleet of approximately 5,000 Sabratek 6060 Homerun pumps began to experience malfunctions and failures of various sorts due to inherent flaws in the design of the pump. Pumps needing repair were sent back to Sabratek for repair at no cost due to a five-year warranty on pump repairs that was part of the underlying contract. However, due to part shortages, Sabratek did not always perform these repairs promptly. When Baxter acquired Sabratek during 2000, the pumps still awaiting repair were transferred to Baxter. The 6060 Homerun pumps continued to malfunction in larger numbers so that by December 2000 approximately 500 pumps were at Baxter awaiting repair. Baxter inherited the same difficulties with repairs that Sabratek experienced: an insufficient labor pool and substandard repair parts. In order to supply a sufficient number of these pumps for patient needs, Coram has had to reserve use of the 6060 Homerun pumps to only those patients who are truly ambulatory, carefully manage its nationwide supply by transferring pumps from branch to branch and, in some cases, rent pumps from other vendors. Vendors in some markets have been similarly affected by Baxter's pump repair backlog and occasionally could not supply the company's 6060 Homerun pump needs. When this has occurred, Coram has doubled its efforts to make effective use of available pumps. Coram has not refused any patients because of the short supply of 6060 Homerun pumps; however, the ability to purchase the amount of tubing required in the contract which Baxter, and thereby attain certain required purchasing thresholds, may be jeopardized by Baxter's inability to repair and return the pumps in a timely manner. Currently, over 600 Coram pumps are in for repair with Baxter. While management believes the company can meet the needs of its patients, quality of care may be impacted resulting in reduced patient satisfaction. Diversifying the pump fleet would add significant cost to the process, as well as, demand on limited resources to provide patient and caregiver training and certification. Under normal conditions, Coram would transition its pump fleet at a rate of approximately 20% per year; however, the current conditions may require the company to replace the entire fleet within the next year. Management is currently pursuing alternatives to the current infusion pump supply chain; however, management cannot predict what consequences will result from obtaining alternate ambulatory infusion pumps.

## Government Regulation

*General.* The federal government and all states in which Coram is currently operating regulate various aspects of Coram's business. In particular, Coram's operations are subject to extensive federal and state laws regulating, among other things, the provision of pharmacy, home care, nursing services, ancillary network management services, health planning, health and safety, environmental compliance and toxic and medical waste disposal. Coram is also subject to fraud and abuse and self-referral laws, which affect its business relationships with physicians, other healthcare providers and referral sources and its reimbursement from government payers. Generally, all states require infusion companies to be licensed as pharmacies and to have appropriate state and federal registrations for dispensing controlled substances. Some states require infusion companies to be licensed as nursing or home health agencies and to obtain medical waste permits. In addition, certain company employees are subject to state laws and regulations governing the ethics and professional practices of pharmacy and/or nursing.

12

JSP 01811

Coram may also be required to obtain certifications or register in order to participate in governmental payment programs such as Medicare and Medicaid. Some states have established certificate-of-need programs regulating the establishment or expansion of healthcare operations, including certain of Coram's operations. The failure to obtain, renew or maintain any of the required regulatory approvals, certifications, registrations or licenses could adversely affect Coram's business and could prevent the location or locations involved from offering products and services to patients and/or from billing third-party payers. Coram's operating results could be adversely affected, directly or indirectly, as a result of any such actions. Coram believes it complies, in all material respects, with these and all other applicable laws and regulations. The healthcare services industry will continue to be subject to pervasive regulation at the federal and state levels, the scope and effect of which cannot be predicted. No assurances can be given that the activities of Coram will not be reviewed and challenged or that government sponsored healthcare reform, if enacted, will not result in material adverse changes to the company.

*Fraud and Abuse.* Coram's operations are subject to the illegal remuneration provisions of the Social Security Act (sometimes referred to as the "anti-kickback" statute) that imposes criminal and civil sanctions on persons who knowingly and willfully solicit, offer, receive or pay any remuneration, whether directly or indirectly, in return for, or to induce, the referral of a patient for treatment, or, among other things, the ordering, purchasing or leasing, of items or services that are paid for in whole or in part by federal healthcare programs. Violations of the federal anti-kickback statute are punishable by criminal penalties, including imprisonment, fines and exclusion of the provider from future participation in federal healthcare programs. Federal healthcare programs have been defined to include any plan or program that provides health benefits which is funded by the United States Government and commonly include, among others, Medicare, Medicaid and the Civilian Health and Medical Program of the Uniformed Services. Administrative exclusion and civil monetary penalties for anti-kickback violations can also be imposed through an administrative process. Federal enforcement officials may also attempt to use other general federal statutes to punish behavior considered fraudulent or abusive, including the Federal False Claims Act, which provides for penalties of up to $10,000 per claim plus treble damages, and permits private persons to sue on behalf of the government. While the federal anti-kickback statute expressly prohibits transactions that have traditionally had criminal implications, such as kickbacks, rebates or bribes for patient referrals, its language has been construed broadly and has not been exclusively limited to such obviously wrongful transactions. Some court decisions state that, under certain circumstances, the statute is also violated when "one" purpose (as opposed to the "primary" or a "material" purpose) of a payment is to induce referrals. Congress has frequently considered, but has not yet adopted, federal legislation that would expand the federal anti-kickback statute to include the same broad prohibitions regardless of payer source.

In addition to the payment or receipt of illegal remuneration for the referral or generation of federal healthcare program business, the fraud and abuse laws cover other billing practices that are considered fraudulent (such as presentation of duplicate claims, claims for services not actually rendered or for procedures that are more costly than those actually rendered) or abusive (such as claims presented for services not medically necessary based upon a misrepresentation of fact) subject to the same remedies described above.

Similarly, a large number of states have varying laws prohibiting certain direct or indirect remuneration between healthcare providers for the referral of patients to a particular provider, including pharmacies and home health agencies. Possible sanctions for violations of these laws include loss of licensure, exclusion from state funded programs and civil and criminal penalties.

*Prohibition on Physician Referrals.* Under the Omnibus Budget Reconciliation Act of 1993 (commonly referred to as "Stark II"), it is unlawful for a physician to refer patients for certain designated health services reimbursable under the Medicare or Medicaid program to an entity with which the physician has a financial relationship, unless the financial relationship fits within an exception enumerated in Stark II or regulations promulgated thereunder. Aspects of Coram's business which are "designated health services" for purposes of Stark II include outpatient prescription drugs, parenteral and enteral nutrition, equipment and supplies, durable medical equipment and home health services. A "financial relationship" under Stark II is defined broadly as an ownership or investment interest in, or any type of compensation arrangement in which remuneration flows between the physician and the provider. Coram has financial relationships with physicians and physician owned entities in the form of medical director agreements and service agreements pursuant to which the company provides pharmacy products. In each case, the relationship has been structured, based on advice of legal counsel, using an arrangement management believes to be consistent with applicable exceptions set forth in Stark II, such as the personal services arrangements exception or the exception for payments by a physician for items and services.

In addition, the company is aware of certain referring physicians that have had a financial interest in the company through ownership of shares of the company's common stock. The Stark II law includes an exception for the ownership of publicly traded stock in certain companies with equity above certain levels. As of December 31, 2000, the company complied with the requirements of such exception. However, there can be no assurance that the ownership of shares of Coram common stock by referring physicians will continue to fit within the public company exception of Stark II because the public company exception requires the issuing company to have stockholders' equity of at least $75 million either as of the end of its most recent fiscal year or on a weighted average

13

JSP 01812

basis during the last three fiscal years. Due principally to the gain on troubled debt restructuring (see Note 8 to the company's Consolidated Financial Statements) and the disposition of CPS (see Note 5 to the company's Consolidated Financial Statements), at December 31, 2000 the company's stockholders' equity was above the required level. However, in light of the company's recurring operational losses during each of the years in the three year period ended December 31, 2000, management's ability to maintain an appropriate level of stockholders' equity cannot be reasonably assured. With a decrease in equity below $75 million at December 31, 2001, Coram may no longer qualify for such exception and would be forced to cease accepting referrals of patients with government sponsored benefit programs from physicians who own shares of Coram's common stock. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Risk Factors."

Under Stark II, an entity is prohibited from claiming payment under the Medicare or Medicaid programs for services rendered pursuant to a prohibited referral and is liable for the refund of amounts received pursuant to prohibited claims. The entity can also be assessed civil penalties of up to $15,000 per improper claim and can be excluded from participation in the Medicare and/or Medicaid programs. In addition, a number of the states in which the company operates have similar prohibitions on physician self-referrals with similar penalties. Although management believes it has structured its financial relationships with physicians to comply with such Stark II and applicable state law equivalents, a failure to comply with the provisions of such laws could have a material adverse effect on the company.

*Other Fraud and Abuse Laws.* The False Claims Act imposes civil liability on individuals or entities that submit false or fraudulent claims for payment to the government. Violations of the False Claims Act may result in civil penalties and forfeitures and exclusion from the Medicare and Medicaid programs. The Health Insurance Portability and Accountability Act of 1996 created two new federal crimes: "Healthcare Fraud" and "False Statements Relating to Healthcare Matters." The Healthcare Fraud statute prohibits knowingly and willfully executing a scheme or artifice to defraud any healthcare benefit program. A violation of this statute is a felony and may result in fines and/or imprisonment. The False Statements statute prohibits knowingly and willfully falsifying, concealing or covering up a material fact by any trick, scheme or device or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items or services. A violation of this statute is a felony and may result in fines and/or imprisonment.

Recently, the federal government has made a decision to significantly increase the financial resources allocated to enforcing the healthcare fraud and abuse laws. In addition, private insurers and various state enforcement agencies have increased their level of scrutiny of healthcare claims in an effort to identify and prosecute fraudulent and abusive practices in healthcare. A failure to comply with any of the fraud and abuse laws could have a material adverse effect on the company.

*Medicare and Healthcare Reform.* As part of the Balanced Budget Act of 1997 (the "BBA"), Congress made numerous changes that affect Part A certified home health agencies and Part B suppliers like Coram that participate in the Medicare program. These policies were subsequently modified by the Medicare, Medicaid and SCHIP Balanced Budget Refinement Act of 1999 (the "BBRA") and the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000 (the "BIPA").

The BBA requires Part A certified home health agencies, as a condition of their participation in Part A of the Medicare program, to post surety bonds. The bonds are to be used to secure performance and compliance with Medicare program rules and requirements. The regulations, as originally published, would have required each Medicare certified home health provider to obtain a surety bond in an amount equal to the greater of 15% of the annual amount Medicare paid to the provider in the prior year (up to a maximum of $3,000,000) or $50,000. The BBRA modified the annual surety bond amounts for home health agencies to require the lesser of 10% of the amount Medicare paid to the provider in the prior year or $50,000. The deadline for securing such bonds has been extended indefinitely while the Health Care Financing Administration ("HCFA") reviews the bonding requirements. HCFA has indicated that the new compliance date will be sixty days after the publication of the final rule. Management believes, based upon currently available information derived from its discussions with surety bond brokers and organizations that issue surety bonds, that the necessary bonds will not be generally available to home health providers until HCFA revises its bonding requirements in a way that clarifies and/or limits the types of liabilities that will be covered by the bonds. As of April 9, 2001, the company had only one Medicare certified home health provider location, which has not obtained a surety bond.

As required by the BBA, HCFA also intends to issue separate surety bond regulations applicable to Part B suppliers. Virtually all of Coram's branch offices participate as suppliers in the Part B Medicare program. Similar bonding requirements are being reviewed by state Medicaid programs. If Coram is not able to obtain all of the necessary surety bonds, it may have to cease its participation in the Medicare and Medicaid programs for some or all of its branch locations. In October 2000, HCFA issued final supplier standards, which expanded certain operational requirements for suppliers. In the final rule, HCFA decided to delay the surety bond rule pending "extensive changes" to this requirement. HCFA stated that it will consider public comments received on the surety bond requirements,

14

JSP 01813

primarily relating to costs, along with its experience with surety bonds for home health agencies and the General Accounting Office's study of Medicare surety bonds, when it issues a proposed rule on surety bonds in the future. Until HCFA issues another rule on this provision, there is no surety bond requirement for suppliers. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Liquidity and Capital Resources -- Part A and Part B Medicare Surety Bonds."

The BBA also reduced reimbursement for oxygen and oxygen related therapies by 25% effective January 1, 1998, with an additional 5% reduction effective January 1, 1999 and in subsequent years. In addition, the BBA eliminated consumer price index updates for durable medical equipment and parenteral and enteral nutrients, supplies and equipment for five years, thereby "freezing" the payment amount for such items until the year 2003. The BBRA restored a portion of the durable medical equipment and oxygen payments by increasing the fee schedules by 0.3% in 2001 and 0.6% in 2002. The BIPA further modified payments for durable medical equipment by providing a full inflation update for items of durable medical equipment (but not oxygen and oxygen equipment) in 2001, implemented in two steps; however, the BIPA does not authorize durable medical equipment payment increases for 2002.

The BBA also mandated the implementation of a prospective payment system ("PPS") for home health services for cost reporting periods beginning on or after October 1, 1999. This deadline was subsequently extended to October 1, 2000. On July 3, 2000, HCFA issued a final rule to implement the home health PPS. Under the final rule, Medicare pays home health agencies for each covered 60-day episode of care, based on the care needs of the patients, as determined by a standardized assessment tool used to assess patient needs. Agencies also are eligible for outlier payments if the costs of caring for an individual beneficiary were significantly higher than the specified payment rate. The BIPA delays a scheduled 15 percent reduction in aggregate home health PPS amounts by another year, until October 1, 2002, while the United States Comptroller General studies the need for the 15 percent reduction. The aggregate amount of Medicare payments to home health agencies in fiscal year 2002 will equal the aggregate payments in fiscal year 2001, updated by the market basket index ("MBI") increase, minus 1.1%. The BIPA also provides a full MBI update for services provided under the home health PPS for fiscal year 2001, implemented in two phases. In addition, the BBA established consolidated billing requirements for home health agencies, under which payment for home health products and services may only be made to the home health agency that establishes the beneficiary's home health plan of care, regardless of whether the item or service was furnished by the agency or by an outside provider or supplier. The BBRA excludes durable medical equipment and oxygen and oxygen supplies from the consolidated billing requirement, thereby enabling durable medical equipment and oxygen suppliers to continue to bill Medicare Part B directly for items and services furnished to home health patients, rather than be dependent on a home health agency for payment.

The BIPA also addresses HCFA policies regarding coverage of and payment for drugs and biologicals. For instance, the BIPA requires that payment for drugs under Part B be made on an assigned basis; in other words, the provider must accept the Medicare fee schedule amount as payment in full. The BIPA also addresses HCFA's attempts to modify the calculation of average wholesale prices ("AWPs") of drugs, upon which Medicare reimbursement is based. The federal government has been investigating whether pharmaceutical manufacturers have been manipulating AWPs. In May 2000, HCFA proposed using new Department of Justice pricing data for updating Medicare payment allowances for drugs and biologicals, although HCFA withdrew this proposal in November 2000, citing the likelihood of Congressional action in this area. The BIPA established a temporary moratorium on direct or indirect reductions (but not increases) in payment rates in effect on January 1, 2001, until the Secretary of Health and Human Services reviews a study that the General Accounting Office ("GAO") is directed to conduct regarding the Medicare reimbursement for drugs and biologicals and related services. The GAO is directed to report to Congress and the Secretary of Health and Human Services within nine months of enactment on specific recommendations for revised payment methodologies. It is uncertain at this time what Medicare prescription drug payment recommendations will be proposed by the GAO or whether such proposals or other payment initiatives will be adopted by the Medicare program in the future.

The BBA also authorized certain demonstration projects for competitive bidding involving, at a minimum, oxygen and oxygen equipment, through December 31, 2002. The first competitive bidding project, underway in Polk County, Florida, is using payment rates that are between 13% and 31% lower than Medicare's existing fee schedule for five categories of products, including oxygen equipment and supplies, enteral nutrition equipment and supplies and urological supplies. Plans are underway to implement another round of competitive bidding in Polk County in October 2001, covering oxygen equipment and supplies, hospital beds and accessories, urological supplies and surgical dressings. A second competitive bidding project was launched on February 1, 2001 in the San Antonio, Texas area, and applies to, among other things, oxygen equipment and supplies and nebulizer inhalation drugs. The long-range impact of the home health prospective payment system and future competitive bidding projects is unclear. Accordingly, there can be no assurances that adoption of these or other payment systems and the implementation of the Medicare reimbursement reductions and freezes described above will not result in a material decrease in the amount of reimbursement Coram receives from the

15

JSP 01814

Medicare program for the services it currently provides and any other home health or related oxygen, durable medical equipment or home infusion services Coram may provide in the future.

*Health Information Practices.* The administrative simplification provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") mandate, among other things, the adoption of standards for the exchange of electronic health information in an effort to encourage overall administrative simplification and enhance the effectiveness and efficiency of the healthcare industry. Among the standards that the Department of Health and Human Services (the "DHHS") must adopt pursuant to HIPAA are standards for the following: electronic transactions and code sets; unique identifiers for providers, employers, health plans and individuals; security and electronic signatures; privacy; and enforcement.

Although HIPAA was intended ultimately to reduce administrative expenses and burdens faced within the healthcare industry, the law may initially bring about significant and, in some cases, costly changes. The DHHS has released two rules to date mandating the use of new standards with respect to certain healthcare transactions and health information. The first rule requires the use of uniform standards for common healthcare transactions, including healthcare claims information, plan eligibility, referral certification and authorization, claims status, plan enrollment and disenrollment, payment and remittance advice, plan premium payments and coordination of benefits, and it establishes standards for the use of electronic signatures.

Second, the DHHS released new standards relating to the privacy of individually identifiable health information. These standards not only require compliance with rules governing the use and disclosure of protected health information, but they also impose those rules, by contract, on any business associate to whom such information is disclosed. Rules governing the security of health information have been proposed but have not yet been issued in final form.

The DHHS finalized the new standards on August 17, 2000, and the company will be required to comply with them by October 16, 2002. The privacy standards were issued on December 28, 2000, to become effective on April 14, 2001, with a compliance date of April 14, 2003. In addition, on February 28, 2001, the DHHS amended the final privacy rule to allow additional public comments before the rule becomes effective on April 14, 2001. The current administration and Congress are taking a careful look at the existing regulations, but it is uncertain whether there will be further changes to the privacy standards or their compliance date. With respect to the security regulations, once they are issued in final form, affected parties will have approximately two years to be fully compliant. Sanctions for failing to comply with the HIPAA health information practices provisions include criminal penalties and civil sanctions.

The company is evaluating the effect of HIPAA and taking steps to achieve compliance. At this time, management anticipates that the company will be able to fully comply with the HIPAA requirements that have been adopted. However, management cannot, at this time, estimate the cost of such compliance, nor can management estimate the cost of compliance with standards that have not yet been finalized by the DHHS. Although the new and proposed health information standards are likely to have a significant effect on the manner in which the company handles health data and communicates with payers, based on current knowledge, management believes that the cost of compliance will not have a material adverse effect on the company's business, financial condition, results of operations or cash flows.

Further statutes or regulations may be adopted which would impose additional requirements in order for Coram to be eligible to participate in the federal and state payment programs. Such new legislation or regulations may adversely affect Coram's business operations. There is significant national concern today about the availability and rising cost of healthcare in the United States. It is anticipated that new federal and/or state legislation will be passed and regulations adopted to attempt to provide broader and better healthcare services and to manage and contain their cost. Management is unable to predict the content of any legislation or what, if any, changes may occur in the method and rates of its Medicare and Medicaid reimbursement or in other government regulations that may affect its businesses, or whether such changes, if made, will have a material adverse effect on Coram's business, financial position and results of operations.

*State Laws Regarding Fee Splitting, Provision of Medicine and Insurance.* The laws of many states prohibit physicians from splitting fees with non-physicians and prohibit non-physician entities from practicing medicine. These laws vary from state to state and are enforced by the courts and by regulatory authorities with broad discretion. Although management believes its operations, as currently conducted, are in material compliance with existing applicable laws, certain aspects of Coram's business operations have not been subject to state or federal regulatory interpretation. There can be no assurance that a review of Coram's business by courts or regulatory authorities will not result in determinations that could adversely affect the company's operations or that the healthcare regulatory environment will not change so as to restrict its existing operations or its expansion.

16

JSP 01815

Most states have laws regulating insurance companies and HMOs. Coram is not qualified in any state to engage in either the insurance or HMO business, but Coram had registered one of its R-Net subsidiaries as a risk-taking preferred provider organization in one state. This subsidiary is no longer operating. As managed care penetration increases, state regulators are beginning to scrutinize the practices of and relationships among third-party payers, medical service providers and entities providing management and administrative services to medical service providers, especially with respect to risk-sharing arrangements by and among such providers. State regulators are also reviewing whether risk-bearing entities are subject to insurance or HMO regulation. Management believes that its practices are consistent with those of other direct healthcare service providers and do not constitute licensable HMO or insurance activities. To the extent such licenses may be required, Coram will make the necessary filings and registrations to achieve compliance with applicable laws. However, given the limited regulatory history with respect to such practices, there can be no assurance that states requiring licensure will not attempt to assert jurisdiction. If the states pursue actions against Coram and/or its customers, Coram may be compelled to restructure or refrain from engaging in certain business practices.

*Pharmacies and Home Health Agencies.* Each of Coram's pharmacies is licensed in the states in which it is located and in the states where its products are delivered. Each of these pharmacies also has a Controlled Substances Registration Certificate issued by the Drug Enforcement Administration of the United States Department of Justice. Many states in which the company operates also require home infusion companies to be licensed as home health agencies. The failure of a branch facility to obtain, renew or maintain any required regulatory approvals or licenses could adversely affect the existing operations of that branch facility.

*Other Regulations.* Coram's operations are subject to various state hazardous and medical waste disposal laws. The laws currently in effect do not classify most of the waste produced during the provision of the company's services to be hazardous, although disposal of non-hazardous medical waste is also subject to regulation. Occupational Safety and Health Administration ("OSHA") regulations require employers of workers who are occupationally exposed to blood or other potentially infectious materials to provide those workers with certain prescribed protections against bloodborne pathogens. The regulatory requirements apply to all healthcare facilities, including the company's branches, and require employers to make a determination as to which employees may be exposed to blood or other potentially infectious materials and to have in effect a written exposure control plan. Furthermore, employers are required to provide hepatitis-B vaccinations, personal protective equipment, infection control training, post-exposure evaluation and follow-up, waste disposal policies and procedures, and engineering and work practice controls. Employers are also required to comply with certain record keeping requirements. Management believes that the company is in material compliance with the foregoing laws and regulations.

*Internal Compliance and Monitoring.* Coram implemented measures to ensure compliance with applicable laws and engaged Richard P. Kusserow, the former Inspector General of the Department of Health and Human Services, as a consultant to assist Coram in its continued development and administration of its compliance program. Coram's internal regulatory compliance review program is intended to deal with legal, regulatory and ethical compliance issues. However, no assurances can be given that Coram's business arrangements, present or past (or those of its predecessors or divested subsidiaries, affiliates or partnerships), will not be the subject of an investigation or prosecution by a federal or state governmental authority in the future. Such investigations could result in a penalty, or any combination of the penalties discussed above, depending upon the agency involved in such investigation and prosecution.

Coram regularly monitors legislative developments and would seek to restructure a business arrangement if it was determined that any of its business relationships placed the company in material noncompliance with any applicable statute or regulation. The healthcare services industry will continue to be subject to substantial regulation at the federal and state levels, the scope and effect of which cannot be predicted by management. Any loss by Coram of its various federal certifications, its authorization to participate in the Medicare or Medicaid programs or its licenses under the laws of any state or other governmental authority from which a substantial portion of its revenue is derived would have a material adverse effect on its business. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations: Risk Factors."

**Employees**

As of December 31, 2000, Coram had approximately 2,200 full-time equivalent employees (2,700 full and part-time employees). None of Coram's employees are currently represented by a labor union or other labor organization, or covered by a collective bargaining agreement. Approximately 34% of the full-time employees are nurses and pharmacists, with the remainder consisting primarily of sales and marketing, billing and reimbursement, branch operations, clinical coordinators, financial and systems professionals. Management believes that its employee relations are good.

17

JSP 01816

## ITEM 2. PROPERTIES

The company's corporate headquarters are located in Denver, Colorado and consist of approximately 20,000 square feet of office space leased through August 31, 2001. Due to the current lease agreement expiring in August 2001, Coram is reviewing several options for the corporate office. As of April 2, 2001, Coram had 76 branch offices throughout the United States and Canada, totaling approximately 0.8 million square feet of facility space with annual rent aggregating approximately $10.3 million. In addition, the company leases space in Bannockburn, Illinois which houses the company's information systems and CTI business. Management believes that the loss of a lease on any one facility would not materially effect the company's operations.

In September 2000, the Bankruptcy Court approved a Debtors' motion to reject four unexpired, non-residential real property leases and any associated subleases. The rejected leases include underutilized locations in: (i) Allentown, Pennsylvania; (ii) Denver, Colorado; (iii) Philadelphia, Pennsylvania; and (iv) Whippany, New Jersey.

## ITEM 3. LEGAL PROCEEDINGS

*Bankruptcy Proceedings.* On August 8, 2000, the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware, In Re: Coram Healthcare Corporation and Coram, Inc., Case Nos. 00-3299 (MFW) and 00-3300 (MFW) (collectively the "Chapter 11 Cases"), respectively. The proceedings have been consolidated for administrative purposes only by the United States Bankruptcy Court in Delaware and are being administered under the docket of In Re: Coram Healthcare Corporation, Case No. 00-3299 (MFW). None of the Debtors' other subsidiaries are a debtor in the proceeding. See Note 3 to the company's Consolidated Financial Statements for further details.

Except as may otherwise be determined by the Bankruptcy Court overseeing the Chapter 11 Cases, the protection afforded by Chapter 11 generally automatically stays any litigation proceedings pending against either or both of the Debtors. All such claims will be addressed through the proceedings applicable to the Chapter 11 Cases. The automatic stay would not, however, apply to actions brought against the company's non-debtor subsidiaries.

*Official Committee of the Equity Security Holders' Matters.* A committee of persons claiming to own shares of the company's publicly-traded common stock (the "Equity Committee") objected to an amended and restated joint plan of reorganization (the "Restated Joint Plan") filed in the Bankruptcy Court on October 20, 2000 by the Debtors, contending that, among other things, the company valuation upon which the Restated Joint Plan of reorganization was premised and the underlying projections and assumptions were flawed. On December 21, 2000, the Bankruptcy Court determined not to confirm the Restated Joint Plan. The company and the Equity Committee are involved in a review of certain company information regarding, among other things, the Equity Committee's contentions. Additionally, the Equity Committee filed a motion with the Bankruptcy Court seeking permission to bring a derivative lawsuit directly against the company's Chief Executive Officer, a former member of the Board of Directors and Cerberus Partners, L.P. (a party to the company's debtor-in-possession financing agreement, Senior Credit Facility and Securities Exchange Agreement). The Equity Committee's lawsuit alleges a collusive plan whereby the named parties conspired to devalue the company for the benefit of the company's creditors under the Securities Exchange Agreement. On February 26, 2001, the Bankruptcy Court ruled that the Equity Committee's motion would not be productive at that time and, accordingly, the motion to proceed with the lawsuit was denied without prejudice.

Management cannot predict whether any future objections of the Equity Committee will be forthcoming or if they would prevent confirmation of a plan of reorganization, if any, set forth by the Debtors' management. Management also cannot predict if any other actions of the Equity Committee will have adverse consequences to the company.

*Resource Network Subsidiaries' Bankruptcy.* On November 12, 1999, the Resource Network Subsidiaries filed voluntary petitions under Chapter 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, Case No. 99-2889 (MFW). On August 19, 1999, a small group of parties with claims against the Resource Network Subsidiaries filed an involuntary bankruptcy petition under Chapter 11 against Coram Resource Network, Inc. in the United States Bankruptcy Court for the District of Delaware. The two proceedings were consolidated by stipulation of the parties and the case is pending under the style, *In Re Coram Resource Network, Inc. and Coram Independent Practice Association, Inc.,* Case No. 99-2889 (MFW). The Resource Network Subsidiaries are now being liquidated pursuant to the proceedings. The Chief Restructuring Officer of the Resource Network Subsidiaries had threatened suit on behalf of the estates against Coram Healthcare Corporation ("CHC"). The draft complaint included claims for damages against CHC and certain of its former and current officers and directors in excess of $41 million. The draft complaint included a threat to pierce the corporate veil of the Resource Network Subsidiaries to reach CHC and included claims of breaches by the officers and directors of their fiduciary duties to the Resource Network Subsidiaries and CHC.

18

JSP 01817

On September 11, 2000, the Resource Network Subsidiaries filed a motion in the Debtor's Chapter 11 proceedings seeking, among other things, to have the two separate bankruptcy proceedings substantively consolidated into one proceeding. If granted, the Chapter 11 proceedings involving the Resource Network Subsidiaries and the Chapter 11 proceedings involving the Debtors would have been combined such that the assets and liabilities of the Resource Network Subsidiaries would be joined with the assets and liabilities of the Debtors, the liabilities of the combined entity would be satisfied from their combined funds and all intercompany claims would be eliminated. Furthermore, the creditors of both proceedings would have voted on any reorganization plan for the combined entities. The Resource Network Subsidiaries and the Debtors engaged in discovery related to this substantive consolidation motion and, in connection therewith, the parties reached a settlement agreement in November 2000. The settlement agreement was approved by the Bankruptcy Court in December 2000 and the Debtors made a payment of $0.5 million to the Resource Network Subsidiaries in January 2001.

Notwithstanding the withdrawal of the substantive consolidation motion, the Resource Network Subsidiaries still maintain a proof of claim in excess of $41 million against CHC's estate and the company maintains a reciprocal claim of approximately the same amount against the Resource Network Subsidiaries' estate. The ultimate outcome of these claims cannot be predicted with any degree of certainty but management, in consultation with legal counsel, does not believe that the final resolution of this matter or other matters raised by the Resource Network Subsidiaries' Chief Restructuring Officer will have a material adverse impact on the company's financial position or results of operations.

*Aetna U.S. Healthcare, Inc.* On June 30, 1999, the company filed a complaint (the "Coram Complaint") against Aetna in the United States District Court for the Eastern District of Pennsylvania setting forth claims against Aetna for fraud, misrepresentation, breach of contract and rescission relating to the Master Agreement between the parties for ancillary network management services through the Master Agreement. On June 30, 1999, the company received a copy of a complaint (the "Aetna Complaint") that had been filed by Aetna on June 29, 1999 in the Court of Common Pleas of Montgomery County, Pennsylvania. The Aetna Complaint sought specific performance, injunctive relief and declaratory relief to compel the company to perform under the Master Agreement, including the payment of compensation to the healthcare providers that had rendered and continued to render services to Aetna's health plan members. As stated in the Aetna Complaint, Aetna disputed the company's right to terminate the Agreement. The company removed the Aetna Complaint to federal court. On July 20, 1999, Aetna filed a counterclaim against the company in the federal court lawsuit brought by the company. In its counterclaim, Aetna sued the company for, among other things, breach of the Master Agreement and fraudulent misrepresentation, contending the company never intended to perform under the Master Agreement, defamation, interference with contractual relations with providers and interference with prospective contractual relations with other companies that allegedly bid for the Master Agreement.

On April 20, 2000, the company and Aetna reached an amicable resolution to the then outstanding disputes and, in connection therewith, all claims and counterclaims amongst the parties were dismissed from the courts of appropriate jurisdiction. The final resolution of these matters did not have a material adverse effect on the company's consolidated financial position or results of operations. The impact of this dispute resolution has been charged to discontinued operations in the accompanying consolidated financial statements.

*Apria Healthcare, Inc.* Apria Healthcare, Inc. and one of its affiliates, Apria Healthcare of New York State, Inc., (collectively "Apria") filed suit against CHC and the Resource Network Subsidiaries in the Superior Court of Orange County, California. Apria's claims related to services that were rendered as part of certain home health provider networks managed by the Resource Network Subsidiaries. Apria's complaint alleged that, among other things, the Resource Network Subsidiaries operated as the alter ego of CHC and, as a result, CHC should be declared responsible for the alleged breaches of the contracts that the Resource Network Subsidiaries had with Apria. The complaint included requests for declaratory, compensatory and other relief in excess of $1.4 million. On February 21, 2001, the company and Apria agreed to a "dismissal without prejudice" from the Superior Court of Orange County, California with each party responsible for its own legal fees.

*TBOB Enterprises, Inc.* On July 17, 2000, TBOB Enterprises, Inc. ("TBOB") filed an arbitration demand against CHC (TBOB Enterprises, Inc. f/k/a Medical Management Services of Omaha, Inc. against Coram Healthcare Corporation, in the American Arbitration Association office in Dallas, Texas). In its demand, TBOB claims that the company breached its obligations under an agreement entered into by the parties in 1996 relating to a prior earn-out obligation of the company that originated from the acquisition of the claimant's prescription services business in 1993 by a wholly-owned subsidiary of the company. The company operated the business under the name Coram Prescription Services ("CPS") and the assets of the CPS business were sold on July 31, 2000. See Note 5 to the company's Consolidated Financial Statements for further details. TBOB alleges, among other things, that the company has impaired the earn-out payments due TBOB by improperly charging certain expenses to the CPS business and failing to

19

JSP 01818

fulfill the company's commitments to enhance the value of CPS by marketing its services. The TBOB demand alleges damages of more than $0.9 million. TBOB contends that this amount must be paid in addition to the final scheduled earn-out payment of approximately $1.3 million that was due in March 2001. TBOB reiterated its monetary demand through a proof of claim filed against CHC's estate for the aggregate amount of approximately $2.2 million (the scheduled earn-out payment plus the alleged damages). The company received a copy of a letter from TBOB to the American Arbitration Association in which it is attempting to obtain a refund of the filing fees that TBOB paid in connection with the arbitration proceeding because the final $1.3 million earn-out payment that was scheduled for March 2001 and the alleged damages of $0.9 million have been stayed by operation of the Bankruptcy Code. In February 2001, TBOB withdrew its arbitration claim due to the ongoing bankruptcy proceedings. Management does not believe that final resolution of this matter will have a material adverse impact on the company's financial position or results of operations.

*Internal Revenue Service Examination.* CHC is contesting a notice of deficiency issued by the Internal Revenue Service through administrative proceedings and litigation. See Note 9 to the company's Consolidated Financial Statements for further details.

*Alan Furst et. al. v. Stephen Feinberg, et. al.* A complaint was filed in the United States District Court for the Third District of New Jersey on November 8, 2000 and an Amended Class Action Complaint was filed on November 15, 2000, alleging that certain current and former officers and directors of the company and the company's principal lenders, Cerberus Partners, L.P., Foothill Capital Corporation and Goldman Sachs & Co., implemented a scheme to perpetrate a fraud upon the stock market regarding the common stock of CHC. A second Amended Class Action Complaint was filed on March 21, 2001, which removed all of the officers and directors of the company as defendants, except the company's Chief Executive Officer and another current member of the Board of Directors. Plaintiffs allege that the defendants artificially depressed the trading price of the company's publicly traded shares and created the false impression that stockholders' equity was decreasing in value and was ultimately worthless. Plaintiffs further allege that members of the class sustained total investment losses of $50 million or more. The company notified its insurance carrier and intends to avail itself of any appropriate insurance coverage for its directors and officers who are vigorously contesting the allegations. Because of the recent nature of this case, the company cannot predict its outcome nor can it predict the scope and nature of any indemnification that the directors and officers may have with the company's insurance carrier.

*General.* Management of the company and its subsidiaries intends to vigorously defend the company in the matters described above. Nevertheless, due to the uncertainties inherent in litigation, including possible indemnification against other parties, the ultimate disposition of such matters cannot presently be determined. Adverse outcomes in some or all of the proceedings could have a material adverse effect on the financial position, results of operations and liquidity of the company.

The company and its subsidiaries are also parties to various other legal actions arising out of the normal course of their businesses, including employee claims, reviews of cost reports submitted to Medicare and examinations by regulators such as Medicare and Medicaid fiscal intermediaries and the Health Care Financing Administration. Management believes that the ultimate resolution of such other actions will not have a material adverse effect on the financial position, results of operations or liquidity of the company.

*PricewaterhouseCoopers.* On July 7, 1997, the company filed suit against Price Waterhouse LLP (now known as PricewaterhouseCoopers) in the Superior Court of San Francisco, California, seeking damages in excess of $165.0 million. As part of the settlement that resolved a case filed by the company against Caremark International, Inc. and Caremark, Inc. (collectively "Caremark"), Caremark assigned and transferred to the company all of Caremark's claims and causes of action against Caremark's independent auditors, PricewaterhouseCoopers, related to the lawsuit filed by the company against Caremark. This assignment of claims includes claims for damages sustained by Caremark in defending and settling its lawsuit with the company. The case was dismissed from the California court because of inconvenience to witnesses with a right to re-file in Illinois. The company re-filed the lawsuit in state court in Illinois and PricewaterhouseCoopers filed a motion to dismiss the company's lawsuit on several grounds, but their motion was denied on March 15, 1999. PricewaterhouseCoopers filed an additional motion to dismiss the lawsuit in May 1999, and that motion was dismissed on January 28, 2000. The lawsuit is currently in the discovery stage and a trial is scheduled to commence after June 22, 2002. There can be no assurance of any recovery from PricewaterhouseCoopers.

*Government Regulation.* Under the physician ownership and referral provisions of the Omnibus Budget Reconciliation Act of 1993 (commonly referred to as "Stark II"), it is unlawful for a physician to refer patients for certain designated health services reimbursable under the Medicare or Medicaid programs to an entity with which the physician has a financial relationship, unless the financial relationship fits within an exception enumerated in Stark II or regulations promulgated thereunder. A "financial relationship" under Stark II is defined broadly as an ownership or investment interest in, or any type of compensation arrangement in which remuneration flows between the physician and the provider. The company has financial relationships with physicians and physician owned entities in the form of medical director agreements and service agreements pursuant to which the company provides pharmacy-

20

JSP 01819

products. In each case, the relationship has been structured, based upon advice of legal counsel, using an arrangement management believes to be consistent with the applicable exceptions set forth in Stark II.

In addition, the company is aware of certain referring physicians that have had financial interests in the company through ownership of shares of the company's common stock. The Stark II law includes an exception for the ownership of publicly traded stock in companies with equity above certain levels. This exception of Stark II requires the issuing company to have stockholders' equity of at least $75 million either as of the end of its most recent fiscal year or on average over the last three fiscal years. Due principally to the extraordinary gain on troubled debt restructuring (see Note 8 to the company's Consolidated Financial Statements) and the disposition of CPS (see Note 5 to the company's Consolidated Financial Statements), at December 31, 2000 the company's stockholders' equity was above the required level. However, in light of the company's recurring operational losses during each of the years in the three year period ended December 31, 2000, management's ability to maintain an appropriate level of stockholders' equity cannot be reasonably assured. The penalties for failure to comply with Stark II include civil penalties that could be imposed upon the company or the referring physician, regardless of whether either the physician or the company intended to violate the law.

Management has been advised by counsel that a company whose stock is publicly traded has, as a practical matter, no reliable way to implement and maintain an effective compliance plan for addressing the requirements of Stark II other than complying with the public company exception. Accordingly, if the company's common stock remains publicly traded and its stockholders' equity falls below the required levels, the company would be forced to cease accepting referrals of patients with government-sponsored benefit programs or run a significant risk of noncompliance with Stark II. Because referrals of the company's patients with government-sponsored benefit programs comprise approximately 23% of the company's consolidated net revenue (excluding CPS) for the year ended December 31, 2000, discontinuing the acceptance of patients with government-sponsored benefit programs would have a material adverse effect on the financial condition, results of operations and cash flows of the company. Additionally, ceasing to accept such referrals could materially adversely affect the company's business reputation in the market as it may cause the company to be a less attractive provider to which a physician could refer his or her patients. The company previously requested a Stark II waiver from the Healthcare Financing Administration, but such waiver request was denied.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None.

## PART II

## ITEM 5. MARKET FOR THE REGISTRANT'S COMMON STOCK AND RELATED SECURITY HOLDER MATTERS

Prior to March 7, 2000, shares of Coram's common stock had been listed and traded on the New York Stock Exchange under the symbol "CRH." Beginning on March 7, 2000, the shares have been traded through the Over the Counter Bulletin Board ("OCBB") maintained by the National Association of Securities Dealers, Inc., under the symbol "CRHE." After the Debtors' filing for Chapter 11 reorganization, the company has been trading under the symbol "CRHEQ." The following table sets forth the high and low sales prices of the company's common stock, as reported on the New York Stock Exchange ("NYSE") Composite Tape and on the OCBB for the two years ended December 31, 2000:

|  | High | Low |
|---|---|---|
| **Calendar Year 2000** | | |
| First Quarter | 1 | 1/4 |
| Second Quarter | 39/64 | 1/4 |
| Third Quarter | 7/16 | 1/32 |
| Fourth Quarter | 27/64 | 3/64 |
| **Calendar Year 1999** | | |
| First Quarter | 2 13/16 | 1 7/16 |
| Second Quarter | 2 5/8 | 1 1/2 |
| Third Quarter | 1 5/8 | 9/16 |
| Fourth Quarter | 1 1/8 | 3/8 |

As of April 2, 2001, there were 4,682 record holders of the company's common stock. On April 2, 2001, the last bid for Coram's common stock on the OCBB was $0.2344 per share and the last reported ask price was also $0.2344 per share. These quotations reflect inter-dealer prices without retail mark-up, mark-down or commission and may not necessarily represent actual transactions.

The trading of company common stock moved to the OCBB following an agreement between the company and the NYSE that shares of Coram's common stock no longer met the requirements for trading on the NYSE. Coram had received notice in 1999 that it

21

JSP 01820

had fallen below the minimum listing criteria of the NYSE, including the minimum share price of $1.00, the minimum market capitalization of $50 million and the minimum equity of $50 million.

Coram has not paid or declared any cash dividends on its capital stock since its inception and is currently precluded from doing so under its borrowing agreements. Coram currently intends to retain all future earnings for use in the operations of its businesses. Accordingly, Coram does not anticipate paying cash dividends on its common stock in the foreseeable future. The payment of any future dividends will depend upon, among other things, the terms and conditions set forth in the Debtors' plan of reorganization related to their bankruptcy proceedings, the terms of its borrowing agreements, future earnings, operations, capital requirements, the general financial condition of the company, contractual restrictions and general business conditions.

Coram did not sell any of its equity securities in the year ended December 31, 2000 that were not registered under the Securities Act of 1933 (the "Act"), as amended. However, the registrant's wholly-owned subsidiary, Coram, Inc., exchanged certain of its outstanding debt obligations for 905 shares of Coram, Inc.'s Series A Cumulative Preferred Stock, with an aggregate liquidation preference of approximately $109.3 million (see Note 11 to the company's Consolidated Financial Statements). These preferred shares were not registered under the Act. Under certain conditions in the Debtors' post-bankruptcy period, the combined voting rights of the holders of the preferred stock may represent a majority controlling interest in Coram, Inc. This circumstance could cause a deconsolidation of the registrant's most significant direct subsidiary.

The holders of Coram's Series B Convertible Subordinated Notes (the "Series B Notes") have the right to convert the Series B Notes into shares of the company's common stock. In addition, these holders and/or their affiliates are lenders under the Series A Senior Subordinated Notes (the "Series A Notes") of the company and are lenders under the Securities Exchange Agreement pursuant to which they were issued warrants to purchase 1.9 million shares of Coram's common stock; however, the warrants expired contemporaneous with the termination of the Securities Exchange Agreement on February 6, 2001. In certain circumstances and assuming conversion of the Series B Notes, such holders may collectively own a majority of the issued and outstanding common stock of the company and be in a position to take steps to control the affairs of the company. See Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations: Risk Factors" and Note 8 to the company's Consolidated Financial Statements.

The Debtors' restated and amended joint plan of reorganization, if approved, would have effectively eliminated all of Coram's common stock because Coram Healthcare Corporation ("CHC") would be dissolved as soon as practicable after the effective date of the plan and all equity interests in CHC would be completely eliminated. At this time, the Debtors have not formulated another plan of reorganization (see Note 3 to the company's Consolidated Financial Statements).

22

JSP 01821

B246

## ITEM 6. SELECTED FINANCIAL DATA

The following selected consolidated financial data should be read in conjunction with the company's Consolidated Financial Statements and related notes and Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations." Amounts are in thousands, except per share data.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| INCOME STATEMENT DATA: | 2000 | 1999 | 1998 | 1997 | 1996 |
| Net revenue | $ 464,820 | $ 521,196 | $ 445,112 | $ 439,472 | $ 502,830 |
| Cost of service | 341,656 | 408,879 | 326,736 | 309,693 | 348,247 |
| Gross profit | 123,164 | 112,318 | 118,376 | 129,779 | 154,583 |
| Operating expenses: | | | | | |
| Selling, general and administrative expenses | 90,329 | 96,809 | 83,337 | 86,457 | 97,981 |
| Provision for estimated uncollectible accounts | 9,773 | 28,310 | 14,845 | 14,943 | 27,327 |
| Amortization of goodwill | 10,227 | 10,784 | 11,139 | 13,586 | 15,259 |
| Restructuring cost (recovery) expense (1) | (322) | 10,784 | — | — | — |
| Losses on impairments of long-lived assets | 8,323 | 5,831 | (3,900) | — | — |
| Provision for (income from) litigation settlements (2) | — | 9,100 | — | (156,792) | 27,875 |
| Total operating expenses | 118,330 | 150,834 | 105,421 | (41,766) | 168,442 |
| Operating income (loss) from continuing operations | 4,834 | (38,516) | 12,955 | 171,545 | (13,859) |
| Other income (expense): | | | | | |
| Interest income | 991 | 655 | 1,086 | 2,236 | 1,486 |
| Interest expense (3) | (26,788) | (29,763) | (32,734) | (75,026) | (78,767) |
| Gains on sales of businesses (4) | 18,649 | — | 1,071 | 26,744 | — |
| Termination fee (5) | — | — | — | 15,182 | — |
| Other income (expense), net | 3,008 | 740 | (266) | 1,517 | 2,114 |
| Income (loss) from continuing operations before reorganization expenses, income taxes, minority interests and extraordinary gain on troubled debt restructuring | 694 | (66,884) | (17,888) | 142,198 | (89,026) |
| Reorganization expenses, net (6) | (8,264) | — | — | — | — |
| Income (loss) from continuing operations before income taxes, minority interests and extraordinary gain on troubled debt restructuring | (7,570) | (66,884) | (17,888) | 142,198 | (89,026) |
| Income tax expense (benefit) | 250 | 440 | 2,300 | 7,350 | (13,998) |
| Minority interests in net income of consolidated joint ventures | 571 | 1,470 | 1,399 | 7,283 | 7,698 |
| Income (loss) from continuing operations before extraordinary gain on troubled debt restructuring | (8,391) | (68,794) | (21,587) | 127,365 | (82,726) |
| Discontinued Operations: | | | | | |
| Loss from operations | — | (28,411) | (108) | (2,105) | (2,288) |
| Loss from disposal | (662) | (17,618) | — | — | — |
| Total discontinued operations | (662) | (46,029) | (108) | (2,105) | (2,288) |
| Extraordinary gain on troubled debt restructuring, net of income tax expense of $400 (7) | 107,772 | — | — | — | — |
| Net income (loss) | $ 98,719 | $ (114,823) | $ (21,695) | $ 125,260 | $ (85,014) |
| Earnings (Loss) Per Share | | | | | |
| Basic: | | | | | |
| Income (loss) from continuing operations | $ (0.17) | $ (1.39) | $ (0.44) | $ 2.68 | $ (1.99) |
| Loss from discontinued operations | (0.01) | (0.93) | — | (0.04) | (0.06) |
| Extraordinary gain on troubled debt restructuring | 2.17 | — | — | — | — |
| Net income (loss) per common share | 1.99 | (2.32) | (0.44) | 2.64 | (2.05) |
| Diluted: | | | | | |
| Income (loss) from continuing operations | $ (0.17) | $ (1.39) | $ (0.44) | $ 2.34 | $ (1.99) |
| Loss from discontinued operations | (0.01) | (0.93) | — | (0.04) | (0.06) |
| Extraordinary gain on troubled debt restructuring | 2.17 | — | — | — | — |
| Net income (loss) per common share | 1.99 | (2.32) | (0.44) | 2.30 | (2.05) |
| BALANCE SHEET DATA: | | | | | |
| Cash and cash equivalents | $ 27,259 | $ 6,633 | $ 203 | $ 108,950 | $ 15,375 |
| Working capital (deficit) (8) | (97,144) | 71,045 | 66,261 | (11,620) | (132,529) |
| Total assets | 345,376 | 402,751 | 421,029 | 515,232 | 543,795 |
| Long-term debt, net of current maturities (9) | 24 | 302,662 | 242,162 | 150,428 | 266,641 |
| Stockholders' equity (deficit) | 76,978 | (21,699) | 92,857 | 125,026 | (21,842) |

Earnings per common share amounts prior to 1997 have been restated to comply with Statement of Financial Accounting Standards No. 128, *Earnings Per Share*. The financial data prior to 2000 has been restated to conform with the 2000 presentation.

JSP 01822

(1) In 2000, management re-evaluated the reserves necessary to complete its restructuring initiatives and, as a result, recognized a net restructuring reserve reversal of approximately $0.3 million. In 1999, Coram initiated two company-wide restructuring plans, the "Coram Restructure Plan" and the "Field Reorganization Plan," and charged approximately $5.8 million to operations as restructuring charges. These plans resulted in the closure of certain facilities and a reduction of personnel. In 1998, it was determined that the original reserve established in 1994 as a result of the Four Way Merger, the "Coram Consolidation Plan," was substantially complete and the reserve was reversed. See Note 6 to the company's Consolidated Financial Statements.

(2) The $156.8 million income from litigation settlement recorded in 1997 relates to the settlement of a lawsuit against Caremark resulting from the purchase of the Caremark home infusion business in 1995. The provision for litigation settlements in 1996 includes approximately $25.9 million of cash and non-cash charges related to an agreement to settle certain stockholder class actions and certain derivative litigations.

(3) On December 28, 2000, the Debtors announced the Bankruptcy Court's approval of their request to exchange a sufficient amount of debt and related accrued interest for equity in the form of Coram, Inc. Series A Cumulative Preferred Stock. On December 29, 2000, Cerberus Partners, L.P., Goldman Sachs Credit Partners, L.P. and Foothill Capital Corporation agreed to exchange $11.6 million of aggregate unpaid accrued contractual interest on the Series A Notes and the Series B Notes; however, such exchanged accrued interest was charged to expense up to and including the date of the exchange. See Note 8 to the company's Consolidated Financial Statements. The 1999 decrease in interest expense was partially the result of the forbearance of interest from November 15, 1999 through April 20, 2000 (the date of the resolution of certain litigation with Aetna), offset by an increase in the principal amount of the debt and an increase in the interest rate charged on the Series A notes, beginning in April 1999. Interest expense decreased significantly in 1998 and 1999 due to a repayment of the company's former senior credit facility and a restructuring of its subordinated debt.

(4) Effective July 31, 2000, the company completed the sale of its CPS business and recorded a gain on sale of approximately $18.3 million. In addition, pursuant to a contingent consideration arrangement related to one of the company's operating subsidiaries, approximately $0.4 million was recognized as incremental proceeds during the year ended December 31, 2000. See Note 5 to the company's Consolidated Financial Statements. In 1998 and 1997, Coram sold its lithotripsy business to Integrated Health Services, Inc., and recorded gains on sales of $0.7 million and $26.7 million, respectively.

(5) In 1997, the company received $21.0 million from the termination of a merger agreement with Integrated Health Services, Inc., pursuant to which Integrated Health Services, Inc. would have acquired Coram. As a result, the company recorded other income of $15.2 million, representing the $21.0 million termination fee less related costs.

(6) In 2000, the company recognized $8.3 million in net reorganization expenses related to the Debtors' Chapter 11 bankruptcy proceedings. These expenses include, but are not limited to, professional fees, expenses related to success and retention plans and United States Trustee fees, offset by interest earned on cash accumulated due to the Debtors not paying their pre-petition liabilities and other expenditures during the Chapter 11 proceedings. See Note 3 to the company's Consolidated Financial Statements.

(7) In connection with the exchange of the Series A Notes and certain accrued interest for Coram, Inc. Series A Cumulative Preferred Stock, the company recognized an extraordinary gain on troubled debt restructuring of approximately $107.8 million, net of tax. See Note 11 to the company's Consolidated Financial Statements.

(8) Under the United States Bankruptcy Code, certain claims against the Debtors in existence prior to the filing date are stayed while the Debtors continue their operations as debtors-in-possession. These claims, which total approximately $159.1 million at December 31, 2000, are reflected in the Consolidated Balance Sheets as liabilities subject to compromise and are deemed to be current liabilities. See Note 3 to the company's Consolidated Financial Statements.

(9) At December 31, 2000, the company's Series A Notes and Series B Notes, which aggregate approximately $153.3 million, are classified as liabilities subject to compromise. See Notes 3 and 8 to the company's Consolidated Financial Statements. The current maturities of long-term debt, which gives effect to certain previous debt restructuring transactions were $0.4 million, $0.3 million, $150.2 million, and $198.0 million at December 31, 1999, 1998, 1997, and 1996, respectively.

24

JSP 01823

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

This Annual Report on Form 10-K contains certain "forward-looking" statements (as such term is defined in the Private Securities Litigation Reform Act of 1995) and information relating to Coram that is based on the beliefs of the management of Coram, as well as, assumptions made by and information currently available to the management of Coram. The company's actual results may vary materially from the forward-looking statements made in this report due to important factors such as the outcome of bankruptcy proceedings of the Debtors and certain other factors, which are described in greater detail later in this Item 7. under the caption "Risk Factors." When used in this report, the words "estimate," "project," "believe," "anticipate," "intend," "expect" and similar expressions are intended to identify forward-looking statements. Such statements reflect the current views of management with respect to future events based on currently available information and are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in such forward-looking statements. For a discussion of such risks, see "Risk Factors." Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. Management does not undertake any obligation to publicly release any revisions to these forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

The company's consolidated financial statements have been prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Debtors' bankruptcy filings and circumstances relating thereto, including the company's leveraged financial structure and cumulative losses from operations, such realization of assets and liquidation of liabilities is subject to significant uncertainty. During the pendency of the Debtors' Chapter 11 bankruptcy proceedings, the company may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the consolidated financial statements. Further, a plan of reorganization filed in the Chapter 11 proceedings could materially change the amounts reported in the consolidated financial statements, which do not give effect to any adjustments of the carrying value of assets or liabilities that might be necessary as a consequence of a plan of reorganization. The company's ability to continue as a going concern is dependent upon, among other things, confirmation of a plan of reorganization, future profitable operations, the ability to comply with the terms of the company's financing agreements, the ability to remain in compliance with the physician ownership and referral provisions of the Omnibus Budget Reconciliation Act of 1993 (commonly known as "Stark II") and the ability to generate sufficient cash from operations and/or financing arrangements to meet obligations.

*Background.* During 2000, Coram and its subsidiaries were engaged primarily in two principal lines of business: (i) alternate site (outside the hospital) infusion therapy, including non-intravenous home health products such as durable medical equipment and respiratory therapy services, and (ii) pharmacy benefit management and specialty mail-order pharmacy services. Effective July 31, 2000, the company sold its pharmacy benefit management and specialty mail-order pharmacy services business to Curascript Pharmacy, Inc. and Curascript PBM Services, Inc. (collectively the "Buyers"). The Buyers were effectively a management-led group that was financed by GTCR Golder Rauner, L.L.C. Other services offered by Coram include centralized management, administration and clinical support for clinical research trials.

Also, Coram's R-Net subsidiaries are being liquidated through proceedings that are currently pending in the United States Bankruptcy Court for the District of Delaware. These proceedings originated in August 1999 following the filing of an involuntary bankruptcy petition against Coram Resource Network, Inc. in such court. All of the R-Net locations have been closed in connection with the pending liquidation of R-Net. Additionally, Coram employees who were members of the Resource Network Subsidiaries' Board of Directors resigned during the year ended December 31, 2000, and currently only the Chief Restructuring Officer appointed by the Bankruptcy Court remains on the Board of Directors to manage and operate the liquidation of the R-Net business. See Note 4 to the company's Consolidated Financial Statements.

*Reorganization.* On August 8, 2000, CHC and CI filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). Following the filing of the voluntary Chapter 11 petitions, the Debtors have been operating as debtors-in-possession subject to the jurisdiction of the Bankruptcy Court. None of the company's other subsidiaries is a debtor in the proceeding. The Debtors' need to seek the relief afforded by the Bankruptcy Code was due, in part, to its requirement to remain in compliance with the physician ownership and referral provisions of Stark II after December 31, 2000 and the scheduled May 27, 2001 maturity of the Series A Senior Subordinated Unsecured Notes. The Debtors sought advice and counsel from a variety of sources and, in connection therewith, the Independent Committee of the Board of Directors unanimously concluded that the bankruptcy and restructuring were the only viable alternatives.

JSP 01824

On August 9, 2000, the Bankruptcy Court approved the Debtors' motions for: (i) payment of all employee wages and salaries and certain benefits and other employee obligations; (ii) payment of critical trade vendors, utilities and insurance in the ordinary course of business for both pre and post-petition expenses; (iii) access to a debtor-in-possession financing arrangement (see Note 8 to the company's Consolidated Financial Statements for details of the executed agreement); and (iv) use of all company bank accounts for normal business operations. In September 2000, the Bankruptcy Court approved the Debtors' motion to reject four unexpired, non-residential real property leases and any associated subleases. The rejected leases include underutilized locations in: (i) Allentown, Pennsylvania; (ii) Denver, Colorado; (iii) Philadelphia, Pennsylvania; and (iv) Whippany, New Jersey. Additionally, on January 25, 2001, the Bankruptcy Court approved a motion to extend the period of time in which the Debtors can reject unexpired leases of non-residential real property to May 4, 2001. Certain other motions filed by the Debtors have been granted and others are presently pending.

In September 2000 and October 2000, the Bankruptcy Court approved payments of up to approximately $2.6 million for retention bonuses payable to certain key employees. The bonuses were scheduled to be paid in two equal installments; (i) the later of the date of emergence from bankruptcy or December 31, 2000 and (ii) December 31, 2001. Due to events that have delayed the emergence from bankruptcy, the Bankruptcy Court approved early payment of the first installment to most individuals within the retention program and such payments, aggregating approximately $0.7 million, were made on March 15, 2001. The remaining portion of the first installments of approximately $0.5 million are scheduled for payment upon approval of a plan of reorganization by the Bankruptcy Court, and the second installment remains scheduled to be paid on December 31, 2001.

The Debtors are currently paying the post-petition claims of their vendors in the ordinary course of business and are, pursuant to an order of the Bankruptcy Court, causing their own subsidiaries to pay their own debts in the ordinary course of business. Even though the filing of the Chapter 11 cases constituted defaults under the company's principal debt instruments, the Bankruptcy Code imposes an automatic stay that will generally preclude the creditors and other interested parties under such arrangements from taking remedial action in response to any such resulting default without prior Bankruptcy Court approval.

On September 11, 2000, the Resource Network Subsidiaries filed a motion in the Debtors' Chapter 11 proceedings seeking, among other things, to have the two separate bankruptcy proceedings substantively consolidated into one proceeding. The Resource Network Subsidiaries and the Debtors engaged in discovery related to this substantive consolidation motion and, in connection therewith, the parties reached a settlement agreement in November 2000. See Note 13 to the company's Consolidated Financial Statements for further details.

All of the R-Net locations have effectively been closed in connection with the pending liquidation of R-Net. Additionally, Coram employees who were members of the Resource Network Subsidiaries' Board of Directors resigned during the year ended December 31, 2000, and currently only the Chief Restructuring Officer appointed by the Bankruptcy Court remains on the Board of Directors to manage and operate the liquidation of the R-Net business.

On the same day as the Chapter 11 cases were filed, the Debtors filed their joint plan of reorganization (the "Joint Plan") and their joint disclosure statement with the Bankruptcy Court. The Joint Plan was subsequently amended and restated (the "Restated Joint Plan") and, on or about October 10, 2000, the Restated Joint Plan and the First Amended Disclosure Statement with respect to the Restated Joint Plan was approved for distribution by the Bankruptcy Court. Among other things, the Restated Joint Plan provided for: (i) a conversion of all of the CI obligations represented by the company's Series A Senior Subordinated Unsecured Notes (the "Series A Notes") and the Series B Senior Subordinated Unsecured Convertible Notes (the "Series B Notes") into (a) a four-year, interest only note in the principal amount of $180 million, that would bear interest at the rate of 9% per annum and (b) all of the equity in the reorganized CI; (ii) the payment in full of all secured, priority and general unsecured debts of CI; (iii) the payment in full of all secured and priority claims against CHC; (iv) the impairment of certain general unsecured debts of CHC, including, among others, CHC's obligations under the Series A Notes and the Series B Notes; and (v) the complete elimination of the equity interests of CHC. Furthermore, pursuant to the Restated Joint Plan, CHC would be dissolved as soon as practicable after the effective date of the Restated Joint Plan and the stock of CHC would no longer be publicly traded. Therefore, under the Debtors' Restated Joint Plan, as filed, the existing stockholders of CHC would receive no value for their shares and all of the outstanding equity of CI as the surviving entity would be owned by the holders of the company's Series A Notes and Series B Notes.

Representatives of the company negotiated the principal aspects of the Joint Plan with representatives of the holders of the company's Series A Notes and Series B Notes and Senior Credit Facility prior to the filing of such Joint Plan.

26

JSP 01825

On or about October 20, 2000, the Restated Joint Plan and First Amended Disclosure Statement were distributed for a vote among persons holding impaired claims that are entitled to a distribution under the Restated Joint Plan. The Debtors did not send ballots to the holders of other types of claims and interested parties, including equity holders; however, the holders of such claims and interested parties are deemed to reject the plan in any event. The tabulated vote of the unsecured creditors was in favor of the company's Restated Joint Plan. A confirmation hearing was held on December 21, 2000 at which time the Restated Joint Plan was not approved by the Bankruptcy Court. On December 28, 2000, the Bankruptcy Court extended the period during which the Debtors have the exclusive right to file a plan or plans before the Bankruptcy Court to March 28, 2001. Additionally, the Bankruptcy Court extended the Debtors' exclusive period to solicit acceptances of any filed plan or plans to May 28, 2001. Management has petitioned the Bankruptcy Court for additional extensions of such exclusivity periods.

In order for the company to remain compliant with the requirements of Stark II, on December 29, 2000, CI exchanged approximately $97.7 million of the Series A Notes and approximately $11.6 million of accrued but unpaid interest on the Series A Notes and the Series B Notes in exchange for 905 shares of CI Series A Cumulative Preferred Stock (see Notes 8 and 11 to the company's Consolidated Financial Statements for further details). This transaction generated an extraordinary gain on troubled debt restructuring of approximately $107.8 million, net of tax, and at December 31, 2000 the company's stockholders' equity exceeded the minimum Stark II requirement necessary to comply with the public company exemption. See Note 13 to the company's Consolidated Financial Statements for further discussion regarding Stark II.

On or about February 6, 2001, the Official Committee of the Equity Security Holders (the "Equity Committee") filed a motion with the Bankruptcy Court seeking permission to bring a lawsuit directly against CHC's Chief Executive Officer, a former member of CHC's Board of Directors and Cerberus Partners, L.P. (a party to the company's debtor-in-possession financing agreement, Senior Credit Facility and Securities Exchange Agreement). On February 26, 2001, the Bankruptcy Court ruled that the Equity Committee's motion would not be productive at that time and, accordingly, the motion was denied without prejudice. See Note 13 to the company's Consolidated Financial Statements for further details.

On the same day, the Bankruptcy Court approved the Debtors' motion and appointed Goldin Associates, L.L.C. ("Goldin") as independent restructuring advisors to the Debtors. Goldin will provide consulting and advisory support services designed to assist the Debtors in concluding their bankruptcy proceedings. Among other things, the scope of Goldin's services include: (i) reporting its findings to the Independent Committee of the Board of Directors (the "Independent Committee"), including its assessment of the appropriateness of the Restated Joint Plan, and advising the Independent Committee respecting an appropriate course of action calculated to bring the Debtors' bankruptcy proceedings to a fair and satisfactory conclusion; (ii) preparing a written report as may be required by the Independent Committee and/or the Bankruptcy Court; and (iii) being available to appear before the court and provide testimony. Goldin was also appointed as an arbiter between the Debtors and the Equity Committee.

Based upon Goldin's findings and recommendations, the Debtors may develop and submit a new joint plan of reorganization to the Bankruptcy Court. However, if the Debtors' exclusivity periods are terminated by one or more interested parties, it is possible that one or more holders of claims or interests in the Debtors will file a plan or plans with the Bankruptcy Court. Any new plan or plans must be approved for distribution by the Bankruptcy Court, voted upon by certain impaired creditors and equity holders of the Debtors and approved by the Bankruptcy Court to become effective after certain findings required by the Bankruptcy Code are made. The Bankruptcy Court may confirm a plan of reorganization notwithstanding the non-acceptance of the plan by an impaired class of creditors or equity holders if certain conditions of the Bankruptcy Code are satisfied. No assurances can be given regarding the timing of or whether the Debtors will submit a new plan or what the terms of such plan may be.

Under the Bankruptcy Code, certain claims against the Debtors in existence prior to the filing date are stayed while the Debtors continue their operations as debtors-in-possession. These claims are reflected in the December 31, 2000 Consolidated Balance Sheet as liabilities subject to compromise. Additional Chapter 11 claims have arisen and may continue to arise subsequent to the filing date resulting from the rejection of executory contracts, including certain leases, and from the determination by the Bankruptcy Court of allowed claims for contingencies and other disputed amounts. Parties affected by the rejections may file claims with the Bankruptcy Court in accordance with the provisions of the Bankruptcy Code and applicable rules. Claims secured by the Debtors' assets also are stayed, although the holders of such claims have the right to petition the Bankruptcy Court for relief from the automatic stay to permit such creditors to foreclose on the property securing their claims. Additionally, certain claimants have sought relief from the Bankruptcy Court to remove the stay against their actions in order to continue pursuit of their claims against the Debtors or the Debtors' insurance carriers.

27

The holders of Coram, Inc.'s Series A Cumulative Preferred Stock continue to maintain an unsecured creditors' position within the Debtors' bankruptcy proceedings in the aggregate amount of their liquidation preference. Notwithstanding the debt to equity exchange, the aforementioned holders' priority in the Debtors' bankruptcy proceedings will be no less than it was immediately prior to said exchange.

Schedules were filed with the Bankruptcy Court setting forth the assets and liabilities of the Debtors as of the filing date as shown by the Debtors' accounting records. Differences between amounts shown by the Debtors and claims filed by creditors are being investigated and resolved. The ultimate amount and the settlement terms for such liabilities will be subject to the New Joint Plan. The New Joint Plan, once developed, will be subject to a vote by the Debtors' impaired creditors and confirmation by the Bankruptcy Court, as described above.

*Business Strategy.* The major strategic alternatives and initiatives currently being implemented by Coram include: (i) renewed focus on the growth in net revenue from core therapies provided by the infusion therapy division; (ii) liquidation of R-Net; (iii) the continued investment into and development of services provided by CTI; (iv) cost reduction initiatives (including a reimbursement site consolidation plan); (v) cash collections; and (vi) submission of a new plan of reorganization by the Debtors. Combined, management believes that success in the foregoing will improve Coram's financial prospects and improve and stabilize relationships with payers and referral sources. There can be no assurance that any other strategic alternatives will be consummated or will be available to Coram on commercially acceptable terms.

In December 1999, Coram announced that it was repositioning its business to focus on its core alternate site infusion therapy business and the clinical research business operated by its subsidiary, CTI. Accordingly, Coram's primary business strategy is to focus its efforts on the delivery of its core infusion therapies, such as nutrition, anti-infective therapies, IVIG and coagulant and blood clotting therapies for persons with hemophilia. To that end, Coram has established product managers with dedicated sales, marketing and clinical resources aimed at expanding Coram's growth in these areas. Coram has also implemented programs focused on the reduction and control of cost of services and operating expenses, assessment of poorly performing branches and review of branch efficiencies. Coram management is also reviewing the way the company provides nursing care and is implementing changes to its practices to maintain Coram's high level of patient satisfaction and effective clinical results while reducing the actual number of nursing visits.

Management throughout the company is continuing to concentrate on reimbursement by emphasizing improved billing and cash collection methods, continued assessment of systems support for reimbursement and concentration of the company's expertise and managerial resources into certain reimbursement locations. In December 2000, Coram announced that as part of its continuing efforts to improve efficiency and overall performance, several Patient Financial Service Centers (reimbursement sites) were being consolidated and the related reimbursement positions were to be eliminated. By consolidating to fewer sites, management expects to implement improved training, more easily standardize "best demonstrated practices," enhance specialization related to payers such as Medicare and achieve more consistent and timely cash collections. Management does not expect this change to affect Coram's patients or payers; but believes, instead, that in the long-term they will receive better, more consistent service. The transition is expected to be accomplished in stages beginning April 1, 2001 and ending in the third quarter of the same year. Management has taken certain actions to mitigate the potential shortfall in cash collections during the upcoming transition period, including, but not limited to, offering incentives for personnel to stay with the company until the completion of their corresponding regional consolidation. No assurances can be given that the consolidation of the company's Patient Financial Service Centers will be completed by the end of the third quarter of 2001, that the consolidation will be successful in enhancing timely reimbursement or that the company will not experience a significant shortfall in cash collections during or after the transition period, which is described in greater detail in this Item 7 under the caption "Risk Factors."

*Factors Affecting Recent Operating Results.* The following list summarizes the major events or factors impacting Coram's operating and financial condition in 2000, and which may impact Coram in the future:

(i)   maintaining compliance with the provisions of Stark II by, in part, exchanging a sufficient amount of debt and related accrued interest for equity in the form of Coram, Inc. Series A Cumulative Preferred Stock in order to increase its stockholders' equity above the required levels;

(ii)  the Debtors' Chapter 11 bankruptcy filings and their related reorganization expenses including, but not limited to, professional fees;

28

JSP 01827

(iii) continued refinement and completion of the Caremark Business Consolidation Plan and the Coram Restructure Plan, as described in Note 6 to the company's Consolidated Financial Statements;

(iv) the sale of the CPS business to Curascript Pharmacy, Inc. and Curascript PBM Services, Inc. on July 31, 2000;

(v) the Chapter 11 bankruptcy filings involving the Resource Network Subsidiaries and their anticipated liquidation through such proceedings;

(vi) resolution of certain litigation between Aetna and the company, which was settled amicably amongst the parties on April 20, 2000;

(vii) an increased focus on the company's durable medical equipment and respiratory services business, including non-consolidated joint ventures, and the significant number of days that elapse between the date that services are rendered and the reimbursement for those services;

(viii) ongoing pricing pressure in the company's infusion business as a result of an unfavorable shift in payer mix from private indemnity insurers to managed care organizations and other contracted payers, and intense competition among infusion providers. The following table sets forth the approximate percentages of the company's infusion therapy net revenue from certain categories of payers for the three years ended December 31, 2000;

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2000 | 1999 | 1998 |
| Managed care organizations and other contracted payers | 59% | 58% | 51% |
| Medicare and Medicaid programs | 23% | 22% | 24% |
| Private indemnity insurance and other non-contracted payers | 18% | 20% | 25% |
| Totals | 100% | 100% | 100% |

(ix) increased competition from hospitals and physicians that have sought to increase the scope of services they offer through their facilities and offices, including services similar to those offered by the company, or that have entered into risk-sharing relationships with third-party payers pursuant to which they have been delegated control over the provision of a wide variety of healthcare services, including the services offered by the company; and

(x) increased costs associated with providing certain infusion therapy services offered by Coram, including increased costs for clinical staffing, product delivery, on-call personnel and other volume related costs associated with such therapies combined with increased costs for certain blood and blood derivative products that are in short supply and an increase in the number of patients receiving such therapies.

Results of Operations

*Year Ended December 31, 2000 Compared to Year Ended December 31, 1999*

*Discontinued Operations.* As discussed in Note 4 to the company's Consolidated Financial Statements, the company considers R-Net's results as part of discontinued operations; however, for the year ended December 31, 2000, the Resource Network Subsidiaries had no operations. The following discussion of Coram's financial condition and results of operations during 2000 and 1999 excludes the discontinued operations for R-Net.

*Net Revenue.* Net revenue decreased $56.4 million or 10.8% to $464.8 million in 2000 from $521.2 million in 1999. The decrease is primarily due to a decrease in CPS net revenue of approximately $25.2 million as a result of the sale of the CPS business on July 31, 2000, a decrease in infusion net revenue due, in part, to the termination of its National Ancillary Services Agreement with Aetna and corporate initiatives to focus on core therapies.

*Gross Profit.* Gross profit increased $10.8 million to $123.2 million or a gross margin of 26.5% in 2000 from $112.3 million or a gross margin of 21.6% in 1999. The gross profit and gross margin percentage increases are primarily due to a more favorable product/therapy mix, increased high margin CTI business and certain cost reduction programs implemented in December 1999. The components of gross profit are as follows (in millions):

29

JSP 01828

| | For the Year Ended December 31, | |
|---|---|---|
| | 2000 | 1999 |
| Infusion | $ 113.5 | $ 99.9 |
| CPS | 8.1 | 11.3 |
| CTI | 1.6 | 1.1 |
| Total gross profit | $ 123.2 | $ 112.3 |

*Selling, General and Administrative ("SG&A") Expenses.* SG&A decreased $6.5 million or 6.7% to $90.3 million in 2000 from $96.8 million in 1999. The decrease is primarily due to the sale of CPS effective July 31, 2000. In addition, certain cost reduction programs were implemented in December 1999 contributing to the favorable expense decrease in 2000. Offsetting the 2000 decrease was an increase in incentive compensation due to certain bonus plans implemented in 2000. In 1999, the recovery of a note receivable of approximately $1.8 million favorably impacted expenses for the year.

*Provision for Estimated Uncollectible Accounts.* The provision for estimated uncollectible accounts is $9.8 million or 2.1% of net revenue in 2000 compared to $28.3 million or 5.4% of net revenue in 1999. The percentage decrease is due primarily to the company's increased collection efforts and certain recoveries of amounts previously deemed to be uncollectible. In 1999, the company's provision was higher as a result of charges of $2.5 million for certain receivables that arose in relation to the R-Net business, receivables due from other healthcare providers or payers that have filed for protection under applicable bankruptcy or receivership laws and other charges of $11.2 million that related to an overall deterioration of the company's accounts receivable aging.

*Restructuring Cost (Recovery) Expense.* During 2000, management re-evaluated the reserves necessary to complete its restructuring plans and, as a result, recognized a net restructuring reversal of $0.3 million. In 1999, Coram initiated two company-wide restructuring plans, the "Coram Restructure Plan" and the "Field Reorganization Plan," and charged approximately $5.8 million to operations as restructuring charges. See Note 6 to the company's Consolidated Financial Statements for further details.

*Loss on Impairment of Long-Lived Assets.* Coram recognized impairments of goodwill and other long-lived assets of $8.3 million and $9.1 million for the years ended December 31, 2000 and 1999, respectively. See Note 2 to the company's Consolidated Financial Statements for further details. These impairment losses relate principally to operating losses of certain infusion business branches that resulted following the termination of agreements with Aetna, the discontinuance of R-Net and certain other operating factors.

*Operating Income (Loss).* Coram had operating income of $4.8 million during 2000 compared to a loss of $38.5 million during 1999. The increase in operating income is due primarily to the increase in gross profit from core therapies, cost reduction efforts, lower net restructuring costs in 2000 and a reduction in the provision for estimated uncollectible accounts.

*Interest Expense.* Interest expense decreased $3.0 million to $26.8 million in 2000 from $29.8 million in 1999. The decrease is primarily due to the forbearance of interest on the Series A and Series B Notes which resulted in a lower effective interest rate for book purposes in 2000 and (ii) the reduced outstanding borrowings on the Senior Credit Facility and the Series A Notes as a result of the application of the proceeds from the sale of the CPS business on July 31, 2000. See Notes 5 and 8 to the company's Consolidated Financial Statements for further details.

*Gains on Sales of Businesses.* During 2000, the company recorded gains on sales of businesses of $18.6 million consisting primarily of the gain on sale of the CPS business and the receipt of a contingent earn-out payment relating to one of the company's operating subsidiaries. See Note 5 to the company's Consolidated Financial Statements for further details.

*Other Income (Expense), Net.* In 2000, the company recognized $3.0 million in other income, compared to $0.7 million in 1999. The increase is primarily due to recovery of a non-operating receivable of approximately $2.0 million and the receipt of approximately $1.0 million in life insurance proceeds, offset by the recognition of a $0.7 million reserve for an escrow deposit receivable related to the 1997 sale of the company's lithotripsy business to Integrated Health Services, Inc., which filed for protection under Chapter 11 of the United States Bankruptcy Code during 2000.

*Reorganization Expenses, Net.* In 2000, the company recognized $8.3 million in net reorganization expenses related to the Debtors' Chapter 11 bankruptcy proceedings. These expenses include, but are not limited to, professional fees, expenses related to success and retention plans and United States Trustee fees, offset by interest earned on accumulated cash due to the Debtors not paying their pre-petition liabilities and other expenditures during the Chapter 11 proceedings. See Note 3 to the company's Consolidated Financial Statements.

30

JSP 01829

*Income Tax Expense*. See Note 9 to the company's Consolidated Financial Statements for discussion of the variance between the statutory income tax rate and the company's effective income tax rate

*Minority Interests in Net Income of Consolidated Joint Ventures*. Minority interests in net income of consolidated joint ventures decreased $0.9 million to $0.6 million in 2000 from $1.5 million in 1999. The reduction was primarily due to reduced profitability of certain majority owned joint ventures and the acquisition of the remaining interest of a joint venture in December 1999 which was previously owned 51% by the company.

*Loss from Discontinued Operations*. During December 1999, as a result of the bankruptcy proceedings pending against the Resource Network Subsidiaries, Coram reclassified the operating losses of this division to discontinued operations for all periods prior to the measurement date of November 12, 1999. The $28.4 million for the year ended December 31, 1999 represents operating losses through such measurement date. See Note 4 to the company's Consolidated Financial Statements for further details.

*Loss on Disposal of Discontinued Operations*. During 1999, Coram recorded charges in the aggregate amount of $17.6 million, including estimated losses through final disposition of the Resource Network Subsidiaries, severance, lease obligations, asset impairments and legal costs related to the bankruptcy and wind-down of R-Net's operations. The 2000 net charge of $0.7 million includes additional reserves for litigation and other wind-down costs, net of certain insurance recoveries, facility cost reserve reductions resulting from the Debtors' bankruptcy proceedings, reserve adjustments due to changes in the estimated amounts of legal and professional fees necessary to complete R-Net's Chapter 11 bankruptcy proceedings and a $0.5 million settlement with the Debtors for a certain substantive consolidation matter. See Note 4 to the company's Consolidated Financial Statements for further details.

*Extraordinary Gain on Troubled Debt Restructuring*. With approval from the Bankruptcy Court, the Debtors exchanged debt and related interest for equity in the form of Coram, Inc. Series A Cumulative Preferred Stock and, as a result, recognized an extraordinary gain of approximately $107.8 million, net of $0.4 million of taxes. See Note 8 to the company's Consolidated Financial Statements for further details.

*Year Ended December 31, 1999 Compared to Year Ended December 31, 1998*

*Discontinued Operations*. As discussed in Note 4 to the company's Consolidated Financial Statements, the company considers R-Net's results as part of discontinued operations. Had R-Net been included in continuing operations, the following would have been contributed to the company's operations (in millions):

|  | For the Year Ended December 31, | |
|---|---|---|
|  | 1999 | 1998 |
| Net revenue | $ 74.4 | $ 61.6 |
| Gross (loss) profit | (8.0) | 13.6 |
| Operating loss | (28.4) | (0.1) |

The following discussion of Coram's financial condition and results of operations during 1999 and 1998 excludes the discontinued operations for R-Net.

*Net Revenue*. Net revenue increased $76.1 million or 17.1% from $445.1 million in 1998 to $521.2 million in 1999. The net revenue increase can be primarily attributed to (i) an increase in infusion therapy business of $36.1 million resulting principally from an 8.9% increase in net revenue per patient and (ii) an increase of approximately $38.8 million from the CPS division, which resulted from expansion of services and improved sales efforts.

*Gross Profit*. Gross profit decreased $6.1 million from $118.4 million or a gross margin of 26.6% in 1998 to $112.3 million or a gross margin of 21.6% in 1999. The gross margin percent decrease was due to a shift to higher cost therapies, partially offset by a gross margin improvement in the CPS and CTI divisions. The components of gross profit are as follows (in millions):

|  | For the Year Ended December 31, | |
|---|---|---|
|  | 1999 | 1998 |
| Infusion | $ 99.9 | $ 114.4 |
| CPS | 11.3 | 3.9 |
| CTI | 1.1 | 0.1 |
| Total gross profit | $ 112.3 | $ 118.4 |

JSP 01830

*Selling, General and Administrative ("SG&A") Expenses.* SG&A increased $13.5 million or 16.2 % from $83.3 million in 1998 to $96.8 million in 1999. Of this increase, $5.5 million was related to the expansion of the CPS division. The remaining increase was related to an increase in personnel costs in the normal course of business, partially offset by the recovery of a note receivable of approximately $1.8 million which favorably impacted expenses in 1999.

*Provision for Estimated Uncollectible Accounts.* The provision for estimated uncollectible accounts was $28.3 million or 5.4 % of net revenue in 1999 compared to $14.8 million or 3.3 % of net revenue in 1998. In 1999, the company's provision was higher as a result of charges of $2.5 million for certain receivables that arose in relation to the R-Net business, receivables due from other healthcare providers or payers that have filed for protection under applicable bankruptcy or receivership laws and other charges of $11.2 million that related to an overall deterioration of the company's accounts receivable aging.

*Restructuring Cost (Recovery) Expense.* During 1999, Coram recorded charges of $5.8 million for estimated costs related to the Field Reorganization Plan and Coram Restructure Plan. In 1998, it was determined that the original reserve established in 1994 as a result of the Four Way Merger, the "Coram Consolidation Plan," was substantially complete and the remaining reserve of approximately $3.9 million was reversed. See Note 6 to the company's Consolidated Financial Statements.

*Loss on Impairment of Long-Lived Assets.* Coram recognized an impairment on goodwill and other long-lived assets of $9.1 million for the year ended December 31, 1999. See Note 2 to the company's Consolidated Financial Statements for further details. This impairment loss related primarily to operating losses of certain infusion business branches that resulted following the termination of agreements with Aetna, the discontinuance of R-Net and certain other operating factors.

*Operating Income (Loss).* Coram had an operating loss of $38.5 million during 1999 compared to income of $13.0 million during 1998. The decrease is due primarily to the decrease in gross profit, the increase in SG&A expenses, the increase in the provision for uncollectible accounts, the increase in restructuring costs and the impairment of goodwill and other long-lived assets.

*Interest Expense.* Interest expense decreased by $2.9 million to $29.8 million in 1999 from $32.7 million in 1998. The decrease is primarily due to a $14.9 million expense reduction resulting from the completion of the restructuring of the company's former credit facilities, offset by an increase of $3.0 million attributable to draws of $44 million on the senior credit facility, an increase in the principal amounts outstanding under the Series A and Series B Senior Notes as a result of PIK interest payments and an increase in the interest rate on the Series A Notes.

*Gains on Sales of Businesses.* In 1998, the company recorded gains on the sales of businesses totaling $1.0 million. Included therein was $0.7 million in connection with the sale of the company's remaining lithotripsy partnership. See Note 5 to the company's Consolidated Financial Statements for further details.

*Income Tax Expense.* See Note 9 to the company's Consolidated Financial Statements for discussion of the variance between the statutory income tax rate and the company's effective income tax rate.

*Loss from Discontinued Operations.* During December 1999, as a result of the bankruptcy proceedings pending against the Resource Network Subsidiaries, Coram reclassified the operating losses of this division to discontinued operations for all periods prior to the measurement date of November 12, 1999. The $28.3 million increase in the loss from discontinued operations during the year ended December 31, 1999 represents operating losses through such measurement date and such increase is principally due to the termination of the Aetna Master Agreement. See Note 4 to the company's Consolidated Financial Statements for further details.

*Loss on Disposal of Discontinued Operations.* During 1999, Coram recorded charges in the aggregate amount of $17.6 million, including estimated losses through final disposition of the Resource Network Subsidiaries, severance, lease obligations, asset impairments and legal costs related to the bankruptcy and wind-down of R-Net's operations. See Note 4 to the company's Consolidated Financial Statements for further details.

JSP 01831

## Quarterly Results (unaudited)

The following summarizes selected quarterly financial information with respect to the company's operations for the last eight fiscal quarters. Amounts are in thousands, except per share data.

| | 2000 Quarter Ended | | | | 1999 Quarter Ended | | | |
|---|---|---|---|---|---|---|---|---|
| | Dec. 31 | Sept. 30 | Jun. 30 | Mar. 31 | Dec. 31 | Sept. 30 | Jun. 30 | Mar. 31 |
| Net revenue | $ 96,934 | $ 102,866 | $ 130,224 | $ 134,796 | $ 134,338 | $ 132,939 | $ 129,571 | $ 124,348 |
| Cost of service | 69,265 | 75,667 | 96,069 | 100,655 | 108,638 | 102,370 | 101,150 | 96,720 |
| Gross profit | 27,669 | 27,199 | 34,155 | 34,141 | 25,700 | 30,569 | 28,421 | 27,628 |
| Operating expenses: | | | | | | | | |
| Selling, general and administrative expenses | 19,711 | 22,109 | 25,053 | 23,436 | 30,718 | 23,538 | 23,612 | 18,941 |
| Provision for estimated uncollectible Accounts | (373) | 3,357 | 3,548 | 3,243 | 16,431 | 3,690 | 4,141 | 4,048 |
| Amortization of goodwill | 2,557 | 2,562 | 2,530 | 2,578 | 2,625 | 2,711 | 2,716 | 2,732 |
| Restructuring cost (recovery) expense | (322) | -- | -- | -- | 4,881 | -- | -- | 950 |
| Losses on impairments of long-lived assets | 8,322 | -- | -- | -- | 9,100 | -- | -- | -- |
| Total operating expenses | 29,894 | 28,028 | 31,131 | 29,277 | 63,755 | 29,939 | 30,469 | 26,671 |
| Operating income (loss) from continuing Operations | (2,225) | (829) | 3,024 | 4,864 | (38,055) | 630 | (2,048) | 957 |
| Other income (expenses): | | | | | | | | |
| Interest income | 502 | 195 | 135 | 159 | 140 | 216 | 244 | 55 |
| Interest expense | (6,473) | (6,866) | (6,771) | (6,676) | (7,570) | (8,110) | (7,524) | (6,559) |
| Equity in net income of unconsolidated joint Ventures | 61 | 322 | 117 | 259 | 248 | 193 | -- | 1 |
| Gains on sales of businesses | 193 | 11,456 | -- | -- | -- | -- | -- | -- |
| Gains (losses) on dispositions of property and equipment, net | (126) | (82) | 9 | (25) | (60) | 115 | (110) | (52) |
| Other income, net | 2,396 | 13 | 52 | 11 | 119 | 47 | 40 | 199 |
| Income (loss) from continuing operations before reorganization expenses, income taxes, minority interests and extraordinary gain on troubled debt restructuring | (5,674) | 11,209 | (3,433) | (1,408) | (45,178) | (6,909) | (9,398) | (5,399) |
| Reorganization expenses, net | (6,459) | (1,805) | -- | -- | -- | -- | -- | -- |
| Income (loss) from continuing operations before income taxes, minority interests and extraordinary gain on troubled debt restructuring | (12,133) | 9,404 | (3,433) | (1,408) | (45,178) | (6,909) | (9,398) | (5,399) |
| Income tax expense | -- | 75 | 75 | 100 | 65 | 125 | 175 | 75 |
| Minority interests in net income (loss) of Consolidated joint ventures | 105 | 129 | 356 | (19) | 287 | 176 | 579 | 428 |
| Income (loss) from continuing operations before extraordinary gain on troubled debt restructuring | (12,238) | 9,200 | (3,864) | (1,489) | (45,530) | (7,210) | (10,152) | (5,902) |
| Discontinued Operations: | | | | | | | | |
| Income (loss) from operations | -- | -- | -- | -- | 1,870 | (7,957) | (27,841) | 5,517 |
| Income (loss) from disposal | 7,495 | 324 | (98) | (3,383) | (17,618) | -- | -- | -- |
| Total discontinued operations | 7,495 | 324 | (98) | (3,383) | (15,748) | (7,957) | (27,841) | 5,517 |
| Extraordinary gain on troubled debt restructuring, net of tax | 107,772 | -- | -- | -- | -- | -- | -- | -- |
| Net income (loss) | $ 98,029 | $ 9,524 | $ (3,962) | $ (4,872) | $ (61,278) | $ (15,167) | $ (37,993) | $ (385) |
| Earnings (Loss) Per Share: | | | | | | | | |
| Basic: | | | | | | | | |
| Income (loss) from continuing operations | $ (0.25) | $ 0.18 | $ (0.08) | $ (0.03) | $ (0.91) | $ (0.15) | $ (0.21) | $ (0.12) |
| Income (loss) from discontinued operations | 0.05 | 0.01 | -- | (0.07) | (0.32) | (0.16) | (0.56) | 0.11 |
| Extraordinary gain on troubled debt restructuring | 2.17 | | | | | | | |
| Net income (loss) per common share | $ 1.97 | $ 0.19 | $ (0.08) | $ (0.10) | $ (1.23) | $ (0.31) | $ (0.77) | $ (0.01) |
| Diluted: | | | | | | | | |
| Income (loss) from continuing operations | $ (0.25) | $ 0.17 | $ (0.08) | $ (0.03) | $ (0.91) | $ (0.15) | $ (0.21) | $ (0.12) |
| Income (loss) from discontinued operations | 0.05 | 0.01 | -- | (0.07) | (0.32) | (0.16) | (0.56) | 0.11 |
| Extraordinary gain on troubled debt restructuring | 2.17 | | | | | | | |
| Net income (loss) per common share | $ 1.97 | $ 0.18 | $ (0.08) | $ (0.10) | $ (1.23) | $ (0.31) | $ (0.77) | $ (0.01) |

The quarterly results have historically varied based upon unusual and infrequently occurring charges. See Note 15 to the company's Consolidated Financial Statements.

33

JSP 01832

**Liquidity and Capital Resources**

*Bankruptcy Proceedings.* The Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code on August 8, 2000. As of such date, the Debtors are operating as debtors-in-possession subject to the jurisdiction of the Bankruptcy Court. None of the company's other subsidiaries is a debtor in the proceeding. Although the filing of the Chapter 11 cases constitutes defaults under the company's principal debt instruments, Section 362 of the Bankruptcy Code imposes an automatic stay that will generally preclude creditors and other interested parties under such arrangements from taking remedial action in response to any such default without prior Bankruptcy Court approval. In addition, the Debtors may reject executory contracts and unexpired leases. Parties affected by the rejections may file claims with the Bankruptcy Court in accordance with the provisions of the Bankruptcy Code and applicable rules. See Note 3 to the company's Consolidated Financial Statements.

Schedules were filed with the Bankruptcy Court setting forth the assets and liabilities of the Debtors as of the filing date as shown by the Debtors' accounting records. Differences between amounts shown by the Debtors and claims filed by creditors are being investigated and resolved. The ultimate amount and the settlement terms for such liabilities is subject to the new plan of reorganization, which is yet to be developed. Therefore, it is not possible to fully or completely estimate the liquidation amount of the liabilities subject to compromise at December 31, 2000 due to the Debtors' Chapter 11 cases and the uncertainty surrounding the ultimate amount and settlement terms for such liabilities.

*Credit Facilities.* On August 20, 1998, the company entered into the Senior Credit Facility, which provided for the availability of up to $60.0 million for acquisitions, working capital, letters of credit and other corporate purposes. The terms of the agreement also provided for the issuance of letters of credit of up to $25.0 million provided that available credit would not fall below zero. On September 21, 2000 and January 29, 2001, the company permanently reduced the commitment to $2.7 million and $2.1 million, respectively, in order to reduce the fees related to commitments on which the company was not be able to borrow against due to the Debtors' bankruptcy proceedings. Effective February 6, 2001, the Senior Credit Facility lenders and the company terminated the agreement. As of December 31, 2000, the lenders had outstanding irrevocable letters of credit issued for the benefit of the company totaling $2.1 million. In connection with the termination of the Senior Credit Facility, the company established new letters of credit through Wells Fargo Bank Minnesota, NA ("Wells Fargo") and such new letters of credit are fully secured by interest bearing cash deposits of the company held by Wells Fargo.

The Debtors entered into a secured debtor-in-possession ("DIP") financing agreement with Madeleine L.L.C., an affiliate of Cerberus Partners, L.P. (a party to the Senior Credit Facility), as of August 30, 2000. The agreement provides that the Debtors could access, as necessary, up to $40 million depending upon borrowing base availability, for use in connection with the operations of their businesses and the businesses of their subsidiaries. On September 12, 2000, the Bankruptcy Court approved the DIP agreement. See Note 8 to the company's Consolidated Financial Statements for further details. Through April 2, 2001, no borrowings had been made under the DIP financing agreement; however, at such date, the borrowing base was approximately $35.5 million pursuant to the limitations of the DIP financing agreement.

On December 29, 2000, the Securities Exchange Agreement was amended ("Amendment No. 4") and an Exchange Agreement was simultaneously executed among the Debtors and Cerberus Partners, L.P., Goldman Sachs Credit Partners, L.P. and Foothill Capital Corporation (collectively the "Holders"). Pursuant to such arrangements, the Holders agreed to exchange approximately $97.7 million aggregate principal amount of the Series A Notes and $11.6 million of aggregate unpaid accrued contractual interest on the Series A Notes and the Series B Notes as of December 29, 2000 for 905 shares of Coram, Inc. Series A Cumulative Preferred Stock (see Note 11 to the company's Consolidated Financial Statements for further details regarding the preferred stock). Following the exchange, the Holders retain approximately $61.2 million aggregate principal amount of the Series A Notes and $92.1 million aggregate principal amount of the Series B Notes. Pursuant to Amendment No. 4, the per annum interest rate on both the Series A Notes and the Series B Notes has been adjusted to 9.0%. Moreover, the Series A Notes' and Series B Notes' original scheduled maturity dates of May 2001 and April 2008, respectively, have both been modified to June 30, 2001. Due to the Holders' receipt of consideration with a fair value less than the face value of the exchanged principal and accrued interest, the exchange transactions qualified as a troubled debt restructuring pursuant to Statement of Financial Accounting Standards No. 15, "Accounting by Debtors and Creditors for Troubled Debt Restructurings." In connection therewith, the company recognized an extraordinary gain of approximately $107.8 million, net of tax, in its Consolidated Statements of Income.

*General.* The company's consolidated financial statements have been prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Debtors' bankruptcy filings and circumstances relating thereto, including the company's leveraged financial structure and cumulative losses from operations, such realization of assets and liquidation of liabilities is subject to significant uncertainty. During

34

JSP 01833

the pendency of the Debtors' Chapter 11 bankruptcy proceedings, the company may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the consolidated financial statements. Further, any plan of reorganization filed in the Chapter 11 proceedings could materially change the amounts reported in the consolidated financial statements, which do not give effect to any adjustments of the carrying value of assets or liabilities that might be necessary as a consequence of any proposed plan of reorganization. The company's ability to continue as a going concern is dependent upon, among other things, confirmation of a plan of reorganization, future profitable operations, the ability to comply with the terms of the company's financing agreements, the ability to remain in compliance with the physician ownership and referral provisions of the Omnibus Budget Reconciliation Act of 1993, known as "Stark II," and the ability to generate sufficient cash from operations and/or financing arrangements to meet obligations.

*Cash and Cash Equivalents.* Cash and cash equivalents increased $20.7 million to $27.3 million at December 31, 2000 compared to $6.6 million at December 31, 1999.

Net cash provided by operating activities was approximately $42.6 million for the year ended December 31, 2000, compared to $9.5 million of net cash used in operating activities for the year ended December 31, 1999. The significant components of the operating cash flows are as follows (in millions):

|  | Years Ended December 31, | |
|  | 2000 | 1999 |
|---|---|---|
| Continuing operations after non-cash charges and before gains on sales of businesses | $ 22,547 | $ (1,661) |
| Changes in operating assets and liabilities, net: |  |  |
| Accounts receivable | 3,490 | (36,828) |
| Prepaid expenses, inventories and other assets | 8,275 | 5,136 |
| Current and other liabilities, including accrued interest | 12,418 | 26,203 |
| Cash basis restructuring costs | (3,505) | (2,375) |
| Cash used by reorganization items, net | (1,581) | -- |
| Miscellaneous, other | 919 | 2,057 |
| Totals | $ 42,563 | $ (9,468) |

The increase in the cash provided by continuing operations after non-cash charges and before gains on sales of businesses is principally attributable to (i) management's cost reduction programs implemented in December 1999, (ii) a favorable change in core therapy mix which provided a higher gross margin to the company and (iii) more efficient utilization of company resources toward profit generation.

The net change in cash provided by or (used in) the accounts receivable activity relates to (i) increased collection efforts in 2000 and certain recoveries of amounts previously deemed to be uncollectible, (ii) the absence of a continued build-up in the accounts receivable balances accompanying the CPS revenue growth due to disposition of the CPS business effective July 31, 2000 and (iii) an overall decline in the infusion therapy net revenue of approximately 7.4%, which is indicative of management's initiative to favorably change the core therapy mix.

Net cash provided by investing activities was $37.8 million for the year ended December 31, 2000 as compared to cash used for investing activities of $7.3 million in the year ended December 31, 1999. For 2000, cash provided by investing activities is primarily due to cash proceeds of $41.3 million from the sale of the CPS business and the receipt of a $0.3 million contingent earn-out payment related to one of the company's operating subsidiaries, offset by purchases of property and equipment totaling approximately $3.5 million.

Net cash used in financing activities was $56.0 million for the year ended December 31, 2000 compared to cash provided by financing activities of $43.4 million in the year ended December 31, 1999. For 2000, cash used in financing activities included net debt repayments of $54.1 million, debtor-in-possession financing fees of $0.5 million and cash distributions paid to minority interests of $1.4 million.

Management believes that the net costs for the Debtors' reorganization and bankruptcy proceedings will result in significant use of cash for the year ending December 31, 2001. These items principally consist of professional fees and expenses and employee retention payments. Management believes that such costs will primarily be funded through cash provided by operations and, if necessary, borrowings from the DIP financing agreement.

JSP 01834

The final liquidation of the Resource Network Subsidiaries through their bankruptcy proceedings may result in certain additional cash expenditures by the company beyond the cash accounts already deemed to be a part of R-Net's bankruptcy estate. However, management does not expect that such amounts, if any, will be material to the financial condition or cash flows of the company.

As of December 31, 2000, the company did not have any material commitments for capital expenditures; however, management is currently evaluating all of the company's information systems. Pending the outcome of this evaluation, certain commitments for material capital expenditures may result.

Coram is in a dispute with the Internal Revenue Service regarding certain tax refunds previously received by the company. Should it not prevail in the majority of the issues in dispute, Coram would need to access funds to address the alleged deficiency of approximately $12.7 million, plus interest and penalties. Furthermore, management cannot predict whether any future objections of the Official Committee of the Equity Security Holders in the Debtors' bankruptcy proceedings will be forthcoming or if they would prevent confirmation of a plan of reorganization set forth by the Debtors' management. Outcomes unfavorable to the company or unknown additional actions could require the company and the Debtors to access significant additional funds. See Notes 3, 4 and 13 to the company's Consolidated Financial Statements.

*Part A and Part B Medicare Surety Bonds.* As discussed in Item 1 under "Government Regulation," the Health Care Financing Administration ("HCFA") is reviewing the bonding requirements for Part A certified home health agencies and Part B suppliers as a condition of participation in the Medicare program. Management expects that the compliance date for having the necessary bonds in place will be sixty days after the publication of the final rule. Such bond amounts may be funded in whole or in part through cash generated from operations or from available funds under the terms of the DIP financing agreement. Any borrowings under the DIP financing agreement could reduce amounts available under that facility to fund other company capital requirements. In addition, depending upon the final regulations, the company may be able to establish letters of credit for the bonding requirement in whole or in part, however, such letters of credit may require the use of cash in order to be fully collateralized. Management also believes that another potential source for meeting a bonding requirement may be to obtain bonds through a qualified insurance carrier. No assurances can be given that capital generated by operations or funds under the terms of the DIP financing agreement or availability from an insurance carrier at a reasonable cost will satisfy these surety bond requirements, when finalized.

*Working Capital.* Working capital at December 31, 2000 is a deficit of $97.1 million compared to working capital surplus of $71.0 million at December 31, 1999, a decrease of $168.3 million. The change in working capital is primarily due to an increase in current liabilities relating to liabilities subject to compromise, which includes the full amount of the company's Series A Notes and the Series B Notes aggregating approximately $153.3 million, and accruals for management incentive compensation, as well as, administrative costs of the Debtors' bankruptcy proceedings. See Note 3 to the company's Consolidated Financial Statements.

*Accounts Receivable.* Coram maintains systems and processes to collect its accounts receivable as quickly as possible after the underlying service is rendered. Nevertheless, there is a spread between when the company collects payments for services and when the company pays for salaries, supplies and overhead related to that service. As such, as Coram grows its revenue, the need for working capital increases. As a result, due to the timing difference between cash received from the growth in sales and disbursement of cash to pay the expenses associated with these sales, the amount of cash generated from accounts receivable may not be sufficient to cover expenses associated with the growth of the business. Furthermore, if Coram incurs a significant increase in its days sales outstanding of accounts receivable, the borrowing base under the terms of the DIP financing agreement could be reduced, which in turn would reduce the amount of available credit under the agreement. Also see Item 7. under the caption "Risk Factors." Coram may not be able to meet its increased cash requirements.

**Risk Factors**

*There can be no assurance regarding Coram's going concern related to the Chapter 11 Proceedings.*

The company's ability to continue operations is dependent upon, among other things, the ability of the company to comply with the terms of the DIP financing arrangement, confirmation of a plan of reorganization, success of future operations after such confirmation and the ability to generate sufficient cash from operations and financing sources to meet obligations. There can be no assurances that any plan of reorganization will be approved by the Bankruptcy Court or that such a plan will allow the company to operate profitably. Any plan of reorganization and other actions during the Chapter 11 proceedings could change materially the financial condition and/or outlook of the company. Furthermore, the future availability or terms of financing can not be determined in light of the Chapter 11 filings and there can be no assurance that the amounts available through the DIP financing will be sufficient to fund the operations of

JSP 01835

the company until a proposed plan of reorganization is approved by the Bankruptcy Court. In addition, the company may experience difficulty in attracting and maintaining patients and appropriate personnel as a result of the Chapter 11 proceedings.

*Coram's future profitability is not certain which could adversely affect the company's continued operations and stock price.*

Numerous factors have affected Coram's performance and financial condition to date, including, among others: (i) ongoing pricing pressure in Coram's infusion therapy business as a result of a continuing shift in payer mix from private indemnity insurance to managed care and governmental payers and intense competition among infusion providers; (ii) increased competition from hospitals and physicians who have sought to increase the scope of services they offer through their facilities and offices, including services similar to those offered by Coram; and (iii) increased competition from hospitals and physicians which have entered into risk-sharing relationships with third-party payers pursuant to which they have been delegated control over the provision of a wide variety of healthcare services, including the services offered by Coram. There can be no assurance that the foregoing factors will not continue to have an adverse effect on the company's financial condition and results of operations in the future.

*The outcome of pending bankruptcy and legal proceedings could adversely affect Coram's business.*

As described in Item 3. Legal Proceedings, Coram is involved in several legal disputes. Additionally, Coram Healthcare Corporation and Coram, Inc. are currently in Chapter 11 Bankruptcy. Even though Coram intends to pursue its claims and defend itself vigorously in these matters, the company can not predict the outcome of current and future matters due to the uncertainties inherent in litigation and bankruptcy proceedings. Pending the submission of a plan of reorganization and its approval by the Bankruptcy Court and the outcome of certain legal disputes, the financial condition, results of operations and liquidity of the company may be materially adversely affected.

*Operations may be adversely affected by the significant outstanding indebtedness.*

Following the exchange of debt for Coram, Inc. Series A Notes Preferred Stock, Coram had approximately $153.3 million outstanding long-term debt in the form of Series A and Series B Notes at an interest rate of 9.0% per annum maturing on June 30, 2001. Pending the submission of plan of reorganization and its approval by the Bankruptcy Court, the financial condition, results of operations and liquidity of the company may be materially adversely affected. See Item 7. "Liquidity and Capital Resources." and Note 8 to the company's Consolidated Financial Statements.

*Under the provisions of Stark II law, Coram will need to maintain certain equity requirements in order to be able to avoid disruption in accepting referrals of certain patients from physicians who may own shares of Coram common stock.*

Coram has learned that certain physicians have, from time to time, owned shares of its common stock. Under federal law, including certain provisions contained in the Stark II law, the ownership of shares in a healthcare service provider is a financial relationship subject to federal regulation. For example, the Stark II law prohibits a physician from making Medicare or Medicaid referrals for certain "designated health services," including durable medical equipment, parenteral and enteral nutrition therapy and outpatient prescription drugs, to entities with which the physician or an immediate family member has a financial relationship, unless an exception to the law is available. The Stark II law includes an exception for the ownership of publicly traded stock in companies with equity above certain levels. This exception of Stark II requires the issuing company to have stockholders' equity of at least $75 million either as of the end of its most recent fiscal year or on average over the last three fiscal years. Due principally to the gain on troubled debt restructuring and the disposition of CPS, at December 31, 2000 the company's stockholders' equity was above the required level. However, in light of the company's recurring operational losses during each of the three years in the period ended December 31, 2000, management's ability to maintain an appropriate level of stockholders' equity cannot be reasonably assured. The penalties for failure to comply with Stark II include civil penalties that could be imposed upon the company or the referring physician, regardless of whether either the physician or the company intended to violate the law. Accordingly, if the company's common stock remains publicly traded, and its stockholders' equity falls below the required levels, the company would be forced to cease accepting referrals of patients with government sponsored benefit programs or run a significant risk of noncompliance with Stark II. Ceasing to accept such referrals could materially adversely affect the company's financial condition and business reputation in the market as it may cause the company to be a less attractive provider to which a physician could refer his or her patients. The company previously requested a Stark II waiver from the Health Care Financing Administration, but such waiver request was denied,

37

JSP 01836

*Coram may not be able to meet its increased cash requirements.*

Management throughout the company is continuing to concentrate on enhancing timely reimbursement by emphasizing improved billing and cash collection methods, continued assessment of systems support for reimbursement and concentration of the company's expertise and managerial resources into certain reimbursement locations. In December 2000, Coram announced that as part of its continuing efforts to improve efficiency and overall performance, several Patient Financial Service Centers (reimbursement sites) were being consolidated and the related reimbursement positions were to be eliminated. By consolidating to fewer sites, management expects to implement improved training, more easily standardize "best demonstrated practices," enhance specialization related to payers such as Medicare and achieve more consistent and timely cash collections. Management does not expect this change to affect Coram's patients or payers, but believes, instead, that in the long-term they will receive better, more consistent service. The transition is expected to be accomplished in stages beginning April 1, 2001 and ending in the third quarter of the same year. Management has taken certain actions to mitigate the potential shortfall in cash collections during the upcoming transition period, including, but not limited to, offering incentives for personnel to stay with the company until the completion of their corresponding regional consolidation. No assurances can be given that the consolidation of the company's Patient Financial Service Centers will be completed by the end of the third quarter of 2001, that the consolidation will be successful in enhancing timely reimbursement or that the company will not experience a significant shortfall in cash collections during or after the transition period.

Coram has experienced pressures from vendors to tighten payment terms for needed drugs and supplies. Noncompliance with terms could result in the company not having access to the necessary drugs and supplies to maintain or grow its present business. In addition, Coram relies heavily on the collection of third party payments from insurance providers to pay these vendors. In connection therewith, it is imperative that the company maintains tightly controlled cash collection and billing practices. There can be no assurance that third party payers will not extend the time in which they pay Coram for its services. Furthermore, there can be no assurances that the closure and consolidation of several reimbursement sites in 2001 will not cause a significant shortfall in cash collections. Any disruption in cash collections, either due to changes in third party payment practices or shortfalls resulting from the closure and consolidation of Coram's reimbursement sites would cause additional liquidity pressures on the company.

*Average Wholesale Price changes have and may continue to trend in a direction that is adverse to Coram's industry.*

For most of the drugs that Coram provides to its patients, it is reimbursed by many of its governmental and third party payers according to rate schedules that are based on the Average Wholesale Price ("AWP") of the drugs provided. AWP is an industry term that is intended to represent the prices at which retail pharmacies, such as Coram, acquire individual drugs from drug manufacturers and distributors. Certain independent sources, including Medical Economics, Inc. and First DataBank, Inc., publish AWP lists for use by the pharmacy and healthcare industries. These independent sources survey drug manufacturers and use the price information provided by these drug manufacturers to calculate AWPs for nearly all the drugs received by Coram's patients. The AWPs provided by these independent sources are intended to represent the prices at which retail pharmacies acquire the drugs provided to their patients. Thus AWPs for drugs should rise and fall roughly corresponding to the rise and fall of the price at which retail pharmacies purchase their drugs.

Since the company is reimbursed by many of its governmental and third party payers for most of the drugs that it provides according to rate schedules that are based on AWP, the company's reimbursement rates for these drugs should move roughly along with the price at which it acquires the drugs. However, in many cases, the AWPs for certain drugs have failed to keep pace with rapid unit cost price increases for those drugs. In such instances, the margin between Coram's reimbursement rate and the cost at which it acquired the drug, which margin should cover the costs of the clinical services and overhead expenses associated with the delivery and administration of the drug, has been substantially reduced or eliminated.

Since 1997, the cost at which Coram has acquired certain drugs has increased over eighty percent with no corresponding increase in AWP. Due to supply shortages, certain drugs derived from blood products, such as certain immunoglobulin agents, have in some instances experienced substantial increases in their unit cost purchase price when compared to their relative changes in AWP. There can be no assurances that the upward trend in the cost of certain drugs will cease, or that the AWPs for certain drugs will keep pace with the increasing unit costs of those drugs. Further significant increases in drug costs that are not accompanied by corresponding increases in AWP could have in a material adverse impact on the company's profit margins.

*The company's revenue and profitability are subject to prices paid by third party payers.*

The company receives payment from government programs and insurance companies for the services it provides. The rates paid by these third parties cannot be controlled by the company and may not be sufficient to allow Coram to generate a profit from providing

38

JSP 01837

its services. Additionally, managed care payers and traditional indemnity insurers are increasingly requesting fee structures and other arrangements providing for the assumption by healthcare providers of all or a portion of the financial risk of providing care. The failure of these third party payers to pay prices adequate enough to cover the company's operating expenses could have a material adverse effect on the business, results of operation or financial condition of Coram.

Additionally, the company maintains certain critical third party vendor relationships with Cardinal Health, Inc. and Baxter Healthcare Corporation. The combined aggregate purchases from these two vendors accounted for approximately 78% of the total activity for the year ended December 31, 2000. Although management considers its relationships with these two important drug and supplies vendors to be good and stable, there can be no assurances that such relationships will continue. Should either of these vendors elect not to provide drugs and supplies to the company on a recurring basis, there would likely be a significant disruption to the company's business and the results of operations could be adversely impacted until such time as a replacement vendor could be identified. Moreover, there could be no assurances that the pricing structure that the company currently enjoys could be matched by a replacement vendor. Additionally, because the company's patient census has declined over the past year, its ability to meet volume commitments with certain vendors has eroded, thereby causing additional price increases on some contracts. Further declines in patient census could result in a breach of a contract that could have significant negative financial impact to the company. It would also erode the positive image management has developed with the vendor community and adversely impact the company's ability to leverage its purchasing activity with new vendors.

*The ongoing shift of services delivered to persons covered under benefit plans funded by governmental or managed care payers could have a material adverse effect on the company's business, financial condition and results of operations.*

Since the inception of Coram's business in 1994, it has been experiencing a shift in its payer sources from private indemnity payers to governmental and managed care payers. Private indemnity payers typically reimburse at a higher amount for a given service and provide a broader range of benefits than governmental and managed care payers. Congress has reduced reimbursement rates applicable to certain home health and durable medical equipment services. Similarly, other legislative and regulatory proposals have been made which, if adopted, would have the effect of reducing the amount received by Coram for its services. Moreover, intense competition among providers of healthcare services have encouraged managed care payers to continue to reduce the prices paid for services, including the services offered by Coram.

*Coram may find itself unable to procure the products necessary to serve its patients.*

The ability to acquire factor product under normal conditions is volatile, but currently the international demand for certain factor products far exceeds the supply. Availability of factor product from manufacturers is spotty, thereby requiring the company to purchase through the blood broker market wherein pricing may not be favorable to the company and product availability can change significantly from day to day. During such times of shortages, prices soar with limited availability to pass these additional costs on to patients. Due to the nature of factor manufacturing processes, intermittent product shortages may be experienced from time to time, which may make it difficult for Coram to meet the needs of its patients and may have an adverse impact on Coram's future results of operations. These shortages could be due to insufficient donor pools, failed production lots, contamination, etc. Moreover, a single patient's requirements may, at any given time, expend what would normally be a whole month's inventory for multiple patients. During March 2001, the company began experiencing difficulties obtaining recombinant factor VIII (rVIII) due to a nationwide shortage of this product which was precipitated by Federal Drug Administration requirements exceeding expectations of current manufacturing. Coram currently has a supply of this factor product in inventory to meet immediate patient demands, however, management is proactively taking steps to secure inventory of this product at levels sufficient to meet anticipated future demands. These steps include, but are not limited to, declining new patients for this particular factor product until the shortage eases, as well as, asking patients who are currently using rVIII to consult with their physicians and consider voluntarily switching to appropriate alternative products on a temporary basis. Under normal circumstances, limited allocations of products from manufacturers greatly impacts the company's ability to expand its customer base, and management believes this current factor shortage is likely to impair the company's ability to grow this segment of its business. Coram's potential inability to purchase pharmaceutical products and supplies required by its patients could have a material, adverse impact on the company's business.

*Consolidation in the healthcare industry could give increased pricing power to purchasers of the company's services and reduce the company's revenue and profits.*

Managed care organizations have grown substantially in terms of the percentage of the population that is covered by such organizations and in terms of their control over an increasing portion of the healthcare economy. Managed care plans have continued to consolidate to enhance their ability to influence the delivery of healthcare services and to exert pressure to control healthcare costs.

39

JSP 01838

This increased pressure may require the company to reduce its prices or forfeit existing or new business which would have a material adverse effect on its business, financial condition and results of operations.

*Coram faces significant competition and may not be able to compete successfully.*

Coram competes in the alternate site infusion therapy market which is highly competitive. Some of Coram's current and potential competitors include:

    (i)    integrated providers of alternate site healthcare services;

    (ii)   hospitals;

    (iii)  local providers of multiple products and services offered for the alternate site healthcare market; and

    (iv)  physicians and physician owned organizations such as independent practice associations and multi-specialty group practices.

Coram has experienced increased competition in its alternate site infusion therapy business from hospitals and physicians that have sought to increase the scope of services offered at or through their facilities or offices, including services similar to those offered by the company and from hospitals and physicians that have entered into risk relationships with managed care organizations pursuant to which they have taken control of certain medical services, including the services offered by the company. Certain competitors in various markets may have superior financial, marketing or managerial resources, size, purchasing power or strategic relationships with providers, referral sources, such as physicians and hospital discharge planners, and traditional indemnity and managed care payers.

There are relatively few barriers to entry in the infusion therapy services market. Local or regional companies are currently competing in many of the markets served by the company and others may do so in the future. Coram expects its competitors to continue to improve their service offerings and price competitiveness. Coram also expects its competitors to develop new strategic relationships with providers, referral sources and payers, which could result in increased competition. The introduction of new and enhanced services, acquisitions and industry consolidation and the development of strategic relationships by Coram's competitors could cause a decline in sales, loss of market acceptance of Coram's services or price competition, or make the company's services less attractive. There can be no assurance that Coram will be able to compete successfully against current or future competitors or that competitive pressures will not have a material adverse effect on Coram's business, financial condition and results of operations. See Item 1. "Competition," and Item 7. "Business Strategy" and "Factors Affecting Recent Operating Results."

*The success of Coram's business is dependent on relationships with third parties.*

The profitability of Coram's business depends in part on its ability to establish and maintain close working relationships with managed care organizations, private and governmental third-party payers, hospitals, physicians, physician groups, home health agencies, long-term care facilities and other institutional health providers and insurance companies and large self-insured employers. A central feature of the company's business strategy is to improve its relationships with such third parties and with physicians and physician groups. There can be no assurance that the company will be successful in improving and maintaining such relationships or that the company's existing relationships will be successfully maintained or that additional relationships will be successfully developed and maintained in existing or future markets. The loss of existing relationships such as the loss of its relationship with Aetna and its affiliated company, Prudential, or the failure to continue to develop and maintain ongoing relationships in the future could have a material adverse effect on the company's business, financial condition and results of operations. See Item 7. "Business Strategy."

*Coram's business may suffer if it is unable to retain key personnel.*

Coram is substantially dependent upon the services of its key executive officers, which include Daniel D. Crowley, Chairman and Chief Executive Officer and Allen J. Marabito, Executive Vice President. The loss of services of any of these executives could have a material adverse effect on the company. The company's future growth and success depends, in large part, upon its ability to obtain, retain and expand its staff of professional personnel. There can be no assurance that the company will be successful in its efforts to attract and retain such personnel.

40

JSP 01839

*Coram may be unable to recruit appropriate personnel, which would have a material adverse effect on its business.*

The continued operation of Coram's business, as well as its future growth and success, depends upon its ability to recruit and retain a staff of professional personnel, including licensed pharmacists and nurses. Certain parts of the United States, including certain states in which the company has operations, are currently experiencing a shortage of these licensed professionals. Coram has been affected by this shortage and management believes that its current financial position has made it more difficult for the company to recruit and retain experienced professional personnel. As a result, the company has experienced higher contract labor costs. A continued prolonged shortage of either or both of these types of professionals being available to or interested in working with Coram could have a material adverse effect on the company's business, results of operations and financial condition.

*Coram's common stock is subject to a high degree of risk and market volatility.*

As a result of the Chapter 11 bankruptcy filings of the Debtors, the equity interests of the common stockholders are subject to a high degree of risk. Should a plan of reorganization similar to the Restated Joint Plan of reorganization be approved, the complete elimination of the equity interests of CHC would occur. The Bankruptcy Court appointed Goldin Associates, L.L.C. as independent restructuring advisors to the Debtors to assess, among other things, the appropriateness of the Restated Joint Plan of reorganization. Goldin is also appointed as an arbiter between the Debtors and the Official Committee of the Equity Security Holders in the Debtors' bankruptcy proceedings. See Note 3 to the company's Consolidated financial Statements.

There has historically been and may continue to be significant volatility in the market price for Coram's common stock. Factors include, but not limited to, the Debtors' Chapter 11 bankruptcy proceedings, actual or anticipated fluctuations in Coram's operating results, new products or services introduced or new contracts entered into by the company or its competitors, conditions and trends in the healthcare industry including changes in government reimbursement policies, changes in financial estimates by securities analysts, general market conditions and other factors could cause the market price of Coram's common stock to fluctuate substantially. In addition, the stock market has from time to time experienced significant price and volume fluctuations that have particularly affected the market price for the common stock of healthcare companies. These broad market fluctuations may adversely affect the market price of the common stock. In the past, following periods of volatility in the market price of a particular company's securities, securities class action litigation has been brought against that company. There can be no assurances that such litigation will not occur in the future with respect to Coram. Such litigation could result in substantial costs and a diversion of management's attention and resources, which could have a material adverse effect upon Coram's business, financial condition and results of operations.

*Coram's reimbursement rates may be adversely impacted by recent regulatory action.*

Approximately thirty state Medicaid programs have adopted regulations or other policies whereby they will begin applying a new average wholesale price list to calculate the amounts that they will pay for certain drugs furnished to Medicaid beneficiaries for services rendered on or after May 1, 2000. Other states may be expected to adopt similar regulations or policies. These new average wholesale price lists would drastically reduce the rates at which the Medicaid programs would reimburse pharmacy providers such as Coram for their services. The drugs and services scheduled for the rate reduction include over 400 individual therapeutic solutions, representing approximately fifty different drug therapies, many of which are commonly received by Coram's patients. The reductions range in size from a ten percent to over ninety percent decrease in the rates that the Medicaid programs would reimburse for these drugs, supplies and services. Some or all of these state Medicaid programs may be expected to adopt new average wholesale price lists that further expand the rate reduction to additional drugs and supplies commonly received by Coram's patients.

Coram has not experienced, and does not expect to experience, any significant decrease in the cost for which it acquires drugs and supplies that would correspond to the decreased reimbursements from the state Medicaid programs. In addition, the state Medicaid programs have made no efforts to balance the reduction in drug and supply reimbursements with a corresponding increase in the amounts which they reimburse providers, such as Coram, for the cost of the clinical services and related overhead associated with the procurement, delivery and administration of these drugs and supplies to Medicaid beneficiaries.

For the year ended December 31, 2000, the company's net revenue derived from services rendered to Medicaid beneficiaries was approximately $34.4 million or 7.4% of the company's overall consolidated net revenue. The company cannot predict what impact such rate reductions will have on the company's results of operations or financial condition.

The Medicare program and most private payer organizations with which the company does business also reimburse the company for its services using a formula that incorporates the average wholesale price of the drug delivered. If the federal Medicare program

41

JSP 01840

and/or private payer organizations adopt the Medicaid average wholesale price lists with the decreased drug reimbursement rates, Coram cannot provide any assurance that its results of operations and financial condition will not be materially adversely impacted.

*The operation of Coram's business is subject to extensive government regulation.*

*General.* Coram's healthcare services business is subject to extensive and frequently changing state and federal regulation. Specifically, Coram is subject to state laws governing and regulating several aspects of its business, including home infusion therapy services (including certificates of need and licensure requirements in certain states), dispensing, distributing and compounding of prescription products and home health services. Federal laws governing Coram's activities include regulation of pharmacy operations and regulations under the Medicare and Medicaid programs relating to, among other things, the submission of claims for payment and certification of home health agencies. Coram also is subject to certain state and federal laws prohibiting the payment of remuneration for patient or business referrals and the provision of services where a prohibited financial relationship exists between a referring physician and the entity providing the service.

New laws and regulations are enacted from time to time to regulate new and existing services and products in the home infusion and home health industries. Changes in the law or new interpretations of existing laws also could have an adverse effect on the company's methods and costs of doing business. Further, Coram's failure to comply with such laws could adversely affect its ability to continue to provide, or receive reimbursement for, its equipment, products and services, and also could subject Coram and its officers and employees to civil and criminal penalties. There can be no assurances that the company will not encounter regulatory impediments that could adversely affect its ability to open new branch offices and to expand the services currently provided at its existing branch offices.

Set forth below is a more detailed discussion of certain factors related to federal and state regulation of Coram and its business.

*Medicare and Medicaid Regulations.* As a provider of services under the Medicare and Medicaid programs, Coram is subject to federal laws and regulations governing its operations, arrangements with other providers and reimbursement procedures and practices. These laws include the federal anti-kickback statute, which prohibits the payment or receipt of any form of remuneration in return for referring business or patients to providers of services for which payments are made by a federal healthcare program. Violation of these laws may result in civil and criminal penalties, including substantial fines, loss of the right to participate in the Medicare and Medicaid programs and imprisonment. In addition, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") expanded the government's fraud and abuse elimination efforts. HIPAA, among other provisions, expands the government's efforts for prosecuting fraud and abuse beyond Medicare and Medicaid to all payers; makes exclusion from the Medicare and Medicaid programs mandatory for a minimum of five years for any felony conviction relating to fraud; requires that organizations contracting with another organization or individual take steps to be informed as to whether the organization or individual is excluded from Medicare and Medicaid participation; and enhances civil penalties by increasing the amount of fines permitted. The applicable federal laws also include prohibitions contained in Stark II, which prohibits referrals by physicians for designated health services, which include outpatient prescription drugs, parenteral and enteral nutrition, equipment and supplies, durable medical equipment and home health services, if such physician has a disqualifying investment or compensation relationship with the supplier of such services and no exceptions applies. While Coram believes it has structured its financial relationships with physicians to comply with Stark II, a failure to comply with the provisions of Stark II could have a material adverse effect on the company. In addition, various federal laws impose civil and criminal penalties against participants in the Medicare or Medicaid programs who make false claims for payment for services or otherwise engage in false billing practices.

Many states also have statutes prohibiting the payment or receipt of (or the offer or solicitation of) anything of value in return for, or to induce, a referral for healthcare goods or services. There are several other state statutes that, although they do not explicitly address payments for referrals, could be interpreted as prohibiting the practice. While similar in many respects to the federal laws, these laws vary from state to state, are often vague and have seldom been interpreted consistently by courts and regulatory agencies. In addition, various state laws impose civil and criminal penalties against participants in the Medicaid program who make false claims for payment for services or otherwise engage in false billing practices. Private insurers and various state enforcement agencies have recently increased their scrutiny of healthcare providers' practices and claims, particularly in the home health and home medical equipment areas.

Enforcement of federal fraud and abuse laws, and regulatory scrutiny generally has increasingly focused on the home healthcare industry. For example, Medicare fiscal intermediaries have implemented "Wedge" audits, which involve a review of a small sample of patient records to identify non-compliance. Any adverse findings under these types of audits can result in overpayment determinations and offsets against future payments. There can be no assurance that Coram will not become the subject of a regulatory or other

42

JSP 01841

investigation or proceeding or that its interpretations of applicable healthcare laws and regulations will not be challenged. The defense of any such challenge could result in substantial cost to the company and diversion of management's time and attention. Any such challenge, whether ultimately sustained or not, could have a material adverse effect on Coram.

*Medicare Certification.* Federal regulations governing the Medicare program are also applicable to Coram's home health services. These regulations include an annual review of healthcare facilities and personnel and provide criteria for coverage and reimbursement. As of December 31, 2000, the company has one location certified by Medicare to provide home health services.

Laws and regulations governing the Medicare and Medicaid programs are complex and subject to interpretation. The company's management is aware of certain current audits and reviews with respect to prior reimbursements from Medicare and Medicaid. While management believes that the company is in compliance with all applicable laws and regulations, compliance with such laws and regulations can be subject to future government review and interpretation, as well as, significant regulatory action including fines, penalties, and exclusion from the Medicare and Medicaid programs.

*Permits and Licensure.* Many states require companies providing home infusion therapy products and services, home healthcare services, and other products and services of the type offered by Coram to be licensed. Through its subsidiaries, Coram currently is licensed under state law to provide nursing services in 20 states and currently is licensed to provide pharmacy services in 42 states and one Canadian province.

*Certificates of Need.* Many states require companies providing home healthcare services, home infusion therapy and other services of the type offered by Coram to have a certificate of need issued by a state health planning agency. Certificates of need are often difficult to obtain and in many instances a certificate of need is not obtainable at all (because an area is determined to be adequately served by existing providers or for other reasons). If Coram commences operations in a state, or expands its operations in a state where it is currently operating, and those operations require a certificate of need, the company will be required to obtain a certificate of need with respect to those operations. There can be no assurance that Coram would be able to obtain required certificates of need and the failure to obtain such certificates of need could adversely affect Coram's ability to grow its business.

*Healthcare Reform.*

The healthcare industry continues to undergo significant changes driven by various efforts to reduce costs, including efforts at national healthcare reform, trends toward managed care, limits in Medicare coverage and reimbursement levels, consolidation of healthcare distribution companies and collective purchasing arrangements by office-based healthcare practitioners. The impact of third-party pricing pressures and low barriers to entry have dramatically reduced profit margins for healthcare providers. Continued growth in managed care and capitated plans have pressured healthcare providers to find ways of becoming more cost competitive. This has also led to consolidation of healthcare providers in the company's market areas. Coram's inability to react effectively to these and other changes in the healthcare industry could adversely affect its operating results.

In addition, political, economic and regulatory influences are subjecting the healthcare industry in the United States to extensive and dynamic change, and many competing proposals have been introduced in Congress and various state legislatures to reform the present healthcare system. It is possible that healthcare reform at the federal or state level, whether implemented through legislation or through action by federal or state administrative agencies, would require Coram to make significant changes in the way it conducts business. Certain aspects of healthcare reform such as proposed reductions in Medicare and Medicaid payments, if successfully developed and adopted, could have a material effect upon the company's business. Coram anticipates that Congress and state legislatures will continue to review and assess alternative healthcare delivery systems and payment methodologies, and public debate of these issues will likely continue in the future. It is not possible at this time to predict what, if any, further reforms will be adopted, or when such reforms will be adopted and implemented. No assurance can be given that any such reforms will not have a material adverse effect upon Coram's business, results of operations, and financial condition.

*Insurance may not be sufficient to cover losses from professional liability and products liability exposure.*

The services performed and products sold by Coram involve an inherent risk of professional and products liability. While the company maintains insurance consistent with industry practice, there can be no assurance that the amount of insurance currently maintained will satisfy any claims made against Coram or that it will be able to obtain insurance in the future at commercially reasonable rates or in adequate amounts. Coram cannot predict the effect that any such claims, regardless of their ultimate outcome, might have on its business or reputation or on its ability to attract and retain patients and employees.

43

JSP 01842

*Coram may be unable to respond to technological change effectively.*

Coram's alternate site infusion business is dependent on physicians continuing to prescribe the administration of drugs and nutrients through intravenous and other infusion methods. Intravenous administration is often the most appropriate method for treating critically ill patients and is often the only way to administer proteins and biotechnology drugs. Nonetheless, technological advances in drug delivery systems, the development of therapies that can be administered orally, such as protease inhibitors for the treatment of persons with HIV/AIDS, and the development of new medical treatments that cure certain complex diseases or reduce the need for infusion therapy could adversely impact Coram's alternate site infusion therapy business.

### ITEM 7a. QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK

The following discusses the company's exposure to market risk related to changes in interest rates. This discussion contains forward-looking statements that are subject to risks and uncertainties. Actual results could vary materially as a result of a number of factors, including but not limited to, changes in interest rates, and those set forth under Item 7. "Management's Discussion and Analysis of Results of Operations and Financial Condition: Background – *Factors Affecting Recent Operating Results.*"

As of December 31, 2000, the company had outstanding long-term debt of $153.6 million of which $153.3 million matures in June 2001 and bears interest at 9.0% per annum. The company also has a debtor-in-possession ("DIP") agreement providing for the availability of up to $40.0 million for use in connection with the operation of its businesses and the businesses of its subsidiaries. The facility matures on the earlier of either confirmation of the Debtors' plan of reorganization or August 31, 2001 and bears an interest rate of prime plus 2.0%, which was 11.5% on December 31, 2000. As of December 31, 2000, the company had no borrowings under the DIP agreement. Because substantially all of the interest on the company's debt is fixed, a hypothetical 10.0% change in interest rates would not have a material impact on the company. Increases in interest rates could, however, increase interest expenses associated with future borrowings by the company, if any. The company does not hedge against interest rate changes. See Note 8 to the company's Consolidated Financial Statements.

The debt to equity exchange transaction described in Note 8 to the company's Consolidated Financial Statements qualified as a troubled debt restructuring pursuant to Statement of Financial Accounting Standards No. 15, "Accounting by Debtors and Creditors for Troubled Debt Restructurings." In accordance therewith, the Debtors will not recognize any interest expense on the Series A Notes and the Series B Notes until after their maturity in June 2001.

### ITEM 8. FINANCIAL STATEMENTS

The company's Consolidated Financial Statements, Notes to Consolidated Financial Statements and financial statement schedule at December 31, 2000 and for the years ended December 31, 2000, 1999 and 1998 and the Report of Independent Auditors are included in this report as indicated on the Index to Financial Statements and Schedule on page F-1.

### ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## PART III

### ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

**Board of Directors**

The following table sets forth certain information concerning each member of Coram's Board of Directors as of April 9, 2001. Except as provided below, none of the directors entered into any arrangement or understanding pursuant to which such person was to serve as a director.

| Name | Age | Position with Coram | Director Since |
|---|---|---|---|
| Daniel D. Crowley | 53 | Chairman of the Board | 1999 |
| Donald J. Amaral | 48 | Director | 1995 |
| William J. Casey | 56 | Director | 1997 |

44

JSP 01843

| L. Peter Smith | 51 | Director | 1994 |
| Sandra L. Smoley | 64 | Director | 2000 |

Mr. Crowley joined Coram as its Chairman, Chief Executive Officer and President as of November 30, 1999. In addition, Mr. Crowley serves as Chairman, Chief Executive Officer and President of Dynamic Healthcare Solutions, LLC, a privately held management consulting and investment firm that he established in 1997. Prior to founding Dynamic Healthcare Solutions, LLC, Mr. Crowley served as the Chairman, Chief Executive Officer and President of Foundation Health Corporation, a post that he had served for more than five years.

Effective August 1, 1999, Mr. Crowley and an affiliate of Cerberus Partners, L.P. ("Cerberus"), a party to the company's debtor-in-possession financing agreement, Senior Credit Facility and Securities Exchange Agreement, executed a three-year employment agreement whereby Mr. Crowley is paid $960,000 per annum, plus the potential of performance related bonus opportunities, equity options and fringe benefits. Such agreement is subject to automatic one year extensions unless either party provides written notice within 60 days of the original expiration date or subsequent renewal dates. The agreement further provides that the Cerberus affiliate can unilaterally terminate the arrangement at any time by written notice; however, certain severance payments would be triggered by such termination. The services rendered by Mr. Crowley include, but are not limited to, business and strategic healthcare investment advice to executive management at Cerberus and its affiliates. Moreover, Mr. Crowley is the Chairman of the Board of Directors of Winterland Productions, Inc. ("Winterland"), a privately held affinity merchandise company, which is a Cerberus affiliate portfolio investment. On January 2, 2001, Winterland voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code in the Northern District of California.

A committee of persons claiming to own shares of the company's publicly-traded common stock (the "Equity Committee") filed a motion with the Bankruptcy Court seeking permission to bring a derivative lawsuit directly against Mr. Crowley, Cerberus and Stephen A. Feinberg, a former member of the Board of Directors. The Equity Committee's lawsuit alleges a collusive plan whereby the named parties conspired to devalue the company for the benefit of the company's creditors under the Securities Exchange Agreement. On February 26, 2001, the Bankruptcy Court ruled that the Equity Committee's motion would not be productive at that time and, accordingly, the motion to proceed with the lawsuit was denied without prejudice.

Mr. Amaral served as Chairman of the company's Board of Directors from September 1997 until November 30, 1999. Mr. Amaral has served as a director of the company since October 1995, Chief Executive Officer of the company from October 1995 through April 23, 1999 and October 22, 1999 through November 30, 1999, and as President from October 1995 through December 1997. Previously, he was President and Chief Operating Officer of OrNda Healthcorp ("OrNda") from April 1994 to August 1995, and served in various executive positions with Summit Health Ltd. ("Summit") from October 1989 to April 1994, including President and Chief Executive Officer between October 1991 and April 1994. Summit was merged into OrNda in April 1994. Mr. Amaral is also a member of the Board of Directors of CareMatrix Corporation.

Mr. Casey has served as a director of Coram since September 1997. Since 1983, Mr. Casey has served as a consultant in the healthcare industry, specializing in hospital management evaluation, hospital planning, managed care contracting and turnaround services. From 1986 to 1997, Mr. Casey also served as Contract Administrator for Emergency Department Physicians' Medical Group, Inc. and its affiliated medical groups, which provide physician services to non-governmental facilities. In addition, from 1988 to 1997, Mr. Casey served as Contract Administrator for NP Medical Group, Inc., which provides physician services to government facilities. Mr. Casey also serves as a director of TriCounties Bank.

Mr. L. Peter Smith has served as a director of Coram since July 1994. Between November 1993 and July 1994, Mr. Smith was a director of Medisys, Inc. (one of the companies that joined together in 1994 to form Coram). Mr. Smith served as the Managing Partner of AllCare Health Services, Inc., which was acquired by Medisys, Inc. in December 1992. Mr. Smith is also the Chief Executive Officer and a member of the Board of Directors of Ralin Medical, Inc., a company specializing in cardiac disease management. Mr. Smith also serves on the Board of Directors of Gateway, Inc. and AMSYS, Inc. Mr. Smith previously served on the Board of Directors of Sabratek Corporation from October 1992 through August 23, 1999. Sabratek Corporation filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code on December 14, 1999 and that proceeding is presently pending before the United States Bankruptcy Court in Delaware. In January 2000, the assets and certain liabilities of Sabratek Corporation's Device Business were acquired by Baxter Healthcare Corporation.

Ms. Smoley was elected to Coram's Board of Directors on February 10, 2000. Ms. Smoley is the Chairperson and Chief Executive Officer of The Sandra Smoley Company, a healthcare and local government consulting firm based in Sacramento, California. From

JSP 01844

October 1993 to January 1999, she served as Secretary of the California Health and Welfare Agency. Prior to that time, she was Secretary of the California State and Consumer Services Agency from January 1993 to October 1993.

Stephen A. Feinberg, a director of Coram since June 1998, resigned from the Board of Directors on July 24, 2000.

Richard A. Fink, a director of Coram since July 1994, resigned from the Board of Directors on February 10, 2000.

Executive Officers

The following table sets forth certain information concerning each of the executive officers of Coram, who serve at the pleasure of the Board of Directors. Biographical information with respect to Daniel D. Crowley is set forth under the caption "Board of Directors" above.

| Name | Age | Position(s) with Coram |
|---|---|---|
| Daniel D. Crowley | 53 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Scott R. Danitz (1) | 43 | Senior Vice President, Chief Financial Officer and Treasurer |
| Scott T. Larson (2) | 38 | Former Senior Vice President, General Counsel and Secretary |
| Allen J. Marabito | 54 | Executive Vice President |
| Vito Ponzio, Jr | 46 | Senior Vice President, Human Resources |
| Joseph D. Smith (3) | 42 | Former Chief Operating Officer |

(1) Effective January 1, 2001, Mr. Danitz was promoted to Chief Financial Officer and Treasurer.

(2) Effective January 15, 2001, Mr. Larson resigned his position with Coram.

(3) Effective June 30, 2000, Mr. Smith resigned his position with Coram and currently has a one year consulting arrangement with the company that expires on June 30, 2001.

Scott R. Danitz served as the company's Vice President and Controller from January 1998 through December 1999, Senior Vice President, Finance and Chief Accounting Officer from January 2000 through December 2000 and Senior Vice President, Chief Financial Officer and Treasurer since January 2001. Previously, Mr. Danitz was employed by First Data Corporation from 1989 through 1997 and held various positions, the most recent of which had been Vice President and Controller, Payment Instruments division.

Scott T. Larson served as the company's Senior Vice President and General Counsel from July 1998 through his resignation date of January 15, 2001. In addition, Mr. Larson was elected Secretary in April 1999. Previously, Mr. Larson served as the company's Vice President and Legal Counsel from March 1996 to July 1998 and as Assistant General Counsel from July 1994 through February 1996. Between December 1991 and July 1994, Mr. Larson served as Corporate Counsel and later as Assistant General Counsel for T² Medical, Inc. (one of the companies that joined together in 1994 to form Coram). Before joining T² Medical, Inc., Mr. Larson was employed as an attorney with the Atlanta-based law firm of Alston & Bird.

Allen J. Marabito joined Coram effective November 30, 1999 as Executive Vice President. From 1997 to 1999, Mr. Marabito was in private law practice and Senior Vice President with Dynamic Healthcare Solutions, LLC. From 1991 to 1997, he served as Senior Vice President, Secretary and General Counsel of Foundation Health Corporation.

Vito Ponzio, Jr. has served as the company's Senior Vice President, Human Resources since September 1998. Previously, Mr. Ponzio served as the company's Vice President of Human Resources from February 1996 to September 1998 and as Director of Human Resources from February 1994 to February 1996.

Joseph D. Smith served as the company's Chief Operating Officer from January 1999 through his resignation date of June 30, 2000. In addition, Mr. Smith was President of the Resource Network division from March 1998 until November 1999. Prior to that time, Mr. Smith served as Chief Operating Officer of the East Area of the company beginning in December 1996. Preceding that and since September 1994, Mr. Smith had served as Area Vice President of the Northeast Area of the company. From 1993 until September 1994, Mr. Smith was the Eastern Area Vice President of H.M.S.S., Inc., a regional home infusion company acquired by Coram in September 1994. Effective June 30, 2000, Mr. Smith resigned his position with Coram and currently has a one year consulting arrangement with the company that expires on June 30, 2001.

46

JSP 01845

Section 16(a) Beneficial Ownership Reporting Compliance

Section 16 of the Securities Exchange Act of 1934, as amended, requires Coram's directors, executive officers and persons who beneficially own greater than 10% of a registered class of Coram's equity securities to file reports of ownership and changes in ownership with the Securities and Exchange Commission. Based solely upon its review of copies of the Section 16 reports that Coram received and written representations from certain reporting persons, management believes that during its year ended December 31, 2000 all of its directors, executive officers and greater than 10% beneficial owners were in compliance with these filing requirements.

## ITEM 11. COMPENSATION OF DIRECTORS AND EXECUTIVE OFFICERS

### Compensation of Directors

*Fees for Board Service.* Under current company policy, non-employee directors earn $2,000 for each Board of Directors' meeting attended in person and $750 for each Board of Directors meeting attended by telephone conference call. No compensation is earned for participating at meetings of committees of the Board of Directors. However, an exception to the aforementioned Board of Director fee structure is the compensation for Donald J. Amaral. Mr. Amaral currently receives a fixed $100,000 per annum for service on the Board of Directors and consulting services to the company's executive management. Such agreement will expire on May 16, 2001.

Employee directors earn no additional compensation for service as a director. All directors are entitled to reimbursement for expenses incurred in connection with attending meetings of the Board of Directors or committees thereof. Compensation for participation on the Board of Directors is at the discretion of the Board of Directors. Effective April 1, 2000, the Board of Directors adopted resolutions approving an annual retainer of $12,000 for each non-employee director, except for Mr. Amaral. Due to the Debtors' bankruptcy proceedings, certain amounts payable to members of the Board of Directors have been stayed and, in connection therewith, such members have filed proofs of claims against the company's bankruptcy estate.

Mr. Crowley, the only director who is currently an employee, received no additional compensation for service on the Board of Directors. In addition to the reimbursement for out-of-pocket expenses relating to meeting attendance, non-employee directors of Coram earned the following compensation for Board of Directors' meetings attended during the year ended December 31, 2000:

| | |
|---|---|
| Donald J. Amaral | $ 100,000 |
| William J. Casey | 25,750 |
| Richard A. Fink (1) | 750 |
| Stephen A. Feinberg (2) | 11,000 |
| L. Peter Smith | 15,750 |
| Sandra L. Smoley | 23,750 |

(1)  Effective February 10, 2000, Mr. Fink resigned from Coram's Board of Directors.

(2)  Effective July 24, 2000, Mr. Feinberg resigned from Coram's Board of Directors.

*Outside Directors' Automatic Option Grant Program.* Non-employee members of the Board of Directors participate in the Automatic Option Grant Program in effect under Coram's 1994 Stock Option Plan. On the date of each annual meeting of Coram's stockholders, each individual who will continue to serve as a non-employee Board member receives a non-statutory stock option to purchase 2,500 shares of Coram common stock at an exercise price equal to the fair market value of Coram's common stock on the automatic option grant date. Due to the absence of an annual meeting of Coram's stockholders during the year ended December 31, 2000, no stock options were granted pursuant to the Automatic Option Grant Program during such year. Additionally, each non-employee individual, upon being newly appointed or elected to Coram's Board of Directors, is automatically granted, at the time of such initial election or appointment, a non-statutory option to purchase 75,000 shares of Coram common stock. For the year ended December 31, 2000, options to purchase 75,000 shares relating to newly appointed/elected individuals were granted to Ms. Smoley upon her appointment to the Board of Directors on February 10, 2000, at an exercise price of $0.6875 per share. With regard to the stock options for both the newly appointed/elected Board members and the continuing Board members, each option is immediately exercisable for all of the option shares. However, any shares purchased under the option will be subject to repurchase by Coram at the original exercise price paid per share upon the optionee's cessation of Board service prior to the vesting of such shares. The optionee's option shares vest in a series of equal monthly installments over twelve months of Board service measured from the automatic option grant date. The shares subject to each automatic option grant under the 1994 Stock Option Plan vest in full upon (i) the optionee's cessation of Board service due to death or disability, (ii) an acquisition of Coram by merger or asset sale or (iii) a change in control of

JSP 01846

Coram. As of April 9, 2001, all stock options granted to members of the Board of Directors under the Automatic Option Grant Program are fully vested.

Each automatic option granted to a non-employee Board member includes a limited stock appreciation right which allows the optionee, upon the successful completion of a hostile tender offer for more than 50% of Coram's outstanding securities, to surrender that option to Coram, in return for a cash distribution in an amount per surrendered option share equal to the highest price per share of Coram common stock paid in the tender offer, less the exercise price payable per share.

Following Richard A. Fink's resignation from Coram's Board of Directors on February 10, 2000, the Board of Directors granted a request made by Mr. Fink to amend his stock option agreement, dated September 9, 1998, pursuant to which Mr. Fink was granted options to purchase 75,000 shares of Coram's common stock at $1.6875 per share. Under the amendment, all such options became immediately exercisable and can be exercised at any time through the stated maximum option expiration date of September 9, 2008.

The Debtors' restated joint plan of reorganization, if approved, would have effectively eliminated all options to purchase Coram's common stock because Coram Healthcare Corporation would be dissolved as soon as practicable after the effective date of the plan and all equity interests therein would be completely eliminated. Another plan put forth by the Debtors' management or other interested parties may have a similar effect, however, appropriate approvals thereof in accordance with the United States Bankruptcy Code would be required.

Coram entered into indemnification agreements with each of its directors and executive officers that would require Coram to provide indemnification to each such person in certain circumstances for claims made against them in connection with their service on behalf of the company.

## Summary of Cash and Certain Other Compensation of Executive Officers

The following table sets forth the annual and long-term compensation earned by the Chief Executive Officer and the five most highly compensated current and former executive officers of the company (other than such Chief Executive Officer) during the year ended December 31, 2000 (collectively the "Named Executive Officers") for services rendered in all capacities to the company and its subsidiaries for each of the years in the three-year period ended December 31, 2000.

### Summary Compensation Table

| Name and Principal Position(1) | Year | Annual Compensation | | | Long-Term Compensation Awards | All Other Compensation |
| | | Salary | Bonus | Other Annual Compensation(2) | Stock Options(#) | |
|---|---|---|---|---|---|---|
| Daniel D. Crowley (3) | 2000 | $ 650,000 | $ -- | $ 127,734 | -- | $ 50,000 |
| Director and Chairman of the Board, | 1999 | 50,000 | -- | -- | 1,000,000 | -- |
| Chief Executive Officer and President | 1998 | -- | -- | -- | -- | -- |
| Allen J. Marabito (4) | 2000 | $ 310,000 | $ -- | $ 100,768 | -- | $ 23,846 |
| Executive Vice President | 1999 | -- | -- | -- | 500,000 | -- |
| | 1998 | -- | -- | -- | -- | -- |
| Joseph D. Smith (5) | 2000 | $ 340,862 | $ -- | $ -- | -- | $ -- |
| Former Chief Operating Officer | 1999 | 311,767 | -- | -- | 350,000 | -- |
| and President, Resource Network division | 1998 | 264,827 | 217,500(8) | -- | 50,000 | -- |
| Scott R. Danitz (6) | 2000 | $ 192,308 | $ -- | $ -- | 50,000 | $ 70,405 |
| Senior Vice President, Chief | 1999 | 132,867 | 100,000(9) | -- | -- | -- |
| Financial Officer and Treasurer | 1998 | 107,231 | 10,000(8) | -- | 45,000 | -- |
| Scott T. Larson | 2000 | $ 185,000 | $ -- | $ -- | 40,000 | $ 100,000(10) |
| Former Senior Vice President, | 1999 | 184,914 | -- | -- | -- | -- |
| General Counsel and Secretary | 1998 | 163,481 | 105,000(8) | -- | 75,000 | -- |
| Vito Ponzio, Jr. (7) | 2000 | $ 161,923 | $ -- | $ -- | 40,000 | $ 50,944 |
| Senior Vice President, Human | 1999 | 143,846 | -- | -- | 50,000 | -- |
| Resources | 1998 | 129,827 | 86,250(8) | -- | 50,000 | -- |

48

JSP 01847

In September 2000 and October 2000, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") approved payments of up to approximately $2.6 million for the Debtors' Key Employee Retention Pan ("KERP"), which provides for bonuses payable to certain key management personnel. The bonuses were scheduled to be paid in two equal installments: (i) the later of the date of emergence from bankruptcy or December 31, 2000 (the "First KERP Installment") and (ii) December 31, 2001 (the "Second KERP Installment"). Due to events that have delayed emergence from bankruptcy, in March 2001 the Bankruptcy Court approved early payment of the First KERP Installment to all participating individuals, except for Mr. Crowley and Mr. Marabito. Mr. Crowley and Mr. Marabito will receive their First KERP Installment upon emergence from bankruptcy. Only the First KERP Installment amounts paid in March 2001 are included in the table above as "All Other Compensation" because such amounts principally relate to the year ended December 31, 2000.

The company also sponsors a Management Incentive Plan ("MIP"), which provides for annual bonuses payable to certain key employees. The bonuses are predicated on overall corporate performance (principally cash collections and earnings before interest, taxes, depreciation and amortization ("EBITDA")), as well as, individual performance targets and objectives. On March 20, 2001, the Compensation Committee of the company's Board of Directors approved an overall award of approximately $13.6 million for those individuals participating in the MIP. No amounts from the MIP for the year ended December 31, 2000 are included in the table above because such amounts are not yet scheduled to be paid.

(1)   See information above under captions "Board of Directors" and "Executive Officers" for employment history.

(2)   Does not include perquisites aggregating in dollar value less than the lesser of $50,000 or 10% of the individual's annual salary and bonus reported for such individual for the year presented. The perquisites exceeding 25% of the total perquisites for the Named Executive Officers include (i) $3,600 per month for temporary corporate housing and an auto allowance of $1,800 per month for Mr. Crowley and (ii) $3,500 per month for temporary corporate housing and an auto allowance of $1,000 per month for Mr. Marabito. The aforementioned corporate housing and auto allowances for Mr. Crowley and Mr. Marabito are subject to certain customary tax gross-up adjustments. Such adjustments are included in the "Other Annual Compensation" amounts.

(3)   Mr. Crowley participates in both the KERP and MIP retention/incentive arrangements. In connection therewith, his allocated amount under the First and Second KERP Installments aggregates $800,000. Mr. Crowley's allocated MIP amount for the year ended December 31, 2000 is approximately $10.8 million.

Effective August 2, 2000, the company's Board of Directors approved a contingent bonus to Mr. Crowley. Under the agreement, subject to certain material terms and conditions, Mr. Crowley is to be paid $1.8 million following the successful refinancing of the company's debt. In connection therewith and the debt to preferred stock conversion discussed in Notes 3 and 6 to the company's Consolidated Financial Statements, the company recorded a $1.8 million success bonus expense for the year ended December 31, 2000. Such success bonus will not be payable until such time as the Debtors' amended plan of reorganization is fully approved by the Bankruptcy Court.

Mr. Crowley owns Dynamic Healthcare Solutions, LLC ("DHS"), a consulting company from which Coram purchased services. For the years ended December 31, 2000 and 1999, the company paid approximately $0.7 million and $0.2 million, respectively, to Mr. Crowley's consulting company for related consulting services and reimbursable expenses (such payments to DHS are not included in the table above). The terms and conditions of the underlying consulting agreement were approved by the company's Board of Directors when Mr. Crowley was hired by Coram. Effective with the Debtors' Chapter 11 filings in the Bankruptcy Court, DHS employees who were serving as consultants to Coram terminated their employment with DHS and became full time Coram employees. Coram continues to reimburse DHS for the actual overhead costs of DHS' Sacramento, California location that are directly attributable to the duties Mr. Crowley performs on behalf of Coram. Such reimbursements do not include any element of profit for DHS.

(4)   Mr. Marabito participates in both the KERP and MIP retention/incentive arrangements. In connection therewith, his allocated amount under the First and Second KERP Installments aggregates $150,000. Mr. Marabito's allocated MIP amount for the year ended December 31, 2000 is $930,000.

(5)   Effective June 30, 2000, Mr. Smith resigned his position as Chief Operating Officer with Coram and has entered into a consulting agreement with the company. Under the agreement, Mr. Smith provides sales consulting services on an independent contractor basis until June 30, 2001. His consulting fee is $25,700 per month.

49

JSP 01848

(6) Effective January 1, 2001, Mr. Danitz was promoted to Chief Financial Officer and Treasurer. Mr. Danitz participates in both the KERP and MIP retention/incentive arrangements. In connection therewith, his allocated amount under the First and Second KERP Installments aggregates $100,000, including $50,000 of which was paid on or about March 15, 2001. Mr. Danitz's allocated MIP amount for the year ended December 31, 2000 is approximately $245,000.

(7) Mr. Ponzio participates in both the KERP and MIP retention/incentive arrangements. In connection therewith, his allocated amount under the First and Second KERP Installments aggregates $80,000, including $40,000 of which was paid on or about March 15, 2001. Mr. Ponzio's allocated MIP amount for the year ended December 31, 2000 is approximately $199,000.

(8) This amount reflects performance, retention and discretionary bonuses paid in 1998 for services rendered in 1997.

(9) This amount reflects discretionary bonuses earned in 1998 and paid in 1999 and retention bonuses paid in 2000 for services rendered in 1999.

(10) Effective January 15, 2001, Mr. Larson resigned his position with Coram. In connection therewith, an incentive/retention bonus of $100,000 was paid to Mr. Larson in January 2001.

## Option Grants in Last Fiscal Year

The following table sets forth information concerning options granted to each of the Named Executive Officers during the year ended December 31, 2000. In addition, in accordance with the rules of the Securities and Exchange Commission, hypothetical gains or "option spreads" that would exist for the respective options are also shown. These gains are based on assumed rates of annual compounded stock price appreciation of 5% and 10% from the date the options were granted over the full option term. No stock appreciation rights were granted to the Named Executive Officers during the year ended December 31, 2000.

| | Individual Grants | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term(1) | |
| Name | Number of Securities Underlying Options Granted | % of Total Options Granted to Employees in Fiscal Year | Exercise Price Per Share | Expiration Date | 5% | 10% |
|---|---|---|---|---|---|---|
| Daniel D. Crowley | -- | -- | $ -- | -- | $ -- | $ -- |
| Allen J. Marabito | -- | -- | -- | | -- | |
| Joseph D. Smith | -- | -- | -- | | -- | |
| Scott R. Danitz | 50,000 | 4.42 | 0.625 | February 1, 2010 | 19,653 | 49,804 |
| Scott T. Larson | 40,000 | 3.53 | 0.625 | February 1, 2010 | 15,722 | 39,844 |
| Vito Ponzio, Jr. | 40,000 | 3.53 | 0.625 | February 1, 2010 | 15,722 | 39,844 |

(1) Potential realizable value is determined by taking the exercise price per share and applying the stated annual appreciation rate compounded annually for the term of the option, subtracting the exercise price per share at the end of the period and multiplying the remaining number by the number of options granted. Actual gains, if any, on stock option exercises and common stock holdings are dependent on the future performance of Coram's common stock and overall stock market conditions. The above table does not reflect changes in the market price of Coram's common stock subsequent to December 31, 2000.

## Aggregated Option Exercises in Last Fiscal Year and Fiscal Year End Option Values

The following table sets forth information concerning the outstanding stock options held by each of the Named Executive Officers at December 31, 2000. No stock options or stock appreciation rights were exercised by the Named Executive Officers during the year ended December 31, 2000. No stock appreciation rights were held by the Named Executive Officers as of such date.

| | Number of Unexercised Options at December 31, 2000 | | In-the-Money Options at December 31, 2000(1) | |
| Name | Exercisable | Unexercisable | Exercisable | Unexercisable |
|---|---|---|---|---|
| Daniel D. Crowley | 333,333 | 666,667 | $ -- | $ -- |
| Allen J. Marabito | 166,667 | 333,333 | -- | -- |
| Joseph D. Smith | -- | -- | -- | -- |
| Scott R. Danitz | 28,853 | 66,147 | -- | -- |
| Scott T. Larson | 115,625 | 74,375 | -- | -- |
| Vito Ponzio, Jr. | 140,467 | 99,533 | -- | -- |

50

JSP 01849

(1)  Whether an option is "in-the-money" is determined by subtracting the exercise price of the option from the closing price for Coram's common stock on December 31, 2000 ($0.42) from the Over the Counter Bulletin Board maintained by the National Association of Securities Dealers, Inc. If the closing price for Coram's common stock on December 31, 2000 is greater than the exercise price of the option, the option is "in-the-money." For the purpose of such calculation, the market price per share is the applicable market price as of December 31, 2000 and does not reflect market price changes subsequent to December 31, 2000.

Shares subject to options granted to the company's Named Executive Officers under the 1994 Stock Option Plan will immediately vest in full upon (i) an acquisition of the company by merger or asset sale in which such options are not to be assumed by the acquiring entity or (ii) if such options are so assumed, the subsequent involuntary termination of the optionee's employment within eighteen months following such acquisition. In addition, the Compensation Committee of the Board of Directors, as the 1994 Stock Option Plan administrator, has the authority to provide for the accelerated vesting of the shares of the company's common stock subject to outstanding options held by the company's executive officers. Similarly, the Compensation Committee can accelerate vesting of any unvested shares actually held by those individuals under the 1994 Stock Option Plan in connection with a hostile takeover of the company effected through a successful tender offer for more than 50% of the company's outstanding securities, or through a change in the majority of the Board of Directors as a result of one or more contested elections for Board of Director membership, or in the event such individual's employment were involuntarily terminated following such hostile takeover.

The Debtors' restated joint plan of reorganization, if approved, would have effectively eliminated all options to purchase Coram's common stock because Coram Healthcare Corporation would be dissolved as soon as practicable after the effective date of the plan and all equity interests therein would be completely eliminated. Another plan put forth by the Debtors' management or other interested parties may have a similar effect, however, appropriate approvals thereof in accordance with the United States Bankruptcy Code would be required.

**Employment Contracts, Termination of Employment and Change of Control Arrangements**

The company has entered into or anticipates entering into employment and/or severance agreements with its Named Executive Officers and certain other executive officers as described below.

*Daniel D. Crowley.* Effective November 30, 1999, Coram entered into an employment agreement with Daniel D. Crowley, for a three-year term commencing on such date, unless otherwise terminated in accordance with its terms. The agreement also provides for two automatic one year renewals after the completion of the initial three year term. Under the agreement and related amendments, Mr. Crowley serves as Chairman of the Board of Directors, President and Chief Executive Officer of the company. He receives a base salary of $650,000 per year, subject to annual merit adjustments, and the right to receive performance bonuses, which are characterized as an EBITDA bonus and a refinancing success bonus. The EBITDA bonus generally provides incentive compensation by measuring operating results (EBITDA) against target EBITDA established by the Compensation Committee of the Board of Directors before the beginning of each year. Pursuant to the second amendment to Mr. Crowley's employment agreement, dated April 6, 2000, such EBITDA bonus for the year ended December 31, 2000 utilizes a two-tier methodology whereby Mr. Crowley receives the sum of (i) 25% of the company's EBITDA in excess of $14 million and (ii) a one-time $5 million enhanced bonus, which may be shared with other individuals as designated by Mr. Crowley, if the company's EBITDA exceeds $35 million. The refinancing success bonus provides for a $1.8 million award upon confirmation of the Debtors' plan of reorganization, if the plan includes a refinancing component. A refinancing, as contemplated by the third amendment to the employment agreement, dated August 2, 2000, is a Board of Directors approved transaction or series of related transactions that converts some or all of the company's principal debt instruments into new debt instruments and/or equity securities (common or preferred) of Coram Healthcare Corporation and Coram, Inc. The company's principal debt instruments are further defined to be those under the Securities Exchange Agreement and the Senior Credit Facility (see Note 8 to the company's Consolidated Financial Statements). Additionally, Mr. Crowley is also eligible to receive an acquisition bonus of approximately three times the sum of (i) his base salary and (ii) his EBITDA performance bonus in the event the company merges with or is acquired by another company.

Under the employment agreement, Mr. Crowley was also granted options to purchase 1,000,000 shares of Coram's common stock at $0.75 per share (the stock price of the company on November 29, 1999). The options vest and become exercisable in three equal annual installments upon Mr. Crowley's completion of each year of service. Mr. Crowley also receives four weeks of vacation, an automobile allowance in the amount of $1,800 per month, a tax preparation fee allowance, certain customary tax gross-up adjustments, temporary corporate housing in Denver and a company sponsored $1.0 million life insurance policy with Mr. Crowley's designee as the beneficiary thereunder. Mr. Crowley is also eligible for health, dental, medical and group life insurance. As part of the agreement, Mr. Crowley agreed that during the term of his employment at the company, and for one year thereafter, he will not directly or indirectly own, manage, control, participate in, consult with, render services to, or in any manner engage in any business

51

JSP 01850

which competes with the company's business in the company's geographical area. In addition, Mr. Crowley may not solicit the company's employees, customers or suppliers during the term of his employment at the company and for one year thereafter.

If Mr. Crowley's duties are substantially altered or his employment is terminated by the company other than for cause or voluntarily by Mr. Crowley in the event that the company fails to comply with any material provision of the agreement, then Mr. Crowley would be entitled to receive his base salary, automobile allowance and all available bonuses otherwise payable pursuant to the employment agreement for a period of three years from the date of separation. Additionally, during such three-year period, Mr. Crowley would retain his eligibility to participate in the company's health, dental, medical, group life and similar welfare benefit plans, as well as, the aforementioned company sponsored $1.0 million life insurance policy. If the Board of Directors and Mr. Crowley mutually agree to a new Chief Executive Officer and/or President, then all of the terms and conditions of Mr. Crowley's employment agreement would continue in effect; however, the aforementioned EBITDA bonus would be subject to an allocation between Mr. Crowley and the new executive.

*Allen J. Marabito.* Effective November 30, 1999, Coram entered into an employment agreement with Allen J. Marabito, for a three-year term commencing on such date, unless otherwise terminated in accordance with its terms. Under the agreement and related amendment, Mr. Marabito serves as Executive Vice President of the company. He receives a base salary of $310,000 per year, subject to annual merit adjustments, and the right to receive a performance bonus between 60% and 300% of his base salary, if the company's EBITDA exceeds the EBITDA target for that year that was established by the Compensation Committee of the Board of Directors. He is also eligible to receive an acquisition bonus of approximately three times the sum of (i) his base salary and (ii) his EBITDA performance bonus in the event the company merges with or is acquired by another company. If Mr. Marabito's employment is terminated by the company other than for cause or voluntarily by Mr. Marabito in the event that the company fails to comply with any material provision of the agreement, then Mr. Marabito would be entitled to receive his base salary through the longer of (i) the remaining term of the agreement; or (ii) twenty four months, plus the EBITDA target bonuses during such period. Under the agreement, Mr. Marabito was also granted options to purchase 500,000 shares of Coram's common stock at $0.8125 per share (the stock price of the company on December 17, 1999). The options vest and become exercisable in three equal annual installments upon Mr. Marabito's completion of each year of service. Mr. Marabito also receives four weeks of vacation, an automobile allowance in the amount of $1,000 per month, a tax preparation fee allowance, certain customary tax gross-up adjustments and temporary corporate housing in Denver. Mr. Marabito is also eligible for health, dental, medical and group life insurance. As part of the agreement, Mr. Marabito agreed that during the term of his employment at the company, and for one year thereafter, he will not directly or indirectly own, manage, control, participate in, consult with, render services to, or in any manner engage in any business which competes with the company's business in the company's geographical area. In addition, Mr. Marabito may not solicit the company's employees, customers or suppliers during the term of his employment at the company and for one year thereafter.

*Scott R. Danitz.* Effective August 1, 2000, Coram entered into an employment agreement with Mr. Danitz for a one-year term, unless otherwise terminated in accordance with its terms. Under the agreement, Mr. Danitz serves as Senior Vice President and Chief Accounting Officer of the company. Subsequently, Mr. Danitz was promoted to Chief Financial Officer and Treasurer, effective January 1, 2001. Mr. Danitz receives a base salary of $200,000 per year, subject to annual merit adjustments, and the right to receive certain bonus/incentive plan compensation. If Mr. Danitz's employment is terminated by the company other than for cause or upon the occurrence of a "change in control," then Mr. Danitz would be entitled to severance equal to a minimum of one year of salary and health and welfare benefits. In addition, Mr. Danitz is eligible to receive an acquisition bonus of approximately $200,000 in the event the company merges with or is acquired by another company. Mr. Danitz also receives an automobile allowance in the amount of $900 per month and is eligible for health, medical, dental and group life insurance. As part of the agreement, Mr. Danitz agreed that during the term of his employment at the company, and for one year thereafter, he will not directly or indirectly own, manage, control, participate in, consult with, render services to, or in any manner engage in any business which competes with the company's business in the company's geographical area. In addition, Mr. Danitz may not solicit the company's employees, customers or suppliers during the term of his employment at the company and for one year thereafter.

*Vito Ponzio, Jr.* Effective April 26, 1999, the company entered into a one-year automatically renewable employment agreement with Mr. Ponzio which provides for a payment of $150,000 and minimum severance equal to one year of salary upon the occurrence of a "change in control." The severance amount represents minimum severance, including health and welfare benefits, due upon termination by the company (other than for cause) or involuntary termination of employment following a "change in control." Mr. Ponzio agreed that during the term of his employment at the company, and for one year thereafter, he will not directly own, manage, control, participate in, consult with, render services to, or in any manner engage in any business which competes with the company's business in the company's geographical area. In addition, Mr. Ponzio may not solicit the company's employees, customers or suppliers during the term of his employment at the company and for one year thereafter.

JSP 01851

*Other Named Executive Officers.* Effective June 30, 2000, Joseph D. Smith resigned his position as Chief Operating Officer with Coram, terminated his then existing employment agreement and entered into a consulting agreement with the company. Under the agreement, Mr. Smith provides sales consulting services on an independent contractor basis until June 30, 2001. Mr. Smith receives a consulting fee of $25,700 per month. As part of the agreement, Mr. Smith agreed that during the term of his consulting arrangement at the company, and for one year thereafter, he will not directly or indirectly own, manage, control, participate in, consult with, render services to, or in any manner engage in any business which competes the company's business in the company's geographical area. In addition, Mr. Smith may not solicit the company's employees, customers or suppliers during the term of his employment at the company and for one year thereafter.

Effective January 15, 2001, Scott T. Larson resigned his position with Coram. In connection therewith, an incentive/retention bonus of $100,000 was paid to Mr. Larson in January 2001. Pursuant to Mr. Larson's employment agreement dated April 26, 1999, Mr. Larson agreed that during the term of his employment with the company, and for one year thereafter, he will not directly or indirectly own, manage, control, participate in, consult with, render services to or in any business which competes with the company's business in the company's geographical area. In addition, Mr. Larson may not solicit the company's employees, customers or suppliers during the term of his employment at the company and for one year thereafter.

Domenic A. Meffe served as the Vice President and General Manager of the company's Coram Prescription Services ("CPS") division from November 1997 through July 2000 and was appointed to serve as the division's President in January 1998. Mr. Meffe had a severance agreement which was to provide him with compensation equal to a minimum of two year's annual salary, a transaction bonus of $500,000 upon the closing of a sale of the CPS division and a retention payment of $72,500 in the event that Mr. Meffe remained employed through the consummation of any such sale. However, in conjunction with the sale of the CPS division to Curascript Pharmacy Services, Inc. and Curascript PBM Services, Inc., which are newly formed affiliates of GTCR Golder Rauner, L.L.C. and are led by certain members of the former CPS management team, including Mr. Meffe, all the aforementioned agreements were effectively rescinded and, as a result, no severance or bonus payments were made.

The Debtors' bankruptcy proceedings and the corresponding impact of the United States Bankruptcy Code could impose certain limitations on the amount of severance that the company would be permitted to pay under the aforementioned employment agreements and contracts.

For employment agreement purposes, a "change in control" is generally defined as (i) a merger or consolidation in which the company is not the surviving entity; (ii) the sale, transfer or other disposition of all or substantially all the assets of the company; (iii) any reverse merger in which the company is the surviving entity but in which securities possessing more than fifty percent of the total combined voting power of Coram's outstanding securities are transferred to a person or persons different from the persons holding those securities immediately prior to such merger. The term "change of control" has been defined in a way that would disqualify any change of control resulting from the conversion by Coram's current debtholders of their current convertible debt instruments into stock of Coram.

## ITEM 12. SECURITY OWNERSHIP OF PRINCIPAL STOCKHOLDERS AND MANAGEMENT

The following table sets forth, as of March 30, 2001 (unless otherwise noted below), the number of shares of outstanding Coram common stock beneficially owned by (i) each person known to Coram to be the owner of more than 5% of the its outstanding common stock, (ii) each of the executive officers of the company as of December 31, 2000, (iii) each of the members of the Board of Directors of the company as of December 31, 2000, and (iv) all members of the Board of Directors and executive officers of Coram as a group. All information is taken from or based upon ownership filings made by such persons with the Securities and Exchange Commission (the "Commission") or upon information provided by such persons to Coram.

| Name and Address of Beneficial Owner (1) | Number of Shares of Common Stock (2) | Percentage of Shares of Common Stock Outstanding |
|---|---|---|
| Donald J. Amaral | 2,624,296 | 5.0% |
| William J. Casey | 81,900 | * |
| Daniel D. Crowley | 333,333 | * |
| Scott R. Danitz | 52,984 | * |
| Scott T. Larson | 124,931 | * |
| Allen J. Marabito | 166,666 | * |
| Vito Ponzio, Jr. | 177,881 | * |

JSP 01852

| | | |
|---|---|---|
| L. Peter Smith | 117,581 | * |
| Sandra R. Smoley | 75,000 | * |
| All executive officers and directors, as a group (9 Persons) | 3,734,572 | .7.1 |
| Reporting Persons (as defined herein), as a group (3) | 6,993,409 | 14.1 |
| Cerberus Entities (4) | 21,190,076 | 29.9 |
| Foothill (5) | 8,633,779 | 14.8 |
| Goldman, Sachs (6) | 21,017,092 | 29.7 |

\* Less than 1%

(1) Unless otherwise indicated, the address of each person named above is 1125 Seventeenth Street, Suite 2100, Denver, Colorado 80202.

(2) The aggregate ownership numbers presented in the table above include shares of common stock acquirable upon exercise of common stock subject to options within 60 days for the following persons: Mr. Amaral 2,500,000; Mr. Casey 80,000; Mr. Crowley 333,333; Mr. Danitz 50,207; Mr. Larson 117,707; Mr. Marabito 166,666; Mr. Ponzio 170,857; Mr. L. Peter Smith 87,500 and Ms. Smoley 75,000. Mr. Larson resigned his position with the company on January 15, 2001. In connection therewith, his options to purchase shares of common stock were outstanding as of March 30, 2001 and are included in the table above, but such options expired on or about April 15, 2001. Except as indicated by footnote, Coram has been advised that the persons and entities named in the table above have sole voting and investment power with respect to all shares of common stock shown as beneficially owned by them.

(3) On July 14, 2000, an investor group seeking representation on the Coram Healthcare Corporation Board of Directors filed a Schedule 13D pursuant to Rule 13d-1(k)(1) of Regulation 13D-G under the Securities Exchange Act of 1934. As stated in such filing, the investor group was concerned that management may consider a restructuring that, absent representation of their interests, would be materially detrimental to their equity holdings. To protect their interests in the company, the investor group may engage in actions directly or through agents such that they may be deemed to constitute a "group" within the meaning of Section 13(d) (3) of the Securities Exchange Act of 1934, and as such, each of the members of such group are deemed to beneficially own all shares of stock owned by the entire group; however, each member of the group has disclaimed beneficial ownership of the shares held by the group. The most recent Schedule 13D/A filing on December 19, 2000 was on behalf of Jerome Blank; Andrew Blank; AEOW '96, LLC, a California limited liability company; Harry Heller Falk; F. Philip Handy; Heller Family Limited Partnership, a Florida limited partnership; the Bernard Osher Trust UTA dated 3-8-88, a California trust; JB Capital Management, Inc., a Florida Corporation; Bernard Osher; the RHH Company, a Florida Corporation and Richard L. Haydon (collectively referred to as the "Reporting Persons").

(4) Information with respect to Cerberus Partners, L.P. ("Cerberus"), Cerberus International, Ltd. ("International"), Ultra Cerberus Fund, Ltd. ("Ultra") and certain private investment funds (the "Other Funds") (Cerberus, International, Ultra and the Other Funds are collectively referred to as the "Cerberus Entities") are based on the Schedule 13D, Amendment No. 1, Amendment No. 2 and Amendment No. 3 thereto, dated June 30, 1998, August 26, 1998, April 9, 1999 and July 16, 2000, respectively, filed with the Commission and Coram's records reflecting the Series B Senior Subordinated Convertible Notes (the "Series B Notes") issued to the Cerberus Entities. The Cerberus Entities hold $42,380,152 principal amount of the Series B Notes of the company as of March 30, 2001. The Series B Notes are convertible, at the option of the holder thereof, into 21,190,076 shares of common stock of Coram at the rate of $2.00 per share.

Pursuant to an agreement between Cerberus and Goldman Sachs Credit Partners, L.P. ("GSCP"), dated April 22, 1997 (the "GSCP Agreement"), GSCP has the right to receive the dividends from, and the proceeds from the sale of, $9,597,796 principal amount (the "GSCP Interest") of the $17,995,868 principal amount of the Series B Notes held by Cerberus and the shares of common stock into which such Series B Notes relating to the GSCP Interest are convertible. In addition, certain unaffiliated entities, in the aggregate, have the right to receive the dividends from, and the proceeds from the sale of, $671,846 principal amount of Series B Notes and the shares of common stock into which such Series B Notes are convertible. The address for the Cerberus Entities is 450 Park Avenue, 28th Floor, New York, New York 10022.

(5) Information with respect to Foothill Capital Corporation is based on the Schedule 13G, Amendment No. 1 and Amendment No. 2 thereto dated June 30, 1998, August 26, 1998 and April 9, 1999, respectively, filed with the Commission and Coram's records reflecting Series B Notes issued to Foothill Capital Corporation. Such filings with the Commission were on behalf of The Foothill Group, Inc., a Delaware Corporation ("Group"); Foothill Capital Corporation, a California corporation ("Capital"); Foothill Partners II, L.P., a Delaware limited partnership ("Partners"); Foothill Income Trust, L.P., a Delaware limited partnership ("Foothill Trust"); FIT GP, LLC, a Delaware limited liability company ("FIT") and M. Edward Stearns, Karen S. Sandler, Dennis

54

JSP 01853

R. Ascher, Jeffrey T. Nikora, and John F. Nickoll (collectively, the "Managing Partners/Members") and Peter E. Schwab and David C. Hilton (the "Managing Partners") (Group, Capital, Partners, Foothill Trust, FIT, the Managing Partners/Members and the Managing Partners are collectively referred to as "Foothill"). Group, the Managing Partners/Members and the Managing Partners are the general partners of Partners. Capital is a wholly-owned subsidiary of Group. FIT is the general partner of Foothill Trust and the Managing Partners/Members are the managing members of FIT. Accordingly, (i) Group, the Managing Partners/Members and the Managing Partners may be deemed to beneficially own the shares of common stock held by Partners, as its general partners, (ii) the Managing Partners/Members may be deemed to beneficially own the shares of common stock held by Foothill Trust as the managing members of the general partner of Foothill Trust, (iii) FIT may be deemed to beneficially own the shares of common stock held by Foothill Trust, as its general partner, and (iv) Group may be deemed to beneficially own the shares held by Foothill Capital as its sole shareholder. Foothill has a beneficial interest in all or part of $17,267,557 principal amount of the company's Series B Notes, which are convertible into 8,633,779 shares of common stock at a conversion price of $2.00 per share. The address for Foothill is 2450 Colorado Avenue, Suite 3000W, Santa Monica, California 90404.

(6) Goldman, Sachs & Co. ("GS") is an indirect wholly-owned subsidiary of The Goldman Sachs Group, Inc. ("GSG"). GSG is the 99% owner of GS Global Holdings L.L.C. ("GSGH"). GSGH is the general partner of Goldman Sachs Credit Partners, L.P. ("GSCP").

As of March 30, 2000, GS, GSG and GSGH may be deemed to own beneficially and indirectly in the aggregate 21,017,092 shares of common stock by reason of the ownership by GSCP of (a) $32,436,389 principal amount of the Series B Notes of the company issued pursuant to the Securities Exchange Agreement dated May 6, 1998, as amended (the "Securities Exchange Agreement"), which are convertible into 16,218,194 shares of common stock and (b) $9,597,796 principal amount of the Series B Notes issued pursuant to the Securities Exchange Agreement with the company which are convertible into 4,798,898 shares of common stock and are deemed to be beneficially and indirectly owned through the GSCP Interest. Under the terms of the Series B Notes the company has the right, in lieu of payment of interest in cash, to pay interest on each interest payment date through the issuance of additional Series B Notes in a principal amount equal to the amount of interest then due and owing. GS, GSG and GSGH each disclaim beneficial ownership of the securities reported herein, except to the extent of their pecuniary interest therein.

GSCP may be deemed to own beneficially and directly $32,436,389 principal amount of the Series B Notes issued pursuant to the Securities Exchange Agreement which are convertible into 16,218,194 shares of common stock and beneficially and indirectly $9,597,796 principal amount of the Series B Notes which are convertible into 4,798,898 shares of common stock pursuant to the GSCP Agreement. GSCP disclaims beneficial ownership of the securities reported herein, except to the extent of its pecuniary interest therein.

GS, a National Association of Securities Dealers member, is an investment banking firm that regularly performs services such as acting as a financial advisor and serving as principal or agent in the purchase and sale of securities. The address for Goldman, Sachs & Co. is 85 Broad Street, New York, New York 10004.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

L. Peter Smith previously served on the Board of Directors of Sabratek Corporation ("Sabratek"), a manufacturer of medical devices. In December 1998, Coram agreed to amend its agreement with Sabratek to make Sabratek the company's sole supplier of multi-therapy infusion pumps and related proprietary telemedicine technology during the next ten years. This agreement contains a provision that allows either party to cancel the agreement upon 90 days notice. The pricing schedule applicable to the infusion pumps and related technology to be purchased was negotiated by certain of Coram's management after proposals from other manufacturers for comparable equipment had been solicited. The company purchased approximately $2.8 and $7.8 million of multi-therapy infusion pumps and related proprietary telemedicine technology from Sabratek Corporation during the years ended December 31, 1999 and 1998, respectively. Sabratek filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court in Delaware on December 17, 1999 and, in connection therewith, Coram filed a $1.3 million proof of claim in Sabratek's bankruptcy proceedings for vendor rebates earned but not paid. In January 2000, the assets and certain liabilities of Sabratek's Device Business were acquired by Baxter Healthcare Corporation ("Baxter"). Baxter subsequently filed a proof claim of approximately $0.3 million in the Debtors' bankruptcy proceedings for products purchased from Sabratek. Management is currently evaluating the validity of Baxter's proof of claim. Notwithstanding the separate proofs of claim filings, Baxter and the company have an ongoing amicable business relationship involving drugs, supplies and pumps sold by Baxter to the company.

55

JSP 01854

On July 31, 2000, Coram completed the sale of its Coram Prescription Services ("CPS") business to a management-led group financed by GTCR Golder Rauner, L.L.C. for a one-time payment of approximately $41.3 million. See Note 5 to the company's Consolidated Financial Statements.

Stephen A. Feinberg, a former director of the company, is the managing member of Cerberus Associates, L.L.C., which is the general partner of Cerberus Partners, L.P., a party to the company's debtor-in-possession financing agreement, Senior Credit Facility and Securities Exchange Agreement (collectively the "Cerberus Entities"). The Cerberus Entities are also the investment managers for each of the International, Ultra and Other Funds. As of April 9, 2001, the Cerberus Entities held $28.2 million and $42.4 million principal amount of the company's Series A Senior Subordinated Unsecured Notes and Series B Senior Subordinated Unsecured Convertible Notes, respectively. No amounts are outstanding under the Senior Credit Facility, which expired on February 6, 2001; however, with the proceeds from the disposition of the CPS division, the company paid approximately $14.6 million to the Cerberus Entities in satisfaction of the outstanding balance on the Senior Credit Facility and a partial payment on the Series A Senior Subordinated Unsecured Notes. Contemporaneous with the expiration of the Senior Credit Facility, warrants held by the Cerberus Entities to purchase 680,124 shares of the company's common stock also expired. In connection with the Debtors' bankruptcy proceedings, effective August 30, 2000, the Debtors entered into a secured debtor-in-possession financing agreement with Madeleine L.L.C., an affiliate of the Cerberus Entities. Although the company has not borrowed any amounts under the debtor-in-possession financing arrangement, approximately $0.4 million was paid to the Cerberus Entities as origination fees.

On December 28, 2000, the Debtors announced the Bankruptcy Court's approval of their request to convert a sufficient amount of debt and related accrued interest to equity in the form of Coram, Inc. Series A Cumulative Preferred Stock in order to maintain compliance with the physician ownership and referral provisions of the Omnibus Budget Reconciliation Act of 1993 (commonly referred to as "Stark II"). On December 29, 2000, the Securities Exchange Agreement was amended ("Amendment No. 4") and an Exchange Agreement was simultaneously executed. Pursuant to such arrangements, the Cerberus Entities agreed to exchange approximately $45.0 million aggregate principal amount of the Series A Senior Subordinated Unsecured Notes (the "Series A Notes") and $3.8 million of aggregate unpaid accrued contractual interest on the Series A Notes and the Series B Senior Subordinated Unsecured Convertible Notes (the "Series B Notes") as of December 29, 2000 for approximately 417 shares of Coram, Inc. Series A Cumulative Preferred Stock (see Note 11 to the Consolidated Financial Statements for further details regarding the preferred stock). Pursuant to Amendment No. 4, the per annum interest rate on both the Series A Notes and the Series B Notes has been adjusted to 9.0%. Moreover, the Series A Notes' and Series B Notes' original scheduled maturity dates of May 2001 and April 2008, respectively, have both been modified to June 30, 2001.

Effective August 1, 1999, Mr. Crowley and Cerberus Capital Management, L.P. (an affiliate of the Cerberus Entities) executed a three-year employment agreement whereby Mr. Crowley provides certain services and is paid $960,000 per annum, plus the potential of performance related bonus opportunities. Additionally, Mr. Crowley is entitled to expense reimbursements and participation in the vacation, pension, profit sharing, life insurance, hospitalization, major medical and other employee benefit plans as may be offered by the Cerberus Entities. The bonuses contemplated under the agreement are predicated on a sophisticated set of financial criteria that principally relate to the fiscal performance, market value and disposition proceeds of the Cerberus Entities' equity investees. Moreover, Mr. Crowley maintains an option to purchase up to 3% of the capital stock in the Cerberus Entities' equity investees, exclusive of Coram. The employment agreement is subject to automatic one year extensions unless either party provides written notice within 60 days of the original expiration date or subsequent renewal dates. The Cerberus Entities may also unilaterally terminate the employment agreement with written notice; however, all unpaid salary and bonuses on the remaining term of the initial three-year agreement, as well as participation in employee benefit plans, would continue to be obligations of the Cerberus Entities pursuant to the terms and conditions of the employment agreement. Termination for cause, disability, death and breach of the employment contract result in varying degrees of severance and employee benefit plan participation. The services rendered by Mr. Crowley include, but are not limited to, business and strategic healthcare investment advice to executive management at the Cerberus Entities. Moreover, Mr. Crowley is the Chairman of the Board of Directors of Winterland Productions, Inc. ("Winterland"), a privately held affinity merchandise company, which is a portfolio investment of the Cerberus Entities. On January 2, 2001, Winterland voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code in the Northern District of California.

Mr. Crowley is the Chairman, Chief Executive Officer and President of Dynamic Healthcare Solutions, LLC ("DHS"), a privately held management consulting and investment firm. Coram utilized the consulting services of Mr. Crowley's company and made payments for these services and certain reimbursable expenses. For the year ended December 31, 2000, the company paid approximately $0.7 million to Mr. Crowley's consulting company for consulting services and reimbursable expenses. Effective with the Debtors' Chapter 11 filings in the Bankruptcy Court, DHS employees who were serving as consultants to Coram terminated their employment with DHS and became full time Coram employees. Coram continues to reimburse DHS for the actual overhead costs of

56

JSP 01855

DHS' Sacramento, California location that are directly attributable to the duties Mr. Crowley performs on behalf of Coram. Such reimbursements do not include any element of profit for DHS.

PART IV

## ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K

(a) The following documents are filed as part of this report:

1. *Financial Statements.* The following Consolidated Financial Statements of the registrant and Report of Independent Auditors are presented on pages F-1 and thereafter:

Report of Independent Auditors

Consolidated Balance Sheets -- December 31, 2000 and 1999

Consolidated Statements of Income -- Years ended December 31, 2000, 1999 and 1998

Consolidated Statements of Stockholders' Equity -- Years ended December 31, 2000, 1999 and 1998

Consolidated Statements of Cash Flows -- Years ended December 31, 2000, 1999 and 1998

Notes to Consolidated Financial Statements

2. *Financial Statement Schedule.* The following consolidated financial statement schedule of the registrant for the years ended December 31, 2000, 1999 and 1998 is presented following the Notes to Consolidated Financial Statements.

Schedule II -- Valuation and Qualifying Account

Schedules not listed above have been omitted because they are not applicable or are not required or the information required to be set forth therein is included in the Consolidated Financial Statements or notes thereto.

(b) Reports on Form 8-K.

On January 16, 2001, Coram Healthcare Corporation filed a report on Form 8-K regarding an order denying acceptance of the joint plan of reorganization of Coram Healthcare Corporation and its wholly-owned subsidiary, Coram, Inc., by the United States Bankruptcy Court for the District of Delaware.

On April 4, 2001, Coram Healthcare Corporation filed a report on Form 8-K relating to the settlement agreement entered into by and among Coram Resource Network, Inc., Coram Independent Practice Association, Inc., Coram Healthcare Corporation and Coram, Inc.

On April 4, 2001, Coram Healthcare Corporation filed a report on Form 8-K announcing the approval by the United States Bankruptcy Court for the District of Delaware of the company's request to exchange a sufficient amount of debt and related accrued interest for equity in the form of Coram, Inc. Series A Cumulative Preferred Stock.

(c) Exhibits

Included as exhibits are the items listed on the Exhibit Index. The registrant will furnish a copy of any of the exhibits listed below upon payment of $5.00 per exhibit to cover the costs to the registrant of furnishing such exhibit.

57

JSP 01856

| Exhibit Number | | Exhibit |
|---|---|---|
| 2.1 | -- | Agreement and Plan of Merger dated as of February 6, 1994, by and Among the registrant, T³ Curaflex, Healthinfusion, Medisys, T³ Acquisition company, CHS Acquisition company and MI Acquisition company (Incorporated by reference to Exhibit 2.1 of Registration No. 33-53957 on Form S-4). |
| 2.2 | -- | First Amendment to Agreement and Plan of Merger dated as of May 25, 1994; by and among the registrant, T³ Curaflex, Healthinfusion, Medisys, T³ Acquisition company, CHS Acquisition company, HII Acquisition company and MI Acquisition company (Incorporated by reference to Exhibit 2.2 of Registration No. 33-53957 on Form S-4). |
| 2.3 | -- | Second Amendment to Agreement and Plan of Merger dated as of July 8, 1994 by and among the registrant, T³, Curaflex, Healthinfusion, Medisys, T³ Acquisition company, CHS Acquisition company, HII Acquisition company and MI Acquisition company (Incorporated by Reference to Exhibit 2.3 of the registrant's Current Report on Form 8-K dated as of July 15, 1994). |
| 2.4 | -- | Asset Sale and Note Purchase Agreement, (the "Asset Purchase Agreement") among the registrant, Caremark International Inc. and Caremark Inc. dated as of January 29, 1995 (Incorporated by reference to Exhibit C of the registrant's Current Report on Form 8-K dated April 6, 1995).(a) |
| 2.5 | -- | Agreement and Plan of Merger among the registrant, CHC Acquisition Corp. and Lincare Holdings Inc., (the "Lincare Merger Agreement") dated as of April 17, 1995 (Incorporated by reference to Exhibit B of The registrant's Current Report on Form 8-K dated May 2, 1995).(a) |
| 2.6 | -- | Agreement and Plan of Merger entered into as of October 19, 1996, Among Coram Healthcare Corporation, Integrated Health Services, Inc. and IHS Acquisition XIX, Inc. (Incorporated by reference to Exhibit 2.1 of the registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1996). |
| 2.7 | -- | Purchase Agreement by and between Integrated Health Services, Inc., T² Medical, Inc., Coram Healthcare Corporation of Greater New York and Coram Healthcare Corporation. (Incorporated by reference to Exhibit 2 of the registrant's Current Report on Form 8-K dated as of August 20, 1997). |
| 2.8 | -- | Side Agreement dated as of September 30, 1997 among Coram Healthcare Corporation, T² Medical, Inc., Coram Healthcare Corporation of Greater New York and Integrated Health Services, Inc. (Incorporated by reference to Exhibit 2.1 of the registrant's Current Report on Form 8-K dated as of September 30, 1997). |
| 2.9 | -- | Purchase Agreement by and between Curaflex Health Services, Inc., Coram Healthcare Corporation, Curascript Pharmacy, Inc., Curascript PBM Services, Inc. and QTCR Fund VI, L.P., dated July 31, 2000. (Incorporated by reference to Exhibit 2.1 of the registrant's Current Report on Form 8-K dated as of July 31, 2000). |
| 2.10 | -- | Debtor-In-Possession Financing Agreement dated August 30, 2000, by and among Coram Healthcare Corporation and Coram, Inc. and Madeleine L.L.C. (Incorporated by reference to Exhibit 2.1 of the registrant's Current Report on Form 8-K dated as of September 13, 2000). |
| 3.1 | -- | Certificate of Incorporation of registrant, as amended through May 1, 1994 (Incorporated by reference to Exhibit 3.1 of Registration No. 33-53957 on Form S-4). |
| 3.2 | -- | Bylaws of registrant (Incorporated by reference to Exhibit 3.2 of Registration No. 33-53957 on Form S-4). |

58

JSP 01857

| 3.3 | -- | Certificate of Amendment of the registrant's Certificate of Incorporation (incorporated by reference to Exhibit 3.3 of the registrant's Annual Report on Form 10-K for the year ended December 31, 1997). |
| 4.1 | -- | Form of Common Stock Certificate for the registrant's common stock, $.001 par value per share. (Incorporated by reference to Exhibit 4.1 of the registrant's Annual Report on Form 10-K for the year ended December 31, 1994). |
| 4.2 | -- | Form of Common Stock Certificate for the registrant's common stock, par value $0.001, including legend thereon in respect of the Stockholder Rights Agreement which exhibit is hereby incorporated by reference thereto. |
| 4.3 | -- | Form of Certificate of Designation, Preferences and Rights of the registrant's Series X Participating Preferred Stock (filed as Exhibit A to the Stockholder Rights Agreement, which was filed as Exhibit 1 To the registrant's Current Report on Form 8-K dated as of June 25, 1997, and which exhibit is hereby incorporated by reference thereto). |
| 4.4 | -- | Form of Certificate of Designation, Preferences and Relative, Participating, Optional and Other Special rights of Preferred Stock and Qualifications, Limitations and Restrictions Thereof, dated December 29, 2000. (Incorporated by reference to Exhibit 4.1 of the registrant's Current Report on Form 8-K dated as of December 28, 2000). |
| 10.1 | -- | Amended and Restated Credit Agreement dated as of February 10, 1995, by and among Curaflex, $T^3$, HealthInfusion, Medisys, and HMSS as Co-Borrowers, Toronto Dominion (Texas), Inc., as Agent (the "Amended Credit Agreement") (Incorporated by reference to Exhibit 10.1 of the registrant's Annual Report on Form 10-K for the year ended December 31, 1994).(a) |
| 10.2 | -- | Form of Employment Agreement between the registrant and Charles A. Laverty (Incorporated by reference to Exhibit 10.1 of Registration No. 33-53957 on Form S-4). |
| 10.3 | -- | Form of Severance/Non-Compete Agreement between the registrant and Miles E. Gilman (Incorporated by reference to Exhibit 10.2 of Registration No. 33-53957 on Form S-4). |
| 10.4 | -- | Form of Severance/Non-Compete Agreement between the registrant and William J. Brummond (Incorporated by reference to Exhibit 10.3 of Registration No. 33-53957 on Form S-4). |
| 10.5 | -- | Form of Severance/Non-Compete Agreement between the registrant and Tommy H. Carter (Incorporated by reference to Exhibit 10.4 of Registration No. 33-53957 on Form S-4). |
| 10.6 | -- | Form of Indemnification Agreement between the registrant and each of the registrant's directors and certain executive officers. (Incorporated by reference to Exhibit 10.6 of the registrant's Form 10-K for the year ended December 31, 1994). Revised Incorporated by reference to Exhibit 10.7 of the registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1999. |
| 10.7 | -- | Registrant's 1994 Stock Option/Stock Issuance Plan and related Forms of agreements (Incorporated by reference to Exhibit 10.15 of Registration No. 33-53957 on Form S-4). |
| 10.8 | -- | Registrant's Employee Stock Purchase Plan (Incorporated by reference to Exhibit 10.16 of Registration No. 33-53957 on Form S-4). |
| 10.9 | -- | 401(k) Plan of $T^3$ Medical, Inc. dated December 8, 1989 (Incorporated herein by Reference to Exhibit 10(c) of $T^3$ Annual Report on Form 10-K for the fiscal year ended September 30, 1989, filed with the Commission on or about December 29, 1988.) |
| 10.10 | -- | 1988 Stock Option Plan of $T^2$ Medical, Inc., as amended and |

59

JSP 01858

restated as of July 31, 1990 and as further amended as of (i) August 20, 1991; (ii) November 12, 1991; and (iii) July 6, 1992 (Incorporated by reference to Exhibit 10.18 of Registration No. 33-53957 on Form S-4).

10.11 — Curaflex 1989 Stock Option Plan (Incorporated by reference to Exhibit 10.53 of Registration No. 33-53957 on Form S-4).

10.12 — Curaflex Amended 1990 Stock Option Plan (Incorporated by reference to Exhibit 10.54 of Registration No. 33-53957 on Form S-4).

10.13 — Curaflex Directors' Nonqualified Stock Option Plan (Incorporated by reference to Exhibit 10.59 of Registration No. 33-53957 on Form S-4).

10.14 — Clinical Homecare Ltd. 1990 Incentive Stock Option Plan, as amended (Incorporated by reference to Exhibit 10.61 of Registration No. 33-53957 on Form S-4).

10.15 — Clinical Homecare Ltd. 1990 Stock Option Plan, as amended (Incorporated by reference to Exhibit 10.67 of Registration No. 33-53957 on Form S-4).

10.16 — 1989 Stock Option Plan of Medisys (Incorporated by reference to Exhibit 10.85 of Registration No. 33-53957 on Form S-4).

10.17 — Form of Non-Plan Option Agreement of Medisys (Incorporated by Reference to Exhibit 10.86 of Registration No. 33-53957 on Form S-4).

10.18 — Credit Agreement among Coram Healthcare Corporation, Coram, Inc., the Lenders named therein and Chemical Bank, as Administrative Agent, Collateral Agent and Fronting Bank (the "Senior Credit Facility") dated as of April 6, 1995. (Incorporated by reference to Exhibit D of the registrant's Current Report on Form 8-K dated April 6, 1995).(a)

10.19 — First Amendment and Waiver to the Credit Agreement, dated as of August 9, 1995, together with exhibits hereto, among the registrant, Coram Inc., each Subsidiary Guarantor (as defined therein), the Financial Institutions party thereto (as defined therein), and Chemical Bank as Agent. (Incorporated by reference to Exhibit 10.19 of the registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1995).(a)

10.20 — Second Amendment to the Credit Agreement dated as of September 7, 1995, by and among the registrant, Coram Inc., each Subsidiary Guarantor (as defined therein), the Financial Institutions party thereto (as defined therein), and Chemical Bank as Agent. (Incorporated by reference to Exhibit 10.20 of the registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1995).(a)

10.21 — Third Amendment and Limited Waiver to the Credit Agreement, dated as of September 29, 1995, by and among the registrant, Coram Inc., each Subsidiary Guarantor (as defined therein), the Financial Institutions party thereto (as defined therein), and Chemical Bank as Agent (Incorporated by reference to Exhibit 10.21 of the registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1995).(a)

10.22 — Fourth Amendment and Limited Waiver to the Credit Agreement and First Amendment to Security Documents dated as of October 13, 1995, together with selected exhibits thereto, by and among the registrant, Coram Inc., each Subsidiary Guarantor (as defined therein), the Financial Institutions Party thereto (as defined therein) and Chemical Bank as Agent (Incorporated by reference to the company's Current Report on Form 8-K as filed October 24, 1995).

10.23 — Warrant Agreement dated as of October 13, 1995, among the registrant, Coram Inc., and the other parties specified therein (Incorporated by reference to the company's Current

60

JSP 01859

Report on Form 8-K as filed October 24, 1995).

10.24 — Amendment and Limited Waiver to Bridge Securities Purchase Agreement, dated as of October 13, 1995, by and among the registrant, Coram Inc., and Donaldson, Lufkin & Jenrette. (Incorporated by reference to Exhibit 10.24 of the registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1995).(a)

10.25 — Form of Employment Agreement, Amendment No. 1 and Amendment No. 2 dated as of April 23, 1999, of Employment Agreement between the registrant and Donald J. Amaral. (Incorporated by reference to Exhibit 10.25 and 10.04 of the registrant's Quarterly Report on Form 10-Q for the quarters ended September 30, 1995, June 30, 1998, and September 30, 1999, respectively).

10.26 — Securities Purchase Agreement ("Securities Purchase Agreement") and Form of Subordinated Bridge Note, dated as of April 6, 1995, among Coram Inc., Coram Funding, Inc. and the registrant (Incorporated by reference to Exhibit E of the registrant's Current report on Form 8-K dated April 6, 1995).(a)

10.27 — Exclusive Distribution Agreement--Healthcare Products and Biomedical Equipment and Services Agreement between Medical Specialties Distributors, Inc. ("MSD") and Coram, dated as of June 1, 1996. (Incorporated by reference to Exhibit 10.1 of the registrant's Quarterly Report on Form 10-Q/A Amendment No. 1 for the quarter ended June 30, 1996).

10.28 — Medical Specialties Master Service Agreement between MSD and Coram, dated as of June 1, 1996. (Incorporated by reference to Exhibit 10.2 of the registrant's Quarterly Report on Form 10-Q/A Amendment No. 1 for the quarter ended June 30, 1996).

10.29 — Medical Specialties Master Rental Agreement between MSD and Coram, dated as of June 1, 1996. (Incorporated by reference to Exhibit 10.3 of the registrant's Quarterly Report on Form 10-Q/A Amendment No. 1 for the quarter ended June 30, 1996).

10.30 — Coram Healthcare Litigation Memorandum of Understanding between all Parties to In re Coram Healthcare Corp. Securities Litigation, Master File No. 95-N-2074 and Shevde v. Sweeney et al., Civil Action No. 96-N-722, dated as of August 5, 1996. (Incorporated by reference to Exhibit 10.4 of the registrant's Quarterly Report on Form 10-Q/A Amendment No. 1 for the quarter ended June 30, 1996).

10.31 — Fifth Amendment to the Credit Agreement dated as of February 6, 1996, by and among the registrant, Coram Inc., each Subsidiary Guarantor (as defined therein), the Financial Institutions party thereto (as described therein), and Chemical Bank as Agent. (Incorporated by reference to Exhibit 99.1 of the registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 1996).(a)

10.32 — Sixth Amendment to Credit Agreement dated as of April 19, 1996, by and among the registrant, Coram Inc., each Subsidiary Guarantor (as defined therein), the Financial Institutions party thereto (as described therein), and Chemical Bank as Agent. (Incorporated by reference to Exhibit 99.2 of the registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 1996).(a)

10.33 — Seventh Amendment to Credit Agreement dated as of July 3, 1996, by and among the registrant, Coram Inc., each Subsidiary Guarantor (as defined therein), the Financial Institutions party thereto (as described therein), and Chemical Bank as Agent. (Incorporated by reference to Exhibit 99.1 of the registrant's Quarterly Report on Form 10-Q/A Amendment No. 1 for the quarter ended June 30, 1996).(a)

10.34 — Eighth Amendment to Credit Agreement dated as of December 3, 1996, By and among the registrant, Coram Inc., each Subsidiary

61

JSP 01860

Guarantor as defined therein), the Financial Institutions
party thereto (as described therein), and Chase Manhattan Bank
as Agent.(a)

10.35 — Ninth Amendment and Limited Waiver to the Credit Agreement
dated as of March 14, 1997, by and among the registrant, Coram
Inc., each Subsidiary Guarantor (as defined therein), the
Financial Institutions party thereto (as described therein),
and Chase Manhattan Bank as Agent.(a)

10.36 — Amended Agreement, dated as of March 28, 1997 by and among the
registrant, Coram Inc., and Donaldson, Lufkin & Jenrette.(a)

10.37 — Sabratek Corporation and Coram Healthcare Exclusive Supply
Agreement for IV Infusion Pumps, IV Disposable Sets and
Related Items, dated as of February 26, 1997.

10.38 — Amendment to 9¾% Subordinated Convertible Debenture and Notice
of Conversion dated as of June 30, 1996, by and among the
registrant, Coram Inc., and the other parties specified
therein (Incorporated by reference to the company's report on
Form 8-K as filed on July 12, 1996).

10.39 — Tenth Amendment to Credit Agreement dated June 2, 1997, by and
Among the registrant, Goldman Sachs Credit Partners L.P.,
Coram, Inc., each Subsidiary Guarantor (as defined therein)
and The Chase Manhattan Bank, as administrative agent and
collateral agent for the Lenders named therein, to that
certain Credit Agreement dated as of April 6, 1995, by and
among the registrant, Coram, Inc, each Subsidiary Guarantor
(as defined therein), the Financial Institutions named therein
and the Chase Manhattan Bank, as collateral agent for the
Lenders named therein (Incorporated by reference to Exhibit 99
of the registrant's Current Report on Form 8-K dated as of
June 2, 1997).(a)

10.40 — Letter Agreement of March 29, 1998 by and among Cerberus
Partners, L.P., Goldman Sachs Credit Partners, L.P. and
Foothill Capital Corporation on the one hand, and Coram
Healthcare Corporation, on the other, deferring the payment of
interest and fees pursuant to (i) the Securities Purchase
Agreement dated as of April 6, 1995 and (ii) the Letter
Agreement dated March 28, 1997 between Coram Funding, Inc. and
Coram Healthcare Corporation. (Incorporated by reference to
Exhibit 10.40 of the registrant's Annual Report on Form 10-K
for the year ended December 31, 1997).

10.41 — Prime Vendor Agreement and Letter Amendment, dated October 14,
1999, between Coram Healthcare Corporation and Cardinal
Health, Inc. Certain portions of the Prime Vendor Agreement
have been omitted pursuant to a request for confidential
treatment. The entire Prime Vendor Agreement has been filed
confidentially with the Securities Exchange Commission.
(Incorporated by reference to Exhibit 10.1 of the registrant's
Quarterly Report on Form 10-Q for the quarters ended September
30, 1998 and 1999, respectively).

10.42 — Amendment No. 1 and Waiver to the Securities Exchange
Agreement among the registrant, Cerberus Partners, L.P.,
Goldman Sachs Credit Partners L.P., and Foothill Capital
Corporation. (Incorporated by reference to Exhibit 10.01 of
the registrant's Quarterly Report on Form 10-Q for the quarter
ended June 30, 1998).

10.43 — Promissory Notes and Security Agreement dated July 21, 1998
among the registrant and Foothill Capital Corporation, as
collateral agent for Cerberus Partners, L.P., Goldman Sachs
Credit Partners L.P. and Foothill Partners III, L.P. and their
respective successors and assigns. (Incorporated by reference
to Exhibit 10.02 of the registrant's Quarterly Report on Form
10-Q for the quarter ended June 30, 1998).

10.44 — Request for Deferral of Interest Payment under the Series B
Convertible Subordinated Notes due 2008 and the related
Securities Exchange Agreement, dated May 6, 1998, by and

62

JSP 01861

between Coram, Inc., Coram Healthcare Corporation, Cerberus Partners, L.P., Goldman SachsCredit Partners, L.P. and Foothill Capital Corporation, as amended (Incorporated by reference to Exhibit 10.03 of the registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 1998).

10.45    --    Securities Exchange Agreement among the company, Cerberus Partners, L.P., Goldman Sachs Credit Partners, L.P. and Foothill Capital Corporation. (Incorporated by reference to Exhibit 10.01 of the registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 1998).(a)

10.46    --    Form of Letter of Credit required by the Master Agreement by and between the registrant and its applicable affiliates and Aetna U.S.Healthcare, Inc. and its applicable affiliates (incorporated by reference to Exhibit 10.02 of the registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 1998).

10.47    --    Addendum amendment to Sabratek Corporation and Coram Healthcare for IV Infusion pumps, IV Disposable Sets and Related Items, dated as of February 26, 1997, as of December 7, 1998.

10.48    --    Employment Agreement and Agreement between the company and Richard M. Smith, dated as of April 26, 1999 and November 11, 1999, respectively. (Incorporated by reference to Exhibits 10.4 and 10.2, respectively of the registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1999).

10.49    --    Employment Agreement, between the company and Wendy L. Simpson, dated as of April 26, 1999. (Incorporated by reference to Exhibit 10.5 of the registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1999).

10.50    --    Employment Agreement, between the company and Joseph D. Smith, dated as of April 26, 1999. (Incorporated by reference to Exhibit 10.6 of the registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1999).

10.51    --    Employment Agreement, between the company and Daniel D. Crowley, dated as of November 30, 1999, together with Amendment No. 1 thereto.

10.52    --    Employment Agreement, between the company and Allen J. Marabito, dated as of November 30, 1999, together with amendment No. 1 thereto.

10.53    --    First Amendment to Prime Vendor Agreement, dated as of January 1, 2000 by and between the company and Cardinal Health, Inc.

10.54    --    Second Amendment to Employment Agreement, between the company and Daniel D. Crowley, dated as of April 6, 2000. (Incorporated by reference to Exhibit 10.1 of the registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2000).

10.55    --    Settlement agreement entered into by and among Coram Resource Network, Inc., Coram Independent Practice Association, Inc., Coram Healthcare Corporation and Coram, Inc. (Incorporated by reference to Exhibit 10.1 of the registrant's Current Report on Form 8-K dated as of November 17, 2000).

10.56    --    Amendment No. 4, dated December 29, 2000, in respect of the Securities Exchange Agreement dated as of May 6, 1998, among Coram Healthcare Corporation, Coram, Inc., Cerberus Partners, L.P., Goldman Sachs Credit Partners, L.P. and Foothill Capital Corporation. (Incorporated by reference to Exhibit 10.1 of the registrant's Current Report on Form 8-K dated of December 28, 2000).

10.57    --    Exchange Agreement, dated December 29, 2000, among Coram, Inc., Goldman Sachs Credit Partners, L.P., Cerberus Partners, L.P. and Foothill Capital Corporation. (Incorporated by reference to Exhibit 10.2 of the registrant's Current Report

63

JSP 01862

on Form 8-K dated as of December 28, 2000).

| 10.58 | -- | Third Amendment to Employment Agreement, between the company and Daniel D. Crowley, dated August 2, 2000.* |
| 10.59 | -- | Employment Agreement, between the company and Scott R. Danitz, dated August 1, 2000.* |
| 10.60 | -- | Employment Agreement, between the company and Vito Ponzio, Jr, dated April 26, 1999.* |
| 10.61 | -- | Consulting Services Agreement, between the company and Joseph D. Smith, dated June 30, 2000.* |
| 10.62 | -- | Consulting Services Agreement, between the company and Donald J. Amaral, dated May 16, 2000.* |
| 20.1 | -- | Stockholder Rights Agreement (the "Stockholder Rights Agreement"), dated as of June 23, 1997, between Coram Healthcare Corporation and BankBoston, N.A., which includes the form of Certificate of Designation, Preferences and Rights setting forth the terms of the Series X Participating Preferred Stock, par value $0.001 per share, as Exhibit A, the Summary of Stockholder Rights Agreement as Exhibit B and the form of Right Certificate as Exhibit C. Pursuant to the Stockholder Rights Agreement, printed Right Certificates will not be mailed until as soon as practicable after the earlier of the tenth business day after public announcement that a person or group has become an Acquiring Person or the tenth business day after a person commences, or announces its intention to commence, a tender offer or exchange offer the consummation of which would result in such person becoming an Acquiring Person. (Incorporated by reference Exhibit 1 of the registrant's Current Report on Form 8-K dated as of June 23, 1997). |
| 21.1 | -- | Subsidiaries of the registrant.* |
| 23.1 | -- | Consent of Ernst & Young LLP.* |

(a) Certain exhibits and schedules of this Exhibit have been omitted. The registrant agrees to furnish supplementally any omitted schedule or exhibit to the Securities and Exchange Commission.

\*    Filed herewith.

JSP 01863

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on April 16, 2001.

CORAM HEALTHCARE CORPORATION

By: _____ /s/ DANIEL D. CROWLEY _____
Daniel D. Crowley
*Chairman of the Board of Directors,*
*Chief Executive Officer and President*

By: _____ /s/ SCOTT R. DANITZ _____
Scott R. Danitz
*Senior Vice President, Chief Financial Officer*
*and Treasurer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities on the dates indicated.

| | | |
|---|---|---|
| /s/ DANIEL D. CROWLEY<br>Daniel D. Crowley | Chairman of the Board<br>of Directors, Chief<br>Executive Officer and<br>President | April 16, 2001 |
| /s/ DONALD J. AMARAL<br>Donald J. Amaral | Director | April 16, 2001 |
| /s/ WILLIAM J. CASEY<br>William J. Casey | Director | April 16, 2001 |
| /s/ L. PETER SMITH<br>L. Peter Smith | Director | April 16, 2001 |
| /s/ SANDRA R. SMOLEY<br>Sandra R. Smoley | Director | April 16, 2001 |

65

JSP 01864