IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| CORAM HEALTHCARE CORP. and | ) | |
| CORAM, INC., | ) | |
| | ) | Case No. 00-3299 (MFW) |
| Debtors. | ) | (Jointly Administered) |

Hearing Date: February 26, 2001, 4:00 p.m.

## DEBTORS' OBJECTION TO EQUITY COMMITTEE'S MOTION FOR LEAVE TO FILE ADVERSARY PROCEEDING

Coram Healthcare Corp. ("CHC") and Coram, Inc. ("Coram"), the above captioned debtors and debtors in possession (the "Debtors"), as and for their objection to the motion (the "Motion") of the Official Committee of Equity Security Holders of CHC (the "Equity Committee") for leave to file an adversary proceeding, represent as follows:

### PRELIMINARY STATEMENT

1. In blatant disregard of this Court's directive to suspend all litigation pending the Debtors' internal investigation, the Equity Committee has sought leave to initiate a lawsuit in the name of the estate against the Debtors' chairman and CEO, and a significant creditor and its managing partner. If this clear violation of the Court's instruction is not in and of itself a sufficient basis for denial of the Motion, the Debtors submit that each of the following additional grounds independently requires the same result:

2. The Equity Committee has failed to comply with applicable law, viz, to request the Debtors to initiate the litigation which the Equity Committee seeks to commence – a

15570-001\DOCS_DE:17724.1
02/20/01 4:06 PM

prerequisite to the relief sought. Indeed, contrary to the Equity Committee's protestations of disenfranchisement, the Equity Committee has declined the Debtors' express written invitation to participate constructively in the reorganization process.

3. The Debtors have already taken appropriate steps to ascertain the extent, if any, to which the relationship between Mr. Crowley and Cerberus may have tainted the reorganization. Subject to Court approval, that relationship will be subject to rigorous scrutiny and analysis by an experienced independent fiduciary who will render a report to the Debtors' Special Committee of independent directors and to the Court. The Debtors' approach is a time-honored, judicially-countenanced response to an actual or potential conflict of interest within a corporate organization and that investigation should be completed as a predicate to the consideration of any litigation.

4. Although the Debtors will be guided by the results of the independent investigation, they are compelled to point out that the allegations that the Equity Committee seeks leave to pursue are demonstrably false and inconsistent with the extensive record before this Court. Indeed, the alleged "value" of the Debtors' claims against Cerberus and Mr. Crowley was placed squarely at issue in the Equity Committee's objections to confirmation and the Equity Committee, after extensive discovery, failed to offer a scintilla of evidence that those claims had any value (that is, that the alleged conflict of interest resulted in any damage to the Debtors). As discussed below, the evidentiary record is devoid of any attribution of value to these claims, and, indeed, the Equity Committee's own counsel acknowledged at the Confirmation Hearing that "I

can't prove and nobody can prove hypothetically that Mr. Unconflicted as CEO would have done

better. . . ." (Tr. 12/21/00, p.78, exhibit 1)

     5.  The Official Committee of Unsecured Creditors disputes the existence of any

value to be realized from the pursuit of these claims and believes that the precious resources of

these estates should not be invaded by their prosecution. Given the Debtors' insolvency, if any

third party should be afforded custody of these claims on behalf of the Debtors' estates it is the

Creditors Committee (whose constituents will effectively be funding the litigation and will be the

beneficiaries of any recovery), not the Equity Committee.

     6.  Based upon the Equity Committee's ready disregard of this Court's directive,

refusal to follow necessary procedures, hostility to the appointment of an independent neutral

investigator, preference for adversity above compromise, and unfettered willingness to

misrepresent the facts (as more fully discussed below), it is self-evident that the Equity

Committee's Motion has been filed solely to embarrass and harass the Debtors and Cerberus, and

to exact concessions through scorched earth "hold up" tactics[1]. This is further evidenced by the

Equity Committee's press release heralding its proposed litigation, which went to great lengths to

describe the alleged but unsupported intentional wrongdoing of Mr. Crowley. That press release

was widely disseminated and resulted in several negative articles about the Debtors. It left the

Debtors' employees to wonder who they worked for and the Debtors' competitors salivating.

---

[1] The Equity Committee goes so far as to argue that approval of a plan of reorganization for the Debtors should be delayed until the proposed claims are litigated to judgment, "which requires a trial." *See* Objection of the Official Committee of Equity Security Holders to Debtors' Motion for Appointment of Independent Restructuring Advisor, p. 8, § D.

15570-001\DOCS_DE:17724.1
02/20/01 4:06 PM

3

While the Equity Committee obviously is oblivious to any harm it causes to these estates, the "in the money" constituencies and those responsible for operating the business feel quite differently and have to cope with the consequences of this irresponsible behavior.

7. Similarly, if, *in arguendo,* the proposed adversary claims are potential assets of the estates, it would be contrary to the interests of the estate to permit the proposed adversary proceeding to be conducted by anyone at the present time, because doing so would inevitably distract the Debtors' officers, directors, and counsel from giving their full attention to the Debtors' pressing restructuring and business challenges.

8. The Motion is procedurally infirm, premature, demonstrably in the worst interests of these estates and filed in bad faith. It should be denied with prejudice.

## BACKGROUND TO THE MOTION

9. On December 21, 2000, this Court declined to confirm the Debtors' plan of reorganization (the "Plan") on the basis that the incomplete disclosure of the extent of the relationship between the Debtors' CEO and a large noteholder precluded the Court from finding that the original plan had been proposed in good faith based upon the evidence in the record at that time.

10. In addition to the good faith issue, the Equity Committee had objected to confirmation of the Plan on a variety of other grounds, including that in formulating a plan that provided no recovery for CHC's common shareholders, the Debtors had failed to account for the value of the estates' purported claims against Cerberus which, we were told, would increase the

B293

value available to equity holders.[2]  Although it had engaged in a great deal of discovery, the Equity Committee failed to support its allegation that the estate had valuable claims arising out of the relationship between Mr. Crowley and Cerberus. The Court found that the Debtors were indeed insolvent under any of the three valuations performed by the respective experts retained by the Equity Committee, the Creditors' Committee, and the Debtors.[3]

11. However, the Court's ruling did make it problematic for the Debtors to propose any new plan of reorganization -- no matter how legally and economically proper the terms -- so long as questions remain as to whether the historical relationship between Mr. Crowley and Cerberus influenced the value of the Debtors' business, its business judgment, or the reorganization process in a manner adverse to the interests of the estate.  Therefore, at a hearing on December 28, 2000, the Debtors, with the support of the Official Committee of Unsecured Creditors (the "Creditors' Committee") proposed that there be a 90-day litigation-free "cooling off" period to afford the Debtors an opportunity to engage in a process of reassessing their affairs and reorganization opportunities in light of the Court's findings and rulings.  The Debtors proposed that a centerpiece of this process would be, subject to the Court's approval, the appointment of a wholly disinterested expert to perform an impartial evaluation of aspects of the

---

[2]    "Third Objection: The conduct of Cerberus and certain of Coram's directors and management was improper and inequitable and caused significant damage to the Company; *a claim against the persons causing such injury is an asset of the estates* [and therefore] the value of the estate available to equity holders will increase."

[3]    "The Equity Committee, even on its numbers, which I agree with the Creditors' Committee's counsel and their valuation expert and the cross-examination of the Equity Committee expert does point out the questionable nature of that valuation [- - ]I think under any of the numbers the company is insolvent today." Hearing Tr. 12/21/00 p.88, ln. 5-11 (exhibit 2).

Debtors' affairs, their CEO's relationship with Cerberus, and other issues that the Equity

Committee raised as barriers to confirmation of a plan.

     12. The Court indicated a willingness to consider the Debtors' proposed motion

for the appointment of an independent restructuring fiduciary and, more importantly, the Court

granted the Debtors' request for a litigation-free period during which the Debtor could conduct

an investigation:

> MR. LEVY:     Your honor, I'm sorry. I missed part of it, and I
> apologize for that. First, are you precluding us, under any
> circumstances, from coming in earlier for an early termination?
>
> THE COURT:     Yes. I think for the 90 days I am. <u>I want nothing to
> happen other than the parties to get together and the debtor to
> conduct its investigation.</u>

Hearing Tr. 12/28/00 p. 37, ln. 25-22 (exhibit 3). Counsel for the Equity Committee confirmed

that it understood the Court's instruction:

> MR. LOW:     Your honor, one – just clarify. <u>You said nothing
> should happen.</u> I assume this would not preclude us from doing
> further investigation in trying to learn additional facts ourselves?
>
> MR. MILLER:     During the 90 days?
>
> MR. LOW:     Yeah. During –
>
> THE COURT:     I think during the 90 days I would like to see the
> parties try to work together consensually.

*Id.* p.38, ln. 10-18 (exhibit 3).

     13. The Debtors proceeded in accordance with their representations and the

Court's instruction. First, while working productively with the Creditors' Committee, the

Debtors reached out to the Equity Committee to attempt to enfranchise it in the process, writing:

> I would like to invite you, again, to make whatever constructive proposals you believe to
> be of benefit to the Coram debtors and their estates. To this end, if you believe that

additional financial or business information, not previously produced, is necessary to your deliberations, please let me know so that we can be responsive to your concerns.

*See* letter dated January 16, 2001 from Adam L. Shiff to Richard Levy (exhibit 4). However, the Equity Committee did not respond by making a constructive proposals or requesting any additional information, but by seeking to commence litigation.

14. After consulting with the Creditors' Committee, the Debtors came to believe that the optimal method of facilitating a reorganization for the benefit of all stakeholders would be a transparent process in which an experienced independent and disinterested third party with a sterling reputation who would be charged with examining and analyzing salient aspects of the Debtors' relationships, historical and current operations, financial results, financial projections, and restructuring alternatives. A Special Committee consisting of Coram's independent board of directors selected Harrison J. Goldin (the former Comptroller of the City of New York, who has had extensive experience serving as a trustee, examiner, financial advisor, and mediator in numerous bankruptcy cases) to investigate these issues and, on February 1, 2001, filed a motion to appointing Goldin Associates, L.L.C. ("Goldin") as independent restructuring advisors for the Debtors in the above cases (the "Goldin Motion"). A copy of the Goldin Motion is attached as exhibit 5 and incorporated by reference herein.

15. Apparently fearful that the Goldin Motion would lead to a fair, impartial, and non-litigious investigation of Coram (*i.e.*, one in which the Equity Committee has less opportunity to use disruptive, defamatory, and costly tactics to extort concessions to which shareholders are not legally entitled), the Equity Committee opted to simply ignore this Court's

plain 90-day no-litigation instruction and file the Motion, undoubtedly in an attempt to obstruct the Debtors' reorganization efforts. Not content with such inappropriate tactics, the Equity Committee also issued a lengthy press release (the "Press Release") (annexed hereto as exhibit 6) containing an exceedingly negative and one-sided account of the Motion to drag the personal and professional reputations of Messrs. Crowley and Feinberg through the mud and visit harmful publicity upon the Debtors.

## ARGUMENT

**A.    At a Minimum, the Court Should Deny the Motion as UntimelyPending the Performance of an Investigation by Goldin**

16. The Debtors are extremely disappointed that the Equity Committee has chosen to ignore the Court's instructions, choosing instead to sabotage the Debtors' efforts to establish a non-litigious, transparent process for resolving the Court's concerns about the Debtor's good faith through the retention of Goldin. The Debtors urge the Court to enforce its directive and terminate the Equity Committee's efforts before any further damage is done.

17. In order to provide the Court and all parties in interest with a reliable understanding as to whether the relationship between the Debtors' CEO and one of the Noteholders adversely affected or impaired the interests of any party in interest or artificially reduced the financial results or valuation of the Debtors, the Debtors are seeking Goldin as an independent restructuring advisor to render certain services (set forth below) in connection with the Debtors' reorganization, at the conclusion of which Goldin will prepare a report to the Court and a special committee consisting of the outside independent members of the Board of Directors of CHC.

18. Goldin is a financial advisory firm specializing in distressed situations whose expertise includes financial advisory services, business valuation services, review of debtors' operations and business plans, solvency analyses, valuation, litigation oversight, and management, and service as trustee, examiner, plan administrator, special master, liquidator, mediator, and other fiduciary capacities in complex and often contentious bankruptcy and insolvency situations. The Senior Managing Director of Goldin Associates is Harrison J. Goldin, a capable and effective independent insolvency professional with a sterling reputation who served as Comptroller of the City of New York from 1974-1989. Goldin has indicated in an affidavit that it is a completely disinterested party with respect to the Debtors' estates, and has no connections to the Debtors, the Debtors' management, the Senior Noteholders, the members of the Creditors' Committee or the members of the Equity Committee.

19. Goldin was selected by an independent special committee of CHC's board of directors, comprised of Messrs. Amaral, Casey, Smith and Smoley (the "Special Committee") none of whom has any business or financial relationship with any of the senior noteholders with the approval of the Creditors' Committee, to perform the following services (the "Investigation") and determine:

a) Whether the Debtors' business plan and the projections that underlie their business plan are consistent with reasonable business judgment;

b) Whether any evidence exists that Chanin Capital Partners' valuation analysis was not independently prepared and free from any undue or improper influence by a member of the Board or the Debtors' management;

c) Whether the Original Plan was consistent with the best interests of the Debtors;

d)  Whether any material facts exist that support a conclusion that the Original Plan was not proposed in good faith and in compliance with applicable law, or was not fundamentally fair to all parties in interest; and

e)  Whether the Original Plan or some modification thereto would best serve the interests of the Debtors.

20.  As the Court can see, the Debtors seek to have Goldin investigate substantially all of the issues raised in the Equity Committee's Proposed Complaint.[4] The Special Committee also will seek Court approval to retain special counsel to assist in the inquiry if either the Special Committee or Goldin finds that to be appropriate.  If the retention of Goldin is approved, Goldin will report on such issues directly to the Court and the Special Subcommittee on or before 60 days after the commencement of the engagement (the "Reporting Deadline"), unless Goldin requires additional time to complete its assignment.  Thus, the Special Committee, (as well as the Court and all parties in interest) will have the benefit of a competent independent professional's investigation and analysis of all of the non-frivolous issues raised by the Equity Committee and the issues regarding which the Court expressed concern at the December 21, 2000 confirmation hearing to guide it in making its determination as to whether further action is appropriate with respect to the proposed claims.  See section B, below.

21.  In addition, the Debtors submit that it will be immensely more helpful to the Court and the estate for Goldin to perform the investigation as a disinterested restructuring expert, than for the Equity Committee to continue down its chosen path of aggressive, self-

---

[4]  The scope of Goldin's services can be modified in the event the Court feels that there are any material allegations in the Proposed Complaint that are not subsumed by the Investigation as presently proposed.

interested, and value-impairing litigation. In addition to providing reliable guidance to the

Special Committee, Goldin's findings also will aid the Court in determining whether the estate

does in fact possess claims against Cerberus, Feinberg, and Crowley that should be prosecuted

by an appropriate fiduciary.

22. Accordingly, the Debtors submit that the Motion would be premature (were it

not otherwise frivolous).  The Court has already directed the parties not to engage in litigation

for a 90-day period while the Debtors undertake the Investigation, and the Equity Committee has

ignored the Court's instruction.  But equally important, the reorganization process and the estate

will benefit, and no stakeholder will be prejudiced, if the Motion is denied as untimely.

**B.**    **The Motion Cannot Be Granted Because the Equity Committee Made No Demand Upon the Debtors to Assert the Claims, and the Debtors Have Not Refused to Act.**

23. Case law is also clear that a Committee may only commence an adversary

proceeding in the name of a debtor if (1) a demand has been made on the debtor-in-possession to

file the action, (2) the demand has been refused, and (3) the refusal is unjustified.  *Canadian*

*Pac. Forest Prods. V. J.D. Irving Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436, 1438-39 (6th Cir.

1995) (creditor has initial burden to allege facts showing that debtor's refusal to file suit is

unjustified); *In re STN Enterprises*, 779 F.2d 901, 905 (2d Cir. 1985) (court must decide, in

addition to other prerequisites, that the debtor unjustifiably failed to bring suit for creditors'

committee to have standing to bring an action); *Tempo Tech Corp. v. CIBC Wood Gundy*

*Ventures (In re Temtechco, Inc.)*, 1998 Bankr. LEXIS 1612 (D. Del. Dec. 18, 1998) (Fitzgerald,

J.) (noting that Judge Balick issued an order permitting creditors committee to pursue claims

after finding in accordance with *In re STN Enterprises, supra*, that the Debtor's estate could not or would not bring action).

24. Here, the Equity Committee cannot possibly show that the Debtors have refused to respond to a demand, with or without justification, because the Equity Committee concedes that it never even made any demand that the Debtors to prosecute the proposed adversary claims. In fact, the Motion came as a complete surprise.[5] Thus, the Equity Committee did not, and cannot, even meet its basic initial burden.

25. More importantly, although the Debtors have stated that they believe the proposed claims are meritless (see below), in this case the Debtors have *not* refused to act. Rather, *prior* to the Motion, the Debtors filed the Goldin Motion to obtain a disinterested party's evaluation of the allegations underlying the Equity Committee's proposed adversary proceeding. Although the Debtors plainly do not intend to prosecute the proposed claims at the present time, they are entitled under applicable Delaware law to an adequate and reasonable amount of time after a demand has been made (had one been made) to adequately investigate the claims, *see Allison v. General Motors Corp.*, 604 F. Supp. 1106, 1117 (D. Del.), *aff'd* 782 F.2d 1026 (3d Cir. 1985); *Smachlo v. Birkelo*, 576 F. Supp. 1439, 1445 (D. Del. 1983).

26. Initially, the members of the Debtors' Special Committee must "determine the best method to inform themselves of the facts relating to the alleged wrongdoing and the considerations, both legal and financial, bearing on a response to the demand." *Rales v.*

---

[5] To be entirely accurate, it was the Press Release that came as the complete surprise since the Equity Committee publicly disseminated it before the Debtor had received or otherwise learned of the Motion.

*Blasband*, 634 A.2d 927, 935 (Del. 1993). They have already done so, without demand from the

Equity Committee, by determining, pending court approval, to retain Goldin and causing the

Debtor to file the Goldin Motion.

27. Moreover, the Motion is improper and premature in all events because the

Equity Committee cannot possibly demonstrate the Debtors *unjustifiably* refused to commence

an adversary proceeding when doing so would have directly violated this Court's no-litigation

directive. *See* Tr. 12/28/00 at 37-38 (exhibit 3).

28. Thus, the because of the Equity Committee's failure to make a demand that

the Debtor prosecute the proposed claims, the Equity Committee lacks standing to commence the

proposed adversary proceeding. Moreover, the Equity Committee cannot show that the Debtors

are refusing to act or unjustifiably refusing to commence an action because the Special

Committee pro-actively sought an independent investigation of the facts through the Goldin

Motion, a reasonable period of time for this investigation to be accomplished certainly has not

elapsed, and the Debtors would clearly be justified in declining to act in contempt of this Court's

order directing that there shall be no litigation for 90 days. The Motion should therefore be

denied.

C.     **The Motion Should Be Denied Because the Claims Set Forth in the
       Proposed Adversary Complaint Are Meritless and Are not Assets of the Estate**

29. The Motion should also be denied on the merits because the Equity

Committee has not met its initial burden of demonstrating that Coram possesses any colorable

claims against Cerberus or Messrs. Crowley and Feinberg. This prerequisite to standing is

related to the issue of whether a debtor's failure to initiate an adversary proceeding is unjustified,

because a debtor is justified in failing to expend estate assets to prosecute claims where there is

little likelihood an action asserting the claims will be of net benefit to the estate. *In re STN*

*Enterprises*, 779 F.2d 901, 905 (2d Cir. 1985).  Therefore, although there is no explicit statutory

authority, bankruptcy courts have allowed creditors' committees (but almost never equity

committees[6]) to initiate adversary proceedings on behalf of an estate where the creditors'

committee has met the burden of demonstrating that: (1) there are colorable claims for relief that

would support a recovery for the estate, and (2) an action asserting such claims is likely to

benefit the reorganization of the estate, duly considering the attendant costs. *Id.; In re*

*Temtechco, Inc.*, 1998 Bankr. LEXIS 1612 (D. Del. Dec. 18, 1998) (Fitzgerald, J.) (noting that

Judge Balick issued order permitting creditors committee to pursue claims after finding in

accordance with *In re STN Enterprises* that the Debtor's estate could not or would not bring

action, that the action was colorable, that there was a possibility for success, and that was

potential for a considerable benefit to the estate.)

        30. Before granting leave to initiate a suit asserting claims of the estate, the Court

"should assure itself that there is a sufficient likelihood of success to justify the anticipated delay

and expense to the bankruptcy estate that the initiation and continuation of litigation will likely

produce." *In re STN Enterprises* at 906; *In re Nicolet, Inc.*, 80 B.R. 733 (Bankr. E.D. Pa. 1987)

---

[6]  The Equity Committee has cited absolutely no authority in which equity holders were permitted to assert claims of
the estate, let alone under circumstances where, as here, the debtor's insolvency renders common shareholder
interests "out of the money" with no economic interest in the subject claims.

15570-001\DOCS_DE:17724.1
02/20/01 4:06 PM                                            14

(committee must prove the potential merit of its case and the debtor in possession's failure to proceed before the Committee is permitted to proceed on its own).

31. Here, the Equity Committee utterly fails to demonstrate that there is any merit to the proposed claims. The reality is that the Complaint does not contain a single allegation of damage to Coram that is not demonstrably false, and/or inconsistent with the evidence presented at the Confirmation Hearing or the Equity Committee's own admissions.

> **Allegation:**   At a time when Coram was seriously short of cash, Crowley made substantial cash interest payments to the Noteholders, including Cerberus, even though Coram was not obligated to make such payments in cash. Proposed Complaint ¶ 33.

**The Record:** The Equity Committee has failed to allege any damage to the Debtors or their estates arising out of Mr. Crowley's decision, and there is no evidence that the Debtors suffered any diminution in value or adverse consequences as a result of this payment. To the contrary, the Equity Committee, which should be bound by its admissions, has asserted that the Debtors' had *too much* cash on hand and was *able* to pay its debts when due. In its Objection to Confirmation, the Equity Committee alleged that "Coram has no difficulty in paying debts incurred in operations as they come due now or in the future." *See* Objection to Confirmation p. 1 (exhibit 7).

32. Subsequently, the chairman of the Equity Committee, Mark E. Slezak, testified as follows:

> Q.    Now, this objection [to confirmation] also says, "Coram has no difficulty in paying debts incurred in operations as they come due now or in the foreseeable future."
>
> Do you know what the basis for that statement is?

A.    Significant cash on hand.

Q.    How much cash does it have on hand?

A.    Enough to meet those obligations, I believe.

Slezak Tr. Nov. 11, 2000, p.74, ln 23 - p. 75, ln. 7 (Exhibit 8).

Q.    Okay. So there's a statement in this objection that Coram has no difficulty in paying debts incurred in operations as they come due.
    Sitting here today, you don't know if that's true or not, right?

A.    I believe that to be true based on the cash they have on hand and the positive underlying business.
    I have not put pen to paper as it relates to those interest payments and the specific timing of those to answer that specifically.

Q.    Do you know if anyone on the Equity Committee has done that, put pen to paper to see if this is true?

A.    I believe counsel has and advised the Equity Committee accordingly. *Id.*, p.75, ln. 21 - p. 76, ln. 15 (exhibit 8)

33. Furthermore, the Equity Committee further asserted in its Objection to Confirmation that when Coram filed the Plan on August 8, 2000, "it faced no liquidity problems". Objection to Confirmation ¶ 10 (exhibit 7).

34. While it may be fair to question whether Mr. Crowley's decision to pay interest on debt that was payable in kind was the best business decision (Mr. Crowley's basis for that decision being in the record), it is self-evident that this decision did not hurt the Debtors' business and, by definition, could have had no impact on equity values.

Allegation:    The Debtors "unconscionably delayed the implementation of steps necessary to comply with government regulations in order to posture its bankruptcy filing as an emergency."

**The Record:** Asides from being factually outlandish[7], the Equity Committee does not and cannot allege that the Debtors were in any way harmed by the manner in which they addressed the Stark II issues under Mr. Crowley's direction. Although there was a close call at the end of year 2000, the Debtors have remained in compliance with Stark II by virtue of the Noteholders' unprecedented consent to the conversion of $122 million of senior note debt to preferred stock. The Debtors now have a far stronger capital structure, and there was no loss or waste of corporate assets at any point in the process. The Equity Committee has not identified any cognizable cause of action arising out of the Debtors' manner of addressing its Stark II issues. Curiously, the Equity Committee neglects to identify what steps the Debtors failed to take, or should have taken sooner.

35. The Equity Committee's reckless allegation that the Debtor did not adequately implement steps necessary to comply with Stark II is particularly unfortunate because only a few months ago the Equity Committee was arguing that the Stark II regulations were *not* a genuine problem for the Debtors, claiming that the Debtors "exaggerated" a "supposed regulatory problem in order to create a pretext" to seek confirmation prior to the end of 2000, Objection to Confirmation ¶ 38 (exhibit 7), and even suggested that the elimination of Coram's Medicare and Medicaid business due to the "alleged Stark II problem" "may be favorable to the business of Coram." Objection to Confirmation ¶ 16 (exhibit 7).

---

[7] The record is abundantly clear that the Debtors did not delay their bankruptcy filing to create an emergency, but rather, filed their petitions within one week after the completion of an independent valuation. Until now, the Equity Committee has complained that the Debtors rushed into a bankruptcy filing without sufficiently pursuing alternatives with their shareholders. Simultaneously, it is heard to state the Debtors should have filed earlier.

**Allegation:** Another example of the manner in which Crowley acted in the short term interests of Cerberus and against the interest of Coram was his decision to sell one of Coram's operating divisions, Coram Prescription Services ("CPS"), at a price far below the value estimated by Coram's investment banker." Motion ¶ 34.

**The Record:** The clear and unrebutted evidence is that CPS was sold in arms-length transaction after extensive marketing efforts, and with the support of a fairness opinion. Coram's investment banker, Deutsche Banc Alex. Brown ("Alex Brown") contacted forty-five potential purchasers and sent confidentiality agreements to twenty-four of them. Alex Brown received preliminary bids from eight parties. After further due diligence, the Debtors received a bid from only one of those parties, GTCR, which is wholly unaffiliated with the Debtors. Prior to closing, Alex Brown performed a valuation of CPS and determined that the $41 million transaction price was well within the range of values it had determined for CPS, and was fair. A copy of Alex Brown's June 9, 2000 presentation which details the foregoing is attached hereto as exhibit 9. A copy of the June 9, 2000 *fairness opinion* issued by Alex Brown is attached hereto as exhibit 10.

36. The Equity Committee's allegation is not only patently frivolous, it is sanctionable, because the Debtors produced a copy of the Alex Brown report (Bates No. Cor.-Eqty 0000226 - 0000249) to the Equity Committee in Committee October, 2000. See transmittal letter from Robert M. Novick to Theodore J. Low dated October 31, 2000 (Exhibit 11).

**Allegation:** Crowley and Feinberg devised a scheme to wipe out the interests of the existing common shareholders of Coram and secure the future value of Coram for Cerberus and the other Noteholders.

15570-001\DOCS_DE:17724.1
02/20/01 4:06 PM

18

**The Record:** There is absolutely no evidence in the record of any such "scheme." Moreover, because the original plan was not confirmed, the alleged "scheme" was never consummated, such that shareholders interests would not have been damaged even if such a scheme had existed. Furthermore, inasmuch as the Debtors' are insolvent even under the Equity Committee's own expert's valuation analysis, shareholders do not have any interests to "wipe out" or "steal."

**Allegation:** "Coram missed attractive business opportunities that would have enhanced its value by increasing its revenues, margins and profits, allowed refinancing of its indebtedness and avoided destructive bankruptcy proceedings."

"What is clear is that Crowley failed to exercise opportunities to grow the business or to explore strategic options but deliberately managed Coram's affairs so that it would appear to have little or no value above the amount owed under the Notes."

**The Record:** After having conducted exhaustive discovery, the Equity Committee has never identified any actual "opportunities" that Mr. Crowley failed to exercise, although it has been attempting to tarnish the Debtors with this assertion for months.

37. Second, the overwhelming evidence, including *the admissions of the Equity Committee*, is that Mr. Crowley improved the Debtors' operations and increased their value. For example, Mr. Lynn, the Equity Committee's own business valuation expert testified in open Court:

Q.      I take it that you view Mr. Crowley's having come to work at Coram as having had a significant positive impact on the company's financial performance?

A.      That assertion would be consistent with the changes over the last year.

Hearing Testimony of Equity Committee's expert, Daniel M. Lynn, Tr. Dec. 18, 2000, p.220, ln. 7-11 (exhibit 12). The Court agreed: "I think there is evidence that Mr. Crowley did do a good job operationally in helping the debtor turn around." Hearing Tr. 12/21/00 p.88 (exhibit 2).

38. Moreover, one of the Equity Committee's primary contentions has been that Coram was enjoying such great *success* under Mr. Crowley's leadership that there is value for equity. For example, the Equity Committee has stated:

> **Debtor has dramatically improved its financial performance recently [and]** the bankruptcy petitions were only filed after there was a **significant operational change in Debtors' business** which resulted in **dramatic improvements in the** Debtors' financial performance

Motion for Appointment of Equity Committee at 5 (emphasis added) (exhibit 13).

39. Finally, the allegations are frivolous because the only Equity Committee member to testify before the Court admitted he has no idea whether the Debtors missed any valuable business opportunities (explaining their failure to allege any):

> Q. You don't know, do you, what alternatives Coram's board considered before it approved the current plan or reorganization, do you?
>
> A. I do not know.

Hearing Tr. (Haydon Cross) 12/18/00 p.33 ln 4-7.

40. The Equity Committee has not and cannot demonstrate that the estate has any colorable claim for missed opportunities that justifies granting the Motion or commencing the adversary proceedings.

> **Allegation:** "Coram, the Noteholders, and the Creditors' Committee flatly refused to even discuss any process by which the Equity Committee or its advisors and representatives would be able to make a meaningful evaluation of Coram. In fact, they have refused to discuss any aspect of this case with the

Equity Committee since the hearing before this Court on December 28, 2000."
Motion ¶ 6.

**The Record:** Since October, 2000, the Debtors have produced more than 30,000

pages of documents to the Equity Committee. The Equity Committee has deposed Mr. Crowley,

Mr. Amaral, Mr. Feinberg, Mr. Danitz, and Mr. Scroggins, all at multiple sessions.

41. Additionally, on January 15, 2001, counsel for the Debtors wrote to Mr. Levy

as follows:

> I would like to invite you, again, to make whatever constructive proposals you
> believe to be of benefit to the Coram debtors and their estates. To this end, if you
> believe that additional financial or business information, not previously produced,
> is necessary to your deliberations, please let me know so that we can be
> responsive to your concerns.

*See* letter dated January 16, 2001 from Adam L. Shiff to Richard Levy (exhibit 4). The Equity

Committee has not made any constructive proposals nor made any reasonable requests for

information. Accordingly, this allegation is verifiably false and misleading.

42. The law is clear that a committee is not permitted standing to commence an

adversary proceeding in the name of the debtor if it fails to meet its burden of demonstrating that

there exist colorable claims that are valuable assets of the estate.. *Seem In re STN Enterprises* at

905-06; *In re First Capital Holdings Corp.*, 146 B.R. 7, 11 (Bankr. C.D. Cal. 1992); *In re

Nicolet, Inc.*, 80 B.R. 733 (Bankr. E.D. Pa. 1987). The Proposed Complaint is devoid of any

claims that can fairly be characterized as assets of the estate, and the Motion utterly fails to

demonstrate otherwise. The Motion therefore should be denied.

**D.** **The Equity Committee is Collaterally Estopped from Bringing the Proposed Claims**

43. Because the Equity Committee raised the value of the estates' supposed claims against Cerberus, Crowley, and Feinberg as an issue in its objection to confirmation, took discovery on the issues set forth in the Motion, and still failed to show that the Debtors are not insolvent, the Equity Committee should be estopped from re-litigating these same issues (at the Debtors' expense) in an adversary proceeding.

44. In its November 21, 2000 Objection to Confirmation (exhibit 7), the Equity Committee pled:

"Third Objection:     The conduct of Cerberus and certain of Coram's directors and management was improper and inequitable and caused significant damage to the Company; *a claim against the persons causing such injury is an asset of the estates* [and therefore] the value of the estate available to equity holders will increase."

It argued that Coram's claims arising out of the Cerberus-Crowley relationship are "an asset of the estate and must be taken into account in determining equity value." Objection to Confirmation, p. 3, 15 (italics in original) (exhibit 7).

45. Yet, after extensive discovery and a hearing over a period of six days, the Equity Committee failed to demonstrate that the claims are sufficiently valuable to create any equity for common shareholders. Tr. 12/21/00. p. 88-89 (exhibit 2). Having availed itself of a full and fair opportunity to litigate all issues relating to Mr. Crowley's relationship to Cerberus and its supposed impact on the Debtors, the Equity Committee should not be permitted to commence a substantially identical smear campaign at the estate's expense in an adversary

proceeding. *See, Yates v. U.S.*, 354 U.S. 298, 336 (1957) ("a party may be precluded under the doctrine of collateral estoppel from attempting a second time to prove a fact that he sought unsuccessfully to prove in a prior action"); *Continental Can Co. v. Marshall*, 603 F.2d 590, 595 (7th Cir. 1979) (requirement that an issue be actually litigated "does not require that the issue be thoroughly litigated. . . . This requirement is generally satisfied if the parties to the original action disputed the issue and the trier of fact resolved it").

E.    **Even if the Court Should Conclude That Valuable Claims Exist, the Equity Committee is not a Proper Party to Prosecute Them.**

46. Even in the unlikely event the Court ultimately finds that the purported claims constitute potentially valuable estate assets, for several reasons the Equity Committee is not the proper party to assert them. First of all, it is highly unlikely that the common shareholders of CHC have any economic interest in the claims. The Court has found that Coram was insolvent under the analyses of all three valuation experts, including the expert of the Equity Committee (notwithstanding that his report contained flaws, such as an unrealistically low weighted average cost of capital, that resulted in an inflated enterprise value). Under the analysis of the Creditors' Committee's expert the common shareholders are out of the money by some $90 million dollars. Although the Debtors' subsequently increased their equity by converting approximately $122 million of note debt into preferred stock, the preferred stock is still senior to the CHC common stock interests of the Equity Committee's constituents.

47. Given the junior position of the common shareholders' interests in the Debtors' financial structure, the unlikelihood that the proposed claims are potentially valuable,

and the attendant cost of prosecuting them, it is highly unlikely that common shareholders could ever realize any economic benefit from them. Similarly, given the Debtors' financial position and capital structure, the expense of prosecuting the claims would be borne by the creditors, not the common shareholders. Thus, if the claims are to be prosecuted at all, the rights to make such a determination possibly do so should be reserved for a fiduciary of the creditors, not those who are extremely unlikely to benefit from any recovery.

48. An additional reason why the Equity Committee should not be permitted to prosecute any claims that might exist is that it has demonstrated by issuing the Press Release that it is not fit to serve as the estate fiduciary charged with prosecuting the claims. As the Court has no doubt observed on many occasions, some of the very significant hurdles faced by a chapter 11 debtor include retaining employees and customers and maintaining vendor relations during the course of the reorganization proceedings. Loss of any of these valuable assets can seriously impair the value of a debtor's estate and its ability to reorganize. Yet, by electing to short-circuit legal process and publish a sensational and one-sided account of the Motion, the Equity Committee demonstrated that it is willing to risk destruction of the value of Coram for the sake of attempting to extort value from the estates. The Equity Committee has thereby demonstrated that it is not equipped with the moral compass and does not have the necessary standing required to prosecute estate claims as a fiduciary for the creditors. Accordingly, although the Debtor does not presently believe that there are any claims to prosecute, whatever claims might exist should not be prosecuted by the Equity Committee.

WHEREFORE, the Debtors request the Court to deny the Motion of the Equity

Committee, and grant such other and further relief as the Court may deem just and proper.

Dated: Wilmington, Delaware
February 20, 2001

PACHULSKI STANG ZIEHL YOUNG & JONES P.C.

Laura Davis Jones (Bar No. 2436)
Christopher J. Lhulier (Bar No. 3850)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

and

KASOWITZ BENSON TORRES & FRIEDMAN LLP
David M. Friedman
Robert M. Novick
633 Broadway
New York, New York 10019
Telephone: (212) 506-1700

Counsel for Debtors and Debtors in Possession

RMN\1077790.1