# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARLIN M. ADAMS, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of CORAM HEALTHCARE CORPORATION, a Delaware Corporation, and of CORAM, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL D. CROWLEY, DONALD J. AMARAL, WILLIAM J. CASEY, L. PETER SMITH, AND SANDRA L. SOMELY,<br><br>Defendants. | Case No. 04-1565 |

---

### APPENDIX OF DOCUMENTS IN SUPPORT OF ANSWERING BRIEF OF DEFENDANT DANIEL D. CROWLEY IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY OR, IN THE ALTERNATIVE, FOR THE COURT TO DEEM CERTAIN FACTS ESTABLISHED (PART 2)

Dated: May 4, 2007

Jeffrey C. Wisler (No. 2795)
Christina M. Thompson (No. 3976)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street; P.O. Box 2207
Wilmington, Delaware 19899
(302) 658-9141

-and-

Elliot R. Peters
R. James Slaughter
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(415) 391-5400
*Attorneys for Daniel D. Crowley*

## TABLE OF CONTENTS

| Document Description | Page |
| --- | --- |
| Second Joint Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code filed 7/31/01 | B315 |
| Equity Committee Objections to Debtors' Second Joint Plan of Reorganization filed 10/22/01 | B419 |
| Debtors' Response to the Equity Committee's Objection to Debtors' Second Joint Plan of Reorganization and Memorandum in Support of Confirmation filed 11/5/01 | B449 |
| Letter agreement dated 12/24/02 from Bressler to Schreiber re modified terms of termination and extension agreement | B481 |
| Letter agreement dated 1/7/03 from Bressler to Schreiber re terms of Transition Agreement | B485 |
| Motion of the Chapter 11 Trustee for Authorization to Enter into Termination and Employment Extension Agreement with Daniel D. Crowley filed 1/24/03 | B487 |
| Request of Daniel Crowley for Payment of Administrative Expenses filed 12/30/04 | B498 |
| Excerpts of transcript of Bankruptcy Court hearing dated 12/1/00 | B506 |
| Excerpts of transcript of Bankruptcy Court hearing dated 12/11/00 | B519 |
| Excerpts of transcript of Bankruptcy Court hearing dated 12/12/00 | B524 |
| Excerpts of transcript of Bankruptcy Court hearing dated 12/13/00 | B529 |
| Excerpts of transcript of Bankruptcy Court hearing dated 12/15/00 | B534 |
| Excerpts of transcript of Bankruptcy Court hearing dated 12/18/00 | B540 |
| Excerpts of transcript of Bankruptcy Court hearing dated 12/21/00 | B545 |
| Excerpts of transcript of Bankruptcy Court hearing dated 11/5/01 | B572 |
| Excerpts of transcript of Bankruptcy Court hearing dated 11/6/01 | B579 |
| Excerpts of transcript of Bankruptcy Court hearing dated 11/7/01 | B584 |
| Excerpts of transcript of Bankruptcy Court hearing dated 11/27/01 | B593 |

Excerpts of transcript of Bankruptcy Court hearing dated 11/30/01          B600

Excerpts of transcript of Bankruptcy Court hearing dated 12/13/01          B606

Excerpts of transcript of Bankruptcy Court hearing dated 12/14/01          B615

Excerpts of transcript of Bankruptcy Court hearing dated 12/17/01          B618

Excerpts of transcript of deposition of William Casey taken 9/28/01        B624

Excerpts of transcript of deposition of Daniel Crowley taken 10/25/01      B631

Excerpts of transcript of deposition of Arlin Adams taken 1/21/04          B637

Excerpts of transcript of deposition of Stephen Feinberg taken 2/14/07     B641

Excerpts of transcript of deposition of Daniel Crowley taken 4/6/07        B644

Excerpts of transcript of deposition of Scott Danitz taken 4/6/07          B649

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| CORAM HEALTHCARE CORP. and | ) | Chapter 11 |
| CORAM, INC., | ) | |
| | ) | Case Nos. 00-3299 (MFW) |
| Debtors. | ) | through 00-3300 (MFW) |
| | ) | |
| | ) | Jointly Administered |

**SECOND JOINT DISCLOSURE STATEMENT**
**PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE**

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
David M. Friedman
Adam L. Shiff
Robert M. Novick
Athena Foley
1633 Broadway
New York, New York 10019
(212) 506-1700

– and –

PACHULSKI, STANG, ZIEHL,
YOUNG & JONES, P.C.
Laura Davis Jones
Rachel Lowy
919 North Market Street, Suite 1600
Wilmington, Delaware 19801
(302) 652-4100

*CO-COUNSEL TO DEBTORS AND*
*DEBTORS-IN-POSSESSION*



# Table of Contents

PAGE

i

# SECOND DISCLOSURE STATEMENT, DATED AUGUST 1, 2001

## Solicitation of Votes

### with Respect to the

### Second Joint Plan of Reorganization

### of

## CORAM HEALTHCARE CORPORATION and
## CORAM, INC.

---

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") ENTERED ON AUGUST __, 2001, AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES ON THE SECOND JOINT PLAN OF REORGANIZATION (THE "PLAN"). THE BANKRUPTCY COURT'S APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT, HOWEVER, INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN OR OF ANY ALTERNATIVE THERETO. THE BANKRUPTCY COURT HAS DETERMINED ONLY THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT VOTING HOLDERS OF ALLOWED CLAIMS TO MAKE AN INFORMED JUDGMENT AS TO WHETHER TO ACCEPT OR REJECT THE PLAN. THE BANKRUPTCY COURT HAS SET _____, 2001 AT __ P.M. EASTERN TIME (THE "VOTING DEADLINE") AS THE DEADLINE FOR VOTING ON THE PLAN. FOR A DESCRIPTION OF VOTING PROCEDURES, SEE "VOTING AND CONFIRMATION OF THE PLAN — VOTING PROCEDURES AND REQUIREMENTS." THE BANKRUPTCY COURT HAS SET _____, 2001 AT __ A.M. AS THE TIME AND DATE FOR THE HEARING ON CONFIRMATION OF THE PLAN. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AS PROVIDED IN OPEN COURT.

---

THIS DISCLOSURE STATEMENT, INCLUDING THE EXHIBITS ATTACHED HERETO, IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. MOST STATEMENTS AND FINANCIAL INFORMATION HEREIN ABOUT THE DEBTORS HAVE BEEN OBTAINED FROM DOCUMENTS AND INFORMATION PREPARED BY OR ON BEHALF OF THE DEBTORS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OR FILING OF THIS DISCLOSURE STATEMENT SHALL UNDER NO CIRCUMSTANCES CONSTITUTE A REPRESENTATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF COMPILATION OF THIS DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTORS UNDER THE PLAN.

---

NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF VOTES FOR THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO. IF ANY SUCH INFORMATION OR REPRESENTATIONS ARE GIVEN OR MADE, THEY MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS. WHILE THE DEBTORS WILL FURNISH TO CREDITORS ENTITLED TO VOTE ON ACCEPTANCE OF THE PLAN ANY SUCH ADDITIONAL INFORMATION AS MAY BE REQUIRED BY APPLICABLE LAW OR BY THE BANKRUPTCY COURT PRIOR TO THE VOTING DEADLINE, THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

2

# I. INTRODUCTION

Coram Healthcare Corporation, a Delaware corporation ("CHC"), and Coram, Inc., a Delaware corporation ("Coram"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), jointly submit this Second Disclosure Statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code. This Disclosure Statement describes the material terms of, and provides additional important information with respect to, the Second Joint Plan of Reorganization, dated as of August 1, 2001 (the "Plan"), a copy of which is attached to this Disclosure Statement as Exhibit A.

The Debtors urge all voting creditors, shareholders, and other parties-in-interest to read this Disclosure Statement and the Plan carefully and in their entirety. This Disclosure Statement does not include a description of each and every term of the Plan. Accordingly, the description of the Plan set forth herein is qualified by the entirety of the Plan, which is incorporated by reference into this Disclosure Statement.

All capitalized terms used in this Disclosure Statement that are not otherwise defined herein have the meanings ascribed to them in the Plan.

## II. FREQUENTLY ASKED QUESTIONS

### A.     What is Chapter 11?

Chapter 11 is the principal reorganization chapter of the Federal Bankruptcy Code. Under chapter 11, the Debtors are permitted a period in which to organize their affairs and to review their assets and obligations in order to reorganize their businesses. The Debtors commenced their chapter 11 cases on August 8, 2000, by filing petitions for relief under chapter 11 with the Bankruptcy Court.

The commencement of the Debtors' chapter 11 cases triggered the application of the "automatic stay" under section 362 of the Bankruptcy Code. The automatic stay halts, with certain exceptions, substantially all attempts to collect pre-petition claims from the Debtors or attempts to otherwise interfere with the Debtors' property.

### B.     What is a Plan of Reorganization?

The principal purpose of a chapter 11 case is to permit the formulation of a plan of reorganization which provides for the restructuring of a debtor's liabilities and the treatment, if any, of its equity interests. The Plan proposed by the Debtors provides that such restructuring will be accomplished principally through the elimination of existing equity interests and the issuance of new equity, new secured notes, and cash to the Debtors' unsecured creditors and holders of equity interests. For a discussion of the new equity to be issued pursuant to the Plan, see "New Coram Stock To Be Issued Pursuant to the Plan."

3

The Plan proposed by the Debtors further provides, among other things, that, after Confirmation and consummation of the Plan, Reorganized Coram and its non-debtor operating subsidiaries shall be able to operate their businesses free from the excessive indebtedness and regulatory concerns that necessitated their filing chapter 11 petitions. For a discussion of the key regulatory factors bearing on the viability of the Debtors' business, see "Discussion of Stark II Issues."

### C.     What is a Disclosure Statement?

After a plan of reorganization has been proposed, the holders of claims against, or equity interests in, the debtors that are impaired by the terms of the plan and that are to receive distributions (in cash or securities) under the plan are entitled to vote on whether to accept or reject the plan. The Bankruptcy Code requires disclosure of "adequate information" to all such voting creditors and equity holders by way of a court-approved "disclosure statement" before the plan proponents (or anyone else) may solicit any votes on the plan. The Bankruptcy Code provides that a disclosure statement must contain "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."

The Debtors present this Disclosure Statement to the voting holders of Allowed Claims and Allowed Interests against the Debtors in order to satisfy the disclosure requirements of the Bankruptcy Code by providing each voting holder of an Allowed Claim or an Allowed Interest with sufficient information to make an informed decision as to whether to accept or reject the Plan.

### D.     How Does One Vote?

Only persons holding "Allowed Claims" and "Allowed CHC Equity Interests" (as defined in the Plan) in Classes impaired under the Plan that are to receive a distribution under the Plan are entitled to vote. Under the Plan, all Classes are impaired except Classes CHC P (CHC Allowed Priority Non-Tax Claims), CHC 1 (Allowed CHC Secured Claims), Coram P (Coram Allowed Priority Non-Tax Claims), Coram 1 (Allowed Coram Secured Claims) and Coram 2 (Allowed Coram General Unsecured Claims). Holders of Allowed Claims in Classes CHC P and Coram P (Allowed Priority Non-Tax Claims), CHC 1 and Coram 1 (Secured Claims) and Coram 2 (General Unsecured Claims) are unimpaired and are therefore conclusively presumed to accept the Plan without the need for solicitation of their votes. Holders of Allowed Claims in Classes CHC 2 (CHC General Unsecured Claims), CHC 3 (CHC Note Claims), CHC 4 (CHC Equity Interests) and Coram 3 (Coram Notes/Preferred Stock Claims) are impaired and are being solicited to vote on the Plan. The holder of the equity interests in Class Coram 4 (Allowed

4

Coram Equity Interests) is impaired and is conclusively deemed to reject the Plan without need for solicitation of their votes.

To vote on the Plan, a voting holder of an Allowed Claim or Allowed Equity Interest must complete the Ballot (enclosed with this Disclosure Statement) and mail it so that it is received at the address set forth on the enclosed pre-addressed envelope by no later than the Voting Deadline, which is __:00 P.M., Eastern Time, on _____, 2001. Votes cannot be transmitted orally. Accordingly, the Debtors urge all voting holders of Allowed Claims and Allowed Equity Interests to return their signed and completed Ballots as promptly as possible and in any event prior to _____, 2001. For more detailed information regarding voting on the Plan, see the section captioned "Voting and Confirmation of the Plan -- Voting Procedures and Requirements."

## III. SUMMARY OF THE PLAN AND THE REORGANIZATION

### A.    Summary of the Plan

The following is a brief overview of certain material provisions of the Plan. This overview is qualified in its entirety by reference to the provisions of the Plan, which is attached hereto as Exhibit A, and the additional exhibits hereto, including the Report of Independent Restructuring Advisor Goldin Associates, L.L.C., dated July 11, 2001 (the "Goldin Report"), attached hereto as Exhibit B, and the documents contained in the Plan Supplement, which will be available for inspection at the United States Bankruptcy Court for the District of Delaware, 844 King Street, Wilmington, Delaware 19801, and Pachulski, Stang, Ziehl, Young & Jones, P.C., 919 North Market Street, Suite 1600, Wilmington, Delaware 19801.

### 1. Generally

The Plan proposed by the Debtors provides for, among other things, the satisfaction or settlement of substantially all of the Debtors' unsecured (non-priority) indebtedness through a combination of cash payments, issuance of New Coram Stock and New Secured Notes, cancellation of existing equity interests, and a distribution to holders of Allowed Equity Interests as described below. The overall purposes of the Plan are:

- to enable Coram to continue to comply with the provisions of "Stark II" so that it can continue its core infusion therapy business;

- to reduce the amount of debt in the Debtors' capital structure and alter certain other obligations of the Debtors; and

- to maximize the value of the ultimate recoveries by creditors and equity interest holders of the Debtors on a fair and equitable basis in accordance with the recommendations in the Goldin Report.

5

The Plan represents the culmination of management analyses regarding the best means to maximize and allocate value to the Debtors' creditors and equity interest holders in accordance with their legal and contractual priorities. Management has determined that the enterprise value of the Debtors that will be created pursuant to the Plan greatly exceeds any values achievable through whole or piecemeal liquidation of the Debtors. See "Voting and Confirmation of the Plan -- Liquidation Analysis." However, management has determined that it is in the best interest of all creditors to implement the recommendations contained in the Goldin Report and detailed below, which recommend that the Debtors make a distribution to holders of Allowed CHC Equity Interests as a "voluntary contribution" in settlement of any issues that may be raised in connection with confirmation of the Plan. Accordingly, the Plan proposed by the Debtors:

- permits Coram and its operating subsidiaries to continue their business operations;

- eliminates and/or refinances substantially all of the Debtors' existing unsecured (non-priority) indebtedness;

- provides for the issuance of Cash and/or New Coram Stock and New Secured Notes to the holders of existing indebtedness; and

- extinguishes all other existing equity interests of the Debtors, while providing a potential settlement to holders of Allowed CHC Equity Interests.

## 2. Summary of Classes and Treatment

Under the Plan, Claims against and Allowed Interests in the Debtors are divided into Classes according to their similarity to other Claims and Allowed Interests, the particular Debtor obligated on the Claims, the Debtor which issued the Allowed Interests and the relative legal and contractual priorities of the Claims and Interests.

In accordance with mandatory provisions of the Bankruptcy Code, the Plan provides that holders of certain Claims (Allowed Administrative Claims, Allowed Non-Tax Priority Claims and Allowed Tax Priority Claims) will be entitled to immediate (or, in the case of Allowed Tax Claims, deferred) cash distributions.

The aggregate amount of Claims estimated in each Class is based upon the Debtors' estimates of the aggregate amounts of Claims that the Debtors believe will be asserted upon resolution of any Claims that the Debtors believe will be Disputed Claims. Certain of these Disputed Claims may be material, and the total amount of all such Claims, including Disputed Claims, may materially exceed the total amount of Allowed Claims assumed in the development of the Plan.

6

The Aggregated Amount of Claims Estimated depicted in the table below are based upon the Debtors' preliminary review of the Debtors' books and records and may be revised upon the completion of a detailed analysis of all Claims filed in the Cases.

7

| Description and Amount of Claims of Interests | Treatment |
|---|---|
| • Administrative Expense Claims (Unclassified) | Unimpaired; payment (i) in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) on such other terms to which the parties agree; provided, however, that Administrative Expense Claims incurred in the ordinary course of business will be paid as such Claims become due and payable in the ordinary course of business. |
| • Aggregate Amount of Claims Estimated: $4,262,000 | Recovery (Estimated):          100%<br><br>Ownership of Reorganized Coram: 0% |
| • Priority Tax Claims (Unclassified) | Unimpaired; at the Debtors' or Reorganized Coram's option, as applicable, (i) payment in full, in Cash, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, (ii) a Tax Note equal to the full amount of such holder's Priority Tax Claim, or (iii) on such other terms as mutually agreed to by the holder of an Allowed Tax Claim and the Debtors or Reorganized Coram. |
| • Aggregate Amount of Claims Estimated: $81,400 | Recovery (Estimated):          100%<br><br>Ownership of Reorganized Coram: 0% |
| •Class CHC P (Allowed CHC Priority Non-Tax Claims)<br><br>• Priority Non-Tax Claims against CHC<br><br>• Aggregate Amount of Claims Estimated $12,900 | Unimpaired; on the Effective Date, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed CHC Priority Non-Tax Claim unimpaired.<br><br>Recovery (Estimated):          100%<br><br>Ownership of Reorganized Coram: 0% |
| •Class CHC 1 (Allowed CHC Secured Claims)<br><br>• Secured Claims against CHC<br><br>• Aggregate Amount of Claims Estimated:   $0 | Unimpaired; on the Effective Date, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed CHC Secured Claim unimpaired.<br><br>Recovery (Estimated):  100%<br><br>Ownership of Reorganized Coram: 0% |

8

| | |
|---|---|
| • Class CHC 2 (Allowed CHC General Unsecured Claims)<br><br>• General Unsecured Claims against CHC<br><br><br><br><br><br><br><br>•Aggregate Amount of Claims Estimated: $7,492,000 | Impaired.  If Class CHC 2 votes to accept the Plan by the majorities required by section 1126(c) of the Bankruptcy Code, each holder of an Allowed CHC General Unsecured Claim shall receive its Pro Rata share of (i) the CHC General Unsecured Consideration and (ii) the CHC Noteholder Consideration, for a total cash pool of $3 million.  If Class CHC 2 fails to accept the Plan by the requisite majorities, each holder of an Allowed CHC General Unsecured Claim will receive a Pro Rata share of only the CHC General Unsecured Consideration, _provided, however_, that if Class CHC 2 rejects the Plan and the Court is unwilling to confirm the Plan unless the CHC Equity Interest Consideration is first made available to Class CHC 2 under 11 U.S.C. § 1129(b)(2)(B), then each holder of an Allowed Class CHC 2 claims shall receive the lesser of (i) its Pro Rata share of $12 million in cash or (ii) an amount necessary to cause such holder to be paid in full.  _See_ Distribution Caveat below.<br><br>_Class CHC 2 receives an enhanced distribution if it votes in favor of the Plan._<br><br>Recovery (Estimated):     40.0% if accepting Plan<br>         26.7% – 100% if rejecting Plan<br><br>Ownership of Reorganized Coram: 0% |
| Class CHC 3 (Allowed CHC Notes Claims)<br><br>•Allowed Claims arising under the Notes against CHC<br><br>•Aggregate Amount of Claims as of the Petition Date Estimated: $252,620,000 | Impaired; if Class CHC 2 votes to accept the Plan, no recovery.  If Class CHC 2 fails to accept the Plan, pro rata share of the CHC Noteholder Consideration.<br><br><br><br>Recovery (Estimated):   0 %<br><br>Ownership of Reorganized Coram: 0% |

9

| | |
|---|---|
| Class CHC 4 (Allowed CHC Equity Interests)<br><br>•All equity interests in CHC<br><br>•Aggregate Value of Interests Estimated: $0 | Impaired. If Class CHC 4 votes to accept the Plan by the majorities required by section 1126(c) of the Bankruptcy Code, each holder of an Allowed CHC 4 Equity Interest shall receive its Pro Rata share of the CHC Equity Interest Consideration, provided, however, that if Class CHC 2 rejects the Plan and the Court is unwilling to confirm the Plan unless the CHC Equity Interest Consideration is first made available to Class CHC 2 under 11 U.S.C. § 1129(b)(2)(B), then each holder of an Allowed CHC 4 Equity Interest shall receive its pro rata share of the balance of the Equity Interest Consideration after giving effect to the distribution to Class CHC 2 described above. If Class CHC 4 fails to accept the Plan by the requisite majorities, Class CHC 4 shall receive no distribution. See Distribution Caveat, below.<br><br>Recovery:    Up to $10 million if Class CHC 4 accepts the Plan (depending upon vote of Class CHC 2 and related litigation).<br>No recovery if Class CHC 4 rejects the Plan.<br><br>Ownership of Reorganized Coram: 0% |
| •Class Coram P (Allowed Coram Priority Non-Tax Claims)<br><br>• Priority Non-Tax Claims against Coram<br><br>• Aggregate Amount of Claims Estimated $18,700 | Unimpaired; on the Effective Date, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed Coram Priority Non-Tax Claim unimpaired.<br><br>Recovery (Estimated):          100%<br><br>Ownership of Reorganized Coram: 0% |
| Class Coram 1 (Allowed Coram Secured Claims)<br><br>• Allowed Secured Claims against Coram<br><br>•Aggregate Amount of Claims Estimated: $0 | Unimpaired; on the Effective Date, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed Coram Secured Claim unimpaired.<br><br>Recovery (Estimated):          100%<br><br>Ownership of Reorganized Coram: 0% |

10

| | |
|---|---|
| Class Coram 2 (Allowed Coram General Unsecured Claims)<br><br>• General Unsecured Claims against Coram<br><br>• Aggregate Amount of Claims Estimated: $124,600 | Unimpaired; at the option of Coram or Reorganized Coram, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, (ii) Reinstatement, or (iii) such other treatment to render such Allowed Coram General Unsecured Claim unimpaired.<br><br>Recovery (Estimated): 100 %<br><br>Ownership of Reorganized Coram: 0% |
| Class Coram 3 (Allowed Coram Notes/Preferred Stock Claims)<br><br>•Allowed Claims arising under the Notes against Coram and any interests or claims against Coram based upon the Preferred Stock<br><br>•Aggregate Amount of Claims and Interests Estimated: $272,679,000 | Impaired; See treatment of subclasses Coram 3A and Coram 3B below |
| Sub-class Coram 3A (Allowed Coram Notes Claims)<br><br>•Allowed Claims arising under the Notes against Coram<br><br>•Aggregate Amount of Claims and Interests Estimated: $154,905,000 | Impaired; each holder of an Allowed Coram Notes Claims shall receive New Secured Notes in an amount equal to the full amount of its Claim.<br><br>Recovery (Estimated):          100%<br><br>Ownership of Reorganized Coram:  0% |
| Sub-class 3B (Allowed Coram Preferred Stock Interests)<br><br>•Allowed Claims and Interests arising under the Preferred Stock against Coram<br><br>•Aggregate Amount of Claims and Interests Estimated: $117,774,000 | Impaired; each holder of an Allowed Coram Preferred Stock Interest shall receive its Pro Rata share of all New Secured Notes remaining after the distribution to Sub-class 3A, and its Pro Rata share of the New Coram Stock.<br><br>Recovery (Estimated, based on          55.2% Goldin's valuation):<br><br>Ownership of Reorganized Coram:  100% |

11

| Class Coram 4 (Allowed Coram Equity Interests)<br><br>All equity interests in Coram<br><br>• Aggregate Value of Interests Estimated: 0 | Impaired; no distribution and all rights and interests canceled.<br><br><br>Recovery (Estimated): 0%<br><br>Ownership of Reorganized Coram: 0%. |
|---|---|

3.    **DISTRIBUTION CAVEAT:**

If Class CHC 2 (Allowed CHC General Unsecured Claims) votes to reject the Plan and Class CHC 4 (Allowed CHC Equity Interest) votes to accept the Plan, the Debtors believe that the Plan may be confirmed and will seek to confirm the Plan under section 1129(b) of the Bankruptcy Code over the rejection by Class CHC 2 because the consideration to be received by Class CHC 4 represents a voluntary contribution by classes that are senior to Class CHC 2 and, therefore, does not diminish the rights of Class CHC 2. However, in the event Class CHC 2 rejects the Plan and the Creditors' Committee contests such treatment (the "Absolute Priority Litigation"), and the Court determines that the above-described distribution scheme precludes confirmation of the Plan unless the CHC Equity Interest Consideration is first made available to Class CHC 2 under 11 U.S.C. § 1129(b)(2)(B), then each holder of an Allowed Class CHC 2 claim shall receive the lesser of (i) its Pro Rata share of $12 million in cash, or (ii) an amount necessary to cause such holder to be paid in full.

THE TREATMENT AND DISTRIBUTION PROVIDED TO HOLDERS OF ALLOWED CLAIMS AND EQUITY INTERESTS PURSUANT TO THE PLAN ARE IN FULL AND COMPLETE SATISFACTION OF THE ALLOWED CLAIMS AND EQUITY INTERESTS, AS THE CASE MAY BE, ON ACCOUNT OF WHICH SUCH TREATMENT IS GIVEN AND SUCH DISTRIBUTIONS ARE MADE.

### 4. Sources of Cash to Make Plan Distributions

Coram, with the consent of the holders of Claims in Class Coram 3, will transfer cash in the amount of $2 million to fund the CHC General Unsecured Consideration, which monies will be distributed to the holders of Allowed Claims in Class CHC 2 and pursuant to the provisions of the Plan.

Coram, with the consent of the holders of Claims in Class Coram 3, will transfer cash in the amount of $1 million to fund the CHC Noteholder Consideration, which monies will be distributed to the holders of Allowed Claims in Classes CHC 2 if Class CHC 2 accepts the Plan, pursuant to the specific provisions of the Plan.

In the event Class CHC 4 accepts the Plan, Coram will transfer cash in the amount of up to $10 million to fund the CHC Equity Interest Consideration, which monies will be distributed to the holders of Allowed Equity Interests in Class CHC 4. If Class CHC 2 rejects the plan but Class CHC 4 accepts the Plan, the amount of the CHC Equity Interest Consideration made available to holders of Allowed CHC Equity Interests may be reduced depending on the outcome of the issues described in the Absolute Priority Litigation.

The cash required to make all other payments and distributions contemplated by the Plan will be generated from the operations of Coram, Reorganized Coram, and, if necessary, borrowing under the Debtors' Exit Financing Facility. Based on current projections, the Debtors believe that they will have sufficient cash to continue to operate their businesses and make the necessary cash distributions under the Plan. See section XVII, "Projections," below. If, however, the Debtors should be engaged in protracted litigation or the Plan is not confirmed by December 31, 2001, there can be no assurance that the Debtors will have sufficient cash to make distributions thereunder without availing themselves of other (non-operational) sources of funds, and there is no assurance that such funds will be available on acceptable terms and conditions. See "Risk Factors -- Capital Requirements."

### 5. Summary of Reorganized Coram

Reorganized Coram will be privately held by the Noteholder Group. Publicly-held CHC will cease to have any direct or indirect business operations and will be dissolved in accordance with the provisions of the Plan. As a privately-held company, Reorganized Coram will be able to maintain compliance with the provisions of Stark II as a result of having eliminated the risk of ownership by (i) physicians who make Medicare and Medicaid referrals to Coram or its operating subsidiaries or (ii) family members of such physicians. So owned, Reorganized Coram will also be substantially likely to remain in compliance with the ownership requirements of Stark II for the foreseeable future, and all of its operating subsidiaries will continue to conduct their prepetition businesses in the ordinary course.

Reorganized Coram will also have a reduced and more manageable level of debt. The only long-term liabilities of Reorganized Coram will consist of the New Secured Notes (in a known, maximum amount of $180 million). Coram's short-term borrowing needs, if any, will be provided by the Exit Financing Facility, a revolving secured credit facility pursuant to which up to $40 million will be available to Reorganized Coram.

13

## IV. BACKGROUND OF THE DEBTORS AND CERTAIN EVENTS PRECEDING THE FILING OF OTHER CHAPTER 11 CASES

### A.    Background of the Debtors

CHC was formed on July 8, 1994, as a result of a merger of $T^2$ Medical, Inc., Curaflex Health Services, Inc., Medisys, Inc., and HealthInfusion, Inc., each of which was a publicly-held national or regional provider of home infusion therapy and related services. Each of these companies became and is now an indirect, wholly-owned subsidiary of CHC, and a direct or indirect subsidiary of Coram.

CHC has made a number of acquisitions since operations commenced, the most significant of which was the acquisition of certain assets of the home infusion business of Caremark, Inc., a wholly-owned subsidiary of Caremark International, Inc., effective April 1, 1995. In addition, CHC acquired the stock of H.M.S.S., Inc., a leading regional provider of home infusion therapies based in Houston, Texas, effective September 12, 1994. An organizational chart reflecting the management and hierarchy of the Debtors and their non-debtor subsidiaries is attached hereto as Exhibit G.

As a result of these acquisitions, CHC became a leading provider of alternate site infusion therapy services in the United States based on geographic service area and total revenue. Presently, CHC and Coram, through their wholly-owned non-debtor subsidiaries, deliver alternate site infusion therapy services through approximately 76 branch offices located in 40 states and Ontario, Canada. Infusion therapy involves the intravenous administration of nutrition, anti-infective therapy, blood factor therapies, pain management, chemotherapy, and other therapies.

The initiation and duration of these infusion therapies is determined by a physician based upon a patient's diagnosis, treatment plan and response to therapy. Certain therapies, such as anti-infective therapy, are generally used in the treatment of temporary infection conditions, while others, such as nutrition or coagulants, may be required on a long-term or permanent basis. The infusion therapies that are administered at the patient's home are administered either by the patient, the designated care partner or an employee or agent of Coram. In patient groups such as immune suppressed patients (e.g., AIDS/HIV, cancer and transplant patients), blood coagulant therapies or anti-infective therapy care may be provided periodically over the duration of the primary disease or for the remainder of the patient's life, generally as episodic care.

The Debtors' business operations are discussed in greater detail below.

### B.    Pre-Petition Date Events

As of January 1, 1997, lithotripsy services were provided through a controlling interest in 11 lithotripsy partnerships and two wholly-owned lithotripsy entities. The Debtors

14

also owned a lithotripsy management company and a lithotripter maintenance company. Lithotripsy is a non-invasive technique that uses shock waves to disintegrate kidney stones. On August 20, 1997, the company signed an agreement with Integrated Health Services, Inc. ("IHS"), for the sale of the Debtors' interest in its thirteen lithotripsy entities, the lithotripsy management company, the stock of its equipment service company and certain related assets. Effective September 30, 1997, the Debtors completed the transaction as to all of the lithotripsy entities other than their interests in three lithotripsy partnerships. Pursuant to a side agreement amending the August 20, 1997, purchase agreement, the Debtors' interests in the three remaining partnerships were placed in escrow pending the satisfaction of certain conditions. Following satisfaction of these conditions, two of the partnerships were conveyed to IHS effective October 3, 1997. Due to the inability of the Debtors and IHS to obtain the consent of the other partner to the transfer of the Debtors' interest therein, the Debtors retained their interest in the remaining partnership. Effective June 1, 1998, the Debtors completed their sale of their remaining lithotripsy partnership to IHS.

During 1999, CHC began to restructure its operations to eliminate unprofitable business units and sell non-strategic business lines to focus operations and improve its financial condition, and recruit executive management to restructure existing operations.

In June 1999, CHC announced that it had determined to terminate an agreement with Aetna U.S. Healthcare, Inc. ("Aetna"). Under the agreement with Aetna, CHC's indirect wholly-owned subsidiaries, Coram Resource Network, Inc., and Coram Independent Practice Association, Inc. (collectively, the "Resource Network Subsidiaries") managed a network of home health service providers for the benefit of approximately 2 million individuals throughout eight states who were enrolled in Aetna health plans. The Resource Network Subsidiaries had additionally provided similar network management services to approximately 1.5 million persons under various other contracts. CHC lost approximately $28.4 million in 1999, from the Resource Network Subsidiaries' businesses and has incurred an additional $18.3 million in losses in connection with the liquidation of the Resource Network Subsidiaries. In November 1999, the Resource Network Subsidiaries filed voluntary petitions under chapter 11 of the Bankruptcy Code. The termination of the Aetna agreement led to significant litigation with Aetna (now resolved), which is discussed below in section IV.E., "Significant Litigation."

Also in November 1999, CHC hired Daniel D. Crowley as its Chief Executive Officer and President to restructure and improve the profitability of its retained operations. The detailed terms of the Debtors' agreements with Mr. Crowley are discussed below.

In September 1999, CHC engaged Deutsche Alex Brown to aid it in divesting the pharmacy benefit management and specialty mail-order pharmacy services business, operated by its subsidiary, Curaflex Health Services, Inc. ("Curaflex"). Curaflex conducted the business under the name Coram Prescription Services ("CPS"). On July 31, 2000, the sale of the CPS unit to a management-led group financed by GTCR Golder Rauner, LLC, was completed. The sale generated approximately $38 million in net cash proceeds. Approximately $28.5 million of the proceeds were utilized to pay the remaining outstanding principal balance due on the secured

revolving line of credit maintained by CHC and Coram. The remaining $9.5 million was used to pay obligations under the Senior A Notes.

### C.    Events Leading to the Debtors' Bankruptcy Filings

The Debtors' bankruptcy filings were precipitated primarily by two factors: a lack of financial resources or debt capacity to meet its maturing debt obligations, and, relatedly, impending failure to comply with the public company exception of the federal law commonly known as Stark II. Further information describing Stark II is set forth below.

As of June 30, 2000, the Debtors had $92.1 million principal outstanding in the form of Series B Notes at 8% interest, and $168.4 million principal outstanding in the form of Series A Notes at 11.5% interest. The company also had $28.5 million outstanding under its senior credit facility at an interest rate of 11% as of June 30, 2000. In connection with the sale of the CPS unit, effective July 31, 2000, the Debtors applied $9.5 million of the net cash proceeds derived from the sale of the CPS business to prepay a portion of the principal amount outstanding under the Series A Notes. The holders of the Series A Notes waived the 103% prepayment premium, thereby permitting the Debtors to reduce the principal amount outstanding under the Series A Notes to approximately $158.9 million as of August 1, 2000. A detailed chronology of the waivers and amendments to the Series A Notes and Series B Notes and the Securities Exchange Agreement through the Petition Date is annexed hereto as Exhibit H.

The Debtors' indebtedness left them extremely vulnerable to competitive and payer pricing pressures and other adverse events and circumstances. In addition, the lenders, pursuant to the senior credit facility and the Series A and B Notes, were entitled to the benefits of various restrictive covenants, and their consent was required to be obtained for the Debtors to engage in various activities and transactions. The Debtors determined that they required additional financing or significant revisions to their existing debt agreements in order to maintain sufficient liquidity to discharge their obligations under the Series A Notes, which were scheduled to come due in fiscal 2001. The holders of the Series B Notes also had the right to cause the Debtors to repay the Series B Notes in fiscal 2001. The Debtors filed bankruptcy petitions to effectuate revisions to their debt structure through the Plan.

The second, and most urgent, reason for the Debtors' bankruptcy filings was their need to remain in compliance with the provisions of the federal law commonly known as "Stark II." (For a detailed discussion of the provisions of Stark II, see section XII, "Discussion of Stark II.") Under federal law, including certain provisions contained in the Omnibus Budget Reconciliation Act of 1993, the ownership of shares in a healthcare services provider is a financial relationship subject to federal regulation. Among other things, Stark II prohibits a physician from making Medicare or Medicaid referrals for certain "designated health services," including durable medical equipment, certain types of nutrition therapy, home health services, and outpatient prescription drugs to entities with which the physician or an immediate family member has a financial relationship, unless an exception is available.

16

The Debtors have learned that certain physicians have owned, from time to time, shares of CHC's common stock. As a public company, the Debtors are unable to confirm, from time to time, which physicians (or their families) own CHC stock. Under the circumstances that existed as and following the Petition Date, if CHC were to remain publicly traded, referrals to subsidiaries of CHC for designated health services after January 1, 2001, by physicians who own (or whose family members own) CHC stock could only have been accomplished through an available exception to Stark II. On the Petition Date, and through December 31, 2000, an exception (the "Public Company Exception") was available. Under that exception, CHC stock must be traded on a national securities exchange or other appropriate trading medium, and CHC must have either stockholders' equity in excess of $75 million as of December 31, 2000, or have had average stockholders' equity of $75 million during the preceding three years. Absent such protection, the Debtors would be obligated to determine whether a referring physician (or an immediate family member of the physician) owns CHC stock prior to accepting any Medicare or Medicaid referrals from that physician. Medicare and Medicaid will not pay for services provided pursuant to a prohibited referral, and the entity is liable for the refund of amounts received pursuant to prohibited claims. In addition, the provider may be subject to civil penalties or excluded from Medicare and Medicaid participation for violating these laws.

Prior to filing for Chapter 11 protection, CHC had determined there was not a reasonable likelihood that it would qualify for the Public Company Exception after December 31, 2000 even though its common stock would be traded on the Over the Counter Bulletin Board. Failure to qualify for the Public Company Exception would create an extremely onerous administrative burden that would not only entail significant additional expenses for the Debtors, but also would place a significant burden on referring physicians that would discourage them from providing referrals of their patients to the Debtors. At the time the Debtors commenced their cases, it was apparent that the Debtors' imminent failure to comply with the Public Company Exception would materially and irreparably affect the Debtors' business and financial condition as of January 1, 2001. The Debtors therefore filed bankruptcy petitions to avoid what would have been a potentially disastrous development.

As detailed below, the Debtors were unable to confirm a plan of reorganization prior to December 31, 2000. In order to maintain compliance with Stark II, on December 26, 2000, the Debtors filed an emergency motion for an order approving an agreement between the Debtors and the Noteholder Group pursuant to which the Noteholder Group agreed to exchange up to $122,000,000 in aggregate amount of the debt evidenced by the Senior Notes for shares of preferred stock of Coram (the "Note Exchange"). As part of the Note Exchange, the Noteholders' remaining Notes were amended to reflect an extended six-month maturity (June 30, 2001) and a reduced interest rate of 9% per annum, payable quarterly. The Debtors are in the process of negotiating a possible extension of the June 30, 2001 maturity date. On December 28, 2000, the Court approved the Note Exchange and it was consummated on December 29, 2000, thereby allowing the Debtors to remain in compliance with Stark II for another year. Specifically, the Note Exchange provided the minimum equity required for the Debtors to qualify for the Public Company Exception. However, there remains a substantial risk that the Debtors will be unable to maintain compliance with the Public Company Exception as of

17

January 1, 2002. By reorganizing as a private company, Reorganized Coram will be positioned to monitor and maintain compliance with Stark II.

### D.    Selected Historical Financial Information

Set forth in Exhibits C and D, respectively, to this Disclosure Statement are copies of CHC's consolidated Annual Report on Form 10-K for the fiscal year ended December 31, 2000, and Quarterly Report on Form 10-Q for the three and six months ended June 30, 2001, with the accompanying Management's Discussion and Analysis.

## V. DEBTORS' CHAPTER 11 CASES AND POST-PETITION OPERATIONS

### A.    The Debtors' Chapter 11 Cases — Overview

On August 8, 2000, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Following the commencement of the Reorganization Cases, all actions and proceedings against the Debtors and all acts to obtain any property of the Estates were automatically stayed under section 362 of the Bankruptcy Code.

Since the Petition Date, the Debtors have continued to operate their businesses in the ordinary course as debtors-in-possession pursuant to sections 1107 and 1108 and, as described below, have taken various actions to minimize any disruption of their business, preserve value, and facilitate reorganization. The following discussion summarizes the significant proceedings and events that have occurred respecting the Debtors' chapter 11 cases since commencement.

### B.    Debtor-in-Possession Financing Agreement

To ensure that the Debtors would be able to satisfy any immediate needs for access to cash after the Petition Date, they determined that it was in the best interest of all parties to enter into a debtor-in-possession facility. The DIP Facility, with Madeleine LLC as lender and agent for lenders, Coram as borrower, and certain of Coram's non-debtor subsidiaries as guarantors was approved by order of the Court dated September 12, 2000. Madeleine LLC is an affiliate of Cerberus Partners, L.P. The provisions of the DIP Facility include a revolving line of credit of up to $40 million bearing interest at the rate of prime plus 2%, secured by a first lien upon substantially all assets of the Debtors and their non-debtor subsidiaries. The DIP Facility further includes a grant of super-priority administrative expense status in accordance with section 364(c)(1) of the Bankruptcy Code to claims of the lenders arising under the DIP Facility. The DIP Facility is presently set to expire on August 31, 2001. The Debtors are considering seeking an extension of such expiration date. The Debtors have not borrowed any funds under

18

the DIP Facility. The operative documents respecting the DIP Facility are on file with the Bankruptcy Court.

### C.    Appointment of the Committees

#### 1.    Creditors' Committee

At a meeting held on August 22, 2000, the United States Trustee designated an Official Committee of Unsecured Creditors (the "Creditors' Committee") consisting of the following three members:

> Aetna US Healthcare Inc.
> Foothill Capital Corporation
> Goldman Sachs Credit Partners LP

After its formation, the Committee retained the law firms of Wachtell, Lipton, Rosen & Katz and Richards, Layton & Finger as its co-counsel. Under the Bankruptcy Code, the Debtors' estates are responsible for the payment of reasonable professional fees and necessary disbursements incurred by these professionals to the extent approved by the Bankruptcy Court.

#### 2.    Equity Holders Committee

On October 18, 2000, the United States Trustee designated an Official Committee of Equity Security Holders (the "Equity Committee") consisting of the following members:

> Samstock, L.L.C.
> Ann and Robert Lurie Foundation
> Richard Haydon

After its formation, the Equity Committee retained Altheimer & Gray and Saul, Ewing as its co-counsel. The Equity Committee also retained Deloitte & Touche LLP as its business valuation and financial advisors. Under the Bankruptcy Code, the Debtors' estates are responsible for the payment of the reasonable professional fees and necessary disbursements incurred by these professionals to the extent approved by the Bankruptcy Court.

### D.    Bar Date and Claims Processing

Pursuant to an order entered on August 8, 2000, the Bankruptcy Court set September 29, 2000, as the last date by which all entities with pre-Petition Date Claims against a Debtor must file proofs of such Claims with the Bankruptcy Court. The Debtors have engaged an outside claims administrator to assist in the administration of these Claims. In addition, the Debtors will seek entry of an order setting a bar date for the filing of proofs of certain designated

19

Administrative Claims, including post-Petition Date, pre-rejection Claims of lessors and Claims of taxing authorities. The claims administrator is in the process of reviewing all of the Claims that were filed. To date, the Debtors have filed two omnibus motions seeking orders authorizing the Debtors to reduce or expunge claims that are duplicative or unsupported by the Debtors' books and records.

     E.      **Significant Litigation**

        (a)     In April 1998, CHC signed a Master Agreement (the "Master Agreement"), effective July 1, 1998, with Aetna. Under the Master Agreement, which was expected to last five (5) years, the Resource Network Subsidiaries managed and provided home healthcare services for over 2,000,000 Aetna enrollees in eight states for a stated monthly fee per enrollee. CHC began serving Aetna enrollees under the Master Agreement on approximately July 1, 1998. CHC provided its notice of termination of the Master Agreement effective June 30, 1999. Subsequently, Aetna terminated the company's National Ancillary Services Agreement effective April 12, 2000. CHC became involved in litigation with Aetna over the operation and termination of the Master Agreement before the United States District Court for the Eastern District of Pennsylvania. CHC and Aetna entered into a settlement agreement in April 2000 that terminated all litigation. The terms of the settlement are subject to an agreement of confidentiality. However, pursuant to the settlement, the Debtors agreed to pay Aetna a total of $3 million. The Debtors paid Aetna $1 million at the time the settlement was entered, and they agreed to pay Aetna $2 million over the following 24 months. Aetna neither paid nor agreed to make any payment to the Debtors in connection with the settlement. Aetna and the Debtors also exchanged mutual releases. Subsequent to the Petition Date, Aetna and the Debtors entered into a stipulation relating to the allowance and payment of Aetna's claims, the reaffirmation and assumption of the settlement agreement and continuing business opportunities. The Debtors filed a motion for the approval of such stipulation to which the Resource Network Subsidiaries filed an objection. Such stipulation has not yet been approved by the Bankruptcy Court.

        (b)     CHC files consolidated federal income tax returns with Coram and each of Coram's direct and indirect wholly-owned U.S. subsidiaries (the "CHC Group"). During the course of an audit conducted by the Internal Revenue Service ("IRS") before the commencement of the Debtors' Chapter 11 cases, the IRS disallowed various deductions claimed by the CHC Group with respect to its taxable year ended September 30, 1995, a portion of which had been carried back to certain taxable years of $T^2$ Medical, Inc. ("$T^2$ Medical"), and its subsidiaries pre-dating the acquisition of $T^2$ Medical in 1994. Separate consolidated federal income tax returns were filed by $T^2$ Medical and its subsidiaries for such prior taxable years, which did not include the Debtors (the "$T^2$ Group"). As a result of the carryback, the $T^2$ Group obtained federal income tax refunds aggregating approximately $12.7 million. On May 14, 1999, the IRS issued a notice of deficiency against the $T^2$ Group seeking to recover the amount of the taxes previously refunded, plus interest. On August 11, 1999, $T^2$ Medical and CHC, as parent of $T^2$ Medical, filed a petition for redetermination with the Tax Court, which proceeding is pending. The matter is styled as <u>$T^2$ Medical Inc. and Coram Healthcare Corporation v. Commissioner of Internal Revenue Service</u>, U.S. Tax Court, Denver, Colorado, Docket No. 13792-99.

20

The disputed issues fall into the following four primary categories: (1) the deductibility of the cost incurred to acquire certain physician owned companies in connection with the settlement agreement executed between T$^2$ Medical and the United States Government, resolving an investigation into certain practices of T$^2$ Medical by the U.S. Office of the Inspector General; (2) the amount of expense that could be deducted in connection with the settlement consideration provided in connection with the settlement of securities class action lawsuits filed against T$^2$ Medical; (3) the write-off of certain amounts of purported goodwill acquired by the T$^2$ Group in connection with the purchase of certain physician owned companies; and (4) the ability to carryback the foregoing deductions up to ten years, rather than the normal three years.

Pursuant to standard IRS procedures, the resolution of the disputed issues contained in the Tax Court petition has initially been assigned to the administrative appeals function of the IRS. Assuming confirmation of the Plan by year end, the unresolved issues in this case would likely be addressed before the Tax Court. While no trial date has been scheduled, the Debtors anticipate that any such trial would occur in Spring 2002 at the earliest. The Debtors are not in a position to predict the final outcome at this time.

The potential federal income tax liability, including accrued interest to date, is estimated at approximately $22 million as of April 2001. The federal income tax adjustments also would give rise to additional state tax liabilities, estimated at approximately $800,000 as of April 2001, including accrued interest to date. The Debtors believe that such tax liabilities are solely liabilities of T$^2$ Medical and certain of its subsidiaries, and are not liabilities of the Debtors. Accordingly, no amount is included in the estimate of Priority Tax Claims of the Debtors in respect of such potential tax liabilities.

(c)     On November 12, 1999, the Resource Network Subsidiaries filed voluntary petitions under Chapter 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, Case No. 99-2889 (MFW). The Resource Network Subsidiaries are now being liquidated pursuant to the proceeding. The Chief Restructuring Officer of the Resource Network Subsidiaries had threatened suit on behalf of the estates against CHC. The draft complaint included claims for damages against CHC and certain former and current officers and directors of CHC and Coram in excess of $41 million. The principal theories included in the draft complaint were piercing the corporate veils of the Resource Network Subsidiaries to reach CHC and breaches by the officers and directors of their fiduciary duties.

Additionally, on September 11, 2000, the Resource Network Subsidiaries filed a motion to substantively consolidate their chapter 11 cases with the Debtors' chapter 11 cases (the "Consolidation Motion"). The Resource Network Subsidiaries alleged that consolidation was warranted because, among other factors, there was an overlap in operations, management, and liabilities between the Resource Network Subsidiaries and the Debtors. The Resource Network Subsidiaries also claimed that they are entitled to any funds paid by Aetna to CHC in a recent confidential settlement of claims arising from Aetna's alleged breach of a contract pursuant to which CHC would service certain of Aetna's healthcare plans. The settlement is described in paragraph E(a) of this section.

21

The Debtors and the Resource Network Subsidiaries subsequently entered into a settlement of their respective claims, which was approved by the Court in December 2000. The settlement provided that the Resource Network Subsidiaries would withdraw the Consolidation Motion and not oppose confirmation of the Debtors' Plan unless the Plan adversely affects the Resource Network Subsidiaries. In consideration therefor, the Debtors made a cash payment of $500,000 to the Resource Network Subsidiaries in January 2001. Notwithstanding the settlement, the Resource Network Subsidiaries maintain a proof of claim against the Debtors' estates in the amount of approximately $41 million, and the Debtors maintain a proof of claim against the Resource Network Subsidiaries' estates in approximately the same amount. While the ultimate outcome of these claims cannot be predicted with any degree of certainty, management, in consultation with legal counsel, does not believe that the final resolution of this matter or other matters raised by the Resource Network Subsidiaries will have a material adverse impact on the company's financial position or results of operations.

(d)     Apria Healthcare, Inc. and one of its affiliates (collectively "Apria") filed suit against CHC and the Resource Network Subsidiaries in the Superior Court of Orange County, California (Apria Healthcare, Inc. and Apria Healthcare of New York State, Inc. v. Coram Healthcare Corporation, Coram Resource Network, Inc. and Coram Independent Practice Association, Inc., Case No. 813264). Apria's claims related to services that were rendered as part of certain home health provider networks managed by the Resource Network Subsidiaries. The complaint included requests for declaratory, compensatory and other relief in excess of $1.4 million. A notice has been filed with the Court notifying it of the bankruptcy proceedings involving the Resource Network Subsidiaries and contending that the case has been stayed by operation of the United States Bankruptcy Code. On February 21, 2001, the parties agreed that the action would be dismissed without prejudice with each party responsible for its own legal fees.

(e)     On July 17, 2000, TBOB Enterprises, Inc. ("TBOB") filed an arbitration demand against CHC, TBOB Enterprises, Inc. f/k/a Medical Management Services of Omaha, Inc. Against Coram Healthcare Corporation, in the American Arbitration Association office in Dallas, Texas. TBOB claims that CHC breached its obligations under an agreement entered into by the parties in 1996 relating to a prior earn-out obligation of the CHC's subsidiary, Curaflex Health Services, Inc. ("Curaflex"), that originated from Curaflex's acquisition of the claimant's prescription services business in 1993. CHC and Curaflex operated the business under the name "Coram Prescription Services" ("CPS"), and the assets of the CPS business were sold on July 31, 2000. TBOB alleges, among other things, that CHC has impaired the earn-out payments due TBOB by improperly charging certain expenses to the CPS business and failing to fulfill CHC's commitments to enhance the value of CPS by marketing its services. The TBOB demand claims damages of approximately $896,000. TBOB contends that this amount must be paid in addition to the final scheduled earn-out payment of over $1,267,000 that would have been due from CHC and Curaflex on March 15, 2001. The arbitration proceeding has been stayed by operation of the Bankruptcy Code.

TBOB filed a proof of claim filed against CHC's estate for the aggregate amount of approximately $2.2 million (the scheduled earn-out payment plus the alleged damages). On

22

July 5, 2001, CHC received a copy of a letter from TBOB to the American Arbitration Association in which it requested that the case remain in abeyance because the final $1.3 million earn-out payment that was scheduled for March 2001, and the alleged damages of $0.9 million have been stayed by operation of the Bankruptcy Code.  Management does not believe that final resolution of this matter will have a material adverse impact on the company's financial position or results of operations.

      (f)    On November 8, 2000, a complaint entitled <u>Alan Furst et. al. v. Stephen Feinberg, et al.</u> was filed in the United States District Court for the District of New Jersey. An Amended Class Action Complaint was filed on November 15, 2000, alleging that certain current and former officers and directors of the company and the company's principal lenders, Cerberus Partners, L.P., Foothill Capital Corporation, and Goldman Sachs & Co., implemented a scheme to perpetrate a fraud upon the stock market regarding the common stock of CHC.  A Second Amended Class Action Complaint was filed on March 21, 2001, which removed all of the officers and directors of the company as defendants, except the company's Chief Executive Officer and another member of the Board of Directors.  A Third Amended Class Action Complaint was filed on June 14, 2001. The plaintiffs allege that the defendants artificially depressed the trading price of CHC's publicly traded shares and created the false impression that stockholders' equity was decreasing in value and was ultimately worthless.  The plaintiffs further allege that members of the class sustained total investment losses of $50 million or more. CHC notified its insurance carrier and intends to avail itself of any appropriate insurance coverage for its directors and officers, who are vigorously contesting the allegations. Although the Debtors, who are not named as defendants in the litigation, believe that this case is without merit, because of the inherent nature of this litigation, the Debtors cannot predict its outcome nor can it predict the scope and nature of any indemnification that the directors and officers may have with the insurance carrier. (*See also,* "The Equity Committee's Motion to Prosecute Certain Purported Claims" below at section H.3).

      (g)    <u>Rita F. Oliai v. Coram Healthcare Corporation</u>.  The Plaintiff, who was the former Vice President of Reimbursement of CHC, left CHC in July of 1998.  She filed a complaint in the United States District Court for the Central District of California, alleging that she was wrongfully terminated in violation of federal and state anti-discrimination statutes.  She also alleges that CHC terminated her as a result of her uncovering certain wrongful claims practices.  CHC has answered by denying all allegations in the complaint.

      A motion for summary judgment based upon the merits was granted in the Summer of 2000, in favor of CHC, wherein the court ruled in favor of CHC on three of the plaintiff's four claims.  The only surviving claim is based on alleged age discrimination, and the litigation is proceeding through the discovery process.  The Bankruptcy Court lifted the automatic stay for the limited purpose of mediation.  After mediation failed, the plaintiff filed a motion to lift the automatic stay to proceed with the litigation, and the Bankruptcy Court granted this motion on May 25, 2001.  No trial date has been set.

      (h)    <u>Mary Kay Alcala EEOC Charge</u>.  A charge of discrimination was filed against CHC by a former employee, Mary Kay Alcala.  The plaintiff sought a right to sue letter

23

from the Chicago office of the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of gender and pregnancy. The EEOC issued a Determination Letter on September 7, 1999, finding cause to believe that a class of employees had been discriminated and retaliated against by CHC.

The plaintiff subsequently filed a motion with the Bankruptcy Court for relief from the automatic stay to pursue recovery from CHC's applicable insurance policy. Additionally, a formal demand was made for $225,000 on November 28, 2000. On May 25, 2001, the court lifted the automatic stay allowing plaintiff to seek a right to sue letter from the EEOC, but which right to sue letter has not been provided to CHC. The Bankruptcy Court also allowed the plaintiff to file a declaratory judgment action regarding an insurance denial and to file suit in federal court on the employment matter in order to preserve her claim.

        (i)    <u>Hashim v. Coram, et al.</u> This case involves a claim for damages allegedly caused by the Company in rendering care to a pediatric patient who died. The plaintiffs allege that a Total Parenteral Nutrition mixture contained too much potassium. Claims for punitive damages have been withdrawn by stipulation.

This case remains in discovery with no trial date set. Certain key witnesses have been deposed, including the parents of the patient and the pharmacists and nurses involved in the case. On December 22, 2000, the plaintiff filed a motion seeking permission from the Bankruptcy Court to proceed against Coram's insurance assets in consideration for giving up any right to recover from the Debtors. On April 9, 2001, the Bankruptcy Court approved this motion, which eliminated CHC's direct exposure.

*          *          *

CHC intends to defend itself vigorously in the matters described above. Nevertheless, due to the uncertainties inherent in litigation and dispute resolution, the ultimate disposition of such matters cannot presently be determined. The Debtors and their subsidiaries are also parties to various other legal actions arising out of the normal course of their business. Management believes that the ultimate resolution of such other actions will not have a material adverse effect on the financial position, results of operations or liquidity of Reorganized Coram.

F.      **The Debtors' First Joint Plan of Reorganization and Respective Confirmation Hearing**

      1.      **The First Joint Plan of Reorganization**

On the Petition Date, the Debtors filed a plan of reorganization (as amended, the "Original Plan") that was similar to the present Plan in many respects. The most significant distinction between the Original Plan and the present Plan is that the Original Plan did not provide for a distribution to holders of Allowed CHC Equity Interests on the basis that CHC was insolvent as of the Petition Date (and other relevant times). The initial basis for the conclusion

24

of insolvency was a valuation of the Debtors prepared by an independent third-party expert valuation firm, Chanin Capital Partners ("Chanin"). Chanin determined that the Debtors were insolvent by approximately $93 million immediately prior to the Petition Date. Chanin subsequently determined that the Debtors were insolvent by approximately $107 million as of December 4, 2000. The increase in the Debtors' negative equity was primarily due to the Debtors' failure to meet their operating performance projections after July 31, 2000, as well as marketplace changes. Chanin continues to believe that there is no economic value for CHC common shares, a view endorsed in the Goldin Report.

### 2.    The Equity Committee Objection and Confirmation Hearing

The Debtors obtained the requisite votes necessary of all impaired classes of creditors for confirmation of the Original Plan, and the Court conducted a confirmation hearing (the "December Confirmation Hearing") over the course of six days between December 1 and December 21, 2000. The Equity Committee had objected to confirmation of the Original Plan, claiming, among other things, that the Debtors' equity interest had "substantial" value that the creditors were reallocating improperly to themselves. However, as the Bankruptcy Court observed at the conclusion of the December Confirmation Hearing, the experts retained by the Equity Committee, as well as those retained by the Debtors and the Creditors' Committee, developed enterprise valuations for the Debtors that were lower than the amount of the Debtors' debt.

The Court, however, declined to confirm the Original Plan on the basis that incomplete disclosure of the extent of the business relationship between Daniel D. Crowley, the Debtors' CEO, and one of the Noteholders, Cerberus Partners, L.P. ("Cerberus"), precluded the Court from finding that the Original Plan was proposed in good faith in accordance with section 1129(a)(3) of the Bankruptcy Code based upon the evidence in the record at that time. The Court did, however, observe that the Debtors were insolvent under the valuations presented by not only the Debtors, but also the Equity Committee and the Creditors' Committee.

### 3.    The Business Relationship between Mr. Crowley and Cerberus

The principal of Cerberus, Stephen Feinberg, served as a director of CHC for approximately two years prior to the Petition Date. He also served on the CHC Board of Directors' compensation committee at the time that CHC retained Mr. Crowley. Mr. Feinberg resigned from the CHC Board of Directors in July, 2000.

Mr. Crowley and Cerberus are parties to an agreement pursuant to which Mr. Crowley receives a fee of $80,000 per month with a potential for additional incentive bonuses for services provided to Cerberus with respect to its investments in companies other than the Debtors. Mr. Crowley neither receives a fee nor earns incentive bonuses from Cerberus for any services he provides respecting the Debtors. Apart from CHC, the only other company in which Cerberus has a financial interest and Mr. Crowley serves as an executive is Winterland Productions, Inc. ("Winterland"). Mr. Crowley is chairman of the board of Winterland, in which

25

Cerberus holds a substantial stake. Winterland is presently a chapter 11 debtor and has never generated sufficient profits to trigger Mr. Crowley's right to incentive compensation. To date, Mr. Crowley has not received incentive compensation from Cerberus under their agreement. Mr. Crowley receives no compensation from Cerberus for any services he provides respecting the Debtors.

Although the CHC Board of Directors had been aware of a business relationship between Mr. Crowley and Cerberus, the Court found that there was inadequate disclosure of the extent and details of the relationship, and that it could not make a finding that the Original Plan was proposed in good faith in accordance with section 1129(a)(3) of the Bankruptcy Code based upon the evidence in the record at the time.

G.     The Emergency Note Exchange

Prior to the Bankruptcy Court's denial of confirmation, the Noteholders had been unwilling to consider a debt conversion of sufficient magnitude to create the requisite $75 million of stockholders' equity to qualify for the Public Company Exception under Stark II. However, after the Court declined to confirm the Original Plan, the Debtors and the Noteholders both recognized that drastic and immediate action was necessary to comply with the Public Company Exception in order to preserve the Debtors as a going concern. Accordingly, after extensive negotiations regarding the terms of such conversion over the December 2000 holiday weekend, the Noteholders agreed to exchange $97,715,434 of principal under the Series A Notes and $11,610,542 of accrued (but unpaid) interest under the Series A and the Series B Notes for 905 shares of the Preferred Stock in Coram so that the Debtors would have the necessary $75 million of stockholders' equity as of December 31, 2000, that was required for the Debtors to meet the Public Company Exception.

The Note Exchange provided for Coram to issue the Preferred Stock with a liquidation preference of $120,802 per share and a cumulative compounding dividend at a rate of 15% per annum of the liquidation preference, payable quarterly in arrears. In addition, the remaining Senior Note indebtedness would be amended to extend its maturity until June 30, 2001, and reduce the coupon thereon to 9% per annum, payable quarterly. In connection with the Note Exchange, the Noteholders were given the right to three of the seven seats on Coram's Board of Directors and 47.5% of the voting power over Coram. The Noteholders agreed to suspend such corporate governance rights during the course of the bankruptcy. The Note Exchange agreement and the Preferred Stock contained terms respecting redemption and anti-dilution provisions that are customary for such securities and covenants that were consistent with the covenants under the Senior Notes, and provided that the preferred stock would not be deemed equity for substantive consolidation purposes.

Following a hearing, on December 28, 2000, the Bankruptcy Court authorized the Debtors and the Noteholders to conduct the Note Exchange, which they effectuated promptly thereafter. On March 30, 2001 and June 29, 2001, Coram made payments-in-kind aggregating $8,400,000 in respect of the Preferred Stock.

26

**H.**     **The Debtors' Motion to Appoint The Independent Restructuring Advisor and the Equity Committee's Motions to Retain Deloitte & Touche LLP and to Prosecute Potential Claims of the Estates**

    **1.**     **The Independent Restructuring Advisor**

    Because the Bankruptcy Court's denial of confirmation of the Original Plan raised questions as to whether the historical relationship between Mr. Crowley and Cerberus influenced the value of the Debtors' business, its business judgment, or the reorganization process in a manner adverse to the interests of the Estate, it became problematic for the Debtors to propose any new plan of reorganization -- no matter how legally and economically proper the terms -- so long as such questions remained. Therefore, at a hearing on December 28, 2000, the Debtors, with the support of the Creditors' Committee, proposed that there be a 90-day litigation-free "cooling off" period to afford the Debtors an opportunity to engage in a process of reassessing their affairs and reorganization opportunities in light of the Court's findings and rulings. After considering their options, the Debtors determined, through a sub-committee of independent directors, to propose that a centerpiece of this process would be, subject to the Court's approval, the appointment of a wholly disinterested expert to perform an impartial evaluation of aspects of the Debtors' affairs, their CEO's relationship with Cerberus, and other issues that the Equity Committee raised as barriers to confirmation of a plan.

    The Debtors concluded that the appropriate way to facilitate a reorganization for the benefit of all stakeholders would be to engage an experienced, independent, and disinterested third party to analyze in detail the Debtors' historical and current operations, financial results and projections, business prospects, and viable restructuring alternatives. A special committee consisting of CHC's independent directors (the "Special Committee") was formed to conduct this task. The Special Committee was and remains comprised of Messrs. Amaral, Casey, Smith and Ms. Smoley. The Special Committee selected Harrison J. Goldin to investigate these issues. On February 1, 2001, the Special Committee filed a motion to appoint Goldin Associates, L.L.C. ("Goldin"), as independent restructuring advisors for the Debtors (the "Goldin Motion"). A copy of the Goldin Motion is on file with, and may be obtained from, the Bankruptcy Court.

    Goldin is a financial advisory firm specializing in distressed situations whose expertise includes financial advisory services, business valuation services, review of debtors' operations and business plans, solvency analyses, valuation, litigation oversight and management, and service as trustee, examiner, plan administrator, special master, liquidator, mediator, and other fiduciary capacities in complex and often contentious bankruptcy and insolvency situations. The Senior Managing Director of Goldin Associates is Harrison J. Goldin, a highly regarded independent insolvency professional who served as Comptroller of the City of New York from 1974-1989. Goldin indicated in an affidavit that it is a completely disinterested party with respect to the Debtors' estates, and has no connections to the Debtors, the Debtors' management, the Senior Noteholders, the members of the Creditors' Committee, or the members of the Equity Committee. No party has objected to Goldin's qualifications or disinterestedness.

27

The independent Special Committee of CHC's Board of Directors, with the approval of the Creditors' Committee, sought to retain Goldin to perform the following services (the "Investigation") and determine:

(a)   Whether the Debtors' business plan and the projections that underlie their business plan are consistent with reasonable business judgment;

(b)   Whether Goldin found any evidence that Chanin Capital Partners' valuation analysis was not independently prepared or free of any undue or improper influence by a member of the Debtors' management or the CHC Board of Directors;

(c)   Whether the Original Plan was consistent with the best interests of the Debtors;

(d)   Whether Goldin found any material facts that support a conclusion that the Original Plan was not proposed in good faith and in compliance with applicable law, or was not fundamentally fair to all parties in interest; and

(e)   Whether the Original Plan or some modification thereto would best serve the interests of the Debtors.

On February 26, 2001, the Court approved the Debtors' motion for an order appointing Goldin as an independent restructuring advisor, and Goldin was charged with (i) evaluating and reporting on the above issues, (ii) advising the Special Committee respecting the allegations raised in a proposed complaint and motion to prosecute certain proposed claims filed by the Equity Committee (discussed below), including whether the Debtors should pursue any of the proposed claims, (iii) advising the Special Committee as to potential amendments to the Original Plan, and (iv) attempting to mediate a consensual resolution among the Debtors, the Equity Committee, and other parties in interest. On May 14, 2001, the Court approved the retention of Kramer Levin Naftalis and Frankel LLP as counsel to the Debtors to assist Goldin in connection with its investigation and report.

### 2.   The Equity Committee's Retention of Deloitte & Touche

On November 29, 2000, the Equity Committee filed a motion to retain Deloitte & Touche ("D&T") as its business valuation and financial advisors. On December 1, 2000, the Court approved the Equity Committee's retention of D&T to serve in that capacity. On March 26, 2001, the Equity Committee filed an Amended Application for an Order Authorizing the Further Retention and Employment of D&T Nunc Pro Tunc as Financial Advisors, seeking authorization to provide additional advisory services to the Equity Committee. On May 7, 2001, the Court approved the application.

Consistent with their efforts to make the reorganization process as open and transparent as reasonably possible, the Debtors have been cooperating with D&T's due diligence

28

efforts. The Debtors believe that D&T has had, and thoroughly availed itself of, the opportunity to obtain full and detailed knowledge of the Debtors' business and operations for the benefit of the Equity Committee.

3.    **The Equity Committee's Motion to**
      **Prosecute Certain Purported Claims**

After the Debtors had applied to the Court for authorization to retain Goldin, the Equity Committee filed a motion for leave to file a complaint on behalf of CHC, asserting breach of fiduciary duty and related claims against Mr. Crowley, Cerberus, and its principal, Stephen Feinberg. The Debtors opposed the motion because they believed that the claims were without merit. Moreover, the Special Committee believed that it, as well as the Court and all parties in interest, would best be served if a competent independent professional such as Goldin would investigate and analyze the potential claims raised by the Equity Committee and provide guidance as to whether further action is appropriate with respect to the Equity Committee's proposed derivative claims.

On February 26, 2001, in connection with the Bankruptcy Court's approval of the Debtors' motion to retain Goldin, the Court denied the Equity Committee's motion without prejudice. Shortly thereafter, Goldin commenced its investigation, which culminated with the issuance of the Goldin Report (*i.e.*, Report of Independent Restructuring Advisor Goldin Associates, L.L.C., dated July 11, 2001).

I.    **The Findings and Conclusions of the Independent Restructuring Advisor**

The Goldin Report, attached hereto, is consistent with the Debtors' position that the Original Plan was fair and equitable. Claimants and holders of Interests are advised to read the Goldin Report for a detailed description of the issues raised by the Equity Committee at the confirmation hearing respecting the Original Plan and in the complaint it sought to file on behalf of CHC, Goldin's findings and recommendations in connection therewith, and the methodology and investigative and analytical techniques Goldin utilized to arrive at its findings and recommendations. In summary, the Goldin Report states, among other things:

1.    **Findings**

- At all relevant times the amount of the Debtors' debt materially exceeded the company's enterprise value.

- At no time during the relevant period was the integrity of the Debtors' accounting, financial reporting, record keeping or system of controls compromised or materially impaired.

- Neither Mr. Crowley nor Mr. Feinberg acted with culpable intent of the sort alleged in the Equity Committee's complaint, although Mr. Crowley and Mr.

29

Feinberg should have disclosed the full extent of the Crowley/Cerberus relationship to other directors and officers and the failure to do so was a breach of their respective fiduciary duties. However, the undisclosed conflict of interest caused Coram no actual harm, other than the limited damages resulting from the Bankruptcy Court's decision not to confirm the initial Plan of Reorganization proposed by the Debtors.

- The evidence indicates that Mr. Crowley worked diligently and effectively to stabilize the Debtors' operations and improve their financial performance.

- There is no evidence to establish that Mr. Crowley or Mr. Feinberg intended or expected that Mr. Crowley would seek to advance Cerberus' interests to the detriment of the Debtors and the shareholders, and that theory is counter-intuitive.

- There is no indication that Cerberus (or the other Noteholders) ever instructed Mr. Crowley to act contrary to the Debtors' best interests.

- There is no evidence that Mr. Crowley advanced Cerberus' interests at the expense of the Debtors, with the possible exception of Mr. Crowley's decision to make a cash interest payment to the Noteholders on July 14, 2000, at a time when the company's cash was low and a bankruptcy filing was under active consideration. However, Goldin found that Mr. Crowley had justification for choosing to make the payment and the payment "did not unwarrantedly benefit the Noteholders at the expense of any other constituency." The payment (i) had no meaningful impact on Coram's solvency, (ii) did not improve the Noteholders' position vis-a-vis other creditors, and (iii) did not impact the shareholders. Indeed, Goldin found that the shareholders "would have been treated no differently in bankruptcy had the payment not been made or had it been made 'in kind' rather than in cash."

- With the possible exception of the interest payment, there is no evidence suggesting that if Mr. Crowley had not had a conflict, he would have managed the Debtors' operations or finances more effectively or that he would have identified (let alone consummated) any merger, sale or financing transaction that might have enabled the Debtors to avoid bankruptcy.

- The only damages that the Debtors suffered by virtue of the undisclosed conflict of interest are the professional fees ($5 to $6 million) and possible speculative business losses ($7 to $9 million) as a result of the Debtors' inability to obtain confirmation of the Original Plan in December 2000.

- A lawsuit against Mr. Crowley and Mr. Feinberg would cost the Debtors more than the lawsuit would be worth.

30

- A lawsuit against Crowley and Feinberg would provide no benefit to CHC's existing equity holders.

## 2.    Recommendations

Goldin recommends in its report that the Debtors strive to achieve a consensual resolution of their cases by proposing a Plan pursuant to which the Noteholders and Mr. Crowley forego a portion of their legal entitlements in order to make two voluntary contributions: (i) an increase in the distribution to CHC General Unsecured Creditors from $2 million (as in the Original Plan) to $3 million (if they vote as a class in favor of the Plan), and (ii) up to a $10 million distribution to holders of Allowed CHC Equity Interests (if they vote as a class in favor of the Plan). As a component of a global settlement to facilitate the Debtors' emergence from bankruptcy, Goldin recommended in its report that the bonus compensation Mr. Crowley has earned pursuant to his employment agreement, dated as of November 30, 1999, (as subsequently amended, the "Executive Employment Agreement") be reduced by $7.5 million such that Mr. Crowley will receive a total of $5.9 million in EBITDA bonus compensation for calendar year 2000 in addition to his base salary of $650,000.

## J.    Statement of Special Committee Regarding Executive Compensation Waiver

The statement of the Special Committee as to its views of the recommendations in the Goldin Report is as follows.

> The independent members of the CHC Board of Directors adopted the recommendations of the Goldin Report in their entirety, believing it is in the best interest of the Company, its customers, employees, shareholders and creditors to attempt to achieve a consensual and swift confirmation of its Second Joint Plan of Reorganization. However, the independent members of the Board of Directors do not believe the recommendation to reduce Mr. Crowley's compensation is warranted.

> Mr. Crowley was retained because of his acknowledged turnaround expertise and his extensive experience in managing large, complex healthcare companies. The Board hired Mr. Crowley when the Company's financial situation was dire. In November 1999, when Mr. Crowley arrived, CHC had more than $300 million in long-term debt, accounts payable were seriously overdue and CHC was on credit hold with important vendors, one of its units had just been forced into involuntary bankruptcy, CHC was engaged in an adversarial lawsuit with its largest customer, cash flow from operations was negative and it had net borrowing of $44 million in that year to fund operations.

31

As part of his compensation for 2000, Mr. Crowley had an incentive program linked to financial performance. During 2000, based on the SEC Form 10-K, net income grew to $98.7 million from a loss of $114.8 million in 1999, and cash flow from operations grew to $42.6 million compared to negative cash flow of $9.5 million in 1999 – a positive swing in cash flow of $52.1 million. In the process, Mr. Crowley made net long-term debt repayments of $54.1 million, brought accounts payable to current status, amicably settled the lawsuit with its largest customer, reorganized and stabilized the management team, achieved an enhanced price in the sale of the CPS asset and improved margins by focusing on profitable therapies and dramatically improving operating costs.

While we wish the business relationship between Mr. Crowley and Cerberus had been more adequately disclosed, we believe it had no material effect on the performance of his duties or the operations and financial condition of CHC. As the Goldin Report stated, Mr. Crowley "worked diligently and effectively to stabilize Coram's operations and improve its financial performance, a goal shared by the Noteholders and the stockholders."

We believe Mr. Crowley's actions saved the Company, preserving and significantly enhancing the value of the Debtors' estates in the best interests of all the claimants. We believe the viability of the ongoing enterprise is clearly attributable to the leadership of Mr. Crowley. For these reasons, we do not concur with the recommendation that his compensation should be reduced.

In light of this, the independent members of the Board of Directors acknowledge Mr. Crowley's contribution and express appreciation for his voluntary agreement to waive his right to a significant portion of his compensation to enable Coram to complete its reorganization.

## K.    Other Administrative Events

On the Petition Date, the Bankruptcy Court entered certain additional orders designed to minimize any disruption of the Debtors' business operations and to facilitate their reorganization. Certain of these orders are described below.

### 1.    Cash Management and Payment of Critical Trade Creditors

One primary objective of these cases is to restructure the Debtors' outstanding indebtedness and to cause Coram to remain in compliance with Stark II. To preserve the value of the Debtors' business operations, it is essential that their

32

relationships with trade vendors, physicians, patients, employees, consultants, and other holders of obligations incurred in the ordinary course of business not be disrupted or impaired. Toward that end, the Bankruptcy Court entered an order authorizing the Debtors to continue their current cash management system. Such relief allowed the Debtors to continue to fund certain day-to-day obligations of their subsidiaries and affiliates, such as payroll, vendor obligations, taxes, employee benefits, and insurance, and to allocate such costs from and among the various subsidiaries. Inasmuch as these debts primarily are the debts of the Debtors' non-debtor subsidiaries, they were not subject to the automatic stay and, accordingly, payment thereof was not only critical, it was mandated by applicable law. The Bankruptcy Court's order also authorized the Debtors to pay their critical trade vendors to the extent the obligations to those vendors were not obligations of non-debtor subsidiaries.

### 2.     Payment of Certain Other Prepetition Obligations

The Bankruptcy Court entered certain orders authorizing the Debtors to pay salaries, wages, benefits and other amounts owed to or with respect to employees and consultants, and insurance premiums. These include obligations that were incurred prior to the Petition Date and include obligations incurred by the Debtors and their subsidiaries.

### 3.     Key Employee Retention Program

To accomplish their reorganization, the Debtors must rely upon the services of certain of their key employees who have unique skills and knowledge of the Debtors' businesses. Understandably, the ongoing uncertainty of the Debtors' future had motivated many of the Debtors' key employees to seek other employment or subjected them to uninvited employment offers from other prospective employers. To provide financial incentives to the key employees to forgo other immediate employment opportunities, remain in their existing positions, and use their expertise to assist the Debtors through their chapter 11 cases, the Bankruptcy Court entered an order authorizing the Debtors to adopt a key employee retention program under which each of 35 key employees or consultants was eligible for up to two bonus payments, depending upon how long each employee remains with the company after the Petition Date. On March 13, 2001, the Debtors paid $640,000 as the first installment of the two bonus payments to 31 employees. The Debtors have thus far deferred seeking permission to make such payments to the two most senior participants in the key employee retention program, Daniel D. Crowley and Allen J. Marabito. The Plan provides that the Debtors shall be authorized to make those payments to Messrs. Crowley and Marabito.

### 4.     Other Events

33

The Debtors filed a motion to reject thirty-six operating leases that the Debtors had determined were no longer necessary for the Debtors' operations and the rejection of which would result in cost savings to the Debtors. The Court granted the motion on November 28, 2000.

The Debtors also filed a motion for permission to enter into an insurance premium financing agreement (the "Financing Agreement"). The Financing Agreement enabled the Debtors to spread the cost of their insurance over the time such insurance protection was utilized. The Court granted the motion on May 9, 2001.

## VI. GENERAL INFORMATION REGARDING THE PLAN

THE FOLLOWING IS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. IT IS NOT A COMPLETE STATEMENT OF THE PLAN OR ITS OPERATION AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A. IN CERTAIN RESPECTS, THE PLAN DEALS WITH SOPHISTICATED LEGAL CONCEPTS AND INCORPORATES THE DEFINITIONS AND REQUIREMENTS OF THE BANKRUPTCY CODE. THEREFORE, YOU MAY WISH TO CONSULT WITH COUNSEL OF YOUR CHOICE BEFORE VOTING ON THE PLAN.

### A.    Classification and Treatment of Claims and Interests

The classification and treatment of Claims and Allowed Interests is summarized below. All Claims and Allowed Interests, other than Administrative Claims and Priority Tax Claims, are placed in Classes under the Plan. The Debtors believe that this classification scheme is consistent with the requirements of the Bankruptcy Code. Under the Bankruptcy Code, only the holders of Allowed Claims that are impaired and holders of Equity Interests are entitled to vote.

#### 1.    Administrative Claims

Administrative Claims are defined in the Plan as any Claim constituting a cost or expense of administration of the Debtors' Chapter 11 cases incurred on or after the Petition Date and allowed by Final Order under section 503(b) of the Bankruptcy Code, including, without limitation: (a) any and all DIP Claims, (b) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates of the Debtors and operating the businesses of the Debtors, (c) any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their businesses or for the acquisition or lease of property or for the procurement of services, (d) any costs and expenses of the Debtors and/or Reorganized Coram for the management, maintenance, preservation, sale or other disposition of any assets, the administration and implementation of the Plan, the administration, prosecution or defense of claims by or

34

Claims against the Debtors and for distributions under the Plan, (e) compensation for legal, financial, advisory, accounting and other services and reimbursement of expenses allowed by the Bankruptcy Court under section 330, 331, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date, (f) all fees and charges assessed against the Debtors' Estates under section 1930, chapter 123 of title 28 of the United States Code, and (e) any costs or expenses to the extent allowed by Final Order.

       In addition to the foregoing, section 503(b) of the Bankruptcy Code provides for payment of compensation to creditors, indenture trustees, and other persons making a "substantial contribution" to the Debtors' Chapter 11 Cases, and to attorneys for, and other professional advisors to, such persons. Certain entities may file applications with the Bankruptcy Court for allowances of compensation and reimbursement of expenses for such substantial contributions. The amounts which such entities may seek or be allowed for such compensation cannot be known by the Debtors at this time. Requests for compensation and reimbursement of this type, as well as those of Bankruptcy Court-approved professionals for the Debtors and the Committee, must be approved by the Bankruptcy Court after a hearing on notice at which the Debtors and other parties-in-interest may participate and, if appropriate, object to the allowance and payment of any such compensation and reimbursement of expenses. The Debtors or Reorganized Coram, as the case may be, specifically reserve all rights to object to the compensation and reimbursement of expenses of professionals in these Cases.

       The Plan provides that each holder of an Allowed Administrative Claim will receive, in accordance with section 1129(a)(9) of the Bankruptcy Code, the full amount of its unpaid Allowed Administrative Claim (i) in cash on the Effective Date or (ii) on such other terms as mutually agreed to by the holder of an Allowed Administrative Claim and the Debtors; provided, however, that Allowed Administrative Claims representing (a) post-Petition Date liabilities incurred in the ordinary course of business, or (b) post-Petition Date liabilities arising under loans or advances to any Debtor(s), whether or not incurred in the ordinary course of business, shall be paid in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto; provided, further, however, that administrative claims of the United States Trustee pursuant to 29 U.S.C. § 1930(a)(6) shall be paid in accordance with the applicable schedule for payment of such fees, provided further, however, that interim and/or final payment of Allowed Administrative Claims approved by the Bankruptcy Court shall be paid in accordance with such Bankruptcy Court approval; provided further, however, that compensation and reimbursement claims shall be paid in accordance with section 6.1.2 of the Plan.

       While any estimate of Allowed Administrative Claims is subject to substantial uncertainty, if there is no significant litigation initiated or objections filed with respect to confirmation of the Plan and the Plan is confirmed within the Debtors' anticipated time frame, the Debtors' forecast that Allowed Administrative Claims (other than the ordinary costs of operating their business) will not exceed $4,262,000. Under

35

the Plan, holders of Allowed Administrative Claims will recover one hundred percent (100%) of the allowed amount of their Allowed Claims.

### 2.    Priority Tax Claims

Priority Tax Claims are unclassified under the Plan and include Claims that are entitled to priority under section 507(a)(7) of the Bankruptcy Code. Generally, Tax Claims are, subject to certain timing and date of assessment limitations, unsecured Claims of governmental units (as defined in the Bankruptcy Code) based on (i) taxes measured by income or gross receipts; (ii) property taxes; (iii) withholding taxes; (iv) employment taxes; (v) excise taxes; (vi) customs duties; and (vii) penalties based on actual pecuniary losses relating to the foregoing. These Tax Claims include, among others, all taxes measured by income or gross receipts attributable for the period from January 1, 2000 through the Petition Date.

The Plan provides that, in full satisfaction, payment and discharge of its Priority Tax Claims and in accordance with section 1129(c)(9)(C) of the Bankruptcy Code, each holder of an Allowed Priority Tax Claim shall receive (i) payment, in cash, of the full amount of such holder's Priority Tax Claim, (ii) a Tax Note equal to the full amount of such holder's Priority Tax Claim, or (iii) payment on such other terms as mutually agreed to by the holder of an Allowed Tax Claim and the Debtors or Reorganized Coram. The Plan further provides that any claim or demand for fines or penalties relating to a Priority Tax Claim shall be disallowed, and the holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Debtors or Reorganized Coram.

As discussed above at section III.E ("Significant Litigation"), the IRS has issued a notice of deficiency against $T^2$ Medical and certain of its subsidiaries for taxes in the aggregate amount of approximately $12.7 million, plus interest, with respect to certain taxable years prior to the acquisition of $T^2$ Medical by CHC. The asserted deficiency results from the carryback of certain losses incurred by $T^2$ Medical and its subsidiaries as members of the CHC consolidated tax group for the taxable year ended September 30, 1995. $T^2$ Medical and CHC have filed a protest for redetermination with the Tax Court and are currently in discussions with the administrative appeals function of the IRS. Although CHC is a party to such action, the Debtors believe that any tax deficiency is solely a liability of $T^2$ Medical and certain of its subsidiaries, and is not a liability of the Debtors. Accordingly, no amount is included in the estimate of Allowed Priority Tax Claims of the Debtors in respect of the asserted deficiency.

The Debtors estimate that, on the Effective Date, such Allowed Priority Tax Claims will not exceed $81,400. Under the Plan, holders of Allowed Priority Tax Claims receive distributions of a value equal to one hundred percent (100%) of the allowed amount of their Allowed Claims.

### 3.    Class CHC P – CHC Priority Non-Tax Claims

36

Class CHC P consists of Priority Non-Tax Claims against CHC, which are defined to include any Claim against CHC that is entitled to priority under section 507 of the Bankruptcy Code, other than Claims entitled to priority under sections 507(a)(1) (Administrative Claims) and 507(a)(7) (Tax Claims) of the Bankruptcy Code.

These claims include (i) allowed unsecured claims for wages, salaries, or commissions (including vacation, severance, and sick leave pay) for the Debtors' employees to the extent earned within 90 days before the Petition Date and subject to a cap of $4,300 per employee, (ii) allowed unsecured claims for contributions to an employee benefit plan for services rendered within 180 days before the Petition Date and limited to a maximum of $4,300 per employee and plan (as reduced by other direct Priority Non-Tax Claims of employees of a kind described in subsection 1 above, and of other benefit plans) and (iii) certain other specific unsecured pre-Petition Date Claims.

The Plan provides that, in full satisfaction, payment and discharge of its Allowed Priority Non-Tax Claim, each holder of a CHC Allowed Priority Non-Tax Claim shall receive in accordance with section 1129(a)(9) of the Bankruptcy Code, payment in full (i) in cash on the Effective Date, or (ii) on such other terms as mutually agreed to by the holder of an Allowed Non-Tax Priority Claim and the Debtors or Reorganized Coram.

Based on the continuation of wage and salary related payments to employees (previously approved by the Bankruptcy Court) and provisions of the Plan under which all non-terminated and unexpired benefit plans are assumed, the Debtors believe that such CHC Allowed Priority Non-Tax Claims will not exceed $12,900.

Class CHC P is unimpaired under the Plan and is therefore conclusively presumed to accept the Plan. Therefore, the Debtors will not solicit votes from the holders of Allowed CHC Priority Non-Tax Claims. Under the Plan, holders of CHC Allowed Priority Non-Tax Claims will recover one hundred percent (100%) of the allowed amount of their Allowed Claims.

### 4.    Class CHC 1 - Allowed CHC Secured Claims

Class 1 consists of Allowed CHC Secured Claims. Under the Plan, Secured Claims are defined to include that portion of a Claim that is secured by a valid, perfected and enforceable security interest, lien, mortgage or other encumbrance that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of the Debtors in and to property of the Estate, to the extent of the value of the holder's interest in such property as of the relevant determination date. The defined term "Secured Claim" includes any Claim that is: (i) subject to an offset right under applicable law; and (ii) a secured claim against a Debtor pursuant to section 506(a) and 553 of the Bankruptcy Code.

37

At present, the Debtors believe there are no pre-petition CHC Secured Claims.

The Plan provides that, in full satisfaction, payment and discharge of their Secured Claims, each holder of an Allowed CHC Secured Claim, if any, shall receive, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed CHC Secured Claim unimpaired.

Class CHC 1 is unimpaired under the Plan and is therefore conclusively presumed to accept the Plan. Therefore, the Debtors will not solicit votes from the holders of Allowed CHC Secured Claims. Under the Plan, holders of Allowed CHC Secured Claims receive distributions of a value equal to one hundred percent (100%) of their Allowed Claims.

### 5. Class CHC 2 – Allowed CHC General Unsecured Claims

Class CHC 2 consists of Allowed CHC General Unsecured Claims. Under the Plan, Allowed CHC General Unsecured Claims include any Claim that is an Allowed Claim against CHC, other than an Administrative Claim, Secured Claim, a Priority Non-Tax Claim, a Priority Tax Claim, an Allowed Coram Notes/Preferred Stock Claim, or an Allowed CHC Note Claim. As used in the Plan, the term "General Unsecured Claim" consists of, except for the foregoing, all impaired unsecured claims not otherwise classified that are not cured, paid, released or waived pursuant to the Plan, assumed by a Debtor pursuant to the Plan or agreements incorporated into the Plan, or classified in any other class, including, without limitation, claims (a) for goods sold and/or services rendered, (b) for moneys lent, (c) based upon guarantees of performance or payment of the obligations or duties of any Person, (d) for tort liability, (e) for environmental remediation, (f) of governmental units under any applicable unclaimed property or escheat laws, (g) of governmental units for taxes, assessments, penalties or charges which are not Tax Claims, (h) for contribution, reimbursement or indemnity, (i) for fines, penalties or other assessments, (j) for the portion of any Claim supported directly or indirectly by a letter of credit issued for the account of a Debtor in excess of the amount available under such letter of credit, and (k) representing the undersecured portion of any claim that is otherwise a Secured Claim.

The Plan provides that Allowed CHC General Unsecured Claims shall be treated as follows:

(a)    If Class CHC 2 votes to accept the Plan by the majorities required by section 1126(c) of the Bankruptcy Code, each holder of an Allowed CHC General Unsecured Claim, in full satisfaction, payment and discharge of its Allowed CHC General Unsecured Claim, shall receive its Pro Rata share of (i) the CHC General Unsecured Consideration and (ii) the CHC Noteholder Consideration, which, in the aggregate, equals $3 million.

38

To provide the distribution of the CHC Noteholder Consideration afforded by subsection (a) above, if it should become applicable, the holders of Coram Notes/Preferred Stock Claims (Class Coram 3) agree and shall be deemed to have authorized the Debtors (or a Plan Administrator or other disbursement agent, if any) to transfer and distribute the CHC Noteholder Consideration to the holders of Class CHC 2.

(b)    If Class CHC 2 fails to accept the Plan by the requisite majorities, each holder of an Allowed CHC General Unsecured Claim will receive, in full satisfaction, payment and discharge of its Allowed CHC General Unsecured Claim, a Pro Rata share of the CHC General Unsecured Consideration, which aggregates $2 million, provided however, if Class CHC 2 fails to accept the Plan and Class CHC 4 (Allowed CHC Equity Interests) votes to accept the Plan by the requisite majority, thereby triggering an entitlement to the CHC Equity Interest Consideration, the Debtors shall seek to confirm the plan pursuant to section 1129(b) of the Bankruptcy Code over the rejection by CHC 2.

The Debtors believe that under applicable law, the receipt of consideration by Class CHC 4 does not violate the absolute priority rule (section 1129(b)(2)(B)(ii)) because the CHC Equity Interest Consideration has been given to Class CHC 4 by the Noteholders. However, if Class CHC 2 rejects the Plan and the Court is unwilling to confirm the Plan unless the CHC Equity Interest Consideration is first made available to Class CHC 2 under 11 U.S.C. § 1129(b)(2)(B), then each holder of an Allowed Class CHC 2 claim shall receive the lesser of (i) its Pro Rata share of $12 million in cash (the CHC General Unsecured Consideration plus the CHC Equity Interest Consideration), or (ii) an amount necessary to cause such holder to be paid in full. See Distribution Caveat.

Generally, pursuant to section 1126(c) of the Bankruptcy Code, a class of claims has accepted a plan if the plan has been accepted by holders of at least two-thirds in amount, and more than one-half in number of the allowed claims of such class.

Class CHC 2 is impaired under the Plan and the Debtors will therefore solicit votes from the holders of Allowed CHC General Unsecured Claims.

The Debtors believe that the treatment accorded the holders of Allowed CHC General Unsecured Claims is both fair and equitable, and meets the requirements of section 1129(b) of the Bankruptcy Code.

The Debtors believe that Allowed CHC General Unsecured Claims will not exceed $7,492,000, except in the event that CHC does not prevail on certain claims (including claims asserted by the Resource Network Subsidiaries). In that instance, holders of Allowed CHC General Unsecured Claims would recover approximately 40% if Class CHC 2 accepts the Plan, approximately 26.7% if Class CHC 2 rejects the Plan and the Creditors' Committee is unsuccessful in the Absolute Priority Litigation, and 100% if Class CHC 2 rejects the Plan and the Creditors' Committee is successful in the Absolute Priority Litigation.

39

6.    **Class CHC 3 - Allowed CHC Note Claims**

Class CHC 3 consists of Allowed CHC Note Claims.  Under the Plan, Allowed CHC Note Claims are defined as any claim against CHC based upon or evidenced by the Notes, which as of the Petition Date, aggregated approximately $252,620,000.

The Plan provides that each holder of an Allowed CHC Note Claim, in full satisfaction, payment and discharge of its Allowed CHC Note Claim, shall receive its Pro Rata share of the CHC Noteholder Consideration; provided, however, that if Class CHC 2 votes to accept the Plan by the majorities required by section 1126(c) of the Bankruptcy Code, then the holders of Allowed CHC Notes Claims shall be deemed to have authorized the Debtors to transfer and to distribute the CHC Noteholder Consideration to the holders of Class CHC 2 Claims in accordance with section 7.3 of the Plan, and the holders of Allowed CHC Notes Claims shall receive no distribution from CHC under the Plan on account of the obligations of CHC's guaranty of payment of the notes.

Class CHC 3 is impaired under the Plan and the Debtors will therefore solicit votes from the holders of Allowed CHC Note Claims.  The Debtors believe that there will be Allowed CHC Note Claims in an aggregate amount of approximately $153,292,000 (plus any applicable post-petition interest, fees and expenses).  Under the Plan, the Holders of Allowed CHC Note Claims receive in respect of such Claims distributions of a value equal to 0% of the Allowed amount of their claims if Class CHC 2 votes to accept the Plan by the majorities required in Section 1126(c) of the Bankruptcy Code, and receive approximately 0.7% of the Allowed amount of their Claims if Class CHC 2 fails to accept the Plan by the majorities set forth in section 1126(c) of the Bankruptcy Code.

7.    **Class CHC 4 – Allowed CHC Equity Interests**

Class CHC 4 consists of Allowed CHC Equity Interests.  Under the Plan, Allowed CHC Equity Interests are defined as any equity interest in CHC that is Allowed and represented by duly authorized, validly issued and outstanding shares of stock, or any interest or right to convert into such an equity interest or acquire any equity interest, that was in existence immediately prior to the Petition Date, including, without limitation, any warrants, stock options, conversion rights, and employee stock options.

The Debtors believe, in accordance with the valuation opinions of Goldin and the experts retained by the Debtors, the Creditors' Committee and the Equity Committee, that Allowed CHC Equity Interests have a value of $0.  As part of a proposed resolution of these Cases, however, and in accordance with the recommendation in the Goldin Report that Noteholders make a voluntary contribution to the Allowed CHC Equity Interests in order to resolve these Chapter 11 cases, the Plan provides that if Class CHC 4 votes to accept the Plan in accordance with 1126(d) of the Bankruptcy Code, each holder of an Allowed CHC Equity Interest shall receive a Pro

40

Rata share of up to $10 million in full satisfaction, redemption, and discharge of the Allowed CHC Equity Interests, which shall be deemed canceled and extinguished, provided, however, if Class CHC 4 votes to accept the Plan and Class CHC 2 votes to reject the Plan, the Debtors shall seek to confirm the Plan over the rejection thereof by Class CHC 2. As set forth in the description of Class CHC 2, the Debtors believe that the Plan can be confirmed over the rejection by Class CHC 2. However, in the event the Bankruptcy Court rules that the proposed distribution of the CHC Equity Interest Consideration to Class CHC 4 otherwise would render the Plan unconfirmable, the CHC Equity Interest Consideration (and the CHC General Unsecured Consideration) shall be used to satisfy Allowed CHC General Unsecured Claims until they have been paid in full with the balance, if any, used for distribution to the Allowed CHC Equity Interests. **If Class CHC 4 fails to accept the Plan by the requisite majorities, no distribution shall be made under the Plan to the holders of Allowed CHC Equity Interests on account of such Allowed CHC Equity Interests, which shall be deemed canceled and extinguished.**

Class CHC 4 is impaired under the Plan and the Debtors therefore will solicit votes from the Holders of Class CHC 4 Interests.

The Debtors believe that the treatment accorded the holders of Allowed CHC Equity Interests is both fair and equitable, and meets the requirements of section 1129(b) of the Bankruptcy Code.

### 8.    Class Coram P – Priority Non-Tax Claims

Class Coram P consists of Coram Priority Non-Tax Claims. Coram Priority Non-Tax Claims are defined to include any Claim against Coram that is entitled to priority under section 507 of the Bankruptcy Code, other than Claims entitled to priority under sections 507(a)(1) (Administrative Claims) and 507(a)(7) (Tax Claims) of the Bankruptcy Code.

These claims include (i) allowed unsecured claims for wages, salaries, or commissions (including vacation, severance, and sick leave pay) for the Debtors' employees to the extent earned within 90 days before the Petition Date and subject to a cap of $4,300 per employee, (ii) allowed unsecured claims for contributions to an employee benefit plan for services rendered within 180 days before the Petition Date and limited to a maximum of $4,300 per employee and plan (as reduced by other direct Priority Non-Tax Claims of employees (of a kind described in subsection 1 above, and of other benefit plans) and (iii) certain other specific unsecured pre-Petition Date Claims.

The Plan provides that, in full satisfaction, payment and discharge of its Allowed Coram Priority Tax Claim, each holder of an Allowed Coram Priority Non-Tax Claim shall receive in accordance with section 1129(a)(9) of the Bankruptcy Code, payment in full (i) in cash on the Effective Date, or (ii) on such other terms as mutually agreed to by the holder of an Allowed Non-Tax Priority Claim and the Debtors or Reorganized Coram.

41

Based on the continuation of wage and salary related payments to employees (previously approved by the Bankruptcy Court) and provisions of the Plan under which all non-terminated and unexpired benefit plans are assumed, the Debtors believe that such Coram Allowed Priority Non-Tax Claims will not exceed $18,700.

Class Coram P is unimpaired under the Plan and is therefore conclusively presumed to accept the Plan. Therefore, the Debtors will not solicit votes from the holders of Allowed Coram Priority Non-Tax Claims. Under the Plan, holders of Coram Allowed Priority Non-Tax Claims will recover one hundred percent (100%) of the allowed amount of their Allowed Claims.

### 9.    Class Coram 1 - Allowed Coram Secured Claims

Class Coram 1 consists of Allowed Coram Secured Claims. Under the Plan, Secured Claims are defined to include that portion of a Claim that is secured by a valid, perfected and enforceable security interest, lien, mortgage or other encumbrance that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of the Debtors in and to property of the Estate, to the extent of the value of the holder's interest in such property as of the relevant determination date. The defined term "Secured Claim" includes any Claim that is: (i) subject to an offset right under applicable Law; and (ii) a secured claim against a Debtor pursuant to section 506(a) and 553 of the Bankruptcy Code.

At present, the Debtors believe that there are no pre-petition Coram Secured Claims.

The Plan provides that, in full satisfaction, payment and discharge of their Secured Claims, each holder of an Allowed Coram Secured Claim, if any, shall receive, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed Coram Secured Claim unimpaired.

Class Coram 1 is unimpaired under the Plan and are therefore conclusively presumed to accept the Plan. Therefore, the Debtors will not solicit votes from the holders of Allowed Coram Secured Claims. Under the Plan, holders of Allowed Coram Secured Claims receive distributions of a value equal to one hundred percent (100%) of their Allowed Claims.

### 10.    Class Coram 2 - Allowed Coram General Unsecured Claims

Class Coram 2 consists of Allowed Coram General Unsecured Claims. Under the Plan, Allowed Coram General Unsecured Claims include any Claim that is an Allowed Claim against Coram other than an Administrative Claim, Secured Claim, a Priority Non-Tax Claim, a Priority Tax Claim, an Allowed Coram Notes/Preferred Stock Claim, or an Allowed CHC Note Claim. As used in the Plan, the term "General Unsecured Claim" consists of, except for the foregoing, all unsecured claims not

42

otherwise classified that are not cured, paid, released or waived pursuant to the Plan, assumed by a Debtor pursuant to the Plan or agreements incorporated into the Plan, or classified in any other class, including, without limitation, claims (a) for goods sold and delivered and/or services rendered, (b) for moneys lent, (c) based upon guarantees of performance or payment of the obligations or duties of any Person, (d) for tort liability, (e) for environmental remediation, (f) of governmental units under any applicable unclaimed property or escheat laws, (g) of governmental units for taxes, assessments, penalties or charges which are not Tax Claims, (h) for contribution, reimbursement or indemnity, (i) for fines, penalties or other assessments, (j) for the portion of any Claim supported directly or indirectly by a letter of credit issued for the account of a Debtor in excess of the amount available under such letter of credit, and (k) representing the undersecured portion of any claim that is otherwise a Secured Claim.

The Debtors believe that Allowed Coram General Unsecured Claims will not exceed $124,600.

The Plan provides that, in full satisfaction, payment and discharge of its Allowed Coram General Unsecured Claim, each holder of an Allowed Coram General Unsecured Claim not otherwise paid prior to the Effective Date shall receive, at the option of Coram or Reorganized Coram, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, (ii) Reinstatement, or (iii) such other treatment as will render such Allowed Coram General Unsecured Claim unimpaired.

Class Coram 2 is unimpaired under the Plan, and is therefore conclusively presumed to accept the Plan. Therefore, the Debtors will not solicit votes from the holders of Allowed Coram General Unsecured Claims. Under the Plan, holders of Allowed Coram General Unsecured Claims receive distributions of a value equal to one hundred percent (100%) of their Allowed Claims.

11.     **Class Coram 3 - Allowed Coram Notes/Preferred Stock Claims**

Class Coram 3 consists of Allowed Coram Notes/Preferred Stock Claims, which are divided into two subclasses, Allowed Coram Notes Claims (Sub-class Coram 3A) and Allowed Coram Preferred Stock Interests (Sub-class Coram 3B). Under the Plan, Allowed Coram Notes/Preferred Stock Claims are defined as any claim against Coram based upon or evidenced by (i) the Notes, which as of the Petition Date, aggregate approximately $252,620,000 (but upon the Note Exchange, were converted to approximately $153,292,000 million of Notes (as amended) and (ii) Preferred Stock issued by Coram with an initial liquidation preference of $109,325,810. For purposes of voting, Class Coram 3 votes as a single class.

The Plan provides that each holder of an Allowed Coram Notes/Preferred Stock Claim shall, in the aggregate, receive in full satisfaction, payment and discharge of its Allowed Coram Notes/Preferred Stock Claim: (A) to the extent such Claim falls into Sub-class Coram 3A, New Secured Notes in an amount equal to the full amount of its

43

Sub-class Coram 3A Claim, and (B) to the extent such Claim falls into Sub-class Coram 3B, its Pro Rata share of (i) all New Secured Notes remaining after the distribution to Sub-class Coram 3A, and (ii) the New Coram Stock.

The New Secured Notes bear interest at a rate of nine percent (9%), which is substantially below the rate of interest that Reorganized Coram would incur in the marketplace, and it is therefore unlikely that the market value of the New Notes will be equal to the face value thereof.

As noted above, the Plan provides that the holders of Allowed Coram Preferred Stock Interests (Sub-class Coram 3B) shall receive all of the shares of New Coram Stock to be issued by Reorganized Coram pursuant to the Plan. The Debtors' management has undertaken a valuation of Reorganized Coram and believes that, as reorganized pursuant to the terms of the Plan, Reorganized Coram will probably have a stockholders' equity value, on a consolidated basis, of approximately $39,900,000.

The actual recoveries of holders of Coram Notes/Preferred Stock Claims will depend on two factors: (1) the enterprise value of Reorganized Coram, and (2) the then current market value of the New Coram Stock (which could be a function of, *inter alia*, whether Class CHC 4 shall have voted to accept the Plan and become entitled to receive up to a $10 million distribution). In addition, although the Debtors' management has formed certain opinions regarding the projected enterprise value of Reorganized Coram on the Effective Date, there can be no assurance that management's view in this regard will be realized. Moreover, based on the lack of an established market for the New Coram Stock, the inability of the Debtors to create an unrestricted trading market and still continue to comply with the provisions of Stark II for an indefinite period of time (see "Discussion of Stark II"), and certain other concerns, there can be no assurance that a trading market will develop for the New Coram Stock or the values at which the New Coram Stock will trade if such a market should eventually develop. For a discussion of the risks associated with the issuance of the New Coram Stock, see "Risk Factors -- Lack of Established market for the New Coram Stock, Volatility."

Class Coram 3 is impaired under the Plan, and the Debtors will therefore solicit votes from the holders of Allowed Coram Notes/Preferred Stock Claims. The Debtors believe that there will be Allowed Coram Notes/Preferred Stock Claims in an aggregate amount of $252,620,000 as of the Petition Date (plus any applicable post-petition interest, fees, and expenses) and that under the Plan, the Holders of Allowed Coram Notes/Preferred Stock Claims receive in respect of such Claims distributions of a value equal to 80.6% of the Allowed amount of their claims.

12.    **Class Coram 4 - Allowed Coram Equity Interests**

Class Coram 4 consists of Allowed Coram Equity Interests. Under the Plan, Allowed Coram Equity Interests are defined as equity interests in Coram that are Allowed and represented by duly authorized, validly issues and outstanding shares of stock, other than Preferred Stock, or any interest or right to convert into such an equity

44

interest or acquire any equity interest, or any claims arising or deriving directly or indirectly therefrom, that was in existence immediately prior to the Petition Date, including, without limitation, any warrants, stock options, conversion rights, and employee stock options. The Debtors believe that CHC is the only holder of Allowed Coram Equity Interests.

The Plan provides that in full satisfaction, payment and discharge of Allowed Coram Equity Interests, no distribution shall be made under the Plan to the holders of Allowed Coram Equity Interests on account of such Allowed Interests.

Class Coram 4 is impaired and is deemed to reject the Plan. The Debtors therefore will not solicit notes from the Holders of Class Coram 4 Interests.

The Debtors believe that the treatment accorded the holders of Allowed CHC Equity Interests is both fair and equitable, and meets the requirements of section 1129(b) of the Bankruptcy Code.

**B.      Request for Cram-Down**

The Debtors believe that the treatment accorded the holders of unsecured Claims under the Plan does not discriminate unfairly, is fair and equitable and the treatment accorded the holders of Equity Interests is fair and equitable and, in all instances, specifically meets the requirements of section 1129(b) of the Bankruptcy Code (i.e., junior classes receive no recovery on account of their junior interests but merely as a result of a voluntary contribution from a more senior class). Accordingly, if Class CHC 2 and/or CHC 4 fail to accept the Plan, the Debtors believe that the Plan nevertheless may be confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. See "Voting and Confirmation of the Plan -- Acceptance or Cramdown" for further information. In that event, the Debtors intend to use the consents obtained from other Classes to confirm the Plan over the dissent of any such Class, and the Plan specifically requests that the Bankruptcy Court confirm the Plan notwithstanding the dissent of any impaired Class of Claims. The Debtors will seek cram-down over the holder of the Allowed Coram Equity Interests (Class Coram 4), which shall receive no distribution under the Plan and is therefore deemed to have rejected the Plan.

**C.      Executory Contracts and Unexpired Leases**

45

Under section 365 of the Bankruptcy Code, the Debtors have the right, subject to approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. Although not defined in the Bankruptcy Code, an "executory contract" is usually described as a contract under which material performance (other than the payment of money) is due by each party. If an executory contract or unexpired lease is rejected under section 365 of the Bankruptcy Code, the "rejection" is treated as a breach of the contract or lease prior to the petition date giving rise to a pre-petition unsecured claim. In addition, "rejection" damages for leases of real property and employment agreements are limited in certain contexts under section 502 of the Bankruptcy Code. If an executory contract or unexpired lease is assumed or assumed and assigned the Debtors or the assignee have the obligation to perform its obligations thereunder in accordance with the terms of such agreement.

Pursuant to the Plan, on the Effective Date, the Debtors will take the following actions set forth below with respect to their various executory contracts. In all instances, the Plan provides that contracts, licenses and leases will only be assumed or rejected, as the case may be, to the extent they constitute executory contracts or unexpired leases within the meaning of section 365 of the Bankruptcy Code. The Plan provides that nothing contained therein constitutes an admission as to the status of any such agreements.

1.    **Assumption of Executory Contracts and Unexpired Leases**

The Plan provides that, on the Effective Date, in accordance with the provisions of sections 365 and 1123 of the Bankruptcy Code, any executory contracts or unexpired leases (including the Executive Employment Agreement, which shall be assumed by Reorganized Coram in its totality subject to the Executive Compensation Waiver) that have not expired by their own terms on or prior to the Effective Date, that have not been assumed, assumed and assigned or rejected with the approval of the Bankruptcy Court, or that are not the subject of a motion to reject the same pending as of the Effective Date or set forth on the Rejection List shall be deemed assumed by the Debtors on the Effective Date and in the case of CHC, assigned to Reorganized Coram, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and/or assignments pursuant to sections 365(a) and 1123 of the Bankruptcy Code. An order of the Bankruptcy Court entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose executory contract or lease is being assumed or assumed and assigned pursuant to the Plan of: (a) the contract or lease being assumed or assumed and assigned; (b) the Cure Claim, if any, that the Debtors believe it would be obligated to pay in connection with such assumption; and (c) the procedures for such party to object to the assumption or the assumption and assignment of the applicable contract or lease and the amount of the proposed Cure Claim.

2.    **Rejection of Executory Contracts and Unexpired Leases**

46

The Plan provides that no later than ten (10) business days prior to the Confirmation Date, the Debtors shall file with the Bankruptcy Court the Rejection List, and such executory contracts and unexpired leases shall be deemed rejected as of the Effective Date. If the rejection of an executory contract or unexpired lease by the Debtor results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors, or their properties or agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor on or before a date thirty (30) days after the later of (a) the Confirmation Date and (b) the date of entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or lease. Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim are timely filed will be treated as General Unsecured Claims subject to the provisions of the Plan. Nothing in the Plan shall obligate any of the Debtors to file any list of assumed or rejected executory contracts or unexpired leases.

**D.    Claims Based Upon Rejection of Executory Contracts or Unexpired Leases**

The Plan provides that all proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court by a date that is the later of (i) thirty (30) days after the date of entry of an order of the Bankruptcy Court approving the rejection of such contracts or leases, and (ii) the Confirmation Date. The Plan further provides that any such Claims, proofs of which are not filed timely, shall be barred forever from assertion against the Debtors, Reorganized Coram, the Estates, and/or any of their respective assets or property. Unless otherwise ordered by the Bankruptcy Court, all such properly filed Claims, upon allowance thereof, shall be, and shall be treated as General Unsecured Claims.

**E.    Indemnification Obligations**

The Plan provides that the obligations of the Debtors to indemnify their respective present and former directors, officers, and employees in such capacity, or as plan administrators or trustees of any employee benefit plan, or any person serving (at the request of a Debtor) as an officer or director of another entity pursuant to the Debtors' certificates of incorporation or by-laws or pursuant to applicable state law or specific agreement, or any combination of the foregoing, shall be deemed assumed executory contracts, shall survive confirmation of the Plan, remain unaffected thereby, shall not be discharged, and shall pass unaltered to and shall be assumed by Reorganized Coram irrespective of whether such indemnification is owed in connection with an event occurring before, on or after the Petition Date. This provision of the Plan enforces the Debtors' corporate policy and provides necessary assurances to existing key personnel regarding Reorganized Coram's commitment to them and to its future. The Debtors believe that this provision is essential to its viability as a going-concern. See "Reorganized Coram -- Management" and "Risk Factors -- Loss of Key Personnel."

47

**F.    Compensation and Benefit Programs**

The Plan provides that all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors, in effect as of the Confirmation Date and applicable generally to the respective active employees (including officers of the Debtors), including, without limitation, all employment contracts not previously rejected or rejected under the Plan, and all retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans are treated as executory contracts under the Plan and, as of and on the Effective Date, shall be assumed by the Debtors and, where applicable, assumed, by Reorganized Coram pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, unless previously (i) terminated, modified or rejected in accordance with the Bankruptcy Code, (ii) modified pursuant to the Executive Compensation Waiver, (iii) subject to a pending motion or application before the Bankruptcy Court to terminate, modify or reject, or (iv) identified to be rejected on a list that is filed with the Bankruptcy Court on or before the Confirmation Date.   As noted above in section V.C.1 "Assumption of Executory Contracts and Unexpired Leases," the Debtors shall assume all executory contracts except those that are set forth on the Rejection List or the subject of a motion to reject.  The Debtors do not intend that any of their contracts with employees or consultants, including the Key Employee Retention Plan approved by the Bankruptcy Court, will be placed on the Rejection List or made the subject of a rejection motion, and accordingly, such contracts and programs shall be assumed under the Plan.

The waiver of certain rights by Daniel D. Crowley as set forth in and pursuant to the Executive Compensation Waiver is subject to the occurrence of the Effective Date of this Plan.  Mr. Crowley's rights existing under the Executive Employment Agreement or otherwise shall in no way be prejudiced by the Executive Compensation Waiver in the event the Effective Date shall not have occurred.

**G.    Legal Effects of Confirmation of the Plan**

**1.    Vesting of Assets**

The Plan provides that except as otherwise provided by the Plan and consistent with sections 1123(a)(5)(A) and 1141 of the Bankruptcy Code, on the Effective Date, title to all assets and property of the Estates shall pass to, and vest in, Reorganized Coram, including, without limitation all shares of and equity interests in Coram and Coram International Holdings Ltd. that are property of the Estate of CHC, free and clear of all Claims, Allowed Interests, liens, charges and other rights of creditors or equity holders arising prior to the Effective Date.  The Confirmation Order shall provide for and shall constitute a judicial determination of discharge of the Debtors' liabilities.  The Plan makes clear that, on and after the Effective Date, Reorganized Coram may operate its businesses, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy

48