Court, except as otherwise provided herein or in the Confirmation Order. Without limiting the foregoing, Reorganized Coram may pay the charges that it incurs on or after the Effective Date for professionals' fees, disbursements, and expenses without application to the Bankruptcy Court.

### 2. Discharge

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and treatment of Claims and Interests under the Plan will be in exchange for, and in complete satisfaction of, discharge and release of all Claims and termination of all Interests arising on or before the Effective Date, including any interest accrued on Claims from the Petition Date. Except as otherwise provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date and immediately after cancellation of the Equity Interests: (a) discharge the Debtors from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (ii) any Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the holder of a Claim based on such debt is accepted the Plan; and (b) terminate all Interests and other rights of equity security holders in the Debtors. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date and immediately after the cancellation of the Equity Interests and the issuance of the New Coram Stock, of a discharge of all Claims and other debts and liabilities against the Debtors and a termination of all Equity Interests and other rights of equity security holders in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharge of the Claim or terminated Interest.

### 3. Release by the Estate and its Representatives

The Plan provides that, in consideration of the promises and obligations of the Debtors and Reorganized Coram thereunder and of Mr. Crowley as embodied in the Executive Compensation Waiver, as of and on the Effective Date, the Debtors, the Estates, the Creditors' Committee, the Equity Committee, the Noteholder Group, and any and all Persons claiming through any of the foregoing entities whether directly or indirectly, and any of their successors, assigns or representatives shall, to the fullest and broadest extent permitted by law, be deemed to have waived, released and discharged all rights or claims, whether based upon tort, fraud, contract or otherwise, whether known or unknown, which they possessed or may possess prior to the Effective Date against the Debtors, their present and former directors, officers, employees, agents, representatives and attorneys and any successors or assigns of the foregoing, whether directly or indirectly, except as otherwise provided in the Plan, the Bankruptcy Code, or the Confirmation Order. As a result of this release, the potential cause of action which the

Equity Committee sought to prosecute, see section V(H)(2) of this Disclosure Statement, and any similar proceedings based upon the same facts and circumstances would be released.

### 4. Exculpation

The Plan provides that, to the fullest and broadest extent permitted by law, the Debtors, their Estates, Reorganized Coram, the Creditors' Committee, the Noteholder Group, and their respective members, officers, directors, employees, representatives, attorneys and agents, shall be deemed released by each of them against the other and by the holders of Claims or Interests and all persons claiming through any of the foregoing entities, directly or indirectly or derivatively, of or from any and all claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Debtors' chapter 11 cases, including without limiting the generality of the foregoing, the commencement of the Cases, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the DIP Facility, the Exit Financing Facility, the pursuit of Confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, or otherwise in connection with the Debtors' Cases, and all such persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.

### 5. Injunction

The Plan provides that, except as otherwise specifically provided for in the Plan or the Confirmation Order, as of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan will be permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts or liabilities or terminated interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Debtors, Reorganized Coram, or their respective property other than to enforce any right to a distribution pursuant to the Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, Reorganized Coram, or their respective property, other than as permitted as pursuant to (a) above; (c) creating, perfecting, or enforcing any lien or encumbrance against the Debtors, Reorganized Coram or their respective property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or Reorganized Coram; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan or with the Confirmation Order.

The Plan further provides that, as of the Effective Date, all entities that have held, currently hold or may hold any claims, obligations, suits, judgments, damages,

50

demands, debts, rights, causes of action or liabilities that are released pursuant to the Plan will be permanently enjoined from taking any of the following actions against any released entity or its property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities: (a) commencing or continuing in any manner or other proceedings; (b) enforcing, attaching, collecting or recovering in any manner, any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released entity; and (e) commencing or continuing any action, in any manner, in any place that does not comply or is inconsistent with the provisions of the Plan or with the Confirmation Order.

### 6.    Third-Party Releases

The Plan provides that, in consideration of the promises, obligations, and waivers of rights to receive funds by Mr. Crowley and the members of the Noteholder Group, as embodied in the Plan and the Executive Compensation Waiver, as of and on the Effective Date, any party that votes in favor of the Plan and any and all Persons claiming through any such party, whether directly or indirectly, and any such party's successors, assigns or representatives (collectively, "Releasors") shall, to the fullest and broadest extent permitted by law, be deemed to have waived, released and discharged all rights or claims, whether based upon tort, fraud, contract or otherwise, whether known or unknown, which they possessed or may possess prior to the Effective Date against the Debtors and all of their present and former directors, officers, employees, agents, representatives and attorneys and any successors or assigns, and against the members of the Noteholder Group and all of their present and former directors, officers, employees, agents, representatives and attorneys and any successors or assigns, whether directly or indirectly, except as otherwise explicitly provided in the Plan, the Bankruptcy Code, or the Confirmation Order. The release described in the preceding sentence shall be enforceable as a matter of contract against any Releasor.

### 7.    Rights of Action

The Plan provides that any rights or causes of action accruing to the Debtors or Reorganized Coram, including, without limitation, those arising under or pursuant to the Bankruptcy Code, shall remain assets of, or vest in, Reorganized Coram. Reorganized Coram may pursue, abandon, settle or release all reserved rights of action, as appropriate, in accordance with what the management of Reorganized Coram deems to be in the best interests and for the benefit of Reorganized Coram. In connection therewith, the Plan provides that any distributions provided for therein and the allowance of any Claim for the purpose of voting on the Plan is and shall be without prejudice to the rights of Reorganized Coram to pursue and prosecute any reserved rights of action including without limitation, those arising under or pursuant to the Bankruptcy Code.

**H.     Limitation of Liability in Connection with the Plan**

The Plan provides that neither the Debtors, Reorganized Coram, or any of their respective members, officers, directors, employees, representatives, counsel or agents, shall have incurred or shall incur any liability to any holder of a Claim or Allowed Interest or any other Person for any act or omission in connection with, or arising out of, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of Confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, and all such persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.

**I.     Conditions Precedent to Confirmation and Effectiveness of the Plan**

1.     The Plan provides that it shall not be confirmed unless and until the following conditions shall have been satisfied or waived by the Debtors and the Noteholder Group:

a. The Confirmation Order will be reasonably acceptable in form and substance to the Debtors and the Noteholder Group;

b. There shall be a binding commitment for the Exit Financing Facility;

c. All exhibits to the Plan are in form and substance reasonably satisfactory to the Debtors and the Noteholder Group;

2. The Plan also provides that it shall not become effective unless and until the following conditions shall have been satisfied or waived in writing by the Debtors and the Noteholder Group:

a. the Bankruptcy Court shall have entered the Confirmation Order;

b. Reorganized Coram shall have, or immediately upon the effectiveness of the Plan shall have, sufficient cash to make all cash payments required to be made on the Effective Date pursuant to the terms of the Plan;

c. All conditions necessary to effectuate Reorganized Coram's Exit Financing Facility shall have been satisfied or waived;

d. Any statutory fees owing the U.S. Trustee shall have been paid in full;

52

e. All other actions and documents necessary to implement the provisions of the Plan shall have been effected or executed or, if waivable, waived by the Person or Persons entitled to the benefit thereof;

f. The Plan Administrator shall have executed the Plan Administration Agreement evidencing the Plan Administrator's agreement to serve in that capacity;

g. The Unsecured Claims Reserve and the CHC Equity Interest Reserve, to the extent necessary, shall have been fully funded in accordance with the Plan and any applicable orders of the Bankruptcy Court with respect thereto;

h. The Effective Date shall have occurred on or before November 30, 2001.

## VII.  IMPLEMENTATION OF THE PLAN

### A.    Cancellation of Existing Securities and Agreements

The Plan provides that, on the Effective Date, except as otherwise provided in the Plan, all securities, instruments, instruments of indebtedness, guarantees and agreements governing any Claims impaired hereby, including the Notes, the Preferred Stock and CHC Equity Interests, shall be deemed canceled and terminated and the obligations of the Debtors and each of their subsidiaries, affiliates, and agents relating to, arising under, in respect of, or in connection with such securities, instruments or agreements shall be discharged.  The Plan further provides that the holder of any such documents canceled pursuant to this provision shall have no rights against the Debtors or Reorganized Coram arising from or relating to such documents, except the right to receive distributions if any, provided for in the Plan.

### B.    Surrender of Instruments

The Plan requires that each holder of an instrument evidencing a Claim or Allowed CHC Equity Interest shall surrender such instrument to the Debtors as a condition to the receipt of any distribution under the Plan to such holder on account thereof.  Unless otherwise agreed by the Reorganized Coram, no distribution under the Plan shall be made to or on behalf of any holder of such Claim or Allowed CHC Equity Interest unless and until such instrument is received or the unavailability of such instrument is reasonably established to the satisfaction of the Debtors.  In accordance with section 1143 of the Bankruptcy Code, any holder of a Claim that (i) fails to surrender or cause to be surrendered such instrument or (ii) fails to execute and to deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Debtors and furnish a bond in form, substance and amount reasonably satisfactory to the Reorganized Coram, in each case within two (2) years after the Effective Date, shall be deemed to have

53

forfeited forever all rights, claims, and interests in respect of said distribution and shall not thereafter have any right to participate in any distribution under the Plan.

### C.    Certificate of Incorporation

The Plan provides that on the Effective Date, the certificate of incorporation and the by-laws of Reorganized Coram will be substantially in the form included in the Plan Supplement. On the Effective Date, or as soon thereafter as practicable, Reorganized Coram shall file its Amended and Restated Certificate of Incorporation of Reorganized Coram. Among other things, the Amended and Restated Certificate of Incorporation of Reorganized Coram shall: (a) prohibit the issuance of non-voting equity securities to the extent required by section 1123(a) of the Bankruptcy Code; (b) provide for the authorization of the New Coram Stock in amounts not less that the amounts necessary to permit distributions thereof required or contemplated by the Plan; and (c) shall comply with section 1123(a)(6) of the Bankruptcy Code. The Plan further provides that after the Effective Date, Reorganized Coram may amend and restate its certificates of incorporation or by-laws as permitted by the Delaware General Corporation Law, and the terms and conditions of such documents.

### D.    Management of Reorganized Coram

The Plan provides that on the Effective Date, the operation of Reorganized Coram shall become the general responsibility of the Reorganized Coram Board of Directors, which shall, thereafter, continue to have the responsibility for the management, control, and operation of Reorganized Coram. The members of the Reorganized Coram Board of Directors on the Effective Date shall be those persons identified in the Plan Supplement. Thereafter, the members of the Reorganized Coram Board of Directors shall be selected in accordance with the Amended By-laws of Reorganized Coram. The officers of Reorganized Coram shall consist of those individuals set forth in the Disclosure Statement and in the Plan Supplement. All existing directors and officers who become officers or directors of Reorganized Coram shall be deemed re-elected. Newly designated directors shall be deemed newly elected pursuant to the Confirmation Order. Those officers and directors not continuing in office, if any, shall be deemed removed therefrom (without cause) pursuant to the Confirmation Order.

54

### E.    Issuance of New Coram Stock

The Plan provides that on the Effective Date, in accordance with the Plan, the Amended and Restated Certificates of Incorporation of Reorganized Coram, and the Amended By-laws of Reorganized Coram, Reorganized Coram shall issue the New Coram Stock in an amount not less than the amounts necessary to permit distributions thereof required or contemplated by the Plan. For a description of the New Coram Stock, see "New Coram Stock to be Issued Pursuant to the Plan."

### F.    Issuance of New Secured Notes

The Plan provides that on the Effective Date, in accordance with the Plan, Reorganized Coram shall issue the New Secured Notes and cause the distribution thereof required by the Plan, subject to the provisions of section 9.4 of the Plan. For a description of the New Secured Notes, see "New Secured Notes to be Issued Pursuant to the Plan."

### G.    Corporate Action

The Plan provides that on the Effective Date authorization of the New Coram Stock, the election of directors and officers, the adoption of the Amended and Restated Certificate of Incorporation of Reorganized Coram, the Amended and Restated By-laws of Reorganized Coram, and any and all other matters provided for under the Plan involving the corporate structure of Reorganized Coram, or otherwise involving or requiring corporate action by the directors and/or stockholders of Reorganized Coram, shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to section 303 of the Delaware General Corporation Law, section 422A of the Tax Code, the rules and regulations issued thereunder, section 16 of the 34 Act, the rules and regulations issued thereunder and any other applicable law, without any requirement of further action by the stockholders and/or directors of the Debtors or Reorganized Coram. On the Effective Date, all agreements entered into pursuant to the Plan shall be valid, binding and in full force and effect in accordance with their respective terms.

### H.    Exit Financing Facility

On the Effective Date, and solely to the extent determined by Reorganized Coram Board of Directors to be in the best interests of Reorganized Coram, Reorganized Coram is authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Financing Facility without further order of the Court. All cash necessary for the Reorganized Debtors to make payments pursuant to the Plan will be obtained from the Reorganized Coram's cash balances and operations and/or the Exit Financing Facility. For a description of the Exit Financing Facility, see section XI, "Exit Finance Facility."

## VIII. PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN

### A.    Distributions

The Plan provides that, except as otherwise provided in the Plan, all Distributions under the Plan shall be made by the Debtors to holders of Allowed Claims and Allowed CHC Equity Interests or their designees at their Most Recent Addresses. Reorganized Coram or the Plan Administrator shall make an initial distribution on the Effective Date or as soon thereafter as is reasonably practicable. Thereafter, the Plan Administrator will make Distributions with respect to claims against CHC on account of Allowed Claims on the first Subsequent Distribution Date that is at least ten (10) Business Days after a Claim becomes an Allowed Claim. Reorganized Coram will make Distributions on account of Allowed Claim in the ordinary course of business as soon as practicable after each such Claim becomes an Allowed Claim. The Plan provides that any distributions received by a holder of an Allowed Claim shall be allocated first to the principal portion of such Claim (as determined for federal income tax purposes) to the extent thereof, and thereafter to the remaining portion of such Claim if any.

### B.    Plan Administrator

The Plan provides that, on the Effective Date, the officers and Board of Directors of CHC shall be deemed removed from office pursuant to the Confirmation Order, CHC shall be dissolved in accordance with section 11.3 of the Plan and the operation of the Unsecured Claims Reserve and the CHC Equity Interest Reserve shall become the general responsibility of the Plan Administrator pursuant to and in accordance with the provisions of the Plan and the Plan Administration Agreement. Specifically, the Plan sets forth the role of the Plan Administrator (subject to all other applicable provisions of the Plan) as follows:

1. *Responsibilities.* The responsibilities of the Plan Administrator shall include maintaining the Unsecured Claims Reserve and the CHC Equity Interest Reserve; liquidating any remaining assets; prosecuting objections to and estimations of Claims against CHC (other than Administrative Claims, Priority Tax Claims and Priority Non-Tax Claims, which shall be the responsibility of Reorganized Claim); calculating and implementing all distributions from the Unsecured Claims Reserve in accordance with the Plan; calculating and implementing the distribution of the CHC Equity Interest Consideration (if applicable), filing all required tax returns and paying taxes and all other obligations on behalf of the Unsecured Claims Reserve from funds therein; and such other responsibilities as may be vested in the Plan Administrator pursuant to the Plan, the Plan Administration Agreement or Bankruptcy Court order or as may be necessary and proper to carry out the provisions of the Plan.

56

2. *Powers.* The Powers of the Plan Administrator shall include, without Bankruptcy Court approval in each of the following cases, the power to invest funds in, and withdraw, make distributions and pay taxes and other obligation owed by the Unsecured Claims Reserve, from funds therein in accordance with the Plan; the powers to engage employees and professional persons to assist the Plan Administrator with respect to its responsibilities; the power to dispose of, and deliver title to others of, remaining assets on behalf of or against CHC; and such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan or the Plan Administration Agreement.

3. *Compensation.* In addition to reimbursement for the actual out-of-pocket expenses incurred, the Plan Administrator shall be entitled to reasonable compensation for services rendered on behalf of the Unsecured Claims Reserve and the CHC Equity Interest Reserve in an amount and on such terms as may be agreed to by the Debtors and as reflected in the Plan Administration Agreement. Any dispute with respect to such compensation shall be resolved by agreement among the parties or, if the parties are unable to agree, determined by the Bankruptcy Court.

### C.    Distribution of Cash

Distributions and transfers of Cash called for under the Plan will be made on the Effective Date, except that with respect to Claims that are Disputed Claims on the Effective Date, distributions shall be made on Subsequent Distribution Dates until there are no longer any Disputed Claims as to which cash payments are required under the Plan. All distributions of Cash under the Plan may be made either by check or by wire transfer, at the option of the Debtors or Reorganized Coram.

### D.    Distributions to Noteholder Group

Distributions and transfers of New Coram Stock and New Coram Secured Notes under the provisions of the Plan will be made on the Effective Date. The Plan also provides that Coram and Reorganized Coram shall have the right to delay any distribution of New Coram Stock or New Secured Notes to any member of the Noteholders Group until it received reasonable satisfaction that such distribution will not result in a violation of any statute or regulation (such as Stark II) applicable to Coram's business.

### E.    Setoffs

The Plan permits, but does not require, the Debtors and Reorganized Coram to set off against any Claim or Equity Interest and the payments or distributions to

be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever the Debtors or the Reorganized Coram may have against the holder thereof, but neither the failure to do so nor the allowance of any Claim under the Plan, for voting purposes or otherwise, shall constitute a waiver or release by the Debtors or Reorganized Coram of any such claim that any of such entities may have against any holder.

F.    **Distribution of Unclaimed Property**

The Plan provides that any distribution of property (Cash or otherwise) under the Plan which is unclaimed after two (2) years following the Effective Date shall be forfeited to, and re-vest in, Reorganized Coram. Any holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undelivered or undeliverable distribution to be made by a Disbursing Agent within this two (2) year period will be forever barred from asserting any such claim against the Debtors, Reorganized Coram or their respective property on account of any such distribution.

G.    **Compliance With Tax Requirements.**

The Plan contains several provisions pertaining to compliance with tax requirements with respect to distributions. The provisions are as follows:

1.    In connection with the Plan, to the extent applicable, each disbursing agent, including Reorganized Coram and the Plan Administrator, is required to comply with all tax reporting requirements imposed upon it by any governmental unit with respect to all distributions to be made pursuant the Plan, and will be authorized to take any actions that may be necessary or appropriate to comply with such reporting requirements.

2.    Notwithstanding any other provision of the Plan, each entity receiving a distribution of cash or New Coram Stock pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed upon it by any governmental unit on account of such distribution.

3.    To the extent (and only to the extent) required by applicable law, any applicable federal, state or local withholding taxes may be deducted by the Debtors or Reorganized Coram from any payments or other Distributions made in respect of Allowed Claims.

H.    **De Minimis Distributions and Fractional Interests**

The Plan provides that no Cash payment of less than $10.00 shall be made to any holder of an Allowed Claim or Allowed CHC Equity Interest unless such holder

58

so requests in writing to the Debtors or the Plan Administrator, as appropriate. Absent a request, such funds shall be distributed as if they are Distributions of Unclaimed Property in accordance with the provisions of section 9.6 of the Plan. The Plan also provides that fractional interests in New Coram Stock shall not be distributed. Notwithstanding any other provision in the Plan, only whole numbers of shares of New Coram Stock shall be issued to holders of Allowed Claims (who are otherwise entitled to receive New Coram Stock). When any distribution on account of an Allowed Claim would result in the issuance of a number of shares of New Coram Stock that is not a whole number, the actual distribution of such New Coram Stock shall be rounded to the next lower whole number. Any fractional interests in New Coram Stock that are allocated for distribution to holders of Allowed Claims shall be deemed contributed to the Reorganized Debtors.

I.      **Provisions Pertaining to Disputed Claims**

The Plan contains provisions governing the Debtors' and Reorganized Coram's rights and obligations respecting distributions and Disputed Claims. These provisions are summarized as follows:

1.      **Objections to and Estimation of Claims; Prosecution of Disputed Claims**

The Debtors, Reorganized Coram, and the Plan Administrator (as applicable) will retain the right to object to the allowance of all Claims (against their respective entity), including any Claims listed in the Schedules or filed with the Bankruptcy Court with respect to which they dispute liability in whole or in part and the characterization of a Claim as secured or unsecured; subject to further extension by the Bankruptcy Court with or without notice, all objections to the allowance of Claims shall be filed with the Bankruptcy Court on or before a date that is sixty (60) days after the Effective Date. All such objections shall be litigated to Final Order; provided however, that the Debtors, Reorganized Coram, and the Plan Administrator, as applicable, may compromise, settle, withdraw or resolve by any other method approved by the Bankruptcy Court, any such objections to Claims, except that Reorganized Coram shall be the only party entitled to settle Administrative Claims, Priority Non-Tax Claims and Priority Tax Claims against CHC. The Debtors, Reorganized Coram, or the Plan Administrator, as applicable, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such contingent or unliquidated Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the amount of such Claim or a maximum limitation on the amount of such Claim, as determined by the Bankruptcy Court, to the extent permissible under the Bankruptcy

59

Code. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, Reorganized Coram, or the Plan Administrator consistent with the second sentence of this paragraph, as appropriate and as the case may be, may elect to pursue any supplemental proceedings to object to any ultimate payment or distribution on such Claim.

### 2.    Payments and Distribution on Disputed Claims

Notwithstanding any provision in the Plan to the contrary, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until such Claim becomes an Allowed Claim, in whole or in part. With respect to Claims against CHC only, on the first Subsequent Distribution Date that is at least ten (10) Business Days after a Disputed Claim (or portion thereof) becomes an Allowed Claim, the holder of such Allowed Claim shall receive all payments and/or distributions to which such holder is then entitled under the Plan net of allocable expenses of the Unsecured Claims Reserve. For a more detailed description of payments of unsecured Claims see "Plan Administrator" in this Article.

### 3.    Disallowance of Reimbursement or Contribution Claims

Effective as of the Effective Date, in accordance with section 502(e)(1) of the Bankruptcy Code, all Claims or Administrative Claims for reimbursement or contribution of an entity that is liable with a Debtor shall be disallowed against that Debtor to the extent such Claim or Administrative Claim, as the case may be, is contingent as of the Effective Date except as otherwise provided by the Plan.

## IX.  REORGANIZED CORAM

### A.    Background of Business

Reorganized Coram intends to conduct essentially the same business as that which is conducted by Coram. The Debtors' pre-petition business is described in section III, and in CHC's Annual Report on Form 10-K for the fiscal year ended December 31, 2000, and the Quarterly Report on Form 10-Q for the periods ended June 30, 2001, annexed hereto as Exhibits C and D, respectively.

### B.    The Debtors' 2001 Results Through June 30, 2001

For the period January 1, 2001 through June 30, 2001, on a consolidated basis, CHC had net revenue of approximately \$_____, and losses before net reorganization expenses, interest and taxes from continuing operations of approximately \$_____ million.

60

### C.    Projected Performance of Reorganized Coram

In connection with its retention, Goldin has prepared projections for Reorganized Coram.  Goldin believes that Reorganized Coram will have infusion net revenue for the fiscal year ending December 31, 2001 totalling approximately $401 million.  Goldin also believes that revenue for the subsequent four (4) fiscal years will increase with revenue for the fiscal year ending December 31, 2005 totalling approximately $460 million.

Also, Goldin has projected that the EBITDA for Reorganized Coram for the fiscal year ending December 31, 2001 will be approximately $27,814,000 and that the EBITDA of Reorganized Coram will increase to $50,908,000 for the fiscal year ending December 31, 2005.

Goldin has projected that the EBITDA of Reorganized Coram as a percentage of revenue will increase from approximately 6.9% percent in the fiscal year ending December 31, 2001, to approximately 11.1% percent in Reorganized Coram's fiscal year ending December 31, 2005.

Attached hereto as Exhibit E are pro forma financial statements which project the financial performance of Reorganized Coram, on a consolidated basis, through December 31, 2005.  Goldin has only created profit and loss statements.  To provide a complete set of statements, Goldin's profit and loss statements are supplemented by balance sheets and cash flow statements prepared by the Debtors.  Goldin's projections and the Debtors' projections are not consistent with each other because they are based upon different assumptions, including growth rates assumed by Goldin that the Debtors believe may be overly optimistic.

### D.    Liquidity and Capital Resources

The Exit Finance Facility will be Reorganized Coram's only initial source of operational financing.  Based upon Goldin's projections (see section VIII. C. "Projections for Reorganized Coram" as qualified by section XVII "Projections"), Goldin believes that the Debtors will generate positive cash flow during the fiscal year ending December 31, 2001.  Based on currently anticipated cash flows, Reorganized Coram anticipates that it will have sufficient cash to meet its obligations from the Exit Finance Facility and its operations.  Reorganized Coram may also be able to develop other sources of financing, but no assurance can be given that such further sources can be developed.  Reorganized Coram believes it will be in a better position to obtain financing alternatives, should it determine that it is in its best interest to do so, after the Plan is implemented.

### E.    Management

#### 1.    Reorganized Coram Board of Directors and Executive Officers

Reorganized Coram will be managed by a Board of Directors initially composed of the below-listed individuals, plus such other individuals as may be agreed to by the Debtors and the Noteholder Group who will be identified in the Plan Supplement. Reorganized Coram will have the overall corporate structure depicted in the chart attached hereto as Exhibit G.

The following biographical information is furnished with respect to the above-named current members of the Board of Directors of CHC and the senior executives of the Debtors:

| NAME | AGE | POSITION WITH CORAM | DIRECTOR SINCE |
|------|-----|---------------------|----------------|
| Daniel D. Crowley | 53 | Chairman of the Board | 1999 |
| Donald J. Amaral | 48 | Director | 1995 |
| William J. Casey | 56 | Director | 1997 |
| L. Peter Smith | 51 | Director | 1994 |
| Sandra L. Smoley | 64 | Director | 2000 |

Mr. Crowley joined CHC as its Chairman, Chief Executive Officer and President as of November 30, 1999. He is also Chairman of Winterland, a privately held affinity merchandise company in the music and entertainment industry, and Chairman, Chief Executive Officer and President of Dynamic Healthcare Solutions, LLC, a privately held management consulting and investment firm that he established in 1997. Prior to founding Dynamic Healthcare Solutions, Mr. Crowley served as the Chairman, Chief Executive Officer and President of Foundation Health Corporation, a post that he had served in since 1989.

As discussed above and at length in the Goldin Report attached hereto, Mr. Crowley also provides services to Cerberus, one of the Noteholders, with respect to its investments in various companies other than the Debtors. Mr. Crowley generally receives a fee of $80,000 per month from Cerberus for such services, with a potential for additional incentive bonuses. Mr. Crowley neither receives a fee nor earns incentive bonuses from Cerberus for any services he provides respecting the Debtors.

Mr. Crowley serves as Chairman of the Board, President, and Chief Executive Officer of CHC pursuant to his Executive Employment Agreement, which provides, among other things, that Mr. Crowley shall receive, among other compensation, a base salary ("Base Salary") in the amount of $650,000 per annum, and a performance bonus based upon CHC's EBITDA results for fiscal year 2000, as reflected in the

Debtors' audited financial statements, in the amount of 25% of the Debtors' EBITDA greater than $14 million, and an additional $5 million to Mr. Crowley and other members of management as designated by Mr. Crowley if EBITDA exceeds $35 million. The Executive Employment Agreement also provides that Mr. Crowley shall receive a restructuring bonus in the amount of $1.8 million, payable on the Effective Date of a plan of reorganization. The Executive Employment Agreement will be assumed by CHC and assigned to Coram under the provisions of the Plan, subject to the Executive Compensation Waiver.

Mr. Amaral served as Chairman of CHC's Board of Directors from September 1997 until November 30, 1999. Mr. Amaral has served as a director of the company since October 1995, Chief Executive Officer of CHC from October 1995 through April 23, 1999, and October 22, 1999 through November 30, 1999, and as President from October 1995 through December 1997. Previously, he was President and Chief Operating Officer of OrNda Healthcorp ("OrNda") from April 1994 to August 1995, and served in various executive positions with Summit Health Ltd. ("Summit") from October 1989 to April 1994, including President and Chief Executive Officer between October 1991 and April 1994. Summit was merged into OrNda in April 1994. Mr. Amaral is also a member of the Board of Directors of CareMatrix Corporation.

Mr. Casey has served as a director of CHC since September 1997. Since 1983, Mr. Casey has served as a consultant in the healthcare industry, specializing in hospital management evaluation, hospital planning, managed care contracting and turnaround services. From 1986 to 1997, Mr. Casey has also served as Contract Administrator for Emergency Department Physicians' Medical Group, Inc. and its affiliated medical groups, which provide physician services to non-governmental facilities. In addition, from 1988 to 1997, Mr. Casey has served as Contract Administrator for NP Medical Group, Inc., which provides physician services to government facilities. Mr. Casey also serves as a director of TriCounties Bank.

Mr. L. Peter Smith has served as a director of CHC since July 1994. Between November 1993 and July 1994, Mr. Smith was a director of Medisys, Inc. Mr. Smith served as the Managing Partner of AllCare Health Services, Inc., which was acquired by Medisys in December 1992. Mr. Smith is also Chief Executive Officer and serves on the Board of Directors of Ralin Medical, Inc., a company specializing in cardiac disease management. Mr. Smith also serves on the Board of Directors of Gateway, Inc. and AMSYS, Inc. Mr. Smith previously served on the Board of Directors of Sabratek Corporation from October 1992 through August 23, 1999. Sabratek Corporation filed a voluntary bankruptcy petition under chapter 11 of the United States Code on December 17, 1999, and that proceeding is presently pending before the United States Bankruptcy Court in Delaware.

Ms. Smoley was elected to CHC's Board of Directors on February 10, 2000. Ms. Smoley is the Chairman and Chief Executive Officer of The Sandra Smoley Company, a healthcare and local government consulting firm based in Sacramento,

California. From October 1993 to January 1999, she served as the Secretary of the California Health and Welfare Agency. Prior to that time, she was Secretary of the California State and Consumer Services Agency from January 1993 to October 1993.

### 2.   Arrangements with Reorganized Coram's Executives

Reorganized Coram's successful implementation of its business strategies will be highly dependent upon the continuing commitment of its key executives to achieving corporate objectives.  Reorganized Coram intends to enter into agreements with its key executives in order to recruit (where necessary) and retain the services of such executives and (a) assure the availability of their skills for the benefit of Reorganized Coram, (b) secure to Reorganized Coram freedom from competition by such persons within reasonable and lawful limits, and (c) provide appropriate base compensation, benefits and financial incentives through bonus, severance and other employment-related programs.

The senior executive officers of Coram and CHC are currently receiving a salary from the Debtors at the following annualized rates:

| NAME | SALARY (BASE) | AGE | POSITION(S) WITH CORAM |
|------|---------------|-----|------------------------|
| Daniel D. Crowley | $650,000 | 53 | Chairman, Chief Executive Officer, President and Director |
| Allen J. Marabito | $350,000 | 54 | Executive Vice President |
| Scott R. Danitz | $250,000 | 44 | Senior Vice President – Finance, Chief Financial Officer and Treasurer |
| David A. Schwab | $165,000 | 41 | Vice President, General Counsel and Secretary |
| Vito Ponzio, Jr. | $180,000 | 47 | Senior Vice President, Human Resources |

64

Certain senior executive officers also receive medical, dental, disability and life insurance coverage, car allowances, housing allowances, paid vacations, and certain other perquisites.

In addition to base salary, Coram's senior executives, as senior executives of Reorganized Coram, will continue to earn bonuses or, if voluntarily terminated or terminated without cause, be provided with severance benefits in accordance with certain of the Debtors' plans that are currently the subject of an application for approval with the Bankruptcy Court.

Specifically, the Debtors have obtained Bankruptcy Court approval of a Key Employee Retention Program, which is described above at section IV.F.3. "Other Administrative Events." Certain of the executives are participants in the Key Employee Retention Program.

The Debtors also have a management incentive program ("Executive Compensation Program") which applies to approximately thirty-six (36) people. The Executive Compensation Program consists of three components: base salaries, short term incentives, and long term incentives. The Debtors or Reorganized Coram intend to assume the Executive Compensation Program, except that the Executive Compensation Program will be modified to the extent necessary to be consistent with the provisions of the Plan. A copy of the Executive Compensation Program, as modified, will be included in the Plan Supplement.

Allen J. Marabito joined CHC effective November 30, 1999, as Executive Vice President. From 1997 to 1999, Mr. Marabito was in private law practice and Senior Vice President with Dynamic Healthcare Solutions, LLC. From 1991 to 1997, he served as the Senior Vice President, Secretary and General Counsel of Foundation Health Corporation.

Scott R. Danitz has served as CHC's Vice President and Controller from January 1998 through December 1999, and as Senior Vice President – Finance and Chief Accounting Officer from January 2000 through December 2000, and Senior Vice President – Finance, Chief Financial Officer and Treasurer since January 2001. Previously, Mr. Danitz was employed by First Data Corporation from 1989 through 1997, and held various positions, the most recent of which had been Vice President and Controller, Payment Instruments division.

David A. Schwab has served as CHC's Vice President, General Counsel and Secretary since January 2001. Previously, Mr. Schwab was employed by Legacy Securities Corporation from 1999 through 2000, and served as General Counsel to Meridian Corporation from 1991 to 1999.

Vito Ponzio, Jr. has served as CHC's Senior Vice President, Human Resources since September 1998. Previously, Mr. Ponzio served as the company's Vice

President of Human Resources from February 1996 to September 1998, and as Director of Human Resources from February 1994 to February 1996.

**F.    Certificate of Incorporation and By-Laws of the Reorganized Coram**

Pursuant to the Plan, on the Effective Date, the Reorganized Coram will file the Amended and Restated Certificate of Incorporation of Reorganized Coram and will adopt the Amended and Restated By-Laws of Reorganized Coram.  See "Implementation of the Plan -- Corporate Action."  The description set forth below is intended as a summary only and is qualified in its entirety by reference to the Amended and Restated Certificate of Incorporation of Reorganized Coram and the Amended and Restated By-Laws of Reorganized Coram, which are included in the Plan Supplement.

Pursuant to the Plan, all currently outstanding capital stock of the Debtors will be canceled and all rights thereunder or relating thereto will be extinguished.  In compliance with section 1123(a)(6) of the Bankruptcy Code, the Amended and Restated Certificate of Incorporation of Reorganized Coram will expressly prohibit the issuance of any non-voting equity securities.

**1.    Board of Directors**

The Amended and Restated By-Laws of Reorganized Coram provide that the number of directors on the Board of Directors shall be no less than three nor more than nine.  The Plan provides that the Board of Directors of the Reorganized Coram shall initially consist of the individuals set forth in subsection E above and the other individuals identified in the Plan Supplement.  In addition, the Amended and Restated By-Laws provide that, unless Reorganized Coram's Board of Directors otherwise determines, any vacancies will be filled by the affirmative vote of a majority of the remaining directors, though less than a quorum.  Under the Delaware General Corporation Law ("DGCL"), directors serving on a board may be removed by the stockholders with or without cause.

**2.    Limitation of Liability of Directors**

The Amended and Restated Certificate of Incorporation of Reorganized Coram will provide that a director will not be personally liable for monetary damages to the Reorganized Coram or its stockholders for breach of fiduciary duty as a director, except for liability for: (i) any breach of the director's duty of loyalty to the Reorganized Coram or its stockholders; (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) paying a dividend or approving a stock repurchase in violation of law; or (iv) any transaction from which the director derived an improper personal benefit.

### 3.    Indemnification of Directors and Officers

Subject to certain limitations, the Amended and Restated By-Laws of Reorganized Coram will provide that any person made a party or threatened to be made a party to a threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action or suit by or in the right of Reorganized Coram to procure a judgment in its favor) by reason of the fact that such person is or was a director, officer, employee or agent of Reorganized Coram, or is or was serving at the request of Reorganized Coram as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall be indemnified by Reorganized Coram against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding if such person acted in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of Reorganized Coram, and, with respect to any criminal action or proceeding, had no reasonable cause to believe such conduct was unlawful.

## X. NEW CORAM STOCK TO BE ISSUED PURSUANT TO THE PLAN

The following description of the terms and provisions of New Coram Stock does not purport to be complete and is qualified in its entirety by reference to the pertinent sections of the proposed form of the Amended and Restated Certificate of Incorporation of Reorganized Coram, which will be included in the Plan Supplement.

Upon effectiveness of the Amended and Restated Certificate of Incorporation of Reorganized Coram, Reorganized Coram will authorize 10 million shares of New Coram Stock ($.01 par value), representing one hundred percent (100%) of the authorized common stock of Reorganized Coram. Pursuant to the Plan, Reorganized Coram will allocate and issue all of the common stock of Reorganized Coram to the holders of Allowed Claims in Class Coram 3. See "General Information Regarding the Plan -- Classification and Treatment of Claims and Interests."

The holders of New Coram Stock will be entitled to one vote for each share held of record on all matters submitted to a vote of stockholders. Holders of New Coram Stock will be entitled to receive ratably such dividends as may be declared by the Reorganized Coram's Board of Directors out of funds legally available therefor. It is presently intended that Reorganized Coram will retain earnings for working capital and to fund capital expenditures; accordingly, Reorganized Coram does not anticipate paying any dividends on New Coram Stock in the foreseeable future. Holders of New Coram Stock will have no preemptive rights and will have no rights to convert their New Coram Stock into any other securities, and there will be no redemption provisions with respect to such shares. All outstanding shares of New Coram Stock to be issued pursuant to the Plan will, upon such issuance, be fully paid and nonassessable. The Amended and Restated Certificate of Incorporation of Reorganized Coram will not authorize, and

Reorganized Coram Board of Directors does not currently contemplate recommending to its shareholders for approval, the authorization of any shares of preferred stock or other stock ranking senior to New Coram Stock in respect of the payment of dividends or the distribution of assets or in any other respect.

## XI. NEW SECURED NOTES TO BE ISSUED PURSUANT TO THE PLAN

The following description of the terms and provisions of New Secured Notes does not purport to be complete and is qualified in its entirety by reference to the pertinent sections of the proposed form of New Secured Note, and the documents ancillary thereto, that will be included in the Plan Supplement.

Pursuant to the Plan, Reorganized Coram will issue New Secured Notes in the aggregate principal amount of $180 million. The New Secured Notes will have a fixed rate of interest at 9% per annum, computed on a 360 day basis, which Reorganized Coram will have the option of paying in kind. The Notes will require Reorganized Coram to make payments of interest only (without amortization) on a quarterly basis for the first four years after the Effective Date. At the end of the fourth year following the Effective Date, all remaining outstanding principal and accrued and unpaid interest will be due. Reorganized Coram may pre-pay any of its obligations under the New Secured Notes without penalty.

The New Secured Notes will be guaranteed by all of Reorganized Coram's operating subsidiaries. The New Secured Notes will be secured by a senior lien on substantially all assets of and a pledge of all shares held by Reorganized Coram and its non-debtor operating subsidiaries, provided, however, that such pledge and security interests will be subject and subordinate to the liens and security interests securing the Exit Finance Facility.

The New Secured Notes will afford Reorganized Coram financing on below-market terms. The Debtors will therefore benefit from reduced interest expense and an enhanced ability to obtain further financing in the future if necessary.

## XII. EXIT FINANCE FACILITY

The following description of the terms and provisions of the Exit Finance Facility is not complete and is qualified in its entirety by reference to the pertinent sections of the Exit Finance Facility documents that will be included in the Plan Supplement.

Pursuant to the Plan, and as a condition prerequisite to the Effective Date of the Plan, Reorganized Coram will enter into a financing facility in the approximate aggregate principal amount of $40 million with one or more lenders that will be

substantially in the form included in the Plan Supplement. The Exit Financing Facility will consist of a revolving senior secured loan on commercially reasonable terms.

## XIII. DISCUSSION OF STARK II

Under the ownership and referral provisions of the Omnibus Budget Reconciliation Act of 1993 ("Stark II"), it is unlawful for a physician to refer patients for certain designated health services reimbursable under the Medicare or Medicaid program to an entity with which the physician (or the physician's immediate family members -- broadly defined) has a financial relationship, unless the financial relationship fits within an exception enumerated in Stark II or regulations promulgated thereunder. Aspects of Coram's business which are "designated health services" for purposes of Stark II include outpatient prescription drugs, parenteral and enteral nutrition, equipment and supplies, durable medical equipment and home health services. A "financial relationship" under Stark II is defined broadly as an ownership or investment interest in the provider, or any type of compensation arrangement in which remuneration flows between the physician and the provider.

Under Stark II, an entity is prohibited from claiming payment under the Medicare or Medicaid programs for services rendered pursuant to a prohibited referral and is liable for the refund of amounts received pursuant to prohibited claims. The entity can also be subject to civil penalties of up to $15,000 per improper claim and can be excluded from participation in the Medicare and Medicaid programs. Suits for violations of Stark II can also potentially be brought under the *qui tam* (whistle blower) provisions of the Federal False Claims Act. A Stark II violation does not require improper intent or actual knowledge with respect to a prohibited referral. Based on final Stark II regulations (Phase I) published on January 4, 2001, with a scheduled effective date of January 4, 2002, the definition of "indirect" financial relationships, including ownership or investment interests, has been modified to include a knowledge element. Under the new regulations, the entity furnishing a designated health service will be liable for submitting a claim based on a prohibited referral only if it has actual knowledge of the indirect financial relationship or acts in reckless disregard or deliberate ignorance of that relationship. 42 C.F.R. § 411.354(b)(5). Moreover, under this regulation, an exception to the Stark II payment prohibition will be available to an entity that submits a claim if the entity did not have actual knowledge of, and did not act in reckless disregard or deliberate ignorance of, the identity of the physician who made the prohibited referral. 42 C.F.R. § 411.353(e)(1). This limited protection for certain indirect financial relationships under Stark II is predicated on, among other things, the absence of reckless disregard or deliberate ignorance on the part of the entity submitting the claims, standards that are not defined in the Stark II regulations and will be subject to varying interpretations and uncertainties. Under these circumstances, an entity can best protect itself by structuring itself to avoid prohibited Stark II relationships and by continuing to monitor its compliance with Stark II. In addition, a number of the states in which the Debtors operate have similar prohibitions on physician self-referrals with similar penalties.

The Stark II regulations broadly define "immediate family members" to include the following:

> [H]usband or wife; birth or adoptive parent, child, or sibling; stepparent, stepchild, stepbrother, or stepsister; father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law; grandparent or grandchild; and spouse of a grandparent or grandchild.

66 Fed. Reg. 855,954 (2001) (42 C.F.R. § 411.351). Thus, a physician who refers patients to the Debtors for the designated health services and who has any immediate family member, as so defined, who is a CHC or Reorganized Coram shareholder would be making an improper referral under Stark II, unless the investment interest were covered by an exception to Stark II. Any improper referrals would subject the Debtors or Reorganized Coram to Stark II liability as described above. The Debtors are aware that certain referring physicians have had financial interests in the company through ownership of shares of the company's common stock.

Stark II includes an exception for a physician's ownership of publicly-traded securities traded under (among others) an automated interdealer quotation system operated by the National Association of Securities Dealers, if the corporation has: (a) at the end of the company's most recent fiscal year, stockholders' equity exceeding $75,000,000, or (b) on average during the previous three (3) fiscal years, stockholders' equity exceeding $75,000,000. Proposed regulations define the term "stockholders' equity" as the difference in value between a corporation's total assets and total liabilities, without further elaboration.

As of December 31, 1999, CHC complied with the requirements of this exception, thereby protecting referrals from physicians who owned (or whose family members owned) CHC stock. As of December 31, 2000, the Debtors would not have been in compliance with this exception, absent the emergency Note Exchange. If CHC were to fail in the future to qualify for the $75 million capitalization exception, it would be forced to cease accepting referrals of Medicare or Medicaid patients from physicians who own (or whose family members own) shares of CHC's common stock. The administrative burdens of attempting to make such determinations on a case-by-case basis could be prohibitive for both the Debtors and the referring physicians. Moreover, it is likely that such efforts would be ineffective in identifying all prohibited referrals and would deter physicians from referring patients to CHC. Accordingly, in order to prevent a failure of CHC's ownership structure to comply with Stark II, the Debtors have determined that it is in the best interest of the estates and their creditors to reorganize as a privately held company. Notwithstanding CHC's present ability to restructure its shareholder ownership to comply with Stark II, in the absence of a restructuring, CHC will not likely be in compliance with Stark II as of January 1, 2002 because it would be a public company with stockholders' equity less than $75 million.

## XIV.  RISK FACTORS

Retention of Claims (if the Plan is not confirmed) or investment in New Coram Stock and New Secured Notes of Reorganized Coram (if the Plan is confirmed) are subject to a number of material risks, including those described below.  Prior to deciding whether to vote in favor of the Plan, each Claimant should carefully consider the following factors, together with all the other information contained herein.

### A.    Lack of Established Market for New Coram Stock; Volatility

There will be no existing market for New Coram Stock.  In addition, it is unlikely that a public market for New Coram Stock can be developed in the foreseeable future because of the restrictions on ownership by referring physicians and their family members under Stark II, and it is impossible to predict the degree of price volatility if any such market should develop.  Accordingly, no assurance can be given that a holder of New Coram Stock will be able to sell such securities in the future or as to the price at which any such sale may occur.  If such a market were to exist, New Coram Stock could trade at prices which depend upon many factors, including the market price for similar securities, industry and general economic conditions and the performance of, and investor expectations for, Reorganized Coram.

Reorganized Coram has no plan to apply for the listing of the New Coram Stock on a national securities exchange.  The New Coram Stock will be issued pursuant to the Plan to certain holders of Allowed Claims, and certain of these Claimants may prefer to sell their New Coram Stock rather than to hold their shares as an investment on a long-term basis.  Accordingly, it is anticipated that the market for New Coram Stock will be volatile, at least for an initial period after the Effective Date.  Moreover, while the Plan was developed based upon certain valuation assumptions for New Coram Stock, such valuation assumptions are not a prediction of trading prices of New Coram Stock after the Effective Date.  New Coram Stock may trade, if it trades at all, at substantially lower prices because of a number of risk factors, as set forth herein.  The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.  Reorganized Coram is not required to, and does not intend to, register New Coram Stock under the Securities Act of 1933, as amended.  See "Applicability Of Federal Securities Laws."

### B.    Competitive Position

Reorganized Coram will face significant competition and may not be able to compete successfully.  Like the Debtors, Reorganized Coram would compete in the alternate site infusion therapy market which is highly competitive.  Some of Coram's current and potential competitors include:

(i)      integrated providers of alternate site healthcare services;

71

(ii)    hospitals;

(iii)   local providers of multiple products and services offered for the alternate site healthcare market; and

(iv)    physicians and physician-owned organizations such as independent practice associations and multi-specialty group practices.

The Debtors have experienced increased competition from hospitals and physicians that have sought to increase the scope of services offered at or through their facilities or offices, including services similar to those offered by the company and from hospitals and physicians that have entered into risk relationships with managed care organizations pursuant to which they have taken control of certain medical services, including the services offered by the Debtors. Certain of the Debtors' competitors in various markets may have superior financial, marketing or managerial resources, size, purchasing power or strategic relationships with providers, referral sources, such as physicians and hospital discharge planners, and traditional indemnity and managed care payers.

There are relatively few barriers to entry in the infusion therapy services market. Local or regional companies are currently competing in many of the markets served by the Debtors and others may do so in the future. Reorganized Coram would expect its competitors to continue to improve their service offerings and price competitiveness. Reorganized Coram would also expect its competitors to develop new strategic relationships with providers, referral sources and payers, which could result in increased competition. The introduction of new and enhanced services, acquisitions and industry consolidation and the development of strategic relationships by Reorganized Coram's competitors could cause a decline in sales, loss of market acceptance of Reorganized Coram's services or price competition, or make its services less attractive. There can be no assurance that Reorganized Coram will be able to compete successfully against current or future competitors or that competitive pressures will not have a material adverse effect on Reorganized Coram's business, financial condition and results of operations.

### C.    Loss of Key Personnel

The success of Reorganized Coram will be highly dependent upon the services of its key executives. The loss of key executives of Reorganized Coram could have an adverse impact on Reorganized Coram's ability to implement successfully its business strategies and achieve its business plans. There is no assurance that Reorganized Coram will be able to retain the services of its current key executives or to effect a timely and cost-comparable replacement of any such executives who leave Reorganized Coram.

### D.    Capital Requirements

Reorganized Coram's businesses are expected to require working capital. While the business plan of Reorganized Coram contemplates that sufficient cash to meet Reorganized Coram's working capital and investment needs for the foreseeable future will either be generated by operations or available under the Exit Financing Facility, Reorganized Coram's ability to gain access to additional capital, if needed, cannot be assured.

### E.    Relationships With Third Parties

The success of Reorganized Coram's business will be dependent on relationships with third parties. The profitability of Reorganized Coram's business will depend in part on its ability to establish and maintain close working relationships with managed care organizations, private and governmental third-party payers, hospitals, physicians, physician groups, home health agencies, long-term care facilities and other institutional health providers and insurance companies and large self-insured employers. A feature of Reorganized Coram's business strategy would be to improve its relationships with such third parties in general, and with physicians and physician groups in particular, but there can be no assurance that Reorganized Coram will be successful in improving and maintaining such relationships, that its existing relationships will be successfully maintained, or that additional relationships will be successfully developed and maintained in existing or future markets. The loss of such existing relationships or the failure to continue to develop and maintain ongoing relationships in the future could have a material adverse effect on Reorganized Coram's business, financial condition and results of operations.

73

### F.    Healthcare Industry Developments and Legislation

The healthcare industry continues to undergo significant changes driven by various efforts to reduce costs, including trends toward managed care, limits in Medicare coverage and reimbursement levels, consolidation of healthcare distribution companies and collective purchasing arrangements by office-based healthcare practitioners. The impact of third-party pricing pressures and low barriers to entry have dramatically reduced profit margins for certain healthcare providers. Continued growth in managed care has pressured healthcare providers to find ways of becoming more cost competitive. This has also led to consolidation of healthcare providers in the Debtors' market areas.

In addition, political, economic and regulatory influences are subjecting the healthcare industry in the United States to extensive and dynamic change. It is possible that healthcare initiatives at the federal or state level, whether implemented through legislation or through action by federal or state administrative agencies, could require Reorganized Coram to make significant changes in the way it conducts business. Certain aspects of healthcare reform, such as payment rate reductions in Medicare and Medicaid payments or changes in methods for calculating the average wholesale prices of drugs, if developed, adopted, and implemented, could have a material adverse effect upon Reorganized Coram's business.

### G.    Other Risk Factors

Confirmation and implementation of the Plan may will have material federal income tax consequences to holders of New Coram Stock and New Secured Notes, and to Reorganized Coram. See "Certain Federal Income Tax Consequences of the Plan" for a discussion of such tax consequences.

Coram is aware that government entities that provide reimbursement for health services may audit the billing practices of health service providers and may seek to impose substantial liability for any perceived improper billing practices. The Debtors believe that their billing practices are now and have in the past been proper, but there is no assurance that the Debtors will not be subject to such an audit or that the auditors will not seek to impose any liability upon the Debtors or Reorganized Coram.

The projections set forth in this Plan are based upon, among other things, the business plan developed for Reorganized Coram in its present configuration, under which the Debtors have a limited operating history. See section XVII "Projections" for a discussion of the projections. The success of Reorganized Coram's business plan is subject to a number of uncertainties and contingencies, and there is no assurance that such projections will be achieved.

## XV.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims and Equity Interests. The following summary does not address the federal income tax consequences to (i) holders whose Claims are entitled to reinstatement or payment in full in cash, or are otherwise unimpaired under the Plan (e.g., holders of Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, certain Secured Claims and Allowed Coram General Unsecured Claims), or (ii) holders whose Equity Interests are or may be extinguished without a distribution in exchange therefor (e.g., holders of Coram Equity Interests).

The following summary is based on the Tax Code, Treasury Regulations promulgated thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effects and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR EQUITY INTERESTS. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

A.      Consequences to the Debtors

Coram and its consolidated subsidiaries (the "Coram Group") reported approximately $159.3 million of net operating loss ("NOL") carryforwards for federal income tax purposes as of December 31, 2000, all or part of which are subject to existing limitations on use (see discussion below, and Exhibit C, note 9, to the Debtors' Consolidated Annual Reports on Form 10-K for the fiscal year ended December 31, 2000). CHC had no reported NOL carryforwards as of December 31, 2000. The Debtors expect the Coram Group to incur additional losses for its taxable year ending September

75

30, 2001. The amount of the Coram Group's NOL carryforwards and other losses remain subject to adjustment by the IRS.

> 1.    Existing Limitations on NOL Carryforwards And Other Tax Attributes

A portion of the Coram Group's existing NOL carryforwards are subject to limitations as discussed at Exhibit C, note 9, to the Debtors' Consolidated Annual Reports on Form 10-K for the fiscal year ended December 31, 2000. As indicated therein, the Coram Group underwent an "ownership change" within the meaning of Section 382 of the Tax Code as a result of the Note Exchange which occurred on December 29, 2000 pursuant to a Bankruptcy Court order.

Under Section 382, if a corporation undergoes an ownership change and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is, in general, subject to an annual limitation. Such limitation also may apply to certain losses or deductions which are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change that are subsequently recognized.

In general, the amount of the annual limitation to which a corporation (or a consolidated group) would be subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (5.39% for ownership changes occurring in December 2000). For a corporation in bankruptcy and, as in the case of the Coram Group, the common parent is in bankruptcy, and that undergoes the ownership change pursuant to an order of the Bankruptcy Court or a confirmed plan, the stock value generally is determined immediately after (rather than before) the ownership change, and certain adjustments that ordinarily would apply do not apply.

Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

As indicated above, Section 382 can operate to limit built-in losses recognized subsequent to the date of the ownership change. If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then any built-in losses recognized during the following five years (up to the amount of the original built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation. Conversely, if the loss corporation (or consolidated

76

group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors believe that the Coram Group likely was in a net unrealized built-in loss position on December 29, 2000, the date of the ownership change.

An exception to the foregoing annual limitation (and built-in gain and loss) rules generally applies where qualified (so-called "old and cold") creditors of the debtor receive at least 50% of the vote and value of the stock of the debtor pursuant to an order of the Bankruptcy Court or a confirmed chapter 11 plan, unless the debtor elects otherwise. Under this exception, a debtor's pre-change losses are not limited on an annual basis but are reduced by the amount of any interest deductions claimed during the three years preceding the effective date of the debt-for-stock exchange, and during the part of the taxable year prior to and including the exchange, in respect of the debt converted into stock in the bankruptcy. Moreover, if this exception applies, any further ownership change of the debtor within a two-year period will preclude the debtor's utilization of any pre-change losses at the time of the subsequent ownership change against future taxable income.

The Debtors believe that the receipt of Coram preferred stock by the holders of Series A Notes and Series B Notes pursuant to the Note Exchange qualifies for this exception. The statute does not address whether this exception can be applied on a consolidated basis or only on a separate company basis. Accordingly, it is possible that only any pre-change losses attributable to Coram itself (rather than to the other members of the Coram Group) may be able to benefit from this exception. If the exception were applicable only to Coram itself, it appears that the pre-change losses attributable to the other members of the Coram Group would be subject to the annual limitation rules described above determined as if Coram had not qualified for this exception.

Although Coram currently intends to avail itself of this exception (on a consolidated basis), it may, if it so desires, elect not to have the exception apply and instead remain subject to the annual limitation and built-in gain and loss rules described above. Such election would have to be made in Coram's federal income tax return for the taxable year in which the Note Exchange occurred.

2.    Additional Alternative Minimum Tax Limitations

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of Section 382 and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. The application of this provision to Coram is unaffected by whether Coram otherwise qualifies for the special bankruptcy exception to the annual limitation (and built-in gain and loss) rules of Section 382 discussed in the preceding section.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

3.    Cancellation of CHC Debt

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes –such as NOL carryforwards and current year NOLs, tax credits, and tax basis in assets– by the amount of any cancellation of debt ("COD"). COD is the amount by which the indebtedness discharged exceeds any consideration given in exchange therefor. To the extent the amount of COD exceeds the tax attributes available for reduction, the remaining COD is simply forgiven. Any reduction in tax attributes does not effectively occur until the first day of the taxable year following the year the COD is realized.

As a result of the discharge of Allowed CHC General Unsecured Claims pursuant to the Plan, it is anticipated that CHC will incur approximately $5,000,000 of COD. Because CHC will have no remaining assets following implementation of the Plan, the cancellation of the COD is not expected to result in the reduction of any tax attributes or the occurrence of any tax cost for federal income tax purposes.

B.    **Consequences to Holders of Allowed CHC General Unsecured Claims**

Pursuant to the Plan, holders of the Allowed CHC General Unsecured Claims (Class CHC 2 Claims) will be entitled to receive one or more cash payments in satisfaction of their Claims.

78

1.    Gain or Loss

In general, each holder of an Allowed CHC General Unsecured Claim will recognize gain or loss in an amount equal to the difference between (i) the amount of cash received by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest and any amounts treated as imputed interest with respect to distributions received after the Effective Date as a result of the disallowance of Disputed Claims) and (ii) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest).

Additional distributions to holders of Allowed CHC General Unsecured Claims may be made after the Effective Date as a result of the disallowance of Disputed Claims. See "Treatment of the Unsecured Claims Reserve," below. Accordingly, the imputed interest provisions of the Tax Code may apply to treat a portion of such distribution as imputed interest. In addition, because additional distributions may be made to holders of Allowed CHC General Unsecured Claims after the initial distribution, any loss, and a portion of any gain, realized by a holder will be deferred until all such subsequent distributions are made.

Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount and whether and to what extent the holder had previously claimed a bad debt deduction. A holder which purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

Pursuant to the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and to the extent thereon and thereafter to the remaining portion of such Claim, if any. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent that any amount received by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.

2.    Treatment of the Unsecured Claims Reserve

79

Pursuant to the Plan, any amounts not distributable pending resolution of CHC General Unsecured Claims which are Disputed Claims will be retained in the Unsecured Claims Reserve, in which the Debtors will have no interest.

Under Section 468B(g) of the Tax Code, amounts earned by an escrow account, settlement fund, or similar fund must be subject to current tax. Although certain Treasury Regulations have been issued under this section, no Treasury Regulations have as yet been promulgated to address the tax treatment of accounts in a bankruptcy setting. Thus, depending on the facts, such accounts possibly could be treated as a separately taxable trust, as a grantor trust treated as owned by the holders of Claims or by the Debtors, or otherwise. On February 1, 1999, the IRS issued a proposed Treasury Regulation that would establish, if finalized in its current form, the tax treatment of reserves of a type similar to that here involved that are established after the date such Treasury Regulation becomes final. In general, such Treasury Regulation would tax such a reserve as a "qualified settlement fund" governed by Treasury Regulation Section 1.468B-1 et seq. Qualified settlement funds are subject to a separate entity level tax. As to previously established accounts or reserves, the proposed Treasury Regulation provides that the IRS would not challenge any reasonable, consistently applied method of taxation for income earned by the escrow, and any reasonable, consistently applied method for reporting such income.

Pursuant to the Plan, and subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Plan Administrator of a private letter ruling if the Plan Administrator so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Administrator), the Plan Administrator shall as to amounts retained in the Unsecured Claims Reserve in respect of Disputed Claims, (i) treat the Unsecured Claims Reserve as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each CHC General Unsecured Claim that is a Disputed Claim, in accordance with the trust provisions of the Tax Code (Sections 641 et seq.) and (ii) to the extent permitted by applicable law, report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties (including holders of CHC General Unsecured Claims which are Disputed Claims) are required to report consistently with such treatment. Accordingly, subject to issuance of definitive guidance, the Plan Administrator will report on the basis that any amounts earned by the CHC Unsecured Claims Reserve are subject to a separate entity level tax, except to the extent such earnings are distributed during the same taxable year. In such event, any amounts earned by the CHC Unsecured Claims Reserve that are distributed to a holder during the same taxable year will be includable in such holder's gross income.

Each holder is urged to consult its tax advisor regarding the potential consequences of the Plan to it, including the tax treatment of the Unsecured Claims Reserve.

C.    **Consequences to Holders of Allowed Coram Notes Claims, Allowed Coram Preferred Stock Interests, and Allowed CHC Notes Claims**

Pursuant to the Plan, holders of Allowed Coram Notes Claims (Sub-Class Coram 3A) will be entitled to receive New Secured Notes in satisfaction of their Claims and, as holders of Allowed CHC Note Claims (Class CHC 3 Claims), potentially may receive cash in satisfaction of their Claims; holders of Allowed Coram Preferred Stock Interests (Sub-Class Coram 3B) will be entitled to receive New Coram Stock and New Secured Notes in satisfaction of their Equity Interests.

The following discussion assumes that (i) the respective distributions provided for with respect to the Allowed Coram Notes Claims and the Allowed Preferred Stock Interests will be respected for federal income tax purposes, even though such Claims and Equity Interests may be held by the same persons and (ii) that for federal income tax purposes, any amounts received by a holder in respect of an Allowed CHC Notes Claim will be treated as received in respect of such holder's Allowed Coram Notes Claim, since such amounts are payable in respect of the same underlying debt and in CHC's capacity as guarantor.

1.    Allowed Coram Note Claims

In general, each holder of an Allowed Coram Note Claim will recognize gain or loss in an amount equal to the difference between (i) the sum of the "issue price" of any New Secured Notes and the amount of any cash received in satisfaction of such Claim (other than any Claim for accrued but unpaid interest and (ii) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). See "Interest and Original Issue Discount on the New Secured Notes," below.

Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount and whether and to what extent the holder had previously claimed a bad debt deduction. A holder which purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

Pursuant to the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and to the extent thereon and thereafter to the remaining portion of such Claim, if any. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent that any amount

received by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in its gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.

A holder's aggregate tax basis in any New Secured Notes received in respect of any Allowed Coram Note Claim will equal the issue price of such notes, and the holding period for such Notes generally will begin the day following the issuance of such notes.

2.    Allowed Coram Preferred Stock Interests

The receipt of New Coram Stock in partial satisfaction of an Allowed Preferred Stock Interest will constitute a "recapitalization" for federal income tax purposes. Accordingly, in general, the holder of such Equity Interest will not recognize loss upon such exchange, but will recognize gain, if any, to the extent of any non-stock consideration received by such holder. The amount of gain realized, if any, generally will be an amount equal to the difference between (i) the "amount realized" by the holder and (ii) the holder's adjusted tax basis in its Equity Interest. The "amount realized" by a holder will equal the sum of the fair market value of any New Coram Stock and the "issue price" of any New Secured Notes received in satisfaction of its Allowed Coram Preferred Stock Interest. See "Interest and Original Issue Discount on New Secured Notes," below.

All or part of any gain recognized by a holder may be treated as ordinary income. Any gain recognized by a holder will be treated as ordinary income in the following cases: (i) to the extent of the holder's ratable share of Coram's accumulated earnings and profits (however, Coram does not anticipate that the Coram Group will have accumulated earnings and profits); (ii) to the extent that the holder claimed any bad debt or ordinary loss deductions (or additions to a bad debt reserve) with respect to the portion of the Series A Notes and the Series B Notes exchanged for the Coram preferred stock; (iii) with respect to a cash basis holder, to the extent of any amounts which would have been included in its gross income if the exchanged notes had been satisfied in full but which was not included by reason of the cash method of accounting; and (iv) in the event the exchanged notes were acquired at a "market discount" and the exchange of the notes for the Coram preferred stock qualified as a tax-free recapitalization, possibly to the extent of any accrued market discount not previously included in income. See "Subsequent Sale of New Common Stock," below. In general, any remaining gain will be treated as capital gain, assuming the preferred stock is held as a capital asset, but will be short term capital gain assuming the Effective Date occurs on or before December 28, 2001 (except to the extent the preferred stock was acquired in a tax-free recapitalization).

A holder's aggregate tax basis in the New Coram Stock received in respect of any Allowed Preferred Stock Interest will equal the holder's aggregate adjusted tax basis in such Equity Interest, increased by any gain recognized in respect of such Equity Interest and decreased by any cash and other non-stock consideration

82

received. In general, the holder's holding period for the New Coram Stock received will include the holder's holding period for its Equity Interest. A holder's aggregate tax basis in any New Secured Notes received will equal the "issue price" of such notes, and the holding period for such generally will begin the day following the issuance of such notes.

3.    Interest And Original Issue Discount on The New Secured Notes

Pursuant to the Plan, interest on the New Secured Notes generally will be payable quarterly at a rate of 9% per annum. Stated interest on the New Secured Notes should be includable in income by a holder in accordance with such holder's method of accounting.

In addition, under certain circumstances, holders of New Secured Notes may be required to recognize imputed interest to the extent such New Secured Notes are treated as issued with original issue discount ("OID"). In general, a debt instrument is treated as having OID to the extent its "stated redemption price at maturity" (in this case, the stated principal amount of the New Secured Notes) exceeds its "issue price." The "issue price" of the New Secured Notes will depend upon whether they are considered traded on an "established securities market" during the sixty day period ending thirty days after the Effective Date. If, as the Debtors anticipate, the New Secured Notes are not traded on an established securities market, the "issue price" of the New Secured Notes will be their stated principal amount, assuming the stated interest rate of 9% is greater than the applicable federal rate for four-year obligations in effect on the Confirmation Date (4.9% compounded quarterly, for August 2001). In such event, there would be no OID in respect of the New Secured Notes. If the New Secured Notes are traded on an established securities market, the "issue price" will be their fair market value, with any OID determined accordingly.

Pursuant to Treasury Regulations, an "established securities market" includes a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions.

In general, if the New Secured Notes are treated as issued with more than a de minimis amount of OID, each holder would be required to accrue the OID in respect of its New Secured Notes, and include such amount in gross income as interest, over the term of such notes based on the constant interest method. Accordingly, each holder generally would be required to include amounts in gross income in advance of the payment of cash in respect of such income. A holder's tax basis in a New Secured Note would be increased by the amount of any OID included in income and reduced by any cash payments (other than payment of stated interest) made with respect to such New Secured Note.

4.    Subsequent Sale of New Coram Stock

83

B399

Any gain recognized by a holder of a Coram Preferred Stock Interest upon a subsequent taxable disposition of New Coram Stock received pursuant to the Plan generally will be treated as ordinary income to the same extent that such holder would have recognized ordinary income upon a taxable disposition of the Coram preferred stock under similar circumstances.

Accordingly, any gain recognized by a holder upon a subsequent taxable disposition of New Coram Stock received pursuant to the Plan (or any stock or property received for it in a later tax-free exchange) will be treated as ordinary income to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the portion of its Series A Notes and Series B Notes exchanged for Coram preferred stock in the Note Exchange and any ordinary loss deductions incurred upon such exchange, less any income (other than interest income) recognized by the holder upon such exchange or the exchange of the Coram preferred stock for New Coram Stock pursuant to the Plan, and (ii) with respect to a cash-basis holder, also any amounts which would have been included in its gross income if the exchanged notes had been satisfied in full but which was not included by reason of the cash method of accounting.

In addition, the Treasury Department is expected to promulgate regulations that will provide that any accrued "market discount" not treated as ordinary income upon a tax-free exchange of market discount bonds would carry over to the nonrecognition property received in the exchange. If such regulations are promulgated and effective as of December 29, 2000 (and possibly even without the issuance of regulations), any accrued market discount that existed with respect to the portion of a holder's Series A Notes or Series B Notes exchanged in the Note Exchange would carry over to any Coram preferred stock received as part of a tax-free recapitalization. In such event, any gain recognized upon a subsequent disposition of any New Coram Stock received by a holder in exchange for such preferred stock would be treated as ordinary income to the extent of any accrued market discount not previously included in income. In general, a note has accrued market discount if the note was acquired after its original issuance at a discount to its adjusted issue price.

D.    **Consequences to Holders of Certain Equity Interests**

84

B400

Pursuant to the Plan, holders of the Allowed CHC Equity Interests (Class CHC 4 Interests) may be entitled to cash payments in satisfaction of their Equity Interests if such holders as a Class vote to accept the Plan.

### 1.    Gain or Loss

In general, each holder of an Allowed CHC Equity Interest will recognize gain or loss in an amount equal to the difference between (i) the amount of cash received by the holder and (ii) the holder's adjusted tax basis in its Equity Interest. If the holder of an Allowed CHC Equity Interest holds its Equity Interest as a capital asset, such gain or loss will be capital gain or loss, and will be long-term capital gain or loss if held for more than one year at the Effective Time. Because additional distributions may be made to holders of Allowed CHC Equity Interests after the initial distribution, any loss, and a portion of any gain, realized by a holder will be deferred until all such subsequent distributions are made.

### 2.    Treatment of the CHC Equity Reserve

Pursuant to the Plan, any amounts not distributable pending resolution of any Absolute Priority Litigation will be retained in the CHC Equity Interests Reserve, in which the Debtors will have no interest.

Under Section 468B(g) of the Tax Code, amounts earned by an escrow account, settlement fund, or similar fund must be subject to current tax. Although certain Treasury Regulations have been issued under this section, no Treasury Regulations have as yet been promulgated to address the tax treatment of accounts in a bankruptcy setting. Thus, depending on the facts, such accounts possibly could be treated as a separately taxable trust, as a grantor trust treated as owned by the holders of CHC Equity Interests or by the Debtors, or otherwise. On February 1, 1999, the IRS issued a proposed Treasury Regulation that would establish, if finalized in its current form, the tax treatment of reserves of a type similar to that here involved that are established after the date such Treasury Regulation becomes final. In general, such Treasury Regulation would tax such a reserve as a "qualified settlement fund" governed by Treasury Regulation Section 1.468B-1 et seq. Qualified settlement funds are subject to a separate entity level tax. As to previously established accounts or reserves, the proposed Treasury Regulation provides that the IRS would not challenge any reasonable, consistently applied method of taxation for income earned by the escrow, and any reasonable, consistently applied method for reporting such income.

Pursuant to the Plan, and subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Plan Administrator of a private letter ruling if the Plan Administrator so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Administrator), the Plan Administrator shall

as to amounts retained in the CHC Equity Reserve pending resolution of any Absolute Priority Litigation, (i) treat the CHC Equity Reserve as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each CHC Equity Interest, in accordance with the trust provisions of the Tax Code (Sections 641 et seq.) and (ii) to the extent permitted by applicable law, report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties (including holders of CHC Equity Interests and holders of CHC General Unsecured Claims) are required to report consistently with such treatment. Accordingly, subject to issuance of definitive guidance, the Plan Administrator will report on the basis that any amounts earned by the CHC Equity Interests Reserve are subject to a separate entity level tax, except to the extent such earnings are distributed during the same taxable year. In such event, any amounts earned by the CHC Equity Interests Reserve that are distributed to a holder during the same taxable year will be includable in such holder's gross income.

**Each holder is urged to consult its tax advisor regarding the potential tax consequences of the Plan to it, including the tax treatment of the CHC Equity Reserve.**

E.    **Information Reporting and Withholding**

All distributions to holders of Allowed Claims and any Equity Interests under the Plan are subject to any applicable withholding (including employment tax withholding). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at a rate of up to 30.5%. Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

**XVI. APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS**

86

Certain holders of Allowed Claims will receive securities under the Plan. Section 1145 of the Bankruptcy Code creates certain exemptions from the registration and licensing requirements of federal and state securities laws with respect to the distribution of securities pursuant to a plan of reorganization.

### 1.     Issuance of Securities Under the Plan

Section 1145 of the Bankruptcy Code exempts the issuance of securities under a plan of reorganization from registration under the Securities Act of 1933, as amended (the "Securities Act"), and under state securities laws if three principal requirements are satisfied:  (i) the securities must be issued under a plan of reorganization by the debtor or its successor under a plan or an affiliate participating in a joint plan of reorganization with the debtor, (ii) the recipients of the securities must hold a claim against the debtor, an interest in the debtor or a claim for an administrative expense against the debtor and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property.  Although the issuance of the New Coram Stock under the Plan satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and is, therefore, exempt from registration under the Securities Act and state securities laws, under certain circumstances subsequent transfers of such securities may be subject to registration requirements under these laws.  Reorganized Coram does not presently intend to file a registration statement under the Securities Act with respect to any New Coram Stock issued pursuant to the Plan.

### 2.     Transfer of New Coram Stock

The securities to be issued pursuant to the Plan may not be freely transferred.  As a condition precedent to the effectiveness of the Plan, each member of Class Coram 3 (Allowed Coram Notes/Preferred Stock Claims) must execute the Shareholder Agreement in the form included in the Plan Supplement.  The purpose of the Shareholder Agreement is to prevent any of the holders of Allowed Coram Notes/Preferred Stock Claims who receive New Coram Stock from transferring such stock so that it becomes held, directly or indirectly, by a physician or family member of a physician, unless indirectly owned by a physician through a publicly-traded company with stockholder equity in excess of $75 million.  The purpose of these restrictions is to ensure that Reorganized Coram will remain in compliance with the Stark II law.  See discussion at section XII, above.

Resales and subsequent transactions in the new securities are exempt from registration under federal and state laws, unless the holder is an "underwriter" with respect to such securities.  Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

(i)  persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to

87

distributing any security received in exchange for such claim or interest;

(ii) persons who offer to sell securities offered under a plan for the holders of such securities;

(iii) persons who offer to buy such securities for the holders of such securities, if the offer to buy is made (a) with a view to distributing such securities or (b) under a distribution agreement; and

(iv) a person who is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

To the extent that persons deemed to be "underwriters" receive securities pursuant to the Plan, resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be "underwriters," however, may be able to sell such securities without registration, subject to the provisions of Rule 144 or Rule 148 under the Securities Act, both of which permit the public sale of securities received pursuant to the Plan by "underwriters," subject to the availability to the public of current information regarding the issuer and to volume limitations and certain other conditions.

Whether or not any particular person would be deemed to be an "underwriter" with respect to any security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any person would be an "underwriter" with respect to any security to be issued pursuant to the Plan.

DUE TO THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE NEW CORAM STOCK TO BE DISTRIBUTED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE NEW CORAM STOCK CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY TRADE SUCH SECURITIES FREELY.

### 3.    Certain Transactions by Stockbrokers

Under section 1145(a)(4) of the Bankruptcy Code, stockbrokers are required to deliver a copy of the Disclosure Statement (and supplements hereto, if any, if ordered by the Bankruptcy Court) at or before the time of delivery of securities issued under the Plan to their customers for the first 40 days after the Effective Date. This requirement specifically applies to trading and other aftermarket transactions in such securities.

### 4.    Additional Information

CHC is presently subject to the information requirements of the Securities Exchange Act of 1934, as amended, and in accordance therewith, files reports and other information with the Securities and Exchange Commission. Such reports and other information so filed can be inspected and copied at the Public Reference Room of the Securities and Exchange Commission at Judiciary Plaza, 450 Fifth Street, N.W., Washington D.C. 20549 and at the public reference facilities maintained by the Securities and Exchange Commission at 7 World Trade Center, New York, New York 10048 and Northwestern Atrium Center, Suite 1400, 500 West Madison Street, Chicago, Illinois 60661. Copies of such materials can also be obtained at prescribed rates from the Public Reference Section of the Securities and Exchange Commission at 450 Fifth Street, N.W., Washington, D.C. 20549.

Any statements contained herein concerning the provisions of any document are not necessarily complete and, in each instance, reference is made to the copy of such document for the full text thereof. Each such statement is qualified in its entirety by such reference. Certain documents referred to herein have not been attached as exhibits because of the impracticality of furnishing copies thereof to all of the Debtors' creditors. All of the exhibits and schedules to the Plan and this Disclosure Statement, and all other documents referred to herein, are available for inspection at the offices of the Debtors located at 1125 Seventeenth Street, Suite 2100, Denver, Colorado, 80202, and any other location designated by the Debtors.

## XVII. VOTING AND CONFIRMATION OF THE PLAN

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims and Allowed Interests in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Debtors have complied with applicable provisions of the Bankruptcy Code; (iv) the Debtors have proposed the Plan in good faith and not by any means forbidden by law; (v) the disclosure required by section 1125 of the Bankruptcy Code has been made; (vi) the Plan has been accepted by the requisite votes of creditors and interest holders (except to the extent that "cramdown" is available under section 1129(b) of the

Bankruptcy Code); (vii) the Plan is feasible and Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of Reorganized Coram; (viii) the Plan is in the "best interests" of all holders of Claims or Allowed Interests in an impaired Class by providing to such holders, on account of their Claims or Allowed Interests, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a liquidation under chapter 7 of the Bankruptcy Code, unless each holder of a Claim or Allowed Interest in such Class has accepted the Plan; (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date; and (x) the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time prior to Confirmation pursuant to sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtors have obligated themselves to provide such benefits.

The Debtors believe that each of these requirements have been or will be met and will seek rulings from the Bankruptcy Court to this effect at the Confirmation Hearing.

### 1.    Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only Classes of Claims and Allowed Interests that are "impaired," within the meaning of section 1124 of the Bankruptcy Code, under the Plan are entitled to vote to accept or reject the Plan. A Class is impaired if the legal, equitable or contractual rights to which the Claims or Allowed Interests of that Class entitle the holders of such Claims or Allowed Interests are modified, other than by curing defaults and reinstating the debt or by payment in full in cash.

The Plan divides creditors and equity holders of the Debtors into various Classes and provides separate treatment for each Class. Under the Plan, only holders of Claims that are Allowed Claims or holders of Allowed Equity Interests as of the Confirmation Date, in impaired Classes receiving or potentially receiving distributions under the Plan are entitled to vote to accept or reject the Plan. Classes CHC 2, CHC 3, CHC 4 and Coram 3 are impaired under the Plan and can receive distributions under the Plan. The Debtors will therefore solicit votes from holders of Claims or Equity Interests, as the case may be, in those Classes. Holders of Allowed Interests in Class Coram 4 will receive no distributions under the Plan and are not entitled to vote on the Plan. The classification of Claims and Allowed Interests is summarized in "Overview of the Plan -- Summary of Classes and Treatment" and discussed in detail in "General Information Regarding The Plan -- Classification and Treatment of Claims and Allowed Interests." Additional information regarding voting is contained in the instructions accompanying the Ballots.

90

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may estimate and temporarily allow a Claim for the purpose of voting on the Plan. The Debtors may seek an order of the Bankruptcy Court temporarily allowing, for voting purposes only, certain Disputed Claims. See "Provisions Covering Distributions Under the Plan -- Disputed Claims."

VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM OR EQUITY INTEREST ENTITLED TO VOTE ON THE PLAN IS IMPORTANT. IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS, YOU MAY RECEIVE MORE THAN ONE BALLOT. YOU SHOULD COMPLETE, SIGN AND RETURN EACH BALLOT YOU RECEIVE. PLEASE FOLLOW CAREFULLY THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT.

TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED BY ___ P.M., NEW YORK TIME, ON _____, 2001, AT THE ADDRESS SET FORTH ON THE ENCLOSED PRE-ADDRESSED ENVELOPE. IT IS OF THE UTMOST IMPORTANCE TO THE DEBTORS THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN. THE DEBTORS SUPPORT THE PLAN AND ENCOURAGE YOU TO VOTE IN FAVOR OF THE PLAN.

VOTES CANNOT BE TRANSMITTED ORALLY. ACCORDINGLY, YOU ARE URGED TO RETURN YOUR SIGNED AND COMPLETED BALLOT PROMPTLY.

IF ANY OF THE CLASSES OF IMPAIRED CLAIMS OR EQUITY INTERESTS VOTE TO REJECT THE PLAN, THE DEBTORS SHALL SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AND, IF REQUIRED, SHALL AMEND THE PLAN TO THE STANDARDS OF SUCH SECTION.

IF YOU HAVE A CLAIM OR EQUITY INTEREST THAT IS IMPAIRED UNDER THE PLAN AND YOU ARE ENTITLED TO VOTE, BUT YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT OR LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT OR THE PLAN, PLEASE CONTACT THE DEBTORS' BALLOTING AGENT, MONGER & CONSULTANTS, L.P., AT (214) 227-1155.

2.    **Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing regarding whether the Plan and Debtor have fulfilled the Confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for _____, 2001, at ___ a.m. before the Honorable Mary F.

91

Walrath, United States Bankruptcy Judge at the United States Bankruptcy Court, District of Delaware, 824 Market Street, 5th floor, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement in court at the Confirmation Hearing of the date to which the Confirmation Hearing has been adjourned.

### 3.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. See "Voting and Confirmation."

### 4.    Acceptance or Cramdown

A plan is accepted by an impaired class of Claims if holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of Claims of that Class vote to accept the plan. A plan is accepted by an impaired class of Interests if holders of at least two-thirds (⅔) in amount of the allowed interests of such class vote to accept the plan. Only those holders of Claims or Allowed Interests who actually vote count in these tabulations.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a Claim or Allowed Interest in an impaired Class or that the plan otherwise be found by the Bankruptcy Court to be in the "best interests" of each holder of a Claim or Allowed Interest in such Class. See "Voting and Confirmation of the Plan -- Best Interests Test." In addition, each impaired class must accept the Plan for the Plan to be confirmed without application of the "cramdown" provisions in section 1129(b) of the Bankruptcy Code discussed below.

The Bankruptcy Code contains provisions authorizing the Confirmation of the Plan even if it is not accepted by all impaired classes, as long as at least one impaired Class of Claims or Allowed Interests (without including any acceptance of the Plan by any insider) has accepted it. These "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code. The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 1129 of the Bankruptcy Code, it (i) is "fair and equitable" and (ii) "does not discriminate unfairly" with respect to each Class of Claims or Allowed Interests that is impaired under, and has not accepted, the Plan. The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured Class of Claims or a Class of Allowed Interests receives full compensation for its allowed Claims or Allowed Interests, no holder of Claims or Allowed Interests in any junior Class may receive or retain any property on account of such Claims. With respect to a dissenting class of secured Claims, the "fair and equitable" standard is met if holders either (i) retain their liens and receive deferred cash payments with a value as of the

92

Plan's Effective Date equal to the value of their interest in property of the Estate or (ii) otherwise receive the indubitable equivalent of their secured Claims. The "fair and equitable" standard has also been interpreted to prohibit any Class senior to a dissenting Class from receiving under a Plan 100% of its Allowed Claims. The requirement that a Plan not "discriminate unfairly" means, among other things, that a dissenting Class must not be treated dissimilarly with respect to other Classes of equal rank.

In view of the treatment proposed for such Classes and the "absolute priority" model adopted by the Debtors, the Debtors believe that, if necessary, the Plan may be crammed down over the dissent of any of the Classes in the Plan, (other than Class CHC 3 and Class Coram 3). If necessary and appropriate, the Debtors intend to amend the Plan to permit cramdown of dissenting Classes of Claims or Equity Interests.

The Debtors believe that the treatment under the Plan of Holders of Allowed Interests in Class CHC 4 will satisfy the "fair and equitable" test because, even in the event no distribution will be made in respect of such Allowed Interests (because Class Coram CHC 4 has failed to vote accept the Plan), no Class junior to such non-accepting Class will receive or retain any property under the Plan. In addition, the Debtors believe that the treatment accorded the holders of Secured Claims under the Plan is both fair and equitable, leaves such holders unimpaired with respect to the portions of their Claims that are Secured Claims, and specifically meets the requirements of section 1129(b) of the Bankruptcy Code. Accordingly, if Class CHC 1, or Coram 1 fail to accept the Plan, the Debtors believe that the Plan nevertheless will be confirmed as to the Secured Claims under the cramdown provisions of section 1129(b) of the Bankruptcy Code. The Debtors also believe that the treatment accorded the holders of Allowed CHC General Unsecured Claims, Allowed CHC Equity Interests, Allowed Coram Notes/Preferred Stock Claims, and Allowed Coram General Unsecured Claims (which are unimpaired) under the Plan does not discriminate unfairly, is fair and equitable and specifically meets the requirements of section 1129(b) of the Bankruptcy Code (i.e., junior classes receive no recovery on account of their junior claims and/or interests, but only, where applicable, on account of a voluntary redistribution of value by a senior class from such senior class to the junior class). Accordingly, if any Class other than Class Coram 3 fails to accept the Plan, the Debtors believe that the Plan nevertheless will be confirmed under the cramdown provisions of section 1129(b) of the Bankruptcy Code.

In the event Class CHC 2 votes to reject the Plan and Class CHC 4 votes to accept the Plan, the Debtors believe that the treatment of Class CHC 2 will, among other things, satisfy the "absolute priority rule" under applicable law and the Plan will be confirmable. If necessary the Debtors will make this argument at the Confirmation Hearing. If the Debtors are successful in this argument, the entire Allowed Equity Interest Consideration will be available for distribution to Class CHC 4. However, if the Debtors are unsuccessful in this argument, in order to satisfy the "absolute priority" rule, the Plan provides that the CHC Equity Interest Consideration (together with the CHC General Unsecured Consideration) will first be available to pay

holders of Allowed Claims in CHC 2 with the balance, if any, available to pay holders of Allowed Claims in CHC 4.

In the event that any Class votes to reject the Plan, the Debtors intend to use the consents obtained from other Classes to confirm the Plan over the dissent of these Classes and, in this regard, the Plan specifically requests that the Bankruptcy Court confirm the Plan notwithstanding the dissent of any impaired Class of Claims.

Subject to the conditions set forth in the Plan, a determination by the Bankruptcy Court that the Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code will not limit or affect the Debtors' ability to modify the Plan to satisfy the confirmation requirements of section 1129 of the Bankruptcy Code.

### 5.    Best Interests Test

The "best interests" test requires that the bankruptcy court find either that all members of each impaired class have accepted the plan, or that each holder of an allowed claim or interest of each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that the holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on that date.

To calculate what holders of Claims and Allowed Interests would receive if the Debtors were hypothetically liquidated under chapter 7 of the Bankruptcy Code, the Court must first determine the dollar amount that would be realized from the liquidation (the "Liquidation Fund") of the Debtors. The Liquidation Fund would consist of the net proceeds from the disposition of the Debtors' assets (after satisfaction of all valid liens) augmented by the Cash held by the Debtors and recoveries on actions against third parties, if any. The Liquidation Fund would then be reduced by the costs of the liquidation. The costs of liquidation under chapter 7 would include the fees and expenses of a trustee, as well as those of counsel and other professionals that might be retained by the trustee, selling expenses, any unpaid expenses incurred by the Debtors during their cases (such as fees for attorneys, financial advisors and accountants) which would be allowed in the chapter 7 proceeding, interest expense on secured debt and claims incurred by the Debtors during the pendency of the case. These claims would be paid in full out of the Liquidation Fund before the balance of the Liquidation Fund, if any, would be made available to holders of unsecured Claims. In addition, other claims which would arise upon conversion to a chapter 7 case (e.g., damage claims for termination of contracts, including real property leases assumed in the chapter 11 Cases and executory contracts entered into during the chapter 11 Cases, and the costs of lengthy litigation related to certain of these claims) would dilute the balance of the Liquidation Fund available to holders of Claims. Moreover, additional claims against the Debtors' estates may be filed as the result of the establishment of a new bar date for the filing of claims in chapter 7 cases for the Debtors. The present value of the distributions out of the Liquidation Fund (after deducting the amounts described above) are then compared with

94

the present value of the property offered to each of the Classes of Claims and Holders of Interests under the Plan to determine if the Plan is in the best interests of each holder of a Claim.

The Debtors believe that a chapter 7 liquidation of the Debtors' remaining assets would result in diminution in the value to be realized under the Plan by holders of Claims and Allowed Interests. That belief is based upon, among other factors: (a) the additional administrative expenses involved in the appointment of a trustee, attorneys, accountants, and other chapter 7 professionals; (b) the substantial time which would elapse before creditors and holders of Equity Interests would receive any distribution in respect of their Claims and Allowed Interests due to a trustee's need to become familiar with the reorganization Cases and the Debtors' books and records, and his duty to conduct his own investigations; (c) the additional unsecured Claims that may be asserted against the Debtors; (d) the substantial cost and delay which can be avoided by a largely consensual plan; (e) the potential for lower returns on the Debtors' assets in a chapter 7 proceeding, as compared to the value of such assets to Reorganized Coram; (f) the disruption related to a change in management and other personnel, including the time and resources needed to train replacement managers and employees; (g) turmoil in the enormous and complex record keeping and information systems involved in the Debtors' business; (h) the potential for diminished recoveries on any causes of action of the Debtors, given the potential difficulties in managing related legal actions and marshaling and presenting required evidence without the presence of any members of the Debtors prior management; and (i) the fact that the potential settlements recommended in the Goldin Report would not be implemented.

The Debtors' liquidation analysis is annexed hereto as Exhibit F.

6.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). For purposes of determining whether the Plan meets this requirement, the Debtors' management analyzed the Reorganized Debtors' future prospects and its ability to meet its respective obligations under the Plan, as well as the projections set forth in the Goldin Report prepared for Reorganized Coram for the years ending December 31, 2001 through December 31, 2005 (the "Projections"). The Projections, and the significant assumption upon which they are based, are included below. Based on the Projections, the Debtors believe that Confirmation is not likely to be followed by the liquidation or further financial reorganization of the Reorganized Debtors.

The Projections include:

(a)      Significant Assumptions;

95

B411

(b)     Projected Pro Forma Consolidated Balance Sheets;

(c)     Projected Pro Forma Consolidated Statements of Operations

(d)     Projected Pro Forma Consolidated Statements of Cash Flows; and

(e)     Projected Pro Forma Capitalization.

The Projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and that the Effective Date of the Plan will be no later than November 30, 2001. Based upon the Projections, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Debtors.

The Debtors' management believes that Goldin's projections may utilize assumptions, including growth rates that are overly optimistic and differ with the Debtors' own internal projections. For purposes of reference, management's projections are attached hereto as Exhibit I.

7.     **Compliance with the Applicable Provisions of the Bankruptcy Code**

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. During the course of management analyses leading to the formulation of the Plan, various legal issues were raised. The Debtors have considered each of these issues in the development of the Plan and believe that the Plan complies with all applicable provisions of the Bankruptcy Code.

8.     **Alternatives to Confirmation and Consummation of the Plan**

The Debtors have evaluated alternatives to the Plan, including alternative Plan structures and terms; including the sale of the Debtors' subsidiaries as a going concern, either as a whole or on a breakup basis; the liquidation of Coram; and delaying the adoption of any plan of reorganization. The Debtors have concluded that the Plan is the best alternative and will maximize recoveries by holders of Allowed Claims and Equity Interests. If the Plan is not confirmed, the Debtors or, subject to further determination by the Bankruptcy Court as to an extension of the Debtors' exclusivity periods under the Bankruptcy Code, any other party-in-interest could attempt to formulate and propose a different plan or plans of reorganization. However, for the reasons discussed in sections III. C. and XII above, the Debtors believe that if their Plan is not confirmed by or before December 31, 2001, the value that might be realized by holders of Allowed Claims and Equity Interests will be dramatically lower under any alternative scenario, including liquidation. Further, if no plan of reorganization can be

96

confirmed the Debtors' chapter 11 cases may be converted to a chapter 7 case or the Debtors may otherwise be liquidated pursuant to a liquidating plan of reorganization under chapter 11. In a liquidation case under chapter 7, the proceeds of the liquidation would be distributed to the respective creditors of the Debtors in accordance with the priorities established by the Bankruptcy Code and contractual priorities, and the Debtors believe holders of Allowed Claims and Equity Interests, other than holders of Allowed Administrative and other Priority Claims, would receive no material distributions whatsoever. Accordingly, the Debtors believe that Confirmation and consummation of the Plan is preferable to any alternatives described above.

## XVIII. PROJECTIONS

### 1.    Purpose of the Projections

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of Reorganized Coram. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management has analyzed Goldin's evaluation of the ability of the Debtors to meet their obligations under the Plan. Goldin has developed projections of earnings and working capital, and the Debtors have developed pro forma balance sheets and cash flow statements for the five year period beginning January 1, 2001. (Goldin's projections and the Debtors' projections are not consistent with each other because they are based upon different assumptions, including growth rates assumed by Goldin that the Debtors believe may be overly optimistic.)

The Projections, annexed hereto as Exhibit E, should be read in conjunction with the assumptions, qualifications, and footnotes to tables containing the Projections set forth herein, the historical consolidated financial information (including the notes and schedules thereto) and the other information set forth in the Annual Report on Form 10-K and the Quarterly Report on Form 10-Q annexed hereto as Exhibits C and D, respectively, the full texts of which are incorporated herein by reference. Goldin prepared its Projections as an independent third party acting pursuant to the scope of its court-ordered retention. The Debtors' management, however, believes Goldin's projections may utilize assumptions, including growth rates, that are overly aggressive, and in that respect differ from the Debtors' own internal projections. However, the Debtors believe Goldin's projections were developed in good faith.

**The Projections were not prepared with a view to complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants. The Debtors' independent accountants have not compiled or examined the accompanying prospective financial information to determine the reasonableness thereof and, accordingly, have not expressed any opinion or any other form of assurance with respect thereto.**

97

The Debtors do not, as a matter of course, publish their business plans and strategies or projections of their anticipated financial position, results of operations or cash flows. Accordingly, the Debtors do not intend, and disclaim, any obligation to (a) furnish updated business plans or Projections to holders of Claims or Equity Interests prior to the Effective Date or to holders of New Coram Stock or any other party after the Effective Date, (b) include such updated information in any documents which may be required to be filed with the sec, or (c) otherwise make such updated information publicly available.

The pro forma profit and loss statements in the Disclosure Statement have been prepared by Goldin. The balance sheets and statements of cash flow in the disclosure statement have been prepared by the Debtors. These projections, while presented with numerical specificity, are necessarily based upon a variety of estimates and assumptions, which may not be realized, and are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond control. The Debtors caution that no representations can be made as to the accuracy of these financial projections or to the ability of Reorganized Coram to achieve the projected results. Some assumptions inevitably will not materialize, and events and circumstances occurring subsequent to the date on which these projections were prepared may be different from those assumed, or may be unanticipated and thus may affect financial results in a material and possibly adverse manner. The Projections, therefore, may not be relied upon as a guaranty or other assurance of the actual results that will occur.

2.    Summary of Significant Assumptions

a.    Effective Date and Plan Terms

The Projections assume an Effective Date of no later than November 30, 2001, with Allowed Claims and Allowed Equity Interests treated in accordance with the treatment provided in the Plan with respect to such Allowed Claims and Allowed Equity Interests. The Projections included herein presume that Class CHC 2 will vote in favor of the plan and receive a distribution of $3.0 million in complete satisfaction of its claims, and that Class CHC 4 will also vote in favor of the Plan and receive $10.0 million in satisfaction and redemption of its Equity Interests.. Moreover, the projections included herein contemplate effectuation of Executive Compensation Modification as recommended by Goldin. The Projections consider the ongoing operations of Reorganized Coram and its proposed plan for managing its operations. With respect to the expenses incurred as a result of the chapter 11 Cases, management has assumed that the Debtors will confirm a chapter 11 Plan of Reorganization and emerge from Bankruptcy by November 30, 2001. If Reorganized Coram does not emerge from chapter 11 by November 30, 2001, the Debtors may be unable to confirm the Plan in the form presently proposed, may have to revise their Projections, and incur additional bankruptcy expenses because, among other reasons, the Debtors may no longer be in compliance with Stark II. See section XII "Discussion of Stark II Issues."

In such event, there will likely be a significant impact on Reorganized Coram's operations and cash flows.

### b.    Reorganized Coram's Business

Reorganized Coram (including its subsidiaries) will continue to operate its core alternate site infusion therapy business. All major management decisions concerning capital expenditures, marketing, human resource policies and other matters will be made centrally from Reorganized Coram's executive offices in Denver, Colorado.

### 3.    Reorganization Value

The Debtors have been advised by Goldin, the Independent Restructuring Advisor, with respect to the reorganization value of Reorganized Coram. The Debtors have also received an enterprise valuation from Chanin, which determined an enterprise value of approximately $204 million. Solely for purposes of the Plan, the reorganization value of Reorganized Coram was assumed by the Debtors, based upon the advice from Goldin, to be approximately $233 million, and the following discussion is based upon Goldin's advice.

THE ASSUMED REORGANIZATION VALUE AS OF APRIL 30, 2001, REFLECTS WORK PERFORMED BY GOLDIN ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO GOLDIN AS OF NOVEMBER 30, 2000. NEITHER THE DEBTORS NOR GOLDIN HAS UPDATED THE ESTIMATED RANGE OF THE REORGANIZATION ENTERPRISE VALUE TO REFLECT INFORMATION AVAILABLE TO THE DEBTORS OR GOLDIN SUBSEQUENT TO MAY 31, 2001.

Based upon Goldin's assumed reorganization enterprise value of Reorganized Coram, the Debtors have employed an imputed estimate of the reorganization equity value for Reorganized Coram of approximately $39,900,000 million, or approximately $3.99 per share of New Coram Stock (based upon an assumed distribution of ten million (10,000,000) shares of New Coram Stock under the Plan and an aggregate amount of zero (0) shares outstanding upon completion of such distribution).

The foregoing estimates of the reorganization value of Reorganized Coram are based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of Reorganized Coram's business plan, the achievement of the forecasts reflected in the Projections, expected market conditions, and the Plan becoming effective in accordance with its terms, on a basis consistent with the estimates and other assumptions discussed herein.

IN ESTIMATING THE REORGANIZATION VALUE OF REORGANIZED CORAM, GOLDIN: (I) REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS FOR RECENT YEARS AND INTERIM PERIODS; (II) REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF THE DEBTORS, INCLUDING FINANCIAL PROJECTIONS PREPARED AND PROVIDED BY MANAGEMENT RELATING TO ITS BUSINESS AND ITS PROSPECTS; (III) MET WITH CERTAIN MEMBERS OF SENIOR MANAGEMENT OF THE DEBTORS TO DISCUSS THEIR OPERATIONS AND FUTURE PROSPECTS; (IV) REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUES OF PUBLIC COMPANIES WHICH GOLDIN DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESS OF THE DEBTORS; (V) CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESS; (VI) REVIEWED CERTAIN ANALYSES PREPARED BY OTHER FIRMS RETAINED BY THE DEBTORS AND (VII) CONDUCTED SUCH OTHER STUDIES, ANALYSES INQUIRIES, AND INVESTIGATIONS AS IT DEEMED APPROPRIATE. ALTHOUGH GOLDIN CONDUCTED A REVIEW AND ANALYSES OF THE DEBTORS' BUSINESS, OPERATING ASSETS AND LIABILITIES AND REORGANIZED CORAM'S BUSINESS PLANS, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL (I) FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTORS AND BY OTHER FIRMS RETAINED BY THE DEBTORS, AND (II) PUBLICLY AVAILABLE INFORMATION. IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE, NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

ESTIMATES OF REORGANIZATION VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES WHICH MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

IN THE CASE OF REORGANIZED CORAM, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY GOLDIN REPRESENT THE HYPOTHETICAL REORGANIZATION ENTERPRISE VALUE OF REORGANIZED CORAM. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF A PLAN OF REORGANIZATION AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF REORGANIZED CORAM THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT, AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE

OF THE REORGANIZATION ENTERPRISE VALUE OF REORGANIZED CORAM SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, GOLDIN, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR ITS ACCURACY. IN ADDITION, THE VALUATION OF NEWLY-ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET VALUES OF SUCH SECURITIES WILL NOT ONLY DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES, BUT ALSO THE TRADING AND OWNERSHIP RESTRICTIONS NECESSITATED BY THE PROVISIONS OF STARK II, WHICH MAY REMAIN IN EFFECT FOR AN INDEFINITE PERIOD OF TIME.

THE ESTIMATES OF THE REORGANIZATION VALUE DETERMINED BY GOLDIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF REORGANIZED CORAM ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR REORGANIZED CORAM ASSOCIATED WITH GOLDIN'S VALUATION ANALYSIS. THE DEBTORS DO NOT NECESSARILY AGREE WITH THE ESTIMATES OF THE REORGANIZATION VALUE DETERMINED BY GOLDIN, BUT THE DEBTORS DO BELIEVE THAT GOLDIN'S ESTIMATES WERE DEVELOPED REASONABLY AND IN GOOD FAITH.

101

## XIX. RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Confirmation and consummation of the Plan is the best means available to provide the greatest level of recovery to creditors and equity security holders in accordance with their legal and contractual rights. Consequently, the Debtors urge all holders of Allowed Claims and Allowed Equity Interests to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before _____ p.m., Eastern Time, on _____, 2001.

Dated:  July 31, 2001

CORAM HEALTHCARE CORPORATION

By: *Allen Marabito*

Name:    Allen J. Marabito

Its:      Executive Vice President

CORAM, INC.

By: *Allen Marabito*

Name:    Allen J. Marabito

Its:      President

Counsel:

PACHULSKI, STANG, ZIEHL,
 YOUNG & JONES, P.C.
Laura Davis Jones
Rachel Lowy
919 North Market Street, Suite 1600
Wilmington, Delaware 19801
(302) 652-4100

- and -

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
David M. Friedman
Adam L. Shiff
Robert M. Novick
Athena F. Foley
1633 Broadway
New York, New York 10019
(212) 506-1700

CO-COUNSEL TO DEBTORS AND
DEBTORS-IN-POSSESSION