## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| CORAM HEALTHCARE CORP., | ) | Case No. 00-3299 (MFW) |
| and CORAM, INC., | ) | and Case No. 00-3300 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Related to Docket Nos. 962 |

Hearing Date:  November 5, 2001 @ 9:30 a.m.
Objection Deadline:  October 19, 2001

### EQUITY COMMITTEE OBJECTIONS TO DEBTORS'
### *SECOND* JOINT PLAN OF REORGANIZATION

The Official Committee of Equity Security Holders of Coram Healthcare Corp. (the "Equity Committee"), by its attorneys, objects to the confirmation of the Second Joint Plan of Reorganization proposed by debtors Coram Healthcare Corp. and Coram, Inc. (collectively "Coram" or "Debtors") on August 1, 2001 (the "Second Plan").

### OBJECTION – LACK OF GOOD FAITH

**Debtors' Second Plan Has Not Been Proposed In Good Faith And The Plan Proponents Have Not Acted In Good Faith. Accordingly, The Second Plan Fails To Comply With The Requirements Of Section 1129(A)(3) And Cannot Be Confirmed.**

1.      Debtors failed to confirm their First Plan[1] because Dan Crowley's loyalties as a director and CEO of Coram were divided and conflicted by his million dollar per year

---

[1]      "First Plan" refers to the Restated Joint Plan of Reorganization filed in August, 2000.  "Second Plan" refers to the Second Joint Plan of Reorganization filed in August, 2001.

442281.1 10/22/01

employment contract with Cerberus, a Noteholder, and its principal, Stephen Feinberg. As a result, this Court could not find the requisite good faith. Finding that such relationship was "an actual conflict" that "tainted" Crowley and perhaps Cerberus, this Court concluded "I just do not want my name confirming a plan where this type of activity occurred for a year before the plan was proposed for confirmation." (12/21/00 Tr. 89)

2.    Now, almost a year later, Debtors seek to confirm their Second Plan even though the same activity that caused rejection of the First Plan goes on: Cerberus and Feinberg continue to pay Crowley $80,000 every month under the same employment contract that caused this court to find "an actual conflict" that "tainted Crowley and perhaps Cerberus and the debtor itself." (12/21/00 Tr. 88)

3.    The forced disclosure of the conflict, which came only after the Equity Committee objected successfully to the First Plan, has not cured anything because Coram's Directors did nothing about the conflict. The central and most critical fact in these proceedings is that the management and operations of Coram, the generation of cash flows and the entire process that led to the proposal of the Second Plan have been essentially controlled by the Noteholders through Crowley, and not by an independent board discharging its fiduciary duty to shareholders. And so whatever was wrong on August 8, 2000, and December 21, 2000, has continued to be wrong for the past year and is wrong now.

**The Attempt to Steal the Equity Continues**

4.    What is wrong now is that Crowley continues to serve two masters whose interests are not aligned. The economic interests of the Noteholders[2] will best be served if

---

[2]    The Noteholders, in addition to Cerberus, are Goldman Sachs and Foothill.

Coram generates sufficient cash flows to pay the Noteholders – *and no more*. Then, if the Second Plan is confirmed, the Noteholders will own the Company, and Crowley can run it up to its full potential. The stockholders' interests, of course, are quite different: They want the Company to run to its full potential *now*, so that their interests can be fairly valued and not delivered to the Noteholders, whose nominee, Cerberus, continues to pay Coram's CEO, Crowley, a million dollars a year, to be Cerberus' "full time" employee.

     5.     Last December, this Court said that it could not confirm Debtors' First Plan:

> ". . . because of the process being tainted by this relationship which began in November of 1999, and perhaps in August of 1999, has so tainted the debtors' restructuring of its debt, the debtors' negotiations towards a plan, even the debtors' restructuring of its operations." (12/21/00 Tr. 88)

We now know that the relationship described by the Court has continued to this day. Debtors argue that the taint and damage caused by the conflicted relationship to Coram's restructuring and operations and the negotiation of a plan, has been removed during the last year. The evidence will show that it has not been removed, but, on the contrary, the actions of the Directors, and of Crowley and Feinberg, represent at best, conscious indifference to the dictates of this Court, and at worst, a deliberate bad faith attempt to allow Crowley to continue to operate Coram, unchecked, for his own benefit and for the benefit of his employer, Cerberus, and the other Noteholders.

     6.     In short, the Directors, Crowley and the Noteholders are asking this Court to put its name on a plan where this type of activity has continued unabated for two years.

442281.1 10/22/01

7.      To do this, Debtors invoke the conclusions of a "special committee" of "independent directors,"[3] which claims to have proposed the Second Plan only after investigating the effect of the admitted conflict on Coram.  That is what they say, but the evidence will show that these Outside Directors completely abdicated (i) their responsibility to oversee the operations and strategy of the Company to Crowley, and (ii) their responsibility to investigate, understand and deal with a profound conflict to Goldin.

**The Members of the Special Committee of Directors
Abdicated Their Responsibilities and Did Not
Discharge Their Fiduciary Duties of Care.**

8.      Shortly after December 21, 2000, the Coram Directors learned that this Court had (i) refused to confirm the First Plan because of the actual conflict of interest, and (ii) expressed a view that Crowley's "intent to hide the relationship" with Cerberus "did, in fact, taint his ability to serve as CEO of the debtor." (12/21/00 Tr. 89).  Yet, for six months or more after learning this, the Outside Directors ignored the conflict, did not increase their oversight on Crowley, took no action to enforce their own Corporate Compliance Standard on Conflicts of Interest that Crowley had clearly violated, did not know, until the Equity Committee told them during their depositions less than one month ago, that the conflict was continuing, didn't care -- and certainly never even approached the level of due care that is required of directors of a Delaware corporation in conflict situations such as this.  The only action taken by the Directors in response to this Court's findings, was to hire Goldin, whose

---

[3]      The "independent directors", who we refer to as "Outside Directors," are L. Peter Smith, William Casey, Sandra Smoley and Don Amaral.  Coram's fifth director is Dan Crowley.

advice on what action they should take in the face of this conflict was not available until six months later.

9.     Recent sworn deposition testimony[4] shows that the Outside Directors asked no questions concerning the effect of the conflict on Crowley's ability to continue to serve as CEO of Coram, did not have or consider getting an outside advisor to provide oversight to protect the Company during this period against possible adverse effects of the conflict, never asked Feinberg or Cerberus why the payments were being made, never asked Crowley whether he intended to hide the relationship, never asked Crowley to terminate his relationship with Cerberus, waited about five months before even raising the issue with Crowley *and never considered whether Coram would have done better if the conflict had not existed.*

10.     This six months of allowing Crowley to operate the Company and make strategic decisions with minimal or no oversight, was a critical part of the process that resulted in the Second Plan.   Cash flows and other drivers of value were being created during this period under the control of a tainted CEO, whose Outside Directors exercised no meaningful oversight or due care on his conflicted activities.

11.     At the end of July, 2001, the Outside Directors received the initial Goldin Report.  They purported to act in accordance with its recommendations, but it is plain enough that they did not have the smallest grasp of the most rudimentary facts relating to the conflict of interest that they had been informed of seven months before.  In September 2001, more

---

[4]     At this point, three of the four Outside Directors have been deposed.  Factual allegations in these objections reflect our information as of October 19th.  Additional discovery, including depositions of Amaral and Crowley, is scheduled before the confirmation hearing.

442281.1 10/22/01

5

than a month after they acted in alleged reliance on the Goldin Report, some or all of the three

Outside Directors who were deposed gave sworn deposition testimony that they:

- Were not aware that this Court had found an actual conflict;

- Had "no idea" whether the Company could have done better if the conflicted relationship had not existed;

- Did not know that Crowley was continuing to receive $80,000 per month from Cerberus under the same contract that had caused the problem last December and never asked;

- Had never read the Cerberus contract;

- Were not aware that the Cerberus contract provides that Crowley would lose his $1 million per year if he failed to follow Feinberg's reasonable instructions;

- Never asked Crowley (to this day) why he didn't disclose the magnitude of his financial relationship with Cerberus;

- Made no attempt to discover why or how Goldin made an error of sufficient magnitude to cause him to issue an "updated" (revised) report;

- Never received a copy of the Deloitte & Touche Report which estimated a potential value for shareholders of $23 to $77 million, or, having received it, never read it because he or she assumed it was biased.

12.     And, despite the findings of this Court and Goldin that an actual conflict existed

and was a serious breach of fiduciary duty and that the relationship plainly violated Coram's

Corporate Compliance Policy on Conflicts of Interest, some of the Directors still refuse to

admit the basic, incontrovertible fact that a conflict existed and continues to this day.  Sandra

Smoley, the Outside Director who was recommended for that role by Crowley, remarkably

takes the position that the million dollar per year relationship between Cerberus and Crowley

was not a conflict.  At the same time, she concedes that if the same relationship had existed in

the California State agency she once headed, that *would* be a conflict.  Her only distinction is

that, in her mind, "it's apples and oranges" because one is "a governmental entity and the other is publicly traded" and there is a lot less conflict in the private sector than there is in the public arena.

13.    From all of this it is clear that what the Special Committee did was rely, hook, line and sinker on conclusions in the Goldin Report, without knowing and understanding the relevant facts and without personal investigation of any sort. That does not satisfy their duty of care, and without the exercise of such care, their action in proposing the Second Plan cannot be said to be in good faith.

14.    The law is clear that merely appointing a "special committee" or "independent directors" is not enough.[5] That committee must be not only a body, but a diligent, active body. **Strassburger v. Early**, 752 A.2d 557, 567-68, 571 (Del. 2000) (refusing to accept the approval of corporate action by a special committee when that committee limited its investigation, avoided information highly relevant to the assignment and was not provided accurate information, "[c]onsequently, and with all due respect for [his] acumen as a businessman and his good intentions, his independent committee role could not and did not provide meaningful protection for the ... minority."). Further, in **Brehm v. Eisner**, 746 A.2d 244 (Del. 2000), Delaware's Supreme Court clarified the requirements of directors' duties to inform themselves in decision-making in cases even absent conflicts of interest: "in making business decisions, directors must consider all material information reasonably available." **Id.** at 259. The court was careful to make clear that "material" means "relevant and of a

---

[5]    The reported cases emphasizing the requirement that special committees must themselves investigate and understand the relevant facts and remain active participants is voluminous. The Equity Committee is prepared to furnish the Court with a Memorandum of Law covering these issues if that would be helpful to the Court.

magnitude to be important to the directors in carrying out their fiduciary duty of care in decision making." **Id.** at 259, n. 49.  Further, while utilization of an expert can provide some protection to a diligent board, the directors will still be found to have violated their fiduciary duties of care under Delaware law if, among other things, the subject matter that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice or if the decision of the Board was so unconscionable as to constitute waste or fraud…". **Id.** at 262.  The "obvious" material that was "reasonably available" is outlined in part above.  Accordingly, any attempt to prop up the Second Plan with eloquent assertions of Goldin's independence must fail because the Outside Directors still abdicated their responsibilities.

**The Goldin Report**

15.    Obviously, the Outside Directors hoped and believed that their dereliction and disregard of duty would be absolved by the Goldin Report.  But Goldin's role was to advise, not absolve, and, as set forth above, the Outside Directors are not permitted to blindly adopt his advice without diligently and actively investigating and understanding the relevant facts. As has been repeatedly affirmed by *all* parties, Goldin is *not* an examiner, he is *not* an expert on good faith whose special knowledge will assist the Court in making its determination of whether the requisite good faith exists, and his fact findings and conclusions are not entitled to any weight with this Court.

16.    In a nutshell, all that the Goldin Report does (valuation issues aside) is (i) accept the Court's conclusion that the Crowley-Cerberus relationship was a conflict of interest and "a

B426

serious breach of fiduciary duty" and (ii) conclude that he could find "no evidence" that this "serious breach" caused any damage to Coram, beyond $13 million.  (Goldin Report, 10-12)

17.    It is not surprising that Goldin found no evidence of damage, since his methodology consisted mostly of interviewing people who were accused of wrongdoing or worked for someone accused of wrongdoing, and then determining that each and everyone of these people said that either there was no wrongdoing, or, if there was wrongdoing, no damage was caused.

18.    Goldin's basic postulate appears to be that conflicts of interest in corporate governance are acceptable and should go undeterred and unpunished unless the party claiming injury (here the shareholders) sustains the burden of proving that the conflict caused damage. That sort of "it's ok as long as you don't get caught" reasoning simply is not the law.

19.    Further, Goldin's entire report is flawed because it does not examine the possibility that Coram's performance might have been even better in the absence of the conflict.  Unlike a discrete transaction that can be dissected to determine if a conflict affected the outcome, the "transaction" here involves the operations of a large company over an extended period of time.  Goldin did not examine the fundamental insidious nature of conflicts of interest in this broad context, rather his investigation was confined to determining that "there was no evidence" that the conflict caused damage.

20.    Goldin's failure to analyze Coram's performance against the performance of competitor firms – especially given that Goldin concedes that Coram was being run by someone with a serious conflict of interest – makes Goldin's conclusions entirely unreliable.

Further, the Goldin Report ignores the possibility that there were other actions that Coram chose not to take because they would have benefited stockholders, but not Noteholders.

21.    Goldin's assumption that noteholders' interests are consistent with shareholders' interests is incorrect.  Noteholders interests are never perfectly aligned with stockholders' interests, because noteholders will oppose corporate decisions that increase the risk of nonpayment, even when those decisions are expected to benefit the company and its stockholders.  As a result of Goldin's incorrect assumption regarding the relationship between noteholders' and stockholders' interests, several of Goldin's conclusions, including the conclusion that Stephen Feinberg did not have an incentive to conceal Daniel Crowley's employment agreement, are flawed.  Feinberg's parochial interests were certainly better served if the world and the Coram stockholders did not know that he was paying Crowley one million dollars a year while restructuring the debt to dilute and eventually eliminate the interests of those stockholders.

22.    That aside, the Goldin Report is replete with material errors, fundamental mistakes in methodology, unsupported conclusions and gaping omissions.  For example, *the Goldin Report, never deals with the fact that the offensive conflict continues.*  It simply is not discussed.  The very different interests of Noteholders and shareholders are denied.  A large body of evidence showing actions by Crowley in favor of the Noteholders and contrary to the interests of the shareholders is omitted.  While acknowledging that Crowley's voluntary cash payment of $6.9 million to the Noteholders was "troublesome," the Goldin Report *ignores a letter from Crowley to the Noteholders (which Goldin had), boasting that Crowley had "caused the Company to voluntarily repay $15.5 million early on the revolver.*  The Goldin Report

B428

ignores also the fact that the letter, addressed by Crowley only to the Noteholders, refers to Coram as "your company."

**Additional Significant Indicia of Lack of Good Faith –**
**The Continued Failure to Disclose Material Facts About**
**The Crowley Relationship**

23.    Crowley, the Debtors and the Noteholders have continued to hide various aspects of Crowley's remuneration from the shareholders, the public and even each other. Crowley's current compensation agreement with the Company is shadowy at best.  According to recent sworn deposition testimony of an Outside Director, the Compensation Committee of Coram's Board of Directors, on March 20, *2001*,[6] granted Dan Crowley's oral request for yet another amendment to his employment contract to make it "more incentivizing" and "motivational" for Crowley in the bankruptcy context – this one involving an additional benefit of "several million dollars."

24.    While draft minutes of the Compensation Committee meeting on March 20, 2001 reflect Crowley's request for some change in compensation, the action is ambiguously described in those minutes as "various multiples applied to base compensation with a threshold target of a 60% EBITDA goal based upon the present financial and operation conditions of the Company."  Debtors' attorneys have been unable to respond to the Equities Committee's request to provide *any* written documentation of the change beyond the vague committee minutes, notwithstanding the Director's sworn testimony that Crowley's employment agreement was amended to reflect the increase.

---

[6]    It is clear beyond doubt that this occurred in 2001, not 2000, as the witness resisted two attempts by Debtors' attorneys to coach him into changing the date of the occurrence to 2000.

442281.1 10/22/01

11

25.    This increase in Crowley's compensation of "several million dollars" is not disclosed in any meaningful terms, in either the Second Disclosure Statement or in Coram's subsequent 10-Q filings with the Securities and Exchange Commission.

26.    There is yet another instance where Crowley has hidden sensitive and unfavorable information about his compensation:  Each of the Outside Directors and Goldin testified unambiguously that, to their knowledge, no compensation consultant was ever retained to advise on the appropriateness of Crowley's compensation.  However, documents discovered by the Equity Committee late last week disclose that in May, 2001, Coram did in fact hire Pearl Meyer & Partners as a compensation consultant to do "CEO Compensation Research – Business Turnaround Study."  The results of this study, which identified compensation for CEOs hired "to turn the company around," vividly demonstrate the outrageous and excessive nature of the compensation awarded to Crowley by the Outside Directors.  According to the testimony of Goldin and the Outside Directors, they were not aware of any compensation consultant.  Therefore, the adverse information was not shared with them, nor was it included in the Second Disclosure Statement.  It is not difficult to understand why.

27.    These additional instances of the concealment of Crowley's compensation, come on the heels of discovery of previously unknown facts concerning the failure to disclose Crowley's Cerberus compensation in the first Disclosure Statement and in earlier filings by Coram with the Securities and Exchange Commission:  Interview and meeting notes, taken by Goldin and his attorneys in connection with the preparation of the Goldin Report, show that some of the Outside Directors, and Dan Crowley in particular, seek to blame the failure to disclose the Cerberus relationship on "the lawyers" and specifically David Friedman, who they

12

say had the Cerberus contract prior to the original filing. According to these notes, Crowley told Goldin that "Friedman knew the specifics of both contracts . . . that Friedman had the Cerberus contract and that he [Crowley] relied on Friedman" with respect to the contents of the filing. The notes of a meeting between Goldin, his attorneys and the Outside Directors disclose "Dfriedman had Crowley Cerberus contract; could have incl. in Disclosure Statement."

28.    The Equity Committee does not seek, at this juncture, to find Mr. Friedman culpable, though it is troubled by the fact that in his interview with the Goldin people, he acknowledged that prior to the filing he thought that the Crowley/Cerberus/Feinberg "relationship would be the most important issue in the case." Friedman says (as reported in the interview notes) that though he relied primarily on public filings to harvest the information required by the bankruptcy filings, he still discussed the Crowley-Feinberg relationship with Crowley's former employee, Alan Marabito, Coram's EVP, who, he says, assured him that the filings were correct. We have no reason to doubt Friedman's version at this point.

29.    However, these newly discovered facts relating to the pre-filing knowledge of the Crowley/Cerberus relationship, viewed in conjunction with the newly discovered failure to disclose Crowley's latest compensation increase and the failure of the Company to disclose the unfavorable analysis of the Coram-retained compensation consultant, strongly suggest that Crowley, with the blind support of the Outside Directors, has continued his malevolent pattern of hiding both the source and amount of his compensation in order to disguise his loyalties to the Noteholders and his extraordinary greed. That is not just a failure of good faith.

## SECOND OBJECTION

**Coram's Enterprise Value Is Greater Than The Amount Of The Debt Due To All Creditors, Even Assuming The Noteholders Have A Valid Claim For 100% Of The Amount Of The Notes (But See Third Objection, Below). Accordingly, The Plan Cannot Be Confirmed Under The Cram Down Provisions Of Section 1129(B) Of The Bankruptcy Code.**

30.    The Deloitte & Touche Report, filed under seal with this Court on July 30 as an exhibit attached to the Equity Committee's Objection to the Debtors' motion to extend exclusivity, estimates a potential value of the interests of the shareholders at between $23 and $77 million.

31.    Different conclusions were reached by Chanin Associates and Goldin concerning value. In reconciling these differences, the Equity Committee will ask the Court to consider the basic unreliability of these two reports. Both the Goldin Report and the Chanin Report are largely driven by information provided by the Debtors and Scott Danitz, the Debtors' CFO, in particular. The evidence will show that the information provided by Danitz, particularly information relating to projections, is not reliable and is not consistent with other records of the Company prepared at a time when no motivation to falsify existed.

32.    The Goldin Report was initially dated and delivered on July 11, 2001. On August 29, 2001, a Goldin principal, Seymour Preston, was deposed by the Equity Committee. Preston testified that he was responsible for the financial analyses contained in the Goldin Report. However, he was unable to testify about such basics as the Company's cost reductions, the fact that by June 1, 2001, the Company was outperforming its target EBITDA by 60%, and the details behind the adjustments made in normalizing EBITDA.

33.    Preston did testify that the Company provided the list of adjustments (as it did for Chanin) and that Goldin made no changes to that list, that "we have no reason to believe that their information was mistaken or had mistakes." However, following the deposition, Goldin had to concede that its calculation of EBITDA contained errors aggregating more than $5 million, or 20% of the total EBITDA calculation, based on that list of adjustments. This material difference (which Coram directors characterized as "an error", or in the case of Smoley, a "boo-boo") caused Goldin to issue an "updated" report to correct the error.

34.    It is unclear what steps Goldin has taken to determine what additional errors exist, but it is apparent that they do. What is clear is that the Directors have taken no steps to determine why an error of this magnitude occurred or what precautions have been taken to insure that the "updated" report is not also materially erroneous.

### THIRD OBJECTION

**The Conduct Of The Noteholders Was Inequitable And Requires That Their Claim Be Recharacterized As Equity, Or That Claims Be Pursued On Behalf Of Coram Against The Noteholders, In Addition To Those Claims Against The Outside Directors Of Coram And Dan Crowley.**

35.    The Equity Committee's derivative claim against Cerberus, Feinberg and Crowley is set forth in the Proposed Derivative Complaint filed on February 6, 2001. That pleading is incorporated in these Objections by reference. Leave to file that complaint was denied, *without prejudice,* on February 21, 2001.

36.    Discovery has revealed evidence, in the form of a reported statement by the Debtors' counsel, that in addition to Cerberus, Goldman Sachs and Foothill may also share responsibility for the breaches of fiduciary duty found by the Court in the initial confirmation hearing and as discussed above. As a result of that statement and other evidence, and

442281.1 10/22/01

15

appropriate inferences, the Equity Committee believes that substantial claims, of the nature set

forth in the Proposed Derivative Complaint, now exist against Goldman Sachs and Foothill.

### FOURTH OBJECTION

**The Proposed Injunctions And Releases Render The Second Plan Non-Confirmable.**

**Plan Section 13.4**

37.     Section 13.4 of the Second Plan states as follows:

> Releases by the Estate and its Representatives. In consideration of
> the promises and obligations of the Debtors, Reorganized Coram
> hereunder, and Mr. Crowley as embodied in the Executive
> Compensation Waiver, as of and on the Effective Date, the
> Debtors, the Estates, the Creditors' Committee, the Equity
> Committee, the Noteholder Group, and any and all Persons
> claiming through any of the foregoing entities whether directly or
> indirectly, and any of their successors, assigns or representatives
> shall, to the fullest and broadest extent permitted by law, be
> deemed to have waived, released and discharged all rights or
> claims, whether based upon tort, fraud, contract or otherwise,
> whether known or unknown, which they possessed or may
> possess prior to the Effective Date against the Debtors, their
> present and former directors, officers, employees, agents,
> representatives and attorneys and any successors or assigns of the
> foregoing, whether directly or indirectly, except as otherwise
> provided in the Plan, the Bankruptcy Code, or the Confirmation
> Order.

38.     The Equity Committee objects to this section because it attempts, in clear

contravention to Code Section 524(e), to force releases of non-debtor parties by both the

Debtors and other non-debtor parties.

**The Purported Release by Debtors of Non-Debtor Parties is Both Inappropriate and Far Too Broad**

39.     Section 13.4 of the Second Plan would release all pre-Effective Date claims by

Debtors and their estates against not only the Debtors (which is redundant), but also against the

Debtors' present or former directors, officers, employees, agents, representatives and attorneys, all of whom are non-debtors. In **In re Zenith Electronics Corp.**, 241 B.R. 92, 110-11 (Bankr. D. Del. 1999), this Court held that, under certain circumstances, debtors could release non-debtor third parties. However those circumstances are not met here. There is no indication that any the unnamed releasees have made a contribution of assets to the reorganization. See **In re Genesis Health Ventures, Inc.**, 266 B.R. 591, 606 (Bankr. D. Del. 2001). Furthermore, Crowley's "waiver" of his executive compensation is nothing more than a blatant attempt to avoid paying for his continuing conflict of interest, not a contribution of assets.[7] Additionally, the Equity Committee believes that one or more classes of claimants and equity holders effected by the Second Plan will be found not to have accepted it, and Debtors will not have the "overwhelming support" necessary to find such releases appropriate, let alone have paid all of the claims and interests represented by the non-consenting classes. See **In re Global Ocean Carriers, Ltd.**, 251 B.R. 31, 43 (Bankr. D. Del. 2000) (releases rejected because the effected class of noteholders did not support the plan).

40.    Additionally, the releases contemplated by Section 13.4 of the Second Plan are entirely too broad. In Debtors' First Plan, such releases were contemplated only for claims arising out of "the Debtors' restructuring, DIP Facility, the Exit Financing Facility or otherwise in connection with the Debtors' Cases." (First Plan, Section 13.4(a).) In its present form, Section 13.4 purports to release non-debtor parties from any kind of claim, even if completely unrelated to Debtors' cases. It should also be noted that in the First Plan, the release of non-debtor parties for acts or omissions related to Debtors' cases specifically

---

[7]    And given the circumstances of the secret raise in Crowley's 2001 compensation agreement, it can be assumed that the Crowley will not end up with any less money in his pocket as a result of the waiver.

excluded from the release acts that amounted to willful misconduct. (First Plan, Section 13.4(b).) The Second Plan does not even purport to exclude willful misconduct, much less gross negligence, a standard which the Third Circuit has found to be appropriate. **In re PWS Holding Corp.**, 228 F.3d 224 (3rd Cir. 2000); **Genesis Health**, 266 B.R. at 607.

**Section 13.4 Improperly Attempts To Force Non-Consensual Releases By Non-Debtors In Favor Of Other Non-Debtor Third Parties.**

41.    In Section 13.4 of the Second Plan, Debtors have expanded the scope of releases far beyond what is allowed by the Code, by adding, as parties releasing claims, the Creditors' Committee, the Equity Committee, and the Noteholder Group.    While the Creditors' Committee and the Noteholder Group are free to release whomever they chose to, with respect to the Equity Committee, which has not consented to such releases, this section contravenes the Third Circuit's holding in **In re Continental Airlines**, 203 F.3d 203 (3rd Cir. 2000).    In **Continental**, the Third Circuit rejected similar "third party releases" which would have exculpated debtors' directors and officers from claims by shareholders of the debtors.    The court found that the shareholders had not received any consideration for the releases, and the directors and officers had made no critical financial contribution to the plan that was necessary to make the plan feasible. **Id.** at 215.    Furthermore, the court rejected the notion that releases were necessary because the debtors' might be obligated to indemnify the officers and directors, or because the debtors' relevant insurance policies might be implicated.   **Id.** at 215-217. Accord **Zenith Electronics**, 241 B.R. at 111 (release of non-debtor could not be permitted "without the affirmative agreement of the creditor affected").

**Plan Section 13.5**

42.     Section 13.5 of the Second Plan states as follows:

> Exculpation. The Debtors, their Estates, Reorganized Coram, the Creditors' Committee, the Noteholder Group, and their respective members, officers, directors, employees, representatives, attorneys and agents, shall, to the fullest and broadest extent permitted by law, be deemed released by each of them against the other and by the holders of Claims or Interests and all persons claiming through any of the foregoing entities, directly or indirectly or derivatively, of or from any and all claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Debtors' chapter 11 Cases, including without limiting the generality of the foregoing, the commencement of the Cases, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the DIP Facility, the Exit Financing Facility, the pursuit of Confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, or otherwise in connection with the Cases, and all such persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.

43.     In **In re PWS Holding Corporation**, 228 F.3d 224, 246 (3rd Cir. 2000), the Third Circuit noted that Section 1103(c) of the Code implies both a fiduciary duty to the constituents of an official committee and a grant of limited immunity to committee members and their professionals. The court permitted an exculpation provision of a plan which provided for exculpation to the extent of the limited immunity. However, the court specifically noted that releases of committees and their professionals cannot release claims for willful misconduct or *ultra vires* acts. **Id.** In so doing, the court upheld a limited exculpation of debtors, the committee and their professionals which specifically excluded conduct amounting to "willful misconduct or gross negligence." **Id.**

442281.1 10/22/01                    19

44.    Section 13.5 of the Second Plan does not comply with the limitations mandated by the **PWS** case.  First, Section 13.5 does not exclude from exculpation acts which amount to willful misconduct or gross negligence, an exclusion that is required by **PWS**.    Second, Section 13.5 includes, as an entity to be exculpated, the Noteholder Group, which is not an official committee and does not have the limited immunity afforded by Section 1103 of the Code.  By including the Noteholder Group, the Debtors are attempting to force the same kind of non-consensual release of non-debtor parties which the court refused to approve in **Genesis Health**, 266 B.R. at 607-609.

45.    In **Genesis Health**, the court recently rejected non-consensual releases by third parties of lenders who made a financial contribution to the Debtors' reorganization.  The court found that, even if the threshold requirements of **Continental** regarding fairness and necessity of non-consensual releases had been met, the reorganization was not one of the type of exceptional cases (involving wide spread litigation against co-liable parties) in which non-consensual releases *might* be approved.  **Id.**   Similarly, here, the Noteholder Group is not entitled to a non-consensual release.

46.    Finally, noticeably missing from the exculpation is the Equity Committee and its professionals, even though the Equity Committee is an official committee pursuant to Code Section 1103.  The Equity Committee and its professionals should be included in this section.

**Plan Section 13.6**

47.    Section 13.6 states as follows:

Third-Party Releases.    In consideration of the promises, obligations, and waivers of rights to receive funds by Mr. Crowley and the members of the Noteholder Group, as embodied in the Plan and the Executive Compensation Waiver, as of and on the Effective Date, any party that votes in favor of the

B438

Plan and any and all Persons claiming through any such party, whether directly or indirectly, and any such party's successors, assigns or representatives (collectively, "Releasors") shall, to the fullest and broadest extent permitted by law, be deemed to have waived, released and discharged all rights or claims, whether based upon tort, fraud, contract or otherwise, whether known or unknown, which they possessed or may possess prior to the Effective Date against the Debtors and all of their present and former directors, officers, employees, agents, representatives and attorneys and any successors or assigns, and against the members of the Noteholder Group and all of their present and former directors, officers, employees, agents, representatives and attorneys and any successors or assigns, whether directly or indirectly, except as otherwise explicitly provided in the Plan, the Bankruptcy Code, or the Confirmation Order. The release described in the preceding sentence shall be enforceable as a matter of contract against any Releasor pursuant to the Plan and/or the Confirmation Order.

48.     Section 13.6 is far too broad, even if it is limited only to those persons or entities who vote in favor of the Second Plan. Section 13.6 is in the nature of a general release, extinguishing all claims, of any nature, against the entities purported to be released. As drafted the release includes claims having nothing to do with Debtors cases, and would release any one of a number of unnamed and unidentified entities and persons related to Debtors and the Noteholder Group. So broad a release is clearly a trap for the unwary. To be acceptable, the releases embodied by this section should release only those claims and causes of action arising by virtue of the Releasors' claim against, or ownership interest in, the Debtors' estates, and only release Debtors, the Noteholder Group and their employees and professionals only from claims related to the Debtors and their chapter 11 cases.

442281.1 10/22/01

21

## CONCLUSION

For the reasons set forth above, the Equity Committee respectfully submits that confirmation of Coram's Second Plan should be denied.

/s/ Mark Minuti

Mark Minuti (No. 2659)
Tara L. Lattomus (No. 3515)
**SAUL EWING LLP**
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
(302) 421-6840/6847

-and-

Richard F. Levy (IL ARDC NO. 01645064)
Theodore J. Low (IL ARDC NO. 01696491)
Benjamin D. Schwartz (IL ARDC NO. 0252276)
Brandy A. Sargent (IL ARDC NO. 06270551)
Maria J. Minor (IL ARDC NO. 06256406)
**ALTHEIMER & GRAY**
10 South Wacker Drive, Suite 4000
Chicago, IL 60606
(312) 715-4000 (phone)
(312) 715-4800 (FAX)

Counsel for the Official Committee of
of Equity Security Holders for Coram Healthcare
Corp. and Coram, Inc.

Dated:  October 22, 2001

442281.1 10/22/01

22

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| CORAM HEALTHCARE CORP., | ) | Case No. 00-3299 (MFW) |
| and CORAM, INC., | ) | and Case No. 00-3300 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |

### CERTIFICATE OF SERVICE

I, Mark Minuti, Esquire, hereby certify that on October 22, 2001, I caused a copy of the attached **Equity Committee Objections To Debtors' *Second* Joint Plan Of Reorganization** to be served on the attached service list in the manner indicated.

/s/ Mark Minuti
Mark Minuti (No. 2659)
**SAUL EWING LLP**
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
(302) 421-6840

442281.1 10/22/01

**CORAM HEALTHCARE CORP.**, *et al.*
**2002 Service List**

**Via Hand Delivery:**
Laura Davis Jones, Esquire
Rachel S. Lowy, Esquire
Pachulski, Stang, Ziehl, Young
  & Jones P.C.
919 Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE  19899-8705

Deborah E. Spivack, Esquire
Mark D. Collins, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Karen C. Bifferato, Esquire
Connolly, Bove, Lodge & Hutz LLP
1220 Market Street
P.O. Box 2207
Wilmington, DE  19899

Pauline K. Morgan, Esquire
Richard Morse, Esquire
Young Conaway Stargatt & Taylor, LLP
11th Floor, Rodney Square North
P.O. Box 391
Wilmington, DE  19899-0391

William D. Sullivan, Esquire
Elzufon, Austin, Reardon, Tarlov
  & Mondell, P.A.
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE  19899-1630

Don Beskrone, Esquire
Office of the United States Trustee
844 N. King Street, Room 2311
Lockbox 35
Wilmington, DE  19801

**Via Telecopy:**
David M. Friedman, Esquire
Athena Foley, Esquire
Adam L. Shiff, Esquire
Kasowitz, Benson, Torres & Friedman
1633 Broadway
New York, NY 10019-6022

Chaim Fortgang, Esquire
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY  10019

Alan B. Miller, Esquire
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153

Carol Morrison, Esquire
Schulte Roth & Zabel, LLP
900 Third Avenue
New York, NY  10022

442281.1 10/22/01

Mr. Harrison J. Goldin
Goldin Associates, L.L.C.
400 Madison Avenue
New York, NY  10017

Kenneth H. Eckstein, Esquire
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, NY  10022

**Via U.S. Mail:**
Allen Marabito
Coram Healthcare
1675 Broadway, Suite 900
Denver, CO  80202

Thomas M. Antone IV, Esquire
Mintz, Levin, Cohn, Ferris,
    Glovsky & Popeo, P.C.
1704 Hunting Ridge Road
Raleigh, NC  27615

John T. Morrier, Esq.
Mintz, Levin, Cohn, Ferris,
    Glovsky & Popeo, P.C.
One Financial Center
Boston, MA  02111

John P. Dillman, Esquire
Linebarger Heard Goggan Blair
    Graham Pena & Sampson, LLP
P.O. Box 3064
Houston, TX  77253-3064

Francis J. Lawall, Esquire
Pepper Hamilton, LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799

Craig W. Relman, Esquire
Craig W. Relman, Co., L.P.A.
23875 Commerce Park Road
Suite 105
Beachwood, OH  44122

Eugene Tillman, Esquire
Reed Smith Shaw & McClay, LLP
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C.  20005-3317

Frederick A. Nicoll, Esquire
Thomas Nash, et al.
250 Park Avenue, Suite 1500
New York, NY  10177

Christopher Beard, Esq.
Beard & Beard
4601 North Park Avenue
Chevy Chase, MD 20815

Bankruptcy Administration
IOS Capital, Inc.
1738 Bass Road
P.O. Box 13708
Macon, GA  31208-3708

Peter A. Chapman
24 Perdicaris Place
Trenton, NJ  08618

Mr. Ed Mule
Goldman Sachs Credit Partners, L.P.
85 Broad Street, 6th Floor
New York, NY  10004

Mr. John Grimm
Cardinal Health
7000 Cardinal Place
Dublin, OH  43017

Mr. Gregory C. Neier
Baxter Healthcare Corporation
Route 120 & Wilson Road
Technology Building RLT-06
Round Lake, IL  60073-0490

Gregory C. Neier
Baxter/Sabratek
Route 120 & Wilson Road
Technology Building RLT-06
Round Lake, IL  60073-0490

Mr. John Sills
Medical Specialties Co. Inc.
58 Norfolk Avenue
South Easton, MA  02375-0600

Mr. William C. Warner
B. Braun Medical/McGaw, Inc.
6021 South Syracuse Way, Suite 190A
Englewood, CO  80111

Joseph Smith
1726 Victoria Circle
Allentown, PA  18103

Robert F. Carter
EDI Payment
Federal Express
2650 Thousand Oaks Boulevard
Suite 3100
Memphis, TN  38118

Ms. Joanne L. Sadowsky
Novo Nordisk Pharmaceuticals, Inc.
100 College Road West
Princeton, NJ  08540

Mr. Joseph Cannon
Aventis Behring LLC
1020 First Avenue
P.O. Box 61501
King of Prussia, PA  19406-0901

Bowne of Dallas
1931 Market Center Boulevard,
Suite 111
Dallas, TX  75207

Prudential Insurance Company
P.O. Box 4347
Houston, TX  77210-4347

Carolyn Ruth
Safeco Life Insurance Company
Group Administration
P.O. Box 84388
Seattle, WA  98124

Ms. Linda Sutton
US Office Products
60 Tejon Street
Denver, CO  80223-1222

AT&T
P.O. Box 78214
Phoenix, AZ  85062-8214

US Healthcare
P.O. Box 1125
Blue Bell, PA  19422-0770

Mr. Gregory C. Neier
Sabratek Corporation
Route 120 & Wilson Road
Technology Building RLT-06
Round Lake, IL  60073-0490

442281.1 10/22/01

-3-

Twelve Oaks Corporation Housing
545 East Algonquin Road, Suite M
Arlington Heights, IL  60005

Brenda Dow
United Health Care
Clearwater Service Center
P.O. Box 740800
Atlanta, GA  30374

Thomas Butter
United Parcel Service
P.O. Box 505820
The Lakes, NV  88905-5820

Mr. Steve Hutton
Employment Leaders, Inc.
1527 Greenville Highway #2
Hendersonville, NC  28792

Mr. Steve Brand
Stephen Brand Productions
15702 Trapp Ridge, Suite 100
Chesterfield, MO  63017-8742

Infusion Solutions
1080 North Swan Road
Tucson, AZ  85711

CDW Computer Centers, Inc.
P.O. Box 75723
Chicago, IL  60675-5723

Daily Insights
225 West 34th Street, Suite 403
New York, NY  10122

Great West
P.O. Box 11111
Ft. Scott, KS  66701

Mr. Stephen Feinberg
Cerberus Partners, L.P.
450 Park Avenue, 28th Floor
New York, NY  10022

Mr. Ed Stearns
Foothill Capital Corporation
2450 Colorado Avenue, #3000W
Santa Monica, CA  90404

Mr. J. Edward Neugebauer
Aetna U.S. Healthcare
980 Lolly Road
Blue Bell, PA  19422

Mr. Bob Dudziuski
Tbob Enterprises, Inc.
12738 Davenport Plaza
Omaha, NE  68154

Farmers Insurance Group of Companies
Truck Insurance Exchange
4601 Wilshire Boulevard, Suite 2508
Los Angeles, CA  90010

Richard M. Smith
571 Silver Oak Grove
Colorado Springs, CO  80906

Ms. Liz Hanmonds
Genetics Institute, Inc.
170 North Radnor Chester Road
St. Davids, PA  19087

Tom Cougiglio
Resource Realty of Northern New Jersey
299 Cherry Hill Road, Suite 202
Parsippany, NJ  07054-1107

Dave Wagner
The Metrix Company
4400 Chavenelle Road
Dubuque, IA  52002

Ms. Pam Gokey
Life Insurance Company of North America
3900 East Mexico Avenue, Suite 1400
Denver, CO  80210

Mr. Mark Lueck
Mediq/PRN
One Mediq Plaza, Unit 10
Pennisauken, NJ  08110

Steven K. Kortanek, Esquire
David L. Zive, Esquire
Klehr, Harrison, Harvey, Branzburg
  & Ellers LLP
260 South Broad Street
Philadelphia, PA  19102

Kathleen M. Miller, Esquire
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue
P.O. Box 410
Wilmington, DE  19899

Vito I. DiMiao
Parcels, Inc.
917 King Street
Wilmington, DE  19801

442281.1 10/22/01

-5-

## Linda Bendlin

**From:** Laura Davis Jones
**Sent:** Monday, October 22, 2001 11:52
**To:** Linda Bendlin
**Subject:** FW: 00-03299-MFW "Reply (A)"

rachel -- paperflow

Laura Davis Jones
Pachulski, Stang, Ziehl, Young & Jones P.C.
919 North Market Street, 16th Floor
Wilmington, DE 19801
Direct Dial: (302) 778-6401
General Office: (302) 652-4100
Fascimile: (302) 652-4400
E-Mail: ljones@pszyj.com

-----Original Message-----
**From:** BKECFLIVEDB@deb.uscourts.gov [mailto:BKECFLIVEDB@deb.uscourts.gov]
**Sent:** Monday, October 22, 2001 9:35 AM
**Subject:** 00-03299-MFW "Reply (A)"

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

Notice of Electronic Filing

The following transaction was received from Minuti, Mark on 10/22/2001 at 9:34 AM EDT

**Case Name:**      CORAM HEALTHCARE CORPORATION and Richards, Layton & Finger P.A.
**Case Number:**    00-03299-MFW
**Document Number:** 1147

**Docket Text:**
Reply *Equity Committee Objections to Debtors' Second Joint Plan of Reorganization* Filed by Official Committee of Equity Security Holders (related document(s)[962]). (Attachments: # (1) Certificate of Service) (Minuti, Mark)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** M:/00-3299/442281.1/Objections to Debtors' Second Joint Plan of Reorganization.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=10/22/2001] [FileNumber=167297-0] [0f0b71b2e9686dc74fbbfa35699cb2e281579dbf988e7e3641770e4002e0449f5a8e 58bdfb65ba23d222a945903c5c2bba56c18fe120a2b485ea1b2dfbb20751]]
**Document description:** Certificate of Service
**Original filename:** M:/00-3299/442281.1/COS - Objections to Debtors' Second Joint Plan of

10/22/2001

Reorganization.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=10/22/2001] [FileNumber=167297-1]
[799a520bf1c63f0f251a9ea22e8ffb7e31f56d37c45fd4286231712e08e9ea96c996
f8992873165b820e26d4633e52f348b4ffbf3015d63b98e91a53b2b92e35]]

**00-03299-MFW Notice will be electronically mailed to:**

Steven T. Davis     delbkr@obermayer.com,

Donald J. Detweiler     saulbankruptcy@saul.com, ddetweiler@saul.com

Laura Davis Jones     ljones@pszyj.com,
efile@pszyj.com;hmartin@pszyj.com;vmobley@pszyj.com;agrasty@pszyj.com

Carl N. Kunz III     ,

Tara L. Lattomus     tlattomus@saul.com,

Christopher James Lhulier     clhulier@pszyj.com,
hmartin@pszyj.com;vmobley@pszyj.com;agrasty@pszyj.com;efile@pszyj.com

Rachel Sarah Lowy     rlowy@pszyj.com,
hmartin@pszyj.com;vmobley@pszyj.com;agrasty@pszyj.com;efile@pszyj.com;rlowy@pszyj.com

Thomas G. Macauley !     bankr@zuckerman.com,

Kevin J Mangan     kmangan@walmon.com,

Katharine L. Mayer     kmayer@elzufon.com

Michelle Kathleen McMahon     mm@cblhlaw.com,

Mark Minuti     saulbankruptcy@saul.com

Francis J. Murphy     ,

Deborah E. Spivack     rbgroup@rlf.com

**00-03299-MFW Notice will not be electronically mailed to:**

Kenneth Eckstein
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

NOT YET APPOINTED

10/22/2001

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| CORAM HEALTHCARE CORP. and | ) | |
| CORAM, INC., | ) | |
| | ) | Case No. 00-3299 (MFW) |
| Debtors. | ) | (Jointly Administered) |

**DEBTORS' RESPONSE TO THE EQUITY COMMITTEE'S
OBJECTION TO DEBTORS' SECOND JOINT PLAN OF
REORGANIZATION AND MEMORANDUM IN SUPPORT OF CONFIRMATION**

TO:    THE HONORABLE MARY F. WALRATH,
         UNITED STATES BANKRUPTCY JUDGE

Coram Healthcare Corp. ("CHC") and Coram, Inc. ("Coram"), the above captioned

debtors and debtors in possession (together, the "Debtors"), hereby submit this Response to the

Equity Committee's Objection (the "Objection") to Debtors' Second Joint Plan of

Reorganization and Memorandum in Support of Confirmation.[1]  In support thereof, the Debtors

respectfully represent as follows:

**PRELIMINARY STATEMENT**

The Court again has the opportunity to consider confirmation of a plan by the Debtors.

While the Debtors' financial picture has not materially changed since last year's confirmation

hearing (the "First Confirmation Hearing"), the process leading to the filing of this plan differs

significantly from the process of a year ago.

---

[1]  The only other objection to confirmation was filed by the Official Committee of
unsecured creditors for Coram Resource Network, Inc. and Coram Independent Practice
Association, Inc. (the "R-Net Committee"), which is addressed in Section V hereof.  The Office
of the United States Trustee (the "UST") has not interposed an objection.

Last year the Court held that the Debtors are insolvent. There is nothing to suggest that this has changed.

Significantly, however, the concerns that the Court expressed last year, which precluded confirmation of that plan, no longer exist. Both the Debtors' operations and the plan process have been completely transparent, and the Debtors have relied upon this Court's guidance to establish procedures to formulate and to pursue confirmation of the Debtors' Second Joint Plan of Reorganization (the "Plan"). Specifically:

(i) The Debtors have been operating under the auspices of this Court and the watchful eye of the Equity Committee for over a year.

(ii) The Equity Committee's financial advisor -- one of the largest accounting firms in the world -- has conducted a six month due diligence process and has had almost unfettered access to the Debtors and their books and records.

(iii) The independent members of the CHC Board of Directors (the "Independent Committee") retained an independent restructuring advisor, Goldin Associates LLC ("Goldin"), together with independent legal counsel, regarding, inter alia, facts underlying the denial of the original plan, the proposed derivative suit and formulation of a new plan of reorganization.

(iv) Goldin performed an extensive investigation and issued a comprehensive report (the "Goldin Report"), after receiving input from numerous constituents, including the Independent Committee.

(v) The Independent Committee, after consultation with Goldin, adopted Goldin's recommendations and proposed a plan consistent therewith, including providing up to $10 million to shareholders if they vote in favor of the Plan. In proposing the new Plan, the Independent Committee also relied upon legal and financial advisers, audited financial statements and their own review, oversight and experience.

2

(vi)    All details and terms of Mr. Crowley's relationship with the Debtors and third parties, including Cerberus Partners LP ("Cerberus"), have been fully disclosed.

Notwithstanding this transparent process, the Equity Committee postulates that a massive conspiracy to seize control of the Debtors for the benefit of CHC's noteholders (the "Noteholders") is occurring before the Court, while Goldin, the Independent Committee and the Official Committee of Unsecured Creditors (the "Creditors Committee") sit idly by. Yet, despite the extraordinary access to the Debtors' files and management afforded to the Equity Committee's professionals (at truly extraordinary costs), the Equity Committee has not identified a single instance of abuse or corruption, or, for that matter, an alternative transaction that would provide a greater recovery to its constituents. Rather, the Equity Committee offers nothing more than rank speculation that the issues that precluded confirmation a year ago should preclude confirmation today.

As set forth herein and in the record to be established during the confirmation hearing, the Equity Committee's objection is wholly without merit. Through the activities of, among others, the Independent Committee and Goldin, the Debtors adhered carefully to the dictates of this Court and applicable law in formulating and pursuing the Plan. For all of these reasons, the Court will be able to make requisite findings, including the good faith finding, to confirm the Plan.

## I.    SECTION 1129(a)(3) GOOD FAITH STANDARD HAS BEEN SATISFIED

Section 1129(a)(3) of the Bankruptcy Code provides that a plan must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. §1129(a)(3). The good faith standard requires a showing that "the plan was proposed with honesty, good intentions and a

3

basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." In re Sound Radio, Inc., 93 B.R. 849, 853 (Bankr. D.N.J. 1988), aff'd in part, remanded on other grounds, 103 B.R. 521 (D.N.J. 1989), aff'd on subsequent appeal, 908 F.2d 964 (3d Cir. 1990) (the good faith test requires that the plan bear some relationship to the statutory objective of resuscitating a financially troubled corporation). See also In re Zenith Electronics Corp., 241 B.R. 92, 107 (Bankr. D. Del. 1999).

At the First Confirmation Hearing with respect to the first plan of reorganization (the "First Plan") in December 2000, the Court held that the First Plan did not satisfy the standards set forth in Zenith Electronics Corp., 241 B.R. 92 (Bankr. D. Del. 1999), because "[i]n Zenith everybody knew LGE was the majority shareholder. [They] disclosed exactly what their position was. There were steps taken and they are detailed in the confirmation hearing regarding special committees outside consultants, etcetera." (Transcript of the Confirmation Hearing, Dec. 21, 2000 at 39-40).

In accordance with this Court's observation at the First Confirmation Hearing and the procedure approved in Zenith, 241 B.R. at 109, the Independent Committee retained Goldin as its restructuring advisor, and the law firm of Kramer, Levin, Naftalis & Frankel LLP to assist Goldin. No party, including the Equity Committee, has questioned Goldin's qualifications or disinterestedness.

Goldin undertook an extensive and lengthy investigation of the Debtors, particularly with respect to the effects of the Crowley/Cerberus conflict of interest. The Independent Committee extensively reviewed and analyzed the Goldin Report and ultimately adopted its recommendations as embodied in the Plan. The Independent Committee authorized and directed

4

the dissemination of a disclosure statement which detailed all the relationships that had been determined to be problematic. Following significant input from the Equity Committee, the First Amended Second Joint Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code (the "Disclosure Statement") was approved. Although the Equity Committee once again argues that there is no evidence of good faith, the Debtors have in fact followed the very road map demanded by Mr. Levy at the First Confirmation Hearing, when he said:

> [d]ue care, in situations like this, with a transaction with people on both sides, requires, as your honor pointed out, an independent counsel to the independent directors. It requires an independent financial advisor. It requires some independent action.

(Transcript of Confirmation Hearing, Dec. 21, 2000 at 67). Having meticulously followed these procedures, the Debtors plainly have acted in good faith in proposing the Plan.

**B.     Delaware Law Supports a Finding of Good Faith**

The gravamen of the Objection is that notwithstanding the fact that the Debtors have been operating under the supervision of this Court, the strictures of the Bankruptcy Code and the watchful eye of the Equity Committee and their advisors for over a year, whatever precluded confirmation a year ago must preclude confirmation today. The Equity Committee, however, glosses over the extensive steps put into place by the Debtors which were successfully designed to address and resolve the prior impediment to confirmation.

The Equity Committee's argument is predicated upon Delaware cases arising out of derivative law suits. To the extent that such law is applicable, it supports a finding of good faith and the approval of the Plan. Summing up the discussion of its primary case, Brehm v. Eisner,

5

746 A.2d 244 (Del. 2000),[2] the Equity Committee argues that because "obvious material" that was "reasonably available" was never considered by the Independent Committee, the members of the Independent Committee "abdicated their responsibilities." (Objection at ¶14). This, however, is not only factually inaccurate, it misstates the standard advanced by Brehm.

In Brehm, the Delaware Supreme Court held that in order to sustain a derivative action, the derivative plaintiff must allege particularized facts that, if proven, would show that, *inter alia*, "the subject matter. . . that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice." Brehm, 746 A.2d at 262 (emphasis added) (standard applies in a case where demand on the board is alleged to be futile).[3] Cf. Aronson v. Lewis, 473 A.2d 805, 813 (Del. 1984) (overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000)) ("[W]here a demand on a board has been made and refused, we apply the business judgment rule in reviewing the board's refusal to act pursuant to a stockholder's demand."); Zapata Corp. v. Maldonado, 430 A.2d 779, n. 10 (Del. 1981) (the decision of directors after demand has been made not to pursue the derivative claims "falls under the business judgment rule and will be respected if the

---

[2]    The Equity Committee also cites Straussburger v. Earley, 752. A.2d 557 (Del. 2000) in support of its argument. Straussburger, however, is distinguishable. In Straussburger, the scope of the investigation of the independent committee was limited by the board of directors to one specific transaction, even though the derivative complaint alleged claims based upon the effect of that transaction in connection with a second transaction. Id. at 571. The Court refused to apply the business judgment rule against the transaction approved by the independent committee because of the exceedingly narrow focus of the investigation. Id.

[3]    Since the Equity Committee only alleges one of six possible grounds raised by Brehm (gross negligence), it is the only one discussed herein. The Equity Committee has not alleged, and cannot prove, any of the other grounds.

6

requirements of the rule are met.").[4]  The faulty, misleading allegations of the Equity Committee,

however, are not the kind of particularized facts necessary to satisfy even remotely the gross

negligence standard and to defeat the Plan.

The Equity Committee's principal argument is that the Independent Committee has failed

in its duty of care by not conducting the investigation itself, not spending enough time

reinvestigating the same issues investigated by Goldin and/or investigating Goldin's

investigation. (Objection at ¶13-14). In the first instance, the Equity Committee fails to consider

or acknowledge the proper standard for overturning the Independent Committee's action: gross

negligence.  None of the faults suggested by the Equity Committee even approach such a level of

misconduct.  Moreover, contrary to the assertions of the Equity Committee, Delaware statutory

law and case precedent plainly provide that it is entirely appropriate for directors to rely upon

experts.  Section 141(e) of the Delaware General Corporation Law specifically states that a

committee of the board shall "be fully protected in relying in good faith" upon an expert.[5]

In Carlton Investments v. TLC Beatrice Int'l Holdings, Inc., 1997 WL 305829 (Del. Ch.

1997), the Delaware Chancery Court rejected the very same argument advanced by the Equity

---

[4]        Regardless of whether the grossly negligent standard (of demand futile) or the
business judgment standard (of demand refused) applies, the Equity Committee cannot come
close to satisfying either standard.

[5]        Delaware General Corporation Law § 141(e) states, in its relevant part:

a member of any committee designated by the board of directors shall, in the performance
of such member's duties, be fully protected in relying in good faith upon . . . such
information, opinions, reports or statements presented to the corporation by any . . . other
person as to matters the member reasonably believes are within such other person's
professional or expert competence and who has been selected with reasonable care by or
on behalf of the corporation.

7

Committee here.  In <u>Carlton</u>, the derivative plaintiff objected to a special litigation committee's motion to dismiss a derivative complaint, in part, because it alleged that the special litigation committee which was comprised of certain independent directors, did not conduct a reasonable investigation, citing its "over-reliance on the research and conclusions of counsel." <u>Id.</u> at *11. The Court, in dismissing the objection of the derivative plaintiff, stated that "good faith reliance by a [special litigation committee] on independent, competent counsel to assist the [special litigation committee] in investigating claims is legally acceptable, practical, and often necessary." <u>Id.</u> at *12.

Similarly, in <u>Litton Industries, Inc. v. Wildflower Partnership</u>, 1993 WL 241549 *3 (9th Cir. 1993), the Court, applying Delaware law, dismissed a derivative action and held that the business judgment rule protects the board's decision to reject a derivative suit if its investigation was reasonable and in good faith and that the board's decision must be respected unless it was grossly negligent.  <u>Id.</u>  The Court further held that it was not grossly negligent for a committee to rely upon and obtain assistance from inside counsel in the investigation and "oral summaries of testimony." <u>Id.</u>[6] The Court concluded that "the directors need not show that they performed a perfect investigation.  The record reflects that the SLC's investigatory procedure were adequate. Nothing more was required." <u>Id.</u>

As set forth in detail below, the Debtors followed exactly the same path as approved by both <u>Carlton</u> and <u>Litton Industries</u> courts.  Since the Independent Committee and Goldin's

---

[6]      In contrast to <u>Litton</u>, where inside counsel was held competent to investigate board members, here the Independent Committee relied upon independent counsel and an independent restructuring adviser.

8

investigation was legally acceptable, practical and necessary, the Independent Committee was not grossly negligent and the Plan was proposed in good faith.

**B.    The Actions of the Independent Directors were in Good Faith and More Than Satisfy the Gross Negligence Standard**

By misstating facts and citing to a few unattributed "sound bites" taken out of context and culled from hours upon hours of depositions, the Equity Committee attempts to paint a picture of an independent committee and its advisors who neglected their respective duties.[7]  Nothing could be further from the truth.  The directors' testimony makes clear that they properly performed the functions expected of an independent committee, with the assistance of outside professionals, to determine whether the conflict found by this Court had any effect on the Debtors' operations, whether litigation should be pursued, and whether a new plan could be proposed in good faith.  Their conduct was consistent with the case law discussed above regarding independent committees in the derivative suit context and does not even remotely constitute gross negligence.

**(i)    The Court's Decision**

The Independent Committee members all testified that they understood that this Court found that Mr. Crowley had a conflict of interest as a result of his relationship with Cerberus.

---

[7]    The Equity Committee has deposed all four members of the Independent Committee, as well as Mr. Crowley, Harrison J. Goldin and Seymour Preston of Goldin, and Coram's Chief Financial Officer, Scott Danitz, who supplied financial information to the Independent Committee and to the outside advisors.  Although the Equity Committee's Objections to Confirmation contain general characterizations of the Independent Committee's testimony, they notably fail to make any citations to the transcripts because they have seriously mischaracterized that testimony.

9

(Amaral at 7-8; Casey at 46-48, 52; Smith at 71-75; Smoley at 50-52.)[8]  While they testified that they respectfully disagreed that Mr. Crowley's relationship with Cerberus did in fact actually conflict with the performance of his duties as CEO and the interests of the Debtors, they accepted the decision. (Casey at 55-58, 154-58; Smith at 73, 89-93; Smoley at 51-52.)  Some of them testified that their review of the Debtors' conflict of interest policy indicated that Mr. Crowley was not violating it because the policy related primarily to conflicts with customers and clients, as well as to making sure that potential conflict relationships are disclosed to the proper persons so that the risk of any abuse can be eliminated. (Casey at 61-65; Smoley at 57, 65-68.)  Here, the relationship between Mr. Crowley and Cerberus did not involve issues of customers and suppliers or issues of patient care.

As some of them put it, they recognized that there was at least the appearance of a conflict or a potential conflict (Smith at 101, 107-08; Smoley at 66), but they unanimously concluded that Mr. Crowley had performed as an outstanding CEO under the most difficult of circumstances and had turned the company around in a manner that could not have been matched by anyone else. (Amaral at 18-22; Casey at 31-32, 55-58; Smoley at 54-56, 58-59.)  Following the First Confirmation Hearing, they all proceeded on the assumption that there was a conflict of interest that had to be dealt with by the Independent Committee, regardless of their own views. (Casey at 55-58; Smith at 73, 89-93; Smoley at 68-69.)

---

[8]     The Equity Committee's unsupported assertion that the independent directors were "unaware that this Court found an actual conflict" (Objection at 5), is simply not true, as they *all* testified that they had reviewed the transcript in which this Court stated that it found an actual conflict within days after the ruling was rendered and they were *all* aware that this court found a conflict of interest.  (Amaral at 7-8; Casey at 46; Smith at 71-74; Smoley at 51-52.)

10

### (ii)    Further Disclosure

Shortly after the denial of confirmation, Mr. Crowley met with the rest of the board and fully disclosed his relationship with Cerberus. Mr. Amaral and Mr. Crowley both testified that there was a board meeting within days of the hearing at which Mr. Crowley discussed his contract with Cerberus, the amount of compensation he was receiving, and the fact that the relationship was continuing. (Amaral at 18; Crowley at 13-19.) Ms. Smoley confirmed that "when it came out that he had this agreement with Cerberus, it was -- he didn't do anything to hide it, he was very forthcoming, very open about what it was. . . ." (Smoley at 79; See also Smoley at 52, 56.) Mr. Casey and Mr. Smith also testified that they did not have to ask Mr. Crowley about the details of the Cerberus relationship after the Court's ruling because Mr. Crowley told them all about it. (Casey at 49-51; Smith at 172.)[9] In fact, all members of the board knew of Mr. Crowley's consultant relationship with Cerberus even before the last hearing, although they did not know the precise terms. Thus, when Mr. Amaral first decided to hire Mr. Crowley as CEO in 1999, he had considered the possibility of a conflict and determined that it would not interfere with Mr. Crowley's duties on behalf of Coram. Mr. Amaral also testified that his confidence was rewarded by the excellent performance by Mr. Crowley. The other members of the Independent Committee all agreed that from their observation of Mr. Crowley's performance, they had concluded that Coram's financial condition could not have been any better

---

[9]    In an effort to cast doubt on the directors' knowledge, the Equity Committee asked three of the directors if they knew whether Mr. Crowley was "still" being paid by Cerberus "today." (Amaral at 17-18; Casey at 80; Smoley at 65.) Each answered that they did not know whether Mr. Crowley was being paid "today" but the record is clear that Mr. Crowley advised the Board after the December hearing that his relationship with Cerberus was continuing and that he was still being paid at the same rate.

11

in the absence of the conflict found by the Court.  (Amaral at 18-22; Casey at 56-58; Smoley at 54-56.)

### (iii)    The Independent Committee Acts

But the Independent Committee did not simply rely on its prior observation of Mr. Crowley's performance before proceeding with a new plan.  The Independent Committee determined to do two things.  First, they decided to hire Goldin as an independent restructuring advisor (together with independent counsel) to investigate fully the conflict found by the Court and to help determine whether there had been any corruption in the Debtors' financial affairs. Goldin's credentials to perform this function were unquestionable.   Second, they increased their own oversight of Mr. Crowley to assure themselves that while he remained as CEO there could be no question that his performance was somehow unbalanced in favor of the Noteholders without consideration for the interests of the equity.  (Amaral at 44-48; Casey at 158; Smith at 77-78, 94, 180-81; Smoley at 68-73, 83-84.)  It is both untrue and unfair for the Equity Committee to argue that the Independent Committee did nothing for six months while they waited for the Goldin Report.

Moreover, the Independent Committee recognized that in order to eliminate the risk of an unfair plan process, they could not propose a plan until the investigation was complete.  The Independent Committee knew that the Debtors' outside auditors, Ernst & Young ("E&Y"), were performing their annual audit.  They knew that CHC's CFO, Scott Danitz, was independent of Mr. Crowley, with no questions about his integrity or competence, and was the primary source of the financial information they received from the Debtors.  They received financial information and other materials at a pace and in a volume that they had never seen before and that allowed

12

them to have knowledgeable oversight of the company's activities and operations. The board met more frequently in 2001, both formally and informally. Inasmuch as the Independent Committee had not seen any evidence to indicate to them that the Crowley/Cerberus relationship had caused the Debtors any harm, they did not see any reason to remove Mr. Crowley or impose a "shadow CEO" to keep an eye on him,[10] yet they maintained a close eye on Mr. Crowley while the Goldin investigation was continuing.

### (iv)    The Goldin Report

Goldin and its counsel interviewed 37 witnesses, examined thousands of documents covering a wide range of issues and spent over five months performing its investigation before issuing its 125 page report. The Independent Committee then met with Goldin and issued comments on its report. Upon receipt of the Goldin Report, the members of the Independent Committee all testified that they reviewed it at length and in detail. (Amaral at 112-13; Casey at 120-22, 144-45; Smith at 149-50, 181-82.) They discussed it among themselves, with counsel, and with Mr. Goldin on several occasions. (Amaral at 112-14, 122-23; Casey at 127-28; Smith at 147-48, 181-82.) They reached their own views as to whether they agreed or disagreed with the Goldin Report's conclusions and they expressed their disagreements as to certain portions. (Amaral at 113-14; Smith at 181-82, 197, 204-05; Smoley at 80-82.) Regardless of their disagreement as to what they viewed as the "harshness" of the punishment of Mr. Crowley that the Goldin Report recommended, they decided to accept those recommendations.

---

[10]    Notably the Equity Committee has never moved for a trustee or an examiner to be appointed in these bankruptcy cases. Given the Equity Committee's extensive oversight of the Debtors' business, it is fair to conclude that the Equity Committee did not seek a trustee because it could find no facts to support such an appointment.

13

The Independent Committee then discussed their conclusions with Mr. Crowley and he agreed to the result recommended by the Goldin Report in order to move toward a resolution of the bankruptcy process. The Independent Committee did not abdicate their responsibility to Goldin. It relied on experts with investigative and financial skill to conduct a thorough inquiry into the issues raised by the Court and the Equity Committee – an inquiry that the Independent Committee could not have done itself. The Independent Committee did not rely upon Goldin alone. It also relied upon the valuations done by the Debtors' independent financial advisor, Chanin Capital Partners ("Chanin"), the audit performed by E &Y, the advice of counsel, the financial information received from Mr. Danitz and their own experience and oversight. The Independent Committee did not abdicate any responsibility.[11]

---

[11] The Deloitte & Touche ("Deloitte") Report (the "Deloitte Report") was not released until the day before the Debtors filed the Plan, leaving the Independent Committee no time to consider it in making their decision to proceed with the Plan. Nonetheless, the Independent Committee agreed to meet with the Equity Committee and Deloitte to discuss their proposals and conclusions. Although they looked forward to an opportunity to hear the bases for Deloitte's contrary view that Coram is solvent – a view shared by no one else who has analyzed the company – counsel for the Equity Committee canceled the meeting at the last minute and refused to meet with the Independent Committee. (Amaral at 101-03; Smoley at 61-64.) Mr. Casey testified that he discussed Deloitte's conclusions with the Debtors' outside auditors to understand why Deloitte's conclusions were so out of line with everyone else. (Casey at 112-14). In light of the fact that the Deloitte valuation was propounded by a party with a specific goal in mind, was contrary to every other valuation prepared by other experts, was contrary to the observations of the members of the Independent Committee that the Debtors were insolvent, and in light of this Court's holding at the prior hearing that the Debtors are insolvent, the Independent Committee reasonably did not give much consideration to the Deloitte Report. Their decision to do so is hardly a sign of bad faith. (Amaral at 103; Smoley at 90-92.)

14

C.    **The Equity Committee's Arguments About The Goldin Report and the Crowley Relationship are Misleading and Irrelevant**

Lacking any effective arguments, The Equity Committee throws out a hodgepodge of misleading and irrelevant arguments, often without any support whatsoever. As shown below, none of these arguments are effective, nor do they stand in the way of a finding of good faith.

(i)    **Goldin's "Errors"**

Without citing specific facts, the Equity Committee argues that the Goldin Report is flawed because it fails to examine the possibility that Coram could have done better. (Objection at ¶20). Goldin did indeed consider this issue and concluded that "there is no evidence suggesting that had he had no conflict Crowley would have managed Coram's operations or finances more effectively . . ." (Other than the pre-petition interest payment) (Goldin Report at 11). In addition, Deloitte previously admitted that Crowley's performance had a significant positive impact on Coram:

> Q.        I take it that you view Mr. Crowley's have come to work at Coram as having had a significant positive impact on the company's financial performance.
> A.        That assertion would be consistent with the changes over the last year.

(Transcript of Confirmation Hearing, December 18, 2000 at 220). At the First Confirmation Hearing, the Court recognized that although it could not conclude that operations would not have been better absent the conflict, "I think there is evidence that Mr. Crowley did a good job operationally in helping the debtor turn around." (Transcript of Confirmation Hearing, Dec. 21, 2000 at 88). Since the First Confirmation Hearing, Deloitte has spent six months going through tens of thousands of pages of documents and has not identified a single missed opportunity by the Debtors whatsoever. Moreover, the Equity Committee's assertion that Goldin should have

15

compared Coram to its competitors is misplaced because Coram's competitors' have much

different and more profitable product lines, their infusion therapy operations constitute a

minuscule percentage of their operations (compared with Coram which does nothing else), and

they are in dramatically better financial condition.

The Equity Committee also alleges that Goldin erred by failing to acknowledge that the

interest of the Noteholders "are never perfectly aligned" with the interests of the shareholders.

(Objection at ¶21). This, however, is not what the Goldin Report states. It states that:

> at the time Crowley became CEO of Coram, the Noteholders' interest in how Coram was
> managed was closely aligned with that of Coram's shareholders. Coram was in a state of
> financial crisis and it was already apparent that the company was worth substantially less
> than the amount of its debt. . . . The immediate imperative, from the standpoint of the
> Noteholders *and* the shareholders, was to try and stabilize Coram's operations and to
> improve its financial performance.

(Goldin Report at 97) (emphasis added). Moreover, the Goldin Report merely recognizes that

when a company is in the vicinity of insolvency, the fiduciary duties of the board are owed to

more than one constituency, and managers must operate in the best interest of the enterprise.

The Equity Committee also argues that Goldin failed to take into account that the alleged

"offensive conduct continues." (Objection at ¶22). For example, the Equity Committee points

to a letter written by Crowley to the Noteholders concerning the Debtors' decision to repay $15.5

million prior to the bankruptcy filing. This letter, which has nothing to do with continuing

conduct, is completely irrelevant to the Plan and has no impact on the issue of whether the

current Plan was proposed in good faith. The Equity Committee fails to point to any "offensive"

conduct after the First Confirmation Hearing despite the fact that Deloitte has been conducting

extensive due diligence and despite the fact that the Debtors were operating under the

microscope of a chapter 11 case.

16

The Equity Committee also much of a quantitative error in the Goldin Report, (Objection at ¶¶32-34), which was not material and did not lead to any changes in Goldin's conclusions. Contrary to the assertions of the Equity Committee, this error does not lead to the conclusion that the entire report is replete with errors and should be discounted or ignored.  Grafman v. Century Broadcasting Corp., 762 F. Supp. 215, 220 (N.D. Ill. 1991) (applying Delaware law) (even if a few minor inconsistencies or inaccuracies are pointed out, it does not "undermine the report as a whole.").  Indeed, the Equity Committee's own financial advisor had to prepare a revised report in connection with the First Plan.

(ii)    **The Crowley Non-Issue**

The Equity Committee attempts to re-introduce Crowley's compensation as a basis to impugn the efforts of Goldin and the Independent Committee. (Objection at ¶¶23-25).   While devoting pages to the issue and utilizing numerous unattributed quotes out of context, the Equity Committee does not point to a single inappropriate action or explain why this is a basis to deny confirmation of the Plan proposed by the Independent Committee.  In fact, the "new compensation" for Crowley that was allegedly "approved" in a March 20, 2001 board compensation committee meeting, (Objection at ¶23), was in actuality a roll-back of Mr. Crowley's compensation to pre-controversial levels.  The Disclosure Statement accompanying the Plan, a document which was reviewed and commented upon significantly by the Equity Committee, states that the Debtors have a management incentive program, i.e. the Executive Compensation Program, and that "a copy of the Executive Compensation Program, as modified, will be included in the Plan Supplement." (Disclosure Statement at 73). The Plan Supplement was timely filed on October 26, 2001.  A review of the Executive Compensation Program reveals

17

that Crowley's compensation for 2001 remains at $650,000 per annum and that his bonus opportunity will be subject to Court approval, but cannot exceed the multiple of base compensation that existed in his original contract. (See Minutes of Compensation Committee, March 20, 2001 at 31) (discusses an amendment to Crowley's employment agreement which would modify "the ongoing bonus arrangement similar to that set forth in his original employment agreement."). Since filing for chapter 11, the Debtors have never paid Mr. Crowley any more than his base salary.

Equally unavailing is the Equity Committee's attempt to impugn the good faith of the Plan by pointing to the fact that management asked Perl Meyer & Partners to perform a compensation study for senior management (which was never performed). (Objection at ¶26). Management asked for information to assist in potential negotiations with the board over senior management's compensation. A preliminary chart was delivered to Coram's Human Resources Department, which shows that Mr. Crowley's compensation was in line with other CEOs of distressed companies of a similar size. There is simply no issue of non-disclosure.

Finally, in a desperate attempt to confuse the current Plan with the First Plan, the Equity Committee has once again attempted to reintroduce the issue of the disclosure of the Crowley-Cerberus contract before the filing of the Disclosure Statement in connection with the First Plan (the "Original Disclosure Statement"). (Objection at ¶¶27-28). The point simply is irrelevant. The Court is now considering a new Plan which is described in the current Disclosure Statement which contains considerable discussion of that contract in language that was specifically approved by the Equity Committee.

18

Each item on the Equity Committee's laundry list of allegations and innuendo is without merit and does not even begin to arise to such a level as to challenge the good faith of the Debtors in proposing the Plan. There were no material errors in the Goldin Report, and the Independent Committee was justified in relying on its expert and its extensive analysis. The Equity Committee has not begun to satisfy its burden to allege particularized facts that, if proven would show that the Independent Committee acted with gross negligence. Thus, the Plan was proposed in good faith and satisfies both section 1129(a)(3) of the Bankruptcy Code and the applicable process outlined by this Court and approved under Delaware law.

## II.    CHC IS INSOLVENT: THERE IS NO VALUE TO THE EQUITY

The Court previously held that CHC is insolvent:

> The Equity Committee, even on its numbers, which I agree with the Creditors' Committee's counsel and their valuation expert and the cross-examination of the Equity Committee expert does point out the questionable nature of that valuation.
>
> I think under any of the numbers the company is insolvent today.

(Transcript of Confirmation Hearing, Dec. 21, 2000 at 88) (emphasis added). There is no basis for the Court to change this decision at this time.

The Court's holding that CHC was insolvent was based in part upon the cross-examination of the Equity Committee's financial advisor, Daniel Lynn of Deloitte, which concluded with the following statement as to the Debtors' financial condition:

> The value - - again, I would hesitate to use the word insolvency or render any sort of impression or opinion or - - well, opinion regarding it, but the liabilities identified [in Exhibit D-11] would exceed the value point estimate that we had calculated.

(Transcript of Confirmation Hearing, Dec. 18, 2000 at 240.)

19

**B.**    <u>Deloitte</u>

Notwithstanding the Court's holding and Deloitte's prior conclusions, Deloitte now estimates in the Deloitte Report that "the <u>potential</u> value of the equity interests of Coram are between" $23 and $77 million.  (Deloitte Report at 17) (emphasis added);  (Objection at ¶30).

The Deloitte Report, which by Deloitte's own admission contains numerous assumptions that are unachievable, is fatally flawed and should be given short shrift by the Court.  "Coram has not actually demonstrated its ability to achieve results consistent with the underlying assumptions." (Deloitte Report at 2.)  At the Confirmation Hearing, the Debtors will demonstrate that Deloitte's valuation is flawed for the following reasons, among others:[12]

    (i)     Deloitte employed an unprecedented technique of applying future potential cost savings to increase base year (historical) operating results "for the estimated impact of such initiatives as if they had been fully implemented as of the beginning of such period" (Deloitte Report at 3), which resulted in increasing the Debtors' December 31, 2000 EBITDA by $9 million.

    (ii)     Deloitte failed to adjust the comparable companies for their proposed business initiatives and non-recurring expenses as it did for the Debtors.[13]

---

[12] Deloitte has not yet complied with the Debtors' document requests nor have its employees been deposed.  The Debtors will supplement the arguments in this Response at the Confirmation Hearing following the completion of discovery.

[13] <u>See</u> Shannon P. Pratt et al., <u>Valuing a Business The Analysis and Appraisal of Closely Held Companies</u>, Chapter 11/Market Approach: Guideline Publicly Traded Company Method -- Common Errors, at 253 (4th ed. 2000) ("We frequently see a good job done on adjustments on the subject company statements, but little or no consideration given to possible appropriate adjustments to the guideline companies' financials.  It is important that the analyst peruse the financial statements of the guideline companies to determine whether adjustments may be appropriate for one or more of the companies to put them on a basis as comparative as possible to the subject.")

20

(iii)    Deloitte relied upon a single sentence on the website of an industry advocacy group ("NHIA") in applying an unsubstantiated 5% annual growth rate.[14]

(iv)    Deloitte improperly relied on industry-wide growth rates that are significantly higher then the Debtors' actual growth rates and that do not account for the specifics of the Debtors' operations, including their size, debt structure and lack of diversification in product lines.

(v)    Deloitte ignored certain known factors adversely impacting the operating results of the Debtors, including a reduction in the average wholesale prices of certain drugs such as Vancomycin. The Debtors anticipate that this will reduce EBITDA by approximately $3.9 and $7.9 million in 2001 and 2002, respectively.

(vi)    Deloitte improperly adjusted for certain legitimate and approved business expenses.

(vii)    Deloitte assumes a $45 million EBITDA for 2000 (which it states is sustainable). However, EBITDA projected by Deloitte for May 31, 2001, results in an annualized EBITDA of only $33 million.

(viii)    Deloitte again utilizes inappropriate comparables to the Debtors (i.e., diverse, healthy, well-capitalized companies). (See Transcript of Confirmation Hearing, Dec. 18, 2000 at 210-212.)

---

[14]    At the Confirmation Hearing, the Debtors will establish (and NHIA has already confirmed ) that (i) the 5% growth rate was "not scientific" and that "no formal study" had been commissioned; (ii) NHIA did not prepare, perform or rely on any reports or studies and that no specific consultants were retained and (iii) the projection was based upon, among other things, informal observations and informal conversations with various consultants.

21

C.    **Chanin**

At the Confirmation Hearing, Chanin will testify that CHC is insolvent.[15]  Specifically,
Chanin will testify that CHC has an enterprise value of approximately $224 million and liabilities
of approximately $324 million which results in approximately $100 million of negative equity.
Unlike Deloitte, Chanin relied upon actual operating results through the third quarter of 2001, did
not retroactively include hoped-for business improvements and relied upon a company-specific
growth rate, not unsubstantiated third party, industry-wide suppositions.

The Equity Committee asks this Court to ignore Chanin's work because it claims that it is
based upon unreliable information.  (Objection at ¶31.)  Notably, however, the Objection fails to
identify any such unreliable information, even after the Equity Committee spent the last six
months performing due diligence.  Consistent therewith, Deloitte previously testified that it had
no basis to challenge the Debtors' projections.  (Transcript of Confirmation Hearing, Dec. 18,
2000 at 194-196.)  There is no reason for the Court to alter its prior holding that the Debtors are
insolvent.

III.    **THERE IS NO BASIS TO RECHARACTERIZE
THE NOTEHOLDERS' CLAIMS AS EQUITY**

The Equity Committee's wholly unsupported allegation that the claims of the Noteholders
should be recharacterized as equity is procedurally flawed and meritless.  Not only is
"recharacterization" an unavailable remedy, there is no evidence of inappropriate conduct by the
Noteholders.  Inasmuch as the Equity Committee devotes two paragraphs to the theory, does not

---

[15]    The Debtors are informed that the Creditors' Committee's financial advisor, UBS
Warburg, will also testify at the Confirmation Hearing.

22

cite a single case or point to a single allegation in support thereof, and has never sought to bring this issue before the Court, it does not appear to be serious about this theory.

Recharacterization, as distinct from equitable subordination,[16] does not turn upon creditors' conduct in attempting to obtain payment, but upon whether the subject debt actually exists or is really a disguised capital contribution. Bayer Corp. v. Mascotech, Inc., (In re Autostyle Plastics, Inc.), 2001 U.S. App. LEXIS 22602 at * 56 (6th Cir. Oct. 22, 2001); In re Cold Harbor Assocs., 204 B.R. 904, 915 (Bankr. E.D. Va. 1997).

There is no issue that the Noteholders' claims arise from true indebtedness: monies loaned by non-insiders years prior to any of the events challenged by the Equity Committee, and denominated as debt in instruments containing fixed rates of interest, payment and maturity dates, and default provisions. To the contrary, the Equity Committee's "discovery" of a (purported and disavowed) hearsay statement by counsel that Goldman Sachs Credit Partners L.P. and Foothill Capital Corporation somehow share responsibility for alleged breaches of fiduciary duty is wholly irrelevant to the showing the Equity Committee would have to make.

Moreover, the Equity Committee has ignored the fact that the indebtedness to the Noteholders is secured by guarantees from the Debtors' non-debtor operating subsidiaries. Even

---

[16] The Equity Committee has not sought equitable subordination of the Noteholders' claims under 11 U.S.C. § 510(c). In any event, such a remedy would not be available. Section 510(c) provides only for subordination of "all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest," 11 U.S.C. § 510(c)(1), but does not provide for subordination of claims to interests. See Acropolis Enterprises, Inc., v. C.R. Amusements, LLC (In re C.R. Amusements, LLC), 259 B.R. 523, 529 (Bankr. D.R.I. 2001); In re Town & Country Corp., 2000 Bankr. LEXIS 1755 at * 16 (B.A.P. 1st Cir. 2000) (section 510(c) is designed to deal with the equitable subordination of claims to other claims or interest to other interests; its language does not extend to treatment of interests vis a vis claims).

23

if the Court were to treat the Noteholders' claims against CHC as equity, their claims against the subsidiaries would consume all of the Debtors' enterprise value and leave the CHC shareholders out of the money.

## IV.    THE PROPOSED RELEASES ARE NARROWLY TAILORED TO BE CONSISTENT WITH THIS COURT'S PRIOR DECISIONS

The release and exculpation clauses in Article 13 of the Plan were constructed to ensure that such provisions are narrowly tailored. The UST previously raised a few issues with respect to these provisions, which were resolved to its satisfaction. As these provisions are garden variety, and are consistent with provisions approved by this Court and other courts in the district, they should be approved in their entirety.[17]

### A.    Releases Given By The Estates And Their Representatives Pursuant To Plan Section 13.4 Are Appropriate

As is common, the Plan provides that the Debtors, their directors, officers, employees, professionals and other agents shall be released by the Debtors, the Creditors' Committee, the Equity Committee, and the Noteholders from all claims arising prior to the Effective Date of the Plan (the "Estate Release"). See Plan §13.4. The Estate Release does not extend to third parties.

The Estate Release is modeled upon the release that this Court approved in In re Zenith Electronics Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999). There, this Court considered the following factors before confirming a plan in which the debtor released all claims against not only its directors, officers and professionals, but also the plan funder and a committee:

---

[17] In the event that the Court sustains any objection to Plan section 13, the Debtors reserve the right to modify the Plan as necessary to resolve the objection.

24

    i.      an identity of interests between the debtor and the third party, such that a suit against the non-debtor is, in effect, a suit against the debtor or will deplete assets of the estate;

    ii.     substantial contribution by the non-debtor of assets to the reorganization;

    iii.    the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

    iv.    an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and

    v.     provision in the plan for payment of all or substantially all of the claims of the classes affected by the injunction.

Id. at 110.

The Equity Committee has not contested that the first, third and fifth Zenith factors favor the Estate Releases. The Equity Committee, however, objects to the Debtors' release of their directors, officers, employees and professionals because those entities allegedly have not contributed assets to the estates. In fact, the Debtors' CEO, Mr. Crowley, made a substantial contribution to the estates when he voluntarily relinquished $7.5 million of his earned compensation, which is being used to fund distributions under the Plan. In addition, the directors retained Goldin to perform an investigation, incorporated Goldin's recommendations into the Plan, extensively negotiated the Plan with major constituencies, and shepherded the Plan through the disclosure, solicitation, and confirmation process.[18] Under Zenith, the performance of such responsibilities (particularly, as here where an independent committee performed substantial

---

[18] This case therefore is distinguishable from In re Genesis Healthcare, Inc., 266 B.R. 591 (Bankr. D. Del. 2001), in which the Court declined to approve the release of the Debtors' prepetition claims against its officers and directors. In Genesis, the releasees had not made a substantial contribution of assets to the cases, which is not the case here.

25

services) constitutes a substantial contribution to the reorganization, and thus, the objection should be overruled.

The Equity Committee's argument that the Estate Release is improper because the Debtors do not have the support of all classes is wrong. The <u>Zenith</u> standard merely requires that a "substantial majority of creditors" must approve the injunction. <u>Zenith</u>, <u>infra</u>, 241 B.R. at 110. The Plan meets this requirement because claimants holding the vast majority of claims and all of Coram's preferred stockholders support the Plan and the Estate Release. Although it appears that Class CHC 4 equity holders are not accepting the Plan, evidence presented at the Confirmation Hearing will show that the Debtors are insolvent, and thus, such equity holders lack an economic interest in the Debtors and this issue.

The Equity Committee also objects to section 13.4 of the Plan because it provides that the Equity Committee will release the Debtors' officers, directors, and agents. It is hard to understand why the Equity Committee believes that this provision is a barrier to confirmation. The Equity Committee has never asserted that it holds any claims in its own right that would be extinguished by the Estate Release (and indeed, such claims would be highly unusual). All of the claims that the Equity Committee has attempted to assert during these cases have been derivative claims of the estate, which, as set forth above, the Debtors are justified in releasing. Moreover, after a comprehensive investigation of the Equity Committee's allegations on behalf of the company against the directors and officers, the Independent Directors and Goldin found that the Debtors suffered no actual harm from the actions in question, other than the relatively limited damages resulting from the Bankruptcy Court's inability to confirm the Debtors' First Plan. (<u>See</u>

26

Goldin Report at p. 113.)  The Equity Committee has not, and cannot, make any showing to the contrary.

**B.    As Modified, The Exculpation Clause Should Be Approved**

As is common with virtually all plans, this Plan provides for an exculpation of the Debtors, the Creditors' Committee, the Noteholders, and their respective officers, directors and agents in connection from claims arising in connection with, or out of, the bankruptcy cases (the "Exculpation Clause").  See Plan § 13.5.  Subject to the modification in the following paragraph, this provision is customary and lawful, and it does not create a basis to deny the Plan.

The Equity Committee objects that the Exculpation Clause fails to exclude acts of willful misconduct and gross negligence, but rather provides that such releases shall be "to the fullest and broadest extent permitted by law."  In order to resolve this objection efficiently and economically, the Debtors will modify this provision to exempt claims for willful misconduct or gross negligence from the scope of the Exculpation Clause.  With this clarification, the Exculpation Clause mirrors the clause approved in In re PWS Holding Corp., 228 F.3d. 246 (3d Cir. 2000), which is cited by the Equity Committee.  Moreover, the UST had previously informed the Debtors that this resolves its potential objection to this provision.

The Equity Committee's unsupported claim that the Noteholders may not be included in the Exculpation Clause because it is not an official committee is incorrect.  Exculpation clauses are not so limited.  Indeed, the very case cited by the Equity Committee for its mistaken position affirmed approval of a provision that exculpated a creditor's representative as well as the debtors and an official committee.  PWS, infra, 228 F.3d at 246. This Court also recently approved a plan that included a minority shareholder and an ad hoc committee of bondholders as beneficiaries of

27

an exculpation clause. See Order Confirming Third Amended Plan of Reorganization of Global Ocean Carriers Limited, et al., In re Global Ocean Carriers, Limited, December 15, 2000, Case No. 00-956 (MFW) (Bankr. D. Del.) (providing that such entities, among others, shall neither have nor incur any liability to any person or entity for acts taken in connection with formulation and confirmation of the plan and disclosure statement, or in connection with the chapter 11 cases).[19]

### C.    The Voluntary Third Party Releases Should Be Approved

The Plan provides the most narrowly tailored third party release. Specifically, it provides that parties who vote in favor of the Plan will waive claims arising prior to the Effective Date against the Debtors, the Noteholders, and their respective directors, officers, agents and attorneys (the "Third Party Releases"). See Plan §13.6. The Third Party Releases are strictly voluntary. Moreover, as a result of a request by the UST, the ballots provide that claimants and equity holders may vote in favor of the Plan and yet decline to consent to such releases simply by checking an opt-out box on their ballots.

Nevertheless, the Equity Committee asserts that the Third Party Releases are too broad, and should be amended to provide that parties who vote in favor of the Plan release the parties only from claims relating to the Debtors and their chapter 11 cases (i.e., the same Exculpation

---

[19]    The Equity Committee's reliance on In re Continental Airlines, Inc., 203 F.3d 203 (3d Cir. 2000) is misplaced because Continental did not concern an exculpation clause. The Equity Committee claims that In re Genesis Health Ventures, Inc., 266 B.R. 591, 606 (Bankr. D. Del. 2001) (JHW), analyzed an exculpation clause under the Continental test, but the Debtors are not aware of other cases that cite Continental with respect to exculpation clauses. Genesis was decided by a judge from outside the district sitting in the Delaware Bankruptcy Court by designation, and is an anomalous decision that is at odds with the standard of permitting such exculpatory clauses in this jurisdiction. See PWS, infra.

28

Clause to which it objects).  Notably, the Equity Committee does not cite any legal authority to so limit the scope of the voluntary releases.

To the contrary, courts in the Third Circuit repeatedly approve plans that provide for a creditor's release of all claims against a non-debtor where the release is not compulsory.  In In re Union Meeting Partners, 160 B.R. 757 (Bankr. E.D. Pa. 1993), the court overruled a creditor's objection and held:

> nothing improper or violative of 11 U.S.C. § 524(e) in plan provisions that allow creditors the option of agreeing to release non-debtor third parties on certain conditions as long as those Plan provisions bind only those parties affirmatively agreeing to the releases.

Id. at 768 (denying confirmation on other, unrelated grounds).  See also In re West Coast Video Enterprises, Inc., 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994); In re Monroe Well Service, Inc., 80 B.R. 324, 334 (Bankr. E.D. Pa. 1987) (third party releases were permissible "so long as the release is purely voluntary and the will of the majority of creditors cannot force dissenting creditors to provide releases.").

As one court explained recently:

> When a releases of liability of a non-debtor is a consensual provision. . . agreed to by the affected creditor, it is no different from any other settlement or contract. . .Where the creditor consents to release, and presumably receives consideration in exchange for that agreement, it has not been forced by virtue of the discharge provisions of the code to accept less than full value for its claim.  As such, non-debtors do not reap the benefits of bankruptcy without accepting its burdens because they must offer sufficient inducement to achieve settlement.

In re Arrowmill Development Corp., 211 B.R. 497, 506-07 (Bankr. D. N.J. 1997).

Accordingly, the Third Party Releases are proper and enforceable because they are effective only with respect to claimants and equity holders who actually vote in favor of the Plan,

and do not exercise the option to opt out of the releases by so indicating on their ballots.

Furthermore, voters receive substantial consideration for the releases because the Noteholders

and Mr. Crowley will forego a portion of their legal entitlements in order to make voluntary

contributions to creditors and equity holders.  Thus, the Third Party Releases should be approved.

## V.     THE R-NET COMMITTEE'S OBJECTIONS SHOULD BE SUMMARILY OVERRULED

The generic objection filed by the R-Net Committee is without merit.  The R-Net

Committee has not even identified which provisions of the Plan that it finds objectionable, e.g.,

"The Committee objects to deficiencies in the Plan which render the Plan unconfirmable

pursuant to 11 U.S.C. § 1129." (R-Net Committee Objection, § 7.)

The R-Net Committee's only "specific" objection– that the Plan discriminates against R-

Net in violation of 11 U.S.C. § 1129(b)(1) because "it does not address or provide for the Claims

of R-Net"-- is patently mistaken.  The Plan does not segregate, separately classify, or otherwise

treat R-Net's claims, to the extent they exist, differently in any respect from any other general

unsecured claims.  The Debtors have indicated that they do not believe R-Net's claims should be

allowed because, among other reasons, R-Net's proofs of claim fail to state claims against the

Debtors as a matter of law, are barred by principals of res judicata, and are barred by applicable

statutes of frauds.  See Disclosure Statement, p. 21.  The allowance of R-Net's claims, however,

is a matter to be dealt with in due course through the claims resolution process.[20]  A challenge to

the validity of a claim is not "unfair discrimination" under 11 U.S.C. § 1129(b)(1).

---

[20]  The Debtors have filed an objection to the claims of R-Net.

30

The R-Net Committee also summarily argues that the Plan "does not propose to distribute the Parent Debtors' assets to the Claims of R-Net in a manner contemplated by the Bankruptcy Code." The Debtors presume that this objection is intended to complain of the proposed distribution of up to $10 million to CHC common shareholders. Such an objection is meritless. The Debtors will demonstrate at the Confirmation Hearing that they are insolvent, such that the property that may be distributed to holders of claims against and interests in CHC is not "the Parent Debtors' assets" but value to which the Noteholders would be entitled had they not voluntarily elected to distribute it as set forth in the Plan. The Bankruptcy Code contemplates that CHC general unsecured creditors receive nothing in such a situation. Any recovery for CHC's general unsecured creditors is therefore fair and equitable.

Moreover, even if the potential distribution to CHC common shareholders before unsecured claimants are paid in full should be found to be improper, that would not be a basis for denying confirmation, because the Plan explicitly provides for alternative distribution schemes to conform with how the Court rules with respect to the Absolute Priority Litigation.[21] However, subject to final certification, it presently appears that Class CHC 4 (Allowed CHC Equity Interests) is voting to reject the Plan. A "no" vote renders this aspect of the R-Net Committee's objection moot, because the Plan does not provide for any distribution to Class CHC 4 if that class fails to accept the Plan.

---

[21] The Absolute Priority Litigation is defined as "the litigation that may be commenced in connection with the Confirmation Hearing if Class CHC 2 votes to reject the Plan, Class CHC 4 votes to accept the Plan, and the Creditors' Committee (or any other party in interest) objects to the Debtors' proposed distribution of the CHC Equity Interest Consideration to Class CHC 3, as more fully described in section III.A.3 of the Disclosure Statement."

31

## CONCLUSION

For the above-stated reasons as well as the record to be established at the Confirmation Hearing, the Debtors respectfully request entry of an order (i) overruling the objections, (ii) confirming the Plan, and (iii) granting such other and further relief as the Court may deem just and proper.

Dated: November 5, 2001
       Wilmington, Delaware

      PACHULSKI, STANG, ZIEHL,
      YOUNG & JONES, P.C.

      *Rachel S. Lowy*

      Laura Davis Jones (Bar No. 2436)
      Rachel S. Lowy (Bar No. 3653)
      919 North Market Street, 16th Floor
      P.O. Box 8705
      Wilmington, Delaware 19899-8705
      Telephone: (302) 652-4100
      Facsimile: (302) 652-4400

          - and -

      KASOWITZ, BENSON, TORRES
        & FRIEDMAN LLP
      David M. Friedman
      Adam L. Shiff
      1633 Broadway
      New York, New York 10019
      Telephone: (212) 506-1700

      CO-COUNSEL TO DEBTORS AND
      DEBTORS-IN-POSSESSION

32