# Schnader
### ATTORNEYS AT LAW

1600 MARKET STREET   SUITE 3600
PHILADELPHIA, PA 19103-7213
215.751.2000   FAX 215.751.2205   schnader.com

December 24, 2002

BARRY E. BRESSLER
Direct Dial 215-751-2050
Direct Fax 215-751-2205
Internet Address: bbressler@schnader.com

**VIA FACSIMILE #312-621-1750**

Scott N. Schreiber, Esquire
Much Shelist Freed Denenberg Ament & Rubenstein
200 North LaSalle Street, Suite 2100
Chicago, IL 60601



Re:    In re: Coram Healthcare Corp., Debtor
       /Daniel D. Crowley

Dear Mr. Schreiber:

        Per our additional discussions, Arlin M. Adams, the Chapter 11 Trustee for Coram Healthcare Corporation ("Coram") has modified the proposed terms for a termination agreement and extension of employment with Daniel D. Crowley ("Dan"), subject to approval of the Bankruptcy Court, to include the following terms:

        1.    Dan has terminated his prior Employment Agreement, as amended ("Employment Agreement") and the Trustee has filed a "placeholder" motion to reject Dan's old Employment Agreement.

        2.    Under the proposed termination and employment extension agreement ("Transition Agreement"), the Trustee and Dan agree that commencing January 1, 2003 Dan will continue to render essentially the same services to Coram as he has heretofore for a term not to exceed the earlier of (a) six (6) months from January 1, 2003; (b) the date on which a Plan is confirmed by final order of a court having jurisdiction in the Coram Bankruptcy ("final order"); or (c) the substantial consummation of a Plan in the Coram Bankruptcy. The term could be extended once for up to an additional sixty (60) days, if a final order has not been entered on or before June 30, 2003, unless either party terminates the arrangement on thirty (30) days' prior written notice.

Schnader Harrison Segal & Lewis LLP
BOSTON, MA   NEW YORK, NY   PHILADELPHIA, PA   PITTSBURGH, PA   SAN FRANCISCO, CA   WASHINGTON, DC
CANONSBURG, PA   CHERRY HILL, NJ   HARRISBURG, PA

PHDATA 1026985_1

# Schnader
### ATTORNEYS AT LAW

Scott N. Schreiber, Esq.
December 24, 2002
Page 2

3.    Dan's current at will employment will continue until December 31, 2002 on the same terms and conditions as under the old Employment Agreement, while we finalize the Transition Agreement and submit it to the Bankruptcy Court. Through December 31, 2002, Dan will receive the same monthly salary and benefits as under the Employment Agreement.

4.    Under the Transition Agreement, beginning January 1, 2003, Coram will pay Dan a base monthly salary of $80,000.00 ("Monthly Salary") payable as heretofore and continue to reimburse direct costs and expenses incurred by Dan or Dynamic Healthcare Solutions ("Dynamic") on behalf of Coram or Coram's employees occupying space in Sacramento, California on the same basis as heretofore during Coram's bankruptcy proceedings. If during the six months of the Transition Agreement the Trustee terminates Dan without cause, Dan would still be entitled to be paid his Monthly Salary for the balance of the six month period. If during that period Dan is terminated for cause, Dan would not be paid the Monthly Salary for the balance of the six month period.

5.    Under the Transition Agreement, Coram will continue to provide the other perquisites and benefits that Coram currently provides to Dan under the old Employment Agreement, including health, dental and disability insurance on the same basis as made available to senior executives of Coram, $1,000,000.00 of whole life coverage, an $1,800.00 transportation allowance, corporate housing in Denver on the same basis as heretofore, gross up for taxes on certain benefits on the same basis as heretofore, reasonable expenses incurred in the course of Dan's rendering services for Coram and tax preparation costs of $10,000.00 for the six months of the Transition Agreement. As heretofore, Dan may maintain his interest in Dynamic and during the term of the Transition Agreement, Dan agrees on behalf of Dynamic that it may consult with other companies not in direct competition with Coram, except for the Noteholders/preferred stockholders or their affiliates for which neither Dynamic nor Dan shall consult, so long as such consulting does not substantially detract from Dan rendering the necessary time and effort to continue to guide Coram on the same basis as heretofore.

6.    During the Transition Agreement, Coram would continue to maintain D&O coverage covering Dan to the same extent available to all Coram officers and directors.

7.    In consideration of Dan's agreement to forego other opportunities during the Transition Period and in partial recognition of his efforts over the past nine (9) months, the Trustee will pay Dan a stay and performance payment totaling $1,000,000.00 ("Stay Bonus"). This will be accomplished by reimbursement for counsel fees (not to exceed $200,000.00) paid on approval of the Transition Agreement by the Court, with the balance of $800,000.00 paid as a stay bonus paid at the end of the six month period or upon a final confirmation order, whichever first occurs. Dan will be entitled to the Stay Bonus whether or not a final confirmation order is entered.

PHDATA 1026985_1

Schnader Harrison Segal & Lewis LLP

# Schnader
### ATTORNEYS AT LAW

Scott N. Schreiber, Esq.
December 24, 2002
Page 3


8.      The Transition Agreement will be governed by Colorado law, as was Dan's old Employment Agreement, and will be enforceable by either party in the Bankruptcy Court.

9.      The Transition Agreement will be subject to approval of the Bankruptcy Court. The Transition Agreement will have an effective date of, and the Trustee will request the Bankruptcy Court to approve it as of, January 1, 2003.

10.     The Trustee will agree, after consultation with Dan, on an appropriate job title during the Transition Agreement, which tentatively will be Chief Transition and Restructuring Officer.

Sincerely,

BARRY E. BRESSLER

BBB/sh
Cc:     Arlin M. Adams, Chapter 11 Trustee
        Mr. Daniel D. Crowley

Agreed as to Terms and Conditions

DANIEL D. CROWLEY

_____


ARLIN M. ADAMS, CHAPTER 11 TRUSTEE

_____

PHDATA 1026985_1

DEC-24-2002  14:32    MUCH SHELIST FDR                                            551121    P.04/04
12/24/2002  15:19                                                                          NO.818  [illegible]

# Schnader
### ATTORNEYS AT LAW

Scott N. Schreiber, Esq.
December 24, 2002
Page 3

8.    The Transition Agreement will be governed by Colorado law, as was Dan's old Employment Agreement, and will be enforceable by either party in the Bankruptcy Court.

9.    The Transition Agreement will be subject to approval of the Bankruptcy Court. The Transition Agreement will have an initial term as and the Trustee will request the Bankruptcy Court to approve it as of January 1, 2003.

10.   The Trustee will agree, after consultation with Dan, on an appropriate job title during the Transition Agreement, which tentatively will be Chief Transition and Restructuring Officer.

Sincerely,

*Barry E. Bressler*

BARRY E. BRESSLER FB

BEB/ah
Cc:    Arlin M. Adams, Chapter 11 Trustee
       Mr. Daniel D. Crowley

Agreed as to Terms and Conditions

DANIEL D. CROWLEY

*Daniel D. Crowley*  24Dec02

ARLIN M. ADAMS, CHAPTER 11 TRUSTEE

*Arlin M. Adams*

Schnader Harrison Segal & Lewis LLP

PHDATA 1026985_1

EC–11

# Schnader
### ATTORNEYS AT LAW

1600 MARKET STREET SUITE 3600
PHILADELPHIA, PA 19103-7211
215.751.2000  FAX 215.751.2205  www.schnader.com

January 7, 2003

BARRY E. BRESSLER
Direct Dial 215-751-2050
Direct Fax 215-751-2205
Internet Address: bbressler@schnader.com



**VIA FACSIMILE #312-621-1750**

Scott N. Schreiber, Esquire
Much Shelist Freed Denenberg Ament & Rubenstein
200 North LaSalle Street, Suite 2100
Chicago, IL 60601

Re:     In re: Coram Healthcare Corp., Debtor
        /Daniel D. Crowley

Dear Mr. Schreiber:

Per our additional discussions, Arlin M. Adams, the Chapter 11 Trustee for Coram Healthcare Corporation ("Coram") and Daniel D. Crowley ("Dan") have entered into a letter agreement (the "Transition Agreement") for terminating Dan's prior Employment Agreement and extending his employment. The Transition Agreement will be submitted to the Bankruptcy Court for approval.

This letter will serve to reflect the intent as to an additional settlement agreement ("Settlement Agreement") to be entered into between the Trustee and Dan, subject to a formal agreement being drawn and subject, of course, to approval of the Bankruptcy Court. The Settlement Agreement is being negotiated and finalized in connection with the Transition Agreement, and will include the following terms:

1. All of Dan's contractual and employment claims for performance bonuses, KERP, MIP, and otherwise, including any and all claims under his old Employment Agreement, not dealt with in the Transition Agreement, will be compromised and satisfied by an additional payment, upon final Plan confirmation, of $2,000,000 and the exchange of releases provided below.

2. Dan will release the Trustee and Debtors from any further claims as part of the Plan and the Trustee and Debtors will in turn release Dan from all proposed derivative claims and any other claims arising out of or related to such proposed derivative claims that the Trustee.

**Schnader Harrison Segal & Lewis LLP**

BOSTON, MA   NEW YORK, NY   PHILADELPHIA, PA   PITTSBURGH, PA   SAN FRANCISCO, CA   WASHINGTON, DC
CHERRY HILL, NJ   HARRISBURG, PA

PHDATA 1658342

CH-11 TRUSTEE

**Schnader**
ATTORNEYS AT LAW

Scott N. Schreiber, Esq.
January 7, 2003
Page 2

Coram, any subsidiaries, or any committees or entities claiming through them, may have against Dan, to the fullest extent approved by the Bankruptcy Court.

3. The parties contemplate that the formal agreement reflecting the above will be finalized by January 31, 2003, and will be presented to the Bankruptcy Court for approval thereafter, but in any event before a Plan to be proposed by the Trustee on or before February 28, 2003.

4. If the Bankruptcy Court fails to approve the Settlement Agreement, all of the undertakings of the parties will be void and the parties will return to their previous positions, retaining all claims which exist and all defenses thereto. The parties will only be legally bound upon approval of the formal agreement by the Bankruptcy Court.

Sincerely,

BARRY E. BRESSLER

cc:    Arlin M. Adams, Chapter 11 Trustee
       Mr. Daniel D. Crowley

The Terms and Conditions above are hereby agreed to:

DANIEL D. CROWLEY

_____

ARLIN M. ADAMS, CHAPTER 11 TRUSTEE

_____

Schnader Harrison Segal & Lewis LLP

PHDATA 1068121_2
CH-11 TRUSTEE

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CORAM HEALTHCARE CORP. and | : | Case No. 00-3299 (MFW) |
| CORAM, INC., | : | (Jointly Administered) |
| | : | |
| Debtors. | : | Objection Deadline: February 21, 2003 |
| | : | Hearing Date: February 28, 2003 |

---

## MOTION OF THE CHAPTER 11 TRUSTEE FOR AUTHORIZATION TO ENTER INTO TERMINATION AND EMPLOYMENT EXTENSION AGREEMENT WITH DANIEL D. CROWLEY

---

Arlin M. Adams, the Chapter 11 Trustee (the "Trustee") of the bankruptcy estates of Coram Healthcare Corp. ("CHC") and Coram, Inc. ("Coram" and, together with CHC, referred to as the "Debtors"), by and through his undersigned counsel, hereby moves this Court for authorization, pursuant to Sections 105 and 363 of Title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code"), to enter into the Termination and Employment Extension Agreement with Daniel D. Crowley ("Crowley"), effective January 1, 2003. In support thereof, the Trustee respectfully represents as follows:

### BACKGROUND

1.      On August 8, 2000 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Until March 7, 2002, the Debtors operated their businesses and managed their properties and assets as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The Debtors'



EXHIBIT
SARACCO 8
CW 3/30/07

2143

Chapter 11 cases have been consolidated for procedural purposes only. The Debtors' cases have not been consolidated with that of any other debtor.

2.      On August 22, 2000, the United States Trustee designated an Official Committee of Unsecured Creditors (the "Creditors' Committee") in the Debtors' bankruptcy cases. On October 18, 2000, the United States Trustee designated a Committee of Equity Interest Holders (the "Equity Committee") to represent the interests of CHC's common shareholders.

3.      On December 21, 2000 the Court denied confirmation of the Debtors' first proposed plan of reorganization. On December 21, 2001, the Court entered an order denying confirmation of the Debtors' proposed second plan of reorganization.

4.      At a hearing held on February 12, 2002, the Court granted two motions seeking the appointment of a trustee to assume control over the Debtors' property and affairs pursuant to Section 1104 of the Bankruptcy Code. The Trustee's appointment was approved by the Court on March 7, 2002 (the "Appointment Date").

5.      On December 19, 2002, the Equity Committee filed a proposed plan of reorganization. As the Trustee's counsel informed the Court during the December 27, 2002 omnibus hearing, the Trustee intends to file his own plan by the end of February, 2003.

Crowley's Current Employment Arrangement

6.      On or about November 30, 1999, CHC and Crowley entered into an Employment Agreement (the "Employment Agreement") pursuant to which CHC agreed to employ him as President and Chief Executive Officer of CHC and all of its wholly-

2

owned subsidiaries and Chairman of CHC's Board of Directors. A true and correct copy of the Employment Agreement, together with any and all amendments thereto, is attached hereto as Exhibit "A" and incorporated herein by reference in its entirety.

7.      Under the Employment Agreement, CHC agreed to compensate Crowley for his services with, *inter alia*, (i) a base salary of $650,000 per annum (the "Salary"), (ii) various performance based bonuses, (iii) stock options, (iv) health insurance benefits, (v) paid vacation time, (vi) life insurance benefits, (vii) a car allowance, (viii) corporate housing, and (ix) tax liability preparation and reimbursement benefits.

8.      While the Trustee has continued to pay Crowley his annual salary and certain benefits in the ordinary course of business, neither the Trustee nor the Debtors while debtors-in-possession have made any payments to Crowley on account of his claimed Management Incentive Plan ("MIP") bonuses and Key Employee Retention Plan ("KERP") bonuses. Crowley also maintains he is entitled to a success bonus of $1,800,000 payable upon consummation of debt refinancing and a plan of reorganization.

9.      On or about November 26, 2002, the Trustee moved the Court to enter an Order that would, among other things, authorize the Trustee to reject the Employment Agreement (Docket No. 1972). Since then, Crowley has terminated the Employment Agreement without prejudice to his claims for substantial bonus compensation, including for MIP and KERP bonuses. The Trustee and Crowley are currently engaged in negotiations in an attempt to resolve these and all other claims between them.

10.      After examining the Debtors' businesses, as discussed in further detail below, the Trustee has determined that Crowley has performed his duties under the Employment Agreement competently and that it would serve the Debtors' best interests

3

to continue Crowley's employment in the capacity of Chief Transition and Restructuring

Officer on an interim basis during the plan confirmation process.

JURISDICTION AND VENUE

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (M).  The statutory

predicates for the relief sought herein are Sections 105 and 363 of the Bankruptcy Code

and Fed. R. Bankr. P. 4001, 6004 and 9014.

REQUESTED RELIEF AND BASIS THEREFORE

12.     By this motion, the Trustee requests that the Court enter an order

authorizing the Trustee to enter into a Termination and Employment Extension

Agreement which he has negotiated with Crowley (the "Transition Agreement"), a true

and correct copy of which is attached hereto as Exhibit "B" and incorporated herein by

reference in its entirety.

**The Transition Agreement**

13.     The Transition Agreement provides, *inter alia*, the following:

- Commencing as of January 1, 2003, Crowley will serve as the Chief Transition and Restructuring Officer for a term not to exceed the earlier of (i) six (6) months from January 1, 2003, (ii) the date on which a Plan of Reorganization is confirmed by final order of the Court, or (iii) the substantial consummation of a plan of reorganization.

- The term may be extended one time for up to an additional sixty (60) days if a final order has not been entered on or before June 30, 2003, unless either party terminates the arrangement on thirty (30) days' prior written notice.

4

- Commencing January 1, 2003, the Debtors will pay Crowley a base monthly salary of $80,000.00 and continue to reimburse direct costs and expenses incurred by Crowley as heretofore.

- The Debtors will continue to provide Crowley with the benefits provided under the Employment Agreement as heretofore, including without limitation health, dental and disability insurance, life insurance, transportation allowance and corporate housing.

- The Debtors will continue to maintain D&O coverage covering Crowley to the same extent available to all of the Debtors' officers and directors.

- In consideration of Crowley's agreement to forego other opportunities during his term, and in partial recognition of his efforts over the past nine (9) months, the Debtors will pay Crowley a stay and performance payment of $800,000, plus $200,000 in partial reimbursement of his counsel fees.

<u>Crowley's Continued Employment</u>

14.    Section 363 of the Bankruptcy Code provides that a trustee must obtain the bankruptcy court's approval to use property of the estate other than in the ordinary course of business. 11 U.S.C. § 363(b).  The proposed transaction may be viewed as being in the ordinary course of business because:  (a) companies comparable to the Debtors regularly extend continued employment terms to existing employees and officers, and (b) creditors of the Debtors would reasonably expect a continued relationship between CHC and its chief executive officer. *See In re Roth American, Inc.,* 975 F.2d 949 (3d Cir. 1992).  Nevertheless, having terminated Crowley as Chief Executive Officer and President and given the controversy surrounding his past employment by the Debtors' in this case, the Trustee seeks the Court's authorization to enter into the Transition Agreement.

15.    In order to obtain authorization for the use of property of the estate outside of the ordinary course of business, a trustee must articulate some business justification for

5

such action. *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169 (D. Del. 1991). This "is similar to many states' 'business judgment rule,' where great deference is given to a business in determining its own best interests." *In re W.A. Mallory Company*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997). *See also Montgomery Ward*, 242 B.R. at 155 (affirming approval of a 363(b) motion where the bankruptcy court based its findings on the debtors' business judgment).

16.   This Court denied confirmation of both of the proposed plans of reorganization offered by the Debtors because it found that an actual conflict of interest arose as a result of Crowley's employment contract with Cerberus Partners, L.P. ("Cerberus"), who is a noteholder and preferred shareholder. The Court's findings regarding Crowley's relationship with Cerberus, as well as his failure to timely make complete disclosure of the relationship to the CHC Board of Directors, raised a substantial question for the Trustee as to whether Crowley should be retained.

17.   Because Crowley and Cerberus have informed the Trustee that all contractual relations between them have been severed and that Crowley has not received any compensation from Cerberus in 2002, the Trustee is satisfied that there is no continuing conflict of interest.

18.   Moreover, the Trustee's own thorough evaluation of Crowley's performance, has led him to conclude that the company is better off with Crowley than without him, at least on an interim basis to provide stability until a plan is confirmed.

6

<u>Crowley's Performance</u>

19.    Since the Appointment Date, the Trustee has independently examined the actions undertaken by Crowley as the Debtors' chief executive officer. The Trustee has visited the corporate offices in Denver and has had several meetings and discussions with Crowley, CHC's senior executives and other employees of CHC. In addition, the Trustee has considered numerous reports regarding the financial performance of the Debtors and has reviewed the Debtors' performance under Crowley with the investment bankers retained by the Trustee.

20.    The Trustee's evaluation is that Crowley has operated the company profitably and efficiently. Under Crowley, notwithstanding being in these bankruptcy proceedings, the Debtors have experienced positive operating margins and EBITDA[1], reduced cost of services, reduced operating costs, improved inventory management, improved information systems, improved management tools, and maintained a stable cash position with no net borrowing to fund post-petition operations.

21.    EBITDA has substantially increased during the period of Crowley's stewardship of the company. From 1995 through 1999, a time prior to Crowley's employment, the Debtors' EBITDA was a negative $37 million. From January 2000

---

[1] EBITDA as discussed herein is defined as earnings before interest expense, income taxes, depreciation, amortization, net reorganization expenses, losses on impairment of long-lived assets, gains on sales of businesses, provision for (income from) litigation settlements, extraordinary gains on troubled debt restructurings, and for the periods after 1999, discontinued operations. The financial information of the Debtors contained herein was derived from and should be read in conjunction with CHC's consolidated financial statements and the notes thereto included in its Annual Reports on Form 10-K for the years ended December 31, 1997, 1998, 1999, 2000 and 2001 and its unaudited condensed consolidated financial statements and the notes thereto included in its Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2002.

7

through September 2002, the Debtors experienced $83 million in positive EBITDA, a $120 million improvement under Crowley's management. For the first nine months of 2002 (including the six months after the Trustee was appointed), EBITDA was a positive $21 million; by contrast, EBITDA was negative $54 million for the year ended December 31, 1999.

22.     Revenue and gross profit are also increasing. For the nine-month period ended September 30, 2002, the Debtors' revenue rose $31 million, or 11 percent, from the same period the year before, resulting in an increased gross profit of $9 million. Indeed, revenue was higher during each month of 2002 than during the same month in 2001.

23.     Under Crowley, CHC has improved its financial performance by identifying and focusing the business on its most profitable core therapies. When Crowley was named CEO, non-core therapies accounted for approximately 38 percent of infusion therapy revenues for the quarter ended December 31, 1999; by the third quarter of 2002, non-core therapies represented only approximately 27 percent of infusion therapy revenues. In addition, daily average revenue per patient for core therapies rose 3% to $151 per day during the nine months ended September 30, 2002 when compared with the same period from the prior year.

24.     The most profitable type of business for CHC is the treatment of patients with chronic disorders. With Crowley at the helm under the Trustee's stewardship, CHC refined its marketing strategy to target chronic patients. As a result of these efforts, revenues from the treatment of hemophilia patients grew by 55 percent ($15 million) during the nine months ended September 30, 2002 when compared with the same period

8

from the prior year. The treatment of hemophilia patients now represents 13 percent of total revenue, up from 9 percent during the nine months ended September 30, 2001. Similarly, revenues from nutrition patients were increased 6 percent during the same time frame.

25. Furthermore, during Crowley's tenure, CHC has also cut costs by, *inter alia*, leveraging volume to purchase drugs and supplies more effectively. Cost of services for infusion, exclusive of depreciation and amortization expense, as a percentage of net revenue has been reduced from 76 percent for the year ended December 31, 1999 to 71 percent for the nine months ended September 30, 2002.

26. Under Crowley, the Debtors have neither required post-petition borrowings to fund operations nor utilized their debtor-in-possession facility.

27. Finally, the evaluation conducted by the Trustee's advisors has revealed improved employee productivity, increased employee morale and reduced employee turnover since Crowley became CEO of the Debtors. Company statistics show that the branch employee turnover rate was reduced by approximately six percent in 2002 when compared to 2001. It is apparent to the Trustee that many of CHC's employees are loyal to Crowley and that they remain confident of his ability to transition the Debtors' through an effective reorganization.

28. The Trustee believes that it is important to maintain the Debtors' operational status quo during the plan confirmation process. The Equity Committee recently filed a plan and the Trustee intends to file his own plan of reorganization shortly. Replacing Crowley now would endanger the Debtors' ability to reorganize. Specifically, the Trustee believes that Crowley's departure would likely encourage "cherry-picking" of

9

key employees by competitors, could cause substantial departures of executives and other key employees, and shift the company's focus from its business plan to mere survival.

29.     Accordingly, the Trustee submits that sound business purposes support the Trustee's request for the entry of an order authorizing him to enter into the Transition Agreement.

## NOTICE

30.     The Trustee shall serve a copy of this Motion upon (i) the United States Trustee, (ii) the Official Committee of Unsecured Creditors, (iii) the Official Committee of Equity Holders, (iv) the Post-Petition Lenders and the Noteholders, (v) Crowley and his identified counsel, and (vi) all parties requesting notice pursuant to Rule 2002 of the Bankruptcy Rules. Notice of this Motion has also been given by filing a Form 8-K with the Securities and Exchange Commission as of the date hereof. The Trustee respectfully submits that no other or further notice need be given.

## NO PRIOR REQUEST

31.     No previous application for the relief requested herein has been made to this or any other court by the Trustee.

[THIS SPACE INTENTIONALLY BLANK]

10

WHEREFORE, the Trustee respectfully requests that this Court enter an Order:

(i) authorizing the Trustee to Enter into the Transition Agreement, and (ii) granting such

other and further relief that this Court deems just and proper under the circumstances.


Dated:  January 24, 2003                          WEIR & PARTNERS LLP


                                                  By:_____/s/ Kenneth E. Aaron_____
                                                      Kenneth E. Aaron (#4043)
                                                      Salene R. Mazur
                                                      824 Market Street Mall, Suite 1001
                                                      P.O. Box 708
                                                      Wilmington, Delaware 19899
                                                      (302) 652-8181 (telephone)
                                                      (302) 652-8909 (facsimile)

                                                      -and-

                                                      SCHNADER HARRISON SEGAL
                                                      & LEWIS LLP
                                                      Barry E. Bressler
                                                      Michael J. Barrie
                                                      1600 Market Street, Suite 3600
                                                      Philadelphia, Pennsylvania 19103-7286
                                                      (215) 751-2000 (telephone)
                                                      (215) 751-2205 (facsimile)

                                                      Co-Counsel to Arlin M. Adams,
                                                          Chapter 11 Trustee.

11

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| | Case No. 00-3299 (MFW) |
| | and Case No. 00-3300 (MFW) |
| CORAM HEALTHCARE CORP. and | |
| CORAM, INC., | Jointly Administered |
| Debtors. | |

## REQUEST OF DANIEL CROWLEY FOR PAYMENT OF ADMINISTRATIVE EXPENSE

Daniel Crowley, by his attorneys, hereby submits this, his Request for Payment of Administrative Expense (the "Request"). In support of the Request, Crowley states as follows:

### FACTUAL BACKGROUND

**A.    The Bankruptcy Filing and Chapter 11 Trustee**

1.    On or about August 8, 2000 (the "Petition Date"), Coram and Coram, Inc. (collectively, the "Debtors") each filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only.

2.    On February 12, 2002, this Court granted the motion to appoint a chapter 11 trustee (the "Trustee") to assume control over the Debtors' property and affairs pursuant to section 1104 of the Bankruptcy Code. On March 7, 2002 the Court approved the appointment of the Hon. Arlin M. Adams as Trustee.

**B.    Crowley's Employment under the Employment Agreement and KERPs**

3.    Prior to the Petition Date, on or about November 30, 1999, Crowley entered into an Employment Agreement (as amended from time to time, the "Employment Agreement")[1] with Coram Healthcare Corporation ("Coram"), whereby Coram agreed, among other things, to employ Crowley as its Chairman of the Board, President and Chief Executive Officer.

---

[1] A copy of the Employment Agreement and its amendments is attached hereto as Group Exhibit A

4.     Coram, and subsequently the Trustee, continued to employ Crowley after the Petition Date pursuant to the terms of the Employment Agreement through its expiration on November 30, 2002. Even after the Employment Agreement expired, the Trustee continued Crowley's employment through March, 2003.

5.     Over the course of Crowley's employment, the Employment Agreement was amended from time to time to provide, among other things, for the payment of certain bonuses (the "Bonuses") to Crowley including without limitation the following: (1) for Fiscal Year 2000, a bonus payment of 25 percent of Coram's EBITDA above $14,000,000 with a one-time payment of $5,000,000 if EBITDA exceeded $35,000,000; (2) for Fiscal Year(s) 2001, and 2002, a bonus of up to three (3) times his then base salary of $650,000 depending upon Coram's EBITDA; and a bonus payment of $1,800,000 if Coram obtained a successful refinancing. Based upon Coram's EBITDA Crowley is due $10,842,000 for Fiscal Year 2000, $996,840 for Fiscal Year 2001, and $1,950,000 for Fiscal Year 2002. Because Coram successfully obtained refinancing, Crowley is further entitled to the $1,800,000 bonus.

6.     Coram also provided for additional compensation to be payable to Crowley, among others, under certain Key Employee Retention Programs ("KERPs"). Pursuant to those KERPs, Crowley was to receive $400,000 for each year ended December 31, 2000, 2001, and 2002. Because Crowley remained employed by Coram at each of those years' end, Crowley is further entitled to an additional $1,200,000 under the KERPs (the "KERP Amounts").

7.     In addition to performance bonuses and KERP payments, Crowley was entitled to receive additional compensation for any unused vacation, and certain other Board-approved payments (the "Additional Compensation").

8.     To date, neither the Debtors nor the Trustee have paid Crowley the Bonuses, the

540480-1

2

KERP Amounts, or the Additional Compensation in an aggregate amount of nearly $16,800,000[2] (the "Administrative Request Amount") to which Crowley is entitled. Therefore, Crowley hereby requests that this Court allow the Administrative Request Amount as an administrative expense of the Debtors and direct the Debtors and the Trustee to pay him that amount.

### C.   Crowley's Contributions to the Debtors' Estates

9.   By all accounts, Crowley did more than stabilize and maintain the Debtors' businesses: he significantly contributed to the Debtors' estates by significantly improving them, even during the most trying of bankruptcy conditions. As noted by Harrison J. Goldin:

> Crowley moved quickly to stabilize Coram's finances and turn the company around. Among other changes, he centralized the purchasing process; brought inventory levels down; increased working capital; paid off some of Coram's debt; reduced accounts receivable from $130 million to about $77 million; and emphasized Coram's core therapy focus. According to Wendy Simpson, who was CFO at the time, Crowley "focused immediately on cash out." She said he literally "went through stacks of invoices and questioned each one."

Update Report of Independent Restructuring Advisor Goldin Associates, L.L.C. dated September 4, 2001, at 43

10.   After the Court denied Coram's Second Plan of Reorganization, Judge Adams was appointed chapter 11 Trustee. At the Trustee's request, Crowley stayed on as Coram's CEO. Judge Adams respected the value that Crowley brought to the Debtors, notwithstanding the circumstances and Crowley's conflict that prompted the Trustee's appointment. As the Trustee himself stated:

> 19.   Since the Appointment Date, the Trustee has independently examined the actions undertaken by Crowley as the Debtors' chief executive officer. The Trustee has visited the corporate offices in Denver and has had several meetings and discussions with Crowley, CHC's senior executives and other employees of CHC. In addition, the Trustee has considered numerous reports regarding the

---

[2] This amount represents an estimate of the bonuses Crowley is entitled to be paid and includes $1,950,000 that was reserved per direction of the Trustee Counsel for 2002 Management Incentive Plan. The Actual amount of Crowley's Additional Compensation which he claims is subject to payment as an administrative expense is subject to further investigation and a more complete review of the Debtors' books and records.

540480-1

3

financial performance of the Debtors and has reviewed the Debtors' performance under Crowley with the investment bankers retained by the Trustee.

20.    *The Trustee's evaluation is that Crowley has operated the company profitably and efficiently. Under Crowley, notwithstanding being in these bankruptcy proceedings, the Debtors have experienced positive operating margins and EBITDA [footnote deleted], reduced cost of services, reduced operating costs, improved inventory management, improved information systems, improved management tools, and maintained a stable cash position with no net borrowing to fund post-petition operations.*

21.    EBITDA has substantially increased during the period of Crowley's stewardship of the company. From 1995 through 1999, a time prior to Crowley's employment, the Debtors' EBITDA was a negative $37 million. *From January 2000 through September 2002, the Debtors experienced $83 million in positive EBITDA, a $120 million improvement under Crowley's management.* For the first nine months of 2002 (including the six months after the Trustee was appointed), EBITDA was a positive $21 million; by contrast, EBITDA was negative $54 million for the year ended December 31, 1999.

22.    Revenue and gross profit are also increasing. For the nine-month period ended September 30, 2002, the Debtors' revenue rose $31 million, or 11 percent, from the same period the year before, resulting in an increased gross profit of $9 million. Indeed, revenue was higher during each month of 2002 than during the same month in 2001.

23.    Under Crowley, CHC has improved its financial performance by identifying and focusing the business on its most profitable core therapies. When Crowley was named CEO, non-core therapies accounted for approximately 38 percent of infusion therapy revenues for the quarter ended December 31, 1999; by the third quarter of 2002, non-core therapies represented only approximately 27 percent of infusion therapy revenues. In addition, daily average revenue per patient for core therapies rose 3% to $151 per pay during the nine months ended September 30, 2002 when compared with the same period from the prior year.

24.    The most profitable type of business for CHC is the treatment of patients with chronic disorders. *With Crowley at the helm under the Trustee's stewardship, CHC refined its marketing strategy to target chronic patients. As a result of these efforts, revenue from the treatment of hemophilia patients grew by 55 percent ($15 million) during the nine months ended September 30, 2002 when compared with the same period from the prior year.* The treatment of hemophilia patients now represents 13 percent of total revenue, up from 9 percent during the nine months ended September 30, 2001. Similarly, revenues from nutrition patients were increased 6 percent during the same time frame.

25.    *Furthermore, during Crowley's tenure, CHC has also cut costs by, inter alia, leveraging volume to purchase drugs and supplies more effectively.* Cost of services for infusion, exclusive of depreciation and amortization expense, as

540480-1

4

a percentage of net revenue has been reduced from 76 percent for the year ended December 31, 1999 to 71 percent for the nine months ended September 30, 2002.

26.    *Under Crowley, the Debtors have neither required post-petition borrowings to fund operations nor utilized their debtor-in-possession facility.*

27.    *Finally, the evaluation conducted by the Trustee's advisors has revealed improved employee productivity, increased employee morale and reduced employee turnover since Crowley became CEO of the Debtors.* Company statistics show that the branch employee turnover rate was reduced by approximately six percent in 2002 when compared to 2001. It is apparent to the Trustee that many of CHC's employees are loyal to Crowley and that they remain confident of his ability to transition the Debtors' through an effective reorganization.

Motion of the Chapter 11 Trustee For Authorization To Enter Into Termination and Employment Extension Agreement with Daniel D. Crowley. (Emphasis added).

11.    Crowley's remarkable achievements at Coram speak for themselves.

## Jurisdiction

12.    This Court has jurisdiction over the Request, which is a core proceeding pursuant to 28 U.S.C. § 1334 and § 157(b)(1), (b)(2)(A), (B), and (O).

## Law and Argument

13.    As the Third Circuit and this Court have recognized, compensation, including bonuses, for debtors' employees are entitled to administrative priority status for services rendered post-petition. *See, e.g., In re Hechinger Inv. Co.*, 298 F.3d 219 (3d Cir. 2002) and *In re Lason, Inc.*, 309 B.R. 441 (Bankr.D.Del. 2001). *Accord, In re Pre-Press Graphics Company, Inc.*, 287 B.R. 726 (Bankr. N.D. Ill 2003).

14.    Here, there is no question that Crowley's services were performed for the Debtors post-petition, resulting from negotiations with the Debtor in Possession and the Trustee. Crowley's post-petition services were performed at the Debtors' and Trustee's request, and pursuant to an agreement entered into by the Debtors and Crowley. Indeed on October 3, 2002, Crowley gave the Trustee notice that he intended on terminating his relationship with Coram at

540480-1                                    5

the expiration of the Employment Agreement. *At the Trustee's request*, however, Crowley continued to serve as Coram's CEO while the Trustee and Crowley negotiated a Transition Agreement and the Trustee sought approval to enter into a Transition Agreement with Crowley. Consequently, the amounts to be paid pursuant to the Employment Agreement and the amounts earned by Crowley during the holdover period are entitled to be paid as an administrative claim pursuant to Section 503(b)(1).

15.    Furthermore, although this alone is sufficient grounds to grant an administrative priority status for those payments, Crowley is entitled to these payments under this Court's general test for administrative expense claims:

> Whether someone is entitled to an administrative claim is determined by a two-part test:  (1) there must be a post-petition transaction between the creditor and the debtor; and (2) the estate must receive a benefit from the transaction.

*In re Waste Sys. Int'l, Inc.*, 280 B.R. 824, 826 (Bankr. D. Del. 2002).  As shown above, by continuing to provide services to the Debtors, and then to the Trustee following his appointment, and then to the Trustee during the holdover period after the Employment Agreement terminated, Crowley's request easily satisfies this test.

16.    Again, it is unquestionable that Crowley's services were part of a transaction between him and the Debtors and, subsequently, the Trustee on behalf of the Debtors' estates. Crowley's services were rendered as part of his employment as CEO of the Debtors pursuant to an agreement that was never rejected.  Indeed, the Trustee waited until November 26, 2002 – four days before the employment Agreement expired on its own terms – to file a motion to reject the Employment Agreements (docket #1972).  The Trustee since abandoned prosecution of that motion.

17.    Second, as amply described above, in pleadings filed by the Trustee, by the Trustee in his deposition, and in the Goldin Report, the Debtors' estates received substantial

540480-1                                    6

benefits from Crowley's services.[3]  In addition to all of the Trustee's findings of Crowley's exemplary performance are the following successes brought by Crowley's efforts:  successful resolution of potentially costly litigation with Aetna; material improvement in the mix of therapies sold by Coram that was followed by fifteen months of consecutive net growth; establishment of a Strategic Business Unit concept that rapidly turned Coram into a viable competitor in its marketplace; a material improvement in costs; assembling a first-class management team; implementation of a crisp Information Technology strategy that brought clarity to this vital area for the first time since Coram's formation; and a multitude of operational improvements ranging from inventory to nursing visits to pricing to contracting.  The value of those benefits are appropriately measured by the amounts agreed to by the parties under the Employment Agreement and the KERPs.

WHEREFORE, Crowley respectfully requests this Court enter an order (i) granting him an administrative priority expense in an amount to be determined; (ii) directing the Debtors and the Trustee to pay Crowley that amount upon the entry of the order, and (iii) for such other and further relief as may be just.

Date: December 30, 2004

Respectfully submitted,
DANIEL CROWLEY, Movant

By: _____
One of His Attorneys

Richard H. Cross, Jr.
Donna L. Harris
Cross & Simon, LLC
913 North Market Street
Wilmington, DE 19899

---

[3] As even this Court has recently observed, in the context of discussing the merits of the Equity Committee's draft complaint "...the evidence suggests that Crowley actually improved the financial position of Coram by reducing debt and increasing earnings [citation omitted]." *In re Coram Healthcare Corp.*, 315 B.R. 321, 333 (Bankr. D. Del. 2004)

540480-1

7

Scott N. Schreiber
Anthony C. Valiulis #2883007
John H. Ward #2939924
**MUCH SHELIST FREED DENENBERG
AMENT & RUBENSTEIN, P.C.**
191 North Wacker Drive
Suite 1800
Chicago, Illinois 60606
(312) 521-2691

540480-1

8

1

*CRowley*
*DIRECT*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In re:                          )
                                )
CORAM HEALTHCARE CORP. and       )
CORAM, INC.,                     ) Case Nos. 00-3299
                                ) through 00-3300 (MFW)
        Debtors.                 )


                United States Bankruptcy Court
                824 Market Street - Sixth Floor
                Wilmington, Delaware


                December 1, 2000
                9:00 a.m.


BEFORE:   HONORABLE MARY F. WALRATH,
          United States Bankruptcy Judge


                TRANSCRIPT OF PROCEEDINGS


                WILCOX & FETZER
     1330 King Street - Wilmington Delaware  19801
                (302) 655-0477

DEC 05 2000



W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

2

1         THE COURT:  *Good morning.*

2         MR. SHIFF:  Good morning, Your Honor.

3  Adam Shiff of Kasowitz, Benson, Torres & Friedman here

4  this morning on behalf of the debtors, Coram

5  Healthcare Corporation and Coram, Inc.

6         Your Honor, our co-counsel, the Pachulski

7  firm, has filed an agenda letter.  I think they then

8  submitted an amended agenda letter yesterday.

9         THE COURT:  Yes.

10         MR. SHIFF:  Needless to say, as often is

11  the case, notwithstanding the amended agenda, things

12  have changed I think slightly before this morning's

13  hearing.  There is one item of a housekeeping nature

14  that was not reflected in the agenda letter which I

15  would just like to bring up first, if I may.

16         Yesterday, the debtors filed a motion

17  seeking to extend the exclusive periods for a 60-day

18  period.  That is set to be heard, it is noticed to be

19  heard on December 27th.  This was filed

20  notwithstanding the fact that there is a plan on file

21  and presumably the solicitation and exclusive periods

22  are still out there.  The 120 days from the petition

23  date runs on or about December 8th.  And since the

24  hearing will be taking place after that, in accordance



WILCOX & FETZER LTD.
Registered Professional Reporters

3

1    with the practice we have prepared a bridge order

2    seeking merely to extend that period until the

3    conclusion of the hearing on that motion.

4            Your Honor, just because we're all here

5    today, it seemed like a convenient time to present

6    that to the Court.

7            THE COURT:  You may bench file it.

8            MR. SHIFF:  Thank you, Your Honor.  May I

9    approach?

10           THE COURT:  Yes.

11           MR. LEVY:  Good morning.  My name is

12   Richard Levy.  I represent the official equity

13   committee.

14           I would just like to note, without

15   objecting, we knew nothing about this until this

16   morning, but I guess there's not much we can do about

17   it.

18           Thanks.

19           THE COURT:  All right.  I will enter the

20   order until it can be heard.

21           MR. SHIFF:  Thank you, Your Honor.  And

22   the order is being served out, the motion, on

23   appropriate notice.

24           Your Honor, turning now to the agenda



WILCOX & FETZER LTD.
Registered Professional Reporters

5

1          MR. LEVY:  No objection.

2          THE COURT:  All right.

3          I forget which is listed first.

4          MR. SCHWARTZ:  Benjamin Schwartz appearing

5   on behalf of the equity committee, Your Honor.  Good

6   morning.  And I think the equity committee motion is

7   No. 6 on page 7, I believe.

8          THE COURT:  I have it.

9          MR. SCHWARTZ:  Your Honor, the equity

10  committee has filed this motion.  As was announced on

11  Tuesday, we're doing it on a hurried basis to engage

12  Deloitte & Touche as valuation and financial advisers.

13  Their principal role is as a valuation witness.

14  That's really what they have been doing.

15          Present today in addition to myself

16  presenting the motion is Mr. Phil Bentley from the

17  Kramer, Levin firm in New York, who represents

18  Deloitte, and Mr. Bernard Pump, who is one of the

19  principals who has been working on the valuation

20  engagement.  And Mr. Bentley would like to take some

21  time to make a proffer of the evidence on some of the

22  underlying things and has discussed that with

23  Mr. Schepacarter.

24          Your Honor, our motion asks for a nunc pro



WILCOX & FETZER LTD.
Registered Professional Reporters

6

1    tunc retention back to November 8th, which is the day

2    we met with and engaged Deloitte & Touche.  As you

3    know, this is on a fast track.  Deloitte & Touche was

4    engaged principally to give a valuation for the

5    hearing, confirmation hearing that's scheduled today.

6         They started right away rather than having

7    -- they did not have the luxury to wait.

8         THE COURT:  Well, before we go further, I

9    think the parties were given until today to voice any

10   objections, so perhaps it would help to focus matters

11   if I hear any objections.

12         MR. SCHWARTZ:  That would be fine, Your

13   Honor.

14         MR. FRIEDMAN:  Your Honor, David Friedman,

15   counsel for the debtors.

16         In the interest of moving ahead with the

17   confirmation hearing, the debtors have determined not

18   to assert any objections to the retention.

19         THE COURT:  All right.  Does the U.S.

20   Trustee wish to present anything?

21         MR. SCHEPACARTER: Thank you, Your Honor.

22   For the record, Richard Schepacarter for the United

23   States Trustee's Office.

24         Your Honor, I only was able to look at



8

1    proffer and perhaps some brief cross-examination.

2            THE COURT:  All right.  Does any other

3    party wish to object?

4            MR. MINUTI:  Good morning, Your Honor.

5    Mark Minuti from Saul, Ewing.

6            As Your Honor knows, I'm local counsel for

7    the equity committee.  As a courtesy to Mr. Bentley, I

8    would like to move his admission pro hac vice.  I

9    prepared a motion, if I may approach?

10           THE COURT:  You may.

11           Thank you.

12           MR. MINUTI:  Thank you, Your Honor.

13           THE COURT:  It will be granted.  You may

14   proceed.

15           MR. BENTLEY:  Good morning, Your Honor.

16   Philip Bentley of Kramer, Levin representing Deloitte

17   & Touche LLP.

18           If Your Honor wishes, what I would propose

19   to do is make a brief proffer of Bernard Pump's

20   testimony and then if parties wish to cross-examine

21   him, he is here in the courtroom and available to be

22   cross-examined.

23           THE COURT:  That's fine.

24           MR. BENTLEY:  And let me preface it by

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

25

1        THE COURT:  Any objection to that for

2   Warburg?

3        MR. GEWERTZ:    I can't speak for Warburg.

4   On behalf of the committee, we don't have any

5   objection.  I think I had made it clear to a Warburg

6   representative that that is the standard that this

7   Court prefers.  And I believe Your Honor so indicated

8   that yesterday in a hearing I heard or the day before.

9        And I believe the engagement letter itself

10  contemplates a final application which would be

11  subject to that standard.

12        THE COURT:  All right.

13        MR. SCHEPACARTER: Okay.

14        THE COURT:  And that was the only concern?

15        MR. SCHEPACARTER: The other part was the

16  $50,000 per month they would have to file, if it gets

17  that far, I think they would have to file fee

18  applications to get paid whatever they need to get

19  paid.

20        THE COURT:  They would follow the normal

21  professional compensation procedures that are

22  applicable in this case.

23        MR. GEWERTZ: .Right.  That doesn't kick in

24  until after four months from November 21, Your Honor.



WILCOX & FETZER LTD.
Registered Professional Reporters

39

1    Your Honor, it's a cheap shot.  It has hurt the

2    company already.  The company has had a hard time

3    staying together, keeping its employees motivated.

4    They have been accused of terrible things.  They have

5    been sued.  It's not fun.  I wouldn't wish it on

6    anybody.

7              But, as I said, it's a good plan.  It's a

8    fair plan.  It's a plan proposed in good faith, which

9    meets all of the requirements of Section 1129 of the

10   Bankruptcy Code.  Hundreds of creditors depend upon

11   confirmation of this plan to recover something upon

12   their claims.  Thousands of employees depend upon

13   confirmation of this plan to keep their jobs.

14             Most importantly, tens of thousands of

15   patients depend upon confirmation of this plan for

16   their very lives.  The debtors and I believe others

17   urge Your Honor to confirm this plan.

18             And, Your Honor, I would just like to

19   introduce for what I think will not be more than two

20   minutes Eugene Tillman of our regulatory firm, who I

21   think has less than two minutes of a presentation.

22             MR. TILLMAN:  Good morning, Your Honor.

23   Eugene Tillman from Reed, Smith in Washington, D.C.

24             Reed, Smith is the outside healthcare



WILCOX & FETZER LTD.
Registered Professional Reporters

40

1  regulatory counsel for the debtors.  We were engaged

2  by Coram in the fall of 1999 and began advising the

3  company on a wide range of issues, including

4  compliance with Stark II at that time.  This was at a

5  time before Mr. Crowley was CEO of the company and the

6  debtors were facing the issue of compliance with Stark

7  II as of the end of 1999 and we advised the company

8  through that process.

9          Obviously, I think Mr. Friedman has done a

10  good job of explaining in a nutshell how Stark II

11  works.  It's not an area of general understanding and

12  common knowledge.  So I am more than prepared, Your

13  Honor, to answer any questions that you have about

14  Stark II.  But I think it's fair to say that but for

15  the exception that Mr. Friedman described --

16          THE COURT:  Well, I don't mean to

17  interrupt, but is your statement in the form of

18  testimony?

19          MR. FRIEDMAN:  Well, Your Honor, our

20  intention was simply to make Mr. Tillman available to

21  the Court if the Court had any questions.  If there

22  are none now, he will be available.

23          THE COURT:  Yes.  I don't think it's

24  necessary, I mean to the extent I don't know what the



WILCOX & FETZER LTD.
Registered Professional Reporters

49

```
1    of it.  We understand how easy it is to attack us for

2    sensationalism.  This is not sensationalism, Your

3    Honor.  It is all shown by the evidence.

4              Finally, and non-controversially I

5    suppose, we believe that the notion that there was a

6    special committee that acted independently in any kind

7    of fashion to protect the equityholders is totally

8    belied by the evidence.

9              With that, Your Honor, I will honor your

10   wishes and sit down.

11             Thank you.

12             THE COURT:  Thank you.

13             Are you ready to start with the testimony?

14             MR. FRIEDMAN:  Your Honor, there's one

15   other comment.

16             MS. TIEN:  Your Honor, Wendy Tien and I am

17   here on behalf of the United States Health Care

18   Financing Administration.  We are the agency that's

19   responsible for administering the Stark II law.

20             And if I may make a few comments, may I

21   make a few comments regarding Stark II before we

22   proceed or, if not, may I make myself available to

23   answer any questions you have about Stark II?

24             THE COURT:  You may be available.  I'm not
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

50

1   sure it's necessary.  It may be more appropriate as

2   testimony.  I don't think it's appropriate as an

3   opening statement.  That's my concern.

4                    MS. TIEN:  Thank you, Your Honor.

5                    MR. MILLER:  Your Honor, Alan Miller.  May

6   I be heard briefly?

7                    THE COURT:  Yes.

8                    MR. MILLER:  Alan Miller from Weil,

9   Gotshal & Manges representing the noteholders.

10                   This is a case that fascinates me and I

11  think Your Honor is going to be fascinated because

12  what Your Honor is going to hear from the witness

13  stand is that these noteholders who allegedly

14  controlled the company didn't get a penny, not one

15  penny of interest, not one penny of principal, until

16  just before these proceedings were filed in connection

17  with a quarter of a billion dollars of debt.

18                   And if you took that money, those

19  relatively few dollars that were paid as a result of

20  an asset sale a few weeks before, a few months before

21  the proceeding was filed, amortized it over the life

22  of this debt, you would find that the interest rate

23  they received was something under 1 percent per annum.

24  And that's the result if there was any influence of



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Crowley - direct                    55

1   Dynamic Healthcare or Cerberus in any way operate to

2   restrict the time or the nature of the work which you

3   can perform for Coram?

4      A.   None at all.

5      Q.   And on average, how much of your attention is

6   devoted to Coram in let's say a particular week?

7      A.   Coram has been all consuming for me.  It's

8   averaged something well north of 40 hours, sometimes

9   as much as 75 or 80 a week.

10     Q.   Has Cerberus engaged you to act on their behalf

11  in any way in connection with Coram?

12     A.   Absolutely not.

13     Q.   Do you receive any consulting fees, any

14  compensation, any other benefits at all from Cerberus

15  for any of the work that you do for Coram?

16     A.   I receive nothing from Cerberus for anything

17  that I do at Coram whatsoever.  In fact, my agreement

18  with Cerberus specifically excludes in writing any

19  compensation from Cerberus related to Coram, period.

20     Q.   Does your compensation from Coram in any way,

21  any way at all depend upon how Cerberus is treated

22  under the plan of reorganization?

23     A.   Absolutely not.  My compensation is

24  specifically, specifically tied to the economic



WILCOX & FETZER LTD.
Registered Professional Reporters

155

State of Delaware    )
                     )
New Castle County    )


## CERTIFICATE OF REPORTER


I, Kurt A. Fetzer, Registered Professional Reporter and Notary Public, do hereby certify that the foregoing record, pages 1 to 153 inclusive, is a true and accurate transcript of my stenographic notes taken on December 1, 2000, in the above-captioned matter.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 4th day of December 2000, at Wilmington.


Kurt A. Fetzer

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                          )
                                )
CORAM HEALTHCARE CORP. and      )    Case No.00-3299 through
CORAM, INC.,                    )    00-3300 (MFW)
                                )
            Debtors.            )


United States Bankruptcy Court
Courtroom No. 1
Sixth Floor
824 North Market Street
Wilmington, Delaware 19801

December 11, 2000
2:00 p.m.


BEFORE:    THE HONORABLE MARY F. WALRATH
           United States Bankruptcy Judge



Transcript of Proceedings

497

WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters



1          MR. SHIFF:  Good afternoon, Your Honor.

2    Adam Shiff here on behalf of Coram Healthcare Corporation

3    and Coram, Inc., the two debtors in these proceedings.

4          Your Honor, on December 7th, the Pachulski

5    firm filed an agenda letter in accordance with the local

6    rules of this Court setting forth the matters that are on

7    for today's hearings.  Very simply, Your Honor, the

8    schedule, the letter contains two items that are set to

9    be heard.  First item is a motion to approve a settlement

10   with Aetna which has been scheduled before.  Again, Your

11   Honor, we are going to seek to carry this motion as we

12   are still working on some final language to clear up an

13   objection.

14          Just for the sake of simplicity, what I

15   would suggest we do is let's just carry it to tomorrow

16   right now which is our next omnibus day where we have a

17   whole number of things scheduled there.  Whatever gets

18   resolved will get resolve.  We'll move the whole group

19   together just so we get everything on the same track.

20          THE COURT:  That's fine.

21          MR. SHIFF:  Your Honor, the second item

22   would be on the continued hearing on the confirmation of

23   the debtors' plan which is listed as number 2 on the

24   agenda, and for that I turn over the podium to



3

1    Mr. Friedman.

2                THE COURT:  Okay.

3                MR. FRIEDMAN:  Your Honor, you may recall

4    that on Friday, December 1st, we began the hearing with

5    Mr. Crowley's direct testimony, and we agreed that we

6    would proceed today with Mr. Danitz and Mr. Scroggins.

7    Now, with respect to Mr. Scroggins, the equity committee

8    has asked to inquire of Mr. Scroggins with respect to

9    some additional documents and we've been asked that to

10   take place either this evening or first thing in the

11   morning.  So we would proceed this morning -- we will

12   proceed today -- I'm sorry -- with Mr. Danitz which I

13   think will take probably the afternoon.

14               THE COURT:  Okay.

15               MR. LEVY:  Your Honor, I think I have a

16   problem.  I have actually a short-run problem and perhaps

17   a longer one.  With respect to Mr. Danitz, who's the

18   witness that is being put on, first of all, I have no

19   problem, of course, with his going ahead on direct.  I

20   have, I think, a very serious problem with being asked to

21   commence cross, and I would like to take a moment and

22   explain why.

23               Mr. Danitz is the source material for

24   valuation here.  He's the chief accounting officer who



WILCOX & FETZER LTD.
Registered Professional Reporters

Scott R. Danitz - Direct (Friedman)                    31

1   Q.   Okay.  But are the numbers accurate?

2   A.   Yes, they are.  These are the numbers.

3   Q.   And again, who is the person at Coram primarily

4   responsible for preparing the financial projections that

5   appear on page 13?

6   A.   Myself.

7   Q.   Now, can you turn also to page 77 of this

8   document?

9   A.   Yes.

10  Q.   Now, do you recognize what this is, what page 77

11  represents?

12  A.   Yes.  It's a summary of the projections between

13  2000 and 2004 from a profitability cash flow standpoint.

14  Q.   Okay.

15        MR. LOW:  David, we've got a real problem.

16  These pages do not line up.  Are there more than one

17  versions of this?

18        MR. LEVY:  Your Honor, I have in front of

19  me the document that has the identical cover sheet as

20  Debtors' Exhibit 8, appears to be the same thing.  It's

21  previously marked as Scroggins' Exhibit 2 and pages don't

22  match.  I'm looking at these pages and seeing different

23  numbers.

24        THE COURT:  Is there an explanation?

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Scott R. Danitz - Cross     y)                          106

1                 MR. MILLER:   Your Honor, just one moment.

2     My silence about converting debt to equity should not be

3     taken as acquiescence.   It is something --

4                 THE COURT:   That was obvious.

5                 MR. MILLER:   It's something so

6     extraordinary that in 35 years I've never heard of it in

7     a Chapter 11.

8                 THE COURT:   That's obvious.  And I'm not

9     considering it.

10                All right.  We will stand adjourned.

11                (Which was all the proceedings had on

12    hearing of said cause on the date aforesaid.)

13

14

15

16

17

18

19

20

21

22

23

24



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1

1    IN THE UNITED STATES BANKRUPTCY COURT

2    FOR THE DISTRICT OF DELAWARE

3

4

In re:                              ) Chapter 11
5                                    ) Case No. 00-3299
CORAM HEALTHCARE CORP. and           ) through 00-3300
6    CORAM, INC.,                     )
                                     )
7        Debtors.                     )

8

9

10                          Bankruptcy Courtroom
                            Courtroom 1 - Sixth Floor
11                          824 Market Street Mall
                            Wilmington, Delaware

12                          Tuesday, December 12, 2000
                            12:35 p.m.
13

14   BEFORE:        HONORABLE MARY F. WALRATH
                    United States Bankruptcy Judge
15

16

17

18

19                          MOTIONS

20

21

22

23            WILCOX & FETZER
         1330 King Street - Wilmington, Delaware  19801
                    (302) 655-0477
24



WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

487x

Scott R. Danitz - Cross-Examination        2

1            THE COURT:  Good morning, I apologize.  I

2  will give you your hour.

3            MR. FRIEDMAN:  Thank you, your Honor.  We

4  got a couple of minor housekeeping items.  I think it

5  makes sense to just go straight to the cross-examination

6  that was pending and then --

7            THE COURT:  Let's do that.  Mr. Danitz will

8  come back.  You are still under oath.

9  BY MR. LEVY:

10     Q.  Good morning, Mr. Danitz.  Richard Levy with the

11  Equity Committee.  I have put in front of you a document

12  that we have marked Equity Committee No. 4, which are

13  minutes marked Draft of a meeting of the Board of

14  Directors of Coram Healthcare on July 31st, 2000.

15     A.  Yes.

16     Q.  And you recall attending that meeting?

17     A.  Yes.

18     Q.  I'd like to explore with you, for just a few

19  moments, the trend of EBITDA at Coram.

20            You recall, at that meeting, there was a

21  discussion which you participated concerning the trends

22  that were evident in the operating results?

23     A.  Yes.

24     Q.  And you recall reporting that, on July 31st, it

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Scott R. Danitz - Cross-Examination    28

1    include, under a maximum calculation, ten million 250,

2    which would include the five million.  So, it's not 35

3    million minus the MIP and you are at a lower number.  The

4    EBITDA has to include the entire MIP cost.

5        Q.    Let's look back now, we are going to move on at

6    Scroggins Exhibit 9, it's Equity Committee 6 now.

7              Now, you testified, at your deposition

8    yesterday, that you had never seen this document until it

9    was shown to you at the deposition; is that correct?

10       A.    That's correct.  I have never seen this

11   document.

12       Q.    Therefore, obviously, it would be your testimony

13   that you didn't prepare this document?

14       A.    I did not prepare this document, but I recognize

15   these numbers.

16       Q.    Now, Mr. Danitz, I am going to represent to you

17   that, at a deposition of Mr. Scroggins, about a week ago,

18   that he testified as follows, page 275:  Mr. Scroggins,

19   can you identify for us Exhibit 9, please?  Excuse me.  I

20   am sorry.  Let's strike that.

21             I am going to represent to you that

22   Mr. Scroggins testified, on page 278, beginning at line

23   15, Now, you have testified that Mr. Danitz?

24             MR. MILLER:  Your Honor, please, I have a

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Scott R. Danitz - Cross-Examination    29

1    transcript of his deposition, but it only goes to page

2    268.

3              MR. FRIEDMAN:  Your Honor, while we are at

4    this, I object to the use of a, of a deposition for any

5    purpose other than, I mean, you can use the deposition to

6    cross the deponent in that deposition, but to represent

7    what someone said in a different context --

8              THE COURT:  Overruled.  He can ask if this

9    witness agrees with that testimony.  What page are we on

10   again?  Do you have the page?

11             MR. MILLER:  I don't.  If somebody else has

12   a copy, I'd like to follow it.

13             MR. FRIEDMAN:  What page?

14             MR. LEVY:  Looks like 278 to me.

15             MR. MILLER:  Got it.

16   BY MR. LEVY:

17     Q.   If everybody has it, let me go on.  I am going

18   to represent to you that Mr. Scroggins' testimony at his

19   deposition, a week or so ago, Now, you have testified

20   that Mr. Danitz, of Coram, prepared Exhibit 9; correct?

21   And his answer is, Yes.

22             Now, can you explain the inconsistency

23   between Mr. Scroggins' testimony that you prepared

24   Exhibit 9 and your testimony that you didn't?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1    so I can start you tomorrow at two and take the rest of

2    the day.  I still don't know about Thursday.

3                    MR. LEVY:  And Friday?

4                    THE COURT:  Friday, I have already reserved

5    the morning for you at nine a.m.  So, who can we do

6    tomorrow?

7                    MR. FRIEDMAN:  I got to make some phone

8    calls.  It's a little quick, but, well, you know, here is

9    the -- Scroggins is in town.  I would, I was going to put

10    him on Friday, but I think we will try to do him

11    tomorrow.  I don't think we have time -- they want to

12    depose him about it for a third time, and I --

13                    MR. LOWE:  Your Honor, this is my, they

14    have already agreed to this.  As you see, Mr. Scroggins,

15    at his deposition, said this is the only piece, I got

16    this piece of paper from Mr. Danitz, it's the only piece

17    of paper I got, and it's what I relied on.  That turned

18    out that his organization had gotten a lot of other stuff

19    and he hadn't even gotten that piece of paper.  It will

20    not be a long deposition, 15, 20 minutes, maybe a half an

21    hour.  I want to go over what he got.

22                    THE COURT:  I'd rather do it without me,

23    so, I will leave it to the parties.

24                    MR. FRIEDMAN:  So, how about sometime

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


IN RE:                          :

   CORAM HEALTHCARE CORP.     :    Case Nos. 00-3299 and
   and CORAM, INC.                 00-3300(MFW)
                                :

        Debtors


        United States Bankruptcy Court
        824 Market Street - Sixth Floor
        Wilmington, Delaware


             December 13, 2000
                2:12 p.m.


BEFORE:   HONORABLE MARY F. WALRATH,
          United States Bankruptcy Judge


        TRANSCRIPT OF PROCEEDINGS


_____

        WILCOX & FETZER, LTD.
   1330 King Street - Wilmington, DE 19801
            (302) 655-0477



W&F
WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

2

```
1              P R O C E E D I N G S

2              MR. FRIEDMAN:  Your Honor, good afternoon.

3    I think you know why we are here.  Should we just keep

4    going?

5              THE COURT:  Why don't you give me a preview

6    of coming attractions?

7              MR. FRIEDMAN:  Okay.

8              THE COURT:  What are we going to hear today?

9              MR. FRIEDMAN:  Today we have the debtors'

10   valuation expert.  I would anticipate that we could

11   finish with him today, direct and cross.

12             MR. LEVY:  Your Honor, Mr. Friedman tells me

13   Friday, a day you had reserved for us, is a day on

14   which he has no witnesses.  We have only -- the only

15   witness we have other than Mr. Crowley's

16   cross-examination, which will take some time, if he

17   gets here, and Mr. Amaral, if Mr. Friedman decides to

18   produce him, is our valuation expert at Deloitte.  They

19   are available any day next week.  Earlier in the week

20   would be better.  We will have one or two literally 10

21   minute witnesses next week, members of the equity

22   committee and that's all.

23             I'm sorry.  There may be, depending if we

24   get the documents, Alex Brown.  But our presentation
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters



13

1    Q    During the past couple of years, about how
2    many health care companies would you say you have been
3    engaged with respect to valuation work?
4    A    In about a year and a half, seven plus.
5    Q    Seven health care companies?
6    A    Right, seven health care companies.
7    Q    Can you name any?
8    A    Yes.  The ones I can name, Sun Healthcare,
9    Manor Post Acute, Healthcore Holdings, Covenant Care.
10   And there are others that we are doing work for on a
11   confidential basis.
12        MR. FRIEDMAN:  Your Honor, we would seek to
13   qualify Mr. Scroggins as an expert on business
14   valuation.
15        MR. LOW:  May I inquire, your Honor?
16        THE COURT:  You may.
17        MR. LOW:  I'll make this brief.
18                CROSS-EXAMINATION
19   BY MR. LOW:
20   Q    Mr. Scroggins, you have no advanced degrees,
21   is that correct?
22   A    I have no advanced degrees, correct.
23   Q    And you have never taken any outside
24   training in valuation other than these in-house



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

61

```
 1        MR. FRIEDMAN:  And no further questions,
 2   your Honor.
 3        MR. LOW: · Your Honor, I believe we have had
 4   a this problem before.  I believe if Mr. Miller has any
 5   questions or Mr. Gewertz, I believe they should go
 6   first.
 7        THE COURT:  I agree.  Any questions?
 8        MR. MILLER:  Just two or three.
 9              CROSS-EXAMINATION
10   BY MR. MILLER:
11     Q    Mr. Scroggins, at any time prior to today,
12   has any of the noteholders, Foothill, Cerebus or
13   Goldman Sachs, contacted you with respect to your
14   valuation of Coram, Inc., and Coram Healthcare?
15     A    No, none whatsoever.
16     Q    Has anyone on their behalf contacted you
17   with respect to your valuation, anyone such as myself
18   or another attorney or other professional?
19     A    Nobody has at all.
20     Q    So no one, to your knowledge, no one, either
21   from or on behalf of any of these noteholders, have
22   made any suggestion to you whatsoever what the results
23   should be of your valuation of these entities?
24     A    Nobody at all has made any suggestion to me
```



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1  regarding the valuation process, et cetera.

2       Q     Are there any relationships that exist that

3  would influence your valuation, any relationships

4  between these noteholders and Chanin Capital Partners

5  that would influence your valuation?

6       A     No, there are not.

7             MR. MILLER:  Thank you, your Honor.  No more

8  questions.

9             MR. GEWERTZ:  The creditors' committee has

10  no questions of this witness.

11                    CROSS-EXAMINATION

12  BY MR. LOW:

13       Q     Good afternoon, Mr. Scroggins.

14       A     Hi.

15       Q     You testified -- a small point.  But you

16  testified that you believe this assignment began in

17  late April or early May, is that correct?

18       A     I believe we met with the company in late

19  April, early May, and the assignment, recalling my

20  dates correctly, began in mid May.

21       Q     I think we previously marked and I'm now

22  going to show to you what's just been marked as Equity

23  Committee Exhibit 10, which I believe is a copy of the

24  Application for Order Authorizing and Approving the



IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In the matter of            )
                            )
CORAM HEALTHCARE CORP.      ) Case No. 00-3299
and CORAM, INC.             ) Through 00-3300 (MFW)
                            )
        Debtors.            )


                    Bankruptcy Courtroom
                    Room No. 2 - Sixth Floor
                    Marine Midland Plaza
                    824 Market Street Mall
                    Wilmington, Delaware


                    Friday, December 15, 2000
                    9:07 a.m.



BEFORE:   THE HONORABLE MARY F. WALRATH,
          United States Bankruptcy Judge




                TRANSCRIPT OF PROCEEDINGS



                WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

488

2

```
 1              MR. FRIEDMAN:  Your Honor, good morning.
 2   I think what's on the schedule today is, as we discussed
 3   at our last session, the cross-examination of
 4   Mr. Crowley.
 5              Just very briefly.  We have one, I think,
 6   minor impasse that we can get past quickly which is that
 7   last Friday a deposition was taken by the Equity
 8   Committee of one of our directors, Donald Amaral, and we
 9   did not ask him any questions at that deposition, because
10   we believed that he would be available for trial.  Now,
11   because of the way this has been scheduled, I think his
12   availability is in serious doubt because of a number of
13   personal circumstances, and what we would like to do is
14   just complete his deposition so that, if the deposition
15   is going to be introduced by the Equity Committee into
16   evidence, there's a complete record.  And we can go to
17   him sometime either on Tuesday or Wednesday in order to
18   do that.  I think it's going to be very brief.  It could
19   be done telephonically if people wish to attend
20   telephonically.  We believe, if the Amaral deposition is
21   to be put into evidence by the Equity Committee, there
22   should be a complete record, and we can make arrangements
23   to go to Mr. Amaral for an hour or two and complete that
24   record.  I understand there's been an objection to that.
```

3

1   So we need to resolve that one issue.

2                MR. LEVY:  Your Honor, at the conclusion of

3   Mr. Amaral's deposition, which was attended by

4   Mr. Harwood, Mr. Low, who took the deposition, asked

5   Mr. Amaral, this is on page 108, "Do you have any plans

6   to attend the trial in this matter in Wilmington?"

7                And his answer, after some colloquy, was,

8   "That's a simple answer.  Today, no."

9                Mr. Harwood then in the last line of the

10  deposition says, "I have no questions at this time."

11  That was on page 110.

12                What happened here, Your Honor, is the

13  transcript came back.  They don't like what they see in

14  it, but --

15                THE COURT:  Well --

16                MR. LEVY:  They had their opportunity to

17  examine him.  He is a director, and he's going to be in

18  Florida next week.  We think they ought to bring him or

19  they have waived their right to do so.  This is serious.

20  The testimony he gave in this deposition was that he was

21  misled --

22                THE COURT:  I don't want to get into the

23  substance of it, and I know that both sides have been

24  very accommodating to each other as far as completing

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

6

1    that we can put that into evidence on our own case.

2                    MR. LEVY:  Your Honor, he's now in Florida.

3    Again, it's not convenient.  I think I have said all I

4    should say.  I really want you to see him if it's

5    important.  We do have time on Monday to do that.

6                    THE COURT:  I'm not going to require that

7    he show up.  I'm going to allow the parties to complete

8    the deposition and allow the debtor to take some cross of

9    him, if you will.

10                    MR. FRIEDMAN:  Thank you.

11                    MR. SHIFF:  Your Honor, I think there are

12   two housekeeping matters.  One which is reflected on the

13   agenda and one which is more in the form of a

14   pro hac vice application, which I will turn to

15   Mr. Lhulier for in one second.

16                    I'm turning to the agenda letter dated

17   December 14th, item No. 2, which relates to the

18   substantive consolidation issue that had been before the

19   Court.  The Court will recall that the R-Net estates had

20   filed a motion for substantive consolidation.

21                    THE COURT:  Why was it put on for today?

22                    MR. SHIFF:  What had occurred was at the

23   hearing, I think, on December 1st Ms. Jones had

24   represented to the Court that settlement had been reached



7

1  with the R-Net estates and that I think she had handed up

2  a stipulation at that time that addressed sort of the

3  procedural aspects of the settlement.  I think she had

4  indicated then that we just needed to complete the

5  documentation and we would then need to hand it up for

6  Court approval.

7           If Your Honor doesn't want to entertain it

8  today, if we can put it off to one of the hearings that

9  are scheduled for next week, I think --

10          THE COURT:  Let's put it off for Monday.

11          MR. SHIFF:  That's fine.

12          THE COURT:  It's related to confirmation.

13          MR. SHIFF:  That's fine, Your Honor.  Thank

14  you.

15          MR. LHULIER:  Good morning, Your Honor.

16  Christopher Lhulier for the debtors.  I'd like to move

17  the admission pro hac vice of Philip Warden of Pillsbury

18  Madison & Sutro, on behalf of Mr. Crowley this morning.

19          THE COURT:  All right.

20          MR. LHULIER:  May I hand up his motion?

21          THE COURT:  You may.  It will be granted.

22  Welcome.

23          MR. FRIEDMAN:  Your Honor, could

24  Mr. Crowley take the stand?



**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Crowley - Cross                                      62

1       A.    I know it has reduced revenues.  I absolutely

2   know it.  I don't believe it.  It lost an $89 million

3   contract with Aetna.

4       Q.    What part of the $13 million that you claim is

5   for reducing revenues?

6       A.    Excuse me?

7       Q.    Withdraw that question.

8              MR. LEVY:  Your Honor, I wonder if we could

9   take a five-minute break for the sake of my voice.

10             THE COURT:  We may.  Since you're under

11  cross, you're not allowed to discuss your testimony with

12  anyone.

13             (A recess was taken.)

14             MR. LEVY:  Your Honor, I'm going to have

15  marked as EC 25 a letter dated February 28, 2000, from

16  Mr. Crowley to the board of directors.

17             MR. MILLER:  What was the date?

18             MR. LEVY:  February 28, 2000.

19  BY MR. LEVY:

20      Q.    Mr. Crowley, you wrote that letter?

21      A.    Yes.

22      Q.    And in that letter you said, and I'm looking at

23  page 2 in the middle paragraph, about halfway down, "The

24  risks for me as a professional are also substantially

Volume 5                                    1                51-10

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In re:                          )
                                )
CORAM HEALTHCARE CORP. and      ) Case No. 00-3299
CORAM, INC.,                    )   through 00-3300
                                )      (MFW)
                    Debtors.    )



                        Bankruptcy Courtroom
                        No. 1, Sixth Floor
                        Marine Midland Plaza
                        824 Market Street
                        Wilmington, Delaware



                        Monday, December 18, 2000
                        9:15 a.m.



BEFORE:  THE HONORABLE MARY F. WALRATH,
         United States Bankruptcy Judge




            -- Transcript of Proceedings --



                WILCOX & FETZER
1330 King Street - Wilmington, Delaware  19801
                (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters
COPY



#489

2

1    THE COURT:  Good morning.

2    ALL:  Good morning, Your Honor.

3    MR. FRIEDMAN:  Your Honor, good morning.  I

4 think this is the last day for evidence in this

5 confirmation hearing.  Just one quick note and then I'll

6 hand the podium over to Mr. Levy.

7    We have this pesky substance consolidation

8 stipulation that we would like the Court to consider.  We

9 thought that, just to give parties the maximum amount of

10 notice, we would just hand it up for consideration on

11 Thursday, which is when closing arguments are being made,

12 if that's okay.

13    THE COURT:  All right.  Any objection?

14    (No response.)

15    THE COURT:  All right.  We'll hear it on

16 Thursday.

17    You might have noticed that all the other

18 matters, since they were uncontested, will not be going

19 forward today, so we have today.

20    MR. LEVY:  Thank you.

21    THE COURT:  Without interruption.

22    MR. LEVY:  I would like to call Mr. Richard

23 Haydon, a member of the Equity Committee.  Mr. Haydon is

24 our last witness but for the valuation witness, and he is

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1          THE COURT:  Yes.

2          MR. LEVY:  Your Honor, may I stand by the

3   witness?

4          THE COURT:  Yes.

5          MR. MILLER:  Your Honor, may we have a copy

6   of this exhibit?

7          MR. LEVY:  I'm sorry.  That's all I have.

8          THE COURT:  Can you share with counsel for

9   the debtor, perhaps?

10         MR. LEVY:  Your Honor, the document we have

11  marked as EC-75 is a group exhibit consisting of four

12  letters:  one dated June 1st, 2000, from me to

13  Mr. Crowley; a response on June 7th to me from

14  Mr. Friedman; a letter that I, then, wrote to

15  Mr. Friedman on June 20th; and Mr. Friedman's response to

16  me on June 21st.

17  BY MR. LEVY:

18     Q.   Are the letters that I wrote letters that were

19  written at your request?

20     A.   Yes, they were.

21     Q.   Can you identify the responses as copies that I

22  furnished to you when I received them?

23     A.   Yes, I can.

24         MR. LEVY:  Your Honor, I would move EC-75

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    have first?

2                    MR. SCHWARTZ:  I sort of assumed that the

3    supporters of the debtor should probably go next.

4                    THE COURT:  Does the committee want to

5    present an expert?

6                    MR. GEWERTZ:  Yes, Your Honor.  I call

7    William C. McGahan, M-c-G-a-h-a-n.

8                         - - - - -

9                    WILLIAM C. MC GAHAN,

10                   the witness herein, having first been

11                   duly sworn on oath, was examined and

12                   testified as follows:

13                   DIRECT EXAMINATION

14   BY MR. GEWERTZ:

15        Q.   Mr. McGahan, by whom are you employed?

16        A.   UBS Warburg.

17        Q.   What is your present position?

18        A.   I am managing director and deputy head of our

19   global healthcare investment banking group.

20        Q.   What does UBS Warburg do, generally?  What are

21   its business activities?

22        A.   We are a securities firm, investment banking

23   underwriting, etcetera.

24        Q.   Does UBS Warburg's work involve the healthcare

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

251

```
 1              (The testimony was then concluded at
 2  4:25 p.m.)
 3              MR. LEVY:  Your Honor, you had reserved on
 4  the letters this morning because Mr. Friedman hadn't had
 5  a chance to see them.
 6              THE COURT:  Well, let's see what exhibits
 7  you are offering that I haven't dealt with.
 8              MR. FRIEDMAN:  I'll respond to anything
 9  that I'm asked to.
10              THE COURT:  EC-75?
11              MR. FRIEDMAN:  No objection.
12              THE COURT:  EC-75 is admitted.
13              (Equity Committee Exhibit 75 was admitted
14  into evidence.)
15              MR. FRIEDMAN:  Were all the documents that
16  were introduced on Mr. Crowley's cross --
17              MS. SARGENT:  That's what I'm here for.
18              MR. FRIEDMAN:  I'll look over your
19  shoulder.
20              MS. SARGENT:  From what was reserved
21  yesterday, you can look at the documents.
22              We have an offer for 18.
23              MR. FRIEDMAN:  Okay.  No objection.
24              THE COURT:  That's admitted.
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters