1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                       )
                             )
CORAM RESOURCES NETWORK, INC.,)
and CORAM INDEPENDENT PRACTICE) Case No. 99-2889
ASSOCIATION, INC.,           )      (MFW)
                             )
              Debtors.       )


                    Bankruptcy Courtroom
                    No. 1, Sixth Floor
                    Marine Midland Plaza
                    824 Market Street
                    Wilmington, Delaware


                    Thursday, December 21, 2000
                    1:35 p.m.


BEFORE:   THE HONORABLE MARY F. WALRATH,
          United States Bankruptcy Judge



          -- Transcript of Proceedings --



              WILCOX & FETZER
1330 King Street - Wilmington Delaware  19801
              (302) 655-0477

15570-001\DOCS_DE:14839.1
12/27/00 10:50 AM

65

1    I'll never know whether we would be in the same boat

2    today or whether a different plan would have been

3    proposed by the debtor.  The problem is for the last year

4    the debtor has been run by a man who had a secret,

5    undisclosed -- as far as the terms of the contract --

6    agreement with one of the significant creditors in the

7    case.

8                MR. MILLER:  That's true.

9                THE COURT:  You'll just never know and

10   that's the problem with conflicts of interest.

11               MR. MILLER:  I would like you to take some

12   comfort from one fact, and Your Honor can check the

13   records because Your Honor can take judicial notice:

14   These notes are unsecured.  Had these creditors

15   controlled this debtor, do you think seriously these

16   notes would be unsecured notes?

17               I'll close with that.  Thank you,

18   Your Honor.

19               MR. LEVY:  Your Honor, first forgive my

20   voice, please.  Before I go to the remarks I had

21   prepared, many of which Your Honor has anticipated, and

22   that will save time, let me just cover two statements

23   that were made about the record that I think are wrong.

24               First, Mr. Friedman told us that the reason

66

1    that the interest was paid in cash rather than PIC was

2    kind of a putting bread on the water. That's

3    Mr. Friedman's testimony. It just isn't there at all in

4    Mr. Crowley's testimony. Mr. Crowley talked about it at

5    page 100 of his cross, and all he argued was, I think,

6    kind of preposterous notion that he didn't want to add to

7    the debt, the burden the company was going to have to

8    bear.

9             Second, with respect to the so-called

10   sophisticated directors. First of all, let's take

11   Mr. Amaral. Mr. Amaral, as the record shows, received a

12   million dollar bonus from Coram at the time that the

13   Securities Exchange Agreement was negotiated, and there

14   was a provision in the Securities Exchange Agreement that

15   he had to stay as chairman and it would be a default if

16   he didn't.

17            That suggests -- at least suggests -- some

18   relationship with Mr. Feinberg who also told Mr. Amaral,

19   according to Mr. Amaral's testimony, that if he wanted a

20   job like Mr. Crowley's job being a CEO of troubled

21   companies, he would be interested.

22            Now, as to the other two directors,

23   Your Honor, it's fine. My friends here say they are

24   sophisticated, but there is no evidence at all about

67

1  that.  Those people who have the burden of showing that

2  this plan is fair didn't come in here.  And, Your Honor,

3  we didn't have time to go out to California and get them.

4  Enough about that.

5              Let me now talk about Zenith, which

6  certainly is the road map here.  We have heard a lot of

7  talk about fair under the Bankruptcy Code.  Except for a

8  brief remark by Mr. Gewertz, we heard nothing about the

9  entirely fair standard of the Weinberger case.

10              Now, why does entirely fair apply here?

11  Well, there is the obvious domination, but there is a lot

12  more.  If you want the benefit of the business judgment

13  rule, you have to use due care.

14              Due care, in situations like this, with a

15  transaction with people on both sides, requires, as

16  Your Honor pointed out, an independent counsel to the

17  independent directors.  It requires an independent

18  financial advisor.  It requires some independent action.

19              There is nothing in this record to show

20  that these two independent directors ever sat down alone,

21  away from Mr. Crowley, away from Mr. Feinberg and said,

22  let's take a look at this.  Let's use the due care the

23  law requires that we use so we can get the benefit of the

24  business judgment rule.  They didn't do it.  And when

68

1    they didn't do it, they subjected themselves to the

2    entirely fair rule.

3              So that, then, moves us into entirely fair.

4    Again, I'm not going to repeat Your Honor's statements,

5    but we know that, as you said, at the April 5th meeting

6    there was a resolution that Mr. Friedman brought that

7    said that the independent directors are authorized to

8    hire independent counsel, independent financial advisors,

9    and they never did anything like that.

10             But the thing that they did that I think is

11    the worst thing that happened here was the conduct with

12    respect to the delay in time.  Mr. Crowley testified in

13    his deposition and here that he didn't know until March

14    or April that Stark II was going to be a problem.  I

15    remember asking him more than once, Are you sure?  Are

16    you sure?

17             Well, Your Honor will recall that I then

18    showed him a December 15th fax from Ernst & Young

19    addressed to him talking about Stark II.  I showed him

20    minutes of three meetings in December which talked about

21    Stark II and the problem and the need for reorganization.

22    He still adamantly insisted at page 76 of his transcript

23    that he didn't know about Stark II and how serious it was

24    before March or April.

15570-001\DOCS_DE:14839.1
12/27/00 10:50 AM

69

1          Now, in December of 1999 they appointed a

2     special committee.  Mr. Amaral testifies it never

3     functioned.  So that special committee, for all purposes,

4     didn't exist.

5          The only special committee there ever was

6     was the one that was appointed one week before the

7     bankruptcy, and their only function was to see if it was

8     fair.  They weren't even out there negotiating.  They

9     didn't have anybody supporting them professionally.  So

10    to say they're fine, upstanding, independent people as

11    Mr. Crowley does is fine for him to say, but it is

12    certainly not in accordance with Delaware law about

13    discharging the fiduciary duty of due care.

14         Now, what I think really happened here,

15    Your Honor, is that on February 15th, there is a meeting,

16    and that's shown in EC-5, and that's not a document that

17    was discussed, but it is in evidence, there was a meeting

18    between the company and the three lenders.  The purpose

19    was to discuss the situation of the company and the

20    Stark II problem that they had known about for three

21    months that was going to clearly be a problem at the end

22    of this year.

23         Following that meeting, Mr. Crowley writes

24    a letter on February 28th, and that's EC-25, and that

70

1    letter is notable for two reasons.

2                    First of all, he knew the third week in

3    January, eleven months ago, that he would need to file a

4    Chapter 11 petition because you'll find attached to that

5    letter a memorandum, it's on Bates page 103 on EC-25, a

6    letter from Paul Weiss, from a bankruptcy lawyer there

7    trying to get the business, dated January 24th talking

8    about, "As I discussed in Denver, I attach an outline of

9    the steps needed to develop and implement a consensual

10   restructuring."

11                   In the letter itself he says to his

12   directors, February 28th, that he intends to initiate a

13   process aimed at restructuring Coram, and because of

14   Stark II, we must restructuring, and he says virtually

15   nothing else is going to alleviate the need.

16                   Now, I think what happened here,

17   Your Honor, is somewhere at this point, somebody got a

18   good idea.  They said, hey, instead of trying to raise

19   $75 million or $100 million, let's solve it a different

20   way.  Let's get rid of all the equity that Stark II says

21   that doctors have to fill out reports.  We know that

22   Cerberus isn't a doctor or Goldman Sachs or Foothill.

23                   That, I suspect -- and I only suspect, but

24   I think it's a reasonable inference -- was the beginning

71

1   of the notion of let's get rid of the equity.  It

2   conforms with a couple of things.

3              Right at this time, and in this same

4   letter, Crowley writes his letter saying give me more

5   money or I'm going to quit.  Now, at that point he had a

6   million options.  At that point, up to that point, he was

7   driven to raise the value of the stock.  That's how he

8   would make money.  Now the equity is gone.  He wants

9   something else.

10             So he negotiates a contract which he said

11  from that witness stand will get him $13 million for a

12  job that I guess wasn't so good.  Who does he negotiate

13  it with?  He negotiates it with Feinberg.  It's approved

14  at a compensation committee meeting on March 22nd.  It's

15  signed by Mr. Feinberg on April 6th after discussion but

16  not approval by the board.  There is just nothing in this

17  record that says that this independent, sophisticated

18  board ever approved that.

19             THE COURT:  Well, Mr. Amaral testified it

20  was approved.

21             MR. LEVY:  He did.

22             THE COURT:  There are board minutes that

23  confirm that, but he testified the board considered it

24  and approved it.

15570-001\DOCS_DE:14839.1
12/27/00 10:50 AM

B552

72

1           MR. LEVY:  He did, indeed.  He did.  But

2  again, there are no board minutes that say it.

3  Mr. Amaral certainly said it.

4           THE COURT:  But let me, perhaps, cut to the

5  chase.

6           MR. LEVY:  Please.

7           THE COURT:  Let's assume that this is

8  correct, that your thesis is correct.

9           MR. LEVY:  Right.

10           THE COURT:  There was a conspiracy, and

11  that Mr. Crowley and Cerberus, and perhaps other members

12  of the board of directors willingly or simply led by

13  Mr. Crowley and Cerberus not knowing they were being led

14  down the garden path, and ultimately we are here on

15  December 21st at 3:10 p.m. with the plan that provides

16  that the equity is wiped out.

17           What is the alternative?  What do you want

18  the Court to say?  Deny confirmation.

19           MR. LEVY:  It's certainly something we've

20  thought about, Your Honor.

21           First, I think we have to say, you know, to

22  use the all-proverbial saw about the child who kills his

23  parents and then pleads for mercy because he is an

24  orphan.

73

1                  What I mean here is that they put

2       themselves in this position.  If they had proceeded in

3       January, then this hearing wouldn't have been on

4       December 22nd.  But we are here.

5                  THE COURT:  But like Solomon, you are

6       asking me to kill your child, too.

7                  MR. LEVY:  No, I'm not, and I have a

8       solution to keep the child alive.

9                  THE COURT:  Deny confirmation, the company

10      is dead.

11                 MR. LEVY:  Okay.  Three points.

12                 One, the debt can, and I have no doubt

13      will, because they are not going to let this company go

14      down, convert to a perpetual preferred which the

15      accountants will say is equity because there is no time

16      when it's due, they convert 100 million --

17                 THE COURT:  But the problem with that

18      proposal, I don't have the power to modify the plan, do

19      I?  I can only confirm this plan or deny confirmation of

20      this plan.  I'm somewhat restricted.  There is no other

21      plan on the table.

22                 MR. LEVY:  Right.  But, Your Honor, you

23      have to say, what are these people going to do if you

24      deny confirmation of the plan?  They are now going to

15570-001\DOCS_DE:14839.1
12/27/00 10:50 AM

74

```
1    have eight days.  If it is correct, if Mr. Crowley was

2    correct that the company will go up in smoke, they are

3    going to have a decision to make.  You can't make them do

4    it.  You can't modify the plan.  But what do we think

5    they are going to do?  Are they going to be stubborn and

6    say we are going to wipe out all of our interest here, we

7    don't care, or they can convert.

8              Number 2, I have another plan, and that is

9    if you use the equitable subordination principle based on

10   the unfairness here and treat whatever the number is,

11   $100 million of debt as equity, you've done it.  You have

12   met with Stark II.

13             Number 3, Your Honor --

14             THE COURT:  Well, but let me push you on

15   this.

16             MR. LEVY:  Please.

17             THE COURT:  As I see the evidence, the only

18   suggested conspirator on the noteholder side is Cerberus.

19             MR. LEVY:  116 million.

20             THE COURT:  Well, don't they have -- is

21   that 116 million?

22             MR. MILLER:  Whatever 35 or 36 percent of

23   250 million is, and I'm not good enough with numbers.

24             MR. LOW:  The disclosure statement does say
```

75

1    116 million.

2                THE COURT:  I know there was a discussion

3    with Mr. Feinberg, and he didn't have a calculator,

4    either.

5                So as punishment for their bad acts, if you

6    will, equitably subordinate the Cerberus portion of the

7    noteholder debt.

8                MR. LEVY:  That solves Stark II.

9                There is a third response I want to give

10   Your Honor, and that is this:  There is no question that

11   Stark II says what it says.  There is no question that

12   they don't have an exemption.

13               But there is another step you have to take.

14   That is:  Will it really wipe out the company?  Now,

15   what's the evidence?  Well, we have Mr. Crowley who says

16   that in his experience, he believes that the company will

17   go up in smoke if they have to comply.  But what's his

18   experience?

19               He testified he never heard of Stark II in

20   any other company.  He did not bring an expert in here.

21   He had an expert sitting in the courtroom here, a

22   healthcare expert, on the first day.  He didn't bring

23   someone in.  There's no basis for that.

24               I would suggest, Your Honor, that these

15570-001\DOCS_DE:14839.1
12/27/00 10:50 AM

B556

76

1   noteholders are pretty smart people.  They are taking a

2   big chance here that you won't confirm the plan.  They

3   deliberately took that chance.  Maybe they took that

4   chance and that one of the things they considered, one of

5   the parts of their calculus was, well, maybe it's not so

6   bad.  Maybe if Judge Walrath doesn't confirm our plan,

7   we'll get by for a while because, you know, we only have

8   2,500 stockholders.  It's not like every doctor in the

9   world is a stockholder.  I don't know if that is the

10  case.

11             But I would like to, if I may, turn --

12             THE COURT:  But since it's a public

13  company, it's not simply a matter of identifying today

14  who are the shareholders.  Because it's publicly traded,

15  isn't the problem that tomorrow a referring doctor could

16  buy a share and, therefore, every time we get a referral

17  from a doctor, we must make that doctor and every member

18  of that doctor's family within the Stark confines sign a

19  disclosure saying they are not a shareholder.

20             MR. LEVY:  I think what you have to do is

21  add one more piece of paper to the pile of papers that I

22  know I fill out every time I go to see a doctor.  I'm not

23  suggesting it's --

24             THE COURT:  It's not the patient filling

77

1    out -- I know doctors have a little problem with filling

2    out forms.

3                    MR. LEVY:  Doctors do that, too.

4                    Your Honor, can I turn your question around

5    a little bit and say, What if you do confirm this plan?

6    You write, forgive me, eloquent opinions.  What if you do

7    confirm this plan and the opinion says because of the

8    problem of Stark II, I don't care that they delayed.  I

9    don't care about a million dollar undisclosed statement.

10                   What it really will say, Your Honor, to

11   people like Cerberus, and I don't mean this pejoratively,

12   but they are in the business, they are high-risk lenders,

13   what it will really say to them is, go buy management and

14   you can take over a company.

15                   It will say that the courts have blessed

16   this kind of behavior.  I know you don't want to do it

17   and I know that that is the solemnic problem that

18   Your Honor is facing now.

19                   I have a whole eleven pages here,

20   Your Honor, of description of the things and I'm not

21   going to go through them.  You know the record better

22   than I do.

23                   THE COURT:  Isn't there an option five?

24                   MR. LEVY:  I would like to hear it.

15570-001\DOCS_DE:14839.1
12/27/00 10:50 AM

78

```
 1              THE COURT:  Strike anything in the plan

 2    such as the releases and the exculpation and -- not the

 3    indemnification, but anything that would insulate

 4    Mr. Crowley or Cerberus or any of the officers and

 5    directors from any action by the shareholders regarding

 6    the actions that they have taken, need I really decide

 7    that they, by their delay, caused harm to the

 8    shareholders, is that really a confirmation issue so long

 9    as any cause of action on that is not released by the

10    plan, and so long as by my confirming the plan I make no

11    decision as to whether or not that type of activity rises

12    to the level of a suit by the individual shareholders

13    under Delaware law?

14              MR. LEVY:  Well, I answer that, Your Honor,

15    by saying that the injury here was to the company, the

16    injury was to the company, not the shareholders for the

17    reason I heard you say, and that is if we had someone

18    watching out for the equity here, somebody truly

19    independent, if instead of Mr. Crowley it would have been

20    Mr. Unconflicted back in January, we might have had a

21    different result.

22              Now, I can't prove and nobody can prove

23    hypothetically that Mr. Unconflicted as CEO would have

24    done better, but there is certainly possible, but the
```

15570-001\DOCS_DE:14839.1
12/27/00 10:50 AM

79

1   burden shouldn't be on the equityholders.  The burden is

2   on the wrongdoers, and they haven't been able to show

3   that.

4           I think that giving the possibility of a

5   long, drawn-out class-action litigation to shareholders

6   is simply not the equivalent of the right of the equity

7   to not have a plan confirmed that doesn't meet the

8   entirely fair standard or the fairness standard of the

9   Bankruptcy Act.

10          That's why, with respect, I think the

11  solution No. 5 just doesn't go.  You can't bless what

12  these people did.

13          Your Honor, on this matter of disclosure,

14  it's not sufficient for these lawyers to sit in here and

15  say I don't know why.  These people filed public

16  statements with the Securities & Exchange Commission.

17  Every 10-K and I think every 10-Q has a section called

18  "Other Relationships" where you have to describe things

19  like that.  The notion that a securities lawyer would

20  say, well, I'm not going to ask you if you are getting

21  this million-dollar-a-year conflicting payment is silly.

22  Of course they had to disclose it.

23          The argument which I heard here that

24  Mr. Crowley is such a rich man or a man of such integrity

80

1   that a million dollars is unimportant to him, it simply

2   doesn't fly.  It doesn't solve the conflict.  The

3   conflict exists no matter what the purity of

4   Mr. Crowley's soul.

5               Your Honor also mentioned the smell test.

6   That's EC-20, the private records, Your Honor.

7   Mr. Crowley testifies that it is a throw-away letter, a

8   cold proposal after testifying that he asked for the

9   relief that's in it immediately before he sent it.  Then

10  look at it.  Can you honestly believe that that's the way

11  Mr. Crowley would write a proposal?  I just don't think

12  you can.

13              I guess I really ought to get back to what

14  I think is the central matter of what's troubling

15  Your Honor.

16              Mr. Friedman talked mostly about valuation.

17  I'm not going to argue who was the more independent

18  appraiser or evaluator here.

19              THE COURT:  Even under your valuation you

20  are not going to meet Stark in ten days.

21              MR. LEVY:  Pardon me?

22              THE COURT:  Even under your valuation, the

23  company can't meet Stark in ten days.

24              MR. LEVY:  I agree, absolutely right.  I'm

81

1   going to come back to Stark in a minute.  I just want to

2   make this point.

3           You can't isolate price from process.  The

4   reason that process is important is because it increases

5   price.  Bad process, bad price.  Good process, good

6   price.  I think that's what we learned from Weinberger

7   and from Zenith.  You can't bifurcate them as Weinberger

8   said.

9           Look.  It is ten days, Your Honor.  It's

10  their fault that it's ten days.  They've got to find the

11  solution.  You can't.  I can't.  They can because if

12  Your Honor refuses to confirm this plan because of their

13  behavior, they are going to have a busy ten days.  But

14  they've thought about it.  They already asked you, by the

15  way, to extend the exclusive period into January.  But

16  it's their problem.  They did wrong.  I believe they will

17  come up with a solution, Your Honor.

18          I believe they are trying to make you the

19  victim.  They are trying to say you, this Court, are

20  going to make sick people even sicker.  They are not

21  going to let that happen because it's going to cost them

22  too much money.

23          Your Honor, I think I'm through.

24          I would like to debate the very difficult

82

1    problem that I truly understand you face, but as you

2    debated, I guess I would just -- I guess --

3                    Mr. Low just handed me a note that says,

4    and he is right, Mr. Crowley testified that preferred

5    would work.

6                    But as you debate this, they did it.  They

7    have the keys to their own jail cell.  That's the reason,

8    and not my failing voice, that I think I'm going to sit

9    down and ask for those reasons that the plan not be

10   confirmed and then -- I'm not quite ready to sit down.

11                   What happens if you don't confirm it?  I

12   think they solve their problem.  I think we then have

13   some time -- remember, the debt doesn't come due until

14   May, so we have time.  We have time to have a process

15   here that is much more fair.  We have time to see if the

16   company can be marketed.  We have time to look at the

17   American investor story and you can pick at it and say

18   you used the wrong companies or you can say, hey, things

19   are getting better and everybody may come out fine if

20   Your Honor does that.

21                   Thank you.  Thank you for all the

22   attention.

23                   THE COURT:  Thank you.

24                   MR. FRIEDMAN:  Your Honor, I'll just be

83

1   very brief.

2                   There is a pending class action, as I

3   mentioned in my opening statement, against the officers

4   and directors against Cerberus, against Foothill, against

5   Goldman, against everybody I know in this case other than

6   me, and I'm probably going to wake up one morning and

7   find myself named, as well.

8                   Your Honor, it's the same issues that have

9   been raised in this case.  The plan never purported to

10  release those claims to start with, so it's not as if you

11  need to make any modifications on that.

12                  If there are claims, if there are

13  derivative claims that exist, they belong to the debtors.

14  If you wanted to give standing to the Equity Committee to

15  bring them going forward, that's an option you have.

16                  I'm not aware of a theory by which you can

17  subordinate debt to equity.  If that's a theory that the

18  Equity Committee wishes to bring going forward, I don't

19  know.  I don't think it has merit, but I suppose they

20  would have the right to do that.

21                  But I want to go back.  I've been sort of

22  searching my soul since I sat down to try to figure out

23  how we got to this place.

24                  Number 1, I don't have a solution despite

15570-001\DOCS_DE:14839.1
12/27/00 10:50 AM

84

1   what Mr. Levy said.  I don't have a solution to this

2   problem if you don't confirm the case.  That's not your

3   problem, but I do want you to understand that.

4           The second thing is:  How did we get here?

5   We got here under the theory that we would file a plan

6   based upon an independent valuation and then we would

7   invite whoever had a problem with it to raise their

8   voices with this Court.

9           Whatever Your Honor has observed about what

10  was disclosed in public filings or whether there was

11  less-than-full disclosure in the disclosure statement

12  cannot be said that in this litigation, in this court,

13  there hasn't been complete disclosure of all these

14  issues.

15          Our view, frankly, was, and I can't even

16  think of why, the question you asked Mr. Miller, I don't

17  have any answer to it, either, why the disclosure

18  statement says that there is an agreement but it doesn't

19  say how much.  I just don't know.  I'm trying to

20  remember.  I don't even remember why it says what it

21  says.

22          What I do know is the general theory of

23  this debtor going into court was we are going to file

24  this plan, we are going to defend this valuation, and

15570-001\DOCS_DE:14839.1
12/27/00 10:50 AM

85

1    what we are going to do is we are going to allow any

2    party who has a problem with it to have complete

3    disclosure.

4              I said at the first hearing that you

5    wouldn't hear any discovery fights in this case, and you

6    didn't.  I've been in plenty of cases where Your Honor

7    has been called upon to deal with counsel fighting over

8    documents and depositions and discovery.  You didn't hear

9    any of that in this case.

10             We made all proper disclosures since the

11   day we filed.  We made all documents available.  There is

12   no lack of understanding as to who gets what and whose

13   relationships are what.  Our view was at the end of the

14   day the bankruptcy process would have a cleansing effect

15   on all these issues.  Your Honor would ultimately decide

16   whether or not the valuation was appropriate, whether or

17   not the plan meets the salutary purpose of

18   rehabilitation.  You confirmed the plan.

19             I honestly can tell you that from the

20   standpoint of those who worked on this plan, which

21   includes the Chanin people, our people, the debtors'

22   management, never in a single time -- this is not in the

23   record, but I feel the need to tell you -- there was

24   never a single moment when there was a piece of

86

1    information that we thought was relevant that we elected

2    not to include in a disclosure document.  Never.  This

3    particular point is one that I honestly cannot recall

4    ever arising.

5                So having said all that, I believe that the

6    failure by this Court to confirm this plan leaves us with

7    no solutions.

8                I think it's also very important to note,

9    Your Honor heard from Mr. Haydon, Your Honor heard from

10    Mr. Crowley.  I think the evidence is consistent.  There

11    is no other plan.  I don't mean in a sense there is no

12    other plan on file.  I mean there is no other plan.

13    There is no other source of equity for this company.  No

14    one has pointed to any.

15                Just like there was a sophisticated debtor,

16    there was a sophisticated Equity Committee.  If there was

17    any other person who had any interest in this company by

18    way of acquisition, by way of investment, by way of

19    financing, it would have surfaced.  There is nobody

20    there.

21                So the ultimate effect of not confirming

22    the plan is we'll go into next year, we'll have

23    incredibly serious problems, and if we manage to solve

24    those problems, we'll come back to the Court at some

87

1   point with another plan or sale or some other vehicle

2   that I think there is no basis to conclude will result in

3   anything other than creditors getting less and the

4   equityholders still getting nothing.

5           So, Your Honor, if the issue is that

6   somebody did something wrong, and I'm not suggesting

7   that, and I'm certainly not endorsing that view, but if

8   that's the point, there is redress in the courts, but I

9   don't think that the answer is to put this company out of

10   business.

11          Thank you.

12          THE COURT:  Well, I'm in a difficult

13   situation.  I would like to sidestep my duties, but I

14   think I have to determine in deciding whether to confirm

15   this plan under 1129(a)(3), I must conclude that it is

16   proposed in good faith and that the plan proponents have

17   acted in good faith.  I just do not want to be in a

18   position to conclude on this record that that is so.  I

19   cannot conclude on this record that that is so.

20          I think that the contractual relationship

21   between Cerberus and the CEO, Mr. Crowley, did taint the

22   process, and I think that, if anything, the ultimate

23   fairness of the process in bankruptcy is a paramount

24   principle to be protected by the Bankruptcy Court.

88

1          Maybe we would be at the same place today

2      if that contractual relationship had not been there, if

3      it had been disclosed to all parties, but I don't know

4      that and I don't think anybody will know that.

5          We are at a terrible place.  The Equity

6      Committee, even on its numbers, which I agree with the

7      Creditors' Committee's counsel and their valuation expert

8      and the cross-examination of the Equity Committee expert

9      does point out the questionable nature of that valuation.

10          I think under any of the numbers the

11      company is insolvent today.  But I don't think I can

12      confirm a plan based on that fact because I think that

13      because of the process being tainted by this relationship

14      which began in November of 1999, and perhaps in August of

15      1999, has so tainted the debtors' restructuring of its

16      debt, the debtors' negotiations towards a plan, even the

17      debtors' restructuring of its operations.

18          I think on that point I think it is a shame

19      that Mr. Crowley and perhaps Cerberus and the debtor

20      itself is tainted in this manner because I think there is

21      evidence that Mr. Crowley did do a good job operationally

22      in helping the debtor turn around.  But I can't conclude

23      that the debtor might not have done even better had there

24      not been this relationship.  I don't know.  That's the

89

1    problem.  I don't know what would have happened without

2    this actual conflict of interest.  I do think it's an

3    actual conflict of interest.

4              I think that the actions of Mr. Crowley to

5    hide the relationship, and I think that EC-20 did show an

6    intent to hide the relationship and to hide his request

7    for additional compensation in Winterland in exchange for

8    his efforts here did at least evidence that he, himself,

9    believed that this relationship should not be disclosed

10   and, therefore, did, in fact, taint his ability to serve

11   as CEO of the debtor.

12             Whether it opens up a Pandora's box or

13   encourages other noteholders or other parties in future

14   bankruptcies to try the same thing, I'm not as concerned

15   about that, but I just do not want my name confirming a

16   plan where this type of activity occurred for a year

17   before the plan was proposed for confirmation.  I just

18   cannot conclude that it's proposed in good faith for

19   those reasons.

20             I do not have the ability to suggest a

21   different plan.  I do not have the ability to give an

22   exemption from Stark II.

23             So I leave it to the debtor to see where it

24   goes from here for now.  I'll look for a form of order if

15570-001\DOCS_DE:14839.1
12/27/00 10:50 AM

90

1    someone wants to present me with one.

2                MR. MINUTI:  We will, Your Honor.

3                THE COURT:  We'll stand adjourned.

4                MR. LEVY:  Thank you, Your Honor.

5                (The hearing was then concluded at

6    3:35 p.m.)

7                      - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

15570-001\DOCS_DE:14839.1
12/27/00 10:50 AM

Goldin
DiRect
Cross                    1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

IN RE:                       ) Chapter 11
                             )
CORAM HEALTHCARE CORP. and ) Case Nos. 00-3299
CORAM, INC.,                 ) through 00-3300(MFW)
                             )
              Debtors.       ) Jointly Administered

                    United States Bankruptcy Court
                    Courtroom No. 1
                    Sixth Floor
                    824 North Market Street
                    Wilmington, Delaware 19801

                    November 5, 2001
                    9:40 a.m.

BEFORE:   HONORABLE MARY W. WALRATH
          United States Bankruptcy Judge

                    WILCOX & FETZER, LTD.
          1330 King Street - Wilmington, Delaware 19801
                      (302) 655-0477

2

1          THE COURT:  Good morning.

2          MR. FRIEDMAN:  Good morning, Your Honor, we

3   are back.  This is the -- this is our confirmation

4   hearing on our second plan, and there are -- let me just

5   deal with a couple housekeeping matters first.  There was

6   a motion filed by the Equity Committee, in limine motion,

7   to exclude the testimony and report of Goldin Associates.

8          Their concern was that the -- that the

9   testimony would be of a nature in which Mr. Goldin would

10  be speaking to statements that he had heard and we would

11  then be seeking to introduce those statements for their

12  truth.  Our response in the case, for purposes of which

13  we wish to introduce the Goldin testimony report, and I

14  believe, on that basis, that motion is moot.

15          We are not seeking to accomplish that which

16  has been suggested.  Rather, what we are seeking to do is

17  to introduce the testimony and report to show the

18  retention of the firm, the investigation that it

19  performed, the methodologies used, the conclusions that

20  were reached, and the recommendations made to the

21  company's independent directors, not that any particular

22  statement or document or -- or any other fact that might

23  have been discovered along the way is true or not true.

24          MR. LEVY:  Your Honor, I believe that's

3

1    right.  Our original motion, in fact, said we had no

2    objection to it coming in, but nothing comes in for the

3    truth, is our understanding, and, on that basis, we can

4    withdraw the motion or stipulate or whatever, simply

5    recognize it, Your Honor.

6                THE COURT:  All right.

7                MR. LEVY:  Might I also mention, we were

8    handed, about ten minutes ago, debtors' response to the

9    Equity Committee's objections.  Now, I have no problem

10   with their filing a response.  I just -- it's kind of

11   late, and I hope it doesn't become part of today's

12   hearing.  Even with my speed reading class, I haven't

13   read it.

14               THE COURT:  I haven't read it either, but I

15   assume, since this is a several-day hearing, we'd all get

16   a chance to look at it and respond.

17               MR. LEVY:  Thank you.

18               MR. FRIEDMAN:  Your Honor, from our side,

19   we are indifferent about opening statements.  The Equity

20   Committee has asked for five minutes.  If you want to

21   hear five minutes of opening statements, we can do it.

22               THE COURT:  I don't know that it's

23   necessary.  I have read the --

24               MR. LEVY:  Your Honor, and I think  --

1    A.    Yes, sir.

2    Q.    Now, your draft report went out on June 29th?

3    A.    Yes, sir.

4    Q.    Isn't it a fact that, on July 2nd, three days

5    later, an e-mail was sent to Mr. Lemanski -- he works for

6    you; right?

7    A.    Yes, sir.

8    Q.    -- in which he said, Subject, Coram.

9          MR. LOW:   From.

10         MR. LEVY:   I am sorry, it was, from, of

11   course -- no.  It was sent to Mr. -- I am sorry, from

12   Deloitte & Touche, and, forgive me, Your Honor, I am

13   reading from a blackberry.  We just retrieved this, from

14   Deloitte & Touche to you, saying, Pursuant to our

15   discussion earlier today, please provide D&T with

16   additional information regarding the following in

17   reference to the Goldin draft report circulated Friday --

18   this is on Monday -- one, source of the unadjusted

19   infusion EBITDA of $30.8 million.

20         That relates to the area where you

21   acknowledged you made a mistake; right?

22   A.    I am not familiar with that e-mail, Mr. Levy, so

23   it's difficult for me to comment.

24   Q.    Second, Deloitte asks -- Deloitte, on behalf of

Harrison J. Goldin - Cross-Examination        55

1    therefore, I am unable to respond, in any meaningful way,

2    to the implications of either.

3        Q.    Okay.    Let's --

4        A.    Mr. Levy, may I turn this off for you or would

5    you like me to leave it on?

6                    MS. MINOR:    If I could return it to its

7    owner.

8                    THE WITNESS:    I have one of my own.    I know

9    the batteries wear down.

10   BY MR. LEVY:

11       Q.    Do you have a copy of the updated report in

12   front of you?

13       A.    Yes, sir.

14       Q.    You may want to refer to this, but I note that,

15   on page 3 of the updated report, you observe that the

16   Court found that Crowley's relationship with Cerberus,

17   and I quote, gave rise to an actual conflict of interest

18   which tainted the Debtors' restructuring of its debt, the

19   Debtors' negotiations toward a plan, even the Debtors'

20   restructuring of its operations.

21                    Do you see that?

22       A.    Yes, sir.

23       Q.    Mr. Goldin, you agree, don't you, that Crowley's

24   relationship tainted all the various aspects of this

Harrison J. Goldin – Cross-Examination       60

1   deposition, that Crowley was continuing to get paid

2   80,000 a month by Cerberus?

3                   MR. FRIEDMAN:  Objection, Your Honor,

4   assumes facts not in evidence.  There is no establishment

5   of that fact.

6                   MR. LEVY:  May I --

7                   THE COURT:  Sustained.  You may ask another

8   question.

9   BY MR. LEVY:

10      Q.   Do you know who L. Peter Smith is?

11      A.   Yes, sir.

12      Q.   I took Mr. Smith's deposition in September, and

13   the following question and answers were given:  Question,

14   Did you ever ask Mr. Crowley whether he was continuing to

15   receive payments from Cerberus?  Answer, No.

16                   MR. MILLER:  Your Honor, may we have a page

17   and a line?

18                   MS. MINOR:  I am sorry, 85, line 24 through

19   four.

20   BY MR. LEVY:

21      Q.   Answer, No.

22                   Do you know, today, whether he is

23   continuing to receive payments from Cerberus?  Answer,

24   No.

Harrison J. Goldin - Cross-Examination        96

1    and if we can get Danitz done today, we will definitely

2    finish by Wednesday, so I will try to be quick on my end

3.   of Danitz and maybe we can get through.

4              MR. LOW:  Your Honor, what is the schedule

5    of the rest of the week?  We are starting at 12:30 on

6    both of those days?

7              THE COURT:  Yes.

8              MR. LOW:  Will we have the rest of the

9    afternoon or just part of the days?

10             THE COURT:  You will have the rest of the

11   afternoons starting at 12:30 tomorrow and on Wednesday.

12             MR. MILLER:  Your Honor, the train

13   schedules have changed a little bit, and I was wondering

14   if we could start ten or 15 minutes late tomorrow and

15   Wednesday.  That gives us another hour in our offices

16   since we are here all day today.

17             THE COURT:  Do you want to start at one?

18             MR. MILLER:  12:45 would work.

19             MR. GEWERTZ:  Train arrives on the half

20   hour.

21             THE COURT:  All right.  That's fine.

22             All right.  We will stand adjourned.

23             (Recess taken.)

24             MR. LEVY:  Your Honor, if I may, I would

224

VOLUME 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

DANITZ CROSS
+ REDIRECT

In Re:                      )
                            )
CORAM HEALTHCARE CORP. and  )
CORAM, INC.,                )Case No. 00-3299
                            )through 00-3300(MFW)
        Debtors.            )


            United States Bankruptcy Court
            824 Market Street - Sixth Floor
            Courtroom No. 1
            Wilmington, Delaware

            November 6, 2001
            1:40 p.m.

            --  --  --  --
            TRANSCRIPT OF PROCEEDINGS
            --  --  --  --


BEFORE:    THE HONORABLE MARY F. WALRATH, JUDGE.

            --  --  --  --

WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware  19801
(302) 655-0477

225

1         THE COURT:  Good afternoon.  Thank you for

2    starting later.  We can proceed.

3         MR. FRIEDMAN:  I think we were in the

4    middle of the cross-examination of Mr. Danitz.

5         THE COURT:  Yes.

6              SCOTT R. DANITZ,

7    having been previously sworn as a witness,

8    was resumed on examination and testified

9    further as follows:

10              CROSS-EXAMINATION

11   BY MR. LOW:

12   Q.   Good afternoon, Mr. Danitz.

13   A.   Good afternoon.

14   Q.   Let's talk briefly about liabilities.  You have

15   Exhibit 7 in front of you?

16   A.   The debtors' or equity?

17   Q.   Debtors' Exhibit 7.

18   A.   Yes.

19   Q.   This is a schedule that was prepared under your

20   direction actually yesterday.  Correct?

21   A.   It was completed yesterday morning.

22   Q.   We got it sometime later yesterday morning.  So

23   I may not have as crisp a questions as I would

24   otherwise have.  Let me do the best I can given the

15    Q.   Mr. Danitz, let me show you what's been marked

16    as Exhibit EC 19.

17              MR. MILLER:   Excuse me.  May I have a

18    copy, please?

19              MS. MINOR:   You certainly may.

20              MR. LOW:   Sorry.  Do we have a missing

21    page?

22              MS. MINOR:   Just this one.

23              MR. LOW:   I'm not going to the top page.

24    BY MR. LOW:

Danitz - Cross                                    250

1     Q.   Mr. Danitz, can you identify this document?

2     A.   This was an executive overview that was

3     provided to the board of directors at the July board

4     meeting related to the forecast that was done at the

5     July time frame for 2001 through 2005.

6     Q.   If you will look past where the text leaves off

7     at about the sixth page and the schedules begin.  Can

8     you identify those schedules?

9     A.   Yes.  These are some of the assumption

10    schedules that were included in reference to in the

11    narrative.

12    Q.   You did this July forecast for the purpose of

13    the reorganization?

14    A.   This one was done because of the second plan

6              MR. LOW:   Nothing further.

7              THE WITNESS:  Thank you.

8              THE COURT:  We're done for today?

9              MR. FRIEDMAN:  We're done.

10            MS. MINOR:  One thing for the record.  At

11   the end of Mr. Goldin's testimony the debtors asked to

12   hold off on deciding about the admissibility of Equity

13   Committee Exhibits 1 through 11.  Mr. Friedman still

14   hasn't had a chance to look at them.  So he said he'd

15   look at them today.  So we'll let you know about their

16   decision tomorrow.

17           MR. FRIEDMAN:  Your Honor, could we start

18   at 1:00 o'clock tomorrow?

19           How long do you think it will take on

20   cross tomorrow?  I'll be a half an hour.

21           THE COURT:  Who can we look forward to

22   hearing from tomorrow?

23           MR. FRIEDMAN:  You will hear from somebody

24   new.

380

1              MR. LOW:  Somebody you never met.

2              MR. FRIEDMAN:  Somebody you never met.

3   Somebody I only met once or twice.  Donald Amaral.

4              MR. LEVY:  An hour, hour and a half, I'd

```
5    guess.

6              MR. FRIEDMAN:  I think if we start by

7    1:00, we'll be finished by 4:00 for sure.

8              THE COURT:  Let's start at 1:00 then.

9    We'll stand adjourned.

10             (Hearing adjourned at 5:07 p.m.)

11             --  --  --  --

12

13

14

15

16

17

18

19

20

21

22

23

24
```

381

```
1                  I N D E X

2    DEBTORS' EVIDENCE

3    WITNESS NAME          DIR CROSS REDIR RECROSS

4    SCOTT R. DANITZ         --   225   311    --
```

Volume 3                                 384

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In re:                           )
                                 )
CORAM HEALTHCARE CORP. and       ) Case No. 00-3299
CORAM, INC.,                     )   through 00-3300
                                 )         (MFW)
                      Debtors.    )


                              Bankruptcy Courtroom
                              No. 1, Sixth Floor
                              Marine Midland Plaza
                              824 Market Street
                              Wilmington, Delaware


                              Wednesday, November 7, 2001
                              1:00 p.m.


BEFORE:  THE HONORABLE MARY F. WALRATH,
         United States Bankruptcy Judge



            -- Transcript of Proceedings --



                    WILCOX & FETZER
      1330 King Street - Wilmington Delaware  19801
                    (302) 655-0477


C:\WINDOWS\Desktop\CR11-7.doc
11/09/01 11:59 AM

1372
01/16/02

385

```
1              MR. FRIEDMAN:  Good afternoon, Your Honor.
2              THE COURT:  Good afternoon.
3              MR. FRIEDMAN:  We would like to move along
4   with the hearing.  We have another witness to call.
5              THE COURT:  All right.  Somebody wants to
6   be heard.
7              MR. VAGNONI:  If I may, Michael Vagnoni on
8   behalf of the Creditors' Committee for Coram Resource
9   Network, Inc.
10              We filed an objection in this case.  I've
11  also filed a motion pro hac.  It has not been ruled upon
12  yet.  Our local counsel has been with me for the last two
13  days.  He had an emergency today and couldn't make it.  I
14  request permission to address the Court.
15              THE COURT:  I'll allow it.
16              MR. VAGNONI:  It's my understanding this
17  testimony is going to be, after testimony today,
18  continued to the 27th so that the committee can put on
19  its case.
20              We are planning on calling, I believe, two
21  witnesses, and that's going to be at least a half day of
22  testimony.  I just wanted to alert the Court to that and
23  then we will be putting on our argument after that.
24              THE COURT:  As well as the Equity
```

C:\WINDOWS\Desktop\CRI1-7.doc
11/09/01 11:59 AM

386

1    Committee.

2              MR. LEVY:  I guess we would like to know

3    who the witnesses are.

4              MR. VAGNONI:  I believe it is going to be

5    George Miller.  George Miller is the accountant for the

6    committee.

7              MR. FRIEDMAN:  Your Honor --

8              MR. LEVY:  Do you have a report for

9    Mr. Miller?

10             THE COURT:  Counsel, are we having these

11   comments on the record or among ourselves?

12             MR. LEVY:  I am going to sit down and

13   withdraw everything I said.  Mr. Low said I don't care.

14             THE COURT:  Okay.

15             MR. FRIEDMAN:  A couple of things.

16             First of all, we have not been advised

17   until this date that they intend to call any witnesses.

18   Their objection is, I think, two pages.  The thrust of

19   their objection is that --

20             THE COURT:  I don't want to hear --

21             MR. FRIEDMAN:  There are no facts that are

22   raised in the objection.  The objection simply says that

23   we don't treat the claim of the R-NET estate against

24   Coram in a proper manner.

388

1            THE COURT:  I'll reserve until that time

2    any objection on relevancy grounds.  I don't know what

3    they are going to say, either, but I guess we'll wait and

4    get their proffer.

5            MR. FRIEDMAN:  Could we have at least a

6    direction that by tomorrow we are made aware of who their

7    witnesses are and that we have the opportunity to depose

8    them prior to the 27th?

9            MR. VAGNONI:  That's fine, Your Honor.

10           THE COURT:  All right.

11           MR. FRIEDMAN:  Thank you.

12           MR. VAGNONI:  Thank you, Your Honor.

13           THE COURT:  Do I need to find additional

14   dates?  You'll be half a day of testimony.

15           The Equity Committee will be how long?

16           MR. LEVY:  We have two witnesses,

17   Your Honor, an accountant and an evaluation expert.  It

18   could be a whole day with cross-examination.

19           MR. LOW:  We also have the Creditors'

20   Committee who comes first.

21           MR. LEVY:  And the Creditors' Committee

22   plans to put --

23           MR. GEWERTZ:  Shouldn't take an hour and a

24   half.  The last time it took two hours and he has already

C:\WINDOWS\Desktop\CR11-7.doc
11/09/01 11:59 AM

389

1    been qualified.  So it wouldn't take more than that.

2    Probably less.

3              MR. LEVY:  You had mentioned November 30th.

4    You said you weren't going to write it down, as I recall,

5    but I would think we are going to need that.  Then

6    perhaps you want to schedule a day -- maybe November 30th

7    is the day for final argument.

8              MR. FRIEDMAN:  While you are looking, can I

9    say one thing?

10             THE COURT:  Yes.

11             MR. FRIEDMAN:  November 30th is a Friday,

12   and for religious reasons, I don't have a full day on

13   November 30th because I won't be able to work past 2:00.

14   So if that could be kept in mind in terms of the

15   scheduling.  If there are going to be witnesses from the

16   R-Net Committee, we would probably need another day.

17             THE COURT:  I'm checking on the 30th.  I

18   believe that the other hearing on that day has been

19   continued.  So I may be able to just hear you in the

20   morning and recess in sufficient time for everybody to

21   get back.

22             The other day I have the 27th, the whole

23   day.

24             MR. FRIEDMAN:  Okay.

C:\WINDOWS\Desktop\CR11-7.doc
11/09/01 11:59 AM

390

1          THE COURT:  If we don't conclude, then

2   let's pick a date after that day.

3          MR. FRIEDMAN:  Okay.  One last thing.

4          I don't know whether there are going to be

5   any deposition designations by the Equity Committee --

6          MR. LEVY:  There are.

7          MR. FRIEDMAN:  So could we have that prior

8   to the 27th, a couple days?

9          MR. LEVY:  Absolutely.  The 25th, let's

10  say.

11          MR. FRIEDMAN:  So we'll cross designate

12  anything that we would need.

13          MR. MILLER:  The 23rd is the Friday after

14  Thanksgiving.

15          MR. LOW:  The Wednesday before Thanksgiving

16  we would want.

17          MR. MILLER:  That's good.

18          MR. LEVY:  The 23rd.  And you'll give us

19  yours --

20          MR. FRIEDMAN:  The Tuesday after

21  Thanksgiving.  Is that okay?  Tuesday or Wednesday.

22          MR. LOW:  The Tuesday after Thanksgiving is

23  the hearing.

24          MR. FRIEDMAN:  Monday then.

C:\WINDOWS\Desktop\CR11-7.doc
11/09/01 11:59 AM

Amaral - Direct                    412

1    the CEO of Coram after the time the conflict was

2    identified but prior to the issuance of the Goldin

3    report?

4         A.    No.   We were -- no, we never asked Mr. Crowley

5    to step down or even considered that.   We were more

6    concerned that the company was in such a tough situation

7    that he may become disgusted and leave the company, so we

8    were concerned because there was no one that could step

9    back in immediately and hold the company together.

10        Q.    Did you have a view at this time as to what

11   would happen to Coram if Mr. Crowley left it?

12        A.    We would perish.

13        Q.    Now, after the decision by the Court in December

14   of last year, did you have a discussion with Mr. Crowley

15   about the Court's findings?

16        A.    Me, on a one-on-one basis, no, but we met with

17   Mr. Crowley.   All the independent outside directors met

18   with him and he discussed the situation.

19        Q.    What do you recall him saying?

20        A.    That he reminded us of the relationship.   He

21   told us of the dollar amount and that it was still in

22   force today.

23        Q.    Have you given any consideration to whether

24   Coram would have performed better had it been run by a

C:\WINDOWS\Desktop\CR11-7.doc
11/09/01 11:59 AM

B590

493

```
1    State of Delaware    )
                          )
2    County of New Castle )

3

4                    C E R T I F I C A T E

5

6
          I, Kathleen White Palmer, Registered
7    Professional Reporter and Notary Public, do hereby
     certify that the foregoing record, pages 384 to 493,
8    inclusive, is a true and accurate transcript of my
     stenographic notes taken on Wednesday, November 7, 2001,
9    in the above-captioned matter before the Federal
     Bankruptcy Court.
10
          IN WITNESS WHEREOF, I have hereunto set my hand
11   and seal this 8th day of November, 2001, in
     New Castle County.
12

13

14                    KATHLEEN WHITE PALMER,
                      Notary Public-Reporter
15

16

17

18

19

20

21

22

23

24
```

C:\WINDOWS\Desktop\CR11-7.doc
11/09/01 11:59 AM

483

1    questions.

2                  THE COURT:  We are done for the day?

3                  MS. MINOR:  If we could move --

4                  MR. FRIEDMAN:  Can Mr. Amaral be excused?

5                  THE COURT:  Yes.  You may step down.

6                  THE WITNESS:  Thanks.

7                  (The testimony was then concluded at this

8    time.)

9                  MS. MINOR:  At this time we would like to

10   move into evidence EC Exhibits 1 through 11, as well as

11   EC Exhibits 12 through 33.  12 through 26 already came

12   in.

13                 THE COURT:  12 through 25 came in.  Did 26

14   come in after Mr. Scroggins' testimony?

15                 MS. MINOR:  I believe 26 came in, didn't

16   it?

17                 MR. FRIEDMAN:  If it didn't, we don't

18   object.

19                 THE COURT:  Okay.  I'll admit 26.

20                 What's the debtors' position on --

21                 MR. FRIEDMAN:  I only have one that I care

22   about, which is 9.

23                 MR. MILLER:  Nine we have a problem with.

24                 MR. FRIEDMAN:  Nine is the demonstrative

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                          )  Chapter 11
                                )
CORAM HEALTHCARE CORP. and      )  Case Nos. 00-3299(MFW)
CORAM, INC.,                    )  through 00-3300(MFW)
                                )
            Debtors.            )  Jointly Administered

United States Bankruptcy Court
Courtroom No. 2A
844 North King Street
Wilmington, Delaware 19801

November 27, 2001
9:30 a.m.

BEFORE:   THE HONORABLE MARY F. WALRATH
          United States Bankruptcy Judge

Transcript of Proceedings

WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

1374
01/15/02



W&F
WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

2

1       THE COURT:  Good morning.

2       MS. LEVY:  Good morning, Your Honor.

3       The first matter on the agenda is the

4   equity's committee renewed application for authorizing

5   retention of Lexicon.  Let me very briefly explain why we

6   filed this motion and the very limited relief we are

7   seeking today.  We plan to present Mr. Fishell this

8   Friday as a witness that we think will contribute to the

9   equity committee's case.  We did not want to be in a

10  position -- as it should be clear from our motion, we are

11  seeking no compensation at this point from the estate.

12  We did not want to be in a position where, after that

13  testimony, if we come in and ask for compensation, the

14  debtor says, too late, nunc pro tunc.  So that, as far as

15  I'm concerned, entering this order and continuing it

16  until after the testimony would be perfectly

17  satisfactory.  Our protective motion is filed.

18      Now, we understand from the responses and

19  from conversations that the debtors and creditors'

20  committee object to our calling the witness.  I think I

21  won't address that at this point.  I'll let them present

22  their objection.  If that's what they want to do, we'll

23  respond to that.

24      THE COURT:  All right.



**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

3

1          MR. FRIEDMAN:  Your Honor, we understood

2     that when you denied the Lexicon retention, it wasn't

3     simply a question of money.  It was a question of whether

4     or not their testimony would be additive to this process,

5     and, Your Honor, I think it goes without saying that

6     expert testimony only exists to the extent necessary to

7     aid the trier of fact.  That's always the case with

8     expert testimony.  And Your Honor is the trier of fact.

9     And obviously, to the extent that Your Honor views it to

10    be necessary, then Your Honor is free to hear that

11    testimony.  But we thought the Court was clear at the

12    last hearing that the testimony of Lexicon was not

13    necessary.  I don't think I need to quote the Court's

14    statement, although it is in our papers, but Your Honor,

15    I think, made the observation that whatever Lexicon would

16    testify was something that could be brought out on

17    cross-examination.

18          And, Your Honor, I believe that in their

19    papers the equity committee itself acknowledged that they

20    achieved exactly what the Court had suggested they

21    attempt to do.  They stated in paragraph 5 of their

22    papers, quote, the committee believes that

23    Professor Fishell's expert insights and analysis will

24    demonstrate not only that the Golden & Associates report



**WILCOX & FETZER LTD.**
Registered Professional Reporters

5

1    something that came up late in the game -- there is a

2    rule, Federal Rule 26, that requires rebuttal expert

3    testimony to be provided in a timely fashion within

4    30 days after the initial report comes out.  They've

5    blown that deadline by a mile.

6            And given the untimeliness, given the fact

7    that his testimony is sought just three days from today,

8    given Your Honor's ruling about the necessity, given

9    their own comments about what a wonderful job they have

10   already done in connection with cross-examining

11   Mr. Golden, we think it's just a waste of time and ought

12   not to be considered not just an a matter of economics

13   but as matter judicial economy how this case proceeds and

14   fundamental fairness.

15           Thank you.

16           THE COURT:  Does the committee wish to be

17   heard?

18           MR. GEWERTZ:  Good morning, Your Honor.

19   Theodore Gewertz with the creditors' committee.

20           We filed an objection yesterday.  If you

21   get past the untimeliness of this motion, which we laid

22   out, I think the debtor laid out in its objection,

23   assuming that the Court would hear it, it still is a

24   motion to rehear, and I think the standards on a motion

15

1            THE COURT:  Let's proceed with the day, and
2   we'll deal with Friday.  And in the meantime, I'll try
3   and come up with another full day.
4            MR. LEVY:  Good.  Thank you.
5            MR. FRIEDMAN:  Thank you.
6            One more thing, Your Honor, if I could, I
7   ask that date not be next Thursday or Friday.
8            THE COURT:  Anybody else have any problems
9   with dates?
10            MR. MILLER:  No.  But I would like to
11   accept the offer to do Professor Fishell's testimony in
12   New York Thursday, if we are going to go ahead with him
13   on Friday, because I do have a commitment I can't change.
14            MR. LEVY:  That is perfectly agreeable.
15            THE COURT:  We'll deal with that.
16            MR. MILLER:  Thank you, Your Honor.
17            MR. GEWERTZ:  Your Honor, the committee
18   calls William C. McGahan.
19            THE CLERK:  Place your hand on the *Bible*
20   and state your name for the record.
21            MR. McGAHAN:  Bill McGahan
22
23
24

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

16

1                    BILL McGAHAN,

2              the witness herein, having first been

3              duly sworn on oath, was examined and

4              testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. GEWERTZ:

7         Q.   Mr. McGahan, you testified in this case last

8    year, is that correct?

9         A.   I did yes.

10        Q.   And at that time you presented a report of UBS

11   Warburg as to the enterprise value of the Coram as of the

12   date of the that report, correct?

13        A.    Yes, I did.

14              MR. GEWERTZ:  Your Honor, I think that

15   report has already been received in evidence here as

16   Equity Committee Exhibit 8.  If I'm not --

17              MR. LOW:  Last year?

18              MR. GEWERTZ:  I think someone put it in

19   this year.  Last year it was Creditors' Committee 1.

20              THE COURT:  Equity Committee 8.

21              MS. MINOR:  Last year Equity Committee 8.

22              (Discussion off the record.)

23              MR. GEWERTZ:  Last year it was Creditors'

24   Committee 1.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1    interest.  We did not factor that in.  That was the

2    reduction from the enterprise valuation.

3      Q.    And in doing valuation analyses, do you often

4    add what we call -- what experts like you call free cash

5    to the value?

6      A.    It depends, yes.  But sometimes we do.

7      Q.    Was that done here?

8      A.    It was not.

9      Q.    Why not?

10     A.    Because it's assumed that the company has, by

11   the end of this year, $8 million on its balance sheet and

12   that's the number that it requires to run the business.

13   So in particular there is no free cash.

14                MR. GEWERTZ:  That's all I have.  Thank

15   you.

16                THE COURT:  Do you want to take a short

17   break before cross?

18                MR. LOW:  If you like, Your Honor,

19   certainly.

20                THE COURT:  Let's take a short five-minute

21   break.

22                (Recess taken.)

23                THE COURT:  Back on the record.  Mr. Low.

24

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE


| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| CORAM HEALTHCARE CORP. and | ) | Case Nos. 00-3299(MFW) |
| CORAM, INC., | ) | through 00-3300(MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |


United States Bankruptcy Court
Courtroom No. 2A
844 North King Street
Wilmington, Delaware 19801

November 30, 2001
9:00 a.m.


BEFORE:   THE HONORABLE MARY F. WALRATH
          United States Bankruptcy Judge


Transcript of Proceedings


WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



W&F
WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

1          THE COURT:  Before we begin, my Monday

2   morning has freed up, if that helps anybody.

3          MR. LEVY:  Excuse us, Your Honor.

4          (Discussion off the record.)

5          MR. LEVY:  I think our consensus is thank

6   you, but we can't.

7          THE COURT:  Unfortunately matters come off

8   one day before or two days before.

9          MR. FRIEDMAN:  We appreciate the

10  opportunity.

11         THE COURT:  Where are we?

12         MR. FRIEDMAN:  We are in the middle of

13  cross-examination of Mr. Pfrang.

14         THE COURT:  You are still under oath.

15              PHIL PFRANG,

16      the witness herein, having previously

17      been duly sworn on oath, was examined

18      and testified further as follows:

19         CONTINUED CROSS-EXAMINATION

20         MR. FRIEDMAN:  Your Honor, before we begin,

21  as we concluded on Tuesday, we had marked as an exhibit

22  Debtors' Exhibit 11 which is a series of handwritten

23  notes.  We've the agreement of the equity committee that

24  all of these notes but for the last page reflect the

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Phil Pfrang - Cross (Friedman)                    248

1   notes by Heather Orsi of a meeting that took place on

2   May 9 of this year.

3              So what we would ask the Court for

4   permission to do is to rip off the last page and then I

5   think we have an exhibit that we will all agree would be

6   acceptable.

7              THE COURT:  All right.

8              MR. FRIEDMAN:  I will do mine first.

9              Your Honor, having ripped off that page, we

10  will move D-11 into evidence.

11             MR. LOW:  No objection, Your Honor.

12             THE COURT:  It's admitted.

13             (Document, so offered and received in

14  evidence, was marked Debtors' Exhibit 11.)

15  BY MR. FRIEDMAN:

16     Q.    Okay.  Mr. Pfrang, when we left off you recall

17  we were talking about a drug called Vancomycin?

18     A.    Yes.

19     Q.    Do you recall that?  And do you recall that you

20  testified on your direct examination that you didn't know

21  until September 4 when you saw the updated Golden report

22  that Vancomycin was an issue that related to Coram's

23  revenue and profitability.  Do you recall that?

24     A.    Yes.

Phil Pfrang - Cross (Friedman)                    254.

1   percentage changes in AWP.  It's sort of a cryptic

2   analysis.  So the answer is the company did give us

3   documents with the word Vancomycin contained in it.

4        Q.    I'm sorry.  I don't think I was clear in my

5   question.  My question to you is, you don't recall a

6   specific information request from Deloitte to Coram that

7   mentions the term "Vancomycin?"

8        A.    Prior to the issuance of our report?

9        Q.    At any time.

10       A.    I would have to qualify my answer.  I'm almost

11  certain prior to the issuance of our report, after the

12  issuance of our report, and once we became aware of the

13  issues around Vancomycin.  I would not be surprised at

14  all if one of my -- if one of the people on our team had

15  either asked over the phone or had asked in writing for

16  information from Coram relative to the impact of

17  Vancomycin.

18       Q.    Do you still have your deposition out there in

19  front of you?

20       A.    I don't think so.  I left it here but --

21            MS. MINOR:  It is up there.

22            THE WITNESS:  There were two days of

23  depositions.  One was sort of short little pages on a --

24  oh, that was it.  I'm sorry.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Phil Pfrang - Cross (Friedman)                    285

1   support that assumption?

2       A.   I think that's consistent with my answers, yes.

3                MR. FRIEDMAN:  Your Honor, could we take

4   just a break for a minute or two?  I think I'm pretty

5   much done.

6                THE COURT:  All right.  Let's take a

7   five-minute break.

8                MR. FRIEDMAN:  Thank you.

9                (Recess taken.)

10               MR. FRIEDMAN:  Your Honor, we would like to

11  move Debtors' 12 through 15 into evidence.

12               THE COURT:  Any objection.

13               MR. LOW:  No objection Your Honor.

14               THE COURT:  All right.  They are admitted.

15               (Documents, so offered and received in

16  evidence, were marked Debtors' Exhibits 12 through 15,

17  inclusive.)

18               MR. FRIEDMAN:  Thank you.

19               THE COURT:  Anybody else have cross?

20               MR. MILLER:  I decided not to try to gild

21  the lily.

22               THE COURT:  All right.  Redirect.

23               MR. LOW:  Thank you, Your Honor.

24

1  understanding and that's how it happened.

2            MR. FRIEDMAN:  Your Honor, could we have a

3  two-minute break?

4            THE COURT:  How much longer do you have?

5            MR. FRIEDMAN:  I may not have any

6  additional.

7            MR. LEVY:  I have five minutes, ten

8  minutes.

9            MR. MILLER:  I am going to have to ask a

10 few questions.

11           MR. GEWERTZ:  So am I.

12           THE COURT:  We have to end by one.  So

13 let's take two minutes.

14           MR. FRIEDMAN:  Okay.  Thanks.

15           (Recess taken.)

16           MR. FRIEDMAN:  Your Honor we are done.  We

17 wanted to move in Debtors' 16, 17 act 8.

18           THE COURT:  Any objection.

19           MR. LEVY:  No objection.

20           THE COURT:  All right.  They are admitted.

21           (Documents, so offered and received in

22 evidence, were marked Debtors' Exhibits 16, 17, and 18.)

23           MR. MILLER:  May I proceed, Your Honor?

24           THE COURT:  You may.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Volume III                                403

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                          )   Chapter 11
                                )
CORAM HEALTHCARE CORP. and      )   Case Nos. 00-3299(MFW)
CORAM, INC.,                    )   through 00-3300(MFW)
                                )
            Debtors.            )   Jointly Administered

United States Bankruptcy Court
Courtroom No. 2A
844 North King Street
Wilmington, Delaware 19801

December 13, 2001
9:00 a.m.

BEFORE:  THE HONORABLE MARY F. WALRATH
         United States Bankruptcy Judge

Transcript of Proceedings

WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

404

1              MR. LEVY:  Good morning, Your Honor.

2    Mr. Friedman and I talked about references with respect

3    to closing arguments and so forth.  I think the first

4    subject obviously is what Your Honor wishes.  We would

5    each like a half hour -- no more -- for closing argument

6    with no written submissions beyond the designations you

7    have.

8              THE COURT:  Yes.

9              MR. LEVY:  Second, I think the ideal

10   time -- we don't always get the ideal time -- would be

11   next Monday or Tuesday if you have an hour or two to do

12   that.

13             I should add to that, Your Honor, it's

14   really clear, I think, that we will finish all

15   presentation of evidence by one o'clock tomorrow.  But

16   I'm not sure -- and I'm just not sure that there's going

17   to be time after the witnesses for closing.

18             THE COURT:  Well, currently I have a

19   twelve, two, three, and four tomorrow afternoon.  I don't

20   think --

21             MR. LEVY:  Mr. Friedman needs to leave at

22   one.  So tomorrow doesn't look very good.  We have only

23   one witness tomorrow, but who knows.

24             THE COURT:  I should later today know how

405

1    my Monday looks.  So I can either let you know before

2    then if I'm aware or at the conclusion or contact your

3    local counsel.

4              MR. MILLER:  I hesitate to rise.  I have a

5    very important Board meeting Monday morning for a company

6    that's about to file, but I can be available in the

7    afternoon.

8              THE COURT:  All right.

9              MR. MILLER:  Thank you, Your Honor.

10             MR. LEVY:  May we proceed?

11             THE COURT:  You may.

12             MR. LEVY:  Good.  The equity committee will

13   call Mr. Dan Crowley as an adverse witness.

14                      DAN CROWLEY,

15             the witness herein, having first been

16             duly sworn on oath, was examined and

17             testified as follows:

18                  CROSS-EXAMINATION

19   BY MR. LEVY:

20       Q.   Good morning Mr. Crowley.

21       A.   Good morning.

22       Q.   Mr. Crowley, you understand, don't you, that

23   last December 21st this Court found that the contractual

24   relationship between you and Cerberus constituted an

Dan Crowley - Cross (Levy)                420

1    letter for them, correct?

2        A.    Yes.

3        Q.    And in that representation letter, you didn't

4    tell Ernst & Young that the Court had found an actual

5    conflict of interest, did you?

6        A.    Ernst & Young knew that I had an actual conflict

7    of interest.  Basis:  the Court finding.  They were party

8    to the Court proceedings.  They were immediately involved

9    thereafter in the Stark 2 conversion.  They had the Court

10   findings in their hand.  Ernst & Young was a party to the

11   K, all three Qs, all the financial reporting.  At all

12   times Ernst & Young has known about the Court findings,

13   yes.  And they are intimately involved in all of those

14   public filings.  They knew what the filings said.

15       Q.    Equity Committee Exhibit 25, you should have in

16   front of you.

17             MS. MINOR:  There are three piles.  One is

18   equity.

19             THE WITNESS:  Can you help me, please?

20             MS. MINOR:  Sure.

21       A.    Okay.  Yes.  I have it in front of me.

22   BY MR. LEVY:

23       Q.    Good.  Would you look at the page that has the

24   Bates number Coram Equity 18,410 on it third from the

Dan Crowley - Cross (Levy)                        449

1     A.    It has been found so by any number of valuation

2     experts.

3     Q.    Okay.  So let's stick with total cash.  Will you

4     agree -- see if I can do my multiplication -- that the

5     performance based cash compensation for a company that

6     hired in this CEO like you to turn the company around in

7     the case of our first comparable, Hyperion, the

8     compensation you claim is more than 300 percent more than

9     the CEO of Hyperion is reported as receiving.  Do you

10    agree with that?

11    A.    The numbers that are on this page are on this

12    page.  You want to go over each one?  I'll do it if

13    that's what you want to do.  But my compensation is based

14    on my contract and the performance standards that are in

15    it.  I don't know what these contracts are and whether

16    someone has options in a different circumstance in a

17    different company in a different industry.  I really

18    can't speak to that compensation.  Total compensation is

19    compensation.

20    Q.    Well, then, why did you spend 10,000 bucks and

21    ask Mr. Smithson to order this report?

22              MR. FRIEDMAN:  Objection.  It's been asked

23    and answered.

24              THE COURT:  Sustained.

Dan Crowley – Redirect (Friedman)          457

1              MR. LEVY:  I'm sorry.  It's as leading as a

2      question can be.

3              THE COURT:  Overruled.  Overruled.

4      A.   I didn't advise.  I did not advise them every

5      month what I was being paid

6      BY MR. FRIEDMAN:

7      Q.   You testified in response to Mr. Levy's question

8      that, in November of 1999, when you signed your contract

9      with Coram, that at that time the Directors were not

10     aware that you were getting $80,000 a month from

11     Cerberus.  Do you recall that testimony?

12     A.   Yes.

13     Q.   At that time were the Directors aware that you

14     had a business relationship with Cerberus?

15     A.   Yes.  They were aware.

16     Q.   Since December of the last year, have the

17     details of your relationship with Cerberus been publicly

18     disclosed?

19     A.   Yes.

20     Q.   To your knowledge, on how many separate

21     occasions?

22     A.   At least five.

23     Q.   Can you identify those separate occasions?

24     A.   SEC filing for the year ended 2000.  It's called

Dan Crowley - Redirect (Friedman)          458

1    a 10-K.  It's disclosed.  There's an SEC filing for the

2    quarters ended March, June, and September.  It's called

3    10-Q.  It's been publicly disclosed in writing in these

4    documents.  And there's a public filing with the

5    confirmation hearing reorganization plan that's been

6    printed and widely distributed in a public document.  So

7    at least those five.  And then there was the disclosure

8    to the Board in a face-to-face meeting.

9        Q.    Since you became the CEO of Coram in November of

10   1999, how much money have you actually received from

11   Coram in compensation?

12       A.    I received my base salary.  It's paid in

13   every-two-week increments.  It's the same base salary.

14   I've not had a raise in two years.  I'm paid for my

15   vacation.  I'm paid for a car allowance.  And I'm paid

16   for temporary living.  I never received anything else.

17   Nothing else.

18       Q.    What is your base salary?

19       A.    650,000.

20       Q.    And just so the record is clear on this, what

21   was your involvement in the development of the current

22   plan of reorganization being considered by the Court?

23       A.    I was uninvolved in the development of the plan

24   being considered by the Court.  No involvement.

499

1    Amaral from Dan Crowley.

2             MR. FRIEDMAN:  Okay.  I have no objection.

3             THE COURT:  Okay.  They are admitted.

4             (Documents, so offered and received in

5    evidence, were marked Equity Committee Exhibits 40

6    through 45, inclusive.)

7             MR. LEVY:  Your Honor, next witness Mr. Low

8    is going to present the witness, Mr. Dan Lynn of

9    Deloitte.  I don't know what our timing is.  I leave it

10   to you.

11            THE COURT:  Well, how long will he be?

12            MR. LOW:  Your Honor, I don't know.  I

13   would think that the direct would be in the range between

14   half an hour and 40 minutes.

15            MR. FRIEDMAN:  Without piling on, I could

16   do it in an hour, cross in an hour.  Maybe a little less.

17   If I really want to go through all this stuff, it will

18   take longer.

19            THE COURT:  Who do we have tomorrow?

20            MR. LOW:  We have Professor Fishell.

21            MR. FRIEDMAN:  Then we are done.

22            THE COURT:  How long will he be.

23            MR. LEVY:  Direct 30 to 45 minutes.

24            MR. FRIEDMAN:  We haven't deposed him yet.

531

State of Delaware    )
                     )
County of New Castle )


C E R T I F I C A T E


I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that the
foregoing record, pages 403 to 530, inclusive, is a true
and accurate transcript of my stenographic notes taken on
December 13, 2001, in the above-captioned matter.

IN WITNESS WHEREOF, I have hereunto set my hand
and seal this 13th day of December, 2001, at Wilmington.


_____
          Ann M. Calligan

DEC....MBER 14, 2001 - December 14, 2001 09 40 00 a.m.

```
532:1    VOLUME 4
     2          IN THE UNITED STATES BANKRUPTCY COURT
     3              FOR THE DISTRICT OF DELAWARE
     4    In the matter of              )
     5                                  )
     6    CORAM HEALTHCARE CORP.  )Case No. 00-3299
     7    and CORAM, INC.        )Through 00-3300 (MFW)
     8                           )
     9          Debtors.         )
    10                    Bankruptcy Courtroom
    11                    Room No. 2 - Sixth Floor
    12                    Marine Midland Plaza
    13                    824 Market Street Mall
    14                    Wilmington, Delaware
    15                    Friday, December 14, 2001
    16                    9:40 a.m.
    17    BEFORE:  THE HONORABLE MARY F. WALRATH,
    18              United States Bankruptcy Judge
    19              TRANSCRIPT OF PROCEEDINGS
    20                    WILCOX & FETZER
    21    1330 King Street - Wilmington, Delaware 19801
    22                    (302) 655-0477
    23
    24
```

DECEMBER 14, 2001 - December 14, 2001 09:40:00 a.m.

```
533:1          MR. LEVY:  Your Honor, let me just describe
     2    where we are.  Because Professor Fischel would have a
     3    problem coming back next week and because there may be
     4    some doubt as to whether everything can be finished, we
     5    agreed at least to this, subject, obviously, to your
     6    approval:  That we would begin this morning with the
     7    direct testimony of Professor Fischel and hopefully
     8    finish that, and Mr. Dalin is here if we can do it.
     9          You want to add to that?
    10          MR. FRIEDMAN:  Your Honor, we're happy to
    11    try to accommodate Professor Fischel's schedule.  The
    12    only point I make is that the deposition yesterday lasted
    13    until 8:00 p.m. and I was supposed to have gotten the
    14    transcript last night.  I didn't get it until this
    15    morning.  I have been preparing for cross since basically
    16    6 o'clock this morning.  I don't feel terribly
    17    comfortable.  I will do the best I can.  But if we can't
    18    do it I'd like to at least -- if we have some breaks and
    19    I'll do the best I can.  Not to the point of prejudicing
    20    the case.
    21          MR. LEVY:  We will defer that fight to see
    22    if it occurs.
    23          THE COURT:  Okay.  Mr. Fischel?
    24              - - - - -
```

DECEMBER 14, 2001 - December 14, 2001 09:40:00 a.m.

```
534:1              DANIEL R. FISCHEL,
     2    the witness herein, having first been
     3    duly sworn on oath, was examined and
     4    testified as follows:
     5              - - - - -
     6              DIRECT EXAMINATION
     7              - - - - -
     8    BY MR. LEVY:
     9      Q.  State your full name and spell it.
    10      A.  Is it okay if I do some housekeeping up here?
    11      Q.  You want to clean up the place?
    12      A.  If it's okay.  Piles of stuff here.
    13          Ready.
    14      Q.  Your name?
    15      A.  Daniel Robert Fischel.
    16          MR. LEVY:  Your Honor, Mr. Fischel has
    17    before him and you have a copy of a document we have
    18    premarked Equity Committee Exhibit 48.  It's the report
    19    of Lexecon and Daniel R. Fischel dated November 13th,
    20    2001, and delivered to all of the parties shortly after
    21    that date.
    22      Q.  Let me ask you a few questions about your
    23    credentials.
    24              Exhibit E to your report, is that your
```

DECEMBER 14, 2001 - December 14, 2001 09:40:00 a.m.

```
535:1    current resume?
     2      A.  Yes.
     3      Q.  Where are you employed?
     4      A.  I am employed both at the University of Chicago
     5    and at a consulting firm in Chicago by the name of
     6    Lexecon, Inc.
     7      Q.  Your position at the University of Chicago?
     8      A.  I am the lee in brena (phonetic) professor of
     9    law and business at the University of Chicago Law School.
    10      Q.  Have you had other academic appointments there?
    11      A.  Yes, for a while I served as dean of the law
    12    school.  I also for a number of years was a professor in
    13    the University of Chicago Graduate School of Business.
    14    And for many years I was director of the law economics
    15    program which is a university-wide program specializing,
    16    as the name suggests, in the relationship between law and
    17    economics.
    18      Q.  Do you have time to teach?
    19      A.  Yes.
    20      Q.  What do you teach?
    21      A.  I teach primarily courses in corporations,
    22    corporate finance, and economic analysis of law.
    23      Q.  And do any of these courses relate to the issues
    24    that are the subject matter of this case?
```

Fischel EXHIBIT 1
FOR I.D. 10-13-03  IANN

556:1 because of an allegiance to the noteholders as opposed to
   2 an allegiance to the stockholders.
   3        For example, you don't know -- there's no
   4 way to know if there was a productive investment, if
   5 there was a profitable merger, if there was some
   6 value-increasing decision that could have been made but
   7 wasn't, because Mr. Crowley never looked for it, because
   8 he was primarily interested in shrinking the firm and
   9 paying off the noteholders if in fact that's what he was
  10 doing as he clearly had an incentive to do in light of
  11 the conflict of interest.
  12        Again, I think in order to even begin to
  13 analyze those issues, you need an objective measure of
  14 performance or an objective analysis of performance, not,
  15 in my opinion, a series of interviews and review of
  16 documents where somebody gives his impressions without
  17 doing the kind of rigorous analysis that's required by
  18 the SEC and is regarded as standard by all recognized
  19 authorities on management performance.
  20        Q.  Have you analyzed how these comparable companies
  21 perform?
  22        A.  Yes.  I have begun that analysis.
  23        Q.  What do you mean "begun that analysis"?
  24        A.  Meaning that what I did was I took the companies

557:1 that Mr. Goldin considered comparable, which happened to
   2 be the identical companies that Coram itself regarded as
   3 comparable when Coram compared its performance against
   4 these other companies, and I compared Coram's performance
   5 against the performance of these comparable companies
   6 without really having had a chance myself to do any
   7 in-depth analysis of Coram's business practices or look
   8 at its financial records.
   9        Q.  Let's start with a document which is attached to
  10 the Lexecon report, and we're going to mark as Equity
  11 Committee Exhibit 59 a bar graph entitled, "Percentage
  12 Change in Stock Prices."
  13        MR. FRIEDMAN:  Why do you need it if it's
  14 in the report?  A separate document.
  15        MR. LEVY:  And attached to that is a chart
  16 that shows the source of the data that led to this bar.
  17        MR. FRIEDMAN:  Your Honor, again, the chart
  18 is attached to the report.  The witness elected not to
  19 attach the data in his report.  You can't then introduce
  20 it into evidence.
  21        MR. LEVY:  Your Honor, the data was
  22 furnished to the debtors after our last go-round.  The
  23 data is all publicly available material.  It's a method
  24 of providing the foundation for it.  This is not a

558:1 surprise.  They have had this for at least two weeks.  I
   2 cannot imagine why we wouldn't want verifying data in
   3 here or what kind of real objection there can be to this.
   4        MR. FRIEDMAN:  Your Honor, it's just a
   5 question of there is a report.  These bar graphs are
   6 attached to the report.  Whatever was decided not to be
   7 attached to the report was made for a reason.  Whatever
   8 that second page is I have never seen.  It may be
   9 perfectly true.  I'm not saying it's not true.  I have
  10 never seen it.  If it's important, it should be in the
  11 report.  If it's not important, we shouldn't be wasting
  12 time talking about it now.
  13        MR. LEVY:  This is truly a no good deed
  14 goes unpunished.  I got a complaint after I sent the
  15 report.  How do we know?  I said I would prepare these.
  16 Mr. Ross prepared them and I mailed them to you.
  17        MR. FRIEDMAN:  I never saw them.
  18        MR. MILLER:  We never received them either,
  19 Your Honor.
  20        THE COURT:  I'm going to allow it, but
  21 again, I have some concerns about lack of disclosure to
  22 the other side.  But let's see if we can go ahead.
  23        MR. LEVY:  In view of that, Your Honor, I'm
  24 going to ask if I can at this point -- excuse me one

559:1 moment -- introduce my copy of a letter that I sent to
   2 Mr. Novick of Kasowitz with a copy to Mr. Miller and to
   3 Mr. Gewertz, the last paragraph of which said, "We have
   4 also attached each exhibit to assist you in verifying the
   5 accuracy of the calculations contained in the exhibit, a
   6 sheet" --
   7        THE COURT:  Are you testifying now?
   8        MR. LEVY:  Your Honor --
   9        THE COURT:  I overruled the objection,
  10 didn't I?
  11        MR. LEVY:  I'm sorry, Your Honor.
  12        THE COURT:  You may go ahead.
  13        MR. LEVY:  I was trying to address your
  14 concern, which I think is an unfair attack.  But let's go
  15 ahead.
  16 BY MR. LEVY:
  17        Q.  You have Equity Committee 59 in front of you,
  18 sir?  I'm sorry.  49.
  19        MR. FRIEDMAN:  I think we're at least
  20 entitled to a copy.
  21        MR. LEVY:  You can have mine.  Here.
  22        THE COURT:  I thought they had been passed
  23 out to all counsel.
  24 BY MR. LEVY:

564:1 in order for the Goldin report to do a proper analysis of
2 how Coram performed. But, as I said, there's nothing in
3 the Goldin report on this subject.
4      Q.   Let's move quickly to the other charts that you
5 used for this purpose. The next one that we marked as
6 Equity Committee Exhibit 50 is a bar chart demonstrating
7 revenue growth of Coram and the four comparables.
8      A.   Would you like me to explain --
9      Q.   I'm sorry?
10     A.   I have it. Would you like me to explain --
11     Q.   Yes, sir.
12     A.   This is a similar chart but this time comparing
13 revenue growth for Coram and the four comparable
14 companies, and, again, because of the availability of
15 data at the time this graph was compiled, it goes from
16 year-end 1999 to year-end 2000. Subsequently we extended
17 this graph just a check to the current time period and
18 nothing in terms of the qualitative nature of the results
19 changes.
20          But what it shows is during this period all
21 four of the comparable companies increased in size. Most
22 dramatically being Option Care again, the company that is
23 the most comparable to Coram according to Mr. Goldin
24 which increased in size by -- increased in revenues by

565:1 17.3 percent, while Coram decreased by 10.8 percent.
2          Again, as I said with the stock price
3 exhibit, there may be many reasons for this and they may
4 even be innocent reasons, but, at a minimum, there would
5 be a need for Mr. Goldin to describe and analyze why it
6 was that the other companies that he himself concluded
7 were comparable and Coram itself concluded were
8 comparable and particularly the company that he decided
9 was the most comparable was going so much in a different
10 direction than Coram was and whether any of the
11 opportunities and the reasons why these other companies
12 were growing, why those reasons and opportunities existed
13 for the other companies but didn't exist for Coram.
14          Again, I'm not suggesting that there's no
15 explanation, but the Coram report doesn't discuss the
16 issue and doesn't provide an explanation. And to the
17 extent there is a discussion of issues that are related
18 such as the sale of CPS, which is one of the reasons why
19 Coram's revenues decreased, and the explanation given by
20 Mr. Goldin for that sale, in my opinion, not
21 persuasive --
22     Q.   Let's stick with this chart. Let's go --
23          MR. MILLER: Before you ask a question, you
24 haven't given me a copy. I was looking at inventory

566:1 turnover, Exhibit B. You're apparently working with some
2 other exhibit.
3          THE COURT: Please provide all the copies.
4          MR. LEVY: You have copies. Didn't I give
5 you a copy?
6          MR. FRIEDMAN: Yes.
7          MR. LEVY: I apologize.
8          MR. MILLER: I'm sorry. I didn't want to
9 interrupt the witness in the middle of a question.
10          THE COURT: All right.
11          MR. GEWERTZ: Skip from A to D; is that
12 correct?
13 BY MR. LEVY:
14     Q.   Next is we marked Equity Committee Exhibit 51,
15 change in inventory turnover. Can you describe this
16 exhibit and why it's relevant?
17     A.   This is relevant because Mr. Goldin in his
18 report made a statement that Mr. Crowley improved
19 inventory turnover, and what I did was basically just
20 look, again, using the same methodology of what happened
21 with comparable companies in order to put that statement
22 in context, and what the graph shows, again, being
23 somewhat brief because it's basically the same pattern as
24 the other graphs, is that on this particular issue

567:1 Coram's performance was somewhere in the middle of the
2 pack. Looks like exactly in the middle of the pack. It
3 was a company that performed better than American Home
4 Patient and Apria. Coram was slightly worse than Gentiva
5 and significantly less good than Option Care.
6          So, again, I think it's just important to
7 put what happened with inventory in context, looking at
8 comparable companies, although I would also say that this
9 is a much less important measure of performance
10 generally, obviously, than stock price performance.
11     Q.   And you're not suggesting that the conflict
12 caused Coram to only reach the middle of the pack?
13     A.   No, I'm not. Basically what I said before, that
14 in order to analyze performance, you need to look at what
15 happens with comparable companies.
16     Q.   And quickly, through change in date of sales
17 outstanding which is a measure of accounts outstanding
18 marked as No. 52.
19     A.   Right. This is exactly the same methodology.
20 This is, again, a measure that Mr. Goldin mentioned, so I
21 performed the same analysis and this is the measure of
22 the measures that I looked at that Mr. Goldin mentioned
23 where Coram did the best. It was at least during this
24 period the second most successful firm in reducing

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In re:                          )
                                )
CORAM HEALTHCARE CORP. and      )  Case No. 00-3299
CORAM, INC.,                    )   through 00-3300
                                )        (MFW)
                    Debtors.     )


                                Bankruptcy Courtroom
                                No. 1, Sixth Floor
                                Marine Midland Plaza
                                824 Market Street
                                Wilmington, Delaware


                                Monday, December 17, 2001
                                4:20 p.m.


BEFORE:   THE HONORABLE MARY F. WALRATH,
          United States Bankruptcy Judge



          -- Transcript of Proceedings --




                WILCOX & FETZER
    1330 King Street - Wilmington Delaware   19801
                (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

COPY



DEC 28 2001

669

1      THE COURT:  Good afternoon.

2      MR. LAW:  Good afternoon, Your Honor.

3      I think the state of the proceedings is we

4  are ready for the finalization of Mr. Lynn's examination.

5  Then we'll proceed from there.

6      MR. FRIEDMAN:  Okay.

7      MR. LAW:  Again, Your Honor, let me offer

8  into evidence Exhibit 47, EC-47, which Mr. Lynn testified

9  is a chart that Deloitte & Touche prepared.  It's really

10  a demonstrative.  It's identical to a chart that UBS

11  prepared.  It has the same information and is supplied by

12  the same --

13      MR. FRIEDMAN:  Your Honor, we don't object.

14      THE COURT:  All right.  It's admitted.

15      (EC Exhibit 47 was admitted into evidence.)

16      MR. LAW:  Your Honor, in the interest of

17  time, we'll pass the witness at this point.

18      THE COURT:  All right.

19      MR. FRIEDMAN:  Your Honor, we understand

20  that we need to get this done within half an hour and

21  we'll do that.

22      THE COURT:  Thank you.

23          - - - - -

24



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1  fair market value today.

2      Q.   Your report does contain in it five months of

3  actual financial information in 2001; correct?

4      A.   Yes, it does.

5      Q.   It's in your report, isn't it?

6      A.   Yes, it does.

7      Q.   Okay.

8           MR. FRIEDMAN:  Thank you, Your Honor.

9           MR. MILLER:  Nothing.

10          THE COURT:  Any redirect?

11          MR. LAW:  Very brief, Your Honor.

12               REDIRECT EXAMINATION

13  BY MR. LAW:

14     Q.   Mr. Friedman showed you the bottom of page 23 of

15  your deposition.  If you could turn to the top of page 24

16  beginning at line 2 through line 20, were you asked those

17  questions and did you give those answers?

18     A.   Your page, again?  Sorry.

19     Q.   Page 24.  Right after where Mr. Friedman left

20  off.

21     A.   Yes.

22     Q.   What did you base your opinion of sustainability

23  on?  Not your opinion, your assumption.  I'm sorry.  I

24  made a very key mistake.  Your assumption of

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

700

```
 1    two answers given last year by Mr. Crowley and Mr. Danitz
 2    that I think --
 3              THE COURT:  Do you want to do that like the
 4    designations?
 5              MR. LEVY:  Yes.
 6              THE COURT:  Any objection to that?
 7              MR. FRIEDMAN:  Not if it's done that way.
 8    I would want to respond.
 9              THE COURT:  All right.
10              MR. LEVY:  I'm sorry.  Is Your Honor
11    suggesting I do it right now?  It is just real, real
12    brief.
13              THE COURT:  I was going to suggest that you
14    do it as you did the depositions.
15              MR. LEVY:  In writing to you?
16              THE COURT:  You can hand them up and the
17    debtor can respond.
18              MR. LEVY:  Okay.  May I refer to them in my
19    closing?
20              THE COURT:  Yes.
21              MR. LEVY:  Okay.  That's fine.
22              Second, Your Honor, and last, there was a
23    stipulation entered into with respect to interview notes
24    taken by Mr. Goldin.  The notes are identified.  It says
```

1    the debtors will not object to the admissibility into

2    evidence at the hearing to consider confirmation of the

3    second plan of the documents for the purpose of

4    establishing that notes of interviews were taken in the

5    form represented by the documents.

6           The debtors reserve the right to object to

7    the admissibility of the documents for any other purpose

8    including but not limited to admissibility for the truth

9    of any statement therein or on the grounds of relevance.

10   In other words, we established foundation without having

11   to take depositions to establish that.

12           I would now like to move them into

13   evidence.  I don't think it is worth going through each

14   one for relevance.  I wonder if they can go in and we can

15   argue weight.

16           MS. MINOR:  Your Honor, in terms of the

17   designations, they were included in our designations.  Do

18   you want us to enter the depositions and documents as

19   exhibits or -- I'm confused just in terms of the comments

20   you made earlier.  Last year they were entered, given

21   exhibit numbers and entered into the record as exhibits.

22   Would you prefer we not do that this time?

23           THE COURT:  I don't care.  Do the parties

24   have any --



WILCOX & FETZER LTD.
Registered Professional Reporters

737

1    the sale of CPS associated with that."

2                    Your Honor, I think I've said all I'm going

3    to say.  Thank you.

4                    THE COURT:  Thank you.

5                    Well, given the hour, I will issue a

6    decision, but not now.  So I appreciate the parties'

7    indulgence.

8                    MR. LEVY:  I hope this is profitable.  It's

9    been a wonderful experience here.

10                   THE COURT:  R-Net had a settlement?

11                   MR. FRIEDMAN:  Could I ask you one

12   question? - This is just for our planning.  Do you know

13   when you'll be getting a decision out?

14                   THE COURT:  I hope this week, but don't

15   hold me to it.

16                   MR. LEVY:  Thank you.

17                   (UNIDENTIFIED SPEAKER):  Your Honor, I've

18   lost my voice.

19                   THE COURT:  Can somebody else report your

20   settlement?

21                   (UNIDENTIFIED SPEAKER):  I'm hoping --

22                   MR. SHUFF:  Your Honor, I'll try to be very

23   brief.  Mr. Adam Shiff of Kasowitz, Benson, Torres &

24   Friedman on behalf of the debtor.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

1

```
 1
 2    UNITED STATES BANKRUPTCY COURT
 3    DISTRICT OF DELAWARE
 4                                      COPY
 5    In Re                  )
                             )
 6    Coram Healthcare Corp. )
                             )
 7    and Coram, Inc.,       )
                             )
 8          Debtors,         )    Chapter 11 Case Nos.
                             )    00-3299 (MFW) through
 9                           )    00-3300 (MFW)
                             )
10
11
12
13
      Deposition of
14
      WILLIAM CASEY
15
      Friday, September 28, 2001
16
17
18
19
20
21
22
23
      Reported by:
24    CARRIE STOTTLEMEYER, RPR, CM, CRR
      CSR No. 4373
25    Job No. 79613
```

ESQUIRE DEPOSITION SERVICES
CHICAGO, ILLINOIS                    (800) 708-8087

CH-11 TRUSTEE/
CrowleyAdmin002304

49

```
1   BY MR. LEVY:
2   Q   Whatever "investigation" means to you,
3   Mr. Casey.  You're smart.
4   MR. HARWOOD:  Object to the form.
5   THE WITNESS:  I didn't call the police, I
6   didn't call the FBI.
7   BY MR. LEVY:
8   Q   Did you call Mr. Crowley and say -- and ask
9   him?
10  A   I talked to Mr. Crowley frequently, yes.
11  Q   Did you call Mr. Crowley and ask him about how
12  much he was making -- how much he was being paid,
13  rather, by Cerberus?
14  MR. HARWOOD:  Object to the form.
15  THE WITNESS:  No.
16  BY MR. LEVY:
17  Q   Ever?
18  A   He told me.
19  MR. HARWOOD:  Object to the form.
20  BY MR. LEVY:
21  Q   Excuse me?
22  A   I didn't have to call and ask him.  He told me.
23  Q   When did he tell you?
24  A   After it became an issue.
25  Q   When it -- it became an issue, I take it, on
```

ESQUIRE DEPOSITION SERVICES
CHICAGO, ILLINOIS                              (800) 708-8087

CH-11 TRUSTEE/
CrowleyAdmin002352

50

1  December 21st when the judge refused to confirm the

2  plan?

3  MR. HARWOOD:  Object to the form.

4  BY MR. LEVY:

5  Q    How much after December 21st did Mr. Crowley

6  tell you how much he was given?

7  A    I guess I don't understand.  How much later?

8  Q    Yes.  How much later?

9  A    Shortly thereafter.  Within hours, days.  I

10  don't know.

11  Q    And tell me who was present in this

12  conversation you had with Crowley.

13  A    It could have been he and I, it could have been

14  he and I and other members of the board.

15  Q    Do you have any recollection?

16  A    As I say, we meet and confer --

17  Q    Do you have any recollection?

18  MR. HARWOOD:  Objection.  Let the witness

19  answer the question.

20  THE WITNESS:  I don't know the first time he

21  told me.

22  BY MR. LEVY:

23  Q    Could it have been as long as six months later?

24  A    I don't believe so.

25  Q    Were you surprised at the amount?

ESQUIRE DEPOSITION SERVICES
CHICAGO, ILLINOIS                          (800) 708-8087

CH-11 TRUSTEE/
CrowleyAdmin002353

B626

51

MR. CUNNINGHAM:  Objection.

THE WITNESS:  What amount?

BY MR. LEVY:

Q   The amount of money that Cerberus was paying Crowley.

A   It's a very substantial amount.

Q   How much was it?  Do you recall?

A   80,000 a month.

Q   Did you ask Crowley what he was doing for that 80,000 a month?

A   I believe he told us what he was doing.

Q   What did he tell you?

A   He has a company in Sacramento, and he provides healthcare consulting to Cerberus when they have issues in the healthcare sector of their business.

Q   Did he tell you how much time he was spending for that 80,000 a month?

A   I knew that he was spending full-time on Coram, so I wasn't real interested in how much time he was spending on that.

Q   Because it was pretty clear to you if he was spending full-time on Coram, couldn't have been spending any time on that, correct?

MR. HARWOOD:  Object to the form.

THE WITNESS:  Well, as an attorney, I'm sure

ESQUIRE DEPOSITION SERVICES
CHICAGO, ILLINOIS                          (800) 708-8087

CH-11 TRUSTEE/
CrowleyAdmin002354

B627

140

1    could have simply added that interest to the note

2    without using cash?

3    A    Yes.

4    Q    Are you aware that Mr. Goldin's report

5    concludes that that was an imprudent thing to do?

6    MR. HARWOOD:  Object to the form.

7    THE WITNESS:  Mr. Goldin said that in a

8    bankruptcy situation it's very prudent to -- and I think

9    the term he used was "husband your cash," okay, and I

10   don't disagree with what he said.  That's not true --

11   BY MR. LEVY:

12   Q    Keep going.

13   A    In this particular instance, he felt it would

14   be -- since we would be renegotiating a DIP line of

15   credit, debtor in possession line of credit, that it

16   would be to our advantage to enter this situation in as

17   favorable a light as we could; therefore, we made the

18   payment.

19   Q    You approved the payment as a director?

20   A    I don't remember approving it specifically, but

21   we did review what happened and we did concur.

22   Q    Isn't it a fact that the Goldin report says it

23   was an imprudent thing to do?

24   MR. HARWOOD:  Object to the form.

25   THE WITNESS:  I believe I just answered that.

ESQUIRE DEPOSITION SERVICES
CHICAGO, ILLINOIS
(800) 708-8087

CH-11 TRUSTEE/
CrowleyAdmin002443

144

1  imprudent?

2  MR. HARWOOD:  Object to the form.

3  MR. CUNNINGHAM:  I'd note that there's an

4  extended discussion elsewhere in the report.

5  MR. HARWOOD:  Exactly.

6  THE WITNESS:  There is an extended discussion

7  elsewhere in the report, and as I said before, it's a

8  judgment call.  Mr. Goldman (sic) does in fact say what

9  he said.  My feeling as a manager, as a board member is

10 that what we did is we made that payment to maintain our

11 relationship with the debt because we were going to have

12 to negotiate new lines of credit and we felt it was

13 prudent to do it.  There's a disagreement.  I believe

14 that he's entitled to his and we're entitled to ours.

15 BY MR. LEVY:

16 Q   Generally speaking, did you find yourself

17 relying on Goldin and the Goldin report?

18 MR. CUNNINGHAM:  Objection.

19 THE WITNESS:  I don't understand the question.

20 BY MR. LEVY:

21 Q   Did the directors of Coram rely on the Goldin

22 report in making their decision to file the second

23 amended plan?

24 A   As it states in the second amended plan, the

25 special committee of the board endorsed the Goldin plan.

ESQUIRE DEPOSITION SERVICES
CHICAGO, ILLINOIS
(800) 708-8087

CH-11 TRUSTEE/
CrowleyAdmin002447

B629

```
 1  STATE OF CALIFORNIA       )
                              :ss
 2  COUNTY OF SACRAMENTO      )

 3

 4      I, the undersigned, a Certified Shorthand Reporter

 5  of the State of California, do hereby certify:

 6      That the foregoing proceedings were taken before me

 7  at the time and place herein set forth; that any

 8  witnesses in the foregoing proceedings, prior to

 9  testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14      I further certify that I am neither financially

15  interested in the action nor a relative or employee of

16  any attorney of the parties.

17      IN WITNESS WHEREOF, I have this date subscribed my

18  name.

19

20  Dated:  Oct. 1, 2001

21

22

23  CARRIE STOTTLEMEYER, RMR, CRR
    CSR No. 4373

24

25
                                                        160
```

ESQUIRE DEPOSITION REPORTERS
1801 I STREET      SACRAMENTO, CA      (916) 448-0505

CH-11 TRUSTEE/
CrowleyAdmin002463

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

In Re                          )
                               )
Coram Healthcare Corp.         )
                               )
and Coram, Inc.,               )
                               )        Chapter 11 Case Nos.
        Debtors,               )        00-3299 (MFW) through
                               )        00-3300 (MFW)
                               )
_____    )

CERTIFIED COPY

Deposition of

DANIEL D. CROWLEY

Thursday, October 25, 2001

Reported by:
CARRIE STOTTLEMEYER, RPR, CM, CRR
CSR No. 4373
Job No. 80965



ESQUIRE
DEPOSITION SERVICES

1801 I Street • First Floor • Sacramento, CA 95814
916.448.0505 • Fax 916.448.8726 • 800.610.0505

CH-11 TRUSTEE/
CrowleyAdmin002717

```
 1   of interest and it's an actual conflict of interest."

 2        A    Be speculative on my part as to what the judge

 3   is thinking.  Are you wishing me to speculate?

 4        Q    That's a good answer.  Have you ever discussed

 5   with anyone what she meant when she said that there was

 6   an actual conflict of interest?

 7             MR. FELDMAN:  You can answer that for anyone

 8   other than your lawyers.

 9   BY MR. LEVY:

10        Q    Well, no.  If you discussed it with your

11   lawyer, you can tell me you discussed it with your

12   lawyer.  I'm not going to ask what was discussed, okay.

13             MR. FELDMAN:  You can answer it yes or no.

14             THE WITNESS:  Yes.

15   BY MR. LEVY:

16        Q    Have you ever discussed that with anyone other

17   than your lawyer?

18        A    No.

19        Q    Have you ever discussed that with any member of

20   the board of directors of Coram?

21             MR. FELDMAN:  The meaning of those words?

22   BY MR. LEVY:

23        Q    The meaning of those words.

24        A    No.

25        Q    Have you ever discussed with any member of the
```

CH-11 TRUSTEE/
CrowleyAdmin002727

                                                          12

ESQUIRE DEPOSITION REPORTERS
1801 I STREET     SACRAMENTO, CA   (916) 448-0505

```
 1    board of directors of Coram the question of whether your

 2    relationship with Cerberus was an actual conflict of

 3    interest?

 4         A    Would you ask that again?

 5              MR. FELDMAN:  I'm sorry, I'm getting

 6    distracted.  I don't mean to be difficult, but all the

 7    movement and the stuff -- if we need to break for you to

 8    hook up your gear, I'm happy to do that, but it's hard

 9    to focus when there's a lot of mechanical stuff going

10    on.

11              MR. LEVY:  Let's hold it a second.

12              (Recess taken.)

13              MR. LEVY:  Why don't you read the last question

14    then.

15              (Record read.)

16              THE WITNESS:  Yes.

17    BY MR. LEVY:

18         Q    With which members of the board of directors of

19    Coram have you discussed that?

20         A    The full board.

21         Q    When was the first time you had such a

22    discussion?

23         A    I don't recall the exact date.

24         Q    Approximate date.

25         A    Couple days after this.  December 21st.
```

CH-11 TRUSTEE/
CrowleyAdmin002728

                                                    13

ESQUIRE DEPOSITION REPORTERS
1801 I STREET      SACRAMENTO, CA    (916) 448-0505

1    Q   And was that at a formal meeting of the board?

2    A   I don't recall.  I think so.

3    Q   What did you say and what did the members of

4  the board respond on that subject to the best of your

5  recollection?  Just give me the substance.

6    A   That I had run the company for the company

7  very, very well and that I believe that I saved the

8  company from rather certain extinction and that I had

9  earned the respect in the company outside the company

10  from every conceivable constituency and that I had

11  complete respect for the judge's decision and understood

12  how she may have been uncomfortable by the relationship

13  between Cerberus and myself but that my duties for

14  Cerberus and my relationship with Cerberus had nothing

15  to do with Coram and that I was disappointed in the

16  outcome, that I believed that the board members knew of

17  my relationship with Cerberus, and I discussed again

18  that I was being paid 80,000 dollars a month to provide

19  services to Cerberus, that would continue, and that the

20  duties at Cerberus had no impact on my activities at

21  Coram and that there was no conflict in that Cerberus

22  had never asked me to do anything at Coram; that's the

23  substance of it, and the board's substance in response

24  was that their feeling was I had conducted myself above

25  and beyond, that I had never acted other than in Coram's

                                                    14

CH-11 TRUSTEE/
CrowleyAdmin002729

1    best interests and that they and I wished that I had

2    simply given them my contract and disclosed the amount

3    of pay with Cerberus because it would have provided

4    Judge Walrath with ostensibly more comfort.

5        Q    Anything else you recall from that meeting?

6        A    No.

7        Q    Now you said, I believe, at the beginning of

8    that answer that you had earned the respect of every

9    conceivable constituency; is that right?  I don't recall

10   those exact words, but it's in the transcript.   In

11   substance?

12       A    Yes.

13       Q    Do you believe you earned the respect of the

14   equity holders as a result of your conduct?

15           MR. FELDMAN:   Mischaracterizes the testimony.

16   BY MR. LEVY:

17       Q    Do you believe that the equity holders are a

18   constituency?

19       A    Yes.

20       Q    Do you believe you earned their respect?

21       A    I believe that the equity holders respect the

22   work that I did and have done at Coram and the results

23   that I have achieved at Coram and are disappointed that

24   Coram's insolvent, and I believe they respect the work.

25       Q    What is the basis of your belief that they

                                                        15

ESQUIRE DEPOSITION REPORTERS
1801 I STREET      SACRAMENTO, CA    (916) 448-0505

CH-11 TRUSTEE/
CrowleyAdmin002730

REPORTER'S CERTIFICATE

I certify that the witness in the foregoing

deposition,

DANIEL D. CROWLEY,

was by me duly sworn to testify in the within-entitled

cause; that said deposition was taken at the time and

place therein named; that the testimony of said witness

was reported by me, a duly Certified Shorthand Reporter

of the State of California authorized to administer

oaths and affirmations, and said testimony was

thereafter transcribed into typewriting.

I further certify that I am not of counsel or

attorney for either or any of the parties to said

deposition nor in any way interested in the outcome of

the cause named in said deposition.

IN WITNESS WHEREOF, I have hereunto set my hand

this 3 day of 3, 2001.


CARRIE STOTTLEMEYER
Certified Shorthand Reporter
Certificate No. 4373

CH-11 TRUSTEE/
CrowleyAdmin002842

127

ESQUIRE DEPOSITION SERVICES
1801 I STREET    SACRAMENTO, CA    (916) 448-0505

**In The Matter Of:**

*In Re: Coram Healthcare - Chapter 11*

*Hon. Arlin Adams*
*January 21, 2004*

*Brusilow & Associates*
*1926 Arch Street*
*1st Floor West*
*Philadelphia, PA  19103-1404*
*(215) 977-9700    FAX: (215) 977-9773*

*Original File ADAM0121.TXT, 73 Pages*
*Min-U-Script® File ID: 0059159295*

**Word Index included with this Min-U-Script®**

CH-11 TRUSTEE/
CrowleyAdmin001615



In Re: Coram Healthcare - Chapter 11

Hon. Arlin Adams
January 21, 2004

**Page 1**

[1]
[2]    IN THE UNITED STATES BANKRUPTCY COURT
[3]        FOR THE DISTRICT OF DELAWARE
[4]
    In re:                        : Chapter 11
[5]  CORAM HEALTHCARE CORP. :
    and CORAM, INC.            :
[6]        Debtors              : Case NO. 00-3299
                                :
[7]
[8]
[9]        Wednesday, January 21, 2004
[10]
[11]
        Continued pretrial examination of
[12]
    HON. ARLIN ADAMS, held in the offices of
[13]
    Schnader, Harrison, Segal & Lewis, 32nd
[14]
    Floor, Philadelphia, PA 19103, commencing
[15]
    at 11:02 a.m., on the above date, before
[16]
    Mickey Dister, Registered Professional
[17]
    Reporter and Commissioner of Deeds for the
[18]
    Commonwealth of Pennsylvania.
[19]
[20]
        BRUSILOW & ASSOCIATES
[21]    COURT REPORTERS & VIDEOGRAPHERS
        1920 Arch Street - 1st Floor West
[22]    Philadelphia, PA 19103-1404
            215.977.9700
[23]        www.brusilow.com
[24]

**Page 2**

[1] APPEARANCES:

[2] JENNER & BLOCK

    BY: RICHARD LEVY, ESQUIRE

[3]    STEVE TOMASHEFSKY, ESQUIRE

    One IBM Plaza

[4] Chicago, IL 60611

    312-222-9350

[5] rlevy@jenner.com

    Counsel for the Equity Committee

[6]

[7]

    SCHULTE, ROTH & ZABEL, LLP  (By telephone)

[8] BY: HOWARD GODNICK, ESQUIRE

    919 Third Avenue

[9] New York, New York 10022

    212-756-2000

[10] howard.godnick@srz.com

    Counsel for Cerberus Partners, L.P.

[11]

[12]

    SCHNADER, HARRISON, SEGAL & LEWIS

[13] BY: BARRY BRESSLER, ESQUIRE

    1600 Market Street

[14] Philadelphia, PA 19103

    215-751-2336

[15] bbressler@schnader.com

    Counsel for the Trustee

[16]

[17] WEIL, GOTSHAL & MANGES LLP  (By telephone)

    BY: JOHN A. NEUWIRTH, ESQUIRE

[18] 767 Fifth Avenue

    New York, New York 10153-0119

[19] 212-310-8722

    john.neuwirth@weil.com

[20] Counsel for Goldman Sachs, Credit Partners,

    L.P., Foothill Capital Corporation

[21]

[22]

[23]

[24]

CH-11 TRUSTEE/
CrowleyAdmin001616

Min-U-Script®                    (3) Page 1 - Page 2

Hon. Arlin Adams
January 21, 2004

In Re: Coram Healthcare - Chapter 11

**Page 11**

[1] the benefits of the directors and officers
[2] liability insurance, correct?
[3]    A: That's right.
[4]    Q: Do you have any notion as to the
[5] value of those claims to the equity
[6] holders that purport to be assigned under
[7] this plan modification?
[8]    A: I really don't have an idea of the
[9] value. The problem in the claim against
[10] Dan Crowley is, again, damages. I think
[11] it would be hard-pressed, we would be
[12] hard-pressed if we were asserting the
[13] claim to establish damages, even though
[14] there is a finding by Judge Walrath
[15] against Dan Crowley because I think there
[16] will be some difficulty in establishing
[17] that whatever he did was deleterious to
[18] the financial well-being of Coram.
[19]    Q: You never retained or authorized
[20] the retention of a damage expert to
[21] analyze the potential damage claims
[22] against Dan Crowley, did you?
[23]    A: We did not because, there, again,
[24] it's premature. We didn't want to do that

**Page 12**

[1] at this early stage until we knew where we
[2] were going. We had to do it in the
[3] PriceWaterhouse because we couldn't talk
[4] to the other side without doing it.
[5]    Q: Why do you believe it's premature,
[6] judge?
[7]    A: We don't know who is going to have
[8] this claim.
[9]    Q: You didn't seek the consent of the
[10] Equity Committee to the terms of the plan
[11] modification that you have in front of
[12] you, did you?
[13]    A: I can't tell you whether Barry
[14] spoke to you or your colleagues. I don't
[15] know. I did not.
[16]    Q: So far as you know, there was no
[17] communication with the Equity Committee
[18] before this?
[19]    A: To my knowledge, you are correct.
[20]    Q: Under the provisions of this plan
[21] modification, you retained, you and you
[22] alone decide whether to commence,
[23] prosecute, compromise and seek Bankruptcy
[24] Court approval of any settlement, do you

**Page 13**

[1] understand that?
[2]    A: Settlement of the PriceWaterhouse?
[3]    Q: Or Crowley or anything assigned
[4] under the plan modification.
[5]    A: That is correct. I think we have
[6] to.
[7]    Q: If the equity holders are to
[8] receive the benefit of any of this
[9] litigation or settlement, why is it
[10] important that you, rather than the Equity
[11] Committee, retain this control?
[12]    A: I think we have to do it.
[13]    Q: What is the basis?
[14]    A: The claim is ours. We can enlist
[15] your help in asserting the claim. It
[16] would have to be done by the Trustee.
[17] That's my understanding.
[18]    Q: Is that the only reason, it's your
[19] belief that as a matter of law you could
[20] not give control of that to, say, a
[21] litigation trust?
[22]    MR. BRESSLER: Objection to
[23] the form of the question.
[24]    THE WITNESS: That was my

**Page 14**

[1] understanding.
[2]    BY MR. LEVY:
[3]    Q: Is that the only reason?
[4]    A: I remember discussing this with
[5] counsel and I was told at that time that
[6] we would be obligated, when we say "we,"
[7] the Trustee would be obligated to assert
[8] the claim. The Trustee could agree to
[9] give the proceeds of the claim to another
[10] party and enlist the help of the other
[11] party in prosecuting the claim, but it
[12] would have to be done under the aegis of
[13] the Trustee.
[14]    Q: That is not quite the question I
[15] asked. Apart from who asserts the claim,
[16] the question has to do with the provision
[17] that says that you and you alone have the
[18] right to commence, prosecute and
[19] compromise the claims. Do you believe
[20] that right, the right to commence,
[21] prosecute and compromise could have been
[22] given to the Equity Committee or a
[23] post-confirmation litigation trust?
[24]    MR. BRESSLER: Objection to

Page 11 - Page 14  (6)

Min-U-Script®

CH-11 TRUSTEE/
CrowleyAdmin001619

Hon. Arlin Adams
January 21, 2004

In Re: Coram Healthcare - Chapter 11

**Page 67**

[1] A: I will not object.

[2] MR. GODNICK: Excuse me,
[3] Mr. Levy, you made requests to the
[4] judge to extend this beyond an hour,
[5] an hour and 15 minutes, an
[6] hour-and-a-half and you were basically
[7] on your knees and she made it very
[8] clear to you and to the court on the
[9] record that this was to be 60 minutes
[10] and no longer.

[11] THE WITNESS: I don't want
[12] to contradict the judge, no. I want
[13] to cooperate, but I don't want to
[14] contradict the Court.

[15] MR. BRESSLER: Your last
[16] question, please.

[17] MR. LEVY: I have a series
[18] of questions that I guarantee will
[19] take five minutes.

[20] MR. GODNICK: I object.

[21] MR. LEVY: Mr. Bressler —

[22] MR. BRESSLER: Ask your
[23] next question.

[24] MR. LEVY: Can I have five

**Page 68**

[1] minutes? I don't want to ask one
[2] question and be cut off.

[3] MR. BRESSLER: You are now
[4] over your limit. We're going to give
[5] you one more question anyway.

[6] THE WITNESS: I think we
[7] are using up too much time.

[8] BY MR. LEVY:

[9] Q: Do you recall a meeting on
[10] November 25th attended by representatives
[11] of the noteholders, you, your counsel?

[12] A: I think I do, yes.

[13] Q: Prior to that meeting, you had
[14] started a process with your investment
[15] bankers?

[16] MR. BRESSLER: These have
[17] been asked and answered of other
[18] people.

[19] THE WITNESS: I did consult
[20] with investment counselors prior to
[21] that meeting.

[22] MR. BRESSLER: You are over
[23] your time.

[24] MR. LEVY: Okay. I can't

**Page 69**

[1] really continue with that kind —

[2] THE WITNESS: Ask me
[3] another two or three questions.

[4] MR. LEVY: I know you want
[5] to cooperate. Your counsel and Mr.
[6] Godnick seem to think five minutes is
[7] just too important.

[8] MR. GODNICK: Judge Walrath
[9] seems to think that anything in excess
[10] of 60 minutes was verboten. You asked
[11] her seven ways to sundown. You can
[12] take issue with the judge.

[13] MR. LEVY: I take issue.
[14] I'm not going to argue about it.
[15] Thank you, judge.

[16] MR. BRESSLER: Your last
[17] topic was going to be about the
[18] November 25th meeting with the
[19] noteholders. Three other people have
[20] testified about that. If it was some
[21] crucial topic that no one else might
[22] have testified to, I may have let him
[23] testify.

[24] (Deposition concluded.)

**Page 70**

[1] CERTIFICATION

[2]

[3] I hereby certify that the testimony

[4] and the proceedings in the foregoing

[5] matter are contained fully and accurately

[6] in the stenographic notes taken by me, and

[7] that the copy is a true and correct

[8] transcript of the same.

[9]

[10] MICKEY DINTER
    Registered Professional Reporter

[11]

[12]

[13] The foregoing certification does not apply

[14] to any reproduction of the same by any

[15] means unless under the direct control

[16] and/or supervision of the certifying

[17] shorthand reporter.

[18]

[19]

[20]

[21]

[22]

[23]

[24]

Page 67 - Page 70   (20)

Min-U-Script®

CH-11 TRUSTEE/
CrowleyAdmin001633

**In The Matter Of:**

*In Re: Coram Healthcare - Chapter 11*

*Hon. Arlin Adams*
*January 21, 2004*

*Brusilow & Associates*
*1926 Arch Street*
*1st Floor West*
*Philadelphia, PA  19103-1404*
*(215) 977-9700     FAX: (215) 977-9773*

*Original File ADAMO121.TXT, 73 Pages*
*Min-U-Script® File ID: 0059159295*

**Word Index included with this Min-U-Script®**

CH-11 TRUSTEE/
CrowleyAdmin001615

In Re: Coram Healthcare - Chapter 11

Hon. Arlin Adams
January 21, 2004



**Page 1**

[1]
[2]    IN THE UNITED STATES BANKRUPTCY COURT
[3]       FOR THE DISTRICT OF DELAWARE
[4]
    In re:                    : Chapter 11
[5]  CORAM HEALTHCARE CORP. :
    and CORAM, INC.          :
[6]                          : Case NO. 00-3299
      Debtors                :
[7]
[8]
[9]    Wednesday, January 21, 2004
[10]
[11]
    Continued pretrial examination of
[12]
    HON. ARLIN ADAMS, held in the offices of
[13]
    Schnader, Harrison, Segal & Lewis, 32nd
[14]
    Floor, Philadelphia, PA 19103, commencing
[15]
    at 11:02 a.m., on the above date, before
[16]
    Mickey Dister, Registered Professional
[17]
    Reporter and Commissioner of Deeds for the
[18]
    Commonwealth of Pennsylvania.
[19]
[20]
        BRUSILOW & ASSOCIATES
[21]  COURT REPORTERS & VIDEOGRAPHERS
     1920 Arch Street - 1st Floor West
[22]    Philadelphia, PA 19103-1404
        215.977.9700
[23]      www.brusilow.com
[24]

**Page 2**

[1] APPEARANCES:

[2] JENNER & BLOCK

    BY: RICHARD LEVY, ESQUIRE

[3]    STEVE TOMASHEFSKY, ESQUIRE

    One IBM Plaza

[4] Chicago, IL 60611

    312-222-9350

[5] rlevy@jenner.com

    Counsel for the Equity Committee

[6]

[7]

    SCHULTE, ROTH & ZABEL, LLP (By telephone)

[8] BY: HOWARD GODNICK, ESQUIRE

    919 Third Avenue

[9] New York, New York 10022

    212-756-2000

[10] howard.godnick@srz.com

    Counsel for Cerberus Partners, L.P.

[11]

[12]

    SCHNADER, HARRISON, SEGAL & LEWIS

[13] BY: BARRY BRESSLER, ESQUIRE

    1600 Market Street

[14] Philadelphia, PA 19103

    215-751-2336

[15] bbressler@schnader.com

    Counsel for the Trustee

[16]

[17] WEIL, GOTSHAL & MANGES LLP (By telephone)

    BY: JOHN A. NEUWIRTH, ESQUIRE

[18] 767 Fifth Avenue

    New York, New York 10153-0119

[19] 212-310-8722

    john.neuwirth@weil.com

[20] Counsel for Goldman Sachs, Credit Partners,

    L.P., Foothill Capital Corporation

[21]

[22]

[23]

[24]

CH-11 TRUSTEE/
CrowleyAdmin001616

Min-U-Script®                    (3) Page 1 - Page 2

Hon. Arlin Adams
January 21, 2004

In Re: Coram Healthcare - Chapter 11

---

Page 11

[1] the benefits of the directors and officers
[2] liability insurance, correct?
[3]    A: That's right.
[4]    Q: Do you have any notion as to the
[5] value of those claims to the equity
[6] holders that purport to be assigned under
[7] this plan modification?
[8]    A: I really don't have an idea of the
[9] value. The problem in the claim against
[10] Dan Crowley is, again, damages. I think
[11] it would be hard-pressed, we would be
[12] hard-pressed if we were asserting the
[13] claim to establish damages, even though
[14] there is a finding by Judge Walrath
[15] against Dan Crowley because I think there
[16] will be some difficulty in establishing
[17] that whatever he did was deleterious to
[18] the financial well-being of Coram.
[19]    Q: You never retained or authorized
[20] the retention of a damage expert to
[21] analyze the potential damage claims
[22] against Dan Crowley, did you?
[23]    A: We did not because, there, again,
[24] it's premature. We didn't want to do that

---

Page 12

[1] at this early stage until we knew where we
[2] were going. We had to do it in the
[3] PriceWaterhouse because we couldn't talk
[4] to the other side without doing it.
[5]    Q: Why do you believe it's premature,
[6] judge?
[7]    A: We don't know who is going to have
[8] this claim.
[9]    Q: You didn't seek the consent of the
[10] Equity Committee to the terms of the plan
[11] modification that you have in front of
[12] you, did you?
[13]    A: I can't tell you whether Barry
[14] spoke to you or your colleagues. I don't
[15] know. I did not.
[16]    Q: So far as you know, there was no
[17] communication with the Equity Committee
[18] before this?
[19]    A: To my knowledge, you are correct.
[20]    Q: Under the provisions of this plan
[21] modification, you retained, you and you
[22] alone decide whether to commence,
[23] prosecute, compromise and seek Bankruptcy
[24] Court approval of any settlement, do you

---

Page 13

[1] understand that?
[2]    A: Settlement of the PriceWaterhouse?
[3]    Q: Or Crowley or anything assigned
[4] under the plan modification.
[5]    A: That is correct. I think we have
[6] to.
[7]    Q: If the equity holders are to
[8] receive the benefit of any of this
[9] litigation or settlement, why is it
[10] important that you, rather than the Equity
[11] Committee, retain this control?
[12]    A: I think we have to do it.
[13]    Q: What is the basis?
[14]    A: The claim is ours. We can enlist
[15] your help in asserting the claim. It
[16] would have to be done by the Trustee.
[17] That's my understanding.
[18]    Q: Is that the only reason, it's your
[19] belief that as a matter of law you could
[20] not give control of that to, say, a
[21] litigation trust?
[22]    MR. BRESSLER: Objection to
[23] the form of the question.
[24]    THE WITNESS: That was my

---

Page 14

[1] understanding.
[2]    BY MR. LEVY:
[3]    Q: Is that the only reason?
[4]    A: I remember discussing this with
[5] counsel and I was told at that time that
[6] we would be obligated, when we say "we,"
[7] the Trustee would be obligated to assert
[8] the claim. The Trustee could agree to
[9] give the proceeds of the claim to another
[10] party and enlist the help of the other
[11] party in prosecuting the claim, but it
[12] would have to be done under the aegis of
[13] the Trustee.
[14]    Q: That is not quite the question I
[15] asked. Apart from who asserts the claim,
[16] the question has to do with the provision
[17] that says that you and you alone have the
[18] right to commence, prosecute and
[19] compromise the claims. Do you believe
[20] that right, the right to commence,
[21] prosecute and compromise could have been
[22] given to the Equity Committee or a
[23] post-confirmation litigation trust?
[24]    MR. BRESSLER: Objection to

---

Page 11 - Page 14 (6)

Min-U-Script®

CH-11 TRUSTEE/
CrowleyAdmin001619

Hon. Arlin Adams
January 21, 2004

In Re: Coram Healthcare - Chapter 11

---

**Page 67**

[1]    A: I will not object.
[2]    MR. GODNICK: Excuse me,
[3] Mr. Levy, you made requests to the
[4] judge to extend this beyond an hour,
[5] an hour and 15 minutes, an
[6] hour-and-a-half and you were basically
[7] on your knees and she made it very
[8] clear to you and to the court on the
[9] record that this was to be 60 minutes
[10] and no longer.
[11]    THE WITNESS: I don't want
[12] to contradict the judge, no. I want
[13] to cooperate, but I don't want to
[14] contradict the Court.
[15]    MR. BRESSLER: Your last
[16] question, please.
[17]    MR. LEVY: I have a series
[18] of questions that I guarantee will
[19] take five minutes.
[20]    MR. GODNICK: I object.
[21]    MR. LEVY: Mr. Bressler —
[22]    MR. BRESSLER: Ask your
[23] next question.
[24]    MR. LEVY: Can I have five

**Page 68**

[1] minutes? I don't want to ask one
[2] question and be cut off.
[3]    MR. BRESSLER: You are now
[4] over your limit. We are going to give
[5] you one more question anyway.
[6]    THE WITNESS: I think we
[7] are using up too much time.
[8]    BY MR. LEVY:
[9]    Q: Do you recall a meeting on
[10] November 25th attended by representatives
[11] of the noteholders, you, your counsel?
[12]    A: I think I do, yes.
[13]    Q: Prior to that meeting, you had
[14] started a process with your investment
[15] bankers?
[16]    MR. BRESSLER: These have
[17] been asked and answered of other
[18] people.
[19]    THE WITNESS: I did consult
[20] with investment counselors prior to
[21] that meeting.
[22]    MR. BRESSLER: You are over
[23] your time.
[24]    MR. LEVY: Okay. I can't

**Page 69**

[1] really continue with that kind —
[2]    THE WITNESS: Ask me
[3] another two or three questions.
[4]    MR. LEVY: I know you want
[5] to cooperate. Your counsel and Mr.
[6] Godnick seem to think five minutes is
[7] just too important.
[8]    MR. GODNICK: Judge Walrath
[9] seems to think that anything in excess
[10] of 60 minutes was verboten. You asked
[11] her seven ways to sundown. You can
[12] take issue with the judge.
[13]    MR. LEVY: I take issue.
[14] I'm not going to argue about it.
[15] Thank you, judge.
[16]    MR. BRESSLER: Your last
[17] topic was going to be about the
[18] November 25th meeting with the
[19] noteholders. Three other people have
[20] testified about that. If it was some
[21] crucial topic that no one else might
[22] have testified to, I may have let him
[23] testify.
[24]    (Deposition concluded.)

**Page 70**

[1]       CERTIFICATION
[2]
[3]    I hereby certify that the testimony
[4] and the proceedings in the foregoing
[5] matter are contained fully and accurately
[6] in the stenographic notes taken by me, and
[7] that the copy is a true and correct
[8] transcript of the same.
[9]
[10] MICKEY DINTER
[11]    Registered Professional Reporter
[11]
[12]
[13] The foregoing certification does not apply
[14] to any reproduction of the same by any
[15] means unless under the direct control
[16] and/or supervision of the certifying
[17] shorthand reporter.
[18]
[19]
[20]
[21]
[22]
[23]
[24]

---

Page 67 - Page 70  (20)                    Min-U-Script®

CH-11 TRUSTEE/
CrowleyAdmin001633

Feinberg, Stephen                                           2/14/2007

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

Certified Copy

ARLIN M. ADAMS, Chapter II      )
Trustee of the Post-            )Case No.
Confirmation Bankruptcy of      )04-1565
Estates of CORAM HEALTHCARE     )
CORPORATION, and of CORAM,      )
INC., a Delaware corporation,)
                                )
            Plaintiff,          )
                                )
        vs.                     )
                                )
DANIEL D. CROWLEY, DONALD J.    )
AMARAL; WILLIAM J. CASEY; L.    )
PETER SMITH; and SANDRA L.      )
SMOLEY,                         )
                                )
        Defendants.             )
------------------------------)


                Wednesday, February 14, 2007
                10:29 a.m.




        Deposition of STEPHEN FEINBERG,
    held at the offices of Cerberus
    Capital Management, L.P., 200 Park
    Avenue, New York, New York 10171,
    pursuant to Notice, before Otis Davis,
    a Notary Public of the State of New
    York.

1              Stephen Feinberg

2    done a Consulting Agreement, which is what

3    we should have done here.  But I wasn't

4    involved with this.  He takes care of the

5    agreements and a mistake was made.

6        Q.    What was your understanding in

7    November 1999 of the form of the

8    relationship between Cerberus and Dan

9    Crowley, putting aside Coram?

10       A.    That he would consult with us

11   and work on companies, on companies we

12   would bring to him if he wanted to, and he

13   would give us advice or more.  For that, he

14   received compensation, a yearly salary, and

15   upside on deals that we did that he

16   recommended.

17       Q.    It says in paragraph 3.1 under

18   "Basic Compensation" that he would receive

19   a salary of $80,000 a month.

20             Was he receiving that salary

21   for work on Coram or for work on other

22   projects with Cerberus?

23       A.    For work on other projects with

24   Cerberus.

25       Q.    How was that number of $80,000

264

```
1
2                      C E R T I F I C A T E
3      STATE OF NEW YORK      )
4                             : ss.
5      COUNTY OF NEW YORK     )
6
7              I, OTIS DAVIS, a Notary Public
8          within and for the State of New York,
9          do hereby certify:
10             That STEPHEN FEINBERG, the
11         witness whose deposition is
12         hereinbefore set forth, was duly sworn
13         by me and that such deposition is a
14         true record of the testimony given by
15         the witness.
16             I further certify that I am not
17         related to any of the parties to this
18         action by blood or marriage, and that
19         I am in no way interested in the
20         outcome of this matter.
21             IN WITNESS WHEREOF, I have hereunto
22         set my hand this 16th day of February 2007.
23
24                         _____
25                              OTIS DAVIS
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


ARLIN M. ADAMS, Chapter 11
Trustee of the Post-Confirmation
Bankruptcy Estates of CORAM
HEALTHCARE CORPORATION, a Delaware
Corporation, and of CORAM, INC.,
a Delaware Corporation,

        Plaintiff,

                              CASE NO.  04-1565

        vs.

DANIEL D. CROWLEY; DONALD
J. AMARAL; WILLIAM J. CASEY;
L. PETER SMITH; and SANDRA
L. SMOLEY,

        Defendants.
_____/

Certified Copy


---oOo---

VIDEOTAPED DEPOSITION OF DANIEL D. CROWLEY

Friday, April 6, 2007

---oOo---

SHEILA CHASE & ASSOCIATES
REPORTING FOR:
LiveNote World Service
221 Main Street, Suite 1250
San Francisco, California  94105
Phone: (415)  321-2300
Fax:  (415)  321-2301



Reported by:
LORRIE L. MARCHANT, CSR, RPR, CRR, CLR
CSR No. 10523

B644

Crowley, Daniel D.                                              4/6/2007

1           BY MR. BARKASY:  Q.  No, not for the moment.

2           Mr. Crowley, I just want to close the loop.

3           As of August 8, 2000, you didn't tell

4    Scott Danis that you were receiving $80,000 a month from

5    Cerberus, did you?

6           MR. SLAUGHTER:  Object to the form.

7           THE WITNESS:  I may have.  I don't recall it.

8           BY MR. BARKASY:  Q.  You testified at the

9    confirmation hearing on Coram's first plan of

10   reorganization; correct?

11       A.   You asked me that before, and I said I did.

12       Q.   And you were represented by Phil Warden, of the

13   Pillsbury firm, during the confirmation hearing; is that

14   correct?

15          MR. SLAUGHTER:  Object to the form.  Calls for

16   a legal conclusion.  Lacks foundation.

17          THE WITNESS:  I don't recall that I was

18   represented by Pillsbury at the confirmation hearing.  I

19   think it was subsequent.

20          BY MR. BARKASY:  Q.  Mr. Crowley, I would like

21   to refer to Exhibit Crowley 19.

22       A.   Give me a second.

23       Q.   Sure.  And I'd like you to look at the very

24   last page of Crowley 19.

25       A.   This (indicating)?

1    Q.    Yeah.

2    A.    Okay.

3    Q.    The last page of Crowley 19 is the court

4  sign-in sheet for the hearing held in Coram on

5  December 15, 2000.  And if you look at the last name, it

6  says Phillip Warden; Pillsbury, Madison & Sutro; D.

7  Crowley.

8          Do you see that?

9    A.    Yes.

10   Q.    Does that refresh your memory as to whether

11 Mr. Warden was representing you at the confirmation

12 hearing held in December of 2000?

13         MR. SLAUGHTER:  Objection to the form of the

14 form of the question.  Lacks foundation.

15         THE WITNESS:  No.  As I sit here, it doesn't

16 refresh my recollection.

17         I will say that at some point, Phil Warden

18 represented me in a deposition.  As to that

19 representation at this date on this matter, I just don't

20 recall that.

21         BY MR. BARKASY:  Q.  Okay.  Mr. Warden flew to

22 Wilmington with you, on a chartered jet, on December 14,

23 2000, with Mr. Davis.

24         Do you remember that?

25   A.    I have a recollection of being told I had to be

Crowley, Daniel D.                                          4/6/2007

```
 1              And then he's writing a 165-page report telling
 2    me you saved the company.  So -- that's a pretty tough
 3    situation for me.
 4              MR. BARKASY:  Let me mark this as I think what
 5    will be the last exhibit.
 6              (Marked for identification purposes,
 7              Exhibit 43.)
 8              BY MR. BARKASY:  Q.  Mr. Crowley, Exhibit -- is
 9    Exhibit Crowley 43 a schedule of attorneys' fees
10    incurred by Dynamic related to the Coram bankruptcy?
11              MR. SLAUGHTER:  Objection.  Lacks foundation.
12              You can testify if you know what it is.  If you
13    don't -- you can tell him what it is if you know.  If
14    you don't know ...
15              THE WITNESS:  Well, I haven't seen this before
16    you just handed it to me, and it says, Attorney fees
17    incurred by DPH related to Coram bankruptcy.  But as I
18    sit here and look at this, I don't have a recollection.
19              BY MR. BARKASY:  Q.  This was --
20              MR. SLAUGHTER:  I think we're -- Counsel, I
21    think we're -- our video operator can tell us what the
22    time is, but I think we're up on our time.
23              THE VIDEOGRAPHER:  Yeah, we are.
24              MR. SLAUGHTER:  Okay.
25              MR. BARKASY:  Well, I have one more question.
```

```
 1              CERTIFICATE OF DEPOSITION OFFICER

 2        I, LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523,

 3   duly authorized to administer oaths pursuant to Section

 4   8211 of the California Code of Civil Procedure, hereby

 5   certify that the witness in the foregoing deposition

 6   was by me sworn to testify to the truth, the whole truth

 7   and nothing but the truth in the within-entitled cause;

 8   that said deposition was taken at the time and place

 9   therein stated; that the testimony of said witness was

10   reported by me and was thereafter transcribed by me or

11   under my direction by means of computer-aided

12   transcription; that the foregoing is a full, complete

13   and true record of said testimony; and that the witness

14   was given an opportunity to read and correct said

15   deposition and to subscribe same.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21        IN WITNESS WHEREOF, I have hereunto subscribed

22   by my hand this 12th day of April          , 2007,

23

24   LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523

25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**Certified Copy**

Case No. 04-1565

------------------------------------------------

VIDEO DEPOSITION OF SCOTT R. DANITZ
April 6, 2007

------------------------------------------------

ARLIN M. ADAMS, Chapter 11 Trustee of the
Post-Confirmation Bankruptcy of Estates of Coram
HEALTHCARE CORPORATION, and of CORAM, INC., a
Delaware corporation,
Plaintiffs,

vs.

DANIEL D. CROWLEY, DONALD J. AMARAL, WILLIAM J.
CASEY, L. PETER SMITH, and SANDRA L. SMOLEY,

Defendants.

------------------------------------------------

APPEARANCES:

    SCHNADER HARRISON SEGAL & LEWIS, LLP
        By Barry E. Bressler, Esq.
            1600 Market Street, Suite 3600
            Philadelphia, Pennsylvania  19103-7286
            215-751-2050
            bbressler@schnader.com
                Appearing on behalf of Plaintiffs.

    KEKER & VAN NEST, LLP
        By Laurie Carr Mims, Esq.
            710 Sansome Street
            San Francisco, California  94111-1704
            415-391-5400
            lmims@kvn.com
                Appearing on behalf of Defendant
                Daniel D. Crowley.

    Also Present:  Carie Finegan, Videographer

Danitz, Scott R.                                    4/6/2007

```
1       Q    What is it?
2       A    This was the company's presentation that
3    was being made at the meeting with Cerberus
4    Partners, Goldman Sachs and Foothill Capital on
5    February 15th.
6       Q    Did you -- were you involved in the
7    preparation of this presentation?
8       A    I was involved with parts of the
9    presentation, but not the entire presentation.
10      Q    Which parts of the presentation were you
11   involved in?
12      A    Without going through every -- I just
13   don't recall.
14      Q    Were you involved in the financial
15   parts --
16      A    Yes.
17      Q    -- of --
18      A    Again, it would have been similar to,
19   first, the financial information and then reviewing
20   it for any editorial comments and recommendations
21   for changes and consideration.
22      Q    Let's go to COR-EQTY 0002749.  Did Coram
23   Healthcare -- Healthcare create a target budget in.
24   2000?
25      A    Yes.
```

1       Q    What was the target budget?

2       A    It was one measurement of operating

3   profitability that was being used to measure

4   performance of the company and then eventually be

5   used to measure performance for any incentive

6   compensation for executives of the company.

7       Q    Was the target budget presented to the

8   board?

9       A    I recall it being presented to the board,

10  yes.

11      Q    I direct your attention to the document

12  Bates labeled COR-EQTY 0002752, so it's a few pages

13  back.

14           The paragraph numbered 4, could you read

15  that out loud?

16      A    Yes.  All interest payments due on Bank

17  debt in 2000 are paid in cash, and in parentheses,

18  no PIKs, P-I-K -- capital P-I-K-s, 60 million

19  reduction in series B debt principal from the sale

20  of CPS Senior Credit Facility line remains at

21  44 million with half percent -- half a point percent

22  increase in July 2000.

23      Q    Does the first sentence that you read

24  refresh your recollection as to the way that Coram

25  budgeted to pay its interest obligations?

Danitz, Scott R.                                    4/6/2007

1      A      Yes, it does.  It was to be paid in cash.

2      Q      Was that part of the budget shared with

3   the board?

4      A      Without going back to the original

5   presentation -- I'd have to see that presentation.

6   I just don't recall.

7      Q      Directing your attention to the lower

8   right side of the page, looking at it where you can

9   read the text, there appears to be a date and time

10  stamp?

11     A      Yes.  December 22nd, 1999, 6 o'clock --

12  6:09 p.m.

13     Q      Does the computer system that you used at

14  Coram at this time date stamp documents?

15     A      It would only be on there if the preparer

16  put that command in the report that's being printed.

17     Q      And what would it indicate?

18     A      It can be different.  I mean, you can put

19  anything in the footer or header of a report.

20     Q      Okay.

21     A      But that was the intent here, is in

22  preparation of this it was to put the date that the

23  report was prepared on -- on this particular page.

24     Q      So you believe that this report was

25  prepared in December of -- December 22nd, '99?

B652

211

1    STATE OF COLORADO   )

2                        )  ss.    REPORTER'S CERTIFICATE

3    COUNTY OF DENVER    )

4            I, Vanessa D. Campbell, do hereby certify

5    that I am a Registered Professional Reporter and

6    Notary Public within the State of Colorado; that

7    previous to the commencement of the examination, the

8    deponent was duly sworn to testify to the truth.

9            I further certify that this deposition was

10   taken in shorthand by me at the time and place

11   herein set forth and was thereafter reduced to

12   typewritten form, and that the foregoing constitutes

13   a true and correct transcript.

14           I further certify that I am not related

15   to, employed by, nor of counsel for any of the

16   parties or attorneys herein, nor otherwise

17   interested in the result of the within action.

18           In witness whereof, I have affixed my

19   signature and seal this 12th day of April, 2007.

20           My commission expires November 6, 2010.

21

22                          _Vanessa D. Campbell_
                            Vanessa D. Campbell, RPR, CRR
23                          216 - 16th Street, Suite 650
                            Denver, Colorado  80202
24

25

B653