## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, *Chapter 11 Trustee of the*  )
*Post-Confirmation Bankruptcy Estates of*  )
*CORAM HEALTHCARE CORP. and CORAM,*  )
*INC.*,  )
            ) Civ. Action No. 04-cv-1565(SLR)
          Plaintiff,  )
      v.  )
            )
DANIEL D. CROWLEY, *et al.*,  )
            )
          Defendants.  )
            )

---

### MEMORANDUM OF CHAPTER 11 TRUSTEE ARLIN M. ADAMS IN OPPOSITION TO MOTION OF DANIEL D. CROWLEY FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

---

Dated: May 4, 2007

Richard A. Barkasy (#4683)
Michael J. Barrie (#4684)

SCHNADER HARRISON SEGAL & LEWIS LLP
824 N. Market Street, Suite 1001
Wilmington, DE  19801
(302) 888-4554 (telephone)
(302) 888-1696 (facsimile)

OF COUNSEL:
Barry E. Bressler (admitted *pro hac vice*)
Wilbur L. Kipnes (admitted *pro hac vice*)
Nancy Winkelman (admitted *pro hac vice*)

SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 751-2400 (telephone)
(215) 751-2205 (facsimile)

*Counsel to Plaintiff,*
*Arlin M. Adams, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of CORAM HEALTHCARE CORP. and CORAM, INC.*

# TABLE OF CONTENTS

**Page**

I.   NATURE AND STAGE OF PROCEEDINGS ................................................................1

II.  SUMMARY OF ARGUMENT .........................................................................................1

III. STATEMENT OF FACTS ...............................................................................................4

IV.  ARGUMENT .................................................................................................................17

     A.   THE SUMMARY JUDGMENT STANDARD....................................................17

     B.   CROWLEY'S BRIEF MAKES EVIDENT THAT THE CASE IS
           FRAUGHT WITH GENUINE ISSUES OF MATERIAL FACT. ........................18

     C.   CROWLEY IS NOT ENTITLED TO THE PROTECTION OF EITHER
           THE EXCULPATORY PROVISION OR THE BUSINESS JUDGMENT
           RULE. .................................................................................................................21

          1.   Neither The Exculpatory Provision Nor The Business Judgment Rule
               Applies To Actions Taken By A Corporation's Officers. ............................22

          2.   Neither The Exculpatory Provision Nor The Business Judgment Rule
               Applies To The Duty Of Good Faith And/Or To The Duty Of Loyalty. ......26

     D.   THE TRUSTEE'S CLAIMS RELATING TO CPS ARE NOT BARRED
           BY JUDICIAL ESTOPPEL.................................................................................28

     E.   THE DAMAGES THE TRUSTEE SEEKS TO RECOVER FLOW
           DIRECTLY FROM CROWLEY'S BREACH OF HIS FIDUCIARY
           DUTIES. .............................................................................................................31

CONCLUSION.........................................................................................................................35

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999)...................................................17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).......................................17

*Kramer v. Nowak*, 908 F. Supp. 2d 1281 (E.D. Pa. 1995).................................26

*Continuing Creditors' Comm. of Star Telecomms. Inc. v. Edgecomb*,
    385 F. Supp. 2d 449 (D. Del. 2004)..............................................................26

*In re Coram Healthcare Corp.*, 271 B.R. 228 (Bankr. D. Del. 2001) ...................... *passim*

*In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) .............................15

*Hollinger Int'l, Inc. v. Hollinger, Inc.*, Civ. A. No. 04-0698,
    2006 U.S. Dist. LEXIS 35947 (N.D. Ill. Jan. 25, 2006) ..............................34

*Int'l Union, United Auto., Aerospace & Ag. Implement Workers
    of Am., U.A., Local No. 1697 v. Skinner Engine Co.*, 188 F.3d 130 (3d Cir.
    1999) ............................................................................................................18

*Klein v. Stahl GMBH & Co.*, 185 F.3d 98 (3d Cir. 1999) .................................30

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...............17

*Montrose Med. Group Participating Sav. Plan v. Bulger*,
    243 F.3d 773 (3d Cir. 2001)....................................................................30, 31

*Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231 (3d Cir. 1995)......................................18

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
    81 F.3d 355 (3d Cir. 1996).......................................................................30, 31

### STATE CASES

*Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270 (Del. 1994) ................................23

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)........................................................24, 27

*Duphily v. Del. Elec.  Corp., Inc.*, 662 A.2d 821 (Del. 1995) ......................................33, 34

*Emerald Partners v. Berlin*, 726 A.2d 1215 (Del. 1999)..................................................26

*Falconi v. Coombs & Coombs, Inc.*, 902 A.2d 1094 (Del. 2006).....................................25

*Fields v. Synthetic Ropes, Inc.*, 215 A.2d 427 (Del. 1965)...............................................25

*Greco v. University of Del.*, 619 A.2d 900 (Del. 1993)......................................................25

*Halley v. Jackson*, 158 A.2d 803 (Del.Ch. 1959) ..............................................................18

*In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1108 (Del.Ch. 2003)..............18

*Heller v. Kiernan*, Civ. A. No. 1484-K, 2002 Del. Ch. LEXIS 17
    (Del. Ch. Feb. 27, 2002) ...............................................................................................27

*Russell v. K-Mart Corp.*, 761 A.2d 1 (Del. 2000)..............................................................34

*Stucker v. Am. Stores Co.*, 171 A. 230 (Del. 1934) ...........................................................34

*In re Tri-Star Pictures Litig.*, 634 A.2d 319 (Del. 1993)....................................................31

## FEDERAL STATUTES AND RULES

11 U.S.C. § 1129(a)(3)..........................................................................................................12

FED. R. CIV. P. 56(c) .............................................................................................................17

## STATE STATUTES

DEL. CODE ANN. tit. 8, § 102(b)(7) ......................................................................................22

DEL. CODE ANN. tit. 8, § 141(a)............................................................................................24

DEL. CODE ANN. tit. 10, §§ 6301-6308 ................................................................................34

## OTHER AUTHORITIES

Lyman Johnson, *Corporate Officers and the Business Judgment Rule*,
    60 Bus. Law. 439, 463-64 (2005) ..................................................................................25

RESTATEMENT (SECOND) OF AGENCY § 379(1) (1958).........................................................25

RESTATEMENT (SECOND) OF AGENCY § 394 ........................................................................25

RESTATEMENT (SECOND) OF TORTS § 447 ..........................................................................33

## I.    NATURE AND STAGE OF PROCEEDINGS

Arlin M. Adams, the Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of Coram Healthcare Corp. and Coram, Inc. (collectively, "Coram"), filed this action on December 29, 2004, alleging that defendant Daniel D. Crowley, Coram's former Chairman, President, and CEO, breached his fiduciary duties to Coram.  Pursuant to the Court's April 25, 2006 Scheduling Order, the Trustee has moved for summary judgment on liability or, in the alternative, to have certain facts deemed established, based on the collateral estoppel effect of two prior decisions of the United States Bankruptcy Court for the District of Delaware.  Crowley has moved for summary judgment or, in the alternative, for partial summary judgment.  This is the Trustee's opposition to Crowley's motion.

## II.    SUMMARY OF ARGUMENT

1.    Crowley's motion for summary judgment is predicated on the misleading assertion that, "[t]he Trustee alleges, in essence, that Crowley breached his fiduciary duties by failing adequately to disclose his relationship with a Coram creditor, Cerberus Partners, when Coram hired him first as a consultant and then as Chairman and CEO in 1999." (D.I. 123 at 1.)  The Trustee's case, "in essence" or otherwise, is not about a failure to disclose.  To be sure, the Trustee alleges that Crowley did not adequately disclose his relationship with Cerberus, one of Coram's three major creditors.  But as the Trustee's complaint makes very clear, the "essence" of the Trustee's case is based on Crowley's breach of his fiduciary duties (due care, loyalty, and good faith) arising out of: (1) Crowley's "actual conflict of interest," as found by the Bankruptcy Court in December 2000 in denying Coram's first proposed plan of reorganization (B152 – B153 [Dec. 21, 2000 Hrg. Tr.] at 87-89); and (2) Crowley's failure to eliminate that conflict of interest following the Bankruptcy Court's 2000 ruling, causing that Court in December 2001 to deny Coram's second proposed plan of

reorganization because "nothing, in fact, has changed." *In re Coram Healthcare Corp.*, 271 B.R. 228, 235 (Bankr. D. Del. 2001.)

2.      In the Bankruptcy Court proceedings on Coram's two failed proposed plans of reorganization, Crowley advanced virtually the identical arguments he makes in this motion:  that he did not have a conflict of interest, but perhaps should have been more forthcoming about the fact that a major Coram creditor was paying him an annual salary of $960,000 plus expenses in accordance with a heavily-negotiated Employment Agreement that required him to follow that creditor's instructions.  The Bankruptcy Court twice rejected Crowley's argument and twice held that it could not approve Coram's proposed plans of reorganization because of Crowley's "actual conflict of interest" (not simply because he had failed adequately to disclose a potential conflict of interest). (B152 – B153 [Dec. 21, 2000 Hrg. Tr.] at 87-89; 271 B.R. at 235.)

3.      As Coram's President and CEO, Crowley owed Coram duties of due care, loyalty, and good faith.  As alleged in the Trustee's complaint, Crowley breached each of these duties.

- *As to the duty of due care*:  A non-conflicted CEO would have placed Coram's interests first, and as CEO of a debtor-in-possession, Crowley's main objective should have been for Coram to emerge from bankruptcy.  Had Crowley avoided his actual conflict of interest, Coram would have been able to emerge from bankruptcy in 2000 or 2001.  (*See, e.g.,* D.I. 1 at 1-3 & ¶¶ 36, 44, 46.)

- *As to the duty of loyalty*:  The complaint sets forth examples of decisions Crowley made that a jury could find that a non-conflicted CEO would not have made. (*See*, *e.g.*, D.I.1 ¶¶ 27, 31, 36, 44, 46.)  These examples demonstrate that Crowley's conflict caused him to act with a mindset of favoring the Noteholders to the detriment of Coram's other unsecured creditors and common shareholders -- *i.e.*, that he was disloyal to Coram.

- *As to the duty of good faith*:  At every point when Crowley had the opportunity to take a hard line with the Noteholders to benefit Coram's other unsecured creditors and common shareholders, Crowley chose to benefit the Noteholders. Following the Bankruptcy Court's December, 2000 ruling, Crowley could have eliminated his conflict.  He elected not to do so.  (*See, e.g.*, D.I. 1 ¶¶ 25, 27,45.)

4.      Crowley relies in his motion on four sets of allegedly "undisputed facts."  (D.I. 123 at 18.)  However, even the most cursory review of Crowley's "undisputed facts" makes clear that they are not only light years away from being undisputed, but are quintessential jury questions.  Crowley's motion for summary judgment can (and should be) denied on that basis alone.  Moreover, these "facts" relate to:  (a) Crowley's disclosure of his relationship with Cerberus; and (b) the sale of CPS, a Coram subsidiary, shortly before Coram filed for bankruptcy protection.  These "facts" ignore the main thrust of the Trustee's complaint -- that Crowley had an impermissible conflict of interest that caused Coram to remain in bankruptcy.

5.      Having misstated the Trustee's complaint, Crowley invokes the exculpatory provision and the business judgment rule in an effort to escape liability for his conflict of interest.  Crowley's attempt fails because the exculpatory provision and the business judgment rule are for the benefit only of directors, while the Trustee's complaint against Crowley involves Crowley's conduct as CEO and President.  Moreover, both apply only to breaches of the duty of care, whereas the Trustee's allegations involve not only breaches of the duty of care, but also of the duty of good faith and the duty of loyalty.  Crowley also invokes the doctrine of judicial estoppel as a defense to liability in connection with CPS, but that doctrine is inapplicable because the Trustee has not taken inconsistent positions on that issue.

6.      Crowley's motion treats the Trustee's damages theories with the same sleight of hand as it does the Trustee's complaint.  Crowley pays lip service to the fact that the Trustee's principal damages theory is based on the delay in Coram's emergence from bankruptcy caused by Crowley's conflict of interest.  As the Bankruptcy Court found, Crowley had an actual conflict of interest that was pervasive and that affected his operation of Coram.  The Trustee seeks damages because the fact of Crowley's actual conflict of interest prevented Coram from emerging from bankruptcy in 2000 or 2001.  That delay caused Coram to incur tens of millions of dollars in reorganization costs and to

3

suffer substantial business losses as well.  The complaint asserts examples of Crowley's decisions

that evidence his conflict and those specific decisions are also properly the subject of damage claims.

## III.    STATEMENT OF FACTS

*Crowley's Conflict Of Interest*

Cerberus, together with Goldman Sachs Credit Partners L.P., and Wells Fargo

Foothill (collectively, the "Noteholders"), owned all of Coram's debt, which included unsecured

notes with a principal balance of more than $250 million.  *See* 271 B.R. at 230.  Cerberus' chairman,

Stephen Feinberg, sat on Coram's Board from 1998 until July 2000.  *Id*.

Cerberus maintains a "'bench' of CEO consultants, who are available to work for

Cerberus with troubled companies on a project-by-project basis."  271 B.R. at 230.  In early 1999,

Cerberus retained Crowley as a turnaround consultant, primarily for health care.  *Id.*  Initially,

Cerberus agreed to pay Crowley $10,000 a day plus expenses to work on a project-by-project basis.

(B125 – B126 [Dec. 7, 2000 Crowley Dep.] at 42:13-43:4.)  In July 1999, Crowley and Cerberus

entered into an oral agreement under which Crowley agreed to work exclusively for Cerberus for

three years at a salary of $80,000 per month plus expenses, with the possibility of substantial

bonuses.  (B127 [Dec. 7, 2000 Crowley Dep.] at 50:7-24.)  Crowley's stated goal was to "make lots

of money for [Feinberg]".  (B2 [May 4, 1999 Letter from Feinberg to Crowley].)

Before he became involved with Coram, Crowley was Chairman of Winterland

Concessions Co., a T-shirt manufacturing company.  Cerberus owned 70% of the equity in

Winterland.  (B129 – B130 [Dec. 7, 2000 Crowley Dep.] at 91:3-11; 93:8-11.)  Cerberus agreed to

pay Crowley a bonus of 20% of any increase in the value of its investment while Crowley served as

Winterland's Chairman.  (B481 [Apr. 6, 2007 Crowley Dep.] at 30:9-21.)

On June 28, 1999, Feinberg requested that Crowley serve as Cerberus' representative on Coram's Board.  (B16 – B17 [June 28, 1999 Letter from Crowley to Feinberg].)  Crowley wanted to become involved with Coram because Feinberg was "very important" to Crowley.  (*Id.*)  Crowley desired to work with Feinberg "over the remainder of [their] careers," and wanted to "turn a nice profit" for Feinberg.  (*Id.*)  Thereafter, at Feinberg's urging, Coram hired Crowley as a consultant to work with Coram's newly-elevated CEO, Richard Smith.  271 B.R. at 231.  Crowley viewed his role as a consultant at Coram to be "stirring the pot on [Feinberg's] behalf."  (B18 [Aug. 27, 1999 Letter from Crowley to Feinberg].)

When Smith left Coram in October 1999, Feinberg asked Crowley to take over as CEO.  (B19 – B20 [Nov. 12, 1999 Letter from Crowley to Feinberg].)  Crowley was interested in the assignment because Feinberg was his "friend" and he felt that Feinberg deserved "a better outcome." (B23 [Nov. 16, 1999 Letter from Crowley to Feinberg].)  Crowley believed that Feinberg's debt was "in jeopardy" and he wanted to "help save it."  (B22 [Nov. 16, 1999 Letter from Crowley to Feinberg].)  Crowley "worried endlessly" about Coram because he wanted to "be there for [Feinberg]."  (B24 [Nov. 16, 1999 Letter from Crowley to Feinberg].)

On November 18, 1999, Crowley entered into an Employment Agreement to serve as Coram's CEO, President, and Chairman for three years at a base annual salary of $650,000 plus eligibility for substantial bonuses and the option to purchase 1,000,000 shares of Coram stock. (B53 – B62 [Nov. 30, 1999 Coram/Crowley Employment Agreement].)

During the negotiations of his Coram Employment Agreement with Donald Amaral (Coram's then-Chairman and interim CEO), Crowley sent a "Personal & Confidential" letter to Feinberg requesting an increase in his bonus for Winterland to induce him to become CEO of Coram. (B19 – B20 [Nov. 12, 1999 Letter from Crowley to Feinberg].)  In November 1999 (the same time

that he entered into the Coram Employment Agreement), Crowley was negotiating a merger for Winterland that Crowley believed would lead to an IPO that would "pop the value" for Cerberus and, therefore, yield him a substantial bonus.  (B51 [Nov. 24, 1999 Letter from Crowley to Tice].)

The day after he signed his Employment Agreement with Coram, Crowley executed a written Employment Agreement with Cerberus, effective retroactive to August 1, 1999.  (B31 – B49 [Nov. 19, 1999 Cerberus/Crowley Employment Agreement].)  The Cerberus Employment Agreement provided that Crowley would receive a base salary of $80,000 per month and performance-based bonuses for his work on Cerberus portfolio companies.  (B34 [Nov. 19, 1999 Ceberus/Crowley Employment Agreement] at §§ 3.1-3.2.)  As Crowley had requested in his "Personal & Confidential" letter to Feinberg, Cerberus increased his bonus on Winterland to 30%.  (B34 [Nov. 19, 1999 Cerberus Employment Agreement] at § 3.2.)

The Cerberus Employment Agreement required Crowley to devote "his entire business time, attention, skill and energy exclusively to the business of [Cerberus]" by performing duties to be assigned by Feinberg.  (B33 [Nov. 19, 1999 Ceberus/Crowley Employment Agreement] at § 2.3.)  The Cerberus Agreement also provided that Cerberus could terminate Crowley for cause if Crowley did not follow Cerberus' reasonable instructions.  (B38 [Nov. 19, 1999 Ceberus/Crowley Employment Agreement] at § 6.3.)

### *Crowley's Failure To Disclose His Conflict Of Interest*

As Crowley admitted in sworn testimony in the Bankruptcy Court, at the time that Coram's Board of Directors approved his Employment Agreement with Coram, the Board did not know that Crowley had a contract with Cerberus that paid him a base salary of $80,000 per month:

> Q.    Let's get some timing on that.  You first said the Board approved your employment agreement.  That would have been back in November 1999?

6

> A.     Approximately.
>
> Q.     At that time the Board did not know that you were receiving $80,000 a month from Cerberus, is that correct?
>
> A.     That is correct.

(B211 [Dec. 13, 2001 Hrg. Tr.] at 425:9-16.)

As he testified in Bankruptcy Court, Crowley did not inform the Coram Board of his compensation arrangements with Cerberus:

> Q.     But you never informed them [the Board] of that part of the relationship with Cerberus that provided you with payment of a million dollars a year, plus a 20 or became 30 percent upside, did you?
>
> A.     Had I been asked, I would have told them.
>
> Q.     Sir, that wasn't my question.    My question - -
>
> A.     I did not inform them.

(B148 [Dec. 15, 2000 Hrg. Tr.] at 120:2-8.)

When he was negotiating with Crowley, Amaral understood only that Crowley was doing some work for Cerberus on Winterland.  (B132 [Dec. 8, 2000 Amaral Dep.] at 38:25-39:14.) Neither Crowley nor Feinberg informed the Board that Crowley was a full-time Cerberus employee or that he was receiving a base annual salary of nearly $1 million from Cerberus.  (B132 – B133 [Dec. 8, 2000 Amaral Dep.] at 38:25-39:5, 52:18-25; B182 [Sept. 24, 2001 Smith Dep.] at 38:10-16.) Amaral believed that he had been misled.  (B132 – B133 [Dec. 8, 2000 Amaral Dep.] at 39:15-18, 53:1-6.)  L. Peter Smith (another Coram outside director) felt that Crowley should have made the

magnitude of his Cerberus compensation clear to the Board from the beginning.  (B183 [Sept. 24, 2001 Smith Dep.] at 81:19-24.)[1]

After he became Coram's CEO, Crowley continued to conceal the key terms of his Employment Agreement with Cerberus.  For example, Crowley did not disclose his relationship with Cerberus in Coram's SEC filings (in either the 8-K announcing that Crowley had become Coram's CEO or the 10-K for the fiscal year ending December 31, 1999).  [B63 – B65; B68 – B73 [SEC Filings].)  Crowley did not tell Coram's CFO, Scott Danitz (who also signed the 10-K) or Coram's SEC attorneys about his contract with Cerberus.  (B492 [Apr. 6, 2007 Danitz Dep.] at 138:23-139:7; B482 [Apr. 6, 2007 Crowley Dep.] at 136:17-21.)  And, in fact, Crowley affirmatively misrepresented to Coram's auditors that he did not have any conflicted relationships by signing a management letter addressed to the auditors for the year ending December 31, 1999, in which he stated:  "There are no instances where any officer or employee of [Coram] has an interest in a company, with which [Coram] does business that would be considered a 'conflict of interest,' that has not been disclosed or waived.  Such an interest would be contrary to [Coram] policy."  (B157 [Apr. 2, 2001 Letter from Crowley and Danitz to Ernst & Young, LLP].)

Shortly after he signed his Employment Agreement with Coram, Crowley wrote to Coram's senior managers and told them that "it goes without saying that every executive must give Coram their undivided loyalty."  (B66 [Dec. 16, 1999 Crowley Letter to Denver Planning Meeting Attendees].)  He also advised them that Coram "deserves our undivided attention, focus and

---

[1]    Crowley's failure to disclose the terms of his relationship to the Coram Board violated Coram's corporate policy:

> Situations that would create an actual or apparent conflict of interest must be avoided.
> Actions that have the potential to create a conflict of interest must be disclosed and
> approved in advance by appropriate higher authority.

(B496 [Coram Corporate Handbook] at 7.)

professional effort." (*Id.*) At the time that Crowley was demanding undivided loyalty from Coram's other executives, he was being paid almost $1 million per year by Cerberus under his undisclosed Cerberus Employment Agreement and spending significant amounts of time on Cerberus projects, including the day-to-day operation of Winterland. (B476 [Apr. 4, 2007 Tice Dep.] at 43:7-14.)

### *Crowley's Demand For More Money From Coram*

A few months into his tenure as Coram's President and CEO, Crowley demanded additional compensation from Coram, claiming that he was working 19-hour days, and that "Coram will take longer, involve more, and will need me to stay 'on task' for much longer than we envisioned when I said 'Yes.'" (B79 [Feb. 28, 2000 Letter from Crowley to Coram Board].) Feinberg renegotiated Crowley's compensation and, on Coram's behalf, executed an amendment to Crowley's Employment Agreement with Coram that greatly enhanced Crowley's bonus package. (B140 [Dec. 15, 2000 Hrg. Tr.] at 60:1-9; B87 – B89 [Second Amendment to Employment Agreement].) Feinberg does not recall ever signing any other contract on Coram's behalf. (B120 [Nov. 28, 2000 Feinberg Dep.] at 95:11-20.)

### *Crowley Works To Generate Cash For The Noteholders*

Feinberg described Amaral as a "pretty fervent spokesperson for the equity." In contrast, Crowley placed a "high priority" on repaying debt. (B123 [Nov. 28, 2000 Feinberg Dep.] at 125:17-25; B494 [April 6, 2007 Danitz Dep.] at 173:10-15.) By the end of February 2000, Crowley anticipated that Coram would file a bankruptcy petition under Chapter 11 with a proposed plan of reorganization that would provide nothing to the public shareholders. (B78 – B79 [Feb 28, 2000 Letter from Friedman to Crowley]; B200 – B201 [October 26, 2001 Amaral Dep.] at 25:14-26:18.) Nevertheless, between November 30, 1999, when Crowley became Coram's CEO, and July 31, 2000, the week before Coram filed for Chapter 11 protection, Crowley caused Coram to pay the Noteholders approximately $60 million. (B93 [July 31, 2000 Letter from Crowley to Noteholders].)

These payments included:  (1) $15.3 million "voluntarily repaid" by Coram "early" on the revolving line of credit; (2) a $6.3 million cash interest payment that Crowley made to the Noteholders three weeks before Coram declared bankruptcy; and (3) all of the net proceeds (about $38 million) from the sale of CPS, Coram's specialty pharmacy division, just one week before Coram filed for bankruptcy.  (*Id.*)

Coram was not obligated to make the $6.3 million interest payment to the Noteholders in July 2000 in cash because the loan documents allowed interest to be "paid in kind" by adding the amounts to the outstanding principal balance of the notes.  (B138 [Dec. 8, 2000 Amaral Dep.] at 93:6-94:12.)  Crowley's decision was never ratified at a board meeting.  (B138 [Dec. 8, 2000 Amaral Dep.] at 94:22-95:1.)  Making the payment in cash eroded Coram's negotiating position with its creditors.  271 B.R. at 237.  Moreover, on the same day that he paid the Noteholders the $38 million from the CPS sale, Crowley was negotiating key terms of Coram's plan of reorganization in its impending bankruptcy directly with Feinberg.  (B94 – B95 [July 31, 2000 Letter from Crowley to Board].)

**Coram Files Its First Plan Of Reorganization**

On August 8, 2000, Coram filed a petition under Chapter 11, together with a plan of reorganization and a disclosure statement.  The proposed plan provided for the cancellation of all of the shareholders' interests and for the issuance of new Coram stock to the Noteholders, who would also be issued a new term note in the amount of $180 million.  Coram estimated that the Noteholders would recover 83% of the total amount of their claims -- in contrast to Coram's other unsecured creditors, who would receive only 28% of their claims; and to Coram's shareholders, who would receive nothing.  (B103 – B106 [Amended Disclosure Statement] at 7-10.)

Although the disclosure statement stated that Crowley served as a consultant to Cerberus, it did not reveal the terms of his Cerberus Employment Agreement. (B96 – B97 [Coram Disclosure Statement] at 44-45.) Further, the disclosure statement falsely represented that Crowley "generally receives a fee from Cerberus for such services" -- not that Cerberus was paying Crowley a base salary of $80,000 per month. (B98 [Coram Disclosure Statement] at 45.) Finally, the disclosure statement falsely stated that Crowley "receives no fee from Cerberus for any services he provides respecting the Debtors," when in fact Crowley had received an increase in his Cerberus bonus compensation with respect to Winterland in exchange for his agreement to serve as Coram's CEO. (*Id.*)

Crowley did not inform Coram's bankruptcy counsel, David Friedman, or Coram's Executive Vice-President, Allen Marabito (who was providing Friedman with information for the disclosure statement) of his Employment Agreement with Cerberus. (B457 – B458 [Mar. 16, 2007 Friedman Dep.] at 56:17-57:12; B479 [April 5, 2007, Marabito Dep.] at 154:25-155:17.) To the contrary, Crowley led Friedman to believe that Crowley had only an *ad hoc* relationship with Cerberus under which he "on occasion" provided consulting services for fees. (B459 [Mar. 16, 2007 Friedman Dep.] at 62:23-63:24.) Friedman "did not have any sense that the relationship between Mr. Crowley and Cerberus was of a seven-figure nature and of the dimensions that the employment agreement ultimately presented." (B460 [Mar. 16, 2007 Friedman Dep.] at 70:22-71:3.) If Friedman had known about the existence of the agreement, he "would have given advice to the board relating to whether or not that was appropriate and what steps should be considered to mitigate the potential conflict." (B462 [Mar. 16, 2007 Friedman Dep.] at 174:3-7.)

After Coram filed its Chapter 11 petition, the Bankruptcy Court appointed an Equity Committee to protect the interests of Coram's shareholders. 271 B.R. at 232. The Equity Committee opposed Coram's proposed plan of reorganization because it extinguished the interests of Coram's

shareholders without any compensation. The Equity Committee uncovered Crowley's Employment

Agreement with Cerberus during discovery. *Id.*

### *The Bankruptcy Court Denies The First Plan Of Reorganization*

In December of 2000, the Bankruptcy Court conducted a confirmation hearing over a

period of seven days. The Bankruptcy Court found that Coram's plan had not been submitted in

good faith as required by 11 U.S.C. § 1129(a)(3) because Crowley's Employment Agreement with

Cerberus "tainted the debtors' restructuring of its debt, the debtors' negotiations towards a plan, even

the debtors' restructuring of its operations." (B151 [Dec. 21, 2000 Hrg. Tr.] at 88.) In rejecting the

plan, the Court specifically found that Crowley had "an actual conflict of interest." (B152 [Dec. 21,

2000 Hrg. Tr.] at 89.) As Chief Judge Walrath explained:

> . . . I think that the actions of Mr. Crowley to hide the relationship,
> and I think that [his November 12 Personal & Confidential letter to
> Feinberg] did show an intent to hide the relationship and to hide his
> request for additional compensation in Winterland in exchange for his
> efforts here did at least evidence that he, himself, believed that this
> relationship should not be disclosed and, therefore, did, in fact, taint
> his ability to serve as CEO of the debtor.

(B152 [Dec.21, 2000 Hrg. Tr.] at 89.)

### *Coram Files Its Second Plan Of Reorganization*

Subsequently, an independent committee of Coram's Board hired Goldin Associates

as an independent restructuring advisor. 271 B.R. at 232-33. In its report, Goldin concluded that

"Crowley's and Feinberg's failure to disclose the full extent of the Crowley/Cerberus relationship

(and the potential for abuse that it posed) to the other directors and officers was a breach of their

respective fiduciary duties." (B172 [Updated Goldin Report] at 10.) Goldin also determined that

Coram was damaged as a result of Crowley's conflict. Goldin determined that Coram had incurred

$5-$6 million in additional professional fees and expenses and had suffered $7-$9 million in business

losses attributable "to the prolongation of the period in which Coram was in Chapter 11."  (B464 –

B465 [Mar. 21, 2007 Goldin Dep.] at 109:21-110:15, 114:3-115:1.)  Goldin made recommendations

concerning a second plan of reorganization, which included a $7.5 million reduction in Crowley's

bonus compensation.  271 B.R. at 233.

Coram incorporated Goldin's recommendations into Coram's second plan of

reorganization, which was filed with the Bankruptcy Court in 2001.  Under the second plan:  (1) the

Noteholders again would receive all of Coram's stock; (2) Coram's remaining unsecured creditors

would receive $3 million, amounting to less than 40% of their claims; (3) the shareholders would

receive a $10 million cash distribution provided that their class voted in favor of the revised plan; and

(4) Crowley's bonus compensation would be reduced by $7.5 million.  The Equity Committee

opposed the second plan.  *Id.*

### Crowley Continues To Accept Payment From Cerberus

After the Bankruptcy Court rejected the first plan, Crowley could have eliminated

any further harm to Coram by either resigning from Coram or severing his relationship with

Cerberus.  Placing his personal interests above those of Coram, Crowley refused to leave Coram

because he "had a disagreement with the judge as to whether [he] had, in fact, a conflict" and he

"ought not be run out of Dodge for no apparent reason."  (B489 [Apr. 6, 2007 Crowley Dep.] at

243:13-244:7.)

Notwithstanding the Bankruptcy Court's ruling that he had an actual conflict of

interest, Crowley continued to accept a salary of $80,000 per month from Cerberus, but did not tell

the Board members that he was continuing to be paid.  The Board members were not aware that

Crowley was still being paid by Cerberus when they were deposed by the Equity Committee after

Coram had filed its second plan.  (B197 – B198 [Oct. 26, 2001 Amaral Dep.] at 17:22-18:10; B188 –

13

B189 [Sept. 28, 2001 Casey Dep.] at 80:23-81:6; B184 [Sept. 24, 2001 Smith Dep.] at 86:3-7; B191 [Sept. 29, 2001 Smoley Dep.] at 65:11-13.)  Moreover, the Board never took action to approve Crowley's decision to continue to receive $80,000 a month from Cerberus.  (B193 – B194 [Oct. 25, 2001 Crowley Dep.] at 18:19-19:4.)  Crowley did not remember telling Goldin that he was still being paid by Cerberus.  (B210 [Dec. 13, 2001 Hrg. Tr.] at 419:10-13.)  He continued to perform work for Cerberus throughout 2001.[2]

### The Bankruptcy Court Denies The Second Plan Of Reorganization

In late 2001, the Bankruptcy Court conducted hearings on Coram's proposed second plan of reorganization over a period of eight days.  The Bankruptcy Court again concluded that it could not confirm the plan because again it was not submitted in good faith.  271 B.R. at 240.  In the Court's view:

> Nothing, in fact, has changed since the first confirmation hearing. Crowley continues to receive almost $1 million a year from one of the Debtors' largest creditors, while serving as the Debtors' CEO and President.  Under this agreement with Cerberus, he is required to obey its instructions or risk having the agreement terminated and losing his $1 million.  This is an actual conflict of interest, as we concluded at the first confirmation hearing."

Id. at 235.  The Bankruptcy Court determined that "Crowley's conflict of interest is a violation of his fiduciary duty to the Debtors and the estate."  Id. at 240.

---

[2]     In addition to serving as Chairman of Winterland and supervising the sale of Winterland's assets in its bankruptcy case, Crowley consulted on other Cerberus investments, including a competitor in the home infusion business, NCS Healthcare, Inc. ("NCSS").  (B453 [Dec. 16, 2004 Letter from Crowley to Feinberg]; B174 – B180 [Sept. 5, 2001 Letter from Neporent to Crowley].)  Crowley even assigned Coram employees to work on Ceberus projects.  (B162, B208 [June 1, 2001 and Nov. 1, 2001 invoices from Dynamic to Cerberus].)

### *The Bankruptcy Court Appoints The Trustee*

Following the rejection of the second proposed plan, the Bankruptcy Court entered an Order appointing plaintiff Arlin M. Adams as Coram's Chapter 11 Trustee.  *In re Coram Healthcare Corp.*, 315 B.R. 321, 327 (Bankr. D. Del. 2004).  The Trustee's goal was to find a consensual resolution of the disputes between the parties and to get the company out of bankruptcy.  (B240 [Mar. 3, 2003 Hrg. Tr.] at 25:1-5.)  Shortly after his appointment, the Trustee reviewed the Bankruptcy Court's two opinions denying each of Coram's proposed plans of reorganization.  (B230 [March 3, 2003 Hrg. Tr.] at 14:1-3)  As a result, the Trustee set down the following specific ground rules that Crowley promised to obey.  The Trustee required that:  (1) Crowley could not accept any compensation from Cerberus; (2) any work that Crowley did for Cerberus in 2002 could not involve the business or relationships of Coram; and (3) any work that Crowley performed for Cerberus could not detract from his duties at Coram.  (B230 – B231, B289 [March 3, 2003 Hrg. Tr.] at 14:22-15:20, 74:15-24.)

### *The Trustee Seeks To Continue Crowley's Employment For A Short Transition Period*

Crowley's Employment Agreement with Coram expired in November, 2002. Because the Trustee was concerned that terminating Crowley could possibly lead to substantial departures of key employees, thereby endangering Coram's ability to reorganize, the Trustee entered into an agreement with Crowley to extend his employment for a short transition period, and filed a motion in Bankruptcy Court for that agreement to be approved.  (B235 [Mar. 3, 2003 Hrg. Tr.] at 19:5-19.)  In addition, as part of his effort to propose a plan that would settle with as many constituencies as possible, the Trustee entered into a letter of intent with Crowley, subject to the negotiation of a formal, written agreement and Bankruptcy Court approval, to reduce Crowley's claim for compensation under his Coram Employment Agreement from more than $16 million to $2 million and to give Crowley a release.  (B470 [Mar. 27, 2007 Adams Dep.] at 84:13-25.)  The Equity

15

Committee, which had previously filed a motion to terminate Crowley, opposed the Trustee's motion to extend Crowley's employment.

Shortly before the March 2003 scheduled hearing on the Trustee's and Equity Committee's motions, Crowley produced documents in response to the Equity Committee's request for production. Among these documents was an e-mail from Crowley's counsel to Cerberus' counsel concerning their negotiations of a settlement. The e-mail states: "I'd appreciate it if you would keep our conversation re; terminating dan's contract between us and our clients for now. No other atty's nor the trustee need to be part of those conversations until dan and Cerberus decide that's the way to go." (B212 [Apr. 5, 2002 Schreiber email to Cook].) The documents also included a letter demanding that Feinberg pay him his monthly salary for 2002, and two unsent draft letters to Cerberus requesting millions of dollars to be paid after the confirmation of Coram's reorganization. (B213 - B215; B497 - B499 [Draft Letters].) One of the draft letters contained an insert drafted by Crowley's counsel, which purported to confirm a settlement agreement between Crowley and Cerberus to be effective after Coram emerged from bankruptcy. (B215 [May 6, 2002 Draft Letter from Crowley to Feinberg].)

The Trustee became aware of these documents prior to the March 2003 hearing. He recently testified that the documents caused him to seriously consider withdrawing the motion to extend Crowley's employment. But, to avoid a claim by Crowley that he breached his agreement to seek Bankruptcy Court approval of the transition employment agreement, the Trustee decided to allow Crowley the opportunity to attempt to explain his position. (B473 – B474 [Mar. 28, 2007 Adams Dep.] at 312:21 - 315:-11.) At the hearing, Crowley testified that the draft letters did not accurately reflect the facts, but instead constituted "a melodrama, a noontime drama." (B305 – B306 [Mar. 3, 2003 Hrg. Tr.] at 90:7 - 91:25.)

16

The Bankruptcy Court rejected Crowley's testimony, stating that "I do not believe [Crowley] is honest." (B410 [Mar. 3, 2003 Hrg. Tr.] at 195.)  The Bankruptcy Court concluded that the draft letters "after the appointment of the Trustee, continue to show what I believe is a continuation of Mr. Crowley's continued efforts to continue to get reimbursement from Cerberus for efforts undertaken in this case." (B411 [March. 3, 2003 Hrg. Tr.] at 196:12-15.)  Given the Court's decision, Crowley resigned from Coram.

### *The Bankruptcy Court Confirms The Trustee's Plan*

The Trustee thereafter proposed a third plan of reorganization, which the Bankruptcy Court confirmed in October 2004.  The Order confirming the third plan allowed for the Trustee to bring an action against Crowley and the outside directors.  This lawsuit is that action.  (The Trustee has settled his claims with the outside directors.)

## IV.   ARGUMENT

### A.   THE SUMMARY JUDGMENT STANDARD.

A party is entitled to summary judgment only if the court concludes "that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is "genuine" if, given the evidence, a reasonable jury could return a verdict in favor of the non-moving party.  *E.g., Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-51 (1986)).  A fact is "material" if it bears on an essential element of the plaintiff's claim.  *E.g., Abraham*, 183 F.3d at 28.

As the moving party, Crowley bears the burden of proving that no genuine issue of material fact is in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  Only if Crowley can meet that initial burden must the Trustee "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *See id.* at 587 (*quoting* FED. R. CIV. P.

56(e)).  The court must "view all the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion."  *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).  The court cannot weigh the evidence or make credibility determinations.  *Int'l Union, United Auto., Aerospace & Ag. Implement Workers of Am., U.A., Local No. 1697 v. Skinner Engine Co.*, 188 F.3d 130, 137 (3d Cir. 1999).

### B.    CROWLEY'S BRIEF MAKES EVIDENT THAT THE CASE IS FRAUGHT WITH GENUINE ISSUES OF MATERIAL FACT.

As discussed above, Crowley focuses on disclosure issues and Coram's pre-filing payments to the Noteholders.  Even as so unfairly construed, a comparison of the alleged "undisputed facts" upon which Crowley bases his motion (as identified on page 18 of his opening brief) with the record shows that -- far from being "undisputed" -- these facts are hotly contested.  For example:

| CROWLEY'S ASSERTION | THE RECORD |
|---|---|
| "Coram's Board of directors knew of Crowley's financial relationship with Cerberus prior to the time that Crowley became CEO of Coram, and received all of the information regarding that relationship that they asked for."  (D.I. 123 at 18.)[3] | • The Bankruptcy Court determined that, "[n]either Crowley, nor Feinberg (who was a director of the Debtors at the time) disclosed the terms of the Consulting Agreement between Cerberus and Crowley to the Debtors."  271 B.R. at 231.<br><br>• Crowley testified in Bankruptcy Court that the Board did not know that he was receiving $80,000 per month from Cerberus when it approved his Coram Employment Agreement.  (B211 [Dec. 13, 2001 Hrg. Tr.] at 425:9-16.) |

---

[3]    Crowley argues that the Board knew all of the details of Crowley's relationship with Cerberus because Feinberg was a director and, therefore, his knowledge is imputed to Coram.  (D.I. 123 at 21.)  But Feinberg's failure to disclose what he knew to the other members of Coram's Board constituted a breach of Feinberg's duty of loyalty to Coram.  Clearly, Feinberg had a motive to conceal this information and, therefore, his knowledge cannot be imputed to Coram.  *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1108 (Del.Ch. 2003).  Moreover, knowledge of an agent is not imputed to the corporation when the agent is "adversely interested."  *Halley v. Jackson*, 158 A.2d 803, 808 (Del.Ch. 1959).

| CROWLEY'S ASSERTION | THE RECORD |
|---|---|
| | • Crowley testified in Bankruptcy Court that he did not inform the Coram Board of his compensation arrangements with Cerberus. (B148 [Dec. 15, 2000 Hrg. Tr.] at 120:2-8.) <br><br> • Amaral, who had negotiated Crowley's Employment Agreement with Coram, testified that he did not learn that Crowley was being paid $80,000 per month by Cerberus until his deposition a year later. (B132 [December 8, 2000 Amaral Dep.] at 37:24-38:5.) |
| "Crowley did not purposefully withhold any information from Coram regarding his relationship with Cerberus."  (D.I. 123 at 18.) | • The Bankruptcy Court determined that, "the actions of Mr. Crowley . . . did show an intent to hide the relationship."  (B152 [Dec. 21, 2000 Hrg. Tr.] at 89.) <br><br> • The Bankruptcy Court found that Crowley did not voluntarily disclose his Cerberus contract to Coram.  271 B.R. at 239. <br><br> • The Bankruptcy Court determined that Crowley's "failure to disclose was a violation of the Debtors' corporate policy."  271 B.R. at 239. <br><br> • Amaral testified that Crowley misled the Coram Board.  (B134 [Dec. 8, 2000 Amaral Dep.] at 53:1-6.) |
| "Coram's Board, including Crowley, relied on DBAB's opinion that the [CPS] transaction was fair."  (D.I. 123 at 18.) | • DBAB's fairness opinion addressed the proposed sale price of CPS only, not the critical decision as to whether Coram would have been best served by retaining CPS. DBAB did not form an opinion about whether Coram should sell the CPS unit. (B467 [Mar. 26, 2007 Morrison Dep.] at 48:3-7.) |

| CROWLEY'S ASSERTION | THE RECORD |
|---|---|
| "In 2000, Coram's Board of directors approved payments to Noteholders in cash."  (D.I. 123 at 18.) | • The Bankruptcy Court determined that, "Crowley did not tell the board of directors, or bankruptcy counsel, about the [$6.3 million] cash payment to the Noteholders until after it had been made."  271 B.R. at 231.  <br><br>• Amaral testified that the Board did not take action to ratify the $6.3 million payment. (B138 [Dec. 8, 200 Amaral Dep.] at 94:25-95:1.) |
| "Coram was obligated to use the proceeds of the sale of CPS to pay down the debt."  (D.I. 123 at 18.) | • Coram had a number of alternatives other than using the CPS sale proceeds to pay down the debt, including:  (1) conditioning the sale of CPS on the Noteholders' consent to Coram's use of all or a portion of the proceeds for other purposes, such as satisfying the claims of Coram's other unsecured creditors; and (2) completing the sale of CPS in its Chapter 11 proceeding, which it filed a week later. Crowley did not explore either of these options.  (B485, B487 – B489 [Apr. 6, 2007 Crowley Dep.] at 199:1-9; 212:22 – 213:3.) |
| "Following denial of the first plan, Coram's Board and outside bankruptcy counsel were aware of Crowley's continuing relationship with Cerberus and never suggested that he resign from Coram or sever his relationship with Cerberus." (D.I. 123 at 18.) [4] | • Each of the four outside directors testified that Crowley did not tell them that he was continuing to receive payments of $80,000 per month from Cerberus.  (B197 – B198 [Oct. 26, 2001 Amaral Dep.] at 17:22-18:10; B188 – B189 [Sept. 28, 2001 Casey Dep.] at 80:23-81:4; B184 [Sept. 24, 2001 Smith Dep.] at 86:3-5; B191 [Sept. 29, 2001 Smoley Dep.] at 65:11-13.) |

[4]    Crowley argues that his continued receipt of $80,000 per month from Cerberus following the denial of the first plan was not "material" because the outside directors did not care.  (D.I. 123 at 23.)  That the outside directors did not care does not render the fact immaterial.  Rather, the outside directors' conduct was a breach of their own fiduciary duties to Coram.  As discussed in Section E, *infra*, Crowley remains liable even if others are also liable.

| CROWLEY'S ASSERTION | THE RECORD |
|---|---|
| | • The Bankruptcy Court did not find Crowley's testimony on this point credible, explaining that, "[a]lthough Crowley testified that he told the Board of Directors that he continued to receive compensation from Cerberus, we do not credit that testimony." 271 B.R. 234. |
| "Crowley had no role in the preparation of Coram's second plan of reorganization." (D.I. 123 at 18.) | • Crowley's decision to remain as Coram's Chairman and CEO was a key component of Coram's second plan. (B166 – B170 [Second Joint Disclosure Statement] at 62-66].)<br><br>• The second plan also reflected an agreement between Coram and Crowley for a $7.5 million reduction in Crowley's claimed bonus compensation that Crowley agreed to. (B164 – B165 [Second Joint Disclosure Statement] at 31-32.) |

As the above table amply illustrates, Crowley's summary judgment motion should be denied because Crowley is wrong that the facts on which he bases his motion are undisputed. Moreover, as next discussed, his motion should be denied for the additional reason that he misconstrues the governing legal principles that he believes entitle him to summary judgment.

### C.    CROWLEY IS NOT ENTITLED TO THE PROTECTION OF EITHER THE EXCULPATORY PROVISION OR THE BUSINESS JUDGMENT RULE.

Crowley asserts that both the exculpatory provision and the business judgment rule insulate him from liability.  He is wrong.

As noted at the outset, Crowley's motion misleadingly portrays the Trustee's complaint as alleging primarily a breach of Crowley's duty to disclose his relationship with Cerberus and as involving primarily an attack on Crowley's decisions with respect to the sale of CPS -- conduct that Crowley presumably believes would be protected under the exculpatory provision and

business judgment rule.  Yet Crowley ignores the Trustee's allegations that Crowley's blatant

conflict of interest constituted a breach of his fiduciary duties of due care, loyalty, and good faith,

and that his conflict was pervasive, precluding him from being able to exercise independent

judgment.  In any event, Crowley is not entitled to the protection of either the exculpatory provision

or the business judgment rule because those protections extend only to directors and because they do

not apply to breaches of the duties of loyalty and good faith.

   1.  **Neither The Exculpatory Provision Nor The Business Judgment Rule Applies To Actions Taken By A Corporation's Officers.**

  Tracking the language of the Delaware exculpatory statute, DEL. CODE ANN. tit. 8, §

102(b)(7) (2007),[5]  the relevant portion of Coram's Articles of Incorporation provides:

> A director of this Corporation shall not be personally liable to this
> Corporation or its stockholders for monetary damages for breach of
> fiduciary duty as a director, except for liability (i) for any breach of
> the director's duty of loyalty to this Corporation or its stockholders,
> (ii) for acts or omissions not in good faith or which involve
> intentional misconduct or a knowing violation of law, (iii) under
> Section 174 of the Delaware General Corporation Law, or (iv) for any

---

[5]  The statute provides:

> In addition to the matters required to be set forth in the certificate of
> incorporation by subsection (a) of this section, the certificate of
> incorporation may also contain any or all of the following matters:
>
> (7) A provision eliminating or limiting the personal liability of a director
> to the corporation or its stockholders for monetary damages for breach of
> fiduciary duty as a director, provided that such provision shall not
> eliminate or limit the liability of a director:  (i) for any breach of the
> director's duty of loyalty to the corporation or its stockholders; (ii) for
> acts or omissions not in good faith or which involve intentional
> misconduct or a knowing violation of law; (iii) under § 174 of this title;
> or (iv) for any transaction from which the director derived an improper
> personal benefit.

Del. Cole Ann. tit. 8, § 102(b)(7) (2007).

transaction from which the director derived any improper personal benefit.

As Crowley concedes, by its plain terms the exculpatory provision does not protect officers, which, of course, Crowley was. Crowley's argument, dropped in a footnote, is that since he was *both* a director *and* an officer, his actions somehow become immunized as if he were acting solely as a director. (D.I. 123 at 24 n.16.) This argument fails as a matter of fact and law.

*First*, although the burden rests with him at this stage of the proceedings (and will rest with him at trial because a claim of protection under the exculpatory clause is an affirmative defense), Crowley fails to identify a single fact to bolster his unsupported assertion that "his actions regarding disclosure of his relationship with Cerberus were in his role as both a director and officer." (*Id*.) This omission dooms his specious argument at the outset. At the least, the question of in which capacity -- officer or director -- Crowley was acting when he breached his duties would be an issue of fact for the jury, thereby rendering summary judgment inappropriate on that basis alone.

*Second*, even if Crowley could show that he took the actions in question in his capacities as both a director and an officer, he still would not be legally entitled to the protection of the exculpatory provision. Crowley cites *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270 (Del. 1994), for the proposition that Section 102(b)(7) does not apply unless the defendant's actions were taken solely in his capacity as an officer. In *Arnold*, a case involving alleged disclosure violations in a merger proxy statement, the plaintiff sued the Board members who voted for the merger, one of whom (Connell) was also an officer. The reason why the Court determined Section 102(b)(7) to be inapplicable was because the plaintiff had failed to highlight any specific actions Connell undertook as an officer. In contrast, the Trustee's claims are based on Crowley's conflict as CEO, as found by the Bankruptcy Court.

Nor is Crowley entitled to the protection of the Delaware business judgment rule. The entire premise of Crowley's argument that his "actions while CEO are protected by the business judgment rule" (D.I. 123 at 26) is flawed, because the Delaware Supreme Court has never applied the business judgment rule to officers, as opposed to directors. And the authority that Crowley cites to support this point is questionable indeed.

Specifically, Crowley's quotation of the Delaware Supreme Court's decision in *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), omits a key phrase from the court's opinion. Crowley contends that, "Delaware's business judgment rule protects disinterested *officers and directors* who, 'in making a business decision . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" (D.I. 123 at 27) (*quoting Aronson*, 473 A.2d at 812) (emphasis added) (ellipses in original). Yet the court's actual holding in *Aronson* was that Delaware's business judgment rule "is a presumption that in making a business decision *the directors of a corporation* acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812 (emphasis added). As the court explained, the "business judgment rule is an acknowledgment of the managerial prerogatives *of Delaware directors* under Section 141(a)." *Id.* (emphasis added).[6]

Thus, the Delaware Supreme Court's leading decision involving the business judgment rule does not support Crowley's assumption that the rule applies to his conduct as an officer of Coram. And there is a good reason why the rule would apply to directors and not to officers: directors are the elected leaders chosen by the shareholders to set policy and make the fundamental decisions for a company, while officers are the professionals hired by the company's

---

[6]     Section 141(a) provides, in relevant part: "The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation." DEL. CODE ANN. tit. 8, § 141(a) (2007).

board of directors to handle the company's day-to-day business.  The policy underlying the business

judgment rule -- insulating corporate leaders from unwarranted scrutiny by courts and disappointed

shareholders -- does not logically apply to challenges by the corporation itself to the conduct of its

hired fiduciaries, *i.e.*, its officers.  As one commentator has noted:

> For a court to broadly shelter a corporate officer's conduct from
> judicial review under the applicable standard of care by using the
> business judgment rule to deflect an assessment of officer misconduct
> serves to undermine the board's decision to hold its agent to the
> relevant standard and *violates* the . . . rationale underlying the
> business judgment rule . . . that directors -- not judges -- possess
> statutory authority to oversee corporate affairs.

Lyman Johnson, *Corporate Officers and the Business Judgment Rule*, 60 BUS. LAW. 439, 463-64

(2005) (emphasis in original).

Furthermore, unlike directors, corporate officers are employees of the corporation and

are thus governed by the same agency principles that control other employer-employee issues.  Under

these principles, an employee is under a duty "to act with standard care and with the skill which is

standard . . . for the kind of work which he is employed to perform and, in addition, to exercise any

special skill that he has."  RESTATEMENT (SECOND) OF AGENCY § 379(1) (1958).  More specifically,

"an agent is subject to a duty not to act or to agree to act during the period of his agency for persons

whose interests conflict with those of the principal in matters in which the agent is employed."  *Id.* §

394; *see also id.* cmt. a.  These are the principles -- not the business judgment rule -- that govern

Crowley's conduct.[7]

---

[7]    In fact, the Delaware Supreme Court frequently has invoked the principles of the *Restatement of
Agency* in adjudicating disputes between a company and its employees.  *See, e.g.*, *Falconi v.
Coombs & Coombs, Inc.*, 902 A.2d 1094, 1099-100 (Del. 2006); *Greco v. University of Del.*, 619
A.2d 900, 903 (Del. 1993); *cf. Fields v. Synthetic Ropes, Inc.*, 215 A.2d 427, 430 (Del. 1965)
(citing Restatement Section 401 for the proposition that an employer can recover against its
employee based "upon the failure of the employee to live up to his independent duty of care owed
for the protection of the employer's interest").  There is nothing about a CEO's relationship with
*Continued...*

### 2.    Neither The Exculpatory Provision Nor The Business Judgment Rule Applies To The Duty Of Good Faith And/Or To The Duty Of Loyalty.

Crowley is not entitled to the protection of either the exculpatory provision or the business judgment rule for the additional reason that both doctrines apply only to breaches of the duty of care -- not to breaches of the duties of loyalty and good faith, which are also at issue here.

The exculpatory provision, of course, excludes by its very terms breaches of the duties of loyalty and good faith.  Further, the protection of the exculpatory provision sought by Crowley is in the nature of an affirmative defense.  *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223 (Del. 1999).  As such, the burden is on Crowley to show that the case involves *solely* allegations of a breach of the duty of care, as opposed to duties of loyalty and/or good faith as well.  *Id*.  If the factual basis for a claim implicates solely a violation of the duty of care -- not the case here -- the exculpatory provision may properly be invoked and applied.  *See Emerald Partners*, 726 A.2d at 1224.  But if the alleged breach also involves breaches of the duty of loyalty and/or good faith -- as is the case here -- an exculpatory provision is inapplicable.  *See Continuing Creditors' Comm. of Star Telecomms. Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 467 n.16 (*citing Levy v. Stern*, 687 A.2d 573 (Del. 1996)).

Clearly, the Trustee has put forth sufficient evidence from which a reasonable juror could find that Crowley's actions, including his actual conflict of interest and his failure to disclose that actual conflict, violated his fiduciary duties.  In fact, one such factfinder -- the Honorable Mary F. Walrath -- so found on no less than two occasions!

---

*…Continued*

his or her employer that would shield the CEO from these precedents holding that the employer-employee relationship is governed by the agency principles embodied in the *Restatement*.  *Cf. Kramer v. Nowak*, 908 F. Supp. 2d 1281, 1288-89 (E.D. Pa. 1995) (applying Section 379 of the *Restatement* and holding that an employer could bring a negligence claim against its employee).

In addition, Crowley's conflict of interest, bad faith, and breach of his duty of loyalty render the business judgment rule's protections unavailable to him. Not surprisingly, Crowley attempts to deflect attention from the serious conflict of interest under which he labored by focusing exclusively on the "decisions" of the Coram board. (*See, e.g.*, D.I. 123 at 27.) But those decisions would enjoy the protection of the business judgment rule only if they were made in the absence of a conflict of interest. As the court held in *Aronson*, the protections of the business judgment rule "can only be claimed by disinterested directors." *Aronson*, 473 A.2d at 812.

Crowley intentionally ignores the thrust of the Trustee's complaint: that Crowley caused substantial harm to Coram when his conflict, bad faith, and breach of his duty of loyalty led to the rejection of Coram's bankruptcy plans and the prolongation of its bankrupt status. Nowhere in his motion does Crowley contend that this claim is subject to the business judgment rule. Nor could he, as this claim is analyzed not under the business judgment rule that was developed to evaluate challenged transactions of corporate directors, but under the well-established fiduciary duty principles governing a fiduciary's conduct discussed above. *Cf. Heller v. Kiernan*, Civ. A. No. 1484-K, 2002 Del. Ch. LEXIS 17, at *9 (Del. Ch. Feb. 27, 2002), *aff'd*, 806 A.2d 164 (Del. 2002).

*        *        *

In short, Crowley is not entitled to summary judgment based on either the exculpatory provision or the business judgment rule. Because Crowley has failed to meet his burden at the summary judgment stage and failed to come forward with evidence to prove conclusively his affirmative defense, he is not entitled to the protection of either the exculpatory provision or the business judgment rule.

27

**D.    THE TRUSTEE'S CLAIMS RELATED TO CPS ARE NOT BARRED BY JUDICIAL ESTOPPEL.**

Crowley asserts that the Trustee is estopped from asserting that Crowley's conduct with respect to CPS is a breach. That is not so.

Judicial estoppel is inapplicable here because there is, in fact, no inconsistency in the Trustee's positions. A bit of background is necessary to understand why this is so. A key issue in the dispute between the Trustee and the Equity Committee was whether the $56 million that the Noteholders agreed to contribute to fund the Trustee's plan to enable Coram to emerge from bankruptcy was sufficient to justify the release the Trustee gave them in exchange. Shortly after the appointment of the Trustee, the Equity Committee had prepared a draft complaint against Crowley, the outside directors, and the Noteholders, alleging causes of action under RICO and common law. The Equity Committee presented testimony from a damages expert, Professor Fischel, who utilized a "yardstick measure" that yielded $137 million in damages, which under RICO would be trebled.

The Trustee retained a litigation expert, Jerome J. Shestack, Esq., to analyze whether the settlement was within the range of reasonableness. In reaching his opinion that the settlement was reasonable, Mr. Shestack performed a traditional litigation risk analysis. (B416 [Dec. 11, 2003 Hrg. Tr.] at 153:19-24.) He evaluated the merits and proposed defenses of each cause of action from the standpoints of liability, causation, and damages. (B416 [Dec. 11 2003 Hrg. Tr.] at 153:11-21.) He testified on direct and cross-examination about the proposed RICO claims and Professor Fischel's proposed yardstick measure of damages.

Citing snippets from Mr. Shestack's pretrial deposition and trial testimony, Crowley now argues that the Trustee has "changed" his position regarding the sale of CPS and that the doctrine of judicial estoppel now precludes the Trustee from claiming that Crowley breached his fiduciary duties in connection with the sale of CPS. (D.I. at 123 at 30-32.) Crowley is wrong.

*First*, the Trustee took no "position" on this issue. Mr. Shestack expressed his views on the merits of the claim involving CPS and the anticipated defenses and included them in his overall litigation risk assessment. Mr. Shestack testified:

> Yes, I think that on CPS the argument goes both ways. The plaintiff would argue that it was unnecessary to sell this, and in the future this would be profitable, and while it might not be a crown jewel at this time, once it was polished and buffed, it would indeed be a crown jewel. On the other hand, the defendants would say, look, they needed the money and they needed it then. They needed to get in a better position with their debt, and when you need the money, you sometimes sell things that you don't want to sell or wouldn't ordinarily sell, and that the process by which they went through in selling it . . . shows the entire fairness of the sale."

(B419 [Jan. 22, 2004 Hrg. Tr.]at 47: 6-19.)

Mr. Shestack's deposition was taken prior to the subsequent sale of CPS for $335 million and he was unaware of that fact when he testified at trial. (B420 [Jan. 22, 2004 Hrg. Tr.] at 53:21-24.) As noted, Mr. Shestack's principal focus was on the RICO claims and the yardstick measure of damages. The only "position" the Trustee took through Mr. Shestack's testimony was that his proposed settlement with the Noteholders was within the range of reasonableness. Mr. Shestack was not asked to assess any proposed claims against Crowley and the outside directors because they were not included in the Trustee's settlement.[8]

*Second*, Crowley does not come close to satisfying the standards for the imposition of the extraordinary remedy of judicial estoppel. "Judicial estoppel bars a litigant from asserting a position that is inconsistent with one he or she previously took before a court or agency." *Montrose*

---

[8]    Mr. Shestack could not have been more clear that if he were the trier of fact, he would find that Crowley had a conflict and that Crowley's conflict was a breach of fiduciary duty. (B415 [Dec. 11, 2003 Hrg. Tr.] at 32:3-9.)

*Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001). Judicial estoppel is

an "extraordinary remedy" to be invoked only if a party's behavior will otherwise result in a

miscarriage of justice. *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 365 (3d

Cir. 1996). "It is not meant to be a technical defense for litigants seeking to derail potentially

meritorious claims." *Id.* This is especially true when "the alleged inconsistency is insignificant at

best and there is no evidence of intent to manipulate or mislead the courts." *Id.* The Court of

Appeals has made it clear that judicial estoppel is "not a sword to be wielded by adversaries unless

such tactics are necessary to secure substantial equity." *Id.* (internal citation and quotation omitted).

Under Third Circuit precedent, judicial estoppel is appropriate only where: (1) the party to be

estopped has taken two positions that are irreconcilably inconsistent; (2) the party has changed its

position in bad faith; and (3) lesser sanctions are inadequate to remedy the damage done by the

misconduct. *Montrose*, 243 F.3d at 779-80. None of these requirements exists here.[9]

      As discussed above, the Trustee has not taken inconsistent positions. Further, there is

no evidence whatsoever that the Trustee has acted in bad faith. The Third Circuit has made clear that

a specific finding of bad faith -- *i.e.*, with intent to play fast and loose with the court," *Ryan*

*Operations,* 81 F.3d at 361 -- is required for the imposition of judicial estoppel. A finding of bad

faith must be based on more than the existence of a mere inconsistency. *Klein v. Stahl GMBH & Co.*,

185 F.3d 98, 111 (3d Cir. 1999). Judicial estoppel may not be employed unless "intentional self

contradiction is . . . used as a means of obtaining unfair advantage." *Ryan Operations*, 81 F.3d at

---

[9]    With regard to the third prong -- tailoring the application of the doctrine to the specific harm --
the Third Circuit has observed that because judicial estoppel "is often the harshest remedy" that a
court can impose for inequitable conduct, a district court may not invoke the doctrine unless: (1)
"no sanction established by the Federal Rules or a pertinent statute is up to the task of remedying
the damage done by a litigant's malfeasance;" and (2) "the sanction [of judicial estoppel] is
tailored to address the harm identified." *Montrose*, 243 F.3d at 784. Even if this Court were
somehow to determine that Crowley had met the first two elements, nothing in the record
suggests that Crowley is entitled to benefit from such a harsh sanction.

362.  Accordingly, judicial estoppel may not be employed unless a litigant's conduct has assaulted the dignity or authority of the court.  *Montrose*, 243 F.3d at 781.

Judicial estoppel is an affirmative defense and Crowley has the burden of proof. Nowhere does Crowley point to a shred of evidence that any so-called change in the Trustee's position was made in bad faith.  Indeed, the Trustee has *an obligation* to hold Crowley accountable for his breach of fiduciary duty to Coram.

For these reasons, Crowley's judicial estoppel argument not only lacks merit, but most certainly does not entitle him to summary judgment.

### E.    THE DAMAGES THE TRUSTEE SEEKS TO RECOVER FLOW DIRECTLY FROM CROWLEY'S BREACH OF HIS FIDUCIARY DUTIES.

Crowley asks this Court to rule on summary judgment that the only "conceivable" damages attributable to his breaches of fiduciary duty were the costs Coram incurred between the denial of its first proposed plan of reorganization on December 21, 2000, and the denial of its second proposed plan of reorganization on December 21, 2001.  (D.I. 123 at 35-37.)  Crowley's position is not supported by the facts, it ignores applicable Delaware law, and it is illogical.

As a threshold matter, the only legal authority Crowley cites in the entire damages section of his brief is a case supporting the undisputed proposition that the Trustee can recover damages incurred by Coram that were proximately caused by Crowley's breach.  (*Id*. at 36) (*citing In re Tri-Star Pictures Litig.*, 634 A.2d 319, 334 n.18 (Del. 1993)).  The damages the Trustee seeks to recover -- the reorganization costs and the business losses attributable to the delay in Coram's

emergence from bankruptcy -- were proximately caused by Crowley's breach of his several fiduciary duties to Coram.[10]

Crowley's motion addresses three separate time periods:  (1) the period from August 8, 2000, when Coram filed its first plan of reorganization to December 21, 2000, when the Bankruptcy Court denied confirmation of that plan; (2) the period from December 22, 2000 to December 21, 2001, when the Bankruptcy Court denied confirmation of Coram's second plan of reorganization; and (3) the period from December 22, 2001 to December 1, 2004, when the Trustee's confirmed plan became effective.  We will address each.

Crowley argues that none of the costs from the first period can be attributed to him because they "would have been incurred regardless."  (D.I. 123 at 37.)  That is not correct.  While it is true that Crowley did not have an actual conflict of interest, Coram still would have incurred costs in proving valuation and that its proposed plan was submitted in good faith.  It is not true that Coram would have incurred the additional expenses involved in litigating Crowley's conflict.  Those costs are directly attributable to Crowley's breach of fiduciary duties.

With respect to the second period, Crowley concedes that the damages incurred by Coram between the denial of the first plan and the denial of the second plan can legally be attributed to his breach.  (D.I. 123 at 36.)

As to the third period, Crowley seeks a ruling that he cannot legally be responsible for any damages following the denial of the second plan.  Crowley does not cite a single case in

---

[10]     Crowley asserts that the Trustee cannot recover damages attributable to the sale of CPS, even if the sale was a breach of fiduciary duty.  (D.I. 123 at 32 – 33.)  The Trustee has not yet calculated his damages because expert reports are not yet due.  Crowley has created an imaginary damages calculation and then has claimed that the Trustee cannot recover because the methodology is flawed.  Crowley is certainly not entitled to summary judgment on this record.

support of this argument, which is contrary to fundamental principles of Delaware law on causation and damages.

Crowley asserts that he had "no role" in the preparation of the second plan. (D.I. 123 at 36.) He attributes the failure of the second plan not to his actual conflict of interest, but to the failure of Coram's bankruptcy counsel and outside directors to have compelled him to eliminate that conflict of interest by severing his relationship either with Cerberus or with Coram. It is undisputed that the Bankruptcy Court denied confirmation of the second plan because Crowley continued to have the same actual conflict of interest that caused the court to deny the first plan. As the Bankruptcy Court stated: "Nothing, in fact, has changed." 271 B.R. at 235. Had Crowley eliminated the actual conflict of interest, the second plan would have been confirmed. Yet, despite this, Crowley argues that the Trustee is not entitled to damages for this period.

The application of two basic tort principles demonstrates that Crowley is wrong. *First*, Crowley ignores basic Delaware law of superseding cause. Delaware largely follows the formulation in the RESTATEMENT (SECOND) OF TORTS. *See Duphily v. Del. Elec. Corp., Inc.*, 662 A.2d 821, 830 n.7 (Del. 1995) (approving RESTATEMENT (SECOND) OF TORTS § 447 with the exception that Delaware employs a "but for" standard for proximate cause rather than the "substantial factor" standard found in Section 447). The RESTATEMENT (SECOND) OF TORTS § 447 reads:

> The fact that an intervening act of a third person is negligent in itself or done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if (a) the actor at the time of his negligent conduct should have realized that a third person might so act, or (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person so acted, or (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

33

Thus, a defendant is not relieved of liability for his or her antecedent misconduct by reason of intervening acts unless the intervening acts were unforeseeable. *See Duphily,* 662 A.2d at 830-31; *see also Stucker v. Am. Stores Co.*, 171 A. 230, 233 (Del. 1934). Crowley could have eliminated his actual conflict after the denial of the first plan of reorganization and should have done so. That the outside directors could have compelled him to eliminate his conflict does not serve to relieve Crowley of liability for all damages incurred by Coram attributable to Crowley's breach.

*Second*, Crowley's argument completely ignores Delaware law on joint tortfeasors. The Trustee need not prove that Crowley was *solely* responsible for Coram's damages in order for Crowley to be liable. *See Russell v. K-Mart Corp.*, 761 A.2d 1, 5 (Del. 2000) ("[t]here may be more than one proximate cause of plaintiffs' injury…."). The Delaware Uniform Contribution Among Joint Tort-Feasors Act, DEL. CODE ANN. tit. 10, §§ 6301-6308 (2007), contemplates that the conduct of multiple actors may each contribute to the same damages. When the Trustee brought this lawsuit, Crowley could have joined Coram's bankruptcy counsel as a third-party defendant, asserting that if Crowley were liable to the Trustee, then Crowley's bankruptcy counsel was liable over to him for contribution and indemnity. Crowley also could have filed a crossclaim against the outside directors. *See Hollinger Int'l, Inc. v. Hollinger, Inc.*, Civ. A. No. 04-0698, 2006 U.S. Dist. LEXIS 35947, at *9 (N.D. Ill. Jan. 25, 2006) (noting that "Delaware courts have hinted, although not explicitly decided, that contribution claims may be asserted based upon the breach of a fiduciary duty."). That others might also be liable does not enable Crowley to escape responsibility for the damages caused by his own conduct.

For these reasons, Crowley is not entitled to any limitation on the Trustee's claim for damages.

## CONCLUSION

For all of the reasons set forth above, the Trustee respectfully requests that the Court deny Crowley's motion for summary judgment or, in the alternative, for partial summary judgment.

Respectfully submitted,

Dated:  May 4, 2007

  /s/ Michael J. Barrie
Richard A. Barkasy (#4683)
Michael J. Barrie (#4684)
SCHNADER HARRISON SEGAL & LEWIS LLP
824 Market Street Mall, Suite 1001
Wilmington, DE  19801
(302) 888-4554 (telephone)
(302) 888-1696 (telecopier)
mbarrie@schnader.com

OF COUNSEL:

Barry E. Bressler (admitted *pro hac vice*)
Wilbur L. Kipnes (admitted *pro hac vice*)
Nancy Winkelman (admitted *pro hac vice*)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 751-2400 (telephone)
(215) 751-2205 (facsimile)

*Counsel to Plaintiff,*
*Arlin M. Adams, Chapter 11 Trustee of the Post-*
*Confirmation Bankruptcy Estates of CORAM*
*HEALTHCARE CORP. and CORAM, INC.*