**Dynamic
Healthcare
Solutions**

May 4, 1999

Mr. Stephen Feinberg
Cerberus Partners
450 Park Avenue, 28th Floor
New York, NY 10022

Dear Steve,

Hope you found the Jamison's to be the "Right Stuff". Let me know what your Dad thinks after he tastes it. I am told it is the "nectar of the gods".

It has been a while since I sent you a note about Winterland. So, here's an update:

We have created both a short and long term incentive program for management. These have been very carefully crafted by us to align management's interests with the owners, to drive EBIT, and to create a sense of urgency that makes it a "right now" environment. A copy of both are attached for you.

We have also begun to directly influence Tice on his thinking about organization, costs, outsourcing, productivity, systems, controls, business planning, and . . . cash.

We have met very frequently with Winterland management and established our own relationships. I think that we have been very well received. Aranda said he has his very own Fortune 500 CEO to help him. He may be pandering to me but I think he sees that we really can help him succeed. The entire tone of the senior management seems more "lit up".

We have set a tone that immediacy matters. That losses are **not** an option and management should accept only big chunk improvements. We are starting to instill the feeling about winning and taking no prisoners that seemed absent. Still lots to do. This group has practiced disappointing and have grown sanguine about lousy results. We'll fix that.

There's still a residue and a momentum of stuff that gets in the way of this group, and lots of execution and event risk here. Remember, there is no business plan or operational discipline so every little issue gets in their way. No institutional way of handling things yet. We will put in place their first rigorous operational business plan real soon. I'll send you a copy (it will be very tight, lean, and focused on results, now).



EXHIBIT

May 4, 1999
Page 2

Steve, it has also been really good to work with Kevin Genda. He's smart, careful, and even-handed. Also, he is one of the hardest working people I have ever come across. He is there early, there late, and always has the energy to work through the issue (s). Anyway, I like his intellect. You have a solid guy in Kevin.

Kevin and Warren Feder asked me to be Chairman at Winterland; to be more directly involved with Tice. I agreed to take on this assignment to facilitate all the changes we need. Clearly, this is taking lots more time, effort, intellectual commitment than I had imagined. Just the same, I am enjoying the involvement.

Finally, I am most appreciative of this assignment. I work with it every day now and so do the folks at Dynamic. We want to make lots of money for you (and some for ourselves, too). So, THANKS!

Sincerely,

Daniel D. Crowley
President & CEO

## Winterland Executive Compensation Program

The Winterland (W/L) Executive Compensation Program (WECP) is designed to permit the company to attract, motivate, and retain the most qualified and highest performing executives in our industry. The WECP shall consist of three (3) key components. These components are:

1) <u>Base Salary</u>: W/L shall position executive salaries generally to be in the range of salaries in W/L's industry for comparable positions.

2) <u>Short Term Incentive</u>: An annual bonus opportunity shall be provided to selected executive management to reward achievement of high levels of profitability and organizational performance.

3) <u>Long Term Incentive</u>: Selected members of Executive Management will receive an opportunity to participate in the equity of W/L through performance that maximizes shareholder value.

The WECP shall be reviewed annually by the W/L Board of Directors to determine participation, individual and corporate goals, as well as the prospective level(s) of potential rewards.

Actual short term incentive awards shall be determined by the W/L Board of Directors in their sole discretion and will be made only after the completion of the annual independent audit of the financial performance of W/L.

This program may be changed or terminated at any time by the Board. Any dispute(s) shall only be decided by the Board in its sole discretion and shall not be subject to any dispute by the participants.

1

<u>Winterland Short Term Incentive Program</u>

Annually the CEO of W/L shall recommend to the W/L Board of Directors the Executive Management positions that should participate in the Short Term Incentive Program (W/LSTIP). The Board shall determine the inclusion or exclusion and approve a list which together with the CEO shall comprise the participant's of the Program.

The rules of the W/LSTIP are as follows:

1) The W/LSTIP shall provide an annual bonus opportunity for Board-approved participants based upon achievements versus pre-approved goals under the Program. Individual bonus awards shall be calculated using that participant's base salary in effect as of January of the bonus year. Participant's who were not with W/L for the full calendar bonus year shall have any bonus awarded prorated for the actual months worked. Partial months shall not be considered. Any executive who is not employed by W/L at the end of the bonus year, or at the date of payout, shall forfeit any bonus accrued.

2) For 1999, the Participant list shall be as follows:

> CEO
> GM/Branded
> GM/Licensed
> VP CFO
> VP Ops

3) Annually the EBIT and Individual Goals shall be submitted by the CEO for the Board's approval.

4) The CEO bonus opportunity shall be 100% of base at Target EBIT. The considered achievements for this Program shall be based solely upon achievement of the EBIT for the CEO.

5) The other selected participants bonus opportunity shall be 50% of base at Minimum EBIT. Their bonus shall be divided into a combination of half (25%) for EBIT and half (25%) for Individual goal accomplishment. Individual performance goals must be tangible, specific, and measurable and shall directly support the W/L annual business and financials plans for each participant's area of responsibility. Suitable goals might include specific, measurable improvements in gross margins, cash flow, productivity, business mix, and costs of materials and overhead.

B4

6) <u>For 1999</u>, the minimum EBIT goal shall be $3,000,000 and the Target EBIT goal shall be $4,000,000 (EBIT is calculated to be after accrual for any bonus to be paid). Bonus for the year shall be accrued against the EBIT of the financials. Such accrual shall be shown on monthly reported numbers to the Board above the EBIT number line of the Income Statement.

7) <u>For 1999</u>, providing the $3,000,000 EBIT goal has been exceeded, the participants are then eligible for an <u>add-on EBIT bonus opportunity</u>. This add-on shall be paid only for the EBIT portion of the various participant's bonus opportunity. The add-on shall be determined as follows:

A) <u>For The CEO</u>:

| | EBIT | Payout Factor |
|---|---|---|
| Minimum | $3 Million | 50% x EBIT Bonus Portion x Base |
| Target | $4 Million | 100% x EBIT Bonus Portion x Base |
| | $4.5Million | 125% x EBIT Bonus Portion x Base |
| | $5 Million | 150% x EBIT Bonus Portion x Base |
| | Uncapped | Uncapped |

B) For The Vice-President(s):

| | EBIT | Payout Factor |
|---|---|---|
| Minimum | $3 Million | 1 x EBIT Bonus Portion x Base |
| Target | $4 Million | 2 x EBIT Bonus Portion x Base |
| | $4.5 Million | 3 x EBIT Bonus Portion x Base |
| | $5 Million | 4 x EBIT Bonus Portion x Base |
| | Uncapped | Uncapped |

At the Minimum EBIT, the CEO would receive a bonus payout of 50% of base. At Target EBIT, the CEO would receive a bonus payout of 100% of base.

At the Target EBIT, the other listed participants would receive a bonus payout of 50% (multiplier of 2 x 25% EBIT Bonus Portion) for the EBIT portion <u>and</u> also be eligible for such % as they have earned for their Individual goals. If 100% of the Individual goals were achieved, then 25% would have been earned for this portion. This would result in a bonus of 75% of base (i.e. 25% for Individual goal achievement, and 2 x 25%, or 50% for the EBIT add-on).

The payout calculation shall be pro-rated should the EBIT fall between an interval (for example, if the actual EBIT is $3.5 million then the payout factor would be 75%). For 1999, there shall be no cap on the add-on EBIT bonus opportunity. EBIT shall be calculated so as to include the accrual for any bonus to be paid. For example, if the reported EBIT is $4,000,000 and the bonus total is $500,000, then the actual EBIT earned before the bonus payout accrual would have been $4,500,000. No bonus whatsoever shall be paid to any participant unless W/L achieves the Board approved Minimum EBIT for the year.

3

<u>Calculation of bonus example(s):</u>

- VP earning $150,000.

- EBIT (including the accrual of the bonus payouts) is $4,000,000.

- VP was eligible for 50% bonus. The 50% was divided, half for EBIT and half for individual goal accomplishment

- VP achieved <u>all</u> of the individual goals.

---

25% (Individual Achievement) x $150,000(Base)=          $37,500.

Plus

2 x (EBIT Bonus Portion %) x $150,000(Base)=          <u>$75,000</u>

Total Bonus          <u>$112,500</u>

Final STIP 4/99
DHS/DDC

4

(note: dated 4 May 99)
## Winterland Long Term Incentive Program

### Overview

Winterland's (W/L's) Board of Directors seeks to create the highest level of corporate success at W/L. The Board believes that W/L's ultimate success will center around the critically important work of the CEO and the CEO's key direct reports. It is anticipated that these executives will operate W/L under intense pressure to work off the high debt, create rapid change, and compete against firms with more resources in a business environment fraught with execution risk. The Board's goal is to create a team-oriented management unit that has the enthusiasm to effectively manage these risks by rewarding their success in direct proportion to the shareholder value they create.

Through the establishment of the W/L Long Term Incentive Plan (W/L LTIP), selected members of Executive Management will receive an opportunity to participate in the equity of W/L through Non-Qualified Stock Options (NQSO). The goal of this program is to maximize the total increase in shareholder value by directly aligning the interest of management with that of the investors.

### Winterland Non-Qualified Stock Option Plan (NQSO) & Management Participation

W/L's initial equity shall consist of 20,000,000 shares.

To maximize organizational performance, the Board has established the W/L LTIP for selected participants. The LTIP is targeted to directly reward participant's long-term performance.

To drive long-term organizational performance, the Investor Group has created a <u>total pool</u> of eighteen (18%) percent, or 3,600,000 Non-Qualified Stock Options (NQSO). This <u>total pool</u> shall consist of a <u>base pool</u> of fifteen (15%) percent or 3,000,000 NQSOs and an <u>over-achievement pool</u> of an additional three (3%) percent, or 600,000 NQSO's that are specifically to be designated for "over-achievement".

To facilitate management's participation in W/L's NQSO pool(s), the Board intends to create an annual W/L LTIP award opportunity. The annual award opportunity will provide for possible NQSO grants for achievement of certain Board designated levels of performance. The actual number of NQSOs that are awarded, if any, will depend solely upon the extent to which Board's pre-approved objectives are achieved.

### Participants

The W/L Board has designated the <u>1999 LTIP participants</u> will be the CEO, the GM/Branded Products, the GM/ Licensed Products, the VP/CFO, and the VP/Operations. Subject to Board approval, other participants may be recommended by the CEO for inclusion in the Plan. The CEO may **not** make any offer of NQSOs without prior approval of the W/L Board.

1

### CEO Current Equity and 1998 Equity "Clawback" Opportunity

The Board has granted the CEO an award of 3.34%, or 668,000 NQSOs on the date of the reorganization.

Additionally, in 1998, the CEO had an opportunity to earn another 2.22%, or 444,000 more NQSOs. These were forfeited due to W/L's failure to make the 1998 EBIT target.

In 1999, the Board will provide a one-time "claw-back" opportunity for the CEO only. This "Clawback" opportunity shall be based solely on achieving certain EBIT levels in 1999 (after accrual for any bonus payments under the W/L STIP).

If W/L achieves an EBIT of between $4.0 million and $5.0 million in 1999, then the CEO will receive a Clawback award of NQSOs. The NQSOs awarded under this category shall be pro-rated from 222,000 NQSOs at $4.0 million EBIT to 444,000 NQSOs awarded at $5.0 million EBIT.

No NQSO's will be "Clawed back" for EBIT under $4.0 million.

### 1999 NQSO Opportunity and LTIP Goals

1) For 1999, LTIP participants will have the opportunity to earn NQSO awards of up to 5.0%, or 1,000,000 NQSOs from the basic and the over-achievement pool(s), for achievement of certain EBIT levels. EBIT shall be <u>after inclusion</u> of any accrual for bonus payment under the W/L Short-Term Incentive Plan, and final only when verified by the W/L's Independent Auditors.

2) The **Total NQSO Pool opportunity** for 1999 shall be divided into 3.33% from the base pool, and 1.67% from the **Over-Achievement Pool**. The **Base Pool** NQSO opportunity will be divided into 2.22%, or 444,000 NQSOs for the CEO, and 1.11%, or 222,000 NQSOs divided equally (55,500 NQSOs each) to the four (4) remaining Board-approved LTIP participants. The Over-Achievement opportunity is as shown below.

3) The Base Pool NQSOs for 1999, shall only be awarded if $3 million EBIT is achieved for 1999.

4) For 1999, an **Over-Achievement Pool Opportunity** of up to 1.67%, or 334,000 NQSO's will be available if EBIT in excess of $4.0 million is achieved. At $4.0 million EBIT, an additional 167,000 NQSO's will be awarded to participants from the over-achievement NQSO pool. This over-achievement award shall be increased, pro-rata; up to a total of 334,000 NQSO's at $5.0 million EBIT. No additional NQSOs shall be awarded for EBIT between $3.0 million and $4.0 million. Any over-achievement NQSOs that are earned shall be allocated to all of the current participants on the same basis as the base pool award for 1999.

2

B8

## 2000 NQSO Opportunity and LTIP Goals

1) For 2000, LTIP participants will have the opportunity to earn NQSO awards of up to 5.0%, or 1,000,000 NQSOs from the basic and the over-achievement pool(s), for achievement of certain EBIT levels. EBIT shall be <u>after inclusion</u> of any accrual for bonus payment under the W/L Short-Term Incentive Plan, and final only when verified by the W/L's Independent Auditors.

2) The **Total NQSO Pool opportunity** for 2000 shall be divided into 3.33% from the base pool, and 1.67% from the **Over-Achievement Pool.** The Base Pool NQSO opportunity will be divided into 2.22%, or 444,000 NQSOs for the CEO, and 1.11%, or 222,000 NQSOs divided equally (55,500 NQSOs each) to the four (4) remaining Board-approved LTIP participants. The Over-Achievement opportunity is as shown below.

3) The Base Pool NQSOs for 2000, shall only be awarded if $5.0 million EBIT is achieved for 2000.

4) For 2000, an **Over-Achievement Pool Opportunity** of up to 1.67%, or 334,000 NQSO's will be available if EBIT in excess of $6.0 million is achieved. At $6.0 million EBIT, an additional 167,000 NQSO's will be awarded to participants from the over-achievement NQSO pool. This over-achievement award shall be increased, pro-rata; up to a total of 334,000 NQSO's at $7.0 million EBIT. No additional NQSOs shall be awarded for EBIT between $5.0 million and $6.0 million. Any over-achievement NQSOs that are earned shall be allocated to all of the current participants on the same basis as the base pool award for 2000.

3

## Other Provision(s) of the Plan

1) NQSOs shall be considered as fully vested upon award, or when a majority of the shares of W/L have changed ownership in a change of control.

2) NQSOs will dilute pro-rata with majority stockholders in all cases in the event future shares of stock are issued.

3) No NQSOs in W/L shall be awarded to any participant who is not actively at work, or is not an employee on the date of the award.

4) NQSOs shall remain valid for five (5) years, except that, NQSOs granted to a participant shall be forfeited ninety (90) days after such participant is no longer an active employee of W/L.

5) Any NQSOs that are actually granted under the W/L LTIP, that are later forfeited, shall be returned to the pool for consideration by the Board as a future grant.

6) The W/L LTIP shall be reviewed annually by the W/L Board of Directors, in its sole discretion, to determine future participation, individual and/or corporate goals, as well as level (s) of award opportunity, if any, for future years.

7) Actual NQSO awards shall be determined by the W/L Board of Directors in their sole discretion, and will be made only after completion of the annual independent audit of the financial performance of W/L.

8) NQSOs shall be granted at a price of one (1) cent each, which value is determined by the Board to be fair market value for NQSOs.

9) This program may be modified, or terminated at any time by the Board. Any dispute(s) shall only be decided by the Board in its sole discretion and shall **not** be subject to any further dispute whatsoever by any participant.

10) NQSOs are not transferable, assignable, and may not be used as collateral by participants.

WL LTIP.2
DHS 5/4/99

4

Daniel D. Crowley                 400 Capitol Mall #1250, Sacramento, CA 95814

# FAX

| | |
|---|---|
| Date: | 5-4-99 |
| Number of pages including cover sheet: | |

*resending last 4 pages*

**To:**
Stephen Feinberg          212-421-2947
**Cerberus Partners**

**From:**
Dan Crowley

| | |
|---|---|
| Phone: | 916.449-6056  (Pam Herrera) |
| Fax phone: | 916.449-6059 |

**REMARKS:**      Urgent        For your review        Reply ASAP        Please comment

## Confidentiality Note

*This communication is intended to be confidential and for the use of only the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution or copy of this telecopy is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original message to us at the address above via the United States Postal Service (we will reimburse postage.) Thank you.*

B11

## WINTER LAND MANAGEMENT STOCK OPTION SUMMARY - 5/4/99

| | VESTED NOW | '98 CLAWBACK | | 1999 BASE | 1999 OVERACHIEVEMENT | | TOTAL 1999 AWARD | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | $4MM EBIT | $5MM EBIT | $3MM EBIT | $4MM EBIT | $5MM EBIT | $4MM EBIT | $5MM EBIT |
| CEO | 3.34% | 1.11% | 2.22% | 2.22% | .556% | 1.12% | 7.23% | 8.9% |
| 4 Reports | -- | -- | -- | 1.11% | .279% | .55% | 1.39% | 1.66% |
| TOTAL | 3.34% | 1.11% | 2.22% | 3.33% | .835% | 1.67% | 8.62% | 10.56% |

StockTable 5/4/99

B12

**MINTERGAND**
**MANAGEMENT STOCK (UNIT) SUMMARY - 5/4/99**

| | 2000 BASE | 2001 OVER ACHIEVEMENT | | | TOTAL 2000 AWARD | |
|---|---|---|---|---|---|---|
| | $ 5MM EBIT | $ 6MM EBIT | $ 7MM EBIT | | $ 6MM EBIT | $ 7MM EBIT |
| CEO | 2.22% | .556% | 1.12% | | 2.78% | 3.34% |
| 4 Reports | 1.11% | .279% | .55% | | 1.39% | 1.66% |
| TOTAL | 3.33% | .835% | 1.67% | | 4.17% | 5.00% |

StockTableB 5/4/99

B13

**WINTERLAND MANAGEMENT STOCK (LTIP) SUMMARY - 5/4/99**

| | VESTED NOW | % CLAW BACK $4MM EBIT | % CLAW BACK $5MM EBIT | 1999 BASE $3MM EBIT | 1999 OVER ACHIEVEMENT $4MM EBIT | 1999 OVER ACHIEVEMENT $5MM EBIT | TOTAL 1999 AWARD $4MM EBIT | TOTAL 1999 AWARD $5MM EBIT |
|---|---|---|---|---|---|---|---|---|
| CEO | 668,000 | 222,000 | 444,000 | 444,000 | 111,000 | 222,000 | 1,445,000 | 1,778,000 |
| **4 Reports** | | | | | | | | |
| Peter Aranda | --- | --- | --- | 55,500 | 14,000 | 28,000 | 69,500 | 83,500 |
| Barbara Kortes | | | | 55,500 | 14,000 | 28,000 | 69,500 | 83,500 |
| Preeti Mehta | | | | 55,500 | 14,000 | 28,000 | 69,500 | 83,500 |
| GM Branded | | | | 55,500 | 14,000 | 28,000 | 69,500 | 83,500 |
| Sub total | --- | --- | --- | 222,000 | 56,000 | 112,000 | 278,000 | 334,000 |
| TOTAL | 668,000 | 222,000 | 444,000 | 666,000 | 167,000 | 334,000 | 1,723,000 | 2,112,000 |

StockTable2 5/4/99

B14

**TWINTERLAND**
**MANAGEMENT STOCK (LTIP) SUMMARY 1/5/99**

|  | 2000 BASE | 2000 OVERACHIEVEMENT | | 2000 TOTAL AWARD | |
|---|---|---|---|---|---|
|  | $5MM EBIT | $6MM EBIT | $7MM EBIT | $6MM EBIT | $7MM EBIT |
| CEO | 444,000 | 111,000 | 222,000 | 555,000 | 666,000 |
| 4 Reports |  |  |  |  |  |
| Peter Aranda | 55,500 | 14,000 | 28,000 | 69,500 | 83,500 |
| Barbara Kortes | 55,500 | 14,000 | 28,000 | 69,500 | 83,500 |
| Preeti Mehta | 55,500 | 14,000 | 28,000 | 69,500 | 83,500 |
| GM Branded | 55,500 | 14,000 | 28,000 | 69,500 | 83,500 |
| Sub total | 222,000 | 56,000 | 112,000 | 278,000 | 334,000 |
| TOTAL | 666,000 | 167,000 | 334,000 | 833,000 | 1,000,000 |

StockTable2B 5/4/99

B15

**Dynamic Healthcare Solutions**

REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523

EXHIBIT: _____ 8 _____    w/L flr

Witness: Crowley
Date: 4/16/07    # of pages: 2

June 28, 1999

Mr. Stephen Feinberg
General Partner
Cerberus Partners, L.P.
450 Park Avenue, 28th Floor
New York, NY 10022

Dear Mr. Feinberg Steve

Your call to me today about Coram was a really nice one to receive. My understanding is that you have secured the CEO's support for me to serve on Coram's Board as your representative. Your hope is that we will work with the organization to determine the reasons that this company is not performing as well as its peer group. Then work with the senior management to create a strategy and the related initiatives that would change the outcomes for the better. Finally, to be available for you should you need to replace management.

Steve, you are very important to me. As I said on our phone call, my goal is for us to work together over the remainder of our careers, to help you take your projects and turn a nice profit for you and to earn a fair profit for myself and my colleagues. To this end, we are committed to making your investment in Winterland into a great one. These past four days, myself and two of my colleagues spent between 15 and 17 hours per day re-directing the Winterland management team and focusing them on those tasks that will specifically create significant EBIT. We are optimistic that we can really show improvement in 1999. If it were not for some gaping holes in management and a real mess in the production area that slows us down, I would practically guarantee you that we could deliver a 8-10% EBIT on sales. Nevertheless, we are on the task and working the issues for you.

You asked that I tell you what would make sense economically for me to change the result at Coram. Presumably, I will be involved in a similar way to that which we are at Winterland. My expectation is that I will begin working with the Coram CEO in July; begin to create the analytics to understand the company; and begin to change the shape of the strategy almost immediately. Following this, we will begin to work with the organization and move the energy into those areas and ways that

400 Capitol Mall • Suite 1250 • Sacramento, CA 95814    916.449.6056 • 916.449.6059 fax

EXHIBIT
11
2/14/07  O.D.

Mr. Steve Feinberg
June 28, 1999
Page 2

will increase your returns. For this effort, I would like you to consider the same retainer we receive for Winterland ($20,000 per month for the next twelve (12) months plus out-of-pocket expenses [travel, etc.]) and five (5) percent of the net gain upon the sale of the asset if you receive a 20% annualized return, pro-rated up to eight (8) percent of your net return between 20% and 30%. This is a lower share than we are receiving for Winterland, but presumably work has already been done and a management team is already in place which will make it a bit less demanding for me. If it makes sense for you, let me know. If not, please tell me what would work for you so that we can get started.

Steve, I want you to know foremost that I genuinely am grateful for the opportunity you have provided for me. Every day I am thankful for your trust and generosity. That makes it all the more intense for me to want to do everything I can to get you the superior results you deserve. Thank you.

Sincerely,

Daniel D. Crowley
Chairman, President & CEO

**CONFIDENTIAL**

27Aug99

REDACTED

Steve Feinberg

Re: Coram
   Update on the Aetna USHealthcare situation.

**As background**, in my former life I had a long-term contract with Aetna on the CHAMPUS (military retirees) for Southern California. Several people ultimately came to work for me directly when we took over Aetna's portion of the business. The fellow who headed CHAMPUS for Aetna became a friend and employee of mine. The actuary and I used to play golf together. He is now in Aetna Corporate (Al Maltz). The general counsel for the Aetna's health biz was Kathy Murphy.

Kathy Murphy feels that I am by reputation the one who could broker a deal. That is, if one can be brokered at all. There are bad feelings with Smith and that impacts everything. That said, she states that she knows me, knows that I am creative, and if anyone can find a way to settle the mess . . . . she thinks it would be me that could do it. She says that Aetna has a high internal regard for me and are *more likely* to be willing to deal if they know it's me.

Murphy is now the General Counsel for Aetna's Retirement bix. She works for the Aetna Corporate General Counsel, Ed Shaw.

David Simon is the General Counsel for Aetna USHealthcare. He is know as a very very difficult person. A deal will *not be possible* with him.

The President of Aetna USHealthcare is Mike Cardillo. Mike applied for a job with my old company a few years ago. He was in my private office and interviewed by me personally. He will be friendly to me.

Murphy thinks that she may be able to broker a meeting with me, Cardillo, and the CFO of Aetna USHealthcare (Don Marin sp??). I would have to have some formal standing in order for them to believe that a meeting would be productive. In other words, they will need confirmation that I can speak for Coram and commit to a deal of any kind.

All this is as a result of my continued stirring of the pot on your behalf. I'm not saying that any deal, or an acceptable deal, or even a meeting can occur. I am saying, that if something can be done, and I get into some kind of a formal relationship that it has possibilities.

CROWLEYKVN 018955

**CONFIDENTIAL**

B18

EC-9

**Dynamic
Healthcare
Solutions**

PERSONAL & CONFIDENTIAL

REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR. NO. 11523

| | |
|---|---|
| *EXHIBIT:* | 18 |
| Witness: | Crowley |
| Date: 4/6/07 | # of pages: 2 |

12 November 1999

Mr. Steven Feinberg
Cerberus Capital
450 Park Avenue, 28th Floor
New York, NY 10022

Dear Steve: Steve

The purpose of this note is to provide both of us with a record that we can both retain for our private records.

You have asked me to take over the Coram operations. Mr. Amaral of Coram has indicated that there is no problem with Cerberus providing me with an upside on their equity in Coram but prefers that upside not be directly tied to Cerberus' debt position.

You agree to increase the economics on Winterland to provide for an upside that is equal to that which I would otherwise have been able to receive (if any) for creating operational and financial improvement resulting in EBITDA at Coram.

Our current deal provides a 20% share on the net gain on Winterland (I also receive 20% from Gordon Brothers on their share of Winterland). A copy of the current Winterland deal between me and Cerberus and Gordon Brothers is attached.

There is to be no change on the Gordon Brothers piece of Winterland.

<u>You (Cerberus) agree</u> to increase my gain share on the Cerberus' piece of Winterland to forty (40) percent for me.

| | |
|---|---|
| EXHIBIT | PLAINTIFF'S EXHIBIT |
| EC-20 | Feinberg -16 11.29.00 mc |

400 Capitol Mall • Suite 1250 • Sacramento, CA 95814   916.449.6056 • 916.449.6059 fax

CERB 01347

EXHIBIT
14
2/4/07

CH-11 TRUSTEE/
CrowleyAdmin000128

Mr. Steve Feinberg
November 12, 1999
Page 2

I agree that if there is no improvement at Coram *or the value of the improvement is less than the value of the 40% share on Cerberus' piece of Winterland, that Cerberus will reduce what Cerberus pays me* on Winterland from 40% to a percentage *and/or amount equal to what I actually achieve* for you at Coram but in *no event less than the 20% base deal* we have on Winterland today. In the event that the return on Coram exceeds 40%, Cerberus will increase the payment accordingly on Winterland.

For the purpose of calculating the Coram improvement, you agree to mark your Coram position to $46M.                                                                    ?

Any compensation or other reward that I or my team receive from Coram will *not* be offset against the calculation of Coram gain sharing.

The Coram result is not to be considered for calculating a portfolio return as it relates to my performance on other Cerberus related work I might do in the future or am presently doing at Winterland now.                              ?

Cerberus agrees that I will continue to be asked to work on its other projects and that the work I may do at Coram shall not be a reason to restrict my activity on Cerberus' portfolio companies now or in the future.

By signing below we both indicate that this reflects our understanding. With these understandings I will undertake to both sign a contract with Coram and a contract with Cerberus today.

Agreed: _Daniel D. Crowley_  12 Nov 99            Agreed: _____
             Daniel D. Crowley/Date                              Stephen A. Feinberg/Date
             Dynamic Healthcare                                  Cerberus Capital Mgt. L.P.

CERB 01348


CH-11 TRUSTEE/
CrowleyAdmin000129

B20

REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR. NO. 10323

EXHIBIT: 16
Witness: Crowley
Date: 4|6|07   # of pages: 10

## PERSONAL & CONFIDENTIAL

16 November 1999

## CONFIDENTIAL

Steve Feinberg

Dear Steve, Steve

A brief update. Amaral and I continue to work on an Employment Agreement.

I accepted a base of $650,000.

I asked for a bonus of up to 3 x base. Amaral did not accept my formula and did not accept my EBITDA target.

I asked for a rolling 3 year contract. Amaral did not accept my term.

I asked for options with a partial vest up front and a slightly advantaged option price. Amaral did not accept either.

I asked for a 2.99 x base and targeted bonus in the event of a dismissal (not for cause). Amaral did not accept either.

I asked for a success fee of 1% in the event that I could engineer a sale/merger to move CRH. Amaral did not accept the fee.

I asked for the contract to continue once I had CRH stabilized and that I have an option to appoint a CEO to replace myself. Amaral did not accept this. Instead he worded the contract to cease my contract and all of the obligations on the date that I appoint someone as CEO. Ultimately, we arrived at wording in which terms remained in effect but pay would be cut, thereby reducing any incentive I might have under the contract or effectively freezing me into the CEO's job until I can sell CRH.

I asked for protection under 280 G if any of the contract triggered an excess golden parachute under IRS rules. Amaral did not accept this. I am having Peat Marwick review the Agreement to see if the IRS limits obviate any real upside on the deal.

## CONFIDENTIAL

EXHIBIT
18
2/4/07 ⊙ D

B21

# CONFIDENTIAL

I asked for the D&O and E&O coverage. Amaral refused to provide this. He later relented and said I will receive this tomorrow.

I asked him how many options remain in the option pool. He told me that he did not know. He later said it was 12,000. He subsequently told me that he would return 800,000 of his own options to be used to recruit a new corporate management team.

Steve, because of our friendship and the other deal we are in together . . . . I want to do what I can for you. I now see the deal you and I have in writing, and it is clear to me that I cannot make the kind of return I want on one or two deals. For this to work for me, I need to be in several deals and *to make them all succeed.*

So, let's come back to CRH. I know your debt is in jeopardy. I want to help save it.

The reality at CRH is there is $300M in debt and it's too much. CRH "may" reduce this by $30M to $100M (???) on the possible sale of CPS (the list of potential buyers is attached, note the number of financial buyers). When and "if" CPS is sold and R Net is shut, CRH will have lost about $200M of its approximately $650M top line. Infusion and Clinical will be left to service the debt. *Remember* Infusion has about $160M in revenue in the red at this time.

Now, for illustration purposes, if CPS' sale reduces the debt by $50M (a high end result in my opinion), to $250M. At that level of debt, CRH will have to make Interest payments of roughly $25M a year (forget about principal repayment). The bad news is that will leave zip for cap-ex or restructuring, so CRH has very little going for it in terms of improving. The point is that the debt will still be too high for CRH.

Suppose that in the next year, *somehow* I am able to improve EBITDA on the $450M top line to roughly $30M to $40M (7% to 9%). No small task given how reduced CRH's situation is at this time. I think it's fair for you to expect there will be a significant charge to be taken at CRH. Certainly the AR is too large and too old not to expect it's soft.

So what? Well, here's how it looks to me from here:
A) Even with the sale of CPS, and the potential for EBITDA improvement, CRH will be able to do little more than service the interest on the debt.
B) With an EBITDA improvement, it's still *quite hard to imagine* that we can turn around and sell this debt-ridden firm to anyone for enough to make this work out well for anyone (think about who's out there to buy something like

# CONFIDENTIAL

B22

CONFIDENTIAL

this and what their realistic appetite would be for CRH and its large debt); and;

C) There's no way there can be any real equity value on the stock. Today's equity value is roughly $40M (50M shares x .75 cents = $37.5M). Obviously, the debt already owns this company and the present public equity value is a mirage, right? Makes having incentive options pointless in my opinion. At any rate, one could expect options to have little value or to be materially diluted if they ever get in the money.

Amaral told me that the debt holders are now offering a six (6) month forebearance on the interest, principal, and covenants.

My reaction is that this is too short of what will be needed by CRH. It really needs to be more like a year. I think CRH will probably need cash ($10M to $20M) versus be able to service debt in 2000. To tell the truth, I think CRH will be lucky if it can show much improvement before the six (6) months payment holiday wears off. Then I will be left to be a disappointment to you, have my name trashed as the guy who couldn't turn CRH (or, in time), or worse, my name is on a BK, and people associate me with the failure. At that point, where am I after busting my butt for CRH? H-m-m-m.

Now if you were me what would you do? Knowing CRH will be a 60-75 hour a week trench-war for me. Obviously, CRH has been horribly mismanaged. So there's no reason to think that there's some silver lining waiting in the wings and all I need to do is show up.

I absolutely want to do what I can for you because you have been generous with me this past year, I consider you a friend, and you deserve a better outcome. (*In fairness, I hope that you feel that I have delivered for you at W/L, in an investment that had clearly failed up until I signed on to help*). But I have to measure the risk - reward. Wouldn't you?

I am seriously asking myself why I should do this? The upside just isn't there. The Board isn't willing to pay for what needs to be done.

Honestly, I do not see how we can reasonably expect W/L to cover the shortfall. What if at the end of the day, the value at W/L is insufficient? Are you just going to write me a check? Based on what?

What if no matter how clever I am, or how many hours I work, CRH just can't be improved, or enough? Will you still pay me and what would that amount be? I don't think it's realistic for me to expect anything. At the same time, I don't

CONFIDENTIAL

CONFIDENTIAL

think CRH will be able to pay me either. In that case, all of my work would have been for nothing.

This is understandably a very sad situation, but it's *not my fault*. I should have been called much earlier.

What should happen now is that I should be hired as Crisis Manager, for six (6) months, working for all the creditors to assess CRH and determine whether CRH can be salvaged or must be liquidated. Then I could implement the plan. My initial inclination is that CRH may need to be put into a BK and be thoughtfully restructured under protection of a court.

I am open to talking about this but the reality is I think we should go back to ground zero. What is your/Goldman/Foothill's goal? We all need to be at this table together.

We've screwed around with this a lot. I've been much tortured by Smith and Amaral. I've worried about this endlessly, because I want to be there for you.

I am recommending all of us (including the creditors and CRH's "Independent" Directors) meet in New York and determine what it is that people think can be done. Whether I am the right person to do it. And, if I am the guy, what is the upside that covers this effort.

Sincerely,

Dan Crowley

NOV 15 1999 17:49 FR CORAM HEALTHCARE EXEC303 672 8799 TO 91115149548?

**Deutsche Bank**

Deutsche Banc Alex. Brown
ONE SOUTH STREET
BALTIMORE, MARYLAND 21202

**Fax Transmission**

Date:   11/15/99

Pages:  7

     (Including Cover Sheet)

To:    Don Amaral

     Wendy Simpson

Fax:   (303) 672-8799

From:  Christina Morrison

     Director

     *Investment Banking*

     (410) 895-4583 - Fax

     (410) 895-4569 - Phone

We need to review and finalize these names as I am not familiar with all of them.

*Dan*

*POTENTIAL buyers of CPS.*

*Don A*

**CONFIDENTIAL**

The information contained in this facsimile is confidential and intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination or copy of this facsimile is strictly prohibited.

NOV 15 1999 17:49 FR CORAM HEALTHCARE EXEC303 672 6799 TO 3410394562

**Deutsche Bank** 

ONE SOUTH STREET
BALTIMORE, MARYLAND 21202
Deutsche Banc Alex. Brown

David D. Stevens
Chairman & Chief Executive Officer
Accredo Health Inc.
1640 Century Center Pkwy
Suite 101
Memphis, TN 38134
(901) 385-3621
(901) 385-3689 FAX

T. Danny Phillips
Senior Vice President &
Chief Financial Officer
Advance Paradigm, Inc.
545 E. John Carpenter Freeway
Suite 1570
Irving, TX 75062
(972) 830-6199
(972) 830-6196 FAX

Peter Kuechle
Principal
Advent International Corporation
75 State Street
Boston, MA 02109
(617) 951-9712
(617) 951-0568 FAX

Burt Zweigenhaft
President & Chief Executive Officer
American Prescription Providers
2 Huntington Quadrangle
Suite 3N01
Melville, NY 11747
(516) 845-5300
(516) 845-9798 FAX

Timothy A. Dugan
Partner
Banc One Equity Capital
3 First National Plaza
Suite 1210
Chicago, IL 60670-0610
(312) 732-8037
(312) 732-7483 FAX

Tim Dahltorp
Chief Financial Officer
The Broe Companies
252 Clayton Street
4th Floor
Denver, CO 80206
(303) 393-0033
(303) 329-2979 FAX

Tom Schlesinger
Associate
Beecken Petty & Co.
901 Warrenville Road
Suite 205
Lisle, IL 60532
(630) 435-0300
(630) 435-0370 FAX

Donald R. Roden
President & Chief Executive Officer
Bergen Brunswig Corporation
4000 Metropolitan Drive
Orange, CA 92868
(714) 385-4000
(714) 385-1442 FAX

Rodney A. Cohen
General Partner
Beasemer Partners & Co
630 Fifth Ave
39th Floor
New York, NY 10111
(212)708-9176
(212)969-9032 FAX

Stephen C. Sherrill
Managing Director
Bruckmann, Rosser, Sherrill & Co., Inc.
126 East 56th Street, 29th floor
New York, NY 10022
(212)521-3701
(212)521-3799 FAX

NOV 15 1999 03:58 FR BT AL HEX BROWN                418 895 4582 TO 913036728799                P.02/07

NOV 15 1999 17:49 FR CORAM HEALTHCARE EXEC303 672 6799 TO 91383...

**Deutsche Bank** ▨

ONE SOUTH STREET
BALTIMORE, MARYLAND 21202
Deutsche Banc Alex. Brown

Martin Engel
Associate
Brown McMillan & Co.
930 Montgomery Street
Suite 310
San Francisco, CA 94133
(415) 273-7178
(415) 273-7171 FAX

Brendan Ford
Senior Vice President –
Corporate Development
Cardinal Health, Inc.
7000 Cardinal Place
Dublin, OH 43017
(614) 757-7713
(614) 757-6918 FAX

Edwin M. Crawford
Chairman/President/
Chief Executive Officer
CareMark RX, Inc.
3000 Galleria Tower
Suite 1000
Birmingham, AL 35244
(205) 733-8996
(205) 733-9780 FAX

Ryan Schwarz
Vice President
The Carlyle Group
1001 Pennsylvania Avenue N.W.
Suite 220 South
Washington D.C. 20004
(202) 661-4334
(202) 347-1818 FAX

Dennis Burton
Vice President of Health Care Services
CVS Procare
One CVS Drive
Woonsocket, RI 02895
(401) 765 - 1500  x2090
(401) 765-7803 FAX

Cam L. Garner
Chairman & Chief Executive Officer
Dura Pharmaceuticals, Inc.
7475 Lusk Boulevard
San Diego, CA 92121
(619) 457-2553
(619) 457-2553 FAX

Barrett A. Toan
President & Chief Executive Officer
Express Scripts, Inc.
14000 Riverport Drive
Maryland Heights, MO 63043
(314) 770-1666
(314) 770-1581 FAX

Joseph E. Whitters
Chief Financial Officer
First Health Group Corporation
3200 Highland Ave
Downers Grove, IL 60515
(630) 241-7510
(630) 241-8105 FAX

Jason B. Hurwitz
Director
Fox Paine & Co. LLC
950 Tower Lane
Suite 1950
Foster City, CA 94404
(650) 525-2037
(650) 525-1396 FAX

Jeremy Silverman
General Partner
Frontenac
135 South LaSalle Street
Suite 3800
Chicago, IL 60603
(312) 368-0044
(312) 759-0854 FAX

NOV 15 1999 17:50 FR CORAM HEALTHCARE EXEC303 672 6799 TO 91303

**Deutsche Bank**

ONE SOUTH STREET
BALTIMORE, MARYLAND 21202
Deutsche Banc Alex. Brown

Mark G. Solow
E. Garrett Bewkes, III
Managing Principal
GarMark Partners, L.P.
1325 Avenue of the Americas
26th Floor
New York, NY 10019
(212) 713-8500
(212) 713-8539 FAX

Don Edwards
Principal
GTCR Golder Rauner LLC
6100 Sears Tower
Chicago, IL 60606-6402
(312) 382-2200
(312) 382-2201 FAX

J. Tod Petherling
Vice President
The Health Network
28 White Bridge Road
Suite 208
Nashville, TN 37205
(615) 354-8810
(615) 354-8841 FAX

Elizabeth Crain-Griffith
Morgan Stanley Dean Witter Capital
Partners
Principal
1585 Broadway 5th Floor
New York, NY 10036
(212) 761-5588
(212) 761-0540 FAX

Mark E. Mlotek
Vice President - General Counsel
Henry Schein, Inc.
135 Duryea Road
Melville, NY 11747
(516) 843-5906
(516) 843-5532 FAX

Bill Connors
Portfolio Manager
Huff Asset Management
67 Park Place
9th Floor
Morristown, NJ 07960
(973) 984-1233
(973) 984-1126 FAX

Michael J. Kluger
Managing Director
Liberty Partners
1177 Avenue of the Americas
New York, NY 10036
(212) 354-7676
(212) 354-0336 FAX

John P. Byrnes
President & Chief Executive Officer
Lincare Holdings Inc.
19337 US 19 North
Suite 500
Clearwater, FL 33764
(727) 530-7700
(727) 532-9692 FAX

William Dawson
Senior Vice President - Business
Development
McKessonHBOC, Inc.
One Post Street
San Francisco, CA 94104-5296
(415) 983-8680
(415) 983-8826 FAX
NOTE: Interested in Pharmacy Distribution
Side of Business ONLY.

Barry A. Posner
Vice President – Secretary & General
Counsel
MIM Corporation
100 Clearbrook Road
Elmsford, NY 10523
(914) 460-1638
(914) 420-5555
(914) 460-1670 FAX

NOV 16 1999 03:38 FR BT ALEX. BROWN    410 895 4582 TO 91303672787799    P.04/07

NOV 15 1999 17:50 FR CORAM HEALTHCARE EXEC303 672 8199 TO 31718418442

**Deutsche Bank** 

ONE SOUTH STREET
BALTIMORE, MARYLAND 21202
Deutsche Banc Alex. Brown

Catherine I. Orcany
Vice President, Mergers and Acquisitions
Omnicare
100 East RiverCenter Blvd.
Suite 1600
Covington, KY 41011
(606) 392-3345
(606) 392-3330 FAX

Dan O'Keefe
Analyst
(212) 753-6300
Patricof & Co. Ventures, Inc.
445 Park Avenue
New York, NY 10022
(212) 753-6300
(212) 319-6155 FAX

Robert L. Myers
Priority Healthcare Corporation
President & Chief Executive Officer
10333 N. Meridian
Suite 300
Indianapolis, IN 46290
(407) 869-7001
(407) 772-3802 FAX

Jeffrey A. Jones
President & Chief Executive Officer
ProVantage Health Services
N 19th West 24130
Waukesha, WI 53188
(414) 641-3759
(414) 641-3770 FAX

Patrick C. Kelly
Chairman & Chief Executive Officer
PSS World Medical Inc.
4345 Southpoint Blvd.
Jacksonville, FL 32216
(904) 332-3000
(904) 332-3395 FAX

Craig Albright
Executive Vice President
Rencor, Inc.
16980 Via Tazon, Suite 240
San Diego, CA 92127
(650) 688-0810
(650) 688-0811 FAX

Martin Mannion
General Partner
Summit Partners
600 Atlantic Avenue, Suite 2800
Boston, MA 02210-2227
(617) 824 – 1010
(617) 824 – 1100 FAX

Ann Koosed
Associate
Sterling Ventures Ltd
276 Post Road West
Westport, CT 06880
(203) 226-8711
(203) 454-5780 FAX

Richard D. Tadler
Managing Director
TA Associates
High Street Tower
125 High Street , Suite 2500
Boston, MA 02110
(617) 574 – 6708
(617) 574 – 6728 FAX

Judy Uhl
Chief Executive Officer
Theracom, Inc.
266 Harristown Road
Glen Rock, NJ 07452
(201) 612-7100
(210) 612-7676 FAX

**B29**

NOV 15 1999 17:50 FR CORAM HEALTHCARE EXECSOF

**Deutsche Bank**

ONE SOUTH STREET
BALTIMORE, MARYLAND 21202
Deutsche Banc Alex. Brown

David Mayer
Principal
Thoma Cressey Equity Partners
Sears Tower
44th Floor
233 S. Wacker Dr.
Chicago, IL 60606
(312) 777-4430
(312) 777-4445 FAX

Bob Zimmerman
Chief Financial Officer
Walgreen's Health Initiatives
520 Lake Cook Road
Deerfield, IL 60015
(847) 374-2640
(847) 374-2645 FAX

James Bigl
President and CEO
York Prescription Benefits
1 Church Street
New Haven, CT 06510
(888) 781-2707
(203) 781-4896 FAX

11/18'99  18:03 FAX 212 738 5305      BLACK ACRE CAPITAL      @006/023

FROM SCHULTE ROTH & ZABEL LLP n2          (THU) 11. 18' 99 16:19/ST. 16:17/NO. 4260783807 P  6

## EMPLOYMENT AGREEMENT

This Employment Agreement (this "Agreement") is made as of August 1, 1999, by Corbinus Capital Management, L.P., a Delaware limited partnership (the "Employer"), and Daniel Crowley, an individual resident at _____ (the "Executive").

### RECITALS

The Employer desires the Executive's employment with the Employer, and the Executive wishes to accept such employment, upon the terms and conditions set forth in this Agreement.

### AGREEMENT

The Employer desires the Executive's employment with the Employer, and the Executive wishes to accept such employment, upon the terms and conditions set forth in this Agreement.

The Parties, intending to be legally bound, agree as follows:

1.  **Definitions**

For the purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.

"Agreement" means this Employment Agreement, as amended from time to time.

"Affiliate" means any entity owned or controlled by funds or accounts managed, directly or indirectly, by the Employer or Stephen A. Feinberg.

"Basic Compensation" means Salary and Benefits.

"Benefits" is defined in Section 3.1(b).

"Bonus Amount" is defined in Section 3.2.

"Competitive Business" is defined in Section 8.2(a).

"Confidential Information" means any and all:

(a)    trade secrets concerning the business and affairs of the Employer and its Affiliates (including Portfolio Companies), product specifications, data, know-how, formulas, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current, and planned research and development, current and planned manufacturing or distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans,

NYLIB4/580091.1

CERB 01351

B31

12/18/99  18:04 FAX 212 758 5303        BLACK ACRE CAPITAL        @007/023

FROM SCHULTE ROTH & ZABEL LLP #2              (THU)11. 18' 99 16:19/ST. 16:17/NO. 4260785807 P  7

computer software and programs (including object code and source code), computer software and database technologies, systems, structures, and architectures (and related formulas, compositions, processes, improvements, devices, know-how, inventions, discoveries, concepts, ideas, designs, methods and information), and any other information, however documented, that is a trade secret within the meaning of all applicable state, federal and common law; and

(b)    information concerning the business and affairs of the Employer or its Affiliate (including Portfolio Companies) (which includes historical financial statements, financial projections and budgets, historical and projected sales, capital spending, budgets and plans, the names and backgrounds of key personnel, personnel training and techniques and materials), however documented; and

(c)    notes, analysis, compilations, studies, summaries, and other material prepared by or for the Employer or its Affiliates (including Portfolio Companies) containing or based, in whole or in part, on any information included in the foregoing.

"Covered Portfolio Company" means any Portfolio Company as to which, at the request of the Employer, the Executive serves as Chief Executive Officer during the term of this Agreement.

"disability" is defined in Section 6.2.

"Dispossession" is defined in Section 8.2(d).

"Effective Date" means the date of this Agreement.

"Employer Invention" means any idea, invention, technique, modification, process or improvement (whether patentable or not), any industrial design (whether registerable or not), any mask work, however fixed or encoded, that is suitable to be fixed, embodied or programmed in a semiconductor production (whether recordable or not), and any work of authorship (whether or not copyright protection may be obtained for it) created, conceived, or developed by the Executive, either solely or in conjunction with others, during the Employment Period, or a period that includes a portion of the Employment Period, that relates in any way to, or is useful in any manner in, the business then being conducted or proposed to be conducted by the Employer or its Affiliates (including Portfolio Companies), and any such item created by the Executive, either solely or in conjunction with others, following termination of the Executive's employment with the Employer or its Affiliates (including Portfolio Companies), that is based upon or uses Confidential Information.

"Employment Period" means the term of the Executive's employment under this Agreement.

"Fiscal Year" means the Employer's fiscal year, as it exists on the Effective Date or as changed from time to time.

- 2 -

CERB 01352

"for cause" is defined in Section 6.3.

"for good reason" is defined in Section 6.4.

"General Partner" means Craig Court, Inc., the general partner of the Employer.

"Options" is defined in Section 3.3.

"person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, or governmental body.

"Portfolio Company" means any corporation, partnership, joint venture or similar entity or arrangement in which the Employer or any of its Affiliates has made a debt or equity investment, and for which Executive is rendering services as an employee thereof, consultant thereto, or on behalf of Employer.

"Post-Employment Period" is defined in Section 8.2.

"Proprietary Items" is defined in Section 7.2(a)(iv).

"Salary" is defined in Section 3.1(a).

2.    Employment Terms and Duties

2.1    Employment

The Employer hereby employs the Executive, and the Executive hereby accepts employment by the Employer, upon the terms and conditions set forth in this Agreement.

2.2    Term

Subject to the provisions of Section 6, the term of the Executive's employment under this Agreement will be three (3) years; provided that such term shall be automatically extended for successive one year periods unless either party provides written notice to the other within sixty (60) days before the expiry of the initial term, or any renewal term, that such party does not wish to extend the term of this Agreement.

2.3    Duties

The Executive will have such duties as are assigned or delegated to the Executive by the General Partner or Stephen A. Feinberg. The Executive will devote his entire business time, attention, skill and energy exclusively to the business of the Employer (or any Portfolio Company or Companies and as to which the Executive is assigned by the Employer), will use his best efforts to promote the success of the Employer's business (or the business of such Portfolio Company), and will cooperate fully with the General Partner in the advancement of the best interests of the Employer. Nothing in this Section 2.3, however, will prevent the Executive from

-3-

CERB 0135

11-18-99  18:04 FAX 212 758 5305        BLACK ACRE CAPITAL                      ☒009-023

FROM SCHULTE ROTH & ZABELLLP :2            (THU)11.18'99 16:20/ST. 16:17/NO. 4260783807 P  9

(a) engaging in additional activities in connection with personal investments and community affairs that are not inconsistent with the Executive's duties under this Agreement or his duties to any Portfolio Company to which the Executive is assigned or (b) continuing to own and operate Dynamic Healthcare Solutions in the same lines of business currently engaged in by such firm, to the extent not inconsistent with the Executive's duties under this Agreement or his duties to any Portfolio Company to which the Executive is assigned. If the Executive is elected as a managing director of the Employer or as a director or officer of any of its Affiliates (other than any Portfolio Company), the Executive will fulfill his duties as such director or officer without additional compensation.

3.      Compensation

3.1     Basic Compensation

(a)     Salary. The Executive will be paid a monthly salary of $80,000, subject to adjustment as provided below (the "Salary"), which will be payable in equal periodic installments according to the Employer's customary payroll practices. The Salary may be reduced to $60,000 per month in the discretion of the General Partner if the Executive ceases to serve as Chief Executive Officer of two or more Portfolio Companies. The Salary shall be reduced and offset, on a dollar for dollar basis, for any directors fees, salary, consulting payments, bonuses or other cash incentive payments that the Executive may receive from any Portfolio Company other than Coram Healthcare ("Coram").

(b)     Benefits. The Executive will, during the Employment Period, be permitted to participate in such pension, profit sharing, bonus, life insurance, hospitalization, major medical and other employee benefit plans of the Employer that may be in effect from time to time, to the extent the Executive is eligible under the terms of those plans (collectively, the "Benefits"). The obligation of Employer to provide the Benefits shall be suspended for each period of time as the Executive shall receive substantially equivalent benefits from a Portfolio Company.

3.2     Bonuses

(a)     As additional compensation for the services to be rendered by the Executive pursuant to this Agreement, the Employer will pay the Executive with respect to Covered Portfolio Companies (other than Coram), the Adjusted Net Profit Share from all Investments in the Covered Portfolio Companies (other than Coram) during the Employment Period, determined as of the last day of each Applicable Period (the "Bonus Amount"). The Adjusted Net Profit Share in respect of an Applicable Period means the amount equal to, without duplication, (A) 20% of the gains actually realized in cash on the Investments in the Covered Portfolio Companies (other than Winterland) during such Applicable Period, and 30% of the gains actually realized in cash in on the Investments in Winterland (if Winterland is a Covered Portfolio Company) during such Applicable Period, plus (B) 20% of any income from Investments in the Covered Portfolio Companies (other than Winterland), including investment income, dividends and other amounts actually received during such Applicable Period and 30% of any income from Investments in Winterland (if Winterland is a Covered Portfolio Company), including investment income, dividends and other amounts actually received during each

- 4 -

CERB 01354

B34

11/18/99  18:02 FAX 212 758 5305       BLACK ACRE CAPITAL                    @010:023

FROM SCHULTE ROTH & ZABEL LLP  #2          (THU)11. 18' 99 16:20/ST. 16:17/NO. 4260783807 P 10

Applicable Period, plus (C) in the case of the final Applicable Period only, 10% of unrealized gains on all Investments in Covered Portfolio Companies (other than Winterland) owned at the end of such Applicable Period and 15% of unrealized gains on all Investments in Winterland (if Winterland is a Covered Portfolio Company) owned at the end of such Applicable Period, minus (D) 30% of all losses actually realized on Investments in the Covered Portfolio Companies (other than Winterland) during such Applicable Period and 30% of all losses actually realized on Investments in Winterland (if Winterland is a Covered Portfolio Company) during such Applicable Period, minus (b) with respect to Investments in the Covered Portfolio Companies owned on the last day of such Applicable Period, 20% of the Net Unrealized Loss (as defined below) if any, with respect to all such Investments other than Winterland and 30% of the Net Unrealized Loss if any with respect to all Investments in Winterland (if Winterland is a Covered Portfolio Company), provided, that if there shall be a Net Unrealized Loss for an Applicable Period which reduces the amount otherwise payable as a Bonus Amount for that Applicable Period, the Cost of the Investments in each of the Covered Portfolio Companies (or in Winterland, if applicable) shall, for the purpose of determining realized and unrealized gains or losses in a subsequent Applicable Period, be reduced, on a pro rata basis by the amount by which the Bonus Amount had been reduced, minus (F) an amount equal to the product of (x) 20% in the case of all Investments in Covered Portfolio Companies (other than Winterland) and 30% in the case of Winterland (if Winterland is a Covered Portfolio Company) and (y) an amount equal to interest at the rate of 14%, compounded annually, on the Cost of Investments in each such Covered Portfolio Company, from the date of such Investment to the date of Disposition, if sold during such Applicable Period, or the last day of such Applicable Period, if not sold, minus (G) 20% (or in the case of Winterland, if Winterland is a Covered Portfolio Company, 30%) of the excess of realized losses over realized gains in any prior Applicable Period, to the extent not previously taken into account for this purpose, minus (H), to the extent not otherwise included in Cost, 20% of all expenses relating to Investments in the Covered Portfolio Companies, including brokerage and transaction costs (to the extent not included above), custodial fees and expenses and any other overhead expenses or expenses hereunder.

(b)     For purposes of valuing the items included in Adjusted Net Profit (all such values being determined as of the last business day of an Applicable Period), all securities, including securities listed on a securities exchange or quoted on the National Association of Securities Dealers, Inc. Automated Quotation System ("NASDAQ"), shall be valued based upon available quotations therefor. In the case of securities not listed on a securities exchange or quoted on NASDAQ, but for which there are available quotations, such valuation shall be based upon quotations obtained by the Employer from market makers, dealers or pricing services. Notwithstanding the foregoing, all valuations shall be equal to the valuation of such securities, properties, assets and liabilities relating to the Investments in the Covered Portfolio Companies based upon the values set forth in the audited financial statements of the investment funds or managed accounts owning all such Investment to the extent applicable, or as otherwise determined in accordance with the same valuation methods and procedures as are used in determining the valuations in such audited financial statements.

(c)     For purposes of this Agreement: "Applicable Period" means each of the three successive 12-month periods following the Effective Date and each 12-month period of any

- 5 -

CERB 01355

renewal term hereunder, *provided,* that if the Executive's employment hereunder terminates pursuant to Section 6.1(a) or Section 6.1(c), the then-current Applicable Period shall end on the date of such termination and shall not be followed by any additional Applicable Periods; "Cost" means the purchase price paid for any Investment in a Covered Portfolio Company, together with all transaction and other costs relating thereto; "Investments" means securities or other obligations of, or interests in, entities or individuals, including publicly or privately traded or quoted equity or debt, indebtedness to banks or other financial institutions; and "Net Unrealized Loss" means the positive difference, if any, between (a) the Cost of all Covered Portfolio Companies as of the date of determination of Net Unrealized Loss and (b) the value of all Covered Portfolio Companies as of the date of determination of Net Unrealized Loss.

To the extent that the Executive receives any non-cash incentive compensation (such as a stock option or restricted stock grants) other than from Corum, the Executive shall, to the extent he may lawfully do so, assign to the Employer such stock option or restricted stock grants, or shall otherwise transfer to the Employer the after-tax benefit realized by the Executive from such incentive compensation (whether or not the Executive realizes such benefit during the term of this Agreement).

3.3    Options to Purchase Shares

The Executive will have the option to purchase, from the Employer or its Affiliate that owns the Investment, up to three percent (3%) of the shares of capital stock of each Covered Portfolio Company (other than Corum) owned by Employer or such Affiliate (the "Options"), at the Cost of such Investment; provided that such option shall not be exercisable (x) until immediately prior to the termination or expiration of this Agreement or (y) if the Executive shall be entitled to receive any payment of any Bonus Amount pursuant to Section 3.2.

3.4    Right of Refusal

From time to time the Employer may request that the Executive become the Chief Executive Officer of a Portfolio Company. If the Executive accepts such request (which acceptance shall be at the Executive's sole discretion), the Executive will be entitled to receive such Salary, Benefits and bonus as may be negotiated between the Executive and such Portfolio Company, as the case may be, subject to the offset provisions of Sections 3.1 and 3.2. If the Executive declines such request, the Executive will not be entitled to receive any Bonus Amount related to such Portfolio Company.

3.5    Relocation

The Employer will have no right to cause the Executive to permanently relocated from his primary residence.

4.    Expenses

The Employer will pay on behalf of the Executive (or reimburse the Executive for) reasonable expenses incurred by the Executive at the request of, or on behalf of, the Employer in

-6-

CERB 01356

11/18/99  16:08 FAX 212 758 5305        BLACK ACRE CAPITAL                    @012/023

FROM SCHULTE ROTH & ZABELLLP #2            (THU)11. 18'99 16:21/ST. 16:17/NO. 4260785807 P 12

the performance of the Executive's duties pursuant to this Agreement, and in accordance with the Employer's employment policies. The Executive must file expense reports with respect to such expenses in accordance with the Employer's policies.

5.    Vacations and Holidays

The Executive will be entitled to paid vacation each Fiscal Year in accordance with the vacation policies of the Employer in effect for its executive officers from time to time. Vacation must be taken by the Executive at such time or times as approved by the General Partner, and as are consistent with the Executive's responsibilities to any Portfolio Company. The Executive will also be entitled to the paid holidays and other paid leave set forth in the Employer's policies. Vacation days and holiday during any Fiscal Year that are not used by the Executive during such Fiscal Year may not be used in any subsequent Fiscal Year.

6.    Termination

6.1    Events of Termination

The Employment Period, the Executive's Salary and the Executive's right to receive the Bonus Amount, and any and all other rights of the Executive under this Agreement or otherwise as an employee of the Employer will terminate (except as otherwise provided in this Section 6):

(a)    upon the death of the Executive;

(b)    upon the disability of the Executive (as defined in Section 6.2) immediately upon notice from either party to the other;

(c)    for cause (as defined in Section 6.3), immediately upon notice from the Employer to the Executive, or at such later time as such notice may specify;

(d)    for good reason (as defined in Section 6.4) upon not less than 30 days' prior notice from the Executive to the Employer; or

(e)    without cause, at any time and in the Employer's sole discretion, upon written notice to the Executive of such termination.

6.2    Definition of Disability

For purposes of Section 6.1, the Executive will be deemed to have a "disability" if, for physical or mental reasons, the Executive is unable to perform the Executive's duties under this Agreement for 45 consecutive days, or 90 days during any twelve month period, as determined in accordance with this Section 6.2. The disability of the Executive will be determined by a medical doctor selected by written agreement of the Employer and the Executive upon the request of either party by notice to the other. If the Employer and the Executive cannot agree on the selection of a medical doctor, each of them will select a medical doctor and the two medical doctors will select a third medical doctor who will determine whether the Executive has a disability. The determination of the medical doctor selected under this Section 6.2 will be

- 7 -

SRZ:N:N:19459V7

CERB 01357

11/18/99  18:06 FAX 212 758 5305          BLA___ __APITAL                    @013/023

FROM SCHULTE ROTH & ZABEL LLP a2          (THU) 11. 18' 99 16:21/ST. 16:17/NO. 4260783807 P 13

binding on both parties. The Executive must submit a reasonable number of examinations by the medical doctor making the determination of disability under this Section 6.2, and the Executive hereby authorized the disclosure and release to the Employer of such determination and all supporting medical records. If the Executive is not legally competent, the Executive's legal guardian or duly authorized attorney-in-fact will act in the Executive's stead, under this Section 6.2, for the purposes of submitting the Executive to the examinations, and providing the authorization of disclosure, required under this Section 6.2.

6.3    Definition of "For Cause"

For purposes of Section 6.1, the phrase "for cause" means: (a) the Executive's material breach of this Agreement; (b) the Executive's: (i) failure to follow the reasonable instructions of the Employer, the General Partner, Stephen A. Feinberg or the Board of Directors of any Portfolio Company, or (ii) failure to adhere to any written Employer or Affiliate (including any Portfolio Company) policy or cure his failure to comply (which reasonable opportunity must be granted during the ten-day period preceding termination of the Executive's employment under this Agreement); (c) the appropriation (or attempted appropriation) of a material business opportunity of the Employer or any of its Affiliates (including any Portfolio Company), including attempting to secure or securing any personal profit in connection with any transaction entered into on behalf of the Employer or any of its Affiliates (including any Portfolio Company); (d) the misappropriation (or attempted misappropriation) of any of the funds or property of the Employer, any of its Affiliates or any Portfolio Company; (e) the conviction of, contact with respect to a felony, the equivalent thereof, or any other crime with respect to which imprisonment is a possible punishment or as a result of which, in the good faith judgment of the Board of Directors of any Portfolio Company, it shall no longer be appropriate for the Executive to continue to serve as an employee of or consistent to such Portfolio Company; or (f) any other act on the part of the executive involving dishonesty toward the Employer, its Affiliates or any Portfolio Company.

6.4    Definition of "For Good Reason"

For purposes of Section 6.1, the phrase "for good reason" means the Employer's material breach of this Agreement.

6.5    Termination Pay

Effective upon the termination of the Executive's employment under this Agreement, the Employer will be obligated to pay the Executive (or, in the event of his death, his designated beneficiary as defined below) only such compensation as is provided in this Section 6.5, and in lieu of all other amounts and in settlement and complete release of all claims the Executive may have against the Employer. For purposes of this Section 6.5, the Executive's designated beneficiary will be such individual beneficiary or trust, located at such address, as the Executive may designate by notice to the Employer from time to time or, if the Executive fails to give notice to the Employer of such a beneficiary, the Executive's estate. Notwithstanding the preceding sentence, the Employer will have no duty, in any circumstances, to attempt to open an

- 8 -

CERB 01358

estate on behalf of the Executive, to determine whether any beneficiary designated by the Executive is alive or to ascertain the address of any such beneficiary, to determine the existence of any trust, to determine whether any person or entity purporting to act as the Executive's personal representative (or the trustee or a trust established by the Executive) is duly authorized to act in that capacity, or to locate or attempt to locate any beneficiary, personal representative, or trustee.

(a)     Termination by the Executive for Good Reason. If the Executive terminates his employment under this Agreement for good reason, the Employer will pay the Executive (i) the Executive's Salary for the remainder of the term of this Agreement and (ii) all Bonus Amounts, determined consistent with this Agreement as of the date of termination, with respect to all Portfolio Companies.

(b)     Termination by the Employer for Cause. If the Employer terminates the Executive's employment under this Agreement for cause, the Executive will be entitled to receive his Salary only through the date such termination is effective, but will not be entitled to any further Salary or any Bonus Amount.

(c)     Termination Upon Disability. If the Executive's employment under this Agreement is terminated by either party as a result of the Executive's disability, as determined under Section 6.1, the Employer will pay the Executive his Salary through the remainder of the calendar month during which such termination is effective and for the lesser of (i) twenty-six (26) consecutive weeks thereafter, or (ii) the period until disability insurance benefits commence under the disability insurance coverage furnished by the Employer to the Executive.

(d)     Termination upon Death. If the Executive's employment under this Agreement is terminated because of the Executive's death, the Executive will be entitled to receive his Salary through the end of the calendar month in which his death occurs.

(e)     Termination Without Cause Pursuant to Section 6.1(e). If the Executive is terminated pursuant to Section 6.1(e) without cause prior to the expiration of the initial three-year term, the Executive shall continue to receive (i) all Salary payments to be made to him pursuant to Section 3.1(a) hereof, and (ii) all Bonus Amounts, determined consistent with this Agreement as of the date of termination, with respect to all Portfolio Companies.

(f)     Benefits. The Executive's accrual of, or participation in plans providing for, the Benefits will continue so long as the Executive continues to receive Salary payments.

7.   Non-disclosure Covenant; Employee Inventions

    7.1   Acknowledgments by the Executive

    The Executive acknowledges that (a) during the Employment Period and as part of his employment, the Executive will be afforded access to Confidential Information; (b) public disclosure of such Confidential Information could have an adverse effect on the Employer, its Affiliates, Portfolio Companies and their respective interests and businesses; (c) because the

-9-

CONFIDENTIAL

CERB 01359

11/18/99  19:67 FAX 212 738 3305        BLACK ACRE CAPITAL                    @013.023

FROM SCHULTE ROTH & ZABELLLP #2              (THU)11. 18' 99 16:22/ST. 16:17/NO. 4260783807 P 15

Executive possesses substantial technical expertise and skill with respect to the Employer's business, the Employer desires to obtain exclusive ownership of such Employee Invention, and the Employer will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each Employee Invention; and (d) the provisions of this Section 7 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information and to provide the Employer and its Affiliates with exclusive ownership of all Employee Inventions.

7.2    Agreements of the Executive

In consideration of the compensation and benefits to be paid or provided to the Executive by the Employer under this Agreement, the Executive covenants as follows:

(a)    Confidentiality

(i)    During and following the Employment Period, the Executive will hold in confidence the Confidential Information and will not disclose it to any person except with the specific prior written consent of the Employer or except as otherwise expressly permitted by the terms of this Agreement.

(ii)    Any trade secrets of the Employer, its Affiliates or any Portfolio Company will be entitled to all of the protections and benefits under applicable state, federal or common trade secret law and any other applicable law. If any information that the Employer deems to be a trade secret for purposes of this Agreement, such information will, nevertheless, be considered Confidential Information for purposes of this Agreement. The Executive hereby waives any requirement that the Employer submit proof of the economic value of any trade secret or post a bond or other security.

(iii)    None of the foregoing obligations and restrictions applies to any part of the Confidential Information that the Executive demonstrates was or became generally available to the public other than as a result of a disclosure by the Executive.

(iv)    The Executive will not remove from the premises of the Employer or any Portfolio Company (except to the extent such removal is for purposes of the performance of the Executive's duties at home or while travelling, or except as otherwise specifically authorized by the Employer) any document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items") The Executive recognizes that, as between the Employer and the Executive (or any Portfolio Company), all of the Proprietary Items, whether or not developed by the Executive, are the exclusive property of the Employer or such Portfolio Company, as the case may be. Upon termination of the Executive's employment under this Agreement by either party, or upon the request of the Employer during the Employment Period, the Executive will return to the Employer all of the Proprietary Items in the Executive's possession or subject to the Executive's

-10-

CERB 01360

control, and the Executive shall not retain any copies, abstracts, sketches, or other physical embodiment of any of the Proprietary Items.

(b)    Employee Inventions.  Each Employee Invention will belong exclusively to the Employer, its Affiliates or a Portfolio Company, as the case may be.  The Executive acknowledges that all of the Executive writing, works or authorship, specifically commissioned works, and other Employee Inventions are works made for hire and the property of the Employer, its Affiliates or a Portfolio Company, as the case may be, including any copyrights, patents, or other intellectual property rights pertaining thereto.  If it is determined that any such works are not works made for hire, the Executive hereby assigns to the Employer or to the applicable Portfolio Company, as the case may be, all of the Executive right, title, and interest, including all rights of copyright, patent and other intellectual property rights, to or in such Employee Inventions.  The Executive covenants that he will promptly:

(i)    disclose to the Employer or such Portfolio Company, as the case may be, in writing any Employee Invention;

(ii)    assign to the Employer or such Portfolio Company, as the case may be, at the Employer's request and without additional compensation, all of the Executive's right to the Employee Invention for the United States and all foreign jurisdictions;

(iii)    execute and deliver to the Employer or such Portfolio Company, as the case may be, such applications, assignments, and other documents as the Employer or such Portfolio Company, as the case may be, may request in order to apply for and obtain patents or other registrations with respect to any Employee Invention in the United States and any foreign jurisdictions;

(iv)    sign all other papers necessary to carry out the above obligations; and

(v)    give testimony and render any other assistance (but without expense to the Executive) in support of the rights of the Employer or such Portfolio Company, as the case may be, to any Employee Invention.

(c)    Policies and Procedures.  As an employee of the Employer, the Executive agrees that he will comply with all policies and procedures of the Employer applicable to its employees, including, without limitation, policies and procedures relating to the purchase and sale of securities.

7.3    Disputes or Controversies

The Executive recognizes that should a dispute or controversy arising from or relating to this Agreement be submitted for adjudication to any court, arbitration panel, or other third party, the preservation of the secrecy of Confidential Information may be jeopardized.  All

- 11 -

CERB 01361

-11/18:99  18:08 FAX 212 758 3303      BLACK ACRE CAPITAL                      ☑017/023

FROM SCHULTE ROTH & ZABEL LLP x2        (THU)11.18'99 16:22/ST.16:17/NO.4260783807 P 17

pleadings, documents, testimony, and records relating to any such adjudication will be maintained in secrecy and will be available for inspection by the Employer, the Executive, and their respective attorneys and experts, who will agree, in advance and in writing, to receive and maintain all such information in secrecy, except as may be limited by them in writing.

8.    Noncompetition And Non-Interference

    8.1    Acknowledgments by the Executive

    The Executive acknowledges that: (a) the services to be performed by him under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Employer's business, and the businesses of its Affiliates and Portfolio Companies, are national in scope and its products are marketed throughout the United States, (c) the Employer, its Affiliates and Portfolio Companies each compete with other businesses that are or could be located in any part of the United States, and (d) the provisions of this Section 8 are reasonable and necessary to protect the Employer's business.

    8.2    Covenants of the Executive

    In consideration of the acknowledgments by the Executive, and in consideration of the compensation and benefits to be paid or provided to the Executive by or on behalf of the Employer, the Executive covenants that he will not, directly or indirectly:

        (a)    during the Employment Period, except in the course of his employment hereunder, and during the Post-Employment Period, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend the Executive's name or any similar name to, lend the Executive's credit to or render services or advice to, any Competitive Business, defined as any business (i) whose products or activities compete in whole or in part with the products or activities of any Covered Portfolio Company or (ii) for which (x) the Employer has granted a confidentiality covenant in connection with the purchase or potential purchase of such business (or any of its assets or debt or equity securities) in contemplation of such business becoming a Portfolio Company and (y) the Executive has assisted the Employer in analyzing such purchase or potential purchase; provided, that the Executive may continue to own and operate, in accordance with past practice, Dynamic Healthcare Solutions in the same lines of business engaged in by such firm as the Effective Date;

        (b)    whether for the Executive's own account or the account of any other person (i) at any time during the Employment Period and the Post-Employment Period, solicit, employ, or otherwise engage as an employee, independent contractor, or otherwise, any person who is or was an employee of the Employer, its Affiliates or any Portfolio Company, at any time during the Employment Period or in any manner induce or attempt to induce any employee of the Employer or any such Affiliate or Portfolio Company to terminate his employment with the Employer; or (ii) at any time during the Employment Period and the Post-Employment Period, at any Portfolio Company,

12

CERB 01362

B42

11/13/99  18:09 FAX 212 758 5305      BLACK ACRE CAPITAL      ☐018/023

FROM SCHULTE ROTH & ZABELLLP  27      (THU)11.18'99 16:23/ST.16:17/NO.4260783807 P 18

interfere with such Portfolio Company's relationship with any person, including any person who at any time during the Employment Period was an employee, contractor, supplier, or customer of such Portfolio Company;

(c)     at any time during or after the Employment Period, disparage the Employer, the General Partner, Stephen A. Feinberg and his Affiliates or any Portfolio Company or any of their partners, members, shareholders, directors, officers, employees, or agents; or

(d)     in the event the Employer or any of its Affiliates sells, transfers or otherwise disposes (a "Disposition") of a Covered Portfolio Company and, as part of such Disposition, the Employer or such Affiliate has granted a noncompetition covenant to the purchaser, take any action which would (or would reasonably be expected to) cause a violation of such noncompetition covenant.

For purposes of this Section 8.2, the term "Post-Employment Period" means the one year period beginning on the date of termination of the Executive's employment with the Employer.

If any covenant in this Section 8.2 is held to be unreasonable, arbitrary, or against public policy, such covenant will be considered to be divisible with respect to scope, time, and geographic area, and each lesser scope, time, or geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary, and not against public policy, will be effective, binding, and enforceable against the Executive.

The period of time applicable to any covenant in this Section 8.2 will be extended by the duration of any violation by the Executive of such covenant.

The Executive will, while the covenant under this Section 8.2 is in effect, give notice to the Employer, within ten days after accepting any other employment, of the identity of the Executive's employer. The Employer may notify such employer that the Executive is bound by this Agreement and, at the Employer's election, furnish such employer with a copy of this Agreement or relevant portions thereof.

9.     General Provisions

9.1     Injunctive Relief and Additional Remedy

The Executive acknowledges that the injury that would be suffered by the Employer, its Affiliates or any Portfolio Company as a result of a breach of the provisions of this Agreement (including any provision of Sections 7 and 8) would be irreparable and that an award of monetary damages to the Employer or any such Affiliate or Portfolio Company for such a breach would be an inadequate remedy. Consequently, the Employer or such Affiliate or Portfolio Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement. Without limiting their rights under this Section 9 or any other remedies of the

- 13 -

CERB 01363

Employer or any such Affiliate or Portfolio Company, if the Executive breaches any of the provisions of Section 7 or 8, the Employer will have the right to cease making any payments otherwise due to the Executive under this Agreement. Each of the parties to this Agreement will be responsible for its own attorneys fees in relation to any remedies sought under this Agreement.

**9.2    Covenants of Sections 7 and 8 are essential and Independent Covenants**

The covenants by the Executive in Sections 7 and 8 are essential elements of this Agreement, and without the Executive's agreement to comply with such covenants, the Employer would not have entered into this Agreement or employed or continued the employment of the Executive. The Employer and the Executive have independent consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Employer, its affiliates and Portfolio Companies.

The Executive's covenants in Sections 7 and 8 are independent covenants and the existence of any claim by the Executive against the Employer under this agreement or otherwise will not excuse the Executive's breach of any covenant in Section 7 or 8.

If the Executive's employment hereunder expires or is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of the Executive in Sections 7 and 8.

**9.3    Representations and Warranties by the Executive**

The Executive represents and warrants to the Employer that the execution and delivery by the Executive of this Agreement do not, and the performance by the Executive of the Executive's obligations hereunder or his services to any Portfolio Company will not, with or without the giving of notice or the passage of time, or both: (a) violate any judgment, writ, injunction, or order of any court, arbitrator, or governmental agency applicable to the Executive; or (b) conflict with, result in the breach of any provisions of or the termination of, or constitute a default under, any agreement to which the Executive is a party or by which the Executive is or may be bound.

**9.4    Obligations Contingent on Performance**

The obligation of the Employer hereunder, including its obligation to pay the compensation provided for herein, are contingent upon the Executive's performance of the Executive's obligations hereunder.

**9.5    Indemnity and Insurance**

It is understood and agreed that the Executive shall be covered by, and entitled to the benefits of, Employer's insurance coverage (as in effect from time to time) for its officers and/or executive employees, including its officers and directors liability policies. In addition, in the event that any claim is asserted against the Executive arising out of the performance of his duties

- 14 -

CERB 01364

under and in accordance with this Agreement, Employer shall provide legal representation to the Executive at Employer's or a Portfolio Company's sole cost and expense, such counsel to be selected at the reasonable discretion of Employer.

### 9.6    Waiver

The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by either party in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

### 9.7    Binding Effect; Delegation of Duties Prohibited

This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto and their respective successors, assigns, heirs, and legal representatives, including any entity with which the Employer may merge or consolidate or to which all or substantially all of its assets may be transferred. The duties and covenants of the Executive under this Agreement, being personal, may not be delegated. Notwithstanding anything to the contrary set forth herein, the Employer reserves the right to cause all Salary and Benefits, any Bonus Amount or any other payment to the Executive to be paid or reimbursed or allocated to a Portfolio Company (other than Coram) or another entity in which the Employer or its Affiliates would have an interest; provided, that the Employer shall continue to be obligated for all such Salary, Benefits, Bonus Amount or other payments to the extent such Portfolio Company or other entity fails to make such payment.

### 9.8    Notices

All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and facsimile numbers set forth below (or to such other addresses and facsimile numbers as a party may designate by notice to the other parties):

- 15 -

SRDIT:4002507

CERB 01365

FROM SCHULTE ROTH & ZABELLLP #2                    (THU) 11. 18' 99 16:24/ST. 16:17/NO. 4260783807 P 21

If to the Employer:          Cerberus Capital Management, L.P.
                             450 Park Avenue
                             28th Floor
                             New York, NY 10022-2605
                             Attention: Stephen A. Feinberg
                                        Mark A. Neporent
                             Facsimile No.: 212-758-5305

With a copy to:              Schulte Roth & Zabel LLP
                             900 Third Avenue
                             New York, New York 10022
                             Attention: Stuart D. Freedman
                             Facsimile No.: (212) 832-4169

If to the
Executive:

With a copy to:

### 9.9    Entire Agreement; Amendments

This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, between the parties hereto with respect to the subject matter hereof. This Agreement may not be amended orally, but only by an agreement in writing signed by the parties hereto.

### 9.10    Governing Law

This Agreement will be governed by the laws of the State of New York without regard to conflicts of laws principles.

### 9.11    Jurisdiction

Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against either of the parties in the courts of the State of New York, or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of New York, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any

- 16 -

CERB 01366

B46

objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on either party anywhere in the world.

### 9.12   Section Headings, Construction

The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement unless otherwise specified. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

### 9.13   Severability

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

### 9.14   Counterparts

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

### 9.15   Waiver of Jury Trial

THE PARTIES HERETO HEREBY WAIVE A JURY TRIAL IN ANY LITIGATION WITH RESPECT TO THIS AGREEMENT.

-17-

CERB 01367

B47

FROM SCHULTE ROTH & ZABELLLP ±2          (THU)11. 18' 99  16:24/ST. 16:17/UD. 4260783807 P 23

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date above first written above.

EMPLOYER                              EXECUTIVE:

CERBERUS CAPITAL
MANAGEMENT, L.P.                      Daniel Crowley

By:  Craig Court, Inc., its
General Partner

By:

CERB 01368

B48

FROM SCHULTE ROTH & ZABELLLP #2          (THU)11. 18' 99  16:24/ST. 16:17/NO. 4260783667 P 23

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date above first written above.

EMPLOYER                                    EXECUTIVE:

CERBERUS CAPITAL                            _Daniel Crowley_
MANAGEMENT, L.P.                            Daniel Crowley

By:   Craig Court, Inc., its
General Partner

By:

CERB 01369

@001/001          BLACK ACRE CAPITAL          11/18/99  18:20 FAX 212 788 6306

B49