PERSONAL & CONFIDENTIAL

24 November 1999

CONFIDENTIAL

Donn Tice
Cc: K. Genda
W. Feder
S. Feinberg

Subject: Winterland

With Winterland continuing to make progress in its business, we have explored the possibility of an IPO. The general reaction is that the earnings are only just emerging and that we would realize substantially better valuation by waiting until Q2 or so of 2000. That is a multiple times $5-6M in 1999 would not be worth as much as a multiple times $10-12M for 2000. So rather than take substantively less, we believe it will be better to wait a couple of quarters.

Winterland has many execution challenges and potential positives. However, it is my belief that we need to have more critical mass and a larger list of artists to create the real optimal value. We just are too small to hit the radar screen and are too vested in four (4) artists/licenses (Ricky Martin, BackStreetBoys, Nsync, and Pokemon). Virtually 90% of our earnings come from these. We just do not have the Private Label working yet. It could break even or eek out a small profit in 2000.

To create the critical mass, I have personally contacted CMGI's Margaret Heffernan to see whether there is a way to "double down" with their Signature unit. She took my call. Here's what I told her:

- I am Chairman and represent the owners of Winterland.
- We had tried to buy Signature to have a larger list of artists and to gain greater absorption.
- Licensed apparel has some awe inspiring cash funding requirements that are hard for new entries to deal with. It takes size, earnings, a factory, management, and on going cash flow . . . . . and it's still hard.
- W/L does not have an ideal portal to capitalize on e-commerce. CMGI could be such a portal.
- W/L and Signatures are only 20 minutes away from each other in the Bay.

CONFIDENTIAL

B50

EXHIBIT
32R
4/14/07 DD

CONFIDENTIAL

- W/L and Signatures (*together*) would have synergies that would enable the combination to be better than either would be on their own. The factory would become a valuable, cost-effective, asset for both. A combined entity would have better costs (of all kinds), improved productivity, and have a better overall ability to be more effectively managed . . . and, importantly be better able to attract even more business at lower costs than either could achieve on their own.
- W/L could give CMGI some pro-rata share in an equity swap (a non-cash transaction), relieve CMGI from having to manage Signature, eliminate the need for CMGI to fund artist/license up-front demands, and . . . . give CMGI *much more* product to run through their portal.
- W/L and Signatures together would have the mass to have an IPO . . . . so their could be another economic pop for all owners. And we would represent a great acquiror for something like Giant, but at better prices than either could achieve individually.

Heffernan got it and she got it quickly. It felt like she was literally jumping at positives of the conversation. She said that I made her holiday. She said that she would talk to her Board and call me back. What she didn't say but what was also obvious was that CMGI sees the management challenge, doesn't see the fit per se, and doesn't want to even try to understand the exigencies of this "unusual" business.

Literally, five (5) minutes after I spoke to Heffernan, she called me back on my private line. She wanted to know whether I had already (or intended) discussed this idea with Del Furano or anyone else at Signatures. I told her no. She was obviously happy and said that she didn't want Del to get in the way of anything CMGI and their Board might want to do. She doesn't sound like she has any vested interest in Signature or Del Furan. She intends to NOT talk to any Signature people and to sort this out at the parent level.

**<u>Be careful to keep this opportunity to yourself so that we don't upend the possibility.</u>**

This could be the absolute best "non-cash" way to really pop the value here. Hopefully, you all agree.

Sincerely,

Dan Crowley

CONFIDENTIAL

REPORTER: LORRIE L MARCHANT, RPR, CRR, CSR NO 10523

EXHIBIT: 17

Witness: Crowley
Date: 4/10/07 # of pages: 11

Dynamic Healthcare Solutions

PERSONAL & CONFIDENTIAL

18 November 1999

To Scott Larson

RECEIVED

Don Amaral
Chairman, President & CEO
Coram Healthcare Corporation
1125 17th Street
Denver, CO 80202

Dear Mr. Amaral,

Attached is the executed copy of the Employment Agreement between myself and Coram Healthcare Corporation. Please have the appropriate individual execute the contract on behalf of Coram and return a fully executed copy to me for my files.

While the contract does not take effect until 30 November 1999, I am having Kurt Davis (~~my former SVP of Investor~~ Relations at FHC) prepare a press release. I will forward it to you for review. Note: *I am stipulating that no announcement of any kind may be made without my prior permission.*

Finally, as we discussed, I have scheduled a meeting with the Coram attorney's in my Sacramento offices on 29 November to have a careful review of the litigation between Coram and Aetna/US Healthcare.

My present intention is to be in Denver on the 30th of November to start.

Sincerely,

Dan Crowley

Daniel D. Crowley
Chairman, President & CEO

EXHIBIT
Feinberg
5
12/15/00

cc Steve Feinberg

EXHIBIT
21
2/14/07

Exhibit 5

Attachment

COR-EQTY0000382

400 Capitol Mall • Suite 1250 • Sacramento, CA 95814 916.449.6056 • 916.449.6059 fax

EMPLOYMENT AGREEMENT

AGREEMENT between Coram Healthcare Corporation, a Delaware corporation (the "Company"), and Daniel Crowley ("Executive"), made as of November 30, 1999, the date upon which Executive has executed and delivered this Agreement to the Company (the "Effective Date").

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Employment. The Company shall employ Executive, and Executive accepts employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on the date hereof and ending as provided in paragraph 5 hereof (the "Employment Period").

2. Position and Duties. During the Employment Period, Executive shall serve as the Chairman of the Board, President and Chief Executive Officer of the Company and all of its wholly-owned subsidiaries, and Executive shall have the normal duties, responsibilities and authority of the Chairman of the Board, President, and Chief Executive Officer. Executive is a former Chief Executive Officer of a Fortune 200 Company in demand to serve as Chairman of the Board, Chief Executive Officer or turn around management. Executive also owns and operates his own company, Dynamic Healthcare, that has various business interests. Executive intends to do whatever is professionally necessary to turn the Company around and the Company recognizes that Executive will have other business interests and may serve as an officer or consultant to other businesses. Executive shall have the right, with the concurrence of the Company's Board of Directors, to appoint a chief executive officer when the Company, in Executive's reasonable opinion, has been stabilized; provided, however, that such an appointment shall not be deemed to cause a termination of the Employment Period by the Company hereunder and shall not trigger payment of any amounts to Executive pursuant to Section 5(d). Upon the appointment of a successor chief executive officer pursuant to this Section 2, Executive shall retain his position as Chairman of the Board and all of the terms of this Agreement shall remain in full effect except to the extent modified in a manner which is mutually acceptable to the parties, including without limitation an adjustment to the base compensation payable hereunder.

3. Base Salary and Benefits.

(a) Executive's base salary (the "Base Salary") shall initially be $650,000 per annum, payable in cash and in accordance with the Company's general payroll practices. The Base Salary shall be reviewed annually by the Board of Directors of the Company (the "Board") and increased (but not decreased) based upon Executive's performance.

(b) In addition to the Base Salary, Executive shall be entitled to a performance bonus (the "Bonus") payable within 90 days of the end of each fiscal year based upon the Company's operating results, as follows: if earnings before interest, taxes, depreciation and amortization (EBITDA) of the Company, as measured by the audited financial statements of the Company in any one year equals or exceeds 100% of the target amounts (the "EBITDA Targets") to be determined by the Compensation Committee of the Board of Directors of the Company (consisting of at least two outside directors who will

comprise a majority of such Committee) and Executive in good faith, beginning in fiscal year 2000, Executive shall be entitled to a bonus for such year (the "Bonus") equal to the percentage set forth on Schedule A hereto of the Base Salary in effect on the last day of the Company's fiscal year for which such Bonus is payable. Any Bonus earned by Executive hereunder shall be payable by the Company in cash.

(c) Executive shall be granted options as of the Effective Date to purchase 1,000,000 shares of Common Stock of the Company (the "Option Shares") at a price equal to the closing price of the Common Stock on the New York Stock Exchange on the Effective Date. The Option Shares shall be granted to Executive under the Company's 1994 Stock Option/Stock Issuance Plan (the "Plan"). Each of the options (the "Options") shall vest and become exercisable by Executive as to 33-1/3% of the Option Shares covered thereby on each of the first, second and third anniversaries of the Effective Date, if Executive is then employed by the Company, and will vest as to 100% of the Option Shares upon: (i) a Change in Control (as defined below); (ii) any termination by the Company of this Agreement other than a termination by the Company for Cause (as defined below); (iii) any termination by Executive pursuant to paragraph 5(a)(ii) hereof; or (iv) if the Employment Period is terminated as a result of Executive's death or permanent Disability (as defined below).

For purposes of this Agreement, a Change in Control of the Company shall be deemed to have occurred if: (i) any "person" (as such term is Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), other than a trustee or other fiduciary holding securities of the Company under an employee benefit plan of the Company or the Senior Subordinated Noteholders pursuant to the Securities Exchange Agreement dated May 6, 1998, or a group composed principally thereof, becomes the "beneficial owner" (as defined in Rule 13d-3 promulgated under the Exchange Act), directly or indirectly, of securities of the Company representing 50% or more of (A) the outstanding shares of Common Stock of the Company or (B) the combined voting power of the Company's then-outstanding securities entitled to vote generally in the election of directors; (ii) during any period of not more than two consecutive years, individuals who at the beginning of such period constitute the Board, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in paragraph (i) or (iii) of this paragraph 3(c)) whose election by the Board or nomination for election by the Company's shareholders was approved by a vote of at least two-thirds of the directors still in office who were either in office at the beginning of such period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority of the Board; or (iii) the shareholders of the Company approve a merger or consolidation which would result in the holders of voting securities of the Company outstanding immediately prior thereto failing to continue to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least 50% of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; or (iv) or the shareholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets or any transaction having a similar effect.

(d) In addition to the Base Salary and any bonuses payable to Executive pursuant to this paragraph, Executive shall be entitled to the following benefits during the Employment Period, unless otherwise increased by the Board:

(i) Health insurance, dental insurance and disability insurance as such coverage is made generally available to the senior executives of the Company and whole life insurance with a policy value of $1,000,000 naming Executive's beneficiary of choice;

(ii) four weeks paid vacation each year (any unused vacation will be paid out at the Base Salary rate on December 31 of each year during the Employment Period and upon termination of this Agreement);

(iii) participation in any group life insurance plan, or other insurance plan, medical expense plan or other benefit arrangement maintained by the Company for its senior executives generally and, if applicable, their family members; and

(iv) a car allowance of $1,800 per month.

(e) The Company shall provide Executive corporate housing in Denver, Colorado for all or such portion of the Employment Period as is requested by Executive.

(f) The Company shall also pay to Executive an amount equal to the "Grossed-up Excess Tax Liability." The term "Grossed-up Excess Tax Liability" means an amount which, after Executive's payment of federal and state income tax liabilities arising on the receipt of the Grossed-up Excess Tax Liability payment, shall equal the amount of the "Benefits Tax Liability." The term "Benefits Tax Liability" shall mean the sum of federal and state income tax liability which is payable by Executive upon the receipt of the benefits provided for in Section 3(d), (e) and (i) hereof.

(g) The Company shall reimburse Executive for all reasonable expenses incurred by him in the course of performing his duties under this Agreement, including upgrades for first class air travel, which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

(h) In addition to the Base Salary and any bonuses payable to Executive hereunder, Executive shall also be entitled to receive an acquisition bonus ("Acquisition Bonus") equal to 2.99 times the annual Base Salary and "Target Bonus" (as defined on Schedule A hereof) payable to Executive hereunder at the time when the Acquisition Bonus becomes payable. The Acquisition Bonus shall be paid concurrently with the consummation of a merger or consolidation which results in the holders of voting securities of the Company outstanding immediately prior thereto failing to continue to represent (either by remaining outstanding, or by being converted into voting securities of the surviving entity) at least 50% of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation, or the sale or disposition by the Company of all or substantially all of the Company's assets, or any transaction having similar effect, other than a liquidation of the Company (an "Acquisition").

(i) The company shall pay for Executive's annual federal and state tax preparation costs up to a maximum of $10,000 per calendar year.

4. Board Membership. Executive shall be elected or appointed to serve as a member of the Board of Directors to fill a vacancy thereon and shall be appointed

Chairman of the Board as of the Effective Date. With respect to all subsequent regular elections of directors during the Employment Period, the Company shall nominate, and use its best efforts to elect, Executive to serve as a member of the Board. If Executive is elected to serve on the Board, Executive shall be named the Chairman of the Board. Upon the termination of the Employment Period for any reason, Executive shall resign as a director and officer of the Company and its Subsidiaries, as the case may be. For purposes of this Agreement, "Subsidiaries" shall mean any corporation of which the securities having a majority of the voting power in electing directors are, at the time of determination, owned by the Company, directly or through one or more Subsidiaries.

5. Term.

(a) The Employment Period shall end on November 29, 2002, provided that: (i) the Employment Period shall terminate prior to such date upon Executive's resignation, death or permanent disability (defined as the expiration of a continuous period of 180 days during which Executive is unable to perform his assigned duties due to physical or mental incapacity); (ii) the Employment Period may be terminated by Executive at any time prior to such date if the Company fails to comply with any material provision of this Agreement, which failure has not been cured within 10 business days after notice of such noncompliance has been given by Executive to the Company; and (iii) the Employment Period may be terminated by the Company at any time prior to such date for Cause.

(b) If the Employment Period is terminated by the Company for Cause or is terminated by Executive's resignation, Executive shall be entitled to receive all amounts due to him through the date of termination.

(c) If the Employment Period is terminated as a result of Executive's death or permanent Disability, the Company shall pay any amounts due to Executive through the date of termination and a Bonus (payable as set forth in paragraph 3(b)) in an amount equal to the Bonus which would have otherwise been payable to Executive pursuant to paragraph 3(b) with respect to the fiscal year in which such termination occurs.

(d) If the Employment Period is terminated by the Company other than for Cause or by Executive pursuant to paragraphs 5(a)(ii) above, Executive shall be entitled to receive (i) his Base Salary through the third anniversary of the Effective Date (or, if longer, for a period of 24 months after the date of termination), payable in accordance with the Company's general payroll practices, and (ii) the then applicable Target Bonus which shall be payable within ninety days after the end of each of the Company's fiscal years ending thereafter through 2002. The Company shall also continue coverage for Employee under the Company's life insurance, medical, health, disability and similar welfare benefit plans and the whole life insurance plan described in paragraph 3(d)(i) through the third anniversary of the Effective Date (or, if longer, for a period of 24 months after the date of termination).

(e) Except as otherwise set forth above, all of Executive's rights to fringe benefits and bonuses hereunder (if any) accruing after the termination of the Employment Period shall cease upon such termination.

(f) For purposes of this Agreement, "Cause" shall mean (i) the continuing willful failure or refusal by Executive to perform substantial and material duties hereunder (other than any such failure resulting from Executive's incapacity due to physical or mental illness), which has not ceased within 10 business days after written demand for substantial

performance is delivered to Executive by the Company, which demand identifies the manner in which the Company believes that Executive has not performed such duties and the steps required to cure such failure to perform; (ii) Executive shall intentionally and willfully engage in misconduct toward the Company which is materially injurious to the Company and its Subsidiaries, monetarily or otherwise (including, but not limited to, conduct in violation of paragraph 7 or 8 hereof), or (iii) the conviction of Executive of or the entering of a plea of nolo contendere by Executive with respect to, a felony. Notwithstanding the foregoing, Executive's Employment hereunder shall not be deemed to be terminated for Cause unless and until there shall have been delivered to Executive a copy of a resolution duly adopted by an affirmative vote of not less than a majority of the entire membership of the Board at a meeting of the Board (after written notice to Executive and a reasonable opportunity for Executive, together with Executive's counsel, to be heard before the Board), finding that in the good faith opinion of the Board, Executive should be terminated for Cause. Cause shall not be deemed to include the performance of duties for other companies or businesses that do not compete with the Company or unreasonably interfere with Executive's turnaround responsibilities for the Company.

(g) In the event of any dispute regarding the existence of Executive's Disability hereunder, the matter will be resolved by the determination of a majority of three physicians qualified to practice medicine in Colorado, one to be selected by each of Executive and the Board and the third to be selected by the two designated physicians. For this purpose, Executive will submit to appropriate medical examinations.

(h) Executive shall not be required to mitigate the amount of any payment provided for in this paragraph 5 by seeking other employment or otherwise, and the amount of any payment or benefit provided for in this paragraph 5 shall not be reduced by any compensation earned by Executive as a result of employment by another employer or by retirement benefits.

6. Confidential Information. The Executive acknowledges that the information, observations and data obtained by him while employed by the Company concerning the business or affairs of the Company or any Subsidiary ("Confidential Information") are the property of the Company or such Subsidiary. Therefore, Executive agrees that he shall not disclose to any unauthorized person or use for his own account any Confidential Information without the prior written consent of the Board, unless and to the extent required by law, rule or regulation or pursuant to any administrative or court order. The term "Confidential Information" shall not include (i) information which is generally available to the public or those in the Company's industry as of the date of execution of this Agreement or which later becomes generally available to the public or those in the Company's industry other than as a result of Executive's prohibited disclosure; (ii) information which comes to Executive from a bona fide third party source so long as such source was not, to Executive's knowledge, prohibited from providing such information to Executive by any contractual, legal, fiduciary or other obligation; and (iii) information which was known to Executive before such information was obtained from the Company. Executive shall deliver to the Company at the termination of the Employment Period, or at any other time the Company may request, all memoranda, notes, plans, records, reports, computer tapes and software and other documents and data (and copies thereof) relating to the Confidential Information or the business of the Company or any Subsidiary which he may then possess or have under his control.

7. Non-Compete, Non-Solicitation.

(a) Executive acknowledges that in the course of his employment with the Company he will become familiar with the Company's trade secrets and with other confidential information concerning the Company and its predecessors and that his services will be of special, unique and extraordinary value to the Company. Therefore, Executive agrees that (i) during the period in which Executive is receiving compensation from the Company pursuant to paragraph 5 hereof, or (ii) if the Employment Period is terminated as provided in paragraph 5(b), for a period of one year following such termination (the "Noncompete Period"), he shall not directly or indirectly own, manage, control, participate in, consult with, render services to, or in any manner engage in any business competing with any business of the Company or its Subsidiaries, as such businesses exist or are in process on the date of the termination of Executive's employment, within any geographical area in which the Company or its Subsidiaries engage or plan to engage in such businesses. Geographic areas in which the Company and/or its Subsidiaries plans to operate any businesses or in which any businesses of the Company exist or are in process will be identified in writing upon request of Executive within thirty days of the date of termination of the Employment Period. Nothing herein shall prohibit Executive from being a passive owner of not more than 5% of the outstanding stock of any class of a corporation which is publicly traded, so long as Executive has no active participation in the business of such corporation.

(b) During the Noncompete Period, Executive shall not directly or indirectly through another entity (i) induce or attempt to induce any employee of the Company or any Subsidiary to leave the employ of the Company or such Subsidiary, or in any way interfere with the relationship between the Company or any Subsidiary and any employee thereof, (ii) solicit any person who was an employee of the Company or any Subsidiary at any time within one year prior to termination of the Employment Period, or (iii) induce or attempt to induce any customer, supplier, licensee or other business relation of the Company or any Subsidiary to cease doing business with the Company or such Subsidiary, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and the Company or any Subsidiary.

(c) If, at the time of enforcement of this paragraph 7, a court shall hold that the duration, scope or area restrictions stated herein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law.

(d) In the event of the breach or a threatened breach by Executive of any of the provisions of this paragraph 7, the Company, in addition and supplementary to other rights and remedies existing in its favor, may apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions thereof (without posting a bond or other security).

8. Executive and Company Representations. Executive hereby represents and warrants to the Company that (i) the execution, delivery and performance of this Agreement by Executive does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Executive is a party or by which he is bound, and (ii) upon the execution and delivery of this

Agreement by the Company, this Agreement shall be the valid and binding obligation of Executive, enforceable in accordance with its terms. The Company hereby represents and warrants to Executive that it is not entering into this Agreement in contemplation of any merger or sale of the Company.

9. Survival. Paragraphs 5, 6, 7 and 8 shall survive and continue in full force in accordance with their terms notwithstanding any termination of the Employment Period.

10. Notices. All notices, requests, demands and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to be delivered and receive five business days after having been deposited in the United States mail and enclosed in a registered or certified post-paid envelope; one business day after having been sent by overnight courier; when personally delivered or sent by facsimile communications equipment of the sending party on a business day, or otherwise on the next succeeding business day thereafter; and in each case addressed to the respective party at the address set forth below or to such other changed addresses as the party may have fixed by notice as provided herein:

Notices to Executive:

Daniel Crowley
400 Capitol Mall
Suite 1250
Sacramento, CA 95814
Telephone: (916) 449-6056
Fax: (916) 449-6059

with a copy to:

Pillsbury, Madison & Sutro LLP
400 Capitol Mall
Suite 1700
Sacramento, CA 95814-4419
Attention: Michael A. Kvarme, Esq.
Telephone: (916) 329-4713
Fax: (916) 441-3583

Notices to the Company:

Coram Healthcare Corporation
1125 Seventeenth Street
Suite 1500
Denver, CO 80202
Attention: Scott Larsen, Esq.
Telephone: (303) 292-4973
Fax: (303) 298-0047

with a copy to:

Paul, Hastings, Janofsky & Walker LLP
555 S. Flower Street, 23rd Floor
Los Angeles, CA 90071
Attention: Anna M. Graves, Esq.
Telephone: (213) 683-6345
Fax: (213) 996-3345

11. Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

12. Complete Agreement. This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

13. Counterparts. This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

14. Successors and Assigns. This Agreement is intended to bind and inure to the benefit of and be enforceable by Executive, the Company and their respective heirs, successors and assigns, except that Executive may not assign his rights or delegate his obligations hereunder without the prior written consent of the Company. The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) of all or substantially all of the business and/or assets of the Company, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

15. Attorneys' Fees and Costs. If any action at law or equity is necessary to enforce or interpret the terms of this Agreement, Executive shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any relief to which he may otherwise be entitled if he is the prevailing party in such action.

16. Choice of Law. This Agreement will be governed by the internal law, and not the laws of conflicts, of the State of Colorado.

17. Amendment and Waiver. The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and Executive, and no course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement.

FROM PAUL HASTINGS #1 (THU)11.18'99 9:24/ST. 9:18/NO. 4260460169 P 10

* * * * *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

CORAM HEALTHCARE CORPORATION

By: [signature]

Its: Chairman

EXECUTIVE

[signature] 30 Nov 99

DANIEL CROWLEY

LA\487923.4

-9-

COR.-EQTY0000391

B61

## SCHEDULE A
## BONUS COMPENSATION

Beginning with the Company's fiscal year 2000, if the Company hits the percentage of its EBITDA Target set forth below, Executive will be entitled to receive as Bonus that percentage of his Base Salary (as in effect on the last day of the fiscal year in question) set forth below. If the Company hits a percentage of its EBITDA Target which is greater than one of the percentages set forth below but less than the next succeeding percentage, Executive shall be entitled to receive a pro rata portion of the incremental Base Salary payment.

| PERCENTAGE OF EBITDA TARGET | PERCENTAGE OF BASE SALARY |
|---|---|
| 100.0 %* | 60%* |
| 101.5% | 65% |
| 103.0% | 70% |
| 104.5% | 75% |
| 106.0% | 80% |
| 107.5% | 85% |
| 109.0% | 85% |
| 110.5% | 95% |
| 112.0% | 100% |
| 114.0% | 110% |
| 116.0% | 121% |
| 118.0% | 132% |
| 120.0% | 143% |
| 122.0% | 154% |
| 124.0% | 166% |
| 126.0% | 177% |
| 128.0% | 188% |
| 130.0% | 200% |
| 132.0% | 211% |
| 134.0% | 212% |
| 136.0% | 223% |
| 138.0% | 234% |
| 140.0% | 245% |
| 142.0% | 256% |
| 144.0% | 267% |
| 146.0% | 278% |
| 148.0% | 289% |
| 150.0% | 300% |

* These represent the "Target Bonus" levels for purposes of this Agreement.

EXHIBIT 99.2

DANIEL D. CROWLEY NAMED CHAIRMAN, PRESIDENT AND CEO OF CORAM HEALTHCARE: NEW LEADER HAS REPUTATION FOR FOCUS, INTENSITY AND SUCCESSFUL TURNAROUNDS

DENVER - NOV. 30, 1999 - Coram Healthcare Corporation (NYSE: CRH) announced that, effective today, Daniel D. Crowley has been named Chairman of the Board, President and Chief Executive Officer. Former Coram Chairman and interim Chief Executive Officer Donald J.

Amaral will remain a member of the Board of Directors.

*"I am pleased to announce Dan Crowley's arrival at Coram today,"* said Mr. Amaral. *"I have known Dan for a number of years and believe his focus, intensity and turnaround experience will strengthen the company to better compete and better serve our customers, healthcare providers, employees and shareholders."*

Mr. Crowley, 52, is Chairman, President and CEO of Sacramento-based Dynamic Healthcare Solutions, a management consulting and investment firm he established in 1997. He also serves as Chairman of the Board of Winterland, a leading privately held affinity merchandise company in the music and entertainment industry. He is also founder of the Crowley Children's Fund, a charitable organization supporting programs for at-risk children.

*"My initial focus will be to assess Coram's strengths and opportunities and to provide the leadership catalyst that will create the possibility for a solid turnaround,"* said Mr. Crowley. "By initiating a disciplined business planning process and a performance-driven incentive program targeted to achieve very specific goals, the Coram team will be able to refocus the energy of the organization toward those areas holding the greatest potential to create profitable growth, positive cash flow and shareholder value.

"With the proposed sale of Coram's prescription services unit and the wind-down of the R-Net subsidiaries, we have a unique opportunity to refocus Coram on its core home infusion business and to build on this with Coram's synergistic clinical trials and medical informatics business. After an initial assessment, we will be prepared to communicate our turnaround plans in more detail.

*"Clearly Coram faces a number of very real challenges. However, one positive is that the company's lenders have indicated their support for the company and its leadership by granting the recently announced 6-month moratorium on certain covenants and principal and interest payments."*

Before founding Dynamic Healthcare Solutions, Mr. Crowley was Chairman, President and CEO of Foundation Health Corporation. He joined Foundation in 1989 to turn around the diffused, unprofitable company heavily indebted from a leveraged buyout. Under his leadership the company rapidly became profitable, established itself as a national leader in

REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523

EXHIBIT: 21
Witness: Crowley
Date: 4/6/07 # of pages: 3

B63

managed care and joined the ranks of the Fortune 500. It grew from less than $300 million in revenues in 1988 to more than $5 billion in 1997, when Mr. Crowley completed a strategic merger with another company.

Prior to his role at Foundation Health, he served as the Executive Vice President of Blue Cross and Blue Shield of Ohio where he led the turnarounds of several business units, including the Western Division, where he reestablished the viability of that operation.

More recently, he brought management focus, stronger profitability and operational improvements to Winterland during a turnaround and a period of rapid growth. The result has been financial performance ahead of plan and the successful refinancing of a portion of Winterland's debt.

Denver-based Coram Healthcare Corporation, through its subsidiaries, is a national leader in providing quality home infusion therapy, support for clinical trials, medical product development and medical informatics, and pharmacy benefit management and mail order services.

Note: Except for historical information, all other statements in this press release are *"forward-looking"* within the meaning of the Private Securities Litigation Reform Act of 1995. The Company's actual results may vary materially from these forward-looking statements due to important risk factors including the Company's history of operating losses and uncertainties associated with future operating results; significant outstanding indebtedness; equity conversion rights held by existing debt holders; limited liquidity; reimbursement-related risks; shifts in the mix of parties that pay for the Company's services; dependence upon relationships with third parties; uncertain future liabilities under capitation arrangements; timing of or ability to complete acquisitions; government regulation of the home health care industry; certain legal proceedings; dependence on key personnel; potential volatility of the stock price; New York Stock Exchange listing status; and unanticipated impacts from the Year 2000 issue. These and other risk factors are described in the Company's form 10-K Annual Report, as amended, Form 10-Q Quarterly Reports, and Form 8-K Current Reports on file with the Securities and Exchange Commission.

---

B64

Case 1:04-cv-01565-SLR Document 138-2 Filed 05/04/2007 Page 16 of 46

**Dates Referenced Herein** ***and*** **Documents Incorporated By Reference**

| *This 8-K Filing* | *Date* | *Referenced-On Page* First | Last | *Other Filings* |
|---|---|---|---|---|
| For The Period Ended | 11/23/99 | | | |
| | 11/30/99 | 1 | | 4 |
| Filed On / Filed As Of | 12/8/99 | | | |

Top List All Filings

*Alternative Formats:* Rich Text / Word (.rtf), Text (.txt), EDGAR (.sgml), XML (.xml), et al.

*Copyright © 2007* ***Fran Finnegan & Company*** *All Rights Reserved.*
*www.secinfo.com - Fri, 30 Mar 2007 17:52:51.0 GMT - Help at SEC Info*

B65

REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523

EXHIBIT: 26

Witness: Crowley

Date: 4/6/07 # of pages: 7

CORAM HEALTHCARE

1125 Seventeenth Street, Suite 2100

Denver, Colorado 80202

Telephone 303.292.4973 800 CORAM HC

Facsimile 303.298.0043

PERSONAL & CONFIDENTIAL

16 December 1999

To: Denver Planning Meeting Attendees

Subject: Executive Impact on Coram Culture

Now that the dust has settled, we need to give greater clarity to the need for the Senior Staff (Denver Planning Meeting Attendees) to be on task and extraordinarily well coordinated effort.

First, it is imperative that we act as a team. Everyone on the common strategy, focused on the corporate goals. No exception!

Second, it goes without saying that every executive must give Coram their undivided loyalty. The company deserves our undivided attention, focus, and best professional effort. All of us are expected to know, in detail, accurately that which is important in the area in which we earn a living. This is not happening every time, every day and we need to do better.

Third, it is essential that all the executives put in the time, effort, and focus to fully work the task ahead of us. It is unfair for some to carry the load of others who are less committed. When some leave in the middle of the task to attend a seminar or non-critical vacation; for some personal diversion; or show up late and leave work early it sets a tone for the rest of our employees.

Fourth, the good work of the many is diluted by politics. Recently, one Senior Officer told another Senior Officer that he would not follow the general guideline to minimize time away from work these next few months. If he was compelled to cancel a vacation, he would just quit. Of course, I am not going to tell anyone when it is an important time to be at work. However, divisive "behind the bosses back" chatter is *politics* and it is unacceptable. For the record, we are right in the middle of a "Corporate Moment" with critical events that need to go right, now. Later happens only if we stay on task and "out-work the issues". How can this happen if we are not actually at work?

We have to be a team, one for all and all for one. No superstars, heroes, or lone rangers. We get there by working together. As hard as it might be for us, we will replace people who have divided loyalties. There is no other choice.

Out of implied respect and consideration for the hard earned money that the shareholders and debt holders gave to Coram, and the years of hard work and sweat equity our own executives have invested. . . we need to get an improved result. For my part, I am absolutely convinced we can get Coram on track. It's right there for us. The question is whether we are willing to do what it takes. To that end, I am writing this letter to make certain we all are on the same page. It would be easier if we could see each other every day and just chat over coffee. But that is not practical given the National geography we occupy. The point is, I want you to understand that you are my own conduit to help shape the culture and I see each of you as an important leader. I believe that any executive who has the words "Vice President" in their title acts as the President in my own absence. This is a material responsibility. Very few people are able to rise to that level in the Corporate world. That's why not everyone can bear the title. The fact is, this is your Company. You and I will shape the future and the way it will go. It happens because of us, or in spite of us. I want you to think about what you are willing to do to make this effort a real success, and the way that you can personally assist me in this "shaping". I hope that you will come to the conclusion that you can count on me and my commitment to get the job done. I also want you to know that I am counting on you, as well.

Sincerely,

Daniel D. Crowley
Chairman, President & CEO

REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523

EXHIBIT: 39

Witness: Crowley

Date: 4/6/07 # of pages:

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
FHpGJbxhmFdSLAWlWTbzV0NnfD5lM9kqRIqEBLvB9i4CBY7mw9zGchVj2FQBJDtB
ThBdlV6BhHB81WSgcAOn+g==

<SEC-DOCUMENT>0000950134-00-002799.txt : 20000331
<SEC-HEADER>0000950134-00-002799.hdr.sgml : 20000331
ACCESSION NUMBER: 0000950134-00-002799
CONFORMED SUBMISSION TYPE: 10-K
PUBLIC DOCUMENT COUNT: 9
CONFORMED PERIOD OF REPORT: 19991231
FILED AS OF DATE: 20000330

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: CORAM HEALTHCARE CORP
CENTRAL INDEX KEY: 0000924174
STANDARD INDUSTRIAL CLASSIFICATION: SERVICES-HOME HEALTH CARE SERVICES [8082
IRS NUMBER: 330615337
STATE OF INCORPORATION: DE
FISCAL YEAR END: 1231

FILING VALUES:
FORM TYPE: 10-K
SEC ACT:
SEC FILE NUMBER: 001-11343
FILM NUMBER: 587013

BUSINESS ADDRESS:
STREET 1: 1125 SEVENTEENTH ST STE 2100
CITY: DENVER
STATE: CO
ZIP: 80202
BUSINESS PHONE: 3032924973

MAIL ADDRESS:
STREET 1: ONE LAKESHORE CENTRE
STREET 2: 3281 GUASTI ROAD SUITE 700
CITY: ONTARIO
STATE: CA
ZIP: 91761
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>FORM 10-K FOR FISCAL YEAR END DECEMBER 31, 1999
<TEXT>

<PAGE> 1

---

---

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE FISCAL YEAR ENDED DECEMBER 31, 1999
COMMISSION FILE NUMBER 1-11343

CORAM HEALTHCARE CORPORATION
(Exact name of registrant as specified in its charter)

<TABLE>

| <S> | <C> |
|---|---|
| DELAWARE (State or other jurisdiction of Incorporation or organization) | 33-0615337 (IRS Employer Identification No.) |
| 1125 SEVENTEENTH STREET, SUITE 2100 DENVER, COLORADO (Address of principal executive offices) | 80202 (Zip Code) |

</TABLE>

Registrant's telephone number, including area code: (303) 292-4973

Securities registered pursuant to Section 12(b) of the Act:

None

Securities registered pursuant to Section 12(g) of the Act:

<TABLE>
<CAPTION>

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| <S> | <C> |
| Common Stock ($.001 par value per share) | Over the Counter Bulletin Board |

</TABLE>

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K [ ]

As of March 14, 2000, there were outstanding 49,638,452 shares of the Registrant's common stock, which is the only class of voting stock of the Registrant outstanding. As of such date, the aggregate market value of the shares of common stock held by nonaffiliates of the Registrant based on the closing price for the common stock on the Over the Counter Bulletin Board on March 14, 2000, was approximately $26.3 million.

million for acquisitions, working capital, letters of credit and other corporate purposes. The facility matures in February 2001 and bears an interest rate of prime plus 1.5%, which was 10.0% as of December 31, 1999. As of December 31, 1999, the company has $44.0 million under the facility. Because substantially all of the interest on the company's debt is fixed, a hypothetical 10.0% decrease in interest rates would not have a material impact on the company. Increases in interest rates could, however, increase interest expenses associated with future borrowings by the company, if any. The company does not hedge against interest rate changes. See Note 9 to the company's Consolidated Financial Statements.

ITEM 8. FINANCIAL STATEMENTS

The company's Consolidated Financial Statements, Notes to Consolidated Financial Statements and financial statement schedule at December 31, 1999 and 1998 and for the years ended December 31, 1999, 1998 and 1997 and the Report of Independent Auditors are included in this report as indicated on the Index to Financial Statements and Schedule on page F-1.

ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

PART III

ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

BOARD OF DIRECTORS

The following table sets forth certain information concerning each member of the Board of Directors of Coram as of March 16, 2000. Except as provided below, none of the directors entered into any arrangement or understanding pursuant to which such person was to serve as a director.

<TABLE>
<CAPTION>

| NAME | AGE | POSITION WITH CORAM | DIRE SIN |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Daniel D. Crowley............................................ | 52 | Chairman of the Board | |
| Donald J. Amaral............................................ | 47 | Director | |
| William J. Casey............................................ | 55 | Director | |
| Stephen A. Feinberg............................................ | 39 | Director | |
| L. Peter Smith............................................ | 50 | Director | |
| Sandra L. Smoley............................................ | 63 | Director | |

</TABLE>

Mr. Crowley joined Coram as its Chairman, Chief Executive Officer and President as of November 30, 1999. He is also Chairman of Winterland, a privately held affinity merchandise company in the music and entertainment industry, and Chairman, Chief Executive Officer and President of Dynamic Healthcare Solutions, LLC, a privately held management consulting and investment firm that he established in 1997. Prior to founding

<PAGE> 41

Dynamic Healthcare Solutions, Mr. Crowley served as the Chairman, Chief

Executive Officer and President of Foundation Health Corporation, a post that he had served in since 1989.

Mr. Amaral served as Chairman of the company's Board of Directors from September 1997 until November 30, 1999. Mr. Amaral has served as a director of the company since October 1995, Chief Executive Officer of the company from October 1995 through April 23, 1999 and October 22, 1999 through November 30, 1999, and as President from October 1995 through December 1997. Previously, he was President and Chief Operating Officer of OrNda Healthcorp ("OrNda") from April 1994 to August 1995, and served in various executive positions with Summit Health Ltd. ("Summit") from October 1989 to April 1994, including President and Chief Executive Officer between October 1991 and April 1994. Summit was merged into OrNda in April 1994. Mr. Amaral is also a member of the Board of Directors of CareMatrix Corporation.

Mr. Casey has served as a director of Coram since September 1997. Since 1983, Mr. Casey has served as a consultant in the healthcare industry, specializing in hospital management evaluation, hospital planning, managed care contracting and turnaround services. From 1986 to 1997, Mr. Casey has also served as Contract Administrator for Emergency Department Physicians' Medical Group, Inc. and its affiliated medical groups, which provide physician services to non-governmental facilities. In addition, from 1988 to 1997, Mr. Casey has served as Contract Administrator for NP Medical Group, Inc., which provides physician services to government facilities. Mr. Casey also serves as a director of TriCounties Bank.

Mr. Feinberg has served as a director of Coram since June 1998. He was designated to serve on the Board of Directors pursuant to the Securities Exchange Agreement. Pursuant to the terms of the Securities Exchange Agreement, Mr. Feinberg has also been designated as a member of the Audit Committee and the Compensation Committee. Mr. Feinberg has managed separate pools of capital since 1985. Through Cerberus Capital Management, L.P., and its affiliates, Mr. Feinberg currently manages approximately ten funds which make investments in publicly traded and private bank debt, trade claims, large and middle market bank loans, distressed real estate and public and private equity, including post-bankruptcy equity.

Mr. L. Peter Smith has served as a director of Coram since July 1994. Between November 1993 and July 1994, Mr. Smith was a director of Medisys, Inc. Mr. Smith served as the Managing Partner of AllCare Health Services, Inc., which was acquired by Medisys in December 1992. Mr. Smith is also Chief Executive Officer and serves on the Board of Directors of Ralin Medical, Inc., a company specializing in cardiac disease management. Mr. Smith also serves on the Board of Directors of Gateway, Inc. and AMSYS, Inc. Mr. Smith previously served on the Board of Directors of Sabratek Corporation from October 1992 through August 23, 1999. Sabratek Corporation filed a voluntary bankruptcy petition under Chapter 11 of the United States Code on December 17, 1999 and that proceeding is presently pending before the United States Bankruptcy Court in Delaware.

Ms. Smoley was elected to Coram's Board of Directors on February 10, 2000. Ms. Smoley is the Chairman and Chief Executive Officer of The Sandra Smoley company, a health care and local government consulting firm based in Sacramento, California. From October 1993 to January 1999, she served as the Secretary of the California Health and Welfare Agency. Prior to that time, she was Secretary of the California State and Consumer Services Agency from January 1993 to October 1993.

<PAGE> 42

</TABLE>

In 1998, unusual or infrequently occurring charges included the reversal of $3.9 million of restructuring reserves in the fourth quarter. In 1999, Coram initiated three restructuring plans and charged $5.8 million to continuing operations as restructuring charges. Coram also recognized impairment on goodwill and other assets of $9.1 million in 1999. See Note 7.

16. INDUSTRY SEGMENT AND GEOGRAPHIC AREA OPERATIONS

Management regularly evaluates the operating performance of the company by reviewing results on a product or service provided basis. The company's reportable segments are Infusion, CPS, and Lithotripsy. Infusion is the company's base business, which derives its revenue primarily from alternate site infusion therapy. CPS primarily provides specialty mail-order pharmacy and pharmacy benefit management services. Lithotripsy, a discontinued operation, derived its revenue from a non-invasive technique that used shock waves to disintegrate kidney stones. The other non-reportable segment represents clinical trials and informatics services. R-Net, also a discontinued operation, is no longer identified as a reportable segments. See Note 3.

Coram uses earnings before interest expense, income taxes, depreciation and amortization ("EBITDA") for purposes of performance measurement. The measurement basis for segment assets includes net accounts receivable, inventory, net property and equipment, and other current assets.

Summary information by segment is as follows (in thousands):

<TABLE>
<CAPTION>

| | AS OF AND FOR THE YEARS ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 1999 | 1998 | 1997 |
| <S> | <C> | <C> | <C> |
| INFUSION | | | |
| Revenue from external customers | $432,823 | $396,669 | $373,684 |
| Intersegment revenue | 22,284 | 18,274 | 13,358 |
| Interest income | 78 | 72 | -- |
| Equity in net income of unconsolidated joint ventures | 442 | 107 | 636 |
| Segment EBITDA profit | 35,819 | 61,874 | 54,935 |
| Segment assets | 131,893 | 142,970 | 123,113 |
| Segment asset expenditures | 5,302 | 11,153 | 17,554 |
| CPS | | | |
| Revenue from external customers | $ 86,625 | $ 47,783 | $ 28,280 |
| Intersegment revenue | 2,452 | 1,534 | 45 |
| Interest income | -- | -- | -- |
| Equity in net income of unconsolidated joint ventures | -- | -- | -- |
| Segment EBITDA profit (loss) | 662 | 2,000 | (919) |
| Segment assets | 24,003 | 11,992 | 4,106 |
| Segment asset expenditures | 1,645 | 403 | 51 |

| | | | |
|---|---|---|---|
| LITHOTRIPSY | | | |
| Revenue from external customers...................... | -- | 658 | $ 37,282 |
| Intersegment revenue.................................. | -- | -- | -- |
| Interest income....................................... | -- | -- | 125 |
| Equity in net income of unconsolidated joint ventures............................................ | -- | -- | 431 |
| Segment EBITDA profit................................. | -- | * | 16,140 |
| Segment assets........................................ | -- | -- | 262 |
| Segment asset expenditures............................ | -- | -- | 1,452 |
| ALL OTHER | | | |
| Revenue from external customers...................... | $ 1,748 | $ 2 | $ 226 |
| Intersegment revenue.................................. | -- | -- | -- |
| Interest income....................................... | -- | -- | -- |
| Equity in net income of unconsolidated joint ventures............................................ | -- | -- | -- |
| Segment EBITDA profit (loss).......................... | 103 | -- | (337) |
| Segment assets........................................ | 492 | -- | -- |
| Segment asset expenditures............................ | -- | -- | -- |

</TABLE>

- ---------------

* Represents less than 2% of total category, therefore, no disclosure is made.

<PAGE> 90

CORAM HEALTHCARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

A reconciliation of the company's segment revenue, segment EBITDA profit (loss), segment assets and other significant items to the corresponding amounts in the Consolidated Financial Statements are as follows (in thousands):

<TABLE>
<CAPTION>

| | AS OF AND FOR THE YEARS ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 1999 | 1998 | 1997 |
| REVENUES | | | |
| Total for reportable segments........................ | $544,184 | $464,918 | $452,649 |
| Other revenue......................................... | 1,748 | 2 | 226 |
| Elimination of intersegment revenue................... | (24,736) | (19,808) | (13,403) |
| Total consolidated revenue............................ | $521,196 | $445,112 | $439,472 |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES AND MINORITY INTERESTS | | | |
| Total EBITDA profit for reportable segments.......... | $ 36,481 | $ 63,874 | $ 70,156 |
| Other EBITDA profit (loss)............................ | 103 | -- | (337) |
| Goodwill amortization expense......................... | (10,784) | (11,139) | (13,586) |
| Depreciation and other amortization expense.......... | (10,598) | (11,040) | (12,486) |
| Interest expense...................................... | (29,763) | (32,734) | (75,026) |
| All other income (expense), net....................... | (52,323) | (26,849) | 173,477 |
| Income (loss) from continuing operations before income taxes and minority interests................ | $(66,884) | $(17,888) | $142,198 |

Attachment 3

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

1301 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6022
212-506-1700
FACSIMILE: 212-506-1800

ONE GATEWAY CENTER
SUITE 2600
NEWARK, NEW JERSEY 07102
973-645-9462

700 LOUISIANA STREET
HOUSTON, TEXAS 77002
713-220-8800

DAVID M. FRIEDMAN
212-506-1740

February 28, 2000

VIA FACSIMILE

Mr. Daniel D. Crowley
Chairman, President and Chief Executive Officer
Coram Healthcare
1125 Seventeenth Street, Suite 2100
Denver, Colorado 80202

Re: Proposal for Representation

Dear Mr. Crowley:

Following up on our conversation of last week, we are pleased to present to you our proposal to act as special counsel to Coram Healthcare ("Coram") in connection with a possible financial restructuring.

Introduction

Before discussing particular tasks and responsibilities, permit me to first summarize our understanding of the primary financial difficulties now confronting Coram:

- Coram has approximately $260 million in debt which is not being serviced. The lenders agreement to forebear with respect to such debt expires not later than May 15, 2000. Certain debt also matures next year. Coram's cash flow may be inadequate to service and/or repay this debt.

- Unless Coram shareholder equity exceeds a $75 million threshold (which it currently does not and will not absent a restructuring), Coram will lose a regulatory exemption under Stark II which is essential to its business.

- Coram is experiencing a contraction of its trade credit and needs to avoid any further restriction. This problem is exacerbated by Coram's limited access to working capital.

As we have discussed, each of these problems may be successfully addressed through a financial restructuring in which debtholders exchange their paper for a reduced amount of debt and new equity in the reorganized company. Typically, such a restructuring is most efficiently accomplished through a "pre-packaged" reorganization under Chapter 11 of the Federal Bankruptcy Code, although, as part of our due diligence, we would certainly give every consideration to alternative methods of accomplishing the same result.

Implementation

A "pre-packaged" reorganization means essentially what it says: A comprehensive plan for restructuring Coram that is agreed to by the relevant parties before a Chapter 11 petition is ever filed. In a pre-packaged case, the steps proceeding bankruptcy are even more important than those which follow. Although every case is unique, set forth below is a general outline of the relevant steps to be taken:

STEP 1: Determine enterprise value. (This enables the Board to determine which constituents are entitled to a recovery upon their claims/interests).

STEP 2: Determine appropriate capital structure. (This enables the Board to determine the form of value to be distributed to parties who are "in the money").

STEP 3: Solidify Management Team. (Resolve all issues relating to senior management).

STEP 4: Negotiate with fulcrum creditors. (Reach an agreement with the Series A and Series B Notes).

STEP 5: Bring other parties on board. (Negotiate with Aetna and parties to contracts proposed to be rejected).

STEP 6: Develop "cram down" structure. (Create structure to impose plan on "out of the money" constituents).

STEP 7: Resolve all legal issues. (Consider all corporate, tax and regulatory issues that may relate to transaction).

STEP 8: Draft Plan of Reorganization and Disclosure Statement. (Finalize all documents necessary to consummate transaction).

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

STEP 9: Presentation to Vendors/Providers. (Meet with trade to ensure smooth transition through Chapter 11 process).

STEP 10: File for Chapter 11

STEP 11: Disclosure Statement Approval and Solicitation of Votes on Plan.

STEP 12: Confirmation and Consummation of Plan.

Responsibilities

Steps 1 and 2 will be performed by an independent investment banking/valuation firm retained by Coram. Step 3 will be accomplished through discussions between senior management and the Board. Steps 4 through 8 will be performed by our firm with backup support from the investment bankers (on valuation issues), senior management (on business issues) and corporate, tax and regulatory counsel. Step 9 primarily will be the responsibility of senior management, with investment banking and legal support. Steps 10 through 12 primarily will be the responsibility of our firm.

Timing

Although Steps 1 through 9 are presented in succession, many can be approached simultaneously. It would seem reasonable that Steps 1 and 2 can be performed in 30 days and Steps 3 through 9 can be achieved in 90 days or less. In other words, there is as much as a 4 month lead time to filing. Once filed, we should plan on another 90 days to achieve Steps 11 and 12.

Our Charges

We charge on an hourly basis based upon the established hourly rates of our attorneys and paralegals. Most partners charge at rates between $350 and $450 per hour and most associates are between $200 and $300 per hour. My hourly rate is $525.

We would ask for an advance retainer of $100,000 and would bill you monthly to maintain a positive retainer balance of $50,000. Prior to filing for Chapter 11, we will ask that our retainer be returned to $100,000. Of course, you may terminate our engagement at any time and we will refund to you the unused portion of our retainer.

At this juncture, it is difficult to estimate what our charges will be in this matter. We would anticipate charges of at least $400,000 through the date of filing. Absent significant litigation in the Bankruptcy Court, we would expect post-filing charges to be approximately $200,000. Obviously, there will be additional charges from other professionals.

* * *

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Please feel free to call me with any questions which you may have.

Sincerely,

David M. Friedman

- 4 -

TOTAL P.25

CROWLEY110

B77

REPORTER: LORRIE L MARCHANT, RPR, CRR, CSR NO. 10523

EXHIBIT: 28

Witness: Crowley

Date: 4/10/07 # of pages: 9

CORAM HEALTHCARE

1125 Seventeenth Street, Suite 2100
Denver, Colorado 80202
Telephone 303.292.4973 / 800 CORAM HC
Facsimile 303.298.0043

PERSONAL & CONFIDENTIAL

28 February 2000

Coram Board of Directors

Dear Board Member,

At the end of March, we will have a face-to-face Board Meeting in New York. The purpose of the meeting will be to consider initiating a process aimed at restructuring Coram Healthcare.

To gain an overall understanding of the restructuring process, I had asked Alan Kornberg (our Counsel on the R Net matter) of Paul, Weiss, Rifkind, Wharton & Garrison to outline the general steps that are involved. See Attachment #1.

Subsequent to the Kornberg outline, we interviewed firms that specialize in restructuring as well as outside counsel that specializes in the same thing. We received proposals from Lazard Frere, from Houlihan & Lokey, and from David Friedman (Restructuring Counsel) of Kasowitz, Benson, Torres & Friedman.

The cost proposed from the restructuring firms is quite large (given the concentration of the debt, and the positive disposition of the debt holders toward working with Coram). I suggested this would be a relatively easier restructuring and that Lazard and Houlihan lower their charge. Even after negotiating with them, the best we can do is . . . . *quite expensive* (in my opinion). Accordingly, I am going to recommend to the Board that Coram use the services of David Friedman. See Attachments #2 and #3.

Please review these materials as well as the "packet" sent to you last week so that you may be well grounded when we discuss this important issue in the future.

In another matter, it is clear that Coram is actually making real progress in "turning around". The accounts payable is down from approximately $17Million when I took over on 30 November to slightly over $10Million at the end of last week (see Attachment #4). Coram's cash collection stabilized enough to actually return some cash to the debt holders for the first time in a very long time. Finally, Coram had a conservative Corporate EBITDA of nearly $1,700,000 (see Attachment #5) versus a budget of $500,000 for January (including an accrual of over $500,000 for the Management Incentive Plan). This positive EBITDA was a direct result of the cost reductions; the beginning of a mix

CROWLEY101

EXHIBIT 26 2/14/07 DP

change to more profitable therapies, and a "mountain" of activity (small and large) that we are hopeful will result in continuing operational performance. Just the same, we all need to know that virtually nothing will obviate the need for restructuring Coram's capital structure. Stark II and the last three (3) years financial performance made that a certainty. So, it is clear we have to deal with Coram's Balance Sheet.

It is also clear to me, that the assignment and the terms I accepted in November 1999 did *not* reflect the activity required to "stabilize" Coram and get it on solid footing. This is more than just a nineteen (19) hour a day "workout". Clearly, Coram will take longer, involve more, and will need me to stay "on task" for much longer than we envisioned when I said, "Yes". The risks for me as a professional are also substantially different that those involved with just fixing the day to day problems of Coram. Had the Board engaged a firm like J.Alix the charge to do the same work at Coram would have been multiples of what I am being compensated.

By way of this memo, I am asking the Board to understand that I need to immediately re-open my compensation relationship to more fairly match it to the task at hand. To do this properly, I think we need assistance from a firm that fully understands all of the varied issues restructuring has on Executives like myself. That is why I am asking the Board to assist me by permitting me to engage (at Coram's cost) a firm that deals in such matters. Such a firm would help me and the Board to properly and promptly reset my relationship, compensation, and importantly to me, properly insulate me from the risks of the restructuring. In the absence of this being done, I need the Board to understand that it is highly probable that I will not be comfortable in going forward with this restructuring and the related assignment to bring continuity to Coram thereafter.

Regards,

Dan

Daniel D. Crowley
Chairman, President & CEO

CROWLEY 102

PAUL, WEISS, RIFKIND, WHARTON & GARRISON

1285 AVENUE OF THE AMERICAS NEW YORK, NEW YORK 10019-6064

Attachment 1

January 24, 2000

MEMORANDUM

To Daniel D. Crowley
Allen J. Marabito
Scott Larson

From Alan W. Kornberg

Subject Restructuring Process

As we discussed in Denver, I attach an outline of the steps needed to develop and implement a consensual restructuring. We look forward to discussing it with you.

Best regards,

A.W.K.

cc: M. Kahn
D. Sullivan
C. Reisner
A. Rosenberg

Doc#: NY: 563793.1

CROWLEY103

| | |
|---|---|
| *Step 11* | Execute an agreement in principle with the lender group describing the principal terms of the restructuring; such agreement in principle should include forbearance and "lock up" arrangements which provide that, subject to satisfaction of certain conditions, the lender group will support consummation of the proposed restructuring and will not pursue any other alternatives |
| *Step 12* | Public announcement of agreement in principle |
| *Step 13* | Prepare documentation for restructuring; if to be implemented by means of a "pre-arranged" chapter 11 case this will involve (i) chapter 11 petitions for each corporate entity; (ii) numerous "first-day" motions; (iii) a proposed chapter 11 plan; (iv) a related disclosure statement; and (v) corporate documents and agreements necessary to carry out the plan |
| *Step 14* | Arrange for debtor-in-possession financing to be in effect during the chapter 11 case and negotiate documentation with lender group |
| *Step 15* | Design public relations program to avoid deterioration in relationships with employees, vendors and customers |
| *Step 16* | Board meeting to approve going forward. File chapter 11 case, accompanied by proposed plan and disclosure statement as well as proposed debtor-in-possession financing arrangements |
| *Step 17* | Obtain bankruptcy court approval of first-day motions and debtor-in-possession financing |
| *Step 18* | Proceed to obtain bankruptcy court approval of proposed disclosure statement and voting mechanics |
| *Step 19* | Solicit acceptances of chapter 11 plan |
| *Step 20* | Arrange for terms of exit financing and document same |
| *Step 21* | Obtain bankruptcy court confirmation of chapter 11 plan |
| *Step 22* | Consummate plan and exit chapter 11 |

** TOTAL PAGE.04 **

CROWLEY105

B81



Attachment 2

HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL

INVESTMENT BANKERS

February 28, 2000

Mr. Daniel D. Crowley
Coram Healthcare Corporation
1125 Seventeenth Street
Suite 2100
Denver, Colorado 80202

Re: *Coram Healthcare Corporation ("Coram" or the "Company")*

Dear Mr. Crowley:

Pursuant to our conversation last Friday, attached please find a revised proposal for the engagement of Houlihan Lokey Howard & Zukin Capital. As indicated in our February 22, 2000 engagement letter we would propose a monthly advisory fee of $150,000 per month for the first 2 months and $125,000 per month thereafter. With respect to the Transaction Fee we would propose a revised fee equal to the net amount of 0.70% of the Accreted Bond Debt Claim only less 33% of any Monthly Fees paid after 6 months.

The partial credit of the monthly fees after six months provides a time incentive for us to work towards a prompt resolution of the restructuring of the Company.

I hope this letter is helpful in clarifying our revised-fee proposal.

If you have any questions, comments or concerns regarding the foregoing or any other matter please feel free to call either one of us at (212) 497-4100.

Best regards,

Michael A. Kramer
Managing Director
Houlihan Lokey Howard & Zukin Capital

David R. Hilty
Director
Houlihan Lokey Howard & Zukin Capital

cc: *Alan Kornberg*
*Andrew Rosenberg*

New York
685 Third Avenue, 15th Floor
New York, New York 10017-4024
Tel 212.497.4100 Fax 212.661.3070
Broker/dealer services through
Houlihan Lokey Howard & Zukin Capital.

Los Angeles Chicago San Francisco Minneapolis Washington, D.C. Dallas Atlanta Toronto Seoul

CROWLEY106

B82

Attachment 3

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

1301 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6022
212-506-1700
FACSIMILE: 212-506-1800

ONE GATEWAY CENTER
SUITE 2600
NEWARK, NEW JERSEY 07102
973-645-9462

700 LOUISIANA STREET
HOUSTON, TEXAS 77002
713-220-8800

DAVID H. FRIEDMAN
212-506-1740

February 28, 2000

VIA FACSIMILE

Mr. Daniel D. Crowley
Chairman, President and Chief Executive Officer
Coram Healthcare
1125 Seventeenth Street, Suite 2100
Denver, Colorado 80202

Re: Proposal for Representation

Dear Mr. Crowley:

Following up on our conversation of last week, we are pleased to present to you our proposal to act as special counsel to Coram Healthcare ("Coram") in connection with a possible financial restructuring.

Introduction

Before discussing particular tasks and responsibilities, permit me to first summarize our understanding of the primary financial difficulties now confronting Coram:

- Coram has approximately $260 million in debt which is not being serviced. The lenders agreement to forebear with respect to such debt expires not later than May 15, 2000. Certain debt also matures next year. Coram's cash flow may be inadequate to service and/or repay this debt.

- Unless Coram shareholder equity exceeds a $75 million threshold (which it currently does not and will not absent a restructuring), Coram will lose a regulatory exemption under Stark II which is essential to its business.

CROWLEY107

- Coram is experiencing a contraction of its trade credit and needs to avoid any further restriction. This problem is exacerbated by Coram's limited access to working capital.

As we have discussed, each of these problems may be successfully addressed through a financial restructuring in which debtholders exchange their paper for a reduced amount of debt and new equity in the reorganized company. Typically, such a restructuring is most efficiently accomplished through a "pre-packaged" reorganization under Chapter 11 of the Federal Bankruptcy Code, although, as part of our due diligence, we would certainly give every consideration to alternative methods of accomplishing the same result.

<u>Implementation</u>

A "pre-packaged" reorganization means essentially what it says: A comprehensive plan for restructuring Coram that is agreed to by the relevant parties before a Chapter 11 petition is ever filed. In a pre-packaged case, the steps proceeding bankruptcy are even more important than those which follow. Although every case is unique, set forth below is a general outline of the relevant steps to be taken:

STEP 1: Determine enterprise value. (This enables the Board to determine which constituents are entitled to a recovery upon their claims/interests).

STEP 2: Determine appropriate capital structure. (This enables the Board to determine the <u>form</u> of value to be distributed to parties who are "in the money").

STEP 3: Solidify Management Team. (Resolve all issues relating to senior management).

STEP 4: Negotiate with fulcrum creditors. (Reach an agreement with the Series A and Series B Notes).

STEP 5: Bring other parties on board. (Negotiate with Aetna and parties to contracts proposed to be rejected).

STEP 6: Develop "cram down" structure. (Create structure to impose plan on "out of the money" constituents).

STEP 7: Resolve all legal issues. (Consider all corporate, tax and regulatory issues that may relate to transaction).

STEP 8: Draft Plan of Reorganization and Disclosure Statement. (Finalize all documents necessary to consummate transaction).

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

STEP 9: Presentation to Vendors/Providers. (Meet with trade to ensure smooth transition through Chapter 11 process).

STEP 10: File for Chapter 11

STEP 11: Disclosure Statement Approval and Solicitation of Votes on Plan.

STEP 12: Confirmation and Consummation of Plan.

Responsibilities

Steps 1 and 2 will be performed by an independent investment banking/valuation firm retained by Coram. Step 3 will be accomplished through discussions between senior management and the Board. Steps 4 through 8 will be performed by our firm with backup support from the investment bankers (on valuation issues), senior management (on business issues) and corporate, tax and regulatory counsel. Step 9 primarily will be the responsibility of senior management, with investment banking and legal support. Steps 10 through 12 primarily will be the responsibility of our firm.

Timing

Although Steps 1 through 9 are presented in succession, many can be approached simultaneously. It would seem reasonable that Steps 1 and 2 can be performed in 30 days and Steps 3 through 9 can be achieved in 90 days or less. In other words, there is as much as a 4 month lead time to filing. Once filed, we should plan on another 90 days to achieve Steps 11 and 12.

Our Charges

We charge on an hourly basis based upon the established hourly rates of our attorneys and paralegals. Most partners charge at rates between $350 and $450 per hour and most associates are between $200 and $300 per hour. My hourly rate is $525.

We would ask for an advance retainer of $100,000 and would bill you monthly to maintain a positive retainer balance of $50,000. Prior to filing for Chapter 11, we will ask that our retainer be returned to $100,000. Of course, you may terminate our engagement at any time and we will refund to you the unused portion of our retainer.

At this juncture, it is difficult to estimate what our charges will be in this matter. We would anticipate charges of at least $400,000 through the date of filing. Absent significant litigation in the Bankruptcy Court, we would expect post-filing charges to be approximately $200,000. Obviously, there will be additional charges from other professionals.

* * *

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Please feel free to call me with any questions which you may have.

Sincerely,

David M. Friedman

-4-

TOTAL P.05

CROWLEY110

B86

APR 25 2000 13:44 FR CORAM HEALTHCARE 9164456859 TO FEINBERG

REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523
EXHIBIT: 29
Witness: Crowley
Date: 4/6/07 # of pages: 5

SECOND AMENDMENT TO EMPLOYMENT AGREEMENT

THIS SECOND AMENDMENT TO EMPLOYMENT AGREEMENT (the "Amendment") is made as of April 6, 2000, by and between Coram Healthcare Corporation, a Delaware corporation (the "Company"), and Daniel D. Crowley ("Executive").

RECITALS

A. The parties previously made and executed that certain Employment Agreement, effective November 30, 1999, that was subsequently amended effective as of November 30, 1999 (collectively, the "Employment Agreement").

B. Each of the parties desires to amend the Employment Agreement as set forth herein.

NOW THEREFORE, in consideration of the premises set forth above and the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Executive hereby agree as follows:

1. Amendment. The Employment Agreement is hereby amended as follows:

(a) Section 3(b) of the Employment Agreement is hereby amended by deleting such paragraph in its entirety and replacing it with the following:

In addition to the Base Salary, Executive shall be entitled to a performance bonus (the "Incentive Bonus") payable within 90 days of the end of each fiscal year based upon the Company's operating results measured against a target level of earnings as established by the Executive and the Compensation Committee of Coram's Board of Directors before the beginning of each of the Company's fiscal years during the Employment Term. With respect to the Company's fiscal year ending December 31, 2000, the Incentive Bonus shall be, as follows: If earnings before interest, taxes, depreciation and amortization (EBITDA) of the Company for such year, as measured by the audited financial statements of the Company for its fiscal year ending December 31, 2000, equals or exceeds $14,000,000 (the "2000 Incentive Target"), the Incentive Bonus to which the Executive shall be entitled shall be an amount equal to 25% of the Company's EBITDA that exceeds the 2000 Incentive Target. The Incentive Bonus shall be paid in cash from Coram's available Free Cash (as defined below) or from the Revolving Credit Facility (as that term is defined below).

In addition to the [handwritten: for its fiscal year ending December 31, 2000] Incentive Bonus, in the event that the EBITDA of the Company as measured by the audited financial statements of the Company equals or exceeds $35,000,000 ~~in 2000~~, the Company shall pay an additional bonus (the "EBITDA Bonus") of $5,000,000 to the Executive or others as designated by Executive, if any.

Any Incentive Bonus, EBITDA Bonus, Success Bonus (as defined below) or other bonus earned by the Executive under any provision of this Employment Agreement

[handwritten, crossed out: The EBITDA Bonus shall be paid in cash from Coram's available Free Cash or from the Revolving Credit Facility]

APR 06 2000 13:45 FR CORAM HEALTHCARE 9164499259 TO FEINBERG P.02/07

shall be payable by the Company in cash out of funds derived from the Company's excess available cash flow ("Free Cash") or from amounts drawn on the Company's Credit Facility, dated August 20, 1998, among the Company, Coram, Inc. and the Guarantors named therein, the Lenders named therein and Foothill Capital Corporation, as Agent, or any subsequent credit facility that replaces such facility (the "Revolving Credit Facility"); provided, however, that in the event that the amount drawn on the Revolving Credit Facility at the time such ~~EBITDA Bonus is due~~ is an amount that is greater than 65% (the percentage drawn as of April 6, 2000) of the maximum funds available to the Company under such credit facility (for example, the maximum amount available under the Revolving Credit Facility is $60,000,000 and as of April 6, 2000 the amount drawn was $38.5 Million), the Company shall pay ~~the EBITDA Bonus~~ to the Executive ~~and each~~ designated individual recipient as follows: 50% in cash on the due date and 50% in monthly installments over the next eleven (11) months. In the event that the Executive or the designated recipient is terminated for any reason whatsoever, any unpaid ~~EBITDA Bonus~~ shall be paid immediately in a lump sum.

(b) Section 3 of the Employment Agreement is hereby amended by adding the following provision to such Section as a new Section 3(j):

In addition to the Base Salary and any other bonuses payable under this Amendment or the Agreement, Executive shall also be entitled to receive, upon consummation of a "Refinancing" (as that term is defined below) of the Company's "Principal Debt Instruments" (as that term is defined below), a success bonus (the "Success Bonus") equal to the greater of (i) 1.5% of the principal amount of the Principal Debt Instruments that are converted into common or preferred stock issued by the Company; or (ii) 1.0% of the total principal amount of the Principal Debt Instruments outstanding after consummation of the Refinancing. Such Success Bonus shall be paid immediately upon the Effective Date of the Refinancing from Free Cash or the Revolver.

The term "Principal Debt Instruments" shall mean (a) the Revolving Credit Facility; and (b) that certain Securities Exchange Agreement, dated as of May 6, 1998, as amended, by and between the Company; Coram, Inc.; Cerberus Partners, L.P.; Goldman Sachs Credit Partners, L.P.; and Foothill Capital Corporation and the Series A and Series B Notes issued pursuant thereto.

The term "Refinancing" shall mean a transaction or series of related transactions approved by the Company's Board of Directors that provides for either: (a) the conversion of some or all of the Principal Debt Instruments into a combination of new Company debt instruments and shares of common or preferred stock issued by the Company; or (b) the conversion of the Principal Debt Instruments into new debt instruments issued by the Company.

(c) Section 5(a) of the Employment Agreement is hereby amended by deleting such Section in its entirety and replacing it with the following:

The Company agrees to employ and Executive accepts such employment for the period beginning as of the Effective Date and ending on the third anniversary of the

LA/CROWLEY AMD 2

B88

APR 10 2006 ...

APR 06 2000 13:45 FR CORAM HEALTHCARE 9164496853 TO FEINBERG

Effective Date, provided that: (i) the Employment Period shall terminate prior to such date upon Executive's resignation, death or permanent disability (defined as the expiration of a continuous period of 180 days during which Executive is unable to perform the essential functions of his assigned duties due to physical or mental incapacity); (ii) the Employment Period may be terminated by Executive at any time prior to such date if the Company fails to comply with any material provision of this Agreement, which failure has not been cured within 10 business days after written notice of such noncompliance has been given by Executive to the Company; and (iii) the Employment Period may be terminated by the Company at any time prior to such date for Cause. In the absence of the occurrence of any of the events in subsections (i) through (iv) of this Section, the Employment Period shall automatically be renewed for additional one (1) year terms commencing on the third anniversary of the Effective Date. up to two (2)

(d) Section 5(d) of the Employment Agreement is hereby amended by deleting such Section in its entirety and replacing it with the following:

If the Employment Period is terminated by the Company other than for Cause or by Executive pursuant to paragraph 5(a)(ii) above, or if Executive's duties, responsibilities, and/or job title is substantially altered from that of Chairman of the Board, Chief Executive Officer and President other as contemplated by Section 2 of this Agreement, then Executive shall be entitled to receive his Base Salary and Automobile Allowance through the third anniversary of the date such termination of employment becomes effective (the "Severance Period"), payable in accordance with the Company's general payroll practices, and all bonuses payable hereunder, however denominated, as described herein throughout the Severance Period. The Company shall also continue coverage for Executive under the Company's life insurance, medical, health, disability and similar welfare benefit plans described in Section 3(d) (or under other plans, including the whole life insurance policy, obtained by the Company for the benefit of the Executive and fully funded by the Company. The Executive shall receive a full tax gross-up for any tax liability of the Executive for such benefits and the Automobile Allowance) throughout the entire Severance Period.

(e) Section 3 of the Employment Agreement is hereby amended by adding the following provision to such Section as a new Section 3(k):

If the Executive and the Board of Directors concur on the appointment of a Chief Executive Officer and/or a President for the Company as contemplated by Section 2 of the Agreement, this Agreement will remain in full force and effect without modification to any of the terms and conditions set forth herein (other than the Executive's duties to the extent they may be assigned to the new chief executive officer), including but not limited to the Executive's Base Salary, bonus opportunities and full benefits; provided, however, that the new Chief Executive Officer and/or President shall be entitled to receive a portion of the EBITDA Bonus in an amount reasonably negotiated between the [Board of Directors, the] Executive and such person. The split of the money between Dan Crowley and the new CEO or president need to be approved by the board whose approval [illegible] unreasonably withheld.

LWCROWLEY...2

B89

2. Counterparts. This Amendment may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same instrument.

3. Miscellaneous. Except as expressly amended by this Amendment, the Employment Agreement shall continue in full force and effect in accordance with the provisions thereof. As used in the Employment Agreement, the terms "hereinafter," "hereto," hereof, and other words of similar import shall, unless the context otherwise requires, mean the Employment Agreement as amended by this Amendment. In the event of any conflict or inconsistency between the terms and conditions of the Employment Agreement and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall control.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CORAM HEALTHCARE CORPORATION

By: ______________________
Stephen A. Feinberg
Chairman of Compensation Committee

By: ______________________
L. Peter Smith
Director, Compensation Committee

EXECUTIVE

______________________ 6 Apr 2000
Daniel D. Crowley

LA/CROWLEY AMD 2

2. Counterparts. This Amendment may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same instrument.

3. Miscellaneous. Except as expressly amended by this Amendment, the Employment Agreement shall continue in full force and effect in accordance with the provisions thereof. As used in the Employment Agreement, the terms "hereinafter," "hereto," hereof, and other words of similar import shall, unless the context otherwise requires, mean the Employment Agreement as amended by this Amendment. In the event of any conflict or inconsistency between the terms and conditions of the Employment Agreement and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall control.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CORAM HEALTHCARE CORPORATION

By:________________________
Stephen A. Feinberg
Chairman of Compensation Committee

By: [signature]
L. Peter Smith
Director, Compensation Committee

EXECUTIVE

[signature] 6 Apr 2000
Daniel D. Crowley

REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523

EXHIBIT: 35

Witness: Crowley

Date: 4/16/07 # of pages: 1

July 21, 2000

Mr. Daniel Crowley
Chairman of the Board
Coram Healthcare
1125 17th Street, Suite 2100
Denver, CO 80202

Dear Mr. Crowley:

The purpose of this letter is to inform you that I hereby resign from the Coram Healthcare Board of Directors effective immediately.

Sincerely,

Stephen Feinberg

CROWLEY 0090

** TOTAL PAGE.02 **

07/21/00 FRI 12:48 FAX 212 752 4837 FEINBERG MANGEMENT 002

CROWLEYKVN 000089

REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523

EXHIBIT: 36

Witness: Crowley

Date: 4/6/07 # of pages: 1

JUL 31 2000 17:18 FR CORAM HEALTHCARE 9154496253 TO S SHOLEY P.04/06

July 31, 2000

Coram Healthcare
1125 Seventeenth Street, Suite 2100
Denver, Colorado 80202
Telephone 303-292-4973 / 800-COLAMIC
Facsimile 303-298-0043

Mr. Stephen Feinberg
General Partner
Cerberus Partners, L.P.
450 Park Avenue, 28th Floor
New York, NY 10022

Mr. Ed Mulé
Managing Director
Goldman, Sachs & Co.
85 Broad Street
New York, NY 10004

Mr. Ed Stearns
Senior VP
Foothill Capital Corporation
11111 Santa Monica Boulevard #1500
Los Angeles, CA 90025-3333

COPY
- Coram Board
- David Friedman
- Russ Belinsky
w/Attachments

Gentlemen:

Nearly a year ago the Coram Board directed management to conduct an auction for the purpose of selling Coram's pharmacy unit. The auction completely failed and Coram did not receive any viable bids. It became rapidly apparent that if there was to be a sale we would have to create it.

I am pleased to inform you that we have been able to sell Coram Prescription Services (CPS) for $41.3 million in cash with no hold-back. The net proceeds are $38 million and these funds will be wired to the debt-holders tomorrow. This will result in Coram repaying the remaining $28.5 million outstanding balance on the revolver in full as well as $9.5 million on the Series A notes.

Earlier this year, we voluntarily repaid $15.5 million early on the revolver, $6.3 million in interest and with the $38 million, have generated $60 million in cash for the debt-holders. This compares to 1999 in which Coram used nearly $55 million in cash. With the $12 million reduction in A/P, and the $1 million used to settle the Aetna lawsuit, this represents a $128 million positive swing in cash at Coram since I became your CEO.

Regards,

Dan

Daniel D. Crowley
Chairman, President & CEO

cc: Coram Board of Directors

Attachments

DEPOSITION EXHIBIT
Goldin 10
12/4/06

COR-EQTY 0007227

EXHIBIT
28
2/14/07 DD

B93

CORAM HEALTHCARE

1125 Seventeenth Street, Suite 2100
Denver, Colorado 80202
Telephone 303.292.4973 / 800 CORAM HC
Facsimile 303.298.0043

July 31, 2000

EXHIBIT: 34
Witness: Crowley
Date: 4/6/07 # of pages: 2
REPORTER: LORRIE L MARCHANT, RPR, CRR, CSR NO. 10523

To Coram Board of Directors:

After the conclusion of the Board meeting on July 31, 2000, we proceeded to contact debt-holders to engage in a negotiation as to the DIP facility, debt-to-equity conversion, a new term note, and for a residual amount on behalf of the shareholders.

In advance of my discussion with Cerberus for new DIP financing, I had Chanin determine an appropriate range of interest rates and fees for such a commitment. Eric Scroggins informed me that we could expect to pay prime plus up to 3.5 percent plus should expect to pay fees of up to 3 percent for such a facility. I also discussed DIP financing with Bank of America and they confirmed that Chanin's assessment was correct. Following this information, I contacted Cerberus and negotiated a DIP facility of $40 million at prime plus 2 percent with a 1 percent fee. The DIP Financing commitment is for one year.

Separately, I contacted Ed Mule at Goldman Sachs and Steve Feinberg at Cerberus to negotiate the terms of a new note. They have agreed to convert approximately $70 million from debt to equity. Further that Coram would have a new four-year term note of $180 million at a 9 percent annual interest rate with no principal amortization. The note would come due with a balloon at the end of four years. This is substantially below the 12.5 percent to 13.5 percent rate that Chanin suggested was the market rate for companies like Coram. The DIP financing would be senior to all other debt on Coram. The new note would be senior to all other debt behind the revolver and ahead of everything else.

Lastly, I requested that the current Coram stockholders receive 10 cents per share in cash. Mr. Mule rejected the request out of hand. Mr. Feinberg suggested we grant the current shareholders some out-of-the-money warrants. Mr. Friedman advised me that the warrants would violate Stark II and that this was not a practical solution. I have not been able to contact Ed Stearns of Foothill Capital yet. However, given that we have the agreement of Cerberus and Goldman Sachs, I expect Foothill will agree with the terms outlined above.

In a personal matter, Mr. Friedman has advised me that we should amend my employment agreement to remove the fee that I was to be paid for restructuring the debt and alter it to be a stay-bonus. I have requested that the Board add a stay-

bonus of $800,000 to my arrangement. Half to be paid on the date the court approves the reorganization and half to be paid on December 31, 2001. I am requesting that the Board amend my employment agreement to pay me $2.2 million on the date the court approves the reorganization ($180 million new term note x 1% restructuring fee = $1.8 million originally due to me + $400,000 representing half of the stay bonus = $2.2 million).

Please be prepared to consider the DIP, term note, the debt-to-equity conversion, shareholder compensation, and my employment relationship at our meeting on Wednesday, August 2.

Sincerely,

[signature]

Daniel D. Crowley
Chairman, President & CEO

cc: David Friedman
Russ Belinski
Eric Scroggins
Allen Marabito