REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR. NO. 10533

**EXHIBIT:** 3

Witness: Crowley
Date: 4/6/07    # of pages: _____

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED BY THE COURT. ALL INFORMATION HEREIN IS SUBJECT TO CHANGE AND SHOULD NOT BE RELIED UPON IN MAKING ANY INVESTMENT OR OTHER DECISION.

FILED

## IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | |
| | ) | |
| CORAM HEALTHCARE CORP. and | ) | Chapter 11 |
| CORAM, INC., | ) | |
| | ) | Case Nos. 00-___ ( ) |
| Debtors. | ) | through 00-___ ( ) |
| | ) | |
| | ) | Jointly Administered |

## DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
David M. Friedman
Adam L. Shiff
Robert M. Novick
1301 Avenue of the Americas
New York, New York 10019
(212) 506-1700

– and –

PACHULSKI, STANG, ZIEHL,
YOUNG & JONES, P.C.
Laura Davis Jones
919 North Market Street, Suite 1600
Wilmington, Delaware 19801
(302) 652-4100

CO-COUNSEL TO DEBTORS AND
DEBTORS-IN-POSSESSION



EXHIBIT
3
OP 2/14/07

35

B96

E.    Management

1.    Reorganized Coram Board of Directors and Executive Officers

Reorganized Coram will be managed by a Board of Directors composed of the below-listed individuals. Reorganized Coram will have the overall corporate structure depicted in the charts attached hereto as Exhibit G.

The following biographical information is furnished with respect to the above-named members of the Board of Directors and senior executives of Reorganized Coram:

| NAME | AGE | POSITION WITH CORAM | DIRECTOR SINCE |
|------|-----|---------------------|----------------|
| Daniel D. Crowley | 52 | Chairman of the Board | 1999 |
| Donald J. Amaral | 47 | Director | 1995 |
| William J. Casey | 55 | Director | 1997 |
| L. Peter Smith | 50 | Director | 1994 |
| Sandra L. Smoley | 63 | Director | 2000 |

Mr. Crowley joined Coram as its Chairman, Chief Executive Officer and President as of November 30, 1999. He is also Chairman of Winterland, a privately held affinity merchandise company in the music and entertainment industry, and Chairman, Chief Executive Officer and President of Dynamic Healthcare Solutions, LLC, a privately held management consulting and investment firm that he established in 1997. Prior to founding Dynamic Healthcare Solutions, Mr. Crowley served as the Chairman, Chief Executive Officer and President of Foundation Health Corporation, a post that he had served in since 1989.

Mr. Crowley serves as Chairman of the Board, President, and Chief Executive Officer of CHC pursuant to an employment agreement dated as of November 30, 1999 (as subsequently amended, the "Crowley Agreement"). The Crowley Agreement provides, among other things, that Mr. Crowley shall receive, among other compensation, a base salary ("Base Salary") in the amount of $650,000 per annum, and a performance bonus based upon CHC's EBITDA results for fiscal year 2000 as reflected in the Debtors' audited financial statements, in the amount of 25% of the Debtors' EBITDA greater than $14 million, and $5 million to Crowley and other members of management as designated by Crowley if EBITDA exceed $35 million. The Crowley Agreement also provides that Mr. Crowley shall receive a restructuring bonus in the amount of $1.8 million, payable on the Effective Date of a plan of reorganization which is approved by CHC's Board of Directors. The Crowley Agreement will be assumed by CHC and assigned to Coram under the provisions of the Plan.

Mr. Crowley also serves as a consultant to Cerberus Partners, L.P. ("Cerberus"), which is a member of the Noteholder Group, with respect to its investments in various health

44

care companies other than the Debtors. Mr. Crowley generally receives a fee from Cerberus for such services, but receives no fee from Cerberus for any services he provides respecting the Debtors.

Mr. Amaral served as Chairman of the company's Board of Directors from September 1997 until November 30, 1999. Mr. Amaral has served as a director of the company since October 1995, Chief Executive Officer of the company from October 1995 through April 23, 1999 and October 22, 1999 through November 30, 1999, and as President from October 1995 through December 1997. Previously, he was President and Chief Operating Officer of OrNda Healthcorp ("OrNda") from April 1994 to August 1995, and served in various executive positions with Summit Health Ltd. ("Summit") from October 1989 to April 1994, including President and Chief Executive Officer between October 1991 and April 1994. Summit was merged into OrNda in April 1994. Mr. Amaral is also a member of the Board of Directors of CareMatrix Corporation.

Mr. Casey has served as a director of Coram since September 1997. Since 1983, Mr. Casey has served as a consultant in the healthcare industry, specializing in hospital management evaluation, hospital planning, managed care contracting and turnaround services. From 1986 to 1997, Mr. Casey has also served as Contract Administrator for Emergency Department Physicians' Medical Group, Inc. and its affiliated medical groups, which provide physician services to non-governmental facilities. In addition, from 1988 to 1997, Mr. Casey has served as Contract Administrator for NP Medical Group, Inc., which provides physician services to government facilities. Mr. Casey also serves as a director of TriCounties Bank.

Mr. L. Peter Smith has served as a director of Coram since July 1994. Between November 1993 and July 1994, Mr. Smith was a director of Medisys, Inc. Mr. Smith served as the Managing Partner of AllCare Health Services, Inc., which was acquired by Medisys in December 1992. Mr. Smith is also Chief Executive Officer and serves on the Board of Directors of Ralin Medical, Inc., a company specializing in cardiac disease management. Mr. Smith also serves on the Board of Directors of Gateway, Inc. and AMSYS, Inc. Mr. Smith previously served on the Board of Directors of Sabratek Corporation from October 1992 through August 23, 1999. Sabratek Corporation filed a voluntary bankruptcy petition under Chapter 11 of the United States Code on December 17, 1999 and that proceeding is presently pending before the United States Bankruptcy Court in Delaware.

Ms. Smoley was elected to Coram's Board of Directors on February 10, 2000. Ms. Smoley is the Chairman and Chief Executive Officer of The Sandra Smoley company, a health care and local government consulting firm based in Sacramento, California. From October 1993 to January 1999, she served as the Secretary of the California Health and Welfare Agency. Prior to that time, she was Secretary of the California State and Consumer Services Agency from January 1993 to October 1993.

## 2. Arrangements with Reorganized Coram's Executives

Reorganized Coram's successful implementation of its business strategies will be highly dependent upon the continuing commitment of its key executives to achieving corporate objectives. Reorganized Coram intends to enter into agreements with its key executives in order to recruit (where necessary) and retain the services of such executives and (a) assure the availability of their skills for the benefit of Reorganized Coram, (b) secure to Reorganized Coram freedom from competition by such persons within reasonable and lawful limits, and (c) provide appropriate base compensation, benefits and financial incentives through bonus, severance and other employment-related programs.

The senior executive officers of Coram and CHC are currently receiving a salary from the Debtors at the following annualized rates:

| NAME | SALARY (BASE) | AGE | POSITION(S) WITH CORAM |
|------|---------------|-----|------------------------|
| Daniel D. Crowley | $650,000 | 52 | Chairman, Chief Executive Officer, President and Director |
| Scott R. Danitz | $200,000 | 42 | Senior Vice President, Finance and Chief Accounting Officer |
| Scott T. Larson | $185,000 | 37 | Senior Vice President, General Counsel and Secretary |
| Allen J. Marabito | $310,000 | 53 | Executive Vice President |
| Vito Ponzio, Jr. | $165,000 | 45 | Senior Vice President, Human Resources |

Certain senior executive officers also receive medical, dental, disability and life insurance coverage, car allowances and paid vacations.

In addition to base salary, Coram's senior executives, as senior executives of Reorganized Coram, will continue to earn bonuses or, if voluntarily terminated or terminated without cause, be provided with severance benefits in accordance with certain of the Debtors' plans that are currently the subject of an application for approval with the Bankruptcy Court.

46

Specifically, the Debtors have obtained Bankruptcy Court approval of a Key Employee Retention Program, which is described above at section IV.F.3. "Other Administrative Events."

The Debtors also have a management incentive program ("Executive Compensation Program") which applies to approximately thirty-five (35) people. The Executive Compensation Program consists of three components: base salaries, short term incentives, and long term incentives. The Debtors intend to assume Executive Compensation Program, except that the Executive Compensation Program will be modified to the extent necessary to be consistent with the provisions of the Plan. A copy of the Executive Compensation Program, as modified, will be included in the Plan Supplement.

Scott R. Danitz has served as the company's Vice President and Controller from January 1998 through December 1999 and as Senior Vice President, Finance and Chief Accounting Officer since January 2000. Previously, Mr. Danitz was employed by First Data Corporation from 1989 through 1997 and held various positions, the most recent of which had been Vice President and Controller, Payment Instruments division.

Scott T. Larson has served as the company's Senior Vice President and General Counsel since July 1998 and was elected Secretary in April 1999. Previously, Mr. Larson served as the company's Vice President and Legal Counsel from March 1996 to July 1998 and as Assistant General Counsel from July 1994 through February 1996. Between December 1991 and July 1994, Mr. Larson served as Corporate Counsel and later as Assistant General Counsel for T(2) Medical, Inc. ("T(2) Medical"). Before joining T(2) Medical, Mr. Larson was employed as an attorney with the Atlanta-based law firm of Alston & Bird.

Allen J. Marabito joined Coram effective November 30, 1999 as Executive Vice President. From 1997 to 1999, Mr. Marabito was in private law practice and Senior Vice President with Dynamic Healthcare Solutions, LLC. From 1991 to 1997, he served as the Senior Vice President, Secretary and General Counsel of Foundation Health Corporation.

Vito Ponzio, Jr. has served as the company's Senior Vice President, Human Resources since September 1998. Previously, Mr. Ponzio served as the company's Vice President of Human Resources from February 1996 to September 1998 and as Director of Human Resources from February 1994 to February 1996.

F.    Certificate of Incorporation and By-Laws of the Reorganized Coram

Pursuant to the Plan, on the Effective Date, the Reorganized Coram will file the Amended and Restated Certificate of Incorporation of Reorganized Coram and will adopt the Amended By-Laws of Reorganized Coram. See "Implementation of the Plan -- Corporate Action." The description set forth below is intended as a summary only and is qualified in its

REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR. NO. 10523

EXHIBIT: _____38_____

Witness: Crowley
Date: 4/6/07          # of pages: _____

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| CORAM HEALTHCARE CORP. and | ) | Chapter 11 |
| CORAM, INC., | ) | |
| | ) | Case Nos. 00-3299 (MFW) |
| Debtors. | ) | through 00-3300 (MFW) |
| | ) | |
| | ) | Jointly Administered |
| | ) | |

## FIRST AMENDED AND RESTATED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
David M. Friedman
Adam L. Shiff
Robert M. Novick
1633 Broadway
New York, New York 10019
(212) 506-1700

– and –

PACHULSKI, STANG, ZIEHL,
YOUNG & JONES, P.C.
Laura Davis Jones
919 North Market Street, Suite 1600
Wilmington, Delaware 19801
(302) 652-4100

## CO-COUNSEL TO DEBTORS AND DEBTORS-IN-POSSESSION

B101

EXHIBIT

EC-2

piecemeal liquidation of the Debtors. See "Voting and Confirmation of the Plan -- Liquidation Analysis." Accordingly, the Plan proposed by the Debtors:

- permits Coram and its operating subsidiaries to continue their business operations;

- eliminates and refinances substantially all of the Debtors' existing unsecured (non-priority) indebtedness and provides for the payment of cash and the issuance of New Coram Stock and New Secured Notes to the holders of such indebtedness; and

- extinguishes all existing equity interests of the Debtors.

## 2. Summary of Classes and Treatment

Under the Plan, Claims against and Allowed Interests in the Debtors are divided into Classes according to their similarity to other Claims and Allowed Interests, the particular Debtor obligated on the Claims and the Debtor which issued the Allowed Interests and the relative legal and contractual priorities of the Claims and Interests.

In accordance with mandatory provisions of the Bankruptcy Code, the Plan provides that holders of certain Claims (Allowed Administrative Claims, Allowed Non-Tax Priority Claims and Allowed Tax Priority Claims) will be entitled to immediate (or, in the case of Allowed Tax Claims, deferred) cash distributions.

The aggregate amount of Claims estimated in each Class is based upon the Debtors' estimates of the aggregate amounts of Claims that the Debtors believe will be asserted upon resolution of any Claims that the Debtors believe will be Disputed Claims. Certain of these Disputed Claims may be material, and the total amount of all such Claims, including Disputed Claims, may materially exceed the total amount of Allowed Claims assumed in the development of the Plan.

The estimated Aggregated Amount of Claims Estimated depicted in the table below are based upon the Debtors' preliminary review of the Debtors' books and records and may be revised following the passage of all applicable bar dates and the completion of a detailed analysis of all Claims filed in the Cases.

6

| Description and Amount of Claims of Interests | Treatment |
|---|---|
| • Administrative Expense Claims (Unclassified) | Unimpaired; payment (i) in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) on such other terms to which the parties agree; provided, however, that Administrative Expense Claims incurred in the ordinary course of business will be paid as such Claims become due and payable in the ordinary course of business. |
| • Aggregate Amount of Claims Estimated: $3,700,000 | Recovery (Estimated):          100%<br><br>Ownership of Reorganized Coram: 0% |
| • Priority Tax Claims (Unclassified) | Unimpaired; at the Debtors' or Reorganized Coram's option, as applicable, (i) payment in full, in Cash, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, (ii) a Tax Note equal to the full amount of such holder's Priority Tax Claim, or (iii) on such other terms as mutually agreed to by the holder of an Allowed Tax Claim and the Debtors or Reorganized Coram. |
| • Aggregate Amount of Claims Estimated: $40,000 | Recovery (Estimated):          100%<br><br>Ownership of Reorganized Coram: 0% |
| • Class CHC P (Allowed CHC Priority Non-Tax Claims)<br><br>• Priority Non-Tax Claims against CHC | Unimpaired; on the Effective Date, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed CHC Priority Non-Tax Claim unimpaired. |
| • Aggregate Amount of Claims Estimated $12,900 | Recovery (Estimated):          100%<br><br>Ownership of Reorganized Coram: 0% |
| • Class CHC 1 (Allowed CHC Secured Claims)<br><br>• Secured Claims against CHC | Unimpaired; on the Effective Date, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed CHC Secured Claim unimpaired. |
| • Aggregate Amount of Claims Estimated:  $1,850,000 | Recovery (Estimated):  100%<br><br>Ownership of Reorganized Coram: 0% |

7

| | |
|---|---|
| • Class CHC 2 (Allowed CHC General Unsecured Claims)<br><br>• General Unsecured Claims against CHC | Impaired. If Class CHC 2 votes to accept the Plan by the majorities required by section 1126(c) of the Bankruptcy Code, each holder of an Allowed CHC General Unsecured Claim shall receive its Pro Rata share of (i) the CHC General Unsecured Consideration and (ii) the CHC Noteholder Consideration, which is a total cash pool of $2 million. If Class CHC 2 fails to accept the Plan by the requisite majorities, each holder of an Allowed CHC General Unsecured Claim will receive a Pro Rata share of only the CHC General Unsecured Consideration.<br><br>Class CHC 2 receives an enhanced distribution if it votes in favor of the Plan. |
| • Aggregate Amount of Claims Estimated: $7,407,000 | Recovery (Estimated):      28% if accepting Plan<br>                                         0.8% if rejecting Plan<br><br>Ownership of Reorganized Coram: 0% |
| Class CHC 3 (Allowed CHC Notes Claims)<br><br>• Allowed Claims arising under the Notes against CHC | Impaired; if Class CHC 2 votes to accept the Plan, no recovery. If Class CHC 2 fails to accept the Plan, pro rata share of the Noteholder Consideration. |
| • Aggregate Amount of Claims Estimated: $252,620,000 | Recovery (Estimated):    0 % if Class CHC 2 accepts Plan<br><br>                                       a pro rata share of a $2 million cash pool if Class CHC 2 rejects Plan<br><br>Ownership of Reorganized Coram: 0% |
| Class CHC 4 (Allowed CHC Equity Interests)<br><br>• All equity interests in CHC | Impaired; no distribution and all rights and interests canceled.<br><br>Recovery (Estimated):      0 % |
| • Aggregate Value of Interests Estimated: $0 | Ownership of Reorganized Coram: 0% |

| | |
|---|---|
| • Class Coram P (Allowed Coram Priority Non-Tax Claims)<br><br>• Priority Non-Tax Claims against Coram<br><br>• Aggregate Amount of Claims Estimated $70,000 | Unimpaired; on the Effective Date, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed Coram Priority Non-Tax Claim unimpaired.<br><br>Recovery (Estimated):        100%<br><br>Ownership of Reorganized Coram: 0% |
| Class Coram 1 (Allowed Coram Secured Claims)<br><br>• Allowed Secured Claims against Coram<br><br>• Aggregate Amount of Claims Estimated: $16,700 | Unimpaired; on the Effective Date, at the option of the Debtors, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, or (ii) such other treatment to render such Allowed Coram Secured Claim unimpaired.<br><br>Recovery (Estimated):        100%<br><br>Ownership of Reorganized Coram: 0% |
| Class Coram 2 (Allowed Coram Note Claims)<br><br>• Allowed Claims arising under the Notes against Coram<br><br>• Aggregate Amount of Claims Estimated: $252,620,000 | Impaired; each holder of an Allowed Coram Note Claim shall receive its Pro Rata share of: (i) the New Coram Stock, and (ii) the New Secured Notes.<br><br>Recovery (Estimated):        $\frac{180 + 29}{252} = 83\%$<br><br>Ownership of Reorganized Coram: 100% |
| Class Coram 3 (Allowed Coram General Unsecured Claims)<br><br>• General Unsecured Claims against Coram<br><br>• Aggregate Amount of Claims Estimated: $830,000 | Unimpaired; at the option of Coram or Reorganized Coram, (i) payment in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim, (ii) Reinstatement, or (iii) such other treatment to render such Allowed Coram General Unsecured Claim unimpaired.<br><br>Recovery (Estimated): 100 %<br><br>Ownership of Reorganized Coram: 0% |

B105

| Class Coram 4 (Allowed Coram Equity Interests)<br><br>All equity interests in Coram<br><br>• Aggregate Value of Interests Estimated: 0 | Impaired; no distribution and all rights and interests canceled.<br><br>Recovery (Estimated): 0%<br><br>Ownership of Reorganized Coram: 0%. |
|---|---|

THE TREATMENT AND DISTRIBUTION PROVIDED TO HOLDERS OF ALLOWED CLAIMS AND EQUITY INTEREST PURSUANT TO THE PLAN ARE IN FULL AND COMPLETE SATISFACTION OF THE ALLOWED CLAIMS AND EQUITY INTERESTS, AS THE CASE MAY BE, ON ACCOUNT OF WHICH SUCH TREATMENT IS GIVEN AND SUCH DISTRIBUTIONS ARE MADE.

### 3. Sources of Cash to Make Plan Distributions

Coram will contribute cash in the amount of $2 million to fund the Unsecured Claims Reserve, which monies will be distributed to the holders of Allowed Claims in Classes CHC 2 and (if Class CHC 2 fails to accept the Plan) CHC 3 pursuant to the provisions of the Plan. The cash required to make all other payments and distributions contemplated by the Plan will be generated from the operations of the Debtors and, if necessary, borrowing under the Debtors' Exit Financing Facility. Based on current projections, the Debtors believe that they will have sufficient cash to continue to operate their businesses and make the necessary cash distributions under the Plan. See section XVII "Projections," below. If, however, the Debtors become engaged in protracted litigation or the Plan is not confirmed as anticipated by December 29, 2000, there can be no assurance that the Debtors will have sufficient cash to make distributions thereunder without availing themselves of other (non-operational) sources of funds, and there is no assurance that such funds will be available on acceptable terms and conditions. See "Risk Factors -- Capital Requirements."

### 4. Summary of Reorganized Company

Reorganized Coram will be privately held by the Noteholder Group. Publicly-held CHC will cease to have any direct or indirect business operations and will be dissolved in accordance with the provisions of the Plan. As a privately-held company, Reorganized Coram will be able to maintain compliance with the provisions of Stark II as a result of having eliminated the risk of ownership by (i) physicians who make Medicare and Medicaid referrals to Coram or its subsidiary operating companies or (ii) family members of such physicians. So owned, Reorganized Coram will also be substantially likely to remain in compliance with Stark II for the

10

E.    **Management**

1.    **Reorganized Coram Board of Directors and Executive Officers**

Reorganized Coram will be managed by a Board of Directors composed of the below-listed individuals plus such other individuals as may be agreed to by the Debtors and the Noteholder Group whose names will be included in the Plan Supplement. Reorganized Coram will have the overall corporate structure depicted in the chart attached hereto as Exhibit H.

The following biographical information is furnished with respect to the above-named current members of the Board of Directors of CHC and the senior executives of the Debtors:

| NAME | AGE | POSITION WITH CORAM | DIRECTOR SINCE |
|------|-----|---------------------|----------------|
| Daniel D. Crowley | 52 | Chairman of the Board | 1999 |
| Donald J. Amaral | 47 | Director | 1995 |
| William J. Casey | 55 | Director | 1997 |
| L. Peter Smith | 50 | Director | 1994 |
| Sandra L. Smoley | 63 | Director | 2000 |

Mr. Crowley joined CHC as its Chairman, Chief Executive Officer and President as of November 30, 1999. He is also Chairman of Winterland, a privately held affinity merchandise company in the music and entertainment industry, and Chairman, Chief Executive Officer and President of Dynamic Healthcare Solutions, LLC, a privately held management consulting and investment firm that he established in 1997. Prior to founding Dynamic Healthcare Solutions, Mr. Crowley served as the Chairman, Chief Executive Officer and President of Foundation Health Corporation, a post that he had served in since 1989.

Mr. Crowley serves as Chairman of the Board, President, and Chief Executive Officer of CHC pursuant to an employment agreement dated as of November 30, 1999 (as subsequently amended, the "Crowley Agreement"). The Crowley Agreement provides, among other things, that Mr. Crowley shall receive, among other compensation, a base salary ("Base Salary") in the amount of $650,000 per annum, and a performance bonus based upon CHC's EBITDA results for fiscal year 2000 as reflected in the Debtors' audited financial statements, in the amount of 25% of the Debtors' EBITDA greater than $14 million, and $5 million to Crowley and other members of management as designated by Crowley if EBITDA exceeds $35 million. The Crowley Agreement also provides that Mr. Crowley shall receive a restructuring bonus in the amount of $1.8 million, payable on the Effective Date of a plan of reorganization which is approved by CHC's Board of Directors. The Crowley Agreement will be assumed by CHC and assigned to Coram under the provisions of the Plan.

47

Mr. Crowley also serves as a consultant to Cerberus Partners, L.P. ("Cerberus"), which is a member of the Noteholder Group, with respect to its investments in various health care companies other than the Debtors. Mr. Crowley generally receives a fee from Cerberus for such services, but receives no fee from Cerberus for any services he provides respecting the Debtors.

Mr. Amaral served as Chairman of CHC's Board of Directors from September 1997 until November 30, 1999. Mr. Amaral has served as a director of the company since October 1995, Chief Executive Officer of CHC from October 1995 through April 23, 1999 and October 22, 1999 through November 30, 1999, and as President from October 1995 through December 1997. Previously, he was President and Chief Operating Officer of OrNda Healthcorp ("OrNda") from April 1994 to August 1995, and served in various executive positions with Summit Health Ltd. ("Summit") from October 1989 to April 1994, including President and Chief Executive Officer between October 1991 and April 1994. Summit was merged into OrNda in April 1994. Mr. Amaral is also a member of the Board of Directors of CareMatrix Corporation.

Mr. Casey has served as a director of CHC since September 1997. Since 1983, Mr. Casey has served as a consultant in the healthcare industry, specializing in hospital management evaluation, hospital planning, managed care contracting and turnaround services. From 1986 to 1997, Mr. Casey has also served as Contract Administrator for Emergency Department Physicians' Medical Group, Inc. and its affiliated medical groups, which provide physician services to non-governmental facilities. In addition, from 1988 to 1997, Mr. Casey has served as Contract Administrator for NP Medical Group, Inc., which provides physician services to government facilities. Mr. Casey also serves as a director of TriCounties Bank.

Mr. L. Peter Smith has served as a director of CHC since July 1994. Between November 1993 and July 1994, Mr. Smith was a director of Medisys, Inc. Mr. Smith served as the Managing Partner of AllCare Health Services, Inc., which was acquired by Medisys in December 1992. Mr. Smith is also Chief Executive Officer and serves on the Board of Directors of Ralin Medical, Inc., a company specializing in cardiac disease management. Mr. Smith also serves on the Board of Directors of Gateway, Inc. and AMSYS, Inc. Mr. Smith previously served on the Board of Directors of Sabratek Corporation from October 1992 through August 23, 1999. Sabratek Corporation filed a voluntary bankruptcy petition under Chapter 11 of the United States Code on December 17, 1999 and that proceeding is presently pending before the United States Bankruptcy Court in Delaware.

Ms. Smoley was elected to CHC's Board of Directors on February 10, 2000. Ms. Smoley is the Chairman and Chief Executive Officer of The Sandra Smoley Company, a health care and local government consulting firm based in Sacramento, California. From October 1993 to January 1999, she served as the Secretary of the California Health and Welfare Agency. Prior to that time, she was Secretary of the California State and Consumer Services Agency from January 1993 to October 1993.

48

REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10533

EXHIBIT: _____6_____

Witness: __Davis__

Date: _4|5|07_    # of pages: __10__

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                                    )
                                          )
CORAM HEALTHCARE CORP,                    )    Chapter 11
                                          )
            and                           )
                                          )    Case No. 00-3299(MFW)
CORAM INC.,                               )    (Jointly Administered)
                                          )
            Debtors.                      )

**NOTICE OF WITHDRAWAL OF DEBTORS' APPLICATION
FOR ORDER AUTHORIZING EMPLOYMENT AND
RETENTION OF DYNAMIC HEALTHCARE SOLUTIONS**

1.      On September 7, 2000, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed the Application for Order Authorizing Employment and Retention of Dynamic Healthcare Solutions (the "Application") [Docket No. 165].

2.      The Office of the United States Trustee objected to the Application (the "Objection") [Docket No. 194].

3.      The Debtors and the Trustee have engaged in extensive negotiations in order to resolve the issues raised by the Application and the Objection.

4.      As a result of the settlement reached with the Trustee, the Debtors believe that the Application should be withdrawn.

5.      However, and as a part of such objection and to facilitate the continued provision of key services by certain personnel to the Debtors, six former Dynamic employees set

15570-001\DOCS_DE:12695.1
11/15/00 11:10 PM

382 X

forth in the Application: Ron Mills, Kurt Davis, Dan Smithson, Peter Andrews, Darlena Bay and

Paul Weber (collectively, the "Employees"), will be employed by the Debtors as "at will"

employees effective as of August 1, 2000.

      6.     The Employees have tendered their resignation to Dynamic and Dynamic

will not profit from the Employees rendition of services to Dynamic.

      7.     Inasmuch as the Debtors' employment of these Employees is as "at will"

employees, the Debtors believe their employment to be ordinary course transactions, and

therefore, do not believe that they should seek approval therefor.

8.      The Debtors will be before the Court on November 28, 2000, and can

address any matters with respect to the foregoing at such time.

Dated:  November 16, 2000   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
           David M. Friedman
           Adam L. Shiff
           Athena F. Foley
           1301 Avenue of the Americas
           New York, New York 10019
           Telephone: (212) 506-1700

            - and -

           PACHULSKI STANG ZIEHL YOUNG & JONES P.C.

           Laura Davis Jones (No. 2436)
           Rachel S. Lowy (Bar No. 3753)
           Christopher J. Lhulier (Bar No. 3850)
           919 North Market Street, 16th Floor
           P.O. Box 8705
           Wilmington, Delaware 19899-8705 (Courier 19801)
           Telephone: (302) 652-4100
           Facsimile: (302) 652-4400
           Attorneys For Debtors And Debtors In Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| CORAM HEALTHCARE CORP. and | ) | Chapter 11 |
| CORAM, INC. | ) | |
| | ) | Case Nos. 00-3299 |
| Debtors. | ) | through 00-3300 (MFW) |
| | ) | |
| | ) | (Jointly Administered) |

## AFFIDAVIT OF SERVICE

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | )  SS: |
| COUNTY OF NEW CASTLE | ) |

Patricia E. Cuniff, being duly sworn according to law, deposes and says that

she is employed by the law firm of Pachulski, Stang, Ziehl, Young & Jones P.C. and that

on the 9th day of November, 2000 she caused a copy of the following documents to be

served upon the individuals on the attached service list in the manner indicated.

1.    **Notice of Withdrawal of Debtors' Application for Order
Authorizing Employment and Retention of Dynamic Healthcare Solutions.**

Dated: November 16, 2000

_Patricia E. Cuniff_
Patricia E. Cuniff

Sworn to and subscribed before
me this 16th day of November, 2000

_Notary Public_

My Commission Expires:  _7/1/01_

B112

Coram Healthcare Corp. 2002 Service List
Case No. 00-3299
vember 16, 2000
Doc. # 8018
*08 - Hand Delivery*
*03 - Federal Express*
*56 - First Class Mail*

*Hand Delivery*
*(Counsel to the Debtors)*
Pachulski Stang Ziehl Young & Jones
Laura Davis Jones, Esquire
Rachel S. Lowy, Esq.
Christopher L. Lhulier, Esq.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE  19899-8705

*Hand Delivery*
*(Copy Service)*
Parcels, Inc.
Vito I. DiMaio
10th & King Streets
Wilmington, DE  19801

*nd Delivery*
*(Counsel for Committee)*
Deborah E. Spivack, Esq.
Mark D. Collins, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE  19899

*Hand Delivery*
*(Proposed Counsel to Equity Committee)*
Mark Minuti, Esq.
Saul, Ewing, Remick & Saul, LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899

*Hand Delivery*
*(Counsel to Coram Resources Network, Inc.,*
*Coram Independent Practice Association, Inc.)*
Richard H. Morse, Esq.
Edwin J. Harron, Esq.
Thnon L. Morton, Esq.
line K. Morgan, Esq.
Young Conaway Stargatt & Taylor LLP
11th Floor Rodney Square North
P.O. Box 391
Wilmington, DE  19899-0391

*Hand Delivery*
*(Counsel to Pacific Insurance Comp)*
Carl N. Kunz, III, Esq.
Murphy, Spadaro & Landon
824 Market Street, Suite 700
P.O. Box 8989
Wilmington, DE  19899

*Hand Delivery*
*(Counsel to Brooklyn Respiratory Home Care)*
Kevin J. Mangan, Esq.
Walsh, Monzack and Monaco, P.A.
1201 Orange Street, Suite 400
Wilmington, DE  19801

*Hand Delivery*
*)*
Ellen W. Slights, Esq.
Assistant United States Attorney
Chase Manhattan Centre
1201 N. Market Street, Suite 1100
P.O. Box 2046
Wilmington, DE  19899-2046

*Federal Express*
*(Debtor)*
Scott R. Danitz, Senior Vice President,
Finance and Chief Accounting Officer
Coram Healthcare
1125 Seventeenth Street, Suite 2100
Denver, CO  80202

*Federal Express*
*(DIP Lender)*
Carol Morrison, Esq.
Schulte Roth & Zabel, LLP
900 Third Avenue
New York, NY  10022

*Federal Express*
*(Counsel for Committee of Unsecured Creditors)*
Chaim J. Fortgang, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY  10019-6150

B113

*First Class Mail*
*(U.S. Trustee)*
ia Giannirakis, Esq.
Ufice of the U.S. Trustee
601 Walnut Street
Curtis Center, Suite 950 West
Philadelphia, PA 19106

*First Class Mail*
*(Representing U.S. Trustee)*
Daniel Astin, Esq.
Office of the U.S. Trustee
601 Walnut Street
Curtis Center, Suite 950 West
Philadelphia, PA 19106

*First Class Mail*
*(Special Counsel)*
Eugene Tillman, Esq.
Reed Smith Shaw & McClay, LLP
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C. 20005-3317

*First Class Mail*
David M. Friedman, Esq.
Athena Foley, Esq.
Adam L. Shiff, Esq.
Kasowitz, Benson, Torres & Friedman, LLP
1301 Avenue of the Americas
New York, NY 10019-6022

*First Class Mail*
)
Thomas M. Antone, IV, Esquire
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
1704 Hunting Ridge Road
Raleigh, NC 27615

*First Class Mail*
)
John T. Morrier, Esquire
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
One Financial Center
Boston, MA 02111

*First Class Mail*
*(Counsel to Harris County, Houston ISD, City of Houston)*
John P. Dillman, Esq.
Linebarger Heard Goggan Blair Graham Pena & Sampson, LLP
P.O. Box 3064
Houston, TX 77253-3064

*First Class Mail*
)
Securities & Exchange Commission
15th & Pennsylvania Avenue, N.W.
Washington, D.C. 20020

*First Class Mail*
)
District Director
IRS
409 Silverside Road
Wilmington, DE 19809

*First Class Mail*
)
Securities & Exchange Commission
Atlanta Regional Office
Branch of Reorganization
3475 Lenox Road, N.E., Suite 100
Atlanta, GA 30326-1232

*First Class Mail*
)
Secretary of Treasury
P.O. Box 7040
Dover, DE 19903

*First Class Mail*
)
Secretary of State
Division of Corporations
Franchise Tax Section
P.O. Box 7040
Dover, DE 19903

*First Class Mail*
*(Counsel to Mark W. Pasmantier, M.D.,*
*Morton Coleman, M.D., Thomas W. Nash, M.D.*
*and Barry J. Hartman, M.D.)*
Attn: Frederick A. Nicoll, Esq.
East 80 Route 4
Sutie 220
Paramus, NJ 07652

*First Class Mail*
*(Counsel to Invacare Corporation and*
*Suburban Ostomy Supply Co.;*
*Counsel to B. Braun Medical, Inc.)*
Francis J. Lawall, Esq.
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799

*First Class Mail*
*(Counsel to Invacare Corporation and*
*Suburban Ostomy Supply Co.)*
Craig W. Relman, Esq.
Craig W. Relman Co., LPA
23875 Commerce Park Road
Suite 105
Beachwood, OH 44122

*First Class Mail*
*(Counsel to B. Braun Medical, Inc.)*
Cathy L. Codrea, Esq.
Assistant General Counsel
B. Braun Medical, Inc.
 Twelfth Avenue
 .lehem, PA 18018

*First Class Mail*
*(Counsel to Aetna US Healthcare, Inc.)*
Kevin S. Anderson, Esq.
Eric P. Wilenzik, Esq.
Elliott Reihner Siedzikowski & Egan, P.C.
Union Meeting Corporate Center V
925 Harvest Drive
Blue Bell, PA 19422

*First Class Mail*
*(Pro Se)*
Mr. Bill Angelowitz
Daily Insights
JAF Box 3127
New York, NY 10116

*First Class Mail*
*(Pro Se)*
Mr. Peter A. Chapman
24 Perdicaris Place
 .ton, NJ 08618

*First Class Mail*
*(Pro Se)*
Christopher Beard, Esq.
Beard & Beard
4601 North Park Avenue
Chevy Chase, MD 20815

*First Class Mail*
*)*
Lori Obernauf, Esq.
Bankruptcy Administration
IOS Capital, Inc.
1738 Bass Road
P.O. Box 13708
Macon, GA 31208-3708

*First Class Mail*
*(Counsel to Trammell Crow Company)*
Sarah A. Hall, Esq.
Mock, Schwabe, Waldo, Elder, Reeves
& Bryant
Fourteenth Floor, #2 Leadership Square
211 North Robinson
Oklahoma City, OK 73102

*First Class Mail*
*(Counsel to Safeco Life Insurance Company)*
Mark E. Felger, Esq.
Cozen and O'Connor
Chase Manhattan Centre
1201 N. Market Street, Suite 1400
Wilmington, DE 19801

*First Class Mail*
*(Counsel to Home Health Corporation of America,*
*Inc.)*
Robert J. Lenahan, Esq.
Adelman Lavine Gold and Levin
1900 Two Penn Center Plaza
Philadelphia, PA 19102-1799

*First Class Mail*
*(Counsel to PCD Brandt, Ltd.)*
Clyde A. Pine, Jr., Esq.
Mounce, Green, Myers, Safi & Galatzan
P.O. Drawer 1977
El Paso, TX 79950-1977

B115

*First Class Mail*
*(Pro Se)*
  :garet A. Holland
Deputy Attorney General
Office of the Attorney General
R. J. Hughes Justice Complex
P.O. Box 106
Trenton, NJ 08625

*First Class Mail*
*(Counsel to Mancini Properties, Inc.)*
Peter A. Kline, Esq.
Joan R. Kester, Esq.
Miller, Morton, Caillat & Nevis, LLP
50 W. San Fernando Street, #1300
San Jose, CA 95113

*First Class Mail*
*(Counsel to Richard M. Smith)*
Joseph A. Eisenberg P.C.
Jeffer, Mangels, Butler & Marmaro, LLP
2121 Avenue of the Stars, 10th Floor
Los Angeles, CA 90067

*‾st Class Mail*
  unsel to 45 South Service Road Associates, LLC)*
Leslie H. Scharaf, Esq.
Certilman, Balin, Adler & Hyman, LLP
90 Merrick Avenue
East Meadow, NY 11554

*First Class Mail*
*(Counsel to North Western Mutual Life Insurance*
*Company)*
Glen Dresser, Esq.
Law Offices of Glen Dresser
12650 Riverside Drive, Suite 100
N. Hollywood, CA 91607

*First Class Mail*
*(Pro Se)*
Blue Cross Blue Shield of Michigan
Attn: Latonya McGrier
Office of the General Counsel
600 Lafayette East, MB 1925
Detroit, MI 48226

*First Class Mail*
*(Counsel to Resource Realty of Northern New Jersey,*
*Inc.)*
Merrill M. O'Brien, Esq.
Dollinger & Dollinger, P.A.
Mack-Cali Centre II
One Mack Centre Drive
Paramus, NJ 07652-3906

*First Class Mail*
*(Counsel to Spieker Properties, L.P.)*
Howard J. Weg, Esq.
David B. Shemano, Esq.
Peitzman, Glassman & Weg LLP
1900 Avenue of the Stars, Suite 650
Los Angeles, CA 90067

*First Class Mail*
*(Counsel to Highwoods Realty Limited Partnership)*
M. Joseph Allman, Esq.
Allman Spry Leggett & Crumpler, P.A.
380 Knollwood Street, Suite 700
P.O. Drawer 5129
Winston-Salem, NC 27113-5129

*First Class Mail*
*(Counsel to Empire Blue Cross Blue Shield)*
Michael B. Guss, Esq.
Morrison Cohen Singer & Weinstein, LLP
750 Lexington Avenue
New York, NY 10022

*First Class Mail*
*(Counsel to Ray McCaslin)*
Michael A. Becker, Esq.
Helfrey Simon & Jones P.C.
120 S. Central, Suite 1500
St. Louis, MO 63105

*First Class Mail*
*(The Travelers Property Casualty Company)*
The Travelers Indemnity Company
Commercial Lines
Attn: Cathy A. Davis, Litigation Management &
Special Collections
1 Tower Square – 9GS
Hartford, CT 06183-4044

First Class Mail
(Counsel to Locust Court Associates, L.P.)
.r A. Lesser, Esquire
Sirlin Gallogly & Lesser, P.C.
1529 Walnut Street, Suite 600
Philadelphia, PA 19102

First Class Mail
(Counsel to Advanced Healthcare)
Stephen J. Dzuranin, Esq.
Wix, Wenger & Weidner
508 North Second Street
P.O. Box 845
Harrisburg, PA 17108-0845

First Class Mail
)
Jeffrey D. Chansler, Esq.
Empire Blue Cross & Blue Shield
1 World Trade Center, 28th Floor
New York, NY 10048-0682

First Class Mail
(proposed Counsel to Equity Committee)
F   `ard`F. Levy, Esq.
`.   jdore J. Low, Esq.
Benjamin D. Schwartz, Esq.
Brandy A. Sargent, Esq.
Altheimer & Gray
10 South Wacker Drive, Suite 4000
Chicago, IL 60606

First Class Mail
(Counsel to Cirquit.com.)
Steven C. Delinko, Esq.
Dollinger & Dollinger, P.A.
Mack-Cali Centre II
One Mack Centre Drive
Paramus, NJ 07652-3906

First Class Mail
(Pro Se)
Alice Nystel Page, Esq.
Sun Healthcare Group, Inc.
101 Sun Avenue NE
Albuquerque, NM 87109

First Class Mail
(Counsel to Summit Health Care, Inc.)
Steven J. Gutter, Esq.
Kahn & Gutter
Paine Webber Plaza – PH4
8211 W. Broward Blvd.
Plantation, FL 33324

First Class Mail
(Pro Se)
Attn: Vladimir Jelisavcic
Longacre Management, LLC
1700 Broadway, Suite 1403
New York, NY 10019

First Class Mail
(Pro Se)
Attn: Jim Flood, CFO
The Broadmoor Hotel
P.O. Box 1439
Colorado Springs, CO 80901

First Class Mail
(Counsel to The Broadmoor Hotel, Inc.)
Steven M. Rudner, Esq.
Law Offices of Steven M. Rudner
P.O. Box 12121
Dallas, TX 75225

First Class Mail
(Counsel to Lancaster County School District 0001,
a/k/a Lincoln Public Schools)
John M. Guthery, Esq.
Perry, Guthery, Haase & Gessford, P.C., L.L.O.
233 South 13th Street, Suite 1400
Lincoln, NE 68508

First Class Mail
(Counsel to Broward County Revenue Collection
Division)
Lance D. Lyons, Assistant County Attorney
Broward County Revenue Collection Division
Litigation Section
Government Center Annex
115 S. Andrews Avenue
Fort Lauderdale, FL 33301

*First Class Mail*
*(Counsel to Pharmerica, Inc.)*
 ‑n W. Forsley, Esq.
‑‑hnson Henrichs & McHugh LLP
290 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212

*First Class Mail*
)
John Cogan
Office of the General Counsel, DHHS
The Public Ledger Building
150 South Independence Mall West, Suite 418
Philadelphia, PA 19106

*First Class Mail*
)
Wendy S. Tien
United States Department of Justice
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875

*First Class Mail*
    *unsel to James F. Spriggs)*
‑eborah Sterling-Scott
UAW Chrysler Legal Services Plan
10820 Sunset Office Drive
Suite 141
St. Louis, MO 63127

*First Class Mail*
*(Counsel to The University of Texas Ssytem on behalf*
*of The University of Texas M.D. Anderson Cancer*
*Center)*
Traci L. Cotton, Esq.
The University of Texas System
Office of General Counsel
201 West Seventh Street
Austin, TX 78701

*First Class Mail*
*(Counsel to Open Terrace Associates, LLC)*
Mary R. Pigorsh, Esq.
Day & Sawdey, P.C.
825 Parchment Drive, SE
C‑‑nd Rapids, MI 49546

*First Class Mail*
*(Counsel to HCA – The Healthcare Company)*
John Tishler, Esq.
Waller Lansden Dortch & Davis
511 Union Street, Suite 2100
P.O. Box 198966
Nashville, TN 37219-8966

B118

1

2   UNITED STATES BANKRUPTCY COURT
    DISTRICT OF DELAWARE

3

4   ----------------------------------------- X
    In Re:        Jointly Administered
5   CORAM HEALTHCARE CORP.  Case Nos.
    and CORAM, INC.,      00-3299 (MFW) and
6                 00-3300 (MFW)
    ----------------------------------------- X
7               November 28, 2000
                9:47 a.m.
8

9

10          Deposition of STEPHEN A. FEINBERG,

11   taken in the above-entitled matter before

12   Michele Anzivino, Notary Public of the State of

13   New York, taken at the offices of Cerberus

14   Capital Management, L.P., 450 Park Avenue, New

15   York, New York, on Tuesday, November 28, 2000,

16   commencing at 9:47 a.m.

17

18

19

20

21

22          DAVID FELDMAN & ASSOCIATES

23             245 Park Avenue

24          New York, New York  10167

25      (212) 792-5623  Fax: (212) 792-5624

95

1       STEPHEN A. FEINBERG

2       A.   Right, my signature.

3       Q.   Do you -- and your only title at

4    Coram at the time you signed this agreement was

5    chairman of the compensation committee; is that

6    right?

7       A.   I believe so.

8       Q.   You were not an officer of the

9    company at that time?

10      A.   I don't recall that.

11      Q.   Can you think of any other document

12   that you ever signed on behalf of Coram

13   Healthcare Corporation, other than Dan

14   Crowley's amendment?

15      A.   I don't recall.

16      Q.   You don't recall any others?

17      A.   I don't recall.

18      Q.   Do you think it's possible there

19   are some others?

20      A.   I don't remember.

21      Q.   Let me just -- we'll break in a

22   minute.

23         MR. MILLER:  You have a half hour.

24         MR. LEVY:  I'd like to talk before

25   he goes.

1    STEPHEN A. FEINBERG

2    the performance of the company and what Dan

3    could accomplish and all the liabilities, that

4    the assets were substantially less than the

5    liabilities.

6    Q.    When was the Aetna lawsuit

7    settled?

8    A.    In 2000.

9    Q.    What month?

10    A.    I believe sometime in the summer.

11    Q.    How about April, does that sound

12    about right?

13    A.    I don't remember when the lawsuit

14    was settled.

15    Q.    In any event, after it was settled,

16    after that it was clear to you that the

17    liabilities exceeded the assets, correct?

18    A.    In -- after the Aetna lawsuit was

19    settled, it was again clear to me that the

20    liabilities were higher than the assets, yes.

21    Q.    And you continued to be a director

22    after the lawsuit was settled, right up until

23    July 24th, I think, right?

24    A.    Yeah.

25    MR. LEVY:  Do you want to take a

1     STEPHEN A. FEINBERG

2  didn't pan out in 2000.

3    Q.   You were disappointed with the CPS

4  sale?

5    A.   Yeah, we were.

6    Q.   By the way, were you very

7  disappointed

8  or -- and surprised?

9    A.   No.  I mean, I was -- from the

10  original projections of Alex Brown, we were

11  disappointed.  But by the time the deal was

12  done, we realized that was the best transaction

13  we could do.  We chopped the heck out of it.

14    Q.   Do you know what kind of bonus

15  reward Crowley got when CPS was sold?

16    A.   I don't recall.

17    Q.   It was a big one, wasn't it?  Do

18  you recall that?

19    A.   I don't -- I don't remember what it

20  was.  Now, remember that Dan basically served

21  as investment banker, in effect, and helped get

22  that deal done.  Alex Brown really wasn't

23  getting it done.  They had fallen down.  And

24  they were the ones telling us they would have

25  these huge values for it.  The market wasn't

1    STEPHEN A. FEINBERG

2    other value plays has been an absolutely

3    horrible area to invest in in the past few

4    years, whether you are talking about nursing

5    homes, you know, home care, you name it,

6    hospitals.  So it's been a horrible IPO market

7    for healthcare, and a bad IPO market in general

8    and bad for healthcare.

9    Q.    Did you consider, in the time

10    period beginning after Crowley came aboard in

11    November of '99, did you consider hiring an

12    investment banker to explore methods of

13    increasing shareholder value?

14    A.    When is this now?  I'm sorry.

15    Q.    Beginning of November, October or

16    November of '99.

17    A.    Prior to Dan coming on board, Don

18    Ameral as chairman, was a pretty fervent

19    spokesman for the equity.  Don pursued all sort

20    of things.  He pursued a deal with American

21    Home Patient, he pursued a deal with Aprea

22    (ph).

23         He pursued all sort of actions,

24    possibilities, sales.  He thought of all sort

25    of things.

COPY

1

1

2          UNITED STATES BANKRUPTCY COURT

3          FOR THE DISTRICT OF DELAWARE

4
           In re:                    )
5                                    )
           CORAM HEALTHCARE CORP.    ) Case No. 3299 (MFW)
6          and CORAM, INC.           ) through 3300 (MFW)
           --------------------------)

7

8

9

10

11

12

13                        December 7, 2000

14                           10:12 a.m.

15

16              Deposition of DANIEL CROWLEY, held at

17          the offices of Kasowitz, Benson, Torres &

18          Friedman LLP, 1633 Broadway, New York, New

19          York, pursuant to notice, before Cary N.

20          Bigelow, RPR, a Notary Public of the State

21          of New York.

22

23

24

25

42

1                    Crowley

2    Healthcore.  We worked on HRH, looked at Continue

3    Care, looked at Vencor, Sun Health Group.  We gave

4    advice on Medicare trends on HCVA, we provided

5    systems support on analyses, we did some actuarial

6    work on various projects, we worked on PHP.

7              There may have been others.  I don't

8    recall.

9         Q.    In this period, again, prior to your

10   introduction to Coram, did you charge for these

11   services?

12        A.    Yes.

13        Q.    Was there a formal written agreement

14   with respect -- well, was there any written

15   agreement with respect to these services?

16        A.    In the beginning, it was just a

17   project-to-project basis, time and charges.

18        Q.    So in the beginning, you would identify

19   that as the beginning of 1999, roughly?

20        A.    Roughly, yes.

21        Q.    How did you charge Cerberus on this

22   project-to-project basis?

23        A.    Generally, I charge $10,000 a day for

24   myself, plus expenses, I generally don't do part

25   days, and there are fees I charge for the other

SPHERION DEPOSITION SERVICES (212) 490-3430

B125

43

1                          Crowley

2    staff based on their experience and the

3    value-added, plus expenses, and we decide what work

4    we wish to take or not.

5         Q.    Again confining yourself to the period

6    before Coram, did you ever become the CEO of a

7    company in which Cerberus had an interest?

8         A.    No, no, I didn't.

9         Q.    How was this rate of $10,000 per day

10   set?

11        A.    That's what I want.

12        Q.    And that's what Cerberus was willing to

13   pay?

14        A.    And others.

15        Q.    Stick with Cerberus for a moment.

16              The answer is yes?

17        A.    Yes.

18        Q.    And in addition to the $10,000, you

19   would be paid your personal expenses and also the

20   expenses of whatever professional staff you thought

21   would assist in the job, generally?

22        A.    Generally, that was the case, yes,

23   generally.

24        Q.    Can you estimate for me how much money

25   you earned in the period from the beginning of your

SPHERION DEPOSITION SERVICES (212) 490-3430

50

1                              Crowley

2          Q.      What did you say?

3          A.      That I will meet with him.

4          Q.      Was this part of your $10,000 a day

5    arrangement?

6          A.      No.  We had already altered that.

7          Q.      Let's go to that.  When had you altered

8    the $10,000 a day arrangement?

9          A.      In July of 1999, we had altered it.

10         Q.      Tell me about the alteration.

11         A.      I was to work exclusively for Cerberus,

12   that I would have a three-year rolling contract,

13   that I would receive $80,000 a month plus expenses,

14   that I would be eligible to purchase some of his

15   position in companies in which we worked together,

16   that I could bring companies to him to look at,

17   that he would bring all of his companies that he

18   worked on to me to look at and that those companies

19   in which I worked, in which I improved the

20   companies, that I could participate in the upside

21   generally at 20 percent of his net gain after a

22   preferred return and his own expenses were taken

23   out and -- I mean, that's the general idea of what

24   we struck back in July of '99.

25         Q.      July of '99?


                SPHERION DEPOSITION SERVICES (212) 490-3430

53

1                          Crowley

2      time, in July.

3                  Didn't you say that?

4                  MR. WARDEN:  Is that a question,

5             Counsel, or are you simply arguing with the

6             witness, badgering the witness?

7                  I object to this line of questioning.

8             I would like to know where you are going

9             with all of this.  I move to strike the

10            prior question.  I will ask that you move

11            this along.

12            A.    Is there a point?

13            Q.    No, there is not a point.  There is a

14      question.  My job is to ask them and your job is to

15      answer them.

16                  MR. WARDEN:  If you understand.

17            Q.    If you don't understand the question, I

18      will be happy to rephrase it.

19            A.    I found myself, in the summer of 1999,

20      spending significant amounts of my time with the

21      Cerberus staff and the portfolio companies.

22            Q.    Could you translate "significant amount

23      of time" into a number of days a month?

24            A.    No, I can't.  I really don't recall.

25            Q.    More than half?

91

1                          Crowley

2          do better.

3          Q.    What was your role with Winterland

4     during the July to November 1999 period?

5          A.    Chairman of the company.

6          Q.    Were you kind of a CEO of the CEO then?

7          A.    I was the chairman of the company.

8          Q.    Was there also a CEO at Winterland?

9          A.    There was a CEO at that time.

10         Q.    And you were his boss?

11         A.    Yes, I was.

12         Q.    Does that relationship continue today?

13         A.    Yes, it does.

14         Q.    What expectation did you have beginning

15    in July as to the kind of return that you could

16    produce for Winterland?

17         A.    In July of 1999?

18         Q.    Yes.  When you -- well, let's start that

19    over.

20               When did Winterland become a company

21    that became subject to the 20 percent upside under

22    your oral arrangement with Cerberus?

23               MR. MILLER:  Objection.  Assumes facts

24         not in evidence.

25               MR. WARDEN:  Misstates the record.

SPHERION DEPOSITION SERVICES (212) 490-3430

1                          Crowley

2              A F T E R N O O N    S E S S I O N

3                    (Time noted:  1:02 p.m.)

4    D A N I E L    C R O W L E Y,    resumed and

5           testified as follows:

6    EXAMINATION BY (Cont'd.)

7    MR. LEVY:

8         Q.    Mr. Crowley, what is your understanding

9    of Cerberus' investment in Winterland?

10        A.    They own 70 percent of the debt and

11   equity, generally speaking, in Winterland.

12        Q.    Who owns the rest of it?

13        A.    30 percent was owned by Gordon Brothers,

14   now Stepping Stone Capital.

15        Q.    I am sorry, I did not hear you.

16        A.    30 percent was owned by Gordon Brothers,

17   which is now Stepping Stone Capital.  Both sides

18   are diluted by management options.

19        Q.    Is Stepping Stone Capital just a new

20   name for Gordon Brothers or is it new ownership

21   or -- do you know?

22        A.    I think they bought out the Gordon

23   Brothers' position in Winterland.

24        Q.    And you say they are diluted by

25   management options.  What do you mean by that?

SPHERION DEPOSITION SERVICES (212) 490-3430

(1)

48-D-02

# FILE COPY

Deposition of Don Amaral taken December 8, 2000

Paulson and Hi-Tech

## Page 1 to Page 112

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

Paulson and Hi-Tech
3960 Howard Hughes Parkway
Suite 730
Las Vegas, NV  89109
Phone:  702-871-7750
FAX:  702-871-7755

B131

### Page 37

(1) I knew that you were available in the job market.
(2) Q. Did you actually interview these people?
(3) A. I talked to Dan and I talked to another person.
(4) And his name escapes me.
(5) Q. The -- you knew that Mr. Feinberg highly
(6) recommended Mr. Crowley; correct?
(7) A. Yes.
(8) Q. At that -- at the time he was recommending him,
(9) did you know that Mr. Feinberg had hired Mr. Crowley to
(10) work for him for a different company or -- or in a
(11) different capacity?
(12) A. Yes.
(13) Q. When did you first learn that?
(14) A. As I testified earlier, sometime in '99.
(15) Q. All right. Now, did you see any problems with
(16) that?
(17) A. No.
(18) Q. The -- was the nature and extent of the
(19) employment relationship between Crowley and Cerberus made
(20) known to you at that time?
(21) A. You mean the form of compensation?
(22) Q. Yes. Or the amount?
(23) A. No.
(24) Q. Did you know that Mr. Crowley was receiving
(25) $80,000 a month from Cerberus at that time?

### Page 38

(1) A. No.
(2) Q. Did you ever know it?
(3) A. Just now.
(4) Q. You -- you did not know that before now?
(5) A. No.
(6) Q. Okay. The -- I take it that was never disclosed
(7) to the Board; correct?
(8) A. No.
(9) Q. The -- the Cerberus/Crowley. . .
(10)     (Discussion between Mr. Low
(11)     and Ms. Harmon.)
(12) BY MR. LOW:
(13) Q. Let me show you, sir, what's been previously
(14) marked as Feinberg Deposition Exhibit 7, which is in fact
(15) a -- been identified as an employment contract effective
(16) as of August 1, 1999, in which Mr. Crowley was hired to
(17) be a full-time employee of Cerberus.
(18)     MR. HARWOOD: Object to the form.
(19)     MR. LOW: That's what the contract says.
(20) BY MR. LOW:
(21) Q. Have you ever seen this document before, sir?
(22) A. No.
(23) Q. Were you aware of its contents?
(24) A. No.
(25) Q. Were you aware that Mr. Crowley in fact had been

### Page 39

(1) employed to be a full-time employee of Cerberus prior to
(2) the time he went to work for Coram?
(3) A. No.
(4) Q. You weren't aware that have till just now?
(5) A. Yes.
(6) Q. Okay. The -- what were you told about his
(7) relationship with Cerberus?
(8) A. That he worked one or two days per week on a
(9) T-shirt company.
(10) Q. Was the name "Winterland" mentioned?
(11) A. Yes.
(12) Q. And that's -- that's the name of the T-shirt
(13) company?
(14) A. I assume that.
(15) Q. Yeah. Were you told that Mr. Feinberg -- that
(16) Mr. Crowley also received a percentage of the profits of
(17) that company?
(18) A. No.
(19) Q. To your knowledge, was the -- were the terms of
(20) this -- of Crowley's relationship with Cerberus ever
(21) disclosed to the Board?
(22) A. No.
(23) Q. The -- there's been testimony here, sir, in this
(24) case that -- that you negotiated with Mr. Crowley the
(25) terms of his employment contract as CEO of Coram in -- in

### Page 40

(1) approximately November 1999; is that correct?
(2) A. Yes.
(3) Q. And what do you recall of those negotiations?
(4) A. Most difficult employment agreement I've ever
(5) negotiated.
(6) Q. Well, that's not dissimilar to what others have
(7) said.
(8)     The -- what made it so difficult?
(9) A. Dan's continual reaching for more.
(10) Q. And Mr. Crowley wished for very highly
(11) compensated for his services; is that correct?
(12) A. Yes.
(13) Q. And you felt that his commands were beyond what
(14) were appropriate under the circumstances?
(15) A. They were more than we could afford.
(16) Q. And you attempted to scale him back; correct?
(17) A. Yes.
(18) Q. And were you successful in doing so?
(19) A. Depends upon the time frame.
(20) Q. Okay. At least in November?
(21) A. When the agreement was executed, I was satisfied
(22) for the company and the shareholders that I had the best
(23) person in America to -- to attempt to turn this company
(24) around.
(25) Q. All right. And on behalf of the company and the

Deposition of Don Amaral taken December 8, 2000

BSA

Paulson and Hi-Tech

XMAX(13/13)

---

Page 49

(1)   MR. LOW: It certainly does.

(2)   MR. HARWOOD: But go ahead.

(3)   THE WITNESS: I was aware that he had asked

(4)   Cerberus for an upside based on his job as the CEO of

(5)   Coram.

(6)   BY MR. LOW:

(7)   Q.  Upside of what?

(8)   A.  An upside on their position for any improvement

(9)   that they may have that he would participate.

(10)   Q.  That he would be paid by Cerberus based on

(11)   his -- any success he had as CEO of Coram?

(12)   A.  Correct.

(13)   MR. HARWOOD: Object to the form.

(14)   THE WITNESS: Correct.

(15)   BY MR. LOW:

(16)   Q.  How did you become aware that he had made such a

(17)   proposal?

(18)   A.  He told me that he had or was going to.

(19)   Q.  And what, if any, reaction did you have?

(20)   A.  I said I needed to think about it. This was at

(21)   the end of a extremely long and difficult negotiation

(22)   process over the phone. And I was tired and worn out,

(23)   and I wanted to move on to somethin' else. And I said

(24)   that I would get back to him. I called he and Cerberus

(25)   the next day and told him that I could not live with it.

---

Page 50

(1)   Q.  Okay. And approximately when was that

(2)   conversation? During the November 1999?

(3)   A.  Yes.

(4)   Q.  All right. Can you -- was it near the end, near

(5)   the beginning, in the middle of the negotiations? Can

(6)   you place it any more affirmatively than that?

(7)   A.  Probably in the middle.

(8)   Q.  And you spoke to Mr. Crowley, as I understand

(9)   your testimony you've just given, and told him that you

(10)   would not agree to such an arrangement; correct?

(11)   A.  Yes.

(12)   Q.  And what reason did you give, if any?

(13)   A.  That he could not be paid by the debtholders.

(14)   He -- he was a full-time employment [sic] -- employee of

(15)   the company.

(16)   Q.  And what, if anything -- and what -- and -- and

(17)   was that in fact your reason for opposing such an

(18)   arrangement?

(19)   A.  Yes.

(20)   Q.  Okay. And what, if anything, did Mr. Crowley

(21)   say in response?

(22)   A.  He whined.

(23)   Q.  Can you be more specific?

(24)   A.  He -- he complained that, you know, I was bein'

(25)   too tough; that I wasn't given him enough compensation;

---

Page 51

(1)   that the risks here; that we needed to up the ante on

(2)   this. And I said, "Dan, that's the deal."

(3)   Q.  And Mr. Crowley eventually signed the contract?

(4)   A.  Yes.

(5)   Q.  Okay. The -- you say you had a conversation

(6)   with Cerberus on the same topic?

(7)   A.  Yes.

(8)   Q.  Was that with Mr. Feinberg?

(9)   A.  Yes.

(10)   Q.  And what do you recall about that conversation?

(11)   A.  I don't recall if I actually had the

(12)   conversation with Steve or I left initially a voice mail

(13)   for him and he called me back. But I told him we could

(14)   not have anything I don't -- and that could cause anyone

(15)   to look to see if he was getting paid for doin' his work

(16)   from anyone other than the company.

(17)   Q.  And what, if anything, did Mr. Feinberg say in

(18)   response?

(19)   A.  He agreed.

(20)   Q.  Was it your understanding based on this

(21)   conversation that Mr. Feinberg was aware that Mr. Crowley

(22)   had or would make such a proposal?

(23)   A.  He had already made it.

(24)   Q.  And Mr. Feinberg indicated familiarity with that

(25)   proposal to you?

---

Page 52

(1)   MR. HARWOOD: Object to the form.

(2)   BY MR. LOW:

(3)   Q.  Is that correct?

(4)   A.  Not familiar. He was -- he had made it known to

(5)   me that Crowley had already hit him up for it.

(6)   Q.  All right. And did Mr. Feinberg give you any --

(7)   any sense of what his Feinberg's reaction to the

(8)   proposal?

(9)   A.  He agreed with me that the CEO of Coram could

(10)   not be compensated by also the debtholders.

(11)   Q.  Okay. Did he say why?

(12)   A.  No.

(13)   Q.  Was the term "conflict of interest" mentioned?

(14)   A.  No.

(15)   Q.  Was your understanding that that would be a

(16)   conflict of interest?

(17)   A.  Yes.

(18)   Q.  Okay. The -- did Mr. Feinberg at that or any

(19)   other time disclose that Mr. Crowley was a full-time

(20)   employee of Cerberus being paid close to a million

(21)   dollars a year?

(22)   A.  As I stated earlier, I did not know until today

(23)   in this deposition that he was a full-time -- required to

(24)   be a full-time employee. That was never disclosed to me

(25)   or the Board.

---

Page 53

(1) Q. Was that something that you would have liked to
(2) have known?
(3) A. Yes.
(4) Q. Do you believe you were misled?
(5) MR. HARWOOD: Object to the form.
(6) THE WITNESS: Yes.
(7) BY MR. LOW:
(8) Q. The -- in this letter of November 12th,
(9) Mr. Crowley states, "Mr. Amaral of Coram has indicated
(10) that there is no problem with Cerberus providing me with
(11) an upside on their equity provision" -- "equity in Coram
(12) but prefers that upside not be directly tied to
(13) Cerberus's debt position."
(14) A. I never agreed to it.
(15) Q. Did you ever -- to be fair to Mr. Crowley, which
(16) is not normally my -- my primary occupation -- the letter
(17) doesn't actually say you agreed to anything. It says you
(18) indicated something.
(19) Did you ever indicate that there was no problem
(20) with such an arrangement?
(21) A. No, I did not.
(22) Q. Did you give -- did you say or do anything that
(23) you believe would fairly give Mr. Crowley reason to
(24) believe that you had agreed to such a thing?
(25) A. No.

Page 54

(1) Q. All right. Did you draw any distinction in your
(2) discussions with -- in your discussions with either
(3) Feinberg or Crowley about whether or not the upside was
(4) directly tied to the Cerberus debt position?
(5) A. No.
(6) Q. Did you say, well, you can do it if you don't
(7) make it direct?
(8) A. No.
(9) Q. Something like that?
(10) A. No.
(11) Q. In your view, it shouldn't be done directly or
(12) indirectly or --
(13) A. It shouldn't be done period.
(14) Q. All right. The -- and you made that -- that
(15) view known to Mr. Crowley?
(16) A. Yes.
(17) Q. Okay. All right. And that the -- did
(18) Mr. Crowley ever indicate to you that -- that -- that the
(19) form of this payment or compensation from Cerberus he was
(20) looking for was in the nature of an increase in his share
(21) on Winterland?
(22) A. No.
(23) Q. You never got into that level of detail?
(24) A. No.
(25) Q. In your discussion with Mr. Feinberg, did

Page 55

(1) Mr. Feinberg indicate to you that -- that if you were
(2) willing to go along he would be willing to pay
(3) Mr. Crowley when he asked --
(4) A. No.
(5) Q. -- or something?
(6) Did he indicate that he wouldn't?
(7) A. No. As I testified earlier, that he says we
(8) can't do that. You know, he can't be paid by Cerberus.
(9) Q. Was it your understanding it was the economics
(10) that bothered Mr. Feinberg or was it the conflict issue?
(11) MR. HARWOOD: Object to the form.
(12) THE WITNESS: The conflict.
(13) BY MR. LOW:
(14) Q. Okay. Not the economics?
(15) A. I just assumed it was the conflict.
(16) Q. The -- all right. And in approximately November
(17) 30th of 1999, Mr. Crowley in fact became the chairman and
(18) CEO; correct?
(19) A. Yes.
(20) Q. And he took Mr. Smith's Board seat; is that
(21) correct?
(22) A. He took a Board seat. I don't know which one it
(23) was.
(24) Q. Okay. And he began to work full time in that
(25) capacity thereafter; correct?

Page 56

(1) A. Yes.
(2) Q. And Mr. Crowley is, if nothing else, an
(3) extremely energetic man; correct?
(4) A. Yes.
(5) Q. I don't our understanding -- I assume you were
(6) there -- but the reports you received that Mr. Crowley
(7) devoted at least full business time to the job of CEO and
(8) thereafter; correct?
(9) A. It was reported to me that Mr. Crowley was
(10) working seven days a week 15 hours a day.
(11) Q. At Coram?
(12) A. On Coram.
(13) Q. Okay. The -- now, again, I think we covered
(14) this. But I just want to make sure. No. I'll do it
(15) this way.
(16) Did there come a time when Mr. Crowley
(17) complained about his compensation agreement?
(18) A. He brought it up.
(19) Q. And how did he bring it up?
(20) A. To the Board.
(21) Q. And when was that?
(22) A. At a subsequent Board meeting.
(23) Q. Was the subject of Mr. Crowley being paid
(24) separately by Cerberus ever discussed at a Board meeting?
(25) A. No.

Deposition of Don Amaral taken December 8, 2000
Paulson and Hi-Tech

BSA                                                                    XMAX(18/18)

## Page 69

(1) problem of Coram?
(2)   A.  Early in my tenure as CEO.
(3)   Q.  To your knowledge, has -- has this problem grown
(4) in -- in importance over time?
(5)   A.  Yes.
(6)   Q.  And what caused it to grow?
(7)   A.  Investigations of doctors self-referring.  It's
(8) an industry problem.  It's not a Coram problem.
(9)   Q.  All right.  Do you understand that Coram has $75
(10) million of net equity that is exempt from the Stark 2
(11) regulations?
(12)   A.  Well, with some caveats t to what you just said.
(13) It can't be a one -- it can't be a 1231 of the fiscal
(14) year.  It has to be over the -- the fiscal year.
(15)   Q.  All right.  And when did you gain such
(16) understanding?
(17)   A.  When Stark 2 was administered.
(18)   Q.  Do you recall any discussions with Stark 2 at
(19) Board meetings during 1999?
(20)   A.  Yes.
(21)   Q.  And what do you recall of those discussions?
(22)   A.  That we, as a result of our write-offs in Q4,
(23) that we may be falling below $75 million.
(24)   Q.  Do you recall any proposed solution to that
(25) problem?

## Page 70

(1)   A.  Yes.
(2)   Q.  And what proposed solution do you recall?
(3)   A.  More equity.
(4)   Q.  And was there discussion of how such more equity
(5) could be achieved?
(6)   A.  Yes.  But either getting new investors, having a
(7) big gain on sale, having the big settlement of the
(8) Pricewaterhouse lawsuit, or getting three debtholders to
(9) convert debt to equity.
(10)   Q.  And was anything ever done in terms of trying to
(11) raise new equity capital?
(12)   A.  Dan spoke to some potential investors and also
(13) some banks about that.  And I think he was surprised with
(14) their lack of interest.
(15)   Q.  Okay.  This is what Dan reported to you;
(16) correct?
(17)   A.  Reported to the Board.
(18)   Q.  All right.  You have no firsthand knowledge of
(19) those discussions?
(20)   A.  No.
(21)   Q.  The -- did he mention the names of who -- who he
(22) had spoken to?
(23)   A.  I know of one he mentioned, Bank of America.
(24)   Q.  Was it your understanding Bank of America is in
(25) the equity investment business?

## Page 71

(1)   A.  In addition to lending, yes, they are.
(2)   Q.  Okay.  Was there any talk given to a public
(3) offering of shares?
(4)   A.  Only in the form of a piggyback warrant type of
(5) offer.  But no clear outright sale in the market of
(6) additional stock.
(7)   Q.  Was it felt that that would not raise sufficient
(8) capital?
(9)   A.  Yeah.  And it was -- there probably wasn't a
(10) market for it.
(11)   Q.  Okay.  Who had such discussions?
(12)   A.  The Board.
(13)   Q.  Okay.  Did the Board hire an advisor, a
(14) financial advisor, in 1999 to consider such options?
(15)     MR. HARWOOD:  Which options are you talking
(16) about?
(17)     MR. LOW:  The ones he mentioned:  sale of an
(18) asset, raising money through debt to equity conversion,
(19) sale of equity to new investors.
(20)     THE WITNESS:  I'm not aware of any direct where
(21) the company employed them.  But routinely a CEO when he
(22) goes out and goes to New York or meets with -- with
(23) investment bankers.  This is how they make money.
(24) They're continually talking to you about it.
(25)  / / /

## Page 72

(1) BY MR. LOW:
(2)   Q.  All right.  But the Board has on occasion
(3) formally retained investment advisors --
(4)   A.  Yes.
(5)   Q.  -- correct?
(6)     In fact, the Board retained Deutsche Bank Alex.
(7) Brown to advise them of the sale of the CPS; correct?
(8)   A.  They conducted the auction.
(9)   Q.  The -- at the time that you put CPS up for sale,
(10) were you still with the -- were you still CEO at the
(11) time?
(12)   A.  I was the interim CEO.
(13)   Q.  All right.  What did you expect to get?
(14)   A.  I didn't know what to expect.  I knew -- I knew
(15) we couldn't afford to keep it and I knew there would be a
(16) gain.  But I didn't believe the numbers that Rick Smith
(17) had been throwing out.
(18)   Q.  What numbers were those?
(19)   A.  Up to a hundred-plus million dollars.
(20)   Q.  All right.  Did Deutsche Bank Alex. Brown give
(21) you a range of what they thought it could be sold for?
(22)   A.  At the front end they were on -- you know, north
(23) of 50 to a hundred million dollars.
(24)   Q.  Do you recall the number 70 million being --
(25)   A.  That's in that range.

### Page 73

(1)  Q.  -- discussed? Yeah.
(2)      And sold for around 40?
(3)  A.  Correct.
(4)  Q.  Okay.  And do you know why the price was so low?
(5)  A.  A lot of lack of interest, other products in the
(6)  marketplace, too much of the contracts were with Coram.
(7)  Q.  During the time you were interim CEO, Coram had
(8)  a lawsuit pending against -- or had lawsuits with Aetna;
(9)  correct?
(10) A.  Yes.
(11) Q.  Okay.  Did you see that -- did you see that as a
(12) net asset or a net liability?
(13) A.  Neutral.
(14) Q.  You -- you -- you thought it would -- it would
(15) wash out?
(16) A.  That -- that the ultimate settlement would wash
(17) out, but it could really damage us with any nugget of
(18) publicity.
(19) Q.  But the litigation itself, you didn't see as
(20) having a big upside; correct?
(21) A.  No.
(22) Q.  Okay.  And you held that view even before
(23) Mr. Crowley came in as CEO; correct?
(24) A.  During the interim period, I never thought we
(25) would get the money.  The -- you know, that it might be

### Page 74

(1)  worth five, ten million dollars but not any extraordinary
(2)  amount.
(3)  Q.  And did you share that few with the Board?
(4)  A.  Yes.
(5)  Q.  And did the Board generally agree?
(6)  A.  We didn't know what it expect.
(7)  Q.  Did anyone else express an opinion on that
(8)  subject at any Board meetings that you recall?
(9)  A.  Steve, Steve Feinberg.
(10) Q.  And what opinion did he express?
(11) A.  He saw it as an enormous downside.
(12) Q.  He was concerned that the company would lose a
(13) great deal?
(14) A.  Yes.
(15) Q.  Okay.  He was even less optimistic than you were
(16) then?  Is that fair?
(17) A.  Oh, yeah.  If I was in the middle, he was a
(18) minus 50.
(19) Q.  Did you ever discuss that topic with
(20) Mr. Crowley?
(21) A.  Yes.
(22) Q.  And what do you recall if anything Mr. Crowley
(23) stated?
(24) A.  Dan was less optimistic than I was after he took
(25) over.

### Page 75

(1)  Q.  Okay.  But at any point was Mr. Crowley more
(2)  optimistic than you were or did they simply have less
(3)  information than you before he took over?
(4)  A.  Dan thought that he could slam bam this and get
(5)  a quick settlement because of his relationship with some
(6)  of the Aetna officers.
(7)  Q.  Did you think that was realistic?
(8)  A.  Yes.
(9)  Q.  Okay.  Did he say what he meant by "slam bam"?
(10) A.  That he could get it done quickly.
(11) Q.  Get what done quickly?  Just to get it over with
(12) quickly?
(13) A.  Yes.
(14) Q.  All right.  Not to make a great deal of money.
(15) Just to stop it?
(16) A.  That he could stop the hemorrhaging and -- and
(17) put the lawsuit behind us.
(18) Q.  Did Mr. Crowley ever express to you that he
(19) thought that there was a tremendous upside to this case?
(20) A.  No.
(21) Q.  And I take it that after he came on full time he
(22) became even less optimistic?
(23) A.  Yes.
(24) Q.  The -- you testified here earlier, sir, that at
(25) the time you signed the Securities Exchange Agreement

### Page 76

(1)  with the debt- -- the debtholders you still believe that
(2)  the debt was too high?
(3)  A.  Yes.
(4)  Q.  And I take it thereafter you continually looked
(5)  for opportunities to reduce that debt; correct?
(6)  A.  Yes.
(7)  Q.  And did you engage in discussions from time to
(8)  time internally at Coram about strategies for reducing
(9)  the debt?
(10) A.  Yes.
(11) Q.  And what do you recall of those discussions?
(12) A.  That we had to put as much pressure as possible
(13) on the debtholders.  I actually had a meeting with my
(14) senior management team and the top four or five people
(15) that I thought the debt was of such burden would they be
(16) willing to stand alongside of me and tell the debtholders
(17) either you agree to our terms or the five of us walk.
(18) Q.  Approximately when was that discussion?
(19) A.  Mid to late '98.
(20) Q.  And did they agree?
(21) A.  No.
(22) Q.  They wanted to keep their jobs?
(23) A.  Yes.
(24) Q.  The -- did you take any other actions to try to
(25) put pressure on the debtholders?

## Page 85

(1)  Q.  But you believe it was at the next Board
(2)  meeting --
(3)  A.  Yes.
(4)  Q.  -- correct?  If you've got one that's in there
(5)  and I'm wrong, I will stand corrected.
(6)      All right.  You made the statement at the Board
(7)  meeting, whenever it was, the date it was, you believe it
(8)  was after Mr. Crowley's letter of July 19th; correct?
(9)  A.  Correct.
(10)  Q.  Do you recall any reaction from anybody else on
(11)  the Board?
(12)  A.  I remember Casey agreeing with me.
(13)  Q.  All right.  Did the Board give any direction to
(14)  Mr. Crowley on this point?
(15)  A.  I think it was agreed upon that we weren't going
(16)  to share things with him.
(17)  Q.  Do you recall Mr. Crowley so agreeing?
(18)  A.  Yes.
(19)  Q.  Okay.  So you believe that it was a directive of
(20)  the Board not to share the --
(21)  A.  Not as a formal motion or something like that
(22)  but that we were gonna keep it together until we had a
(23)  plan.
(24)  Q.  And did you have -- do you know whether or not
(25)  Mr. Feinberg was immediately advised of the valuation?

## Page 86

(1)  A.  No, I don't.  I'm not aware that he was.
(2)  Q.  All right.  If Mr. Feinberg testified that he
(3)  was, would you accept his word on that?
(4)  A.  Yes, I would.
(5)  Q.  The -- and you believe that that would have been
(6)  contrary to the Board's wishes; correct?
(7)      MR. HARWOOD:  Object to the form.
(8)      THE WITNESS:  It was contrary to what we have
(9)  discussed.
(10)  BY MR. LOW:
(11)  Q.  Okay.  The -- and the reason you wanted -- just
(12)  so I'm clear and it makes sense to me -- the reason you
(13)  didn't want the debtholders to know until you had a plan
(14)  is that once they had that number it would be hard to
(15)  negotiate with them; correct?
(16)  A.  Absolutely.
(17)  Q.  All right.  The -- it really wouldn't matter who
(18)  did the negotiating after that.  You'd be at a tremendous
(19)  disadvantage.  Correct?
(20)  A.  Yes.
(21)  Q.  The -- now, you -- you testified at -- at the
(22)  beginning of your testimony that that they were -- there
(23)  was a Board meeting yesterday to approve various minutes.
(24)      Do you have with you the minutes that were
(25)  approved?

## Page 87

(1)  A.  No, I do not.
(2)  Q.  Do you recall over what period of time they --
(3)  they -- I mean, is this just for last month's meeting?
(4)  A.  No.  There was a series of like six or seven
(5)  Board meeting minutes that were approved.
(6)  Q.  All right.  And going back through last July?
(7)  A.  I'm sorry.  I didn't -- I don't know the first
(8)  date/the last date.
(9)  Q.  Okay.
(10)  A.  But I think it was to get all the minutes
(11)  through our last Board meetings approved because we
(12)  haven't approved minutes for a period of time.
(13)  Q.  The --
(14)      (Discussion between Mr. Low
(15)      and Ms. Harmon.)
(16)  BY MR. LOW:
(17)  Q.  The -- here they are.  For example, in Exhibit 3
(18)  on December 21 -- do you have that?
(19)      MR. HARWOOD:  No.  You've got his copy.
(20)      MR. LOW:  I've copy his copy.  Where's my copy?
(21)      MS. HARMON:  I don't know.
(22)      MR. LOW:  You're supposed to find these things.
(23)  BY MR. LOW:
(24)  Q.  -- there's a reference to -- at the beginning
(25)  very very beginning of the minutes, there's a reference to

## Page 88

(1)  approving the prior minutes from meetings in October and
(2)  November.
(3)      And -- and isn't it a fact, sir, that it was
(4)  very typical that -- that you would start each meeting by
(5)  approving the minutes of the prior meeting or the most --
(6)  A.  Prior meetings.
(7)  Q.  Yes.
(8)      MR. HARWOOD:  I'll just note that he's referring
(9)  to approving the prior minutes of last four meetings
(10)  before that.
(11)      MR. LOW:  Right.  Right.  But they all --
(12)      MR. HARWOOD:  Not just their immediate meeting.
(13)  BY MR. LOW:
(14)  Q.  But they had been held in the last two months;
(15)  correct?
(16)  A.  On these that were approved in December, yes, it
(17)  was October/November.
(18)  Q.  All right.  Is it unusual in the history of this
(19)  Board to be -- to not approve minutes for as long as six
(20)  months?
(21)  A.  I think if you go back -- in one of the cleanups
(22)  I did, it probably was longer than that.
(23)  Q.  Okay.  Do you know why there was no approval of
(24)  the minutes of the last six months until yesterday?
(25)  A.  No.

Deposition of Don Amaral taken December 8, 2000

### Page 93

(1) that that was at least an option?

(2) A. Yes.

(3) Q. Okay. And, in fact, within a month Coram did

(4) file bankruptcy?

(5) A. Correct.

(6) Q. Okay. In the -- in this letter, the July 19th

(7) letter, Exhibit 4, in the middle of the page -- of the

(8) first page, the last couple sentences of the third

(9) paragraph says, "Cash flow for June was positive and this

(10) permitted the Company to pay 16 [sic]" -- "6.3 million in

(11) interest on the debt rather than 'pik'" -- in quotation,

(12) p-i-k -- "the interest as occurred" -- "as occurred the

(13) prior 18 months."

(14)      In terms of putting pressure on the debtholders,

(15) was that a smart move?

(16)      MR. HARWOOD: Object to the form.

(17)      THE WITNESS: Depends upon what you're trying to

(18) do with the -- and where -- and what the pressure point

(19) is. Everyone has a different way of going about

(20) negotiating.

(21) BY MR. LOW:

(22)      Q. But as a -- as a man experienced in turnaround

(23) situations, wouldn't you say that if you had the ability

(24) to not pay the interest -- you do understand that Coram

(25) had the ability to not pay, to simply let it --

### Page 94

(1) A. Pay in kind.

(2) Q. Pay in kind.

(3)      -- let it -- let it just be added to

(4) principle --

(5) A. Um-hum.

(6) Q. -- that -- that that it would put more pressure

(7) on the debtholders to withhold the cash than to pay the

(8) cash?

(9)      MR. HARWOOD: Object to the form.

(10)      THE WITNESS: I understand your question. And I

(11) don't know whether I would have paid it in cash rather

(12) than take it.

(13) BY MR. LOW:

(14)      Q. Okay. You certainly think that's a subject that

(15) required serious thought when you go into such a

(16) negotiation; correct?

(17) A. Yes.

(18) Q. And was that ever discussed at a Board meeting?

(19) A. To pik rather than paying cash?

(20) Q. Or to pay rather than pik.

(21) A. I don't recall.

(22) Q. All right. Do you believe Mr. Crowley made this

(23) decision?

(24) A. Yes.

(25) Q. Was it ever ratified at a Board meeting?

### Page 95

(1) A. Not that I'm aware of.

(2) Q. The -- now, your opinion -- when you came back

(3) as an interim CEO and you believe that the value of the

(4) company was less than the value of the debt, that was not

(5) based on any formal appraisal or study; correct?

(6) A. No.

(7) Q. And you had no financial advisor assist you in

(8) reaching that opinion; correct?

(9) A. None other than myself.

(10) Q. And you weren't certain, were you?

(11) A. Certain? No.

(12) Q. Okay. And, obviously, you were hopeful that

(13) something could be done promptly; correct?

(14) A. Yes.

(15) Q. And one of the reasons was to hire Mr. Crowley

(16) was to turn things around in the hopes that equity could

(17) benefit; correct?

(18) A. Yes.

(19) Q. When was the first time bankruptcy was discussed

(20) as -- as an option of the Board?

(21) A. Summer of '99 -- or 2000.

(22) Q. Do you recall a meeting of the Board that took

(23) place on April 5, 2000, at Cerberus's office?

(24) A. I remember a meeting, yes.

(25) Q. And were you present in person?

### Page 96

(1) A. Yes.

(2) Q. And do you recall a discussion about

(3) restructuring at that meeting?

(4) A. Yes.

(5) Q. And what do you recall about that?

(6) A. That we had a number of people there giving us

(7) what we may or may not do; how to go about the process --

(8) it was more of a process really -- and how do we, you

(9) know, go about doing this; you know, who we needed to

(10) hire, how we needed to hire; could we afford to get the

(11) consultants in. And there was a lot of discussion about,

(12) you know, how do we keep the company going operationally

(13) while we got all this other crap goin' on.

(14) Q. Okay. The -- and Mr. Friedman was the

(15) bankruptcy counsel that was introduced to the Board at

(16) that meeting?

(17) A. That's my recollection.

(18) Q. Okay. And do you recall who recommended

(19) Mr. Friedman?

(20) A. No, I don't.

(21) Q. Was it Mr. Feinberg?

(22) A. I don't remember.

(23) Q. Okay.

(24)      (Discussion between Mr. Low

(25)      and Ms. Harmon.)