IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In the matter of            )
                            )
CORAM HEALTHCARE CORP.       ) Case No. 00-3299
and CORAM, INC.              ) Through 00-3300 (MFW)
                            )
        Debtors.            )


Bankruptcy Courtroom
Room No. 2 - Sixth Floor
Marine Midland Plaza
824 Market Street Mall
Wilmington, Delaware


Friday, December 15, 2000
9:07 a.m.


BEFORE:   THE HONORABLE MARY F. WALRATH,
          United States Bankruptcy Judge


TRANSCRIPT OF PROCEEDINGS


WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B139



1     Q.    The person you negotiated with was Mr. Feinberg,

2   right?  Mr. Feinberg was chairman of the Compensation

3   Committee, wasn't he?

4     A.    He may have been at that time.

5     Q.    You know he was, don't you?

6     A.    He may have been at that time.

7     Q.    Your negotiations principally were with

8   Mr. Feinberg.

9     A.    Principally they were with him.

10    Q.    And the basic nature of the negotiations was pay

11  me more or I'll leave, correct?

12    A.    No.  That wasn't the basic negotiation process

13  at all.  I wrote a letter to the board outlining those

14  areas which I thought were important to me.  The board

15  considered it.  Steve Feinberg was a member of the board.

16  It was a process in which they discussed it without me in

17  the room and went back and forth.  Steve went back and

18  forth.  He didn't agree to everything I asked for.  It

19  was a process.  Principally provided me with no more than

20  an upside if I could improve the performance, versus a

21  guarantee or a search in an amount of money.  I got the

22  opportunity to earn more if I could make the company

23  better.  That was the process.

24    Q.    And your understanding of the result of that

1    no company to which Coram could sell.  Coram

2    Prescriptions Service.  The fact of the matter is the

3    company had an auction and nobody showed up.  It failed.

4    So I did not know that.  And the facts would show that

5    that's not true.

6        Q.    Mr. Crowley, is it your testimony that the

7    EBITDA gain on the sale of CPS was less than $18 million?

8        A.    My testimony is that in the auction that was

9    conducted by Alex Brown, no one showed up; that the only

10   bid the company received from CVS Pro Care was inferior.

11   It had next to no gain in it whatsoever.  It was

12   rejected.  It was no consequence to me, because there was

13   no gain to be had.  So I did not know that there would be

14   a gain.  I could not know that there would be a gain.  It

15   was an auction in process.

16       Q.    Let me cut to it.  What is your understanding of

17   what the gain was on the sale of CPS?

18       A.    On the gain that I arranged -- for sale that I

19   arranged, which was not a part of the auction process,

20   because the auction had failed, it was an $18 million

21   gain.

22       Q.    And you became entitled to 25 percent of that

23   under your formulation, or about 4-and-a-half million

24   dollars.  Right?

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

1      A.    The bonus program says that for EBITDA between

2   $14 million and $35 million, I'm entitled to 25 percent

3   such that the company has the cash to pay me.

4      Q.    Actually, you're entitled to 25 percent of

5   EBITDA, however high it goes.  There's no $35 million

6   limit, is there?

7      A.    That would be your interpretation.  But that

8   would not be the understanding between myself and the

9   board of directors.

10     Q.    I'm going to ask you again to look at the

11  contract you signed.  In paragraph 1-A I will simply put

12  it to you that I see no limit, and, if you do, I'd like

13  you to point it out.

14     A.    I'd be happy to have you represent me in a

15  dispute on that matter, and it would be great to get

16  extra, but my understanding with the board is it's

17  25 percent up to $35 million.

18     Q.    I'm looking at the document you signed.  Is

19  there anything in there that gives you an understanding

20  that the 25 percent stops at $35 million?

21     A.    Other than the fact that it's my understanding

22  that it stops at $35 million, there's nothing in the

23  document.

24     Q.    Thank you.  You would agree, would you not, that



1    company's 401(k), and on and on and on.  The meeting

2    started at 9:35 and went to 11:15.  It didn't go two

3    hours.  We covered a lot of subjects in broad sweep.  And

4    one of them was STARK II.

5        Q.   Is it your testimony that by this date you

6    weren't aware that there was no way the company was going

7    to meet STARK II a year and 10 days later?

8        A.   It's my testimony that I was aware that we had

9    Coram Prescription Services up for sale and it had the

10   potential for -- I was aware that there were people on

11   the board, certainly Don Amaral and at that time

12   Wendy Simpson, the chief financial officer, who felt that

13   there was a large gain to getting Coram Prescription

14   Services.  I was pretty unfamiliar with it at that time.

15   The auction was undergoing.  No indications of interest

16   were made aware to me, so I didn't know what the year

17   would unfold.

18       Q.   At that same meeting you did one other thing you

19   haven't mentioned.  Didn't you?  If you look at the last

20   page.  That is, the board retained Dynamic Healthcare

21   Solutions as a consultant firm.  Correct?  That's on the

22   last page, fourth paragraph, on the bottom.

23       A.   I see that.

24       Q.   They agreed to pay them fees as shown on



1    Exhibit 4, $500 a day, plus expenses, for Kurt Davis,

2    thousand dollars a day for Mills, $750 a day for Smith.

3       A.    Yes.

4       Q.    You owned Dynamic Services?

5       A.    Yes.

6       Q.    You are the only owner?

7       A.    I am.

8       Q.    You earned between 15 and 25 percent markup on

9    all of these fees.  Isn't that right?

10      A.    Between 15 and 20 percent is what I said.

11      Q.    Let's go on from December 21st to February 28.

12   That, Your Honor, is EC 25.  I guess you have seen that.

13   You have it in front of you.  It's the February 28, 2000,

14   letter that you wrote to the board of directors in which

15   you asked to increase your compensation.  Right?

16      A.    I'm trying to locate what you're talking about.

17      Q.    EC 25.

18      A.    I'm sorry.  You're giving me a raft of paper

19   here.  EC 25.  I have located it.

20      Q.    By this date, surely you knew that STARK II was

21   a problem that would require restructuring Coram's

22   balance sheet, didn't you?

23      A.    I don't know that.

24      Q.    I'm sorry?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    MR. LEVY:  Would you read the question

2    again?

3              (The reporter read back as instructed.)

4              THE WITNESS:  No.

5    BY MR. LEVY:

6       Q.    During this period interest fell due on your

7    debt to the noteholders, correct?  "This period" being

8    say from the beginning of the year up through the filing

9    of the bankruptcy.

10      A.    I'm sure there was an interest payment that was

11   due.

12      Q.    And that interest payment under the terms of the

13   securities exchange agreement gave you the option to pay

14   it either in cash or a payment in kind, or PIK.  Isn't

15   that right?

16      A.    It may have.  I never read it.

17      Q.    It could have.  Isn't that right?

18      A.    It could have.

19      Q.    In fact, you paid, was it, six-and-a-half

20   million dollars this year in cash in interest to the

21   noteholders, correct?

22      A.    We made an interest payment in cash, that's

23   certain.

24      Q.    Did you check with anyone to see whether you had

1    A.    I'm listening to you, sir.

2    Q.    -- that the debt could be restructured with a

3    perpetual preferred which would then qualify for

4    accounting purposes as equity and thereby solve the

5    STARK II problem, didn't you?

6    A.    I had talked to Goldman Sachs and Foothill

7    Capital and Stephen Feinberg and told all of them that

8    the company could not pay back debt and we needed a

9    restructuring.  We discussed many alternatives, one of

10   which was a perpetual preferred.

11   Q.    And they refused to do it?

12   A.    They were unanimously against a perpetual

13   preferred.

14   Q.    EC 37 is a document called "Incentive Agreement"

15   which your attorney, Mr. Warden, handed me at the very

16   brief deposition this morning.  And my question simply,

17   sir, is is this -- I guess I've got two questions.

18   Madelyn LLC, who is one of the parties to this agreement,

19   is an affiliate of Cerberus; is that right?

20   A.    Yes.

21   Q.    And you're a party to this?

22   A.    Yes.

23   Q.    You signed it on or about the date it bears?

24   A.    Yes.



Crowley   Recross

1    accomplished at Coram?  There isn't anything, is there?

2        A.   The document and the meeting of the minds and

3    the understanding between the parties and the expression

4    in writing and otherwise is that I will receive nothing

5    from Cerberus for anything I do at Coram.

6        Q.   Show me where in the document it says you will

7    receive nothing for what you do for Coram.

8        A.   I told you what I can, sir.

9        Q.   You don't know any more than that?

10       A.   Beyond reading all 23 pages.  The point is that

11   I'm not to receive any economic remuneration from

12   Cerberus related to anything I do at Coram.

13       Q.   Why didn't you write a letter to Mr. Feinberg

14   some months back and suggest that Cerberus pay you

15   through Winterland for what you accomplished at Coram?

16       A.   Now, I answered that one a couple times.  I'll

17   try to answer it again.  It was a cold, unsolicited

18   letter.  I was not an employee of Coram's.  I had told

19   Don Amaral, the chairman of Coram, that I was going to

20   seek some compensation from the debtholders.  I attempted

21   to do so.  It was rejected and I got nothing.

22       Q.   You also testified that you always informed the

23   board of Coram of your relationship with Cerberus and

24   indeed that you disclosed that in public filings.  Right?



1      A.    That was my intention.

2      Q.    But you never informed them of that part of the

3  relationship with Cerberus that provided you with payment

4  of a million dollars a year, plus a 20 or became

5  30 percent upside, did you?

6      A.    Had I been asked, I would have told them.

7      Q.    Sir, that wasn't my question.  My question --

8      A.    I did not inform them.

9      Q.    And no public filing that you're aware of

10 discloses that you were getting that kind of compensation

11 and potential future compensation from Cerberus.  Right?

12     A.    I don't know.

13     Q.    And, finally, it is a fact that you were the CEO

14 of only one other Cerberus portfolio company other than

15 Coram, and that was Winterland.  Right?

16     A.    Wrong.

17     Q.    Wrong?

18     A.    Wrong.

19     Q.    What other portfolio?

20     A.    I am not the CEO of Winterland.  I have already

21 testified to the fact that I'm the chairman of the

22 company and I do not serve in the capacity of CEO.

23              MR. LEVY:  Mr. Crowley, thank you so much.

24              THE COURT:  Thank you.  You may step down.

# SIGN-IN SHEET

**CASE NAME:** Oran Healthcare

**CASE NO.:** 00-3299

**COURTROOM NO.:**

**DATE:** 12/15/0

| NAME | LAW FIRM OR COMPANY | CLIENT REPRESENTING |
|---|---|---|
| Theodore Gewertz | Wachtell, Lipton, Rosen & Katz | Creditors Committee |
| Richard Levy | Altheimer & Gray | Equity Committee |
| Theodore Low | Altheimer & Gray | Equity Committee |
| Brandy Sargent | Altheimer & Gray | Equity Committee |
| David K. Friedman | Esgnitz Berger Boss + Frish | Debtors |
| Adam C. Chipp | Wagoritz Berga Forese Friedman | " |
| Mark Minuti | Saul Ewing LLP | Equity Committee |
| Co Harmon | YCST | Enro Subsidiaries |
| Christopher Langlu | PSZYJ | Debtors |
| Deeane Ryland | KGP | Creditors Committee |
| Alan B. Miller | Weil Gotshal + Manges | Noteholders |
| Philip S Warson | Pillsbury Madison Sutro | D. Crossley |

## PLEASE PRINT OR YOUR APPEARANCE CANNOT BE CORRECTLY NOTED!

B149

# In The Matter Of:

*Coram Healthcare Corp.*

---

*Hearing*
*December 21, 2000*
*C.A. # 99-2889 (MFW)*

---

*Wilcox & Fetzer, Ltd.*
*Registered Professional Reporters*
*1330 King Street*
*Wilmington, DE  U.S.A.  19801*
*(302) 655-0477*

*Original File CR12-21.KW, 91 Pages*
*Min-U-Script® File ID: 2267155769*

**Word Index included with this Min-U-Script®**

#524

Page 85

[1] what we are going to do is we are going to allow any
[2] party who has a problem with it to have complete
[3] disclosure.

[4]     I said at the first hearing that you
[5] wouldn't hear any discovery fights in this case, and you
[6] didn't. I've been in plenty of cases where Your Honor
[7] has been called upon to deal with counsel fighting over
[8] documents and depositions and discovery. You didn't hear
[9] any of that in this case.

[10]     We made all proper disclosures since the
[11] day we filed. We made all documents available. There is
[12] no lack of understanding as to who gets what and whose
[13] relationships are what. Our view was at the end of the
[14] day the bankruptcy process would have a cleansing effect
[15] on all these issues. Your Honor would ultimately decide
[16] whether or not the valuation was appropriate, whether or
[17] not the plan meets the salutary purpose of
[18] rehabilitation. You confirmed the plan.

[19]     I honestly can tell you that from the
[20] standpoint of those who worked on this plan, which
[21] includes the Chanin people, our people, the debtors'
[22] management, never in a single time — this is not in the
[23] record, but I feel the need to tell you — there was
      never a single moment when there was a piece of

Page 86

[1] information that we thought was relevant that we elected
[2] not to include in a disclosure document. Never. This
[3] particular point is one that I honestly cannot recall
[4] ever arising.

[5]     So having said all that, I believe that the
[6] failure by this Court to confirm this plan leaves us with
[7] no solutions.

[8]     I think it's also very important to note,
[9] Your Honor heard from Mr. Haydon, Your Honor heard from
[10] Mr. Crowley. I think the evidence is consistent. There
[11] is no other plan. I don't mean in a sense there is no
[12] other plan on file. I mean there is no other plan.
[13] There is no other source of equity for this company. No
[14] one has pointed to any.

[15]     Just like there was a sophisticated debtor,
[16] there was a sophisticated Equity Committee. If there was
[17] any other person who had any interest in this company by
[18] way of acquisition, by way of investment, by way of
[19] financing, it would have surfaced. There is nobody
[20] there.

[21]     So the ultimate effect of not confirming
[22] the plan is we'll go into next year, we'll have
[23] incredibly serious problems, and if we manage to solve
[24] those problems, we'll come back to the Court at some

Page 87

[1] point with another plan or sale or some other vehicle
[2] that I think there is no basis to conclude will result in
[3] anything other than creditors getting less and the
[4] equityholders still getting nothing.

[5]     So, Your Honor, if the issue is that
[6] somebody did something wrong, and I'm not suggesting
[7] that, and I'm certainly not endorsing that view, but if
[8] that's the point, there is redress in the courts, but I
[9] don't think that the answer is to put this company out of
[10] business.

[11]     Thank you.

[12]     THE COURT: Well, I'm in a difficult
[13] situation. I would like to sidestep my duties, but I
[14] think I have to determine in deciding whether to confirm
[15] this plan under 1129(a)(3), I must conclude that it is
[16] proposed in good faith and that the plan proponents have
[17] acted in good faith. I just do not want to be in a
[18] position to conclude on this record that that is so. I
[19] cannot conclude on this record that that is so.

[20]     I think that the contractual relationship
[21] between Cerberus and the CEO, Mr. Crowley, did taint the
[22] process, and I think that, if anything, the ultimate
[23] fairness of the process in bankruptcy is a paramount
[24] principle to be protected by the Bankruptcy Court.

Page 88

[1]     Maybe we would be at the same place today
[2] if that contractual relationship had not been there, if
[3] it had been disclosed to all parties, but I don't know
[4] that and I don't think anybody will know that.

[5]     We are at a terrible place. The Equity
[6] Committee, even on its numbers, which I agree with the
[7] Creditors' Committee's counsel and their valuation expert
[8] and the cross-examination of the Equity Committee expert
[9] does point out the questionable nature of that valuation.

[10]     I think under any of the numbers the
[11] company is insolvent today. But I don't think I can
[12] confirm a plan based on that fact because I think that
[13] because of the process being tainted by this relationship
[14] which began in November of 1999, and perhaps in August of
[15] 1999, has so tainted the debtors' restructuring of its
[16] debt, the debtors' negotiations towards a plan, even the
[17] debtors' restructuring of its operations.

[18]     I think on that point I think it is a shame
[19] that Mr. Crowley and perhaps Cerberus and the debtor
[20] itself is tainted in this manner because I think there is
[21] evidence that Mr. Crowley did do a good job operationally
[22] in helping the debtor turn around. But I can't conclude
[23] that the debtor might not have done even better had there
[24] not been this relationship. I don't know. That's the

Case 1:04-cv-01565-SLR    Document 138-5    Filed 05/04/2007    Page 14 of 42    Hearin

Coram Healthcare Corp.                C.A. # 99-2889 (MFW)                December 21, 2000

Page 89

[1] problem. I don't know what would have happened without

[2] this actual conflict of interest. I do think it's an

[3] actual conflict of interest.

[4]     I think that the actions of Mr. Crowley to

[5] hide the relationship, and I think that EC-20 did show an

[6] intent to hide the relationship and to hide his request

[7] for additional compensation in Winterland in exchange for

[8] his efforts here did at least evidence that he, himself,

[9] believed that this relationship should not be disclosed

[10] and, therefore, did, in fact, taint his ability to serve

[11] as CEO of the debtor.

[12]     Whether it opens up a Pandora's box or

[13] encourages other notcholders or other parties in future

[14] bankruptcies to try the same thing, I'm not as concerned

[15] about that, but I just do not want my name confirming a

[16] plan where this type of activity occurred for a year

[17] before the plan was proposed for confirmation. I just

[18] cannot conclude that it's proposed in good faith for

[19] those reasons.

[20]     I do not have the ability to suggest a

[21] different plan. I do not have the ability to give an

[22] exemption from Stark II.

[23]     So I leave it to the debtor to see where it

[24] goes from here for now. I'll look for a form of order if

Page 90

[1] someone wants to present me with one.

[2]     MR. MINUTI: We will, Your Honor.

[3]     THE COURT: We'll stand adjourned.

[4]     MR. LEVY: Thank you, Your Honor.

[5]     (The hearing was then concluded at

[6] 3:35 p.m.)

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]     **B152**

[23]

[24]

Page 91

[1] State of Delaware                )

[2] County of New Castle )

[3]

[4]

                        CERTIFICATE

[5]

[6]

    I, Kathleen E. White, Registered Professional

[7] Reporter and Notary Public, do hereby certify that the
    foregoing record, pages 1 to 91, Inclusive, is a true and

[8] accurate transcript of my stenographic notes taken on
    Thursday, December 21, 2000, In the above-captioned

[9] matter before the Federal Bankruptcy Court.

[10]     IN WITNESS WHEREOF, I have hereunto set my hand
    and seal this 24th day of December, 2000, In

[11] New Castle County.

[12]

[13]

                        KATHLEEN E. WHITE,

[14]                     Notary Public-Reporter

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

April 2, 2001

Ernst & Young LLP
370 17th Street, Suite 3300
Denver, Colorado 80202

In connection with your audits of the consolidated financial statements of Coram Healthcare Corporation and its subsidiaries (collectively the "Company") as of December 31, 2000 and 1999 and for the three years in the period ended December 31, 2000, we recognize that obtaining representations from us concerning the information contained in this letter is a significant procedure in enabling you to form an opinion whether the consolidated financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the Company in conformity with accounting principles generally accepted in the United States.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

All representations included herein for Gerald A. Reynolds solely relate to the year ended December 31, 2000.

Accordingly, we make the representations set forth below, which are true to the best of our present knowledge and belief:

*General*

We recognize that, as members of management of the Company, we are responsible for the fair presentation of its consolidated financial statements. We believe the consolidated statements of financial position, results of operations and cash flows are fairly presented in conformity with accounting principles generally accepted in the United States applied on a basis consistent with that of the preceding periods.

We believe that the effects of any unadjusted audit differences, summarized in the accompanying schedule, accumulated by you during the current audit and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the consolidated financial statements taken as a whole.

We have made available to your representatives all financial records and related data.

We have no plans or intentions that may materially affect the carrying value or classification of assets and liabilities, except as disclosed in the notes to the consolidated financial statements.

COR-EQTY 0018404

*Minutes and Contracts*

We have made available to you all significant contracts and agreements and all minutes of the meetings of shareholders, directors, and committees of directors or summaries of actions of



B153

recent meetings for which minutes have not yet been prepared. We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

## Internal Control

There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.

There are no material weaknesses in internal control, including any for which we believe the cost of corrective actions exceeds the benefits. There have been no significant changes in internal control since December 31, 2000.

## Risks and Uncertainties

There are no risks and uncertainties related to significant estimates and current vulnerabilities due to material concentrations that have not been disclosed in accordance with AICPA Statement of Position 94-6, *Disclosure of Certain Significant Risks and Uncertainties*.

## Ownership and Pledging of Assets

Except for properties capitalized under capital leases, the Company has satisfactory title to all assets appearing in the balance sheets. Except as disclosed in the notes to the consolidated financial statements, no security agreements have been executed under the provisions of the Uniform Commercial Code and there are no liens or encumbrances on assets, nor has any asset been pledged. All assets to which the Company has satisfactory title appear in the balance sheets.

## Receivables

Adequate provision has been made for losses, costs and expenses that may be incurred subsequent to the balance sheet dates in respect of sales and services rendered prior to those dates and for uncollectible accounts, discounts, returns and allowances that may be incurred in the collection of receivables at those dates.

Receivables represent valid claims against the debtors indicated and do not include amounts for goods shipped or services provided subsequent to the balance sheet dates, goods shipped on consignment or approval or other types of arrangements not constituting sales.

Adequate consideration has been given to, and appropriate provision has been made for, estimated adjustments to revenue, such as for denied claims.

Adequate provision has been made for estimated adjustments to revenue. Recorded reserves are necessary, appropriate and properly supported.

All peer review organizations, fiscal intermediary and third-party payor reports and information have been made available to your representatives.

## Cost Reports Filed with Third Parties

COR-EQTY 0018405

All required Medicare, Medicaid, and similar reports have been properly filed.

B154

We recognize that as members of management of the Company, we are responsible for the accuracy and propriety of all cost reports filed with Medicare, Medicaid, or other third parties. We believe that all costs reflected in such reports are appropriate and allowable under the applicable reimbursement rules and regulations. All such costs are patient-related and properly allocated to applicable payors. The reimbursement methodologies and principles employed are in accordance with applicable rules and regulations. Adequate consideration has been given to, and appropriate provisions have been made in the cost reports to reflect applicable prior audit adjustments by intermediaries, third-party payors or regulatory agencies. We have fully disclosed in the Company's cost reports items required to be disclosed, if any, including disputed costs that are being claimed to establish a basis for a subsequent appeal.

Third-party settlements recorded in the Company's financial statements include differences between filed (and to be filed) cost reports and calculated settlements, which are necessary based on historical experience or new or ambiguous regulations that may be subject to different interpretations. While we believe the Company is entitled to all the amounts claimed on its cost reports, we believe the amounts of these differences are appropriate.

### Inventories

Inventories, including goods that are defective, slow-moving, obsolete, or unusable, are stated at amounts not in excess of their estimated net realizable values.

Physical counts and measurements of inventories were made by our employees under the supervision of management and book records were appropriately adjusted after giving recognition to cut-off for materials received and products shipped.

Except as discussed in Form 10-K Item 7. "Risk Factors," there have been no reductions in the list selling prices of the products and services offered by the Company subsequent to December 31, 2000 and none are contemplated.

### Investments in Subsidiaries and Affiliates

The equity method is used to account for certain of the Company's investments because the Company has the ability to exercise significant influence over the investees' operating and financial policies.

### Deferred Charges

We believe that all material expenditures that have been deferred to future periods will be recoverable.

COR-EQTY 0018406

### Long-Lived Assets, Including Intangible Assets

No events or changes in circumstances have occurred that indicate the carrying amount of long-lived assets to be held and used, including related goodwill, may not be recoverable, except for the amounts that were written-off in the income statements for the years ended December 31, 2000 and 1999. Assets to be disposed of other than those that are part of a "discontinued operation," as defined by Accounting Principles Board Opinion No. 30, are measured at the lower of carrying amount or fair value less cost to sell.

Long-lived assets to be held and used, including related goodwill, have been reviewed for impairment whenever events or changes in circumstances have indicated that their carrying

amounts may not be recoverable. Where appropriate under Statement of Financial Accounting Standards No. 121, such assets have been written down to fair value. Our estimates of future cash flows are based on reasonable and supportable assumptions and represent our best estimates of the cash flows expected to result from the use of the assets and their eventual disposition. Assets to be disposed of, other than those that are part of a "discontinued operation," as defined by Accounting Principles Board Opinion No. 30 are measured at the lower of carrying amount or fair value less cost to sell.

### Discontinued Operations

The Company has made adequate provision for any loss on the disposal of the R-Net division.

### Related Party Transactions

Transactions with related parties, as defined in Statement of Financial Accounting Standards No. 57, and related amounts receivable or payable, including sales, purchases, loans, transfers, leasing arrangements and guarantees, have been properly recorded or disclosed in the financial statements.

### Arrangements with Financial Institutions

There are no arrangements with financial institutions involving compensating balances or other arrangements involving restrictions on cash balances and line-of-credit or similar arrangements, except as disclosed in the notes to the financial statements.

### Contingent Liabilities

There are no unasserted claims or assessments, including those our lawyers have advised us of, that are probable of assertion and must be disclosed in accordance with Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies*, other than those disclosed in the financial statements.

Other than those disclosed or accrued in the financial statements, there are no violations or possible violations of laws or regulations, such as those related to Medicare and Medicaid antifraud and abuse statutes, including, but not limited to, the Anti-Kickback Act, Limitation on Certain Physician Referrals (commonly referred to as the "Stark Law"), and the False claims Act, in any jurisdiction whose effects should be disclosed in the financial statements or as a basis for recording a loss contingency.

Billings to third-party payors comply in all material respects with applicable coding guidelines (e.g., ICD-9-CM, CPT-4) and laws and regulations (including those dealing with Medicare and Medicaid antifraud and abuse), and billings reflect only charges for goods and services that were medically necessary, properly approved by regulatory bodies (e.g., the Food and Drug Administration), if required, and properly rendered.

We recognize that we are responsible for the Company's compliance with the laws, regulations, and contracts that are applicable to it. We have identified and disclosed to your representatives all laws and regulations that have a direct and material effect on the determination of financial statement amounts.

There have been no communications (oral or written) from regulatory agencies, or government representatives, employees or others concerning investigations or allegations of noncompliance with laws or regulations in any jurisdiction (including those related to the Medicare and Medicaid antifraud and abuse statutes), deficiencies in financial reporting

COR-EQTY 0018407

practices, or other matters that could have a material effect on the financial statements, other than these matters discussed with your representatives.

There are no other material liabilities or gain or loss contingencies that are required to be accrued or disclosed by Statement of Financial Accounting Standards No. 5 other than those accrued or disclosed in the financial statements, nor are there any accruals for loss contingencies included in the balance sheets that are not in conformity with the provisions of Statement of Financial Accounting Standards No. 5.

The Company has reported to its legal department all material known asserted and unasserted claims and incidents. Adequate and reasonable provision has been made for losses related to asserted and unasserted malpractice, health insurance, worker's compensation and any other self-insured claims.

### Oral or Written Guarantees of the Debt of Others

There are no oral or written guarantees of the debt of others.

### Capital Stock

Capital stock repurchase options or agreements, or capital stock reserved for options, warrants, conversion, or other requirements have been properly recorded or disclosed in the financial statements.

### Purchase and Sales Commitments and Sales Terms

At December 31, 2000 and 1999, the Company had no purchase commitments for inventories in excess of normal requirements or at prices that were in excess of market at those dates. Provisions have been made for losses to be sustained in fulfilling or our inability to fulfill any sales commitments.

There were no agreements or commitments to repurchase assets previously sold. There were no material commitments outstanding at December 31, 2000 and 1999 as a result of being a party to futures or forwards contracts, short sales or hedge transactions.

We have disclosed to you all sales terms, including all rights of return or price adjustments, and all warranty provisions.

### Fraud and Conflicts of Interests

Other than the matter discussed with your representatives, there has been no fraud involving management or employees who have significant roles in internal control. There has been no fraud involving other employees that could have a material effect on the financial statements.

There are no instances where any officer or employee of the Company has an interest in a company with which the Company does business that would be considered a "conflict of interest." Such an interest would be contrary to Company policy.

COR-EQTY 0018408

### Segment Information

The information about operating segments included in the notes to the consolidated financial statements has been prepared and presented in conformity with Statement of Financial Accounting Standards No. 131. This information is consistent with the information used by our chief operating decision maker to evaluate operating performance of and make resource allocation decisions among business units. The determination of operating segments, the methods used for allocating items of profit/loss or assets that are included in segment information for management purposes, the accounting principles used, and the presentation of segment information are consistent with the preceding year, except as disclosed in the notes to the consolidated financial statements. In addition, differences between the measurements used in reporting operating segment information and those used in the consolidated financial statements are adequately disclosed in the notes to the financial statements.

### Interim Financial Information

The unaudited quarterly financial information included in the notes to the consolidated financial statements was derived from quarterly financial statements prepared in conformity with accounting principles generally accepted in the United States and with Item 302(a) of Regulation S-K, consistently applied during the years and on a basis consistent with that used to prepare the audited financial statements.

### Deferred Tax Assets

The valuation allowance has been determined pursuant to the provisions of Statement of Financial Accounting Standards No. 109, *Accounting for Income Taxes*, including the company's estimation of future taxable income, if necessary, and is adequate to reduce the total deferred tax asset to an amount that will more likely than not be realized.

The tax planning strategies that we assumed in determining a valuation allowance for deferred tax assets are prudent and feasible strategies that we would implement, if necessary, to prevent a tax operating loss or credit carryforward from expiring.

We are responsible for the significant assumptions used in developing the analysis of future taxable income for purposes of determining a valuation allowance for deferred tax assets.

### Restructuring Cost

All charges, either incurred or anticipated, classified as restructuring cost have been recognized and disclosed in accordance with Emerging Issues Task Force No. 94-3 and No. 95-3 and with the Securities and Exchange Commission Staff Accounting Bulletin No. 100.

### Estimation Methods and Assumptions—Stock-Based Employee Compensation

We are responsible for the estimation methods and assumptions used in determining the fair value of the Company's stock options in accordance with Statement of Financial Accounting Standards No. 123. The assumptions represent our best estimates of future conditions.

COR-EQTY 0018409

## Use of the Work of a Specialist

We agree with the findings of the specialist in evaluating the fair value of the Coram, Inc. Series A Cumulative Preferred Stock and have adequately considered the qualifications of the specialist in determining the amounts and disclosures included in the consolidated financial statements and the underlying accounting records. We did not give or cause any instructions to be given to the specialist with respect to the values or amounts derived in an attempt to bias the work, and we are not otherwise aware of any matters that have had an effect on the independence or objectivity of the specialist.

## Going Concern

Note 2 to the consolidated financial statements discloses all of the matters of which we are aware that are relevant to the Company's ability to continue as a going concern, including significant conditions and events, and management's plans.

## Bankruptcy Reorganization

In connection with the Company's filing for reorganization under Chapter 11 of the United States Bankruptcy Code, the Company has complied with all accounting and reporting requirements of American Institute of Certified Public Accountants SOP 90-7, *Financial Reporting by Entities in Reorganization under the Bankruptcy Code.*

## Subsequent Events

Other than the matters discussed in the notes to the consolidated financial statements, no events or transactions have occurred since December 31, 2000 or are pending that would have a material effect on the financial statements at that date or for the year then ended, or that are of such significance in relation to the Company's affairs to require mention in a note to the financial statements in order to make them not misleading regarding the financial position, results of operations, or cash flows of the Company.

We understand that your audits were conducted in accordance with auditing standards generally accepted in the United States as defined and described by the American Institute of Certified Public Accountants and were, therefore, designed primarily for the purpose of expressing an opinion on the consolidated financial statements of the Company taken as a whole, and that your tests of the accounting records and other auditing procedures were limited to those that you considered necessary for that purpose.

Very truly yours,

Daniel D. Crowley
Chairman, President and Chief Executive Officer

Scott R. Danitz
Senior Vice President,

COR-EQTY 0018410

B159

Chief Financial Officer and Treasurer

*Gerald A. Reynolds*

Gerald A. Reynolds
Vice President—Controller

Attachment

COR-EQTY 0018411

B160

8

# Coram Healthcare Corporation
## December 31, 2000
### Summary of Audit Differences

|  | Increase / (Decrease) in Income | |
| --- | --- | --- |
|  | 12/31/00 Differences | 12/31/99 Differences |
| **Errors:** |  |  |
| • Impairment of assets overstatement | $0 | $300,000 |
| • Litigation accrual understatement | 0 | (300,000) |
| Effect of Errors | 0 | 0 |
| **Judgmental Differences:** |  | 0 |
| • Restructuring reserve | 471,000 | 0 |
| • Restructuring reserve | 280,000 | 0 |
| Effect of Judgmental Differences | 751,000 | 0 |
|  | 751,000 | 0 |
| **Pretax effect** |  |  |
| Tax effect (0%) | 0 | 0 |
| **Cumulative difference, before turn-around** | 751,000 | $0 |
| **Turn-around effect of prior-year differences, net of taxes** | 0 |  |
| • All errors | 0 |  |
| • Judgmental differences | 0 |  |
| **Cumulative difference, after turn-around** | $751,000 |  |

COR-EQTY 0018412

≣ℐℐ *ERNST & YOUNG* LLP



*postal tray*

# Dynamic
# Healthcare
# Solutions

## Invoice

June 1, 2001

Mr. Stephen Feinberg
General Partner
Cerberus Partners
450 Park Avenue, 28th Floor
New York, NY  10022

---

Professional Consulting Services for June, 2001

$ 80,000.00

Additional Consultants – Project Hanger Orthopedics
May 21-23, 2001, Bethesda, Maryland:

| | | |
|---|---|---|
| Garry Garrison – 3 days @$2,000/day | $6,000 | |
| Kurt Davis – 3 days @$1,000/day | $3,000 | |
| Darlena Blay – 3 days @$1,250/day | $3,750 | |
| | | $ 12,750.00 |

Expenses:
- Daniel Crowley          $4,367.97
- Garry Garrison          $1,854.32
- Kurt Davis              $2,924.54
- Darlena Blay            $2,796.40

Total Expenses                              $ 11,943.23

TOTAL AMOUNT DUE                            $104,693.23

Please wire funds to Dynamic Healthcare Solutions
Bank of America, Sacramento, ABA/Routing #1210-00-358
Account No. 01485-07867

Dynamic Healthcare Solutions
Federal I.D. #94-3279677

CROWLEYKVN 002209

400 Capitol Mall • Suite 1250 • Sacramento, CA 95814   916.449.6056 • 916.449.6059 fax

CXR 01015

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| CORAM HEALTHCARE CORP. and | ) | Chapter 11 |
| CORAM, INC., | ) | |
| | ) | Case Nos. 00-3299 (MFW) |
| Debtors. | ) | through 00-3300 (MFW) |
| | ) | |
| | ) | Jointly Administered |

## SECOND JOINT DISCLOSURE STATEMENT
## PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE

KASOWITZ, BENSON, TORRES
   & FRIEDMAN LLP
David M. Friedman
Adam L. Shiff
Robert M. Novick
Athena Foley
1633 Broadway
New York, New York  10019
(212) 506-1700

– and –

PACHULSKI, STANG, ZIEHL,
YOUNG & JONES, P.C.
Laura Davis Jones
Rachel Lowy
919 North Market Street, Suite 1600
Wilmington, Delaware 19801
(302) 652-4100

*CO-COUNSEL TO DEBTORS AND*
*DEBTORS-IN-POSSESSION*

G63

7-31-01

- A lawsuit against Crowley and Feinberg would provide no benefit to CHC's existing equity holders.

### 2.    Recommendations

Goldin recommends in its report that the Debtors strive to achieve a consensual resolution of their cases by proposing a Plan pursuant to which the Noteholders and Mr. Crowley forego a portion of their legal entitlements in order to make two voluntary contributions: (i) an increase in the distribution to CHC General Unsecured Creditors from $2 million (as in the Original Plan) to $3 million (if they vote as a class in favor of the Plan), and (ii) up to a $10 million distribution to holders of Allowed CHC Equity Interests (if they vote as a class in favor of the Plan). As a component of a global settlement to facilitate the Debtors' emergence from bankruptcy, Goldin recommended in its report that the bonus compensation Mr. Crowley has earned pursuant to his employment agreement, dated as of November 30, 1999, (as subsequently amended, the "Executive Employment Agreement") be reduced by $7.5 million such that Mr. Crowley will receive a total of $5.9 million in EBITDA bonus compensation for calendar year 2000 in addition to his base salary of $650,000.

### J.    Statement of Special Committee Regarding Executive Compensation Waiver

The statement of the Special Committee as to its views of the recommendations in the Goldin Report is as follows.

> The independent members of the CHC Board of Directors adopted the recommendations of the Goldin Report in their entirety, believing it is in the best interest of the Company, its customers, employees, shareholders and creditors to attempt to achieve a consensual and swift confirmation of its Second Joint Plan of Reorganization. However, the independent members of the Board of Directors do not believe the recommendation to reduce Mr. Crowley's compensation is warranted.

> Mr. Crowley was retained because of his acknowledged turnaround expertise and his extensive experience in managing large, complex healthcare companies. The Board hired Mr. Crowley when the Company's financial situation was dire. In November 1999, when Mr. Crowley arrived, CHC had more than $300 million in long-term debt, accounts payable were seriously overdue and CHC was on credit hold with important vendors, one of its units had just been forced into involuntary bankruptcy, CHC was engaged in an adversarial lawsuit with its largest customer, cash flow from operations was negative and it had net borrowing of $44 million in that year to fund operations.

As part of his compensation for 2000, Mr. Crowley had an incentive program linked to financial performance. During 2000, based on the SEC Form 10-K, net income grew to $98.7 million from a loss of $114.8 million in 1999, and cash flow from operations grew to $42.6 million compared to negative cash flow of $9.5 million in 1999 – a positive swing in cash flow of $52.1 million. In the process, Mr. Crowley made net long-term debt repayments of $54.1 million, brought accounts payable to current status, amicably settled the lawsuit with its largest customer, reorganized and stabilized the management team, achieved an enhanced price in the sale of the CPS asset and improved margins by focusing on profitable therapies and dramatically improving operating costs.

While we wish the business relationship between Mr. Crowley and Cerberus had been more adequately disclosed, we believe it had no material effect on the performance of his duties or the operations and financial condition of CHC. As the Goldin Report stated, Mr. Crowley "worked diligently and effectively to stabilize Coram's operations and improve its financial performance, a goal shared by the Noteholders and the stockholders."

We believe Mr. Crowley's actions saved the Company, preserving and significantly enhancing the value of the Debtors' estates in the best interests of all the claimants. We believe the viability of the ongoing enterprise is clearly attributable to the leadership of Mr. Crowley. For these reasons, we do not concur with the recommendation that his compensation should be reduced.

In light of this, the independent members of the Board of Directors acknowledge Mr. Crowley's contribution and express appreciation for his voluntary agreement to waive his right to a significant portion of his compensation to enable Coram to complete its reorganization.

### K.    Other Administrative Events

On the Petition Date, the Bankruptcy Court entered certain additional orders designed to minimize any disruption of the Debtors' business operations and to facilitate their reorganization. Certain of these orders are described below.

### 1.    Cash Management and Payment of Critical Trade Creditors

One primary objective of these cases is to restructure the Debtors' outstanding indebtedness and to cause Coram to remain in compliance with Stark II. To preserve the value of the Debtors' business operations, it is essential that their

### E.    Management

#### 1.    Reorganized Coram Board of Directors and Executive Officers

Reorganized Coram will be managed by a Board of Directors initially composed of the below-listed individuals, plus such other individuals as may be agreed to by the Debtors and the Noteholder Group who will be identified in the Plan Supplement. Reorganized Coram will have the overall corporate structure depicted in the chart attached hereto as Exhibit G.

The following biographical information is furnished with respect to the above-named current members of the Board of Directors of CHC and the senior executives of the Debtors:

| NAME | AGE | POSITION WITH CORAM | DIRECTOR SINCE |
|------|-----|---------------------|----------------|
| Daniel D. Crowley | 53 | Chairman of the Board | 1999 |
| Donald J. Amaral | 48 | Director | 1995 |
| William J. Casey | 56 | Director | 1997 |
| L. Peter Smith | 51 | Director | 1994 |
| Sandra L. Smoley | 64 | Director | 2000 |

Mr. Crowley joined CHC as its Chairman, Chief Executive Officer and President as of November 30, 1999. He is also Chairman of Winterland, a privately held affinity merchandise company in the music and entertainment industry, and Chairman, Chief Executive Officer and President of Dynamic Healthcare Solutions, LLC, a privately held management consulting and investment firm that he established in 1997. Prior to founding Dynamic Healthcare Solutions, Mr. Crowley served as the Chairman, Chief Executive Officer and President of Foundation Health Corporation, a post that he had served in since 1989.

As discussed above and at length in the Goldin Report attached hereto, Mr. Crowley also provides services to Cerberus, one of the Noteholders, with respect to its investments in various companies other than the Debtors. Mr. Crowley generally receives a fee of $80,000 per month from Cerberus for such services, with a potential for additional incentive bonuses. Mr. Crowley neither receives a fee nor earns incentive bonuses from Cerberus for any services he provides respecting the Debtors.

Mr. Crowley serves as Chairman of the Board, President, and Chief Executive Officer of CHC pursuant to his Executive Employment Agreement, which provides, among other things, that Mr. Crowley shall receive, among other compensation, a base salary ("Base Salary") in the amount of $650,000 per annum, and a performance bonus based upon CHC's EBITDA results for fiscal year 2000, as reflected in the

Debtors' audited financial statements, in the amount of 25% of the Debtors' EBITDA greater than $14 million, and an additional $5 million to Mr. Crowley and other members of management as designated by Mr. Crowley if EBITDA exceeds $35 million. The Executive Employment Agreement also provides that Mr. Crowley shall receive a restructuring bonus in the amount of $1.8 million, payable on the Effective Date of a plan of reorganization. The Executive Employment Agreement will be assumed by CHC and assigned to Coram under the provisions of the Plan, subject to the Executive Compensation Waiver.

Mr. Amaral served as Chairman of CHC's Board of Directors from September 1997 until November 30, 1999. Mr. Amaral has served as a director of the company since October 1995, Chief Executive Officer of CHC from October 1995 through April 23, 1999, and October 22, 1999 through November 30, 1999, and as President from October 1995 through December 1997. Previously, he was President and Chief Operating Officer of OrNda Healthcorp ("OrNda") from April 1994 to August 1995, and served in various executive positions with Summit Health Ltd. ("Summit") from October 1989 to April 1994, including President and Chief Executive Officer between October 1991 and April 1994. Summit was merged into OrNda in April 1994. Mr. Amaral is also a member of the Board of Directors of CareMatrix Corporation.

Mr. Casey has served as a director of CHC since September 1997. Since 1983, Mr. Casey has served as a consultant in the healthcare industry, specializing in hospital management evaluation, hospital planning, managed care contracting and turnaround services. From 1986 to 1997, Mr. Casey has also served as Contract Administrator for Emergency Department Physicians' Medical Group, Inc. and its affiliated medical groups, which provide physician services to non-governmental facilities. In addition, from 1988 to 1997, Mr. Casey has served as Contract Administrator for NP Medical Group, Inc., which provides physician services to government facilities. Mr. Casey also serves as a director of TriCounties Bank.

Mr. L. Peter Smith has served as a director of CHC since July 1994. Between November 1993 and July 1994, Mr. Smith was a director of Medisys, Inc. Mr. Smith served as the Managing Partner of AllCare Health Services, Inc., which was acquired by Medisys in December 1992. Mr. Smith is also Chief Executive Officer and serves on the Board of Directors of Ralin Medical, Inc., a company specializing in cardiac disease management. Mr. Smith also serves on the Board of Directors of Gateway, Inc. and AMSYS, Inc. Mr. Smith previously served on the Board of Directors of Sabratek Corporation from October 1992 through August 23, 1999. Sabratek Corporation filed a voluntary bankruptcy petition under chapter 11 of the United States Code on December 17, 1999, and that proceeding is presently pending before the United States Bankruptcy Court in Delaware.

Ms. Smoley was elected to CHC's Board of Directors on February 10, 2000. Ms. Smoley is the Chairman and Chief Executive Officer of The Sandra Smoley Company, a healthcare and local government consulting firm based in Sacramento,

California. From October 1993 to January 1999, she served as the Secretary of the
California Health and Welfare Agency. Prior to that time, she was Secretary of the
California State and Consumer Services Agency from January 1993 to October 1993.

### 2. Arrangements with Reorganized Coram's Executives

Reorganized Coram's successful implementation of its business strategies
will be highly dependent upon the continuing commitment of its key executives to
achieving corporate objectives. Reorganized Coram intends to enter into agreements
with its key executives in order to recruit (where necessary) and retain the services of
such executives and (a) assure the availability of their skills for the benefit of
Reorganized Coram, (b) secure to Reorganized Coram freedom from competition by such
persons within reasonable and lawful limits, and (c) provide appropriate base
compensation, benefits and financial incentives through bonus, severance and other
employment-related programs.

The senior executive officers of Coram and CHC are currently receiving a
salary from the Debtors at the following annualized rates:

| NAME | SALARY (BASE) | AGE | POSITION(S) WITH CORAM |
|---|---|---|---|
| Daniel D. Crowley | $650,000 | 53 | Chairman, Chief Executive Officer, President and Director |
| Allen J. Marabito | $350,000 | 54 | Executive Vice President |
| Scott R. Danitz | $250,000 | 44 | Senior Vice President — Finance, Chief Financial Officer and Treasurer |
| David A. Schwab | $165,000 | 41 | Vice President, General Counsel and Secretary |
| Vito Ponzio, Jr. | $180,000 | 47 | Senior Vice President, Human Resources |

B168

Certain senior executive officers also receive medical, dental, disability and life insurance coverage, car allowances, housing allowances, paid vacations, and certain other perquisites.

In addition to base salary, Coram's senior executives, as senior executives of Reorganized Coram, will continue to earn bonuses or, if voluntarily terminated or terminated without cause, be provided with severance benefits in accordance with certain of the Debtors' plans that are currently the subject of an application for approval with the Bankruptcy Court.

Specifically, the Debtors have obtained Bankruptcy Court approval of a Key Employee Retention Program, which is described above at section IV.F.3. "Other Administrative Events." Certain of the executives are participants in the Key Employee Retention Program.

The Debtors also have a management incentive program ("Executive Compensation Program") which applies to approximately thirty-six (36) people. The Executive Compensation Program consists of three components: base salaries, short term incentives, and long term incentives. The Debtors or Reorganized Coram intend to assume the Executive Compensation Program, except that the Executive Compensation Program will be modified to the extent necessary to be consistent with the provisions of the Plan. A copy of the Executive Compensation Program, as modified, will be included in the Plan Supplement.

Allen J. Marabito joined CHC effective November 30, 1999, as Executive Vice President. From 1997 to 1999, Mr. Marabito was in private law practice and Senior Vice President with Dynamic Healthcare Solutions, LLC. From 1991 to 1997, he served as the Senior Vice President, Secretary and General Counsel of Foundation Health Corporation.

Scott R. Danitz has served as CHC's Vice President and Controller from January 1998 through December 1999, and as Senior Vice President – Finance and Chief Accounting Officer from January 2000 through December 2000, and Senior Vice President – Finance, Chief Financial Officer and Treasurer since January 2001. Previously, Mr. Danitz was employed by First Data Corporation from 1989 through 1997, and held various positions, the most recent of which had been Vice President and Controller, Payment Instruments division.

David A. Schwab has served as CHC's Vice President, General Counsel and Secretary since January 2001. Previously, Mr. Schwab was employed by Legacy Securities Corporation from 1999 through 2000, and served as General Counsel to Meridian Corporation from 1991 to 1999.

Vito Ponzio, Jr. has served as CHC's Senior Vice President, Human Resources since September 1998. Previously, Mr. Ponzio served as the company's Vice

President of Human Resources from February 1996 to September 1998, and as Director of Human Resources from February 1994 to February 1996.

### F.    Certificate of Incorporation and By-Laws of the Reorganized Coram

Pursuant to the Plan, on the Effective Date, the Reorganized Coram will file the Amended and Restated Certificate of Incorporation of Reorganized Coram and will adopt the Amended and Restated By-Laws of Reorganized Coram. See "Implementation of the Plan -- Corporate Action." The description set forth below is intended as a summary only and is qualified in its entirety by reference to the Amended and Restated Certificate of Incorporation of Reorganized Coram and the Amended and Restated By-Laws of Reorganized Coram, which are included in the Plan Supplement.

Pursuant to the Plan, all currently outstanding capital stock of the Debtors will be canceled and all rights thereunder or relating thereto will be extinguished. In compliance with section 1123(a)(6) of the Bankruptcy Code, the Amended and Restated Certificate of Incorporation of Reorganized Coram will expressly prohibit the issuance of any non-voting equity securities.

### 1.    Board of Directors

The Amended and Restated By-Laws of Reorganized Coram provide that the number of directors on the Board of Directors shall be no less than three nor more than nine. The Plan provides that the Board of Directors of the Reorganized Coram shall initially consist of the individuals set forth in subsection E above and the other individuals identified in the Plan Supplement. In addition, the Amended and Restated By-Laws provide that, unless Reorganized Coram's Board of Directors otherwise determines, any vacancies will be filled by the affirmative vote of a majority of the remaining directors, though less than a quorum. Under the Delaware General Corporation Law ("DGCL"), directors serving on a board may be removed by the stockholders with or without cause.

### 2.    Limitation of Liability of Directors

The Amended and Restated Certificate of Incorporation of Reorganized Coram will provide that a director will not be personally liable for monetary damages to the Reorganized Coram or its stockholders for breach of fiduciary duty as a director, except for liability for: (i) any breach of the director's duty of loyalty to the Reorganized Coram or its stockholders; (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) paying a dividend or approving a stock repurchase in violation of law; or (iv) any transaction from which the director derived an improper personal benefit.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------- x
                                       :
   In re                               :   Chapter 11
                                       :
   CORAM HEALTHCARE CORP. and          :   Case Nos. 00-3299 (MFW)
   CORAM, INC.,                        :   through 00-3300 (MFW)
                                       :
                          Debtors.     :   Jointly Administered
                                       :
-------------------------------------- x
```

## UPDATED REPORT OF INDEPENDENT RESTRUCTURING ADVISOR
## GOLDIN ASSOCIATES, L.L.C.

GOLDIN ASSOCIATES, L.L.C.
400 Madison Avenue
New York, New York 10017
(212) 593-2255

OF COUNSEL:
KRAMER LEVIN NAFTALIS & FRANKEL LLP
919 Third Avenue
New York, NY 10022
(212) 715-9100

KL2:2108873.7

wish, Goldin will be available to continue its mediation efforts following dissemination of this. Report in final form.

## II.    CONCLUSIONS AND RECOMMENDATIONS

As the Bankruptcy Court found, Crowley's employment agreement with Cerberus created an "actual conflict of interest" on his part; the non-disclosure of that agreement "tainted the debtors' restructuring of its debt, the debtors' negotiations towards the plan, [and] even the debtors' restructuring of its operations." (Tr. of Dec. 21, 2000 hearing, at 88-89)  Crowley's and Feinberg's failure to disclose the full extent of the Crowley/Cerberus relationship (and the potential for abuse it posed) to other directors and officers was a breach of their respective fiduciary duties.  While the evidence as to Crowley's and Feinberg's intentions in this regard is not conclusive, Feinberg's nondisclosure appears to have been inadvertent.  Crowley, by contrast, had an incentive to conceal the existence of his Cerberus contract (so as not to risk a reduction of his Coram compensation) and his failure to make appropriate disclosure may not have been inadvertent.

It does not appear, however, that either Crowley or Feinberg acted with culpable intent of the sort alleged in the Equity Committee's Complaint.  The evidence does not establish that either man intended or expected that Crowley would seek to advance Cerberus' interests to the detriment of Coram and its shareholders.  There is no indication that Cerberus (or the other Noteholders) ever instructed Crowley to act contrary to the company's best interests or -- with one possible exception -- that Crowley ever did so of his own accord.  The one possible exception is Crowley's decision to make a $6.3 million cash interest payment to the Noteholders on July 14, 2000, at a time when the company's cash was low and a bankruptcy filing was under

-10-

Smith believes that Crowley, considering himself a "CEO of CEOs," envisioned Smith working for him, rather than the other way around. For example, he says Crowley sent Simpson, Coram's CFO, to New York "behind his back" to talk to bankers and took other actions on behalf of the company without consulting with Smith. He also says that in October 1999 Crowley wrote a highly critical memo about Coram's management information system -- in defiance of Smith's explicit instructions not to write any memos --which could have potentially hurt Coram in the Aetna litigation.

By mid-October it had become clear that Smith and Crowley could not work together. After the October 22 board meeting Richard Fink spoke to Smith on the board's behalf. Fink told Smith that he lacked turnaround experience and needed help; Fink explained that the board wanted Crowley to function, in the short term, as a "CEO coach." He proposed that Crowley and Smith serve as "co-CEOs" for the next few months, at which point Smith could resume running the company on his own. Fink says the board "tried to make it work for everyone."

While conceding that the board *did* ask him to stay on in some capacity, Smith claims Fink conveyed a somewhat different message. According to Smith, he was told the Noteholders would agree to forgive $11 million in debt if the board brought Crowley in to run the company with him as co-CEO. Smith says this was put to him as a direct quid pro quo. Simpson, who was CFO at the time, does not recall the two having been connected. But Fink recalls that the interest/accrual holiday was, in fact, conditioned on Crowley taking over.[9]

---

[9]     As noted below, Crowley's contract with Cerberus, Crowley's contract with Coram and the forbearance agreement between Coram and the Noteholders were executed within

KL3 2108873 6

B173



## CERBERUS
### CAPITAL MANAGEMENT, L.P.



**VIA FEDERAL EXPRESS**

September 5, 2001

Mr. Daniel Crowley
Dynamic Healthcare
400 Capital Mall #1250
Sacramento, CA 95814

Re:  NCS Healthcare, Inc.

Dear Dan:

As we discussed, enclosed please find the investment summary for NCS.  I would be grateful if you would review this at your earliest convenience and give me or Bob Davenport a call.  We have to make an "in or out" decision by September 13th.

Thanks.

Very truly yours,

Mark A. Neporent

MAN/cd
enc.


Cc:  Robert Davenport (w/out enc.)

450 PARK AVENUE • NEW YORK, NY 10022-2605 • TEL: (212) 891-2100 • FAX: (212) 891-1545

CROWLEYKVN 008976

# NCS HEALTHCARE, INC.
## A World Class Provider of Integrated HealthCare Solutions

$40,000,000 SUBORDINATED NOTES
$35,000,000 PREFERRED STOCK
AND
$15,000,000 COMMON STOCK

---

### INFORMATION MEMORANDUM

---

$90 mm

AUGUST 2001

PALLADIUM EQUITY PARTNERS, L.L.C.
&
THE AETHENA GROUP, L.L.C.

CROWLEYKVN 008977

# NCS HEALTHCARE, INC.

## Table of Contents

1.   Executive Summary

2.   Palladium Letter of Intent (dated August 8, 2001)

3.   Presentation to Senior Creditors (dated July 23, 2001)

4.   Financial model

5.   Comparable company analysis

6.   NCS HealthCare, Inc. Business Plan for Fiscal 2002-2004 (prepared by the Company)

7.   Preliminary Institutional Pharmacy Market Overview (from Palladium commissioned LEK Consulting report dated August 3, 2001)

8.   Institutional Pharmacy Services Overview (part of CIBC World Markets report on Long Term Care dated March 1, 2000)

9.   NCS Healthcare, Inc. June 2001 Earnings Press Release and Internal Preliminary Draft June 30, 2001 Financial Statements

10.  NCS HealthCare, Inc. 10-Q (dated March 31, 2001)

11.  NCS HealthCare, Inc. 10-K (dated June 30, 2000)

12.  Selected Additional Information
     a.   Industry Size and Segments
     b.   Company Overview
     c.   Pharmacy Site Listing
     d.   Geographic Dispersion
     e.   State Bed Data
     f.   Bed Count by Site
     g.   Service/Product Mix
     h.   Payor Mix
     i.   Largest Customers
     j.   Pharmaceutical Purchasing Data – By Manufacturer
     k.   Pharmaceutical Purchasing Data – By Product
     l.   Brand vs. Generic Analysis

13.  The Aethena Group, L.L.C. Press Release

CROWLEYKVN 008978

# NCS HealthCare, Inc.

# Executive Summary

Palladium Equity Partners, L.L.C. (together with its affiliates "Palladium") has entered into negotiations to acquire all principal operations of NCS HealthCare, Inc. ("NCS" or the "Company"). The total cash purchase consideration of $185 million, excluding transaction fees and expenses, represents a 5.5x multiple of the Company's June 30, 2001 estimated EBITDA of $33.4 million. This value assumes the utilization of $30 million in cash on the balance sheet. Net of existing cash, the valuation would represent a multiple of approximately 4.6x LTM EBITDA.

In consummating the transaction, Palladium has partnered with Vernon Loucks, Jr. and David Loucks, the founding principals of The Aethena Group, L.L.C. ("Aethena"), a private management company. Palladium and Aethena have been working together since March 2001 to acquire and build a major healthcare business as investors and operators. The principals of Aethena bring a wealth of experience in managing, supervising and financing healthcare concerns, Vernon Loucks most recently as Chairman and CEO of Baxter International, Inc. and David Loucks most recently as President and CEO of Physician Dynamics, Inc.

## COMPANY OVERVIEW

NCS HealthCare, Inc. is a leading independent provider of pharmacy services to long-term care institutions including skilled nursing facilities ("SNFs"), assisted living facilities and other institutional health care settings. The Company purchases and dispenses prescription and non-prescription pharmaceuticals and provides client facilities with related management services, automated medical record keeping, drug therapy evaluation and regulatory assistance. The Company also provides various ancillary health care services to complement its core pharmacy services, including infusion therapy, nutrition management, software services, and other services.

NCS entered the long-term care pharmacy services industry in 1986 with the acquisition of Modern Pharmacy Consultants, Inc. in Northeastern Ohio. Since 1986, the Company has completed a total of 49 acquisitions (other than fold-in acquisitions). As a result of these acquisitions, the Company has expanded its geographic presence into 33 states serving approximately 209,000 residents.

As is generally the case for long-term care facility services, NCS receives payments through reimbursement from Medicaid and Medicare programs and directly from individual residents (private pay), private third-party insurers and long-term care facilities. For the quarter ended March 31, 2001, the Company's payor mix was approximately 49% Medicaid, 1% Medicare, 16% private pay, 14% third-party insurance and other and 19% long-term care facilities, including amounts for which the long-term care facility receives reimbursement under Medicare Part A.

NCS completed its initial public offering of common stock in February, 1996, raising net proceeds in excess of $67 million. A secondary offering was completed in October, 1996 with net proceeds of approximately $124 million. In addition, a convertible subordinated debenture offering was completed in August, 1997, raising approximately $100 million.

CROWLEYKVN 008979

206.1
102.0
$308.1

## TRANSACTION SUMMARY

The implementation of the Prospective Payment System ("PPS") through the Balanced Budget Act of 1997 (the "BBA") significantly weakened the long-term care industry, and consequently NCS. Faced with an increased debt load from recent acquisitions and a sudden degradation in receivables, in April of 2000 the Company violated covenants on the senior debt. The Company has remained current in interest on the senior debt, however, the Company is in payment default on the convertible subordinated debentures. The Company is currently in default on the $206.1 million par value of senior debt and $102.0 million par value of convertible subordinated debentures. The Company has retained Brown, Gibbons, Lang & Company ("BGL") to explore opportunities, including the sale of the company, to recoup value for the current creditors.

Palladium and Aethena have met with Company management, toured two of the Company's pharmacy sites and reviewed the historical and projected financial performance of the Company. On August 8, 2001, Palladium and Aethena submitted a letter of intent to the Company stipulating an exclusivity period up to and including September 21, 2001. This Letter of Intent was based on an indicated purchase price for the Company, free and clear of all debt obligations, of $185 million in cash with the potential to achieve additional upside through equity (the "Transaction").

.85 / 308    48.7%

## INVESTMENT OPPORTUNITY

The institutional pharmacy market has undergone significant transition since the implementation of PPS and the ensuing reimbursement cutbacks and non-performing receivables from nursing home bankruptcies. However, the Balanced Budget Refinement Act of 1999 and the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 are expected to increase reimbursement rates and to partially offset the damage done by the BBA. Coupled with favorable industry trends including higher acuity levels, increased drug utilization and forecasted higher occupancy rates, we believe this to be an opportune time for NCS.

Palladium and Aethena believe the industry has begun to adapt to the new environment and is showing signs of stability. A June 2001 equity research report from McDonald Securities states "the financial condition of the nursing home operators is improving, in part as a result of the latest increase to Medicare reimbursement rates that became effective April 1, 2001. The nursing home industry as a whole is moving past the major disruption brought on by PPS, the new nursing home reimbursement system, in 1999."

Palladium and Aethena will leverage the significant operating experience of Aethena to reposition NCS to take advantage of the consolidating marketplace. We are in the process of a thorough business review of the Company, and the refinement of the Company operating plan. Our current model represents a conservative view of the market potential for NCS and we believe there to be significant upside potential through implementation of efficiency measures, realignment of the corporation and introduction of expansionary business lines.

CROWLEYKVN 008980

# THE OFFERING AND USE OF PROCEEDS

The following table summarizes the sources and uses of funds for the Transaction at closing:

| ($ in Millions) | | | |
|---|---|---|---|
| **Sources of Funds** | | **Uses of Funds** | |
| Existing Cash | $30.0 | Cash Proceeds to Creditors | $185.0 |
| Senior Credit Facility | 80.0 | Other * | 15.0 |
| Subordinated Notes | 40.0 | | |
| Preferred Stock | 35.0 | | |
| Common Stock | 15.0 | | |
| **Total Uses** | **$200.0** | **Total Sources** | **$200.0** |

\* *Other Includes: Due diligence expenses, financing fees, legal expenses, advisory fees, transaction and other fees and all out-of-pocket expenses.*

### *Senior Credit Facility*

The Company is in negotiations to secure a $75.0 to $85.0 million senior credit facility ("Senior Credit Facility") to i) support the acquisition of NCS, ii) refinance existing debt, iii) provide on-going working capital, and iv) pay acquisition related fees and expenses. The Company expects a bank group including GE Capital Commercial Finance, Inc., Heller Financial, Inc. and Foothill Capital Corporation to provide this facility.

### *Subordinated Notes*

The Company is offering $40.0 million of Subordinated Notes with detachable Warrants due 2011 (collectively, the "Subordinated Notes"). The Subordinated Notes will be unsecured obligations of NCS and will be subordinated in terms of interest, principal and premium payments to all senior debt obligations of the Company and its subsidiaries during the time the Subordinated Notes are outstanding. The Subordinated Notes will have a maturity of 10 years and are expected to have a current cash coupon in the range of 10% to 12% and a paid-in-kind ("PIK") coupon in the range of 0% to 3%.

### *Preferred Stock*

The Company is offering $35.0 of preferred stock with detachable Warrants due 2011 (collectively, the "Preferred Stock"). The Preferred Stock will have a maturity of 10 years and is expected to have a PIK dividend in the range of 12% to 14%.

### *Common Stock*

The Company is offering $15.0 million of common stock (the "Common Stock").

The anticipated close of the transaction will occur on or about November 30, 2001.

B179

CROWLEYKVN 008981

## PRO FORMA CAPITALIZATION

The following table sets forth the pro forma capitalization of the Company assuming the Transaction had been consummated on June 30, 2001:

| | Pro Forma Estimated At June 30, 2001 | | |
| --- | --- | --- | --- |
| | $ | % | EBITDA Multiple * |
| **Total Debt:** | | | |
| Senior Credit Facility | $80,000 | 47.06% | 2.40x |
| **Total Senior Debt** | **80,000** | **47.06%** | **2.40x** |
| | | | |
| Subordinated Debt | 40,000 | 23.53% | 1.20x |
| **Total Debt** | **120,000** | **70.59%** | **3.60x** |
| | | | |
| **Stockholders Equity** | | | |
| Preferred Stock | 35,000 | 20.59% | 1.05x |
| Common Stock | 15,000 | 8.82% | 0.45x |
| **Total Stockholders' Equity** | **50,000** | **29.41%** | **1.50x** |
| | | | |
| **Total Capitalization** | **$170,000** | **100.00%** | **5.10x** |

*\* Based on June 30, 2001 LTM EBITDA of $33.4 million*

## POTENTIAL RETURNS

The following table illustrates potential internal rates of return ("IRRs") for each investment class assuming base case projections and an exit after five years (2006) at exit multiples of EBITDA in the range of 5 to 6 times.

| | Rate | | | Potential IRR * | |
| --- | --- | --- | --- | --- | --- |
| Investment | Cash | PIK | Warrants | Low | High |
| Subordinated Debt | 10-12% | 0-3% | 5-10% | 17% | 21% |
| Preferred Stock | | 12-14% | 17-23% | 23% | 28% |
| Common Stock | | | | 30% | 45% |

*\* IRR includes interest/dividends and equity participation from warrants. Returns are based on fully diluted ownership which accounts for additional dilution for warrant and option grants to existing creditors, management and Aethena.*

CROWLEYKVN 008982