UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE


In re                    ) Jointly Administered

Coram Healthcare Corp.   ) Case Nos. 00-3299 (MFW)

and Coram, Inc.,         ) and 00-3300 (MFW)

                Debtors. ) Chapter 11


        The deposition of L. PETER SMITH, called

for examination, taken pursuant to the Federal

Rules of Civil Procedure of the United States

Bankruptcy Courts pertaining to the taking of

depositions, taken before JULIANA F. ZAJICEK, CSR

No. 84-2604, a Notary Public within and for the

County of Kane, State of Illinois, and a Certified

Shorthand Reporter of said state, at Suite 4000,

10 South Wacker Drive, Chicago, Illinois, on the

24th day of September, A.D. 2001, at 2:08 p.m.

COPY

B181



ESQUIRE™
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

02:57 PM  1       A.    I don't know if I know anybody named DC

02:57 PM  2   other than Dan Crowley.

02:57 PM  3       Q.    Okay.  Did you tell the Goldin

02:57 PM  4   representatives who interviewed you in words or

02:57 PM  5   substance what was reported here in this fourth

02:57 PM  6   paragraph that I just read to you?

02:57 PM  7       MR. CUNNINGHAM:  Objection.  The question is

02:57 PM  8   compound.

          9   BY MR. LEVY:

02:57 PM  10      Q.    Okay.  Did you tell Goldin or his

02:57 PM  11  representatives that, "They did not know that DC

02:57 PM  12  was a consultant and employee of Cerberus"?

02:58 PM  13      A.    I believe I did say they, yes.

02:58 PM  14      Q.    And they would refer to the members of

02:58 PM  15  the board of directors, correct?

02:58 PM  16      A.    Um-hum, yes.

02:58 PM  17      Q.    Did you tell Goldin that you learned of

02:58 PM  18  the Cerberus contract during the bankruptcy?

02:58 PM  19      A.    Yes.

02:58 PM  20      Q.    Did you tell Goldin or his

02:58 PM  21  representatives that you still hadn't seen it as

02:58 PM  22  of the day of this interview?

02:58 PM  23      A.    Yes.

02:58 PM  24      Q.    And did you tell them that if you had

ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE

Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

81

| 04:28 PM | 1 | successful person who had options in his life to |
|---|---|---|
| 04:28 PM | 2 | earn certain levels of income, and I think he was |
| 04:28 PM | 3 | attempting to earn what he thought he could earn. |
| | 4 | BY MR. LEVY: |
| 04:28 PM | 5 | Q.    Did any of your fellow directors on the |
| 04:28 PM | 6 | independent committee ever tell you that they |
| 04:29 PM | 7 | thought Mr. Crowley was greedy? |
| 04:29 PM | 8 | A.    Not that I can recall. |
| 04:29 PM | 9 | Q.    Did you ever have a face-to-face -- |
| 04:29 PM | 10 | ever after December 21st or perhaps after you read |
| 04:29 PM | 11 | the judge's opinion just a face-to-face |
| 04:29 PM | 12 | conversation with Crowley which you expressed some |
| 04:29 PM | 13 | concern that he hadn't told you about the |
| 04:29 PM | 14 | magnitude of his financial benefits from Cerberus? |
| 04:29 PM | 15 | A.    I had a conversation with him, not |
| 04:29 PM | 16 | face-to-face, but on the telephone, in which I |
| 04:29 PM | 17 | told him I was disappointed.  I felt that he |
| 04:30 PM | 18 | should have made that clear to us at the beginning |
| 04:30 PM | 19 | and that it was unfortunate that it had not been |
| 04:30 PM | 20 | made clear certainly. |
| 04:30 PM | 21 | Q.    Why were you disappointed? |
| 04:30 PM | 22 | A.    Well, I think, as I said at the |
| 04:30 PM | 23 | beginning of all of our questions here, he should |
| 04:30 PM | 24 | have made that point clear. |

B183

ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE

*Chicago*: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

04:33 PM    1    was continuing to receive payments from Cerberus?

04:33 PM    2        A.    No.

04:34 PM    3        Q.    Do you know today whether he is

04:34 PM    4    continuing to receive payments from Cerberus?

04:34 PM    5        A.    No.

04:34 PM    6        Q.    Does it interest you?

04:34 PM    7        A.    Not really.

04:34 PM    8        Q.    Why?

04:34 PM    9        A.    Well, because I believe that what's

04:34 PM    10   important for the company is that Mr. Crowley

04:34 PM    11   performs his duties as the CEO of a company in the

04:34 PM    12   way in which we want him to perform his duties,

04:34 PM    13   and having been through all of this and seeing the

04:34 PM    14   results, I believe that that's exactly what he is

04:34 PM    15   doing.

04:34 PM    16       Q.    Did it concern you that Mr. Crowley was

04:34 PM    17   violating the express terms of Coram's conflict

04:34 PM    18   policy?

04:34 PM    19       MR. CUNNINGHAM:   Objection.

04:34 PM    20       MR. HARWOOD:   Object to the form.

04:34 PM    21   BY THE WITNESS:

04:34 PM    22       A.    That's an issue which I think is a fair

04:34 PM    23   question and obviously should be considered, but I

04:34 PM    24   am not at this moment in the position to say that

B184


ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

06:41 PM   1           A.      It must have been spring of 2001.

06:41 PM   2           Q.      Did you ever attempt to contact him

06:41 PM   3    after you learned about his payments of $80,000 a

06:41 PM   4    month to Mr. Crowley?

06:41 PM   5           A.      No.

06:41 PM   6           MR. CUNNINGHAM:   Objection.

           7    BY MR. LEVY:

06:41 PM   8           Q.      Did you ever suggest to Crowley he

06:41 PM   9    ought to stop taking $80,000 a month from Cerberus

06:41 PM  10    as long as he continued as CEO?

06:41 PM  11           A.      No.

06:41 PM  12           Q.      Did anybody, to your knowledge?

06:41 PM  13           A.      I don't know.

06:42 PM  14           Q.      Did you ever ask Mr. Crowley what he

06:42 PM  15    does for Cerberus for that $80,000 a month?

06:42 PM  16           A.      I never asked him.  He did explain to

06:42 PM  17    the board that he evaluates companies and

06:42 PM  18    investments and so on, but it was not a detailed

06:42 PM  19    explanation, no.

06:42 PM  20           Q.      When did he make that explanation to

06:42 PM  21    you?

06:42 PM  22           A.      Sometime in the early part of the

06:42 PM  23    new -- of the year 2001 once this all came to

06:42 PM  24    light.

ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE

Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

06:42 PM 1      Q.    When he made that explanation in the

06:42 PM 2   early 2001, were you aware that the payments were

06:42 PM 3   continuing?

06:42 PM 4      A.    No.

06:42 PM 5      Q.    When did you become aware that the

06:42 PM 6   payments were continuing?

06:42 PM 7      A.    During the discussion of the Goldin

06:42 PM 8   report, I believe, somehow.

06:42 PM 9      Q.    Early July?

06:42 PM 10     A.    Yep.

06:42 PM 11     Q.    And who raised that during the

06:42 PM 12  discussion?

06:42 PM 13     A.    I don't remember.

06:42 PM 14     Q.    Were you surprised?

06:43 PM 15     A.    Not completely.

06:43 PM 16     Q.    Slightly?

06:43 PM 17     A.    No.  At that point I had focused my

06:43 PM 18  attention on whether, you know, the steps we had

06:43 PM 19  taken, as I've mentioned before, were the correct

06:43 PM 20  ones anyway, and at that point actually I just

06:43 PM 21  didn't consider it a major material fact in what

06:43 PM 22  we were dealing with.

06:43 PM 23     Q.    But Goldin or somebody from Goldin's

06:43 PM 24  side raised it during the July meeting?

ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE

*Chicago:* 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1

2   UNITED STATES BANKRUPTCY COURT

3   DISTRICT OF DELAWARE

4                                         COPY

5   In Re                      )
                               )
6   Coram Healthcare Corp.     )
                               )
7   and Coram, Inc.,           )
                               )
8        Debtors,              )   Chapter 11 Case Nos.
                               )   00-3299 (MFW) through
9                              )   00-3300 (MFW)
                               )
10  ———————————————————————————)

11

12

13

    Deposition of
14
    WILLIAM CASEY
15
    Friday, September 28, 2001
16

17

18

19

20

21

22

23

    Reported by:
24  CARRIE STOTTLEMEYER, RPR, CM, CRR
    CSR No. 4373
25  Job No. 79613

1   written contract between Cerberus and Feinberg, he was

2   entitled to certain other potential profits, that is to

3   say other than Winterland?

4   MR. HARWOOD:  Object to the form.

5   THE WITNESS:  As I said, I haven't read the

6   contract.

7   BY MR. LEVY:

8   Q    And you haven't asked about the terms of the

9   contract, correct?

10  MR. HARWOOD:  Objection.

11  THE WITNESS:  Well, the terms of the contract

12  is that he's paid 80,000 dollars a month.

13  BY MR. LEVY:

14  Q    How do you know that?

15  A    What you've said, that's what he's said, that's

16  what everyone has said.

17  Q    But other than what he said and I said and

18  everyone said -- strike that.

19  A    I haven't read the contract, I admit it.

20  Q    Are you aware of whether the contract remains

21  in force today?

22  A    No, I don't know.

23  Q    Do you know whether Mr. Crowley continues to

24  receive 80,000 dollars a month from Cerberus today?

25  A    Do I think?  I just answered the question.  I

1  don't know if the contract's still in effect.

2  Q    Answer the question the way I put it.  Do you

3  know whether he's still getting 80,000 dollars a month?

4  A    I don't know that.

5  Q    Did you ever ask?

6  A    No.

7  Q    Let's go back to your interview with Mr. Goldin

8  on May 15th.  I have a set of handwritten notes -- well,

9  strike that, just strike that.

10  And tell me whether you recall saying to

11  Mr. Goldin in substance "EC equals a ploy and outside

12  force rather than real, in essence, ambulance chasers."

13  Did you say that in words or substance?

14  A    I don't have any idea what you're talking

15  about.

16  MS. HAKALA:    I'm sorry.  Can you just repeat

17  that?

18  MR. LEVY:  You couldn't hear me?

19  MS. HAKALA:  I couldn't hear you.

20  MR. HARWOOD:  May the court reporter read it

21  back?

22  MR. LEVY:  I'll ask it again.  Let's just do it

23  simpler.

24  BY MR. LEVY:

25  Q    Do you recall the interview on May 15th with

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

In Re                           )
                                )
Coram Healthcare Corp.          )      **CERTIFIED COPY**
                                )
and Coram, Inc.,                )
                                )      Chapter 11 Case Nos.
        Debtors,                )      00-3299 (MFW) through
                                )      00-3300 (MFW)
                                )
_____)

Deposition of

**SANDRA R. SMOLEY**

Saturday, September 29, 2001

Reported by:
CARRIE STOTTLEMEYER, RPR, CM, CRR
CSR No. 4373
Job No. 79663

E S Q U I R E
DEPOSITION SERVICES

1801 I Street • First Floor • Sacramento, CA 95814

916.448.0505 • Fax 916.448.8726 • 800.610.0505

B190

1          MR. HARWOOD:  Object to the form.

2          THE WITNESS:  No, I didn't consider that.

3  BY MR. LEVY:

4     Q    Did you consider the fact that that's why

5  Mr. Feinberg is paying a million dollars a year to your

6  chief executive officer?

7          MR. HARWOOD:  Objection.

8  BY MR. LEVY:

9     Q    Question is did you consider it?

10    A    No, no.

11    Q    Okay.  Thank you.  Do you know whether Crowley

12  is still getting that 80,000 dollars a month?

13    A    I do not.

14    Q    You never asked?

15    A    No.  It's outside of Coram.  My judgment as a

16  board member is how he's doing with our company, not

17  what he's doing outside of our company in my mind.

18  That's just my value system.

19    Q    Peter Smith Exhibit 10 is the Corporate

20  Compliance Handbook.

21    A    Coram Compliance Handbook.  Okay.

22    Q    You've seen this?

23    A    I have.

24    Q    Do you believe your duties as a director

25  included oversight to make sure that this policy was

65

ESQUIRE DEPOSITION REPORTERS
1801 I STREET    SACRAMENTO, CA    (916) 448-0505

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

In Re                          )
                               )
Coram Healthcare Corp.         )
                               )
and Coram, Inc.,               )
                               )        Chapter 11 Case Nos.
          Debtors,             )        00-3299 (MFW) through
                               )        00-3300 (MFW)
                               )
_____)

**CERTIFIED COPY**

Deposition of

**DANIEL D. CROWLEY**

Thursday, October 25, 2001

Reported by:
CARRIE STOTTLEMEYER, RPR, CM, CRR
CSR No. 4373
Job No. 80965



ESQUIRE
DEPOSITION SERVICES

1801 I Street • First Floor • Sacramento, CA 95814

916.448.0505 • Fax 916.448.8726 • 800.610.0505

B192

2    Coram, that they were pleased with me, my conduct, and

3    the results spoke for themselves.

4        Q    Did you tell them at that time that you

5    intended to continue receiving 80,000 dollars a month

6    from Cerberus, "at that time" being sometime shortly

7    after December 21st, 2000?

8        A    Yes.

9        Q    You disclosed that?

10       A    Yes again.

11       Q    And you didn't mention Mr. Smith.  Did

12   Mr. Peter Smith, a director, have a response?

13           MR. FELDMAN: · No foundation.

14           THE WITNESS:  Am I to answer this?

15           MR. FELDMAN:  You can.  It's a defective

16   question, but you can answer.

17           THE WITNESS:  I don't recall.

18   BY MR. LEVY:

19       Q    Did the directors at that meeting take any

20   formal action, form of a resolution confirming their

21   views as you just testified to?

22       A    I don't recall that.

23       Q    Did the directors, to your knowledge, ever take

24   any action approving your decision to continue to

25   receive 80,000 dollars a month from Cerberus?

                                                    18

ESQUIRE DEPOSITION REPORTERS
1801 I STREET    SACRAMENTO, CA    (916) 448-0505

```
 2   question, it was broken up.

 3              (Record read.)

 4              THE WITNESS:  I don't think so.

 5   BY MR. LEVY:

 6       Q    Mr. Crowley, I'm going to represent to you that

 7   none of the minutes, the director minutes provided to us

 8   by Coram reflect any action or discussion with respect

 9   to your continuing to receive 80,000 dollars a month

10   from Coram.  Can you explain that omission?

11              MR. FELDMAN:  I don't go off representations.

12   I don't want to have you sworn as a witness.

13              MR. LEVY:  No, you don't.

14              MR. FELDMAN:  You can show him documents and

15   ask him questions, but you can't testify and then ask

16   him to react.

17              MR. LEVY:  Let me be clear.  By making a

18   representation, I mean that if the representation is

19   wrong, the question and the answer are stricken.

20              MR. FELDMAN:  It doesn't matter to me.  It's

21   not a good way -- I'm not going to have a lawyer testify

22   and then him react.  He'll answer questions or read

23   documents, but he won't respond to testimony by a

24   lawyer.

25              MR. LEVY:  Boris, there are approximately 15 --
                                                          19
```

1
2
3

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

4   In Re                          )
                                   )
5   CORAM HEALTHCARE CORPORATION   )   Chapter 11 Case Nos.
    and CORAM, INC.,               )   00-3299 (MFW) through
6                                  )   00-3300 (MFW)
              Debtors.             )
7   _____)

8
9

COPY

10
11
12
13

14              DEPOSITION OF DON AMARAL

15                Palo Alto, California

16              Friday, October 26, 2001

17
18
19
20
21
22
23

    Reported by:
24  RACHEL FERRIER
    CSR No. 6948
25  Job No. 28956

ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

B195

1    Q    You recall potential conflict of interest, or

2    do you recall the transcript saying actual conflict of

3    interest?

4    A    I don't remember.

5    Q    Did you discuss -- at about that time, did you

6    discuss with Mr. Crowley this conflict of interest?

7    A    I don't know the exact period of time, but

8    we -- the board, which is almost all independent

9    directors, discussed it with Mr. Crowley, the potential

10   conflict of interest.

11   Q    You say, "potential."  What -- let's break it

12   down evening further.

13        What do you understand the conflict of interest

14   to be, whether it was potential or actual?

15   A    That Mr. Crowley was an employee of Coram

16   Healthcare as our chairman/CEO, and he also was a

17   consultant to Cerberus or one of their subsidiaries.

18   Q    And did you, Mr. Amaral, view that as a

19   conflict of interest?

20   A    No.

21   Q    When did you become aware of the amount of

22   money that Cerberus was paying Crowley?

23   A    About five minutes before my second phase of --

24   this is my third deposition on this -- the second one,

25   which was in Orlando.

ESQUIRE™
DEPOSITION SERVICES

A RECORD OF EXCELLENCE

Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    substantially under water.

2        A    Yes.

3        Q    Now, having read the portion of the opinion I

4    put in front of you, is that still your testimony?

5        A    Yes.

6        Q    Will you find for me where she said it was

7    substantially under water?

8        A    I think under any of the numbers the company is

9    insolvent today.

10       Q    And you interpret that to mean substantially

11   under water?

12       A    Yes, sir.

13       MR. HARWOOD:  And for the record, the witness was

14   pointing to page 88, lines 10 and 11.

15   BY MR. LEVY:

16       Q    Are you aware that a -- did anyone tell you at

17   a subsequent court hearing Judge Walrath said when she

18   denied confirmation she didn't -- she did not deny it on

19   the basis of insolvency, but rather on the basis of lack

20   of good faith?

21       A    I don't recall.

22       Q    Are you aware that Mr. Crowley continues to

23   receive $80,000 a month from Cerberus?

24       A    I don't know.

25       Q    Never asked?

1    A    Not recently.

2    Q    Ever -- ever since -- I'm sorry.

3         Ever since December 21st?

4    A    It was disclosed to us that he was receiving

5    that compensation in -- sometime after December 21st,

6    2000.

7    Q    But since then you have never asked him whether

8    he continues to receive it, and you don't know whether

9    he's receiving it today?

10   A    I don't know if he's receiving that today.

11   Q    Is that something you would want to know as a

12   director?

13   A    No.

14   Q    Why?

15   A    Because I'm very pleased with the job

16   Mr. Crowley is doing as CEO.  And when I hired him, I

17   knew he was doing some consulting for Cerberus or one of

18   those -- one of the subsidiaries.

19   Q    Did it ever occur to you that though he is

20   doing a good job, he might have done even better -- he

21   might have done an even better job had there not been

22   this relationship?

23   A    It occurred to me that he could not have done a

24   better job than what he has done, whether he was getting

25   $80,000 or a million dollars a month.

B198

ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE

Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1  established.

2     THE WITNESS:  I know I -- I don't know the exact

3  15 million that you are referring to.  I know under Dan

4  Crowley's leadership the company paid back a lot of

5  debt.

6  BY MR. LEVY:

7     Q    Okay.  Let's establish the fact.  Goldin

8  Exhibit 10 is a letter dated July 31st, 2000 written by

9  Dan Crowley to the three noteholders, Feinberg of

10  Cerberus, Goldman Sachs, and Foothill.

11          Have you ever seen that letter before today?

12  And I do note it shows that a copy was sent to the board

13  of directors.

14     A    Do I remember seeing it?  Yes.

15     Q    And in the last paragraph, Mr. Crowley says,

16  "Earlier this year we voluntarily repaid $15 1/2 million

17  early on the revolver.  6.3 million in interest" --

18  let's just say -- let me stop there.

19          "Earlier this year we voluntarily repaid

20  $15 1/2 million early on the revolver."  Does that

21  refresh your recollection so that you can now testify

22  that you were aware that during the year 2000 up to

23  July 31st the company voluntarily repaid $15 1/2 million

24  early?

25     A    Yes.

ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE

Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    Q    Do you think that payment was in the interests

2    of the noteholders, the shareholders, or both?

3    A    Both.

4    Q    How was it in the interests of the

5    shareholders?

6    A    Reduced interest expense, increased earnings.

7    Q    And the -- at the time this payment was made,

8    the company was having cash difficulties; is that --

9    when these payments were made, the company was having

10   difficulties; is that right?

11   MR. CUNNINGHAM:  Objection.

12   THE WITNESS:  I don't think so.

13   BY MR. LEVY:

14   Q    Well, the company had been considering, at

15   least discussing, filing a Chapter 11 bankruptcy at

16   least since the prior December, December of '99; isn't

17   that correct?

18   A    That's correct.

19   Q    Okay.  So during the period when the company

20   was considering filing a bankruptcy, the company

21   voluntarily repaid $15 1/2 million; correct?

22   A    Yes.

23   Q    Did the company or its board of directors

24   consider that if it had conserved that cash, it would

25   have a better -- and not paid, voluntarily paid the

ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE

Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1  noteholders, it would have been in a better negotiating

2  position with the noteholders?

3      A    That, again, is in the eyes of the -- you know,

4  of the negotiator.  But you need to remember all the

5  facts here.

6          As part of the hiring of our CEO, when I was

7  the interim CEO post Rick Smith, Richard Smith, is I got

8  Haven interest free for I believe four months and maybe

9  six months where no interest was paid whatsoever.

10         So during that period of time, the cash flows

11  of the company were substantially improved.  So while

12  the company was considering bankruptcy because of this

13  enormous $300 million of debt on our shoulders, we still

14  had interest -- I mean, excuse me, cash flow to pay our

15  bills, pay our salaries, increase inventories, do all

16  those business things.  We were just under water since

17  the day I came over because of the amount of debt on the

18  company.

19      Q    Was this something that was considered and

20  decided by the board of directors?

21      MR. CUNNINGHAM:  Objection.

22      MR. HARWOOD:  Object to the form.  What's the

23  "this"?

24      THE WITNESS:  Please clarify the question.

25  BY MR. LEVY:

SQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1     Q    The decision to voluntarily pay

2   $15 1/2 million, voluntarily over the period from the

3   beginning of the year to July 31st, was that a decision

4   of the board, or was that a decision of Dan Crowley?

5     A    I don't remember.  However, when I was CEO and

6   I had sufficient cash, I just paid the debt down.

7     Q    During this period between the beginning of

8   2000 and July 31st, 2000, did you as a director ever

9   discuss the possibility of not making voluntary payments

10   in order to improve your negotiating position with the

11   noteholders?

12     A    I don't think there was any way by not paying

13   our debt down that we could have improved our position

14   with our debtholders.

15     Q    The question was, did you consider it?

16     A    I personally?

17     Q    You personally.

18     A    I don't remember.

19     Q    Do you recall it ever being considered by any

20   directors?

21     A    You would have to ask them.

22     Q    You don't recall?

23     A    I don't recall.

24     Q    Let's go back to December of 2000.  You

25   described a telephone call where you learned about the

B202

SQUIRE
POSITION SERVICES

A RECORD OF EXCELLENCE

Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

60

```
1        A    Yes.

2        MR. HARWOOD:  Can you tell me where you are reading

3   from.

4        MR. LEVY:  9019.

5        MR. HARWOOD:  Thank you.

6        MR. LEVY:  At the top.

7        Q    Did you tell Goldin that you thought Crowley

8   was greedy?

9        A    I don't remember saying that, but I think he

10  is.

11       Q    Do you think Crowley is greedy?

12       A    Yes.

13       Q    Do you recall a discussion -- you touched on

14  this earlier -- with Crowley and perhaps with Feinberg

15  in November of 1999 -- strike that.

16            I'm going to just bring you -- November of 1999

17  is when Crowley became the CEO of Coram and signed a

18  contract.  Do you recall that?

19       A    Yes.

20       Q    Okay.  Now, do you recall at about that time a

21  discussion with Crowley and perhaps Feinberg concerning

22  Crowley's request to be compensated by Cerberus or

23  Winterland based on his success at Coram?

24       MR. HARWOOD:  Objection; this goes before

25  December 21st and was covered at the last deposition.
```

ESQUIRE™
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950



1    MR. LEVY:  I understand, but there was new

2  information about it in here.

3    THE WITNESS:  Yes.

4    MR. HARWOOD:  If you are just trying to bring him to

5  the time period, that's fine, but let's not cover that

6  same territory again.  Thank you.

7    MR. LEVY:  Okay.

8    Q    And do you recall telling Goldin that you said

9  at that -- telling Goldin in the spring that you had

10  said the prior November that it would be wrong for

11  Crowley to receive compensation for Cerberus or

12  Winterland for his work at Coram and that the CEO should

13  only receive compensation from the company?

14    A    Based upon work that he's doing at the company,

15  yes.

16    Q    And do you recall -- and was that because you

17  thought there would be a conflict?

18    A    I don't think that -- I want my CEO to be

19  compensated in my companies for the work that he does

20  for my company, not by a third party.

21    Q    Because that would be a conflict?

22    A    Based upon the performances of the company,

23  yes.

24    Q    You said, "based upon the performances of the

25  company."  Which company?



SQUIRE
OSITION SERVICES

A RECORD OF EXCELLENCE

*Chicago:* 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    A    Coram.

2    Q    So to put it together, you believed -- you

3    believe that if Crowley was paid for -- by someone else

4    based upon the performance of Coram, that would be a

5    conflict?

6    A    Dan Crowley should only be paid by Coram for

7    his activities on Coram.

8    MR. CUNNINGHAM:  Could we possibly --

9         (Recess taken.)

10   MR. LEVY:  I think we are going to mark this -- do

11   we have copies?

12   MS. MINOR:  Yeah.

13   MR. LEVY:  We are going to mark as Amaral

14   Exhibit 102, pages with Bates Nos. G 9009 through 9037.

15         (Equity Committee Exhibit 102 was marked for

16         identification by the court reporter.)

17   BY MR. LEVY:

18   Q    And Mr. Amaral, these were furnished to us by

19   Goldin & Associates.  And as you can see from the first

20   page, they appear to be the notes of a meeting with you

21   and all the people you described earlier.

22   A    What pages, please?

23   Q    Okay.  Now, please look at page 9021.  In what

24   I suppose you call the second paragraph it says on the

25   left, "JG," which I am interpreting to be Jay Goldin.

SQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

74

1    Q    And are you aware that as a result of the

2  change made back then, that he now claims some

3  $13 1/2 million?

4    A    I don't think he claims to think the

5  companies -- based upon the signed contract the company

6  owes him that money.

7    Q    Now, did you tell Goldin that you were not even

8  aware of the second negotiation?  And I'm looking at the

9  top line on 9026.

10   A    The negotiation of Dan Crowley's second -- the

11 renegotiation of Dan Crowley's contract was mentioned at

12 a board meeting by Peter Smith, that he would be getting

13 back to Dan about some issue regarding his contract.

14 And I said, what the fuck is this all about.

15   Q    That means you were surprised?

16   A    Yes.

17   Q    Annoyed?

18   A    Surprised.

19   Q    Annoyed?

20   A    Surprised.

21   Q    And not annoyed?

22   A    Surprised.

23   MR. HARWOOD:   Objection.

24 BY MR. LEVY:

25   Q    Why were you surprised?

SQUIRE™
DEPOSITION SERVICES

A RECORD OF EXCELLENCE

Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    Q    Well, who was the compensation committee at

2  that time?

3    A    Should have been Feinberg, Fink, and Smith.

4    Q    I think Fink was gone.

5    A    Then it would have been Smith and Feinberg.

6    Q    Isn't it a fact that the deal to change

7  Crowley's compensation to what now you -- to an amount

8  that you now believe to be $13 1/2 million is made

9  between Crowley and Feinberg?

10    MR. HARWOOD:  This is pre-December 21st, 2000?

11    MR. LEVY:  Just hold on a minute and I'll make you

12  happy.

13    THE WITNESS:  I don't know that.

14    MR. LEVY:  Okay.  Let me mark as Amaral Exhibit 103

15  a document dated April 12th, 2000 bearing Bates Nos.

16  D&T 4407.

17         And Mr. Harwood, or Michael, I will tell you

18  that this letter was never furnished to us until we

19  received it from Goldin who had -- we received it from

20  Deloitte & Touche, who had received it from Goldin, and

21  that's why I'm going back on this.

22         For some reason Coram saw fit -- or didn't

23  produce this, and they should have.

24    MS. MINOR:  And just to clarify, because it is

25  marked "D&T," Coram did produce it in the last two

ISQUIRE™
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950



# Dynamic Healthcare Solutions

## Invoice

▪November 1, 2001

Mr. Stephen Feinberg
General Partner
Cerberus Partners
450 Park Avenue, 28th Floor
New York, NY  10022

---

Professional Consulting Services for November, 2001

<u>$80,000.00</u>

Expenses:
- Dan Crowley – Centennial in Atlanta          $3,344.34
- Dan Crowley – Winterland meeting          $  27.35
- Kurt Davis – Centennial in  Atlanta          $3,210.52
- Darlena Blay – Centennial in Atlanta          $1,690.00

Total Expenses                                                <u>$8,272.21</u>

TOTAL AMOUNT DUE                                    <u>$88,272.21</u>

Please wire funds to Dynamic Healthcare Solutions
Bank of America, Sacramento, ABA/Routing #1210-00-358
Account No. 01485-07867

Dynamic Healthcare Solutions
Federal I.D. #94-3279677

REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10123

*EXHIBIT:* _____5_____

Witness: _____Davis_____
Date: 4/5/07    # of pages: 22

CROWLEYKVN 002204

CXR 01010

B208

Volume III

403

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

FILED 2002 JAN 15 PM 3:4 CLERK U.S. BANKRUPTCY COURT DISTRICT OF DELAWARE

IN RE:                        )
                              )   Chapter 11
CORAM HEALTHCARE CORP. and    )
CORAM, INC.,                  )   Case Nos. 00-3299(MFW)
                              )   through 00-3300(MFW)
            Debtors.          )
                              )   Jointly Administered


United States Bankruptcy Court
Courtroom No. 2A
844 North King Street
Wilmington, Delaware 19801

December 13, 2001
9:00 a.m.


BEFORE:   THE HONORABLE MARY F. WALRATH
          United States Bankruptcy Judge



Transcript of Proceedings



WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

ORIGINAL                        1271

Dan Crowley - Cross (Levy)                                    419

1    Q.    More than once?

2    A.    Yes.

3    Q.    Did you cooperate with him?

4    A.    Fully.

5    Q.    Did you give him open access and total

6    information?

7    A.    Whatever I had.

8    Q.    I'm sorry?

9    A.    Everything I had.

10    Q.    But you don't recall ever telling Mr. Golden

11    that you were continuing to receive 80,000 a month from

12    Cerberus, do you?

13    A.    I don't remember that I told him, no.

14    Q.    And you are aware, aren't you, that the updated

15    Golden report doesn't discuss at all the issue of

16    payments received by you from Cerberus after December of

17    2000, right?

18    A.    I'm not conversant with whether it does or

19    doesn't at this point.

20    Q.    You read it?

21    A.    I read it when it came out.

22    Q.    Ernst & Young are the auditors for Coram, right?

23    A.    Yes.

24    Q.    And you were required to sign a representation

Dan Crowley – Cross (Levy)

425

1    A.   I believe that -- what I said was that the Board

2  was informed of it and that the Board had assented to my

3  employment agreement and individually, in front of

4  counsel, the Board gave accolades and spoke highly of my

5  performance and that they did not believe that the

6  conflict had manifested itself in any way that's

7  derogatory to the performance of my duties as CEO for

8  Coram.

9    Q.   Let's get some timing on that.  You first said

10 the Board approved your employment agreement.   That would

11 have been back in November of 1999?

12   A.   Approximately.

13   Q.   At that time the Board did not know that you

14 were receiving $80,000 a month from Cerberus, is that

15 correct?

16   A.   That is correct.

17   Q.   Okay.  Now, the next event that I think you were

18 speaking about was January of this year, is that right?

19   A.   Right.

20   Q.   When was the next time?

21   A.   The end of December of 2000.  As early as I

22 could get them together in January.

23   Q.   Fine.  That's the meeting where you claim that

24 you told the directors that you were going to continue to

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B211

EC-6

**Reid, Cynthia**

From:        Cook, Michael
Sent:        Friday, April 05, 2002 2:36 PM
To:          'Scott Schreiber'
Subject:     RE: crowley


No problem. Has there been a leak? I know of none.

Michael L. Cook,
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY10022
(212)756-2150
FAX: : (212)593-5955
E-mail:michael.cook@srz.com



-----Original Message-----
From: Scott Schreiber [mailto:sschreiber@muchlaw.com]
Sent: Friday, April 05, 2002 2:35 PM
To: Cook, Michael
Subject: crowley

mike

I'd appreciate it if you would keep our conversations re: terminating dan's
contract between us and our clients for now. no other atty's nor the
trustee need to be part of those conversations until dan and Cerberus decide
that's the way to go.

thanks

scott





1

MAY-06-2002
MAY 06 2002 15:45 FR ---          561:21   P.22/23
9164496059 TO SCHREIBER           P.02/03



*EC-8*

**DRAFT**          **REDACTED**

May 6, 2002

Steve Feinberg

Dear Steve,

I have been thinking about our dinner last week. In retrospect it didn't unfold as you said when you insisted that I had to come to New York. ~~Not agreed.~~

Well these past 30 months have sure been unusual for me. While I am crystal clear that I have not done anything "wrong", I sure have suffered dearly. I am in a job that I would never ever have accepted at a rate of pay that I earned 8-9 years ago. I am enmeshed in endless Chapter 11 molasses. I am the only person at Coram that has been paid *nothing* on the 2000 MIP or the KERP(s) or the 2001 MIP or anything. No raise. No nothing. Just be a good soldier.

At the same time, I have had my own Company (Dynamic) totally up-ended. I have had my monthly retainer with Cerberus ended ruining my cash flow. ~~I have been told I am due nothing under the Cerberus Agreement.~~ I have had to pay significant legal bills. I have been unable to participate in any new business deals. All this, and my professional reputation has been trashed, too. But as you once said, I'm working with you and Cerberus so it doesn't matter that my reputation has been hurt. Right?

I am also recalling when you said once that I should think about it all as having..."kissed the wrong woman". I owe it to myself to tell you, Steve, that I guess I don't operate the same way.

~~If I asked you to NYC and told you that I would have a number ....I would have had a~~ "number" and probably ~~would have had a~~ check if the shoe were on the other foot, and it ~~was you coming to New York~~ to see me.

I would have been calling often just to see how you were doing. I would not have been badgering you to resign over Christmas/New Years. I would not have been chasing you to get you before you met the Trustee to get your resignation done. If I had done something wrong........you should have simply fired me. If not, why have I been put at arms length? The reality is that I have done a lot right. Nothing to deserve what has happened to me. Nothing.

If the shoe were on the other foot, your legal bills would have been promptly paid. I would have fought to the end on the front side. I would never have stood back and said see you later, let's see how it turns out. Mr. Bressler has told me that he/Trustee don't want to give us/me advice about ending the contract or my getting paid. He also said, we have smart lawyers and he's sure that they can figure out how to get me paid. He has no objection to my being paid for work done or for terming the contract.

CRX 00063



DRAFT

It will be your natural reaction to start to say "Dan's mad". Well, I can honestly tell you that, I am not "mad" at anyone.

I think that Friedman did a terrible job handling this case. He mis-advised me, didn't focus properly, poorly prepared me, and didn't handle most any important aspect of this case correctly. That said, I know that I didn't have to hire Friedman just because you recommended him. I did it on my own. And I didn't have to recite the answers that Friedman gave me to say in Court. And, I didn't have to hire Chanin simply because you felt Houlihan Lokey was too expensive.

I suppose if I had been more trusting maybe (maybe) I would not have written the memo about trying to get upside on your position if I did a great job at Coram. I didn't have to take the assignment at Coram. In retrospect, I should have simply told you "no".

If I had been more trusting, maybe (maybe) I would not have asked for a formal contract outlining things like legal bills being paid, upside being shared. I guess I just didn't know you that well when we entered this relationship. History has taught me hard lessons about "amnesia" when it comes to money. To this day, you are still telling me that the 2000 MIP was based upon the gain on the CPS sale even though I have told you it didn't more times than I can count. EBITDA was $37 Million w/o CPS and $54 Million with it. I would have earned another $4.25 Million if I included the gain. I didn't.

Really, the way I am looking at this is that it is just one more sobering seminar in my life-long education. And yes, I still like and admire you a lot. Admire what you do and have built. Admire your intellect and your family commitment. I also like me a lot, when it comes to being back to back with someone in good and bad times. I really like me a lot when it comes to counting on someone to do what they say they will do. No question about that. I never f— a friend. Never.

That's it. I'm not keeping a copy of this note. You can toss yours. I just wanted you to know how I am feeling on this particular day.

Dan Crowley

**REDACTED**

CONFIDENTIAL

CRX 0006-1

B214

Insert

Hence, I expect that you'll honor the commitment that you made to me over dinner: after Coram's plan is confirmed or its assets sold, I'll be reinstated with Cerberus and receive $5,000,000 from Cerberus. Also, Cerberus will indemnify me for all of my legal fees, plus pay me the difference between what I ultimately receive from Coram by way of bonuses, and $11,200,000. If this is not our deal, please just send this letter back to me.

CRX 00065

B215

EC 14

✳ TX STATUS REPORT ✳          AS OF AUG 20 2002 14:51   PAGE.01

DYNAMIC HEALTHCARE

| | DATE  TIME | TO/FROM | MODE | MIN/SEC | PGS | JOB# | STATUS |
|---|---|---|---|---|---|---|---|
| 15 | 08/20 14:51 | 1 212 421 2947 | EC—S | 00'19" | 001 | 236 | OK |

<u>PERSONAL AND CONFIDENTIAL</u>

August 20, 2002

Mr. Steve Feinberg
Cerberus Capital

Re: Employment Agreement

Dear Steve,

It is now nearly September 2002 and I would very much like to conclude the mutual termination of the employment agreement between Dynamic Healthcare Solutions and Cerberus.

Without respect to deal activity, I think we reasonably agree that under the Agreement that I am eligible to receive payment for a termination *without cause* thereunder that would include payment for the months that I have gone unpaid in 2002 *plus* one (1) additional year for severance.

I would sincerely appreciate handling this expeditiously and amicably bringing closure to this open issue.

Thanks,

Dan Crowley

CRX 00816





CROWLEY
EXHIBIT
405 ID.