UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE: . Case No. 00-3299

CORAM HEALTHCARE, . 824 Market Street
. Wilmington, DE 19801

Debtor, . March 3, 2003
. . . . . . . . . . . . . . . . . . . . . 9:30 A.M.

TRANSCRIPT OF TRUSTEE'S MOTION FOR AUTHORIZATION TO REJECT
THE EXECUTORY CONTRACT OF DANIEL CROWLEY
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Trustee: Schnader Harrison Segal & Lewis, LLP
By: BARRY E. BRESSLER, ESQ.
WILBUR KIPNES, ESQ.
RICHARD BARKASY, ESQ.
1600 Market Street, Suite 3600
Philadelphia, PA 19103

Weir & Partners
By: JOHN B. YORK, ESQ.
824 Market Street Mall, Suite 101
P.O. Box 708
Wilmington, DE 19899

Office of the U.S. Trustee
By: RICHARD SCHEPACARTER, ESQ.
J. Caleb Boggs Federal Building
844 King Street, Lockbox 35
Wilmington, DE 19801

Audio Operator: Jennifer M. Patone

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@optonline.net**

**(609)586-2311 Fax No. (609)587-3599**

#2479

APPEARANCES: (continued)

For Daniel Crowley:

RICHARD H. CROSS, JR., ESQ.
1201 North Orange Street, St. 610
P.O. Box 1380
Wilmington, DE 19899

Much Shelis Freed Denenberg Ament & Rubenstein
By: SCOTT N. SCHREIBER, ESQ.
200 North LaSalle St., Suite 2100
Chicago, IL 60601

For Unsecured Creditors:

Richards, Layton & Finger, P.A.
By: ETTA WOLFE, ESQ.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

For Equity Committee:

Saul, Ewing, Remick & Saul, LLP
By: MARK MINUTI, ESQ.
222 Delaware Avenue, Suite 1200
Wilmington, DE 19899

Jenner & Block, LLC
By: RICHARD F. LEVY, ESQ.
STEVE TOMASHEFSKY, ESQ.
One IBM Plaza
Chicago, IL 60611

For Senior Noteholders:

Weil, Gotshal & Manges, LLP
By: ALAN B. MILLER, ESQ.
767 Fifth Avenue
New York, NY 10153

For Cerberus Partners, LP

Klett Rooney Lieber & Schorling
By: ADAM G. LANDIS, ESQ.
1000 West Street, 14th Floor
Wilmington, DE 19801

Schulte Roth & Zabel LLP
By: HOWARD O. GODNICK, ESQ.
MICHAEL L. COOK, ESQ.
919 Third Avenue
New York, NY 10022

APPEARANCES: (continued)

For Goldman Sachs:

Connolly Bove Lodge & Hutz, LLP
By: GWEN LACY, ESQ.
1220 Market Street
Wilmington, DE 19899

I N D E X


**WITNESSES FOR THE TRUSTEE** — **Page**

ARLIN M. ADAMS

Direct Examination by Mr. Bressler 12
Cross Examination by Mr. Levy 24
Cross Examination by Mr. Godnick 68
Redirect Examination by Mr. Bressler 69

DANIEL CROWLEY

Direct Examination by Mr. Kipnes 73
Cross Examination by Mr. Levy 85
Redirect Examination by Mr. Kipnes 109
Recross Examination by Mr. Levy 110
Further Redirect Examination by Mr. Kipnes 113
Further Recross Examination by Mr. Godnick 114

MICHAEL SARACCO

Direct Examination by Mr. Barkasy 116
Cross Examination by Mr. Tomashefsky 125
Redirect Examination by Mr. Barkasy 133

DEBORAH MEYER

Direct Examination by Mr. Barkasy 136
Cross Examination by Mr. Tomashefsky 141
Redirect Examination by Mr. Barkasy 144

VITO PONZIO

Direct Examination by Mr. Barkasy 146
Cross Examination by Mr. Tomashefsky 153
Redirect Examination by Mr. Barkasy 158

JAY SCOTT VICTOR

Direct Examination by Mr. Kipnes 159
Cross Examination by Mr. Tomashefsky 162
Cross Examination by Mr. Godnick 179
Redirect Examination by Mr. Kipnes 181

**ARGUMENT**

BY MR. BRESSLER 184
BY MR. LEVY 187
BY MR. SCHREIBER 191

I N D E X

**REBUTTAL ARGUMENT**

BY MR. BRESSLER 194
BY MR. LEVY 195

**DECISION**

BY THE COURT 195

| **EXHIBITS** | | **Ident.** | **Evid.** |
|---|---|---|---|
| T-1 | Proposed Termination Agreement and Extension of Employment Agreement | 13 | 72 |
| EC-1 | 3/26/02 Letter | 32 | 72 |
| EC-2 | Letter to Coram Employees | 34 | 72 |
| EC-3 | 8K Form filed with SEC | 37 | 72 |
| EC-4 | Group Exhibit | 44 | 72 |
| EC-5 | 2/18 Letter | 47 | 72 |
| EC-6 | Two Emails | 49 | 72 |
| EC-7 | 4/10/02 Letter | | 72 |
| EC-8 | 5/6/02 Draft | 51 | 117 |
| EC-9 | Document Dated 11/12/99 | 58 | 72 |
| EC-10 | Document Dated 5/8/02 | | 115 |
| EC-11 | Document Dated 5/8/02 | 63 | 72 |
| T-2 | 3/11/02 Letter | 77 | 115 |
| EC-12 | 2002 Earnings Summary | | 118 |
| EC-13 | 4/1/02 Document | 103 | 118 |
| EC-14 | 8/20/02 Letter | 105 | 118 |
| EC-15 | 9/20/02 Letter | 107 | 118 |
| EC-16 | 2/28/03 Letter | 113 | 118 |
| EC-17 | 3-Page Document from SSG | 163 | |

THE COURT: Good morning.

MR. YORK: Good morning, Your Honor. My name is John York. I'm with the firm of Weir & Partners. We are local counsel for Arlin Adams, the Chapter 11 Trustee in this matter.

With Your Honor's permission, the agenda today will be presented by Barry Bresslor, Richard Barkasy and Wilbur Kipnes of the firm of Schnader, Harrison, Segal & Lewis.

Mr. Bressler and Mr. Barkasy have been previously admitted by motion pro hac vice. Mr. Kipnes's motion was entered some time ago, but so far as we can determine that motion has never been signed. I have an extra copy of that motion if it would be convenient for Your Honor.

THE COURT: Yeah, you may hand it up, and I will grant it.

MR. LEVY: And may I just record, Your Honor, I'm Richard Levy. I will be presenting for the Equity Committee along with my partner, Mr. Stephen Tomashefsky. We have here Mr. Mark Minuti and of course Mr. Donald Levature of the Equity Committee.

THE COURT: Thank you.

MR. YORK: Thank you, Your Honor.

MR. BRESSLER: Good morning, Your Honor, Barry Bressler for Arlin Adams, the Chapter 11 trustee. I will omit the --

THE COURT: Continued matters.

MR. BRESSLER: -- continued matters with one exception, and that being the indication on number 4, which is the equity committee's motion for balloting agent and related matters is going to be put off until May the 1st, as are the disclosure statement hearings which were scheduled for April the 3rd. We have already arranged with Your Honor's office for the day on May the 1st for the two disclosure statements.

Our plan would not have been in enough time for the notice, so that's why we took that date.

THE COURT: Okay.

MR. BRESSLER: Before I start the contested matters today, there are local counsel who have asked for permission to present the counsel that they are moving pro hac, so that that may be part, if that would be entertained.

THE COURT: All right, it will be.

MR. CROSS: Good morning, Your Honor, Richard Cross for Daniel Crowley. With me this morning is Scott Schreiber of the firm of Much Shelis, and Your Honor, Mr. Schreiber is a member in good standing, I can represent, of the Courts of the Northern District if Illinois, Eastern Division of Wisconsin, Illinois Supreme Court, and Seventh Circuit Court of Appeals, and I'd ask that he be admitted pro hac in order to present on behalf of Mr. Crowley this morning. A formal motion hasn't been filed yet. It will be promptly, so I'd ask that he be admitted pro hac.

THE COURT: It will be granted, thank you.

UNIDENTIFIED ATTORNEY: Thank you, Judge.

MR. CROSS: Thank you, Your Honor. If I can, I'd like to be excused for the remainder of this morning's session.

THE COURT: You may.

MR. CROSS: Thank you.

THE COURT: Anyone else?

Okay.

MR. BRESSLER: Your Honor, on number 5, the uncontested matters has been resolved by stipulation; it's been submitted. So that takes us to the contested matters which are related matters number 6, which would be continued until confirmation. That is the Trustee's motion for authorization to reject the executory contract of Daniel Crowley.

While the status says it may be superseded and moot depending on today, we'd like to continue that until confirmation one way or the other.

THE COURT: Okay.

MR. BRESSLER: The contested matters on for this morning, Your Honor, are number 7 and number 8. The first one is the motion of the Chapter 11 Trustee for authorization to enter into a termination and employment extension agreement with Daniel B. Crowley, and then number 8 is the Equity Committee's motion for an order terminating Daniel Crowley's employment and for other relief, including disgorgement. And

they are, of course, related.

I should point out that even though that this is a motion to continue Mr. Crowley's employment for what now is another only four months and for some remuneration, there have been 9,000 pages of documents produced. There have been 30 hours of deposition testimony, including seven-hour depositions of the Trustee, the investment bankers for the Trustee and Mr. Crowley again.

We are hopeful that this motion can be heard today and finished today, and we will try and make the Trustee's direct evidence of all of our witnesses be held to under two hours. We would hope that Mr. Levy's cross would be completed within one day so that we don't have further delay in this matter.

I would also ask, if possible, that we take the lunch break at exactly noon. Judge Adams has a very short conference call for fifteen minutes at that time, or that we take a break for fifteen minutes if we cannot do the lunch break then.

THE COURT: All right. I don't know that I need oral argument, certainly not at the beginning. I've read the papers. Both motions are related.

Any objection to having the testimony relate to both?

MR. LEVY: No, and that's just the point I wanted to make.

THE COURT: All right.

MR. LEVY: And so there won't be objections about exceeding the scope of --

THE COURT: Direct, etcetera.

MR. LEVY: -- direct or cross, and for what it's worth, though, Mr. Bressler mentioned the Trustee's motion is number 1. In fact, the motion by the Equity Committee to terminate was filed two or three weeks before the Trustee's motion.

THE COURT: But do you have any objection to the Trustee presenting first?

MR. LEVY: None at all.

THE COURT: All right, I think that's the best way to proceed.

MR. BRESSLER: Thank you, Your Honor. We would call the Trustee, Arlin M. Adams.

MR. LEVY: Before the Trustee takes the stand, Your Honor, I would ask that we exclude from the courtroom all witnesses who plan to testify during -- that they be excluded during the testimony of Judge Adams.

THE COURT: Any objection to that?

MR. SCHREIBER: Your Honor, Scott Schreiber for Mr. Crowley. Obviously I don't expect that Mr. Crowley will be excluded from testimony. These two motions are clearly about him, and I think he has a right to be here for each and every moment of the testimony that Your Honor's about to hear.

MR. LEVY: I think that's a discretionary matter, and we'd prefer --

THE COURT: Well, I think he is a party and is entitled to be here, so I will allow him.

MR. SCHREIBER: Thank you, Judge.

THE COURT: Any other witnesses that the parties intend to call?

MR. BRESSLER: Your Honor, yes, we intend to call other witnesses, and we have no problem with they're being excluded for this purpose.

THE COURT: All right. All right, Judge Adams, you may approach. Good morning.

COURT CLERK: Please state your full name. Spell your last name.

THE WITNESS: Arlin M. Adams, A-d-a-m-s.

ARLIN M. ADAMS, TRUSTEE'S WITNESS, SWORN

MR. BRESSLER: Your Honor, before we begin, the only exhibit that I intend to introduce through the Trustee is attached to our motion. It is the proposed termination and extension of employment agreement.

THE COURT: All right, can we have that marked Trustee 1?

MR. BRESSLER: May I approach the witness?

THE COURT: You may.

DIRECT EXAMINATION

BY MR. BRESSLER:

Q Judge Adams, before we get to the document, the Court is generally familiar with your legal experience and your judicial experience, but in connection with this matter, and since Mr. Levy asked about it at your deposition, I would ask you to briefly describe for the Court your health care experience.

A Well, very early in my career the Court -- Orphan's Court of Pennsylvania asked me to become a trustee of Home for Incurables. I agreed, of course, and after spending about a year in that job I decided we ought to convert that home from incurables into a home for rehabilitation, and that has now become one of the great rehabilitation hospitals in the country, Moss Rehabilitation.

Probably based on that performance Governor Scranton, when elected, asked me to be Secretary of Health and Welfare of Pennsylvania. One of the duties in that office was to supervise all of the hospitals in Pennsylvania.

I took that seriously and decided to visit all of those hospitals, well over 100, over the weekends of my tenure, and my good wife accompanied me so I was able to do that.

When I returned to Philadelphia the mayor appointed me to the Hospital Study Commission which was a group created pursuant to federal law to approve or disapprove the building or additions to hospitals throughout the Delaware Valley region.

At about that time I became very active in a hospital, a profit hospital known as the Oxford Hospital. And that was a very successful hospital and it eventually sold to Medicare a large conglomerate. I then went on the board of the Albert Einstein Hospital, which at that time was the largest non-profit hospital in the State of Pennsylvania and eventually became chairman of Einstein.

While I was there we created a series of profit centers; although, Einstein was a non-profit institution. And I have remained fairly active at the University of Pennsylvania where I'm a trustee with their medical affairs. So, all in all I've had a very extensive experience in hospital work.

Q You have before you what's been marked as Trustee 1.

A I do.

Q I will ask you if you recognize that as the proposed termination agreement and extension of employment agreement that we're here today about?

A It is.

Q And did you execute that?

A I did.

Q And Mr. Crowley executed it?

A He did.

Q Let me start with your analysis of Mr. Crowley as it relates to Coram. When you first were appointed in this matter, when was the first time that you met Mr. Crowley?

A Oh, maybe a week or so after I was appointed. The first thing I did after I was appointed was to read carefully the opinions written by Her Honor relating to this matter, and then I called Mr. Crowley and arranged to go to Denver, told him I wanted to meet with him and his entire staff, and he set that meeting up. I forget the date, but it was some time in the latter part of March. And I went out to Denver and talked with Mr. Crowley for, I don't know, two hours, maybe three hours, and then met with the entire staff, first collectively, but then I asked that I be given the opportunity to meet with each of the executive staff individual and on a private basis.

Q It is accurate that of the -- approximately the 2,100 employees that Coram has, about 100 are in Denver.

A About that.

Q But members of the senior executive were brought in from elsewhere around the country to meet with you?

A They were, and there were approximately fifteen. I can't tell you precisely the number.

Q when you first met with Mr. Crowley was there any discussion of Her Honor's opinion or of his then current relationship with Cerberus?

A There was. Almost the first thing I did with Mr. Crowley was to ask him about the conflicts and that had been referred to in the opinions that I've just averted to, and he assured me that he had no further contractual relationship with Cerberus

except for the remaining claim under the contract for work that he had done prior to my appointment that had nothing to do with Coram, and I made it clear to him that he could not take any compensation from Cerberus for anything except that claim and that he could not spend any time that he would ordinarily be devoting to Coram in order to deal with any of the remaining Cerberus matters.

He gave me that assurance.

Q Did he also discuss with you that that he still had some talking relationship with Cerberus?

A He did. He said from time to time Cerberus asked him to give his comments or opinions about matters that came to their attention, an I said, "Well, you could do that, but you have to make sure that those matters could have nothing to do with Coram, couldn't be a competitive situation or anything of the sort," and the reason why I gave them -- him that opportunity, although I was mindful of the judge's concerns, was I knew he had a substantial claim against Cerberus, and I didn't want to do anything to prejudice that claim. I didn't think that was fair on my part.

And I knew that if I was going to succeed as a Trustee it was important to have a good relationship, not only with Mr. Crowley, but all of his people. And that's the style that I use in handling these matters. Some people don't use that style. Mr. Levy, for example, uses a very confrontational

style. That is not the way I handle these things.

THE COURT: Overruled.

BY MR. BRESSLER:

Q Judge Adams, just to correct one thing that I heard at your deposition. Did you understand at that time where Mr. Crowley resided and how he split his time between Sacramento and Denver?

A Yes, I understood that he resided in Sacramento, used the Coram office in Sacramento primarily for his site of operation, but would frequently come to Denver.

Q Has he always been available to you when you tried to contact him?

A Always.

Q And usually that's by telephone?

A Yes, and that's with some frequency.

Q The executive you were referring to is mostly in Denver and sometimes in Sacramento, who would that be?

A That is the second in command, Mr. Marabito.

Q What else did you do besides meeting with the senior executives in Denver to immerse yourself in Coram's business and become familiar with it?

A I read a lot of their documents. They had a whole series of documents that they let me go over. They had a video demonstration that showed the progress of Coram from before the time Mr. Crowley took over until the time of my appointment and

what their plans were, what areas they were interested in, where their various locations throughout the country were situated and what they were doing, what they were trying to do. It was a very intensive discussion and a very good one.

Q Besides the main office, have you visited branches of Coram?

A I have.

Q And where would those have been?

A Well, there's one on Pennsylvania, Malvern, and I visited one in Denver as a matter of fact.

Q Have you or your advisors done reviews and investigations of the financial performance and -- of Coram and the conduct of the business?

A Yes, as a matter of fact, I receive each a week a statement of sales, gross profit, expenses, cash flow and things of that sort. That generally is on my desk on Monday morning, done over the weekend. I of course go over the filings with the SEC. I go over the accountant's statements and I have interviewed the accountants on a number of occasions.

The accounts are Ernst & Young, by the way.

Q Have you also interacted with investment bankers and --

A I have --

Q -- rehabilitation advisors in this case?

A I have.

Q And that would be SSG and the Ewing Menorabemus (phonetic) firm?

A Yes, I've met with them and I've talked with them.

Q And what have you discussed regarding the operation of the company with them?

A Well, one of the things that was always on my mind was whether I should continue Mr. Crowley. I was very concerned about the opinion of the court and conflicts issue. So, I approached that decision with a -- with a ceratin amount of skepticism, and since my family is from Missouri anyway, I kind of took an approach, you've got to show me.

And that has been my approach with Mr. Crowley and his entire staff. You have to demonstrate to me that you are the best people to be operating this what I thought was a very valuable company.

And I never made a final decision. I think Mr. Crowley understood -- I hope he did, that it was kind of a situation where if they did not produce I would feel free to make other decisions.

Q What have you been advised regarding the earnings of the company, or what have you observed yourself regarding the earnings and profitability of the company over the last nine months and since Mr. Crowley has been in control?

A It's been on an upward trend during that entire period in the sales, in profits, in cash flow, in what they call EBITDA

all during that period.

And I think that's been true all during the period Mr. Crowley has been there, but that has not been my concern. My concern was primarily while I was in charge.

Q Have you formed a view as to what the consequences of Mr. Crowley no longer being with the -- Coram might be?

A I have.

Q And what is that view?

A I think it would de-stabilize the business, it would cause the executives to begin worrying about their situation and maybe depart for other more secure situations. It would cause the suppliers to begin worrying about having their bills paid, it would cause some of the important customers to feel a good deal of uncertainty.

When you make a change at the very top of the corporation, it has a tendency to de-stabilize unless there is a very, very good reason, such as heart attack or another job or promotion. But if you suddenly remove the CEO it causes a lot of consternation.

Q Have you consulted with processionals in developing that opinion?

A I have.

Q And who have you talked to or consulted with?

A Well, I talked to the -- to gentlemen whose names you have just mentioned on a number of occasions.

MR. LEVY: Excuse me --

THE COURT: Well, I can't -- you can't be heard unless you're speaking into the microphone, Mr. Levy.

MR. LEVY: Excuse me, the response the gentleman just mentioned is a little vague. I just would like to hear the names again so we're clear.

THE WITNESS: The one was Scott, and I think the other was Barra.

BY MR. BRESSLER:

Q Bemus.

A Bemus. As I told Mr. Levy on -- last week, I talked to some of my former colleagues at Albert Einstein. I'm still the honorary president, so maybe I shouldn't say former colleagues. One in particular that I did not mention to him, I thought about after the deposition, was Mark Levitan. Mark Levitan had run the University of Pennsylvania Hospital system and had created a conglomerate known as Medicorps, and he was my executive assistant -- or actually the president of Einstein when I was the chairman. And he pretty much confirmed what the other gentlemen had said. You have to worry about de-stabilizing an organization unless you have a very good reason.

And then I'm on the board of a --

MR. LEVY: I apologize. That's clear hearsay, Your Honor, what he said --

THE COURT: Overruled. It's not being offered for

the truth of it but what he did to reach his decision.

THE WITNESS: I also talked to Jeffrey Perman who's the CEO of a corporation in which I served on the board which does a great deal of business in the dental industry, and he gave me the same advice.

BY MR. BRESSLER:

Q How many times have you visited Denver?

A Oh, four or five. I can't tell you for sure. See, I went there twice in connection with a matter that brought me to Denver, and I thought I would use that as an opportunity to stop by and see how things were going.

Q And I presume in connection with your determination as to Mr. Crowley you also consulted with your counsel?

A With Mr. Crowley's counsel?

Q No, with your counsel.

A Oh, sure, every day, two, three times a day, yeah. You've become one of my closest friends.

Q Thank you. Looking at Trustee's 1 that's in front of you, did you believe that the terms provided in the agreement were fair and reasonable under the circumstances?

A Yes, but I have to in all frankness and openness say I'm pretty tough when it comes to salaries. You know that. I have a reputation for that. I don't like to see big salaries, and I think I pressed you pretty hard on it. Subject to that, I thought that you had done a very, very good job in hammering

out this contract.

Q Would it be fair to say that it was your understanding that Mr. Crowley, through his counsel, was looking for a lot more?

A Well, I knew it. It wasn't only my understanding, I knew that they were asking for a lot more, but they weren't going to get it from me. And he knew it. He knew that there was a high water mark, and he knew that if they could not come to terms I was prepared reluctantly to go out to Denver myself.

I don't think I could do as good a job as Mr. Crowley, nowhere near a job like he has done.

Q What has your role with the -- Coram been as opposed to Mr. Crowley's role since March of 2002?

A What has my role been?

Q Yes.

A Like supervise the operation. I didn't tell him on a day-t0-day basis what to do, but I made ceratin that I reviewed every major decision, every contract for over $50,000, any changes that he wanted to make in the executive branch, any financial arrangements that Coram wanted to do, purchase of software which was an especially big contract, caused me to come out and interview the people for several hours to make sure we were getting our money's worth.

I kept on top of it. I called him very frequently and called people like Mr. Marabita. I supervised the claim

against Price Waterhouse, which I think is a fairly substantial claim. I got involved in the negotiations with the IRS which involved approximately $18 million. I watch very carefully the negotiations regarding Arnet, which is a stumbling block, and I spent a great deal of time with claimants who would call ion and write in and things of that sort.

Q Do you have any reason to believe that Mr. Crowley has done anything that would be a financial impropriety during your term as Trustee?

A I have no such reason.

Q Have you formed any view as to Mr. Crowley's forthrightness in advising you of the operation of the company during the nine months?

A I have --

MR. LEVY: Can I hear the question again?

MR. BRESSLER: I asked him if he has formed any view as to the forthrightness of Mr. Crowley's information to him regarding the operation of the company since March 7, 2002.

THE WITNESS: I have formed a view, and my view is that he has been completely forthright and forthcoming. If he wasn't, I would not be sitting here today.

BY MR. BRESSLER:

Q During your deposition, in response to some questions from Mr. Levy, I think at one point you stated that in your 55 years of practice you don't recall another occasion when your

integrity had been questioned prior to this. Would that be generally accurate?

A That's absolutely accurate.

Q And I believe you also stated, and I'll paraphrase somewhat, that if the Court had any question about your integrity or the job you've done that you would be happy to tender your resignation as Chapter 11 Trustee?

A I repeat that to the Court. If there's any question at all, I would much prefer to step down. In my career there's no occasion for serving if there's any serious question about my integrity. I have no desire to serve.

MR. LEVY: Your Honor, since Mr. Bressler quoted from the deposition, I think he should indicate that when Judge Adams said that, I said to him, as plainly and as clearly as I could and as plainly and clearly as I do now, Judge Adams, I have never questioned your integrity. I have no reason to. And --

THE COURT: All right.

MR. LEVY: Thank you.

MR. BRESSLER: I accept Mr. Levy's representation. I have no further questions.

THE COURT: Thank you. Anybody else?

All right, cross?

CROSS EXAMINATION

BY MR. LEVY:

Q Judge Adams, would it be fair to say that during this engagement your principal focus has been to find a consensual resolution of the disputes between the parties and get the company out of bankruptcy?

A I think that would be fair.

Q And it's also correct, isn't it, that if it was determined that Mr. Crowley did have a continuing conflict of interest it would not have been your judgment to keep him on?

A That is correct.

Q No matter how good a job he was doing?

A That is correct.

Q And, sir, you also recognize that the ultimate legal issues in this case are to be determined by the Court?

A Yes, that's true.

Q And notwithstanding what I truly believe your extraordinary legal abilities, you've not tried to adjudicate the legal ability -- the legal issue, rather, of whether Mr. Crowley has a continuing conflict.

A Not the sense of a judge deciding something, but on the factual basis I did attempt to ascertain that, yes.

Q Well, would it be fair to say, sir, that you've not made it a principal focus of your efforts as Trustee to investigate the conflict issues that have been raised?

A Well, I don't think it's the principal focus. I thought I did that right at the beginning, and it was continuing. I

continually watched to see if there was any infraction of that understanding. I could not represent that I've spent an enormous amount of time checking on it. I relegated that to my counsel. If there were any documents or anything like that I expected counsel to unearth them. I did not set myself up as a sleuth or something of that sort. You're quite right.

Q And right, sir, that you did not, just so we're clear, make it a principal focus to investigate the conflict issues.

A From my standpoint, that is correct. I would -- I limited that to my discussions with Mr. Crowley and Cerberus's attorneys. I talked to them about it. They knew where I stood. I think he knew where I stood. And my counsel particularly knew where I stood, and I asked them to exercise all due caution in that regard, yes.

Q It would be fair to say you didn't view your role here as a prosecutor with respect to this conflict issue?

A Correct. I did not view my role as a prosecutor.

Q And it wasn't your principal job as a trustee to be a detective or an investigator. You agree with that, sir?

A It was not my principal job to be a detective, yes.

Q And the reason for that, Judge Adams, is because you believe that the various constituencies, everybody here, had an obligation to deal with you in the utmost good faith. Would you agree with that?

A Correct.

Q To be forthright?

A Correct.

Q And is it fair to say there are a number of questions you did not ask because you expected that Mr. Crowley, for example, would deal with you openly, candidly, forthrightly?

A I think that's fair.

Q And the results, sir, was that you pretty much took Mr. Crowley's statements concerning a conflict at face value.

A Well, certainly to start with that's true, but then of course I checked with Cerberus and had my counsel check as well.

Q You didn't rely on your counsel for a determination as to whether there was a continuing conflict, did you?

A No, I ascertained that myself based on any facts that they could bring to my attention.

Q Okay, and you did testify, sir, during your deposition, and at Page 167, "If I took his, Crowley's, statements at face value, I didn't see a conflict."

And then I said, "You did take his statements at face value."

And you said, "I did."

That's correct, isn't it?

A That is correct, yes.

Q Okay. For example, when he told you in March, first time you met him, that he had terminated his relationship with

Cerberus you didn't ask him to see any written evidence of the termination, did you?

A Well, he didn't say that he had terminated. He said that except for the claim he had against Cerberus he terminated it, his relationship.

Q Okay. I accept that, sir, and -- but you didn't ask for any written evidence that he had terminated subject to that.

A No, I didn't, but when I came back to Philadelphia I talked to counsel about that, and I assume that they did.

Q And what, sir?

A And I assume that they did, because --

Q What is the basis of that assumption, sir? Did they tell you that?

A I think they said that they had checked it as well. I think they did. I'm not absolutely sure at the time.

Q And who would they be?

A Mr. Bressler from --

Q Did Mr. Bressler tell you at that time that he had seen written evidence of termination?

A No, I don't believe he did.

Q Okay, now you became trustee about March 7th.

A That's correct.

Q And you met with Mr. Crowley, I think your testimony was, for the first time in Denver. I think you weren't clear whether it was March 25th or 26th, right?

A One of those two days.

Q Right.

A I think I arrived there on the 25th and we had our first meeting on the 26th, something like that.

Q And it was at that meeting that he told you that he had terminated all contractual arrangements with Cerberus, that the only thing that remained was his claim against them for large sums of money, correct?

A In substance, that's what -- I don't know that they were his exact words, but in substance that's what he was saying.

Q Now, when he told you that on March 25th or 26th he did not tell you whether he was still getting $80,000 a month from Cerberus.

A I did not.

Q And that's because he said it was terminated, and you took him at face value, right?

A Probably that was so.

Q Now, at that point, March 25th --

MR. LEVY: I'm going to mark first as Exhibit ECX, and I'm going to use an X, Your Honor, 'cause we've had a lot of EC exhibits in this case, even in prior hearings; is that satisfactory?

THE COURT: Why X?

MR. LEVY: Because I suspect if I'd mark it EC-1 -- I don't really care, but we've had that twice before. No

problem, I --

THE COURT: I prefer numbers.

BY MR. LEVY:

Q Okay, EC-1, a document previously identified, Judge Adams, during your deposition as Trustee Exhibit 5. It's a letter --

MR. LEVY: Would you hand me, Judge --

BY MR. LEVY:

Q It's a letter dated March 26th, 2002 to you, Judge Adams, signed by Dan Crowley.

THE COURT: Give the original to the witness, please.

MR. LEVY: I'm sorry?

THE COURT: The original should go to the witness.

THE WITNESS: Thank you.

THE COURT: I'll take a copy, if you have it.

THE WITNESS: I have it.

BY MR. LEVY:

Q Now, in -- do you recall receiving this letter, Judge Adams? We did look at it during the deposition.

A I recall receiving this letter, yes.

Q And you recall that in that letter and following your meeting Mr. Crowley said to you, and I'm looking at the third paragraph --

A One, two, three --

Q -- "As I have directed, it is my understanding --" I'm sorry. "As you have directed, Judge, Adams, it is my

understanding that I am to continue operating Coram on a day-to-day basis, except that you are now to be considered the board. As such we will now seek your approval for those matters that were formerly taken to the Coram Health Care Corporation Board of Directors."

A I see that.

Q And was that an accurate statement in that letter?

A It's generally accurate except for the first one, two, three, four words, because I don't remember giving any direction. But aside from that, I think it's correct.

Q I accept that, and so it was your understanding.

A It was my understanding.

Q Okay, that -- okay, and going on, it was also your understanding -- read it all. There's a discussion about check signing authority, and then there's attached to this letter a check signing approval authority sheet that gives the Coram president and CEO up to a million dollars authority to sign checks without any approval needed beyond his own; is that right?

A That's what it says.

Q And you approved that procedure at least implicitly when you received this letter.

MR. BRESSLER: I would object, Your Honor, because it mis-states a fact. As Mr. Levy knows, subsequently the Trustee filed a motion and the Court granted a motion which lowered the

authority of anyone else at Coram to $50,000.

THE COURT: Well, overruled. You can raise that on redirect.

MR. LEVY: Thank you, Your Honor.

THE WITNESS: You're just asking me whether this was attached?

BY MR. LEVY:

Q Yeah, at the time of your receipt of the letter.

A It was attached.

Q And do you recollect, sir -- I'm through with that exhibit if you like.

I say I'm through with this --

A Okay.

Q -- with that exhibit.

A Okay.

Q Do you recall that the next day Mr. Crowley or one of his people asked your permission to send a letter to the employees of Coram describing the visit and what you had said to him about the continuation of the operation of the company?

A I thought he did that by mail. Maybe he said it orally. I recall receiving a letter.

Q We'll mark as Equity Committee Exhibit 2 now a document previously marked as Crowley Exhibit 409.

THE COURT: Is somebody marking this as EC-2?

All right.

THE WITNESS: Yes, I see it.

BY MR. LEVY:

Q And generally speaking, you approved the sending of this letter to the employees.

A Generally speaking, yes, that's correct.

Q And if you look at the bottom, the first page of this letter, which went to what, about 2,200 employees was it, Judge Adams?

A I'm looking at the last paragraph.

Q Yeah.

A "Monday we had our first meeting"?

A Well, I was particularly -- direct your attention, sir, to the last sentence. "Judge Adams was complimentary of the work all of you have been doing to stabilize and strengthen Coram." I take it that's true.

A That's true.

Q "And he has asked me to continue operating the company in my present role reporting to him in essentially the same manner as I reported to Coram's board of directors."

Did you authorize Mr. Crowley to tell the employees that?

A Well, I did authorize that in so many words, but that was the substance. I said, "Let's let this thing go now, and you continue to run it under my supervision, of course, and we'll see how it goes." Yes.

Q Well, when you say, "under my supervision," the way Mr.

Crowley expressed it was reporting to him in essentially the same manner as I reported to Coram's board of directors.

A I see that.

Q Does that capture the essence of what you told Mr. Crowley?

A Well, that doesn't capture the essence of what I told him no, because I don't know how often he reported to the board of directors, and he was going to report to me almost on a daily basis.

But I visualized this letter -- some people call it a puffing peace or something like that. He was trying to say to his executives and employees and suppliers things are going to continue as they always have. And I understood that. And although I disagreed with the precise language, I didn't want to make a fuss about it.

Q Well, did you agree, as it says on the next page, did you tell -- I'm sorry, did you tell Mr. Crowley, as it says on the next page, "Judge Adams told us that our job is to do what we know, operating the company as well as we can, while he --" that's you, Judge Adams, -- "works on resolving the bankruptcy issues." Did you tell him that?

A Essentially that's what I told him. I said, You keep at this. I want to see the sales increase. I want to see the profits increase. And I want to see the morale kept high. I'll take care substantially of the legal problems and the

bankruptcy problems."

Q Okay, sir, now the next document that we're going to mark as Equity Committee 3 is a form 8K filed with the Securities and Exchange Commission as of December 9th, 2002.

And I take it, sir, that you reviewed at least all forms filed with the SEC before they were filed.

A Correct.

Q And under Item 5 it says, "Arlin M. Adams, Esquire, the Chapter 11 Trustee for the bankruptcy estate of Coram Health Care Corporation, Coram maven Dan Crowley, who served as Coram's chairman of the board of directors, chief executive officer and president through November 29th, 2002 have further extended Mr. Crowley's employment through December 31st."

A That's correct.

Q And that's a correct statement.

A That's correct, yes. I'll continue, "In order to continue their discussions and negotiations regarding what Mr. Crowley's role with Coram, if any, will be following December 31st." The contract that we had was scheduled to expire on November the 29th, so we had to do something about the one month. And that's what this is saying.

Q It's saying, isn't it, to the investing public that Mr. Crowley who was chairman, president and CEO before you became the Trustee is continuing in the same role.

A For that month, yes.

Q No, through the year, through December -- through December 9th, 2002.

A No, this document is dated December the 11th, 2002, the document that you've handed to me, and it refers to his contract which would have expired on November the 29th, 2002. And then it says it's going to continue until December the 31st, 2002. That's a month. Maybe I'm misunderstanding the question or this document.

Q Is it clear to you, sir, that this document informed the investing public that Mr. Crowley who had been chairman, president and CEO of Coram Health Care prior to your becoming trustee had continued and would continue at least through the date of the public filing to be chairman, president and CEO?

A Yeah, that's what --

MR. BRESSLER: I object to the form, Your Honor.

THE COURT: Overruled.

THE WITNESS: That's what the -- that's what the contract said, and it would have expired November the 30th or one of the last days in November, and all we did -- November the 29th -- and all we did is to say we'll let it go for one more month until we see what we're going to do.

BY MR. LEVY:

Q Thank you.

A Otherwise, I don't -- am I answering your question? I'm trying to.

Q Yes, indeed. You have, sir, thank you.

Now, you testified on the direct examination when you met Mr. Crowley in March he told you that from time to time Cerberus would ask him to evaluate situations, but that he -- and this is during 2002.

A Correct.

Q But that he received no compensation, that he had -- that those situations would have nothing to do with Coram, and that it would not take time away from his work on Cerberus, correct?

A Correct.

MR. BRESSLER: Work on Coram.

BY MR. LEVY:

Q On Coram. I'm sorry. On Coram.

A Is that a question?

Q Yes, it is.

A Correct.

Q That's correct. Now, Crowley told you at that time that the reason he did this work for free for Cerberus is that he thought it was important for him to continue his relationship with Cerberus because of the large claim he had against him -- them, didn't he?

A Not quite that. He -- what he said to me, I'm trying to recollect. He said, "You know, I do have this claim against Cerberus, and I don't want to do anything to upset them or get them angry with me. After all, I have to protect my claim,

which is fairly large."

That's as I remember it. And that sounded reasonable to me. I wasn't there to hurt this man. I was there to run this company and to make it as successful as possible.

My charge, as I understood it, was to get this company out of bankruptcy as quickly as possible, not to de-stabilize it, to maximize the assets and to minimize the liabilities. That was the Polestar as far as I was concerned.

Q Would it be fair to say that during this conversation Mr. Crowley said to you or -- I'm sorry, that during this conversation you got the impression that Mr. Crowley didn't want to do anything to disturb his relationship with Cerberus if it jeopardized this big claim that he had, this money claim?

A I think I've tried to answer that. What he was saying is, "Look, you know, I've known these people. I don't want to irritate them. I don't want to get myself in a position that I'm going to jeopardize my claim. If you don't mind, I --"

And my answer was, "Look, you can't get any compensation. You can't do anything that conflicts with Coram. And you can't do anything that's going to take any amount of your time that I expect you to devote to Coram. Aside from that I'm not going to interfere with that."

That's really what I recall of our conversation.

Q Judge Adams, perhaps I can refresh your recollection. And I'm now going to, if I may, read to you just a couple of

questions and answers from the deposition of last week, and this appears on Page 156, beginning at Line 6.

I asked you, I said, "When he told you that he was not being compensated for this work did you ask him why he was doing free work from Cerberus?"

And you said, "I didn't ask him. He told me what he thought, that it was important for him to continue his relationship because of the large claim he had."

And I said, "His relationship with Cerberus?"

And you said, "Yes, I got the impression -- I don't know whether he said it or not -- that he didn't want to do anything to disturb that relationship if it jeopardized this big claim that he had, this money claim."

And I said, "How much was the claim?"

You said, "I don't know what it was. I know it was a substantial amount of money."

Now, sir, did I ask those questions? Did you give those answers?

A You did, but I think you're putting a little bit of a spin on my answer --

Q Sir --

A -- to your questions. You did ask those questions, and I gave that answer, and I'm explaining what I meant somowhat differently than you're trying to get it across, but that's for the Court to decide. I'm not the judge.

Q Sir, you don't know how many transactions he worked on for Cerberus in 2002, do you?

A A number. No, I don't know precisely the number. I didn't want to get involved in that subject.

Q You never asked him.

A Did I ask him? I can't recall ever asking how many transactions he would advise them about, no, I do not recall that.

Q And you don't know the names of the companies he worked for?

A No, he did. He gave me the names of the companies, and I didn't recognize any of them.

Q Or how much time he spent with those companies?

A Yes, he told me that the time he spent was negligible and not on company time.

Q Now, at some point you talked to Cerberus on this issue of the relationship and Cerberus told you that there was some obligation to pay Crowley for past services, correct?

A Something to that effect. I didn't talk to Cerberus, I talked to their counsel.

Q Okay, but you didn't know then, and you don't know now -- let's just stick with -- you didn't know then that if those services were past services rendered for Coram or rendered for the benefit of other Cerberus investments, correct?

A I don't think I can answer that question. No, I don't

know.

Q Let's see if I can refresh your recollection again, sir. On Page 50 of last week's deposition, beginning at Line 10, "For past services rendered by Mr. Crowley to Cerberus in connection with Coram."

The witness, "I didn't know what the past services were."

Did I ask that question, sir? Did you give that answer?

A I think that's right. I thought this recent question was what were the current services. I don't know what the past services were, no.

Q And you don't know whether they were for Coram.

A (No verbal response)

Q The money he was trying to collect or is trying to collect, you have no knowledge about whether that is for Coram.

A I understand it was not for Coram. Do I know it? No, I don't know it.

Q Well, sir, you said, "I didn't know what the past services were," and you still don't know; isn't that correct?

A That's what I'm saying now.

Q Thank you.

Now, let's get back to March 25th when he told you he had terminated his relationship with Cerberus other than for this claim. You recall that?

A I do.

Q Okay. When he said that, he did not tell you about three

documents he had already executed that showed that he had not terminated his relationship with Cerberus but had only suspended it; is that correct?

A He did not show me any documents. I don't know what the documents say that you have. I didn't see any documents.

Q Equity Committee Exhibit 4 is a group exhibit -- a group exhibit consisting of a document dated December 27th, 2001 signed by both Mr. Crowley and Steven Feinberg of Cerberus, another exhibit formerly marked Trustee Exhibit 11 dated January 29th, 2002, also signed by Crowley and Feinberg, and finally a document formerly marked Trustee Exhibit 14 signed only by Mr. Crowley.

These documents were not -- I'm sorry, February 28th, 2002. These documents, Judge Adams, are identical with the exception that the first one suspends or purports to suspend his contact, Crowley's contract, with Cerberus for January, the second for February and the third for March.

A Correct.

Q You never saw these documents actually prior to the time that I showed them to you at your deposition last week.

A That is correct.

Q And if you had seen them, you would have asked for a clarif -- if you had seen them before March 25th, when you met with him you would have asked for a clarification of these documents.