Adams - Cross/Levy                        43

1  A    I think I would have.  It's hard to say.  It's a
2  hypothetical question, but I suspect yes.  I don't know.
3  Q    And you would have asked him what suspension meant.
4  A    Probably.
5  Q    And in your mind there is a distinction between terminate
6  and suspend, isn't there?
7  A    I think there is.
8  Q    And that distinction is, if you terminate it it's ended,
9  period.  If you suspend it, it's held kind of on abeyance,
10 correct?
11 A    Ordinarily I would think that's correct.  I would think in
12 this instance what he's talking about, this is all
13 hypothetical, because I didn't have the document --
14           MR. LEVY:  Your Honor, I'm going to ask the witness
15 confine his answer to my question.
16           THE COURT:  Yeah, there's no question pending.
17           THE WITNESS:  Right.
18           THE COURT:  No question pending.
19 BY MR. LEVY:
20 Q    Crowley -- Mr. Crowley, he never told you about these
21 suspension documents during the many phone calls you had with
22 him between March and last week actually, did he?
23 A    Until you showed me these documents at the deposition, I
24 was not aware of these documents.  What they mean -- I take a
25 different meaning from them than you do, but you don't want to

Adams - Cross/Levy

44

1 hear that, so I won't answer that.

2 Q    Well, let me ask you this, Judge Adams.  Now that you've

3 seen these documents, would you agree it would have been more

4 open and candid for Mr. Crowley to have shown you these

5 documents when he met with you in Denver?

6 A    Well, I don't like to be as judgmental as you about a

7 subject that I really know nothing about it.  I never saw the

8 documents.  I don't know the people.  These were before I was

9 the Trustee.  Sure, I'd like to see everything, just like a

10 court does.  More candid?  I don't want to put a

11 characterization on there.  He may have a good reason.  I don't

12 know.  I haven't discussed them.

13 Q    Do you think it would have been more open of him to show

14 them to you?

15 A    Well, you're characterizing it.  The court can decide that

16 as well as I can.

17 Q    I don't mean to, sir, so let me read you again from Page

18 157 of your deposition, what you said about them.

19     Beginning at Line 4.  I said, "Did you feel at that point

20 in time, March, April, did you feel that Mr. Crowley was being

21 completely open with you about his relations and discussions

22 with Cerberus?"

23     Answer, "Well, now that you've shown me some of these

24 documents, perhaps to be completely open, I guess, he should

25 have shown me copies of these.  He did not, to my recollection.

Adams - Cross/Levy                          45

1  I don't want to characterize what he was doing.  I don't do
2  that."
3      Did I ask that question, sir?
4  A    You did.
5  Q    Did you give that answer?
6  A    It's the same answer I'm giving today.
7  Q    Sir, did I ask the question?  Did you give that answer?
8  A    Yes, it's the same answer that I'm giving today.
9  Q    Actually you would have preferred that he had made
10 everything available to you; isn't that correct?
11 A    You say everything.  I don't know what you mean by -- you
12 mean these documents or --
13 Q    Again, sir, let me pull that question, 'cause I need
14 another document to do it, and we'll get back to it.  I'll
15 withdraw the question.
16     The next document, which is Equity Committee Exhibit 5 --
17 I'm sorry -- is a letter formerly marked Trustee Exhibit 12.
18 It's a letter that appears to be from Scott Schreiber,
19 somewhere over in that crowd, to Michael Cook, who is
20 Cerberus's lawyer, and this one is dated February 18th.
21     Now, this letter was also written before you met Mr.
22 Crowley, correct?
23 A    Correct.
24 Q    And it says that Crowley was waiving his $80,000 retainer
25 from Cerberus for the last two months and that he had not been

Adams - Cross/Levy

46

1  paid money from five other investments in which he assisted

2  Cerberus, correct?

3      You see that?

4  A    Does this document say what you've read?  The answer is

5  yes.

6  Q    That was my question, sir.

7      Now, you would agree that a waiver of a retainer for two

8  months is not the same thing as terminating a contract or in

9  this case a contract between Cerberus and Crowley.  Would you

10  agree with that?

11  A    I don't think I can answer that question in a vacuum.  I

12  never saw this document until last week when you showed it to

13  me for the first time.  Haven't had it in my possession.  You

14  or somebody else have had it.  You're showing it to me again.

15  You're asking me for a legal opinion whether a waiver is a

16  termination?

17  Q    Well, sir, let me respond as follows --

18  A    I can't give it to you.

19  Q    I got this document the day before I showed it to you, and

20  I'm not asking for a legal opinion.  I simply want your -- is

21  this a document that you wish you had seen on March 25th after

22  Crowley told you he had terminated --

23  A    Being the workaholic that I am, and that you know that I

24  am, sure I would want to see everything possible, citations and

25  all that, but that's not what you're asking me.  I don't think

Adams - Cross/Levy                    47

1  so.

2      You're asking me for a hypothetical answer.  I would want

3  to see everything.  I'd want to see your notes, I would want to

4  see everything, of course.

5  Q    The next document, Equity Committee 6, is a document --

6          THE COURT:  Please don't walk away from the

7  microphone and -- you can keep your voice up.

8          MR. LEVY:  I'm sorry.

9  BY MR. LEVY:

10 Q    Equity Committee 6, sir, appears to be two emails.  The

11 first one, which is on the bottom, is from Scott Schreiber, Mr.

12 Crowley's lawyer, to Michael Cook, who of course is Cerberus's

13 lawyer, and on the top is his response.

14     And in the first one, it's dated April 6, Mr. Crowley's

15 lawyer says, "Mike, I'd appreciate it if you would keep our

16 conversations re terminating Dan's contract between us and our

17 clients for now.  No other attorneys, nor the trustee, need to

18 be part of those conversations until Dan and Cerberus decide

19 that's the way to go.  Thanks.  Scott."

20     And Mr. Cook responds, it looks like one minute later, "No

21 problem.  Has there been a leak?  I know of none."

22     Now, I guess the first question I'd ask, sir, is this

23 shows that even as late as April the contract hadn't been

24 terminated, even though  Mr. Crowley told you in March it had.

25 Would you agree with that?  Is that your understanding of the

Adams ~ Cross/Levy                    48

1  document?

2  A     This document that you've shown me, EC-6, would indicate

3  that they were working on terminating the contract, but that

4  had not been finalized.

5  Q     If you had seen this document on March 25th or 26th it

6  might have -- it could have affected your views as to whether

7  there was a conflict; isn't that correct?

8  A     It could have.  I would have said, if he had shown me

9  this, "Now, Dan, I don't understand it.  You've just assured me

10 that you have no other relationship between yourself and

11 Cerberus except for this claim that you have.  How do you

12 explain this?"  That's what I would have done, given him an

13 opportunity to explain it.

14     Now, some of the other documents indicate that he made a

15 distinction between terminating a contract and suspending a

16 contract.  I don't know whether that distinction is a valid

17 distinction, but he thought so.  In other words, what he was

18 saying, I don't want to say that my contract with Cerberus is

19 completely terminated, because that will prejudice my claim,

20 but we are not getting anything from them, and subject to that,

21 that's what I'm telling you.

22     Now, that's as I understood what he was saying.

23 Q     Does it trouble you at all, sir, as you sit here that Mr.

24 Crowley's lawyer who presumably speaks for Mr. Crowley, wanted

25 to keep this fact from you?

Adams - Cross/Levy                              49

1  A    Well, I don't know why he did.  So, I don't want to jump

2  to a conclusion.  I don't like to do that.

3  Q    Have you asked --

4  A    I've never talked to him about this, and he might have a

5  completely valid reason.  I don't know.

6  Q    Well, sir, you saw this last week.  Have you made any

7  effort to ask him since then?

8  A    I really don't know this gentleman at all, no, and I

9  understand he was tied up in depositions.

10  Q    It's a fact, isn't it, that up until your deposition last

11  week you did not believe that there was a continuing

12  relationship between Cerberus and Crowley other than for

13  Crowley pursuing his claim and providing free advice?

14  A    Correct.

15  Q    Did the next document, EC-6, formerly marked Trustee's

16  Exhibit 17 is a letter to you from Mr. Crowley dated April

17  10th.  You received that --

18  A    Correct.

19  Q    -- about that date, sir?

20  A    Correct.

21  Q    And on the second page Mr. Crowley expresses his desire or

22  to put it more precisely it says, "The items on which we need

23  direction are --" and one of the items, number 6, is the terms

24  for termination of the Crowley/Cerberus contract.

25  A    Correct.

Adams - Cross/Levy

50

1  Q    I'm through with that document, sir.

2  A    Is there a question that I --

3  Q    No, there's not.

4  A    Oh, okay.

5  Q    Judge Adams, when you signed the transition agreement,

6  which is before the Court now, were you aware from any of your

7  conversations with Mr. Crowley that in early May of 2002 that

8  Mr. Crowley had -- Mr. Feinberg, rather, had invited Mr.

9  Crowley to New York to have dinner to talk about resolving

10 their differences?

11 A    I was not aware.

12 Q    And were you aware when you signed the transition

13 agreement that a few days, five days, after having that meeting

14 with Mr. Feinberg, Mr. Crowley wrote a document consisting of

15 three pages which he ended by saying, "I just --" a document he

16 called a draft consisting of three pages, in which he said, "I

17 just wanted you to know how I'm feeling on this particular

18 day."

19        MR. SCHREIBER:  Your Honor, I have to object.  I

20 think the letter --

21        THE COURT:  You can't be heard, though, unless you

22 speak into the microphone.

23        MR. SCHREIBER:  Your Honor, I have to object.  The

24 letter that Mr. -- the document that Mr. Levy is referring to

25 he heard much testimony about is a three-page document, two

Adams - Cross/Levy                                          51

1  pages of which were written by Mr. Crowley and one page that

2  was written by me.

3          To have it now described as a letter written by Mr.

4  Crowley is, not only contradictory to the prior evidence, but

5  it's misleading and just not true.

6          MR. LEVY:  I'll amend that.  I will call it -- let me

7  re-state the question.

8  BY MR. LEVY:

9  Q    Were you aware five days after this meeting with Mr.

10 Feinberg, that Mr. Crowley himself typed two pages that he

11 called a draft that he then sent his lawyer which he concluded

12 by saying, "I just wanted you to know how I'm feeling on this

13 particular day?"

14 A    I was not aware of that -- or that document, whatever it

15 is.  I don't know what it is.  I can't see it.

16 Q    And were you aware that attached to that document was a

17 sheet written, as Mr. Schreiber has just said, by him, Mr.

18 Schreiber?

19 A    I was not aware.

20 Q    Okay.  Let's mark then as Equity Committee Exhibit --

21         THE COURT:  You can't be heard, Mr. Levy.

22         MR. LEVY:  Let's mark then as Equity Committee

23 Exhibit 8.

24         Your Honor, I have a blow-up of this remarkable

25 exhibit which with your permission I'd like to put on the

Adams - Cross/Levy                    52

1  tripod, perhaps over there with the witness, and Your Honor can

2  -- over here with the witness -

3        THE COURT:  You may.

4        MR. LEVY:  May I do that?

5        THE COURT:  Yes.

6        MR. LEVY:  Just put up the first --

7        Does that help you read it from there, Your Honor, or

8  would you rather look at it yourself?

9        THE COURT:  I've got the --

10 BY MR. LEVY:

11 Q    First question, sir, is that you'll see on the page marked

12 CRX-63 Mr. Feinberg writes -- I'm sorry.  Mr. Crowley writes in

13 this document, "Mr. Bressler has told me that he/Trustee don't

14 want to give us/me advice about ending the contract or my

15 getting paid.  He also said we have smart lawyers and he's sure

16 they can figure out how to get me paid.  He has no objection to

17 my being paid for work done or for terming --" presumably

18 meaning terminating -- "the contract."

19       Now, my question, sir, is did you authorize Mr. Bressler

20 to say that on your behalf?

21 A    I did not authorize him as such.

22 Q    I'm sorry, I can't hear you.

23 A    I did not authorize him as such.  I recall he came in to

24 see me and said, "Do you think we should get involved in this

25 subject?

Adams - Cross/Levy                    53

1    I said, "No, that's none of our business.  I'm trying to

2  run Coram.  They have their own lawyers."

3    That I do remember.

4  Q    Okay, now I'd ask you to look at the second page where in

5  the first paragraph it says in this draft, at the bottom of the

6  page Mr. Crowley says how he was feeling on this particular

7  day.  "I think that Friedman did a terrible job handling this

8  case.  He mis-advised me, didn't focus properly, fully prepared

9  me.  Didn't handle most -- any important aspect of this case

10 correctly.  That's sad.  I know I didn't have to hire Friedman

11 just 'cause you recommended him.  I did it on my own.  And I

12 didn't have to recite the answers that Friedman gave me to say

13 in court."

14    Now, sir, when you entered into the transition agreement

15 did you know that Mr. Crowley had written a draft suggesting

16 that he recited answers given to him by his attorney when he

17 testified before this court?

18 A    I was not aware of this document.

19 Q    And move on, if you would, to the next paragraph.  "I

20 suppose if I had been more trusting, maybe," paren, maybe, "I

21 would not have written the memo about trying to get upside on

22 your position if I did a great job at Coram."

23    Now, you didn't know then, sir, but perhaps you know now

24 -- let me interrupt that question and mark as EC-9 a copy of a

25 document marked during actually the first hearing back in 2000

Adams - Cross/Levy                                    54

1  as EC-20.

2      Now, I'll ask the question again, and say you didn't know

3  then but perhaps you know now that the memo Mr. Feinberg --

4  that Mr. -- please forgive me.  Mr. -- that Mr. Crowley appears

5  to be referring to was this EC-20, which Judge Walrath found in

6  her first opinion to be evidence that Crowley was trying to

7  hide his relationship with Cerberus.  You didn't know that, did

8  you?

9  A   I never saw this document until the deposition.

10 Q   Now, sir, please turn to the last page.  And I will

11 represent to you, actually I don't need to, Mr. Schreiber

12 himself has said that he wrote Page 65, and that the word

13 "insert" is in his, Mr. Schreiber's -- Mr. Crowley's

14 handwriting.

15          MR. MILLER:  Your Honor, I heard him say Mr.

16 Schreiber and then Mr. Crowley's handwriting.

17          THE COURT:  You can't be heard.

18          MR. MILLER:  I'm sorry.

19          THE COURT:  Mr. Miller, do you want to object on the

20 record?

21          MR. MILLER:  I just want a clarification --

22          MR. LEVY:  I appreciate that, and obviously I better

23 ask the question again.

24 BY MR. LEVY:

25 Q   I'm going to represent to you, sir, that Mr. Crowley

Adams - Cross/Levy                                    55

1  testified that Page CRX-65 was written by Mr. Schreiber, his

2  lawyer, and that the word "insert" on Page CRX-65 is in the

3  handwriting of Mr. Schreiber, okay?

4      Now, you did not know, obviously, the existence of CRX-65

5  when you signed the transition agreement, did you?

6  A     Correct.

7  Q     And you certainly didn't know of it when you asked this

8  Court to approve the transition agreement.

9  A     Correct.

10 Q     You didn't know that Mr. Crowley's lawyer had written an

11 insert stating that Mr. Feinberg had made a commitment to pay

12 Mr. Crowley the difference between $11.2 million and whatever

13 compensation he received from Coram.

14 A     I did not know.

15 Q     You didn't know that.

16 A     No, I did not.

17 Q     Now, do you recall that the figure of $11 million or

18 $11,200,000 came to your mind as the approximate amount of Mr.

19 Crowley's claim against Coram?

20 A     Vaguely remember that.  I didn't know what his specific

21 claim was, but somebody must have mentioned that figure.

22 Q     Well, let's see -- I think that's what you said in your

23 deposition, but let's get it clear.  On Page 214, beginning at

24 Line 7, I said, "At this time how big was -- how big did you

25 understand that Mr. Crowley's claim against Coram to be?"

Adams - Cross/Levy                    56

1    And answer, "For some reason the filing of $11 million

2  comes into my mind.  I'm not sure of that."

3  A    The filling or the figure.

4  Q    Let me finish, please, sir.

5    Question, "Does $11,200,000 sound about right?"

6    Answer, "Could be."

7    Now, did I ask those questions, did you give that answer?

8  A    I don't remember the word "filing."  That seems discordant

9  to me.

10    THE COURT:  Mr. Levy, I'm not sure this is helpful.

11  It's not different from what he's saying here.

12    MR. LEVY:  Okay.

13    THE COURT:  And given the limited time we have,

14  unless he says something drastically different --

15    MR. LEVY:  I'll move right along.

16    THE COURT:  -- from his deposition, I'd appreciate

17  you relying on his testimony here.

18    MR. LEVY:  Of course.

19    THE COURT:  You can't be heard.

20    MR. BEATIE:  I assure you I can be heard, Your Honor.

21  Can you hear me now?

22    THE WITNESS:  No, you have to go to the microphone.

23    THE COURT:  No, the tape system cannot hear you, so

24  you must speak into a microphone.

25    And identify yourself for the record, please.

Adams - Cross/Lévy                              57

1      MR. BEATIE:  Your Honor, my name is Russell Beatie.

2  The Court has granted my application pro hac vice to appear

3  here, and I appreciate that.

4      I am counsel for Mr. Stephen Feinberg.  I have bit my

5  tongue all morning long, Your Honor, and not made objections,

6  because I'm told that the Court wishes to proceed and not

7  engage in pedafogging over the rules of evidence, but I take

8  this moment to tell the Court that I am confident that

9  absolutely every document which has been intended to impeach

10 Judge Adams with the -- aha, I got you, has not been

11 inconsistent with his testimony.  And I would appreciate it if

12 Mr. Levy would stop that so that we could all finish today and

13 not give the impression that somehow he is making headway

14 against a witness whose integrity has not been touched.

15      Thank you.

16      THE COURT:  All right.

17 BY MR. LEVY:

18 Q    And continuing to refer to this document, EC-8.

19 A    Yes, sir.

20 Q    Okay.  You didn't know when you signed the transition

21 agreement that Mr. Crowley's lawyer had written an insert

22 stating that Mr. Feinberg has made a commitment to Mr. Crowley

23 to make a five-million-dollar payment once this case is over.

24 A    I did not know about this document.  I didn't know

25 anything about Cerberus.

Adams - Cross/Levy                                    58

1  Q    And you don't know today.

2  A    I don't know -- I don't know Mr. Feinberg.  I've never met

3  the man.

4  Q    You don't know today, sir, whether that commitment exists,

5  do you?

6  A    I don't know anything about this.  I've never seen it.

7  Q    Now, the fact, sir, regardless of whether there is a

8  commitment or there is not a commitment, the fact that Mr.

9  Crowley thought that he was feeling on May 5th that he had

10  these commitments, is that something that you would like to

11  have known about before you entered into the transition

12  agreement?

13       MR. BRESSLER:  I'll object to the form.  There's no

14  foundation as to what Mr. Crowley may have thought, and I don't

15  know how actually Mr. Levy would know.

16       THE COURT:  Sustained.  Sustained.

17  BY MR. LEVY:

18  Q    The next document, EC-9.

19       THE COURT:  Ten.

20       THE WITNESS:  Ten.  Thank you.

21  BY MR. LEVY:

22  Q    Is a letter or a piece of paper to avoid conflict -- I'm

23  sorry.  I have the wrong document.

24       I have the right document.  Is a letter which includes a

25  redacted stand sent two days later -- strike that.  Dated two

Adams - Cross/Levy                                    59

1  days later signed by Mr. Crowley and containing his handwriting

2  on the first page where he wrote, "Steve."

3            MR. BRESSLER:  I'll object to the form, since Mr.

4  Levy went to go back with the document.  He's had plenty of

5  testimony that this was another unsent draft, not a letter.

6            THE COURT:  Well, overruled.

7            Is there a question pending?

8            MR. LEVY:  Yes, there is, Your Honor.

9            THE COURT:  What is it?

10           MR. LEVY:  The question is you haven't seen this

11  letter.

12           THE WITNESS:  I had not seen this letter, if it is a

13  letter.  I don't know what it is.

14  BY MR. LEVY:

15  Q    You haven't seen this --

16  A    I haven't seen this document.

17  Q    -- this exhibit, thank you, sir.

18  A    I have not seen this document, which is marked EC-10.

19  Q    And you notice in the back document that once again it is

20  suggested, whatever this document is by Mr. Crowley, that he

21  was owed $5 million for non-Coram work in early termination of

22  the agreement and that he had a commitment for that amount.

23  A    I see the second from the last paragraph which seems to

24  indicate that.

25  Q    Thank you.  And you would have wanted to know if your CEO

Adams - Cross/Levy

1  had a commitment to receive $5 million from Coram's principal

2  creditor, wouldn't you?

3  A    I want to know all the facts I could know about any

4  situation I'm in.  You know me well enough to know that.

5           MR. LEVY:  Your Honor, I wonder if we could take a

6  five-minute recess, both because I think I need it and to

7  assemble these papers.

8           THE COURT:  Any objection?

9           All right, let's take a short recess.

10          MR. LEVY:  Thank you, Your Honor.

11          THE COURT:  You should not discuss your testimony

12  with your attorney in the interim.

13          THE WITNESS:  Thank you, Your Honor.

14     (Recess)

15          THE COURT:  You may begin.

16  BY MR. LEVY:

17  Q    Judge Adams, I'll try and hurry along here.  I wonder if

18  you put Trustee Exhibit 1, which is the transition agreement in

19  a place where you can get to it?

20  A    Okay, got it.

21  Q    You decided, sir, that you supported a raise for Mr.

22  Crowley from $48,000 a month to $80,000 a month.

23  A    That's correct.

24          MR. BRESSLER:  I'm going to object to the form, Your

25  Honor.  The numbers are inaccurate.

                              Adams - Cross/Levy                    61

1              THE COURT:  Sustained.
2   BY MR. LEVY:
3   Q    I'm sorry, $54,000 a month to $80,000 a month.
4   A    Correct.
5   Q    Thank you.  And to give him a stay bonus of a million
6   dollars if he stays for six months.
7   A    If he stays, right.
8   Q    Right, and get $200,000 now for legal fees.
9   A    Correct.
10  Q    And those were legal fees for defending himself in this
11  court, correct?
12  A    Well, I don't know whether he's defending himself in this
13  court.   I thought it was involved in the whole documentation of
14  the retention agreement.
15             THE COURT:  Excuse me, Judge Adams.  You can't be
16  heard.  Can you --
17             THE WITNESS:  I don't know -- we didn't know that you
18  were going to object to it.  I didn't know about retention --
19  about this proceeding in court when we entered into this.
20  Q    Well, did you know -- do you know as you sit here what
21  that $200,000 legal fee reimbursement is for?
22  A    No, he has to submit bills to us and in no case -- the cap
23  is $200,000.  I don't know what the bills are going to say.
24  Q    And he gets the million dollars after six months whether a
25  plan is confirmed -- let's see, that'd be the end of June.

Adams - Cross/Levy                                    62

1  A     Correct.

2  Q     Correct?

3  A     Correct.

4  Q     And you have not yet filed a plan.

5  A     No, we would have filed a plan had this proceeding not

6  unfolded.  We had hoped to file a plan in January, in the

7  latter part of January.  I think we will be filing one now in

8  April, hopefully in April.

9  Q     And the hearing on the disclosure statement as Mr.

10  Bressler said was May.  You've considered the possibility that

11  the plan may not be confirmable before the end of June, haven't

12  you?

13  A     Possibly, sure.

14  Q     And in that case Mr. Crowley could exer -- by notice

15  refuse to extend his agreement, correct?

16  A     He can, and we have the same privilege.

17  Q     Of course you do.  And have you taken any precautions to

18  ensure that as a condition of staying on past June 30th he

19  won't ask for an additional stay bonus?

20  A     Have I taken any precautions to make sure he won't?  No, I

21  can't control him in the future.

22  Q     Now, you submitted the application before the Court,

23  that's now before the Court, on January 24th.

24  A     Correct.

25  Q     But actually, let's see, two and a half weeks earlier you

Adams — Cross/Levy                                      63

1    and Mr. Crowley had entered into a document that is character

2    -- that's dated January 7th, and that's characterized as a

3    settlement agreement.

4    A    Correct.

5          MR. BRESSLER:  I'll object to the form, Your Honor.

6    It says on its face it's a letter of intent.  I'd also object

7    that it is not relevant to the proceeding before us.  It would

8    be relevant to a plan.

9          THE COURT:  Overruled.  Is it marked?

10   BY MR. LEVY:

11   Q    I've put in front of you -- and this Equity Committee

12   Exhibit 11 was signed by you and was signed by Mr. Crowley on

13   or about January 7th; is that correct?

14   A    That's correct.

15         MR. LEVY:  I think we can stipulate to that, Mr.

16   Bressler?

17         MR. BRESSLER:  I agree.

18   BY MR. LEVY:

19   Q    And you never characterized this supplemental agreement as

20   a letter of intent, did you?

21   A    Did I?  Yes, I did.  If you look at --

22   Q    Let me read you then from Page -- I'm sorry?

23   A    -- Paragraph 2, "This letter will serve to reflect that

24   intent."  You see that?

25   Q    I do.

Adams - Cross/Levy                    65

1  Q   Now, this supplemental agreement that you have in front of

2  you contemplates that Mr. Crowley will get a complaint release

3  from all claims for damages to the company resulting from his

4  conflict of interest if a plan is confirmed, correct?

5          MR. BRESSLER:  Your Honor, I'd like a continuing

6  objection to the reference to it as supplemental agreement.

7  The witness just said he viewed it as a letter of intent.

8          THE COURT:  Overruled.

9          THE WITNESS:  What's the question, please?

10 BY MR. LEVY:

11 Q   The supplemental agreement contemplates that Mr. Crowley

12 will get a complete release from all claims for damages to the

13 company resulting from his conflict of interest, correct?

14 A   Only if the Court approves it.

15 Q   If the Court approves it.

16 A   Right.

17 Q   But you agreed to it, subject to Judge Walrath's approval.

18 A   Subject to the Court's approval.

19 Q   And you don't know the value of the estate's claims

20 against Mr. Crowley, the damages caused by the failure of the

21 first and second plans, do you?

22 A   I think I do.

23 Q   What do you think that is?

24 A   Well, I think we've been over this.  We have an expert

25 witness on this question.  When you're trying to evaluate the

                        Adams - Cross/Levy                    64

1  A     That's why we described it as a letter of intent.

2  Q     But you never characterized it as a letter of intent.

3  A     You say I never did.

4  Q     Well --

5  A     I think I did.

6  Q     Let me see if I can refresh your recollection for, I hope

7  the last time during this session, on Page 258 of your

8  deposition beginning at Line 16.

9      "And Mr. Adams, let me refer for a moment again to the

10 supplemental agreement executed by you on January 7th."

11     Answer, "Correct."

12     "You called it a supplemental agreement.  Did you consider

13 it a letter of intent or a supplemental agreement?"

14     The witness, "I didn't characterize it."

15     Did I ask that question --

16         MR. BRESSLER:  Your Honor, I object.  Mr. Levy in

17 reading the transcript has skipped Mr. Kipnes's objection to

18 the form of the question.

19         MR. LEVY:  I didn't know I needed to indicate that.

20         THE COURT:  Well, that's fine.  Overruled.

21 BY MR. LEVY:

22 Q     I asked that question; you gave that answer.

23 A     You asked that question; I gave that answer, and it

24 doesn't change my testimony.  That's up to the Court, of

25 course.

1 value of a piece of litigation, Your Honor, there's no fixed

2 figure.   This is a mater being negotiated among the parties.  I

3 really don't think this has anything to do with Mr. Crowley's

4 contract.   And to let Mr. Levy get the benefit of that thinking

5 I think is unfair.

6        If you direct me to answer it, I'll answer it.

7             THE COURT:  You should answer.

8             THE WITNESS:  Well, I don't know the precise value.

9 BY MR. LEVY:

10 Q    Thank you, sir.

11       And in the second paragraph of the January 7th letter you

12 did say in the letter you signed the settlement agreement is

13 being negotiated and finalized in connection with the

14 transition agreement; correct?

15 A    In connection --

16 Q    In connection -- it's in the second paragraph of the

17 letter that's in front of you.

18 A    Correct.

19 Q    Now, you're pretty unhappy about the money that you seek

20 to have the Court award to Mr. Crowley as a stay bonus, aren't

21 you?

22 A    Same as I'm unhappy about the fees that the Court has

23 awarded to you.  Same unhappiness.  I think that the fees in

24 these proceedings go beyond any reasonable bounds.  Everyone

25 who knows me knows my strong feeling about that.

Adams - Cross/Levy                                        67

1  Q    It is a lot of money you're paying him, isn't it?

2  A    It's a lot of money.  Of course it is.

3  Q    And one of the reasons you want to pay him that money is

4  because he makes an awful lot of important decisions about this

5  company; isn't that right?

6  A    That's not the basic reason.

7  Q    What is the basic reason?

8  A    The basic reason is that I thought that my responsibility

9  was to get Coram out of bankruptcy, to stabilize the company

10 for the benefit of the creditors, and I have tried as earnestly

11 as I can to do that.  I've had a lot of road blocks.  That is

12 still my goal.  If I can't achieve it, I've said it in my

13 deposition, I will say it in this Court, I will tender my

14 resignation.  I mean that most seriously.

15      I'm not here at my -- this stage in my career to be

16 playing tricks.  You know that.

17 Q    Thank you very much, Judge.  I have no more questions.

18          MR. LEVY:  And, Your Honor, may I move exhibits --

19 Equity Committee Exhibits 1 through 11?

20          THE COURT:  Well, let's wait 'til the conclusion of

21 the testimony.

22          MR. GODNICK:  Good morning, Your Honor, Howard

23 Godnick on behalf of Cerberus.  I've previously been admitted

24 pro hac vice by the Court, and I thank the Court.

25                    CROSS EXAMINATION

Adams - Cross/Godnick                              68

1 BY MR. GODNICK:

2 Q    Judge Adams, I'd like to refer you to Equity Committee

3 Exhibit 6.

4            MR. GODNICK:  I put that before Your Honor.

5 BY MR. GODNICK:

6 Q    Those are the series of emails between Messrs. Schreiber

7 and --

8 A    I got it.  I got it.

9 Q    Thank you.  And specifically I'd like to direct your

10 attention to Mr. Schreiber's email to Mr. Cook dated April 5th,

11 2002 in which he says, among other things, no other attorney is

12 to know the Trustee needs to be part of those conversations.

13 Do you see that?

14 A    I do.

15 Q    Now, Judge Adams, as of April 5th am I correct it was your

16 understanding that Mr. Crowley believed that Cerberus owed him

17 money under the contract that had existed between Cerberus and

18 Mr. Crowley, correct?

19 A    That's correct.

20 Q    And it was your view, am I right, that that was a matter

21 between Cerberus and Mr. Crowley, correct?

22 A    That was my view, yes.

23 Q    And in fact, I think you testified earlier the resolution

24 of that, in terms of how much, if anything, Cerberus agreed to

25 pay Mr. Crowley was none of your business; is that right?

Adams - Redirect                                    69

1  A    Well, something to that effect.  I don't think I ever used

2  that expression, but something to that effect.

3  Q    Okay, and therefore, would you agree, Judge Adams, that

4  those conversations between counsel for Mr. Crowley and counsel

5  for Cerberus were matters that you needed not be a party to?

6  A    Correct.

7          MR. GODNICK:  No further questions.  Thank you, Your

8  Honor.

9          THE COURT:  Anybody else?

10         MR. BRESSLER:  Some brief redirect, Your Honor.

11                    REDIRECT EXAMINATION

12 BY MR. BRESSLER:

13 Q    Judge Adams, in response to one of Mr. Levy's questions I

14 think you indicated that you wished your counsel to stay out of

15 the negotiations regarding the dollars that Mr. Godnick was

16 just talking to that Crowley was claiming from Cerberus; is

17 that correct?

18 A    That is correct.

19 Q    You did not, however, instruct your counsel or anyone else

20 to stay out of inquiring continuously as to the possibility of

21 any conflict or Mr. Crowley getting at any dollars in 2002 from

22 Cerberus for any work.  To the contrary, your instructions and

23 your own pursuit was to inquire as to that.

24 A    Correct.

25         MR. LEVY:  That's a leading question.

B284

Adams - Redirect                               70

1          THE COURT:  Sustained.

2   BY MR. BRESSLER:

3   Q    What were your views as to the inquiry into the continued

4   possible conflict?

5   A    I instructed you and your colleagues to be very attentive

6   to that issue.  I knew of the judge's position, and I had every

7   intention to adhere very closely to that.  And if I couldn't

8   take care of the details, I expected you and your associates to

9   do so.

10  Q    Have you seen anything in the documents and unsent drafts

11  that Mr. Levy has shown you that is not consistent with Mr.

12  Crowley's representation to you that he's no longer getting

13  paid by Cerberus?

14  A    I have seen nothing.  If I did, I would be upset about it

15  and probably take steps.

16  Q    What is the current level of authority that any of the

17  officers of Coram have to write checks or spend money without

18  your approval?

19  A    I think the level is $50,000.  I approve everything above

20  -- from 50,000 up.

21  Q    You don't have to know what services Mr. Crowley may have

22  been claiming monies from Cerberus for to know that he told you

23  they were not for Coram work; is that correct?

24          MR. LEVY:  Objection, leading.

25          THE COURT:  Overruled, but it could be clarified.

Adams - Redirect                    71

1        MR. BRESSLER:  I'll rephrase.

2   BY MR. BRESSLER:

3   Q    What was the representation Mr. Crowley made to you as to

4   whether any of the dollars he was claiming from Cerberus were

5   for Coram work or just for Cerberus work?

6   A    Just for Cerberus work.  Had nothing to do with Coram.

7   Q    Given that you and your advisors are essentially running

8   Coram, is there anything that Mr. Crowley did or could do to

9   curry favor with any of the noteholders that you know of?

10       MR. LEVY:  Objection, assumes facts.

11       THE COURT:  Sustained.

12  BY MR. BRESSLER:

13  Q    Do you know of anything that Mr. Crowley has done to curry

14  favor with the noteholders?

15  A    I know of nothing.  If I did, I would have taken steps.

16       MR. BRESSLER:  Nothing further.

17       THE COURT:  All right, thank you.

18       THE WITNESS:  Thank you very much.

19       MR. BRESSLER:  Your Honor, we would move for the

20  admission of Trustee's 1.

21       THE WITNESS:  Now, does somebody want to take over?

22       THE COURT:  Yes.

23       THE WITNESS:  Thank you.

24       THE COURT:  Any objection?

25       MR. LEVY:  No, I don't, and I've move Equity

72

1  Committee 1 through 11, please.

2       MR. BRESSLER:  Your Honor, we would make the same

3  objection regarding the draft documents by Mr. Crowley sent to

4  his lawyers that were never sent.

5       THE COURT:  What same objection?

6       MR. BRESSLER:  The objection would be that these are

7  apparently documents with no foundation that this witness said

8  he'd never seen before, which were apparently drafts sent to

9  counsel by Mr. Crowley.

10       MR. LEVY:  Let me suggest that I'll fix it with Mr.

11  Crowley if there's a problem, which I don't think there is.

12       THE COURT:  All right, I won't admit those at this

13  time, and they are Exhibits EC-8 and EC-10?  Eight and ten, am

14  I right?

15       MR. BRESSLER:  EC-8 and EC-10 is correct, Your Honor.

16       THE COURT:  All right, any objection to the remainder

17  of the Equity Committee documents?

18       MR. BRESSLER:  No objection, Your Honor.

19       THE COURT:  All right, they will be admitted, as will

20  T-1.

21       MR. BRESSLER:  Your Honor, the Trustee's next witness

22  is Mr. Crowley, and Mr. Kipnes will handle that witness.

23       THE COURT:  All right.

24       COURT CLERK:  Please place your hand on the Bible.

25  Please state your full name and spell your last name for the

Crowley - Direct                                    73

1  Court.

2              THE WITNESS:  Daniel D. Crowley, C-r-o-w-l-e-y.

3              DANIEL D. CROWLEY, TRUSTEE'S WITNESS, SWORN

4              COURT CLERK:  Please be seated.

5              MR. KIPNES:  Thank you for granting my admission pro

6  hac vice, Your Honor.

7                        DIRECT EXAMINATION

8  BY MR. KIPNES:

9  Q    Mr. Crowley, Judge Adams testified about your meeting in

10 Denver., March 25th or 26th, 2002.  Would you describe what

11 discussions you had at that meeting regarding the operations of

12 Coram?

13 A    Yes.  Judge Adams asked me to go over in detail how the

14 company was running, how it was operating, how it had operated,

15 what issues there were, problems, and began to inquire and

16 create an awareness for himself and understanding of the

17 business that is Coram.

18         I discussed the sales and the strategies.  I discussed the

19 costs and the drivers.  I discussed the gross profitability,

20 the administration.  I discussed the EBITDA, the cash flow.  I

21 discussed the staffing and I had -- I'd been asked to go over

22 what the trends were, and I discussed those in great detail.

23 Q    At some point did Judge Adams ask you to submit a weekly

24 report?

25 A    Judge Adams directed me to submit a weekly report and a

Crowley - Direct                    74

1  monthly report.

2  Q    And have you done that?

3  A    Yes, I prepared the weekly report in accordance with his

4  instructions.

5  Q    At your initial meeting with Judge Adams, what

6  conversations, if any, did you have regarding Cerberus?

7  A    Judge Adams discussed Judge Walrath's opinion with me.  He

8  asked me directly about my relationship with Cerberus.  He

9  asked me if I was receiving any compensation from Cerberus in

10 2002.  He asked me what work I was doing for Cerberus.  We

11 discussed the current activities that I had with Cerberus, and

12 he instructed me as to what circumstances and conditions in

13 which he would grant permission for me to do those projects for

14 Cerberus.

15 Q    What instructions were those?

16 A    Judge Adams was very specific in that he said I'm not to

17 be paid anything by Cerberus for work done in 2002. I agreed to

18 that.  Judge Adams was very specific in saying that any work

19 that I did for Cerberus in 2002 could not be involved in any

20 way with the business or relationships of Coram.  I said

21 absolutely, I had no problem with that.

22      Judge Adams was very specific that the work, if any, that

23 I would do for Cerberus could not detract from the activities

24 and focus that I had to provide to Coram, and I agreed to that.

25          MR. KIPNES:  Your Honor, may I hand the witness

Crowley - Direct                           75

1  what's been marked as Trustee's Exhibit 2, which is a letter

2  without attachments from Mr. Crowley to Judge Adams dated March

3  11, 2002?

4          THE COURT:  Yes.  Any objection to my having a copy?

5          MR. KIPNES:  My apologies.

6          THE COURT:  Thank you.

7  BY MR. KIPNES:

8  Q    Do you have Trustee's Exhibit 2 in front of you, Mr.

9  Crowley?

10 A    Yes, sir.

11 Q    Did you write this letter?

12 A    Yes.

13 Q    This letter was written before your in-person meeting with

14 Judge Adams, correct?

15 A    Yes.

16 Q    In the last paragraph of Trustee's Exhibit number 2

17 there's a number of entities listed.  You see that?

18 A    On Page --

19 Q    Page 1, last paragraph of Trustee's Exhibit 2.

20 A    Yes, sir.

21 Q    What are those entities?

22 A    Yes.

23 Q    Generally.

24 A    In 1999, 2000 and 2001 my work for Cerberus involved many

25 aspects, one for which I would be entitled to receive upside if

Crowley - Direct                                    76

1  any were earned by Cerberus related to deals in which I had

2  placed some 20 or so portfolio managers for Cerberus.  The

3  listing here are some of the deals, not all of the deals, that

4  included Beverly Nursing Homes of Florida.  I did a lot of work

5  for Cerberus as it related to nursing homes, Texas Nursing

6  Homes, Beverly Nursing Homes, Kindred Nursing Homes, Care

7  Matric Nursing Homes, Assisted Living, Sun Nursing Homes, and

8  other work, a worker's comp company, MCA PHP, which was an HMO,

9  Winterland which was a T-shirt company, Curative Health Care

10 which became produced Willen Care (phonetic), Hangor

11 Orthopedics (phonetic) that did artificial limbs and many

12 others, and it lists some of the other work, health care

13 research, locating board members, fund-raising, management team

14 recruiting, all work that related to Cerberus, none that

15 related to Coram, some of which I had an upside.

16 Q     What did you tell Judge Adams about the claim you thought

17 you had against Cerberus at your March 25th or 26th meeting?

18 A     I told Judge Adams that I thought there was a mountain of

19 evidence that could and should have been presented to the Court

20 here in Delaware, but it for whatever reason hadn't, but that

21 there was a substantive and provable mountain of work that I

22 did for Cerberus, had nothing to do with Coram, in which I was

23 owed money, upside, substantial money, and that I hadn't been

24 paid, and I wished to pursue that.

25        Judge Adams said that has nothing to do with this

Crowley - Direct                              77

1  bankruptcy.  That's your claim against Cerberus for non-Coram

2  work.  Pursue it.

3  Q    At the time of your meeting with Judge Adams, had you

4  received any money or any compensation of any kind from

5  Cerberus in the year 2002?

6  A    I have not received any money for anything from Cerberus

7  since December of 2001, not a penny.

8  Q    Do you have the -- are the exhibits before you that have

9  previously been --

10 A    No.

11 Q    -- introduced?

12 A    No, sir.

13         THE COURT:  I have it.

14         MR. KIPNES:  Thank you, Your Honor.

15 BY MR. KIPNES:

16 Q    Would you turn to Equity Committee 7, which is a letter of

17 April 10, 2002.

18 A    Yes, sir.

19 Q    Please turn to the second page, Mr. Crowley.

20 A    Yes.

21 Q    Now, this letter follows your meeting with Judge Adams,

22 your first meeting with Judge Adams.

23 A    Yes, it does.

24 Q    And on the second page there's a list of items on which

25 you say, quote, "We need direction."  See that?

Crowley - Direct                                78

1  A    Yes, I do.

2  Q    Then there's a series of items, and one of which is,

3  quote, "The terms for termination of the Crowley/Cerberus

4  contract."

5       See that?

6  A    Yes, I do.

7  Q    Why did you include that on a list of items that -- to

8  Judge Adams on which you said you needed direction?

9  A    I obviously read Judge Walrath's opinion.  The contract

10 was dead in December.  I had discussed it with the Trustee in

11 March.  I'm in the middle of trying to negotiate a termination,

12 and I have upside due me from Cerberus.  I wish to know what

13 role the office of the Trustee or the Chapter 11 Trustee Judge

14 Adams wished to play, because I feel some sense of urgency to

15 terminate this contract.

16      And by that I mean I'm negotiating the amounts of money

17 that are due me for work I did for Cerberus that were unrelated

18 to Coram.  I want to get paid for what I did three years ago,

19 two years ago, one year ago, and I want to know what does Judge

20 Adams wish to participate in what way, what role, what

21 oversight, what does he want to know?

22 Q    What response did you get, if any?

23 A    That that contract was between Cerberus and myself,

24 writing it had nothing to do with Coram.  That he did not wish

25 to weight in.  He did wish to be informed if and when we came

Crowley - Direct                                    79

1  to an agreement as to what payment and for what.  And I said we

2  would absolutely do that, submit it to him, and it would be

3  submitted to this Court.

4  Q    Have you reached any agreement relating to that contract

5  with Cerberus?

6  A    No.  And in the end having talked to them, met with them,

7  wrote them, asked my counsel to talk with them, meet with them,

8  write them, I ended up terminating them for a material breach

9  for not paying the amounts of money that were due for 1999,

10  2000 and 2001.

11 Q    About when was that?

12 A    September of 2002.

13 Q    What's the status of that claim, your claim against

14 Cerberus, today?

15 A    They haven't paid me a penny, and I'm left to my

16 alternatives, which I have not ruled out litigating.

17 Q    In your -- has Cerberus committed to pay you anything?

18 A    No.  If they had, I would have written it to Judge Adams.

19 I would have presented it through Judge Adams, if he wished, to

20 this Court.   We would be talking about in public.  I haven't

21 any agreement or commitment with Cerberus.

22 Q    Why are you still at Coram?

23 A    Judge Adams asked me to stay at Coram.  My contract was

24 expiring at the end of November.  At the beginning of October I

25 wrote the judge a note saying my contract's coming to an end.

Crowley - Direct                                    80

1   For the good of the enterprise and everything around it, here's

2   60 days.  What would you wish to do?  We negotiated, we ended

3   up with a month's extension, there was bargaining back and

4   forth.  The judge asked me to stay.  The judge asked me to stay

5   for an additional six months.  I -- so that's one reason.

6        Another is, you know, I had given three years of my life

7   to this thing.  I made commitments to the blood factor supplier

8   to Bax -- the pump company, to Baxter, to providers, to

9   customers.  I -- people in -- 61 people in management count on

10  me.  I want to see the process through.

11       I feel that had evidence been provided I believe other

12  decisions could be made.  It wasn't.  Okay, that's my fault.

13  Was there to present -- my pride, my self-respect, my

14  reputation, I want to see it through.  I'd like to see this

15  process come to a successful conclusion.  And I don't -- I

16  mean, I will.  Judge Walrath, if you wish me to leave, I'll

17  just leave.  I don't want to.

18       I understand that it may not be possible for me to stay.

19  I'd like to.

20  Q   Up until the execution of the agreement that's been marked

21  as Trustee's Exhibit 1, had Judge Adams given you any

22  commitment regarding continued employment at Coram?

23  A   Judge Adams made it clear from the beginning that every

24  day was a day in which he was re-deciding whether I was going

25  to be at Coram another day.  He never made a commitment to me.

Crowley - Direct                                    8

1  Q    What's your view, Mr. Crowley, of the current financial

2  situation at Coram?

3  A    Coram has nineteen months, almost -- eighteen months,

4  sorry, of increased sales.  It's the longest string of same

5  store, no big one account, one patient at a time, sales

6  increases since the company was formed in 1994.  Coram mixes

7  the best mix of therapies of patients we've taken ever.

8       Coram's gross margins are the best it's been in five

9  years.  Each year's better.  Coram's cash flow in January was

10 130 percent of the prior year's January.  We went into 2002

11 with $28 million.  We came out here in the last month -- there

12 are many days where we have $40 million in cash.

13      The EBITDA from this company, we were just told by Ernst &

14 Young, we passed a field audit, fourth one under my watch

15 without an adjustment, and no material weaknesses in management

16 controls, fourth year.

17      But turnover in Coram is -- it's the best it's been since

18 before I came there.  It's -- and still we're almost 1,000

19 employees less.  We've grown $45 million over the prior year,

20 albeit because some companies failed.

21      The morale is good.  We have had virtually no turnover in

22 senior management other than the initial turnover that I

23 directed.  The team has stuck together.  I think we also have

24 340 or fifty million dollar worth of debt, I mean, we can't pay

25 it back, we can't service it.  We're under a mound of debt, but

Crowley - Direct                                    82

1  all of that preceded me.  I never put a penny of debt on this

2  company.  So, that all came before me.

3      This -- the company's in -- it's operating -- I mean, it's

4  a handful every day of stuff to deal with.  It's -- but it's

5  stabilized.

6  Q    You said something in your answer about companies failing.

7  What --

8  A    Well, any number of home infusion companies have failed in

9  the last year.  Dr. Kook dot com (phonetic) was a big infusion

10 company.  Genteva (phonetic) sold themselves to Acredo

11 (phonetic).  Acredo ran around trying to sell the non-

12 hemophilia portion of their business to anyone else.  They were

13 unable to sell it at all.  In the end they -- Credo made the

14 decision and closed infusion businesses all over the United

15 States and gave the business away.

16      We benefitted by that.  There were any number of local,

17 small regional infusion companies because of the low margins in

18 infusion, and the fact that the sellers of the drug to us

19 require we pay up front in cash.  And the payers, customers of

20 Coram, pay so slow.  Any company that had much debt couldn't

21 service it.  A lot of them failed.  And that's what I'm talking

22 about.  It's been a watershed two, three, four, five years for

23 home infusion.

24 Q    What was your salary when you first became employed by

25 Coram?

Crowley - Direct                                    83

1  A     Yes, Don Emerol (phonetic) made the offer to me.  He said,

2  "You're going to get the same salary I had."

3       I said, "When was that?"

4       "1998."

5       That's the salary I got in '99, 650.

6  Q     What was your salary in 2000?

7  A     650.

8  Q     What was your salary in 2001?

9  A     650.

10  Q     What was your salary in 2002?

11  A     650.

12  Q     In the years 2000, 20002 have you received any bonuses

13  under the management incentive plan or the key employee

14  retention program?

15  A     I have not received one penny under any incentive plan,

16  whether it be management incentive, key employee retention in

17  2000, success fee in 2000, none of it.  I didn't receive

18  management incentive plan or key employee plan in 2001.  I did

19  not receive management incentive plan or key employee retention

20  plan in 2002.  And my expectation is I will earn a bonus for

21  2002.  With the negotiations with Judge Adams I expect not to

22  receive that either.

23  Q     Is there any other management person at Coram who has not

24  received entitled bonuses in those years?

25  A     Of the 2,200 people that work at Coram and the roughly 100

Crowley - Direct                                    89

1   that work in management and have for the last three years,

2   every one of them in the same plan that I am, every one of them

3   were paid.  The only person that has not been paid a penny is

4   me.

5   Q    What is your best view, Mr. Crowley, of what happens to

6   Coram in the next four months if Judge Walrath grants the

7   Equity Committee motion and you are terminated from further

8   employment?

9   A    I think that the management and the employees will be

10  completely disaffected.  I think for them to see their leader

11  thrown out in court when they don't believe that the strategy

12  was wrong, that the company has prospered, that the company has

13  flourished, that we're viable and vibrant and doing well, I

14  think they would not know what to do with it.

15       Because of the nature of the business I'm glue in so many

16  areas, so I'm meeting with Baxa (phonetic) and meeting with FFF

17  and I'm meeting with head of medical relations for Anthem.  I'm

18  in the middle of our largest customer, nearly $40 million in a

19  rebid.  I -- I'm central to so much that goes on.  I think it's

20  a calamity.  I believe it's more than just casual entropy.  I

21  worry for the company.

22            MR. KIPNES:  That's all I have, Your Honor.  Thank

23  you.

24            THE COURT:  Do we need to take a break then?

25            MR. LEVY:  I would like to do that, Your Honor.