Crowley - Cross/Levy                    85

1        MR. BRESSLER:  We do not for Judge Adams.  I think

2   you've made your call, Judge?

3        MR. LEVY:  I think I can be more effective with a

4   little time.  Can we take a short lunch break?

5        THE COURT:  Well, do you want to take a short lunch

6   break then, and come back at quarter of one.

7        MR. LEVY:  Thank you.

8        THE COURT:  All right, we'll stand adjourned.

9        (Luncheon recess)

10        THE COURT:  You may.

11                     CROSS EXAMINATION

12   BY MR. LEVY:

13   Q    Mr. Crowley, a few moments ago you told Judge Walrath that

14   your salary was $650,000; is that right?

15   A    Yes.

16   Q    And that you never received a raise; is that right?

17   A    (No verbal response)

18   Q    Over the three years you've been at Coram.

19   A    Yes.

20   Q    Equity Exhibit -- Equity Committee Exhibit 12 is a W-2

21   earnings summary for the year 2002 for Daniel D. Crowley.  That

22   says your wages, tips and other comp during 2002 were not

23   650,000 but were $921,298.08, correct?

24   A    It misrepresents what my wages were, sir.

25   Q    I'm sorry?

Crowley - Cross/Levy                86

1   A     It misrepresents what my wages were, sir.  My base salary

2   was 650,000.  I received gross-ups for corporate facilities in

3   which I resided when I'm in Denver and life insurance and other

4   emoluments that go to the total.  My base salary is 650.  It's

5   publicly available and known.

6   Q     It costs coram $921,00 for 2002 to have you around,

7   correct, sir?

8   A     Health insurance, life insurance, dental, vision,

9   pharmacy, corporate facilities, travel.  This is what it says.

10  Q     Thank you.  Now, in May of 2002 you had a face-to-face

11  meeting with Stephen Feinberg of Cerberus, correct?

12  A     Yes.

13  Q     The reason you had the meeting is because you thought

14  Cerebus owed you a lot of money, right?

15  A     Cerebus owes me a lot of money, sir.

16  Q     At that time you thought it was more than $10 million,

17  right?

18  A     Testified too that I didn't know what the amount was.  I

19  was trying to ascertain it, but I have a belief that it's

20  significant.

21  Q     Between ten and fifteen million, is that what your belief

22  was when you went to New York to meet with Mr. Feinberg?

23  A     It's significant.  I have never been able to receive the

24  information that would allow me to know for certain what it is.

25  Q     But you think it's more than 10 million, correct?

Crowley - Cross/Levy                                    87

1   A    I believe it's more than 10 million.

2   Q    Now you tried to discuss this on the telephone with

3   Feinberg, and you told him you wanted a number, correct?

4   A    I had been asking Mr. Feinberg to pay me --

5   Q    Sir, can you answer that yes or no?

6   A    I'd like to put it in context.

7        THE COURT:  Well, first answer the question.

8        THE WITNESS:  Ask it again, please?

9   BY MR. LEVY:

10  Q    You tried to discuss it on the phone with him and told him

11  you wanted a number.

12  A    Yes.

13  Q    He's told you he didn't want to give you a number on the

14  phone, right?

15  A    Yes.

16  Q    He said he wanted to see you eyeball, face-to-face.

17  A    He wished to discuss it in person.

18  Q    He told you he didn't owe you any money when you got to

19  New York, right?

20  A    He had no proposal.  He told me he thought I was not due

21  anything.

22  Q    But he did say at that same time that if you weren't

23  associated with Coram you could go right back to work for

24  Cerberus if you wanted to, didn't he?

25  A    What he said was that if in the future it became

Crowley – Cross/Levy                    88

1  appropriate, and I was no longer affiliated with Coram and I

2  wished to return to Cerberus, that I may.

3  Q    And you told him at that meeting you'd take $5 million

4  even though you thought he owed you ten or fifteen million,

5  right?

6  A    What I said was I believe that I'm owed significant

7  monies.  We talked about the deals that I believed that related

8  to those significant monies, that if we could get the thing

9  settled, I'd been trying for two and a half years, that night I

10 would accept $5 million and call it a day and move on.

11 Q    And you also told him that if Judge Walrath decides that

12 Coram -- strike that, please.

13     You also told him that if Judge Adams decides that Coram

14 should pay you something under the NIP you wanted him to be

15 supportive, right?

16 A    What I said was --

17 Q    Can you answer that yes or no?

18 A    Yes.

19 Q    And he said he would be supportive, right?

20 A    He said specifically that whatever was done would be with

21 full awareness of the Trustee, in full public view in front of

22 Judge Walrath.  He would be supportive to the extent that the

23 Trustee made a decision to pay me something.

24 Q    Since that dinner in May you're pretty sure you've talked

25 to Feinberg, right?

Crowley - Cross/Levy                                89

1  A    I have talked to Feinberg.

2  Q    But you don't know how many times.

3  A    A number of occasions.

4  Q    And you don't know whether in any of those conversations

5  you talked to him about the money that you claim is due to you

6  from him, right?

7  A    I'm certain on some of those occasions I did.  I don't

8  recall.

9  Q    So, you went to the meeting.  You expected a proposal, you

10  expected a number, and there was none, right?

11  A    I answered that, yes.

12  Q    And you came away from the meeting disappointed?

13  A    I wondered why I was asked to come to New York to receive

14  a proposal if the proposal was nothing.

15  Q    Five days after the meeting you sat down at your computer

16  and you typed a document relating to that meeting, correct?

17  A    I wrote a draft.

18  Q    Can you answer that yes or no?

19  A    Yes.

20  Q    And the draft you wrote -- do you have the documents up

21  there, Mr. Crowley?

22  A    Yes, I do.

23  Q    Will you look at EC-8, please?  The draft you wrote, the

24  first two pages of EC-8, the ones that have Bates numbers CRX-

25  63 and 64, correct?

Crowley - Cross/Levy                          90

1  A    Yes.

2  Q    And in that draft you wrote -- the very next to the last

3  thing you wrote -- no, the very last thing you wrote was, "I

4  just wanted you to know how I am feeling on this particular

5  day," correct?

6  A    Those are the words.

7  Q    And that is how you felt on that particular day, correct?

8  A    Of course I testified for hours with you in the deposition

9  and told you this was --

10  Q    Excuse me.  The judge was not at the deposition.  Could

11  you just answer my question, please?

12  A    No.

13  Q    That's not how you felt on that day?

14  A    It's out of context.

15  Q    How is it out of context, Mr. Crowley?

16  A    Mr. Levy, I see how you would like to characterize it, but

17  this was part of my life has been -- I write something down,

18  think about it the next day.  In this case I wrote something

19  down, the first two pages.  I sent it to my attorney.  I re-

20  crafted it the next day.  I was ready to send that.  I sent

21  that to my attorney.  Neither one of these letters went beyond

22  me to my attorney.  I haven't seen this thing in darn near a

23  year until my attorney showed it to me again a week ago.

24  Q    Well, you talked to your attorney about it -- let's see,

25  this is May 6th.  You tell -- you went it to Mr. Schreiber,

Crowley – Cross/Levy                           91

1  looks like from the fax marks on May 6, correct?

2  A    I sent to Mr. Schreiber.  I admit it.

3  Q    And you talked to him about it almost immediately

4  thereafter, didn't you?

5  A    I don't know that.

6  Q    You deny that, sir?

7  A    I don't know if I talked to him immediately thereafter.

8  Q    You talked to him shortly thereafter.

9  A    I talked to him thereafter.

10 Q    About this document.

11 A    About this document

12 Q    And that was pay before I took your deposition last week.

13 A    I talked to him about this document in May 2002, yes.

14 Q    Now, in this document, the portion you wrote, on Page 2

15 beginning in the second paragraph, some rather -- some

16 complaints about the job that David Friedman did and after

17 complaining you said, "I didn't have to recite the answers that

18 Friedman gave me to say in court."  Did you wrote that?

19 A    Yes, I wrote that.

20 Q    Did you mean it when you said it?

21 A    Absolutely not.  I told you that.

22 Q    You wrote it but didn't mean it, absolutely.

23 A    Again, this was a melodrama, a noontime drama.  I wrote

24 what I felt was -- that David Friedman could have done a whole

25 lot better job and didn't do as well as he could have.  There

1  was significant evidence he could have presented -- different

2  ways he could have handled this case to supply Your Honor with

3  the information that you have, 1,635 pages of it that had he

4  done that, we may have had a different decision.  And I don't

5  think that he did do that.

6  Q   He did hand you a list of questions and answers before you

7  took the stand last December, didn't he?

8  A    He gave me a list of questions and probable answers and

9  asked me to read them over and we would discuss it.   I

10 testified to the best of my ability the truth.   I did not

11 recite -- I couldn't recite or wouldn't recite anything that

12 anybody gave me.

13      I gave my own answers.

14 Q    Can you give me any explanation then of why you chose the

15 word "recite" in here?

16 A    Here's a letter that's a year old.  I was completely

17 sideways because I'm calling Feinberg saying, "I want to be

18 paid for '99, 2000, 2001.  You and I know what the deals are."

19      "Send them to Bob Gadigan."

20      I sent him a list.  I said, "Where are we?"

21      He said, "Send them to Bob Gadigan."

22      I said, "I did."

23      He said, "Send them again."

24      "I think I'm due a lot of money."

25      "What do you think you're due?

Crowley - Cross/Levy                              9

1      "A lot."

2      "You have to give me the source data."

3      "What do you think I'm due?"

4      "I don't know."

5      "Steve, what -- I think l'm due something.  I'd like to be

6  paid."

7      He pushed me off in '98, in 2000 and 2001.  The contract

8  was dead.  I'm not taking anything from him, I'm simply asking

9  for what I'm due.

10     I asked for proposals, I didn't get it, he drags me to New

11 York for a proposal that he gives me is -- there is none.

12     This letter is, you know, not in my many letters that I've

13 written, when I sit them on the side of my desk it's Draft One

14 of two drafts.  You don't show me Draft Two, but there is Draft

15 Two that I was willing to sign my name to that says, "I'm

16 putting whatever it is in here in front of Judge Walrath and

17 he United States Trustee and Judge Adams.  I'm happy to do it,

18 and if they say no, then no it is."

19     But you're -- I did not recite anything David Friedman

20 provided to me.

21 Q    Is that, sir, your complete explanation to my question of

22 why you chose the word "recite"?

23 A    I chose the word "recite" --

24 Q    Can you answer that yes or no?

25 A    I have no idea.

Crowley - Cross/Levy                                94

1  Q    Okay, thank you.

2       Let's go now to the next paragraph which says -- you wrote

3  on your computer, "I suppose if I had been more trusting,

4  maybe, paren, maybe I would not have written the memo about

5  trying to get upside on your position if I did a great job at

6  Coram."

7       See that, sir?

8  A    Yes.

9  Q    Now, would you look at EC-9.

10 A    Yes.

11 Q    And I'm sure you'll recall that that document that was

12 marked in evidence at the hearing, that document which is dated

13 November 12th, 1999 was marked in evidence at the hearing heard

14 in this courtroom in December of 2000.  Remember that?

15 A    Yes, I do.

16 Q    And do you remember that you denied at that time that EC-

17 9, then EC-20 indicated an intention -- indicated an intention

18 to get upside on the position if I did a great job at Coram?

19 A    You know, my testimony's in the court as to this pre-

20 employment letter to which we did not agree.  I don't know what

21 else to say.

22 Q    Well, why did you tell Mr. Friedman, that you -- quote --

23 I'm sorry, you didn't tell that to Mr. Friedman.

24      Why did you write in this letter, quote, "I would not have

25 written the memo about trying to get upside on your position."

**B309**

Crowley - Cross/Levy                                95

1  A    Well, this is not a letter.  This is draft one of two

2  drafts of material I sent simply to my lawyer that never went

3  to anybody.

4  Q    I'll correct the -- I'll correct that --

5  A    I thought --

6  Q    What -- I'm not sure I see the importance, but why did you

7  write in this draft, "I would not have written the memo about

8  trying to get upside on your position if I did a great job at

9  Coram"?

10  A    I think what I'm saying -- you know, I don't know.  I just

11  didn't trust the man, I guess.

12  Q    You do agree, by the way, don't you, that the reference

13  here in this document that we're looking at, EC-8, is a

14  reference to EC-9, the older document?  No question in your

15  mind about that; is there?

16  A    No.

17  Q    Now, let's look at the next page, CRX-65.  And we have --

18  we agree, don't we, that this was written by Mr. Scott

19  Schreiber?

20  A    This was written by Scott Schreiber.

21  Q    And that that's his handwriting where it says "insert"?

22  A    I believe it is.

23  Q    And Mr. Schreiber was your lawyer?

24  A    He is my lawyer.

25  Q    Was and is your lawyer.

Crowley - Cross/Levy                          96

1  A    Yes.

2  Q    Was on May 6th, 2002.

3  A    Yes.

4  Q    And there's no doubt in your -- now, Mr. Schreiber writes

5  in CRX-65, "Hence, I expect that you'll honor the commitment

6  that you made to me over dinner." You see that?

7  A    Yes.

8  Q    Do you have any idea where Mr. Schreiber could have gotten

9  information suggesting that Feinberg made a commitment to you

10 over dinner other than from you?

11 A    I never saw this document, Mr. Levy.

12 Q    Can you answer that? My question is, do you have any

13 idea?

14 A    No.

15 Q    Do you have any idea where Mr. Schreiber could have gotten

16 the idea that the commitment specifically was that Coram's plan

17 is confirmed -- if Coram's plan is confirmed or its assets

18 sold, you'd be reinstated with Cerebus and receive $5 million?

19 A    I --

20 Q    Yes or no, do you have any idea?

21 A    No.

22 Q    Good.

23         MR. KIPNES: Move to strike, Your Honor.

24         MR. LEVY: I --

25         THE COURT: Sustained.

1          MR. LEVY:  Okay.  I withdraw it.

2  BY MR. LEVY:

3  Q    And I assume you had no idea of any source of information

4  that Mr. Schreiber might have had that you had received a

5  commitment from Mr. Feinberg that Cerebus would indemnify you

6  for legal fees, correct?

7  A    No, because they haven't.

8  Q    And finally, perhaps most importantly, do you have an idea

9  where Mr. Schreiber could have gotten information that would

10  lead him to write that you had a commitment from Mr. Feinberg

11  to pay you the difference between what you ultimately received

12  from Coram by way of bonuses and $11,200,000?

13  A    None at all.

14  Q    And do you recognize $11,200,000 as a number that you once

15  perhaps told Judge Adams was the amount you thought was due

16  from Cerebus?

17  A    It is not.

18  Q    Judge Adams was wrong?

19  A    It's not a number that I provided.  The numbers are

20  public, they're available in every form of SEC document.

21  They've been testified in court, you've subpoenaed them, I've

22  provided them to the office of the Trustee, the current number

23  is almost 17-million-9.  Back then it was 15-million-7.  This

24  number represents nothing I would know.

25          MR. KIPNES:  Your Honor, for the purpose of the

Crowley - Cross/Levy                    98

1  record, Mr. Levy said owed by Cerberus.

2         THE COURT:  All right, just to clarify, it's owed by

3  Coram is what you're question --

4         MR. LEVY:  It is, and I thank you.

5         THE COURT:  All right.

6  BY MR. LEVY:

7  Q    Now, the next letter, the next communication, the next

8  draft if you like, is EC-10, a May 8th, 2002 document with

9  number 71 -- CRX-71, 2 and 3 on it; is that correct?

10 A    Yes.

11 Q    Something you wrote.

12 A    Yes.

13 Q    And this one you signed.

14 A    Yes.

15 Q    And you wrote, "Dear Steve," and you wrote Steve in,

16 correct?

17 A    That's my handwriting.

18 Q    Right, and just exactly the same way, if you look back at

19 EC-9, the 1999 document, same way you wrote, "Dear Steve,"

20 right?

21 A    The first two pages of the prior equity committee are a

22 draft that I wrote, first two pages, the memo that's dated May

23 8th that's EC-10 I wrote and I signed, both of them were

24 drafts, neither of them were sent.  They both went to my

25 attorney and nowhere else.

Crowley - Cross/Levy                          99

1  Q    And with respect to EC-10, the May 8th letter, you did

2  discuss that letter with Mr. Schreiber some time in May,

3  correct?

4  A    I must have.  I don't recall it.

5  Q    And do you -- look specifically now at EC-10, and

6  specifically on the last page in the third paragraph from the

7  bottom, about the middle, you say, "Steve, I am also anxious

8  that unforeseen events sometimes overtake good intentions.  You

9  could get hit by a bus and be gone.  Cerebus would get bought

10 out or whatever.  The point is that then I would be left with

11 nothing.  Now, that's not right or fair, is it?"

12      You see that?

13 A    Yes.  .

14 Q    And you wrote that.

15 A    Yes, I wrote that.

16 Q    Now, why would it be unfair to you?  Mr. Feinberg wouldn't

17 like it, but why would it be unfair to you if he was hit by a

18 bus and was gone?

19 A    Well, in December of 2001 I received my last payment from

20 this guy.  I've asked him to pay me for '99, 2000, 2001.  I

21 have tried more ways than I know how to terminate this contract

22 and be paid up front, in the public, in front of Your Honor or

23 anyone what I'm doing for what?  Nothing for Coram.  Never

24 asked.  Don't expect.  Not going to accept.  Nothing relates to

25 Coram.

Crowley - Cross/Levy                                    100

1    I'm saying to this man, "You know that, and I know that,

2  how about let's just get this over and be done with it and put

3  it on public?  I'm okay with that."

4    There isn't any conspiracy.  Let's get it over with.  He's

5  saying, "Good, let's do that.  Let's put it in front of

6  everybody."

7    And I'm saying, "Fine.  What's the number?"

8    We're going back and forth, and I believe that the man --

9  he's a terrific businessman.  He's playing hide the ball.  I

10  don't know why or what's going on here, but I would just like

11  it over.

12    Lord knows, you've accused me of everything under the sun,

13  Mr. Levy, and it's not true.  So, I'm left to this guy saying,

14  I'll pay you."  What?  When?  For what?  I'd like to be done

15  with it.

16    Here's what for, here's how much, here's the

17  documentation, do it.  That's all I'm saying.  That's what this

18  letter says.  I didn't send it, though.  Cooled down and threw

19  it in the circular file, the trash.

20  Q    Mr. Crowley, your claim is not -- for all his money you're

21  talking about was not against Feinberg personally; it was

22  against Cerberus, wasn't it?

23  A    In many ways Steve's the principal there.

24  Q    You have -- still have -- or there is a written contract

25  between you and Cerberus, correct?

Crowley - Cross/Levy                     101

1  A    Sure, and it's --

2  Q    And it's that contract that defines the rights you think

3  you have for certain upsides; isn't that right?

4  A    That's right.

5  Q    Well, then why -- and presumably Cerberus has records of

6  what those upsides were, though you've never seen them, right?

7  A    I'd like to.

8  Q    Okay, then why is Mr. Feinberg's being gone going to

9  affect your right -- will leave you with nothing?

10  A    I must have come to the same conclusion as you, 'cause I

11  threw the letter away and never sent it to him.  I thought this

12  was attorney-client privilege, 'cause it went from me to my

13  lawyer to the trash.  But here I guess I'm testifying.

14  Q    Equity Committee Exhibit --

15        THE COURT:  Thirteen.

16        MR. LEVY:  Thirteen, thank you, Your Honor.

17  BY MR. LEVY:

18  Q    -- is a document bearing numbers CRX-486 and 487 dated

19  April 1st, 2002.  I think you've testified you prepared this

20  document?

21  A    I did testify that.

22  Q    And it reflected your intentions as to what you would like

23  to see in the termination agreement on or about the date you

24  wrote it?

25  A    Again, I --

Crowley - Cross/Levy                                          102

1  Q    Yes or no, sir?

2  A    Generally.

3  Q    And in the -- one, two, three, four, five, six paragraph

4  --

5        MR. KIPNES:  Could you identify the document for the

6  record, please?

7        MR. LEVY:  I thought I did.  CRX 486 and 487.  It's a

8  document dated April 1st, 2002 the witness has identified as

9  something he prepared.

10        Okay?

11 BY MR. LEVY:

12 Q    On that date you were asking Cerberus, its principals and

13 affiliates to indemnify you from litigation currently being

14 threatened by the Equity Committee of Coram Healthcare

15 Corporation, correct?

16        MR. GODNICK:  Your Honor, Objection.

17        MR. KIPNES:  Object to the question.

18        MR. GODNICK:  I'll go to the microphone.  Thank you.

19 Objection.  I don't think there's any foundation that in fact

20 this letter was sent, and therefore, the question assumes that,

21 in fact, Mr. Crowley was asking Cerebus for something.

22 Therefore, the question has no foundation.

23        MR. LEVY:  I'll withdraw.

24 BY MR. LEVY:

25 Q    It was your state of mind, sir, on April 1st that you

Crowley - Cross/Levy                               103

1  believed that Cerberus, its principals and affiliates should

2  indemnify you against derivative litigation currently being

3  threatened by the Equity Committee, correct?

4  A    My state of mind --

5  Q    Yes.

6  A    -- was my lawyer, Scott Traver, was going to be

7  negotiating with Cerberus and these were some ideas as to what

8  elements he should decide ought to be included.  Ultimately I'm

9  suggesting to my lawyer take a look at these things.

10       Now, this document, of course, is not on letterhead, it's

11  not signed by me, and it was sent by myself to my attorney and

12  never went to anybody.

13  Q    And you other than for the purpose of telling your

14  attorney what you desired him to negotiate on your behalf,

15  including this indemnity against the Equity Committee, proposed

16  derivate suit, correct?

17  A    Of course, I'm not a lawyer.

18  Q    Yes or no?

19  A    I'm not a lawyer.  This is me writing to my attorney

20  giving him suggestions as to what areas I might be interested

21  in.

22  Q    Equity Committee Exhibit 14, also identified as Crowley

23  405, is a one-page letter marked personal and confidential

24  dated August 20th, 2002 from Mr. Crowley to Mr. Feinberg.

25  A    Thank you.

Crowley - Cross/Levy                                    104

1  Q    Mr. Crowley, you wrote that letter on about August 20th,

2  2002?

3  A    Yes.

4  Q    And you sent it to Mr. Feinberg?

5  A    Yes.

6  Q    And as late as August of 2002 you were asking -- and in

7  fact, you were saying he should reasonably agree that you were

8  eligible to receive payments for termination without cause that

9  would include payments for the months that have gone unpaid in

10 2002, plus one additional year for severance, right?

11      Yes or no, right?

12 A    It's not a yes or no.

13 Q    Okay.

14 Q    The fact is that the contract says that if I'm released

15 without cause there's a liquidated damage section that says I'm

16 due certain amounts of money.  This is what I thought I was due

17 under the termination without clause section.  This is not

18 about paying me for services rendered in 2002.  This is about

19 the contract's dead, we've ended it, I'm not going anything to

20 create upside for you.  I'm not being paid, I'm not going to be

21 paid, but we're terminating the contract, ending it.

22      I'm seeking to receive two things from Mr. Feinberg.  One

23 is payment for the deals I worked on, not Coram, and the other

24 is we terminated the contract without cause.  I think -- I'm

25 thinking, I'm not an attorney, but I can read, and it says this

B319

Crowley - Cross/Levy                                       105

1  section under "without cause," and that's what I thought it

2  was.

3      That's what I wrote.

4  Q   Did you have your attorney look at this before you sent

5  it?

6  A   I don't know.

7  Q   And these payments for the months, I take it, were

8  payments at the rate of $80,000?  Yes or no, sir?

9  A   They were at $80,000, yes.

10 Q   Equity Committee 14 is a letter dated September 20th, 2002

11 signed --

12         THE COURT:  No, it isn't.  Equity Committee 15?

13         MR. LEVY:  I have 14.  Maybe I'm not reading your

14 handwriting.

15         Equity Committee 15, letter signed by Scott Schreiber

16 sent to Cerberus dated September 20th, 2002.

17         THE COURT:  Thank you.

18 BY MR. LEVY:

19 Q   The exhibit in front of you, sir, Equity Committee 15, I

20 believe, did you authorize Mr. Schreiber to send that letter

21 terminating your agreement?

22 A   I did.

23 Q   And I note that you reserved all your rights under the

24 agreement with Cerberus including but not limited to those set

25 forth in the agreement?

Crowley - Cross/Levy                                    106

1  A    That's what the lawyer wrote.

2  Q    That means you reserve the right to sue Cerberus.

3  A    I believe that is an element and an alternative that is

4  available to me.

5  Q    Now, during all this time you were doing what I think you

6  call pro bono work for Cerberus, correct?

7  A    I --

8  Q    All this time being the year 2000 up to the date that you

9  terminated.

10  A    Yes.

11        MR. KIPNES:   2002.

12  BY MR. LEVY:

13  Q    2002 up to the date you terminated.

14  A    Yes, in 2002, that's right.

15  Q    Why were you doing favors for Feinberg and Cerberus after

16  all this frustration, their refusal to pay you this large sum

17  of money?

18  A    The work that I'm in, what I liked doing, I like working

19  on deals.  I -- it was mindful of Judge Adams' instruction.

20  The work I did in 2002 had nothing to do with Coram.  It didn't

21  -- it took 15, 20 hours in total out of the two or 3,000 hours

22  I put in for Coram.  I didn't get paid anything for it.  I --

23  if you called me from TPG and asked me to take a look at

24  something I would do it.  Why?  Because it might be a customer

25  of mine one way.  Madison Dearborn called, Liberty Partners

Crowley - Cross/Levy                107

1  call -- if you called, Mr. Levy, and asked me to look at

2  something, Bank of America.  Lots of people do.  I take a look

3  at it, and if I write one sentence saying, "This looks like

4  it's worth looking at," I don't view that as the kind of due

5  diligence that I was doing in the many other deals before,

6  arranging accountants and lawyers and advisors and researching

7  putting due diligence teams on the -- in the company, meeting

8  with management, understanding the corporation.

9      I didn't do that kind of work in 2002.  Why I did it --

10 Peter Lockett at Cerberus, maybe one day he's at Soros

11 (phonetic) and we're working together.  He says, "Would you

12 look at this as a favor?"  I takes fifteen minutes.  I looked

13 at it.

14     "What do you think?"  "Looks like junk to me.  I wouldn't

15 pursue it."  "Looks okay, why don't you pursue it?"

16 Q   But you had already told Mr. Feinberg that you would never

17 go back to work for Cerberus; isn't that true?

18 A   I think you've mischaracterized me for whatever intention

19 you have.  What I've said was I don't think we'll ever work

20 together again.  I don't see it.  Maybe it happens, but I don't

21 see it.

22 Q   Mr. --

23 A   It's not been great.

24 Q   Mr. Crowley, you testified in response to MR. Kipnes's

25 question as to why you're still at Coram, it was a long answer,

1 but one of the things was your pride and your self-respect, and

2 your desire to finish a job, correct?

3 A    Well, one of the things was Judge Adams asked me.  And one

4 of the things is I would like to see it through.

5 Q    Let me ask you this, sir.  If this Court presently denies

6 you the million-dollar bonus and the $80,000 raise, will -- and

7 defers, let's say, for example, to the client hearing

8 confirmation as the United States Trustee has suggested the

9 Court do, will your pride and self-respect keep you at the

10 company?

11          MR. KIPNES:  Object to the question.

12          THE COURT:  Overrule.

13          MR. KIPNES:  First of all, it's not an $80,000 raise,

14 Your Honor.  One mis-statement of --

15          MR. LEVY:  I correct that.

16          THE COURT:  80,000 per month.

17          MR. KIPNES:  Sorry.

18          THE WITNESS:  Mr. Levy, I think you've tortured me to

19 death and ruined a fair part of my life.  I've not been paid

20 virtually anything by virtue of what I've done, what I've

21 earned.  I entered into good faith negotiations with the

22 Chapter 11 trustee and his lawyers.  We struck a bargain in

23 December of 2002.  I'm living up to my end of the bargain.  I

24 would expect the Trustee to -- he is -- try to live up to his

25 end of the bargain.

Crowley – Redirect                          109

1    If Judge Walrath decides against that, then I'll decide

2  what I want to do.  I don't know what that is.

3  Q    Thanks a lot, Mr. Crowley.

4        THE COURT:  Any redirect?

5        MR. KIPNES:  Very briefly, Your Honor.

6             REDIRECT EXAMINATION

7  BY MR. KIPNES:

8  Q    Mr. Crowley, would you turn to Equity Committee-8?  Equity

9  Committee 8.

10 A    Yes, sir.

11 Q    The exhibit you marked is Equity Committee 8, the May 6,

12 2002 draft.  Would you turn to the third page.

13 A    Yes.

14 Q    Let's establish that Mr. Schreiber wrote those words,

15 correct?

16 A    He wrote them.

17 Q    When did you see them?

18 A    Last week Mr. Schreiber showed them to me.

19 Q    What did you say to MR. Schreiber when you read the five

20 lines that appear on the third page of Equity Committee Exhibit

21 8?

22 A    I --

23 Q    A verbatim response it not required.

24 A    -- really --

25 Q    Just what did you tell him?

Crowley - Recross/Levy                    110

1  A    I was really angry.  I -- this is bullshit.  I'm sorry. I

2  apologize to the Court.

3  Q    Did you have any conversation at that time with Mr.

4  Schreiber about the accuracy of what appears on that page?

5  A    I did.

6  Q    And what did you say?

7  A    This is absolutely wrong.  It's not in context with that

8  meeting.  None of this happened.  Where in the hell did you get

9  this?  And why am I looking at it a year later, an insert that

10  I've never seen before?  What is this about?

11  Q    Does Cerberus owe you any money in your view for any work

12  you have done at any time from the date of your birth to now

13  that has anything to do with Coram?

14  A    Not a penny.

15        MR. KIPNES:  No further questions.

16               RECROSS EXAMINATION

17  BY MR. LEVY:

18  Q    Perhaps I misunderstood you, Mr. Crowley.  I thought you

19  had testified that after you wrote the May 6 letter and

20  discussed it and the third page, Page 65, with Mr. Schreiber;

21  is that not your testimony?

22  A    Mr. Levy, I told you I hadn't seen this thing in over a

23  year, that the only time I've seen it since I thought it was

24  thrown away, I sent it to my lawyer.  I did Draft Two, was

25  ready to send it.  I cooled down the next day, in the trash it

Crowley - Recross/Levy                    111

1  went.  The next time I saw it was Mr. Schreiber's calling me

2  saying, "I would like to talk to you about this draft letter of

3  May 6 and whatever the next date is."

4      And I said, "What letter?  Fax it to me.  Let me see it.

5  I want to see what that is."

6      He faxed it to me.  I said, "Scott, I think this is

7  attorney-client privilege.  I only sent it to you.  I never

8  sent the darn thing."

9      And he said, "Oops."

10     And I said, "What is this insert?  I don't recall."  I

11 said, "Where did that come from?  I don't remember it."  I

12 said, "It's just out of context.  It's just wrong."  That's the

13 nature of all of it.

14 Q   Sir, you answered when you first saw it.  My question was

15 didn't you discuss Page CRX-65 with Mr. Schreiber shortly after

16 -- sometime in May of 2002?

17 A   No.

18 Q   Let me mark as EC-16 a letter addressed to me dated

19 February 28th, 2003 last Friday from Mr. John H. Ward, an

20 attorney at Cellis (phonetic).

21     Have you seen this letter before I just handed it to you?

22 A   I think so.

23 Q   And Mr. Ward is one of your lawyers?

24 A   He's a colleague of Mr. Schreiber's.

25 Q   I'm sorry?

Crowley - Cross/Levy                     112

1  A    He's a colleague of Mr. Schreiber's.

2  Q    And would you -- I had asked Mr. Ward to unredact certain

3  materials.  There's a letter in which he indicates why he won't

4  unredact it, but then he goes on to say in the middle of the

5  second paragraph on the first page, "As you now know from the

6  deposition testimony, as well as from Mr. Valiusis' (phonetic)

7  telephone call to you before the deposition, the process was

8  that Mr. Crowley drafted Exhibit 19 and sent it to Mr.

9  Schreiber.  Mr. Schreiber then marked it up and composed an

10 insert; however, he did not send any of these materials to

11 Crowley, but instead discussed the draft with Crowley."

12      You see that?

13 A    I do.

14 Q    Mr. Crowley.  Thank you.

15      Does that not indicate to you, sir, does that not refresh

16 your recollection, sir, that you discussed Page 65, which is

17 part of Exhibit 19, with Mr. Schreiber?

18 A    You can characterize this any way you wish.  I'm telling

19 you I didn't discuss it with him.  I don't remember, and I --

20 I'm sending the letter to my lawyer that I don't see for

21 another year, that never went outside the office in court, so I

22 -- no.

23 Q    But when you had this conversation with him in -- the one

24 in which you characterized it as bullshit, did you say, "Where

25 do you get this idea?  Where did you -- where do you get the

Crowley - Further Redirect                    113

1  idea that there was a commitment?"

2      Did you?

3  A    (No verbal response)

4  Q    Yes or no, did you?

5  A    You know, you've badgered me for two and a half years, so

6  I get a chance to take a breath.

7      For the entirety of 2002 myself and my lawyers have been

8  trying to negotiate a termination and payment from Cerberus. I

9  did not discuss that insert with Scott Schreiber. I have no

10  recollection of it. It's flat wrong. I reject it. I'm

11  absolutely on the record here with something that was signed.

12  I didn't send it, but I signed it, saying whatever we do I'm

13  going to submit in court.

14      I'm not afraid of that. I'm open to that. Bring it on..

15  Q    Thank you, sir.

16          MR. LEVY:  No more questions.

17          MR. KIPNES:  Your Honor, if I may.

18              FURTHER REDIRECT EXAMINATION

19  BY MR. KIPNES:

20  Q    Do you have EC-16 in front of you? That's the February

21  28th letter from Mr. Ward to Mr. Levy.

22  A    Yes.

23  Q    Let's read together, Mr. Crowley. I'm in the middle of the

24  second paragraph on the first page. "The process was that Mr.

25  Crowley" -- mis-spelled, "drafted Exhibit 19 and sent it to Mr.

Crowley - Further Recross/Godnick                    114

1  Schreiber." Did I read that correctly?

2  A    I drafted it, sent it to Mr. Schreiber.

3  Q    Mr. Schreiber then marked it up and composed the quote,

4  insert, close quote. Did I read that correctly?

5  A    Yes.

6  Q    However, he did not send any of these materials to

7  Crowley, but instead discussed the draft with Mr. Crowley. Did

8  I read that correctly?

9  A    Yes.

10 Q    Does it say that he discussed the insert with Mr. Crowley

11 in this letter, marked Equity Committee Exhibit 16, sent by

12 your lawyer -- one of your lawyers to Mr. Levy?

13 A    It doesn't say anything about the insert being discussed

14 with me.

15         MR. KIPNES:  No further questions from the Trustee.

16         MR. GODNICK:  Your Honor, very briefly?

17              FURTHER RECROSS EXAMINATION

18 BY MR. GODNICK:

19 Q    Mr. Crowley, with regard to EC-8 and EC-10 I think your

20 testimony is very clear that these documents are draft and

21 never were sent to Mr. Feinberg; is that correct?

22 A    Yes.

23 Q    Okay, putting aside the fact that they weren't sent, did

24 you ever discuss with Mr. Feinberg the fact that you had

25 prepared draft documents and were intending on sending them to

B329

Crowley - Further Recross/Godnick                115

1  him?

2  A     No.

3  Q     Okay, you never discussed EC-8 or EC-10 with Mr. Feinberg,

4  correct?

5  A     Or anyone else, just Scott Schreiber.

6  Q     Thank you very much.

7          THE COURT:  All right, than you.  You may step down.

8          THE WITNESS:  Yes, ma'am.

9          MR. KIPNES:  Your Honor, the Trustee would like to

10 move Trustee Exhibit 2 into evidence, please.

11         THE COURT:  Any objection?

12         MR. LEVY:  And I would now like to move the --

13         THE COURT:  Any objections to that?

14         MR. LEVY:  Oh, I'm sorry, I thought -- no objection,

15 Your Honor.

16         THE COURT:  All right, it's admitted.

17         MR. LEVY:  And I would now like to move into evidence

18 the documents on which you withheld a ruling earlier, the May

19 6th letter and the May 8th letter.

20         THE COURT:  Exhibit EC-8 and 10.  Any objections?

21         MR. KIPNES:  No objection, Your Honor.

22         THE COURT:  They're admitted.

23         MR. LEVY:  And did I mark anything else?  And also

24 EC-12 through 16 which were marked during this testimony.

25

Saracco - Direct                                    116

1         MR. KIPNES:  No objection.

2         THE COURT:  Admitted.

3         UNIDENTIFIED ATTORNEY:  Permission to --

4         THE COURT:  Yes.

5         UNIDENTIFIED ATTORNEY:  Thank you.

6         MR. BRESSLER:  The Trustee is going to call Michael

7  Saracco, one of the sequestered witnesses, and Mr. Barkasy will

8  do his examination.

9         THE COURT:  Okay.

10        MR. BRESSLER:  Since I was at one deposition while he

11  was at another one with him.

12        MR. BARKASY:  Your Honor, for his next witness, the

13  Trustee calls Michael Saracco.

14        THE COURT:  All right.

15        Please remain standing.

16        COURT CLERK:  Place your left hand on the Bible.

17  Would you please state your full name and spell your last name

18  for the Court?

19        THE WITNESS:  Michael A. Saracco, S-a-r-a-c-c-o.

20        MICHAEL A. SARACCO, TRUSTEE'S WITNESS, SWORN

21        THE COURT:  Please be seated.

22                    DIRECT EXAMINATION

23  BY MR. BARKASY:

24  Q    Good afternoon, Mr. Saracco.  You work for Coram; is that

25  right?

Saracco - Direct                    117

1  A    Yes, I do.

2  Q    What do you do for Coram?

3  A    I'm currently the president of specialty services and the

4  president of Solunet (phonetic).

5  Q    What are your duties as president of specialty services?

6  A    Specialty services encompasses five strategic business

7  units called SBU's.  The marketing department and Coram's

8  research division are called CTI.  I oversee those divisions.

9  Q    And what do you do with regard to Solunet?

10  A    Solunet is a very new entity that's -- has been formed to

11  -- Coram's pharmacy and distribution network in an effort to

12  see if we can generate some new business by providing pharmacy

13  services to hospitals.

14  Q    Where's your office?

15  A    My office is in the Coram facility on Totowa, New Jersey.

16  Q    To whom do you report on a day-to-day basis?

17  A    Dan Crowley.

18  Q    How long have you been at Coram?

19  A    Well, the way I came to Coram was through the acquisition

20  of Caramark (phonetic).  I joined Caramark in 1982 and

21  continued through various roles and responsibilities through

22  1995, and then Caramark was acquired by Coram, and I continued

23  on since then.

24  Q    What position did you have with Coram in November of 1999

25  when Dan Crowley became CEO?

Saracco - Direct                         118

1   A    I was the area vice president of sales for the northeast.

2   Q    And has Mr. Crowley since promoted you?

3   A    Yes, he has.

4   Q    You worked at Coram for many years before Dan Crowley

5   became CEO, and you've been there the entire time since he's

6   been CEO?

7   A    Yes, sir.

8   Q    Did Mr. Crowley make any changes in the way the company is

9   operated afer he became CEO?

10  A    Well, the initial time that we had met Dan Crowley was

11  when we were summoned to a meeting in the Monica Hotel when he

12  took over.  And he and a few others were brought into the room

13  and introduced by Vito Ponzio.  And a couple of things were

14  rather immediately discussed and we had -- we were advised that

15  immediately -- looked around the room and at that point in time

16  the management group was allowed to have dress-down for those

17  kinds of meetings, and so he immediately said that Coram was in

18  a rather serious situation that needed a serious approach.  So,

19  things that changed was the dress code was changed immediately.

20  Dress-down Fridays at the corporate officer was changed, and he

21  also canceled all vacation.  He said that the senior management

22  group needed to stay focused on the job at hand, and until

23  further notice no vacations would be allowed.

24       On that same day we spent the better part of the day in

25  that meeting.  We needed to introduce ourselves, talk about our

1  responsibilities, give a business update.  And then he went

2  through the various types of information and reporting systems

3  that we ought to know about or understand if we were, in fact,

4  going to be senior executives to run the company.

5  Q    Did Mr. Crowley make any changes in the way the company is

6  managed after that first day?

7  A    Well, we -- you know, he outlined those various activities

8  and kinds of systems that would be put in place, and then from

9  that time on, continually worked and focused on implementing

10 those kind of systems.

11     Some of the immediate changes were the need to be able to

12 understand and get sales information on a much more routine,

13 consistent basis.  And so the early months of him coming in was

14 setting up policies and procedures and systems so that those of

15 us that were responsible to deliver performance and sales for

16 the company would have access to solid information about

17 revenue sales, cost of goods, cash collections.

18     He also implemented a system where he felt that we needed

19 to know how much we had -- how much Coram had in the bank and

20 what our accounts receivable -- I'm sorry, what our accounts

21 payable were.  So, we also began to get access on a daily basis

22 to our cash collections, our cash balance in the bank and what

23 our accounts payable were.

24 Q    How has the financial performance of the company been

25 under Dan Crowley?

1 A    Well, from -- from my perspective it's been rather

2 stellar, really exciting.  When we looked at the performance

3 today or along that process since he joined, there's more cash

4 in the bank today than there was when he got here.  After the

5 former individual left I -- some of the management team then

6 learned that in fact the company had had a credit line, and

7 that credit line was almost completely maxed out.  So, there

8 was almost -- not much cash left to run the company.

9      Our venders today are very happy with us.  And they've

10 been very happy with us through the time period of him coming

11 to the company, because we now pay our bills timely.

12 Previously we had trouble with some of our locations, getting

13 access to drugs and supplies to service our patients, because

14 of our cash flow situation we weren't paying our bills timely.

15 And all of those things have since improved dramatically, been

16 erased, and we just had a phenomenally stellar quality service

17 that we can now present to our customers.

18 Q    What's it like to work for Dan Crowley?

19 A    It's pretty difficult.  It has its days, it has its times.

20 He's a tough manager.  He's very demanding.  There's no such

21 thing as no for an answer.  If he asks you a new question, and

22 there's some information that you didn't previously know, and

23 you should have known, you can say, "I don't know," on one or

24 two occasions, but you need to know your information, you need

25 to know information down to the basis point, and you need to

Saracco - Direct                    121

1  have a strategic plan and operate by that plan.

2       As horrible as that sounds or difficult and challenging as

3  that may sound, the reality is that the group that he has

4  helped succeed has learned a tremendous amount of information

5  and guidance and leadership of how to manage a business from

6  him.

7  Q    How closely does Dan Crowley monitor sales?

8  A    Daily.

9  Q    Does Dan Crowley put any pressure on senior management to

10  increase sales?

11  A    I'm sorry, you know, as I said previously, the reality is

12  that it doesn't matter how well we're doing.  We need to do

13  better.  We need to think of better ways to grow sales.  We

14  need to know how to improve our mix on a daily, monthly, weekly

15  basis.

16       And if we do well, he says, "Hey, you know, good job,

17  thanks, but what are you going to do later today?  What are you

18  going to do tomorrow for us?"  Because Coram has a long way to

19  go.  We've come a very long way, and we're going to continue to

20  success (sic).

21  Q    What is your view as to the impact on the company if Dan

22  Crowley's employment with the company ended?

23  A    Well, you know, having been in home infusion for twenty

24  years, fortunately or unfortunately I have been through a

25  significant number of changes in management, large numbers of

1  changes at Caramark, and then now followed on through Coram.

2  And so when you watch what happens to change personally, my

3  perspective, is that there's two things that happen.  There's

4  an internal impact and there's an external impact.

5       The external customer only sees the company through the

6  internal employees and staff.  And so I can tell you that with

7  almost every change that's happened in the previous companies

8  and through the previous management of CEO's and executives

9  above me, that there's fallout.  And the fallout begins slowly

10 the first few weeks or months, and then it begins to snowball

11 because the competition -- this is a very, very, very

12 competitive industry.  It's a very difficult industry to find

13 patients and manage patients effectively, and so any changes in

14 managing the company that could impact the quality of the

15 service or the relationships with vendors and suppliers or the

16 stability in the marketplace is deemed very negative.

17      And so, I would be very concerned about the fallout that

18 would impend in the potential reversal of the success that

19 we've had now with 18 consecutive months of revenue and EBITDA

20 growth.

21 Q    Mr. Saracco, are you aware that a Chapter 11 Trustee has

22 been appointed in this bankruptcy cases?

23 A    Absolutely.

24 Q    And do you know who that is?

25 A    That's Judge Adams.

Saracco - Direct                    123

1  Q    All right.  Have you had the opportunity to meet Judge

2  Adams?

3  A    I met Judge Adams on two occasions, at -- in our corporate

4  offices for our corporate management meetings, and then also

5  along that period of time it was determined that it would

6  really be beneficial for the judge to physically visit a Coram

7  location, see either singularly or in multiple.  And so not

8  only did we meet after two corporate meetings, but then I had

9  the pleasure of escorting Judge Adams along with our senior

10  vice president of operations John Ellis to spend a day at the

11  Malvern Philadelphia -- I'm sorry, the Malvern, Pennsylvania

12  facility.

13       At the facility there he spent the day with myself and

14  other senior executives as well as the branch management staff,

15  which would be branch manager, pharmacy manager, nurse manager.

16  The group made some presentations about the business and the

17  operation, the kinds of patients we serve.  Then the judge took

18  a tour of the facility, and in that facility is also housed our

19  blood products division treating very severely ill, factor or

20  hemophilia patients, and there was a whole separate section of

21  time that the judge spent with the hemophilia group also,

22  learning about that business.

23  Q    Have you had any private meetings with the Trustee?

24  A    Yes, I have.  One of the things that the judge announced

25  at his very first visit was that he was there to learn and

Saracco - Direct                                    124

1  understand the business, to evaluate what it was and who it

2  was, and so not only did he spend time in these group meetings,

3  but at each and every meeting he offered and set aside a

4  specific time for anyone of the group or anyone else that

5  wanted to visit with him and ask any questions that they might

6  of he about any issue whatsoever, and that was done privately

7  and separately from the group.  And he made that offer and in

8  fact did that on multiple occasions.

9  Q      And you met privately with the trustee?

10 A      Yes, I did.

11 Q      Did you discuss with Judge Adams what you thought would

12 happen to Coram if Mr. Crowley was no longer employed by Coram?

13 A      I did do that.

14 Q      And what did you tell Judge Adams?

15 A      Well, I availed myself of his offer to meet privately.

16 Personally I felt I had invested a significant number of years

17 on my personal career in our company, and I wanted to

18 understand what might be happening in the future.  And I also

19 wanted him to understand that personally, from my perspective,

20 having worked directly or indirectly with a large number of

21 senior management folks above me, that quite honestly this guy

22 was doing a really good job.  And I wanted to understand what

23 was going to be the process moving forward, because the team

24 had worked really hard together with Dan Crowley to bring this

25 thing forward and improve it, and I had not been through a

Saracco - Cross/Tomashefsky                          125

1  bankruptcy before, and I wanted to understand what was going to

2  happen.

3       And I told him that personally -- I wasn't speaking for

4  large numbers of folks, but with my twenty years experience, I

5  would be very worried and concerned if, in fact, the leadership

6  was going to change once again, causing those of us who really

7  dedicate significant hours to managing this business, that we

8  would have to rebuild it once again, and I would really be very

9  disappointed if that would happen.

10  Q    Thank you, Mr. Saracco.

11  A    Okay.

12            THE COURT:   Cross?

13            MR. TOMASHEFSKY:   Thank you, Your Honor.

14                    CROSS EXAMINATION

15  BY MR. TOMASHEFSKY:

16  Q    Mr. Saracco, you said that among the things -- the changes

17  that Mr. Crowley made were that he put in some sales

18  information systems, some accounts receivable, reporting

19  systems and some cash reporting systems; is that right?

20  A    Yes, sir.

21  Q    And now those systems are in place, correct?

22  A    Yes, sir.

23  Q    And you have no reason to believe those systems would

24  simply fall apart if Mr. Crowley were no longer in the company;

25  is that right?

Saracco - Cross/Tomashefsky                 126

1  A    That's right.

2  Q    Okay.  Now, I think you said you reported directly to Mr.

3  Crowley; is that right?

4  A    Yes.

5  Q    Okay, and Mr. Crowley handles your annual merit review?

6  A    Yes, he does.

7  Q    Okay, and Mr. Crowley decides what your salary is; is that

8  right?

9  A    Yes, he does.

10  Q    Okay, in January -- well, at the time Mr. Crowley became

11  CEO, your salary was $157,000 a year; is that right?

12  A    Yes, sir.

13  Q    Okay, and in January of 2000, shortly after Mr. Crowley

14  took over, you received a $43,000 raise.

15  A    Yes, I did.

16  Q    Okay.

17  A    That was -- that was a merit change that was instituted

18  from a commitment that was made by Rick Smith, the former CEO,

19  that had never been fulfilled with Mr. Smith's decision to

20  leave the company.

21  Q    And Mr. Crowley decided to fulfill it.

22  A    Mr. Crowley learned of the promise that Mr. Smith had made

23  to me for assuming a new responsibility, managing the nutrition

24  business of Coram, which is Coram's most important business.

25  Then when he learned of that, I voiced that through Vito

B341

Saracco - Cross/Tomashefsky                    127

1  Ponzio, and subsequently, eventually learned that that, in

2  fact, was true, and then my salary was brought up to Mr.

3  Smith's commitment.

4  Q    Mr. Crowley went along with that.

5  A    Yes.

6  Q    Okay, and your current salary three years later is

7  $290,000 a year, right?

8  A    Yes, sir.

9  Q    Okay, and that's 90,000 more than it was in January of

10  2000.

11  A    Yes, sir.

12  Q    Okay.  Now, I --

13  A    Since that time I've picked up -- I've assumed

14  responsibility for two more divisions, the CTI Research

15  Division as well as the marketing group.  Previously Coram did

16  not have a marketing department.  And so the ability to help

17  the field sales group grow it's business is improved by having

18  a marketing department.  So, I assumed another two divisions,

19  the research group, the marketing department, and another --

20  approximately four direct reports.

21  Q    Um-hum.  And Mr. Crowley is responsible for giving you all

22  that new -- those new responsibilities; is that right?

23  A    Um-hum.

24  Q    Okay.

25  A    He gives more responsibilities to people who perform well.

Saracco - Cross/Tomashefsky                    128

1  Q    At least he's done that in your case.

2  A    Thank you.

3  Q    Now, I think you said before Mr. Crowley became the CEO

4  you were out in the field as an area vice president in the

5  east?

6  A    Yes, sir.

7  Q    Okay, and as a field person you really didn't have a full

8  picture of everything that was going on in Coram's finances;

9  would that be true?

10  A    That's true.

11  Q    Okay.  And to the extent you then came into the full

12  picture later, that was largely because of information that you

13  received from Mr. Crowley; is that right?

14  A    I'm sorry?  I don't understand the question.

15  Q    To the extent you later, after Mr. Crowley came on board,

16  learned more about Coram's historical past performance, that

17  information came to you largely from Mr. Crowley; is that

18  right?

19  A    That came to us through now being included in the meetings

20  of the rest of the management team who managed the corporation,

21  meaning the CFO, president contracting, marketing.  Information

22  is distributed, reviewed, analyzed and evaluated now to

23  everyone in the organization.  And today that information -- if

24  I were to use a similar scenario, comparing today to

25  previously, today in my -- if I was in my old role today I

Saracco - Cross/Tomashefsky                129

1  would be knowing and learning the information from the

2  corporate group that historically you only learned as a very,

3  very senior executive.

4  Q    All right, but what information that you have today about

5  Coram's performance before Mr. Crowley was not information you

6  had received contemporaneously; it was only information you

7  received later from other people secondhand; is that right?

8  A    Not -- I'm not clear on the question.

9  Q    You were not in the information flow for the whole company

10  until after Mr. Crowley became CEO; is that correct?

11  A    That's correct.

12  Q    Now, I know you view Mr. Crowley as having done a good job

13  for the company, and I know you've expressed some concern that

14  if Mr. Crowley were to leave that there would be some de-

15  stabilization in the company; is that right?

16  A    Yes, sir.

17  Q    Okay.  It's true, isn't it though, that you can't recall

18  the name or tell me the name of a single employee who has told

19  you -- a single Coram employee who has told you that they would

20  be concerned if Mr. Crowley left the company, the name?

21  A    When you and I spoke about that, you're correct, I had

22  said that to you.

23  Q    And that was on Friday.

24  A    That was on Friday.  And the situation is the fact that

25  staff become very concerned and were very concerned in the

1  initial year, year and a half, because things were not

2  improving yet.  The questions have stopped and have declined in

3  this last year and a half when things have been very well

4  directed, very focused and that we have a plan.

5  Q    But there was some concern in late 2002, because people

6  knew that Mr. Crowley's contract was up at that point, right?

7  A    (No verbal response)

8  Q    Mr. Crowley's original contract expired?

9  A    Yes, sir.

10 Q    Okay, and my question is, and I think your answer is yes,

11 is that you cannot tell me the name of a single Coram employee

12 who has said to you that they would be concerned if Mr. Crowley

13 were to leave the company.  That's correct, right?

14 A    We had said that.  And I would also say to you that --

15 Q    I think that's your answer.

16 A    Well, but --

17        MR. TOMASHEFSKY:  Move to strike.  It's beyond the

18 scope of the question.

19        THE COURT:  Well, he's answered.  He can explain --

20 he can explain his answer.  You may.

21        MR. TOMASHEFSKY:  All right.

22        THE WITNESS:  Thank you, Your Honor.

23        THE COURT:  Anything further?

24        THE WITNESS:  Well, I would just want to say that

25 after managing the folks for twenty years, I think you also

Saracco - Cross/Tomashefsky                    131

1  have to be concerned and aware of the things that your staff

2  doesn't say to you.

3  BY MR. TOMASHEFSKY:

4  Q    That about covers the whole ball of wax.  If Mr. Crowley

5  is terminated or leaves Coram for some reason, Mr. Ponzio, it's

6  fair to say you personally haven't made up your mind what you

7  would do.

8  A    I'm Michael Saracco.

9  Q    Mr. Saracco.

10  A    That's okay, we both have Italian last names.  Would you

11  ask the question again, please?

12  Q    Yes, if Mr. Crowley leaves Coram, it's fair to say you

13  personally have not made up your mind about what you would do.

14  A    No, I shared with you on Friday that I really cannot tell

15  you that I would want to go through another change, so I -- you

16  asked me if I would stay, and I told you I can't tell you that

17  I would want to do that again.

18  Q    No, what I asked you is you haven't made up your mind

19  about what you would do if Mr. Crowley were to leave the

20  company.

21  A    And I think I said I would have to think long and hard

22  about that.

23  Q    Well, that's not exactly what you did say.  As -- in your

24  deposition I asked you, Page 63 to 64 of your deposition.

25       "If Mr. Crowley quits or is terminated for Coram --"

Saracco - Cross/Tomashefsky                    132

1 A    Um-hum.

2 Q    --" is it your feeling that you would quit as well?

3      And you said, "First of all, I certainly would hope that

4 would not happen.  Someone who's dedicated a significant

5 portion of his life, the commission to helping people better at

6 home, in the hospital, from personal perspective, he made a

7 difference in who we are today.  If he were not here, that's

8 something I would have to sit back and think about personally."

9      And then I said, "You haven't come to any conclusions on

10 that score yourself as of today; is that right?"

11     Your answer, "That's right.  I really -- you may think I'm

12 just a pie in the sky kind of guy.  I don't spend a lot of time

13 thinking about competition or those kinds of issues."

14 A    Um-hum.

15 Q    "I spend my time focusing on things I'm responsible for" -

16 -

17 A    Um-hum.

18 Q    -- "in the company."  That's what you testified.

19 A    Okay.

20 Q    And, indeed, in your career Mr. Ponzio -- excuse me, Mr.

21 Saracco.

22 A    It's okay.

23 Q    You've been through a lot of changes, and you've survived

24 them, haven't you?

25 A    Um-hum.  There's a difference, though, surviving them in

Saracco - Redirect                133

1 your thirties and forties and thinking about doing something

2 like that again.  And so that's why I share with you, I could

3 not -- if you ask me today, I could not tell you what would

4 happen if a change was made with Dan Crowley.

5 Q     And you haven't told the Trustee what would happen,

6 either.

7 A     No.

8 Q     Thank you.

                    REDIRECT EXAMINATION

10 BY MR. BARKASY:

11 Q     Mr. Saracco, when you just answered that last question I

12 took it to mean, and tell me if you disagree with me that you

13 haven't told the Trustee whether or not you would leave the

14 company because Dan Crowley was no longer with the company.

15 A     We don't have those kinds of conversations, because in my

16 world people that do a good job aren't left to leave -- I'm

17 sorry, aren't asked to leave.

18     So, when I think about and look at what Dan Crowley's done

19 for Coram Healthcare, I can't even imagine that there would be

20 a reason that he wouldn't be here, because he's done the most

21 stellar job of any CEO, and I've probably reported directly or

22 indirectly to six or seven folks.

23     So, I'm under oath, and I'm being extremely honest.  I

24 don't think about talking to the judge about what happens if a

25 certain person leaves.  If it happens, myself and significant

Saracco - Redirect                        134

1  other people will have to make a hard decision, but the judge

2  and I have not spoken about that.

3  Q    Are you concerned as to whether people who report to you

4  might consider leaving if Dan Crowley's employment is

5  terminated?

6  A    Absolutely.

7  Q    And what do you base that on, other than a conversation

8  with one of those folks who comes to you and says, "If Dan

9  Crowley's employment's terminated, I'm going to leave"?  What

10 do you base it on?

11         MR. TOMASHEFSKY:  Object to the form of the question,

12 Your Honor.

13         THE COURT:  Overruled.  You can answer.

14         THE WITNESS:  Thank you.

15         I base it on thirty-two years in health care, twenty

16 years managing people, and as I said earlier to the gentleman,

17 if you manage your staff and you know them well, and you're

18 tightly working on your strategic plan, etcetera, etcetera, you

19 need to, also, many times know what they're thinking when they

20 don't say it, but you understand who they are, what they are

21 and what they think about.

22         Clinical and operational people in this business have

23 a concern about consistent, continued leadership, and so do the

24 folks who trust you to refer those patients.  When those

25 changes occur, you lose business, you lose momentum, you lost

Saracco - Redirect                                      135

1  trust and faith.  So, the folks who sent you those patients

2  stop referring, and your staff gets concerned, and there's a

3  very high demand for nurses and pharmacists in hospitals and in

4  this kind of business.  They have no problem making a move very

5  quickly onto a new entity or new organization that's not going

6  through a bunch of strife or new changes or problems.

7           So, personally, without asking them, I don't need to

8  ask them.  I've watched our turnover rate escalate and decline

9  based upon the longevity and the leadership and direction of

10 the CEO or leader of a company.

11          People have had a lot of change.  If you do it again,

12 or if it occurs again, you will lose people.  Can I tell you

13 who and how many?  No, I don't need to.  I can tell you about

14 turnover rates and what happens when management changes.

15 BY MR. BARKASY:

16 Q   Mr. Saracco, do you have any understanding as to whether

17 the Chapter 11 Trustee reviews the terms and conditions of your

18 employment, such as your compensation?

19 A   I understand that since we have had a Trustee come in,

20 that it is his responsibility for the changes or payments that

21 are -- that are made to us.  I also understand that if any

22 changes in employment were to be made he would have to approve

23 that.

24 Q   Thank you, Mr. Saracco.

25          THE COURT:  All right, thank you.  Thank you, you may