Meyer - Direct                                    136

1  step down.

2          THE WITNESS:  Thank you, Your Honor.

3          MR. BARKASY:  Your Honor, for his next witness, the

4  Trustee will call Deborah Meyer.

5          THE COURT:  Just for planning purposes, how many

6  other witnesses does the Trustee have?

7          MR. BARKASY:  We have three witnesses, Ms. Meyer, Mr.

8  Ponzio, who will be about ten minutes on direct, each, and Mr.

9  Victor, who will not be much longer than that.

10         THE COURT:  And the Equity Committee?

11         MR. LEVY:  No one.

12         THE COURT:  All right, thank you.  You may step

13 forward and please remain standing so you can be sworn in.

14         COURT CLERK:  Place your hand on the Bible.  Please

15 state your full name and spell your last.

16         THE WITNESS:  Deborah Marie Meyer, M-e-y-e-r.

17         DEBORAH MEYER, TRUSTEE'S WITNESS, SWORN

18         COURT CLERK:  Please be seated.

19                 DIRECT EXAMINATION

20 BY MR. BARKASY:

21 Q    Good afternoon, Ms. Meyer.  You work for Coram, correct?

22 A    Yes.

23 Q    What do you do for Coram?

24 A    I'm the senior vice president of field sales.

25 Q    And what are your duties as senior vice president of field

Meyer - Direct                                137

1  sales?

2  A    To provide strategic leadership to the sales force and to

3  have strategic planning to grow top line.

4  Q    Where's your office?

5  A    Denver, Colorado.

6  Q    Even though your office is in Denver, do you travel at all

7  as part of your job?

8  A    At least fifty percent of the time I travel.

9  Q    And what is it you do when you travel?

10 A    Several things.  I see customers, I will meet with

11 individual branches and do sales office meetings.  I will do

12 strategic planning with individual regions.

13 Q    To whom do you report on a day-to-day basis?

14 A    Dan Crowley.

15 Q    How long have you been with Coram?

16 A    Well, actually in 1988 I started with a company called

17 Caravan Medical Systems and started as a infusion nurse.   I

18 went out in the field seeing patients, and then five years

19 later Caravan Medical Systems was part of the consolidation

20 that was created in the forming of Coram Healthcare.

21 Q    When did you become senior vice president of field sales?

22 A    August 1st, 2000.

23 Q    What position did you have before that?

24 A    Area vice president of sales.

25 Q    Was it Mr. Crowley that promoted you?

Meyer - Direct                    138

1  A    Yes.

2  Q    And is that the position that you had when Mr. Crowley

3  became CEO in November of 1999?

4  A    Area vice president?

5  Q    Yes.

6  A    Yes.

7  Q    How did the company change after Mr. Crowley became CEO?

8  A    Well, when Mr. Crowley became CEO there was a fairly quick

9  change, I would say, in vision or clear vision for the company.

10      Pretty immediately we had a meeting, and it was very clear

11 at that point that Dan felt that there was a clear, concise way

12 to be able to create a healthier Coram, and it still stands

13 today.  It's grow the top line, cut costs, wear it out, do

14 without and collect the cash.  And that's really the focus that

15 we have from a financial standpoint for the company at the

16 beginning, and that still holds true for today as well.

17 Q    How have sales been under Mr. Crowley's tenure as CEO?

18 A    Well, preliminary for February we've just completed the

19 eighteenth month of top-line growth, month over month.  So, we

20 have had solid growth for the last eighteen months.

21 Q    Ms. Meyer, what is it like to work with Dan Crowley on a

22 day-to-day basis?

23 A    Intense.  He's -- he expects a lot from you.  Working with

24 him and for him, he expects a lot of himself, but in working

25 for Dan Crowley you have to be very committed.  You have to

1  understand what you do, and you have to do it well.

2  Q    How closely does Mr. Crowley work with you to track sales?

3  A    I talk to him pretty much on a daily basis.  The routine

4  is I call him in the morning once I get the sales, and we

5  basically -- we talk about the daily sales, but we basically

6  start with the northeast and work our way over to California.

7  So, we go region by region as far as how they're doing, where

8  they are to budget, any opportunities, anything that'll get in

9  the way of making their budget for the month.

10 Q    And you do that every day?

11 A    I would say mostly every day.  Four out of five days at

12 the last.

13 Q    Have you given any thought to what might happen if Dan

14 Crowley's employment was terminated?

15 A    I have, because I think off and on throughout the

16 reorganization there's been rumors that have come and gone, so

17 I have given it thought.  And I would be concerned, just

18 because I've been here for so long, and I think the stability

19 and the trust that people have -- when I say the people, I mean

20 the employees of Coram.  The trust that they have and the

21 confidence they have in Dan's leadership and the confidence

22 they have in Coram today is the strongest that I have seen it,

23 and I would be worried that that would change.

24 Q    Would Mr. Crowley's departure have any impact on your

25 thoughts about your own career plans?

Meyer - Direct                                      140

1  A    I guess I would go back to your last question.  I would be

2  concerned of what Coram would look like.  And I would be

3  concerned about the opportunity that would give our competitors

4  on the field.

5  Q    You are aware that a Chapter 11 Trustee's been appointed

6  in this bankruptcy case?

7  A    Yes.

8  Q    And you know that trustee is Judge Adams?

9  A    Yes.

10 Q    Have you met Judge Adams?

11 A    Yes, I have.

12 Q    And in what context?

13 A    Three different occasions.  He has been in Denver at

14 senior management meetings, and I've had the opportunity to do

15 a presentation in reference to field sales to Judge Adams.

16 Q    What happens at those management meetings, other than your

17 presentation?

18 A    Judge Adams has given a book which encompasses the whole

19 presentation.  Dan Crowley starts off the presentation with an

20 overview of the company.  I think on the initial meeting he did

21 a history of the company, and then talked about the financial

22 situation we were in with each of the meetings.  Then each of

23 us with our individual departments, individual

24 responsibilities, would go over the initiatives.  A little bit

25 different at every meeting, but we would go over the

Meyer - Cross/Tomashefsky                    141

1   initiatives that we were working on for our department.

2        I know the first time I had an overhead that had really a

3   look at the daily sales and compared it month over month to the

4   year previous to that.

5   Q    Thank you.  I don't have any further questions.

6                        CROSS EXAMINATION

7   BY MR. TOMASHEFSKY:

8   Q    Before Mr. -- you had worked for Coram, Ms. Meyer, when

9   Rick Smit was the CEO, correct?

10  A    Correct.

11  Q    Okay, and when you heard that -- and Mr. Smith left Coram

12  and was replaced by Mr. Crowley; is that right?

13  A    Correct.

14  Q    And when you heard that one CEO had left and another was

15  going to be joining, at that time in 1999, you took a wait and

16  see attitude; is that right?

17  A    That's correct.

18  Q    Okay, and if Mr. Crowley were to leave Coram today there's

19  no reason why you wouldn't also take a wait and see attitude

20  depending on who comes in to replace him; isn't that right?

21  A    I think the situation's a little bit different in that I

22  would also look at -- I would look at the situation as it is.

23  I'm still very confident in what I do in the industry and for

24  the company.  The difference would be the instability that that

25  might create for the company, and that would, I think, would be

Meyer - Cross/Tomashefsky                    142

1    a different challenge than what we had when we had a transition

2    from Rick Smith to Dan Crowley, because we didn't have the -- I

3    know it sounds strange -- stability in the middle of a

4    reorganization, but I'm out in the field a lot, so I see -- I

5    see the kinds of morale that's going on in the company.

6         It's a different level of enthusiasm, a different level of

7    morale today than that transition that happened with Rick to

8    Mr. Crowley.

9    Q    But what the effect on the morale would be would depend,

10   to some extent, wouldn't it, on who the replacement for Mr.

11   Crowley is, wouldn't it?

12   A    Yes, except that I would also say on that, that whatever

13   the moment is, I think that the competitors would probably

14   enjoy that moment, whether they saw it a moment of weakness or

15   whatever, and I think that would be a challenge for us to try

16   to -- try to keep the momentum going during that timeframe,

17   whatever it may be.

18   Q    But you have no reason to believe that that's a challenge

19   that it would be impossible to overcome, do you?

20   A    I would certainly try to overcome it, but I will tell you

21   that they -- the competitors have certainly enjoyed whatever

22   they can do to try to disrupt what we've created over the last

23   couple years, and I believe that they would enjoy that moment

24   of transition as well.

25   Q    All right, your area of responsibility, Ms. Meyers, is

Meyer - Cross/Tomashefsky                    143

1  principally sales; is that right?

2  A    Correct.

3  Q    Now, it's true to say that you have never had any conversa

4  -- any discussions with any customers of Coram about what their

5  reaction might be if Mr. Crowley were no longer with the

6  company; is that right?

7  A    That's correct.

8  Q    Okay, and you've also never had any conversations with any

9  suppliers of Coram about what their reaction might be if Mr.

10 Crowley were to leave the company; is that right?

11 A    That's correct.

12 Q    Okay.  And it is true, Ms. Meyer, that Mr. Crowley is

13 principally responsible for setting your salary?

14 A    Yes, although I don't know -- I think today it's more the

15 responsibility of Mr. Crowley as well as Judge Adams.

16 Q    All right, but on January 1st, 2000 shortly after Mr.

17 Crowley took over as CEO, you received a raise of $30,000 a

18 year from him, right?

19 A    Correct.

20 Q    Okay.  And you've received additional responsibility in

21 the company from Mr. Crowley when you were promoted in August

22 of 2000, right?

23 A    Correct.

24 Q    That was before a Trustee was appointed.

25 A    Yes.

Meyer - Redirect                                    144

1  Q    And by the way, when you were -- before you were promoted

2  to senior vice president your area was Midwest sales; is that

3  right?

4  A    Midwest -- the actual terminology was the tundra region.

5  Q    'Cause it was Midwest and north.

6  A    I had North Dakota.  No -- I guess it means open big space

7  or something like that.

8  Q    Um-hum.  And would it be fair to say that at that time,

9  until you became senior vice president, you didn't have an

10  overall view of what Coram's financial picture was; is that

11  right?

12  A    That is correct.

13  Q    Your only perception at that time was that your area was

14  very successful, correct?

15  A    Correct.

16  Q    Thank you.  No further questions.

17           THE COURT:  Redirect?

18                    REDIRECT EXAMINATION

19  BY MR. BARKASY:

20  Q    If Mr. Crowley's employment ended -- with Coram ended

21  today, is it your view that you would have a significant

22  problem in holding together the managers and sales staff that

23  report to you?

24  A    Yes, I do believe I would, because even today I

25  continually deal with employees calling me direct, whether it

Meyer - Redirect                                    145

1   be an area vice president, regional vice president or even some

2   sales people will call me and just openly say, you know, "Are

3   things going to be okay?  I just heard somebody through this

4   recruiter that this is going on in the company, and you know, I

5   have an opportunity to go here or wherever," so I can give them

6   the reassurance that things are okay today.  I can't give them

7   the reassurance that Dan will be here, 'cause that's not in my

8   control, but I have had many calls throughout the course of the

9   reorganization, and some I've lost.

10       I mean, some people have chosen to go to a competitor,

11  because they don't like the unknown or whatever it may be.  But

12  for the most part I've been able to build a very strong team

13  through the course of these last couple of years, and I don't

14  think I should take all the credit, because I think as well as

15  myself, Dan has spent the time to educate, not only myself,

16  area, regional and in many case the orientation groups that

17  come through Denver on really kind of a business 101, 201.

18  Q    Thank you.  I don't have anything further.

19            THE COURT:  I have a question.

20            THE WITNESS:  Yes.

21            THE COURT:  Do you know why a Trustee was appointed?

22            THE WITNESS:  Do I know why a Trustee was appointed?

23  I believe a Trustee was appointed because there was the feeling

24  that there was a conflict with Dan Crowley, and service.  And

25  so there was a -- for that reason chosen to have a Trustee

Ponzio - Direct                           146

1  appointed to help with the running of the company.

2            THE COURT:  All right.  Thank you.

3            MR. BARKASY:  Go up there and get sworn in.  Wait to

4  sit down.

5            THE COURT:  Please remain standing.

6            COURT CLERK:  Place your left and on the Bible.

7  State your full name and spell your last name for the Court.

8            THE WITNESS:  Vito Ponzio, Jr, P, as in Paul, o-n-z,

9  as in zebra, i-o.

10             VITO PONZIO, TRUSTEE'S WITNESS, SWORN

11            COURT CLERK:  Please be seated.

12                    DIRECT EXAMINATION

13  BY MR. BARKASY:

14  Q    Mr. Ponzio, you work for Coram; is that right?

15  A    Yes, sir, that's correct.

16  Q    And what do you do for Coram?

17  A    I'm the senior vice president of Human Resources.

18  Q    And what are your duties?

19  A    My duties encompass all of the human resource function,

20  benefits, training, compensation, employee organizational

21  development.

22  Q    Where's your office?

23  A    In Denver, Colorado.

24  Q    To whom do you report on a day-to-day basis?

25  A    I report to Mr. Alan Maravito, the executive vice

B361

Ponzio - Direct                          147

1  president of the company.

2  Q    How long have you been with Coram?

3  A    I've been with Coram since 1990, a little over twelve

4  years.

5  Q    How long have you worked -- and some of that time was for

6  a predecessor of Coram?

7  A    That's correct.  I've been with Coram since its inception

8  in 1994.

9  Q    How long have you worked in human resources in general?

10  A    Since 1976, 27 years.

11  Q    Were you senior vice president of human resources at the

12  time Dan Crowley became CEO in November of 1999?

13  A    I was in that role at that time, yes.

14  Q    And to whom did you report before Dan Crowley became CEO?

15  A    I reported to Don Emeral, the former chairman, and Rick

16  Smith, the president and CEO.

17  Q    Has Mr. Crowley made changes in the way the company is

18  operated, as CEO?

19  A    Yes.  Yes, when Mr. Crowley first came in the organization

20  we were more of a virtual company in that many of our officers

21  were scattered throughout the country rather than being based

22  in Denver.  Mr. Crowley began an initiative to bring the

23  corporate office to Denver.  Some of the individuals chose not

24  to come to Denver, so there was some movement in some of our

25  senior positions.

1    He also began holding us much more accountable to our

2  roles in much more of a communicative style in terms of what we

3  knew about the business, about sales, about operations, about

4  cash, and began communicating on a regular basis with the

5  employees.

6  Q    Is one of your responsibilities as senior vice president

7  of human resources to monitor employee morale?

8  A    That's correct.

9  Q    Have the changes that Mr. Crowley has brought to the

10  company had any impact on employee morale?

11  A    There's been many changes, yes.  The company -- the

12  employees felt during the time prior to Mr. Crowley of a sense

13  of uncertainty, a sense of job security.  Mr. Crowley, with his

14  communication styles, with his employee letters began a

15  campaign to keep the employees informed.  And as the company

16  stated to improve and as that word got out there in terms of

17  our sales performance, in terms of our operational performance,

18  employee morale started to improve and our retention, our

19  turnover started to decrease, because there was more of a sense

20  that we would be a viable ongoing company.

21  Q    As part of your duties, do you monitor employee turnover?

22  A    Yes, we do.

23  Q    What has happened to employee turnover under Mr. Crowley?

24  A    Our employee turnover has decreased under Mr. Crowley, and

25  that's fairly significant because of the shortage of

Ponzio - Direct                                    149

1  clinicians.  It's vital that we retain our employees

2  consistently.  And our turnover rate has decreased over the

3  last three years.

4  Q    Has Mr. Crowley done anything to change the corporate

5  culture at Coram?

6  A    The corporate culture is one of -- yes, he has.  I'm

7  sorry, to answer the question.

8  Q    And how has he changed the corporate culture?

9  A    In terms of communication, in terms of from a senior

10  level, a much more accountable, much more demanding role for

11  those of us in senior positions.  A culture of mentoring.  He's

12  very good at bringing his direct reports to higher levels and

13  just in general, again, the communication style to keep the

14  employees informed.

15  Q    What are your views as to what might happen at the company

16  if Mr. Crowley's employment was terminated?

17  A    Our company's been through a lot in the seven years that

18  it's been an organization and some of the predecessor

19  companies.  Our employees believe that we have a very stable

20  company today.  I think if there was a change that the general

21  consensus would be, "What does that mean again?"

22       It would be harmful to the company.  It would be

23  disruptive to the company, because there is a sense that Mr. --

24  amongst the employees that Mr. Crowley has done a very good job

25  for the company.

Ponzio - Direct                                    150

1   This would just be another disruption that 1 don't believe

2   the company would be able to withstand.

3   Q    Are Coram employees the subject of regular recruiting

4   efforts by competitors and -- or headhunters?

5   A    At all levels, yes, they are.  I think as I mentioned

6   earlier, there is a shortage of nurses and pharmacists and

7   there is a shortage of infusion experts, because it's a small

8   industry.  The people at Coram and the employees at Coram are

9   known to be the experts, and so the competitors try to lure our

10  employees all the time.

11  Q    In your view, would those recruiting efforts increase if

12  Mr. Crowley's employment was terminated?

13  A    Absolutely.

14  Q    Why do you think that?

15  A    I think, again, the competitors, the recruiters, would

16  seize the opportunity to try and disrupt the company, to try

17  and disrupt sales, and would just as they have been in the

18  past, would tout the fact that you don't know the future at

19  Coram.  You do know the future of X company.

20  Q    Would you stay at Coram if Mr. Crowley left?

21  A    I would have to consider my options.

22  Q    I take it from your testimony so far you think it would be

23  a good idea for Mr. Crowley to stay at Coram.

24  A    I think it would be a very good idea for Mr. Crowley to

25  stay at Coram.

Ponzio - Direct                                          151

1  Q    Are you aware of the reasons why the first two plans of

2  reorganization submitted by the debtors in this case were not

3  confirmed?

4  A    Yes, I am.

5  Q    And what is your understanding as to the reason?

6  A    My understanding that there was a conflict that Mr.

7  Crowley may have had with one of our lenders and something that

8  was not disclosed.

9  Q    Does that change your view as to whether it would be a

10 very good idea for Mr. Crowley to remain at Coram?

11 A    The way Mr. Crowley has run the company has not faltered,

12 no.

13 Q    You mentioned that you worked and reported to both Don

14 Emeral and Rick Smith.  How does Mr. Crowley's leadership of

15 Coram compare to that of Rick Smith and Don Emeral?

16 A    They really don't compare.  Mr. Emeralal was on a

17 different mission.  His mission was to try and sell the

18 company.  Rick Smith was young and inexperienced in his role.

19     Mr. Crowley is a very tenured manager, very experienced

20 manager who has communicated with us, communicated with the

21 employees, is very demanding in what he expects us to do in our

22 roles.

23 Q    In your view, is there anybody currently in senior

24 management that could seamlessly replace Mr. Crowley?

25 A    I do not believe so, no.

Ponzio - Direct                              152

1  Q    Have you met the Chapter 11 trustee, Judge Adams?

2  A    Yes, sir, I have.

3  Q    What occasioned you to meet with Judge Adams?

4  A    I've met with Judge Adams on his several visits to the

5  Denver corporate office when we were updating the judge and

6  giving him an overview of the company's operations, either from

7  his first visit or from his subsequent visits, how we've done

8  since those visits.

9  Q    Did you have any private discussions with the Trustee

10 about how Coram was doing while the judge was in Denver?

11 A    Yes, I did.  I had the opportunity, actually, to pick up

12 Judge Adams and transport him to the corporate office.  And it

13 was during that ride that we said -- he asked how the company

14 was doing, and I personally said the company is really doing

15 well.

16          MR. BARKASY:  I don't have any further questions.

17          MR. TOMASHEFSKY:  Your Honor?

18          THE COURT:  You may.  Speak into the microphone,

19 though, if you wish to be heard.

20          MR. BEATIE:  Your Honor, I think we're nearing the

21 end, but would it be appropriate now to take a brief recess?  I

22 have some matters on behalf of Mr. Feinberg that I need to

23 consider.

24          THE COURT:  All right.

25          MR. BEATIE:  If that's convenient for the Court.

Ponzio - Cross/Tomashefsky                    153

1          THE COURT:  All right, et's take a ten minute recess.

2          All right.  He's not under cross, so you may speak

3    with your counsel if you need to.

4        (Recess)

5          MR. TOMASHEFSKY:  May I proceed?

6          THE COURT:  You may.

7                         CROSS EXAMINATION

8    BY MR. TOMASHEFSKY:

9    Q    Mr. Ponzio, in your capacity as human resources senior

10   vice president at Coram you have discussed with Mr. Crowley at

11   least at some level the negotiations he'd been having with the

12   Trustee to extend his contract, haven't you?

13   A    Yes, sir, that's correct.

14   Q    And you're aware that his contract extension is only for

15   another four months now, 'til the end of June, right?

16   A    That's correct.

17   Q    That's --

18   A    That's what I understand.

19   Q    -- the only commitment Mr. Crowley has made to Coram thus

20   far.

21   A    That's my understanding.

22   Q    And others in senior management know that Mr. Crowley's

23   commitment to Coram at this point is only another four months.

24   A    That's correct.

25   Q    In fact, it's public information, because it's been filed

Ponzio - Cross/Tomashefsky                    154

1  with the Court that Mr. Crowley's commitment to Coram is only

2  another four months.

3  A    That's correct.

4  Q    And that hasn't had a tremendous de-stabilizing effect on

5  Coram as you sit here today, correct?

6  A    That's correct.

7  Q    Now, you mentioned, Mr. Ponzio, that employee morale has

8  improved considerably at Coram since Mr. Crowley took over; is

9  that right?

10 A    Yes, sir.

11 Q    Now, Coram did an employee satisfaction survey some time

12 ago that you helped administer, didn't you?

13 A    That's also correct.

14 Q    And that was about three years ago?

15 A    December of 2000.

16 Q    And that was intended to establish a kind of a baseline of

17 employee morale for Mr. Crowley?

18 A    That's right.

19 Q    Okay, and in general, back in December of 2000, employee

20 morale as shown by the survey results was quite high, wasn't

21 it?

22 A    Employee morale was not quite high.  It was stable.

23 Q    Well, in general it was a very positive survey in terms of

24 employee satisfaction, wasn't it?

25 A    That's right, it was one year after Mr. Crowley had been

Ponzio - Cross/Tomashefsky                    155

1  in his role.

2  Q    That was at least -- that's three years ago, though.

3  A    December of 2000, so it would be a little over two years.

4  Q    All right.  And by the way, you've never -- and there's

5  never been a follow-up to that employee satisfaction survey.

6  A    There has not.

7  Q    Mr. Crowley's never asked for one.

8  A    Actually, yes the decision was made to do the second

9  employee survey when we came out of bankruptcy, which we had

10 assumed would be one year later.  That didn't occur, so we did

11 not proceed with the -- with the next survey.

12 Q    And you haven't -- there's no current plans to do one.

13 A    No, there's been discussions, but there's not a schedule.

14 Q    And by the way, you've never mentioned to Judge Adams, the

15 bankruptcy trustee, that there was an employee satisfaction

16 survey in your discussion with him.

17 A    The subject did not come up, no, sir.

18 Q    Now, from your perspective there was some concern of

19 instability at Coram when the Trustee was appointed based on

20 employees questions that came into you; is that right?

21 A    I'm sorry?  Repeat the question?

22 Q    From your perspective there was concern of instability at

23 Coram when the Trustee was appointed, based on employee

24 questions that came to you.

25 A    There was a concern as to what exactly the appointment

Ponzio - Cross/Tomashefsky                    156

1  meant, yes.

2  Q     But your understanding is that Mr. Crowley -- that Mr.

3  Crowley's role at Coram did not change after the Trustee was

4  appointed; is that right?

5  A     That is my understanding, yes, sir.

6  Q     And you have an understanding that subsequent to the

7  Trustee's appointment Mr. Crowley would continue to function in

8  the role that he was performing before the Trustee was

9  appointed.

10 A     That's correct.

11 Q     And you got that understanding directly from Mr. Crowley,

12 correct?

13 A     From my Crowley, actually, and from Judge Adams.

14 Q     Now, I believe there was a meeting three or four months

15 ago that was attended by Judge Adams and his lawyers and other

16 members of senior management in which there was a general

17 conversation on the topic of the impact on Coram's work force

18 if Mr. Crowley ceased to be with the company; is that right?

19 A     The timing I'm not sure of, but yes, there was a

20 discussion that occurred.

21 Q     And the subject of Coram's key employee retention plan and

22 turnover came up at that discussion?

23 A     That came up at the last meeting, yes.

24 Q     But you, yourself, didn't say anything about the key

25 employee retention play or employee turnover during that

Ponzio - Cross/Tomashefsky                    157

1  meeting; isn't that right?

2  A    Not at that discussion, no.

3  Q    And it's true that at that -- Deborah Meyer was at that

4  meeting; is that right?

5  A    Yes.

6  Q    And it's true that you can't remember anything specific

7  that Deborah Meyer said on the subject of the key employee

8  retention plan and turnover at Coram at that meeting with the

9  Trustee; is that right?

10 A    Her exact words, no.

11 Q    And you can't remember anything specific that Michael

12 Saracco said at that meeting at that subject when he was there;

13 is that right?

14 A    Exact words, no.

15 Q    You do remember Judge Adams asking a question, "Has anyone

16 left the organization?"

17 A    Yes, that's correct.

18 Q    And the answer to that was no.

19 A    That's correct, 'cause the employees were still under

20 their agreement, their KERP agreement.

21 Q    The KERP agreement, that's the Key Employee Retention Plan

22 required the employees to stay with Coram for some period of

23 time as a condition of receiving payment; is that correct?

24 A    Right, we are still in that period.

25 Q    Okay, when is that period over?

B372

Ponzio - Redirect                               158

1  A    I believe it's March 6th.

2  Q    So, as of March 6th the employees are no longer required

3  to stay with Coram.

4  A    That's correct.

5  Q    And no one has talked about extending that as far as you

6  know?

7  A    About extending the KERP?

8  Q    Right.

9  A    No one has talked to me about that.  Well, I take that

10 back.  No one has said there will be an extension.  We've had

11 discussions, some of the senior managers, about what to do

12 after March 6th.

13 Q    But no one has said there would be an extension of the key

14 employee retention plan to ensure continued employment of the

15 senior management.

16 A    There has not been another plan put in place, correct.

17 Q    Thank you.

18        MR. TOMASHEFSKY:  No further questions.

19        MR. BARKASY:  Your Honor, I just have one question.

20              REDIRECT EXAMINATION

21 BY MR. BARKASY:

22 Q    Mr. Ponzio, you were asked a question about whether it was

23 your understanding that Mr. Crowley's role was the same before

24 and after a Trustee was appointed.  You're aware -- well, what

25 do you know about the -- what do you know about the level of

Victor - Direct                                    159

1  expenses that must be reviewed by Judge Adams?

2  A     There is an approval policy in place in terms of dollar

3  limits that start at an employee level all the way up to Mr.

4  Crowley, and Mr. Crowley has a $50,000 limit.

5  Q     And previously Mr. Crowley didn't have to look to anybody

6  to approve a $50,000 expenditure, before a Trustee was

7  appointed.

8  A     That's correct.

9          MR. BARKASY:  That's all I have.

10         THE COURT:  All right, thank you.

11         MR. KIPNES:  Your Honor, in the interest of speeding

12 things along, the Trustee has one further witness, and --

13         THE COURT:  Okay.

14         MR. KIPNES:  We will be brief.  Mr. Victor.

15         COURT CLERK:  Please place your hand on the Bible.

16 Please state your full name and spell your last name for the

17 Court.

18         THE WITNESS:  Jay Scott Victor, V-i-c-t-o-r.

19         JAY SCOTT VICTOR, TRUSTEE'S WITNESS, SWORN

20         COURT CLERK:  Please be seated.

21                    DIRECT EXAMINATION

22 BY MR. KIPNES:

23 Q     Mr. Victor, you've previously testified in these

24 proceedings; is that correct?

25 A     That is correct.

Victor - Direct                              160

1  Q    You are among the financial advisors retained by the

2  Trustee?

3  A    That is correct.

4  Q    Have you discussed with the Trustee an the Trustee's

5  counsel your views on the impact on Coram were Mr. Crowley's

6  employment to be terminated?

7  A    I have.

8  Q    And what have you said?

9  A    The Trustee and the Trustee's counsel had asked me if I

10 thought the company would suffer or may suffer if Mr. Crowley

11 was no longer employed with the company.  My response was that,

12 yes, it is a possibility and that I worried about two distinct

13 things.

14 Q    Would you tell us what two distinct things you worried

15 about?

16 A    I worry that if Mr. Crowley was no longer with the company

17 the referral sources which are the lifeblood of this company

18 may see that as a sign of weakness, that the CEO is no longer

19 there or the chief executive is no longer there.  And those

20 referral sources are the physicians, the practice groups and

21 the hospitals.

22      And my even larger concern was that the key managers, the

23 people who are actually in the offices around the country that

24 see the patients, generate the revenue where the day-to-day

25 business of this company goes on may leave because of

Victor - Direct                                161

1  instability and go to competitors.

2  Q    Mr. Victor, have you reviewed the financial performance of

3  Coram for the last year or so?

4  A    Yes.

5  Q    Have you reached any conclusions based on that review?

6  A    Yes.

7  Q    And what conclusions have you reached?

8  A    My conclusions are that the company is performing quite

9  well.  The company has approximately $28 million of EBITDA for

10  the prior last twelve months, has not borrowed anything on its

11  debtor-in-possession facility and has approximately $20 million

12  of cash built up.

13  Q    Do you know, Mr. Victor, the process by which sales are

14  reported to arrive at sales figures within Coram?

15  A    Well, my understanding is there -- there are a number of

16  ways that input goes into the system, but when a new patient is

17  brought into the company for home infusion therapies, depending

18  on what type of therapy, it's inputted into the system.

19  Whoever is the insurer, or if it's a government payer, Medicaid

20  or Medicare, is input into the system, and bills are generated.

21  Q    And that starts at the branch level?

22  A    That starts at the branch level, yes.

23  Q    Based on your work in this case have you see any evidence

24  whatsoever that Coram's financial figures have been manipulated

25  by management in any way?

Victor - Cross/Tomashefsky                                162

1  A    No.  No way whatsoever.

2  Q    Thank you, sir.

3         THE COURT:  Cross?

4                CROSS EXAMINATION

5  BY MR. TOMASHEFSKY:

6  Q    Now, Mr. Victor, you were retained as an advisor to the

7  trustee just this past October; is that right?

8  A    That is correct.

9  Q    Okay, and you were not retained for the purpose of

10 evaluating or advising on whether to retain Mr. Crowley.

11 A    No.

12 Q    In fact, the Trustee has never asked you to evaluate Mr.

13 Crowley's performance; isn't that right?

14 A    Only the performance of the company.

15 Q    But not Mr. Crowley's performance.

16 A    Not as an individual.

17 Q    And the Trustee or his representatives have never asked

18 you to give them your opinion on whether Mr. Crowley's

19 employment agreement with Coram should or shouldn't be

20 extended; isn't that right?

21 A    That's correct, only my concerns if Mr. Crowley were no

22 longer employed.

23 Q    So, you never expressed an opinion to the Trustee on the

24 subject of whether Mr. Crowley's employment contract should or

25 shouldn't be extended.

Victor - Cross/Tomashefsky                     163

1  A    No.

2  Q    Mr. Victor, I am showing you a document that's been marked

3  EC-17.   It's a three-page document, the first page of which is

4  a fax cover sheet.   The second page of it is titled, "Objection

5  of SSG Capital Advisors, LP to the Official Committee of Equity

6  Security Holders, February 13, 2003 Subpoena."   You see that?

7  A    Yes.

8  Q    Have you ever seen this document before?

9  A    Never.

10  Q   Okay.   SSG is the firm you work for?

11  A    Yes, I'm a managing director.

12  Q    And you are aware that the Equity Committee served a

13  document subpoena on SSG.

14  A    Yes, I received it.

15  Q    Okay.   Now, focusing on the second page of Exhibit EC-17,

16  you see under number one in the objections, it says, "To the

17  extent the subpoena seeks testimony and/or documents relating

18  to SSG's valuation analysis of Coram Healthcare Corporation and

19  Coram, Inc. the subject subjects SSG to annoyance,

20  embarrassment, depression and undue burden because (a) SSG has

21  not completed its valuation analysis or issued a final report."

22  You see that?

23  A    Yes.

24  Q    And that's true, isn't it, that SSG has not completed its

25  valuation analysis or issued a final report?

Victor - Cross/Tomashefsky                    154

1  A    Yes and no.  As of Friday we were asked by the company to

2  expeditiously complete our Series B stock valuation which we

3  did and did furnish it to Mr. Danitz, the CFO of the company.

4  I don't know if that's final, but that was issued as of Friday.

5  Q    All right, that's not been furnished to the Equity

6  Committee, has it?

7  A    Not to my knowledge.

8  Q    Has it been furnished to the Trustee's counsel?

9  A    They were copied on it, yes.

10 Q    All right.  Now, you see the third page of this document.

11 It's signed by layers at the law firm of Schnader, Harrison,

12 Segal and Lewis, LLP, and Weir & Partners, LLP as attorneys for

13 SSG Capital Advisors, LP?

14 A    I see that.  I hope I don't have to pay them a bill.

15 Q    Well, because in fact they were never your attorneys;

16 isn't that right?

17 A    They are not our counsel.

18 Q    And they didn't represent you in connection with this

19 subpoena; is that right?

20 A    Well, we did speak about this subpoena, and I advised

21 counsel for the Trustee that I would happily prepare our own

22 objection or sign an objection once I reviewed what they had

23 prepared, but it didn't turn out that way.

24 Q    You never retained them to represent you.

25 A    Did not.

Victor - Cross/Tomashefsky                     165

1  Q    Okay, and you didn't retain them to represent you at your
2  deposition last week, either, did you?
3  A    Did not.
4  Q    Okay.  But it was the case, by the way, that at your
5  deposition you received several instructions not to answer
6  questions from the Trustee's counsel; isn't that right?
7  A    That is correct.
8  Q    All right, now your deposition was taken last Thursday,
9  Mr. Victor?
10 A    Yes.
11 Q    All right, and the day before that deposition you spoke to
12 the Trustee's counsel, and they asked you whether a crisis
13 manager could come into this situation.
14 A    Yes.
15 Q    Okay.
16 A    It wasn't just the day before.  We've had those
17 discussions for some short time before the hearing.
18 Q    Maybe even as many as fifty times.
19 A    I don't know about fifty, but we have discussed it before,
20 yes.
21 Q    All right, and the day before your deposition you told
22 them that a crisis manager could be brought in; is that right?
23 A    Could be brought in at any time.
24 Q    Okay, and you told them that a senior crisis manager would
25 cost about $80,000 a month.

Victor - Cross/Tomashefsky                    166

1  A    For an individual, that's correct.

2  Q    And when the Trustee asked you could a crisis manager run

3  this business, your answer was yes.

4  A    I believe a crisis manager slash turnaround advisor could

5  run this company, yes.

6  Q    Indeed, isn't it your view that a competent crisis manager

7  could be found to run the company the way its being run today?

8  A    In terms of financial performance, maintaining the status

9  quo, yes, I do.

10  Q    A crisis manager could be found to run the company the way

11  it's being run today in all respects.

12  A    I believe so.

13  Q    All right.  To be sure, I take it you believe that Mr.

14  Crowley has brought some discipline to this company, but you

15  believe that he can be replicated, don't you?

16  A    I believe that during the remainder part of this year,

17  when the company is either going to be restructured, sole or

18  what have you, I believe a crisis manager could run this

19  company.

20  Q    But you believe Mr. Crowley could be replicated, don't

21  you?

22  A    I don't know what you mean by replicated, but he could be

23  replaced by a turnaround manager for the balance of this year.

24  I do believe that.

25  Q    Well, in your deposition, Mr. Victor, Page 70, you were

Victor - Cross/Tomashefsky                    167

 1  asked the question, "Have you ever expressed the point of view

 2  that Mr. Crowley has unique talents or competencies that would

 3  be extremely difficult to replicate through another manager?"

 4       And your answer was, "Only one that I can think of, the

 5  discipline that he brought to this company.  I think he can be

 6  replicated."

 7       You said that, didn't you?

 8  A    Yes.

 9  Q    Okay.  And you're not really concerned about whether a

10  crisis manager could be incapable of continuing the discipline

11  that Mr. Crowley has brought to Coram, are you?

12  A    No.

13  Q    But as you testified earlier, you do have some concern

14  that it's necessary to avoid creating a fear that people will

15  think the company's going to be liquidated if a crisis manager

16  is brought in.

17  A    Yes.

18  Q    Okay.  But you agree, don't you, that it would be possible

19  to accomplish bringing in a crisis manager in a way that avoids

20  that fear by assuring people that the company is not going to

21  be liquidated.

22  A    Yes and no.  I think that a crisis manager being brought

23  in can overcome fears or uncertainty that referral sources may

24  have.  I just don't know if a crisis manager can -- coming in

25  can get past the fear of the key employees in all the satellite