Victor - Cross/Tomashefsky                    168

1  offices that the company is in trouble because Mr. Crowley's no
2  longer there.  That's my greatest concern.
3  Q    All right, you mentioned at the beginning of your
4  testimony you've had two concerns.  Okay, one was that referral
5  sources might be deterred and the other was that key employee
6  might leave.
7  A    Correct.
8  Q    Do you think it's possible to bring in a crisis manager in
9  a way that would assure the referral sources that there would
10 be no problem?
11 A    With a good communication plan, probably yes.
12 Q    All right, and in fact you've had lots of experiences in
13 your business with crisis managers being brought in and
14 communications plans being developed to assure important
15 constituencies that the company is not going to be liquidated.
16 A    I have.
17 Q    All right.  In your main experience with crisis managers
18 where you have serious problems involve businesses where there
19 were only a small number of customers who accounted for a
20 significant part of the company's business; is that fair?
21 A    Where communications plans have not been successful,
22 that's correct.
23 Q    But that's not the case with Coram, is it?
24 A    No.
25 Q    Okay, Coram has hundreds, if not thousands, of referral

Victor - Cross/Tomashefsky                          169

1  sources.

2  A    That's correct.

3  Q    So getting back, though, you do have a fear that if Mr.

4  Crowley were to leave and a crisis manager were brought in,

5  some of Coram's managers might leave.

6  A    Around the country, yes.

7  Q    But you've seen strategies implemented at other companies

8  to address that concern when crisis managers are brought in,

9  haven't you?

10  A    To try to allay those fears, I have.

11  Q    And those strategies are principally good communication

12  and a key employee retention program.

13  A    A very far and wide key employee retention program, yes.

14  Q    And in your opinion it's possible that an effective

15  communication strategy and a good key employee retention

16  program would be likely to succeed in persuading top managers

17  to stay at Coram if a crisis manager were brought in.

18  A    In this particular case I don't know if it's likely, but

19  it certainly could be put in place, but I believe that the key

20  employee retention really would have to go to many, many, many

21  people, not just in the Denver corporate office, but I think in

22  the offices around the country that actually see the patients.

23  Q    Um-hum.  Well, you said you didn't know whether it was

24  likely.  You do think it's very possible.

25  A    It is possible.

Victor - Cross/Tomashefsky                    170

1  Q    It's very possible, isn't it?

2  A    Is it very possible not to lose key employees?  I'll say

3  it's clearly possible.

4  Q    Well, in your deposition, at Page 73, you were asked the

5  question, "Do you have an opinion as to whether with an

6  effective communication strategy and a good key --" KERP or key

7  employee -- that's key employee retention plan -- "top managers

8  could be persuaded to stay at Coram if a crisis manager was

9  brought in?"

10     Mr. Barkasy objected.  "Could be, as is it possible that

11 could happen?"  I suppose he meant or is it possible.

12     The witness, that's you, "It would help."

13     And the question was asked, "Do you have an opinion one

14 way or the other as to whether an approach would be likely to

15 succeed?

16     And your answer was, "It's very possible."  You did say

17 that.

18 A    I'm -- if I said that in the transcript after seven hours,

19 I said it on the transcript.

20 Q    And it would be correct to say, Mr. Victor, that no top

21 manager of the company has told you directly or indirectly that

22 he or she would leave the company if Mr. Crowley no longer was

23 the CEO.

24 A    That's correct.

25 Q    And as of a few days ago, as of the date of your

1 deposition at least, you could not identify a single competitor
2 of Coram that was hiring Coram's managers; isn't that right?
3 A    That is right.
4 Q    It's fair to say, Mr. Victor, that you do not believe that
5 Mr. Crowley's serving as CEO is critical to the decisions of
6 Coram's top managers to stay with the company; isn't it?
7 A    I don't think I can say that.  I think that many of the top
8 managers are there and look to the reorganization of this
9 company because Mr. Crowley is there today.
10 Q    But you wouldn't say he was critical.  Let me rephrase
11 that.
12      You wouldn't say it was critical that Mr. Crowley be there
13 to get them to stay, would you?
14 A    It depends on whether this KERP plan and a crisis manager
15 and if a good communications scheme could be put in place.
16 Q    But you don't know whether it's critical at the moment;
17 your best characterization is it's a fear.  Is that right?
18 A    It is a fear that I have had for quite some time that if
19 Mr. Crowley left we would lose a lot of the key people around
20 the country, yes.
21 Q    And as far as you know, Mr. Crowley's made no commitment
22 to stay with Coram past the end of June.
23 A    That's my understanding, yes.
24 Q    And as far as you know Mr. Crowley's made no commitment to
25 stay with the company past a plan of reorganization's

Victor - Cross/Tomashefsky                    172

1  confirmation; isn't that right?

2  A    That is my understanding.

3  Q    I'd like to ask you a few questions about Mr. Crowley's

4  work at Coram.

5       In the course of forming your views of Coram's operations,

6  you've spoken to several potential purchasers or their

7  investment bankers to gather information; isn't that correct?

8  A    I have.

9  Q    You spoke, in fact, with three investment bankers?

10 A    Approximately, yes.

11 Q    And one of those was an investment banker from the Raymond

12 James firm?

13 A    Yes.

14 Q    And that person told you, among other things, that Mr.

15 Crowley is not a well-loved person.

16 A    Those were his words.

17 Q    And what he -- what he meant by that when you followed up

18 was that Mr. Crowley -- that employees, managers and other

19 people in the industry consider him arrogant; is that right?

20 A    Those were the words of this particular investment banker.

21 Q    And apart from speaking to this investment banker, you

22 formed an impression in the course of your work interviewing

23 several people at Coram that they fear Mr. Crowley; isn't that

24 right?

25 A    Some I -- my own impression was that some of his employees

Victor - Cross/Tomashefsky                173

1  did fear him, because he was a tough manager.  He has brought

2  great discipline to this company from what we've seen.

3  Q     But the impression of fear actually runs from the very top

4  managers down to the branch managers; isn't that right?

5  A     My impression, some, yes.

6  Q     Now, you, yourself, have met Mr. Crowley in the course of

7  performing your work, haven't you?

8  A     Before today we actually met once in a face-to-face

9  meeting in Denver, that's correct.

10 Q     And when you met him at that face-to-face meeting you

11 actually questioned him about the conflict of interest issue

12 that was discussed in Judge Walrath's opinion in denying

13 confirmation.

14 A     I did.

15 Q     And during that discussion Mr. Crowley blamed it all on

16 his counsel, didn't he?

17 A     He did.  He felt it was an oversight of debtor's counsel.

18 Q     Indeed, your impression of that conversation is that he

19 felt it was much ado about nothing.

20 A     He felt that he was being unfairly crucified throughout

21 this proceeding because of that, yes.

22 Q     But he -- the impression you got was that it was much to

23 do over nothing.

24 A     Yes.

25 Q     Now, there's been some testimony today, in fact some from

Victor - Cross/Tomashefsky                    174

1  you, about Mr. Crowley's performance as Coram's CEO.  And a lot

2  of that testimony is to the effect that Coram's doing better

3  now than it was before he became the CEO; isn't that right?

4  A    From what --

5  Q    Well, you haven't heard a lot of that testimony.

6  A    I haven't heard any of it.  We were sequestered, but I do

7  believe the company is performing very well today, yes.

8  Q    But you would agree that comparing the company's

9  performance today, at least judged by its EBITDA, e-b-i-t-d-a,

10 in 1999 compared to its EBITDA today is not really an apples to

11 apples comparison, is it?

12 A    No, only in that the company was very different in the

13 late nineties than it is today.  It was in the midst of

14 essentially a roll-up, so when I look at the company's

15 performance in the late nineties to normalized operations

16 today, it is different.

17 Q    The company was rolling up all of the elements that form

18 Coram today, right?

19 A    It was, and that had been completed certainly by '98, '99,

20 yes.

21 Q    Okay.  And also there was some unusual cir -- or

22 extraordinary circumstances affecting the company's performance

23 in 1999 when its EBITDA was zero or negative; is that right?

24 A    Yes, there was that Arnet proceeding.

25 Q    Now, EBITDA's a fairly important measure of a company's

Victor - Cross/Tomashefsky                    175

1  performance in your view; is that a fair statement?

2  A    It is one of a -- one of a few very important measuring

3  sticks, yes.

4  Q    And it would be correct to say that over the past three

5  years Coram's EBITDA has not been consistent, and it's gone up

6  and down and up; isn't that right?

7  A    It has spiked.  It was -- it was up in 2000, down in 2001

8  and the up again in 2002.

9  Q    Um-hum.  Another measure of a company's performance would

10 be its accounts receivable collection, wouldn't it?

11 A    Yes.

12 Q    Okay, and in your view the company's accounts receivable

13 collections have not been improved in the way they should be

14 improved; is that fair?

15 A    I think they can do better, and I think they have been

16 trying to do better.

17 Q    But it's not been improved the way it should have been

18 improved in your view.

19 A    It has not been improved drastically in the number of days

20 that the medical receivables are outstanding.

21 Q    In fact, that's your greatest criticism of current

22 management, is that they have not managed to decrease the

23 number of days that accounts receivable remain outstanding.

24 A    That is correct.

25 Q    All right, I'd like to ask just a few questions about what

Victor - Cross/Tomashefsky                    176

1  the future holds, since that seems to be, in part, what we're

2  here about today.

3        Until last week when you learned about some documents that

4  Mr. Crowley had produced in discovery, you had no idea that Mr.

5  Crowley had continued to do any work for Cerberus during 2002;

6  isn't that right?

7  A    That is correct.

8  Q    And at your deposition, shortly after you learned about

9  those documents, my partner, Mr. Bradford, asked you whether

10 you thought it was imprudent for Mr. Crowley to continue to do

11 work for Cerberus, to do work for Cerberus while he was

12 employed as Coram's CEO; do you recall that?

13         MR. KIPNES:  Objection.  No foundation and an

14 incomplete hypothetical.

15         MR. TOMASHEFSKY:  Just asking him if he recalls being

16 asked a question.

17         THE COURT:  Yeah, what --

18         MR. KIPNES:  I apologize.

19         THE COURT:  Overruled.

20         THE WITNESS:  I recall a question that I was -- that

21 I was asked about what my impression was when I heard that he

22 was still looking at transactions for Cerberus, something like

23 that, yes.

24 BY MR. TOMASHEFSKY:

25 Q    The question was, if you recall -- maybe this'll refresh

Victor - Cross/Tomashefsky                    177

1  your recollection -- do you think it's imprudent for Mr.

2  Crowley to be continuing to do work for Cerberus while he's

3  employed as the CEO of Coram?  That was the question.  You were

4  asked that?

5  A    Yes, you just -- I think so.  You just read that.

6  Q    Right, and at your deposition the Trustee's counsel

7  instructed you not to answer that question; is that correct?

8  A    I honestly don't recall, but I take your word for it.

9  Q    But you do have concerns, Mr. Victor, about keeping

10 Crowley on because in your own words, he taints the process,

11 doesn't he?

12 A    I think the two issues that Mr. Crowley has had before

13 this court, one in the first plan confirmation where he had a

14 failure to disclose that relationship, and the one in the

15 second plan confirmation denial where he was still getting

16 compensation from Cerberus and a conflict of interest was

17 there.  I think that's why we're all here today.  If that

18 didn't happen, none of us would be here today.

19 Q    And that taints the process.

20 A    I think it has tainted the process, which is why we're

21 here today, but I believe that process has been cured, because

22 that's why a Chapter 11 trustee was appointed last March.

23 Q    You say that as a -- as a legal opinion or as a business

24 opinion?

25 A    Both.

B392

Victor - Cross/Tomashefsky                    178

1  Q    You've not been retained by this estate to render legal

2  opinions.

3  A    No, I have not.  I've hung up my legal hat several years

4  ago.

5  Q    Okay.

6        MR. KIPNES:  Your Honor, he's asking the witness's

7  opinion.  He doesn't like the answer, and now he's trying to --

8        THE COURT:  Overruled if that's an objection.

9  BY MR. TOMASHEFSKY:

10 Q    Would it be correct to say though, Mr. Victor, that it's

11 your opinion that keeping -- if keeping Mr. Crowley on as the

12 senior executive at Coram would preclude Coram's exiting

13 bankruptcy before the end of this year, that it would be a very

14 bad thing to keep Mr. Crowley on as a senior executive?

15 A    Any --

16        MR. KIPNES:  Objection.

17        THE COURT:  What's the objection?

18        MR. KIPNES:  It's a hypothetical.  He's asking for

19 his legal -- now he's asking for his legal opinion?

20        MR. TOMASHEFSKY:  No, I'm just asking his opinion.

21        MR. KIPNES:  Is he -- are you -- is part of the

22 question that by definition the company is not out of

23 bankruptcy this year?

24        THE COURT:  He's asking a hypothetical.  I'll

25 overrule.  You can answer.

Victor - Cross/Godnick                    179

1        THE WITNESS:  I think anything that precludes this

2  company from emerging from Chapter 11 by the end of the year is

3  a bad thing.

4  BY MR. TOMASHEFSKY:

5  Q     And if keeping Mr. Crowley as a CEO or senior executive in

6  this company would slow that process down or make it impossible

7  to exit bankruptcy before the end of the year, then in your

8  opinion keeping Mr. Crowley on as a senior executive would be a

9  very bad thing.

10 A     Same answer.  If that or any other thing precludes this

11 company from getting out of bankruptcy by 12/31/03 that's a bad

12 thing.

13 Q     Thank you, Mr. Victor.

14        MR. TOMASHEFSKY:  No further questions.

15        MR. BARKASY:  I'm sorry.

16        MR. GODNICK:  Very briefly, Your Honor.

17                CROSS EXAMINATION

18 BY MR. GODNICK:

19 Q     Sir?

20 A     Yes.

21 Q     Counsel referred you back t your deposition and he asked

22 if you recalled being asked a question, and this is on Page 93

23 of the transcript, not Page 73 as you indicated.

24     "Do you have an opinion as to whether with an effective

25 communication strategy and a good KERP program top managers

Victor - Cross/Godnick                    180

1    could be persuaded to stay at Coram if a crisis manager was

2    brought in?"

3         He appropriately pointed out that there was an objection.

4    You stated, "It would help."

5         Question, "Do you have an opinion one way or another as to

6    whether an approach would be likely to succeed?"

7         And he referred you t your answer, Answer, "It's very

8    possible."

9         Do you recall that?

10   A    On cross, yes.

11   Q    Okay, do you recall what else you said at your deposition

12   immediately following, "It's very possible"?

13   A    I might have said, "I just don't know."

14   Q    Okay, does it refresh your recollection if I say -- I tell

15   you, you said, quote, "I can't say whether it's likely or

16   unlikely or more likely than not, but it is the way you deal

17   with a situation like this, yes."

18        And then there was a question, "What specifically about

19   Coram would cause you to believe that such an approach would be

20   less likely to succeed than it ordinarily would?"

21        And your answer was, "Because there are so many offices in

22   so many different locations that the key people are the branch

23   managers, the people who are managing the specific therapies at

24   each place.  Those are the ones that will likely be cherry

25   picked.  I think for a KERP plan to be truly effective in a

B395

Victor – Redirect                                   181

1    case like Coram, you really need to have that KERP plan go far

2    and wide which they usually don't."

3        Do you recall giving that answer?

4    A    I do.

5    Q    And, in fact, is that your view today?

6    A    Absolutely.

7    Q    Thank you.

                        REDIRECT EXAMINATION

9    BY MR. KIPNES:

10   Q    What's the derivation, if you know, of the term "crisis

11   manager"?

12   A    There's a crisis.

13   Q    Is there a crisis at Coram in your view?

14   A    No.

15   Q    Could a crisis manager come in and absolutely bomb?

16   A    Yes.

17   Q    And that would not be a good thing for the company, would

18   it?

19   A    No, the company is performing well.

20   Q    Do you have any estimate that you can give us of the cost

21   of the kind of KERP program you think would be necessary in

22   order -- that you would like to see put in place if Mr.

23   Crowley's to be replaced?

24   A    Cost or number of people?

25   Q    Either way.  Start with the number of people.

Victor - Redirect                          182

1  A    Number of people, 1 think you would need 160 to 200 people

2  to be included in the KERP plan to really keep the managers

3  nationwide from being cherry picked.

4  Q    Do you have any idea of what the minimum number, dollar

5  number, you would have to give one of these managers in order

6  to be sure that they would stay in the face of Mr. Crowley

7  leaving and a crisis manager being brought in?

8  A    Per individual?

9  Q    Yes.

10  A    I would say probably minimum $50,000.

11  Q    You were a very experienced bankruptcy lawyer in your

12  former life, correct?

13  A    I would like to think so.

14  Q    I just said experienced.  I didn't go any farther.

15     How could Mr. Crowley give the Trustee a commitment that

16  he would stay beyond a plan of reorganization?

17  A    I don't think he can.

18  Q    Would you think that a person, not necessarily Judge

19  Adams, but any person looking at this situation who decided

20  that it would be in the best interest of Coram to keep Mr.

21  Crowley in place for another four months would have no rational

22  basis for reaching that conclusion?  That was a horrible

23  question.

24  A    Wow, that was a tough question.  Could you ask that again?

25  Q    Do you want me to ask -- do you want me to ask that one

Victor - Redirect                                    183

1  again?

2  A    Yes, please.

3  Q    Is it unreasonable to conclude that Coram is better off

4  with Mr. Crowley in place through a reorganization process than

5  replacing Mr. Crowley with a crisis manager?

6  A    Yes.

7  Q    Would that be unreasonable?

8  A    No, it is very reasonable to keep him under these

9  circumstances, and that's been my opinion personally.

10 Q    You were shown these objections for which I personally

11 apologize.  Were you ever made aware that these objections were

12 corrected?

13 A    No, I never saw these before.

14 Q    Are you aware whether any of the current folks at Coram

15 came with Mr. Crowley?

16 A    Some.

17 Q    So, they moved with Mr. Crowley at least once as far as

18 you know.

19 A    Some.

20 Q    I think you said that anything that would stand in the way

21 of this company coming out of reorganization this year would be

22 a bad thing.

23 A    I did say that several times.

24 Q    Thank you.

25        MR. KIPNES:  I have no further questions.  I think I

Mr. Bressler - Argument                    184

1 have no further questions.

2          THE COURT:  Well, I have a question.  Is the Trustee

3 currently -- or have you had any discussions with the Trustee

4 currently about any extension of the current KERP?

5          THE WITNESS:  No, I have not.

6          THE COURT:  All right, thank you.  You may step down.

7          THE WITNESS:  Thank you.

8          MR. BRESSLER:  The Trustee rests, Your Honor.

9          THE COURT:  Any -- no witnesses by the Committee?

10          All right, I'll hear brief argument.

11          Let's take a ten-minute recess.

12          Yes, I have to be out of here by 4:30.

13      (Recess)

14          MR. BRESSLER:  Your Honor, you read the papers,

15 you've hear a lot of testimony.  I think I'll start out by

16 saying thank you for your attention and direct you merely to

17 the response of the Chapter 11 Trustee in opposition to the

18 Equity Committee's motion.

19          We believe that that sets forth the accurate standard

20 to be applied here, which is the Trustee's business judgment.

21 He has properly exercised his discretion and his belief, and in

22 an informed way in good faith, continuously keeping in mind, as

23 he said, Your Honor's prior rulings.

24          Equity has generated lots of documents, and those

25 produced actually support what Mr. Crowley's been telling the

1  Chapter 11 Trustee and don't vary from it, and do not show that

2  he's taken any money in 2002 from any other party, that he's

3  done -- tried to collect any money from any other party for

4  work done for Coram in 2002, or that in any way his efforts for

5  anyone else, fortuitous or otherwise, have detracted from his

6  performance at Coram.

7          Performance shows stability, profitability and a

8  situation that should remain as the status quo until the plan

9  can be confirmed.  There hasn't really been any showing as to

10 why Equity has waited for I guess two and a half years or

11 certainly more than a year since your last opinion to file this

12 motion.

13         The agreement that's been entered into with the

14 Trustee by Mr. Crowley now specifically states, and Equity has

15 said where is there a document?  Here is a document that says,

16 you shall not do any more work of any kind for the next six

17 months or any of the noteholders or any of the preferred

18 stockholders.   And we now have the documents that show that

19 Mr. Crowley has completely terminated in every which way other

20 than possibly having a monetary claim ensuing any relationship

21 he has with Coram -- with Cerberus, and that presumably is the

22 only reason that we're here today.

23         Under these circumstances, given the lateness of the

24 day, reminding the Court that Equity hasn't shown in any way

25 that the Trustee's business judgment is not informed and is not

Mr. Bressler - Argument                    186

1  based on his thorough observation of the company, its

2  employees, consulting with his advisors, doesn't seem to be any

3  reason to not grant the motion, and certainly speculation about

4  what somebody could spend five or ten million dollars on for

5  some sort of a crisis manager for the next four months would be

6  something that the Trustee --

7          THE COURT:  Where do you get five or ten million

8  dollars for a crisis manager?  I've heard Mr. Victor say 80,000

9  a month.

10         MR. BRESSLER:  No, I understand the 80,000, but

11 $50,000 per person for a KERP plan for 125 people to go with

12 that.

13         THE COURT:  Well, do you intend to file any extension

14 of the existing KERP after March 6?

15         MR. BRESSLER:  The answer is yes, Your Honor, we have

16 considered that, and we are working on numbers.   You may

17 recall that when we filed last time both the KERP and the MIP,

18 the Management Incentive Plan, the Trustee -- and his direction

19 I'm sure will be the same -- squashed the numbers down from the

20 two larger numbers that had originally been recommended by

21 management into a smaller amount and also, as you heard, tied

22 it to company employee agreed -- employee agreements to

23 continue on for six months in order to earn the money, and we

24 are in the process of considering that now.

25         We have recommendations from management.  It is the

Mr. Levy - Argument                    187

1  opinion of the Trustee's advisors that the numbers recommended

2  by management are numbers that he would not be agreeable to.

3  And we'll be filing an extension, but it will be in --

4           THE COURT:  Remind me what --

5           MR. BRESSLER:  -- significantly smaller amounts.

6           THE COURT:  Remind me what the last KERP entailed.

7           MR. BRESSLER:  The last KERP was --

8           THE COURT:  In dollars.

9           MR. BRESSLER:  The last KERP was approximately a

10 million-two, I believe.  And there was also, in addition to

11 that, a branch incentive plan, and I do not recall the exact

12 number of that for the next layer of employees down, but for

13 the top 40 employees it was roughly a million-two.

14          And that was a combination of both the management

15 incentive plan and the key employee retention plan.

16          THE COURT:  And you're seeking a million-two to get

17 Mr. Crowley to stay 'til June 30.

18          MR. BRESSLER:  We are seeking $800,000 plus off the

19 $200,000 reimbursement of his legal fees, after a rather

20 protracted negotiation to get to that point.

21          THE COURT:  All right, thank you.

22          MR. LEVY:  Your Honor, we are not questioning Judge

23 Adams' business judgment.  Mr. Crowley may be the best manager

24 in the world.  So far as I know there is no competency

25 exception to the rule that says that a corporate officer, a

Mr. Levy - Argument                              188

1 CEO, cannot have a conflict with a major creditor.  We have not

2 contested how well the company is doing.  It gives us some

3 heart that when we come to confirm our plan perhaps somebody

4 will take -- believe what we've said, that it's valuable.

5 That's not the issue here.

6        The issue here, Your Honor, is that no plan can ever

7 be confirmed if you have a conflicted CEO, and make no mistake,

8 Mr. Crowley is the CEO.  Why else is he getting -- or are they

9 trying to give him a million dollars?  There are -- as Your

10 Honor said in a number of prior opinions -- hundreds of

11 decisions what he does is pervades everything that goes on with

12 the company.

13       Now, Your Honor, we don't have a problem with Judge

14 Adams' decision that he chose not to investigate the conflict.

15 Judge Adams is one of the most experienced jurists in this

16 country, and if that's what he decided to do, that's fine.  But

17 Judge Adams conceded on the witness stand that the issue of a

18 conflict is not a business judgment issue.  It's an issue to be

19 decided by this Court.

20       I don't think you need to determine today

21 definitively that a conflict exists.  I think what you need to

22 do is look forward.  Are we going to confirm the plan in four

23 months?  Two years ago, as we all know, we couldn't confirm a

24 plan.  A year ago we couldn't confirm a plan, both because of

25 Mr. Crowley.  And this year we won't be able to confirm a plan

Mr. Levy - Argument                               189

1 if Mr. Crowley is there.

2       Now, why is there still a conflict?  Well, first of
3 all, Mr. Crowley says, "I'm working pro bono."  That's an
4 insult to the word "pro bono".  He's not working for free.
5 He's working for favors.  He said it himself.  He's working
6 because he wants Cerberus, who he wants, what is it, five, ten,
7 fifteen million dollars for, to be nice to him, to pay him that
8 money.  That's a conflict.  He's the CEO.  Cerberus is the
9 major creditor.  And there's no pro bono here.  He may not be
10 getting paid 80,000 a month, but he sure is trying to get
11 something back.

12       Second reason there's a conflict.  Your Honor, I
13 think we've really seen who Mr. Crowley is.  And he may try and
14 say, "Well, I didn't mean it.  It was attorney-client
15 privilege," but he wrote a memo.  He wrote a memo, and he says
16 he's angry.  He is angry at Mr. Feinberg because he got -- he
17 got stiffed.  Now, what is he write in the memo?  He says, "I'm
18 not really angry at you."  Instead he says, "I didn't have to
19 recite what Friedman told me.  I didn't have to write that EC-
20 320 memo."

21       What was he doing?  I think he was planning -- I
22 don't know whether -- I'm not suggesting that Feinberg got it.
23 I don't know. Maybe in the fullness of time we'll find out.
24 But what was his state of mind?  He was going to spill the
25 beans on Feinberg.  He was going to say, "Yeah, I perjured

B404

Mr. Levy - Argument                              190

1  myself.  I recited what they said.  Yeah, I wrote that memo and

2  lied about it."  And yes, he thought better.  He never sent it.

3  But that's not important.  What's important is that there were

4  bills to -- there were beans to spill.

5           And that memo, the one that Mr. Schreiber wrote,

6  $11,200,000, that's the same amount, approximately, that Judge

7  Adams remembered as the amount he claimed.  Now, if in fact --

8  the most important question I asked is if Schreiber didn't get

9  these ideas, these three commitments, pay him the difference,

10 pay him $5 million and reinstate him, pay his legal fees, if he

11 didn't get them from Mr. Crowley, where could he have gotten

12 them from?

13          There may be an answer.  Mr. Schreiber's sitting

14 right there.  He could have gotten on the witness stand and

15 told us.  He didn't.

16          Now, Your Honor, as far as this sky is falling

17 argument, you know, I saw three professionals.  They're going

18 to stick with it.  They have pride in this company.  I think if

19 they're fairly compensated, why should they go to someplace

20 else?  I don't think the sky is falling.  I think we all are

21 desperate to get a plan confirmed, our plan, their plan, if

22 it's fair to us.  We still haven't seen their plan for a reason

23 we'll never, never understand.  But these people are going to

24 soldier on, Your Honor.  I believe that.  I think we ought to

25 get rid of Mr. Crowley, we ought to clean up this company.  And

Mr. Schreiber - Argument                    191

1  finally, the notion to pay him a million dollars so that he'll

2  stay for six months, first of all, it really puts the lies to

3  all this pious testimony about how much he cares about the

4  company.  Why couldn't he wait six months if he cares about the

5  company?  Judge Adams doesn't like it.  It's unfair.  He

6  blackmailed us once, six months or four months.  He'll

7  blackmail us again.

8          Thank you very much.

9          MR. SCHREIBER:  Your Honor, I was hoping to have an

10 opportunity to speak before Mr. Levy, but he certainly put me

11 to the challenge.  I think there's really only two issues here,

12 and the first one is a slam dunk winner.  First one is whether

13 the Trustee has reasoned business judgment to make his

14 decision.  And I think we all concede that the Trustee's

15 integrity is something we'd all like to aspire to.  No one

16 questions his integrity or his reason business judgment.

17         The second is obviously the conflict, the conflict

18 that has pre-dated my existence in this case, and it's

19 something that I want to address in just a minute.

20         But first I want to talk a little bit about the three

21 rules that the Trustee gave my client, Mr. Crowley, when they

22 met in early March.  They were very simple rules.  First, no

23 Cerberus money.  He accepted that.  The $80,000 a month, Mr.

24 Crowley had not received that for three months.  He hasn't

25 received it since December of '01.

Mr. Schreiber - Argument                    192

1    Second, he can look at other businesses for Cerberus,

2 but not businesses that conflict with Coram.  And he did that.

3 My client, I've discovered over the past fourteen months as

4 I've represented him for the first time ever, has two great

5 habits.  One is he loves to look at businesses, challenges,

6 deals.  And the second is he likes to write things.  We'll get

7 to that in a second.

8    The third rule is that none of these investigations

9 of Cerberus matters should be on Coram time.  And no one has

10 said that any of these investigations were done on Coram time.

11 So, I guess what I'm saying in a nutshell, Judge, is that Judge

12 Adams laid out three ground rules, and Mr. Crowley lived by

13 those ground rules.

14    Judge Adams approved the ongoing discussions with

15 Cerberus and recognized that Cerberus owed my client a lot of

16 money.  Now, in the perfect world I'll tell you, Judge, I would

17 have wished -- and I negotiated hard for that payment to be

18 made and this portion of the relationship over.  But that

19 didn't happen.  Cerberus didn't want to pay for reasons which I

20 don't understand at this point, but that's irrelevant.

21    The reality is, is that my client got very

22 frustrated.  And he has a tendency to write, as well as do, as

23 Your Honor is doing.  We like to write things.  I've done it

24 myself in writing.  As he said, a lot of times he writes

25 things, he puts the on the side of his desk, and they sit there

Mr. Schreiber - Argument                    193

1  for awhile.  Sometimes he re-writes them.  Sometimes he sends

2  them to me, and I keep them and I make marks.  I throw them in

3  my file.

4          But we write our ideas down so we don't do other

5  things, so we don't act on them sometimes.  We write our

6  thoughts down 'cause we're frustrated.  And when we're owed a

7  lot of money from somebody and someone invites you to New York

8  because they want to meet you face to face to make an offer to

9  settle it, and you don't get that offer, you get nothing,

10 that's a pretty frustrated experience I imagine.

11         And I certainly don't criticize my client for writing

12 down some words that might or might not have been accurate at

13 the time, might have been how he was feeling, might have --

14 might have been maybe too strong.  Whatever.  That's his

15 tendency.

16         We're not here to confirm a plan, Judge.  We're here

17 to question whether or not it's appropriate to give Mr. Crowley

18 essentially the same sort of KERP stay bonus that the other

19 Coram employees got.  He's not getting a million dollars today.

20 He's getting a million dollars -- he's getting $200,000 now.

21 And he's getting some more money in four months.  It was

22 supposed to be six months, but it's taken us two months to get

23 here.

24         So, clearly there's the same sort of tie-down that

25 every other employee of Coram has had.

Mr. Bressler - Rebuttal Argument                    194

1    Finally, Judge, we did hear a parade of horribles.

2  We did hear, as Mr. Levy says, the sky if falling.  I hate to

3  use this analogy, but I will.  I mean sometimes it's better to

4  stick with what you know than what you don't know.  When you

5  have a very fragile entity that's been in bankruptcy for two

6  and a half years, where we have a president who's done nothing

7  but keep this company from going to total ruin, we have a

8  Trustee who's investigated this company and feels comfortable

9  with this management.  Do we really want to change horses in

10  midstream, Judge?  I think not.  I think $800,000 is a lot of

11  money.  I think a million dollars is a lot of money.  But I

12  think it's fair, I think it's what the Trustee has determined,

13  and as the guy on the other side of those negotiations with the

14  Trustee I'll tell you.  It was a hard-fought battle.  So, I

15  respect his position, and I hope that Your Honor will as well.

16        Thank you.

17        MR. BRESSLER:  One or two short words of rebuttal,

18  Your Honor.  This is a Trustee's motion, not the motion of the

19  debtor in possession or of the debtors.  The cases we cite made

20  it clear that the Trustee, even if there had been a conflict

21  under certain circumstances, could retain Mr. Crowley.

22        We submit that there hasn't been any showing, and

23  yes, the Trustee recognizes that Mr. Crowley says he has a

24  claim against Cerberus.  Your Honor heard a lot of testimony

25  about that.  The Trustee has not taken any position on that,

Decision                                195

1  and has kept out of whatever monetary claim Mr. Crowley may

2  have against Cerberus.

3       MR. LEVY:  Mr. Schreiber said we ought to stick with

4  him.  Merely resonance of what the director's witness, Mr.

5  Emeral said, "Well, he's doing a good job, let's stick with

6  him."

7       And the cases that Mr. Bressler talks about do talk

8  about people who in the past have a conflict.  I certainly

9  think his past conflict twice colors what happened here today,

10 but it is the ongoing relationship that troubles us so.

11      Thanks.

12      THE COURT:  Well, I'm going to deal with the

13 Trustee's motion for approval of the extension.  And in doing

14 so, I agree that it is the business judgment rule that I just

15 consider.

16      To express my feelings I'm going to paraphrase

17 someone I think epitomizes the business judgment rule, and that

18 is Warren Buffet.  And he has said that the ideal employee is

19 someone who's smart, hard-working and honest.  But if the

20 employee isn't honest, you darn well better hope he's stupid

21 and lazy, because otherwise you're in trouble.

22      There is no question in this case that Mr. Crowley is

23 smart, hard-working, a brilliant businessman.  But I do not

24 believe he is honest.  And his testimony today has not

25 convinced me that he has changed since the last time he

Decision                              196

1 testified.

2         Judge Adams has an impeccable reputation for

3 integrity.  Quite frankly, I don't want his reputation or mine

4 sullied by approving continuing employment of an employee that

5 I do not believe to be an honest person.  I think being asked

6 today to trust that Mr. Crowley is complying with the Trustee's

7 request simply because there is no proof that he has not

8 complied with the requirements imposed upon him by the Trustee

9 goes too far, given the fact that he has previously failed to

10 disclose relevant information.  And quite frankly, the draft

11 documents that were produced continue to show at least in May

12 of 2002, after the appointment of the Trustee, continue to show

13 what I believe is a continuation of Mr. Crowley's continued

14 efforts to continue to get reimbursement from Cerberus for

15 efforts undertaken in this case.

16         It's a belief I have.  There is no evidence that an

17 agreement was reached with Cerberus or that Cerberus

18 participated in it, but I think that the drafts show that Mr.

19 Crowley sought to have that continuation, sought to be paid,

20 albeit after confirmation, that is after he was no longer

21 subject to the jurisdiction of this court, sought to get

22 remuneration for efforts taken in this case, which quite

23 frankly is not permissible.

24         And given that belief, I will not approve any

25 extension of employment.  I've said before that fortunately or

Decision                    197

1  unfortunately I'm in the position where principles can guide

2  me, even though it may result in financial harm to others.  But

3  even saying that, I do take into consideration that my decision

4  will have or may have some adverse effect on the business

5  operations.

6        But I am satisfied that the employees that were put

7  in place before and by Mr. Crowley, the systems that were put

8  in place can survive Mr. Crowley leaving.  There are plenty of

9  other competent, in fact, brilliant businessmen who can step

10  in, whether from within this organization or from without.

11        And I think it's more important that the debtor,

12  under the supervision of this Trustee, not be tainted by any

13  suggestion that the senior executive has anything other than

14  100 percent dedication to this entity and to this entity alone.

15        So, I will deny the motion.

16        I'll look for a form of order, Mr. Levy?

17        Need we go any further?

18        UNIDENTIFIED ATTORNEY:  I think Mr. Levy has a

19  motion.

20        MR. LEVY:  Your Honor, we have a motion, and that

21  motion calls for the termination of Mr. Crowley and an

22  instruction to the Trustee to pursue disgorgement of

23  compensation collected.

24        THE COURT:  I'm going to hold that under advisement.

25        MR. LEVY:  Thank you.

Decision                                198

1         THE COURT:  Because the ramifications of my decision

2    may have an impact on that.

3         MR. LEVY:  Thank you very much, Your Honor.

4         THE COURT:  All right?

5         We'll stand adjourned.

6         UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

7      (Recording ends)

8              *            *            *

9              C E R T I F I C A T I O N

10        I, Betsy Wolfe, certify that the foregoing is a

11   correct transcript from the electronic sound recording of the

12   proceedings in the above-entitled matter.

13

14   _Betsy Wolfe_                    _March 9, 2003_

15   Betsy Wolfe                      Date

16   J&J COURT TRANSCRIBERS, INC.

17

18

19

20

21

22

23

24

25

B413