UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

IN RE:  . Case No.: 00-3299
. 00-3300 (MFW)

. 821 North Market Street
CORAM HEALTHCARE CORP. and  . Wilmington, Delaware 19801
CORAM, INC.  .
          Debtors,  .
. Date:  December 11, 2003
. . . . . . . . . . . . . .. Time:  10:10 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Equity Committee:  Jenner & Block
By: RICHARD F. LEVY, ESQ.
DAVID J. BRADFORD, ESQ.
C. STEVEN TOMASHEFSKY, ESQ.
ANDERS C. WICK, ESQ.
One IBM Plaza
Chicago, IL 60611

Saul Ewing, LLP
By: MARK MINUTI, ESQ.
222 Delaware Avenue
Wilmington, DE 19801

For the RenGen Capital:  Monzack and Monaco
By: KEVIN J. MANGAN, ESQ.
400 Commerce Center
Wilmington, DE 19899

Audio Operator:  Lesa Neal

Proceedings recorded by electronic sound recording, transcript
Produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail: jjcourt@optonline.net

(609)586-2311    Fax No. (609) 587-3599

Shestack - Direct/Kipnes          32

1 effect, but they would challenge the fact that there was a

2 scheme to put the company into bankruptcy.

3 Q    But let's be clear.  If you were the trier of fact you

4 would find that Crawley had a conflict.

5 A    Yes, absolutely.

6 Q    And you find that was a breach of fiduciary duty.

7 A    Yes.

8 Q    By Crawley.

9 A    Yes.

10 Q    What would, do you think, Mr. Feinberg alleged in

11 opposition to the claim that he breached his fiduciary duty?

12 A    Well, he has several arguments.  One, that while he was on

13 the board of directors he didn't breach anything and that he

14 wasn't liable after he was on the board which is somewhat

15 dubious.  And he would say basically that he didn't fail to

16 disclose anything, Crawley failed to disclose anything.  I

17 think that Feinberg would have the short side of that argument.

18 Q    What do you think Cerberus would argue?

19 A    Well, Cerberus would argue that they weren't at all

20 involved, Feinberg acted as a director, he had duties as a

21 director and that Cerberus didn't participate in the scheme at

22 all.

23 Q    Now I think we can turn to the Rico counts.  Count nine on

24 page 42.  How would you characterize just as an overview, Mr.

25 Shestack, the Rico statute in terms of its clarity?

J&J COURT TRANSCRIBERS, INC.

Stearns - Further Redirect/Godnick        153

1 Q    Let's turn to another topic.  You determined, as I

2 understand your testimony on direct, that $56 million was

3 within the range of reason to settle the litigation, correct?

4 A    Yes.

5 Q    As far as you were concerned this was comparable to other

6 settlements that you had seen where one party pays a particular

7 amount of money to settle litigation, correct?

8 A    Well, that's true of every settlement.

9 Q    And here you thought that paying $56 million was an

10 appropriate amount to pay to resolve the litigation, correct?

11 A    I thought that it was within the zone of reasonableness.

12 I mean, the basic test under the courts says the criteria that

13 the courts consider as to whether it's within the zone of

14 reasonableness are such matters as probability of success in

15 the litigation, the complexity of the litigation, the expense

16 and convenience in delay.  They also consider collectibility

17 which I didn't consider here.  And they also consider effect on

18 creditors which I didn't consider here.

19      The main criteria in deciding whether it's in the zone of

20 reasonableness is a probability of success in litigation and

21 the complexity of the litigation involving expense and delay.

22 Q    You did what might be called a traditional litigation risk

23 analysis in coming to the $56 million opinion, correct?

24 A    I think that's correct.

25 Q    You didn't, for example look at valuations of the company

J&J COURT TRANSCRIBERS, INC.

# Express Scripts and CuraScript Announce Acquisition Agreement; Specialty Pharmacy Will Enhance PBM Service Offering

1,495 words
22 December 2003
05:08
Business Wire
English
(c) 2003 Business Wire. All Rights Reserved.

ST. LOUIS Express Scripts, Inc. (Nasdaq:ESRX) announced today it has signed a definitive agreement to acquire the capital stock of CuraScript Pharmacy, Inc. and CuraScript PBM Services, Inc., together comprising the business of CuraScript for $335 million. CuraScript, headquartered in Orlando, Florida, is one of the nation's largest **specialty pharmacy** services companies. This transaction is expected to close during the first quarter of 2004, subject to customary closing conditions and the expiration of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act, and is expected to be slightly accretive to Express Scripts' 2004 diluted earnings per share.

1. CuraScript will enhance Express Scripts' ability to provide comprehensive clinical services in many disease states and improve the quality and affordability of specialty drug therapy for clients and patients. The specialty pharmaceutical market is expected to grow 20 to 30 percent or more annually over the next 3 to 5 years as there are over 350 products targeting more than 200 diseases in the biotech pipeline today.

The acquisition delivers a number of strategic benefits to both companies including greater scale and complementary service capabilities. Serving over 175 managed care organizations, 30 Medicaid programs and the Medicare program, CuraScript operates six specialty pharmacies throughout the United States. CuraScript has a broad product offering, with particularly strong capabilities in oncology, rheumatoid arthritis, multiple sclerosis and other complex chronic therapies. It has a solid reputation for quality and expertise in the specialty market, which will enhance Express Scripts' competitive positioning.

"CuraScript shares our client-centric focus for managing specialty drugs, mutually reinforcing the alignment of both companies' business models with the interests of clients and patients," said Barrett Toan, chairman and chief executive officer of Express Scripts. "Domenic Meffe and his team have done an outstanding job building strong capabilities in many disease states, offering comprehensive clinical services and developing significant managed care relationships. We at Express Scripts share CuraScript's commitment to providing the best possible patient care, and together with CuraScript, we will be able to drive better savings for our clients. We are pleased that CuraScript's management team will lead our **specialty pharmacy** group going forward."

B417



EXHIBIT
tabbies®
EC-150

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                    . Case Nos. 00-3299(MFW) and
                              00-3300(MFW)
                        . (Jointly Administered under)
    CORAM HEALTHCARE CORP. and .            00-3299)
    CORAM, INC.,           . 824 Market Street
                        . Wilmington, Delaware  19801

        Debtors.    . January 22, 2004
. . . . . . . . . . . . . . . 9:41 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For Cerberus:              Schulte Roth & Zabel LLP
                    By:  MICHAEL L. COOK, ESQ.
                         HOWARD GODNICK, ESQ.
                         NIKHIL SINGHVI, ESQ.
                         SOPHIE KIM, ESQ.
                    919 Third Avenue
                    New York, NY 10022


For Chapter 11 Trustee:    Schnader Harrison Segal
                    & Lewis, LLP
                    By:  BARRY E. BRESSLER, ESQ.
                         WILLIAM KIPNES, ESQ.
                         RICHARD BARKASY, ESQ.
                         MICHAEL BARBIE, ESQ.
                    1600 Market Street
                    Suite 3600
                    Philadelphia, PA  19103


Audio Operator:            Jennifer M. Patone

Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.

_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail: jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

Shestack - Cross/Bradford       47

1 just mis-typing.

2 Q    And, in fact, your own final report indicated that the

3 range of value identified by the investment bankers at the time

4 of the CPS sale was as high as $100 million. Do you recall

5 that?

6 A    Yes, I think that on CPS the argument goes both ways. The

7 plaintiff would argue that it was unnecessary to sell this, and

8 in the future this would be profitable, and while it might not

9 be a crown jewel at this time, once it was polished and buffed,

10 it would indeed be a crown jewel.  On the other hand, the

11 defendants would say, look, they needed the money, and they

12 needed it then.  They needed to get in a better position with

13 their debt, and when you need the money, you sometimes sell

14 things that you don't want to sell or wouldn't ordinarily sell,

15 and that the process by which they went through in selling it

16 by getting Deutsch Bank, Alex Brown, to give an opinion by

17 having some 40 competitive bids, by rejecting the bids, by

18 getting more than the last bid was a reasonable fairness and

19 shows the entire fairness of the sale.  But even if you say

20 that they would come out on the short end of that, what you're

21 talking about is a limited sale that doesn't result in anywhere

22 near the $300 million damages or the figures that the

23 plaintiffs claim -- that the plaintiff would claim.

24 Q    When you say that the company needed money, these

25 projections would show that the cash requirements of CPS over

J&J COURT TRANSCRIBERS, INC.

Shestack - Cross/Bradford          53

1 A   Yes, normally the Court is reluctant to put in a

2 rescission, because there are other parties in effect.  So it

3 would assess what the difference is between a fair value sale

4 and allegedly an unfair value sale.  That would be the likely

5 way the Court would handle it.

6 Q   Okay, and, in fact, under rescissory damages, if the Court

7 awards rescissory damages, it generally looks at the fair

8 market value of the asset at the time it awards those damages

9 and gives the plaintiff what that asset would be worth today

10 rather than what it was sold for back at some time in the past.

11 Correct?

12 A   I'm not sure of the answer to that.

13 Q   In fact, the Tristar Picture case, which you referred to

14 earlier, discusses that concept.  Does it not?

15 A   The Technicolor case?

16 Q   Tristar Pictures at 634 A 2d 319.

17 A   What's the full title of that case?

18 Q   I believe it's In re:  Tristar Pictures Litigation.

19 A   I'm not sure, but that concept is discussed in other

20 cases.

21 Q   And are you familiar with the fact that the CPS operations

22 were just sold a month ago by the party that acquired them from

23 Coram?

24 A   No.

25 Q   I'd like you to turn, if you would, to Exhibit 150, which

J&J COURT TRANSCRIBERS, INC.

Shestack - Cross/Bradford          72

1 Crowley and that was paying Crowley for some responsibility for

2 his conduct.

3 A   It's possible, but there's a lot of testimony that it was

4 meant as a consultant agreement, that it was never exercised,

5 and that testimony never seems to have been refuted.  There's

6 considerable testimony about that employment agreement, what it

7 meant, whether counsel took a form agreement rather than

8 customizing it to Crowley's case.

9 Q   Now turning, if we can to the RICO claims, you would agree

10 that if the company succeeded under RICO, that the damages

11 would automatically be trebled, and it would recover all of its

12 attorney's fees.  Correct?

13 A   Yes.

14 Q   I'm sorry.  I didn't hear the answer?

15 A   Yes.

16 Q   And you agree that the Supreme Court, in fact, in some of

17 the decisions you testified about on your direct testimony have

18 said -- and I'm quoting from the Sedima decision, 473 U.S. 479,

19 "RICO is to be read broadly.  The lesson -- this not only the

20 lesson of Congress self-consciously expansive language and

21 overall approach but also the express admonition that RICO is

22 to be liberally construed to effectuate its remedial purposes."

23 A   Well, Sedima, the issue was did it apply only to criminal

24 proceedings, or did it go to civil proceedings of an ordinary

25 kind, and I think Justice White gave that decision -- or

J&J COURT TRANSCRIBERS, INC.

Shestack - Cross/Bradford          73

1 whoever it was who gave the decision made the point that

2 Congress did not limit it to just criminal activities, and,

3 therefore, it had to be interpreted more widely, and he wasn't

4 saying that within the civil context it had to be interpreted

5 more widely than the act itself provided for or what was

6 interpreted later on in other decisions later than Sedima.

7 Q    In fact, the Third Circuit en banc in Tabas vs. Tabas made

8 it clear that RICO included cases that would ordinarily fall

9 into the category, quote, of common law or garden variety fraud

10 in which in the past would've been the subject of commercial

11 litigation under state law."

12 A    Would you mind repeating that question?

13 Q    Sure.  You're familiar with the Third Circuit's en banc

14 RICO decision in Tabas, T-a-b-a-s, vs. Tabas 47 F 3d?

15 A    Yes.

16 Q    And in that case the Court recognized again that RICO is

17 expansive, and that it applies to cases that in the past

18 would've been deemed, quote, garden variety fraud or the

19 subject of commercial litigation under state law?"

20 A    Well, that general statement, yes, but in that particular

21 case they also dealt with the continuity issue, and 12 months,

22 which was longer than the continuity here, was insufficient.

23 Three years in that case wasn't -- and then they also dealt

24 with the Babachek factors which -- and which was a great

25 division in the Third Circuit as to whether they applied or

J&J COURT TRANSCRIBERS, INC.

Shestack - Cross/Bradford          74

1 not.  That was kind of a complicated case, and that one

2 sentence you read isn't a fair characterization of that case in

3 Judge Ross's opinion.

4 Q    And, in fact, there are three different grounds of RICO

5 violations alleged in this complaint, what we've called the B

6 claim and C claim and the D claim.  Correct?

7 A    In the potential complaint here?  Yes.

8 Q    Yes, and essentially, the B claim -- let me withdraw that.

9 Each of them require a pattern of predicate acts.  Correct?

10 A    Yes.

11 Q    And for a B claim the pattern of predicate acts has to be

12 in furtherance of a scheme to acquire or maintain control or an

13 interest in an enterprise.  Correct?

14 A    Right.

15 Q    And in a C claim the defendants have to conduct the

16 affairs of the enterprise through a pattern of predicate acts.

17 Correct?

18 A    That's right.

19 Q    And the D claim can be a conspiracy to do either of those

20 two things.

21 A    Right.

22 Q    Okay, and let's talk, if you would, about the B claim.

23 That is a pattern of predicate acts for the purpose of

24 acquiring or maintaining control or an interest in an

25 enterprise.  Okay?


J&J COURT TRANSCRIBERS, INC.

Shestack - Cross/Bradford          75

1 A   Now would you give me a moment --

2 Q   Of course.

3 A   -- to kind of get some of these cases I have here?

4 Q   Tell me whenever you're ready.

5 A   Okay.

6                    (Pause)

7 A   Okay.

8 Q   Now with respect to the B case, you have no dispute that

9 Coram qualifies as the enterprise.  Correct?

10 A   In the B claim, that's right.

11 Q   And, in fact, an enterprise is generally just a legitimate

12 business that some --

13 A   Yes, I think that's -- right.  That's not true of the C

14 claim.  I think that's true of the B claim.

15 Q   And, in fact, with respect to a B claim, the U.S. Supreme

16 Court has said that the enterprise will ordinarily be the

17 victim.  Correct?

18 A   In the B claim.

19 Q   In the B claim.

20 A   Yes.

21 Q   And that's, because the defendants who are bad guys are

22 trying to acquire an interest in this victim innocent

23 enterprise for a pattern of predicate acts.

24 A   Right.

25 Q   That's the theory.  Right?


J&J COURT TRANSCRIBERS, INC.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:              .   Case Nos. 00-3299 and
                    .        00-3300 (MFW)
                    .   Chapter 11
                    .
CORAM HEALTHCARE CORP.    .    (Jointly Administered under
and CORAM, INC.,    .    00-3299)
                    .
                    .   824 Market Street
                    .   Wilmington, Delaware 19801
        Debtors.  .
                    .   March 4, 2004
. . . . . . . . . . . . . . . .   11:17 a.m.

TRANSCRIPT OF CONFIRMATION HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Equity Committee:    Jenner & Block, LLC
                    By:  RICHARD F. LEVY, ESQ.
                         C. STEVEN TOMASHEFSKY, ESQ.
                         ANDERS C. WICK, ESQ.
                         DAVID J. BRADFORD, ESQ.
                         TERRI L. MASCHERIN, ESQ.
                    One IBM Plaza
                    Chicago, IL  60611

For Cerberus Partners, L.P.:  Landis, Rath & Cobb, LLP
                    By:  KERRI KING MUMFORD, ESQ.
                    919 Market Street
                    Wilmington, DE  19801

Audio Operator:        Brandon J. McCarthy

Proceedings recorded by electronic sound recording, transcript
        produced by transcription service

B425

Liebentritt - Direct          158

1 Q    And what was the purpose of that letter?

2 A    The purpose of that letter was to solicit votes for our

3 plan. And as we indicated in the letter, we also thought it

4 would be okay that if -- and this was sent to the unsecured

5 creditors of both Coram and Coram Healthcare Corporation. We

6 indicated in that letter that it would be okay for them to vote

7 for both plans on the premise that that would best assure to

8 them that some plan got approved and allowed this Court to

9 choose which was the best plan.

10 Q    Has there been any change in circumstance since the

11 Trustee's plan was filed that affects the Equity Committee's

12 evaluation of the Trustee's plan?

13 A    Certainly, I think the performance of the company has been

14 significantly positive over the past six months as indicated by

15 the financial results we've seen. Although this slightly

16 proceeded the filing of the Trustee's plan, the whole -- what

17 we learned in the process of the Crowley motions I think

18 certainly enhanced the value of the lawsuit. The CPS

19 transaction I think is an indication of a lost opportunity that

20 was a result, I believe, of someone who was trying to sell off

21 assets for the benefit of reduction of debt prematurely.

22 Q    Why did you consider the recent CPS transaction to be

23 relevant to the Equity Committee's assessment of the Trustees

24 plan?

25 A    I think what that showed us, and albeit in hindsight, that

J&J COURT TRANSCRIBERS, INC.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                    . Case No.  00-3299 and 00-3300
                          . (Jointly Administered under
                          .  00-3299)
CORAM HEALTHCARE CORP. and   .
CORAM, INC.,              . 824 Market Street
                          . Wilmington, Delaware 19801
        Debtors.  .
. . . . . . . . . . . . . . . . 9:37 a.m.

April 7, 2004


TRANSCRIPT OF CONFIRMATION HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Equity Committee:    Saul Ewing, LLP
                        By:  MARK MINUTI, ESQ.
                        222 Delaware Avenue, Suite 1200
                        Wilmington, Delaware  19801

                        Jenner & Block
                        By:  C. STEVEN TOMASHEFSKY, ESQ.
                             RICHARD F. LEVY, ESQ.
                        One IBM Plaza
                        Chicago, Illinois  60611

For Cerberus:            Schulte Roth & Zabel, LLP
                        By:  HOWARD O. GODNICK, ESQ.
                             MICHAEL L. COOK, ESQ.
                             NIKHIL SINGHUI, ESQ.
                             S. KIM, ESQ.
                        919 Third Avenue
                        New York, New York  10022

Audio Operator:          Jennifer M. Patone

Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

B427

Hurst - Cross                    78

1    THE COURT:  All right.  What's the exhibit number?

2    MR. TOMASHEFSKY:  250.

3    THE COURT:  250?

4    MR. TOMASHEFSKY:  Yes.

5    THE COURT:  Thank you.

6 Q   I'm showing you now, Mr. Hurst, a document that's marked

7 EC-250.  That's the copy that you produced to us that had some

8 writing on it, isn't it?

9 A   Yes, it is.

10 Q   And that's your handwriting on page six?

11 A   Yes.

12 Q   Okay.  And while you were reading this Deloitte report,

13 you made the following note in your handwriting on it, as

14 reflected in this exhibit.  "41.3, 12.2 LTM, Curascript 335

15 Curascript .8, CPS Curascript."  Is that right?

16    THE COURT:  I'm sorry.  What page were you on again?

17    MR. TOMASHEFSKY:  Page six.

18    THE COURT:  Thank you.

19    MR. TOMASHEFSKY:  This is the handwritten note.

20 Q   Did I read that correctly?

21 A   Yes.

22 Q   And that refers, doesn't it, to the recent sale of

23 Curascript, which was Coram's former CPS subsidiary for 335

24 million, doesn't it?

25 A   Yes, it does.

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                          :    Chapter 11

CORAM HEALTHCARE CORP. and                      :    Case No. 00-3299 (MFW)
CORAM, INC.,                                     :    (Jointly Administered)

        Debtors.                                :    *QE: 4051 , 4052 , 4057*

---

### ORDER CONFIRMING THE CHAPTER 11 TRUSTEE'S
### SECOND AMENDED JOINT PLAN OF REORGANIZATION

---

WHEREAS, on May 2, 2003, Arlin M. Adams, the Chapter 11 Trustee of the above-
captioned bankruptcy estates (the "Trustee"), filed the Chapter 11 Trustee's Joint Plan of
Reorganization (the "Original Plan"), which Plan the Trustee subsequently amended or modified
on June 17, 2003 (the "Amended Plan"), September 8, 2003 and April 15, 2004 (the "Second
Amended Plan") (a copy of the Second Plan is annexed hereto as Exhibit A);

WHEREAS, on June 26, 2003, the Court entered an Order (the "Solicitation Order") that,
among other things, (i) approved the Disclosure Statement[1] under Section 1125 of the
Bankruptcy Code and Fed. R. Bankr. P. 3017, (b) approved the form and method of the notice of
Confirmation Hearing (the "Confirmation Hearing Notice") and (c) established certain
procedures for the solicitation and tabulation of votes with respect to the Amended Plan;

WHEREAS, the Confirmation Hearing Notice together with the (i) the Amended Plan,
(ii) the Disclosure Statement, (iii) the Solicitation Order, (iv) the appropriate ballot(s) and voting
instructions, and (v) a pre-addressed return envelope (collectively, a "Solicitation Package")

---

[1] Unless otherwise defined herein, all capitalized terms shall have the same meanings ascribed to them in the Plan.

PHDATA 1234490_1

*Slezak* 8
**DEP. EXH. #** 8
Date: 3/15/07   8

SL 001657        *4061*

B429

were transmitted in the manner set forth in the Disclosure Statement Order, and such service is adequate as provided by Fed. R. Bankr. P. 3017(d);

WHEREAS, the Trustee filed the: (i) certification of publication of Jacqueline Haslbauer, principal clerk of the *New York Times*, attesting to the fact that the Confirmation Hearing Notice was published in the *New York Times* on August 20, 2003, and (ii) certification of Gregg Palmer, advertising clerk of the *Wall Street Journal*, attesting to the fact that the Confirmation Hearing Notice was published in the *Wall Street Journal* on August 20, 2003;

WHEREAS, on June 9, 2004, Henry Colvin of AlixPartners LLC, the claims agent appointed in these bankruptcy cases, filed the Affidavit of Henry Colvin Certifying the Ballots Accepting or Rejecting the Chapter 11 Trustee's Amended Joint Plan of Reorganization, Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Chapter 11 Trustee Dated June 7, 2004 (the "Voting Report");

WHEREAS, on September 29, 2003, the Trustee filed the Plan Supplement with respect to the Amended Plan;

WHEREAS, objections to confirmation of the Amended Plan were filed (collectively, the "Objections");

WHEREAS, the Court held confirmation hearings with respect to the Amended Plan, as amended by the Second Amended Plan, and a competing plan of reorganization filed by the Equity Committee, beginning on September 30, 2003 and ending on April 20, 2004;

WHEREAS, following the conclusion of the confirmation hearings, the Trustee, the Equity Committee and the Noteholders submitted post-confirmation hearing briefs and reply briefs;

WHEREAS, on September 10, 2004, the Trustee filed a Stipulation between the Trustee and the Equity Committee regarding the Second Amended Plan (the "Stipulation");

2

PHDATA 1234490_1

SL 001658

WHEREAS, on October 5, 2004, the Court issued an Opinion (the "Opinion") and Order (the "Order"): (i) denying confirmation of the Equity Committee's plan; and (ii) stating that the request by the Trustee for confirmation of the Second Amended Plan would be granted, provided that the Second Amended Plan was modified in accordance with the Opinion (copies of the Opinion and Order are annexed hereto as Exhibits B and C, respectively); and

WHEREAS, on October 15, 2004, the Trustee filed with the Court the Modification of Chapter 11 Trustee's Second Amended Joint Plan of Reorganization in Accordance with Opinion and Order Dated October 5, 2004 (the "Plan Modification," and together with the Second Amended Plan, the "Plan") (a copy of the Plan Modification is annexed as Exhibit D).

NOW, THEREFORE, IT IS HEREBY FOUND AND DETERMINED THAT:[2]

1.    Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2), 1334(a)). The Court has jurisdiction over the Bankruptcy Cases and the Plan pursuant to 28 U.S.C. §§ 157(b)(2)(A) & (L) & 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 & 1409. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)&(L) and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

2.    Judicial Notice. The Court takes judicial notice of the docket of these Bankruptcy Cases maintained by the Clerk of the Bankruptcy Court and/or its duly-appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of the Bankruptcy Cases.

---

[2] Pursuant to Fed. R. Bankr. P. 7052, as made applicable to contested matters under Fed. R. Bankr. P. 9014, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.

3

PHDATA 1234490_1

SL 001659

3.    <u>Burden of Proof</u>. The Trustee has the burden of proving the elements of Section 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

4.    <u>Transmittal and Mailing of Materials; Notice</u>. The Solicitation Package was transmitted and served in accordance with the Solicitation Order and the Bankruptcy Rules and such transmittal and service were adequate and sufficient; publication of the Confirmation Hearing Notice as set forth in the certifications of Jacqueline Haslbauer of the *New York Times* and Gregg Palmer of the *Wall Street Journal* were adequate and sufficient, and no other or further notice was required.

5.    <u>Voting</u>. Votes to accept and reject the Amended Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Order.

6.    <u>Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>. The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying Section 1129(a)(1) of the Bankruptcy Code.

(a)    <u>Proper Classification (11 U.S.C. §§ 1122, 1123 (a)(1)</u>. The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exists for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between holders of Claims and Equity Interests. Thus, the Plan satisfies Sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(b)    <u>Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>. Article 4 of the Plan specifies that Classes 1 and 2 are unimpaired under the Plan, thereby satisfying Section 1123(a)(2) of the Bankruptcy Code.

4

PHDATA 1234490_1

SL 001660

B432

(c)     Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Article

4 of the Plan designates Classes 3, 4, 5 and 6 as impaired and the Plan specifies the treatment of

Claims and Equity Interests in those Classes, thereby satisfying Section 1123(a)(3) of the

Bankruptcy Code.

(d)     No Discrimination (11 U.S.C. § 1123(a)(4)). The Plan provides for the

same treatment for each Claim or Equity Interest in each respective Class unless the holder of a

particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or

Equity Interest, thereby satisfying Section 1123(a)(4) of the Bankruptcy Code.

(e)     Implementation of Plan (11 U.S.C. § 1123(a)(5)). The Plan and the

various documents and agreements set forth in the Plan and the Plan Supplement provide

adequate and proper means for the Plan's implementation, thereby satisfying Section 1123(a)(5)

of the Bankruptcy Code.

(f)     Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)). Article 5.4 of the

Plan provides that the Certificate of Incorporation and Bylaws of Reorganized Coram shall be

amended to satisfy the provisions of the Plan and the Bankruptcy Code, including to prohibit the

issuance of nonvoting equity securities. Thus, the requirements of Section 1123(a)(6) of the

Bankruptcy Code are satisfied.

(g)     Designation of Directors (11 U.S.C. § 1123(a)(7)). Article 5.5 of the Plan

contains provisions with respect to the manner of selection of directors of Reorganized Coram

that are consistent with the interests of creditors, equity security holders, and public policy in

accordance with Section 1123(a)(7) of the Bankruptcy Code.

(h)     Additional Plan Provisions (11 U.S.C. § 1123(b)). The Plan's provisions

are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code.

5

PHDATA 1234490_1

SL 001661

B433

(i)    Bankruptcy Rule 3016(a). The Plan is dated and identifies the party submitting it as proponent, thereby satisfying Bankruptcy Rule 3016(a).

7.    Debtors' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)). The Trustee has complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Section 1129(a)(2) of the Bankruptcy Code.

8.    Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)). As set forth in the Opinion, the Trustee has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying Section 1129(a)(3) of the Bankruptcy Code. The Trustee's good faith is evident from the facts and record of the Bankruptcy Cases, including the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in the Bankruptcy Cases.

9.    Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)). Any payment made or to be made by any of the Debtors for services or for costs and expenses in or in connection with the Bankruptcy Cases, or in connection with the Plan and incident to the Bankruptcy Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable, thereby satisfying Section 1129(a)(4) of the Bankruptcy Code.

10.    Directors, Officers and Insiders (11 U.S.C. § 1129(a)(5)). The Trustee has complied with Section 1129(a)(5) of the Bankruptcy Code. The identity and affiliations of the persons proposed to serve as initial directors or officers of Reorganized Coram after confirmation of the Plan have been disclosed, and the appointment to, or continuance in, such offices of such persons is consistent with the interests of holders of Claims against and Equity Interests in Reorganized Coram and with public policy. The identity of any insider that will be employed or retained by Reorganized Coram and the nature of such insider's compensation have also been fully disclosed.

6

PHDATA 1234490_1

SL 001662

11.    No Rate Changes (11 U.S.C. § 1129(a)(6)).  After confirmation of the Plan,

Reorganized Coram's businesses will not involve rates established or approved by, or otherwise

subject to, any governmental regulatory commission.  Thus, Section 1129(a)(6) of the

Bankruptcy Code is not applicable in the Bankruptcy Cases or with respect to the Plan.

12.    Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).  The Plan satisfies Section

1129(a)(7) of the Bankruptcy Code.  Each holder of an impaired Claim or Equity Interest either

has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Equity

Interest, property of a value, as of the Effective Date, that is not less than the amount that such

holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy

Code on such date.

13.    Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).  Classes 1 (Priority,

Non-Tax Claim) and 2 (Secured Claim) of the Plan are Classes of unimpaired Claims that are

conclusively presumed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code.

Classes 3 (General Unsecured Claims) and 4 (Coram Preferred Stock) voted to accept the Plan in

accordance with Sections 1126(c) and (d) of the Bankruptcy Code.  Class 5 (Coram Equity

Interests) is not entitled to receive or retain any property under the Plan and, therefore, is deemed

to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Class 6 (CHC

Equity Interests) voted to reject the Plan.  Although Section 1129(a)(8) has not been satisfied

with respect to Classes 5 and 6, the Plan is confirmable because the Plan satisfies Section

1129(b) of the Bankruptcy Code with respect to such rejecting Classes.

14.    Treatment of Administrative and Priority Claims (11 U.S.C. § 1129(a)(9)).  The

treatment of Administrative Claims and Priority Claims pursuant to Articles 3 and 4 of the Plan

satisfies the requirements of Sections 1129(a)(9)(A) and (B) of the Bankruptcy Code, and the

7

PHDATA 1234490_1

SL 001663

B435

treatment of Priority Tax Claims pursuant to Article 3 of the Plan satisfies the requirements of Section 1129(a)(9)(C) of the Bankruptcy Code.

15.   Acceptance By Impaired Classes (11 U.S.C. § 1129(a)(10)).  At least one Class of Claims against the Debtors that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider, thus satisfying the requirements of Section 1129(a)(10) of the Bankruptcy Code.

16.   Feasibility (11 U.S.C. § 1129(a)(11)).  Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Reorganized Coram, thus satisfying the requirements of Section 1129(a)(11) of the Bankruptcy Code.

17.   Payment of Fees (11 U.S.C. § 1129(a)(12)).  All fees payable under Section 1930 of title 28 of the United States Code have been paid or will be paid pursuant to Article 13.2(c) of the Plan on or before the Effective Date.

18.   Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).  Article 5.12 of the Plan provides that pursuant to Section 1114 of the Bankruptcy Code, payments, if any, due to any person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical, surgical or hospital care benefits, or benefits in the event of sickness, accident, disability or death under any plan, fund or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the Debtors prior to the Petition Date, shall be continued for the duration of the period the Debtors have obligated themselves to provide such benefit; provided, however, that Reorganized Coram retains any right to modify any and all such plans, funds and programs in accordance with the terms thereof. Thus, the requirements of Section 1129(a)(13) of the Bankruptcy Code are satisfied.

19.   Fair and Equitable; No Unfair Discrimination (11 U.S.C. § 1129(b)).  Class 5 is deemed to have rejected the Plan and Class 6 voted to reject the Plan (collectively, the

PHI\ATA 1234490_1

SL 001664

"Rejecting Classes"). The Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes, as required by Section 1129(b)(1) and (2) of the Bankruptcy Code. Upon confirmation and the occurrence of the Effective Date, the Plan shall be binding upon the members of the Rejecting Classes.

20.    Principal Purpose of the Plan (11 U.S.C. § 1129(d)). The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, as amended.

21.    Modifications to the Plan. The modifications of the Amended Plan set forth in the Second Amended Plan and the Plan Modification constitute technical changes and/or changes with respect to particular Claims and Equity Interests adversely affected thereby by agreement with and the consent of the holders of such Claims and Equity Interests, and do not materially adversely affect or change the treatment of any other Claims or Equity Interests. Accordingly, pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under Section 1125 of the Bankruptcy Code or resolicitation of votes under Section 1126 of the Bankruptcy Code, nor do they require that holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Amended Plan.

22.    Good Faith Solicitation (11 U.S.C. § 1125(e)). Based on the record before the Bankruptcy Court in these Bankruptcy Cases, the Trustee, the Debtors, AlixPartners LLC, any Disbursing Agent, the Noteholders, the Equity Committee and their respective members, officers, directors, employees, agents, counsel or other professionals have acted in good faith within the meaning of Section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules in connection with all their respective activities described in Section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by Section 1125(e) of the Bankruptcy Code and the exculpation provisions

PHDATA 1234490_1

SL 001665

set forth in Article 9 of the Second Amended Plan, as modified in conformity with the Opinion by the Plan Modification.

23.    <u>Assumption of Executory Contracts and Unexpired Leases</u>.  Article 8 of the Plan governing the assumption and rejection of executory contracts and unexpired leases satisfies the requirements of Sections 365(a) and (b) of the Bankruptcy Code.  The assumption of those executory contracts and unexpired leases to be assumed in accordance with the Plan is in the best interest of the Debtors, their estates, Reorganized Coram and all parties in interest in the Bankruptcy Cases.  The assignment to Reorganized Coram of those assumed executory contracts and unexpired leases to which the Debtors are a party and of any executory contracts and unexpired leases heretofore assumed by the Debtors during the Bankruptcy Cases is in the best interest of the Debtors, their estates, Reorganized Coram and all parties in interest in the Bankruptcy Cases.  The Plan and this Confirmation Order each adequately provides for the timely payment of cure amounts, if any, in Cash in accordance with Section 365(b)(1) of the Bankruptcy Code.

24.    <u>Rejection of Executory Contracts and Unexpired Leases</u>.  The executory contracts or unexpired leases of the Debtors listed in the Plan Supplement as all executory contracts and unexpired leases to be rejected are burdensome and, as such, the rejection thereof is in the best interest of the Debtors, their estates, and all parties in interest in the Bankruptcy Cases.

25.    <u>Substantive Consolidation</u>.  No creditor of any of the Debtors will be prejudiced by the limited substantive consolidation of the Bankruptcy Cases solely for Plan purposes; such substantive consolidation will benefit all creditors of the Debtors.

26.    <u>R-Net Settlement</u>.  For the reasons and based upon the findings and conclusions set forth in the Opinion, the compromise and settlement between the Trustee and R-Net,

10

PHDATA 1234490_1

SL 001666

incorporated in the Plan, is hereby approved pursuant to Bankruptcy Rule 9019 and is binding upon all entities affected thereby.

27.    The Plan Funding Agreement.  For the reasons and based upon the findings and conclusions set forth in the Opinion, the compromise and settlement between the Trustee and the Noteholders that is incorporated in the Plan, is hereby approved and is binding upon all entities affected thereby.

28.    Satisfaction of Confirmation Requirements.  As provided herein and in the Opinion, the Plan satisfies the requirements for confirmation set forth in Section 1129 of the Bankruptcy Code.

29.    Retention of Jurisdiction.  The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article 11 of the Plan and Section 1142 of the Bankruptcy Code.

**DECREES**

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

30.    Confirmation.  The Plan (which consists of the Second Amended Plan as modified by the Plan Modification) is approved and confirmed under Section 1129 of the Bankruptcy Code.  The terms of the Plan and the Opinion are incorporated by reference into and are an integral part of this Confirmation Order.

31.    Technical Amendments.  The modifications and amendments to the Amended Plan reflected in the Second Amended Plan and Plan Modification, meet the requirements of Sections 1127 of the Bankruptcy Code, such modifications do not adversely change the treatment of any Creditor or any Equity Interest of which the holder has not consented thereto, and thus no further solicitation or voting is required.

11                           PHDATA 1234490_1

SL 001667

B439

32.    <u>Objections</u>.  Certain of the objections to the Plan by the Equity Committee are addressed in the Opinion.  All other objections that have not been withdrawn, waived, or settled, and all reservations of rights pertaining to confirmation of the Plan included therein, are overruled on the merits.

33.    <u>Plan Supplement</u>.  The documents contained in the Plan Supplement and any amendments, modifications, and supplements thereto are incorporated by reference into and are an integral part of the Plan, all documents and agreements related thereto or to consummation and implementation of the Plan, and the execution, delivery, and performance thereof by Reorganized Coram, are authorized and approved.  Without need for further order or authorization of the Bankruptcy Court, the Trustee, the Debtors and Reorganized Coram are each authorized and empowered to make any and all modifications to any and all documents included as part of the Plan Supplement that do not materially modify the terms of such documents and are consistent with the Plan.

34.    <u>Restructuring Transactions</u>.  The Trustee, the Debtors and Reorganized Coram are authorized to take all steps, and to execute and deliver all documents, necessary to implement and effectuate the Plan and the transactions contemplated by the Plan.

35.    <u>Plan Classification Controlling</u>.  The classifications of Claims and Equity Interests for purposes of the Distributions to be made under the Plan shall be governed solely by the terms of the Plan.  The classifications set forth on the Ballots tendered to or returned by the Debtors' creditors and equity security holders in connection with voting on the Amended Plan (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims and Equity Interests under the Plan for distribution purposes, and (c) shall not be binding on the Debtors or Reorganized Coram.

12                    PHDATA 1234490_1

SL 001668

36.    <u>Binding Effect.</u> The Plan and its provisions shall be binding upon the Trustee, the Debtors, Reorganized Coram, the Disbursing Agent, any entity acquiring or receiving property or a distribution under the Plan, and any holder of a Claim against or Equity Interest in the Debtors, including all governmental entities, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder or entity has accepted the Plan.

37.    <u>Transmittal; Notice.</u> The transmittal and service of the Disclosure Statement, the Amended Plan, the Ballots, the Solicitation Order and the Confirmation Hearing Notice are hereby approved. The publication of the Confirmation Hearing Notice is hereby approved.

38.    <u>Vesting of Assets (11 U.S.C. § 1141(b), (c)).</u> Except as otherwise specifically provided in the Plan, in accordance with Article 5.9 of the Plan, upon the Effective Date, title to all assets and property of the Debtors' estates, including the Debtors' equity and other interests in non-debtor affiliates of the Debtors, shall pass to and revest in Reorganized Coram, free and clear of all Claims, Equity Interests, liens and other rights of creditors or holders of Equity Interests arising before the Effective Date. On and after the Effective Date, Reorganized Coram may operate its business and may use, acquire, and dispose of its property free of any restrictions of the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, except as otherwise specifically provided in the Plan.

39.    <u>Dissolution of CHC.</u> Consistent with Article 5.1 of the Plan, on the Effective Date, or as soon thereafter as may be reasonably practicable, the Trustee shall cause CHC to be dissolved as a corporation under the laws of the State of Delaware, without the taking of any further action by the stockholders, officers and directors of CHC.

40.    <u>Assumption of Executory Contracts and Unexpired Leases (11 U.S.C. §§ 365 and 1123(b)(2)).</u> Pursuant to Article 8 of the Plan and Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the Trustee is authorized to assume, as of the Effective Date, those executory

13                                   PHDATA 1234490_1

SL 001669

contracts or unexpired leases to which the Debtors are parties, unless such contract or lease (i) was previously assumed or rejected, (ii) previously expired or terminated pursuant to its own terms, or (iii) is on a list of executory contracts to be rejected contained in the Plan Supplement. Pursuant to Section 365(f) and 1123(b)(2)of the Bankruptcy Code, and in accordance with Article 8 of the Plan, the Trustee is authorized to assign to Reorganized Coram and Reorganized Coram is authorized to assume, any executory contracts and unexpired leases to which CHC is a party (and which has not been rejected).

41.     Cure Amounts in Connection with Assumption.  With respect to each executory contract or unexpired lease assumed by the Trustee or the Debtors, any monetary amounts required as cure payments shall be satisfied by Reorganized Coram's payment of the cure amount in Cash on the Effective Date, or upon such other terms the Bankruptcy Court may order or the parties to such executory contract or unexpired lease otherwise may agree.  In the event of a dispute regarding whether a default exists under the executory contract or unexpired lease or the amount of any cure payment, the cure of any default required by Section 365(b)(1) of the Bankruptcy Code shall occur after the entry of a Final Order of the Bankruptcy Court resolving the dispute.

42.     Rejection of Executory Contracts and Unexpired Leases (11 U.S.C. §§ 365(a) and 1123(b)(2)).  The Trustee is authorized pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code to reject the executory contracts or unexpired leases of the Debtors listed in the Plan Supplement.  Reorganized Coram shall have no liability under such rejected contracts and leases except as specifically provided for in the Plan.

43.     Bar Date for Rejection Damage Claims.  If the rejection of any executory contract or unexpired lease listed as rejected in the Plan Supplement, results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall

14

PHDATA 1234490_1

SL 001670

B442

not be enforceable against the Debtors, Reorganized Coram or the Debtors' estates, assets, properties or interests in properties unless a proof of claim is filed with the Bankruptcy Court and served upon the Trustee on or before thirty (30) days after the Effective Date.

44.    General Authorization. The Trustee and each of the Debtors and Reorganized Coram are authorized to execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan. The Trustee, the Debtors and Reorganized Coram and their respective directors, officers, members, agents and attorneys, are authorized and empowered to issue, execute, deliver, file, or record any agreement, document or security, including without limitation the documents contained in the Plan Supplement, as modified, amended and supplemented, in substantially the form included therein, and to take any action necessary or appropriate to implement, effectuate and consummate the Plan in accordance with its terms and to take any or all corporate actions authorized to be taken pursuant to the Plan, and any release, amendment, or restatement of any bylaws, certificates of incorporation, or other organization documents of Reorganized Coram, whether or not specifically referred to in the Plan or the Plan Supplement, without further order of the Court or action by the holder of a Claim against or Equity Interest in either of the Debtors, and any or all such documents shall be accepted by each of the respective state filing offices and recorded in accordance with applicable state law and shall become effective in accordance with their terms and the provisions of state law.

45.    Corporate Action. On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of and/or one or both of the Debtors or Reorganized Coram or their successors in interest under the Plan, including, without limitation, the authorization to issue or cause to be issued the Reorganized Coram

15                              PHDATA 1234400_1

SL 001671

Common Stock, the Reorganized Coram Preference Stock and documents relating thereto, the adoption of the amended certificate of incorporation and amended bylaws of Reorganized Coram and the dissolution of CHC and the election or appointment, as the case may be, of directors and officers of the Debtors pursuant to the Plan, shall be in full force and effect from and after the Effective Date pursuant to Section 303 of the General Corporation Law of the State of Delaware without any requirement of further action by the stockholders or directors of the Debtors, the Trustee or Reorganized Coram. On the Effective Date, or as soon thereafter as is reasonably practicable, Reorganized Coram shall file its amended certificate of incorporation with the Secretary of State of the State of Delaware and the Trustee shall file the appropriate documents to effectuate the dissolution of CHC in accordance with applicable law. The amended certificate of incorporation and bylaws of Reorganized Coram shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Court and shall include, _inter alia_, a provision prohibiting the issuance of nonvoting equity securities, to the extent such a provision is required by Section 1123(a)(6) of the Bankruptcy Code.

46.     _Reorganized Coram Management._ On the Effective Date, operation of Reorganized Coram shall become the general responsibility of the board of directors of Reorganized Coram, which shall, thereafter, continue to have the responsibilities for the management, control and operation of Reorganized Coram. As of the Effective Date, the Noteholders or their designees shall be the holders of all of the capital stock of Reorganized Coram and shall, consistent with the requirements of Delaware law, have the right to elect the board of directors of Reorganized Coram. However, as provided in Article 5.5 of the Plan, Daniel Crowley shall not be employed or otherwise affiliated with Reorganized Coram, or any subsidiary or affiliate of Reorganized Coram, for a period of one (1) year following the Effective Date.

16

47.    Annual Meeting of Shareholders.  For purposes of Section 211 of the Delaware General Corporation Law Act, the first annual meeting of shareholders of Reorganized Coram shall be deemed to have taken place on the Effective Date.

48.    Actions by Reorganized Coram; Issuance of New Securities.  As of the Effective Date, Reorganized Coram is authorized, without further action under applicable law, regulation, rule or order, to:  (i) issue Reorganized Coram Common Stock and the Reorganized Coram Preferred Stock as contemplated by the Plan and (ii) execute, deliver, file or record any documents, and take any other actions as may be necessary to effectuate the terms and provisions of the Plan.

49.    Dissolution of Committee.  As of the Effective Date, the Creditors' Committee and the Equity Committee shall be dissolved and have no further duties, authority or responsibility, and Reorganized Coram shall not have any responsibility for fees, costs and expenses of the Creditors' Committee and the Equity Committee, its individual members or its professionals, incurred on and after the Confirmation Date.

50.    The Causes of Action.  As set forth in Article 5.3 of the Plan, the Trustee shall retain the sole and exclusive right, from and after the Effective Date, to commence, prosecute, compromise and seek Bankruptcy Court approval of any settlement of any of the Causes of Action on behalf of the Debtors' estates; provided, however, that the Trustee shall not commence or maintain any action or cause of action released under Article 9 of the Plan.  Reorganized Coram shall be responsible for payment of all Post-Effective Date Administrative Claims related to the Causes of Action.  The proceeds of the Causes of Action, if any, shall be distributed as follows:  (i) first, to Reorganized Coram in an amount equal to the Post-Effective Date Administrative Claims relating to the Causes of Action; (ii) second, to the holders of Allowed General Unsecured Claims on a *pro rata* basis in an amount equal to the interest accruing (at the

17

PHDATA 1234490_1

SL 001673

statutory judgment rate set forth in Section 1961 of Title 28 of the United States code) from the

Petition Date through the Effective Date on account of such Allowed General Unsecured Claims

until such interest has been paid in full; and (iii) third, on a *pro rata* basis to the holders of CHC

Equity Interests.

      51.   Securities Laws Exemption.  The offering, issuance, transfer, exchange, and/or

distribution by Reorganized Coram of shares in Reorganized Coram are exempt from registration

under the Securities Act of 1933, as amended, and any similar state or local laws by reason of

Section 1145(a) of the Bankruptcy Code.

      52.   Substantive Consolidation.  Upon the occurrence of the Effective Date, the

Debtors' estates shall be deemed substantively consolidated, but only for the limited purpose of

effectuating the settlements contemplated by, and making Distributions to the holders of Claims

and Equity Interests under the Plan.  For such limited purposes, on the Effective Date:  (a) all

guaranties of either Debtor for the payment, performance or collection of an obligation of the

other Debtor with respect to any class of Claims or Equity Interests shall be deemed terminated

and cancelled; (b) any obligation of one of the Debtors and all guarantees with respect to any

class of Claims or Equity Interests executed by one of the Debtors and any joint obligation of the

Debtors, and all multiple Claims against the Debtors on account of such joint obligation, shall be

treated and allowed only as a single Claim against the consolidated estates of the Debtors; and

(c) each Claim filed in the Chapter 11 Case of either of the Debtors shall be deemed filed against

the consolidated Debtors and shall be deemed a Claim against and an obligation of the

consolidated Debtors.  Except as set forth herein, such substantive consolidation will not (other

than for purposes related to Distributions to be made under the Plan) (a) affect the legal entity

and corporate structures of either of the Debtors or Reorganized Coram, subject to the right of

the Debtors or Reorganized Coram to effect any transaction contemplated by the Plan; (b) render

18

SL 001674

B446

valid and enforceable against either Debtor any Claim or Equity Interest under the Plan for
which it is otherwise not liable, and the liability of the Debtors for any such Claim or Equity
Interest will not be affected by such substantive consolidation other than to extinguish duplicate
liability on account of such a Claim, and (c) affect interests in any non-debtor affiliates, except as
otherwise may be required in connection with any transaction contemplated by the Plan.

53.    <u>Governmental Approvals Not Required</u>.  This Confirmation Order shall constitute
all approvals and consents required, if any, by the laws, rules, or regulations of any state or any
other governmental authority with respect to the implementation or consummation of the Plan
and any documents, instruments, or agreements, and any amendments or modifications thereto,
and any other acts referred to in or contemplated by the Plan, the Disclosure Statement, the Plan
Supplement, and any documents, instruments, or agreements and any amendments or
modifications thereto.

54.    <u>Exemption from Certain Taxes</u>.  Pursuant to Section 1146(c) of the Bankruptcy
Code, any transfer from the Debtors to Reorganized Coram or any other Person pursuant to the
Plan shall not be subject to any recording or stamp tax, conveyance fee or similar tax, mortgage
recording or other similar tax or governmental assessment.  This Confirmation Order hereby
directs the appropriate state or local government officers to forego the collection of any such tax
or governmental assessment and to accept for filing and recording any documents without
payment of said tax or governmental assessment.

55.    <u>Disputed Claims</u>.  No Distribution shall be made to the holder of a disputed Claim
or disputed Equity Interest until such Claim or Equity Interest is Allowed.  From and after the
Effective Date, the Trustee shall have the authority to compromise, withdraw or otherwise
resolve objections to Claims, subject to Bankruptcy Court approval.  The total amount of the
Distribution attributable to a disputed Claim or disputed Equity Interest (or such lessor amount as

19

PHDATA 1234490_1

SL 001675

the Bankruptcy Court may determine) shall be held in reserve from Plan Funding Cash by

Reorganized Coram pending resolution by the Bankruptcy Court or agreement of the Trustee or

holder of such Claim or Equity Interest that is in dispute. Any Distribution shall be made as

soon as reasonably practicable after the date that the Bankruptcy Court enters a Final Order

allowing such Claim. The holder of a disputed Claim or disputed Equity Interest shall not be

entitled to receive or recover any amount in excess of the amount reserved to pay such Claim or

Equity Interest. The Trustee may at any time request the Bankruptcy Court to estimate any

contingent or unliquidated claim pursuant to Section 502(c) of the Bankruptcy Code or other

applicable law.

    56.    *Disbursing Agent.* All Distributions under the Plan shall be made by Reorganized

Coram and all monetary distributions shall be at the direction of the Disbursing Agent. If the

Disbursing Agent is an independent third party designated by the Trustee to serve in such

capacity, such Disbursing Agent shall receive, without further Bankruptcy Court approval,

reasonable compensation for services rendered pursuant to the Plan and reimbursement of

reasonable out-of-pocket expenses incurred in connection with such services by Reorganized

Coram. No Disbursing Agent shall be required to give any bond or surety or other security for

the performance of its duties unless otherwise ordered by the Bankruptcy Court.

    57.    *Equity Interests.* As set forth in Article 4 of the Plan, all CHC Equity Interests

shall be deemed cancelled and extinguished as of the Effective Date. In accordance with Article

4 of the Plan and as set forth in the Stipulation, the distributions to the members of Class 6 (CHC

Equity Interests) provided for in Article 4 of the Plan shall be made to the current holder as of

the Effective Date of each CHC Equity Interest that was in existence as of the Record Date. In

accordance with Article 1.55 of the Plan, the Record Date for the Purposes of the Plan is June 26,

PHIDATA 1234490_1

SL 001676

B448

2003, the date on which the order approving the Trustee's Disclosure Statement was entered upon the docket.

58.    The Plan Funding Agreement.  As of the Effective Date, the Noteholders shall be deemed to have agreed to the settlement terms set forth in Article 7.1 of the Plan and the Plan Funding Agreement.

59.    R-Net Settlement.  As of the Effective Date, R-Net shall be deemed to have agreed to the settlement set forth in Article 7.2 of the Plan and the R-Net Settlement Agreement.

60.    Administrative Bar Date.  Pursuant to Article 3.1(b) of the Plan, the holder of an Administrative Claim that arises before the Effective Date, other than an Administrative Claim of a professional employed under Section 327 and 328 of the Bankruptcy Code, or an Administrative Claim incurred by the Debtors in the ordinary course of the Debtors' business, must file an application seeking allowance of such Administrative Claim on or before the thirtieth (30th) day after the Effective Date.  Pursuant to Article 3.1(c) of the Plan, the holder of an Administrative Claim of a professional employed under Section 327 and 328 of the Bankruptcy Code that arises before the Effective Date must file an application for payment of such Administrative Claim under Section 330 of the Bankruptcy Code on or before the thirtieth (30th) day after the Effective Date.  As provided for in Article 3.1(d) of the Plan, Allowed Administrative Claims that arise before the Effective Date shall be paid from Plan Funding Cash. Any Allowed Administrative Claims that arise after the Effective Date shall be paid by Reorganized Coram, but not with the Plan Funding Cash.

61.    Discharge and Injunction.  Pursuant to Articles 10.1 and 10.2 of the Plan, the consideration to be distributed to holders of Allowed Claims or Allowed Equity Interests under the Plan shall completely satisfy, discharge and release all Claims and Equity Interests of any nature whatsoever against or in the Debtors or any assets, property or interests in property of the

PHDATA 1234490_1

SL 001677

Debtors to the fullest extent permitted by Section 1141 of the Bankruptcy Code. The Debtors shall be discharged from any and all Claims, including Claims that arose before the Confirmation Date, and all debts of the kind specified in Sections 502(g), (h) and (i) of the Bankruptcy Code whether or not a proof of Claim based upon such debt is filed or deem filed under Section 501 of the Bankruptcy Code, a Claim based upon such debt is allowed under Section 502 of the Bankruptcy Code, or the holder of a claim based upon such debt has accepted the Plan or any Distribution under the Plan. The discharge shall act as a permanent injunction against, among other things, the taking of any of the following actions against the Debtors, Reorganized Coram, and/or assets or property of the Debtors' estates. (i) the commencement or continuation of any action or other proceeding of any kind to enforce a Claim against or Equity Interests in either of the Debtors; (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors; (iii) the creation, perfection or enforcement of any encumbrance of any kind against the Debtors, Reorganized Coram or any of their or its property; and/or (iv) the assertion of any right of setoff, subrogation or recoupment of any kind against any obligation.

62. <u>Releases, Exculpations, and Injunctions.</u> The release, exculpation, and injunction provisions contained in the Plan, which incorporates the modifications to the Second Amended Plan made in accordance with the Opinion and set forth in the Plan Modification, are approved and such provisions shall be effective and binding upon all persons and entities.

63. <u>Termination of Injunctions and Automatic Stay.</u> Except as otherwise provided in the Plan or this Confirmation Order, all injunctions or stays arising under or entered during the Bankruptcy Cases under Sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

22

PHLDATA 1234490_1

SL 001678

B450

64.    Termination of Existing Securities.  Except for purposes of evidencing a right to

Distributions under the Plan, on the Effective Date all agreements and other documents

evidencing Claims or rights of any holder of a Claim against or Equity Interests in any of the

Debtors, including all stock, indentures and notes, shall be canceled and deemed null and void

and of no force and effect as against the Debtors and Reorganized Coram.

65.    Non-occurrence of Effective Date.  If each condition to the Effective Date

specified in Article 13, Section 2 of the Plan has not been satisfied or duly waived within ninety

(90) days after the Confirmation Date, then (unless the period of waiver or satisfaction of such

conditions has been extended with the consent of the Trustee and the Noteholders) the

Confirmation Order will be vacated by the Bankruptcy Court.

66.    Notice of Entry of Confirmation Order.  On or before the tenth (10th) Business

Day following the date of entry of this Confirmation Order, the Trustee shall serve notice of

entry of this Confirmation Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c)

on all creditors and interest holders, the United States Trustee, and other parties in interest, by

causing notice of entry of the Confirmation Order (the "Notice of Confirmation"), to be

delivered to such parties by first-class mail, postage prepaid.  The Trustee also shall cause the

Notice of Confirmation to be published as promptly as practicable after the entry of this

Confirmation Order once in *The New York Times* (National Edition).  The notice described

herein is adequate under the particular circumstances and no other or further notice is necessary.

67.    Notice of Effective Date.  Within five (5) Business Days following the occurrence

of the Effective Date, the Trustee shall file notice of the occurrence of the Effective Date and

shall serve a copy of same on those entities which have filed a notice of appearance and request

for service of pleadings in the Bankruptcy Cases.

23                         PHDATA 1234490_1

SL 001679

B451

68.    Binding Effect.  Pursuant to Sections 1123(a) and 1142(a) of the Bankruptcy Code and the provisions of this Confirmation Order, the Plan, the Plan Documents and the Plan Supplement shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

69.    Conflicts Between Confirmation Order and Plan.  To the extent of any inconsistency between the provisions of the Plan and this Confirmation Order, the terms and conditions contained in this Confirmation Order shall govern.  The provisions of this Confirmation Order are integrated with each other and are nonseverable and mutually dependent unless expressly stated by further order of this Bankruptcy Court.  The failure to reference or discuss all or part of any particular provision of the Plan herein shall have no effect on the validity, binding effect and enforceability of such provision, and such provision shall have the same validity, binding effect and enforceability as every other provision of the Plan.

70.    Modification/Reversal.  If any provision of this Confirmation Order is hereafter modified, vacated or reversed by subsequent order of this Bankruptcy Court or any other court, such reversal, modification or vacation shall not affect the validity or enforceability of the obligations incurred or undertaken under or in connection with the Plan prior to the ~~Trustee of Reorganized Coram's receipt of written notice~~ entry of any such order unless such order specifically provides otherwise.

71.    Effective Date.  This Order shall be deemed entered as of November 1, 2004 and the Effective Date of the Plan shall be December 1, 2004.  Plan Ending Cash under the Plan shall be computed as of the close of business on the business day immediately preceding the Effective Date.

_Mary F Walrath_ 10/27/04
HONORABLE MARY F. WALRATH,
UNITED STATES BANKRUPTCY JUDGE

24                          PHDATA 1234490_1

SL 001680



**Dynamic
Healthcare
Solutions**

# CONFIDENTIAL

*December 16, 2004

Mr. Steve Feinberg
Cerberus

Re: Financial Obligations

Dear Steve, Steve

The purpose of this letter and the attached invoice is fully and finally conclude all
outstanding matters between Cerberus and Dynamic Healthcare Solutions and myself.

During the period 1999-2000-2001, I provided professional assistance on a variety of
investment opportunities for which I believe I earned an incentive that has never been
paid. While I lack the final reporting of the outcomes, it is my belief that some number
of these were successful and resulted in economic gains or reversal of losses. Those
deals include FCHN, Curative, Hangar, MSC, Rite Aide, MaxiCare, NCSS, Pacificare,
Sunstar, Kindred (estimated gain of $50 Million or more), Sun Health (estimated gain $1
Million or more), PHP (estimated gain of $2 Million or more), Beverly Nursing Homes
(estimated gain of $14 Million/year or more), Health Plan Services, Winterland
(estimated gain of $24 Million caused by reducing Cerberus' loan exposure from $44
Million to $20 Million).

Your prompt attention to this invoice will be sincerely appreciated.

Respectfully,

Daniel D. Crowley
Chairman, President and CEO

# REDACTED