# M U C H  *S H E L I S T*

**ATTORNEYS AT LAW**

191 N. WACKER DRIVE
SUITE 1800
CHICAGO, IL 60606.1615

T 312.521.2000
F 312.521.2200

www.muchshelist.com

DIRECT DIAL:
312.521.2485
sschreiber@muchshelist.com

April 19, 2005



**VIA FEDERAL EXPRESS**

Cerberus Capital Management, LP
450 Park Avenue
20th Floor
New York, NY 10022-2605
Attention: Steven A. Feinberg and Mark A. Neporent

Re:  Daniel D. Crowley v. Cerberus, et al.

Dear Gentlemen:

We represent Mr. Crowley in the above-captioned matter. Reference is made to an Employment Agreement dated as of August 1, 1999 ("Agreement") between Mr. Crowley and Cerberus Capital Management, LP ("Cerberus"). Further reference is made to Section 3.1(b) of the Agreement pursuant to which Mr. Crowley is entitled to participate in such "benefit plans of the Employer that may be in effect from time to time..." Reference is also made to Section 4 of the Agreement which provides that Cerberus will reimburse Mr. Crowley for expenses incurred by Mr. Crowley "in performance of [Mr. Crowley's] duties pursuant to the Agreement". Finally, reference is drawn to Section 9.5 of the Agreement pursuant to which Cerberus agreed that Mr. Crowley will be "covered by and entitled to the benefits of [Cerberus'] insurance coverage (in effect from time to time) for its officers and/or executive employees, including its officers and directors liability policies".

As you know, Mr. Crowley has been sued by Arlin M. Adams, Chapter 11 Trustee of the post-confirmation bankruptcy estate of Coram Healthcare Corporation and Coram, Inc. ("Coram"). That lawsuit pertains directly to matters relating to Mr. Crowley's performance of his duties under the Agreement, and other conduct undertaken by Mr. Crowley with respect to Coram. A copy of that lawsuit is enclosed for your reference. Mr. Crowley has also been named as a defendant in an action pending in the United States District Court for the District of Colorado entitled *Genesis Insurance Company v. Daniel D. Crowley, et al.* A copy of that lawsuit is also enclosed for your reference.

B454

CXR 02980

Much Shelist Freed Denenberg Ament & Rubenstein, P.C.

**MUCH** *SHELIST*

April 19, 2005
Page 2

_____

In accordance with the promises and representations made in the Agreement, Mr. Crowley hereby demands that Cerberus provide to Mr. Crowley the benefits described in the Agreement including, but not limited to insurance coverage, reimbursement of all legal expenses, and indemnity of all claims asserted against Mr. Crowley.

Mr. Crowley reserves all rights against other individuals in addition to the claims he has described against Cerberus in this letter. Nothing in this letter should be construed as a waiver of any rights that Mr. Crowley asserts against any individuals for conduct they have personally undertaken in connection to the activities that form the basis of the claims asserted against Mr. Crowley.

Sincerely,

Scott N. Schreiber

SNS/cmc
Enclosures

cc:   Stuart D. Friedman (w/enclosures)
      Daniel Crowley (w/o enclosures)
      Anthony Valiulis (w/o enclosures)

B455

CXR 02981

ProTEXT Transcript Condensing for Windows

SHEET 1    PAGE 1

1

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELWARE
3    ----------------------------X
     ARLIN M. ADAMS, Chapter 11
4    Trustee of the
     Post-Confirmation
5    Bankruptcy Estates of
     CORAM HEALTHCARE CORPORATION,
6    a Delaware Corporation,
     and of CORAM INC.,
7    a Delaware Corporation,

8                 Plaintiff,

9         vs.           No. 04-1565 (SLR)

10   DANIEL D. CROWLEY,
     DONALD J. AMARAL,
11   WILLIAM J. CASEY,
     L. PETER SMITH, and
12   SANDRA L. SMOLEY,

13               Defendants.
     ----------------------------X

14

15   VIDEOTAPED DEPOSITION OF DAVID M. FRIEDMAN

16              New York, New York

17            Friday, March 16, 2007

18

19

20   Reported by:
     Jennifer Ocampo-Guzman, RPR, CRR
21

22

23

24

25

PAGE 2

2

3    March 16, 2007

4    9:31 a.m.

5

6         Deposition of DAVID M. FRIEDMAN,

7    held at the offices of Kasowitz, Benson,

8    Torres & Friedman, LLP, 1633 Broadway,

9    New York, New York, pursuant to subpoena,

10   before Jennifer Ocampo-Guzman, a

11   Registered Professional Reporter,

12   Certified Real-Time Shorthand Reporter

13   and a Notary Public of the State of New

14   York.

15

16

17

18

19

20

21

22

23

24

25

PAGE 3

3

1    A P P E A R A N C E S:
2
3    SCHNADER HARRISON SEGAL & LEWIS LLP
4    Attorneys for Plaintiffs
5         1600 Market Street, Suite 3600
6         Philadelphia, Pennsylvania 19103
7    BY:  BARRY E. BRESSLER, ESQ.
8         bbressler@schnader.com
9         RICHARD A. BARKASY, ESQ.
10        220 Lake Drive East, Suite 200
11        Cherry Hill, New Jersey 08002-1165
12        rbarkasy@schnader.com
13   KEKER & VAN NEST, LLP
14   Attorneys for Defendant
15        710 Sansome Street
16        San Francisco, California 94111
17   BY:  R. JAMES SLAUGHTER, ESQ.
18        rslaughter@kvn.com
19   KASOWITZ, BENSON, TORRES & FRIEDMAN
20   Attorneys for the Deponent
21        1633 Broadway
22        New York, New York 10019
23   BY:  ROBERT M. NOVICK, ESQ.
24        rnovick@kasowitz.com
25   ALSO PRESENT:  JOSE RIJO, Videographer

PAGE 4

4

1
2         THE VIDEOGRAPHER:  Here begins the
3    videotaped deposition of David Friedman,
4    tape 1, volume I, in the matter of Adams
5    versus Crowley in the United States
6    District Court of the District of
7    Delaware, case number 04-1565.  Today is
8    March 16, 2007 and the time on the video
9    monitor is 9:31 a.m.
10        The video operator today is Jose
11   Rijo representing LiveNote World
12   Services located at 221 Main Street,
13   suite 1250, San Francisco, California
14   94105, phone number (415) 321-2300.
15        The court reporter is Jennifer
16   Ocampo of David Feldman Worldwide
17   reporting on behalf of LiveNote World
18   Services.
19        Today's deposition is being taken
20   on behalf of defendant and is taking
21   place at 1633 Broadway, New York, New
22   York.
23        Will counsel please introduce
24   themselves and whom they represent.
25        MR. NOVICK:  This is James

ProTEXT Transcript Condensing for Windows

SHEET 14   PAGE 53

53

FRIEDMAN

1
2   which Mr. Marabito or Mr. Danitz or anybody
3   else didn't -- refused to provide you
4   information in response to a request?
5       A.   No.
6       Q.   At the time you filed the
7   disclosure statement had you had an adequate
8   opportunity to gather the information you
9   needed for the disclosure statement?
10      A.   We thought we had, yes.
11      Q.   Who decided what would be put into
12  the disclosure statement?
13      A.   Probably, probably various lawyers
14  within the office, to the extent that there
15  was a decision, but I don't recall us ever
16  deciding not to include anything.  We were
17  just gathering information that we thought
18  was relevant and throwing it all in as we got
19  it.
20      Q.   Now, at the time that you filed the
21  statement, you believed it to be accurate;
22  correct?
23      A.   Yes.
24           MR. SLAUGHTER:  Now, I would like
25       to talk to you about a specific portion

PAGE 54

54

FRIEDMAN

1
2       of the disclosure statement, because I
3       know that this has been previously
4       marked at least at Mr. Feinberg's
5       deposition and Mr. Weinstein's
6       deposition.  It seems silly to mark it
7       again, but I will if you prefer to have
8       it today.
9           MR. BRESSLER:  Whichever your
10      pleasure.  We not need repeatedly mark
11      the same document.
12          MR. SLAUGHTER:  I am just going to
13      refer to this as Feinberg's Exhibit 31,
14      which has been marked as Exhibit 31 at
15      Mr. Feinberg's deposition.
16      Q.   Mr. Friedman, I'm obviously not
17  going to ask you to read the entire thing,
18  but does this appear to be the disclosure
19  statement filed by your firm on August 8,
20  2000, in connection with the filing of the
21  Coram bankruptcy petition?
22      A.   Yes.
23      Q.   Now, directing your attention to
24  pages 44 and 45 --
25      A.   Yes.

PAGE 55

55

FRIEDMAN

1
2       Q.   -- there's some information here on
3   these pages with respect to Mr. Crowley.  Do
4   you see that?
5       A.   Yes.
6       Q.   And the disclosure statement at the
7   bottom of 44 and the top of 45 provides:
8   "Mr. Crowley also serves as a consultant to
9   Cerberus Partners LP, 'Cerberus,' which is a
10  member of the Noteholder Group, with respect
11  to its investments in various health care
12  companies other than the debtor" -- Debtors.
13  Mr. Crowley generally receives a fee from
14  Cerberus for such services, but receives no
15  fee from Cerberus for any services he
16  provides respecting the Debtors."
17      Do you see that?
18      A.   Yes.
19      Q.   Do you know who collected that
20  information and put it into the disclosure
21  statement?
22      A.   Yes.
23      Q.   Who?
24      A.   It was provided to us by
25  Mr. Marabito.

PAGE 56

56

FRIEDMAN

1
2       Q.   Did you ever ask Mr. Crowley about
3   it at the time that you filed the disclosure
4   statement?
5       A.   I believe I did have conversations
6   with Mr. Crowley about this.
7       Q.   Prior to the time you filed the
8   disclosure statement?
9       A.   Yes.
10      Q.   Okay.  And what -- and how many
11  times did you have that conversation,
12  conversations with Mr. Crowley about this?
13      A.   I really don't recall the number of
14  times.
15      Q.   More than once?
16      A.   I don't know.
17      Q.   And what were the substance of
18  those conversations with Mr. Crowley?
19      A.   I think Mr. Crowley volunteered to
20  me that he had a relationship with Cerberus
21  with respect to other matters, and he made a
22  particular point of telling me that his
23  relationship with Cerberus was completely
24  divorced from his role at Coram.  And I think
25  I asked him to please make sure that we had

ProTEXT Transcript Condensing for Windows

SHEET 15 PAGE 57

57

FRIEDMAN
1  accurate language that would describe that
2  relationship.
3      Q.   Did you ask to see his agreement
4  with Cerberus?
5      A.   I wasn't --
6          MR. NOVICK:  Object to the form,
7  foundation.
8      A.   I was never informed that there was
9  a written agreement.  And I did not
10 understand that there was a written agreement
11 at the time.
12     Q.   Do you have a recollection that
13 your firm didn't have a copy of that
14 agreement prior to the time the disclosure
15 statement was filed?
16     A.   I don't know whether or not our
17 firm had a copy of it or not.  I don't
18 recall, at least sitting here today I don't
19 recall being aware of the agreement at the
20 time.
21     Q.   Did you ever ask Mr. Crowley how
22 much he was being paid by Cerberus?
23     A.   I don't know.
24     Q.   I'm sorry.  Was that "I don't know"

PAGE 58

58

FRIEDMAN
1  or, "no, I don't think I did"?
2      A.   I don't know.
3      Q.   Did you ever talk to Mr. Feinberg
4  about his relationship, about Cerberus'
5  relationship with Mr. Crowley prior to the
6  time the disclosure statement was filed?
7      A.   I don't recall having that
8  conversation.
9      Q.   Did you ever speak with anybody
10 from Cerberus about Mr. Crowley's
11 relationship with Cerberus prior to the time
12 the disclosure statement was filed?
13     A.   I don't recall having such a
14 conversation.
15     Q.   Did you ever ask Mr. Crowley to see
16 any written agreement he might have had with
17 Cerberus prior to the time the disclosure
18 statement was filed?
19     A.   I didn't understand such an
20 agreement to exist, and I didn't ask him to
21 see it.
22     Q.   I am going to show you a -- I'm not
23 going mark it since it's a transcript, but I
24 am going to show you here a transcript from

PAGE 59

59

FRIEDMAN
1  the December 21st hearing in front of Judge
2  Walrath --
3      A.   Yes.
4      Q.   --in connection with the
5  confirmation of the plan.
6      A.   Which plan, the first plan?
7      Q.   The first plan.
8          MR. SLAUGHTER:  And in fact, I
9  apologize, I have only one of these, but
10 I'll read it, and if we need to take
11 some time, take a break, make a copy of
12 it, I can do that.  But let me read it
13 and then if you could share it around, I
14 have one highlighted and one there, but
15 the portions that I am going to be
16 looking at are on pages 36, 37, and 38.
17     And there is -- and this is a --
18 let me -- should we go off the record
19 make a quick copy of that, so everyone
20 has a copy of that?
21          MR. NOVICK:  Why don't we do that.
22          MR. SLAUGHTER:  I apologize for not
23 having enough copies.
24     Off the record.

PAGE 60

60

FRIEDMAN
1          THE VIDEOGRAPHER:  Off the record.
2  The time is 10:40 a.m.
3      (A brief recess was taken.)
4          THE VIDEOGRAPHER:  Going back on
5  the record.  The time is 10:47 a.m.
6      Q.   Mr. Friedman, I've placed in front
7  of you a portion of the transcript from the
8  December 21, 2000 confirmation hearing, and I
9  think you've got pages 36, 37, 38 and 39 in
10 front of you.  And I want to talk to you --
11 and before we went off the record, you had
12 testified that, I think, either in words or
13 effect that you didn't know of a written
14 contract with -- between Mr. Crowley and
15 Cerberus prior to the time that a plan was
16 filed.
17     A.   That's correct.
18     Q.   And starting on 36, "THE COURT:" --
19 36, line 5 -- "Well, are you suggesting,
20 however, that Mr. Crowley's relationship is
21 adequately disclosed?"
22     Line 8, "MR. FRIEDMAN:  Yes,
23 certainly.
24     "THE COURT:  Well, does the



SHEET 16   PAGE 61

61

FRIEDMAN

1  disclosure statement mention that the
2  consulting agreement is subject to a written
3  contract where he is receiving a million
4  dollars a year?
5       "MR. FRIEDMAN:  Well, no, it
6  doesn't say that but there are two points
7  with respect to that."
8       And then there's colloquy back and
9  forth with the court, and I'm sure if counsel
10 wants me to include it, he can ask some
11 questions about it, but I'm going to focus on
12 page 37 there where you give an answer in the
13 middle of the page, Mr. Friedman, says, "But,
14 Your Honor, I think that when you tell
15 someone public that your chairman has a
16 business relationship with Cerberus, I think
17 anybody who is interested in the terms is
18 free to ask.  Frankly, Your Honor, we would
19 have put it in without hesitation had anyone
20 asked" -- "anybody asked.  We just didn't
21 think of it.  But, Your Honor, certainly
22 there was no attempt to hide from public
23 filing."
24      And then again on page 38,
25 Mr. Friedman, near the top, your first

---

PAGE 63

63

FRIEDMAN

1  filing.
2       My recollection, sir, is that there
3  was some point after the bankruptcy began
4  that I became aware of a document that was
5  called an employment agreement, rather than a
6  consulting agreement, and read it and
7  understood that rather than -- what I
8  understood to be an ad hoc relationship of
9  providing fees for services on occasion, that
10 it was actually an employment agreement with
11 a salary, with affirmative commitments that
12 Mr. Crowley made to Cerberus, none of which I
13 was aware of when the bankruptcy was filed.
14      Q.   You knew, however, that Mr. Crowley
15 was receiving a fee from Cerberus prior to
16 the time the bankruptcy was filed?
17      A.   I knew that he was paid by
18 Cerberus -- by Cerberus for consulting
19 services, but I did not understand that him
20 to be an employee of Cerberus on a fixed
21 salary, or that there were other traditional
22 types of employee commitments that he had
23 made to Cerberus.
24      MR. SLAUGHTER:  I am going to move

---

PAGE 62

62

FRIEDMAN

1       response, the court says, "You don't think it
2  was relevant to advise the court about that?
3       "MR. FRIEDMAN:  Your Honor,
4  candidly we certainly knew that Mr. Crowley's
5  relationship would come out.  I mean the day
6  after the disclosure statement was approved,
7  we gave everything we had in our files to the
8  equity committee.  I mean there was no secret
9  about the relationship."
10      Does that refresh your
11 recollection, Mr. Friedman, that you had the
12 consulting agreement between Crowley and
13 Cerberus at the time the disclosure statement
14 was filed?
15      MR. NOVICK:  I will just note for
16      the record that those quotations were
17      taken out of a larger colloquy, and that
18      it goes on for a number of pages, not
19      all of which are even in front of the
20      witness, and with that qualification,
21      you can answer.
22      A.   Yeah, I mean actually it just -- it
23 makes me further certain that I did not have
24 the agreement before the -- before the

---

PAGE 64

64

FRIEDMAN

1       to strike that answer, and I will ask it
2  again.
3       Q.   You knew, however, that Mr. Crowley
4  was receiving a fee from Cerberus prior to
5  the time the bankruptcy was filed; isn't that
6  correct?
7       A.   When you say "a fee," the answer is
8  no.  I understood that he was being paid for
9  services, but when you say "a fee," I did not
10 know that there was a fixed fee involved.
11      Q.   You knew that he was being paid by
12 Cerberus for services?
13      A.   Yes, that's correct.
14      Q.   You never asked him how much he was
15 being paid?
16      A.   At the time I don't believe I did.
17      Q.   Why not?
18      A.   I don't know.  I think I probably
19 should have.
20      Q.   Was it a failing on your part not
21 to ask that question?
22      A.   Well, in hindsight it certainly
23 was.  I mean at the time we were trying to
24 get a disclosure statement on file, and we

ProTEXT Transcript Condensing for Windows

SHEET 18   PAGE 69

69

FRIEDMAN

```
 1    court.  And from our perspective, to the
 2    extent that his compensation were considered
 3    relevant by any party, including
 4    shareholders, we had no doubt that the --
 5    that the final disclosure statement would
 6    contain whatever incremental information
 7    people thought was necessary.
 8        Q.   Well, if you were so sure that the
 9    terms were going to come out, why didn't you
10    figure out what they were before the
11    disclosure statement was filed?
12        A.   I think this was probably put
13    together on August 7th at, you know,
14    midnight, and we were trying to get something
15    on file the next day.  We were under a lot of
16    pressure to get it on file the next day, and
17    we left it to Mr. Marabito to provide us with
18    this language, and this was a draft
19    disclosure statement.  We were going to file
20    it, and then we were going to make whatever
21    changes to it, needed to be made to comply
22    with the Court's directions and the
23    informational requests of any stakeholder.
24        Q.   I think you just told me that you
25
```

PAGE 71

71

FRIEDMAN

```
 1    that the employment agreement ultimately
 2    presented.
 3        So I understood that it is always
 4    important to disclose every affiliation
 5    between management and stakeholders.  But
 6    there are orders of magnitude, and I did not
 7    understand the order of magnitude with
 8    respect to Mr. Crowley and Cerberus to be
 9    what it was at the time this was filed.
10        MR. SLAUGHTER:  I am going to --
11        Q.   I want to direct your attention now
12    for a moment, Mr. Friedman, to Richard Levy.
13    Prior -- do you know who Richard Levy is?
14        A.   Yes.
15        Q.   Who is Richard Levy?
16        A.   He is a lawyer currently employed
17    by Jenner & Block, who was the lawyer for the
18    equity committee in the Coram case.
19        Q.   Have you had experience with
20    Mr. Levy prior to his representation of the
21    equity committee on the Coram case?
22        A.   No.
23        Q.   When did you first become aware
24    that Mr. Levy was representing individuals
25
```

PAGE 70

70

FRIEDMAN

```
 1    thought it was an important issue, you knew
 2    it was an important issue before the time of
 3    the filing, in fact you knew it not only just
 4    days before, but a certain good amount of
 5    time before?
 6        A.   Yes.
 7        Q.   But if it was that important, why
 8    didn't you try to find out more about the
 9    terms of that relationship prior to the time
10    the disclosure statement was filed, rather
11    than just wait for people to object to it
12    later?
13        A.   Well, because we relied upon
14    Mr. Marabito to give us the language, and
15    this is what we got, and it was August 8th
16    and it had to be filed, and it was a draft.
17    And drafts are typically amended, and we
18    considered this issue to be one would be
19    amended if there was more information that
20    was needed.
21        Now I just have to tell you, I did
22    not have any sense that the relationship
23    between Mr. Crowley and Cerberus was of a
24    seven-figure nature and of the dimensions
25
```

PAGE 72

72

FRIEDMAN

```
 1    with an interest in the Coram matter?
 2        A.   I think that sometime shortly
 3    before or after in the bankruptcy filing we
 4    received a letter from Mr. Levy.
 5        MR. SLAUGHTER:  Let me give you two
 6    exhibits.  What number are we on?
 7        THE WITNESS:  6 and 7.
 8        MR. SLAUGHTER:  The first letter,
 9    which I am going to label Exhibit 6, and
10    a June 7th letter which I will label
11    number 7.
12        (Exhibit Friedman-6, Letter dated
13    6/1/00, marked for identification, this
14    date.)
15        (Exhibit Friedman-7, Letter dated
16    6/7/00, marked for identification, this
17    date.)
18        Q.   Mr. Friedman, the June 6th letter
19    -- excuse me -- Exhibit 6 is a June 1st
20    letter addressed to Mr. Crowley signed by
21    Mr. Levy, and the June 7th letter -- excuse
22    me.  Exhibit 7 is a June 7th letter from you
23    to Mr. Levy in response.
24        Is this the correspondence that you
25
```

ProTEXT Transcript Condensing for Windows

165

```
1              FRIEDMAN
2   the board at the time that Mr. Crowley was
3   hired by Coram; isn't that right?
4       A.   I think he was, yes.
5       Q.   And he knew the terms?
6       A.   Presumably.
7       Q.   Mr. Amaral knew the terms too,
8   didn't he?
9       A.   I don't think so.  Put it this way,
10  if he did, that's not what he told me.
11      Q.   Okay.  And you said that all of
12  the -- whether they knew the specific terms
13  of the contract relationship between
14  Mr. Crowley and Cerberus, the directors knew
15  that there was such a relationship?
16      A.   Yes.
17      Q.   Was there anything in your view
18  that prevented any of those directors from
19  requesting more specific information from
20  Crowley?
21      A.   No.
22      Q.   Do you know if Mr. Crowley ever
23  refused at any time to provide information
24  about the substance of his agreement with
25  Cerberus upon being asked to?
```

167

```
1              FRIEDMAN
2   understood it to be a full, you know,
3   essentially a full-time employment agreement.
4       Q.   You knew that he was receiving a
5   fee from Cerberus?
6       A.   Yes.
7       Q.   Okay.  Did you ever ask what that
8   fee was?
9       A.   Not at the time, no.
10      Q.   Did you ever -- did you ever speak
11  to Mr. Feinberg about the relationship
12  between Cerberus and Mr. Crowley at the time
13  of the, prior to the time the first
14  disclosure plan was filed?
15           MR. NOVICK:  Disclosure statement?
16           MR. SLAUGHTER:  Disclosure
17      statement.  Thank you.
18      A.   I'm quite sure I did not speak to
19  Mr. Feinberg about it.
20      Q.   Why not?
21      A.   I tried not to speak with Mr.
22  Feinberg about this at all.  I thought Mr.
23  Feinberg was going to be, as I understood it,
24  he was going to be exiting the board with the
25  company going into bankruptcy.  He was
```

166

```
1              FRIEDMAN
2       A.   I'm not aware of that, no.
3       Q.   Moving now on to the second time
4   period, again the time period in which you
5   are preparing, you or your firm is preparing
6   the disclosure statement.
7       A.   Right.
8       Q.   You viewed at that time the
9   relationship between Cerberus and Mr. Crowley
10  as an important one in connection with the
11  disclosure statement?
12      A.   Yes.
13      Q.   But you didn't ask to see -- you
14  didn't ask for the specific terms of that
15  agreement?
16      A.   Again, you are presuming that I was
17  aware of an agreement.  I really, again
18  whether I should have divined this or not is
19  debatable but in my mind at the time this was
20  being become prepared, I did not understand
21  the relationship to be one that was
22  formalized in an agreement.  I thought he
23  just doing sort of ad hock consulting work,
24  which did not -- which was not on my radar
25  screen at the level it would have been had I
```

168

```
1              FRIEDMAN
2   clearly in the creditor camp and I didn't
3   think it was appropriate for me to spending a
4   lot of time talking to him about what Coram
5   should be doing.
6       Q.   Okay.  You -- but knowing that this
7   was going to be an important issue, you
8   testified today that you knew that the
9   relationship between the CEO of the debtor
10  and one of the debtors' note holders would be
11  an important issue, what actions did you take
12  to learn the full extent of that
13  relationship?
14      A.   When?
15      Q.   Prior to the time the disclosure
16  statement was filed.
17      A.   I talked to Allen Marabito, who I
18  considered to be a sophisticated person with
19  a law degree and one who -- who presented
20  himself as being extremely close to Crowley
21  and one who was quite familiar with his --
22  his relationships and background, and I asked
23  Mr. Marabito to give me what he considered to
24  be appropriate disclosure with respect to
25  Mr. Crowley's relationship, and I really
```

ProTEXT Transcript Condensing for Windows

173

FRIEDMAN

1       FRIEDMAN
2  was filed.
3       A.    The answer is, no.
4            But I want to put this in context,
5  just so we have a clear record here.  It is a
6  common practice for lenders to have working
7  relationships with crisis managers and to
8  recommend that those crisis managers be
9  engaged by their borrowers.  It is quite
10 common in the restructuring world for a
11 lender to agree with the borrower that it
12 will only lend money to the borrower if the
13 borrower hires the crisis manager selected by
14 the lender.  Lenders have significant
15 influence in how borrowers operate,
16 especially when they're in default, and that
17 is something that's common.
18           What is not common is there being
19 an employment agreement between the crisis
20 manager and the lender.  That is highly
21 uncommon.  What is even more uncommon is an
22 employment agreement that contains the types
23 of covenants and commitments that this
24 employment agreement had.
25           Had I known about the existence of

174

1       FRIEDMAN
2  that agreement prior to the filing for
3  bankruptcy, I am quite sure I would have
4  given advice to the board relating to whether
5  or not that was appropriate and what steps
6  should be considered to mitigate the
7  potential conflict.
8            So just so you understand and the
9  record is clear, there is a significant
10 difference between a lender employing a
11 crisis manager and a lender selecting a
12 crisis manager to work for a borrower.  The
13 latter happens frequently, and typically a
14 crisis manager business under those
15 circumstances, even though it's getting
16 business from the lender in the future, the
17 crisis manager is in a position to act
18 appropriately.
19           It's where -- it's where that
20 employment agreement existed that I felt, as
21 I said earlier, unique facts here.  And those
22 facts, had they been known to me back in July
23 of 2000 or August of 2000, I would in all
24 likelihood have caused a whole host of
25 different advice to have been given.

175

1       FRIEDMAN
2       MR. SLAUGHTER:  Move to strike
3  everything after the "no" --
4       MR. NOVICK:  Denied.
5       MR. SLAUGHTER:  -- as
6  nonresponsive.
7            Actually you're not the judge.
8       MR. NOVICK:  That the point.  There
9  isn't one here.
10      MR. BRESSLER:  And it's your
11 witness, so I'm not moving to strike it.
12      MR. SLAUGHTER:  It's actually a
13 third-party witness, Mr. Bressler, as
14 I'm sure you're perfectly aware.
15      Q.    Are you aware of any harm that was
16 caused by Mr. Crowley's relationship with
17 Cerberus as it pertains to Coram?
18      A.    Other than the harm relating to
19 denial of confirmation twice?
20      Q.    Yes.
21      A.    No.
22      Q.    And did not -- each of those
23 denials, even with full knowledge of
24 Mr. Crowley's relationship with Cerberus, you
25 were nevertheless surprised that each of

176

1       FRIEDMAN
2  those plans were denied?
3       A.    As I've so testified.
4       Q.    And you told the -- you endorsed, I
5  think is what you testified earlier, you
6  endorsed the plan developed by you and others
7  to bring in Goldin as an independent
8  restructuring advisor as a means to get a
9  second plan approved; correct?
10      A.    Yes.
11      Q.    And you understood that the board
12 was going to be relying on your
13 recommendation?
14      A.    In part, yes.
15      Q.    Do you recall ever telling anybody
16 that you thought that Mr. Crowley was the
17 smartest guy you've ever met?
18      A.    As of that -- as of what date?
19 I've met a lot of smart people over the
20 years.
21      Q.    Well, as of 2001, was Mr. Crowley
22 one of the smartest guys you've ever met?
23      A.    He's a very smart guy.
24      Q.    Directing your attention to
25 Exhibit 3, notes of your interview with

ProTEXT Transcript Condensing for Windows

SHEET 1    PAGE 1

```
1

 1

 2    IN THE UNITED STATES DISTRICT COURT,
      FOR, THE DISTRICT OF DELAWARE
 3
      ARLIN M. ADAMS, Chapter II    )
 4    Trustee of the Post-          )Case No.
      Confirmation Bankruptcy of    )04-1565
 5    Estates of Coram Healthcare   )
      CORPORATION, and of CORAM,    )
 6    INC., a Delaware corporation, )
                      Plaintiff,    )
 7                                  )
                  vs.               )
 8                                  )
      DANIEL D. CROWLEY, DONALD J.  )
 9    AMARAL; WILLIAM J. CASEY; L.  )
      PETER SMITH; and SANDRA L.    )
10    SMOLEY,                       )
                                    )
11                Defendants.       )
      ----------------------------- )
12

13

14

15         Wednesday, March 21, 2007

16              10:20 a.m.

17

18         Deposition of HARRISON GOLDIN held at

19    the offices of Cerberus Capital Management, L.P.,

20    1177 Avenue of the Americas, New York, New York

21    pursuant to Notice, before Danielle Grant, a

22    Notary Public of the State of New York.

23

24

25
```

PAGE 2

```
2

 1    A P P E A R A N C E S:

 2    SCHNADER HARRISON SEGAL & LEWIS, LLP

 3    Counsel for Plaintiff Arlin Adams, Trustee

 4    1600 Market Street, Suite 3600

 5    Philadelphia, PA 19103-7286

 6    BY:   WILBUR L. KIPNES, ESQ.

 7          MICHAEL J. BARRIE, ESQ.

 8          wkipnes@schnader.com

 9          mbarrie@schnader.com

10

11    KEKER & VAN NEST, LLP

12    Counsel for Daniel Crowley

13    710 Sansome Street

14    San Francisco, California 94111

15    BY:   R. JAMES SLAUGHTER, ESQ.

16          rslaughter@kvn.com

17

18    KRAMER LEVIN NAFTALIS & FRANKEL, LLP

19    Counsel for Witness

20    1177 Avenue of the Americas

21    New York, New York 10036

22    BY:   KENNETH H. ECKSTEIN, ESQ.

23          PHILIP BENTLEY, ESQ.

24          keckstein@kramerlevin.com

25          pbentley@kramerlevin.com
```

PAGE 3

```
3
 1
 2         IT IS HEREBY STIPULATED AND
 3    AGREED, by and among counsel for
 4    the respective parties hereto, that
 5    the filing, sealing and certification
 6    of the within deposition shall be and
 7    the same are hereby waived.
 8         IT IS FURTHER STIPULATED AND
 9    AGREED that all objections, except as
10    to the form of the question, shall be
11    reserved to the time of the trial.
12         IT IS FURTHER STIPULATED AND
13    AGREED that the within deposition may
14    be signed before any Notary Public
15    with the same force and effect as if
16    signed and sworn to before the Court.
17
18
19
20
21
22
23
24
25
```

PAGE 4

```
4
 1
 2    H A R R I S O N    J.  G O L D I N, called as a
 3         witness, having been first duly sworn by
 4         Danielle Grant, a Notary Public within and
 5         for the State of New York, was examined and
 6         testified as follows:
 7    BY MR. KIPNES:
 8         Q    Good morning, Mr. Goldin.  My name
 9    is Will Kipnes.  I represent Arlin M. Adams as
10    Chapter 11 Trustee of the Bankruptcy Estates of
11    Coram in the lawsuit pending in the United States
12    District Court, District of Delaware against
13    Daniel D. Crowley and others.
14         Would you tell me a little bit
15    about the business of Goldin Associates?
16         A    Yes, sir.  Goldin Associates is a
17    financial advisory firm that specializes in
18    distressed situations.  We act either as
19    financial advisors to debtor companies or in
20    other instances to their institutional creditors.
21    We also perform interim management services.
22         We provide litigation support
23    services in distressed situations and we act
24    extensively as a fiduciary, as a trustee, as an
25    examiner, as a special master to the courts,
```

ProTEXT Transcript Condensing for Windows

SHEET 28    PAGE 109

109

H. Goldin

1
2       A    I reached the conclusion, as I told
3   you, and you know that Mr. Crowley did not
4   conduct himself in a manner designed or
5   calculated to diminish the interests of Coram to
6   favor the opinions of any other party and
7   interest, the converse of that is he conducted
8   himself in a manner to maximize the interest of
9   Coram.
10      Q    Did you come to a conclusion about
11  whether or not the second plan of reorganization
12  was proposed in good faith?
13      A    I did.
14      Q    What was your conclusion?
15      A    That it was.
16      Q    You testified earlier and it's
17  referenced here in your Paragraph 98 that you
18  attributed some damage from Mr. Crowley's
19  conflict, do you recall that testimony?
20      A    Yes, I do.
21      Q    And I think you mentioned, or it's
22  in this report, that there's two categories of
23  damages you attributed to Mr. Crowley's conduct?
24      A    Correct.
25      Q    Can you describe the categories?

PAGE 110

110

H. Goldin

1
2       A    Yes, the first related to the
3   professional and related expenses that arose as
4   the result of the Court having concluded that
5   Mr. Crowley had a conflict of interest when she
6   ruled in December of 2000, therefore prolonging
7   the bankruptcy.
8           And the second category was the
9   inability of the business to capitalize earlier
10  on the advantages of emerging from bankruptcy
11  with the multiplier effect that that has, and
12  that process having had to be delayed because
13  of Mr. Crowley's conflict of interest and the
14  prolongation of the period in which Coram was
15  in Chapter 11.
16      Q    I'm going to take the out-of-pocket
17  damages, I think if you look at page one of your
18  report, your updated report, there is a reference
19  here, you estimated those damages at five to
20  $6 million?
21      A    Yes, sir.
22      Q    How did you determine that figure?
23      A    I don't remember specifically, but I
24  do know that we undertook to try to put a price
25  tag on all of the incremental professional

PAGE 111

111

H. Goldin

1
2   services that resulted from the failure of the
3   case to be confirmed in December 2000.
4       Q    So, are those fees then associated
5   not with the efforts to get the first plan
6   adopted, but fees associated after the first
7   plan?
8       A    That's my recollection.
9       Q    Did you have an understanding about
10  whether the Equity Committee challenged the
11  second proposed plan of the debtor on issues
12  other than Mr. Crowley's conflict?
13      A    Yes, I seem to remember that the --
14  among the Equity Committee objections was an
15  assertion that the finding that the company was
16  insolvent was incorrect.
17      Q    Did you have an understanding about
18  whether or not the Equity Committee and the
19  debtors, for that matter or other interested
20  parties, undertook efforts to value the company
21  to figure out if that was true or not true?
22      A    I don't recall specifically and in
23  detail, but I seem to recall that Deloitte &
24  Touche undertook some related efforts in
25  connection with its services to the Equity

PAGE 112

112

H. Goldin

1
2   Committee.
3       Q    Do you know if the Equity Committee
4   hired any other experts with respect to
5   valuation?
6       A    I don't recall.
7       Q    Does your analysis regarding those
8   professional fees depend upon the nature of how
9   those fees were spent?
10      A    I don't understand the question.
11      Q    Does your analysis regarding the
12  damages regarding the professional fees, for
13  instance, only spent investigating issues with
14  respect to the conflict of interest?
15          Does your analysis regarding the
16  out-of-pocket damages depend at all on the
17  nature of how those fees are spent? That is,
18  whether they were spent investigating the
19  alleged conflict issue or whether they were
20  some other matters?
21          MR. KIPNES: Objection to the form.
22      A    I'm unable to answer the question
23  because I'm unable to understand, but if I did, I
24  would not be able to answer it.
25      Q    Did you have an understanding

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

SHEET 29   PAGE 113 _____ 113

```
1                   H. Goldin
2   whether or not -- strike that.
3            Did you have an understanding
4   about whether Mr. Crowley at some point in time
5   left Coram?
6        A    I heard this morning from Mr. Kipnes
7   that he left Coram a year after the appointment
8   after the trustees.
9        Q    I represent to you that he left in
10  March 2003 and I further represent to you that
11  the trustee subsequently proposed a new plan of
12  reorganization and that the Equity Committee
13  proposed a plan of reorganization and the Equity
14  Committee opposed the plan.  Does that change
15  your view about the likelihood of the costs
16  associated with the conflict in light of the fact
17  that the Equity Committee has opposed the plan of
18  Mr. Eckstein.
19            MR. BENTLEY:  Objection to the form.
20            MR. KIPNES:  Objection to the form
21       of the question.
22       A    You lost me.  Had you not lost me,
23  it's a question that I do not believe I could
24  answer without reflection and covering the facts
25  more closely than I could do answering in a
```

PAGE 114 _____ 114

```
1                   H. Goldin
2   deposition.
3        Q    Let's move to the second set of
4   damages that you concluded were related to in
5   Mr. Crowley's conflict.  You say delay in
6   emerging from bankruptcy?
7        A    Yes.
8        Q    How did you calculate the 7 to
9   9 million figure in your report?
10       A    Our evaluation analysis presupposed
11  based on a careful review of a whole variety of
12  financial inputs what the financial status of
13  Coram would be at various points in time and
14  included an assumption, as I suggested a view
15  minutes ago to you, that immediately in the
16  aftermath of its emergence from bankruptcy,
17  Coram, for reasons I can get into if you like me
18  to, would enjoy a bounce, a post Chapter 11
19  bounce.  That bounce would then have a leverage
20  effect on the value of the company going forward.
21            The delay in the achievement, in
22  the realization of the economic advantage as
23  driving from a company's exit from chapter 11
24  causes not only the immediate delay in those
25  advantages, but has a multiplier effect over a
```

PAGE 115 _____ 115

```
1                   H. Goldin
2   period of years and that's what we calculated.
3        Q    I want to direct your attention to
4   the $6.3 million payment.  Do you recall we
5   discussed that some today?
6        A    Yes.
7        Q    And you concluded that while the
8   payment was troublesome in your view, ultimately
9   it caused no damage to Coram?
10       A    Correct.
11       Q    Can you tell why it's your view it
12  caused no damage?
13       A    Because of an answer I have given
14  more than once today, is that the company was
15  deeply insolvent.  As a consequence, any value
16  available would accrue to the benefit of the
17  constructive Noteholders.  Therefore a payment to
18  the Noteholders that might have not been made to
19  the Noteholders would -- to the extent of its
20  availability, would have gone to the Noteholders
21  and that is the reason.  It didn't cause any harm
22  to the company.
23       Q    I want to direct your attention to
24  pages 107 and 108 of your report addressing
25  additional reasons that there was no harm
```

PAGE 116 _____ 116

```
1                   H. Goldin
2   associated with the $6.3 million payment.  Do you
3   recall concluding that Coram's cash position
4   improved shortly after the payment was made and
5   that was an additional reason the payment hadn't
6   caused -- improved as a result of the sale?
7        A    Yes, I have a general recollection,
8   not a specific recollection.  But I know that the
9   report refers to that and I have no reason not to
10  endorse and confirm what it was at the time I
11  wrote the report.
12       Q    Did you come to a conclusion
13  regarding the reasonableness of the judgment that
14  had been made to make the $6.3 million payment in
15  cash rather than in kind?
16       A    I think we speak to that in the
17  report, but the overriding conclusion was the
18  payment was troublesome.
19       Q    I'm going to direct your attention
20  to Exhibit 19, the 2005 hearing transcript.  I'll
21  further direct your attention to pages 43 and 44
22  to that transcript.
23            The bottom of Page 42, you were
24  asked a question, "Did you consider whether or
25  not it was appropriate for Coram to pay
```

You may have up to 3 Header and 3 Footer Lines

Morrison, Christina
CONFIDENTIAL                                    3/26/2007

## Page 1

CONFIDENTIAL
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
- - -

ARLIN M. ADAMS, Chapter 11       :
Trustee of the                   :
Post-Confirmation Bankruptcy     :
Estates of CORAM HEALTHCARE      :
CORPORATION, a Delaware          :
Corporation and of CORAM,        :
INC., a Delaware Corporation,    :
          Plaintiff              : CASE NO.
     vs.                         : 04-1565
                                 :
DANIEL D. CROWLEY; DONALD J.     :
AMARAL; WILLIAM J. CASEY;        :
L. PETER SMITH; AND SANDRA L.    :
SMOLEY,                          :
          Defendants             :
                      - - -

Monday, March 26, 2007
9:46 a.m.
- - -

Videotaped deposition of
CHRISTINA MORRISON, held at the law
offices of Ballard Spahr Andrews &
Ingersoll, LLP, 1735 Market Street, 51st
Floor, Philadelphia, Pennsylvania, 19103,
pursuant to notice before Cynthia A.
Whyte, Registered Professional Reporter
and Notary Public.

- - -

## Page 2

1  A P P E A R A N C E S:
2  SCHNADER HARRISON SEGAL & LEWIS LLP
   Counsel for Plaintiff Arlin Adams,
3     Trustee
          1600 Market Street
4         Suite 3600
          Philadelphia, PA  19103
5         (215) 751-2336
6     BY:  WILBUR L. KIPNES, ESQ.
          wkipnes@schnader.com
7
8  KEKER & VAN NEST LLP
   Counsel for Defendant Daniel Crowley
9         710 Sansome Street
          San Francisco, CA  94111-1704
10        (415) 391-5400
11    BY:  WARREN A. BRAUNIG, ESQ.
          wbraunig@kvn.com
12
      AND:  ELLIOT R. PETERS, ESQ.
13          epeters@kvn.com
14
   DEUTSCHE BANK
15 Counsel for Witness Christina Morrison
          Deutsche Bank AG New York
16        Legal Department
          60 Wall Street
17        New York, NY  10005-2858
          (212) 250-7332
18
      BY:  CHARLIE GAMBINO, ESQ.
19          charlie.gambino@db.com
20
21    ALSO PRESENT:  VINCENZO PETULLA,
22                   Videographer
23
24
25

## Page 3

1          IT IS HEREBY STIPULATED AND
2  AGREED by and among counsel for the
3  respective parties hereto that the
4  filing, sealing and certification of the
5  within deposition shall be and the same
6  are hereby waived.
7          IT IS FURTHER STIPULATED
8     AND AGREED that all objections,
9     except as to the form of the
10    question, shall be reserved to the
11    time of the trial.
12         IT IS FURTHER STIPULATED AND
13 AGREED that the within deposition may be
14 signed before any Notary Public with the
15 same force and effect as if signed and
16 sworn to before the Court.
17
18
19
20
21
22
23
24
25

## Page 4

1              I N D E X
2  WITNESS:                            PAGE
3  CHRISTINA MORRISON
4          By Mr. Braunig         7, 181
5          By Mr. Kipnes             136
6          MORRISON EXHIBITS
7  NO.         DESCRIPTION          PAGE
8  Exhibit 1   Memo, 6/5/01, to List
               from Ms. Gould          25
9
   Exhibit 2   Letter, 1/16/99, to
10             Mr. Smith from Ms.
               Morrison                29
11
   Exhibit 3   Excerpt of Transcript,
12             10/26/01                39
13 Exhibit 4   Letter, 7/12/99, to
               Mr. Kahn from Mr.
14             Crowley                 43
15 Exhibit 5   Memo, 9/20/99, to Mr.
               Meffe and Ms. Kopta from
16             Ms. Morrison and Mr.
               Guthner                 54
17
   Exhibit 6   Offering Memorandum     62
18
   Exhibit 7   "Project Caddy,
19             Confidentiality
               Agreements Proposal
20             Packets Distributed
               December 1999"          71
21
22 Exhibit 8   Second round bid letters 74
23 Exhibit 9   "Buyer Due Diligence
               Questions 1-31-00.doc   82
24
   Exhibit 10  Minutes, 2/10/00        84
25

Pages 1 to 4

**Morrison, Christina**
**CONFIDENTIAL**

3/26/2007

| Page 45 | Page 46 |
|---|---|
| 1    MR. GAMBINO:  Objection. | 1    situations in which a business is using a lot |
| 2    MR. KIPNES:  -- to the form of | 2    of cash be a basis for a company's decision to |
| 3    the question. | 3    sell a unit? |
| 4    Warren, can we have an | 4    A.    Did not see that very often.  Didn't |
| 5    understanding if Mr. Gambino or I object | 5    typically sell a lot of divisions, so... |
| 6    to the form, that it's a joint objection | 6    Q.    Was there ever mention to you during |
| 7    so the other doesn't have to jump in. | 7    the process of the sale of CPS that CPS was |
| 8    MR. BRAUNIG:  I'll agree to | 8    not a core business for Coram, that it was not |
| 9    that. | 9    aligned with its infusion business? |
| 10    Q.    Do you need to have the question | 10    A.    I don't recall any real specific |
| 11    repeated? | 11    discussions about that.  They wanted to focus |
| 12    A.    Yes. | 12    on the home infusion business at the time, but |
| 13    MR. BRAUNIG:  Could we read it | 13    I don't recall anything of a more strategic |
| 14    back, please? | 14    nature than that. |
| 15    (The court reporter read the | 15    Q.    When we talked earlier about the |
| 16    record as requested.) | 16    engagement letter and the paragraph related to |
| 17    MR. GAMBINO:  Only if you can | 17    the fees, you mentioned -- am I stating it |
| 18    answer the question. | 18    correctly that you mentioned that Deutsche |
| 19    A.    I'm not sure how to answer that | 19    Bank had incentives to help CPS -- to help |
| 20    question. | 20    Coram sell CPS for as high a value as |
| 21    Q.    Okay.  I'm going to rephrase. | 21    possible? |
| 22    In your experience does the fact | 22    A.    The engagement letter was structured |
| 23    that a business unit is requiring a lot of | 23    such that the more that CPS was sold for, the |
| 24    cash -- strike that. | 24    higher our fee would be. |
| 25    In your experience have you seen | 25    Q.    At all times did Deutsche Bank do |

| Page 47 | Page 48 |
|---|---|
| 1    everything it could to get the highest | 1    alternatives to determine if there was |
| 2    possible price for Coram's shareholders? | 2    something there that would be concrete or not. |
| 3    A.    Yeah.  Our objective was to present | 3    Q.    Did you ever form an opinion about |
| 4    all the options to the board.  Price isn't | 4    whether Coram should sell the CPS unit? |
| 5    always the only consideration.  There's also | 5    MR. GAMBINO:  Objection. |
| 6    other things in the agreement that might play | 6    A.    I was hired to sell the business.  I |
| 7    into it.  So you could have a high price but | 7    didn't have any other opinions beyond that. |
| 8    have a very stringent agreement that could | 8    Q.    Did you ever come to know a person |
| 9    sometimes change that.  Our job was to bring | 9    named Dan Crowley? |
| 10    all of those options forward to the board and | 10    A.    Just by phone.  I never met him. |
| 11    let them make that choice. | 11    Q.    When were you first introduced to |
| 12    Q.    At any time did Deutsche Bank -- | 12    Dan Crowley? |
| 13    strike that. | 13    A.    I don't recall.  It was at some |
| 14    Did Deutsche Bank do everything it | 14    point during the process that we were working |
| 15    could to get Coram as good a deal as Coram was | 15    on it, and I don't remember if he called me or |
| 16    going to get in the sale of CPS? | 16    if I was told to call him, but our initial -- |
| 17    A.    Yes.  We went through -- the fact | 17    in fact, our only conversations were |
| 18    that the sale had been publicly announced by | 18    telephonic. |
| 19    Coram, that they were seeking to sell the | 19    Q.    How often did you talk to Dan |
| 20    business, really brought a lot of people out | 20    Crowley over the seven months between -- |
| 21    to take a look at the business.  And we | 21    strike that. |
| 22    followed up with everything and investigated | 22    From the time you were first |
| 23    everything.  So went through -- whether we | 23    introduced to Dan Crowley, was your primary |
| 24    contacted them or they contacted us, went | 24    interface at Coram regarding the sale of CPS? |
| 25    through and reviewed each of those | 25    A.    In terms of the deal negotiations |

Pages 45 to 48

**Morrison, Christina**
**CONFIDENTIAL**                                                    3/26/2007

---

Page 49

1   and the deal terms, yes.
2       Q.    But you continued to interact with
3   Dom Meffe and other employees at Coram?
4       A.    We spent most of our time at the
5   company at that point.  We had buyers coming
6   through and were probably in Orlando fairly
7   frequently through that process, so spent most
8   of the time with Dom and then Dan by phone.
9       Q.    About how often would you say you
10  spoke to Dan during that period?
11      A.    I don't recall.
12      Q.    What was the nature of the calls
13  that you had with him?  Did he typically call
14  you.  Did you call him?  Were they -- I'll
15  leave it at that.
16      A.    We would -- most of our
17  conversations initially were just around the
18  deal, getting him updated on where we were in
19  the process, who was in, who was out, who we
20  were talking to, and where we were in the
21  diligence process.  So periodically it was
22  just updates on the deal.  That was most of
23  our conversations.
24           And then towards the end it was much
25  more specific and focused on that one final

Page 50

1   transaction.  So I don't remember who called
2   whom, but it was just calls.
3       Q.    Was it your understanding when you
4   first spoke to Dan Crowley that he was the new
5   CEO of Coram?
6       A.    Initially I didn't really know who
7   he was, what his official role was.  Rick
8   was -- had gone and Dan was there and nobody
9   officially told us that one was out and one
10  was in.  I figured that out eventually, but...
11      Q.    About how long is it --
12  approximately how long had you been working on
13  this deal before you first spoke to Dan
14  Crowley?
15      A.    I don't recall when I first talked
16  to him.
17      Q.    The process of -- was the process of
18  due diligence ongoing when you first spoke to
19  Dan Crowley?
20      A.    Yes.
21      Q.    Was the process of the auction --
22  strike that.
23           Was the auction process ongoing when
24  you first spoke to Dan Crowley?
25      A.    It was.  I don't remember what point

Page 51

1   of the process it was, but we had already
2   undergone part of the process because I do
3   recall bringing him up to speed as to where we
4   were, but I don't recall where we were at that
5   point in the process.
6       Q.    Did Dan Crowley change your marching
7   orders or the nature of the scope of your
8   engagement when he -- when you first spoke to
9   him?
10      A.    No.
11      Q.    At any point did Dan Crowley alter
12  what you understood to be your job, your role?
13      A.    The engagement letter was never
14  amended or changed.
15      Q.    What were your perceptions of Dan
16  Crowley from the interactions that you had
17  with him?
18           MR. KIPNES:  Object to the form
19  of the question.
20      A.    Didn't have a lot of conversation
21  with him other than he was just asking about
22  the business and the process, where we were.
23  Beyond that I didn't have a lot of
24  conversations with him.  It was just really
25  very focused.  He would get on the phone, ask

Page 52

1   some questions.  I would give him the answers
2   and the phone call would be over.
3       Q.    Did you have an understanding of
4   whether Dan Crowley was trying to maximize the
5   value of the sale to Coram?
6       A.    I'm not sure how to answer that.
7   Did I have an understanding?
8       Q.    Did you understand that Dan Crowley
9   wanted to sell the CPS unit for as much as he
10  could sell it for?
11      A.    We -- towards the end of the process
12  we brought forth a handful of specific offers
13  at the very end.  I don't remember how many
14  there were.  And he didn't like any of them.
15  And so he said, "Stop the process."
16      Q.    Why didn't he like them in your
17  understanding?
18      A.    He said they weren't enough, and so
19  he stopped the process.  And we were basically
20  suspended for some period of time.  I think it
21  was up to a month, I don't recall
22  specifically, where we just didn't do anything
23  and went back to those parties and told them
24  that the process was completed, you know, was
25  done at that point.

Pages 49 to 52

ProTEXT Transcript Condensing for Windows

## SHEET 1   PAGE 1

```
1                    VOLUME I
2        IN THE UNITED STATES DISTRICT COURT
3           FOR THE DISTRICT OF DELAWARE
4                  - - -
5    ARLIN M. ADAMS, Chapter 11        :
     Trustee of the
6    Post-Confirmation Bankruptcy      :
     Estates of CORAM HEALTHCARE
7    CORPORATION, a Delaware           :
     Corporation and of CORAM,
8    INC., a Delaware Corporation,     :
             Plaintiff                 : CASE NO.
9           vs.                        : 04-1565
10   DANIEL D. CROWLEY; DONALD J.      :
     AMARAL; WILLIAM J. CASEY;         :
11   L. PETER SMITH; and SANDRA L.     :
     SMOLEY,                           :
12              Defendants             :
13                  - - -
14
                 Tuesday, March 27, 2007
15                     9:34 a.m.
16                    - - -
17
18          Videotaped deposition of ARLIN
     M. ADAMS, held at the law offices of
19   Schnader Harrison Segal & Lewis, LLP,
     1600 Market Street, Suite 3600,
20   Philadelphia, Pennsylvania, 19103,
     pursuant to notice before Cynthia A.
21   Whyte, Registered Professional Reporter
     and Notary Public.
22
23                  - - -
24
25
```

## PAGE 2

```
1    A P P E A R A N C E S :
2        SCHNADER HARRISON SEGAL & LEWIS LLP
         Counsel for Plaintiff Arlin M. Adams,
3        Trustee
             1600 Market Street
4            Suite 3600
             Philadelphia, PA  19103
5            (215) 751-2050
6        BY:     BARRY E. BRESSLER, ESQ.
                 bbressler@schnader.com
7
         AND:    RICHARD A. BARKASY, ESQ.
8                rbarkasy@schnader.com
9
         KEKER & VAN NEST LLP
10       Counsel for Defendant Daniel Crowley
             710 Sansome Street
11           San Francisco, CA  94111-1704
             (415) 391-5400
12
         BY:     ELLIOT R. PETERS, ESQ.
13               epeters@kvn.com
14       AND:    WARREN A. BRAUNIG, ESQ.
                 wbraunig@kvn.com
15
16
17   ALSO PRESENT:    VINCENZO PETULLA,
18                    Videographer
19
20
21
22
23
24
25
```

## PAGE 3

```
1        IT IS HEREBY STIPULATED AND
2    AGREED by and among counsel for the
3    respective parties hereto that the
4    filing, sealing and certification of the
5    within deposition shall be and the same
6    are hereby waived.
7        IT IS FURTHER STIPULATED
     AND AGREED that all objections,
     except as to the form of the
7    question, shall be reserved to the
     time of the trial.
7        IT IS FURTHER STIPULATED AND
12   AGREED that the within deposition may be
13   signed before any Notary Public with the
14   same force and effect as if signed and
15   sworn to before the Court.
16
17
18
19
20
21
22
23
24
25
```

## PAGE 4

```
1                  I N D E X
2    WITNESS:                              PAGE
3    ARLIN M. ADAMS, ESQ.
4        By Mr. Peters                       5
5
6             ADAMS EXHIBITS
7    NO.          DESCRIPTION             PAGE
8    Exhibit 1    Chronology                 7
9    Exhibit 2    Transcript, 2/25/03       52
10   Exhibit 3    Transcript, 3/3/03        52
11   Exhibit 4    Letter, 12/24/02, to
                  Mr. Schreiber from
12                Mr. Bressler              80
13   Exhibit 5    Letter, 1/7/03, to
                  Mr. Schreiber from
14                Mr. Bressler              81
15   Exhibit 6    Disclosure Statement     111
16   Exhibit 7    E-mail string            120
17   Exhibit 8    Employment Agreement     122
18   Exhibit 9    Letter, 10/28/03, to
                  Mr. Schepacarter from
19                Mr. Barkasy              130
20   Exhibit 10   Letter, 10/3/06, to
                  Mr. Bressler from Mr.
21                Temin                    142
22   Exhibit 11   Motion of Chapter 11
                  Trustee                  163
23
         Exhibit 12   Updated Report of
24                    Goldin Associates    170
25
```

B469

ProTEXT Transcript Condensing for Windows

SHEET 21    PAGE 81

81

1    appears to bear your signature.
2        (Adams Exhibit 5 was marked for
3    identification.)
4        Q.    So the first question with respect
5    to Adams 4 -- and if you want to take some
6    time to review it, you go right ahead.
7        A.    Go ahead. Ask me the question.
8        Q.    Does Adams 4 bear your signature?
9        A.    Is that my signature on the last
10    page? Yes.
11        Q.    And was this an agreement that you
12    as trustee entered into with Dan Crowley?
13        A.    When you say "is this," the letter?
14        Q.    Correct.
15        A.    It was an agreement that was entered
16    into by Barry Bressler with Crowley's
17    attorney, Mr. Schreiber, which I saw and
18    approved as to terms and conditions. That's
19    what it says.
20        Q.    On whose behalf was Mr. Bressler
21    acting when he entered into that agreement?
22        A.    Say that again.
23        Q.    On whose behalf was Barry Bressler
24    acting when he entered into that agreement?
25        A.    The trustee.

PAGE 82

82

1        Q.    Who is that?
2        A.    Myself.
3        Q.    So is it a fair statement that this
4    is an agreement that you entered into with Dan
5    Crowley?
6        A.    The terms and conditions, yes. See
7    that? "Agreed as to terms and conditions."
8    Do you see that on Page 4?
9        Q.    Okay.
10        And that means that you agreed to
11    the terms and conditions --
12        A.    To the terms and conditions.
13        Q.    -- contained in this letter?
14        A.    Correct.
15        Q.    And, in doing so, did you understand
16    that you were acting as the Chapter 11 trustee
17    for Coram?
18        A.    That's the second time you have
19    asked that question in three minutes. The
20    answer is yes.
21        Q.    What were the terms and conditions
22    that you were agreeing to as you understand
23    them when you affixed your signature to this
24    document, Adams 4?
25        A.    The agreement speaks for itself.

PAGE 83

83

1        Q.    Do you recall what the terms and
2    conditions were?
3        A.    I do not recall.
4        Q.    Do you recall that one of the terms
5    and conditions was that Dan Crowley would
6    continue to render essentially the same
7    services to Coram as he had before for a term
8    of up to six months?
9        A.    Correct.
10        Q.    And would he receive during that
11    period a salary, a base salary, of $80,000 a
12    month?
13        A.    Correct.
14        Q.    Was that a raise for him?
15        A.    I think it was an adjustment upward,
16    yeah.
17        Q.    Pursuant to this agreement, he was
18    going to be receiving more base monthly salary
19    than he had been receiving before that?
20        A.    Correct.
21        Q.    Was he also, pursuant to this
22    agreement, eligible for a stay in performance
23    payment, a stay bonus?
24        A.    That's what it says.
25        Q.    And how much was that stay bonus?

PAGE 84

84

1        A.    I forget, but I think it was a
2    million dollars. I may be wrong. That's my
3    recollection.
4        Q.    So under this agreement Crowley was
5    going to receive $80,000 a month for up to six
6    months and a million dollars' stay bonus,
7    correct?
8        A.    If he stayed.
9        Q.    If he stayed, he was going to
10    receive about a million and a half dollars,
11    correct?
12        A.    Correct.
13        Q.    And that was agreeable to you on
14    December 24, 2002, correct?
15        A.    I was willing to go along with it in
16    order to get rid of the claim that he had in
17    the amount of $17 million. You don't always
18    sign contracts that are agreeable to you, as
19    you know.
20        Q.    Well, but in signing that contract,
21    you were agreeing to pay him that amount of
22    money if he stayed, correct?
23        A.    I was agreeing as the trustee in
24    consideration of what I was going to get as a
25    result as the trustee.

ProTEXT Transcript Condensing for Windows

SHEET 22  PAGE 85

85

1    Q.   And one of the purposes of the
2  hearing on March 3, 2003, the transcript that
3  we have been looking at, was for the court to
4  consider your motion to approve this
5  agreement, Adams 4, correct?
6    A.   That's true.
7    Q.   So on March 3 of 2003 you were a
8  proponent of the court's approval of this
9  agreement, correct?
10    A.   That's correct.
11    Q.   You said that Mr. Crowley had a
12  claim for $17 million?
13    A.   He said, yeah; he said that.
14    Q.   And did you ever consider whether or
15  not such a claim existed?
16    A.   I did consider it.
17    Q.   Did you have an understanding of his
18  position as to why he was owed $17 million?
19          MR. BRESSLER:  Object to the
20    form, but he can answer if he knows.
21    A.   Yeah, I knew what he was advocating.
22    Q.   And what was your understanding in
23  that regard?
24    A.   That there was a bonus arrangement
25  that he had entered into that would have

PAGE 86

86

1  enabled him to support such a claim.
2    Q.   He had a written contract with
3  Coram, correct?
4    A.   I think that's correct.
5    Q.   And pursuant to that written
6  contract there were bonus provisions
7  in the contract?
8    A.   That's my recollection.
9    Q.   And do you also recall that the
10  bonus provisions were triggered by the company
11  hitting certain EBITDA targets?
12    A.   That's my recollection.
13    Q.   And that, in fact, the company had
14  hit certain EBITDA targets, correct?
15    A.   That's my recollection.
16    Q.   And so based on your understanding
17  of the agreement Mr. Crowley had a claim or
18  communicated to you that he had a claim for
19  bonus compensation from Coram of approximately
20  $17 million?
21    A.   Yes.  And you were asking me about
22  an hour ago of the various negatives that
23  flowed from his relationship with
24  Mr. Feinberg.  This is one that I should have
25  mentioned because this shows the sinister

PAGE 87

87

1  nature of that relationship.
2    Q.   And how does a contract which
3  rewarded Mr. Crowley financially for the
4  company's success demonstrate the sinister
5  nature of that relationship?
6    A.   Because the exaggerated compensation
7  could only have flowed from that sort of
8  relationship.
9    Q.   Do you know whether the board of --
10  the board of directors of Coram approved
11  Mr. Crowley's employment agreement with Coram?
12    A.   They may have under the influence of
13  Mr. Feinberg.
14    Q.   Did you ever speak to an individual
15  named Don Amaral?
16    A.   Did I speak to him?  I did not.
17    Q.   Do you know who he was at Coram?
18    A.   I do.
19    Q.   Was he the chairman of the board of
20  Coram?
21    A.   At one time, yes.
22    Q.   Was he the chairman of the board of
23  Coram when Mr. Crowley entered into his
24  employment agreement with Coram?
25    A.   Could have been.  I'm not positive

PAGE 88

88

1  about that.  He could have been.
2    Q.   In any event, Mr. Crowley had a
3  claim for $17 million in compensation from
4  Coram and, as a result of all of these events,
5  that money has never been paid to Mr. Crowley,
6  correct?
7    A.   Has not been.  He has renounced it.
8  He has withdrawn the request for it.
9    Q.   And did you ever communicate with
10  him, or, to your knowledge, did any of your
11  attorneys ever communicate with him or his
12  representative about that claim?
13    A.   Well, through his attorney we did.
14    Q.   And what knowledge do you have of
15  the communication was his attorney about that
16  claim?
17    A.   We had a lot of questions about it.
18    Q.   What were those questions?
19    A.   That it was an exaggerated claim;
20  there was no justification for it.
21    Q.   Do you mean that the contract didn't
22  call for those payments?  Is that what you
23  mean by no justification?
24    A.   Didn't call for a payment of that
25  amount.

ProTEXT Transcript Condensing for Windows

SHEET 1   PAGE 1

177

```
 1                    VOLUME II

 2        IN THE UNITED STATES DISTRICT COURT

 3          FOR THE DISTRICT OF DELAWARE

 4                    -  -  -

 5   ARLIN M. ADAMS, Chapter 11    :
     Trustee of the               :
 6   Post-Confirmation Bankruptcy  :
     Estates of CORAM HEALTHCARE   :
 7   CORPORATION, a Delaware       :
     Corporation and of CORAM,     :
 8   INC., a Delaware Corporation, :
              Plaintiff           : CASE NO.
 9        vs.                      : 04-1565

10   DANIEL D. CROWLEY; DONALD J.  :
     AMARAL; WILLIAM J. CASEY;     :
11   L. PETER SMITH; AND SANDRA L. :
     SMOLEY,                       :
12              Defendants        :

13                    -  -  -

14
             Wednesday, March 28, 2007
15                  9:33 a.m.

16                    -  -  -

17

18           Continued videotape deposition
     of ARLIN M. ADAMS, held at the law
19   offices of Schnader Harrison Segal &
     Lewis, LLP, 1600 Market Street, Suite
20   3600, Philadelphia, Pennsylvania, 19103,
     pursuant to notice before Cynthia A.
21   Whyte, Registered Professional Reporter
     and Notary Public.

22
                      -  -  -
23

24

25
```

PAGE 2

178

```
 1   A P P E A R A N C E S:

 2   SCHNADER HARRISON SEGAL & LEWIS LLP
     Counsel for Plaintiff Arlin M. Adams,
 3   Trustee
              1600 Market Street
 4            Suite 3600
              Philadelphia, PA  19103
 5            (215) 751-2050

 6   BY:      BARRY E. BRESSLER, ESQ.
              bbressler@schnader.com
 7
     AND:     RICHARD A. BARKASY, ESQ.
 8            rbarkasy@schnader.com

 9
     KEKER & VAN NEST LLP
10   Counsel for Defendant Daniel Crowley
              710 Sansome Street
11            San Francisco, CA  94111-1704
              (415) 391-5400
12
     BY:      ELLIOT R. PETERS, ESQ.
13            epeters@kvn.com

14   AND:     WARREN A. BRAUNIG, ESQ.
              wbraunig@kvn.com
15

16

17   ALSO PRESENT:    VINCENZO PETULLA,

18              Videographer

19

20

21

22

23

24

25
```

PAGE 3

179

```
 1           IT IS HEREBY STIPULATED AND
 2   AGREED by and among counsel for the
 3   respective parties hereto that the
 4   filing, sealing and certification of the
 5   within deposition shall be and the same
 6   are hereby waived.
 7           IT IS FURTHER STIPULATED
 8      AND AGREED that all objections,
 9   except as to the form of the
10   question, shall be reserved to the
11   time of the trial.
12           IT IS FURTHER STIPULATED AND
13   AGREED that the within deposition may be
14   signed before any Notary Public with the
15   same force and effect as if signed and
16   sworn to before the Court.
17
18
19
20
21
22
23
24
25
```

PAGE 4

180

```
 1              I N D E X

 2   WITNESS:                        PAGE

 3   ARLIN M. ADAMS - VOLUME II

 4        By Mr. Peters      184, 391

 5        By Mr. Bressler         390

 6           ADAMS EXHIBITS

 7   NO.       DESCRIPTION          PAGE

 8   Exhibit 13   Transcript, 11/14/03   219

 9   Exhibit 14   Letter, 5/16/02, to
                  Judge Adams from Mr.
10                Crowley               234

11   Exhibit 15   Form 10-Q             240

12   Exhibit 16   Form 10-K             250

13   Exhibit 17   Letter, 3/14/02, to
                  Mr. Adams from Mr.
14                Liebentritt          257

15   Exhibit 18   Letter, 8/22/02, to
                  Mr. Beskrone from Mr.
16                Adams                258

17   Exhibit 19   Letter, 4/11/02, to
                  Mr. Levy from Mr.
18                Bressler             261

19   Exhibit 20   Letter, 5/1/02 to
                  Judge Adams from Mr.
20                Levy                 267

21   Exhibit 21   Letter, 9/17/02, to
                  Judge Adams from Mr.
22                Zell                 272

23   Exhibit 22   Letter, 9/18/02, to
                  Judge Adams from Mr.
24                Levy                 278

25
```

ProTEXT Transcript Condensing for Windows

SHEET 34   PAGE 133

309

```
1   until I dwelled on them.  And then when
2   Mr. Crowley at the hearing that came a few
3   days later began trying to explain them, I
4   realized how discordant his answers were and
5   that I had been misled.
6            And I'm not sure that I said that in
7   sequential form yesterday.
8        Q.   But you testified at deposition on
9   February 25 of '03 and you reviewed the
10  documents at the deposition; you were shown
11  them?
12       A.   I don't recall it, but if you say.
13       Q.   I thought you just said that a
14  minute ago, that you were first shown those
15  documents at your deposition.
16       A.   That's right.
17       Q.   And then after the deposition you
18  had six or so days to review them with your
19  lawyers, reflect on them, discuss them,
20  correct?
21       A.   I did say that.
22       Q.   And you did that?
23       A.   And I did that.
24       Q.   And do you know whether your lawyers
25  prepared Mr. Crowley for his testimony on
```

PAGE 134

310

```
1   March 3?
2        A.   I don't know that.
3            MR. BRESSLER:  Object to the
4   form.
5        A.   I don't know that.
6        Q.   Do you know who called Mr. Crowley
7   as a witness on March 3?
8        A.   I think we.  We had previously
9   called him as a witness as one of our
10  executives.
11       Q.   Did you know that Mr. Kipnes met
12  with Mr. Crowley to prepare him for his
13  testimony on March 3 prior to March 3?
14       A.   I'm not surprised to hear that.  I
15  don't think I know it, but I'm not surprised
16  to learn it.
17       Q.   Did you learn from Mr. Kipnes what
18  it was that Mr. Crowley was saying in
19  preparation for that hearing?
20           MR. BRESSLER:  Object to the
21  form and direct him not to answer
22  anything Mr. Kipnes told him.
23       A.   I don't know, no.
24       Q.   Was there anything preventing you
25  from asking, having now had the chance to
```

PAGE 135

311

```
1   review the documents and discuss them with
2   your lawyers, was there anything preventing
3   you from asking Mr. Kipnes on prior to March 3
4   what's Crowley saying about these documents?
5            MR. BRESSLER:  Object to the
6   form.
7            You may answer.
8        A.   I think that Mr. Kipnes was quite
9   surprised and he told me that he was upset.
10           MR. BRESSLER:  Please don't
11  testify as to what counsel said to you or
12  you said to counsel.
13       Q.   The question is whether there was
14  anything preventing you from having Mr. Kipnes
15  question Crowley and report back to you?
16       A.   Was there anything preventing me?
17       Q.   Yes.
18       A.   Well, I wanted to be very, very
19  careful about that.
20       Q.   Was there anything preventing you
21  from questioning Mr. Crowley yourself prior to
22  March 3 after you had reviewed the documents?
23       A.   After I saw the documents I didn't
24  think any further discussion with Mr. Crowley
25  was fruitful.
```

PAGE 136

312

```
1        Q.   So you --
2        A.   I had lost complete confidence.
3        Q.   So prior to March 3 you lost
4   complete confidence in Crowley?
5        A.   I'm not sure of those dates; after
6   having seen those documents and dwelling on
7   them, but the real conclusion occurred, in my
8   mind, after Mr. Crowley tried to explain in
9   the courtroom five, six days later the import
10  of those documents.  I was completely
11  convinced that he had deceived me, that his
12  explanation did not hold water, and, well, I
13  was pretty discouraged.
14       Q.   You saw those documents and dwelled
15  on them prior to March 3, right?
16           MR. BRESSLER:  Object to the
17  form.  That's not what he said.
18       A.   Prior to March 3 I can't say.  I'm
19  not sure about the sequence.  I don't
20  believe --
21       Q.   Was there anything preventing you
22  from withdrawing your motion prior to March 3?
23       A.   Yes, there was.
24       Q.   What was that?
25       A.   I gave that some thought.
```

ProTEXT Transcript Condensing for Windows

SHEET 35    PAGE 137

313

1    We had agreed in writing as part of
2 the settlement with Crowley to use our best
3 efforts to implement the settlement, the
4 proposed settlement. So that I was then in
5 the position that if I withdrew the settlement
6 it would lead to more litigation from Crowley
7 against me as the trustee, and I thought that
8 it was wiser to let the court decide the issue
9 because then Crowley couldn't say, well, you
10 reneged on your agreement. You owe me $17
11 million or whatever he was talking about.
12    And, fortunately, I was right
13 because what happened is that the court
14 decided that Crowley's explanation was
15 incredible, unbelievable, or whatever the
16 words she used. That relieved me as the
17 trustee of any legal obligation to implement
18 the proposed deal with Crowley.
19    Q.    So you went to court on March 3
20 pursuing a motion for approval of the
21 agreement you had entered into with Crowley
22 but secretly hoping that the court would deny
23 that motion?
24    A.    Oh, no, no --
25    MR. BRESSLER:  Object to the

PAGE 138

314

1    form of the question. That's not what he
2    said.
3    A.    -- no, no, no. You misunderstood
4 what I said. I did not say that.
5    Q.    Did you also enter into a written
6 agreement with Mr. Crowley to give him a
7 release from litigation?
8    A.    I didn't enter into a written
9 agreement. It was part of the proposal as I
10 recall it, but I'm not sure. Whatever it says
11 it says.
12    Q.    And when you went into court on
13 March 3, had you also signed a document by
14 which Mr. Crowley was going to get $2 million
15 and a release from litigation?
16    MR. BRESSLER:  Object to the
17    form, but he can answer.
18    A.    Would get it if the plan was
19 approved.
20    Q.    And when you went into court on
21 March 3, was it your unexpressed hope that the
22 court would deny your application?
23    A.    No.
24    MR. BRESSLER:  Object to the
25    form.

PAGE 139

315

1    A.    No.
2    Q.    So your objective then on March 3 in
3 court was that your application be approved by
4 the court?
5    A.    That the court would make the
6 decision. I can't make the decision for the
7 court. And a lot of that decision depends on
8 credibility, and I'm not so sure that I was
9 the proper person to determine credibility,
10 since I read part of the plan that was being
11 submitted to the court.
12    Q.    Had your views about Mr. Crowley
13 changed prior to the March 3, 2003 hearing?
14    A.    Prior to? No. Up until the time I
15 saw the documents, I was in support of the
16 plan.
17    Q.    You just told us you saw the
18 documents on February 25.
19    A.    Well, whatever the date was. I made
20 it clear I can't remember the dates. I don't
21 propose to.
22    Q.    Fine, but my question is: Assuming
23 you saw the documents for the first time on
24 February 25, looked at them thereafter, talked
25 about them with counsel, had your view of

PAGE 140

316

1    Mr. Crowley changed prior to the beginning of
2 that hearing on March 3, 2003?
3    MR. BRESSLER:  Object to the
4    form. Asked and answered.
5    A.    It didn't change definitively. I
6 said that it was going to depend on his
7 explanation of the documents. He was
8 explaining I guess to Kipnes, I don't know
9 that, his interpretation. He didn't see the
10 documents, et cetera.
11    By the time of the hearing the judge
12 heard under oath and said, in effect,
13 Mr. Crowley, I just don't believe you. When
14 she said that, that reenforced my suspicion
15 that he had not been frank with us.
16    Q.    And when did you first form that
17 suspicion?
18    A.    When I saw the documents.
19    Q.    So you formed that suspicion prior
20 to the March 3 hearing?
21    A.    We're going to go through this
22 again.
23    Q.    I wasn't asking you about this, sir,
24 but you raised it all on your own. You
25 started telling us what you were thinking

ProTEXT Transcript Condensing for Windows

SHEET 1  PAGE 1

```
 1
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF DELAWARE
 3
 4   ARLIN M. ADAMS, Chapter 11
 5   Trustee of the Post-Confirmation
     Bankruptcy Estates of CORAM
     HEALTHCARE CORPORATION, a Delaware
 6   Corporation, and of CORAM, INC.,
     a Delaware Corporation,
 7
              Plaintiff,
 8                               CASE NO.  04-1565
         vs.
 9
     DANIEL D. CROWLEY; DONALD
10   J. AMARAL; WILLIAM J. CASEY;
     L. PETER SMITH; and SANDRA
11   L. SMOLEY,
12            Defendants.
13   _____/
14            ---oOo---
15     VIDEOTAPED DEPOSITION OF DONN TICE
16          Wednesday, April 4, 2007
17            ---oOo---
18        SHEILA CHASE & ASSOCIATES
19             REPORTING FOR:
           LiveNote World Service
           221 Main Street, Suite 1250
20       San Francisco, California 94105
           Phone: (415)  321-2300
21         Fax:   (415)  321-2301
22
23
24   Reported by:
     LORRIE L. MARCHANT, CSR, RPR, CRR, CLR
25   CSR NO. 10523
```

PAGE 2

```
 2
 1                 I N D E X
 2          INDEX OF EXAMINATION
 3                               PAGE
 4   MR. LYNCH                     5
     MR. BARKASY                  60
 5   MR. LYNCH                    97
 6            ---oOo---
 7        INDEX OF EXHIBITS
 8      DESCRIPTION              PAGE
 9
10   Exhibit 1  Letter to Donn Tice from Dan     60
                Crowley, dated 11/24/1999, 2 pages
11   Exhibit 2  Letter to Daniel Crowley from Jed  67
12              Hughes, dated 12/18/2000,
                Bates-stamped CROWLEYKVN 005794 –
13              CROWLEYKVN 005801, 8 pages
14   Exhibit 3  Letter to Kevin Genda and Warren   68
                Feder from Dan Crowley, dated
15              10/10/2000, Bates-stamped
                CROWLEYKVN 005750, 1 page
16   Exhibit 4  Letter to Steve Feinberg and Kevin 74
17              Genda from Dan Crowley, dated
                11/6/2000, 4 pages
18   Exhibit 5  Letter to Kevin Genda, Warren      77
19              Feder and Donn Tice from Daniel
                Crowley, dated 1/2/2001, 7 pages
20   Exhibit 6  Letter to Kevin Genda from Dan     90
21              Crowley, dated 10/30/2001, 5 pages
22   Exhibit 7  Letter to Warren Feder and Kevin   91
23              Genda from Daniel Crowley, dated
                9/28/2000, Bates-stamped CROWLEYKVN
                005747 - CROWLEYKVN 005749, 3 pages
24
25
```

PAGE 3

```
 3
 1       BE IT REMEMBERED that on Wednesday, April 4, 2007,
 2   commencing at the hour of 9:07 a.m., thereof, at the
 3   offices of Keker & Van Nest, LLP, 710 Sansome Street,
 4   San Francisco, California, before me, LORRIE L.
 5   MARCHANT, CSR, RPR, CRR, CLR, CSR, a Certified Shorthand
 6   Reporter for the State of California, personally
 7   appeared
 8                     DONN TICE,
 9   called as a witness by the Defendants herein, who, being
10   by me first duly sworn/affirmed, was thereupon examined
11   and testified as hereinafter set forth.
12            ---oOo---
13   Appearing as counsel on behalf of Plaintiffs:
14       RICHARD A. BARKASY, Esquire
         SCHNADER HARRISON SEGAL & LEWIS, LLP
15       824 N. Market Street, Suite 1001
         Wilmington, DE 19801
16       (302) 888-4554 - Phone
         (302) 888-1696 - Fax
17       e-mail: rbarkasy@schnader.com
18   Appearing as counsel on behalf of the Defendants:
19       GARRETT A. LYNCH, Esquire
         KEKER & VAN NEST, LLP
20       710 Sansome Street
         San Francisco, California 94111
21       (415) 391-5400 - Phone
         (415) 397-7188 - Fax
22       e-mail: glynch@kvn.com
23   Also present:
24       James Terrell, CLVS
25
```

PAGE 4

```
 4
 1       THE VIDEOGRAPHER:  This begins the videotaped
 2   deposition of Donn Tice, Tape 1, Volume I, in the matter
 3   of Arlin M. Adams versus Daniel D. Crowley, et al.,
 4   filed in the United States District Court for the
 5   District of Delaware.  Case No. 041565SLR.
 6       Today's date is April 4, 2007.  The time on the
 7   video monitor is 9:07.  The video operator today is
 8   James Terrell, representing LiveNote World Service,
 9   located at 221 Main Street, Suite 1250, San Francisco,
10   California 94105.  The phone number is (415) 321-2300.
11       The court reporter today is Lorrie Marchant,
12   with Sheila Chase & Associates, reporting on behalf of
13   LiveNote World Service.
14       Today's deposition is being taken on behalf of
15   defendant and is taking place at 710 Sansome Street,
16   San Francisco, California.
17       If counsels will now please identify yourselves
18   and whom you represent.
19       MR. LYNCH:  Garrett Lynch with Keker & Van
20   Nest, on behalf of the defendant, Daniel Crowley.
21       MR. BARKASY:  Rich Barkasy, from the law firm
22   of Schnader, Harrison, Segal & Lewis, for Arlin M.
23   Adams, the Chapter 11 trustee of Coram Healthcare
24   Corporation and Coram, Inc.
25       THE VIDEOGRAPHER:  Thank you.
```

ProTEXT Transcript Condensing for Windows

41

1  emerging nature of the company's performance. And the
2  decision was made to wait in the hopes of potentially
3  higher earnings performance.
4          And this was in probably late '99. And
5  everybody knows what happens -- what happened to the
6  equity markets in the spring of 2000. You know, the
7  public equity markets essentially crashed and took years
8  to come back and are still really just coming back.
9          So in some way, our -- our -- and then for
10 reasons that we'll get into later, Winterland's own
11 performance turned. And so whether or not, in
12 hindsight, it would have been a good thing or a bad
13 thing to have taken the company public is a matter of
14 legitimate debate.
15         The point isn't really so much to assess
16 whether it was a good idea or a bad idea, but rather
17 that, you know, Dan took a stand on behalf of the
18 company that, you know, wasn't necessarily popular or in
19 the interest of the investors, per se, or, you know,
20 sort of siding with the investor's interest. He was
21 trying to do what was right for the health and interest
22 of the company in an objective way.
23     Q.   Who was on the board of directors at this time?
24     A.   So there was four people: Kevin Genda, the
25 representative of Cerberus; Warren Feder, the

42

1  representative of -- I think by then Stepping Stone
2  Capital --
3      Q.   Formerly Gordon Brothers?
4      A.   Formerly Gordon Brothers.
5          -- Dan, the chairman of the board; and myself,
6  the CEO.
7      Q.   And how was it that Dan Crowley became the
8  chairman of the board of Winterland?
9      A.   Relatively soon after his involvement, and I
10 really don't remember the exact dates, the -- it was
11 very, very clear that -- that he was an incredibly
12 capable operating executive, that -- that he was adding
13 significant value to Winterland.
14         You know, we were really grateful for his
15 team's involvement and his involvement. You know, all
16 the sort of stereotypical, you know, fears and concerns
17 that incumbent management teams have about third parties
18 getting involved, you know, did not bear out in this
19 case at all.
20         And, you know, the bottom line is that, you
21 know, Dan, because of his proximity to the business, his
22 operating experience and -- and his ability and
23 capacity, was chosen by the investors to play a more
24 active -- really executive chairman would be a more
25 active and descriptive, you know, way of characterizing

43

1  his role, than sort of chairman of the board. He was
2  really executive chairman.
3      Q.   And when you say "executive chairman" as a more
4  descriptive term, is it fair to say because he was so --
5  because he was involved in the daily operation of the
6  business or do you mean --
7      A.   Yeah. I'm just really trying to characterize
8  the level of active involvement.
9          Whereas, a typical sort of chairman of the
10 board might be really involved more in the governance of
11 the business and the management of board affairs and
12 business strategy, Dan was really much more involved in
13 not just those matters, but the day-to-day execution and
14 management of the business.
15     Q.   You mentioned there were efforts to raise
16 equity capital for the business and another business
17 strategy was to secure new licenses; correct?
18     A.   Yes.
19     Q.   Did there also come a time when Winterland
20 explored the possibility of selling the business or
21 merging the business?
22     A.   Yeah. As the business was able to stand and --
23 and -- on its own two feet and produce really strong
24 performance, we began to explore two possibilities. I
25 mean, really, we were pursuing almost any merger or

44

1  acquisition candidate that we could.
2          So either Dan or I or Dan and I together opened
3  up channels to virtually everyone in the industry at the
4  highest levels. So the -- you know, there were three or
5  four principal players.
6          The two largest were Signatures, who was at
7  this time was owned by CMGI, a big Internet
8  consolidation or holding company. Signatures was run by
9  the management that had originally run Winterland. So
10 there was a lot of overlap. They were based in the San
11 Francisco Bay area.
12         There was also a company called Giant, which
13 was owned by Time Warner. And in both of these cases,
14 Dan was intimately -- not just intimately involved, but
15 really the spearhead of those discussions.
16         So in the case of Signatures and CMGI, we
17 actually had -- Dan actually led some discussions that
18 resulted in sort of a draft term sheet of how our
19 businesses might be combined.
20         And in the case of Time Warner, we ended up
21 with some extremely high-level meetings, you know, at --
22 you know, at Rockefeller Center in New York with the
23 Time Warner senior executives, exploring the possibility
24 of a combination.
25         The idea being that if we could combine our

ProTEXT Transcript Condensing for Windows

SHEET 23  PAGE 89

89

1  Did Mr. Crowley tell you that the bankruptcy
2  court in Delaware had rejected Coram's first plan of
3  reorganization, finding that the plan was not proposed
4  in good faith because of Mr. Crowley's relationship with
5  Cerberus on December 11, 2000?
6      MR. LYNCH:  Objection to form.
7      THE WITNESS:  What I can say, just in simple
8  terms, is that while Dan and I covered a lot of things,
9  we didn't talk very much about Coram.  So that just
10  wouldn't have been a topic that we necessarily would
11  have gotten into.  Certainly at that level of depth.
12  So ...
13      THE VIDEOGRAPHER:  When he's done with his
14  answer, we should go off record and change the tape.
15  When you're done with your answer, though.
16      BY MR. BARKASY:  Q.  Are you done with your
17  answer?
18  A.  So, you know, in summary, if any conversation
19  that we may have had would have been in a -- in a much
20  more general kind of context.  That just isn't the kind
21  of -- we mainly talked about Winterland.
22      THE VIDEOGRAPHER:  This marks the end of Tape 1
23  in Volume I in the deposition of Donn Tice at 11:15.
24  Going off the record.
25      (Recess taken, from 11:15 to 11:19.)

PAGE 90

90

1      THE VIDEOGRAPHER:  On record at 11:19.  This
2  marks the beginning of Tape 2 in Volume I of the
3  deposition of Donn Tice.
4      (Marked for identification purposes,
5      Exhibit 6.)
6      BY MR. BARKASY:  Q.  Mr. Tice, Exhibit Tice 6
7  is a copy of a letter from Mr. Crowley to Mr. Genda and
8  Mr. Feinberg dated October 30, 2001.
9      In the -- in the third paragraph, Mr. Crowley
10  writes:  Winterland's revenue hit an air pocket and
11  dropped from $96,019,000 in 2000 to what looks like
12  approximately 35- -- 34 to 35 million in 2001.  EBITDA
13  went with it.
14      Do you see that?
15  A.  M-hm.
16  Q.  Is that -- is that an accurate statement of
17  what happened to Winterland's revenue and EBITDA in 2000
18  and 2001?
19      MR. LYNCH:  Objection to form.
20      THE WITNESS:  I think the numbers are accurate.
21  I think the characterization would need to be added to
22  by saying that after the company filed for Chapter 11,
23  it wasn't signing any new licenses.  And consequently it
24  wasn't able to renew its revenue base.
25      And it was really hindered in its ability to

PAGE 91

91

1  acquire licenses or develop the licenses it had.  And it
2  was essentially in a sort of liquidation mode.  So,
3  consequently, apart from the declines in its strong
4  underlying licenses, it -- it had no sort of new sources
5  of revenue coming in the door.
6      BY MR. BARKASY:  Q.  During this time, in 2000
7  and 2001, when the revenue dropped and the EBITDA went
8  with it, Mr. Crowley was the chairman; correct?
9  A.  Um, yes.
10  Q.  And you were reporting to him; correct?
11  A.  Yes.  I was the CEO.
12  Q.  And he was involved on a day-to-day basis in
13  the management of the business; is that correct?
14  A.  Yes.  And as in a situation like this, we were
15  doing everything we could to deal with external
16  circumstances.  And we actually produced a profit
17  turnaround that's described here in this exhibit,
18  despite a two-thirds reduction this revenue and no
19  capital to operate with.  And a second complete massive
20  restructuring.
21      (Marked for identification purposes,
22      Exhibit 7.)
23      BY MR. BARKASY:  Q.  Mr. Tice, Exhibit Tice 7
24  is a copy of a letter from Mr. Crowley to Mr. Feder and
25  Mr. Genda dated September 28, 2000.

PAGE 92

92

1      And I want to draw your attention to the last
2  paragraph on the first page in which Mr. Crowley writes:
3  Winterland has had a, quote, tough, end quote, first
4  half.
5      Do you see that?
6  A.  M-hm.
7  Q.  Do you agree that Winterland had a tough first
8  half --
9  A.  Yes.
10  Q.  -- in 2000?
11  A.  Yes.
12  Q.  And was Mr. Crowley chairman at that time?
13  A.  Yes.
14  Q.  And you reported to him; correct?
15  A.  Yes.
16  Q.  And he was involved on a day-to-day basis with
17  the management of the company throughout 2000; is that
18  correct?
19  A.  Yes.  And we had the external factors that I
20  described earlier about The Backstreet Boys and Pokemon
21  that no one in the management or ownership of the
22  company could have had any control over.
23  Q.  Have you ever met Steve Feinberg?
24  A.  Yes.
25  Q.  In -- in -- in what capacity did you meet

## Page 1

```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Case No. 04-1565

------------------------------------------------

VIDEO DEPOSITION OF ALLEN J. MARABITO
April 5, 2007
------------------------------------------------

ARLIN M. ADAMS, Chapter 11 Trustee of the
Post-Confirmation Bankruptcy of Estates of Coram
HEALTHCARE CORPORATION, and of CORAM, INC., a
Delaware corporation,
Plaintiffs,
vs.
DANIEL D. CROWLEY, DONALD J. AMARAL, WILLIAM J.
CASEY, L. PETER SMITH, and SANDRA L. SMOLEY,

Defendants.

------------------------------------------------

APPEARANCES:

     SCHNADER HARRISON SEGAL & LEWIS, LLP
          By Barry E. Bressler, Esq.
          1600 Market Street, Suite 3600
          Philadelphia, Pennsylvania  19103-7286
          215-751-2050
          bbressler@schnader.com
               Appearing on behalf of Plaintiffs.

     KEKER & VAN NEST, LLP
          By Laurie Carr Mims, Esq.
          710 Sansome Street
          San Francisco, California  94111-1704
          415-391-5400
          lmims@kvn.com
               Appearing on behalf of Defendant
               Daniel D. Crowley.
     Also Present:  Carie Finegan, Videographer
```

## Page 2

```
1          Pursuant to Notice and the Federal Rules
2    of Civil Procedure, the video deposition of ALLEN J.
3    MARABITO, called by Defendant Daniel D. Crowley, was
4    taken on Thursday, April 5, 2007, commencing at
5    10:04 a.m., at 410 17th Street, Denver, Colorado,
6    before Vanessa D. Campbell, Registered Professional
7    Reporter and Notary Public within and for the State
8    of Colorado.

10                    I N D E X
11   VIDEO DEPOSITION OF ALLEN J. MARABITO
12   EXAMINATION BY:                              PAGE
13        Mr. Bressler                         151, 215
14        Ms. Mims                               5, 205
15
16   EXHIBIT NAME     DESCRIPTION              PAGE #
17   Exhibit 1        Notice of Third-Party Subpoena to   15
                      Allen Marabito
18
     Exhibit 2        Letter to R. James Slaughter from   17
19                    Michael J. Barrie, 3/29/07,
                      PHDATA 1431832_1 and PHDATA
20                    1430744_1
21   Exhibit 3        Letter to Don Amaral from           46
                      Daniel D. Crowley, CROWLEY
22                    0075 - 0076
23   Exhibit 4        Employment agreement, MARABITO      56
                      0036 - 0046
24
25
```

## Page 3

```
1                I N D E X (Continued)
2    Exhibit 5    Letter to Michael Kahn and Coram    66
                  Board of Directors from John M.
3                 Elliott, 12/7/99, with attachments,
                  CROWLEYKVN 004139 - 004156
4
     Exhibit 6    Disclosure Statement Pursuant to    84
5                 Section 1125 of the Bankruptcy
                  Code, with attachments
6
     Exhibit 7    Letter to Coram Board of Directors  97
7                 from Daniel D. Crowley, 4/20/00,
                  with attachments, CROWLEY KVN
8                 014103 - 014108
9    Exhibit 8    Memorandum to various parties      103
                  from Shaunna Stribling, 2/11/00,
10                with attachments,
                  COR-EQTY0002727 - 0002796
11
     Exhibit 9    Facsimile transmission sheet to    119
12                various parties from Carole
                  Hedrick/David Schwab, 2/9/01,
13                CROWLEYKVN 013824 - 013849
14   Exhibit 10   Update of Coram Healthcare and     125
                  Management Initiatives, Daniel D.
15                Crowley, 1/9/03, CH-11 TRUSTEE/
                  CrowleyAdmin006198 - 006244
16
     Exhibit 11   Transcript of the pretrial        128
17                examination of Allen Marabito,
                  11/7/03
18
     Exhibit 12   Letter to Barry E. Bressler from   135
19                Allen J. Marabito, 4/22/02, with
                  attachments, CH-11 TRUSTEE/
20                CrowleyAdmin005719 - 005811
                  and CXR 003348
21
     Exhibit 13   10-K form for fiscal year ending   207
22                12/31/00
23
24
25
```

## Page 4

```
1                 P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Here begins the
3    videotape deposition of Allen Marabito, Tape 1,
4    Volume I in the matter of Arlin M. Adams, Chapter
5    versus Daniel D. Crowley, et al., in the United
6    States District Court for the District of Delaware,
7    Case No. 04-1565 (SLR).
8          Today's date is April 5th, 2007 and the
9    time on the video monitor is 10:04 a.m.  The video
10   operator today is Carie Finegan, representing
11   LiveNote World Service, located at 221 Main Street,
12   Suite 1250, San Francisco, California, 94105, phone
13   number (415)321-2300.
14         The court reporter is Vanessa Campbell of
15   Agren Blando Court Reporting, reporting on behalf of
16   LiveNote World Service.
17         Today's deposition is being taken on
18   behalf of the defendant and is taking place at 410
19   17th Street, Suite 2200, Denver, Colorado.
20         Will counsel please introduce yourselves
21   and state whom you represent.
22         MS. MIMS:  Laurie Mims for defendant
23   Daniel Crowley.
24         MR. BRESSLER:  Barry Bressler from
25   Schnader Harrison Segal & Lewis for plaintiff Arlin
```

**Marabito, Allen J.**    4/5/2007

## Page 153

1  you said near the end of your testimony that you
2  believed in hindsight it was an error to pay the
3  note holders roughly $6.8 million on the eve of
4  bankruptcy?
5          MS. MIMS:  Object to form.
6      A   Yes.
7      Q   (By Mr. Bressler)  And you talked about if
8  someone were given bankruptcy rules, that would be
9  pretty high on the list of things not to do.
10      A   I think so.
11      Q   Do you recall that the bankruptcy judge
12  also commented on that payment in refusing to
13  confirm the first plan?
14          MS. MIMS:  Objection.
15      A   I believe you're correct.
16      Q   (By Mr. Bressler)  In your view and from
17  your recollection, what was the reason the first
18  plan of reorganization was not confirmed?
19          MS. MIMS:  Objection.
20      Q   (By Mr. Bressler)  I'll rephrase it.  Do
21  you know the reason the first plan of reorganization
22  was not confirmed?
23      A   I believe I know what the ruling said were
24  the reasons.
25      Q   And what's your understanding?

## Page 154

1      A   The reasons were that there was an actual
2  conflict of interest, that the conflict of interest
3  stemmed from an employment relationship with
4  Cerberus, and that relationship being in conflict
5  tainted the restructuring process and the judge did
6  not believe that she could confirm with that
7  ambiguity or taint on the record.
8      Q   Who had that conflict of interest?
9          MS. MIMS:  Objection.
10      A   I think, again, from the ruling, from what
11  I recall from the ruling, the judge said Mr. Crowley
12  had a conflict of interest.
13      Q   (By Mr. Bressler)  And you just referred
14  to an employment relationship with Cerberus.  Whose
15  employment relationship were you referring to?
16          MS. MIMS:  Objection to the extent that
17  it -- it's calling for him to characterize a
18  document.
19          MR. BRESSLER:  I'm not asking him to
20  characterize a document.  His answer was an
21  employment relationship with Cerberus.  I'm asking
22  him to explain his answer.
23      A   I think specifically it was receiving a
24  salary from Cerberus.
25      Q   (By Mr. Bressler)  When's the first time

## Page 155

1  you saw Mr. Crowley's written employment agreement
2  with Cerberus?
3      A   I actually saw it was subsequent to the
4  hearing when we were preparing for another 10-K.
5      Q   Subsequent to the first confirmation
6  hearing?
7      A   Yes.
8      Q   When's the first time you learned of it?
9      A   At the -- at the hearing.
10      Q   Mr. Crowley never showed it to you before
11  the first confirmation hearing?
12      A   No.
13      Q   Do you know if Mr. Crowley ever showed the
14  employment agreement with Cerberus to Mr. Friedman
15  before discovery in connection with the first
16  confirmation hearing?
17      A   I do not know.
18      Q   Do you think having an actual conflict of
19  interest, in Ms. Mims' words, harmed Coram?
20          MS. MIMS:  Objection.
21      A   I think it prolonged Coram's bankruptcy.
22      Q   (By Mr. Bressler)  From December of 2000
23  until November of 2004?
24      A   You're telling me those -- those were the,
25  you know, beginning and ending dates of that portion

## Page 156

1  of the proceeding, then I'll take your
2  representation.
3      Q   Okay.  The first confirmation hearing was
4  in the fall or winter of 2000; is that correct?
5      A   Yes.
6      Q   And --
7      A   To clarify, what I'm -- you know, you want
8  to use the term harm, others have wanted to use it.
9  The confirmation was denied.  After the confirmation
10  was denied, you had to take additional steps to
11  obtain the release of Coram from bankruptcy.  I -- I
12  don't think there was another way out.  Once the
13  company became a debtor in possession subject to the
14  jurisdiction of the bankruptcy court, we were in it
15  until the court said we were confirmed.
16      Q   Who was the chairman of the board and the
17  CEO when Coram filed bankruptcy?
18      A   It would be Mr. Crowley.
19      Q   And Mr. Crowley recommended to the board
20  that a Chapter 11 be filed?
21      A   I think Mr. Crowley, like other officers
22  or chairmen or directors, they followed advice,
23  which becomes recommendations, but it is predicated
24  on all of the steps and the information that goes
25  into reaching a conclusion or a recommendation.

Pages 153 to 156

ProTEXT Transcript Condensing for Windows

---

SHEET 1  PAGE 1
1

```
 1        IN THE UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF DELAWARE

 3

 4   ARLIN M. ADAMS, Chapter 11
     Trustee of the Post-Confirmation
 5   Bankruptcy Estates of CORAM
     HEALTHCARE CORPORATION, a Delaware
 6   Corporation, and of CORAM, INC.,
     a Delaware Corporation,
 7
            Plaintiff,
 8                                    CASE NO.  04-1565
          vs.
 9
     DANIEL D. CROWLEY; DONALD
10   J. AMARAL; WILLIAM J. CASEY;
     L. PETER SMITH; and SANDRA
11   L. SMOLEY,

12          Defendants.
     _____/
13

14            ---oOo---

15   VIDEOTAPED DEPOSITION OF DANIEL D. CROWLEY

16          Friday, April 6, 2007

17            ---oOo---

18        SHEILA CHASE & ASSOCIATES
               REPORTING FOR:
19        LiveNote World Service
          221 Main Street, Suite 1250
20      San Francisco, California  94105
          Phone: (415)  321-2300
21          Fax:  (415)  321-2301

22

23

24   Reported by:
     LORRIE L. MARCHANT, CSR, RPR, CRR, CLR
25   CSR No. 10523
```

---

PAGE 2
2

```
 1            I N D E X

 2        INDEX OF EXAMINATION

 3                                        PAGE

 4   MR. BARKASY                            9

 5            ---oOo---

 6        INDEX OF EXHIBITS

 7        DESCRIPTION                      PAGE

 8   Exhibit 1  Letter to Stephen Feinberg from   21
 9              Daniel Crowley, dated 4/9/1999, 1
                page

10   Exhibit 2  Document entitled "Incentive      25
11              Agreement," 7 pages

12   Exhibit 3  Disclosure Statement Pursuant to  28
13              Section 1125 of the Bankruptcy
                Code, 152 pages

14   Exhibit 4  Memo to Donn Tice, K. Genda, W.   40
15              Feder and S. Feinberg from Dan
                Crowley, dated 11/24/1999, subject:
                Winterland, 2 pages

16   Exhibit 5  Letter to Kevin Genda, Warren     50
17              Feder and Donn Tice from Daniel
                Crowley, dated 1/2/2001, and
18              attachment of Corporate Resolution
                of Winterland Concessions Company,
                7 pages

19
     Exhibit 6  Letter to Steve Feinberg, Warren  53
20              Feder and Steven Wincott from
                Daniel Crowley, dated 2/15/2001,
21              and attached initial offer from
                Signatures Network, 8 pages

22
     Exhibit 7  Faxed memo to Steve Feinberg,     55
23              Kevin Genda and Warren Feder from
                Daniel Crowley, dated 12/6/2001, 3
24              pages

25
```

---

PAGE 3
3

```
 1        INDEX OF EXHIBITS (Continued)
 2        DESCRIPTION                      PAGE
 3   Exhibit 8  Letter to Stephen Feinberg from   61
              Daniel Crowley, dated 6/28/1999, 2
 4            pages
 5   Exhibit 9  e-mail to Pam from Ron Mills,     65
              dated 1/18/2000, subject:  Jeff
 6            Turner, Bates-stamped CROWLEYKVN
              004766, 1 page
 7
     Exhibit 10 Letter to Steve Feinberg from Dan 78
 8            Crowley, dated 9/30/1999,
              Bates-stamped CROWLEYKVN 018962 -
 9            CROWLEYKVN 018968, 7 pages
10   Exhibit 11 Document entitled "Consultant     88
              Agreement," with handwritten notes,
11            Bates-stamped CROWLEYKVN 018750 -
              CROWLEYKVN 018765, 16 pages
12
     Exhibit 12 Letter to Julia Kopta from Daniel 90
13            Crowley, dated 9/23/1999,
              Bates-stamped CROWLEYKVN 018957 -
14            CROWLEYKVN 018961, 5 pages
15   Exhibit 13 Letter to Mark Neporent from      91
              Pamela Gridley Herrera, dated
16            11/19/1999, Bates-stamped CERB
              01350 - CERB 01369, 20 pages
17
     Exhibit 14 Memorandum to Daniel Crowley,     95
18            cc'd to Steve Feinberg, from Mark
              Neporent, dated 11/2/1999, subject:
19            Employment Agreement, Bates-stamped
              CROWLEYKVN 018111 - CROWLEYKVN
20            018129, 19 pages
21   Exhibit 15 Letter to Mark Neporent from      105
              Daniel Crowley, dated 11/3/1999,
22            Bates-stamped CROWLEYKVN 018988 -
              CROWLEYKVN 018994, 7 pages
23
     Exhibit 16 Letter to Steve Feinberg from Dan 111
24            Crowley, dated 11/16/1999, 10 pages
25
```

---

PAGE 4
4

```
 1        INDEX OF EXHIBITS (Continued)
 2        DESCRIPTION                      PAGE
 3   Exhibit 17 Letter to Don Amaral from Daniel  114
              Crowley, dated 11/18/1999,
 4            Bates-stamped COR.EQTY0000382 -
              COR.EQTY0000392, 11 pages
 5
     Exhibit 18 Letter to Steven Feinberg from    119
 6            Daniel Crowley, dated 11/12/1999,
              Bates-stamped CERB 01347 - CERB
 7            01348, 2 pages
 8   Exhibit 19 Copy of transcript of the         129
              proceedings before Judge Walrath on
 9            December 15, 2000, 135 pages
10   Exhibit 20 Copy of a transcript of           132
              proceedings before the Honorable
11            Mary F. Walrath in the United
              States Bankruptcy Court for the
12            District of Delaware on December
              13, 2001, 95 pages
13
     Exhibit 21 Copy of Exhibit 99.2 to an 8-K    135
14            filed by Coram with the Securities
              and Exchange Commission, 3 pages
15
     Exhibit 22 Letter to Don Amaral from Daniel  138
16            Crowley, dated 11/19/1999,
              Bates-stamped CROWLEYKVN 000074 -
17            CROWLEYKVN 000077, 4 pages
18   Exhibit 23 Various documents Bates-stamped   142
              CROWLEYKVN 019168 - CROWLEYKVN
19            019182, 15 pages
20   Exhibit 24 Copy of the transcript of the     148
              proceedings before the Honorable
21            Mary F. Walrath on December 1, 2000
              in the Coram bankruptcy matter, 96
22            pages
23   Exhibit 25 Request of Daniel Crowley for     150
              Payment of Administrative Expense,
24            30 pages
25
```

ProTEXT Transcript Condensing for Windows

SHEET 8   PAGE 29

29

1    Q.    And it says in the second sentence a DIP
2    facility with Madeleine, LLC, as lender and agent for
3    lenders; Coram as borrower.
4         Do you see that?
5    A.    Yes, I see it.
6    Q.    Does reviewing page 15 of the disclosure
7    statement refresh your recollection as to who Coram's
8    DIP lender was?
9         MR. PETERS:  I'm going to object to the form.
10        THE WITNESS:  No, it doesn't refresh my memory.
11   The only memory I'd have about the debtor-in-possession
12   facility was the firm never drew on it and never took
13   any money from it.  That's my recollection.
14        BY MR. BARKASY:  Q.  All right.  Mr. Crowley,
15   if you could turn back to Exhibit 2, which is the
16   incentive agreement.
17   A.    I have it.
18   Q.    Exhibit 2, the incentive agreement, provided
19   for you to be compensated by receiving 20 percent of the
20   upside in Winterland; is that correct?
21   A.    Do you want me to take the time to read the
22   document?
23   Q.    Yeah.  I do.
24   A.    Okay.  Where -- where would you like me to be
25   looking?

PAGE 31

31

1    recall.  But I think generally it's consistent with it.
2    Q.    What did you -- I'm going to withdraw the.
3         What -- what services did you provide
4    Winterland for Cerberus?
5    A.    Are we done with this document (indicating)?
6    Q.    Yes.
7    A.    Okay.  Winterland was a firm started by
8    Bill Graham, in the old rock-and-roll era, to fund what
9    they called artists' and musicians' and bands' and
10   singers' tours, by selling merchandise around the tour,
11   T-shirts and lunchpails and calendars and posters and
12   peripheral items that kids and attendees to these
13   concerts might like.
14        And so a company -- not unlike the publishing
15   industry, which publishes a book and advances the author
16   some funding against the potential proceeds of the sale
17   of the book or, in this case, the merchandise, and that
18   provides financing for the artist to go on tour.
19        And Winterland, that name, is a merchandising
20   company.  Donn Tice, T-I-C-E, was the CEO who ran the
21   company, and his financial reporting had been
22   disappointing to the owners of Winterland in that he
23   would promise it would do one thing and then it wouldn't
24   and was constantly calling for cash and investment --
25   more investment in the company and taking up additional

PAGE 30

30

1    Q.    At any portion of the document that you feel
2    you need to review to answer my question.  I don't want
3    to limit you in any way.
4    A.    Thank you.
5         Okay.
6    Q.    Can you answer my question?
7    A.    Can you ask it again, please.
8    Q.    Certainly.
9         Exhibit 2, the incentive agreement, provided
10   for you to be compensated by receiving 20 percent of the
11   upside in Winterland; is that correct?
12        MR. PETERS:  Objection to the form.
13        THE WITNESS:  I think it provides for an
14   opportunity to earn up to -- an incentive, rather, equal
15   to 20 percent of the fair market value after a
16   subtraction of various expenses and indebtedness and
17   costs to get to the net equity.
18        And if there was gain on the net equity after
19   payment of all these costs and expenses and repayment of
20   debt, that I would participate by getting 20 percent of
21   the return.
22        BY MR. BARKASY:  Q.  Is that essentially what
23   you were asking for in Exhibit 1, your April 9 letter to
24   Mr. Feinberg?
25   A.    As I sit here today, it's difficult for me to

PAGE 32

32

1    debt.
2         And Cerberus -- excuse me -- and Gordon
3    Brothers and -- I just think there's someone else I
4    can't recall -- were concerned that the entity was
5    adrift and wasn't succeeding and that there was a
6    terrific opportunity and that Tice could use and could
7    benefit by a CEO coach of sorts.
8         And so I was cast to be available to him and to
9    oversee and look over his shoulder and to help him.
10        And that -- that wasn't clear when we started
11   what that meant.  But I found myself involved in depth
12   with Winterland.
13        And they had a problem with the mix in that
14   they were using equipment that they bought to print
15   silkscreen, multiple colors and multiple screens, shirts
16   and such for private label.
17        So something like North Face or Ralph Lauren
18   Polo would have Winterland bid on and take orders for,
19   you know, millions of dollars worth of apparel that they
20   would screen on the image that these entities wanted,
21   and inadvertently the company took it below cost and was
22   losing money on it, and it constituted a large portion
23   of the Winterland business.
24        Winterland was in a number of contracts with
25   musical artists in which it advanced monies and

ProTEXT Transcript Condensing for Windows

### SHEET 34   PAGE 133

133

```
1        MR. SLAUGHTER: Rich, is this a deposition or
2   is this the -- the hearing?
3        MR. BARKASY: It's -- it's -- it says on the
4   first page --
5        MR. SLAUGHTER: Hearing. Sorry. Got it.
6        BY MR. BARKASY: Q. You --
7        MR. SLAUGHTER: I'm sorry. And there's writing
8   on various pages. I don't know if --
9        MR. BARKASY: Yeah. Unfortunately, that's the
10  only copy of this we've ever been provided --
11       MR. SLAUGHTER: Fair enough.
12       MR. BARKASY: -- in the trustee's office I
13  believe, so ...
14       MR. SLAUGHTER: Okay. I just wanted to make
15  sure that you knew it so in case they were your notes or
16  something like that.
17       MR. BARKASY: I think they preceded us.
18       MR. SLAUGHTER: Fair enough.
19       BY MR. BARKASY: Q. You testified in the
20  confirmation hearing on Coram's second proposed plan of
21  reorganization on December 13, 2001; didn't you?
22       A. Yes, I testified.
23       Q. Okay. Please turn to page 425 of the
24  transcript.
25       A. (Witness complies.)
```

### PAGE 134

134

```
1        Q. Were you asked these questions and did you give
2   these answers when you testified at the confirmation
3   hearing before Judge Walrath on December 13th, 2001:
4            Question: Let's get some timing on that.
5        MR. SLAUGHTER: What line are you --
6        MR. BARKASY: Line -- page 425, line 9,
7   continuing to 425, line 16.
8        BY MR. BARKASY: Q. Question: Let's get some
9   timing on that. You first said the board approved your
10  employment agreement. That would have been back in
11  November of 1999?
12           Answer: Approximately.
13           Question: At that time the board did not know
14  that you were receiving $80,000 a month from Cerberus;
15  is that correct?
16           Answer: That is correct.
17           Were you asked those questions and did you give
18  your -- those answers in your testimony before Judge
19  Walrath?
20       A. That's what the transcript says.
21       Q. Coram issued a press release announcing your
22  becoming Coram's CEO; correct?
23       A. I think it did.
24       Q. And there was no mention in the press release
25  of your contract with Cerberus, was there?
```

### PAGE 135

135

```
1        MR. SLAUGHTER: Objection to the form of the
2   question. Calls for speculation. Lacks foundation.
3        THE WITNESS: Do you have the press release?
4            (Marked for identification purposes,
5        Exhibit 21.)
6        BY MR. BARKASY: Q. Mr. Crowley, Exhibit
7   Crowley 21 is a copy of Exhibit 99.2 to an 8-K filed by
8   Coram with the Securities and Exchange Commission. And
9   it is a press release dated November 30, 1999.
10           Did you approve this press release before it
11  was issued?
12       A. I think counsel approved it. And the board
13  approved it.
14       Q. Did you read it?
15       A. I'm sure I read it, and I'm sure it had
16  multiple drafts. It went through various people is my
17  practice when I ran Foundation and Health Net, to run
18  these kind of things through regulatory counsel. And
19  that's what would have happened here.
20           And you're not showing me it, but I do believe
21  there were a number of drafts before this that had been
22  scrubbed by counsel.
23       Q. Did -- did Kurt Davis, of Dynamic, prepare the
24  original draft of this document?
25       A. He may have. I'm not certain.
```

### PAGE 136

136

```
1        Q. Okay. But you read this before it was issued,
2   didn't you, Mr. Crowley?
3        A. Well, again, I -- I'm saying that this would
4   have been drafted; I would have been shown it. It would
5   have gone through the various approval processes that
6   included -- I think at that time it was probably Reed
7   Smith -- I can't remember the name of the fellow there;
8   it's an odd name -- who would have written all over this
9   and changed it.
10           It had a review by Don Amaral, because his name
11  is in there. And it would have been things that may
12  have been included that didn't end up in here.
13           Certainly Winterland is in -- embedded in the
14  first part of the document.
15           But did I approve it? I approved it after
16  everybody else approved it.
17       Q. Did you tell any lawyers at Reed Smith as of
18  November 30, 1999, that you had a contract with Cerberus
19  under which you were being paid the sum of $80,000 per
20  month?
21       A. I don't recall doing that.
22       Q. Did you tell Scott Larson, the general counsel
23  of Coram, that you had a contract with Cerberus that
24  paid you $80,000 a month as of the date of this press
25  release, November 30, 1999?
```

ProTEXT Transcript Condensing for Windows

SHEET 35   PAGE 137
137

```
1              MR. SLAUGHTER:  Objection.  Vague and
2    ambiguous.
3              THE WITNESS:  I need to tell you, that rocking
4    back and forth is distracting me.
5              BY MR. BARKASY:  Q.  I'm sorry.  Nervous habit.
6         A.   Okay.  But I don't -- I don't know that I did
7    or didn't.  I don't recall it.
8         Q.   Did you -- is there any mention in this press
9    release, Crowley 21, of your contract with Cerberus?
10             MR. SLAUGHTER:  Objection.  The document speaks
11   for itself.
12             BY MR. BARKASY:  Q.  You can answer.
13        A.   Only to the extent that it calls out chairman
14   of the board of Winterland.
15        Q.   All right.  The word "Cerberus" doesn't appear
16   in here, does it?
17        A.   No, it doesn't.
18        Q.   No 80,000 a month; right?
19        A.   It doesn't appear in there.
20             MR. SLAUGHTER:  Objection.  Argumentative.
21             MR. PETERS:  You don't have a better copy of
22   this?  Mine's only half.  I'm only getting part -- it
23   looks like I'm only getting part of the page, but we'll
24   see what the questions are.
25             MR. BARRIE:  It looks -- but it looks like
```

PAGE 138
138

```
1    they're complete.
2              MR. BARKASY:  We need to get another copy of
3    this.
4              MR. SLAUGHTER:  Do you want to do this later?
5              MR. BARKASY:  Yeah.  Can we get a copy on a
6    break, Jamie?
7              MR. SLAUGHTER:  Sure.
8              MR. BARKASY:  Thank you.
9              MR. SLAUGHTER:  Do you want to do that now or
10   do you want to keep going?
11             MR. BARKASY:  We might as well keep going until
12   we hit a natural break.
13             MR. BARRIE:  So is this going to be Crowley 22?
14             THE REPORTER:  Yes.
15             (Marked for identification purposes,
16             Exhibit 22.)
17             BY MR. BARKASY:  Q.  Mr. Crowley, you've been
18   handed Exhibit Crowley 22.
19             Is it a copy of a letter from you to
20   Don Amaral?
21        A.   Yes.  This is a letter from myself to
22   Don Amaral.
23        Q.   You wrote in the third paragraph on the -- on
24   the first page, Inasmuch as the contract does not take
25   effect until 30 November 1999, and importantly to me, my
```

PAGE 139
139

```
1    options price at the close of the market on the 30th, I
2    am stipulating that no public press release be made
3    until after the close of the market.
4              Correct?
5         A.   That's what it says there.
6         Q.   Why was it important to you that no public
7    press release be made until November 30th?
8         A.   I don't think the contract took effect until
9    November 30th.  I wasn't an employee or the chairman or
10   the CEO or working for Coram until November 30th, and it
11   seemed to me to be jumping by announcing something
12   before the actual event.
13        Q.   Were you at all concerned about the price of
14   your options?
15        A.   I don't think that I was thinking about the
16   price of the options, per se.  Although that is the date
17   that it would be priced, so much as, you know, my
18   experience is things happen between the 19th of November
19   and the 30th of November.  And I didn't work there.  So
20   he would be announcing something?  I didn't know.
21        Q.   Well, didn't you mean to be telling Mr. Amaral
22   that you were worried that if your contract was
23   announced to the public on November 19, that the stock
24   price would go up and that you would have to pay more to
25   exercise your options because the price for your options
```

PAGE 140
140

```
1    would be fixed as of November 30?
2              MR. SLAUGHTER:  Object to the form of the
3    question.
4              BY MR. BARKASY:  Q.  You can answer.
5         A.   Well, Rich, it's -- this -- my contract didn't
6    take effect until the 30th of November.  This thing was
7    reviewed by Don Amaral.  It was reviewed by counsel.
8    And ultimately, you know, I am saying if I don't work
9    there, I don't -- I don't want you to announce me until
10   I work there.
11             So you can draw whatever conclusion you wish
12   from that, but I wasn't an employee.
13        Q.   What thing was reviewed by counsel?
14        A.   This press release was.
15        Q.   Okay.  But not your letter to Mr. Amaral;
16   right?
17        A.   This press release was.  My contract was dated
18   the 30th.
19        Q.   When you became Coram's CEO, did Dynamic
20   Healthcare provide consulting services to Coram?
21             MR. SLAUGHTER:  Object to the form.
22             THE WITNESS:  Ultimately, I believe it did.
23             BY MR. BARKASY:  Q.  Who from Dynamic provided
24   consulting services to Coram?
25        A.   If you have a list you could refresh my memory,
```

ProTEXT Transcript Condensing for Windows

SHEET 49  PAGE 193

193

```
1   are in people who haven't been paying as much attention.
2        BY MR. BARKASY:  Q.  Do you recall asking any
3   Coram executives who did not reside in the Denver area
4   to move to Denver after you became Coram's chief
5   executive officer?
6        A.   Well, the one that comes to mind -- his name
7   escapes me.  It is a man that was responsible for
8   contracts and maybe purchasing.  And I could be not
9   quite right about the responsibility.  But he was
10  basically working in his house in -- I think Maryland,
11  Baltimore.
12       We did not have anything there other than this
13  guy.  But he had people that he was supervising that
14  were three time zones away or a couple of time zones
15  away, and -- and yet we had, you know, a big opportunity
16  to get purchasing for less.
17       By that I mean we're buying stuff, millions and
18  millions and millions of dollars of stuff, and here
19  is -- you know, my assessment was that if he would be
20  with his people and if he would be near the financial
21  people and if he would be in the headquarters, then he
22  would be buying better.
23       And if he bought better, our cost would be
24  better.  And if our costs were better, our profit would
25  be better.  And that he ought to be where his job was.
```

PAGE 195

195

```
1        THE WITNESS:  Well, of course, you know this
2   because you were, you know, my counsel at a period of
3   time.  And we talked about it in due diligence and all
4   of that.
5        And, you know, this release was vetted by, you
6   know, Reed Smith and other lawyers and was vetted by,
7   you know, half of the planet Earth at the time, and --
8   likely.  And if I could see source documents, if you had
9   them, very likely David Friedman and very likely the
10  full board of directors before it went out.
11       So I think at that time the majority of this
12  was put back to the revolver.  And my understanding of
13  the covenants of the revolver were such that it required
14  it; that you could then redraw it if you needed.  That's
15  how revolvers work.
16       A revolver is you take what you need when you
17  need and then you put it back and then you take it again
18  and you don't suffer the interest cost to warehouse
19  money unless you needed it, you know, to pay the bills.
20       And we were running a cash report every day.
21  I would get that report between 6 and 7 a.m.  And the
22  report would say, Here's what cash we entered in
23  yesterday and here's what cash we have today and here's
24  what cash we have to put out and where and here's what
25  cash balance is.
```

PAGE 194

194

```
1   And I -- I'm thinking that's the guy that I can recall.
2        Q.   Do you recall anybody resigning because they
3   did not want to move to Denver in the months after you
4   became Coram's CEO?
5        A.   Well, it surely could have happened.  I -- I
6   don't recall it.
7        Q.   Mr. Crowley, I'd like to go back to Crowley
8   Exhibit 31.
9        A.   Okay.
10       Q.   Mr. Crowley, it says -- and this is the press
11  release announcing the completion of the CPS sale -- it
12  says, in the second paragraph, The sale generated
13  approximately $38 million in cash after expenses.  The
14  cash proceeds are being used to pay the remaining
15  outstanding principal balance under Coram Healthcare's
16  revolving line of credit of $28.5 million and      $9.5
17  million is being applied to the principal of the Series
18  A notes.
19       Do you see that?
20       A.   Yes.
21       Q.   Why were all of the net proceeds of the sale of
22  CPS paid to the noteholders?
23       MR. SLAUGHTER:  Objection to the form of the
24  question.  It lacks foundation.  Calls for a legal
25  conclusion.
```

PAGE 196

196

```
1        And this company was producing a cash
2   projection as to what its -- I think it was a 13-week
3   rolling cash projection as to what its obligations were.
4        And, you know, the debt was due.  The debt
5   contract was being told to me is requiring that the
6   revolver be paid and -- and that the Series A be paid.
7   And the projections were telling me we have adequate
8   cash.
9        You know, the truth is we never drew on the DIP
10  the entirety of the time.  And I left a cash balance
11  when I left Coram at -- you know, whenever it was in
12  2003.  And there was negative arbitrage on the money in
13  the sense that we could only put it out short term.  And
14  what interest we would get paid on it was substantially
15  less than the cost that we would have to pay on it.
16       And so, you know, the thinking, the reasonable
17  business judgment that we were using, was that it saved
18  the company money and it -- and it, you know, generated
19  a positive return for the company to put it back.
20       And we had a contract saying we were supposed
21  to put it back.  And the best inside judgment was that
22  we didn't need the cash, and it turned out we didn't.
23       And, you know, Friedman and bankruptcy
24  counsel's, you know, fully aware in and copying him on
25  all of that stuff, that we're doing this.
```

ProTEXT Transcript Condensing for Windows

**SHEET 50  PAGE 197**

197

```
 1         And that nobody has said to me -- and, again
 2  Rich, remember, I have not had any real bankruptcy
 3  experience operating a firm in something like this, so I
 4  wouldn't have known any different.
 5         And it -- you know, in the end, Walrath's final
 6  approval said it didn't matter.  The company was
 7  insolvent and money was due and it was paid and there
 8  was no harm.  So I'm not quite sure why you're asking
 9  me.
10         BY MR. BARKASY:  Q.  The $9.5 million was
11  applied to principal on the Series A notes; is that
12  correct?
13     A.   I think that's what the words say.  And it must
14  have been due.
15     Q.   Well, it was a principal payment, not an
16  interest payment; right?
17     A.   But I'm saying, we wouldn't have made a
18  principal payment unless it was due.  And as I sit here,
19  I don't recall, but it -- I think it must have been due.
20  We wouldn't pay an early principal payment in that
21  company, so it must have been due and perhaps even in
22  default.
23     Q.   Did you review the Securities and Exchange
24  Agreement with the noteholders before the $9.5 million
25  was applied to principal in the Series A notes?
```

**PAGE 199**

199

```
 1         BY MR. BARKASY:  Q.  Did you consider retaining
 2  CPS and selling it in a Section 363 sale under the
 3  bankruptcy code?
 4         MR. SLAUGHTER:  Objection.  Calls for a legal
 5  conclusion.  Calls for speculation.  Lacks foundation.
 6         THE WITNESS:  I don't -- I don't recall that
 7  particularly.  I think at the time we were getting
 8  advice from lawyers and accountants and regulatory
 9  counsels and the advisers of all shapes and sizes.
10  And -- I don't know that it was considered or not.
11         BY MR. BARKASY:  Q.  As of July 31, you were in
12  the process of negotiating with the noteholders
13  regarding the DIP financing, new notes to be provided
14  under Coram's bankruptcy plan and the amount of money to
15  be paid to shareholders under Coram's bankruptcy plan;
16  correct?
17         MR. SLAUGHTER:  Object to the form.
18         THE WITNESS:  Do you have something you would
19  like me to look at that you're looking at?
20         BY MR. BARKASY:  Q.  I'm asking you a question.
21     A.   Well, I just don't recall.
22     Q.   Okay.  That's fine.
23         MR. SLAUGHTER:  Rich, it's fair for him, as he
24  sees you pick up a piece of paper and you're apparently
25  reading from it, to wonder what you're looking at while
```

**PAGE 198**

198

```
 1     A.   You know, the CFO and Allen Marabito and
 2  regulatory counsel and Ernst & Young and Friedman and
 3  Benson and Torres and, you know, others would have
 4  reviewed that, and I would have relied on them, who had,
 5  you know, more expertise and their business judgment as
 6  to what was required and appropriate.
 7     Q.   Who told you that it was required that
 8  $9.5 million be paid toward principal on the Series A
 9  notes?
10     A.   You know, as I sit here and try to recall who
11  told me in 2000, I'm going to say it's likely that it
12  was Scott Danis (phonetic) and Allen Marabito.  And if
13  you can remember the name of the fellow at Reed Smith
14  who was steeped in that and working in it and
15  exercising, you know, the business judgment.
16     Q.   You don't recall any particular conversation,
17  do you?
18     A.   If -- you know, you've got something to refresh
19  my memory, I'd look at it.  But as I sit here, I don't
20  recall it.
21     Q.   Did -- Coram filed bankruptcy eight days after
22  the sale was completed; correct?
23         MR. SLAUGHTER:  Objection.
24         THE WITNESS:  Did it?  I -- I don't know the
25  date.
```

**PAGE 200**

200

```
 1  he's answering the question.
 2  ///
 3         (Marked for identification purposes,
 4  Exhibit 34.)
 5         BY MR. BARKASY:  Q.  Mr. Crowley, Exhibit -- is
 6  Exhibit -- is Exhibit Crowley 34 a copy of a letter from
 7  you to the Coram board of directors dated July 31, 2000?
 8     A.   It's a copy of a memo that's directed to the
 9  board of directors, and it's also directed to
10  David Friedman, who was counsel advising the board on
11  what strategic alternatives were available to it and to
12  the people at Chanin that -- I'm not sure when we
13  actually finally got the valuation to say what the
14  company was worth and what its debt was versus what it
15  was worth.
16     Q.   Well, you wrote this letter; correct?
17     A.   Let me read it, then.
18         Okay.  I wrote -- I wrote this letter, yes.
19     Q.   In the first paragraph of the letter, you say
20  you contacted Cerberus and negotiated a DIP facility of
21  $40 million at prime plus 2 percent with a 1 percent
22  fee; correct?
23         MR. SLAUGHTER:  Second paragraph.
24         THE WITNESS:  Well, what it says was, you know,
25  I talked to Chanin about what was a range of
```

ProTEXT Transcript Condensing for Windows

SHEET 51   PAGE 201

201

```
1   reasonableness, and they told me 3 1/2 percent plus
2   3 percent fees.
3          And it says I discussed debtor-in-possession,
4   DIP, financing with Bank of America, and they confirmed
5   that that was right.
6          And then I ground Cerberus in the dust to take
7   35 percent less on the fee and -- close to 70 percent
8   less, rather, on the fee and -- and 35 percent less on
9   the facility itself.  And that I tried to negotiate a
10  benefit to the stockholders and had not been successful.
11         And that I was prepared to modify the
12  restructuring bonus that I had negotiated with the board
13  to something different.  And that they ought to think
14  about it and consider it, and that we ought to get
15  together as a board and talk about it.
16         And here I'm advising lawyers and Chanin and
17  advisers, this is what's going on post the board meeting
18  on July 31.
19         BY MR. BARKASY:  Q.  Who did you speak to at
20  Cerberus regarding the DIP facility?
21     A.   You know, I'm not altogether certain I only did
22  it.  It may have been Allen Marabito and Scott Danis and
23  myself and counsel.  And I'm not clear that it was with
24  Mark Neporent or Mark and Steve Feinberg or vice versa,
25  but it was a sparky conversation.
```

PAGE 203

203

```
1   speculation.
2          THE WITNESS:  I see the words and all of that.
3   I don't recall that I did it myself or that some others
4   did it or Friedman did it or Allen or Scott Danis did it
5   or -- just reading this doesn't refresh my memory,
6   per se.  Except that I -- I remember talking with the
7   board about it and Amaral saying, It's a killer deal and
8   it's -- you know, it's better than what he would be able
9   to do or had a sense of what the market was, and it was
10  good.
11         BY MR. BARKASY:  Q.  So when you used the word
12  "I" here in reporting to the board of directors what was
13  going on within the negotiations on the new note under
14  the plan, you might have meant Mr. Friedman or Mr. Danis
15  or Mr. Marabito or some combination; correct?
16         MR. SLAUGHTER:  Object to the form of the
17  question.
18         BY MR. BARKASY:  Q.  Is that what you're
19  saying?
20         MR. SLAUGHTER:  Object to the form of the
21  question.  Argumentative.
22         THE WITNESS:  As I sit here --
23         MR. SLAUGHTER:  And mischaracterizes testimony.
24         THE WITNESS:  In April of 2007, commenting on
25  my letter of July 31, 2000, I simply can't recall all of
```

PAGE 202

202

```
1   Q.   During that conversation, did Mr. Feinberg
2   indicate that he was pleased because you were going to
3   be sending the noteholders $38 million in cash as a
4   result of the closing of the sale of the CPS
5   transaction?
6          MR. SLAUGHTER:  Object to the form.
7          THE WITNESS:  No.  No.  He seemed --
8          BY MR. BARKASY:  Q.  He wasn't happy about
9   that?
10     A.   Yeah.  He had 135 million stuck in this thing.
11  The totality of the debt was 300 million.  These are
12  people that had a company that was in default.  He isn't
13  giving me any compliments for anything.
14         And now I'm grinding him into the dirt on a DIP
15  well below market, and, you know, why is that?  Why
16  can't I get market?  Because I want better.  Give it to
17  me.  And he did.
18     Q.   In the -- by the way -- in the second paragraph
19  you say you contacted Ed Mule at Goldman Sachs and
20  Steve Feinberg at Cerberus to negotiate the terms of the
21  new note.
22         When was it that you spoke to Mr. Feinberg
23  about the terms of a new note?
24     A.   I don't recall doing --
25         MR. SLAUGHTER:  Object to the form.  Calls for
```

PAGE 204

204

```
1   the dynamics that went on in the process.
2          BY MR. BARKASY:  Q.  You do remember Mr. Amaral
3   telling you it was a killer deal, though?
4      A.   He said it, actually, in a board meeting.
5      Q.   In the next paragraph, you say that you
6   requested that the current Coram stockholders receive
7   ten cents per share in cash.
8      A.   Yeah.  That was a -- Amaral, one, was a
9   shareholder, of course.  The board wanted the
10  stockholders to get something.  David Friedman's view
11  was they're out of the money.  They're not entitled to
12  anything.
13         Ed Mule's feeling was that Goldman had been
14  disadvantaged by this investment and it was a terrible
15  investment and that they ought not to get anything.
16         And Friedman went back, I went back.
17  Ultimately, I think there was an independent committee,
18  and Amaral and perhaps Casey and someone else maybe --
19  board minutes might show it -- went back and everybody
20  went back, trying to get something for the equity.
21         And we met with, you know, Calis Turndan
22  (phonetic).  So that -- that was part of the process
23  that was going on back then.
24     Q.   Did you have discussions with Mr. Feinberg
25  about money going to the equity as part of Coram's plan?
```

ProTEXT Transcript Condensing for Windows

SHEET 53   PAGE 209

209

```
 1   counsel that with this process, that Feinberg ought to
 2   get off the board and let the independent directors
 3   decide what goes on with the company.  And that's what
 4   he did.
 5       Q.   Was there a concern about a conflict?
 6       A.   I don't think --
 7            MR. SLAUGHTER:  Object to the form.
 8            THE WITNESS:  I don't think I could sit here
 9   and tell you now, having just answered I don't recall
10   what the reasons totally were.  But he did resign, and
11   he resigned on the advice from counsel.
12            MR. SLAUGHTER:  Why don't we go off the record
13   and take a break.
14            MR. BARKASY:  Yes.
15            THE VIDEOGRAPHER:  Off record at 5:05.
16            (Recess taken, from 5:05 to 5:16.)
17            THE VIDEOGRAPHER:  On record at 5:16.
18            BY MR. BARKASY:  Q.  Mr. Crowley, did you have
19   any discussions with Mr. Feinberg in or around July 31,
20   2000, about whether it was appropriate for you and he to
21   be discussing the terms and conditions of Coram's plan
22   of reorganization given your contractual relationship
23   with Cerberus?
24       A.   I don't recall.
25
```

PAGE 211

211

```
 1       Q.   Do you see that?
 2       A.   Yes.
 3       Q.   Did Mr. Feinberg tell you that he was pleased
 4   that you had generated $60 million of cash for the debt
 5   holders during 2000?
 6       A.   The board was pretty pleased and excited about
 7   it because it created equity value by reducing the
 8   obligation on the company.  And so it narrowed the gap
 9   of insolvency, so they were really excited about it.
10   But Feinberg could care less.
11       Q.   Feinberg didn't care about receiving Cerberus's
12   portion of the $60 million paid to the noteholders?
13            MR. SLAUGHTER:  Object to form.
14            THE WITNESS:  You'd have to ask him if he cared
15   about it, but he never told me.
16            BY MR. BARKASY:  Q.  Did you, in or about
17   July 31, 2000, request that the noteholders permit Coram
18   to use a portion of the net proceeds of the sale of CPS
19   so that Coram could make payment in full to Coram's
20   general unsecured creditors?
21            MR. SLAUGHTER:  Object to the form.  Vague and
22   ambiguous.
23            Do you understand the question?
24            THE WITNESS:  No.  I understand the question.
25   I'm not sure as to the logic at that time.  I
```

PAGE 210

210

```
 1            (Marked for identification purposes,
 2       Exhibit 36.)
 3            BY MR. BARKASY:  Q.  Mr. Crowley, Exhibit
 4   Crowley 35 --
 5            THE REPORTER:  Thirty-six.
 6            BY MR. BARKASY:  Q.  -- 36 is a copy of a
 7   letter from you to Steven Feinberg, Ed Mule and
 8   Ed Stearns dated July 31, 2000; correct?
 9       A.   It's a copy of a letter sent to Feinberg, Mule,
10   Ed Stearns and to the entire Coram board of directors,
11   with attachments that are not seen on this.
12            And it also says it's gone to David Friedman
13   and Russ Belinsky at Chanin, with attachments.  So it
14   appears to have gone to more than what you just said.
15       Q.   Is that your handwriting on the side, on the
16   right side?
17       A.   No.  That's -- that's not my handwriting.
18       Q.   Whose handwriting is that?
19       A.   I -- I don't know.  It does say, Coram board of
20   directors down below my signature.
21       Q.   In the last paragraph, you wrote, Earlier this
22   year, we voluntarily repaid 15.5 million early on the
23   revolver, 6.3 million in interest, and with the
24   38 million, we have generated 60 million in cash for the
25   debt holders.
```

PAGE 212

212

```
 1   mean, here this thing has gone to Dave Friedman, who's
 2   counsel to the board and is a party to this.  And here
 3   it's -- it's obviously going to the board.  It's --
 4   there's a board member named on the top of the note.
 5            I have no reason to believe that the full board
 6   didn't receive it.  And here it's showing in Goldin and
 7   equity and, you know, you guys have had it as well and
 8   discovered it and you even discussed it with me.
 9            I don't think we had, you know, full
10   appreciation of what the value of the firm was.  And I
11   wasn't receiving advice from counsel to the contrary.
12   And the contracts called for it.
13            Cash flow suggested it was a good -- okay.  The
14   arbitrage made it logical.  The cash forecast didn't
15   suggest otherwise.  We never drew on the DIP
16   subsequently.  And Walrath found that the payments were
17   owed in her approval of the confirmation of the
18   trustee's plan.  I --
19            BY MR. BARKASY:  Q.  I'd like you to focus on
20   the question that -- that I asked you.
21       A.   Which one?
22       Q.   Which was did you, in or about July 31, 2000,
23   contact the noteholders and ask them whether they would
24   consent to Coram using some of the net proceeds of the
25   sale of CPS toward payment of Coram's general unsecured
```

B487

ProTEXT Transcript Condensing for Windows

SHEET 54    PAGE 213

213

1  creditors under Coram's bankruptcy plan?
2         MR. SLAUGHTER:  Object to the form.
3         THE WITNESS:  I don't recall doing that.
4         MR. BARKASY:  What?
5         BY MR. BARKASY:  Q.  Well, you were negotiating
6  the terms of the plan on July 31, 2000; correct?
7         MR. SLAUGHTER:  Object to the form.
8         THE WITNESS:  I think the document, you know,
9  you showed me earlier, there's a -- at the conclusion of
10 the board meeting on July 31st, we proceeded to contact
11 folks and all of that, and we talked about that back and
12 forth.
13        It wasn't clear that we were going to be filing
14 bankruptcy yet.  And I don't think we filed it until
15 sometime in August, because we didn't have a valuation.
16        BY MR. BARKASY:  Q.  On July 30 you were
17 negotiating a DIP facility, and a DIP facility is a
18 debtor-in-possession facility in a Chapter 11 case;
19 right?
20        MR. SLAUGHTER:  Object to the form.
21        THE WITNESS:  On July 31st we've seen a note
22 from me saying that we were in the process of trying to
23 negotiate a debtor-in-possession financing facility.
24        BY MR. BARKASY:  Q.  Right.  And that -- and
25 that would be only be applicable in a Chapter 11

PAGE 214

214

1  bankruptcy case; right?
2         A.  If we were to file one.  And that wasn't
3  decided or clear and we had not.
4         Q.  And the new notes referred to in the third
5  paragraph of your letter are the new notes that were
6  going to be issued under Coram's Chapter 11 plan of
7  reorganization; correct?
8         MR. SLAUGHTER:  Objection.  Argumentative.
9  Object to the form.
10        Are you -- what document are you referring to,
11 Rich?
12        MR. BARKASY:  The July 31, 2000, letter from
13 Mr. Crowley to the Coram board of directors, which is
14 marked as Crowley Exhibit 34.
15        THE WITNESS:  Well --
16        MR. SLAUGHTER:  Further, the question lacks
17 foundation.
18        THE WITNESS:  Well, this -- this July 31st
19 letter I think is in contrast to whatever the plan
20 actually was that was arrived at.  It was written by
21 counsel.  It was approved by the board unanimously.
22        And it was not a given that this company was
23 going to file for Chapter 11.  It didn't have the
24 bankruptcy plan filed, and we hadn't received the Chanin
25 capital valuation.  And you know that, Rich.

PAGE 215

215

1         (Reporter clarification.)
2         THE WITNESS:  The Chanin capital valuation.
3  And you know that, Rich.
4         (Marked for identification purposes,
5  Exhibit 37.)
6         BY MR. BARKASY:  Q.  Mr. Crowley, Exhibit
7  Crowley 37 is a letter from you to the Coram board of
8  directors dated July 24th, 2000; correct?
9         A.  Yes.
10        MR. SLAUGHTER:  Object -- objection.  It's more
11 than just a letter.
12        THE WITNESS:  Yes.
13        BY MR. BARKASY:  Q.  And there's attachments to
14 the letter; correct?
15        A.  Yes.
16        Q.  Okay.  And one of those attachments is a
17 preliminary valuation report that you received from
18 Chanin; correct?
19        A.  It's a draft.
20        Q.  And the other attachment is a revision to the
21 valuation; correct?
22        MR. SLAUGHTER:  Object to the form.
23        Can you point us to where you're referring?  I
24 only have -- I'm sorry.  There's two things.  I
25 apologize.

PAGE 216

216

1         THE WITNESS:  My recollection of this document
2  is that this was a draft.  It was preliminary.  It was
3  subject to change, and that it was not the final report
4  from Chanin.
5         BY MR. BARKASY:  Q.  Okay.  Let's -- let's look
6  at your letter.
7         In the first sentence, it says, Over the past
8  weekend, we received and reviewed the preliminary
9  valuation report from Chanin Capital Partners.
10        Is that statement accurate?
11        A.  It appears to be the preliminary report.
12        Q.  Okay.  It goes on to say, Adjustments were made
13 to make the cash flow in 2001 and forward somewhat more
14 conservative in keeping with my view of the business and
15 its prospects.
16        Do you see that?
17        A.  Yes.
18        Q.  What adjustments were made to make the cash
19 flow in 2001 and forward more conservative in keeping
20 your view of the business?
21        A.  Yeah.  I don't recall, as I sit here, except to
22 say that the accounting department, Scott Danis and the
23 people who were involved in the projecting of the cash
24 and the actual flows of the company, were looking at it
25 and feeding into Chanin information such as they knew

ProTEXT Transcript Condensing for Windows

241

```
 1          (Record read as follows:
 2      "Q  Did you -- after the first -- after
 3   confirmation of the first plan was denied
 4   by the Bankruptcy Court, did you discuss
 5   with Mr. Feinberg whether you should sever
 6   your employment arrangement with
 7   Cerberus?")
 8          THE WITNESS:  You know, I vaguely recall
 9   discussing it with Steve Feinberg.  And particularly I
10   remember discussing it with David Friedman and
11   discussing it with the full board of directors, you
12   know, what was I being paid, why was I being paid, what
13   I did for it, how did that relate to Coram or not relate
14   to Coram and the amount of money involved.
15          We had a full face-to-face meeting, and I think
16   they were all there.  All the board members.  And I do
17   generally recall having a pretty detailed conversation
18   with David Friedman about it.  And what do we do with
19   this and how do we get this -- our company out of
20   bankruptcy and what do I need to do.
21          And I may have discussed it with Steve.  I
22   think I did.
23          BY MR. BARKASY:  Q.  Do you remember what you
24   and Steve said when you were discussing whether you
25   should sever your relationship with Cerberus?
```

PAGE 243

243

```
 1   The Court didn't find it so.
 2          And so counsel was saying disclose it in the
 3   most clear fashion that we possibly can.  And I think
 4   regulatory counsel and restructuring counsel rewrote it
 5   and put in a much more thorough and adequate disclosure.
 6      Q.  Did you consider resigning your position at
 7   Coram as a result of the Bankruptcy Court's decision
 8   denying confirmation of Coram's first plan of
 9   reorganization?
10      A.  Yeah.  I -- I considered it and the board
11   considered it, and we discussed it.  And counsel
12   discussed it.  And we talked about it quite a bit.
13      Q.  And why was it that you decided not to resign
14   your position at Coram?
15      A.  Well, flat out, I think I did a terrific job
16   there.  And I think that, you know, I had a disagreement
17   with the judge as to whether I had, in fact, a conflict
18   because everything about my arrangement with Coram was
19   to generate as, you know, great an EBITDA earnings and
20   improve the company.
21          And, you know, on one hand, Walrath was saying,
22   you know, it's sad that there's this apparent conflict
23   because you've done, you know, such a terrific job here
24   and the company is hopelessly insolvent.  And I'm sure
25   I'll find in another plan that it is insolvent.
```

PAGE 242

242

```
 1      A.  Well, it -- it's a long time ago, but I think
 2   we came to the conclusion that it was more of -- as
 3   David Friedman advised, a disclosure matter, and
 4   adequately disclose it.  If we didn't, it was
 5   inadvertent.
 6          We'd pile on the disclosures.  And I think
 7   you'd find that thereupon in the 10-K and -- for year
 8   2000, it was a fairly thorough disclosure that included
 9   the amount of money and everything related to it.
10          And then it was a disclosure in the SEC
11   document, 10-Q, for March and then for June and then for
12   September and then December.  And then in the Q -- of
13   the K for 2001 and thereafter.
14          So the advice was from counsel that the board
15   ought to form an independent committee and hire an
16   independent outsider.  And the Court approved Goldin,
17   and the disclosures were-- you'd have to show me what
18   they were in the K and Qs, but I think they were very
19   thorough.
20      Q.  Were they more thorough than the disclosures
21   that were made for the fiscal year ending 12/31/99?
22      A.  I -- I think that they expanded to add the
23   $80,000 a month that you've been asking me all day
24   about.  Because it -- well, I felt that it was
25   adequately disclosed.  It doesn't matter what I thought.
```

PAGE 244

244

```
 1          On the other hand -- you know, so here I think
 2   I've done a terrific job.  And a U.S. Bankruptcy Court
 3   judge is saying, You did a good job.
 4          And the board of directors were lauding me and
 5   complimenting me all the way along the way for doing a
 6   great job.  And it just seemed to me I ought not to be
 7   run out of Dodge for no apparent reason when I've saved
 8   the company and a couple thousand jobs.
 9          And I was willing to be open to the scrutiny of
10   this independent adviser they chose, Harrison J. Goldin,
11   and not afraid of it.  I just felt, gosh, I saved the
12   company, and I've done everything I know how to make it
13   better.  And so be it.  Come ahead.  Investigate me
14   however you want.
15          And Harrison Goldin went about ripping the
16   company apart from pillar to post.  And I never knew
17   what was going to come out of it until the end of it,
18   but -- except to say that I know in my heart I did a
19   great job at Coram, and I wasn't going to leave with my
20   tail between my legs for no reason.  So, yeah, I
21   considered it.
22          You know, the board could have tossed me.  No
23   doubt about it.  That board was comprised of independent
24   thinking.  Don Amaral has never been anyone's sycophant.
25          (Reporter clarification.)
```

ProTEXT Transcript Condensing for Windows

SHEET 62   PAGE 245

245

```
1        THE WITNESS: Anyone's sycophant,
2   S-Y-N-C-H-O-P-H-A-N-T [sic].
3        And they chose to keep me and complimented me.
4        So I, you know, made a decision. I could stay.
5   And more completely disclosed, to the extent that I
6   inadvertently may not have fully disclosed, and I
7   thought that I had.
8        BY MR. BARKASY: Q. You mentioned that the
9   Court discussed and -- the Court found -- let me
10  withdraw that.
11       The Court found that there was an actual
12  conflict of interest; is that right?
13       MR. SLAUGHTER: Objection. Lacks foundation.
14  Calls for a legal conclusion.
15       THE WITNESS: You know, you're an attorney, and
16  whatever the Court found, you -- you know, she can say
17  that it's an actual conflict, and I would say we have a
18  disagreement.
19       And there are decent people in the room, and I
20  respect her thoroughly. But, you know, I saved the
21  company, and I know it and everyone who worked there
22  knows it.
23       BY MR. BARKASY: Q. Would --
24       (Marked for identification purposes,
25       Exhibit 42.)
```

PAGE 247

247

```
1   walk off from it. But I -- I really wanted to see it
2   through. And, Rich, I just was convinced in my heart I
3   had done a lot of good and nothing wrong.
4        BY MR. BARKASY: Q. Mr. Crowley, Exhibit
5   Crowley 42 is the portion of the transcript of the
6   proceedings before Judge Walrath on December 21, 2000,
7   in which she rendered her ruling regarding the debtor's
8   first plan.
9        And if you could look at page 89.
10       A.   (Witness complies.)
11       Q.   And at the top, Judge Walrath says, I don't
12  know what would have happened without this actual
13  conflict of interest. I do think it's an actual
14  conflict of interest.
15       Do you see that?
16       A.   I do. And I remember talking to your boss
17  about it, Arlin Adams, who told me that he thought she
18  said too much on the record and she was wrong.
19       Q.   All right. Given that Judge Walrath thought
20  that your relationship with Cerberus presented an actual
21  conflict of interest, would the safest thing for Coram
22  have been for you to either resign from Coram or sever
23  your relationship with Cerberus?
24       MR. SLAUGHTER: Object to the form of the
25  question. Lacks foundation. Calls for speculation.
```

PAGE 246

246

```
1        THE WITNESS: Is it possible be to take a two-
2   or three-minute break and just uncrick my back?
3        MR. BARKASY: Yes.
4        THE VIDEOGRAPHER: Off the record at 6:12.
5        (Recess taken, from 6:12 to 6:19.)
6        THE VIDEOGRAPHER: On record at 6:19.
7        BY MR. BARKASY: Q. Mr. Crowley, when you were
8   deciding what to do with regard to your contractual
9   relationships with Coram and Cerberus after the
10  Bankruptcy Court denied confirmation of Coram's first
11  plan, your primary concern was what was in the best
12  interest of Coram; is that right?
13       MR. SLAUGHTER: Object to the form.
14       You can answer.
15       THE WITNESS: Well, my -- I mean, my primary
16  interest was -- as CEO of Coram was always to do the
17  best I could for the company. And I'm a pretty ethical
18  guy. I think -- I wanted Coram to succeed, and I also
19  wanted Coram to get out of bankruptcy.
20       And I -- you know, I talked with the directors
21  and -- and David about it and came to the conclusion in
22  my own heart and mind that, you know, Coram was hanging
23  on me and my skills and talent and smarts and
24  experience, and that I ought not to walk off from it.
25       If someone said I had to walk off from it, I'd
```

PAGE 248

248

```
1   Calls for a legal conclusion.
2        Other than that, you may answer.
3        THE WITNESS: Well, you know, I -- I read this
4   back then. And I remember feeling personally stunned by
5   it, and it broke my heart at the time because, you know,
6   here's this lady saying, I think there is evidence that
7   Mr. Crowley did do a good job operationally in helping
8   the debtor turn around.
9        And -- and here's this, you know, lady saying,
10  Even on its numbers, which I agree with the creditor
11  committee's counsel, that under any of the numbers, the
12  company is insolvent today.
13       So I'm in a court. This federal judge is
14  saying the company is insolvent today. She's saying
15  Crowley did a good job operationally. She doesn't like
16  the relationship.
17       And lawyers are saying to me -- David Friedman
18  is saying to me directly, and Boris Feldman (phonetic)
19  is saying to me directly, This is a disclosure thing,
20  Dan. Put a more expansive disclosure out there. Let
21  this independent committee do what it's going to do. Go
22  run the company.
23       You know, and I -- I wanted to continue and see
24  this thing through. I -- you know, I wanted to get it
25  out of bankruptcy, and I wanted the company to prosper
```

B490

ProTEXT Transcript Condensing for Windows

SHEET 1   PAGE 1

```
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
 2
     Case No. 04-1565
 3
     ------------------------------------
 4
     VIDEO DEPOSITION OF SCOTT R. DANITZ
 5   April 6, 2007

 6   ------------------------------------

 7   ARLIN M. ADAMS, Chapter 11 Trustee of the
     Post-Confirmation Bankruptcy of Estates of Coram
 8   HEALTHCARE CORPORATION, and of CORAM, INC., a
     Delaware corporation,
 9      Plaintiffs,

10   vs.

11   DANIEL D. CROWLEY, DONALD J. AMARAL, WILLIAM J.
     CASEY, L. PETER SMITH, and SANDRA L. SMOLEY,
12
        Defendants.
13
     ------------------------------------
14
     APPEARANCES:
15
     SCHNADER HARRISON SEGAL & LEWIS, LLP
16        By Barry E. Bressler, Esq.
          1600 Market Street, Suite 3600
17        Philadelphia, Pennsylvania 19103-7286
          215-751-2050
18        bbressler@schnader.com
            Appearing on behalf of Plaintiffs.
19
     KEKER & VAN NEST, LLP
20        By Laurie Carr Mims, Esq.
          710 Sansome Street
21        San Francisco, California 94111-1704
          415-391-5400
22        lmims@kvn.com
            Appearing on behalf of Defendant
23          Daniel D. Crowley.

24   Also Present:  Carie Finegan, Videographer

25
```

PAGE 2

```
 1          Pursuant to Notice and the Federal Rules

 2   of Civil Procedure, the video deposition of SCOTT R.

 3   DANITZ, called by Defendant Daniel D. Crowley, was

 4   taken on Friday, April 6, 2007, commencing at

 5   9:00 a.m., at 410 17th Street, Denver, Colorado,

 6   before Vanessa D. Campbell, Registered Professional

 7   Reporter and Notary Public within and for the State

 8   of Colorado.

 9

10              I N D E X

11   VIDEO DEPOSITION OF SCOTT R. DANITZ

12   EXAMINATION BY:                    PAGE

13     Mr. Bressler                  137, 208

14     Ms. Mims                        6, 200

15

16   EXHIBIT NAME    DESCRIPTION            PAGE #

17   Exhibit 1   Notice of Third-Party Subpoena     12
                 to Scott Danitz
18
19   Exhibit 2   Agent, March 25, 2002, Coram       38
                 Executive Overview for Arlin M.
20               Adams, Esq., Chapter 11 Trustee,
                 CH-11 TRUSTEE 000345 - 000422
21   Exhibit 3   Letter to Ernst & Young LLP from   52
                 Scott Danitz, 12/15/99, COR-EQTY
22               0001681 - 0001683

23   Exhibit 4   Minutes of a meeting of the        72
                 board of directors of Coram
24               Healthcare Corporation, 7/31/00,
                 TRUSTEE 01721 - 01729
25
```

PAGE 3

```
 1                I N D E X  (Continued)

 2   Exhibit 5   Fax transmittal page to Coram      83
                 Healthcare Board of Directors
 3               from Daniel D. Crowley, 3/9/01;
                 Letter to Coram Healthcare Board
 4               of Directors from Daniel D.
                 Crowley, 3/9/01, COR-EQTY
 5               0009064 - 0009071

 6   Exhibit 6   Letter to Judge Arlin M. Adams    105
                 from Daniel D. Crowley, 8/5/02,
 7               with attachments, CH-11 TRUSTEE
                 004448 - 004462
 8
 9   Exhibit 7   Letter to Keith W. Mumford from   107
                 Scott R. Danitz, 11/6/02, with
10               attachment, CH-11 TRUSTEE/
                 CrowleyAdmin 014839 - 014841
11   Exhibit 8   10-K form for fiscal year ending  125
                 12/31/00
12
     Exhibit 9   10-K form for fiscal year ending  128
13               12/31/01
14   Exhibit 10  E-mail to dcrowley@attglobal.net  133
                 from Vito Ponzio, 3/8/03,
15               CrowleyKVN 000324 - 000325
16   Exhibit 11  Memo to Denver Planning Meeting   145
                 Attendees from Daniel D. Crowley,
17               12/16/99, CROWLEYKVN 017682 -
                 017683
18
     Exhibit 12  Selected Reorganization Expenses  162
19
     Exhibit 13  Letter to "Dear Friend of Coram"  165
20               from Scott R. Danitz, 1/19/01,
                 CROWLEYKVN 018187
21
     PREVIOUSLY MARKED EXHIBITS              PAGE #
22
     Marabito 3  Letter to Don Amaral from         197
23               Daniel D. Crowley, CROWLEY
                 0075 - 0076
24
25
```

PAGE 4

```
 1                I N D E X  (Continued)

 2   Marabito 8  Memorandum to various parties     113
                 from Shaunna Stribling, 2/11/00,
 3               with attachments,
                 COR-EQTY0002727 - 0002796
 4
     Marabito 12 Letter to Barry E. Bressler from  176
 5               Allen J. Marabito, 4/22/02, with
                 attachments, CH-11 TRUSTEE/
 6               CrowleyAdmin005719 - 005811
                 and CXR 003348
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

ProTEXT Transcript Condensing for Windows

137

```
 1      A    No.
 2          MS. MIMS:  I have no further questions at
 3  this time, but I'd like to reserve the right to ask
 4  questions after Mr. Bressler asks his questions.
 5  Thank you.
 6          THE VIDEOGRAPHER:  We are off the record
 7  at 1:40.
 8          (A recess was taken from 1:40 p.m. to
 9           1:41 p.m.)
10          THE VIDEOGRAPHER:  We are back on the
11  record at 1:41.
12              EXAMINATION
13  BY MR. BRESSLER:
14      Q    Good afternoon, Mr. Danitz.
15      A    Hello.
16          (Pause.)
17      Q    Why don't we start out where Ms. Mims
18  finished off.  Could you get in front of you Danitz
19  Exhibit 8 and Danitz Exhibit 9?
20          (Pause.)
21      Q    Am I correct that your testimony was that
22  you recognized these as the SEC 10-K filings for the
23  fiscal years ended December 31, 2000 and
24  December 31, 2001?
25      A    Yes.
```

138

```
 1      Q    There was a similar filing for the fiscal
 2  year ended December 31, 1999; is that correct?
 3      A    Yes.
 4      Q    Were you also involved in the process that
 5  led to that filing?
 6      A    Yes.
 7      Q    Ms. Mims showed you some disclosures
 8  regarding Mr. Crowley's relationship with Cerberus
 9  in each of these two documents.  Do you recall that?
10      A    Yes.
11      Q    Was there, to your recollection, any such
12  description in the 10-K for the prior period ending
13  December 31, 1999?
14          MS. MIMS:  Object to form.
15      A    No.
16      Q    (By Mr. Bressler)  I think you testified
17  that the first time you were aware that Mr. Crowley
18  had an employment contract with Cerberus was after
19  it became an exhibit at the bankruptcy court hearing
20  on confirmation of the first plan; is that correct?
21          MS. MIMS:  Objection.  Mischaracterizes
22  his testimony.
23      Q    (By Mr. Bressler)  Mr. Danitz, when's the
24  first time you became aware that Mr. Crowley had an
25  employment contract with Cerberus?
```

139

```
 1      A    It would have been right on the eve of our
 2  confirmation hearings, near November, December of
 3  2000.
 4      Q    Prior to that, Mr. Crowley had never told
 5  you he had an employment contract with Cerberus, did
 6  he?
 7      A    No, he did not.
 8      Q    Prior to that no one from Cerberus ever
 9  told you that they had an employment contract with
10  Mr. Crowley, did they?
11      A    No, they did not.
12      Q    I think Ms. Mims went through the
13  disclosure language with you in Danitz 8 and
14  Danitz 9, and the description of Mr. Crowley's
15  contract with Cerberus was identical.
16      A    Right.  I -- I didn't compare
17  word-for-word, but I didn't see any differences
18  between the two up to a certain point in time.
19      Q    And the difference that you found in
20  Danitz 9 was the language about the suspension of
21  Mr. Crowley's contract with Cerberus, which appeared
22  several paragraphs later?
23      A    It was the paragraph right after the first
24  disclosure of the agreement.
25      Q    And I'll direct your attention to Danitz 9
```

140

```
 1  at Page 53.
 2          (Pause.)
 3      A    Yes.  I'm there.
 4      Q    And on the part of Page 53 that runs over
 5  to the end of the page, the language was,
 6  "Mr. Crowley and Cerberus agreed to suspend their
 7  contract and all related obligations immediately
 8  after the bankruptcy court's denial of the second
 9  plan of reorganization on December 21, 2001, and the
10  contract remains suspended through April 12th,
11  2002."
12      A    Yes.
13      Q    What did the words "and all related
14  obligations" mean?
15          MS. MIMS:  Object to form.
16      A    That would have been in the context of
17  the -- the document that Mr. Crowley and Cerberus
18  had in place.
19      Q    (By Mr. Bressler)  Do you recall if there
20  was an obligation in that document for Mr. Crowley
21  to follow Cerberus' directions or be subject to
22  termination?
23      A    I recall in general terms, yes, that
24  that -- that was included in the document.
25      Q    So would that be a related obligation that
```

ProTEXT Transcript Condensing for Windows

SHEET 43  PAGE 169

169

```
1    A    It -- again, a user group, and really had
2  close ties to us, because we looked to work with
3  them for any potential referrals of patients.
4    Q    Do you recall in early 2001 that they
5  expressed some concerns about Coram because of the
6  bankruptcy proceedings in December 2000?
7    A    Yes.
8    Q    Who was Nutrashare?
9    A    I do not recall who Nutrashare was.
10   Q    Do you know who Health Net is?
11   A    Yes.
12   Q    And who are they?
13   A    They were one of our major customers,
14  and -- out in California.
15   Q    In 2003, did Health Net send Coram a
16  request for proposal in connection with renewal of
17  their contract?
18   A    Yes.
19   Q    And do you recall participating and
20  responding to that RFP?
21   A    Yes.
22   Q    Did Mr. Melancon also participate in
23  responding to that RFP?
24   A    Yes.
25   Q    In fact, he would be the lead on that?
```

PAGE 171

171

```
1  second plan of reorganization was not confirmed
2  damage Coram's ability to increase sales?
3          MS. MIMS:  Object to form.
4          MR. BRESSLER:  You may answer.
5    A    It -- it would have damaged it some, yes.
6    Q    (By Mr. Bressler)  Looking back at the
7  historical performance of the company, was 1999 a
8  particularly bad year for Coram?
9    A    Yeah, it was a terrible year.
10   Q    And could you expound on why you think
11  that was?
12   A    Well, first of all, we were expending a
13  lot of cash on the Resource Network Group, and it
14  was operating at a loss.  The contracts that it had
15  entered into just weren't profitable.
16        The Coram Prescription Services was a
17  start-up business, as well, and wasn't generating
18  enough profitability to make a difference for the
19  company, and then the base business, parts of it
20  were doing well and the other parts were not doing
21  well.  We had some branches that were operating at
22  losses, and Clinical Trials Group, CTI, was, again,
23  a start-up and -- and not contributing any
24  profitability.
25   Q    Were there still problems from the
```

PAGE 170

170

```
1    A    Yes, he was.  He was responsible for our
2  man -- managed care group, and he was the primary
3  contact with the customer.
4    Q    Do you recall that at some point in time
5  Health Net wanted assurances that Coram would
6  finally get out of bankruptcy?
7    A    Yes.
8    Q    And did there come a time when there were
9  conference calls with Health Net to offer those
10  assurances?
11   A    There were conference calls and meetings
12  and a lot of paperwork provided, as well, yes.
13   Q    I didn't want to underestimate.
14        When Health Net finally did renew the
15  contract, were there provisions in it that they
16  could terminate the contract if Coram did not exit
17  bankruptcy within a particular period of time?
18   A    Yes.
19   Q    Do you recall also previously testifying
20  in 2001 that emerging from bankruptcy would increase
21  sales and the ability to increase sales for Coram?
22   A    Yes.
23   Q    Do you believe that was true at the time?
24   A    Yes.
25   Q    Did not emerging from bankruptcy when the
```

PAGE 172

172

```
1  CareMark role in in 1999?
2    A    There were some, in that we had this level
3  of debt that we couldn't service.
4    Q    Perfect segue to my next topic.  Ms. Mims
5  asked you whether the revolver that Coram had with
6  its lenders was at a high rate of interest.  Do you
7  recall that?
8    A    Yes.
9    Q    And I think your answer is the revolver
10  doesn't have to be at a high rate of interest, does
11  it?
12        MS. MIMS:  Object to form.
13   Q    (By Mr. Bressler)  Does a revolver have to
14  be a loan at a high rate of interest?
15   A    No.
16   Q    Just like a credit card that Ms. Mims
17  referred you to, you could have a credit card that
18  had a bargain low rate of interest or a credit card
19  with a very high rate of interest, couldn't you?
20   A    Ms. Mims:  Object to form.  And he called
21  it like a credit card.
22   A    I did call it like a credit card.
23   Q    (By Mr. Bressler)  And you could have a
24  credit card with a very low interest rate?
25   A    A percent of zero to very high rates, yes.
```

ProTEXT Transcript Condensing for Windows

SHEET 44   PAGE 173

173

```
1    Q     Likewise, depending on what you negotiate
2  with a lender, you could have a very low rate of
3  interest or a very high rate of interest.
4    A     Yes.
5    Q     Did Mr. Crowley seem particularly
6  interested in paying off debt owed to the note
7  holders?
8        MS. MIMS:  Object to form.
9    Q     Can you repeat the question?
10    A     (By Mr. Bressler)  Yes.  Did Mr. Crowley
11  seem particularly interested in paying off debt owed
12  to the note holders?
13        MS. MIMS:  Same objection.
14    A     It was -- yes, he did.  He had a high
15  priority.  That was a high priority.
16    Q     (By Mr. Bressler)  And did he ever explain
17  to you why that was?
18    A     I -- I don't recall.
19    Q     In hindsight, do you think the fact that
20  Mr. Crowley had a $960,000 a year contract with
21  Cerberus at this time that was not disclosed to you
22  or anyone else at Coram might have influenced his
23  decisions in regard to paying off debt?
24        MS. MIMS:  Object to form,
25  mischaracterizes the record.
```

PAGE 174

174

```
1    Q     (By Mr. Bressler)  You may answer.
2    A     That could have an influence on decisions,
3  yes.
4    Q     Would it have had an influence on you?
5    A     If I had --
6        MS. MIMS:  Object to form, hypothetical.
7    A     Would it have an influence on me?  I would
8  have to say yes, because I had a -- an arrangement,
9  that I was being paid by one of the lenders.
10        (Pause.)
11    Q     (By Mr. Bressler)  Could you find Danitz
12  No. -- Exhibit No. 4?  Would you locate that?
13        (Pause.)
14    Q     The problem is I have to also.  Do you
15  have that in front of you, Mr. Danitz?
16    A     Yes, I do.
17    Q     And I think you said you were at this
18  board meeting as indicated by these minutes?
19    A     Yes.
20    Q     Direct your attention to Page 01725.
21    A     Yes.
22    Q     Second paragraph in is headed "Stark II
23  Alternatives"?
24    A     Yes.
25    Q     Could you read the last sentence of that
```

PAGE 175

175

```
1  paragraph out loud?
2    A     Yes.  "Mr. Tillman added that a bankruptcy
3  proceeding does not suspend Stark II and the Company
4  was required to follow the law."
5    Q     What did you understand that to mean?
6    A     That in order -- well, under bankruptcy we
7  would still have the requirement of meeting the
8  $75 million equity.
9    Q     So filing of bankruptcy did not relieve
10  you of that requirement under Stark II.
11    A     No, not at all.
12    Q     So if the lenders had agreed to exchange
13  debt for equity either in bankruptcy or out of
14  bankruptcy, that was a way of satisfying Stark II.
15    A     Yes.
16        MS. MIMS:  Object to form.
17    Q     (By Mr. Bressler)  But the filing of a
18  bankruptcy in and of itself wasn't going to satisfy
19  Stark II, was it?
20    A     No.
21        (Pause.)
22    Q     Were you familiar with Stephen Feinberg?
23    A     Yes.
24    Q     And who was he?
25    A     He was the principal at Cerberus and then
```

PAGE 176

176

```
1  became a board member at Coram Healthcare
2  Corporation.
3    Q     And did there come a time when
4  Mr. Feinberg no longer sat on the board at Coram
5  Healthcare Corporation?
6    A     Yes.
7    Q     He resigned?
8    A     He resigned.
9    Q     And do you remember why?
10    A     I do not remember why.
11    Q     Do you remember when?
12    A     It would have been, I recall, in 2000 --
13  sometime in 2000, before the Chapter 11 filing.
14        MR. BRESSLER:  May I have Marabito
15  Exhibit 12, please?
16        (Pause.)
17        MS. MIMS:  Can we go off the record for a
18  minute?
19        MR. BRESSLER:  Why don't we go off the
20  record for a minute.
21        THE VIDEOGRAPHER:  We are off the record
22  at 2:39.
23        (A recess was taken from 2:39 p.m.to
24        2:45 p.m.)
25        THE VIDEOGRAPHER:  We are back on the
```

B494

# Corporate Compliance Handbook

- Mission

- Coram Cornerstones

- Standards of Conduct

- The Coram Compliance Program

- The Coram Compliance Hotline



CORAM HEALTHCARE

*Peter Smith* EXHIBIT 10
FOR I.D. 9-24/01   13

SSM 000026
CONFIDENTIAL

B495

# Conflicts of Interest

## CONDUCT STANDARD NO. 4

*We shall refrain from and avoid conflicts or appearance of conflicts between our private interests and our responsibilities as Coram employees.*

- We shall avoid engaging in any activity, practice or act which conflicts with the interests of Coram or its patients. Situations that would create an actual or apparent conflict of loyalty or interest must be avoided. Actions that have the potential to create a conflict of interest must be disclosed and approved in advance by appropriate higher authority.

- We shall not engage in any outside employment that interferes with our ability to adequately perform our duties at Coram. Placing business with any firm in which there is a family relationship, or hiring or having a reporting relationship with relatives may constitute a conflict of interest. Advance disclosure and approval are required in such a situation.

- Investment in any organization that is a potential competitor, supplier or customer of Coram requires prior written approval. An exception is granted for an investment in stock purchased on a public exchange that constitutes less than 1% of the total outstanding stock of the issuing corporation.

- We shall not become involved, directly or indirectly, in outside commercial interests which could improperly influence our actions. This would include being an officer, director, manager or consultant of a potential competitor, customer, or supplier of Coram.

- Employees shall avoid accepting or providing benefits that could be seen as creating conflict between their personal interests and Coram's legitimate business interests. This includes accepting expensive meals, gifts, refreshments, transportation, or entertainment provided or received in connection with the job.

- We shall not accept gifts provided in connection with employment that exceed $35 in value unless reported and approved in writing. Those gifts exceeding $100 must be assigned or turned into the company. Gifts of nominal value, such as meal and entertainment courtesies are not hereby prohibited, but should comply with standard company policy.

- Gifts and benefits to clinicians or referral sources are not appropriate. However, occasional non-cash gifts that are limited to reasonable meal expenditures or entertainment or that are of nominal value ($35) are not expressly prohibited.

- We shall not use or share inside information which is not otherwise available to the general public for any manner of direct or indirect personal gain or other improper use.

- We shall report any potential conflicts of interest concerning ourselves or our family members in accordance with Coram policies and procedures.

7

SSM 000034
CONFIDENTIAL

B496