# EXHIBIT C-1

MAY 06 2002  17:35    MUCH SHELIST FDA
MAY 06 2002 15:45 FR ———        9164496059 TO SCHREIBER        561121    P.22-23
                                                                           P.02/03

*EC-8*



May 6, 2002            *DRAFT*            **REDACTED**

Steve Feinberg

Dear Steve,

I have been thinking about our dinner last week. In retrospect it didn't unfold as you said when you insisted that I had to come to New York, ~~the proposal~~.

Well these past 30 months have sure been unusual for me. While I am crystal clear that I have not done anything "wrong", I sure have suffered dearly. I am in a job that I would never ever have accepted at a rate of pay that I earned 8-9 years ago. I am enmeshed in endless Chapter 11 molasses. I am the only person at Coram that has been paid *nothing* on the 2000 MIP or the KERP(s) or the 2001 MIP or anything. No raise. No nothing. Just be a good soldier.

At the same time, I have had my own Company (Dynamic) totally up-ended. I have had my monthly retainer with Cerberus ended ruining my cash flow. ~~I have been told I am due nothing under the Cerberus Agreement.~~ I have had to pay significant legal bills. I have been unable to participate in any new business deals. All this, and my professional reputation has been trashed, too. But as you once said, I'm working with you and Cerberus so it doesn't matter that my reputation has been hurt. Right?

I am also recalling when you said once that I should think about it all as having..."kissed the wrong woman". I owe it to myself to tell you, Steve, that I guess I don't operate the same way.

~~If I asked you to NYC and told you that I would have a number ....I would have had a~~ "number" and probably ~~would have had a check~~ if the shoe were on the other foot, and it ~~was you coming to New York~~ to see me.

I would have been calling often just to see how you were doing. I would not have been badgering you to resign over Christmas/New Years. I would not have been chasing you to get you before you met the Trustee to get your resignation done. If I had done something wrong.........you should have simply fired me. If not, why have I been put at arms length? The reality is that I have done a lot right. Nothing to deserve what has happened to me. Nothing.

If the shoe were on the other foot, your legal bills would have been promptly paid. I would have fought to the end on the front side. I would never have stood back and said see you later, let's see how it turns out. Mr. Bressler has told me that he/Trustee don't want to give us/me advice about ending the contract or my getting paid. He also said, we have smart lawyers and he's sure that they can figure out how to get me paid. He has no objection to my being paid for work done or for terming the contract.

CONFIDENTIAL



CRX 00063

MAY 06 2002 15:46 FR —

9164496059 TO SCHREIBER

DRAFT

It will be your natural reaction to start to say "Dan's mad". Well, I can honestly tell you that, I am not "mad" at anyone.

I think that Friedman did a terrible job handling this case. He mis-advised me, didn't focus properly, poorly prepared me, and didn't handle most any important aspect of this case correctly. That said, I know that I didn't *have to hire* Friedman just because you recommended him. I did it on my own. And I didn't have to recite the answers that Friedman gave me to say in Court. And, I didn't have to hire Chanin simply because you felt Houlihan Lokey was too expensive.

I suppose if I had been more trusting maybe (maybe) I would not have written the memo about trying to get upside on your position if I did a great job at Coram. I didn't have to take the assignment at Coram. In retrospect, I should have simply told you "no".

If I had been more trusting, maybe (maybe) I would not have asked for a formal contract outlining things like legal bills being paid, upside being shared. I guess I just didn't know you that well when we entered this relationship. History has taught me hard lessons about "amnesia" when it comes to money. To this day, you are still telling me that the 2000 MIP was based upon the gain on the CPS sale even though I have told you it didn't more times than I can count. EBITDA was $37 Million w/o CPS and $54 Million with it. I would have earned another $4.25 Million if I included the gain. I didn't.

Really, the way I am looking at this is that it is just one more sobering seminar in my life-long education. And yes, I still like and admire you a lot. Admire what you do and have built. Admire your intellect and your family commitment. I also like me a lot, when it comes to being back to back with someone in good and bad times. I really like me a lot when it comes to counting on someone to do what they say they will do. No question about that. I never f— a friend. Never.

That's it. I'm not keeping a copy of this note. You can toss yours. I just wanted you to know how I am feeling on this particular day.

Dan Crowley

**REDACTED**

CRX 00064

Insert

Hence, I expect that you'll honor the commitment that you made to me over dinner: after Coram's plan is confirmed or its assets sold, I'll be reinstated with Cerberus and receive $5,000,000 from Cerberus. Also, Cerberus will indemnify me for all of my legal fees, plus pay me the difference between what I ultimately receive from Coram by way of bonuses, and $11,200,000. If this is not our deal, please just send this letter back to me.

CRX 00065



# Dynamic Healthcare Solutions



EXHIBIT #16
Schreiber
3-21-07

May 8, 2002

Mr. Steve Feinberg
Cerberus Capital
450 Park Avenue
New York, New York

**REDACTED**



EXHIBIT
hustler 16
2-25-03

Steve

Dear Steve,

I have been thinking a great deal about our dinner last week because, while I have suspended it, I still haven't formally ended my contract with Cerberus. In retrospect the meeting really just didn't unfold as you said it would when you invited that me to come to New York to meet "face to face". You said that in response to my inquiry about the amount due, you had thought about the matter and "had a number", but it was too important to simply discuss over the phone.

Well, these past 30 months have sure been unusual for me. While I am crystal clear that I have not done anything to hurt or deceive anyone, I sure have suffered dearly. I am in a job that I would never ever have accepted, at a rate of pay that I earned 8-9 years ago. I am enmeshed in endless Chapter 11 molasses. I am the only person in Senior Management at Coram that has been paid *nothing* on the Board approved incentives that are in my employment contract with Coram. No raise. No nothing. Just a good soldier.

At the same time, I have had my own Company (Dynamic) totally up-ended. I have had my monthly retainer with Cerberus ended, ruining cash flow. I have significant legal bills. I have been unable to participate in any new business deals, damaging my future earnings. All this, and my professional reputation has been trashed, too.

CRX 00071

MAY-08-2002 19:20    MUCH SHELIST FDA
MAY 08 2002 17:30 FR ——      9164496059 TO SCHREIBER     561121   P.03/04
                                                  P.03/04

Page 2 of 3 Pages                 **REDACTED**
Letter dated May 9, 2002 to Mr. Steve Feinberg

Mr. Bressler has told me personally that the Trustee doesn't want to tell us what to do, or give advice about ending the contract, or my getting paid by Cerberus. He also said, that "you guys have smart lawyers" . . . and he's certain that they can . . . "figure out how to make the payment and terminate the contract". He has said, that he has no objection to my "being paid by Cerberus for work done unrelated to Coram or for ending a pre-existing contract". So, why don't we have the attorneys work up a termination agreement and when we all are in agreement that it is worded properly, go ahead and tell Mr. Bressler that, unless the Trustee specifically objects . . . Crowley's being paid by Cerberus for prior services rendered for *non-Coram* work and for ending the contract early, and that with this, the Agreement is being mutually terminated. Then make the payment and end the Agreement.

Steve, it will be your natural reaction to start to say that "Dan's mad". Well, I can honestly tell you that I am not mad at anyone. Not at all. I just want all of this over and I would like to be paid by Coram for the results I delivered to Coram and . . . by Cerberus for the work Dynamic did related to Cerberus' *non-Coram* investments.

As an aside, I owe it to myself to tell you straight out that I do think that David Friedman did a terrible job handling this case. Contrast what Boris Feldman was able to do with the NJ litigation to what David Friedman did in Delaware. Friedman mis-advised me and Coram's Board, didn't focus or focus properly, poorly prepared me and the case, improperly positioned the whole case, had a flawed Reorganization Plan, was not fully engaged, and didn't handle most any important aspect of this case very well.

In retrospect, when you asked me to step in and save Coram, I should have simply told you "no" and let Coram go promptly down the drain. It is a fact that I had been routinely *turning down* jobs like this "out of hand". I didn't want this job, and it (Coram) wasn't my problem. Now, 2 ½ years later, I'm still there because you pleaded with me to step in and save Coram from the complete melt-down that you feared. The result: Coram "has been saved", and for my reward, I have gone on to be wrongfully accused of all sorts of things, blamed for everything that prior management ever did wrong, and . . . hounded to the end of the earth. The reality is, where several other Coram CEOs had completely failed, I actually saved Coram and have done a whole lot of things very very right that now give this Company a chance to continue in existence if Coram ever emerges from Chapter 11 with a reorganized capital structure.

I guess I just didn't really know you very well when we entered into our relationship. But my own history has taught me very hard lessons about the level of "amnesia" some folks experience when it comes to actually "paying" money for performance when the time comes. To this day, *even you are still telling* me that the 2000 MIP was based upon a gain on the sale of CPS. This is even though I testified in open Court to the contrary, and have personally told you more times than I can count that . . . *it didn't*.

CRX 00072

MAY-08-2002  19:20     MUCH SHELIST FDA
   MAY 08 2002 17:31 FR ——
                                                9164496059 TO SCHREIBER        561121   P.04/04
                                                                                        P.04/04

Page 3 of 3 Pages
Letter dated May 9, 2002 to Mr. Steve Feinberg

2000 EBITDA was $37 Million ~~without the gain~~ on the sale of CPS and $54 Million with
it. I would have ~~earned another~~ $4.25 Million if ~~I had~~ included the gain on that sale. I
didn't.

In fairness to myself, I think that *I should be paid now* for the professional work that I
provided to assist with investments made in your non-Coram portfolio. I am concerned
that ~~to not pay me actually feeds an unjustified controversy or somehow~~ adds fuel to the
theory there is some kind of a secret conspiracy when there really isn't. ~~Steve, I also am~~
anxious that unforeseen events sometimes overtake good intentions. ~~You could~~ get hit by
a bus and be gone, Cerberus could get bought out, or . . . *whatever*. The point is that then
I ~~would be left with nothing. Now, that's not right or fair, is it?~~

My understanding of your commitment is that, absent an objection by the Chapter 11
Trustee, Dynamic Healthcare Solutions will be paid $5 Million for the *non-Coram* work
that was done for Cerberus and for the early termination of the Agreement between us.

I am asking that you please move promptly to have your attorney draft up a ~~Mutual
Contract~~ Termination Agreement consistent with this understanding and let the matter be
known to the Trustee's attorney who can object or not. Then the Agreement can be
terminated and I can be paid for the *non-Coram* work that I did for Cerberus.

Regards,

Dan Crowley

Dan Crowley                                    **REDACTED**

Cc: Mr. Scott Schreiber, Esq.

CRX 00073

# EXHIBIT C-2

ProTEXT Transcript Condensing for Windows

SHEET 1  PAGE 1 ——————— 1

```
1                    VOLUME I

2      IN THE UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF DELAWARE

4              -   -   -

5   ARLIN M. ADAMS, Chapter 11    :
    Trustee of the               :
6   Post-Confirmation Bankruptcy :
    Estates of CORAM HEALTHCARE  :
7   CORPORATION, a Delaware      :
    Corporation and of CORAM,    :
8   INC., a Delaware Corporation, :
                 Plaintiff       : CASE NO.
9            vs.                 : 04-1565
                                 :
10  DANIEL D. CROWLEY; DONALD J. :
    AMARAL; WILLIAM J. CASEY;    :
11  L. PETER SMITH; AND SANDRA L.:
    SMOLEY,                      :
12             Defendants        :

13            -   -   -

14
         Tuesday, March 27, 2007
15            9:34 a.m.

16            -   -   -

17

18          Videotaped deposition of ARLIN
    M. ADAMS, held at the law offices of
19  Schnader Harrison Segal & Lewis, LLP,
    1600 Market Street, Suite 3600,
20  Philadelphia, Pennsylvania, 19103,
    pursuant to notice before Cynthia A.
21  Whyte, Registered Professional Reporter
    and Notary Public.

22

23            -   -   -

24

25
```

PAGE 2 ——————— 2

```
1   A P P E A R A N C E S :

2   SCHNADER HARRISON SEGAL & LEWIS LLP
    Counsel for Plaintiff Arlin M. Adams,
3   Trustee
         1600 Market Street
4        Suite 3600
         Philadelphia, PA  19103
5        (215) 751-2050

6   BY:    BARRY E. BRESSLER, ESQ.
           bbressler@schnader.com
7
    AND:   RICHARD A. BARKASY, ESQ.
8          rbarkasy@schnader.com

9
    KEKER & VAN NEST LLP
10  Counsel for Defendant Daniel Crowley
         710 Sansome Street
11       San Francisco, CA  94111-1704
         (415) 391-5400
12
    BY:    ELLIOT R. PETERS, ESQ.
13         epeters@kvn.com

14  AND:   WARREN A. BRAUNIG, ESQ.
           wbraunig@kvn.com
15

16

17  ALSO PRESENT:   VINCENZO PETULLA,

18                  Videographer

19

20

21

22

23

24

25
```

PAGE 3 ——————— 3

```
1          IT IS HEREBY STIPULATED AND
2   AGREED by and among counsel for the
3   respective parties hereto that the
4   filing, sealing and certification of the
5   within deposition shall be and the same
6   are hereby waived.
7          IT IS FURTHER STIPULATED
     AND AGREED that all objections,
     except as to the form of the
7    question, shall be reserved to the
     time of the trial.
12         IT IS FURTHER STIPULATED AND
13  AGREED that the within deposition may be
14  signed before any Notary Public with the
15  same force and effect as if signed and
16  sworn to before the Court.
17
18
19
20
21
22
23
24
25
```

PAGE 4 ——————— 4

```
1                I N D E X
2   WITNESS:                         PAGE
3   ARLIN M. ADAMS, ESQ.
4        By Mr. Peters                5
5
6          ADAMS EXHIBITS
7   NO.        DESCRIPTION          PAGE
8   Exhibit 1  Chronology             7
9   Exhibit 2  Transcript, 2/25/03   52
10  Exhibit 3  Transcript, 3/3/03    52
11  Exhibit 4  Letter, 12/24/02, to
               Mr. Schreiber from
12             Mr. Bressler          80
13  Exhibit 5  Letter, 1/7/03, to
               Mr. Schreiber from
14             Mr. Bressler          81
15  Exhibit 6  Disclosure Statement 111
16  Exhibit 7  E-mail string        120
17  Exhibit 8  Employment Agreement 122
18  Exhibit 9  Letter, 10/28/03, to
               Mr. Schepacarter from
19             Mr. Barkasy          130
20  Exhibit 10 Letter, 10/3/06, to
               Mr. Bressler from Mr.
21             Temin                142
22  Exhibit 11 Motion of Chapter 11
               Trustee              163
23
    Exhibit 12 Updated Report of
24             Goldin Associates    170
25
```

ProTEXT Transcript Condensing for Windows

SHEET 21   PAGE 81

81

```
 1        appears to bear your signature.
 2               (Adams Exhibit 5 was marked for
 3        identification.)
 4        Q.    So the first question with respect
 5   to Adams 4 -- and if you want to take some
 6   time to review it, you go right ahead.
 7        A.    Go ahead.  Ask me the question.
 8        Q.    Does Adams 4 bear your signature?
 9        A.    Is that my signature on the last
10   page? Yes.
11        Q.    And was this an agreement that you
12   as trustee entered into with Dan Crowley?
13        A.    When you say "is this," the letter?
14        Q.    Correct.
15        A.    It was an agreement that was entered
16   into by Barry Bressler with Crowley's
17   attorney, Mr. Schreiber, which I saw and
18   approved as to terms and conditions.  That's
19   what it says.
20        Q.    On whose behalf was Mr. Bressler
21   acting when he entered into that agreement?
22        A.    Say that again.
23        Q.    On whose behalf was Barry Bressler
24   acting when he entered into that agreement?
25        A.    The trustee.
```

PAGE 82

82

```
 1        Q.    Who is that?
 2        A.    Myself.
 3        Q.    So is it a fair statement that this
 4   is an agreement that you entered into with Dan
 5   Crowley?
 6        A.    The terms and conditions, yes.  See
 7   that? "Agreed as to terms and conditions."
 8   Do you see that on Page 4?
 9        Q.    Okay.
10              And that means that you agreed to
11   the terms and conditions --
12        A.    To the terms and conditions.
13        Q.    -- contained in this letter?
14        A.    Correct.
15        Q.    And, in doing so, did you understand
16   that you were acting as the Chapter 11 trustee
17   for Coram?
18        A.    That's the second time you have
19   asked that question in three minutes.  The
20   answer is yes.
21        Q.    What were the terms and conditions
22   that you were agreeing to as you understand
23   them when you affixed your signature to this
24   document, Adams 4?
25        A.    The agreement speaks for itself.
```

PAGE 83

83

```
 1        Q.    Do you recall what the terms and
 2   conditions were?
 3        A.    I do not recall.
 4        Q.    Do you recall that one of the terms
 5   and conditions was that Dan Crowley would
 6   continue to render essentially the same
 7   services to Coram as he had before for a term
 8   of up to six months?
 9        A.    Correct.
10        Q.    And would he receive during that
11   period a salary, a base salary, of $80,000 a
12   month?
13        A.    Correct.
14        Q.    Was that a raise for him?
15        A.    I think it was an adjustment upward,
16   yeah.
17        Q.    Pursuant to this agreement, he was
18   going to be receiving more base monthly salary
19   than he had been receiving before that?
20        A.    Correct.
21        Q.    Was he also, pursuant to this
22   agreement, eligible for a stay in performance
23   payment, a stay bonus?
24        A.    That's what it says.
25        Q.    And how much was that stay bonus?
```

PAGE 84

84

```
 1        A.    I forget, but I think it was a
 2   million dollars.  I may be wrong.  That's my
 3   recollection.
 4        Q.    So under this agreement Crowley was
 5   going to receive $80,000 a month for up to six
 6   months and a million dollars' stay bonus,
 7   correct?
 8        A.    If he stayed.
 9        Q.    If he stayed, he was going to
10   receive about a million and a half dollars,
11   correct?
12        A.    Correct.
13        Q.    And that was agreeable to you on
14   December 24, 2002, correct?
15        A.    I was willing to go along with it in
16   order to get rid of the claim that he had in
17   the amount of $17 million.  You don't always
18   sign contracts that are agreeable to you, as
19   you know.
20        Q.    Well, but in signing that contract,
21   you were agreeing to pay him that amount of
22   money if he stayed, correct?
23        A.    I was agreeing as the trustee in
24   consideration of what I was going to get as a
25   result as the trustee.
```

ProTEXT Transcript Condensing for Windows

SHEET 24    PAGE 93

93
```
1       Q.   Was that your understanding of what
2  you were agreeing to when you put your
3  signature --
4       A.   Yes.
5       Q.   -- on Page 2 of Adams 5?
6            So had this agreement which you
7  signed been approved by the court, you would
8  not have been able to bring this lawsuit
9  against Dan Crowley, correct?
10           MR. BRESSLER:  I'll object to
11      the form.  This says it's a letter of
12      intent contemplating --
13      A.   I'm not so sure about that, and
14 that's a legal question.  Get an expert.
15      Q.   When you were testifying in court on
16 March 3 of 2003, were you intending to release
17 all claims Coram had against Dan Crowley as is
18 set forth in Adams Exhibit 5?
19           MR. BRESSLER:  I'll object to
20      the form.  He already said --
21      A.   If that's what it says, that's what
22 it says.
23      Q.   Do you have an understanding on that
24 issue one way or the other?
25      A.   I'm not sure what we would have
```

PAGE 94

94
```
1  done.
2       Q.   So if you look at Adams 4 and Adams
3  5 together, is it a fair statement that the
4  arrangement that you were a proponent of in
5  court on March 3, 2003 was to give Dan Crowley
6  approximately three and a half million dollars
7  and a release from future claims against him
8  by Coram or its trustee?
9            MR. BRESSLER:  I will object.
10      A.   Whatever the legal --
11           MR. BRESSLER:  I'll object to
12      the form.
13      A.   Whatever the legal connotations of
14 those documents are, they are.
15      Q.   But is that your understanding, sir?
16      A.   I wasn't sure about what would
17 happen.
18      Q.   So you went to court on March 3,
19 2003, with your three lawyers and you weren't
20 sure what was going to happen if your motion
21 was granted?
22           MR. BRESSLER:  I'll object to
23      the form.  He has already testified as to
24      it.  The documents speak for themselves
25      and --
```

PAGE 95

95
```
1       A.   Whatever it says.
2            MR. BRESSLER:  -- you are
3  trying to mislead him because only Adams
4  4 was the subject of the hearing that
5  day.
6       A.   That's another example of the harm
7  that was caused by the breach of the fiduciary
8  relationship.
9       Q.   Do you have a recollection of what
10 the effect was going to be if the bankruptcy
11 court granted your motion on March 3 of 2003?
12      A.   The effect was going to be?  It
13 would have eliminated Mr. Crowley's, quote,
14 claim, end quote, for this $17 million, and
15 that was very important to me because with the
16 existence of that claim it made it impossible
17 to sell this company, another defect brought
18 about by the fiduciary relationship.
19      Q.   And in exchange for that he was
20 going to get a release?
21      A.   In exchange for that, yes, that
22 was -- he extracted that.  He was able to
23 extract that from us.
24      Q.   You agreed that he was going to get
25 a release, right?
```

PAGE 96

96
```
1       A.   Yeah.  Well, we all agree with
2  extractions.  I go to a dentist.  I agree to
3  the extraction, but it hurts.
4       Q.   And you also agreed to pay him three
5  and a half million dollars, right?
6       A.   Agreed in order to get rid of the
7  17.5 claim.
8       Q.   Were you aware in January, February
9  and March of 2003 that Coram paid Mr. Crowley
10 $80,000 a month pursuant to the agreement
11 which was Adams Exhibit 4?
12      A.   I imagine I was.
13      Q.   And did you agree to that?
14      A.   Well, that's what the document says.
15      Q.   Did you agree that he could keep
16 that money that he had already been paid after
17 the court did not grant your motion to approve
18 that agreement?
19      A.   No.
20           MR. BRESSLER:  I will object to
21      the form.
22      A.   No, I never agreed to that.
23      Q.   Did you ask him to give back that
24 money to Coram?
25      A.   I think we did, but I never agreed
```

ProTEXT Transcript Condensing for Windows

SHEET 26    PAGE 101

101

```
1   Coram?
2       A.    The United States Trustee called me
3   on the telephone, told me of this bankruptcy
4   proceeding in Delaware, and said that he would
5   very much appreciate my considering an
6   appointment as trustee.  I said I had never
7   heard of Coram, would you explain what it is.
8           And in a few words he told me it was
9   an infusion company, medical infusion company,
10  and I said, "Why did you call me?"  He
11  explained why.  And that's the occasion.
12      Q.    When was that in relationship to the
13  date you were appointed?
14      A.    Two weeks ahead of it, something
15  like that, 20 days.
16      Q.    What, if anything, did you do after
17  receiving that phone call in order to decide
18  whether this was an assignment that was of
19  interest to you?
20      A.    I don't think I did anything.
21      Q.    Did you decide on the spot that you
22  would accept the appointment as trustee?
23      A.    I said I wanted to look at my own
24  docket to see whether I would have an adequate
25  opportunity to do -- to discharge my duties.
```

PAGE 102

102

```
1           I think I called him back in a day
2   or so and said I'd be honored to serve if the
3   court appointed me.
4       Q.    And thereafter did you begin to take
5   steps to familiarize yourself with Coram?
6       A.    I think he sent me some material,
7   some pleadings, to give me an idea.  Maybe he
8   sent me a brochure of what services they were
9   selling, and I spent the next few days reading
10  that material.
11      Q.    And what do you recall was the
12  material that he sent you?
13      A.    I just said it was a brochure or
14  maybe several brochures and some financial
15  data.
16      Q.    What did your understanding --
17  withdrawn.
18          What was your understanding of the
19  scope of your assignment --
20          MR. BRESSLER:  I'll object to
21      the form, but he can answer.
22      Q.    -- as a trustee of Coram?
23      A.    Well, the United States Trustee told
24  me that the big problem was a dispute between
25  the note holders and the equity holders and he
```

PAGE 103

103

```
1   thought that my experience in the New Era
2   matter, another bankruptcy matter that was
3   resolved fairly successfully, would be very
4   helpful; perhaps I could bring the two sides
5   together.
6       Q.    Did you have any other understanding
7   about the nature of your assignment at Coram
8   in the general time period in which you
9   assumed the trusteeship?
10          MR. BRESSLER:  I'll object to
11      the form, but he can answer.
12      A.    Well, I knew the company was
13  headquartered in Denver and it was pretty much
14  a national company.
15      Q.    Did you have any understanding about
16  what your objectives would be in connection
17  with the operations of the company, its
18  revenues, protecting the company, anything
19  along those lines during the early period of
20  your trusteeship?
21      A.    The trustee may have mentioned the
22  volume of sales.  I'm not sure of that.  I
23  know that I was under the impression that it
24  was something less than half a billion
25  dollars, roughly $400 million, something like
```

PAGE 104

104

```
1   that.
2       Q.    Did you form in the first several
3   weeks of the trusteeship any general sense of
4   objectives as Coram's bankruptcy trustee?
5       A.    I did.
6       Q.    What were they?
7       A.    To get the company out of bankruptcy
8   as promptly as possible.  That's what the
9   trustee had instructed me.
10      Q.    Did you also consider it one of your
11  objectives to try and see if there was a way
12  to make peace between the shareholders and the
13  note holders?
14      A.    Yes; that's what he said, to resolve
15  those differences.
16      Q.    And did you also consider it one of
17  your objectives to make sure that the company
18  was run as well as it could be run under the
19  circumstances?
20      A.    Correct.
21      Q.    Now, in connection with a
22  trusteeship, when you are the bankruptcy
23  trustee, do you bill the company for your
24  services?
25      A.    We didn't discuss that.
```

# EXHIBIT C-3

LAW OFFICES

# KEKER & VAN NEST
## LLP

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1704
TELEPHONE (415) 391-5400
FAX (415) 397-7188
WWW.KVN.COM

R. JAMES SLAUGHTER
RSLAUGHTER@KVN.COM

March 8, 2007

**VIA EMAIL & U.S. MAIL**

Wilbur L. Kipnes, Esq.
Barry E. Bressler, Esq.
Richard Barkasy, Esq.
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286

Re:    *Adams v. Crowley*

Dear Counsel:

    I write to inform you of our intentions with respect to Dan Crowley's drafted but unsent letters to Stephen Feinberg prepared between May 6 and May 9, 2002. These draft letters were privileged, that privilege has not been waived, and it would be inappropriate for the Trustee and his lawyers, having previously conceded the document were privileged and inadvertently produced, and having denied the relevance of these drafts at the March 2003 hearing before Judge Walrath, to rely on them in proceeding against Mr. Crowley.

    There can be no doubt that the draft letters were privileged. Mr. Crowley sent the draft letters to his lawyer Scott Schreiber for the purpose of obtaining legal advice and comment with respect to ongoing bankruptcy proceedings involving Mr. Crowley and potential litigation against Feinberg and Cerberus. *See* Del. R. Evid. 502(b). These drafts were never sent to or received by Feinberg or Cerberus, a fact confirmed by Cerberus's attorneys, nor were they shared with any other party.

    The production of these documents was inadvertent. In response to a Request for the Production of Documents from the Equity Committee, Mr. Crowley's then-counsel reviewed thousands of documents, ultimately producing 1,635 documents on February 16-17, 2003 (the CRX/CXR production). Although Mr. Crowley's then-counsel carefully reviewed the production for privilege issues, counsel mistakenly believed that the letter had actually been sent to Feinberg, when in fact it had not. On February 17, the very day of the production, Mr. Crowley and his counsel realized the error and, that day, contacted attorneys for the Equity

Barry Bressler, Esq.
Wilbur L. Kipnes, Esq.
March 8, 2007
Page 2

Committee, the Trustee, and Cerberus to clarify that the drafts were privileged and seeking their return. On behalf of the Trustee, Mr. Bressler agreed to return the letter; Richard Levy did not.

While the Delaware Supreme Court has never opined on the standard to be applied to allegedly inadvertent disclosures, a number of Delaware state courts have identified factors to be applied in determining whether attorney-client privilege has been waived. *See Int'l Business Mach. Corp. v. Comdisco, Inc.*, 1992 WL 149502 (Del. Super. June 22, 1992) (unpublished), at \*1 (evaluating the size of the production, the presence of an "elaborate review process," the difficulty in determining the confidential nature of the document, and the speed with which its return was sought); *Monsanto Co. v. Aetna Cas. & Sur. Co.*, 1994 WL 315238 (Del. Super. May 31, 1994) (unpublished) (evaluating, in context of the waiver of work product doctrine, the reasonableness of the precautions to prevent inadvertent disclosure; time taken to rectify the error; scope of discovery and extent of disclosure; and overall fairness, judged against care or negligence with which the privilege was guarded). For example, in *Comdisco*, where the scope of discovery was very large and great care was taken to prevent inadvertent disclosure, the court held the privilege was not waived even though the document at issue "was produced 14 months before the privilege was asserted" and had been introduced and discussed at five different depositions, including that of the author. *Comdisco*, 1992 WL 149502, at \*1.

This reasoned approach to inadvertently disclosed documents is consistent with both the purpose of the attorney-client privilege—"to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice," *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)—and the law applied in the U.S. District Court for the District of Delaware. *See Berg Electronics, Inc. v. Molex, Inc.*, 875 F. Supp. 261, 263 (D. Del. 1995) (holding that, so long as the client did not intend to produce the document and the producing party can prove that the disclosure was inadvertent and not "extreme or gross negligence," privilege is not waived).

The Trustee's behavior in the wake of the inadvertent disclosure confirms his understanding that the drafts were both privileged and unrelated to Crowley's performance at Coram. On February 17, 2003, Mr. Crowley's then-counsel had a phone conversation with the Trustee's counsel Mr. Bressler, in which Mr. Bressler agreed to return the letter. During the March 3, 2003 hearing before Judge Walrath on the *Trustee's* motion to extend Crowley's employment at Coram, the Trustee was asked by Mr. Bressler whether Mr. Crowley had represented that the unpaid dollars he was claiming against Cerberus "were for Coram work or just for Cerberus work," to which Trustee Adams responded "Just for Cerberus work. Had nothing to do with Coram." Transcript of Hearing, March 3, 2003, at 71. After Richard Levy showed the Trustee the draft, unsent letter from Mr. Crowley and the insert authored by Mr. Schreiber, the Trustee explicitly stated that he did not believe these drafts meant that Mr. Crowley continued to be paid by Cerberus or was working for the benefit of the Noteholders. *Id.* at 70-71.

To now suggest precisely the opposite, intimating as the Trustee did at pages 11-12 of his Answers to Defendant's First Set of Interrogatories that Mr. Crowley sought payment from

Barry Bressler, Esq.
Wilbur L. Kipnes, Esq.
March 8, 2007
Page 3

Cerberus for his Coram work after the date of confirmation, is most disingenuous. You are well aware that the "insert" to which the Trustee cited was penned by Scott Schreiber, and that the letter was an unsent draft. Indeed, it was Mr. Kipnes who elicited from Mr. Crowley that it was Mr. Schreiber, not Mr. Crowley, who drafted the insert; that Crowley saw the insert for the first time only eight months after it was written; and that the insert was factually "absolutely wrong" because Crowley never believed that the money Cerberus owed him pertained at all to his work for Coram. Transcript of Hearing, March 3, 2003, at 109-10.

Given these factors, we demand that you return all copies of the draft letters and acknowledge that they are privileged. If you do not agree, we will seek to take the deposition of either Mr. Kipnes or Mr. Bressler with respect to the draft letters. Either way, at the deposition of Scott Schreiber on March 21, we intend to direct Mr. Schreiber not to answer, on privilege grounds, any questions about the inadvertently disclosed draft letters and insert, and any related matters.

Very truly yours,

R. James Slaughter /wb

R. JAMES SLAUGHTER

RJS/ltm

391184.01

# Schnader
### ATTORNEYS AT LAW

1600 MARKET STREET  . TE 3600
PHILADELPHIA, PA 19103-7286
215.751.2000  FAX 215.751.2205  schnader.com

March 16, 2007

Wilbur L. Kipnes
Direct Dial 215-751-2336
Direct Fax 215-751-2205
E-mail: wkipnes@schnader.com

*VIA EMAIL AND U.S. MAIL*

R. James Slaughter, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA  94111-1704

Re:    *Adams v. Crowley*

Dear Jamie:

This will respond to your March 8, 2007 letter in which you demand the return of "Dan Crowley's drafted but unsent letters to Stephen Feinberg prepared between May 6 and May 9, 2002" (the "Letters"). You contend that the Letters are privileged and were "inadvertently" produced and should be returned. Even if you were correct that Mr. Schreiber's production of these documents was inadvertent – which is doubtful – the privilege has been waived by Mr. Schreiber's failure to file a motion seeking their return and his failure to object to their admission into evidence at the March 3, 2003 hearing.

As you acknowledge, Mr. Crowley's counsel produced the Letters four years ago in response to the Equity Committee's Request for Production. (Although we do not think we need debate "inadvertence," Mr. Schreiber acknowledged to the Trustee's counsel that the production of the Letters was purposeful.) Although Mr. Schreiber later requested that the Letters be returned, the Equity Committee refused. Despite having ample time to do so, Mr. Crowley's counsel did not file a motion even though he stated his intention to do so. *See* 2/21/03 letter from John H. Ward to Michael Cook (CROWLEYKVN 008470).

At the bankruptcy court hearing on March 3, 2003, Mr. Schreiber successfully argued that Mr. Crowley was a party. Tr. at 10:21-11:5. During the hearing, the Equity Committee elicited pages of foundational and substantive testimony regarding the Letters. Although Mr. Crowley's counsel objected to the Equity Committee's characterization of the Letters, he never objected on any privilege ground. In fact, the Equity Committee moved the Letters, exhibits EC-8 and EC-10, into evidence without objection. Tr. at 115:17-22.

In his closing argument, Mr. Crowley's counsel explained the motivation for and the circumstances surrounding the drafting of the Letters. Tr. at 191:9-194:16. Relying on the Letters in its ruling, the bankruptcy court determined that they showed "a continuation of Mr. Crowley's continued efforts to continue to get reimbursement from Cerberus for efforts

PHDATA 1428636_1

# Schnader
###### ATTORNEYS AT LAW

R. James Slaughter, Esq.
March 16, 2007
Page 2

undertaken in this case," leading to the court's conclusion that Mr. Crowley was not "an honest person."

Given these undisputed facts, it is clear under Delaware law that the privilege has been waived. *See, e.g., Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992); *Traute-Ugone v. The Estate of Albert G. Ugone*, No. C.A. 099-S, 2006 WL 389944 (Del. Ch. 2006) (privileged waived when party testified about communications with attorney); *Giordano v. Marta*, No. C.A. 11613, 1999 WL 350493 (Del. Ch. 1999). Mr. Crowley needed to take prompt action in order to preserve the claim of inadvertent waiver and despite having ample time to do so, he did nothing. *See In re Grand Jury (Impounded)*, 138 F.3d 978 (3d Cir. 1998) (affirming Judge Robinson's decision finding waiver of privilege where the defendant delayed more than three months to file a motion to compel the return of documents); *In re Hechinger Investment Cop. Of Del.*, 303 B.R. 18 (D. Del. 2003) (finding waiver of privilege where party abandoned its demand for the return of inadvertently produced documents); *In re Circon Corp. Shareholders Litig.*, No. C.A. 15165, WL 409166 (Del. Ch. 1998) (finding waiver of privilege where party waited seven months following production to demand return of inadvertently produced documents). Two of the cases you cite, *Montaso Co. v. Aetna Caus. And Surety Co.* and *Berg Electronics, Inc. v. Molex, Inc.*, concerned motions to compel return of documents filed promptly after discovery of the inadvertent production and, therefore, are easily distinguished. (The third case, *IBM Corp. v. Comdisco, Inc.*, is inapplicable because of the court-ordered clawback agreement governing that case.)

Accordingly, it is clear that Mr. Crowley has waived the privilege with respect to the Letters themselves and to the subject-matter of the Letters.

Very truly yours,

*[signature]*

Wilbur L. Kipnes
For SCHNADER HARRISON SEGAL & LEWIS LLP

cc:    Barry E. Bressler, Esq.
       Richard A. Barkasy, Esq.

# EXHIBIT C-4

ProTEXT Transcript Condensing for Windows

---

**SHEET 1  PAGE 1**

177

```
1                    VOLUME II

2       IN THE UNITED STATES DISTRICT COURT

3          FOR THE DISTRICT OF DELAWARE

4                  -    -    -

5   ARLIN M. ADAMS, Chapter 11   :
    Trustee of the              :
6   Post-Confirmation Bankruptcy :
    Estates of CORAM HEALTHCARE  :
7   CORPORATION, a Delaware      :
    Corporation and of CORAM,    :
8   INC., a Delaware Corporation,:
              Plaintiff          : CASE NO.
9         vs.                    : 04-1565
                                 :
10  DANIEL D. CROWLEY; DONALD J. :
    AMARAL; WILLIAM J. CASEY;    :
11  L. PETER SMITH; AND SANDRA L.:
    SMOLEY,                      :
12            Defendants         :

13                  -    -    -

14
              Wednesday, March 28, 2007
15                 9:33 a.m.

16                  -    -    -

17

18          Continued videotape deposition
    of ARLIN M. ADAMS, held at the law
19  offices of Schnader Harrison Segal &
    Lewis, LLP, 1600 Market Street, Suite
20  3600, Philadelphia, Pennsylvania, 19103,
    pursuant to notice before Cynthia A.
21  Whyte, Registered Professional Reporter
    and Notary Public.

22                  -    -    -

23

24

25
```

---

**PAGE 2**

178

```
1   A P P E A R A N C E S :

2   SCHNADER HARRISON SEGAL & LEWIS LLP
    Counsel for Plaintiff Arlin M. Adams,
3   Trustee
          1600 Market Street
4         Suite 3600
          Philadelphia, PA  19103
5         (215) 751-2050

6   BY:   BARRY E. BRESSLER, ESQ.
          bbressler@schnader.com
7
    AND:  RICHARD A. BARKASY, ESQ.
8         rbarkasy@schnader.com

9
    KEKER & VAN NEST LLP
10  Counsel for Defendant Daniel Crowley
          710 Sansome Street
11        San Francisco, CA  94111-1704
          (415) 391-5400
12
    BY:   ELLIOT R. PETERS, ESQ.
13        epeters@kvn.com

14  AND:  WARREN A. BRAUNIG, ESQ.
          wbraunig@kvn.com
15

16

17  ALSO PRESENT:   VINCENZO PETULLA,

18              Videographer

19

20

21

22

23

24

25
```

---

**PAGE 3**

179

```
1              IT IS HEREBY STIPULATED AND
2   AGREED by and among counsel for the
3   respective parties hereto that the
4   filing, sealing and certification of the
5   within deposition shall be and the same
6   are hereby waived.
7              IT IS FURTHER STIPULATED
8   AND AGREED that all objections,
9   except as to the form of the
10  question, shall be reserved to the
11  time of the trial.
12             IT IS FURTHER STIPULATED AND
13  AGREED that the within deposition may be
14  signed before any Notary Public with the
15  same force and effect as if signed and
16  sworn to before the Court.
17
18
19
20
21
22
23
24
25
```

---

**PAGE 4**

180

```
1              I N D E X
2   WITNESS:                      PAGE
3   ARLIN M. ADAMS - VOLUME II
4       By Mr. Peters        184, 391
5       By Mr. Bressler           390
6              ADAMS EXHIBITS
7   NO.        DESCRIPTION       PAGE
8   Exhibit 13  Transcript, 11/14/03   219
9   Exhibit 14  Letter, 5/16/02, to
                Judge Adams from Mr.
10              Crowley               234
11  Exhibit 15  Form 10-Q            240
12  Exhibit 16  Form 10-K            250
13  Exhibit 17  Letter, 3/14/02, to
                Mr. Adams from Mr.
14              Liebentritt          257
15  Exhibit 18  Letter, 8/22/02, to
                Mr. Beskrone from Mr.
16              Adams                258
17  Exhibit 19  Letter, 4/11/02, to
                Mr. Levy from Mr.
18              Bressler             261
19  Exhibit 20  Letter, 5/1/02 to
                Judge Adams from Mr.
20              Levy                 267
21  Exhibit 21  Letter, 9/17/02, to
                Judge Adams from Mr.
22              Zell                 272
23  Exhibit 22  Letter, 9/18/02, to
                Judge Adams from Mr.
24              Levy                 278
25
```

ProTEXT Transcript Condensing for Windows

SHEET 33   PAGE 129
305

1  the United States involving Enron as making it
2  easier to bring a case even if it didn't have
3  actual merit against executives because jurors
4  would be prejudice against them?
5              MR. BRESSLER:  I'll object to
6  the form.
7      A.   Yes, he did.
8      Q.   And did you think that was an
9  appropriate thing for you to be considering?
10     A.   I thought I should consider it.  I
11 didn't know how valid the observation was, but
12 it was a factor.
13     Q.   Continuing on Page 35, Line 11,
14 question of you by Mr. Levy:
15         "QUESTION:  Did you consider after
16 September 25th the effect on a jury of the
17 currents climate of Enron, conflicts of
18 interest, and corporate misbehavior?
19         "ANSWER:  I did.
20         "QUESTION:  What conclusions did you
21 come to after considering that?
22         "ANSWER:  I think that that is the
23 factor.
24         "QUESTION:  Which way does that
25 factor go?

PAGE 130
306

1         "ANSWER:  I did consider that
2  factor, but you don't reach that type of a
3  climate unless the court will permit you to go
4  to the jury, and I didn't know in this case,
5  what I knew about the claim, whether the
6  plaintiffs will get that far.
7         "I agree with Mr. Shestack.  There
8  is a very serious damage question.  There is a
9  serious causation question, but I concluded
10 that the case had some value."
11         Do you recall that testimony?
12     A.   I do.
13     Q.   So by January 21 of 2004 you were
14 familiar with Mr. Shestack's conclusions about
15 evaluating this claim?
16             MR. BRESSLER:  Object to the
17 form, but he may answer.
18     A.   I was familiar with them.  I knew
19 what he was thinking.  I don't know that he
20 had reached a final conclusion, but I was
21 familiar with his trend.
22     Q.   So you thought that this case that
23 Mr. Levy was proposing to bring -- let me ask
24 you:  Were these breach of fiduciary duty
25 claims against Mr. Crowley that you've brought

PAGE 131
307

1  a subset of the claims that Mr. Levy was
2  proposing that you bring?
3              MR. BRESSLER:  I'll object to
4  the form, but he can answer.
5      A.   I think they are different because
6  my attitude was greatly shaped by the
7  documents that were produced a little later.
8      Q.   Those documents that were produced
9  in February of '03?
10     A.   Whenever.  I don't know the date.
11     Q.   This testimony is being given in
12 January of '04.  Do you see that?
13     A.   I can't give you the sequence.
14     Q.   Did you --
15     A.   Let me say now that in my testimony
16 yesterday I may have missed the sequence
17 somewhat, and what I want to do is go back and
18 read the transcript of my testimony and
19 correct it if I did miss it.  I don't know
20 that I did.
21     Q.   Since yesterday have you had any
22 discussions with your lawyers about that
23 sequence?
24     A.   No, I haven't.
25     Q.   Have you looked at any documents

PAGE 132
308

1  since yesterday about that sequence?
2      A.   No, not a single document.  I
3  haven't paid any attention to this deposition
4  overnight except that one thing.  When I
5  thought about it last night, I wondered
6  whether I may have given you an answer that
7  not twisted the sequence; had the sequence out
8  of order.
9      Q.   Well, I suggest if you want to help
10 with the sequence, look at the exhibits you
11 were shown as reflected in the record in your
12 February 25, '03 deposition because that will
13 show that you saw those documents on February
14 25.
15     A.   That's what I thought last night.
16 When I went back and thought about it, I began
17 recalling that the first time that I saw those
18 explosive documents was while my deposition
19 was being taken but that Mr. Levy had obtained
20 those documents in connection with Crowley's
21 testimony, although he had not yet testified,
22 but Mr. Levy showed me those documents during
23 my deposition I guess before the hearing and
24 that I was taken aback, but I didn't fully
25 realize the implication of those documents

ProTEXT Transcript Condensing for Windows

SHEET 34   PAGE 133
309

1  until I dwelled on them.  And then when
2  Mr. Crowley at the hearing that came a few
3  days later began trying to explain them, I
4  realized how discordant his answers were and
5  that I had been misled.
6         And I'm not sure that I said that in
7  sequential form yesterday.
8     Q.  But you testified at deposition on
9  February 25 of '03 and you reviewed the
10 documents at the deposition; you were shown
11 them?
12    A.  I don't recall it, but if you say.
13    Q.  I thought you just said that a
14 minute ago, that you were first shown those
15 documents at your deposition.
16    A.  That's right.
17    Q.  And then after the deposition you
18 had six or so days to review them with your
19 lawyers, reflect on them, discuss them,
20 correct?
21    A.  I did say that.
22    Q.  And you did that?
23    A.  And I did that.
24    Q.  And do you know whether your lawyers
25 prepared Mr. Crowley for his testimony on

PAGE 134
310

1  March 3?
2     A.  I don't know that.
3            MR. BRESSLER:  Object to the
4     form.
5     A.  I don't know that.
6     Q.  Do you know who called Mr. Crowley
7  as a witness on March 3?
8     A.  I think we.  We had previously
9  called him as a witness as one of our
10 executives.
11    Q.  Did you know that Mr. Kipnes met
12 with Mr. Crowley to prepare him for his
13 testimony on March 3 prior to March 3?
14    A.  I'm not surprised to hear that.  I
15 don't think I know it, but I'm not surprised
16 to learn it.
17    Q.  Did you learn from Mr. Kipnes what
18 it was that Mr. Crowley was saying in
19 preparation for that hearing?
20           MR. BRESSLER:  Object to the
21    form and direct him not to answer
22    anything Mr. Kipnes told him.
23    A.  I don't know, no.
24    Q.  Was there anything preventing you
25 from asking, having now had the chance to

PAGE 135
311

1  review the documents and discuss them with
2  your lawyers, was there anything preventing
3  you from asking Mr. Kipnes on prior to March 3
4  what's Crowley saying about these documents?
5            MR. BRESSLER:  Object to the
6     form.
7            You may answer.
8     A.  I think that Mr. Kipnes was quite
9  surprised and he told me that he was upset.
10           MR. BRESSLER:  Please don't
11    testify as to what counsel said to you or
12    you said to counsel.
13    Q.  The question is whether there was
14 anything preventing you from having Mr. Kipnes
15 question Crowley and report back to you?
16    A.  Was there anything preventing me?
17    Q.  Yes.
18    A.  Well, I wanted to be very, very
19 careful about that.
20    Q.  Was there anything preventing you
21 from questioning Mr. Crowley yourself prior to
22 March 3 after you had reviewed the documents?
23    A.  After I saw the documents I didn't
24 think any further discussion with Mr. Crowley
25 was fruitful.

PAGE 136
312

1     Q.  So you --
2     A.  I had lost complete confidence.
3     Q.  So prior to March 3 you lost
4  complete confidence in Crowley?
5     A.  I'm not sure of those dates; after
6  having seen those documents and dwelling on
7  them, but the real conclusion occurred, in my
8  mind, after Mr. Crowley tried to explain in
9  the courtroom five, six days later the import
10 of those documents.  I was completely
11 convinced that he had deceived me, that his
12 explanation did not hold water, and, well, I
13 was pretty discouraged.
14    Q.  You saw those documents and dwelled
15 on them prior to March 3, right?
16           MR. BRESSLER:  Object to the
17    form.  That's not what he said.
18    A.  Prior to March 3 I can't say.  I'm
19 not sure about the sequence.  I don't
20 believe --
21    Q.  Was there anything preventing you
22 from withdrawing your motion prior to March 3?
23    A.  Yes, there was.
24    Q.  What was that?
25    A.  I gave that some thought.

ProTEXT Transcript Condensing for Windows

SHEET 35   PAGE 137

313

```
 1            We had agreed in writing as part of
 2   the settlement with Crowley to use our best
 3   efforts to implement the settlement, the
 4   proposed settlement.  So that I was then in
 5   the position that if I withdrew the settlement
 6   it would lead to more litigation from Crowley
 7   against me as the trustee, and I thought that
 8   it was wiser to let the court decide the issue
 9   because then Crowley couldn't say, well, you
10   reneged on your agreement.  You owe me $17
11   million or whatever he was talking about.
12           And, fortunately, I was right
13   because what happened is that the court
14   decided that Crowley's explanation was
15   incredible, unbelievable, or whatever the
16   words she used.  That relieved me as the
17   trustee of any legal obligation to implement
18   the proposed deal with Crowley.
19       Q.   So you went to court on March 3
20   pursuing a motion for approval of the
21   agreement you had entered into with Crowley
22   but secretly hoping that the court would deny
23   that motion?
24       A.   Oh, no, no --
25           MR. BRESSLER:  Object to the
```

PAGE 138

314

```
 1   form of the question.  That's not what he
 2   said.
 3       A.   -- no, no, no.  You misunderstood
 4   what I said.  I did not say that.
 5       Q.   Did you also enter into a written
 6   agreement with Mr. Crowley to give him a
 7   release from litigation?
 8       A.   I didn't enter into a written
 9   agreement.  It was part of the proposal as I
10   recall it, but I'm not sure.  Whatever it says
11   it says.
12       Q.   And when you went into court on
13   March 3, had you also signed a document by
14   which Mr. Crowley was going to get $2 million
15   and a release from litigation?
16           MR. BRESSLER:  Object to the
17   form, but he can answer.
18       A.   Would get it if the plan was
19   approved.
20       Q.   And when you went into court on
21   March 3, was it your unexpressed hope that the
22   court would deny your application?
23       A.   No.
24           MR. BRESSLER:  Object to the
25   form.
```

PAGE 139

315

```
 1       A.   No.
 2       Q.   So your objective then on March 3 in
 3   court was that your application be approved by
 4   the court?
 5       A.   That the court would make the
 6   decision.  I can't make the decision for the
 7   court.  And a lot of that decision depends on
 8   credibility, and I'm not so sure that I was
 9   the proper person to determine credibility,
10   since I was part of the plan that was being
11   submitted to the court.
12       Q.   Had your views about Mr. Crowley
13   changed prior to the March 3, 2003 hearing?
14       A.   Prior to?  No.  Up until the time I
15   saw the documents, I was in support of the
16   plan.
17       Q.   You just told us you saw the
18   documents on February 25.
19       A.   Well, whatever the date was.  I made
20   it clear I can't remember the dates.  I don't
21   propose to.
22       Q.   Fine, but my question is:  Assuming
23   you saw the documents for the first time on
24   February 25, looked at them thereafter, talked
25   about them with counsel, had your view of
```

PAGE 140

316

```
 1   Mr. Crowley changed prior to the beginning of
 2   that hearing on March 3, 2003?
 3           MR. BRESSLER:  Object to the
 4   form.  Asked and answered.
 5       A.   It didn't change definitively.  I
 6   said that it was going to depend on his
 7   explanation of the documents.  He was
 8   explaining I guess to Kipnes, I don't know
 9   that, his interpretation.  He didn't see the
10   documents, et cetera.
11           By the time of the hearing the judge
12   heard under oath and said, in effect,
13   Mr. Crowley, I just don't believe you.  When
14   she said that, that reenforced my suspicion
15   that he had not been frank with us.
16       Q.   And when did you first form that
17   suspicion?
18       A.   When I saw the documents.
19       Q.   So you formed that suspicion prior
20   to the March 3 hearing?
21       A.   We're going to go through this
22   again.
23       Q.   I wasn't asking you about this, sir,
24   but you raised it all on your own.  You
25   started telling us what you were thinking
```

# EXHIBIT C-5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, as Chapter 11 Trustee of    :    Case No. 04-1565(SLR)
the Bankruptcy Estates of Coram Healthcare  :    (Jointly Administered)
Corp., a Delaware Corporation, and Coram,   :
Inc., a Delaware Corporation,               :
                                            :
                Plaintiff,                  :
                                            :
v.                                          :
                                            :
DANIEL D. CROWLEY,                          :
                                            :
                Defendant.                  :

---

### THE CHAPTER 11 TRUSTEE'S ANSWERS TO
### DEFENDANT DANIEL D. CROWLEY'S FIRST SET OF
### INTERROGATORIES TO PLAINTIFF ARLIN M. ADAMS

---

Plaintiff Arlin M. Adams, the Chapter 11 Trustee (the "Trustee") of the

Bankruptcy Estates of Coram Healthcare Corp. and Coram, Inc. (collectively, "Coram"), hereby

responds to Defendant Daniel D. Crowley's ("Crowley") First Set of Interrogatories to Plaintiff

Arlin M. Adams, as follows:

### GENERAL OBJECTIONS

The Trustee asserts the following general objections, all of which are incorporated

in his specific responses:

1.      The Trustee objects to each interrogatory, definition and instruction, to the

extent that it seeks to impose an obligation or burden beyond that required by the Federal Rules

of Civil Procedure.

2.      The Trustee objects to each interrogatory to the extent that it seeks information subject to the attorney client privilege, or the work product doctrine, or any other privilege or doctrine which precludes discovery.

3.      The Trustee objects to each interrogatory to the extent that responding would impose an undue burden on the Trustee.

4.      The Trustee objects to each interrogatory to the extent that the information requested is equally available to Crowley.

5.      The Trustee objects to each interrogatory to the extent it seeks information not relevant to this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

## PRESERVATION OF RIGHTS

The Trustee's responses do not waive and do not intend to waive but, on the contrary, preserve and intend to preserve:

1.      All objections as to competency, relevancy, materiality, privilege and admissibility for any purpose in any subsequent proceeding or the trial of this or any other actions;

2.      The right to object on any ground to the use of any of these responses, or the subject matter thereof, in any subsequent proceeding or trial of this or any other actions;

3.      The right to object at any time to a demand for further responses to these or any other discovery requests involving or relating to the subject matter of these interrogatories; and

4.      The right at any time to revise, correct, supplement, clarify or amend the answers and responses set forth herein.

2

CHDATA 38155_1

## RESPONSES TO INTERROGATORIES

1.      Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley had a conflict of interest with Coram.

**SPECIFIC OBJECTIONS:** The Trustee objects to Interrogatory No. 1 on the grounds that it contains undefined terms, is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe every act Crowley undertook or failed to undertake over a several-year period that underlies the Trustee's allegations that he had a conflict of interest.  Subject to these objections, the Trustee will provide a combined response to Interrogatories 1 through 4.

2.      Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley breached his duty to Coram to act in good faith.

**SPECIFIC OBJECTIONS:** The Trustee objects to Interrogatory No. 2 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe every act Crowley undertook or failed to undertake over a several-year period that underlies the Trustee's allegations that he breached his duty to Coram to act in good faith.  Subject to these objections, the Trustee will provide a combined response to Interrogatories 1 through 4.

3.      Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley breached his duty to Coram to act with due care.

**SPECIFIC OBJECTIONS:** The Trustee objects to Interrogatory No. 3 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to

CHDATA 38155_1

identify and describe every act Crowley undertook or failed to undertake over a several-year period that underlies the Trustee's allegations that he breached his duty to Coram to act with due care. Subject to these objections, the Trustee will provide a combined response to Interrogatories 1 through 4.

      4.     Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley breached his duty of loyalty to Coram.

      **SPECIFIC OBJECTIONS:** The Trustee objects to Interrogatory No. 4 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe every act Crowley undertook or failed to undertake over a several-year period that underlies the Trustee's allegations that he had a breached his duty of loyalty to Coram. Subject to these objections, the Trustee will provide a combined response to Interrogatories 1 through 4.

      **COMBINED RESPONSE TO INTERROGATORIES 1 THROUGH 4:**

      Subject to and without waiving the foregoing objections, the Trustee responds to Interrogatories 1 through 4 by setting forth this summary of facts, which form the basis of his allegations that Crowley had a conflict of interest and breached the triad of fiduciary duties that he owed to Coram as an officer and director:

      From approximately 1997 on, Cerberus Partners, L.P. ("Cerberus"), together with Goldman Sachs Credit Partners L.P., and Wells Fargo Foothill (collectively, the "Noteholders"), owned substantially all of Coram's debt. Cerberus is a major investor in the debt of numerous distressed companies; it alone held approximately 36% of Coram's debt. The chairman of

4

CHDATA 38155_1

Cerberus, Stephen Feinberg ("Feinberg"), sat on Coram's Board from 1998 until July 2000, shortly before Coram filed for bankruptcy. Cerberus maintained a "bench" of CEO consultants, who were available to work for Cerberus with troubled companies on a project-by-project basis.

In early 1999, Cerberus retained Crowley as a turnaround consultant. In July 1999, Crowley and Cerberus entered into an oral agreement under which Crowley agreed to work exclusively for Cerberus for three years at a salary of $80,000 per month plus expenses, with the possibility of substantial bonuses.

In August 1999, after Crowley and Cerberus had entered into their oral agreement Feinberg recommended to Coram's Board of Directors (the "Board") that it hire Crowley as a consultant to work with Coram's newly-elevated CEO, Richard Smith ("Smith"). Feinberg disclosed to the directors that Crowley had a relationship with Cerberus, but provided no information about that relationship.

After Smith left Coram in October 1999, Crowley wrote to Coram Chairman Donald Amaral ("Amaral"), on October 26, 1999. In that letter, Crowley stated that he and Smith had a "six(6) month crisis management contract in place," and that he "would like to help you [Amaral] with this project and begin the restructuring process." Crowley and Amaral began negotiations on an employment agreement no later than early November 1999.

At the same time as he was negotiating with Amaral to be Coram's CEO, Crowley sent a "Personal & Confidential" letter dated November 12, 1999 to Feinberg stating that "[y]ou [Feinberg]have asked me to take over the Coram operations" and requesting additional compensation from Cerberus to induce him to become CEO of Coram.

5

CHDATA 38155_1

The Noteholders offered Coram a six-month interest accrual holiday if Crowley was hired as CEO. On November 15, 1999, Amaral and the Noteholders agreed on the terms of the interest forbearance agreement.

On November 17, 1999, the Board approved a three-year employment agreement with Crowley, which he signed the next day (the "Crowley/Coram Employment Agreement"). The Crowley/Coram Employment Agreement provided for a base salary of $650,000, benefits, potential bonuses of between $390,000 and $1,950,000 depending on Coram's EBITDA, a minimum 24-month severance period, options to purchase one million shares of Coram stock at then market rates, and an acquisition bonus upon change in control.

The day after he signed the Crowley/Coram Employment Agreement, Crowley executed a written employment agreement with Cerberus, effective August 1, 1999, which memorialized the terms of their July oral agreement (the "Crowley/Cerberus Employment Agreement"). The Crowley/Cerberus Employment Agreement required Crowley to devote "his entire business time, attention, skill and energy exclusively to the business of [Cerberus]" by performing duties to be assigned by Feinberg. The Crowley/Cerberus Employment Agreement also provided that Cerberus could terminate Crowley for cause if Crowley did not follow Cerberus' reasonable instructions. Neither Crowley nor Feinberg disclosed to the Board the existence or terms of the Crowley/Cerberus Employment Agreement.

Coram's corporate policy provided that actual conflicts of interest must be avoided and that any action creating a potential conflict of interest must be disclosed and approved in advance. Crowley failed to seek Board approval of his employment contract with Cerberus.

CHDATA 38155_1

Crowley signed the management letter to Coram's outside auditors for the year ending December 31, 1999, in which he stated that "[t]here are no instances where any officer or employee of [Coram] has an interest in a company, with which [Coram] does business that would be considered a 'conflict of interest,' that has not been disclosed or waived. Such an interest would be contrary to [Coram] policy."

Coram retained Crowley's wholly-owned consulting company, Dynamic ("Dynamic") Health Care Solutions, L.L.C. ("Dynamic"), to act as a consultant to Coram, which paid fees to Dynamic in excess of $1 million.

On February 28, 2000, Crowley wrote to the Board and demanded additional compensation from Coram, claiming that he was working 19-hour days, and that "Coram will take longer, involve more, and will need me to stay 'on task' for much longer than we envisioned when I said 'Yes.'" Crowley did not disclose to the Board that while he was allegedly working 19-hour days for Coram, Cerberus was paying him $80,000 per month.

In response to Crowley's demand for additional compensation from Coram, Feinberg and Crowley negotiated an amendment to the Crowley/Coram Employment Agreement with Coram, which was executed as of April 6, 2000. The amendment provided a new bonus structure that was far greater than the maximum $1.9 million bonus for which Crowley was eligible under the employment agreement that he had signed just four months earlier. Under the new arrangement, Crowley could claim a bonus of up to 25% of the amount by which Coram's EBITDA for 2000 exceeded $14 million and an additional $5 million bonus if EBITDA exceeded $35 million.

CHDATA 38155_1

At the time Crowley and Feinberg were negotiating the amendment to the Crowley/Coram Employment Agreement, Crowley anticipated that Coram would be restructured by filing a bankruptcy petition under Chapter 11 with a proposed plan of reorganization that would eliminate the public shareholders without any payment to them. Nevertheless, between November 30, 1999 and July 31, 2000, Crowley caused Coram to pay the Noteholders approximately $60 million. These payments included: (a) much of the proceeds from Coram's July 2000 sale of its specialty pharmacy division, Coram Prescription Services ("CPS") (nearly $40 million); and (b) an additional $6.3 million payment that Crowley made to the Noteholders just three weeks before Coram declared bankruptcy.

Although the CPS division was losing a small amount of money, it had excellent long-term profit potential. CPS had been valued in excess of $100 million by Coram's investment bankers, but was sold for approximately $40 million.

On August 8, 2000, Coram filed a Chapter 11 petition in the U.S. Bankruptcy Court for the District of Delaware, together with a proposed plan of reorganization (the "First Plan"). The First Plan provided for the cancellation of all of the shareholders' interests and for the issuance of all of the new Coram stock to the Noteholders. Coram's other unsecured creditors would receive $2 million and Coram's shareholders would receive nothing.

On October 18, 2000, the United States Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee") to represent the interests of Coram's common shareholders. The Equity Committee obtained the Crowley/Cerberus Employment Agreement and other documents in discovery in connection with the First Plan, which the Equity Committee opposed.

8

CHDATA 38155_1

During the confirmation hearing, Crowley testified that the Crowley/Cerberus Employment Agreement -- which provided for payments significantly greater than did his agreement with Coram -- had nothing to do with Coram. The Court did not find Crowley's position credible. Rather, on December 21, 2000, the Bankruptcy Court denied confirmation, holding that Coram had not proposed its reorganization plan in good faith as required under the Bankruptcy Code. In its oral ruling, the Bankruptcy Court explained that it could not confirm the plan because Crowley "had an actual conflict of interest" by virtue of his contractual relationship with Cerberus. Op. 12/21/00, at 89. The Bankruptcy Court found that that actual conflict of interest "tainted the debtors' restructuring of its debt, the debtors' negotiations towards a plan, even the debtors' restructuring of its operations." *Id.* at 88. As a result of Crowley's relationship with Cerberus, Coram did not emerge from bankruptcy in December 2000.

Despite the Bankruptcy Court's ruling, Crowley did not terminate his relationship with Cerberus. In fact, Crowley continued to be paid $80,000 per month by Cerberus throughout 2001.

The Board formed a Special Committee, which retained Harrison J. Goldin Associates, L.L.C. ("Goldin"), as a restructuring advisor. In a report of its investigation, Goldin concluded that Crowley should have disclosed the full extent of his employment agreement with Cerberus and that his failure to do so was a breach of his fiduciary duties to Coram. Goldin also concluded that Crowley had advanced Cerberus' interests at Coram's expense by making cash payments to the Noteholders prior to Coram's filing for bankruptcy. In addition, Goldin determined that, as of the date of his report, Crowley's conflict had caused Coram to incur at least $12 to $15 million in business losses and professional fees in the bankruptcy proceedings.

9                    CHDATA 38155_1

Coram based its second proposed plan of reorganization (the "Second Plan") on Goldin's report. The Second Plan again provided for the cancellation of all shareholders' interests and for the issuance of new Coram stock to the Noteholders, including Cerberus. Coram's shareholders would receive $10 million if they voted to approve the plan. Coram's other unsecured creditors would receive $3 million, amounting to less than 40% of their claims. In addition, the Second Plan provided that Crowley's compensation be reduced by $7.5 million as recommended by Goldin.

During the confirmation hearing on the Second Plan, Crowley testified that Cerberus was not paying him for his work at Coram, but instead for his work on non-Coram matters. Again, the Bankruptcy Court rejected Crowley's testimony as not credible. Op. 12/21/01, at 16-17.

On December 21, 2001, the Bankruptcy Court issued a written opinion denying confirmation. The Bankruptcy Court concluded that Crowley's agreement with Cerberus continued to present an actual conflict of interest. As the Bankruptcy Court put it, "[n]othing, in fact, has changed since the first confirmation hearing." Op.12/21/01, at 13. The Bankruptcy Court explained that:

> Crowley's actual conflict of interest goes beyond the mere appearance of impropriety. Crowley cannot serve the interests of both the Debtors and a large creditor, Cerberus. Under the Consulting Agreement, Cerberus has the discretion to fire Crowley if he fails to follow its instructions, resulting in the loss of $1 million per year in compensation to Crowley. That control over Crowley, and indirectly the Debtors, is simply not proper.

CHDATA 38155_1

Op. 12/21/01, at 15. The Bankruptcy Court concluded that "the conflict in this case transcends every single thing Crowley does on behalf of the Debtors." Op. 12/21/01, at 24. As a result of Crowley's relationship with Cerberus, Coram did not emerge from bankruptcy in December 2001.

Following the rejection of the Second Plan, the Bankruptcy Court entered an order appointing the plaintiff Arlin M. Adams as Coram's Chapter 11 Trustee. Shortly after his appointment, the Trustee reviewed the Bankruptcy Court's two opinions denying confirmation of each of Coram's proposed plans of reorganization. As a result, the Trustee required that Crowley have no continuing conflict of interest and that he not receive any further compensation from Cerberus. The Trustee elected to continue Crowley's employment with Coram only after Crowley explicitly represented to the Trustee that he that he was no longer receiving any compensation from Cerberus.

Crowley's employment agreement with Coram expired on November 26, 2002. Because the Trustee was concerned that terminating Crowley could possibly lead to substantial departures of key employees, thereby endangering Coram's ability to promptly reorganize, the Trustee filed a motion to extend his employment for a limited transition period (as well as a motion to reject his employment agreement). The Equity Committee opposed the Trustee's motion and filed a motion to immediately terminate Crowley's employment.

In the course of discovery on the motions, Crowley produced documents that made clear that his prior representations to the Trustee were false. These documents showed that Crowley was in fact continuing to ask Cerberus for millions of dollars to be paid after the confirmation, when neither he nor Coram would be under the jurisdiction of the Bankruptcy

CHDATA 38155_1

Court. Specifically, an insert to a draft letter to Feinberg dated May 2, 2002 states: "I expect that you'll honor the commitment you made to me over dinner: after Coram's plan is confirmed or its assets sold, I'll be reinstated with Cerberus and receive $5,000,000 from Cerberus. Also, Cerberus will indemnify me for all of my legal fees, plus pay me the difference between what I ultimately receive from Coram by way of bonuses, and $11,200,000." In another part of the letter, Crowley stated that he "didn't have to recite the answers that [Coram's bankruptcy lawyer] gave [him] to say in Court."

The Bankruptcy Court denied the Trustee's motion to extend Crowley's employment and rejected Crowley's testimony, stating that "I do not believe he is honest." Tr. 3/3/03, at 195. Referring to the draft letter from Crowley to Feinberg, the Bankruptcy Court concluded that the letter "after the appointment of the Trustee, continue[s] to show what I believe is a continuation of Mr. Crowley's continued efforts to continue to get reimbursement from Cerberus for efforts undertaken in this case." *Id.* at 196. Crowley resigned from Coram effective March 31, 2003.

The Trustee thereafter proposed a reorganization plan, as did the Equity Committee. Following extensive discovery and a lengthy confirmation hearing, in October 2004, the Bankruptcy Court confirmed the Trustee's Plan and rejected the Equity Committee's Plan. *See In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del 2004).

The Trustee reserves his right to amend or supplement his response as discovery continues.

CHDATA 38155_1

5. Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 1, including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:** The Trustee objects to Interrogatory No. 5 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period. Subject to these objections, the Trustee will provide a combined response to Interrogatories 5 through 8.

6. Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 2 including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:** The Trustee objects to Interrogatory No. 6 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period. Subject to these objections, the Trustee will provide a combined response to Interrogatories 5 through 8.

7. Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 3 including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:** The Trustee objects to Interrogatory No. 7 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to

CHDATA 38155_1

identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period. Subject to these objections, the Trustee will provide a combined response to Interrogatories 5 through 8.

8.     Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 4, including but not limited to any valuation of any such harm or damage.

SPECIFIC OBJECTIONS: The Trustee objects to Interrogatory No. 8 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period.

COMBINED RESPONSE TO INTERROGATORIES 1 THROUGH 8:

Subject to and without waiving the foregoing objections, the Trustee states that Coram's emergence from bankruptcy was delayed as a result of Crowley's conflict of interest and his breaches of his fiduciary duties, causing Coram to suffer damages. Coram incurred reorganization costs in excess of $36 million directly attributable to the delay in Coram's emergence from bankruptcy. Coram also sustained business losses as a result of remaining in bankruptcy. The calculation of such damages will be provided in expert report(s), which will be served in accordance with the current scheduling order, unless amended.

The sale of CPS deprived Coram of the increase in value CPS enjoyed following the sale. CPS was sold to a management-led buy out group for $40 million and was sold three years later for $335 million.

CHDATA 38155_1

Coram is also entitled to disgorgement of the compensation that it paid Crowley

while he served as a conflicted CEO.

The Trustee reserves his right to amend or supplement his answer to this

interrogatory as discovery continues.

As to objections:

Dated:  December 20, 2006                SCHNADER HARRISON SEGAL
                                                          & LEWIS LLP


                                            By: /s/ Richard A. Barkasy _____
                                                   Richard A. Barkasy (#4683)
                                                   Michael J. Barrie (#4684)
                                                   824 Market Street Mall, Suite 1001
                                                   Wilmington, DE 19801
                                                   (302) 888-4554 (telephone)
                                                   (302) 888-1696 (facsimile)

                                                   -and-

                                                   Wilbur L. Kipnes
                                                   Barry E. Bressler
                                                   1600 Market Street, Suite 3600
                                                   Philadelphia, PA 19103-7286
                                                   (215) 751-2000 (telephone)
                                                   (215) 751-2205 (facsimile)

                                                Counsel to Arlin M. Adams,
                                                   Chapter 11 Trustee

CHDATA 38155_1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, as Chapter 11 Trustee of     :    Case No. 04-1565(SLR)
the Bankruptcy Estates of Coram Healthcare    :    (Jointly Administered)
Corp., a Delaware Corporation, and Coram,      :
Inc., a Delaware Corporation,                :
                                   :
               Plaintiff,           :
                                     :
v.                                     :
                                     :
DANIEL D. CROWLEY,            :
                                     :
               Defendant.        :

## CERTIFICATE OF SERVICE

      I, Michael J. Barrie, certify that I am not less than 18 years of age and that service of the **Chapter 11 Trustee's Answers to Defendant Daniel D. Crowley's First Set of Interrogatories to Plaintiff Arlin M. Adams**, was made on December 20, 2006 upon the persons listed below via Electronic Mail and United States First Class Mail.

      I certify the foregoing to be true and correct under penalty of perjury.

                              /s/ Michael J. Barrie
                              Michael J. Barrie

Dated: December 20, 2006

### Parties Served:

Jeffrey C. Wisler, Esquire
Christina M. Thompson, Esquire
1007 N. Orange St., P.O. Box 2207
Wilmington, DE 19899
Email: jwisler@cblh.com
Email: cthompson@cblh.com

Elliot R. Peters, Esquire
Garrett A. Lynch, Esquire
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
Email: epeters@kvn.com
Email: glynch@kvn.com

16

CHDATA 38155_1

## CERTIFICATION

I hereby certify that the facts set forth in the foregoing interrogatory answers are true and correct to the best of my knowledge, information and belief.

_Arlin M. Adams_
Arlin M. Adams, Ch. 11 Trustee

Dated:  December 20, 2006

CHDATA 38155_1