# EXHIBIT C-6

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                · Case No. 00-3299
                                      ·
                                      ·
CORAM HEALTHCARE,                     · 824 Market Street
                                      · Wilmington, DE  19801
                                      ·
            Debtor,                   · March 3, 2003
· · · · · · · · · · · · · · · · · · · · 9:30 A.M.

TRANSCRIPT OF TRUSTEE'S MOTION FOR AUTHORIZATION TO REJECT
THE EXECUTORY CONTRACT OF DANIEL CROWLEY
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Trustee:                   Schnader Harrison Segal & Lewis,
                                   LLP
                                   By:  BARRY E. BRESSLER, ESQ.
                                        WILBUR KIPNES, ESQ.
                                        RICHARD BARKASY, ESQ.
                                   1600 Market Street, Suite 3600
                                   Philadelphia, PA  19103

                                   Weir & Partners
                                   By:  JOHN B. YORK, ESQ.
                                   824 Market Street Mall, Suite 101
                                   P.O. Box 708
                                   Wilmington, DE  19899

                                   Office of the U.S. Trustee
                                   By:  RICHARD SCHEPACARTER, ESQ.
                                   J. Caleb Boggs Federal Building
                                   844 King Street, Lockbox 35
                                   Wilmington, DE  19801

Audio Operator:                    Jennifer M. Patone


        Proceedings recorded by electronic sound
    recording, transcript produced by transcription service.
_____

                J&J COURT TRANSCRIBERS, INC.
                    268 Evergreen Avenue
                  Hamilton, New Jersey  08619
                E-mail:  jjcourt@optonline.net

        (609) 586-2311      Fax No.  (609) 587-3599

2

APPEARANCES:   (continued)

For Daniel Crowley:

RICHARD H. CROSS, JR., ESQ.
1201 North Orange Street, St. 610
P.O. Box 1380
Wilmington, DE  19899

Much Shelis Freed Denenberg Ament
& Rubenstein
By:  SCOTT N. SCHREIBER, ESQ.
200 North LaSalle St., Suite 2100
Chicago, IL  60601

For Unsecured Creditors:

Richards, Layton & Finger, P.A.
By:  ETTA WOLFE, ESQ.
One Rodney Square
P.O. Box 551
Wilmington, DE  19899

For Equity Committee:

Saul, Ewing, Remick & Saul, LLP
By:  MARK MINUTI, ESQ.
222 Delaware Avenue, Suite 1200
Wilmington, DE  19899

Jenner & Block, LLC
By:  RICHARD F. LEVY, ESQ.
     STEVE TOMASHEFSKY, ESQ.
One IBM Plaza
Chicago, IL  60611

For Senior Noteholders:

Weil, Gotshal & Manges, LLP
By:  ALAN B. MILLER, ESQ.
767 Fifth Avenue
New York, NY  10153

For Cerberus Partners, LP

Klett Rooney Lieber & Schorling
By:  ADAM G. LANDIS, ESQ.
1000 West Street, 14th Floor
Wilmington, DE  19801

Schulte Roth & Zabel LLP
By:  HOWARD O. GODNICK, ESQ.
     MICHAEL L. COOK, ESQ.
919 Third Avenue
New York, NY  10022

APPEARANCES:    (continued)

For Goldman Sachs:              Connolly Bove Lodge & Hutz, LLP
                                By:  GWEN LACY, ESQ.
                                1220 Market Street
                                Wilmington, DE  19899

I N D E X                                    4

**WITNESSES FOR THE TRUSTEE**                            <u>Page</u>

ARLIN M. ADAMS

        Direct Examination by Mr. Bressler           12
        Cross Examination by Mr. Levy                24
        Cross Examination by Mr. Godnick             68
        Redirect Examination by Mr. Bressler         69

DANIEL CROWLEY

        Direct Examination by Mr. Kipnes             73
        Cross Examination by Mr. Levy                85
        Redirect Examination by Mr. Kipnes          109
        Recross Examination by Mr. Levy             110
        Further Redirect Examination by Mr. Kipnes  113
        Further Recross Examination by Mr. Godnick  114

MICHAEL SARACCO

        Direct Examination by Mr. Barkasy           116
        Cross Examination by Mr. Tomashefsky        125
        Redirect Examination by Mr. Barkasy         133

DEBORAH MEYER

        Direct Examination by Mr. Barkasy           136
        Cross Examination by Mr. Tomashefsky        141
        Redirect Examination by Mr. Barkasy         144

VITO PONZIO

        Direct Examination by Mr. Barkasy           146
        Cross Examination by Mr. Tomashefsky        153
        Redirect Examination by Mr. Barkasy         158

JAY SCOTT VICTOR

        Direct Examination by Mr. Kipnes            159
        Cross Examination by Mr. Tomashefsky        162
        Cross Examination by Mr. Godnick            179
        Redirect Examination by Mr. Kipnes          181

**ARGUMENT**

BY MR. BRESSLER                                      184
BY MR. LEVY                                          187
BY MR. SCHREIBER                                     191

I N D E X                                    5

**REBUTTAL ARGUMENT**

BY MR. BRESSLER                                        194
BY MR. LEVY                                            195

**DECISION**

BY THE COURT                                           195

| **EXHIBITS** | | Ident. | Evid. |
|---|---|---|---|
| T-1 | Proposed Termination Agreement and Extension of Employment Agreement | 13 | 72 |
| EC-1 | 3/26/02 Letter | 32 | 72 |
| EC-2 | Letter to Coram Employees | 34 | 72 |
| EC-3 | 8K Form filed with SEC | 37 | 72 |
| EC-4 | Group Exhibit | 44 | 72 |
| EC-5 | 2/18 Letter | 47 | 72 |
| EC-6 | Two Emails | 49 | 72 |
| EC-7 | 4/10/02 Letter | | 72 |
| EC-8 | 5/6/02 Draft | 51 | 117 |
| EC-9 | Document Dated 11/12/99 | 58 | 72 |
| EC-10 | Document Dated 5/8/02 | | 115 |
| EC-11 | Document Dated 5/8/02 | 63 | 72 |
| T-2 | 3/11/02 Letter | 77 | 115 |
| EC-12 | 2002 Earnings Summary | | 118 |
| EC-13 | 4/1/02 Document | 103 | 118 |
| EC-14 | 8/20/02 Letter | 105 | 118 |
| EC-15 | 9/20/02 Letter | 107 | 118 |
| EC-16 | 2/28/03 Letter | 113 | 118 |
| EC-17 | 3-Page Document from SSG | 163 | |

1 A    Oh,  maybe a week or so after I was appointed.  The first

2 thing I did after I was appointed was to read carefully the

3 opinions written by Her Honor relating to this matter, and then

4 I called Mr. Crowley and arranged to go to Denver, told him I

5 wanted to meet with him and his entire staff, and he set that

6 meeting up.  I forget the date, but it was some time in the

7 latter part of March. And I went out to Denver and talked with

8 Mr. Crowley for, I don't know, two hours, maybe three hours,

9 and then met with the entire staff, first collectively, but

10 then I asked that I be given the opportunity to meet with each

11 of the executive staff individual and on a private basis.

12 Q    It is accurate that of the -- approximately the 2,100

13 employees that Coram has, about 100 are in Denver.

14 A    About that.

15 Q    But members of the senior executive were brought in from

16 elsewhere around the country to meet with you?

17 A    They were, and there were approximately fifteen.  I can't

18 tell you precisely the number.

19 Q    when you first met with Mr. Crowley was there any

20 discussion of Her Honor's opinion or of his then current

21 relationship with Cerberus?

22 A    There was.  Almost the first thing I did with Mr. Crowley

23 was to ask him about the conflicts and that had been referred

24 to in the opinions that I've just averted to, and he assured me

25 that he had no further contractual relationship with Cerberus

Adams - Direct                              15

1   except for the remaining claim under the contract for work that

2   he had done prior to my appointment that had nothing to do with

3   Coram, and I made it clear to him that he could not take any

4   compensation from Cerberus for anything except that claim and

5   that he could not spend any time that he would ordinarily be

6   devoting to Coram in order to deal with any of the remaining

7   Cerberus matters.

8       He gave me that assurance.

9   Q   Did he also discuss with you that that he still had some

10  talking relationship with Cerberus?

11  A   He did.  He said from time to time Cerberus asked him to

12  give his comments or opinions about matters that came to their

13  attention, an I said, "Well, you could do that, but you have to

14  make sure that those matters could have nothing to do with

15  Coram, couldn't be a competitive situation or anything of the

16  sort," and the reason why I gave them -- him that opportunity,

17  although I was mindful of the judge's concerns, was I knew he

18  had a substantial claim against Cerberus, and I didn't want to

19  do anything to prejudice that claim.  I didn't think that was

20  fair on my part.

21      And I knew that if I was going to succeed as a Trustee it

22  was important to have a good relationship, not only with Mr.

23  Crowley, but all of his people.  And that's the style that I

24  use in handling these matters.  Some people don't use that

25  style.  Mr. Levy, for example, uses a very confrontational

Adams - Redirect                          70

1    THE COURT:  Sustained.

2  BY MR. BRESSLER:

3  Q   What were your views as to the inquiry into the continued
4  possible conflict?

5  A   I instructed you and your colleagues to be very attentive
6  to that issue.  I knew of the judge's position, and I had every
7  intention to adhere very closely to that.  And if I couldn't
8  take care of the details, I expected you and your associates to
9  do so.

10  Q   Have you seen anything in the documents and unsent drafts
11  that Mr. Levy has shown you that is not consistent with Mr.
12  Crowley's representation to you that he's no longer getting
13  paid by Cerberus?

14  A   I have seen nothing.  If I did, I would be upset about it
15  and probably take steps.

16  Q   What is the current level of authority that any of the
17  officers of Coram have to write checks or spend money without
18  your approval?

19  A   I think the level is $50,000.  I approve everything above
20  -- from 50,000 up.

21  Q   You don't have to know what services Mr. Crowley may have
22  been claiming monies from Cerberus for to know that he told you
23  they were not for Coram work; is that correct?

24          MR. LEVY:  Objection, leading.

25          THE COURT:  Overruled, but it could be clarified.

1  A    I have talked to Feinberg.

2  Q    But you don't know how many times.

3  A    A number of occasions.

4  Q    And you don't know whether in any of those conversations

5  you talked to him about the money that you claim is due to you

6  from him, right?

7  A    I'm certain on some of those occasions I did.  I don't

8  recall.

9  Q    So, you went to the meeting.  You expected a proposal, you

10  expected a number, and there was none, right?

11  A    I answered that, yes.

12  Q    And you came away from the meeting disappointed?

13  A    I wondered why I was asked to come to New York to receive

14  a proposal if the proposal was nothing.

15  Q    Five days after the meeting you sat down at your computer

16  and you typed a document relating to that meeting, correct?

17  A    I wrote a draft.

18  Q    Can you answer that yes or no?

19  A    Yes.

20  Q    And the draft you wrote -- do you have the documents up

21  there, Mr. Crowley?

22  A    Yes, I do.

23  Q    Will you look at EC-8, please?  The draft you wrote, the

24  first two pages of EC-8, the ones that have Bates numbers CRX-

25  63 and 64, correct?

Crowley - Cross/Levy                     90

1  A    Yes.

2  Q    And in that draft you wrote -- the very next to the last

3  thing you wrote -- no, the very last thing you wrote was, "I

4  just wanted you to know how I am feeling on this particular

5  day," correct?

6  A    Those are the words.

7  Q    And that is how you felt on that particular day, correct?

8  A    Of course I testified for hours with you in the deposition

9  and told you this was --

10 Q    Excuse me.  The judge was not at the deposition.  Could

11 you just answer my question, please?

12 A    No.

13 Q    That's not how you felt on that day?

14 A    It's out of context.

15 Q    How is it out of context, Mr. Crowley?

16 A    Mr. Levy, I see how you would like to characterize it, but

17 this was part of my life has been -- I write something down,

18 think about it the next day.  In this case I wrote something

19 down, the first two pages.  I sent it to my attorney.  I re-

20 crafted it the next day.  I was ready to send that.  I sent

21 that to my attorney.  Neither one of these letters went beyond

22 me to my attorney.  I haven't seen this thing in darn near a

23 year until my attorney showed it to me again a week ago.

24 Q    Well, you talked to your attorney about it -- let's see,

25 this is May 6th.  You tell -- you went it to Mr. Schreiber,

Crowley - Cross/Levy                          91

1  looks like from the fax marks on May 6, correct?

2  A    I sent to Mr. Schreiber.  I admit it.

3  Q    And you talked to him about it almost immediately

4  thereafter, didn't you?

5  A    I don't know that.

6  Q    You deny that, sir?

7  A    I don't know if I talked to him immediately thereafter.

8  Q    You talked to him shortly thereafter.

9  A    I talked to him thereafter.

10 Q    About this document.

11 A    About this document

12 Q    And that was pay before I took your deposition last week.

13 A    I talked to him about this document in May 2002, yes.

14 Q    Now, in this document, the portion you wrote, on Page 2

15 beginning in the second paragraph, some rather -- some

16 complaints about the job that David Friedman did and after

17 complaining you said, "I didn't have to recite the answers that

18 Friedman gave me to say in court."  Did you wrote that?

19 A    Yes, I wrote that.

20 Q    Did you mean it when you said it?

21 A    Absolutely not.  I told you that.

22 Q    You wrote it but didn't mean it, absolutely.

23 A    Again, this was a melodrama, a noontime drama.  I wrote

24 what I felt was -- that David Friedman could have done a whole

25 lot better job and didn't do as well as he could have.  There

1  was significant evidence he could have presented -- different

2  ways he could have handled this case to supply Your Honor with

3  the information that you have, 1,635 pages of it that had he

4  done that, we may have had a different decision.  And I don't

5  think that he did do that.

6  Q    He did hand you a list of questions and answers before you

7  took the stand last December, didn't he?

8  A    He gave me a list of questions and probable answers and

9  asked me to read them over and we would discuss it.  I

10 testified to the best of my ability the truth.  I did not

11 recite -- I couldn't recite or wouldn't recite anything that

12 anybody gave me.

13      I gave my own answers.

14 Q    Can you give me any explanation then of why you chose the

15 word "recite" in here?

16 A    Here's a letter that's a year old.  I was completely

17 sideways because I'm calling Feinberg saying, "I want to be

18 paid for '99, 2000, 2001.  You and I know what the deals are."

19      "Send them to Bob Gadigan."

20      I sent him a list.  I said, "Where are we?"

21      He said, "Send them to Bob Gadigan."

22      I said, "I did."

23      He said, "Send them again."

24      "I think I'm due a lot of money."

25      "What do you think you're due?

1    "A lot."

2    "You have to give me the source data."

3    "What do you think I'm due?"

4    "I don't know."

5    "Steve, what -- I think I'm due something.  I'd like to be

6  paid."

7    He pushed me off in '98, in 2000 and 2001.  The contract

8  was dead.  I'm not taking anything from him, I'm simply asking

9  for what I'm due.

10    I asked for proposals, I didn't get it, he drags me to New

11  York for a proposal that he gives me is -- there is none.

12    This letter is, you know, not in my many letters that I've

13  written, when I sit them on the side of my desk it's Draft One

14  of two drafts.  You don't show me Draft Two, but there is Draft

15  Two that I was willing to sign my name to that says, "I'm

16  putting whatever it is in here in front of Judge Walrath and

17  he United States Trustee and Judge Adams.  I'm happy to do it,

18  and if they say no, then no it is."

19    But you're -- I did not recite anything David Friedman

20  provided to me.

21  Q    Is that, sir, your complete explanation to my question of

22  why you chose the word "recite"?

23  A    I chose the word "recite" --

24  Q    Can you answer that yes or no?

25  A    I have no idea.

Crowley - Cross/Levy                    94

1  Q    Okay, thank you.

2       Let's go now to the next paragraph which says -- you wrote

3  on your computer, "I suppose if I had been more trusting,

4  maybe, paren, maybe I would not have written the memo about

5  trying to get upside on your position if I did a great job at

6  Coram."

7       See that, sir?

8  A    Yes.

9  Q    Now, would you look at EC-9.

10 A    Yes.

11 Q    And I'm sure you'll recall that that document that was

12 marked in evidence at the hearing, that document which is dated

13 November 12th, 1999 was marked in evidence at the hearing heard

14 in this courtroom in December of 2000.  Remember that?

15 A    Yes, I do.

16 Q    And do you remember that you denied at that time that EC-

17 9, then EC-20 indicated an intention -- indicated an intention

18 to get upside on the position if I did a great job at Coram?

19 A    You know, my testimony's in the court as to this pre-

20 employment letter to which we did not agree.  I don't know what

21 else to say.

22 Q    Well, why did you tell Mr. Friedman, that you -- quote --

23 I'm sorry, you didn't tell that to Mr. Friedman.

24      Why did you write in this letter, quote, "I would not have

25 written the memo about trying to get upside on your position."

1  A    Well, this is not a letter.  This is draft one of two

2  drafts of material I sent simply to my lawyer that never went

3  to anybody.

4  Q    I'll correct the -- I'll correct that --

5  A    I thought --

6  Q    What -- I'm not sure I see the importance, but why did you

7  write in this draft, "I would not have written the memo about

8  trying to get upside on your position if I did a great job at

9  Coram"?

10  A    I think what I'm saying -- you know, I don't know.  I just

11  didn't trust the man, I guess.

12  Q    You do agree, by the way, don't you, that the reference

13  here in this document that we're looking at, EC-8, is a

14  reference to EC-9, the older document?  No question in your

15  mind about that; is there?

16  A    No.

17  Q    Now, let's look at the next page, CRX-65.  And we have --

18  we agree, don't we, that this was written by Mr. Scott

19  Schreiber?

20  A    This was written by Scott Schreiber.

21  Q    And that that's his handwriting where it says "insert"?

22  A    I believe it is.

23  Q    And Mr. Schreiber was your lawyer?

24  A    He is my lawyer.

25  Q    Was and is your lawyer.

Crowley - Cross/Levy                    96

1  A    Yes.

2  Q    Was on May 6th, 2002.

3  A    Yes.

4  Q    And there's no doubt in your -- now, Mr. Schreiber writes

5  in CRX-65, "Hence, I expect that you'll honor the commitment

6  that you made to me over dinner."  You see that?

7  A    Yes.

8  Q    Do you have any idea where Mr. Schreiber could have gotten

9  information suggesting that Feinberg made a commitment to you

10 over dinner other than from you?

11 A    I never saw this document, Mr. Levy.

12 Q    Can you answer that?  My question is, do you have any

13 idea?

14 A    No.

15 Q    Do you have any idea where Mr. Schreiber could have gotten

16 the idea that the commitment specifically was that Coram's plan

17 is confirmed -- if Coram's plan is confirmed or its assets

18 sold, you'd be reinstated with Cerebus and receive $5 million?

19 A    I --

20 Q    Yes or no, do you have any idea?

21 A    No.

22 Q    Good.

23      MR. KIPNES:  Move to strike, Your Honor.

24      MR. LEVY:  I --

25      THE COURT:  Sustained.

Crowley - Cross/Levy                    97

1          MR. LEVY:  Okay.  I withdraw it.

2   BY MR. LEVY:

3   Q    And I assume you had no idea of any source of information

4   that Mr. Schreiber might have had that you had received a

5   commitment from Mr. Feinberg that Cerebus would indemnify you

6   for legal fees, correct?

7   A    No, because they haven't.

8   Q    And finally, perhaps most importantly, do you have an idea

9   where Mr. Schreiber could have gotten information that would

10  lead him to write that you had a commitment from Mr. Feinberg

11  to pay you the difference between what you ultimately received

12  from Coram by way of bonuses and $11,200,000?

13  A    None at all.

14  Q    And do you recognize $11,200,000 as a number that you once

15  perhaps told Judge Adams was the amount you thought was due

16  from Cerebus?

17  A    It is not.

18  Q    Judge Adams was wrong?

19  A    It's not a number that I provided.  The numbers are

20  public, they're available in every form of SEC document.

21  They've been testified in court, you've subpoenaed them, I've

22  provided them to the office of the Trustee, the current number

23  is almost 17-million-9.  Back then it was 15-million-7.  This

24  number represents nothing I would know.

25          MR. KIPNES:  Your Honor, for the purpose of the

Crowley - Cross/Levy                    98

1  record, Mr. Levy said owed by Cerberus.

2         THE COURT:  All right, just to clarify, it's owed by

3  Coram is what you're question --

4         MR. LEVY:  It is, and I thank you.

5         THE COURT:  All right.

6  BY MR. LEVY:

7  Q    Now, the next letter, the next communication, the next

8  draft if you like, is EC-10, a May 8th, 2002 document with

9  number 71 -- CRX-71, 2 and 3 on it; is that correct?

10 A    Yes.

11 Q    Something you wrote.

12 A    Yes.

13 Q    And this one you signed.

14 A    Yes.

15 Q    And you wrote, "Dear Steve," and you wrote Steve in,

16 correct?

17 A    That's my handwriting.

18 Q    Right, and just exactly the same way, if you look back at

19 EC-9, the 1999 document, same way you wrote, "Dear Steve,"

20 right?

21 A    The first two pages of the prior equity committee are a

22 draft that I wrote, first two pages, the memo that's dated May

23 8th that's EC-10 I wrote and I signed, both of them were

24 drafts, neither of them were sent.  They both went to my

25 attorney and nowhere else.

1  Q    And with respect to EC-10, the May 8th letter, you did

2  discuss that letter with Mr. Schreiber some time in May,

3  correct?

4  A    I must have.  I don't recall it.

5  Q    And do you -- look specifically now at EC-10, and

6  specifically on the last page in the third paragraph from the

7  bottom, about the middle, you say, "Steve, I am also anxious

8  that unforeseen events sometimes overtake good intentions.  You

9  could get hit by a bus and be gone.  Cerebus would get bought

10 out or whatever.  The point is that then I would be left with

11 nothing.  Now, that's not right or fair, is it?"

12     You see that?

13 A    Yes.

14 Q    And you wrote that.

15 A    Yes, I wrote that.

16 Q    Now, why would it be unfair to you?  Mr. Feinberg wouldn't

17 like it, but why would it be unfair to you if he was hit by a

18 bus and was gone?

19 A    Well, in December of 2001 I received my last payment from

20 this guy.  I've asked him to pay me for '99, 2000, 2001.  I

21 have tried more ways than I know how to terminate this contract

22 and be paid up front, in the public, in front of Your Honor or

23 anyone what I'm doing for what?  Nothing for Coram.  Never

24 asked.  Don't expect.  Not going to accept.  Nothing relates to

25 Coram.

Crowley - Cross/Levy                    100

1    I'm saying to this man, "You know that, and I know that,

2  how about let's just get this over and be done with it and put

3  it on public?  I'm okay with that."

4    There isn't any conspiracy.  Let's get it over with.  He's

5  saying, "Good, let's do that.  Let's put it in front of

6  everybody."

7    And I'm saying, "Fine.  What's the number?"

8    We're going back and forth, and I believe that the man --

9  he's a terrific businessman. He's playing hide the ball.  I

10  don't know why or what's going on here, but I would just like

11  it over.

12    Lord knows, you've accused me of everything under the sun,

13  Mr. Levy, and it's not true.  So, I'm left to this guy saying,

14  I'll pay you."  What?  When?  For what?  I'd like to be done

15  with it.

16    Here's what for, here's how much, here's the

17  documentation, do it.  That's all I'm saying.  That's what this

18  letter says.  I didn't send it, though.  Cooled down and threw

19  it in the circular file, the trash.

20  Q    Mr. Crowley, your claim is not -- for all his money you're

21  talking about was not against Feinberg personally; it was

22  against Cerberus, wasn't it?

23  A    In many ways Steve's the principal there.

24  Q    You have -- still have -- or there is a written contract

25  between you and Cerberus, correct?

Crowley - Cross/Levy                    101

1  A    Sure, and it's --

2  Q    And it's that contract that defines the rights you think

3  you have for certain upsides; isn't that right?

4  A    That's right.

5  Q    Well, then why -- and presumably Cerberus has records of

6  what those upsides were, though you've never seen them, right?

7  A    I'd like to.

8  Q    Okay, then why is Mr. Feinberg's being gone going to

9  affect your right -- will leave you with nothing?

10 A    I must have come to the same conclusion as you, 'cause I

11 threw the letter away and never sent it to him.  I thought this

12 was attorney-client privilege, 'cause it went from me to my

13 lawyer to the trash.  But here I guess I'm testifying.

14 Q    Equity Committee Exhibit --

15        THE COURT:  Thirteen.

16        MR. LEVY:  Thirteen, thank you, Your Honor.

17 BY MR. LEVY:

18 Q    -- is a document bearing numbers CRX-486 and 487 dated

19 April 1st, 2002.  I think you've testified you prepared this

20 document?

21 A    I did testify that.

22 Q    And it reflected your intentions as to what you would like

23 to see in the termination agreement on or about the date you

24 wrote it?

25 A    Again, I --

Crowley - Recross/Levy                          110

1  A    I was really angry.  I -- this is bullshit.  I'm sorry.  I

2  apologize to the Court.

3  Q    Did you have any conversation at that time with Mr.

4  Schreiber about the accuracy of what appears on that page?

5  A    I did.

6  Q    And what did you say?

7  A    This is absolutely wrong.  It's not in context with that

8  meeting.  None of this happened.  Where in the hell did you get

9  this?  And why am I looking at it a year later, an insert that

10 I've never seen before?  What is this about?

11 Q    Does Cerberus owe you any money in your view for any work

12 you have done at any time from the date of your birth to now

13 that has anything to do with Coram?

14 A    Not a penny.

15         MR. KIPNES:  No further questions.

16                    RECROSS EXAMINATION

17 BY MR. LEVY:

18 Q    Perhaps I misunderstood you, Mr. Crowley.  I thought you

19 had testified that after you wrote the May 6 letter and

20 discussed it and the third page, Page 65, with Mr. Schreiber;

21 is that not your testimony?

22 A    Mr. Levy, I told you I hadn't seen this thing in over a

23 year, that the only time I've seen it since I thought it was

24 thrown away, I sent it to my lawyer.  I did Draft Two, was

25 ready to send it.  I cooled down the next day, in the trash it

Decision                                    195

1 and has kept out of whatever monetary claim Mr. Crowley may

2 have against Cerberus.

3          MR. LEVY:  Mr. Schreiber said we ought to stick with

4 him.  Merely resonance of what the director's witness, Mr.

5 Emeral said, "Well, he's doing a good job, let's stick with

6 him."

7          And the cases that Mr. Bressler talks about do talk

8 about people who in the past have a conflict.  I certainly

9 think his past conflict twice colors what happened here today,

10 but it is the ongoing relationship that troubles us so.

11          Thanks.

12          THE COURT:  Well, I'm going to deal with the

13 Trustee's motion for approval of the extension.  And in doing

14 so, I agree that it is the business judgment rule that I just

15 consider.

16          To express my feelings I'm going to paraphrase

17 someone I think epitomizes the business judgment rule, and that

18 is Warren Buffet.  And he has said that the ideal employee is

19 someone who's smart, hard-working and honest.  But if the

20 employee isn't honest, you darn well better hope he's stupid

21 and lazy, because otherwise you're in trouble.

22          There is no question in this case that Mr. Crowley is

23 smart, hard-working, a brilliant businessman.  But I do not

24 believe he is honest.  And his testimony today has not

25 convinced me that he has changed since the last time he

1  testified.

2       Judge Adams has an impeccable reputation for

3  integrity.  Quite frankly, I don't want his reputation or mine

4  sullied by approving continuing employment of an employee that

5  I do not believe to be an honest person.  I think being asked

6  today to trust that Mr. Crowley is complying with the Trustee's

7  request simply because there is no proof that he has not

8  complied with the requirements imposed upon him by the Trustee

9  goes too far, given the fact that he has previously failed to

10 disclose relevant information.  And quite frankly, the draft

11 documents that were produced continue to show at least in May

12 of 2002, after the appointment of the Trustee, continue to show

13 what I believe is a continuation of Mr. Crowley's continued

14 efforts to continue to get reimbursement from Cerberus for

15 efforts undertaken in this case.

16      It's a belief I have.  There is no evidence that an

17 agreement was reached with Cerberus or that Cerberus

18 participated in it, but I think that the drafts show that Mr.

19 Crowley sought to have that continuation, sought to be paid,

20 albeit after confirmation, that is after he was no longer

21 subject to the jurisdiction of this court, sought to get

22 remuneration for efforts taken in this case, which quite

23 frankly is not permissible.

24      And given that belief, I will not approve any

25 extension of employment.  I've said before that fortunately or

1  Q    Judge Adams, would it be fair to say that during this

2  engagement your principal focus has been to find a consensual

3  resolution of the disputes between the parties and get the

4  company out of bankruptcy?

5  A    I think that would be fair.

6  Q    And it's also correct, isn't it, that if it was determined

7  that Mr. Crowley did have a continuing conflict of interest it

8  would not have been your judgment to keep him on?

9  A    That is correct.

10 Q    No matter how good a job he was doing?

11 A    That is correct.

12 Q    And, sir, you also recognize that the ultimate legal

13 issues in this case are to be determined by the Court?

14 A    Yes, that's true.

15 Q    And notwithstanding what I truly believe your

16 extraordinary legal abilities, you've not tried to adjudicate

17 the legal ability -- the legal issue, rather, of whether Mr.

18 Crowley has a continuing conflict.

19 A    Not the sense of a judge deciding something, but on the

20 factual basis I did attempt to ascertain that, yes.

21 Q    Well, would it be fair to say, sir, that you've not made

22 it a principal focus of your efforts as Trustee to investigate

23 the conflict issues that have been raised?

24 A    Well, I don't think it's the principal focus.  I thought I

25 did that right at the beginning, and it was continuing.  I

Crowley - Direct                                74

1  monthly report.

2  Q    And have you done that?

3  A    Yes, I prepared the weekly report in accordance with his

4  instructions.

5  Q    At your initial meeting with Judge Adams, what

6  conversations, if any, did you have regarding Cerberus?

7  A    Judge Adams discussed Judge Walrath's opinion with me.  He

8  asked me directly about my relationship with Cerberus.  He

9  asked me if I was receiving any compensation from Cerberus in

10 2002.  He asked me what work I was doing for Cerberus.  We

11 discussed the current activities that I had with Cerberus, and

12 he instructed me as to what circumstances and conditions in

13 which he would grant permission for me to do those projects for

14 Cerberus.

15 Q    What instructions were those?

16 A    Judge Adams was very specific in that he said I'm not to

17 be paid anything by Cerberus for work done in 2002. I agreed to

18 that.  Judge Adams was very specific in saying that any work

19 that I did for Cerberus in 2002 could not be involved in any

20 way with the business or relationships of Coram.  I said

21 absolutely, I had no problem with that.

22      Judge Adams was very specific that the work, if any, that

23 I would do for Cerberus could not detract from the activities

24 and focus that I had to provide to Coram, and I agreed to that.

25           MR. KIPNES:  Your Honor, may I hand the witness

Adams - Direct                                    19

1  all during that period.

2      And I think that's been true all during the period Mr.

3  Crowley has been there, but that has not been my concern.  My

4  concern was primarily while I was in charge.

5  Q    Have you formed a view as to what the consequences of Mr.

6  Crowley no longer being with the -- Coram might be?

7  A    I have.

8  Q    And what is that view?

9  A    I think it would de-stabilize the business, it would cause

10  the executives to begin worrying about their situation and

11  maybe depart for other more secure situations.  It would cause

12  the suppliers to begin worrying about having their bills paid,

13  it would cause some of the important customers to feel a good

14  deal of uncertainty.

15      When you make a change at the very top of the corporation,

16  it has a tendency to de-stabilize unless there is a very, very

17  good reason, such as heart attack or another job or promotion.

18  But if you suddenly remove the CEO it causes a lot of

19  consternation.

20  Q    Have you consulted with processionals in developing that

21  opinion?

22  A    I have.

23  Q    And who have you talked to or consulted with?

24  A    Well, I talked to the -- to gentlemen whose names you have

25  just mentioned on a number of occasions.

Saracco - Redirect                               135

1  trust and faith.  So, the folks who sent you those patients

2  stop referring, and your staff gets concerned, and there's a

3  very high demand for nurses and pharmacists in hospitals and in

4  this kind of business.  They have no problem making a move very

5  quickly onto a new entity or new organization that's not going

6  through a bunch of strife or new changes or problems.

7          So, personally, without asking them, I don't need to

8  ask them.  I've watched our turnover rate escalate and decline

9  based upon the longevity and the leadership and direction of

10 the CEO or leader of a company.

11         People have had a lot of change.  If you do it again,

12 or if it occurs again, you will lose people.  Can I tell you

13 who and how many?  No, I don't need to.  I can tell you about

14 turnover rates and what happens when management changes.

15 BY MR. BARKASY:

16 Q    Mr. Saracco, do you have any understanding as to whether

17 the Chapter 11 Trustee reviews the terms and conditions of your

18 employment, such as your compensation?

19 A    I understand that since we have had a Trustee come in,

20 that it is his responsibility for the changes or payments that

21 are -- that are made to us.  I also understand that if any

22 changes in employment were to be made he would have to approve

23 that.

24 Q    Thank you, Mr. Saracco.

25         THE COURT:  All right, thank you.  Thank you, you may

Meyer - Direct                              136

1  step down.

2        THE WITNESS:  Thank you, Your Honor.

3        MR. BARKASY:  Your Honor, for his next witness, the

4  Trustee will call Deborah Meyer.

5        THE COURT:  Just for planning purposes, how many

6  other witnesses does the Trustee have?

7        MR. BARKASY:  We have three witnesses, Ms. Meyer, Mr.

8  Ponzio, who will be about ten minutes on direct, each, and Mr.

9  Victor, who will not be much longer than that.

10       THE COURT:  And the Equity Committee?

11       MR. LEVY:  No one.

12       THE COURT:  All right, thank you.  You may step

13 forward and please remain standing so you can be sworn in.

14       COURT CLERK:  Place your hand on the Bible.  Please

15 state your full name and spell your last.

16       THE WITNESS:  Deborah Marie Meyer, M-e-y-e-r.

17             DEBORAH MEYER, TRUSTEE'S WITNESS, SWORN

18       COURT CLERK:  Please be seated.

19                    DIRECT EXAMINATION

20 BY MR. BARKASY:

21 Q    Good afternoon, Ms. Meyer.  You work for Coram, correct?

22 A    Yes.

23 Q    What do you do for Coram?

24 A    I'm the senior vice president of field sales.

25 Q    And what are your duties as senior vice president of field

Meyer - Direct                137

1  sales?

2  A    To provide strategic leadership to the sales force and to

3  have strategic planning to grow top line.

4  Q    Where's your office?

5  A    Denver, Colorado.

6  Q    Even though your office is in Denver, do you travel at all

7  as part of your job?

8  A    At least fifty percent of the time I travel.

9  Q    And what is it you do when you travel?

10  A    Several things.  I see customers, I will meet with

11  individual branches and do sales office meetings.  I will do

12  strategic planning with individual regions.

13  Q    To whom do you report on a day-to-day basis?

14  A    Dan Crowley.

15  Q    How long have you been with Coram?

16  A    Well, actually in 1988 I started with a company called

17  Caravan Medical Systems and started as a infusion nurse.  I

18  went out in the field seeing patients, and then five years

19  later Caravan Medical Systems was part of the consolidation

20  that was created in the forming of Coram Healthcare.

21  Q    When did you become senior vice president of field sales?

22  A    August 1st, 2000.

23  Q    What position did you have before that?

24  A    Area vice president of sales.

25  Q    Was it Mr. Crowley that promoted you?

Meyer - Direct                                138

1  A    Yes.

2  Q    And is that the position that you had when Mr. Crowley

3  became CEO in November of 1999?

4  A    Area vice president?

5  Q    Yes.

6  A    Yes.

7  Q    How did the company change after Mr. Crowley became CEO?

8  A    Well, when Mr. Crowley became CEO there was a fairly quick

9  change, I would say, in vision or clear vision for the company.

10     Pretty immediately we had a meeting, and it was very clear

11  at that point that Dan felt that there was a clear, concise way

12  to be able to create a healthier Coram, and it still stands

13  today.  It's grow the top line, cut costs, wear it out, do

14  without and collect the cash.  And that's really the focus that

15  we have from a financial standpoint for the company at the

16  beginning, and that still holds true for today as well.

17  Q    How have sales been under Mr. Crowley's tenure as CEO?

18  A    Well, preliminary for February we've just completed the

19  eighteenth month of top-line growth, month over month.  So, we

20  have had solid growth for the last eighteen months.

21  Q    Ms. Meyer, what is it like to work with Dan Crowley on a

22  day-to-day basis?

23  A    Intense.  He's -- he expects a lot from you.  Working with

24  him and for him, he expects a lot of himself, but in working

25  for Dan Crowley you have to be very committed.  You have to

Meyer - Direct                                          139

1  understand what you do, and you have to do it well.

2  Q    How closely does Mr. Crowley work with you to track sales?

3  A    I talk to him pretty much on a daily basis.  The routine

4  is I call him in the morning once I get the sales, and we

5  basically -- we talk about the daily sales, but we basically

6  start with the northeast and work our way over to California.

7  So, we go region by region as far as how they're doing, where

8  they are to budget, any opportunities, anything that'll get in

9  the way of making their budget for the month.

10 Q    And you do that every day?

11 A    I would say mostly every day.  Four out of five days at

12 the last.

13 Q    Have you given any thought to what might happen if Dan

14 Crowley's employment was terminated?

15 A    I have, because I think off and on throughout the

16 reorganization there's been rumors that have come and gone, so

17 I have given it thought.  And I would be concerned, just

18 because I've been here for so long, and I think the stability

19 and the trust that people have -- when I say the people, I mean

20 the employees of Coram.  The trust that they have and the

21 confidence they have in Dan's leadership and the confidence

22 they have in Coram today is the strongest that I have seen it,

23 and I would be worried that that would change.

24 Q    Would Mr. Crowley's departure have any impact on your

25 thoughts about your own career plans?

Meyer - Direct                                          140

1  A    I guess I would go back to your last question.  I would be

2  concerned of what Coram would look like.  And I would be

3  concerned about the opportunity that would give our competitors

4  on the field.

5  Q    You are aware that a Chapter 11 Trustee's been appointed

6  in this bankruptcy case?

7  A    Yes.

8  Q    And you know that trustee is Judge Adams?

9  A    Yes.

10 Q    Have you met Judge Adams?

11 A    Yes, I have.

12 Q    And in what context?

13 A    Three different occasions.  He has been in Denver at

14 senior management meetings, and I've had the opportunity to do

15 a presentation in reference to field sales to Judge Adams.

16 Q    What happens at those management meetings, other than your

17 presentation?

18 A    Judge Adams has given a book which encompasses the whole

19 presentation.  Dan Crowley starts off the presentation with an

20 overview of the company.  I think on the initial meeting he did

21 a history of the company, and then talked about the financial

22 situation we were in with each of the meetings.  Then each of

23 us with our individual departments, individual

24 responsibilities, would go over the initiatives.  A little bit

25 different at every meeting, but we would go over the

# EXHIBIT C-7

1

1

2      IN THE UNITED STATES BANKRUPTCY COURT

3      FOR THE DISTRICT OF DELAWARE

4      ------------------------x Chapter 11

5      In re:                    ) Case Nos. 00-3299 (MFW)

6      CORAM HEALTHCARE CORP.    ) through 00-3300 (MFW)

7      and CORAM, INC.,          ) (Jointly Administered

8                     Debtors. ) Under Case No.

9      ------------------------x 00-3299 (MFW))

10                     February 27, 2003

11                     9:38 a.m.

12

13          Deposition of DANIEL D. CROWLEY, held at

14     the law offices of Weil, Gotshal & Manges LLP, 767

15     Fifth Avenue, New York, New York, pursuant to

16     notice and agreement, before Donald R. DePew, an

17     RPR, CRR and Notary Public within and for the

18     State of New York.

19

20

21

22

23

24

25

6

1
2    follows:
3    EXAMINATION BY
4    MR. LEVY:
5        Q.  Mr. Crowley --
6        MR. MILLER: Richard, point of order,
7    please.
8        MR. LEVY: Yes, sir.
9        MR. MILLER: You said you didn't know
10   if Don Liebentritt was the chairman.  I
11   recall you telling the Court he was the
12   chairman of the committee; has there been a
13   change?
14       I'd just like to know who the client
15   is.
16       MR. LEVY: I don't know that he is the
17   chairman and your statement doesn't refresh
18   my recollection.  I'll be happy to straighten
19   out with you whether he is the chairman or
20   not, Alan. I'm not trying to keep it from
21   you.  I just don't know at this point.
22       MR. MILLER: I know you wouldn't try to
23   hide anything, so thank you.
24       MR. LEVY: You're welcome.
25   BY MR. LEVY:

7

1                    Crowley
2        Q.  Mr. Crowley, did you spend some time
3    preparing for this deposition?
4        A.  Yes.
5        Q.  Was any of that time spent with any
6    person present, other than your attorney,
7    Mr. Ward, or your attorney, Mr. Schreiber?
8        A.  Yes.
9        Q.  Who?
10       A.  Counsel for the trustee.
11       Q.  Who?
12       A.  Principally, Mr. Kipnes.
13       Q.  How much time did you spend with
14   Mr. Kipnes preparing for this deposition?
15       A.  A couple of hours.
16       Q.  When?
17       A.  Yesterday.
18       Q.  Yesterday?
19       A.  Yes.
20       Q.  During the course of that preparation
21   did you look at any documents?
22       A.  Yes.
23       Q.  What documents did you look at?
24       MR. GODNICK: Objection.
25       MR. MILLER: The same stipulation?

8

1                    Crowley
2        MR. LEVY: Yes, objection by one is an
3    objection but for all.
4        Q.  What documents did you look at?
5        A.  The materials that had been provided by
6    me to respond to the subpoena by yourself.
7        Q.  About how many documents were those?
8        A.  Several.
9        Q.  Hundred?
10       A.  I don't recall.
11       Q.  Sir, we've got, I believe, 1300
12   numbered pages with the Bates symbol CRX on it,
13   meaning it had been produced by you, is that the
14   approximate number you looked at yesterday?
15       A.  No.
16       Q.  About what part of that 1300 did you
17   look at?
18       A.  25, 50, something in that neighborhood.
19       Q.  This was yesterday, right, yes?
20       A.  Yes.
21       Q.  Can you describe to me any of the
22   documents you looked at?
23       Name one.
24       A.  Correspondence between myself and my
25   attorney as to a draft letter that was part of

9

1                    Crowley
2    your brief to the court.
3        Q.  The letter dated May 6th about?
4        A.  About that date.
5        It was two versions of the letter that
6    was one letter, yes.
7        Q.  During your meeting in preparation in
8    which Mr. Kipnes was present at who said let's
9    discuss this document?
10       Whose idea was it?
11       A.  My counsel.
12       MR. WARD: Objection.
13       The attorneys have a joint interest in
14   this and I think that is covered by
15   privilege.
16       Q.  I'm sorry.
17       A.  I don't understand the procedure when
18   someone objects, am I just --
19       MR. WARD: I think who said what to
20   whom in this meeting would be privileged.
21       Mr. Kipnes represents the trustee.
22   Mr. Crowley is an employee of the trustee.
23   And I think in this particular proceeding
24   there is a joint interest.
25       MR. LEVY: Are you going to instruct

3 (Pages 6 to 9)

94

Crowley

1
2    A.  I don't know.  I might have.
3    Q.  Do you have any recollection of it at
4    all?
5    A.  I just said I don't know.
6    Q.  Did you tell Feinberg at this
7    meeting -- perhaps this will refresh your
8    recollection -- that David Friedman, who, of
9    course, was the debtors' attorney, did a poor job?
10   A.  I don't recall.
11        I do think he didn't do as good a job
12   as he could have.
13   Q.  Do you think he did a poor job?
14   A.  He did a lousy job.
15   Q.  Did he ask you to recite some things on
16   the witness stand?
17   A.  Mr. Levy, you're mischaracterizing a
18   draft of my --
19   Q.  I'm not mischaracterizing anything.
20        I'm asking did he, David Friedman, ask
21   you to recite anything on the witness stand?
22   A.  No.  He handed me a sheet with
23   questions and with what he thought were my
24   probable answers.  And I gave my answers in court
25   to the best of my ability, the truth and nothing

95

Crowley

1
2    but the truth.
3    Q.  Did the answers that you gave in court
4    vary from the probable answers on the sheet that
5    David Friedman gave you?
6        MR. KIPNES:  Object to the question.
7        MR. WARD:  Objection to the substance
8    of the form.
9        MR. KIPNES:  Also might be privileged.
10       Go ahead.
11   A.  Sure, they were my answers.
12       I'm my own person.  I speak what I
13   think is right.
14   Q.  Did you come away from that meeting in
15   May disappointed?
16       MR. GODNICK:  You're referring to the
17   dinner?
18       MR. LEVY:  The dinner.
19       MR. GODNICK:  Thank you.
20       MR. LEVY:  Let's clear that up.
21   Q.  You didn't have any meeting in May with
22   Feinberg other than that dinner, did you?
23   A.  I don't recall it.
24   Q.  Did you come away disappointed?
25   A.  I came away disappointed, yes.

96

Crowley

1
2    Q.  Why?
3    A.  I think I've already testified to this.
4    Q.  What disappointed you?
5    A.  I believe I've already testified to
6    this.
7    Q.  I don't believe you've answered that
8    question.  You've told me what happened.  I want
9    to know what part of that or anything else you can
10   think of that disappointed you.
11   A.  Mr. Levy, I believe I'm due a
12   substantial money sum from Cerberus for work I
13   did, unrelated to Coram, in which value was
14   created --
15        Would you like me to stop while you're
16   talking?
17        MR. BEATIE:  I think we've heard this
18   six, seven times already.
19   A.  -- I expected a proposal and a number,
20   there was none.  I was disappointed, I don't know
21   why I was asked to come to New York to hear
22   nothing.
23   Q.  Do you recall him saying to you that
24   "you kissed the wrong woman"?
25   A.  Generally.

97

Crowley

1
2    Q.  Did he say that at the May meeting?
3    A.  I don't recall when it was said.
4    Q.  What did you understand that to mean?
5        MR. WARD:  Objection, foundation.
6        How does he know?
7        Go ahead.
8    A.  I don't know anymore.  I just don't
9    know.  It's a long time ago.
10   Q.  Ten months ago, yes?
11       You don't remember?
12   A.  I think you're going to depose him.
13   Ask him.
14       I don't remember.
15   Q.  Do you know what EC 20 is, does that
16   ring a bell at all?
17   A.  Not a clue.
18   Q.  That's the personal -- memorandum of
19   personal and confidential that you sent to
20   Mr. Feinberg.  You signed it, he never signed it.
21   It was mentioned in the judge's opinion.  It
22   related to your getting an upside on Cerberus's
23   position if you did well at Coram generally.
24       Do you recall that?
25       MR. GODNICK:  I'm going to object to

25 (Pages 94 to 97)

98

Crowley

1
2    the characterization of the document.
3        MR. KIPNES: I assume by definition
4    we're talking about a document that's before
5    December 14th of 2001, which is what I --
6        MR. MILLER: 2000, early.
7        MR. KIPNES: -- which is what I thought
8    we were here about.
9        MR. LEVY: I'm simply trying to
10    identify it, because I don't have it here.
11    Q.   Do you recall it at all?
12    A.   I'm sorry, I don't know EC 20 from
13    lunar planetary orbit -- I don't recall what
14    you're talking about.
15    Q.   Do you recall that evening in May with
16    Mr. Feinberg, telling him you didn't have to write
17    a document in which you asked for an upside on
18    Cerberus's position if you did well with Coram?
19    A.   No, I don't remember that.
20    Q.   Trustee's Exhibit 19.
21        MR. KIPNES: 19?
22        MR. LEVY: 19.
23    Q.   There's Bates numbers CRX 63, 4, and 5.
24        And I won't characterize it otherwise
25    for a moment.

99

Crowley

1
2        MR. GODNICK: I can't hear you.
3        MR. LEVY: I said I won't characterize
4    it otherwise for the moment.
5        MR. MILLER: It's a draft letter to...
6    Q.   Do you have that in front of you?
7        MR. WARD: No, not yet.
8        I believe you've got the original.
9    Q.   Have you seen this before today?
10    A.   Yes. Counsel showed it to me in
11    preparation.
12    Q.   Did you write this?
13    A.   I wrote the first two pages.
14    Q.   Did you write the third page?
15    A.   No.
16    Q.   Do you know who wrote the third page?
17        MR. GODNICK: I can't hear you.
18    Q.   Do you know who wrote the third page?
19        MR. GODNICK: I'm sorry, Richard, you
20    asked if he wrote the third page, he said,
21    no?
22        MR. LEVY: That's correct.
23    A.   I wrote the first two pages. It's a
24    draft --
25    Q.   If you can confine yourself, please.

100

Crowley

1
2    A.   Well, you have to put it in context.
3    This is the first draft of two drafts, which
4    you've mischaracterized and basically did not tell
5    the truth to -- in your brief, two drafts of a
6    single letter, unsent. The third attachment was
7    not written by me. I did not see it. And had no
8    awareness of it until this proceeding and counsel
9    showed it to me. And it was written by Scott
10    Schreiber, not me.
11    Q.   Do you know whose handwriting appears
12    for the word "Insert" on CRX 65?
13    A.   It's Mr. Schreiber's handwriting.
14    Q.   Did you discuss this document in your
15    preparation for your deposition yesterday?
16    A.   Yes.
17    Q.   And Mr. Kipnes was present at that
18    discussion?
19    A.   Yes.
20    Q.   What did Mr. Kipnes say about that?
21        MR. WARD: Same objection as
22    previously.
23        MR. KIPNES: Objection to the form of
24    the question.
25        Assumes facts not in evidence.

101

Crowley

1
2        MR. GODNICK: I will make the Federal
3    Rule of Evidence 612 objection.
4        MR. LEVY: Are you going to instruct
5    him?
6        MR. WARD: As long as it is discussions
7    with counsel for the trustee for whom he is
8    an employee, and the counsel for the trustee
9    and counsel for him previously have interest,
10    it is privileged.
11        MR. LEVY: Will you join in the
12    instruction?
13        MR. KIPNES: I do, subject also to my
14    objection that the question assumed a fact
15    not in evidence.
16    Q.   During the preparation did Mr. Kipnes
17    say anything at all about this document?
18        I'm not asking you what he said. I
19    just want to know whether he said anything at all
20    about it.
21        MR. WARD: I'll let the witness answer
22    to the extent, yes or no, was there any
23    discussion with Mr. Kipnes as to the
24    document.
25        MR. KIPNES: Whoa, that's not what the

26 (Pages 98 to 101)

102

Crowley

1
2  question was.
3      MR. LEVY: I adopt the question.
4  Withdraw my question and I adopt Mr. Ward's
5  question.
6      MR. GODNICK: I need to know.
7      MR. KIPNES: Now we need Mr. Ward's
8  question.
9      MR. MILLER: Stop it, will you guys?
10  We're wasting a lot of time.
11     MR. KIPNES: I wasn't fencing.
12     The first question was did Mr. Kipnes
13  say anything. Then what Mr. Ward said was
14  there a discussion at which Mr. Kipnes was
15  present. Those are two very different
16  questions, which question are we asking.
17     MR. LEVY: I thought I was clear, we're
18  asking Mr. Ward's question first.
19     MR. GODNICK: Can you state the
20  question, because I believe you're the
21  questioner, Mr. Levy.
22     Q.  During your preparation was there a
23  discussion of this document at which Mr. Kipnes
24  was present?
25     A.  Yes.

103

Crowley

1
2      Q.  Did Mr. Kipnes say anything -- and you
3  don't have to tell me what he said -- just did
4  Mr. Kipnes say anything about this document?
5      A.  I don't recall that.
6      Q.  Was this document --
7      You know, we've been talking about it
8  being written by you, did you dictate it, did you
9  type it, did you handwrite it and have it
10  transcribed?
11     How did it come into being?
12     MR. GODNICK: We're referring now to
13  the first two pages, correct?
14     MR. LEVY: Sure.
15     A.  Again, this is -- you've only shown me
16  one document. This is draft one of two drafts.
17     MR. LEVY: Let me be clear. I'm
18  talking about only pages CRX 63 and 64.
19     A.  I understand.
20     Q.  My question is physically how did it
21  come into being, did you type it, did you dictate
22  it, did you handwrite it and have someone else
23  type it?
24     A.  I will answer that.
25     I also know you take things out of

104

Crowley

1
2  context, you do sound bites, and mischaracterize.
3      This is an unsigned draft, one of a
4  couple of -- the next letter is the same letter.
5  And you've handed me three pages. The third page
6  is -- I did not see it until this proceeding,
7  written by not me, but my attorney.
8      This letter was typed by me, period.
9      Q.  "This letter" now meaning 63 and 64?
10     A.  CRX 00063 and CRX 00064 was a draft
11  typed by me. I thought it was attorney-client
12  privilege, because I sent it only to my lawyer,
13  Scott Schreiber, and I've never seen it again.
14     Q.  Did you write it?
15     Did you type it on or about May 6th?
16     A.  I must have. I don't know.
17     Q.  Your meeting was on May 1st; is that
18  correct?
19     A.  I don't know. On and about there.
20     Q.  Between May 1st and May 6th did you
21  make any notes, write anything --
22     A.  No.
23     I'm sorry.
24     Q.  -- concerning the meeting?
25     A.  No.

105

Crowley

1
2      Q.  So five days after the meeting you sat
3  down and you typed -- it's called "draft" -- your
4  first draft or a draft of a letter to Feinberg,
5  right?
6      MR. GODNICK: Is there a basis for
7      assuming it's on May 1st?
8      I haven't heard testimony as to
9  May 1st.
10     MR. LEVY: Yes, there is. I was trying
11  to save time. I'll represent to you based on
12  e-mails that Mike was a party to, in fact.
13     A.  Mr. Levy, you said "called "draft,""
14  that's not what this is. It is a draft. It is
15  one of two drafts. You have both of them. It is
16  not called "draft," it is a draft, I typed it. I
17  didn't have any notes. And I sent it to my
18  attorney.
19     Q.  There's what looks like a rubber stamp
20  impression on the top that says "Draft" on both
21  pages.
22     A.  Right.
23     Q.  Do you see that?
24     A.  That would be the "Draft" stamp.
25     Q.  Who put it on?

27 (Pages 102 to 105)

# EXHIBIT C-8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

# Certified Copy

Case No. 04-1565

--------------------------------------------------------

VIDEO DEPOSITION OF SCOTT R. DANITZ
April 6, 2007

--------------------------------------------------------

ARLIN M. ADAMS, Chapter 11 Trustee of the
Post-Confirmation Bankruptcy of Estates of Coram
HEALTHCARE CORPORATION, and of CORAM, INC., a
Delaware corporation,
Plaintiffs,

vs.

DANIEL D. CROWLEY, DONALD J. AMARAL, WILLIAM J.
CASEY, L. PETER SMITH, and SANDRA L. SMOLEY,

Defendants.

--------------------------------------------------------

APPEARANCES:

        SCHNADER HARRISON SEGAL & LEWIS, LLP
            By Barry E. Bressler, Esq.
                1600 Market Street, Suite 3600
                Philadelphia, Pennsylvania  19103-7286
                215-751-2050
                bbressler@schnader.com
                    Appearing on behalf of Plaintiffs.

        KEKER & VAN NEST, LLP
            By Laurie Carr Mims, Esq.
                710 Sansome Street
                San Francisco, California  94111-1704
                415-391-5400
                lmims@kvn.com
                    Appearing on behalf of Defendant
                    Daniel D. Crowley.

        Also Present:  Carie Finegan, Videographer

fiscal year 2000.

        MR. BRESSLER:    I understand.

    Q      (By Mr. Bressler)    If the -- if the
threshold in 2001 was still $14 million, it would
have been exceeded in six months, wouldn't it have?

    A      At that point in time, if that was the
measurement date, yes.

    Q      Various people are shown as getting copies
of this report.    Let's go through them.    My name is
first?

    A      Yes.

    Q      And what did you understand my function to
be?

    A      You were chief counsel, lead counsel for
Judge Adams.

    Q      In the bankruptcy?

    A      In the bankruptcy, yes.

    Q      Next name is Joseph Devine.    Do you know
who Mr. Devine is?

    A      Yes, he's a partner colleague in your firm
and handled SEC work for Judge Adams in working with
myself and other employees in the company in our SEC
filings.

    Q      Are you also aware that Mr. Devine was
also involved in the KERP program and other business

# EXHIBIT C-9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Certified Copy

Case No. 04-1565

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEO DEPOSITION OF ALLEN J. MARABITO
April 5, 2007

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ARLIN M. ADAMS, Chapter 11 Trustee of the
Post-Confirmation Bankruptcy of Estates of Coram
HEALTHCARE CORPORATION, and of CORAM, INC., a
Delaware corporation,
Plaintiffs,

vs.

DANIEL D. CROWLEY, DONALD J. AMARAL, WILLIAM J.
CASEY, L. PETER SMITH, and SANDRA L. SMOLEY,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:

    SCHNADER HARRISON SEGAL & LEWIS, LLP
        By Barry E. Bressler, Esq.
            1600 Market Street, Suite 3600
            Philadelphia, Pennsylvania  19103-7286
            215-751-2050
            bbressler@schnader.com
                Appearing on behalf of Plaintiffs.

    KEKER & VAN NEST, LLP
        By Laurie Carr Mims, Esq.
            710 Sansome Street
            San Francisco, California  94111-1704
            415-391-5400
            lmims@kvn.com
                Appearing on behalf of Defendant
                Daniel D. Crowley.

    Also Present:  Carie Finegan, Videographer

Marabito, Allen J.                                4/5/2007

with SEC issues.  So Joe Devine was a corporate

practice attorney.

Q    Can you describe the procedure by which

KERP or other incentive compensation plans were

handled after Mr. Crowley left the company?

A    I think when -- when Judge Adams came in

as trustee, one of the initial topics was how do you

keep the employees as employees, and your office

came up with a concept that was then permitted under

the bankruptcy code, management incentives to stay

and perform, and then we were asked as the

management side, myself and senior HR officer

principally what was the existing compensation

arrangements, what were recommended compensation

arrangements, and that information was in turn

provided to Joe Devine, your firm and the trustee to

crunch.

Q    And there was some back and forth between

you and Mr. Devine and the trustee, I take it?

A    Yes.

Q    Would it be fair to say that the trustee

has a reputation for frugality?

A    Yes.  Yes, he's -- he's frugal and he

comes from an era that was by necessity frugal.

Q    And then once a decision was reached or a

1  consensus between the trustee, Mr. Devine, you and

2  Mr. Ponzio, right, I think is the senior HR person?

3      A    Yes.

4      Q    Counsel for the trustee prepared a motion

5  to approve such KERPs that went to the court?

6      A    Yes.

7      Q    And do you know who prepared and presented

8  those motions to the court?

9      A    That would have been Mr. Devine and Judge

10 Adams.

11     Q    And do you know who the lawyers were who

12 drafted the motion and filed it with the court?

13     A    Not all of them, but I know Joe Devine had

14 signature power on all of the instruments.

15     Q    And in respect to those KERPs, my function

16 was to be the court -- the trustee's bankruptcy

17 lawyer?

18     A    Yeah, I think you were the bankruptcy

19 lawyer.  I -- I wouldn't look to Joe for bankruptcy

20 advice.

21     Q    Could you tell us who Will Kipnes is?

22     A    Will Kipnes is an attorney in your firm

23 that was present at confirmation hearings,

24 depositions, and has a litigation practice.

25     Q    By the way, now that we've reviewed the