# In The Matter Of:

*Coram Healthcare Corp.*

---

*Hearing*
*December 21, 2000*
*C.A. # 99-2889 (MFW)*

---

*Wilcox & Fetzer, Ltd.*
*Registered Professional Reporters*
*1330 King Street*
*Wilmington, DE  U.S.A.  19801*
*(302) 655-0477*

*Original File CR12-21.KW, 91 Pages*
*Min-U-Script® File ID: 2267155769*

## Word Index included with this Min-U-Script®

#524

Page 21

[1] management that they hoped to achieve, and Mr. Danitz
[2] words were, "if everything goes right."

[3] Now, in May, at the request of Chanin, a
[4] long-term business plan and forecast was presented to
[5] Chanin so they could undertake a valuation. Lo and
[6] behold, the EBITDA target under the new business plan for
[7] the year 2000 was projected to be $35 million, the exact
[8] same number as was presented in the stretch budget.

[9] Now, Your Honor, if management had any
[10] desire to artificially depress the value of Coram in
[11] order to deliver it to its creditors instead of its
[12] shareholders, why in the world would they present a
[13] business plan to Chanin that reflects a stretch budget, a
[14] budget that exists only if everything goes right and a
[15] budget that we have seen since then the company has
[16] missed by some 20 percent. If this management has erred
[17] at all in connection with the valuation process, it did
[18] so only by giving the equity every benefit of the doubt.

[19] Your Honor, you have authored, perhaps, the
[20] seminal opinion on good faith in the Zenith Electronics
[21] case. As Your Honor knows, good faith is generally
[22] described, and I'm paraphrasing this to some extent, but
[23] it's a legitimate, honest purpose to resuscitate a
[24] financially troubled company.

Page 22

[1] I don't think there can be any serious
[2] question about this plan's good faith. The evidence is
[3] unrebutted that Coram does not have enough cash flow to
[4] pay interest on its debt together with capital
[5] expenditures and other ordinary and necessary business
[6] expenses. That's simply unrebutted. There isn't enough
[7] money there to cover all the obligations.

[8] The evidence is unrebutted: Coram's debt
[9] comes due in four months. One quarter of a billion
[10] dollars matures in four months, and it cannot be repaid
[11] and it cannot be refinanced. Chanin's debt capacity
[12] analysis was completely unchallenged in this record.
[13] Their analysis was that Coram cannot support any more
[14] debt than is currently provided for in this plan of
[15] reorganization.

[16] Mr. Lynn, although he had not done a debt
[17] capacity analysis, conceded that Coram would not be
[18] appealing to a new lender if it tried to refinance the
[19] debt.

[20] Finally, the evidence is unrebutted that
[21] Coram will be noncomplying with Stark II if confirmation
[22] and consummation do not occur within ten days. I think,
[23] as Mr. Crowley testified, if there is not compliance, his
[24] quote was: "I think it's the end of Coram. Period."

Page 23

[1] So I don't think that anyone would suggest
[2] that Coram is not facing life-threatening problems. The
[3] record is clear that the plan effectively resolves those
[4] problems. So I think the record on good faith is
[5] overwhelming.

[6] There is not a scintilla of evidence which
[7] rebuts the final comment of Mr. Crowley in his direct
[8] testimony which he said "which was an earnest effort by
[9] independent citizens who thought this was the best we
[10] could do to save this company. It was a very
[11] well-considered and thought out, much discussed,
[12] unanimously voted for, well advised. We did the best we
[13] know how. I don't think there is any evidence in the
[14] record to the contrary."

[15] Now, Mr. Levy has gone to enormous lengths
[16] to prove that to which there is no dispute: that Dan
[17] Crowley has a separate business relationship with
[18] Cerberus Capital whose principal, Steve Feinberg, is a
[19] former director of Coram. It has been fully disclosed in
[20] public documents and it is fully disclosed in the
[21] disclosure statement. It is stipulated.

[22] Mr. Levy has established that Mr. Crowley
[23] is an enormously successful executive with high
[24] compensation requirements. That's stipulated.

Page 24

[1] He has established that Mr. Crowley went to
[2] the board of directors and asked to change his
[3] compensation in February, even though he already had a
[4] contract, because he felt that the task was larger than
[5] he originally anticipated. Agreed. It is stipulated.

[6] I'm not sure how these points relate to the
[7] good faith of the plan. I don't think they do.

[8] What Mr. Levy has argued but has utterly
[9] failed to prove is that Cerberus, through Mr. Crowley or
[10] Mr. Feinberg or some combination of the two of them,
[11] dominated the board, controlled the company, and most
[12] importantly, caused Coram to act in derogation of its
[13] duties to stockholders.

[14] In his opening statement Mr. Levy said that
[15] was what he was going to prove. He was going to prove
[16] that the noteholders dominated the board and caused Coram
[17] to act in derogation of its duties. There is no evidence
[18] in this record to support any of them.

[19] Your Honor, I don't think I could say it
[20] better than Your Honor did in the Zenith case.

[21] Your Honor stated: "Other than conclusory statements of
[22] the multiplicity of relationships between LGE and Zenith
[23] and how LGE dominated the company, there is little
[24] support offered for the Equity Committee's premise."

Case 1:04-cv-01565-SLR    Document 149-3    Filed 05/15/2007    Page 3 of 39

Hearing
Coram Healthcare Corp.                C.A. # 99-2889 (MFW)                December 21, 2000

Page 25

[1] Your Honor, those words apply with equal
[2] force here. Your Honor, in Zenith, as Your Honor knows,
[3] LGE Electronics was a 57 percent stockholder of the
[4] debtor. It could but didn't control the board.
[5] Here Cerberus or the noteholders couldn't
[6] control Coram even if they wanted to. The evidence is
[7] clear that they didn't. Mr. Crowley's loyalties were
[8] challenged on the witness stand. I don't think anything
[9] was introduced that rebuts his basic statement which he
[10] stated: "I am my own man. I'm no sycophant for Cerberus
[11] or anybody. I don't have any special allegiance to
[12] Cerberus, Steve Feinberg, or anybody. My position at
[13] Coram is to do the best that I know for all of the
[14] stakeholders of Coram. Your Honor, that is what I have
[15] tried to do."
[16] I don't think there is any evidence in this
[17] record to the contrary. It is telling that Mr. Levy
[18] devoted almost his entire cross-examination to the period
[19] between September and November of 1999, more than a year
[20] ago, a time frame that preceded Mr. Crowley's employment
[21] by Coram.
[22] It is duly stipulated again that
[23] Mr. Crowley became the chairman and CEO of Coram. His
[24] position was unclear. His role was unclear. He went

Page 26

[1] looking for money in all different places. He asked for
[2] more money than he was able to get from Coram. He asked
[3] for money from Cerberus. He certainly explored every
[4] opportunity to profit from this relationship.
[5] But at the end of the day, the debtors,
[6] Coram, were not willing to allow him to be paid from
[7] Cerberus. Cerberus was not willing to allow him to be
[8] paid from Cerberus. At the end of the day, as his
[9] employment with Coram was reduced to a contract, and look
[10] at his contract to Coram, you look at his contract with
[11] Cerberus, you see the roles are clearly defined.
[12] Cerberus does not pay Mr. Crowley for any work which
[13] Mr. Crowley does to Coram that is in the documents.
[14] There is no evidence to the contrary.
[15] Virtually nothing was asked of Mr. Crowley
[16] about how the plan came to be, which I think is the only
[17] relevant issue in connection with the confirmation
[18] hearing. Mr. Levy would like you to infer that because
[19] Mr. Crowley was an employee of Cerberus, that the plan
[20] must be infirm. There must be something wrong with the
[21] plan when an officer of the company has a business
[22] relationship with Cerberus.
[23] This is not a case for res ipsa loquitur.
[24] This is not an airplane falling out of the sky. This is

Page 27

[1] a case that if you want to show that there was an
[2] improper conduct taken, improper relationship, you have
[3] to prove it.
[4] There is no evidence in the record,
[5] Your Honor, that any action was taken in derogation of
[6] any duties to stockholders, creditors, or anyone else.
[7] I think the evidence is clear —
[8] THE COURT: Well, what about the payment of
[9] the cash interest rather than PIC?
[10] MR. FRIEDMAN: Your Honor, it's a very good
[11] question, and I think the answer is quite clear on the
[12] record. I think it is helpful to look at the Amaral
[13] deposition, as well.
[14] This company had been trying since 1998 to
[15] restructure the debt. There were special committees
[16] appointed in 1999. There were discussions back in 1998
[17] when Mr. Amaral was trying. There has never been any
[18] success by this company in being able to restructure its
[19] debt. Mr. Crowley made a judgment call.
[20] Number 1, I think he testified that it
[21] didn't make any sense to continue to have the debt of
[22] this company expand which would have been resulted — the
[23] paying of the cash was simply — if he didn't pay the
[24] cash, the debt would have expanded by the amount of the

Page 28

[1] nonpayment.
[2] THE COURT: So what? It was being
[3] restructured, anyway. Do you know of any debtors'
[4] counsel who has recommended to the debtor to pay
[5] creditors in cash when they don't have to shortly before
[6] bankruptcy is filed?
[7] MR. FRIEDMAN: Yes. I'll tell you why.
[8] Because you're asking these creditors to buy into
[9] ownership of the company at a valuation which is a lot
[10] less than they are owed. When they become the owners of
[11] this company, when they become the owners of this
[12] company, every other —
[13] THE COURT: The alternative, they have two
[14] choices. One, I'll give them the keys today, or the
[15] other is they buy into a restructuring, where, by the
[16] way, no matter what amount of debt you call them, since
[17] you are giving them 100 percent of the equity, they get
[18] it all, anyway. They are getting the keys no matter
[19] what.
[20] MR. FRIEDMAN: Well, Your Honor, nobody
[21] wants to give the keys to the Creditors' Committee.
[22] THE COURT: The creditors don't want the
[23] keys.
[24] MR. FRIEDMAN: Your Honor, I don't think

Page 45

[1]  But, Your Honor, the whole point of all of
[2]  this, I think if you look at the letters that were
[3]  prepared by counsel that somehow that got into the
[4]  record, that's basically what everybody said. Let's not
[5]  make this about people. Let's not make this about
[6]  agendas or conflicts. Let's find out what the company is
[7]  worth. Once we find out what the company is worth, the
[8]  allocations will flow from it. Then if people feel that
[9]  the valuation is wrong, they'll have every opportunity to
[10]  convince the Court that they are wrong.
[11]  That was my advice. My advice was when you
[12]  find out what it's worth, you know who has standing to
[13]  appear and who doesn't.
[14]  Then take it one step better. When you go
[15]  through a bankruptcy proceeding, people that don't agree
[16]  with the valuation have every opportunity to come in and
[17]  argue that the valuation is wrong. Then if the Court
[18]  disagrees with the valuation, then the plan never gets
[19]  confirmed.
[20]  So, I think, Your Honor we are relying
[21]  frankly upon the fail-safe notion that through a
[22]  bankruptcy, one of two things would happen: either a
[23]  Court would agree that the equityholders were out of the
money and conclude that they can't complain about how

Page 46

[1]  this process unfolded, or Your Honor would conclude or
[2]  someone else would conclude that they are in the money,
[3]  in which case the plan wouldn't be confirmed as filed and
[4]  there would be no argument that they would get their
[5]  economic entitlement. I think that that's the way this
[6]  was structured.
[7]  You can't fault a company. I mean, what
[8]  happened here was the company was in particularly
[9]  difficult circumstances. There is no question about
[10]  that. Mr. Feinberg basically told the company, here is a
[11]  guy you may want to hire. He's a great guy. Hire him.
[12]  And they hired him. I mean, I don't think that that
[13]  ought to be discouraged or — you know, I don't
[14]  understand the crime in that.
[15]  THE COURT: Well, should I encourage the
[16]  failure of disclosure to the debtor? Should I encourage
[17]  that type of activity? Again, where on the scale can
[18]  they not disclose?
[19]  MR. FRIEDMAN: Your Honor, the board
[20]  consisted of sophisticated real people. They were told
that Mr. Crowley had an arrangement with Cerberus.
[22]  Here is their thinking. Their thinking is
[23]  whatever he is making from Cerberus, God bless him, we
[24]  don't care. If he can come in and turn around this

Page 47

[1]  company, it doesn't matter to us what he is doing
[2]  elsewhere. He is not a full-time employee of Coram. We
[3]  are not asking him to be a full-time employee of Coram.
[4]  We are not demanding that he do anything other than get
[5]  us the results. If he can save this company and get us
[6]  the results, God bless him. It's not our business. We
[7]  are not going to interfere.
[8]  That is not irrational thinking. This
[9]  company was on the verge of liquidation. It lost
[10]  $120 million last year. It's not irrational for a board
[11]  to say, look, come help us, save us, and whatever you are
[12]  doing elsewhere, it's your business. That's the way it
[13]  was treated.
[14]  It wasn't nondisclosure. It wasn't someone
[15]  said I'm not going to tell you. No one asked. It just
[16]  didn't come up. Maybe it should have come up. This is a
[17]  company that was going down the drain.
[18]  THE COURT: Well, you are asking for
[19]  releases from the officers and directors. You are asking
[20]  me to say they acted completely reasonably in their
[21]  actions.
[22]  MR. FRIEDMAN: No, we are not. Well, we
[23]  are only asking Your Honor two things.
[24]  Number 1, we are asking for exculpation,

Page 48

[1]  not really releases in connection with the plan process.
[2]  Your Honor, I mean, we'll drop it certainly if that's
[3]  what it takes to get the plan confirmed. That's
[4]  something which I think Your Honor knows is typical in
[5]  most bankruptcy cases.
[6]  But this is not about protecting anybody,
[7]  protecting any officers or directors, and it's not about
[8]  doing anything other than allowing the value of this
[9]  company to be distributed in accordance with the
[10]  priorities under the Code.
[11]  If Your Honor doesn't agree that the
[12]  company is insolvent, please don't confirm the plan. We
[13]  will try something else. I don't know what we will do.
[14]  We will try something else.
[15]  If the company is insolvent, Your Honor,
[16]  please let this company survive. Let the plan get
[17]  confirmed. If there are issues about individuals, about
[18]  their compensation, about whether they ought to be
[19]  exonerated or not, we will leave that for another day.
[20]  But it seems to me that when the board
[21]  invited Mr. Crowley to come save the company and
[22]  Mr. Crowley came in and the company was saved, things
[23]  were happening very quickly and things were happening,
[24]  you know, I think in a crisis environment and none of the

Case 1:04-cv-01565-SLR    Document 149-3    Filed 05/15/2007    Page 5 of 39    Hearing

Coram Healthcare Corp.    C.A. # 99-2889 (MFW)    December 21, 2000

Page 49

[1] board members at this point feel misled. They are happy
[2] that he came in.
[3]    I think everybody is better for it. I
[4] think the shareholders are better for it. They have an
[5] argument today that the company is solvent. They had no
[6] argument eight months ago that the company was solvent.
[7]    I don't think it's the appropriate thing to
[8] do to penalize this company for what may be in
[9] Your Honor's view indiscretion on the part of the
[10] chairman. We will live with whatever modifications on
[11] those points Your Honor would insist upon. But certainly
[12] I don't think it behooves the Court to deny confirmation
[13] on that basis.
[14]    MR. GEWERTZ: I think Mr. Friedman was
[15] forced to take longer than he had intended.
[16]    THE COURT: Yes.
[17]    MR. GEWERTZ: So I'll try to be shorter
[18] than I had intended.
[19]    We represent the Creditors' Committee here.
[20] While the general unsecured creditors are a small part of
[21] the creditor constituency, putting aside the noteholders
[22] who have guarantees, and two of the three noteholders,
[23] not Cerberus, is on the committee, the other being Aetna,
[24] nevertheless, the creditor's body, as a whole, has

Page 50

[1] unanimously, 100 percent of the general unsecured
[2] creditors, whose claims were not disputed and were timely
[3] filed and who are impaired, because the other company,
[4] they are getting 100 percent, but in healthcare, they are
[5] sharing a pool of money, they have 100 percent voted in
[6] favor of the plan.
[7]    For that reason, as well as the absence of
[8] any legal — what appears to be absence of any legal
[9] impediment under the Bankruptcy Code or otherwise, the
[10] Creditors' Committee supports the plan and urges its
[11] confirmation.
[12]    I don't want to repeat some of the
[13] arguments that Mr. Friedman made in the interest of
[14] saving time, but as I said, there does not appear to be
[15] any legal impediment.
[16]    Essentially our view of this matter is that
[17] it's a valuation issue. The evidence shows liabilities
[18] of close to $290 million. The expert report of
[19] UBS Warburg, which was hired by the Creditors' Committee,
[20] and UBS Warburg, you heard the testimony, has the largest
[21] and most active practice on Wall Street in the healthcare
[22] industry, and the particular witness was the only witness
[23] here who has ever valued a company in the home healthcare
[24] infusion business, they valued this company within a

Page 51

[1] range. They weren't looking for a particular number or
[2] anything.
[3]    I must say that we didn't know, and I don't
[4] think the noteholders knew where they were coming out.
[5] They valued it within a range of $170 million to
[6] $215 million, or if you throw in the value for the NOL,
[7] at $221 and a half million. The midpoint of that range
[8] is a little bit below $200 million.
[9]    Thus, on at least UBS Warburg's valuation
[10] and the exhibit which shows the liabilities, the company
[11] is insolvent by at least $90 million, which is a
[12] substantial number.
[13]    I think Mr. Friedman mentioned that the
[14] Equity Committee's own valuation shows a $283 million
[15] valuation. So there still would be a marginally
[16] insolvent situation here.
[17]    Now, under the plan, the noteholders, who
[18] are owed 251 or 252 million, I think that exhibit showed
[19] a little bit more than $251 million, plus before there
[20] could be any distribution to shareholders, they would be
[21] entitled to postpetition interest of almost another
[22] $12 million, therefore, they give up over $70 million in
[23] value in exchange for the stock of the reorganized
[24] debtor. They accept new notes at a market rate of

Page 52

[1] interest of 9 percent, far below what the prevailing
[2] market would be for a company of this sort, and not to
[3] get any interest payment for four years.
[4]    So I think that gives this company a fairly
[5] good chance to succeed if the plan is confirmed and the
[6] debt is restructured along those lines.
[7]    Given those numbers and given those
[8] circumstances, the Creditors' Committee believes that the
[9] cramdown here of the equity under 1129(b) of the Code is
[10] proper and that the absolute priority rule is satisfied
[11] and that the noteholders will not — and this is one of
[12] the first objections in the Equity Committee's objection
[13] that was filed in this court — they will not receive
[14] more than 100 percent on their claims.
[15]    That would dispose of the first objection.
[16] The other three objections sort of play off
[17] each other. Running through them all is really this
[18] valuation thread because the theme is that somehow there
[19] was this conspiracy between the noteholders and the
[20] creditors to deprive the equity of the value of their
[21] interests.
[22]    Well, if there was no value for their
[23] interest, then there is nothing to conspire to deprive
[24] them of.

Coram Healthcare Corp.                    C.A. # 99-2889 (MFW)

Hearing
December 21, 2000

**Page 73**

[1] What I mean here is that they put
[2] themselves in this position. If they had proceeded in
[3] January, then this hearing wouldn't have been on
[4] December 22nd. But we are here.
[5] THE COURT: But like Solomon, you are
[6] asking me to kill your child, too.
[7] MR. LEVY: No, I'm not, and I have a
[8] solution to keep the child alive.
[9] THE COURT: Deny confirmation, the company
[10] is dead.
[11] MR. LEVY: Okay. Three points.
[12] One, the debt can, and I have no doubt
[13] will, because they are not going to let this company go
[14] down, convert to a perpetual preferred which the
[15] accountants will say is equity because there is no time
[16] when it's due, they convert 100 million —
[17] THE COURT: But the problem with that
[18] proposal, I don't have the power to modify the plan, do
[19] I? I can only confirm this plan or deny confirmation of
[20] this plan. I'm somewhat restricted. There is no other
[21] plan on the table.
[22] MR. LEVY: Right. But, Your Honor, you
[23] have to say, what are these people going to do if you
[24] deny confirmation of the plan? They are now going to

**Page 74**

[1] have eight days. If it is correct, if Mr. Crowley was
[2] correct that the company will go up in smoke, they are
[3] going to have a decision to make. You can't make them do
[4] it. You can't modify the plan. But what do we think
[5] they are going to do? Are they going to be stubborn and
[6] say we are going to wipe out all of our interest here, we
[7] don't care, or they can convert.
[8] Number 2, I have another plan, and that is
[9] if you use the equitable subordination principle based on
[10] the unfairness here and treat whatever the number is,
[11] $100 million of debt as equity, you've done it. You have
[12] met with Stark II.
[13] Number 3, Your Honor —
[14] THE COURT: Well, but let me push you on
[15] this.
[16] MR. LEVY: Please.
[17] THE COURT: As I see the evidence, the only
[18] suggested conspirator on the noteholder side is Cerberus.
[19] MR. LEVY: 116 million.
[20] THE COURT: Well, don't they have — is
[21] that 116 million?
[22] MR. MILLER: Whatever 35 or 36 percent of
[23] 250 million is, and I'm not good enough with numbers.
[24] MR. LOW: The disclosure statement does say

**Page 75**

[1] 116 million.
[2] THE COURT: I know there was a discussion
[3] with Mr. Feinberg, and he didn't have a calculator,
[4] either.
[5] So as punishment for their bad acts, if you
[6] will, equitably subordinate the Cerberus portion of the
[7] noteholder debt.
[8] MR. LEVY: That solves Stark II.
[9] There is a third response I want to give
[10] Your Honor, and that is this: There is no question that
[11] Stark II says what it says. There is no question that
[12] they don't have an exemption.
[13] But there is another step you have to take.
[14] That is: Will it really wipe out the company? Now,
[15] what's the evidence? Well, we have Mr. Crowley who says
[16] that in his experience, he believes that the company will
[17] go up in smoke if they have to comply. But what's his
[18] experience?
[19] He testified he never heard of Stark II in
[20] any other company. He did not bring an expert in here.
[21] He had an expert sitting in the courtroom here, a
[22] healthcare expert, on the first day. He didn't bring
[23] someone in. There's no basis for that.
[24] I would suggest, Your Honor, that these

**Page 76**

[1] noteholders are pretty smart people. They are taking a
[2] big chance here that you won't confirm the plan. They
[3] deliberately took that chance. Maybe they took that
[4] chance and that one of the things they considered, one of
[5] the parts of their calculus was, well, maybe it's not so
[6] bad. Maybe if Judge Walrath doesn't confirm our plan,
[7] we'll get by for a while because, you know, we only have
[8] 2,500 stockholders. It's not like every doctor in the
[9] world is a stockholder. I don't know if that is the
[10] case.
[11] But I would like to, if I may, turn —
[12] THE COURT: But since it's a public
[13] company, it's not simply a matter of identifying today
[14] who are the shareholders. Because it's publicly traded,
[15] isn't the problem that tomorrow a referring doctor could
[16] buy a share and, therefore, every time we get a referral
[17] from a doctor, we must make that doctor and every member
[18] of that doctor's family within the Stark confines sign a
[19] disclosure saying they are not a shareholder.
[20] MR. LEVY: I think what you have to do is
[21] add one more piece of paper to the pile of papers that I
[22] know I fill out every time I go to see a doctor. I'm not
[23] suggesting it's —
[24] THE COURT: It's not the patient filling

**Page 77**

[1] out — I know doctors have a little problem with filling
[2] out forms.
[3]    MR. LEVY: Doctors do that, too.
[4]    Your Honor, can I turn your question around
[5] a little bit and say, What if you do confirm this plan?
[6] You write, forgive me, eloquent opinions. What if you do
[7] confirm this plan and the opinion says because of the
[8] problem of Stark II, I don't care that they delayed. I
[9] don't care about a million dollar undisclosed statement.
[10]    What it really will say, Your Honor, to
[11] people like Cerberus, and I don't mean this pejoratively,
[12] but they are in the business, they are high-risk lenders,
[13] what it will really say to them is, go buy management and
[14] you can take over a company.
[15]    It will say that the courts have blessed
[16] this kind of behavior. I know you don't want to do it
[17] and I know that that is the solemnic problem that
[18] Your Honor is facing now.
[19]    I have a whole eleven pages here,
[20] Your Honor, of description of the things and I'm not
[21] going to go through them. You know the record better
[22] than I do.
[23]    THE COURT: Isn't there an option five?
    MR. LEVY: I would like to hear it.

**Page 78**

[1]    THE COURT: Strike anything in the plan
[2] such as the releases and the exculpation and — not the
[3] indemnification, but anything that would insulate
[4] Mr. Crowley or Cerberus or any of the officers and
[5] directors from any action by the shareholders regarding
[6] the actions that they have taken, need I really decide
[7] that they, by their delay, caused harm to the
[8] shareholders, is that really a confirmation issue so long
[9] as any cause of action on that is not released by the
[10] plan, and so long as by my confirming the plan I make no
[11] decision as to whether or not that type of activity rises
[12] to the level of a suit by the individual shareholders
[13] under Delaware law?
[14]    MR. LEVY: Well, I answer that, Your Honor,
[15] by saying that the injury here was to the company, the
[16] injury was to the company, not the shareholders for the
[17] reason I heard you say, and that is if we had someone
[18] watching out for the equity here, somebody truly
[19] independent, if instead of Mr. Crowley it would have been
[20] Mr. Unconflicted back in January, we might have had a
[21] different result.
[22]    Now, I can't prove and nobody can prove
[23] hypothetically that Mr. Unconflicted as CEO would have
[24] done better, but there is certainly possible, but the

**Page 79**

[1] burden shouldn't be on the equityholders. The burden is
[2] on the wrongdoers, and they haven't been able to show
[3] that.
[4]    I think that giving the possibility of a
[5] long, drawn-out class-action litigation to shareholders
[6] is simply not the equivalent of the right of the equity
[7] to not have a plan confirmed that doesn't meet the
[8] entirely fair standard and the fairness standard of the
[9] Bankruptcy Act.
[10]    That's why, with respect, I think the
[11] solution No. 5 just doesn't go. You can't bless what
[12] these people did.
[13]    Your Honor, on this matter of disclosure,
[14] it's not sufficient for these lawyers to sit in here and
[15] say I don't know why. These people filed public
[16] statements with the Securities & Exchange Commission.
[17] Every 10-K and I think every 10-Q has a section called
[18] "Other Relationships" where you have to describe things
[19] like that. The notion that a securities lawyer would
[20] say, well, I'm not going to ask you if you are getting
[21] this million-dollar-a-year conflicting payment is silly.
[22] Of course they had to disclose it.
[23]    The argument which I heard here that
[24] Mr. Crowley is such a rich man or a man of such integrity

**Page 80**

[1] that a million dollars is unimportant to him, it simply
[2] doesn't fly. It doesn't solve the conflict. The
[3] conflict exists no matter what the purity of
[4] Mr. Crowley's soul.
[5]    Your Honor also mentioned the smell test.
[6] That's EC-20, the private records, Your Honor.
[7] Mr. Crowley testifies that it is a throw-away letter, a
[8] cold proposal after testifying that he asked for the
[9] relief that is in it immediately before he sent it. Then
[10] look at it. Can you honestly believe that that's the way
[11] Mr. Crowley would write a proposal? I just don't think
[12] you can.
[13]    I guess I really ought to get back to what
[14] I think is the central matter of what's troubling
[15] Your Honor.
[16]    Mr. Friedman talked mostly about valuation.
[17] I'm not going to argue who was the more independent
[18] appraiser or evaluator here.
[19]    THE COURT: Even under your valuation you
[20] are not going to meet Stark in ten days.
[21]    MR. LEVY: Pardon me?
[22]    THE COURT: Even under your valuation, the
[23] company can't meet Stark in ten days.
[24]    MR. LEVY: I agree, absolutely right. I'm

Case 1:04-cv-01565-SLR    Document 149-3    Filed 05/15/2007    Page 8 of 39

Coram Healthcare Corp.    C.A. # 99-2889 (MFW)    Hearing
December 21, 2000

Page 81

[1] going to come back to Stark in a minute. I just want to
[2] make this point.
[3]     You can't isolate price from process. The
[4] reason that process is important is because it increases
[5] price. Bad process, bad price. Good process, good
[6] price. I think that's what we learned from Weinberger
[7] and from Zenith. You can't bifurcate them as Weinberger
[8] said.
[9]     Look. It is ten days, Your Honor. It's
[10] their fault that it's ten days. They've got to find the
[11] solution. You can't. I can't. They can because if
[12] Your Honor refuses to confirm this plan because of their
[13] behavior, they are going to have a busy ten days. But
[14] they've thought about it. They already asked you, by the
[15] way, to extend the exclusive period into January. But
[16] it's their problem. They did wrong. I believe they will
[17] come up with a solution, Your Honor.
[18]     I believe they are trying to make you the
[19] victim. They are trying to say you, this Court, are
[20] going to make sick people even sicker. They are not
[21] going to let that happen because it's going to cost them
[22] too much money.
[23]     Your Honor, I think I'm through.
[24] I would like to debate the very difficult

Page 82

[1] problem that I truly understand you face, but as you
[2] debated, I guess I would just — I guess —
[3]     Mr. Low just handed me a note that says,
[4] and he is right, Mr. Crowley testified that preferred
[5] would work.
[6]     But as you debate this, they did it. They
[7] have the keys to their own jail cell. That's the reason,
[8] and not my failing voice, that I think I'm going to sit
[9] down and ask for those reasons that the plan not be
[10] confirmed and then — I'm not quite ready to sit down.
[11]     What happens if you don't confirm it? I
[12] think they solve their problem. I think we then have
[13] some time — remember, the debt doesn't come due until
[14] May, so we have time. We have time to have a process
[15] here that is much more fair. We have time to see if the
[16] company can be marketed. We have time to look at the
[17] American investor story and you can pick at it and say
[18] you used the wrong companies or you can say, hey, things
[19] are getting better and everybody may come out fine if
[20] Your Honor does that.
[21]     Thank you. Thank you for all the
[22] attention.
[23]     THE COURT: Thank you.
[24]     MR. FRIEDMAN: Your Honor, I'll just be

Page 83

[1] very brief.
[2]     There is a pending class action, as I
[3] mentioned in my opening statement, against the officers
[4] and directors against Cerberus, against Foothill, against
[5] Goldman, against everybody I know in this case other than
[6] me, and I'm probably going to wake up one morning and
[7] find myself named, as well.
[8]     Your Honor, it's the same issues that have
[9] been raised in this case. The plan never purported to
[10] release those claims to start with, so it's not as if you
[11] need to make any modifications on that.
[12]     If there are claims, if there are
[13] derivative claims that exist, they belong to the debtors.
[14] If you wanted to give standing to the Equity Committee to
[15] bring them going forward, that's an option you have.
[16]     I'm not aware of a theory by which you can
[17] subordinate debt to equity. If that's a theory that the
[18] Equity Committee wishes to bring going forward, I don't
[19] know. I don't think it has merit, but I suppose they
[20] would have the right to do that.
[21]     But I want to go back. I've been sort of
[22] searching my soul since I sat down to try to figure out
[23] how we got to this place.
[24]     Number 1, I don't have a solution despite

Page 84

[1] what Mr. Levy said. I don't have a solution to this
[2] problem if you don't confirm the case. That's not your
[3] problem, but I do want you to understand that.
[4]     The second thing is: How did we get here?
[5] We got here under the theory that we would file a plan
[6] based upon an independent valuation and then we would
[7] invite whoever had a problem with it to raise their
[8] voices with this Court.
[9]     Whatever Your Honor has observed about what
[10] was disclosed in public filings or whether there was
[11] less-than-full disclosure in the disclosure statement
[12] cannot be said that in this litigation, in this court,
[13] there hasn't been complete disclosure of all these
[14] issues.
[15]     Our view, frankly, was, and I can't even
[16] think of why, the question you asked Mr. Miller, I don't
[17] have any answer to it, either, why the disclosure
[18] statement says that there is an agreement but it doesn't
[19] say how much. I just don't know. I'm trying to
[20] remember. I don't even remember why it says what it
[21] says.
[22]     What I do know is the general theory of
[23] this debtor going into court was we are going to file
[24] this plan, we are going to defend this valuation, and

Page 85

[1] what we are going to do is we are going to allow any
[4] party who has a problem with it to have complete
[3] disclosure.
[4]     I said at the first hearing that you
[5] wouldn't hear any discovery fights in this case, and you
[6] didn't. I've been in plenty of cases where Your Honor
[7] has been called upon to deal with counsel fighting over
[8] documents and depositions and discovery. You didn't hear
[9] any of that in this case.
[10]     We made all proper disclosures since the
[11] day we filed. We made all documents available. There is
[12] no lack of understanding as to who gets what and whose
[13] relationships are what. Our view was at the end of the
[14] day the bankruptcy process would have a cleansing effect
[15] on all these issues. Your Honor would ultimately decide
[16] whether or not the valuation was appropriate, whether or
[17] not the plan meets the salutary purpose of
[18] rehabilitation. You confirmed the plan.
[19]     I honestly can tell you that from the
[20] standpoint of those who worked on this plan, which
[21] includes the Chanin people, our people, the debtors'
[22] management, never in a single time — this is not in the
[23] record, but I feel the need to tell you — there was
    never a single moment when there was a piece of

Page 86

[1] information that we thought was relevant that we elected
[2] not to include in a disclosure document. Never. This
[3] particular point is one that I honestly cannot recall
[4] ever arising.
[5]     So having said all that, I believe that the
[6] failure by this Court to confirm this plan leaves us with
[7] no solutions.
[8]     I think it's also very important to note,
[9] Your Honor heard from Mr. Haydon, Your Honor heard from
[10] Mr. Crowley. I think the evidence is consistent. There
[11] is no other plan. I don't mean in a sense there is no
[12] other plan on file. I mean there is no other plan.
[13] There is no other source of equity for this company. No
[14] one has pointed to any.
[15]     Just like there was a sophisticated debtor,
[16] there was a sophisticated Equity Committee. If there was
[17] any other person who had any interest in this company by
[18] way of acquisition, by way of investment, by way of
[19] financing, it would have surfaced. There is nobody
[20] there.
[21]     So the ultimate effect of not confirming
[22] the plan is we'll go into next year, we'll have
[23] incredibly serious problems, and if we manage to solve
[24] those problems, we'll come back to the Court at some

Page 87

[1] point with another plan or sale or some other vehicle
[2] that I think there is no basis to conclude will result in
[3] anything other than creditors getting less and the
[4] equityholders still getting nothing.
[5]     So, Your Honor, if the issue is that
[6] somebody did something wrong, and I'm not suggesting
[7] that, and I'm certainly not endorsing that view, but if
[8] that's the point, there is redress in the courts, but I
[9] don't think that the answer is to put this company out of
[10] business.
[11]     Thank you.
[12]     THE COURT: Well, I'm in a difficult
[13] situation. I would like to sidestep my duties, but I
[14] think I have to determine in deciding whether to confirm
[15] this plan under 1129(a)(3), I must conclude that it is
[16] proposed in good faith and that the plan proponents have
[17] acted in good faith. I just do not want to be in a
[18] position to conclude on this record that that is so. I
[19] cannot conclude on this record that that is so.
[20]     I think that the contractual relationship
[21] between Cerberus and the CEO, Mr. Crowley, did taint the
[22] process, and I think that, if anything, the ultimate
[23] fairness of the process in bankruptcy is a paramount
[24] principle to be protected by the Bankruptcy Court.

Page 88

[1]     Maybe we would be at the same place today
[2] if that contractual relationship had not been there, if
[3] it had been disclosed to all parties, but I don't know
[4] that and I don't think anybody will know that.
[5]     We are at a terrible place. The Equity
[6] Committee, even on its numbers, which I agree with the
[7] Creditors' Committee's counsel and their valuation expert
[8] and the cross-examination of the Equity Committee expert
[9] does point out the questionable nature of that valuation.
[10]     I think under any of the numbers the
[11] company is insolvent today. But I don't think I can
[12] confirm a plan based on that fact because I think that
[13] because of the process being tainted by this relationship
[14] which began in November of 1999, and perhaps in August of
[15] 1999, has so tainted the debtors' restructuring of its
[16] debt, the debtors' negotiations towards a plan, even the
[17] debtors' restructuring of its operations.
[18]     I think on that point I think it is a shame
[19] that Mr. Crowley and perhaps Cerberus and the debtor
[20] itself is tainted in this manner because I think there is
[21] evidence that Mr. Crowley did do a good job operationally
[22] in helping the debtor turn around. But I can't conclude
[23] that the debtor might not have done even better had there
[24] not been this relationship. I don't know. That's the

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| CORAM HEALTHCARE CORP. | ) | Case Nos. 00-3299 (MFW) |
| and CORAM, INC., | ) | and Case No. 00-3300 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |

Objection Deadline: February 20, 2001 at 4:00 p.m.
Hearing Date: February 26, 2001 at 4:00 p.m.

### NOTICE OF HEARING

**PLEASE TAKE NOTICE** that The Official Committee of Equity Security Holders of Coram Healthcare Corp. in the above-captioned cases, by and through their attorneys, filed the attached **Motion For Leave To File Adversary Proceeding** (the "Motion"), with the Court on February 6, 2001.

**PLEASE TAKE FURTHER NOTICE** that any objection to the relief sought in the Motion must be submitted in writing, filed with the United States Bankruptcy Court for the District of Delaware, Marine Midland Plaza, 824 Market Street, Wilmington, Delaware, 19801, and served on the undersigned counsel on or before **February 20, 2001 at 4:00 p.m.**

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion is scheduled before the Honorable Mary F. Walrath on **February 26, 2001 at 4:00 p.m.** in the United States Bankruptcy Court for the District of Delaware, Marine Midland Plaza, 824 Market Street, Wilmington,

584|

FEB 0 6 2001

C75

425484.1 2/6/01

Delaware, 19801. Only those objections that are timely filed and served in accordance with this Notice will be considered by the Bankruptcy Court at the hearing.

*Tara L Lattomus*

Mark Minuti (No. 2659)
Tara L. Lattomus (No. 3515)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P. O. Box 1266
Wilmington, DE 19899
(302) 421-6840\6847

-and-

Richard F. Levy (IL ARDC NO. 01645064)
Theodore J. Low (IL ARDC NO. 01696491)
Benjamin D. Schwartz (IL ARDC NO. 0252276)
Brandy A. Sargent (IL ARDC NO. 06270551)
ALTHEIMER & GRAY
10 South Wacker Drive, Suite 4000
Chicago, IL 60606
(312) 715-4000 (phone)
(312) 715-4800 (FAX)

Attorneys for The Official Committee of Equity Security Holders of Coram Healthcare Corp.

Dated:  February 6, 2001

C76

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| CORAM HEALTHCARE CORP. | ) | Case Nos. 00-3299 (MFW) |
| and CORAM, INC., | ) | and Case No. 00-3300 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |

## MOTION FOR LEAVE TO FILE ADVERSARY PROCEEDING

The Official Committee of Equity Security Holders of Coram Healthcare Corporation ("Equity Committee") hereby moves for the entry of an order permitting it to file an adversary complaint ("Proposed Adversary Complaint") on behalf of Coram Healthcare Corporation ("Coram") in substantially the form attached to this motion as Exhibit "A." The statutory bases for this motion are Code Sections 1103(c)(5) and 1109(b).

The Proposed Adversary Complaint seeks recovery of significant damages from Stephen A. Feinberg ("Feinberg"), several Cerberus entities[1] and Daniel D. Crowley ("Crowley"), (collectively, the "Proposed Defendants"). The Proposed Adversary Complaint alleges that Feinberg (the principal of Cerberus) and Crowley created and concealed an actual, impermissible conflict of interest, thereby breaching their fiduciary duties to Coram. It also alleges that the conflict was created by Feinberg to induce Crowley to secretly manage Coram for the benefit of Cerberus, one of Coram's largest creditors, and seeks recovery for grave and substantial damage to Coram arising from the missed opportunities, strategic mismanagement, corporate waste and deterioration of Coram's business

---

[1] The proposed Cerberus defendants (referred to collectively as "Cerberus") are Cerberus Partners L.P., Cerberus Capital Management L.P., Cerberus Associates L.L.C., and Craig Court, Inc., its general partner.

C77

caused by the Proposed Defendants. The Proposed Adversary Complaint also seeks punitive damages and equitable relief to prevent and deter future improper conduct by the Proposed Defendants. The grounds for this motion are:

1.    On December 21, 2000, this Court found that the plan proposed by Coram could not be confirmed because there was an actual conflict of interest arising from the fact that Crowley, the Chairman and CEO of Coram, was in the pay of Cerberus pursuant to a concealed full-time employment agreement which paid him more than $1 million per year, plus the opportunity for substantial bonuses.[2] Further, Cerberus' principal, Feinberg, acting as a director of Coram, negotiated and executed a huge -- $13 million -- incentive increase in Crowley's compensation from Coram (again without disclosing the $1 million payment that Crowley was secretly getting from Cerberus). It is also significant that Crowley, weeks before the Chapter 11 filing, caused Coram to make substantial cash interest payments to Cerberus and other Noteholders (as defined in the Proposed Adversary Complaint) which Coram was not required to make.

2.    Under the circumstances, this Court determined that it could not find, as required by § 1129(a)(3) of the Bankruptcy Code, that Coram's Plan was proposed in good faith.

3.    The Proposed Adversary Complaint builds upon those basic facts. It alleges that the actual conflict of interest not only tainted the reorganization process so as to make the plan not confirmable, but also caused significant monetary damage to Coram; and that the persons causing such damage include Feinberg, Cerberus and Crowley. Moreover, that damage to Coram

---

[2] The Court: "I do think it's an actual conflict of interest." December 21, 2000 Trial Transcript at pg. 89.

C78

425484.1 2/6/01                                    2

was a direct result of breach of the fiduciary duty of loyalty that both Crowley and Feinberg owed

to Coram as directors, and in the case of Crowley, as Chairman and Chief Executive Officer.

4.    The standard for assessing damages arising from breach of the duty of loyalty, and

the need to award punitive damages to deter such conduct, is described in *Bomarko v.*

*International Telecharge*, Del. Ch., C.A. Nos. 13052 and 14727, 1999 WL 1022083, at \*21

(Nov. 16, 1999) (*citing Thorpe v. CERBCO. Inc.*, 676 A.2d 436 (Del. 1996)) (emphasis added)

(attached hereto as Exhibit "B"):

> where, as is true here, issues of loyalty are involved, potentially harsher rules come
> into play. "Delaware law dictates that the scope of recovery for a breach of duty of
> loyalty is not to be determined narrowly. . . . *The strict imposition of penalties under*
> *Delaware law are designed to discourage disloyalty.*"

*See also Cede & Co. v. Technicolor*, Del. Supr., 542 A.2d 1182, 1187 (1988) (emphasis added):

> . . . in contrast, a fraud action asserting fair dealing and fair price claims affords an
> *expansive remedy* and is brought against the alleged wrongdoers to provide whatever
> relief the facts of a particular case may require.

5.    The only way Coram can collect those damages from Feinberg, Cerberus, and

Crowley is by a judgment in favor of Coram at the conclusion of an adversary proceeding. The

Proposed Defendants have sufficient assets to satisfy a substantial judgment.

6.    Consensual resolution of the disputes between the parties has been foreclosed by

Coram, the Noteholders, and the Creditors' Committee, each of whom have refused to consider

even the preliminary steps that would be needed to get together and settle this case. After this

Court's ruling on December 21, 2000, the Equity Committee attempted to initiate a dialog for the

purpose of finding a mechanism by which the Equity Committee could review the history,

condition, and operations of Coram. The purpose of the proposed due diligence review was to

permit the Equity Committee to make a realistic assessment of Coram's current and potential

C79

value. However, Coram, the Noteholders, and the Creditors Committee flatly refused to even discuss any process by which the Equity Committee or its advisors and representatives would be able to make a meaningful evaluation of Coram. In fact, they have refused to discuss any aspect of this case with the Equity Committee since the hearing before this Court on December 28, 2000.

7.     This Court has the authority to authorize filing of the Proposed Adversary complaint by the Equity Committee. *See In Re Monsour Medical Center,* 5 B.R. 715 (Bankr. W.D. Pa. 1980). Coram will not pursue the causes of action alleged in the Proposed Adversary Complaint because of the plain, actual conflicts of interest between Coram and the Proposed Defendants.[3]

8.     If the suit is successful, as the Equity Committee believes it will be, substantial value will be added to Coram's estate and the issues related to the conflict of interest will no longer be theoretical or speculative, but will be reduced to a binding and collectable judgment.

---

[3] Crowley is Chairman and CEO of Coram, Cerberus is Crowley's full-time employer and Feinberg is the principal of Cerberus. Present management of Coram would never seek to recover damages against any of these defendants.

C80

## CONCLUSION

For the reasons stated, we respectfully request the entry of an order authorizing the Equity Committee to file the Proposed Adversary Complaint.

Mark Minuti (No. 2659)
Tara L. Lattomus (No. 3515)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6840/6847

-and-

Richard F. Levy (IL ARDC NO. 01645064)
Theodore J. Low (IL ARDC NO. 01696491)
Benjamin D. Schwartz (IL ARDC NO. 0252276)
Brandy A. Sargent (IL ARDC NO. 06270551)
ALTHEIMER & GRAY
10 South Wacker Drive, Suite 4000
Chicago, IL 60606
(312) 715-4000 (phone)
(312) 715-4800 (FAX)

Attorneys for The Official Committee of Equity Security Holders of Coram Healthcare Corp.

Dated: February 6, 2001

C81

425484.1 2/6/01

5

# EXHIBIT "A"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | **Chapter 11** |
| | ) | |
| **CORAM HEALTHCARE CORP.** | ) | **Case Nos. 00-3299 (MFW)** |
| **and CORAM, INC.,** | ) | **and Case No. 00-3300 (MFW)** |
| | ) | |
| Debtors. | ) | **Jointly Administered** |

---

| | | |
|---|---|---|
| **THE OFFICIAL COMMITTEE OF** | ) | |
| **EQUITY SECURITY HOLDERS** | ) | |
| **OF CORAM HEALTHCARE** | ) | |
| **CORPORATION, on behalf of** | ) | |
| **CORAM HEALTHCARE** | ) | |
| **CORPORATION, a Delaware** | ) | |
| **Corporation** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Adv. No. A-01-** |
| | ) | |
| **STEPHEN A. FEINBERG,** | ) | **PLAINTIFF DEMANDS TRIAL BY** |
| **CERBERUS PARTNERS L.L.P.,** | ) | **JURY ON ALL ISSUES SO TRIABLE** |
| **CERBERUS CAPITAL MANAGEMENT** | ) | |
| **L.P., CRAIG COURT, INC. and** | ) | |
| **DANIEL D. CROWLEY** | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

The Official Committee of Equity Security Holders of Coram Healthcare Corporation (the "Equity Committee" or the "Plaintiff"), by and through its attorneys, brings these claims on behalf of Coram Healthcare Corporation ("Coram") to seek redress for significant damage to Coram resulting from deliberate breaches of fiduciary duty, impermissible and secret conflicts of interest, gross mismanagement and corporate waste caused by the Defendants. The complaint also seeks

425495.1 2/6/01

equitable relief and punitive damages to prevent and deter future improper conduct by these Defendants. In support of these claims, Plaintiff alleges as follows:

## PARTIES

1.    Plaintiff, the Equity Committee, was appointed by the United States Trustee in the pending bankruptcy action of *In re Coram Healthcare Corp. and Coram, Inc.,* Nos. 00-3299 (MFW) and 00-3300 (MFW) in the United States Bankruptcy Court, District of Delaware, on October 19, 2000, to act on behalf of all of the common shareholders of Coram in said proceedings. The Equity Committee has been authorized to bring this action by an order entered by the Bankruptcy Court on February __, 2001.

2.    The following individual Defendants are referred to in this complaint collectively as "Cerberus" unless otherwise specified:

   a.    Defendant Cerberus Partners, L.P. ("Cerberus Partners") is a limited partnership whose business includes large investments in high-risk, high-yield debt instruments of troubled companies. Cerberus Partners (and, possibly, other Cerberus entities) is the holder of "Series A" and "Series B" notes ("Notes") issued by Coram. The Notes are far and away Coram's largest obligations.

   b.    Defendant Cerberus Associates L.L.C. ("Cerberus Associates") is the General Partner of Cerberus Partners.

   c.    Defendant Cerberus Capital Management L.P. ("Cerberus Capital") is an affiliate of Cerberus Partners. Cerberus Capital acts as the agent of Cerberus Partners and is under its management and control.

   d.    Defendant Craig Court, Inc. ("Cerberus Craig") is the general partner of Cerberus Capital.

3.    Stephen A. Feinberg ("Feinberg") is the managing member of Cerberus Associates, which is the general partner of Defendant Cerberus Partners. Feinberg was a member of the Coram Board of Directors from the summer of 1998 until July 24, 2000, and was Chairman of

C84

its compensation committee. Feinberg dominated and controlled each of the Cerberus Defendants, all of whom have acted as his agent and on all of whose behalf he acted as agent.

4.    Defendant Daniel D. Crowley ("Crowley") is Chairman and Chief Executive Officer of Coram; he has held that position since November, 1999. Crowley is also an employee of Cerberus Capital.

## NATURE OF THE CASE

5.    The essence of the Equity Committee's claims is that beginning in 1999, Feinberg and Crowley secretly agreed to act together to operate Coram for the benefit of Cerberus, one of Coram's significant creditors, and contrary to the interests of Coram itself. The resulting breach of fiduciary duties owed by Feinberg and Crowley to Coram benefitted Feinberg and Cerberus (and two other holders of Notes, which are not presently parties to this action) and caused substantial damage to Coram.

6.    This scheme and conspiracy began sometime in 1999 (and perhaps earlier), and was refined and implemented during the year 2000 and continues to this day. Feinberg implemented this scheme by arranging for Crowley to "take over the operations" of Coram (in the words of a furtive letter from Crowley) and become its Chairman and Chief Executive Officer, while concealing the significant and critically disabling actual conflict of interest that arose from the terms of a secret, undisclosed employment agreement between Crowley and Cerberus.

7.    That secret employment agreement provided for Cerberus to pay Crowley cash compensation of $960,000 per year and gave Crowley additional significant bonus opportunities. In return, Crowley agreed to remain a full-time employee of Cerberus and to cooperate fully with Feinberg in the advancement of the best interests of Cerberus. Crowley agreed that he would be

C85

subject to dismissal and loss of all of these benefits if he failed to follow Feinberg's directions. Crowley and Feinberg concealed the terms of the employment arrangement; those terms were not disclosed to the directors of Coram, nor were they disclosed in any public filings of Coram notwithstanding the fact that such disclosure was mandated by provisions of the Securities and Exchange Act and the United States Bankruptcy Code.

8.    In early 2000, Feinberg increased Crowley's incentive to manage the affairs of Coram for the benefit of Cerberus. Acting as Chairman of the Compensation Committee of Coram, Feinberg arranged for Coram to bind itself to pay Crowley huge (potentially $13 million or more) incentive bonuses for one year's work.

9.    Consistent with these arrangements, Crowley used his position as Chairman and Chief Executive Officer at Coram to run Coram in a manner that benefitted Cerberus and injured Coram. The Board of Directors of Coram relied on Crowley for information, judgment and strategic and tactical direction, without knowledge that Crowley was secretly in the pay of, agent for and acting under the direction of Cerberus, and had thereby abandoned the fiduciary duties of care, loyalty and good faith which he owed to Coram.

10.    The actions that Crowley took in breach of his fiduciary duties in order to benefit Cerberus included, but were not limited to: (i) adoption of a business strategy that focused on liquidation of assets and reduction of debt even when such actions were adverse to the interests of Coram and taken solely for the benefit of Cerberus and the other Noteholders (as defined below); (ii) failure to retain and consult independent financial advisors; (iii) failure to explore opportunities for business combinations, capital infusions and strategies to grow Coram; (iv) payment of interest to Cerberus and other holders of Notes that was not required by the terms of the Notes; (v) failure to use reasonable business judgment in negotiations with Cerberus

concerning use of proceeds of asset sales; (vi) failure to use processes that were entirely fair (or in some cases, fair at all) in dealings with Coram's shareholders; (vii) unconscionable delay in implementing steps necessary to comply with government regulations in order to posture Coram's bankruptcy filing as an emergency; and (viii) other steps designed to reduce the real and/or apparent value of Coram, and thereby to facilitate Cerberus' scheme and conspiracy.

11. As a result, Coram missed attractive business opportunities that would have enhanced its value by increasing its revenues, margins and profits, allowed refinancing of its indebtedness and avoided potentially destructive bankruptcy proceedings.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) because this litigation is related to a Chapter 11 proceeding pending in the United States Bankruptcy Court for the District of Delaware: *Coram Healthcare Corporation, et. al.*, Case Number 00-3299 (MFW).

13. This is a non-core proceeding. Plaintiffs do not consent to entry of final orders or judgment by the Bankruptcy Court.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1408.

## BACKGROUND

**History of Coram**

15. Coram is a publicly traded company that provides home infusion services to healthcare patients throughout the United States. Coram was formed in July, 1994, as a result of the merger of several national and regional providers of home infusion therapy and related services. Since that time, Coram has made a number of acquisitions that resulted in Coram

C87

becoming the leading provider of alternative site infusion therapy services in the United States based on geographic service area and total revenue.

16.     Infusion therapy involves the intravenous administration of nutrition, anti-infective therapy, HIV therapy, blood factor therapies, pain management, chemotherapy and other therapies. The initiation and duration of these infusion therapies is determined by a physician based upon a patient's diagnosis, treatment plan and response to therapy.

## Cerberus Becomes Interested in Coram

17.     Cerberus invests in high-risk, high-yield debt instruments of troubled companies for itself and others. Its business objectives are based on its belief that such debt (often purchased at a severe discount from its face value) may increase in value if the fortunes of the troubled company reverse, or that if bankruptcy ensues, Cerberus can become an owner of the troubled company through debt restructuring at an attractive price.

18.     Cerberus began to acquire Coram's debt in 1995. In April, 1997, Cerberus purchased a significant amount of additional Coram debt. At or about the same time, Cerberus sold or exchanged a portion of Coram's debt instruments to Goldman Sachs Credit Partners LP ("Goldman Sachs") and Foothill Capital Corporation ("Foothill").

19.     In May, 1998, Cerberus, Goldman Sachs and Foothill (collectively, the "Noteholders") executed a Securities Exchange Agreement with Coram whereby the Noteholders agreed to exchange their existing Rollover Notes and Warrants for Series A ("Series A Notes") and Series B Notes ("Series B Notes"). The Series A Notes mature in May, 2001. The Series B Notes mature in 2008 but can be redeemed by the Noteholders at par when the Series A Notes mature.

20.    Feinberg became a director of Coram when the Securities Exchange Agreement was executed, in accordance with a provision that permitted Cerberus and the other Noteholders to designate a director.

21.    The Securities Exchange Agreement also provided that a default would result if Coram's then CEO, Donald J. Amaral (who, with Feinberg, arranged the agreement) ceased to be CEO. Feinberg incentivized Amaral to execute the agreement and to act in the best interests of Cerberus, not Coram, by (as a member of Coram's Board of Directors) approving payment of a $1 million bonus to Amaral. The Securities Exchange Agreement further benefitted Amaral by providing that a default under the Coram debt instruments held by the Noteholders would occur if Amaral ceased to be CEO of Coram.

**The Actual Conflict of Interest — Feinberg Arranges For Crowley
to Take Over Coram's Operations While Secretly in the Pay of Cerberus**

22.    In April, 1999, despite the job security provided for him under the Securities Exchange Agreement, Amaral resigned as CEO of Coram. He was replaced at that time by Richard M. Smith. Smith's business plan was to prudently build Coram's business and increase the value of the Company.

23.    These actions led Smith into conflict with Feinberg, who had no interest in increasing the value of Coram except to divert all available cash flow to repayment of the Notes held by Cerberus, regardless of whether such repayment was required or was in the best interests of Coram. Feinberg then developed a plan to replace Smith with a CEO who would act under his direction, and in the interests of Cerberus rather than Coram.

24.    To implement this plan, Cerberus, acting through Feinberg, hired Crowley in August, 1989, to be a full-time employee of Cerberus with cash compensation of $1 million per

year and opportunities for substantial additional bonuses. As soon as Crowley was hired to work full time for Cerberus, Feinberg recommended that Coram hire Crowley as a "consultant." Feinberg, a member of the Coram Board of Directors, did not disclose to the board the compensation terms of Crowley's employment agreement with Cerberus nor did he disclose that Crowley had agreed to work full time for Cerberus under the direction of Feinberg and that all of Crowley's benefits could be terminated by Feinberg if Crowley did not follow his instructions.

25.     As a result of Feinberg's recommendation, Crowley was in fact hired as a consultant to Coram in approximately September 1999. Crowley's duties as a consultant to Coram were essentially to supervise the CEO, Smith. Not surprisingly – and as intended by Feinberg – Smith was unhappy with having Crowley look over his shoulder while Smith remained responsible for management of the business. Smith protested this relationship and requested that if Crowley were to be retained as a consultant, it be under Smith's direction and that Crowley report to Smith. After Feinberg persuaded the other members of the Coram Board of Directors that Smith must report to Crowley, Smith – again as intended by Feinberg – resigned in October 1999, less than six weeks after Crowley was hired as a consultant.

26.     When this happened, Feinberg was able to persuade the Coram Board of Directors, as he had intended all along, to have Crowley take over management of Coram's operations. However, prior to agreeing to act as Chief Executive Officer of Coram, Crowley demanded more compensation from Cerberus, above the $960,000 annual salary he was already receiving from Cerberus and in addition to his compensation from Coram. Crowley made these demands in a furtive letter, in which he requested that such additional compensation for his success at Coram be disguised by giving him an additional share of the upside in an unrelated company partly owned by Cerberus called Winterland. As proposed by Crowley, the compensation would not be

C90

measured by the success of Winterland, but rather by the result of Crowley's efforts at Coram. Feinberg in fact agreed to provide Crowley with additional potential compensation from Cerberus' share of Winterland in exchange for Crowley agreeing to act as CEO of Coram under Feinberg's direction.

27.     Within days of the discussions described in Paragraph 26, Crowley was hired by Coram for a three-year term, effective November 30, 1999, as Chairman of the Board, President and Chief Executive Officer. His compensation included options to purchase 1 million shares of Coram common stock, a base salary and a potential performance bonus.

28.     On or about the same day that Crowley agreed to employment terms with Coram, Crowley and Cerberus executed a written employment agreement that reflected the earlier terms described in Paragraph 26 and confirmed that Crowley agreed to devote "his entire business time, attention, skill and energy exclusively" to Cerberus by performing duties to be assigned by Feinberg, in exchange for a base salary of $80,000 a month ($960,000 a year) plus the potential for Crowley to receive sizeable bonuses, including by a share in the profits of Winterland. The written agreement also provided that Cerberus could terminate all of Crowley's rights to receive these payments if he did not follow Feinberg's reasonable instructions.

29.     Almost immediately upon hiring Crowley, Feinberg recommended to Coram's Board of Directors, of which Feinberg was then a member, that Coram hire Crowley's consulting company, Dynamic Health Care Solutions ("Dynamic") to act as a "consultant" to Coram. Many of the services performed by Dynamic were services for which Crowley was to be compensated as CEO of Coram, so that for the most part the substantial fees paid by Coram to Dynamic were simply so much additional hidden compensation arranged by Feinberg for Crowley. Fees paid to Dynamic for only one month in December, 1999, were approximately $200,000; the amount

of fees paid during the first seven months of 2000, prior to the bankruptcy filing, are unknown but are believed to be substantial.

30. For the duration of the Cerberus employment agreement, continuing to this day, Crowley has cooperated fully with Feinberg in the advancement of the best interests of Cerberus as required by that agreement.

31. Neither Crowley nor Feinberg disclosed to Coram and its Board of Directors that Crowley had been engaged as a full-time, exclusive Cerberus employee or that Crowley was being paid nearly $1 million a year, plus expenses, and potential bonuses, by Cerberus. Further, it was not disclosed in any public filings of Coram notwithstanding that such disclosure was mandated by provisions of the Securities and Exchange Act and the United States Bankruptcy Code.

**Crowley Manages Coram for the Benefit of Cerberus and the Noteholders**

32. Once installed as CEO, Crowley immediately made substantial changes in the way Coram was managed and operated. He discarded the efforts of his predecessor, Rick Smith, to grow the business. Instead, Crowley's efforts were designed to enhance the value of the Notes held by Cerberus, his employer, and to give Cerberus and the other Noteholders a claim to the equity of Coram. He made strategic decisions designed to provide cash to reduce debt at the expense of future cash flow and without regard to the injury thereby caused to Coram. While some of these decisions were warranted by legitimate business concerns, most of them, and the thrust of his efforts, were designed to decrease future profitability – and hence present value – in the interest of repaying debt.

33. For example, at a time when Coram was seriously short of cash, Crowley made substantial cash interest payments to the Noteholders, including Cerberus, even though Coram was not obligated to make such payments in cash.

425495.1 2/6/01

10

C92

34.     Another example of the manner in which Crowley acted in the short term interests of Cerberus and against the interests of Coram was his decision to sell one of Coram's operating divisions, Coram Prescription Services ("CPS"), at a price far below the value estimated by Coram's investment banker, Deutsche Bank Alex Brown.  The only constituency that benefitted by that sale was the Noteholders, including Cerberus; they received all of the proceeds of the sale and Coram lost the cash flows that CPS had been generating.  Crowley did not attempt to negotiate the amount of this payment to the Noteholders, though prudent business practice required that he do so.

**Stark II**

35.     In December, 1999, shortly after becoming CEO of Coram, Crowley became aware that the company needed to address its future compliance with federal heath care regulations regarding Medicare and Medicaid payments.  Under the ownership and referral provisions of Omnibus Budget Reconciliation Act of 1993 ("Stark II") it is unlawful for a physician to refer patients for certain designated health services reimbursable under the Medicare and Medicaid programs to an entity with which the physician (or the physician's immediate family members – broadly defined) has a financial relationship, unless the financial relationship fits within an exception enumerated under Stark II or regulations promulgated thereunder.  Coram is subject to the provisions of Stark II.

36.     Stark II includes an exception for a physician's ownership of publicly-traded securities if, among other things, the company has stockholder equity exceeding $75 million. As of December 31, 1999, Coram complied with the stockholder equity exception to Stark II.

37.     In December, 1999, Crowley became aware that Coram would not qualify for exception to Stark II as of the end of the year 2000.  One way to solve the problem which was

briefly considered would have been for Cerberus and the other Noteholders to convert some of their Coram debt into equity. Such conversion might dilute existing equity, but would not have destroyed it. This initially appealed to Crowley, who owned one million stock options.

## The Scheme to Steal the Equity In Bankruptcy

38.    In February, 2000, Cerberus and the other Noteholders rejected any proposal that would have retained value for existing equity. Instead, with the assistance of bankruptcy counsel retained for Coram at the urging, if not insistence, of Feinberg, Crowley and Feinberg devised a scheme to use Stark II as an excuse to wipe out the interests of the existing common shareholders of Coram and secure the future value of Coram for Cerberus and the other Noteholders. The essence of this scheme was to present to the Bankruptcy Court an argument that the solution to the looming Stark II problem was to make Coram a private company by canceling the interests of the public shareholders and transferring the entire equity to Cerberus and the other Noteholders. This would solve the Stark II problem because no referring physicians would be shareholders of Coram and thus no physician referrals would run afoul of Coram's Stark II obligations. However, this solution deprived equity of its true value.

39.    To implement this scheme, Crowley and Feinberg, with the assistance of counsel, decided to delay any bankruptcy filing as long as possible in the year 2000 so that Coram could argue that there were emergency circumstances that required the approval of a bankruptcy plan of reorganization by the end of the year. This was intended to stifle shareholder opposition by severely limiting the opportunity to oppose the plan in the Bankruptcy Court. Crowley and Feinberg hoped that a busy bankruptcy judge, faced with an apparent drop dead end of the year deadline for reorganization if Coram was to remain viable, would not allow time for proper scrutiny of the facts pertinent to the plan of reorganization.

40.    To further this scheme, Coram waited until the second week of August, 2000, to file its Chapter 11 petition  This, despite the fact that Crowley and Feinberg were aware as early as December, 1999 that the Stark II problem had a drop dead date thirteen months later, and that Crowley and Feinberg discussed restructure options at every Board of Directors meeting from November, 1999 to August, 2000.  Specifically, the directors (i) were advised in January, 2000 about bankruptcy options; (ii) made serious preparatory efforts in mid-February, 2000; (iii) engaged bankruptcy counsel at their April 5, 2000 Board meeting; and (iv) engaged a valuation expert on April 12, 2000.  After the bankruptcy petition was filed, Coram, through its counsel acting under the direction of Crowley, opposed the formation of an official committee of Coram's common shareholders, thus resulting in further delay and further squeezing the reorganization proceedings on the basis of a deadline that Crowley had known about a year earlier.

## How the Scheme to Steal Equity Injured Coram

41.    While the scheme devised by Feinberg and Crowley was directed by them towards the elimination of equity, they also knew that a direct and inevitable result of their plan would be to cause material injury to Coram and its business – and in fact it did cause such harm in a myriad of ways.

42.    For example, Feinberg caused Crowley to manage Coram so as to avoid all reasonable efforts to explore options other than Chapter 11.  Coram never retained an investment banker to explore the manner in which the value of Coram could be increased and never had a functioning special committee of independent directors to explore strategic options to grow the company.  As a result, Coram missed attractive business opportunities that would have enhanced

C95

its value by increasing its revenues, margins and profits, allowed refinancing of its indebtedness and avoided destructive bankruptcy proceedings.

43.    Further, as it became apparent in the healthcare industry and provider community that Coram was being managed towards bankruptcy, healthcare organizations that were the driving force in referring customers ceased to do so.    Coram's failure to deal with the Stark II problem had a direct, negative effect on revenues.    After rising during the first half of 2000, revenues declined once the scheme to have Cerberus and the Noteholders acquire the equity of Coram without any recompense to the existing owners was put in place in approximately April, 2000, and the inevitable Stark II deadline – which Coram had failed to deal with for eight months – approached.    What is clear is that Crowley failed to exercise opportunities to grow the business or to explore strategic options but deliberately managed Coram's affairs so that it would appear to have little or no value above the amount owed under the Notes.

**The Crowley Payoff**

44.    Crowley demanded more compensation if he was to go along with the scheme to steal the equity for Cerberus and the other Noteholders.    The $960,000 annual salary he was receiving from Cerberus and the $650,000 in annual salary (plus a potential bonus capped at less than $2 million) from Coram was not sufficient for Crowley.    For example, a significant part of Crowley's original compensation package with Coram was one million options to purchase Coram stock at a price measured by the public price on the day Crowley became CEO.    If the scheme to wipe out equity succeeded, these options would become worthless.    In addition, Crowley is a high net worth individual who would have potential personal exposure if the scheme was discovered. Crowley did not want to accept such a risk without a significant reward.

45.    In response to Crowley's demand, and to ensure Crowley's cooperation with the Cerberus scheme, Feinberg, as Chairman of Coram's Compensation Committee, renegotiated Crowley's employment agreement, even though that agreement had been signed only three or four months earlier, and Crowley right to renegotiate his contract at that time.

46.    The renegotiated agreement (the second amendment to Crowley's employment agreement) was finalized in April, 2000. It was signed on behalf of Coram by Feinberg, who was not an officer of Coram. It is probably the only Coram contract that Feinberg ever signed. The second amendment provided that Crowley was to receive a potentially unlimited bonus and one that would almost certainly dwarf the maximum $1.9 million bonus that Crowley could receive under the employment agreement he had agreed to and executed in late 1999. Crowley was virtually guaranteed a bonus of at least $4.5 million under the second amendment negotiated by Feinberg and in fact expected then, and still expects today, to receive a bonus of at least $13 million.

47.    In late July, 2000, about two weeks before the bankruptcy filing, Feinberg attempted to cover his tracks by abruptly resigning from Coram's Board of Directors. However, since Cerberus's employee Crowley remained as Chairman and CEO of Coram and was contractually obligated to act under Feinberg's direction or be fired from his lucrative employment contract with Cerberus, the change was merely cosmetic. Feinberg still had de facto control over Coram and exercised it to carry out the scheme to bankrupt Coram.

## COUNT I

## AGAINST CROWLEY AND FEINBERG
## FOR BREACH OF FIDUCIARY DUTIES

48.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 47 as if fully set forth herein.

49.    Crowley and Feinberg, as directors of Coram, owed Coram a duty of care, loyalty, accountability and disclosure commensurate with their fiduciary obligations.

50.    Crowley and Feinberg, individually and collectively in their roles as executives and/or directors of Coram, participated in the acts of mismanagement alleged herein.

51.    Crowley and Feinberg intentionally mismanaged Coram as alleged herein and thereby breached their duty of care, loyalty, accountability, and disclosure to Coram.

52.    Crowley and Feinberg intentionally and materially breached their fiduciary duties to Coram in at least the following ways:

  a.    causing Coram to: (i) adopt a business strategy that focused on liquidation of assets and reduction of debt even when such actions were adverse to the interests of Coram and taken solely for the benefit of Cerberus and the other Noteholders;  (ii) fail to retain and consult independent financial advisors; (iii) fail to explore opportunities for business combinations, capital provisions and strategies to grow; (iv) use scarce resources for the purpose of paying down debt owed to Cerberus and other Noteholders that was not required by the terms of the Notes and thus forgoing more prudent and beneficial uses of such cash, such as by developing and growing the business; (v) fail to use reasonable business judgment in negotiations with Cerberus concerning use

of proceeds of asset sales; (vi) unconscionably delay the implementation of steps necessary to comply with government regulations in order to posture its bankruptcy filing as an emergency;

b.      as members of Coram's Board of Directors, approving the extraordinary and imprudent expenditures of money and waste of corporate assets by providing executive compensation to Crowley in excess of $14 million;

c.      placing the interests of Cerberus above the interests of Coram and forcing Coram to enter bankruptcy to the benefit of both Crowley and Feinberg;

d.      failing to take appropriate steps to preserve the stockholder equity of Coram so that it could comply with Stark II; and

e.      engaging in self-dealing to the detriment of Coram.

53.     As a result of the acts, omissions, and breach of fiduciary duties by Crowley and Feinberg, Coram has been damaged in an amount to be proven at trial.

## COUNT II

### CLAIM AGAINST CERBERUS
### AS PRINCIPAL OF ITS AGENT, CROWLEY

54.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 53 as if fully set forth herein.

55.     Crowley at all times, while nominally acting as Chairman and CEO of Coram, was in fact an express agent, pursuant to a written contract, of Cerberus. The scope of this agency agreement required Crowley to act in his capacity as CEO and Chairman of Coram under the direction of and on behalf of Cerberus.

C99

56.    The above stated intentional and material breaches of fiduciary duty by Crowley were taken within the scope of the principal/agent relationship that he had with Cerberus. Cerberus is thus liable as principal for the damages caused by those actions.

57.    As a result of the acts, omissions and breaches of fiduciary duty by Crowley for which his principal, Cerberus, is legally responsible, Coram has been damaged in an amount to be proven at trial.

## COUNT III

### CLAIM AGAINST CERBERUS
### FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

58.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 57 as if fully set forth herein.

59.    Crowley owed fiduciary duties to Coram.

60.    As more fully set forth above, Crowley materially and intentionally breached his fiduciary obligations to Coram.

61.    Cerberus knowingly encouraged Crowley to breach his fiduciary obligations in the manner set forth above in at least the following ways:

    a.    Cerberus induced Crowley to conceal the extent and nature of his relationship with Cerberus from Coram; and

    b.    Cerberus compensated Crowley for his actions at Coram through direct salary and by side-payments tied to a Cerberus portfolio company.

62.    Cerberus is jointly and severally liable with Crowley for his breaches of fiduciary duty.

63.    As a result of the actions of the breaches of fiduciary duty by Crowley, which were wrongfully induced, aided and abetted by Cerberus, Coram has been damaged in an amount to be proven at trial.

## COUNT IV

### CLAIM AGAINST FEINBERG AND CROWLEY
### FOR FRAUDULENT MISREPRESENTATION

64.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 63 as if fully set forth herein.

65.    Defendants Crowley and Feinberg made certain statements to Coram's Board of Directors regarding Crowley's relationship to Cerberus, which were memorialized in various Securities and Exchange Commission filings and Bankruptcy Court filings, that indicated that Crowley was nothing more than a consultant to Cerberus on other projects.

66.    These statements were false and misleading in that they contained material omissions of fact necessary to make the statements that were made true and not misleading. Specifically, both Crowley and Feinberg did not reveal and in fact concealed the facts that: (i) Crowley was at all relevant times a full-time employee of Cerberus; (ii) Crowley's efforts on behalf of Coram were within the scope of his employment agreement with Cerberus; (iii) Crowley was subject to immediate dismissal from his lucrative employment contract with Cerberus should he fail to comply with directions – including directions on Coram matters – given to him by Feinberg; and (iv) the enormity of the compensation being paid to Crowley by Cerberus.

67.    Crowley and Feinberg, as directors of Coram, had a duty to fully disclose the facts of the relationship between Crowley and Cerberus in order to prevent such statements from being misleading. Crowley's and Feinberg's failure to disclose the material facts alleged herein as to

the nature and extent of the relationship between Crowley and Cerberus made their statements to the Coram Board of Directors materially false.

68.    Crowley and Feinberg knew of the material facts which were not disclosed to the Coram Board of Directors and intentionally concealed them from the board.

69.    Crowley and Feinberg intended to deceive the Coram Board of Directors by concealing the material facts and intended that Coram rely upon the resulting false statements in making its business decisions.

70.    Coram had a right to reasonably rely on the statements made by Crowley and Feinberg, fiduciaries of Coram, as to the nature of their relationship and did so.

71.    Coram was thereby damaged in an amount to be proven at trial.

## COUNT V

### CLAIM AGAINST CERBERUS
### FOR BREACH OF FIDUCIARY DUTY

72.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 71 as if fully set forth herein.

73.    Cerberus exercised de facto control over the affairs of Coram through its relationship with Crowley, Feinberg and Amaral.

74.    By virtue of its control over the affairs of Coram, Cerberus owed the company the fiduciary duties of care, loyalty, accountability and disclosure.

75.    Cerberus intentionally and materially breached the duties that it owed to Coram in at least the following ways:

   a.    causing Coram to: (i) adopt a business strategy that focused on liquidation of assets and reduction of debt even when such actions were adverse to the

interests of Coram and taken solely for the benefit of Cerberus and the other Noteholders; (ii) fail to retain and consult independent financial advisors; (iii) fail to explore opportunities for business combinations, capital provisions and strategies to grow the Company; (iv) use scarce resources for the purpose of paying down debt owed to Cerberus and other Noteholders that was not required by the terms of the Notes and thus forgoing more prudent and beneficial uses of such cash, such as by developing and growing the business; (v) fail to use reasonable business judgment in negotiations with Cerberus concerning use of proceeds of asset sales; and (vi) unconscionably delay the implementation of steps necessary to comply with government regulations in order to posture its bankruptcy filing as an emergency.

76.    As a result, Coram was damaged in an amount to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Granting judgment against each and every Defendant in favor of Coram for the amount of damages sustained by Coram as a result of the actions, inactions, omissions, and breaches of each Defendant;

B.    Awarding Coram punitive damages for the intentional misconduct alleged herein in an amount sufficient to deter such future conduct, taking into account the net worth of each individual against whom punitive damages are awarded;

C.    Requiring that a full accounting be made in granting judgment against each Defendant for the amount of the total financial losses to Coram as a result of the acts complained of;

D.    Removing Daniel D. Crowley from the Coram Board of Directors;

E.    Awarding to Plaintiff the costs and disbursements of this action, including

reasonable attorneys', accountants', and experts' fees, and costs and expenses;

and

F.    Granting such other and further relief as the Court may deem just and proper.

Mark Minuti (No. 2659)
Tara L. Lattomus (No. 3515)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6840/6847

-and-

Richard F. Levy (IL ARDC NO. 01645064)
Theodore J. Low (IL ARDC NO. 01696491)
Benjamin D. Schwartz (IL ARDC NO. 0252276)
Brandy A. Sargent (IL ARDC NO. 06270551)
ALTHEIMER & GRAY
10 South Wacker Drive, Suite 4000
Chicago, IL 60606
(312) 715-4000 (phone)
(312) 715-4800 (FAX)

Attorneys for The Official Committee of Equity
Security Holders of Coram Healthcare Corp.

Dated:  February 6, 2001

C104