## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| CORAM HEALTHCARE CORP., | ) | Case No. 00-3299 (MFW) |
| and CORAM, INC., | ) | and Case No. 00-3300 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Related to Docket Nos. 962 |

Hearing Date:  November 5, 2001 @ 9:30 a.m.
Objection Deadline:  October 19, 2001

## EQUITY COMMITTEE OBJECTIONS TO DEBTORS'
## *SECOND* JOINT PLAN OF REORGANIZATION

The Official Committee of Equity Security Holders of Coram Healthcare Corp. (the "Equity Committee"), by its attorneys, objects to the confirmation of the Second Joint Plan of Reorganization proposed by debtors Coram Healthcare Corp. and Coram, Inc. (collectively "Coram" or "Debtors") on August 1, 2001 (the "Second Plan").

### OBJECTION – LACK OF GOOD FAITH

**Debtors' Second Plan Has Not Been Proposed In Good Faith And The Plan Proponents Have Not Acted In Good Faith. Accordingly, The Second Plan Fails To Comply With The Requirements Of Section 1129(A)(3) And Cannot Be Confirmed.**

1.      Debtors failed to confirm their First Plan[1] because Dan Crowley's loyalties as a director and CEO of Coram were divided and conflicted by his million dollar per year

---

[1]      "First Plan" refers to the Restated Joint Plan of Reorganization filed in August, 2000.  "Second Plan" refers to the Second Joint Plan of Reorganization filed in August, 2001.

442281.1 10/22/01

employment contract with Cerberus, a Noteholder, and its principal, Stephen Feinberg. As a result, this Court could not find the requisite good faith. Finding that such relationship was "an actual conflict" that "tainted" Crowley and perhaps Cerberus, this Court concluded "I just do not want my name confirming a plan where this type of activity occurred for a year before the plan was proposed for confirmation." (12/21/00 Tr. 89)

2.    Now, almost a year later, Debtors seek to confirm their Second Plan even though the same activity that caused rejection of the First Plan goes on:    Cerberus and Feinberg continue to pay Crowley $80,000 every month under the same employment contract that caused this court to find "an actual conflict" that "tainted Crowley and perhaps Cerberus and the debtor itself." (12/21/00 Tr. 88)

3.    The forced disclosure of the conflict, which came only after the Equity Committee objected successfully to the First Plan, has not cured anything because Coram's Directors did nothing about the conflict. The central and most critical fact in these proceedings is that the management and operations of Coram, the generation of cash flows and the entire process that led to the proposal of the Second Plan have been essentially controlled by the Noteholders through Crowley, and not by an independent board discharging its fiduciary duty to shareholders. And so whatever was wrong on August 8, 2000, and December 21, 2000, has continued to be wrong for the past year and is wrong now.

**The Attempt to Steal the Equity Continues**

4.    What is wrong now is that Crowley continues to serve two masters whose interests are not aligned. The economic interests of the Noteholders[2] will best be served if

---

[2]    The Noteholders, in addition to Cerberus, are Goldman Sachs and Foothill.

C204

Coram generates sufficient cash flows to pay the Noteholders – *and no more.*  Then, if the Second Plan is confirmed, the Noteholders will own the Company, and Crowley can run it up to its full potential.  The stockholders' interests, of course, are quite different:  They want the Company to run to its full potential *now,* so that their interests can be fairly valued and not delivered to the Noteholders, whose nominee, Cerberus, continues to pay Coram's CEO, Crowley, a million dollars a year, to be Cerberus' "full time" employee.

5.   Last December, this Court said that it could not confirm Debtors' First Plan:

> ". . . because of the process being tainted by this relationship which began in November of 1999, and perhaps in August of 1999, has so tainted the debtors' restructuring of its debt, the debtors' negotiations towards a plan, even the debtors' restructuring of its operations." (12/21/00 Tr. 88)

We now know that the relationship described by the Court has continued to this day.  Debtors argue that the taint and damage caused by the conflicted relationship to Coram's restructuring and operations and the negotiation of a plan, has been removed during the last year.  The evidence will show that it has not been removed, but, on the contrary, the actions of the Directors, and of Crowley and Feinberg, represent at best, conscious indifference to the dictates of this Court, and at worst, a deliberate bad faith attempt to allow Crowley to continue to operate Coram, unchecked, for his own benefit and for the benefit of his employer, Cerberus, and the other Noteholders.

6.   In short, the Directors, Crowley and the Noteholders are asking this Court to put its name on a plan where this type of activity has continued unabated for two years.

C205

7.    To do this, Debtors invoke the conclusions of a "special committee" of "independent directors,"[3] which claims to have proposed the Second Plan only after investigating the effect of the admitted conflict on Coram. That is what they say, but the evidence will show that these Outside Directors completely abdicated (i) their responsibility to oversee the operations and strategy of the Company to Crowley, and (ii) their responsibility to investigate, understand and deal with a profound conflict to Goldin.

**The Members of the Special Committee of Directors**
**Abdicated Their Responsibilities and Did Not**
**Discharge Their Fiduciary Duties of Care.**

8.    Shortly after December 21, 2000, the Coram Directors learned that this Court had (i) refused to confirm the First Plan because of the actual conflict of interest, and (ii) expressed a view that Crowley's "intent to hide the relationship" with Cerberus "did, in fact, taint his ability to serve as CEO of the debtor." (12/21/00 Tr. 89). Yet, for six months or more after learning this, the Outside Directors ignored the conflict, did not increase their oversight on Crowley, took no action to enforce their own Corporate Compliance Standard on Conflicts of Interest that Crowley had clearly violated, did not know, until the Equity Committee told them during their depositions less than one month ago, that the conflict was continuing, didn't care -- and certainly never even approached the level of due care that is required of directors of a Delaware corporation in conflict situations such as this. The only action taken by the Directors in response to this Court's findings, was to hire Goldin, whose

---

[3]    The "independent directors", who we refer to as "Outside Directors," are L. Peter Smith, William Casey, Sandra Smoley and Don Amaral. Coram's fifth director is Dan Crowley.

C206

advice on what action they should take in the face of this conflict was not available until six months later.

9.    Recent sworn deposition testimony[4] shows that the Outside Directors asked no questions concerning the effect of the conflict on Crowley's ability to continue to serve as CEO of Coram, did not have or consider getting an outside advisor to provide oversight to protect the Company during this period against possible adverse effects of the conflict, never asked Feinberg or Cerberus why the payments were being made, never asked Crowley whether he intended to hide the relationship, never asked Crowley to terminate his relationship with Cerberus, waited about five months before even raising the issue with Crowley *and never considered whether Coram would have done better if the conflict had not existed.*

10.    This six months of allowing Crowley to operate the Company and make strategic decisions with minimal or no oversight, was a critical part of the process that resulted in the Second Plan.  Cash flows and other drivers of value were being created during this period under the control of a tainted CEO, whose Outside Directors exercised no meaningful oversight or due care on his conflicted activities.

11.    At the end of July, 2001, the Outside Directors received the initial Goldin Report.  They purported to act in accordance with its recommendations, but it is plain enough that they did not have the smallest grasp of the most rudimentary facts relating to the conflict of interest that they had been informed of seven months before.  In September 2001, more

---

[4]    At this point, three of the four Outside Directors have been deposed.  Factual allegations in these objections reflect our information as of October 19[th.]  Additional discovery, including depositions of Amaral and Crowley, is scheduled before the confirmation hearing.

C207

than a month after they acted in alleged reliance on the Goldin Report, some or all of the three

Outside Directors who were deposed gave sworn deposition testimony that they:

- Were not aware that this Court had found an actual conflict;

- Had "no idea" whether the Company could have done better if the conflicted relationship had not existed;

- Did not know that Crowley was continuing to receive $80,000 per month from Cerberus under the same contract that had caused the problem last December and never asked;

- Had never read the Cerberus contract;

- Were not aware that the Cerberus contract provides that Crowley would lose his $1 million per year if he failed to follow Feinberg's reasonable instructions;

- Never asked Crowley (to this day) why he didn't disclose the magnitude of his financial relationship with Cerberus;

- Made no attempt to discover why or how Goldin made an error of sufficient magnitude to cause him to issue an "updated" (revised) report;

- Never received a copy of the Deloitte & Touche Report which estimated a potential value for shareholders of $23 to $77 million, or, having received it, never read it because he or she assumed it was biased.

12.     And, despite the findings of this Court and Goldin that an actual conflict existed

and was a serious breach of fiduciary duty and that the relationship plainly violated Coram's

Corporate Compliance Policy on Conflicts of Interest, some of the Directors still refuse to

admit the basic, incontrovertible fact that a conflict existed and continues to this day. Sandra

Smoley, the Outside Director who was recommended for that role by Crowley, remarkably

takes the position that the million dollar per year relationship between Cerberus and Crowley

was not a conflict. At the same time, she concedes that if the same relationship had existed in

the California State agency she once headed, that *would* be a conflict. Her only distinction is

that, in her mind, "it's apples and oranges" because one is "a governmental entity and the other is publicly traded" and there is a lot less conflict in the private sector than there is in the public arena.

13.    From all of this it is clear that what the Special Committee did was rely, hook, line and sinker on conclusions in the Goldin Report, without knowing and understanding the relevant facts and without personal investigation of any sort. That does not satisfy their duty of care, and without the exercise of such care, their action in proposing the Second Plan cannot be said to be in good faith.

14.    The law is clear that merely appointing a "special committee" or "independent directors" is not enough.[5] That committee must be not only a body, but a diligent, active body. **Strassburger v. Early**, 752 A.2d 557, 567-68, 571 (Del. 2000) (refusing to accept the approval of corporate action by a special committee when that committee limited its investigation, avoided information highly relevant to the assignment and was not provided accurate information, "[c]onsequently, and with all due respect for [his] acumen as a businessman and his good intentions, his independent committee role could not and did not provide meaningful protection for the ... minority."). Further, in **Brehm v. Eisner**, 746 A.2d 244 (Del. 2000), Delaware's Supreme Court clarified the requirements of directors' duties to inform themselves in decision-making in cases even absent conflicts of interest: "in making business decisions, directors must consider all material information reasonably available." **Id.** at 259. The court was careful to make clear that "material" means "relevant and of a

---

[5]    The reported cases emphasizing the requirement that special committees must themselves investigate and understand the relevant facts and remain active participants is voluminous. The Equity Committee is prepared to furnish the Court with a Memorandum of Law covering these issues if that would be helpful to the Court.

C209

magnitude to be important to the directors in carrying out their fiduciary duty of care in decision making." **Id**. at 259, n. 49. Further, while utilization of an expert can provide some protection to a diligent board, the directors will still be found to have violated their fiduciary duties of care under Delaware law if, among other things, the subject matter that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice or if the decision of the Board was so unconscionable as to constitute waste or fraud...". **Id**. at 262. The "obvious" material that was "reasonably available" is outlined in part above. Accordingly, any attempt to prop up the Second Plan with eloquent assertions of Goldin's independence must fail because the Outside Directors still abdicated their responsibilities.

**The Goldin Report**

15.    Obviously, the Outside Directors hoped and believed that their dereliction and disregard of duty would be absolved by the Goldin Report. But Goldin's role was to advise, not absolve, and, as set forth above, the Outside Directors are not permitted to blindly adopt his advice without diligently and actively investigating and understanding the relevant facts. As has been repeatedly affirmed by *all* parties, Goldin is *not* an examiner, he is *not* an expert on good faith whose special knowledge will assist the Court in making its determination of whether the requisite good faith exists, and his fact findings and conclusions are not entitled to any weight with this Court.

16.    In a nutshell, all that the Goldin Report does (valuation issues aside) is (i) accept the Court's conclusion that the Crowley-Cerberus relationship was a conflict of interest and "a

C210

serious breach of fiduciary duty" and (ii) conclude that he could find "no evidence" that this "serious breach" caused any damage to Coram, beyond $13 million. (Goldin Report, 10-12)

17.    It is not surprising that Goldin found no evidence of damage, since his methodology consisted mostly of interviewing people who were accused of wrongdoing or worked for someone accused of wrongdoing, and then determining that each and everyone of these people said that either there was no wrongdoing, or, if there was wrongdoing, no damage was caused.

18.    Goldin's basic postulate appears to be that conflicts of interest in corporate governance are acceptable and should go undeterred and unpunished unless the party claiming injury (here the shareholders) sustains the burden of proving that the conflict caused damage. That sort of "it's ok as long as you don't get caught" reasoning simply is not the law.

19.    Further, Goldin's entire report is flawed because it does not examine the possibility that Coram's performance might have been even better in the absence of the conflict. Unlike a discrete transaction that can be dissected to determine if a conflict affected the outcome, the "transaction" here involves the operations of a large company over an extended period of time. Goldin did not examine the fundamental insidious nature of conflicts of interest in this broad context, rather his investigation was confined to determining that "there was no evidence" that the conflict caused damage.

20.    Goldin's failure to analyze Coram's performance against the performance of competitor firms – especially given that Goldin concedes that Coram was being run by someone with a serious conflict of interest – makes Goldin's conclusions entirely unreliable.

C211

Further, the Goldin Report ignores the possibility that there were other actions that Coram chose not to take because they would have benefited stockholders, but not Noteholders.

21.    Goldin's assumption that noteholders' interests are consistent with shareholders' interests is incorrect. Noteholders interests are never perfectly aligned with stockholders' interests, because noteholders will oppose corporate decisions that increase the risk of nonpayment, even when those decisions are expected to benefit the company and its stockholders. As a result of Goldin's incorrect assumption regarding the relationship between noteholders' and stockholders' interests, several of Goldin's conclusions, including the conclusion that Stephen Feinberg did not have an incentive to conceal Daniel Crowley's employment agreement, are flawed. Feinberg's parochial interests were certainly better served if the world and the Coram stockholders did not know that he was paying Crowley one million dollars a year while restructuring the debt to dilute and eventually eliminate the interests of those stockholders.

22.    That aside, the Goldin Report is replete with material errors, fundamental mistakes in methodology, unsupported conclusions and gaping omissions. For example, *the Goldin Report, never deals with the fact that the offensive conflict continues.* It simply is not discussed. The very different interests of Noteholders and shareholders are denied. A large body of evidence showing actions by Crowley in favor of the Noteholders and contrary to the interests of the shareholders is omitted. While acknowledging that Crowley's voluntary cash payment of $6.9 million to the Noteholders was "troublesome," the Goldin Report *ignores a letter from Crowley to the Noteholders (which Goldin had), boasting that Crowley had "caused the Company to voluntarily repay $15.5 million early on the revolver.* The Goldin Report

ignores also the fact that the letter, addressed by Crowley only to the Noteholders, refers to Coram as "your company."

### Additional Significant Indicia of Lack of Good Faith – The Continued Failure to Disclose Material Facts About The Crowley Relationship

23.    Crowley, the Debtors and the Noteholders have continued to hide various aspects of Crowley's remuneration from the shareholders, the public and even each other. Crowley's current compensation agreement with the Company is shadowy at best. According to recent sworn deposition testimony of an Outside Director, the Compensation Committee of Coram's Board of Directors, on March 20, *2001*,[6] granted Dan Crowley's oral request for yet another amendment to his employment contract to make it "more incentivizing" and "motivational" for Crowley in the bankruptcy context – this one involving an additional benefit of "several million dollars."

24.    While draft minutes of the Compensation Committee meeting on March 20, 2001 reflect Crowley's request for some change in compensation, the action is ambiguously described in those minutes as "various multiples applied to base compensation with a threshold target of a 60% EBITDA goal based upon the present financial and operation conditions of the Company." Debtors' attorneys have been unable to respond to the Equities Committee's request to provide *any* written documentation of the change beyond the vague committee minutes, notwithstanding the Director's sworn testimony that Crowley's employment agreement was amended to reflect the increase.

---

[6]    It is clear beyond doubt that this occurred in 2001, not 2000, as the witness resisted two attempts by Debtors' attorneys to coach him into changing the date of the occurrence to 2000.

C213

25.    This increase in Crowley's compensation of "several million dollars" is not disclosed in any meaningful terms, in either the Second Disclosure Statement or in Coram's subsequent 10-Q filings with the Securities and Exchange Commission.

26.    There is yet another instance where Crowley has hidden sensitive and unfavorable information about his compensation: Each of the Outside Directors and Goldin testified unambiguously that, to their knowledge, no compensation consultant was ever retained to advise on the appropriateness of Crowley's compensation. However, documents discovered by the Equity Committee late last week disclose that in May, 2001, Coram did in fact hire Pearl Meyer & Partners as a compensation consultant to do "CEO Compensation Research – Business Turnaround Study." The results of this study, which identified compensation for CEOs hired "to turn the company around," vividly demonstrate the outrageous and excessive nature of the compensation awarded to Crowley by the Outside Directors. According to the testimony of Goldin and the Outside Directors, they were not aware of any compensation consultant. Therefore, the adverse information was not shared with them, nor was it included in the Second Disclosure Statement. It is not difficult to understand why.

27.    These additional instances of the concealment of Crowley's compensation, come on the heels of discovery of previously unknown facts concerning the failure to disclose Crowley's Cerberus compensation in the first Disclosure Statement and in earlier filings by Coram with the Securities and Exchange Commission: Interview and meeting notes, taken by Goldin and his attorneys in connection with the preparation of the Goldin Report, show that some of the Outside Directors, and Dan Crowley in particular, seek to blame the failure to disclose the Cerberus relationship on "the lawyers" and specifically David Friedman, who they

C214

say had the Cerberus contract prior to the original filing. According to these notes, Crowley told Goldin that "Friedman knew the specifics of both contracts . . . that Friedman had the Cerberus contract and that he [Crowley] relied on Friedman" with respect to the contents of the filing. The notes of a meeting between Goldin, his attorneys and the Outside Directors disclose "Dfriedman had Crowley Cerberus contract; could have incl. in Disclosure Statement."

28.    The Equity Committee does not seek, at this juncture, to find Mr. Friedman culpable, though it is troubled by the fact that in his interview with the Goldin people, he acknowledged that prior to the filing he thought that the Crowley/Cerberus/Feinberg "relationship would be the most important issue in the case." Friedman says (as reported in the interview notes) that though he relied primarily on public filings to harvest the information required by the bankruptcy filings, he still discussed the Crowley-Feinberg relationship with Crowley's former employee, Alan Marabito, Coram's EVP, who, he says, assured him that the filings were correct. We have no reason to doubt Friedman's version at this point.

29.    However, these newly discovered facts relating to the pre-filing knowledge of the Crowley/Cerberus relationship, viewed in conjunction with the newly discovered failure to disclose Crowley's latest compensation increase and the failure of the Company to disclose the unfavorable analysis of the Coram-retained compensation consultant, strongly suggest that Crowley, with the blind support of the Outside Directors, has continued his malevolent pattern of hiding both the source and amount of his compensation in order to disguise his loyalties to the Noteholders and his extraordinary greed. That is not just a failure of good faith.

C215

<u>SECOND OBJECTION</u>

**Coram's Enterprise Value Is Greater Than The Amount Of The Debt Due To All Creditors, Even Assuming The Noteholders Have A Valid Claim For 100% Of The Amount Of The Notes (But See Third Objection, Below). Accordingly, The Plan Cannot Be Confirmed Under The Cram Down Provisions Of Section 1129(B) Of The Bankruptcy Code.**

30.     The Deloitte & Touche Report, filed under seal with this Court on July 30 as an exhibit attached to the Equity Committee's Objection to the Debtors' motion to extend exclusivity, estimates a potential value of the interests of the shareholders at between $23 and $77 million.

31.     Different conclusions were reached by Chanin Associates and Goldin concerning value. In reconciling these differences, the Equity Committee will ask the Court to consider the basic unreliability of these two reports. Both the Goldin Report and the Chanin Report are largely driven by information provided by the Debtors and Scott Danitz, the Debtors' CFO, in particular. The evidence will show that the information provided by Danitz, particularly information relating to projections, is not reliable and is not consistent with other records of the Company prepared at a time when no motivation to falsify existed.

32.     The Goldin Report was initially dated and delivered on July 11, 2001. On August 29, 2001, a Goldin principal, Seymour Preston, was deposed by the Equity Committee. Preston testified that he was responsible for the financial analyses contained in the Goldin Report. However, he was unable to testify about such basics as the Company's cost reductions, the fact that by June 1, 2001, the Company was outperforming its target EBITDA by 60%, and the details behind the adjustments made in normalizing EBITDA.

C216

33.    Preston did testify that the Company provided the list of adjustments (as it did for Chanin) and that Goldin made no changes to that list, that "we have no reason to believe that their information was mistaken or had mistakes." However, following the deposition, Goldin had to concede that its calculation of EBITDA contained errors aggregating more than $5 million, or 20% of the total EBITDA calculation, based on that list of adjustments. This material difference (which Coram directors characterized as "an error", or in the case of Smoley, a "boo-boo") caused Goldin to issue an "updated" report to correct the error.

34.    It is unclear what steps Goldin has taken to determine what additional errors exist, but it is apparent that they do. What is clear is that the Directors have taken no steps to determine why an error of this magnitude occurred or what precautions have been taken to insure that the "updated" report is not also materially erroneous.

### THIRD OBJECTION

**The Conduct Of The Noteholders Was Inequitable And Requires That Their Claim Be Recharacterized As Equity, Or That Claims Be Pursued On Behalf Of Coram Against The Noteholders, In Addition To Those Claims Against The Outside Directors Of Coram And Dan Crowley.**

35.    The Equity Committee's derivative claim against Cerberus, Feinberg and Crowley is set forth in the Proposed Derivative Complaint filed on February 6, 2001. That pleading is incorporated in these Objections by reference. Leave to file that complaint was denied, *without prejudice,* on February 21, 2001.

36.    Discovery has revealed evidence, in the form of a reported statement by the Debtors' counsel, that in addition to Cerberus, Goldman Sachs and Foothill may also share responsibility for the breaches of fiduciary duty found by the Court in the initial confirmation hearing and as discussed above. As a result of that statement and other evidence, and

appropriate inferences, the Equity Committee believes that substantial claims, of the nature set

forth in the Proposed Derivative Complaint, now exist against Goldman Sachs and Foothill.

## FOURTH OBJECTION

### The Proposed Injunctions And Releases Render The Second Plan Non-Confirmable.

**Plan Section 13.4**

37.    Section 13.4 of the Second Plan states as follows:

> Releases by the Estate and its Representatives. In consideration of the promises and obligations of the Debtors, Reorganized Coram hereunder, and Mr. Crowley as embodied in the Executive Compensation Waiver, as of and on the Effective Date, the Debtors, the Estates, the Creditors' Committee, the Equity Committee, the Noteholder Group, and any and all Persons claiming through any of the foregoing entities whether directly or indirectly, and any of their successors, assigns or representatives shall, to the fullest and broadest extent permitted by law, be deemed to have waived, released and discharged all rights or claims, whether based upon tort, fraud, contract or otherwise, whether known or unknown, which they possessed or may possess prior to the Effective Date against the Debtors, their present and former directors, officers, employees, agents, representatives and attorneys and any successors or assigns of the foregoing, whether directly or indirectly, except as otherwise provided in the Plan, the Bankruptcy Code, or the Confirmation Order.

38.    The Equity Committee objects to this section because it attempts, in clear

contravention to Code Section 524(e), to force releases of non-debtor parties by both the

Debtors and other non-debtor parties.

### The Purported Release by Debtors of Non-Debtor Parties is Both Inappropriate and Far Too Broad

39.    Section 13.4 of the Second Plan would release all pre-Effective Date claims by

Debtors and their estates against not only the Debtors (which is redundant), but also against the

Debtors' present or former directors, officers, employees, agents, representatives and attorneys, all of whom are non-debtors. In **In re Zenith Electronics Corp.**, 241 B.R. 92, 110-11 (Bankr. D. Del. 1999), this Court held that, under certain circumstances, debtors could release non-debtor third parties. However those circumstances are not met here. There is no indication that any the unnamed releasees have made a contribution of assets to the reorganization. See **In re Genesis Health Ventures, Inc.**, 266 B.R. 591, 606 (Bankr. D. Del. 2001). Furthermore, Crowley's "waiver" of his executive compensation is nothing more than a blatant attempt to avoid paying for his continuing conflict of interest, not a contribution of assets.[7] Additionally, the Equity Committee believes that one or more classes of claimants and equity holders effected by the Second Plan will be found not to have accepted it, and Debtors will not have the "overwhelming support" necessary to find such releases appropriate, let alone have paid all of the claims and interests represented by the non-consenting classes. See **In re Global Ocean Carriers, Ltd.**, 251 B.R. 31, 43 (Bankr. D. Del. 2000) (releases rejected because the effected class of noteholders did not support the plan).

40.    Additionally, the releases contemplated by Section 13.4 of the Second Plan are entirely too broad. In Debtors' First Plan, such releases were contemplated only for claims arising out of "the Debtors' restructuring, DIP Facility, the Exit Financing Facility or otherwise in connection with the Debtors' Cases." (First Plan, Section 13.4(a).) In its present form, Section 13.4 purports to release non-debtor parties from any kind of claim, even if completely unrelated to Debtors' cases. It should also be noted that in the First Plan, the release of non-debtor parties for acts or omissions related to Debtors' cases specifically

---

[7]    And given the circumstances of the secret raise in Crowley's 2001 compensation agreement, it can be assumed that the Crowley will not end up with any less money in his pocket as a result of the waiver.

C219

excluded from the release acts that amounted to willful misconduct. (First Plan, Section 13.4(b).) The Second Plan does not even purport to exclude willful misconduct, much less gross negligence, a standard which the Third Circuit has found to be appropriate. **In re PWS Holding Corp.**, 228 F.3d 224 (3rd Cir. 2000); **Genesis Health**, 266 B.R. at 607.

## Section 13.4 Improperly Attempts To Force Non-Consensual Releases By Non-Debtors In Favor Of Other Non-Debtor Third Parties.

41.    In Section 13.4 of the Second Plan, Debtors have expanded the scope of releases far beyond what is allowed by the Code, by adding, as parties releasing claims, the Creditors' Committee, the Equity Committee, and the Noteholder Group.    While the Creditors' Committee and the Noteholder Group are free to release whomever they chose to, with respect to the Equity Committee, which has not consented to such releases, this section contravenes the Third Circuit's holding in **In re Continental Airlines**, 203 F.3d 203 (3rd Cir. 2000).    In **Continental**, the Third Circuit rejected similar "third party releases" which would have exculpated debtors' directors and officers from claims by shareholders of the debtors.    The court found that the shareholders had not received any consideration for the releases, and the directors and officers had made no critical financial contribution to the plan that was necessary to make the plan feasible. **Id**. at 215.    Furthermore, the court rejected the notion that releases were necessary because the debtors' might be obligated to indemnify the officers and directors, or because the debtors' relevant insurance policies might be implicated. **Id**. at 215-217. Accord **Zenith Electronics**, 241 B.R. at 111 (release of non-debtor could not be permitted "without the affirmative agreement of the creditor affected").

C220

**Plan Section 13.5**

42.     Section 13.5 of the Second Plan states as follows:

> Exculpation. The Debtors, their Estates, Reorganized Coram, the Creditors' Committee, the Noteholder Group, and their respective members, officers, directors, employees, representatives, attorneys and agents, shall, to the fullest and broadest extent permitted by law, be deemed released by each of them against the other and by the holders of Claims or Interests and all persons claiming through any of the foregoing entities, directly or indirectly or derivatively, of or from any and all claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Debtors' chapter 11 Cases, including without limiting the generality of the foregoing, the commencement of the Cases, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the DIP Facility, the Exit Financing Facility, the pursuit of Confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, or otherwise in connection with the Cases, and all such persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.

43.     In **In re PWS Holding Corporation**, 228 F.3d 224, 246 (3rd Cir. 2000), the Third Circuit noted that Section 1103(c) of the Code implies both a fiduciary duty to the constituents of an official committee and a grant of limited immunity to committee members and their professionals. The court permitted an exculpation provision of a plan which provided for exculpation to the extent of the limited immunity. However, the court specifically noted that releases of committees and their professionals cannot release claims for willful misconduct or *ultra vires* acts. **Id.** In so doing, the court upheld a limited exculpation of debtors, the committee and their professionals which specifically excluded conduct amounting to "willful misconduct or gross negligence." **Id.**

C221

44.    Section 13.5 of the Second Plan does not comply with the limitations mandated by the **PWS** case. First, Section 13.5 does not exclude from exculpation acts which amount to willful misconduct or gross negligence, an exclusion that is required by **PWS**. Second, Section 13.5 includes, as an entity to be exculpated, the Noteholder Group, which is not an official committee and does not have the limited immunity afforded by Section 1103 of the Code. By including the Noteholder Group, the Debtors are attempting to force the same kind of non-consensual release of non-debtor parties which the court refused to approve in **Genesis Health**, 266 B.R. at 607-609.

45.    In **Genesis Health**, the court recently rejected non-consensual releases by third parties of lenders who made a financial contribution to the Debtors' reorganization. The court found that, even if the threshold requirements of **Continental** regarding fairness and necessity of non-consensual releases had been met, the reorganization was not one of the type of exceptional cases (involving wide spread litigation against co-liable parties) in which non-consensual releases *might* be approved. **Id**. Similarly, here, the Noteholder Group is not entitled to a non-consensual release.

46.    Finally, noticeably missing from the exculpation is the Equity Committee and its professionals, even though the Equity Committee is an official committee pursuant to Code Section 1103. The Equity Committee and its professionals should be included in this section.

**Plan Section 13.6**

47.    Section 13.6 states as follows:

> Third-Party Releases.   In consideration of the promises, obligations, and waivers of rights to receive funds by Mr. Crowley and the members of the Noteholder Group, as embodied in the Plan and the Executive Compensation Waiver, as of and on the Effective Date, any party that votes in favor of the

Plan and any and all Persons claiming through any such party, whether directly or indirectly, and any such party's successors, assigns or representatives (collectively, "Releasors") shall, to the fullest and broadest extent permitted by law, be deemed to have waived, released and discharged all rights or claims, whether based upon tort, fraud, contract or otherwise, whether known or unknown, which they possessed or may possess prior to the Effective Date against the Debtors and all of their present and former directors, officers, employees, agents, representatives and attorneys and any successors or assigns, and against the members of the Noteholder Group and all of their present and former directors, officers, employees, agents, representatives and attorneys and any successors or assigns, whether directly or indirectly, except as otherwise explicitly provided in the Plan, the Bankruptcy Code, or the Confirmation Order. The release described in the preceding sentence shall be enforceable as a matter of contract against any Releasor pursuant to the Plan and/or the Confirmation Order.

48.     Section 13.6 is far too broad, even if it is limited only to those persons or entities who vote in favor of the Second Plan. Section 13.6 is in the nature of a general release, extinguishing all claims, of any nature, against the entities purported to be released. As drafted the release includes claims having nothing to do with Debtors cases, and would release any one of a number of unnamed and unidentified entities and persons related to Debtors and the Noteholder Group. So broad a release is clearly a trap for the unwary. To be acceptable, the releases embodied by this section should release only those claims and causes of action arising by virtue of the Releasors' claim against, or ownership interest in, the Debtors' estates, and only release Debtors, the Noteholder Group and their employees and professionals only from claims related to the Debtors and their chapter 11 cases.

C223

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | **Chapter 11** |
| | ) | |
| **CORAM HEALTHCARE CORP.,** | ) | **Case No. 00-3299 (MFW)** |
| and **CORAM, INC.,** | ) | **and Case No. 00-3300 (MFW)** |
| | ) | |
| Debtors. | ) | **Jointly Administered** |

### CERTIFICATE OF SERVICE

I, Mark Minuti, Esquire, hereby certify that on October 22, 2001, I caused a copy of the attached **Equity Committee Objections To Debtors'** *Second* **Joint Plan Of Reorganization** to be served on the attached service list in the manner indicated.

/s/ Mark Minuti
_____
Mark Minuti (No. 2659)
**SAUL EWING LLP**
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
(302) 421-6840

442281.1 10/22/01

C225

**CORAM HEALTHCARE CORP.,** *et al.*
**2002 Service List**

**Via Hand Delivery:**
Laura Davis Jones, Esquire
Rachel S. Lowy, Esquire
Pachulski, Stang, Ziehl, Young
  & Jones P.C.
919 Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE  19899-8705

Deborah E. Spivack, Esquire
Mark D. Collins, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Karen C. Bifferato, Esquire
Connolly, Bove, Lodge & Hutz LLP
1220 Market Street
P.O. Box 2207
Wilmington, DE  19899

Pauline K. Morgan, Esquire
Richard Morse, Esquire
Young Conaway Stargatt & Taylor, LLP
11th Floor, Rodney Square North
P.O. Box 391
Wilmington, DE  19899-0391

William D. Sullivan, Esquire
Elzufon, Austin, Reardon, Tarlov
  & Mondell, P.A.
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE  19899-1630

Don Beskrone, Esquire
Office of the United States Trustee
844 N. King Street, Room 2311
Lockbox 35
Wilmington, DE  19801

**Via Telecopy:**
David M. Friedman, Esquire
Athena Foley, Esquire
Adam L. Shiff, Esquire
Kasowitz, Benson, Torres & Friedman
1633 Broadway
New York, NY 10019-6022

Chaim Fortgang, Esquire
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY  10019

Alan B. Miller, Esquire
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153

Carol Morrison, Esquire
Schulte Roth & Zabel, LLP
900 Third Avenue
New York, NY  10022

442281.1 10/22/01

C226

Mr. Harrison J. Goldin
Goldin Associates, L.L.C.
400 Madison Avenue
New York, NY  10017

Kenneth H. Eckstein, Esquire
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, NY  10022

**Via U.S. Mail:**
Allen Marabito
Coram Healthcare
1675 Broadway, Suite 900
Denver, CO  80202

Thomas M. Antone IV, Esquire
Mintz, Levin, Cohn, Ferris,
   Glovsky & Popeo, P.C.
1704 Hunting Ridge Road
Raleigh, NC  27615

John T. Morrier, Esq.
Mintz, Levin, Cohn, Ferris,
   Glovsky & Popeo, P.C.
One Financial Center
Boston, MA  02111

John P. Dillman, Esquire
Linebarger Heard Goggan Blair
   Graham Pena & Sampson, LLP
P.O. Box 3064
Houston, TX  77253-3064

Francis J. Lawall, Esquire
Pepper Hamilton, LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799

Craig W. Relman, Esquire
Craig W. Relman, Co., L.P.A.
23875 Commerce Park Road
Suite 105
Beachwood, OH  44122

Eugene Tillman, Esquire
Reed Smith Shaw & McClay, LLP
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C.  20005-3317

Frederick A. Nicoll, Esquire
Thomas Nash, et al.
250 Park Avenue, Suite 1500
New York, NY  10177

Christopher Beard, Esq.
Beard & Beard
4601 North Park Avenue
Chevy Chase, MD 20815

Bankruptcy Administration
IOS Capital, Inc.
1738 Bass Road
P.O. Box 13708
Macon, GA  31208-3708

Peter A. Chapman
24 Perdicaris Place
Trenton, NJ  08618

Mr. Ed Mule
Goldman Sachs Credit Partners, L.P.
85 Broad Street, 6th Floor
New York, NY  10004

C227

Mr. John Grimm
Cardinal Health
7000 Cardinal Place
Dublin, OH  43017

Mr. Gregory C. Neier
Baxter Healthcare Corporation
Route 120 & Wilson Road
Technology Building RLT-06
Round Lake, IL  60073-0490

Gregory C. Neier
Baxter/Sabratek
Route 120 & Wilson Road
Technology Building RLT-06
Round Lake, IL  60073-0490

Mr. John Sills
Medical Specialties Co. Inc.
58 Norfolk Avenue
South Easton, MA  02375-0600

Mr. William C. Warner
B. Braun Medical/McGaw, Inc.
6021 South Syracuse Way, Suite 190A
Englewood, CO  80111

Joseph Smith
1726 Victoria Circle
Allentown, PA  18103

Robert F. Carter
EDI Payment
Federal Express
2650 Thousand Oaks Boulevard
Suite 3100
Memphis, TN  38118

Ms. Joanne L. Sadowsky
Novo Nordisk Pharmaceuticals, Inc.
100 College Road West
Princeton, NJ  08540

Mr. Joseph Cannon
Aventis Behring LLC
1020 First Avenue
P.O. Box 61501
King of Prussia, PA  19406-0901

Bowne of Dallas
1931 Market Center Boulevard,
Suite 111
Dallas, TX  75207

Prudential Insurance Company
P.O. Box 4347
Houston, TX  77210-4347

Carolyn Ruth
Safeco Life Insurance Company
Group Administration
P.O. Box 84388
Seattle, WA  98124

Ms. Linda Sutton
US Office Products
60 Tejon Street
Denver, CO  80223-1222

AT&T
P.O. Box 78214
Phoenix, AZ  85062-8214

US Healthcare
P.O. Box 1125
Blue Bell, PA  19422-0770

Mr. Gregory C. Neier
Sabratek Corporation
Route 120 & Wilson Road
Technology Building RLT-06
Round Lake, IL  60073-0490

C228

Twelve Oaks Corporation Housing
545 East Algonquin Road, Suite M
Arlington Heights, IL  60005

Brenda Dow
United Health Care
Clearwater Service Center
P.O. Box 740800
Atlanta, GA  30374

Thomas Butter
United Parcel Service
P.O. Box 505820
The Lakes, NV  88905-5820

Mr. Steve Hutton
Employment Leaders, Inc.
1527 Greenville Highway #2
Hendersonville, NC  28792

Mr. Steve Brand
Stephen Brand Productions
15702 Trapp Ridge, Suite 100
Chesterfield, MO  63017-8742

Infusion Solutions
1080 North Swan Road
Tucson, AZ  85711

CDW Computer Centers, Inc.
P.O. Box 75723
Chicago, IL  60675-5723

Daily Insights
225 West 34th Street, Suite 403
New York, NY  10122

Great West
P.O. Box 11111
Ft. Scott, KS  66701

Mr. Stephen Feinberg
Cerberus Partners, L.P.
450 Park Avenue, 28th Floor
New York, NY  10022

Mr. Ed Stearns
Foothill Capital Corporation
2450 Colorado Avenue, #3000W
Santa Monica, CA  90404

Mr. J. Edward Neugebauer
Aetna U.S. Healthcare
980 Lolly Road
Blue Bell, PA  19422

Mr. Bob Dudziuski
Tbob Enterprises, Inc.
12738 Davenport Plaza
Omaha, NE  68154

Farmers Insurance Group of Companies
Truck Insurance Exchange
4601 Wilshire Boulevard, Suite 2508
Los Angeles, CA  90010

Richard M. Smith
571 Silver Oak Grove
Colorado Springs, CO  80906

Ms. Liz Hanmonds
Genetics Institute, Inc.
170 North Radnor Chester Road
St. Davids, PA  19087

Tom Cougiglio
Resource Realty of Northern New Jersey
299 Cherry Hill Road, Suite 202
Parsippany, NJ  07054-1107

C229

Dave Wagner
The Metrix Company
4400 Chavenelle Road
Dubuque, IA  52002

Ms. Pam Gokey
Life Insurance Company of North America
3900 East Mexico Avenue, Suite 1400
Denver, CO  80210

Mr. Mark Lueck
Mediq/PRN
One Mediq Plaza, Unit 10
Pennisauken, NJ  08110

Steven K. Kortanek, Esquire
David L. Zive, Esquire
Klehr, Harrison, Harvey, Branzburg
 & Ellers LLP
260 South Broad Street
Philadelphia, PA  19102

Kathleen M. Miller, Esquire
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue
P.O. Box 410
Wilmington, DE  19899

Vito I. DiMiao
Parcels, Inc.
917 King Street
Wilmington, DE  19801

C230

## Linda Bendlin

**From:** Laura Davis Jones
**Sent:** Monday, October 22, 2001 11:52
**To:** Linda Bendlin
**Subject:** FW: 00-03299-MFW "Reply (A)"

rachel -- paperflow


Laura Davis Jones
Pachulski, Stang, Ziehl, Young & Jones P.C.
919 North Market Street, 16th Floor
Wilmington, DE 19801
Direct Dial: (302) 778-6401
General Office: (302) 652-4100
Fascimile: (302) 652-4400
E-Mail: ljones@pszyj.com


-----Original Message-----
**From:** BKECFLIVEDB@deb.uscourts.gov [mailto:BKECFLIVEDB@deb.uscourts.gov]
**Sent:** Monday, October 22, 2001 9:35 AM
**Subject:** 00-03299-MFW "Reply (A)"

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

Notice of Electronic Filing

The following transaction was received from Minuti, Mark on 10/22/2001 at 9:34 AM EDT

**Case Name:**        CORAM HEALTHCARE CORPORATION and Richards, Layton & Finger P.A.
**Case Number:**      00-03299-MFW
**Document Number:** 1147

**Docket Text:**
Reply *Equity Committee Objections to Debtors' Second Joint Plan of Reorganization* Filed by Official Committee of Equity Security Holders (related document(s)[962]). (Attachments: # (1) Certificate of Service) (Minuti, Mark)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**M:/00-3299/442281.1/Objections to Debtors' Second Joint Plan of Reorganization.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=10/22/2001] [FileNumber=167297-0] [0f0b71b2e9686dc74fbbfa35699cb2e281579dbf988e7e3641770e4002e0449f5a8e 68bdfb65ba23d222a945903c5c2bba56c18fe120a2b485ea1b2dfbb20751]]
**Document description:**Certificate of Service
**Original filename:**M:/00-3299/442281.1/COS - Objections to Debtors' Second Joint Plan of

Reorganization.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=10/22/2001] [FileNumber=167297-1]
[799a520bf1c63f0f251a9ea22e8ffb7e31f56d37c45fd4286231712e08e9ea96c996
f8992873165b820e26d4633e52f348b4ffbf3015d63b98e91a53b2b92e35]]

**00-03299-MFW Notice will be electronically mailed to:**

Steven T. Davis    delbkr@obermayer.com,

Donald J. Detweiler    saulbankruptcy@saul.com, ddetweiler@saul.com

Laura Davis Jones    ljones@pszyj.com,
efile@pszyj.com;hmartin@pszyj.com;vmobley@pszyj.com;agrasty@pszyj.com

Carl N. Kunz III    ,

Tara L. Lattomus    tlattomus@saul.com,

Christopher James Lhulier    clhulier@pszyj.com,
hmartin@pszyj.com;vmobley@pszyj.com;agrasty@pszyj.com;efile@pszyj.com

Rachel Sarah Lowy    rlowy@pszyj.com,
hmartin@pszyj.com;vmobley@pszyj.com;agrasty@pszyj.com;efile@pszyj.com;rlowy@pszyj.com

Thomas G. Macauley !    bankr@zuckerman.com,

Kevin J Mangan    kmangan@walmon.com,

Katharine L. Mayer    kmayer@elzufon.com

Michelle Kathleen McMahon    mm@cblhlaw.com,

Mark Minuti    saulbankruptcy@saul.com

Francis J. Murphy    ,

Deborah E. Spivack    rbgroup@rlf.com

**00-03299-MFW Notice will not be electronically mailed to:**

Kenneth Eckstein
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

NOT YET APPOINTED

,

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                          )
                                )
CORAM HEALTHCARE CORP. and      ) Case No. 00-3299
CORAM, INC.,                    )  through 00-3300
                                )      (MFW)
              Debtors.          )

                        Bankruptcy Courtroom
                        No. 1, Sixth Floor
                        Marine Midland Plaza
                        824 Market Street
                        Wilmington, Delaware

                        Monday, December 17, 2001
                        4:20 p.m.

BEFORE:   THE HONORABLE MARY F. WALRATH,
          United States Bankruptcy Judge

          -- Transcript of Proceedings --

WILCOX & FETZER
1330 King Street - Wilmington Delaware  19801
(302) 655-0477




WILCOX & FETZER LTD.
Registered Professional Reporters



DEC 28 2001

C241

1    MR. FRIEDMAN:  I'm indifferent.

2    THE COURT:  You can mark them as an exhibit

3  now.

4    MR. LEVY:  Thank you.  Did you say now 15

5  minutes?

6    THE COURT:  Yes.

7    Mr. FRIEDMAN:  Thank you, Your Honor.

8    Your Honor, clearly our CEO has a conflict

9  and life would be much, much simpler if he didn't.  My

10  life, and I'm sure your life and everyone else's life

11  would have been simpler.  Life is just not that simple.

12    With the help of Professor Fischel, we

13  learned a little bit on Friday about conflicts that exist

14  between creditors and shareholders of an insolvent firm.

15  In this case our CEO has a relationship with a creditor.

16  That creditor also happens to have an equity interest,

17  but I don't think that really matters.

18    I think, as Professor Fischel acknowledged,

19  and I'm sure the Court has undoubtedly observed,

20  corporate management is often dominated by people who

21  have alliances to shareholders.  Many times management,

22  they are shareholders themselves.  Professor Fischel

23  commented in that context:  "Directors who are responsive

24  only to equityholders in the case of an insolvent company

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

C242

1    can have perverse incentives of their own."

2         So, Your Honor, it is the case that

3    conflicts of interest exist, and in some cases they

4    abound including among corporations that are

5    debtors-in-possession.  They are not, per se, illegal.

6    They are not, per se, immoral, but they are certainly

7    important.

8         I think since December of last year we have

9    treated Mr. Crowley's conflict of interest as extremely

10   important.  They must be dealt with.  Both Delaware

11   corporate law, statutory law, applicable case law in

12   relevant bankruptcy decisions all inform us as to the

13   proper manner in which to deal with conflicts of

14   interest.  Essentially it's a three-prong approach.  The

15   conflicts have to be disclosed.  The conflicts have to be

16   investigated.  To the extent that the conflicts touch

17   upon any corporate action, the conflicts of interest have

18   to be isolated.  Your Honor, that is the process that

19   we've adopted here.

20        Mr. Crowley's relationship with Cerberus

21   was fully disclosed on numerous occasions since this

22   Court's decision.  It was disclosed in the 10-K.  It was

23   disclosed in every quarterly 10-Q.  It was disclosed in

24   the disclosure statement with the input of the Equity

1    Committee who insisted upon the same things that we might

2    not have said ourselves but we said them, anyway, because

3    of the importance to us that there be no issue about

4    disclosure.

5              Mr. Crowley fully disclosed his

6    relationship with Cerberus to his own board of directors

7    after this Court's ruling as he testified last Thursday.

8              Mr. Amaral testified in court that

9    Mr. Crowley's relationship was fully disclosed.  He said

10   at page 412 of the record beginning at line 13:

11             "QUESTION:  Now, after the decision by the

12        Court in December of last year, did you have a

13        discussion with Mr. Crowley about the Court's

14        findings?

15             "ANSWER:  Me, on a one-on-one basis, no, but

16        we met with Mr. Crowley.  All the independent

17        outside directors met with him and he discussed

18        the situation.

19             "QUESTION:  What do you recall him saying?

20             "ANSWER:  That he reminded us of the

21        relationship.  He told us of the dollar amount

22        and that it was still in force today."

23             Your Honor, I'm going to take up probably

24   more time than I should, but I think this is a very

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

C244

1    important point and I'm very sensitive to this.

2         He disclosed this relationship, as well, to

3    each of the other directors and that is as clear as day

4    from the deposition record which was not made clear when

5    Mr. Crowley was confronted with certain sound bytes, but

6    I do want to read this into the record even if it takes

7    up some of my other time.

8         Mr. Smith was asked this at page 21

9    beginning on line 11 of his deposition:

10        "QUESTION:  Do you know today the amount of

11        the financial arrangements between Crowley, the

12        CEO, and the creditor which gave rise to the

13        conflict that you learned about on December 27?

14        "ANSWER:  I know order of magnitude.  I

15        don't know all of the details of it, but enough

16        to know that it was in order of magnitude.

17        "QUESTION:  What's the order of magnitude?

18        "ANSWER:  My understanding, it was a payment

19        of $80,000 a month or something in that range."

20        He went on to say at page 22 of his

21    deposition beginning at line 11:

22        "80,000 a month was a material enough

23        number to tell me that was a material

24        relationship between the two.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:

CORAM HEALTHCARE CORP. and
CORAM, INC.,
          **Debtors.**

Chapter 11
**Case No. 00-3299 (MFW)**
**and Case No. 00-3300 (MFW)**

**Jointly Administered**

## REQUEST OF DANIEL CROWLEY FOR PAYMENT OF ADMINISTRATIVE EXPENSE

Daniel Crowley, by his attorneys, hereby submits this, his Request for Payment of Administrative Expense (the "Request"). In support of the Request, Crowley states as follows:

### FACTUAL BACKGROUND

**A.**    **The Bankruptcy Filing and Chapter 11 Trustee**

1.    On or about August 8, 2000 (the "Petition Date"), Coram and Coram, Inc. (collectively, the "Debtors") each filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only.

2.    On February 12, 2002, this Court granted the motion to appoint a chapter 11 trustee (the "Trustee") to assume control over the Debtors' property and affairs pursuant to section 1104 of the Bankruptcy Code. On March 7, 2002 the Court approved the appointment of the Hon. Arlin M. Adams as Trustee.

**B.**    **Crowley's Employment under the Employment Agreement and KERPs**

3.    Prior to the Petition Date, on or about November 30, 1999, Crowley entered into an Employment Agreement (as amended from time to time, the "Employment Agreement")[1] with Coram Healthcare Corporation ("Coram"), whereby Coram agreed, among other things, to employ Crowley as its Chairman of the Board, President and Chief Executive Officer.

---

[1] A copy of the Employment Agreement and its amendments is attached hereto as Group Exhibit A

4.  Coram, and subsequently the Trustee, continued to employ Crowley after the Petition Date pursuant to the terms of the Employment Agreement through its expiration on November 30, 2002. Even after the Employment Agreement expired, the Trustee continued Crowley's employment through March, 2003.

5.  Over the course of Crowley's employment, the Employment Agreement was amended from time to time to provide, among other things, for the payment of certain bonuses (the "Bonuses") to Crowley including without limitation the following: (1) for Fiscal Year 2000, a bonus payment of 25 percent of Coram's EBITDA above $14,000,000 with a one-time payment of $5,000,000 if EBITDA exceeded $35,000,000; (2) for Fiscal Year(s) 2001, and 2002, a bonus of up to three (3) times his then base salary of $650,000 depending upon Coram's EBITDA; and a bonus payment of $1,800,000 if Coram obtained a successful refinancing. Based upon Coram's EBITDA Crowley is due $10,842,000 for Fiscal Year 2000, $996,840 for Fiscal Year 2001, and $1,950,000 for Fiscal Year 2002. Because Coram successfully obtained refinancing, Crowley is further entitled to the $1,800,000 bonus.

6.  Coram also provided for additional compensation to be payable to Crowley, among others, under certain Key Employee Retention Programs ("KERPs"). Pursuant to those KERPs, Crowley was to receive $400,000 for each year ended December 31, 2000, 2001, and 2002. Because Crowley remained employed by Coram at each of those years' end, Crowley is further entitled to an additional $1,200,000 under the KERPs (the "KERP Amounts").

7.  In addition to performance bonuses and KERP payments, Crowley was entitled to receive additional compensation for any unused vacation, and certain other Board-approved payments (the "Additional Compensation").

8.  To date, neither the Debtors nor the Trustee have paid Crowley the Bonuses, the

C247

KERP Amounts, or the Additional Compensation in an aggregate amount of nearly $16,800,000[2]

(the "Administrative Request Amount") to which Crowley is entitled. Therefore, Crowley

hereby requests that this Court allow the Administrative Request Amount as an administrative

expense of the Debtors and direct the Debtors and the Trustee to pay him that amount.

### C.    Crowley's Contributions to the Debtors' Estates

9.    By all accounts, Crowley did more than stabilize and maintain the Debtors'

businesses: he significantly contributed to the Debtors' estates by significantly improving them,

even during the most trying of bankruptcy conditions. As noted by Harrison J. Goldin:

> Crowley moved quickly to stabilize Coram's finances and turn the company around. Among other changes, he centralized the purchasing process; brought inventory levels down; increased working capital; paid off some of Coram's debt; reduced accounts receivable from $130 million to about $77 million; and emphasized Coram's core therapy focus. According to Wendy Simpson, who was CFO at the time, Crowley "focused immediately on cash out." She said he literally "went through stacks of invoices and questioned each one."

Update Report of Independent Restructuring Advisor Goldin Associates, L.L.C. dated September

4, 2001, at 43

10.    After the Court denied Coram's Second Plan of Reorganization, Judge Adams was

appointed chapter 11 Trustee. At the Trustee's request, Crowley stayed on as Coram's CEO.

Judge Adams respected the value that Crowley brought to the Debtors, notwithstanding the

circumstances and Crowley's conflict that prompted the Trustee's appointment. As the Trustee

himself stated:

> 19.    Since the Appointment Date, the Trustee has independently examined the actions undertaken by Crowley as the Debtors' chief executive officer. The Trustee has visited the corporate offices in Denver and has had several meetings and discussions with Crowley, CHC's senior executives and other employees of CHC. In addition, the Trustee has considered numerous reports regarding the

---

[2] This amount represents an estimate of the bonuses Crowley is entitled to be paid and includes $1,950,000 that was reserved per direction of the Trustee Counsel for 2002 Management Incentive Plan. The Actual amount of Crowley's Additional Compensation which he claims is subject to payment as an administrative expense is subject to further investigation and a more complete review of the Debtors' books and records.

C248

financial performance of the Debtors and has reviewed the Debtors' performance under Crowley with the investment bankers retained by the Trustee.

20.    *The Trustee's evaluation is that Crowley has operated the company profitably and efficiently. Under Crowley, notwithstanding being in these bankruptcy proceedings, the Debtors have experienced positive operating margins and EBITDA [footnote deleted], reduced cost of services, reduced operating costs, improved inventory management, improved information systems, improved management tools, and maintained a stable cash position with no net borrowing to fund post-petition operations.*

21.    EBITDA has substantially increased during the period of Crowley's stewardship of the company. From 1995 through 1999, a time prior to Crowley's employment, the Debtors' EBITDA was a negative $37 million. *From January 2000 through September 2002, the Debtors experienced $83 million in positive EBITDA, a $120 million improvement under Crowley's management.* For the first nine months of 2002 (including the six months after the Trustee was appointed), EBITDA was a positive $21 million; by contrast, EBITDA was negative $54 million for the year ended December 31, 1999.

22.    Revenue and gross profit are also increasing. For the nine-month period ended September 30, 2002, the Debtors' revenue rose $31 million, or 11 percent, from the same period the year before, resulting in an increased gross profit of $9 million. Indeed, revenue was higher during each month of 2002 than during the same month in 2001.

23.    Under Crowley, CHC has improved its financial performance by identifying and focusing the business on its most profitable core therapies. When Crowley was named CEO, non-core therapies accounted for approximately 38 percent of infusion therapy revenues for the quarter ended December 31, 1999; by the third quarter of 2002, non-core therapies represented only approximately 27 percent of infusion therapy revenues. In addition, daily average revenue per patient for core therapies rose 3% to $151 per pay during the nine months ended September 30, 2002 when compared with the same period from the prior year.

24.    The most profitable type of business for CHC is the treatment of patients with chronic disorders. *With Crowley at the helm under the Trustee's stewardship, CHC refined its marketing strategy to target chronic patients. As a result of these efforts, revenue from the treatment of hemophilia patients grew by 55 percent ($15 million) during the nine months ended September 30, 2002 when compared with the same period from the prior year.* The treatment of hemophilia patients now represents 13 percent of total revenue, up from 9 percent during the nine months ended September 30, 2001. Similarly, revenues from nutrition patients were increased 6 percent during the same time frame.

25.    *Furthermore, during Crowley's tenure, CHC has also cut costs by, inter alia, leveraging volume to purchase drugs and supplies more effectively.* Cost of services for infusion, exclusive of depreciation and amortization expense, as

540480-1                                         4

C249

a percentage of net revenue has been reduced from 76 percent for the year ended December 31, 1999 to 71 percent for the nine months ended September 30, 2002.

26. *Under Crowley, the Debtors have neither required post-petition borrowings to fund operations nor utilized their debtor-in-possession facility.*

27. *Finally, the evaluation conducted by the Trustee's advisors has revealed improved employee productivity, increased employee morale and reduced employee turnover since Crowley became CEO of the Debtors.* Company statistics show that the branch employee turnover rate was reduced by approximately six percent in 2002 when compared to 2001. It is apparent to the Trustee that many of CHC's employees are loyal to Crowley and that they remain confident of his ability to transition the Debtors' through an effective reorganization.

Motion of the Chapter 11 Trustee For Authorization To Enter Into Termination and Employment Extension Agreement with Daniel D. Crowley. (Emphasis added).

11. Crowley's remarkable achievements at Coram speak for themselves.

### Jurisdiction

12. This Court has jurisdiction over the Request, which is a core proceeding pursuant to 28 U.S.C. § 1334 and § 157(b)(1), (b)(2)(A), (B), and (O).

### Law and Argument

13. As the Third Circuit and this Court have recognized, compensation, including bonuses, for debtors' employees are entitled to administrative priority status for services rendered post-petition. *See, e.g., In re Hechinger Inv. Co.*, 298 F.3d 219 (3d Cir. 2002) and *In re Lason, Inc.*, 309 B.R. 441 (Bankr.D.Del. 2001). *Accord, In re Pre-Press Graphics Company, Inc.*, 287 B.R. 726 (Bankr. N.D. Ill 2003).

14. Here, there is no question that Crowley's services were performed for the Debtors post-petition, resulting from negotiations with the Debtor in Possession and the Trustee. Crowley's post-petition services were performed at the Debtors' and Trustee's request, and pursuant to an agreement entered into by the Debtors and Crowley. Indeed on October 3, 2002, Crowley gave the Trustee notice that he intended on terminating his relationship with Coram at

540480-1                                          5

C250

the expiration of the Employment Agreement. *At the Trustee's request*, however, Crowley

continued to serve as Coram's CEO while the Trustee and Crowley negotiated a Transition

Agreement and the Trustee sought approval to enter into a Transition Agreement with Crowley.

Consequently, the amounts to be paid pursuant to the Employment Agreement and the amounts

earned by Crowley during the holdover period are entitled to be paid as an administrative claim

pursuant to Section 503(b)(1).

      15.    Furthermore, although this alone is sufficient grounds to grant an administrative

priority status for those payments, Crowley is entitled to these payments under this Court's

general test for administrative expense claims:

> Whether someone is entitled to an administrative claim is
> determined by a two-part test:  (1) there must be a post-petition
> transaction between the creditor and the debtor; and (2) the estate
> must receive a benefit from the transaction.

*In re Waste Sys. Int'l, Inc.*, 280 B.R.  824, 826 (Bankr. D. Del. 2002).  As shown above, by

continuing to provide services to the Debtors, and then to the Trustee following his appointment,

and then to the Trustee during the holdover period after the Employment Agreement terminated,

Crowley's request easily satisfies this test.

      16.    Again, it is unquestionable that Crowley's services were part of a transaction

between him and the Debtors and, subsequently, the Trustee on behalf of the Debtors' estates.

Crowley's services were rendered as part of his employment as CEO of the Debtors pursuant to

an agreement that was never rejected.  Indeed, the Trustee waited until November 26, 2002 –

four days before the employment Agreement expired on its own terms – to file a motion to reject

the Employment Agreements (docket #1972).  The Trustee since abandoned prosecution of that

motion.

      17.    Second, as amply described above, in pleadings filed by the Trustee, by the

Trustee in his deposition, and in the Goldin Report, the Debtors' estates received substantial

540480-1                      6

C251

benefits from Crowley's services.[3]  In addition to all of the Trustee's findings of Crowley's

exemplary performance are the following successes brought by Crowley's efforts:  successful

resolution of potentially costly litigation with Aetna; material improvement in the mix of

therapies sold by Coram that was followed by fifteen months of consecutive net growth;

establishment of a Strategic Business Unit concept that rapidly turned Coram into a viable

competitor in its marketplace; a material improvement in costs; assembling a first-class

management team; implementation of a crisp Information Technology strategy that brought

clarity to this vital area for the first time since Coram's formation; and a multitude of operational

improvements ranging from inventory to nursing visits to pricing to contracting.  The value of

those benefits are appropriately measured by the amounts agreed to by the parties under the

Employment Agreement and the KERPs.

    **WHEREFORE**, Crowley respectfully requests this Court enter an order (i) granting him

an administrative priority expense in an amount to be determined; (ii) directing the Debtors and

the Trustee to pay Crowley that amount upon the entry of the order, and (iii) for such other and

further relief as may be just.


Date: December 30, 2004                    Respectfully submitted,
                                           **DANIEL CROWLEY, Movant**


                                           By: _____
                                           **One of His Attorneys**


Richard H. Cross, Jr.
Donna L. Harris
Cross & Simon, LLC
913 North Market Street
Wilmington, DE 19899

---

[3] As even this Court has recently observed, in the context of discussing the merits of the Equity Committee's draft complaint "…the evidence suggests that Crowley actually improved the financial position of Coram by reducing debt and increasing earnings [citation omitted]." *In re Coram Healthcare Corp.*, 315 B.R. 321, 333 (Bankr. D. Del. 2004)

540480-1                                   7

C252

Scott N. Schreiber
Anthony C. Valiulis #2883007
John H. Ward #2939924
**MUCH SHELIST FREED DENENBERG**
 **AMENT & RUBENSTEIN, P.C.**
191 North Wacker Drive
Suite 1800
Chicago, Illinois 60606
(312) 521-2691

C253

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CORAM HEALTHCARE CORP. and | ) | Case No. 00-3299 (MFW) |
| CORAM, INC., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Related to Docket Nos. 4253, 4340, 4352 |

### CERTIFICATION OF COUNSEL IN SUPPORT OF ORDER APPROVING
### STIPULATED WITHDRAWAL OF REQUEST OF DANIEL D. CROWLEY
### FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM

Undersigned counsel hereby certifies that Daniel Crowley, Arlin M. Adams, Chapter 11

Trustee of the estates of the above-captioned debtors, and the United States Trustee have entered

into the attached *Stipulated Withdrawal of Request of Daniel D. Crowley for Payment of*

*Administrative Expense Claim* (the "Stipulation") (Exhibit A).  The Stipulation provides for the

withdrawal, with prejudice, of the *Request of Daniel D. Crowley of Payment of Administrative*

*Expense Claim* [Docket No. 4253], pursuant to Federal Rule of Bankruptcy Procedure 7041 and

F.R.Civ.P. 41(a).  Undersigned counsel respectfully requests that this Court enter the attached

proposed form of order approving the Stipulation at the Court's earliest convenience.

Dated: December 29, 2005        CONNOLLY BOVE LODGE & HUTZ LLP

                             **/s/ Christina M. Thompson**
                             Jeffrey C. Wisler (No. 2795)
                             Christina M. Thompson (No. 3976)
                             The Nemours Building
                             1007 N. Orange Street; P.O. Box 2207
                             Wilmington, DE 19899
                             (302) 658-9141
                             *Counsel to Daniel Crowley*

#436780

C254

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CORAM HEALTHCARE CORP. and | ) | Case No. 00-3299 (MFW) |
| CORAM, INC., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Related Docket Nos. 4253, 4340, 4352** |

## STIPULATED WITHDRAWAL OF REQUEST OF
## DANIEL CROWLEY FOR PAYMENT OF
## ADMINISTRATIVE EXPENSE CLAIM

**WHEREAS:**

A.    On December 30, 2004, Daniel Crowley ("Crowley") filed his *Request of Daniel Crowley for Payment of Administrative Expense Claim* [Docket No. 4253] ("Request").

B.    On February 18, 2005, the United States Trustee ("U.S. Trustee") filed his *Objection of the United States Trustee to the Request of Daniel Crowley for Payment of Administrative Expense* [Docket No. 4340].

C.    On February 23, 2005, Arlin M. Adams, the Chapter 11 Trustee of the bankruptcy estates of Coram Healthcare Corporation and Coram, Inc. ("Chapter 11 Trustee") filed his *Objection of the Chapter 11 Trustee to the Request of Daniel Crowley for Payment of Administrative Expense* [Docket No. 4352].

D.    Claimant wishes to withdraw and voluntarily dismiss the Request pursuant to Federal Rule of Bankruptcy Procedure 7041 and Fed.R.Civ.P. 41(a) and the U.S. Trustee and Chapter 11 Trustee are agreeable to stipulating thereto.

**NOW, THEREFORE**, it is hereby STIPULATED and AGREED by and among Crowley, the U.S. Trustee and the Chapter 11 Trustee that the Request be and is hereby withdrawn, with prejudice.

[Signature Page Follows]

PHDATA 1336026_2

STIPULATED AND AGREED TO THIS _8th_ day of December, 2005.

| **WEIR & PARTNERS LLP** | **CONNOLLY BOVE LODGE & HUTZ LLP** |
|---|---|
| *Kenneth A. Aaron* /BAB | *Christina M. Thompson* |
| Kenneth A. Aaron (No. 4043) | Jeffrey C. Wisler (No. 2795) |
| 824 Market Street, Suite 1001 | Christina M. Thompson (No. 3976) |
| P.O. Box 708 | The Nemours Building |
| Wilmington, DE 19899 | 1007 N. Orange Street |
| (302) 652-8181 | P.O. Box 2207 |
|  | Wilmington, DE 19801 |
| -and- | (302) 658-9141 |
|  |  |
| Barry E. Bressler, Esquire | -and- |
| Richard A. Barkasy, Esquire |  |
| Michael J. Barrie, Esquire | Scott N. Schreiber, Esquire |
| SCHNADER HARRISON SEGAL & | Anthony C. Valiulis, Esquire |
| LEWIS, LLP | Edward D. Shapiro, Esquire |
| 1600 Market Street, Suite 3600 | Oran F. Whiting, Esquire |
| Philadelphia, PA 19103-7286 | MUCH SCHELIST FREED |
| (215) 751-2000 | DENENBERG AMENT & |
|  | RUBENSTEIN, P.C. |
| *Attorneys for Arlin M. Adams,* | 191 North Wacker Drive, Suite 1800 |
| *Chapter 11 Trustee* | Chicago, Illinois 60606 |
|  | (312) 521-2000 |
|  | *Attorneys for Daniel D. Crowley* |

**KELLY BEAUDIN STAPLETON
UNITED STATES TRUSTEE**

By: *Richard L. Schepacarter* (cut)

    Richard L. Schepacarter, Esquire
    Trial Attorney
    United States Department of Justice
    Office of the United States Trustee
    J. Caleb Boggs Federal Building
    844 King Street, Rm. 2207, Lockbox 35
    Wilmington, Delaware 19801
    (302) 573-6492

PHDATA 1336026_2

C256

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CORAM HEALTHCARE CORP. and | ) | Case No. 00-3299 (MFW) |
| CORAM, INC., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Related Docket No.** _____ |

### ORDER APPROVING STIPULATED WITHDRAWAL OF THE
### REQUEST OF DANIEL CROWLEY FOR PAYMENT OF
### ADMINISTRATIVE EXPENSE CLAIM

**AND NOW**, this _____ day of _____, 20__, upon consideration of the

*Stipulated Withdrawal of the Request of Daniel Crowley for Payment of Administrative Expense*

*Claim* ("Stipulation"), it is hereby

**ORDERED** that the Stipulation is **APPROVED** and the Request of Daniel Crowley for

Payment of Administrative Expense Claim is **WITHDRAWN WITH PREJUDICE**;

**AND FURTHER ORDERED** that the hearing on the Request scheduled for January 11,

2006 is CANCELLED.


_____
Mary F. Walrath
Chief United States Bankruptcy Judge


#436783


C257

## CERTIFICATE OF SERVICE

I, Christina M. Thompson, hereby certify that on this 29th day of December, 2005, I caused a true and correct copy of the foregoing *Certification of Counsel In Support of Order Approving Stipulated Withdrawal of Request of Daniel D. Crowley for Payment of Administrative Expense Claim* to be served upon the following persons in the manner as indicated.

### VIA HAND DELIVERY

Kenneth A. Aaron, Esquire
824 Market Street, Suite 1001
P.O. Box 708
Wilmington, DE 19899

Richard L. Schepacarter, Esquire
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Room 2207, Lockbox 35
Wilmington, Delaware 19801

### VIA U.S. MAIL

Barry E. Bressler, Esquire
Richard A. Barkasy, Esquire
Michael J. Barrie, Esquire
SCHNADER HARRISON SEGAL &
LEWIS, LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286

/s/ **Christina M. Thompson**
Christina M. Thompson (No. 3976)

#436793

C258

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                     )     Chapter 11

                               )

CORAM HEALTHCARE CORP. and   )     Case No. 00-3299 (MFW)

CORAM, INC.,                )     (Jointly Administered)

                               )

                Debtors.     )     **Related Docket No.** _____

## ORDER APPROVING STIPULATED WITHDRAWAL OF THE
## REQUEST OF DANIEL CROWLEY FOR PAYMENT OF
## ADMINISTRATIVE EXPENSE CLAIM

AND NOW, this $\underline{3^{d}}$ day of $\underline{January}$, 2006, upon consideration of the

*Stipulated Withdrawal of the Request of Daniel Crowley for Payment of Administrative Expense*

*Claim* ("Stipulation"), it is hereby

**ORDERED** that the Stipulation is **APPROVED** and the Request of Daniel Crowley for

Payment of Administrative Expense Claim is **WITHDRAWN WITH PREJUDICE**;

**AND FURTHER ORDERED** that the hearing on the Request scheduled for January 11,

2006 is CANCELLED.

_Mary F. Walrath_
Mary F. Walrath
Chief United States Bankruptcy Judge

#436783

C259

¼4622