# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                              )
                                    )
CORAM RESOURCES NETWORK, INC.,)
and CORAM INDEPENDENT PRACTICE)     Case No. 99-2889
ASSOCIATION, INC.,                  )         (MFW)
                                    )
                 Debtors.           )

                              Bankruptcy Courtroom
                              No. 1, Sixth Floor
                              Marine Midland Plaza
                              824 Market Street
                              Wilmington, Delaware

                              Thursday, December 21, 2000
                              1:35 p.m.

BEFORE:  THE HONORABLE MARY F. WALRATH,
         United States Bankruptcy Judge

            -- Transcript of Proceedings --

                WILCOX & FETZER
1330 King Street - Wilmington Delaware  19801

                (302) 655-0477

37

1    point with another plan or sale or some other vehicle

2    that I think there is no basis to conclude will result in

3    anything other than creditors getting less and the

4    equityholders still getting nothing.

5              So, Your Honor, if the issue is that

6    somebody did something wrong, and I'm not suggesting

7    that, and I'm certainly not endorsing that view, but if

8    that's the point, there is redress in the courts, but I

9    don't think that the answer is to put this company out of

10    business.

11              Thank you.

12              THE COURT:  Well, I'm in a difficult

13    situation.  I would like to sidestep my duties, but I

14    think I have to determine in deciding whether to confirm

15    this plan under 1129(a)(3), I must conclude that it is

16    proposed in good faith and that the plan proponents have

17    acted in good faith.  I just do not want to be in a

18    position to conclude on this record that that is so.  I

19    cannot conclude on this record that that is so.

20              I think that the contractual relationship

21    between Cerberus and the CEO, Mr. Crowley, did taint the

22    process, and I think that, if anything, the ultimate

23    fairness of the process in bankruptcy is a paramount

24    principle to be protected by the Bankruptcy Court.

35

1        Maybe we would be at the same place today

2   if that contractual relationship had not been there. If

3   it had been disclosed to all parties, but I don't know

4   that and I don't think anybody will know that.

5        We are at a terrible place.  The Equity

6   Committee, even on its numbers, which I agree with the

7   Creditors' Committee's counsel and their valuation expert

8   and the cross-examination of the Equity Committee expert

9   does point out the questionable nature of that valuation.

10       I think under any of the numbers the

11  company is insolvent today.  But I don't think I can

12  confirm a plan based on that fact because I think that

13  because of the process being tainted by this relationship

14  which began in November of 1999, and perhaps in August of

15  1999, has so tainted the debtors' restructuring of its

16  debt, the debtors' negotiations towards a plan, even the

17  debtors' restructuring of its operations.

18       I think on that point I think it is a shame

19  that Mr. Crowley and perhaps Cerberus and the debtor

20  itself is tainted in this manner because I think there is

21  evidence that Mr. Crowley did do a good job operationally

22  in helping the debtor turn around.  But I can't conclude

23  that the debtor might not have done even better had there

24  not been this relationship.  I don't know.  That's the

39

1   problem.  I don't know what would have happened without

2   this actual conflict of interest.  I do think it's an

3   actual conflict of interest.

4            I think that the actions of Mr. Crowley to

5   hide the relationship, and I think that EC-20 did show an

6   intent to hide the relationship and to hide his request

7   for additional compensation in Winterland in exchange for

8   his efforts here did at least evidence that he, himself,

9   believed that this relationship should not be disclosed

10  and, therefore, did, in fact, taint his ability to serve

11  as CEO of the debtor.

12           Whether it opens up a Pandora's box or

13  encourages other noteholders or other parties in future

14  bankruptcies to try the same thing, I'm not as concerned

15  about that, but I just do not want my name confirming a

16  plan where this type of activity occurred for a year

17  before the plan was proposed for confirmation.  I just

18  cannot conclude that it's proposed in good faith for

19  those reasons.

20           I do not have the ability to suggest a

21  different plan.  I do not have the ability to give an

22  exemption from Stark II.

23           So I leave it to the debtor to see where it

24  goes from here for now.  I'll look for a form of order if

30

1    someone wants to present me with one.

2              MR. MINUTI:  We will, Your Honor.

3              THE COURT:  We'll stand adjourned.

4              MR. LEVY:  Thank you, Your Honor.

5              (The hearing was then concluded at

6    3:35 p.m.)

7                        - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

31

```
1    State of Delaware      )
                            )
2    County of New Castle )

3

4              C E R T I F I C A T E

5

6          I, Kathleen E. White, Registered Professional
7    Reporter and Notary Public, do hereby certify that the
     foregoing record, pages 1 to 91, inclusive, is a true and
8    accurate transcript of my stenographic notes taken on
     Thursday, December 21, 2000, in the above-captioned
9    matter before the Federal Bankruptcy Court.

10         IN WITNESS WHEREOF, I have hereunto set my hand
     and seal this 24th day of December, 2000, in
11   New Castle County.

12

13                    KATHLEEN E. WHITE,
14                    Notary Public-Reporter

15

16

17

18

19

20

21

22

23

24
```

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, Chapter 11 Trustee of      :
The Post-Confirmation Bankruptcy Estates of      :
CORAM HEALTHCARE CORPORATION,      :
A Delaware Corporation, and of CORAM      :
INC., a Delaware Corporation,      :      Case No. 04-1565 (SLR)
                                                             :
            Plaintiffs,      :
                                                             :
      v.      :
                                                             :
DANIEL D. CROWLEY, DONALD J.      :
AMARAL, WILLIAM J. CASEY, L. PETER      :
SMITH, and SANDRA L. SMOLEY,      :
                                                             :
            Defendants.      :

---

**EXPERT REPORT
OF
JOSEPH A. DWORETZKY**

---

## I.    INTRODUCTION

1.      I am a lawyer practicing law as a shareholder in the firm of Hangley Aronchick Segal & Pudlin in Philadelphia, Pennsylvania. I have been a member of the Pennsylvania bar since 1978. Except for the period from 1993 to 1996 when I served as the City Solicitor for the City of Philadelphia, my practice has been largely devoted to bankruptcy, creditors' rights and related litigation matters. I have taught bankruptcy courses at Rutgers School of Law – Camden and at Temple University's James E. Beasley School of Law and frequently spoken on bankruptcy matters in professional education seminars. I am a member of the American College of Bankruptcy and serve as a member of the Board of Regents of that organization. A copy of my curriculum vitae is attached as Exhibit 1.

2.      I have been requested by the lawfirm Keker & Van Nest LLP to express my opinion concerning various issues in connection with the reorganization proceedings of Coram Healthcare Corporation ("Coram") that were conducted in the United States Bankruptcy Court for the District of Delaware during the period from August 8, 2000 through October 5, 2004. In connection with that assignment I have reviewed the documents listed on Exhibit 2 attached hereto and I reserve the right to amend or supplement my report if further information is provided. I have reached the opinions I express in this report with a reasonable degree of

professional certainty. I understand that my report is to be considered in connection with a lawsuit filed under the caption Arlin M. Adams, et al. v. Daniel D. Crowley, No. 05-1565 pending in the United States District Court for the District of Delaware (the "Lawsuit"). The Keker firm represents defendant Daniel D. Crowley in the Lawsuit. My services have been provided at my regular billing rate of $575 per hour. My compensation is not contingent upon the outcome of the matter. A list of the matters in which I have served as an expert in the last four years is attached as Exhibit 3.

## II.    OVERVIEW OF THE CORAM BANKRUPTCY

1.      The Coram bankruptcy case lasted almost four years and I will not attempt to describe here all the steps in the process. By way of overview, prior to its bankruptcy filing in August of 2000, Coram was a public company providing home infusion therapy and related services to individuals referred by their physicians. Coram was heavily leveraged. It owed approximately $250 million to three noteholders (the "Noteholders") and $8 million to trade creditors. A balloon payment was due to the Noteholders on May 1, 2001. Coram also faced a significant regulatory problem. Under the federal regulations commonly referred to as Stark II, Coram was required to have a net worth of approximately $75 million at the close of calendar 2000. In 1999 the company complied only by averaging several prior years' net worth, a strategy that would not work thereafter, and it faced the likelihood of being out of compliance with Stark II at the end of 2000 unless it could generate a substantial amount of net income during the year or restructure its balance sheet. The effect of being out of compliance with Stark II was potentially serious: physicians would not be able to refer patients to Coram without certain checks and investigations that Coram would not be able to perform on a practical basis and which would discourage physician referrals.

2.      After exploring other ways to meet Stark II, Coram concluded that it could only feasibly restructure its balance sheet in proceedings under Chapter 11 of the United States Bankruptcy Code (the "Code"). Coram filed bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware on August 8, 2000. Coram had obtained a valuation prior to the bankruptcy filing that concluded that Coram's enterprise value was $207 million. Given that the enterprise value did not exceed its debts, in bankruptcy Coram hoped to eliminate the existing shareholders and convert a substantial portion of the debt to its Noteholders to equity. The effect of such a conversion would be to create sufficient balance sheet net worth to satisfy Stark II and, hopefully, position the company for future successful operation.

3.      Coram filed a plan of reorganization (the "First Plan") and a related disclosure statement at the time of its bankruptcy petition. After the First Plan was filed, several stockholders asked the Bankruptcy Court to appoint an official committee of equity holders to represent the interests of stockholders in the bankruptcy case. While Coram opposed such an appointment, an equity committee (the "Equity Committee") was ultimately appointed. The Equity Committee engaged counsel and a financial advisor. The Equity Committee challenged the First Plan and, after a lengthy confirmation hearing in December of 2000, the Bankruptcy Court denied confirmation of the First Plan on the basis that the debtor, as the plan proponent, had not met its burden of proving that the plan had been proposed in good faith. Important to the Bankruptcy Court's conclusion was its determination that Crowley, the Chairman of the Board

2

and CEO of Coram, had an employment contract with Cerberus Partners, L.P. ("Cerberus"), the largest of the three Noteholders that were to be restructured under the First Plan, which had not been adequately disclosed in the Disclosure Statement.

4.    As a result of the Bankruptcy Court's refusal to confirm the First Plan, Coram's Board of Directors formed a Special Committee that did not include Mr. Crowley. In February of 2001, the Special Committee retained an independent restructuring advisor, Goldin Associates L.L.C. ("Goldin") to evaluate the relationship identified by the Bankruptcy Court and determine whether it had an impact on the restructuring process. Goldin undertook an investigation of the relationship between Crowley and Coram and Cerberus and made a number of findings and determinations concerning what had happened. In addition, it made a series of recommendations to Coram as to the steps that Coram should take to address the concerns raised by the Bankruptcy Court and to resolve the bankruptcy proceedings. Coram adopted the Goldin suggestions and, on July 31, 2001, proposed another plan of reorganization (the "Second Plan") incorporating those suggestions. Crowley took no part in the creation or proposal of the Second Plan. The Second Plan proposed a payment of $10 million to the holders of the old equity contingent on their support for the Plan. The Equity Committee opposed the Second Plan. The Bankruptcy Court considered the Second Plan and, after an extended confirmation hearing, determined that the Second Plan would not be confirmed.

5.    On March 7, 2002, after the Bankruptcy Court's decision on the Second Plan, the United States Trustee appointed Arlin Adams to serve as a Chapter 11 trustee for Coram (the "Trustee"). The Trustee has continued to serve as trustee since that time.

6.    For over a year after the Trustee's appointment, at the request of the Trustee, Crowley continued to serve the company as its CEO. The Trustee requested the Bankruptcy Court to approve an agreement that the Trustee negotiated with Crowley that would have paid Crowley approximately $3.4 million, reduced his performance related bonus and released him from any claims. The Bankruptcy Court declined to approve the arrangement and Crowley resigned on March 31, 2003.

7.    The Trustee proposed its own plan of reorganization (the "Third Plan"). Like the First Plan and Second Plan, the Third Plan eliminated old equity and converted some of the Noteholders' debt to equity. The Third Plan, however, provided for a distribution to old equity of approximately $40 million and also assigned the class the net proceeds of certain litigation claims, including the claims against Crowley that are asserted in the Lawsuit. The Third Plan, like the First and Second Plans, was vigorously opposed by the Equity Committee. Indeed, the Equity Committee proposed its own plan of reorganization (the "EC Plan"). After 12 days of hearings, the Bankruptcy Court rejected the EC Plan and, instead, confirmed the Third Plan. The Trustee's plan was confirmed on October 5, 2004, approximately a year and a half after the Trustee was appointed.

8.    Following confirmation of the Third Plan, the Trustee commenced the Lawsuit asserting claims against Crowley for breach of fiduciary duty to Coram. I understand the Trustee has asserted claims against Mr. Crowley in excess of $100 million. The Trustee's theory is that Crowley was responsible for the failure of the First Plan and accordingly he should be held personally liable for professional costs incurred during the bankruptcy as well as the alleged

difference in value between Coram at the time the Third Plan was confirmed and the value
Coram would have had at that time had its First Plan been confirmed in December of 2001.

## III.    THE BANKRUPTCY SYSTEM AND PROCESS

1.    The Trustee's claim that Crowley was responsible for the failure of the First and
Second Plans and the nearly four year stay in bankruptcy before the confirmation of the Third
Plan, should be considered in the context of the bankruptcy system and process.

### *Bankruptcy is An Expensive and Uncertain Process*

2.    As a general matter, business bankruptcies under Chapter 11 do not come with
any guarantee of success. Many Chapter 11 proceedings never produce a confirmed plan of
reorganization. Estimates of the failure rate in Chapter 11 cases run from 50 to 75 percent. The
course of a Chapter 11 case is highly uncertain; bankruptcy is a form of litigation and it carries
with it all the uncertainty that is attendant to matters litigated in the court system. Bankruptcy is
a high risk strategy which is generally undertaken only when there are no feasible alternatives.

3.    Chapter 11 is also expensive. The Chapter 11 process relies on extensive
involvement of lawyers, accountants and financial advisors ("professionals") to serve the various
constituencies. Because there are a number of different constituencies in the bankruptcy process,
when each is armed with its own professionals, fees tend to mount quickly. These professional
fees – at least many of them – are borne by the debtor. The burden of this extraordinary expense,
particularly on a business that is in bankruptcy court because of its financial problems, is
sometimes too great for the business to absorb. Many bankruptcy cases flounder because the
cost of the bankruptcy process exceeds the capacity of the debtor.

4.    In broad terms, there are two forms of bankruptcy - liquidation and
reorganization. In a liquidation proceeding, the assets of the bankrupt are assembled, sold and
the proceeds are distributed among the creditors in accordance with a statutory scheme of
priorities. Typically in a liquidation proceeding, the debtor's business is not sold on a "going
concern" basis and the debtors' assets typically only realize "liquidation value".

5.    Reorganization is based on the idea that a company that is operating as a going
concern will have a greater worth than the liquidation value of its assets. The difference between
the liquidation and going concern values is often referred to as the "reorganization premium." In
a company where the reorganization premium is significant, it is generally in the best interests of
the creditors and equity holders, as a group, for the company to continue in operation so that the
going concern value can be preserved and the parties able to share the reorganization premium.
However, when a company becomes insolvent and/or suffers a cash flow crisis, the non-
bankruptcy legal system does not encourage creditors to act collectively to preserve the going
concern. In fact, the law invites a "race to judgment" and rewards the most aggressive creditors
by letting them execute against a debtor's assets and obtain full payment even if doing so will
destroy the debtor's ability to operate as a going concern and leave other creditors unable to
collect anything on their legitimate claims.

6.    This is where the bankruptcy laws step in. The provisions of Chapter 11 impose a
stay against all creditor action against the debtor or its assets (the so-called bankruptcy "estate")

4

and permit the debtor to operate free of non-bankruptcy creditor litigation. Under the protection of the bankruptcy court, the debtor has an opportunity to address its operations, maximize its cash flow and propose a plan to distribute to its creditors an amount greater than the liquidation value of its assets.

### The Plan of Reorganization

7.      Chapter 11 adopts a class-based bargaining approach. Under a Chapter 11 Plan, the creditors are divided into "classes" determined by the nature and character of their claims or equity interests.. The classes that hold claims or equity interests that are "impaired" (that is, modified) by the plan are given an opportunity to vote in favor or against the plan. The plan must provide each creditor at least as much as it would receive in a liquidation, however, the reorganization premium may be shared among classes by agreement.

8.      The bankruptcy process is designed to encourage the reaching of a "consensus." In bankruptcy terminology, a consensual plan is a plan that is accepted by all of the classes which are impaired under the plan. Within each class, acceptance need not be unanimous. The Code provides specific voting majorities. Thus, a consensual plan in bankruptcy does not mean that one hundred percent of creditors agree, but rather that all classes that have been impaired under the plan have voted to accept by the requisite voting majorities. Individual dissenting creditors in an accepting class are bound by the classes' acceptance.

9.      While Chapter 11 encourages and rewards consensual plans, it also contemplates that there will be situations in which a class does not consent to the treatment proposed by a plan. Because a holdout class should not frustrate the goal of preserving the going concern premium for all creditors and interest holders, the bankruptcy court may, under certain circumstances, approve the plan despite the rejection of the plan by a dissenting class. This process is commonly referred to as "cram down" of the dissenting class.

10.      The cram down process is intricate and a summary will not capture all the nuance, but in simple terms, a plan that has been accepted by all impaired classes - that is, a consensual plan - may be confirmed if it passes a checklist of thirteen items set out in Section 1129(a) of the Code which generally insure that the plan is in accordance with law and was proposed and voted on through proper process. However, a plan that is presented for confirmation despite the rejection of one or more impaired classes - that is, a non-consensual or "cram down" plan - can only be confirmed if the bankruptcy court makes an additional determination that the plan is "fair and equitable" to the class that has rejected the plan. In order to make the fair and equitable determination and "cram down" the dissenting class, the bankruptcy court must value the debtor's enterprise and determine that the value is distributed under the plan in accordance with the "absolute priority rule" which is expressed in the detail of Section 1129(b) of the Code. Put a different way, in order for a plan to be approved over a challenge by a dissenting class, the proponents will need to show that not only is the plan "procedurally fair", but also that the plan is "substantively fair" based on the value of the debtor' business.

11.      Valuation of a business enterprise, particularly one in bankruptcy, is not cut and dried. Valuation requires the bankruptcy court to consider the testimony of valuation experts presented by the parties. Because the value of an operating business is generally based on

predictions of the financial performance of the business in the future, there are often sharp disputes among the parties concerning the assumptions to be used in the valuation. In a litigated valuation dispute, it is not uncommon for modest differences in assumptions (for example, whether to use a 3% growth rate rather than a 4% growth rate) to translate into tens of millions of dollars in the valuation conclusion. The valuation of a business is not an exact science and the final value determined by a court may be different from the value proposed by any of the experts.

12.    It is widely accepted by bankruptcy practitioners and judges, that cram down plans are more difficult to confirm than consensual plans because section 1129(b) and the related rules and case law give creditors or interest holders who are subject to cram down a variety of rights and procedural protections that permit them the opportunity to make confirmation more difficult and more expensive for the debtor and the other parties. While it requires expertise - often expensive expertise – to utilize those rights and procedural protections effectively, when that expertise is present the rights translate into bargaining leverage in the negotiation of a plan. Put a different way, a class that holds a position that may not have objective value according to the applicable rules of priority may nevertheless be able to use its ability to litigate the cram down to obtain a share of the reorganization premium. For this reason, it is not unusual in bankruptcy for creditors or interest holders to receive more than they would be entitled to receive by virtue of the absolute priority rule, in order to obtain their consent to a plan. This fact is widely known to bankruptcy practitioners and often forms a part of the strategy adopted by creditors and interest holders in a bankruptcy proceeding. Indeed, as noted above, the Bankruptcy Code expects and encourages classes to seek to maximize their leverage and bargain for a piece of the pie.

13.    While the parties are incented to bargain vigorously during the bankruptcy process, as time progresses and as the business improves or deteriorates, the rights and leverage of the parties may change significantly. The ongoing attempts to gain and utilize leverage in the bargaining process is much of the art of the bankruptcy practice for the lawyers and other bankruptcy professionals. Bankruptcy is a keenly strategic process and it is often difficult to predict how the parties will come to a final agreement about the reorganization and what that agreement will provide.

### The Debtor in Possession

14.    There are a number of important players in the bankruptcy process. The most important is the debtor-in-possession or the "DIP". The debtor-in-possession is a term that refers to the management that ran the debtor immediately prior to the bankruptcy, but reflects the fact that the old management is now vested with new duties and responsibilities. The Code presumes that the pre-bankruptcy management will operate the debtor during the bankruptcy. However, the debtor-in-possession is given new responsibilities and powers that management did not have prior to bankruptcy. The debtor-in-possession is entrusted with responsibility to preserve the bankruptcy estate – all the debtor's assets – for the benefit of the creditors and equity interest holders.

15.    Chapter 11 makes the policy decision to entrust the bankruptcy estate to the same people who were the debtor's pre-petition management. The decision is an important one and the reasons for it are not immediately intuitive. After all, the prior management is the group of

people who were arguably responsible for the company being in bankruptcy. It would be reasonable to assume that these are the last people the law would make responsible for the estate.

16.    The policy decision to leave prior management in possession results from experience under Chapters X and XI of the prior Bankruptcy Act. Under old Chapter X, when a public company filed a bankruptcy proceeding, an independent trustee was immediately appointed to take control of the company and was given responsibility to propose a plan to reorganize it during the course of the bankruptcy proceeding. A separate chapter, Chapter XI, applied to non-public companies and, in Chapter XI, the norm was different. In Chapter XI, existing management was permitted to operate the company during the reorganization and to propose a plan to restructure the company's debts. Companies displayed far greater reluctance to file under Chapter X than XI. In consequence, many businesses that could only file under Chapter X failed before filing and many others filed under Chapter X only after their business had deteriorated too far to be reorganized successfully. Comparing the experience under Chapter X with Chapter XI, the drafters of the Code concluded that the automatic appointment of a trustee at the beginning of the case was a significant disincentive to the filing of Chapter X petitions. Because the drafters believed that it was important for businesses to access the reorganization powers of the Code before they reached the point where they could no longer be successfully reorganized, it was appropriate to build into the Chapter 11 process certain inducements to encourage businesses to initiate a reorganization proceeding before it was too late. Accordingly, in Chapter 11 the presumption is that the prior management continues to operate the debtor's business during the Chapter 11 proceeding. In addition, the Code provides that there will be an exclusive period in which only the debtor may propose a plan of reorganization. These two provisions, particularly combined with the provision that permits a debtor to operate its business in the ordinary course without the approval of the bankruptcy court, were intended to create an environment in which the pre-petition management would have a meaningful opportunity to operate in Chapter 11 and propose its own plan of reorganization.

17.    There were recognized trade-offs in the policy decision. On one hand, there are several clear advantages to the prior management operating a business during Chapter 11. Independent trustees are often excellent at liquidating a business and capturing and distributing to creditors the liquidation value of the assets. However, running a business is a much more complicated matter than liquidating it, and independent trustees may or may not have the kind of skills and experience that would allow them to be successful in actually operating the business. The contacts and knowledge base of the former managers are often essential to successfully reorganizing a business and, in those situations, keeping existing management in place during a Chapter 11 proceeding may be the only way to achieve the reorganization premium. On the downside, however, prior management brings to the bankruptcy the whole history of their dealings and relationships with the Debtor and with the creditors and equity interest holders. The relationships may be complicated and conflicting. Whether the "baggage" brought by prior management outweighs the benefits of their knowledge, history and continuity is a question – or perhaps better said, a tension – that is present in virtually every Chapter 11 proceeding.

18.    This tension, built into the structure of the Code, makes for a complicated system of governance. The Code gives the debtor-in-possession fiduciary responsibilities to preserve and maximize the bankruptcy estate, but the pre-petition managers will often have interests that are adverse to one or more classes of creditors or equity interest holders. Put another way, the

7

fiduciary responsibilities of the debtor-in-possession are presumptively exercised by individuals who, as a result of their pre-bankruptcy history, may have adverse or conflicting interests.

19.     The rules for management are different than the rules relating to the professionals who represent and advise the debtor concerning the bankruptcy estate. It is not unlawful in bankruptcy for the debtor-in-possession, or any of the individuals who serve as management, to hold conflicting or adverse interests to one or more classes of creditors or equity holders (however, they are expected to act without regard to their conflicting interests). The professionals, however, must be "disinterested" and hold no interest "adverse" to the estate. The requirement of being disinterested and without adverse interest is explicit in the Code, and it applies to the lawyers and accountants who are involved during the bankruptcy case for the debtor.

20.     As noted above, there is no requirement that the management of the debtor-in-possession be disinterested or free of interests adverse to the estate. Management frequently includes the same people that own the debtor's stock; that have made loans to the debtor; or that have guaranteed bank loans to the debtor. These historical relationships do not go away when a bankruptcy is filed and they may exert strong influences on management.

21.     The fact that a debtor-in-possession has an adverse interest to a creditor or stockholder does not mean that a plan of reorganization cannot be successfully proposed and approved. There are many examples of bankruptcy plans that are approved by the bankruptcy courts despite the fact that the debtor's management hold interests adverse to one or more classes of creditors or interest holders under the plan. For example, plans are frequently confirmed where the principal of the debtor has provided personal guarantees to creditors of the debtor; where principals of the debtor hold secured or unsecured claims against the debtor; or where principals of the debtor lease or license to the debtor assets that are used in the debtor's operation. In all these situations and many others, plans may be confirmed by the debtor despite the fact that the debtor's management is not "disinterested", although there is no assurance that in any given case a plan will be reached and approved by the Court.

22.     The Code is not oblivious to the potential problems caused by the decision to entrust the estate to people who are not disinterested or who hold adverse interests. The potential problems created by this structure are dealt with by a number of protections and safeguards built into the Code that are intended to insure that parties who serve as the debtor-in-possession fulfill their responsibilities notwithstanding the fact that they may not be disinterested.

23.     The safeguards include, among other things, the appointment of committees of creditors and, in some cases, equity security holders, to serve as watchdogs over the debtor, the requirement that the Court approve transactions outside of the ordinary course of the debtors' business and the power of the Court to replace the debtor in possession with an independent trustee for "cause".

24.     Because Chapter 11 involves a highly strategic bargaining process that occurs within a litigation environment, the parties and their professionals often consider how to use the lack of disinterestedness of the debtor's management to gain bargaining leverage. Conversely, a

8

debtor seeking to reorganize may find that management's pre-petition relationships are obstacles to reorganization that need to be addressed in connection with the case.

## IV.    CONFIRMATION OF A PLAN OF REORGANIZATION FOR CORAM

### The Cerberus Relationship

1.    Part of the overall landscape facing Coram at the time of the bankruptcy was the relationship between the company and Cerberus. By virtue of a 1998 agreement between the debtor and the Noteholders, the Noteholders had a contractual right to designate a representative to serve as one of the five members of Coram's board. The Noteholders had exercised that right and appointed Stephen Feinberg to Coram's board in 1998. Feinberg was a principal of Cerberus. As noted above, Cerberus held the largest claim of the three Noteholders. Feinberg served on Coram's board (and as a member of the Board's compensation committee) until a few weeks before the bankruptcy filing.

2.    While Feinberg was on the board, he introduced Crowley to the company. Crowley was an accomplished healthcare manager and had previously run an organization considerably larger than Coram. After a period of consulting to Coram, in late 1999 Crowley became the CEO and Chair of the Coram Board under the terms of an employment contract that paid him roughly $650,000 per year and assured him certain performance related bonus compensation if the company achieved certain benchmarks.

3.    Crowley's employment contract provided that he was entitled to "have other business interests and may serve as an officer or consultant to other business."

4.    Crowley had an employment contract with Cerberus under which he was to be paid approximately $1 million per year for work on non-Coram business. The contract made it grounds for dismissal if Crowley failed to follow "the reasonable instructions" of Cerberus.

### Obstacles to Confirmation

5.    Coram faced a number of obstacles to confirming a plan of reorganization along the lines it contemplated when it filed bankruptcy.

- First, Coram's bankruptcy was filed in August of 2000, leaving less than 5 months to reach confirmation before the Stark II problem landed. While it is possible, as a matter of statutory timing, to confirm a plan in 5 months, average periods from filing to confirmation are significantly greater. On a national basis, the average number of days to confirm a Chapter 11 plan during the period from 1990 to 1999 was 528 days, roughly 18 months. The average in the Delaware Bankruptcy Court was 414 days, or about 14 months.

- Second, the debtor contemplated a cram down of old equity, a fact that required that the Court apply the absolute priority rule in Section 1129(b) of the Code and provide the equity class all of the procedural rights and protections of Section 1129(b) of the Code.

9

- Third, while there had been negotiations with the Noteholders concerning the First Plan prior to bankruptcy, the debtor did not negotiate with equity so that all of the dealings with equity's representatives would occur within the litigation atmosphere of Chapter 11.

- Fourth, the transaction contemplated did not involve a sale to a third party or any market testing of the values, rather the essential transaction was between the debtor and the existing Noteholders, the largest of whom, Cerberus, had a director on the board and a business relationship with the CEO while the transaction was being structured. The relationship between the Debtor and Cerberus made it likely that equity would be distrustful of the First Plan and the bankruptcy court would give it particularly careful scrutiny.

- Fifth, a large part of Coram's equity was owned or acquired by financially sophisticated distress investors. I understand that a number of sophisticated investors bought as much as 25% of that equity in the period before the bankruptcy proceeding was filed[1]. The investors formed an informal group to maximize the value of the equity. The group made a 13-D filing with the Securities Exchange Commission on July 17th and July 27th, 2000, indicating an intention to act together with respect to their investment in Coram. The investors engaged an experienced bankruptcy litigator named Richard Levy of Altheimer & Grey who had both the experience and expertise to be able to utilize the protections and procedural rights granted to a class proposed to be crammed down under a bankruptcy plan. As early as June of 2000, Levy was in touch with the Coram's professionals demanding an opportunity to participate in Coram's restructuring and complaining about Coram's conduct.

- Sixth, after the case was filed, Levy was successful in persuading the U.S. Trustee to form an official committee of equity security holders (the "Equity Committee") and appoint several members of the 13-D group as members. The appointment of the Equity Committee was significant for a number of reasons, among them the fact that as an "official" committee, the Equity Committee was entitled to engage counsel – they promptly retained Levy and his firm – and other bankruptcy professionals. Moreover, the cost of the Equity Committee's professionals was paid by Coram not by the individual equity owners.

- Finally, the Noteholders, on one hand, and the investors who had retained Levy, on the other, were knowledgeable and financially sophisticated players. Given that bankruptcy is a zero sum game, in order to increase distribution to the equity class, the debtor would have to reduce the distribution to the

---

[1] The purchases continued after the bankruptcy was filed. Some of the shares were purchased for as little as $.06 per share.

Noteholders. Thus, in some respects, the plan process became a fight between the Equity Committee and the Noteholders.

### The First Plan

6.    Represented by professionals with significant expertise whose fees were funded by the debtor, the Equity Committee proved to be a formidable opponent.

7.    The Equity Committee raised several challenges to the First Plan. While there were a number of challenges, they can be summarized as contentions that the First Plan (i) was not substantively fair, that is the old equity interests were not worthless and their true value was not recognized under the Plan; and (ii) was not procedurally fair because the Debtor and Crowley had a relationship with Cerberus that undermined the bona fides of the plan.

8.    With respect to the valuation issue, the Trustee concedes that Coram's value, both at the time of the bankruptcy and in December of 2000, was less than the amount of Coram's debt. Thus, the First Plan's proposal to eliminate equity did not in fact deprive equity of value to which it was entitled and was therefore substantively fair to the holders of the old equity.

9.    With respect to the procedural fairness challenge, the Equity Committee proved to be successful in raising enough concern about the Cerberus relationship to defeat the First Plan. An important issue was the adequacy of the debtor's disclosure concerning Crowley's relationship.

10.   Crowley's relationship with Cerberus was discussed in the Disclosure Statement filed at the commencement of the bankruptcy case. A section stated:

> Mr. Crowley also serves as a consultant to Cerberus Partners LP, "Cerberus" which is a member of the Noteholder Group, with respect to its investments in various health care companies other than the Debtors. Mr. Crowley generally receives a fee from Cerberus for such services, but receives no fee from Cerberus for any services he provides respecting the Debtors.

11.   Although the language disclosed that Crowley worked for Cerberus for a fee, the Disclosure Statement did not state there was a written contract between Cerberus and Crowley which generally provided that Crowley was to be paid approximately $1 million per year for non-Coram work and which required Crowley to follow the "reasonable instructions" of Cerberus.

12.   While the Disclosure Statement addressed (inadequately) Crowley's relationship to Cerberus, the draft did not state that Feinberg had been a director of Coram until a few weeks before the bankruptcy filing.

### Drafting of Disclosure Statement

13.    At the end of the confirmation hearing with respect to the First Plan the bankruptcy court determined that the disclosure was inadequate and, at least in part because of that, concluded that there was a "taint" to the restructuring.

14.    The Trustee contends that the inadequate disclosure was Crowley's responsibility, and therefore he should be held personally liable for Coram's extended stay in bankruptcy. I disagree. In a Chapter 11 case, the Disclosure Statement is generally prepared by the debtor's professionals based on information that they gather from the debtor and from the information that they learn during the course of the bankruptcy case. This was the case here. The lead lawyer representing Coram in the bankruptcy, David Friedman, testified that his firm prepared the Disclosure Statement. With respect to the section that relates to Mr. Crowley, his firm obtained the language used in the Disclosure Statement from Allen Marabito, who was a lawyer and an officer of Coram. Friedman did not follow up with Crowley about the relationship described in the Disclosure Statement. While the language Mr. Marabito supplied and which was used in the Disclosure Statement states that Crowley worked for Cerberus on non-Coram matters and was "paid a fee" for such services, Friedman did not ask the amount or the other details of the arrangement.

15.    Friedman testified that, in hindsight, that it was a failing not to have asked Crowley for more information concerning Crowley's relationship with Cerberus, in particular the amount he was paid.

16.    There were several reasons why Friedman and the lawyers representing the debtor should have been more focused on the disclosure:

- Beginning on June 1, 2000 – more than two months prior to the bankruptcy – Levy had advised Friedman that Levy's clients would scrutinize any transaction in which any member of the Coram's board had an interest. Levy specifically raised a concern about Feinberg's approval of Crowley's employment contract with Coram.

- Given the fact that Feinberg, a principal of Cerberus, had served on the Debtor's board until a few weeks before the bankruptcy was filed and that Cerberus was the largest holder of the Notes, the debtor's relationship with Cerberus would be an important area for examination in the confirmation process.

- In view of the challenges presented in confirming a cram down plan in less than five months, the lawyers would not have wanted to give the Equity Committee the opportunity to divert attention away from the underlying substantive fairness of the plan.

- Crowley was not experienced with the bankruptcy process and could not be expected to be as focused on the scope of disclosure required in bankruptcy as the lawyers. Knowing that Crowley worked for Cerberus and got a fee for his work, the lawyers should have followed up and more fully disclosed the employment contract.

17.    The inadequacy of the disclosure proved to be a flash point in the hearings on the confirmation of the First Plan and while it contributed to the Court's decision on the First Plan, I do not think it is reasonable to conclude that the inadequacy of disclosure is what made confirmation so difficult to obtain in this case. By the time of the Second Plan, there had been complete disclosure with respect to Crowley's relationship to Cerberus, and yet the Second Plan was rejected as well.

### The Second Plan

18.    The Trustee attributes the failure of the Second Plan to Crowley and urges that he be held personally liable for Coram's continued stay in bankruptcy. I do not think this view is reasonable.

19.    After the First Plan was rejected, Coram (without Crowley's participation) engaged Goldin as an Independent Restructuring Advisor. Goldin looked into the concerns that had caused the rejection of the First Plan. Goldin and Friedman made recommendations about how to proceed. Coram accepted those recommendations[2] and prepared and prosecuted the Second Plan. By the time of the confirmation hearing concerning the Second Plan, there was no longer any issue concerning disclosure. In rejecting the Second Plan, the Court took the view that despite the full disclosure and despite the fact that Crowley had not participated in the preparation or presentation of the Second Plan, the contractual relationship between Cerberus and Crowley created such a continuing conflict that the plan could not be confirmed. As a result, the Trustee contends, with the benefit of hindsight, that Crowley should have resigned or severed his relationship with Cerberus after the First Plan was rejected.

20.    As I discussed above, the Code does not create a flat prohibition on a member of a debtor's management from serving as a debtor-in-possession, even if he or she is not "disinterested" or holds an adverse interest to the estate. In such circumstances, the manager and the debtor's professionals need to determine how best to address the situation. The appropriate response is very much determined on a case-by-case basis.

21.    Here it is not reasonable to expect that Crowley would know the best way to address the situation. Neither Friedman nor Goldin advised Crowley that he should resign or sever his relationship to Cerberus. The steps that Friedman and Goldin proposed to address the Judge's concern appear reasonable. Friedman was an experienced bankruptcy lawyer and he thought that proceeding as Coram did made sense. Indeed, he testified that he was "very surprised" that the Second Plan was rejected after those steps had been followed. I do not see why Crowley would have disagreed with his lawyers' judgment on this issue of bankruptcy process.

### The Length of the Bankruptcy

---

[2] The Special Committee of the Board adopted all of Goldin's recommendations but issued a statement to the effect that it disagreed with Goldin's recommendation to reduce Crowley's compensation because, among other things, Crowley's management had saved the company.

22.    While the Trustee asserts that the problems that led to Coram's nearly four year stay in bankruptcy can all be attributed to Crowley, I do not believe that position is reasonable.

23.    In my view, the problems in reorganizing Coram arose from a combination of factors:

- The high risk and uncertainty attendant to any Chapter 11 filing.

- The particular difficulty of confirming a cram down plan of reorganization when the class suffering cram down is well represented and aggressive in using its rights under the Bankruptcy Code.

- The fact that there were large and sophisticated financial players in the Equity Committee and the Noteholders and any distribution to the former had to be taken from the later.

- The fact that the debtor's professionals underestimated the difficulties they would face in confirming a plan. Despite knowing as early as June of 2000 that equity was seriously concerned about a possible restructuring of the debt and had engaged an experienced professional to protect its interests, the debtor's professionals did not fully explore the relationship between the debtor and Cerberus. This lead to a disclosure statement that was inadequate and diverted the Bankruptcy Court's attention from the substantive fairness of the First Plan.

- The skill of the Equity Committee's professionals in utilizing the bankruptcy process to maximize the Equity Committee's leverage. Over the course of several years they required the debtor and the Trustee to propose three fully developed plans of reorganization to bring the case to conclusion. By challenges to the disclosure, to the conflict in the Cerberus-debtor relationship and ultimately to the valuation of the enterprise, the Equity Committee created enough roadblocks that its position was significantly improved over what it would have received simply based on the priority of their position.[3]

---

[3] The way that the Coram Chapter 11 played out, the Equity Committee maximized its leverage through an aggressive litigation position and ultimately achieved a better bargain than originally proposed. The Equity Committee's efforts improved the distribution to the holders of the old equity from zero under the First Plan to $10 million under the Second Plan and to at least $40 million under the Third Plan. I understand that old shareholders have received at least $.80 per share under the Third Plan. That means that shareholders who purchased Coram's stock at $.06 per share at the time of bankruptcy have received 13 times their investment.

24.     These factors – and those I have identified earlier in this report - lead to a long term, intense fight between the Noteholders and the Equity Committee.  While Coram initially hoped to confirm a plan in five months, I note that the Trustee – highly reputable, conflict-free and independent – did not confirm a plan for more than 18 months after his appointment and the plan he confirmed provided at least $40 million in value to the Equity Class.  Indeed after Crowley left the Company, the Equity Committee repeatedly attacked the Trustee's conduct of the case, leading the Trustee's professionals to complaint to the Assistant United States Trustee (the official in the U. S. Justice Department overseeing the bankruptcy) that the Equity Committee "made outrageously high demands", "has shown that it is willing to take actions that will harm shareholders so long as they advance some undefined agenda" and "the Equity Committee has engaged in needless and duplicative discovery that will end up costing the shareholders millions."  According to the Trustee's calculation, the Equity Committee's professionals sought to bill more than $10 million to Coram for their work.  This lead the Trustee to observe that the "Equity Committee's scorched earth litigation tactics have resulted in an astonishing amount of administrative claims."

25.     For the reasons I have stated above, I do not think that the Trustee's claim that Crowley is responsible for Coram's extended stay in Chapter 11 is reasonable.

Dated:  July 20, 2007

Joseph A. Dworetzky
Hangley Aronchick Segal & Pudlin
One Logan Square, 27th Floor
Philadelphia, PA  19103

15

# EXHIBIT 1

**Curriculum Vitae**
**Exhibit 1**

### JOSEPH A. DWORETZKY

Hangley Aronchick Segal & Pudlin
One Logan Square - 27th Floor
Philadelphia, PA 19103-6933
(215) 496-7014 (Office)
(215) 568-0300 (Office Fax)
JAD@hangley.com

### EDUCATION

| | |
|---|---|
| Law School: | VILLANOVA UNIVERSITY SCHOOL OF LAW |
| Degrees: | J.D., summa cum laude in May 1977 |
| Class Rank: | First in class of 182 |
| Average: | 3.78 |
| Honors: | Saint Ives Medal (best overall cumulative average); Pulling Award (best Law Review article); Roman Catholic Alumni Award (best first year grades: 4.0 gpa); Order of the Coif; Villanova Law Review (Staff, Volume 21; Associate Editor, Volume 22); Title Insurance Award (best grades). |

| | |
|---|---|
| College: | PURDUE UNIVERSITY |
| Degree: | B.A. with distinction in June 1972 |
| Concentration: | 3-year program with double majors in Philosophy and Writing |
| Class Rank: | Top 5% |
| Average: | 3.6 |
| Honors: | Phi Beta Kappa; Marchette Award (outstanding student of philosophy) |

### EXPERIENCE

| | |
|---|---|
| 1997 - Date: | HANGLEY ARONCHICK SEGAL & PUDLIN, Shareholder and Member of Board of Directors. Represent business and governmental clients in all types of commercial dispute resolution, bankruptcy and financial and operational restructurings. |
| 1993 - 1996: | CITY OF PHILADELPHIA, City Solicitor, 1994 to 1996; Acting City Solicitor, 1994; Chair of Corporate Group, July - December 1993. As City Solicitor responsible for the overall legal representation of the City in all civil matters as well as management of 130-lawyer department. Senior legal advisor to the Mayor and City Council. Member of the Mayor's Cabinet and numerous boards, commissions and other governmental policy making groups. |
| 1978 - 1993: | DRINKER BIDDLE & REATH, Managing Partner 1992-1993; Partner 1984-1993; Associate 1978-84. Concentration in bankruptcy and creditors' rights. Representation of debtors and creditors in all phases of Chapter 11 proceedings and commercial workouts and restructurings. Represented clients in hundreds of Chapter 11 cases involving a wide array of different types of law. |
| 1977 - 1978: | JUDGE ELLSWORTH A. VAN GRAAFEILAND, United States Court of Appeals for the Second Circuit, Law Clerk. |

## PROFESSIONAL

- Adjunct Professor, RUTGERS UNIVERSITY SCHOOL OF LAW-CAMDEN (1987-93). Taught Bankruptcy in the fall semester from 1987 through 1991 and Advanced Bankruptcy Practice in the spring semester from 1988 through 1993. Designed the latter course to simulate an actual Chapter 11 case in which students represented clients in litigation and negotiation.

- Fellow, American College of Bankruptcy Law (1994–date). Member of the Board of Regents (2003-date).

- Chair, Merit Selection Committee for Bankruptcy Judges in Eastern District of Pennsylvania (2005, 2006).

- Vice Chair, Lawyers Advisory Committee of the Third Judicial Circuit (2006-date) appointed by Chief Judge Scirica.

- Chair, Eastern District of Pennsylvania Bankruptcy Conference (2001): Co-chair of Education Committee (1990-91), Steering Committee (1992, 1999), Vice Chair (2000).

- Board Member and Treasurer of the Consumer Bankruptcy Assistance Project. Co-Chair, Long Range Planning Committee (1997-98). CBAP provides pro bono representation to low income Philadelphians who need to file bankruptcy to obtain relief from financial burdens.

- The Best Lawyers in America, Bankruptcy and Creditor-Debtor Rights Law (2004-05; 05-06; 2007).

- Chambers USA, America's Leading Lawyers for Business (2004-07) selected as "Band 1", one of top 10 bankruptcy attorneys in Pennsylvania.

- Law & Politics and Philadelphia Magazine, peer-selected as one of top 100 (out of 34,000) lawyers in Pennsylvania in all disciplines (2004-07).

## SIGNIFICANT REPRESENTATIONS

- Counsel for Pennsylvania Department of Education in action to have a receiver appointed for Chester-Upland School District on account of financial mismanagement.

- Counsel to Liberty Mutual Insurance Company in Chapter 11 proceedings of Enron Corporation and related litigation concerning the validity of more than a billion dollars worth of long term prepaid natural gas supply contracts discovered to have been part of "roundtrip" or "circular" sales. Trial counsel for Liberty in 5-week jury trial in the Southern District of New York.

- Served as advisor to management or debtholders in numerous healthcare industry restructurings. Lead counsel for Saint Joseph's Hospital in its Chapter 11 proceedings. Negotiated the merger of Saint Joseph's and Girard Hospital into North Philadelphia Health System and, by settling a Boren Amendment suit against the Commonwealth of Pennsylvania, obtained for the reorganized debtors an annual supplemental payment from DPW on account of the grossly disproportionate share of low income patients at the two hospitals. Served as principal counsel to the bondholders in the bankruptcy of Metropolitan Hospital (sale and liquidation of three hospital system in Philadelphia). Lead counsel in the reorganizations of life care communities in Pine Run Trust (bank creditor) and Lutheran Retirement Home (debtor). Counsel for principal debtholders in the restructurings of Clivedon Nursing Home and Tucker House. Represented the owners of a group of seven affiliated nursing homes in their successful Chapter 11 proceedings. Counsel for Germantown Home, a Pennsylvania continuing care retirement community, in its successful Chapter 11 reorganization. Principal negotiator and lead counsel in the City of Philadelphia's privatization of a troubled 500 bed nursing facility.

2

- Successfully argued on behalf of the Southeastern Pennsylvania Transportation Authority in In re Penn Central Transportation Company, (Toxic Tort Cases) 944 F.2d 164 (3d Cir. 1991) (discharge of CERCLA claim); on behalf of Remington Rand in In re Remington Rand Corp., 836 F.2d 825 (3d Cir. 1988) (date government contract claim "arises"); and on behalf of the debtor in Saint Joseph's Hospital v. Department of Public Welfare, 103 B.R. 643 (Bankr. E.D.Pa. 1989) (11th Amendment waiver).

## PRO BONO REPRESENTATIONS

- Represented Philadelphia Theatre Company in reorganizing after it canceled its season in 1988 due to financial problems. Over a two year period, PTC eliminated most of its debt, renegotiated its lease and raised enough funds to put on four productions. Today, PTC is one of the leading professional theatres in Philadelphia.

- Represented the Pennsylvania Ballet in reorganizing in 1983 after it was forced to terminate its season. Negotiated a consensual workout with 5 bank creditors that resulted in significant debt forgiveness and restructured the remaining debt.

## COMMUNITY AFFAIRS

- Member, Board of Directors of Pennsylvania Energy Development Authority (2004 to date) appointed by Governor and confirmed by State Senate.

- Member, Board of Directors of Parkway Council Foundation (2005 to date). The Parkway Council is made up of the significant cultural institutions on the Benjamin Franklin Parkway in Philadelphia.

- Trustee, William Penn Foundation. Board member and member of Executive Committee of a $1.1 billion charitable foundation concentrating its philanthropy in the Philadelphia region (2001 to 2005).

- Member, Board of Managers, Moore College of Art & Design (2003 to 2006). Moore is the country's only women's art college. Member of Academic Affairs and College Planning Committees.

- Board Member, Vice President and Director of the Philadelphia Volunteer Lawyers for the Arts from 1980 through 1985.

- Coleman Award, 1997, for outstanding service to the arts community in Philadelphia.

# EXHIBIT 2

---

**Documents Reviewed**
**Exhibit 2**

---

**Summary Judgment Documents**

4/17/2007        Opening Brief of Defendant Daniel Crowley in Support of Motion for
                 Summary Judgment, or, in the Alternative, Partial Summary Judgment

4/17/2007        Declaration of Daniel Crowley in Support of Motion for Summary
                 Judgment, or, in the Alternative, Partial Summary Judgment

4/17/2007        Appendix of Documents in Support of Defendant Daniel D. Crowley's
                 Opening Brief in Support of his Motion for Summary Judgment (Part 1, 2
                 and 3)

4/17/2007        Brief in Support of Motion for Summary Judgment on Liability or, in the
                 Alternative, For the Court to Deem Certain Facts Established

4/17/2007        Appendix of Documents in Support of Motion for Summary Judgment
                 or, in the Alternative, for the Court to Deem Certain Facts Established

5/4/2007         Memorandum of Chapter 11 Trustee Arlin M. Adams in Opposition to
                 Motion of Daniel D. Crowley for Summary Judgment, or, in the
                 Alternative Partial Summary Judgment

5/4/2007         Appendix of Documents in Support of Memorandum of Arlin M. Adams
                 in Opposition to Motion of Daniel D. Crowley for Summary Judgment,
                 or, in the Alternative Partial Summary Judgment

5/4/2007         Declaration of Daniel Crowley in Opposition to Plaintiff's Motion for
                 Summary Judgment

5/4/2007         Answering Brief of Defendant Daniel Crowley in Opposition to
                 Plaintiff's Motion for Summary Judgment on Liability or, in the
                 Alternative, for the Court to Deem Certain Facts Established

5/4/2007         Appendix of Documents in Support of Answering Brief of Defendant
                 Daniel Crowley in Opposition to Plaintiff's Motion for Summary
                 Judgment on Liability or, in the Alternative, for the Court to Deem
                 Certain Facts Established (Part 1 and 2)

5/15/2007        Reply Brief of Daniel Crowley in Support of Motion for Summary
                 Judgment, or, in the Alternative, Partial Summary Judgment

5/15/2007    Appendix of Documents in Support of Daniel Crowley's Reply Brief in Support of Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment

5/15/2007    Reply Brief in Support of the Trustee's Motion for Summary Judgment on Liability or, in the Alternative, For the Court to Deem Certain Facts Established

5/15/2007    Appendix of Documents in Support of Reply Brief in Support of the Trustee's Motion for Summary Judgment on Liability or, in the Alternative, For the Court to Deem Certain Facts Established

## Depositions

3/22/2007    Richard F. Levy

3/16/2007    David M. Friedman

3/27/2007    Arlin Adams

3/28/2007    Arlin Adams

4/05/2007    Allen J. Marabito

4/06/07    Daniel D. Crowley

11/9/06    Michael Temin (Genesis v. Crowley)

## Pleadings and Filings

9/21/2000    Objection of the U.S. Trustee to the Disclosure Statement and Plan of Reorganization

9/25/2000    Objection of Coram Resource Network, Inc., and Coram Independent Practice Association, Inc. to the Disclosure Statement in Support of the Plan of Reorganization of Debtors and Debtors in Possession

9/26/2000    Objection of the Official Committee of Unsecured Creditors in the Matter of Coram Resource Network, Inc. and Coram Independent Practice Association, Inc., to Debtors' Application to Approve Disclosure Statement Relating to Chapter 11 Plan of Reorganization

10/6/2000    Debtors' Reply to Objections to Adequacy of Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code

10/10/2000    Debtors' First Amended and Restated Joint Plan Pursuant to Chapter 11

2

of the U.S. Bankruptcy Code

| 10/10/2000 | First Amended and Restated Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code |
|---|---|
| 10/10/2000 | Order (I) Approving the Disclosure Statement, (II) Establishing a Form of Ballot and Procedures for the Solicitation of Votes on Chapter 11 Plan, (III) Establishing a Voting Deadline and Procedures for Tabulation of Votes on the Chapter 11 Plan, and (IV) Scheduling a Hearing to Consider Confirmation of Chapter 11 Plan |
| 10/22/2001 | Equity Committee Objections to Debtors' Second Joint Plan of Reorganization |
| 10/25/2000 | Application of the Official Committee of Equity Security Holders of Coram Healthcare Corp. for An Order Authorizing the Retention and Employment of Altheimer & Gray as Counsel |
| 11/5/2001 | Debtors' Response to the Equity Committee's Objection to debtors' Second Joint Plan of Reorganization and Memorandum in Support of Confirmation |
| 6/17/2003 | Chapter 11 Trustee's Amended Joint Plan of Reorganization |
| 6/24/2003 | Second Amended Disclosure Statement With Respect to The Chapter 11 Trustee's Amended Joint Plan of Reorganization |
| 10/28/2003 | Richard Barkasy Letter to U.S. Trustee |
| 4/15/2004 | Chapter 11 Trustee's Second Amended Joint Plan of Reorganization |
| 10/27/2004 | Order Confirming the Chapter 11 Trustee's Second Amended Joint Plan of Reorganization |
| 12/29/2004 | Complaint, *Adams v. Crowley, et al.*, No. 04-1565 (D. Del.) |
| 4/24/2006 | Order Granting Motion of the Chapter 11 Trustee for Approval of Settlement With Outside Directors |

**Transcripts**

| 12/21/2000 | Transcript of Proceedings before Judge Mary Walrath |
|---|---|

3

### Opinions

| 12/21/2001 | Opinion and Order Denying Confirmation of the Second Joint Plan of Reorganization of Coram Healthcare Corporation and Coram, Inc. |
| 10/5/2004 | Opinion and Order Denying Confirmation of the Equity Committee's Third Amended Joint Plan of Reorganization and Granting Confirmation of the Trustee's Second Amended Joint Plan of Reorganization |
| 10/27/04 | Order Confirming the Chapter 11 Trustee's Second Amended Joint Plan of Reorganization |

### Expert Reports

| 8/4/2006 | Report of Justice Joseph T. Walsh, Retired Expert Witness for Plaintiff Genesis Insurance Company (Genesis v. Crowley) |
| 10/3/2006 | Expert Report of Michael L. Temin, Esquire (Genesis v. Crowley) |
| 6/5/2007 | Expert Report of Michael L. Temin, Esquire |
| 6/8/2007 | Expert Report of J. Scott Victor, National City Investment Banking |
| 6/8/2007 | Expert Report of Jeffrey L. Baliban of NERA Economic Consulting |

### Dockets

Coram Healthcare Corporation, 00-03299-MFW (Bkcy. D. Del.)

Coram Resource Network, Inc., 99-02889-MFW, (Bkcy. D. Del.)

### Other

G. Bermant, E. Flynn, *Outcomes of Chapter 11 Cases: U.S. Trustee Database Sheds New Light on Old Questions*, American Bankruptcy Institute Journal (February, 1998)

E. Flynn, G. Bermant, *Related Chapter 11 Filings*, American Bankruptcy Institute Journal (June 2004)

D.P. Bart, S. Peltz, *Rethinking the Concept of "Success" in Bankruptcy and Corporate Recovery*, American Bankruptcy Institute Journal (May, 1998)

E. Flynn, G. Bermant, *Delaware Chapter 11s*, American Bankruptcy Institute Journal (March 2002)

# EXHIBIT 3

**Expert Testimony**
**Exhibit 3**

Listed below are the cases in which I have provided expert testimony in the last four years:

*Joe Gorka and Laurel Larson v. Attorneys Title Insurance Fund, Inc.*      Deposition Testimony
Case No. 05-0596-CA, 20th Judicial Circuit Court, Charlotte Co., FL

# EXHIBIT C

```
 1
 2         IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
 3
 4
       ARLIN M. ADAMS, Chapter      :
 5     11 Trustee of the            :
       Post-Confirmation            :
 6     Bankruptcy Estates of        :
       CORAM HEALTHCARE             :
 7     CORPORATION, a Delaware      :
       Corporation, and of          :
 8     CORAM INC., a Delaware       :
       Corporation                  :
 9              Plaintiff           :
          vs.                       :
10     DANIEL D. CROWLEY, DONALD J. : CASE NO.
       AMARAL; WILLIAM J. CASEY;    : 04-1565
11     L. PETER SMITH; AND SANDRA L.: (SLR)
12     SMOLEY,                      :
13              Defendants          :
                  - - -
14          Philadelphia, Pennsylvania,
             Wednesday, August 8, 2007
15                - - -
16          Video deposition of JOSEPH A.
17     DWORETZKY, ESQUIRE, taken pursuant to
18     notice, at Schnader, Harrison, Segal &
19     Lewis, 1600 Market Street, Suite 3600, on
20     the above date, beginning at approximately
21     9:43 a.m., before Michelle L. Gray,
22     Certified Shorthand Reporter and Notary
23     Public.
24
25
```

Dworetzky, Esq., Joseph A.                                    8/8/2007

Page 186

1          JOSEPH A. DWORETZKY, ESQUIRE
2          THE WITNESS:  It's Goldin's
3     recommendations.
4     BY MR. BRESSLER:
5          Q.  I think you said earlier -- and I
6     didn't want to skip over it -- that you
7     concluded that the Trustee's claim that
8     Crowley's responsible for Coram's extended
9     stay in Chapter 11 is not reasonable; is that
10    correct?
11         A.  Is that the one on Page -- Paragraph
12    25 on Page 15?
13         Q.  Yes.
14         A.  Yeah.  You directed me to that, and
15    I said that was my opinion.
16         Q.  Okay.  Do you think that Crowley
17    contributed to the stay in bankruptcy?
18         MR. PETERS:  Objection to the
19    form.
20         THE WITNESS:  I think that
21    Crowley's relationship with Cerberus
22    definitely was one of the factors that
23    made this a tough bankruptcy.
24    BY MR. BRESSLER:
25         Q.  And Judge Walrath cited to that in

Page 187

1          JOSEPH A. DWORETZKY, ESQUIRE
2     both of her opinions?
3          A.  She did.
4          Q.  Can you tell us what other factors
5     Judge Walrath cited in denying the second plan
6     of reorganization?
7          A.  You asked me about this before.  My
8     recollection of her opinion, the second plan,
9     was that she concluded that not -- nothing had
10    changed from the first plan.  And she did not
11    regard the steps or the recommendations that
12    had been made by Friedman and Goldin and had
13    led to the creation and promulgation of the
14    second plan were sufficient to adequately
15    address the concerns that she expressed about
16    the first plan.
17         Q.  Okay.  Let's look at her opinion on
18    that.  Let's look at Dworetzky-6, starting on
19    Page 18 at the bottom, where she talks about
20    harm to the debtors.
21         A.  Yes.
22         Q.  And first she says:  That the
23    debtors argue that we must confirm the
24    debtor's second plan, because they hired an
25    independent investigator, who concluded that

Page 188

1          JOSEPH A. DWORETZKY, ESQUIRE
2     the conflict of interest did not result in any
3     harm to the debtors.  We cannot accept this
4     "no harm, no foul" argument for several
5     reasons.
6          And she says:  First, there is no
7     evidence that there was no harm resulting from
8     the conflict of interest.  In fact, Mr. Goldin
9     concluded that the debtors did suffer harm as
10    a result of Crowley's conflict, because it
11    caused a delay in confirmation of the debtor's
12    first plan, thereby resulting in the loss of
13    profits and additional expenses to the
14    debtor's estates of $12 million to $15
15    million.
16         Do you disagree with Judge Walrath's
17    conclusion in that regard?
18         MR. PETERS:  Objection to the
19    form.
20         THE WITNESS:  She says there
21    was no evidence that there was no harm.
22    I don't think I know whether that's
23    correct or not.  I have no reason to
24    dispute it.  I didn't go through the
25    proof that was presented to her and see

Page 189

1          JOSEPH A. DWORETZKY, ESQUIRE
2     what evidence had been presented.
3     BY MR. BRESSLER:
4          Q.  In fact, you didn't read any of the
5     transcript from the second confirmation
6     hearing except what was attached to motions?
7          A.  That's right, as I described with
8     respect to the first --
9          Q.  And obviously she sat through the
10    confirmation?
11         A.  She did.  She did.
12         Q.  So when she says:  In fact, Mr.
13    Goldin concluded that the debtors did suffer
14    harm as a result of Crowley's conflict,
15    because it caused a delay in confirmation of
16    the debtor's first plan, she seems to be
17    adopting Mr. Goldin's conclusion in that
18    regard.
19         A.  I don't know about that.  I assume
20    she's referring to the report and to the
21    section that you referred to me before.  And
22    so it would seem to me that it could read what
23    Mr. Goldin said.
24         Q.  She goes further in the next
25    paragraph and says:  in her view, the $6.3

LiveNote World Service                    800.548.3668 Ext. 1

# EXHIBIT D

**NationalCity.**

**NatCity Investments, Inc.**
**Investment Banking**
1900 East 9th Street, 20th Floor
Cleveland, OH  44114

June 8, 2007


Barry E. Bressler, Esquire
Schnader, Harrison, Segal & Lewis, LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103

Dear Mr. Bressler:

You have asked us our opinion regarding certain issues pertaining to the bankruptcy case of Coram Healthcare Corporation and Coram, Inc. ("Coram"), Case 00-3299 and 00-3300 in the United States Bankruptcy Court for the District of Delaware.  Following is a discussion of these issues.

### Unusual Cash Payments Made by Coram Prior to Chapter 11 Filing

Bankruptcy is typically an expensive undertaking.  Companies that have just filed for bankruptcy protection require substantial liquidity to fund administrative costs, to fund operations that may be negatively impacted by the filing, and to make payments to stakeholders that facilitate the company's emergence pursuant to a Plan of Reorganization.  As a result, it is normal operating procedure for companies to prepare for an anticipated bankruptcy filing by conserving as much cash as possible.

As CEO of Coram, Dan Crowley made several decisions that ran counter to this accepted logic.  Specifically, he made cash payments to the Noteholders in the months leading up to Coram's bankruptcy filing on August 8, 2000 even though these disbursements were not required.  This had the effect of reducing precious cash needed in the Coram estate for the sole benefit of the recipients of that cash, the Noteholders.  These disbursements were made in July 2000 and August 2000, literally weeks prior to the bankruptcy filing.  It is clear that Mr. Crowley was contemplating bankruptcy well before these payments were made and as early as February 2000, when Coram retained bankruptcy counsel.  On February 28, 2000, Coram's bankruptcy attorney, David Friedman, sent Mr. Crowley a letter that specifically suggests bankruptcy as a means to address Coram's financial difficulties.

Barry E. Bressler, Esquire
June 8, 2007
Page 2

The first unusual cash disbursement made just prior to the bankruptcy filing and while the Company was contemplating the Chapter 11 filing was a $6.3 million interest payment made to the Noteholders on July 14, 2000. Coram had the option to make this payment "in kind" rather than in cash, whereby the payment would simply be added to the principal balance. This action depleted the cash that was available to Coram when it filed for bankruptcy less than one month later. Further, the contemplated Plan of Reorganization encompassed the conversion of the entire Noteholders debt balance into equity. This would have been the case if the interest payment was made in cash or in kind. Therefore, the cash payment served to benefit only the Noteholders while harming the Debtor-in-Possession by depleting it of much needed cash.

On July 31, 2000, Coram sold its specialty pharmacy division, CPS, and was able to reap $38 million in net proceeds. All of the proceeds were wired to the Noteholders, $28.5 million of which was used to pay down the secured revolver and $9.5 million of which was use to make a voluntary pre-payment of the Series A Notes. The $9.5 million payment was discretionary and highly unusual in light of Coram's bankruptcy filing one week later. While it is true that Noteholder consent was required to consummate the sale of CPS, this provision would have been unenforceable in Chapter 11. This payment benefited only the Noteholders as the $9.5 million would have otherwise remained with Coram for the purposes of funding bankruptcy expenses or disbursements to stakeholders pursuant to the Plan of Reorganization.

**Confirmability of First Plan and Impact of Non-Confirmation**

On December 21, 2000, the Court rejected Coram's First Amended and Restated Plan of Reorganization ("First Plan"). The Court held that the First Plan was not confirmable due to Mr. Crowley's conflict. The only other material issue during the confirmation hearing related to valuation. The ultimate valuation that was accepted by the Court when the Trustee's Plan was confirmed was consistent with the Debtor's original valuation put forth at the time of the First Plan. Therefore, the competing valuation testimony would not have prevented confirmation of the First Plan since the very same valuation dispute did not prevent confirmation of the Trustee's Plan. But for the relationship between Mr. Crowley and Cerberus, the First Plan would have been confirmed.

Without this relationship which tainted the First Plan, Coram would have emerged from bankruptcy approximately three years earlier than it actually did. Confirmation of the First Plan would have saved Coram over $30 million of bankruptcy-related expenses from December 2001 to October 2004.

All of the professional fees paid throughout the prolonged bankruptcy were approved by the Court. All parties in interest in the case had standing to object to all final fee applications. Approval of final fee applications is a conclusive determination that the fees and expenses allowed by the Court were reasonable and necessary. The Trustee objected to the Equity Committee's counsel's final fee application and the fee was reduced by the Court.

Barry E. Bressler, Esquire
June 8, 2007
Page 3

## Performance of Companies in Chapter 11

Companies that are in Chapter 11 typically do not perform as well as those not in Chapter 11. There are several reasons. First, when a company files, concerns are immediately raised by the customer base about whether the bankrupt company will continue its operations. In response, customers may cease or ratchet back orders until these fears are allayed. Competitors often exacerbate these fears by circulating negative press in the marketplace and other such tactics. In the case of Coram, the prior liquidation of its R-Net subsidiary likely further raised going-concern suspicions and had negative implications for referring physicians.

In a letter to the Board of Directors dated October 20, 2000, Mr. Crowley conveyed that Coram was enduring this adverse impact of bankruptcy. He wrote, "Coram has seen a significant 'softness' in revenue in the past two (2) months that is directly relational to the reduced referrals caused, at least in part, by the Chapter 11 filing." He reiterated the same sentiment in another letter to the Board of Directors dated March 9, 2001 in which he attributed "a general 'softness' in referrals from providers" to, in part, "the prolonged Chapter 11." He also wrote that "some providers are concerned about continuity of care, are risk averse for their patients, and respond to the Chapter 11 and competitive entreaties to shift business from Coram to Apria, Gentiva, Caremark, Option Care Nutrashare, local hospitals, and local infusion providers. The impact of all of this is a constant tamping down of Coram's sales." Through both e-mails and testimony, other members of the Coram senior management team also explicitly expressed how the bankruptcy was adversely impacting Coram's operations.

In addition to the patient and referring physician concerns, which did in fact negatively impact Coram according to its CEO and management team, there are several other reasons why companies in bankruptcy tend to perform worse than those not in bankruptcy. Since trade payables are stayed at the time of a filing, there is often the risk of post-petition supply disruptions. A bankruptcy is also very time consuming for the senior management team. Rather than focusing exclusively on running the business, they must allocate time to formulate emergence strategy, allay customer fears, draft bankruptcy related documents, attend hearings and meet with attorneys and financial advisors, among other things. All of these matters serve to distract management from maximizing the performance of the business. Since all non-normal course activities and extraordinary uses of cash must be approved by the Court, a bankrupt company is less agile and less able to react to and exploit market opportunities on a timely basis. Finally, while in bankruptcy, a company must alleviate the uncertainty of the employees, who may have the same going-concern fears as customers. A bankruptcy can often prompt an employee exodus. In addition, the loss of value in any stock-based compensation, which usually accompanies a bankruptcy filing, can demotivate employees. For these reasons, bankrupt companies often find it necessary to institute key employee retention plans.

The impact of the bankruptcy was particularly harmful in the case of Coram as it lasted for an unusually long period of time, over four years. Further, the reasons for the rejection of the first two Plans of Reorganization (conflict of interest, lack of good faith) cast Coram's situation in a particularly negative light in the marketplace.

Barry E. Bressler, Esquire
June 8, 2007
Page 4


**Trustee's Dealings with Mr. Crowley**

Mr. Crowley's employment contract with Coram expired on November 30, 2002. The Trustee entered into a Transition Agreement with Mr. Crowley to extend his employment for six months, subject to Bankruptcy Court approval. The Trustee also entered into a letter of intent with Mr. Crowley to settle his administrative claim, subject to Bankruptcy Court approval. These efforts by the Trustee were a reasonable exercise of his business judgment as they were done to try to facilitate a speedy emergence from bankruptcy on a consensual basis with all constituents. Consistent with this strategy, the Trustee conducted mediations with the Noteholders and the Equity Committee in September 2002. The Trustee also proceeded to enter into settlements with the Noteholders, the IRS, R-Net, TBOB and AT&T.

The Trustee's goal in extending Mr. Crowley's employment for six months was to maintain as much stability as possible while he was negotiating a consensual Plan of Reorganization and eliminate any potential disruption in operations caused by the departure of the CEO and President. The Trustee's attempt to settle Mr. Crowley's claims was consistent with his goal of proposing a Plan of Reorganization that resolved as many disputes as possible, which would create as much certainty as possible as to the cash distribution to be received by shareholders. The proposed settlement would have reduced Mr. Crowley's approximately $17 million claim to $2 million and would have provided additional certainty as to the distributions to the unsecured creditors and shareholders under the Trustee's Plan. Thus, the Trustee's decision to extend Mr. Crowley's appointment through a Transition Agreement and to attempt to settle his claim was a reasonable exercise of his business judgment.

Shortly before the hearing to approve the Transition Agreement, Mr. Crowley produced documents which included draft letters that reflected conversations between him and Cerberus regarding a possible settlement with Cerberus. The Equity Committee argued that the draft letters showed that Mr. Crowley was continuing to attempt to get paid by Cerberus for his work at Coram. It was reasonable for the Trustee to proceed with his motion to allow the Court to determine whether that was so or whether, as Mr. Crowley argued, the draft letters did not relate to Coram.

After the Court denied the motion, The Trustee and Mr. Crowley went back to their prior positions and the Trustee properly included the claims against Mr. Crowley as part of the Plan of Reorganization. Under the Bankruptcy Code, the Trustee has a responsibility to maximize the value of the Estate for the benefit of stakeholders. As per the Order confirming the Trustee's Second Amended Plan of Reorganization, the net proceeds from the Causes of Action "shall be distributed as follows: (i) first, to Reorganized Coram in an amount equal to the Post-Effective Date Administrative Claims relating to the Causes of Action; (ii) second, to the holders of Allowed General Unsecured Claims on a pro rata basis in an amount equal to the interest accruing (at the statutory judgment rate set forth in Section 1961 of Title 28 of the United States code) from the Petition Date through the Effective Date on account of such Allowed General Unsecured Claims until such interest has been paid in full; and (iii) third, on a pro rata basis to the holders of CHC Equity interest."

Barry E. Bressler, Esquire
June 8, 2007
Page 5

A list of the documents reviewed as well as my Resume are attached to this report.


The conclusions in the discussion above constitute my professional opinion to a reasonable degree of professional certainty. I reserve the right to supplement this report and respond to the opinions of any opposing experts.

_____

J. Scott Victor
Senior Managing Director and
Co-Head, Special Situations Group
National City Investment Banking

**Documents Reviewed**

Michael Temin report dated October 3, 2006

Letter from David Friedman to Dan Crowley dated February 28, 2000

Letter from Daniel Crowley to Cerberus dated July 31, 2000

Letter from Daniel Crowley to Coram Board of Directors dated October 20, 2000

Draft letter from Daniel Crowley to "Friends of Coram"

Letter from Daniel Crowley to Coram Board of Directors dated March 9, 2001

Transcript of Trustee's Motion for Authorization to Reject the Executory Contract of Daniel Crowley dated March 3, 2003

Coram press release dated July 31, 2000

Opinion confirming the Trustee's Plan dated October 5, 2004

Order confirming the Chapter 11 Trustee's Second Amended joint Plan of Reorganization dated October 27, 2004

Opinion denying confirmation of the Second Joint Plan of Reorganization dated December 21, 2001

Spreadsheet of selected reorganization expenses

E-mail from Michael Sarocco to Kurt Davis dated February 12, 2001

E-mail from Kurt Davis to executive Planning dated February 16, 2001

Terms of Crowley Transition Agreement dated December 24, 2002

Terms of Crowley Settlement Agreement dated January 7, 2003

Chapter 11 Trustee's Answers to Defendant Daniel Crowley's First Set of Interrogatories to Plaintiff Arlin Adams dated December 20, 2006

Chapter 11 Trustee's Answers to Defendant Daniel Crowley's Second Set of Interrogatories to Plaintiff Arlin Adams dated March 27, 2007

Several Filings Pertaining to the Fee Application of Jenner & Block

Several Filings Pertaining to the Key Employee Retention Plan

Securities Exchange Agreement dated May 6, 1998

Chapter 11 Trustee's Answers to Interrogatories

Transcript of Confirmation Hearing dated November 10, 2003

Several Filings Pertaining to Motion for Summary Judgment or, in the Alternative, for the Court to Deem Certain Facts Established

Transcript of Depositions of Arlin Adams, Scott Danitz, Kurt Davis, Daniel Crowley, Allen Marabito and Michael Saracco

Amendment 2 to Securities Exchange Agreement between Coram and Noteholders dated April 9, 1999

Transcript of December 21, 2000 Court hearing

First Plan Disclosure Statement

First Amended and Restated Disclosure Statement

Coram 1999 10-K

Coram 2000 10-K

Updated Report of Goldin Associates

First Amended Second Joint Disclosure Statement

Request of Daniel Crowley for Payment of Administrative Expense

Several Filings Pertaining to the Fee Application of Altheimer & Gray

**Resume of J. Scott Victor**

SPECIAL SITUATIONS GROUP/SSG

# National City.

**Investment Banking**

### J. Scott Victor
### Senior Managing Director
### Co-Head, Special Situations Group

J. Scott Victor is a Senior Managing Director and Co-Head of the Special Situations Group/SSG of National City Investment Banking with offices outside of Philadelphia, PA, New York, NY, Cleveland, OH and Cincinnati, OH. Scott was one of four founding partners of SSG Capital Advisors, L.P., a boutique middle-market investment banking firm that was acquired in August, 2006 by National City Bank. Prior to his transition to investment banking in 2000, Scott was a partner at Saul Ewing, LLP and a senior member of its Bankruptcy and Reorganization Department.

With over 20 years of experience in representing companies in Chapter 11 proceedings, workouts and restructurings, Scott is an expert in the restructuring, refinancing and sale of distressed middle-market companies. As a Senior Managing Director and Co-Head of the Special Situations Group/SSG of National City Investment Banking, Scott provides investment banking services focusing on the sale, turnaround financing, restructuring and complex valuation of middle-market companies facing operational and/or financial challenges both in and out of Chapter 11 proceedings throughout the U.S. and Europe. His clients are both public traded and privately held companies in a wide variety of industries including manufacturing, home furnishings, automotive, distribution, consumer products, healthcare, chemical, telecommunications, food processing, media, printing, packaging, service, transportation, publishing, e-commerce and retail.

Scott has lead or participated in well over 100 sale, refinancing and restructuring assignments for distressed middle-market companies both in and outside of Chapter 11 proceedings and has testified as an expert in numerous Bankruptcy Courts across the U.S. Scott has given more than 100 presentations around the U.S. and Europe on Bankruptcy and Insolvency Law, Distressed M&A and Turnaround Financing issues for organizations such as the American Bankruptcy Institute, Turnaround Management Association, Wharton School of the University of Pennsylvania, Pennsylvania Bar Institute, Philadelphia Bar Education Center, Eastern District of Pennsylvania Bankruptcy Conference, Southern District of Florida Bankruptcy Bar Association, New York Business Forum, Strategic Research Institute, Institute for International Research and Financial Research Associates.

Scott is a Fellow of the American College of Bankruptcy. He is also an active member of the Turnaround Management Association – immediate past President and Chairman of the Philadelphia Chapter and member of the Executive Committee of Board of Directors of TMA International and serves as 2006-2007 Vice President of Conferences, the American Bankruptcy Institute – 2007-2008 Co-Chair of the Investment Banking Committee, Co-Chair - 2006 ABI Complex Financial Restructuring Conference and Board of Advisors for the 2007 ABI Mid-Atlantic Bankruptcy Conference, the Eastern District of Pennsylvania Bankruptcy Conference – Steering Committee 2006-2007, Association of Insolvency and Restructuring Advisors, Association for Corporate Growth, Philadelphia Bar Association, Pennsylvania Bar Association and American Bar Association. Scott is a former President and a member of the Executive Committee and Board of Directors of the Consumer Bankruptcy Assistance Project, a member of the Board of Trustees of the Cardiovascular Institute of Philadelphia, a member of the Hamilton Circle and former member of the Board of Trustees of the Philadelphia Bar Foundation. Scott has also been named a Pennsylvania Super Lawyer for 2006 and 2007 as well as named a Top Investment Banker by The Deal for 2004, 2005, 2006 and 2007.

Scott received his BA from the University of Pennsylvania, 1980 and his JD from the University of Miami School of Law, 1983.