# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, Chapter 11 Trustee of
the Post-Confirmation Bankruptcy Estates of
CORAM HEALTHCARE CORPORATION,
a Delaware Corporation, and of CORAM
INC., a Delaware Corporation,

                        Plaintiffs,

     v.

DANIEL D. CROWLEY, DONALD J.
AMARAL, WILLIAM J. CASEY, L. PETER
SMITH, and SANDRA L. SMOLEY,

                     Defendants.

Case No. 04-1565 (SLR)

---

## DEFENDANT'S MOTION *IN LIMINE* NO. 1 TO EXCLUDE TESTIMONY OF JEFFREY L. BALIBAN

---

August 20, 2007

Jeffrey C. Wisler - #2795
Christina M. Thompson - #3976
Marc J. Phillips - #4445
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE  19801
(302) 658-9141

-and-

John W. Keker
Elliot R. Peters
R. James Slaughter
KEKER & VAN NEST, LLP
710 Sansome Street
San Francisco, CA  94111
(415) 391-5400

*Attorneys for Defendant DANIEL D. CROWLEY*

400808.02

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...............................................................................................1

II.  BACKGROUND ...............................................................................................2

III.  LEGAL STANDARD.........................................................................................5

IV.  ARGUMENT ....................................................................................................6

    A.  Baliban's Opinion that Coram Suffered Indirect Costs Due to Bankruptcy Fails to Meet the Requirements of Rule 702 and *Daubert*.................6

        1.  Baliban's Opinion Is Not Based Upon Sufficient Facts or Data. ...............6

        2.  Baliban's Opinion is Not Based on a Reliable Principle or Method. ........................................................................................8

        3.  Baliban's Opinion Does Not "Fit" the Issues in the Case. ........................10

    B.  Baliban's Opinion Regarding the Extent of the Loss to Coram Fails to Meet the Requirements of Rule 702 and *Daubert*. ................................12

        1.  Baliban Fails to Identify Any Peer-Reviewed Publication Applying his Single-Period Capitalization Method..................................13

        2.  Baliban's Single-Period Capitalization Method Does Not Have Wide Acceptance. .......................................................................14

        3.  Baliban's Application of his Single Period Capitalization Method Relies on False Assumptions.........................................................15

            a.  Baliban Assumes that Coram Had Stable Cash Flow...................15

            b.  Baliban's Assumption Is Contradicted by Coram's History.........................................................................16

            c.  Baliban's Assumption Regarding the Capitalization Factor Is also Wrong.....................................................17

        4.  Baliban's Single-Period Capitalization Method Produces Wildly Varying and Nonsensical Results. ..................................................18

        5.  Baliban's Opinion Is Not Corroborated...................................................19

        6.  Baliban's Opinion Regarding the Extent of Coram's Loss Does Not "Fit" the Issues in the Case. .............................................................19

V.  CONCLUSION................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Augustine Medical, Inc. v. Mallinckrodt, Inc.,*
No. Civ.A. 01-387-SLR, 2003 WL 1873836 (D. Del. Apr. 9, 2003) ........................................ 7

*Benjamin v. Peter's Farm Condominium Owners Assoc.,*
820 F.2d 640 (3d Cir. 1987) ........................................................................................................ 15

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993) .............................................................................................................. passim

*Elcock v. Kmart Corporation,*
233 F.3d 734 (3d Cir. 2000) ........................................................................................................ 15

*Gumbs v. Int'l Harvester, Inc.,*
718  F.2d 88 (3d Cir. 1983) ..................................................................................................... 6, 15

*ID Security Sys. Canada, Inc. v. Checkpoint Systems, Inc.,*
249 F. Supp. 2d 622 (E.D. Pa. 2003) ........................................................................................... 7

*In re Caldwell,*
350 B.R. 182 (Bankr. E.D. Pa. 2006) ......................................................................................... 18

*Joy v. Bell Helicopter Textron, Inc.,*
999 F.2d 549 (D.C. Cir. 1993) ..................................................................................................... 6

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999) ................................................................................................................. 5, 14

*Lithuanian Commerce Corp. v. Sara Lee Hosiery,*
179 F.R.D. 450 (D.N.J. 1998) ...................................................................................................... 6

*United States v. Downing,*
753 F.2d 1224 (3d Cir. 1985) ........................................................................................... 10, 14, 19

*Weisgram v. Marley Co.,*
528 U.S. 440 (U.S. 2000) .............................................................................................................. 5

## Federal Rules

Federal Rule of Evidence 702 ................................................................................................. passim

## I.    INTRODUCTION

By this motion, and pursuant to Federal Rules of Evidence 702 and 703, Defendant Daniel D. Crowley moves to exclude the testimony of Jeffrey L. Baliban, retained by the Trustee, Arlin M. Adams to provide an expert opinion on damages to Coram. Baliban's opinions are neither "based upon sufficient facts or data," "the product of reliable principles and methods," nor "applied ... reliably to the facts of the case." Fed. R. Evid. 702. Because it is the court's obligation to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), the court must exclude Baliban's testimony.

The court should exclude Baliban's opinion that Coram suffered indirect costs as a result of bankruptcy. Baliban did not identify a single specific sale, transaction, or other event that impacted Coram's cash flows and that resulted Coram's bankruptcy. His opinion is based solely on an anecdotal and unsystematic review of a limited set of unrepresentative depositions and documents. And he fails to distinguish indirect costs attributable to the delay in Coram's emergence from bankruptcy from indirect costs attributable to Coram's original bankruptcy filing.

The court should also exclude Baliban's opinion regarding Coram's lost value as a result of these alleged indirect costs. To reach his opinion, Baliban applied what he calls the "single-period capitalization method," but he can point to neither a peer-reviewed publication nor another appraisal of Coram (among the nearly 10 such appraisals that were done) that applied this method. J. Scott Victor, another witness retained as an expert by the Trustee who performed valuations of Coram in connection with the bankruptcy, testified that he had never heard of the single-period capitalization method. Two critical assumptions of Baliban's method are also flatly incorrect. First, the assumption—critical to his method—that Coram's cash flow as of 2000 and 2003 were stable and representative of Coram's value is plainly contradicted by the history of Coram's widely varying cash flow. Second, according to Victor, Baliban's assumption regarding the "capitalization factor"—the multiplier which Baliban used to derive a value for Coram from its projected cash flow—is "just wrong." Finally, Baliban's single-period

capitalization method produces inconsistent and illogical results when applied to years other than the two picked by Baliban in his report, and it produces valuation figures that are inconsistent with the results reached in the other independent appraisals done of Coram over the years.

## II.    BACKGROUND

The Trustee alleges that Crowley's breach of fiduciary duty caused Coram to stay in Bankruptcy until December 2004 instead of emerging in December 2000. The Trustee proposes to call Jeffrey L. Baliban of the National Economic Research Associates (NERA) as an expert on the damages allegedly suffered by Coram as a result of staying in bankruptcy until 2004. On June 8, 2007, Baliban submitted an expert report pursuant to Federal Rule of Civil Procedure 26. *See* Ex. A (Report of Jeffrey L. Baliban). On July 17, 2007, counsel for Crowley took Mr. Baliban's deposition. *See* Ex. B (Excerpts of the Deposition of Jeffrey L. Baliban).

Baliban, who has spent the bulk of his career working for insurance companies valuing businesses that have suffered catastrophic losses, admits that he is not an expert on bankruptcy. *See* Ex. B at 41:25-42:8. Baliban has little experience evaluating or valuing companies in bankruptcy. Of the nearly 25 engagements in which Baliban offered testimony over the last four years listed on his CV, only two were related to bankruptcy. *Id.* at 49:11-15. Baliban testified at his deposition that, with one exception, he "ha[s] not been in involved in any matter … where the issue was measuring the impact of a company being in bankruptcy or certainly never, as in this matter, measuring prolonged bankruptcy." *Id.* at 23:17-23.[1]

Notwithstanding his lack of bankruptcy expertise and his inexperience measuring the economic impact of bankruptcy on businesses, Baliban, in his Rule 26 Report, concludes that Coram lost more than $100 million in value due to the "indirect" costs of its bankruptcy.[2]

---

[1] In the one case in which he was asked to examine a company in bankruptcy, Baliban was only asked to evaluate the company's access to capital during bankruptcy. *See* Ex. B at 20:14-18.

[2] Baliban offers no analysis of the "direct" costs of bankruptcy to Coram, which Baliban defines as the "legal and administrative fees, including the costs of lawyers, accountants, and other professionals involved in the bankruptcy filing." Ex. A ¶ 8. Baliban attached to his report a schedule "prepared by Jerry Reynolds, a Coram representative," which purports to show that Coram spent approximately $36 million in bankruptcy-related fees after January 2001. *See* Exhibit 3 to Ex. A. However, Baliban did not himself calculate the fees incurred by Coram during bankruptcy, and his report neither details the source of Reynolds's data, reflects that Baliban did anything to corroborate or verify Reynolds's calculations, nor even identifies

"Indirect" costs, according to Baliban, include "lost sales from falling demand ..., declining margins ..., loss of key personnel, ... loss of management time and effort[, and] higher costs of credit." Ex. A ¶ 8. Baliban's analysis of the supposed indirect costs of bankruptcy to Coram includes two discrete opinions.

Baliban first opines, based on only "anecdotal evidence," that it is "likely" that Coram suffered these kinds of indirect costs of bankruptcy. Ex. A ¶ 9. Baliban based this opinion on (1) selective deposition testimony from four of the more than 75 depositions taken in this and related cases; (2) statements made by Crowley in six of the more than 75 status reports he sent to the Trustee and Coram's Directors during his tenure as CEO; and (3) risk disclosure statements made in Coram's SEC Form 10-Ks for the years 2000-2003. *See id.* Baliban did not speak directly to a single Coram employee, customer, supplier, or competitor, and there is no indication that he did any research on the industry.

Notwithstanding his opinion that it is "likely" that Coram suffered indirect costs, Baliban identifies no specific "indirect" cost that Coram actually incurred. Other than reading deposition testimony, Baliban did nothing to identify particular customers or specific opportunities in the marketplace that Coram lost because it was in bankruptcy. *See* Ex. B at 126:1-9. And his report does not identify a single specific customer or sale that Coram lost as a result of its extended bankruptcy. *See* Ex. A at 3-11. Baliban claims that one indirect cost of bankruptcy is higher cost of credit, but he made no determination whether Coram actually suffered high credit costs. Ex. B at 128:7-15. Similarly, Baliban does not know whether Coram lost a single employee as a result of its bankruptcy. *Id.* at 129:10-13; 130:13-22. Indeed, when asked, Baliban could not identify any specific event that occurred during bankruptcy that would not have occurred otherwise that impacted Coram's cash flow. *Id.* at 158:13-159:25.

Baliban also opines on the loss in value to Coram from December 2000 to December 2004. Baliban did this by comparing, on the one hand, a value of Coram derived from its expected cash flow as of December 2004 had the company emerged from bankruptcy in

---

Reynolds's job or function at Coram.

December 2000, with, on the other hand, a value of Coram derived from its cash flow as of December 2004. Baliban's report proceeds in several steps.

Baliban's first step is to come up with Coram's normalized free cash flow for 2000 and 2004. *See* Ex. A ¶ 15, Table 1. "Free cash flow" is, according to Baliban, cash flow generated by a business, net of its capital expenditures. As shown in Table 1 of his report, Baliban calculated normalized free cash flow for 2000 and 2003[3] by adjusting Coram's cash flow from operations to account for non-recurring events, such as the sale of CPS in 2000, *see* Ex. A at 13 n. 24, and to account for capital expenses and interest expenses, *see id.* at 13 nn. 25 & 26. As reflected in Table 1, Baliban finds that Coram had "normalized free cash flow" of approximately $27 million in 2000 and $23 million in 2003.

Baliban's second step is to apply what he calls the "single-period capitalization method." *See* Ex. A ¶ 16. He first calculates two values for Coram's free cash flow as of 2005. He calculates one value based on Coram's 2000 normalized annual free cash flow by assuming that Coram's 2000 cash flow was essentially stable and would grow at a steady rate of 4.76% (the U.S. Treasury risk free rate of return as of January 2001). *See* Ex 5 to Ex A at 1 n.10. He thus concludes that based on Coram's year 2000 cash flows, had Coram's cash flows continued to grow at a steady rate, Coram should have had cash flow of approximately $34.5 million in 2005. *See* Ex. A ¶ 16, Table 2. Baliban then does the same analysis for Coram's year 2003 cash flows. He applies the U.S. Treasury rate as of January 2004 to conclude that based on Coram's year 2003 cash flow and assuming a steady rate of increase, Coram should have had cash flow of approximately $24.5 million in 2005. *See* Ex. A ¶ 16, Table 2; Ex. 5 to Ex. A at 1 n.9.

Next, Baliban applies what he terms a "capitalization factor" to convert the two values for 2005 cash flow into values for Coram itself as of the end of 2004. The "capitalization factor" functions as a multiplier to convert cash flow to value. Applying a "capitalization factor" of 10.2, Baliban concludes that, based on Coram's cash flow in 2000 and assuming a steady rate of increase, Coram would have had a value of approximately $352 million in 2004. *See* Ex. A ¶ 17, Table 2. And based on Coram's cash flow in 2003 and assuming a steady rate of increase,

Coram would have had a value of approximately $251 million in 2004. *See id.* By subtracting

the two values, Baliban concludes that Coram lost approximately $100 million from the end of

2000 to the end of 2004. *See id.* ¶ 17, Table 3.

## III.    LEGAL STANDARD

Federal Rules of Evidence 702 permits "an expert by knowledge, skill, experience,

training, or education" to testify to "scientific, technical, or other specialized knowledge" only if

"(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of

reliable principles and methods, and (3) the witness has applied the principles and methods

reliably to the facts of the case." Fed. R. Evid. 702.

In *Daubert*, the United States Supreme Court clarified that the district court must act as a

gatekeeper to "ensur[e] that an expert's testimony both rests on a reliable foundation and is

relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

The Court in *Daubert* explained that expert testimony must comprise "scientific knowledge,"

and that "the adjective 'scientific' implies a grounding in the methods and procedures of science"

and "the word 'knowledge' connotes more than subjective belief or unsupported speculation."

*Id.* at 590. Thus, in order to qualify as "scientific knowledge" under *Daubert*, "an inference or

assertion must be derived by the *scientific method*" and "[p]roposed testimony must be

supported by appropriate validation." *Id.* "*Daubert*'s general holding—setting forth the trial

judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific'

knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Trustee bears the burden of proving that Baliban's proposed testimony meets the

requirements of the Rule 702/*Daubert* test. *Daubert*, 509 U.S. at 593 n.10. The Supreme Court

has emphasized that the *Daubert* test for the reliability of expert evidence is "exacting."

*Weisgram v. Marley Co.*, 528 U.S. 440, 455 (U.S. 2000).

In fulfilling its gate-keeping function and applying the *Daubert* test, the court "must resist

the temptation to answer objections to receipt of expert testimony with the shorthand remark that

---

[3] To determine Coram's 2004 cash flow, Baliban uses Coram's year-end 2003 cash flow figures.

the jury will give it 'the weight it deserves.'" *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549,

569 (D.C. Cir. 1993) (internal quotation omitted), *modified on other grounds*, 40 F.3d 475 (D.C.

Cir. 1994); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 459 (D.N.J.

1998). "[D]istrict courts must evaluate proffered expert evidence in the first instance rather than

leaving the task for the jury to sort through." *Lithuanian Commerce Corp.*, 179 F.R.D. at 459.;

*see also Bell Helicopter*, 999 F.2d at 569 (reversing damages award on the grounds that "the

decision to receive expert testimony was simply tossed off to the jury under a 'let it all in'

philosophy").

## IV.    ARGUMENT

### A.    Baliban's Opinion that Coram Suffered Indirect Costs Due to Bankruptcy Fails to Meet the Requirements of Rule 702 and *Daubert*.

Baliban's opinion that Coram incurred indirect costs as a result of its bankruptcy fails

each of the three requirements of Rule 702 and *Daubert*.

- Baliban's opinion that Coram suffered indirect costs as a result of bankruptcy is not "based upon sufficient facts or data." Fed. R. Evid. 702. Baliban did not identify a single specific sale, transaction or other event that occurred—or did not occur—as a result of Coram's bankruptcy and that impacted its cash flows.

- Baliban's opinion is not the "product of reliable principles and methods." Fed. R. Evid. 702. Instead, he reached his opinion based solely on an anecdotal and unsystematic review of a limited set of depositions and documents.

- Baliban's opinion does not fit the facts of this case. Baliban fails to distinguish indirect costs attributable to the delay in Coram's emergence from bankruptcy from indirect costs attributable to Coram's original bankruptcy filing.

For these three independent reasons, the Court should exclude Baliban's testimony.

### 1.    Baliban's Opinion Is Not Based Upon Sufficient Facts or Data.

The court should exclude Baliban's opinion that Coram suffered indirect costs as a result

of bankruptcy because it is not "based upon sufficient facts or data." Fed. R. Evid. 702. Under

*Daubert*, the trial court is responsible for "ensuring that an expert's testimony ... rests on a

reliable foundation." *Daubert*, 509 U.S. at 597. Indeed, an "expert's testimony [concerning

economic loss] must be accompanied by a sufficient factual foundation before it can be

submitted to the jury." *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983).

The court should exclude Baliban's opinion because Baliban fails to identify a single

specific indirect cost borne by Coram. This Court and others have held that the testimony of a damages expert is inadmissible under Rule 702 and *Daubert* when the expert relies on conclusory statements and fails to identify specific lost business opportunities. *Augustine Medical, Inc. v. Mallinckrodt, Inc.*, No. Civ.A. 01-387-SLR, 2003 WL 1873836 (D. Del. Apr. 9, 2003) (Robinson, J.); *see also ID Security Sys. Canada, Inc. v. Checkpoint Systems, Inc.*, 249 F. Supp. 2d 622, 695-96 (E.D. Pa. 2003).

In *Augustine Medical*, which involved an anti-trust counter-claim arising out of a patent case, the counter-claim plaintiff's damages expert relied only on discussions with a company employee for his conclusion that the company suffered anti-trust injury. But "it [was] evident from [the employee's] deposition that she could not identify even one actual lost sale," and "there [was] no evidence of record of any actual lost sales" *Augustine Medical*, 2003 WL 1873836, at *9. The expert "assume[ed] … that there was a perception by customers of the risks related to [the counter-claim plaintiff's] patent infringement liability," but "[t]here [was] no evidence … that any actual customer had that perception.…" *Id.* And, the expert "assume[ed] that [the counter-claim plaintiff's] ability to compete was hampered by this perception," but "[t]here [was] no evidence of record of any actual lost sales or other specific obstacles.…" *Id.* For these reasons, this court concluded that the expert "failed to gather facts and data sufficient to form a reliable opinion and, therefore, his testimony would be excluded under Fed.R.Evid. 702 and *Daubert*."

Likewise, Baliban fails to identify any specific indirect costs to Coram as a result of bankruptcy; instead of facts, he "stacks assumption upon assumption to come to his conclusion." *Id.* at *9. He identifies "lost sales from falling demand" as one of the indirect costs of Coram's bankruptcy. Ex. A ¶ 8. Yet, just as in *Augustine Medical*, "[t]here is no evidence of record of any actual lost sales." *Augustine Medical*, 2003 WL 1873836, at *9. Baliban admits that did not speak to any of Coram's customers in reaching his opinion, Ex. B at 125:2-3, 9-16, and that, other than reading deposition testimony, he did not make any effort to identify particular customers or opportunities in the marketplace that Coram lost because it was in bankruptcy. *Id.* at 126:1-9. Thus, his conclusion that Coram suffered lost sales as a result of its bankruptcy is not

supported by sufficient facts or data to be admissible.

Baliban similarly fails to identify any other specific indirect costs to Coram. He claims that higher costs of credit are an indirect cost of bankruptcy, but he did not calculate this cost to Coram. *Id.* at 128:7-15. Baliban's report lists a "decline in the value of inventory" as one of the indirect costs of bankruptcy, Ex. A ¶ 8, but at his deposition he admitted that he "didn't make a specific evaluation of [Coram's] inventory values," Ex. B at 128:22-23. Baliban also claims that "loss of key personnel" is one of the indirect costs of bankruptcy, but he does not know whether Coram lost a single employee as a result of its bankruptcy.

> Q.    Are you aware of any key employees that Coram lost because it was in bankruptcy?
>
> ....
>
> A.    Specifically, no.
>
> Q.    How about any employees that it sought to recruit but couldn't get because it was in bankruptcy?
>
> A.    Specifically, no.

*Id.* at 130: 6-7, 18-22. In fact, Baliban cannot identify any specific event that occurred during bankruptcy that would not have occurred otherwise that impacted Coram's cash flow. *Id.* at 158:13-159:25.

## 2.    Baliban's Opinion is Not Based on a Reliable Principle or Method.

The second reason to exclude Baliban's opinion regarding the existence of indirect costs is that it not the "product of reliable principles and methods." Fed. R. Evid. 702. Indeed, Baliban appears to have employed no method whatsoever to reach his opinion. Baliban cites to deposition excerpts from four witnesses, six reports Crowley made to the Board of Directors, and select language from Coram's 10-Ks. *See* Ex. A ¶¶ 9-12. Yet, he offers no rationale—much less a reliable methodology—that explains (a) why these documents are the best evidence for determining the existence of indirect costs; (b) why the particular deposition witnesses cited are the most authoritative; or (c) why the six Crowley letters he chose to cite out of the nearly 80 such letters that he reviewed are the most probative of the effect of bankruptcy on Crowley.

None of the more than other independent appraisers that have evaluated Coram since the

inception of it bankruptcy in 2000 employed such an *ad hoc* and methodologically thin approach. For example, the Trustee's expert J. Scott Victor, who performed a valuation of Coram in 2003 in connection with the bankruptcy proceeding, testified that he conducted wide-ranging due diligence while preparing his valuation:

> We read a lot.  We looked at all [Coram's] internal financial, both historical and their forecast
>
> We went with management in Denver several times.
>
> We went to several of [Coram's] actual field offices to see what they do in the field offices and how they service the patients.

Ex. C (8/7/07 Victor Depo.) at 56:18-25.  Victor's 2003 valuation report reflects that, in addition to reviewing Coram's SEC filings, he reviewed—among other records—detailed internal financial statements and projections, including statements and projections broken out by branch, region, and product line.  *See* Ex. D (SSG/Ewing Bemiss & Co. June 30, 2003 Valuation) at 9. He also met with at least 16 Coram executives and made two site visits to Coram branch offices. *See id.* at 7-8.

The unreliable nature of Baliban's anecdotal approach is also highlighted by the fact that there is as much anecdotal evidence—if not more—that shows that Coram suffered *no* indirect costs during bankruptcy and, in fact, *prospered* during bankruptcy under Crowley's direction. Baliban cites heavily to select deposition testimony from Michael A. Saracco, Coram's President of Specialty Services and Senior Vice President, to support his opinion that Coram suffered indirect costs, *see* Ex. A at 4-5, but Saracco actually testified that bankruptcy did not adversely effect Coram's business:

> Q:     Did being in bankruptcy affect Coram's vendor relationships?
>
> A:     No.
>
> Q:     Did being in bankruptcy affect Coram's ability to service its patients?
>
> A:     No.
>
> Q:     Did being in bankruptcy affect Coram's ability to grow its business?
>
> A:     Business grew.
>
> Q:     So then the answer would be it didn't affect Coram's ability to grow its

business?

A:     No.

Ex. E at 126:10-22.

Similarly, Baliban relies on selective quotes from Crowley's weekly reports to the Trustee and to Coram's directors to support his opinion regarding indirect costs. However, Crowley's reports actually reflect the reality that Coram performed well during the period it was in bankruptcy. For example, Crowley reported that, as of May 2002, Coram's management had "gotten Coram's bills paid current, improve[d] its vendor relationships and eliminate[d] all credit holds, and create[d] a *reliable* positive daily operating cash balance, too." Ex. F (May 6, 2002 letter from Crowley to Adams) at 3. By November 2002, Crowley reported that:

> "Daily Sales Revenue for November ... [may] exceed $1,800,000 per day. This compares to Daily Sales Revenue of $1,662,000 in November 2001 and will be the 15th month in a row with net growth. *More significantly*, Coram has the possibility of actually exceeding the $1,793,00 per day that it recorded in November 1999 ...."

Ex. G (December 2, 2002 letter from Crowley to Adams) at 1.

Finally, Baliban fails to cite, or discuss in his expert report, the references in the literature that contradict his conclusion that bankruptcy results in indirect costs. For example, the authors Kalay, Singhal, and Tashjian in their article "Is Chapter 11 Costly?", which Baliban had in his work papers but failed to mention in his report, conclude that the "evidence is consistent with the hypothesis that Chapter 11, if anything, provides net benefits to bankrupt firms" and that "[o]verall, [their] **empirical evidence is inconsistent with the hypothesis that Chapter 11 results in net indirect costs.**" Ex. H at 1, 28 (emphasis added).

### 3.     Baliban's Opinion Does Not "Fit" the Issues in the Case.

The third, independent, reason to exclude Baliban's opinion is that, even if it were based on sufficient facts or data and derived from a reliable principle or method (which it is not, as discussed above), his opinion is not "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985), *quoted in Daubert*, 509 U.S. at 591. Rule 702 requires that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

"Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citation omitted). The Third Circuit refers to this requirement as one of "fit" between the proffered expert opinion and the issues in the case. *Downing*, 753 F.2d at 1242.

In this case, the issue is Crowley's liability for the fact that Coram's bankruptcy reorganization plan was not confirmed in December 2000 but was approved four years later, in December 2004. The Trustee alleges that, but for Crowley's allegedly wrongful conduct, Coram would have emerged from bankruptcy in 2000. "The damages the Trustee seeks to recover," according to the Trustee, are "the reorganization costs and business losses *attributable to the delay in Coram's emergence from bankruptcy*." D.I. 137 at 31-32 (emphasis added.)

Baliban's testimony should be excluded because it does not relate to Coram's "business losses attributable to the delay in Coram's emergence from bankruptcy." *Id.* It is true that Baliban makes the conclusory assertion that "[h]ad Coram exited bankruptcy in December 2000, its [indirect] bankruptcy costs ... would have been lower." Ex. A ¶ 2. But Baliban did no analysis to support this conclusion. He relied on deposition testimony, Crowley's internal reports to the Board of Directors, and statements in Coram's SEC Form 10-Ks that discuss the impacts of bankruptcy on Coram generally. Baliban did no analysis—and cites no evidence—that isolates "losses attributable to the delay in Coram's emergence from bankruptcy" from losses attributable to the filing of Coram's bankruptcy petition in the first place. Thus, at best, Baliban's testimony supports the conclusion that Coram suffered indirect costs as a result of going into bankruptcy, but such testimony is irrelevant.

As Baliban's report makes clear, Coram in fact incurred indirect bankruptcy costs as a result of the filing of its bankruptcy petition in August 2000. Baliban cites an August 10, 2000 report from Crowley to the Board regarding vendors and payors that "placed Coram on hold" "[a]s a result of the filing" of the bankruptcy petition. Ex. A ¶ 10 (quoting letter from Crowley to Board of Directors, dated August 10, 2000). He also cites an October 5, 2000 report by Crowley that attributes, in part, Coram's less-than-expected revenue in September 2000 to "the filing of Chapter 11." *Id.* (quoting letter from Crowley to Board of Directors, October 5, 2000).

Any loss of revenue or increased costs to Coram that resulted from these actions are not "attributable to the delay in Coram's emergence from bankruptcy," and therefore cannot be recovered by the Trustee. Baliban's opinion, because it does not distinguish indirect costs attributable to the delay in Coram's bankruptcy from costs attributable to the fact of bankruptcy in the first place, will not "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, and should be excluded.

Baliban's opinion is further irrelevant because it does not specify indirect costs incurred during the period between the denial of Coram's first reorganization plan in December 2000 and the denial of Coram's second reorganization plan in December 2001. As explained in Crowley's Opening Brief in support of his Motion for Summary Judgment, Crowley can, at most, be held responsible for costs related to the denial of Coram's first reorganization plan in December 2000. Because Crowley had nothing to do with Coram's second reorganization plan, which was denied in December 2001, he cannot be responsible for any costs after that date. Baliban does no analysis to determine the existence of indirect costs specifically during the period between the denials of the first and second reorganization plan. In fact, he relies on evidence of indirect costs both before the first organization plan was denied, *see* Ex. A ¶ 10 (citing Crowley letters dated in August and October 2000), and after the denial of the second plan, *see id.* (citing Crowley letter dated January 2002); *id.* ¶ 11 (citing Coram's 2003 Form 10-K). Thus, Baliban's opinion is doubly irrelevant to the specific damages at issue here.

**B.    Baliban's Opinion Regarding the Extent of the Loss to Coram Fails to Meet the Requirements of Rule 702 and *Daubert.***

Even if the court concludes that Baliban's opinion regarding the *existence* of indirect costs passes muster under Rule 702 and *Daubert*, the Court should exclude his opinion regarding the extent of harm to Coram. As discussed above, Baliban applies what he terms the "single-period capitalization method" to compare the value of Coram had it emerged from bankruptcy in December 2000 versus the value of Coram after it exited bankruptcy in 2004. Baliban opines, based on his calculation, that Coram lost in excess of $100 million in value as a result of unspecified indirect costs of bankruptcy.

There are multiple, independent reasons to exclude Baliban's testimony regarding Coram's loss of value.

- Baliban can point to neither a single peer-reviewed publication applying his "single-period capitalization method," nor another appraisal of Coram that uses his method. In fact, of all the valuations done of Coram since 2000, not one used his "single-period capitalization method."

- Baliban admits that the critical assumption of his method is that Coram's cash flow as of 2000 and 2003 are stable and representative of Coram's value. In fact, it is plainly apparent that Coram's cash flow varied widely year to year.

- According to J. Scott Victor, another witness designated as an expert by the Trustee, Baliban's assumption regarding the collect "capitalization factor" is "just wrong."

- Baliban's method produces widely varying and improbable results for Coram's value when applied to years other than the two chosen by Baliban.

- Baliban fails to corroborate the result reached using his single-period capitalization method.

- Baliban fails to calculate what—if any—portion of the alleged decline in value of Coram is "attributable to the delay in Coram's emergence from bankruptcy" as opposed to attributable to Coram's original bankruptcy filing.

For all of these reasons, the court should exclude Baliban's testimony.

### 1.    Baliban Fails to Identify Any Peer-Reviewed Publication Applying his Single-Period Capitalization Method

In "assessing the scientific validity of a particular technique or methodology," the Court should consider "whether the theory or technique has been subjected to peer review and publication." *Daubert*, 509 U.S. at 593, 594. "[S]ubmission to the scrutiny of the scientific community is a component of 'good science' ... because it increases the likelihood that substantive flaws in methodology will be detected." *Id.* at 593.

Baliban cites no support in the peer-reviewed literature for his valuation methodology. His expert report does not cite any books or articles endorsing his single-period capitalization method. And, at his deposition, Baliban could not identify a single reference or publication in the literature endorsing the calculation he performed in reaching his ultimate opinion on Coram's loss of value. Ex. B at 144:23-145:12.

### 2. Baliban's Single-Period Capitalization Method Does Not Have Wide Acceptance.

The "degree of acceptance" of a given methodology within the "relevant scientific community" is also directly relevant to the Court's reliability analysis. *Daubert*, 509 U.S. at 594 (quoting *United States v. Downing*, 753 F.2d 1224, 1238 (3d Cir. 1985)). Baliban's opinion regarding the extent of Coram's indirect costs should be excluded because, as in *Kumho Tire*, there is "no indication in the record that other experts in the industry use" the single period capitalization method relied upon by Baliban in calculating Coram's alleged damages. *Kumho Tire*, 526 U.S. at 157.

At least nine economists have done valuations of Coram at various times since it filed for bankruptcy in August 2000, and **not one** of them used the "single period capitalization method" applied by Baliban or otherwise based their valuations on a single-year snapshot of Coram's cash flow. Baliban himself conceded at his deposition that he had reviewed five previous valuations of Coram and not one of the used his method. Ex. B at 146:1-147:5.

Moreover, J. Scott Victor, who performed an appraisal of Coram in 2003 on behalf of the Trustee and has been designated an expert in this matter on behalf of the Trustee *had never even heard of the single-period capitalization method.* Victor is an investment banker who considers himself to be a qualified "expert in performing business valuations," Ex. C at 48:17-21, and who testified that he has read dozens of valuations done of bankrupt companies, Ex. C at 54:23-55:5. At his deposition, he testified as follows:

Q.    Okay. Have you ever heard of something called a single period capitalization method evaluation?

A.    It's a methodology for valuation.

Q.    You've heard of it?

A.    No. I can't say that I've had. It's one of the forms of valuation, I assume.

Q.    … [W]hen did you first hear of a single period capitalization method?

A.    The actual methodology you just mentioned? You just told me.

Q.    You never heard of it before in your life?

A.    No.

Ex. C (Victor Deposition) at 51:12-52:2 The Trustee's other designated expert in this case, Michael Temin, a bankruptcy lawyer familiar with the methods used to value companies, had also never heard of the single period capitalization method. Ex. T (Temin Deposition) at 171:10-13.

Victor also testified that, in conducting business valuations based on cash flows, he never relies upon cash flow from just a single year, as Baliban did in reaching his conclusion. Ex. C at 53:3-9. In fact, Victor testified that, in deriving a value from cash flows, he relies on five years worth of cash flows. *Id.* at 56:6-9 ("I typically use five years for a discounted cash flow because I take the company's projections over that five-year period of time, and I try to get a valuation.").

### 3. Baliban's Application of his Single Period Capitalization Method Relies on False Assumptions.

Expert damages testimony is inadmissible under 702 and *Daubert* when the expert relies on assumptions that are not supported by the facts. *Elcock v. Kmart Corporation*, 233 F.3d 734, 756 (3d Cir. 2000); *Benjamin v. Peter's Farm Condominium Owners Assoc.*, 820 F.2d 640, 643 (3d Cir. 1987); *Gumbs*, 718 F.2d at 98. In *Elcock*, the Third Circuit held that the district court abused its discretion in admitting testimony from an expert on damages where the expert's "economic damages model relied on several assumptions not supported by the record." *Elcock*, 233 F.3d at 756. Because Baliban similarly relies on false assumptions, the court should exclude his testimony.

### a. Baliban Assumes that Coram Had Stable Cash Flow.

Baliban admits that a prerequisite for using his single period capitalization method for valuing a company is that the company's cash flow is stable.

> **"If one assumes future growth to be at a constant level,** current year free cash flow can be converted to an indication of value by capitalizing that amount.... Capitalization is arithmetically equivalent to a multi-period [discounted cash flow] model where **the growth rate is assumed to be constant into the future."** Ex. A (Baliban Report) ¶ 15.

> Single period capitalization method "is the arithmetic equivalent of a discounted cash flow model. But one can simplify the arithmetic into a single period capitalization rate **if one assumes that the growth will be constant."** Ex. B (Baliban Deposition) at 93:20-24.

> **[I]f the assumption that you make is that you have reached a period of**

**constant growth**, then you can use a single period capitalization model …. Ex. B at 94:24-95:2

Baliban also observed, in an article entitled "Accounting for Economic Loss," that in forecasting economic loss based on past experience, "[i]t is not enough to establish what the historic track-record was. It has to be shown to be representative and relevant before it can be accepted as a basis for a forecast." Ex. J (Jeffrey L. Baliban, Accounting for Economic Loss, Texas Bar J., July 1991) at BALIBAN 003340.[4]

Here, Baliban assumed, in applying his single-period capitalization method to Coram, that Coram's cash flow as of 2000 was representative of the company's value and performance and that Coram's growth as of the end of 2000 would be stable. Ex. B at 102:12-103:5. At his deposition, Baliban testified that "2000 was more representative of the future of the company than '98, '97 and the cash flows that were generated in that period." Ex. B at 103:2-5. He also testified that he "assume[ed] not only that Coram's cash flows will remain relatively stable, but that they will increase at a steady rate." Ex. B at 156:3-6.

### b.    Baliban's Assumption Is Contradicted by Coram's History.

Baliban's assumption that Coram's cash flows as of 2000 were stable and representative is contrary to the reality of Coram's history. In the five years prior to bankruptcy, Coram's cash flow from operations, as reported in the Company's annual SEC Form 10-K reports, varied from as low as negative $16,783,000 in 1995 to a high of $68,838,000 in 1997. See Ex K (Ex. B to Ueltzen Report). And in the two years prior to 2000, Coram reported negative cash flow from operations, reporting approximately negative $16 million in 1998 and approximately negative $9.5 million in 1999. See id.

Moreover, there is no evidence of any analysis by Baliban to validate this assumption that Coram's 2000 cash flows were representative in any way of Coram's value or his assumption that Coram's cash flows were stable. When asked at his deposition whether he could identify

---

[4] The Financial Accounting Standards Board's Statement of Financial Accounting Standards ("SFAS") governing fair value measurements also warns that valuations based on discounted cash flows must consider "[e]xpectations about possible variations in the amount and/or timing of the cash flows representing the uncertainty inherent in the cash flows. SFAS No. 157 at 37.

any facts in Coram's history to support the assumption that Coram's cash flow would grow steadily after 2000, Baliban could not provide a single fact to support this assumption. Ex. B at 156:16-158:12. His only response was to refer to his expert report, *id*. at 158:10-12, but his report contains no discussion of any analysis to support this assumption.

               **c.**      **Baliban's Assumption Regarding the Capitalization Factor Is also Wrong.**

Another assumption critical to Baliban's analysis is that the appropriate "capitalization factor" for Coram is 10.2. As discussed above, the capitalization factor is, in essence, a multiplier that converts a given cash flow into a value. Here, Baliban applied a capitalization factor of 10.2 to convert his values for Coram's 2005 cash flows into values for the company as whole. *See* Ex. A ¶ 16, Table 2.

According to the Trustee's expert Victor, however, Baliban's assumption that the correct capitalization factor is 10.2 is "just wrong." Ex. C at 125:18. Victor, as noted above, prepared a valuation of Coram in June 2003, in which he applied capitalization factors of between 6.27 and 7.22 based on a review of merger and acquisition transactions involving comparable companies. *See* Ex. D (SSG Ewing Bemiss & Co. report) at 16; Ex. C (Victor Depo) at 122:25-124:11. Victor never considered using a capitalization factor of 10:

     Q.     Did you ever consider using a multiple of 10?

     A.     It wouldn't have been justified.

     ....

     Q.     [S]o a multiple of 10.2 would not be justified, in your opinion?

     A.     **A multiple of 10.2 would not have been justified and was not and would not have been justified.**

     Q.     What would you say if someone performed a valuation of Coram and used a multiple of 10.2 times cash flow?

     ....

     A     In this case?

     Q.     Yeah, in Coram. During this time period.

     A.     In this time period? I would say they are wrong.

Ex C at 124:12-14, 124:19-125:2, 125:5-10 (emphasis added). Baliban's incorrect assumption regarding the capitalization factor dramatically affected his ultimate opinion regarding Coram's alleged loss in value. Had Baliban used even the high end of Victor's range of capitalization factors, his loss calculation would have dropped by approximately $30 million.[5]

**4.    Baliban's Single-Period Capitalization Method Produces Wildly Varying and Nonsensical Results.**

Another, related reason to find that Baliban's methodology—the single-period capitalization method—is unreliable is that it produces varying and nonsensical results when applied to years other than those to which Baliban applied it. *See In re Caldwell*, 350 B.R. 182, 190, 193 (Bankr. E.D. Pa. 2006) (rejecting expert opinion in part because it relied on a test that "notoriously generates inconsistent and false positive results").

Baliban's single-period capitalization method yields wildly inconsistent and irrational value figures for Coram when applied to years other than the years picked by Baliban. As discussed above, Baliban derives a value for Coram by applying a capitalization factor (10.2) to the value of Coram's cash flow for a single year as adjusted for non-recurring events, capital expenditures, and interest expenses. Michael G. Ueltzen, an accountant retained by Crowley, calculated the supposed value of Coram using Baliban's method for each year from 1995 to 2003. *See* Ex. K (Ueltzen report) at 14; Ex. K (Ex. C to Ueltzen report). The results for Coram range as follows:

| | |
|---|---|
| 1995: | $0 |
| 1996: | $440,000,000 |
| 1997: | $592,000,000 |
| 1998: | $0 |
| 1999: | $0 |
| 2000: | $279,000,000 |
| 2001: | $0 |
| 2002: | $116,000,000 |
| 2003: | $235,000,000 |

*See* Ex. K (Ueltzen report) at 14. The varying and illogical value figures produced by Baliban's

---

[5] Using Victor's capitalization factor of 7.22 but leaving the rest of Baliban's analysis unchanged yields values of Coram in 2004 of approximately $178 million assuming a 2004 exit from bankruptcy (24,591,000 x 7.22 = 177,547,020) and approximately $249 million assuming a 2000 exit from bankruptcy (34,440,000 x 7.22 = 248,656,800). The difference between these two values is approximately $71 million, as compared to the approximately $100 Baliban calculated.

method illustrate the flaw in relying on cash flow in a single year to calculate a company's value.

### 5.    Baliban's Opinion Is Not Corroborated.

Baliban's opinion should also be excluded because his single-period capitalization method produces results that are inconsistent with the other valuations done of Coram. Fed. R. Evid. 702 Committee Note (2000). "[W]hen an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied." *Id.*

In his expert report, Baliban cites three valuations of Coram as of late 2000 done by other appraisers. *See* Ex. A ¶ 21.[6] Excluding the one valuation figure that Baliban excludes as an outlier (the valuation figure obtained by Deloitte & Touche), the average of the two remaining valuations is $192 million. Applying Baliban's method to value Coram as of 2000 yields a value of $279 million, almost 50% higher than the average calculated by the other appraisers. An output so far off from what other independent appraisers have found is further evidence that Baliban's method is unreliable.[7]

### 6.    Baliban's Opinion Regarding the Extent of Coram's Loss Does Not "Fit" the Issues in the Case.

Finally, as with his opinion regarding the existence of indirect costs, Baliban's opinion regarding the extent of Coram's lost value over the years 2000 to 2004 is not "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Downing*, 753 F.2d at 1242. As discussed above, "[t]he damages the Trustee seeks to recover," according to the Trustee, are "the reorganization costs and business losses *attributable to the delay in Coram's emergence from bankruptcy.*" D.I. 137 at 31-32 (emphasis added). Yet, Baliban did no analysis

---

[6] Baliban claims to cite to four valuations done in late 2000, but, in fact, one of the valuations to which he cites is a calculation of Coram's value done by himself. *See* Ex. A at 16 n.31.

[7] Not only are Baliban's calculations at odds with the work of other experts who have valued Coram, his conclusion is at odds with a draft report he prepared in 2005. In his most recent report, Baliban opines that Coram's value fell by approximately $100 million from 2000 to 2004. However, in a draft report prepared in September 2005, in which Baliban claims he applied the same single-period capitalization method he applied here, he concluded that Coram lost only $91 million. *See* Ex. L (Sept. 13, 2005 letter at 1-2).

to calculate whether—or to what extent—any of the supposed $100 million in lost value is "attributable to the delay in Coram's emergence from bankruptcy" as opposed to attributable to the fact of bankruptcy itself.  Neither did he calculate what percentage of the supposed $100 million loss in value can be attributed to the one-year delay in Coram's emergence from bankruptcy between the denial of the first reorganization plan in December 2000 and the denial of the second reorganization plan in December 2001.  As noted above and argued in Crowley's Motion for Summary Judgment, Crowley cannot be responsible for any costs after December 2001 because he had nothing to do with preparing Coram's second reorganization plan.  For these reason's Baliban's opinion "does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591.  It should be excluded.

## V.    CONCLUSION

For the foregoing reasons, the testimony of the Trustee's damages expert Jeffrey L. Baliban should be excluded from trial.

Dated:  August 20, 2007                    CONNOLLY BOVE LODGE & HUTZ LLP

Jeffrey C. Wisler - #2795
Christina M. Thompson - #3976
Marc J. Phillips - #4445
The Nemours Building
1007 N. Orange Street
Wilmington, DE  19801
(302) 658-9141

-and-

John W. Keker
Elliot R. Peters
R. James Slaughter
KEKER & VAN NEST, LLP
710 Sansome Street
San Francisco, CA  94111
(415) 391-5400

Attorneys for Defendant
DANIEL D. CROWLEY