# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re:

**Arlin M. Adams**, Chapter 11 Trustee of the
Post-Confirmation Bankruptcy Estates of
**Coram Healthcare Corporation**, a Delaware
Corporation, and of **Coram, Inc.**, a Delaware
Corporation,

                Plaintiff

                v.

**Daniel D. Crowley**, et al.

                Defendant

Case No. 04-1565 (SLR)

### REPORT OF JEFFREY L. BALIBAN
#### JUNE 8, 2007

# I.    INTRODUCTION

1.      Coram Healthcare Corporation and Coram, Inc., (collectively "Coram" or the "Company") were engaged primarily in the business of furnishing alternate site (outside the hospital) infusion therapy and related services, including non-intravenous home health products such as respiratory therapy services and related equipment and durable medical equipment. Other services offered by Coram include outsourced hospital compounding services and centralized management, administration and clinical support for clinical research trials.[1]

2.      Coram filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code on August 8, 2000. On the same day as the Chapter 11 cases were filed, the Debtors filed their joint plan of reorganization and their disclosure statement with the Bankruptcy Court.[2]  A Restated Joint Plan was distributed on or about October 20, 2000. At a confirmation hearing on December 21, 2000, the Restated Joint Plan was not approved by the Bankruptcy Court.[3][4]  A second plan of reorganization was submitted on July 31, 2001, and was similarly denied by the Court on December 21, 2001. The Trustee's reorganization plan was submitted May 2, 2003, which the Bankruptcy Court ultimately confirmed in November 2004 and Coram exited bankruptcy as of December 1, 2004, nearly four years after confirmation of its initial plan was denied.[5]

3.      Daniel D. Crowley was Chairman and Chief Executive Officer of Coram from November 1999 until November 2002, although he effectively continued in this function until March 2003. Prior to November 1999, we understand Mr. Crowley had entered into an

---

[1] Coram 10-K, December 31, 2003. Coram's primary business strategy is to focus its efforts on the delivery of its core infusion therapies, which include nutrition, anti-infective therapies, pain management, intravenous immunoglobulin ("IVIG") and coagulant and blood clotting therapies for persons with hemophilia. Most of the company's alternate site infusion therapy net revenue is derived from third party payers such as insurance companies, managed care plans and governmental payers.

[2] Coram 10-K, December 31, 2000, p. 24 - 25.

[3] Coram 10-K, December 31, 2001, p. 28.

[4] October 5, 2004 Opinion of US Bankruptcy Judge Mary F. Walrath – "In December 2000, at the conclusion of the confirmation hearings on the Debtors' First Plan, we found that the Debtors' CEO, Dan Crowley, was also employed as a consultant by Cerberus (the largest Noteholder). We concluded that this employment created a conflict of interest which tainted the Debtors' restructuring efforts."

[5] Paragraph 71 of Order Confirming the Chapter 11 Trustee's Second Amended Joint Plan of Reorganization signed October 27, 2004.

employment agreement with Cerberus Partners, L.P., one of Coram's noteholders since 1997.[6]
According to the December 29, 2004 Complaint in the above-captioned matter, the Trustee
brings this action for breach of fiduciary duty against Mr. Crowley.

4.    National Economic Research Associates, Inc. ("NERA") has been retained by
counsel on behalf of the Trustee to provide assistance in understanding certain technical
economic and valuation issues. Specifically, NERA has been asked to analyze the financial
statements of Coram and other relevant information, and to determine the extent to which Coram
has incurred indirect costs related to its protracted bankruptcy.

5.    I am a Senior Vice President in the Securities & Finance practice of NERA and
am the senior firm member responsible for this report. Prior to joining NERA, I was a senior
partner in the Dispute Advisory Services practice of KPMG LLP. I have billed for my time in
this matter at my standard hourly billing rate of $550. My experience and education are set out
in my *curriculum vitae*, attached as **Exhibit 1**. I, along with professional staff working under my
direction, have been provided various documents and information in connection with this
assignment. A list of documents relied upon is attached as **Exhibit 2**.

## II.    FINDINGS

6.    Coram emerged from bankruptcy in December 2004. Had Coram exited
bankruptcy in December 2000, its bankruptcy costs, both direct and indirect, would have been
lower. Direct bankruptcy costs can be measured by tallying actual invoiced and allowed legal
and administrative costs. Indirect bankruptcy costs relate to lost business, profits and other
opportunity costs, and are more difficult to measure. Such costs reduce the business's ability to
generate cash flows during the pendency of the bankruptcy and into the future. In the case of
Coram, we have been asked to assume that, but for Mr. Crowley's conflict issue, Coram would
have emerged from bankruptcy by year-end 2000 instead of its emergence being delayed until
December 1, 2004. As such, we can reasonably estimate excess indirect costs due to the
prolonged bankruptcy by measuring the difference between what Coram was worth upon its

---

[6] Cerberus Partners, L.P. became a Coram noteholder in 1997. The relationship between Mr. Cowley and Cerberus
is discussed in the July 2001 Updated Report of Independent Restructuring Advisor Goldin Associates, L.L.C.
("Goldin").

emergence from bankruptcy in December 2004 versus what it should have been worth by December 2004 had it emerged from bankruptcy in December 2000, all else being equal.  Our analysis results in the following measures:

|  | ($ Millions) |
|---|---|
| Present value of expected free cash flows at December 2004 | $251.4 |
| Present value of expected free cash flows by December 2004 had Coram emerged from bankruptcy in December 2000 | $352.1 |
| Diminution in value due to extended bankruptcy | $100.7 |

7.    Our analyses are based on free cash flows before deducting restructuring costs. As such, damages due to the incurrence of incremental direct costs during prolonged bankruptcy are in addition to this estimate of indirect bankruptcy costs.

## III.   COSTS OF BANKRUPTCY

8.    Direct costs of bankruptcy "encompass the legal and administrative fees, including the cost of lawyers, accountants, and other professionals involved in the bankruptcy filing."[7]  We have been provided an analysis prepared by Jerry Reynolds, a Coram representative, that shows Coram's direct costs of bankruptcy exceeded $36 million.[8]  This analysis is attached hereto as **Exhibit 3**.  Indirect bankruptcy costs can include "lost sales from falling demand as a result of customer concerns over future service difficulties, declining margins resulting from increased input costs from suppliers, loss of key personnel, and loss of management time and effort."[9]  The finance literature includes other definitions of indirect bankruptcy costs, as follows:

---

[7] Weiss, Lawrence, Bankruptcy Resolution: Direct Costs and Violation of Priority of Claims, *Journal of Financial Economics*, 27:285-286, 1990.

[8] Scott Danitz April 6, 2007 deposition, p. 163.

[9] Cays, Stephen E., A Study on the Measurement and Prediction of The Indirect Costs of Bankruptcy, The Leonard N. Stern School of Business, April 2001.  Cays further says that "such costs are difficult to measure and, consequently, there is a dearth of information on their potential magnitude.  However, it is generally believed that these indirect costs can be substantially higher than the more easily observed 'direct' costs of bankruptcy."

Under this heading [indirect costs], I would include the opportunity costs of lost managerial energies ...[ and indirect costs] usually are thought to include lost sales, lost profits, the higher cost of credit, or possibly the inability of the enterprise to obtain credit or issue securities to finance new opportunities.[10]

[Indirect costs of bankruptcy] include a range of unobservable opportunity costs, ... including lost sales and a decline in the value of inventory. Customers may become concerned about assured supply or warranties. In certain industries (*e.g.*, financial services) these costs can completely destroy the value of the firm (*e.g.*, Drexel Burnham Lambert). [Such costs can also include] increased operating costs. Firms may lose key employees or have to pay more to keep them from abandoning a troubled firm. Suppliers may refuse to ship on favorable credit terms, and the firm's costs of capital may increase. [There can also be a] reduction in the firm's competitiveness. Management attention is focused on the bankruptcy, increasing the firm's vulnerability to competitors."[11]

Indirect costs include lost sales, lost profits, and possibly the inability of the firm to obtain credit or to issue securities except under especially onerous terms.[12]

9.    Based on the following anecdotal evidence in the record, it is likely that Coram suffered these indirect costs of bankruptcy:

    a. *From the March 30, 2007 deposition of Michael A. Saracco, President of Specialty Services, Senior Vice President in March 2002:*

        Q: And along those same grounds, did you ever encounter any concern among third party payers about Coram being in bankruptcy?

        A: Overall the majority of the payers really didn't have issue but it is on the record again that I was personally involved with the team that was renewing and worked with the HealthNet agreement. HealthNet is a large California payer that we had a capitated arrangement with that represented a significant amount of Coram's revenues at the time. And, if I recall, on one of the successive renewals, they wanted to be cautious about how they announced the renewal in working with us and there was a time frame that they had actually put in the acceptance letter of a date by which we had to be out of bankruptcy or they – they didn't have to, but they could exercise their right to make the agreement null and void.

---

[10] Altman, Edward, A Further Empirical Investigation of the Bankruptcy Cost Question, *The Journal of Finance*, 39(4):1070-1071, September 1984.

[11] Weiss, Lawrence, Bankruptcy Resolution: Direct Costs and Violation of Priority of Claims, *Journal of Financial Economics*, 27:286, 288-289, 1990.

[12] Warner, Jerold B., Bankruptcy costs: Some evidence. *The Journal of Finance*, 32(2):338, May 1977.

Q: [In reference to HealthNet and Nutrashare] These examples of pressures put on by outside vendors and customers, did they require time and attention to deal with?

A: Well, yeah. I mean whenever anyone that runs a good business, if anyone voices an issue, concern, you dedicate time and attention to it, not always from me personally, but as you can – especially with something like this, you can see the list of people that were involved in an account of this size.

Q: [...] Would you agree that it would be better for the company, Coram, to be able to focus on just its business rather than these external pressures?

A: Yes.

Q: [...] Do you feel that Coram would have been a stronger company had it not been in bankruptcy for four and a half years?

A: I mean I guess at the end of the day I don't think any organization wants to be in bankruptcy, but to be able to – I don't think you can sit and say how much better or how much different would it or could it have been, but, you know, were there things that you needed to do to pay attention to a company in bankruptcy? Sure.

b. *From the April 5, 2007 deposition of Allen J. Marabito, Executive Vice President. Becomes interim CEO upon Crowley's departure:*

Q: As the bankruptcy continued for a protracted period of time, did that cause any difficulty for Coram in dealing with either vendors or customers?

A: There may have been some that were troubled by its continued pendency.

Q: And do you recall having to make assurances that the company would continue to certain patients or groups?

A: There – there – yes. There – there were interest groups, like the term suggests, representing customers, patients, some advocacy groups, some – and as their name would suggest, they were interested in what Coram's status was so that their members would be properly serviced.

Q: [...] And do you believe that there were opportunities to be taken advantage of that could not be taken advantage of because Coram was still in bankruptcy?

A: The way I would try to express that is Coram lost a degree of flexibility in the bankruptcy process. For example, under Judge Adams' stewardship, we were not very aggressive in modifying, advancing, trying new ventures with Coram. It was – during that period of time, it was the preservation of the estate so that the ultimate owners of the company could make those types of decisions for themselves.

Q: So would it be fair to say that you still agree with what you previously testified to, that after December of 2000, when Coram did not emerge

from bankruptcy, in that posture it has no flexibility, it is not nimble, it is being overburdened by litigation, all the distractions, costs are enormous to this company and this process has to end, in my belief as soon as it can. I'm sorry, as soon as possible.

A: Yeah. I – I was – I'd agree with that. That's an expression of frustration right there.

c. *From the April 6, 2007 deposition of Scott R. Danitz, CFO:*

Q: As a member of Coram's senior management team, did you ever encounter any vendors or suppliers concerned about Coram being in bankruptcy?

A: Yes.

Q: Do you recall that such concerns changed at all after the first plan of reorganization?

A: No.

Q: Do you recall in early 2001 that [the Oley Foundation] expressed some concerns about Coram because of the bankruptcy proceedings in December 2000?

A: Yes.

Q: Do you recall also previously testifying in 2001 that emerging from bankruptcy would increase sales and the ability to increase sales for Coram?

A: Yes.

Q: Do you believe that was true at the time?

A: Yes.

Q: Did not emerging from bankruptcy when the second plan of reorganization was not confirmed damage Coram's ability to increase sales?

A: It – it would have damaged it some, yes.

d. *From the April 5, 2007 deposition of Kurt Davis, Vice President of Investor Relations / Vice President of Corporate Communications:*

Q: Were you concerned, as the bankruptcy filing approached, about how the filing might impact Coram's business?

A: Yes.

Q: What were your concerns in that regard?

A: Well, as with employees, a lot of people who hear about bankruptcy believe that the organization is going out of business and will cease to

exist or that if they're a vendor to the organization, they won't be paid or that sort of thing. So they can cut you off. And so my concern was just the continuity of business and making sure that people understood that the enterprise would continue to exist.

Q: Did Coram's competitors attempt to use Coram's bankruptcy filing to their advantage?

A: It – it was represented in some of the management meetings that there had been some attempts by the competitors to do that. It – it was not as – it wasn't rampant, to my recollection, but, yes, I remember instances of that being discussed by people in the field.

Q: Did you have a concern after the Bankruptcy Court denied confirmation of Coram's first plan of reorganization that Coram employees would be disturbed by the ruling?

A: Yeah.

Q: Coram's second proposed plan of reorganization was not confirmed by the Bankruptcy Court; is that correct?

A: Correct.

Q: Did you have a concern about how denial of the second plan of reorganization would be viewed by Coram's employees?

A: Yes.

Q: What was your concern?

A: It would have been similar to the concern the first time, going to our credibility and, you know, again, the – you know, our – you know, our counsel had told us how to solve this, you know, disclosure problem that had resulted in the failure in the first one. And so, you know, we were confident, following his advice, that that's what would cure this and solve it. And when it didn't, we were dismayed. And then we were concerned that our employees would be dismayed, too.

10.    Mr. Crowley also remarked on the indirect costs of bankruptcy to Coram on a number of occasions, as follows:

Field personnel contacted the significant referring providers, payors, regulators, and vendors. As a result of the filing, a number of vendors had immediately placed Coram on hold. A typical example is attached from Nestle who provides Enteral. We have reversed the vast majority of the holds. There are similar provider and payor issues that are requiring intense remedial activity.[13]

---

[13] Letter from Crowley to Board of Directors, August 10, 2000 (CROWLEYKVN 009677)

September's Revenue looks like it came in at approximately $29.4 Million (the business forecast plan was $36.1 Million). Reasons: R Net implosion in the Eastern Region, Medicaid reimbursement level declines, tighter administration of the admissions grids, loss of the Aetna/US Healthcare/Prudential/Humana business, staff turnover, and, of course, the filing of Chapter 11.[14]

Coram is in the process of finalizing an operational budget for 2001. The process for creation of the budget was materially disrupted by the activity level required for the Chapter 11.[15]

Currently Coram's selling effort has been impacted by competitors who have continued to hire key sales employees from Coram by stressing the fragility of our firm's financial situation. Competitors try to scare our employees by telling them Coram is going to close its doors any day now. We counteract this every day with active communication to the contrary.[16]

With the continuing impact of the R Net issues in the Northeast, the impact of physicians who held Coram shares that lost value, and the prolonged Chapter 11, as well as aggressive competition, Coram continues to experience a general "softness" in referrals from providers. Some providers are concerned about continuity of care, are risk averse for their patients, and respond to the Chapter 11 and competitive entreaties to shift business from Coram to Apria, Gentiva, Caremark, Option Care, Nutrishare, local hospitals, and local infusion providers. *The impact of all this is a constant tamping down of Coram's sales.*[17]

All of us recognize that Coram's situation remains cloudy with the Bankruptcy. Just the same, the point of reminding you of these issues is to create a current awareness of Coram's situation as it begins to establish financial and management incentive goals for 2002 for the Board to consider. We are already a bit tardy in completing the establishment of goals and management incentives for 2002 due to other pressing matters. However, considerable work has been done on these matters and over the next few weeks, recommendations will be brought to you for review and consideration.[18]

11.    Coram also included the various comments in its 10-K filings with regard to the increased risks it faced while operating in bankruptcy:

---

[14] Letter from Crowley to Board of Directors, October 5, 2000 (CROWLEYKVN 013496)

[15] Letter from Crowley to Board of Directors, January 22, 2001(CROWLEYKVN 008487)

[16] Letter from Crowley to Board of Directors, February 5, 2001(CROWLEYKVN 008496)

[17] Letter from Crowley to Board of Directors, March 9, 2001(CROWLEYKVN 008505)

[18] Letter from Crowley to Board of Directors , January 14, 2002 (CROWLEYKVN 009949)

*From the December 31, 2000 10-K*

The company's ability to continue operations is dependent upon, among other things, the ability of the company to comply with the terms of the DIP financing arrangement, confirmation of a plan of reorganization, success of future operations after such confirmation and the ability to generate sufficient cash from operations and financing sources to meet obligations. There can be no assurances that any plan of reorganization will be approved by the Bankruptcy Court or that such a plan will allow the company to operate profitably. Any plan of reorganization and other actions during the Chapter 11 proceedings could change materially the financial condition and/or outlook of the company. Furthermore, the future availability or terms of financing cannot be determined in light of the Chapter 11 filings and there can be no assurance that the amounts available through the DIP financing will be sufficient to fund the operations of the company until a proposed plan of reorganization is approved by the Bankruptcy Court. In addition, the company may experience difficulty in attracting and maintaining patients and appropriate personnel as a result of the Chapter 11 proceedings.

*From the December 31, 2001 10-K:*

On the same day that the Chapter 11 cases were filed, the Debtors filed their joint plan of reorganization (the "Joint Plan") and their joint disclosure statement with the Bankruptcy Court. The Joint Plan was subsequently amended and restated (the "Restated Joint Plan") and, on or about October 10, 2000, the Restated Joint Plan and the First Amended Disclosure Statement with respect to the Restated Joint Plan were authorized for distribution by the Bankruptcy Court. [  ] At a confirmation hearing on December 21, 2000, the Restated Joint Plan was not approved by the Bankruptcy Court.

[On February 6, 2001], the Bankruptcy Court approved the Debtors' motion to appoint Goldin Associates, L.L.C. ("Goldin") as independent restructuring advisor to the Independent Committee of the Board of Directors (the "Independent Committee"). Among other things, the scope of Goldin's services included (i) assessing the appropriateness of the Restated Joint Plan and reporting its findings to the Independent Committee and advising the Independent Committee respecting an appropriate course of action calculated to bring the Debtors' bankruptcy proceedings to a fair and satisfactory conclusion, (ii) preparing a written report as may be required by the Independent Committee and/or the Bankruptcy Court and (iii) appearing before the Bankruptcy Court to provide testimony, as needed. Goldin was also appointed as a mediator among the Debtors, the Equity Committee and other parties in interest.

Based upon Goldin's findings and recommendations, as set forth in the Report of Independent Restructuring Advisor, Goldin Associates, L.L.C (the "Goldin Report"), on July 31, 2001, the Debtors filed with the Bankruptcy Court a Second Joint Disclosure Statement, as amended (the "Second Disclosure Statement"), with respect to their Second Joint Plan of Reorganization, as amended (the "Second Joint Plan"). [  ] On December 21, 2001, after several weeks of confirmation hearings, the Bankruptcy Court issued an order denying confirmation of the Debtors' Second Joint Plan.

On March 7, 2002, the Bankruptcy Court approved the appointment of Arlin M. Adams, Esquire, as the Debtors' Chapter 11 trustee. [ ] The Bankruptcy Code also provides that a Chapter 11 trustee must either file a plan of reorganization as soon as practicable or an explanation as to why he/she is unable to file a plan of reorganization. With the appointment of a Chapter 11 trustee, the Debtors are no longer debtors-in-possession under the Bankruptcy Code. [ ] A Chapter 11 trustee also assumes responsibility for management functions, including decisions relative to the hiring and firing of personnel. As is the case in the instance of the Debtors, when existing management is necessary to run the day-to-day operations, the Chapter 11 trustee retains and oversees this management.

### From the December 31, 2002 10-K:

Additionally, in February 2001, the Equity Committee filed a motion with the Bankruptcy Court seeking permission to bring a derivative lawsuit directly against the company's Chief Executive Officer, a former member of the CHC Board of Directors, Cerberus Partners, L.P., Cerberus Capital Management, L.P., Cerberus Associates, L.L.C. and Craig Court, Inc. (all the aforementioned corporate entities being parties to certain of the company's debt agreements or affiliates of such entities). The Equity Committee's proposed lawsuit alleged a collusive plan whereby the named parties conspired to devalue the company for the benefit of the company's creditors under the Securities Exchange Agreement. On February 26, 2001, the Bankruptcy Court denied the Equity Committee's motion without prejudice. In January 2002, the Equity Committee filed a substantially similar motion with the Bankruptcy Court, which additionally named certain current CHC directors, the company's other noteholders and Harrison J. Goldin Associates, L.L.C. (sic) as possible defendants. On February 12, 2002, the Bankruptcy Court again denied the renewed motion without prejudice.

Coram is involved in certain legal disputes and the Debtors are currently in the Bankruptcy Cases. Although Coram intends to pursue its claims and defend itself vigorously in these matters, management cannot predict the outcome of current and future matters due to the uncertainties inherent in litigation and the bankruptcy proceedings. The company's financial condition, results of operations and liquidity may be materially adversely impacted by the outcome of its legal disputes and an approved plan or plans of reorganization submitted by the Chapter 11 trustee or another interested party.

### From the December 31, 2003 10-K:

Management believes that the overall costs for the Bankruptcy Cases will result in a significant use of cash for the year ending December 31, 2004, and thereafter. These costs principally consist of professional fees and expenses. Management believes that such costs, when authorized for payment by the Chapter 11 trustee and the Bankruptcy Court, will be funded through available cash balances and cash provided by operations; however, this significant use of cash could have a materially adverse effect on the company's financial position and liquidity.

In recent years, Coram experienced significant increases in premiums related to D&O insurance, principally due to the ongoing bankruptcy proceedings and litigation matters involving directors and officers of the company. The company currently has adequate D&O coverage for the 2004 policy year and management believes that the company will be able to obtain adequate D&O insurance coverage in future periods. Management further believes that the related future insurance premiums will be paid with available cash balances and cash provided by operations. However, in the event that the company is unable to maintain adequate D&O insurance coverage in future policy years, Coram may be unable to attract and retain qualified directors and officers, which could have a materially adverse effect on the company's operations.

The continued successful operation of Coram's business, as well as its future growth, depends upon its ability to recruit and retain a staff of professional personnel, including licensed pharmacists and nurses. Certain parts of the United States, including states where the company has operations, are currently experiencing a shortage of these licensed professionals. Coram has been directly affected by this shortage and management believes that the company's current financial position and the ongoing bankruptcy proceedings have made it more difficult to recruit and retain experienced professional personnel.

As a result of the Bankruptcy Cases, the equity interests of the common stockholders are subject to a high degree of risk. A confirmed plan or plans of reorganization could result in the complete elimination of the CHC equity interests.

12. Coram designates emergence from Chapter 11 bankruptcy proceedings as one of several "major strategic alternatives and initiatives being implemented by Coram."[19] Based on these comments, it is clear that Coram both anticipated and likely suffered some impact of indirect costs from its protracted bankruptcy.

## IV. NERA ANALYSIS

13. Determining the existence of indirect bankruptcy costs is a more straightforward matter than determining their measure with exactitude. However, information exists to make reasonable estimates of their impact on Coram. First, in the July 2001 Updated Report of Independent Restructuring Advisor Goldin Associates, L.L.C. ("Goldin Report"), Goldin states that Coram suffered "approximately $7 million to $9 million in business losses attributable to the

---

[19] 2001 SEC Form 10-K, p. 30. Similar statements are made in the 2000, 2002 and 2003 10-Ks.

prolonged bankruptcy."[20] Goldin provides no description of his method in making this determination but, given the report date (July 2001) it is clear it cannot have been the result of an exhaustive study for the entire period through December 2004.

14.     In theory, the value of an interest in a business depends on the future benefits that will accrue to it, with the value of the future benefits discounted back to a present value at some appropriate discount (capitalization) rate.[21] This definition is the basis of our approach to estimate the diminution of Coram's business value as a result of the protracted bankruptcy proceedings.  One definition of the benefits that accrue to a business is the cash flow generated by its operations net of capital expenditures ("free cash flow").  Annual cash flow from operations and capital expenditures are reflected in the Statement of Cash Flows reported in each year's SEC Form 10-K.

15.     The annual free cash flow amount can be converted to an indication of value by using it as a basis on which to forecast future years' annual free cash flow and then discounting these future amounts at a rate of return consistent with the risk of the investment (discounted cash flow or DCF model).  If one expects future growth to be at a constant level, current year free cash flow can be converted to an indication of value by capitalizing that amount; that is, dividing it by a capitalization rate.  Capitalization is arithmetically equivalent to a multi-period DCF model where the growth rate is assumed to be constant into the future.  As shown in Table 1 below, we compare normalized free cash flows of Coram for both 2003 and 2000.

---

[20] Goldin Report, p. 11.

[21] Pratt, Shannon P., Valuing a Business, The Analysis and Appraisal of Closely Held Companies, Second Edition, Business One Irwin, Homewood, IL, page 35.

12

| | ($ Thousands) | |
| --- | --- | --- |
| | 2003[22] | 2000 |
| Cash flow from operations before bankruptcy-related expenses, as reported in annual SEC Form 10-K for year-end 2003 and 2000. | $28,960 | $44,144[23] |
| Adjustment for sale of CPS segment's impact on working capital.[24] | | (9,694) |
| Adjustment to normalize capital expenditures and depreciation. In the long run, capital expenditures will equal depreciation expense. This adjustment normalizes any single-period timing differences.[25] | (6,953) | (23,227) |
| Add back interest expense, net of the tax shield. This is done to reflect debt-free cash flows to all capital (debt & equity) investors.[26] | 1,015 | 16,073 |
| Normalized annual free cash flow. | $23,022 | $27,295 |

*Table 1—Normalized Annual Free Cash Flow*

16.     In Table 2, we show the value of these two normalized annual free cash flow levels, given the actual bankruptcy exit date ("2004 Exit") and the but for bankruptcy exit date ("2000 Exit"). We applied the single-period capitalization method to estimate present value:

---

[22] We use year-end 2003 as a starting point to estimate year-end 2004 free cash flow because 2003 is the most current audited financial statements available for Coram.

[23] Based on CPS's negative $1.9MM in earnings before interest expense, taxes, and depreciation (EBITDA), reported by Coram in its 2000 10-K (page F-30), we assume that none of the 2000 reported cash flow from operations are attributed to CPS, which was sold in July of 2000 for $41.3MM. Thus, we do not need to adjust this figure downward to make a fair comparison to the 2003 figures.

[24] In 2000, Coram reported significant decreases in working capital (inventories and accounts receivable less accounts payable) that increased cash flow from operations as a result of the sale of CPS. Since we do not expect these cash flows to recur we reduce cash flows to reflect this one-time windfall. See calculation on **Exhibit 4**.

[25] Normalized free cash flow should account for both long-term capital investment and long-term depreciation. When normalizing cash flows, depreciation expense should be set equal to capital expenditures. Since Coram charged approximately $23MM in depreciation expense in 2000 and because we are assuming it normally spends about $8MM on capital, we must adjust the depreciation add-back down to $8MM by reducing it an additional $15MM

[26] Cash flow from operations as reported by Coram includes a reduction in cash flows resulting from interest expense (net of tax). In order to determine cash flows before any impact of financing activities we must add back this after-tax interest deduction.

| $ amounts in thousands (except capitalization factor) | 2004 Exit | 2000 Exit |
|---|---|---|
| Normalized annual free cash flow | $23,022 | $27,295 |
| Annual free cash flow at year-end, 2005 (c)[27] | 24,591 | 34,440 |
| Single-Period Capitalization Factor (1/(r-g)) | 10.2 | 10.2 |
| Value of Coram as of year-end 2004 (c/(r-g)) | $251,384 | $352,078 |

*Table 2—Comparative Values of Coram Based on 2003 vs. 2000 Bankruptcy Exit*

17.    In Table 3, we compare the present value of future Coram free cash flows as of year-end 2004 assuming exit from bankruptcy at year-end 2000 relative to the actual bankruptcy exit in year-end 2004. The difference in values under these two scenarios, $100.7 million, is the loss or damages resulting from the four-year delay in exiting bankruptcy. These calculations are presented on **Exhibit 5.**

| | Value as of Year-End 2004 (*$ thousands*) |
|---|---|
| Value of Coram had it exited bankruptcy at year-end 2000 | $352,078 |
| Value of Coram given its actual year-end 2004 bankruptcy exit | $251,384 |
| Difference in value of Coram resulting from extended bankruptcy | $100,694 |

*Table 3—Damages Resulting from Extended Bankruptcy*

18.    In determining the capitalization rate, we applied the Capital Asset Pricing Model ("CAPM") to calculate an appropriate cost of equity capital at a risk level consistent with a similar alternative investment in this industry. CAPM states that the expected return of an investment, $r_e$, equals the rate on a risk-free security, $r_f$, plus a market risk premium, $r_m - r_f$. The market risk premium is adjusted by a systematic risk coefficient, beta or $\beta_e$, which represents the particular industry's systematic risk; that is, a measure of the volatility of a particular industry relative to the market as a whole. The CAPM formula is, therefore,

14

$$r_e = r_f + \beta_e(r_m - r_f)$$

19.     For $r_f$ we use the yield on the 30-year Treasury Bond (5.0 percent) as of December 1, 2004, as reported by Bloomberg LP. To measure $(r_m - r_f)$, we use the historical return on the market index relative to the return on US government securities.[28] Finally, to derive Coram's beta $(\beta_e)$ we examine the historical movement (or correlation) of the peer group return-on-total-capital relative to the market as a whole.[29]

20.     Using the CAPM formula and adjusting for Coram's size, we derive an expected return of approximately 12.6 percent for Coram capital as of year-end 2004 (that is, from January 2005 onward). We use this rate net of the expected inflationary growth of approximately 2.9 percent to capitalize Coram's terminal cash flows under the two scenarios depicted above. See calculations on **Exhibit 6**.

## V.   MARKET ANALYSIS

21.     To corroborate this analysis, we utilized the various valuation analyses prepared at various points in time to estimate any diminution in business value occurring from December 2000 through December 2004. We were provided the following valuations from 2000:

---

[27] We rolled the year-end 2003 and year-end 2000 annual debt-free cash flow amounts forward at the risk-free rate of return available at each period. In other words, we added 2 years of interest to year-end 2003 cash flow and 5 years of interest to year-end 2000 cash flow.

[28] We also incorporate a small firm premium of 4.0 percent as reported by Ibbotson Associates SBBI Valuation Edition 2005 Yearbook, Appendix C, table C-1. The long-horizon expected equity risk premium and micro-cap size premium are based on the differences of historical arithmetic mean returns from 1926 - 2004 using the S&P 500 as the market benchmark. pp.70-71, 127-37.

[29] Our peer index includes Apria Healthcare Group, Gentiva Health Services Inc., American Homepatient Inc., and Option Care, Inc. The daily equity returns for the peer index is regressed against the returns of the S&P500 index. We then adjust the beta to remove the effects of financing so that our risk factor is indicative of Coram's underlying asset return risk and not its method of financing these assets.

15

| Valuation Firm | Valuation Date | Value Estimate ($ thousands) |
|---|---|---|
| UBS Warburg | September 30, 2000 | $195,773 |
| Deloitte & Touche | November 15, 2000 | $292,000 |
| Chanin Capital Partners[30] | December 31, 2000 | $189,391 |
| 2000 10-K Value estimate[31] | December 31, 2000 | $215,500 |

22. The average of these values is $223.166 million. Excluding the much higher Deloitte value reduces the average value estimate of Coram to about $200 million at December 31, 2000.

23. A report prepared by SSG Capital Advisors, L.P. and Ewing Bemiss & Co. estimates the actual value of Coram 2½ years later at $219.8 million as of June 30, 2003. This supports an annual compound growth rate of about 4 percent.[32]

24. Our analyses of comparable companies operating in this industry show that, in general, this industry enjoyed significant growth in revenues and returns on equity during the 2001-to-2004 period. While the value of Coram increased during this period, the increase it enjoyed was appreciably below general industry levels. Additionally, actual returns to Coram debt and equity holders during this period on average were below expected rates of return as measured by the Company's weighted average cost of capital.

25. Over the period January 2001 to December 2004, one measure of the market conditions facing Coram is the performance of its peers. Coram identifies its peers on its proxy statement for the period ending August 5, 1999, as Apria Healthcare Group, American Homepatient, Gentiva Health Services, and Option Care.[33] These companies are also used as comparables in the various valuations performed on Coram. The performance of these

---

[30] Chanin Capital Partners had issued a previous report, dated July 31, 2000, valuing Coram at $207 million.

[31] The value of Coram at December 31, 2000 can also be estimated by adding to the year-end market value of equity all book values of long-term debt and future payments on operating leases.

[32] December 2000 value of $200 million $\times$ $1.04^{2.5}$ = $220 million.

[33] According to the March 13, 2000 SEC Form 8-K for Olsten Corporation, Olsten Corporation split off its health services business as an independent public company – Gentiva Health Services.

companies can be measured by the cumulative return of the companies' equity (*i.e.*, cumulative appreciation of each company's stock price), where each return is weighted by its relative market capitalization. During this period, the market capitalization return grew at compound annual rates of 18 percent. See **Exhibit 7**.[34]

26.     Another metric for the growth of the industry is change in the peers' enterprise value. As shown in **Exhibit 8**, the average enterprise value compound annual growth rate for the peers over the period is approximately 13.7 percent. Therefore, if Coram's enterprise value grew at the same rate over that time period and we assume its value at December 2000 was $200 million, its value at the end of 2004 should have been about $334.1 million.[35] Further, if Coram had enjoyed a compound annual growth rate in value of 13 percent from December 2000 through June 30, 2003, its value would have been $275.6 million.[36] This compares to the $219.8 million in value measured by SSG Capital Advisors and Ewing Bemis at June 30, 2003, for a difference of $55.8 million through June 30, 2003.

## VI.    OTHER CORAM MATTERS

27.     Coram's December 31, 2001 10-K discusses the reduction of average wholesale price reimbursement rates on the antibiotic drug Vancomycin as well as four other anti-infective drugs. We analyzed the extent to which this could meaningfully explain Coram's below-market growth rates. We noted the following from Coram's 10-Ks:

*From the December 31, 2001 10-K, p. 34.*

Effective July 1, 2001, the AWP for a certain brand of the antibiotic drug Vancomycin and four other anti-infective drugs were permanently reduced. Net revenue related to these drugs decreased $2.4 million or 21.4% to $8.8 million in 2001 from $11.2 million in 2000. The components of the net revenue reduction were an unfavorable pricing variance of $3.1 million related to the adverse AWP change offset by a favorable variance in volume, resulting in a net revenue increase of $0.7 million.

---

[34] Our preliminary estimates of infusion-weighted return grew at an even higher rate.

[35] For the purpose of this analysis, this value compares favorably to the value estimate at December 2004, reflected in Table I above based on the capitalization of free cash flows, had Coram exited bankruptcy in 2000.

[36] December 2000 value of $200 million $\times$ $1.1368^{2.5}$ = $275.6 million.

*From the December 31, 2002 10-K, p. 40*

> Effective July 1, 2001, the AWP reimbursement rates for a certain brand of the antibiotic drug Vancomycin and four other anti-infective drugs were permanently reduced. Net revenue related to these drugs decreased $3.9 million or 33.3% to $7.8 million during the year ended December 31, 2002, from $11.7 million during the year ended December 31, 2001. The net revenue reduction included an unfavorable pricing variance of $6.5 million related to the adverse AWP reimbursement rate changes, which was offset by an increase in volume relating to such drugs.

28.　　The most this seems to have affected revenues is by about $3.9 million for the year ended 2002. Assuming an EBITDA margin of 10 percent, the cash flow impact would be limited to about $400,000. Further, this reduction in AWP is explained in Coram's 10-Ks as being due to reimbursement rates as prescribed by Medicare, Medicaid, investigations performed by the Government Accounting Office as well as recommendations by the Department of Health & Human Services. To the extent Coram's peers were similarly affected by these events, our analysis of the peers already takes these issues into account.

## VII. CONCLUSION

29.　　Indirect costs of bankruptcy include a range of unobservable opportunity costs. The testimony and evidence provided to me indicates the existence of these losses was recognized by Coram management at the time and by Mr. Crowley himself. The July 2001 Goldin report confirms the existence of business losses due to protracted bankruptcy, even as of that early date. We measured the damages to Coram based on the value associated with a protracted bankruptcy that lasted an additional four years as a result of the Crowley conflict. By examining Coram's reported cash flows and adjusting for non-recurring events as well as bankruptcy and financing related costs, we find that Coram lost approximately $100.7 million in value as a result of exiting from bankruptcy at year-end 2004 as opposed to year-end 2000. This reduction in value does not appear to be explained by any other market, industry or Coram-specific factors.

30.　　We understand discovery is continuing in this matter. As such, we reserve the right to amend, change or update these comments as necessary. We also understand that, to the extent other experts opine on these issues, counsel may request our input or rebuttal.

18

Respectfully submitted,

June 11, 2007
Date

Jeffrey L. Baliban

Exhibit 1

# NERA
Economic Consulting

National Economic Research Associates, Inc.
1166 Avenue of the Americas
New York, New York 10036
+1 212 345 3000 Fax +1 212 345 4650
jeffrey.baliban@nera.com
www.nera.com

## Jeffrey L. Baliban
### Senior Vice President

Mr. Baliban is a Senior Vice President in the Securities and Financial Economics practice. Prior to joining NERA, he was a senior partner in the Disputes Advisory Services practice at KPMG, LLP. Mr. Baliban has devoted the majority of his 30 years of professional practice to the study of how internal operations and external market factors affect business results, and to the process of resolving complex commercial disputes. Mr. Baliban began his career in audit at Ernst & Ernst (now Ernst & Young) in 1977. He became a Certified Public Accountant in 1981. In the mid-1980s, his practice moved from audit to forensic accounting and economic valuation. In addition to his CPA, Mr. Baliban successfully completed the American Institute of Certified Public Accountants' business valuation accreditation (ABV) program, successfully completed all four exam levels of the American Society of Appraisers' business valuation program, and earned an M.A. in Economics at the University of Texas in 1995, concentrating in business and economic forecasting, statistical analysis and finance modeling.

Mr. Baliban has significant national and international experience, and has testified in various federal, state and municipal jurisdictions, in business valuation matters, measurement of economic value and/or damages in commercial disputes and business litigation matters, business interruption and lost profits, contract and tort damage claims, bankruptcy related matters, fraudulent conveyance and other insolvency matters, long-term construction contract issues, lender liability issues, intellectual property matters, antitrust and class certification matters, fraud, embezzlement and other forensic accounting investigations. His clients include corporations, law firms and commercial property and casualty insurance companies. Industries include, among others, banking and financial institutions, P&C insurance and reinsurance, petrochemical and energy, extraction and mining, healthcare, distribution, telecommunications, manufacturing, retail, real estate, technology, restaurants and food distribution, automobile dealerships, hotel and hospitality, insurance brokerage, professional practices, clothing and fashion. Mr. Baliban has significant experience in the litigation, discovery and testimony process. He has also written and spoken widely on accounting, economics, valuation and damages measurement issues.

# NERA
Economic Consulting

Page 2

## EDUCATION

M.A., Economics, 1995
UNIVERSITY OF TEXAS

B.S., Accounting, 1977
FAIRLEIGH DICKINSON UNIVERSITY

CPA/ABV

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2003- | NATIONAL ECONOMIC RESEARCH ASSOCIATES, INC. <br> *Senior Vice President*. Securities and Finance. |
| 1999-2003 | KPMG LLP <br> *Partner*. Dispute Advisory Services Leader. Regional Partner-in-charge, southwest and western regions. Insurance Services Group Leader. |
| 1980-1999 | CAMPOS & STRATIS LLP <br> *Partner, Vice Chairman, Southwest Region Managing Partner.* Heavy commercial and industrial business interruption insurance disputes, forensic accounting and economic damages analysis. |
| 1977-1980 | ERNST & ERNST (now Ernst & Young) <br> *Auditor*. Member of audit staff, concentrating in manufacturing, financial services and not-for-profit clients. |

## CERTIFICATIONS AND AFFILIATIONS

- Certified Public Accountant in Pennsylvania, Texas, and New York
- Member of the American Institute of Certified Public Accountants
- Member of the Pennsylvania Institute of Certified Public Accountants
- Member of the Texas Society of Certified Public Accountants (previously served on the Litigation Services and Management Services Committees)

# NERA
Economic Consulting

Page 3

- Accredited by the American Institute of Certified Public Accountants in Business Valuation
- Member of the American Society of Appraisers
- Certified Fraud Examiner
- Who's Who in the World; Who's Who in America in Finance and Industry
- Adjunct Professor of Economics at the University of Texas (formerly)

## TYPICAL CONSULTING PROJECTS

- Mr. Baliban's focus has been on resolving complex commercial and business disputes by analyzing, measuring and clarifying the often equally complex economic, accounting and valuation issues they engender. He has been the designated economic and financial damages expert in a broad range of contract and tort damage claims, representing both plaintiffs and defendants in a variety of industries. He typically provides economic analysis, economic valuation, forensic accounting and/or statistical studies in order to provide an independent analysis of the financial impact related to the issues at hand.

- Analysis of financial condition, solvency analysis and valuation studies in matters relating to fraudulent conveyance, misrepresentation in reporting and deepening insolvency, bankruptcy preference defense issues typically related to statistical analysis of transactions in determining subjective and objective tests related to ordinary course of business and other preference defenses, and a variety of other forensic accounting investigations.

- Consultant and analyst in various P&C insurance related issues including risk analysis in underwriting, measurement of risk transfer, ART modeling using probability models and Monte Carlo game theory on risk transfer, administration of claims run-off, insurer/reinsurer disputes, insurance agency valuation and other damages issues. Heavy commercial and industrial property damage insurance claims measurement, including property damage and cost accounting analyses, business interruption, contingent business interruption and extra expense claims, third-party liability matters, fidelity bond claims audits and subrogation actions.

- Economic analysis in intellectual property matters including measurement of lost profits damages/unjust enrichment, reasonable royalty and hypothetical negotiation estimation, market definition and elasticity of demand analysis. Application of audit and other investigative techniques to royalty reviews, including accuracy and completeness of licensee reporting, investigation of underreporting (intentional or unintentional), and objective analysis of systems and supporting information.

**NERA**
Economic Consulting

Page 4

- Damages analysis in class action matters to identify financial impact on class members and the extent to which they meet typicality and commonality standards.
- Accredited business valuation analyst, providing independent measurement of ongoing business value in both dispute and non-dispute circumstances.
- Independent arbitrator in a variety of accounting matters including post-acquisition and purchase price disputes.

### REPRESENTATIVE LITIGATION PROJECTS

Analysis relating to allegations of deepening insolvency in the offshore drilling rig construction industry. Analyses pertain to cash flow models and identification of zone of insolvency.

Rebuttal testimony on the value of the Gas Fractionation Plant presented by owner in the form of a discounted future earnings model. Discussed model methodologies and appropriate techniques for reasonably estimating risk-adjusted discount rates.

Solvency analysis pertaining to claims of breach of fiduciary duty, misrepresentation and fraudulent conveyance relating to pre-bankruptcy leverage buyout.

Affidavit regarding business valuation methodologies and Uniform Standards of Professional Appraisal Practice, 2003.

Provided damages analysis in a matter arising between a managing general agent and two insurance carriers with whom it had previous agreements. Issues dealt with alleged wrongful termination of agreements. Provided valuation of lost profits, diminution of business value, and an overall economic analysis of relevant market forces driving the workers compensation line of business along with associated pricing forecasts.

Provided analysis of financial condition where the claim was that, due to accounting firm's alleged malpractice, the true financial condition of the plaintiff was not known by the directors. Analyzed Board of Directors reports, minutes and information provided.

Class certification hearing testimony on impact of alleged damages on class members.

Provided analysis of ability to pay in punitive damages matter involving a large Korean commercial contractor. Performed overall analysis of financial condition, availability and quality of net worth, liquidity and solvency issues.

# NERA
Economic Consulting

Page 5

Provided damages analysis in a dispute between a major gasoline refiner and a corporation regarding co-branding of quick service restaurants and retail gasoline outlets. Performed economic analysis of long-term co-branding opportunities and valuation of existing locations.

Provided damages and valuation analysis in a dispute arising between two surety bond agencies. Allegations included breach of contract and tortious interference. Economic analysis of relevant market and forecast of commercial construction.

Provided damages analysis in a claim brought by a mid-western refiner arising from partial refinery destruction allegedly due to a negligent contractor. Performed economic analysis related to production, costing, demand and product pricing. Forecasted earnings based on historic and index trends and reconciled results to plant linear model governing production.

Provided damages analysis in dispute between two scaffolding manufacturers. Issues arose regarding patent infringement and alleged wrongful seizure of inventory. Performed economic analysis defining relevant market and forecast of retail and commercial construction.

Provided damages and valuation analysis in large construction defect matter related to a major Las Vegas resort. Economic analysis performed relating to gaming issues, hospitality issues, impact of 9/11 on the market, competition and resort life-cycle and other salient matters.

Provided damages in alleged patent infringement and false advertising claims arising between two competing manufacturers of gas refinery plant filtration systems for in-line live carbon feeds.

Performed accounting analysis of working capital issues and potential loss of earnings arising from a post-acquisition dispute between competitors in medical services and supplies. Performed economic analysis of relevant market and damages quantification.

Provided economic analysis between two states Utilities Commissions with regard to an agreement to swap power seasonally. This matter arose from lack of available supply connected with various impacts from energy deregulation. Economic analysis performed to outline and describe such economic impact.

**NERA**
Economic Consulting

Page 6

## PUBLICATIONS & CONTINUING EDUCATION COURSES

"Valuation of Out-of-Sight Inventory Losses," *Texas Insurance Law Reporter*, June 1984.

"Accounting for Economic Loss," *Texas Insurance Law Reporter* and *Texas Bar Journal*, July 1991.

"Loss Measurement—The Investigative Accountant's Initial Concerns," *Claims Magazine*, May 1992.

"NAFTA: New Concept or Inevitable Theory," *Dallas Business Journal*, April 1993.

"Economic Damages—The Time Element," *Dallas Business Journal*, September 1993.

"Mexico—Lessons for Us All," *Professional Review*, Spring 1995.

"Business Damages in Commercial Cases," *CPA Litigation Services Counselor*, August and September 1996.

"Economic Analysis of Environmental Damages," *The National Law Journal*, October 1996.

"FAQs About Y2K," *Texas Lawyer*, February 1999.

"Calculating Fines for Environmental Infractions," *Environmental Protection*, March 1999.

CLE Course-Financial Statements—What They Are and How to Read Them

CLE Course-Analyzing Financial Condition

CLE Course-Basics of Business Damages

CLE Course-Basics of Business Valuation

CLE Course-Damages in Commercial Litigation

CLE Course-An Economic Approach to Punitive Damages

CLE Course-First and Third Party Property Insurance Claims Financial Services

CLE Course-Accounting for Insurance Claims

CLE Course-Business and Economic Forecasting Basics—Statistical and Regression Models

# NERA
Economic Consulting

Page 7

## DEPOSITION AND TRIAL TESTIMONY (PREVIOUS FOUR YEARS)

*John Crane, Inc. v. Admiral Insurance Company, et al.*, 04 CH 08266, In the Circuit Court of Cook County, Illinois County Department, Chancery Division. (Deposition)

*Celebrity Cruises, Inc., et al. v. Essef Corporation, et al.*, 96 Civ 3135 (JCF), In the United States District Court for the Southern District of New York. (Deposition & Trial)

*James P. Stephenson, as Trustee for the estate of MJK Clearing, Inc., v. Deutsche Bank AG, et al.*, Civil No. 02-4845 RHK/AJB, and *Stockwalk Group, Inc., v. Deutsche Bank AG, et al.*, Civil No. 04-4164 RHK/AJB, United States District Court, District of Minnesota. (Deposition)

*Michael Vogt, Paul Beaumont, and Fred Breu on their own behalf and as representative plaintiffs on behalf of all similarly situated employees of Outboard Marine Corporation v. Greenmarine Holdings, LLC; Quantum Industrial Partners; and Quantum Industrial Holdings, LTD.*, Case No. 1:02-CV-02059-GEL., In The United States District Court for The Southern District of New York. (Deposition)

*Forrest W. Garvin and E-Netec, Corp. v. McGuire Woods, LLP, et al.*, County, File No. 02-CVS-19813, In the General Court of Justice, Superior Court Division for the State of North Carolina, Mecklenburg. (Deposition)

*Paceholder High Yield Fund, Inc., et al. v. Ranko Cucuz*, Civil Action No. 02-71778, In the United States District Court for the Eastern District of Michigan. (Deposition)

*Nassau County PBA v. Nassau County*, Interest Arbitration, 2002. (Hearing)

*Interline Energy Services, Inc., and Interline Resources Corporation v. Basin Western*, Eighth Judicial District, State of Wyoming, County of Converse, Civil Action No. 13629. (Deposition & Trial)

*Grinnell Fire Protection v. Road Sprinkler Fitters Union No. 669, U.A., United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the U.S. and Canada, AFL-CIO*, Case No. 5-CA-24521, Before the National Labor Relations Board. (Trial)

# NERA
Economic Consulting

Page 8

## TESTIMONY (CONT.)

*Teachers' Retirement System of Louisiana v. M. Bernard Aidinoff, et al., and American International Group, Inc.*, C.A. No. 20106-NC, In the Court of Chancery of the State of Delaware In and for New Castle County.  (Deposition)

*CISI v. MemberWorks*, Case CV99-0362655 S, State of Connecticut, Judicial District of Fairfield at Bridgeport.  (Deposition)

*Deep South Surplus of Texas, Arkansas, Tennessee and Georgia, Inc. v. Great American Insurance Company and The Ohio Casualty Insurance Company*, Case 00-03955, 134th Judicial District, Dallas County, Texas.  (Deposition)

*Koch Petroleum Group LP, et al. v. Truck Crane Service Co, et al.*, C7-00-7606, District Court, State of Minnesota.  (Deposition)

*State of Washington, Ex Rel., Public Disclosure Commission v. Washington Education Association*, 00-2-01837, In the Superior Court of the State of Washington, In and for the County of Thurston.  (Deposition & Trial)

*Jordan B. Fishman, Ph.D. v. BioSource International, Inc., et al.*, CV 00-06426 ER (RNBx), United States District Court, Central District of California, Western Division.  (Deposition)

*Willis of New York, Inc., et al v. Lockton Companies, Inc., et al.*, 00 Civ. 6476 (JSR), New York Southern District Court.

*Landmark Organization, Inc., et al. v. Monex Credit Company, et al.*, 00CC10279, Superior Court of the State of California. For the County of Orange.  (Deposition)

*Michael Leonard and Michael Sawyer v. Farmers' Insurance Exchange, et al.*, GN-001634, In the District Court, Travis County, Texas, 98th Judicial District.  (Deposition & Class Certification Hearing)

*Waco v. KHK*, H-98-1309, United States District Court for Southern District of Texas Houston Division.  (Deposition & Trial)

*MCI Telecommunication v. Gilbert Texas Construction Corp.*, 3:97-CV-1180-G, District Court of the Northern District of Texas, Dallas Division.  (Deposition & Trial)

# NERA
Economic Consulting

Page 9

## TESTIMONY (CONT.)

*Main Street v. Shell Oil*, 97-10741-L, District Court, 193rd Judicial District, Dallas County, Texas.  (Deposition)

*Trinity Industries v. American Energy*, 97-06498, District Court, 191st Judicial District, Dallas County, Texas.  (Deposition & Trial)

*Antonia M. Igelsias v. Kawasho International (Guam) Inc., et al*, CV-1497-93, In the Superior Court of Guam.  (Deposition & Trial)