# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of CORAM HEALTHCARE CORPORATION, a Delaware Corporation, and of CORAM INC., a Delaware Corporation
Plaintiff
vs.
DANIEL D. CROWLEY; DONALD J. AMARAL; WILLIAM J. CASEY; L. PETER SMITH; AND SANDRA L. SMOLEY,
Defendants

CASE NO. 04-1565 (SLR)

Philadelphia, Pennsylvania,
Tuesday, August 7, 2007

\- - -

Video deposition of J. SCOTT VICTOR, ESQUIRE, taken pursuant to notice, at Schnader, Harrison, Segal & Lewis, 1600 Market Street, Suite 3600, on the above date, beginning at approximately 9:46 a.m., before Michelle L. Gray, Certified Shorthand Reporter and Notary Public.

APPEARANCES:

Counsel for Plaintiffs
Schnader, Harrison, Segal & Lewis
BARRY E. BRESSLER, ESQ.
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2572
bbressler@schnader.com

Counsel for Defendants
Keker & Van Nest, LLP
ELLIOT R. PETERS, ESQ.
710 Sansome Street
San Francisco, California 94111
(415) 391-5400
epeters@kvn.com

ALSO PRESENT: Gerard Alfe, Videographer

\- - -

(INDEX at end of transcript.)

THE VIDEOGRAPHER: This videotape deposition is now beginning. The date, August 7, 2007. The time, 9:46.

This is the videotape deposition of J. Scott Victor taken in the matter of Adams versus Crowley, et al., in the United States District Court for the District of Delaware, Case No. 04-1565 (SLR).

The court reporter is Michelle Gray. I'm the video operator. My name is Gerard Alfe. This deposition is taking place at 1600 Market Street, Philadelphia, PA, 19103.

Counsel will now introduce themselves.

MR. PETERS: Elliot Peters on behalf of Daniel Crowley.

MR. BRESSLER: Barry Bressler on behalf of Arlin M. Adams, the Chapter 11 Trustee.

(Documents pre-marked for identification as Exhibits Victor-1 through Victor-4.)

... J. SCOTT VICTOR, ESQUIRE, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. PETERS:

Q. Mr. Victor, good morning.

A. Good morning.

Q. How are you employed, sir?

A. I am -- why don't you -- why don't we hold off for a second.

MR. PETERS: Do you want to just go off the record for a minute, for a second?

THE WITNESS: No.

BY MR. PETERS:

Q. Okay. We'll take it from the top. We had a little unexpected interruption. Now let's do the question.

How are you employed, sir?

A. I'm the senior managing director and co-head of the Special Situations Group of National City Investment Banking.

Q. Where is that located?

J. SCOTT VICTOR, ESQUIRE

Q. And then -- and then when was it that Larry Shaiman sued you?

A. I would say probably in 1992 or '93; brought an action in Common Pleas Court to compel me to file the fee application in that Bankruptcy Court in New York, which I did, got paid, and that was the end of that.

Q. So was that case settled, dismissed? What happened?

A. It was dismissed. Or withdrawn.

Q. Do you know why Mr. Shaiman found it necessary to file a lawsuit to force you to file a fee application?

MR. BRESSLER: Object to the form.

THE WITNESS: Because I was extremely busy in 1992 when I went to Saul Ewing, and I was working on a number of matters, and I kept promising that I would file the fee application and just never did.

So that's why he filed the action. I filed the fee application. The firm got paid. He dismissed the

J. SCOTT VICTOR, ESQUIRE

action.

BY MR. PETERS:

Q. When you were a practicing lawyer, were any allegations of malpractice ever raised against you?

A. Not that I have ever known about, no.

Q. Prior to leaving Saul Ewing, did anyone from the board members suggest to you that maybe you should leave?

A. No. In fact, I was offered the head of the bankruptcy department in an effort to try to get me not to leave.

Q. When did that happen?

A. February -- January and February of 2000.

Q. Who offered that to you?

A. John Stoviak, who was the managing partner of Saul Ewing at the time. But I think Saul Ewing was okay with me leaving because they became our counsel, and they got a client out of the matter.

Q. You said when you -- withdrawn.

You were listing a minute ago, I

J. SCOTT VICTOR, ESQUIRE

think, the different components of your assignments at Coram.

A. Yes.

Q. Was it Mr. Bressler or the Trustee or someone else that gave you those assignments?

A. The assignments came up as things needed to get done, but it was for the Trustee.

Q. Who gave them to you is my question.

A. Sometimes the Trustee directly. Sometimes through Mr. Bressler, Mr. Kipnes, Mr. Barkasy, Mr. Barrie, any of the trustees.

Q. What is a FASB 142 valuation?

A. It's a valuation of the company; essentially, an enterprise value under the accounting rules that public companies have to do.

And the problem with Coram was, as a public company, in order to comply with the federal regulations under Stark 2, they needed to have 75 million of equity value. And they didn't. So year after year, things were done at December of each calendar year to have

J. SCOTT VICTOR, ESQUIRE

Coram be compliant with Stark 2. Because if they weren't compliant, they were out of business.

Q. So what could be -- withdrawn.

Do you know over what period of time this Stark 2 had existed at Coram?

A. I think for a while. I think for sure it existed in 2001. It existed in 2002, 2003, until the company came out of bankruptcy and through its Chapter 11 plan.

Q. Okay.

A. But I'm sure it happened before we were involved. I know it happened before we were involved.

Q. Have you been asked to -- withdrawn.

Do you consider yourself an expert in performing business valuations?

A. Yes. I do.

Q. You're certainly qualified to do that work?

A. I'm qualified to do that work. I don't do it often. But valuation work is involved in distressed M&A, which is what we do day in and day out. We prepare valuations

J. SCOTT VICTOR, ESQUIRE

for companies.

The only time I actually testified as an expert on valuation, I believe, was Coram, though, in terms of an expert report, that one valuation.

Q. That was my next question. You previously actually gave testimony as an expert on behalf of the Schnader firm and the Trustee about the value of Coram, right?

MR. BRESSLER: Object to form.

THE WITNESS: On behalf of the Trustee, yes, several times.

BY MR. PETERS:

Q. Okay. In the -- in the course of your assignment in this particular case, the assignment that I gather you were given in May of '07 --

A. Yes.

Q. -- have you been asked to perform any valuation work of Coram?

A. In this current Crowley litigation?

Q. Yes.

A. No.

Q. Do you know if anyone else from your

J. SCOTT VICTOR, ESQUIRE

firm has?

A. No one else from my firm has.

Q. Do -- have you had any discussions about valuation with Mr. Bressler or any of the other counsel in the course of your work on this assignment?

A. No.

Q. Do you know an individual named Jeffrey Baliban?

A. I know the name, but I don't know him.

Q. Do you know whether or not he's performed any valuation work for Coram in connection with this case, Adams v. Crowley?

A. He is the Trustee's expert.

Q. So you know that he's their expert?

A. I do.

Q. Have you ever discussed with him -- withdrawn.

Have you ever read his expert report?

A. I glanced through it. I couldn't say I read it. I glanced through it.

Q. Experts always say they glanced at

J. SCOTT VICTOR, ESQUIRE

things. I don't believe I've ever seen experts -- heard experts say they read anything --

A. I've read things, but I glanced at this.

MR. BRESSLER: Object to the form of the question.

THE WITNESS: It's not in the scope of my assignment.

BY MR. PETERS:

Q. Okay. Have you ever heard of something called a single period capitalization method evaluation?

A. It's a methodology for valuation.

Q. You've heard of it?

A. No. I can't say that I've had. It's one of the forms of valuation, I assume.

Q. I'm not asking you to assume things.

Prior to -- well, when did you first hear of a single period capitalization method?

A. The actual methodology you just mentioned? You just told me.

Q. You never heard of it before in your life?

J. SCOTT VICTOR, ESQUIRE

A. No.

Q. Correct?

A. No.

Q. Do you know whether Jeffrey Baliban in the course of his work for the Trustee in this case employed a single period capitalization method?

A. No. Because I didn't read his report. I glanced at it.

Q. But -- if you assumed he had, that would be the first time you would have ever encountered such a thing in your career; is that correct?

A. How does he use it? In what context?

Q. Value in Coram.

A. Well, there's lots of different methodologies for valuation. The methodologies that I'm familiar with is public comps, M&A comps, and discounted cash flow.

Q. When you use a discounted cash flow methodology, do you ever use just one, the cash flow for one period of time?

A. It depends on what you're trying to

Victor, Esq., J. Scott 8/7/2007

Page 53

J. SCOTT VICTOR, ESQUIRE

do.

Q. Have you ever done a valuation where you simply took one year's cash flow and made a valuation based upon that?

MR. BRESSLER: Object to the form.

THE WITNESS: You could. I haven't.

BY MR. PETERS:

Q. "You could" meaning it would be physically possible to?

A. Well, I think it's possible to use many different forms of valuation --

Q. Have you ever seen -- have you ever seen a discounted cash flow valuation where the person performing the valuation simply used one year's cash flow and didn't use either projected cash flows over a period of time or actual cash flows over a period of time?

MR. BRESSLER: Object to the form.

BY MR. PETERS:

Q. You may answer.

Page 54

J. SCOTT VICTOR, ESQUIRE

A. The real answer is that I just don't look at that much competing valuation work, because, generally, I don't testify in litigation just for the sake of valuation.

If it's a valuation of an entire case like we did in Coram, if it's a valuation because of a distressed M&A transaction, but I'm not in the business of being an expert in valuation disputes.

Q. But in the course of your experience in special situations, don't you frequently see valuations?

A. I do.

MR. BRESSLER: Object to the form.

BY MR. PETERS:

Q. And when you're an expert on one side of the case in bankruptcy court, isn't there typically a counterpart who's an expert on the other side?

A. No. Not in my cases, typically, no.

Q. How many valuations do you think you've read or glanced at in your career?

A. Quite a number.

Page 55

J. SCOTT VICTOR, ESQUIRE

Q. Hundreds, if not thousands?

A. No, I don't think hundreds or thousands, but quite a few. Certainly -- certainly dozens.

Q. And you've never before today heard of a single period capitalization method?

MR. BRESSLER: Object to the form; asked and answered.

THE WITNESS: Well, as to hear the phrase -- I mean, the phrase just means he took one year, and he looked at one year, so you're using it as a phraseology. As that phraseology, I never heard of it. But you could take one year.

I've -- I had to do an expert report where I was only given three years by the company to look at. Typically, when I do a discounted cash flow and analysis, I'll do five years.

In this particular case I'm working on right now, the company wouldn't give me five years. They haven't done it. So I could only work on

Page 56

J. SCOTT VICTOR, ESQUIRE

three years. This fellow must have just worked on one year according to --

BY MR. PETERS:

Q. Why do you typically use five years?

A. I typically use five years for a discounted cash flow because I take the company's projections over that five-year period of time, and I try to get a valuation. If -- if you take less than that, sometimes it gives you a lesser valuation.

Q. You said in the course of your assignments for Coram, you did due diligence and that you tried to find out as much about the business as possible.

Just tell us what kind of things you did to do that.

A. We read a lot. We looked at all their internal financials, both historical and their forecast.

We went with management in Denver several times.

We went to several of their actual field offices to see what they do in the field offices and how they service the patients.

Pages 53 to 56

LiveNote World Service 800.548.3668 Ext. 1

Victor, Esq., J. Scott 8/7/2007

Page 121

J. SCOTT VICTOR, ESQUIRE

A. Yes.
Q. The proforma EBITDA?
A. Mm-hmm.
Q. And then alongside it, you've got a multiple.
A. Mm-hmm.
Q. There's actually two different columns on Page 16 there. The one column, the multiple is 6.27.
A. That's right.
Q. And in one column the multiple is 7.22. First tell us what the point of the multiple is?
A. The point of the multiple is based on these different methodologies.
The multiple is for the first one, comparable public companies. So you look at public companies and what they are trading at in the marketplace, and you can determine what multiple of EBITDA is being traded at. That's how you value a public company. And you can tell from public companies what that is.
With respect to announced comparable M&A transactions, you do the same thing. You

Page 122

J. SCOTT VICTOR, ESQUIRE

look at what you believe to be comparable M&A transactions that are reported, and you look to see what multiple is being paid. You come up with your calculation of what's the median, and you apply that multiple to your adjusted EBITDA.
MR. PETERS: We got to change the tape.
THE VIDEOGRAPHER: We are now going off the video record. That concludes Videotape Number 1. The time, 11:50 -- 49, rather.
(Short break.)
THE VIDEOGRAPHER: We are now back on the videotape record. This commences Videotape Number 2. The date, August 7, 2007. The time, 11:57.
Please continue.
BY MR. PETERS:
Q. We were looking at your June of '03 report at Page 16, and we were talking a little bit about the multiple there.
A. Mm-hmm.
Q. How did you arrive at the multiple,

Page 123

J. SCOTT VICTOR, ESQUIRE

6.27, or the multiple, 7.22?
A. We looked at different transactions. We looked at comparable public companies, and we looked at comparable M&A transaction valuations and came up with multiples.
Q. And why are there two different multiples?
A. There's actually three different -- there's several different multiples.
Q. Fair enough. Why are there two different multiples when you're looking at proforma EBITDA?
MR. BRESSLER: Object to the form, but he can answer.
THE WITNESS: There are two different ones. Are you looking at just comparable M&A transaction values? Or are you looking at why are there different ones?
BY MR. PETERS:
Q. Right.
A. Well, it's footnoted. The first is based on revenue, and it's a median multiple based on home infusion and home nursing M&A

Page 124

J. SCOTT VICTOR, ESQUIRE

transactions.
The second 6.27 is a median multiple based on all selected M&A transactions.
And then the third is a median multiple based on selected M&A transactions greater than 50 million of total enterprise value.
Q. Okay. And those three numbers are between 6.27 and 7.22?
A. Yes.
Q. Did you ever consider using a multiple of 10?
A. It wouldn't have been justified.
Q. Why not?
A. Because these were the median multiples based upon comparable transactions and was not.
Q. And a multiple -- so a multiple of 10.2 would not be justified, in your opinion?
A. A multiple of 10.2 would not have been justified and was not and would not have been justified.
Q. What would you say if someone performed a valuation of Coram and used a

Pages 121 to 124

LiveNote World Service 800.548.3668 Ext. 1

Victor, Esq., J. Scott 8/7/2007

Page 125

J. SCOTT VICTOR, ESQUIRE

multiple of 10.2 times cash flow?

MR. BRESSLER: Object to the form.

THE WITNESS: In this case?

BY MR. PETERS:

Q. Yeah, in Coram. During this time period.

A. In this time period? I would say they are wrong. They probably got to a higher multiple by looking at different companies which are more pharmaceutical provider based, which Coram was not a drop and ship pharmaceutical provider. Those pharmaceutical providers have higher multiples.

So if Deloitte or anybody else did a higher multiple, that's how they justified it. But it was just wrong, because Coram was not a drop and ship pharmacy provider.

Q. Have you ever heard of something called a single period capitalization factor?

MR. BRESSLER: Object to the form. Asked and answered this morning.

MR. PETERS: It actually wasn't asked and answered this morning if you'd

Page 126

J. SCOTT VICTOR, ESQUIRE

listen a little more carefully.

BY MR. PETERS:

Q. Have you ever heard of something called a single period capitalization factor?

A. No.

Q. Does that phrase have any meaning to you?

A. I'm sure it's done in connection with a single period valuation on discounted cash flow.

Q. But based upon --

A. That would be my guess.

Q. Let's -- putting aside guessing. Based on your experience up until today, did that phrase have any meaning to you?

A. No.

Q. Just, if you don't mind, sir, flipping over to Page 30 --

A. Same exhibit?

Q. -- of your report. Yeah.

A. Okay.

Q. There's a discounted cash flow valuation summary.

A. Yes.

Page 127

J. SCOTT VICTOR, ESQUIRE

Q. And over in the right-hand column, there's a little box there. It says: 2008 EBITDA. Do you see that?

A. Yes.

Q. And then there's a number, 48, 420, and then it's multiplied by 7.2.

A. Yes.

Q. Is that 7.2 the same 7.2 that we have -- that we were talking about in our discussion of a multiple on Page 16?

A. Yes.

Q. And would you call that the capitalization rate?

MR. BRESSLER: Object to the form.

THE WITNESS: Would I call that the capitalization rate? No. The multiple that we're talking about on Page 16 was the multiple based on M&A transactions.

BY MR. PETERS:

Q. Correct. What's this one on Page 30?

A. Well, I'm trying to refresh my

Page 128

J. SCOTT VICTOR, ESQUIRE

recollection from four years ago.

Q. Go ahead and look if you need to look at some other place in the report to refresh your recollection.

A. (Witness complies.)

No. This is different. This is the terminal value multiple.

Q. What's --

A. Which is different than the M&A multiple.

Q. It's a different concept, but it's pretty close to being the same number?

A. Similar.

Q. Okay. What's the terminal value multiple?

A. That's used for discounted cash flow of sensitivity analysis.

Q. And tell us what a terminal value is.

A. A terminal value is what you multiply the discount rate by for, again, a DCF sensitivity analysis.

Q. How do you come up with that number -- withdrawn.

Pages 125 to 128

LiveNote World Service 800.548.3668 Ext. 1

CERTIFICATE

I HEREBY CERTIFY that the proceedings, evidence and objections are contained fully and accurately in the stenographic notes taken by me upon the video deposition of J. SCOTT VICTOR, ESQUIRE, taken on AUGUST 7, 2007, and that this is a true and correct transcript of same.

MICHELLE L. GRAY, CSR
and Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of same by any means, unless under the direct control and/or supervision of the certifying reporter.)

# EXHIBIT D





# CORAM

## Confirmation Valuation Analysis

*As of June 30, 2003*

*Prepared by:*

**SSG Capital Advisors, L.P.**
Five Tower Bridge, Suite 420
300 Barr Harbor Drive
West Conshohocken, PA 19428
(610) 940-1094
www.ssgca.com

**Ewing Bemiss & Co.**
901 East Byrd Street, Suite 1650
Riverfront Plaza, West Tower
Richmond, Virginia 23219
(804) 780-1900
www.ewingbemiss.com

# DISCLOSURE

The following pages contain material related to a fair market valuation of Coram Healthcare Corporation ("CHC", "Coram" or the "Company") and related supporting materials. Certain information, estimates and opinions contained in this report were obtained from Coram management, and the Advisors (as defined on page 5 herein) assume no liability for such data. Information supplied by Coram management has been accepted without further verification as correctly reflecting the Company's past results and current condition in accordance with generally accepted accounting principles, unless otherwise noted. We have not attempted to independently verify any such information, nor have we conducted an appraisal of the assets or liabilities of the Company, nor have we been given any such appraisals. With respect to certain financial projections and forecasts, we have assumed that they have been reasonably prepared on a basis that reflects currently available estimates and judgments of senior management of the Company.

Possession of this report, or a copy thereof, does not carry with it the right of publication of all or part of it, nor may it be used for any purpose by anyone but the client without the previous written consent of the Advisors or Coram and, in any event, only with proper attribution.

The various estimates of value presented in this report apply to this valuation only and may not be used out of the context presented herein. This valuation is valid only as of the date, and only for the purposes, specified herein.

SSG
CAPITAL ADVISORS, L.P.

EMB 006406

# Table of Contents

| | | Page |
|---|---|---|
| I. | **Executive Summary** | 4 |
| | Purpose of Valuation | 5 |
| | Valuation Methodology | 6 |
| | Due Diligence Summary | 7 |
| | Advisors' Qualifications | 10 |
| II. | **Enterprise Valuation** | 11 |
| | Financial Assumptions | 12 |
| | Financial Summary and Projections – Continuing Operations (unaudited) | 13 |
| | Pro Forma EBITDA | 14 |
| | Calculation of Pro Forma EBITDA for the 12 Months Ended June 30, 2003 | 15 |
| | Valuation Summary | 16 |
| | Summary of Valuation Methodologies | 17 |
| | Comparable Public Company Analysis | 19 |
| | Selection Criteria | 19 |
| | Comparable Public Company Candidates | 21 |
| | Comparable Public Company Valuation Summary | 22 |
| | Comparable Public Company Analysis | 23 |
| | Comparable Merger & Acquisition ("M&A") Transactions Analysis | 25 |
| | Selection Criteria | 25 |
| | Comparable M&A Transactions Valuation Summary | 26 |
| | Comparable M&A Transactions – Home Medical Equipment | 27 |
| | Comparable M&A Transactions – Home Nursing | 28 |
| | Discounted Cash Flow Analysis | 29 |
| | Discounted Cash Flow Valuation Summary | 30 |
| | Discount Rate | 31 |
| | Net Operating Loss Analysis | 34 |
| | Additional Valuation Considerations | 35 |
| III. | **Exhibits** | 36 |
| | Federal Net Operating Loss Carryforwards Schedule | 37 |
| | Financial Transactions – Potential Non-Recurring, Out-Of-Period or Normalizing Items | 38 |

EMB 006407

CORAM HEALTHCARE CORPORATION Confidential

# I. EXECUTIVE SUMMARY

SSG CAPITAL ADVISORS, L.P.

4

EMB 006408

CORAM HEALTHCARE CORPORATION                                                    *Confidential*

## PURPOSE OF VALUATION

Judge Arlin M. Adams, Chapter 11 Bankruptcy Trustee of the bankruptcy estates of Coram Healthcare Corporation and its debtor affiliate (the "Trustee"), asked that SSG Capital Advisors, L.P. ("SSG") and Ewing Bemiss & Co. ("EB"), financial advisors to the Trustee (collectively the "Advisors"), provide a fair market valuation of Coram to support the Trustee's proposed Plan of Reorganization (the "Trustee's Plan").



SSG
CAPITAL ADVISORS, L.P.

5

EMB 006409

## VALUATION METHODOLOGY

The fair market value of an enterprise is the value that a willing buyer would pay to acquire the enterprise from a willing seller, assuming that both parties are in possession of all material facts and neither is under any compulsion. The Advisors' approach to the valuation of Coram involved:

1. Performing an extensive due diligence investigation of the Company, including an analysis of its history and its future prospects;
2. Comparing certain key metrics of the Company to those of certain publicly-traded companies that the Advisors consider to be comparable to the Company;
3. Comparing certain key metrics of the Company to those of certain recently merged or acquired companies that the Advisors consider to be comparable to the Company;
4. Utilizing a detailed financial model, provided by the Company, projecting the future performance of the Company, determining a discount rate that reasonably reflects the Company's weighted average cost of capital, and using a discounted cash flow analysis to determine the present value of the cash flows that the Company can reasonably be expected to generate in the future;
5. Performing a systematic assessment of the qualitative strengths and weaknesses of the Company;
6. Applying the Advisors' extensive knowledge of the home healthcare industry in general, and the home infusion sector in particular, with reference to current industry dynamics and pending regulatory considerations; and
7. Synthesizing quantitative analyses and qualitative assessments into a range of the fair market enterprise valuation of the Company.

## DUE DILIGENCE SUMMARY

The following outline provides an overview of the Advisors' due diligence investigation of Coram since their engagement by the Trustee on October 14, 2002.

I. Management Discussions:

a. Meetings and discussions with Coram's Executive Vice President, Allen J. Marabito, focusing on operations and corporate administration;

b. Meetings and discussions with Coram's Senior Vice President, Chief Financial Officer and Treasurer, Scott R. Danitz, focusing on issues related to the past and current financial performance of the Company, and on the Company's detailed financial model projecting the future performance of the Company;

c. Meetings and discussions with several other senior managers of Coram, including:

1. Michael Dell, Assistant General Counsel,
2. John Ellis, Senior Vice President, Operations – East Region,
3. Frank Geiger, Senior Vice President, Materials Management,
4. Richard Iriye, Senior Vice President, Operations – West Region,
5. Debbie Meyer, Senior Vice President, Sales,
6. Ron Mills, Senior Vice President, MIS,
7. Scott Moeller, Director, Tax,
8. Vito Ponzio, Jr., Senior Vice President, Human Resources,
9. Jerry Reynolds, Vice President, Controller,
10. Michael Saracco, President, Specialty Services,
11. Stephen Schmahl, Vice President, Contracts & Pricing,
12. Joe Sivori, Vice President, Finance,
13. Merl Wallace, Vice President, Patient Financial Services, and
14. Mary Zega, Vice President, Operations – Central Region; and

d. November 2002 meeting and discussion with Coram's former Chief Executive Officer, Daniel D. Crowley, focusing on his assessment of various aspects of the Company's historical performance, operations, key initiatives, management, and prospects.



II. Branch Visits

a. Meetings and discussions with regional managers and branch level employees at Coram's Totowa, New Jersey branch focusing on admissions, patient care, inventory management, competition and patient financial services.

b. Meetings and discussions with regional managers and branch level employees at Coram's Malvern, Pennsylvania branch focusing on admissions, patient care, inventory management (specifically preparation and storage of drugs and equipment) and patient financial services. Discussed operations and growth initiatives of its hemophilia center as well as the effects of the liquidation of Coram Resource Network, Inc. and of Coram Independent Practice Association (collectively "R-Net") on Coram.

III. Operational and Infrastructure Review

a. Discussed with senior management of Coram: (i) the operational initiatives that they have undertaken prior to and during the course of the bankruptcy to improve the financial performance of the Company, (ii) the operational initiatives that are currently underway to continue to improve the performance of the Company, and (iii) their vision for the Company and the issues that represent the greatest opportunities for, and challenges to, the Company in the foreseeable future;

b. Reviewed Coram's key referral relationships, payer mix and accounts receivable management systems;

c. Reviewed Coram's patient count and discussed with management certain patterns that emerged from such review;

d. Reviewed Coram's business mix, management information systems, billing and collections processes and related matters;

e. Discussed with senior and line management Coram's policies with respect to employee retention, management development, customer service, quality control and regulatory compliance;

f. Discussed day-to-day operations and procedures with regional managers and branch level employees;

g. Discussed the effects of the Chapter 11 filing on the Company's operations with senior managers and branch level employees;

h. Discussed the competitive landscape with senior managers and branch level employees; and

i. Reviewed management presentations provided to the Trustee.

IV. Financial Review

a. Reviewed the Company's reports filed with the Securities and Exchange Commission ("SEC") on Form 10-K for the years ended December 31, 1998 through 2002;

b. Reviewed the Company's reports filed with the SEC on Form 10-Q for the fiscal quarters ended March 31, 2002, June 30, 2002, September 30, 2002, March 31, 2003, and June 30, 2003;

c. Reviewed several of the Company's filings filed with the SEC on Forms 8-K;

d. Reviewed the valuations prepared by Goldin Associates, L.L.C. (on behalf of the Debtors), Chanin Capital Partners (on behalf of the Debtors), UBS Warburg (on behalf of the Unsecured Creditors' Committee) and Deloitte & Touche (on behalf of the Official Committee of the Equity Security Holders of Coram Healthcare Corporation (the "Equity Committee"));

e. Reviewed detailed financial projections prepared by the Company's management as of August 20, 2003;

f. Reviewed the Company's detailed internal financial statements sub-categorized by branch, region and therapy on a monthly and year-to-date basis;

g. Reviewed monthly, quarterly and year-to-date internal analyses by payer;

h. Reviewed analyses pertaining to accounts receivable, including detailed days sales outstanding ("DSO") and accounts receivable aging analyses;

i. Reviewed analyses pertaining to the Company's net operating loss ("NOL") carryforwards;

j. Reviewed analyses pertaining to the goodwill amortization for tax purposes; and

k. Reviewed analyses pertaining to certain non-ordinary course liabilities and non-recurring financial expenses and income.

V. Other

a. Reviewed certain bankruptcy documents, exchange documents and financing agreements; and

b. Held discussions with Ernst & Young LLP and Schnader Harrison Segal & Lewis LLP regarding certain corporate tax issues.

## ADVISORS' QUALIFICATIONS

- SSG Capital Advisors, L.P. is a leading provider of investment banking services to private and public companies facing challenging situations. Services include mergers and acquisitions, private placements of senior and subordinated debt and equity, financial restructurings involving Chapter 11, Article 9 sales, out-of-court sales and workouts, debt to equity conversions, and complex valuations and fairness opinions.
- SSG (and its predecessor) has been active in providing financial advisory services in connection with Chapter 11 and other bankruptcy proceedings since 1993.
- Ewing Bemiss & Co., formerly Ewing Monroe Bemiss & Co., is a leading provider of investment banking services to middle-market private and public companies. Founded in 1992, EB has served as a financial advisor on mergers and acquisitions, private placements of senior and subordinated debt and equity, strategic finance evaluations, recapitalizations and restructurings, and valuations and fairness opinions. EB is primarily focused on serving four industries, including healthcare.
- EB's healthcare group has particular expertise in the field of home healthcare services, equipment and products.



CORAM HEALTHCARE CORPORATION

*Confidential*

# II. ENTERPRISE VALUATION

SSG CAPITAL ADVISORS, L.P.

11

EMB 006415

## FINANCIAL ASSUMPTIONS

- Coram is predominantly engaged in the provision of home infusion therapy services, which represents over 96% of the Company's revenue. In addition, Coram provides home respiratory therapy and home medical equipment ("HME") and related services (treated as part of Coram's home infusion business for SEC segment reporting purposes), as well as clinical research services provided by CTI Network, Inc. ("CTI"), and compounding services to hospitals provided by SoluNet LLC ("SoluNet"), whose combined revenue represents less than 1% of total revenue.. These core and ancillary businesses are referred to as "Continuing Operations."
- This valuation reflects Continuing Operations of Coram only.
- Coram's management provided the Advisors with:
  - Financial projections for the 6 months ending December 31, 2003, and for the 12 months ending December 31, 2004 through 2008, and
  - Potential non-recurring or out-of-period items to be considered in developing normalized earnings before interest, taxes, depreciation and amortization ("EBITDA") for the 12 months ended June 30, 2003 for valuation purposes.
- The valuation is based on actual revenue and pro forma EBITDA financial results through June 30, 2003, and on projected financial results through December 31, 2008.
- The Advisors reviewed a list of the potential non-recurring or out-of-period items with management and made a determination of what should be added back to actual EBITDA in order to arrive at a pro forma EBITDA.
- The Company's projections include a significant number of detailed assumptions that are considered proprietary and confidential. These assumptions were documented in reports provided to the Advisors and reviewed with management. The Advisors believe that the assumptions are reasonable and appropriate.
- The projections do not anticipate any significant adverse consequences as a result of restructuring, such as loss of senior management or loss of referral sources, nor do they anticipate significant reimbursement and regulatory changes.
- The projections do not include reorganization costs associated with exiting bankruptcy and any "fresh start" accounting adjustments.
- The projections are based on a private company status, as contemplated by the Trustee's Plan. As a result, certain expenses in the forecast would change if Coram remained public.
- For purposes of the discounted cash flow analysis, the Advisors have assumed debt-free working capital, which excludes reorganization costs, interest income or expense, and taxes payable.

EMB 006416

# FINANCIAL SUMMARY AND PROJECTIONS – CONTINUING OPERATIONS (UNAUDITED)

| ($ in Thousands) | Years Ended December 31, | | | 6 Months Ended | | 12 Months Ended | Management Projections: 6 Months Ending | Years Ending December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 6/30/02 | 6/30/03 | 6/30/03 | 12/31/03 | 2003 (1) | 2004 | 2005 | 2006 | 2007 | 2008 |
| INCOME STATEMENTS | | | | | | | | | | | | | |
| Total Net Revenues | $ 403,432 | $ 393,629 | $ 433,470 | $ 210,413 | $ 233,441 | $ 456,498 | $ 234,184 | $ 467,625 | $ 493,876 | $ 525,522 | $ 550,815 | $ 579,249 | $ 609,059 |
| *Growth %* | -6.6% | -2.4% | 10.1% | NA | 10.9% | NA | NA | 7.9% | 5.6% | 6.4% | 4.8% | 5.2% | 5.1% |
| Total Cost of Services | 282,858 | 273,315 | 304,662 | 148,756 | 168,734 | 324,640 | 163,033 | 331,765 | 345,250 | 370,470 | 390,768 | 411,330 | 431,410 |
| *% of Revenue* | 70.1% | 69.4% | 70.3% | 70.7% | 72.3% | 71.1% | 69.6% | 70.9% | 69.9% | 70.5% | 70.9% | 71.0% | 70.8% |
| Gross Profit | 120,574 | 120,314 | 128,808 | 61,657 | 64,707 | 131,858 | 71,151 | 135,860 | 148,626 | 155,052 | 160,046 | 167,919 | 177,649 |
| *% of Revenue* | 29.9% | 30.6% | 29.7% | 29.3% | 27.7% | 28.9% | 30.4% | 29.1% | 30.1% | 29.5% | 29.1% | 29.0% | 29.2% |
| Operating Expenses: | | | | | | | | | | | | | |
| Selling, general and administrative | 79,791 | 79,381 | 86,854 | 40,043 | 44,488 | 91,299 | 47,415 | 91,906 | 97,662 | 99,732 | 101,455 | 107,052 | 113,022 |
| Bad Debt Expense | 8,991 | 17,533 | 15,887 | 8,220 | 7,746 | 15,413 | 7,193 | 14,939 | 15,169 | 16,141 | 16,918 | 17,792 | 18,707 |
| Total Operating Expenses | 88,782 | 96,914 | 102,741 | 48,263 | 52,234 | 106,712 | 54,608 | 106,845 | 112,832 | 115,873 | 118,373 | 124,844 | 131,729 |
| Total Operating Contribution | 31,792 | 23,400 | 26,067 | 13,394 | 12,473 | 25,146 | 16,543 | 29,015 | 35,794 | 39,179 | 41,673 | 43,075 | 45,920 |
| Minority / equity interest in JV | 188 | 99 | 740 | 263 | 297 | 774 | 680 | 976 | 1,482 | 1,674 | 1,800 | 2,025 | 2,500 |
| EBITDA (2) | $ 31,980 | $ 23,499 | $ 26,807 | $ 13,657 | $ 12,770 | $ 25,920 | $ 17,223 | $ 29,991 | $ 37,276 | $ 40,853 | $ 43,473 | $ 45,100 | $ 48,420 |
| | 7.9% | 6.0% | 6.2% | 6.5% | 5.5% | 5.7% | 7.4% | 6.4% | 7.5% | 7.8% | 7.9% | 7.8% | 8.0% |
| Adjustment for non-recurring, out-of-period, or normalizing items (3) | | | | | | 5,285 | | | | | | | |
| Pro Forma EBITDA | | | | | | $ 31,205 | | | | | | | |
| *% of Revenue* | | | | | | 6.8% | | | | | | | |

(1) Includes 6 months of actual results (through June 30, 2003) and 6 months of projections.

(2) Historical EBITDA above differs from EBITDA reported by the Company in its Form 10-K and Form 10-Q filings. Excludes depreciation and amortization, interest expense, income taxes, interest income, miscellaneous income, gains on sales of assets, losses on impairments of assets and restructuring expenses.

(3) Pro Forma EBITDA discussion and calculation on pages 14 - 15.

## PRO FORMA EBITDA

Included in the Company's reported EBITDA are certain transactions, which for valuation purposes were considered to be non-recurring or out-of-period items, for which the Advisors believe that adjustments should be made in order to determine the Company's pro forma EBITDA. In addition, the Advisors considered adjustments to "normalize" certain expense categories. The chart included as an exhibit on page 38, with footnotes following on pages 39 - 43 identifies various financial transactions (income and expense items) provided by management for the Advisors' consideration. Management routinely tracks these types of financial transactions in order to compare trends between financial reporting periods (e.g., 3 Months Ended June 30, 2003 v. 3 Months Ended June 30, 2002). Management generally excludes the following types of transactions from the specific reports reviewed with the Advisors:

(1) General revenue changes or cost reductions from operational strategies;
(2) Month-to-month recurring operations such as AP accruals, rebates, commissions, legal and accounting accruals, month-end revenue cut-off accruals, software capitalization under the MIS project, DME adjustments, and physical inventory adjustments that are part of quarterly physical inventory observation; and
(3) Transactions of less than $50,000.

After careful review and consideration, the Advisors focused on making adjustments to actual EBITDA based on material non-recurring, out-of-period, or normalizing items (defined as greater than $500,000) as shown on the following page. These items have been adjusted out of the calculation of Coram's actual EBITDA for the 12 months ended June 30, 2003. This approach is consistent with the way the Advisors would expect a buyer to calculate pro forma EBITDA for valuation purposes.

In addition to the financial transactions provided by Coram, the chart included as an exhibit on page 38 also includes the potential adjustments to actual EBITDA and the type of adjustment, as determined by the Advisors.

## Calculation of Pro Forma EBITDA for the 12 Months Ended June 30, 2003

*($ in Thousands)*

| | |
|---|---|
| Actual EBITDA (12 Months Ended June 30, 2003) | $25,920 |
| Non-Recurring, Out-Of-Period or Normalizing Items: | |
| 2003 Tail Insurance - PL coverage (1) | 3,418 |
| PricewaterhouseCoopers Litigation (2) | 1,321 |
| Management Information Systems ("MIS") Costs (3) | 1,346 |
| Additional Management Incentive Plan ("MIP") Reserve (4) | (1,050) |
| Regulatory Reserve (5) | 780 |
| Sales & Use Tax Year End Reserve Analysis & Adjustment (6) | (530) |
| Total | 5,285 |
| **Pro Forma EBITDA** | **$31,205** |

(1) In March 2003, Coram purchased tail insurance for its professional liability ("PL") policies because its previous carrier exited the malpractice insurance business.

(2) During the 12-month period ended 6/30/03, Coram incurred approximately $1.3 million of legal expenses in connection with litigation against PricewaterhouseCoopers related to the acquisition of Caremark's infusion business.

(3) During the 12-month period ended 6/30/03, Coram had $1,466,000 in both internal and external costs associated with systems conversions (the "MIS Project"). The MIS Project slowed dramatically in 2003, but is expected to continue through 2005. The Company has used some of those same consultants and employees to work on various ongoing projects/assignments throughout the company during 2003. The adjustment excludes the expenses for staff necessary to "support" the internal MIS function going forward that were included in the MIS Project expenses ($1,466,000 less $120,000).

(4) In order to arrive at a "normalized" MIP, the Advisors adjusted the actual expense incurred for the last 12 months ("LTM") ended 6/30/03 ($1.95 million) to include an additional expense of $1.05 million to reflect a reasonable annual incentive plan for both executive and senior management. The adjustment is based on the same criteria as the MIP included in management's projections. The Advisors did not make an adjustment for the out-of-period accrual adjustment that Coram made in December of 2002 to adjust an overestimate of 2001 MIP. These types of adjustments occur from time to time in the normal course of business and an Advisors' adjustment would have further reduced pro forma EBITDA by $49,000.

(5) In December 2002, the Company established a $1 million "regulatory reserve" associated with $366,000 in estimated Medicaid overbillings for the period March through December 2002 and an estimated $634,000 in potential late filing reductions. The Advisors have determined that the $634,000 reserve for possibly failing to meet filing deadlines is a material, non-recurring item. Additionally, because the time period utilized for the calculation of EBITDA (12 months ended 6/30/03) includes 6 months of 2002 (July – December), it is appropriate to potentially adjust out 4 months (March-June) or $146,400 ($366,000 divided by 10 months and multiplied by 4 months) of the Medicaid overbillings. The total adjustment is $780,400. In March 2003, there was an additional $200,000 accrual for Medicaid overbillings (similar to the $366,000 mentioned above); no adjustment should be made for these accruals.

(6) The Sales and Use Tax Reserve was established in prior periods. An adjustment to the reserve of this magnitude is unusual and is therefore deemed non-recurring.

*Confidential*

# VALUATION SUMMARY

- The Advisors determined the enterprise value ("EV") of Coram by considering three valuation methodologies:
  - Comparable public company multiples analysis
  - Comparable merger & acquisition transactions analysis
  - Discounted cash flow analysis
- Using this approach, the Advisors determined the enterprise value of Coram, as of the date hereof, to be in the range of **$195 million to $225 million.**

| Valuation Summary<br>*($ in Thousands)*<br>Valuation Methodology | LTM 6/30/03 Financials | Multiple | Enterprise Value | For Comparative Purposes Only: Weight | Weighted Average EV |
|---|---|---|---|---|---|
| **Comparable Public Company Valuation** | | | | | |
| EV / Revenue | $456,498 | 0.53x | $239,708 | 5.0% | $11,985 |
| EV / Pro Forma EBITDA | $31,205 | 6.73x | $209,976 | 10.0% | $20,998 |
| **Comparable M&A Transactions Valuation** | | | | | |
| EV / Revenue | $456,498 | 0.47x (1) | $215,350 | 10.0% | $21,535 |
| EV / Pro Forma EBITDA | $31,205 | 6.27x (2) | $195,528 | 15.0% | $29,329 |
| EV / Pro Forma EBITDA | $31,205 | 7.22x (3) | $225,194 | 40.0% | $90,077 |
| **Discounted Cash Flow Valuation** | | | | | |
| Management Projections | | | $229,646 | 20.0% | $45,929 |
| | | | | 100.0% | $219,854 |

(1) Median multiple based on home infusion and home nursing M&A transactions.

(2) Median multiple based on all selected M&A transactions.

(3) Median multiple based on selected M&A transactions >$50 million of total enterprise value.

- For the SFAS 142 enterprise valuation as of December 11, 2002, the Advisors weighted each of the valuation methodologies in order to determine a specific enterprise value, as required. For comparative purposes, the right-hand portion of the table above also shows the single point valuation that the Advisors' original weighting methodology would have provided.

## Summary of Valuation Methodologies

*Comparable Mergers and Acquisitions*

The Advisors focused on determining a current fair market enterprise valuation of Coram. The Advisors consider fair market value to be the price that a willing seller would pay to a willing buyer, assuming that neither party is under any compulsion and that both parties are in possession of all material information. Based on their extensive collective experience in valuations, mergers, acquisitions and divestitures, the Advisors believe that, in an actively consolidating sector such as the home healthcare industry, publicly disclosed information on multiples paid in recent merger and acquisition transactions provides the best indication of fair market value. The enclosed analysis of comparable mergers and acquisitions is based on numerous historical mergers and acquisitions in the home nursing, HME and home infusion sectors of the home healthcare industry during the past seven years. Based on their extensive experience in the home healthcare industry, the Advisors determined that multiples of EBITDA provide the most dependable indication of fair value. Consequently, they consider transaction-based EBITDA multiples to be the primary indicator of fair market value.

With respect to the revenue-based valuation, the Advisors focused only on acquisitions of home infusion and home nursing providers (not those of HME providers) due to the current similarities in growth and margin characteristics between the home nursing and home infusion sectors.

*Comparable Publicly Traded Companies*

The Advisors considered a second valuation method - Comparable Publicly Traded Companies – as an important secondary indicator of value of the Company. Because of the historical volatility of the relationship between public market and M&A valuation multiples, the Advisors elected not to apply a "control premium" to indications of value derived by reference to comparable publicly traded companies. The stocks of public home healthcare companies have not consistently traded at a meaningful discount to the multiples paid in M&A transactions involving home healthcare companies and, from time to time, the public equities have actually traded at a premium to M&A valuations.

Also, for reasons stated above, the Advisors considered only the current revenue trading multiples of public home infusion and home nursing providers.



*Discounted Cash Flow Analysis*

The Advisors considered a discounted cash flow ("DCF") valuation as a third method. The DCF valuation provides an indication of "going concern" valuation based on specific projections of the future earnings potential of a business. Given the improving performance of Coram since 1999, the Advisors consider the DCF to be an important secondary indicator of the value of the Company. The Advisors utilized Coram management projections that assumed net revenue growth of approximately 5-7% per annum and EBITDA margins from approximately 7-8% throughout the forecast period. The Advisors worked closely with the Company's financial staff to review and discuss in detail the assumptions underlying the financial forecast. The Advisors believe that the forecast underlying the discounted cash flow analysis was prepared in a thorough and careful manner, and that the forecast, and the underlying assumptions, are reasonable.

# COMPARABLE PUBLIC COMPANY ANALYSIS

Utilizing market multiples of selected comparable publicly traded companies is a common valuation approach. This technique is based upon the efficient market theory, which assumes that the price at which an investment security is traded reflects all readily available information, that buyers and sellers are educated and rational, and that conventional supply and demand dynamics apply. The theory assumes that the market continuously evaluates each publicly traded company and that the value of each company is expressed in the bids for its stock. While they note the ongoing dispute over whether the stock markets are entirely efficient, the Advisors believe that comparable public company analysis is meaningful for the following reasons:

- Today's markets are composed, more than ever before, of highly educated money managers, sophisticated investors and successful corporate managers in addition to individual investors;
- The SEC has dedicated significant resources to maintaining the integrity and efficiency of the public capital markets; and
- The public markets are one of the best available venues for arm's-length exchanges between willing buyers and willing sellers.

The most significant drawback to using the market multiple approach is that it is nearly impossible to find even a single perfectly comparable company. In addition, public trading multiples do not typically reflect a control premium that may be afforded to the stock of a company by a buyer of 100% of the company. Based on their extensive experience in home healthcare, the Advisors have developed detailed criteria to refine their selection of appropriate comparable companies and have applied those criteria to identify a valid group of publicly traded "peers" for Coram. These selection criteria are described in detail below.

## Selection Criteria

*Business Criteria*

A comparable company provides equipment, products, related services and/or nursing care to patients at home, ideally through a network of local-market service and delivery branches (versus mail-order or other more centralized distribution methods), and derives at least 50% of its revenue from this operating model.

Operating elements that are common to these various homecare services include:

- Distribution and logistics
- Range of skilled and unskilled care services
- Service based on prescription or certificate of medical necessity ("CMN") and care plan of a physician
- Significant claims processing and submission requirements
- Similar referral and payer sources
- Care coordination with physicians
- Patient follow-up and training

*Growth Criteria*

The organic revenue and operating earnings growth characteristics of the comparable company should be reasonably close to the organic growth of the home infusion sector (5-9%) and the underlying growth characteristics and potential of Coram. However, if a company has accelerated revenue and earnings growth characteristics due to such factors as aggressive acquisitions and business diversification, that company may be excluded from the comparable company list.

*Cash Flow Criteria*

For purposes of this criteria, EBITDA minus capital expenditures ("cash flow") is the definition under consideration. While the cash flow "margin" characteristics of the comparable company should be close to the home infusion sector and Coram, this may not necessarily be viewed as a 100% exclusionary criteria. Certain high-margin outliers may be excluded.

*Note:* Home respiratory therapy and home medical equipment providers typically have higher EBITDA margins than home infusion providers (due to a higher amount of Medicare and rental business), but also have higher capital expenditure requirements (purchases of rental equipment) than home infusion providers.

*Other Criteria*

- Enterprise Value: exclude companies with enterprise values (market capitalization plus net debt) under $50 million
- Solvency: exclude companies operating in Chapter 11 bankruptcy
- Geography: majority of revenue in the United States; exclusion of small, local providers

Conclusion: The Advisors consider companies in the following healthcare services sectors to constitute the most appropriate universe of companies comparable to Coram:

- Home nursing providers
- Home respiratory therapy and home medical equipment ("HME") providers
- Home infusion providers
- Hospice providers

## Comparable Public Company Candidates

| Companies Considered | Ticker | Type of Company (1) | Include as Comp? | Rationale |
|---|---|---|---|---|
| Accredo Health | ACDO | S-Phar | No | High-growth, centralized specialty pharmacy provider (has closed most of home IV business) |
| Allied Healthcare International | ADH | Home Nursing | No | Majority of revenue in the U.K. homecare market; has divested home IV |
| Almost Family | AFAM | Home Nursing | No | Enterprise value under $50 million |
| ✓ Amedisys | AMED | Home Nursing | Yes | Fits all criteria |
| ✓ American HomePatient | AHOM | HME | Yes | Recently emerged from Chapter 11 (appealed by the secured lenders); fits all criteria |
| ✓ Apria Healthcare Group | AHG | HME | Yes | Fits well despite higher EBITDA margin characteristics |
| Beverly Enterprises | BEV | SNF | No | Significant majority of business is institutional elder care |
| Critical Home Care | CCLH | HME | No | Enterprise value under $50 million |
| Curative Health Services | CURE | S-Phar | No | Centralized, specialty pharmacy provider (side business of outpatient wound care) |
| ✓ Gentiva Health Services | GTIV | Home Nursing | Yes | Fits all criteria |
| Lincare Holdings | LNCR | HME | No | High cash flow "margin" and acquisition-driven earnings growth |
| Manor Care | HCR | SNF | No | Majority of focus in skilled nursing and assisted living facilities |
| Matria Healthcare | MATR | DM | No | Only its women's health division has some element of homecare (<50% of revenue) |
| MIM Corporation | MIMS | PBM/S-Phar | No | No branch system; PBM with centralized S-Phar business |
| National HealthCare | NHC | SNF | No | Significant majority of business is institutional elder care |
| National Home Health Care | NHHC | Home Nursing | No | Enterprise value under $50 million |
| New York Health Care | BBAL | Home Nursing/Biotech | No | Enterprise value under $50 million |
| Odyssey Healthcare | ODSY | Hospice | No | High growth through roll-up acquisitions |
| ✓ Option Care | OPTN | Home IV/S-Phar | Yes | Home infusion remains key aspect of its overall business |
| ✓ Pediatric Services of America | PSAI | Home Nursing | Yes | Fits criteria and also operates home infusion, HME and S-Phar units |
| Priority Healthcare | PHCC | S-Phar | No | Centralized, S-Phar provider and drug distributor to physicians |
| ✓ Rotech Healthcare | ROHI | HME | Yes | Fits well despite higher EBITDA margin characteristics |
| Star Multi-Care Services | SMCS | Home Nursing | No | Enterprise value under $50 million; appears to be liquidating |

(1) Primary business highlighted (>50% of revenues). HME = home respiratory and home durable medical equipment services. S-Phar = specialty pharmacy. PBM = pharmacy benefit manager. DM = disease management. SNF = skilled nursing facility.

## Comparable Public Company Valuation Summary

**Comparable Public Company Market Statistics**
*($ in Thousands, Except per Share)*

| | Stock Price as of 8/29/03 | Enterprise Value (EV) | EV / Revenue | EV / EBITDA |
|---|---|---|---|---|
| Amedisys, Inc. | $8.04 | $85,255 | 0.67 x | 8.70 x |
| American HomePatient | 1.88 | 312,209 | 0.96 | 6.28 |
| Apria Healthcare Group, Inc. | 25.90 | 1,674,577 | 1.27 | 5.24 |
| Gentiva Health Services, Inc. | 10.58 | 188,898 | 0.24 | 6.79 |
| Option Care, Inc. | 11.66 | 255,257 | 0.73 | 8.25 |
| Pediatric Services of America, Inc. | 8.99 | 81,253 | 0.38 | 5.99 |
| Rotech Healthcare Inc. | 23.30 | 1,006,763 | 1.66 | 6.73 |
| | | Low | 0.24 | 5.24 |
| | | High | 1.66 | 8.70 |
| | | Average | 0.84 | 6.86 |
| | | **Consolidated Median** | **0.73 x** | **6.73 x** |
| | | **Home IV / Nursing Median (1)** | **0.53 x** | **7.52 x** |

(1) Home IV / nursing median includes Amedisys, Gentiva, Option Care and Pediatric Services.

**Comparable Public Company Valuation Summary**
*($ in Thousands)*

| | LTM 6/30/03 Financials | Multiple | Enterprise Value (EV) |
|---|---|---|---|
| EV / Revenue | $456,498 | 0.53x | $239,708 |
| EV / Pro Forma EBITDA | $31,205 | 6.73x | $209,976 |

- The 0.53x revenue multiple used above represents the median trading multiple for home infusion and nursing providers only (i.e., excludes HME) because HME providers offering home respiratory and durable medical equipment typically have higher operating margins (EBITDA margins of 20-30%) than home infusion and home nursing providers (EBITDA margins of 5-15%) because of equipment rental revenue, which results in a higher revenue multiple than home nursing and home infusion providers.
- The 6.73x EBITDA multiple used above represents the median multiple for all of the public comparables companies.

EMB 006426

*Confidential*

# Comparable Public Company Analysis

| ($ in Thousands) | Amedisys, Inc. | American HomePatient | Apria Healthcare Group, Inc. | Gentiva Health Services, Inc. | Option Care, Inc. | Pediatric Services of America, Inc. | Rotech Healthcare Inc. | MEDIAN |
|---|---|---|---|---|---|---|---|---|
| Symbol | AMED | AHOM | AHG | GTIV | OPTN | PSAI | ROHI | |
| Exchange | NASDAQ | OTC | NYSE | NASDAQ | NASDAQ | NASDAQ | OTC US | |
| Current Price as of 8/29/03 | $8.04 | $1.88 | $25.90 | $10.58 | $11.66 | $8.99 | $23.30 | |
| Weighted Average Diluted Shares Outstanding | 9,666 | 18,835 | 55,453 | 27,490 | 21,222 | 7,052 | 25,000 | |
| Market Capitalization | $77,715 | $35,410 | $1,436,233 | $290,844 | $247,449 | $63,383 | $582,500 | $247,449 |
| Net Debt | $7,540 | $276,799 | $238,344 | ($101,946) | $7,808 | $17,870 | $424,263 | |
| Total Enterprise Value | $85,255 | $312,209 | $1,674,577 | $188,898 | $255,257 | $81,253 | $1,006,763 | $255,257 |
| Net Debt as % of Enterprise Value | 8.8% | 88.7% | 14.2% | -54.0% | 3.1% | 22.0% | 42.1% | |
| FY End | 12/31/02 | 12/31/02 | 12/31/02 | 12/31/02 | 12/31/02 | 09/30/02 | 12/31/02 | |
| Most Recent Quarter Used | 06/30/03 | 06/30/03 | 06/30/03 | 06/30/03 | 06/30/03 | 06/30/03 | 06/30/03 | |
| | | | | | | | | |
| Net Revenue | $128,046 | $326,277 | $1,318,779 | $790,541 | $349,608 | $211,382 | $606,317 | $349,608 |
| EBITDA (LTM) | $9,798 | $49,682 | $319,473 | $27,805 | $30,939 | $13,574 | $149,619 | $30,939 |
| EBITDA (Projected '03) | $12,606 | NA | $335,598 | $30,342 | $31,906 | $15,195 | $177,969 | |
| EBITDA (Projected '04) | $13,888 | NA | $388,902 | $35,486 | $36,576 | NA | $202,005 | |
| EBITDA Margin | 7.7% | 15.2% | 24.2% | 3.5% | 8.8% | 6.4% | 24.7% | 8.8% |
| EBIT | $6,902 | $25,592 | $193,486 | $20,886 | $26,524 | $9,514 | $54,257 | $25,592 |
| EBIT Margin | 5.4% | 7.8% | 14.7% | 2.6% | 7.6% | 4.5% | 8.9% | |
| EBIAT | $4,141 | $15,355 | $116,092 | $12,532 | $15,914 | $5,708 | $32,554 | |
| Net Income to Common | ($1,263) | $23,438 | $111,759 | $16,497 | $15,679 | $12,057 | $6,364 | |
| EPS (LTM) | ($0.13) | $1.24 | $2.02 | $0.60 | $0.74 | $1.71 | $0.25 | |
| EPS (Projected '03) | 0.55 | NA | 2.13 | 0.50 | 0.79 | 0.72 | 1.39 | |
| EPS (Projected '04) | 0.64 | NA | 2.43 | 0.59 | 0.91 | NA | 1.90 | |
| Return on Revenue | NM | 7.2% | 8.5% | 2.1% | 4.5% | 5.7% | 1.0% | |
| | | | | | | | | |
| Cash & Near Cash Items | $12,801 | $21,998 | $24,433 | $101,946 | $328 | $4,861 | $29,308 | |
| Total Assets | $60,069 | $291,166 | $856,778 | $272,634 | $160,495 | $105,993 | $1,051,857 | |
| Short Term Debt and Current Mat. | $13,684 | $0 | $28,508 | $0 | $1,448 | $176 | $1,499 | |
| Long Term Debt | $6,657 | $298,797 | $234,269 | $0 | $6,688 | $22,555 | $452,072 | |
| Total Debt | $20,341 | $298,797 | $262,777 | $0 | $8,136 | $22,731 | $453,571 | |
| Shareholders' Equity | $21,139 | ($38,737) | $406,863 | $116,461 | $126,990 | $59,325 | $507,182 | |
| Total Capitalization | $41,480 | $260,060 | $669,640 | $116,461 | $135,126 | $82,056 | $960,753 | $135,126 |
| Debt/Total Capitalization | 49.0% | 114.9% | 39.2% | 0.0% | 6.0% | 27.7% | 47.2% | 39.2% |
| Book Value per Share | $2.19 | NM | $7.34 | $4.24 | $5.98 | $8.41 | $20.29 | |
| Return on Assets | NM | 8.0% | 13.0% | 6.1% | 9.8% | 11.4% | 0.6% | |
| Return on Equity | NM | NM | 27.5% | 14.2% | 12.3% | 20.3% | 1.3% | 14.2% |
| Return on Invested Capital | 16.6% | 9.8% | 28.9% | 17.9% | 19.6% | 11.6% | 5.6% | 16.6% |
| | | | | | | | | |
| Value as a Multiple of: | | | | | | | | |
| EBITDA (LTM) | 8.70 x | 6.28 x | 5.24 x | 6.79 x | 8.25 x | 5.99 x | 6.73 x | 6.73 x |
| EBITDA (Projected '03) | 6.76 x | NA | 4.99 x | 6.23 x | 8.00 x | 5.35 x | 5.66 x | 5.94 x |
| EBITDA (Projected '04) | 6.14 x | NA | 4.31 x | 5.32 x | 6.98 x | NA | 4.98 x | 5.32 x |
| EBIT | 12.35 x | 12.20 x | 8.65 x | 9.04 x | 9.62 x | 8.54 x | 18.56 x | 9.62 x |
| EBIAT | 20.59 x | 20.33 x | 14.42 x | 15.07 x | 16.04 x | 14.23 x | 30.93 x | 16.04 x |
| EPS (LTM) | NM | 1.51 x | 12.85 x | 17.63 x | 15.78 x | 5.26 x | 91.54 x | 14.32 x |
| EPS (Projected '03) | 14.62 x | NA | 12.16 x | 21.16 x | 14.76 x | 12.48 x | 16.76 x | 14.69 x |
| EPS (Projected '04) | 12.56 x | NA | 10.66 x | 17.93 x | 12.81 x | NA | 12.26 x | 12.56 x |
| Book | 3.68 x | NM | 3.53 x | 2.50 x | 1.95 x | 1.07 x | 1.15 x | 2.22 x |
| Revenue | 0.67 x | 0.96 x | 1.27 x | 0.24 x | 0.73 x | 0.38 x | 1.66 x | 0.73 x |
| Assets | 1.42 x | 1.07 x | 1.95 x | 0.69 x | 1.59 x | 0.77 x | 0.96 x | 1.07 x |

## *Comparable Public Company Descriptions*

| Company | Ticker | Description | LTM Revenue[1] ($ in millions) |
|---|---|---|---|
| Amedisys, Inc. | AMED | Amedisys is a multi-regional provider of home healthcare nursing services. The company operates 56 home care nursing offices and two corporate offices in the southern and southeastern United States. Amedisys has over a decade of experience in home care nursing and was an early innovator in bringing technology, previously used only in acute care settings, to the home, as well as providing traditional home care services. Services provided in home healthcare include four broad categories: nursing and allied health services, infusion therapy, respiratory therapy and home medical equipment. | $128.0 |
| American HomePatient | AHOM | American HomePatient, Inc. provides home healthcare services and products to patients through its 285 centers in 35 states. These services and products are primarily paid for by Medicare, Medicaid and other third-party payers. The company's home respiratory services include oxygen systems, nebulizers, aerosol medications and home ventilators, and are provided primarily to patients with severe and chronic pulmonary diseases. Its home infusion services are used to administer nutrients, antibiotics and other medications to patients with medical conditions such as neurological impairments, infectious diseases or cancer. The company also sells and rents a variety of home medical equipment and supplies, including wheelchairs, hospital beds and ambulatory aids. | $326.3 |
| Apria Healthcare Group, Inc. | AHG | Apria provides comprehensive home healthcare services through approximately 400 branch locations that serve patients in all 50 states. Apria has three major service lines: home respiratory therapy, home infusion therapy and home medical equipment. The company provides home respiratory therapy services to patients with a variety of conditions, including chronic obstructive pulmonary disease, such as emphysema, chronic bronchitis and asthma; nervous system-related respiratory conditions; congestive heart failure, and lung cancer. Home infusion therapy involves the administration of a drug or nutrient directly into the body intravenously through a needle or a catheter. Apria's primary emphasis in the home medical equipment service line is on the provision of patient safety items and ambulatory and patient room equipment. | $1,318.8 |
| Gentiva Health Services, Inc. | GTIV | Gentiva is a provider of home healthcare services. With Gentiva's network of licensed and certified home healthcare agencies, the company employs an expansive team of caregivers, and provides health services for a diverse group of patients each year. Gentiva's customers include managed care organizations, employers, governmental agencies, hospitals and individuals, who rely on Gentiva as their single source for a variety of home health services, including skilled nursing, physical, occupational, neurological and speech therapy, home health aides and personal care assistants, home medical equipment, respiratory therapy, pediatric and perinatal care, rehabilitation, disease management, network services for managed care organizations and self-insured employers. | $790.5 |
| Option Care, Inc. | OPTN | Option Care, Inc. provides pharmacy services to patients on behalf of managed care organizations and other third party payers. Option Care contracts with these payers to provide infusion therapy, specialty pharmacy and other related services to patients at home or at other alternate-site settings, such as physicians' offices. | $349.6 |
| Pediatric Services of America, Inc. | PSAI | Pediatric Services of America is a provider of children's healthcare and related services through 121 branch offices located in 22 states. The company provides a broad range of pediatric healthcare services and equipment, including nursing, respiratory therapy, rental and sale of durable medical equipment, pharmaceutical services and infusion therapy services. In addition, the company provides pediatric rehabilitation services, day treatment centers for medically fragile children, pediatric well care services and special needs educational services for pediatric patients. The company also provides case management services in order to assist the family and patient by coordinating the provision of services between the insurer or other payer, the physician, the hospital and other healthcare providers. As a complement to its pediatric respiratory and infusion therapy services, the company also provides respiratory and infusion therapy and related services for adults. | $211.4 |
| Rotech Healthcare Inc. | ROHI | Rotech Healthcare Inc. provides home respiratory therapy and duarable medical equipment and services. The company services patients with breathing disorders such as chronic obstructive pulmonary diseases. Rotech provides its equipment and services across the United States through various operating centers. | $606.3 |

(1) Per Comparable Public Company Analysis schedule on the previous page.

EMB 006428

# COMPARABLE MERGER & ACQUISITION ("M&A") TRANSACTIONS ANALYSIS

The application of multiples paid in recently completed merger and acquisition transactions is a second commonly used valuation technique. This analysis is particularly relevant as a reasonable indication of value in actively consolidating industry sectors such as home healthcare.

The significant drawbacks to using this approach include the absence of available information on private transactions, the absence of acquisition targets that are perfectly comparable to the Company, and the fact that the information on a publicly disclosed transaction may be outdated. Based on their extensive experience in the home healthcare industry, the Advisors have identified a group of M&A transactions in which the acquired, or "target", companies are reasonably comparable to Coram. The selection criteria used by the Advisors are described below.

## Selection Criteria

*Business Criteria*
The target company provides equipment, products, medications, related services and/or nursing care to patients at home, ideally through a network of local-market service and delivery branches (versus centralized mail-order), and derives at least 50% of its revenue from this operating model.

*Transaction Size Criteria*
Enterprise value of the transaction should be approximately $10 million, or greater. Generally speaking, in the highly fragmented homecare sector (often referred to as "Mom & Pop"), transactions over approximately $10 million in value are often referred to as "larger" transactions. Given the size of Coram, a higher weighting has been given to transactions with enterprise values of $50 million, and greater.

Conclusion: The Advisors believe that the companies that were targets in merger and acquisition transactions in the following sectors constitute the most appropriate universe of companies comparable to Coram:

- Home nursing providers
- Home respiratory therapy and home medical equipment providers
- Home infusion providers
- Hospice providers

## Comparable M&A Transactions Valuation Summary

**Comparable M&A Transactions Valuation Summary**
*($ in Thousands)*

| | LTM 6/30/03 Financials | Multiple | Enterprise Value (EV) |
|---|---|---|---|
| EV / Revenue | $456,498 | 0.47x | $215,350 |
| EV / Pro Forma EBITDA | $31,205 | 6.27x (1) | $195,528 |
| EV / Pro Forma EBITDA | $31,205 | 7.22x (2) | $225,194 |

(1) Median multiple based on all selected M&A transactions.

(2) Median multiple based on selected M&A transactions >$50 million of total enterprise value.

- The 0.47x revenue multiple used above represents the median multiple for transactions in the home infusion and home nursing sectors only (i.e., excludes HME) for the following reasons:
  - ➢ There are only two M&A deals with publicly available financial and transaction information involving a home infusion provider that the Advisors could use to develop a reasonable revenue multiple benchmark, but 14 deals if home nursing transactions are included, and
  - ➢ HME providers offering home respiratory and durable medical equipment typically have substantially higher EBITDA margins than home infusion and home nursing providers, which results in a higher revenue multiple than home nursing and home infusion providers.
- The 6.27x EBITDA multiple used above represents the median multiple for all of the HME, home infusion and home nursing M&A transactions presented on the next two pages.
- The 7.22x EBITDA multiple used above represents the median multiple for all of the HME, home infusion and home nursing M&A transactions that are greater than $50 million in enterprise value, as presented on the next two pages.
- The following transactions are broken into two groups:
  - ➢ Home medical equipment, including home respiratory, durable medical equipment and home infusion
  - ➢ Home nursing

# Comparable M&A Transactions – Home Medical Equipment

*($ in millions)*

| Announcement or Effective Date | Target | Acquiror | Enterprise Value ("EV") | LTM Target Financials: Revenue | LTM Target Financials: EBITDA | EV as a Multiple of: Revenue | EV as a Multiple of: EBITDA |
|---|---|---|---|---|---|---|---|
| HOME MEDICAL EQUIPMENT | | | | | | | |
| Apr-03 | Gateway HomeCare<br>RT (59%); DME (18%); Wound Care (23%) | Auria Healthcare | $16.7 | $26.1 | $2.9 | 0.64 x | 5.75 x |
| Apr-03 | PromptCare/Steri-Pharm (Allied)<br>IV (73%); RT/DME (27%) | MidMark Capital | 8.5 | 16.9 | 1.5 | 0.50 | 5.86 |
| Oct-02 | American Homecare Supply (1)<br>RT (43%); DME, IV, rehab | Air Products & Chemicals | 165.0 | 110.0 | 25.9 | 1.50 | 6.38 |
| Aug-02 | Wasserott's Ltd (1)<br>RT, DME | Auria Healthcare | 28.0 | 19.0 | NA | 1.47 | NA |
| Aug-02 | Allina Health Home IV Pharmacy<br>IV | Option Care | 15.1 | 17.0 | NA | 0.89 | NA |
| Nov-01 | HHCA (HME Assets) (1)<br>RT, DME | Auria Healthcare | 20.8 | 17.0 | 3.4 | 1.22 | 6.12 |
| Aug-01 | Medi-Rents (1)<br>RT (50%), DME | Home Care Supply | 35.0 | 20.0 | 6.2 | 1.75 | 5.65 |
| Aug-01 | Chartwell Diversified Services (2)<br>IV, RT, DME, S-Phar, HHA | Med Diversified | 107.4 | 144.0 | 13.2 | 0.75 | 8.14 |
| May-01 | Interwest Home Medical<br>RT (72%), DME (28%) | Praxair | 60.0 | 43.2 | 9.3 | 1.39 | 6.44 |
| Oct-00 | Young's Medical (1)<br>RT (45%), DME (35%), rehab | American Homecare Supply | 29.5 | 27.5 | 5.6 | 1.07 | 5.30 |
| Jun-00 | United Medical (3)<br>RT (50%), IV, DME, rehab | Lincare Holdings | 121.0 | 80.0 | NA | 1.51 | NA |
| Jan-00 | UPC Home Health Care<br>RT, DME | Walgreen's Advanced Care | 12.7 | 18.5 | NA | 0.69 | NA |
| Nov-99 | Caretenders (HME/IV Assets) (1)<br>RT (43%), DME and IV (57%) | Lincare Holdings | 14.5 | 21.0 | 3.1 | 0.69 | 4.70 |
| Jul-99 | HealthCor (Just looking at RT)<br>HHA, IV, RT | Lincare Holdings | 13.0 | 9.0 | NA | 1.44 | NA |
| Jun-99 | Community Care<br>DME/Supplies (59%), RT (25%), Rehab (16%) | Landauer Hospital Supplies | 12.6 | 17.9 | 2.0 | 0.70 | 6.27 |
| Dec-97 | National Medical Systems<br>RT (51%), DME (29%), IV (20%) | American HomePatient | 35.4 | 34.4 | 7.1 | 1.03 | 4.99 |
| Oct-97 | Rotech Medical<br>RT (50%), DME (29%), IV (17%), Other (4%) | Integrated Health Services | 798.0 | 422.7 | 108.2 | 1.89 | 7.38 |
| Mar-97 | Nahatan Medical (4)<br>RT (62%), DME (38%) | Home Health Corp. of America | 13.9 | 9.7 | 2.5 | 1.43 | 5.56 |
| Feb-97 | Medical Air (1)<br>RT (81%), DME (19%) | Home Health Corp. of America | 9.9 | 6.5 | 2.3 | 1.52 | 4.30 |
| Jul-96 | Miller Medical Systems<br>RT, Rehab | American HomePatient | 24.7 | 18.6 | 3.9 | 1.33 | 6.27 |
| Oct-95 | Revco Home Health<br>DME (73%), Rehab & RT (32 branches) | RoTech Medical | 10.4 | 25.8 | (0.0) | 0.40 | NM |
| May-95 | ConPharma Home<br>RT (41%), IV (33%), DME (15%), Other (11%) | American HomePatient | 35.5 | 39.4 | 5.2 | 0.90 | 6.83 |
| | | | | HME/IV Median Multiple: | | 1.15 x | 5.99 x |

See next page for all M&A transactions footnotes.

## Comparable M&A Transactions – Home Nursing

*($ in millions)*

| Announcement or Effective Date | Target | Acquiror | Enterprise Value ("EV") | LTM Target Financials: Revenue | EBITDA | EV as a Multiple of: Revenue | EBITDA |
|---|---|---|---|---|---|---|---|
| **HOME NURSING** | | | | | | | |
| May-02 (ann.) | Patient Care, Inc.<br>HHA | Investor Group *(led by Schroder Ventures)* | $70.0 | $140.4 | $9.7 | 0.50 | 7.22 x |
| May-02 | InterLink Home Health<br>HHA, IV | Phoenix Group | 9.0 | 30.0 | NA | 0.30 | NA |
| Sep-01 | Amserv Healthcare (Star Multi Care Services) (1) (5)<br>HHA | Premier Home HealthCare | 9.8 | 21.4 | NA | 0.45 | NA |
| Aug-01 | Tender Loving Care Services, Inc. (6)<br>HHA, IV | Med Diversified | 149.9 | 263.0 | 17.1 | 0.57 | 8.75 |
| Aug-01 (not compl.) | Addus Healthcare<br>HHA, MS, RT, DME | Med Diversified | 62.5 | 210.0 | 11.5 | 0.30 | 5.43 |
| Dec-00 | In Home Health<br>HHA, IV | Manor Care | 22.5 | 91.5 | 4.4 | 0.25 | 5.10 |
| May-99 | Arcadia Services/ IHS<br>MS, HHA | Addus Healthcare | 13.6 | 60.0 | NA | 0.23 | NA |
| Dec-98 | COL Homecare Ops-LA,OK (7)<br>HHA | Amedisys | 24.0 | 137.7 | NA | 0.24 | NA |
| Jun-98 (ann.) | Housecall Medical<br>HHA, IV, RT, DME | Adventist Health | 56.2 | 184.2 | 4.8 | 0.31 | 11.68 |
| Apr-98 | CASHA Resource (1)<br>HHA, IV | Banyan Healthcare | 13.0 | 18.0 | NA | 0.72 | NA |
| Nov-97 (ann.) | Nursefinders (Personnel Group of America) (8)<br>HHA, MS | Atlantic Medical / CIBC | 65.3 | 133.5 | 9.7 | 0.49 | 6.65 |
| Jun-97 (ann.) | Interim HealthCare (9)<br>MS | Cornerstone Equity | 134.0 | 251.7 | 20.5 | 0.53 | 6.55 |
| | | | **Home Nursing Median Multiple** | | | 0.38 x | 6.65 x |

| | Revenue | EBITDA |
|---|---|---|
| Home IV / Nursing Median Multiple: | 0.47 x | NM |
| Consolidated Median Multiple (All Deals): | NM | 6.27 x |
| Consolidated Median Multiple (>$50MM Deals): | NM | 7.22 x |

*Notes:*
HHA = Home Health Agency (i.e., home nursing), MS = Medical Staffing, DME = Durable Medical Equipment, IV = Home Infusion, RT = Respiratory Therapy, NM = Not Meaningful
(1) Certain statistics estimated by EB based on one or more industry sources.
(2) Purchase price as of closing. Multiple based on 5 month run rate.
(3) Revenue multiple reflects annualized financial results for the 6 months ended.
(4) Revenue and EBITDA were based on estimated run rate.
(5) Revenue reflects last quarter annualized net of retained revenue (per press release) post-divestiture.
(6) Revenue and EBITDA Multiples reflect 6 months ended September 30, 2001 financial results, annualized.
(7) Multiple reflects annualized financial results for the 9 months ended September 30, 1998.
(8) Multiple reflects annualized financial results for the 9 months ended September 28, 1997.
(9) Multiple reflects annualized financial results for the 6 months ended June 27, 1997.
Source: SEC reports, EB estimates, Bloomberg, Irving Levin Associates, HME News, and HomeCare Magazine.

## DISCOUNTED CASH FLOW ANALYSIS

The discounted cash flow valuation provides a "going concern" value, which is a present valuation of a company's future ability to produce cash flows and earnings. The DCF analysis assumes that the corporation has an infinite life. Accordingly, the analysis contains two parts: a forecast period and a residual or terminal value.

For the forecast period, 6 months ending December 31, 2003 through fiscal years ending December 31, 2004 - 2008, the Advisors have distilled projected income statements, balance sheets and cash flow statements into after-tax operating cash flows ("free cash flows") according to the following formula:

**Free Cash Flow = EBIT (1 – T) + D&A- Capex – ΔNWC**

*where:*
EBIT = operating income or earnings before interest and taxes
T = marginal cash tax rate
D&A = non-cash operating expenses, including depreciation, depletion and amortization
Capex = capital expenditures for fixed assets
ΔNWC = change in net working capital

The value of a company derived from free cash flows arising after the forecast period is captured by the terminal value. Terminal value is estimated in the last year of the forecast period and capitalizes the present value of all future cash flows beyond the forecast period. The terminal value assumes that the firm enjoys no opportunities for abnormal growth. In arriving at an appropriate terminal value for Coram, the Advisors have applied the median EBITDA multiple (7.2 times) of the M&A transactions greater than $50 million in enterprise value to the 2008 projected EBITDA.

Value is calculated by adding the present value of the projected free cash flows to the present value of the terminal value at the end of the projection period. Typically, the free cash flows, including the terminal value, are discounted back to a present value at a rate commensurate with the risk inherent in those cash flows. A widely accepted proxy for this rate is the risk-adjusted, weighted average cost of capital ("WACC") of the subject company. The Advisors utilized a mid-period discounting methodology, which assumes the cash flows are realized at the mid-point of a given period and discounted accordingly. The result of the discounted cash flow calculation is the enterprise value of the company, which represents the entire value to both debt and equity holders.

The Advisors utilized Coram management projections that assumed net revenue growth of approximately 5-7% per annum and EBITDA margins from approximately 7-8% throughout the forecast period. The Advisors worked closely with the Company's financial staff to review and discuss in detail the assumptions underlying the financial forecast. The Advisors believe that the forecast underlying the discounted cash flow analysis was prepared in a thorough and careful manner, and that the forecast, and the underlying assumptions, are reasonable.