Confidential

## CORAM HEALTHCARE CORPORATION

### Discounted Cash Flow Valuation Summary
($ In Thousands)

*Unleveraged Free Cash Flows*

| | 6 Months Ending December 31, 2003 | Fiscal Year Ending December 31, 2004 | 2005 | 2006 | 2007 | 2008 | |
|---|---|---|---|---|---|---|---|
| EBITDA | $17,223 | $37,276 | $40,853 | $43,473 | $45,100 | $48,420 | |
| % of Revenue | 7.4% | 7.5% | 7.8% | 7.9% | 7.8% | 8.0% | |
| Depreciation and Amortization | 3,706 | 6,427 | 5,555 | 6,117 | 6,000 | 4,515 | |
| EBIT | 13,518 | 30,849 | 35,298 | 37,356 | 39,100 | 43,905 | |
| Cash Income Taxes @ 40% [1] | (5,407) | (12,340) | (14,119) | (14,942) | (15,640) | (17,562) | |
| EBIAT | 8,111 | 18,510 | 21,179 | 22,414 | 23,460 | 26,343 | |
| Depreciation and Amortization | 3,706 | 6,427 | 5,555 | 6,117 | 6,000 | 4,515 | |
| Capital Expenditures [2] | (12,460) | (4,555) | (4,885) | (4,111) | (4,003) | (4,003) | |
| Working Capital Source/(Use) [3] | 1,626 | (7,412) | (3,993) | 990 | (3,901) | (518) | |
| Unleveraged Free Cash Flow (FCF) | 976 | 12,990 | 17,856 | 25,410 | 21,556 | 26,337 | |
| | | | | | | | |
| | | | | | | 2008 EBITDA | |
| Terminal Value (TV) | | | | | | 48,420  7.2x | 348,627 |
| | | | | | | | |
| Total Cash Flows | 976 | 12,990 | 17,856 | 25,410 | 21,556 | 26,337 | 348,627 |
| | | | | | | | |
| Present Value @ 15% (assuming mid-period discounting for FCFs, not TV) | 96.6% | 87.0% | 75.6% | 65.8% | 57.2% | 49.7% | 46.4% |
| | $943 | $11,301 | $13,499 | $16,720 | $12,330 | $13,089 | $161,763 |
| | | | | | | | |
| Net Present Value (NPV) of FCF | | | | | | | |
| | | | | | | | |
| Total NPV | $229,646 | | | | | | |

*DCF Sensitivity*

| | | | Terminal Value Multiple of EBITDA | | | |
|---|---|---|---|---|---|---|
| | | 4.2x | 5.2x | 6.2x | 7.2x | 8.2x |
| Discount Rate | 11% | $190,047 | $217,308 | $244,568 | $271,829 | $299,090 |
| | 13% | $175,468 | $200,211 | $224,954 | $249,697 | $274,440 |
| | 15% | $162,244 | $184,712 | $207,179 | $229,646 | $252,113 |
| | 17% | $150,295 | $170,729 | $191,162 | $211,595 | $232,029 |
| | 19% | $139,404 | $157,998 | $176,591 | $195,185 | $213,778 |

(1) Assumes no use of NOLs or goodwill amortization.
(2) Includes forecasted capital leases principal payments of approximately $36,000 per month for 33 months for infusion pumps purchased in May 2003.
(3) Assumes debt-free working capital and does not include interest payable or taxes payable, which refers to the non-ordinary course IRS tax liability.

30

**SSG**
CAPITAL ADVISORS, L.P.

EMB 006434

*Confidential*

# CORAM HEALTHCARE CORPORATION

## Discount Rate

The discount rate typically mirrors the return that an investor would demand on an investment in assets with business risk characteristics similar to those inherent in the assets of the subject company. In addition, the discount rate implies an appropriate capital structure for the target company going forward. The appropriate rate is a weighted average of the required rates of return on debt and equity to be invested. The Advisors determined the appropriate discount rate by calculating a WACC based on average capital structures, capital costs, betas and tax rates of the group of publicly traded companies that they deemed comparable to Coram.

### Summary of WACC Calculation

After-Tax WACC = (Kd * (1 – T) * D / (D + E)) + (Ke * (E / (D + E)))

where:
Kd = pretax cost of debt financing
Ke = cost of equity financing
D = estimated market value of debt (book value used as proxy)

B = estimated market value of equity (market capitalization)
T = assumed tax rate

### WACC Calculation

| WACC - Debt Component | |
|---|---|
| Pretax cost of debt (Kd) | 5.7% |
| Assumed tax rate (T) | 40.0% |
| After-tax cost of debt | 3.4% |
| Average % debt | 28.4% |
| WACC- debt component | 1.0% |

| WACC - Equity Component | |
|---|---|
| Beta coefficient | 0.67 |
| Equity Risk Premium | 7.0% |
| Adjusted equity risk premium | 4.7% |
| Risk free rate | 5.3% |
| Company specific risk premium | 6.0% |
| Size risk premium | 3.5% |
| Cost of equity (Ke) | 19.6% |
| Average % equity | 71.6% |
| WACC - equity component | 14.0% |

| WACC Calculation | |
|---|---|
| WACC - debt component | 1.0% |
| WACC - equity component | 14.0% |
| WACC | 15.0% |

- The calculated WACC of 15% is in line with the public comparable companies' median returns on equity ("ROE") and invested capital ("ROIC") of 14.2% and 16.6%, respectively.



SSG
CAPITAL ADVISORS, L.P.

31

EMB 006435

*Confidential*

# CORAM HEALTHCARE CORPORATION

## Cost of Equity Calculation

The cost of equity can be calculated using the Capital Asset Pricing Model ("CAPM"):

$$Ke = rf + (rp * B) + SRP + CSRP$$

where:

Ke = cost of equity financing
rf = risk-free rate of return
rp = expected equity market risk premium
B = expected equity beta for Coram
SRP = size risk premium
CSRP = company specific risk premium

### Cost of Equity Variables

| | | | |
|---|---|---|---|
| Risk-free rate of return (rf). | 5.3% | Size risk premium (SRP) | 3.5% |
| *Yield on 20-year Treasuries as of August 29, 2003.* | | *Incremental return required for companies with equity capitalization below $314 million.* | |
| *Source: Wall Street Journal* | | *Source: Ibbotson Associates* | |
| Expected equity market risk premium (rp) | 7.0% | Company specific risk premium (CSRP) | 6.0% |
| *Average risk premium required for equity market over treasuries from 1926 – 2001* | | | |
| *Source: Ibbotson Associates* | | | |
| Beta Coefficient (B) | 0.67 | | |
| *Average Beta of comparable companies.* | | | |
| *Source: Bloomberg* | | | |

| Cost of Equity | 19.6% |
|---|---|

- The cost of equity calculated using CAPM without the CSRP is consistent with the median ROE of approximately 14% calculated for the comparable public companies.

- Based on the uncertainty surrounding Coram's ability to meet its current projections, the Advisors felt the risk, and thus additional required return on equity for Coram, warranted an additional 6% CSRP, which results in a 19.6% cost of equity.



32



SSG
CAPITAL ADVISORS, L.P.

EMB 006436

Confidential

CORAM HEALTHCARE CORPORATION

## NET OPERATING LOSS ANALYSIS

- As of June 30, 2003, Coram Healthcare Corporation and Coram, Inc. and its subsidiaries had approximately $202.6 million of federal net operating loss carryforwards ("NOLs") that may be available to offset future taxable income. These NOLs expire in varying amounts through the year 2023. A schedule of the NOLs is included as an exhibit on page 37.

- The availability of the NOLs to Coram, Inc.'s current owners, or to any potential buyer or transferee of the Company, is uncertain, and depends on the Internal Revenue Service's acceptance of certain tax positions that have been taken. While such positions have been taken based on the advice of certain tax advisors, the positions are not without risk.

- The issuance of the Coram, Inc. Series A Preferred Stock in December 2000 caused an ownership change at Coram, Inc. for federal income tax purposes.

- Although section 382 of the Internal Revenue Code ("IRC") imposes a general limitation on the use of NOLs and certain other corporate tax assets in the event of an ownership change, section 382(l)(5) provides an exception for companies in bankruptcy. Coram, Inc. and subsidiaries have applied section 382(l)(5) on a consolidated basis, effectively excluding all NOLs from the general limitations imposed by section 382. Section 382(l)(5) does not address whether this exception can be applied on a consolidated basis or only on a separate entity basis. Accordingly, it is possible that section 382(l)(5) may not provide any benefit to Coram, Inc. and subsidiaries, as almost all of the NOLs are attributable to the non-bankrupt subsidiaries.

- Although cancellation of indebtedness ("COD") is generally taxable, IRC section 108 provides an exclusion from gross income for COD income of bankrupt or insolvent debtors. Instead of recognizing taxable income, the debtor must, under section 108, reduce its tax attributes until first its NOLs and, ultimately, the tax basis of its property have been reduced to zero. With respect to certain debt-to-equity conversions, NOLs have been reduced on a "separate entity" basis, thereby eliminating the NOLs incurred at the Coram, Inc. level, but effectively preserving those created at the subsidiary companies. If the tax attribute reductions were to be evaluated on a consolidated group basis, Coram, Inc. and its subsidiaries' federal NOLs would be reduced by the entire amount of the COD, which would be sufficient to eliminate the NOLs altogether.

- The Advisors believe that the risk associated with the future availability of the NOLs is sufficient to make it highly unlikely that an informed buyer of the Company would attribute incremental value to the NOLs. Accordingly, the Advisors have given no incremental value to the NOLs.



SSG
CAPITAL ADVISORS, L.P.

EMB 006438

*Confidential*

CORAM HEALTHCARE CORPORATION

## ADDITIONAL VALUATION CONSIDERATIONS

- Coram is a plaintiff in a lawsuit against PricewaterhouseCoopers and has claimed certain damages. Because a favorable outcome from this claim is uncertain, no recognition is given to this contingent asset.

- The enterprise value assumes normal working capital as previously defined.

- The Advisors have not considered any cash costs or proceeds related to a settlement of the R-Net litigation.

- Possible fresh start accounting under a reorganization plan is not included in the projections.

- Because the aggregate amount of the Company's non-ordinary course liabilities and anticipated bankruptcy-related expenses significantly exceed the amount of cash on the Company's balance sheet, and it is currently contemplated in the Trustee's Plan that cash in excess of the Company's normal working capital needs will be used to pay these liabilities and expenses, the Advisors have not increased the enterprise valuation by the Company's cash balance.

- Any goodwill amortization for tax purposes could provide incremental value upside for a potential buyer in a stock purchase.

- The following factors could imply valuation downside:

  o Potential for reimbursement reductions based on draft 2003 Senate and House Medicare-related and State Medicaid-related proposals (no adjustment reflected in Pro Forma EBITDA or DCF);

  o Several recent notifications by a national health insurance customer of terminations of certain contracts with Coram (no adjustment reflected in Pro Forma EBITDA);

  o Potential near-term contract change with a regional health insurance customer that could result in either price reductions beyond those already included in management's forecast or outright contract termination (no adjustment reflected in Pro Forma EBITDA); and

  o CTI and SoluNet do not achieve margin contributions, which are substantial in management's 2007 and 2008 projections.

35



SSG
CAPITAL ADVISORS, L.P.

EMB 006439

Confidential

CORAM HEALTHCARE CORPORATION

III. EXHIBITS

36

SSG
CAPITAL ADVISORS, L.P.

EMB 006440

# CORAM HEALTHCARE CORPORATION

*Confidential*

## Federal Net Operating Loss Carryforwards Schedule

Coram Healthcare Corporation
Federal Net Operating Loss Carryforwards
Estimated Federal NOL as of June 30, 2003



| | Originating NOL | | Carried Back | Utilized 9/30/97 | Utilized 9/30/01 (CHC Group) | $382(l)(5) Reduction | §108 Reduction | Expired | Net Operating Loss Carryforward | Expires |
|---|---|---|---|---|---|---|---|---|---|---|
| | Tax Year Ended | Amount | | | | | | | | |
| **Coram, Inc. & Subsidiaries** | | | | | | | | | | |
| Curaflex and Subsidiaries | 12/31/1988 | 839,167 | | | (839,167) | | | | 0 | 9/30/02 |
| Curaflex and Subsidiaries | 12/31/1989 | 10,844,356 | | | (3,976,175) | (3,062,888) | | (3,805,293) | 0 | 9/30/03 |
| Curaflex and Subsidiaries | 12/31/1990 | 11,962,661 | | | | | | | 11,962,661 | 9/30/05 |
| Curaflex and Subsidiaries | 12/31/1992 | 3,086,626 | | | | | | | 3,086,626 | 9/30/05 |
| Curaflex and Subsidiaries | 12/31/1993 | 1,732,626 | | | | | | | 1,732,626 | 9/30/06 |
| Curaflex and Subsidiaries (IRS Audit) | 12/31/1993 | 2,701,304 | | | | | | | 2,701,304 | 9/30/06 |
| Curaflex and Subsidiaries | 7/7/1994 | 14,914,534 | | | | | | | 14,914,534 | 9/30/07 |
| Coram, Inc. and Subsidiaries (w/ proposed IRS Settlement) | 9/30/1995 | 134,186,271 | (105,748,952) | (28,437,319) | | | | | 0 | |
| Coram, Inc. and Subsidiaries | 9/30/1996 | 127,330,670 | (34,200,081) | (62,490,096) | | | (6,274,922) | | 24,385,571 | 9/30/10 |
| Coram, Inc. and Subsidiaries | 9/30/1998 | 83,948,506 | | | | (14,566,358) | (33,410) | | 69,352,738 | 9/30/17 |
| Coram, Inc. and Subsidiaries | 9/30/1999 | 54,329,506 | | | | (11,559,180) | (1,390,048) | | 41,380,357 | 9/30/18 |
| Coram, Inc. and Subsidiaries | 9/30/2000 | 11,058,849 | | | | (7,161,027) | (704,440) | | 3,213,382 | 9/30/19 |
| Coram, Inc. and Subsidiaries | 9/30/2001 | 18,736,716 | | | | | | | 18,736,716 | 9/30/21 |
| Coram, Inc. and Subsidiaries | 9/30/2002 | 4,972,990 | | | | | | | 4,972,990 | 9/30/22 |
| Coram, Inc. and Subsidiaries (estimate) | 10/01/02-6/30/03 | 4,611,583 | | | | | | | 4,611,583 | 9/30/23 |
| **Totals** | | 485,266,445 | (139,949,033) | (90,927,415) | (4,815,342) | (36,329,453) | (8,408,821) | (3,805,293) | 201,031,088 | |
| **Coram Healthcare Corporation** | | | | | | | | | | |
| CHC | 9/30/2002 | 876,551 | | | | | | | 876,551 | 9/30/22 |
| CHC (estimate) | 10/01/02-6/30/03 | 657,413 | | | | | | | 657,413 | 9/30/23 |
| **Totals** | | 1,533,964 | | | | | | | 1,533,964 | |
| **Grand Totals** | | 486,800,409 | (139,949,033) | (90,927,415) | (4,815,342) | (36,329,453) | (8,408,821) | (3,805,293) | 202,565,052 | |



SSG
CAPITAL ADVISORS, L.P.

EMB 006441

*Confidential*

# CORAM HEALTHCARE CORPORATION

## Financial Transactions – Potential Non-Recurring, Out-Of-Period or Normalizing Items

*($ In Thousands)*

| | Items (1) | 12 Months Ended 6/30/2003 (1) | Potential Adjustment to EBITDA (2) | Type of (3) Adjustment |
|---|---|---|---|---|
| 1. | MIP 2001 Adjustment to Actual | $49 | ($49) | Out-of-period |
| 2. | Accounts Payable Vendor Reconciliations - Drugs and Supplies | (149) | | N/A |
| 3. | Bay Area Escrow 2002 Settlement | 36 | | N/A |
| 4. | Overpayment Recovery Analysis and Adjustment | 1,195 | | N/A |
| 5. | Bad Debt Reserve Analysis and Adjustment | (1,827) | | N/A |
| 6. | PTO Analysis and Adjustment | (226) | 226 | Out-of-period |
| 7. | 2003 PTO Accrual | (150) | | N/A |
| 8. | Escheatment Analysis and Adjustment | 457 | | N/A |
| 9. | Finalization of R. Smith Settlement Against Amount Reserved | 92 | (92) | Non-recurring |
| 10. | Patient Financial Services ("PFS") Consultants, Prior Year Costs | (70) | 70 | Out-of-period |
| 11. | "Non-Recurring" MIS Project Conversion Costs | (1,466) | 1,346 | Non-recurring |
| 12. | PFS Consultants 2002 Medicare Cash Collections | (399) | 399 | Non-recurring |
| 13. | PricewaterhouseCoopers Litigation | (1,321) | 1,321 | Non-recurring |
| 14. | Restructure Reserve Analysis and Adjustment | 100 | | N/A |
| 15. | Regulatory Reserve | (1,200) | 780 | Non-recurring |
| 16. | Sales & Use Tax Year End Reserve Analysis & Adjustment | 530 | (530) | Non-recurring |
| 17. | Risk Insurance - Workers' Compensation carrier "True Up" for April / December 2001 | (225) | 225 | Out-of-period |
| 18. | Risk Insurance - Workers' Compensation carrier "True Up" for 2002 | (255) | 85 | Non-recurring |
| 19. | Risk Insurance - Workers' Compensation carrier "True Up" for 2003 | (85) | | N/A |
| 20. | 2002 Risk Insurance & Health Insurance Reserve Analysis and Adjustments | 497 | (249) | Out-of-period |
| 21. | 2003 Risk Insurance & Health Insurance Reserve Analysis and Adjustments | (657) | | N/A |
| 22. | 2002 MIP Reserve Analysis and Adjustment | (1,950) | (1,050) | Normalizing |
| 23. | 2002 Accounts Payable Lag Analysis | (200) | | N/A |
| 24. | 2003 Tail Insurance - PI coverage | (3,418) | 3,418 | Non-recurring |
| 25. | Deferred Revenue | 87 | | N/A |
| 26. | Ex Employee Receivable | 76 | (179) | Normalizing |
| 27. | MCC Commission Plan "True Up" for 2002 | (387) | 55 | Normalizing |
| | Total | | $5,777 | |

(1) A negative value in this column reflects an expense or reduction in actual EBITDA reflected in the Company's financial statement.

(2) Amount to be applied in order to normalize actual EBITDA. A positive value in this column reflects an add back to actual EBITDA.

(3) The types of adjustments are a) non-recurring, b) out-of-period, or c) normalizing adjustments. N/A (not applicable) means no adjustment is appropriate.



SSG
CAPITAL ADVISORS, L.P.

38

EMB 006442

*Confidential*

## CORAM HEALTHCARE CORPORATION

## Footnotes to Financial Transactions

**1.) MIP 2001 Adjustment to Actual**
- Coram accrues for the MIP throughout the year based on estimates.
- In the fourth quarter of 2002, an adjustment was made to reflect actual payments for the 2001 MIP paid in 2002.
- Type of Adjustment: Out-of-period but below the Advisors' materiality threshold

**2.) Accounts Payable Vendor Reconciliations – Drugs and Supplies**
- The Company periodically performs vendor reconciliations.
- Type of Adjustment: N/A

**3.) Bay Area Escrow 2002 Settlement**
- Coram collected cash from a previously fully-reserved escrow account in 2002.
- Type of Adjustment: Non-recurring, but already reported below operating income for Pro Forma EBITDA so no adjustment necessary

**4.) Overpayment Recovery Analysis and Adjustment**
- In certain circumstances, a payer will overcompensate Coram for the services rendered.
- For government payers such as Medicare and Medicaid, overpayments are always refunded.
- Other overpayments may be retained if Coram issues proper notice and a response is not received, or a response is received indicating no balance due.
- Other overpayments that are kept by Coram are recognized as revenue.
- Amounts vary from year to year. The overpayment in 2001 was excessively high ($3.8 million) because it was based on a multi-year project to cumulatively analyze past years. In 2002, the Company recognized $1.4 million of overpayment revenue. For the 12 months ended 6/30/03, the Company recognized $1.2 million of overpayment revenue.
- Management indicates that approximately $1.0 – $1.5 million is a reasonable run-rate figure.
- Type of Adjustment: N/A

**5.) Bad Debt Reserve Analysis and Adjustment**
- Coram accrues bad debt expense at a rate of 3.1% of consolidated revenue.
- For the 12 months ended 6/30/2003, Coram accrued additional bad debt expense (not a write-off) of $1.8 million over and above the forecast 3.1% of consolidated revenue.
- As the chart on the following page illustrates, the average total bad debt expense as a % of revenue for the past 4 ½ years (1999 – 6 months ended 6/30/03) and 2 ½ years (2001 – 6 months ended 6/30/03) is 4.1% and 3.9%, respectively.
- The bad debt expense as a % of revenue for the 12 months ended 6/30/03 is 3.4%, lower than the 2 ½ year and 5 ½ year averages. The Advisors have determined that no adjustment is necessary or warranted.
- Type of Adjustment: N/A

39



SSG
CAPITAL ADVISORS, L.P.

EMB 006443

*Confidential*

# CORAM HEALTHCARE CORPORATION

*($ in thousands)*

| | 1999 | 2000 | 2001 | 2002 | 6 Months Ended 6/30/03 | 12 Months Ended 6/30/03 |
|---|---|---|---|---|---|---|
| Revenue | $432,119 | $403,432 | $399,629 | $433,470 | $233,441 | $456,498 |
| Bad Debt Expense | 26,927 | 8,991 | 17,533 | 15,887 | 7,746 | 15,413 |
| *% of Net Revenue* | *6.2%* | *2.2%* | *4.5%* | *3.7%* | *3.3%* | *3.4%* |
| | | | | | | |
| *Average (2001 – 6/30/03)* | | | | *3.9%* | | |
| | | | | | | |
| *Average (1999 – 6/30/03)* | | *4.1%* | | | | |

**6.) PTO Analysis and Adjustment**
- In September of 2002, an adjustment to reduce the PTO accrual by $300,000 was based on an evaluation of PTO reserve requirements. This adjustment was based on PTO and vacation substantially earned in prior periods.
- The aggregate $526,000 increase in the PTO reserve made in each of the months from November 2002 – March 2003 is related to a change in the PTO policy in Q4 2002 to payout the accumulation of prior period vacation and the related retention component of such policy.
- Type of Adjustment: Out-of-period but below the Advisors' materiality threshold

**7.) 2003 PTO Accrual**
- Based on an increase in the number of full time employees and in the tenure of employees, vacation expense is higher and therefore the Company is recording an increase in the PTO accrual.
- Type of Adjustment: N/A

**8.) Escheatment Analysis and Adjustment**
- In certain instances, Coram will pay a vendor or an employee only to later discover that the check has gone uncashed because the vendor has gone out of business or the employee has moved from his/her last known address.
- Coram conducts due diligence on each uncashed check, and those not requiring escheatment under applicable state escheatment laws can occasionally be recorded as income.
- Type of Adjustment: N/A

**9.) R. Smith Settlement Adjustment Against Amount Reserved**
- Richard Smith served as Chief Executive Officer and a director from April 22, 1999 through October 22, 1999. Mr. Smith left the Company and resigned his position on the Board of Directors in November 1999.
- Coram established a reserve for severance payments to Mr. Smith. The final settlement was less than the amount reserved. The remaining $92,000 in reserve was reversed and recorded as other income.
- Type of Adjustment: Non-recurring but below the Advisors' materiality threshold

**10.) Patient Financial Services Consultants, Prior Year Costs**
- Coram recognized $70,000 in expenses in 2002 for a consultant that evaluated the DME business and other reimbursement issues from 2001.
- Type of Adjustment: Out-of-period but below the Advisors' materiality threshold



**SSG**
CAPITAL ADVISORS, L.P.

40

EMB 006444

*Confidential*

## CORAM HEALTHCARE CORPORATION

11.) "Non-Recurring" MIS Project Conversion Costs
- For the 12-month period ended 6/30/03, Coram had $1,466,000 in both internal and external costs associated with the MIS Project, primarily to pay consultants and project dedicated employees.
- The MIS Project slowed dramatically in 2003, but is expected to continue through 2005.
- The Company has used some of these same consultants and employees to work on various ongoing projects/assignments throughout the Company during 2003.
- The adjustment excludes the expenses for staff necessary to "support" the internal MIS function going forward that were included in the MIS Project expenses ($1,466,000 less $120,000).
- Type of Adjustment: Non-recurring

12.) Patient Financial Services Consultants 2002 Medicare Cash Collections
- Coram hired consultants to review patient accounts receivable greater than $25,000 for reimbursement purposes.
- Type of Adjustment: Non-recurring but below the Advisors' materiality threshold

13.) PricewaterhouseCoopers Litigation Accrual
- The Company incurred approximately $1.3 million of legal expenses to pursue litigation against PricewaterhouseCoopers over the acquisition of Caremark's infusion business.
- Type of Adjustment: Non-recurring

14.) Restructure Reserve Analysis and Adjustment
- In December 2000, as a result of the reimbursement site consolidation plan, the Company established a restructuring reserve to provide for, among other things, excess capacity through the termination of certain leases.
- This adjustment was due to a change in estimate attributable to future utilization of the Mount Prospect, Illinois leased facility.
- Type of Adjustment: Non-recurring, but already reported below operating income for Pro Forma EBITDA so no adjustment necessary

15.) Regulatory Reserve
- In December 2002, the Company established a $1 million "regulatory reserve" associated with $366,000 in estimated Medicaid overbillings for the period March 2002 through December 2002 and an estimated $634,000 in potential late filing reductions.
- The Advisors have determined that the $634,000 reserve for possibly failing to meet filing deadlines is a potential non-recurring item. Additionally, because the time period utilized for the calculation of EBITDA (12 months ended 6/30/03) includes 6 months of 2002 (July – December), it is appropriate to adjust out 4 months (March-June) or $146,400 ($366,000 divided by 10 months and multiplied by 4 months) of the Medicaid overbillings. The total adjustment is $780,400.
- In March 2003, there was an additional $200,000 accrual for Medicaid overbillings (similar to the $366,000 mentioned above); no adjustment should be made for these accruals.
- Type of Adjustment: Non-recurring and out-of-period

16.) Sales and Use Tax Year End Reserve Analysis and Adjustment
- The Sales and Use Tax Reserve was established in prior periods. An adjustment to the reserve of this magnitude is unusual and is therefore deemed non-recurring.
- Type of Adjustment: Non-recurring

17.) Risk Insurance – Workers' Compensation carrier "True Up" for April / December 2001
- The Company increased its workers' compensation insurance accrual in 2002 in connection with notification of a retrospective adjustment by the carrier for 2001.
- Type of Adjustment: Out-of-period but below the Advisors' materiality threshold



SSG
CAPITAL ADVISORS, L.P.

EMB 006445

*Confidential*

# CORAM HEALTHCARE CORPORATION

18.) Risk Insurance – Workers' Compensation carrier "True Up" for 2002
- The Company increased its workers' compensation insurance accrual in 2003 in connection with reserves required for the April – December 2002 period (the Company's policy runs on an April – March year).
- This type of "true up" is normal; however, the time period utilized for the calculation of EBITDA (12 months ended 6/30/03) only includes 6 months of 2002 (July – December); therefore, it would be appropriate to adjust out 3 months (April-June) or $85,000, but this figure is below the Advisors' materiality threshold
- Type of Adjustment: Out-of-period but below the Advisors' materiality threshold

19.) Risk Insurance – Workers' Compensation carrier "True Up" for 2003
- This expense was recorded in March 2003 for January – February 2003. This type of "true up" is normal.
- Type of Adjustment: N/A

20.) 2002 Risk Insurance & Health Insurance Reserve Analysis and Adjustments
- In December of each year, the Company makes an end-of-year adjustment to the risk insurance & health insurance accrual, if necessary.
- The $497,000 accrual in December 2002 applied to the entire 2002 calendar year. Because the time period utilized for the calculation of EBITDA (12 months ended 6/30/03) only includes 6 months of 2002 (July – December), it would be appropriate to exclude 6 months (January – June) or $249,000, but this figure is below the Advisors' materiality threshold.
- Type of Adjustment: Out-of-period but below the Advisors' materiality threshold

21.) 2003 Risk Insurance & Health Insurance Reserve Analysis and Adjustments
- In June 2003, the Company recorded a $739,000 adjustment to the risk insurance & health insurance reserve and $82,000 to the insurance administrative fee reserve.
- This expense applies to the January – June 2003 period and is normal
- Type of Adjustment: N/A

22.) 2002 MIP Reserve Analysis and Adjustment
- The amount shown reflects the LTM actual accrual of $1.95 million for the MIP.
- In order to arrive at a "normalized" MIP, the Advisors adjusted the actual expense incurred for the 12 months ended 6/30/03 of $1.95 million, to include an additional expense of $1.05 million to reflect a reasonable annual incentive plan for both executive and senior management. The adjustment is based on the same criteria as the MIP included in management's projections.
- Type of Adjustment: Normalizing

23.) 2002 Accounts Payable Lag Analysis
- Coram is centralized for accounts payable processing, but decentralized for invoice approval.
- The Accounts Payable Lag Analysis is a monthly estimate of the invoices that have been received at the branches for services provided, but not yet sent to corporate for processing.
- In February 2003, the reserve for this item was evaluated and adjusted based on a change in estimate relative to the December 2002 accrual, but is not out-of-period relative to the time period utilized for the calculation of EBITDA (12 months ended 6/30/03).
- Moreover, Accounts Payable Lag Analysis adjustments are recurring in nature.
- Type of Adjustment: N/A





SSG
CAPITAL ADVISORS, L.P.

42

EMB 006446

*Confidential*

## CORAM HEALTHCARE CORPORATION

**24.) 2003 Tail Insurance – PL coverage**
- In March 2003, the Company purchased tail insurance for professional liability ("PL") coverage because its previous carrier exited the malpractice insurance business.
- Type of Adjustment: Non-recurring

**25.) Deferred Revenue**
- Normal deferred revenue for the 12 months ended 6/30/03.
- Type of Adjustment: N/A

**26.) Ex Employee Receivable**
- On January 24, 2003, the Trustee filed a motion with the Bankruptcy Court seeking authorization to enter into a Termination and Employment Extension Agreement (the "Transition Agreement"), effective January 1, 2003, with Mr. Crowley to induce him to serve as CHC's Chief Transition and Restructuring Officer. Pursuant to the Transition Agreement, Mr. Crowley would have continued to render essentially the same services as previously provided to the Company.
- On March 3, 2003, the Bankruptcy Court denied the Trustee's motion for authorization to enter into the Transition Agreement. As a consequence, Mr. Crowley resigned from the Company effective March 31, 2003.
- During the period January 1, 2003 through March 31, 2003, the Company paid Mr. Crowley based on the executed Transition Agreement. The Trustee has requested repayment from Mr. Crowley of all amounts paid in the 2003 period for the difference between the bi-weekly salary of the expired employment agreement and the Transition Agreement. The total amount due is $76,000.
- Because the time period utilized for the calculation of EBITDA (12 months ended 6/30/03) only includes 9 months of CEO salary (July 2002 – March 2003), it would be appropriate to adjust and include 3 months (April – June) of expense or $179,000 ($650,000 annual CEO salary, excluding perquisites, with 10% included for benefits, or $715,000, divided by 12 months and multiplied by 3 months), but this figure is below the Advisors' materiality threshold.
- Type of Adjustment: Normalizing but below the Advisors' materiality threshold

**27.) MCC Commission Plan "True Up" for 2002**
- In June 2003, the Company recorded an expense of $387,000 in order to "true up" the Managed Care Consultant ("MCC") commission plan. This expense was for the January – December 2002 period.
- Based on preliminary estimates, the Company also expects an annual 2003 MCC commission plan cost of $387,000.
- The June 2003 "true up" is normal; however, the time period utilized for the calculation of EBITDA (12 months ended 6/30/03) only includes 6 months of 2002 (July – December); therefore, it would be appropriate to adjust out 6 months (January – June) or $193,500.
- However, because the Company estimates a similar $387,000 expense necessary for 2003, it is appropriate to add back an additional $193,500 to normalize the MCC commission plan expense for the 12 months ended 6/30/03, which effectively offsets the out-of-period adjustment discussed above.
- Because the Company has recorded an expense of $55,000 for the MCC commission plan for the 6 months ended 6/30/03; a $55,000 adjustment would be appropriate in order not to overstate the aggregate MCC commission plan expense for the 12 months ended 6/30/03, but this figure is below the Advisors' materiality threshold.
- Type of Adjustment: Normalizing but below the Advisors' materiality threshold



SSG CAPITAL ADVISORS, L.P.

EMB 006447

# EXHIBIT E

Saracco, Michael A.                                    3/30/2007

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, Chapter 11    :
Trustee of the                :
Post-Confirmation Bankruptcy  :
Estates of CORAM HEALTHCARE   :
CORPORATION, a Delaware       :
Corporation and of CORAM,     :
INC., a Delaware Corporation, :
              Plaintiff       : CASE NO.
      vs.                     : 04-1565
                              :
DANIEL D. CROWLEY; DONALD J.  :
AMARAL; WILLIAM J. CASEY;     :
L. PETER SMITH; AND SANDRA L. :
SMOLEY,                       :
              Defendants      :

Friday, March 30, 2007
10:01 a.m.
- - -

Videotape deposition of MICHAEL
A. SARACCO, held at the law offices of
Schnader Harrison Segal & Lewis, LLP,
1600 Market Street, Suite 3600,
Philadelphia, Pennsylvania, 19103,
pursuant to notice before Cynthia A.
Whyte, Registered Professional Reporter
and Notary Public.
- - -

## Page 2

1  A P P E A R A N C E S:
2    SCHNADER HARRISON SEGAL & LEWIS LLP
     Counsel for Plaintiff Arlin M. Adams,
3    Trustee
        1600 Market Street
4       Suite 3600
        Philadelphia, PA  19103
5       (215) 751-2529
6    BY:  MICHAEL J. BARRIE, ESQ.
          mbarrie@schnader.com
7
     AND:  BARRY E. BRESSLER, ESQ.
8          bbressler@schnader.com
9
     KEKER & VAN NEST LLP
10   Counsel for Defendant Daniel Crowley
        710 Sansome Street
11      San Francisco, CA  94111-1704
        (415) 391-5400
12
13   BY:  WARREN A. BRAUNIG, ESQ.
          wbraunig@kvn.com
14
15
16   ALSO PRESENT:   VINCENZO PETULLA,
                     Videographer
17
18
19
20
21
22
23
24
25

## Page 3

1         IT IS HEREBY STIPULATED AND
2  AGREED by and among counsel for the
3  respective parties hereto that the
4  filing, sealing and certification of the
5  within deposition shall be and the same
6  are hereby waived.
7         IT IS FURTHER STIPULATED
8  AND AGREED that all objections,
9  except as to the form of the
10 question, shall be reserved to the
11 time of the trial.
12        IT IS FURTHER STIPULATED AND
13 AGREED that the within deposition may be
14 signed before any Notary Public with the
15 same force and effect as if signed and
16 sworn to before the Court.
17
18
19
20
21
22
23
24
25

## Page 4

1              I N D E X
2  WITNESS:                        PAGE
3  MICHAEL A. SARACCO
4       By Mr. Braunig      6, 173
5       By Mr. Barrie          141
6         SARACCO EXHIBITS
7  NO.        DESCRIPTION       PAGE
8  Exhibit 1  Power Point
              Presentation        34
9
   Exhibit 2  Letter, 12/9/99, to
10            Fellow Coram Employee
              from Mr. Crowley     54
11
   Exhibit 3  Memo, 12/21/99, to List
12            from Mr. Crowley     56
13 Exhibit 4  Memo, 12/20/99, to Denver
              Planning Meeting Attendees
14            from Mr. Crowley     57
15 Exhibit 5  Transcript, 3/3/03   88
16 Exhibit 6  Power Point
              Presentation        98
17
   Exhibit 7  Agenda, 2/6/03     114
18
   Exhibit 8  Motion             131
19
   Exhibit 9  e-mail, 2/12/01, to Mr.
20            Davis from Mr. Saracco 151
21 Exhibit 10 e-mail, 10/22/03, to
              Mr. Koury from Mr.
22            Melancon           157
23 Exhibit 11 Letter, 12/16/99, to
              Denver Planning Meeting
24            Attendees from Mr.
              Crowley            166
25

Pages 1 to 4

## Page 125

1    A.   Yes.

2         MR. BARRIE:  Objection.  It was

3    August 2000.

4         MR. BRAUNIG:  I'm sorry.  Thank

5    you.

6    Q.   To correct the record, that was in

7    August of 2000, correct?

8    A.   Yes.

9    Q.   That would mean then, would it not,

10   that for much of Mr. Crowley's tenure as CEO

11   Coram was in Chapter 11 bankruptcy?

12   A.   Yes.

13   Q.   During the period Coram was in

14   bankruptcy, Coram continued to serve its

15   patients, correct?

16   A.   Yes.

17   Q.   The improvements that Coram made to

18   its mix of core and noncore therapies were all

19   made while Coram was in bankruptcy, correct?

20   A.   Yes.

21   Q.   I'm going to actually ask that a

22   separate way.

23        The improvements that Coram made to

24   its mix of core and noncore therapies

25   continued once -- withdrawn.

## Page 126

1         Is it correct that the changes that

2    Coram implemented to its mix of core and

3    noncore therapies began before Coram entered

4    Chapter 11 bankruptcy?

5    A.   Yes.

6    Q.   But those changes to mix continued

7    while Coram was in Chapter 11 bankruptcy,

8    correct?

9    A.   Yes.

10   Q.   Did being in bankruptcy affect

11   Coram's vendor relationships?

12   A.   No.

13   Q.   Did being in bankruptcy affect

14   Coram's ability to service its patients?

15   A.   No.

16   Q.   Did being in bankruptcy affect

17   Coram's ability to grow its business?

18   A.   Business grew.

19   Q.   So then the answer would be it

20   didn't affect Coram's ability to grow its

21   business?

22   A.   No.

23   Q.   Are you aware of any corporate

24   opportunities that Coram was unable to take

25   because it was in Chapter 11 bankruptcy?

## Page 127

1         MR. BARRIE:  Object to form.

2         You can answer if you can.

3    A.   I wouldn't know if -- beyond the

4    scope of, again, executing the plan that we

5    had to execute, I wouldn't know if there

6    were -- you know, I guess it depends on what

7    the word "opportunity" is.

8         We grew the business.  We serviced

9    our patients.  We maintained our vendor

10   relationships.  We maintained its presence in

11   the marketplace, probably surprising many

12   folks to be able to do that during a

13   bankruptcy.  I don't know if something was,

14   you know -- if something could have happened,

15   but we -- I think we had a very impressive

16   record during a bankruptcy which is, from what

17   I understand, is quite surprising for most

18   companies when they are in a bankruptcy.

19   Q.   The question that I was asking is

20   whether to your knowledge there were any

21   corporate opportunities that Coram was not

22   able to take because it was in Chapter 11

23   bankruptcy?

24        MR. BARRIE:  Objection.  Asked

25   and answered.  I believe he said he

## Page 128

1    didn't know.

2         THE WITNESS:  Yeah, I don't

3    know.

4         MR. BRAUNIG:  No; what he

5    testified was that he didn't know beyond

6    the scope of executing the plan.

7         THE WITNESS:  Right.

8         MR. BRAUNIG:  The question is:

9    Is he aware, based on his understanding,

10   are there any corporate opportunities

11   that Coram --

12        THE WITNESS:  I wasn't aware of

13   any.

14   Q.   You testified a moment ago that many

15   folks were probably surprised at Coram's

16   ability to maintain its vendor relationships

17   and its presence in the marketplace.

18        Did anyone express that to you at

19   any time?

20   A.   I would say that we -- that was

21   feedback that was second or third hand during

22   the planning meetings.  It was our job to

23   filter back information from the field both

24   positive and negative, and I think -- I think

25   where a lot of that came from was from the

Page 177

```
1                    CERTIFICATE
2          I HEREBY CERTIFY that the
3   proceedings, evidence and objections are
4   contained fully and accurately in the
5   stenographic notes taken by me on Friday,
6   March 30, 2007, and that this is a true and
7   correct transcript of same.
8
9
10
11
12
13          _____
14              Cynthia A. Whyte, RPR
15
16
17          (The foregoing certification of
18  this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)
22
23
24
25
```

Page 177

# EXHIBIT F

MAY 07 2002 12:52 FR CORAM HEALTHCARE    9164496059 TO 13104537470    P.02/05

CORAM HEALTHCARE

1125 Seventeenth Street
Suite 2100
Denver, Colorado 80202
303.292.4973 / 800 CORAM HC
303.298.0943 FAX
www.coramhealthcare.com

May 6, 2002

Judge Arlin M. Adams
Chapter 11 Trustee, Coram Healthcare Corporation
Schnader Harrison Segal & Lewis, LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103-728

Dear Judge Adams,

When we met in Denver you stressed that as Chapter 11 Trustee, your duties included maintaining close oversight of Coram's cash management. To that end, you requested that we report the detail of Coram's cash activities on a weekly basis. With the last several weekly reports now in hand, hopefully you can readily see that I have maintained a fairly disciplined and quite rigorous cash management program in this Company.

Prior to my joining Coram, Management took a deduction for tax purposes that has been subsequently disallowed, leaving a substantial tax and cash problem to be dealt with in the Chapter 11. The firm's cash resources were essentially uncontrolled. Coram's Accounts Receivables went uncollected, its Days Sales Outstanding ballooned, and Coram lived off of a steady diet of expensive *draws* until its Revolver was nearly exhausted. To fund its operations, Coram went from a zero Revolver balance on November 30, 1998 to ($44,000,000) prior to my arrival. The week before I joined Coram as CEO, the Company took a draw of $7,000,000 to fund payroll and get off "credit hold" with key vendors that refused to ship drugs needed in the field for infusion therapy. Not a pretty picture.

Immediately after I joined Coram, we went to a philosophy of "use it up, fix it up, wear it out, and do without". In essence, squeeze the buck. We set up goals to change the mix, to cut the costs, and to collect the cash. We began a thoughtful program targeted to collect our Accounts Receivable and to restore a real working relationship with Coram's vendors. In other words, we sought to restore Coram's ability to do business by improving cash flow, paying bills on time, and acting responsibly.



EXHIBIT
Adams 29
CW 3/28/00

WFF    1432

Page 2 of 4 Pages
Letter to Judge Adams, dated May 6, 2002

We believe that operations should generally be funded by properly managing the business. That's not what Coram had been doing. It was borrowing to fund Million Dollar sales meetings, fund its generous 401(k), and to pay for strategic forays that turned out to be serious Corporate mistakes. And, that's why we are quite proud of the fact that Coram has managed its affairs well enough not to need even one draw since January 22, 2000. In fact, we managed the Company well enough to not only completely pay back the revolver by August 2000, but to get Coram's bills paid current, improve its vendor relationships and eliminate all credit holds, and create a *reliable* positive daily operating cash balance, too.

Unfortunately, Your Honor, based on the Caremark, Aetna, and R Net issues, significant losses were recorded from 1995 through 1999. In the end, Coram amassed over $304,000,000 in debt by the end of 1999. In essence, the reason for the insolvency was two-fold. 1) The fact that Coram was in violation of its covenants and could not repay the principal on loans that were due, and 2) because of its losses, Coram no longer met the $75,000,000 Minimum Net Equity required to qualify for the public company exception under Stark II.

Of course, by now you have learned that Stark II is a key regulation that relates to Coram's ability to reasonably accept Medicare and MediCaid referrals. These referrals matter greatly to Coram because the Company generates the majority of its *Total* Gross Margin from Medicare and MediCaid patients. In my professional opinion, if Coram lost the Stark II exception, it simply would up-end Coram's ability to retain its Medicare and MediCaid referrals as well as most of its *other* business. That is because, in many circumstances, the same doctors that refer Medicare and/or MediCaid patients also refer Commercial patients. Once a doctor stops referring Medicare and/or MediCaid patients, it is most likely that their referrals of Commercial patients would dry up, too. With Coram's average patient only staying "on service" for approximately twenty-one (21) days . . . if referrals dried up, Coram's business could go away fairly quickly. We believe that qualifying for Stark II and being able to efficiently take Medicare and MediCaid patients matters. We also believe that the Gross Margins coming from Medicare and MediCaid are significant. The point is that without these patients. . . . Coram would no longer be a viable Company.

MAY 07 2002 12:53 FR CORAM HEALTHCARE      9164496059 TO 13104537470      P.04/05

Page 3 of 4 Pages
Letter to Judge Adams, dated May 6, 2002

From the table below you can easily see that Coram was "out of control" and made painful use of its Revolver to fund its insatiable appetite for cash. By their nature, revolvers are quite expensive. Coram's revolver was no exception in that it had a very high interest cost. Our view is that companies should manage their operations well enough to only borrow when it is necessary to fuel accretive and profitable growth.

Based upon your interest in Coram's cash situation, I thought you might like to see Coram's cash *history* both *before* and *after* I became CEO. Here is how Coram's cash situation developed from January 1, 1999 until August 1, 2000:

| Date | Borrowing On Revolver | Paydown | Revolver Balance Outstanding |
|---|---|---|---|
| 1/1/99 | | | 0 |
| 1/10/99 | $3,000,000 | | $ 3,000,000 |
| 1/14/99 | $5,000,000 | | $ 8,000,000 |
| 1/21/99 | $3,000,000 | | $11,000,000 |
| 1/25/99 | | ($1,000,000) | $10,000,000 |
| 1/26/99 | $1,000,000 | | $11,000,000 |
| 1/28/99 | | ($5,000,000) | $ 6,000,000 |
| 2/9/99 | $2,000,000 | | $ 8,000,000 |
| 2/18/99 | $1,000,000 | | $ 9,000,000 |
| 3/9/99 | $6,000,000 | | $15,000,000 |
| 4/14/99 | $7,500,000 | | $22,500,000 |
| 7/25/99 | $11,500,000 | | $34,000,000 |
| 7/26/99 | $3,000,000 | | $37,000,000 |
| 11/25/99* | $7,000,000 | | $44,000,000 |
| 1/5/00 | | ($3,000,000) | $41,000,000 |
| 1/22/00 | $1,500,000 | | $42,500,000 |
| 3/1/00 | | ($1,000,000) | $41,500,000 |
| 3/15/00 | | ($1,000,000) | $40,500,000 |
| 3/29/00 | | ($2,000,000) | $38,500,000 |
| 4/11/00 | | ($2,000,000) | $36,500,000 |
| 4/25/00 | | ($1,000,000) | $35,500,000 |
| 5/2/00 | | ($1,000,000) | $34,500,000 |
| 5/11/00 | | ($500,000) | $34,000,000 |
| 5/16/00 | | ($1,000,000) | $33,000,000 |
| 5/23/00 | | ($2,000,000) | $31,000,000 |
| 6/6/00 | | ($2,500,000) | $28,500,000 |
| 8/1/00 | | ($28,500,000) | 0 |

* Crowley was Appointed as CEO on 11/30/99.

WFF      1434

Page 4 of 4 Pages
Letter to Judge Adams, dated May 6, 2002

Analytics prove that paying down the Revolver substantially improved Coram's situation. There really is an "ITDA" in Ebitda. The cost of those Revolver funds versus the return on the capital employed was *negative*. Every day the Revolver was drawn was a net loss for Coram. By selling the firm's Pharmacy unit, Coram Prescription Services (CPS), Coram was able to eliminate a unit that was draining cash and had inferior margins (13% versus 27-28% on Infusion). With the closer management of operations and cash and the sale of CPS ... Coram paid back the Revolver saving Millions in net costs.

Of course, Coram has not been paying interest on its debts since filing for Chapter 11. In large measure, that's why Coram has been able to accumulate **$30,374,290.18** in its checkbook. Month to date Coram is cash flow positive (Receipts of $6,899,693.83 less Disbursements of $6,227,642.23). If the firm had to make the interest payment on the total debt outstanding (roughly a quarter of a Billion Dollars), it would have serious difficulty. It could not make the payments nor could it find the funds for working capital. Infusion companies buy their drugs and supplies, make payroll, and fund operations with cash needs in 0 to 30 days, while payors actually make their payments for services in 80-90 days. The debt is unmanageable, the Stark II issue remains, and Coram has a basic need for capital to fund its operations. Therein lies the need for a Reorganization.

Because Coram has the IRS liability and has a Balance Sheet loaded with Debt it cannot service or re-pay, absent a Plan of Reorganization, it is illogical to compare Coram to any *solvent* healthcare provider that does not have a quarter of a Billion Dollars of pre-petition debt on Net Revenue(s) of $400 Million, with Coram's Debt/Equity ratio, with Coram's Stark II reality, and Coram's need for working capital.

Your Honor, I recognize that you are still early in the fact gathering phase of your work. Hopefully, this paper will provide some useful detail about Coram, its history, and its day-to-day issue(s). If I can provide any other information that you feel is important please let me know and we will gather the data for you.

Sincerely,

Daniel D. Crowley
Chairman, President & CEO

** TOTAL PAGE.05 **

WFF        1435

# EXHIBIT G

CORAM HEALTHCARE

1675 Broadway
Suite 900
Denver, Colorado 80202
303.292.4973 / 800 CORAM HC
303.298.0043 FAX
www.coramhc.com

December 2, 2002

Judge Arlin M. Adams
Chapter 11 Trustee, Coram Healthcare Corporation
Schnader Harrison Segal & Lewis, LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103-7286

Subject: Weekly Report

Dear Judge Adams,

Attached is the Weekly Report for the week ended November 29, 2002. (See Attachment(s) #1 Treasury Cash Flow, #2 Cash Receipts, #3 Cash Disbursements, #4 Reorganization Checks/Wires Issued, #5 for the Significant Checks Issued/Wired, #6 Checks Issued/Wired related to Partnerships and Joint Ventures, and #7 Partnership and Joint Venture Equity Distributions.)

While we have yet to see the final numbers, Daily Sales Revenue for November, there is a possibility that daily sales will exceed $1,800,000 per day. This compares to Daily Sales Revenue of $1,662,000 in November 2001 and will be the 15th month in a row with net growth. *More significantly*, Coram has the possibility of actually exceeding the $1,793,000 per day that it recorded in November 1999 (before the Aetna and R Net impact began to diminish the firm). And . . . it appears that our mix of therapies sold remains solid as well. Good signs.

Sincerely,

Daniel D. Crowley
Chairman, President & CEO

cc:    Barry Bressler, Esq.
       Joseph Devine, Esq.
       Scott Schreiber, Esq.
       Allen Marabito, Esq.
       Scott Danitz



EXHIBIT
Adams 31
CW 3/28/09

CROWLEYKVN.008045

**Coram Healthcare Corporation - Consolidated (1)**
**Treasury Cash Flow Statement (2)**
**(In Thousands)**

Proprietary Confidential

| For Period Ending | 11/04/2002 | Week 11/08/2002 | Week 11/15/2002 | Week 11/22/2002 | Week 11/29/2002 | Nov '02 |
|---|---|---|---|---|---|---|
| | | | Month of November 2002 | | | |
| **Operating Cash Flows** | | | | | | |
| Infusion | $ 1,630 | $ 6,765 | $ 8,195 | $ 7,253 | $ 7,328 | $ 31,201 |
| Clinical Research | - | 33 | 31 | 11 | 2 | 77 |
| Partnerships (3) | - | - | - | - | 350 | 350 |
| Other | - | 64 | 31 | 107 | 2 | 204 |
| **Total Cash Receipts** | 1,650 | 6,862 | 8,257 | 7,381 | 7,682 | 31,832 |
| Cash Disbursements (see attached) | 2,327 | 10,601 | 5,346 | 10,560 | 4,044 | 32,878 |
| **Total Operating Cash Flow - Increase/(Decrease)** | (677) | (3,739) | 2,911 | (3,179) | 3,638 | (1,046) |
| **Other Cash Flow** | | | | | | |
| **Cash Receipts** | | | | | | |
| Interest/Misc. | 50 | 3 | - | 1 | - | 54 |
| Collateral and Deposits | - | - | - | - | - | - |
| **Total** | 50 | 3 | - | 1 | - | 54 |
| **Cash Disbursements** | | | | | | |
| Administrative Professionals & Bankruptcy Related Expenses (see attached) | - | 153 | 51 | 181 | - | 385 |
| Bank and Merchant Service Fees | - | 4 | - | - | 21 | 25 |
| Collateral and Deposits | - | - | - | - | - | - |
| **Total** | - | 157 | 51 | 181 | 21 | 410 |
| **Total Other Cash Flow - Increase/(Decrease)** | 50 | (154) | (51) | (180) | (21) | (356) |
| **Total Cash Flow - Increase/(Decrease)** | $ (627) | $ (3,893) | $ 2,860 | $ (3,359) | $ 3,617 | $ (1,402) |
| **Beginning Treasury Cash** | $ 38,431 | $ 37,804 | $ 33,911 | $ 35,771 | $ 33,412 | $ 38,431 |
| **Ending Treasury Cash** | 37,804 | 33,911 | 36,771 | 33,412 | 37,029 | 37,029 |
| Increase (Decrease) | (627) | (3,893) | 2,860 | (3,359) | 3,617 | (1,402) |

(1) This schedule excludes Canadian cash and cash held by affiliated partnerships and joint ventures.
(2) This schedule represents bank cash receipts and clearings unless otherwise noted.
(3) Equity distributions or payments to Coram from affiliated partnerships and joint ventures.

CROWLEYKVN 008046

Attachment I

12/02/2002

Page 1 of 7

Proprietary Confidential

**Coram Healthcare Corporation - Consolidated (1)**
**Cash Receipts (2)**
**(In Thousands)**

### Month of November 2002

| For Period Ending | 11/01/2002 | Week 11/08/2002 | Week 11/15/2002 | Week 11/22/2002 | Week 11/29/2002 | Monthly Total |
|---|---|---|---|---|---|---|
| Infusion | $ 1,650 | $ 6,765 | $ 8,195 | $ 7,263 | $ 7,328 | $ 31,201 |
| Clinical Research | - | 33 | 31 | 11 | 2 | 77 |
| Partnerships (3) | - | - | - | - | 350 | 350 |
| Other | - | 64 | 31 | 107 | 2 | 204 |
| TOTAL CASH RECEIPTS | $ 1,650 | $ 6,862 | $ 8,257 | $ 7,381 | $ 7,682 | $ 31,832 |

| Daily Averages | Daily | Daily | Daily | Daily | Daily | MTD |
|---|---|---|---|---|---|---|
| Total Bank Days | 1 | 5 | 4 | 5 | 4 | 19 |
| Total Daily Average | $ 1,650 | $ 1,372 | $ 2,064 | $ 1,476 | $ 1,921 | $ 1,675 |
| Infusion | 1,650 | 1,353 | 2,049 | 1,453 | 1,832 | 1,642 |
| Clinical Research | - | 7 | - | 2 | 1 | 4 |
| Partnerships (3) | - | - | - | - | 88 | 18 |
| Other | - | 13 | 8 | 21 | 1 | 11 |

(1) This schedule excludes Canadian cash and cash held by affiliated partnerships and joint ventures.
(2) This schedule represents bank cash receipts unless otherwise noted.
(3) Equity distributions or payments to Coram from affiliated partnerships and joint ventures.

CROWLEYRVN 008047

Attachment 2

12/02/2002

Proprietary Confidential

**Coram Healthcare Corporation - Consolidated (1)**
**Cash Disbursements (2)**
**(In Thousands)**

| For Period Ending | Week 11/01/2002 | Week 11/08/2002 | Week 11/15/2002 | Week 11/22/2002 | Week 11/29/2002 | Monthly Total |
|---|---|---|---|---|---|---|
| | | | Month of November 2002 | | | |
| Drugs & Supplies and Other, Including Fixed Assets | $ 1,987 | $ 6,011 | $ 4,624 | $ 6,085 | $ 3,435 | $ 22,142 |
| Payroll (4) | 47 | 4,462 | 415 | 4,272 | 377 | 9,573 |
| Benefits | 129 | 128 | 129 | 203 | 71 | 660 |
| 401(k) Employee Withholdings (4) | 164 | - | 178 | - | 161 | 503 |
| Total Payroll & Related | 340 | 4,590 | 722 | 4,475 | 609 | 10,736 |
| Total Operating Disbursements (3) | $ 2,327 | $ 10,601 | $ 5,346 | $ 10,560 | $ 4,044 | $ 32,878 |

(1) This schedule excludes Canadian cash and cash held by affiliated partnerships and joint ventures.
(2) This schedule represents bank cash clearings unless otherwise noted.
(3) Total Operating Disbursements exclude interest, collateral and deposits, administrative professionals and bankruptcy related expenses.
(4) Payroll is bi-weekly and 401(k) employee withholding remittance to the plan administrator typically occurs the week following a payroll week.

CROWLEYKVN 008048

Attachment 3

12/02/2002

Page 3 of 7

Coram Healthcare Corporation
Reorganization, Professional & Other Checks Cleared & Wires Issued

Proprietary Confidential

| For Period Ended: | Week 11/01/2002 | Week 11/08/2002 | Week 11/15/2002 | Week 11/22/2002 | Week 11/29/2002 | Monthly Total |
|---|---|---|---|---|---|---|
| **NORMAL COURSE ADMINISTRATIVE PROFESSIONALS:** | | | | | | |
| Ernst & Young, LLP | $ | $ | $ 51,182 | $ 121,335 | $ | $ 172,517 |
| Hodusd, Hanley, Koenigsknecht & Entzlat | - | - | - | - | - | - |
| Michael J Koenigsknecht & Associates LLC | - | - | - | 59,644 | - | 59,644 |
| Reed Smith, LLP | - | 118,759 | - | - | - | 118,759 |
| Weil, Gotshal (ZenMatter) | - | - | - | - | - | - |
| **Total Normal Course Administrative Professionals** | - | 118,759 | 51,182 | 180,779 | - | 349,720 |
| **BANKRUPTCY PROFESSIONALS:** | | | | | | |
| Creditors | | | | | | |
| Richards, Layton & Finger, P.A. | - | - | - | - | - | - |
| Wachtell, Lipton, Rosen & Katz | - | - | - | - | - | - |
| **Total Creditors** | - | - | - | - | - | - |
| Debtors | | | | | | |
| Chaso Capital Partners, LLC | - | - | - | - | - | - |
| Chlopak, Leonard (Public Relations) | - | - | - | - | - | - |
| Gavin Anderson and Company | - | 35,959 | - | - | - | 35,959 |
| Kasowitz, Benson, Torres & Friedman, LLP | - | - | - | - | - | - |
| Kramer Levin Naftalis & Frankel LLP | - | - | - | - | - | - |
| Mangerliey Alk (Debtors' Claims) | - | - | - | - | - | - |
| Pachulski, Stang, Ziehl, Young & Jones P.C. | - | - | - | - | - | - |
| **Total Debtors** | - | 35,959 | - | - | - | 35,959 |
| Chapter 11 Trustee and Related Professionals | | | | | | |
| Schnader Harrison Segal and Lewis, LLP | - | - | - | - | - | - |
| Weir & Partners LLP | - | - | - | - | - | - |
| **Total Chapter 11 Trustee and Related Professionals** | - | - | - | - | - | - |
| Equity Committee | | | | | | |
| Alleheimer & Gray | - | - | - | - | - | - |
| Deloitte & Touche, LLP | - | - | - | - | - | - |
| Saul Ewing, LLP | - | - | - | - | - | - |
| **Total Equity Committee** | - | - | - | - | - | - |
| Office of the US Trustee | | | | | | |
| Office of the US Trustee | - | - | - | - | - | - |
| **Total Bankruptcy Professionals** | - | 35,959 | - | - | - | 35,959 |
| **Totals** | $ - | $ 152,718 | $ 51,182 | $ 180,779 | $ - | $ 384,678 |

CROWLEYKVN 008049

Attachment 4

Corsin Healthcare Corporation - Consolidated
Checks Issued and Wire Transfer Detail
Week Ended November 29, 2002

Proprietary Confidential

| Significant Checks Issued & Wire Transfer | Scope | Payee | Description | Approval Type | Total Issued | Ordinary Course | Non-Ordinary Course |
|---|---|---|---|---|---|---|---|
| General & Fixed Assets, other than IT Project | >$25k | CIGNA | Employee 401 (k) Contributions - 11/22/2002 Payroll | (2) | $ 181,409 | $ 181,409 | $ |
| | | LMIA | Employee Life Insurance Premiums | (2) | 100,358 | 100,358 | |
| | | AT&T | Telephone - Long Distance Charges | (2) | 77,643 | 77,643 | |
| | | United Healthcare | Self-Insured Employee Medical Plan Claims | (1) | 68,835 | 68,835 | |
| | | Rexptronics, Inc. | DME Oxygen and Other Equipment Purchases | (3) | 34,912 | 34,912 | |
| | | Delaware Secretary of State | Franchise Taxes | (3) | 30,000 | 30,000 | |
| | | J.Y. Pricing, Inc. | Printing and Forms | (7) | 26,004 | 26,004 | |
| Contract Labor & Nursing | >$25k | None | | | | | |
| Employee Expense Reports | >$15k | None | | | | | |
| Leases/Rent/Utilities/Taxes | >$25k | Embay, Inc. | National Vehicle Lease and Maintenance | (2) | 65,337 | 65,337 | |
| | | Mircom, Inc. | Monthly Facility Lease - Corporate Office | (2) | 46,310 | 46,310 | |
| | | Cabot Acquisition, LLC | Monthly Facility Lease - Mt. Prospect, IL | (2) | 42,918 | 42,918 | |
| | | Dolan Associates, LTD | Monthly Facility Lease - Bensenheim, IL | (2) | 37,878 | 37,878 | |
| | | 45 South Service Road, LLC | Monthly Facility Lease - Fairview, NY | (2) | 34,180 | 34,180 | |
| | | Commercenter Realty | Monthly Facility Lease - Totowa, NJ | (2) | 30,574 | 30,574 | |
| | | Halfpenny Management Company | Monthly Facility Lease - Malvern, PA | (2) | 28,256 | 28,256 | |
| | | CRT Realty Trust | Monthly Facility Lease - Hopkinton, MA | (2) | 25,650 | 25,650 | |
| Legal Professionals | >$25k | None | | | | | |
| Patient Refunds | >$25k | None | | | | | |
| Re-engineering IT Project, including Fixed Assets | >$25k | Lawson Software | Application Consulting Support | (3) | 27,651 | 27,651 | |
| Drugs & Supplies | >$100k | Cardinal Health, Inc. - Wire Transfer | Drugs & Supplies | (2) | 1,315,191 | 1,315,191 | |
| | | FFF Enterprises, Inc. | Blood Products/IVIG Drugs | (2) | 552,002 | 552,002 | |
| | | Tracker Healthcare Corporation | Drugs & Supplies | (2) | 454,541 | 454,541 | |
| | | Medical Specialties Distributors | Drugs & Supplies | (2) | 125,454 | 125,454 | |
| | | B Braun Medical Inc. | Drugs & Supplies | (1) | 139,507 | 139,507 | |
| | | Wyeth-Ahearst Laboratories | Drugs & Supplies | (2) | 138,209 | 138,209 | |
| Administrative Professionals & Bankruptcy Related Expenses | All | None | | | | | |
| | | | Total Significant Items | | $ 3,815,920 | $ 3,815,920 | $ |
| | | | Total Checks Issued & Wire Transfers | | $ 5,915,858 | | |
| | | | Percent Scheduled | | 65.6% | | |

Notes:
(1) Expenditure pre-approved by Chapter 11 Trustee. If not referenced, none for the reporting period.
(2) Expenditure pre-approved not required because of its exemption pursuant to the Expenditure Approval Authority
     Policy submitted to the Bankruptcy Court by the Trustee (approved by the Bankruptcy Court on July 24, 2002).
(3) Expenditure exempt from pre-approval because it is less than $50,000. If not referenced, none for the reporting period.

Report Presentation Comments:
- Does not represent total disbursements clearing the bank in the Treasury Cash Flow Statement
- Excludes payroll transactions
- Excludes Partnership and Joint Venture transactions. See separate schedule for Partnerships and Joint Ventures (attached)
- When scheduled, expenditures denominated in foreign currency (Canadian dollars) are translated using the applicable foreign exchange rate

CROWLEYKVN 008050

Attachment 5

12/02/2002

Coram Healthcare Corporation - Partnerships and Joint Ventures
Checks Issued and Wire Transfer Detail
Week Ended November 29, 2002

Proprietary Confidential

| Significant Checks Issued & Wire Transfers | Scope | Payor / Payee | Description | Approval Type | Total Issued | Ordinary Course | Non-Ordinary Course |
|---|---|---|---|---|---|---|---|
| General & Fixed Assets, other than IT Project | >$25k | Carolina Home Therapeutics / Coram Healthcare Corporation | Settlement of intercompany liability in the ordinary course of business | (2) | $ 100,000 | $ 100,000 | $ |
| | | ASC Infusion Therapy / Coram Healthcare Corporation | Settlement of intercompany liability in the ordinary course of business | (2) | 85,000 | 85,000 | |
| | | Wisconsin I.V. - Fox Valley / Coram Healthcare Corporation | Settlement of intercompany liability in the ordinary course of business | (2) | 50,000 | 50,000 | |
| | | SSM Infusion Services, L.L.C. / Coram Healthcare Corporation | Settlement of intercompany liability in the ordinary course of business | (2) | 40,000 | 40,000 | |
| Contract Labor & Nursing | >$25k | None | | | | | |
| Employee Expense Reports | >$15k | None | | | | | |
| Leases/Rents/Utilities/Taxes | >$25k | None | | | | | |
| Legal Professionals | >$25k | None | | | | | |
| Patient Refunds | >$25k | None | | | | | |
| Re-engineering IT Project, including Fixed Assets | >$25k | None | | | | | |
| Drugs & Supplies | >$100k | None | | | | | |
| Administrative Professionals & Bankruptcy Related Expenses | All | None | | | | | |
| | | | Total Significant Items | | $ 275,000 | $ 275,000 | $ |

Notes:
(1) Expenditure pre-approved by Chapter 11 Trustee. If not referenced, none for the reporting period.
(2) Expenditure pre-approved not required because of its exemption pursuant to the Expenditure Approval Authority
    Policy submitted to the Bankruptcy Court by the Trustee (approved by the Bankruptcy Court on July 24, 2002).
    If not referenced, none for the reporting period
(3) Expenditure exempt from pre-approved because it is less than $50,000. If not referenced, none for the reporting period.

Report Presentation Comments:
 - Excludes payroll transactions
 - Only Partnerships and Joint Ventures included herein
 - Wisconsin I.V. - Fox Valley is 50% owned by each of Wisconsin I.V. L.L.C. and Ministry Home Care, Inc.
   In turn, Wisconsin I.V. LLC is 50% owned by each of Durither Health Services, Inc. and Ministry Home Care, Inc.

CROWLEY KVN 008051

Attachment 6

- 12/02/2002

Page 6 of 7

Coram Healthcare Corporation - Partnerships and Joint Ventures
Equity Distributions
Week Ended November 29, 2002

Proprietary Confidential

| Payor Partnership or Joint Venture | Scope | Payee | Description | Approval Type | Total Issued | Ordinary Course | Non-Ordinary Course |
|---|---|---|---|---|---|---|---|
| ABC Infusion Therapy | All | Alexian Brothers Medical Center | Distribution effected November 27, 2002 | (2) | $ 50,000 | $ 50,000 | $ - |
| | All | Coram Healthcare Corporation | Distribution effected November 27, 2002 | (2) | 50,000 | 50,000 | - |
| Wisconsin I.V. - Fox Valley | All | Ministry Home Health | Distribution effected November 27, 2002 | (2) | 25,000 | 25,000 | - |
| | All | Wisconsin I.V., L.L.C. | Distribution effected November 27, 2002 | (2) | 25,000 | 25,000 | - |
| SSM Infusion Services, L.L.C. | All | SSM DePaul Health Services Hospital | Distribution effected November 27, 2002 | (2) | 25,000 | 25,000 | - |
| | All | Coram Healthcare Corporation | Distribution effected November 27, 2002 | (2) | 25,000 | 25,000 | - |
| | | Total Equity Distributions | | | $ 200,000 | $ 200,000 | $ - |

Notes:
(1) Expenditure pre-approved by Chapter 11 Trustee, if not referenced, none for the reporting period.
(2) Expenditure pre-approval not required because of its exemption pursuant to the Expenditure Approval Authority
    Policy submitted to the Bankruptcy Court by the Trustee (approved by the Bankruptcy Court on July 24, 2001).
    If not referenced, none for the reporting period
(3) Expenditure exempt from pre-approval because it is less than $50,000. If not referenced, none for the reporting period.

Report Presentation Comments:
· Wisconsin I.V. - Fox Valley is 50%-owned by each of Wisconsin I.V. L.L.C. and Ministry Home Care, Inc.
  In turn, Wisconsin I.V. LLC is 50%-owned by each of Curaflex Health Services, Inc. and Ministry Home Care, Inc.
· When scheduled, expenditures denominated in foreign currency (Canadian dollars) are translated using the applicable foreign exchange rate

CROWLEYKYN 008052

Attachment 7