# EXHIBIT K

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JULY 20, 2007

ARLIN M. ADAMS, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of
CORAM HEALTHCARE CORPORATION, a Delaware Corporation, and of CORAM,
INC., a Delaware Corporation, Plaintiff

v.

DANIEL D. CROWLEY, Defendant

CASE NO. 04-1565 (SLR)

REPORT OF
MICHAEL G. UELTZEN, CPA



UELTZEN
& COMPANY, LLP
CERTIFIED PUBLIC ACCOUNTANTS

1. INTRODUCTION AND BACKGROUND

I, Michael G. Ueltzen, a partner with Ueltzen & Company, LLP, have been retained by Keker & Van Nest, LLP, counsel for defendant Daniel D. Crowley in connection with the proceeding entitled *Arlin M. Adams, Chapter 11 Trustee of the Post-Confirmation Bankruptcy Estates of Coram Healthcare Corporation, a Delaware Corporation, and of Coram, Inc., A Delaware Corporation v. Daniel D. Crowley* filed in the U.S. District Court for the District of Delaware.

Coram Healthcare and Coram, Inc. ("Coram") were in the business of providing alternative site infusion therapy and related services. Coram filed for Chapter 11 bankruptcy protection on August 8, 2000. Coram's first reorganization plan was rejected by the bankruptcy court on December 21, 2000. A second reorganization plan was rejected by the bankruptcy court on December 21, 2001. A third reorganization plan was confirmed in November 2004.

In December of 2004, Trustee Arlin M. Adams filed suit against Daniel Crowley, Coram's Chief Executive Officer from November 1999 through March 2003, alleging that Crowley breached his fiduciary duty to Coram and that as a result Coram's bankruptcy was unnecessarily protracted. Specifically, the Trustee claims that absent Crowley's alleged breach of fiduciary duty, Coram's first bankruptcy plan would have been approved. On June 11, 2007, the Trustee served an expert report prepared by Jeffrey L. Baliban of National Economic Research Associates ("NERA") that purports to calculate damages incurred by Coram as a result of the protracted bankruptcy.

2. NATURE AND SCOPE OF ASSIGNMENT

The purpose of my retention has been to review and comment upon the Baliban report, and to quantify any damages suffered by Coram allocable to the employment of Crowley.

In the course of preparing my analyses, I have:

➢ Reviewed data produced by the parties and made available to me.

➢ Reviewed and considered the methods of calculating damages appropriate for such matters.

➢ Drawn on my collective experience in similar matters.

➢ Incorporated all of this information into findings and observations I consider appropriate in this situation.

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 2

3.    **SUMMARY OF OPINIONS**

*a.    Indirect Costs of Extended Bankruptcy Resulting from Crowley Employment*

In my review I have concluded:

(1) No empirical evidence has been produced to support the calculation of any alleged indirect costs of bankruptcy suffered by Coram.

(2) No empirical evidence has been produced to allocate any alleged indirect costs of Coram's bankruptcy to Crowley.

(3) The Baliban report's attempt to quantify Coram's alleged indirect costs of bankruptcy is flawed as to both theory and methodology.

*b.    Direct Costs of Extended Bankruptcy Resulting from Crowley Employment*

I have concluded the following with respect to the direct costs of Coram's extended bankruptcy:

(1) Consistent with Baliban, I have been asked to assume that the only allocable direct costs of Coram's extended bankruptcy are those legal and administrative fees and expense reimbursements paid to consultants for services and expenses. I have been further asked to consider only such fees and expenses occurring within the time frame between the Bankruptcy Court's denial of the Company's first and second plans of reorganization (i.e. from December 21, 2000 through December 21, 2001). I have calculated such fees and expenses in the amounts of $12,762,310 and $1,096,819 respectively, for a total of $13,859,129 (see discussion at *4.b.* below and Exhibit G).

(2) These total fees and expenses should be offset by quantifiable mitigating factors that resulted from Crowley's actions as CEO, as well as compensation concessions made by Crowley. I have calculated such potential quantifiable mitigating factors in the amount of approximately $84 million (see discussion at *4b.* below and Exhibit J).

Given the fact that the total quantifiable financial benefits and concessions resulting from Crowley's employment exceed the allocable direct costs of Coram's extended bankruptcy, it is my opinion that Coram suffered no net damages allocable to the employment of Crowley.

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 3

4.    SUMMARY OF ANALYSIS

*a.    Indirect Costs of Bankruptcy*

*(1)    Assumptions regarding Coram's alleged incurrence of indirect costs*

According to the Baliban report, "indirect bankruptcy costs relate to lost business, profits and other opportunity costs, and are ... difficult to measure."[1]  The Baliban report goes on to quote a study by Stephen Cays, indicating that indirect bankruptcy costs can include "lost sales from falling demand as a result of customer concerns over future service difficulties, declining margins resulting from increased input costs from suppliers, loss of key personnel, and loss of management time and effort."[2]

The Baliban report also quoted an article by Lawrence Weiss as stating that indirect costs of bankruptcy "include a range of unobservable opportunity costs,...including lost sales...Customers may become concerned about assured supply or warranties...Firms may lose key employees or have to pay more to keep them from abandoning a troubled firm. Suppliers may refuse to ship on favorable credit terms, and the firm's costs of capital may increase.  Management attention is focused on the bankruptcy, increasing the firm's vulnerability to competitors."[3]

Significantly absent from the Baliban report are any opinions offered by authors of articles that are contained in the NERA files produced in this matter concluding that businesses do not suffer adverse consequences from bankruptcy.  For example, the Baliban report does not address a conclusion reached in a study by authors Avner Kalay, Rajeev Singhal and Elizabeth Tashjian that "our evidence is consistent with the hypothesis that Chapter 11, if anything, provides net benefits to bankrupt firms...Overall, our empirical evidence is inconsistent with the hypothesis that Chapter 11 results in net indirect costs."[4]

In order to conclude that Coram "likely suffered these indirect costs of bankruptcy", the Baliban report includes excerpts from deposition testimony.  Given the substantial amount of deposition testimony taken in this matter, the presumption that these excerpts represent the best evidence of Coram's incurrence of indirect

---

[1] Baliban report, p. 2.
[2] Quoted in Baliban report, p. 3.
[3] Quoted in Baliban report, p. 4.
[4] Baliban workpaper file at Bates 000827 and 000854.

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 4

costs of bankruptcy is troublesome. In fact, the testimony of these deponents is far
from conclusive as to the existence of these costs, as follows:

> *Deposition of Michael A. Saracco (President of Specialty Services, Senior Vice
> President):*
> (as to the concerns of Coram's third party payers):  "Overall the
> majority of payers really didn't have issue..."[5]

> "I don't think you can sit and say how much better or how much
> different would it or could it have been..."[6]

> *Deposition of Allan J. Marabito (Executive Vice President, subsequently interim
> Chief Executive Officer):*
> (as to the concerns of vendors or customers):  "There may have been
> some that were troubled..."[7]

> "Coram lost a degree of flexibility in the bankruptcy process.  For
> example, under *Judge Adams'* stewardship, we were not very
> aggressive..."[8]

> *Deposition of Scott Danitz (Chief Financial Officer):*
> (as to the concerns of vendors or suppliers):
> "Q:  Do you recall that such concerns changed at all after the first plan
> of reorganization?
>   A: No."[9]

> *Deposition of Kurt Davis (Vice President of Investor Relations/Vice President of
> Corporate Communications):*
> (as Coram's competitors' potential attempt to use Coram's bankruptcy
> to their advantage):  "...it was represented in some of the management
> meetings that there had been some attempts by the competitors to do
> that...it wasn't rampant, to my recollection..."[10]

Additional comments contained in the NERA materials produced in this matter

---

[5] Quoted in Baliban report, p. 4.
[6] Quoted in Baliban report, p. 5.
[7] Quoted in Baliban report, p. 5.
[8] Quoted in Baliban report, p. 5.
[9] Quoted in Baliban report, p. 6.
[10] Quoted in Baliban report, p. 7.

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 5

regarding the effect of Coram's bankruptcy that were omitted from the Baliban report include the following:

> *Deposition of Michael A. Saracco (President of Specialty Services, Senior Vice President):*
> "Q: Did being in bankruptcy affect Coram's vendor relationships?
>  A: No."
>
> "Q: Did being in bankruptcy affect Coram's ability to service its patients?
>  A: No."
>
> "Q: Did being in bankruptcy affect Coram's ability to grow its business?
>  A: Business grew."
>
> "Q: So then the answer would be it didn't affect Coram's ability to grow its business?
>  A: No."
>
> "Q: Are you aware of any acts Dan Crowley took as CEO of Coram that were not in the best interests of Coram?
>  A: No."
>
> "Q: Are you aware of anything Dan Crowley could have done to benefit Coram during his years as CEO that he did not do?
>  A: No."[11]

The Baliban report also quotes from the Company's SEC filings as support for the incurrence of indirect costs. Closer reading of these excerpts indicates that they primarily consist of disclosures regarding the status of the Company's bankruptcy and corresponding disclosure statements that the Company's operations could be impacted.

While the Baliban report concludes that "Based on these comments, it is clear that Coram both anticipated and likely suffered some impact of indirect costs from its protracted bankruptcy"[12], I cannot conclude likewise from these limited deposition and SEC report excerpts.

---

[11] Baliban workpaper file at Bates 000760 to 000761.
[12] Baliban report, p. 11.

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 6

In fact, the Baliban report is missing key elements including:

(1) No attempt appears to have been made to ascertain the extent to which specific customers, suppliers, or employees reacted to Coram's extended bankruptcy status in such a manner as to financially damage the Company.

(2) No attempt appears to have been made to interview any customers, suppliers or employees.

(3) No attempt appears to have been made to identify any specific customer relationships that were lost or impaired due to Coram's extended bankruptcy, nor has any attempt been made to specifically quantify the amount of any revenue lost due to the bankruptcy.

(4) No attempt appears to have been made to identify any specific supplier relationships that were lost or impaired due to Coram's extended bankruptcy, nor has any attempt been made to specifically quantify the amount of any costs of sales or services to Coram that increased due to the bankruptcy.

(5) No attempt appears to have been made to identify any specific employee relationships that were impaired by Coram's extended bankruptcy, nor has any attempt been made to specifically quantify the amount of any employee compensation or related expenses that increased as a result of the extended Coram bankruptcy.

In the recent years prior to its bankruptcy filing, Coram had faced a substantial number of issues. Incurrence of substantial debt in connection with the Caremark acquisition, litigation involving the Aetna contract, and continuing Stark II compliance concerns were all plaguing the Company well prior to its bankruptcy filing. In fact, one relevant commentary as to these issues was quoted in the Baliban report and is reproduced here:

> *"September's Revenue looks like it came in at approximately $29.4 Million (the business forecast plan was $36.1 Million). Reasons: R Net implosion in the Eastern Region, Medicaid reimbursement level declines, tighter administration of the admissions grids, loss of the Aetna/US Healthcare/Prudential/Humana business, staff turnover, and, of course, the filing of Chapter 11."*[13]

---

[13] Quoted in Baliban report, p. 8.

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 7

It is significant to note that this quote came from a Crowley letter to the Coram Board of Directors dated **October 5, 2000**, i.e. prior to the hearing on the Coram first plan of reorganization. This indicates that, despite Crowley's best efforts, Coram was subject to market forces that were independent of the filing of Chapter 11. In addition, to the extent that any customers, suppliers, or employees made any bankruptcy-related decisions that could have financially impaired Coram, the question remains as to whether these decisions were made in reaction to the initial bankruptcy filing. To the extent such decisions were made at that time (perhaps in part due to the impending bankruptcy, or perhaps due to Coram's historical financial performance), then any permanent loss of revenue or increase in operating expenses resulting from such actions can be ascribed to Coram's initial bankruptcy status rather than to any extension of the bankruptcy process (or the actions of Crowley).

The Baliban report relies on a few excerpts from deposition transcripts and SEC filings to conclude that Coram suffered indirect costs of bankruptcy. But, again, Baliban made no attempt to specifically identify any customers, suppliers or employees who made decisions that were financially harmful to Coram, nor was any apparent attempt made to quantify the financial impact of any such decisions. Likewise, Baliban made no attempt to ascertain, had any such decisions in fact been made, whether these decisions were made in reaction to Coram's initial filing or historical performance as opposed to Coram's extended bankruptcy. Accordingly, Baliban has presented no empirical evidence to support the calculation of any alleged indirect costs of bankruptcy suffered by **Coram**.

(2)    *Relationship of Coram's alleged indirect costs to Crowley*

Similar to its analysis regarding Coram's alleged incurrence of indirect costs of bankruptcy, the Baliban report then attributes these costs to Crowley's alleged conflict of interest without any substantive analysis. Baliban seems to be relying on an assumption regarding the Bankruptcy Court's opinions rejecting the first and second plans of reorganization, in order to therefore conclude that any costs of bankruptcy extending beyond the date of rejection of the first plan would automatically be attributable to Crowley.

Baliban has performed no analysis to determine whether specific actions were undertaken by Coram customers, suppliers, and/or employees that could have harmed Coram's financial performance, whether any such actions were the result of Coram's historical pre-bankruptcy performance, whether any such actions were the

In Re: Arlin M. Adams v. Daniel D. Crowley
Report of Michael G. Ueltzen
July 20, 2007

Page 8

result of Coram's initial bankruptcy filing, or whether any such actions actually resulted from Coram's extended bankruptcy. Moreover, Baliban performed no analysis to determine whether, in fact, any portion of Coram's extended bankruptcy period could even be attributed to Crowley (as opposed to the actions of other parties which may well have served to unduly extend the bankruptcy period).

As mentioned above, Baliban should logically have examined specific customer, supplier and employee relationships in order to determine the specific cause of any deterioration of such relationships, and then calculated the resulting specific economic impact of such impaired relationships attributable to the either the pre-bankruptcy financial condition of Coram, the initial bankruptcy filing by Coram, the rejection of the first and second plans of reorganization, or to any extended period of bankruptcy caused by other parties.

Baliban (after having assumed that such indirect costs existed in the first place, as we have commented above), relies solely on the assumption that such indirect costs are automatically attributable to Crowley. Such attribution to Crowley is mere speculation unaccompanied by any financial analysis of customer, supplier and/or employee relationships. Further, given the continued presence of Crowley throughout 2002 and through March of 2003 (due to his retention by the Trustee), it is certainly conceivable that Crowley had continued to prevent any further deterioration of customer, supplier and employer relationships beyond those which may have occurred as a result of the initial bankruptcy filing alone.

Evidence of this is referenced in the Trustee's January 2003 motion to the bankruptcy court to extend Crowley's employment, in which the trustee states:

> "The Trustee's evaluation is that Crowley has operated the company profitably and efficiently. Under Crowley, notwithstanding being in these bankruptcy proceedings, the Debtors have experienced positive operating margins and EBITDA, reduced cost of services, reduced operating costs, improved inventory management, improved information systems, improved management tools, and maintained a stable cash position with no net borrowing to fund post-petition operations.
>
> EBITDA has substantially increased during the period of Crowley's stewardship of the company. From 1995 through 1999, a time prior to Crowley's employment, the Debtors' EBITDA was a negative $37 million. From January 2000 through September 2002, the Debtors experienced $83 million in positive EBITDA, a $120 million improvement under Crowley's

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 9

> *management. For the first nine months of 2002 (including the six months after the Trustee was appointed), EBITDA was a positive $21 million; by contrast, EBITDA was negative $54 million for the year ended December 31, 1999.*
>
> *Revenue and gross profit are also increasing. For the nine-month period ended September 30, 2002, the Debtors' revenue rose $31 million, or 11 percent, from the same period the year before, resulting in an increased gross profit of $9 million. Indeed, revenue was higher during each month of 2002 than during the same month in 2001."*[14]

In the absence of specific analyses of the motivations and actions of those customers, suppliers and/or employees which could have caused indirect costs to occur, Baliban has presented no empirical evidence to allocate any alleged indirect costs of Coram's bankruptcy to Crowley.

(3)    *Critique of Baliban analysis*

Instead of identifying specific sources of potential indirect costs of bankruptcy both incurred by Coram, and attributable to Crowley, Baliban has first relied on an excerpt from the report prepared by Goldin Associates, LLC (Goldin). The Baliban report notes that "in the July Updated Report of Independent Restructuring Advisor Goldin Associates, L.L.C. ('Goldin Report'), Goldin states that Coram suffered 'approximately $7 million to $9 million in business losses attributable to the prolonged bankruptcy.'"[15]

Baliban fails to note that the July Goldin report (dated July 11, 2001) actually was the first Golden report. The updated Goldin report was dated September 4, 2001 and contained the same language regarding the alleged $7 million to $9 million of business losses. One could infer from this that, for some reason, Coram suffered no additional bankruptcy-related business losses between July and September of 2001.
In any event, the fact remains that pointing to the Goldin analysis provides no discernable benefit to any damage analysis since, as Baliban admits, "Goldin provides no description of his method in making this determination but, given the report date...it is clear it cannot have been the result of an exhaustive study for the

---

[14] Motion of the Chapter 11 Trustee for Authorization to Enter Into Termination and Employment Extension Agreement with Daniel Crowley, p.7-8.
[15] Quoted in Baliban report, p. 11-12.

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 10

entire period through December 2004."[16]  Thus Baliban has used a loss calculation
for which no support exists as somehow supportive of the fact that some loss does,
in fact, exist.

### (a) Rationale for valuation analysis

The Baliban report then proceeds to a valuation-based analysis, which submits that
the appropriate measure of the indirect costs suffered by Coram equals the alleged
decline in value of the Company as of 2004, given its emergence from bankruptcy as
of two alternative dates (December 2000 v. November 2004).  Several conceptual
problems exist with this approach.

Valuation literature commonly refers to three approaches which are appropriate for
use in determining value.  For example, the Financial Accounting Standards Board
Statement of Financial Accounting Standards No. 157, Fair Value Measurements
("SFAS 157") defines these approaches as follows:

> *Market approach: "The market approach uses process and other relevant information
> generated by market transactions involving identical or comparable assets or
> liabilities (including a business).  For example, valuation techniques consistent with
> the market approach often use market multiples derived from a set of comparables.
> Multiples might lie in ranges with a different multiple for each comparable.  The
> selection of where within the range the appropriate multiple falls requires judgment,
> considering factors specific to the measurement (qualitative and quantitative)."*

> *Income approach: "The income approach uses valuation techniques to convert future
> amounts (for example, cash flows or earnings) to a single present amount
> (discounted).  The measurement is based on the value indicated by current market
> expectations about these future amounts."*

> *Cost approach: "The cost approach is based on the amount that currently would be
> required to replace the service capacity of an asset (often referred to as current
> replacement cost)."*[17]

SFAS 157 further suggests that a present value measurement should include
consideration of "An estimate of future cash flows for the asset or liability being
measured," and "Expectations about possible variations in the amount and/or

---

[16] Baliban report, p. 12.
[17] SFAS 157, p. 7-8.

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 11

timing of the cash flows representing the uncertainty inherent in the cash flows."[18]

Of course, the use of any valuation approach in this instance presumes that any resultant damage claim can be attributed to the conduct of Crowley (a presumption that I believe is unsubstantiated based upon earlier discussion in this report). Assuming for the moment that attribution to Crowley could have been demonstrated, SFAS 157 provides that an income approach is acceptable, assuming that possible variations in the amount and timing of expected cash flows have been properly considered.

In his report, Baliban bases his valuations on the relative "free cash flows" of the Company assuming its emergence from bankruptcy in 2000 versus 2004. To quote Baliban:

> *"The annual free cash flow amount can be converted to an indication of value by using it as a basis on which to forecast future years' annual free cash flow and then discounting these future amounts at a rate of return consistent with the risk of the investment...If one expects future growth to be at a constant level, current year free cash flow can be converted to an indication of value by capitalizing that amount; that is, dividing it by a capitalization rate."[19]*

In order to determine free cash flow at these relative points in time, Baliban begins with cash flow from operations before bankruptcy-related expenses, as reported in annual SEC forms 10K for 2000 and 2003.

However, first, Baliban has failed to perform any detailed analysis as to why cash flow from operations differs between these two years. Is the difference due to changed market conditions between these two periods? Is the difference due to changes in Coram's business plans between these two periods? Is the decreased 2003 cash flow from operations due to the departure of Crowley in early 2003 (a reasonable presumption which runs directly opposite to the plaintiff's damage theory in this matter)?

Baliban has done no detailed study of the motivations of customers, suppliers or the market which could have caused fluctuations in revenue and expenses (and, as a result, cash flow from operations) between these periods. Baliban has simply ascribed these fluctuations in cash flow to the alleged indirect costs of bankruptcy

---

[18] SFAS 157, p. 37.
[19] Baliban report, p. 12.

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 12

rather than investigating whether other internal or external factors could have caused any differential. In addition, Baliban does not consider the possibility that a potential buyer of Coram might project no continuing effect of any alleged indirect bankruptcy costs for valuation purposes. In that instance, no difference in value could have resulted from any indirect costs of bankruptcy. Thus, Baliban has again failed to demonstrate any connection between the results of his valuation analysis and the alleged actions of Crowley.

Second, Baliban assumes that the capitalization of cash flow method is appropriate to derive relative values for Coram. But the capitalization of cash flow method, as Baliban points out, assumes that these single period "snapshots" of Coram's performance in 2000 and 2003 are representative of all expected future years' performance (subject to a constant rate of growth) for valuation purposes. This approach is typically used when a company's financial performance reflects a consistent historical trend; or has been stabilized for several years prior to the valuation date and therefore, that future years' performance can be predicted merely by looking at the most recent historical year and adjusting it for some relatively minimal growth rate. This is done in lieu of a detailed projection of several years into the future (which might typically be appropriate if future years' financial results are expected to differ from the latest historical year by more than some minor growth rate). By using single period results to compute value, Baliban has determined that "current market expectations" are that these single period results represent the best indication of future Coram performance.

I see no indication in either the Baliban report or the supporting materials provided by NERA of any detailed analysis sufficient to justify a conclusion that Coram's financial performance in either 2000 or 2003 would be representative of all future years' performance. In order to support such a conclusion, I would expect to see a detailed study of the motivations of customers, suppliers and the market. The independent appraisers who valued Coram performed this type of analysis through interviews with company personnel and detailed projections of future expected Coram performance, often determined in regard to separate lines of business. The Baliban report does not indicate that any such analyses have been done, and instead relies on a review of annual 10K SEC reports filed by the Company.

In the five years prior to its bankruptcy filing in 2000, Coram's financial performance varied dramatically. Cash flow from operations, as indicated in the Company's annual 10K SEC reports (and summarized in Exhibit B), varied from a low of negative $16,783,000 in 1995 to a high of $68,838,000 in 1997. This degree of

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 13


fluctuation provides no assurance that the 2000 operating cash flow of $44,144,000 is indicative of future years' performance. The valuation reports provided to me indicate that, given this history, none of the appraisers who valued Coram from 2000 through 2003 (including Goldin, Chanin Capital Partners, UBS Warburg, Deloitte & Touche, and SSG Capital Advisors/Ewing Monroe Bemiss) determined a value for Coram by using a single-period capitalization of cash flow approach. Instead, each of these appraisers determined a value for Coram by applying an appropriate discount rate to cash flow projections for several years into the future. Representative comments from these appraisers are as follows:

> <u>Goldin (7/11/2001 report at page 66):</u>
> *"What constitutes an appropriate initial projection period varies, depending…on industry, economic conditions, availability of information and predictability of performance; but a five-year period is often utilized in connection with this part of the projection."*

> <u>Deloitte & Touche (11/15/2000 report):</u>
> *"Our analysis discounts cash flows from November 16, 2000 through December 31, 2004"*

> <u>SSG Capital Advisors/Ewing Monroe Bemiss (12/11/2002 report at page 10):</u>
> *"The Advisors' approach to the valuation of Coram involved: …developing a detailed financial model projecting the future performance of the Company"*

> <u>Chanin Capital Partners (7/31/2000 report at Executive Summary):</u>
> *"Coram completed projections for both Infusion Services and CTI covering July of 2000 through December of 2001 ('the Projections")…Projections for FY 2002 through 2004 (the 'Pro Forma Period') were extrapolated from the Projections using growth rates consistent with industry trends."*

Similarly, by ignoring the necessity for projecting potential cash flow from operations beyond the initial year, Baliban ignores the potential for inordinate fluctuation in revenue and/or expenses in years immediately following the emergence from bankruptcy. To the extent such fluctuations might have been different following an emergence from bankruptcy in 2004 (as opposed to 2000), Baliban's analysis potentially misstates the valuation differences between the two years.

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 14

Last, in only considering the difference between two specific years' operating results, and quantifying a resulting value differential based just upon those two years, Baliban is in essence assuming that the difference in operating results would last forever. This is highly unlikely, and again highlights the deficiency in using a single-period capitalization of cash flow approach versus a projection of future operating results for a multi-year period.

 *(b) Specific valuation calculations*

In addition to the theoretical concerns outlined immediately above, a review of the specific valuation calculations performed by Baliban reveals inconsistent and inappropriate results.

First, as noted above, the Baliban report assumes that net cash flow from operations for 2000 and 2004 (subject to adjustment) had stabilized to a point at which they could be subject to a capitalization rate in order to determine value. However, if 2000 and/or 2004 are appropriate years for such an approach, why are other single years not also appropriate as a one-period measurement of Coram's potential value? As illustrated at Exhibit C, for example, we can see that if single periods from 1995 through 2003 were used to calculate a value for Coram (using Baliban's approach), the values for Coram would range as follows:

| | |
|------|-------------|
| 1995 | $0 |
| 1996 | $440,000,000 |
| 1997 | $592,000,000 |
| 1998 | $0 |
| 1999 | $0 |
| 2000 | $279,000,000 |
| 2001 | $0 |
| 2002 | $116,000,000 |
| 2003 | $235,000,000 |

This highlights the fact that a capitalization of single period cash flow to derive a value for Coram is simply inappropriate when operating cash flow is historically fluctuating to the degree indicated at Exhibit C.

Alternatively, if one could apply the same theory to the 1999/2000 time frame that Baliban has attempted to apply to the 2000/2004 time frame, one could logically conclude that the value of Coram from 1999 to 2000 has effectively increased from

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 15

zero to over $270,000,000 (i.e. roughly ten times the 2000 "normalized free cash flow" of $27,296 determined by Baliban). One could further conclude that, given the fact that Crowley became Coram's CEO at a point too late in 1999 to substantially influence the Company's 1999 operations, that his presence throughout 2000 is largely responsible for such a value increase; negating any subsequent decrease in value as computed by Baliban.

Second, in determining the value of Coram using the 2000 cash flow from operations as a starting point, the Baliban report states that the "depreciation expense add-back is normalized by adjusting the actual add-back so that depreciation is equal to normalized capital expenditures" (footnote 5 at Exhibit 5 of the Baliban report). The Baliban report also states that "capital expenditures are normalized using the forecast average level of capital expenditures from 2001 to 2004 per management's October 1999 forecast (footnote 6 at Exhibit 5 of the Baliban report).

It is unclear to me why an October 1999 management forecast was used for the purpose of determining capital expenditures but not used for any other purpose (i.e. perhaps to assist in generating an actual multi-period projection), or why the same level of capital expenditures are deemed appropriate to generate $44,000,000 of cash flow (2000) versus $29,000,000 of cash flow (2003).

More importantly, Baliban has made a fundamental error by deducting the *entire* amount of depreciation ($23,227,000) from the 2000 cash flow. The proper adjustment should have been to deduct only the normalized capital expenditures ($7,931,000 per Baliban).

To extend this error to its illogical conclusion, if Baliban had correctly deducted only the $7,931,000 in his calculation, his resulting value for Coram would equal nearly $550,000,000 (see Exhibit D). The fact that this value vastly exceeds any value determined for Coram at any date by any other appraiser again highlights that fact that Baliban's valuation methodology is inappropriate.

Third, since Baliban is determining the value differential of Coram as of the end of 2004 using normalized free cash flows at two different points in time (i.e. as of 2000 and 2003), these cash flows must be adjusted to a comparable point in time. Baliban actually adjusted both of these cash flows to the end of 2005, presumably on the theory that a prospective buyer of Coram at the end of 2004 would be looking at projected 2005 results in deriving a value for the Company. In order to make this adjustment, Baliban used the rate of interest for five-year U.S. treasuries in effect as of the beginning of 2001 (to adjust the 2000 free cash flow) and as of the beginning of

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 16

2004 (to adjust the 2003 cash flow).[20] This adjustment lacks any support. As mentioned earlier, actual multi-period projections should have been derived using expected assumptions as to the internal and external economic influences on the Company over the projection period (including any possible discontinued effect of indirect bankruptcy costs, assuming such costs were appropriate and measurable to begin with).

Even if capitalization of these single period cash flows were appropriate to reach a conclusion of value, then their respective growth rates should be derived in regard to some examination of the expected Company performance over this period. As noted earlier, should the Company's growth rate be greater than expected given a 2004 emergence from bankruptcy as opposed to a 2000 emergence from bankruptcy, any value differential could be dramatically affected. In any event, simply using a growth rate for five-year U.S. treasuries to represent expected Coram growth over this period is inappropriate.

   *(c) Market analysis*

In order to corroborate its valuation analysis, Baliban looks at two alternative market analyses. At page 16 of his report, Baliban first looks at four alternative valuations of the Company or about the latter part of 2000. The average of these values is then compared to an average of two alternative valuations prepared as of June 30, 2003. According to Baliban, the value differential indicated by these appraisals as of these two periods reflects an approximate growth rate of about four percent in enterprise value over this time frame. This growth rate is then compared to a derived growth rate of 13.7% in the enterprise value of four peer companies from the end of 2000 to the end of 2004 (see Baliban Exhibit 8). This approach raises some specific concerns.

First, the Coram enterprise values listed as of the end of 2000 include a value labeled "2000 10-K estimate". As indicated in footnote 31 of the Baliban report, this appears to be the result of an estimate based on the year-end market value of Coram equity plus the book value of long-term debt and operating leases. This value is not the result of the application of any valuation analysis by an independent party, but rather a value derived by Baliban. If this value is omitted from the calculation, the beginning enterprise value of Coram at 2000 (also excluding the Deloitte & Touche valuation, as Baliban does) lowers the average indicated value at that date from approximately $200 million to $193 million, and the return from that date to any

---

[20] See footnote 27 at Baliban report, p.15.

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 17

point forward correspondingly increases.

Second, Baliban interestingly does not compare the enterprise values determined by these appraisers as of the end of 2000 to his own value calculation. The average of the UBS Warburg and Chanin Capital Partners valuations, as we noted above, equals $193 million. However, Baliban's valuation conclusion at that point in time would equal nearly $280 million (i.e. $27,296,000 in normalized free cash flow times a multiple of 10.2). This is not only nearly 45% higher than the average of the UBS Warburg/Chanin Capital Partners valuations, it also approaches the amount of the Deloitte and Touche valuation (whose valuation approach and conclusions were rejected by the Bankruptcy Court in its October 5, 2004 opinion). Likewise, if Baliban's depreciation expense is adjusted as suggested above, his valuation conclusion at the end of 2000 would increase to over $435 million (i.e. $42,592,000 in normalized cash flow times the 10.2 multiple). This compares even more unfavorably with the conclusions reached by all of these independent appraisers. Again, this casts doubt on the validity of the Baliban approach to valuation as discussed earlier in our report.

Finally, the use of peer companies in this analysis illustrates the danger in overly simplistic analyses of peer companies. As noted in SFAS 157 regarding the use of the market approach, "The selection of where within the range the appropriate multiple falls requires judgment, considering factors specific to the measurement (qualitative and quantitative)."[21]

At Exhibit 8 of his report as noted above, Baliban calculates a return of approximately 13.7% from the end of 2000 through the end of 2004. In reality, this return is virtually entirely attributable to OptionCare. If one were to remove OptionCare from the analysis, the remaining peer companies exhibited no growth in enterprise value over this time frame (see Exhibit E). In effect, Baliban has measured Coram growth against only one peer company; most valuation experts would agree that one peer company is an insufficient sample from which to form a market-based valuation analysis. At a minimum, one might expect Baliban to have weighted the relative enterprise values of these companies in deriving an average growth rate (much as he has appeared to weight the market capitalization data presented at Exhibit 7A of his report). Obviously, such weighting would have also dramatically affected the average peer company return over this period, since OptionCare represents less than ten percent of the average total enterprise values of these peer companies over this period (see Exhibit E).

---

[21] SFAS 157, p.7.

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 18

In his second market analysis, Baliban measures the performance of the peer companies by computing the "cumulative return of the companies' equity (i.e., cumulative appreciation of each company's stock price), where each return is weighted by its relative market capitalization. During this period, the market capitalization return grew at compound annual rates of 18 percent" (see Exhibit 7 of Baliban's report). Curiously, having computed this rate of return, Baliban does not compare it to anything.

Since this analysis deals with relative returns to equity (as opposed to enterprise value), one would assume it would be appropriate to compare any derived peer company rate of return to the actual return to Coram's equity shareholders. In particular, the period allegedly relevant to this proceeding (i.e. December 2000 to December 2004) would be a relevant time frame to measure this actual return. As of December 21, 2000, had the original plan of reorganization been approved, Coram's equity shareholders would have received nothing. Under the Trustee's plan of reorganization ultimately approved in November, Coram's equity shareholders received approximately $40 million (as well as the right to receive the net proceeds of any litigation brought by Coram against Crowley and the former Coram board members). Measured over this time frame, not only has it exceeded the 18% comparable peer company return, the return to Coram's equity shareholders is well in excess of 100%.

(4)    *Conclusion*

Baliban has inferred that continuing indirect costs of bankruptcy have been incurred by Coram and were caused by the alleged conflict of interest resulting from Crowley's employment. However, Baliban has performed no financial analysis or investigation to determine the existence of any alleged indirect costs of bankruptcy suffered by Coram and therefore produces no evidence to support the calculation of any such costs.

In the absence of any specific analysis or investigation as to the origin or duration of any alleged indirect costs of bankruptcy suffered by Coram, Baliban produces no evidence to support the allocation of any such costs to Crowley's actions. Instead, Baliban simply relies on the assumption that any such costs are entirely allocable to Crowley.

Having performed no analysis as to the existence or allocation of any alleged indirect costs of bankruptcy suffered by Coram, Baliban defaults to a valuation approach which is flawed as to both theory and methodology.

In Re: Arlin M. Adams v. Daniel D. Crowley
Report of Michael G. Ueltzen
July 20, 2007

Page 19


As a result, Baliban has not:

(1) established that any indirect costs of bankruptcy exist,

(2) established that any alleged indirect costs of bankruptcy are allocable to Crowley's actions, and

(3) established that any alleged indirect costs of bankruptcy impacted the financial performance of Coram.

b.    *Direct Costs of Bankruptcy*

In his report at page two, Baliban finds that: "Had Coram exited bankruptcy in 2000, its bankruptcy costs, both direct and indirect, would have been lower.  Direct bankruptcy costs can be measured by tallying actual invoiced and allowed legal and administrative costs."  At page three of his report (in part quoting a Lawrence Weiss article in the Journal of Financial Economics) Baliban adds: "Direct costs of bankruptcy 'encompass the legal and administrative fees, including the cost of lawyers, accountants, and other professionals involved in the bankruptcy filing.'  We have been provided an analysis prepared by Jerry Reynolds, a Coram representative, that shows Coram's direct costs of bankruptcy exceeded $36 million."

Baliban presents no further analyses of direct costs, presumably implying that the Reynolds analysis presents the appropriate amount of direct costs of bankruptcy incurred by Coram and allocable to Crowley's employment.

I have reviewed the Reynolds analysis and have also reviewed the bankruptcy fee application detail for the various legal firms and other advisors listed on the Reynolds analysis.  Based on the fee application detail, I have summarized the fees charged by these firms by both date and consultant (Exhibits F and G).  Since in some cases, the applications for fees and expenses were partially denied, I have also compared the fees and expenses requested to those awarded for each firm (Exhibit H).

Finally, I have compared the fees and expenses on my analysis to those included on the Reynolds analysis in an attempt to reconcile any differences (see Exhibit I).  In reviewing the Reynolds analysis, it appears as though any fees and expenses allocable to periods prior to January 1, 2001 have been excluded (although the notes

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 20

included on the Reynolds analysis seem to reserve the right, in some instances, to include earlier expenses if deemed appropriate).

Given this methodology, I have adjusted the total fees and expenses included in my analysis to also exclude amounts prior to this date for the purpose of reconciling the amount presented by my analysis and the Reynolds analysis (see Exhibit I, page 2). After adjusting my analysis for this cut-off date, I have concluded that my analysis presents total fees and expenses in the amount of $36,768,470.72 versus the Reynolds analysis' total fee and expenses of $36,438,946.13. Since the difference between these totals is less than one percent, and since the difference primarily results from one law firm (which difference also proves to be irrelevant given my methodology for computing allocable costs, as discussed below), I have not attempted to refine this difference further. Should additional information become available, a more precise reconciliation might be possible.

(1)    *Proper Damage Period*

Having sufficiently reconciled my analysis to the Reynolds analysis, I now turn to the proper period for inclusion of such direct costs. Again, as noted above, the assumption inherent in the Reynolds analysis seems to be that all fees and expenses incurred from the period beginning January 1, 2001 through the end of Coram's bankruptcy should be included as direct costs allocable to Crowley.

I have been asked by counsel to assume that only fees and expenses allocable to the period from December 21, 2000 (the date of rejection of Coram's first plan of reorganization) through December 21, 2001 (the date of rejection of Coram's second plan of reorganization) should be included as direct costs of bankruptcy allocable to Crowley. Accordingly, I have calculated only those fees and expenses allocable to that period using the methodology described below.

(2)    *Computation of Allocable Legal and Administrative Fees*

In the course of my review of the detailed fee applications, I have listed the time frame to which each fee and expense request relates. For the most part, such requests are presented on a monthly basis. However, in some cases, the initial fee request covers a period extending over several months. Where this initial period ends after the assumed beginning date of December 21, 2000, I have included all charges listed for the period, even though some of these charges may have been incurred prior to December 21, 2000.

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 21

For example, for Altheimer & Gray, the initial fee application covered the period from October 1, 2000 through January 1, 2001. Although a portion of the fees and expenses included in this request may well have been incurred prior to December 21, 2000, in the absence of additional detail I have included the entire amount of this initial request as allocable to the December 21, 2000 to December 21, 2001 time frame. I reserve the right to recalculate these allocable amounts should additional information become available from which to make a more precise calculation.

Similarly, for periods encompassing the ending date of December 21, 2001, I have also included the entire application amount for those periods as well, notwithstanding the possibility that a portion of these amounts might be allocable to periods occurring after the ending date of December 21, 2001. More often than not, these time periods cut-off at December 31, 2001, thus the amounts inappropriately included could be minimal. Nonetheless, I again reserve the right to recalculate these allocable amounts should additional information become available from which to make a more precise calculation.

Having isolated the fee and expense requests allocable to the December 21, 2000 to December 21, 2001 time frame (subject to the limitations discussion above), it was then necessary to review the actual amounts awarded as compared to the amounts requested. In reviewing the Bankruptcy Court orders awarding fees in this matter, there was typically no detail showing the precise fees and expenses disallowed by period. Therefore, I determined an appropriate allocation by computing the percentage of fee requests allocable to the December 21, 2000 to December 21, 2001 time frame, to total fees requested. I then applied this percentage to the total fees allowed, in order to determine the appropriate allocation of amounts allowed to the December 21, 2000 to December 21, 2001 time frame.

Again using Altheimer & Gray as an example, total fee requests equaled $2,604,326.25, of which $2,233,492.15 were allocable to the December 21, 2000 to December 21, 2001 time frame (a percentage of approximately 85.76%). I then applied that percentage to the total fees awarded of $2,415,058.64, in order to conclude that $2,071,174.74 (i.e. $2,415,058.64 times 85.76%) was allocable to the December 21, 2000 to December 21, 2001 time frame (see Exhibit G, page 1). In the limited instances in which expenses were only partially awarded, I used the same methodology.

In one instance (UBS Securities), it was relatively apparent the fees disallowed related to a specific request by UBS for a "valuation fee" related to its earlier work,

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 22

thus the above allocation methodology was not utilized (see Exhibit G, page 11).

Using this approach, I have calculated $12,762,309.98 of fees awarded and $1,096,818.52 of expenses awarded (a total of $13,859,128.50) as allocable to the December 21, 2000 to December 21, 2001 time frame (see Exhibit G).

(3)    *Appropriate Mitigating Factors*

Having calculated the total fees and expenses allocable to the December 21, 2000 to December 21, 2001 time frame, I have been further asked to consider any potential mitigating factors that should be considered. For example, to the extent that any specific financial benefits to Coram can be quantified and attributed to the employment of Crowley, these amounts could be included as appropriate mitigating factors.

My review of the documents provided to me indicates the following mitigating factors that should be considered.

First, according to the Trustee's complaint, the "noteholders offered Coram a six-month interest accrual holiday if Crowley were hired as CEO, which amounted to a cash savings to Coram of approximately $11 million."[22]

Second, bonus payments which would have been payable based upon the Crowley revised employment agreement were, in fact, never paid. According to Crowley's request for payment of administrative expenses filed in December 2004, this unpaid compensation equaled approximately $16.8 million.[23]

Finally, if the measure of damages, as argued by the plaintiff, is the effect of adopting a plan of reorganization in 2004 rather than the initial plan proposed in 2000, it should be noted that the ultimate plan adopted in 2004 called for a $56 million contribution by the noteholders to the Company.[24] If Crowley is held responsible for this delay in plan approval, he should likewise be credited with any financial benefit accruing to the Company as a result of the delay.

The total of these potential mitigating factors equals approximately $84 million (Exhibit J) which, it should be noted, not only offsets the allocable direct costs of

---

[22] Complaint dated December 29, 2004, p. 6.
[23] Request of Daniel Crowley for Payment of Administrative Expense, p. 2-3.
[24] Bankruptcy Court opinion dated October 5, 2004, p. 4.

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 23

$13.9 million as I have calculated above, but also offsets the alleged indirect costs calculated by Baliban. In addition to these specific mitigating factors that I have identified, it is likely that Crowley's employment resulted in significant indirect benefits to Coram (see the discussion of Crowley's performance contained in the Trustee's January 2003 motion to the bankruptcy court and quoted in part at pages 8 and 9 of this report) which could further offset the alleged indirect costs calculated by Baliban.

(4)     *Conclusion*

Given the total potential mitigating factors quantified above versus the total amount of direct costs that I have calculated, my opinion is that Coram suffered no net damages allocable to the employment of Crowley.

**5.     INFORMATION CONSIDERED**

See Exhibit L for information I considered to assist me in my analysis.

**6.     EXHIBITS INCLUDED**

Exhibit A - Michael G. Ueltzen, CPA – Resume, Prior Testimony, and Publications

Exhibit B - Coram Healthcare Corporation Cash Flow from Operations, December 31, 1995 through December 31, 2003

Exhibit C - Coram Healthcare Corporation Equivalent Calculation of Normalized Free Cash Flow, December 31, 1995 through December 31, 2003

Exhibit D - Coram Healthcare Corporation Corrected Baliban Calculation of Normalized Free Cash Flow and Value, December 31, 2000

Exhibit E - Coram Healthcare Corporation Enterprise Value Data per Baliban (with OptionCare adjustment), December 29, 2000 through December 31, 2004

Exhibit F - Coram Healthcare Corporation Fee Summary by Date

Exhibit G - Coram Healthcare Corporation Fee Summary by Consultant

*In Re: Arlin M. Adams v. Daniel D. Crowley*
Report of Michael G. Ueltzen
July 20, 2007

Page 24

Exhibit H - Coram Healthcare Corporation Fee Summary by Consultant, Fees
Requested v. Awarded

Exhibit I - Coram Healthcare Corporation Fee Summary by Consultant,
Reconciliation of U&Co. v. Trustee Analyses

Exhibit J - Coram Healthcare Corporation Summary of Mitigating Factors

Exhibit K - Coram Healthcare Corporation Financial Statement Summaries

Exhibit L - Information Considered

7.  TIME SENSITIVE DOCUMENTS/SUPPLEMENTAL REPORTS

Many of the findings included in this report are based on facts, reasonable estimates
or assumptions at a point in time. As a result, the findings may need to be updated
or supplemented with the passage of time or the introduction of new information.
Accordingly, I would expect to issue a supplemental report(s), should any
additional information be provided to me which would cause a change in the
opinions expressed above.

8.  TRIAL TESTIMONY

In presenting our opinions and the basis at trial, I may be developing or using
exhibits including overhead transparencies, flip charts or other media. I may also
use certain demonstrative aids and illustrations to assist in presenting technical
concepts and analyses.

9.  COMPENSATION

Ueltzen & Company, LLP is being paid at its normal hourly rates for individuals
involved in this assignment. My current personal rate is $400 per hour. My
compensation is not contingent on the conclusions reached in the ultimate resolution
of this case.

Michael G. Ueltzen, CPA

# EXHIBIT A



### UELTZEN & COMPANY, L.L.P
CERTIFIED PUBLIC ACCOUNTANTS



## Michael G. Ueltzen
### Certified Public Accountant

**Professional Credentials**

Certified Public Accountant (CPA) – California, Nevada, and New York with practice privileges in other states

Certified Fraud Examiner (CFE) – Association of Certified Fraud Examiners

**Employment**

Ueltzen & Company, LLP
*Consultants and Accountants to Management and Counsel*
1997 – Present – Partner – Forensic Accounting Practice

John Waddell & Co., An Accountancy Corporation
*Local Accounting and Consulting Firm*
1977 – 1997 – Managing Director of the Firm and its Accounting and Audit Practice

Peat, Marwick, Mitchell and Company, CPAs
*International Accounting and Consulting Firm*
1970 – 1977 – Audit Supervisor

**Professional Activities**

American Institute of Certified Public Accountants

Chair of the National Forensic and Valuation Services (BVFLS) Executive Committee (2004 – Present)

AICPA Forensic and Litigation Services Committee Volunteer of the Year (2003)

Chair of the California Delegation to the AICPA Council (1996 – 1997)

Member of the AICPA Council (the governing body) (1992 – 1999)

Member on national committees dealing with regulatory affairs and professional standards including the National Steering Committee on Regulation of the Profession, Special Committee on Interstate Mobility, Relations with the Judiciary, Forensic and Litigation Services, Relations with the Bar, State Legislative Committees, and a Professional Ethics Committee Task Force

Michael G. Ueltzen, CPA
Curriculum Vitae
Page 2

Professional Activities - Continued

California Society of Certified Public Accountants

Distinguished Service Award (2002)

President (1996 - 1997) and prior service as Vice President and Treasurer

Chair of the Accounting Principles and Auditing Standards, California Bankers Liaison, Forensic and Litigation Services, Government Relations, Professional Conduct, and Finance Committees

Chair of the Professional Accountability and Curriculum Development Task Forces

Member of the Executive Committee and Board of Directors

National Judicial College (1993 - Present) and Federal Judicial Center (1993 - 2002) Faculty Member

Resolution Advocate - U.S. Bankruptcy Court - Eastern District of California (2000 - Present)

Education

Master of Business Administration, California State University, Sacramento - June 1970

Bachelor of Science Degree with Honors in Accounting, California State University, Sacramento - June 1969; awarded membership in the Honor Fraternities Phi Kappa Phi, Beta Gamma Sigma, and Beta Alpha Psi (President)

Civic Activities

Accounting Advisory Council, California State University, Sacramento (1992 - 2006)

BloodSource (Sacramento Medical Foundation) Board of Trustees - President (2002 - 2004 and 1990 - 1992), member of the Executive Committee and other leadership positions (1985 - 1993 and 1999 - Present)

Personal Information

Born in San Jose, California, 1947

Email: mueltzen@ueltzen.com

UELTZEN & COMPANY, LLP
Rev.1/07

Michael G. Ueltzen
Prior Expert Testimony

Bostontec v. WorkRite Ergonomics (2007)
    Marin County Superior Court
    Economic Damages for the Defendant.  Deposition and Trial
    Retained by Schiff Hardin

American AgCredit FLCA v. Michael B. Stewart, et. al. (2007)
    Second Judicial District Court of Nevada, County of Washoe
    Analysis of Business Transactions.  Deposition and Trial
    Retained by Epstein, Englert, Staley & Coffey

Lindquist v. CBIZ Accounting, Tax and Advisory of Topeka, et. al. (2007)
    United States Bankruptcy Court, Central District of California
    Professional Standards for the Defendant, Report, Pending
    Retained by Chapman, Glucksman & Dean

Ralph Gonzales, et al. v. Lloyds TSB Bank, et al. (2007)
    United States District Court, Central District of California
    Professional Standards for the Defendant, Report, Settled
    Retained by Garrett and Tully

Knight Textile Corporation v. Talmadge Knight, et. al. (2006)
    United States District Court, District of South Carolina
    Professional Standards for the Defendant.  Report, Deposition, Pending
    Retained by Carlock, Copeland, Semler & Stair, LLP

Clifford E. Bressler v. John J. Kirth & Company (2006)
    Tulare County Superior Court
    Professional Standards and Damages for the Defendant.  Deposition, Settled
    Retained by Jenkins, Goodman, Neuman & Hamilton, LLP

Topcon Positioning Systems v. Javad Navigation System) (2006)
    American Arbitration Association
    Calculation of Economic Damages for Plaintiff. Report, Trial
    Retained by Keker and Van Nest

Newton Tran, et. al. v. Tony Lam, (2006)
    United States District Court, Central District of California
    Professional Standards for Defendant.  Report, Settled
    Retained by Garrett and Tully

Michael G. Ueltzen
Prior Expert Testimony

Page 2

Metro Commercial Corporation, Inc. v. Timber Cove Lodge, (2006)
        El Dorado Superior Court
        Special Accounting for Contract Claim
        Court Appointed Arbitrator

George Goff v. Thomas Kinkade and Media Arts Group, Inc., (2006)
        American Arbitration Association
        Accounting and Economic Damages for Plaintiff. Arbitration.
        Retained by Christensen, Glaser, Fink, Jacobs, Weil and Shapiro

Thomas Swain, et. al. v. Dennis Scott, Eel River Sawmills, Inc. et. al. (2006)
        Humboldt County Superior Court
        Professional Standards for Defendant. Deposition, Settled
        Retained by O'Leary and O'Leary

Harold T. Nielson, et. al. v. Forum Building Associates, et. al. (2006)
        Sacramento Superior Court
        Special Accounting for Partnership Interests
        Court Appointed Referee

JRS Products, Inc. v. Panasonic Office Products, (2006)
        Sacramento County Superior Court
        Economic damages for Plaintiff. Deposition, On Appeal
        Retained by Friedberg and Parker

Bank of America v. State of California (2006)
        San Francisco County Superior Court
        Calculation of Economic Damages for Defendant. Deposition, Settled
        Retained by Stevens and O'Connell

Walter L. Cole, Worldwide Aircraft Movement v. Olen Cole, Cole Services Inc. (2005)
        United States District Court, Eastern District of California
        Special Accounting
        Court Appointed Special Master

Greg Braun, Trustee v. Marcha Weinberg, et al. (2005)
        United States District Court, Eastern District of California
        Professional Standards and Economic Damages for Defendant. Rule 26 Report, Settled.
        Retained by the Berliner Law Firm

**Michael G. Ueltzen**
**Prior Expert Testimony**

Page 3


Stephen M. Waltrip, et al. v. Kevin B. Kimberlin, et al., (2005)
      Sacramento County Superior Court
      Professional Standards for Plaintiff.  Deposition, Trial.
      Retained by Sedgwick, Detert, Moran & Arnold, LLP


Robert B. Silliman as Chapter 7 Trustee for Leisure Time Casinos and Resorts, Inc. v. Alan N. Johnson et. al. (2005)
      United States Bankruptcy Court, Northern District of Georgia
      Professional Standards and Economic Damages for Defendant.  Report, Settled.
      Retained by Carlock, Copeland, Semler & Stair, LLP


Franscioni v. Hayashi & Wayland (2005)
      Monterey County Superior Court
      Professional Standards and Economic Damages for Defendant, Deposition, Settled.
      Retained by Jenkins, Neuman & Goodman


TransContinental Capital Partners, Ltd. v. Jana Alcover & Frank Rimerman & Company, (2004)
      Santa Clara County Superior Court
      Professional Standards and Economic Damages for Defendant.  Deposition, Settled.
      Retained by Ferrari Ottoboni, LLP


The Hon. Charles B. Renfrew (Ret.) as Trustee of the Toms Sierra Company Employee Stock Ownership Plan Trust, et al. v. Roy Toms, et al. & Elaine L. Chao, Secretary of the United States Department of Labor v. Wells Fargo Bank, N.A., et al., (2004)
      United States District Court – Eastern District of California
      Economic Damages for Defendant.  Report, Settled.
      Retained by Stuart L. Smits & Associates


Solectron v. Netro/SR Telecom, (2004)
      American Arbitration Association
      Economic Damages for Defendant.  Deposition, Settled.
      Retained by Townsend and Townsend and Crew


Dr. Hobson v. O.C.A. (Orthodontic Centers of America), (2004)
      United States District Court – Eastern District of California
      Economic Damages for Plaintiff.  Report & Deposition Only.
      Retained by Wilke, Fleury, Hoffelt, Gould & Birney, LLP

**Michael G. Ueltzen**
**Prior Expert Testimony**

Page 4


Unified Western Grocers, Inc. v. PricewaterhouseCoopers, LLP et al., (2004)
  Multnomah County, Circuit Court, State of Oregon
  Professional Standards. Trial
  Retained by Perkins Coie, LLP


Bernard P. Vanderfin & Oscar F. Kaas v. Stribling, Vanderfin & Assoc., LLC et al, (2004)
  Santa Barbara County Superior Court
  Application of Generally Accepted Accounting Principles. Deposition & Trial.
  Retained by Hatch & Parent


EDS v. Aspect Communication, (2003)
  American Arbitration Association
  Economic Damages for Defendant. Deposition & Trial.
  Retained by Keker & Van Nest


Susan Schoenig v. Dr. Mike Levin, (2003)
  Sacramento County Superior Court
  Accounting for a Trust. Deposition & Trial.
  Retained by Goldsberry Freeman Guzman & Ditora LLP


Susan Kivi v. Kevin Lee May, Road One, Inc. and Central Valley Towing, Inc., (2003)
  Sacramento County Superior Court
  Economic Damages for Plaintiff. Deposition, Settled.
  Retained by Law Offices of Christopher Kreeger


Thorpe v. Cousins & Del Toro, (2003)
  Kern County Superior Court
  Special Accounting for Plaintiff. Deposition, Settled.
  Retained by Law Offices of Kenneth Kind


Michael Hansen v. Tahoe Edgelake Beach Club, Inc., (2003)
  Placer County Superior Court
  Fraud Investigation & Special Accounting for Plaintiff. Deposition & Trial.
  Retained by Porter Simon


George Goff v. Thomas Kinkade and Media Arts Group, Inc., (2003)
  American Arbitration Association
  Accounting and Economic Damages for Plaintiff. Arbitration.
  Retained by Weintraub, Genshlea Chediak & Sproul

**Michael G. Ueltzen**
**Prior Expert Testimony**

Page 5


<u>Thomas F. Lennon as Receiver for Capital Consultants, Inc. v. Reuben E. Price & Company,</u> (2003)
> United States District Court – District of Oregon
> Professional Standards for Defendant. Report, Settled.
> Retained by Murphy Pearson Bradley & Feeney


<u>Nationwide Insurance Company v. Robert Reed dba Ruby Mountain,</u> (2003)
> United States District Court – District of Nevada
> Analysis of Financial Condition. Trial.
> Retained by Korshak, Kracoff, Kong & Sugano


<u>Oakland Raiders v. Oakland-Alameda County Coliseum,</u> (2003)
> Sacramento County Superior Court
> Economic Damages for Plaintiff. Deposition & Trial.
> Retained by Howard Rice Nemerovski, et al. and Dreyer Babich & Buccolla


<u>Polisso v. Century Surety Company,</u> (2003)
> Sacramento County Superior Court
> Economic and Punitive Damages for Plaintiff. Deposition & Trial.
> Retained by Bolling Walter & Gawthrop


<u>Venditti v. Stevens, Enterprise Rent-A-Car, Geico,</u> (2003)
> Sacramento County Superior Court
> Economic Damages for Plaintiff. Deposition, Settled.
> Retained by Guichard, Tarkoff & Portello


<u>Watts v. Ford Motor,</u> (2003)
> Sacramento County Superior Court
> Economic Damages for Plaintiff. Deposition & Trial.
> Retained by Mackenroth, Ryan & Fong


<u>Candance Pendleton v. Barry Fireman, et al.,</u> (2003)
> Los Angeles County Superior Court
> Professional Standards and Damages for Defendant. Deposition, Settled.
> Retained by Garrett & Tully


<u>Ciphergen v. T. William Hutchens, MAS, Inc., Lumicyte,</u> (2003)
> Santa Clara County Superior Court
> Economic Damages for Plaintiff. Deposition, Settled.
> Retained by Keker and Van Nest

Summary of Publications – Michael G. Ueltzen

<u>Articles</u>

*Interstate Mobility,* California CPA, January/February 2007

*Audit Documentation,* California CPA, January/February 2005

*Document, Document, Document,* California CPA, October 2004

*Auditor Independence Rules Impact Business and Litigation Services,* The Practicing CPA, August 2003

*The Landscape Has Changed (Sarbanes – Oxley),* The Witness Chair, Fall 2002

*Computing Lost Profits,* The Litigator, September 2002

*Present Value Concepts & The Litigation Services Practitioner,* The Witness Chair, Spring 2002

*Expert Testimony: The CPA's Responsibilities,* The Practicing CPA, September 2001

*Identifying and Resolving Conflicts of Interest,* California CPA, Spring 2001

*Do You Need A Forensic Accountant?* The Witness Chair, Spring 2000

<u>Committee Reports</u>

*Forensic Procedures and Specialists: Useful Tools and Techniques,* Business Valuation and Forensic & Litigations Services, August, 2006, American Institute of Certified Public Accountants, Task Force Member

*Forensic Services, Audits, and Corporate Governance: Bridging the Gap,* Discussion Memorandum, July 15, 2004, American Institute of Certified Public Accountants, (Roundtable Participant)

*Engagement Letters for Litigation Services,* Business Valuation and Forensic and Litigation Services Section Practice Aid 04-1, American Institute of Certified Public Accountants

*Litigation Services and Applicable Professional Standards,* Consulting Services Special Report 03-1, American Institute of Certified Public Accountants, Task Force Chair

*Business Valuation in Bankruptcy,* Consulting Services Practice Aid 02-1, American Institute of Certified Public Accountants