# Exhibit B

**NationalCity.**

NatCity Investments, Inc.
Investment Banking
1900 East 9th Street, 20th Floor
Cleveland, OH 44114

June 8, 2007

Barry E. Bressler, Esquire
Schnader, Harrison, Segal & Lewis, LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103

Dear Mr. Bressler:

You have asked us our opinion regarding certain issues pertaining to the bankruptcy case of Coram Healthcare Corporation and Coram, Inc. ("Coram"), Case 00-3299 and 00-3300 in the United States Bankruptcy Court for the District of Delaware. Following is a discussion of these issues.

## Unusual Cash Payments Made by Coram Prior to Chapter 11 Filing

Bankruptcy is typically an expensive undertaking. Companies that have just filed for bankruptcy protection require substantial liquidity to fund administrative costs, to fund operations that may be negatively impacted by the filing, and to make payments to stakeholders that facilitate the company's emergence pursuant to a Plan of Reorganization. As a result, it is normal operating procedure for companies to prepare for an anticipated bankruptcy filing by conserving as much cash as possible.

As CEO of Coram, Dan Crowley made several decisions that ran counter to this accepted logic. Specifically, he made cash payments to the Noteholders in the months leading up to Coram's bankruptcy filing on August 8, 2000 even though these disbursements were not required. This had the effect of reducing precious cash needed in the Coram estate for the sole benefit of the recipients of that cash, the Noteholders. These disbursements were made in July 2000 and August 2000, literally weeks prior to the bankruptcy filing. It is clear that Mr. Crowley was contemplating bankruptcy well before these payments were made and as early as February 2000, when Coram retained bankruptcy counsel. On February 28, 2000, Coram's bankruptcy attorney, David Friedman, sent Mr. Crowley a letter that specifically suggests bankruptcy as a means to address Coram's financial difficulties.

Barry E. Bressler, Esquire
June 8, 2007
Page 2

The first unusual cash disbursement made just prior to the bankruptcy filing and while the Company was contemplating the Chapter 11 filing was a $6.3 million interest payment made to the Noteholders on July 14, 2000. Coram had the option to make this payment "in kind" rather than in cash, whereby the payment would simply be added to the principal balance. This action depleted the cash that was available to Coram when it filed for bankruptcy less than one month later. Further, the contemplated Plan of Reorganization encompassed the conversion of the entire Noteholders debt balance into equity. This would have been the case if the interest payment was made in cash or in kind. Therefore, the cash payment served to benefit only the Noteholders while harming the Debtor-in-Possession by depleting it of much needed cash.

On July 31, 2000, Coram sold its specialty pharmacy division, CPS, and was able to reap $38 million in net proceeds. All of the proceeds were wired to the Noteholders, $28.5 million of which was used to pay down the secured revolver and $9.5 million of which was use to make a voluntary pre-payment of the Series A Notes. The $9.5 million payment was discretionary and highly unusual in light of Coram's bankruptcy filing one week later. While it is true that Noteholder consent was required to consummate the sale of CPS, this provision would have been unenforceable in Chapter 11. This payment benefited only the Noteholders as the $9.5 million would have otherwise remained with Coram for the purposes of funding bankruptcy expenses or disbursements to stakeholders pursuant to the Plan of Reorganization.

### Confirmability of First Plan and Impact of Non-Confirmation

On December 21, 2000, the Court rejected Coram's First Amended and Restated Plan of Reorganization ("First Plan"). The Court held that the First Plan was not confirmable due to Mr. Crowley's conflict. The only other material issue during the confirmation hearing related to valuation. The ultimate valuation that was accepted by the Court when the Trustee's Plan was confirmed was consistent with the Debtor's original valuation put forth at the time of the First Plan. Therefore, the competing valuation testimony would not have prevented confirmation of the First Plan since the very same valuation dispute did not prevent confirmation of the Trustee's Plan. But for the relationship between Mr. Crowley and Cerberus, the First Plan would have been confirmed.

Without this relationship which tainted the First Plan, Coram would have emerged from bankruptcy approximately three years earlier than it actually did. Confirmation of the First Plan would have saved Coram over $30 million of bankruptcy-related expenses from December 2001 to October 2004.

All of the professional fees paid throughout the prolonged bankruptcy were approved by the Court. All parties in interest in the case had standing to object to all final fee applications. Approval of final fee applications is a conclusive determination that the fees and expenses allowed by the Court were reasonable and necessary. The Trustee objected to the Equity Committee's counsel's final fee application and the fee was reduced by the Court.

Barry E. Bressler, Esquire
June 8, 2007
Page 3

## Performance of Companies in Chapter 11

Companies that are in Chapter 11 typically do not perform as well as those not in Chapter 11. There are several reasons. First, when a company files, concerns are immediately raised by the customer base about whether the bankrupt company will continue its operations. In response, customers may cease or ratchet back orders until these fears are allayed. Competitors often exacerbate these fears by circulating negative press in the marketplace and other such tactics. In the case of Coram, the prior liquidation of its R-Net subsidiary likely further raised going-concern suspicions and had negative implications for referring physicians.

In a letter to the Board of Directors dated October 20, 2000, Mr. Crowley conveyed that Coram was enduring this adverse impact of bankruptcy. He wrote, "Coram has seen a significant 'softness' in revenue in the past two (2) months that is directly relational to the reduced referrals caused, at least in part, by the Chapter 11 filing." He reiterated the same sentiment in another letter to the Board of Directors dated March 9, 2001 in which he attributed "a general 'softness' in referrals from providers" to, in part, "the prolonged Chapter 11." He also wrote that "some providers are concerned about continuity of care, are risk averse for their patients, and respond to the Chapter 11 and competitive entreaties to shift business from Coram to Apria, Gentiva, Caremark, Option Care Nutrashare, local hospitals, and local infusion providers. The impact of all of this is a constant tamping down of Coram's sales." Through both e-mails and testimony, other members of the Coram senior management team also explicitly expressed how the bankruptcy was adversely impacting Coram's operations.

In addition to the patient and referring physician concerns, which did in fact negatively impact Coram according to its CEO and management team, there are several other reasons why companies in bankruptcy tend to perform worse than those not in bankruptcy. Since trade payables are stayed at the time of a filing, there is often the risk of post-petition supply disruptions. A bankruptcy is also very time consuming for the senior management team. Rather than focusing exclusively on running the business, they must allocate time to formulate emergence strategy, allay customer fears, draft bankruptcy related documents, attend hearings and meet with attorneys and financial advisors, among other things. All of these matters serve to distract management from maximizing the performance of the business. Since all non-normal course activities and extraordinary uses of cash must be approved by the Court, a bankrupt company is less agile and less able to react to and exploit market opportunities on a timely basis. Finally, while in bankruptcy, a company must alleviate the uncertainty of the employees, who may have the same going-concern fears as customers. A bankruptcy can often prompt an employee exodus. In addition, the loss of value in any stock-based compensation, which usually accompanies a bankruptcy filing, can demotivate employees. For these reasons, bankrupt companies often find it necessary to institute key employee retention plans.

The impact of the bankruptcy was particularly harmful in the case of Coram as it lasted for an unusually long period of time, over four years. Further, the reasons for the rejection of the first two Plans of Reorganization (conflict of interest, lack of good faith) cast Coram's situation in a particularly negative light in the marketplace.

Barry E. Bressler, Esquire
June 8, 2007
Page 4

### Trustee's Dealings with Mr. Crowley

Mr. Crowley's employment contract with Coram expired on November 30, 2002. The Trustee entered into a Transition Agreement with Mr. Crowley to extend his employment for six months, subject to Bankruptcy Court approval. The Trustee also entered into a letter of intent with Mr. Crowley to settle his administrative claim, subject to Bankruptcy Court approval. These efforts by the Trustee were a reasonable exercise of his business judgment as they were done to try to facilitate a speedy emergence from bankruptcy on a consensual basis with all constituents. Consistent with this strategy, the Trustee conducted mediations with the Noteholders and the Equity Committee in September 2002. The Trustee also proceeded to enter into settlements with the Noteholders, the IRS, R-Net, TBOB and AT&T.

The Trustee's goal in extending Mr. Crowley's employment for six months was to maintain as much stability as possible while he was negotiating a consensual Plan of Reorganization and eliminate any potential disruption in operations caused by the departure of the CEO and President. The Trustee's attempt to settle Mr. Crowley's claims was consistent with his goal of proposing a Plan of Reorganization that resolved as many disputes as possible, which would create as much certainty as possible as to the cash distribution to be received by shareholders. The proposed settlement would have reduced Mr. Crowley's approximately $17 million claim to $2 million and would have provided additional certainty as to the distributions to the unsecured creditors and shareholders under the Trustee's Plan. Thus, the Trustee's decision to extend Mr. Crowley's appointment through a Transition Agreement and to attempt to settle his claim was a reasonable exercise of his business judgment.

Shortly before the hearing to approve the Transition Agreement, Mr. Crowley produced documents which included draft letters that reflected conversations between him and Cerberus regarding a possible settlement with Cerberus. The Equity Committee argued that the draft letters showed that Mr. Crowley was continuing to attempt to get paid by Cerberus for his work at Coram. It was reasonable for the Trustee to proceed with his motion to allow the Court to determine whether that was so or whether, as Mr. Crowley argued, the draft letters did not relate to Coram.

After the Court denied the motion, The Trustee and Mr. Crowley went back to their prior positions and the Trustee properly included the claims against Mr. Crowley as part of the Plan of Reorganization. Under the Bankruptcy Code, the Trustee has a responsibility to maximize the value of the Estate for the benefit of stakeholders. As per the Order confirming the Trustee's Second Amended Plan of Reorganization, the net proceeds from the Causes of Action "shall be distributed as follows: (i) first, to Reorganized Coram in an amount equal to the Post-Effective Date Administrative Claims relating to the Causes of Action; (ii) second, to the holders of Allowed General Unsecured Claims on a pro rata basis in an amount equal to the interest accruing (at the statutory judgment rate set forth in Section 1961 of Title 28 of the United States code) from the Petition Date through the Effective Date on account of such Allowed General Unsecured Claims until such interest has been paid in full; and (iii) third, on a pro rata basis to the holders of CHC Equity interest."

Barry E. Bressler, Esquire
June 8, 2007
Page 5

A list of the documents reviewed as well as my Resume are attached to this report.


The conclusions in the discussion above constitute my professional opinion to a reasonable degree of professional certainty. I reserve the right to supplement this report and respond to the opinions of any opposing experts.


J. Scott Victor
Senior Managing Director and
Co-Head, Special Situations Group
National City Investment Banking

**Documents Reviewed**

Michael Temin report dated October 3, 2006

Letter from David Friedman to Dan Crowley dated February 28, 2000

Letter from Daniel Crowley to Cerberus dated July 31, 2000

Letter from Daniel Crowley to Coram Board of Directors dated October 20, 2000

Draft letter from Daniel Crowley to "Friends of Coram"

Letter from Daniel Crowley to Coram Board of Directors dated March 9, 2001

Transcript of Trustee's Motion for Authorization to Reject the Executory Contract of Daniel Crowley dated March 3, 2003

Coram press release dated July 31, 2000

Opinion confirming the Trustee's Plan dated October 5, 2004

Order confirming the Chapter 11 Trustee's Second Amended joint Plan of Reorganization dated October 27, 2004

Opinion denying confirmation of the Second Joint Plan of Reorganization dated December 21, 2001

Spreadsheet of selected reorganization expenses

E-mail from Michael Sarocco to Kurt Davis dated February 12, 2001

E-mail from Kurt Davis to executive Planning dated February 16, 2001

Terms of Crowley Transition Agreement dated December 24, 2002

Terms of Crowley Settlement Agreement dated January 7, 2003

Chapter 11 Trustee's Answers to Defendant Daniel Crowley's First Set of Interrogatories to Plaintiff Arlin Adams dated December 20, 2006

Chapter 11 Trustee's Answers to Defendant Daniel Crowley's Second Set of Interrogatories to Plaintiff Arlin Adams dated March 27, 2007

Several Filings Pertaining to the Fee Application of Jenner & Block

Several Filings Pertaining to the Key Employee Retention Plan

Securities Exchange Agreement dated May 6, 1998

Chapter 11 Trustee's Answers to Interrogatories

Transcript of Confirmation Hearing dated November 10, 2003

Several Filings Pertaining to Motion for Summary Judgment or, in the Alternative, for the Court to Deem Certain Facts Established

Transcript of Depositions of Arlin Adams, Scott Danitz, Kurt Davis, Daniel Crowley, Allen Marabito and Michael Saracco

Amendment 2 to Securities Exchange Agreement between Coram and Noteholders dated April 9, 1999

Transcript of December 21, 2000 Court hearing

First Plan Disclosure Statement

First Amended and Restated Disclosure Statement

Coram 1999 10-K

Coram 2000 10-K

Updated Report of Goldin Associates

First Amended Second Joint Disclosure Statement

Request of Daniel Crowley for Payment of Administrative Expense

Several Filings Pertaining to the Fee Application of Altheimer & Gray

**Resume of J. Scott Victor**

SPECIAL SITUATIONS GROUP/SSG

**NationalCity.**
**Investment Banking**

### J. Scott Victor
### Senior Managing Director
### Co-Head, Special Situations Group

J. Scott Victor is a Senior Managing Director and Co-Head of the Special Situations Group/SSG of National City Investment Banking with offices outside of Philadelphia) PA, New York, NY, Cleveland, OH and Cincinnati, OH.  Scott was one of four founding partners of SSG Capital Advisors, L.P., a boutique middle-market investment banking firm that was acquired in August, 2006 by National City Bank.  Prior to his transition to investment banking in 2000, Scott was a partner at Saul Ewing, LLP and a senior member of its Bankruptcy and Reorganization Department.

With over 20 years of experience in representing companies in Chapter 11 proceedings, workouts and restructurings, Scott is an expert in the restructuring, refinancing and sale of distressed middle-market companies.  As a Senior Managing Director and Co-Head of the Special Situations Group/SSG of National City Investment Banking, Scott provides investment banking services focusing on the sale, turnaround financing, restructuring and complex valuation of middle-market companies facing operational and/or financial challenges both in and out of Chapter 11 proceedings throughout the U.S. and Europe.  His clients are both public traded and privately held companies in a wide variety of industries including manufacturing, home furnishings, automotive, distribution, consumer products, healthcare, chemical, telecommunications, food processing, media, printing, packaging, service, transportation, publishing, e-commerce and retail.

Scott has lead or participated in well over 100 sale, refinancing and restructuring assignments for distressed middle-market companies both in and outside of Chapter 11 proceedings and has testified as an expert in numerous Bankruptcy Courts across the U.S.  Scott has given more than 100 presentations around the U.S. and Europe on Bankruptcy and Insolvency Law, Distressed M&A and Turnaround Financing issues for organizations such as the American Bankruptcy Institute, Turnaround Management Association, Wharton School of the University of Pennsylvania, Pennsylvania Bar Institute, Philadelphia Bar Education Center, Eastern District of Pennsylvania Bankruptcy Conference, Southern District of Florida Bankruptcy Bar Association, New York Business Forum, Strategic Research Institute, Institute for International Research and Financial Research Associates.

Scott is a Fellow of the American College of Bankruptcy.  He is also an active member of the Turnaround Management Association – immediate past President and Chairman of the Philadelphia Chapter and member of the Executive Committee of Board of Directors of TMA International and serves as 2006-2007 Vice President of Conferences, the American Bankruptcy Institute – 2007-2008 Co-Chair of the Investment Banking Committee, Co-Chair - 2006 ABI Complex Financial Restructuring Conference and Board of Advisors for the 2007 ABI Mid-Atlantic Bankruptcy Conference, the Eastern District of Pennsylvania Bankruptcy Conference – Steering Committee 2006-2007, Association of Insolvency and Restructuring Advisors, Association for Corporate Growth, Philadelphia Bar Association, Pennsylvania Bar Association and American Bar Association.  Scott is a former President and a member of the Executive Committee and Board of Directors of the Consumer Bankruptcy Assistance Project, a member of the Board of Trustees of the Cardiovascular Institute of Philadelphia, a member of the Hamilton Circle and former member of the Board of Trustees of the Philadelphia Bar Foundation.  Scott has also been named a Pennsylvania Super Lawyer for 2006 and 2007 as well as named a Top Investment Banker by The Deal for 2004, 2005, 2006 and 2007.

Scott received his BA from the University of Pennsylvania, 1980 and his JD from the University of Miami School of Law, 1983.

# Exhibit C

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


ARLIN M. ADAMS, Chapter          :
11 Trustee of the               :
Post-Confirmation               :
Bankruptcy Estates of           :
CORAM HEALTHCARE                 :
CORPORATION, a Delaware         :
Corporation, and of             :
CORAM INC., a Delaware          :
Corporation                      :
                                 :
        vs.                      :
                                 :
DANIEL D. CROWLEY, DONALD        : CASE NO.
J. AMARAL; WILLIAM J. CASEY;     : 04-1565
L. PETER SMITH; and SANDRA      :
L. SMOLEY,                       :
        Defendants.              :


        Philadelphia, Pennsylvania,
        Monday, August 6, 2007
                - - -

    Video deposition of MICHAEL L. TEMIN,
ESQUIRE, taken pursuant to notice, at
Schnader, Harrison, Segal & Lewis, 1600
Market Street, Suite 3600, on the above
date, beginning at approximately 10:10 a.m.,
before Michelle L. Gray, Certified Shorthand
Reporter and Notary Public.

Page 2

1
2  APPEARANCES:
3  Counsel for Plaintiffs

4      BARRY E. BRESSLER, ESQUIRE
       Schnader, Harrison, Segal & Lewis
5      1600 Market Street, Suite 3600
       Philadelphia, Pennsylvania 19103
6      (215) 751-2572
       bbressler@schnader.com
7
8  Counsel for Defendants

9      ELLIOT PETERS, ESQUIRE
       Keker & Van Nest, LLP
10     710 Sansome Street
11     San Francisco, California 94111
12     (415) 391-5400
13     epeters@kvn.com
14
15 ALSO PRESENT:  Gerard Alfe, Videographer
                - - -
16
17
18
19
20
21
22
23
24
25          (INDEX at end of transcript.)

Page 3

1
2                  THE VIDEOGRAPHER:  This
3   videotape deposition is now beginning.
4   This is the videotape deposition of
5   Michael C Temin, Tape 1, Volume 1, taken
6   in the matter of Adams versus Crowley, et
7   al., in the United States District Court
8   in the District of Delaware, Case No.
9   04-1565 (SLR).
10          Today's date is August 6, 2007.
11   The time is 10:10.  The court reporter is
12   Michelle Gray.  I am the video operator,
13   Gerard Alfe, both representing LiveNote
14   Worldwide Service.
15          Counsel will now introduce
16   themselves.
17          MR. PETERS:  Elliott Peters of
18   Keker and Van Ness, LLP, on behalf of the
19   defendant, Daniel Crowley.
20          MR. BRESSLER:  Barry Bressler
21   of Schnader, Harrison, Segal & Lewis on
22   behalf of the plaintiff, Arlin M. Adams,
23   the Chapter 11 Trustee.
24          And before the witness does so,
25   his correct middle initial is L, as in

Page 4

1           MICHAEL L. TEMIN, ESQUIRE
2    Lewis.
3           ... MICHAEL L. TEMIN, ESQUIRE,
4    having been first duly sworn, was examined
5    and testified as follows:
6                  EXAMINATION
7    BY MR. PETERS:
8        Q.  Mr. Temin, how are you employed?
9        A.  I'm employed by Wolf, Block,
10   Solis-Cohen, LLP.
11       Q.  What are they?
12       A.  A law firm.
13       Q.  Are you testifying as an expert in
14   this case?
15       A.  Yes.
16       Q.  Have you testified as an expert in
17   any other cases?
18       A.  Yes.
19       Q.  On how many other occasions have you
20   testified as an expert?
21       A.  In court or at depositions?
22       Q.  Any sworn testimony.
23       A.  What time period?
24       Q.  How about the last ten years?
25       A.  Five or six, I believe.

## Page 13

```
 1          MICHAEL L. TEMIN, ESQUIRE
 2   consider yourself an expert on the standard of
 3   care of a bankruptcy lawyer?
 4       A.   Yes.
 5       Q.   Is your area of expertise in this
 6   case all of bankruptcy law?  A particular
 7   portion of bankruptcy law?
 8       A.   In this case?
 9       Q.   In this case.
10       A.   I was asked to answer one question.
11       Q.   And did that -- withdrawn.
12            Did answering that question cause
13   you to call upon your expertise in any
14   particular areas of bankruptcy law?
15       A.   Yes.
16       Q.   Which areas?
17       A.   My knowledge of reorganization law
18   and my views of the way the Bankruptcy Court
19   in Delaware, Judge Walrath in particular,
20   would apply that law.
21       Q.   In rendering your opinion in this
22   case, did you draw upon your knowledge and
23   expertise in the operation of the bankruptcy
24   process?
25       A.   To some extent.
```

## Page 14

```
 1          MICHAEL L. TEMIN, ESQUIRE
 2       Q.   In rendering your opinions in this
 3   case, did you draw upon your expertise in
 4   predicting what a judge would do under
 5   particular circumstances?
 6       A.   What a particular judge would do
 7   under a particular set of circumstances.
 8       Q.   Do you consider yourself an expert
 9   in the behavior of judges in the Bankruptcy
10   Court in Delaware?
11            MR. BRESSLER:  Object to the
12       form.
13            THE WITNESS:  Generally?  No.
14   BY MR. PETERS:
15       Q.   Are you an expert with respect to
16   the behavior of judges on the Third Circuit?
17       A.   No.
18       Q.   Are there any judges in the Delaware
19   Bankruptcy Court as to whom you consider
20   yourself an expert in evaluating or opining
21   about their behavior?
22       A.   In general?
23       Q.   Correct.
24       A.   No.
25       Q.   Do you consider yourself an expert
```

## Page 15

```
 1          MICHAEL L. TEMIN, ESQUIRE
 2   in predicting the behavior of Judge Mary
 3   Walrath?
 4       A.   In general?  Or in a particular
 5   case?
 6       Q.   Let's start out with in general.
 7       A.   No.
 8       Q.   Do you consider yourself an expert
 9   at predicting the behavior of any other judges
10   in the Delaware Bankruptcy Court under any
11   particular circumstances?
12       A.   It would depend on which judge and
13   what set of circumstances.
14       Q.   As to which of the judges in the
15   Delaware Bankruptcy Court do you consider that
16   there are circumstances under which you would
17   be an expert at predicting their behavior?
18       A.   Judge Walsh, Judge Carey, and Judge
19   Walrath.
20       Q.   Only those three?
21       A.   Yes.
22       Q.   Why Judge Walsh?
23       A.   Because he is the longest serving
24   bankruptcy judge in Delaware.
25       Q.   Any other reasons?
```

## Page 16

```
 1          MICHAEL L. TEMIN, ESQUIRE
 2       A.   No.
 3       Q.   How about Judge Carey?
 4       A.   Yes.
 5       Q.   And why do you consider yourself an
 6   expert?
 7       A.   Because I've known Judge Carey since
 8   he started practicing law and observed him as
 9   a judge in the Bankruptcy Court for the
10   Eastern District of Pennsylvania and as a
11   judge in the District of Delaware Bankruptcy
12   Court.
13       Q.   And how about Judge Walrath?  Why do
14   you consider yourself an expert in --
15       A.   I have known her since she started
16   practicing law and have observed her as a
17   judge in the Bankruptcy Court in the District
18   of Delaware.
19       Q.   But with respect to any of the other
20   judges in the Bankruptcy Court in Delaware,
21   you do not consider yourself an expert in
22   evaluating or opining about their behavior?
23            MR. BRESSLER:  I'll object to
24       the form, but he can answer.
25            THE WITNESS:  That's correct.
```

Case 1:04-cv-01565-SLR     Document 178-4 · Filed 08/20/2007 · Page 14 of 47
Temin, Esq., Michael L.

8/6/2007

## Page 17

```
1              MICHAEL L. TEMIN, ESQUIRE
2   BY MR. PETERS:
3       Q.   Are there particular circumstances
4   under which you would feel yourself to be an
5   expert, for example, in predicting the
6   behavior of Judge Walsh?
7       A.   Yes.
8       Q.   What types of circumstances?
9       A.   In a defined case in which the facts
10  were laid out, I think that I would be an
11  expert in predicting what Judge Walsh would
12  opine.
13      Q.   What do you mean by if the facts had
14  laid out?
15      A.   I would not do it in the abstract,
16  nor do I think I could, but in a particular
17  case in which I knew the evidence that Judge
18  Walsh had heard or would hear, I think that I
19  would be able to predict what Judge Walsh
20  would do.
21      Q.   So in any case where you
22  familiarized yourself with the factual record
23  before Judge Walsh and considered the legal
24  questions, you could predict the outcome of
25  that case?
```

## Page 18

```
1              MICHAEL L. TEMIN, ESQUIRE
2           MR. BRESSLER:  Object to the
3      form.  That's not what he said.
4           THE WITNESS:  I think I
5      probably could.
6   BY MR. PETERS:
7       Q.   To -- under those circumstances, to
8   what -- what do you believe your success rate
9   would be in predicting the outcome of a case
10  before Judge Walsh?  100 percent?
11      A.   No.
12      Q.   What would your percentage rate be?
13      A.   I don't know.
14      Q.   50 percent?
15      A.   Over 50 percent.
16      Q.   80 percent?
17      A.   I do not know.  Between 50 and 100.
18      Q.   More than 90 percent, you think?
19      A.   I do not know.  Between 50 and 100.
20      Q.   So -- now, the bankruptcy
21  proceedings in Delaware, they are public; is
22  that right?
23      A.   Yes.
24      Q.   So in every single case before Judge
25  Walsh, you could find out what the factual
```

## Page 19

```
1              MICHAEL L. TEMIN, ESQUIRE
2   record was by reading the public record,
3   right?
4       A.   Generally.
5       Q.   So in any case before that court,
6   before that judge, you could predict the
7   outcome of the case based on what's publicly
8   available?
9           MR. BRESSLER:  Object to the
10     form.
11          THE WITNESS:  I believe that I
12     could.
13  BY MR. PETERS:
14      Q.   Do you believe you can do that more
15  than other practitioners in Philadelphia or
16  Delaware?
17      A.   More than most others, yes.
18      Q.   Do you represent that to your
19  clients, that you're able to predict better
20  than other lawyers what's going to happen in
21  court?
22      A.   No.
23      Q.   Why not?
24      A.   Why?
25      Q.   I asked you the question, though.
```

## Page 20

```
1              MICHAEL L. TEMIN, ESQUIRE
2   Why not?
3       A.   I have no occasion to do so.
4       Q.   Do you believe that your ability to
5   predict the behavior of a federal bankruptcy
6   judge under certain circumstances is necessary
7   to the completion of your assignment in this
8   case?
9       A.   Generally?  No.
10      Q.   Does it bear upon your assignment at
11  all?
12      A.   It bears upon it only with respect
13  to my ability to predict how Judge Walrath
14  would act in
15  a particular -- in this particular case.
16      Q.   Is the ability to predict how Judge
17  Walrath would act in a particular case
18  necessary for the completion of your
19  assignment in this case?
20      A.   Only necessary for me to predict how
21  she would act in this case.
22      Q.   But in order to do that, to predict
23  how she would act in this case, you need to be
24  able to predict how she would act in other --
25  under a certain set of facts and
```

Page 21

```
1              MICHAEL L. TEMIN, ESQUIRE
2    circumstances, right?
3        A.   No.
4        Q.   Are you only able to predict Judge
5    Walrath's behavior in this case, or would you
6    be able to predict her behavior in other
7    cases?
8              MR. BRESSLER:  Object to the
9        form.
10             THE WITNESS:  I believe I could
11       predict her behavior in other cases as
12       well, but it is not necessary for my
13       expert opinion in this case.
14   BY MR. PETERS:
15       Q.   As with Judge Walsh, who you
16   testified about, would you be able to predict
17   Judge Walrath's behavior in any case in which
18   you knew the factual record?
19       A.   Any case?  I don't know about any
20   case.
21       Q.   So there are certain circumstances
22   under which you think you could not predict
23   Judge Walrath's behavior?
24       A.   I don't have a thought about that
25   one way or the other.
```

Page 22

```
1              MICHAEL L. TEMIN, ESQUIRE
2        Q.   You would be able in any case before
3    Judge Walrath, though, to obtain -- to obtain
4    from the Court the factual record, correct?
5              MR. BRESSLER:  Object to the
6        form.
7              THE WITNESS:  In most cases.
8    BY MR. PETERS:
9        Q.   In the course of your career, have
10   you handled cases before Judges Walsh, Carey,
11   and Walrath?
12       A.   Define "handled."
13       Q.   Been an attorney of record in a
14   contested proceeding.
15       A.   Which went to trial or just in a
16   contested proceeding?
17       Q.   Fair -- fair point of clarification.
18   In any contested proceeding in which the Court
19   had to rule.
20             MR. BRESSLER:  I'll object to
21       the form, but he can answer.
22             THE WITNESS:  Yes, yes, and no.
23   BY MR. PETERS:
24       Q.   Can you explain what the "yes, yes,
25   and no" refer to?
```

Page 23

```
1              MICHAEL L. TEMIN, ESQUIRE
2        A.   You asked three questions.  I
3    answered them.
4        Q.   Okay.  Have you ever appeared in a
5    contested proceeding in front of Judge Walsh
6    where the Court had to rule?
7        A.   Yes.
8              MR. BRESSLER:  I'll object to
9        the form.  But he can answer.
10   BY MR. PETERS:
11       Q.   Have you ever appeared as counsel in
12   a contested proceeding before Judge Walsh
13   where he ruled against you or your client?
14       A.   I don't recall.
15       Q.   On how many occasions have you
16   appeared on behalf of a client in a contested
17   proceeding before Judge Walsh?
18       A.   I don't recall.
19       Q.   Do you recall whether you have ever
20   appeared before Judge Walsh in a contested
21   proceeding on behalf of a client where your
22   client won?
23       A.   I don't recall.
24       Q.   Do you recall whether you've ever
25   appeared in front of -- if I've just asked you
```

Page 24

```
1              MICHAEL L. TEMIN, ESQUIRE
2    this, I apologize, but do you recall if you
3    ever appeared in a contested proceeding before
4    Judge Walsh on behalf of a client?
5        A.   Yes.
6              MR. BRESSLER:  I'll object to
7        the form.
8    BY MR. PETERS:
9        Q.   You do?
10       A.   Yes.  But I don't recall the
11   specifics.
12       Q.   When was the last time you appeared
13   before Judge Walsh?
14       A.   I don't recall.
15       Q.   Was it in the last ten years?
16       A.   Yes.
17       Q.   Was it in the last five years?
18       A.   Probably.
19       Q.   How about Judge Carey?  Have you
20   ever appeared before him in a contested
21   proceeding on behalf of a client?
22             MR. BRESSLER:  I'll object to
23       the form.
24             THE WITNESS:  Yes.
25   BY MR. PETERS:
```

Pages 21 to 24

## Page 81

```
 1              MICHAEL L. TEMIN, ESQUIRE
 2      form.
 3              THE WITNESS:  If I know there
 4      was information I don't have, the answer
 5      is yes.
 6  BY MR. PETERS:
 7      Q.   Then under those circumstances,
 8  you'd ask the client for it?
 9      A.   Yes.
10      Q.   Okay.  Sticking with the same
11  hypothetical, I'd like you to further assume
12  that the CEO of this company serves as a paid
13  consultant to one of the company's largest
14  creditors and that fact is disclosed in the
15  disclosure statement.
16              Should the disclosure statement also
17  contain the terms of the CEO's contract with
18  the creditor and the amount that the CEO is
19  being paid by the creditor?
20              MR. BRESSLER:  I'll object to
21      the form.
22              THE WITNESS:  Probably.
23  BY MR. PETERS:
24      Q.   When you give that opinion, are you
25  drawing on your expertise and knowledge as an
```

## Page 82

```
 1              MICHAEL L. TEMIN, ESQUIRE
 2  attorney?
 3              MR. BRESSLER:  I'll object to
 4      the form, and I'll object to the word
 5      "opinion."  He wasn't giving an opinion;
 6      he was answering a question.  And he can
 7      answer.
 8              MR. PETERS:  Fair enough.  I'll
 9      rephrase it.
10  BY MR. PETERS:
11      Q.   In answering that question, were you
12  drawing on your expertise as an attorney?
13      A.   Yes.
14      Q.   Sticking with that same
15  hypothetical, assume that the Bankruptcy Court
16  denies confirmation of the plan because the
17  CEO's relationship with the creditor is an
18  actual conflict of interest in the view of
19  Bankruptcy Court, even though the plan was
20  otherwise confirmable.
21              Was the attorney under that
22  hypothetical in any way responsible for the
23  denial of the plan?
24              MR. BRESSLER:  Object to the
25      form.  He can answer.
```

## Page 83

```
 1              MICHAEL L. TEMIN, ESQUIRE
 2              THE WITNESS:  No.  I have no
 3      idea.
 4  BY MR. PETERS:
 5      Q.   In your opinion, if a member of the
 6  board of a company filing for bankruptcy is
 7  also the president of the company's largest
 8  creditor, should that fact be contained in the
 9  disclosure statement?
10      A.   Say it again, please.
11      Q.   If a member of the board of
12  directors of a company filing for bankruptcy
13  is the most senior executive of the company's
14  largest creditor, should that fact be
15  disclosed in the disclosure statement?
16      A.   Yes.
17      Q.   What if under those same facts the
18  board member had resigned his position on the
19  board two weeks before the bankruptcy filing?
20  Should that relationship still be disclosed in
21  the disclosure statement?
22      A.   I think I've gone as far as I'm
23  going in terms of answering questions that
24  have nothing to do with my opinion.  And I'm
25  not going to respond to that.
```

## Page 84

```
 1              MICHAEL L. TEMIN, ESQUIRE
 2      Q.   So you're going to refuse to answer
 3  that?
 4      A.   I'm going to refuse to answer.  And
 5  I'd be delighted for you to seek a ruling on
 6  that question.  Now is a good time for you to
 7  do that.
 8      Q.   Do you understand the relationship
 9  to this case of the hypotheticals that I've
10  been asking you?
11              MR. BRESSLER:  Object to the
12      form.
13              THE WITNESS:  Yes.
14  BY MR. PETERS:
15      Q.   So you understand that the
16  hypotheticals that I've been asking you are,
17  in fact, related to the facts of this case?
18              MR. BRESSLER:  Object to the
19      form.
20              THE WITNESS:  Yes.
21  BY MR. PETERS:
22      Q.   Have a look at your -- Temin Exhibit
23  1, which is in front of you, if you don't
24  mind, sir.
25      A.   (Witness complies.)
```

Pages 81 to 84

Page 133

```
 1        MICHAEL L. TEMIN, ESQUIRE
 2   I'm not sure as I read the language -- I'm not
 3   so sure that I do understand it.
 4        The language seems to say that the
 5   -- for their $40 million, the noteholders will
 6   be getting preferred stock in Coram.
 7        Q.   Was this the payment that you were
 8   referring to earlier when we were discussing
 9   your conversation with Mr. Shestack and his
10   testimony about a settlement with the
11   noteholders?
12        A.   I didn't discuss with Mr. Shestack
13   the substance of the settlement between the
14   noteholders and the Trustee. The only thing I
15   discussed with him was the bankruptcy process.
16        Q.   But I believe you testified -- and
17   correct me if I'm wrong -- that you understood
18   when you discussed with him the bankruptcy
19   process, that he was testifying about the
20   fairness or appropriateness of the settlement
21   between the Trustee and the noteholders, which
22   involved $56 million?
23        A.   Yes.
24        Q.   And is that the same $56 million
25   event that's being discussed here in this
```

Page 134

```
 1        MICHAEL L. TEMIN, ESQUIRE
 2   e-mail from
 3   Mr. Bressler?
 4        A.   I assume so.
 5        MR. PETERS:  What time is it
 6   now?  It's five minutes of 1:00.  Why
 7   don't we -- as planned, why don't we take
 8   our luncheon recess now and go off the
 9   record.
10        THE VIDEOGRAPHER:  We're now
11   going off the videotape record.  The
12   time, 12:54 and 33 seconds.
13        (Lunch break.)
14        THE VIDEOGRAPHER:  We are now
15   back on the videotape record.  The time,
16   1:53.
17   BY MR. PETERS:
18        Q.   Prior to the time that you prepared
19   your report in this case, Temin-1, what did
20   you understand your assignment to be?
21        A.   Just what I stated in the first
22   paragraph.
23        Q.   So just tell us in your own words
24   what your assignment was.
25        A.   Presented with the plan of
```

Page 135

```
 1        MICHAEL L. TEMIN, ESQUIRE
 2   reorganization that was the first amended and
 3   restated joint plan, would Judge Walrath have
 4   confirmed it if Crowley and Cerberus Partners
 5   did not have the contractual and other
 6   relationships that they had.
 7        Q.   Is that the full scope of your
 8   assignment?
 9        A.   Yes.
10        Q.   Who gave you that assignment?
11        A.   Mr. Bressler.
12        Q.   When did you receive it?
13        A.   Some time in 2006.  Summer 2006, I
14   think.
15        Q.   Okay.  And how did you go about
16   doing your work?  What did you do?
17        A.   Read some pleadings and all of the
18   notes of testimony on the confirmation
19   hearings, Court's opinions, and the other
20   documents that are referenced in my opinion.
21        Q.   So you read all those materials?
22        A.   Yes.
23        Q.   And then what did you do?
24        A.   Thought about it and then wrote my
25   opinion.
```

Page 136

```
 1        MICHAEL L. TEMIN, ESQUIRE
 2        Q.   What else did you do?  Anything?
 3        A.   No.
 4        Q.   What -- what deposition testimony
 5   taken in this case have you read?
 6        A.   I haven't read any.
 7        Q.   Have you ever read any testimony
 8   given by David Friedman?
 9        A.   No.
10        Q.   Have you ever read any testimony
11   given by Richard Levy?
12        A.   No.
13        Q.   Have you ever read any testimony
14   given by Arlin Adams?
15        A.   I can't recall.  I may have read
16   some testimony by Judge Adams, but I can't
17   remember whether it was in one of the hearings
18   or depositions.
19        Q.   How much time have you spent on the
20   matter altogether?
21        A.   I don't recall.
22        Q.   Can you give us your best estimate?
23        A.   20 or 30 hours.
24        Q.   Was most of that time spent reading?
25        A.   Yes.
```

Pages 133 to 136

## Page 141

1          MICHAEL L. TEMIN, ESQUIRE
2      Q.   Does a court, a bankruptcy court,
3  have considerable judicial discretion in
4  determining whether a particular bankruptcy
5  plan was proposed in good faith?
6      A.   Within the confines of the statute.
7      Q.   Does a -- does a bankruptcy court,
8  in deciding whether to confirm a plan of
9  reorganization, evaluate the totality of
10  circumstances surrounding a plan?
11      A.   No.
12      Q.   In so doing, does a court have
13  considerable judicial discretion in finding
14  good faith?
15      A.   Since I disagreed with your first
16  statement, I have trouble agreeing with your
17  second.
18      Q.   Okay.  Does a court, in evaluating a
19  plan, have considerable judicial discretion in
20  finding good faith?
21      A.   It has discretion based upon what is
22  presented to it, and that is the one element
23  of confirmation that can be found without any
24  evidence.
25      Q.   Is the most important feature of an

## Page 142

1          MICHAEL L. TEMIN, ESQUIRE
2  inquiry into good faith the fundamental
3  fairness of the plan?
4      A.   No.
5      Q.   What is the most important feature
6  with respect to the good faith of a plan?
7      A.   Good faith of a plan?  I don't
8  understand the concept.
9      Q.   Into the fundamental fairness of a
10  plan; I'm sorry.
11      A.   Fundamental fairness is not one of
12  the confirmation elements.
13      Q.   So fundamental fairness isn't
14  something that a bankruptcy court would
15  consider --
16          MR. BRESSLER:  Object to the
17      form.
18  BY MR. PETERS:
19      Q.   -- in determining whether to confirm
20  a plan?
21      A.   That is correct.
22      Q.   Tell me whether you agree or
23  disagree with the following statement:  In
24  evaluating the totality of circumstances
25  surrounding a plan, a court has considerable

## Page 143

1          MICHAEL L. TEMIN, ESQUIRE
2  judicial discretion in finding good faith,
3  with the most important feature being an
4  inquiry into the fundamental fairness of the
5  plan.
6      A.   I disagree.
7      Q.   You consider yourself an expert on
8  the decision-making of Judge Mary Walrath?
9      A.   No.  I consider myself expert on
10  determining what she would do in a particular
11  circumstance that's been submitted.
12      Q.   Have you ever read Judge Walrath's
13  written plan -- written opinion on the second
14  joint plan of reorganization dated August 20,
15  2001 submitted to the Court by Coram?
16      A.   Yes.
17      Q.   The statement that I just read to
18  you that you disagreed with comes from Judge
19  Walrath's opinion in that case.  Are you aware
20  of that?
21      A.   No.
22      Q.   Would it surprise you to learn that?
23      A.   I'll take your representation.
24      Q.   But does it surprise you that that
25  statement that you just disagreed with came

## Page 144

1          MICHAEL L. TEMIN, ESQUIRE
2  from Judge Walrath?
3      A.   Yes.
4      Q.   Do you believe that statement is
5  incorrect?  I'll read it again if you'd like.
6          MR. BRESSLER:  Object to form.
7          THE WITNESS:  I'd like you to
8      read it in context.
9  BY MR. PETERS:
10      Q.   Let me just read it to you.
11      "In evaluating the totality of
12  circumstances surrounding a plan, a court has
13  considerable judicial discretion in finding
14  good faith, with the most important feature
15  being an inquiry into the fundamental fairness
16  of the plan."
17          Do you think that's incorrect?  I'm
18  reading from Judge Walrath's opinion on Page
19  12.
20      A.   I don't think fundamental fairness
21  is one of the confirmation standards.
22      Q.   So you think that that statement of
23  the law is incorrect?
24      A.   I think it's overbroad.
25      Q.   You formed the opinion, I believe,

Page 145

```
 1            MICHAEL L. TEMIN, ESQUIRE
 2   that the Bankruptcy Court would have confirmed
 3   the plan in the absence of a Crowley-Cerberus
 4   relationship, although it might have required
 5   a modification of the plan release. I'm just
 6   reading from your report there. Is that
 7   right?
 8        A.   Yes.
 9        Q.   And in the prior paragraph, you used
10   the statement "but for" the relationship
11   between Crowley and Cerberus, and in essence,
12   as I understand your opinion, you're saying
13   but for the relationship between Crowley and
14   Cerberus, the plan would have been confirmed?
15        A.   Yes.
16        Q.   Do you agree with the following
17   statement: That but for the efforts of the --
18   but for the appointment of an Equity Committee
19   in Coram's bankruptcy, the plan would have
20   been confirmed?
21            MR. BRESSLER:  Object to the
22        form.
23            THE WITNESS:  No.
24   BY MR. PETERS:
25        Q.   Do you agree with the following
```

Page 146

```
 1            MICHAEL L. TEMIN, ESQUIRE
 2   statement: But for the work of Richard Levy
 3   on behalf of the interest of the shareholders,
 4   the plan would have been confirmed?
 5            MR. BRESSLER:  Same objection
 6        to form.
 7            THE WITNESS:  I can't tell.
 8   BY MR. PETERS:
 9        Q.   Why can't you tell?
10        A.   Because I don't know whether the
11   information about the Crowley-Cerberus
12   relationship would have been presented to the
13   Court, even if
14   Mr. Levy hadn't been involved in the case.
15        Q.   Do you think the relationship about
16   the Crowley-Cerberus relationship would have
17   been presented to the Court if there had been
18   no Equity Committee?
19        A.   Yes.
20        Q.   Who would have presented it to the
21   Court?
22        A.   Among other things, Mr. Levy.
23        Q.   On whose behalf would Mr. Levy have
24   presented it to the Court?
25        A.   The shareholders whom he was
```

Page 147

```
 1            MICHAEL L. TEMIN, ESQUIRE
 2   representing.
 3        Q.   Do you know who they were?
 4        A.   No.
 5        Q.   You don't know anything about any of
 6   the shareholders that Mr. Levy was
 7   representing?
 8        A.   No.
 9        Q.   Have you ever heard of a fellow
10   named Sam Zell?
11        A.   Yes.
12        Q.   Do you know who he is?
13        A.   I know he is a Chicago-based
14   investor.
15        Q.   Was he one of the people that Mr.
16   Levy was representing?
17        A.   I don't know.
18        Q.   How about Wil Weinstein? Do you
19   know who he is?
20        A.   No.
21        Q.   Ever heard of something called the
22   Lurie Trust?
23        A.   Not that I recall.
24        Q.   How about Sam's Stock, L.L.C.? Do
25   you know what that is?
```

Page 148

```
 1            MICHAEL L. TEMIN, ESQUIRE
 2        A.   No.
 3        Q.   Tell me whether or not you agree
 4   with the following statement: But for the
 5   advice and representation Coram received in
 6   connection with the preparation and filing of
 7   its first bankruptcy plan, that plan would
 8   have been approved.
 9            MR. BRESSLER:  Object to the
10        form.
11            THE WITNESS:  I disagree.
12   BY MR. PETERS:
13        Q.   Do you think if Coram had received
14   better representation in connection with its
15   first plan of reorganization that the plan
16   would have been approved?
17            MR. BRESSLER:  Object to the
18        form.
19            THE WITNESS:  I don't know.
20   BY MR. PETERS:
21        Q.   Do you think it's possible that a
22   different lawyer could have made a difference
23   in the outcome of that plan?
24            MR. BRESSLER:  Object to the
25        form again.
```

Pages 145 to 148

## Page 149

MICHAEL L. TEMIN, ESQUIRE

1    MICHAEL L. TEMIN, ESQUIRE
2         THE WITNESS: If you change the
3    facts, you might change the results.
4    BY MR. PETERS:
5         Q.   Aren't you changing the facts when
6    you posed the hypothetical to yourself of
7    whether the plan would have been approved if
8    Crowley and Cerberus didn't have the
9    relationship?
10        A.   Yes.
11        Q.   And isn't that inherent in the work
12   that you're doing; that you're going to change
13   the facts and draw conclusions about what
14   would have happened in a different situation?
15        A.   In one different situation, yes.
16        Q.   So what I'm asking you to do is
17   change the facts and imagine -- and assume a
18   different lawyer -- yourself, perhaps --
19   represented Coram in the bankruptcy.
20        If you had represented Coram in
21   connection with the preparation and submission
22   of its first plan of reorganization, would the
23   outcome have been different?
24        A.   Are we changing any other fact or
25   just that one?

## Page 150

MICHAEL L. TEMIN, ESQUIRE

1    MICHAEL L. TEMIN, ESQUIRE
2         Q.   Oh, we're not changing any other
3    facts other than that you might have done
4    things differently than Mr. Friedman.
5         A.   Then we are starting to change other
6    facts.
7         Q.   Well, I'm asking you to answer the
8    question.
9         A.   I'm saying that I don't know the
10   answer to that question because it would have
11   depended upon what other facts we changed.
12        Q.   Okay.  If you had represented Coram
13   in the bankruptcy, would you have done
14   anything differently than Mr. Friedman did?
15             MR. BRESSLER:  Object to form.
16             THE WITNESS:  I would hope so.
17   BY MR. PETERS:
18        Q.   What would you have done
19   differently?
20        A.   I would have known more about the
21   Coram-Cerberus (sic) relationship and taken
22   some action in response to that knowledge.
23        Q.   What action would you have taken?
24        A.   A variety, but it would have
25   depended upon my recommendation to the client

## Page 151

MICHAEL L. TEMIN, ESQUIRE

1    MICHAEL L. TEMIN, ESQUIRE
2    and then the client would have to agree.
3         Q.   What would you have recommended to
4    the client?
5             MR. BRESSLER:  Object to the
6    form.
7             THE WITNESS:  What I discussed
8    earlier; that is, having Crowley removed
9    from the plan negotiations and an
10   independent committee of the board with
11   knowledge of the Crowley-Cerberus
12   relationship involved and then see
13   whether or not the result at that point
14   would have been the same plan or a
15   different plan.
16   BY MR. PETERS:
17        Q.   Do you know whether or not Crowley
18   was removed from negotiations with the
19   noteholders in connection with the first plan?
20        A.   I do not believe he was.
21        Q.   Do you think the outcome of the
22   Coram -- if you were representing Coram, you
23   could have gotten a different outcome on the
24   first plan of reorganization?
25             MR. BRESSLER:  Object to form.

## Page 152

MICHAEL L. TEMIN, ESQUIRE

1    MICHAEL L. TEMIN, ESQUIRE
2         THE WITNESS:  I don't know
3    whether it would have been the same plan.
4    BY MR. PETERS:
5         Q.   As you sit here, do you see any need
6    to have changed the plan?
7         A.   Whether it would have needed to
8    change the plan would have depended upon what
9    Coram wanted to do on the one hand, what the
10   noteholders wanted to do on the other hand.
11   And if you change one of the facts, I don't
12   know what other facts might change as a
13   result.
14        Q.   I'm not changing -- do you have any
15   reason to believe that Coram or the
16   noteholders wanted anything differently than
17   what was in the first plan?
18        A.   I have no reason to believe either
19   way.
20        Q.   The only thing we are changing is
21   the identity of the attorney representing
22   Coram.
23        A.   No.  You want me then to change some
24   of the other facts as a result of becoming the
25   attorney for Coram.

Pages 149 to 152

## Page 153

MICHAEL L. TEMIN, ESQUIRE

1
2      Q.    Well, if you think that you would
3   have changed some of the other facts based
4   upon becoming the attorney for Coram...
5          If -- can you predict -- you've told
6   us that you think you can predict what a federal judge
7   will do in a case.  I'm asking whether, as a
8   lawyer, you could have changed the outcome of
9   the first confirmation plan of the Coram
10  bankruptcy.
11          MR. BRESSLER:  Object to the
12      form.
13          THE WITNESS:  And I'm telling
14      you that, as a lawyer, all I can do is
15      recommend things to the client.
16  BY MR. PETERS:
17      Q.    Okay.  Assume the client would have
18  followed all of your recommendations.
19      A.    Then we might have had a different
20  plan or we might have had the same plan.  I
21  don't know.
22      Q.    So you don't know whether you would
23  have done anything differently than Mr.
24  Friedman did?
25      A.    That isn't what I said.

## Page 154

MICHAEL L. TEMIN, ESQUIRE

1
2      Q.    Well, would you have done anything
3   differently than what Mr. Friedman did?
4      A.    I think I have said that before.
5      Q.    And do you think that that would
6   have caused a different outcome in the plan?
7      A.    I don't know.
8      Q.    Why not?
9      A.    Because I don't know what the client
10  to whom I would have made recommendations
11  would have done.
12      Q.    But I've asked you to assume they
13  would follow you -- all your recommendations.
14      A.    Then the question is:  Once that
15  happened, would the result have been the same
16  in the negotiations between Coram and the
17  noteholders.
18      Q.    About the contents of the plan, you
19  mean?
20      A.    That's correct.
21      Q.    Okay.  Assume that they would have
22  been the same.  Would you have been able to
23  get that plan confirmed?
24          MR. BRESSLER:  Object to the
25      form.

## Page 155

MICHAEL L. TEMIN, ESQUIRE

1
2          THE WITNESS:  Yes.
3   BY MR. PETERS:
4      Q.    How would you have gone about
5   getting that plan confirmed?
6      A.    By removing the Crowley-Cerberus
7   relationship, and by having the plan negotiated
8   between people that did not involve Crowley
9   and by having a disclosure of all of those
10  facts, including Crowley's prior relationship,
11  which would have been discontinued at that
12  point between Crowley and Cerberus.
13      Q.    And -- and if you had done those
14  things, it's your opinion, then, the plan
15  would have been confirmed?
16      A.    Yes.
17          MR. PETERS:  Let's mark this,
18      if you don't mind, Michelle, as the next
19      exhibit, Temin-4.
20          (Document marked for
21      identification as Exhibit Temin-4.)
22  BY MR. PETERS:
23      Q.    I think you've been shown what's
24  been marked as Temin-4.  It's a set of Coram
25  Healthcare board of directors minutes dated

## Page 156

MICHAEL L. TEMIN, ESQUIRE

1
2   July 31st of 2000.
3          I'd ask you -- have you ever seen
4   this document before?
5      A.    No.
6      Q.    I ask you to -- you can read any
7   part of it you'd like, but I'm going to ask
8   you questions about a portion of it that
9   starts on Page 7.
10      A.    All right.  I've read it.
11      Q.    Have you had a chance to read the
12  portion of Page 7 under the subheading,
13  Special Committee?
14      A.    Yes.
15      Q.    Did Coram's board on or about July
16  31st of 2000 create a special committee of
17  directors to review any preliminary agreement
18  or understanding reached between Coram and the
19  noteholders?
20          MR. BRESSLER:  Object to the
21      form.
22          THE WITNESS:  Yes.
23  BY MR. PETERS:
24      Q.    Is that something that you weren't
25  aware of prior to reading this?

Page 241

```
1
2          E X H I B I T S  (Cont'd.)
3
4   NO.            DESCRIPTION           PAGE
5   Exhibit 10     Transcript from Court  203
6                  12/21/00
7   Exhibit 11     Expert Report of       217
8                  Dworetzky
9
10                  - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 242

```
1
2           I have read the foregoing transcript of
3   my video deposition given on AUGUST 6, 2007,
4   and it is true, correct and complete, to the
5   best of my knowledge, recollection and belief,
6   except for the corrections noted hereon and/or
7   list of corrections, if any, attached on a
8   separate sheet herewith.
9
10
11
12
13
14       _____
14           MICHAEL L. TEMIN, ESQUIRE
15
16
17
18       Subscribed and sworn to
19       before me this _____ day
20       of _____, 20____.
21
22
23       _____
24       Notary Public
25
```

Page 243

```
1
2               CERTIFICATE
3
4       I HEREBY CERTIFY that the
5   proceedings, evidence and objections are
6   contained fully and accurately in the
7   stenographic notes taken by me upon the video
8   deposition of MICHAEL L. TEMIN, ESQUIRE, taken
9   on AUGUST 6, 2007, and that this is a true and
10  correct transcript of same.
11
12
13
14
15       _____
16           MICHELLE L. GRAY, CSR
             and Notary Public
17
18       (The foregoing certification of this
19  transcript does not apply to any reproduction
20  of same by any means, unless under the direct
21  control and/or supervision of the certifying
22  reporter.)
23
24
25
```

# Exhibit D

Victor, Esq., J. Scott                                              8/7/2007

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, Chapter       :
11 Trustee of the            :
Post-Confirmation            :
Bankruptcy Estates of        :
CORAM HEALTHCARE             :
CORPORATION, a Delaware      :
Corporation, and of          :
CORAM INC., a Delaware       :
Corporation                  :
        Plaintiff            :
    vs.                      :
                             : CASE NO.
DANIEL D. CROWLEY; DONALD J. : 04-1565
AMARAL; WILLIAM J. CASEY;    : (SLR)
L. PETER SMITH; AND SANDRA L.:
SMOLEY,                      :
        Defendants

        Philadelphia, Pennsylvania,
        Tuesday, August 7, 2007

    Video deposition of J. SCOTT VICTOR,
ESQUIRE, taken pursuant to notice, at
Schnader, Harrison, Segal & Lewis, 1600
Market Street, Suite 3600, on the above
date, beginning at approximately 9:46 a.m.,
before Michelle L. Gray, Certified Shorthand
Reporter and Notary Public.

## Page 2

```
 1
 2  APPEARANCES:
 3  Counsel for Plaintiffs
        Schnader, Harrison, Segal & Lewis
 4      BARRY E. BRESSLER, ESQ.
        1600 Market Street, Suite 3600
 5      Philadelphia, Pennsylvania 19103
        (215) 751-2572
 6      bbressler@schnader.com
 7  Counsel for Defendants
 8      Keker & Van Nest, LLP
        ELLIOT R. PETERS, ESQ.
 9      710 Sansome Street
        San Francisco, California 94111
10      (415) 391-5400
11      epeters@kvn.com
12
13  ALSO PRESENT:  Gerard Alfe, Videographer
14
15
16
17
18
19
20
21
22
23
24
25      (INDEX at end of transcript.)
```

## Page 3

```
 1
 2          THE VIDEOGRAPHER:  This
 3  videotape deposition is now beginning.
 4  The date, August 7, 2007.  The time,
 5  9:46.
 6          This is the videotape
 7  deposition of J. Scott Victor taken in
 8  the matter of Adams versus Crowley, et
 9  al., in the United States District Court
10  for the District of Delaware, Case No.
11  04-1565 (SLR).
12          The court reporter is Michelle
13  Gray.  I'm the video operator.  My name
14  is Gerard Alfe.  This deposition is
15  taking place at 1600 Market Street,
16  Philadelphia, PA, 19103.
17          Counsel will now introduce
18  themselves.
19          MR. PETERS:  Elliot Peters on
20  behalf of Daniel Crowley.
21          MR. BRESSLER:  Barry Bressler
22  on behalf of Arlin M. Adams, the Chapter
23  11 Trustee.
24          (Documents pre-marked for
25  identification as Exhibits Victor-1
```

## Page 4

```
 1          J. SCOTT VICTOR, ESQUIRE
 2  through Victor-4.)
 3          ... J. SCOTT VICTOR, ESQUIRE,
 4  having been first duly sworn, was
 5  examined and testified as follows:
 6          EXAMINATION
 7  BY MR. PETERS:
 8      Q.  Mr. Victor, good morning.
 9      A.  Good morning.
10      Q.  How are you employed, sir?
11      A.  I am -- why don't you -- why don't
12  we hold off for a second.
13          MR. PETERS:  Do you want to
14  just go off the record for a minute, for
15  a second?
16          THE WITNESS:  No.
17  BY MR. PETERS:
18      Q.  Okay.  We'll take it from the top.
19  We had a little unexpected interruption.  Now
20  let's do the question.
21          How are you employed, sir?
22      A.  I'm the senior managing director and
23  co-head of the Special Situations Group of
24  National City Investment Banking.
25      Q.  Where is that located?
```

Page 17

```
1              J. SCOTT VICTOR, ESQUIRE
2      A.   I'm doing it, number one, because I
3  was involved in this case, and I'm intimately
4  familiar with this case since the fall of 2002
5  when I was first hired.  And I'm doing it
6  because I was asked to do it.  And my
7  particular expertise is very fitting for this
8  case.
9      Q.   How many hours have you spent on
10 this engagement?
11     A.   I would say, myself, probably 30 to
12 40 hours, closer to 40 since May.  And my
13 colleague, Michael Goodman, I would say
14 probably 30 hours.
15     Q.   What is your hourly rate?
16     A.   My hourly rate as I proposed to the
17 Trustee is $695 an hour.
18     Q.   Did they agree to that?
19     A.   They've agreed on it for my hourly
20 rate.  The Trustee has not yet agreed to the
21 hourly rate requested for a director, Mr.
22 Goodman, who helped me with this assignment.
23     Q.   What's his hourly rate?
24     A.   695.
25     Q.   What's his background?
```

Page 18

```
1              J. SCOTT VICTOR, ESQUIRE
2      A.   Mr. Goodman worked on this case with
3  me from 2002 on; intimately familiar with this
4  case.  He's a director.  He was a director at
5  SSG Capital Advisors.  Then when we were
6  acquired by National City, he became a
7  director of National City Investment Banking,
8  and he's in the Special Situations Group.
9  He's been an investment banker his entire
10 career, probably since the late '90s, I would
11 say; '97, '98.
12     Q.   How old is he?
13     A.   I think Michael Goodman is in his
14 mid to late 30s.
15     Q.   And you say it's unfortunate that
16 you're charging by the hour because you can
17 make more money doing other things than $695
18 an hour working on this case?
19     A.   It's not a question of making more
20 money.  It's just that investment bankers
21 don't like to charge and keep time sheets.
22 It's just not what we do.  We do deals,
23     Q.   And when you do deals, you make more
24 on an hourly basis than $695 an hour?
25         MR. BRESSLER:  Objection to
```

Page 19

```
1              J. SCOTT VICTOR, ESQUIRE
2  form.  He can answer.
3         THE WITNESS:  I wish that were
4  always the case, but it's not.  There's
5  many cases where it's a small matter or a
6  smaller M&A assignment or a small
7  financing assignment, and they take just
8  as long as large assignments, but the fee
9  is significantly lower.
10         So, no, I can't say that --
11 bless you -- I can't say that I make any
12 more -- bless you -- on an hourly basis
13 in all of my investment banking
14 assignments.
15 BY MR. PETERS:
16     Q.   What has Michael Goodman done in
17 connection with your assignment in this case?
18     A.   Michael Goodman reviewed all the
19 documents that are referenced in the expert
20 report, and he did the first draft of the
21 expert report.
22     Q.   So the first draft of your report
23 was actually written by Michael Goodman?
24     A.   Yes.
25     Q.   What did you do after he wrote the
```

Page 20

```
1              J. SCOTT VICTOR, ESQUIRE
2  first draft of your expert report?
3      A.   I similarly reviewed all the
4  documents that are referenced in the expert
5  report, and I edited it and revised and made
6  the expert report my work product.
7      Q.   And you did that by reading what he
8  wrote and revising it?
9      A.   Yes, and also adding to it, based
10 upon my review of all the documents.
11     Q.   Did you revise it in long hand?  Did
12 you make your edits in --
13     A.   No.  On the computer.
14     Q.   So you took his draft on the
15 computer and then put in words or phrases that
16 you wanted to put in?
17     A.   Yes.
18     Q.   How much of what's in the report was
19 -- what's in the final report was written by
20 Michael Goodman as opposed to you?
21         MR. BRESSLER:  Object to the
22 form.
23         THE WITNESS:  The -- a good
24 portion of it.  A very good portion of it
25 was as originally compiled.
```

Victor, Esq., J. Scott

8/7/2007

## Page 21

1           J. SCOTT VICTOR, ESQUIRE
2  BY MR. PETERS:
3      Q.   80 percent?
4      A.   60 percent.
5      Q.   Is Michael Goodman a lawyer?
6      A.   He is not a lawyer.
7      Q.   So he didn't bring any legal
8  training to bear in drafting the report?
9      A.   No.   Special situation investment
10 banking.
11     Q.   Does Michael Goodman have a graduate
12 degree, to your knowledge?
13     A.   He does not.
14     Q.   Where did he go to school as an
15 undergrad?
16     A.   University of Michigan, I believe.
17     Q.   How long has he worked for you?
18     A.   He has worked for me ever since I
19 became an investment banker in 2000, when I
20 left Saul Ewing to go to Berwind Financial as
21 an investment banker, and he was an analyst at
22 Berwind when I arrived on March 1st, 2000.
23     Q.   You went to the University of Miami
24 Law School?
25     A.   I did.

## Page 22

1           J. SCOTT VICTOR, ESQUIRE
2      Q.   And you graduated in '83?
3      A.   '83.
4      Q.   What law firms did you work for
5  after graduating from law school?
6      A.   I worked first for Melvin Lashner
7  Associates. Mel Lashner was a former senior
8  partner and one of the deans of the old law
9  bankruptcy bar.  He was a senior partner at
10 the firm, Adelman Levine, which is a
11 well-known bankruptcy boutique.  He split off
12 and formed his own firm in 1981, I believe.
13          He hired me right out of law school
14 in 1983.  The firm changed names in 1986 to
15 Lashner, Victor and Maschmeyer and lasted from
16 1986 to 1990, when Mr. Maschmeyer and I left
17 and went to another firm that became Shaiman,
18 Phelan, Victor and Maschmeyer in 1990, I
19 believe.
20          In 1991, still at that firm,
21 Mr. Maschmeyer left, and that firm became
22 Shaiman, Phelan, Victor, Schwartz and
23 Krekstein, I believe.  And then I went to Saul
24 Ewing January 1st, 1992, first as special
25 counsel, and then October of that same year

## Page 23

1           J. SCOTT VICTOR, ESQUIRE
2  was elected to full equity partner and was an
3  equity partner in Saul Ewing until the last
4  day of February 2000 when I became an
5  investment banker.
6      Q.   Where was the Lachner (ph.) Firm?
7      A.   Lashner.
8      Q.   I'm sorry.  Was the Lashner firm in
9  Delaware or in Philly?
10     A.   Philadelphia.
11     Q.   And the Saul Ewing firm, where was
12 that?
13     A.   Saul Ewing is based here in
14 Philadelphia, but there's multiple locations
15 around the mid Atlantic: Wilmington,
16 Delaware; Harrisburg, Pennsylvania; Princeton;
17 Baltimore.
18     Q.   Are you admitted to the Bar of
19 Pennsylvania?
20     A.   Yes.
21     Q.   Are you still an active member of
22 the Bar?
23     A.   Yes.
24     Q.   Are you admitted to the bars of any
25 other state?

## Page 24

1           J. SCOTT VICTOR, ESQUIRE
2      A.   No.  But I am admitted to the Bar of
3  the district outside of Pennsylvania.  I'm
4  admitted to the Bar, I believe, of the Eastern
5  District of Michigan.
6      Q.   That would be -- you're admitted to
7  practice in the Federal Court there?
8      A.   Yes.
9      Q.   But are you -- but you were not a
10 member of the bar of any state other than
11 Philadelphia -- Pennsylvania?
12     A.   Pennsylvania.  Commonwealth of
13 Pennsylvania since 1983.
14     Q.   You're not a member of the Bar of
15 the State of Delaware?
16     A.   I am not, though I routinely
17 practice there as a lawyer and routinely have
18 investment banking assignments with bankruptcy
19 cases in Delaware.
20     Q.   But you are not and never have been
21 a member of the --
22     A.   Of Delaware, no.
23     Q.   Do you know whether or not this case
24 involves the law of Delaware or of some other
25 jurisdiction?

Pages 21 to 24

Page 129

1           J. SCOTT VICTOR, ESQUIRE
2           Let me rephrase and be more
3    specific.
4           How do you come up with the terminal
5    value multiple number, that 7.2 number that's
6    there on Page 30?
7    A.    It's a spread. And you're looking
8    at different spreads to make sure that you're
9    discounted cash flow analysis is within the
10   realm of reasonableness. And it's essentially
11   taking that same multiple that we used on Page
12   16 and just testing your discounted cash flow.
13   Q.    So, again, here, if someone were to
14   use that number, approximately 10, to perform
15   this analysis, you would think that's
16   incorrect?
17          MR. BRESSLER:  Object to the
18   form.
19          THE WITNESS:  Yes.  I think so,
20   yes.  I don't remember this calculation
21   exactly from four years ago, but 10 is
22   not listed in our terminal value
23   multiple.  We go from 4.2 to 8.2 for a
24   sensitivity analysis.
25   BY MR. PETERS:

Page 130

1           J. SCOTT VICTOR, ESQUIRE
2    Q.    Okay.  Let's have a look at Exhibit
3    2, which I believe is your report.  Do you
4    have Victor-2 in front of you?  You can place
5    those other exhibits aside if you'd like, sir.
6    A.    I have it.
7    Q.    Mr. Bressler called you in May of
8    '07?
9    A.    Yes.
10   Q.    When in May of '07?
11   A.    First or second week.
12   Q.    And what did he say?
13   A.    I'd like you to be an expert in the
14   Coram case again for the Crowley litigation.
15   Q.    What else did he tell you?
16   A.    We went over what the assignment
17   would be, what documents I had to review, and
18   what kind of expert report he was looking for.
19   Q.    Okay.  And what issues did he ask
20   you to analyze and render opinions on?
21   A.    The payments made by the company
22   pre-bankruptcy to the noteholders.  The
23   confirmation or the confirmability of the
24   first plan and the impact of not confirming
25   that first plan.  Performance of companies in

Page 131

1           J. SCOTT VICTOR, ESQUIRE
2    Chapter 11 generally.  The Trustee's dealings
3    with Mr. Crowley directly once the Trustee was
4    appointed.  And that's pretty much it.  Those
5    are the main topics of my expert report.
6    Q.    And how much time did you spend
7    discussing those issues with Mr. Bressler or
8    anyone else acting on behalf of the Trustee?
9    A.    The very first phone call, maybe 10,
10   15 minutes.  And then we had a subsequent
11   conversation, and then we had a meeting in mid
12   May.
13   Q.    Who's "we"?
14   A.    Myself, Mr. Goodman, Mr. Bressler,
15   and I think Mr. Barkasy.
16   Q.    Where did that meeting take place?
17   A.    In my office.
18   Q.    How long did it last?
19   A.    I don't know because I was only
20   there for a very short part of it.  A few
21   hours, I would imagine.
22   Q.    How long were you there?
23   A.    Less than an hour.
24   Q.    What was discussed while you were
25   there?

Page 132

1           J. SCOTT VICTOR, ESQUIRE
2    A.    What was discussed was what kind of
3    report they were looking for and what the
4    focus should be and the focus, as I've stated,
5    was those four items.
6    Q.    Okay.  The first item that you
7    referred to is -- and it's listed in your
8    report -- is unusual cash made -- payments
9    made by Coram prior to Chapter 11 filing.
10   A.    Mm-hmm.
11   Q.    What documents, if any, did you rely
12   on in connection with that opinion?
13   A.    Well, the Court's opinions.  I'm
14   trying to see what else specifically.
15          The Goldin report.  And that's
16   pretty much it for that specific issue.
17   Q.    So just the Bankruptcy Court
18   opinions, the Goldin report; what else?
19   A.    And I think that's it.
20   Q.    Okay.
21   A.    Specifically for that issue.
22          I looked at -- I mean, it's hard to
23   say what specific documents for each specific
24   opinion, but these were all -- what's listed
25   is all the documents reviewed to come up with

Page 133

```
1              J. SCOTT VICTOR, ESQUIRE
2    this report.
3        Q.    Okay.  Now, you -- in your report on
4    that first page, you describe -- you use the
5    phrase that certain payments to noteholders
6    had the effect of reducing precious cash
7    needed in the Coram estate.  Do you see that?
8        A.    Yes.
9        Q.    Then on the next page, you said that
10   -- the bottom of the first paragraph -- that
11   the cash payment depleted Coram of "much
12   needed cash."  Do you see that?
13       A.    Yes.
14       Q.    You use the phrase, "precious cash
15   needed in the Coram estate," and you use the
16   phrase, "much needed cash"?
17       A.    Yes.
18       Q.    Did you write those portions of the
19   report or did Mr. Goodman?
20       A.    I don't know who actually used those
21   words.  I couldn't tell you that.
22       Q.    Now, this is the issue --
23       A.    But it is true.
24       Q.    Okay.  This is the issue we were
25   discussing --
```

Page 134

```
1              J. SCOTT VICTOR, ESQUIRE
2        A.    Previously.
3        Q.    -- a few minutes ago.  And as it
4    turned out, Coram didn't need this cash,
5    right?
6              MR. BRESSLER:  Object to the
7         form.
8              THE WITNESS:  Well, Coram
9         didn't need the cash to ultimately do the
10        Trustee's plan of reorganization.
11   BY MR. PETERS:
12       Q.    No, no, no.  The Trustee's plan of
13   reorganization is in '04.  We're talking about
14   what happened in 2000.
15       A.    Well, you say that, but they did
16   need the cash.  They didn't have $15 million
17   of cash that they could have had for no
18   reason.
19       Q.    Okay.  But it was -- it was shortly
20   after the events that you're describing here
21   that Coram filed for bankruptcy, right?
22       A.    Just within a few days.
23       Q.    And they had a DIP -- debtor in
24   possession financing facility, right?
25       A.    They did, from Cerberus.
```

Page 135

```
1              J. SCOTT VICTOR, ESQUIRE
2        Q.    And they never drew a penny on that,
3    right?
4        A.    Never drew on that.
5        Q.    So they actually had enough cash to
6    handle whatever obligations they had shortly
7    after filing for bankruptcy, right?
8              MR. BRESSLER:  Object to the
9         form.
10             THE WITNESS:  They did have
11        enough cash, but there's no reason these
12        payments should have been made.
13   BY MR. PETERS:
14       Q.    Well, we'll get to that in a second.
15   I'm still focusing on your use of the phrase,
16   "precious cash needed in the Coram estate" and
17   "much needed cash."  Do you see that?
18       A.    I do.
19       Q.    And as it turned out, in fact, Coram
20   did not need that cash to function during the
21   balance of 2000, did they?
22             MR. BRESSLER:  Object to the
23        form.
24             THE WITNESS:  Because they got
25        lucky.  There was no unforeseen
```

Page 136

```
1              J. SCOTT VICTOR, ESQUIRE
2         circumstance --
3    BY MR. PETERS:
4        Q.    If you can properly characterize why
5    it happened, maybe you would be just kind
6    enough to answer my question.
7              Here's my question:  As it turned
8    out, Coram didn't need that cash to function
9    during the balance of 2000, did it?
10       A.    They didn't.  But they were still
11   out 15 million of cash.  And that harmed the
12   company.
13       Q.    Okay.  But they still -- I know that
14   you desire to inject your views here.  But in
15   answer to my question, the fact is they didn't
16   need any cash other than what they had to
17   operate in 2000, did they?
18             MR. BRESSLER:  Object to the
19        form.
20             THE WITNESS:  They didn't need
21        it to pay claims.  They didn't need it to
22        operate.  But I said just what the Court
23        said.  They are out 15 million.  And they
24        didn't need to pay.  And the company was
25        harmed by not having that 15 million of
```

Page 141

```
1       J. SCOTT VICTOR, ESQUIRE
2   more liquidity and more flexibility.
3       Q.  Okay.  But is there a single thing
4   you can identify that they would otherwise
5   have done in 2000 or 2001 that because they
6   didn't have that $15 million, they were not
7   able to do?
8           MR. BRESSLER:  Object to the
9       form.
10          THE WITNESS:  I don't know the
11      answer to that.  I wasn't around --
12  BY MR. PETERS:
13      Q.  You don't know the answer as to
14  whether you're able to identify such a thing?
15      A.  I don't know if there was anything
16  that they were able or not able to do as a
17  result of not having that 15 million of cash.
18  I can't identify anything.  I wasn't around in
19  management in 2000.
20      Q.  Is there any additional work that
21  you contemplate doing in order to be able to
22  answer that question?
23      A.  No.
24      Q.  So as you sit here today, is there
25  anything that you can identify that they would
```

Page 142

```
1       J. SCOTT VICTOR, ESQUIRE
2   have done if they had had that $15 million
3   that they couldn't do because they didn't?
4           MR. BRESSLER:  Object to the
5       form, and it was just asked.
6   BY MR. PETERS:
7       Q.  Either you can identify something or
8   you can't.
9       A.  I cannot identify any specific thing
10  that Coram could not do because they didn't
11  have the cash, but I'd sure rather have 15.8
12  million of cash going into bankruptcy than
13  not.
14      Q.  Was the board aware of the decision
15  to use the cash the way it was used by Coram
16  in the weeks before bankruptcy?
17      A.  I believe so, though I don't know
18  for sure.  But I believe they were aware.
19      Q.  Have you considered -- have you
20  looked at any documents to learn about that?
21      A.  I'm sure it was mentioned somewhere
22  that they were aware of it.
23      Q.  Does it have any significance to you
24  whatever whether or not the board approved of
25  these decisions?
```

Page 143

```
1       J. SCOTT VICTOR, ESQUIRE
2           MR. BRESSLER:  Object to the
3       form.
4           THE WITNESS:  None whatsoever.
5   BY MR. PETERS:
6       Q.  Okay.
7       A.  They shouldn't have paid the cash to
8   the noteholders, whether the board approved it
9   or not.
10      Q.  According to what standard they
11  shouldn't have paid the cash to the
12  noteholders?  That's just based on your --
13      A.  Any standard -- any debtor going
14  into bankruptcy preserves cash to have maximum
15  liquidity and flexibility.  They didn't have
16  15 million.
17      Q.  Do you know David Friedman?
18      A.  I do.
19      Q.  And do you -- have you worked on
20  cases with him?
21      A.  I worked on one case with him when I
22  practiced law very -- back in the mid '80s
23  when he was young.
24      Q.  When he was young?
25      A.  When we were both young.
```

Page 144

```
1       J. SCOTT VICTOR, ESQUIRE
2       Q.  He's the same age as you?
3       A.  Identical age.
4       Q.  Do you know whether he was aware of
5   the decisions that were being made?
6       A.  I don't know.
7       Q.  Have you made any effort to find
8   out?
9       A.  If he was aware of those decisions?
10      Q.  Yes.
11      A.  No.
12      Q.  Would it matter to you if he were
13  aware of the decision and approved of those
14  transactions?
15      A.  It wouldn't matter to me.
16      Q.  You've just told us that anybody
17  would have concluded it wasn't appropriate to
18  make those payments?
19      A.  Those payments should have been --
20  those payments should not have been made
21  regardless of who approved it.
22      Q.  So if David Friedman approved it, in
23  your view, he was committing malpractice?
24          MR. BRESSLER:  Object to the
25      form.
```

Pages 141 to 144

## Page 161

1                J. SCOTT VICTOR, ESQUIRE
2   they paid down the revolver.
3        Q.   Okay.  But you would agree, would
4   you not, that the company's bankruptcy lawyers
5   at Casowitz, Benson, Torres and Friedman, LLP
6   were aware of that decision no later than June
7   9th of 2000?
8        A.   I see that, yes.
9        Q.   Are you aware of at any point the
10  company's bankruptcy lawyers at the Kasowitz
11  firm advising or instructing the company not
12  to make those payments?
13       A.   Unaware.
14       Q.   Have you made any efforts to find
15  out whether they did that?
16       A.   Other than to go through David
17  Friedman's deposition, no.
18       Q.   Would that be of significance to you
19  in your opinions?
20       A.   What?
21       Q.   Whether Mr. Friedman was fully aware
22  of the decision to make the payments that
23  you're now criticizing and never advised
24  against it?
25       A.   It wouldn't make a difference in my

## Page 162

1                J. SCOTT VICTOR, ESQUIRE
2   judgment, in my opinion, no.
3        Q.   So is it your opinion that Dan
4   Crowley should have known how things are
5   normally handled in a bankruptcy even if his
6   bankruptcy lawyer didn't tell him?
7             MR. BRESSLER:  Object to the
8        form.
9             THE WITNESS:  Well, I think
10       anybody should know that you need to
11       preserve cash before a bankruptcy.
12  BY MR. PETERS:
13       Q.   Anybody should know that?
14       A.   Anybody should know that.
15       Q.   Six members of a Delaware jury from
16  all walks of life should know that?
17            MR. BRESSLER:  Object to the
18       form.
19            THE WITNESS:  Everyone should
20       know that if a company files a
21       bankruptcy, you need to preserve cash.
22            MR. PETERS:  Let's mark that
23       next.
24            (Document marked for
25       identification as Exhibit Victor-7.)

## Page 163

1                J. SCOTT VICTOR, ESQUIRE
2             MR. PETERS:  Victor-7.
3             THE WITNESS:  Thank you.  Okay.
4   I have it.
5   BY MR. PETERS:
6        Q.   You have Victor-7 in front of you.
7   Do you recognize it?
8        A.   I recognize it to be the minutes of
9   a meeting of the board of directors of Coram,
10  July 30th, 2000 -- July 31st, 2000.
11       Q.   In looking in the first paragraph
12  there, can you see whether David Friedman was
13  present?
14       A.   He was, according to this.
15       Q.   Do you see where the meeting took
16  place?
17       A.   Where did the meeting take place?
18  At his office.
19       Q.   Okay.  And how much before the
20  bankruptcy was this?
21       A.   One week.
22       Q.   Okay.  Have a look at the CPS sale
23  section on Page 2.
24       A.   Okay.
25       Q.   It says:  "The company represented

## Page 164

1                J. SCOTT VICTOR, ESQUIRE
2   by Deutsche Banc Alex. Brown sold CPS for 41.3
3   million with a gain to the company of $18.5
4   million dollars.  Net proceeds are intended to
5   pay down the company's revolving senior credit
6   facility and a portion of the Series A notes
7   in the amount of approximately $38 million
8   dollars combined."
9        A.   Mm-hmm.
10       Q.   Do you see that?
11       A.   I do.
12       Q.   Now, as I understand your testimony,
13  you were not critical of the company using
14  proceeds to pay down the revolver, but you are
15  critical of the company's decision to pay down
16  the principal on the Series A notes?
17       A.   Series B notes, I think, was
18  actually paid down.  Yeah, I am.
19       Q.   Okay.  Is it clear to you from
20  looking at this exhibit that Mr. Friedman,
21  himself, was perfectly well aware that the
22  company was making that decision a week before
23  bankruptcy?
24       A.   Yes.
25       Q.   Does it say anywhere in these board

Page 173

1                J. SCOTT VICTOR, ESQUIRE
2      A.    I have no idea.  At some point
3   between the fall of 2002 and 2004.
4      Q.    Between the fall of 2002 and the end
5   of March of 2003, did you have any discussions
6   with the Trustee or his lawyers about bringing
7   preference actions relating to these payments?
8      A.    I may have.  I just don't remember.
9      Q.    "May have" actually doesn't help us.
10  If you remember, tell us.
11     A.    I don't remember.
12     Q.    Is your second opinion that but the
13  for the relationship between Mr. Crowley and
14  Cerberus, the first plan would have been
15  confirmed?
16     A.    Yes.
17     Q.    So there you're predicting what the
18  bankruptcy judge would have done under certain
19  circumstances?
20            MR. BRESSLER:  Object to the
21     form.
22            THE WITNESS:  Yes.  To an
23     extent, yes.  I think it was a
24     confirmable plan but for that conflict.
25  BY MR. PETERS:

Page 174

1                J. SCOTT VICTOR, ESQUIRE
2      Q.    But your opinion is more than that
3   it was a confirmable plan; you're saying it
4   would have been confirmed?
5      A.    I believe it would have.
6      Q.    Okay.  It -- and what expertise are
7   you drawing on in predicting what would have
8   happened in Judge Walrath's courtroom?
9      A.    Well, where do you want me to start.
10  I've known Judge Walrath since my very first
11  case that I ever did as a young bankruptcy
12  lawyer in 1983.  It was with Judge Walrath.
13  We've practiced together many, many years.
14  I've been in front of her now many times as a
15  judge.  I know her well.  I think I can
16  predict her well.
17     Q.    Has Judge Walrath ever ruled against
18  you?
19     A.    No.  I don't think she ever has on
20  any of my opinions.
21     Q.    So in every -- in every matter that
22  you've appeared on in front of Judge Walrath,
23  she's ruled in your favor?
24     A.    Yes.
25     Q.    Is it just Judge Walrath whose

Page 175

1                J. SCOTT VICTOR, ESQUIRE
2   decisions you can predict, or is it also the
3   other judges in the Bankruptcy Court in
4   Delaware?
5            MR. BRESSLER:  Object to the
6     form of the question.
7            THE WITNESS:  I can predict
8     what -- I think I can predict what many
9     bankruptcy judges do that I'm familiar
10    with around the country, including
11    Delaware.  I know Judge Walsh very well.
12    I know the other judges very well.
13  BY MR. PETERS:
14     Q.    And you're able to predict the
15  outcome of a matter before that court?
16     A.    Sometimes.  If I'm asked to, I could
17  predict it.  I've never been asked to.
18     Q.    Have you ever told a client that you
19  can predict the outcome of matters in court?
20     A.    No.  Never been asked.
21     Q.    But in this case, that's what you
22  are being asked to do.
23            MR. BRESSLER:  Object to the
24     form.
25            THE WITNESS:  In this case one

Page 176

1                J. SCOTT VICTOR, ESQUIRE
2     of my opinions is that but for the actual
3     conflict of interest, that first plan
4     would have been confirmed, because there
5     are only two issues.
6            One was the conflict.  And one
7     was the valuation.  And she ultimately
8     came down and decided on the valuation,
9     along the lines as we provided our
10    valuation in the Trustee's plan, but it
11    was the same methodology, the same
12    general numbers as was being provided by
13    the debtor's valuation expert back at the
14    end of 2000.
15  BY MR. PETERS:
16     Q.    Do you know whether David Friedman
17  predicted to Coram that the plan would be
18  confirmed?
19     A.    Don't know what David did.
20     Q.    Do you think your ability to predict
21  what a bankruptcy judge will -- would do is
22  better than David Friedman's?
23            MR. BRESSLER:  Object to the
24     form.
25            THE WITNESS:  That's a nebulous

Page 177

1           J. SCOTT VICTOR, ESQUIRE
2      and vacuumes question.
3  BY MR. PETERS:
4      Q.   It's a vacuumes question?
5      A.   It's a question that's done in a
6  vacuum.  You can't say that.  In this
7  particular case, I believe Judge Walrath would
8  have approved the first plan but for that
9  conflict.
10          This -- this case, really, but for
11 the conflict, is no different than hundreds of
12 other cases where you have a valuation
13 disputed.  It was a run of the mill.  When it
14 was started, it was a run of the mill
15 valuation dispute between the debtor and the
16 Equity Committee.
17     Q.   Would Judge Walrath have been within
18 her rights confirming the first plan?
19     A.   No, not when she found out about the
20 conflicts.
21     Q.   So once she found out about the
22 relationship between Crowley and Cerberus, she
23 had to deny the plan?
24     A.   I believe so.  She found that it was
25 not proposed good faith.

Page 178

1           J. SCOTT VICTOR, ESQUIRE
2      Q.   If she had confirmed that first
3  plan, would she have been committing
4  reversible error?
5           MR. BRESSLER:  Object to the
6      form.
7           THE WITNESS:  I don't know.
8  BY MR. PETERS:
9      Q.   Did she have the discretion to
10 confirm the first plan?
11     A.   Bankruptcy courts have wide
12 discretion under 1129 in proposing plans.  You
13 go through all the various criteria that's
14 required in 1129 of the Bankruptcy Code to
15 determine whether a plan is feasible.  One of
16 those -- one of those requirements is good
17 faith.  And that's discretionary with the
18 court.  The court has to find that as a matter
19 of fact.
20     Q.   You say here but for the
21 relationship between Mr. Crowley and Cerberus,
22 the first plan would have been confirmed.  How
23 about the second plan?
24     A.   I believe it was the same thing.
25 The second plan wasn't confirmed because of

Page 179

1           J. SCOTT VICTOR, ESQUIRE
2  the actual conflict of interest.
3      Q.   And if Coram had fired Crowley,
4  would the second plan have been confirmed?
5      A.   If Coram had fired Crowley before
6  the confirmation hearings, I believe the
7  second plan would have been confirmed.
8      Q.   And, in your opinion, would Coram
9  have been worse off with Crowley gone but the
10 second plan confirmed?
11     A.   They would have been better off
12 coming out of bankruptcy.
13     Q.   Why?
14     A.   They'd be out of bankruptcy.
15     Q.   And they would have lost their CEO,
16 who you testified was doing a good job?
17     A.   He was doing a good job.  The
18 company lost the CEO, anyway, when the Trustee
19 lost the motion to continue his employment for
20 six months.
21     Q.   How long was that after the
22 confirmation decision on the second plan?
23     A.   The confirmation decision on the
24 second plan was December of '01, and the
25 Trustee lost the employment motion in March of

Page 180

1           J. SCOTT VICTOR, ESQUIRE
2  '03.
3      Q.   Would you agree with the following
4  statement:  But for the decision of Coram not
5  to fire Crowley in December of 2000, the
6  second plan would have been confirmed?
7           MR. BRESSLER:  Object to the
8      form.
9           THE WITNESS:  I don't think
10     that Coram had to fire him.  I think all
11     Dan had to do was to sever his
12     relationship with Cerberus.
13 BY MR. PETERS:
14     Q.   How about answering my question,
15 Mr. Victor?
16     A.   Please restate the question.
17     Q.   Do you agree or disagree with the
18 following statement:  But for the decision not
19 to fire Crowley at the end of 2000, the second
20 plan would have been confirmed?
21           MR. BRESSLER:  Object to the
22     form.
23           THE WITNESS:  Is that a
24     hypothetical?
25 BY MR. PETERS:

## Page 193

1              J. SCOTT VICTOR, ESQUIRE
2    BY MR. PETERS:
3        Q.   Right.
4        A.   I don't recall that.  I know there
5    was with respect to the second plan.
6        Q.   Should there have been one prior to
7    the submission of the first plan?
8        A.   It wouldn't have mattered.
9        Q.   Have you ever done any investigation
10   to determine whether there was one in
11   connection with the first plan?
12       A.   No.
13       Q.   Have a look at Victor-7.  It's in
14   front of you.  It's board minutes of July 31,
15   2000.
16       A.   Okay.
17       Q.   Have a look at Page 7.
18       A.   Okay.  Okay.  I see.  Special
19   committee.
20       Q.   So was there a special committee of
21   Coram's board created on or about July 31,
22   2000 to negotiate with the noteholders?
23       A.   Looks that way, yes.
24       Q.   Crowley wasn't a member of it?
25       A.   It doesn't say.

## Page 194

1              J. SCOTT VICTOR, ESQUIRE
2        Q.   Well, see who the members of it are.
3    Third paragraph up from the bottom:  Amaral,
4    Smith, Casey, and Smoley?
5        A.   No Crowley.
6        Q.   Turning to Page 3 of your report,
7    you say:  "Companies that are in Chapter 11
8    typically do not perform as well as those not
9    in Chapter 11"?
10       A.   Generally.
11       Q.   Does it take an expert to figure
12   that one out?
13       A.   No.  It's pretty common knowledge.
14       Q.   You're saying companies in
15   bankruptcy do better -- withdrawn.
16            You're saying companies in
17   bankruptcy don't -- aren't doing as well as
18   companies that are not in bankruptcy?
19       A.   No, there's a little more to it than
20   that.
21       Q.   But is that part of what you're
22   saying?
23       A.   That's part of what I'm saying.
24   Generally.  Generally, companies that are in
25   Chapter 11, their customers and their

## Page 195

1              J. SCOTT VICTOR, ESQUIRE
2    suppliers have a great deal of consternation
3    about what the future of the company is going
4    to be; and just about every company that I've
5    ever been involved in in 25 years in a
6    bankruptcy usually shows a drop in revenue in
7    the bankruptcy.
8        Q.   Typically, companies that wind up in
9    bankruptcy do so because they are having some
10   problems, right?
11       A.   Yes.
12       Q.   So the group of companies that are
13   in bankruptcy, you start off with a selected
14   group of companies that are dealing with some
15   business problems, right?
16       A.   Yeah.  They are companies in Chapter
17   11.  By definition, they have a problem, some
18   sort of problem.
19       Q.   And by definition, the population of
20   companies that file for bankruptcy are doing
21   worse off than the companies that don't file
22   for bankruptcy, right?
23            MR. BRESSLER:  Object to the
24       form.
25            THE WITNESS:  No, that's not

## Page 196

1              J. SCOTT VICTOR, ESQUIRE
2    what it's meant to say.  It's meant to
3    say that companies in chapter don't
4    perform as well as the same company does
5    out of bankruptcy because of those very
6    concerns.
7            It's obviously very -- it's
8    easy to say companies in bankruptcy
9    aren't as good as companies out of
10   bankruptcy, as a general rule.  But this
11   is companies in bankruptcy generally
12   don't perform as well as they would, the
13   same company, out of a bankruptcy.
14   BY MR. PETERS:
15       Q.   So you mean when a company is in
16   bankruptcy, typically its revenues decrease?
17       A.   Often.  Often.
18       Q.   Typically when a company is in
19   bankruptcy, its EBITDA decreases?
20            MR. BRESSLER:  Object to form.
21            THE WITNESS:  Not necessarily.
22   BY MR. PETERS:
23       Q.   Typically when a company is in
24   bankruptcy, does its value decrease while it's
25   in bankruptcy?

Victor, Esq., J. Scott                                              8/7/2007

Page 201

1           J. SCOTT VICTOR, ESQUIRE
2      Q.   So for the first couple of months it
3    was in bankruptcy, it had a problem --
4      A.   No, no.
5      Q.   -- and then it turned the corner?
6      A.   No.  Its --
7           MR. BRESSLER:  Object to the
8    form.
9           THE WITNESS:  Its revenues
10   dropped about 7 or 8 percent for the
11   second half of 2000 after it filed.  It
12   continued to have trouble in 2001.
13   Continued to have -- people were worried.
14   The physicians that refer patients for
15   infusion services to Coram were worried
16   that Coram was going to be there or not.
17   They might as well go to a competitor.
18   BY MR. PETERS:
19     Q.   Did you speak to any physicians?
20     A.   No.  I spoke to the people in the
21   satellite offices who do speak with the
22   physicians, and that's exactly what they said.
23     Q.   So you learned that physicians were
24   worried?
25     A.   Yes.

Page 202

1           J. SCOTT VICTOR, ESQUIRE
2      Q.   And you conducted those discussions
3    in the satellite offices when?
4      A.   Late 2002, early 2003.
5      Q.   So in late '02, early '03, the
6    physicians were worried?
7      A.   I think throughout the bankruptcy
8    physician referrals were worried that Coram is
9    still going to be a company and be around and
10   not be sold or not be chopped up and
11   liquidated.
12     Q.   The -- the worry of the physicians
13   that you just testified about learning about
14   --
15     A.   Mm-hmm.
16     Q.   -- from interviews --
17     A.   Hmm-hmm.
18     Q.   -- you conducted those interviews in
19   late 2002 and early 2003?
20     A.   Mm-hmm.
21           THE COURT REPORTER:  Yes?
22           THE WITNESS:  Yes.
23   BY MR. PETERS:
24     Q.   So was it your understanding that
25   the worries that you were learning about were

Page 203

1           J. SCOTT VICTOR, ESQUIRE
2    contemporaneous worries that physicians had at
3    that time?
4           MR. BRESSLER:  Object to the
5    form.
6           THE WITNESS:  Yes, and also
7    what their concerns were since Coram has
8    been in bankruptcy.
9    BY MR. BARRY:
10     Q.   So -- so at least some of the
11   physicians' concerns that you learned about in
12   late 2002 and early 2003 were concerns that
13   those physicians had at that time, right?
14     A.   And previously.
15     Q.   And during that time, between 2002
16   and June of 2003, Coram's value was
17   increasing?
18     A.   Yes.
19     Q.   In connection with the preparation
20   of your report, did you prepare any type of
21   empirical study, empirical analysis?  Did you
22   do any work like that?
23     A.   When you mean "empirical analysis,"
24   a review of other cases and values in and out
25   of bankruptcy, no.

Page 204

1           J. SCOTT VICTOR, ESQUIRE
2      Q.   Okay.  Is this a fair statement:
3    That the sum total of your work as an expert
4    in this case involved getting a phone call
5    from Mr. Bressler, meeting with him and your
6    colleague, Mr. Goodman?
7      A.   Mm-hmm.
8      Q.   Leaving the meeting earlier
9    yourself?
10     A.   Yes.
11     Q.   Having Mr. Goodman continue in a
12   meeting with Mr. Bressler and Mr. Barkasy;
13   having
14   Mr. Goodman draft a report; editing a report,
15   and that you did -- that's what you did,
16   right?
17     A.   And reviewing all these documents.
18   Reviewing what I had been involved in for two
19   years in the bankruptcy.  I'm quite familiar
20   with this case and what happens.  I've been in
21   it since 2002.
22     Q.   Is there -- other than that, is
23   there anything that you've done -- else that
24   you've done in connection with your assignment
25   in this case?

Pages 201 to 204

**Page 205**

J. SCOTT VICTOR, ESQUIRE
1
2          MR. BRESSLER:  Object to the
3     form.
4          THE WITNESS:  I have reviewed
5     documents.  I wrote the report.  I
6     reviewed documents again in preparation
7     for this examination; spoke with
8     Mr. Bressler and
9     Mr. Barkasy; have not done any empirical
10    analysis other than what's already
11    included in my expert report.
12 BY MR. PETERS:
13    Q.   You wrote this report?  I thought
14 Mr. Goodman wrote the report?
15    A.   Mr. Goodman wrote the first draft,
16 I wrote thereafter.
17    Q.   How did patient and referral
18 physician concerns negatively impact Coram?
19    A.   Drop in revenue.
20    Q.   And what analysis have you performed
21 to connect any particular patient or referring
22 physician concern to a drop in revenue at
23 Coram?
24          MR. BRESSLER:  Object to the
25     form.

**Page 206**

1          J. SCOTT VICTOR, ESQUIRE
2          THE WITNESS:  Coram's revenue
3     dropped in 2000 after the bankruptcy was
4     filed; continued to drop in 2001.  It
5     dropped because it didn't have as much
6     sales.  In Coram's particular
7     circumstance, the sales come from
8     referring physicians.
9 BY MR. PETERS:
10    Q.   How long into 2001 did Coram's sales
11 continue to drop?
12    A.   I don't recall.  There was -- I
13 think in 2000, there was like a 7 or 8 percent
14 drop in revenue, and for 2001, maybe 2 or 3
15 percent drop in revenue.
16    Q.   If Coram had emerged from bankruptcy
17 in December of 2000, would at that point in
18 time -- would it have had to continue to --
19 withdrawn.
20          If it had emerged from bankruptcy in
21 2000, would it have had any expenses in early
22 2001 that it did not have as a result of
23 continuing to be in bankruptcy?
24          MR. BRESSLER:  Object to form.
25          THE WITNESS:  Under the plan

**Page 207**

1          J. SCOTT VICTOR, ESQUIRE
2     that was proposed?
3 BY MR. PETERS:
4    Q.   Right.
5    A.   Well, the plan -- the first plan as
6 proposed converted the debt to equity, so they
7 wouldn't have had interest payments.  They
8 still would have had to deal with Arnet, the
9 Arnet settlement.  They still would have had
10 to have dealt with the Internal Revenue
11 Service.  All the things that the Trustee had
12 to settle would have had to have been settled
13 by the debtor, anyway, if they had -- if that
14 plan had been confirmed back in December of
15 2000.
16    Q.   Are you aware of any particular
17 vendor refusing to do business with Coram
18 because Coram was in bankruptcy?
19    A.   No.
20    Q.   Are you aware of any particular item
21 of revenue that Coram lost as a result of
22 being in bankruptcy?
23    A.   The revenue dropped, as is
24 extraordinarily common for companies that file
25 Chapter 11.  Revenue drops.  People don't want

**Page 208**

1          J. SCOTT VICTOR, ESQUIRE
2 to do business with companies in Chapter 11.
3    Q.   Are you able to identify any
4 customer, referrer --
5    A.   No.
6    Q.   -- who did not refer business to
7 Coram or come to Coram because Coram was in
8 bankruptcy?
9    A.   No.  I just saw -- I just saw that
10 there was a drop in revenue in 2000 and 2001,
11 which is common.
12    Q.   When was the drop of revenue in
13 2000?
14    A.   Right after the company filed for
15 their third -- third and fourth quarters, they
16 had a drop in revenue.
17    Q.   August, September, October,
18 November --
19    A.   -- November, December --
20    Q.   December?
21    A.   And into 2001.
22    Q.   And even if the plan had been
23 confirmed on December 21st of 2000, Coram
24 would have already suffered that drop of
25 revenue --

Page 209

1                J. SCOTT VICTOR, ESQUIRE
2    A.    Sure.
3    Q.    -- in 2000?
4    A.    Absolutely.
5    Q.    Let's turn to Page 4 of your report.
6    A.    Okay.
7    Q.    You refer in this section of your
8    report to a claim that Mr. Crowley had.
9    A.    A proof of claim file, yes.
10   Q.    What was Mr. Crowley's claim?
11   A.    Mr. Crowley's claim was 17 million,
12   approximately.
13   Q.    And what was it based upon?
14   A.    It was based upon his claim that he
15   was entitled to a bonus for increasing Coram's
16   EBITDA.
17   Q.    And did Mr. Crowley's employment
18   contract with Coram contain a provision that
19   he was entitled to a bonus based upon certain
20   EBITDA targets?
21   A.    Yes.
22   Q.    And had Coram achieved those EBITDA
23   targets?
24   A.    Yeah.  They did.
25   Q.    So based on the language of

Page 210

1                J. SCOTT VICTOR, ESQUIRE
2    Mr. Crowley's employment agreement with Coram
3    and Coram's financial performance, was Mr.
4    Crowley entitled to those bonuses?
5    A.    He was entitled to it as a matter of
6    contract.  Whether he was entitled to it as a
7    matter of the pre-petition employment
8    agreement and everything that went on in the
9    case with the conflict of interest, very
10   doubtful.
11        But by the book, his contract
12   provided for a bonus for EBITDA improvement.
13   There was EBITDA improvement.  And that's why
14   he filed a very large claim.
15   Q.    And how much was he entitled to
16   based upon his contract and based upon the
17   performance of Coram?
18              MR. BRESSLER:  Object to the
19   form.
20              THE WITNESS:  I don't know how
21   much he was entitled to.  I know that his
22   claim as filed was about 17 million.
23   BY MR. PETERS:
24   Q.    And did you ever look at that claim
25   to determine whether or not, based upon the

Page 211

1                J. SCOTT VICTOR, ESQUIRE
2    contract and based upon Coram's economic
3    performance, he was really entitled to 17
4    million under that agreement, putting aside
5    whatever defenses somebody might have had?
6    A.    I did not.  Never did that.  Never
7    looked and never had -- did that analysis --
8    Q.    Did anybody ever suggest to you that
9    Crowley was entitled to some bonus number less
10   or other than $17 million?
11   A.    Well, I know the Trustee had reached
12   a letter of intent settlement with Mr. Crowley
13   simultaneously with seeking to extend his
14   employment for six months.  And I think under
15   the settlement agreement, Mr. Crowley was
16   getting a few million dollars.
17   Q.    But I'm asking you whether you have
18   any reason to believe that the amount that
19   Crowley was entitled to based upon his
20   contract was other than 17 million?
21   A.    No.
22              MR. BRESSLER:  Object to the
23   form.
24              THE WITNESS:  I have no opinion
25   one way or the other.

Page 212

1                J. SCOTT VICTOR, ESQUIRE
2    BY MR. PETERS:
3    Q.    But you're aware that Crowley was,
4    in fact, entitled to some type of performance
5    bonus based on his contract with Coram?
6    A.    I believe so, yes.
7              MR. PETERS:  Mark this one.  So
8    we have 7 and 8.
9              THE COURT REPORTER:  8 and 9.
10             (Documents marked for
11   identification as Exhibits Victor-8 and
12   Victor-9.)
13             MR. BRESSLER:  Which one is 8
14   and which one's 9?
15             THE COURT REPORTER:  This one's
16   9.
17   BY MR. PETERS:
18   Q.    Do you recognize Victor-8?  It's a
19   letter from Barry Bressler to Scott Schreiber
20   dated December 24, 2002.
21   A.    I have seen this at some point in my
22   involvement in this case, yes.
23   Q.    What is it?
24   A.    This is a letter of intent between
25   the Trustee and Mr. Crowley for a transition

Victor, Esq., J. Scott

8/7/2007

Page 233

```
1
2                          CERTIFICATE
3
4             I HEREBY CERTIFY that the
5   proceedings, evidence and objections are
6   contained fully and accurately in the
7   stenographic notes taken by me upon the video
8   deposition of J. SCOTT VICTOR, ESQUIRE, taken
9   on AUGUST 7, 2007, and that this is a true and
10  correct transcript of same.
11
12
13
14
15               _____
16                 MICHELLE L. GRAY, CSR
                    and Notary Public
17
18            (The foregoing certification of this
19  transcript does not apply to any reproduction
20  of same by any means, unless under the direct
21  control and/or supervision of the certifying
22  reporter.)
23
24
25
```

# Exhibit E

Coram — 5/17
Conversation w/ Rich Barkasy

Testify about 5-6 issues
① July 2000 (Coram filed Aug 8, 2000, Crowley CEO in Nov '99)
 - Crowley made $6.3 mil <u>cash</u> int payment
 - Loan docs allowed for PIK
 - Summer 2000 - sold CPS (closed 7/31)
 - Aug 1, 2000 - net proceeds ($38 mil) wired to N/H
   ∘ $28.5 mil to pay off secured revolver
   ∘ Balance to pay down principal of unsecured notes - except    *Discretion N/H had*
 - JGV: unusual for company to make these payments before Ch. 11    *to concern to sale*
   ∘ Particularly if POR is to give N/H the Company
   ∘ Court found $6.3 mil unusual    *↓ Wouldn't have*
   ∘ If waited on unsecured note payment    *been effective if they filed*
 - JGV: Companies usually conserve cash
     going into Ch. 11    *$75 would have to be stayed if part of POR.*

Payments discretionary + ~~improvement~~ imprudent


② Support damages claim
   - POR 1+2 not confirmed b/c of Crowley conflict
     ∘ Dec 2000 + Dec 2001
   - Trustee's plan effective 12/1/04
   - Claim - stayed in bankruptcy for longer than
      it should have

VICTOR 000001
Adams v. Crowley
USDC-DE #04-1565

- Claims
  - Professional claims incurred
  - Business losses due to bankruptcy
- JSV: likely that absent Crowley conflict, POR I confirmable
  - Only other main objection by E.C. was valuation
  - Ultimate valuation that was accepted by Court (€8/55G) was consistent w/ Debtors original valuation (Goldin) rather than E.C. (Deloitte)
  - Can summarize (Matae) Temin report

③ exacerbated mkt concerns b/c it/Net was a liquidation in which physicians lost $

③ Companies in bankruptcy do not perform as well as those outside Ch. 11
  - Customer concerns about going concern
  - Supply disruption from trade    • Competitors flame concerns (specific references)
  - Mgmt distractions    • Liquidity used for professional fees
  - Court monitored use of cash    • Potential for employee exodus
  - Less agility to explore opportunities b/c of had to required court approval    institute costly KERP

- Employee uncertainty
- Loss of value of stock comp

- Danitz sent out letter to customers
- JSV: Particularly bad for Coram b/c of nature of reasons for rejection of plan
  - Public through filings: CEO in "bad faith" and "conflict of interest"

- JSV: If plan was confirmed, no need for KERPs.
  - Ultimately did KERP b/c of uncertainty stemming from prolonged nature of case

VICTOR 000002
Adams v. Crowley
USDC-DE #04-1565

④ Description of why Trustee tried to employ Crowley
for 6 months

- Trustee appointed March 2002
- Trustee said Crowley couldn't get paid by Cerberus
- Crowley still was trying to get paid by agre
- Judge did not approve Employment Agreement or
  proposed settlement claim of $2 mil for
  $16 mil claim.
- Defense: Assertion: Why would Trustee seek to settle if
  Estate ultimately had bigger claim against him
- SSU: Why did Trustee seek to enter into agreement?
  • Trustee viewed his task as quick emergence
  • Had discussions w/ E.C. & N/H

Reasonable
exercise of
business
judgement

① Fix/reduce claim to
create clear value
for Company &
create certainty

      Tried to mediate + reached agreement w/
      N/H only
    • Noteholders contribute notes + $56 mil in cash
      for Company + release
  • Trustee settled w/ Crowley
    ① keep Crowley so as not to disstabilize Company
    ② Trustee was trying to settle w/ as many
      parties as possible to facilitate consensual
      plan
        • Saves $ through expedited emergence
        • Certainty
        • Evidenced by mediation/settlement w/ N/H,
          settlement w/ R-Net, settlement w/ IRS
      • Only variable not settled was w/ E.C.
      • settlement w/ Crowley would have fixed $
        for S/H + establish certainty of payout

VICTOR 000003
Adams v. Crowley
USDC-DE #04-1565

Cover Page:
  Expert Report of JSV in the case of ...

Hours
  5/17  Call w/ Barkasy    1 hour
  5/23  Review material    30 min
  5/29  Review material    60 min
  5/30  Meeting w/ Barkasy/Barrie   120 min
  5/30  Draft report        120 min
  5/31    "      "          90 min
  6/1   Draft Report        90 min
  6/4     "      "          60 min
  6/4   Call w/ JSV         10 min
  6/5   Calls w/ Barrie     10 min
  6/6   Conf call           10 min
  6/8   Review report       30 min

VICTOR 000004
Adams v. Crowley
USDC-DE #04-1565

Coram - 5/30

Letter to Rich Barkasy
  - "Asked to consider..."
  - List of materials that were considered
  - Resume for JSV

① Debt repayments while Coram was considering
   bankruptcy - unusual
   - 7/31 letter from Crowley to N/H (will be sent) CL to NH has summary of payments
     • Says he is sending $60 mil of CPS proceeds (FCL)
   - 2/28/00: Friedman to Crowley letter → says bankruptcy
     is an option (Friedman is bankruptcy counsel)
   - Payments totalled $60 mil
     - $6.3 int payment - July 2000  reasonable
     - $38 mil from CPS
     - "Voluntarily" balance paid to reduce revolver
   - In most instances pre Ch. 11 - conserve cash
     - Especially when debt converted to equity
     - Cash needed to fund bankruptcy expenses
   - $6.3 mil made in cash but could have been
     made in kind 3 weeks before bankruptcy
     - Read Walrath's second decision (W2D) - reference
       argument but not Walrath
   - $38 mil CPS payment
     "If completed in Ch. 11 would not have had
      to use proceeds to pay down debt (NH
      consent not enforceable in Ch. 11)

VICTOR 000005
Adams v. Crowley
USDC-DE #04-1565

Good background on
  - SEC filings
  - Disclosure statement

② Plan confirmed absent conflict
  - Summarize Temin report in 1 ¶

$30 mil in admin from rejection of plan 1
  + effective date of Trustee's plan
  - Source doc: Danitz spreadsheet (DS)
  - Danitz deposition - Pg. 162-164
      • With exception of winddown costs, all would
        not have been incurred

Professional fees paid were approved by Court
  - Approval of final fee apps subject to any
    Party of Interest
  - Approval of final fee apps is a conclusive
    determination that the fees + expenses allowed
    by Court were reasonable + necessary
  - Trustee objected to E.C. counsel's final
    fee app + that Court reduced fee

VICTOR 000006
Adams v. Crowley
USDC-DE #04-1565

③ Companies in Ch. 11 don't perform as well
  - JSU's experience
  - Coram specifically hindered/harmed b/c of prolonged
    nature of proceeding
  - Harm exacerbated b/c of nature of rejection
  - Recite/reference Walrath opinions 1 + 2
      • Breach, conflict, bad faith
  - Evidence that Coram didn't do as well
specifically mention → • Crowley letters (x4) to B or D
              - Softness of revenue
              - Calm constituents
              - Apria, Gentiva, etc., "tamping down of sales"
Members of mgmt { - Memo from Sarocco to Crowley re NutraShare
team through testimony    fixing press release to referral source (SL)
and EM's expressed    • EM from kurt Davis
concerns    • Danitz depo - Pg. 164
No need to be    • Danitz Pg. 165-166 re letter to venders +
too specific )      customers to calm them    , interest group for TPN patients
          • Danitz 168-169 - OLey Foundation expressed concerns
          • Danitz 170-171 - contract w/ HealthNet mandated
          emergence by a certain time
          • Sarocco deposition 146-171
          • Marabito testimony - HealthNet, no flexibility - Pg. 164
          • Davis depo 88-95 - concerns about venders looking
          unfavorable upon rejection of plans b/c Coram
          said they would emerge quickly

VICTOR 000007
Adams v. Crowley
USDC-DE #04-1565

④ Transition agreement w/ Crowley + fixing claim (FCC
   (TAC)
- Reasonable exercise of business judgement
- Tried to facilitate quick emergence through POR
   consensual w/ all constituents
- Conducted mediation w/ N/H + EC in 9/02
- Entered into settlement w/ N/H - agreed to
   contribute $56 mil + preferred stock int + Notes
   in exchange for release + ownership of
   reorg Coram
- Trustee entered into settlements w/ other large
   creditors - IRS, R-Net, TBOB, AT+T
- Crowley's emp contract expired 11/30/02
   • Trustee wanted to maintain stability while
      negotiating ^consensual plan → transitional agreement
   • Potential disruption in operations from departure
      made Trustee's decision reasonable exercise
      of bus judgement
   • Trustee reduced Crowley claim from $6 mil
      to $2 mil plus release, subject to
      execution of formal settlement agreement
      + court approval
- Agreement consistent w/ Trustee's goal of
   proposing POR that resolved as many disputes
   as possible + provided as much certainty
   as possible as to amount of cash distribution
   that would be received by shareholders
   • Consequently, letter agreement represented
      reasonable exercise of business judgement

VICTOR 000008
Adams v. Crowley
USDC-DE #04-1565

Shortly before hearing on Trustee's
motion to approve
transition agreement (confirm exact name),
Crowley produced documents which included
draft letters that reflected conversations b/w
Crowley + Cerberus + Crowley's thoughts re
possible settlement w/ Cerberus.

Equity committee argued that draft letters
showed that Crowley was continuing to
attempt to get paid by Cerberus for his
work at Colam. It was reasonable for
Trustee to proceed w/ his motion to allow
the Court to determine whether that was
so or whether, as Crowley argued, the
draft letters had nothing to do w/ Colam.

See transcript
of Crowley
agreement
hearing
(CAH)

After court denied motion, Trustee properly
included prosecution of claim against
Crowley as part of POR
- Under code, Trustee has responsibility to maximize
  value of estate for benefit of stakeholders
- Under confirmed plan, net proceeds of case are
  first payable to unsecured creditors for
  post-petition interest + remaining goes
  to shareholders
- Reference provision in POR / confirmation order
  (to come)

**VICTOR 000009**
Adams v. Crowley
USDC-DE #04-1565