# Exhibit A

_Goldin_ *13*
EXHIBIT

MAR 2 1 2007

Danielle Grant

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
| CORAM HEALTHCARE CORP. and CORAM, INC., | : | Case Nos. 00-3299 (MFW) through 00-3300 (MFW) |
| Debtors. | : | Jointly Administered |

## UPDATED REPORT OF INDEPENDENT RESTRUCTURING ADVISOR
### GOLDIN ASSOCIATES, L.L.C.

GOLDIN ASSOCIATES, L.L.C.
400 Madison Avenue
New York, New York 10017
(212) 593-2255

OF COUNSEL:
KRAMER LEVIN NAFTALIS & FRANKEL LLP
919 Third Avenue
New York, NY 10022
(212) 715-9100

K12:2108873.7

# TABLE OF CONTENTS

Page

I.    THE NATURE AND SCOPE OF THE EXAMINATION .................................................1

    A.    Background ................................................................................................................1

    B.    Scope of the Examination .........................................................................................4

    C.    Methodology of the Examination .............................................................................6

II.   CONCLUSIONS AND RECOMMENDATIONS ......................................................10

III.  FACTUAL FINDINGS ..............................................................................................14

    A.    Background ..............................................................................................................14

    B.    The Noteholders ......................................................................................................18

    C.    The Aetna Contract .................................................................................................21

    D.    The Smith Era .........................................................................................................23

    E.    Crowley's Arrival ...................................................................................................28

        1.    The Relationship Between Crowley and Cerberus .....................................28

        2.    Crowley's Role as Consultant ....................................................................32

        3.    Coram's Outside Directors .........................................................................35

    F.    The Crowley Era .....................................................................................................37

        1.    Crowley's Compensation ...........................................................................37

        2.    Coram's Financial Condition at Year End 1999 ........................................40

        3.    Crowley's Performance as CEO .................................................................43

    G.    Events Leading up to the Bankruptcy Filing ..........................................................48

IV.   FINANCIAL ANALYSIS ..........................................................................................53

    A.    Coram's Enterprise Value .......................................................................................53

        1.    Comparable Public Company Market Analysis..........................................55

            a.    Selection of Comparable Companies.............................................56

RL22108973.7

|  | b. | Calculation of Multiples | 57 |
|  | c. | Application of Multiples – Coram Valuation | 59 |
| 2. |  | Comparable Company Transaction Analysis | 61 |
|  | a. | Selection of Comparable Transactions | 61 |
|  | b. | Calculation of Multiples | 63 |
|  | c. | Application of Multiples – Coram Valuation | 63 |
| 3. |  | Discounted Cash Flow Analysis | 64 |
|  | a. | Industry Fundamentals and Coram's Circumstances | 65 |
|  | b. | Projections – Initial Period | 68 |
|  | c. | Perpetual Period Projection | 72 |
|  | d. | Discount Rate – Weighted Average Cost of Capital | 72 |
|  | e. | DCF Valuation | 74 |
| 4. |  | Adjustments to Enterprise Value Considered | 75 |
|  | a. | Excess Cash | 75 |
|  | b. | Internal Revenue Service Claim | 76 |
|  | c. | SabraTek Pump Replacement | 76 |
|  | d. | Net Operating Tax Loss Carryforward | 77 |
|  | e. | Clinical Trials, Inc. | 77 |
|  | f. | PricewaterhouseCoopers Litigation | 77 |
| 5. |  | Conclusions | 78 |
| B. |  | The Integrity and Accuracy of Coram's Financial Records | 79 |
|  | 1. | Reliability of Financial Statements | 80 |
|  | a. | In General | 80 |
|  | b. | Interviews | 81 |
|  | c. | Analytical Procedures | 82 |

K122108873.7

2.   Issues Raised Regarding Potentially Managed Results ..........................83

   a.   The Chanin Valuation ...........................................................83

   b.   Gross Revenue, Contractual Allowances and Net Revenue ..........84

   c.   Deferral of Revenue ............................................................86

   d.   Deferral of Cost-Cutting Initiatives .......................................87

   e.   A Question of Managed 2000 EBITDA ...................................87

3.   Conclusions ..........................................................................90

V.   LEGAL ANALYSIS .........................................................................91

   A.   The Equity Committee's Proposed Complaint ...................................91

      1.   The Allegations .................................................................92

         a.   The "Conspiracy" Allegations .........................................92

         b.   The "Mismanagement" Allegations ...................................98

            i.   The alleged scheme to oust Smith .............................98

            ii.  The alleged failure to explore options other than
                 Chapter 11 .........................................................101

               (A)   Merger or Sale Opportunities .........................102

               (B)   Capital-Raising Opportunities ........................103

            iii.  The allegedly improper CPS sale ..............................104

            iv.  The challenged July 2000 payments to the
                 Noteholders .......................................................106

            v.   The allegation that Coram delayed filing as long as
                 possible .............................................................108

      2.   The Asserted Causes of Action ...............................................110

         a.   Crowley and Feinberg .......................................................110

         b.   Cerberus .......................................................................114

   B.   The Equity Committee's Objections to Confirmation ..........................114

KL22l095737

1.    The "Fair and Equitable" Requirement...................................................115

2.    The "Good Faith" Requirement............................................................115

3.    The Validity of Cerberus' Claim........................................................117

APPENDICES 1 - 12

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| CORAM HEALTHCARE CORP. and CORAM, INC., | Case Nos. 00-3299 (MFW) through 00-3300 (MFW) |
| Debtors. | Jointly Administered |

## UPDATED REPORT OF INDEPENDENT RESTRUCTURING ADVISOR, GOLDIN ASSOCIATES, L.L.C.

This report (the "Updated Report") of the independent restructuring advisor, Goldin Associates, L.L.C. ("Goldin"), sets forth Goldin's findings of fact, financial analysis and legal conclusions, as well as its recommendations concerning potential amendments to the Debtors' plan of reorganization. The Updated Report begins with a description of the circumstances that gave rise to Goldin's appointment, the objectives and scope of its investigation and the methodology it used (Section I). The Updated Report then presents a summary of Goldin's conclusions and recommendations to Coram's independent directors (Section II), before turning to a detailed discussion of Goldin's findings of fact (Section III), valuation of the Debtors and assessment of the integrity and accuracy of the Debtors' financial records (Section IV) and analysis of the Equity Committee's proposed complaint and objections to confirmation of the Debtors' plan of reorganization (Section V).

## I.    THE NATURE AND SCOPE OF THE EXAMINATION

### A.    Background

On August 8, 2000 (the "Petition Date") Coram Healthcare Corp. ("Coram Healthcare") and its wholly-owned subsidiary Coram, Inc. (together, "Coram" or "the Debtors")

filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Pursuant to sections 1107 and 1108 of the Code, the Debtors are continuing to operate their businesses and manage their properties and assets as debtors-in-possession.

On August 22, 2000 the United States Trustee designated an Official Committee of Unsecured Creditors (the "Creditors' Committee"). On October 18, 2000 the United States Trustee designated an Official Committee of Equity Security Holders (the "Equity Committee") to represent the interests of the holders of Coram Healthcare's common stock.

The Debtors filed a joint plan of reorganization and a disclosure statement on the Petition Date and filed an amended joint plan of reorganization (the "Plan of Reorganization" or "Plan") and an accompanying disclosure statement (the "Disclosure Statement") on or about October 10, 2000. The Bankruptcy Court approved the Disclosure Statement in October 2000. All classes entitled to vote on the Plan voted to accept the Plan.

The Plan provided, among other things, for Coram Healthcare's stock to be extinguished and for its shareholders to receive no distributions. The Plan also provided for Coram's Noteholders, who were owed approximately $252.6 million of principal and accrued interest, to receive $180 million of secured notes and 100% of the equity of Reorganized Coram, consideration with an aggregate value estimated at approximately 83% of the amounts owed the Noteholders. Finally, the Plan provided for a $2 million cash payment to Coram Healthcare's general unsecured creditors (whose claims totaled approximately $7.66 million) and for the claims of Coram Inc.'s general unsecured creditors (which totaled less than $100,000) to pass through the bankruptcy unimpaired.

-2-

The Equity Committee took extensive discovery in anticipation of the confirmation hearing. In November 2000, toward the conclusion of that discovery, the Equity Committee filed objections to confirmation of the Plan. It objected to confirmation on four grounds: (i) that the Debtors were not insolvent; (ii) that the Plan was not proposed in good faith because Coram had failed to disclose that its Chief Executive Officer ("CEO") and Chairman, Daniel Crowley, had a lucrative employment contract with Cerberus Partners L.P. ("Cerberus") — a Noteholder whose principal, Stephen Feinberg, had been a member of the Coram board of directors and Chairman of its Compensation Committee until July 2000; (iii) that "[t]he conduct of Cerberus and certain of Coram's directors and management was improper and inequitable and caused significant damage to the Company," giving rise either to a derivative claim on behalf of the estates or the need to recharacterize Cerberus' claim as equity; and (iv) that the Plan improperly released the shareholders' claims against Crowley and others. (Objections to Confirmation, at 2-3)

On December 21, 2000, at the conclusion of a six day confirmation hearing, the Court denied confirmation of the Plan. The Court found that, under all the various and competing valuations, Coram was, in fact, insolvent. (December 21, 2000 Tr. at 88) The Court concluded, however, that Crowley's relationship with Cerberus gave rise to "an actual conflict of interest," which "tainted the debtors' restructuring of its debt, the debtors' negotiations towards a plan, even the debtors' restructuring of its operations." (*Id.* at 87-89) As a result of the taint, the Court found it impossible to know whether "we would be in the same boat today or whether a different plan would have been proposed by the debtor" had the existence and terms of Crowley's contract with Cerberus been disclosed timely. (*Id.* at 65) Accordingly, the Court was unable to find, on the record before it, that the Plan had been proposed in good faith. (*Id.* at 87)

-3-

B.     **Scope of the Examination**

On February 1, 2001 the Debtors moved for entry of an order, pursuant to

Bankruptcy Code § 105, appointing Goldin independent restructuring advisor to the Debtors.

The motion proposed that Goldin examine, analyze and report on the following issues:

a.     whether the Debtors' business plan and the projections that underlie their business plan are consistent with reasonable business judgment;

b.     whether Goldin found any evidence that Chanin Capital Partners' valuation analysis was not independently prepared or free of any undue or improper influence by a member of the board or the Debtors' management;

c.     whether the Plan was consistent with the best interests of the Debtors;

d.     whether Goldin found any material facts that support a conclusion that the Plan was not proposed in good faith and in compliance with applicable law, or was not fundamentally fair to all parties in interest; and

e.     whether the Plan or some modification thereto would best serve the interests of the Debtors.

The motion proposed that Goldin report on these issues both to the Court and to a special

committee (the "Special Committee") of the independent members of Coram Healthcare's board

of directors. The motion stated that, in the Debtors' view, Goldin's services would "enable the

Court to make a definitive determination as to whether it can properly confirm a plan similar to

the [Plan] and/or provide guidance to the Court, the Debtors, and other parties in interest with

respect to the negotiation and formulation of any viable alternative Plan as may be appropriate."

(Motion to Appoint Goldin, at ¶¶ 17, 26-29)

Objections to the Debtors' motion to retain Goldin were filed by the Office of the

U.S. Trustee and the Equity Committee. In addition, on February 6, 2001 the Equity Committee

-4-

moved for leave to file a complaint (the "Complaint") on behalf of Coram Healthcare, asserting breach of fiduciary duty and related claims against Crowley, Feinberg and Cerberus.

At a hearing on February 26, 2001 the Bankruptcy Court approved the Debtors' motion to appoint Goldin as their independent restructuring advisor, subject to certain modifications.[1] To resolve the U.S. Trustee's objection that the motion impinged on her exclusive power to appoint examiners, the Debtors agreed that (i) Goldin would be retained by the Debtors pursuant to Code § 327(a); (ii) Goldin's report would not be filed with the Court, but would be given to the Special Committee and other parties in interest; and (iii) Goldin's function would not be to report to the Court as an examiner, but, rather, to advise the Special Committee respecting (A) the allegations and claims in the proposed Complaint (including whether the Debtors ought to pursue any of the proposed claims) and (B) potential amendments to the Plan. It was also agreed that Goldin would attempt to mediate a consensual resolution among the Debtors, the Equity Committee and other parties in interest. (Tr. of Feb. 26, 2001 hearing, at 7–9, 14-18, 26).

On March 29, 2001 Goldin filed an application to approve the retention of Kramer Levin Naftalis & Frankel LLP as counsel to the Debtors to assist Goldin in connection with its investigation and report. By order dated May 14, 2001 the Court approved that retention.

---

[1]    The Court also denied the Equity Committee's motion for leave to file the Complaint, without prejudice to renewal of the motion at a later date. It was also agreed at the February 26 hearing that the Debtors would give the Equity Committee "full due diligence access" to Coram's financial records and other pertinent documents. (Tr. of Feb. 26, 2001 hearing, at 35-36) Subsequently, the Court approved a supplemental retention application filed by the Equity Committee, pursuant to which its financial advisor, Deloitte & Touche LLP ("D&T"), was authorized to undertake a due diligence review.

KL2211668717

C.    Methodology of the Examination

During March 2001 Goldin met with representatives of many of the key participants in these bankruptcy cases, including the Debtors, the Equity Committee, the Creditors' Committee and the Noteholders. At these meetings Goldin reviewed with each constituency the process it intended to follow in conducting its examination. Goldin also solicited the views of these parties on various factual and legal issues and invited them to provide further input. Finally, Goldin circulated a draft report to the various constituencies for their comment and review. After reviewing and considering those comments and suggestions, Goldin prepared a Report that it issued on July 11, 2001. This Updated Report is dated September 4, 2001.

Documents. Goldin and Kramer Levin reviewed the following documents, among others: the discovery taken in connection with the confirmation hearing, including the depositions taken by the Equity Committee and the exhibits marked at those depositions; the transcript of the confirmation hearing and the hearing exhibits; the papers filed in support of and in opposition to the Equity's Committee's motion for leave to file the Complaint; documents filed with the Securities Exchange Commission or in the bankruptcy case; and publicly available analysts' reports and news articles concerning Coram. In addition, Goldin reviewed extensively the Debtors' financial records and other pertinent company reports and documents, as well as the three financial advisors' valuation reports and numerous healthcare company and industry reports.

Interviews. Over seven weeks Goldin and its counsel interviewed the following 15 people with knowledge relevant to the investigation:

-6-

KL2.2108872.7

| Person | Relationship to Coram |
|--------|----------------------|
| Donald Amaral | CEO of Coram from October 1995 to April 1999 and October to November 1999; director of Coram from October 1995 to present |
| William Casey | Outside director of Coram since 1997 |
| Daniel Crowley | CEO, President and Chairman of the Board of Coram from November 1999 to present |
| Stephen Feinberg | Managing member of Cerberus Associates, L.L.C., the general partner of Cerberus Partners, LLP; outside director of Coram from June 1998 to July 2000 |
| Richard Fink | Outside director of Coram from 1994 to February 2000 |
| David Friedman | Partner at Kasowitz, Benson, Torres & Friedman LLP, bankruptcy counsel to Coram |
| Daniel M. Lynn | Deloitte & Touche Financial Advisory Services |
| Christina Morrison | Principal at Deutsche Banc Alex. Brown, financial advisors to Coram |
| Edward Mule | Former partner at Goldman, Sachs & Co. |
| Wendy Simpson | CFO of Coram from March 1998 through March 2000 |
| Peter Smith | Outside director of Coram since 1994 |
| Richard Smith | CEO of Coram from April 1999 to October 1999; CFO and then President of Coram prior to April 1999 |
| Sandra Smoley | Outside director of Coram since February 2000 |
| Edward Stearns | Senior Vice President of Foothill Capital Corporation |
| Eugene Tillman | Partner at Reed Smith Shaw & McClay, LLP, regulatory counsel to Coram |

KL2:11857;7

These interviews took place in person or by telephone in New York, Denver, Baltimore and California.

Goldin opted for a relatively informal style of interviewing, which it believed would facilitate the free flow of information and help limit costs. The interviews were not transcribed and other parties in interest were not permitted to attend the interviews. All the interviewees were given the opportunity to appear with counsel; some chose to do so, while others did not. Goldin and/or Kramer Levin took notes at each interview and prepared interview summaries for use in drafting the Report.

In addition, Goldin personnel spent ten days at Coram's offices in Denver, Colorado on four separate occasions, meeting with members of the Debtors' current management. Goldin spoke with the following people, who provided information pertinent to Goldin's financial analysis:

**Coram**

| | |
|---|---|
| Scott R. Danitz | SVP and CFO |
| Kate Douglass | SVP Clinical Services |
| John Ellis | SVP Operations – Eastern Region |
| Frank Geiger | SVP Materials Management |
| Richard Iriye | SVP Operations – Western Region |
| Allen J. Marabito | EVP |
| Debbie Meyers | SVP Field Sales |
| Ron Mills | VP Management Information Systems |
| Vito Ponzio | SVP Human Resources |
| Gerald A. Reynolds | Controller |
| Michael A. Saracco | SVP Specialty Products |
| Steven Schmahl | VP Contracting and Pricing |
| David A. Schwab | General Counsel |
| Joseph Sivori | VP Finance |
| Rodney Wright | VP Reimbursements |

**Ernst & Young**

| | |
|---|---|
| Arlyn J. Dozeman | Partner |
| Shawn A. Simmons | |

-8-

K1.2211283717

John R. Sato

**Chanin Capital Partners**
Eric A. Scroggins          Managing Director
Robert J. Stobo           VP Healthcare Group

**UBS Warburg**
Robert D. Dishner         Associate Director Global High-Yield Research
Philip M. Pucciarelli      Global Healthcare

**Financial Analysis.** Drawing on its extensive review of Coram's financial records and other documents, as well as the discovery and hearing record, the interviews it conducted and other due diligence, Goldin performed a detailed financial analysis to determine the value of Coram at four times: (i) the Petition Date; (ii) the time of the confirmation hearing on the Plan; and (iii) June 15, 2001; and (iv) August 31, 2001. In addition to performing its own independent valuation, Goldin reviewed, analyzed and critiqued the valuations performed by Chanin Capital Partners (on behalf of the Debtors), UBS Warburg (on behalf of the Creditors' Committee) and D&T (on behalf of the Equity Committee).

**Mediation Efforts.** In an effort to explore a possible consensual resolution of the outstanding dispute, Goldin had a number of meetings and discussions with representatives of the Equity Committee, the Noteholders and the Debtors. Goldin has considered alternative settlement proposals and has discussed them with the parties. In addition, as noted, in an attempt to further the settlement dialogue, Goldin simultaneously furnished this Report, in draft form, to the parties in interest, including the Special Committee. The parties' comments on the draft report were considered and, when appropriate, the Report issued on July 11 was modified accordingly. The settlement dialogue is ongoing and, should the Court and/or parties in interest

-9-

wish, Goldin will be available to continue its mediation efforts following dissemination of this Report in final form.

## II.     CONCLUSIONS AND RECOMMENDATIONS

As the Bankruptcy Court found, Crowley's employment agreement with Cerberus created an "actual conflict of interest" on his part; the non-disclosure of that agreement "tainted the debtors' restructuring of its debt, the debtors' negotiations towards the plan, [and] even the debtors' restructuring of its operations." (Tr. of Dec. 21, 2000 hearing, at 88-89) Crowley's and Feinberg's failure to disclose the full extent of the Crowley/Cerberus relationship (and the potential for abuse it posed) to other directors and officers was a breach of their respective fiduciary duties. While the evidence as to Crowley's and Feinberg's intentions in this regard is not conclusive, Feinberg's nondisclosure appears to have been inadvertent. Crowley, by contrast, had an incentive to conceal the existence of his Cerberus contract (so as not to risk a reduction of his Coram compensation) and his failure to make appropriate disclosure may not have been inadvertent.

It does not appear, however, that either Crowley or Feinberg acted with culpable intent of the sort alleged in the Equity Committee's Complaint. The evidence does not establish that either man intended or expected that Crowley would seek to advance Cerberus' interests to the detriment of Coram and its shareholders. There is no indication that Cerberus (or the other Noteholders) ever instructed Crowley to act contrary to the company's best interests or -- with one possible exception -- that Crowley ever did so of his own accord. The one possible exception is Crowley's decision to make a $6.3 million cash interest payment to the Noteholders on July 14, 2000, at a time when the company's cash was low and a bankruptcy filing was under

-10-

KL2:2108733

active consideration. That decision is troublesome: whatever the niceties of the situation, companies preparing for a bankruptcy are invariably advised (well) to husband cash.

Other than the $6.3 million interest payment — which, as it turned out, did not cause the company any harm — there is no evidence suggesting that had he had no conflict Crowley would have managed Coram's operations or finances more effectively or that he would have identified (let alone consummated) any merger, sale or financing transaction that might have enabled him to avoid bankruptcy. The evidence indicates that Crowley worked diligently and effectively to stabilize Coram's operations and improve its financial performance, a goal shared by the Noteholders *and* the stockholders.

Moreover, at all relevant times the amount of Coram's debt materially exceeded the company's enterprise value. At no time during the relevant period was the integrity of Coram's accounting, financial reporting, recordkeeping or system of controls compromised or materially impaired.

In sum, the only damages Coram has suffered by virtue of Crowley's undisclosed conflict of interest are those related to the Debtors' inability to obtain confirmation of their Plan of Reorganization in December 2000 — that is, the approximately $5 million to $6 million of additional professional fees and expenses incurred by Coram, and the approximately $7 million to $9 million in business losses attributable to the prolonging of the bankruptcy. Under Delaware law the remedies available for Crowley's breach of fiduciary duty are limited to (i) recovery of these damages and (ii) disgorgement (or more precisely, reduction) of amounts owed Crowley under his employment agreement. Recovery, if any, on account of Feinberg's breach of fiduciary duty would be limited to the damages to Coram just noted.

KL3:2168871.3

A potentially protracted lawsuit against Crowley and Feinberg to recover the sums potentially awardable could entail more cost to Coram than the suit would be worth. In addition to the direct expense of prosecuting the suit, it would likely divert the attention of Coram's management from the urgent business tasks ahead. It also would provide no benefit to Coram's existing equity holders. From the standpoint of Coram, its creditors *and its* shareholders, a consensual and swift resolution of the claims — if achievable on appropriate terms — would be far preferable. Accordingly, Goldin recommends that the Special Committee attempt to resolve the litigation through, among other things, amendments to Coram's Plan of Reorganization.

A necessary first step toward a consensual resolution is to reduce substantially the $13.4 million owed Crowley under his employment agreement (which Crowley is not entitled to receive anyway unless and until the Bankruptcy Court approves Coram's assumption of that agreement). Goldin recommends that the Special Committee require a $7.5 million reduction in that amount. This would leave Crowley with a total of $5.9 million in bonus compensation, on top of his $650,000 annual salary.

Second, Goldin recommends that the Special Committee cause Coram to amend its Plan of Reorganization so as to offer a $13 million distribution to Coram Healthcare's general unsecured creditors and shareholders. Specifically, Goldin recommends that the Plan be amended as follows:

a. The cash distribution to Coram Healthcare's general unsecured creditors should be increased from $2 million to $3 million, contingent on a vote by that creditor class approving the amended Plan. This would increase this class' recovery from the 26% each

-12-

creditor would have received under the Plan (which they voted unanimously to approve) to almost 40%.

      b. In addition, a $10 million distribution should be offered to Coram Healthcare's shareholders, contingent on a shareholder class vote approving the amended Plan by the requisite majorities. The Plan should provide that, if the shareholder class rejects the Plan (and the proposed payment), shareholders will receive no distribution, with the Bankruptcy Court asked to approve the Plan pursuant to the "cramdown" provisions of Code § 1129(b). Goldin recommends that the distribution to shareholders take the form of an equity security, if that can be done consistent with the requirements of Stark II; should Stark II preclude a distribution in that form, the distribution should be in cash.[2]

      The recommended $13 million distribution by Coram Healthcare to its shareholders and unsecured creditors is tantamount to a voluntary contribution, designed to achieve a consensual reorganization, by those who would otherwise be the beneficiaries of this distribution, *i.e.*, the Noteholders. Its sole purpose is to conclude the bankruptcy and proposed litigation. Significantly in that regard, the proposed $13 million payment approximates the losses suffered by Coram as a result of the breach of fiduciary duty by Crowley and Feinberg.

---

[2]    Goldin has not attempted to probe whether a distribution of equity securities in any form can be accomplished in a way that meets Stark II requirements.

KL2:2108871.7

### III.    FACTUAL FINDINGS

A.    Background

Coram Healthcare was formed in July 1994 as a result of the merger of T[2] Medical, Inc., Curaflex Health Services, Inc., Medisys, Inc. and HealthInfusion, Inc., each of which was a publicly held national or regional provider of home infusion therapy and related services. Each of these companies became and is now an indirect, wholly-owned subsidiary of Coram Healthcare and a direct or indirect subsidiary of Coram, Inc.. Coram Healthcare has made a number of acquisitions since it commenced operations, the most significant of which was the acquisition of certain assets of the home infusion business of Caremark, Inc., a wholly-owned subsidiary of Caremark International, Inc., effective in April 1995. In addition, Coram Healthcare acquired the stock of H.M.S.S., Inc., a leading regional provider of home infusion therapies based in Houston, Texas, effective in September 1994.

As a result of these acquisitions, Coram Healthcare became a leading provider of alternative site infusion therapy services in the United States, based on geographic service area and total revenue. Presently, Coram Healthcare and Coram, Inc., through their wholly-owned non-debtor subsidiaries, deliver infusion therapy services through approximately 80 branch offices located in 40 states and Ontario, Canada. Infusion therapy involves the intravenous administration of nutrition, anti-infective therapy, HIV, blood factor therapies, pain management, chemotherapy and other therapies.[3]

---

[3] The initiation and duration of these infusion therapies is determined by a physician based upon a patient's diagnosis, treatment plan and response to therapy. Certain therapies, such as anti-infective therapy, are generally used in the treatment of temporary infection conditions, while others, such as nutrition or coagulants, may be required on a long-term or permanent basis. The infusion therapies that are administered at a patient's home are

KL2.2108871.7

In addition to the infusion services, which are the core of its business, Coram owned businesses that provided other home health services, including a women's health business, which provided alternate site obstetrical and gynecological support services; a lithotripsy business, for the outpatient treatment of kidney stones; and a mail order pharmacy and claim administration business. Coram also had a web of companies, collectively known as the Resource Network ("R-Net"), that provided network management services to assist managed care organizations in coordinating the provision of home healthcare. In addition, starting in 1995, Coram began to provide support services for clinical research studies involving alternate site infusion therapy. Coram makes its warehouse of clinical data from the provision of home infusion therapies available to pharmaceutical companies and others, for use in designing clinical trials and other aspects of product development.

To finance its acquisition of Caremark in early 1995 Coram borrowed approximately $355 million, consisting of a $205 million senior credit facility and a $150 million subordinated bridge loan from an affiliate of Donaldson Lufkin Jenrette ("DLJ"). In the words of Coram director Peter Smith, Coram from that time on was "always living under a cloud of debt." By the Summer of 1995 Coram, according to another former director, was "going off a cliff" financially. It had amassed over $400 million in long-term debt; it suffered a loss of more than $65 million in the second quarter of 1995; and the price of its stock had fallen by almost 50%.

---

administered by the patient, a designated care partner or an employee or agent of Coram. In such patient groups as immune suppressed patients (e.g., AIDS/HIV, cancer and transplant patients), blood coagulant therapies or anti-infective therapy care may be provided periodically over the duration of the primary disease or for the remainder of the patient's life, generally as episodic care.

At the urging of its lenders (DLJ and Chase), in October 1995 Coram hired Don Amaral to replace the company's founder, James Sweeney, as CEO and President. Sweeney remained Chairman of the Board.

Before joining Coram, Amaral had held executive and/or board positions at several healthcare companies, including OrNda Healthcorp, Summit Health Ltd. and CareMatrix Corporation. He was known throughout the industry as an experienced turnaround executive. He says Coram was "the biggest mess I ever saw in my life when I took over as CEO." Upon taking over in October 1995 he commenced a $1.5 billion lawsuit against Caremark, alleging that Caremark had misrepresented the value of its home infusion business. Amaral says that Coram's claims against Caremark were its "prime asset" at the time and that the litigation was a "must win" for the company.

In Amaral's view, Coram was "fighting on three fronts" at the time he took over as CEO: (1) the Caremark litigation; (2) improving operations; and (3) refinancing its debt and/or obtaining breathing room from its lenders. The Caremark suit was settled in July 1997, netting Coram $165 million through a combination of a cash payment and loan forgiveness. Amaral proceeded to try and tackle the other two "fronts."

Throughout 1996 and 1997 Amaral devoted significant energies to trying to sell or merge the company. He believed Coram could never survive as a stand-alone company because it offered only one of the three basic segments within the home healthcare industry — infusion services, but not oxygen therapy or durable medical equipment ("DME"). His sale efforts continued, although with less intensity, into 1998. Incentivized by a $4 million

-16-

prospective bonus, Amaral reported working with Bear Stearns to explore possible transactions with approximately ten companies.

Although Amaral seems to have come close on at least two occasions, he never succeeded in finding a purchaser. In October 1996 Integrated Health Services agreed to acquire Coram. But in April 1997, after its initial due diligence, Integrated abandoned its bid. Coram's stock promptly lost half its value. Coram also held serious discussions with Apria respecting a merger; at the time, Apria was Coram's main competitor and the leading provider of both oxygen therapy and DME. In such a merger Coram would have provided the third element that both Amaral and Coram's founder, Sweeney, believed was critical to being an industry leader. The proposed deal fell through in the Summer of 1998.

Amaral offers several explanations for Coram's inability to merge. First, the industry was going through difficult times during 1997 and 1998 and stock prices were depressed in the wake of the Columbia Healthcare imbroglio. Second, because of Coram's growing debt it became clear that Coram would have to be the consolidator rather than the acquiree, which limited the available options. Finally, Amaral — who was a significant shareholder, owning 124,296 shares and 2,500,000 options, and a consistent advocate for the shareholders — says that a number of the proposed deals failed because he held out, perhaps too tenaciously, for the highest price possible. In retrospect, he believes he should have done whatever it took to consummate a deal, even if that meant accepting a lower offer.

In 1998 and 1999 Amaral's focus shifted from actively soliciting mergers to trying to grow the company internally. The main growth area was a division called Coram Prescription Services ("CPS"). CPS provided mail-order prescription services to HMOs,

K12-21088717

employer benefit plans and other managed care customers, as well as pharmacy benefit plan

management. Its services included on-line claims administration and drug utilization review

through a nationwide network of over 51,000 retail pharmacies. Coram wanted to expand CPS

into an internet retailer by developing an on-line drug store, along the lines of Drugstore.com.

Coram invested in expanding and developing CPS, accepting that it would not generate any

profits for at least a few years. Under Amaral the company also invested money to expand the

R-Net subsidiaries and devoted additional resources to developing and marketing Coram's

clinical services division.

**B.     The Noteholders**

         In April 1997 Cerberus Partners, L.P. (together with its affiliates, "Cerberus"),

Goldman Sachs Credit Partners, L.P. ("Goldman") and Foothill Capital Corporation ("Foothill";

collectively, the "Noteholders") purchased the $150 million bridge loan from DLJ.[4] Cerberus,

Goldman and Foothill acquired approximately 36%, 45% and 19% of the loan, respectively.

(Goldman's 45% share included a 10% piece that Cerberus held in record name and participated

to Goldman.) At the time of their purchase, the outstanding value of the loan, including principal

and accrued interest, was $190 million. The Noteholders paid more than 90 cents on the dollar.

At the time, the Noteholders believed the debt had significant risk, but that the risk was

countered by the high coupon rate and the accompanying warrants. They also expected that

Coram would pay down the debt in full, through assets sales and/or another refinancing,

relatively soon.

---

[4]     Prior to the April 1997 purchase of the bridge note, each of the Noteholders had
separately made smaller investments in Coram's bank debt.

K12221003737

Coram's ever-increasing debt limited the company's options. As the debt grew, Coram became a less attractive sale or merger candidate. The high level of debt also made it difficult for Coram to free up money to grow the company internally. During the remainder of his term as CEO, Amaral engaged in constant discussions and negotiations with the Noteholders to try and gain some relief. He succeeded in renegotiating the debt on three separate occasions: (i) in April 1998, around the time Coram entered into the Aetna contract; (ii) in April 1999, shortly before Amaral resigned as CEO; and (iii) in November 1999, while serving as interim CEO following Richard Smith's resignation as CEO.

By the Spring of 1998 it had become clear to Amaral that Coram was unlikely to find a viable sale or merger opportunity. He felt he needed to obtain relief from Coram's high interest burden so he could grow the company and devote resources to R-Net and CPS. Ever since the Noteholders acquired the bridge loan from DLJ, the relationship between Amaral and the Noteholders had been adversarial. Originally, DLJ told Amaral that it would sell the note back to Coram at a substantial discount from its par value. Instead, DLJ sold the debt to the Noteholders for more than 90% of face value. Amaral says that, from that time forward, he harbored resentment toward the Noteholders, which carried over into his negotiations with them. He bargained as hard as possible to extract concessions from the Noteholders for the benefit of the company and its shareholders and instructed Coram's management to put as much pressure as possible on the Noteholders. At one point in 1998 he tried unsuccessfully to persuade senior management to threaten to resign en masse if the Noteholders would not accede to his demands.

In April 1998, through a restructuring of the debt held by the Noteholders, Coram obtained financial "breathing room" through May 2001. The Noteholders cancelled their existing bridge note (including deferred interest and fees) and the accompanying warrants in

KL2210837J7

exchange for the payment of $4.3 million in cash, the issuance of $150 million in unsecured Series A Notes, payable in May 2001, and the issuance of $87.9 million in unsecured Series B Notes, convertible at $3.00 per share (subject to certain downward reset provisions) and payable in April 2008. Because of the conversion feature plus holdings of warrants to purchase 1.9 million common shares at $.01 per share, Cerberus, Goldman and Foothill in the aggregate had the right to own approximately 39% of the equity of Coram.

Shortly thereafter, but as part of the same negotiations, the Noteholders provided a $60 million senior secured revolving credit facility to Coram. At year-end 1998, following the Spring refinancing, Coram had $242.2 million in long-term debt and $92.9 million in stockholder equity.

At the time of the April 1998 restructuring, Amaral suggested that the Noteholders exercise their right -- which they possessed under the original loan documents governing the bridge note and continued to possess following the 1998 restructuring -- to designate a representative to Coram's board. In June 1998 the Noteholders exercised that right for the first time, designating Feinberg as their representative on the board. (Neither Goldman nor Foothill had any desire to serve on the board themselves.)

Feinberg served on Coram's board from June 1998 until July 2000. For the most part, his role as a board member was no different from that of any other outside director, with one significant exception. He recused himself from all board discussions concerning the refinancing, renegotiation or restructuring of Coram's debt. According to his fellow board members, Feinberg was in all other respects an active and helpful participant; he was extremely

KL2:2108872.7

attentive to detail and asked probing and incisive questions. He did not attempt to control the decision-making process or to dominate the board in any way.

Under Amaral's employment contract with Coram he was entitled to a $1 million bonus in the event he was able to refinance the company's debt. Accordingly, upon the completion of the Spring 1998 restructuring the board awarded Amaral a $1 million bonus. The board also asked him to stay on as President and CEO.

C.    **The Aetna Contract**

By the time of the April 1998 restructuring Amaral's focus had shifted from actively seeking out mergers to promoting internal growth. Among other projects, he devoted substantial resources to developing and expanding the R-Net subsidiaries. In April 1998 the board approved a five year contract with Aetna under which Coram -- through its R-Net division -- would manage and provide home healthcare services for over two million Aetna enrollees in eight states. The contract went into effect in July 1998. While Coram's services were still limited to infusion, Amaral says the Aetna contract was intended to fulfill the "one-stop shopping" model both he and Sweeney had envisioned for Coram from the outset.

Under the agreement, the R-Net subsidiaries would provide the full panoply of network assistance services, including intake of referrals, utilization management, claims processing and payments and arranging for the provision of home health services. Coram would be paid a so-called "capitated" monthly rate per enrollee. That rate was fixed at the outset, based on Aetna's representations respecting home healthcare utilization levels. Despite the inclusion of an integration clause in the contract, Coram relied on Aetna's oral representation that, should utilization levels exceed expectations, Aetna would increase Coram's compensation accordingly.

K1.2:21088737

The contract itself, however, did not allow Coram to adjust the capitation rate should actual utilization exceed the parties' expectations.

Within months of signing the contract Coram realized that utilization levels, i.e., the number of Aetna enrollees accessing home healthcare benefits, were much higher than Aetna had represented. Hence, the capitation rate in the contract, which was based on expected levels of utilization, was too low. As a result, Coram was spending money to provide services for which it was not being paid. Instead of generating a profit, the contract resulted in an ongoing net loss. Coram management met repeatedly with Aetna to discuss the problem and tried, without success, to renegotiate the fee structure.

In September 1998 the Coram board began to consider seeking a termination of the agreement. It engaged the law firm of Folger, Levin and Kahn, LLP to prepare a draft complaint, in the event legal action became necessary. But Amaral chose not to go that route. During the remainder of Amaral's tenure as CEO Coram continued to perform under the terms of the original agreement, while trying — unsuccessfully — to renegotiate the capitation rate with Aetna.

In June 1999, shortly after Richard Smith had succeeded Amaral as CEO, Coram terminated the contract and on June 30, 1999 filed suit against Aetna in the United States District Court for the Eastern District of Pennsylvania. Coram asserted claims for fraudulent inducement, misrepresentation, breach of contract and rescission and requested in excess of $50 million in compensatory and punitive damages. On July 20, 1999 Aetna filed counterclaims against Coram, asserting claims for breach of contract, fraudulent misrepresentation, defamation

KL2.2210337.7

and interference with contractual relations, and seeking at least $133 million in compensatory and punitive damages.[5]

Richard Smith was President when Coram entered into the contract with Aetna. At the time, Amaral was devoting more time and attention to family matters; in particular to a family member who was suffering from a serious illness. Accordingly, Smith played a central role -- perhaps *the* central role -- in negotiating the Aetna contract. Several of the directors blame Smith for the defects in the Aetna contract. As described below, the disastrous collapse of that contract contributed to the board's growing disillusionment with Smith.

## D.  The Smith Era

In October 1998 Amaral informed the board that for family reasons he needed to step down as CEO. The board persuaded him to continue for another six months, in the hope that he could help during that period to bring about a sale or merger. Amaral agreed to continue as CEO through April 1999. In the perception of some of Amaral's co-directors, for the remaining six months of his tenure -- *i.e.*, from October 1998 through April 1999 -- he was less focused on the company; Rick Smith, Amaral's intended successor, assumed a more prominent role.

On April 23, 1999 Amaral resigned as CEO. He agreed to remain Chairman of the board and consult with Coram on a part-time basis through May 2000, for which he would

---

[5]   The suit was settled in April 2000. Coram agreed to pay Aetna a total of $3 million in three annual installments.

K12.21088737

receive compensation of $100,000 a year. On Amaral's recommendation, the board agreed unanimously to appoint Smith his successor, elevating Smith from President to CEO.[6]

In 1998 Coram's operating performance had begun to weaken. That year's EBITDA was $20,070,000 versus $26,228,000 in 1997. Beginning in the first quarter of 1999, and continuing throughout the rest of the year, Coram's performance declined dramatically. The problems associated with the Aetna contract — deriving from the unexpectedly high utilization levels and the insufficient capitation rates — were the primary culprits. Those problems, which had begun to surface in 1998 within months of the execution of the contract, continued into 1999. Despite ongoing efforts by Coram's management, Aetna refused to renegotiate payment terms. Meanwhile, Coram continued to perform under the agreed-upon terms, providing services for which it was not being paid.

In late June 1999, two months after he became CEO, Smith terminated the Aetna contract and authorized Folger, Levin & Kahn to file suit against Aetna. The termination of the Aetna contract presaged a drastic decline in the performance of Coram's R-Net subsidiaries, which managed and serviced the underlying contracts. In August 1999, two months after Coram terminated the Aetna agreement, R-Net was placed into involuntary bankruptcy proceedings.

In addition to these Aetna-related problems, Coram was also struggling with adverse trends and a deteriorating economic climate in the infusion business. Among other

---

[6]     In April 1999, just before resigning as CEO, Amaral again renegotiated the terms of Coram's debt. The conversion rate on the Series B Notes was lowered from $3.00 a share to $2.00 a share (without this amendment the conversion rate would automatically have been adjusted to below $2.00) and the interest rate on the Series A notes was increased from 9.875% to 11.5% per annum.

problems, Coram faced ongoing pricing pressure resulting from an unfavorable shift in payor mix from private indemnity insurers to managed care organizations; increased competition from hospitals, physicians and other providers of alternate-site infusion therapy; increased costs associated with providing infusion therapy services, including the costs of clinical staffing; a decreasing supply and corresponding price increase of blood and blood-derivative products; and declining government reimbursement rates.

Although the decision to elevate Smith to CEO had been unanimous, in retrospect all agree that he lacked the experience to run a company as troubled as Coram. Confronted with growing internal problems and adverse economic conditions in the infusion business at large, Smith failed to take decisive action to address Coram's increasing costs and declining profitability. The entire board has criticized him for focusing on growth at the expense of cutting costs and questioned whether he had the requisite skills and experience to run the company.

The board's dissatisfaction with Smith began to emerge shortly after he became CEO. Amaral says Smith "repeated rosy projections which never panned out." Peter Smith claims he undertook too many growth initiatives at one time. Casey says Smith had the "unrealistic" idea that he could grow and spend the company out of its problems. Fink says Smith was "keen on growing the top line, but did not contribute to the bottom line." Amaral said similarly that Smith was "trying to grow the top line for its own sake." Unable to fund growth from the company's own earnings, Smith began drawing down large sums from the senior revolver, thereby further increasing Coram's debt.

Smith admits that he allowed the Aetna litigation to consume his time and did not delegate the problem to anyone other than himself. Focusing primarily on the Aetna suit, Smith

KL2:2105832.7

did not devote his energies to solving any of the internal causes of Coram's financial decline. Two issues in particular stand out. First, he continued to allow Coram to operate under a decentralized system, in which each branch office made its own purchasing decisions. Under that system, Coram could not take advantage of volume discounts, could not control costs and, thus, could not control the bottom line. Second, Coram faced a mounting accounts receivables problem; among other things, the average number of days that elapsed between Coram's provision of services and its receipt of payment increased considerably. Smith seems to have done nothing to correct the problem.

     The Equity Committee has characterized Smith as an architect of growth. On one level that characterization is apt. Smith had, in fact, been an advocate of building both R-Net and CPS. According to Wendy Simpson, Coram's CFO under Smith, CPS was Coram's "crown jewel."[7] But in 1999 CPS was still very much in the development stage. To transform it into a full-fledged internet retailer Coram would have had to continue to invest huge amounts of cash, without the prospect of an immediate return. Given Coram's mounting liquidity problem, those expenditures could not be justified. At a meeting on September 17, 1999 the board retained Deutsche Banc Alex. Brown ("DBAB") to assess "strategic alternatives" for CPS -- specifically, an initial public offering of CPS stock or a sale of the division to a third party. DBAB concluded that there was no market for an IPO and confined its efforts to trying to sell the company. Both

---

[7]    Smith's other growth initiatives were limited. His main project, apart from R-Net and CPS, was to expand the clinical services business, which took the clinical data from Coram's infusion business and sold it to pharmaceutical companies and other customers for use in clinical trials and other aspects of product development. Although the project appears to have had the support of the board, there is no evidence that Smith implemented it in a meaningful or profitable way.

KL2:2108873.7

Smith and Simpson acknowledge that the board had no choice but to try and sell CPS, given Coram's liquidity crisis.

The decision to put CPS on the market appears to have been a sound one. The business was growing very rapidly (revenues increased from $30.4 million in 1997 to $96.7 million for the 12-month period ended March 31, 1999) and had begun to show a profit. But this rapid growth engendered a heavy need for cash, which was anticipated to continue beyond 2001; indeed, projections showed that CPS would be a net of user cash through at least 2004. When the board decided to try and sell CPS, Coram was at or near the limit of availability under the borrowing base formula of its revolving credit line and was on "credit hold" with many of its vendors. When the sale closed in July 2000 Coram received net cash of approximately $38 million, of which about $28.5 million was used to pay off its working capital line of credit.

Given the prospect that Coram could have difficulty meeting the minimum $75 million stockholders' equity requirement under the Stark II public company exclusion provision, selling CPS at a gain would increase Coram's net worth and, thereby, help meet the Stark II hurdle. It was initially expected that the sale price of CPS would be significantly higher than was achieved, perhaps because the on-line part of CPS' business might command an Internet-type premium. The sale did generate a gain of $18.3 million, increasing Coram's net worth by that amount.

Coram suffered losses in each of the first two quarters of 1999. By July 1999, three months into Smith's tenure as CEO, Coram was again in difficult financial straits. At some point in the Summer of 1999 the board decided to bring in a more experienced consultant to assist Smith. Feinberg recommended Daniel Crowley. The rest of the board supported

-27-

Feinberg's recommendation unanimously. The board does not appear to have sought out or considered any other candidates.

E.    **Crowley's Arrival**

    1.    **The Relationship Between Crowley and Cerberus**

Crowley had a strong reputation in the healthcare field and was known to have particular expertise turning around troubled companies. Among a number of other healthcare jobs, he had been President and CEO of Foundation Healthcare and had run Blue Cross of Ohio. In 1997 he founded a consulting and investing firm called Dynamic Healthcare Solutions; its focus was finding distressed opportunities. In or around 1998 Dynamic made a pitch to do turnaround work at Oxford. Dynamic did not get the job. But in the process, Crowley met Feinberg and became associated with Cerberus. Cerberus maintains a "bench" of CEO consultants, available to work with troubled companies on a project-by-project basis.[8] In 1998 or early 1999 Crowley joined Cerberus' "bench" of CEO consultants.

Until July 1999 Crowley worked with Cerberus on a project-by-project basis, earning $10,000 a day plus expenses. In July 1999 Crowley struck a "handshake deal" with Feinberg, altering the $10,000 a day arrangement. From July forward Cerberus would pay Crowley a base salary of $80,000 a month (plus expenses) to serve as a consultant to distressed companies in which Cerberus had or contemplated an investment -- referred to in the agreement as "Portfolio Companies." Although Feinberg and Crowley began to operate under this

---

[8]    Cerberus has a roster of consultants, whom it hires out as "coaches" or "mentors" to the CEOs of the troubled companies in which Cerberus invests. Typically, these consultants have incentive-based compensation arrangements with Cerberus. If they succeed in turning the company around, thereby increasing the value of Cerberus' investment, they can share in the profits, in addition to their base compensation from Cerberus.

arrangement in July 1999, the contract itself was not executed until November 19, 1999.

Crowley claims that from August on he repeatedly asked Feinberg to memorialize their

arrangement, but that "Feinberg takes forever to paper a deal." The written contract was to last

for an initial three year term, which "shall be automatically extended to successive one year

periods" unless either party provided written notice of termination.

      In the Cerberus contract a "Portfolio Company" is defined as "any corporation . . .

in which [Cerberus] or any of its Affiliates has made a debt or equity investment, and for which

[Crowley] is rendering services as an employee thereof, consultant thereto, or on behalf of

[Cerberus]." A "Covered Portfolio Company" is defined to include "any Portfolio Company as

to which, at the request of [Cerberus], [Crowley] serves as Chief Executive Officer during the

term of this Agreement." Coram fit both descriptions.

      Section 2.3 sets forth, in broad terms, the nature and scope of Crowley's duties

under the contract. It states that Crowley "will have such duties as are assigned or delegated . . .

by . . . Feinberg;" that he "will devote his entire business time, attention, skill and energy

exclusively to the business of [Cerberus] (or any Portfolio Company or Companies as to which

[Crowley] is assigned by [Cerberus]);" and that he "will use his best efforts to promote the

success of [Cerberus'] business (or the business of such Portfolio Company)." Under section 6.3

of the contract, Cerberus could terminate Crowley "for cause," which is defined to include

Crowley's "failure to follow the reasonable instructions of [Cerberus] . . . , Feinberg, or the

Board of Directors of any Portfolio Company."

      According to Crowley and Feinberg, the idea was for Crowley to be a so-called

"CEO of CEOs," or a CEO "coach," assisting the CEOs of four or five "portfolio companies" at

KL3:2108873.7

a time. In addition to his guaranteed annual salary of nearly $1 million a year, the agreement also gave Crowley the opportunity to earn up to 20% of the profits from Cerberus' holdings in each "Covered Portfolio Company" *other than Coram*, provided the profits exceeded a certain threshold level. (Section 3.2)  During the relevant time period, a company called Winterland, in which Cerberus had a significant stake, was the only company that arguably qualified as a "Covered Portfolio Company," based on Crowley's position there as Chairman. Winterland never generated sufficient profits to trigger Crowley's right to upside compensation under the contract. It is now in bankruptcy.

In August 1999, shortly after agreeing to this arrangement with Cerberus, Crowley became a consultant to the CEO of Coram and began earning $40,000 a month from Coram. Earlier that month Feinberg had become a member of the compensation committee of the Coram board.  Under Section 3.1 of the Cerberus contract, Crowley's $80,000 per month salary from Cerberus would, as a general rule, be offset by any compensation he received from the portfolio companies for which he worked.  Coram was exempted from this arrangement:

> The Salary shall be reduced and offset, on a dollar for dollar basis,
> for any directors' fees, salary, consulting payments, bonuses or
> other cash incentive payments that [Crowley] may receive from
> any Portfolio Company *other than Coram Healthcare*.

(Section 3.1, emphasis added)  Thus, from July to November Crowley earned a combined base salary from both companies of $120,000 per month, or $1,440,000 on a full year basis.

Richard Smith claims this consulting arrangement was never formally put to the board of directors of Coram.  According to the minutes, the board did not discuss Crowley until its meeting on September 4, 1999. The relevant entry on that date states: "A discussion ensued regarding the consultant, Dan Crowley, that Mr. Feinberg had proposed to assist the Company in

KL2:2108572.7

operating its business. Messrs. Kahn and Sullivan were requested to prepare documents that would establish a privileged relationship between the Company and Mr. Crowley." Amaral, however, says all six board members were actively involved in the decision to hire Crowley. Several board members -- Amaral included -- either knew, or knew of, him from their past experiences in the healthcare field. They believed he was an excellent and appropriate choice for the task at hand and that, under the circumstances, Coram was fortunate to have him.

Crowley and Feinberg told the board that they had met each other in connection with Oxford. They also told the board that Crowley was currently serving as chairman of the board of a t-shirt company (Winterland) in which Cerberus held a substantial stake. In addition, they told the board that Crowley had, *in the past*, done some consulting work for Cerberus. They did not explain that Crowley's consulting work for Cerberus was ongoing. Nor did they explain that Crowley had an existing contract with Cerberus under which he was earning at least $80,000 a month, with the potential to earn much more. Indeed, Crowley and Feinberg both admit that they did not disclose either the existence, or the terms, of the Cerberus contract to the directors or shareholders of Coram, either orally or in writing, prior to discovery in the bankruptcy case.

The other two Noteholders had limited knowledge of the relationship between Crowley and Cerberus. Ed Stearns (the Foothill principal responsible for the Coram investment) and Ed Mule (his counterpart at Goldman) did not learn about the Crowley/Cerberus contract until after Coram had filed for bankruptcy. Stearns knew that Crowley had worked for Feinberg at Winterland, but assumed that the Winterland assignment was either over or nearing completion. He did not know that Crowley was still being paid by Cerberus for potential projects other than Winterland. Nor did he know that there was an ongoing employment relationship between them. Mule knew Cerberus was paying Crowley almost $1 million a year;

KL2:2110057137

he believed this was compensation for his services as a healthcare consultant and his work at Winterland. He did not know whether Feinberg ever disclosed the amount of Crowley's compensation, or other aspects of the Crowley/Cerberus relationship, to the Coram board; he assumed Feinberg would make whatever disclosures were appropriate.

### 2. Crowley's Role as Consultant

Originally, Crowley was supposed to consult for only three to four months, with the limited objective of getting Smith up to speed and back on track. Crowley, who lived in Sacramento and had recently gotten engaged, did not want to stay at Coram long-term; he insists that he had no desire to become CEO. Smith, however, viewed Crowley's arrival as a ruse to get rid of him. They did not get along from the start and Smith admits that he did not cooperate with Crowley.

Smith says that at their initial meeting Crowley blamed Smith for "screwing up" the Aetna contract. Smith admits that for the first month or so after that he did not communicate with Crowley. In his defense, he claims that an attorney from Folger Levin, which was representing Coram in the Aetna litigation, advised him not to bring in an outside consultant for fear that might prejudice Coram in the pending case. Amaral put pressure on Smith to cooperate with Crowley; at Amaral's insistence, Smith met with Crowley again in September 1999. Smith says that he eventually "embraced" Crowley and "gave him all necessary information." Yet he concedes that he often did not return Crowley's phone calls because he was busy "trying to run a business" and that accommodating Crowley's information requests "was not my top priority" at the time.

KL2:2108873.7

Smith believes that Crowley, considering himself a "CEO of CEOs," envisioned Smith working for him, rather than the other way around. For example, he says Crowley sent Simpson, Coram's CFO, to New York "behind his back" to talk to bankers and took other actions on behalf of the company without consulting with Smith. He also says that in October 1999 Crowley wrote a highly critical memo about Coram's management information system — in defiance of Smith's explicit instructions not to write any memos — which could have potentially hurt Coram in the Aetna litigation.

By mid-October it had become clear that Smith and Crowley could not work together. After the October 22 board meeting Richard Fink spoke to Smith on the board's behalf. Fink told Smith that he lacked turnaround experience and needed help; Fink explained that the board wanted Crowley to function, in the short term, as a "CEO coach." He proposed that Crowley and Smith serve as "co-CEOs" for the next few months, at which point Smith could resume running the company on his own. Fink says the board "tried to make it work for everyone."

While conceding that the board *did* ask him to stay on in some capacity, Smith claims Fink conveyed a somewhat different message. According to Smith, he was told the Noteholders would agree to forgive $11 million in debt if the board brought Crowley in to run the company with him as co-CEO. Smith says this was put to him as a direct quid pro quo. Simpson, who was CFO at the time, does not recall the two having been connected. But Fink recalls that the interest/accrual holiday was, in fact, conditioned on Crowley taking over.[9]

---

[9]     As noted below, Crowley's contract with Cerberus, Crowley's contract with Coram and the forbearance agreement between Coram and the Noteholders were executed within

KL2210872.7

In October 1999 Smith's attorney sent a letter to the board of directors of Coram, claiming Smith had been constructively terminated. According to the minutes of the October 27, 1999 board meeting, the board determined "that it was in the best interests of the Company to treat Mr. Smith's departure as one in which Mr. Smith had resigned, but one in which he would receive the benefits of his employment agreement as if his employment were 'involuntarily' terminated." Amaral (with the board's concurrence) ultimately agreed to pay Smith severance in an amount that was roughly commensurate with the terms of his employment agreement. Smith is currently pursuing an arbitration against Coram and its subsidiaries to recover unpaid severance amounts.

Upon Smith's resignation Amaral agreed to serve as CEO on a temporary basis, while Coram looked for a long-term replacement. Amaral had three goals as interim CEO: (i) "to come to terms with Smith's severance;" (ii) to find a new CEO; and (iii) to assess Coram's financial condition.

Amaral met with an executive search firm to identify possible CEO candidates. But as several directors explained, by November 1999 Coram was in dire financial straits. It could not afford a long and drawn out search and, even if it could, there were few (if any) qualified candidates willing to take on a troubled healthcare company. Feinberg recommended Crowley. But Crowley initially turned the job down. After speaking with Feinberg, however, he changed his mind.

---

days of each other. On November 15, 1999 Amaral and the Noteholders agreed on the terms of the forbearance agreement. On November 18, 1999 Crowley signed the contract with Coram. On November 19, 1999 he executed his contract with Cerberus.

KL2:2108377.7