revenue from declining, Coram's normalized EBITDA is estimated to improve over the projection period. The Financial Advisors assumed modest improvements to this margin over the initial projection period, as did Goldin. However, absent acquisitions, Goldin concluded that Coram cannot be expected to achieve its 12% EBITDA target in this period.

Unlevered Free Cash Flow.  For purposes of DCF valuation analysis, unlevered free cash flow represents the flows coming to an owner or acquirer over the projection period. In the initial projection period particularly, these flows are often affected significantly by capital expenditure assumptions. The Financial Advisors accepted management's capex assumptions; Goldin did, as well, updated as reflected in Appendix 8.

Summary of Projections
(Utilized for June 15, 2001 and August 31, 2001 DCF Analysis)
($000s)

| | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| Net revenue: | | | | | |
| Core therapies | 270,983 | 291,044 | 301,812 | 314,489 | 330,213 |
| Non-core therapies and other | 130,017 | 130,017 | 130,017 | 130,017 | 130,017 |
| | 401,000 | 421,061 | 431,830 | 444,506 | 460,230 |
| Growth rate | | 5.0% | 2.6% | 2.9% | 3.5% |
| | | | | | |
| Gross margin | 113,082 | 124,399 | 129,348 | 136,088 | 145,757 |
| Percent of net revenue | 28.2% | 29.5% | 30.0% | 30.6% | 31.7% |
| | | | | | |
| Branch margin | 54,090 | 63,844 | 67,590 | 73,008 | 81,239 |
| Percent of net revenue | 13.5% | 15.2% | 15.7% | 16.4% | 17.7% |
| | | | | | |
| EBITDA | 27,814 | 36,448 | 39,316 | 43,789 | 50,908 |
| Percent of net revenue | 6.9% | 8.7% | 9.1% | 9.9% | 11.1% |
| | | | | | |
| Unlevered Free Cash Flow | | 13,753 | 25,072 | 28,567 | 33,422 |

KL2:2108870.7

c.    **Perpetual Period Projection**

All the Financial Advisors utilized the "exit method" short cut to calculate the value of unlevered free cash flows in perpetuity. Each calculated a terminal value by applying the EBITDA multiple derived from its comparable public company market analysis to the EBITDA in the last year of its initial projection period. Goldin used the average of its two comparable analyses to capture the information provided by the multiple calculations of both valuation methods. Appendix 10 presents these calculations for each Advisor and for Goldin as of each of the Valuation Dates. In the Report Goldin issued on July 11 it did not update from its previous draft report the EBITDA multiple it used for its calculation as of June 15, 2001; it does so here.

UBS also did a perpetual value analysis. It adjusted the last year's unlevered free cash flow for early tax benefits to reflect that Coram could be assumed to be a taxpayer during the perpetual period. It assumed a 2.5% growth rate for the perpetual period and, it appears, used the same discount rate utilized for calculating the present value of all earlier flows (see discussion below). The result of this calculation is approximately half that which UBS derived using the exit method, which suggests that the terminal value calculation of UBS has a strong upward bias.[25]

d.    **Discount Rate -- Weighted Average Cost of Capital**

A DCF analysis establishes the enterprise value of Coram by calculating the present value of its projected unlevered free cash flows and the terminal value (or perpetual value), using a discount rate equal to an estimated weighted average cost of capital ("WACC").

---

[25]    Gasiorek 184.

The estimation of WACC requires a number of assumptions regarding an optimal capital structure,[26] i.e., the debt to equity ratio; the likely cost of debt at such a level that the market at the Valuation Dates would require Coram to pay; and the expected return on equity that an investor would require at the time. Appendix 9 sets forth the assumptions made by the Financial Advisors and by Goldin for the purpose of deriving the appropriate discount rate.

### Summary of Goldin's WACC Calculation

| Factor | 7/31/00 | 12/14/00 | 6/15/01 | 8/31/01 |
|---|---|---|---|---|
| Cost of Debt, after tax | 6.3% | 5.7% | 4.7% | 4.4% |
| Cost of Equity | 25.8% | 22.5% | 21.4% | 21.0% |
| Debt / Equity | 20% / 80% | 20% / 80% | 20% / 80% | 20% / 80% |
| WACC | 21.9% | 19.1% | 18.1% | 17.7% |

The most significant difference among the Financial Advisors and Goldin in the calculation of WACC is the assumptions made respecting the cost of equity. The components of the analysis (derived from the capital asset pricing model) reflect the expected incremental return investors in the equity of a business require for the assumption of defined incremental risks. Investors in distressed companies, i.e., companies in bankruptcy and/or experiencing significant operating or financial problems, require an incremental expected return to compensate for the risk that a turnaround and recovery will not occur as planned.

The projections presented in Appendix 8 reflect that Coram's recovery, while still problematic, can, in Goldin's view, reasonably be expected to continue. Furthermore, notwithstanding Goldin's conclusions on other matters set forth elsewhere in this Updated

---

[26]     Gasiorek 28, 44-50.

KL2:2103873.7

Report (and while it may be that no individual is indispensable), Goldin believes that the best

chance for Coram to recover may rest on continuity and stability of management. Accordingly,

in the absence of appropriate management contracts, the risk of a change of management must be

factored into the risk equation.

To reflect these risks, Goldin has included a substantial "turnaround risk" factor

in its calculation of WACC.

e.        DCF Valuation

Based on the assumptions discussed above, the Financial Advisors' and Goldin's

DCF analyses determined Coram's enterprise value as set forth in Appendix 10. The tables

below summarize Goldin's computation of Coram's enterprise value as of June 15, 2001 and

August 31, 2001, utilizing the discounted cash flow methodology.

Summary of Goldin's DCF Analysis
(as of June 15, 2001 – revised)
($000s)

|  | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Unlevered Free Cash Flow | 13,753 | 25,072 | 28,567 | 33,422 |
| Terminal Value @ 7.22x EBITDA of 50,908 |  |  |  | 367,554 |
| Present Value @18.1% | 11,647 | 17,982 | 17,352 | 17,193 |
| Present Value of Terminal Value |  |  |  | 173,997 |
| Enterprise Value |  |  |  | 238,171 |

K12:2108872.7

<u>a. Summary of Goldin's DCF Analysis</u>
<u>(as of August 31, 2001)</u>
<u>($000s)</u>

|  | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Unlevered Free Cash Flow | 13,753 | 25,072 | 28,567 | 33,422 |
| Terminal Value @ 7.13x EBITDA of 50,908 |  |  |  | 363,465 |
| Present Value @17.7% | 12,005 | 18,592 | 17,996 | 17,885 |
| Present Value of Terminal Value |  |  |  | 179,269 |
| Enterprise Value |  |  |  | 245,747 |

4.     <u>Adjustments to Enterprise Value Considered</u>

Depending on the circumstances, a variety of adjustments to enterprise value may be appropriate to determine the fair market value of a business. Goldin considered those that could have a significant impact on the result (discussed below), but concluded that no adjustment to enterprise value is indicated.

a.     <u>Excess Cash</u>

Enterprise value calculations assume normalized balance sheets and, particularly, normal working capital. If, as of any of the Valuation Dates, there are material abnormalities, adjustments may be appropriate. D&T adjusted upward from its enterprise value as of December 2000 (by approximately $16 million) on account of cash it considered excess of normal requirements. Goldin did not make this adjustment as of that Valuation Date because Coram had an offsetting obligation to pay substantial incentive bonuses; D&T assumed away this "abnormal" liability, but Goldin concluded that this was not appropriate for the analysis.

As of June 15, 2001, Coram had over $30 million in cash; as of August 31, the cash balance was lower. Offsetting this amount are the obligation to pay some $13.4 million in

KL2 2102873.7

management incentive and other bonuses to Mr. Crowley, substantial anticipated bankruptcy costs and significant rental obligations due July 1. Coram estimates a minimum requirement of approximately $6 million to run the business; the difference, which may be "excess cash," is less than $5 million.

### b.  Internal Revenue Service Claim

The IRS has made a claim against $T^2$ Medical ("$T^2$"), a non-bankrupt subsidiary of Coram, for back taxes in the amount of $12.7 million plus interest; $T^2$ (with Coram) is disputing the claim. UBS adjusted down its estimated free cash flow by approximately $2.1 million per year to account for this potential liability, assuming a six year pay-out of a compromised claim. Coram's view is that any related tax liability is only an obligation of its subsidiary. Nonetheless, just as the value of $T^2$ is part of Coram's enterprise value, any offset of the subsidiary's value is an offset to Coram's. Accordingly, Goldin considered this claim in its determination of Coram's value.

### c.  SabraTek Pump Replacement

Coram is experiencing problems with pumps it purchased from SabraTek and is replacing them as required. When SabraTek went into bankruptcy Baxter Laboratories purchased its pump business and has since stood behind these products. However, Coram anticipates that it may need to accelerate its replacement expenditures. This would have a short-term negative impact on cash flows, aggregating $12 to $14 million above projections, but would reduce projected capital expenditures modestly for a number of years thereafter.

### d.    Net Operating Tax Loss Carryforward

Coram reports having an NOL carryforward of approximately $159.3 million. Its ability to use this potential shelter to offset taxes, however, is problematic for a number of reasons. The Plan contemplates that Coram will have $180 million of post-reorganization debt. Were that level of debt imposed on Coram, after interest expense it would have little, if any, taxable income to shelter. Also, the change-of-control rules in the Federal tax code would reduce the annual utilization of Coram's NOL significantly were control to change. This limitation relates, in part, to Coram's equity value at the time it emerges from bankruptcy. Should the capital structure be as highly leveraged as the Plan contemplates, the equity would be relatively small. Under these circumstances, the NOL would have little value.

### e.    Clinical Trials, Inc.

For several years Coram has provided drug-testing services for pharmaceutical manufacturers through a subsidiary, Clinical Trials, Inc. ("CTI"). With access to industry contacts and over 350,000 patients treated, Coram is able to plan and implement tests utilizing human subjects under controlled circumstances pursuant to FDA guidelines. Although expected to continue to grow at a relatively high rate, the business constitutes less than 1.5% of revenue and is not estimated to exceed 2% of revenue within the initial projection period. Its impact is small and its expected growth uncertain, so its operations are not reflected in Coram's projections used for the various valuations.

### f.    PricewaterhouseCoopers Litigation

A fall-out of Coram's disastrous acquisition of Caremark's home infusion business is a litigation claim Coram assumed against PricewaterhouseCoopers for $165 million. While this claim may have merit and might ultimately result in a substantial recovery, it has

-77-

KL221088737

dragged on for many years without resolution. Goldin has concluded that an investor/acquiror of Coram would not attribute much value, if any, to this litigation.

Based on the foregoing in the aggregate, Goldin concluded that these six possible adjustments to enterprise value would not materially increase or decrease enterprise value. Accordingly, it made no adjustments based on them.

### 5.    Conclusions

The Financial Advisors and Goldin respectively determined Coram's value as of the various Valuation Dates, utilizing the results of the calculations of enterprise value from the methodologies discussed above and making the adjustments each deemed appropriate; each applied its professional judgment to the ensuing computation, including a weighting of the results.[27] The various calculations and the respective determination of values is set forth in Appendix 11.

Goldin's weighting reflects its view that the DCF analysis is the most informative of the valuation methodologies utilized.[28] As to the comparable market and comparable transaction analyses, Goldin considered the multiple of revenue approach the least informative; revenue is a good indicator of demand for products and services, but is not reflective of the profitability of this revenue[29]; and profitability drives value. Accordingly, Goldin placed greater weight on the multiple of EBITDA calculations.

---

[27]    Pratt 371.

[28]    Pratt 151; also Tom Copeland, et al., *Valuation: Measuring and Managing the Value of Companies* (New York: John Wiley & Sons, Inc. 1995) 70-1.

[29]    Damodaran 338.

## Summary of Goldin's Valuation of Coram
### ($000s)

| Method | Basis | July 31, 2000 EV | Weight | December 14, 2000 EV | Weight | June 15, 2001 EV | Weight | August 31, 2001 EV | Weight |
|--------|-------|---------|--------|---------|--------|---------|--------|---------|--------|
| Comparable | EV/Revenue | 227,116 | 5% | 255,604 | 5% | 396,312 | 5% | 375,242 | 5% |
| Market | EV/EBITDA | 251,444 | 10% | 257,940 | 10% | 255,555 | 10% | 248,225 | 10% |
| Comparable | EV/Revenue | 455,690 | 5% | 409,141 | 5% | 485,210 | 5% | 485,210 | 5% |
| Transactions | EV/EBITDA | 278,703 | 20% | 239,687 | 20% | 159,542 | 20% | 157,817 | 20% |
| DCF | | 182,502 | 60% | 182,899 | 60% | 238,171 | 60% | 245,747 | 60% |
| Enterprise Value | | 224,527 | | 216,708 | | 244,443 | | 246,857 | |

**B.     The Integrity and Accuracy of Coram's Financial Records**

The valuations performed by the Financial Advisors and Goldin utilized the financial information reported by Coram and/or provided by Coram's management; hence, Goldin needed to satisfy itself as to the integrity and accuracy of this information. Given the issues raised in Coram's bankruptcy, Goldin's examination focused on whether:

- the valuation analysis by Chanin as of July 2000 utilized sound and reliable financial information;

- Coram's accounting and financial management systems had been manipulated in a way calculated to produce false or misleading information and to lead the Financial Advisors and Goldin to a particular (and potentially erroneous) conclusion, *i.e.*, that the enterprise value of Coram was, on the Valuation Dates, significantly below the amount of the debt claims; and

- Mr. Crowley and/or Cerberus (Mr. Feinberg) used their positions deliberately to mismanage the company and benefit themselves or itself in dereliction of their respective duties to Coram.

Especially in light of the substantial shortfalls in enterprise value Goldin found from the amount of the debt claims on the Valuation Dates, Goldin focused closely on issues and areas in which a finding of impropriety and/or inaccuracy could have a potentially material financial impact, *i.e.*, could result in a different outcome. Goldin undertook an inquiry in that

KL2-21988727

regard of a nature and to an extent it deemed appropriate and necessary to form professionally bona fide conclusions respecting these matters.

With the assistance of counsel, Goldin performed a number of tasks in this regard, including the following:

- A review and analyses of Coram's 10-K and 10-Q filings with the Securities and Exchange Commission;

- Interviews of the Ernst & Young ("E&Y") audit partner and associates responsible for the audits of Coram from 1997 through 2000, a review of E&Y's management letters and a review of certain of E&Y's work papers pertaining to its 2000 audit;

- An interview of the partner at Reed Smith responsible for counseling Coram regarding Stark II issues;

- Interviews of numerous members of management, including senior officers responsible for Coram's sales efforts, operations, certain branch operations and management of certain core therapies, as well as present and former chief financial officers; and

- A review and analysis of documents requested of management, as well as documents prepared by management at Goldin's request.

In all cases the individuals interviewed cooperated fully, were forthcoming in responding to detailed and multiple inquires, produced all information requested and/or asked to be developed and provided complete and credible responses.  The only exception to the foregoing is certain information requested of E&Y that Goldin was advised was proprietary and that, as a matter of strict policy, could not be shared with anyone, including clients.

1.    Reliability of Financial Statements

a.    In General

As a general rule, business convention justifies reliance on the financial statements of public companies, especially where they are independently audited by reputable

KL2210857A7

accounting firms and are reported to the public in documents signed by officers and/or directors and filed with the SEC. Historically, Coram has received unqualified audit opinions from its independent auditor. (Unqualified audits mean that nothing of a material nature has caused the reported data to be unreliable.) Goldin has found no reason to question the professional bona fides of Coram's financial disclosure and/or statements:

- Accounting firms, including E&Y, have had increasing reason in recent years to apply rigorous auditing standards, given enhanced public scrutiny of their work and the financial risks implicit in negligence or serious dereliction in their application of professional standards;

- The SEC has intensified its scrutiny and willingness to institute and prosecute enforcement actions; and

- Manipulation and/or conspiracy to meet Stark II financial compliance requirements carries potential criminal penalties.

Goldin conducted a broad inquiry into Coram's financial information systems, recordkeeping, other systems and control environment.

### b.    Interviews

Interviews with Coram financial personnel focused on such as matters as: revenue recognition and billing systems (particularly the difference between gross revenue and allowable deductions to get to net revenue); contract coding, pricing and standard deduction protocols; the relationship between average wholesale prices of drugs and billed amounts; collections and cash application; and the determination of uncollectible receivables and allowances for doubtful accounts. Goldin's inquiry also addressed: profitability by therapy and the application of admission grids; inventory and fixed asset oversight; centralization of accounts payable and the company's approval mechanism; computer systems; divisional and branch accounting and roll-

K1.2:21088733

up; write-downs for impairment of long-term assets; and restructuring expenses taken in the first three quarters of 2000, but reversed in the fourth quarter.

The independent auditors were specifically asked to address, inter alia, their audit program and risk analysis; internal controls evaluation; review of the general ledger; examination of the billing system and testing at the branch level; review of contractual allowances as deductions from gross receivables; review of the accounts receivable ledger, including allowance for doubtful accounts and write-offs; review and testing of Coram's inventory system at the branch level; review and analysis of plant, property and equipment records; and analysis of all impairment reserves taken or reversed.

### c.   Analytical Procedures

In addition to the interviews and reviews noted above, Goldin performed certain analytical procedures to test for material variances in the financial records. The following analytical measures were performed:

1. For the period December 1998 through March 2001, changes in balance sheet and income statements were calculated, utilizing Coram's 10-Ks and 10-Qs. Adjustments were made for discontinued operations.

2. An analysis of the changes in EBITDA for each of the years ended 2000, 1999 and 1998.

3. Analyses of changes in accounts receivable, the allowance for doubtful accounts and the provision for doubtful accounts.

The foregoing analytical procedures highlighted areas for further discussion and review, helped identify the nature of year-to-year changes in income and assets and assisted in examining the estimation process.

-82-

KL2:2168873.7

2.    <u>Issues Raised Regarding Potentially Managed Results</u>.

    a.    <u>The Chanin Valuation</u>

In addition to reviewing the financial information and assumptions utilized by Chanin in performing its valuation analysis in July 2000, Goldin also examined Chanin's role in helping management develop projections. In that regard, Goldin focused on such matters as: the forecast model provided to Chanin; the financial templates provided to branch management; the assumptions for such factors as pricing levels, volumes and drug and supply costs; G&A levels; inflation; and the review work done at corporate headquarters. Chanin professionals were queried about their roles in helping Coram develop budgets for use in the Chanin valuation and in undertaking independent verification of therapy market shares, patient censuses, payor reimbursement rates, industry conditions and outlook, revenue growth rates, operating costs and profit margins.

Goldin concluded that Chanin conducted appropriate independent due diligence (involving professionals with extensive healthcare experience) from a financial point of view and guided management in the development of projections by giving direction respecting the form and level of detail such projections should involve; in addition, Chanin examined management's assumptions in a fashion necessary and appropriate to a valuation expert in such circumstances. Chanin made appropriate adjustments in its valuation; for example, Chanin used a standard estimate for losses on uncollectible accounts (approximately 3%), rather than the varied estimates actually made for 1999 and 2000. Goldin found no evidence of improper influence on Chanin or reason to question the professional integrity of its work.

KL2:2108573.7

### b.    Gross Revenue, Contractual Allowances and Net Revenue

Goldin probed carefully the points at which Coram's financial information might be distorted or manipulated in a manner calculated to reduce Coram's apparent value. The prime, albeit not exclusive, candidate is net revenue.

Specified contractual allowances must be deducted from gross revenue (the price for services indicated in Coram's contracts with third-party payors) to calculate billable amounts for those services. The amount billed is booked as net revenue. Calculations of contractual allowances can be complex. At Coram these calculations are performed by computer and checked manually.

The ways to manipulate results boil down essentially to two: (i) booking net revenue below the actual, proper, invoice amount and charging full costs against net revenue, resulting in artificially low margins and profit and (ii) booking net revenue below invoice amounts and charging estimated costs on the basis of assumed margins (similar to standard cost systems), resulting in maintained margins, but, again, artificially low profit. As profits drive value, these manipulations, if on a grand scale, would materially impact calculations of enterprise value.

Since contractual allowances account for more than 60% of gross revenue, there is ample room for a distortion to have an impact. However, for several reasons which Goldin finds compelling such an exercise would be highly unlikely and, in any event, highly unlikely to succeed.

Cash Implications.  A form of manipulation outlined above would result in unreconciled cash amounts: payments of invoices would produce cash receipts in excess of

revenues booked as receivables, unless the cash could be diverted from the attention of members of management and/or auditors not part of the fraud. Alternatively, were the basis for estimating costs booked net revenue amounts, actual costs would exceed estimated costs. This would have the effect of offsetting unexpected cash; but, again, those responsible for paying Coram's bills would be unable to reconcile the bills received against the estimated costs booked. Assuming material differences over time, this, too, would be unlikely to go undiscovered.

      Account Distortion.  An understatement of net revenue would require either that a fictional expense be interposed or a legitimate deduction from gross revenue be overstated. For the impact on valuation to be material, the distortion would have to be substantial. The principles of double-entry accounting require that balancing entries be made throughout. Consequently, fictional expense inputs or gross overstatements of deductions would require at least one other distortion (which would accumulate), such as a balancing liability on the balance sheet reflecting an obligation to pay the fictional or overstated and unpaid expense. Without the counterbalancing entries, Coram's general ledgers would not balance; with them, the growing distortion would quickly reach detectable proportions. Goldin questioned E&Y respecting its review of Coram's accounts and, in particular, balancing entries, in connection with its audits of Coram's financial statements; Goldin also examined numerous financial reports and questioned management closely in connection with this review. Goldin found no distortions.

      Dispersed Operations.  Coram has over 70 branches across the United States. Currently, as for the past several years, much of the recordkeeping inputs and management of collections and payments of bills occur at the branch level. For a financial manipulation scheme to affect value materially, the requisite scale would require the involvement in the fraud of a

significant number of branches. That such a scheme could be put in place, managed and kept quiet across such a diverse operation is highly unlikely.

Consolidation of Billing and Collections. Coram is in the process of consolidating its reimbursement management to twelve sites and centralizing the processing of Medicare and Medicaid billing and collections. In the process of making these changes, a fraud of the kind hypothesized would overwhelmingly likely come to light and could not be maintained. Consequently, a rational person involved in such a fraud would not institute these consolidations.

c.    Deferral of Revenue

With the demand for infusion home care services said to be rising, but with Coram's revenue declining, query whether Coram has been pursuing revenue opportunities aggressively.

Goldin interviewed the senior management officials responsible for sales and operations, as well as the officer responsible for increasing sales of the most significant of Coram's core therapies. Goldin interviewed a branch manager and sales management personnel at the branch level. Goldin found the branch personnel to be alert and focused; every indication is that they are trying hard to hit revenue targets. Indeed, Mr. Crowley has set very high revenue goals for the core therapies; branch management outlined the efforts being made to realize those goals, the various impediments involved and their strategies for overcoming them.

A changed commission structure for sales managers is designed to incentivize increases in the core therapy census and, on the other hand, not to encourage non-core, unprofitable business. Nonetheless, regional and national payors will likely defer meaningful

KL2:2108573.7

expansion of long-term arrangements with Coram, pending the outcome of its bankruptcy and the resolution of Coram's ownership and leadership. Consequently, the projections of management and those developed by Goldin with management's assistance contemplate a boost in revenue in the year 2002, after Coram exits the bankruptcy proceeding.

### d.    Deferral of Cost-Cutting Initiatives

Management has instituted procedures for analyzing profitability by therapy, payor and branch. The strategy that focuses on profitable "core therapies" and attempts to reduce the unprofitable therapy census reflects that analysis. Some unprofitable branches have been closed already; significant reductions in headcount have been effected.

Through these and other initiatives management effected a significant improvement in EBITDA in 2000. EBITDA for 2001 is estimated to improve modestly over 2000's EBITDA (after the normalization adjustments discussed in the next section), despite flat revenue. Management acknowledges that more must be done, albeit consistent with balancing the need to maintain a level of infrastructure sufficient to develop and service anticipated opportunities to increase revenue once the bankruptcy is over.

### e.    A Question of Managed 2000 EBITDA

Coram took significantly higher reserves for uncollectible accounts in 1999 than past practice would indicate was required: $28 million in reserves as against an indicated $14 million based on historic levels. In 2000, however, approximately $10 million of these "uncollectible" receivables were collected; since the amount of reserves for uncollectible accounts in 2000 was partially offset by this experience, only $9 million, not an indicated $12.8

-87-

K122108873.7

million, was taken in reserve in 2000. The difference of $3.8 million was an element in the higher EBITDA in 2000.

Numerous other adjustments, in the aggregate, also boosted reported EBITDA. For example, the company made 23 separate adjustments to EBITDA at the operating level; these aggregated $9.0 million of net additions. At the corporate level, Coram made 15 separate adjustments to EBITDA; these aggregated $4.6 million of net additions. Taken together with the $3.8 million of lower-than-usual reserves for losses, the total upward bias to EBITDA was $17.4 million. As reflected in Appendix 12, Goldin deducted certain of these amounts as part of the calculation for a "normalized" EBITDA (after considering MIP at 5.5% of branch operating profit) of $29.1 million. Query whether Mr. Crowley, who renegotiated his EBITDA-based compensation arrangement early in 2000, and whose new arrangement produced a bonus owed of $10.8 million on these results, managed these EBITDA levels for his own benefit.

On the other hand, the higher EBITDA achieved in 2000 has caused calculations of enterprise value to be higher than they would otherwise have been. Such a result is inconsistent with the assertion that Mr. Crowley was motivated to manage financial results in a fashion that was calculated to produce a lower valuation.

Moreover, Goldin probed the underlying facts in this matter and sought to adduce any evidence of wrongdoing. Goldin has concluded that there is no such evidence, other than the finding of an actual conflict of interest by the Court.

Toward the end of 1999 Coram's DSOs (days sales outstanding – a measure of the level of accounts receivable) climbed dramatically. Collections had slowed, the amount of receivables over 90 days past due had grown substantially and, consequently, the business was

cash constrained. It would appear that senior management was consumed by problems associated with Coram's Aetna contract and the resulting dispute and litigation, as well as the bankruptcy of the R-Net subsidiaries. At the same time, management was also focused on the sale of Coram Prescription Services. The conclusion seems inescapable that the collection process, which requires constant attention in any business and especially in Coram's, had been neglected.

Given this circumstance, management determined that an unusually large reserve against uncollectible accounts was necessary. Generally accepted accounting practices required recognition of the situation; it could not be avoided simply by assuming that corrective action would be timely and would result in recovery of a substantial portion of the long-overdue accounts.

The spectre of Coram not complying with the minimum net worth requirements of Stark II hung over the company at the time. Given that the failure to comply with this requirement would unquestionably be fatal to Coram, it is hard to imagine a deliberate effort by management to jeopardize the company's existence by contriving to minimize Coram's net worth.

In this situation, Coram's year-end 1999 accounting entries were bound to receive maximum attention and the greatest possible scrutiny — by management, by E&Y and by Reed Smith, which had to advise whether requirements of Stark II had been met.

The results in 2000, except insofar as they were affected by these reserve decisions in 1999, were otherwise ordinary, raising no question of impropriety.

-89-

Accordingly, for the reasons enumerated, Goldin concluded that these accounting entries were appropriate under the circumstances and found no other improprieties.

### 3.    Conclusions

Given the foregoing, Goldin determined that there are no facts, substantiated suspicions or material variances that lend credence to the inference that Coram's books and records and/or reporting systems (financial and otherwise) should be considered suspect or lacked independence and reliability, giving rise to a need for a more intensive investigation. To be sure, a material part of the results of Coram's operations are based on management's estimates of such matters as collections, write-offs and the value of long-term assets. Many of these types of estimates could cause large fluctuations from year to year, were the estimates incorrect or were economic circumstances to change. However, Coram's historical estimates were substantiated by management (with no evidence of any effort to distort them), not concealed and agreed to by the independent auditors.

Throughout the course of Goldin's examination, Coram's senior finance personnel were forthcoming, knowledgeable and professional, providing whatever help they could, given the many demands on their time. To be sure, they are subordinates of the Chief Executive Officer. Nonetheless, they did not evidence a proclivity to whitewash or tilt facts to vindicate Mr. Crowley.

-90-

KL2 21093T3.7

## V.    LEGAL ANALYSIS

### A.    The Equity Committee's Proposed Complaint

The Equity Committee's Complaint posits that, in exchange for almost $1 million a year in undisclosed cash compensation and other potential benefits from Cerberus, Crowley agreed "to operate Coram for the benefit of Cerberus . . . and contrary to the interests of" Coram and its shareholders. (Compl. ¶ 5) The Committee contends that "[t]his scheme and conspiracy began sometime in 1999 (and perhaps earlier)," with the decision to bring Crowley in as a consultant; that it "was refined and implemented during the year 2000," after Crowley became CEO; that Feinberg — acting through Crowley — "still had de facto control over Coram" even after Feinberg resigned from the board in July 2000; and that the alleged conspiracy "continues to this day." (Id. ¶¶ 5, 47)

The objective of the alleged scheme was to "steal the equity" from the shareholders and transfer it, through the reorganization process, to the Noteholders. (Id. at p. 12) The Complaint alleges that, after Crowley became CEO of Coram, he "deliberately managed Coram's affairs so that it would appear to have little or no value above the amount owed under the Notes." (Id. ¶ 43) If Coram was — or at least appeared to be — insolvent, then it would lack sufficient shareholder equity to satisfy the public company exception to Stark II, which would put it out of business by year end 2000. The only solution would be to file for bankruptcy protection and reorganize as a private company, with the Noteholders emerging as the new owners.

According to the Complaint, Crowley and Feinberg initiated this alleged scheme by conspiring to oust Rick Smith so they could discard his growth plans and set Coram on a course toward insolvency. (Id. ¶¶ 23 and 32) Once installed as CEO, Crowley allegedly ignored

-91-

KL2:2103873.7

all sale, merger or capital-raising opportunities; at the same time, he allegedly made

"concessions" to the Noteholders. For example, he made a $6.3 million cash interest payment in

July 2000, when he supposedly could and should have made the payment "in kind." He also

allegedly agreed to sell CPS for an unjustifiably low price and unwarrantedly used the sale

proceeds, at a time of a "serious cash shortage," to pay down debt. Finally, the Committee

contends that Feinberg and Crowley intentionally delayed the filing of the bankruptcy petition as

long as possible so the Court and the shareholders would have no alternative but to approve it in

light of the impending Stark II deadline. (*Id.* ¶¶ 39-40)

### 1.   The Allegations

Broadly speaking, the Equity Committee's allegations fall into two categories:

(i) the existence of an alleged conspiracy between Crowley and Feinberg and (ii) the separate

and independent claim that Crowley mismanaged Coram and caused it to become insolvent. We

address these in turn below, before analyzing the causes of action asserted in the Complaint.

### a.   The "Conspiracy" Allegations

As the Bankruptcy Court has already found, that Crowley was being paid by, and

had an employment agreement with, one of Coram's principal creditors constituted an actual and

serious conflict of interest. The facts that gave rise to this conflict are not in dispute:

- Crowley entered into a three year employment contract with Cerberus under which he earned a base salary of nearly $1 million a year;

- Under Section 2.3 of his Cerberus contract, Crowley was required to work full-time for Cerberus and its Portfolio Companies, to perform "such duties as are assigned or delegated . . . by . . . Feinberg," and to "use his best efforts to promote the success of [Cerberus'] business or the business of each [Portfolio Company]";

-92-

- Under Section 6.3 of his Cerberus contract, Crowley's "failure to follow the reasonable instructions of" Cerberus, Feinberg or the board of directors of a Portfolio Company was grounds for termination and forfeiture of his Cerberus compensation;

- On November 12, 1999, while his contract negotiations with Coram were ongoing, Crowley sent a "personal and confidential" letter to Feinberg seeking additional compensation from Cerberus tied to his performance at Coram.

It is also undisputed that Crowley and Feinberg did not disclose either the existence, or the terms, of the Cerberus contract to the directors or shareholders of Coram, either orally or in writing, prior to discovery in the bankruptcy case. The 1999 Form 10-K, in the section titled "Certain Relationships and Related Transactions," states only that "Cerberus owns an interest in Winterland, the privately held affinity merchandise company of which Mr. Crowley is the Chairman of the Board of Directors." (10-K at 45) There is no mention of the Cerberus contract there or in the section titled "Related Party Transactions." (Id. at 72-73) The "Management" section of the Disclosure Statement describes Crowley as "Chairman of Winterland," but does not explain the relationship between Winterland and Cerberus. It goes on to state that Crowley "also serves as a consultant to Cerberus . . . with respect to its investments in various healthcare companies other than the Debtors" and that he "generally receives a fee from Cerberus for such services." It is silent as to the nature and amount of that "fee" or the nature of the contractual relationship between Crowley and Cerberus. (Disclosure Statement at 47-48)

There is no question that these facts were material, that they were not timely disclosed and that Crowley's and Feinberg's failure to disclose them was a serious breach of duty. As discussed in Point V.A.2. below, the non-disclosure of these facts gives rise to potentially significant claims against Crowley and Feinberg for breach of fiduciary duty.

KL2 2168873.7

This does not end the analysis, however. For while the non-disclosure of the basic facts is undisputed, the parties hotly dispute two issues: (i) whether Feinberg and Crowley acted with improper motives when they entered into Crowley's Cerberus contract and (ii) whether their non-disclosure of that contract to Coram's other directors and officers was intentional or inadvertent. The resolution of these disputed issues has significant bearing on the nature and magnitude of the penalty that may be imposed on Crowley or Feinberg. We address these two issues in turn below.

The evidence on the first issue — whether Feinberg and Crowley intended or expected Crowley to advance Cerberus' interests to the detriment of Coram and its shareholders — is not conclusive. Crowley's Cerberus contract, the non-disclosure of its terms to Coram's other directors and officers and his November 12, 1999 letter could be deemed sufficient to support an inference of malevolent intent. Feinberg and Crowley, on the other hand, both vociferously deny having had any such intent. They claim it was their understanding and intent that Crowley would "run Coram for Coram" (as Crowley put it), acting at all times in the best interests of Coram and its shareholders.

While an inference to the contrary cannot be precluded definitively, Goldin finds credible Feinberg's and Crowley's assertions that they never intended or expected Crowley to breach his fiduciary duties at Coram. A number of factors support this conclusion:

> • Most significant is that, at the time Crowley became CEO of Coram, the Noteholders' interest in how Coram was managed was closely aligned with that of Coram's shareholders. Coram was in a state of financial crisis and it was already apparent that the company was worth substantially less than the amount of its debt. Cerberus, for example, had

-94-

written down its Coram debt at this time to less than 50% of its face amount. The immediate imperative, from the standpoint of the Noteholders *and* the shareholders, was to try and stabilize Coram's operations and to improve its financial performance. Given the lack of any conflict between the shareholders' and the Noteholders' basic interests, Feinberg would seem to have had little incentive at the outset to conspire with Crowley in the egregious fashion the Complaint alleges.

•       As for Crowley, his compensation arrangements at Coram gave him strong incentives to maximize shareholder value. Crowley's base salary at Coram was only $650,000 -- a substantial sum, but far below the amount to which an executive of his caliber and experience might be entitled. On top of his base salary, his November 1999 employment agreement gave him options to purchase one million shares of Coram's stock at the then market-price, plus a performance bonus of up to nearly $2 million contingent on his ability to increase Coram's EBITDA, plus an acquisition bonus of almost $2 million in the event of a sale of the company. The April 2000 amendment to his employment agreement increased his incentives to maximize shareholder value; it substantially increased the amount of his EBITDA-based performance bonus and also gave him the right to a $1.9 million "success fee" payable upon the consummation of a refinancing. As a result, the potential benefits to Crowley from generating value for Coram's shareholders far outweighed the relatively small benefits to which he was entitled under his Cerberus agreement -- that is, his salary of $960,000 per year plus expenses and his 30% stake in Winterland (which was worth next to nothing).

•       While the terms of Crowley's employment agreement with Cerberus are susceptible of adverse inferences, they are not inconsistent with an expectation that he would honor his fiduciary duties at Coram. For example, Crowley's agreement with Cerberus requires

-95-

Crowley to "use his best efforts to promote the success of the Employer's business (or the business of [each] Portfolio Company)...." (Agreement § 2.3; emphasis added). Similarly, the agreement defines "cause" for termination to include Crowley's "failure to follow the *reasonable* instructions of the Employer ... *or* the Board of Directors of any Portfolio Company ...." (*Id.* § 6.3; emphasis added) The less strained reading of the agreement would suggest that when the "success" of Cerberus appears to conflict with that of a particular Portfolio Company (in this case, Coram), Crowley is to put his fiduciary duties to the Portfolio Company ahead of his contractual duties to Cerberus. Similarly, it is sensible to read Section 6.3's reference to "reasonable instructions of the Employer" to suggest that an instruction requiring Crowley to breach his fiduciary duties to a Portfolio Company would be unreasonable.

As noted, a separate issue is whether Crowley's and Feinberg's failure to disclose the Cerberus contract to Coram's other directors and officers was deliberate or inadvertent. Both Feinberg and Crowley characterize their failure to disclose the full extent of the Crowley/Cerberus relationship as an oversight, which they greatly regret. While the evidence on this issue, too, is inconclusive, we believe the weight of the evidence points to different conclusions for Feinberg and for Crowley.

We find credible Feinberg's assertion that his non-disclosure was not a calculated deceit. Central to this conclusion is the lack of any apparent motivation for Feinberg to conceal Crowley's Cerberus relationship. Given that the Noteholders' interests at the time were consistent with those of Coram and its shareholders, and given the urgent need felt by Coram's directors to hire a CEO of Crowley's caliber without delay, it appears that the board would have had little hesitation in hiring Crowley, even following full disclosure of his Cerberus ties. In these circumstances, query why Feinberg would have deliberately concealed Crowley's Cerberus

KL2:2103873.7

ties, thereby risking both liability and a taint to Cerberus' reputation. More plausible is that Feinberg, for whom Coram is merely one of many diverse investments under management, was guilty of an inadvertence.

Crowley, by contrast, did have an incentive to conceal the existence of his Cerberus contract. As noted, Crowley consistently sought strongly to maximize his compensation at both Coram and Cerberus. He negotiated and renegotiated his compensation with an unrelenting zeal, on which Amaral, Feinberg and others have commented. Crowley may have feared that disclosure of his $960,000 salary and other compensation from Cerberus might have caused Coram to seek to renegotiate his compensation arrangements, or at least resist demands for increases of the kind Crowley negotiated in April 2000.

Moreover, as the Bankruptcy Court has found, Crowley's November 12, 1999 letter to Feinberg, requesting additional compensation from Winterland tied to Coram's performance, evidences that Crowley was not above concealing his compensation arrangements:

> I think that EC-20 [the November 12, 1999 letter] did show an
> intent to hide [Crowley's] relationship [with Cerberus] and to hide
> his request for additional compensation in Winterland in exchange
> for his efforts here [i.e., at Coram] . . . .

(Tr. of Dec. 21, 2000 confirmation hearing, at 89) Arguably, Crowley did not mean to conceal the existence of his Cerberus contract, but simply his request for additional compensation from Cerberus tied to Coram's performance (a type of compensation that Amaral, as chairman of Coram's board, had told Crowley he would not permit); but it is at least equally plausible that Crowley meant to conceal the existence of his Cerberus contract, as well.

XL221088717

### b.    The "Mismanagement" Allegations

Despite the conflict posed by Crowley's undisclosed dual employment, Goldin's investigation has disclosed no evidence that he deliberately favored the interests of Feinberg and Cerberus to the detriment of Coram and its shareholders. No evidence suggests that Cerberus (or the other Noteholders) instructed Crowley to act in a manner that was contrary to the best interests of the company. Nor does the evidence suggest that Crowley did so of his own accord, with the possible exception of his $6.3 million cash interest payment to the Noteholders (which turned out not to cause Coram any harm). Consequently, Coram and its shareholders have suffered no damage by virtue of Crowley's and Feinberg's breaches of fiduciary duty, other than the delays, professional fees and business losses resulting from the Bankruptcy Court's refusal to confirm the Debtors' Plan.

### i.    The alleged scheme to oust Smith

According to the Complaint, Rick Smith's plans to grow the company were incompatible with Feinberg's and Crowley's alleged plan to drive it into Chapter 11 and "steal the equity" for the Noteholders. The Complaint alleges that Feinberg and Crowley developed and implemented a scheme to provoke Smith's resignation as Coram's CEO and his eventual replacement by Crowley. The first step in the alleged scheme was to hire Crowley as a consultant, with the intention that Smith would resign shortly thereafter, as, in fact, he did. (Compl. ¶ 25) Once Crowley became CEO, the Complaint alleges he "discarded the efforts of . . . Rick Smith to grow the business" and set out, instead, "to enhance the value of the Notes held by Cerberus . . . and to give Cerberus and the other Noteholders a claim to the equity of Coram." (Compl. ¶ 32)

No evidence supports these allegations. Rather than "increas[ing] the value of the Company" (Compl. ¶ 22), Smith presided over a severe decline in Coram's financial condition. In 1999 Coram suffered a net loss of $115 million, $93 million more than in the prior year. By the end of 1999 Coram had negligible EBITDA (only $307,000). A number of factors contributed to Coram's declining performance in 1999. In addition to the loss of the Aetna contract and the attendant business losses (including the bankruptcy of the R-Net subsidiaries), Coram faced increased competition from hospitals and physicians offering infusion and other home healthcare services, pricing pressure caused by an unfavorable shift in payor mix from private insurance to managed care plans and an increase in the costs associated with providing infusion therapy services. At the same time, Coram's accounts receivable had grown substantially and the rate of collections had declined.

To be sure, not all of Coram's declining performance in 1999 can fairly be laid at Smith's doorstep. Nonetheless, Smith seems to have done little to counter the negative trends facing Coram and may well have contributed to them. Smith concedes that the Aetna litigation consumed the bulk of his time and attention throughout a large part of his tenure as CEO, preventing him from devoting his energies to other areas. Perhaps because of his inability to extricate himself from the Aetna dispute, Smith failed to act decisively to stem the company's declining revenues, slower collections and increased costs.

When Smith became CEO in April 1999 he was relatively young and had no prior experience as a CEO. Within a few months the board concluded unanimously, and not without justification, that he was in over his head. Even Amaral, who had trained Smith and urged his elevation to CEO, soon came to believe that Smith was not up to the job and needed to be replaced or, at least, "coached" by a healthcare executive with more experience. Hence, in the

Summer of 1999 — after two quarters of precipitous declines in the fortunes of the company — the board decided to bring in a more seasoned CEO to serve as a "consultant," "mentor" or "coach" to Smith. From the board's standpoint, it was not unreasonable to think that Crowley, with his strong track record in turning around troubled healthcare companies, could give Smith the guidance he appeared to need.

Unfortunately, the Crowley/Smith relationship got off to a poor start and never recovered, a result for which both men appear to bear responsibility. Smith admits that, for at least the first month after Crowley was hired, he refused to cooperate with him. Although Smith eventually became somewhat more cooperative, he concedes that he often did not return Crowley's phone calls and did not treat Crowley's requests for information as a priority. He considered Crowley an overbearing manager, who sometimes criticized Smith in front of other board members and at other times made decisions behind his back. By October 1999, when Smith resigned and rejected the board's request that he stay on as "co-CEO" with Crowley, it had become clear that Crowley and Smith could not function effectively together.

In any event, there is little, if any, basis for the Equity Committee's allegation that Crowley "discarded" Smith's efforts "to grow the business." Neither Smith nor his CFO, Wendy Simpson, identified *any* significant growth plans that were originated or implemented by Smith, but subsequently abandoned by Crowley. CPS was the major growth area during Smith's tenure. But CPS was still in an early stage of development; it was consuming large amounts of scarce cash and was not expected to generate positive cash flow for years. Given Coram's liquidity problems at the time, CPS was an obvious candidate for the auction block. Accordingly, with the board's approval, Smith retained DBAB to explore a sale or other disposition of CPS, a decision that, in retrospect, Smith continues to believe was sound. Smith's other growth plans

-100-

were much smaller in scope and magnitude; and by and large, they were continued, not abandoned, by Crowley.

    **ii.**   **The alleged failure to explore options other than Chapter 11**

The Equity Committee asserts that "Feinberg caused Crowley to manage Coram so as to avoid all reasonable efforts to explore options other than Chapter 11." The Complaint alleges, for example, that "Coram never retained an investment banker to explore the manner in which the value of Coram could be increased" and that it "never had a functioning special committee of independent directors to explore strategic options to grow the company." By failing to explore such potential options, Coram "missed attractive business opportunities that would have enhanced its value by increasing its revenues, margins and profits, allowed refinancing of its indebtedness and avoided destructive bankruptcy proceedings." (Compl. ¶ 42)

The inferences and allegations are wide of the mark, even were one to assume that Crowley *was* acting at the behest of the Noteholders. On a stand-alone basis, Coram was worth substantially less than its debt throughout Crowley's tenure as CEO. Consequently, any sale or merger that benefited Coram's shareholders (*i.e.*, for consideration in excess of Coram's debt) would have benefited the Noteholders, as well. Similarly, the Noteholders would have benefited directly and substantially from any equity investment or other financing transaction that benefited shareholders.

It is apparent that the prospects for any sale or financing transaction beneficial to the shareholders were remote at best. Nor does the Complaint identify any specific "opportunity" that was supposedly left unexplored.

### (A)   Merger or Sale Opportunities

At the time Crowley became CEO Coram was concluding a disastrous year and was in no condition to be sold advantageously. Coram's net losses had increased for two consecutive years; it had over $300 million in debt; and it had shareholder equity of *minus* $21,699,000. The prospects for 2000 were no better. Coram was defending a $100 million suit brought by its largest customer, Aetna. It was suffering a decline in revenue due to the resulting bankruptcy of its R-Net subsidiaries. The infusion business was less profitable than ever because of the difficulties associated with managed care and other regulatory and reimbursement issues. And it was highly likely that, absent a substantial capital infusion, Coram would not satisfy Stark II at year-end. In addition to Coram's severe problems, the home healthcare industry as a whole was experiencing hard times.

On a number of occasions in 1999 and 2000 various board members, including Amaral and Crowley, spoke with executives and bankers in the healthcare field to assess the opportunities for either a business combination or a financing. The response was uniform: no such opportunities existed. In the Fall of 1999, while serving as interim CEO, Amaral met with investment bankers from Bear Stearns, Chase Capital, Bain and Fox Payne. Based on those discussions he concluded that "there was no appetite out there for a deal." In the Spring of 2000 Crowley called a number of banks to try and raise capital. Citibank told him that it would lend at most $25 million, and only if the loan was secured by inventory. Everyone else turned him down.

Under these circumstances, retaining an investment banker to explore strategic options for the company would have been an unwarranted and likely pointless expense. In fact, in June or July 2000 Crowley asked Christina Morrison of DBAB whether it made sense for

-102-

K12221088727

Coram to retain DBAB to try and sell the company. Morrison's response was that, given the size of Coram's market capitalization (less than $20 million at the time), it did not make sense for Coram to pay the minimum fee of $1 million to $1.5 million that DBAB charges for such an engagement.

### (B)    Capital-Raising Opportunities

Given the state of Coram's balance sheet and the inflexible requirements of Stark II, scant reason exists to believe that Coram could have raised sufficient capital to avoid having to file for bankruptcy protection.

At the end of 1999 Coram had barely met the $75 million threshold required to satisfy the public company exception of Stark II. Moreover, it was able to do so only by computing shareholder equity based on the preceding-three-years average -- and that approach would not be available the following year. Because shareholder equity in 1999 was negative $22 million, Coram would have had to increase shareholder equity by more than $95 million before the end of 2000 to satisfy Stark II. With negligible EBITDA, it was virtually impossible for Coram to achieve that result on its own. Thus, as the company's regulatory counsel told the board at its meeting on December 17, 1999, "an equity infusion of some type would probably be required before the end of the year 2000 in order for the Company to be able to use the public company exception beyond December 31, 2000."

Several factors made it difficult or impossible for Coram to raise any equity capital, let alone the massive dollar amount it would have needed to satisfy Stark II and avoid bankruptcy. First and foremost, Coram's reorganization value was substantially less than its existing debt. That alone posed a formidable hurdle to Coram's ability to raise capital without a

-103-

KL2:2108717

restructuring of its balance sheet. The pendency of Aetna's $100 million claim against Coram posed an additional, very substantial barrier to a potential investment.

A further problem, according to Christina Morrison of DBAB, was that the availability of capital for non-Internet service companies, and for healthcare companies in particular, was relatively scarce in the first half of 2000. Yet another problem was that Coram's stock was held primarily by individual shareholders; few, if any, institutional investors owned significant blocks of Coram stock. The absence of substantial institutional ownership was an impediment to raising capital through either a rights offering or a public offering.

In the circumstances, the board's decision not to incur the expense of retaining a financial advisor to pursue potential financings was reasonable. Nonetheless, prior to authorizing the bankruptcy filing Coram obtained advice from DBAB (gratis) that there was no way to raise sufficient capital to satisfy Stark II and that, accordingly, bankruptcy was unavoidable. Christina Morrison of DBAB addressed the board on July 31, 2000 on a variety of capital-raising alternatives, including a follow-on offering, a rights offering, a strategic investment by a third party and a leveraged buyout. She concluded that none of these options was a viable means of raising the substantial capital that Coram needed to avoid bankruptcy. As Morrison explained, her conclusion on this point was "not a close call."

### iii. The allegedly improper CPS sale

The Complaint alleges that by deciding to sell CPS for $41.3 million Crowley favored the short-term interests of the Noteholders; the price was allegedly "far below the value estimated by Coram's investment banker, Deutsche Banc Alex. Brown." It maintains that he

KL2:2108873.7

compounded the error by using the sale proceeds to pay down the outstanding balance of the

senior revolver and a portion of the Series A Notes. (Compl. ¶ 34)  The allegation is unfounded.

       For a starter, it is misleading at best to suggest that DBAB had "estimated" CPS'

value to be far greater than the eventual sale price.  The sole basis for that assertion appears to be

an informal discussion between Coram and DBAB in the Summer of 1999, before DBAB was

formally retained, before it had been given any meaningful financial information about CPS

(other than its gross revenues) and before it had done any financial analysis.  In that preliminary

meeting DBAB said CPS might yield as much as $100 million, were it valued on the basis of a

multiple of gross revenues.  A valuation based solely on gross revenues generally has limited

utility as a measure of actual value; it appears to have been mentioned by DBAB at the time only

because, at that early stage, it had no other financial information about the company.  DBAB's

preliminary observations, therefore, have little or no bearing on the ultimate valuation of CPS.

       When judged from the dual perspective of process and price, the CPS sale appears

to have been entirely proper.  The sale was the result of a lengthy and competitive bidding

process, in which DBAB contacted 45 prospects; 24 were sent confidentiality agreements;

16 returned those agreements and were sent the Offering Memorandum; eight submitted non-

binding bids and were given the opportunity to undertake due diligence; four actually did so; and

two provided written offers.  At the conclusion of that process GTCR emerged as the highest

bidder by a substantial margin.  The next highest bidder, CVS, offered only $34.5 million, 10%

of which was subject to a holdback; Crowley rejected that offer and instructed DBAB to hold out

for at least $40 million in cash.  There is no reason to believe that the sale process -- which was

conducted by DBAB, a respected and independent investment bank, with the assistance of the

law firm Reed Smith Shaw & McClay — was conducted in anything other than a professional, thorough and arms-length fashion.

The board approved the sale unanimously . In doing so, it relied (among other things) on DBAB's opinion that the sale was fair from a financial perspective.  In rendering its fairness opinion, DBAB used the three standard methods of valuation:  (i) comparable public company market analysis; (ii) comparable company transaction analysis; and (iii) discounted cash flow analysis.  The first method yielded valuations that ranged from $9.7 million to $145 million, the second yielded valuations that ranged from $13.4 million to $61.7 million and the third yielded valuations that ranged from $24.6 million to $53.6 million.  The price that Coram obtained ultimately -- $41.3 million in cash -- was within this range of values.

iv.     The challenged July 2000 payments to the Noteholders

The Committee alleges that to further the Noteholders' interests Crowley "made strategic decisions designed to provide cash to reduce debt at the expense of future cash flow and without regard to the injury thereby caused to Coram." (Compl. ¶ 32).  In that regard, it refers to several debt payments Crowley made in July 2000.  First, it questions Crowley's decision to make a $6.3 million cash interest payment to the Noteholders, claiming that Coram was "seriously short of cash" and should have exercised its right to make the payment "in kind."  It also questions Crowley's decision to use the entire $38 million in proceeds from the sale of CPS to pay down the balance of the revolver ($28.5 million) and part of the principal on the Series A Notes ($9.5 million), claiming that as a matter of "prudent business practice" Coram should have "attempt[ed] to negotiate the amount of this payment." (Id. ¶¶ 33-34)

KL2:2103871.7

Crowley's decision to make the $6.3 million interest payment in cash, rather than in kind, on the eve of Coram's bankruptcy filing raises troubling questions. (By contrast, Coram had no alternative but to use the CPS sale proceeds to pay down the revolver in full and to partially pay down the Series A Notes.) Given Crowley's financial ties to Cerberus, query whose benefit the cash interest payment was intended to promote. Moreover, the payment reduced Coram's cash to a dangerously low level at a time when the company could not count on additional cash coming in. The CPS sale had not yet closed and, indeed, was not even assured of taking place. Immediately following the interest payment, Coram had $7,472,429 in cash — barely enough to cover its weekly cash needs. One week later, cash had dwindled to only $5,481,008. Allowing cash to decline to a level below what the company might need to pay its bills, by making a cash payment that could have been avoided, is difficult to justify.

However, Coram suffered no damages as a result of the interest payment. The CPS sale closed shortly after the payment was made, bringing a sizeable amount of cash into the company and eliminating the need to spend cash on inventory for CPS. Moreover, when viewed from a bankruptcy perspective, the July 2000 debt payments (all of which were made by Coram, Inc., not Coram Healthcare) did not unwarrantedly benefit the Noteholders at the expense of any other constituencies. The Plan of Reorganization proposed to pay general unsecured creditors of Coram, Inc. in full. Consequently, these payments did not have the effect of improving the Noteholders' position vis-à-vis other creditors.

As for the shareholders, they would have been treated no differently in bankruptcy had these payments not been made or had they been made "in kind" rather than in cash. In either case, the net result would have been to increase Coram's outstanding debt, leaving its margin of insolvency unchanged. The payments, thus, had no meaningful impact on

KL2:2108857.7

Coram's solvency from the standpoint of its balance sheet and did not place the shareholders in any worse position.

Arguably, Coram might have gained leverage in its negotiations with the Noteholders had it withheld the $6.3 million cash interest payment. Had Coram withheld that cash payment, the Noteholders would have faced the risk that these monies might be dissipated during the course of the bankruptcy proceeding, a risk they might have been willing to avoid by making concessions for the benefit of the shareholders. Debtors often employ such tactics, particularly when a priority of a debtor's management is to defend shareholder, as distinct from creditor, interests. The argument, therefore, is that Crowley's ties to Cerberus caused him to prioritize the creditors' interests ahead of those of the shareholders and to avoid unduly pressuring the Noteholders during pre-filing negotiations.

On the other hand, Crowley had justification for the alternative he chose. Chanin's valuation and Goldin's independent analysis both confirm that Coram was insolvent by a substantial margin. Accordingly, the shareholders had no entitlement to any distribution under a plan of reorganization; any bargaining leverage Coram might have obtained by withholding the interest payment would have been in furtherance of an outcome not legally or financially warranted. Crowley cannot be held liable for any "damages" Coram's shareholders might arguably have suffered as a result of his failure to employ bargaining tactics of this sort.

'v.     __The allegation that Coram delayed filing as long as possible__

The Committee alleges that Crowley and Feinberg, with the assistance of Coram's bankruptcy counsel, "decided to delay any bankruptcy filing as long as possible in the year

2000" in order to create an artificial Stark II "emergency," so Coram would have to emerge from Chapter 11 as a private company before year-end. The allegation appears to lack support.

Had Crowley's and Feinberg's objective been to contrive to wipe out the equity, that goal would have been best served by filing sooner, rather than later. In 1999 Coram had EBITDA of only $307,000 and suffered a $114,823,000 net loss. Clearly, any valuation that rests principally on Coram's 1999, rather than 2000, performance yields a value much further below the amount of Coram's debt. Consequently, deliberate delays in filing for bankruptcy would have increased the chances that improved performance in 2000 would result in a higher valuation, possibly one that would yield value for the equity.

In any event, no evidence has emerged that Crowley or anyone else deliberately delayed the bankruptcy filing in an attempt to prejudice Coram's shareholders. Rather, the timing of the decision was driven by a number of objective factors.[30]

---

[30] Had Coram been able to raise sufficient equity to satisfy the public company exception to Stark II it might have been able to avoid a bankruptcy filing. Although that prospect became increasingly remote, in the spring of 2000 a few avenues remained open. CPS was still on the market; the Aetna litigation was still pending; and Coram was involved in a litigation against PricewaterhouseCoopers arising out of the Caremark acquisition. Had Coram achieved favorable resolutions of these lawsuits and a high price for CPS, it could conceivably have obtained sufficient equity to satisfy the exception. It was not until the end of April — when both lawsuits were settled on terms less favorable than had been hoped for and Coram had accepted GTCR's bid for CPS — that all three avenues were finally closed off.

In April Coram hired Chanin to prepare a valuation of the company, a necessary step prior to filing the petition. From that point on it appears that any "delay" in filing the petition was attributable to the fact that Chanin did not complete its valuation until July 31. Chanin's delay, in turn, appears to be attributable to the fact that when it was retained Coram was not close to having finalized a business plan, much less the projections that Chanin needed to do its work.

K1221088727