Even could the Committee prove that Crowley improperly delayed Coram's bankruptcy filing, Coram does not appear to have suffered damage as a result. There is no reason to believe that the deterioration in the company's performance beginning in mid-2000 was in any way attributable to Coram's failure to file earlier in the year. Arguably, an earlier filing would have precipitated an earlier decline in performance.

### 2. The Asserted Causes of Action

Based on the foregoing allegations, the Complaint asserts claims against Crowley and Feinberg for breach of fiduciary duty and fraudulent misrepresentation. (Counts I and IV) The Complaint also asserts three claims against Cerberus, alleging that (i) it is liable as principal for the alleged misconduct of Crowley, its agent; (ii) it aided and abetted Crowley's alleged breaches of fiduciary duty by knowingly inducing those breaches; and (iii) it owed and breached fiduciary duties of its own by virtue of its supposed *de facto* control over Coram's affairs. (Counts II, III and V) We address these in turn below.

#### a. Crowley and Feinberg

Goldin believes that Crowley and Feinberg's actions amounted to a breach of fiduciary duty, but the scope of, and remedies for, the breach are far more limited than the Equity Committee asserts. Crowley and Feinberg breached their fiduciary duties to Coram by failing to disclose the full extent of the Crowley/Cerberus relationship to Coram's other directors and officers. As the Bankruptcy Court has found, Crowley's employment agreement with Cerberus constituted an "actual conflict of interest" and the non-disclosure of that agreement "tainted the debtors' restructuring of its debt, the debtors' negotiations towards the plan [and] even the debtors' restructuring of its operations." (Tr. of Dec. 21, 2000 hearing at 88-89) Nonetheless, as noted, Crowley does not appear to have mismanaged Coram for the benefit of the Noteholders.

Consequently, the undisclosed conflict caused Coram no actual harm, other than the relatively limited damages resulting from the Bankruptcy Court's inability to confirm the Debtors' Plan of Reorganization.

The Equity Committee has suggested that, under Delaware law (which governs its claims), punitive damages are potentially available as a remedy. (Motion for Leave to File Adversary Proceeding, dated Feb. 6, 2001, at ¶ 4) Our research has disclosed no support for this proposition. To our knowledge, no reported decision applying Delaware law has ever awarded punitive damages (or even suggested that such damages may be appropriate) for breaches of duty in the corporate context.[31]

To be sure, as the Committee notes, Delaware courts frequently characterize the remedies available for breaches of the duty of loyalty as "expansive," *Cede & Co. v. Technicolor*, 542 A.2d 1182, 1187 (Del. 1988), and as involving "[t]he strict imposition of penalties . . . designed to discourage disloyalty," *Bomarko v. Int'l Telecharge, Inc.*, 1999 WL 1022083, at *21 (Del. Ch. Nov. 16, 1999). However, as the Delaware Supreme Court recently observed, statements of this sort

---

[31]    A jury in Indiana did in one case award punitive damages for perceived breaches of fiduciary duty committed by majority shareholders of a Delaware corporation. *See Nagy v. Riblet Products Corp.*, 79 F.3d 572 (7th Cir. 1996) However, the district court had charged the jury under Indiana, not Delaware, law on all issues. *See id.* at 576 On appeal, the Seventh Circuit held the breach of duty claim was governed by Delaware law and certified to the Delaware Supreme Court the question whether defendants' fiduciary duties were even implicated, given that the suit arose under an employment agreement. *Id.* at 577-78 The Delaware Supreme Court answered the certified question in the negative, holding that "[t]his is not a case of breach of fiduciary duty," but, rather, "a case governed by an employment contract." *Riblet Products Corp. v. Nagy*, 683 A.2d 37, 40 (Del. 1996) In light of its ruling, the Delaware Supreme Court did not address the availability *vel non* of punitive damages. *Id.* at 40 n.6

KL2:2108873.7

> stand for nothing more than the proposition that the imposition of damages should eliminate the possibility of profit flowing to defendants from the breach of the fiduciary relationship.

*Int'l Telecharge, Inc. v. Bomarko*, Inc., 766 A.2d 437, 441 (Del. 2000). While many Delaware cases recognize the propriety of disgorgement as an alternative to compensatory damages, *e.g.*, *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996) (ordering disgorgement, despite a lack of harm to the corporation, on the ground that "a fiduciary [should] not profit personally from his conduct"), not one of those cases suggests the availability of a monetary remedy that is punitive in nature, *i.e.*, that is, that goes beyond the twin goals of disgorgement and compensation of loss.

A recent Chancery Court decision, *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *3 (Del. Ch. May 11, 2001), illustrates the Delaware courts' unwillingness to award punitive damages, even for serious breaches of duty. There, the court repeatedly characterized the defendants' breaches of their duty of loyalty as "egregious." *Id.* at *1, 3  In addition, with the defendants' conduct having harmed plaintiff "in several identifiable, but inherently unmeasurable, ways," the court found that even an award of compensatory damages "will not make the plaintiff completely whole." *Id.* at 3  Nonetheless, the court declined to award damages beyond the amount of plaintiff's attorneys' fees and expenses, observing that any greater award "could fairly be deemed tantamount to awarding punitive damages." *Id.*; *see also id.* (noting "the peril of over-harshly punishing the defendants").

Under Delaware law, therefore, only two kinds of remedies are potentially available in a suit against Crowley and Feinberg. A court might order disgorgement of an appropriate portion of Crowley's compensation or, more precisely, a reduction of the approximately $13.4 million owed under his employment agreement. In addition, Crowley and Feinberg might be held liable for Coram's actual damages, which appear to be limited to the

KL2:2103873.7

losses related to the Debtors' inability to obtain confirmation of their Plan of Reorganization. These losses fall into two categories:

1.    The non-disclosure of Crowley's conflict of interest has caused or will cause Coram to have to pay approximately $5 million to $6 million more in fees and expenses to bankruptcy professionals than it otherwise would have paid. The bulk of these additional fees and expenses -- about $4 million to $5 million -- are those that have been incurred since the December 21, 2000 conclusion of the confirmation hearing by the various counsel and financial advisors to the Debtors and the two official committees, as well as by Goldin and its counsel, as a result of the inability to conclude the bankruptcy. In addition, the non-disclosure of Crowley's conflict of interest caused the December 2000 confirmation hearing and related discovery to be significantly more protracted and costly than would otherwise have been the case and will cause Coram to have to bear the expense of a second confirmation hearing later this year. While any estimate of the magnitude of these additional expenses (the incremental cost of the December 2000 hearing and the total cost of the future confirmation hearing) is necessarily imprecise, Goldin estimates them to be at least $1 million.

2.    Independent of the professional fees, the approximately ten-month delay in concluding this bankruptcy will cause Coram business losses with an estimated present value of between $7 million and $9 million. Assuming that an earlier emergence from chapter 11 would have resulted in an earlier realization of (i) higher revenues and (ii) correspondingly higher EBITDA, Goldin estimates that the ten-month delay in confirmation of Coram's plan of reorganization will cause the company's EBITDA in the years 2001 through 2004 to be approximately $4 million to $5 million lower, in the aggregate, than it would have been had the Plan been confirmed last December. Using the discounted cash flow assumptions discussed in

-113-

Section IV above (including an 18.1% discount rate and a 7.01 exit multiplier), the effect is to reduce Coram's enterprise value by approximately $8 million. Changes in the assumptions used would, of course, change the amount of the estimated loss.

### b.   Cerberus

Goldin believes that the three claims the Equity Committee asserts against Cerberus are unlikely to prevail. As discussed in Section V.A.1 above, the evidence suggests that Feinberg did not intend for or expect Crowley to disregard his fiduciary duties to Coram. Because of the apparent lack of wrongful intent on Feinberg's part, the Equity Committee is unlikely to be able to prove that Crowley was acting *at Coram* as Cerberus' "agent" (Count II) or that Cerberus *knowingly* induced Crowley to breach his fiduciary duties (Count III) or that Cerberus exercised *de facto* control over Coram's affairs (Count V).[32]

### B.   The Equity Committee's Objections to Confirmation

The Equity Committee objected to confirmation of the Debtors' Plan of Reorganization on three principal grounds: (i) the Plan did not satisfy the "fair and equitable" requirement of Bankruptcy Code § 1129(b) because the value of the distributions to be made to the Noteholders supposedly exceeded the amount of their claims; (ii) the Plan did not satisfy the requirement of Code § 1129(a)(3) that it be "proposed in good faith and not by means forbidden

---

[32]   It is possible that Cerberus might be held liable for Feinberg's breaches of fiduciary duty on an alternative ground, which the Equity Committee has not yet asserted, *i.e.*, that Cerberus is liable as principal for the breaches of Feinberg, its agent. Feinberg served on Coram's board in his capacity as agent for Cerberus, which (along with the two other Noteholders) designated him as board representative pursuant to the loan documents. Nonetheless, the limits on recoverable damages under Delaware law, discussed above, would apply to claims against Cerberus as much as to those against Feinberg.

K1221088717

by law"; and (iii) Cerberus' claim, which the Plan presumed to be valid, should be recharacterized as equity.[33] We address these objections in turn below.

### 1.    The "Fair and Equitable" Requirement

As discussed in Section IV above, we believe the Equity Committee's first objection to the Plan was unfounded at the time of the confirmation hearing and is still unfounded. Goldin's valuation indicates that, far from having an enterprise value in excess of its approximately $290 million of debt (at the time of the confirmation hearing), Coram's enterprise value was approximately $198 million in December 2000 and is approximately $240 million today.

### 2.    The "Good Faith" Requirement

Given the record before it at the confirmation hearing, the Bankruptcy Court was unable to find that the Debtors had proposed the Plan in good faith as required by Bankruptcy Code § 1129(a)(3). (Dec. 21, 2000 Tr. at 87) The Court found that the contractual relationship between Cerberus and Crowley gave rise to an "actual conflict of interest" on Crowley's part, which "tainted the debtors' restructuring of its debt, the debtors' negotiations towards a plan, [and] even the debtors' restructuring of its operations." (*Id.* at 88-89) As a result, the Court concluded, it was impossible to know whether "we would be in the same boat today or whether a

---

[33]    The Equity Committee also objected to the Plan's releases of direct shareholder claims against Crowley, Feinberg and others, contending that these releases are improper as a matter of law. The objection is well-founded. Under the standards articulated by the Third Circuit in *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000), non-consensual releases of direct shareholder claims are clearly impermissible in the circumstances of this case. By contrast, the Plan's releases of claims held by the Debtors' estates are permissible, provided the Plan amendments recommended in Section II above are implemented.

KL2:2103873.7

different plan would have been proposed by the debtor" had Crowley not suffered from an undisclosed conflict of interest. (*Id.* at 65)

The central focus of Goldin's investigation has been to address the question raised by the Court: whether, absent Crowley's undisclosed conflict of interest, Coram would be "in the same boat today" or, instead, would be in a financial position strong enough to entitle its equity holders to share in distributions under its Plan of Reorganization. As the Court observed, that question is inherently speculative and can never be answered with certainty. Nonetheless, Goldin's investigation -- which has included extensive review of Coram's financial records and other documents, interviews of more than 35 present and former representatives of Coram and its creditors, and comprehensive financial analysis — has unearthed no evidence that Coram's financial position would be materially stronger today had the Crowley conflict been disclosed at the outset.

No evidence suggests that timely disclosure of the conflict would have resulted in more effective management of Coram's operations, in improved financial performance or in the identification (let alone consummation) of a possible merger, sale or financing transaction that might have enabled Coram to avoid bankruptcy. Nor is there any evidence that Coram's financial records, or its accounting or financial management systems, have been malevolently manipulated in any way, much less in a way that might alter the conclusion that the enterprise value of Coram is now, and has at all pertinent times been, substantially below the amount of its debt.

Goldin believes that at a confirmation hearing on an amended Plan of Reorganization (particularly one that incorporates a settlement along the lines discussed in

KL2210887L7

Section II above) the Court will be in a position to find that the amended Plan has been proposed in good faith. At the initial confirmation hearing the record on good faith was deficient, in part because evidence of Crowley's conflict of interest had surfaced only weeks before, leaving the parties and the Court with only a limited ability to investigate and determine what effect, if any, the conflict had had on Coram's management. Based on its extensive investigation, Goldin believes that the Court can have confidence that the possibility of mismanagement has been probed adequately.

In Goldin's view, therefore, the Court can fairly conclude that the Debtors' amended Plan satisfies the good faith requirement of Code §1129(a)(3). Given the Debtors' undeniable need to restructure their debts in order to satisfy the requirements of Stark II, there is little question that the Plan "will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir. 1984); *see also, e.g., In re Zenith Electronics Corp.*, 241 B.R. 92, 108 (Bankr. D. Del. 1999) (Walrath, J.) (plan satisfied the good faith requirement where it was "proposed with the legitimate purpose of restructuring [the debtors'] finances to permit it to reorganize successfully").

### 3.    The Validity of Cerberus' Claim

The Plan is predicated on the assumption that the claims of Cerberus and the other Noteholders are valid. *Compare* Plan § 2.13 (defining "Allowed Coram Note Claims" to mean "the Coram Note Claims") *with* Plan § 2.11 (defining "Allowed Coram General Unsecured Claim" to mean "a Coram General Unsecured Claim, to the extent it is or has become an Allowed Claim"). Consequently, were Cerberus' claim disallowed or subordinated in whole or in part, and were the Plan not amended to modify Cerberus' treatment accordingly, the "fair and

equitable" requirement of Code §1129(b) would not be satisfied. *See generally* 7 Lawrence P. King, *Collier on Bankruptcy* ¶ 1129.04[4][a][ii] ("fair and equitable" standard requires that "no creditor . . . be paid a 'premium' over the allowed amount of its claim") (15th ed., rev. 1997).

The Equity Committee contends that Cerberus is guilty of inequitable conduct and that its claim should, therefore, be "recharacterized as equity." Objections to Confirmation, dated November 21, 2000, at ¶ 37 (quoting *Zenith Electronics*, 241 B.R. at 107) This assertion is unfounded. There is no legal basis for recharacterizing Cerberus' debt as equity.[34] Nor does any basis exist for "equitable disallowance" of Cerberus' claim (the doctrine the Equity Committee appears to intend to invoke). Even were Cerberus to be held responsible for Feinberg's breach of duty -- and it is uncertain whether such a result would be warranted -- the maximum appropriate remedy would be a reduction of the amount of Cerberus' claim to the extent necessary to compensate creditors for the damages caused by the non-disclosure of Crowley's conflict of interest.

Prior to the enactment of the Bankruptcy Code, the power of bankruptcy courts to "equitably disallow" a claim in appropriate circumstances, when subordination would not be a

---

[34] The doctrine of recharacterization of debt as equity rests not on facts of the sort alleged here -- misconduct by a creditor -- but, instead, on facts indicating that the debt *ab initio* was more akin to an equity contribution than to a debt. "Where a loan has the substance and character of an equity contribution, the court may recharacterize the debt as equity regardless of whether the requirements of equitable subordination have been satisfied." *In re Kids Creek Partners, L.P.*, 200 B.R. 996, 1019 (Bankr. N.D. Ill. 1996). "[T]the primary factor this Court is to consider when evaluating whether funds advanced by a shareholder are the result of an equity contribution or a loan is whether the transaction bears the earmarks of an arm's length negotiation." *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) (citing *Pepper v. Litton*). The Equity Committee has not alleged that Cerberus' debt was in fact an equity contribution *ab initio*, or even that Cerberus engaged in collusive or inequitable behavior in the *acquisition* of the debt.

KL2:2108873.7

sufficient equitable remedy, was well established. *See Pepper v. Litton*, 308 U.S. 295 (1939)

(Douglas, J.) (affirming the bankruptcy court's power to subordinate *or* disallow the claim of a

fiduciary who had committed gross misconduct in connection with the acquisition of the claim).

The language of Bankruptcy Code § 510(c), which expressly codifies the Bankruptcy Court's

equitable subordination power but is silent as to disallowance, could be read to suggest that

Congress intended to nullify the courts' equitable disallowance power.  However, the legislative

history makes clear that Congress intended no such result:

> This section is intended to codify case law, such as *Pepper v.
> Litton*, 308 U.S. 295 (1939), . . . and is not intended to limit the
> court's power in any way.  The bankruptcy court will remain a
> court of equity . . . .  Nor does this subsection preclude a
> bankruptcy court from completely disallowing a claim in
> appropriate circumstances.  *See Pepper v. Litton, supra*

H. Rep. No. 95-595, 95th Cong., 1st Sess. 359 (1977).

Since the Code's enactment, few, if any, courts have had occasion to apply the

doctrine of equitable disallowance (perhaps not surprisingly, given that complete subordination

of a claim has the same effect as disallowance, except in cases where the debtor is solvent).

Nonetheless, the courts that have addressed the issue in *dicta* have overwhelmingly recognized

the continuing viability of the equitable disallowance doctrine.  *See, e.g., HBE Leasing v. Frank*,

48 F.3d 623, 634 (2d Cir. 1995); *Koch Refining v. Farmers Union Cent. Exch.*, 831 F.2d 1339,

1350-51 (7th Cir. 1987); *Murgillo v. Cal. State Bd. of Equalization*, 176 B.R. 524, 531 (9th Cir.

BAP 1995); *In re Outdoor Sports Headquarters*, 168 B.R. 177 (Bankr. S.D. Ohio 1994); *but see*

*In re Foundation for New Era Philanthropy*, 201 B.R. 382, n. 13 (Bankr. E.D. Pa. 1996)

(questioning the availability of equitable disallowance after enactment of Code § 510(c)).  The

Third Circuit has noted, but not decided, this issue.  *See Citicorp Venture Capital, Ltd. v.*

RLF2-3035733.1

*Committee of Creditors*, 160 F.3d 982, 991 n.7 (3d Cir. 1998) ("The rationale of *Pepper* would suggest that, under pre-Code law, a bankruptcy court was authorized to disallow a portion of the fiduciary's claim when that would produce an equitable result. We find it unnecessary here to resolve the issue as to whether equitable 'disallowance' remains an available remedy").

Because equitable disallowance rests on the same principles as equitable subordination, *see Pepper v. Litton*, 308 U.S. at 306-12, the two doctrines are subject to the same equitable limitations. The Third Circuit recently delineated those limitations in *Citicorp Venture Capital*. There, the bankruptcy court equitably subordinated debt claims that CVC, a fiduciary of the debtor, had secretly purchased at a discount in an attempt to gain control of the debtor. The Court of Appeals held that it was appropriate to equitably subordinate CVC's claims to the extent of depriving CVC of any profit on its purchases, but that subordination beyond that extent would only be appropriate if the relief was proportional to the injuries suffered by those who would benefit:

> [W]e do not suggest that a bankruptcy court can never impose a subordination remedy beyond disgorgement of profit without putting a specific price tag on the loss suffered by those who will benefit from the subordination. Such quantification may not always be feasible and, where that is the case, it should not redound to the benefit of the wrongdoer. A bankruptcy court should, however, attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination.

160 F.3d at 991

In the present case, Cerberus has reaped no improper gains by virtue of Feinberg's alleged misconduct. Disgorgement, therefore, is not a proper remedy. At most, equitable

KL2:2105871?

subordination — if warranted, which is questionable[35] — would be appropriate to a limited extent, proportional to the losses Coram has suffered as a result of the nondisclosure of Crowley's conflict of interest. Under the controlling *Citicorp Venture Capital* decision, no greater remedy — and certainly not the drastic remedy of disallowing Cerberus' claim — would be permitted.

---

[35] It is uncertain whether Cerberus will be found to be an "insider" for equitable subordination purposes. It is widely recognized that a lender will not be treated as an insider unless it exerts virtually complete control over the borrower. *See In re Paolella,* 161 B.R. 107, 118 (E.D. Pa. 1993) (collecting cases). A lender's exercise of contractual rights under its loan documents is not by itself sufficient to confer insider status. *See id.* at 120 ("Our attention has not been called to any case wherein a court has equitably subordinated the claims of a non-insider who adhered to the terms of a loan agreement."). Moreover, while Feinberg himself was an insider by virtue of his board seat, *see* Bankruptcy Code § 101(31)(B)(i), that fact alone may be insufficient to confer insider status on Cerberus, given that over 90% of the financial interests in Cerberus Partners, L.P. (the record owner), as well as in the other Cerberus funds that hold participations in the Coram debt, is held by investors unaffiliated with Feinberg.

Were Cerberus not deemed to be an insider, equitable subordination of its claim would be warranted only were it found to have engaged in "gross or egregious misconduct tantamount to fraud, overreaching or spoliation," *In re Paolella,* 161 B.R. at 122, conduct clearly not present here.

-121-

* * *

The above constitutes the Updated Report of the Independent Restructuring

Advisor.  The attached Exhibits are incorporated herein and should be treated as part of the

Updated Report.

Dated:    New York, New York
          September 4, 2001

                                      /s/
                              _____
                              Harrison J. Goldin
                              GOLDIN ASSOCIATES, L.L.C.
                              767 Fifth Avenue
                              New York, New York 10153
                              (212) 593-2255

Of counsel:

KRAMER LEVIN NAFTALIS & FRANKEL LLP

        /s/
_____
By:    Kenneth H. Eckstein
       Philip Bentley
       Marjorie Sheldon
919 Third Avenue
New York, New York  10022
(212) 715-9100

KL2:2108872.7

**Coram Healthcare**
**Appendix 1**
**Comparable Market Analysis - Selection of Comparables**

| | Chanin 7/00 July 31, 2000 | Chanin 12/00 December 4, 2000 | UBS 12/00 December 11, 2000 | DXT 12/00 December 14, 2000 | Goldin 7/00 July 31, 2000 | Goldin 12/00 December 14, 2000 | Goldin 6/01 June 15, 2001 | Goldin 8/01 August 31, 2001 |
|---|---|---|---|---|---|---|---|---|
| Apria Healthcare Group | X | X | | | | | | |
| American Home Patient | X | | X | X | X | X | X | X |
| Gentiva Health Services | X | X | X | X | X | X | X | X |
| In Home Health | | | X | | | | | |
| Lincare Holdings, Inc. | X | X | X | X | X | X | X | X |
| Option Care, Inc. | X | X | X | X | X | X | X | X |
| Pediatric Services, Inc. | | | X | | | | | |
| US Oncology, Inc. | | | X | | | | | |

Cqram Healthcare
Appendix 2
Comparable Market Analysis- Consideration of Comparables

**Criteria:**

| | |
|---|---|
| Business Line | Services must include performance of Infusion at patients' home |
| Sales | Must exceed $50 million and/or exceed 10% of company's sales |
| Industry | Home Health Care, SIC 8082 |
| Structure | Must be publicly traded company and can not be a subsidiary |
| Solvency | Can not be In bankruptcy |
| Location | Majority of sales in USA and services to more than a regional area |

| Company Name | Net Sales $ millions | Comp? Y / N | Details / Comments |
|---|---|---|---|
| Almost Family, Inc. | 44.7 | N | Basic business is day-care for elderly |
| | | | Discontinued its visiting nurses service, and sold Infusion business |
| Amedisys, Inc. | 90.8 | N | Regional (South & Southeast) |
| | | | Home Infusion is not a material part of revenue |
| America Service Group, Inc. | 361.9 | N | Provides various medical services to prisons |
| | | | Home Infusion is not a material part of revenue |
| American Disease Mgmt. Assoc, LLC | Not Public | N | Subsidiary of MIM Corp. |
| American HomePatient, Inc. | 363.4 | Y | 16% of Revenues from Home Infusion |
| Apria Healthcare Group Inc. | 1,014.2 | Y | 16% of Revenues from Home Infusion |
| Chemed Corporation/Patient Care Inc. | 500.7 | N | Home Healthcare is regional (Northeast) |
| | | | 50% of sales through its Roto-Rooter subsidiary |
| Community Care Services, Inc. | Not Public | N | Subsidiary of Landauer Hospital Supplies, Inc. |
| Continue Care Corp. | 116.6 | N | Provides various healthcare services |
| | | | Home Infusion is not a material part of revenue |
| Dynsatcq Int'l, Inc. | 28.0 | N | Too small |
| EMSA Government Services, Inc. | Not Public | N | Subsidiary of American Service Group |
| Gentiva Health Services, Inc. | 1,506.6 | Y | Home Infusion ("Specialty Pharmaceutical Services") 50% of sales |
| | | | Nationwide |
| Gliling Health Care Inc. | Not Public | N | Not in Home Health Care SIC 8082 |
| Home Health Corp. of America, Inc. | 174.3 | N | Has filed for chapter 11 bankruptcy protection |
| Homedco Group | Not Public | N | Subsidiary of Apria Healthcare |
| Housecall Medical Services | Not Public | N | Subsidiary of Adventist Health System |
| In Home Health, Inc. | 80.0 | N | Subsidiary of Manor Care, Inc. |
| Infusioncare Solutions, Inc. | Not Public | N | Subsidiary of Amedysis, Inc. |
| InfuTech, Inc. | 18.7 | N | Too small |
| Integrated Health Services | 2,559.3 | N | Has filed for chapter 11 bankruptcy protection |
| Interwest Home Medical, Inc. | 43.3 | N | Subsidiary of Praxair |
| Landauer Hospital Supplies Inc. | 47.2. | N | Too small |
| | | | Manufactures and markets dosimeters (radiation detection badges) |
| Lincare Holdings Inc. | 702.5 | N | Primary business is oxygen and respiratory home treatment |
| | | | Home Infusion is not a material part of revenue |

Coram Healthcare
Appendix 2
Comparable Market Analysis- Consideration of Comparables

| Company | Value | | Notes |
|---|---|---|---|
| Manor Care | 2,350.6 | N | Mostly "assisted living services" and nursing homes |
| Mahta Healthcare, Inc. | 225.8 | N | Specializes in services and supplies to diabetics |
| | | | Home infusion is not a material part of revenue |
| MIM Corp. | 369.8 | N | Negotiates discounts on pharmacy discounts for its group members |
| National HealthCare Corp. | 492.4 | N | Manages Long Term Healthcare Centers |
| | | | Regional (Southeast) |
| National Home Health Care Corp. | 55.6 | N | Home care for physical therapy, mental therapy and geriatrics |
| | | | Regional (Northeast) |
| New York Health Care, Inc. | 29.4 | N | Too small |
| NuMED Home Health Care, Inc. | 17.1 | N | Too small |
| Option Care, Inc. | 141.3 | Y | Infusion therapies and services is 64% of sales |
| | | | Services over 30 states |
| Pediatric Services of America, Inc. | 186.4 | N | Focuses on nursing and respiratory therapy |
| Precision Health Systems LLC | Not Public | N | Not in Home Health Care SIC 8082 |
| Ro Tech Medical | Not Public | N | Subsidiary of Integrated Health Services |
| Star Multi Care Services, Inc. | 39.2 | N | Too small |
| Sunbelt Home Health Services | Not Public | N | Not in Home Health Care SIC 8082 |
| Tender Loving Care Health Care Services, Inc. | 255.7 | N | Home Infusion is not a material part of revenue |
| Transworld Healthcare, Inc. | 135.4 | N | Over 2/3rd of sales in UK |
| | | | US services are regional (New York and New Jersey) |
| | | | Services include delivery of continence and wound-care products |
| United Medical Inc. | Not Public | N | Subsidiary of Uncare Holdings |
| US Oncology | 1,324.2 | N | Focus on Oncology |
| | | | Home Infusion is not a material part of revenue |

**Coram Healthcare**
**Appendix 3**
**Comparable Market Analysis – Calculation of Multiples**

### Apria Healthcare Group

| | Charin 7/00 July 31, 2000 | Charin 12/00 December 4, 2000 | UBS 12/00 December 11, 2000 | D&T 12/00 December 14, 2000 | Golds 7/00 July 31, 2000 | Golds 12/00 December 14, 2000 | Golds 6/01 June 15, 2001 | Golds 8/01 August 31, 2001 |
|---|---|---|---|---|---|---|---|---|
| Revenue | 982,452 | | | 988,203 | 982,452 | 988,203 | 1,034,833 | 1,095,743 |
| EBITDA | 220,276 | | | 239,702 | 220,276 | 239,702 | 251,497 | 252,391 |
| EBITDA - Capital expenditures | 211,951 | | | | | | | |
| Market capitalization | 667,123 | | | 1,349,144 | 667,123 | 1,340,144 | 1,459,747 | 1,460,285 |
| Debt | 378,975 | | | 322,989 | 376,975 | 322,989 | 332,734 | 320,716 |
| Enterprise value | 1,046,098 | | | 1,669,133 | 1,046,088 | 1,659,133 | 1,782,541 | 1,781,001 |
| Equity percent | 64% | | | 81% | 64% | 81% | 81% | 82% |
| Debt percent | 36% | | | 19% | 36% | 19% | 19% | 18% |
| **Multiple** | | | | | | | | |
| EV/Revenue | 1.09 | 1.42 | | 1.67 | 1.09 | 1.67 | 1.73 | 1.67 |
| EV/EBITDA | 4.75 | 5.35 | | 6.98 | 4.75 | 6.93 | 7.13 | 7.06 |
| EV/EBITDA - Capital expenditures | 4.94 | 6.28 | | | | | | |

### American Home Patient

| | Charin 7/00 July 31, 2000 | Charin 12/00 December 4, 2000 | UBS 12/00 December 11, 2000 | D&T 12/00 December 14, 2000 | Golds 7/00 July 31, 2000 | Golds 12/00 December 14, 2000 | Golds 6/01 June 15, 2001 | Golds 8/01 August 31, 2001 |
|---|---|---|---|---|---|---|---|---|
| Revenue | | | 358,832 | 907,135 | 354,950 | 358,832 | 364,484 | 391,531 |
| EBITDA | | | 28,256 | 29,020 | 27,080 | 28,339 | 28,430 | 28,187 |
| EBITDA - Capital expenditures | | | | | | | | |
| Market capitalization | | | 2,169 | 2,325 | 5,594 | 2,169 | 6,123 | 25,124 |
| Debt | | | 135,542 | 288,417 | 122,417 | 145,341 | 289,255 | 233,350 |
| Enterprise value | | | 137,508 | 288,742 | 128,011 | 147,507 | 245,378 | 258,474 |
| Equity percent | | | 2% | 1% | 4% | 1% | 2% | 10% |
| Debt percent | | | 98% | 99% | 96% | 99% | 98% | 90% |
| **Multiple** | | | | | | | | |
| EV/Revenue | | | 0.38 | 0.31 | 0.36 | 0.41 | 0.67 | 0.72 |
| EV/EBITDA | | | 4.87 | 10.31 | 4.92 | 5.22 | 8.63 | 9.20 |

# Coram Healthcare
## Appendix 3
### Comparable Market Analysis - Calculation of Multiples

| | Chanin 7/00 July 31, 2000 | Chanin 12/00 December 4, 2000 | UBS 12/00 December 11, 2000 | DSI 12/00 December 14, 2000 | Goldin 7/00 July 31, 2000 | Goldin 12/00 December 14, 2000 | Goldin 8/01 June 15, 2001 | Goldin 8/01 August 31, 2001 |
|---|---|---|---|---|---|---|---|---|
| **Gentiva Health Services** | | | | | | | | |
| Revenue | 1,505,359 | | 1,415,400 | 1,510,970 | 1,505,359 | 1,415,400 | 1,470,215 | 1,431,309 |
| EBITDA | 46,912 | | 49,500 | (80,421) | 46,912 | 49,500 | 88,508 | 85,340 |
| EV/EBITDA - Capital expenditures | 33,008 | | | | | | | |
| Market capitalization | 173,644 | | 312,009 | 287,433 | 171,944 | 287,433 | 399,720 | 450,628 |
| Debt | 119,691 | | - | 92,584 | 119,691 | 92,584 | 20,000 | 19,400 |
| Enterprise value | 291,335 | | 312,009 | 380,017 | 291,335 | 380,017 | 419,720 | 470,028 |
| Equity percent | 59% | | 100% | 74% | 59% | 74% | 95% | 96% |
| Debt percent | 41% | | 0% | 26% | 41% | 26% | 5% | 4% |
| **Multiple** | | | | | | | | |
| EV/Revenue | 0.19 | 0.28 | 0.22 | 0.24 | 0.19 | 0.25 | 0.28 | 0.33 |
| EV/EBITDA | 5.96 | 6.15 | 6.25 | - | 5.98 | 7.21 | 4.71 | 5.51 |
| EV/EBITDA - Capital expenditures | 8.83 | 7.46 | | | | | | |
| | | | | | | | | |
| **In Home Health** | | | | | | | | |
| Revenue | | | 81,520 | | | | | |
| EBITDA | | | 4,406 | | | | | |
| EBITDA - Capital expenditures | | | | | | | | |
| Market capitalization | | | 20,769 | | | | | |
| Debt | | | 1,235 | | | | | |
| Enterprise value | | | 22,004 | | | | | |
| Equity percent | | | 94% | | | | | |
| Debt percent | | | 6% | | | | | |
| **Multiple** | | | | | | | | |
| EV/Revenue | | | 0.24 | | | | | |
| EV/EBITDA | | | 4.99 | | | | | |
| EV/EBITDA - Capital expenditures | | | | | | | | |

Coram Healthcare
Appendix 3
Comparable Market Analysis - Calculations of Multiples

| | Chain 7/00 July 31, 2000 | Chain 12/00 December 4, 2000 | UBS 12/00 December 11, 2000 | D&T 12/00 December 14, 2000 | GoldN 7/00 July 31, 2000 | GoldN 12/00 December 14, 2000 | GoldN 6/01 June 15, 2001 | GoldN 6/01 August 31, 2001 |
|---|---|---|---|---|---|---|---|---|
| **Uhens Holdings, Inc.** | | | | | | | | |
| Revenue | 629,795 | | | 665,573 | | | 154,283 | 171,161 |
| EBITDA | 246,984 | | | 209,726 | | | 17,682 | 16,539 |
| EBITDA - Capital expenditures | 185,462 | | | | | | | |
| | | | | | | | | |
| Market capitalization | 1,434,100 | | | | | | | 107,575 |
| Debt | 209,000 | | | | | | | 27,522 |
| Enterprise value | 1,703,100 | | | | | | | 215,097 |
| | | | | | | | | |
| Equity percent | 84% | | | 91% | | | 91% | 87% |
| Debt percent | 16% | | | 9% | | | 0% | 13% |
| | | | | | | | | |
| Multiple | | | | | | | | |
| EV/Revenue | 2.70 | 3.82 | | 4.69 | | | 1.41 | 1.26 |
| EV/EBITDA | 6.90 | 9.79 | | 11.78 | | | 12.76 | 11.60 |
| EV/EBITDA - Capital expenditures | 9.28 | 12.69 | | | | | | |
| | | | | | | | | |
| **Dalon Corp, Inc.** | | | | | | | | |
| Revenue | 124,191 | | | 132,834 | 124,191 | 132,834 | 138,304 | |
| EBITDA | 13,009 | | | 14,594 | 13,009 | 14,594 | 18,323 | |
| EBITDA - Capital expenditures | 12,094 | | | | | | | |
| | | | | | | | | |
| Market capitalization | 65,319 | | | 76,162 | 65,316 | 76,162 | 199,304 | |
| Debt | 12,493 | | | 16,323 | 12,493 | 16,323 | 18,843 | |
| Enterprise value | 77,609 | | | 92,465 | 77,609 | 92,465 | 216,007 | |
| | | | | | | | | |
| Equity percent | 84% | | | 82% | 84% | 82% | 91% | |
| Debt percent | 16% | | | 16% | 18% | 19% | 0% | |
| | | | | | | | | |
| Multiple | | | | | | | | |
| EV/Revenue | 0.63 | 0.76 | | 0.70 | 0.63 | 0.70 | 1.41 | |
| EV/EBITDA | 5.63 | 6.68 | | 6.34 | 5.63 | 6.34 | 12.76 | |
| EV/EBITDA - Capital expenditures | 6.03 | 7.37 | | | | | | |

**Coram Healthcare**
**Appendix 3**
**Comparable Market Analysis - Calculation of Multiples**

| | Chariz 7/00 July 31, 2000 | Chariz 12/00 December 4, 2000 | UBS 12/00 December 11, 2000 | D&T 12/00 December 14, 2000 | Goldin 7/00 July 31, 2000 | Goldin 12/00 December 14, 2000 | Goldin 6/01 June 15, 2001 | Goldin 8/01 August 31, 2001 |
|---|---|---|---|---|---|---|---|---|
| **Pediatric Services, Inc.** | | | | | | | | |
| Revenue | | | 181,588 | | | | | |
| EBITDA | | | 9,368 | | | | | |
| | | | | | | | | |
| Market capitalization | | | 29,962 | | | | | |
| Debt | | | 24,503 | | | | | |
| Enterprise value | | | 54,465 | | | | | |
| | | | | | | | | |
| Equity percent | | | 55% | | | | | |
| Debt percent | | | 45% | | | | | |
| | | | | | | | | |
| Multiple | | | | | | | | |
| EV/Revenue | | | 0.30 | | | | | |
| EV/EBITDA | | | 5.81 | | | | | |
| | | | | | | | | |
| **US Oncology, Inc.** | | | | | | | | |
| Revenue | | | 1,287,844 | | | | | |
| EBITDA | | | 176,008 | | | | | |
| | | | | | | | | |
| Market capitalization | | | 403,421 | | | | | |
| Debt | | | 305,187 | | | | | |
| Enterprise value | | | 708,608 | | | | | |
| | | | | | | | | |
| Equity percent | | | 62% | | | | | |
| Debt percent | | | 38% | | | | | |
| | | | | | | | | |
| Multiple | | | | | | | | |
| EV/Revenue | | | 0.83 | | | | | |
| EV/EBITDA | | | 4.54 | | | | | |
| | | | | | | | | |
| **Calculation of Multiples:** | | | | | | | | |
| EV/Revenue | 0.78 | 1.09 | | 0.83 | 0.51 | 0.54 | 0.99 | 0.94 |
| EV/EBITDA | 5.71 | 6.51 | 6.00 | 7.70 | 5.59 | 5.55 | 8.59 | 0.73 |
| EV/EBITDA less Capital expenditures | 7.41 | 7.43 | | | | | | |

(GA derived its multiple by weighting the individual comparables according to their relative percentages of infusion revenue.)

**Coram Healthcare**
**Appendix 4**
**Comparable Market Analysis - Application of Multiples - Valuation**

| | Chanin 7/00 July 31, 2000 | Chanin 12/00 December 4, 2000 | UBS 12/00 (1) December 11, 2000 | DST 12/00 (2) December 14, 2000 | Goldin 7/00 (3) July 31, 2000 | Goldin 12/00 (3) December 14, 2000 | Goldin 6/01 June 15, 2001 | Goldin 8/01 August 31, 2001 |
|---|---|---|---|---|---|---|---|---|
| Coram Revenue | 446,755 | 401,119 | | 401,249 | 446,755 | 401,119 | 401,000 | 401,000 |
| Coram EBITDA | 33,589 | 27,193 | 33,591 | 35,941 | 45,689 | 38,283 | 29,740 | 28,438 |
| Coram EBITDA less Capital expenditures | 24,428 | 23,193 | | | | | | |
| EV/Revenue multiple | 0.76 | 1.09 | | 0.83 | 0.51 | 0.64 | 0.99 | 0.94 |
| EV/EBITDA multiple | 5.71 | 6.51 | 6.00 | 7.70 | 5.50 | 6.55 | 8.59 | 8.73 |
| EV/EBITDA less Capital expenditures multiple | 7.41 | 7.43 | | | | | | |
| Valuation Revenue by EV/Revenue multiple | 346,469 | 437,220 | | 346,304 | 227,116 | 255,604 | 396,312 | 375,242 |
| Valuation EBITDA by EV/EBITDA multiple | 191,783 | 177,025 | 201,488 | 287,287 | 251,444 | 257,940 | 255,555 | 248,225 |
| Valuation EBITDA less Capex by EV/EBITDA less Capex multiple | 181,011 | 172,324 | | | | | | |

(1) UBS Warburg calculated values varying "normalized" MIP from 4 - 8 million and the EV/EBITDA multiple from 5 - 7 times. The range of values resulting was $157,507 to $246,059.
(2) DST added 12,852 of excess cash in their valuation calculation.
(3) Goldin normalized MIP at 5.5% of branch operating income.

**Coram Healthcare**
**Appendix 5**
**Comparable Transaction Analysis - Selection of Comparables**

| Target by Acquirer | Transaction Date | Chorin 7/00 July 31, 2000 | Chorin 12/00 December 4, 2000 | UBS 12/00 December 11, 2000 | DSF 12/00 December 14, 2000 | Goldin 7/00 July 31, 2000 | Goldin 12/00 December 14, 2000 | Goldin 6/01 June 15, 2001 | Goldin 8/01 August 31, 2001 |
|---|---|---|---|---|---|---|---|---|---|
| American Disease Management by ABM Corporation | 8/4/2000 | | | | X | X | X | X | X |
| Community Care by Landauer Hospital | 12/20/1999 | | X | | | | | | |
| EMSA Government Service by America Service | 1/27/1999 | | | X | | | | | |
| Homedco by Abbey Healthcare (treated Apria) | 3/21/1995 | X | X | | X | X | X | X | X |
| Housecall Medical by Sunbelt Home | 6/4/1998 | X | X | | X | X | X | X | X |
| Infusion Solutions by Amedisys | 2/1/1998 | | | X | | | | | |
| In Home Health by Manor Care | 9/15/2000 | X | X | X | | | | | |
| RoTech Medical by Integrated Health Services | 7/7/1997 | | | | X | X | | X | X |
| United Medical by Lincare Holdings | 6/28/2000 | | | | | | | X | X |
| Interwest Home Medical by Pravail | 3/16/2001 | | | | | | | | |

**Corum Healthcare**
**Appendix 6**
**Comparable Transaction Analysis – Calculation of Multiples**

| Transaction by Acquirer | Closin 7/00 July 31, 2000 | Closin 12/00 December 4, 2000 | UHS 12/00 December 11, 2000 | D&T 12/00 December 14, 2000 | Goldin 7/00 July 31, 2000 | Goldin 12/00 December 14, 2000 | Goldin 6/01 June 15, 2001 | Goldin 8/01 August 31, 2001 |
|---|---|---|---|---|---|---|---|---|
| **American Disease Management by MIM Corporation** | | | | | | | | |
| EV/Revenue | | 1.51 | | 1.51 | 1.51 | 1.51 | 1.51 | 1.51 |
| EV/EBITDA | | 5.00 | | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 |
| **Community Care by Lindauer Hospital** | | | | | | | | |
| EV/Revenue | | | | 0.74 | 0.74 | 0.74 | 0.74 | 0.74 |
| EV/EBITDA | | | | 6.10 | 6.10 | 6.10 | 6.10 | 6.10 |
| **EHSA Government Service by America Service** | | | | | | | | |
| EV/Revenue | 0.50 | 0.50 | 0.50 | | | | | |
| EV/EBITDA | | | | | | | | |
| **Homedco by Abbey Healthcare** | | | | | | | | |
| EV/Revenue | | | 8.50 | | | | | |
| EV/EBITDA | | | | | | | | |
| **Housecall Medical by Sunbelt Home** | | | | | | | | |
| EV/Revenue | 0.28 | 0.28 | 0.28 | 0.28 | 0.28 | 0.28 | 0.28 | 0.28 |
| EV/EBITDA | 13.09 | 13.09 | 13.09 | 14.09 | 13.09 | 13.09 | 13.09 | 13.09 |
| **Infusion Solutions by Amedisys** | | | | | | | | |
| EV/Revenue | | | 15.70 | 1.02 | 1.02 | 1.02 | 1.02 | 1.02 |
| EV/EBITDA | | | | | | | | |
| **In Home Health by Manor Care** | | | | | | | | |
| EV/Revenue | 0.41 | 0.41 | 5.10 | | | | | |
| EV/EBITDA | 6.08 | 6.08 | | | | | | |
| **RoTech Medical by Integrated Health Services** | | | | | | | | |
| EV/Revenue | | | 8.20 | 2.02 | 2.02 | 2.02 | 2.02 | 2.02 |
| EV/EBITDA | | | | | | | | |
| **United Medical by Lincare Holdings** | | | | | | | | |
| EV/Revenue | | | | | | | 1.40 | 1.40 |
| EV/EBITDA | | | | | | | 3.90 | 3.90 |
| **Interwest Home Medical by Praxair** | | | | | | | | |
| EV/Revenue | 0.41 | | | | | | | |
| EV/EBITDA | 9.97 | | | | | | | |
| **EV/Revenue Multiple** | 0.41 | 0.45 | 6.50 | 0.74 | 0.74 | 1.02 | 1.02 | 1.21 |
| **EV/EBITDA Multiple** | 9.97 | 6.05 | | 6.10 | 6.10 | 6.10 | 5.55 | 5.55 |

*(GA derived is multiple by taking the median of the comps.)*

Coram Healthcare
Appendix 7
Comparable Transaction Analysis - Application of Multiples

| | Chmln 7/00 July 31, 2000 | Chmln 12/00 December 4, 2000 | UBS 12/00 (1) December 11, 2000 | DST 12/00 (2) December 14, 2000 | Goldm 7/00 (3) July 31, 2000 | Goldm 12/00 (3) December 14, 2000 | Goldm 6/01 June 15, 2001 | Goldm 6/01 August 31, 2001 |
|---|---|---|---|---|---|---|---|---|
| Coram Revenue | 446,755 | 401,119 | | 401,740 | 448,755 | 401,119 | 401,000 | 401,000 |
| Coram EBITDA | 33,589 | 27,193 | 33,591 | 35,541 | 45,689 | 39,283 | 28,746 | 28,430 |
| EV/Revenue Multiple | 0.41 | 0.45 | | 0.74 | 1.02 | 1.02 | 1.21 | 1.21 |
| EV/EBITDA Multiple | 9.07 | 8.08 | 6.60 | 6.10 | 6.10 | 6.10 | 5.55 | 5.55 |
| Valuation: Revenue by EV/Revenue multiple | 183,170 | 162,249 | | 310,143 | 453,690 | 409,141 | 485,210 | 485,210 |
| Valuation: EBITDA by EV/EBITDA multiple | 334,692 | 187,098 | 216,278 | 230,282 | 270,703 | 239,897 | 159,542 | 157,517 |

(1) UBS Warburg calculated values varying "normalized" MIP from 4 - 8 million and the EV/EBITDA multiple from 5.5 - 7.6 times. The range of values resulting was 173,897 to 258,660.
(2) DST added 12,552 of excess cash in their valuation calculation.
(3) Goldm normalized MIP at 5.5% of branch operating income.

Coram Healthcare
Appendix 8
Projection

| | | Restated | | 2000 | Estimated | | Projected | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
| Gross revenue | | 1,122,911 | 1,227,531 | 1,102,972 | 1,030,513 | 1,082,068 | 1,103,742 | 1,142,318 | 1,182,727 |
| less contractual allowance | | 726,242 | 794,708 | 702,371 | 629,513 | 661,007 | 677,912 | 697,812 | 722,497 |
| Net revenue | | | | | | | | | |
| Core therapies | | 231,453 | 259,784 | 263,062 | 270,983 | 291,044 | 301,812 | 314,489 | 330,213 |
| Non-core therapies and all other | | 165,216 | 173,070 | 137,509 | 130,017 | 130,017 | 130,017 | 130,017 | 130,017 |
| Total net revenue | | 396,669 | 432,824 | 400,601 | 401,000 | 421,061 | 431,830 | 444,505 | 460,230 |
| Growth rate | | | | | | 5.0% | 2.6% | 2.9% | 3.5% |
| Cost of drugs and supplies | | | | | | | | | |
| Core therapies | | 68,747 | 98,995 | 97,004 | 99,395 | 103,847 | 105,924 | 109,043 | 110,204 |
| Non-core therapies and all other | | 80,126 | 88,677 | 65,729 | 63,411 | 65,314 | 66,620 | 67,932 | 69,311 |
| Total cost of drugs and supplies | | 148,873 | 165,672 | 162,813 | 162,806 | 169,161 | 172,544 | 175,905 | 179,515 |
| Percent of net revenue | | 37.5% | 42.5% | 40.6% | 40.6% | 40.2% | 40.0% | 39.6% | 39.0% |
| Standard margin | | 247,795 | 247,152 | 237,788 | 238,194 | 251,900 | 259,285 | 268,511 | 280,715 |
| Percent of net revenue | | 62.5% | 57.1% | 59.4% | 59.4% | 59.8% | 60.0% | 60.4% | 61.0% |
| Clinical services expense | | | | | | | | | |
| Salaries and general | | 127,827 | 138,089 | 118,529 | 119,442 | 121,031 | 124,267 | 126,753 | 129,288 |
| Depreciation and amortization | | 6,052 | 5,359 | 5,170 | 5,670 | 5,670 | 5,670 | 5,670 | 5,670 |
| Gross margin | | 114,117 | 103,704 | 113,089 | 113,082 | 124,399 | 129,340 | 136,088 | 145,757 |
| Percent of net revenue | | 28.8% | 24.0% | 28.2% | 28.2% | 29.5% | 30.0% | 30.6% | 31.7% |
| Branch expenditures | | | | | | | | | |
| Salaries and general | | 42,412 | 45,262 | 40,708 | 44,044 | 44,925 | 45,623 | 46,740 | 47,675 |
| Provision for uncollectibles | | 14,488 | 28,927 | 8,991 | 12,532 | 13,474 | 13,619 | 14,224 | 14,727 |
| Depreciation and amortization | | 2,684 | 2,477 | 2,091 | 2,116 | 2,116 | 2,116 | 2,116 | 2,116 |
| Branch margin | | 54,533 | 29,038 | 62,159 | 54,090 | 63,884 | 67,908 | 73,008 | 81,239 |
| Percent of net revenue | | 13.7% | 6.7% | 15.5% | 13.5% | 15.2% | 15.7% | 16.4% | 17.7% |
| Corporate expenditures | | | | | | | | | |
| Salaries and general | | 36,559 | 35,791 | 24,972 | 31,087 | 31,709 | 32,343 | 32,990 | 33,650 |
| Management incentive plan | | | | 13,530 | 2,975 | 3,514 | 3,717 | 4,015 | 4,468 |
| Depreciation and amortization | | 13,373 | 13,187 | 12,717 | 12,544 | 14,217 | 17,200 | 20,182 | 23,165 |
| EBIT | | 4,561 | (19,940) | 10,800 | 7,484 | 14,445 | 14,330 | 15,820 | 19,957 |
| Percent of net revenue | | 1.1% | -4.6% | -2.7% | 1.9% | 3.4% | 3.3% | 3.6% | 4.3% |
| EBITDA | | 26,670 | 1,063 | 30,858 | 27,814 | 36,448 | 39,316 | 43,789 | 50,908 |
| Percent of net revenue | | 6.7% | 0.3% | 7.7% | 6.9% | 8.7% | 9.1% | 9.9% | 11.1% |

**Coram Healthcare**
**Appendix 9**
**Weighted Average Cost of Capital**

| | Chanin 7/00 July 31, 2000 | Chanin 12/00 December 4, 2000 | UBS 12/00 December 11, 2000 | D&T 12/00 December 14, 2000 | Goldin 7/00 July 31, 2000 | Goldin 12/00 December 14, 2000 | Goldin 6/01 June 15, 2001 | Goldin 8/01 August 31, 2001 |
|---|---|---|---|---|---|---|---|---|
| Pretax cost of debt (a) | 8.6% | | 11.5% | 8.9% | 10.5% | 9.5% | 7.8% | 7.3% |
| Assumed tax rate | 40% | | 40% | 40% | 40% | 40% | 40% | 40% |
| After tax cost of debt | 5.2% | | 6.9% | 5.3% | 6.3% | 5.7% | 4.7% | 4.4% |
| | | | | | | | | |
| Cost of equity | | | | | | | | |
| Risk free rate (b) | 6.3% | | 5.7% | 5.6% | 6.3% | 6.0% | 5.5% | 5.5% |
| Beta (c) | 1.40 | | 1.00 | 1.05 | 1.40 | 1.15 | 1.15 | 1.15 |
| Equity risk premium (d) | 8.1% | | 12.7% | 8.1% | 8.1% | 8.1% | 8.1% | 8.1% |
| Company specific risk | | | | 2.0% | | | | |
| Size risk premium (e) | 2.2% | | | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% |
| Turnaround premium | 6.0% | | | | 6.0% | 5.0% | 4.0% | 4.0% |
| | | | | | | | | |
| Cost of equity | 25.8% | | 18.4% | 18.3% | 25.6% | 22.5% | 21.4% | 21.0% |
| | | | | | | | | |
| Debt percent | 27.3% | | 38.3% | 20.4% | 20.0% | 20.0% | 20.0% | 20.0% |
| Equity percent | 72.7% | | 61.7% | 79.6% | 80.0% | 80.0% | 80.0% | 80.0% |
| | | | | | | | | |
| WACC | 20.2% | 21.8% | 14.0% | 15.7% | 21.9% | 19.1% | 18.1% | 17.7% |

Footnotes:
(a) LIBOR plus 350 basis points (Goldin)
(b) 20-year Treasury yield
(c) Ibbotson Associates (Chanin); the average of the Advisors (Goldin)
(d) Ibbotson Associates
(e) Ibbotson Associates

**Coram Healthcare**
**Appendix 10**
**Discounted Cashflow Analysis**

### Chartin 7/00 *

| | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| EBIT | 19,557 | 25,851 | 32,616 | 33,281 |
| Non-deductible amortization | 7,600 | 7,600 | 7,600 | 7,600 |
| EBITDA | 27,157 | 34,451 | 40,216 | 40,881 |
| Taxes @ 40% | 10,863 | 13,780 | 16,088 | 16,352 |
| Operating profit after taxes | 16,294 | 20,671 | 24,130 | 24,529 |
| Deductible depreciation and amortization | 17,558 | 16,443 | 11,693 | 12,008 |
| Capital expenditures | 11,099 | 8,529 | 8,709 | 8,895 |
| Change in working capital | 24,715 | 7,163 | 3,930 | 1,781 |
| Free Cash Flow | (1,961) | 21,422 | 24,089 | 25,950 |
| | | | | |
| Weighted average cost of capital | 20.2% | 20.2% | 20.2% | 20.2% |
| | | | | |
| Discounted free cash flow @ WACC, mid-year convention | (1,768) | 16,255 | 15,207 | 13,529 |
| Terminal value @ EBITDA - Cap ex multiple | | | | 326,714 |
| PV factor at end of year | | | | 0.48 |
| PV of terminal value (end of year) | | | | 159,513 |
| | | | | |
| Total cash flows | (1,768) | 16,255 | 15,207 | 170,142 |

Sum of cash flows   200,000

### GA revision to Chartin 7/00 *

| | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| EBIT | 19,863 | 25,982 | 32,872 | 33,737 |
| Non-deductible amortization | 7,600 | 7,600 | 7,600 | 7,600 |
| EBITDA | 27,463 | 34,582 | 40,472 | 41,337 |
| Taxes @ 40% | 10,873 | 13,833 | 16,169 | 16,535 |
| Operating profit after taxes | 16,310 | 20,749 | 24,283 | 24,802 |
| Deductible depreciation and amortization | 17,558 | 16,443 | 11,686 | 12,039 |
| Capital expenditures | 11,099 | 8,529 | 8,709 | 8,895 |
| Change in working capital | 24,715 | 7,163 | 3,930 | 1,781 |
| Free Cash Flow | (1,945) | 21,500 | 24,242 | 25,223 |
| | | | | |
| Weighted average cost of capital | 21.9% | 21.9% | 21.9% | 21.9% |
| | | | | |
| Discounted free cash flow @ WACC, mid-year convention | (1,762) | 15,975 | 14,776 | 13,112 |
| Terminal value @ EBITDA multiple | | | | 310,016 |
| PV factor at end of year | | | | 0.45 |
| PV of terminal value (end of year) | | | | 140,400 |
| | | | | |
| Total cash flows | (1,762) | 15,975 | 14,776 | 153,513 |

Sum of cash flows   182,502

* These calculate Coram's enterprise value as of the end of 2000. Goldin determined that adjusting its calculation to 7/31/00, after taking into account estimated free cash flow for the balance of 2000, would not make a material difference.

**Coram Health**
**Appendix 10**
**Discounted Cashflow Analysis**

### Chart-a 12/00

| | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| EBIT | 25,548 | 29,162 | 28,492 | 29,019 |
| Non-deductible amortization | 6,536 | 6,536 | 6,536 | 6,536 |
| Net operating losses | 2,000 | 2,000 | 2,000 | 2,000 |
| EBITA | 30,085 | 33,698 | 33,028 | 33,555 |
| Taxes @ 40% | 12,034 | 13,479 | 13,211 | 13,422 |
| Operating profit after taxes | 18,051 | 20,219 | 19,817 | 20,133 |
| Net operating loss addback | 2,000 | 2,000 | 2,000 | 2,000 |
| Deductible depreciation and amortization | 4,226 | 6,346 | 7,706 | 8,406 |
| Capital expenditures | 11,100 | 10,100 | 3,500 | 3,500 |
| Change in working capital | 9,173 | 4,144 | 2,580 | 2,755 |
| Free Cash Flow | 4,004 | 14,321 | 23,433 | 24,284 |
| | | | | |
| Weighted average cost of capital | 21.6% | 21.6% | 21.6% | 21.6% |
| | | | | |
| Discounted free cash flow @ WACC, mid-year convention | 3,626 | 10,654 | 14,312 | 12,177 |
| Terminal value @ EBITDA - Cap as multiple | | | | 298,202 |
| PV factor at end of year | | | | 0.45 |
| PV of terminal value (end of year) | | | | 135,494 |
| | | | | |
| Total cash flows | 3,626 | 10,654 | 14,312 | 147,672 |
| | | | | |
| Sum of cash flows | 176,488 | | | |

### GA revision to Chart-a 12/00

| | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| EBIT | 25,583 | 29,305 | 28,715 | 29,417 |
| Non-deductible amortization | 6,536 | 6,536 | 6,536 | 6,536 |
| Net operating losses | 2,000 | 2,000 | 2,000 | 2,000 |
| EBITA | 30,119 | 33,841 | 33,251 | 33,953 |
| Taxes @ 40% | 12,048 | 13,536 | 13,300 | 13,581 |
| Operating profit after taxes | 18,071 | 20,304 | 19,951 | 20,372 |
| Net operating loss addback | 2,000 | 2,000 | 2,000 | 2,000 |
| Deductible depreciation and amortization | 4,226 | 6,346 | 7,706 | 8,406 |
| Capital expenditures | 11,100 | 10,100 | 3,500 | 3,500 |
| Change in working capital | 9,173 | 4,144 | 2,580 | 2,755 |
| Free Cash Flow | 4,024 | 14,405 | 23,581 | 24,523 |
| | | | | |
| Weighted average cost of capital | 19.1% | 16.1% | 19.7% | 19.1% |
| | | | | |
| Discounted free cash flow @ WACC, mid-year convention | 3,688 | 11,084 | 15,224 | 13,301 |
| Terminal value @ EBITDA multiple | | | | 280,393 |
| PV factor at end of year | | | | 0.50 |
| PV of terminal value (end of year) | | | | 139,603 |
| | | | | |
| Total cash flows | 3,688 | 11,084 | 15,224 | 152,903 |
| | | | | |
| Sum of cash flows | 182,899 | | | |

Coram Healthcare
Appendix 10
Discounted Cashflow Analysis

| UBS 12/00 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| Sales | 428,543 | 437,556 | 446,875 | 456,506 |
| | | | | |
| EBITA before MIP | 42,404 | 46,219 | 45,558 | 44,908 |
| Taxes @ 40% | 16,962 | 18,488 | 18,223 | 17,963 |
| | | | | |
| NOPAT | 25,442 | 27,731 | 27,335 | 26,945 |
| Depreciation | 4,226 | 6,189 | 7,913 | 9,673 |
| Capital expenditures | (11,090) | (8,529) | (6,709) | (8,686) |
| Increase in debt free working capital | (15,687) | (4,496) | (2,945) | (3,047) |
| Payments on disputed income taxes | (2,088) | (2,088) | (2,088) | (2,088) |
| | | | | |
| Estimated free cash flow before MIP | 795 | 18,817 | 21,506 | 22,597 |
| Terminal EBITDA before MIP | | | | 54,581 |
| | | | | |
| Enterprise value | | | | |

(UBS assumed a range of discount rates from 14% to 18% and varying
MIP levels from 4 to 6 million. These assumptions produced a range of
enterprise values from 168,194 to 214,630.)

| D&T 12/00 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| Revenue | 421,936 | 442,928 | 465,075 | 488,328 |
| | | | | |
| EBITDA | 37,099 | 45,071 | 48,143 | 51,880 |
| | | | | |
| Free cash flow (FCF) | 3,754 | 16,485 | 26,718 | 29,217 |
| | | | | |
| Net present value of FCF | 3,490 | 13,241 | 18,543 | 17,522 |
| | | | | |
| Terminal value | | | | 401,608 |
| | | | | |
| Net present value of total cash flows | 3,490 | 13,241 | 18,543 | 223,999 |
| | | | | |
| Enterprise Value | 276,795 | | | |

**Coram Healthcare**
**Appendix 10**
**Discounted Cashflow Analysis - Goldin as of June 15, 2001**

| | 1998 | Restated 1999 | Restated 2000 | Estimated 2001 | 2002 | Projected 2003 | Projected 2004 | Projected 2005 | |
|---|---|---|---|---|---|---|---|---|---|
| EBIT | 4,561 | (19,940) | 10,880 | 7,484 | 14,445 | 14,330 | 15,820 | 19,957 | |
| Non-deductible amortization | 7,200 | 7,200 | 7,200 | 7,200 | 7,200 | 7,200 | 7,200 | 7,200 | |
| EBITDA | 11,761 | (12,740) | 18,080 | 14,684 | 21,645 | 21,530 | 23,020 | 27,157 | |
| Taxes @ 40% | 4,704 | (5,098) | 7,232 | 5,874 | 8,658 | 8,612 | 9,208 | 10,863 | |
| Operating profit after taxes | 7,057 | (7,644) | 10,848 | 8,810 | 12,987 | 12,918 | 13,812 | 16,294 | |
| Deductible depreciation and amortization | 14,909 | 13,823 | 12,778 | 13,130 | 14,803 | 17,786 | 20,768 | 23,751 | |
| Capital expenditures | 10,997 | 5,303 | 3,272 | 11,844 | 10,025 | 3,478 | 3,478 | 3,478 | |
| Change in working capital | | | | 80 | 4,012 | 2,154 | 2,535 | 3,145 | |
| Unlevered free cash flow | 10,969 | 876 | 20,354 | 10,017 | 13,753 | 25,072 | 28,597 | 33,422 | |
| | | | | | | | | | |
| WACC | 18.1% | | | | | | | | |
| Discounted unlevered free cash flow @ WACC | | | | | 11,647 | 17,982 | 17,352 | 17,193 | 64,174 |
| | | | | | | | | | |
| EBITDA | | | | | | | | 50,908 | |
| Terminal multiple | | | | | | | | 7.22 | |
| Terminal value | | | | | | | | 367,554 | |
| | | | | | | | | | |
| Present value of terminal value | | | | | | | Enterprise value | 173,997 | |
| | | | | | | | | 238,171 | |

**Coram Healthcare**
**Appendix 10**
**Discounted Cashflow Analysis - Goldin as of August 31, 2001**

| | 1998 | Restated 1999 | 2000 | Estimated 2001 | Projected 2002 | 2003 | 2004 | 2005 | |
|---|---|---|---|---|---|---|---|---|---|
| EBIT | 4,561 | (19,940) | 10,880 | 7,484 | 14,445 | 14,330 | 15,820 | 19,857 | |
| Non-deductible amortization | 7,200 | 7,200 | 7,200 | 7,200 | 7,200 | 7,200 | 7,200 | 7,200 | |
| EBITA | 11,761 | (12,740) | 18,080 | 14,684 | 21,645 | 21,530 | 23,020 | 27,157 | |
| Taxes @ 40% | 4,704 | (5,096) | 7,232 | 5,874 | 8,658 | 0,612 | 9,208 | 10,863 | |
| Operating profit after taxes | 7,057 | (7,644) | 10,848 | 8,810 | 12,987 | 12,918 | 13,812 | 16,294 | |
| Deductible depreciation and amortization | 14,909 | 13,823 | 12,778 | 13,130 | 14,803 | 17,786 | 20,768 | 23,751 | |
| Capital expenditures | 10,997 | 5,303 | 3,272 | 11,344 | 10,025 | 3,478 | 3,478 | 3,478 | |
| Change in working capital | | 876 | | 80 | 4,012 | 2,154 | 2,535 | 3,145 | |
| Unlevered free cash flow | 10,969 | 876 | 20,354 | 10,017 | 13,753 | 25,072 | 28,567 | 33,422 | |
| WACC | 17.7% | | | | | | | | |
| Discounted unlevered free cash flow @ WACC | | | | | 12,005 | 16,592 | 17,998 | 17,885 | 66,478 |
| EBITDA | | | | | | | | 50,908 | |
| Terminal multiple | | | | | | | | 7.14 | |
| Terminal value | | | | | | | | 363,465 | |
| Present value of terminal value | | | | | | | | | 179,269 |
| Enterprise value | | | | | | | | | 245,747 |



Cyenus Healthcare
Appendix 11
Valuation Methodology - Summary

Coram Healthcare
Appendix 12
Normalized 2000 EBITDA

|  | 2000 Per Company-Populated, Adjusted by Goldin Infusion Only |
|---|---|
| Infusion EBITDA | 30,858 |
| Additional Infusion income - joint ventures and minority interest | 188 |
| MIP | 13,630 |
|  | 44,676 |
|  |  |
| Normal 3.2% Reserve for Uncollectibles | 12,819 |
| Amount deducted - current period | 8,991 |
| Amount reversed - prior periods | 3,451 |
|  | (377) |
|  |  |
| Adjustments to Operating expenses | (9,039) |
| Additional adjustments affecting Infusion EBITDA - Operating | (143) |
| Adjustments to Corporate expenses | (4,639) |
| Adjustments not affecting Infusion EBITDA - Corporate | 2,000 |
|  |  |
| Normalized Pre-MIP | 32,478 |
| MIP @ 5.5% of Branch EBITDA | 3,421 |
|  |  |
| * Post-MIP EBITDA | 29,057 |

# Exhibit B

## Page 1

IN THE UNITED STATES DISTRICT COURT,
FOR, THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, Chapter II      )
Trustee of the Post-            )Case No.
Confirmation Bankruptcy of      )04-1565
Estates of Coram Healthcare     )
CORPORATION, and of CORAM,      )
INC., a Delaware corporation,   )
            Plaintiff,          )
                                )
        vs.                     )
                                )
DANIEL D. CROWLEY, DONALD J.    )
AMARAL; WILLIAM J. CASEY; L.    )
PETER SMITH; and SANDRA L.      )
SMOLEY,                         )
                                )
            Defendants.         )
-------------------------------)

Wednesday, March 21, 2007

10:20 a.m.

Deposition of HARRISON GOLDIN held at
the offices of Cerberus Capital Management, L.P.,
1177 Avenue of the Americas, New York, New York
pursuant to Notice, before Danielle Grant, a
Notary Public of the State of New York.

## Page 2

1   A P P E A R A N C E S:

2   SCHNADER HARRISON SEGAL & LEWIS, LLP

3   Counsel for Plaintiff Arlin Adams, Trustee

4   1600 Market Street, Suite 3600

5   Philadelphia, PA 19103-7286

6   BY:   WILBUR L. KIPNES, ESQ.

7         MICHAEL J. BARRIE, ESQ.

8         wkipnes@schnader.com

9         mbarrie@schnader.com

10

11  KEKER & VAN NEST, LLP

12  Counsel for Daniel Crowley

13  710 Sansome Street

14  San Francisco, California 94111

15  BY:   R. JAMES SLAUGHTER, ESQ.

16        rslaughter@kvn.com

17

18  KRAMER LEVIN NAFTALIS & FRANKEL, LLP

19  Counsel for Witness

20  1177 Avenue of the Americas

21  New York, New York 10036

22  BY:   KENNETH H. ECKSTEIN, ESQ.

23        PHILIP BENTLEY, ESQ.

24        keckstein@kramerlevin.com

25        pbentley@kramerlevin.com

## Page 3

1

2           IT IS HEREBY STIPULATED AND

3   AGREED, by and among counsel for

4   the respective parties hereto, that

5   the filing, sealing and certification

6   of the within deposition shall be and

7   the same are hereby waived.

8           IT IS FURTHER STIPULATED AND

9   AGREED that all objections, except as

10  to the form of the question, shall be

11  reserved to the time of the trial.

12          IT IS FURTHER STIPULATED AND

13  AGREED that the within deposition may

14  be signed before any Notary Public

15  with the same force and effect as if

16  signed and sworn to before the Court.

17

18

19

20

21

22

23

24

25

## Page 4

1

2   H A R R I S O N    J. G O L D I N, called as a

3   witness, having been first duly sworn by

4   Danielle Grant, a Notary Public within and

5   for the State of New York, was examined and

6   testified as follows:

7   BY MR. KIPNES:

8           Q    Good morning, Mr. Goldin. My name

9   is Will Kipnes. I represent Arlin M. Adams as

10  Chapter 11 Trustee of the Bankruptcy Estates of

11  Coram in the lawsuit pending in the United States

12  District Court, District of Delaware against

13  Daniel D. Crowley and others.

14          Would you tell me a little bit

15  about the business of Goldin Associates?

16          A    Yes, sir. Goldin Associates is a

17  financial advisory firm that specializes in

18  distressed situations. We act either as

19  financial advisors to debtor companies or in

20  other instances to their institutional creditors.

21  We also perform interim management services.

22          We provide litigation support

23  services in distressed situations and we act

24  extensively as a fiduciary, as a trustee, as an

25  examiner, as a special master to the courts;

Goldin, Harrison

## Page 57

H. Goldin

1
2  sentence states, "It does not appear, however,
3  that Crowley or Feinberg acted with culpable
4  intent with the sort alleged in the Equity
5  Committee's Complaint." What do you mean
6  "culpable intent"?
7      A    It's hard for me to recollect with
8  specificity all of these many years later
9  specifically what the underlying elements were
10  that led me to this conclusion other than that
11  Coram had been so deeply insolvent throughout the
12  period that we examined that one could not
13  conclude that it would have been rationale for
14  the CEO leading Coram not to have sought to
15  maximize the value of Coram.
16      Q    My question is: Whether you intend
17  the culpable intent to be some statement of a
18  legal standard?
19          MR. BENTLEY:  Objection to form.
20      A    Mr. Kipnes, I do have a law degree,
21  although I have not practiced law in many, many
22  years and do not purport to practice.  I recite
23  that because everything I do professionally is
24  surely informed and shaped by my training and
25  experience as a lawyer, but I do not personally

## Page 58

H. Goldin

1
2  express legal opinions and so I am sure that I
3  did not mean to express a legal opinion in using
4  those words.
5      Q    There is a reference to an interest
6  payment made by Mr. Crowley to the Noteholders
7  shortly before the filing of the bankruptcy
8  petition on Page 11?
9      A    Yes, sir.
10      Q    You were critical of his decision to
11  do that; is that correct?
12          MR. SLAUGHTER:  Objection to the
13  form.
14      A    Yes.  As I indicate on Page 11, the
15  decision to make that payment, I found
16  troublesome.
17      Q    Notes held by the Noteholders were
18  unsecured; is that correct?
19      A    I have not a lot of recollection
20  about the specifics of those notes, Mr. Kipnes.
21      Q    Coram filed for bankruptcy on
22  August 8, 2000.  At the time there were general
23  unsecured creditors other than the Noteholders,
24  do you recall that?
25      A    Yes, sir.

## Page 59

H. Goldin

1
2      Q    And under your recommendation, those
3  Noteholders were to get $3 million -- excuse me,
4  those general unsecured contractors were to get
5  $3 million?
6      A    As I recollect, it was $3 million
7  out of 10 million.
8      Q    Less than a hundred cents on the
9  dollar?
10      A    That's my recommendation.
11      Q    Mr. Crowley could have used the $6.3
12  he didn't pay the Noteholders to pay the payment.
13          MR. BENTLEY:  Objection to the form.
14          MR. SLAUGHTER:  Objection to the
15  form.
16      A    That is something I would need to
17  review to comment on.
18      Q    Based on what you remember of your
19  extensive work in this matter, are you aware of
20  any constraints on Mr. Crowley that would have
21  precluded him from paying a supplier of syringes
22  to Coram who was owed money?
23      A    Did you use the word constraint?
24          MR. SLAUGHTER:  Objection.
25      Q    Yes.

## Page 60

H. Goldin

1
2      A    The period preceding the bankruptcy
3  filing at Coram was likely as it is at virtually
4  every company with which I am familiar that
5  ultimately files for bankruptcy, a tumultuous
6  period in which typically strenuous efforts are
7  made to avoid a bankruptcy.  And in which
8  management pursues alternatives and options which
9  it hopes and often prays will somehow or other
10  avoid the need to file.
11      The mindset that led to the
12  determination to make that payment is not one
13  that I am able fully to reconstruct.  I do know
14  that I found the payment of the $6.3 million
15  troublesome.  I also remember that in the end
16  the company was not harmed by the payment of
17  the $6.3 million, which I believe is likely
18  reflected in the report, although I would have
19  to review the report carefully to be sure that
20  it is.
21      Q    In the course of your work, did you
22  consult with any person who held himself or
23  herself out as a damages expert?
24      A    Well, I recall that I had
25  considerable conversation with counsel.  The

Pages 57 to 60

Page 129

H. Goldin

1  were interviewed in connection with your report.
2  I think he may have pointed you to the portion of
3  your report, the beginning that listed the people
4  interviewed at pages six, seven and eight of your
5  report.
6        Do you recall those questions from
7  Mr. Kipnes?
8    A   I do.
9    Q   Do you recall, as far as you knew,
10 no one from the Equity Committee was on that
11 list?
12   A   Was on that list?
13   Q   Yes?
14   A   Correct.
15   Q   Did you attempt to interview a
16 member of Equity Committee?
17   A   That list in the report is a list of
18 fact witness, people involved in Coram or with
19 Coram or for Coram who participated directly sent
20 that could help to elucidate for us what had
21 transpired and assist us in forming the
22 conclusions based on their activity, involvement
23 and participation.
24       During the course of the

Page 130

H. Goldin

1  deposition, as I have looked at material as
2  it's been shown to me, I have noticed that
3  there were instances in which we met with
4  members of the Equity Committee and involve any
5  specific recollection of those meetings.
6  Indeed, I don't have any specific recollection
7  of the people. But as I say, I have seen in
8  the exhibits that have been shown to me over
9  the course of the day references to meetings
10 that I had with members of the Equity
11 Committee.
12   Q   You are confident in connection with
13 the preparation of your report you were able to
14 ascertain the views of the Equity Committee and
15 incorporate them as you saw fit into the final
16 report that was submitted?
17   A   I'm confident that I had a full
18 grasp of the views of the Equity Committee.
19       MR. SLAUGHTER:  I have nothing
20 further, thank you.
21 BY MR. KIPNES:
22   Q   Mr. Goldin, you were not a trier of
23 fact in Coram's confirmation hearing; is that
24 correct?

Page 131

H. Goldin

1    A   That's correct.
2        MR. SLAUGHTER:  Objection to the
3  form.
4    Q   You were not an examiner reporting
5  to the Court; is that correct?
6    A   That is correct.
7    Q   You were an independent restructure
8  advisor retained by the advisory committee of
9  Coram Board of Directors?
10   A   Correct.
11   Q   Final word on factual findings rests
12 with the Court, correct?
13       MR. SLAUGHTER:  Objection to form.
14   A   Yes, sir.
15   Q   In the course of your investigation,
16 did you form a view as to when it was that Coram
17 decided that it would be filing a Chapter 11
18 proceeding?
19       MR. SLAUGHTER:  Objection to the
20 form; beyond the scope.
21   A   We spoke to the issue, not as
22 directly as you asked, how when you questioned me
23 earlier today, Mr. Kipnes, and I say to you in my
24 experience, company's don't make the final

Page 132

H. Goldin

1  decision virtually until they pull the trigger.
2        The implication of that is that
3  they may begin the process of preparing for a
4  possible filing much earlier, interviewing,
5  restructuring counsel consider what the all the
6  it naive finding are related to it.  But I
7  said earlier today that in my experience, and
8  these are not the words I use, hope and prepare
9  predominate until the very end, and they pull
10 the trigger.
11       Therefore, I don't know when the
12 decision was made definitively by Coram to
13 file, but if it's typical, which I had no
14 reason to believe it was not, it was probably
15 late in the game prior to its filing.
16   Q   Mr. Slaughter asked you when your
17 first out CPS on the market and you say you don't
18 recall whether it was, Mr. Crowley or Mr. Smith?
19   A   Yes, I did.
20   Q   Do you recall Mr. Smith left Coram
21 in October of 1999?
22   A   I have a general recollection of
23 that, yes.
24   Q   Do you recall that restructuring

## Page 137

H. Goldin

1
2   obligated to pay --
3        A    I did other than the 6.3, the
4   interest payment.
5        Q    The interest payment was separate?
6        A    Yes.
7        Q    Did you have the Amaral testimony?
8        A    Which exhibit is that?
9        Q    I referenced, I handed you a
10  transcript.
11       A    I do not have it.
12       Q    Mr. Kipnes asked you some questions
13  and redirected you to 424 and 425 about the
14  timing of the CPS sale going up.  This is -- who
15  decided to put CPA up for sale?  Answer, I did.
16  When was that, probably at the end of my tenure,
17  March, April, 1999.
18            Does that refresh your
19  recollection Mr. Amaral put CPS up for sale?
20       A    It does not.
21            MR. SLAUGHTER:  I have nothing
22  further.
23            MR. KIPNES:  I am done.
24
25            (Time noted:  4:00 p.m.)

## Page 138

H. Goldin

1
2
3            HARRISON J. GOLDIN
4   Subscribed and sworn to before me
5   this_____day of _____2007.
6   _____
7
8

## Page 139

H. Goldin

1
2            CERTIFICATE
3   STATE OF NEW YORK )
4                     )ss:
5   COUNTY OF RICHMOND)
6            I, DANIELLE GRANT, a Certified
7        Shorthand Reporter, and Notary
8        Public within and for the State of
9        New York, do hereby certify:
10       That HARRISON J. GOLDIN, the
11       witness whose deposition is
12       hereinbefore set forth, was duly
13       sworn by me and that such
14       deposition is a true record of the
15       testimony given by such witness.
16       I further certify that I am not
17       related to any of the parties to
18       this action by blood or marriage
19       and that I am in no way interested
20       in the outcome of this matter.
21       In witness whereof, I have hereunto
22       set my hand this 29th day of March,
23       2007.
24
25       _____

## Page 140

H. Goldin

1
2   -------------------------INDEX--------------------
3   WITNESS              EXAMINATION BY      PAGE
4   HARRISON J. GOLDIN   Mr. Kipnes          4
5                        Mr. Slaughter       7
6
7   -----------------------EXHIBITS-------------------
8   Goldin               DESCRIPTION         PAGE
    Exhibit No. 1        December 21, 2000    6
9                        Transcript
10  Exhibit No. 2        December 28, 2000    8
                         Transcript
11
    Exhibit No. 3        Coram Board of Directors  13
12                       Resolution
13  Exhibit No. 4        Motion for order    14
14  Exhibit No. 5        Order to appoint Goldin   22
                         Associates
15
16  Exhibit No. 6        February 26, 2001   28
                         Transcript Hearing
17  Exhibit No. 7        Coram Healthcare    31
                         Assignment Task List
18
    Exhibit No. 8        March 22, 2001 Levy  32
19                       Letter
20  Exhibit No. 9        April 11, 2001 Levy  33
                         Letter
21
    Exhibit No. 10       Letter, dated April 16,  33
22                       2001
23  Exhibit No. 11       May 17, 2001 Eckstein  37
                         Letter
24
    Exhibit No. 12       Document            41
25