# Exhibit A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No. 00-3299
                                    .
CORAM HEALTHCARE,                   . 824 Market Street
                                    . Wilmington, DE  19801
                                    .
         Debtor,                    . March 3, 2003
. . . . . . . . . . . . . . . . . . . 9:30 A.M.

TRANSCRIPT OF TRUSTEE'S MOTION FOR AUTHORIZATION TO REJECT
THE EXECUTORY CONTRACT OF DANIEL CROWLEY
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Trustee:                    Schnader Harrison Segal & Lewis,
                                    LLP
                                    By:  BARRY E. BRESSLER, ESQ.
                                         WILBUR KIPNES, ESQ.
                                         RICHARD BARKASY, ESQ.
                                    1600 Market Street, Suite 3600
                                    Philadelphia, PA  19103

                                    Weir & Partners
                                    By:  JOHN B. YORK, ESQ.
                                    824 Market Street Mall, Suite 101
                                    P.O. Box 708
                                    Wilmington, DE  19899

                                    Office of the U.S. Trustee
                                    By:  RICHARD SCHEPACARTER, ESQ.
                                    J. Caleb Boggs Federal Building
                                    844 King Street, Lockbox 35
                                    Wilmington, DE  19801

Audio Operator:                     Jennifer M. Patone


         Proceedings recorded by electronic sound
   recording, transcript produced by transcription service.

---

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey  08619
E-mail:  jjcourt@optonline.net

(609)586-2311     Fax No. (609)587-3599

Adams - Direct                                    14

1  A    Oh, maybe a week or so after I was appointed. The first
2  thing I did after I was appointed was to read carefully the
3  opinions written by Her Honor relating to this matter, and then
4  I called Mr. Crowley and arranged to go to Denver, told him I
5  wanted to meet with him and his entire staff, and he set that
6  meeting up. I forget the date, but it was some time in the
7  latter part of March. And I went out to Denver and talked with
8  Mr. Crowley for, I don't know, two hours, maybe three hours,
9  and then met with the entire staff, first collectively, but
10 then I asked that I be given the opportunity to meet with each
11 of the executive staff individual and on a private basis.
12 Q    It is accurate that of the -- approximately the 2,100
13 employees that Coram has, about 100 are in Denver.
14 A    About that.
15 Q    But members of the senior executive were brought in from
16 elsewhere around the country to meet with you?
17 A    They were, and there were approximately fifteen. I can't
18 tell you precisely the number.
19 Q    When you first met with Mr. Crowley was there any
20 discussion of Her Honor's opinion or of his then current
21 relationship with Cerberus?
22 A    There was. Almost the first thing I did with Mr. Crowley
23 was to ask him about the conflicts and that had been referred
24 to in the opinions that I've just averted to, and he assured me
25 that he had no further contractual relationship with Cerberus

Adams - Direct                                             15

1  except for the remaining claim under the contract for work that
2  he had done prior to my appointment that had nothing to do with
3  Coram, and I made it clear to him that he could not take any
4  compensation from Cerberus for anything except that claim and
5  that he could not spend any time that he would ordinarily be
6  devoting to Coram in order to deal with any of the remaining
7  Cerberus matters.
8      He gave me that assurance.
9  Q    Did he also discuss with you that that he still had some
10 talking relationship with Cerberus?
11 A    He did.  He said from time to time Cerberus asked him to
12 give his comments or opinions about matters that came to their
13 attention, an I said, "Well, you could do that, but you have to
14 make sure that those matters could have nothing to do with
15 Coram, couldn't be a competitive situation or anything of the
16 sort," and the reason why I gave them -- him that opportunity,
17 although I was mindful of the judge's concerns, was I knew he
18 had a substantial claim against Cerberus, and I didn't want to
19 do anything to prejudice that claim.  I didn't think that was
20 fair on my part.
21     And I knew that if I was going to succeed as a Trustee it
22 was important to have a good relationship, not only with Mr.
23 Crowley, but all of his people.  And that's the style that I
24 use in handling these matters.  Some people don't use that
25 style.  Mr. Levy, for example, uses a very confrontational

Adams - Redirect                                                    70

1           THE COURT: Sustained.
2  BY MR. BRESSLER:
3  Q    What were your views as to the inquiry into the continued
4  possible conflict?
5  A    I instructed you and your colleagues to be very attentive
6  to that issue. I knew of the judge's position, and I had every
7  intention to adhere very closely to that. And if I couldn't
8  take care of the details, I expected you and your associates to
9  do so.
10 Q    Have you seen anything in the documents and unsent drafts
11 that Mr. Levy has shown you that is not consistent with Mr.
12 Crowley's representation to you that he's no longer getting
13 paid by Cerberus?
14 A    I have seen nothing. If I did, I would be upset about it
15 and probably take steps.
16 Q    What is the current level of authority that any of the
17 officers of Coram have to write checks or spend money without
18 your approval?
19 A    I think the level is $50,000. I approve everything above
20 -- from 50,000 up.
21 Q    You don't have to know what services Mr. Crowley may have
22 been claiming monies from Cerberus for to know that he told you
23 they were not for Coram work; is that correct?
24           MR. LEVY: Objection, leading.
25           THE COURT: Overruled, but it could be clarified.

1   If Judge Walrath decides against that, then I'll decide
2 what I want to do. I don't know what that is.
3 Q   Thanks a lot, Mr. Crowley.
4       THE COURT: Any redirect?
5       MR. KIPNES: Very briefly, Your Honor.
6                    REDIRECT EXAMINATION
7 BY MR. KIPNES:
8 Q   Mr. Crowley, would you turn to Equity Committee-8? Equity
9 Committee 8.
10 A   Yes, sir.
11 Q   The exhibit you marked is Equity Committee 8, the May 6,
12 2002 draft. Would you turn to the third page.
13 A   Yes.
14 Q   Let's establish that Mr. Schreiber wrote those words,
15 correct?
16 A   He wrote them.
17 Q   When did you see them?
18 A   Last week Mr. Schreiber showed them to me.
19 Q   What did you say to MR. Schreiber when you read the five
20 lines that appear on the third page of Equity Committee Exhibit
21 8?
22 A   I --
23 Q   A verbatim response it not required.
24 A   -- really --
25 Q   Just what did you tell him?

Crowley - Recross/Levy                                              110

1  A    I was really angry. I -- this is bullshit. I'm sorry. I
2  apologize to the Court.
3  Q    Did you have any conversation at that time with Mr.
4  Schreiber about the accuracy of what appears on that page?
5  A    I did.
6  Q    And what did you say?
7  A    This is absolutely wrong. It's not in context with that
8  meeting. None of this happened. Where in the hell did you get
9  this? And why am I looking at it a year later, an insert that
10 I've never seen before? What is this about?
11 Q    Does Cerberus owe you any money in your view for any work
12 you have done at any time from the date of your birth to now
13 that has anything to do with Coram?
14 A    Not a penny.
15         MR. KIPNES:  No further questions.
16                    RECROSS EXAMINATION
17 BY MR. LEVY:
18 Q    Perhaps I misunderstood you, Mr. Crowley. I thought you
19 had testified that after you wrote the May 6 letter and
20 discussed it and the third page, Page 65, with Mr. Schreiber;
21 is that not your testimony?
22 A    Mr. Levy, I told you I hadn't seen this thing in over a
23 year, that the only time I've seen it since I thought it was
24 thrown away, I sent it to my lawyer. I did Draft Two, was
25 ready to send it. I cooled down the next day, in the trash it

Decision                                                            19

1   THE COURT: Because the ramifications of my decision
2   may have an impact on that.
3       MR. LEVY: Thank you very much, Your Honor.
4       THE COURT: All right?
5       We'll stand adjourned.
6       UNIDENTIFIED ATTORNEY: Thank you, Your Honor.
7       (Recording ends)
8                       *           *           *
9               C E R T I F I C A T I O N
10      I, Betsy Wolfe, certify that the foregoing is a
11  correct transcript from the electronic sound recording of the
12  proceedings in the above-entitled matter.
13
14  *Betsy Wolfe*                    March 9, 2003
15  Betsy Wolfe                      Date
16  J&J COURT TRANSCRIBERS, INC.

# Exhibit B

# MUCH SHELIST

**ATTORNEYS AT LAW**
191 N. WACKER DRIVE
SUITE 1800
CHICAGO, IL 60606.1615

T 312.521.2000
F 312.521.2200

www.muchshelist.com

DIRECT DIAL:
312.521.2699
jward@muchshelist.com

February 21, 2003

**VIA FACSIMILE (212) 593-5955**

Michael Cook
Schulte Roth & Zabel, LLP
900 3rd Avenue
New York, New York 10022



Re:  Coram Healthcare Corp., et al.

Dear Mike:

This is to confirm my telephone conversation with you and Howard Godnick this morning in which you confirmed that you had checked with your client and with the documents in your possession and no version of the letter represented by documents CRX00063-65 or CRX00071-73 was ever received by your client and no copy of that letter or any version of it was received by your client or exists in the Cerberus documents in your possession.

As I informed you, we will be filing a motion to have the unsent drafts returned. It will be filed Monday, because Richard Levy has not yet responded to our request that he agree to return the documents voluntarily.

Sincerely,

John H. Ward

slw

Much Shelist Freed Denenberg Ament & Rubenstein, P.C.

CROWLEYKVN 008470

# Exhibit C

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, Chapter 11  )
Trustee of the              )
Post-Confirmation           )
Bankruptcy Estates of CORAM )
HEALTHCARE CORPORATION, a   )
Delaware Corporation, and   )
of CORAM, INC., a Delaware  )
Corporation,                )
                            )
        Plaintiff,          )
                            )
    vs.                     ) No. 04-1565
                            )
DANIEL D. CROWLEY; DONALD   )
J. AMARAL; WILLIAM J.       )
CASEY; L. PETER SMITH; and  )
SANDRA L. SMOLEY,           )
                            )
        Defendants.         )

The videotaped deposition of SCOTT SCHREIBER, called by Plaintiff, for examination, pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions taken before Stephanie A. Battaglia, CSR and Notary Public in and for the County of DuPage and State of Illinois, at 55 West Monroe Street, Chicago, Illinois, on March 21, 2007, 10:37 a.m.

## Page 2

1  PRESENT:
2      SCHNADER, HARRISON, SEGAL & LEWIS, LLP
       BY:  MR. RICHARD A. BARKASY and
3           MR. BARRY E. BRESSLER
       Woodland Falls Corporate Park
4      220 Lake Drive East, Suite 200
       Cherry Hill, New Jersey 08002-1165
5      (856) 482-5721 / FAX:  (856) 482-6980
       e-mail: rbarkasy@schnader.com
6              bbressler@schnader.com
7      appeared on behalf of Plaintiff Arlin M.
       Adams, Chapter 11 Trustee of Coram Healthcare
8      Corporation and Coram, Inc.;
9  KEKER & VAN NEST, LLP
       BY:  MR. ELLIOT R. PETERS and
10          MR. GARRETT A. LYNCH
       710 Sansome Street
11     San Francisco, California 94111
       (415) 391-5400 / FAX:  (415) 397-7188
12     e-mail: epeters@kvn.com
               glynch@kvn.com
13
       appeared on behalf of Defendant
14     Daniel Crowley.
15  ALSO PRESENT:
16     Mr. Bruce Witty, CLVS
       Thompson Court Reporters

## Page 3

                I N D E X
WITNESS:                                PAGE:
Scott Schreiber                            8

EXAMINATION BY:
Mr. Barkasy                            8, 178
Mr. Peters                            131, 200

                E X H I B I T S
SCHREIBER DEPOSITION EXHIBITS
Exhibit 1    Biography of Scott Schreiber       14
             No Bates Nos.

Exhibit 2    Letter to A. Adams                 22
             from S. Schreiber
             re: Coram Healthcare
             4-2-2002
             Bates No. CROWLEYKVN 014088 -
             Bates No. CROWLEYKVN 014089

Exhibit 3    Letter to M. Cook                  26
             from S. Schreiber
             re: Coram Healthcare
             2-18-2002
             Bates No. CROWLEYKVN 014090 -
             Bates No. CROWLEYKVN 014091

Exhibit 4    E-mail to S. Schreiber             32
             from M. Cook
             re: Crowley
             4-5-2002
             Bates No. CERB 20092

Exhibit 5    Suspension letter of               35
             Agreement
             12-27-2001
             Bates No. CRX 00752

Exhibit 6    E-mail to S. Schreiber             37
             from C. Reid
             re: Proposed Termination
             Agreement
             (Crowley)
             4-10-2002
             Bates No. CROWLEYKVN 001831

## Page 4

             E X H I B I T S (Cont'd):
Exhibit 7    Letter to M. Cook                  38
             from S. Schreiber with
             attached agreement to
             terminate employment agreement
             between D. Crowley and Cerberus
             5-21-2002
             Bates No. CROWLEYKVN 001732 -
             Bates No. CROWLEYKVN 001733

Exhibit 8    Letter to S. Schreiber             41
             from M. Cook
             re: Cerberus Capital Management/
             D. Crowley
             9-20-2002
             Bates No. CROWLEYKVN 000609 -
             Bates No. CROWLEYKVN 000608

Exhibit 9    Letter to Cerberus Capital         43
             Management from S. Schreiber
             9-20-2002
             Bates No. CROWLEYKVN 000607

Exhibit 10   Letter to S. Feinberg              51
             from D. Crowley
             re: Employment Agreement
             8-20-2002
             Bates No. CRX 00816

Exhibit 11   Letter to B. Bressler              53
             from S. Sims
             re: Dan Crowley
             10-18-2002
             Bates No. CROWLEYKVN 014083 -
             Bates No. CROWLEYKVN 014085

Exhibit 12   Letter to S. Schreiber             55
             from B. Bressler
             re: Letter Agreement
             12-24-2002
             No Bates Nos.

Exhibit 13   Letter from B. Bressler            56
             to S. Schreiber
             re: Letter Agreement
             1-7-2003

### Page 161

1  whether or not a lawyer that was an equity committee
2  of Coram represented by a gentleman named Richard
3  Levy?
4       A.   Yes.
5       Q.   And were you aware as of the time that
6  you were negotiating this agreement, Schreiber 13,
7  whether Mr. Levy had on numerous occasions requested
8  that a lawsuit be filed against Steve Feinberg,
9  Dan Crowley, and others?
10      A.   I was well aware of that, yes.
11      Q.   Did you ever discuss that with
12 Mr. Bressler?
13      A.   Yes.
14      Q.   Did you ever discuss that with
15 Arlin Adams?
16      A.   No.
17      Q.   But you discussed it with -- withdrawn.
18           When you discussed it with Mr. Bressler
19 did you understand that Mr. Bressler was speaking on
20 behalf of the Trustee, Mr. Adams?
21      A.   Yes.
22      Q.   Now, under this agreement, under
23 Paragraph 1, is it a fair statement that Mr. Crowley
24 would give up certain claims that he had against Coram

### Page 162

1  for money, but he would receive $2 million from Coram?
2       A.   $2 million, plus releases.
3            MR. BARKASY:  Object.
4  BY MR. PETERS:
5       Q.   And then the next paragraph says that
6  "Dan will release the Trustee," and it goes on to say
7  "And the Trustee and debtors will in turn release Dan
8  from all proposed derivative claims and any other
9  claims arising out of or related to such proposed
10 derivative claims that the Trustee, Coram, any
11 subsidiary, or any committee or entities claiming
12 through them may have against Dan."  Do you see that?
13           And was that a term that you negotiated
14 with Mr. Bressler?
15      A.   Yes.
16      Q.   And was the Trustee, as expressed by
17 Mr. Bressler, willing to give Dan Crowley that broad
18 release?
19      A.   Yes.
20           MR. BARKASY:  Object to form.
21 BY MR. PETERS:
22      Q.   Did you understand that to be, in
23 essence, a promise not to sue Dan Crowley?
24      A.   Yes.

### Page 163

1            MR. BARKASY:  Object to form.
2  BY MR. PETERS:
3       Q.   Is this document -- well, what
4  understanding did you have based upon that language
5  that the promise that was being made to Mr. Crowley in
6  this document with respect to any further lawsuits
7  against him in the future?
8            MR. BARKASY:  Object to form.  There were
9  so many instructions not to answer as to his
10 understanding of things, that I have an objection to
11 questions related to what Mr. Schreiber's
12 understanding was.
13           MR. PETERS:  Let me rephrase it then.
14 BY MR. PETERS:
15      Q.   In this document did Arlin Adams agree
16 not to sue Dan Crowley?
17           MR. BARKASY:  Object to form.  Calls for
18 a legal conclusion on behalf of Mr. Schreiber.
19           THE WITNESS:  I think the letter speaks
20 for itself.
21 BY MR. PETERS:
22      Q.   Was it significant in your negotiations
23 with Mr. Bressler that Arlin Adams agreed to give
24 Dan Crowley the release?

### Page 164

1       A.   Yes.
2       Q.   Did Mr. Bressler agree to do so on behalf
3  of the Trustee?
4       A.   Mr. Bressler, yes, entered into this
5  letter agreement.
6       Q.   Who actually wrote Schreiber 13?
7       A.   Well, I think Mr. Bressler did, actually.
8  In fact, I am pretty certain he did.
9       Q.   And then that signature at the bottom of
10 the second page, that is Arlin Adams' signature?
11      A.   Yes, I understand that is.  I have never
12 seen him sign anything, but I understand that is his
13 signature.
14      Q.   And we are now here today in a lawsuit
15 that Arlin Adams has brought against Dan Crowley?
16      A.   Yes.
17           MR. PETERS:  I am going to turn to a new
18 topic.  Does anybody want to take five minutes or
19 should we keep going?
20           THE WITNESS:  Go.
21           MR. PETERS:  Is that okay with everybody?
22           MR. BARKASY:  Yes.
23 BY MR. PETERS:
24      Q.   I want to ask you some questions about

### Page 165

1  Schreiber 15 and 16.
2     A.   Yes.
3     Q.   First of all, putting aside the question
4  of waiver, did you have any doubt back in February
5  of 2003 that these were both privileged?
6     A.   I had no doubt that these were
7  privileged.
8     Q.   And do you know how they came to be
9  produced to the equity committee?
10    A.   Yes.
11    Q.   Were you personally involved in that
12 document production?
13    A.   No.
14    Q.   Why not?
15    A.   Because on February 12th of '02 I filed
16 five Chapter 11 bankruptcy cases in Chicago and
17 sometime a couple of days later I filed three -- two
18 or three bankruptcy cases in Peoria, Chapter 11 cases.
19 I had two huge mega cases going on simultaneously. I
20 was working 20 hours a day on two Chapter 11s. And
21 the document production request came in, I asked my
22 partners, Mr. Valiulis and Mr. Ward, to please handle
23 this. I just couldn't find the time of day to go
24 home.

### Page 166

1     Q.   And do you have an understanding of what
2  happened and how these documents came to be produced?
3     A.   They produced them, yes.
4     Q.   And did they do so inadvertently?
5     A.   Certainly.
6          MR. BARKASY:  Object to the form.
7  BY MR. PETERS:
8     Q.   Can you explain to us what your
9  understanding is of how they came to be produced?
10         MR. BARKASY:  Object to the form.
11         THE WITNESS:  Mr. Peters, I don't know
12 how they came to be produced. All I know is that they
13 were produced. And when I found out that they were
14 produced I was shocked, floored, humiliated,
15 embarrassed, angry, and I asked my partners how it was
16 that these were produced, and they told me that they
17 produced them by mistake.
18 BY MR. PETERS:
19    Q.   It was a mistake and it shouldn't have
20 happened?
21    A.   It should not have happened.
22    Q.   Did you request of the Trustee that he
23 return those documents?
24    A.   Yes. Well, I didn't, but Mr. Ward did.

### Page 167

1     Q.   Fair enough. Let me rephrase the
2  question.
3          Was a request made to the Trustee to your
4  knowledge that the documents be returned?
5     A.   Yes. I am sorry, I believe it was
6  Mr. Ward, it might have been me, but there was a
7  request made from someone in my firm to return these
8  documents.
9     Q.   What was the response of the equity
10 committee's lawyer, Mr. Levy?
11    A.   No, they would not return the documents.
12         MR. BARKASY:  The questions I didn't
13 object to them, the previous questions were directed
14 towards demand to the Trustee to return the documents,
15 your last question was Mr. Levy's response. So I --
16         MR. PETERS:  You know what -- I think I
17 meant to refer to the equity committee and I misspoke.
18 Let me go back.
19 BY MR. PETERS:
20    Q.   Were requests made by persons at Much,
21 Shelist to the equity committee's lawyers that the
22 documents be returned?
23    A.   Yes.
24    Q.   And what was the response?

### Page 168

1     A.   No, they would not return these
2  documents.
3     Q.   Did you -- were any discussions had with
4  counsel for the Trustee about whether they would agree
5  to return the documents?
6     A.   I believe there were those discussions.
7     Q.   What do you recall about those
8  discussions?
9     A.   Just recall that there were discussions
10 and the Trustee's counsel agreed to return the
11 documents.
12    Q.   Did the Trustee's counsel ever express to
13 you an opinion about whether or not those documents
14 were privileged?
15         MR. BARKASY:  Object to form.
16         THE WITNESS:  I really don't recall.
17 BY MR. PETERS:
18    Q.   Do you recall discussing this issue with
19 Mr. Bressler?
20         MR. BARKASY:  Object to form.
21         THE WITNESS:  No. I just don't recall.
22 BY MR. PETERS:
23    Q.   Was a motion prepared for the return of
24 these documents?

### Page 173

1  this was discovered, and whether or not -- and I don't
2  recall whether that conversation also included whether
3  or not a motion like this should be filed.
4  BY MR. PETERS:
5      Q.  Do you recall either Mr. Bressler or
6  Mr. Kipnes suggesting to you that from a tactical
7  standpoint in light of the upcoming motion hearing it
8  would be a good idea not to file this motion?
9          MR. BARKASY:  Objection to form.
10 BY MR. PETERS:
11     Q.  And that it would just create more
12 problems than it would solve?
13         MR. BARKASY:  Object to form, no
14 foundation.
15         THE WITNESS:  You know, I can't recall
16 specifically.
17         I will tell you that everything we did in
18 connection to this matter was done in lockstep with
19 the Trustee's counsel.  But can I recall specific
20 conversation, no.
21         But I will tell you that everything from
22 the pleadings on the termination pay to this motion to
23 the hearing was done where we were in lockstep with
24 them and subordinate to them.

### Page 174

1  BY MR. PETERS:
2      Q.  So based on your recollection of the
3  working relationship that you had with the Trustee's
4  counsel during this time period, do you have an
5  understanding of whether you would have made a
6  decision not to file this motion for return of the
7  privileged documents without first consulting
8  Mr. Bressler and Mr. Kipnes?
9          MR. BARKASY:  Objection to form of the
10 question.
11         THE WITNESS:  I am certain we consulted
12 with Mr. Bressler and Mr. Kipnes before we made a
13 decision whether or not to file this motion, and I am
14 certain that their opinion on that decision influenced
15 our ultimate decision.
16 BY MR. PETERS:
17     Q.  And when you say our ultimate decision,
18 you are referring to yourself and your partners at
19 Much, Shelist?
20     A.  Correct.
21         If we did not file this motion it was
22 because we did not think that they would support this
23 and they believed it was good that we didn't file this
24 motion.  If we did file this motion it was because

### Page 175

1  they believed we should file this motion.
2      Q.  Now, the subpoena in connection with
3  which these privileged documents were produced, was
4  that served specifically in connection with this
5  hearing to approve the agreements,
6  Schreiber 12 and 13?
7      A.  Yes.
8          I don't know if it was ultimately served
9  that way or if it was narrowed down through subsequent
10 conversations that Trustee's counsel, we Cerberus, and
11 equity committee counsel all subsequently had.
12     Q.  And did you ever discuss with the
13 Trustee's counsel whether you had a commonality of
14 interest with the Trustee with respect to this
15 March 3rd hearing?
16     A.  I am not sure that we ever used those
17 exact words, but we all agreed that we had a common
18 interest in the outcome of this hearing and no one
19 party would go it alone.
20     Q.  And at the hearing did the lawyers for
21 the Trustee, meaning Mr. Bressler, Mr. Kipnes, did
22 they take the lead at the hearing?
23         MR. BARKASY:  Objection to form.
24         THE WITNESS:  Yes.

### Page 176

1          They not only took the lead, they ran the
2  show.  And whether they told me -- they never told me
3  directly, but it was very clear that this was their
4  show, this was their hearing.  My client wasn't -- my
5  client was just tangentially affected.  This was their
6  motion.  This wasn't my client's motion.
7  BY MR. PETERS:
8      Q.  Mr. Crowley, we can see from the
9  transcript, testified at the hearing.
10         Was he prepared to testify at the hearing
11 by any lawyers?
12     A.  Yes.
13     Q.  By whom?
14     A.  By Mr. Ward, Mr. Bressler -- I don't know
15 if it was Mr. Bressler or Mr. Kipnes, but -- I guess
16 Mr. Bressler is shaking his head, it must have been
17 Mr. Kipnes, and Mr. Ward and I prepared Mr. Crowley
18 before the hearing.
19     Q.  In those meetings -- withdrawn.
20         How long did those meetings last in which
21 Mr. Crowley was prepared to testify?
22     A.  Not as long as this deposition, but it
23 was a large part of a day.
24     Q.  Who took the lead in those meetings?

## Page 201

1 that you had always acted in the best interests of
2 Mr. Crowley. Do you recall that?
3    A.   Yes.
4    Q.   And is it a fair statement that what you
5 mean by that is you always intended to act in the best
6 interests of Mr. Crowley?
7    A.   Yes.
8    Q.   But if a mistake was made that might have
9 harmed Mr. Crowley that would be unintentional but
10 that might have happened?
11        MR. BARKASY: Object, leading.
12        THE WITNESS: A mistake by its nature is
13 unintentional. I never intended to do anything that
14 would hurt Mr. Crowley.
15        MR. PETERS: I have nothing further.
16        MR. BARKASY: I don't have anything
17 further at this time.
18        I of course reserve rights with regard to
19 the numerous instructions not to answer.
20        THE VIDEOGRAPHER: This marks the end of
21 Tape 3, Volume 1, in the deposition of Scott
22 Schreiber.
23        Going off the record at 5:22 p.m.
24        MS. REPORTER: Signature?

## Page 202

1        MR. PETERS: We will reserve signature.
2   (WHICH WERE ALL OF THE PROCEEDINGS HAD OR
3    TAKEN PLACE IN THE ABOVE-ENTITLED MATTER.)

## Page 203

            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, Chapter 11      )
Trustee of the                  )
Post-Confirmation               )
Bankruptcy Estates of CORAM     )
HEALTHCARE CORPORATION, a       )
Delaware Corporation, and       )
of CORAM, INC., a Delaware      )
Corporation,                    )
                                )
        Plaintiff,               )
                                )
    vs.                          ) No. 04-1565
                                )
DANIEL D. CROWLEY; DONALD        )
J. AMARAL; WILLIAM J.            )
CASEY; L. PETER SMITH; and       )
SANDRA L. SMOLEY,                )
                                )
        Defendants.              )

    I, SCOTT SCHREIBER, being first duly sworn,
on oath say that I am the deponent in the aforesaid
deposition taken on March 21, 2007; that I have read
the foregoing transcript of my deposition, consisting
of pages No. 1 through No. 203, inclusive, and affix
my signature to same.
                            ------------------------
                                SCOTT SCHREIBER
Subscribed and sworn to
before me this    day of
                   , 2007

Notary Public

## Page 204

STATE OF ILLINOIS)
                 ) SS.
COUNTY OF DUPAGE )

    I, STEPHANIE A. BATTAGLIA, CSR and Notary
Public in and for the County of DuPage and State of
Illinois, do hereby certify that on the 21st of March,
2007, at 10:37 a.m., at 55 West Monroe Street,
Chicago, Illinois, the deponent SCOTT SCHREIBER
personally appeared before me.
    I further certify that the said SCOTT
SCHREIBER was by me first duly sworn to testify and
that the foregoing is a true record of the testimony
given by the witness.
    I further certify that the deposition was
terminated at 5:22 p.m.
    I further certify that I am not counsel for
nor related to any of the parties herein, nor am I
interested in the outcome hereof.
    In witness whereof, I have hereunto set my
hand and seal of office this _____ of March, 2007.

                            Notary Public
CSR No. 084-003337 - Expiration Date: May 31, 2007.

# Exhibit D

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:

CORAM HEALTHCARE CORP. and
CORAM, INC.,
        Debtors.

Chapter 11
Case No. 00-3299 (MFW)
and Case No. 00-3300 (MFW)

Jointly Administered

### AFFIDAVIT OF DANIEL CROWLEY

Daniel Crowley, on oath, states as follows:

1. The two draft letters dated May 6 and May 8, 2002, which are numbered CRX00063 to CRX00065 and CRX00071 to CRX00073 were drafts prepared by me and submitted to my attorneys for legal advice.

2. Although the May 8 draft was signed by me, I submitted it to my attorneys for further legal advice before deciding whether to mail it. This is my not infrequent practice when dealing with legal matters.

3. Thereafter, I decided not to mail the letter and, to the best of my knowledge, neither it nor any version of it was ever sent or revealed to the addressee or anyone else other than my attorneys.

4. I never intended that these documents be produced or otherwise disclosed.

5. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 18, 2003

_____
DANIEL CROWLEY

