# Exhibit E

```
MODE = MEMORY TRANSMISSION          START=FEB-21 14:04      END=FEB-21 14:07

     FILE NO.=806

STN    COMM.   ONE-TOUCH/   STATION NAME/EMAIL ADDRESS/TELEPHONE NO.   PAGES   DURATION
NO.            ABBR NO.

001            ☒            13027774224                                        00:02:09
```

                              -MUCH SHELIST FDA      -

************************** -MUCH SHELIST   - ***** -     561121- *********

# M U C H   S H E L I S T

ATTORNEYS AT LAW
191 N. WACKER DRIVE
SUITE 1800
CHICAGO, ILLINOIS 60606,1615

T 312.521.2000
F 312.521.2355

www.muchshelist.com

## FACSIMILE TRANSMITTAL FORM

**DATE:**              February 21, 2003

**TO:**                Richard H. Cross, Jr.

**FIRM:**              Law Office of Richard H. Cross, Jr. LLC

**FAX NUMBER:**        302-777-4224

**RECIPIENT'S PHONE:** 304-777-4200

**FROM:**              William M. Aguiar

**NO. OF PAGES:**

                       (Including Cover Sheet)

PLEASE CALL (312) 521-2134 IF YOU DO NOT RECEIVE ALL OF THE PAGES.

CLIENT NUMBER.MATTER NUMBER   0001714.0001
EQUITRAC BILLING NUMBER/CODE   377

**MESSAGE:**

**Rick,**

     Here is the Motion I told you about. I will let you know if it is being filed today or Monday.

                       Thanks,

PLEASE RETURN FAX CONFIRMATION TO: 



**WARNING:**  This telecopier transmittal may contain confidential or privileged information intended only for the use of the individual or entity named on this cover sheet. If you are not the intended recipient, please understand that any disclosure, copying, distribution, or use of the contents of this transmittal is strictly prohibited. If you have received this transmittal in error, please notify us by telephone immediately so we can arrange for retrieval of the original documents at no cost to you. Thank you.

# MUCH SHELIST

ATTORNEYS AT LAW
191 N. WACKER DRIVE
SUITE 1800
CHICAGO, ILLINOIS 60606-1615

T 312.521.2000
F 312.521.2355

www.muchshelist.com

## FACSIMILE TRANSMITTAL FORM

**DATE:** February 21, 2003

**TO:** Richard H. Cross, Jr.

**FIRM:** Law Office of Richard H. Cross, Jr. LLC

**FAX NUMBER:** 302-777-4224

**RECIPIENT'S PHONE:** 304-777-4200

**FROM:** William M. Aguiar

**NO. OF PAGES:** 8

(Including Cover Sheet)

PLEASE CALL (312) 521-2134 IF YOU DO NOT RECEIVE ALL OF THE PAGES.

CLIENT NUMBER.MATTER NUMBER  0001714.0001
EQUITRAC BILLING NUMBER/CODE  377

**MESSAGE:**

**Rick,**

**Here is the Motion I told you about. I will let you know if it is being filed today or Monday.**

**Thanks,**

PLEASE RETURN FAX CONFIRMATION TO:  <u>William M. Aguiar</u>

<u>WARNING:</u>  This telecopier transmittal may contain confidential or privileged information intended only for the use of the individual or entity named on this cover sheet. If you are not the intended recipient, please understand that any disclosure, copying, distribution, or use of the contents of this transmittal is strictly prohibited. If you have received this transmittal in error, please notify us by telephone immediately so we can arrange for retrieval of the original documents at no cost to you. Thank you.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:

CORAM HEALTHCARE CORP. and
CORAM, INC.,

Debtors.

Chapter 11
Case No. 00-3299 (MFW)
and Case No. 00-3300 (MFW)

Jointly Administered

## CROWLEY'S EMERGENCY MOTION TO COMPEL RETURN OF INADVERTENTLY PRODUCED DOCUMENTS

Daniel Crowley, by his attorneys, moves this Court to compel the Shareholders Committee

and its counsel to return certain attorney client privileged documents that were inadvertently

produced in the document production by Crowley to the Committee. In support of his motion,

Crowley states as follows:

1.      Daniel Crowley is an individual who is the subject of pending motions to terminate

his current employment as CEO of the Debtor and either to engage him as Chief Transition Officer

(Trustee's Motion) or to force him to forfeit certain compensation and to take nothing for three

years of work that has benefited Debtor immensely (Committee Motion),

2.      In accordance with Committee's Request for the Production of Documents,

Crowley reviewed his files and had his attorneys review their files for documents that were

responsive. Crowley's goal was to produce as much as possible, holding back nothing that was

not privileged.

3.      Crowley's attorneys withheld some documents for privilege, and redacted

privileged material (principally attorney notes) from others. A total of 1,635 documents was

Bate-stamped and produced, out of a significantly larger mass of materials that was reviewed.

Most of the documents not produced were outside the scope of the demand, as modified by

Committee Counsel, in that they were outside the limited date range (after 12/21/2001) and had

already been produced if previously requested. Nevertheless, the larger group had to be reviewed.

4       The only documents at issue are two three page drafts, dated May 6 and May 8, 2002, of the same letter – a letter which was never sent to anyone other than Crowley's attorneys. They are numbered CRX00063 to CRX00065 ("May 6 draft") and CRX 00071 to CRX 00073 ("May 8 Draft"). Copies of these documents will be submitted to the Court in a sealed envelope along with this motion, so that the Court may elect to review or not review the documents as it finds appropriate.

5.      The documents were inadvertently produced because, in performing the document review in preparation for production, two of Crowley's senior attorneys separately determined the two documents in question should be produced because the May 8 draft had Crowley's signature, and bore a handwritten salutation. Thus it appeared to be the law firm's indicated "cc" of a letter actually sent to a party outside the protection of the attorney client privilege. The May 6 draft was clearly a draft of the same letter and would itself be producible as a draft of a producible letter.

6.      Certain handwritten notes by another attorney at Crowley's law firm who was also involved in rendering legal advice to Crowley were redacted. These notes appeared to consist of attorney communications to Crowley or the attorney's work product comments on the supposedly sent letter. (Both documents contained such notes by Crowley's other attorney. As there were no clean copies, these notes had to be redacted to allow for production of what was then mistakenly thought to be the unprivileged underlying letter and draft.)

7.      The documents were produced on February 16-17 through a commercial copy service. On the afternoon of February 17, Crowley was discussing with his attorneys the various documents that had been produced when it suddenly became evident that a misunderstanding had

occurred. The May 8 draft, although signed and bearing a salutation in Crowley's handwriting, had never been sent to the named recipient or to anyone else. Instead, both the May 6 and May 8 drafts had been prepared by Crowley and sent for legal comment only to Crowley's attorney, whose notes on them had been redacted.

8.　　Thus, contrary to the good faith belief of the reviewing attorneys, these documents did not represent a letter sent and a draft of that letter. They instead represented two versions of a proposed letter that was never sent to anyone outside the ambit of the attorney client privilege.

9.　　Immediately upon discovering that the draft letters should not have been produced, Crowley's attorneys were instructed to and did contact the attorneys for The Equity Committee and for the Trustee (the two parties who received copies of the production) in order to explain the error and to request return of all copies of the two documents. In the early evening of February 17, a voice message was left with Richard Levy, representing the Equity Committee. A follow up call was made the next morning. A phone conversation was had with Barry Bressler, attorney for the Trustee on the evening of February 17. Mr. Bressler agreed to the requested return; Levy refused.

10.　　Because the request for return was made as quickly as possible after the error was discovered, and because the production was clearly and truly inadvertent, based on a reasonable misapprehension of the nature of the May 8 draft as a draft rather than a sent letter, the law requires that the recipients return the two documents and that they be excluded from direct and indirect use in future discovery and hearings in this case. This result is required under the laws of both Delaware (the place of the hearing and where the bankruptcy case is pending) and Illinois (the place where the production to Mr. Levy was actually made).

11.　　Delaware and Illinois both adhere to the intent analysis of inadvertent production,

which requires return of the documents here. *Helman v. Murry's Steaks, Inc.*, 728 F.Supp 1099-1104 (D.Del. 1990); *Mendenhall v. Barber-Greene Co.*, 531 F.Supp. 951, 954-5 (N.D.Ill. 1982) Crowley never intended to produce these two documents, which had never been disclosed to anyone beyond his attorneys. Nor did his attorneys intend to produce drafts of proposed letters never sent to anyone except to Crowley's own lawyers for legal analysis. They only released the documents because of their mistaken belief that the May 8 draft had been mailed to the addressee. As the Court in *Mendenhall* wrote: "if we are serious about the attorney-client privilege and the client's welfare, we should require more than . . . negligence by counsel before the client can be deemed to have given up the privilege." [*Mendenhall*, 531 F.Supp. at 954-5] Crowley never intended to waive anything and the documents must therefore be returned. [See Exhibit "A", Crowley Affidavit].

12.    Moreover, In *Berg Electronics, Inc. v. Molex, Inc.*, 875 F.Supp 261, (D.Del 1995), District Judge McKelvie analyzed the various approaches to the inadvertent production paradigm and confirmed that Delaware law did indeed dictate return of inadvertently produced materials. The materials in *Berg* had been marked for non-production but the markers had been carelessly dislodged and the documents were produced. The error was not discovered until the documents were actually used by the other side in a deposition. Only then did the defendant ask for their return and, when refused, move for an order.

13.    Here, Crowley has been far more diligent than the movant in *Berg*. Instead of doing nothing until after the documents were used in a deposition, Crowley has sought their return immediately after learning of the mistake -- and on the day after they were sent out for production.

14.    Basic equity and fairness also require the return of these materials to Crowley. *See generally, Sanner v. The Board of Trade of the City of Chicago*, 181 F.R.D. 374, 379 (N.D. Ill.

1998) (fairness is a factor to be considered in determining the proper consequences of an inadvertent disclosure).   Here, Crowley bent over backward to seek proper advice, even submitting the signed version (the May 8 Draft) to his attorneys for a last review -- after which he elected not to send the letter at all.   It would be unfair to penalize him because that exercise of prudence happened to leave a signed but never sent copy in the files, which would later mislead other attorneys into inadvertent production.   Thus both documents, but particularly the unsigned version, should be returned.

15.    The Committee will not suffer any hardship or be prejudiced if this motion is granted.   As stated above, almost no time has passed since the inadvertent production.   Moreover, the documents can have no relevance or probative value as they were never sent to anyone and represent nothing more than Crowley's inadmissible stream of consciousness submitted to an attorney for advice.


WHEREFORE, Crowley respectfully requests this Court

A) to order the Committee and its counsel and the Trustee and his counsel

(i) to immediately return to Crowley's counsel all existing copies in their possession of Documents bearing production numbers CRX 00063 to CRX 00065 and CRX 00071 to CRX 00073,

(ii) to immediately retrieve and return to Crowley all copies of those documents that have been given to anyone else for any reason whatsoever;

(iii) to destroy any summaries, abstracts or notes they may have made based on those documents; and

(iiii) to refrain from questioning about or alluding to those documents in any discovery or hearing

in this case or elsewhere; and

B) to grant such other and further relief as may be just.


Date:  February 21, 2003                    Respectfully submitted,

                                            DANIEL CROWLEY,  Movant


                                            By:_____
                                                One of His Attorneys


Richard H. Cross, Jr.
Law Office of Richard H. Cross, Jr., LLC
1201 North Orange Street, Suite 610
Wilmington, DE  19801

Scott N. Schreiber
Anthony C. Valiulis #2883007
John H. Ward #2939924
MUCH SHELIST FREED DENENBERG
   AMENT & RUBENSTEIN, P.C.
191 North Wacker Drive
Suite 1800
Chicago, Illinois  60606
(312) 521-2691

**CORAM HEALTHCARE CORP.,** *et al.*
Service List

| | |
|---|---|
| Michael E. Swartz, Esquire<br>Carol Morrison, Esquire<br>Schulte Roth & Zabel, LLP<br>919 Third Avenue<br>New York, NY 10022<br>michael.swartz@srz.com<br>Counsel for Cerberus Partners, L.P. | Don Beskrone, Esquire<br>Office of the United States Trustee<br>844 N. King Street, Room 2313<br>Lockbox 35<br>Wilmington, DE 19801-3519<br>don.a.beskrone@usdoj.gov<br>Counsel for the United States Trustee |
| Barry E. Bressler, Esquire<br>Wilbur L. Kipnes, Esquire<br>Schnader, Harrison, Segal & Lewis LLP<br>1600 Market Street, Suite 3600<br>Philadelphia, PA 19103-7286<br>bbressler@schnader.com<br>wkipnes@schander.com<br>Counsel for the Chapter 11 Trustee | Alan B. Miller<br>John A. Neuwirth, Esquire<br>Weil, Gotshal & Manges, LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>alan.miller@weil.com<br>john.neuwirth@weil.com<br>Counsel for the Noteholders |
| Matthew P. Heiskell, Esquire<br>Beatie and Osborn LLP<br>34th Floor<br>521 Fifth Avenue.<br>New York, NY 10175<br>mheiskell@bandolaw.com<br>Counsel for Stephen Feinberg | Mark Minuti<br>Jeremy W. Ryan<br>Saul Ewing LLP<br>222 Delaware Avenue, Suite 1200<br>P.O. Box 1266<br>Wilmington, DE 19899 |
| Laura Davis Jones, Esquire<br>Rachel S. Lowy, Esquire<br>Pachulski, Stang, Ziehl, Young<br>& Jones P.C.<br>919 Market Street, 16th Floor<br>P.O. Box 8705<br>Wilmington, DE 19899-8705<br>Counsel to Debtors | Theodore Gewertz, Esquire<br>Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, NY 10019<br>Creditors' Committee |
| David M. Friedman, Esquire<br>Adam L. Shiff, Esquire<br>Kasowitz, Benson, Torres & Friedman<br>1633 Broadway<br>New York, NY 10019-6022<br>Counsel to Debtors | Richard Levy<br>Jenner & Block, LLC<br>One IBM Plaza<br>Chicago, IL 60611<br>Counsel for the Official Committee of Equity Security<br>Holders |

424914v1

# Exhibit F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARLIN M. ADAMS, as Chapter 11 Trustee of the Bankruptcy Estates of Coram Healthcare Corp., a Delaware Corporation, and Coram, Inc., a Delaware Corporation, | :   Case No. 04-1565(SLR)<br>:   (Jointly Administered)<br>: |
| Plaintiff, | : |
| v. | : |
| DANIEL D. CROWLEY, | : |
| Defendant. | : |

### THE CHAPTER 11 TRUSTEE'S ANSWERS TO
### DEFENDANT DANIEL D. CROWLEY'S FIRST SET OF
### INTERROGATORIES TO PLAINTIFF ARLIN M. ADAMS

Plaintiff Arlin M. Adams, the Chapter 11 Trustee (the "Trustee") of the

Bankruptcy Estates of Coram Healthcare Corp. and Coram, Inc. (collectively, "Coram"), hereby

responds to Defendant Daniel D. Crowley's ("Crowley") First Set of Interrogatories to Plaintiff

Arlin M. Adams, as follows:

### GENERAL OBJECTIONS

The Trustee asserts the following general objections, all of which are incorporated

in his specific responses:

      1.     The Trustee objects to each interrogatory, definition and instruction, to the

extent that it seeks to impose an obligation or burden beyond that required by the Federal Rules

of Civil Procedure.

CHDATA 38155_1

2.    The Trustee objects to each interrogatory to the extent that it seeks information subject to the attorney client privilege, or the work product doctrine, or any other privilege or doctrine which precludes discovery.

3.    The Trustee objects to each interrogatory to the extent that responding would impose an undue burden on the Trustee.

4.    The Trustee objects to each interrogatory to the extent that the information requested is equally available to Crowley.

5.    The Trustee objects to each interrogatory to the extent it seeks information not relevant to this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

## PRESERVATION OF RIGHTS

The Trustee's responses do not waive and do not intend to waive but, on the contrary, preserve and intend to preserve:

1.    All objections as to competency, relevancy, materiality, privilege and admissibility for any purpose in any subsequent proceeding or the trial of this or any other actions;

2.    The right to object on any ground to the use of any of these responses, or the subject matter thereof, in any subsequent proceeding or trial of this or any other actions;

3.    The right to object at any time to a demand for further responses to these or any other discovery requests involving or relating to the subject matter of these interrogatories; and

4.    The right at any time to revise, correct, supplement, clarify or amend the answers and responses set forth herein.

2

CHDATA 38155_1

## RESPONSES TO INTERROGATORIES

1.     Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley had a conflict of interest with Coram.

**SPECIFIC OBJECTIONS:** The Trustee objects to Interrogatory No. 1 on the grounds that it contains undefined terms, is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe every act Crowley undertook or failed to undertake over a several-year period that underlies the Trustee's allegations that he had a conflict of interest.  Subject to these objections, the Trustee will provide a combined response to Interrogatories 1 through 4.

2.     Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley breached his duty to Coram to act in good faith.

**SPECIFIC OBJECTIONS:**  The Trustee objects to Interrogatory No. 2 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe every act Crowley undertook or failed to undertake over a several-year period that underlies the Trustee's allegations that he breached his duty to Coram to act in good faith.  Subject to these objections, the Trustee will provide a combined response to Interrogatories 1 through 4.

3.     Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley breached his duty to Coram to act with due care.

**SPECIFIC OBJECTIONS:**  The Trustee objects to Interrogatory No. 3 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to

3

CHDATA 38155_1

identify and describe every act Crowley undertook or failed to undertake over a several-year period that underlies the Trustee's allegations that he breached his duty to Coram to act with due care. Subject to these objections, the Trustee will provide a combined response to Interrogatories 1 through 4.

4.    Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley breached his duty of loyalty to Coram.

SPECIFIC OBJECTIONS:  The Trustee objects to Interrogatory No. 4 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe every act Crowley undertook or failed to undertake over a several-year period that underlies the Trustee's allegations that he had a breached his duty of loyalty to Coram. Subject to these objections, the Trustee will provide a combined response to Interrogatories 1 through 4.

COMBINED RESPONSE TO INTERROGATORIES 1 THROUGH 4:

Subject to and without waiving the foregoing objections, the Trustee responds to Interrogatories 1 through 4 by setting forth this summary of facts, which form the basis of his allegations that Crowley had a conflict of interest and breached the triad of fiduciary duties that he owed to Coram as an officer and director:

From approximately 1997 on, Cerberus Partners, L.P. ("Cerberus"), together with Goldman Sachs Credit Partners L.P., and Wells Fargo Foothill (collectively, the "Noteholders"), owned substantially all of Coram's debt. Cerberus is a major investor in the debt of numerous distressed companies; it alone held approximately 36% of Coram's debt. The chairman of

4

CHDATA 38155_1

Cerberus, Stephen Feinberg ("Feinberg"), sat on Coram's Board from 1998 until July 2000, shortly before Coram filed for bankruptcy. Cerberus maintained a "bench" of CEO consultants, who were available to work for Cerberus with troubled companies on a project-by-project basis.

In early 1999, Cerberus retained Crowley as a turnaround consultant. In July 1999, Crowley and Cerberus entered into an oral agreement under which Crowley agreed to work exclusively for Cerberus for three years at a salary of $80,000 per month plus expenses, with the possibility of substantial bonuses.

In August 1999, after Crowley and Cerberus had entered into their oral agreement Feinberg recommended to Coram's Board of Directors (the "Board") that it hire Crowley as a consultant to work with Coram's newly-elevated CEO, Richard Smith ("Smith"). Feinberg disclosed to the directors that Crowley had a relationship with Cerberus, but provided no information about that relationship.

After Smith left Coram in October 1999, Crowley wrote to Coram Chairman Donald Amaral ("Amaral"), on October 26, 1999. In that letter, Crowley stated that he and Smith had a "six(6) month crisis management contract in place," and that he "would like to help you [Amaral] with this project and begin the restructuring process." Crowley and Amaral began negotiations on an employment agreement no later than early November 1999.

At the same time as he was negotiating with Amaral to be Coram's CEO, Crowley sent a "Personal & Confidential" letter dated November 12, 1999 to Feinberg stating that "[y]ou [Feinberg] have asked me to take over the Coram operations" and requesting additional compensation from Cerberus to induce him to become CEO of Coram.

CHDATA 38155_1

The Noteholders offered Coram a six-month interest accrual holiday if Crowley was hired as CEO. On November 15, 1999, Amaral and the Noteholders agreed on the terms of the interest forbearance agreement.

On November 17, 1999, the Board approved a three-year employment agreement with Crowley, which he signed the next day (the "Crowley/Coram Employment Agreement"). The Crowley/Coram Employment Agreement provided for a base salary of $650,000, benefits, potential bonuses of between $390,000 and $1,950,000 depending on Coram's EBITDA, a minimum 24-month severance period, options to purchase one million shares of Coram stock at then market rates, and an acquisition bonus upon change in control.

The day after he signed the Crowley/Coram Employment Agreement, Crowley executed a written employment agreement with Cerberus, effective August 1, 1999, which memorialized the terms of their July oral agreement (the "Crowley/Cerberus Employment Agreement"). The Crowley/Cerberus Employment Agreement required Crowley to devote "his entire business time, attention, skill and energy exclusively to the business of [Cerberus]" by performing duties to be assigned by Feinberg. The Crowley/Cerberus Employment Agreement also provided that Cerberus could terminate Crowley for cause if Crowley did not follow Cerberus' reasonable instructions. Neither Crowley nor Feinberg disclosed to the Board the existence or terms of the Crowley/Cerberus Employment Agreement.

Coram's corporate policy provided that actual conflicts of interest must be avoided and that any action creating a potential conflict of interest must be disclosed and approved in advance. Crowley failed to seek Board approval of his employment contract with Cerberus.

CHDATA 38155_1

Crowley signed the management letter to Coram's outside auditors for the year ending December 31, 1999, in which he stated that "[t]here are no instances where any officer or employee of [Coram] has an interest in a company, with which [Coram] does business that would be considered a 'conflict of interest,' that has not been disclosed or waived.  Such an interest would be contrary to [Coram] policy."

Coram retained Crowley's wholly-owned consulting company, Dynamic ("Dynamic") Health Care Solutions, L.L.C. ("Dynamic"), to act as a consultant to Coram, which paid fees to Dynamic in excess of $1 million.

On February 28, 2000, Crowley wrote to the Board and demanded additional compensation from Coram, claiming that he was working 19-hour days, and that "Coram will take longer, involve more, and will need me to stay 'on task' for much longer than we envisioned when I said 'Yes.'"  Crowley did not disclose to the Board that while he was allegedly working 19-hour days for Coram, Cerberus was paying him $80,000 per month.

In response to Crowley's demand for additional compensation from Coram, Feinberg and Crowley negotiated an amendment to the Crowley/Coram Employment Agreement with Coram, which was executed as of April 6, 2000.  The amendment provided a new bonus structure that was far greater than the maximum $1.9 million bonus for which Crowley was eligible under the employment agreement that he had signed just four months earlier.  Under the new arrangement, Crowley could claim a bonus of up to 25% of the amount by which Coram's EBITDA for 2000 exceeded $14 million and an additional $5 million bonus if EBITDA exceeded $35 million.

7

At the time Crowley and Feinberg were negotiating the amendment to the Crowley/Coram Employment Agreement, Crowley anticipated that Coram would be restructured by filing a bankruptcy petition under Chapter 11 with a proposed plan of reorganization that would eliminate the public shareholders without any payment to them. Nevertheless, between November 30, 1999 and July 31, 2000, Crowley caused Coram to pay the Noteholders approximately $60 million. These payments included: (a) much of the proceeds from Coram's July 2000 sale of its specialty pharmacy division, Coram Prescription Services ("CPS") (nearly $40 million); and (b) an additional $6.3 million payment that Crowley made to the Noteholders just three weeks before Coram declared bankruptcy.

Although the CPS division was losing a small amount of money, it had excellent long-term profit potential. CPS had been valued in excess of $100 million by Coram's investment bankers, but was sold for approximately $40 million.

On August 8, 2000, Coram filed a Chapter 11 petition in the U.S. Bankruptcy Court for the District of Delaware, together with a proposed plan of reorganization (the "First Plan"). The First Plan provided for the cancellation of all of the shareholders' interests and for the issuance of all of the new Coram stock to the Noteholders. Coram's other unsecured creditors would receive $2 million and Coram's shareholders would receive nothing.

On October 18, 2000, the United States Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee") to represent the interests of Coram's common shareholders. The Equity Committee obtained the Crowley/Cerberus Employment Agreement and other documents in discovery in connection with the First Plan, which the Equity Committee opposed.

8

CHDATA 38155_1

During the confirmation hearing, Crowley testified that the Crowley/Cerberus Employment Agreement -- which provided for payments significantly greater than did his agreement with Coram -- had nothing to do with Coram. The Court did not find Crowley's position credible. Rather, on December 21, 2000, the Bankruptcy Court denied confirmation, holding that Coram had not proposed its reorganization plan in good faith as required under the Bankruptcy Code. In its oral ruling, the Bankruptcy Court explained that it could not confirm the plan because Crowley "had an actual conflict of interest" by virtue of his contractual relationship with Cerberus. Op. 12/21/00, at 89. The Bankruptcy Court found that that actual conflict of interest "tainted the debtors' restructuring of its debt, the debtors' negotiations towards a plan, even the debtors' restructuring of its operations." *Id.* at 88. As a result of Crowley's relationship with Cerberus, Coram did not emerge from bankruptcy in December 2000.

Despite the Bankruptcy Court's ruling, Crowley did not terminate his relationship with Cerberus. In fact, Crowley continued to be paid $80,000 per month by Cerberus throughout 2001.

The Board formed a Special Committee, which retained Harrison J. Goldin Associates, L.L.C. ("Goldin"), as a restructuring advisor. In a report of its investigation, Goldin concluded that Crowley should have disclosed the full extent of his employment agreement with Cerberus and that his failure to do so was a breach of his fiduciary duties to Coram. Goldin also concluded that Crowley had advanced Cerberus' interests at Coram's expense by making cash payments to the Noteholders prior to Coram's filing for bankruptcy. In addition, Goldin determined that, as of the date of his report, Crowley's conflict had caused Coram to incur at least $12 to $15 million in business losses and professional fees in the bankruptcy proceedings.

9

CHDATA 38155_1

Coram based its second proposed plan of reorganization (the "Second Plan") on Goldin's report. The Second Plan again provided for the cancellation of all shareholders' interests and for the issuance of new Coram stock to the Noteholders, including Cerberus. Coram's shareholders would receive $10 million if they voted to approve the plan. Coram's other unsecured creditors would receive $3 million, amounting to less than 40% of their claims. In addition, the Second Plan provided that Crowley's compensation be reduced by $7.5 million as recommended by Goldin.

During the confirmation hearing on the Second Plan, Crowley testified that Cerberus was not paying him for his work at Coram, but instead for his work on non-Coram matters. Again, the Bankruptcy Court rejected Crowley's testimony as not credible. Op. 12/21/01, at 16-17.

On December 21, 2001, the Bankruptcy Court issued a written opinion denying confirmation. The Bankruptcy Court concluded that Crowley's agreement with Cerberus continued to present an actual conflict of interest. As the Bankruptcy Court put it, "[n]othing, in fact, has changed since the first confirmation hearing." Op.12/21/01, at 13. The Bankruptcy Court explained that:

> Crowley's actual conflict of interest goes beyond the mere appearance of impropriety. Crowley cannot serve the interests of both the Debtors and a large creditor, Cerberus. Under the Consulting Agreement, Cerberus has the discretion to fire Crowley if he fails to follow its instructions, resulting in the loss of $1 million per year in compensation to Crowley. That control over Crowley, and indirectly the Debtors, is simply not proper.

10

CHDATA 38155_1

Op. 12/21/01, at 15. The Bankruptcy Court concluded that "the conflict in this case transcends every single thing Crowley does on behalf of the Debtors." Op. 12/21/01, at 24. As a result of Crowley's relationship with Cerberus, Coram did not emerge from bankruptcy in December 2001.

Following the rejection of the Second Plan, the Bankruptcy Court entered an order appointing the plaintiff Arlin M. Adams as Coram's Chapter 11 Trustee. Shortly after his appointment, the Trustee reviewed the Bankruptcy Court's two opinions denying confirmation of each of Coram's proposed plans of reorganization. As a result, the Trustee required that Crowley have no continuing conflict of interest and that he not receive any further compensation from Cerberus. The Trustee elected to continue Crowley's employment with Coram only after Crowley explicitly represented to the Trustee that he that he was no longer receiving any compensation from Cerberus.

Crowley's employment agreement with Coram expired on November 26, 2002. Because the Trustee was concerned that terminating Crowley could possibly lead to substantial departures of key employees, thereby endangering Coram's ability to promptly reorganize, the Trustee filed a motion to extend his employment for a limited transition period (as well as a motion to reject his employment agreement). The Equity Committee opposed the Trustee's motion and filed a motion to immediately terminate Crowley's employment.

In the course of discovery on the motions, Crowley produced documents that made clear that his prior representations to the Trustee were false. These documents showed that Crowley was in fact continuing to ask Cerberus for millions of dollars to be paid after the confirmation, when neither he nor Coram would be under the jurisdiction of the Bankruptcy

11

Court.   Specifically, an insert to a draft letter to Feinberg dated May 2, 2002 states: "I expect that you'll honor the commitment you made to me over dinner:  after Coram's plan is confirmed or its assets sold, I'll be reinstated with Cerberus and receive $5,000,000 from Cerberus.  Also, Cerberus will indemnify me for all of my legal fees, plus pay me the difference between what I ultimately receive from Coram by way of bonuses, and $11,200,000."  In another part of the letter, Crowley stated that he "didn't have to recite the answers that [Coram's bankruptcy lawyer] gave [him] to say in Court."

The Bankruptcy Court denied the Trustee's motion to extend Crowley's employment and rejected Crowley's testimony, stating that "I do not believe he is honest."  Tr. 3/3/03, at 195.  Referring to the draft letter from Crowley to Feinberg, the Bankruptcy Court concluded that the letter "after the appointment of the Trustee, continue[s] to show what I believe is a continuation of Mr. Crowley's continued efforts to continue to get reimbursement from Cerberus for efforts undertaken in this case." *Id.* at 196.  Crowley resigned from Coram effective March 31, 2003.

The Trustee thereafter proposed a reorganization plan, as did the Equity Committee.   Following extensive discovery and a lengthy confirmation hearing, in October 2004, the Bankruptcy Court confirmed the Trustee's Plan and rejected the Equity Committee's Plan. *See In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del 2004).

The Trustee reserves his right to amend or supplement his response as discovery continues.

12

5.      Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 1, including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:** The Trustee objects to Interrogatory No. 5 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period. Subject to these objections, the Trustee will provide a combined response to Interrogatories 5 through 8.

6.      Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 2 including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:** The Trustee objects to Interrogatory No. 6 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period. Subject to these objections, the Trustee will provide a combined response to Interrogatories 5 through 8.

7.      Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 3 including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:** The Trustee objects to Interrogatory No. 7 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to

13

identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period.  Subject to these objections, the Trustee will provide a combined response to Interrogatories 5 through 8.

8.    Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 4, including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:**  The Trustee objects to Interrogatory No. 8 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period.

**COMBINED RESPONSE TO INTERROGATORIES 1 THROUGH 8:**

Subject to and without waiving the foregoing objections, the Trustee states that Coram's emergence from bankruptcy was delayed as a result of Crowley's conflict of interest and his breaches of his fiduciary duties, causing Coram to suffer damages.  Coram incurred reorganization costs in excess of $36 million directly attributable to the delay in Coram's emergence from bankruptcy.  Coram also sustained business losses as a result of remaining in bankruptcy.  The calculation of such damages will be provided in expert report(s), which will be served in accordance with the current scheduling order, unless amended.

The sale of CPS deprived Coram of the increase in value CPS enjoyed following the sale.  CPS was sold to a management-led buy out group for $40 million and was sold three years later for $335 million.

14

CHDATA 38155_1

Coram is also entitled to disgorgement of the compensation that it paid Crowley while he served as a conflicted CEO.

The Trustee reserves his right to amend or supplement his answer to this interrogatory as discovery continues.

As to objections:

Dated:  December 20, 2006

SCHNADER HARRISON SEGAL
& LEWIS LLP

By:  /s/ Richard A. Barkasy
     Richard A. Barkasy (#4683)
     Michael J. Barrie (#4684)
     824 Market Street Mall, Suite 1001
     Wilmington, DE 19801
     (302) 888-4554 (telephone)
     (302) 888-1696 (facsimile)

     -and-

     Wilbur L. Kipnes
     Barry E. Bressler
     1600 Market Street, Suite 3600
     Philadelphia, PA  19103-7286
     (215) 751-2000 (telephone)
     (215) 751-2205 (facsimile)

     Counsel to Arlin M. Adams,
       Chapter 11 Trustee

15

CHDATA 38155_1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, as Chapter 11 Trustee of   :   Case No. 04-1565(SLR)
the Bankruptcy Estates of Coram Healthcare   :   (Jointly Administered)
Corp., a Delaware Corporation, and Coram,   :
Inc., a Delaware Corporation,   :
  :
             Plaintiff,   :
  :
  :
v.   :
  :
DANIEL D. CROWLEY,   :
  :
             Defendant.   :

### CERTIFICATE OF SERVICE

I, Michael J. Barrie, certify that I am not less than 18 years of age and that service of the Chapter 11 Trustee's Answers to Defendant Daniel D. Crowley's First Set of Interrogatories to Plaintiff Arlin M. Adams, was made on December 20, 2006 upon the persons listed below via Electronic Mail and United States First Class Mail.

I certify the foregoing to be true and correct under penalty of perjury.

/s/ Michael J. Barrie
Michael J. Barrie

Dated: December 20, 2006

### Parties Served:

Jeffrey C. Wisler, Esquire
Christina M. Thompson, Esquire
1007 N. Orange St., P.O. Box 2207
Wilmington, DE 19899
Email: jwisler@cblh.com
Email: cthompson@cblh.com

Elliot R. Peters, Esquire
Garrett A. Lynch, Esquire
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
Email: epeters@kvn.com
Email: glynch@kvn.com

16

CHDATA 38155_1

## **CERTIFICATION**

I hereby certify that the facts set forth in the foregoing interrogatory answers are

true and correct to the best of my knowledge, information and belief.

_Arlin M. Adams_
Arlin M. Adams, Ch. 11 Trustee

Dated:  December 20, 2006

17

# Exhibit G

LAW OFFICES

# KEKER & VAN NEST
## LLP

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1704
TELEPHONE (415) 391-5400
FAX (415) 397-7188
WWW.KVN.COM

R. JAMES SLAUGHTER
RSLAUGHTER@KVN.COM

March 8, 2007

**VIA EMAIL & U.S. MAIL**

Wilbur L. Kipnes, Esq.
Barry E. Bressler, Esq.
Richard Barkasy, Esq.
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286

Re:    *Adams v. Crowley*

Dear Counsel:

I write to inform you of our intentions with respect to Dan Crowley's drafted but unsent letters to Stephen Feinberg prepared between May 6 and May 9, 2002. These draft letters were privileged, that privilege has not been waived, and it would be inappropriate for the Trustee and his lawyers, having previously conceded the document were privileged and inadvertently produced, and having denied the relevance of these drafts at the March 2003 hearing before Judge Walrath, to rely on them in proceeding against Mr. Crowley.

There can be no doubt that the draft letters were privileged. Mr. Crowley sent the draft letters to his lawyer Scott Schreiber for the purpose of obtaining legal advice and comment with respect to ongoing bankruptcy proceedings involving Mr. Crowley and potential litigation against Feinberg and Cerberus. *See* Del. R. Evid. 502(b). These drafts were never sent to or received by Feinberg or Cerberus, a fact confirmed by Cerberus's attorneys, nor were they shared with any other party.

The production of these documents was inadvertent. In response to a Request for the Production of Documents from the Equity Committee, Mr. Crowley's then-counsel reviewed thousands of documents, ultimately producing 1,635 documents on February 16-17, 2003 (the CRX/CXR production). Although Mr. Crowley's then-counsel carefully reviewed the production for privilege issues, counsel mistakenly believed that the letter had actually been sent to Feinberg, when in fact it had not. On February 17, the very day of the production, Mr. Crowley and his counsel realized the error and, that day, contacted attorneys for the Equity

391184.01

Barry Bressler, Esq.
Wilbur L. Kipnes, Esq.
March 8, 2007
Page 2

Committee, the Trustee, and Cerberus to clarify that the drafts were privileged and seeking their return. On behalf of the Trustee, Mr. Bressler agreed to return the letter; Richard Levy did not.

While the Delaware Supreme Court has never opined on the standard to be applied to allegedly inadvertent disclosures, a number of Delaware state courts have identified factors to be applied in determining whether attorney-client privilege has been waived. *See Int'l Business Mach. Corp. v. Comdisco, Inc.*, 1992 WL 149502 (Del. Super. June 22, 1992) (unpublished), at *1 (evaluating the size of the production, the presence of an "elaborate review process," the difficulty in determining the confidential nature of the document, and the speed with which its return was sought); *Monsanto Co. v. Aetna Cas. & Sur. Co.*, 1994 WL 315238 (Del. Super. May 31, 1994) (unpublished) (evaluating, in context of the waiver of work product doctrine, the reasonableness of the precautions to prevent inadvertent disclosure; time taken to rectify the error; scope of discovery and extent of disclosure; and overall fairness, judged against care or negligence with which the privilege was guarded). For example, in *Comdisco*, where the scope of discovery was very large and great care was taken to prevent inadvertent disclosure, the court held the privilege was not waived even though the document at issue "was produced 14 months before the privilege was asserted" and had been introduced and discussed at five different depositions, including that of the author. *Comdisco*, 1992 WL 149502, at *1.

This reasoned approach to inadvertently disclosed documents is consistent with both the purpose of the attorney-client privilege—"to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice," *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)—and the law applied in the U.S. District Court for the District of Delaware. *See Berg Electronics, Inc. v. Molex, Inc.*, 875 F. Supp. 261, 263 (D. Del. 1995) (holding that, so long as the client did not intend to produce the document and the producing party can prove that the disclosure was inadvertent and not "extreme or gross negligence," privilege is not waived).

The Trustee's behavior in the wake of the inadvertent disclosure confirms his understanding that the drafts were both privileged and unrelated to Crowley's performance at Coram. On February 17, 2003, Mr. Crowley's then-counsel had a phone conversation with the Trustee's counsel Mr. Bressler, in which Mr. Bressler agreed to return the letter. During the March 3, 2003 hearing before Judge Walrath on the *Trustee's* motion to extend Crowley's employment at Coram, the Trustee was asked by Mr. Bressler whether Mr. Crowley had represented that the unpaid dollars he was claiming against Cerberus "were for Coram work or just for Cerberus work," to which Trustee Adams responded "Just for Cerberus work. Had nothing to do with Coram." Transcript of Hearing, March 3, 2003, at 71. After Richard Levy showed the Trustee the draft, unsent letter from Mr. Crowley and the insert authored by Mr. Schreiber, the Trustee explicitly stated that he did not believe these drafts meant that Mr. Crowley continued to be paid by Cerberus or was working for the benefit of the Noteholders. *Id.* at 70-71.

To now suggest precisely the opposite, intimating as the Trustee did at pages 11-12 of his Answers to Defendant's First Set of Interrogatories that Mr. Crowley sought payment from

Barry Bressler, Esq.
Wilbur L. Kipnes, Esq.
March 8, 2007
Page 3

Cerberus for his Coram work after the date of confirmation, is most disingenuous. You are well aware that the "insert" to which the Trustee cited was penned by Scott Schreiber, and that the letter was an unsent draft. Indeed, it was Mr. Kipnes who elicited from Mr. Crowley that it was Mr. Schreiber, not Mr. Crowley, who drafted the insert; that Crowley saw the insert for the first time only eight months after it was written; and that the insert was factually "absolutely wrong" because Crowley never believed that the money Cerberus owed him pertained at all to his work for Coram. Transcript of Hearing, March 3, 2003, at 109-10.

Given these factors, we demand that you return all copies of the draft letters and acknowledge that they are privileged. If you do not agree, we will seek to take the deposition of either Mr. Kipnes or Mr. Bressler with respect to the draft letters. Either way, at the deposition of Scott Schreiber on March 21, we intend to direct Mr. Schreiber not to answer, on privilege grounds, any questions about the inadvertently disclosed draft letters and insert, and any related matters.

Very truly yours,

*R. James Slaughter / wb*

R. JAMES SLAUGHTER

RJS/ltm

391184.01

# Exhibit H

# Schnader
ATTORNEYS AT LAW

1600 MARKET STREET   SUITE 3600
PHILADELPHIA, PA 19103-7286
215.751.2000   FAX 215.751.2205   schnader.com

March 16, 2007

Wilbur L. Kipnes
Direct Dial 215-751-2336
Direct Fax 215-751-2205
E-mail wkipnes@schnader.com

REC'D
MAR      2007
KRK's

***VIA EMAIL AND U.S. MAIL***

R. James Slaughter, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94111-1704

Re:   ***Adams v. Crowley***

Dear Jamie:

This will respond to your March 8, 2007 letter in which you demand the return of "Dan Crowley's drafted but unsent letters to Stephen Feinberg prepared between May 6 and May 9, 2002" (the "Letters"). You contend that the Letters are privileged and were "inadvertently" produced and should be returned. Even if you were correct that Mr. Schreiber's production of these documents was inadvertent – which is doubtful – the privilege has been waived by Mr. Schreiber's failure to file a motion seeking their return and his failure to object to their admission into evidence at the March 3, 2003 hearing.

As you acknowledge, Mr. Crowley's counsel produced the Letters four years ago in response to the Equity Committee's Request for Production. (Although we do not think we need debate "inadvertence," Mr. Schreiber acknowledged to the Trustee's counsel that the production of the Letters was purposeful.) Although Mr. Schreiber later requested that the Letters be returned, the Equity Committee refused. Despite having ample time to do so, Mr. Crowley's counsel did not file a motion even though he stated his intention to do so. *See* 2/21/03 letter from John H. Ward to Michael Cook (CROWLEYKVN 008470).

At the bankruptcy court hearing on March 3, 2003, Mr. Schreiber successfully argued that Mr. Crowley was a party. Tr. at 10:21-11:5. During the hearing, the Equity Committee elicited pages of foundational and substantive testimony regarding the Letters. Although Mr. Crowley's counsel objected to the Equity Committee's characterization of the Letters, he never objected on any privilege ground. In fact, the Equity Committee moved the Letters, exhibits EC-8 and EC-10, into evidence without objection. Tr. at 115:17-22.

In his closing argument, Mr. Crowley's counsel explained the motivation for and the circumstances surrounding the drafting of the Letters. Tr. at 191:9-194:16. Relying on the Letters in its ruling, the bankruptcy court determined that they showed "a continuation of Mr. Crowley's continued efforts to continue to get reimbursement from Cerberus for efforts

R. James Slaughter, Esq.
March 16, 2007
Page 2

undertaken in this case," leading to the court's conclusion that Mr. Crowley was not "an honest person."

Given these undisputed facts, it is clear under Delaware law that the privilege has been waived. *See, e.g., Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992); *Traute-Ugone v. The Estate of Albert G. Ugone*, No. C.A. 099-S, 2006 WL 389944 (Del. Ch. 2006) (privileged waived when party testified about communications with attorney); *Giordano v. Marta*, No. C.A. 11613, 1999 WL 350493 (Del. Ch. 1999). Mr. Crowley needed to take prompt action in order to preserve the claim of inadvertent waiver and despite having ample time to do so, he did nothing. *See In re Grand Jury (Impounded)*, 138 F.3d 978 (3d Cir. 1998) (affirming Judge Robinson's decision finding waiver of privilege where the defendant delayed more than three months to file a motion to compel the return of documents); *In re Hechinger Investment Cop. Of Del.*, 303 B.R. 18 (D. Del. 2003) (finding waiver of privilege where party abandoned its demand for the return of inadvertently produced documents); *In re Circon Corp. Shareholders Litig.*, No. C.A. 15165, WL 409166 (Del. Ch. 1998) (finding waiver of privilege where party waited seven months following production to demand return of inadvertently produced documents). Two of the cases you cite, *Montaso Co. v. Aetna Caus. And Surety Co.* and *Berg Electronics, Inc. v. Molex, Inc.*, concerned motions to compel return of documents filed promptly after discovery of the inadvertent production and, therefore, are easily distinguished. (The third case, *IBM Corp. v. Comdisco, Inc.*, is inapplicable because of the court-ordered clawback agreement governing that case.)

Accordingly, it is clear that Mr. Crowley has waived the privilege with respect to the Letters themselves and to the subject-matter of the Letters.

Very truly yours,

*Kill*

Wilbur L. Kipnes
For SCHNADER HARRISON SEGAL & LEWIS LLP

cc:    Barry E. Bressler, Esq.
       Richard A. Barkasy, Esq.