# Exhibit A

JUN 13 2000 11:42 FR CORAM LEGAL        303 298 0047 TO 19164456059        P.03/04

Deutsche Banc Alex. Brown

Deutsche Bank 🔲

Deutsche Banc Alex. Brown
Deutsche Bank Securities, Inc
One South Street
Baltimore, MD 21202

June 9, 2000

Board of Directors
CORAM HEALTHCARE CORPORATION
1125 Seventeenth Street, Suite 2100
Denver, CO 80202

ATTN: Mr. Daniel D. Crowley
       Chairman of the Board

Lady and Gentlemen:

Deutsche Bank Securities Inc. ("Deutsche Bank") has acted as financial advisor to Coram Healthcare Corporation (the "Company") in connection with the sale of the mail order services business and pharmacy benefit management services business (collectively, the "Business") of Curaflex Health Services, Inc., a wholly owned subsidiary of the Company (the "Subsidiary"), to Curascript Pharmacy, Inc. and Curascript PBM Services, Inc., (collectively, the "Buyer") pursuant to the Asset Purchase Agreement, dated as of June 9, 2000 by and among the Subsidiary, the Company, the buyer and GTCR Fund VI (the "Agreement").

As set forth more fully in the Agreement, the Buyer will purchase substantially all the assets used in the Business from the Subsidiary and the Buyer will assume substantially all the liabilities relating to the Business, other than certain excluded liabilities, for a purchase price of $41,300,000 in cash less the amount of certain liabilities to employees to be assumed by the Buyer (the "Consideration").

You have requested Deutsche Bank's opinion, as investment bankers, as to the fairness, from a financial point of view, to the Company of the Consideration to be received by the Subsidiary in connection with the Transaction.

In connection with Deutsche Bank's role as financial advisor to the Company, and in arriving at its opinion, Deutsche Bank has reviewed certain financial and other information concerning the Business and certain internal analyses furnished to it by the Company and Subsidiary. Deutsche Bank has also held discussions with members of the senior management of the Company and Subsidiary regarding the business and prospects of the Business. In addition, Deutsche Bank has (i) compared certain financial information for the Subsidiary with similar information for certain other companies whose securities are publicly traded, (ii) reviewed the financial terms of certain recent business combinations which it deemed comparable in whole or in part, (iii) reviewed the terms of the Agreement and certain related documents, and (iv) performed such other studies and analyses and considered such other factors as it deemed appropriate.



EXHIBIT
Morrison 17
CW 3/26/07

COR-EQTY 0011168

JUN 13 2000 11:43 FR CORAM LEGAL        303 298 0047 TO 19164496059        P.84/84

**Deutsche Bank** ☑

Deutsche Banc Alex. Brown

CORAM HEALTHCARE CORPORATION
June 9, 2000
Page 2

Deutsche Bank has not assumed responsibility for independent verification of, and has not independently verified any information furnished to it, concerning the Business, including, without limitation, any financial information, forecasts or projections considered in connection with the rendering of its opinion. Accordingly, for purposes of its opinion, Deutsche Bank has assumed and relied upon the accuracy and completeness of all such information and Deutsche Bank has not conducted a physical inspection of any of the properties or assets, and has not prepared or obtained any independent evaluation or appraisal of any of the assets or liabilities, of the Business. With respect to the financial forecasts and projections made available to Deutsche Bank and used in its analyses, Deutsche Bank has assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of the Company and Subsidiary as to the matters covered thereby. In rendering its opinion, Deutsche Bank expresses no view as to the reasonableness of such forecasts and projections or the assumptions on which they are based. Deutsche Bank's opinion is necessarily based upon economic, market and other conditions as in effect on, and the information made available to it as of, the date hereof.

For purposes of rendering its opinion, Deutsche Bank has assumed that, in all respects material to its analysis, the representations and warranties of the Subsidiary contained in the Agreement are true and correct.

This opinion is addressed to, and is for the use and benefit of, the Board of Directors of the Company. This opinion is limited to the fairness, from a financial point of view, to the Company of the Consideration to be received by the Subsidiary in connection with the Transaction, and Deutsche Bank expresses no opinion as to the merits of the underlying decision by the Company and the Subsidiary to engage in the Transaction.

Deutsche Bank will be paid a fee for its services as financial advisor to the Company in connection with the Transaction. We are an affiliate of Deutsche Bank AG (together with its affiliates, the "DB Group"). In the ordinary course of business, members of the DB Group may actively trade in the securities and other instruments and obligations of the Company for their own accounts and for the accounts of their customers, or have other business dealings with GTCR Fund VI, LP or other GTCR affiliates. Accordingly, the DB Group may at any time hold a long or short position in such securities, instruments and obligations of the Company, or have other pending business with GTCR Fund VI, LP or other GTCR affiliates.

Based upon and subject to the foregoing, it is Deutsche Bank's opinion as investment bankers that the Consideration to be received by the Subsidiary in connection with the Transaction is fair, from a financial point of view, to the Company.

Very truly yours,

*Deutsche Bank Securities Inc.*

DEUTSCHE BANK SECURITIES INC.

COR-EQTY 0011169

** TOTAL PAGE.03 **

** TOTAL PAGE.84 **

# Exhibit B

REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523

EXHIBIT: 32

Witness: Crowley
Date: 4|6|07     # of pages: 5

# MINUTES OF A TELEPHONIC MEETING

## OF THE BOARD OF DIRECTORS OF

### CORAM HEALTHCARE CORPORATION

#### June 9, 2000

A telephonic meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was called to order at approximately 12:35 p.m. MDT. Participating in the meeting were the following Directors: Daniel D. Crowley, Chairman of the Board, Chief Executive Officer and President; Donald J. Amaral; William J. Casey, and Sandra R. Smoley. Stephen A. Feinberg and L. Peter Smith were absent. Allen J. Marabito, Executive Vice President; Scott R. Danitz, Senior Vice President, Finance and Chief Accounting Officer; John T. McIntyre, Vice President, Treasury; Gerald Reynolds, Vice President, Controller; and Scott T. Larson, Senior Vice President, General Counsel and Secretary, also participated in the meeting. Also participating in the meeting were Fred Leech of Reed Smith Shaw & McClay LLP; David Rosner of Kasowitz, Benson, Torres & Friedman LLP and Christina Morrison and Otu Hughes of Deutsche Banc Alex. Brown. Mr. Crowley acted as Chairman of the meeting and Mr. Larson kept the minutes.

The meeting began with a summary of the events that had transpired during the auction of the Company's Coram Prescription Services business ("CPS") and the ultimate negotiation of the sale of such business to two (2) newly formed affiliates of GTCR Golder Rauner LLC. Ms. Morrison was then invited to discuss in greater detail the terms of the engagement of Deutsche Banc Alex. Brown and the auction process that they were managing for the Company. Ms. Morrison reviewed the parties that received information regarding the business, those that submitted bids and how the buyer entered the process.

Ms. Morrison then outlined the financial analysis that Deutsche Banc Alex. Brown had undertaken in connection with their fairness opinion analysis. She explained that the full analysis was set forth in the fairness opinion that would be delivered to the Company immediately following this meeting. She offered that the legal documents that had been negotiated among the parties were typical and reasonable and that the agreements included many standard provisions, including a liquidated damages provision that included an amount that was within the range of amounts used in other similar transactions. She explained that the fairness analysis performed demonstrated that the value of the CPS business yielded a range of fair prices between $24.6 and $53.6 million. Accordingly, Deutsche Bank Alex. Brown was of the opinion that the transaction was fair from a financial point of view to the Company. She added that the Fairness Opinion would be transmitted to the Company following the meeting and would be made available to all members of the Board of Directors.

Mr. Crowley opened the meeting for questions from the Board of Directors to Ms. Morrison and the other professionals attending the meeting. After discussion, a motion was then

Minutes of the Board of Directors
June 9, 2000
Page 2

made to accept and approve the transaction and the related resolutions approving the Asset Purchase Agreement and the related Marketing Services and Transition Services Agreements in the forms presented.

The discussion on the motion continued with a review of the gain calculation and estimated cash proceeds that were presented at the June 7, 2000, meeting of the Board. It was explained that substantially all the estimated net cash proceeds would be applied to the Company's debt.

Mr. Leech was invited to describe the negotiations that had occurred following the June 7, 2000 meeting. Mr. Leech described the discussions that occurred regarding the liquidated damages provisions, copies of which were distributed to the Board prior to the meeting. Mr. Leech stated that the buyer had insisted upon adding a provision that would prevent the Company from "shopping" the deal during the pendency of the Asset Purchase Agreement as a condition to accepting the liquidated damages proposal made by the Company. Ms. Morrison then offered that the provisions that were presented were standard for this type of transaction. Mr. Rosner added that he agreed with the assessment of Ms. Morrison.

It was reported that the Asset Purchase Agreement and the revised provisions thereof were transmitted to the General Counsel of Cerberus Financial Partners for their review. It was further reported that the Cerberus General Counsel stated that he did not find any significant omissions in the documents and that the documents reflected standard agreement provisions for transactions of this nature. Furthermore, Mr. Crowley reported that Mr. Feinberg had provided him his written approval of the terms of the transaction as now modified and that Mr. Feinberg stated satisfaction with the terms of the transaction as presented at this time.

There being no further questions or discussion of such matters and the questions of the Board having been responded to, the motion to approve the transactions and the resolutions set forth below was seconded and unanimously approved:

WHEREAS, Coram Healthcare Corporation (the "Company"), through its indirect wholly owned subsidiary, Curaflex Health Services, Inc., a Delaware corporation ("Curaflex"), operates a specialty mail order pharmacy and pharmacy benefit management services business known as "Coram Prescription Services" (the "Business");

WHEREAS, the Company, as the ultimate parent Company of Curaflex has determined it to be in the best interests of Curaflex to sell substantially all of the assets of Curaflex related to the Business (the "Transaction");

Minutes of the Board of Directors
June 9, 2000
Page 3

WHEREAS, in connection with the Transaction, the Company and Curaflex have, upon receipt of advice from their financial advisors with Deutsche Banc Alex.Brown, determined it to be in the best interests of the Company and Curaflex to enter into an Asset Purchase Agreement, by and between Curaflex, the Company, as Seller.Guarantor, CuraScript Pharmacy, Inc., CuraScript PBM Services, Inc. and GTCR Fund VI, L.P., as Buyers Guarantor (the "Purchase Agreement"), together with all of the Exhibits to the Purchase Agreement (collectively, the "Purchase Documents"); and

WHEREAS, in connection with the Transaction, the directors of the Company have determined it to be in the best interests of Curaflex and the Company to guaranty the full performance and compliance of Curaflex's obligations under the Purchase Agreement, as well as the Transition Services Agreement and the Marketing Services Agreement contemplated by the Purchase Agreement, pursuant to Section 11.9(a) of the Purchase Agreement (the "Guaranty");

NOW, THEREFORE, BE IT RESOLVED, that the Guaranty be, and it hereby is, in all respects approved;

RESOLVED FURTHER, that the form and content of the Guaranty set forth in Section 11.9(a) of the Purchase Agreement be, and it hereby is, in all respects approved;

RESOLVED FURTHER, that the Chairman of the Board, Chief Executive Officer and President, the Executive Vice President, any Senior Vice President or the Secretary of the Company (the "Authorized Officers") be, and hereby is, authorized and directed for and on behalf of the Company to make, execute and deliver (and, if desired, under the corporate seal of the Company attested to by its Secretary) the Purchase Agreement, substantially in the form presented herewith, together with such changes therein and additions thereto as such Authorized Officer shall approve, the execution and delivery thereof by such Authorized Officer to constitute conclusive evidence of such approval;

RESOLVED FURTHER, that the Authorized Officers be, and each hereby is, authorized and directed for and on behalf of the Company to take any and all further action and to execute and deliver any and all other agreements, instruments, certificates and documents for and on behalf of the Company as in his or her opinion may be necessary or desirable to carry out the Guaranty and the Transaction Documents; and

Minutes of the Board of Directors
June 9, 2000
Page 4

RESOLVED FURTHER, that any and all actions heretofore and hereafter taken by the Authorized Officers in connection with the Guaranty and the Transaction Documents be, and they hereby are, ratified and in all respects approved.

**Approval of the Transition Services Agreement and the Marketing Services Agreement in connection with the Sale of Substantially All of the Assets of the Business**

WHEREAS, in connection with the Transaction, the directors of the Company have determined it to be in the best interests of the Company, Curaflex, and Coram, Inc. ("CI") to enter into, upon the closing of the Transaction as contemplated by the Purchase Agreement, (a) a Transition Services Agreement, by and between the Company and CI, on the one hand, and CuraScript Pharmacy, Inc. and CuraScript PBM, Inc., on the other hand (the "Transition Services Agreement"), and (b) a Marketing Services Agreement, by and between the Company and CI, on the one hand, and CuraScript Pharmacy, Inc. and CuraScript PBM, Inc. on the other hand (the "Marketing Services Agreement");

NOW, THEREFORE, BE IT RESOLVED FURTHER, that the form and content of the Transition Services Agreement and the Marketing Services Agreement presented at the June 7, 2000, meeting of the Company's Board of Directors, and each hereby is, in all respects approved;

RESOLVED FURTHER, that the Authorized Officers be, and each hereby is, authorized and directed for and on behalf of the Company to execute and deliver (and, if desired, under the corporate seal of the Company attested to by its Secretary) the Transition Services Agreement and the Marketing Services Agreement, substantially in the forms heretofore approved, with such changes therein and additions thereto as such Authorized Officer shall approve, the execution and delivery thereof by such Authorized Officer to constitute conclusive evidence of such approval;

RESOLVED FURTHER, that the Authorized Officers be, and each hereby is, authorized and directed for and on behalf of the Company to take any and all further action and to execute and deliver any and all other agreements, instruments, certificates and documents for and on behalf of the Company as in his or her opinion may be necessary or desirable to carry out the Transition Services Agreement and the Marketing Services Agreement; and

Minutes of the Board of Directors
June 9, 2000
Page 5

RESOLVED FURTHER, that any and all actions heretofore and hereafter taken by the Authorized Officers in connection with the Transition Services and the Marketing Services Agreement be, and they hereby are, ratified and in all respects approved.

FURTHER RESOLVED, that each Authorized Officer is hereby authorized, empowered and directed, for and on behalf of the Company, to take all such other actions and execute all such documents, certificates and agreements, as may be necessary, appropriate or expedient to carry out the intent of any resolutions adopted or actions taken at this meeting of the Board of Directors.

There being no further business, the meeting was adjourned at approximately 12:30 p.m. MDT.

Respectfully submitted,

Scott T. Larson
Secretary

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARLIN M. ADAMS, as Chapter 11 Trustee of the Bankruptcy Estates of Coram Healthcare Corp., a Delaware Corporation, and Coram, Inc., a Delaware Corporation, | : Case No. 04-1565(SLR)<br>: (Jointly Administered)<br>:<br>: |
| Plaintiff, | : |
| v. | : |
| DANIEL D. CROWLEY, | : |
| Defendant. | : |

---

### THE CHAPTER 11 TRUSTEE'S ANSWERS TO DEFENDANT DANIEL D. CROWLEY'S FIRST SET OF INTERROGATORIES TO PLAINTIFF ARLIN M. ADAMS

---

Plaintiff Arlin M. Adams, the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estates of Coram Healthcare Corp. and Coram, Inc. (collectively, "Coram"), hereby responds to Defendant Daniel D. Crowley's ("Crowley") First Set of Interrogatories to Plaintiff Arlin M. Adams, as follows:

### GENERAL OBJECTIONS

The Trustee asserts the following general objections, all of which are incorporated in his specific responses:

1.    The Trustee objects to each interrogatory, definition and instruction, to the extent that it seeks to impose an obligation or burden beyond that required by the Federal Rules of Civil Procedure.

CHDATA 38155_1

2.     The Trustee objects to each interrogatory to the extent that it seeks information subject to the attorney client privilege, or the work product doctrine, or any other privilege or doctrine which precludes discovery.

3.     The Trustee objects to each interrogatory to the extent that responding would impose an undue burden on the Trustee.

4.     The Trustee objects to each interrogatory to the extent that the information requested is equally available to Crowley.

5.     The Trustee objects to each interrogatory to the extent it seeks information not relevant to this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

## PRESERVATION OF RIGHTS

The Trustee's responses do not waive and do not intend to waive but, on the contrary, preserve and intend to preserve:

1.     All objections as to competency, relevancy, materiality, privilege and admissibility for any purpose in any subsequent proceeding or the trial of this or any other actions;

2.     The right to object on any ground to the use of any of these responses, or the subject matter thereof, in any subsequent proceeding or trial of this or any other actions;

3.     The right to object at any time to a demand for further responses to these or any other discovery requests involving or relating to the subject matter of these interrogatories; and

4.     The right at any time to revise, correct, supplement, clarify or amend the answers and responses set forth herein.

2

CHDATA 38155_1

## RESPONSES TO INTERROGATORIES

1.    Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley had a conflict of interest with Coram.

SPECIFIC OBJECTIONS:  The Trustee objects to Interrogatory No. 1 on the grounds that it contains undefined terms, is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe every act Crowley undertook or failed to undertake over a several-year period that underlies the Trustee's allegations that he had a conflict of interest.   Subject to these objections, the Trustee will provide a combined response to Interrogatories 1 through 4.

2.    Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley breached his duty to Coram to act in good faith.

SPECIFIC OBJECTIONS:  The Trustee objects to Interrogatory No. 2 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe every act Crowley undertook or failed to undertake over a several-year period that underlies the Trustee's allegations that he breached his duty to Coram to act in good faith.   Subject to these objections, the Trustee will provide a combined response to Interrogatories 1 through 4.

3.    Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley breached his duty to Coram to act with due care.

SPECIFIC OBJECTIONS:  The Trustee objects to Interrogatory No. 3 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to

CHDATA 38155_1

identify and describe every act Crowley undertook or failed to undertake over a several-year period that underlies the Trustee's allegations that he breached his duty to Coram to act with due care. Subject to these objections, the Trustee will provide a combined response to Interrogatories 1 through 4.

4.    Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley breached his duty of loyalty to Coram.

**SPECIFIC OBJECTIONS:** The Trustee objects to Interrogatory No. 4 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe every act Crowley undertook or failed to undertake over a several-year period that underlies the Trustee's allegations that he had a breached his duty of loyalty to Coram. Subject to these objections, the Trustee will provide a combined response to Interrogatories 1 through 4.

**COMBINED RESPONSE TO INTERROGATORIES 1 THROUGH 4:**

Subject to and without waiving the foregoing objections, the Trustee responds to Interrogatories 1 through 4 by setting forth this summary of facts, which form the basis of his allegations that Crowley had a conflict of interest and breached the triad of fiduciary duties that he owed to Coram as an officer and director:

From approximately 1997 on, Cerberus Partners, L.P. ("Cerberus"), together with Goldman Sachs Credit Partners L.P., and Wells Fargo Foothill (collectively, the "Noteholders"), owned substantially all of Coram's debt. Cerberus is a major investor in the debt of numerous distressed companies; it alone held approximately 36% of Coram's debt. The chairman of

4

Cerberus, Stephen Feinberg ("Feinberg"), sat on Coram's Board from 1998 until July 2000,
shortly before Coram filed for bankruptcy. Cerberus maintained a "bench" of CEO consultants,
who were available to work for Cerberus with troubled companies on a project-by-project basis.

In early 1999, Cerberus retained Crowley as a turnaround consultant. In July
1999, Crowley and Cerberus entered into an oral agreement under which Crowley agreed to
work exclusively for Cerberus for three years at a salary of $80,000 per month plus expenses,
with the possibility of substantial bonuses.

In August 1999, after Crowley and Cerberus had entered into their oral agreement
Feinberg recommended to Coram's Board of Directors (the "Board") that it hire Crowley as a
consultant to work with Coram's newly-elevated CEO, Richard Smith ("Smith"). Feinberg
disclosed to the directors that Crowley had a relationship with Cerberus, but provided no
information about that relationship.

After Smith left Coram in October 1999, Crowley wrote to Coram Chairman
Donald Amaral ("Amaral"), on October 26, 1999. In that letter, Crowley stated that he and
Smith had a "six(6) month crisis management contract in place," and that he "would like to help
you [Amaral] with this project and begin the restructuring process." Crowley and Amaral began
negotiations on an employment agreement no later than early November 1999.

At the same time as he was negotiating with Amaral to be Coram's CEO,
Crowley sent a "Personal & Confidential" letter dated November 12, 1999 to Feinberg stating
that "[y]ou [Feinberg]have asked me to take over the Coram operations" and requesting
additional compensation from Cerberus to induce him to become CEO of Coram.

CHDATA 38155_1

The Noteholders offered Coram a six-month interest accrual holiday if Crowley was hired as CEO. On November 15, 1999, Amaral and the Noteholders agreed on the terms of the interest forbearance agreement.

On November 17, 1999, the Board approved a three-year employment agreement with Crowley, which he signed the next day (the "Crowley/Coram Employment Agreement"). The Crowley/Coram Employment Agreement provided for a base salary of $650,000, benefits, potential bonuses of between $390,000 and $1,950,000 depending on Coram's EBITDA, a minimum 24-month severance period, options to purchase one million shares of Coram stock at then market rates, and an acquisition bonus upon change in control.

The day after he signed the Crowley/Coram Employment Agreement, Crowley executed a written employment agreement with Cerberus, effective August 1, 1999, which memorialized the terms of their July oral agreement (the "Crowley/Cerberus Employment Agreement"). The Crowley/Cerberus Employment Agreement required Crowley to devote "his entire business time, attention, skill and energy exclusively to the business of [Cerberus]" by performing duties to be assigned by Feinberg. The Crowley/Cerberus Employment Agreement also provided that Cerberus could terminate Crowley for cause if Crowley did not follow Cerberus' reasonable instructions. Neither Crowley nor Feinberg disclosed to the Board the existence or terms of the Crowley/Cerberus Employment Agreement.

Coram's corporate policy provided that actual conflicts of interest must be avoided and that any action creating a potential conflict of interest must be disclosed and approved in advance. Crowley failed to seek Board approval of his employment contract with Cerberus.

6

CHDATA 38155_1

Crowley signed the management letter to Coram's outside auditors for the year ending December 31, 1999, in which he stated that "[t]here are no instances where any officer or employee of [Coram] has an interest in a company, with which [Coram] does business that would be considered a 'conflict of interest,' that has not been disclosed or waived. Such an interest would be contrary to [Coram] policy."

Coram retained Crowley's wholly-owned consulting company, Dynamic ("Dynamic") Health Care Solutions, L.L.C. ("Dynamic"), to act as a consultant to Coram, which paid fees to Dynamic in excess of $1 million.

On February 28, 2000, Crowley wrote to the Board and demanded additional compensation from Coram, claiming that he was working 19-hour days, and that "Coram will take longer, involve more, and will need me to stay 'on task' for much longer than we envisioned when I said 'Yes.'" Crowley did not disclose to the Board that while he was allegedly working 19-hour days for Coram, Cerberus was paying him $80,000 per month.

In response to Crowley's demand for additional compensation from Coram, Feinberg and Crowley negotiated an amendment to the Crowley/Coram Employment Agreement with Coram, which was executed as of April 6, 2000. The amendment provided a new bonus structure that was far greater than the maximum $1.9 million bonus for which Crowley was eligible under the employment agreement that he had signed just four months earlier. Under the new arrangement, Crowley could claim a bonus of up to 25% of the amount by which Coram's EBITDA for 2000 exceeded $14 million and an additional $5 million bonus if EBITDA exceeded $35 million.

CHDATA 38155_1

At the time Crowley and Feinberg were negotiating the amendment to the Crowley/Coram Employment Agreement, Crowley anticipated that Coram would be restructured by filing a bankruptcy petition under Chapter 11 with a proposed plan of reorganization that would eliminate the public shareholders without any payment to them. Nevertheless, between November 30, 1999 and July 31, 2000, Crowley caused Coram to pay the Noteholders approximately $60 million. These payments included: (a) much of the proceeds from Coram's July 2000 sale of its specialty pharmacy division, Coram Prescription Services ("CPS") (nearly $40 million); and (b) an additional $6.3 million payment that Crowley made to the Noteholders just three weeks before Coram declared bankruptcy.

Although the CPS division was losing a small amount of money, it had excellent long-term profit potential. CPS had been valued in excess of $100 million by Coram's investment bankers, but was sold for approximately $40 million.

On August 8, 2000, Coram filed a Chapter 11 petition in the U.S. Bankruptcy Court for the District of Delaware, together with a proposed plan of reorganization (the "First Plan"). The First Plan provided for the cancellation of all of the shareholders' interests and for the issuance of all of the new Coram stock to the Noteholders. Coram's other unsecured creditors would receive $2 million and Coram's shareholders would receive nothing.

On October 18, 2000, the United States Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee") to represent the interests of Coram's common shareholders. The Equity Committee obtained the Crowley/Cerberus Employment Agreement and other documents in discovery in connection with the First Plan, which the Equity Committee opposed.

8

CHDATA 38155_1

During the confirmation hearing, Crowley testified that the Crowley/Cerberus Employment Agreement — which provided for payments significantly greater than did his agreement with Coram -- had nothing to do with Coram. The Court did not find Crowley's position credible. Rather, on December 21, 2000, the Bankruptcy Court denied confirmation, holding that Coram had not proposed its reorganization plan in good faith as required under the Bankruptcy Code. In its oral ruling, the Bankruptcy Court explained that it could not confirm the plan because Crowley "had an actual conflict of interest" by virtue of his contractual relationship with Cerberus. Op. 12/21/00, at 89. The Bankruptcy Court found that that actual conflict of interest "tainted the debtors' restructuring of its debt, the debtors' negotiations towards a plan, even the debtors' restructuring of its operations." *Id.* at 88. As a result of Crowley's relationship with Cerberus, Coram did not emerge from bankruptcy in December 2000.

Despite the Bankruptcy Court's ruling, Crowley did not terminate his relationship with Cerberus. In fact, Crowley continued to be paid $80,000 per month by Cerberus throughout 2001.

The Board formed a Special Committee, which retained Harrison J. Goldin Associates, L.L.C. ("Goldin"), as a restructuring advisor. In a report of its investigation, Goldin concluded that Crowley should have disclosed the full extent of his employment agreement with Cerberus and that his failure to do so was a breach of his fiduciary duties to Coram. Goldin also concluded that Crowley had advanced Cerberus' interests at Coram's expense by making cash payments to the Noteholders prior to Coram's filing for bankruptcy. In addition, Goldin determined that, as of the date of his report, Crowley's conflict had caused Coram to incur at least $12 to $15 million in business losses and professional fees in the bankruptcy proceedings.

9

Coram based its second proposed plan of reorganization (the "Second Plan") on Goldin's report. The Second Plan again provided for the cancellation of all shareholders' interests and for the issuance of new Coram stock to the Noteholders, including Cerberus. Coram's shareholders would receive $10 million if they voted to approve the plan. Coram's other unsecured creditors would receive $3 million, amounting to less than 40% of their claims. In addition, the Second Plan provided that Crowley's compensation be reduced by $7.5 million as recommended by Goldin.

During the confirmation hearing on the Second Plan, Crowley testified that Cerberus was not paying him for his work at Coram, but instead for his work on non-Coram matters. Again, the Bankruptcy Court rejected Crowley's testimony as not credible. Op. 12/21/01, at 16-17.

On December 21, 2001, the Bankruptcy Court issued a written opinion denying confirmation. The Bankruptcy Court concluded that Crowley's agreement with Cerberus continued to present an actual conflict of interest. As the Bankruptcy Court put it, "[n]othing, in fact, has changed since the first confirmation hearing." Op.12/21/01, at 13. The Bankruptcy Court explained that:

> Crowley's actual conflict of interest goes beyond the mere appearance of impropriety. Crowley cannot serve the interests of both the Debtors and a large creditor, Cerberus. Under the Consulting Agreement, Cerberus has the discretion to fire Crowley if he fails to follow its instructions, resulting in the loss of $1 million per year in compensation to Crowley. That control over Crowley, and indirectly the Debtors, is simply not proper.

10

CHDATA 38155_1

Op. 12/21/01, at 15. The Bankruptcy Court concluded that "the conflict in this case transcends every single thing Crowley does on behalf of the Debtors." Op. 12/21/01, at 24. As a result of Crowley's relationship with Cerberus, Coram did not emerge from bankruptcy in December 2001.

Following the rejection of the Second Plan, the Bankruptcy Court entered an order appointing the plaintiff Arlin M. Adams as Coram's Chapter 11 Trustee. Shortly after his appointment, the Trustee reviewed the Bankruptcy Court's two opinions denying confirmation of each of Coram's proposed plans of reorganization. As a result, the Trustee required that Crowley have no continuing conflict of interest and that he not receive any further compensation from Cerberus. The Trustee elected to continue Crowley's employment with Coram only after Crowley explicitly represented to the Trustee that he that he was no longer receiving any compensation from Cerberus.

Crowley's employment agreement with Coram expired on November 26, 2002. Because the Trustee was concerned that terminating Crowley could possibly lead to substantial departures of key employees, thereby endangering Coram's ability to promptly reorganize, the Trustee filed a motion to extend his employment for a limited transition period (as well as a motion to reject his employment agreement). The Equity Committee opposed the Trustee's motion and filed a motion to immediately terminate Crowley's employment.

In the course of discovery on the motions, Crowley produced documents that made clear that his prior representations to the Trustee were false. These documents showed that Crowley was in fact continuing to ask Cerberus for millions of dollars to be paid after the confirmation, when neither he nor Coram would be under the jurisdiction of the Bankruptcy

CHDATA 38155_1

Court. Specifically, an insert to a draft letter to Feinberg dated May 2, 2002 states: "I expect that you'll honor the commitment you made to me over dinner: after Coram's plan is confirmed or its assets sold, I'll be reinstated with Cerberus and receive $5,000,000 from Cerberus. Also, Cerberus will indemnify me for all of my legal fees, plus pay me the difference between what I ultimately receive from Coram by way of bonuses, and $11,200,000." In another part of the letter, Crowley stated that he "didn't have to recite the answers that [Coram's bankruptcy lawyer] gave [him] to say in Court."

The Bankruptcy Court denied the Trustee's motion to extend Crowley's employment and rejected Crowley's testimony, stating that "I do not believe he is honest." Tr. 3/3/03, at 195. Referring to the draft letter from Crowley to Feinberg, the Bankruptcy Court concluded that the letter "after the appointment of the Trustee, continue[s] to show what I believe is a continuation of Mr. Crowley's continued efforts to continue to get reimbursement from Cerberus for efforts undertaken in this case." *Id.* at 196. Crowley resigned from Coram effective March 31, 2003.

The Trustee thereafter proposed a reorganization plan, as did the Equity Committee. Following extensive discovery and a lengthy confirmation hearing, in October 2004, the Bankruptcy Court confirmed the Trustee's Plan and rejected the Equity Committee's Plan. *See In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del 2004).

The Trustee reserves his right to amend or supplement his response as discovery continues.

12

CHDATA 38155_1

5.    Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 1, including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:**  The Trustee objects to Interrogatory No. 5 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period.  Subject to these objections, the Trustee will provide a combined response to Interrogatories 5 through 8.

6.    Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 2 including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:**  The Trustee objects to Interrogatory No. 6 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period.  Subject to these objections, the Trustee will provide a combined response to Interrogatories 5 through 8.

7.    Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 3 including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:**  The Trustee objects to Interrogatory No. 7 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to

CHDATA 38155_1

identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period. Subject to these objections, the Trustee will provide a combined response to Interrogatories 5 through 8.

8.    Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 4, including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:** The Trustee objects to Interrogatory No. 8 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period.

**COMBINED RESPONSE TO INTERROGATORIES 1 THROUGH 8:**

Subject to and without waiving the foregoing objections, the Trustee states that Coram's emergence from bankruptcy was delayed as a result of Crowley's conflict of interest and his breaches of his fiduciary duties, causing Coram to suffer damages. Coram incurred reorganization costs in excess of $36 million directly attributable to the delay in Coram's emergence from bankruptcy. Coram also sustained business losses as a result of remaining in bankruptcy. The calculation of such damages will be provided in expert report(s), which will be served in accordance with the current scheduling order, unless amended.

The sale of CPS deprived Coram of the increase in value CPS enjoyed following the sale. CPS was sold to a management-led buy out group for $40 million and was sold three years later for $335 million.

14

CHDATA 38155_1

Coram is also entitled to disgorgement of the compensation that it paid Crowley while he served as a conflicted CEO.

The Trustee reserves his right to amend or supplement his answer to this interrogatory as discovery continues.

As to objections:

Dated:  December 20, 2006

SCHNADER HARRISON SEGAL
& LEWIS LLP

By:  /s/ Richard A. Barkasy
     Richard A. Barkasy (#4683)
     Michael J. Barrie (#4684)
     824 Market Street Mall, Suite 1001
     Wilmington, DE 19801
     (302) 888-4554 (telephone)
     (302) 888-1696 (facsimile)

     -and-

     Wilbur L. Kipnes
     Barry E. Bressler
     1600 Market Street, Suite 3600
     Philadelphia, PA  19103-7286
     (215) 751-2000 (telephone)
     (215) 751-2205 (facsimile)

     Counsel to Arlin M. Adams,
     Chapter 11 Trustee

CHDATA 38155_1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, as Chapter 11 Trustee of    :   Case No. 04-1565(SLR)
the Bankruptcy Estates of Coram Healthcare  :   (Jointly Administered)
Corp., a Delaware Corporation, and Coram,   :
Inc., a Delaware Corporation,               :
                                            :
              Plaintiff,    :
                                            :
v.                                          :
                                            :
DANIEL D. CROWLEY,                          :
                                            :
              Defendant.    :

### CERTIFICATE OF SERVICE

I, Michael J. Barrie, certify that I am not less than 18 years of age and that service

of the Chapter 11 Trustee's Answers to Defendant Daniel D. Crowley's First Set of

Interrogatories to Plaintiff Arlin M. Adams, was made on December 20, 2006 upon the

persons listed below via Electronic Mail and United States First Class Mail.

I certify the foregoing to be true and correct under penalty of perjury.

                                         /s/ Michael J. Barrie
                                         Michael J. Barrie

Dated:  December 20, 2006

### Parties Served:

Jeffrey C. Wisler, Esquire
Christina M. Thompson, Esquire
1007 N. Orange St., P.O. Box 2207
Wilmington, DE  19899
Email:  jwisler@cblh.com
Email:  cthompson@cblh.com

Elliot R. Peters, Esquire
Garrett A. Lynch, Esquire
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA  94111
Email:  epeters@kvn.com
Email:  glynch@kvn.com

CHDATA 38155_1

## CERTIFICATION

I hereby certify that the facts set forth in the foregoing interrogatory answers are true and correct to the best of my knowledge, information and belief.

_Arl. M. Adams_
Arlin M. Adams, Ch. 11 Trustee

Dated:  December 20, 2006

17

CHDATA 38155_1