# Exhibit D

## Page 177

VOLUME II
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, Chapter 11 :
Trustee of the :
Post-Confirmation Bankruptcy :
Estates of CORAM HEALTHCARE :
CORPORATION, a Delaware :
Corporation and of CORAM, :
INC., a Delaware Corporation, :
        Plaintiff     : CASE NO.
    vs.              : 04-1565
DANIEL D. CROWLEY; DONALD J. :
AMARAL; WILLIAM J. CASEY; :
L. PETER SMITH; AND SANDRA L. :
SMOLEY, :
        Defendants    :

Wednesday, March 28, 2007
9:33 a.m.

        Continued videotape deposition
of ARLIN M. ADAMS, held at the law
offices of Schnader Harrison Segal &
Lewis, LLP, 1600 Market Street, Suite
3600, Philadelphia, Pennsylvania, 19103,
pursuant to notice before Cynthia A.
Whyte, Registered Professional Reporter
and Notary Public.

## Page 178

1  A P P E A R A N C E S:
2  SCHNADER HARRISON SEGAL & LEWIS LLP
   Counsel for Plaintiff Arlin M. Adams,
3  Trustee
       1600 Market Street
4      Suite 3600
       Philadelphia, PA  19103
5      (215) 751-2050
6  BY:   BARRY E. BRESSLER, ESQ.
       bbressler@schnader.com
7
   AND:  RICHARD A. BARKASY, ESQ.
8        rbarkasy@schnader.com
9
   KEKER & VAN NEST LLP
10 Counsel for Defendant Daniel Crowley
       710 Sansome Street
11     San Francisco, CA  94111-1704
       (415) 391-5400
12
   BY:   ELLIOT R. PETERS, ESQ.
13       epeters@kvn.com
14 AND:  WARREN A. BRAUNIG, ESQ.
       wbraunig@kvn.com
15
16 ALSO PRESENT:    VINCENZO PETULLA,
17                  Videographer
18
19
20
21
22
23
24
25

## Page 179

1          IT IS HEREBY STIPULATED AND
2  AGREED by and among counsel for the
3  respective parties hereto that the
4  filing, sealing and certification of the
5  within deposition shall be and the same
6  are hereby waived.
7          IT IS FURTHER STIPULATED
8  AND AGREED that all objections,
9  except as to the form of the
10 question, shall be reserved to the
11 time of the trial.
12         IT IS FURTHER STIPULATED AND
13 AGREED that the within deposition may be
14 signed before any Notary Public with the
15 same force and effect as if signed and
16 sworn to before the Court.
17
18
19
20
21
22
23
24
25

## Page 180

1                    I N D E X
2  WITNESS:                            PAGE
3  ARLIN M. ADAMS - VOLUME II
4      By Mr. Peters         184, 391
5      By Mr. Bressler            390
6         ADAMS EXHIBITS
7  NO.      DESCRIPTION             PAGE
8  Exhibit 13   Transcript, 11/14/03   219
9  Exhibit 14   Letter, 5/16/02, to
                Judge Adams from Mr.
10              Crowley                234
11 Exhibit 15   Form 10-Q             240
12 Exhibit 16   Form 10-K             250
13 Exhibit 17   Letter, 3/14/02, to
                Mr. Adams from Mr.
14              Liebentritt           257
15 Exhibit 18   Letter, 8/22/02, to
                Mr. Beskrone from Mr.
16              Adams                 258
17 Exhibit 19   Letter, 4/11/02, to
                Mr. Levy from Mr.
18              Bressler              261
19 Exhibit 20   Letter, 5/1/02 to
                Judge Adams from Mr.
20              Levy                  267
21 Exhibit 21   Letter, 9/17/02, to
                Judge Adams from Mr.
22              Zell.                 272
23 Exhibit 22   Letter, 9/18/02, to
                Judge Adams from Mr.
24              Levy                  278
25

Page 201

1    A.    I don't know of my own knowledge,
2  but during the course of the hearings it came
3  out that the prices that had been obtained,
4  had been proffered, were less than the
5  ultimate sales price that was consummated.  I
6  do know that.
7    Q.    Do you know how many bidders there
8  were for --
9    A.    There was some dispute as to how
10  many bidders.  Some entities I was
11  told -- and this is not my knowledge; this is
12  hearsay.
13         There were some bidders who evinced
14  an interest but did not make a bid, but I am
15  left with the impression that those that
16  actually made bids were rather few in number,
17  three or four.  Many companies showed an
18  interest, but I don't think made bids.  But
19  that's hearsay.  I wasn't there.  I have not
20  researched it.  I can't answer your question
21  specifically.
22    Q.    Do you believe that Deutsche Bank
23  Alex Brown -- and I'll represent to you those
24  were the investment bankers who worked on the
25  CPS sale -- that they failed to exercise

Page 202

1  proper care or diligence in that assignment?
2         MR. BRESSLER:  Object to the
3    form.
4    A.    I make no such charge.
5    Q.    What should Dan Crowley have done
6  differently in 2000 in connection with that
7  transaction to have acted appropriately and
8  not, in your opinion, breached his fiduciary
9  duties?
10         MR. BRESSLER:  Object to the
11    form.
12    A.    I don't want to pretend that I'm an
13  expert on selling subsidiaries in this
14  industry.  I am not.  So when you're asking me
15  what more he should have done, I'm not sure I
16  can be helpful.
17         I do know that there was a
18  subsequent sale of the subsidiary at a
19  considerably higher price, which created the
20  impression on my mind as a nonexpert that he
21  did not exercise the diligence that somebody
22  in his position with his salary should have
23  exercised.
24    Q.    That sale that you're referring to,
25  how many years after the original sale did it

Page 203

1  occur?
2    A.    Several years, but I can't tell you
3  specifically.
4    Q.    Approximately three years later?
5    A.    Could be.
6    Q.    Do you know whether at that time the
7  company that was sold had acquired other
8  companies?
9    A.    It was my understanding that it had
10  acquired.
11    Q.    So it was a larger and somewhat
12  different company than the one that Coram had
13  sold?
14    A.    That's my understanding.  I don't
15  have that personal knowledge; hearsay.
16    Q.    So is it a fair statement that your
17  view about the CPS transaction is somewhat
18  informed by the fact that a number of years
19  later the company was sold for a higher price?
20         MR. BRESSLER:  Object to the
21    form, but he may answer.
22    A.    It is one of the factors, yes.
23    Q.    Do you think your view of the CPS
24  transaction that Dan Crowley participated in
25  in 2000 is informed by hindsight?

Page 204

1    A.    It's not informed by my hindsight;
2  by other persons who criticized it perhaps.
3    Q.    I'm asking you about your state of
4  mind, not about other person's state of mind.
5    A.    I'm not an expert in the field.  I
6  don't pretend to be.
7    Q.    I'm not asking you for an expert
8  opinion.
9         Can you identify a single act that
10  Dan Crowley took or failed to take in July or
11  August of 2000 in connection with the CPS
12  transaction that you contend evidences a
13  breach of fiduciary duty on his part?
14         MR. BRESSLER:  Object to the
15    form --
16    A.    Yes.
17         MR. BRESSLER:  -- but he may
18    answer.
19    A.    I don't think he paid as much
20  attention to the potential of that company in
21  completing the sale.  He took the figures that
22  you've averted to now.  You called it an
23  auction or something like that.  I understand
24  there were just a few actual bidders.  Somehow
25  he raised those figures.  How he did it, I

Page 393

```
1    A.    That's about all.
2              MR. BRESSLER:  No further
3    questions.
4              MR. PETERS:  I have nothing
5    further at this time subject to my
6    earlier comments.
7              Thank you very much for your
8    patience, sir.
9              THE WITNESS:  You're welcome.
10             VIDEO TECHNICIAN:  This is the
11   end of Tape 3, Volume 2, in the
12   deposition of Arlin M. Adams.
13             The original videotape will be
14   retained by Livenote World Services.  We
15   are going off the record.  The time on
16   the monitor is 1:55.
17             (Witness excused.)
18             (The deposition concluded at
19   1:55 p.m.)
20
21
22
23
24
25
```

Page 394

```
1              I have read the foregoing
2    transcript of my deposition given on
3    Wednesday, March 28, 2007, and it is
4    true, correct and complete to the best of
5    my knowledge, recollection and belief
6    except for the corrections noted hereon
7    and/or the list of corrections, if any,
8    attached on a separate sheet herewith.
9
10
11
12             _____
13                ARLIN M. ADAMS
14
15
16
17   Subscribed and sworn before
18   me this ____ day of_____, 2007
19
20
21
22
23
24
25
```

Page 395

```
1                   CERTIFICATE
2         I HEREBY CERTIFY that the
3    proceedings, evidence and objections are
4    contained fully and accurately in the
5    stenographic notes taken by me on
6    Wednesday, March 28, 2007, and that this is
7    a true and correct transcript of same.
8
9
10
11
12
13             _____
14             Cynthia A. Whyte, RPR
15
16
17         (The foregoing certification of
18   this transcript does not apply to any
19   reproduction of the same by any means,
20   unless under the direct control and/or
21   supervision of the certifying reporter.)
22
23
24
25
```

# Exhibit E

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| CORAM HEALTHCARE CORP. and | ) | |
| CORAM, INC., | ) | Case No. 00-3299 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

---

## CHAPTER 11 TRUSTEE'S POST-CONFIRMATION HEARING REPLY BRIEF

---

Barry E. Bressler
Wilbur L. Kipnes
Richard A. Barkasy
Matthew B. Holmwood
Michael J. Barrie

SCHNADER HARRISON SEGAL & LEWIS
LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103-7213
(215) 751-2000

-and-

Kenneth E. Aaron (#4043)

WEIR & PARTNERS LLP
824 Market Street Mall, Suite 1001
P.O. Box 708
Wilmington, Delaware 19899
(302) 652-8181

Co-Counsel to Arlin M. Adams, Chapter 11
Trustee

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................... ii

I.    INTRODUCTION. ..................................................................... 1

II.   THE TRUSTEE'S PLAN IS PROPOSED IN GOOD FAITH. ...................... 1

III.  THE TRUSTEE'S PLAN IS FAIR AND EQUITABLE TO CHC'S
      COMMON SHAREHOLDERS BECAUSE THEIR DISTRIBUTION
      UNDER THE PLAN IS GREATER THAN THE VALUE OF THEIR
      INTERESTS. ................................................................................. 5

      A.   The Trustee's Confirmation Value Comports With Existing Case Law
           and Is More Credible Than The EC's Valuation..................................... 5

      B.   If The EC's Estimates of The Settlement Value of The Litigation
           Claims Prove Accurate, Equity Will Receive More than $126 Million
           Under The Trustee's Plan. ........................................................ 7

      C.   The Noteholders Do Not Receive a Windfall Under The Plan. ................. 8

IV.   THE TRUSTEE'S PROPOSED PARTIAL SETTLEMENT OF THE
      PROPOSED DERIVATIVE LITIGATION IS WELL ABOVE THE
      LOWEST RANGE OF REASONABLENESS. ......................................... 9

V.    THE COURT SHOULD APPROVE THE R-NET SETTLEMENT
      WHICH WAS NEGOTIATED AND PROPOSED IN GOOD FAITH. ............ 12

VI.   CONCLUSION. ....................................................................... 15

*        *        *

EVIDENTIARY REPLY APPENDIX.........................................................

i

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

In re Dow Corning Corp., 244 B.R. 678 (Bankr. E.D. Mich. 1999)............................... 8

In re Exide Technologies, 303 B.R. 38 (Bankr. D. Del. 2003).................................. 5-7

In re Lorazepam & Clorazepate Antitrust Litigation, 205 F.R.D. 369 (D.D.C. 2002)...... 12

Oak Park Calabasas Condominium Assoc., 302 B.R. 665 (Bankr. C.D. Cal. 2003).......... 8

Onink v. Cardellucci (In re Cardellucci), 285 F.3d 1231 (9th Cir.), cert. denied,
    537 U.S. 1072 (2002).................................................................... 8

In re Sound Radio, Inc., 93 B.R. 849 (Bankr. D.N.J. 1988)................................. 1

In re Times Sales Financial Corp., 491 F.2d 841 (3d Cir. 1974)............................. 8-9

In re Trans World Airlines, Inc., 134 F.3d 188 (3d Cir. 1998)............................... 5-6

In re Warfarin Sodium Antitrust Litigation, 212 F.R.D. 231 (D. Del. 2002)............... 12

Weil v. Long Island Savings Bank, 188 F. Supp. 2d 258 (E.D.N.Y. 2002).................. 12

In re Zenith Electronics Corp., 241 B.R. 92 (Bankr. D. Del. 1999)......................... 1

**FEDERAL STATUTES**

11 U.S.C. §1129............................................................................... 1

18 U.S.C. §1962............................................................................... 11-12

## I. INTRODUCTION.

The Trustee submits this Brief in reply to the Equity Committee's Post-Trial Memorandum ("EC Brief").[1] Unfortunately, the EC's argument is based on many half-truths, mistruths, out of context quotes, and blatantly disregards the record. Space limitations make it impossible to correct all of these misstatements or address all the internal inconsistencies and contradictory arguments in the EC's Brief. The Court carefully listened to the testimony and received the exhibits, and will consider the post-hearing Briefs. The Trustee believes that the evidence in support of confirmation of his Plan is compelling.

## II. THE TRUSTEE'S PLAN IS PROPOSED IN GOOD FAITH.

The EC contends that the Trustee's Plan cannot be confirmed because it was not proposed in good faith as required by 11 U.S.C. §1129(a)(3). Apparently having been successful in arguing lack of good faith in connection with the Debtors' prior plans, the EC has decided to place the Trustee into the same category as the Debtors' prior conflicted CEO. Despite the EC's extensive discovery of every aspect of the Trustee's settlement negotiations, all the evidence confirms that the Trustee has proposed his Plan with honesty, good intentions, and a reasonable basis for expecting that his Plan is feasible and can be confirmed and effected with results consistent with the objectives and purposes of the Bankruptcy Code.[2]

The record is clear that the Trustee first pursued a consensual plan of reorganization and proposed the current Plan only after the EC's conduct established clear that the EC had no

---

[1] Terms referred to herein and not defined shall have the same meaning as used in the Chapter 11 Trustee's Post-Confirmation Hearing Brief ("Trustee's Brief"). Transcripts the Trustee refers to for the first time in this reply Brief appear in the Trustee's Supplement Appendix ("TSA_").

[2] See In re Zenith Electronics Corp., 241 B.R. 92, 107 (Bankr. D. Del. 1999) (quoting In re Sound Radio, Inc., 93 B.R. 849, 853 (Bankr. D.N.J. 1988)), where the Court noted: "The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code."

genuine interest in a consensual plan.  The Trustee moved forward consistent with his fiduciary

obligations to serve the interests of all the constituencies.  In doing so, he negotiated favorable

settlements of the substantial claims of the Internal Revenue Service and R-Net.  He was able to

propose a Plan which provided for:  (a) payment in full to all unsecured creditors (other than the

Noteholders), and (b) a very substantial certain distribution to the shareholders.  In formulating

his Plan, the Trustee was cognizant that the Noteholders were unsecured creditors and interest

holders with claims including post-petition interest in excess of $370 million.  He was also

cognizant of the claims of CHC's shareholders and sought to maximize their return.[3]  Finally, the

Trustee proceeded with the interests of Coram's thousands of employees and patients/customers

in mind, groups totally lost sight of by the EC.

     The process and substance of the Trustee's negotiations with various parties was detailed

in the testimony of:  the Trustee, Marshall Stearns, Hobart Truesdell, J. Scott Victor, Samuel

Bemiss, and even Donald Liebentritt.  That testimony made clear that the Trustee proceeded in a

manner that was a model of honesty and good intentions, and that his goal was to achieve a

feasible, fair and equitable result for all the constituencies to which he owed a fiduciary duty.

The EC's contentions to the contrary are not supported by the record.  Indeed, its representations

regarding "process" at times border on the intellectually dishonest.

     The following, while by no means exhaustive, are illustrative:

     (1)     The evidence clearly established that the Trustee's Plan was _not_ agreed to

on September 25, 2002.  Indeed, the EC itself submitted into evidence numerous drafts of the

Plan Funding Agreement, each reflecting ongoing negotiations and various substantive changes,

including changes made up to the very day the Plan was filed on May 2, 2003.  Those changes

---

[3] The Trustee's Plan, unlike the two prior failed Debtors' plans, pays the unsecured creditors in full and is far more beneficial to CHC's shareholders.

included a significant increased contribution to the settlement by the Noteholders. Between September 25, 2002 and May 2003, the Trustee was also negotiating settlements with the IRS and R-Net, which were necessary prerequisites to filing a plan providing payment in full to unsecured creditors and a large distribution to shareholders.

(2)    The Trustee attempted to negotiate a consensual resolution with the EC, but the evidence revealed that the EC was less than forthright in its negotiating tactics. After Samuel Zell told the Trustee that the EC wanted a settlement for shareholders of approximately $60 million dollars (TA311), the EC's initial demand at the mediation session was $118 million, and the EC never decreased its demand below $99 million. (TA127). Even worse, Mr. Liebentritt, the EC's lead spokesman, testified that just before the Trustee was appointed, he would have accepted an amount in the $50-55 million dollar range. He never disclosed that fact to the Trustee or his counsel because, as Liebentritt lamely said, "no one asked that question." (TA260).

(3)    That the EC had no intention of engaging in meaningful negotiations is demonstrated by the fact that the EC had begun to work on its own plan before the mediation session took place, without even mentioning this to the Trustee. Indeed, the EC never advised the Trustee at any time that it was preparing its own plan until a week before its EC Plan was prematurely filed in December 2002. (TA259).

(4)    The EC is incorrect that the Trustee did not have sufficient information regarding the value of Coram or the proposed derivative claims before entering into a proposed settlement with the Noteholders or proposing his Plan. In particular:

(a)    The uncontradicted testimony was that both Messrs. Victor and Bemiss consistently advised to the Trustee that there was no realistic likelihood that the company

3

could be sold for more than $250 million (TA24-27; TA59), even though they stood to earn far

larger fees by selling Coram.

        (b)    The Trustee and his advisors had the benefit of the extensive and

detailed investigation[4] of the prospective derivative claims by counsel for the EC, as well as

additional investigation of those claims by Trustee's counsel, and the Briefs and arguments all

parties presented.  (TA126-27; TA265).  Even then, the Trustee did not agree to the Plan

Funding Agreement with the Noteholders until after he received Mr. Shestack's advice that the

settlement was well above the low end of the range of reasonableness.  (TA125-26).

        (c)    The EC asserts that "notwithstanding the material increase in

Coram's value since the Trustee made his deal with the Noteholders, the Trustee acknowledges

that he has not increased the return to the stockholders."  That statement is completely

inaccurate.  The first amendment to the Trustee's Plan changed the recipient of the net proceeds

of both the proposed derivative claim against Daniel Crowley and the outside directors and the

PWC litigation from Reorganized Coram to the shareholders (after only payment of judgment

rate interest to the unsecured creditors).  The EC Brief asserts that the settlement values of these

claims are $56 million and $30 million respectively.  Even if the EC's estimates are drastically

overstated, as it appears, it is clear that the Trustee's first plan amendment will likely increase

substantially the return to the CHC shareholders.  Likewise, the Trustee's second plan

amendment, by which the Noteholders assume direct payment of the $16 million balance due on

the IRS settlement and contribute $40 million of the Noteholders' in cash,[5] greatly benefited the

---

[4] The EC spent millions of dollars investigating the litigation claims before and after the Trustee was appointed.
(TA264).  Surely, the EC does not contend that the Trustee should have duplicated that work.

[5] The Noteholders will now receive only zero coupon preferred stock, rather than a secured loan.

shareholders. Moreover, the $560,000 commitment fee in the previous loan agreement will no longer be required and will be available for distribution to CHC shareholders.

(d)     EC's discussion of the Trustee's second plan amendment is illustrative of the inconsistencies that have pervaded the EC's entire confirmation case. Judge McKelvie testified that it was hard to gauge whether the settlement was worth $56 million dollars because it was largely reflected by a loan to Reorganized Coram. (TA229). Although the Trustee disagreed that the form of the contribution was substantively meaningful, in order to satisfy this concern, the Trustee continued to negotiate with the Noteholders and persuaded them to make the entire funding in cash. It is disingenuous for the EC now to contend that the second modification to the Plan was "entirely cosmetic" and adds no value.

(e)     Similarly, the EC ignores the undisputed fact that the Noteholders have received no cash interest payments or cash dividends on their preferred stock since these proceedings began several years ago, which represents a large counter-balance to the increase in Coram's value since the Trustee proposed his Plan.

## III.     THE TRUSTEE'S PLAN IS FAIR AND EQUITABLE TO CHC'S COMMON SHAREHOLDERS BECAUSE THEIR DISTRIBUTION UNDER THE PLAN IS GREATER THAN THE VALUE OF THEIR INTERESTS.

### A.     *The Trustee's Confirmation Value Comports With Existing Case Law and Is More Credible Than The EC's Valuation.*

The EC contends that Judge Carey's opinion in In re Exide Technologies, 303 B.R. 48 (Bankr. D. Del. 2003), supports its position on valuation. This reliance on Exide is misplaced.

The EC asserts that Exide rejected a "third-party sale" approach to the valuation of an asset in bankruptcy. Contrary to the EC's contention, Judge Carey did not depart from established Third Circuit precedent that the fair valuation of an asset in bankruptcy requires the determination of its market value, which "must be analyzed in a realistic framework,"

5

considering amounts that can be realized "in a reasonable time" assuming a "willing buyer" and a "willing seller." In re Trans World Airlines, Inc., 134 F.3d 188, 193-94 (3d Cir. 1998).[6]

Exide states that the most appropriate method to determine the enterprise value of a debtor corporation is by a "straight forward application" of three standard valuation methodologies:  (1) comparable company analysis; (2) comparable transactions analysis; and (3) discounted cash flow ("DCF") analysis. See Exide, 303 B.R. at 65-66. Judge Carey criticized the debtor's valuation expert because he made "numerous adjustments to the valuation methodologies" in order to bring it in line with the expert's view of the current market value. See id. In contrast, EB/SSG made no such adjustments.

As explained by both Victor and Bemiss, EB/SSG performed its valuation of Coram by utilizing this precise "straight forward application" of the three standard valuation methodologies. (TA60-64; Tr. Ex. 11). EB/SSG did not make downward subjective adjustments to the results of the analyses to reflect their view of the current market value. Indeed, Bemiss testified that the value indicated by the traditional methodologies was "aggressive" given his knowledge of the market. (TA70).

Deloitte's valuation for the EC is not consistent with Exide. It is not a "straight forward" application of the valuation methodologies which, as performed by Deloitte, yielded a valuation of $279 million. (EC Ex. 51 at 38). Apparently concerned that even this stretched valuation was not high enough to support the Equity Plan, Deloitte departed from its previous methodology[7] and added approximately $100 million for what it calls non-operating assets: cash, NOLs and goodwill amortization. In Exide, the valuation experts for both sides utilized management's

---

[6] Indeed, EB/SSG and Deloitte both indicated that they followed this approach. (TA56-57; TSA34).

[7] Deloitte did not ascribe any value for cash, NOLs or goodwill in the valuations that it performed for the Debtors' first and second confirmation hearings.

6

five-year projections in performing their DCF analyses. Deloitte, however, performed just the type of adjustment of which Judge Carey was critical -- it rejected management's projections and adjusted Coram's growth rate upward for its DCF analysis, from the growth rate deemed appropriate by management, in order to achieve its artificially inflated value, even before adding the "non-operating assets." Similarly, Deloitte made overly aggressive subjective adjustments to EBITDA, which increased its indicated value under the comparable transactions analysis by approximately $78 million.

The EB/SSG's valuation totaled more than eight times reported trailing 12 months EBITDA (TA70-71) and utilized methodologies consistent with <u>Exide</u>. Every expression of interest the Trustee and his financial advisors received supported EB/SSG's valuation and confirmed that Coram is worth less then $250 million (TA24-27; TA58-59), which leaves the common shareholders "out of the money."

> **B.**    *If The EC's Estimates of The Settlement Value of The Litigation Claims Prove Accurate, Equity Will Receive More Than $126 Million Under The Trustee's Plan.*

Under the Trustee's Plan, common shareholders get a cash distribution of more than $40 million, which is in excess of the market cap of the stock at the time the confirmation hearings ended. If the EC's unsupported estimates of the settlement value of the PWC litigation ($30 million) and the claims against Crowley and the outside directors ($56 million) turn out to be accurate, **<u>CHC's shareholders</u>,** which the testimony of Victor, Bemiss and Hurst established were out of the money, **<u>will receive a total distribution of more than $126 million</u>.** This would represent a return of more than 3000% on Samstock's post-petition investment of more than two million shares. (Tr. Ex. 6). Such a distribution is clearly fair and equitable.

**C.    *The Noteholders Do Not Receive a Windfall Under The Plan.***

The EC contends that the Trustee's Plan is not fair and equitable because the Noteholders will receive more than the value of their claims. The EC's argument relies upon several false premises.

Initially, the EC reduces the Noteholders' claims from more than $370 million to $262 million. The EC has still not coherently answered the question posed by the Court during argument on the Noteholders' motion to dismiss the equitable subordination complaint:

> If the enterprise value permits post petition interest to a creditor, a
> debt holder, why would they [the Noteholders] not be entitled to
> the interest?

The arguments in the EC Brief in this regard make no more sense now than when made by Mr. Bradford at argument and were skeptically received by the Court then. (TSA38-42).

The cases relied upon by the EC do not support its position. The court in In re Dow Corning Corp., 244 B.R. 678 (Bankr. E.D. Mich. 1999), actually held that a plan that proposed to pay commercial creditors post-petition interest at the federal judgment rate instead of the contract rate was not fair and equitable. The EC's reliance upon Onink v. Cardellucci (In re Cardellucci, 285 F.3d 1231, 1233 (9th Cir.), cert. denied, 537 U.S. 1072 (2002), is also misplaced. The Ninth Circuit's holding in Onink was specifically limited to the distribution by a trustee in a Chapter 7 case pursuant to §726(a)(5) of the Code and is not applicable in a Chapter 11 context. See Oak Park Calabasas Condominium Assoc., 302 B.R. 665, 672 (Bankr. C.D. Cal. 2003). Likewise, the Third Circuit's opinion under the old Bankruptcy Act in In re Times Sales Financial Corp., 491 F.2d 841 (3d Cir. 1974) (J. Adams) -- holding no abuse of discretion by the denial of post-petition interest to a creditor where a subordination agreement did not clearly provide that post-petition interest was to be subordinated -- is inapposite.

The EC adds $86 million it unilaterally attributes to the potential settlement value of the retained litigation claims to the Noteholders' column. This is not forthright. The **shareholders** are to receive the net proceeds of such claims. The EC also contends inexplicably that $41 million of Coram's cash will remain "in the Noteholders' hands" even though all but $10 million of that cash will be used to pay creditors or go to the shareholders.

Finally, the NOLs will have only speculative (if any) value to the post-confirmation Debtors. Coram's Director of Taxation, Scott Moeller, gave detailed and unrebutted testimony that the Debtors would likely lose an IRS challenge to the Debtors' use of NOLs due to arguably inconsistent past tax filing positions. The EC's witness on NOLs is neither an expert in tax nor NOL issues and he did not fully review Moeller's testimony.

In reality, under the Trustee's Plan, the Noteholders are not receiving anything close to the full amount of their claims. The Noteholders are contributing $56 million in fresh funding and relinquishing claims of more than $370 million and in return are receiving a company that can be fairly valued at no more than $229 million.[8]

## IV.    THE TRUSTEE'S PROPOSED PARTIAL SETTLEMENT OF THE PROPOSED DERIVATIVE LITIGATION IS WELL ABOVE THE LOWEST RANGE OF REASONABLENESS.

In its Disclosure Statement, based upon Professor Fischel's initial report, the EC represented to creditors and shareholders that the damages in the derivative action exceeded $320 million. (Tr. Ex. 6 at 22). But during the confirmation hearing, Professor Fischel reduced his calculation to $265 million. (TA210-211). Now that Dr. Tabak has established, without

---

[8] Although not appropriate for valuation purposes, even if the $10 million in cash working capital remaining in Reorganized Coram is added to what the Noteholders receive under the Plan in exchange for all their claims, they are still $150 million short of being made whole even excluding their $56 million cash settlement payment. The shortfall to the Noteholders was illustrated by Mr. Liebentritt's testimony on cross-examination regarding the demonstrative chart he had prepared. (TSA30-32).

challenge, that Professor Fischel made a mistake of more than $100 million and that the maximum amount of damages under his flawed yardstick methodology would approximate $138 million, the EC ignores the other potential deficiencies in the yardstick methodology.  In fact, the EC seems to have abandoned Fischel's figures and now suggests a different damages theory.

The EC Brief asserts that rescissory damages based on the sale of CPS are approximately $275 million, but did not offer any competent evidence to support this belated damages calculation.  Damages cannot be calculated simply by subtracting the sale price of CPS in 2000 from the sale price of Curascript in 2004.  As the Trustee explained, such a simple comparison is "very unrealistic" because the nature of the company changed dramatically after Coram sold it.  (TSA22-24).  The damages analysis will be complex and it will certainly be opposed vigorously.

Furthermore, because the Curascript sale occurred so recently and minimal evidence would be more misleading than illuminating, the Court properly sustained objections to questions regarding the sale of Curascript and the documents the EC now improperly cites in support of its argument.  (EC Exs. 150, 179; TSA12; TSA21; TA148-49).

The EC also ignores the liability defenses available to contest this claim.  As Mr. Shestack testified, the defendants would have strong arguments as to why Coram's decision to sell CPS did not constitute a breach of fiduciary duty:

- CPS was a cash drain on the company;
- The initial decision to sell CPS pre-dated Crowley;
- The sale was completed after competitive bidding;
- The sale was approved by the Board of Directors;
- The Board received a fairness opinion from Deutsche Bank Alex Brown.  (TSA8-9; TSA14-15).

Finally, as pointed out in our main Brief, if there is a basis for such a claim, it would be against Crowley and the outside directors who made the decision to sell CPS.  The possibility of

10

a claim based on the sale of CPS does not in any way detract from the reasonableness of the Trustee's proposed settlement with the Noteholders.

The EC next adds $55 million in "hard" damages it contends were established by Mr. Godnick during his cross-examination of Shestack. The EC appears to contend that Mr. Godnick's questions themselves constitute evidence.[9]  Actually, what Mr. Godnick asked Mr. Shestack was a series of hypothetical questions through which he sought to establish that the maximum amount of the possible damages in the derivative case, aside from damages based on Professor Fischel's yardstick measure, could not exceed $55 million. He made various assumptions "to give equity the benefit of the doubt." (TSA18). For example, he asked Mr. Shestack to assume that the Noteholders would be liable for all of the costs associated with Coram's bankruptcy and that those costs were $45 million, without reference to any supporting documentation for the years since the Goldin report was issued. (TSA18). Mr. Shestack clearly did not agree that there are $55 million in "hard" damages. A fair reading of Mr. Shestack's testimony suggests that he did not concur, other than to suggest that if $55 million were the maximum damages then $56 million was obviously a tremendous settlement. (TSA18).

The EC next suggests that its inflated damages claim should be trebled. According to the EC, Judge McKelvie testified "persuasively" that the RICO case against Cerberus, Feinberg and Crowley "would survive a summary judgment motion." (EC Brief at 42). But, Judge McKelvie acknowledged that he was not offering an opinion that the 18 U.S.C. §1962(c) claim would survive summary judgment. (TA233-34). In addition, Judge McKelvie testified that there was no guarantee that the other RICO claims would get past motion practice and that he was "not

---

[9] Neither Professor Fischel nor Judge McKelvie testified about any "hard" damages.  To the contrary, Judge McKelvie admitted that he did not even analyze them. (TA237).

11

prepared to put a percentage to it." (TA234). In any event, surviving summary judgment does not mean success at trial or on appeal.

The EC Brief also asserts that Mr. Shestack acknowledged that all of the elements of a RICO claim, except whether Coram could prove a "pattern of predicate acts," were present in this case. (EC Brief at 43). That statement is unsupportable. Mr. Shestack repeatedly stated that the biggest obstacle facing the RICO plaintiff was that the alleged scheme was subject to vigorous attack. Yet, the alleged scheme is the linchpin of a RICO claim.

In arguing that there is evidence from which Goldman and Foothill could be held liable under RICO (EC Brief at 45), the EC is at odds with its proposed complaint and is at odds with its own expert. Neither Goldman nor Foothill are named as RICO defendants. Addressing the claims naming them, Judge McKelvie testified that "I couldn't identify from the core facts that I looked at sufficient facts to say from those facts alone that they would survive a motion for summary judgment." (TSA29).

Finally, because RICO and antitrust claims are so difficult to prove, the recovery of treble damages is considered "purely speculative," and courts evaluate settlements by comparing the settlement amount with the estimated single damages, not treble damages. See In re Warfarin Sodium Antitrust Litigation 212 F.R.D. 231, 257-58 (D. Del. 2002) (C.J. Robinson); see also In re Lorazepam & Clorazepate Antitrust Litigation 205 F.R.D. 369, 377, n.12 (D.D.C. 2002); Weil v. Long Island Savings Bank, 188 F. Supp. 2d 258, 264 (E.D.N.Y. 2002).

## V.    THE COURT SHOULD APPROVE THE R-NET SETTLEMENT WHICH WAS NEGOTIATED AND PROPOSED IN GOOD FAITH.

The Equity Committee contends that the Trustee's Plan should not be confirmed because his Disclosure Statement did not adequately disclose the terms of his settlement with R-Net. This argument is based upon serious distortions of the record.

On May 2, 2003, when the Trustee filed his Plan, counsel for the Trustee sent counsel for the R-Net Creditors' Committee a letter to confirm the oral "settlement in principle" that the Trustee had reached with the R-Net Creditors' Committee and the R-Net Debtors. Contrary to the EC's assertion, the letter was not the final settlement agreement -- the letter specifically provides that a formal settlement agreement would be negotiated in due course. (Tr. Ex. 27).

As Hobart Truesdell, R-Net's court-appointed Chief Liquidating Officer testified, as of May 2, 2003, neither he nor his counsel had engaged in any negotiations with counsel for the Trustee regarding the language of a settlement agreement. (TSA3). Thereafter, the parties did negotiate a written settlement agreement that contains a number of different material terms from the May 2 letter. The written agreement was executed at the end of July 2003. (Tr. Ex. 96).

A copy of the written settlement agreement was not included in the Trustee's Disclosure Statement because it had not been completed when the disclosure statement was approved. The settlement agreement was filed on August 18, 2003 with the Trustee's motion to allow R-Net's claim for voting purposes and was included in the Trustee's Plan Supplement, which was filed before the commencement of the confirmation hearings and prior to the conclusion of voting.

The EC claims that the Trustee did not reveal R-Net's agreement to vote for the Trustee's Plan and against the Equity Plan. In fact, there was nothing for the Trustee to disclose because there was no such agreement. The final, integrated settlement agreement does not contain such a provision and Mr. Truesdell testified that R-Net did not have an obligation to vote for the Trustee's Plan or against the Equity Plan. (TSA4-5; Tr. Ex. 96). Mr. Truesdell explained that, despite the EC's substantial efforts to solicit its vote, R-Net voted against the Equity Plan because he was "quizzical about how the plan was being funded." (TSA5).

13

The EC also asserts that the Plan and Disclosure Statement do not reflect that the Noteholders would be released from R-Net's claims. Contrary to this argument, the Plan clearly provides that the Noteholders are to receive a complete release from all persons who may have claims against them "in any way relating to the Debtors, this Plan or the Chapter 11 Case." (Tr. Ex. 2 at p. 34). To the extent there was any question whether this broad release language covered the R-Net claims, it was answered when, before the confirmation hearing commenced, the Trustee filed his motion to allow the R-Net claim for voting purposes and the Plan Supplement. The EC is the only party in either these proceedings, or the R-Net Chapter 11 cases, to object to that release. Indeed, this Court confirmed R-Net's Chapter11 Plan and approved R-Net's settlement with the Trustee in the R-Net case.

The EC's arguments are a continuation of its attempts to mislead the Court regarding the R-Net settlement. For example, Donald Liebentritt inaccurately testified about how and when the EC first received a copy of the R-Net settlement agreement. During his direct examination, he testified that the EC learned of R-Net's release of the Noteholders when it subpoenaed documents from R-Net. (TSA26-27). In fact, as established during Mr. Liebentritt's cross-examination, the Trustee's counsel faxed a copy of the settlement agreement (which includes R-Net's release of the Noteholders) to Mr. Levy on July 30, 2003, just after it was executed. (Tr. Ex. 96; TSA36-37). The motion of the R-Net Creditors' Committee to quash the subpoena served upon it by the EC was filed about a month later and, contrary to Liebentritt's testimony, was not joined in by the Trustee. (Tr. Ex. 97; TSA37).

The EC's argument that estate funds were used to obtain R-Net's release of the Noteholders is a misrepresentation of the terms of the Trustee's Plan. One of the main sources of funding for the Trustee's Plan, including the $7.95 million to be paid to R-Net, is the $56 million

14

to be contributed by the Noteholders. Without a global release, the Noteholders would not have agreed to contribute these funds. (TA111-12). And even a cursory review of the R-Net Plan and dockets makes clear that the increase in the settlement payment to R-Net was to fund unexpectedly large GAP claims, allowing a dividend to R-Net's unsecured creditors.

## VI.    CONCLUSION.

What these proceedings come down to is the following comparison. If the Trustee's Plan is confirmed: (1) the unsecured creditors will be paid in full; (2) the R-Net settlement will be paid and the R-Net Plan will be implemented; (3) the IRS claim will be paid by the Noteholders; (4) the Noteholders will relinquish the balance of their claims; (5) a debt-free Coram will proceed as a private company with no STARK II problems; (6) the shareholders will receive over $40 million in cash and the opportunity for substantially more from the claims against Crowley, the outside directors and PWC. In contrast, if the EC Plan is confirmed, there is no reason to believe that Coram would be able to meet its debt obligations, which would include payments to the IRS and the Noteholders, and it will likely encounter additional STARK II problems as a public company. Furthermore, the future of the company and any return to shareholders would be bet on speculative litigation that would result in continued turmoil for the Debtors. The choice is clear -- the Trustee's Plan is better for all constituencies[10] and more closely conforms to the Bankruptcy Code and its purposes. Accordingly, it should be confirmed.

**[This space intentionally left blank.]**

---

[10] The Trustee's Plan was accepted by all classes of creditors and a clear majority of the shareholders who cast ballots. See Affidavits of Balloting Agent and the Trustee's Report of Plan Voting (TSA at 43-103).

Dated: June 14, 2004                    Respectfully submitted,

WEIR & PARTNERS LLP                     SCHNADER HARRISON SEGAL & LEWIS LLP

By: /s/  Kenneth E. Aaron               Barry E. Bressler
    Kenneth E. Aaron                    Wilbur L. Kipnes
824 Market Street Mall, Suite 1001      Richard A. Barkasy
P.O. Box 708                            Matthew B. Holmwood
Wilmington, Delaware  19899             Michael J. Barrie
Ofc: 302-652-8181/Fax: 302-652-8909     1600 Market Street, Ste. 3600
                                        Philadelphia, PA  19103-7213

              Co-Counsel to Arlin M. Adams, Chapter 11 Trustee

16

### EVIDENTIARY REPLY APPENDIX

**I.    THE EC'S BRIEF IMPROPERLY RELIES ON EXHIBITS 150 AND 179 WHICH ARE INADMISSIBLE.**

The EC seeks to admit, and relies in the EC Brief upon, EC Exhibits 150 and 179, which relate to the recent sale of Curascript to Express Scripts.  EC Exhibit 150 appears to be some sort of press release for which the author was not identified and EC Exhibit 179 is alleged by the EC to be the Stock Purchase Agreement.

No witness with knowledge of these documents or of the transaction testified.  Hence, the documents constitute hearsay statements that are inadmissible pursuant to Fed. R. Evid. 802. Further, without some testimony as to the nature of the company being sold at the time of sale, the entire structure of the transaction, and all considerations of the parties, these documents would not be relevant to the valuations or damages theory here in any event.

During the hearing, the EC sought to question Mr. Shestack and the Trustee about EC Exhibits 150 and 179, but the Court did not permit it to do so, sustaining objections.  (STA12; STA21; TA148-49).

For these reasons, EC Exhibits 150 and 179 should not be admitted and should not be considered by the Court.

**II.    THE EQUITY COMMITTEE'S ONLY OBJECTION TO THE TRUSTEE'S DEPOSITION DESIGNATIONS IS WITHOUT MERIT AND ITS OBJECTIONS TO THE NOTEHOLDERS' DESIGNATIONS HAVE NO IMPACT ON THE TRUSTEE'S POST-CONFIRMATION BRIEF.**

The EC's Objections To The Designations suggests that the Trustee "attempted to submit substantial portions of deposition testimony without even acknowledging the requirements of admissibility placed on that testimony – let alone demonstrating compliance with those requirements."  Yet, the EC actually objects to only one individual's testimony designated by the

Trustee – Richard Haydon – and the designation of the testimony of Richard Haydon is entirely proper. Many of the EC's objections of the Noteholders designations appear wrong, but are irrelevant to the Trustee's Post-Confirmation Brief since the Trustee has not cited to such designations.

**A.    The Equity Committee Ignores The Fact That Richard Haydon Is A Member Of The Equity Committee.**

The EC objects to the designations from Richard Haydon's testimony, apparently contending that Haydon's testimony is hearsay and it cannot be admitted under an exception to the hearsay rule because the requirements of Fed. Rule of Evidence 804(b)(1) have not been met. Haydon's testimony, however, is not hearsay and no exception to the hearsay rule is required.

Haydon is a member of the EC. (Tr. Ex. 6 at 15 (EC Disc. Statement at 11)). His deposition testimony is admissible as the testimony of a party-opponent under Rule 801(d)(2).[1] The EC apparently agrees with this analysis as it does not object to the designations of either Donald Liebentritt's or Samuel Zell's deposition testimony.

Even assuming that the EC's reliance on Federal Rule of Evidence 804(b)(1) was correct, its argument that the requirements of Rule 804(b)(1) are not met is frivolous. The EC contends that this Court should exclude deposition testimony of a number of individuals – most of whom were noticed and deposed by the EC – on the basis that the parties did not have sufficient motive to develop the testimony. This Court is well aware that these proceedings have been litigated exhaustively and, while the Trustee's Plan is significantly different than the Debtors' plans, many of the same issues have dominated (e.g., valuation) throughout these proceedings.

---

[1] The Federal Rules of Evidence apply pursuant to Bankruptcy Rule 9017. In addition, Federal Rule of Civil Procedure 32(a)(2) incorporated by Bankruptcy Rule 7032 allows the use of deposition testimony taken from a party without regard to whether the person is located more than 100 miles from the place of trial.

2

**B.**     ***The Equity Committee's Objections To The Noteholders' Designations Are
Generally Incorrect And Are Irrelevant To The Trustee's Post-Confirmation
Brief.***

The Trustee's Post-Confirmation Brief did refer to four witnesses designated by the

Noteholders that the EC contends are not admissible.  The EC's objections are meritless and the

facts cited to by the Trustee are amply supported by other testimony cited in the Trustee's Brief.

On page 31, the Trustee cited to the deposition testimony of Coram directors – Don

Amaral, William Casey, L. Peter Smith and Sandra Smoley – to substantiate Mr. Shestack's

testimony that the directors testified under oath that Daniel Crowley did a good job at Coram.

The testimony of these individuals about Mr. Crowley's performance clearly meets the EC's

Rule of Evidence 804(b)(1) objection.  The EC had a motive to develop testimony about Mr.

Crowley's performance.  In fact, in each case, Richard Levy, counsel for the EC, asked the

question that lead to the testimony relied upon by the Trustee.  Regardless, even if the testimony

was hearsay, the Trustee cited the testimony for non-hearsay uses.  First, it was cited to support

Mr. Shestack's testimony.  Second, it was cited to show that in defending the derivative claims

the Noteholders could elicit testimony that Coram improved operationally under Mr. Crowley.

Finally, on page 29 of the Trustee's Brief, he cited Professor Fischel's deposition to show

that Professor Fischel admitted that any number of factors could have caused Coram to

underperform his index.  Professor Fischel admitted this fact again during his testimony at the

confirmation hearings on the current Plans (TA221), and the Trustee's Brief cited to the hearing

transcript as well.

3