## EXHIBIT 3

## CORAM HEALTHCARE CORPORATION

## RESOLUTIONS OF THE BOARD OF DIRECTORS

### December 21, 1999

WHEREAS, this Board of Directors recognizes that the Company is facing a number of serious financial, litigation, operational and other challenges that may impair its ability to attract and retain qualified and experienced persons to serve on its Board of Directors and to serve as officers;

WHEREAS, this Board has previously authorized Company management to obtain insurance to cover the errors and omissions of its directors and officers in the course and scope of their employment and/or engagement with the Company and the Company currently maintains such coverage totaling $35 million; and

WHEREAS, this Board has determined that obtaining additional levels of insurance to cover such acts or omissions of its directors and officers would be in the best interests of the Company and its stakeholders;

NOW, THEREFORE BE IT RESOLVED, that the Chairman of the Board, Chief Executive Officer and President or any Executive Vice President, any Senior Vice President, any Vice President or the Secretary of the Company (the "Authorized Officers") are each hereby authorized, empowered and directed to obtain and expend Company funds to obtain additional insurance to cover certain acts or omissions of its directors and officers supplementing the Company's existing coverage to bring the overall coverage under such policies to an aggregate of $100,000,000 to be effective as of November 30, 1999;

FURTHER RESOLVED, that all prior actions taken by the Authorized Officers in searching for, negotiating, obtaining and binding the director and officer insurance coverages that were outlined at this meeting are hereby ratified, confirmed and approved as the acts and deed of the Company; and

FURTHER RESOLVED, that each Authorized Officer is hereby authorized, empowered and directed to take such further actions and make and execute as the act and deed of this Company any agreement, certificate or document as may be necessary, appropriate or expedient to carry out the intent of these resolutions as set forth above and all such future actions taken are hereby authorized, ratified and confirmed as the acts and deeds of the Company.

## EXHIBIT 4

## CORAM HEALTHCARE CORPORATION

### RESOLUTIONS OF THE BOARD OF DIRECTORS

#### December 21, 1999

WHEREAS, this Board of Directors elected a new Chairman of the Board, Chief Executive Officer and President effective November 30, 1999, to lead the Company and its management team;

WHEREAS, the new Chairman of the Board, Chief Executive Officer and President has recommended that this Board consider continuing the use of his health care consulting firm, Dynamic Healthcare Solutions, L.L.C. ("Dynamic Healthcare"), so that the Company may continue to benefit from the consulting services offered by Dynamic Healthcare and its staff of professionals that are experienced in improving the performance of health care companies;

WHEREAS, the new Chairman of the Board, Chief Executive Officer and President has provided this Board with a summary of the experience and credentials of the Dynamic Healthcare staff and the role that he expects Dynamic Healthcare will play in consulting with the Company;

WHEREAS, the rates applicable to the engagement of Dynamic Healthcare are outlined on Exhibit A hereto and would be set forth in a Consulting Agreement that would be substantially similar to the Consulting Agreement previously negotiated between the Company and Dynamic Healthcare, recognizing that certain members of Dynamic Healthcare have become officers or employees of the Company; and

WHEREAS, this Board has determined that continuing the relationship with Dynamic Healthcare on the terms contemplated hereby would be in the bests interests of the Company and its stockholders due to, among other factors, the experience and credentials of the members of the team at Dynamic Healthcare and the established relationship they have with the Company's new Chairman of the Board, Chief Executive Officer and President;

NOW, THEREFORE BE IT RESOLVED, that the Chairman of the Board, Chief Executive Officer and President or any Executive Vice President, any Senior Vice President or the Secretary of the Company (the "Authorized Officers") are each hereby authorized, empowered and directed to execute and deliver, on behalf of the Company, a new consulting agreement with Dynamic Healthcare using the principal terms presented on Exhibit A with these resolutions and in substantially the form of the prior agreement

negotiated between the Company and Dynamic Healthcare with such changes as such Authorized Officers may deem to be, in their discretion  in the best interests of the Company; and

FURTHER RESOLVED, each Authorized Officer is hereby authorized, empowered and directed, for and on behalf of the Company, to take all such other actions and execute all such documents, certificates and agreements, as may be necessary, appropriate or expedient to carry out the intent of these resolutions as set forth above.

## EXHIBIT A

Coram services to be billed by Dynamic Healthcare Solutions, L.L.C. as follows

| Duties | Name | Rate |
|---|---|---|
| Investor Relations<br>Marketing Communications<br>Print Services | Kurt Davis | $500/day plus expenses |
| Software/Hardware Systems Consulting | Ron Mills | $1,000/day plus expenses |
| Organizational Planning<br>Business Plan Development<br>Human Resources<br>Management Incentive Plans | Dan Smithson | $750/day plus expenses |

# Exhibit C

REPORTER: LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523

EXHIBIT: 32

Witness: Crowley
Date: 4/6/07    # of pages 5

# MINUTES OF A TELEPHONIC MEETING

# OF THE BOARD OF DIRECTORS OF

# CORAM HEALTHCARE CORPORATION

## June 9, 2000

A telephonic meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was called to order at approximately 12:35 p.m. MDT. Participating in the meeting were the following Directors: Daniel D. Crowley, Chairman of the Board, Chief Executive Officer and President; Donald J. Amaral; William J. Casey, and Sandra R. Smoley. Stephen A. Feinberg and L. Peter Smith were absent. Allen J. Marabito, Executive Vice President; Scott R. Danitz, Senior Vice President, Finance and Chief Accounting Officer; John T. McIntyre, Vice President, Treasury; Gerald Reynolds, Vice President, Controller; and Scott T. Larson, Senior Vice President, General Counsel and Secretary, also participated in the meeting. Also participating in the meeting were Fred Leech of Reed Smith Shaw & McClay LLP; David Rosner of Kasowitz, Benson, Torres & Friedman LLP and Christina Morrison and Otu Hughes of Deutsche Banc Alex. Brown. Mr. Crowley acted as Chairman of the meeting and Mr. Larson kept the minutes.

The meeting began with a summary of the events that had transpired during the auction of the Company's Coram Prescription Services business ("CPS") and the ultimate negotiation of the sale of such business to two (2) newly formed affiliates of GTCR Golder Rauner LLC. Ms. Morrison was then invited to discuss in greater detail the terms of the engagement of Deutsche Banc Alex. Brown and the auction process that they were managing for the Company. Ms. Morrison reviewed the parties that received information regarding the business, those that submitted bids and how the buyer entered the process.

Ms. Morrison then outlined the financial analysis that Deutsche Banc Alex. Brown had undertaken in connection with their fairness opinion analysis. She explained that the full analysis was set forth in the fairness opinion that would be delivered to the Company immediately following this meeting. She offered that the legal documents that had been negotiated among the parties were typical and reasonable and that the agreements included many standard provisions, including a liquidated damages provision that included an amount that was within the range of amounts used in other similar transactions. She explained that the fairness analysis performed demonstrated that the value of the CPS business yielded a range of fair prices between $24.6 and $53.6 million. Accordingly, Deutsche Bank Alex. Brown was of the opinion that the transaction was fair from a financial point of view to the Company. She added that the Fairness Opinion would be transmitted to the Company following the meeting and would be made available to all members of the Board of Directors.

Mr. Crowley opened the meeting for questions from the Board of Directors to Ms. Morrison and the other professionals attending the meeting. After discussion, a motion was then

Minutes of the Board of Directors
June 9, 2000
Page 2

made to accept and approve the transaction and the related resolutions approving the Asset Purchase Agreement and the related Marketing Services and Transition Services Agreements in the forms presented.

The discussion on the motion continued with a review of the gain calculation and estimated cash proceeds that were presented at the June 7, 2000, meeting of the Board. It was explained that substantially all the estimated net cash proceeds would be applied to the Company's debt.

Mr. Leech was invited to describe the negotiations that had occurred following the June 7, 2000 meeting. Mr. Leech described the discussions that occurred regarding the liquidated damages provisions, copies of which were distributed to the Board prior to the meeting. Mr. Leech stated that the buyer had insisted upon adding a provision that would prevent the Company from "shopping" the deal during the pendency of the Asset Purchase Agreement as a condition to accepting the liquidated damages proposal made by the Company. Ms. Morrison then offered that the provisions that were presented were standard for this type of transaction. Mr. Rosner added that he agreed with the assessment of Ms. Morrison.

It was reported that the Asset Purchase Agreement and the revised provisions thereof were transmitted to the General Counsel of Cerberus Financial Partners for their review. It was further reported that the Cerberus General Counsel stated that he did not find any significant omissions in the documents and that the documents reflected standard agreement provisions for transactions of this nature. Furthermore, Mr. Crowley reported that Mr. Feinberg had provided him his written approval of the terms of the transaction as now modified and that Mr. Feinberg stated satisfaction with the terms of the transaction as presented at this time.

There being no further questions or discussion of such matters and the questions of the Board having been responded to, the motion to approve the transactions and the resolutions set forth below was seconded and unanimously approved:

WHEREAS, Coram Healthcare Corporation (the "Company"), through its indirect wholly owned subsidiary, Curaflex Health Services, Inc., a Delaware corporation ("Curaflex"), operates a specialty mail order pharmacy and pharmacy benefit management services business known as "Coram Prescription Services" (the "Business");

WHEREAS, the Company, as the ultimate parent Company of Curaflex has determined it to be in the best interests of Curaflex to sell substantially all of the assets of Curaflex related to the Business (the "Transaction");

Minutes of the Board of Directors
June 9, 2000
Page 3

WHEREAS, in connection with the Transaction, the Company and Curaflex have, upon receipt of advice from their financial advisors with Deutsche Banc Alex Brown, determined it to be in the best interests of the Company and Curaflex to enter into an Asset Purchase Agreement, by and between Curaflex, the Company, as Seller Guarantor, CuraScript Pharmacy, Inc., CuraScript PBM Services, Inc. and GTCR Fund VI, L.P., as Buyers Guarantor (the "Purchase Agreement"), together with all of the Exhibits to the Purchase Agreement (collectively, the "Purchase Documents"); and

WHEREAS, in connection with the Transaction, the directors of the Company have determined it to be in the best interests of Curaflex and the Company to guaranty the full performance and compliance of Curaflex's obligations under the Purchase Agreement, as well as the Transition Services Agreement and the Marketing Services Agreement contemplated by the Purchase Agreement, pursuant to Section 11.9(a) of the Purchase Agreement (the "Guaranty");

NOW, THEREFORE, BE IT RESOLVED, that the Guaranty be, and it hereby is, in all respects approved;

RESOLVED FURTHER, that the form and content of the Guaranty set forth in Section 11.9(a) of the Purchase Agreement be, and it hereby is, in all respects approved;

RESOLVED FURTHER, that the Chairman of the Board, Chief Executive Officer and President, the Executive Vice President, any Senior Vice President or the Secretary of the Company (the "Authorized Officers") be, and each hereby is, authorized and directed for and on behalf of the Company to make, execute and deliver (and, if desired, under the corporate seal of the Company attested to by its Secretary) the Purchase Agreement, substantially in the form presented herewith, together with such changes therein and additions thereto as such Authorized Officer shall approve, the execution and delivery thereof by such Authorized Officer to constitute conclusive evidence of such approval;

RESOLVED FURTHER, that the Authorized Officers be, and each hereby is, authorized and directed for and on behalf of the Company to take any and all further action and to execute and deliver any and all other agreements, instruments, certificates and documents for and on behalf of the Company as in his or her opinion may be necessary or desirable to carry out the Guaranty and the Transaction Documents; and

Minutes of the Board of Directors
June 9, 2000
Page 4

RESOLVED FURTHER, that any and all actions heretofore and hereafter taken by the Authorized Officers in connection with the Guaranty and the Transaction Documents be, and they hereby are, ratified and in all respects approved.

**Approval of the Transition Services Agreement and the Marketing Services Agreement in connection with the Sale of Substantially All of the Assets of the Business**

WHEREAS, in connection with the Transaction, the directors of the Company have determined it to be in the best interests of the Company, Curaflex, and Coram, Inc. ("CI") to enter into, upon the closing of the Transaction as contemplated by the Purchase Agreement, (a) a Transition Services Agreement, by and between the Company and CI, on the one hand, and CuraScript Pharmacy, Inc. and CuraScript PBM, Inc., on the other hand (the "Transition Services Agreement"), and (b) a Marketing Services Agreement, by and between the Company and CI, on the one hand, and CuraScript Pharmacy, Inc. and CuraScript PBM, Inc. on the other hand (the "Marketing Services Agreement");

NOW, THEREFORE, BE IT RESOLVED FURTHER, that the form and content of the Transition Services Agreement and the Marketing Services Agreement presented at the June 7, 2000, meeting of the Company's Board of Directors, and each hereby is, in all respects approved;

RESOLVED FURTHER, that the Authorized Officers be, and each hereby is, authorized and directed for and on behalf of the Company to execute and deliver (and, if desired, under the corporate seal of the Company attested to by its Secretary) the Transition Services Agreement and the Marketing Services Agreement, substantially in the forms heretofore approved, with such changes therein and additions thereto as such Authorized Officer shall approve, the execution and delivery thereof by such Authorized Officer to constitute conclusive evidence of such approval;

RESOLVED FURTHER, that the Authorized Officers be, and each hereby is, authorized and directed for and on behalf of the Company to take any and all further action and to execute and deliver any and all other agreements, instruments, certificates and documents for and on behalf of the Company as in his or her opinion may be necessary or desirable to carry out the Transition Services Agreement and the Marketing Services Agreement; and

Minutes of the Board of Directors
June 9, 2000
Page 5

RESOLVED FURTHER, that any and all actions heretofore and hereafter taken by the Authorized Officers in connection with the Transition Services and the Marketing Services Agreement be, and they, hereby are, ratified and in all respects approved.

FURTHER RESOLVED, that each Authorized Officer is hereby authorized, empowered and directed, for and on behalf of the Company, to take all such other actions and execute all such documents, certificates and agreements, as may be necessary, appropriate or expedient to carry out the intent of any resolutions adopted or actions taken at this meeting of the Board of Directors.

There being no further business, the meeting was adjourned at approximately 12:50 p.m. MDT.

Respectfully submitted,

Scott T. Larson
Secretary

# Exhibit D

# MINUTES OF A MEETING

## OF THE BOARD OF DIRECTORS OF

## CORAM HEALTHCARE CORPORATION

### July 31, 2000

A meeting of the Board of Directors of Coram Healthcare Corporation (the "Company") was convened at approximately 11:00 a.m. EDT at Kasowitz, Benson, Torres & Friedman LLP, 1301 Avenue of the Americas, 36th Floor, New York, New York 10019. Participating in the meeting were the following Directors: Daniel D. Crowley, Chairman of the Board, Chief Executive Officer and President; Donald J. Amaral; William J. Casey; L. Peter Smith (telephonically) and Sandra R. Smoley (telephonically). Also participating in the meeting were Allen J. Marabito, Executive Vice President and Scott R. Danitz, Senior Vice President, Finance and Chief Accounting Officer. Also participating were the following legal and financial advisors: David F. Friedman, Esquire of Kasowitz, Benson, Torres & Friedman, LLP; Russell A. Belinsky, Senior Managing Director, Chanin Capital Partners; Eric A. Scroggins, Senior Vice President, Chanin Capital Partners; Robert J. Stobo, Vice President, Healthcare Group, Chanin Capital Partners; Christina Morrison of Deutsche Banc Alex. Brown; and Eugene Tillman, Esquire, of Reed Smith Shaw & McClay L.L.P.

Mr. Crowley, Chairman of the Board, convened the meeting and Mr. Marabito acted as secretary at the meeting.

## REVIEW AND APPROVAL OF MINUTES FROM PRIOR MEETING

Upon a motion duly made and seconded, the minutes from the prior meetings of the Audit Committee dated March 10, 2000, and of the Board of Directors dated May 17, 2000, June 7, 2000, and June 9, 2000, having been previously provided to the Board, were unanimously approved as presented.

## FINANCIAL REPORT

Mr. Crowley requested the financial report. Mr. Danitz led a discussion of the financial information as previously presented and presently updated to the Board of Directors. Mr. Danitz's report included, among other financial information and schedules, the Company's operating results for the month ended June 30, 2000, including actual to budget for the second quarter ended June 30, 2000, and the year-to-date ended June 30, 2000. Also reported to the Board were analyses of the variances, including second quarter 2000 to first quarter 2000, second quarter 2000 to second quarter 1999 and year-to-date June 30, 2000, to year-to-date June 30, 1999. Messrs. Danitz and Crowley responded to the Board through a discussion of the financial results. Discussion was had concerning the financial results with and without the inclusion of the operating results of Coram Prescription Services ("CPS").

TRUSTEE009463
USDC-DE #04-1565

Minutes of the Board of Directors
July 31, 2000
Page 2

Discussion continued concerning the trends evident in the operating results. It was noted that without the inclusion of CPS, the Company's EBITDA was ahead of budget obtained through continued cost savings as opposed to revenue growth. It was noted that, among other factors, the Company was continuing to improve and lower its costs in such operating categories as drugs, supplies, payroll, inventory and clinical expenses. It was noted that net revenues were under budget for infusion and clinical research for the period ended June 30, 2000. In a comparison of the year-to-date 2000 to year-to-date 1999 revenue it was noted that revenue was approximately two percent less reduced by, among other factors, the runoff of the Aetna business in the Company's second quarter. There has been a 70% improvement in EBITDA over 1999, inclusive of the MIP accrual and without CPS proceeds. The reductions in revenues having been offset by the cost reductions that were carried out during this period as described before. At midyear the Company has a run rate to produce a $35 million EBITDA, inclusive of the MIP accrual. Discussion and analysis next turned to the balance sheet. The discussion included a description of the projected balance sheets provided to the Board. Mr. Danitz indicated additional schedules would be sent to the Board. It was noted in the discussion that the reclassification of the current maturities of the long-term debt of the A and B notes creates a greater short-term liability that produces a negative current ratio as of June 30, 2000.

## CPS SALE

The Company, represented by Deutsche Banc Alex. Brown, sold CPS for $41.3 million with a gain to the Company of $18.5 million. Net proceeds are intended to pay down the Company's Revolving Senior Credit Facility and a portion of the Series A Notes in the amount of approximately $38 million combined. Combined Series A and B remaining debt would remain at approximately $252 million. The equity from the sale is insufficient to meet Stark II, pay the balloon on the Series A notes or satisfy the call of the Series B notes scheduled for May 27, 2001.

Beyond the presently intended debt repayments, discussion concerned the necessity of the Company to address the payment of the A note at approximately $168 million on May 27, 2001; and the potential default of the Series B Notes of approximately $92 million which may be called May 27, 2001; and the so-called Stark II net equity requirements.

## 2000, 2001 BUSINESS PLAN

Mr. Crowley reviewed with the Board an overview of the operational and financial business plan for the Company and its underlying assumptions. The business plan was discussed regarding its strengths and weaknesses, including its capacity to make debt service, including principal and interest. It was noted that even after the sale of CPS the equity of the Company is at a deficit. It was noted that the business plan cannot demonstrate the required earnings to obtain a positive equity in the current calendar year. Further, although the 2000 and 2001 business plans are cash positive, the business plans cannot overcome the balloon payment due on the A notes in May 2001 without new financing. The Board discussed the implications of the

TRUSTEE009464
USDC-DE #04-1565

Minutes of the Board of Directors
July 31, 2000
Page 3

business plans that show after improved cash flow, the sale of CPS, the reduction of debt, and improved operations, the Company does not have the financial wherewithal to resolve the Stark II problem or meet the balloon payment when due without other options.

## STARK II EQUITY REQUIREMENTS

Following discussion of the 2000, 2001 business plan, the Board was advised by Eugene Tillman, Esquire, special regulatory counsel, of Reed Smith Shaw & McClay LLP. Mr. Tillman explained to the Board the Stark II statute, its prohibition on certain referrals and the relevant exceptions included in the Stark II statute. Mr. Tillman, who had previously advised the Board, detailed the rules and prohibitions under the law. Mr. Tillman also reviewed and advised the Board with respect to the equity issues created by Stark II. Discussion with Mr. Tillman also included stock ownership and the incidences of ownership sufficient or not sufficient to trigger Stark II liability. Also discussed, amongst other elements of the Stark II regulation, were the liability and penalty provisions and litigation potential.

Christina Morrison joined the meeting.

Mr. Tillman discussed with the Board the legal and practical implications for the Company in the event that it retained its current ownership structure and failed to meet the equity and other requirements of the public company exception of Stark II at December 31, 2000. The requirements of Stark II and the possible Stark II compliance options at January 1, 2000, were discussed with the Board by Mr. Tillman. The Board discussed the alternatives of increasing shareholder equity, screening out prohibited referrals, taking the Company "private" and seeking an exception from the Health Care Financing Administration ("HCFA") or congressional intervention. Mr. Tillman responded to the questions of the Board and referred to his memorandum provided to the Board regarding Stark II compliance requirements and options.

## STARK II EQUITY ANALYSIS

In connection with the discussion of Company's business plan and projected earnings, cash flow, and financial position for 2000 and 2001 and Mr. Tillman's report, the Board examined the analysis provided by Management regarding the proposed equity required to be compliant with the public company exception of Stark II at the end of the years 2000 and 2001. To aid the analysis, the calculations were presented under various business plan pro formas beginning with the sale of CPS and forecasted operating revenues at 100% and 90% of forecast with and without various levels of debt restructuring. The Board was referred to the prepared materials. The 100% of forecast scenario requires a $100,000,000 equity infusion at forecasted revenue and a $110,000,000 equity infusion at 90% of forecasted revenue. The Board discussed the assumptions and additional models of the Stark II analysis that proposed several note and revolver debt restructuring levels and assumed interest rates along with estimated debt carrying capacities under the business plan.

TRUSTEE009465
USDC-DE #04-1565

Minutes of the Board of Directors
July 31, 2000
Page 4

## STRATEGIC FINANCIAL ALTERNATIVES

The Company requested Deutsche Banc Alex. Brown to analyze the Company's financial options in view of the Company's inability to meet its debt and Stark II obligations.

Christina Morrison of Deutsche Banc Alex. Brown addressed the Board on financial alternatives available to the Company to raise the necessary capital to obtain the required equity under Stark II and the refinancing of its current debt obligations under the business plan.

Ms. Morrison addressed the Board on the additional financing alternatives that had been considered by Deutsche Banc Alex. Brown. She referred to materials previously provided to the Board. Ms. Morrison led a discussion with the Board, responding to their inquiries on each of the capital raising alternatives included in her analyses, such as: follow-on offering alternatives, rights offerings and strategic investment by a third party, and a leveraged buyout to create a new debt and equity capital structure.

The Board discussion compared and contrasted the options. Christina Morrison responded to questions regarding the viability of each. Ms. Morrison noted that at the forecasted EBITDA for 2000 and 2001 and existing debt of the Company in the range of $250,000,000, it is not feasible to raise conventional capital for its additional financing needs. Ms. Morrison discussed with the Board the culmination of her perceptions of the financial markets available to the Company based on her recent experience and present experience in seeking capital for healthcare related companies. Ms. Morrison stated the range for investment capital is small, generally from two times to 4 to 4.5 times EBITDA, and the terms are stringent and the availability uncertain in healthcare. The more available capital is bank debt in amounts in the range of 2 to 2.5 times EBITDA.

The Board discussion considered a follow-on equity offering and the points raised in Ms. Morrison's presentation.

The Board further discussed the possibility of a rights offering to raise equity with the existing shareholders for the estimated $100,000,000 capital infusion required for Stark II (approximately $2.00 a share).

The Board discussed an auction as an alternative. Christina Morrison opined the limited buyers in this market, the financial troubles of potential buyers, the timing requirements of public auction and the uncertainty of anyone paying for 100% of equity with an existing $250,000,000 debt all suggested this was not a viable alternative.

The Board considered partial liquidation, for example selling the Hemophilia business or another part of the Company. However, Hemophiliac is performing and growing and a cash generator for the Company, and its absence would likely reduce the Company's going concern value as would other piecemeal sales or liquidations.

TRUSTEE009466
USDC-DE #04-1565

Minutes of the Board of Directors
July 31, 2000
Page 5

In response to inquiries from the Board, Ms. Morrison advised the Board on the alternatives available as described in her presentations. Ms. Morrison concluded in discussion that none of the alternatives were viable in Deutsche Banc Alex. Brown's opinion. The Board, having had its questions answered regarding strategic financing alternatives, further examined the Company's options under Stark II. At this time Ms. Morrison was excused from the meeting.

## STARK II ALTERNATIVES

Eugene Tillman responded to additional questions and reported on the recent conversations he had with HCFA representatives to determine the status of the Stark II regulations promised earlier but as yet unpromulgated by HCFA. Mr. Tillman reported that he was informed and knows not otherwise that HCFA has given no relief from Stark II. The new regulations have been promised for late summer or October 2000, time frame. Mr. Tillman opined that, based on his HCFA experience, he did not believe there was likely relief for the Company of the Stark II requirements by reprieve, waiver, new legislation or new rule. Mr. Tillman added that a bankruptcy proceeding does not suspend Stark II and the Company was required to follow the law.

## REORGANIZATION VALUE

The Company had asked Chanin Capital Partners, an independent financial advisor, to advise the Company with respect to its opinion of the going concern value of the Company. The Company requested the evaluation to help determine the value to be realized by the various interests.

Eric Scroggins explained the materials provided to the Board, and he updated the materials for the Board at the meeting in serial fashion.

He discussed with the Board the process followed in the valuation study and the types of financial and operating information, comparative information, economic information, company projections and the sources of such information that were reviewed and analyzed. Discussion evolved regarding valuation and the various methodologies. The evaluation excludes CPS and R-Net finances and operations resulting in estimated run rates for the two primary business lines, infusion therapy services and CTI. The Chanin representatives addressed through comparison and contrast the discounted cash flow analysis, public company comparable analysis and the comparable functional analysis used to arrive at the enterprise value of approximately $207.0 million for the Company's primary lines of business. Chanin described the various methodologies and their components and their effect on the valuation outcomes. The $207.0 million evaluation results from the weighted average of the three valuation methodologies. It is a cashflow, run rate valuation of the projected go forward business and not what the Company may sell for. The Chanin representatives along with Mr. Friedman responded to the Board's questions regarding the evaluation and the process and its assumptions.

TRUSTEE009467
USDC-DE #04-1565

Minutes of the Board of Directors
July 31, 2000
Page 6

Following discussion of valuations, the Board inquired about the Company's debt capacity. Mr. Scroggins addressed the interest rate sensitivity tables and the range of debt capacity based upon EBITDA and EBITDA-CAPEX as projected for 2000 and 2001. Discussion ensued regarding the debt load the Company can meet from anticipated future income.

## LEGAL RIGHTS, RESPONSIBILITIES AND ALTERNATIVES

In a privileged and confidential communication, in furtherance of the Board's evaluation of its options and the advice of its financial and legal outside advisors, the Board requested Mr. Friedman to provide his legal advise and opinions. Following the communication with Mr. Friedman, the Board had further discussion.

## DEBT CAPACITY

Chanin reiterated its analysis of the debt capacity of the Company. Discussion of market interest rates ensued and the ranges of debt load with and without amortization of principal and the Company's capital needs and projected revolver requirements. Mr. Friedman provided additional legal advice. The Board discussed possible ranges of conversion for the remaining $252.0 million in Series A and B notes, following the sale of CPS. It was noted that default on the notes could force an involuntary bankruptcy.

## REORGANIZATION PROCEEDINGS

Mr. Friedman, in a privileged and confidential communication, advised the Board on the rights and obligations of the various potential parties in and out of a Chapter 11 reorganization proceeding. Mr. Friedman highlighted the usually significant issues and discussed their relevance to the Company. Mr. Friedman advised on the purpose an independent valuation opinion serves for an organization undergoing reorganization and the manner in which the reorganization proceeds under the bankruptcy rules. Mr. Friedman addressed Stark II concerns, valuation issues, claims against the Company and maximizing resources for the various interests, among others, in the context of a Chapter 11 reorganization.

## 401(K) AND SHAREHOLDER VALUE

Based on Chanin's evaluation, the enterprise value, without contingent liabilities, is approximately $45 million less than the $252.0 million debt owed by the Company, and the Company has balance sheet insolvency with current liabilities approximately three times current assets.

Board members reviewed with David Friedman their responsibilities to the Company's shareholders and the relationship between the creditors and shareholders of the Company. Mr. Friedman, in a privileged and confidential communication, provided the Board with legal advice

TRUSTEE009468
USDC-DE #04-1565

Minutes of the Board of Directors
July 31, 2000
Page 7

regarding the rights of creditors and shareholders and the Company's potential negotiation with the debt holders regarding value to the shareholders. Mr. Friedman also advised on the existing shareholder group represented by Mr. Levy, Esq. and the communications he had with Mr. Levy.

<u>SPECIAL COMMITTEE</u>

Mr. Friedman proposed a resolution intended to create a special committee to review the Company's bank indebtedness based on the advice of the Company's advisors. The Board discussed the procedure for the committee to proceed with the initial negotiations following which the following resolution was unanimously approved.

WHEREAS, Coram Healthcare Corporation (the "Company") has identified the necessity to restructure its bank indebtedness in order to improve its capital structure and comply with the Stark II statute;

WHEREAS, in the first instance, it is appropriate for management of the Company to initiate discussions with the holders of the Company's bank indebtedness (the "Bank Group") with a view towards achieving an understanding of acceptable parameters for a restructuring, consistent with the Company's financial resources and the valuation opinion provided to the Company by Chanin Capital Partners, LLC, the company's financial advisor;

WHEREAS, it is appropriate that a special committee of the Board of Directors be appointed (the "Special Committee") to review any preliminary agreement or understanding reached between management and the Bank Group, to assess the overall fairness to the Company of any such agreement or understanding, to determine what, if any, changes to such agreement or understanding are appropriate and to make its recommendations to the entire Board of Directors with respect thereto;

NOW, THEREFORE, BE IT RESOLVED that Donald J. Amaral, L. Peter Smith, William J. Casey and Sandra L. Smoley be, and they hereby are, appointed to the Special Committee;

RESOLVED FURTHER that in performing its appointed functions, the Special Committee shall have unrestricted access to the Company's financial and legal advisors and to such other information in the custody or control of the Company as the Special Committee deems necessary or appropriate;

RESOLVED FURTHER that the special Committee shall report back to the entire Board of Directors upon the completion of its appointed tasks, whereupon the Board of Directors shall consider such additional steps as are

TRUSTEE009469
USDC-DE #04-1565

Minutes of the Board of Directors
July 31, 2000
Page 8

necessary or appropriate to implement a restructuring of the Company's bank indebtedness.

## SHAREHOLDER GROUP

The timing, SEC requirements and present interests of the Richard Levi Esq. shareholder group were further reported on by David Friedman. Mr. Friedman informed the Board that he had spoken with Mr. Levy, the representative of the so-called 13-D Shareholders. Mr. Friedman recommended that he invite Mr. Levy's clients to enter into a confidentiality agreement in order to keep lines of communication open. The Board accepted this recommendation and, after discussion, unanimously agreed to cause the Company to request the Company's principal debt holders to consider a cash payment in some reasoanble amount to the shareholders despite the insolvency of the Company in order to resolve quickly and efficiently any dispute that may arise with the shareholders.

## RETENTION OF KEY EMPLOYEES

Mr. Crowley discussed the necessity of retaining and motivating management and employees during the uncertainties facing the Company. The Board also considered a recommendation from Mr. Crowley that the Company enter into an employment agreement with Mr. Danitz. Mr. Crowley also discussed with the Board a management retention plan along with the proposed terms and suggested participants. The outside Directors were also of the consensus that a retention bonus should be considered for Mr. Crowley and would consider the action further.

The Board, following its discussion and its questions being answered, unanimously approved the following resolution:

RESOLVED, that the Board of Directors of the Company hereby deems that it is in the best interests of the Company to enter into an Employment Agreement with its Senior Vice President, Finance and Chief Accounting Officer, Scott R. Danitz;

FURTHER RESOLVED, that the Chairman, Chief Executive Officer and President, the Executive Vice President or any Senior Vice President of the Company (the "Authorized Officers") are each hereby authorized, empowered and directed to negotiate, make, execute and deliver as the act and deed of the Company, an employment agreement between the Company and Scott R. Danitz incorporating the principal terms set forth on Exhibit A hereto together with such other terms and conditions as any such Authorized Officer deems necessary, appropriate or expedient for such employment agreement;

TRUSTEE009470
USDC-DE #04-1565

Minutes of the Board of Directors
July 31, 2000
Page 9

FURTHER RESOLVED, that the Authorized Officers are each hereby authorized, empowered and directed to prepare, negotiate, make, execute and deliver on behalf of the Company such documents or agreements as may be necessary, appropriate or expedient to cause the issuance and payment of the "Stay Bonuses" in such amounts and to the persons listed on Exhibit A hereto on the principal terms described on such Exhibit A; and

FURTHER RESOLVED, that the Authorized Officers are each hereby authorized, empowered and directed to prepare, negotiate, execute and deliver as the act and deed of the Company such other documents, certificates, motions or agreements as may be necessary, appropriate or expedient to effect the intent of all resolutions adopted at this meeting.

OTHER BUSINESS

There being no further business, the meeting was adjourned.

Respectfully submitted,

Allen J. Marabito
Secretary of the Meeting

TRUSTEE009471
USDC-DE #04-1565

## PERSONAL & CONFIDENTIAL

To provide more certainty that Coram Healthcare will have management both in place and properly focused on the business of the Company *during and after* any restructuring proceeding the following proposal is offered:

1) Coram provide contractual commitment as follows:

| Name | Title | Details |
|------|-------|---------|
| Danitz, Scott | Chief Accountant | one (1) year contract eff 8-1 with one (1) year's pay if Change of control, one (1) year Severance if termed w/o rsn, $200,000 for sale bonus, $900 month car allowance. |

2) Coram provide "Stay Bonus" with 50% paid on successful emergence from any restructuring proceeding but not earlier than December 31, 2000, and the reaminging 50% paid on the last day business day of 2001. Bonus would only be paid to those who listed who remain successfully employed by Coram and are actively at work on the date of payment.

| Name | Title | 50% | Total |
|------|-------|-----|-------|
| Marabito, Allen | Exec. VP | $75,000 | $150,000 |
| Danitz, Scott | Chief Acct | $50,000 | $100,000 |
| Ponzio, Vito | SVP, Human Rscs | $40,000 | $ 80,000 |
| Geiger, Frank | VP Purchasing | $25,000 | $ 50,000 |
| Meyer, Debbie | SVP, Field Sales | $40,000 | $ 80,000 |
| Sarraco, Micael | SVP, Spec. Prods | $40,000 | $ 80,000 |
| Ellis, John | AVP, Ops East | $40,000 | $ 80,000 |
| Iriye, Richard | AVP, Ops West | $40,000 | $ 80,000 |
| Douglass, Kate | VP, Clincial Svcs | $40,000 | $ 80,000 |
| Hill, Eric | VP, Hemophilia | $40,000 | $ 80,000 |
| Reynolds, Gerald | VP, Controller | $25,000 | $ 50,000 |
| Wright, Rodney | VP, Collections | $25,000 | $ 50,000 |
| McIntyre, John | VP, Treasurer | $15,000 | $ 30,000 |

TRUSTEE009472
USDC-DE #04-1565

| | | | |
|---|---|---|---|
| Sivori, Joe | Director, Finance | $15,000 | $ 30,000 |
| Moeller, Scott | Director, Tax | $15,000 | $ 30,000 |
| Schott, Alex | Director, Accounting | $15,000 | $ 30,000 |
| Jarm, Beth | VP, Rgnl Sales | $15,000 | $ 30,000 |
| Sokolowski, Winnie | VP, Rgnl Sales | $15,000 | $ 30,000 |
| Thomas, Eileen | VP, Rgnl Sales | $15,000 | $ 30,000 |
| Vollmer, Craig | VP, Rgnl Sales | $15,000 | $ 30,000 |
| Dennis, Debbie | VP, Rgnl Sales | $15,000 | $ 30,000 |
| Justice, Jayne | VP, Rgnl Sales | $15,000 | $ 30,000 |
| Poillon, Roy | Mgd Care Consult | $15,000 | $ 30,000 |
| Ruehle, Janet | Mgd Care Consult | $15,000 | $ 30,000 |
| Johnson, Lisa | Mgd Care Consult | $15,000 | $ 30,000 |
| Trimble, Angela | Mgd Care Consult | $15,000 | $ 30,000 |
| Turner, Susan | Mgd Care Consult | $15,000 | $ 30,000 |
| Lampart, Carl | VP, Rgnl Ops | $15,000 | $ 30,000 |
| DePalma, Andrew | VP, Rgnl Ops | $15,000 | $ 30,000 |
| Nechamkin, Melissa | Mgr, Collections | $10,000 | $ 20,000 |
| Velella, Angela | Mgr, Collections | $10,000 | $ 20,000 |
| Mater, Chris | Mgr, Collections | $10,000 | $ 20,000 |
| | | $765,000 | $1,530,000 |

**Other**

| | | | |
|---|---|---|---|
| Crowley, Dan | Chairman, CEO, Pres | NA | NA |

NOTE: I am not making any recommendation for myself and will leave that matter up to the Board for its consideration, if any.

As a reminder, I am rewarded solely for EBITDA (which *does not* take into consideration the impact of a Bankruptcy proceeding on EBITDA). That said, my Agreement with the Board is that I have the *opportunity* to earn Bonuses as follows:

1) Nothing for EBITDA below $14Million,
2) 25% of the EBITDA above $14Million and capped at $35Million EBITDA,
3) A $5Million Bonus if EBITDA is above $35Million.
4) A restructuring bonus of the greater of one and half (1 ½%) percent of the equity after restructuring or one (1%) percent on the debt remaining after restructuring (e.g. if the debt remaining after the restructuring is $150Million, I would receive $1.5Million at closing).
5) Nothing for remaining as CEO post restructuring or for 2001.

TRUSTEE009473
USDC-DE #04-1565

# Exhibit E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, as Chapter 11 Trustee of    :    Case No. 04-1565(SLR)
the Bankruptcy Estates of Coram Healthcare    :    (Jointly Administered)
Corp., a Delaware Corporation, and Coram,    :
Inc., a Delaware Corporation,    :
         :
         Plaintiff,    :
         :
v.          :
         :
DANIEL D. CROWLEY,    :
         :
         Defendant.    :

---

## THE CHAPTER 11 TRUSTEE'S ANSWERS TO
## DEFENDANT DANIEL D. CROWLEY'S FIRST SET OF
## INTERROGATORIES TO PLAINTIFF ARLIN M. ADAMS

---

Plaintiff Arlin M. Adams, the Chapter 11 Trustee (the "Trustee") of the

Bankruptcy Estates of Coram Healthcare Corp. and Coram, Inc. (collectively, "Coram"), hereby

responds to Defendant Daniel D. Crowley's ("Crowley") First Set of Interrogatories to Plaintiff

Arlin M. Adams, as follows:

### GENERAL OBJECTIONS

The Trustee asserts the following general objections, all of which are incorporated

in his specific responses:

1.     The Trustee objects to each interrogatory, definition and instruction, to the

extent that it seeks to impose an obligation or burden beyond that required by the Federal Rules

of Civil Procedure.

CHDATA 38155_1

2.     The Trustee objects to each interrogatory to the extent that it seeks information subject to the attorney client privilege, or the work product doctrine, or any other privilege or doctrine which precludes discovery.

3.     The Trustee objects to each interrogatory to the extent that responding would impose an undue burden on the Trustee.

4.     The Trustee objects to each interrogatory to the extent that the information requested is equally available to Crowley.

5.     The Trustee objects to each interrogatory to the extent it seeks information not relevant to this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

### PRESERVATION OF RIGHTS

The Trustee's responses do not waive and do not intend to waive but, on the contrary, preserve and intend to preserve:

1.     All objections as to competency, relevancy, materiality, privilege and admissibility for any purpose in any subsequent proceeding or the trial of this or any other actions;

2.     The right to object on any ground to the use of any of these responses, or the subject matter thereof, in any subsequent proceeding or trial of this or any other actions;

3.     The right to object at any time to a demand for further responses to these or any other discovery requests involving or relating to the subject matter of these interrogatories; and

4.     The right at any time to revise, correct, supplement, clarify or amend the answers and responses set forth herein.

2

CHDATA 38155_1

## RESPONSES TO INTERROGATORIES

1.    Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley had a conflict of interest with Coram.

SPECIFIC OBJECTIONS:  The Trustee objects to Interrogatory No. 1 on the grounds that it contains undefined terms, is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe every act Crowley undertook or failed to undertake over a several-year period that underlies the Trustee's allegations that he had a conflict of interest.   Subject to these objections, the Trustee will provide a combined response to Interrogatories 1 through 4.

2.    Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley breached his duty to Coram to act in good faith.

SPECIFIC OBJECTIONS:  The Trustee objects to Interrogatory No. 2 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe every act Crowley undertook or failed to undertake over a several-year period that underlies the Trustee's allegations that he breached his duty to Coram to act in good faith.   Subject to these objections, the Trustee will provide a combined response to Interrogatories 1 through 4.

3.    Identify and describe each act or omission by Crowley that forms the basis for your allegations that Crowley breached his duty to Coram to act with due care.

SPECIFIC OBJECTIONS:  The Trustee objects to Interrogatory No. 3 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to

3

CHDATA 38155_1

identify and describe every act Crowley undertook or failed to undertake over a several-year

period that underlies the Trustee's allegations that he breached his duty to Coram to act with due

care. Subject to these objections, the Trustee will provide a combined response to Interrogatories

1 through 4.

   4.  Identify and describe each act or omission by Crowley that forms the basis

for your allegations that Crowley breached his duty of loyalty to Coram.

     **SPECIFIC OBJECTIONS:**  The Trustee objects to Interrogatory No. 4

on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to

identify and describe every act Crowley undertook or failed to undertake over a several-year

period that underlies the Trustee's allegations that he had a breached his duty of loyalty to

Coram. Subject to these objections, the Trustee will provide a combined response to

Interrogatories 1 through 4.

    **COMBINED RESPONSE TO INTERROGATORIES 1 THROUGH 4:**

     Subject to and without waiving the foregoing objections, the Trustee responds to

Interrogatories 1 through 4 by setting forth this summary of facts, which form the basis of his

allegations that Crowley had a conflict of interest and breached the triad of fiduciary duties that

he owed to Coram as an officer and director:

     From approximately 1997 on, Cerberus Partners, L.P. ("Cerberus"), together with

Goldman Sachs Credit Partners L.P., and Wells Fargo Foothill (collectively, the "Noteholders"),

owned substantially all of Coram's debt. Cerberus is a major investor in the debt of numerous

distressed companies; it alone held approximately 36% of Coram's debt. The chairman of

4

CHDATA 38155_1

Cerberus, Stephen Feinberg ("Feinberg"), sat on Coram's Board from 1998 until July 2000, shortly before Coram filed for bankruptcy.  Cerberus maintained a "bench" of CEO consultants, who were available to work for Cerberus with troubled companies on a project-by-project basis.

In early 1999, Cerberus retained Crowley as a turnaround consultant.  In July 1999, Crowley and Cerberus entered into an oral agreement under which Crowley agreed to work exclusively for Cerberus for three years at a salary of $80,000 per month plus expenses, with the possibility of substantial bonuses.

In August 1999, after Crowley and Cerberus had entered into their oral agreement Feinberg recommended to Coram's Board of Directors (the "Board") that it hire Crowley as a consultant to work with Coram's newly-elevated CEO, Richard Smith ("Smith").  Feinberg disclosed to the directors that Crowley had a relationship with Cerberus, but provided no information about that relationship.

After Smith left Coram in October 1999, Crowley wrote to Coram Chairman Donald Amaral ("Amaral"), on October 26, 1999.  In that letter, Crowley stated that he and Smith had a "six(6) month crisis management contract in place," and that he "would like to help you [Amaral] with this project and begin the restructuring process."  Crowley and Amaral began negotiations on an employment agreement no later than early November 1999.

At the same time as he was negotiating with Amaral to be Coram's CEO, Crowley sent a "Personal & Confidential" letter dated November 12, 1999 to Feinberg stating that "[y]ou [Feinberg]have asked me to take over the Coram operations" and  requesting additional compensation from Cerberus to induce him to become CEO of Coram.

CHDATA 38155_1

The Noteholders offered Coram a six-month interest accrual holiday if Crowley was hired as CEO. On November 15, 1999, Amaral and the Noteholders agreed on the terms of the interest forbearance agreement.

On November 17, 1999, the Board approved a three-year employment agreement with Crowley, which he signed the next day (the "Crowley/Coram Employment Agreement"). The Crowley/Coram Employment Agreement provided for a base salary of $650,000, benefits, potential bonuses of between $390,000 and $1,950,000 depending on Coram's EBITDA, a minimum 24-month severance period, options to purchase one million shares of Coram stock at then market rates, and an acquisition bonus upon change in control.

The day after he signed the Crowley/Coram Employment Agreement, Crowley executed a written employment agreement with Cerberus, effective August 1, 1999, which memorialized the terms of their July oral agreement (the "Crowley/Cerberus Employment Agreement"). The Crowley/Cerberus Employment Agreement required Crowley to devote "his entire business time, attention, skill and energy exclusively to the business of [Cerberus]" by performing duties to be assigned by Feinberg. The Crowley/Cerberus Employment Agreement also provided that Cerberus could terminate Crowley for cause if Crowley did not follow Cerberus' reasonable instructions. Neither Crowley nor Feinberg disclosed to the Board the existence or terms of the Crowley/Cerberus Employment Agreement.

Coram's corporate policy provided that actual conflicts of interest must be avoided and that any action creating a potential conflict of interest must be disclosed and approved in advance. Crowley failed to seek Board approval of his employment contract with Cerberus.

6

Crowley signed the management letter to Coram's outside auditors for the year ending December 31, 1999, in which he stated that "[t]here are no instances where any officer or employee of [Coram] has an interest in a company, with which [Coram] does business that would be considered a 'conflict of interest,' that has not been disclosed or waived. Such an interest would be contrary to [Coram] policy."

Coram retained Crowley's wholly-owned consulting company, Dynamic ("Dynamic") Health Care Solutions, L.L.C. ("Dynamic"), to act as a consultant to Coram, which paid fees to Dynamic in excess of $1 million.

On February 28, 2000, Crowley wrote to the Board and demanded additional compensation from Coram, claiming that he was working 19-hour days, and that "Coram will take longer, involve more, and will need me to stay 'on task' for much longer than we envisioned when I said 'Yes.'" Crowley did not disclose to the Board that while he was allegedly working 19-hour days for Coram, Cerberus was paying him $80,000 per month.

In response to Crowley's demand for additional compensation from Coram, Feinberg and Crowley negotiated an amendment to the Crowley/Coram Employment Agreement with Coram, which was executed as of April 6, 2000. The amendment provided a new bonus structure that was far greater than the maximum $1.9 million bonus for which Crowley was eligible under the employment agreement that he had signed just four months earlier. Under the new arrangement, Crowley could claim a bonus of up to 25% of the amount by which Coram's EBITDA for 2000 exceeded $14 million and an additional $5 million bonus if EBITDA exceeded $35 million.

7

CHDATA 38155_1

At the time Crowley and Feinberg were negotiating the amendment to the Crowley/Coram Employment Agreement, Crowley anticipated that Coram would be restructured by filing a bankruptcy petition under Chapter 11 with a proposed plan of reorganization that would eliminate the public shareholders without any payment to them. Nevertheless, between November 30, 1999 and July 31, 2000, Crowley caused Coram to pay the Noteholders approximately $60 million. These payments included: (a) much of the proceeds from Coram's July 2000 sale of its specialty pharmacy division, Coram Prescription Services ("CPS") (nearly $40 million); and (b) an additional $6.3 million payment that Crowley made to the Noteholders just three weeks before Coram declared bankruptcy.

Although the CPS division was losing a small amount of money, it had excellent long-term profit potential. CPS had been valued in excess of $100 million by Coram's investment bankers, but was sold for approximately $40 million.

On August 8, 2000, Coram filed a Chapter 11 petition in the U.S. Bankruptcy Court for the District of Delaware, together with a proposed plan of reorganization (the "First Plan"). The First Plan provided for the cancellation of all of the shareholders' interests and for the issuance of all of the new Coram stock to the Noteholders. Coram's other unsecured creditors would receive $2 million and Coram's shareholders would receive nothing.

On October 18, 2000, the United States Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee") to represent the interests of Coram's common shareholders. The Equity Committee obtained the Crowley/Cerberus Employment Agreement and other documents in discovery in connection with the First Plan, which the Equity Committee opposed.

8

During the confirmation hearing, Crowley testified that the Crowley/Cerberus Employment Agreement -- which provided for payments significantly greater than did his agreement with Coram -- had nothing to do with Coram. The Court did not find Crowley's position credible. Rather, on December 21, 2000, the Bankruptcy Court denied confirmation, holding that Coram had not proposed its reorganization plan in good faith as required under the Bankruptcy Code. In its oral ruling, the Bankruptcy Court explained that it could not confirm the plan because Crowley "had an actual conflict of interest" by virtue of his contractual relationship with Cerberus. Op. 12/21/00, at 89. The Bankruptcy Court found that that actual conflict of interest "tainted the debtors' restructuring of its debt, the debtors' negotiations towards a plan, even the debtors' restructuring of its operations." *Id.* at 88. As a result of Crowley's relationship with Cerberus, Coram did not emerge from bankruptcy in December 2000.

Despite the Bankruptcy Court's ruling, Crowley did not terminate his relationship with Cerberus. In fact, Crowley continued to be paid $80,000 per month by Cerberus throughout 2001.

The Board formed a Special Committee, which retained Harrison J. Goldin Associates, L.L.C. ("Goldin"), as a restructuring advisor. In a report of its investigation, Goldin concluded that Crowley should have disclosed the full extent of his employment agreement with Cerberus and that his failure to do so was a breach of his fiduciary duties to Coram. Goldin also concluded that Crowley had advanced Cerberus' interests at Coram's expense by making cash payments to the Noteholders prior to Coram's filing for bankruptcy. In addition, Goldin determined that, as of the date of his report, Crowley's conflict had caused Coram to incur at least $12 to $15 million in business losses and professional fees in the bankruptcy proceedings.

CHDATA 38155_1

Coram based its second proposed plan of reorganization (the "Second Plan") on Goldin's report. The Second Plan again provided for the cancellation of all shareholders' interests and for the issuance of new Coram stock to the Noteholders, including Cerberus. Coram's shareholders would receive $10 million if they voted to approve the plan. Coram's other unsecured creditors would receive $3 million, amounting to less than 40% of their claims. In addition, the Second Plan provided that Crowley's compensation be reduced by $7.5 million as recommended by Goldin.

During the confirmation hearing on the Second Plan, Crowley testified that Cerberus was not paying him for his work at Coram, but instead for his work on non-Coram matters. Again, the Bankruptcy Court rejected Crowley's testimony as not credible. Op. 12/21/01, at 16-17.

On December 21, 2001, the Bankruptcy Court issued a written opinion denying confirmation. The Bankruptcy Court concluded that Crowley's agreement with Cerberus continued to present an actual conflict of interest. As the Bankruptcy Court put it, "[n]othing, in fact, has changed since the first confirmation hearing." Op.12/21/01, at 13. The Bankruptcy Court explained that:

> Crowley's actual conflict of interest goes beyond the mere appearance of impropriety. Crowley cannot serve the interests of both the Debtors and a large creditor, Cerberus. Under the Consulting Agreement, Cerberus has the discretion to fire Crowley if he fails to follow its instructions, resulting in the loss of $1 million per year in compensation to Crowley. That control over Crowley, and indirectly the Debtors, is simply not proper.

CHDATA 38155_1

Op. 12/21/01, at 15. The Bankruptcy Court concluded that "the conflict in this case transcends every single thing Crowley does on behalf of the Debtors." Op. 12/21/01, at 24. As a result of Crowley's relationship with Cerberus, Coram did not emerge from bankruptcy in December 2001.

Following the rejection of the Second Plan, the Bankruptcy Court entered an order appointing the plaintiff Arlin M. Adams as Coram's Chapter 11 Trustee. Shortly after his appointment, the Trustee reviewed the Bankruptcy Court's two opinions denying confirmation of each of Coram's proposed plans of reorganization. As a result, the Trustee required that Crowley have no continuing conflict of interest and that he not receive any further compensation from Cerberus. The Trustee elected to continue Crowley's employment with Coram only after Crowley explicitly represented to the Trustee that he that he was no longer receiving any compensation from Cerberus.

Crowley's employment agreement with Coram expired on November 26, 2002. Because the Trustee was concerned that terminating Crowley could possibly lead to substantial departures of key employees, thereby endangering Coram's ability to promptly reorganize, the Trustee filed a motion to extend his employment for a limited transition period (as well as a motion to reject his employment agreement). The Equity Committee opposed the Trustee's motion and filed a motion to immediately terminate Crowley's employment.

In the course of discovery on the motions, Crowley produced documents that made clear that his prior representations to the Trustee were false. These documents showed that Crowley was in fact continuing to ask Cerberus for millions of dollars to be paid after the confirmation, when neither he nor Coram would be under the jurisdiction of the Bankruptcy

CHDATA 38155_1

Court. Specifically, an insert to a draft letter to Feinberg dated May 2, 2002 states: "I expect that you'll honor the commitment you made to me over dinner: after Coram's plan is confirmed or its assets sold, I'll be reinstated with Cerberus and receive $5,000,000 from Cerberus. Also, Cerberus will indemnify me for all of my legal fees, plus pay me the difference between what I ultimately receive from Coram by way of bonuses, and $11,200,000." In another part of the letter, Crowley stated that he "didn't have to recite the answers that [Coram's bankruptcy lawyer] gave [him] to say in Court."

The Bankruptcy Court denied the Trustee's motion to extend Crowley's employment and rejected Crowley's testimony, stating that "I do not believe he is honest." Tr. 3/3/03, at 195. Referring to the draft letter from Crowley to Feinberg, the Bankruptcy Court concluded that the letter "after the appointment of the Trustee, continue[s] to show what I believe is a continuation of Mr. Crowley's continued efforts to continue to get reimbursement from Cerberus for efforts undertaken in this case." *Id.* at 196. Crowley resigned from Coram effective March 31, 2003.

The Trustee thereafter proposed a reorganization plan, as did the Equity Committee. Following extensive discovery and a lengthy confirmation hearing, in October 2004, the Bankruptcy Court confirmed the Trustee's Plan and rejected the Equity Committee's Plan. *See In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del 2004).

The Trustee reserves his right to amend or supplement his response as discovery continues.

CHDATA 38155_1

5.    Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 1, including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:**  The Trustee objects to Interrogatory No. 5 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period.  Subject to these objections, the Trustee will provide a combined response to Interrogatories 5 through 8.

6.    Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 2 including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:**  The Trustee objects to Interrogatory No. 6 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period.  Subject to these objections, the Trustee will provide a combined response to Interrogatories 5 through 8.

7.    Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 3 including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:**  The Trustee objects to Interrogatory No. 7 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to

13

identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period. Subject to these objections, the Trustee will provide a combined response to Interrogatories 5 through 8.

8.    Identify and describe any harm or damage to Coram caused by each act or omission by Crowley identified in response to Interrogatory No. 4, including but not limited to any valuation of any such harm or damage.

**SPECIFIC OBJECTIONS:**  The Trustee objects to Interrogatory No. 8 on the grounds that it is overly broad, vague and ambiguous, and it is overly burdensome to identify and describe the harm or damage resulting from every act Crowley undertook or failed to undertake over a several-year period.

## COMBINED RESPONSE TO INTERROGATORIES 1 THROUGH 8:

Subject to and without waiving the foregoing objections, the Trustee states that Coram's emergence from bankruptcy was delayed as a result of Crowley's conflict of interest and his breaches of his fiduciary duties, causing Coram to suffer damages. Coram incurred reorganization costs in excess of $36 million directly attributable to the delay in Coram's emergence from bankruptcy. Coram also sustained business losses as a result of remaining in bankruptcy. The calculation of such damages will be provided in expert report(s), which will be served in accordance with the current scheduling order, unless amended.

The sale of CPS deprived Coram of the increase in value CPS enjoyed following the sale. CPS was sold to a management-led buy out group for $40 million and was sold three years later for $335 million.

CHDATA 38155_1

Coram is also entitled to disgorgement of the compensation that it paid Crowley while he served as a conflicted CEO.

The Trustee reserves his right to amend or supplement his answer to this interrogatory as discovery continues.

As to objections:

Dated: December 20, 2006

SCHNADER HARRISON SEGAL
& LEWIS LLP

By: /s/ Richard A. Barkasy
 Richard A. Barkasy (#4683)
 Michael J. Barrie (#4684)
 824 Market Street Mall, Suite 1001
 Wilmington, DE 19801
 (302) 888-4554 (telephone)
 (302) 888-1696 (facsimile)

 -and-

 Wilbur L. Kipnes
 Barry E. Bressler
 1600 Market Street, Suite 3600
 Philadelphia, PA 19103-7286
 (215) 751-2000 (telephone)
 (215) 751-2205 (facsimile)

 Counsel to Arlin M. Adams,
  Chapter 11 Trustee

15        CHDATA 38155_1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ARLIN M. ADAMS, as Chapter 11 Trustee of the Bankruptcy Estates of Coram Healthcare Corp., a Delaware Corporation, and Coram, Inc., a Delaware Corporation, | : : : : | Case No. 04-1565(SLR) (Jointly Administered) |
|  | : |  |
| Plaintiff, | : : |  |
|  | : |  |
| v. | : : |  |
|  | : |  |
| DANIEL D. CROWLEY, | : : |  |
|  | : |  |
| Defendant. | : |  |

### CERTIFICATE OF SERVICE

I, Michael J. Barrie, certify that I am not less than 18 years of age and that service of the Chapter 11 Trustee's Answers to Defendant Daniel D. Crowley's First Set of Interrogatories to Plaintiff Arlin M. Adams, was made on December 20, 2006 upon the persons listed below via Electronic Mail and United States First Class Mail.

I certify the foregoing to be true and correct under penalty of perjury.

/s/ Michael J. Barrie
Michael J. Barrie

Dated:  December 20, 2006

### Parties Served:

Jeffrey C. Wisler, Esquire
Christina M. Thompson, Esquire
1007 N. Orange St., P.O. Box 2207
Wilmington, DE 19899
Email: jwisler@cblh.com
Email: cthompson@cblh.com

Elliot R. Peters, Esquire
Garrett A. Lynch, Esquire
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
Email: epeters@kvn.com
Email: glynch@kvn.com

16

CHDATA 38155_1

## CERTIFICATION

I hereby certify that the facts set forth in the foregoing interrogatory answers are true and correct to the best of my knowledge, information and belief.

_Arlin M. Adams_
Arlin M. Adams, Ch. 11 Trustee

Dated: December 20, 2006

17.

CHDATA 38155_1

# Exhibit F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re:

**Arlin M. Adams,** Chapter 11 Trustee of the
Post-Confirmation Bankruptcy Estates of
**Coram Healthcare Corporation,** a Delaware
Corporation, and of **Coram, Inc.,** a Delaware
Corporation,

    Plaintiff

    v.

**Daniel D. Crowley,** et al.

    Defendant

Case No. 04-1565 (SLR)

REPORT OF JEFFREY L. BALIBAN

JUNE 8, 2007

## I. INTRODUCTION

1.      Coram Healthcare Corporation and Coram, Inc., (collectively "Coram" or the "Company") were engaged primarily in the business of furnishing alternate site (outside the hospital) infusion therapy and related services, including non-intravenous home health products such as respiratory therapy services and related equipment and durable medical equipment. Other services offered by Coram include outsourced hospital compounding services and centralized management, administration and clinical support for clinical research trials.[1]

2.      Coram filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code on August 8, 2000. On the same day as the Chapter 11 cases were filed, the Debtors filed their joint plan of reorganization and their disclosure statement with the Bankruptcy Court.[2] A Restated Joint Plan was distributed on or about October 20, 2000. At a confirmation hearing on December 21, 2000, the Restated Joint Plan was not approved by the Bankruptcy Court.[3] [4] A second plan of reorganization was submitted on July 31, 2001, and was similarly denied by the Court on December 21, 2001. The Trustee's reorganization plan was submitted May 2, 2003, which the Bankruptcy Court ultimately confirmed in November 2004 and Coram exited bankruptcy as of December 1, 2004, nearly four years after confirmation of its initial plan was denied.[5]

3.      Daniel D. Crowley was Chairman and Chief Executive Officer of Coram from November 1999 until November 2002, although he effectively continued in this function until March 2003. Prior to November 1999, we understand Mr. Crowley had entered into an

---

[1] Coram 10-K, December 31, 2003. Coram's primary business strategy is to focus its efforts on the delivery of its core infusion therapies, which include nutrition, anti-infective therapies, pain management, intravenous immunoglobulin ("IVIG") and coagulant and blood clotting therapies for persons with hemophilia. Most of the company's alternate site infusion therapy net revenue is derived from third party payers such as insurance companies, managed care plans and governmental payers.

[2] Coram 10-K, December 31, 2000, p. 24 - 25.

[3] Coram 10-K, December 31, 2001, p. 28.

[4] October 5, 2004 Opinion of US Bankruptcy Judge Mary F. Walrath – "In December 2000, at the conclusion of the confirmation hearings on the Debtors' First Plan, we found that the Debtors' CEO, Dan Crowley, was also employed as a consultant by Cerberus (the largest Noteholder). We concluded that this employment created a conflict of interest which tainted the Debtors' restructuring efforts."

[5] Paragraph 71 of Order Confirming the Chapter 11 Trustee's Second Amended Joint Plan of Reorganization signed October 27, 2004.

1

employment agreement with Cerberus Partners, L.P., one of Coram's noteholders since 1997.[6]
According to the December 29, 2004 Complaint in the above-captioned matter, the Trustee
brings this action for breach of fiduciary duty against Mr. Crowley.

     4.    National Economic Research Associates, Inc. ("NERA") has been retained by
counsel on behalf of the Trustee to provide assistance in understanding certain technical
economic and valuation issues. Specifically, NERA has been asked to analyze the financial
statements of Coram and other relevant information, and to determine the extent to which Coram
has incurred indirect costs related to its protracted bankruptcy.

     5.    I am a Senior Vice President in the Securities & Finance practice of NERA and
am the senior firm member responsible for this report. Prior to joining NERA, I was a senior
partner in the Dispute Advisory Services practice of KPMG LLP. I have billed for my time in
this matter at my standard hourly billing rate of $550. My experience and education are set out
in my *curriculum vitae*, attached as **Exhibit 1**. I, along with professional staff working under my
direction, have been provided various documents and information in connection with this
assignment. A list of documents relied upon is attached as **Exhibit 2**.

## II.   FINDINGS

     6.    Coram emerged from bankruptcy in December 2004. Had Coram exited
bankruptcy in December 2000, its bankruptcy costs, both direct and indirect, would have been
lower. Direct bankruptcy costs can be measured by tallying actual invoiced and allowed legal
and administrative costs. Indirect bankruptcy costs relate to lost business, profits and other
opportunity costs, and are more difficult to measure. Such costs reduce the business's ability to
generate cash flows during the pendency of the bankruptcy and into the future. In the case of
Coram, we have been asked to assume that, but for Mr. Crowley's conflict issue, Coram would
have emerged from bankruptcy by year-end 2000 instead of its emergence being delayed until
December 1, 2004. As such, we can reasonably estimate excess indirect costs due to the
prolonged bankruptcy by measuring the difference between what Coram was worth upon its

---

[6] Cerberus Partners, L.P. became a Coram noteholder in 1997. The relationship between Mr. Cowley and Cerberus
is discussed in the July 2001 Updated Report of Independent Restructuring Advisor Goldin Associates, L.L.C.
("Goldin").

emergence from bankruptcy in December 2004 versus what it should have been worth by December 2004 had it emerged from bankruptcy in December 2000, all else being equal. Our analysis results in the following measures:

|  | ($ Millions) |
|---|---|
| Present value of expected free cash flows at December 2004 | $251.4 |
| Present value of expected free cash flows by December 2004 had Coram emerged from bankruptcy in December 2000 | $352.1 |
| Diminution in value due to extended bankruptcy | $100.7 |

       7.      Our analyses are based on free cash flows before deducting restructuring costs. As such, damages due to the incurrence of incremental direct costs during prolonged bankruptcy are in addition to this estimate of indirect bankruptcy costs.

## III.   COSTS OF BANKRUPTCY

       8.      Direct costs of bankruptcy "encompass the legal and administrative fees, including the cost of lawyers, accountants, and other professionals involved in the bankruptcy filing."[7] We have been provided an analysis prepared by Jerry Reynolds, a Coram representative, that shows Coram's direct costs of bankruptcy exceeded $36 million.[8] This analysis is attached hereto as **Exhibit 3**. Indirect bankruptcy costs can include "lost sales from falling demand as a result of customer concerns over future service difficulties, declining margins resulting from increased input costs from suppliers, loss of key personnel, and loss of management time and effort."[9] The finance literature includes other definitions of indirect bankruptcy costs, as follows:

---

[7] Weiss, Lawrence, Bankruptcy Resolution: Direct Costs and Violation of Priority of Claims, *Journal of Financial Economics*, 27:285-286, 1990.

[8] Scott Danitz April 6, 2007 deposition, p. 163.

[9] Cays, Stephen E., A Study on the Measurement and Prediction of The Indirect Costs of Bankruptcy, The Leonard N. Stern School of Business, April 2001. Cays further says that "such costs are difficult to measure and, consequently, there is a dearth of information on their potential magnitude. However, it is generally believed that these indirect costs can be substantially higher than the more easily observed 'direct' costs of bankruptcy."

Under this heading [indirect costs], I would include the opportunity costs of lost managerial energies …[ and indirect costs] usually are thought to include lost sales, lost profits, the higher cost of credit, or possibly the inability of the enterprise to obtain credit or issue securities to finance new opportunities.[10]

[Indirect costs of bankruptcy] include a range of unobservable opportunity costs, … including lost sales and a decline in the value of inventory. Customers may become concerned about assured supply or warranties. In certain industries (*e.g.*, financial services) these costs can completely destroy the value of the firm (*e.g.*, Drexel Burnham Lambert). [Such costs can also include] increased operating costs. Firms may lose key employees or have to pay more to keep them from abandoning a troubled firm. Suppliers may refuse to ship on favorable credit terms, and the firm's costs of capital may increase. [There can also be a] reduction in the firm's competitiveness. Management attention is focused on the bankruptcy, increasing the firm's vulnerability to competitors."[11]

Indirect costs include lost sales, lost profits, and possibly the inability of the firm to obtain credit or to issue securities except under especially onerous terms.[12]

9.      Based on the following anecdotal evidence in the record, it is likely that Coram suffered these indirect costs of bankruptcy:

   *a.   From the March 30, 2007 deposition of Michael A. Saracco, President of Specialty Services, Senior Vice President in March 2002:*

Q:  And along those same grounds, did you ever encounter any concern among third party payers about Coram being in bankruptcy?

A:  Overall the majority of the payers really didn't have issue but it is on the record again that I was personally involved with the team that was renewing and worked with the HealthNet agreement. HealthNet is a large California payer that we had a capitated arrangement with that represented a significant amount of Coram's revenues at the time. And, if I recall, on one of the successive renewals, they wanted to be cautious about how they announced the renewal in working with us and there was a time frame that they had actually put in the acceptance letter of a date by which we had to be out of bankruptcy or they – they didn't have to, but they could exercise their right to make the agreement null and void.

---

[10] Altman, Edward, A Further Empirical Investigation of the Bankruptcy Cost Question, *The Journal of Finance*, 39(4):1070-1071, September 1984.

[11] Weiss, Lawrence, Bankruptcy Resolution: Direct Costs and Violation of Priority of Claims, *Journal of Financial Economics*, 27:286, 288-289, 1990.

[12] Warner, Jerold B., Bankruptcy costs: Some evidence. *The Journal of Finance*, 32(2):338, May 1977.

Q: [In reference to HealthNet and Nutrashare] These examples of pressures put on by outside vendors and customers, did they require time and attention to deal with?

A: Well, yeah. I mean whenever anyone that runs a good business, if anyone voices an issue, concern, you dedicate time and attention to it, not always from me personally, but as you can – especially with something like this, you can see the list of people that were involved in an account of this size.

Q: […] Would you agree that it would be better for the company, Coram, to be able to focus on just its business rather than these external pressures?

A: Yes.

Q: […] Do you feel that Coram would have been a stronger company had it not been in bankruptcy for four and a half years?

A: I mean I guess at the end of the day I don't think any organization wants to be in bankruptcy, but to be able to – I don't think you can sit and say how much better or how much different would it or could it have been, but, you know, were there things that you needed to do to pay attention to a company in bankruptcy? Sure.

b. *From the April 5, 2007 deposition of Allen J. Marabito, Executive Vice President. Becomes interim CEO upon Crowley's departure:*

Q: As the bankruptcy continued for a protracted period of time, did that cause any difficulty for Coram in dealing with either vendors or customers?

A: There may have been some that were troubled by its continued pendency.

Q: And do you recall having to make assurances that the company would continue to certain patients or groups?

A: There – there – yes. There – there were interest groups, like the term suggests, representing customers, patients, some advocacy groups, some – and as their name would suggest, they were interested in what Coram's status was so that their members would be properly serviced.

Q: […] And do you believe that there were opportunities to be taken advantage of that could not be taken advantage of because Coram was still in bankruptcy?

A: The way I would try to express that is Coram lost a degree of flexibility in the bankruptcy process. For example, under Judge Adams' stewardship, we were not very aggressive in modifying, advancing, trying new ventures with Coram. It was – during that period of time, it was the preservation of the estate so that the ultimate owners of the company could make those types of decisions for themselves.

Q: So would it be fair to say that you still agree with what you previously testified to, that after December of 2000, when Coram did not emerge

5

from bankruptcy, in that posture it has no flexibility, it is not nimble, it is
being overburdened by litigation, all the distractions, costs are enormous
to this company and this process has to end, in my belief as soon as it can.
I'm sorry, as soon as possible.

A: Yeah. I – I was – I'd agree with that. That's an expression of frustration
right there.

c.  *From the April 6, 2007 deposition of Scott R. Danitz, CFO:*

Q: As a member of Coram's senior management team, did you ever
encounter any vendors or suppliers concerned about Coram being in
bankruptcy?

A: Yes.

Q: Do you recall that such concerns changed at all after the first plan of
reorganization?

A: No.

Q: Do you recall in early 2001 that [the Oley Foundation] expressed some
concerns about Coram because of the bankruptcy proceedings in
December 2000?

A: Yes.

Q: Do you recall also previously testifying in 2001 that emerging from
bankruptcy would increase sales and the ability to increase sales for
Coram?

A: Yes.

Q: Do you believe that was true at the time?

A: Yes.

Q: Did not emerging from bankruptcy when the second plan of reorganization
was not confirmed damage Coram's ability to increase sales?

A: It – it would have damaged it some, yes.

d.  *From the April 5, 2007 deposition of Kurt Davis, Vice President of Investor
Relations / Vice President of Corporate Communications:*

Q: Were you concerned, as the bankruptcy filing approached, about how the
filing might impact Coram's business?

A: Yes.

Q: What were your concerns in that regard?

A: Well, as with employees, a lot of people who hear about bankruptcy
believe that the organization is going out of business and will cease to

exist or that if they're a vendor to the organization, they won't be paid or that sort of thing. So they can cut you off. And so my concern was just the continuity of business and making sure that people understood that the enterprise would continue to exist.

Q: Did Coram's competitors attempt to use Coram's bankruptcy filing to their advantage?

A: It – it was represented in some of the management meetings that there had been some attempts by the competitors to do that. It – it was not as – it wasn't rampant, to my recollection, but, yes, I remember instances of that being discussed by people in the field.

Q: Did you have a concern after the Bankruptcy Court denied confirmation of Coram's first plan of reorganization that Coram employees would be disturbed by the ruling?

A: Yeah.

Q: Coram's second proposed plan of reorganization was not confirmed by the Bankruptcy Court; is that correct?

A: Correct.

Q: Did you have a concern about how denial of the second plan of reorganization would be viewed by Coram's employees?

A: Yes.

Q: What was your concern?

A: It would have been similar to the concern the first time, going to our credibility and, you know, again, the – you know, our – you know, our counsel had told us how to solve this, you know, disclosure problem that had resulted in the failure in the first one. And so, you know, we were confident, following his advice, that that's what would cure this and solve it. And when it didn't, we were dismayed. And then we were concerned that our employees would be dismayed, too.

    10.     Mr. Crowley also remarked on the indirect costs of bankruptcy to Coram on a number of occasions, as follows:

> Field personnel contacted the significant referring providers, payors, regulators, and vendors. As a result of the filing, a number of vendors had immediately placed Coram on hold. A typical example is attached from Nestle who provides Enteral. We have reversed the vast majority of the holds. There are similar provider and payor issues that are requiring intense remedial activity.[13]

---

[13] Letter from Crowley to Board of Directors, August 10, 2000 (CROWLEYKVN 009677)

September's Revenue looks like it came in at approximately $29.4 Million (the business forecast plan was $36.1 Million). Reasons: R Net implosion in the Eastern Region, Medicaid reimbursement level declines, tighter administration of the admissions grids, loss of the Aetna/US Healthcare/Prudential/Humana business, staff turnover, and, of course, the filing of Chapter 11.[14]

Coram is in the process of finalizing an operational budget for 2001. The process for creation of the budget was materially disrupted by the activity level required for the Chapter 11.[15]

Currently Coram's selling effort has been impacted by competitors who have continued to hire key sales employees from Coram by stressing the fragility of our firm's financial situation. Competitors try to scare our employees by telling them Coram is going to close its doors any day now. We counteract this every day with active communication to the contrary.[16]

With the continuing impact of the R Net issues in the Northeast, the impact of physicians who held Coram shares that lost value, and the prolonged Chapter 11, as well as aggressive competition, Coram continues to experience a general "softness" in referrals from providers. Some providers are concerned about continuity of care, are risk averse for their patients, and respond to the Chapter 11 and competitive entreaties to shift business from Coram to Apria, Gentiva, Caremark, Option Care, Nutrishare, local hospitals, and local infusion providers. *The impact of all this is a constant tamping down of Coram's sales.[17]*

All of us recognize that Coram's situation remains cloudy with the Bankruptcy. Just the same, the point of reminding you of these issues is to create a current awareness of Coram's situation as it begins to establish financial and management incentive goals for 2002 for the Board to consider. We are already a bit tardy in completing the establishment of goals and management incentives for 2002 due to other pressing matters. However, considerable work has been done on these matters and over the next few weeks, recommendations will be brought to you for review and consideration.[18]

11.     Coram also included the various comments in its 10-K filings with regard to the increased risks it faced while operating in bankruptcy:

---

[14] Letter from Crowley to Board of Directors, October 5, 2000 (CROWLEYKVN 013496)

[15] Letter from Crowley to Board of Directors, January 22, 2001(CROWLEYKVN 008487)

[16] Letter from Crowley to Board of Directors, February 5, 2001(CROWLEYKVN 008496)

[17] Letter from Crowley to Board of Directors, March 9, 2001(CROWLEYKVN 008505)

[18] Letter from Crowley to Board of Directors , January 14, 2002 (CROWLEYKVN 009949)

8

*From the December 31, 2000 10-K*

The company's ability to continue operations is dependent upon, among other things, the ability of the company to comply with the terms of the DIP financing arrangement, confirmation of a plan of reorganization, success of future operations after such confirmation and the ability to generate sufficient cash from operations and financing sources to meet obligations. There can be no assurances that any plan of reorganization will be approved by the Bankruptcy Court or that such a plan will allow the company to operate profitably. Any plan of reorganization and other actions during the Chapter 11 proceedings could change materially the financial condition and/or outlook of the company. Furthermore, the future availability or terms of financing cannot be determined in light of the Chapter 11 filings and there can be no assurance that the amounts available through the DIP financing will be sufficient to fund the operations of the company until a proposed plan of reorganization is approved by the Bankruptcy Court. In addition, the company may experience difficulty in attracting and maintaining patients and appropriate personnel as a result of the Chapter 11 proceedings.

*From the December 31, 2001 10-K:*

On the same day that the Chapter 11 cases were filed, the Debtors filed their joint plan of reorganization (the "Joint Plan") and their joint disclosure statement with the Bankruptcy Court. The Joint Plan was subsequently amended and restated (the "Restated Joint Plan") and, on or about October 10, 2000, the Restated Joint Plan and the First Amended Disclosure Statement with respect to the Restated Joint Plan were authorized for distribution by the Bankruptcy Court. [ ] At a confirmation hearing on December 21, 2000, the Restated Joint Plan was not approved by the Bankruptcy Court.

[On February 6, 2001], the Bankruptcy Court approved the Debtors' motion to appoint Goldin Associates, L.L.C. ("Goldin") as independent restructuring advisor to the Independent Committee of the Board of Directors (the "Independent Committee"). Among other things, the scope of Goldin's services included (i) assessing the appropriateness of the Restated Joint Plan and reporting its findings to the Independent Committee and advising the Independent Committee respecting an appropriate course of action calculated to bring the Debtors' bankruptcy proceedings to a fair and satisfactory conclusion, (ii) preparing a written report as may be required by the Independent Committee and/or the Bankruptcy Court and (iii) appearing before the Bankruptcy Court to provide testimony, as needed. Goldin was also appointed as a mediator among the Debtors, the Equity Committee and other parties in interest.

Based upon Goldin's findings and recommendations, as set forth in the Report of Independent Restructuring Advisor, Goldin Associates, L.L.C (the "Goldin Report"), on July 31, 2001, the Debtors filed with the Bankruptcy Court a Second Joint Disclosure Statement, as amended (the "Second Disclosure Statement"), with respect to their Second Joint Plan of Reorganization, as amended (the "Second Joint Plan"). [ ] On December 21, 2001, after several weeks of confirmation hearings, the Bankruptcy Court issued an order denying confirmation of the Debtors' Second Joint Plan.

9

On March 7, 2002, the Bankruptcy Court approved the appointment of Arlin M. Adams, Esquire, as the Debtors' Chapter 11 trustee. [   ] The Bankruptcy Code also provides that a Chapter 11 trustee must either file a plan of reorganization as soon as practicable or an explanation as to why he/she is unable to file a plan of reorganization. With the appointment of a Chapter 11 trustee, the Debtors are no longer debtors-in-possession under the Bankruptcy Code. [   ] A Chapter 11 trustee also assumes responsibility for management functions, including decisions relative to the hiring and firing of personnel. As is the case in the instance of the Debtors, when existing management is necessary to run the day-to-day operations, the Chapter 11 trustee retains and oversees this management.

### From the December 31, 2002 10-K:

Additionally, in February 2001, the Equity Committee filed a motion with the Bankruptcy Court seeking permission to bring a derivative lawsuit directly against the company's Chief Executive Officer, a former member of the CHC Board of Directors, Cerberus Partners, L.P., Cerberus Capital Management, L.P., Cerberus Associates, L.L.C. and Craig Court, Inc. (all the aforementioned corporate entities being parties to certain of the company's debt agreements or affiliates of such entities). The Equity Committee's proposed lawsuit alleged a collusive plan whereby the named parties conspired to devalue the company for the benefit of the company's creditors under the Securities Exchange Agreement. On February 26, 2001, the Bankruptcy Court denied the Equity Committee's motion without prejudice. In January 2002, the Equity Committee filed a substantially similar motion with the Bankruptcy Court, which additionally named certain current CHC directors, the company's other noteholders and Harrison J. Goldin Associates, L.L.C. (sic) as possible defendants. On February 12, 2002, the Bankruptcy Court again denied the renewed motion without prejudice.

Coram is involved in certain legal disputes and the Debtors are currently in the Bankruptcy Cases. Although Coram intends to pursue its claims and defend itself vigorously in these matters, management cannot predict the outcome of current and future matters due to the uncertainties inherent in litigation and the bankruptcy proceedings. The company's financial condition, results of operations and liquidity may be materially adversely impacted by the outcome of its legal disputes and an approved plan or plans of reorganization submitted by the Chapter 11 trustee or another interested party.

### From the December 31, 2003 10-K:

Management believes that the overall costs for the Bankruptcy Cases will result in a significant use of cash for the year ending December 31, 2004, and thereafter. These costs principally consist of professional fees and expenses. Management believes that such costs, when authorized for payment by the Chapter 11 trustee and the Bankruptcy Court, will be funded through available cash balances and cash provided by operations; however, this significant use of cash could have a materially adverse effect on the company's financial position and liquidity.

In recent years, Coram experienced significant increases in premiums related to D&O insurance, principally due to the ongoing bankruptcy proceedings and litigation matters involving directors and officers of the company. The company currently has adequate D&O coverage for the 2004 policy year and management believes that the company will be able to obtain adequate D&O insurance coverage in future periods. Management further believes that the related future insurance premiums will be paid with available cash balances and cash provided by operations. However, in the event that the company is unable to maintain adequate D&O insurance coverage in future policy years, Coram may be unable to attract and retain qualified directors and officers, which could have a materially adverse effect on the company's operations.

The continued successful operation of Coram's business, as well as its future growth, depends upon its ability to recruit and retain a staff of professional personnel, including licensed pharmacists and nurses. Certain parts of the United States, including states where the company has operations, are currently experiencing a shortage of these licensed professionals. Coram has been directly affected by this shortage and management believes that the company's current financial position and the ongoing bankruptcy proceedings have made it more difficult to recruit and retain experienced professional personnel.

As a result of the Bankruptcy Cases, the equity interests of the common stockholders are subject to a high degree of risk. A confirmed plan or plans of reorganization could result in the complete elimination of the CHC equity interests.

12.     Coram designates emergence from Chapter 11 bankruptcy proceedings as one of several "major strategic alternatives and initiatives being implemented by Coram."[19] Based on these comments, it is clear that Coram both anticipated and likely suffered some impact of indirect costs from its protracted bankruptcy.

## IV.    NERA ANALYSIS

13.     Determining the existence of indirect bankruptcy costs is a more straightforward matter than determining their measure with exactitude. However, information exists to make reasonable estimates of their impact on Coram. First, in the July 2001 Updated Report of Independent Restructuring Advisor Goldin Associates, L.L.C. ("Goldin Report"), Goldin states that Coram suffered "approximately $7 million to $9 million in business losses attributable to the

---

[19] 2001 SEC Form 10-K, p. 30. Similar statements are made in the 2000, 2002 and 2003 10-Ks.

prolonged bankruptcy."[20]  Goldin provides no description of his method in making this determination but, given the report date (July 2001) it is clear it cannot have been the result of an exhaustive study for the entire period through December 2004.

14.     In theory, the value of an interest in a business depends on the future benefits that will accrue to it, with the value of the future benefits discounted back to a present value at some appropriate discount (capitalization) rate.[21]  This definition is the basis of our approach to estimate the diminution of Coram's business value as a result of the protracted bankruptcy proceedings.  One definition of the benefits that accrue to a business is the cash flow generated by its operations net of capital expenditures ("free cash flow").  Annual cash flow from operations and capital expenditures are reflected in the Statement of Cash Flows reported in each year's SEC Form 10-K.

15.     The annual free cash flow amount can be converted to an indication of value by using it as a basis on which to forecast future years' annual free cash flow and then discounting these future amounts at a rate of return consistent with the risk of the investment (discounted cash flow or DCF model).  If one expects future growth to be at a constant level, current year free cash flow can be converted to an indication of value by capitalizing that amount; that is, dividing it by a capitalization rate.  Capitalization is arithmetically equivalent to a multi-period DCF model where the growth rate is assumed to be constant into the future.  As shown in Table 1 below, we compare normalized free cash flows of Coram for both 2003 and 2000.

---

[20] Goldin Report, p. 11.

[21] Pratt, Shannon P., Valuing a Business, The Analysis and Appraisal of Closely Held Companies, Second Edition, Business One Irwin, Homewood, IL, page 35.