# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re:

**Arlin M. Adams**, Chapter 11 Trustee of the
Post-Confirmation Bankruptcy Estates of
**Coram Healthcare Corporation**, a Delaware
Corporation, and of **Coram, Inc.**, a Delaware
Corporation,

          Plaintiff

          v.

**Daniel D. Crowley**, et al.

          Defendant

Case No. 04-1565 (SLR)

REPORT OF JEFFREY L. BALIBAN

JUNE 8, 2007

## I.    INTRODUCTION

1.    Coram Healthcare Corporation and Coram, Inc., (collectively "Coram" or the "Company") were engaged primarily in the business of furnishing alternate site (outside the hospital) infusion therapy and related services, including non-intravenous home health products such as respiratory therapy services and related equipment and durable medical equipment. Other services offered by Coram include outsourced hospital compounding services and centralized management, administration and clinical support for clinical research trials.[1]

2.    Coram filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code on August 8, 2000. On the same day as the Chapter 11 cases were filed, the Debtors filed their joint plan of reorganization and their disclosure statement with the Bankruptcy Court.[2] A Restated Joint Plan was distributed on or about October 20, 2000. At a confirmation hearing on December 21, 2000, the Restated Joint Plan was not approved by the Bankruptcy Court.[3] [4] A second plan of reorganization was submitted on July 31, 2001, and was similarly denied by the Court on December 21, 2001. The Trustee's reorganization plan was submitted May 2, 2003, which the Bankruptcy Court ultimately confirmed in November 2004 and Coram exited bankruptcy as of December 1, 2004, nearly four years after confirmation of its initial plan was denied.[5]

3.    Daniel D. Crowley was Chairman and Chief Executive Officer of Coram from November 1999 until November 2002, although he effectively continued in this function until March 2003. Prior to November 1999, we understand Mr. Crowley had entered into an

---

[1] Coram 10-K, December 31, 2003. Coram's primary business strategy is to focus its efforts on the delivery of its core infusion therapies, which include nutrition, anti-infective therapies, pain management, intravenous immunoglobulin ("IVIG") and coagulant and blood clotting therapies for persons with hemophilia. Most of the company's alternate site infusion therapy net revenue is derived from third party payers such as insurance companies, managed care plans and governmental payers.

[2] Coram 10-K, December 31, 2000, p. 24 - 25.

[3] Coram 10-K, December 31, 2001, p. 28.

[4] October 5, 2004 Opinion of US Bankruptcy Judge Mary F. Walrath – "In December 2000, at the conclusion of the confirmation hearings on the Debtors' First Plan, we found that the Debtors' CEO, Dan Crowley, was also employed as a consultant by Cerberus (the largest Noteholder). We concluded that this employment created a conflict of interest which tainted the Debtors' restructuring efforts."

[5] Paragraph 71 of Order Confirming the Chapter 11 Trustee's Second Amended Joint Plan of Reorganization signed October 27, 2004.

1

employment agreement with Cerberus Partners, L.P., one of Coram's noteholders since 1997.[6]
According to the December 29, 2004 Complaint in the above-captioned matter, the Trustee
brings this action for breach of fiduciary duty against Mr. Crowley.

    4.     National Economic Research Associates, Inc. ("NERA") has been retained by
counsel on behalf of the Trustee to provide assistance in understanding certain technical
economic and valuation issues.  Specifically, NERA has been asked to analyze the financial
statements of Coram and other relevant information, and to determine the extent to which Coram
has incurred indirect costs related to its protracted bankruptcy.

    5.     I am a Senior Vice President in the Securities & Finance practice of NERA and
am the senior firm member responsible for this report.  Prior to joining NERA, I was a senior
partner in the Dispute Advisory Services practice of KPMG LLP.  I have billed for my time in
this matter at my standard hourly billing rate of $550.  My experience and education are set out
in my *curriculum vitae*, attached as **Exhibit 1**.  I, along with professional staff working under my
direction, have been provided various documents and information in connection with this
assignment.  A list of documents relied upon is attached as **Exhibit 2**.

## II.    FINDINGS

    6.     Coram emerged from bankruptcy in December 2004.  Had Coram exited
bankruptcy in December 2000, its bankruptcy costs, both direct and indirect, would have been
lower.  Direct bankruptcy costs can be measured by tallying actual invoiced and allowed legal
and administrative costs.  Indirect bankruptcy costs relate to lost business, profits and other
opportunity costs, and are more difficult to measure.  Such costs reduce the business's ability to
generate cash flows during the pendency of the bankruptcy and into the future.  In the case of
Coram, we have been asked to assume that, but for Mr. Crowley's conflict issue, Coram would
have emerged from bankruptcy by year-end 2000 instead of its emergence being delayed until
December 1, 2004.  As such, we can reasonably estimate excess indirect costs due to the
prolonged bankruptcy by measuring the difference between what Coram was worth upon its

---

[6] Cerberus Partners, L.P. became a Coram noteholder in 1997.  The relationship between Mr. Cowley and Cerberus
is discussed in the July 2001 Updated Report of Independent Restructuring Advisor Goldin Associates, L.L.C.
("Goldin").

emergence from bankruptcy in December 2004 versus what it should have been worth by December 2004 had it emerged from bankruptcy in December 2000, all else being equal. Our analysis results in the following measures:

|  | (*$ Millions*) |
|---|---|
| Present value of expected free cash flows at December 2004 | $251.4 |
| Present value of expected free cash flows by December 2004 had Coram emerged from bankruptcy in December 2000 | $352.1 |
| Diminution in value due to extended bankruptcy | $100.7 |

7.      Our analyses are based on free cash flows before deducting restructuring costs. As such, damages due to the incurrence of incremental direct costs during prolonged bankruptcy are in addition to this estimate of indirect bankruptcy costs.

## III.    COSTS OF BANKRUPTCY

8.      Direct costs of bankruptcy "encompass the legal and administrative fees, including the cost of lawyers, accountants, and other professionals involved in the bankruptcy filing."[7] We have been provided an analysis prepared by Jerry Reynolds, a Coram representative, that shows Coram's direct costs of bankruptcy exceeded $36 million.[8] This analysis is attached hereto as **Exhibit 3**. Indirect bankruptcy costs can include "lost sales from falling demand as a result of customer concerns over future service difficulties, declining margins resulting from increased input costs from suppliers, loss of key personnel, and loss of management time and effort."[9] The finance literature includes other definitions of indirect bankruptcy costs, as follows:

---

[7] Weiss, Lawrence, Bankruptcy Resolution: Direct Costs and Violation of Priority of Claims, *Journal of Financial Economics*, 27:285-286, 1990.

[8] Scott Danitz April 6, 2007 deposition, p. 163.

[9] Cays, Stephen E., A Study on the Measurement and Prediction of The Indirect Costs of Bankruptcy, The Leonard N. Stern School of Business, April 2001. Cays further says that "such costs are difficult to measure and, consequently, there is a dearth of information on their potential magnitude. However, it is generally believed that these indirect costs can be substantially higher than the more easily observed 'direct' costs of bankruptcy."

Under this heading [indirect costs], I would include the opportunity costs of lost managerial energies ...[ and indirect costs] usually are thought to include lost sales, lost profits, the higher cost of credit, or possibly the inability of the enterprise to obtain credit or issue securities to finance new opportunities.[10]

[Indirect costs of bankruptcy] include a range of unobservable opportunity costs, ... including lost sales and a decline in the value of inventory. Customers may become concerned about assured supply or warranties. In certain industries (*e.g.*, financial services) these costs can completely destroy the value of the firm (*e.g.*, Drexel Burnham Lambert). [Such costs can also include] increased operating costs. Firms may lose key employees or have to pay more to keep them from abandoning a troubled firm. Suppliers may refuse to ship on favorable credit terms, and the firm's costs of capital may increase. [There can also be a] reduction in the firm's competitiveness. Management attention is focused on the bankruptcy, increasing the firm's vulnerability to competitors."[11]

Indirect costs include lost sales, lost profits, and possibly the inability of the firm to obtain credit or to issue securities except under especially onerous terms.[12]

9. Based on the following anecdotal evidence in the record, it is likely that Coram suffered these indirect costs of bankruptcy:

   a. *From the March 30, 2007 deposition of Michael A. Saracco, President of Specialty Services, Senior Vice President in March 2002:*

   Q: And along those same grounds, did you ever encounter any concern among third party payers about Coram being in bankruptcy?

   A: Overall the majority of the payers really didn't have issue but it is on the record again that I was personally involved with the team that was renewing and worked with the HealthNet agreement. HealthNet is a large California payer that we had a capitated arrangement with that represented a significant amount of Coram's revenues at the time. And, if I recall, on one of the successive renewals, they wanted to be cautious about how they announced the renewal in working with us and there was a time frame that they had actually put in the acceptance letter of a date by which we had to be out of bankruptcy or they – they didn't have to, but they could exercise their right to make the agreement null and void.

---

[10] Altman, Edward, A Further Empirical Investigation of the Bankruptcy Cost Question, *The Journal of Finance*, 39(4):1070-1071, September 1984.

[11] Weiss, Lawrence, Bankruptcy Resolution: Direct Costs and Violation of Priority of Claims, *Journal of Financial Economics*, 27:286, 288-289, 1990.

[12] Warner, Jerold B., Bankruptcy costs: Some evidence. *The Journal of Finance*, 32(2):338, May 1977.

Q: [In reference to HealthNet and Nutrashare] These examples of pressures put on by outside vendors and customers, did they require time and attention to deal with?

A: Well, yeah. I mean whenever anyone that runs a good business, if anyone voices an issue, concern, you dedicate time and attention to it, not always from me personally, but as you can – especially with something like this, you can see the list of people that were involved in an account of this size.

Q: [...] Would you agree that it would be better for the company, Coram, to be able to focus on just its business rather than these external pressures?

A: Yes.

Q: [...] Do you feel that Coram would have been a stronger company had it not been in bankruptcy for four and a half years?

A: I mean I guess at the end of the day I don't think any organization wants to be in bankruptcy, but to be able to – I don't think you can sit and say how much better or how much different would it or could it have been, but, you know, were there things that you needed to do to pay attention to a company in bankruptcy? Sure.

b. *From the April 5, 2007 deposition of Allen J. Marabito, Executive Vice President. Becomes interim CEO upon Crowley's departure:*

Q: As the bankruptcy continued for a protracted period of time, did that cause any difficulty for Coram in dealing with either vendors or customers?

A: There may have been some that were troubled by its continued pendency.

Q: And do you recall having to make assurances that the company would continue to certain patients or groups?

A: There – there – yes. There – there were interest groups, like the term suggests, representing customers, patients, some advocacy groups, some – and as their name would suggest, they were interested in what Coram's status was so that their members would be properly serviced.

Q: [...] And do you believe that there were opportunities to be taken advantage of that could not be taken advantage of because Coram was still in bankruptcy?

A: The way I would try to express that is Coram lost a degree of flexibility in the bankruptcy process. For example, under Judge Adams' stewardship, we were not very aggressive in modifying, advancing, trying new ventures with Coram. It was – during that period of time, it was the preservation of the estate so that the ultimate owners of the company could make those types of decisions for themselves.

Q: So would it be fair to say that you still agree with what you previously testified to, that after December of 2000, when Coram did not emerge

from bankruptcy, in that posture it has no flexibility, it is not nimble, it is being overburdened by litigation, all the distractions, costs are enormous to this company and this process has to end, in my belief as soon as it can. I'm sorry, as soon as possible.

A: Yeah. I – I was – I'd agree with that. That's an expression of frustration right there.

c.  *From the April 6, 2007 deposition of Scott R. Danitz, CFO:*

Q: As a member of Coram's senior management team, did you ever encounter any vendors or suppliers concerned about Coram being in bankruptcy?

A: Yes.

Q: Do you recall that such concerns changed at all after the first plan of reorganization?

A: No.

Q: Do you recall in early 2001 that [the Oley Foundation] expressed some concerns about Coram because of the bankruptcy proceedings in December 2000?

A: Yes.

Q: Do you recall also previously testifying in 2001 that emerging from bankruptcy would increase sales and the ability to increase sales for Coram?

A: Yes.

Q: Do you believe that was true at the time?

A: Yes.

Q: Did not emerging from bankruptcy when the second plan of reorganization was not confirmed damage Coram's ability to increase sales?

A: It – it would have damaged it some, yes.

d.  *From the April 5, 2007 deposition of Kurt Davis, Vice President of Investor Relations / Vice President of Corporate Communications:*

Q: Were you concerned, as the bankruptcy filing approached, about how the filing might impact Coram's business?

A: Yes.

Q: What were your concerns in that regard?

A: Well, as with employees, a lot of people who hear about bankruptcy believe that the organization is going out of business and will cease to

exist or that if they're a vendor to the organization, they won't be paid or that sort of thing. So they can cut you off. And so my concern was just the continuity of business and making sure that people understood that the enterprise would continue to exist.

Q: Did Coram's competitors attempt to use Coram's bankruptcy filing to their advantage?

A: It – it was represented in some of the management meetings that there had been some attempts by the competitors to do that. It – it was not as – it wasn't rampant, to my recollection, but, yes, I remember instances of that being discussed by people in the field.

Q: Did you have a concern after the Bankruptcy Court denied confirmation of Coram's first plan of reorganization that Coram employees would be disturbed by the ruling?

A: Yeah.

Q: Coram's second proposed plan of reorganization was not confirmed by the Bankruptcy Court; is that correct?

A: Correct.

Q: Did you have a concern about how denial of the second plan of reorganization would be viewed by Coram's employees?

A: Yes.

Q: What was your concern?

A: It would have been similar to the concern the first time, going to our credibility and, you know, again, the – you know, our – you know, our counsel had told us how to solve this, you know, disclosure problem that had resulted in the failure in the first one. And so, you know, we were confident, following his advice, that that's what would cure this and solve it. And when it didn't, we were dismayed. And then we were concerned that our employees would be dismayed, too.

10.    Mr. Crowley also remarked on the indirect costs of bankruptcy to Coram on a number of occasions, as follows:

> Field personnel contacted the significant referring providers, payors, regulators, and vendors. As a result of the filing, a number of vendors had immediately placed Coram on hold. A typical example is attached from Nestle who provides Enteral. We have reversed the vast majority of the holds. There are similar provider and payor issues that are requiring intense remedial activity.[13]

---

[13] Letter from Crowley to Board of Directors, August 10, 2000 (CROWLEYKVN 009677)

September's Revenue looks like it came in at approximately $29.4 Million (the business forecast plan was $36.1 Million). Reasons: R Net implosion in the Eastern Region, Medicaid reimbursement level declines, tighter administration of the admissions grids, loss of the Aetna/US Healthcare/Prudential/Humana business, staff turnover, and, of course, the filing of Chapter 11.[14]

Coram is in the process of finalizing an operational budget for 2001. The process for creation of the budget was materially disrupted by the activity level required for the Chapter 11.[15]

Currently Coram's selling effort has been impacted by competitors who have continued to hire key sales employees from Coram by stressing the fragility of our firm's financial situation. Competitors try to scare our employees by telling them Coram is going to close its doors any day now. We counteract this every day with active communication to the contrary.[16]

With the continuing impact of the R Net issues in the Northeast, the impact of physicians who held Coram shares that lost value, and the prolonged Chapter 11, as well as aggressive competition, Coram continues to experience a general "softness" in referrals from providers. Some providers are concerned about continuity of care, are risk averse for their patients, and respond to the Chapter 11 and competitive entreaties to shift business from Coram to Apria, Gentiva, Caremark, Option Care, Nutrishare, local hospitals, and local infusion providers. *The impact of all this is a constant tamping down of Coram's sales.[17]*

All of us recognize that Coram's situation remains cloudy with the Bankruptcy. Just the same, the point of reminding you of these issues is to create a current awareness of Coram's situation as it begins to establish financial and management incentive goals for 2002 for the Board to consider. We are already a bit tardy in completing the establishment of goals and management incentives for 2002 due to other pressing matters. However, considerable work has been done on these matters and over the next few weeks, recommendations will be brought to you for review and consideration.[18]

11.    Coram also included the various comments in its 10-K filings with regard to the increased risks it faced while operating in bankruptcy:

---

[14] Letter from Crowley to Board of Directors, October 5, 2000 (CROWLEYKVN 013496)

[15] Letter from Crowley to Board of Directors, January 22, 2001 (CROWLEYKVN 008487)

[16] Letter from Crowley to Board of Directors, February 5, 2001 (CROWLEYKVN 008496)

[17] Letter from Crowley to Board of Directors, March 9, 2001 (CROWLEYKVN 008505)

[18] Letter from Crowley to Board of Directors , January 14, 2002 (CROWLEYKVN 009949)

*From the December 31, 2000 10-K*

The company's ability to continue operations is dependent upon, among other things, the ability of the company to comply with the terms of the DIP financing arrangement, confirmation of a plan of reorganization, success of future operations after such confirmation and the ability to generate sufficient cash from operations and financing sources to meet obligations. There can be no assurances that any plan of reorganization will be approved by the Bankruptcy Court or that such a plan will allow the company to operate profitably. Any plan of reorganization and other actions during the Chapter 11 proceedings could change materially the financial condition and/or outlook of the company. Furthermore, the future availability or terms of financing cannot be determined in light of the Chapter 11 filings and there can be no assurance that the amounts available through the DIP financing will be sufficient to fund the operations of the company until a proposed plan of reorganization is approved by the Bankruptcy Court. In addition, the company may experience difficulty in attracting and maintaining patients and appropriate personnel as a result of the Chapter 11 proceedings.

*From the December 31, 2001 10-K:*

On the same day that the Chapter 11 cases were filed, the Debtors filed their joint plan of reorganization (the "Joint Plan") and their joint disclosure statement with the Bankruptcy Court. The Joint Plan was subsequently amended and restated (the "Restated Joint Plan") and, on or about October 10, 2000, the Restated Joint Plan and the First Amended Disclosure Statement with respect to the Restated Joint Plan were authorized for distribution by the Bankruptcy Court. [   ] At a confirmation hearing on December 21, 2000, the Restated Joint Plan was not approved by the Bankruptcy Court.

[On February 6, 2001], the Bankruptcy Court approved the Debtors' motion to appoint Goldin Associates, L.L.C. ("Goldin") as independent restructuring advisor to the Independent Committee of the Board of Directors (the "Independent Committee"). Among other things, the scope of Goldin's services included (i) assessing the appropriateness of the Restated Joint Plan and reporting its findings to the Independent Committee and advising the Independent Committee respecting an appropriate course of action calculated to bring the Debtors' bankruptcy proceedings to a fair and satisfactory conclusion, (ii) preparing a written report as may be required by the Independent Committee and/or the Bankruptcy Court and (iii) appearing before the Bankruptcy Court to provide testimony, as needed. Goldin was also appointed as a mediator among the Debtors, the Equity Committee and other parties in interest.

Based upon Goldin's findings and recommendations, as set forth in the Report of Independent Restructuring Advisor, Goldin Associates, L.L.C (the "Goldin Report"), on July 31, 2001, the Debtors filed with the Bankruptcy Court a Second Joint Disclosure Statement, as amended (the "Second Disclosure Statement"), with respect to their Second Joint Plan of Reorganization, as amended (the "Second Joint Plan"). [   ] On December 21, 2001, after several weeks of confirmation hearings, the Bankruptcy Court issued an order denying confirmation of the Debtors' Second Joint Plan.

On March 7, 2002, the Bankruptcy Court approved the appointment of Arlin M. Adams, Esquire, as the Debtors' Chapter 11 trustee. [ ] The Bankruptcy Code also provides that a Chapter 11 trustee must either file a plan of reorganization as soon as practicable or an explanation as to why he/she is unable to file a plan of reorganization. With the appointment of a Chapter 11 trustee, the Debtors are no longer debtors-in-possession under the Bankruptcy Code. [ ] A Chapter 11 trustee also assumes responsibility for management functions, including decisions relative to the hiring and firing of personnel. As is the case in the instance of the Debtors, when existing management is necessary to run the day-to-day operations, the Chapter 11 trustee retains and oversees this management.

### *From the December 31, 2002 10-K:*

Additionally, in February 2001, the Equity Committee filed a motion with the Bankruptcy Court seeking permission to bring a derivative lawsuit directly against the company's Chief Executive Officer, a former member of the CHC Board of Directors, Cerberus Partners, L.P., Cerberus Capital Management, L.P., Cerberus Associates, L.L.C. and Craig Court, Inc. (all the aforementioned corporate entities being parties to certain of the company's debt agreements or affiliates of such entities). The Equity Committee's proposed lawsuit alleged a collusive plan whereby the named parties conspired to devalue the company for the benefit of the company's creditors under the Securities Exchange Agreement. On February 26, 2001, the Bankruptcy Court denied the Equity Committee's motion without prejudice. In January 2002, the Equity Committee filed a substantially similar motion with the Bankruptcy Court, which additionally named certain current CHC directors, the company's other noteholders and Harrison J. Goldin Associates, L.L.C. (sic) as possible defendants. On February 12, 2002, the Bankruptcy Court again denied the renewed motion without prejudice.

Coram is involved in certain legal disputes and the Debtors are currently in the Bankruptcy Cases. Although Coram intends to pursue its claims and defend itself vigorously in these matters, management cannot predict the outcome of current and future matters due to the uncertainties inherent in litigation and the bankruptcy proceedings. The company's financial condition, results of operations and liquidity may be materially adversely impacted by the outcome of its legal disputes and an approved plan or plans of reorganization submitted by the Chapter 11 trustee or another interested party.

### *From the December 31, 2003 10-K:*

Management believes that the overall costs for the Bankruptcy Cases will result in a significant use of cash for the year ending December 31, 2004, and thereafter. These costs principally consist of professional fees and expenses. Management believes that such costs, when authorized for payment by the Chapter 11 trustee and the Bankruptcy Court, will be funded through available cash balances and cash provided by operations; however, this significant use of cash could have a materially adverse effect on the company's financial position and liquidity.

In recent years, Coram experienced significant increases in premiums related to D&O insurance, principally due to the ongoing bankruptcy proceedings and litigation matters involving directors and officers of the company. The company currently has adequate D&O coverage for the 2004 policy year and management believes that the company will be able to obtain adequate D&O insurance coverage in future periods. Management further believes that the related future insurance premiums will be paid with available cash balances and cash provided by operations. However, in the event that the company is unable to maintain adequate D&O insurance coverage in future policy years, Coram may be unable to attract and retain qualified directors and officers, which could have a materially adverse effect on the company's operations.

The continued successful operation of Coram's business, as well as its future growth, depends upon its ability to recruit and retain a staff of professional personnel, including licensed pharmacists and nurses. Certain parts of the United States, including states where the company has operations, are currently experiencing a shortage of these licensed professionals. Coram has been directly affected by this shortage and management believes that the company's current financial position and the ongoing bankruptcy proceedings have made it more difficult to recruit and retain experienced professional personnel.

As a result of the Bankruptcy Cases, the equity interests of the common stockholders are subject to a high degree of risk. A confirmed plan or plans of reorganization could result in the complete elimination of the CHC equity interests.

12.     Coram designates emergence from Chapter 11 bankruptcy proceedings as one of several "major strategic alternatives and initiatives being implemented by Coram."[19] Based on these comments, it is clear that Coram both anticipated and likely suffered some impact of indirect costs from its protracted bankruptcy.

## IV.    NERA ANALYSIS

13.     Determining the existence of indirect bankruptcy costs is a more straightforward matter than determining their measure with exactitude. However, information exists to make reasonable estimates of their impact on Coram. First, in the July 2001 Updated Report of Independent Restructuring Advisor Goldin Associates, L.L.C. ("Goldin Report"), Goldin states that Coram suffered "approximately $7 million to $9 million in business losses attributable to the

---

[19] 2001 SEC Form 10-K, p. 30. Similar statements are made in the 2000, 2002 and 2003 10-Ks.

prolonged bankruptcy."[20]  Goldin provides no description of his method in making this determination but, given the report date (July 2001) it is clear it cannot have been the result of an exhaustive study for the entire period through December 2004.

14.    In theory, the value of an interest in a business depends on the future benefits that will accrue to it, with the value of the future benefits discounted back to a present value at some appropriate discount (capitalization) rate.[21]  This definition is the basis of our approach to estimate the diminution of Coram's business value as a result of the protracted bankruptcy proceedings.  One definition of the benefits that accrue to a business is the cash flow generated by its operations net of capital expenditures ("free cash flow").  Annual cash flow from operations and capital expenditures are reflected in the Statement of Cash Flows reported in each year's SEC Form 10-K.

15.    The annual free cash flow amount can be converted to an indication of value by using it as a basis on which to forecast future years' annual free cash flow and then discounting these future amounts at a rate of return consistent with the risk of the investment (discounted cash flow or DCF model).  If one expects future growth to be at a constant level, current year free cash flow can be converted to an indication of value by capitalizing that amount; that is, dividing it by a capitalization rate.  Capitalization is arithmetically equivalent to a multi-period DCF model where the growth rate is assumed to be constant into the future.  As shown in Table 1 below, we compare normalized free cash flows of Coram for both 2003 and 2000.

---

[20] Goldin Report, p. 11.

[21] Pratt, Shannon P., Valuing a Business, The Analysis and Appraisal of Closely Held Companies, Second Edition, Business One Irwin, Homewood, IL, page 35.

| | ($ Thousands) | |
| --- | --- | --- |
| | *2003*[22] | *2000* |
| Cash flow from operations before bankruptcy-related expenses, as reported in annual SEC Form 10-K for year-end 2003 and 2000. | $28,960 | $44,144[23] |
| Adjustment for sale of CPS segment's impact on working capital.[24] | | (9,694) |
| Adjustment to normalize capital expenditures and depreciation. In the long run, capital expenditures will equal depreciation expense. This adjustment normalizes any single-period timing differences.[25] | (6,953) | (23,227) |
| Add back interest expense, net of the tax shield. This is done to reflect debt-free cash flows to all capital (debt & equity) investors.[26] | 1,015 | 16,073 |
| Normalized annual free cash flow. | $23,022 | $27,295 |

*Table 1—Normalized Annual Free Cash Flow*

16.     In Table 2, we show the value of these two normalized annual free cash flow levels, given the actual bankruptcy exit date ("2004 Exit") and the but for bankruptcy exit date ("2000 Exit").  We applied the single-period capitalization method to estimate present value:

---

[22] We use year-end 2003 as a starting point to estimate year-end 2004 free cash flow because 2003 is the most current audited financial statements available for Coram.

[23] Based on CPS's negative $1.9MM in earnings before interest expense, taxes, and depreciation (EBITDA), reported by Coram in its 2000 10-K (page F-30), we assume that none of the 2000 reported cash flow from operations are attributed to CPS, which was sold in July of 2000 for $41.3MM. Thus, we do not need to adjust this figure downward to make a fair comparison to the 2003 figures.

[24] In 2000, Coram reported significant decreases in working capital (inventories and accounts receivable less accounts payable) that increased cash flow from operations as a result of the sale of CPS. Since we do not expect these cash flows to recur we reduce cash flows to reflect this one-time windfall. See calculation on **Exhibit 4.**

[25] Normalized free cash flow should account for both long-term capital investment and long-term depreciation. When normalizing cash flows, depreciation expense should be set equal to capital expenditures. Since Coram charged approximately $23MM in depreciation expense in 2000 and because we are assuming it normally spends about $8MM on capital, we must adjust the depreciation add-back down to $8MM by reducing it an additional $15MM

[26] Cash flow from operations as reported by Coram includes a reduction in cash flows resulting from interest expense (net of tax). In order to determine cash flows before any impact of financing activities we must add back this after-tax interest deduction.

13

| $ amounts in thousands (except capitalization factor) | 2004 Exit | 2000 Exit |
|---|---|---|
| Normalized annual free cash flow | $23,022 | $27,295 |
| Annual free cash flow at year-end, 2005 (c)[27] | 24,591 | 34,440 |
| Single-Period Capitalization Factor (1/(r-g)) | 10.2 | 10.2 |
| Value of Coram as of year-end 2004 (c/(r-g)) | $251,384 | $352,078 |

*Table 2—Comparative Values of Coram Based on 2003 vs. 2000 Bankruptcy Exit*

17.     In Table 3, we compare the present value of future Coram free cash flows as of year-end 2004 assuming exit from bankruptcy at year-end 2000 relative to the actual bankruptcy exit in year-end 2004. The difference in values under these two scenarios, $100.7 million, is the loss or damages resulting from the four-year delay in exiting bankruptcy. These calculations are presented on **Exhibit 5.**

| | Value as of Year-End 2004 ($ thousands) |
|---|---|
| Value of Coram had it exited bankruptcy at year-end 2000 | $352,078 |
| Value of Coram given its actual year-end 2004 bankruptcy exit | $251,384 |
| Difference in value of Coram resulting from extended bankruptcy | $100,694 |

*Table 3—Damages Resulting from Extended Bankruptcy*

18.     In determining the capitalization rate, we applied the Capital Asset Pricing Model ("CAPM") to calculate an appropriate cost of equity capital at a risk level consistent with a similar alternative investment in this industry. CAPM states that the expected return of an investment, $r_e$, equals the rate on a risk-free security, $r_f$, plus a market risk premium, $r_m - r_f$. The market risk premium is adjusted by a systematic risk coefficient, beta or $\beta_e$, which represents the particular industry's systematic risk; that is, a measure of the volatility of a particular industry relative to the market as a whole. The CAPM formula is, therefore,

14

$$r_e = r_f + \beta_e (r_m - r_f)$$

19. For $r_f$ we use the yield on the 30-year Treasury Bond (5.0 percent) as of December 1, 2004, as reported by Bloomberg LP. To measure $(r_m - r_f)$, we use the historical return on the market index relative to the return on US government securities.[28] Finally, to derive Coram's beta $(\beta_e)$ we examine the historical movement (or correlation) of the peer group return-on-total-capital relative to the market as a whole.[29]

20. Using the CAPM formula and adjusting for Coram's size, we derive an expected return of approximately 12.6 percent for Coram capital as of year-end 2004 (that is, from January 2005 onward). We use this rate net of the expected inflationary growth of approximately 2.9 percent to capitalize Coram's terminal cash flows under the two scenarios depicted above. See calculations on **Exhibit 6**.

## V.    MARKET ANALYSIS

21. To corroborate this analysis, we utilized the various valuation analyses prepared at various points in time to estimate any diminution in business value occurring from December 2000 through December 2004. We were provided the following valuations from 2000:

---

[27] We rolled the year-end 2003 and year-end 2000 annual debt-free cash flow amounts forward at the risk-free rate of return available at each period. In other words, we added 2 years of interest to year-end 2003 cash flow and 5 years of interest to year-end 2000 cash flow.

[28] We also incorporate a small firm premium of 4.0 percent as reported by Ibbotson Associates SBBI Valuation Edition 2005 Yearbook, Appendix C, table C-1. The long-horizon expected equity risk premium and micro-cap size premium are based on the differences of historical arithmetic mean returns from 1926 - 2004 using the S&P 500 as the market benchmark. pp.70-71, 127-37.

[29] Our peer index includes Apria Healthcare Group, Gentiva Health Services Inc., American Homepatient Inc., and Option Care, Inc. The daily equity returns for the peer index is regressed against the returns of the S&P500 index. We then adjust the beta to remove the effects of financing so that our risk factor is indicative of Coram's underlying asset return risk and not its method of financing these assets.

15

| Valuation Firm | Valuation Date | Value Estimate ($ thousands) |
|---|---|---|
| UBS Warburg | September 30, 2000 | $195,773 |
| Deloitte & Touche | November 15, 2000 | $292,000 |
| Chanin Capital Partners[30] | December 31, 2000 | $189,391 |
| 2000 10-K Value estimate[31] | December 31, 2000 | $215,500 |

22.     The average of these values is $223.166 million. Excluding the much higher Deloitte value reduces the average value estimate of Coram to about $200 million at December 31, 2000.

23.     A report prepared by SSG Capital Advisors, L.P. and Ewing Bemiss & Co. estimates the actual value of Coram 2½ years later at $219.8 million as of June 30, 2003. This supports an annual compound growth rate of about 4 percent.[32]

24.     Our analyses of comparable companies operating in this industry show that, in general, this industry enjoyed significant growth in revenues and returns on equity during the 2001-to-2004 period. While the value of Coram increased during this period, the increase it enjoyed was appreciably below general industry levels. Additionally, actual returns to Coram debt and equity holders during this period on average were below expected rates of return as measured by the Company's weighted average cost of capital.

25.     Over the period January 2001 to December 2004, one measure of the market conditions facing Coram is the performance of its peers. Coram identifies its peers on its proxy statement for the period ending August 5, 1999, as Apria Healthcare Group, American Homepatient, Gentiva Health Services, and Option Care.[33] These companies are also used as comparables in the various valuations performed on Coram. The performance of these

---

[30] Chanin Capital Partners had issued a previous report, dated July 31, 2000, valuing Coram at $207 million.

[31] The value of Coram at December 31, 2000 can also be estimated by adding to the year-end market value of equity all book values of long-term debt and future payments on operating leases.

[32] December 2000 value of $200 million $\times 1.04^{2.5} = \$220$ million.

[33] According to the March 13, 2000 SEC Form 8-K for Olsten Corporation, Olsten Corporation split off its health services business as an independent public company – Gentiva Health Services.

companies can be measured by the cumulative return of the companies' equity (*i.e.*, cumulative appreciation of each company's stock price), where each return is weighted by its relative market capitalization. During this period, the market capitalization return grew at compound annual rates of 18 percent. See **Exhibit 7**.[34]

26.   Another metric for the growth of the industry is change in the peers' enterprise value. As shown in **Exhibit 8**, the average enterprise value compound annual growth rate for the peers over the period is approximately 13.7 percent. Therefore, if Coram's enterprise value grew at the same rate over that time period and we assume its value at December 2000 was $200 million, its value at the end of 2004 should have been about $334.1 million.[35] Further, if Coram had enjoyed a compound annual growth rate in value of 13 percent from December 2000 through June 30, 2003, its value would have been $275.6 million.[36] This compares to the $219.8 million in value measured by SSG Capital Advisors and Ewing Bemis at June 30, 2003, for a difference of $55.8 million through June 30, 2003.

## VI.   OTHER CORAM MATTERS

27.   Coram's December 31, 2001 10-K discusses the reduction of average wholesale price reimbursement rates on the antibiotic drug Vancomycin as well as four other anti-infective drugs. We analyzed the extent to which this could meaningfully explain Coram's below-market growth rates. We noted the following from Coram's 10-Ks:

*From the December 31, 2001 10-K, p. 34.*

Effective July 1, 2001, the AWP for a certain brand of the antibiotic drug Vancomycin and four other anti-infective drugs were permanently reduced. Net revenue related to these drugs decreased $2.4 million or 21.4% to $8.8 million in 2001 from $11.2 million in 2000. The components of the net revenue reduction were an unfavorable pricing variance of $3.1 million related to the adverse AWP change offset by a favorable variance in volume, resulting in a net revenue increase of $0.7 million.

---

[34] Our preliminary estimates of infusion-weighted return grew at an even higher rate.

[35] For the purpose of this analysis, this value compares favorably to the value estimate at December 2004, reflected in Table 1 above based on the capitalization of free cash flows, had Coram exited bankruptcy in 2000.

[36] December 2000 value of $200 million $\times 1.1368^{2.5} = \$275.6$ million.

17

*From the December 31, 2002 10-K, p. 40*

Effective July 1, 2001, the AWP reimbursement rates for a certain brand of the antibiotic drug Vancomycin and four other anti-infective drugs were permanently reduced. Net revenue related to these drugs decreased $3.9 million or 33.3% to $7.8 million during the year ended December 31, 2002, from $11.7 million during the year ended December 31, 2001. The net revenue reduction included an unfavorable pricing variance of $6.5 million related to the adverse AWP reimbursement rate changes, which was offset by an increase in volume relating to such drugs.

28.     The most this seems to have affected revenues is by about $3.9 million for the year ended 2002. Assuming an EBITDA margin of 10 percent, the cash flow impact would be limited to about $400,000. Further, this reduction in AWP is explained in Coram's 10-Ks as being due to reimbursement rates as prescribed by Medicare, Medicaid, investigations performed by the Government Accounting Office as well as recommendations by the Department of Health & Human Services. To the extent Coram's peers were similarly affected by these events, our analysis of the peers already takes these issues into account.

## VII.  CONCLUSION

29.     Indirect costs of bankruptcy include a range of unobservable opportunity costs. The testimony and evidence provided to me indicates the existence of these losses was recognized by Coram management at the time and by Mr. Crowley himself. The July 2001 Goldin report confirms the existence of business losses due to protracted bankruptcy, even as of that early date. We measured the damages to Coram based on the value associated with a protracted bankruptcy that lasted an additional four years as a result of the Crowley conflict. By examining Coram's reported cash flows and adjusting for non-recurring events as well as bankruptcy and financing related costs, we find that Coram lost approximately $100.7 million in value as a result of exiting from bankruptcy at year-end 2004 as opposed to year-end 2000. This reduction in value does not appear to be explained by any other market, industry or Coram-specific factors.

30.     We understand discovery is continuing in this matter. As such, we reserve the right to amend, change or update these comments as necessary. We also understand that, to the extent other experts opine on these issues, counsel may request our input or rebuttal.

Respectfully submitted,

June 11, 2007
Date

Jeffrey L. Baliban

19

# Exhibit B

Page 1

THE UNITED STATES DISTRICT COURT,
FOR THE DISTRICT OF DELAWARE
-------------------------------)
ARLIN M. ADAMS, Chapter 11     )
Trustee of the Post-           )Case No.
Confirmation Bankruptcy        )04-1565
Estates of Coram Healthcare    )
CORPORATION, and of CORAM,     )
INC., a Delaware corporation,  )
                 Plaintiff,    )
            vs.                )
DANIEL D. CROWLEY; DONALD J.   )
AMARAL; WILLIAM J. CASEY; L.   )
PETER SMITH; and SANDRA L.     )
SMOLEY,                        )
                               )
                 Defendants.   )
-------------------------------)
         DEPOSITION OF JEFFREY L. BALIBAN
              New York, New York
                 July 17, 2007

Reported by:
MARY F. BOWMAN, RPR, CRR
JOB NO. WS 02254

---

Page 2

1
2
3
4                        July 17, 2007
5                        9:58 a.m.
6
7
8            Deposition of JEFFREY L. BALIBAN,
9    held at the offices of Schnader, Harrison,
10   Segal & Lewis, LLP, 140 Broadway, New York,
11   New York, before Mary F. Bowman, a Registered
12   Professional Reporter, Certified Realtime
13   Reporter, and Notary Public of the State of
14   New York.
15
16   Reporting for:
17   LiveNote World Service
18   221 Main Street, Suite 1250
19   San Francisco, Ca. 94105
20   Phone: (415) 321-2300
21   Fax: (415) 321-2301
22
23
24
25

---

Page 3

1                    APPEARANCES:
2
3    SCHNADER HARRISON SEGAL & LEWIS, LLP
4    Counsel for Plaintiff Arlin Adams, Trustee
5       220 Lake Drive East, Suite 200
6       Cherry Hill, NJ 08002
7       856-482-5222
8    BY: WILBUR L. KIPNES, ESQ.; wkipnes@schnader.com
9    KEKER & VAN NEST, LLP
10   Counsel for Daniel Crowley
11      710 Sansome Street
12      San Francisco, California 94111
13      415-391-5400
14   BY: ELLIOT PETERS, ESQ.; epeters@kvn.com
15   ALSO PRESENT: J.D. Martinez, Videographer
16
17
18
19
20
21
22
23
24
25

---

Page 4

1
2            IT IS HEREBY STIPULATED AND AGREED, by
3    and between the attorneys for the respective
4    parties herein, that filing and sealing be
5    and the same are hereby waived.
6            IT IS FURTHER STIPULATED AND AGREED
7    that all objections, except as to the form
8    of the question, shall be reserved to the
9    time of the trial.
10           IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized to
13   administer an oath, with the same force and
14   effect as if signed and sworn to before the
15   Court.
16
17
18
19
20
21
22
23
24
25

## Page 217

1  Q.   But you did consider the market
2  capitalization of these other companies listed
3  in Exhibit 11 and determining their enterprise
4  values?
5  A.   In estimating their enterprise values,
6  that's correct, since these entities were not --
7  were not in bankruptcy during this period of
8  time, and so their share price would be a better
9  indication of or at least the market's
10  indication of expected future returns to equity.
11  Q.   So if a company is not in bankruptcy,
12  the share price is relevant to a determination
13  of the company's value?
14  A.   I wouldn't say solely if a company is
15  not in bankruptcy, a company's share price is
16  relevant. It may be relevant. But certainly
17  where you have an efficient market trading the
18  shares and that those shares are efficiently
19  priced, then they would be, according to an
20  efficient market hypothesis, a reflection in
21  total of expected future cash flows to the
22  equity holders.
23  Q.   But you didn't consider the return to
24  Coram shareholders at all in doing your
25  analysis, correct?

## Page 218

1  MR. KIPNES:  Objection, asked and
2  answered.
3  A.   I did not consider the return to Coram
4  shareholders individually or as a separate
5  group. I looked at the return or the ability of
6  the company as a whole to generate cash flows
7  into the future. So it would be looking at the
8  impact on the entity and I think that that's
9  what I was asked to do, to determine the extent
10  to which Coram has incurred any direct costs
11  related to its prolonged bankruptcy which I
12  defined as Coram Health Corporation and Coram
13  Inc.
14  Q.   On page 14 of your report, where it
15  says damages resulting from extended bankruptcy,
16  that's the damage to Coram?
17  A.   Yes.
18  Q.   And does that idea of damage to Coram
19  take into account the fact that the Coram
20  shareholders actually profited during this time
21  period?
22  MR. KIPNES:  Object to the form of the
23  question.
24  A.   It takes into consideration the damage
25  to Coram as an entity, not allocating that

## Page 219

1  damage individually to equity holders or debt
2  holders. I am looking at --
3  Q.   Who was damaged by this alleged -- you
4  say Coram was damaged by 100 million dollars or
5  more due to extended bankruptcy and I want to
6  know who was damaged by that?
7  MR. KIPNES:  Object to the form of the
8  question.
9  A.   If you are looking for a list of
10  names, I couldn't give you that.
11  Q.   How about a description of the people?
12  Were the shareholders damaged?
13  A.   I am looking at the investors as a
14  whole, be they equity or a combination of
15  investors, equity and debt.
16  Q.   So the persons who were damaged
17  according to your analysis are the investors,
18  both debt and equity?
19  A.   A combination.
20  Q.   OK.
21  A.   All of -- I mean the Coram entity
22  itself.
23  Q.   Some combination of the investors in
24  Coram including debt and equity were damaged to
25  the tune of 100 and whatever million dollars you

## Page 220

1  come up with in your report, is that what you
2  are telling us?
3  A.   The entity itself was damaged and if
4  you are looking at the entity as some
5  combination of debt and equity investors, that
6  would be correct.
7  Q.   Well, don't you have to look at the
8  entity as some combination of the investors in
9  it? I mean, to -- can you say the entity was
10  damaged but no group of persons who had an
11  economic interest was damaged?
12  MR. KIPNES:  I object to the form of
13  the question.
14  A.   I don't know. I would have to think
15  about that. I mean, the -- Coram is an
16  entity -- as a corporation, it is an entity in
17  and of itself. So I am looking at the impact to
18  the entity, not to any particular investor or
19  any particular class of investor.
20  Q.   But it has -- withdrawn.
21  There are people who have an economic
22  interest in Coram?
23  A.   There are people who have had an
24  economic interest in Coram and those interests
25  may be different than, you know, as individuals

Pages 217 to 220

## Page 221

1  than the entity itself.
2        Q.    But the, according to you, some class
3  of investors was harmed to the tune of 100
4  million dollars, is that correct?
5        A.    The entity itself was harmed.
6        Q.    You keep saying that, but my question
7  is, was some group of persons who were investors
8  in Coram in one form or another harmed to the
9  tune of 100 million dollars?
10       A.    I haven't thought about how this
11  damage would be allocated amongst various groups
12  of investors, but the harm would ultimately be
13  to the combined investment.
14       Q.    So the harm was to the investors,
15  defined broadly?
16       A.    Defined broadly, correct.
17       Q.    OK.  Now, the harm wasn't to the
18  equity investors, right, because they started
19  out with something worth almost nothing and they
20  are going to get 80 cents a share, maybe more,
21  correct?  I mean, they weren't harmed, right?
22       A.    I don't know.  I don't know.  If you
23  are looking at the -- certainly I couldn't
24  answer with respect to any individual investor
25  and I would have to --

## Page 222

1        Q.    I am not asking you about individual
2  investors.
3        A.    I would have to think about the entire
4  ramifications of the different plans before I
5  could respond as to the ultimate economic impact
6  on, even on the entire class of investors.
7        Q.    OK.  So you don't have -- you're not
8  able to express an opinion on which of the broad
9  class of Coram investors was harmed, is that
10  right?
11       A.    That's correct.  I haven't reached an
12  opinion on that -- I am expressing no opinion on
13  any -- on the harm caused to any specific class
14  of investor, just on the harm caused to the
15  entity or the sum total of all the investors as
16  a whole.
17       Q.    But you're not drawing a distinction
18  between the entity and the sum total of the
19  investors as a whole.  They are -- that's the
20  same thing, right?
21       A.    I think that's correct.
22       Q.    But don't you think -- it is pretty
23  unlikely that if the shareholders got 80 cents a
24  share, that they weren't harmed?
25       A.    I would have to think about it.  I

## Page 223

1  would have to look and -- look at the
2  differences amongst the two plans and it would
3  be something that I would have to think about.
4  It is nothing that I would want to opine on
5  without having thought about it.
6        Q.    OK, so you are not able comfortably to
7  opine on that right now?
8        A.    That's correct.
9        Q.    Are you able to opine on whether the
10  note holders of Coram were harmed?
11       A.    Again, individual note holders?
12       Q.    No, just as a group.
13       A.    It would be again something I would
14  have to consider individually as a -- you know,
15  the individual groups.
16       Q.    Well, in your report, you say that the
17  total costs of bankruptcy, both direct and
18  indirect are what, 130 some odd million?
19       A.    That's the estimate.
20       Q.    And you understand that that number is
21  then going to be used by the trustee and his
22  lawyers to ask for that amount from my client,
23  Dan Crowley?
24       A.    OK.
25       Q.    Don't you understand that?  This isn't

## Page 224

1  your first time doing this.  You understand
2  that, right?
3        A.    I'm taking that as a given.
4        Q.    Is it also your understanding that the
5  reason you performed your analysis is so that if
6  a judgment is rendered against Dan Crowley for
7  130 million dollars, that that money would then
8  go to compensate somebody who has been harmed?
9             MR. KIPNES:  Object to the form of the
10  question.
11       A.    I don't know how that money would get
12  allocated to individuals or individual entities.
13       Q.    I guess my question is, who was
14  harmed?
15             MR. KIPNES:  Objection, asked and
16  answered.
17       Q.    And -- yeah, who was harmed, what
18  class or group of individuals was harmed?
19             MR. KIPNES:  Objection, asked and
20  answered.
21       A.    If the entity itself is harmed, then
22  the sum total of the return to all of the
23  investors, debt and equity, is lower than it
24  should have been.  But for the occurrence, but
25  for the --

Pages 221 to 224

## Page 237

```
 1                    EXHIBITS
 2   Exhibit No.                    Marked
 3   Exhibit 9   document entitled "Coram        163
 4               Healthcare Corporation
 5               Equivalent Calculation of
 6               Normalized Free Cash Flow"
 7   Exhibit 10  document entitled "Coram        175
 8               Health Care Corporation
 9               Exhibit C Equivalent
10               Calculation of Normalized Free
11               Cash Flow" dated December 31,
12               1995 through December 31, 2003
13   Exhibit 11  document entitled Coram         193
14               Healthcare Corp. Enterprise
15               Value Data 12/29/2000 through
16               12/31/2004
17   Exhibit 12  document entitled Motion for    226
18               the Chapter 11 Trustee For
19               Authorization To Enter Into
20               Termination and Employment
21               Extension Agreement with
22               Daniel D. Crowley
23
24
25
```

## Page 238

```
 1                    CERTIFICATE
 2   STATE OF NEW YORK )
 3                     )ss:
 4   COUNTY OF NEW YORK)
 5           I, MARY F. BOWMAN, a Registered
 6   Professional Reporter, Certified Realtime
 7   Reporter, and Notary Public within and for
 8   the State of New York, do hereby certify:
 9           That Jeffrey L. Baliban, the witness
10   whose deposition is hereinbefore set forth,
11   was duly sworn by me and that such
12   deposition is a true record of the testimony
13   given by such witness.
14           I further certify that I am not
15   related to any of the parties to this action
16   by blood or marriage and that I am in no way
17   interested in the outcome of this matter.
18           In witness whereof, I have hereunto
19   set my hand this 23rd day of July, 2007.
20
21
                     _____
22                   MARY F. BOWMAN, RPR, CRR
23
24
25
```

## Page 239

```
 1           * * *ERRATA SHEET* * *
 2   NAME OF CASE:  Adams v. Crowley
 3   DATE OF DEPOSITION:  July 17, 2007
 4   NAME OF WITNESS:  Jeffrey L. Baliban
 5   Reason codes:
 6       1. To clarify the record.
         2. To conform to the facts.
 7       3. To correct transcription errors.
 8   Page _____ Line _____ Reason_____
     From _____ to_____
 9
10   Page _____ Line _____ Reason_____
     From _____ to_____
11
12   Page _____ Line _____ Reason_____
     From _____ to_____
13
14   Page _____ Line _____ Reason_____
     From _____ to_____
15
16   Page _____ Line _____ Reason_____
     From _____ to_____
17
18   Page _____ Line _____ Reason_____
     From _____ to_____
19
20   Page _____ Line _____ Reason_____
     From _____ to_____
21
22
23
                 _____
                 JEFFREY L. BALIBAN
24
25
```

Pages 237 to 239

# Exhibit C

# Schnader
## ATTORNEYS AT LAW

1600 MARKET STREET   SUITE 3600
PHILADELPHIA, PA  19103-7286
215.751.2000  FAX 215.751.2205   schnader.com.

October 28, 2003

Richard A. Barkasy
Direct Dial 856-482-5721
Direct Fax 856-482-6980
E-mail: rbarkasy@schnader.com

## VIA ELECTRONIC MAIL

Richard L. Schepacarter, Esquire
U.S. Department of Justice
Office of The U.S. Trustee
District of Delaware
J. Caleb Boggs Federal Bldg.
844 Kings St., Ste. 2313, Lockbox 35
Wilmington, DE  19801

Re:    In re Coram Healthcare Corp. and Coram, Inc., Debtors

Dear Rich:

I am writing in response to Mr. Levy's October 23, 2003 letter.

Judge Adams is a man of impeccable character and integrity, who has done an excellent job as Coram's Trustee. Mr. Levy's use of false statements and distortions of the record to assault him is demeaning to his client constituency, himself and our profession. Mr. Levy should be ashamed of himself.

Coram has prospered under the supervision of Judge Adams. For example:

- Coram's net revenues were up 10.1% for the calendar year 2002
- Through August, 2003, the companies' net revenues had increased by 11.3%
- Through the end of August, revenues from the most profitable core therapies were up by 9.9%
- Average weekly cash collections are better in 2003 than in 2002
- The cash balance of the company has grown faster than the rate of sales growth since calendar year 2001.

Judge Adams has proposed a plan that is fair to all constituencies. Under the Trustee's Plan, all creditors are paid in full and Coram's shareholders will receive a cash distribution that the Trustee's financial advisors estimate will exceed $37 million. The cash payment to shareholders is estimated to be at least 74 cents per share, which is about the price at which Coram stock has recently been trading. Plus, the shareholders will receive the net proceeds of all of Coram's remaining litigation claims, including the

Schnader Harrison Segal & Lewis LLP

NEW YORK    PENNSYLVANIA    CALIFORNIA    WASHINGTON, DC    NEW JERSEY

L 10559

Schnader
ATTORNEYS AT LAW

Richard L. Schepacarter, Esq.
October 28, 2003
Page 2

proposed derivative claims against Daniel Crowley and the outside directors. The shareholders will receive these sums even though the valuation of the company performed by the Trustee's financial advisors shows that they are out of the money by more than $100 million.

The only interested party that opposes the Trustee's Plan is the Equity Committee. Judge Adams' Plan is supported by each class of creditors and even by nearly 70% of the shareholders casting ballots.

Despite the support of nearly 70% of the shareholders, the Equity Committee has never given the Trustee's Plan meaningful consideration. Donald Liebentritt of the Zell Organization testified that no meeting or telephone conference of the Equity Committee was held to discuss the Trustee's Plan. Mark Slezak of the Robert and Ann Lurie Foundation (the "Lurie Foundation") testified that he did not have an understanding as to the amount that shareholders would receive under the Trustee's Plan and that he had not performed any calculations to try to determine the amount.

Contrary to Mr. Levy's assertion, it has been Judge Adams' work which has increased the value of the distributions that will be received by unsecured creditors and Coram's shareholders under his Plan from those that would have been made if the Debtors' earlier plans had been confirmed, not the efforts of the Equity Committee. The distribution of 100% to unsecured creditors and an estimated in excess of $37 million to shareholders is possible only because: (1) Judge Adams has been able to enter into favorable settlements with the Noteholders, the IRS and R-Net; and (2) revenues have increased during the period that Judge Adams has been Trustee.

Judge Adams properly recognized that the paramount goal of a Chapter 11 case is a consensual plan and he set out to try to formulate one. The Equity Committee that has made outrageously high demands foiled him. For instance, Slezak recently testified that he would not support a settlement of less than $1.50 per share, more than twice the current trading price.

The members of a committee have a fiduciary duty to the committee's constituents and are responsible for maximizing their recovery. As a result, a committee member may not use its position on the committee to advance his own individual interests. Here, the Equity Committee is clearly not concerned for its constituents. As Mr. Levy's own firm's website says, this case is about **"Sam Zell's battle for control of Coram Healthcare Corporation."**

The Equity Committee consists of Samstock, LLC, the Lurie Foundation and Richard Haydon. Discovery has shown that all have strong connections to Mr. Zell and to one another.

L 10560

# Schnader
ATTORNEYS AT LAW

Richard L. Schepacarter, Esq.
October 28, 2003
Page 3

Samstock is owned by Mr. Zell and is one of his investment vehicles.

Robert Lurie was Mr. Zell's business partner until Mr. Lurie's death and he and the Lurie family still have common business interests. Mr. Slezak, who now runs the Lurie family businesses, was a former Zell employee.

Mr. Zell was introduced to Coram by his longtime friend and investment advisor, Will Weinstein. Mr. Weinstein is described as an advisor to the Lurie Foundation on the Coram matter and he has participated in Equity Committee meetings and conference calls. Both Mr. Zell and the Lurie Foundation were muti-million dollar investors in Mr. Weinstein's hedge fund, Jackson Square Partners. Mr. Zell speaks to Mr. Weinstein several times per day.

Mr. Haydon is one of Mr. Weinstein's clients.

Mr. Levy is a personal friend of Mr. Zell. According to Mr. Levy's website, Mr. Zell has been one of his clients.

The individual who is the Equity Committee's designated spokesman and witness, Mr. Liebentritt, is employed by Mr. Zell.

At least three of the five directors proposed by the Equity Committee for Coram have close ties to Mr. Zell. One of the directors would be Mr. Liebentritt. Another proposed director, Dr. Peter Linneman, was the Senior Managing Director of Equity International Properties, a private international real estate investment fund controlled by Mr. Zell. A third proposed director, Mark Gainor has been an investor in ventures in which Mr. Zell's affiliates have been investors.

In a letter dated September 17, 2002, Mr. Zell advised the Trustee that "economics is not the sole motivator behind my participation in these events." This is contrary to the Equity Committee's duty to maximize the recovery of all shareholders. As a committee member, economics is the only permissible motivation for Mr. Zell.

The Equity Committee has shown that it is willing to take actions that will harm shareholders so long as they advance some undefined agenda. For example, in an effort to secure votes for its failed plan, the Equity Committee has filed a motion to allow more than $6 million in creditor claims for voting purposes, to which the Trustee objected. In its motion papers, the Equity Committee argues for the validity of the claims even though the allowance of the claims would reduce the distribution to shareholders by more than $6 million.

We do not know for certain why Mr. Zell and the Equity Committee have adopted this strategy. Perhaps Mr. Zell is seeking to settle an old score. He told the Trustee that

L 10561

Schnader
ATTORNEYS AT LAW

Richard L. Schepacarter, Esq.
October 28, 2003
Page 4

he had a significant dispute with one of the Noteholders, Goldman Sachs, over the Rockefeller Center deal (although he has recently said he has made peace with Goldman Sachs). Or, maybe Mr. Zell is seeking to harm a competitor, Cerberus, which also invests in distressed debt.

However, what we do know for sure is that the tolerance for risk of Mr. Zell and the other committee members is far greater than that of the other shareholders. Mr. Zell and his colleagues can afford to support a plan that gambles the company on the outcome of risky, expensive and time-consuming litigation, the only sure beneficiary of which will be the Equity Committee's professionals, who would undoubtedly receive millions of dollars of additional fees if the Equity Committee Plan were confirmed.

Further, it appears that Messrs. Haydon and Weinstein wrongfully profited from their association with the Equity Committee. Both Mr. Zell and Mr. Slezak testified that it would be inappropriate for a member of the Equity Committee to trade in Coram stock after the formation of the Equity Committee. Nevertheless, both Mr. Haydon and Mr. Weinstein did just that.

The Equity Committee takes issue with the motion that Judge Adams filed to extend Crowley's employment for a short period pending confirmation of a plan. Given the improvement in the company's financial performance while Crowley was CEO, Judge Adams believed that it would be better to maintain stability in management until the company emerged from bankruptcy. Judge Adams took this position with the best interest of the creditors and shareholders in mind. He had already taken tight control of Coram's purse strings and no Coram expenditure over $50,000 (beyond medication purchases in the ordinary course of business) was made by Crowley or has been made during the nine months since his departure without Judge Adams' approval. His motion was supported by substantial evidence that Crowley's removal could have a negative impact on the company. Although she denied Judge Adams' motion, Judge Walrath did not find that it was frivolous or taken in bad faith.

The Equity Committee cannot in good conscience contend that it has been denied access to information. During his deposition, Mr. Liebentritt testified that **"I think that we have sufficient information to proceed with what we're doing."**

Indeed, the Equity Committee has engaged in needless and duplicative discovery that will end up costing the shareholders millions. The Trustee, his financial advisors and accountants have produced more than 65,000 pages of documents in response to the Equity Committee's discovery requests. Even though it has already deposed the Trustee for 14 hours and the Trustee has offered to sit for an additional hour, the Equity Committee is not satisfied and is demanding more time. Scott Victor of SSG has been deposed for three full days as to valuation and feasibility issues, but the Equity Committee has demanded at least two more hours. The Equity Committee has deposed

L 10562

Schnader
ATTORNEYS AT LAW

Richard L. Schepacarter, Esq.
October 28, 2003
Page 5

Sam Bemiss, Michael Weber and Scott Mumford of EB as to valuation issues and Ernst & Young's audit partner for a full day each. It has deposed Coram's Chief Financial Officer, Scott Danitz, four times. The Equity Committee's financial advisor, Deloitte & Touche, and one of Mr. Zell's employees, Ellen Havdala, have interviewed Mr. Danitz informally. The Equity Committee has deposed several other members of Coram's senior management: Allen Marabito, Executive Vice President; Vito Ponzio, Senior Vice President of Human Resources; Deborah Meyer, Senior Vice President of Sales; and Michael Saracco, President of Specialty Services. Dan Crowley has been deposed by the Equity Committee twice and will be deposed for a third time on November 7. And the Equity Committee has deposed Stephen Feinberg and Mark Neporent of Cerberus, former CEO Donald Amaral and the other outside directors who are targeted as defendants in the Equity Committee's proposed derivative complaint. Yet the Equity Committee is not satisfied. As Mr. Levy says in his October 23 letter, "[t]o be sure, there will be other depositions."

Judge Adams joins in your concern over the Equity Committee's administrative expenses. The Equity Committee's scorched earth litigation tactics have resulted in an astonishing amount of administrative claims. Through August 31, 2003, the Equity Committee's professionals had applied for fees and expenses totaling $10,104,259.19. When asked at his August 21, 2003 deposition to estimate the amount of fees that would be incurred by the Equity Committee through confirmation, Donald Liebentritt of the Zell Organization testified flippantly "it could be a lot or more than a lot."

The Equity Committee's assertion that the Trustee has failed to conduct a thorough investigation of the company and its assets is without merit. Judge Adams and his counsel have spent a significant amount of time meeting and discussing the company with members of senior management. Judge Adams retained experienced investment bankers to provide him with advice and guidance with regard to financial matters. He also brought on an experienced accountant to serve with him on the company's audit committee.

The Equity Committee's contention that Judge Adams did not do anything to investigate Crowley's conflict of interest and the proposed derivative claims is absurd. Before proposing a plan, Judge Adams reviewed extensive written briefs by all parties as to the merits of the derivative claims. Counsel for the Equity Committee and Daniel Fischel of Lexecon, the Equity Committee's damages expert, made an in-person presentation to the Trustee regarding the proposed lawsuit, as did counsel for each of the proposed defendants. In addition, Judge Adams' counsel reviewed the transcripts of the two confirmation hearings and all of the related depositions. In evaluating the claims and in settling with the Noteholders, Judge Adams relied upon his more than 50 years of legal experience, including his 18 years as a Judge of the United States Court of Appeals for the Third Circuit.

**L 10563**

**Schnader**
ATTORNEYS AT LAW

Richard L. Schepacarter, Esq.
October 28, 2003
Page 6

Finally, Judge Adams consulted with Jerome Shestack, an experienced trial lawyer and a former American Bar Association president, who has opined that the settlement is reasonable. There can be no reasonable question that Judge Adams acted prudently.

During his deposition, Liebentritt was unable to identify anything that the Trustee did not do to investigate the litigation claims:

> Q.    Are there things that you believe the Trustee should
>       have done to develop additional information concerning the litigation
>       claims?
> A.    They should have filed a lawsuit.

If his mission had been to run up fees for his professionals, Judge Adams could have directed his counsel to repeat all of the discovery concerning the proposed derivative claims that was conducted prior to his appointment, at a cost of several million dollars. However, since his primary goals were to maximize the assets, minimize the liabilities and to get the company out of bankruptcy, Judge Adams relied in part on the thousands of pages of testimony and documents relating to the proposed derivative claims that had already been developed in connection with two prior confirmation hearings. This was the right thing to do.

The Equity Committee's suggestion that Judge Adams has breached his duties as Trustee is truly offensive. It shows that the Equity Committee cares not what it says or does so long as the case goes on and its professionals' fees are paid. A far more reasoned suggestion would be to reconstitute the Equity Committee so that it is more reflective of the shareholder group.

If you have any questions or if you need any additional information as the confirmation process proceeds, please do not hesitate to call.

Yours very truly,

Richard A. Barkasy
For SCHNADER HARRISON SEGAL & LEWIS LLP

RAB/sh

L 10564

Schnader Harrison Segal & Lewis LLP

Schnader
ATTORNEYS AT LAW

Richard L. Schepacarter, Esq.
October 28, 2003
Page 7


Cc:    Barry E. Bressler, Esquire
       Wilbur L. Kipnes, Esquire
       Richard F. Levy, Esquire
       Alan B. Miller, Esquire
       Michael L. Cook, Esquire
       Howard O. Godnick, Esquire
       John A. Neuwirth, Esquire
       David J. Bradford, Esquire
       C. Steven Tomashefsky, Esquire
       Matthew P. Heiskell, Esquire

L 10565

# Exhibit D

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARLIN M. ADAMS, Chapter      :
11 Trustee of the           :
Post-Confirmation           :
Bankruptcy Estates of       :
CORAM HEALTHCARE            :
CORPORATION, a Delaware     :
Corporation, and of         :
CORAM INC., a Delaware      :
Corporation                 :
                            :
        vs.                 :
                            :
DANIEL D. CROWLEY, DONALD   : CASE NO.
J. AMARAL; WILLIAM J. CASEY; : 04-1565
L. PETER SMITH; and SANDRA  :
L. SMOLEY,                  :
        Defendants.         :

Philadelphia, Pennsylvania,
Monday, August 6, 2007

Video deposition of MICHAEL L. TEMIN,
ESQUIRE, taken pursuant to notice, at
Schnader, Harrison, Segal & Lewis, 1600
Market Street, Suite 3600, on the above
date, beginning at approximately 10:10 a.m.,
before Michelle L. Gray, Certified Shorthand
Reporter and Notary Public.

## Page 2

```
 1
 2   APPEARANCES:
 3   Counsel for Plaintiffs
 4       BARRY E. BRESSLER, ESQUIRE
         Schnader, Harrison, Segal & Lewis
 5       1600 Market Street, Suite 3600
         Philadelphia, Pennsylvania 19103
 6       (215) 751-2572
         bbressler@schnader.com
 7
 8   Counsel for Defendants
 9       ELLIOT PETERS, ESQUIRE
         Keker & Van Nest, LLP
10       710 Sansome Street
11       San Francisco, California 94111
12       (415) 391-5400
13       epeters@kvn.com
14
15   ALSO PRESENT:  Gerard Alfe, Videographer
16
17
18
19
20
21
22
23
24
25          (INDEX at end of transcript.)
```

## Page 3

```
 1
 2          THE VIDEOGRAPHER:  This
 3   videotape deposition is now beginning.
 4   This is the videotape deposition of
 5   Michael C Temin, Tape 1, Volume 1, taken
 6   in the matter of Adams versus Crowley, et
 7   al., in the United States District Court
 8   in the District of Delaware, Case No.
 9   04-1565 (SLR).
10          Today's date is August 6, 2007.
11   The time is 10:10.  The court reporter is
12   Michelle Gray.  I am the video operator,
13   Gerard Alfe, both representing LiveNote
14   Worldwide Service.
15          Counsel will now introduce
16   themselves.
17          MR. PETERS:  Elliott Peters of
18   Keker and Van Ness, LLP, on behalf of the
19   defendant, Daniel Crowley.
20          MR. BRESSLER:  Barry Bressler
21   of Schnader, Harrison, Segal & Lewis on
22   behalf of the plaintiff, Arlin M. Adams,
23   the Chapter 11 Trustee.
24          And before the witness does so,
25   his correct middle initial is L, as in
```

## Page 4

```
 1          MICHAEL L. TEMIN, ESQUIRE
 2   Lewis.
 3          ... MICHAEL L. TEMIN, ESQUIRE,
 4   having been first duly sworn, was examined
 5   and testified as follows:
 6                  EXAMINATION
 7   BY MR. PETERS:
 8   Q.   Mr. Temin, how are you employed?
 9   A.   I'm employed by Wolf, Block,
10   Solis-Cohen, LLP.
11   Q.   What are they?
12   A.   A law firm.
13   Q.   Are you testifying as an expert in
14   this case?
15   A.   Yes.
16   Q.   Have you testified as an expert in
17   any other cases?
18   A.   Yes.
19   Q.   On how many other occasions have you
20   testified as an expert?
21   A.   In court or at depositions?
22   Q.   Any sworn testimony.
23   A.   What time period?
24   Q.   How about the last ten years?
25   A.   Five or six, I believe.
```

## Page 53

MICHAEL L. TEMIN, ESQUIRE

1

2      Q.   He represented the interests of the

3   shareholders?

4      A.   Yes.

5      Q.   What were the shareholders of Coram

6   going to receive under Coram's original

7   bankruptcy plan?

8      A.   In 2000 now?

9      Q.   Right.

10     A.   Nothing.

11     Q.   And was that -- would that have been

12  a fair result for them at the time?

13          MR. BRESSLER:  Object to the

14     form.

15          THE WITNESS:  Define "fair."

16  BY MR. PETERS:

17     Q.   Do you have any understanding of

18  what's fair?

19     A.   Not in the bankruptcy context.  The

20  question is what were their legal

21  entitlements.  You might or might not

22  determine that that is fair.

23     Q.   Well, in your view, were they

24  legally entitled to more than zero in the year

25  2000?

## Page 54

MICHAEL L. TEMIN, ESQUIRE

1

2      A.   No.

3      Q.   So the Coram shareholders in 2000

4   were legally entitled to zero out of the Coram

5   bankruptcy estate?

6      A.   Yes.

7      Q.   And what were the -- withdrawn.

8           What would the Coram shareholders

9   have received out of Coram's first amended

10  plan of reorganization?

11     A.   Nothing.  Still 2000?

12     Q.   2001 now.

13     A.   I don't think your nomenclature is

14  right.  But for in 2000 -- I think the answer

15  is still nothing.

16     Q.   So under the bankruptcy plan that

17  was considered by Judge Walrath and rejected

18  in 2001, the shareholders would also have

19  received nothing?

20          MR. BRESSLER:  Object to the

21     form, but he can answer.

22          THE WITNESS:  I believe that is

23     true, although I'm not sure that I recall

24     that plan correctly.

25  BY MR. PETERS:

## Page 55

MICHAEL L. TEMIN, ESQUIRE

1

2      Q.   Were they -- in 2001, were they

3   legally entitled to anything more than

4   nothing?

5      A.   I don't know.

6      Q.   In 2004, under the Trustee's plan of

7   reorganization which was confirmed, what did

8   the -- what did the shareholders receive?

9      A.   According to her opinion, they were

10  going to receive at least $40 million.

11     Q.   What were they legally entitled to

12  at that time?

13     A.   $40 million.

14     Q.   Where did that $40 million come

15  from?

16     A.   Probably from the noteholders'

17  settlement.

18     Q.   So the legal entitlement of the

19  shareholders changed from 2000 when it was

20  zero to 2004 when it was 40 million?

21     A.   Yes.

22     Q.   And what changed between 2000 and

23  2004 to make the shareholders legally entitled

24  to $40 million in 2004 when they were entitled

25  to nothing in 2000?

## Page 56

MICHAEL L. TEMIN, ESQUIRE

1

2           MR. BRESSLER:  Object to the

3      form.

4           THE WITNESS:  Noteholders'

5      settlement and perhaps the difference in

6      the negotiating position.

7   BY MR. PETERS:

8      Q.   What do you mean by "perhaps the

9   difference in the negotiating position"?

10     A.   Bankruptcy is both a legal process

11  and a negotiation process, and it might

12  explain the difference in result, and it might

13  not.  I haven't looked in detail at that

14  issue.  So this is an off the top of the head

15  reaction.

16     Q.   Was the Trustee's plan confirmed in

17  2004 confirmed via negotiation?

18     A.   Partially.

19     Q.   Was it confirmed via negotiation

20  with the Equity Committee?

21     A.   No.

22     Q.   The Equity Committee opposed and

23  litigated the Trustee's plan?

24     A.   Yes.

25     Q.   Do you know how much the equity --

Page 241

```
 1
 2          E X H I B I T S  (Cont'd.)
 3
 4   NO.          DESCRIPTION          PAGE
 5   Exhibit 10   Transcript from Court  203
 6                12/21/00
 7   Exhibit 11   Expert Report of       217
 8                Dworetzky
 9
10                    - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 242

```
 1
 2        I have read the foregoing transcript of
 3   my video deposition given on AUGUST 6, 2007,
 4   and it is true, correct and complete, to the
 5   best of my knowledge, recollection and belief,
 6   except for the corrections noted hereon and/or
 7   list of corrections, if any, attached on a
 8   separate sheet herewith.
 9
10
11
12
13
14        _____
14            MICHAEL L. TEMIN, ESQUIRE
15
16
17
18   Subscribed and sworn to
19   before me this _____ day
20   of _____, 20____.
21
22
23   _____
24   Notary Public
25
```

Page 243

```
 1
 2             CERTIFICATE
 3
 4        I HEREBY CERTIFY that the
 5   proceedings, evidence and objections are
 6   contained fully and accurately in the
 7   stenographic notes taken by me upon the video
 8   deposition of MICHAEL L. TEMIN, ESQUIRE, taken
 9   on AUGUST 6, 2007, and that this is a true and
10   correct transcript of same.
11
12
13
14
15        _____
16           MICHELLE L. GRAY, CSR
               and Notary Public
17
18        (The foregoing certification of this
19   transcript does not apply to any reproduction
20   of same by any means, unless under the direct
21   control and/or supervision of the certifying
22   reporter.)
23
24
25
```

Pages 241 to 243

# Exhibit E

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE.

ARLIN M. ADAMS, Chapter                    :
11 Trustee of the                          :
Post-Confirmation                          :
Bankruptcy Estates of                      :
CORAM HEALTHCARE                           :
CORPORATION, a Delaware                    :
Corporation; and of                        :
CORAM INC., a Delaware                     :
Corporation                               :
          Plaintiff                        :
vs.                                        :
                                           : CASE NO.
DANIEL D. CROWLEY; DONALD J.               : 04-1565
AMARAL; WILLIAM J. CASEY;                  : (SLR)
L. PETER SMITH; AND SANDRA L.              :
SMOLEY,                                    :
          Defendants                       :

Philadelphia, Pennsylvania,
Tuesday, August 7, 2007
        - - -
     Video deposition of J. SCOTT VICTOR,
ESQUIRE, taken pursuant to notice, at
Schnader, Harrison, Segal & Lewis, 1600
Market Street, Suite 3600, on the above
date, beginning at approximately 9:46 a.m.,
before Michelle L. Gray, Certified Shorthand
Reporter and Notary Public.

## Page 2

1
2   APPEARANCES:
3   Counsel for Plaintiffs
        Schnader, Harrison, Segal & Lewis
4       BARRY E. BRESSLER, ESQ.
        1600 Market Street, Suite 3600
5       Philadelphia, Pennsylvania 19103
        (215) 751-2572
6       bbressler@schnader.com
7   Counsel for Defendants
8       Keker & Van Nest, LLP
        ELLIOT R. PETERS, ESQ.
9       710 Sansome Street
        San Francisco, California 94111
10      (415) 391-5400
11      epeters@kvn.com
12
13  ALSO PRESENT:  Gerard Alfe, Videographer
14
15
16
17
18
19
20
21
22
23
24
25      (INDEX at end of transcript.)

## Page 3

1
2           THE VIDEOGRAPHER:  This
3   videotape deposition is now beginning.
4   The date, August 7, 2007.  The time,
5   9:46.
6           This is the videotape
7   deposition of J. Scott Victor taken in
8   the matter of Adams versus Crowley, et
9   al., in the United States District Court
10  for the District of Delaware, Case No.
11  04-1565 (SLR).
12          The court reporter is Michelle
13  Gray.  I'm the video operator.  My name
14  is Gerard Alfe.  This deposition is
15  taking place at 1600 Market Street,
16  Philadelphia, PA, 19103.
17          Counsel will now introduce
18  themselves.
19          MR. PETERS:  Elliot Peters on
20  behalf of Daniel Crowley.
21          MR. BRESSLER:  Barry Bressler
22  on behalf of Arlin M. Adams, the Chapter
23  11 Trustee.
24          (Documents pre-marked for
25  identification as Exhibits Victor-1

## Page 4

1           J. SCOTT VICTOR, ESQUIRE
2   through Victor-4.)
3           ... J. SCOTT VICTOR, ESQUIRE,
4   having been first duly sworn, was
5   examined and testified as follows:
6                 EXAMINATION
7   BY MR. PETERS:
8       Q.  Mr. Victor, good morning.
9       A.  Good morning.
10      Q.  How are you employed, sir?
11      A.  I am -- why don't you -- why don't
12  we hold off for a second.
13          MR. PETERS:  Do you want to
14  just go off the record for a minute, for
15  a second?
16          THE WITNESS:  No.
17  BY MR. PETERS:
18      Q.  Okay.  We'll take it from the top.
19  We had a little unexpected interruption.  Now
20  let's do the question.
21          How are you employed, sir?
22      A.  I'm the senior managing director and
23  co-head of the Special Situations Group of
24  National City Investment Banking.
25      Q.  Where is that located?

## Page 61

1          J. SCOTT VICTOR, ESQUIRE
2    all of this.
3             But other than that, this was a run
4    of the mill case that you see every day.
5    What's the value of the company; how much is
6    the debt; are the shareholders in the money.
7       Q.   And the shareholders weren't in the
8    money?
9       A.   The shareholders were not in the
10   money.
11      Q.   They were never in the money?
12      A.   They were never in the money.
13      Q.   Was the original plan under which
14   the shareholders were going to get nothing
15   fair?
16             MR. BRESSLER:  Object to the
17        form.
18             THE WITNESS:  I don't know what
19        that means.
20   BY MR. PETERS:
21      Q.   Did Judge Walrath -- have you read
22   Judge Walrath's opinions?
23      A.   Yes.
24      Q.   Did she use the phrase
25   "fundamentally fair" in her opinions?

## Page 62

1          J. SCOTT VICTOR, ESQUIRE
2       A.   She may have, but "fair" doesn't
3    mean anything to the Bankruptcy Code. It's
4    "fair and reasonable."
5             So in that context -- in that
6    context -- she found that, in the first
7    opinion, denying the company's first plan of
8    reorganization, that Dan Crowley had an
9    absolute conflict of interest, and that's why
10   she did not confirm that plan.
11      Q.   Putting aside any alleged conflict
12   of interest by Crowley, was that first plan
13   fair and reasonable?
14      A.   From a valuation perspective, yes,
15   it was.
16      Q.   So the various stakeholders in the
17   Coram bankruptcy would have been treated
18   fairly and reasonably if that plan had been
19   approved?
20      A.   They would have, because they were
21   out of the money.
22      Q.   Now, under the Trustee's plan, the
23   shareholders got what?
24      A.   The shareholders got a very nice
25   recovery. They got approximately $40 million.

## Page 63

1          J. SCOTT VICTOR, ESQUIRE
2       Q.   And is that $40 million which they
3    really weren't in fairness entitled to?
4             MR. BRESSLER:  Object to the
5        form.
6             THE WITNESS:  That 40 million
7        came from a settlement from the
8        noteholders. It did not come because
9        that was the value of the company upon a
10       sale.
11   BY MR. PETERS:
12      Q.   But my question was:  Did those
13   shareholders get $40 million that they weren't
14   entitled to?
15             MR. BRESSLER:  Object to the
16       form.
17             THE WITNESS:  The shareholders
18       got $40 million as a result of the
19       Trustee's settlement with the
20       noteholders.  If the company had been
21       sold either in 2000 or in 2004 when the
22       Trustee's plan went effective, the
23       shareholders wouldn't have gotten any
24       money.
25   BY MR. PETERS:

## Page 64

1          J. SCOTT VICTOR, ESQUIRE
2       Q.   I thought you told us that the
3    original plan was fair and reasonable and the
4    shareholders were going to get nothing?
5       A.   That's right. Because they were out
6    of money.
7       Q.   Okay. And, sir, you also told us
8    the shareholders were always out of the money,
9    right?
10      A.   Always out of the money.
11      Q.   So even though the shareholders were
12   out of the money, they ended up getting 40
13   million, right?
14      A.   They ended up getting $40 million
15   because of the conflict of interest in their
16   settlement with the noteholders.
17      Q.   And so the settlement of the
18   shareholders -- the settlement -- withdrawn.
19             So the settlement with the
20   noteholders pertained to the conflict of
21   interest?
22             MR. BRESSLER:  Object to the
23       form of the question.
24   BY MR. PETERS:
25      Q.   Is that's right?

Pages 61 to 64

Page 65

```
 1          J. SCOTT VICTOR, ESQUIRE
 2     A.  The settlement with the noteholders
 3  was an all over settlement.  It provided for a
 4  settlement of whatever claims the estate had
 5  against those noteholders as a result of the
 6  conflict.  It was for them to take control of
 7  the company as part of the company's plan of
 8  reorganization which was confirmed by the
 9  Court.  So it was an overall settlement.
10          MR. PETERS:  Can you read,
11  Michelle, please?  Read back the
12  witness's answer prior to the one he just
13  gave.
14          (Whereupon the court reporter
15  read back the requested portion of
16  testimony.)
17          THE WITNESS:  And them getting
18  control of the company through the plan.
19  It's an overall settlement.
20  BY MR. PETERS:
21     Q.  But I thought you told us that they
22  were -- withdrawn.
23          Weren't they entitled to control the
24  company under the original plan without giving
25  the shareholders anything?
```

Page 66

```
 1          J. SCOTT VICTOR, ESQUIRE
 2          MR. BRESSLER:  Object to the
 3  form.
 4          THE WITNESS:  Under the first
 5  plan as proposed by Coram, the
 6  noteholders were exchanging debt for
 7  equity.  The noteholders were getting
 8  nothing -- I'm sorry.  The shareholders
 9  were getting nothing.  The noteholders
10  were getting the company.  And unsecured
11  creditors were getting $2 million.
12  BY MR. PETERS:
13     Q.  So the shareholders made out pretty
14  well in the Coram bankruptcy, right?
15     A.  The shareholders got a $40 million
16  recovery.
17     Q.  When they were really entitled to
18  nothing?
19          MR. BRESSLER:  Object to the
20  form.
21          THE WITNESS:  If the company
22  had been sold, they wouldn't have had any
23  proceeds from the sale.
24  BY MR. PETERS:
25     Q.  And if the first bankruptcy plan had
```

Page 67

```
 1          J. SCOTT VICTOR, ESQUIRE
 2  been approved, which you've just told us was
 3  fair and reasonable, they would have got
 4  nothing, too, right?
 5     A.  But for that conflict.
 6     Q.  Okay.  But -- but from the
 7  perspective of the shareholders, it turned out
 8  pretty well for them?
 9     A.  $40 million.
10     Q.  Are they in line for -- are the
11  shareholders in line for more money still?
12     A.  The shareholders are in line for
13  more money.  The proceeds of the Trustee's
14  litigation, this and others, goes first to
15  repay the reorganized company for the costs
16  it's advanced for the litigation.
17          Second, it goes to pay interest to
18  the unsecured creditors under the Trustee's
19  plan.
20          And then, third, it goes to the
21  shareholders.
22     Q.  Do you know how much interest there
23  is going to creditors under the Trustee's
24  plan?
25     A.  I don't.  Total unsecured claims,
```

Page 68

```
 1          J. SCOTT VICTOR, ESQUIRE
 2  about 10 million.  So whatever the interest
 3  was on that.
 4     Q.  What's the interest rate?
 5     A.  I don't know.  Don't know what the
 6  interest rate is under the plan.  I assume
 7  it's the federal judgment rate.
 8     Q.  Okay.
 9     A.  It could be.  I don't know what it
10  is.  It could be current market rate.  I don't
11  really recall what that is.
12     Q.  So the proceeds of this litigation,
13  if any, go to pay the professionals, the
14  lawyers, and experts involved in litigation on
15  behalf of the Trustee?
16     A.  Well, it goes to repay the company,
17  who's advancing costs for all of that.
18     Q.  Okay.
19     A.  And interest to the unsecured
20  creditors and then to the shareholders.
21     Q.  And then to the shareholders?
22     A.  Yes.
23     Q.  So the shareholders actually have an
24  interest in the outcome of this litigation?
25     A.  I would assume they do.
```

Pages 65 to 68

Victor, Esq., J. Scott                                    8/7/2007

Page 233

```
 1
 2                    CERTIFICATE
 3
 4        I HEREBY CERTIFY that the
 5   proceedings, evidence and objections are
 6   contained fully and accurately in the
 7   stenographic notes taken by me upon the video
 8   deposition of J. SCOTT VICTOR, ESQUIRE, taken
 9   on AUGUST 7, 2007, and that this is a true and
10   correct transcript of same.
11
12
13
14
15        _____
16            MICHELLE L. GRAY, CSR
             and Notary Public
17
18        (The foregoing certification of this
19   transcript does not apply to any reproduction
20   of same by any means, unless under the direct
21   control and/or supervision of the certifying
22   reporter.)
23
24
25
```